## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**KIMBERLEE WILLIAMS**, individually, as personal representative of the Estate of Charles L. Williams, deceased on behalf of said estate, and as representative of others similarly situated;

**NANCY PEASE**, individually, as personal representative of the Estate of William Clark, deceased on behalf of said estate, and as representative of others similarly situated;

**MARILYN L. HOLLEY,** as personal representative of the Estate of Kathryn Darnell, deceased on behalf of said estate, and as representative of others similarly situated;

**DONNA WARE**, individually, as personal representative of the Estate of Ralph Ware, deceased on behalf of said estate, and as representative of others similarly situated; and

**DONNETTE WENGERD,** individually, as personal representative of the Estate of Jennifer Graham, deceased on behalf of said estate, and as representative of others similarly situated,

Plaintiffs,

vs.

**BASF CATALYSTS LLC,**
**CAHILL GORDON & REINDEL LLP,**
**CAHILL GORDON & REINDEL,** A Partnership including a Professional Corporation,
**THOMAS D. HALKET**,
**ARTHUR A. DORNBUSCH II**,
**GLENN HEMSTOCK**,
**HOWARD G. SLOANE (A/K/A "PETER SLOANE")**,
**IRA J. DEMBROW,**
**SCOTT A. MARTIN,**
**JOHN DOE BUSINESS ENTITIES 1 to 100** are fictitious corporations, partnerships, or other business entities or organizations that BASF Catalysts LLC is responsible or liable for and whose identities are not presently known, which entities may have mined, milled,

CIVIL ACTION

No.

CLASS ACTION COMPLAINT

Jury Trial Demanded

1

manufactured, sold, supplied, purchased, marketed, installed and/or removed asbestos or asbestos-containing materials, or alternatively, are responsible for, are the alter egos of, or are otherwise responsible for the conduct or liability of such entities;

**JOHN DOE BUSINESS ENTITIES 101 to 200** are the fictitious firms, corporations, partnerships, limited liability companies/associations or other business entities or organizations whose identities are not presently known, and who may have perpetrated, or are responsible for, are the alter egos of, or are otherwise responsible for the conduct or liability of those who perpetrated or acted in concert with, in furtherance of, or in conjunction with the other Defendants in the conduct, activities, acts and omissions set forth herein;

**JOHN DOE LAWYERS 1 to 500** are the fictitious names of lawyers and law firms, legal professional corporations, legal professional partnerships, or other professional business entities or organizations, or their agents, employees, or servants, acting within the course and scope of their employment, or other individuals whose identities are not presently known, and who may have perpetrated, and/ or are responsible for, or are the alter egos of, or are otherwise responsible for the conduct or liability of those who perpetrated, aided and abetted, or acted in concert with, in furtherance of, or in conjunction with the other Defendants in the conduct, activities, acts and omissions set forth herein; and,

**Defendants JOHN DOE 1 to 500** are the fictitious names of individuals whose identities are not presently known, who may have perpetrated, aided and abetted, conspired with, acted in concert with and/or are secondarily responsible or liable under law for the conduct or activities of those who may have acted in concert with, in furtherance of, or in conjunction with the other Defendants in the conduct, activities, acts and omissions set forth herein, including but not limited to employees, officers, agents, members and partners of named Defendants herein, jointly, severally and in the alternative,

Defendants.

Plaintiffs, Kimberlee Williams, Nancy Pease, Marilyn L. Holley, Donna Ware and Donnette Wengerd, individually and on behalf of all other individuals similarly situated, for their claims and causes of action against Defendants referenced herein, and based upon personal knowledge as to each Plaintiff's own respective actions and, as to all other matters, upon information and belief based upon the investigation of counsel[1], state and allege against the Defendants, jointly, severally and in the alternative the following:

**Table of Contents**

I.    INTRODUCTION .............................................................................................. 5

II.   SUMMARY OF THE CASE .............................................................................. 7

III.  PARTIES ....................................................................................................... 16

  A.  Plaintiffs ................................................................................................... 16

  B.  Defendants ............................................................................................... 25

    (1) The BASF Defendants ............................................................................ 25

    (2) The Cahill Gordon & Reindel Defendants .............................................. 28

    (3) The Fictitious Defendants ....................................................................... 32

IV. VENUE AND JURISDICTION. .......................................................................... 33

V. FACTS COMMON TO CLASS CERTIFICATION AND ALL COUNTS ............... 34

  A.  Asbestos Background Information ............................................................. 34

  B.  Engelhard's Emtal Talc Products and Asbestos ........................................ 34

---

[1] The investigation of counsel includes the results of the spoliation claim discovery taken in *Paduano v. Ace Scientific Supply Co.*, MID-L-2976-09 (N.J. Super. Ct. Law Div.) described *infra*. The *Paduano* case was one of several companion asbestos cases filed in Middlesex County, New Jersey in which the trial court permitted amendment of complaints to assert fraudulent concealment claims based upon alleged spoliation of evidence that is the subject of this suit. The Hon. Jack L. Lintner, P.J.A.D. (Ret.) was appointed as Discovery Master in *Paduano* and its companion cases to resolve privilege issues relating to discovery. As observed by Judge Lintner in his initial discovery opinion in these cases:

> "Here, during the hearing on plaintiffs' motion to amend, Judge McCormick specifically noted there was evidence that documents reflecting asbestos content in EMTAL's talc were not produced over a period of twenty years and, as a result, plaintiffs' cases were dismissed. In determining that plaintiffs had pled a *prima facie* case of fraudulent concealment, Judge McCormick intimated that plaintiffs should be able to pursue discovery as to why those documents had been concealed and not produced over the twenty-year period."

C.   The *Westfall* Asbestos Lawsuit's Discovery..........................................................38

D.   The *Westfall* Case's Settlement and Confidentiality Agreement and Origins of the BCAD Enterprise ..........................................................................................................44

E.   The Gathering and Spoliation of Inculpatory Evidence after the Settlement of the *Westfall* Case...............................................................................................................47

F.   BCAD Enterprise's Twenty-Five Years Long Pattern and Practice of Misleading and Deceiving Asbestos Injury Claimants, Asbestos Claimants' Counsel and Asbestos Courts..........................................................................................................................49

G.   Representative Misrepresentations and Material Omissions in Furtherance of the Fraudulent Asbestos Defense Scheme .........................................................................55

   a.   The 1988 and 1989 Misrepresentations and Material Omissions to Counsel for Tireworker Asbestos Injury Litigation Claimants Suing BASF in the United States Eastern District of Pennsylvania and Southeastern Pennsylvania State Courts...............................................................................................................58

   b.   November 19, 1990 Misrepresentations in BASF's Answers to Plaintiffs' Standard Interrogatory Answers in *In Re: All "Asbestos" Cases Presently Pending Before and All Future Cases Assigned to the Honorable James E. Mies, Circuit Court Judge*, (Circuit Court, Wayne County, Michigan). ....................................64

   c.   November 1990 and October 1991 Misrepresentations in the Answers to Plaintiffs' Master Interrogatories in *In Re: Northern Ohio Tireworker Asbestos Litigation* (C.P. Summit Cty., Ohio)..............................................................................67

   d.   April 2002 and December 22, 2010 Misrepresentations and Material Omissions in Engelhard's Correspondence to Asbestos Claimants' Counsel and in Responses to Plaintiffs' First Standard Set of Liability Interrogatories in the New York City Asbestos Litigation Matter of *Estate of Steven Chernick et. al. v. ABB Lumus Global, Inc*...............................................................................................73

   e.   Cahill Gordon's and BASF's Continuing Fraudulent and Misleading Representations to the Representative Plaintiffs' Attorneys, Bevan & Economus and Bevan & Associates LPA, Inc., Beginning in 1992. ......................................79

H.   The Discovery and Uncovering of the Fraudulent Asbestos Defense Scheme .... 97

I.   The BASF Perpetrators Undeterred Attempt to Mislead and Deceive the *Paduano* Suit's Plaintiffs' Counsel Regarding Emtal Talc's Asbestos Content........................ 104

J.   BASF's Admissions That False and Misleading Statements Were Given to Asbestos Claimants Over the Years as Part of BASF's Asbestos Claim Defense ..... 105

K.   Plaintiffs Learn They and Other Asbestos Claimants Similarly Situated Were Victimized and Harmed by the Fraudulent Asbestos Defense Scheme...................... 107

L.   Defendants' Clandestine Misconduct and Concealments Prevented Plaintiffs and Class Members From Discovering the Fraudulent Asbestos Defense Scheme Despite the Exercise of Diligence Thereby Warranting Tolling of Any Applicable Statute of Limitations. ............................................................................................................... 108

4

VI. CLASS ACTION ALLEGATIONS ......................................................................... 111

VII. CAUSES OF ACTION .................................................................................... 122

   COUNT I -  VIOLATION OF N.J.S.A. § 2C:41-2c.................................................. 122

   COUNT II - VIOLATION OF N.J.S.A. § 2C:41-2D BY CONSPIRING TO VIOLATE N.J.S.A. § 2C:41-2C ............................................................................................ 132

   COUNT III - FRAUDULENT CONCEALMENT - SPOLIATION.......................... 134

   COUNT IV  - FRAUD AND DECEIT....................................................................... 144

   COUNT V - NEGLIGENT MISREPRESENTATION ............................................. 147

   COUNT  - VI ABUSE OF PROCESS....................................................................... 149

   COUNT VII - UNJUST ENRICHMENT.................................................................. 150

   COUNT VIII - UNJUST ENRICHMENT ............................................................... 151

   COUNT IX - NEGLIGENT SUPERVISION OF EMPLOYEES............................. 152

   COUNT X - NEGLIGENT SUPERVISION OF EMPLOYEES AND AGENTS..... 153

   COUNT XI - PUNITIVE DAMAGES ..................................................................... 155

VIII.    DEMAND FOR RELIEF................................................................................. 156

JURY DEMAND .......................................................................................................... 158

# I.  INTRODUCTION

1.      This is a class action suit against BASF Catalyst, LLC and its corporate predecessors (collectively "**BASF**"), the law firm of Cahill Gordon & Reindel, LLP and its predecessor law partnership (collectively "**Cahill Gordon**"), and certain BASF in-house and Cahill Gordon law firm lawyers. BASF manufactured and sold talc products that contained asbestos fiber.  As part of a scheme to reduce and possibly eliminate BASF's liability for asbestos personal injuries and deaths caused by its talc products, BASF and Cahill Gordon conspired to carry out a scheme to defend BASF in asbestos injury litigation that involved: (a) the destruction or secreting away of evidence that proved the presence of asbestos fiber in BASF's talc products; and (b) thereafter: (i) falsely denying to or concealing from asbestos injury victims, their lawyers and, on

occasion, presiding courts, the existence and spoliation of this evidence; and/or (ii) submitting statements or evidence to asbestos injury victims, their counsel and, on occasion, presiding courts, that falsely represented BASF's talc products did not contain asbestos. To execute this Fraudulent Asbestos Defense Scheme (as defined hereinafter), BASF and Cahill Gordon in around 1984 created an enterprise, the "BASF Cahill-Gordon Asbestos Defense Enterprise" ("**BCAD Enterprise**").  Over the next twenty-five (25) years, BASF and Cahill Gordon had the BCAD Enterprise engage in a pattern of fraudulent and misleading activities that involved or utilized the United States ("U.S.") Mail, private or commercial interstate carriers, telefax, telephone and other forms of interstate communication and commerce to transmit statements, correspondence, verified discovery responses, sworn affidavits, and testimony under oath that uniformly represented BASF's talc and talc products did not contain asbestos and/or denied the existence of any evidence to the contrary.  These false representations were intended to, and did in fact, induce the named Plaintiffs and members of the Class defined herein to either: (1) forego filing what would have been lawful and proper asbestos injury claims against BASF; (2) voluntarily discontinue legal actions seeking to enforce their asbestos injury claims against BASF; (3) accept nominal financial settlements of their asbestos injury claims against BASF; or, (4) if subject to an application to courts for summary judgment or dismissal, suffer the involuntary termination of their claims.  At the time these representations were made, BASF and Cahill Gordon each knew them to be false and misleading. Defendants' fraudulent and misleading activities affected thousands of injured and innocent asbestos victims and their families and the courts in which their claims were pending.  Plaintiffs accordingly seek for themselves and others similarly

6

situated declaratory, equitable, and economic relief based upon violations of N.J.S.A. § 2C:41-1 *et seq.* and various New Jersey common law claims, including spoliation of evidence, fraud  and fraudulent concealment, abuse of process, unjust enrichment, negligent misrepresentation, and negligent supervision of employees and agents.

## II.  SUMMARY OF THE CASE

2.     This suit arises out of a long-standing and far reaching pattern and practice of obstruction of justice and fraudulent concealment, misrepresentations and failures to truthfully and fully disclose material information concerning asbestos in certain products by Defendants BASF and Cahill Gordon in asbestos claim matters in which BASF and its predecessors were either a named defendant or a potential party.

3.     The Fraudulent Asbestos Defense Scheme at issue in this case was designed to end filed and ward off future potential asbestos claims against BASF that were or could be based upon contentions or claims that talc ore and talc products mined or manufactured by BASF's predecessors, Engelhard Corporation, Engelhard Industries, Engelhard Minerals & Chemicals Corporation, Minerals & Chemicals Phillip Corporation, Eastern Magnesia Talc Company, Porocel Corporation and Pita Realty Limited, contained asbestos.  (When context requires, these BASF predecessor companies are collectively referred to herein as "**Engelhard**.")

4.     The targets and victims of Defendant BASF's fraudulent suppression and misrepresentation scheme are and were persons who were: (a) exposed to various forms of asbestos fiber contained in Engelhard's talc ore and talc products and injured as a result; and/or, (b) an exposed person's family members or personal representatives who claimed or could claim derivatively for or through these exposed individuals. (These

victims are collectively referred to herein as the "**Asbestos Claimant Class**" or the "**Class**.")

5.     As a result of Defendants' Fraudulent Asbestos Defense Scheme as more fully set out below, each member of the Asbestos Claimant Class was ultimately wrongfully deceived and defrauded into believing that there was no evidence that Engelhard's talc contained asbestos and/or that Engelhard's talc did not contain asbestos and consequently either: (a) terminated or abandoned his or her asbestos injury claim against BASF; (b) accepted a nominal financial settlement of their claim; or (c) suffered a dismissal of his or her lawsuit where and when the misrepresentations at issue were submitted by the Defendants to presiding courts in the form of motions seeking dismissal of BASF.  Plaintiffs and each Class Member thereby suffered a significant loss of their property.  Each has been deprived of fair, full and just compensation for their respective asbestos injury claims as was their property right under the law.

6.     As described in greater detail below, Plaintiffs and the Asbestos Claimant Class, the lawyers representing them, and, in some cases, the courts presiding over Class Members' lawsuits, were systematically supplied with uniform, material misrepresentations and omissions by BASF and its lawyers regarding: (a) the existence and dangerous nature of asbestos in Engelhard's talc ore and products; and/or  (b) the existence of inculpatory evidence contradicting BASF's exculpatory representations. As a direct and proximate result of the Defendants' deceptive acts, statements and material omissions, the property rights of the Plaintiffs and others similarly situated to them were lost or significantly impaired when, in natural and reasonable  reliance upon the concealment and deception practiced upon them, made as they were in such forms

including verified answers to discovery requests or affidavits signed under oath by corporate representatives, they either: (a) did not pursue their claims against BASF; (b) voluntarily ended their claims against BASF without receiving any or full, fair and just compensation (in some cases Class Members were given a nominal or token settlement in exchange for a full release of BASF); or (c) based upon the misrepresentations and omissions to courts, suffered an involuntary termination of their asbestos injury claims against BASF.

7.     A significant central and integral part of Defendants' Fraudulent Asbestos Defense Scheme was BASF's widespread spoliation of material evidence and documents establishing or tending to establish that Engelhard's talc ore and products contained asbestos fibers. This spoliation of crucial material evidence began in and around 1984. At that time internal Engelhard company documents and other evidence relating to the existence and nature of asbestos in Engelhard's talc ore and talc product lines were systematically gathered up from employees at Engelhard's laboratories and offices by BASF's management at the instigation and direction of BASF's legal department.  This spoliation of evidence, on information and belief, was committed with the knowing aid and assistance of BASF's national asbestos counsel, Cahill Gordon.  This evidence was then either disposed of or secreted away.  Despite inquiry in a prior New Jersey state court proceeding in which the existence of the spoliation was first uncovered, the fate and current whereabouts of this evidence remain unaccounted for by BASF.

8.     The collection and spoliation of this evidence occurred following BASF's in-house and outside defense attorneys (Cahill Gordon) witnessing first hand or otherwise knowing about Engelhard's research and management employees' inculpatory deposition

testimony that acknowledged the existence and contents of documents and scientific test results that reported the presence of asbestos in Engelhard's talc ore and products, including documents and test results produced by Engelhard in connection with a Rhode Island asbestos injury lawsuit.  In settling the Rhode Island suit, BASF obtained an agreement in the form of a release requiring that the Rhode Island plaintiff and plaintiff's attorney keep the settlement and all discovery confidential.

9.      BASF's collection and spoliation of asbestos evidence in 1984 occurred at a time and under circumstances that BASF's management and its in-house and outside attorneys knew BASF was or would in the future be the subject of additional asbestos injury lawsuits and claims.  BASF's management and attorneys also knew that the materials collected in 1984, including the inculpatory testimony transcripts and documents referenced during the Engelhard employee depositions in the Rhode Island asbestos case, were or could be relevant to such asbestos injury lawsuits and claims.

10.      With the inculpatory evidence relating to Engelhard's talc ore and products destroyed or secreted away, the perpetrators of BASF's Fraudulent Asbestos Defense Scheme then began to uniformly, systematically and repeatedly represent in sworn and unsworn statements in asbestos injury claim matters that: (a) Engelhard's talc ore and talc products did not contain any asbestos; and/or (b) that no evidence existed to the contrary.  Over the ensuing twenty-five  (25) years, from 1984 until late 2009 — when by chance the spoliation and fraudulent concealment were uncovered during a deposition of a former Engelhard chemist whose daughter had developed mesothelioma from exposure to, among other products, BASF's talc ore and products — BASF and its lawyers persistently and uniformly lied to, misled, and withheld material evidence

10

regarding the presence of asbestos in Engelhard's talc from numerous (in the thousands) asbestos injury claimants, asbestos claimant lawyers, and asbestos injury claimant representatives, as well as to courts presiding over asbestos injury claims.

11.   The Fraudulent Asbestos Defense Scheme at issue herein was devised, implemented, managed, directed, and controlled in large and substantial part at BASF's headquarters in the State of New Jersey.  It was executed through the means and mechanism of a corrupt association (the BCAD Enterprise) which was comprised of and operated by, at least so far as is presently known: (a) BASF; (b) BASF management and in-house attorney employees; and, (c) the law firm and lawyers of Cahill Gordon, which firm and its lawyers until 2010 or so had been BASF's national asbestos claim defense counsel for at least twenty-five years.

12.   BASF, Cahill Gordon and the BCAD Enterprise's Fraudulent Asbestos Defense Scheme was highly successful in terminating and warding off numerous asbestos injury claims and lawsuits against BASF, as well as enabling Defendants to settle asbestos injury claims against BASF with nominal or token payments in exchange for a release or agreement not to sue when doing so was advantageous to BASF.  As was Defendants' design, purpose and intent, the spoliation and fraudulent misrepresentation/omission scheme misled numerous asbestos injury claimants and their counsel, including the representative Plaintiffs and their counsel, into naturally and reasonably believing there was no evidence that Engelhard's talc products contained asbestos that could support an injury compensation claim against BASF.  The Plaintiffs' and other Class Members' ultimate response to BASF, Cahill Gordon and the BCAD Enterprise's spoliation and deceitful conduct was likewise uniform, natural, and direct, as

well as consistent with the intent of the Defendants.  Depending upon the procedural status of their claim, Plaintiffs and members of the Class either dropped their claims, settled for a token amount in exchange for a release or covenant not to sue, or did not commence a law suit or other claim (such as workers' compensation) against BASF based upon exposure to BASF talc; all to their substantial economic detriment and loss. In addition to the loss of their asbestos injury claim or chose in action, Plaintiffs and others were not fairly and fully compensated by BASF for their medical expenses, loss of earnings, and other economic and non economic losses.

13.     Compounding the harm caused to Plaintiffs and the Class by the Defendants' spoliation of evidence and deceptive misconduct, the passage of time has greatly impaired and in some cases eliminated Plaintiffs' and Class Members' access to evidence needed to establish their underlying asbestos injury claims.

14.     The existence and/or scope of Defendants' Fraudulent Asbestos Defense Scheme and BCAD Enterprise's existence and corrupt activities was neither known nor reasonably knowable to Plaintiffs until recently in 2010 or  2011, when representative Plaintiffs were first advised of the Defendants' Fraudulent Asbestos Defense Scheme through Plaintiffs' asbestos claim counsel who, in turn, had only shortly before that time learned of the scheme as a result of being contacted by other lawyers who were investigating spoliation claims against BASF in connection with then pending litigation in New Jersey state court.

15.     The spoliation of evidence and other elements and aspects of the Fraudulent Asbestos Defense Scheme, as well as BCAD Enterprise's existence, all of which date back to the mid-1980's, were uncovered only by chance in 2009 when

12

deposition testimony by a former Engelhard employee chemist, Mr. David Swanson, made some alarming revelations. His testimony not only contradicted BASF's and its counsel's representations that Engelhard's talc did not contain any asbestos, but revealed the fact that during his employment with Engelhard material  documents relating to the talc were gathered from research department employees and destroyed at the direction of Engelhard's legal department. Mr. Swanson was deposed in connection with a New Jersey Superior Court Law Division asbestos lawsuit captioned *Paduano v. Ace Scientific Supply Co*., MID-L-2976-09 (N.J. Super. Ct. Law Div.) ( "***Paduano* suit**"). The *Paduano* suit was filed by Mr. Swanson's daughter, a mesothelioma victim claiming asbestos injury caused by BASF's talc products as well as other exposures.  During his deposition, Mr. Swanson testified that while he was employed in Engelhard's research department, test results, laboratory notebooks and other documents concerning talc products were gathered from all Engelhard research and testing personnel, including his own written materials. This testimony generated an investigation into BASF's and Cahill Gordon's spoliation of documents and evidence that is the subject of this lawsuit. Accordingly, the existence of the Fraudulent Asbestos Defense Scheme, the existence of the BCAD Enterprise's existence and the activities and overt actions of the corrupt scheme are and were not known to members of the Class despite the diligent efforts of their counsel; which ignorance of these things will continue on unless and until Class Members are notified and informed of the circumstances and their potential claims by an appropriate notice.

16.     This suit accordingly seeks wide class relief declaring, correcting and redressing Defendants' egregious misconduct and the injuries inflicted upon thousands of members of the Asbestos Claimant Class (excluding those who opt out), including:

a.     Declaratory and equitable relief restoring members of the Asbestos Claimant Class back to the position they were in prior to the commission of Defendants' obstruction of justice and fraud upon them, including: (i) reopening of cases that were dismissed or closed; (ii) setting aside any releases, covenants not to sue or settlement agreements obtained by or for BASF; (iii) barring BASF from asserting any time passage related defense such as statutes of limitations, repose or death action claim time commencement requirements; and/or (iv) barring Defendants from asserting any defense based upon the existence of a release of claims, covenants not to sue or settlement agreement;

b.     Declaratory and equitable relief addressing and alleviating any impairment of Plaintiffs' and Class Members' ability to gather and present evidence establishing their underlying asbestos injury claims that Defendants' spoliation and ensuing misrepresentations and material omissions proximately caused, including, but not limited to any detrimental loss or impact on Plaintiffs' and Asbestos Claimant Class Members' ability to: (i) establish the dangerous, defective nature of Engelhard's talc ore or products; (ii) establish harmful exposure to Engelhard's talc ore or products; (iii) establish Engelhard's failure to warn; and/or, (iv) establish the heeding of any proper warning or precautions that should have been given in connection with Engelhard's talc ore or products;

14

c.   A determination and declaration of the need for and ordering execution of a notice program paid for by Defendants informing Class Members or their representatives of the situation, their available claims and rights to proceed against Defendants and of this action;

d.   A determination and declaration of Defendants' liability for compensatory and punitive damages to Plaintiffs and the Class relating to the spoliation of evidence relevant and material to establishing asbestos injury claims against BASF, together with the establishment of an available forum and an elective program for Class Members to efficiently and cost effectively establish the amount of damages due to them;

e.   A determination and declaration of Defendants' liability to Plaintiffs and the Class for compensatory and treble damages, costs and attorney fees and costs relating to Plaintiffs' and the Class Members' claims under N.J.S.A. § 2C:41-1 *et seq.*, together with the establishment of an available forum and an elective program for Class Members to efficiently and cost effectively establish the amount of damages due to them;

f.   A determination and declaration of Defendants' liability for compensatory and punitive damages to Plaintiffs and the Class relating to the common law fraud, fraudulent concealment, abuse of process, negligent misrepresentation, unjust enrichment and negligent supervision claims asserted against them herein, together with the establishment of an available forum and an elective program for Class Members to efficiently and cost effectively establish the amount of damages due to them;

g.   A determination and declaration of BASF's and Cahill Gordon's liability for disgorgement or restitution of revenues, profits and money unjustly earned from proscribed activities in violation of N.J.S.A. § 2C:41-1 *et. seq.*;

h.   A determination and declaration of BASF's and Cahill Gordon's liability for unjust enrichment together with an order requiring them to provide an accounting and thereafter disgorgement or restitution of monies unjustly earned from their activities violating N.J.S.A. § 2C:41-1 *et seq.*, the spoliation of evidence and/or the misrepresentation and deceit that was practiced by them upon Plaintiffs and members of the Class;

i.   A determination and declaration that BASF's and Cahill Gordon's communications relating to the their fraudulent conduct and/or the spoliation of evidence are not privileged attorney-client communication under the crime fraud exception;

j.   A permanent injunction enjoining the Defendants from further misrepresenting and suppressing evidence relating to BASF's asbestos liability; and,

k.   Such other relief as may be available and just.

### III.   PARTIES

#### A.   Plaintiffs

17.   Plaintiff Kimberlee Williams ("**Williams**") is an individual and a citizen of the State of Ohio, residing at 2299 Winter Parkway, Apt. 235, Cuyahoga Falls, Ohio 44221. At all times relevant herein she was married to the late Charles L. Williams, who died on September 7, 1998.  She is the personal representative of Mr. Williams' estate.

Plaintiff Williams brings this suit in her individual capacity, as personal representative of the Estate of Charles L. Williams, deceased, on behalf of said Estate, and as a Class representative of a Class of others similarly situated as defined below.

18.     Williams' deceased husband, Charles L. Williams, was a tire worker employed at Goodyear Tire & Rubber in Akron, Ohio from 1950 to 1985. During that time he was exposed during his employment to asbestos containing talc products mined, manufactured, processed, sold and/or distributed by Engelhard. That exposure proximately caused him to develop asbestos injuries, including asbestosis and lung cancer, which injuries in turn proximately led to and caused his death on September 7, 1998. Prior to his death, Plaintiff's decedent suffered and endured great pain and suffering and great mental anguish and emotional distress. Plaintiff Williams' decedent while alive, and his estate thereafter following his death, as well as Plaintiff Williams herself, incurred substantial costs and expenses in obtaining medical treatment and care of Mr. Williams' asbestos injuries. Plaintiff Williams and the Estate of Charles L. Williams, deceased, also sustained loss of income, earning capacity, funeral expenses and pecuniary losses. Plaintiff Williams also suffered a loss of consortium, services and society of her husband before his death and a loss of services following his death. All of these injuries, losses and damages were compensable asbestos injury claims.

19.     In 1992, Plaintiff Williams and her husband commenced an asbestos injury lawsuit in the Court of Common Pleas, Cuyahoga County, Ohio, against BASF's predecessor, Eastern Magnesia and Pita Reality; said suit captioned *Charles Williams and Kimberlee Williams v. B. F. Goodrich Company*, *et al.*, Case No. 229108. The case was removed to the United States District Court for the Northern District of Ohio, where it

was made a tag-a-long case in the Asbestos Multi-District Litigation case assigned to the late Honorable Charles R. Weiner in the United States District Court of the Eastern District of Pennsylvania.  During the pendency of that lawsuit, and reasonably relying and acting upon the misrepresentations and material omissions of Defendants regarding Engelhard's talc product and the absence of any evidence indicating Engelhard's talc contained asbestos fibers that were made to their attorneys and representatives, Dale S. Economus Esq. and Thomas W. Bevan, Esq., as set forth more particularly below, Plaintiff Williams and her husband, on or about March 2,1993, filed and later served by U.S. Mail a voluntarily partial dismissal of their lawsuit dismissing their asbestos injury claims against Eastern Magnesia without receiving full, fair and adequate compensation for their asbestos injury claims against BASF's predecessors.  The partial dismissal was ordered and entered by Judge Weiner on or about March 16, 1993.  Plaintiff Williams and her husband did not know that she and her husband had been the victim of Defendants' Fraudulent Asbestos Defense Scheme described herein while her husband was alive, and she did not learn of such fact until late 2010/early 2011, when she was first informed of same by her attorney, Thomas W. Bevan, Esquire.

20.     Plaintiff Nancy Pease ("**Pease**") is an individual and a citizen of the State of Ohio, residing at 3212 Bent Oak Trail, Ravenna, Ohio 44266.  She is a daughter of the late William F. Clark, deceased, and has been appointed executrix of his Estate. Plaintiff Pease brings this suit in her individual capacity, as personal representative of the Estate of William F. Clark, deceased, on behalf of the Estate, and as a Class representative of a Class of others similarly situated as defined below.

21.     Plaintiff Pease's decedent, William F. Clark, was a tire production worker employed at B. F. Goodrich Company in Akron, Ohio from 1952 to 1983.  During that time he was exposed through his employment to asbestos containing talc products mined, manufactured, processed, sold and/or distributed by Engelhard. That exposure proximately caused him to develop asbestos injuries, including mesothelioma, which injuries proximately led to and caused his death on May 5, 1994.  Prior to his death, Plaintiff Pease's decedent suffered and endured great pain and suffering and great mental anguish and emotional distress. Plaintiff Pease's Decedent while alive, and his estate following his death, incurred substantial costs and expenses in obtaining medical treatment and care of Mr. Clark's asbestos injuries and mesothelioma.  The Estate of William Clark, deceased sustained loss of income, earning capacity, funeral expenses and pecuniary losses.  All of these injuries, losses and damages were compensable asbestos injury claims.

22.     On or about June 21, 1995, Plaintiff Pease commenced an asbestos injury lawsuit in the Court of Common Pleas, Cuyahoga County, Ohio against BASF's predecessor, Eastern Magnesia; said suit captioned *Nancy Pease, executrix of the Estate of William Clark, deceased v. B. F. Goodrich Company, et al.*, Case No. CV-95-291272. This suit replaced a Summit County, Ohio, Court of Common Pleas asbestos personal injury suit commenced by Plaintiff Pease's parents during their lifetimes which was captioned *William F. Clark et al. v. Owens Corning Fiberglass Corp. et al.*, Case No. ACV-94-04-1107.  During the pendency of Plaintiff Pease's lawsuit, and reasonably relying and acting upon the misrepresentations and material omissions of Defendants regarding Engelhard's talc product and the absence of any evidence indicating

Engelhard's talc contained asbestos fibers that were made to her attorney and representative, Thomas W. Bevan, Esq., as set forth more particularly herein, Plaintiff on or about December 4, 1998 voluntarily dismissed the Estate's lawsuit against Eastern Magnesia, as part of a nominal amount settlement with a group of talc supplier defendants, without receiving full, fair and adequate compensation for the Estate's asbestos injury claims against BASF's predecessors. The fraudulently obtained notice of dismissal in her case was served upon all counsel of record, including Defendant Cahill Gordon, on or about December 4, 1996, by U.S. Mail. Plaintiff did not know that she and her father's estate had been the victims of Defendants' Fraudulent Asbestos Defense Scheme described herein until late 2010/early 2011, when she was first informed of same by her attorney, Thomas W. Bevan, Esquire.

23.     Plaintiff Marilyn L. Holley ("**Holley**") is an individual and a citizen of the State of Ohio, residing at 931 Morningstar, Akron, Ohio 44307. Holley is a daughter of Kathryn Darnell, deceased. She has been appointed executrix of the Estate of Kathryn Darnell, deceased. Plaintiff Holley brings this suit in her individual capacity, as personal representative of the Estate of Kathryn Darnell, deceased, on behalf of the estate, and as a Class representative of a Class of others similarly situated as defined below.

24.     Plaintiff Holley's decedent, Kathryn Darnell, was a rubber industry worker employed at B. F. Goodrich Company in Akron, Ohio from 1969 to 1987. During that time she was exposed through her employment to asbestos containing talc products mined, manufactured, processed, sold and/or distributed by Engelhard. That exposure proximately caused her to develop asbestos injuries, including mesothelioma, which proximately led to and caused her death on June 7, 2001. Prior to her death

Plaintiff Holley's decedent suffered and endured great pain and suffering and great mental anguish and emotional distress. Plaintiff Holley's decedent while alive and her Estate following her death incurred substantial costs and expenses in obtaining medical treatment and care of her asbestos injuries and mesothelioma.  Plaintiff Holley's decedent, Kathryn Darnell, during her life and her estate following her death sustained loss of income, earning capacity, funeral expenses and pecuniary losses.  All of these injuries, losses and damages were compensable asbestos injury claims.

25.     On or about November 14, 2000, Plaintiff Holley's decedent, Kathryn Darnell, while alive, commenced an asbestos injury lawsuit in the Court of Common Pleas, Cuyahoga County, Ohio against BASF's predecessor, Eastern Magnesia; said suit captioned *Kathryn Darnell v. B. F. Goodrich Company, et al.*, Case No. CV-423183. Prior to her death on June 7, 2001, and reasonably relying and acting upon the misrepresentations and material omissions of Defendants regarding Engelhard's talc product and the absence of any evidence indicating Engelhard's talc contained asbestos fibers that were made to her attorney and representative, Thomas W. Bevan, Esquire, as set forth more particularly herein,  Plaintiff Holley's decedent on or about May 8, 2001, voluntarily dismissed her lawsuit against Eastern Magnesia as part of a nominal settlement with a group of talc supplier defendants without receiving full, fair and adequate compensation for her asbestos injury claims against BASF's predecessors. Kathryn Darnell during her lifetime did not know that she had been the victim of Defendants' Fraudulent Asbestos Defense Scheme described herein.  Plaintiff Holley did not know and learn that her decedent was a victim of Defendants' Fraudulent Asbestos

Defense Scheme until late 2010/early 2011, when she was informed of same by her attorney, Thomas W. Bevan, Esquire.

26.     Plaintiff Donna Ware ("**Ware**") is an individual and a citizen of the State of Ohio, residing at 441 Randolph Road, Mogadore, Ohio 44260.  At all times relevant herein she was married to Ralph Ware, who died on December 1, 2002.  Plaintiff Ware is the Executrix of Mr. Ware's Estate.  Plaintiff Ware brings this suit in her individual capacity, as personal representative of the Estate of Ralph Ware, deceased, on behalf of said Estate, and as a Class representative of a Class of others similarly situated as defined below.

27.     Plaintiff Ware's deceased husband, Ralph Ware, was employed at Goodyear Aerospace in Akron, Ohio from 1950 to 1985 as, among other things, a compound mixer.  During that time he was exposed in the course of his occupation to asbestos containing talc products mined, manufactured, processed, sold and/or distributed by Engelhard.  That exposure proximately caused him to develop asbestos injuries, including mesothelioma, which proximately led to and caused his death on December 1, 2002.  Prior to his death Plaintiff Ware's decedent suffered and endured great pain and suffering and great mental anguish and emotional distress.  Plaintiff Ware's decedent, while alive, his estate thereafter, and Plaintiff Ware herself, also incurred substantial costs and expenses in obtaining medical treatment and care of Mr. Ware's asbestos injuries. Plaintiff Ware's husband's estate sustained loss of income, earning capacity, funeral expenses and pecuniary losses. Plaintiff Ware also suffered a loss of consortium, services and society of her husband.  All of these injuries, losses and damages were compensable asbestos injury claims.

28.     On or about May 29, 1997, Plaintiff Ware and her deceased husband commenced an asbestos injury lawsuit in the Court of Common Pleas, Cuyahoga County, Ohio against BASF's predecessors, Eastern Magnesia and Pita Reality; said suit captioned *Ralph Ware v. B. F. Goodrich Company, et al.,* Case No. 02-475504. Reasonably relying and acting upon the misrepresentations and material omissions of Defendants regarding Engelhard's talc product and the absence of any evidence indicating Engelhard's talc contained asbestos fibers that were made to their attorney and representative, Thomas W. Bevan, Esquire, as set forth more particularly herein, Plaintiff Ware and her husband's estate in 2003 voluntarily dismissed their lawsuit against Engelhard's predecessors as part of a multi-plaintiff, multi-talc defendant settlement that BASF's predecessors were party to, without receiving any full, fair and adequate compensation for their asbestos injury claims against BASF's predecessors.  Plaintiff Ware and her husband did not know that she and her husband had been the victims of Defendants' Fraudulent Asbestos Defense Scheme described herein while her husband was alive and she did not learn of such fact until late 2110/early2011, when she was informed of same by her attorney, Thomas W. Bevan, Esquire.

29.     Plaintiff Donnette Wengerd ("**Wengerd**") is an individual and a citizen of the State of Ohio, 3147 S. Medina Line Road, Norton, Ohio 44203.  She is the daughter of the late, Jennifer Graham, deceased, and has been appointed executrix of her estate. Plaintiff Wengerd brings this suit in her individual capacity, as personal representative of the Estate of Jennifer Graham, deceased, on behalf of the estate, and as a Class representative of a Class of others similarly situated as defined below.

30.     Plaintiff Wengerd's decedent, Jennifer Graham, was a tireworker employed at Goodyear Tire and Rubber Company in Akron, Ohio from 1974 to 1978. During that time Plaintiff's decedent was exposed through the decedent's employment to asbestos containing talc products mined, manufactured, processed, sold and/or distributed by Engelhard.  That exposure proximately caused Ms. Graham to develop asbestos injuries, including mesothelioma, which injuries proximately led to and caused her death on July 21, 2008.  Prior to her death, Plaintiff Wengerd's decedent suffered and endured great pain and suffering and great mental anguish and emotional distress. Plaintiff Wengerd's decedent while alive, and her Estate following her death, incurred substantial costs and expenses in obtaining medical treatment and care of Ms. Graham's asbestos injuries and mesothelioma.  The Estate of Jennifer Graham sustained loss of income, earning capacity, funeral expenses and pecuniary losses.  All of these injuries, losses and damages were compensable asbestos injury claims.

31.     On or about May 10, 2008, Plaintiff Wengerd's decedent during her life commenced an asbestos injury lawsuit in the Court of Common Pleas, Cuyahoga County, Ohio against BASF; said suit captioned *Jennifer Graham et al. v. Goodyear Tire Company, et al.*, Case No. 656405.  In or around January, 2009, after Plaintiff Wengerd's decedent had refused to voluntarily dismiss her mesothelioma injury lawsuit against BASF as it had requested through counsel in a letter mailed on or about November 12, 2008, BASF electronically filed and served a Motion for Summary Judgment brief and, later, a reply brief in the Court of Common Pleas in which it misrepresented to the presiding trial court, as set forth more particularly hereinafter, that Plaintiff Wengerd could not establish her case against BASF because, *inter alia*, its predecessor's,

Engelhard, talc did not contain any asbestos.  On or about June 18, 2009, the Court of Common Pleas of Cuyahoga granted BASF's Motion for Summary Judgment and dismissed Plaintiff Wengerd's mesothelioma lawsuit against BASF, thereby denying her full, fair and adequate compensation for her asbestos injury claims against BASF. Plaintiff Wengerd did not know that she and her mother's estate had been the victim of Defendants' Fraudulent Asbestos Defense Scheme described herein until 2010/early 2011, when she was first informed of same by her attorney, Thomas W. Bevan, Esquire.

### B.      Defendants

### (1) The BASF Defendants

32.      Defendant, BASF Catalysts LLC is a limited liability company formed and existing under the laws of the State of Delaware, with its headquarters, principle place of business and managerial control located in the State of New Jersey, at 25 Middlesex/Essex Turnpike, Iselin, New Jersey 08830.

33.      BASF Catalysts LLC is the successor in interest by merger and is responsible and liable for the following companies: Engelhard Corporation, Engelhard Industries, Engelhard Minerals & Chemicals Corporation, Minerals & Chemicals Phillip Corporation, Eastern Magnesia Talc Company, Porocel Corporation and Pita Realty Limited (collectively "**Engelhard**").  Unless context indicates otherwise, "**BASF**" refers to and includes BASF Catalysts LLC and the Engelhard predecessor companies collectively.

34.      At all times material herein, BASF and its predecessor companies, including in particular Engelhard, regularly and continuously transacted business in the State of New Jersey.

25

35.     BASF and its predecessors, including Engelhard, directed and/or committed the statutorily unlawful and other tortious activities and omissions alleged and complained about herein in the State of New Jersey, even though the impact and harm to Plaintiffs and many of the Class Member victims may have occurred outside of New Jersey.

36.     At all times material herein, Defendant BASF and its predecessors, including Engelhard, acted by and through its officers, employees, servants, attorneys, agents, actual, apparent and/or ostensible, any and all of whom were then and there acting within the course and scope of their authority, duties and employment, actual or apparent.

37.     Defendant BASF, acting as aforesaid, jointly conceived, orchestrated and participated in the Fraudulent Asbestos Defense Scheme alleged herein; was a co-conspirator with others participating in the Fraudulent Asbestos Defense Scheme to defraud Plaintiffs and members of the Class, including the "Lawyer Perpetrators" indentified herein; was a member of the BCAD Enterprise and participated in its creation, direction and management, and participated in the execution and commission of the BCAD Enterprise's unlawful activities.

38.     Defendant Thomas D. Halket ("**Halket**") was, at all times material herein, an attorney at law employed by BASF as an in-house counsel.  Defendant Halket jointly participated in the Fraudulent Asbestos Defense Scheme alleged herein; was a co-conspirator with others participating in the Fraudulent Asbestos Defense Scheme to defraud Plaintiffs and members of the Class, including the "Lawyer Perpetrators" indentified herein; was a member of the BCAD Enterprise and participated in its creation,

direction and management, and participated in the execution and commission of the BCAD Enterprise's unlawful activities.

39.     Defendant Glenn Hemstock ("**Hemstock**") was, at all times relevant hereto, an employee of BASF-Engelhard.  Defendant Hemstock was a top scientist at BASF.  He worked with and tested Engelhard's talc and he managed and directed Engelhard employees and consultants who tested or conducted research on Engelhard's talc.  Defendant Hemstock jointly participated in the Fraudulent Asbestos Defense Scheme alleged herein; was a co-conspirator with others participating in the Fraudulent Asbestos Defense Scheme to defraud Plaintiffs and members of the Class, including the "Lawyer Perpetrators" indentified herein; was a member of the BCAD Enterprise and participated in its creation, direction and management, and participated in the execution and commission of the BCAD Enterprise's unlawful activities.

40.     Defendant Arthur A. Dornbusch II ("**Dornbusch**") was, at all times material herein, an attorney at law employed by BASF as an in-house counsel.  He also is and was at all times relevant herein a Vice President of BASF, BASF's General Counsel and BASF's Corporate Secretary.  Dornbusch jointly participated in the Fraudulent Asbestos Defense Scheme alleged herein; was a co-conspirator with others participating in the Fraudulent Asbestos Defense Scheme to defraud Plaintiffs and members of the Class, including the "Lawyer Perpetrators" indentified herein; was a member of the BCAD Enterprise and participated in its creation, direction and management, and participated in the execution and commission of the BCAD Enterprise's unlawful activities.

41.     With respect to the activities, conduct and omissions set forth herein, Defendants BASF, Halket, Dornbusch and Hemstock (collectively referred to as the "**BASF Perpetrators**") acted recklessly, knowingly, deliberately and/or intentionally to mislead and deceive Plaintiffs and the Asbestos Claimant Class or, in the alternative, to cause, assist, aid or abet others to mislead and deceive Plaintiffs and the Asbestos Claimant Class.

## (2) The Cahill Gordon & Reindel Defendants

42.     Defendant Cahill Gordon & Reindel LLP ("**Cahill LLP**" when referred to individually for context) is a limited liability partnership organized and existing under the laws of the State of New York.  It came into existence on or as of April 29, 2003.  It is the successor in interest to the law firm partnership known as "Cahill Gordon & Reindel" and is responsible for this predecessor partnership's debts and liabilities.

43.     Defendant Cahill LLP regularly and continuously did and does transact business in the State of New Jersey, as did its predecessor, Cahill Gordon & Reindel.  At all times material to this matter, Cahill LLP also committed relevant statutorily unlawful and other tortious conduct in, and directed towards, New Jersey and citizens of New Jersey.

44.     Defendant Cahill Gordon & Reindel ("**Cahill Partnership**" when referred to individually for context) is and was a New York professional partnership that was in existence from 1919 until April 29, 2003, at which time it was succeeded to by Cahill LLP in an organizational form change transaction.

28

45.     Defendant Cahill Partnership regularly and continuously transacted business in the State of New Jersey and at all times material to this matter committed relevant statutorily unlawful and other tortious conduct in, and directed towards, New Jersey and citizens of New Jersey.

46.     At all times material herein, Defendants Cahill LLP and Cahill Partnership (collectively "**Cahill Gordon**") acted by and through their shareholders, members, partners, officers, employees, servants, associate attorneys, agents, actual, apparent and/or ostensible, any and all of whom were then and there acting within the course and scope of their authority, duties and employment, actual, apparent or ostensible, and/or within the authority of his or her copartners or the partnership.  All Cahill Gordon partners, members or shareholders were acting in the ordinary course of business of the partnership and/or with the authority of his or her co-partners or members.  Defendant Cahill Gordon is liable herein under the doctrine of *respondeat superior* for the actions of its partners, members, officers, agents, employees, servants and associate attorneys.  All Cahill Gordon partners, members or shareholders are jointly and severally liable for the negligent or wrongful acts, omissions of him or her, his or her partners, and/or for any negligent or wrongful act of misconduct committed by persons under his or her direct supervision and control while rendering professional services.

47.     From at least 1983 and continuing to in or about 2010, Defendant Cahill Gordon was BASF and its predecessors' national counsel regarding asbestos injury claim defense matters.  Based upon information and belief, Cahill Gordon was terminated by BASF as its national asbestos defense counsel after the spoliation and Fraudulent

Asbestos Defense Scheme alleged herein was uncovered during discovery proceedings in the *Paduano* suit.

48.     Defendant Cahill Gordon, through its members, shareholders or partners, officers, agents, employees, servants and associate attorneys, acting as aforesaid, jointly conceived, orchestrated and participated in, and/or negligently and/or recklessly permitted its members, shareholders or partners, officers, agents, employees, servants and associate attorneys, acting as aforesaid, to orchestrate and participate in, the Fraudulent Asbestos Defense Scheme alleged herein, or was a co-conspirator with, or an aider and abettor of others participating in the Fraudulent Asbestos Defense Scheme, including the BASF Perpetrators.

49.     Defendant Cahill Gordon, through its members, shareholders or partners, officers, agents, employees, servants and associate attorneys, acting as aforesaid, was a member of the BCAD Enterprise and participated in its creation, direction and management, and participated in the execution and commission of the BCAD Enterprise's unlawful activities.

50.     Defendant Howard G. Sloane (a/k/a "Peter Sloane") ("**Sloane**") was, at all times relevant hereto a member of the bar of New York State, a partner in the Cahill Partnership and then a shareholder of Cahill LLP.  Plaintiffs believe Sloane is a citizen of a state or territory different than they are.  Sloane at all material times herein was one of the principal Cahill Gordon attorneys entrusted with the representation of BASF in asbestos claim matters.  Defendant Sloane jointly conceived, orchestrated and participated in the fraudulent conduct scheme alleged herein with others including the BASF perpetrators; was a co-conspirator with others participating in the scheme to

defraud Plaintiffs and members of the Class; was a member of the BCAD Enterprise and participated in its creation, direction and management; and participated in the execution and commission of the BCAD Enterprise's unlawful activities. At all times material herein Sloane was acting in the ordinary course of business of Cahill Gordon and/or with the authority of his Cahill Gordon co-partners, co-members or co-shareholders.

51.     Defendant Scott A. Martin ("**Martin**") was, at all times relevant hereto, a member of the bar of the State of New York and an attorney employed by and practicing with Cahill Gordon. Plaintiffs believe Martin is a citizen of a state or territory different than they are. Martin at times material herein was one of the Cahill Gordon attorneys entrusted with and responsible for the representation of BASF in asbestos claim matters. Martin jointly conceived, orchestrated and/or participated in the fraudulent conduct scheme alleged herein with others including the BASF Perpetrators; was a co-conspirator with others participating in the scheme to defraud Plaintiffs and members of the Class; was a member of the BCAD Enterprise and participated in its creation, direction and/or management; and participated in the execution and commission of the BCAD Enterprise's unlawful activities. At all times material herein Martin was acting in the ordinary course of business of Cahill Gordon and/or with the authority of his Cahill Gordon co-partners, co-members or co-shareholders.

52.     Defendant Ira J. Dembrow ("**Dembrow**") was, at all times relevant hereto, an attorney at the law firm of Cahill Gordon. Plaintiffs believe Dembrow is a citizen of a state or territory different than them. Dembrow at all times material herein was one of the Cahill Gordon attorneys entrusted with and responsible for the representation of BASF in asbestos claim matters. Dembrow jointly conceived, orchestrated and/or

participated in the fraudulent conduct scheme alleged herein with others including the

BASF Perpetrators; was a co-conspirator with others participating in the scheme to

defraud Plaintiffs and members of the Class; was a member of the BCAD Enterprise and

participated in its creation, direction and/or management; and participated in the

execution and commission of the BCAD Enterprise's unlawful activities.  At all times

material herein Dembrow was acting in the ordinary course of business of Cahill Gordon

and/or with the authority of his Cahill Gordon co-partners, co-members or so-

shareholders.

     53.    With respect to the activities, conduct and omissions set forth herein,

Defendants Cahill Gordon, Sloane, Martin and/or Dembrow (collectively referred to as

the "**Lawyer Perpetrators**") acted recklessly, knowingly, deliberately and/or

intentionally to mislead and deceive Plaintiffs and the Asbestos Claimant Class or, in the

alternative, to recklessly, knowingly, deliberately and/or intentionally cause, assist, aid or

abet others to mislead and deceive Plaintiffs and the Asbestos Claimant Class.

### (3) The Fictitious Defendants

     54.    JOHN DOE BUSINESS ENTITIES 1 to 100 are fictitious corporations,

partnerships, or other business entities or organizations that BASF is responsible or liable

for and whose identities are not presently known, which entities may have mined, milled,

manufactured, sold, supplied, purchased, marketed, installed and/or removed asbestos or

asbestos-containing materials, or alternatively, are responsible for, are the alter egos of,

or are otherwise responsible for the conduct or liability of such entities, as set forth

herein.

55.     JOHN DOE BUSINESS ENTITIES 101 to 200 are the fictitious firms,

corporations, partnerships, limited liability companies/associations or other business

entities or organizations whose identities are not presently known, and who may have

perpetrated, or are responsible for, are the alter egos of or are otherwise responsible for

the conduct or liability of those who perpetrated or acted in concert with, in furtherance

of, or in conjunction with the other Defendants in the conduct, activities, acts and

omissions as set forth herein.

56.     JOHN DOE LAWYERS 1 to 500 are the fictitious names of lawyers and

law firms, legal professional corporations, legal professional partnerships, or other

professional business entities or organizations, or their agents, employees, or servants,

acting within the course and scope of their employment, or other individuals whose

identities are not presently known, and who may have perpetrated and/or are responsible

for, or are the alter egos of, or are otherwise responsible for the conduct or liability of

those who perpetrated, aided and abetted, or acted in concert with, in furtherance of, or in

conjunction with the other Defendants in the conduct, activities, acts and omissions as set

forth herein.

57.     Defendants JOHN DOE 1 to 500 are the fictitious names of individuals

whose identities are not presently known, who may have perpetrated, aided and abetted,

conspired with, acted in concert with and/or are secondarily responsible or liable under

law for the conduct or activities of those who may have acted in concert with, in

furtherance of, or in conjunction with the other Defendants in the conduct, activities, acts

and omissions set forth herein, including but not limited to employees, officers, agents,

members and partners of named Defendants as set forth herein.

## IV. VENUE AND JURISDICTION.

58.     This Court has subject-matter jurisdiction over this nationwide class action pursuant to 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which some members of the class are citizens of states different than the Defendants. 28 U.S.C. § 1332(d)(2)(A).

59.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because numerous Defendants, as described above, reside in, are headquartered in, and/or conduct business in, this judicial district, and because a substantial part of the acts or omissions giving rise to the claims set forth herein occurred in this judicial district, or were directed and controlled from within this judicial district.

## V. FACTS COMMON TO CLASS CERTIFICATION AND ALL COUNTS

### A.     Asbestos Background Information

60.     Asbestos is a naturally occurring mineral and is a human carcinogen.

61.     A common form of asbestos fiber is chrysotile asbestos.  Chrysotile asbestos is a recognized and regulated human carcinogen.  Chrysotile is the most common variety of asbestos found in products in the United States.

62.     Other forms of asbestos are amosite, crocidolite, tremolite, actinolite and anthophyllite.  The United States Environmental Protection Agency, the Occupational Health and Safety Administration, and the World Health Organization, among others, have stated that there is <u>no</u> known safe level of exposure to asbestos of <u>any</u> type.

63.     Talc is a naturally occurring mineral that is mined and then processed or used in manufacturing by companies in numerous parts of the United States.

64.     Asbestos has been identified as a contaminant of some talc mines.

**B.     Engelhard's Emtal Talc Products and Asbestos**

65.     BASF's predecessor Engelhard either directly or indirectly through a subsidiary owned or operated a talc mine located in Johnson, Vermont (the "**Johnson Mine**") from 1967 until 1983.

66.     The Johnson Mine was closed in 1983.

67.     At some time presently unknown to Plaintiffs, and according to information provided by Defendants in preceding asbestos litigation, the Johnson Mine became flooded with water and valid samples of its talc can longer be obtained.

68.     BASF's predecessor Engelhard processed or manufactured the Johnson Mine's talc ore into talc products that were marketed under the trade name "Emtal talc". The "Emtal" trademark was owned and utilized by BASF's subsidiary, Eastern Magnesia.  Emtal talc products also included "G&S Talc," a talc that contained serpentine asbestos fiber.

69.     Emtal talc ore and products were used across the nation in diverse industries for many purposes.  As examples, it was an ingredient, a component of, or a coating in or on the following products: wall board, joint compound, auto body "filler," dusting agents and children's balloons.

70.     Emtal talc and talc products produced, processed and/or manufactured by BASF, contained chrysotile asbestos fibers, as well as other asbestos forms including tremolite  and serpentine asbestos.

35

71.     During the 1970s and continuing through the early 1980s, BASF through its internal personnel or outside consultants  or laboratories conducted tests and assays on its talc ore and products, as well as in, about  or on areas or environments where the talc was mined, processed, or used. Third parties also conducted tests and assays on BASF talc ore and products.  A number of the tests and assays were to determine if the Johnson Mine's talc and processed Emtal talc products contained asbestos fibers.

72.     BASF had knowledge of testing and assays performed on talc obtained from the Johnson Mine and Emtal talc and had knowledge of the test results, including the findings that the talc and talc products contained asbestos fibers and that certain environments in its facilities, including laboratories, had high levels of airborne asbestos fibers.

73.     The tests and assay results are scientific and business records that BASF and predecessors regularly kept and maintained.

74.     The test and assay results conducted on Johnson Mine talc and processed Emtal talc products found asbestos fibers in the ore and products.

75.     Among the testing and assays of Emtal talc which found the presence of asbestos fibers in the Emtal talc which were uncovered in the *Paduano* suit discovery are:

a.   A 1972 Royal Globe Insurance test with results indicating four out of five Emtal talc samples contained asbestos fibers.

b.   A May 1972 Johns Manville test which identified asbestos fibers, including tremolite fibers, in all of the Emtal talc samples.

c.   A 1977 test by Mr. Triglia, an Engelhard employee, which identified the presence of asbestos in Emtal talc.

d.   A 1978 test which established the presence of asbestos in all Emtal talc sampled.

e.   A 1979 Georgia Tech electron microscope analysis test which found fibers in the Emtal talc.

f.   Three other 1979 tests which all confirmed the presence of asbestos in Emtal talc.

76.     The above identified tests and assays, on information and belief, are not an exhaustive list of the asbestos tests and assays with positive findings for asbestos in Emtal talc.  Plaintiffs believe there are or were other tests and assays of Emtal talc and/or talc from the Johnson Mine that had positive findings of asbestos, which BASF claims are privileged and refuses to divulge or, as will be described below, were reported in documents collected by BASF in or about 1984 and then either destroyed or secreted away once the BASF Perpetrators and Lawyer Perpetrators became aware of the implications of such positive test and assay findings on BASF's liability exposure and national risk management program regarding asbestos injury claims.

77.     The BASF Perpetrators and Lawyer Perpetrators, based upon the aforementioned information and belief, had knowledge and were aware of the test results and other non-publically available data, opinions, findings and conclusions of experts which established that the Johnson Mine talc and/or Emtal talc products contained asbestos.

78.     Despite the findings from these tests and assays to the contrary, BASF represented to its customers, industry trade groups and the Federal Government that the Emtal talc was asbestos free and even marketed the product as a viable asbestos substitute, thereby causing wide spread and unknowing exposure to asbestos to United States citizens, including workers and workers' spouses and children, nationwide.

### C.     The *Westfall* Asbestos Lawsuit's Discovery

79.     In 1979, Mr. David Howard Westfall, a family member of a deceased rubber and rubberized product industry worker, filed an asbestos injury lawsuit in the United States District Court for the District of Rhode Island captioned *Westfall v. Whittaker*, C.A. No. 79-0269 (the "***Westfall* case**"), based upon his decedent's exposure to asbestos containing talc products.

80.     In the *Westfall case*, plaintiff indentified one of the Engelhard companies, Eastern Magnesia Talc Company, as a company that manufactured the talc his decedent was exposed to and which caused the mesothelioma injury underlying the case.

81.     BASF was represented and defended in the *Westfall* case by, among others, Cahill Gordon, its national counsel.

82.     The BASF Perpetrators were aware of the *Westfall* case and participated in and/or oversaw BASF's defense of the case along with Cahill Gordon.

83.     The BASF Perpetrators and the Lawyer Perpetrators were aware of, participated in and/or oversaw the investigation in the defense of the *Westfall* case on

behalf of BASF and in such capacity were aware of internal and external investigations, tests and assays relating to the Johnson Mine talc ore and Emtal talc products.

84.     In particular, Defendant Sloane was among the Cahill Gordon attorneys actively representing BASF in the *Westfall* case, and in such capacity was aware of the discovery and evidence relating to BASF that existed in that suit.

85.     In particular, Defendant Halket was among BASF's in-house attorneys actively involved and participating in the *Westfall* case defense, and in such capacity was aware of the discovery and evidence relating to BASF that existed in that suit.

86.     In response to document discovery requests served on BASF by the *Westfall* case's attorneys, documents that established the existence of asbestos fibers in Emtal talc, including test and assay results that were in BASF's possession, were produced in or about 1983 to Westfall's attorneys by BASF through its counsel, Cahill Gordon.

87.     In 1983, as part of the *Westfall* case discovery, Defendant Hemstock was deposed under oath over two days in his capacity as an employee of Engelhard. Appended as Exhibit 1 is a copy of his deposition transcripts produced to the plaintiff's counsel in the *Paduano* suit only after Mr. Swenson's deposition testimony therein revealed the existence of the spoliation and fraudulent concealment scheme that is the subject of this suit.  The exhibits identified in Defendant Hemstock's depositions were not produced by BASF in the *Paduano* suit discovery despite request. Accordingly, a full and complete copy of the entire Hemstock transcript including all exhibits cannot be appended.

88.     At the time of his deposition in the *Westfall* case, Defendant Hemstock was one of Engelhard's top scientists and held a management position with Engelhard.

89.     Defendant Sloane was present at and represented Defendant Hemstock and BASF at Hemstock's deposition in the *Westfall* case.

90.     Defendant Halket was also present at Dr. Hemstock's *Westfall* case deposition in his capacity as BASF in-house counsel.

91.     During his deposition in the *Westfall* case, Defendant Hemstock testified that the Emtal talc did in fact contain asbestos fibers.

92.     During his deposition in the *Westfall* case, Defendant Hemstock was questioned by Mr. Westfall's lawyer about assays and tests on Emtal talc that had been conducted at the Engelhard's laboratory in New Jersey.

93.     During his deposition in the *Westfall* case, Defendant Hemstock admitted that various tests performed throughout the 1970s and 1980s, both by BASF employees and by third parties, indicated the presence of asbestos fibers in Emtal talc that was tested or assayed.

94.     During his deposition in the *Westfall* case, Defendant Hemstock was shown and then questioned about various documents, including what were apparently test or assay results.  These documents were produced to Mr. Westfall's attorney by BASF, through its attorneys Cahill Gordon, during discovery in the *Westfall* case and were marked as exhibits during the course of Defendant Hemstock's deposition.

95.     During his deposition in the *Westfall* case, Defendant Hemstock was shown the results of various tests and assays which characterized the level of asbestos fibers in the Emtal talc as having "high levels of chrysotile."

96.     Defendants Sloane, other Cahill Gordon attorneys present at Hemstock's deposition, and Defendant Halket all heard Hemstock's testimony under oath and all were able to examine and review the exhibits that Defendant Hemstock was shown and testified to or about during Defendant Hemstock's deposition, if not beforehand as well.

97.     Defendants Sloane and the other Cahill Gordon attorneys present at Hemstock's deposition were aware of and appreciated the negative implications on BASF's asbestos injury claim liability and BASF's future asbestos risk management created by Hemstock's testimony and the test and assay results showing the presence of asbestos fiber in BASF products indentified during his deposition in the *Westfall* case.

98.     Defendant Halket and other BASF Perpetrators were aware of and appreciated the negative implications on BASF's asbestos injury claim liability and BASF's future asbestos risk management created by Hemstock's testimony and the test and assay results showing the presence of asbestos fiber in BASF products indentified during his deposition in the *Westfall* case.

99.      Following Defendant Hemstock's deposition, BASF and/or Cahill Gordon obtained a full and complete copy of Hemstock's deposition transcripts as well as a copy of the documents upon which he was examined that were identified in the transcript.

100.     On or about March 29, 1983, Defendant Sloane in the *Westfall* case took the deposition of a former Engelhard research and development employee, Peter Gale ("**Gale**").

101.     Gale, during his employment with Engelhard in the 1970's, had conducted analytical testing research on Emtal talc.  He also during that time visited and took samples of talc ore from the Johnson Mine.

102.     During his deposition, Gale testified in response to Sloane's questioning that he kept laboratory notebooks of his work and analysis which were considered confidential records of Engelhard and were stored in Engelhard's library.  In response to the *Paduano* suit's spoliation investigation discovery, BASF stated that it was not able to produce Gale's laboratory notebooks.

103.     After Gale was identified as a possible expert witness for the plaintiff in the *Westfall* case, BASF through Cahill Gordon objected to his serving as an expert for the *Westfall* plaintiff.  Gale acquiesced to BASF's demand that he not serve as an expert to the *Westfall* case's plaintiff based on the terms of his employment contract with Engelhard and BASF's objection to his voluntarily testifying.

104.     On or about April 7, 1983, a deposition under oath of another employee of Engelhard, Mr. Emil J. Triglia ("**Triglia**"), was taken in the *Westfall* case in Metuchen, New Jersey.  A copy of Mr. Triglia's deposition transcript as produced in the *Paduano* suit is appended as Exhibit 2.

105.    During his deposition in the *Westfall* case, Triglia testified that Emtal talc contained asbestos fibers.

106.    During his deposition in the *Westfall* case, Mr. Triglia was shown various documents relating to Emtal talc which were subsequently identified and marked as exhibits during the deposition.  In response to requests for copies of the marked exhibits in the *Paduano* suit's spoliation investigation discovery, BASF stated that it was not able to produce copies of the actual marked exhibits referred to in the deposition transcript. BASF offered instead an attempted partial reconstruction of the deposition exhibits in which it produced copies of some (but not all) of documents purportedly matching the description of the documents referenced during the deposition.

107.    According to the Triglia deposition transcript produced in the *Paduano* case, Defendant Halket and Cahill Gordon attorneys were identified as being present at the Triglia deposition.

108.    After Triglia's deposition was transcribed, the BASF Perpetrators and and/or the Lawyer Perpetrators obtained a full and complete copy of Triglia's deposition transcripts, as well as a copy of the documents that were identified during the depositions and about which he was questioned during the deposition.

109.    On or about or about May 6, 1983, Defendant Sloane wrote a letter to the court reporter who recorded and transcribed Triglia's deposition and requested that the transcript record be corrected to reflect that Defendant Halket and Defendant Cahill Gordon's attorneys were not present at the deposition as indicated because, according to Defendant Sloane in his letter, they were not invited to attend the deposition.  Defendant

Sloane's letter further transmitted to the court reporter for inclusion with the deposition transcripts *errata* sheets by Triglia purporting to correct his testimony or the transcript.

110.    Whether present at the disposition or not, Defendant Sloane did receive the transcript of the Triglia deposition and was aware of its contents as he reviewed it sufficiently to provide the court reporter with *errata* information.

111.    Copies of Triglia's deposition were circulated or mailed to BASF's in-house attorneys, including Defendant Halket, and to the Lawyer Perpetrators.

112.    The BASF Perpetrators and the Lawyer Perpetrators were aware and appreciated the negative implications on BASF's asbestos injury claim liability and BASF's future asbestos risk management of both Triglia's testimony and the test and assay results showing the presence of asbestos fiber in BASF products indentified during Triglia's deposition.

113.    At the time of the *Westfall* case, the BASF and Lawyer Perpetrators knew that BASF could and would in the future be sued by other asbestos injury claimants who were exposed to BASF's Emtal talc products.  The existence of such potential claims created a substantial national asbestos risk management and liability problem for BASF.

**D.    The *Westfall* Case's Settlement and Confidentiality Agreement and Origins of the BCAD Enterprise**

114.    BASF's management had knowledge of the *Westfall* case's discovery at or about the time it was occurring.  Also, at or about that time BASF's management was aware of the negative implications that its production of positive test/assay results and internal documents establishing Emtal talc products contained asbestos produced in the

*Westfall* case had upon not only the *Westfall* case, but upon BASF's asbestos claim liability and asbestos liability risk management in general.

115.    Sometime following the depositions of Defendant Hemstock and Mr. Triglia in 1983, the BASF Perpetrators and the Lawyer Perpetrators, including but not limited to Defendants Sloane, Halket and Hemstock, devised and agreed to a strategy, plan and scheme to control and even possibly eliminate BASF's (then Engelhard's) future asbestos injury claim liability and asbestos risk management exposure.  Under this plan and scheme: (a) the *Westfall* case would be resolved by a settlement that required a confidentially agreement which prevented the BASF discovery responses, deposition transcripts, and other evidence of asbestos fiber present in BASF talc products gathered in that case, from becoming disclosed or otherwise known and available to other asbestos claimants and their counsel; (b) steps would taken to gather-up and then limit access or conceal all evidence and documents in Engelhard's possession and control relating to Emtal talc ore and products, including the discovery in *Westfall* case; and, (c) all claimants and experts consulted from that time forward would be told by BASF and/or its attorneys that Emtal talc ore and products did not contain asbestos and/or that there was no evidence to the contrary and in support of these representations only samples, test results or documents consistent with this representation would be provided or referred to in connection with asbestos injury claims.

116.    On information and belief, the BASF Perpetrators and the Lawyer Perpetrators obtained BASF's (then Engelhard's) management's consent and authorization to implement and execute the strategy, plan and scheme.

117.    On information and belief, Defendant Sloane and other Cahill Gordon lawyers obtained Defendant Cahill Gordon's management's authorization or acquiesces in implementing and executing the BASF asbestos defense strategy, plan and scheme.

118.    To execute, manage and control the plan and scheme, which due to the nature of asbestos injury claims was foreseeably expected to continue on for decades, an association in fact arose in or about 1983 or 1984, the exact date being presently unknown to Plaintiffs, that was comprised of the BASF Perpetrators, the Lawyer Perpetrators, and other BASF and Cahill Gordon related personnel over time.  As mentioned, this association in fact is identified and referred to as the "BASF-Cahill Gordon Asbestos Defense Enterprise" or "BCAD Enterprise" for short.

119.    BASF, through Cahill Gordon, settled the *Westfall* case.

120.    The terms of the *Westfall* case settlement included a confidentiality agreement that bound the *Westfall* case's plaintiff and his attorneys to not discuss the case or share or otherwise disclose the discovery and evidence obtained in the matter.  Upon information and belief, the inculpatory evidence developed in the *Westfall* case was either destroyed or secreted away by the BASF Perpetrators after the case was settled.

121.    The *Westfall* case settlement and confidentiality agreement were parts of the BASF and Lawyer Perpetrators' plan, scheme and agreement to mislead, deceive and defraud asbestos injury claimants and their attorneys, and in some circumstances courts, regarding the merit of asbestos injury claims against BASF based upon Emtal talc products.

122.    The *Westfall* case settlement and obtaining the confidentiality agreement that bound its plaintiffs and counsel were overt acts in furtherance of the BASF and Lawyer Perpetrators' agreement and conspiracy to mislead, deceive and defraud asbestos injury claimants and their attorneys regarding the viability or the merit of asbestos injury claims against BASF based upon Emtal talc products and in furtherance of the agreement and conspiracy among the BASF and Lawyer Perpetrators to commit a pattern of unlawful predicate activities, as defined and proscribed in N.J.S.A. § 2C:41-1 *et seq*.,  in order to conduct and effectuate BASF's asbestos injury claim defense and operate and manage the BCAD Enterprise.

**E.    The Gathering and Spoliation of Inculpatory Evidence after the Settlement of the *Westfall* Case.**

123.    After the *Westfall* case was settled, a memorandum dated March 7, 1984, signed by Defendant Hemstock entitled "DOCUMENT RETRIEVAL – DISCONTINUED OPERATIONS" ("**Document Retrieval Memorandum**") was sent to employees of Engelhard.  A copy of the Document Retrieval Memorandum is appended as Exhibit 3 and incorporated herein by reference.

124.    The Document Retrieval Memorandum directed all Engelhard minerals division employees to search for, retrieve, and gather all "all notebooks, duplicate copies of notebooks, technical service requests and responses, memoranda and reports" relating to operations of Engelhard Minerals Ltd. and Emtal, among other BASF predecessor companies.

125.    BASF's employees were directed by the Document Retrieval Memorandum and the BASF Perpetrators to place the documents they gathered in

response to the memorandum in file boxes for discard, and to make the boxes available for pick-up on March 16, 1984.

126.    All documentary evidence relating to Engelhard's asbestos-containing talc, was thereafter gathered up, collected by the BASF Perpetrators or their agents, and subsequently was either destroyed or secreted away by the BASF Perpetrators, all with the knowledge, approval and agreement of the Lawyer Perpetrators.

127.    The evidence gathered as a result of the Document Retrieval Memorandum is believed to include, among other things, Emtal talc sales and inventory records, laboratory notebooks, which would include data and test or assay results on Emtal talc products and talc ore from the Johnson Mine, and test and assay result documents on tests or assays performed by third parties, such as Royal Globe Insurance, Johns Manville and Georgia Institute of Technology ("Georgia Tech").

128.    The collection of documents and other evidence relating to asbestos in Engelhard's talc ore and talc products took place at a time and under circumstances that both the BASF Perpetrators and the Lawyer Perpetrators knew or foresaw that BASF would be the subject of asbestos injury claims in the future in which it would be contended that its talc ore, Emtal talc and products contained asbestos fibers.  Because of this knowledge, BASF had a duty, of which duty the BASF and Lawyer Perpetrators were well aware, to preserve evidence and documents relevant to such asbestos claims that were in BASF's possession or control.  The Lawyer Perpetrators as BASF's national counsel in asbestos matters had a duty to advise and assist BASF in fulfilling that duty.

129.     BASF, the BASF Perpetrators and the Lawyer Perpetrators breached their respective duties regarding the preservation of evidence and documents by not preserving and/or by otherwise spoliating same.

130.     Despite being asked in the *Paduano* suit for an inventory of the documents collected pursuant to the Document Retrieval Memorandum and for a clear, unequivocal statement as to the fate and, if applicable, current location of the Engelhard talc and asbestos documents, BASF has to date neither provided an inventory nor stated the fate or current whereabouts of all of the documents collected in 1984.

131.     The collection and destruction or secreting away of Engelhard's documents in 1984 were parts of the BASF and Lawyer Perpetrators' plan, scheme and agreement to mislead, deceive and defraud asbestos claimants and their attorneys regarding the viability or merit of asbestos injury claims against BASF based upon Emtal talc products.

132.     The collection and destruction or secreting away of Engelhard's documents in 1984 were overt acts in furtherance of the BASF and Lawyer Perpetrators' agreement and conspiracy to mislead, deceive and defraud asbestos claimants and asbestos claimant attorneys regarding the viability or merit of asbestos injury claims against BASF based upon Emtal talc products and in furtherance of the agreement and conspiracy among the BASF and Lawyer Perpetrators to commit a pattern of unlawful activities as defined and proscribed in N.J.S.A. § 2C:41-1 *et seq*. in order to conduct and effectuate BASF's asbestos defense.

**F.     BCAD Enterprise's Twenty-Five Years Long Pattern and Practice of Misleading and Deceiving Asbestos Injury Claimants, Asbestos Claimants' Counsel and Asbestos Courts**

133.     After the collection and subsequent destruction or secreting away of BASF's asbestos documents and other evidence was completed in or about March 1984, the BASF and Lawyer Perpetrators began executing the second element of their plan and scheme to end and ward off asbestos injury claims and lawsuits against BASF,  namely: whenever an asbestos injury claim or lawsuit was filed or came to BASF's attention, the asbestos injury claimant, their lawyer(s) and, when and where applicable, the court  in which such claim was pending, were systematically and uniformly told (often in identical language) that Emtal talc ore and products did not contain asbestos and/or there was not any evidence that it did.  (This plan and scheme and its material misrepresentations and omissions and evidence spoliation is referred to as the **"Fraudulent Asbestos Defense Scheme**.")  As a result of the execution of the Fraudulent Asbestos Defense Scheme, Defendants were able to obtain either the dismissal or termination of claims voluntarily or, if required, involuntarily by order or judgment, or, when circumstances warranted, pay a small token settlement amount in exchange for a full release of claims or equivalent agreement.

134.     To facilitate and enable the Fraudulent Asbestos Defense Scheme to successfully work over the many years it would necessarily continue, due to the widespread use of the Emtal talc products in the United States and the nature of asbestos disease injuries, including its long latency period, the BASF and Lawyer Perpetrators formed and utilized the BCAD Enterprise, an association in fact, which they managed and controlled to conduct BASF's asbestos defense, including among other things the

retaining, indoctrination, instruction and direction of local defense law firms involved or assisting in implementing BASF's asbestos defense.

135.   The BCAD Enterprise existed from 1983 or 1984, the exact date being presently unknown to Plaintiffs, to at least, 2009.

136.   The BCAD Enterprise was organized to conduct and execute the Fraudulent Asbestos Defense Scheme.

137.   The BASF and Lawyer Perpetrators, as well as others associated with the BCAD Enterprise, had specialized roles and functions in conducing and managing the operation of BCAD Enterprise and in executing the Fraudulent Asbestos Defense Scheme.

138.   Defendant BASF's and other the BASF Perpetrators' particular roles, functions and activities in the BCAD Enterprise included:

a.   Managing and handling asbestos injury claims against BASF in general, including performing the tasks, functions and duties as required or needed in overseeing the administration of the claims or lawsuits;

b.   Making insurance coverage claims;

c.   Retaining and compensating counsel;

d.   Answering discovery or other information requests and supplying BASF personnel for discovery as required;

e.   Funding the BCAD Enterprise's asbestos defense and claim resolution activities, including compensating national and local counsel;

f.   Collecting and spoliating evidence that its talc and other products contained asbestos, as described above;

g.   Suborning or otherwise procuring false unsworn and sworn representations from its employees, officers consultants and experts as needed, including obtaining or  assisting in obtaining incorrect, misleading or false affidavits and discovery response verifications by BASF employees, BASF officers, and/or BASF consultants and experts;

h.   Authorizing, permitting, and aiding and abetting the Lawyer Perpetrators and other asbestos defense lawyers representing  BASF in asbestos defense matters to make false, misleading and incorrect representations and/or material omissions to asbestos claimants, asbestos claimants' counsel, presiding asbestos courts and other tribunals; and

i.   Concealing and covering-up the fraudulent, tortious and/or illegal aspects of the BCAD Enterprises' conduct and operations.

139.    The Lawyer Perpetrators' particular roles, functions and activities included:

a.   Representing BASF and its predecessors in asbestos claims directly or indirectly through local counsel as necessary;

52

b.   Collecting and spoliating and/or directing the collection and spoliation of evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos, as described above;

c.   Addressing or responding to asbestos insurance matters as required or requested as national counsel;

d.   Retaining, instructing, guiding and managing local defense counsel handling asbestos injury claims lawsuits against BASF;

e.   Preparing template and stock pleading, discovery and motions documents for use by local counsel in asbestos injury claim lawsuits that contained information Cahill Gordon knew to be false or misleading regarding the presence of asbestos fiber in BASF's talc ore, Emtal talc and Emtal products and/or the existence of evidence tending to prove the existence of asbestos fiber BASF's talc ore, Emtal talc and Emtal products;

f.   Falsely and incorrectly stating and representing to asbestos claimants, asbestos claimants' counsel and presiding asbestos courts and other tribunals in correspondence, responses to discovery and/or pleadings or motion papers that BASF's talc ore, Emtal talc and Emtal products did not contain asbestos and/or that there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos;

g.   Instructing and directing BASF's local asbestos counsel to knowingly or unknowing falsely state and represent to asbestos claimants, asbestos claimants'

counsel and presiding asbestos courts and other tribunals, that BASF's talc ore, Emtal talc and Emtal products did not contain asbestos and/or that there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos;

h.   Suborning or otherwise procuring and submitting false unsworn and sworn representations, including false affidavits, false and incorrect expert reports, and discovery verifications of false and incorrect information by BASF employees, BASF officers or BASF consultants and experts;

i.   Threatening asbestos injury claimants and/or their counsel with the possibility of sanctions or penalties if asbestos claims or suits were not discontinued by questioning counsels' good faith basis to continue the claims in the face of the BASF Perpetrators' and/or the Lawyer Perpetrators' false representations that BASF's talc ore, Emtal talc and Emtal products did not contain asbestos and/or that there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos;

j.   Filing or directing local counsel to file motions or other court documents that they knew, or should have known, falsely and incorrectly stated that BASF's talc ore, Emtal talc and Emtal products did not contain asbestos and/or that there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos as a basis for judicial action in BASF's favor;

k.   Drafting and obtaining agreements to and execution of the *Westfall* case confidentiality agreement;

l.   Drafting and obtaining agreement to and execution of stipulations or agreements of dismissal, releases and other claim resolution documents from asbestos injury claimants based upon false and incorrect representations that BASF's talc ore, Emtal talc and Emtal products did not contain asbestos and/or that there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos;

m.  Concealing and covering-up BASF's spoliation of evidence; and,

n.  Concealing and covering-up the fraudulent, tortious and/or illegal aspects of the BCAD Enterprise's conduct and operations.

**G.    Representative Misrepresentations and Material Omissions in Furtherance of the Fraudulent Asbestos Defense Scheme**

140.    After the *Westfall* case was settled and BASF's asbestos documents were collected and either destroyed or secreted away, whenever an asbestos claim was made against BASF between 1984 and 2009, the Lawyer Perpetrators would systematically and uniformly communicate with the claimant's counsel either directly through Cahill Gordon personnel or indirectly through BASF's local counsel and state or otherwise represent that: (a) BASF's talc ore, Emtal talc and Emtal products did not contain any asbestos and/or there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos; and, (b) there was in fact no good faith basis to allege or claim that BASF's talc ore, Emtal talc and Emtal products contained asbestos and thereby injured the claimant.

141.    To purportedly support and corroborate these false and misleading representations, the Lawyer Perpetrators, with BASF's knowledge, authorization and/or

assistance, would routinely supply, or would direct BASF's local counsel to supply, asbestos injury claimants' counsel handling cases against BASF with one or more documents which the Defendants knew were false and misleading when considered without the contrary evidence in Defendants' possession or which they had destroyed or otherwise spoliated:

a.   The May 8, 1989 affidavit by Mr. William H. Ashton ("**Ashton Affidavit**").  In this affidavit Mr. Ashton, a purported expert on asbestos in talc, avers that Emtal talc did not contain asbestos fibers based upon data and information he reviewed that was supplied by Cahill Gordon and/or BASF.  While Mr. Ashton cites to a few studies supporting his claimed conclusion, the data and studies he reviewed notably did not include any of the studies with positive asbestos findings that Defendant Hemstock and Mr. Triglia testified about during their 1983 *Westfall* case depositions even though his affidavit cites to, and included as an exhibit, excerpts of deposition testimony of another witness taken in that case which purportedly demonstrated that the talc ore and products did not contain asbestos. A copy of the Ashton Affidavit is appended as Exhibit 4 and incorporated herein by reference;

b.   A report purportedly prepared by Dr. F. D. Pooley ("**Pooley Report**"). Dr. Pooley, based on a purported analysis of two Johnson Mine talc samples that were allegedly collected in 1961, finds and concludes that the two Johnson Mine talc samples made available to him did not contain any fibrous mineral particles.  A copy of the Pooley Report is appended as Exhibit 5 and incorporated herein by reference;

c.   One or more affidavits by Mr. Charles D. Carter, a BASF employee who self-identifies himself in his affidavits as "Director of Joint Ventures and Resources of Engelhard Corporation" ("**Carter Affidavits**").  Similar in content, the Carter Affidavits over the years averred some or all of the following alleged facts: (i) that the Johnson Mine was acquired by Eastern Magnesia Talc Company in 1967; (ii) that Johnson Mine was closed in 1983 for economic reasons; (iii) that the Johnson Mine following its closure and non-use became filled with water making it impossible to obtain any samples of talc from the mine; (iv) that Engelhard did not possess any samples of the Johnson Mine talc; and (v) that "Engelhard does not currently possess any testing data other than the data provided…by way of the Ashton Affidavit and the report of Dr. Pooley."  Exemplifying these Carter Affidavits are Mr. Carter's September 20, 1988 Affidavit (appended as Exhibit 6), his June 19, 1989 Affidavit (appended as Exhibit 7) and his August 18, 1989 Affidavit (appended as Exhibit 8), all of which are incorporated herein by reference;

d.   Interrogatory answers verified by Mr. Carter or other BASF employees, including on occasion members of BASF's in-house counsel, in which BASF, under oath, represented Emtal talc did not contain any asbestos and/or provided selected references to tests or studies indicating Johnson Mine talc did not contain asbestos, such as the Pooley Report or other studies referenced in the Ashton Affidavit, but omits to mention or reference: (1) any of the studies which had positive findings for asbestos that were in BASF's possession or knowledge at the time the *Westfall* case discovery was conducted; or, (2) any of Defendant Hemstock's and Mr. Triglia's *Westfall* case deposition testimony stating that the asbestos was found in tests and

assays of Emtal talc.  Exemplifying these interrogatory responses are BASF's 2002

Reponses to Plaintiff's First Standard Set of Liability Interrogatories in *Chernick v.*

*ABB*  (appended as Exhibit 10), all of which are incorporated herein by reference.

Additional illustrative interrogatory responses are also referred to in the paragraphs

below.

142.    While the full and entire extent and scope of Defendants' pattern and

practice of conduct and material omissions is not known to Plaintiffs due to the

clandestine nature of their wrongful actions, conduct and concealments, along with

BASF's refusal to provide complete details regarding same in the *Paduano* suit, the

existence, continuity, breadth and longstanding nature of Defendants' pattern and practice

of fraudulent and unlawful activity are indicated, illustrated and exemplified by the

incidents and events set forth in the following paragraphs.

> **a.    The 1988 and 1989 Misrepresentations and Material Omissions to
> Counsel for Tireworker Asbestos Injury Litigation Claimants
> Suing BASF in the United States Eastern District of Pennsylvania
> and Southeastern Pennsylvania State Courts.**

143.    On or about May 17, 1989, Cahill Gordon attorney, Defendant Dembrow,

sent via Federal Express a letter to a Philadelphia, Pennsylvania lawyer who was

representing at the time twenty-eight (28) tireworker plaintiffs in pending Pennsylvania

Federal and State Court asbestos injury lawsuits that had named Engelhard and Eastern

Magnesia as defendants in the suits. (These twenty-eight Pennsylvania tireworker

asbestos claimants are hereinafter referred as the "**Pennsylvania Tireworker**

**Claimants**.")  A true and correct copy of this letter uncovered during the *Paduano* suit's

spoliation discovery is appended as Exhibit 11 and incorporated herein by reference.  In

this letter, Cahill Gordon states that during an August 1988 face to face meeting at the Montgomery County, Pennsylvania Courthouse, between the Pennsylvania Tireworker Claimants' lawyer, Cahill Gordon attorneys, Messrs. Craig Newman and Eric S. Sarner ("**Sarner**"), and BASF's local counsel, BASF's attorneys then and there affirmatively represented to the Pennsylvania Tireworker Claimants' counsel that "the talc manufactured by Emtal [sic] did not contain any asbestos."  The copy of the letter, also establishes that blind copies of it were sent to, among others, Cahill Gordon attorneys, Defendant Sloane and Mr. Sarner.  Mr. Sarner's office at the time was located in Cahill Gordon's Washington, D.C. offices.

144.    According to Cahill Gordon's May 17, 1989 letter (Exhibit 11), between August 1988 and May 17, 1989, a number of in person meetings, telephone calls and letters by and between BASF's local counsel and the Pennsylvania Tireworker Claimants' counsel occurred during which BASF and its attorneys requested that the Pennsylvania Tireworker Claimants' asbestos injury claims be voluntarily ended against BASF.  During these communications BASF's counsel reiterated and repeated the misrepresentations and omissions of material fact regarding absence of any asbestos in Emtal talc and the non existence of any contrary evidence as scripted by the Lawyer Perpetrators.  One letter, according to the May 17, 1989 letter, tendered to the Pennsylvania Tireworker Claimants' lawyer a copy of the Carter Affidavits concerning the location of the Johnson Mine and its alleged closure for "economic reasons."

145.    The purpose and intent of Cahill Gordon's May 17, 1989 letter (Exhibit 11), was to further Cahill Gordon's efforts to convince the Pennsylvania Tireworker Claimants' lawyer to voluntarily dismiss BASF.  In furtherance of this goal, Cahill

59

Gordon's May 17, 1989 letter continued the misrepresentations and misleading omissions of material facts by offering the newly coined Ashton Affidavit.  In previewing the contents of the Ashton Affidavit for claimants' counsel, the Cahill Gordon May 17, 1989 letter twice called out the claimed fact that various assays and tests on Johnson Mine talc referred to in the Ashton Affidavit established that no asbestos was present.

146.    On June 21, 1989, Defendant Dembrow sent via Federal Express yet another letter and enclosures to the Pennsylvania Tireworker Claimants' lawyer with blind copies sent to, *inter alia*, Defendant Sloane and Mr. Sarner.  In this letter, Cahill Gordon provided the Pennsylvania Tireworker Claimants' counsel with a copy of Dr. Pooley's purported exculpatory analysis of Johnson Mine talc along with another Carter Affidavit, this one dated June 19, 1989 (*See* Exhibit 7).  In this June 19, 1989 affidavit, Mr. Carter avers that the closed Johnson Mine was now filled with water so no samples could be obtained and, additionally, that Engelhard did not currently possess any samples of the talc produced by the Johnson Mine.    A copy of the June 21, 1989 letter is appended as Exhibit 12 and is incorporated herein by reference.

147.    Subsequently, on or about, July 19, 1989, the Pennsylvania Tireworker Claimants' lawyer sent a letter to Sarner at Cahill Gordon's Washington D.C office, with a copy to Defendant Dembrow at Cahill Gordon's New York office, both of which were sent by U.S. Mail.  Claimants' counsel in this letter questioned BASF's representations to him that Emtal talc did not contain any asbestos, based upon references to the Johnson Mine appearing in a report issued by the Mine Health and Safety Administration ("MHSA") that his law firm had obtained through a Freedom of Information Act request. The MHSA report referred to in the letter indicated that samples of Johnson Mine's talc

60

that MHSA had obtained and analyzed contained fibrous mineral contaminants.  The Pennsylvania Tireworker Claimants' lawyer's letter additionally informed Cahill Gordon that:

> [W]e had obtained definitive product identification evidence of the presence of [Engelhard/Eastern Magnesia's] talc at Firestone in Pottstown, PA, and [would] name [Engelhard/Eastern Magnesia] in all future Firestone cases. If, of course, we ultimately decide to let your client out of the B.F. Goodrich litigation, we will also dismiss them from the Firestone cases.

A copy of this letter is appended as Exhibit 13 and is incorporated herein by reference.

148.    On or about July 28, 1989, Cahill Gordon attorney Sarner telefaxed a letter on behalf of BASF replying to the Pennsylvania Tireworker Claimants' lawyer's July 17, 1989 letter.  Cahill Gordon's letter purportedly explained how and why the MHSA report was flawed, incorrect, and contrary to the evidence Cahill Gordon had previously provided the Claimants' lawyer by means of the Ashton Affidavit and Pooley Report. Cahill Gordon, in the July 28, 1989 letter, once again falsely represented to Claimants' counsel that BASF's talc did not contain asbestos, stating: "Thus no EmTal [sic] talc was found to contain asbestos fibers," and "[w]e again urge that on the basis of all of the affidavits supplied to you there is no good faith basis for keeping Engelhard and EmTal [sic] in these cases." Appended as Exhibit 14 is a copy of Cahill Gordon's July 28, 1989 letter, which is incorporated herein by reference.

149.    On or about August 21, 1989, Cahill Gordon's Sarner sent another letter via Federal Express to the Pennsylvania Tireworker Claimants' lawyer's Philadelphia office.  In this letter, Cahill Gordon submitted, in lieu of answering interrogatories, the

original of another Carter Affidavit, which was dated August 18, 1989. A copy of Cahill Gordon's letter is appended as Exhibit 15 and incorporated herein by reference. (The referenced Carter affidavit is appended as Exhibit 8 and incorporated herein by reference.) In the referenced Carter Affidavit, Mr. Carter under oath states: "In addition, Engelhard does not currently possess any testing data other than the data provided to you by way of the Ashton Affidavit and the report of Dr. Pooley." The letter also establishes that copies of it were sent to, *inter alia*, Defendants Sloane and Dembrow at their New York offices.

150. At no time during or in any of Cahill Gordon's communications or correspondence to the Pennsylvania Tireworker Claimants' counsel, including the affidavits or reports Cahill Gordon provided to him in support of the representation that BASF's talc did not contain asbestos, was there ever any mention or reference by the Lawyer Perpetrators, BASF's local defense counsel, or the BASF Perpetrators to the fact that contrary and inculpatory evidence developed in the *Westfall* case's discovery existed. Neither was there any mention or reference whatsoever to BASF's gathering and spoliation of all contrary and inculpatory evidence in 1984. These material omissions occurred and were committed despite the fact the Lawyer Perpetrators were aware of these facts and knew and appreciated the relevance of such material information to asbestos injury claimants.

151. Following the exchange of correspondence and documents described above, and in obvious and reasonable reliance on the communications, correspondence, corroborating affidavits and corroborating reports set forth above, some time in or about September of 1989, the Pennsylvania Tireworker Claimants voluntarily discontinued or

dismissed their asbestos injury claims as to the Engelhard Defendants, to their detriment and loss.

152.    As soon as the Pennsylvania Tireworker Claimants' lawyer agreed to have his clients voluntarily dismiss their State and Federal lawsuits against Engelhard, the Lawyer Perpetrators began executing a campaign to extend and parlay this successful execution of the Fraudulent Asbestos Defense Scheme to other asbestos injury litigations around the country.  Starting in late August 1989, even before the dismissals and discontinuances of the Pennsylvania Tireworker Claimants' cases were filed in the presiding courts, Cahill Gordon put in motion what would become, over the years, a systematic pattern and practice to obtain voluntary dismissals or cheap token settlements by, either directly through its own lawyers or indirectly through local BASF defense counsel, writing other asbestos injury claimant lawyers around the country and: (a) providing the asbestos claimants' counsel with copies of the false and misleading Ashton Affidavit, Pooley report and Carter Affidavits; (b) informing the targeted asbestos injury claimant lawyer that the Pennsylvania Tireworker Claimants' counsel (and later other asbestos claimant lawyers as well) had voluntarily dismissed the Engelhard Defendants based upon Engelhard's representations and purported corroborating expert reports stating that there was not any asbestos in Emtal talc (*i.e.*- Ashton Affidavit; and Pooley Report); and (c) requesting that the asbestos injury claimants' counsel likewise voluntarily dismiss their asbestos suits against BASF in order to avoid putting BASF through unnecessary litigation expenses without a good faith basis to sue, thereby intimating that the asbestos injury claimants and their counsel might risk of being assessed sanctions for pursuing a claim not brought in good faith.  Exemplifying Cahill

Gordon's efforts in this vein are two similar October 2, 1989 letters sent by different BASF local counsel; one mailed to a Cleveland, Ohio tireworker asbestos claimants' lawyer (appended as Exhibit 16) and another mailed to a Kansas City, Missouri tireworker claimants' lawyer (appended as Exhibit 17). Exhibits 16 and 17 are incorporated herein by reference.

> **b.   November 19, 1990 Misrepresentations in BASF's Answers to Plaintiffs' Standard Interrogatory Answers in *In Re: All "Asbestos" Cases Presently Pending Before and All Future Cases Assigned to the Honorable James E. Mies, Circuit Court Judge*, (Circuit Court, Wayne County, Michigan).**

153.    BASF's predecessor was a defendant in a number of asbestos injury suits filed and pending in the Wayne County, Michigan, Circuit Court in the late 1980s and/or early 1990s.  In response to standard interrogatories directed to BASF by the asbestos claimants in the Wayne County State Court actions ("**Wayne County Interrogatories**"), which sought disclosure of information about Engelhard's talc products, verified answers on behalf of BASF's predecessor Pita Realty Limited (identified in the Answers to Interrogatories as being successor to Eastern Magnesia) were served on the asbestos claimants' counsel by means of U.S. Mail on or about November 19, 1990.  A copy of the Answers to the Wayne County Interrogatories is appended as Exhibit 18 and incorporated herein by reference.

154.    Cahill Gordon lawyers, including Sarner and Defendant Sloane, whose names appear on the Answers to the Wayne County Interrogatories as co-counsel to Pita Reality Limited, prepared and/or reviewed the interrogatory answers for signing and/or verification by BASF.  The Answers were verified under oath on behalf of BASF by Mr. Carter.

155.    In BASF's "Preliminary Statement" in its Answers to the Wayne County Interrogatories, BASF, through Cahill Gordon and BASF's local counsel, stated in pertinent part:

> … Pita, formerly known as Eastern Magnesia Talc Company, was engaged in the mining and milling of talc from a single mine located in Johnson, Vermont from 1967 to 1983. Pita previously has provided to plaintiffs' counsel an affidavit and supporting materials demonstrating that the talc from this mine did not contain asbestos….
>
> ***
>
> Pita hereby incorporates by reference this preliminary statement into the response to each interrogatory.

156.    In response to Interrogatory No. 34 of the Wayne County Interrogatories, which inquired into whether any person ever served as a consultant to BASF's Engelhard companies in any manner regarding the potential medical, toxicologic, or industrial hygiene aspects of asbestos or any asbestos-containing product, BASF responded:

> Not Applicable. In addition, Defendant has previously supplied documents to plaintiffs' counsel that indicate that its talc products did not contain asbestos, including an affidavit prepared by William Ashton. These documents are in the possession of plaintiffs' counsel.

157.    In response to Interrogatory No. 108 of the Wayne County Interrogatories, which inquired into whether BASF's Engelhard companies pursuant to its record destruction or retention policy, or otherwise, destroyed any documents, records or writings pertaining to health hazards of asbestos, Cahill Gordon's answer on behalf of BASF responded: "Pita does not believe that it destroyed such records."

158.    At no time in any of BASF answers to the Wayne County Interrogatories that Cahill Gordon prepared and/or reviewed for signing and verification by BASF, were the Wayne County asbestos claimants or their counsel ever fairly (or otherwise) informed by the Lawyer Perpetrators, or the BASF Perpetrators, that inculpatory facts and evidence existed which contradicted that which had been represented in the verified interrogatory answers or in the Ashton Affidavit that was referred to in the interrogatory answers, such as that which had been developed and obtained by the plaintiff in the *Westfall* case prior to Defendants implementing their Fraudulent Asbestos Defense Scheme.  There was no mention or reference in the Answers to the Wayne County Interrogatories to the BASF Perpetrators' gathering and spoliation of all contrary and inculpatory asbestos claim evidence in 1984.  These material omissions occurred and were committed despite the fact the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, despite the fact they knew and appreciated the relevance of the subject information to asbestos injury claimants, and despite the fact they were under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation.

159.    Cahill Gordon and BASF's fraudulent and deceitful efforts aimed at Michigan asbestos injury claimants were successful.  According to an April 23, 1992 Cahill Gordon letter addressed to other asbestos injury claimants' counsel in Ohio, the Michigan State Court Tireworkers' asbestos injury cases against BASF's predecessors were voluntarily dismissed after "the plaintiffs' counsel had been … provided with the Ashton materials…." See Cahill Gordon letter of April 23, 1992, appended as Exhibit 19 and discussion of this letter *infra*. A copy of specific Michigan dismissal orders were not produced in the *Paduano* suit materials.

    **c.**    **November 1990 and October 1991 Misrepresentations in the Answers to Plaintiffs' Master Interrogatories in *In Re: Northern Ohio Tireworker Asbestos Litigation* (C.P. Summit Cty., Ohio).**

160.    In or about the late 1980s and/or early 1990's, BASF's predecessors, Engelhard Corporation, Eastern Magnesia and Pita Realty Limited, were parties to a number of tireworker asbestos injury suits that were filed and pending in the Court of Common Pleas for Summit County, Ohio, and assigned to Judge William H. Victor.  In connection with these Northern Ohio Tireworker cases, BASF's predecessor responded under oath to Plaintiffs' Questionnaire and First Request for Production of Documents ("**Tireworkers' Questionnaire**") and Plaintiffs' Master Discovery Requests ("**Summit County Master Interrogatories**").

161.    The Tireworkers' Questionnaire sought disclosure of information from BASF's predecessors about Engelhard's talc products used at a number of rubber product manufacturing companies.  On or about November 21, 1990, BASF's counsel served verified responses to this discovery upon Plaintiffs' counsel by regular U.S. Mail.  A copy of BASF's verified Tireworkers' Questionnaire answers is appended as Exhibit 20 and incorporated herein by reference.

162.    BASF's answers to the Tireworkers' Questionnaire identify Cahill Gordon lawyers Defendant Sloane, Mr. Sarner and Michael D. Sullivan, Esq. as being "of counsel" to BASF's predecessors in the Summit County, Ohio, cases.

163.    Cahill Gordon, as national asbestos counsel to BASF, prepared and/or reviewed BASF's predecessors' answers to the Tireworkers' Questionnaire for signing and/or verification by BASF's predecessors.

164.    The answers to the Tireworkers' Questionnaire were verified by Mr. Carter on behalf of BASF on November 15, 1990.  The answers state that Mr. Carter "participated in the gathering of the records for this litigation, which have been turned over to counsel."  *See* Exhibit 20, Interrogatory No. 20(b).

165.    BASF's predecessors' Preliminary Statement to the Tireworkers' Questionnaire reads in pertinent part:

> …For purposes of simplifying the responses to this Questionnaire, the name Pita when used herein shall refer collectively to Pita, EmTal [Eastern Magnesia], and, Engelhard.
>
> ….Pita, formerly known as Eastern Magnesia Talc Company, was engaged in the mining and milling of talc from a single mine located in Johnson, Vermont from 1967 to 1983. Pita previously has provided to plaintiffs' counsel an affidavit and supporting materials demonstrating that the talc from this mine did not contain asbestos….
>
> ***
>
> Pita hereby incorporates by reference this preliminary statement into the response to each question.

166.    In its answer to Question No. 2 of the Tireworkers' Questionnaire, which generally sought information about whether BASF's predecessors had been involved in the mining, milling, manufacture, processing, sale, supplying or distribution of talc, soapstone, or asbestos-containing products at any time, BASF predecessors stated under oath:

> With respect to talc only, yes. Pita did not mine, mill, manufacture, process, market, distribute, or sell asbestos or asbestos-containing products.  Pita was engaged in the mining and milling of talc from a single mine located in Johnson, Vermont from 1967 to 1983.  Pita previously has provided to plaintiffs' counsel an affidavit and supporting materials demonstrating that the talc from this mine did not contain asbestos.

167.    In its answer to Question No. 2(e) of the Tireworkers' Questionnaire,

which specifically asked whether BASF's predecessors' products contained crocidolite,

amosite, tremolite or chrysotile asbestos, or any combination of them, and to specify the

qualitative percentage of the particular form of asbestos fiber to the whole amount of

asbestos in the product, BASF's predecessors stated under oath:

> (e).   No. Plaintiffs' counsel has previously been provided with evidence,
> including an affidavit, which proves that Emtal talc did not contain asbestos.

168.    In answer to Question No. 4 of the Tireworkers' Questionnaire, which

specifically asked how BASF's predecessors' talc, soapstone, or asbestos-containing

products were packaged and shipped, BASF predecessors stated under oath:

> Pita did not mine, mill, manufacture, process, market, distribute, or sell
> asbestos or asbestos-containing products….

169.    At no time in any of BASF's answers to the Tireworkers' Questionnaire

which Cahill Gordon prepared and/or reviewed for signing and verification by BASF,

were the Northern Ohio Tireworker claimants or their counsel ever fairly (or otherwise)

informed by the Lawyer Perpetrators, or by the BASF Perpetrators, that inculpatory facts

and evidence existed that contradicted what was represented on behalf of BASF's

predecessors in the answers to the Tireworkers' Questionnaire or in the affidavit referred

to in the Tireworkers' Questionnaire, such as that which was developed and obtained by

the plaintiff in the *Westfall* case.  There was no mention or reference in the Tireworkers'

Questionnaire answers to the BASF Perpetrators' gathering and spoliation of all contrary

and inculpatory asbestos claim evidence in 1984.  These material omissions occurred and were committed despite the fact the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, knew and appreciated the relevance of the subject information to asbestos claimants, and were under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation.

170.    The Summit County Master Interrogatories sought disclosure of information from BASF's predecessors about Engelhard's talc products.  In or about October 1991, verified answers to the Summit County Master Interrogatories on behalf of BASF's predecessors were served on the Northern Ohio Tireworker claimants' counsel.  A copy of BASF's answers to the Summit County Master Interrogatories is appended as Exhibit 21 and incorporated herein by reference.  The date alleged is based upon the date of the document's verification by Mr. Carter.

171.    Lawyers at Cahill Gordon, as counsel to BASF's predecessors at the time, prepared and/or reviewed the answers to the Summit County Master Interrogatories for signing and/or verification by BASF.  The answers were verified for BASF under oath by BASF's Mr. Carter based upon, according to his verification, information gathered by others.

172.    BASF's predecessors' "Preliminary Statement" to its answers to the Summit County Master Interrogatories reads in pertinent part:

> …Pita, formerly known as Eastern Magnesia Talc Company, was engaged in the mining and milling of talc from a single mine located in Johnson, Vermont from 1967 to 1983. Pita previously has provided to plaintiffs' counsel an affidavit and supporting materials demonstrating that the talc from this mine did not contain asbestos….

*** 

Pita hereby incorporates by reference this preliminary statement into the response to each interrogatory.

173.    In answer to Interrogatory No. 30 of the Summit County Master Interrogatories, which asked about testing, studies or surveys on BASF's products, BASF's predecessors' response lists a number of studies purporting to corroborate BASF's general denial that its talc products contained any asbestos.  However, not one of the contrary and inculpatory studies on Engelhard's talc or any of the contrary and inculpatory statements about the existence of asbestos in Engelhard's talc that were made or discussed during the Hemstock and Triglia *Westfall* case depositions were listed or otherwise disclosed to the Northern Ohio Tireworker claimants' counsel.  There was not any qualification or disclosure in the answers to the Summit County Master Interrogatories that informed the Northern Ohio Tireworker claimants' counsel of the fact that the BASF Perpetrators had collected all documents relating to Emtal talc in 1984 following the settlement of the *Westfall* case.  There was not any disclosure on what was the fate or whereabouts of the talc documents and evidence the BASF Perpetrators had collected in 1984 following the *Westfall* case settlement.  These material omissions occurred and were committed despite the fact the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, knew and appreciated the relevance of the subject information to asbestos claimants, and were under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation.

174.    In response to Interrogatory No. 66 of the Summit County Master Interrogatories, which inquired into whether BASF was contending the Northern Ohio

Tireworker claimants' injuries were not causally related to asbestos exposure, Cahill

Gordon's prepared responses on behalf of BASF stated:

> Pita does not currently make any contentions on the subject, but asserts
> that if plaintiffs have injuries related to asbestos exposure, Pita cannot be
> liable therefore since its talc did not contain asbestos.

Here, once again, not one of the contrary and inculpatory studies or statements made or

discussed during Hemstock's and Triglia's *Westfall* case depositions was disclosed to the

Northern Ohio Tireworker claimants' counsel.   There were not any disclosures about

BASF's collection of all documents relating to Emtal talc in 1984 following the *Westfall*

case settlement, or the existence or fate of the documents and evidence.

175.    The misrepresentations and material omissions embodied in the Answers

to the Summit County Master Interrogatories were repeated and renewed years later on or

about August 31, 1994, when Cahill Gordon lawyers, Defendant Sloane and his partner,

Allen S. Joslyn ("Joslyn"), adopted them in their entirety as the Response of Eastern

Magnesia Talc Company to Master Interrogatories in the Summit County case captioned

*William F. Clark, et al. v. Owens Corning Fiberglass Corp*., *et al*., Case No. ACV-94-04-

1107, filed by the Law firm of Bevan & Economus.  A copy of Cahill Gordon's filing on

behalf of BASF's predecessor is appended as Exhibit 22 and incorporated herein by

reference.

> **d.    April 2002 and December 22, 2010 Misrepresentations and
> Material Omissions in Engelhard's Correspondence to Asbestos
> Claimants' Counsel and in Responses to Plaintiffs' First Standard
> Set of Liability Interrogatories in the New York City Asbestos
> Litigation Matter of *Estate of Steven Chernick et. al. v. ABB
> Lumus Global, Inc.*

176.    In or about 2001, BASF's predecessor Engelhard Corporation was named

as a defendant in an asbestos injury suit filed in the Supreme Court of New York

captioned *Estate of Chernick et al. v. ABB Lumus Global, Inc*., Index No. 01-010116741

("***Chernick* case**").  The *Chernick* case contended that Engelhard's talc was used as a

component ingredient of "Bondo" auto body repair filler, which product caused the

*Chernick* case plaintiffs' asbestos injury.  The *Chernick* case was part of the New York

Supreme Court's "New York City Asbestos Litigation Program."

177.    On or about April 15, 2002, Gideon Mark, Esq., a local New York City

defense attorney who had been retained to defend BASF's predecessor, Engelhard, in the

*Chernick* case, sent the *Chernick* plaintiffs' counsel a letter and several enclosures,

including a copy of the Ashton Affidavit and the Pooley Report.  The purpose of the

letter was to convince the *Chernick*'s counsel and the *Chernick* plaintiffs to voluntarily

dismiss Engelhard from the case on the basis that Engelhard's talc did not contain

asbestos.  A copy of the letter is appended as Exhibit 23 and incorporated herein by

reference.  The letter was sent via Federal Express, and subsequently, on May 10, 2002, a

copy was also telefaxed to another recipient.

178.    The April 15, 2002 letter's representations about the nature and content of

Engelhard's talc were supported by Mr. Mark's references to the Ashton Affidavit, the

Pooley Report, and a third study which all purported to establish, in the letter's own

words, "that the talc Engelhard Corporation … or any of its present or former subsidiaries allegedly sold to Bondo Corporation was asbestos free."  After summarizing the purported exculpatory findings of the three studies provided, Mr. Mark's letter then concluded:

> Given the foregoing, there appears to be no basis for your clients to assert claims against Engelhard. We hereby request that you dismiss Engelhard from this action.…

179.    Cahill Gordon, as national asbestos counsel to BASF and its predecessors, assisted in the preparation and/or review of the April 15, 2002 letter prior to it being sent to the *Chernick* plaintiffs' counsel.  Cahill Gordon and BASF's predecessor authorized and/or consented to Mr. Mark's sending the letter.

180.    On or about April 16, 2002, BASF's predecessor, Engelhard, responded under oath to "Plaintiffs' First Standard Set of Liability Interrogatories" served within the *Chernick* case ("***Chernick* Interrogatories**").  The Responses to the *Chernick* Interrogatories are attached as (Exhibit 10).  According to the Affirmation of Service appended to the Responses to the *Chernick* Interrogatories, this written discovery was served upon the parties' counsel to the case by U.S. mail.

181.    Engelhard's answers to the *Chernick* Interrogatories were verified on its behalf by Mr. Mark, on April 16, 2002.  His verification states:

> Working in conjunction with Engelhard, I have prepared and reviewed the foregoing Responses to First Standard Set of liability Interrogatories. I know the contents thereof to be true, based on factual analyses conducted with and on behalf of Engelhard.

182.     The response to Interrogatory No. 1 of the *Chernick* Interrogatories states that Michael J. Hassett, Esq., who is identified as Associate General Counsel for Engelhard Corporation, coordinated Engelhard's Responses to the *Chernick* Interrogatories.

183.     Cahill Gordon, as national asbestos counsel to BASF and its predecessors, assisted in the preparation and/or reviewed the Responses to the *Chernick* Interrogatories prior to BASF's local counsel's verification and service of them upon counsel in the *Chernick* case.

184.     The Responses to the *Chernick* Interrogatories repeatedly stated and represented that Engelhard had not mined, milled, manufactured, processed, marketed, distributed, or sold asbestos or asbestos containing products. Exemplifying such representations is the response to Interrogatory No. 52, which reads:

Interrogatory No. 52:

Does your company recognize that it was foreseeable that people working in the same area where your asbestos products were being used or installed would inhale and/or ingest asbestos fibers emitted from your product?

Response to Interrogatory No. 52:

Engelhard recognizes that, in general, it might be foreseeable that people working in the same area where asbestos products are being used or installed might inhale and/or ingest asbestos fibers. However, Engelhard has not mined, milled, manufactured, processed, marketed, distributed, or sold asbestos or asbestos containing products.

185.     The Responses to the *Chernick* Interrogatories referred to the same three purported exculpatory studies on Engelhard's talc that were provided to the *Chernick* claimants' counsel in the April 15, 2002 letter in support of Engelhard's representations

that "the talc supplied to Bondo by Engelhard's former subsidiary, EMTal [sic] was asbestos-free."  *See* Exhibit 10, Interrogatories Nos. 3 and 86.

186.    Interrogatory No. 63 of the *Chernick* Interrogatories directly asked BASF's predecessor, Engelhard, about prior depositions of its employees.  Engelhard's answer under oath to this question reads:

> Interrogatory No. 63:
>
> If any of your employees or officers have testified at trial or by deposition or before any Congressional Committee or administrative agency concerning asbestos exposure, pulmonary or asbestos-related diseases or Industrial hygiene relating to asbestos use, state:
>
> a. The name, address and title of each person who testified;
>
> b. The date, location and forum of such testimony;
>
> c. Whether the defendant has a copy of such testimony;
>
> d. Whether the defendant will voluntarily produce a copy of such testimony.
>
> Response to Interrogatory No. 63:
>
> No.

187.    Interrogatory No. 81 of the *Chernick* Interrogatories directly asked BASF's predecessor, Engelhard, about the destruction of pertinent documents. Engelhard's answer under oath to this question reads:

> Interrogatory No. 81:
>
> Have you destroyed any documents, records or writings pertaining to:
>
> a. Health hazards of asbestos;
>
> b. Workmen's Compensation claims arising out of asbestos, lung cancer, mesothelioma, cor pulmonale, pneumoconiosis, or pulmonary fibrosis;

c. Placing warning labels on your products;

d. Hazardous conditions in your plants or factories;

e. Funding of studies about health hazards of asbestos;

f. Lawsuits arising out of Injuries alleged to have been caused by asbestos.

If so, list every such document destroyed by author, date and subject.

<u>Response to Interrogatory No. 81</u>:

No, so far as Engelhard is able to ascertain - with the possible exception of any documents that might have been routinely destroyed as part of Engelhard's record retention policy.

188.    Mr. Mark's April 15, 2002 letter requesting voluntary dismissal of the *Chernick* case and Engelhard's April 16, 2002 answers to the *Chernick* Interrogatories were fraudulent and misleading to one reading and reasonably relying on them regarding BASF's predecessor's liability.  At no time did these documents timely and fairly reveal or disclose to the *Chernick* plaintiffs' counsel that evidence existed that was contrary to that which was represented in the letter, in the Responses to Interrogatories and/or contained or referred to in the supplied Ashton Affidavit, Poole Report and the other report mentioned in the documents, such as the inculpatory documents and deposition testimony that had been obtained by the plaintiff in the *Westfall* case.  There was not any mention or reference in any of these documents or answers to interrogatories to the fact of and the circumstances surrounding BASF's gathering and spoliation of all contrary and inculpatory asbestos claim evidence relating to Engelhard's talc in 1984.  These misrepresentations and material omissions occurred and were committed despite the fact that the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, knew and appreciated the relevance of the subject information to asbestos claimants, and were

under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation.

189.    Subsequently, BASF's predecessor moved for summary judgment in the New York Supreme Court asking the Court to dismiss it from the *Chernick* case.  Relying on the forgoing letter, attachments and Responses to Interrogatories, *Chernick's* counsel concluded that there was no evidence or basis to oppose the Motion for Summary Judgment and voluntarily executed and provided to BASF's predecessors' counsel for filing a consent "No Opposition Summary Judgment Motion Order," by which he agreed to the presiding court granting a summary judgment dismissal of the *Chernick* case's claims as to the Engelhard Defendants.

190.    On or about December 22, 2010, Mr. Mark, BASF's local New York City counsel, sent an e-mail to *Chernick*'s counsel asking him to execute a consent No Opposition Summary Judgment Motion Order which was attached to the email.  The email explained that an earlier No Opposition Summary Judgment Motion Order had not, according to BASF's counsel, been timely filed in accordance with New York State's civil procedure rules.  On or about December 23, 2010, the *Chernick* plaintiffs' counsel's office by e-mail acknowledged that the consent order would be given to the attorney handling the matter.  The requested order was in course executed by *Chernick* plaintiffs' counsel and returned by mail or e-mail to BASF's local counsel's office.  When asking for the consent order, BASF's counsel did not correct any of the previous misrepresentations or material omissions it had made to the *Chernick* plaintiffs' counsel as set forth above.  BASF's counsel also disclose or reveal on December 22, 2010, that there was evidence that Engelhard's talc contained asbestos and/or that evidence relating

to same had been spoliated by BASF as set forth above.  Had this been revealed or disclosed on December 22, 2010, *Chernick*'s counsel would have not executed and sent back the requested consent order and would have rescinded his prior agreement to consent to the dismissal of BASF or its predecessors.  On or about January 18, 2011, BASF's counsel filed the fraudulently obtained consent order with the Supreme Court of New York City.  The No Opposition Summary Judgment Motion Order was then in due course signed by New York Supreme Court Justice Sherry Klein Heitler and then filed with the New York Supreme Court Clerk on February 3, 2011.  A copy of the e-mails requesting the December 22, 2010 Consent Order, acknowledging receipt of the request, and acknowledging receipt back of the signed Consent are jointly appended as Exhibit 24 and incorporated herein by reference.  A copy of the referenced December 22, 2010 Consent Order as filed with the Clerk of Court on February 3, 2011, is appended as Exhibit 25 and incorporated herein by reference

### e. Cahill Gordon's and BASF's Continuing Fraudulent and Misleading Representations to the Representative Plaintiffs' Attorneys, Bevan & Economus and Bevan & Associates LPA, Inc., Beginning in 1992.

191.    Representative Plaintiffs Williams, Pease, Holley, Ware, Wengerd and/or their respective decedents as the case may be, were all represented in asbestos injury claims by the Northern Ohio law firm of Bevan & Economus or Bevan & Associates LPA, Inc. (collectively referred to as "**Bevan Law Firm**").  These plaintiffs — and where and when applicable their respective decedents — each asserted asbestos injury claims against BASF's predecessors in Northern Ohio federal or state court law suits as set forth above.

79

192.    On or about April 23, 1992, Washington D.C. based Cahill Gordon attorney Scott A. Martin, Esq., sent the Bevan Law Firm a letter (Exhibit 19) and several enclosures (discussed below) on behalf of BASF.  The letter and enclosures concerned three (3) then pending Northern Ohio asbestos cases the Bevan Law Firm was handling that Cahill Gordon referred to as "Cuyahoga County Tireworker Actions."  Among the three Cuyahoga County Tireworker Actions identified in Cahill Gordon's letter was Plaintiff Williams' and her late husband's asbestos injury case.

193.    Cahill Gordon's April 23, 1992 letter and enclosures were sent to the Bevan Law Firm by Federal Express.  The letter states Cahill Gordon's New York based partners Joslyn and Defendant Sloane were blind copy recipients.  Presumably their copies were sent to them at their New York office via U.S. Mail in view of the absence of any stated indication to the contrary in the letter.

194.    Cahill Gordon's purpose in sending the April 23, 1992 letter and enclosures to the Bevan Law Firm, according to the letter's tenor, was to request the Bevan Law Firm to voluntarily dismiss Engelhard as a defendant in the three (3) Cuyahoga County Tireworker Actions "on the basis that the talc produced by EmTal [sic] contained no asbestos."

195.    The April 23, 1992 letter's representations that Engelhard's talc did not contain asbestos and the request for voluntary dismissal of BASF's predecessors were supported with copies of the Ashton Affidavit, the Pooley Report and several Carter Affidavits.

80

196.    With respect to the Ashton Affidavit provided to the Bevan Law Firm in Cahill Gordon's April 23, 1992 letter, Cahill Gordon through Mr. Martin stated and represented in pertinent part:

> …The Affidavit of William H. Ashton summarizes numerous investigations, examinations, and studies of the Johnson mine. The conclusion derived from all these studies is that the talc produced from this mine did not contain asbestos….

197.    As further reason and support for its request that the Bevan Law Firm voluntarily dismiss BASF's predecessors from asbestos injury claim, Cahill Gordon represented that the Pennsylvania Tireworkers Asbestos Claimants, as well as tireworker cases in the District of Kansas and Michigan State Court, were dismissed by their respective counsel after being provided the "Ashton materials."

198.    On or about May 18, 1992, Cahill Gordon's Attorney Martin wrote the Bevan Law Firm again after it had filed a fourth asbestos injury suit, *Gonzalez v. Abex Corp., et al*., naming Engelhard as a defendant.  A copy of Cahill Gordon's May 18, 1992 letter is appended as Exhibit 26 and incorporated herein by reference.

199.    Cahill Gordon's May 18, 1992 letter, which was sent via Federal Express, represented to the Bevan Law Firm again that the various documents sent to it the previous month demonstrated "that the talc produced by Emtal [sic] from its sole mine and mill in Johnson, Vermont contained no asbestos."  Cahill Gordon's letter then again requested that Engelhard be promptly dismissed from the Cuyahoga County Tireworker Actions voluntarily because "under the circumstances there appears to be no basis in fact for maintaining Engelhard as a Defendant."

200.    On or about December 22, 1992, Cahill Gordon's Attorney Martin telephoned attorney Dale Economus, Esq., a principal of the Bevan Law Firm, to discuss BASF's predecessor's requests that it be voluntarily dismissed from what was then five (5) pending tireworker asbestos injury cases that Mr. Economus' law firm had filed in Cuyahoga County against Engelhard.  During the telephone conversation, Attorney Martin obtained Mr. Economus' agreement to respond to Cahill Gordon's request for dismissal of Engelhard in the five cases by December 31, 1992 because an answer to the complaint in one of the five cases was at the time almost due.

201.    Subsequently, by letter on or about December 21, 1992, Cahill Gordon's Attorney Martin wrote once more to Mr. Economus, this time to confirm their conversation.  This correspondence was both telefaxed and sent by U.S. Mail to the Bevan Law Firm by Cahill Gordon's Washington, D.C. office.  A copy of Cahill Gordon's December 21, 1992 letter is appended as Exhibit 27 and incorporated herein by reference.

202.    In his December 21, 1992 letter, Attorney Martin once again renewed and supported Cahill Gordon and BASF's predecessors' request for a voluntarily dismissal of the claims against Engelhard and Eastern Magnesia on the basis and representation that Engelhard/Eastern Magnesia's talc did not contain any asbestos, stating:

> Engelhard was named in these cases solely because its former subsidiary, Eastern Magnesia Talc Company ("EMTal") allegedly sold talc to plaintiffs' employers. As demonstrated in the various affidavits and other documents forwarded to you with my previous correspondence, talc produced by EMTal from its sole mine and mill in Johnson, Vermont contained no asbestos. The alleged diagnosis of the plaintiff in each of the actions in which Engelhard is named as a defendant is an asbestos-related disease, which cannot be attributed to EMTal talc.

(*emphasis in original*).

203.    On or about February 4, 1993, Cahill Gordon's Mr. Martin sent the Bevan

Law Firm another letter regarding dismissal of the five Cuyahoga County Tireworker

Action cases. A copy of this letter is appended as Exhibit 28 and incorporated by

reference. This letter begins with a memoralization of the Bevan Law Firm's request to

Cahill Gordon the prior month (in or about January 1993) that Cahill Gordon draft and

send notices of dismissal for the five asbestos actions referenced in Cahill Gordon's

April, May and December 1992 letters.  According to the February 4, 1993 letter, the

Bevan Law Firm was agreeing to sign and file the voluntary dismissals in the five cases

"on the basis of [Cahill Gordon's] correspondence demonstrating" that Talc produced by

Engelhard's former subsidiary, Eastern Magnesia Talc Company ("EMTal"), contained

no asbestos.

204.    The Bevan Law Firm responded to Cahill Gordon's February 4, 1993

letter in a letter dated February 11, 1993 that was sent to Attorney Martin at his

Washington D.C. office address by regular mail.  In this letter, the Bevan Law Firm

advised Cahill Gordon that it was reconsidering its decision to dismiss Engelhard based

on its recent uncovering of some correspondence dating to 1950 from the State of

Vermont Department of Health that purportedly discussed the propensity of employees at

Eastern Magnesia Talc Company to develop pneumoconiosis and further referenced

therein future employee x-rays and an anticipated publication.  The Bevan Law Firm

invited Cahill Gordon's comments on this information, as well as an opportunity to

review the results of any studies on the Waterbury and Johnson employees and any

publication mentioned in the 1950 Vermont Department of Health correspondence.  The

Bevan Law Firm's letter also requested invoices or purchase orders indicating the years and volumes of talc sold to the Goodyear, Goodrich and Goodyear Aerospace plants in Akron.  A copy of the February 11, 1993 letter is appended at Exhibit 29 and incorporated herein by reference.

205.    On or about February 22, 1993, Cahill Gordon's Martin responded to the Bevan Law Firm's letter, which, according to the letter, was transmitted to the Bevan Law Firm by means of both telefax and certified U.S. Mail.  A copy of this letter is appended as Exhibit 30 and incorporated herein by reference.

206.    In Cahill Gordon's February 22, 1993 letter, Attorney Martin states that the 1950 Vermont Health Department correspondence the Bevan Law Firm inquired about "should in no way alter your previous expressed decision to dismiss Engelhard from these cases."  Cahill Gordon's letter then proceeds to distinguish and deflect the information contained in the subject 1950 Vermont Health Department correspondence by explaining that the 1950 letter referenced workers who were not employed at Engelhard's subsidiary's Johnson Mine, but rather were workers employed at some other company's mine. Cahill Gordon's letter then returned to and reiterated once more BASF's purported uncontradicted exculpatory evidence and information that Cahill Gordon had provided the Bevan Firm previously in furtherance of the Fraudulent Asbestos Defense Scheme, stating:

> Beginning with my first request for dismissal last April I sent your firm voluminous materials concerning the Johnson mine. In reaching your decision to dismiss Engelhard, your firm reviewed, inter alia, the Affidavit of William H. Ashton, which summarizes numerous investigations examinations and studies of the Johnson mine. The conclusions derived from all of these studies is that talc produced from this mine did not

<u>contain asbestos</u>. The only analysis which we have not previously forwarded to you is one just completed by the R.J. Lee  Group which showed no evidence of asbestos minerals nor of their non-fibrous analogs, and found the talc to be a platy, non fibrous variety.

(*emphasis in the original*).

207.    Shortly after receipt of Cahill Gordon's February 22, 1993 letter, and reasonably relying upon Cahill Gordon's representations and supporting materials supplied by it in the various correspondence and communications referred to above, the Bevan Law Firm proceeded to recommend to its asbestos injury clients that Engelhard be voluntarily dismissed from their claims.  Included in those to whom this recommendation was made was Plaintiff Williams.  Based upon the Bevan Law Firm's recommendations and advice, which in turn were based upon the documents and representations made by and on behalf of the defendants that BASF's talc and talc products contained no asbestos, the Bevan Law Firm's clients in the five Cuyahoga County Tireworker Action cases, including Plaintiff Williams and her late husband, each consented and authorized the Bevan Law Firm to voluntarily dismiss their asbestos injury claims against BASF's predecessors.

208.    In or about late February or March, 1993, the Bevan Law Firm, acting and relying upon Cahill Gordon's representations and supplied materials as set out above, filed Notices of Voluntary Dismissal dismissing its clients' asbestos injury claims against BASF's Predecessors in the five Cuyahoga County Tireworker Actions as Cahill Gordon requested.  A copy of the Notice of Dismissal that voluntarily dismissed Plaintiff Williams and her late husband's asbestos case against only BASF's predecessor, which was entered as an order of the Court on or about March 23, 1993 by the Honorable Charles R. Weiner, the presiding federal court Multi-District asbestos litigation judge, is

appended as Exhibit 31 and incorporated herein by reference.  Copies of the dismissals of

the four other Cuyahoga County Tireworker Action cases are also collectively appended

as Exhibit 31 and incorporated herein by reference.  All five dismissal notices were

transmitted to the respective courts and served on defense counsel by regular U.S. Mail.

209.   At no time in any of the aforementioned Cahill Gordon communications

or correspondence with or to the Bevan Law Firm during 1992 and 1993, or in any of the

affidavits or reports supplied or referred to in Cahill Gordon's communications or letters

seeking the voluntary dismissal of Engelhard from the Cuyahoga County Tireworker

Action cases, was the Bevan Law Firm, and through this law firm, the Bevan Law Firm

asbestos injury clients, including Plaintiff Williams and her late husband, ever fairly (or

otherwise) informed by the Lawyer Perpetrators or the BASF Perpetrators that evidence

existed that was contrary to that represented in Cahill Gordon's letters and in the supplied

Ashton Affidavit, Poole Report, Carter Affidavits or any of other material provided by

Cahill Gordon, such as the inculpatory documents and deposition testimony that had been

obtained by the plaintiff in the *Westfall* case.  There additionally was no mention or

reference in the any of Cahill Gordon's communications or correspondence to the Bevan

Law Firm, or in any of the affidavits or reports Cahill Gordon supplied to the Bevan Law

Firm, to the fact of and the circumstances surrounding BASF's gathering and spoliation

of all contrary and inculpatory asbestos injury claim evidence relating to Engelhard's talc

in 1984.  These misrepresentations and material omissions occurred and were committed

despite the fact that the BASF Perpetrators and the Lawyer Perpetrators were aware of

these facts, knew and appreciated the relevance of the subject information to asbestos

claimants, and were under a duty to truthfully and fairly answer and provide information and discovery to adverse parties in litigation.

210.    Had the BASF Perpetrators or the Lawyer Perpetrators fully, fairly and timely disclosed the truth about its talc products' asbestos content, the existence of inculpatory and contradictory evidence regarding the existence of asbestos in Engelhard's talc, such as that which had been developed in the *Westfall* case, and/or the facts and the circumstances surrounding BASF's gathering and spoliation of contrary and inculpatory asbestos claim evidence relating to Engelhard's talc to the Bevan Law Firm, the Bevan law firm then would not have recommended to its clients, including Plaintiff Williams and her late husband, that they voluntarily dismiss their asbestos claim against BASF's predecessors without first receiving from BASF's predecessor payment of full, fair and just compensation.  Correspondingly, the Bevan Law Firm's asbestos injury clients, including Ms. Williams and her husband, as well as others similarly situated to them, would not have given their consent or authorization to voluntarily dismiss their asbestos claims against BASF's predecessor without first receiving from BASF's predecessors full, fair and just compensation for their respective asbestos injury claims.

211.    During and throughout the 1990s and continuing into and throughout the 2000s, the Bevan Law Firm also represented thousands of other tireworker and industrial worker clients who were exposed to hazardous workplace dusts and fibrous materials during and at their employment that caused them to develop asbestos and/or other occupational pulmonary diseases and disorders, such as mesothelioma, asbestos induced cancers, asbestosis, pneumoconiosis and pulmonary talcosis.  When and where such clients (or their decedents) were diagnosed with an asbestos and/or industrial dust related

exposure and a lawsuit was commenced, Engelhard, Eastern Magnesia and, eventually, BASF were named in such suits as a co-defendant along with other parties.  Among the asbestos injury clients were Representative Plaintiffs Williams, Pease, Holley, Ware, Wengerd and/or their respective decedents.

212.    In connection with the lawsuits filed by the Bevan Law Firm during the 1990s through the 2000s, BASF and its predecessors periodically responded under oath to written discovery relating to Engelhard's talc products.  Cahill Gordon either directly or indirectly through local Ohio counsel prepared the responses to this written discovery on behalf of BASF or its predecessors.  In BASF or its predecessors' responses to written discovery that Cahill Gordon prepared and/or reviewed prior to BASF verifying and serving, BASF or its predecessors continued to uniformly and consistently represent to the Bevan Law Firm, and through that firm its clients, including Representative Plaintiffs Williams, Pease, Holley, Ware, Wengerd and/or their respective decedents, that Engelhard's talc did not contain any asbestos and/or there was no evidence to the contrary.  Representative of such written discovery responses are BASF's and its predecessors 1991 responses to the discovery in the Summit County, Ohio *Clark* case (Exhibit 22) referred to and discussed above, and October 19, 2007, in Answers to Interrogatories in "Bevan Group 14" cases that were electronically filed and served by BASF local counsel via the Internet through the LexisNexis File & Serve system ("**2007 Bevan Group 14 Interrogatories**").  A copy of the 2007 Bevan Group 14 Interrogatories is appended as Exhibit 32 and incorporated herein by reference.

213.    In response to Interrogatory No. 5 of the 2007 Bevan Group 14

Interrogatories, an answer that is thereafter referred to in response to numerous

subsequent questions, BASF states under oath:

EVER SELL ASBESTOS

5.    Has Defendant ever engaged in the mining, manufacturing, selling, marketing, installation or distribution of asbestos-containing products (including equipment of any kind containing asbestos in any form)? If so, please state the following:

(a) The name of the company engaged in the activity (whether it is Defendant, Defendant's predecessor, or Defendant's subsidiary);

(b) As to each product mined, manufactured, sold, marketed, installed or distributed, please state the following:

1. The trade or brand name.

2. Its identification number (model, serial number, etc.).

3. The time period it was manufactured, mined, marketed, distributed or sold.

4. Its physical description including color, general composition, and form.

5. A detailed description of its intended use and purpose.

6. A detailed description of the type package in which it was sold, listing the dates of each type of package used, a physical description of the package, and a description of any printed material or trademarks that appeared thereon.

7. The percent of asbestos which it contained.

8. The percent of asbestos by asbestos type (amosite, crocidolite, tremolite, anthophyllite).

(c) The time period during which each of these products were on the market;

(d) The material components/ingredients of each such product, giving specific or approximate percentage both by weight and by volume of each

material component/ingredient (this interrogatory is not limited to the asbestos component of the product but seeks information as to the nature, weight and volume of non-asbestos ingredients, as well) of each such product;

(e) How each of these asbestos-containing product [sic] can be distinguished from those of competitors;

(f) A description of the physical appearance of such product;

(g) A detailed description of the intended uses.

ANSWER: No.

214.    Following the dismissal of the Cuyahoga County Tireworker Action cases in early 1993, during and throughout the ensuing mid-1990s and continuing throughout the 2000s, a number of periodic aggregate settlements occurred by and between several talc suppliers and manufacturers and Bevan Law Firm clients. From time to time BASF and its predecessors participated in these talc company aggregate settlements when doing so enabled it or them to cheaply settle and obtain releases of liability from thousands of the Bevan Law Firm's asbestos injury claimants. Among the thousands of asbestos injury claims so settled in this manner were Plaintiff Pease's (whose lawsuit against Engelhard was voluntarily dismissed in or about December 1998 (Exhibit 33)), Plaintiff's Holley's decedent's, Ms. Darnell, (whose lawsuit against Engelhard was voluntarily dismissed in or about May 2001 (Exhibit 34)) and Plaintiff Ware's and her husband's (whose lawsuit, together with slightly under 2,200 other Cuyahoga County, Ohio Court of Common Pleas lawsuits, was voluntarily dismissed in or about April 2003 (Exhibit 35)). Exhibits 33, 34, and 35 are hereby incorporated by reference. The dismissals were all filed with the Cuyahoga Court of Common Pleas and served on the parties to the suit electronically.

215.     When negotiating these aggregate settlements and deciding to recommend and obtain its clients' consent and authorization to participate in them, the Bevan Law Firm reasonably relied and acted upon Cahill Gordon's and BASF's (or its predecessors') representations and the materials provided to it by Cahill Gordon and BASF from 1992 forward that purported to show Engelhard's talc did not contain asbestos and/or that there was absolutely no evidence to the contrary as set out above.

216.     In turn, Plaintiff Pease, Plaintiff Holley's decedent, Ms. Darnell, and Plaintiff Ware, as well as others similarly situated, reasonably relied and acted upon Cahill Gordon's and BASF's (or its predecessors') representations and materials provided by Cahill Gordon and BASF that Engelhard's talc did not contain asbestos and/or that there was absolutely no evidence to the contrary which had been made or supplied to the Bevan Law Firm from 1992 forward, as set out above.

217.     Had the BASF Perpetrators or the Lawyer Perpetrators fully, fairly and timely disclosed to the Bevan Law Firm the truth about Engelhard's talc products' asbestos content, the existence of inculpatory and contradictory evidence regarding the existence of asbestos in Engelhard's talc, such as that which had been developed in the *Westfall* case, and/or the facts and the circumstances surrounding BASF's gathering and spoliation of contrary and inculpatory asbestos claim evidence relating to Engelhard's talc in 1984 as was their duty, the Bevan law firm would not have negotiated and agreed to the terms of the aggregate settlements with BASF or its predecessors on the terms that were offered, and, further, it would not have recommended to its clients that they agree to participate in such aggregate settlements with Engelhard and dismiss their cases against it voluntarily as they did. Correspondingly, the Bevan Law Firm's asbestos injury clients,

including Plaintiff Pease, Plaintiff Holley's decedent, Ms. Darnell, and Plaintiff Ware, as well as others similarly situated to them, would not have given their consent or authorization to participate in an aggregate settlement with BASF or its predecessor on the basis of the terms of the agreement nor authorized and consented to the Bevan Law Firm voluntarily dismissing their asbestos claims against BASF's predecessor without first receiving from BASF's predecessors full, fair and just compensation for their respective asbestos injury claims.

218.    As a direct result of the Fraudulent Asbestos Defense Scheme, Plaintiff Pease, Plaintiff Holley's decedent, Ms. Darnell, and Plaintiff Ware, as well as others similarly situated to them, have not received full, fair and just compensation from BASF's predecessors for their respective asbestos injury claims, to their detriment and loss.

219.    On or about November 12, 2008, BASF's Northern Ohio area local defense attorney, Jennifer A. Reister, Esq., mailed a letter with enclosures to the Bevan Law Firm requesting voluntary dismissal of two of the firm's then pending asbestos injury matters it had filed in the Cuyahoga County, Ohio, Court of Common Pleas, namely: Plaintiff Wengerd's decedent's law suit, *Jennifer Graham v. Eastern Magnesia Talc*, and *Russell Young v. Eastern Magnesia Talc*.  Prompting the letter was the Bevan Law Firm's service of discovery requests on BASF in connection with the two cases.  A copy of this letter is appended as Exhibit 36 and incorporated herein by reference.

220.    Ms. Reister's November 12, 2008 letter requested the Bevan Law Firm to "voluntarily dismiss Eastern Magnesia Talc and, in the Young case, both Eastern

Magnesia Talc and Engelhard Corporation, from these cases on the basis that talc produced by EmTal contained no asbestos."

221.    In support of both her request for voluntary dismissal and her representation that Engelhard's talc "contained no asbestos," Ms. Reister provided the Bevan Law Firm with copies of the Ashton Affidavit and Pooley Report, along with other purported analyses that allegedly state or indicate that talc from Engelhard's Johnson talc mine did not contain asbestos.  The letter and enclosures were further intended, according to the letter, to serve as BASF's responses to the Bevan Law Firm's discovery initiatives in the two cases

222.    To further bolster her request for voluntary dismissals of the two cases Ms. Reister's letter noted to the Bevan Law Firm that Engelhard and Emtal had been named as Defendants and subsequently dismissed voluntarily in 567 asbestos claims as a result of the enclosed materials in various jurisdictions including four (4) plaintiffs in Arkansas, 191 plaintiffs in Kansas, forty (40) plaintiffs in Michigan, thirty-one (31) plaintiffs in Mississippi, over 300 plaintiffs in Pennsylvania, and one (1) plaintiff in Florida.

223.    According to BASF's court ordered answers to Question No. 4 of a set interrogatories served on it in the *Paduano* suit, Cahill Gordon supplied Ms. Reister with the information and documents she used in writing and sending her November 2, 2008 letter and enclosures to the Bevan Law Firm.  A copy of these interrogatory answers is appended as Exhibit 37 and incorporated herein by reference.

224.     Just as in the Cahill Gordon correspondence and interrogatory answers set out above, Ms. Reister's November 12, 2008 letter and enclosures on behalf of BASF did not fairly, candidly and truthfully inform the Bevan Law Firm, and through this law firm, its asbestos injury clients, including Plaintiff Wengerd and/or her decedent, Ms. Graham, that evidence existed that was contrary to that which was represented in Ms. Reister's letter and in the supplied Ashton Affidavit, Poole Report and/or other materials provided by her and Cahill Gordon, such as the inculpatory documents and deposition testimony that had been obtained by the plaintiff in the *Westfall* case.  Neither was there any mention or reference in Ms. Reister's correspondence to the Bevan Law Firm, nor in any of the affidavits or reports that she and Cahill Gordon supplied to the Bevan Law Firm, to the fact of and the circumstances surrounding BASF's gathering and spoliation of all contrary and inculpatory asbestos claim evidence relating to Engelhard's talc in 1984. These misrepresentations and material omissions occurred and were committed despite the fact that the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, knew and appreciated the relevance of the subject information to asbestos claimants, and were under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation.

225.     Neither BASF nor Cahill Gordon took any steps or measures to correct Ms. Reister's misrepresentations.  BASF also did not take any steps or measures to prevent Ms. Reister (or any other counsel representing it) from making such misrepresentations and material omissions in the future.

226.     When Plaintiff Wengerd in her capacity as personal representative of her mother's estate (Mrs. Graham having died on July 8, 2008) did not voluntary dismiss

BASF from her mother's asbestos injury case as requested by Ms. Reister in her November 12, 2008 letter, Ms. Reister and her firm thereafter filed a Motion for Summary Judgment seeking its involuntary dismissal. Asking the Cuyahoga County Court of Common Pleas to dismiss this case, BASF claimed to the court that there was no proof that its predecessor Engelhard's talc was present in Ms. Graham's workplace at the Goodyear tire and rubber plant she was employed in, and, in any event, there was no evidence that Engelhard's talc contained asbestos.

227. The Bevan Firm in or about early 2009 opposed BASF's motion for Summary Judgment in the *Graham* case by establishing that there was an outstanding question of fact on Ms. Graham's exposure to Engelhard talc at the Goodyear plant in which she worked. It was not able, however, due to the Lawyer Perpetrators and the BASF Perpetrator's misrepresentations and material omissions set forth above, to mount any opposition to BASF's claim and representations to the presiding court that there was not any evidence Engelhard's talc contained asbestos. Thus in a reply brief on behalf of BASF that Ms. Reister electronically filed via the File and Serve System in February, 2009, it was stated to the Cuyahoga Court of Common Pleas:

> Lastly, plaintiff attempts to rely on her own answers to interrogatories. In her answers, she states that one of the asbestos containing products she was exposed to at Goodyear was talc. She does not identify EMT as the seller of the talc. Additionally, plaintiff has provided no evidence that EMT's talc is an asbestos-containing product. On the other hand, EMT filed numerous materials in response to plaintiff's discovery request that indicate that the talc mined by EMT was asbestos-free. (See Letter and to John Mismas and attachments filed November 12, 2008) These materials included:
>
> 1) A copy of an Affidavit prepared by William H. Ashton dated May 8, 1989, with attached Exhibits A through G;

2) A copy of a report prepared by Dr. F.D. Pooley concerning an examination of talc samples taken from EMT's Johnson, Vermont mine;

3) A copy of a 1977 NIOSH study entitled "Analysis of Talc By XRay Diffraction and Polarized Light Microscopy"; and

4) A copy of a letter from RJ Lee Group, Inc. dated January 27, 1993 reporting the results of their analysis of a sample of EMT talc.

It is elementary that plaintiff must show that she was exposed to an asbestos-containing product to survive summary judgment. In this case, plaintiff has failed to produce any evidence that either she was exposed to any talc sold by EMT or that the talc sold by EMT contained asbestos.

(*emphasis added*).

A copy of this reply is appended as Exhibit 38 and incorporated herein by reference.

228.    In the Motion for Summary Judgment filed on behalf of BASF in the *Graham* case, the BASF Perpetrators and/or the Lawyer Perpetrators (who were directing and controlling Ms. Reister's actions on BASF's behalf) failed to fairly and candidly inform the presiding court that evidence that BASF's talc contained asbestos existed and/or that there was contrary evidence to that which was represented in the motion, *i.e.* - BASF's reference to Ms. Reister's November 12, 2008 letter and attachments submitted to the court in connection with the motion, such as the inculpatory documents and deposition testimony that had been obtained by the plaintiff in the *Westfall* case.  Neither was there any mention or reference in Ms. Reister's Motion for Summary Judgment on behalf of BASF, nor in any of the corroborating affidavits or corroborating reports that she filed in support of the motion, to the fact of and the circumstances surrounding BASF's gathering and spoliation of all contrary and inculpatory asbestos claim evidence relating to Engelhard's talc. These misrepresentations and material omissions occurred

and were committed despite the fact that the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, knew and appreciated the relevance of the subject information to asbestos claimants, were under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation, and were under a duty of candor to the presiding court.

229.    As the direct and proximate result of the BASF Perpetrators and the Lawyer Perpetrators misrepresentations and material omissions as set forth above, on June 18, 2009, the Cuyahoga County Court of Common Pleas granted BASF's motion for summary judgment and dismissed Ms. Graham's case as to BASF, thereby depriving Plaintiff Wengerd's deceased mother and her estate of their right to full, fair and just compensation from BASF on the subject asbestos injury claim.

230.    On or about May 15, 2009, a notice of voluntary dismissal of Engelhard, as well as three other defendants, was electronically filed in the lawsuit relating to Mr. Young's asbestos injury through the electronic File and Serve System.  A copy of the dismissal is appended as Exhibit 39 and incorporated herein by reference.  In agreeing to and obtaining its client's consent to this dismissal, the Bevan Law Firm relied and acted upon the misrepresentations and material omissions set forth above.

**H.    The Discovery and Uncovering of the Fraudulent Asbestos Defense Scheme**

231.    The longstanding Fraudulent Asbestos Defense Scheme started to unravel during a June 15, 2009 deposition of Mr. David Swanson, a former a BASF research and development employee, that was taken in connection with an asbestos injury case captioned *Paduano v. Ace Scientific Supply Co.*, captioned MID-L-2976-09 (N.J. Super.

Ct.) (the "**Swanson deposition**").  A copy of Mr. Swenson's deposition is attached as Exhibit 9, and incorporated herein by refenence.

232.    Mr. Swanson was a chemist for Engelhard in Menlo Park, New Jersey.

233.    During his tenure at Engelhard, Swanson conducted experiments and assays with talc in his laboratory.  He also visited the Johnson Mine.

234.    Mr. Swanson's daughter, Donna Paduano, developed mesothelioma and contended the asbestos causing same was from, *inter alia*, BASF's talc her father worked with or was exposed to at Engelhard, to which she came into contact.

235.    During his deposition Mr. Swanson testified:

a.    He was aware that Emtal talc contained asbestos fibers based on his work for the company;

b.    That Engelhard's talc mine was shut down after it was determined that the talc contained asbestos;

c.    That sometime after the BASF talc mine was shut down, he was given a directive by the head of Engelhard's research and development department, Defendant Hemstock, to gather all of his lab notebooks and records regarding Engelhard's talc;

d.    That Defendant Hemstock explained to him that the directive to gather up the documents  had come from BASF's legal department;

e.   That he understood and believed that the materials gathered were to be shredded or destroyed;

f.   That he complied with the instructions and gathered his documents on Emtal talc, including his laboratory notebooks, and turned over all of his records as directed;

g.   That BASF's legal department checked with all employees to ensure that all documents that revealed that the talc contained asbestos had been recovered and subsequently destroyed or secreted away; and

h.   That he never saw his Emtal talc documents again.

236.   The Swanson Deposition testimony led to an investigation by the *Paduano* suit's plaintiffs' counsel into whether BASF had spoliated material evidence (the "***Paduano* spoliation investigation**").

237.   The *Paduano* spoliation investigation ultimately led to the discovery of evidence that prompted and grounded a successful motion to amend before the New Jersey Superior Court to plead a New Jersey spoliation "Fraudulent Concealment" claim against BASF in the *Paduano* suit, along with three other pending New Jersey state court asbestos laws suits, based upon the spoliation of Emtal talc documents described herein.

238.   The *Paduano* spoliation investigation also eventually led to BASF producing documents relating to its 1984 gathering of documents relating to Emtal talc and portions of some, but not all, of the *Westfall* case's depositions.

239.   During the *Paduano* spoliation investigation plaintiffs' counsel reviewed thousands of pages of documents produced by BASF relating to its corporate knowledge of asbestos in Johnson Mine talc ore and Emtal talc products and what BASF and Cahill Gordon had produced and represented to asbestos claimants' counsel over the years regarding same. Additionally, interrogatories were served and depositions of BASF designated representatives taken on topics relating to the spoliation of evidence and documents.

240.   During the *Paduano* spoliation investigation BASF withheld numerous documents from its production that were responsive to the spoliation investigation on claims of attorney-client privilege. The *Paduano* plaintiffs challenged BASF's withholding of documents based upon the "crime-fraud" exception to the attorney-client privilege. This dispute led to the appointment of retired New Jersey Superior Court Appellate Division Judge Jack L. Lintner ("**Judge Lintner**") as Special Discovery Master in *Paduano* and three related asbestos cases.   A copy of said order is appended as Exhibit 43 and incorporated herein by reference.

241.   Judge Lintner requested briefing from the *Paduano* parties on the applicability of the crime-fraud exception and following his review of same rendered an initial opinion in October, 2010 in which he determined that an *in camera* review of BASF's withheld documents was warranted. On November 4, 2010, following his *in camera* review of the withheld documents, Judge Lintner advised the *Paduano* parties that he was going to report his opinion concerning which documents should be produced by BASF under New Jersey's crime-fraud exception to the attorney-client privilege. Thereafter, on November 10, 2010, and with notice to all *Paduano* parties, Judge Lintner

provided BASF s counsel, and only it, with a copy of his tentative report setting forth his determinations in order to allow BASF's counsel to review and make any objections it had to his recommendations as well as to production of his report to the Paduanos' counsel.

242.    After Judge Lintner submitted his tentative report to BASF's counsel, the *Paduano* case settled. Pursuant to the order of the court the tentative report is confidential.

243.    The terms of the *Paduano* settlement and the order appointing Judge Lintner require Judge Lintner and his law firm, Norris McLaughlin & Marcus, P.A., to hold both a copy of his tentative report and the withheld documents he reviewed in escrow for seven (7) years.

244.    Plaintiffs in support of their claims are seeking production of the documents held in escrow.

245.    The *Paduano* spoliation investigation  led to the discovery of the following tests and assays of Emtal talc that found the presence of asbestos fibers in the Emtal talc:

a.   A 1972 Royal Globe Insurance test which established four out of five Emtal talc samples contained asbestos fibers;

b.   A May 1972 Johns Manville test which identified asbestos fibers, including tremolite fibers, in all of the Emtal samples;

c.   A 1977 test by Mr. Triglia, an Engelhard employee, which identified the presence of asbestos in Emtal talc;

d.   A 1978 test which established the presence of asbestos in all Emtal talc;

e.   A 1979 Georgia Tech electron microscope analysis test which found fibers in the Emtal talc.; and,

f.    Three other 1979 tests which all confirmed the presence of asbestos in Emtal talc.

246.   In the twenty five (25) years between the *Westfall* case settlement and the Swanson deposition, upon information and belief, none of the above referenced tests or the underlying data were ever produced to any asbestos injury claimant or their counsel even though they were often well within the scope of discovery requests made by asbestos claimants' counsel.  These tests and their underlying data were also not referred to in correspondence or defense reports sent to claimants' counselor in court submissions that were filed seeking dismissal of BASF.  These tests and data represent only a portion of the original evidence relating to the presence of asbestos in Emtal talc, and are an indication of the once-extensive evidence which Defendants possessed regarding the presence of asbestos in the Emtal talc.

247.   Based upon information and belief, BASF terminated Cahill Gordon as its national counsel in or about 2009 or 2010.

248.   The documents produced during the *Paduano* spoliation investigation after Cahill Gordon was terminated, many of which are stamped by BASF's counsel with the document management prefix "FC," revealed the existence of the BCAD enterprise and

how the BASF Perpetrators and the Lawyer Perpetrators used it to repeatedly mislead and deceive asbestos injury claimants, their counsel and presiding courts.

249.    Many of the exhibits and test and assay results referred to in the depositions of Hemstock and Triglia still have not been produced to any asbestos injury claimant lawyer other than counsel in the *Westfall* case who was and is bound to a confidentiality agreement.

a.   The following exhibits from the Hemstock deposition are missing or have otherwise not been produced:  Exhibits 1, 5, 13, 15, 16, 18, 19, 21, 22, 23, 24, 25, 29, 30, 32, 34, 37, 39, 43, 44, 46, 47, 49, 50 (partially), and 51.

b.   The following exhibits from the Triglia deposition are missing or have otherwise not been produced: Exhibits 1, 2, 5, 6, 9, 11, 12, 13, 15, 16, 17, 18, 19, 20, 23, 24, 26, 27, 28 and 30.

250.    Many other presently unknown tests, studies, and other evidence which Defendants conducted, possessed, or had access  to have been destroyed, secreted away and/or due to the passage of time caused by the BASF Perpetrators' and the Lawyer Perpetrators' spoliation and tortious conduct, are no longer accessible or recoverable.

251.    The evidence spoliated by the BASF Perpetrators and the Lawyer Perpetrators includes the Engelhard internal lab notebooks which have never been located and/or produced and at this point and may be inferred or presumed to have been permanently destroyed. Based upon information and belief, these lab notebooks would

have contained testing and assay data regarding the composition of the Emtal talc

including but limited to the asbestos content of the Emtal talc.

252.    Due to the spoliation of this evidence, asbestos victims, their counsel and

courts across the country have been prevented from obtaining or receiving material

evidence and accordingly may never know the full nature, extent and breadth of the

asbestos fibers in BASF's talc and talc products including Emtal talc.

I.    **The BASF Perpetrators Undeterred Attempt to Mislead and Deceive the *Paduano* Suit's Plaintiffs' Counsel Regarding Emtal Talc's Asbestos Content**

253.    Less than six months after the Swanson deposition led to the discovery of

the Fraudulent Asbestos Defense Scheme, Mr. Ernest Behm ("**Behm**") was produced by

BASF to testify in the *Paduano* suit as the corporate designee with the most knowledge

concerning BASF-Engelhard's historical knowledge of the dangers of asbestos at a

deposition noticed and taken on November 6, 2009. (A copy of excerpts of Mr. Behm's

deposition transcript is appended as Exhibit 40).

254.    During this deposition, Behm was asked specifically by Ms. Paduano's

counsel to identify the location of documents related to the *Westfall* case which referred

to asbestos containing talc sold by BASF-Engelhard.  Mr. Behm testified that his search

prior to his deposition disclosed no such documents.

255.    Six months after the Swanson deposition led to the uncovering BASF's

twenty-five year scheme of fraudulently denying the existence of evidence that its talc

contained asbestos fiber, Mr. Behm, as the BASF representative most knowledgeable

about the asbestos risks of its products, repeated the misrepresentations and material omissions that were the *modus operandi* of the Fraudulent Asbestos Defense Scheme, stating: "[I]t is my understanding that Engelhard never sold any asbestos containing product. And when it comes to talc, I have materials which I had available to me which stated that talc does not contain asbestos." (*See* Exhibit 40 at pg. 107).

256.    BASF's corporate designee's continued misrepresentations under oath in November, 2009 demonstrate how ingrained and persistent the Fraudulent Asbestos Defense Scheme had become.  Its designated representative continued to parrot the misrepresentations even in the face of an investigation that was beginning to unravel BASF's fraud and spoliation of evidence.

**J.     BASF's Admissions That False and Misleading Statements Were Given to Asbestos Claimants Over the Years as Part of BASF's Asbestos Claim Defense**

257.    In connection with the *Paduano* suit*,* BASF designated and produced for deposition Ms. Ellen Poole as its representative with the most knowledge concerning the sale, supply and distribution of BASF-Engelhard's talc to National Gypsum Facilities, as well as its designee to testify on matters relating to the *Paduano* spoliation investigation. (A copy of excerpts of Ms. Poole's deposition transcript is appended as Exhibit 41).

258.    In her deposition on May 25, 2010, Ms. Poole admitted as a designee of BASF:

a.    That there are documents which show the existence of asbestos in Emtal talc (*See* Exhibit 41 at pg. 185-190);

b.   That testing on Emtal talc performed throughout the 1970s showed the presence of asbestos fibers in BASF products (*See* Exhibit 41 at pg. 185-190);

c.   That testing on Emtal talc conducted by Georgia Tech and by BASF were in agreement that the asbestos fiber count in Emtal talc varied from trace amounts to abundant (*See* Exhibit 41 at pg. 185-190);

d.   That a geologist named "Gale", who it is believed is referring to Peter Gale, a former Engelhard research and development employee who BASF sought to restrain from being retained as an expert by the *Westfall* case's plaintiff, confirmed the existence of asbestos in Emtal talc in 1979 (*See* Exhibit 41 at pg. 252);

e.   That sworn affidavits and statements made and frequently used in the Fraudulent Asbestos Defense Scheme, such as the Ashton Affidavit and Eastern Magnesia's October 19, 2007 answers to interrogatories, which stated that BASF's asbestos knowledge was irrelevant because it never sold asbestos containing products, are contradicted by tests and studies that were known to BASF (*See* Exhibit 41 at pg. 252); and,

f.   That Cahill Gordon had maintained the storage facility where some of the documents establishing the presence of asbestos fibers in the Emtal talc had been secretly held for the past twenty-five years. (Exhibit 42 at pg. 59).

**K.    Plaintiffs Learn They and Other Asbestos Claimants Similarly
Situated Were Victimized and Harmed by the Fraudulent Asbestos
Defense Scheme**

259.    Plaintiffs first learned that they and others were the victims of the BASF
and Lawyer Perpetrators' Fraudulent Asbestos Defense Scheme, and the BCAD
Enterprise's role in executing it, in or about late 2010 or early 2011 when they were first
advised by their former asbestos counsel of the foregoing alleged facts and circumstances
which their asbestos claim counsel had learned of through being contacted by the counsel
conducting the *Paduano* spoliation investigation as part of that investigation.

260.    The existence and/or scope of the fraudulent concealment, the Fraudulent
Asbestos Defense Scheme and BCAD Enterprise's existence and corrupt activities was
not known  to Plaintiffs prior to that time, and, because of its covert nature, was not
reasonably knowable to them until such time as they were first advised of its existence by
their asbestos counsel.

261.    Due to the nature of the facts and circumstances concerning the Fraudulent
Asbestos Defense Scheme and the BCAD Enterprise's role in executing this scheme,
such are reasonably not known or knowable to members of the Class and will not be
unless and until they are notified of these circumstances, which is an element of relief
sought in this class action.

262.    Plaintiffs and others similarly situated to them have been harmed by the
misrepresentations, omissions of material fact and deceitful conduct involved in the
Fraudulent Asbestos Defense Scheme and the BCAD Enterprise's role in executing it, as
well as by the negligence and recklessness of the Defendants in not discovering and /or in

allowing the tortious conduct to be committed and practiced upon Plaintiffs and members of the Class.

263.    As a direct and proximate result of Defendants' acts, omissions and activities, including the BASF and Lawyer Perpetrators' pattern of unlawful activities that violate N.J.S.A. § 2C: 41-1 *et seq.*, Plaintiffs and members of the Class similarly situated sustained the loss of their property in the form of the termination of their asbestos injury claims and/or their right under law to pursue and receive full, fair and just compensation for their asbestos injury claims, together with the time value monetary loss due to their not timely receiving the full, fair and just compensation to which they were entitled.

264.    Based upon information in the documents produced during the *Paduano* spoliation investigation, at least several thousand asbestos claimants across the United States have been similarly so injured and harmed. Discovery and appropriate notice to the class may likely reveal more.

**L.    Defendants' Clandestine Misconduct and Concealments Prevented Plaintiffs and Class Members From Discovering the Fraudulent Asbestos Defense Scheme Despite the Exercise of Diligence Thereby Warranting Tolling of Any Applicable Statute of Limitations.**

265.    For over twenty-five (25) years, the BASF Perpetrators and the Lawyer Perpetrators were able to successfully keep the Fraudulent Asbestos Defense Scheme secret and unknown by Plaintiffs, their counsel and others similarly situated.

266.    The successful operation of Defendants' Fraudulent Asbestos Defense Scheme, as well as each Defendant's own respective financial, corporate and/or

professional well being once execution of the scheme got underway, depended upon: (a) the destruction, secreting and/or concealment of BASF's and its predecessor companies' documents and evidence relating to Class Members' underlying asbestos injury claims beginning in 1984; (b) the concealment and cover-up of this spoliation of documents and evidence; (c) the secreting and concealment each Defendant's respective role(s), activities and involvement in the spoliation of documents and evidence; and, (d) the secreting and concealment of the Defendants' respective roles and activities in the execution of the subsequent misrepresentation and fraudulent material misrepresentations relating to or based upon the spoliation of documents and evidence.

267.    The successful operation of Defendants' Fraudulent Asbestos Defense Scheme, as well as their own financial, corporate and/or professional well being once execution of the scheme got underway, also depended upon there being continuity and consistency in making the exculpatory misrepresentations and misleading omissions involved in the scheme. Defendants therefore carefully, consistently and, as it turned out, successfully, secreted and concealed the Fraudulent Asbestos Defense Scheme as well as their involvement and activities in its commission until Mr. Swanson happened to come forward and testify in his daughter's mesothelioma case.

268.    In view of the foregoing, Plaintiffs and the members of the Class could therefore not reasonably have discovered the Fraudulent Asbestos Scheme alleged herein any earlier despite the exercise of reasonable diligence.  Indeed, as indicated above, over the years that the Fraudulent Asbestos Defense Scheme was in existence the lawyers for Plaintiffs, as well as the lawyers for other similarly situated asbestos injury claimants, did their jobs of investigating and conducting discovery into BASF and its predecessors' talc

products, only to be directly or indirectly lied to by the BASF Perpetrators' and Lawyer

Perpetrators who were closely controlling and conducting BASF's and its predecessors'

asbestos claims defense.  As set forth in the preceding paragraphs of this complaint, said

investigation included but was not limited to:

> a.   Utilizing means of discovery authorized by rules of civil procedure
>
> including interrogatories and requests for production of documents which sought
>
> information regarding testing and/or other evidence related to the presence of
>
> asbestos in BASF's talc, or talc products, its sale of asbestos and asbestos containing
>
> products, its knowledge of the risks of asbestos fibers to those near where asbestos
>
> containing products were used in the workplace, and whether it destroyed any
>
> evidence pertaining to the hazards of asbestos, warning labels or hazardous conditions
>
> at its plants or factories;

> b.   Engaging in written correspondence seeking clarification or comment
>
> from the defendants regarding information suggesting possible health risks caused by
>
> BASF's talc or conditions at the Johnston Mine found through their investigation as
>
> claimants' counsel as described above; and,

> c.   Considering the fact provided by defendants that other leading and
>
> experienced asbestos counsel had voluntarily withdrawn their clients' cases against
>
> BASF based upon the material provided directly or indirectly by BASF and Cahill
>
> Gordon.

Moreover much of the Fraudulent Asbestos Defense Scheme to this day still remains

concealed by Defendants and unknown to Plaintiffs and members of the Class.

269.     Once the existence of the Fraudulent Asbestos Defense Scheme was suggested by the deposition testimony of Mr. Swanson in the *Paduano* suit, Ms. Paduano's counsel began the *Paduano* spoliation investigation described above that led to revelation of the fraudulent scheme. Absent Mr. Swanson's testimony, however, there was no reason or indication for asbestos injury claimants or their counsel to suspect or investigate the existence of the Fraudulent Asbestos Defense Scheme.

270.     In view of the foregoing, any applicable statutes of limitations should therefore be held inapplicable or tolled due to and on account of Defendants' knowing and active concealment, suppression and denial of the facts alleged herein.  Plaintiffs and members of the Class have, as a direct result of the conduct of the Defendants, been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.  Plaintiffs could not reasonably have discovered the spoliation and the fraudulent nature of Defendants' conduct.  Accordingly, Defendants should be estopped from asserting or relying upon any of any statute of limitations, statutes of repose, laches, or substantive cause of action time limitations, such as those contained in applicable personal injury and/or survival or wrongful death laws, to defeat any of Plaintiffs' claims asserted herein.

## VI. CLASS ACTION ALLEGATIONS

271.     Plaintiffs bring this action on behalf of themselves and pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "**Class**"  or "**Asbestos Claimant Class**") defined as follows:

All persons in the United States and its territories who at any time between March 7, 1984 through and including the date of the commencement of this class action, inclusive (the "**Class period**") —

(a)   Who had an asbestos injury claim or potential asbestos injury claim against BASF Catalyst, Inc. ("**BASF**") or any of its predecessor companies that mined, manufactured, processed, distributed or sold talc ore or talc products, including but not limited to Engelhard Corporation, Engelhard Industries, Engelhard Minerals & Chemicals Corporation, Minerals & Chemicals Phillip Corporation, Eastern Magnesia Talc Company, Porocel Corporation and Pita Realty Limited (collectively "**BASF Predecessor Companies**") that is based upon claimed exposure to asbestos fiber present in talc ore or talc products mined, manufactured, processed or sold  by one or more of the BASF Predecessor Companies (which talc products were commonly marketed under the trademark "Emtal"); and

(b)   Who during the Class Period either:

(i)   had their asbestos injury claim involuntarily dismissed or terminated on dispositive motion filed by or for BASF or one or more of the BASF Predecessor Companies asserting that its or their talc ore or products did not contain asbestos fibers and/or that there was no evidence its or their talc products contained asbestos; or

(ii)   voluntarily dismissed or discontinued their asbestos injury claim against BASF or one or more of the BASF Predecessor Companies (including any asbestos injury claim that was discontinued or ended based upon the receipt of nominal or token consideration from BASF or one or more of the BASF Predecessor Companies in exchange for a release or settlement agreement) subsequent to the receipt of a representation to him or her, or to his/her agent or attorney, by BASF or one or more of the BASF Predecessor Companies that asserted that its or their talc ore and talc products did not contain asbestos fibers and/or that there was no evidence its or their talc products contained asbestos; or

(iii)   voluntarily refrained the filing or pursuit of their asbestos injury claim against BASF or one or more of the BASF Predecessor Companies subsequent to the receipt of a representation to him or her, or to his/her agent or attorney, by BASF or one or more of the BASF Predecessor Companies that asserted that its or their talc ore and talc products did not contain asbestos fibers and/or that there was no evidence its or their talc products contained asbestos.

For purposes of this class definition:

"**Person**" includes any family member or personal representative of an injured asbestos victim who claimed or could claim derivatively upon, for, behalf of or through an exposed individual; and

"**BASF**" and "**BASF Predecessor Companies**" includes its or their attorneys, claims agents and/or claims representatives.

272.     Plaintiffs are members of the Class that they seek to represent.

273.     Members of the Class can be identified from Defendants' records, court records, records of asbestos claimants' counsel, records of unions in which Class Members belonged, and  asbestos claims representatives and claimants' records. Notice can be given to the Class through direct notice and general print and electronic publication means.

274.     Plaintiffs' claims are typical of the claims of the other Class Members because Plaintiffs and all putative Class Members were and are similarly affected by Defendants' spoliation of asbestos evidence and the subsequent pattern and practice of uniform misrepresentations, concealments and suppression of material fact, and the relief sought herein is for the benefit of Plaintiffs and members of the putative Class.

275.     Class Members are so numerous that their individual joinder is impracticable.

276.     Common questions of law and fact predominate over the questions affecting only individual Class Members.  Some of the common legal and factual questions include:

a)  Whether BASF spoliated evidence relating to Class Members' underlying asbestos claims?

b) Whether all or some of the Defendants conspired to spoliate evidence relating to Class Members' underlying asbestos claims?

c) Whether all or some of the Lawyer Perpetrators aided and abetted BASF's spoliation of evidence relating to Class Members' underlying asbestos claims?

d) Whether Defendants utilized and exploited the spoliation of evidence relating to Class members' underlying asbestos claims to Class Members' detriment and harm?

e) Whether, and if so how, Defendants concealed the spoliation of evidence relating to Class Members' underlying asbestos claims from Class Members?

f) Whether Defendants systematically and uniformly misrepresented to Class Members that BASF's Predecessor Companies' talc ore and talc products did not contained asbestos?

g) Whether Defendants systematically and uniformly misrepresented to Class Members that there was no evidence that BASF's Predecessor Companies' talc ore and talc products contained asbestos?

h) Whether Defendants omitted to disclose material information and facts to Class Members concerning the presence of asbestos in BASF's Predecessor Companies' talc ore and talc products?

i) Whether Defendants omitted to disclose material information and facts to Class Members concerning documents and other evidence about the

presence of asbestos in BASF's Predecessor Companies' talc ore and talc products?

j)  Whether or not all or some of the Defendants conspired or acted in concert with other Defendants to commit the Fraudulent Asbestos Defense Scheme, including misrepresenting to Class Members that BASF's predecessor companies' talc ore and talc products did not contain asbestos and/or there was no evidence that BASF's Predecessor Companies' talc ore and talc products contained asbestos?

k)  Whether Defendants are liable to the Class for damages, punitive damages and other available relief under New Jersey' for committing spoliation and fraudulent concealment of evidence?

l)  Whether the Defendants formed and utilized BCAD Enterprise to conduct, execute and manage BASF's asbestos claim defense?

m)  Whether or not the BASF Perpetrators and/or the Lawyer Perpetrators obstructed justice in violation of 18 U.S.C. § 1503 (Obstruction of Justice), committed Mail Fraud in violation of 18 U.S.C. § 1341, or committed Wire Fraud in violation of 18 U.S.C. § 1343 in the execution of the Fraudulent Asbestos Defense Scheme?

n)  Whether the BASF Perpetrators and/or Lawyer Perpetrators conducted or participated, directly or indirectly, in the conduct of the BCAD Enterprise through a pattern of unlawful activity, as defined under N.J.S.A. § 2C:41-1?

o) Whether the BASF Perpetrators and/or Lawyer Perpetrators violated N.J.S.A. § 2C:41-1 *et seq.*?

p) Whether the BASF Perpetrators and/or Lawyer Perpetrators violations of N.J.S.A. § 2C:41-1 *et seq.,* damaged Plaintiffs and Class Members' property entitling them, upon proof and adjudication of their respective damages as the Court directs, to a threefold damages recovery, as well as such other relief available under N.J.S.A. § 2C:41-1 *et seq.*?

q) Whether Defendants are liable to Plaintiffs and the Class for damages and equitable relief for committing common law fraud, conspiring to commit common law fraud, or aiding and abetting other Defendants' commission of common law fraud?

r) Whether Defendants are liable to Plaintiffs and the Class for damages for committing negligent misrepresentations?

s) Whether Cahill Gordon's  management negligently and/or recklessly failed to monitor, oversee and control Cahill Gordon's professional staff and thereby permitted, enabled or facilitated Cahill Gordon partners and associate attorneys to engage in the wrongful and tortious conduct and activities they are claimed to have committed towards Plaintiffs and members of the Class?

t) Whether Cahill Gordon in its capacity as BASF's national asbestos counsel negligently and/or recklessly failed to monitor, oversee and control the local counsel handling BASF's asbestos defense matters and

thereby permitted, enabled or facilitated such local attorneys to engage in the wrongful and tortious conduct and activities they are claimed to have committed towards Plaintiffs and members of the Class?

u)  Whether Cahill Gordon is liable to Plaintiffs and the Class for negligent supervision or entrustment of partners, associates and employees or local defense counsel they managed?

v)  Whether Defendants committed obstructions of justice or abuses of process when they threatened Class Members and/or their counsel with imposition of civil sanctions for filing or continuing to prosecute an asbestos injury lawsuit against BASF and/or by filing false or materially misleading motions or sworn documents with courts adjudicating asbestos injury lawsuits?

w)  Whether by their wrongful acts, activities and omissions Defendants unjustly enriched themselves at the expense and to the detriment of Plaintiffs and other Class Members?

x)  What is the nature and extent of damages and other remedies to which Defendants' conduct entitles the Class?

y)  Whether Plaintiffs and the Class are entitled to equitable relief restoring them and BASF to the *status quo ante* the commission of the misrepresentations or material omissions of information against them pursuant to the Fraudulent Asbestos Defense Scheme?

z)  Whether Plaintiffs and the Class are entitled to equitable relief restoring them and BASF to the *status quo ante* the spoliation of the evidence relating to Class Members' underlying asbestos claims?

aa) Whether Plaintiffs and the Class are entitled to equitable relief that alleviates and cures any impairment, detriment or harm inflicted upon them by the spoliation of the evidence relating to Class Members' underlying asbestos claims, including any detriment or harm attributable to the passage of time such as loss of witnesses and documentation needed to establish a Class Members' underlying asbestos injury claim?

bb) Whether Plaintiffs and the Class are entitled to equitable relief that alleviates and cures any impairment, detriment or harm inflicted upon them by the Defendants' fraudulent and deceitful acts and omissions in furtherance of the Fraudulent Asbestos Defense Scheme, including any harm attributable to the passage of time such as loss of witnesses and other documentation needed to establish Class Members' underlying asbestos injury claims?

cc) Whether and how Defendants benefited by the spoliation of evidence relating to Class Members' underlying asbestos injury claims and if so in what monetary amounts?

dd) Whether Class Members are entitled the restitution of any moneys or property unlawfully obtained or retained by any person found to be in violation of N.J.S.A. § 2C:41-1 *et seq.*?

ee) Whether Defendants should be required to disgorge any moneys that are found to unjustly enrich them or were illegally earned?

ff)  Whether assessment of punitive damages against the Defendants is warranted and just under the circumstances?

gg) Whether the circumstances require creation of special judicial procedures and claims dispute mechanisms to efficiently and fairly correct and redress the extraordinary detriment, injury and harm Defendants' wrongful and tortious conduct caused and inflicted upon Plaintiffs and members of the Class, and if so what those procedures and mechanism should be and how they should be financed?

hh) Whether the spoliation of evidence relating to Class Members' underlying asbestos injury claims was unknown and unknowable to plaintiffs and members of the class due to Defendants' concealment of the spoliation and its Fraudulent Asbestos Defense Scheme?

ii)  Whether in light of the extraordinary circumstances of the matter, an immediate publication notice to the Class apprising them of the alleged circumstances and their legal rights at Defendants' expense is warranted and should be ordered as preliminary injunctive relief?

jj)  Whether class members are entitled to a declaration that BASF's and Cahill Gordon's communications relating to the fraudulent conduct and/or the spoliation of evidence are not privileged attorney-client communication under the crime fraud exception?

277.    The Defendants engaged in a common course of conduct and in a common, coordinated fraudulent scheme giving rise to the legal rights sought to be enforced by Plaintiffs and the Class Members.  Similar or identical statutory and common law violations are involved, and New Jersey's statutory and common law may be constitutionally, properly and prudentially applied in this matter to the Class Members claims. Individual questions, if any, pale in comparison to the numerous common questions that predominate.

278.    The injuries sustained by Plaintiffs and Class Members flow, in each instance, from a common nucleus of operative facts — the spoliation of evidence and/or fraudulent or misleading denial of the existence of evidence material to Class Members' underlying asbestos injury claims; the Defendants' uniform pattern practice of misrepresentations and deceitful misconduct and non disclosures regarding the nature of Engelhard's "Emtal" talc products; and the Defendants' false claim of non existence of any evidence that these products contained asbestos.

279.    Plaintiffs and the Class Members have been damaged by the BASF Perpetrators' and the Lawyer Perpetrators' misconduct.  In the absence of the BASF Perpetrators' and the Lawyer Perpetrators' fraudulent scheme, Plaintiffs and the Class Members would not have sustained the economic damages and losses described above.

280.    Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are familiar with the basic facts that form the bases of their and the Class Members' claims.  Plaintiffs' interests do not conflict with the interests of the other Class Members that Plaintiffs seek to represent.  Plaintiffs have retained counsel competent and

experienced in Class action litigation and intend to prosecute this action vigorously. Plaintiffs' counsel has successfully prosecuted complex asbestos, fraud and misrepresentation cases and class actions.  Plaintiffs' counsel also uncovered the Fraudulent Asbestos Defense Scheme during their representation of the plaintiffs in the *Paduano* suit, which has since resolved.  Plaintiffs and Plaintiffs' counsel will fairly and adequately protect the interests of the Class Members.

281.    The Class is certifiable under Rule 23(b)(1) (A) in that prosecuting separate actions by individual class members against the Defendants could create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class, the Defendants herein.

282.    The Class is certifiable under Rule 23(b)(2) in that all or some of the Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

283.    The Class is certifiable under Rule 23(b)(3) because:

a.    Individual litigation of the legal and factual issues raised by Defendants' wrongful conduct would increase delay and expense to all parties and to the court system, causing a denial of justice to many Class Members.  The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision and management of a complex situation created by Defendants' egregious alleged

misconduct by a single court. Given the similar nature of the Class Members' claims, the uniform applicability of N.J.S.A. § 2C:41-1 *et seq.* and New Jersey common-law in this case is warranted and proper due to, *inter alia*, the following factors: New Jersey's overwhelming  significant contacts and government interests to the matter; the location of BASF's and its predecessors' headquarters in New Jersey; the spoliation of evidence occurring in New Jersey;  and the commission of numerous deceitful acts and omissions taking place in New Jersey, where many of BASF's  its predecessor companies alleged fraudulent affirmations under oath were signed and notarized; and the relative absence of material differences in the laws upon which the Class Members' claims are based. A nationwide Class can therefore be easily managed by the Court and the parties; and,

b. The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the Class Members. The relief sought per individual members of the Class is small given the burden and expense of hundreds if not thousands of individual prosecution of the potentially extensive litigation necessitated by the Defendants' wrongful conduct.

## VII. CAUSES OF ACTION

### COUNT I
### VIOLATION OF N.J.S.A. § 2C:41-2c
#### (Against BASF Perpetrators and the Lawyer Perpetrators)

284.    Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

285.     Each of the Defendants comprising the BASF Perpetrators (BASF, Halket, Dornbusch and Hemstock) and the Lawyer Perpetrators (Cahill LLP, Cahill Partnership, Sloane, Martin and Dembrow) is a "person" within the meaning of N.J.S.A. § 2C:41-1b.

286.     The BCAD Enterprise is an association-in-fact within the meaning of N.J.S.A. § 2C:41-1, consisting of:

a.   The BASF Perpetrators,  as well as from time to time, other BASF employees and agents who may or may not have been aware or knowledgeable of the Fraudulent Asbestos Defense Scheme; and,

b.   The Lawyer Perpetrators, as well as from time to time, other Cahill Gordon partners, shareholders, members, associates and employees who may or may not have been aware or knowledgeable of the Fraudulent Asbestos Defense Scheme.

287.     The BASF Perpetrators and the Lawyer Perpetrators are "persons" as defined N.J.S.A. § 2C:41-1 who are distinct from the BCAD Enterprise.

288.     The BASF Perpetrators and Lawyer Perpetrators created and maintained the BCAD Enterprise to manage and conduct BASF's and the BASF Predecessor Companies' asbestos injury claim administration and defense.  It was, however, corrupted by the BASF Perpetrators and Lawyer Perpetrators through their operation of it through a continuous pattern of activities and conduct constituting predicate acts or violations under N.J.S.A. § 2C:41-1 *et seq.* which they devised and executed in order to end and/or ward off asbestos injury claims being filed or successfully maintained against BASF and the BASF Predecessor Companies.

289.   The BCAD Enterprise was an ongoing organization that functioned as a continuing unit or association for at least 25 years – 1983 or 1984 to 2009, if not longer.

290.   The BASF Perpetrators and Lawyer Perpetrators used the BCAD Enterprise to manage and defend asbestos injury lawsuits filed throughout the country, as well as other asbestos injury claims against BASF, and conducted its operations through the suppression and spoliation of inculpatory evidence and documents relating to asbestos in BASF's talc, Emtal talc, or Emtal talc products, and/or through false and/or fraudulent misrepresentations and material omissions relating to the existence of asbestos in BASF's talc, Emtal talc, or Emtal talc products which were conveyed or transmitted through means of telephone and telefax, the U.S. Mail, the internet and/or private or commercial interstate carriers such as Federal Express; all as set forth above. Any and all of these actions or material omissions were committed to obstruct justice or as a part of an endeavor to obstruct justice.

291.   Each of the Defendants comprising the BASF Perpetrators and the Lawyer Perpetrators, acting as set forth above, thereby conducted the affairs of the BCAD Enterprise through a pattern of activity or conduct proscribed under N.J.S.A. § 2C:41-1, *et seq.,* and thereby violated N.J.S.A. § 2C:41-2c.

292.   The BCAD Enterprise enabled and facilitated the BASF Perpetrators' and the Lawyer Perpetrators' successful and secret execution of the Fraudulent Asbestos Defense Scheme continuously for over twenty-five (25) years.

293.   The BCAD Enterprise had a chain of command structure and was organized into groupings of participants or actors with specific roles, functions and

duties. Cahill Gordon, until sometime in 2009 or 2010, the exact time not being known presently, served as BASF's national asbestos defense counsel and in such capacity managed and oversaw the defense of all asbestos claims in the United States involving BASF and its predecessor companies. In this capacity Cahill Gordon shared responsibility with the BASF Perpetrators for devising defense strategy and tactics. Cahill Gordon was then responsible for uniformly executing that strategy throughout the United States, which task and role included instructing local defense counsel who were directly interacting with asbestos injury claimants' counsel on the strategy and tactics to be employed on behalf of BASF or its predecessor. Cahill Gordon additionally was responsible for providing local counsel with materials to execute same. Cahill Gordon also authored or procured from third parties or BASF employees the false and misleading exculpatory documents and reports routinely provided to and used by local defense counsel when dealing with asbestos injury claimants in BASF's asbestos defense, such as the Ashton Affidavit, Pooley Report, and Carter Affidavits. Cahill Gordon also prepared and supplied to such local defense counsel the templates for requests for voluntary dismissals letters and for interrogatory answers which referred to these false and misleading exculpatory documents. The local defense firms reported to both Cahill Gordon and BASF's in-house counsel. BASF employees provided affidavits and testimony for the defense when needed, and the BASF Perpetrators controlled the information provided to such employees in connection with these activities.  The BASF perpetrators also controlled the BCAD Enterprise via its funding of its operations directly and/or indirectly through its insurance coverage it owned and paid for, as well as by

BASF and Engelhard's ability to retain or discharge Cahill Gordon or any of the local law firm's representing it or them.

294.    Each of the participants in the BCAD Enterprise received substantial revenue or economic benefit from the BCAD Enterprise.  Each member of the BCAD Enterprise also benefited from the existence of the other parts or participants in the enterprise.  Cahill Gordon earned lucrative professional fees for numerous years for its activities associated with the BCAD Enterprise, including activities that constituted a pattern of activities and conduct that are proscribed and constitute predicate acts or violations under N.J.S.A. § 2C:41-1, *et seq*. Cahill Gordon attorneys also benefited from being able to claim when marketing the firm or themselves that Engelhard, and later on, BASF, was a client for which it (or he/she) had successfully handled complex mass tort litigation.  BASF was able to eliminate, avoid or reduce its payments of compensation to asbestos injury claimants and reduce its overall defense transaction costs by the operations and activities of the BCAD Enterprise.  Individual BASF employees involved in the asbestos claims defense were able to maintain their employment and earn favorable employment reviews based on the handling or participation in BASF's asbestos injury claims management.  All participants in the management of the BCAD Enterprise also gained and were benefitted by the BCAD Enterprise's operations facilitating and maintaining both the continuity and the invisibility of the Fraudulent Asbestos Defense Scheme due to the grave economic and professional consequences that were possible if the scheme became exposed.

295.    The BCAD Enterprise engaged in and affected New Jersey and interstate trade and commerce.  It handled and managed the administration and defense of

thousands of asbestos injury claims across the United States.  It utilized insurance coverage underwritten by national insurance carriers to fund, in part, its operations.  It regularly utilized interstate communication systems, including the U.S. Mail, interstate telephone/telefax, internet and private or commercial interstate carriers, such as Federal Express, to conduct its operations as set forth above.

296.    The BASF Perpetrators and Lawyer Perpetrators exerted control over the BCAD Enterprise.

297.    The BASF Perpetrators and Lawyer Perpetrators have conducted and managed the BCAD Enterprise's affairs through a pattern of acts and activities that are indictable under 18 U.S.C. § 1503 (Obstruction of Justice), 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud), all of which are defined and proscribed unlawful acts, activities or conduct under N.J.S.A. § 2C:41-1a(2) and which serve as predicate acts in violation of  N.J.S.A. § 2C:41-2c ("**predicate acts**").

298.    The BASF Perpetrators and Lawyer Perpetrators acts of obstruction  of justice  include the spoliation of material evidence and documents as described above, their cover-up and concealment of the spoliation of material evidence and documents as described above, and/or their misrepresentation and material omissions of fact relating to: (a) BASF-Engelhard's claim of "no asbestos" being present in BASF's talc, Emtal talc, or Emtal talc products and/or (b) the non-existence of any evidence establishing the presence of asbestos in BASF's talc, Emtal talc, or Emtal talc products in verified discovery, in dismissal motions filed with courts, and in law suit related correspondence requesting voluntary dismissals, as described above.

299.     The BASF Perpetrators' and Lawyer Perpetrators' use of the mails, wires and/or private or commercial interstate carriers to perpetrate their Fraudulent Asbestos Defense Scheme through the BCAD Enterprise involved hundreds, if not thousands, of mail, wire or private or commercial interstate carrier communications, including those set forth above, which communications constitute predicate acts and unlawful activities under N.J.S.A. § 2C:41-1a(2), including, but not limited to those mailings, interstate carrier mailings and wire communications which directly or indirectly:

a.   Made and transmitted fraudulent misrepresentations and material omissions of information and fact to asbestos injury claimants and/or their counsel and/ or courts in which it was falsely and deceptively represented to asbestos injury claimants and/or their counsel (and when applicable, courts) that BASF's talc, Emtal talc, or Emtal talc products did not contain asbestos fibers, and/or that there was not any evidence that BASF's talc, Emtal talc, or Emtal talc products contained asbestos;

b.   Submitted false and misleading sworn statements in the form of affidavits and verified interrogatory answers to asbestos injury claimants, their counsel and/or presiding courts that that BASF's talc, Emtal talc, or Emtal talc products did not contain asbestos fibers and/or that there was not any evidence that BASF's talc, Emtal talc, or Emtal talc products contained asbestos;

c.   Served and/or filed motions asserting false, deceitful and fraudulent representations and statements that BASF's talc, Emtal talc, or Emtal talc products did not contain asbestos fibers and/or that there was not any evidence that in BASF's talc, Emtal talc, or Emtal talc products contained asbestos;

d.   Transmitted and received back releases, settlement agreements and notices, stipulations or consent orders for dismissal or discontinuance fraudulently obtained from asbestos injury claimants and/or their counsel; and/or,

e.   Transmitted or received professional fees and cost reimbursements relating to the Fraudulent Asbestos Defense Scheme.

300.    In addition, in furtherance of BCAD Enterprise's fraudulent and unlawful conduct BASF personnel in New Jersey communicated by United States mail, private or commercial interstate carriers, telephone, and facsimile with Cahill Gordon in New York, as well with various local BASF asbestos defense counsel and various asbestos injury claimants' counsel around the country.

301.    The BASF Perpetrators' and Lawyer Perpetrators' activities and conduct that related to the BCAD Enterprise amounted to a longstanding common course and pattern of conduct intended to deceive and harm Plaintiffs and Class Members that are proscribed predicate acts under N.J.S.A. § 2C:41-1.  Each such activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and Class Members.

302.    The BASF Perpetrators' unlawful activities and predicate acts violating N.J.S.A. § 2C:41-2(c) still remain a part of BASF's ongoing business affairs and constitute a continuing threat to the property of Class Members in view of BASF's spoliation of material evidence relating to Class Members' underlying asbestos claims and BASF's subsequent longstanding course of misrepresentations about the non existence of asbestos in BASF's talc, Emtal talc, or Emtal talc products.  BASF's pattern

and practice of misrepresentations continues unabated. As described above, BASF continued to attempt to misrepresent the asbestos content of BASF's talc, Emtal talc, or Emtal talc products in the *Paduano* case even after the spoliation and the fraudulent misrepresentations was uncovered. Subsequently, on or about December 22, 2010, BASF's local counsel, in the New York Supreme Court *Chernick* case mentioned above sought and obtained from the defrauded *Chernick* claimants' counsel a replacement consent "No Opposition Summary Judgment Motion and Order" for filing in order to obtain a judicial dismissal with prejudice. It did so without making any disclosures, corrections or retractions regarding previous misrepresentations and material omissions made years earlier to procure agreement to the dismissal. That fraudulently obtained consent order was then submitted to the New York Supreme Court by BASF's local counsel on or about January 18, 2011 and, in course, was approved, executed and entered by said Court on or about February 3, 2011.

303.    Defendants' predicate acts of mailing by U.S. Mail or private/commercial interstate carrier and/or by transmitting via wire instrumentalities the misleading material representations and omissions of fact in furtherance of the Fraudulent Asbestos Defense Scheme constitutes a pattern of unlawful conduct and predicate acts under N.J.S.A. § 2C:41-1d, which in turn violates N.J.S.A. § 2C:41-2c, based upon both the relationship between the acts and the continuity over the period of time of the acts.  The relationship was related because the predicate acts were connected to each other in furtherance of the Fraudulent Asbestos Defense Scheme.  Continuity was reflected by both the long and repeated nature of the mailed, telefaxed and telephoned misrepresentations and material omissions during and in furtherance of the Fraudulent Asbestos Defense Scheme and the

threat of similar acts occurring in the future.  The threat was related by the lengthy

continuing and ongoing nature of the predicate acts.

304.    Defendants' unlawful and predicate acts were related, because they: (a)

reflected the same purpose or goal (obstructing, impeding, impairing, disrupting and/or

otherwise defeating the rights of asbestos litigation claimants in suits in which BASF

and/or its predecessor companies was or were a party, and/or deterring and warding off

the filing of asbestos injury claims against BASF and/or its predecessor companies); (b)

obtained the same results (the warding off and termination of asbestos suits with no or

only nominal/token consideration, if any,  paid to asbestos claimants); (c) involved the

same participants (the BASF Perpetrators', Lawyer Perpetrators', asbestos claimants and

their counsel); (d) targeted the same victims (Plaintiffs and the Class Members); and, (e)

employed the same methods and means (*modus operandi*) of commission (the Fraudulent

Asbestos Defense Scheme and other acts described in this Complaint).  The predicate acts

were interrelated and not isolated events since they were carried out for the same

purposes in a continuous manner and in secret over a substantial period of time- at least

twenty-five (25) years.

305.    Plaintiffs and Class Members have been injured in their business and

property by reason of the violations of N.J.S.A. § 2C:41-2c in that they either: (a)

suffered an  involuntary dismissal of their lawsuit because they could not produce

evidence contradicting BASF and its predecessor companies assertions and averments

that its talc and talc ore did not contain any asbestos and there was no evidence that it did;

(b) voluntarily dismissed or discontinued their cases without consideration; (c)

voluntarily dismissed or discontinued their cases for a nominal or token consideration

instead of full, fair and complete compensation they were entitled to under law; or, (d) refrained from filing a claim or suit against BASF and/or its predecessor companies. In each instance Plaintiffs and member of the Class would not have done so had the BASF Perpetrators and Lawyer Perpetrators not engaged in their patterns of unlawful activity.

306.    The BASF Perpetrators' and Lawyer Perpetrators' above-described unlawful activity directly and proximately caused Plaintiffs and Class Members ascertainable property losses and damage.

307.    By virtue of these violations of N.J.S.A. § 2C:41-2c, the  BASF Perpetrators' and Lawyer Perpetrators are jointly and severally liable to Plaintiffs and Class members for three times the damages they have sustained, plus the cost of this suit and  reasonable attorney's fees.

**COUNT II**
**VIOLATION OF N.J.S.A. § 2C:41-2D BY**
**CONSPIRING TO VIOLATE N.J.S.A. § 2C:41-2C**

**(Against BASF Perpetrators and the Lawyer Perpetrators)**

308.    Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

309.    Section N.J.S.A. § 2C:41-2d provides that it "shall be unlawful for any person to conspire as defined by N.J.S. 2C:5-2 to violate any of the provisions of this section."  N.J.S.A. § 2C:41-2c is one such provision.

310.    The BASF Perpetrators and Lawyer Perpetrators have violated N.J.S.A. § 2C:41-2d by agreeing to and thereby conspiring to violate N.J.S.A. § 2C:41-2c.

311.    The object of the conspiracy has been, and remains to this date, to (a) conduct or participate in, directly or indirectly, the conduct of the affairs of the BCAD Enterprise through a pattern of unlawful activity as described above; and (b) take or perform all actions and measures as are necessary  to conceal  the fraudulent acts, misrepresentations and  suppressions of evidence that had been committed or were being committed in furtherance of the Fraudulent Asbestos Defense Scheme so that the scheme remained unknown by the public, the judiciary, professional regulators and law enforcement officials.

312.    The co-conspirators, the BASF Perpetrators and Lawyer Perpetrators, have engaged in, or have aided and abetted the commission of, numerous overt and fraudulent predicate acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiffs and Class Members of their asbestos injury claims as described above.

313.    The nature of the above-described co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that the BASF Perpetrators and Lawyer Perpetrators not only agreed to the objective of an N.J.S.A. § 2C:41-2d violation by conspiring to violate N.J.S.A. § 2C:41-2c, but they were aware that their ongoing unlawful and fraudulent acts have been and are part of an overall pattern of activity that was and is unlawful.

314.    As a direct and proximate result of  the BASF Perpetrators' and Lawyer Perpetrators' overt acts and predicate acts in furtherance of violating N.J.S.A. § 2C:41-2d by conspiring to violate N.J.S.A. § 2C:41-2c, Plaintiffs and members of the Class have

been and will continue to be injured in their business or property as set forth more fully above.  By reason of the unlawful acts engaged in by Defendants, Plaintiffs and members of the Class have suffered ascertainable loss and damages of their property entitling them to relief and damages.

315.    Injuries suffered by Plaintiffs and members of the Class were directly and proximately caused by the BASF Perpetrators' and Lawyer Perpetrators' unlawful activities and conspiracy to commit violations of N.J.S.A. § 2C:41-2c, as described above.

316.    By virtue of these violations of N.J.S.A. § 2C:41-2d, Defendants are liable to Plaintiffs and members of the Class for three times the damages Plaintiffs and members of the Class have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT III
## FRAUDULENT CONCEALMENT - SPOLIATION
### (Against All Defendants)

317.    Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

318.    On or about March 7, 1984, and continuing thereafter as well, the BASF Perpetrators and Lawyer Perpetrators were cognizant and aware that BASF's Predecessor Companies had been sued by asbestos injury claimants contending Engelhard's Emtal talc mined at the Johnson Mine contained asbestos which caused asbestos personal injuries.

319.     On or about March 7, 1984, and continuing thereafter as well, the BASF Perpetrators and Lawyer Perpetrators were cognizant and aware that it was foreseeable and likely that BASF's predecessor companies in the future would be sued by other asbestos injury claimants, including claimants who were injured or residing in New Jersey, who would claim and contend that Engelhard's Emtal talc mined at the Johnson Mine and/or talc products made with same contained asbestos which injured them.

320.     On or about March 7, 1984, and continuing thereafter as well, given their knowledge about the volume and the wide use of Engelhard's talc in the United States, the latent and progressive nature of asbestos disease, and the state of asbestos litigation at that time, the BASF Perpetrators and Lawyer Perpetrators were aware and understood that it was foreseeable and likely that BASF's Predecessor Companies in the future would be sued by asbestos injury claimants, including claimants who were injured or residing in New Jersey, who would claim and contend that Engelhard's Emtal talc mined at the Johnson Mine and/or products made with same contained asbestos which injured them.

321.     In view of their knowledge that future asbestos injury claims against BASF and the BASF Predecessor Companies were foreseeable and likely, at all times material herein, including March 7, 1984, the BASF Perpetrators were under a duty to preserve evidence and documents that were relevant to such claims and litigation, including a duty to suspend any document retention policies that were in effect or were being put into operation as such related to documents and evidence relevant to asbestos injury claims involving Engelhard's Emtal talc or the Johnson Mine.

322.    At all times material herein, including March 7, 1984, in view of their knowledge that future asbestos injury claims against the BASF Predecessor Companies were foreseeable and likely, the Lawyer Perpetrators were under a duty to counsel and advise BASF and its predecessors to preserve evidence and documents that were relevant to such claims, including the suspension of any document retention policies that were in effect or being put into operation as to such documents and evidence.  The Lawyer Perpetrators were also under a duty to not aid and abet BASF and its predecessors' violation of its or their duty to preserve evidence.

323.    At all times material herein, Defendant BASF and the BASF Predecessor Companies also were under a legal duty of candor and truthfulness towards asbestos litigants suing it or them, as well as to courts presiding over the law suits concerning these claims.  This duty of candor or truthfulness precluded the filing or submission of affidavits and verifications in support of facts, requests or motions where Defendant BASF and the BASF Predecessor Companies knew the facts to be false or where Defendant BASF and the BASF Predecessor Companies had no reasonable and good faith basis to believe and assert the facts as being true.

324.    At all times material herein, the Lawyer Perpetrators, as counsel to BASF and the BASF Predecessor Companies in asbestos injury matters, had a duty to advise, counsel and instruct BASF and the BASF Predecessor Companies to provide candid, truthful and non-misleading factual affidavits, responses to discovery and other factual information in asbestos ligation matters in which they were a party and not submit or file affidavits and verifications in support of claims, defenses, requests or motions where Defendant BASF, the BASF Predecessor Companies, the BASF Perpetrators and/or  the

Lawyer Perpetrators knew that the facts being asserted or claimed were not true or where Defendant BASF and the BASF Predecessor Companies had no reasonable and good faith basis to believe and assert the facts as being true.

325.    At all times material herein, the Lawyer Perpetrators, as counsel to BASF and the BASF Predecessor Companies in asbestos injury litigation matters, and as officers of the court, were under a duty to prepare and serve documents, and/or monitor and review the preparation and service of documents, that related to the asbestos injury litigation so that the documents fairly, truthfully and candidly disclosed and/or produced material non privileged information and evidence to Plaintiffs and members of the Class relating to their underlying asbestos claims in accordance with the Federal Rules of Civil Procedure and state procedural law counterparts. Under these principles and authorities, as well applicable professional responsibility codes or rules, the Lawyer Perpetrators were bound to a duty of fairness and candor to counsel and to courts that required that they not mislead or defraud Plaintiffs' and members of the Class, or their counsel, or the courts in which the asbestos injury litigation cases were filed.

326.    As set forth above, and in violation of their duties regarding the preservation of evidence, beginning on or about March 7, 1984, the BASF Perpetrators and Lawyer Perpetrators, together with all or some of the Fictitious Defendants, began and continued to engage in a uniform and persistent pattern and practice of evidence spoliation by withholding, concealing and/or destroying material evidence relating to the Plaintiffs' and Class Members' underlying asbestos injury claims; all with the purpose and design of obstructing, impeding, impairing, disrupting and/or otherwise defeating the rights of asbestos injury litigation claimants in suits in which BASF and/or its

predecessor companies was or were a party, and/or to deter and ward off the filing of asbestos injury claims against BASF and/or its predecessor companies.

327.    As a result of the discovery in the *Westfall* case, beginning from at least 1984, and continuing forward, the BASF Perpetrators and Lawyer Perpetrators, together with all or some of the Fictitious Defendants, knew that BASF and its predecessor companies possessed material evidence relating to Plaintiffs' and Class Members' underlying asbestos injury claims in its or their possession, including evidence and corporate knowledge that BASF's and its predecessor companies' talc ore and talc products contained asbestos, including that developed in the *Westfall* case's discovery.

328.    At all times material herein, the BASF Perpetrators and Lawyer Perpetrators, together with all or some of the Fictitious Defendants, knew that BASF and the BASF Predecessor Companies' records and corporate knowledge, along with discovery and other litigation materials, including deposition transcripts and related documents, in prior asbestos injury suits or claims, such as the *Westfall* case, were a material and important source of information and evidence regarding BASF's and its predecessor companies' talc ore and talc products. The BASF Perpetrators and Lawyer Perpetrators also knew that said information and evidence as time progressed could not be obtained from any other source.

329.    Sometime in and around 1983 or 1984, the exact date being presently unknown to Plaintiffs, the BASF Perpetrators and the Lawyer Perpetrators agreed and conspired with each other, and/or with all or some of the Fictitious Defendants identified above, to commit the Fraudulent Asbestos Defense Scheme in which the material

evidence relating to the Plaintiffs' and the Class Members' underlying asbestos injury claims would be gathered together and subsequently and systematically  withheld, concealed and/or destroyed as an integral part of the scheme.

330.    As set forth above, the BASF Perpetrators and the Lawyer Perpetrators, together with all or some of the Fictitious Defendants identified above, either  committed, aided and abetted the commission, and/or acted in concert with each other to commit the Fraudulent Asbestos Defense Scheme, in which the gathering and withholding, concealing and/or destroying material evidence relating to Plaintiffs' and Class Members' underlying asbestos injury claims was an integral part, as well as being overt acts in furtherance of the conspiracy.

331.    As a direct and proximate result of the above described deliberate gathering and withholding, concealment and/or destruction of documents and evidence relating to Plaintiffs' and Class Members' underlying asbestos injury claims, and/or the false and misleading statements thereafter that no such documents or evidence existed, Plaintiffs and others Class Members were harmed and injured in that they were materially hampered, impaired and prevented from proving their claims that BASF's and its predecessor companies' talc ore and talc products contained asbestos and proximately caused their underlying asbestos injury.

332.    As the direct, proximate and naturally occurring result of the above described deliberate gathering and withholding, destruction and/or concealment of documents and evidence relating to Class Members' underlying asbestos claims, and/or the false and misleading statements thereafter that no such documents or evidence

existed, Plaintiffs and members of the Class either: (a) suffered an involuntary dismissal of their lawsuit because they could not produce evidence contradicting BASF and its predecessor companies' assertions and averments that its talc and talc ore did not contain any asbestos and there was no evidence that it did; (b) voluntarily dismissed or discontinued their cases without consideration; (c) voluntarily dismissed or discontinued their cases for a nominal or token consideration instead of full, fair and complete compensation they were entitled to under law; or, (d) refrained from filing a claim or suit against BASF and/or its predecessor companies.

333.    As a the result of the voluntary or involuntary dismissal or discontinuance of asbestos claims against BASF and its predecessor companies, or the forbearance of filing an asbestos claim against BASF and its predecessor companies, Plaintiffs and members of the Class suffered the loss of their asbestos injury claim and/or their right under law to pursue and receive full, fair and just compensation for their asbestos injury claim.

334.    As a further proximate result of the above described deliberate gathering and withholding, destruction and/or concealment of documents and evidence relating to Class Members' underlying asbestos claims, and/or the false and misleading statements thereafter that no such documents or evidence existed, Plaintiffs and other Class Members may or will incur, or have already incurred pecuniary losses and damages, including but not limited to the loss of their underlying asbestos injury claim, the expenses and costs of proceeding without this evidence, and/or the expenses and costs incurred in the effort to replace, locate, or identify evidence, any and all of which Plaintiffs and the members of the Class would not otherwise have suffered or incurred.

335.    Under the forgoing circumstances, Plaintiffs are entitled to an assessment of punitive damages against all Defendants based upon their roles in committing, conspiring, aiding and abetting the spoliation of evidence material and/or otherwise relating to Plaintiffs' and Class Members' underlying asbestos injury claims.

336.    Because of BASF Perpetrators' and Lawyer Perpetrators' deliberate gathering and withholding, destruction and/or concealment of documents and evidence relating to Class Members' underlying asbestos claims, and/or the false and misleading statements thereafter that no such documents or evidence existed, extraordinary equitable relief in the nature of an order and decree restoring Plaintiffs and other Class Members back to the *status quo ante* as of the time of the spoliation of evidence relating to Plaintiffs' and Class Members' underlying asbestos injury claims is needed, warranted and just in order to alleviate and avoid imposing further irreparable injury to Plaintiffs and Class Members, namely the loss, diminishment and/or deprivation of their right to obtain just, full and fair compensation for their asbestos injury claims against BASF and its predecessor companies.

337.    In addition to the requested equitable relief restoring Plaintiffs and Class Members back to the *status quo ante*, Plaintiffs and the members of Class are also entitled to further equitable and declaratory relief addressing the corollary problems proximately caused by the Defendants' spoliation of evidence and/or their misrepresentations about the existence of material evidence. Among these corollary problems is that even if Plaintiffs' and Class Members' cases are restored, they will be unable to establish, or will be greatly hampered in establishing, BASF's liability for their underlying asbestos injury claims due to: (a) the passage of time; and/or (b) the loss or

141

absence of material evidence needed to prove their cases, including that which was spoliated by the BASF Perpetrators and Lawyer Perpetrators. Either or both of these factors are attributable to Defendants' tortious wrongdoing in that their wrongful conduct in spoliating material evidence led to the interruption or termination of the investigation, development and prosecution of  Class Members' claims. Each of these factors may or will greatly impair, impede or prevent Plaintiffs and Class Members from being able to locate and obtain witnesses and other documents needed to establish their underlying asbestos injury claims, or these factors have already done so. Accordingly Plaintiffs and the Class are entitled to any or all of the following declaratory or equitable remedies that are provided for under New Jersey's spoliation law, which is applicable here in view of New Jersey's substantial contacts with and government interest in the conduct of and spoliation by the Defendants at issue in this matter, as well as, alternatively, available under other jurisdictions' law that may be determined by the Court  to be applicable:

a. An order barring and estopping  Defendants from asserting any time related defenses, affirmative defenses or requests for abatement, relief or reduction, including but not limited the application of any statute of limitations, statutes of repose, laches, or substantive cause of action time limitations, such as those contained in applicable survival or wrongful death laws;

b. An order barring reliance on and/or assertion by the Defendants of the existence of a Release executed by or on behalf of the Plaintiffs or Class Members related to the settlement of any asbestos injury claim;

c. An order and decree directing or imposing a finding of liability against BASF and in favor of  Plaintiffs and Class Members with respect to their respective

142

underling asbestos injury claims, leaving for case specific determination only the amount of  compensatory and, if applicable, punitive damages owed to a Plaintiff or Class Member;

    d.   An order and decree imposing spoliation and heeding presumptions against Defendants to be applied by the fact finder when determining Plaintiffs' and Class Members' underlying asbestos claims, as well as the other claims being asserted herein, that are based upon the underlying asbestos injury claims;

    e.   An order and decree establishing this Court as an available forum to all Class Members to pursue their asbestos claims;

    f.   An order and decree  establishing an elective voluntarily alternative dispute resolution program for Plaintiffs and Class Members to efficiently and cost effectively establish the amounts of damages due to them for damages resulting from their underlying asbestos injuries  and an assessment of punitive damages against Defendants found liable for punitive damages;

    g.   A mandatory preliminary injunction, which may be combined with any class certification notice, requiring Defendants to provide and pay for notice by appropriate print, electronic or other means of publication and by direct mail where possible to all persons and entities who were victimized by the spoliation of evidence, including members of the Class and their counsel where known, advising them of the circumstances, the claims being asserted in this matter, their rights to participate and the rights and obligations to take steps necessary to preserve any evidence of their claims, including medical and employment records that may still exist;

h.   A determination and declaration that BASF's and Cahill Gordon's communications relating to their fraudulent conduct and/or the spoliation of evidence are not privileged attorney-client communication under the crime fraud exception; and/or

i.   Such other declaratory or equitable relief as may be available and just.

## COUNT IV
## FRAUD AND DECEIT
### (Against All Defendants)

338.   Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

339.   As set forth above, beginning on or about March 7, 1984, the BASF Perpetrators and Lawyer Perpetrators, together with and all or some of the Fictitious Defendants, engaged in a continuous, uniform and persistent pattern and practice of falsely misrepresenting to Plaintiffs, members of the Class, their counsel, and presiding courts, that:

a.   BASF and its predecessor companies' talc ore and talc products did not contain asbestos fibers;  and/or

b.   That there was not any evidence BASF and its predecessor companies talc ore and talc products contained asbestos.

340.   Each such representation was false and misleading at the time it was made.

341. Defendants, acting as aforesaid, knew each representation was false and misleading or made the representation in reckless disregard as to its truth or falsity.

342. Each representation was deliberately made with the purpose and design of obstructing, impeding, impairing, terminating and/or otherwise disrupting asbestos injury litigation in which BASF and/or its predecessor companies was or were a party, and/or deterring and warding off the filing of asbestos injury claims against BASF and/or its predecessor companies.

343. In addition to the above misrepresentations, the BASF Perpetrators and Lawyer Perpetrators, together with all or some of the Fictitious Defendants, engaged in a continuous, uniform and persistent pattern and practice of directly or indirectly making material omissions of fact, or, alternatively, omitting and withholding facts that they were under a duty to divulge in order make any statements made, in the light of the circumstances under which they were made, not misleading, regarding: (a) the absence of asbestos in BASF and its predecessor companies' talc ore and talc products; and/or, (b) the non-existence of evidence that BASF and its predecessor companies talc ore and talc products contained asbestos.

344. Among other things Defendants uniformly failed to disclose to Plaintiffs and others similarly situated, or their legal counsel or courts, was the existence of the facts, deposition transcripts, documents and other evidence developed in the *Westfall* case discovery that established BASF's and its predecessor companies' talc ore and talc products contained asbestos, and/or that the BASF Perpetrators' gathered and then

withheld, concealed and destroyed material evidence relating to Plaintiffs' and Class Members' underlying asbestos injury claims.

345.    Defendants, acting as aforesaid, knew each represented, omitted or withheld fact and/or their non disclosures, were false and misleading to those they were made or directed to, including Plaintiffs and members of the Class, their respective counsel, and where and when applicable, presiding courts.

346.    As set forth above the BASF Perpetrators and the Lawyer Perpetrators agreed or conspired with each other, and/or with all or some of the Fictitious Defendants identified above, to commit the Fraudulent Asbestos Defense Scheme, in which the fraudulent misrepresentations and material misrepresentations were an integral part as well as constituting an overt act in furtherance of this conspiracy.

347.    Each misrepresentation and omission of material fact was deliberate and committed with the intent, purpose and design of obstructing, impeding, impairing, terminating and/or otherwise disrupting asbestos injury litigation in which BASF and/or its predecessor companies was or were a party, and/or deterring and warding off the future filing of asbestos injury claims against BASF and/or its predecessor companies, as well as to cover up Defendants' wrong doing and conspiracy.

348.    Plaintiffs and members of the Class, as did their counsel, naturally, reasonably and detrimentally relied upon the above misrepresentations and omissions causing Plaintiffs and Class Members to either: (a)  suffer an  involuntary dismissal of their lawsuit because they could not produce evidence contradicting BASF and its predecessor companies' assertions and averments that its talc and talc ore did not contain

any asbestos and/or there was no evidence that it did; (b) suffer a voluntary dismissal or discontinuance of their cases without consideration; (c) suffer a voluntary dismissal or discontinuance of their cases for a nominal or token consideration instead of full, fair and complete compensation they were entitled to under law; or, (d) refrain from filing a claim or suit against BASF and/or its predecessor companies.

349.    As the direct and proximate result of the above fraud and deceitful conduct, Plaintiffs and Class Members suffered the harms, losses and detriments set forth above in Count III and require, request and demand the same relief and remedies.

## COUNT V
## NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

350.    Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

351.    In the alternative to the above alleged fraud claim, Plaintiffs allege that the BASF Perpetrators and Lawyer Perpetrators, together with all or some of the Fictitious Defendants, made the misrepresentations and material omissions described above negligently.

352.    As a result of Fraudulent Asbestos Defense Scheme and the spoliation of evidence set forth above, the BASF Perpetrators and Lawyer Perpetrators, together with all or some of the Fictitious Defendants, were in a superior position over Plaintiffs and Class Members and their respective counsel to know the material facts regarding, among other things:

       a.   The existence of asbestos in BASF and its predecessor companies' talc ore and talc products;

       b.   The existence of evidence indicating BASF and its predecessor companies' talc ore and talc products contained asbestos;

       c.   The existence and content of the *Westfall* case's discovery; and,

       d.   That they or their co-defendants were providing, or allowing to be provided, to asbestos injury claimants, their counsel and/or to courts  false and misleading material information upon which they were being asked to act upon.

353.    The BASF Perpetrators and/or the Lawyer Perpetrators, together with all or some of the Fictitious Defendants, negligently misrepresented facts regarding the presence of asbestos in BASF's talc ore and Emtal talc products and the existence of evidence regarding asbestos in BASF's talc ore and Emtal talc products by means of, *inter alia*, false and incorrect sworn affidavits, false and incorrect verifications to discovery responses, false and incorrect correspondence to claimants' counsel and false and incorrect motions (including exhibits) filed with courts.

354.    The BASF Perpetrators and Lawyer Perpetrators, together with all or some of the Fictitious Defendants, intended and expected asbestos claimants and courts to rely and act upon their representations and omissions.

355.    Plaintiffs and members of the Class, as well presiding courts when involved, naturally and reasonably relied on the representations and omissions of the BASF Perpetrators and Lawyer Perpetrators, together with all or some of the Fictitious

Defendants, proximately causing Plaintiffs and members of the class to suffered damages.

## COUNT VI
## ABUSE OF PROCESS
### (Against All Defendants)

356.     Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

357.     Defendants in the course of committing the Fraudulent Asbestos Defense Scheme made an improper, illegal and perverse use of legal process and procedure.

358.     Defendants by and through their conduct described above abused legal process and procedures through filing or submission of motions, sworn documents, and representations to presiding courts that contained wholly inaccurate and or misleading statements.

359.     The Defendants used the legal process in an abusive way by failing to preserve evidence; by failing to provide discovery, by falsely claiming all discovery had been provided after destroying evidence that they knew or should have known that they had a duty to preserve and produce; by filing papers before various courts which were false and misleading; and by using, in conjunction with assertions they knew to be false, the threat of a sanctions for lack of good faith basis to assert or to continue asbestos claims in order to coerce Plaintiffs and Class Members to drop otherwise meritorious actions.

360.    As a proximate result of this abuse of process, Plaintiffs and Class Members suffered damages and losses as set forth above.

361.    Defendants' abuse of legal process was done deliberately, with malice and without justification and for an improper purpose, warranting imposition of exemplary damages.

## COUNT VII
## UNJUST ENRICHMENT

**(Against Lawyer Perpetrators and John Doe Lawyers 1 to 500)**

362.    Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

363.    The Lawyer Perpetrators and the Fictitious Defendants identified as John Doe Lawyers 1 to 500 obtained fees and compensation based upon their committing, or their aiding and abetting others committing, the spoliation of evidence and/or other deceitful, fraudulent, unlawful, wrongful and unethical professional actions as set forth above. By so doing they were unjustly enriched.

364.    The Lawyer Perpetrators and Fictitious Defendants identified as John Doe Lawyers 1 to 500 in all fairness and equity should not be permitted to unjustly retain the proceeds from such misconduct at the expense of Plaintiffs and members of the Class, whose compensation rights and claims were wrongfully taken and deprived by these Defendants' wrongful and deceitful conduct, or by the conduct of others they supervised, directed and controlled.

365.     The Lawyer Perpetrators and Fictitious Defendants identified as John Doe Lawyers 1 to 500 should be ordered to account for and disgorge all fees, bonuses and other compensation received, together with any interest earned thereon, in connection with the Fraudulent Asbestos Defense Scheme, with such funds being paid into Court for fair and just allocation among Plaintiffs and members of the Class as their interests lie.

## COUNT VIII
## UNJUST ENRICHMENT

### (Against BASF Only)

366.     Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

367.     BASF earned or increased its revenues and profits through its employees and managers committing, or aiding and abetting others committing, the spoliation of evidence and/or other deceitful, fraudulent, unlawful, wrongful and unethical professional actions as set forth above.  By so doing they were unjustly enriched at the expense and to the detriment of Plaintiffs and members of the Class who were denied their right to fair, full and just compensation for their asbestos claims.

368.     BASF in all fairness and equity should not be permitted to unjustly retain the revenues and profits from such misconduct at the expense of Plaintiffs and members of the Class, whose compensation rights and claims were wrongfully taken and deprived by BASF's wrongful and deceitful conduct, or by the conduct of others they supervised, directed and controlled.

369.     BASF should be ordered to account for and disgorge all revenues and profits, together with any interest earned thereon, earned in connection with or as a result

151

of the Fraudulent Asbestos Defense Scheme, with such funds being paid into Court for fair and just allocation among Plaintiffs and members of the Class as their interests lie.

**COUNT IX**
**NEGLIGENT SUPERVISION OF EMPLOYEES**
**(Against Cahill Gordon only)**

370.    Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

371.     Cahill Gordon had a duty to supervise, manage, monitor, audit, oversee, learn of and otherwise ensure that its partners, members and employee attorneys, such as its associate, of counsel, and contract attorneys engaged in the practice of law in a manner that was lawful and ethical.

372.    Cahill Gordon knew or had reason to know that that its attorneys representing BASF and the BASF predecessor companies were using the name, resources and facilities of Cahill Gordon to further a massive widespread fraud and negligently failed to take reasonable actions and measures to detect, prevent, stop and correct such activities.

373.    Cahill Gordon negligently, carelessly and recklessly failed to properly supervise, manage, review, oversee and ensure that its partners, members and employee attorneys by, *inter alia*, failing to conduct periodic and appropriate checks, audits and reviews of internal Cahill Gordon attorneys as well as local BASF asbestos defense counsel that Cahill Gordon directed and controlled.

374. Cahill Gordon's negligent, careless and reckless supervision or failure to supervise its internal Cahill Gordon attorneys, as well as local BASF asbestos defense counsel that Cahill Gordon directed and controlled, proximately caused it to fail to detect, prevent and/or stop Cahill Gordon and local BASF defense counsel misleading and defrauding the Plaintiffs and members of the Class as set forth above, causing them to suffer injury and damages.

## COUNT X
## NEGLIGENT SUPERVISION OF EMPLOYEES AND AGENTS

### (Against BASF only)

375. Plaintiffs repeat and re-allege the allegations set forth above as if fully contained herein.

376. At all times material herein, Defendant BASF had a duty to supervise, manage, monitor, audit, oversee, learn of and otherwise ensure that its employees, servants and agents, including its attorneys advising and representing it in asbestos matters, acted and performed their duties, work, and responsibilities for BASF in a lawful and ethical manner.

377. At times material herein, BASF knew or should have known that its employees were directing and using BASF's or BASF predecessor companies' facilities and resources to gather up and then destroy or conceal material evidence relating to Plaintiffs' and Class Members' underlying asbestos injury claims, and despite such actual or constructive knowledge BASF negligently failed to take reasonable actions and measures to detect, prevent, stop and correct such activities.

378.    At times material herein, BASF knew or should have known that the Lawyer Perpetrators in association with various BASF management personnel made false and misleading misrepresentations and omissions of material fact in affidavits, verified pleadings, verified discovery responses and at depositions that they were asked to make, give or attest to on behalf of BASF or BASF Predecessor Companies in connection with asbestos claims matters, and despite such actual or constructive knowledge BASF negligently failed to take reasonable actions and measures to prevent, stop and correct such activities.

379.    At times material herein, BASF knew or should have known that the Lawyer Perpetrators had directed various attorneys representing BASF in asbestos claims defense matters to make, prepare and/or submit false and misleading misrepresentations and omissions of material fact in: (a) communications with asbestos claimants and/or their counsel; and/or (b) in various affidavits, verified pleadings, verified discovery responses or depositions that BASF employees were asked to make, give or attest to on behalf of BASF or BASF's predecessor companies  in connection with asbestos claim matters, and despite such actual or constructive knowledge BASF negligently failed to take reasonable actions and measures  to prevent, stop and correct such activities.

380.    At times material herein, BASF knew or should have known that the various attorneys representing BASF in asbestos claims defense matters  were making, preparing and/or submitting false and misleading misrepresentations and omissions of material fact in: (a) communications with asbestos claimants and/or their counsel;  and/or (b) in various affidavits, verified pleadings, verified discovery responses or depositions that BASF employees were asked to make, give or attest to on behalf of BASF or

BASF's predecessor companies in connection with asbestos claim matters, and despite such actual or constructive knowledge BASF negligently failed to take reasonable actions and measures  to prevent, stop and correct such activities.

381.    The negligence of Defendant BASF in failing to monitor, oversee supervise, manage, audit, learn of and prevent the spoliation of evidence and/or the pattern and practice of misleading and fraudulent activities aimed at Plaintiffs and members of the Class described previously directly and proximately caused Plaintiffs and Class Members to suffer injury and damages as set forth above.

## COUNT XI
## PUNITIVE DAMAGES

### (Against All Defendants)

382.    Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

383.    In committing the tortious acts, activities, misrepresentations and omissions set forth above, each Defendant acted outrageously, maliciously, oppressively, willfully, wantonly, recklessly and in conscious disregard for, or with reckless indifference to, the rights of others, including Plaintiffs and Class Members, warranting imposition of punitive damages against them.

384.    An award of punitive damages is appropriate in this case to deter the Defendants and others from engaging in similar conduct.

## VIII.   DEMAND FOR RELIEF

**WHEREFORE**, Plaintiffs in their own right, and on behalf of others similarly situated, demand judgment against Defendants jointly, severally and in the alternative for the following relief:

a.   Certification of the matter as a class action under Rule 23 as requested;

b.   Entry of an order or orders by the Court granting declaratory and equitable relief restoring Plaintiffs and Class Members back to the position they were in prior to the commission of Defendants' obstruction of justice and fraud upon them, including: (i) reopening of cases that were dismissed or closed if the claimant so chooses; (ii) setting aside any releases, covenants not to sue or settlement agreements obtained by or for BASF if the claimant so chooses; (iii) barring BASF from asserting any time passage related defense such as statutes of limitations, repose or death action claim time commencement requirements; and/or, (iv) barring Defendants from asserting any defense based upon the existence of a release of claims, covenants not to sue or settlement agreement;

c.   Entry of an order or orders by the Court granting declaratory and equitable relief addressing and alleviating any impairment of Plaintiffs' and Class Members' ability to gather and present evidence establishing their underlying asbestos injury claims that Defendants' spoliation and ensuing misrepresentations and material omissions proximately caused, including, but not limited to any detrimental loss or impact on Plaintiffs' and Asbestos Claimant Class Members' ability to: (i) establish the dangerous, defective nature of Engelhard's talc ore or products; (ii) establish harmful exposure to Engelhard's talc ore or products; (iii) establish Engelhard's

156

failure to warn; and/or, (iv) establish the heeding of any proper warning or precautions that should have been given in connection with Engelhard's talc ore or products;

d.   Entry of an order or orders by the Court as soon as practicable declaring the need for and thereafter ordering execution of a notice program paid for by Defendants informing Class Members or their representatives of the situation, their available claims and rights to proceed against Defendants, and of this action;

e.   Entry of an order or orders by the Court determining and declaring that BASF's and Cahill Gordon's communications relating to the their fraudulent conduct and/or the spoliation of evidence are not privileged attorney-client communication under the crime fraud exception;

f.   Entry of an order or orders by the Court determining and declaring Defendants' liability for compensatory and punitive damages to Plaintiffs and the Class relating to the spoliation and/or fraudulent concealment of evidence relevant and material to establishing asbestos injury claims against BASF, together with the establishment of an available forum and an elective program for Class Members to efficiently and cost effectively establish the amount of damages due to them;

g.   Entry of an order or orders by the court determining and declaring Defendants' liability to Plaintiffs and the Class for compensatory and treble damages, costs and attorneys' fees and costs relating to Plaintiffs' and the Class Members' claims under N.J.S.A. § 2C:41-1 *et seq*., together with the establishment of an available forum and an elective program for Class Members to efficiently and cost effectively establish the amount of damages due to them;

h.   Entry of an order or orders by the Court determining and declaring Defendants' liability for an accounting and thereafter disgorgement of any and all revenues, profits or money received that derived from or are traceable to Defendants' violations of N.J.S.A. § 2C:41-1 *et seq*., together with a determination by the Court of Plaintiffs' and Class Members interests in the fund so created;

i.   Entry of an order or orders by the Court determining and declaring Defendants' liability for compensatory and punitive damages to Plaintiffs and the Class relating to the common law fraud, fraudulent concealment, spoliation, abuse of process, negligent misrepresentation, unjust enrichment, and negligent supervision claims asserted against them herein, together with the establishment of an available forum and an elective program for Class Members to efficiently and cost effectively establish the amount of damages due to them;

j.   Entry of an order or orders by the Court determining and declaring Cahill Gordon's liability for unjust enrichment together with an order requiring it and/or its partners/shareholders to provide an accounting and thereafter disgorgement or restitution of monies unjustly earned;

k.   A permanent injunction enjoining the Defendants from further misrepresenting and suppressing evidence relating to BASF's asbestos liability; and,

l.   Such other relief as may be available and just.

## JURY DEMAND

Plaintiffs hereby demand trial by Jury on all issues so triable.

Dated: March 28, 2011        Respectfully Submitted,

**COHEN, PLACITELLA & ROTH, P.C.**

    \_\_\_\_/s/ Christopher M. Placitella\_\_\_\_

Christopher M. Placitella, Esq.
Michael Coren. Esq.
Michael Noonan, Esq.
cplacitella@cprlaw.com
mcoren@cprlaw.com
mnoonan@cprlaw.com
127 Maple Ave
Red Bank, New Jersey 07701
(732) 747-9003

Attorneys for Plaintiffs and the Proposed Class

*Of Counsel*:
Stewart L. Cohen, Esq.[*]
Harry M. Roth, Esq.[*]
Mark B. Goodheart, Esq.
Jillian A. S. Roman, Esq.
**COHEN, PLACITELLA & ROTH, P.C.**
Two Commerce Square
2001 Market Street, Suite 2900
Philadelphia, PA 19103
(215) 567-3500

(* P*ro hac vice* admission to be applied for)