## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**KIMBERLEE WILLIAMS**, individually, as personal representative of the Estate of Charles L. Williams, deceased on behalf of said estate, and as representative of others similarly situated;

**NANCY PEASE**, individually, as personal representative of the Estate of William Clark, deceased on behalf of said estate, and as representative of others similarly situated;

**MARILYN L. HOLLEY,** as personal representative of the Estate of Kathryn Darnell, deceased on behalf of said estate, and as representative of others similarly situated;

**DONNA WARE**, individually, as personal representative of the Estate of Ralph Ware, deceased on behalf of said estate, and as representative of others similarly situated;

**DONNETTE WENGERD,** individually, as personal representative of the Estate of Jennifer Graham, deceased on behalf of said estate, and as representative of others similarly situated, and

**ROSANNE CHERNICK**, individually, as personal representative of the Estate of Steven Chernick, deceased on behalf of said estate, and as representative of others similarly situated,

Plaintiffs,

vs.

**BASF CATALYSTS LLC,**
**CAHILL GORDON & REINDEL LLP,**
**CAHILL GORDON & REINDEL**, A Partnership including a Professional Corporation,
**THOMAS D. HALKET**,
**ARTHUR A. DORNBUSCH II**,
**GLENN HEMSTOCK**,

CIVIL ACTION

No. 11-cv-01754-SRC -MAS

AMENDED CLASS
ACTION COMPLAINT

Jury Trial Demanded

1

**HOWARD G. SLOANE (A/K/A "PETER SLOANE"),**
**IRA J. DEMBROW,**
**SCOTT A. MARTIN,**
**JOHN DOE BUSINESS ENTITIES 1 to 100** are fictitious corporations, partnerships, or other business entities or organizations that BASF Catalysts LLC is responsible or liable for and whose identities are not presently known, which entities may have mined, milled, manufactured, sold, supplied, purchased, marketed, installed and/or removed asbestos or asbestos-containing materials, or alternatively, are responsible for, are the alter egos of, or are otherwise responsible for the conduct or liability of such entities;

**JOHN DOE BUSINESS ENTITIES 101 to 200** are the fictitious firms, corporations, partnerships, limited liability companies/associations or other business entities or organizations whose identities are not presently known, and who may have perpetrated, or are responsible for, are the alter egos of, or are otherwise responsible for the conduct or liability of those who perpetrated or acted in concert with, in furtherance of, or in conjunction with the other Defendants in the conduct, activities, acts and omissions set forth herein;

**JOHN DOE LAWYERS 1 to 500** are the fictitious names of lawyers and law firms, legal professional corporations, legal professional partnerships, or other professional business entities or organizations, or their agents, employees, or servants, acting within the course and scope of their employment, or other individuals whose identities are not presently known, and who may have perpetrated, and/ or are responsible for, or are the alter egos of, or are otherwise responsible for the conduct or liability of those who perpetrated, aided and abetted, or acted in concert with, in furtherance of, or in conjunction with the other Defendants in the conduct, activities, acts and omissions set forth herein; and,

**Defendants JOHN DOE 1 to 500** are the fictitious names of individuals whose identities

are not presently known, who may have
perpetrated, aided and abetted, conspired with,
acted in concert with and/or are secondarily
responsible or liable under law for the conduct or
activities of those who may have acted in concert
with, in furtherance of, or in conjunction with
the other Defendants in the conduct, activities,
acts and omissions set forth herein, including but
not limited to employees, officers, agents,
members and partners of named Defendants
herein, jointly, severally and in the alternative,


Defendants.

   Plaintiffs, Kimberlee Williams, Nancy Pease, Marilyn L. Holley, Donna Ware,

Donnette Wengerd, and Rosanne Chernick, individually and on behalf of all other

individuals similarly situated, for their claims and causes of action against Defendants

referenced herein, and based upon personal knowledge as to each Plaintiff's own

respective actions and, as to all other matters, upon information and belief based upon the

investigation of counsel[1], state and allege against the Defendants, jointly, severally and in

the alternative the following:

---

[1] The investigation of counsel includes the results of the spoliation claim discovery taken in *Paduano v. Ace Scientific Supply Co.*, MID-L-2976-09 (N.J. Super. Ct. Law Div.) described *infra*. The *Paduano* case was one of several companion asbestos cases filed in Middlesex County, New Jersey in which the trial court permitted amendment of complaints to assert fraudulent concealment claims based upon alleged spoliation of evidence that is the subject of this suit. The Hon. Jack L. Lintner, P.J.A.D. (Ret.) was appointed as Discovery Master in *Paduano* and its companion cases to resolve privilege issues relating to discovery. As observed by Judge Lintner in his initial discovery opinion in these cases:

> "Here, during the hearing on plaintiffs' motion to amend, Judge McCormick specifically noted there was evidence that documents reflecting asbestos content in EMTAL's talc were not produced over a period of twenty years and, as a result, plaintiffs' cases were dismissed. In determining that plaintiffs had pled a *prima facie* case of fraudulent concealment, Judge McCormick intimated that plaintiffs should be able to pursue discovery as to why those documents had been concealed and not produced over the twenty-year period."

**Table of Contents**

I.    INTRODUCTION ........................................................................................... 6

II.   SUMMARY OF THE CASE.......................................................................... 7

III.  PARTIES ...................................................................................................... 18

   A.   Plaintiffs............................................................................................... 18

   B.   Defendants ........................................................................................... 31

      (1) The BASF Defendants ..................................................................... 31

      (2) The Cahill Gordon & Reindel Defendants........................................ 35

      (3) The Fictitious Defendants ............................................................... 40

IV. VENUE AND JURISDICTION. .................................................................. 41

V. FACTS COMMON TO CLASS CERTIFICATION AND ALL COUNTS ............... 42

   A.   Asbestos Background Information ....................................................... 42

   B.   Engelhard's Emtal Talc Products and Asbestos .................................. 43

   C.   The *Westfall* Asbestos Lawsuit's Discovery...................................... 46

   D.   The *Westfall* Case's Settlement and Confidentiality Agreement and Origins of the BCAD Enterprise .................................................................................. 53

   E.   The Gathering and Spoliation of Inculpatory Evidence after the Settlement of the *Westfall* Case............................................................................................... 56

   F.   BCAD Enterprise's Twenty-Five Years Long Pattern and Practice of Misleading and Deceiving Asbestos Injury Claimants, Asbestos Claimants' Counsel and Asbestos Courts. ....................................................................................................... 59

   G.   Representative Misrepresentations and Material Omissions in Furtherance of the Fraudulent Asbestos Defense Scheme ......................................................... 65

      a.    The 1988 and 1989 Misrepresentations and Material Omissions to Counsel for Tireworker Asbestos Injury Litigation Claimants Suing BASF in the United States Eastern District of Pennsylvania and Southeastern Pennsylvania State Courts. ................................................................................................ 68

      b.    November 19, 1990 Misrepresentations in BASF's Answers to Plaintiffs' Standard Interrogatory Answers in *In Re: All "Asbestos" Cases Presently Pending Before and All Future Cases Assigned to the Honorable James E. Mies, Circuit Court Judge*, (Circuit Court, Wayne County, Michigan). ................................... 74

      c.    November 1990 and October 1991 Misrepresentations in the Answers to Plaintiffs' Master Interrogatories in *In Re: Northern Ohio Tireworker Asbestos Litigation* (C.P. Summit Cty., Ohio). ....................................................... 76

      d.    April 2002 and December 22, 2010 Misrepresentations and Material Omissions in Engelhard's Correspondence to Asbestos Claimants' Counsel and in Responses to Plaintiffs' First Standard Set of Liability Interrogatories in the New

York City Asbestos Litigation Matter of *Steven Chernick et. al. v. ABB Lumus Global, Inc.* ................................................................................................ 82

    e.    Cahill Gordon's and BASF's Continuing Fraudulent and Misleading Representations to the Representative Plaintiffs' Attorneys, Bevan & Economus and Bevan & Associates LPA, Inc., Beginning in 1992. ..................................... 90

H.   The Discovery and Uncovering of the Fraudulent Asbestos Defense Scheme .. 108

I.    The BASF Perpetrators Undeterred Attempt to Mislead and Deceive the *Paduano* Suit's Plaintiffs' Counsel Regarding Emtal Talc's Asbestos Content ........................ 115

J.    BASF's Admissions That False and Misleading Statements Were Given to Asbestos Claimants Over the Years as Part of BASF's Asbestos Claim Defense ..... 116

K.   Plaintiffs Learn They and Other Asbestos Claimants Similarly Situated Were Victimized and Harmed by the Fraudulent Asbestos Defense Scheme ...................... 118

L.    Defendants greatly benefited and profited from their participation in the Fraudulent Asbestos Defense Scheme. ....................................................................... 119

M.   Defendants' Clandestine Misconduct and Concealments Prevented Plaintiffs and Class Members From Discovering the Fraudulent Asbestos Defense Scheme Despite the Exercise of Diligence Thereby Warranting Tolling of Any Applicable Statute of Limitations. ........................................................................................................... 120

VI.  CLASS ACTION ALLEGATIONS ....................................................................... 123

VII. CAUSES OF ACTION ........................................................................................... 133

    COUNT I - VIOLATION OF N.J.S.A. § 2C:41-2c ..................................................... 133

    COUNT II - VIOLATION OF N.J.S.A. § 2C:41-2D BY CONSPIRING TO VIOLATE N.J.S.A. § 2C:41-2C ................................................................................................. 144

    COUNT III - FRAUDULENT CONCEALMENT - SPOLIATION ......................... 146

    COUNT IV - FRAUD AND DECEIT ....................................................................... 154

    COUNT V - FRAUD UPON THE COURT .............................................................. 158

    COUNT VI - VIOLATION OF N.Y JUDICIARY LAW §487 ................................ 160

    COUNT VII - UNJUST ENRICHMENT .................................................................. 164

    COUNT VIII - UNJUST ENRICHMENT ................................................................. 165

    COUNT IX - Civil conspiracy .................................................................................. 166

    VIII. DEMAND FOR RELIEF .................................................................................. 168

    JURY DEMAND ...................................................................................................... 171

## I.     INTRODUCTION

1.      Sometime in 1984, having settled an asbestos injury case and recognizing its continued exposure to liability for damages caused by asbestos in its talc ore and talc products, Defendant BASF Catalyst, LLC, then known as Engelhard Corporation (collectively "BASF"), together with the law firm of Cahill Gordon & Reindel, LLP ("Cahill Gordon"), devised a strategy to defend itself against asbestos injury claims by gathering all of the evidence of asbestos in its talc, storing or destroying the evidence and thereafter withholding and lying about its existence to mesothelioma, cancer and other victims suffering asbestos induced diseases, their counsel, and those courts presiding over asbestos injury claims. In short, after first gathering up and concealing or destroying documents and evidence establishing BASF's talc ore and products contained asbestos, BASF and Cahill Gordon repeatedly lied to claimants and courts by denying BASF's talc contained asbestos and that there ever existed any proof to the contrary.  Because the very foundation of our judicial system is violated and eroded when conspirators like BASF and Cahill Gordon lie, fraudulently withhold evidence, destroy incriminating records, and mislead courts and opposing parties regarding essential facts that are only within their knowledge and control, this class action is essentially one based upon fraud upon the court. The harm these defendants and their confederates have inflicted upon both the numerous judicial systems and the asbestos claimants they targeted requires equitable relief. The scope and breadth of their conduct is extraordinary and such calls for extraordinary relief. There is no adequate remedy at law to address and redress the massive miscarriage of justice defendants' corrupt spoliation of evidence, fraud, and deceit has caused. This action therefore seeks to provide the named plaintiffs and members of a class with an honest and full inquiry and understanding of what happened,

6

and thereafter a trial of the facts concerning defendants' misconduct. The relief sought on behalf of the class is necessarily limited because the underlying asbestos exposure injury claims will need to be assessed in light of the fraud that BASF and Cahill Gordon perpetrated upon the public, asbestos victims and the courts.  Nevertheless, the class is cohesive in their cause and claims.  The plaintiffs and class members, as well as the courts, relied upon the integrity of the judicial system and parties' duties towards each other and the courts to abide by the rules of court and the rules of professional responsibility and  perform their discovery obligations in good faith. Both courts and class members justifiably relied upon the knowing, uniform misrepresentations and material omissions by BASF and Cahill Gordon and to their detriment were deceived and harmed. Plaintiffs accordingly submit this Amended Complaint  for equitable relief so that each of them and every other member of the class ultimately receive their constitutional right to one fair, honest and just day in court on their respective asbestos injury claims.

## II.      SUMMARY OF THE CASE

2.      In 1983, BASF's Vice-President of Research and Development, Dr. Glenn Hemstock, acknowledged during a deposition in an asbestos injury suit the presence of a number of tests BASF had produced during discovery that showed that its talc contained asbestos.  The case in which he testified subsequently settled under terms that included a confidentiality order binding the plaintiff and his lawyer to non-disclosure of discovery obtained in the suit. Dr. Hemstock thereafter circulated a memo directing the collection from BASF scientists and research staff of their entire work product regarding the content of BASF talc and talc products.  The information was collected and then stored and/or

destroyed by BASF and or its counsel Cahill Gordon.  Over the next 25 years, BASF and Cahill Gordon  then deceitfully and falsely denied the existence of evidence, demonstrating that BASF talc and talc products contained asbestos fiber they had in their possession or that they destroyed.  Their false denials of the existence of this evidence resulted in the obstruction of justice, fraud upon courts, and damage to the property rights of the plaintiffs.  Defendants engaged in a pattern of fraudulent concealment, misrepresentations and failures to truthfully and fully disclose material information concerning asbestos in certain products in asbestos claim matters in which BASF and its predecessors were either a named defendant or a potential party (all of which conduct comprises the "**Fraudulent Asbestos Defense Scheme**").

3.       The Fraudulent Asbestos Defense Scheme at issue in this case was designed to end filed cases and ward off future potential asbestos claims against BASF that were or could be based upon contentions that talc ore and talc products mined or manufactured by BASF's predecessors, Engelhard Corporation, Engelhard Industries, Engelhard Minerals & Chemicals Corporation, Minerals & Chemicals Phillip Corporation, Eastern Magnesia Talc Company, Porocel Corporation and Pita Realty Limited, contained asbestos.  (When context requires, these BASF predecessor companies are collectively referred to herein as "**Engelhard**").

4.       The targets and victims of Defendant BASF's fraudulent suppression and misrepresentation scheme are and were persons who were: (a) exposed to various forms of asbestos fiber contained in Engelhard's talc ore and talc products and who were injured as a result by an asbestos related disease; and/or, (b) an exposed person's family members or personal representatives who claimed or could claim damages for or through

these exposed individuals. (These victims are collectively referred to herein as the "**Asbestos Claimant Class**" or the "**Class**.")

5.      As described in greater detail below, Plaintiffs and the Asbestos Claimant Class, the lawyers representing them, and, in some cases, the courts presiding over class members' lawsuits, were systematically supplied with uniform material misrepresentations and omissions by BASF and its lawyers regarding: (a) the existence and dangerous nature of asbestos in Engelhard's talc ore and products; and/or  (b) the existence of evidence that the defendants had in their possession, or destroyed, demonstrating that Engelhard talc or and products contained asbestos.   As a direct and proximate result of the Defendants' spoliation, deceptive acts, false statements and material omissions, the property rights of the Plaintiffs and others similarly situated to them were lost or significantly impaired when, in natural and reasonable  reliance upon Defendants' deceptions, made as they were in such forms including verified answers to discovery requests or affidavits signed under oath by corporate representatives, they either: (a) did not  pursue their claims against BASF; (b) voluntarily ended their claims against BASF without receiving any or full, fair and just compensation (in some cases Class Members were given a nominal or token settlement in exchange for a full release of BASF); or (c) based upon the misrepresentations and omissions to courts, suffered an involuntary termination of their asbestos injury claims against BASF.

6.      As a result of Defendants' Fraudulent Asbestos Defense Scheme as more fully set out below, Plaintiffs and members of the Asbestos Claimant Class were purposely deceived and defrauded into believing that there was no evidence that Engelhard's talc contained asbestos and/or that Engelhard's talc did not contain asbestos

and consequently either: (a) terminated or abandoned their asbestos injury claims against BASF; (b) accepted a nominal financial settlement of their claim; or (c) suffered a dismissal their  lawsuits where and when the misrepresentations at issue were submitted by the Defendants to presiding courts in the form of motions seeking dismissal of BASF. Plaintiffs and each Class Member thereby suffered a significant loss of their property. Each has been deprived of fair, full and just compensation for their respective asbestos injury claims as was their property right under the law. Furthermore, Defendants' egregious misconduct in spoliating evidence and thereafter systematically and repeatedly misrepresenting core facts about the existence of asbestos in BASF's talc ore and talc products has seriously undermined and impugned the integrity and validity of the administration of justice, thereby depriving each Plaintiff and Class Member of his or her right to a fair, honest and just judicial proceeding.

7.     A key integral part of Defendants' Fraudulent Asbestos Defense Scheme was BASF's widespread spoliation of material evidence and documents establishing or tending to establish that Engelhard's talc ore and products contained asbestos fibers. This spoliation of material evidence overtly began in and around 1984.  At that time internal Engelhard company documents and other evidence relating to the existence and nature of asbestos in Engelhard's talc ore and talc product lines were systematically gathered up from employees at Engelhard's laboratories and offices by BASF's management at the instigation and direction of BASF's legal department.  This spoliation of evidence, on information and belief, was committed with the knowing aid and assistance of BASF's national asbestos counsel, Cahill Gordon.  This evidence was then either destroyed by the defendants or secreted away.  Despite inquiry in a prior New Jersey state court

proceeding in which the existence of the spoliation was first uncovered, the fate and current whereabouts of this evidence remain unaccounted for by BASF.

8.       The collection and spoliation of this evidence occurred following BASF's in-house and outside defense attorneys (Cahill Gordon) witnessing first hand or otherwise knowing about sworn deposition testimony of Engelhard's research and management employees, including Dr. Hemstock, that acknowledged the existence and contents of documents and scientific test results that reported the presence of asbestos in Engelhard's talc ore and products, including documents and test results produced by Engelhard in connection with a Rhode Island asbestos injury lawsuit.  In settling the Rhode Island suit, BASF obtained an agreement in the form of a release requiring that the Rhode Island plaintiff and plaintiff's attorney keep the settlement and all discovery obtained during the case confidential.

9.       BASF's collection and spoliation of asbestos evidence in 1984 occurred at a time and under circumstances that BASF's management and its in-house and outside attorneys knew BASF was or would in the future be the subject of additional asbestos injury lawsuits and claims.  BASF's management and attorneys also knew that the materials collected in 1984, including the transcripts of the inculpatory testimony and documents referenced during the Engelhard employee depositions in the Rhode Island asbestos case, were or could be relevant to such asbestos injury lawsuits and claims. The collection and disposition of this material was undertaken by BASF in bad faith, with the intent to obstruct justice, with the intent to deceive and harm asbestos claimants, such as Plaintiffs, and not for legitimate document retention management purposes.

10.     With the inculpatory evidence relating to Engelhard's talc ore and products destroyed or secreted away, the perpetrators of BASF's Fraudulent Asbestos Defense Scheme then began to uniformly, systematically and repeatedly represent in sworn and unsworn statements in asbestos injury claim matters that: (a) Engelhard's talc ore and talc products did not contain any asbestos; and/or (b) that no evidence existed to the contrary.  Over the ensuing twenty-five  (25) years, from 1984 until late 2009 — when by chance the spoliation. fraudulent concealment and deceit  were uncovered during a deposition of a former Engelhard chemist whose daughter had developed mesothelioma from exposure to, among other products, BASF's talc ore and products — BASF and its lawyers persistently and uniformly lied to, misled, and withheld material evidence thatEngelhard's talc's contained asbestos from numerous (in the thousands) asbestos injury claimants, asbestos claimant lawyers, and asbestos injury claimant representatives, as well as to courts presiding over asbestos injury claims. And even after BASF became aware that the Fraudulent Asbestos Defense scheme was beginning to become uncovered in or about 2009, the scheme was nevertheless allowed to continue on into 2011 as set forth herein. Notably none of the defendants herein has ever taken any step or measure to affirmatively reveal the existence of, or renounce their participation in, the Fraudulent Asbestos Defense Scheme or to cure or mitigate the injuries and damage it caused or could cause to the plaintiffs, class members, presiding courts and the administration of justice. The fraud and the harm unleashed by the defendants in furtherance of the Fraudulent Asbestos Defense Scheme thus continues on to this date.

11.     The Fraudulent Asbestos Defense Scheme at issue herein was devised, implemented, managed, directed, and controlled in large and substantial part at BASF's

headquarters in the State of New Jersey.  It was executed through the means and

mechanisms of a conspiracy and a corrupted association (the "BCAD Enterprise") which

was comprised of and operated by, at least so far as is presently known: (a) BASF; (b)

BASF management and in-house attorney employees; and, (c) the law firm and lawyers

of Cahill Gordon, which firm and its lawyers until 2010 or so had been BASF's national

asbestos claim defense counsel for at least twenty-five years.

12.     The BCAD Enterprise's Fraudulent Asbestos Defense Scheme was highly

successful in terminating and warding off numerous asbestos injury claims and lawsuits

against BASF, as well as enabling Defendants to settle asbestos injury claims against

BASF with nominal or token payments in exchange for a release or agreement not to sue

when doing so was advantageous to BASF.  As was Defendants' design, purpose and

intent, the spoliation and fraudulent misrepresentation and omissions scheme misled

numerous asbestos injury claimants and their counsel, including the representative

Plaintiffs and their counsel, into naturally and reasonably believing there was no evidence

that Engelhard's talc products contained asbestos that could support an injury

compensation claim against BASF.  The Plaintiffs' and other Class Members' ultimate

response to BASF, Cahill Gordon and the BCAD Enterprise's spoliation and deceitful

conduct was likewise uniform, natural, and direct, as well as consistent with the intent of

the Defendants.  Depending upon the procedural status of their claim, Plaintiffs and

members of the Class either dropped their claims, settled for a token amount in exchange

for a release or covenant not to sue, suffered an involuntary dismissal of their claim or

did not commence a law suit or other claim (such as workers' compensation) against

BASF based upon exposure to BASF talc; all to their substantial economic detriment and

loss. In addition to the loss of their asbestos injury claim or chose in action, Plaintiffs and

others were not fairly and fully compensated by BASF for their medical expenses, loss of

earnings, and other economic and non-economic losses. Defendants' egregious

misconduct further seriously undermined and impugned the integrity and validity of the

administration of justice, thereby depriving each Plaintiff and Class Member of his or her

right to a fair, honest and just judicial proceeding.

13.    Compounding the harm caused to Plaintiffs and the Class by the

Defendants' spoliation of evidence and deceptive misconduct, the passage of time has

greatly impaired, and in some cases eliminated, Plaintiffs' and Class Members' access to

evidence needed to establish their underlying asbestos injury claims.

14.    The existence and/or scope of Defendants' Fraudulent Asbestos Defense

Scheme and BCAD Enterprise's existence and corrupt activities was neither known nor

reasonably knowable to Plaintiffs until recently in 2010 or 2011, when representative

Plaintiffs were first advised of the Defendants' Fraudulent Asbestos Defense Scheme

through Plaintiffs' asbestos claim counsel who, in turn, had only shortly before that time

learned of the scheme as a result of being contacted by other lawyers who were

investigating spoliation claims against BASF in connection with then pending litigation

in New Jersey state court, or in connection with the investigation of this matter.

15.    The spoliation of evidence and other elements and aspects of the

Fraudulent Asbestos Defense Scheme, as well as BCAD Enterprise's existence, all of

which date back to the mid-1980's, were uncovered only by chance in 2009 when

deposition testimony by a former Engelhard employee chemist, Mr. David Swanson,

provided some alarming revelations. His testimony not only contradicted BASF's and its

counsel's representations that Engelhard's talc did not contain any asbestos, but revealed the fact that during his employment with Engelhard material documents relating to the talc were gathered from research department employees and destroyed at the direction of Engelhard's legal department. Mr. Swanson was deposed in connection with a New Jersey Superior Court Law Division asbestos lawsuit captioned *Paduano v. Ace Scientific Supply Co.*, MID-L-2976-09 (N.J. Super. Ct. Law Div.) ( "***Paduano* suit**"). The *Paduano* suit was filed by Mr. Swanson's daughter, a mesothelioma victim claiming asbestos injury caused by BASF's talc products as well as other exposures.  During his deposition, Mr. Swanson testified that while he was employed in Engelhard's research department, test results, laboratory notebooks and other documents concerning talc products were gathered from all Engelhard research and testing personnel, including his own written materials and never returned. This testimony generated an investigation into BASF's and Cahill Gordon's spoliation of documents which in turn revealed the facts and conduct that are the subject of this lawsuit. Accordingly, the existence of the Fraudulent Asbestos Defense Scheme, the existence of the BCAD Enterprise's existence and the activities and overt actions of the corrupt scheme are, and were not known to members of the Class despite the diligent efforts of their counsel; which ignorance of these things is a natural consequence of the defendants fraud and will continue on unless and until Class Members are notified and informed of the circumstances and their potential claims by an appropriate notice.

16.     This suit accordingly seeks classwide declaratory and equitable relief correcting and redressing Defendants' egregious misconduct, obstruction of justice and fraud upon the courts and the corresponding resulting injuries to the judicial process and

economic and personal rights inflicted upon thousands of members of the Asbestos

Claimant Class (excluding those who opt out), including:

     a.   Declaratory and equitable relief restoring members of the Asbestos

Claimant Class back, as near as possible, to the position they were in prior to the

commission of Defendants' obstruction of justice and fraud, including but not limited

to, should the Court find it equitable and just, a declaration or injunction: (i)

prohibiting the BASF and Cahill Gordon defendants from asserting or claiming

against Plaintiffs and members of the Class the benefit of *res judica* or any other

claim preclusion doctrine or right based upon prior litigation or a claim adjudication

concerning BASF's talc or talc products; (ii) barring the BASF and Cahill Gordon

defendants from asserting any time passage related defense such as statutes of

limitations, laches, repose or death action claim time commencement requirement;

and/or (iii) upon a Plaintiff's or any class member's election to file or re-file suit

against BASF and the repayment to BASF of any money paid by BASF in

consideration of a settlement, barring Defendants from asserting any defense based

upon the existence of a release of claims, covenants not to sue or settlement

agreement;

     b.   Declaratory and equitable relief addressing and alleviating any impairment

of Plaintiffs' and Class Members' ability to gather and present evidence establishing

their underlying asbestos injury claims that Defendants' spoliation and ensuing

misrepresentations and material omissions proximately caused, including, but not

limited to any detrimental loss or impact on Plaintiffs' and Asbestos Claimant Class

Members' ability to: (i) establish the dangerous, defective nature of Engelhard's talc

ore or products; (ii) establish harmful exposure to Engelhard's talc ore or products; (iii) establish Engelhard's failure to warn; and/or, (iv) establish the heeding of any proper warning or precautions that should have been given in connection with Engelhard's talc ore or products;

c.   A determination and declaration of the need for and ordering execution of a notice program paid for by Defendants informing Class Members or their representatives of the pendency of this action, the BASF and Cahill's alleged misconduct and the import and possible impact of same on their present or former asbestos injury claims, and their rights to proceed against Defendants;

d.   A declaration, injunction or decree imposing a constructive trust upon BASF's and Cahill Gordon's property and requiring BASF and Cahill Gordon to each render an accounting to the Court of all fees, revenues, costs, insurance proceeds, and expense savings relating to Plaintiff s and absent class member's asbestos injury claims.

e.   A determination and declaration of BASF's and Cahill Gordon's liability for disgorgement of revenues, profits and money unjustly earned from the commission of the frauds upon the courts, Plaintiffs and members of the class and/or the commission of proscribed activities described below, together with a determination and decree on the disposition and distribution of such disgorgement;

f.   A determination of Defendants' liability for punitive damages to Plaintiffs and the Class relating to the spoliation of evidence relevant and material to establishing asbestos injury claims against BASF;

g.   A determination and declaration that BASF's and Cahill Gordon's communications relating to the their fraudulent conduct and/or the spoliation of evidence are not privileged attorney-client communication under the crime fraud exception and an injunction barring and prohibiting either from asserting same are privileged in any proceeding involving and class members asbestos injury claims;

h.   A injunction requiring BASF and Cahill Gordon to fund the maintenance of  an independent trust established by the Court for the purpose of locating, collecting, housing, archiving and making available BASF's asbestos documents and materials to Plaintiffs, class members and further requiring BASF and Cahill Gordon to assist and cooperate fully with the Court appointed trustees in the accomplishment of these remedial objectives, including providing information,  waivers of privilege and waivers of confidentially rights where applicable;.

i.   A permanent injunction enjoining the Defendants from further misrepresenting and suppressing evidence relating to BASF's asbestos liability; and,

j.   Such other relief as may be available and just.

### III.   PARTIES

### A.   Plaintiffs

17.   Plaintiff Kimberlee Williams ("**Williams**") is an individual and a citizen of the State of Ohio, residing at 2299 Winter Parkway, Apt. 235, Cuyahoga Falls, Ohio 44221. At all times relevant herein she was married to the late Charles L. Williams, who died on September 7, 1998.  She is the personal representative of Mr. Williams' estate. Plaintiff Williams brings this suit in her individual capacity, as personal representative of

the Estate of Charles L. Williams, deceased, on behalf of said Estate, and as a Class

representative of a Class of others similarly situated as defined below.

18.     Williams' deceased husband, Charles L. Williams, was a tire worker

employed at Goodyear Tire & Rubber in Akron, Ohio from 1950 to 1985.  During that

time he was exposed during his employment to asbestos containing talc products mined,

manufactured, processed, sold and/or distributed by Engelhard.  That exposure

proximately caused him to develop asbestos injuries, including asbestosis and lung

cancer, which injuries in turn proximately led to and caused his death on September 7,

1998.  Prior to his death, Plaintiff's decedent suffered and endured great pain and

suffering and great mental anguish and emotional distress.  Plaintiff Williams' decedent

while alive, and his estate thereafter following his death, as well as Plaintiff Williams

herself, incurred substantial costs and expenses in obtaining medical treatment and care

of Mr. Williams' asbestos injuries.  Plaintiff Williams and the Estate of Charles L.

Williams, deceased, also sustained loss of income, earning capacity, funeral expenses and

pecuniary losses.  Plaintiff Williams also suffered a loss of consortium, services and

society of her husband before his death and a loss of services following his death.  All of

these injuries, losses and damages were compensable asbestos injury claims.

19.     In 1992, Plaintiff Williams and her husband commenced an asbestos

injury lawsuit in the Court of Common Pleas, Cuyahoga County, Ohio, against BASF's

predecessor, Eastern Magnesia and Pita Reality; said suit captioned *Charles Williams and*

*Kimberlee Williams v. B. F. Goodrich Company*, *et al.*, Case No. 229108. The case was

removed to the United States District Court for the Northern District of Ohio, where it

was made a tag-a-long case in the Asbestos Multi-District Litigation case assigned to the

late Honorable Charles R. Weiner in the United States District Court of the Eastern

District of Pennsylvania.  During the pendency of that lawsuit, and reasonably relying

and acting upon the misrepresentations and material omissions of Defendants regarding

Engelhard's talc product and the absence of any evidence indicating Engelhard's talc

contained asbestos fibers that were made to their attorneys and representatives, Dale S.

Economus, Esq. and Thomas W. Bevan, Esq., as set forth more particularly below,

Plaintiff Williams and her husband, on or about March 2,1993, filed and later served by

U.S. Mail a voluntarily partial dismissal of their lawsuit dismissing their asbestos injury

claims against Eastern Magnesia without receiving full, fair and adequate compensation

for their asbestos injury claims against BASF's predecessors.  The partial dismissal was

ordered and entered by Judge Weiner on or about March 16, 1993.  At no time thereafter

did any of the Defendants take any affirmative step or measure to retract, rescind or cure

the misrepresentations and material omissions made to Economus, Bevan or their law

firms. Plaintiff Williams and her husband did not know that she and her husband had

been the victim of Defendants' Fraudulent Asbestos Defense Scheme described herein

while her husband was alive, and she did not learn of such fact until late 2010/early 2011,

when she was first informed of same by her attorney, Thomas W. Bevan, Esquire after he

was informed of the Fraudulent Asbestos Defense Scheme by the *Paduano* case's

counsel in the course of  their investigation into the spoliation and fraudulent defense

scheme.  Had Plaintiff's counsel and Plaintiff known about the existence of the spoliation

described more particularly herein and the existence of evidence that BASF's talc and

talc products contained asbestos, the dismissal would not have been entered as to BASF

(Engelhard at the time), and in view of the circumstances Plaintiff would have either had her day in court, or obtained a substantial settlement amount.

20.     Plaintiff Nancy Pease ("**Pease**") is an individual and a citizen of the State of Ohio, residing at 3212 Bent Oak Trail, Ravenna, Ohio 44266.  She is a daughter of the late William F. Clark, deceased, and has been appointed executrix of his Estate. Plaintiff Pease brings this suit in her individual capacity, as personal representative of the Estate of William F. Clark, deceased, on behalf of the Estate, and as a Class representative of a Class of others similarly situated as defined below.

21.     Plaintiff Pease's decedent, William F. Clark, was a tire production worker employed at B. F. Goodrich Company in Akron, Ohio from 1952 to 1983.  During that time he was exposed through his employment to asbestos containing talc products mined, manufactured, processed, sold and/or distributed by Engelhard. That exposure proximately caused him to develop asbestos injuries, including mesothelioma, which injuries proximately led to and caused his death on May 5, 1994.  Prior to his death, Plaintiff Pease's decedent suffered and endured great pain and suffering and great mental anguish and emotional distress. Plaintiff Pease's Decedent while alive, and his estate following his death, incurred substantial costs and expenses in obtaining medical treatment and care of Mr. Clark's asbestos injuries and mesothelioma.  The Estate of William Clark, deceased sustained loss of income, earning capacity, funeral expenses and pecuniary losses.  All of these injuries, losses and damages were compensable asbestos injury claims.

22.     On or about June 21, 1995, Plaintiff Pease commenced an asbestos injury lawsuit in the Court of Common Pleas, Cuyahoga County, Ohio against BASF's

predecessor, Eastern Magnesia, naming same as a defendant in accordance with the

accepted asbestos practice in that area in view of settlement programs that potentially

responsible product manufacturers or suppliers were negotiating or had developed; said

suit captioned *Nancy Pease, executrix of the Estate of William Clark, deceased v. B. F.*

*Goodrich Company, et al.*, Case No. CV-95-291272.  This suit replaced a Summit

County, Ohio, Court of Common Pleas asbestos personal injury suit commenced by

Plaintiff Pease's parents during their lifetimes which was captioned *William F. Clark et*

*al. v. Owens Corning Fiberglass Corp. et al.*, Case No. ACV-94-04-1107.  During the

pendency of Plaintiff Pease's lawsuit, and reasonably relying and acting upon the

misrepresentations and material omissions of Defendants regarding Engelhard's talc

product and the absence of any evidence indicating Engelhard's talc contained asbestos

fibers that were made to her attorney and representative, Thomas W. Bevan, Esq., as set

forth more particularly herein, Plaintiff on or about December 4, 1998 voluntarily

dismissed the Estate's  lawsuit against Eastern Magnesia, as part of a nominal amount

settlement with a group of talc supplier defendants, without receiving full, fair and

adequate compensation for the Estate's asbestos injury claims against BASF's

predecessors.  The fraudulently obtained notice of dismissal in her case was served upon

all counsel of record, including Defendant Cahill Gordon, on or about December 4, 1996,

by U.S. Mail.  Plaintiff did not know that she and her father's estate had been the victims

of Defendants' Fraudulent Asbestos Defense Scheme described herein until late

2010/early 2011, when she was first informed of same by her attorney, Thomas W.

Bevan, Esquire. Had Plaintiff's counsel and Plaintiff known about the existence of the

spoliation described more particularly herein and/or the existence of evidence that

BASF's talc and talc products contained asbestos, the settlement demand would have been higher and/or Plaintiff would have taken her case to trial.  Plaintiff is willing and offers to return the portion of the settlement contributed by BASF, or such other amount the Court deems fair and just, in order to be restored to the *status quo ante* the settlement with BASF.

23.     Plaintiff Marilyn L. Holley ("**Holley**") is an individual and a citizen of the State of Ohio, residing at 931 Morningstar, Akron, Ohio 44307. Holley is a daughter of Kathryn Darnell, deceased.  She has been appointed executrix of the Estate of Kathryn Darnell, deceased.  Plaintiff Holley brings this suit in her individual capacity, as personal representative of the Estate of Kathryn Darnell, deceased, on behalf of the estate, and as a Class representative of a Class of others similarly situated as defined below.

24.     Plaintiff Holley's decedent, Kathryn Darnell, was a rubber industry worker employed at B. F. Goodrich Company in Akron, Ohio from 1969 to 1987. During that time she was exposed through her employment to asbestos containing talc products mined, manufactured, processed, sold and/or distributed by Engelhard.  That exposure proximately caused her to develop asbestos injuries, including mesothelioma, which proximately led to and caused her death on June 7, 2001.  Prior to her death Plaintiff Holley's decedent suffered and endured great pain and suffering and great mental anguish and emotional distress. Plaintiff Holley's decedent while alive and her Estate following her death incurred substantial costs and expenses in obtaining medical treatment and care of her asbestos injuries and mesothelioma.  Plaintiff Holley's decedent, Kathryn Darnell, during her life and her estate following her death sustained

loss of income, earning capacity, funeral expenses and pecuniary losses.  All of these injuries, losses and damages were compensable asbestos injury claims.

25.     On or about November 14, 2000, Plaintiff Holley's decedent, Kathryn Darnell, while alive, commenced an asbestos injury lawsuit in the Court of Common Pleas, Cuyahoga County, Ohio against BASF's predecessor, Eastern Magnesia, naming same as a defendant in accordance with the accepted asbestos practice in that area in view of settlement programs that potentially responsible product manufacturers or suppliers were negotiating or had developed; said suit captioned *Kathryn Darnell v. B. F. Goodrich Company, et al.*, Case No. CV-423183. Prior to her death on June 7, 2001, and reasonably relying and acting upon the misrepresentations and material omissions of Defendants regarding Engelhard's talc product and the absence of any evidence indicating Engelhard's talc contained asbestos fibers that were made to her attorney and representative, Thomas W. Bevan, Esquire, as set forth more particularly herein,  Plaintiff Holley's decedent on or about May 8, 2001, voluntarily dismissed her lawsuit against Eastern Magnesia as part of a nominal settlement with a group of talc supplier defendants without receiving full, fair and adequate compensation for her asbestos injury claims against BASF's predecessors. Kathryn Darnell during her lifetime did not know that she had been the victim of Defendants' Fraudulent Asbestos Defense Scheme described herein.  Plaintiff Holley did not know and learn that her decedent was a victim of Defendants' Fraudulent Asbestos Defense Scheme until late 2010/early 2011, when she was informed of same by her attorney, Thomas W. Bevan, Esquire.  Had Plaintiff's counsel and Plaintiff known about the existence of the spoliation described more particularly herein and/or the existence of evidence that BASF's talc and talc products

contained asbestos, the settlement demand would have been higher and/or Plaintiff would have taken her case to trial. Plaintiff is willing and offers to return the portion of the settlement contributed by BASF, or such other amount the Court deems fair and just, in order to be restored to the status quo ante the settlement with BASF.

26.     Plaintiff Donna Ware ("**Ware**") is an individual and a citizen of the State of Ohio, residing at 441 Randolph Road, Mogadore, Ohio 44260. At all times relevant herein she was married to Ralph Ware, who died on December 1, 2002. Plaintiff Ware is the Executrix of Mr. Ware's Estate. Plaintiff Ware brings this suit in her individual capacity, as personal representative of the Estate of Ralph Ware, deceased, on behalf of said Estate, and as a Class representative of a Class of others similarly situated as defined below.

27.     Plaintiff Ware's deceased husband, Ralph Ware, was employed at Goodyear Aerospace in Akron, Ohio from 1950 to 1985 as, among other things, a compound mixer. During that time he was exposed in the course of his occupation to asbestos containing talc products mined, manufactured, processed, sold and/or distributed by Engelhard. That exposure proximately caused him to develop asbestos injuries, including mesothelioma, which proximately led to and caused his death on December 1, 2002. Prior to his death Plaintiff Ware's decedent suffered and endured great pain and suffering and great mental anguish and emotional distress. Plaintiff Ware's decedent, while alive, his estate thereafter, and Plaintiff Ware herself, also incurred substantial costs and expenses in obtaining medical treatment and care of Mr. Ware's asbestos injuries. Plaintiff Ware's husband's estate sustained loss of income, earning capacity, funeral expenses and pecuniary losses. Plaintiff Ware also suffered a loss of consortium,

services and society of her husband.  All of these injuries, losses and damages were
compensable asbestos injury claims.

28.     On or about May 29, 1997, Plaintiff Ware and her deceased husband
commenced an asbestos injury lawsuit in the Court of Common Pleas, Cuyahoga County,
Ohio against BASF's predecessors, Eastern Magnesia and Pita Reality, naming same as a
defendant in accordance with the accepted asbestos practice in that area in view of
settlement programs that potentially responsible product manufacturers or suppliers were
negotiating or had developed; said suit captioned *Ralph Ware v. B. F. Goodrich
Company, et al.,* Case No. 02-475504. Reasonably relying and acting upon the
misrepresentations and material omissions of Defendants regarding Engelhard's talc
product and the absence of any evidence indicating Engelhard's talc contained asbestos
fibers that were made to their attorney and representative, Thomas W. Bevan, Esquire, as
set forth more particularly herein, Plaintiff Ware and her husband's estate in 2003
voluntarily dismissed their lawsuit against Engelhard's predecessors as part of a multi-
plaintiff, multi-talc defendant settlement that BASF's predecessors were party to, without
receiving any full, fair and adequate compensation for their asbestos injury claims against
BASF's predecessors.  Plaintiff Ware and her husband did not know that she and her
husband had been the victims of Defendants' Fraudulent Asbestos Defense Scheme
described herein while her husband was alive and she did not learn of such fact until late
2110/early2011, when she was informed of same by her attorney, Thomas W. Bevan,
Esquire. Had Plaintiff's counsel and Plaintiff known about the existence of the spoliation
described more particularly herein and/or the existence of evidence that BASF's talc and
talc products contained asbestos, the settlement demand would have been higher and/or

Plaintiff would have taken her case to trial.  Plaintiff is willing and offers to return the portion of the settlement contributed by BASF, or such other amount the Court deems fair and just, in order to be restored to the status quo ante the settlement with BASF.

29.     Plaintiff Donnette Wengerd ("**Wengerd**") is an individual and a citizen of the State of Ohio, 3147 S. Medina Line Road, Norton, Ohio 44203.  She is the daughter of the late, Jennifer Graham, deceased, and has been appointed executrix of her estate. Plaintiff Wengerd brings this suit in her individual capacity, as personal representative of the Estate of Jennifer Graham, deceased, on behalf of the estate, and as a Class representative of a Class of others similarly situated as defined below.

30.     Plaintiff Wengerd's decedent, Jennifer Graham, was a tireworker employed at Goodyear Tire and Rubber Company in Akron, Ohio from 1974 to 1978. During that time Plaintiff's decedent was exposed through the decedent's employment to asbestos containing talc products mined, manufactured, processed, sold and/or distributed by Engelhard.  That exposure proximately caused Ms. Graham to develop asbestos injuries, including mesothelioma, which injuries proximately led to and caused her death on July 21, 2008.  Prior to her death, Plaintiff Wengerd's decedent suffered and endured great pain and suffering and great mental anguish and emotional distress. Plaintiff Wengerd's decedent while alive, and her Estate following her death, incurred substantial costs and expenses in obtaining medical treatment and care of Ms. Graham's asbestos injuries and mesothelioma.  The Estate of Jennifer Graham sustained loss of income, earning capacity, funeral expenses and pecuniary losses.  All of these injuries, losses and damages were compensable asbestos injury claims.

31.     On or about May 10, 2008, Plaintiff Wengerd's decedent during her life commenced an asbestos injury lawsuit in the Court of Common Pleas, Cuyahoga County, Ohio against BASF, naming same as a defendant in accordance with the accepted asbestos practice in that area in view of settlement programs that potentially responsible product manufacturers or suppliers were negotiating or had developed; said suit captioned *Jennifer Graham et al. v. Goodyear Tire Company, et al.*, Case No. 656405.  In or around January, 2009, after Plaintiff Wengerd's decedent had refused to voluntarily dismiss her mesothelioma injury lawsuit against BASF as it had requested through counsel in a letter mailed on or about November 12, 2008, BASF electronically filed and served a Motion for Summary Judgment brief and, later, a reply brief in the Court of Common Pleas in which it misrepresented to the presiding trial court, as set forth more particularly hereinafter, that Plaintiff Wengerd could not establish her case against BASF because, *inter alia*, its predecessor's, Engelhard, talc did not contain any asbestos.  On or about June 18, 2009, the Court of Common Pleas of Cuyahoga granted BASF's Motion for Summary Judgment and dismissed Plaintiff Wengerd's mesothelioma lawsuit against BASF, thereby denying her full, fair and adequate compensation for her asbestos injury claims against BASF. Plaintiff Wengerd did not know that she and her mother's estate had been the victim of Defendants' Fraudulent Asbestos Defense Scheme described herein until 2010/early 2011, when she was first informed of same by her attorney, Thomas W. Bevan, Esquire.

32.     Plaintiff Rosanne Chernick ("**Chernick**") is an individual and a citizen of the State of North Carolina, residing at 1446 Clifton Pond Road, Louisburg, North Carolina 27549.  At all times relevant herein she was married to Steven Chernick, who

died on February 24, 2002.  Plaintiff Chernick is the Executrix of Mr. Chernick's Estate. Plaintiff Chernick brings this suit in her individual capacity, as personal representative of the Estate of Steven Chernick, deceased, on behalf of said Estate, and as a Class representative of a Class of others similarly situated as defined below.

33.     Plaintiff Chernick's decedent, Steven Chernick, worked with and/or in the vicinity of asbestos containing products and equipment with asbestos containing components while performing auto body repair work and brake lining repairs. He worked at locations including, but not limited to, Tom's Thumb Collision in the Bronx, New York during the early to mid 1980s and at other locations in the States of New York and Florida after such time.  During that time Plaintiff's decedent was exposed through his employment to asbestos containing talc products mined, manufactured, processed, sold and/or distributed by Engelhard. That exposure proximately caused Mr. Chernick to develop asbestos injuries, including lung cancer, which injuries proximately led to and caused his death on February 24, 2002 at the age of 41.  Prior to his death, Plaintiff Chernick's decedent suffered and endured great pain and suffering and great mental anguish and emotional distress. Plaintiff Chernick's decedent while alive, and his Estate following his death, incurred substantial costs and expenses in obtaining medical treatment and care of Mr. Chernicks's asbestos injuries and lung cancer.  The Estate of Steven Chernick sustained loss of income, earning capacity, funeral expenses and pecuniary losses.  Plaintiff  Chernick also suffered a loss of consortium, services and society of her husband.  All of these injuries, losses and damages were compensable asbestos injury claims.

34.      On or about August 30, 2001 October 31, 2001, Plaintiff  Chernick and her husband commenced an asbestos injury lawsuit in the Supreme Court of New York, County of New York, N.Y. and by amendment to the complaint in that suit filed on or about October 29, 2001 joined Engelhard Minerals & Chemical Corporation,  a predecessor to BASF, as a defendant; said suit was captioned *Steven Chernick, et al. v. ABB Lummus Global, Inc., et al.*, Case No. 01-116741.  Reasonably relying and acting upon the false statements of the defendants (as more particularly described herein) that Engelhard's talc and talc products did not contain asbestos and/or upon the material omissions of Defendants regarding evidence that they possessed, or destroyed, that demonstrated the presence of asbestos fiber in Engelhard's talc and talc products made to Plaintiff Chernick's and her husband's attorneys and representative, Early, Lucarelli, Sweeney & Strauss, as set forth more particularly herein, Plaintiff Chernick and her husband's estate authorized her attorney to voluntarily execute and provide a consent "No Opposition Summary Judgment Motion Order," to BASF's counsel for filing, by which he, on behalf of his client, agreed to the presiding court granting a summary judgment dismissal of the Chernick case's claims as to the Engelhard Defendants.  Plaintiff Chernick did not know that she and her husband's estate had been the victims of Defendants' Fraudulent Asbestos Defense Scheme described herein and she did not learn of such fact until 2011, when she was informed of same by her attorney, Early, Lucarelli, Sweeney & Strauss, after it had learned of the fraudulent scheme in connection with the investigation of this matter. Had Plaintiff's counsel and Plaintiff known about the existence of the spoliation described more particularly herein and the existence of evidence that BASF's talc and talc products contained asbestos, the consent order for

summary judgment would not have been entered as to BASF (Engelhard at the time), and in view of the circumstances Plaintiff would have issued a substantial settlement demand or would have taken her case to trial.

### B.      Defendants

### (1) The BASF Defendants

35.      Defendant, BASF Catalysts LLC is a limited liability company formed and existing under the laws of the State of Delaware, with its headquarters, principle place of business and managerial control located in the State of New Jersey, at 25 Middlesex/Essex Turnpike, Iselin, New Jersey 08830.

36.      BASF Catalysts LLC is the successor in interest by merger and is responsible and liable for the following companies: Engelhard Corporation, Engelhard Industries, Engelhard Minerals & Chemicals Corporation, Minerals & Chemicals Phillip Corporation, Eastern Magnesia Talc Company, Porocel Corporation and Pita Realty Limited (collectively "**Engelhard**").  Unless context indicates otherwise, "**BASF**" refers to and includes BASF Catalysts LLC and the Engelhard predecessor companies collectively.

37.      At all times material herein, BASF and its predecessor companies, including in particular Engelhard, regularly and continuously transacted business in the State of New Jersey.

38.      BASF and its predecessors, including Engelhard, directed and/or committed the statutorily unlawful and other tortious activities and omissions alleged and complained about herein in the State of New Jersey, even though the impact and harm to

Plaintiffs and many of the Class Member victims may have occurred outside of New Jersey.

39.     At all times material herein, Defendant BASF and its predecessors, including Engelhard, acted by and through its officers, employees, servants, attorneys, agents, actual, apparent and/or ostensible, any and all of whom were then and there acting within the course and scope of their authority, duties and employment, actual or apparent.

40.     Defendant BASF, acting as aforesaid, jointly conceived, orchestrated, agreed to participate in, and participated in the Fraudulent Asbestos Defense Scheme alleged herein; became a co-conspirator with others participating in the Fraudulent Asbestos Defense Scheme to defraud Plaintiffs and members of the Class, including the "Lawyer Perpetrators" indentified herein; was a member of the BCAD Enterprise and participated in its creation, direction and management, and participated in the execution and commission of the BCAD Enterprise's unlawful activities.

41.     Defendant Thomas D. Halket ("**Halket**") was, at times material herein, an attorney at law employed by BASF as an in-house counsel.  Defendant Halket during his employment with BASF as an in-house attorney assigned asbestos claim matters jointly participated in the creation and operation of the Fraudulent Asbestos Defense Scheme alleged herein; became a co-conspirator with others participating in the Fraudulent Asbestos Defense Scheme to defraud Plaintiffs and members of the Class, including the "Lawyer Perpetrators" indentified herein; was a member of the BCAD Enterprise and participated in its creation, direction and management, and participated in the execution and commission of the BCAD Enterprise's unlawful activities either directly or indirectly as a co-conspirator. Halket never expressly or affirmatively advised his co-conspirators or

anyone outside of the conspiracy, such the affected courts, claimant counsel or claimants, that he withdrew from the conspiracy, and consequently is liable for the acts of his co-conspirators following his termination of employment with BASF.

42.      Defendant Glenn Hemstock ("**Hemstock**") was, at times material herein, employed by BASF (then Engelhard) as its Vice President of Research and Development. During his employment with BASF he was a top scientist.  He worked there with and tested Engelhard's talc and he managed and directed Engelhard employees and consultants who tested or conducted research on Engelhard's talc.  Defendant Hemstock during his employment with BASF jointly participated in the creation and operation of the Fraudulent Asbestos Defense Scheme alleged herein; became  a co-conspirator with others participating in the Fraudulent Asbestos Defense Scheme to defraud Plaintiffs and members of the Class, including the "Lawyer Perpetrators" indentified herein; was a member of the BCAD Enterprise and participated in its creation, direction and management, and participated in the execution and commission of the BCAD Enterprise's unlawful activities either directly or indirectly as a co-conspirator. Hemstock never expressly or affirmatively advised his co-conspirators or anyone outside of the conspiracy, such the affected courts, claimant counsel or claimants, that he withdrew from the conspiracy, and consequently is liable for the acts of his co-conspirators following his termination of employment with BASF.

43.      'Defendant Arthur A. Dornbusch II ("**Dornbusch**") was, at all times material herein, an attorney at law employed by BASF as an in-house counsel.  He also is and was at all times relevant herein a Vice President of BASF, BASF's General Counsel and BASF's Corporate Secretary.  Defendant Dornbusch during his employment and

tenure with BASF as General Counsel jointly participated in the creation and operation of the Fraudulent Asbestos Defense Scheme alleged herein; became a co-conspirator with others participating in the Fraudulent Asbestos Defense Scheme to defraud Plaintiffs and members of the Class, including the "Lawyer Perpetrators" indentified herein; was a member of the BCAD Enterprise and participated in its creation, direction and management, and participated in the execution and commission of the BCAD Enterprise's unlawful activities either directly or indirectly as a co-conspirator. Dornbusch never expressly or affirmatively advised his co-conspirators or anyone outside of the conspiracy, such the affected courts, claimant counsel or claimants, that he withdrew from the conspiracy, and consequently is liable for the acts of his co-conspirators following his termination of employment with BASF.

44.     With respect to the activities, conduct and omissions set forth herein, Defendants BASF, Halket, Dornbusch and Hemstock (collectively referred to as the "**BASF Perpetrators**") acted recklessly, knowingly, deliberately and/or intentionally to mislead and deceive courts in which asbestos claims were pending, the Plaintiffs, the Asbestos Claimant Class and Asbestos Claimants' counsel, or, in the alternative, to cause, assist, aid or abet others to mislead and deceive Plaintiffs and the Asbestos Claimant Class.

45.     The BASF Perpetrators, including attorney defendants Dornbusch and Halket in their representation of BASF, and in carrying out the functions of the Fraudulent Asbestos Defense Scheme, acted in bad-faith, with ill will, and with intent to harm, deceive and defraud the plaintiffs, class members and, as described more fully

below, presiding courts in which asbestos matters were pending, including the asbestos Multi-District Litigation court.

### (2) The Cahill Gordon & Reindel Defendants

46.     Defendant Cahill Gordon & Reindel LLP ("**Cahill LLP**" when referred to individually for context) is a limited liability partnership organized and existing under the laws of the State of New York.  It came into existence on or as of April 29, 2003.  It is the successor in interest to the law firm partnership known as "Cahill Gordon & Reindel" and is responsible for this predecessor partnership's debts and liabilities.

47.     Defendant Cahill LLP regularly and continuously did and does transact business in the State of New Jersey, as did its predecessor, Cahill Gordon & Reindel.  At all times material to this matter, Cahill LLP also committed relevant statutorily unlawful and other tortious conduct in, and directed towards, New Jersey and citizens of New Jersey.

48.     Defendant Cahill Gordon & Reindel ("**Cahill Partnership**" when referred to individually for context) is and was a New York professional partnership that was in existence from 1919 until April 29, 2003, at which time it was succeeded to by Cahill LLP in an organizational form change transaction.

49.     Defendant Cahill Partnership regularly and continuously transacted business in the State of New Jersey and at all times material to this matter committed relevant statutorily unlawful and other tortious conduct in, and directed towards, New Jersey and citizens of New Jersey.

50.     At all times material herein, Defendants Cahill LLP and Cahill Partnership (collectively "**Cahill Gordon**") acted by and through their shareholders, members, partners, officers, employees, servants, associate attorneys, agents, actual, apparent and/or ostensible, any and all of whom were then and there acting within the course and scope of their authority, duties and employment, actual, apparent or ostensible, and/or within the authority of his or her copartners or the partnership.  All Cahill Gordon partners, members or shareholders were acting in the ordinary course of business of the partnership and/or with the authority of his or her co-partners or members.  Defendant Cahill Gordon is liable herein under the doctrine of *respondeat superior* for the actions of its partners, members, officers, agents, employees, servants and associate attorneys.  All Cahill Gordon partners, members or shareholders are jointly and severally liable for the negligent or wrongful acts, omissions of him or her, his or her partners, and/or for any negligent or wrongful act of misconduct committed by persons under his or her direct supervision and control while rendering professional services. As a New York law firm, Cahill Gordon and its attorneys are also subject to the prohibitions, penalties and civil remedies relating to attorney misconduct in court matters provided by N.Y. Judiciary Law §487.

51.     From at least 1983 and continuing to in or about 2010, Defendant Cahill Gordon was BASF and its predecessors' national counsel regarding asbestos injury claim defense matters.  Based upon information and belief, Cahill Gordon was terminated by BASF as its national asbestos defense counsel after the spoliation and Fraudulent Asbestos Defense Scheme alleged herein was uncovered during discovery proceedings in the *Paduano* suit.

52.     Defendant Cahill Gordon, through its members, shareholders or partners, officers, agents, employees, servants and associate attorneys, acting as aforesaid, jointly conceived, orchestrated, agreed to participate in, or  participated in, and/or or recklessly permitted its members, shareholders or partners, officers, agents, employees, servants and associate attorneys, acting as aforesaid, to orchestrate, agree to participate in and actively participate in, the Fraudulent Asbestos Defense Scheme alleged herein, or was a co-conspirator with, or an aider and abettor of others participating in the Fraudulent Asbestos Defense Scheme, including the BASF Perpetrators. Cahill Gordon never expressly or affirmatively advised its co-conspirators or anyone outside of the conspiracy, such the affected courts, claimant counsel or claimants, that it withdrew from the conspiracy, and consequently is liable for the harmful acts of its co-conspirators following its termination as BASF's National Counsel.

53.     Defendant Cahill Gordon, through its members, shareholders or partners, officers, agents, employees, servants and associate attorneys, acting as aforesaid, was a member of the BCAD Enterprise and participated in its creation, direction and management, and participated in the execution and commission of the BCAD Enterprise's unlawful activities.

54.     Defendant Howard G. Sloane (a/k/a "Peter Sloane") ("**Sloane**") was, at times relevant hereto a member of the bar of New York State, a partner in the Cahill Partnership and then a shareholder of Cahill LLP.  Plaintiffs believe Sloane is a citizen of a state or territory different than they are.  Sloane at all material times herein was one of the principal Cahill Gordon attorneys entrusted with the representation of BASF in asbestos claim matters.  Defendant Sloane jointly conceived, orchestrated and

participated in the fraudulent conduct scheme alleged herein with others including the BASF perpetrators; became a co-conspirator with others participating in the scheme to defraud Plaintiffs and members of the Class; was a member of the BCAD Enterprise and participated in its creation, direction and management; and participated in the execution and commission of the BCAD Enterprise's unlawful activities. At all times material herein Sloane was acting in the ordinary course of business of Cahill Gordon and/or with the authority of his Cahill Gordon co-partners, co-members or co-shareholders. Sloane never expressly or affirmatively advised his co-conspirators or anyone outside of the conspiracy, such the affected courts, claimant counsel or claimants, that he withdrew from the conspiracy, and consequently is liable for the acts of his co-conspirators following his termination as counsel for BASF.

55.     Defendant Scott A. Martin ("**Martin**") was, at times relevant hereto, a member of the bar of the State of New York and an attorney employed by and practicing with Cahill Gordon. Plaintiffs believe Martin is a citizen of a state or territory different than they are. Martin at times material herein was one of the Cahill Gordon attorneys entrusted with and responsible for the representation of BASF in asbestos claim matters. Martin jointly conceived, orchestrated and/or participated in the fraudulent conduct scheme alleged herein with others including the BASF Perpetrators; was a co-conspirator with others participating in the scheme to defraud Plaintiffs and members of the Class; was a member of the BCAD Enterprise and participated in its creation, direction and/or management; and participated in the execution and commission of the BCAD Enterprise's unlawful activities. At all times material herein Martin was acting in the ordinary course of business of Cahill Gordon and/or with the authority of his Cahill

Gordon co-partners, co-members or co-shareholders. Martin never expressly or affirmatively advised his co-conspirators or anyone outside of the conspiracy, such the affected courts, claimant counsel or claimants, that he withdrew from the conspiracy, and consequently is liable for the acts of his co-conspirators following his termination as counsel for BASF.

56.     Defendant Ira J. Dembrow ("**Dembrow**") was, at times relevant hereto, an attorney at the law firm of Cahill Gordon.  Plaintiffs believe Dembrow is a citizen of a state or territory different than them.  Dembrow at all times material herein was one of the Cahill Gordon attorneys entrusted with and responsible for the representation of BASF in asbestos claim matters.  Dembrow jointly conceived, orchestrated and/or participated in the fraudulent conduct scheme alleged herein with others including the BASF Perpetrators; was a co-conspirator with others participating in the scheme to defraud Plaintiffs and members of the Class; was a member of the BCAD Enterprise and participated in its creation, direction and/or management; and participated in the execution and commission of the BCAD Enterprise's unlawful activities.  At times material herein Dembrow was acting in the ordinary course of business of Cahill Gordon and/or with the authority of his Cahill Gordon co-partners, co-members or so-shareholders. Dembrow never expressly or affirmatively advised his co-conspirators or anyone outside of the conspiracy, such the affected courts, claimant counsel or claimants, that he withdrew from the conspiracy, and consequently is liable for the acts of his co-conspirators following his termination as counsel for BASF.

57.     With respect to the activities, conduct and omissions set forth herein, Defendants Cahill Gordon, Sloane, Martin and/or Dembrow (collectively referred to as

the "**Lawyer Perpetrators**") acted recklessly, knowingly, deliberately and/or intentionally to mislead and deceive courts in which asbestos claims were pending, Plaintiffs, the Asbestos Claimant Class and Asbestos Claimants' counsel, or, in the alternative, to cause, assist, aid or abet others to mislead and deceive Plaintiffs and the Asbestos Claimant Class.

58.     The Lawyer Perpetrators in and during their and its representation of BASF and in carrying out the functions of the Fraudulent Asbestos Defense Scheme, acted in bad-faith, with ill will, and with intent to harm, deceive and defraud the plaintiffs, class members and, as described more fully below, presiding courts in which asbestos matters were pending, including the asbestos Multi-District Litigation court.

### (3) The Fictitious Defendants

59.     JOHN DOE BUSINESS ENTITIES 1 to 100 are fictitious corporations, partnerships, or other business entities or organizations that BASF is responsible or liable for and whose identities are not presently known, which entities may have mined, milled, manufactured, sold, supplied, purchased, marketed, installed and/or removed asbestos or asbestos-containing materials, or alternatively, are responsible for, are the alter egos of, or are otherwise responsible for the conduct or liability of such entities, as set forth herein.

60.     JOHN DOE BUSINESS ENTITIES 101 to 200 are the fictitious firms, corporations, partnerships, limited liability companies/associations or other business entities or organizations whose identities are not presently known, and who may have perpetrated, or are responsible for, are the alter egos of or are otherwise responsible for the conduct or liability of those who perpetrated or acted in concert with, in furtherance

of, or in conjunction with the other Defendants in the conduct, activities, acts and omissions as set forth herein.

61.   JOHN DOE LAWYERS 1 to 500 are the fictitious names of lawyers and law firms, legal professional corporations, legal professional partnerships, or other professional business entities or organizations, or their agents, employees, or servants, acting within the course and scope of their employment, or other individuals whose identities are not presently known, and who may have perpetrated and/or are responsible for, or are the alter egos of, or are otherwise responsible for the conduct or liability of those who perpetrated, aided and abetted, or acted in concert with, in furtherance of, or in conjunction with the other Defendants in the conduct, activities, acts and omissions as set forth herein.

62.   Defendants JOHN DOE 1 to 500 are the fictitious names of individuals whose identities are not presently known, who may have perpetrated, aided and abetted, conspired with, acted in concert with and/or are secondarily responsible or liable under law for the conduct or activities of those who may have acted in concert with, in furtherance of, or in conjunction with the other Defendants in the conduct, activities, acts and omissions set forth herein, including but not limited to employees, officers, agents, members and partners of named Defendants as set forth herein.

## IV. VENUE AND JURISDICTION.

63.   This Court has subject-matter jurisdiction over this nationwide class action pursuant to 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5,000,000, exclusive of interest and costs,

and is a class action in which some members of the class are citizens of states different than the Defendants. 28 U.S.C. § 1332(d)(2)(A).

64.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because numerous Defendants, as described above, reside in, are headquartered in, and/or conduct business in, this judicial district, and because a substantial part of the acts or omissions giving rise to the claims set forth herein occurred in this judicial district, or were directed and controlled from within this judicial district.

## V. FACTS COMMON TO CLASS CERTIFICATION AND ALL COUNTS

**A**.     **Asbestos Background Information**

65.     Asbestos is a naturally occurring mineral and is a human carcinogen.

66.     A common form of asbestos fiber is chrysotile asbestos.  Chrysotile asbestos is a recognized and regulated human carcinogen.  Chrysotile is the most common variety of asbestos found in products in the United States.

67.     Other forms of asbestos are amosite, crocidolite, tremolite, actinolite and anthophyllite.  The United States Environmental Protection Agency, the Occupational Health and Safety Administration, and the World Health Organization, among others, have stated that there is <u>no</u> known safe level of exposure to asbestos of <u>any</u> type.

68.     Talc is a naturally occurring mineral that is mined and then processed or used in manufacturing by companies in numerous parts of the United States.

69.     Asbestos has been identified as a contaminant of some talc mines.

**B.    Engelhard's Emtal Talc Products and Asbestos**

70.    BASF's predecessor Engelhard either directly or indirectly through a subsidiary owned or operated a talc mine located in Johnson, Vermont (the "**Johnson Mine**") from 1967 until 1983.

71.    The Johnson Mine was closed in 1983.

72.    At some time presently unknown to Plaintiffs, and according to information provided by Defendants in preceding asbestos litigation, the Johnson Mine became flooded with water, thereby preventing the obtaining of any future valid samples of its talc.

73.    BASF's predecessor Engelhard processed or manufactured the Johnson Mine's talc ore into talc products that were marketed under the trade name "Emtal talc". The "Emtal" trademark was owned and utilized by BASF's subsidiary, Eastern Magnesia.  Emtal talc products also included "G&S Talc," talc that contained serpentine asbestos fiber.

74.    Emtal talc ore and products were used across the nation in diverse industries for many purposes.  As examples, it was an ingredient, component of, or coating in or on the following products: wall board, joint compound, auto body "filler," dusting agents and children's balloons.

75.    Emtal talc and talc products produced, processed and/or manufactured by BASF, contained chrysotile asbestos fibers, as well as other asbestos forms including tremolite  and serpentine asbestos.

76.     During the 1970s and continuing through the early 1980s, BASF through its internal personnel or outside consultants  or laboratories conducted tests and assays on its talc ore and products, as well as in, about  or on areas or environments where the talc was mined, processed, or used. Third parties also conducted tests and assays on BASF talc ore and products.  A number of the tests and assays were to determine if the Johnson Mine's talc and processed Emtal talc products contained asbestos fibers.

77.     BASF had knowledge of testing and assays performed on talc obtained from the Johnson Mine and Emtal talc products, and had knowledge of the tests' results, including test findings that the talc and talc products contained asbestos fibers and that certain environments in its facilities, including laboratories, had high levels of airborne asbestos fibers.

78.     The tests and assay results are scientific and business records that BASF and predecessors regularly kept and maintained.

79.     The test and assay results conducted on Johnson Mine talc ore and processed Emtal talc products found asbestos fibers in the ore and products.

80.     Among the testing and assays of Emtal talc which found the presence of asbestos fibers in the Emtal talc which were uncovered in the *Paduano* suit discovery are:

a.   A 1972 Royal Globe Insurance test with results indicating four out of five Emtal talc samples contained asbestos fibers.

b.   A May 1972 Johns Manville test which identified asbestos fibers, including tremolite fibers, in all of the Emtal talc samples.

c.   A 1977 test by Mr. Triglia, an Engelhard employee, which identified the presence of asbestos in Emtal talc.

d.   A 1978 test which established the presence of asbestos in all Emtal talc sampled.

e.   A 1979 Georgia Tech electron microscope analysis test which found fibers in the Emtal talc.

f.   Three other 1979 tests which all confirmed the presence of asbestos in Emtal talc.

81.     The above identified tests and assays, on information and belief, are not an exhaustive list of the asbestos tests and assays with positive findings for asbestos in Emtal talc.  Plaintiffs believe there are or were other tests and assays of Emtal talc and/or talc from the Johnson Mine that had positive findings of asbestos, which BASF claims are privileged and refuses to divulge or, as will be described below, were reported in documents collected by BASF in or about 1984 and then either destroyed or secreted away once the BASF management or in-house counsel, including Hemstock, Dornbush and Halket, and Cahill Gordon counsel, including Sloane, became aware of the implications of such positive test and assay findings on BASF's liability exposure and national risk management program regarding asbestos injury claims.

82.     BASF's management and in-house counsel, including Hemstock, Dornbush and Halket, and Cahill Gordon counsel, including Sloane, based upon information and belief, had knowledge and were aware of the test results and other non-

publically available data, opinions, findings and conclusions of experts which established that the Johnson Mine talc and/or Emtal talc products contained asbestos.

83.     Despite the findings from these tests and assays to the contrary, BASF represented to its customers, industry trade groups and the Federal Government that the Emtal talc was asbestos free and even marketed the product as a viable asbestos substitute, thereby causing wide spread and unknowing exposure to asbestos to United States citizens, including workers and workers' spouses and children, nationwide.

C.     **The *Westfall* Asbestos Lawsuit's Discovery**

84.     In 1979, Mr. David Howard Westfall, a family member of a deceased rubber and rubberized product industry worker, filed an asbestos injury lawsuit in the United States District Court for the District of Rhode Island captioned *Westfall v. Whittaker,* C.A. No. 79-0269 (the "***Westfall* case**"), based upon his decedent's exposure to asbestos containing talc products.

85.     In the *Westfall case*, plaintiff indentified one of the Engelhard companies, Eastern Magnesia Talc Company, as a company that manufactured the talc his decedent was exposed to and which caused the mesothelioma injury underlying the case.

86.     BASF was represented and defended in the *Westfall* case by, among others, Cahill Gordon, its national counsel.

87.     The BASF Perpetrators were aware of the *Westfall* case and participated in and/or oversaw BASF's defense of the case along with Cahill Gordon.

88.     The BASF Perpetrators and the Lawyer Perpetrators were aware of,
participated in and/or oversaw the investigation in the defense of the *Westfall* case on
behalf of BASF and in such capacity were aware of internal and external investigations,
tests and assays relating to the Johnson Mine talc ore and Emtal talc products.

89.     In particular, Defendant Sloane was among the Cahill Gordon attorneys
actively representing BASF in the *Westfall* case, and in such capacity was aware of the
discovery and evidence relating to BASF that existed in that suit.

90.     In particular, Defendant Halket was among BASF's in-house attorneys
actively involved and participating in the *Westfall* case defense, and in such capacity was
aware of the discovery and evidence relating to BASF that existed in that suit.

91.     In response to document discovery requests served on BASF by the
*Westfall* case's attorneys, documents that established the existence of asbestos fibers in
Emtal talc, including test and assay results that were in BASF's possession, were
produced in or about 1983 to Westfall's attorneys by BASF through its counsel, Cahill
Gordon.

92.     In 1983, as part of the *Westfall* case discovery, Defendant Hemstock was
deposed under oath over two days in his capacity as an employee of Engelhard.
Appended as Exhibit 1 is a copy of his deposition transcripts produced to the plaintiff's
counsel in the *Paduano* suit only after Mr. Swenson's deposition testimony therein
revealed the existence of the spoliation and fraudulent concealment scheme that is the
subject of this suit.  The exhibits identified in Defendant Hemstock's depositions were
not produced by BASF in the *Paduano* suit discovery despite request. Accordingly, a full

and complete copy of the entire Hemstock transcript including all exhibits cannot be appended.

93.     At the time of his deposition in the *Westfall* case, Defendant Hemstock was one of Engelhard's top scientists and held a management (Vice-President of Research and Development) position with Engelhard.

94.     Defendant Sloane was also present at and represented Defendant Hemstock and BASF at Hemstock's deposition in the *Westfall* case.

95.     Defendant Halket was also present at Dr. Hemstock's *Westfall* case deposition in his capacity as BASF in-house counsel.

96.     During his deposition in the *Westfall* case, Defendant Hemstock testified that the Emtal talc did in fact contain asbestos fibers. He was thus aware of the issue over Emtal Talc's asbestos content in asbestos claims and was aware that evidence relating to same was pertinent to asbestos claims against BASF.

97.     During his deposition in the *Westfall* case, Defendant Hemstock was questioned by Mr. Westfall's lawyer about assays and tests on Emtal talc that had been conducted at the Engelhard's laboratory in New Jersey.

98.     During his deposition in the *Westfall* case, Defendant Hemstock admitted that various tests performed throughout the 1970s and 1980s, both by BASF employees and by third parties, indicated the presence of asbestos fibers in Emtal talc that was tested or assayed.

48

99.     During his deposition in the *Westfall* case, Defendant Hemstock was shown and then questioned about various documents, including what were apparently test or assay results.  These documents were produced to Mr. Westfall's attorney by BASF, through its attorneys Cahill Gordon, during discovery in the *Westfall* case and were marked as exhibits during the course of Defendant Hemstock's deposition.

100.     During his deposition in the *Westfall* case, Defendant Hemstock was shown the results of various tests and assays which characterized the level of asbestos fibers in the Emtal talc as having "high levels of chrysotile."

101.     Defendants Sloane, other Cahill Gordon attorneys present at Hemstock's deposition, and Defendant Halket all heard Hemstock's testimony under oath and all were able to examine and review the exhibits that Defendant Hemstock was shown and testified to or about during Defendant Hemstock's deposition, if not beforehand as well.

102.     Defendants Sloane and the other Cahill Gordon attorneys present at Hemstock's deposition were aware of and appreciated the negative implications on BASF's asbestos injury claim liability and BASF's future asbestos risk management created by Hemstock's testimony and the test and assay results showing the presence of asbestos fiber in BASF products indentified during his deposition in the *Westfall* case.

103.     Defendant Halket and other BASF Perpetrators were aware of and appreciated the negative implications on BASF's asbestos injury claim liability and BASF's future asbestos risk management created by Hemstock's testimony and the test and assay results showing the presence of asbestos fiber in BASF products indentified during his deposition in the *Westfall* case.

104.     Following Defendant Hemstock's deposition, BASF and/or Cahill Gordon obtained a full and complete copy of Hemstock's deposition transcripts as well as a copy of the documents upon which he was examined that were identified in the transcript.

105.     On or about March 29, 1983, Defendant Sloane in the *Westfall* case took the deposition of a former Engelhard research and development employee, Peter Gale ("**Gale**").

106.     Gale, during his employment with Engelhard in the 1970's, had conducted analytical testing research on Emtal talc.  He also during that time visited and took samples of talc ore from the Johnson Mine.

107.     During his deposition, Gale testified in response to Sloane's questioning that he kept laboratory notebooks of his work and analysis which were considered confidential records of Engelhard and were stored in Engelhard's library.  In response to the *Paduano* suit's spoliation investigation discovery, BASF stated that it was not able to produce Gale's laboratory notebooks.

108.     After Gale was identified as a possible expert witness for the plaintiff in the *Westfall* case, BASF through Cahill Gordon objected to his serving as an expert for the *Westfall* plaintiff.  Gale acquiesced to BASF's demand that he not serve as an expert to the *Westfall* case's plaintiff based on the terms of his employment contract with Engelhard and BASF's objection to his voluntarily testifying.

109.     On or about April 7, 1983, a deposition under oath of another employee of Engelhard, Mr. Emil J. Triglia ("**Triglia**"), was taken in the *Westfall* case in Metuchen, New Jersey.  A copy of Mr. Triglia's deposition transcript as produced in the *Paduano* suit is appended as Exhibit 2.

110.     During his deposition in the *Westfall* case, Triglia testified that Emtal talc contained asbestos fibers.

111.     During his deposition in the *Westfall* case, Mr. Triglia was shown various documents relating to Emtal talc which were subsequently identified and marked as exhibits during the deposition.  In response to requests for copies of the marked exhibits in the *Paduano* suit's spoliation investigation discovery, BASF stated that it was not able to produce copies of the actual marked exhibits referred to in the deposition transcript. BASF offered instead an attempted partial reconstruction of the deposition exhibits in which it produced copies of some (but not all) of documents purportedly matching the description of the documents referenced during the deposition.

112.     According to the Triglia deposition transcript produced in the *Paduano* case, Defendant Halket and Cahill Gordon attorneys were identified as being present at the Triglia deposition.

113.     After Triglia's deposition was transcribed, the BASF Perpetrators and and/or the Lawyer Perpetrators obtained a full and complete copy of Triglia's deposition transcripts, as well as a copy of the documents that were identified during the depositions and about which he was questioned during the deposition.

114.     On or about or about May 6, 1983, Defendant Sloane wrote a letter to the court reporter who recorded and transcribed Triglia's deposition and requested that the transcript record be corrected to reflect that Defendant Halket and Defendant Cahill Gordon's attorneys were not present at the deposition as indicated because, according to Defendant Sloane in his letter, they were not invited to attend the deposition.  Defendant Sloane's letter further transmitted to the court reporter for inclusion with the deposition transcripts *errata* sheets by Triglia purporting to correct his testimony or the transcript.

115.     Whether present at the disposition or not, Defendant Sloane did receive the transcript of the Triglia deposition and was aware of its contents as he reviewed it sufficiently to provide the court reporter with *errata* information.

116.     Copies of Triglia's deposition were circulated or mailed to BASF's in-house attorneys, including Defendant Halket, and to the Lawyer Perpetrators.

117.     The BASF Perpetrators and the Lawyer Perpetrators were aware and appreciated the negative implications on BASF's asbestos injury claim liability and BASF's future asbestos risk management of both Triglia's testimony and the test and assay results showing the presence of asbestos fiber in BASF products indentified during Triglia's deposition.

118.     At the time of the *Westfall* case, the BASF and Lawyer Perpetrators knew that BASF could and would in the future be sued by other asbestos injury claimants who were exposed to BASF's Emtal talc products.  The existence of such potential claims created a substantial national asbestos risk management and liability problem for BASF.

**D.     The *Westfall* Case's Settlement and Confidentiality Agreement and Origins of the BCAD Enterprise**

119.    BASF's management had knowledge of the *Westfall* case's discovery at or about the time it was occurring.  Also, at or about that time BASF's management and in-house counsel, including Hemstock, Dornbusch and Halket, were aware of the negative implications that BASF's production of positive test/assay results and internal documents establishing Emtal talc products contained asbestos produced in the *Westfall* case had upon not only the *Westfall* case, but upon BASF's asbestos claim liability and asbestos liability risk management in general. This created a significant liability and risk management problem for BASF given the widespread distribution and use of EMTAL talc products.

120.    Sometime following the depositions of Defendant Hemstock and Mr. Triglia in 1983 and prior to March 7, 1984, members of BASF's management and in-house general counsel's office and Cahill Gordon, including but not limited to Defendants Dornbusch, Hemstock, Halket and Sloane, devised and agreed to a strategy, plan and scheme to control and even possibly eliminate BASF's (then Engelhard's) future asbestos injury claim liability and asbestos risk management exposure.  Under this plan and scheme: (a) the *Westfall* case would be resolved by a settlement that required a confidentially agreement which prevented the BASF discovery responses, deposition transcripts, and other evidence of asbestos fiber present in BASF talc products gathered in the discovery of that case from becoming disclosed or otherwise known and available to other asbestos claimants and their counsel; (b) steps would then taken under the pretense or guise of record retention management to gather-up and then limit access or

conceal or destroy all evidence and documents in Engelhard's possession and control

relating to Emtal talc ore and products, including the discovery in *Westfall* case; and, (c)

all claimants and experts consulted from that time forward would be told by BASF and/or

its attorneys that Emtal talc ore and products did not contain asbestos and/or that there

was no evidence to the contrary and in support of these representations only samples, test

results or documents consistent with these representations would be provided or referred

to in connection with asbestos injury claims, thus corrupting, biasing and tainting the

opinions of such experts. Thus began the Fraudulent Asbestos Defense Scheme and the

collusion and conspiracy among BASF and Cahill Gordon, and members of each

company, to implement the scheme and conceal its existence and operation from all

persons and institutions outside of BASF and Cahill Gordon.

121.    On information and belief, sometime following the depositions of

Defendant Hemstock and Mr. Triglia in 1983 and prior to March 7, 1984, members of

BASF's management, in-house General Counsel's office, including but not limited to

Defendants Dornbusch, Hemstock, and Halket, obtained BASF's (then Engelhard's)

management's consent and authorization to implement and execute the strategy, plan and

scheme.

122.    On information and belief, Defendant Sloane and other Cahill Gordon

lawyers obtained Defendant Cahill Gordon's management's authorization or acquiesces

in implementing and executing the BASF asbestos defense strategy, plan and scheme.

123.    To execute, manage and control the asbestos defense plan and scheme,

which due to the nature of asbestos injury claims was foreseeably expected to continue on

54

for decades, an association in fact arose in or about 1983 or 1984, the exact date being

presently unknown to Plaintiffs, that was comprised of the BASF Perpetrators, the

Lawyer Perpetrators, and other BASF and Cahill Gordon related personnel over time.  As

mentioned, this association in fact is identified and referred to as the "BASF-Cahill

Gordon Asbestos Defense Enterprise" or "BCAD Enterprise" for short. The BCAD

Enterprise had both legitimate and illegitimate functions and purposes in conducting

BASF's asbestos injury claim defense.

124.    BASF, through Cahill Gordon, settled the *Westfall* case.

125.    The terms of the *Westfall* case settlement included a confidentiality

agreement that bound the *Westfall* case's plaintiff and his attorneys to not discuss the case

or share or otherwise disclose the discovery and evidence obtained in the matter.  Upon

information and belief, the inculpatory evidence developed in the *Westfall* case was either

destroyed or secreted away by the BASF Perpetrators after the case was settled.

126.    The *Westfall* case settlement and confidentiality agreement were parts of

the BASF and Lawyer Perpetrators' plan, scheme and agreement to mislead, deceive and

defraud asbestos injury claimants and their attorneys, and in some circumstances the

courts directly, regarding the merit of asbestos injury claims against BASF based upon

Emtal talc products.

127.    The *Westfall* case settlement and obtaining the confidentiality agreement

that bound the Westfall case's plaintiffs and counsel were overt acts in furtherance of the

BASF and Lawyer Perpetrators' agreement and conspiracy to (a) mislead, deceive and

defraud asbestos injury claimants,  asbestos claimant attorneys and presiding asbestos

courts, including the federal District Court asbestos multi-district litigation, regarding the

viability or the merit of asbestos injury claims against BASF based upon Emtal talc

products; and (b) in furtherance of the agreement and conspiracy among the BASF and

Lawyer Perpetrators to commit a pattern of unlawful predicate activities, as defined and

proscribed in N.J.S.A. § 2C:41-1 *et seq.*,  in order to conduct and effectuate BASF's

asbestos injury claim defense and operate and manage the BCAD Enterprise. These overt

acts also serve as predicate to Cahill Gordon's and its New York attorneys' violation of

N.Y. Judicial Law §487, which prohibits New York State attorneys from engaging in

deceit or collusion towards courts and parties to litigation.

### E.   The Gathering and Spoliation of Inculpatory Evidence after the Settlement of the *Westfall* Case.

128.   After the *Westfall* case was settled, a memorandum dated March 7, 1984,

signed by Defendant Hemstock entitled "DOCUMENT RETRIEVAL –

DISCONTINUED OPERATIONS" ("**Document Retrieval Memorandum**") was sent to

employees of Engelhard.  A copy of the Document Retrieval Memorandum is appended

as Exhibit 3 and incorporated herein by reference.

129.   The Document Retrieval Memorandum directed all Engelhard minerals

division employees to search for, retrieve, and gather all "all notebooks, duplicate copies

of notebooks, technical service requests and responses, memoranda and reports" relating

to operations of Engelhard Minerals Ltd. and Emtal, among other BASF predecessor

companies.

130.   BASF's employees were directed by the Document Retrieval

Memorandum and the BASF Perpetrators to place the documents they gathered in

response to the memorandum in file boxes for discard, and to make the boxes available for pick-up on March 16, 1984.

131.    All documentary evidence relating to Engelhard's asbestos-containing talc, was thereafter gathered up, collected by the BASF Perpetrators or their agents, and subsequently was either destroyed or secreted away by the BASF Perpetrators, all with the knowledge, approval and agreement of the Lawyer Perpetrators.

132.    The evidence gathered as a result of the Document Retrieval Memorandum is believed to include, among other things, Emtal talc sales and inventory records, laboratory notebooks, which would include data and test or assay results on Emtal talc products and talc ore from the Johnson Mine, and test and assay result documents on tests or assays performed by third parties, such as Royal Globe Insurance, Johns Manville and Georgia Institute of Technology ("Georgia Tech").

133.    The collection of the documents in March, 1984 was not for legitimate record retention purposes and any claim that the collection of the documents on such basis is and was pretext and in bad faith on BASF's part, including Defendants Dornbusch, Hemstock and Halket. The collection of documents and other evidence relating to asbestos in Engelhard's talc ore and talc products took place at a time and under circumstances that both the BASF Perpetrators and the Lawyer Perpetrators knew or foresaw that BASF was, or would be the subject of asbestos injury claims in which it was, or would be contended that its talc ore and Emtal talc products contained asbestos fibers.  Because of this knowledge, BASF had a duty, of which duty the BASF and Lawyer Perpetrators were well aware, to preserve evidence and documents relevant to

such asbestos claims that were in BASF's possession or control.  The Lawyer Perpetrators as BASF's national counsel in asbestos matters had a duty to advise and assist BASF in fulfilling that duty.

134.    BASF, the BASF Perpetrators and the Lawyer Perpetrators breached their respective duties regarding the preservation of evidence and documents by not preserving and/or by otherwise spoliating same and/or by gathering such evidence for purposes of denying access to that evidence to those who were then, or could in the future asserting claims against BASF for injuries caused by asbestos in its talc and talc products.

135.    Despite being asked in the *Paduano* suit for an inventory of the documents collected pursuant to the Document Retrieval Memorandum and for a clear, unequivocal statement as to the fate and, if applicable, current location of the Engelhard talc and asbestos documents, BASF has to date neither provided an inventory nor stated the fate or current whereabouts of all of the documents collected in 1984.

136.    The collection and destruction or secreting away of Engelhard's documents in 1984 were parts of the BASF and Lawyer Perpetrators' plan, scheme, collusion  and agreement to mislead, deceive and defraud asbestos claimants and their attorneys regarding the viability or merit of asbestos injury claims against BASF based upon Emtal talc products.

137.    The collection and destruction or secreting away of Engelhard's documents in 1984 were overt acts in furtherance of the BASF and Lawyer Perpetrators' agreement and conspiracy to mislead, deceive and defraud asbestos claimants and asbestos claimant attorneys regarding the viability or merit of asbestos injury claims

against BASF based upon Emtal talc products and in furtherance of the agreement and

conspiracy among the BASF and Lawyer Perpetrators to commit a pattern of unlawful

activities as defined and proscribed in N.J.S.A. § 2C:41-1 *et seq*. in order to conduct and

effectuate BASF's asbestos defense. These overt acts also serve as predicate to Cahill

Gordon's and its New York attorneys' violation of N.Y. Judicial Law §487, which

prohibits New York State attorneys from engaging in deceit or collusion towards courts

and parties to litigation.

**F.     BCAD Enterprise's Twenty-Five Years Long Pattern and Practice of
         Misleading and Deceiving Asbestos Injury Claimants, Asbestos
         Claimants' Counsel and Asbestos Courts.**

138.    After the collection and subsequent destruction or secreting away of

BASF's asbestos documents and other evidence was completed in or about March 1984,

the BASF and Lawyer Perpetrators acting directly or through their co-conspirators, began

executing the second related element of the fraudulent plan and scheme to end and ward

off asbestos injury claims and lawsuits against BASF,  namely: whenever an asbestos

injury claim or lawsuit was filed or came to BASF's attention, the asbestos injury

claimant, their lawyer(s) and, when and where applicable, the court  in which such claim

was pending, were systematically and uniformly told (often in identical language

authored by Cahill Gordon) that Emtal talc ore and products did not contain asbestos

and/or there was not any evidence that it did.  As a result of the execution of the

Fraudulent Asbestos Defense Scheme, Defendants were able to obtain either the

dismissal or termination of claims voluntarily or, if required, involuntarily by order or

judgment, or, when circumstances warranted, pay a small token settlement amount in

exchange for a full release of claims or equivalent agreement.

139.    To facilitate and enable the Fraudulent Asbestos Defense Scheme to successfully work over the many years it would necessarily continue, due to the widespread use of the Emtal talc products in the United States and the nature of asbestos disease injuries, including its long latency period, the BASF and Lawyer Perpetrators formed and utilized the BCAD Enterprise, an association in fact, which they managed and controlled to conduct not only BASF's legitimate asbestos defense activities, including among other things the retaining, indoctrination, instruction and direction of local defense law firms involved or assisting in implementing BASF's asbestos defense, but as well their illegal and illegitimate Fraudulent Asbestos Defense Scheme.

140.    The BCAD Enterprise existed from 1983 or 1984, the exact date being presently unknown to Plaintiffs, to at least, 2009.

141.    The BCAD Enterprise was organized to conduct and execute the Fraudulent Asbestos Defense Scheme. The parties organizing it, including Dornbusch, Hemstock, Halket and Sloane, intended it would continue for the many years to come that asbestos claims would be filed.

142.    The BASF and Lawyer Perpetrators, as well as others associated with the BCAD Enterprise, had specialized roles and functions in conducting and managing the operation of BCAD Enterprise and in executing the Fraudulent Asbestos Defense Scheme.

143.    Defendant BASF's and the BASF Perpetrators' particular roles, functions and activities in the BCAD Enterprise it, acting as aforesaid performed, included:

a.   Managing and handling asbestos injury claims against BASF in general, including performing the tasks, functions and duties as required or needed in overseeing the administration of the claims or lawsuits;

b.   Making insurance coverage claims;

c.   Retaining and compensating counsel;

d.   Answering discovery or other information requests and verifying the truth of those responses and supplying BASF personnel for discovery as required;

e.   Funding the BCAD Enterprise's asbestos defense and claim resolution activities, including compensating national and local counsel;

f.   Collecting and spoliating evidence that its talc and other products contained asbestos, as described above;

g.   Suborning or otherwise procuring false unsworn and sworn representations from its employees, officers consultants and experts as needed, including obtaining or  assisting in obtaining incorrect, misleading, improperly biased or false affidavits and discovery response verifications by BASF employees, BASF officers, and/or BASF consultants and experts which they knew were to be provided to asbestos claimants, asbestos claimants' counsel and in some cases presiding asbestos courts and other tribunals with the intention that they would be relied upon;

h.   Authorizing, permitting, and aiding and abetting the Lawyer Perpetrators and other asbestos defense lawyers representing  BASF in asbestos defense matters to

make false, misleading and incorrect representations and/or material omissions to asbestos claimants, asbestos claimants' counsel, presiding asbestos courts and other tribunals; and

    i.    Concealing and covering-up the fraudulent, tortious and/or illegal aspects of the BCAD Enterprises' conduct and operations.

144.    The Lawyer Perpetrators' particular roles, functions and activities it, acting as aforesaid, performed included:

    a.    Representing BASF and its predecessors in asbestos claims directly or indirectly through local counsel as necessary;

    b.    Collecting and spoliating and/or directing the collection and spoliation of evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos, as described above;

    c.    Addressing or responding to asbestos insurance matters as required or requested as national counsel;

    d.    Retaining, instructing, guiding and managing local defense counsel handling asbestos injury claims lawsuits against BASF;

    e.    Preparing template and stock pleading, discovery and motions documents for use by local counsel in asbestos injury claim lawsuits that contained information Cahill Gordon knew to be false or misleading regarding the presence of asbestos fiber in BASF's talc ore, Emtal talc and Emtal products and/or the existence of evidence

tending to prove the existence of asbestos fiber BASF's talc ore, Emtal talc and Emtal products;

f.   Falsely and incorrectly stating and representing to asbestos claimants, asbestos claimants' counsel and presiding asbestos courts and other tribunals in correspondence, responses to discovery and/or pleadings or motion papers that BASF's talc ore, Emtal talc and Emtal products did not contain asbestos and/or that there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos;

g.   Instructing and directing BASF's local asbestos counsel to, knowingly or unknowingly, falsely state and represent to asbestos claimants, asbestos claimants' counsel and presiding asbestos courts and other tribunals, that BASF's talc ore, Emtal talc and Emtal products did not contain asbestos and/or that there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos;

h.   Suborning or otherwise procuring false unsworn and sworn representations, including false affidavits, false and incorrect expert reports  and discovery response verifications by BASF employees, BASF officers, and/or BASF consultants and experts which they knew were to be provided to asbestos claimants, asbestos claimants' counsel and in some cases presiding asbestos courts and other tribunals with the intention that they would be relied upon;

i.   Threatening asbestos injury claimants and/or their counsel with the possibility of sanctions or penalties if asbestos claims or suits were not discontinued by questioning counsels' good faith basis to continue the claims in the face of the

BASF Perpetrators' and/or the Lawyer Perpetrators' false representations that BASF's talc ore, Emtal talc and Emtal products did not contain asbestos and/or that there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos;

j.   Filing or directing local counsel to file motions or other court documents that they knew, or should have known, falsely and incorrectly stated that BASF's talc ore, Emtal talc and Emtal products did not contain asbestos and/or that there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos as a basis for judicial action in BASF's favor;

k.   Drafting and obtaining agreements to and execution of the *Westfall* case confidentiality agreement;

l.   Drafting and obtaining agreement to and execution of stipulations or agreements of dismissal, releases and other claim resolution documents from asbestos injury claimants based upon false and incorrect representations that BASF's talc ore, Emtal talc and Emtal products did not contain asbestos and/or that there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos;

m.  Concealing and covering-up BASF's spoliation of evidence; and,

n.   Concealing and covering-up the fraudulent, tortious and/or illegal aspects of the BCAD Enterprise's conduct and operations.

**G.      Representative Misrepresentations and Material Omissions in
         Furtherance of the Fraudulent Asbestos Defense Scheme**

145.    After the *Westfall* case was settled and BASF's asbestos documents were

collected and either destroyed or secreted away, whenever an asbestos claim was made

against BASF between 1984 and 2009, the Lawyer Perpetrators would systematically and

uniformly communicate with the claimant's counsel either directly through Cahill

Gordon personnel or indirectly through BASF's local counsel and state or otherwise

represent that: (a) BASF's talc ore, Emtal talc and Emtal products did not contain any

asbestos and/or there was no evidence that BASF's talc ore, Emtal talc and Emtal

products contained asbestos; and, (b) there was in fact no good faith basis to allege or

claim that BASF's talc ore, Emtal talc and Emtal products contained asbestos and thereby

injured the claimant.

146.    To purportedly support and corroborate these false and misleading

representations, the Lawyer Perpetrators, with BASF's knowledge, authorization and/or

assistance, would routinely supply, or would direct BASF's local counsel to supply,

asbestos injury claimants' counsel handling cases against BASF with one or more

documents which the Defendants knew were false and misleading when considered

without the contrary evidence in Defendants' possession or which they had destroyed or

otherwise spoliated:

a.   The May 8, 1989 affidavit by Mr. William H. Ashton ("**Ashton

**Affidavit**").  In this affidavit Mr. Ashton, a purported expert on asbestos in talc, avers

that Emtal talc did not contain asbestos fibers based upon data and information he

reviewed that was supplied by Cahill Gordon and/or BASF.  While Mr. Ashton cites

to a few studies supporting his claimed conclusion, the data and studies he reviewed notably did not include any of the studies with positive asbestos findings that Defendant Hemstock and Mr. Triglia testified about during their 1983 *Westfall* case depositions even though his affidavit cites to, and included as an exhibit, excerpts of deposition testimony of another witness taken in that case which purportedly demonstrated that the talc ore and products did not contain asbestos. A copy of the Ashton Affidavit is appended as Exhibit 4 and incorporated herein by reference;

    b.   A report purportedly prepared by Dr. F. D. Pooley ("**Pooley Report**"). Dr. Pooley, based on a purported analysis of two Johnson Mine talc samples that were allegedly collected in 1961, finds and concludes that the two Johnson Mine talc samples made available to him did not contain any fibrous mineral particles.  A copy of the Pooley Report is appended as Exhibit 5 and incorporated herein by reference.;

    c.   One or more affidavits by Mr. Charles D. Carter, a BASF employee who self-identifies himself in his affidavits as "Director of Joint Ventures and Resources of Engelhard Corporation" ("**Carter Affidavits**").  Similar in content, the Carter Affidavits over the years averred some or all of the following alleged facts: (i) that the Johnson Mine was acquired by Eastern Magnesia Talc Company in 1967; (ii) that Johnson Mine was closed in 1983 for economic reasons; (iii) that the Johnson Mine following its closure and non-use became filled with water making it impossible to obtain any samples of talc from the mine; (iv) that Engelhard did not possess any samples of the Johnson Mine talc; and (v) that "Engelhard does not currently possess any testing data other than the data provided…by way of the Ashton Affidavit and the report of Dr. Pooley."  Exemplifying these Carter Affidavits are Mr. Carter's

September 20, 1988 Affidavit (appended as Exhibit 6), his June 19, 1989 Affidavit (appended as Exhibit 7) and his August 18, 1989 Affidavit (appended as Exhibit 8), all of which are incorporated herein by reference;

d.   Interrogatory answers verified by Mr. Carter or other BASF employees, including on occasion members of BASF's in-house counsel, in which BASF, under oath, represented Emtal talc did not contain any asbestos and/or provided selected references to tests or studies indicating Johnson Mine talc did not contain asbestos, such as the Pooley Report or other studies referenced in the Ashton Affidavit, but omits to mention or reference: (1) any of the studies which had positive findings for asbestos that were in BASF's possession or knowledge at the time the *Westfall* case discovery was conducted; or, (2) any of Defendant Hemstock's and Mr. Triglia's *Westfall* case deposition testimony stating that the asbestos was found in tests and assays of Emtal talc.  Exemplifying these interrogatory responses are BASF's 2002 Reponses to Plaintiff's First Standard Set of Liability Interrogatories in  Plaintiff Chrenick's New York asbestos injury claim law suit, *Chernick v. ABB*  (appended as Exhibit 10), all of which are incorporated herein by reference. Additional illustrative interrogatory responses are also referred to in the paragraphs below.

147.   While the full and entire extent and scope of Defendants' pattern and practice of conduct and material omissions is not known to Plaintiffs due to the clandestine nature of their wrongful actions, conduct and concealments, along with BASF's refusal to provide complete details regarding same in the *Paduano* suit, the existence, continuity, collusiveness, breadth and longstanding nature of Defendants'

pattern and practice of fraudulent and unlawful activity are indicated, illustrated and

exemplified by the incidents and events set forth in the following paragraphs.

      **a.**    **The 1988 and 1989 Misrepresentations and Material Omissions to**
                **Counsel for Tireworker Asbestos Injury Litigation Claimants**
                **Suing BASF in the United States Eastern District of Pennsylvania**
                **and Southeastern Pennsylvania State Courts.**

148.    On or about May 17, 1989, Cahill Gordon attorney, Defendant Dembrow,

sent via Federal Express a letter to a Philadelphia, Pennsylvania lawyer who was

representing at the time twenty-eight (28) tireworker plaintiffs in pending Pennsylvania

Federal and State Court asbestos injury lawsuits that had named Engelhard and Eastern

Magnesia as defendants in the suits. (These twenty-eight Pennsylvania tireworker

asbestos claimants are hereinafter referred as the "**Pennsylvania Tireworker**

**Claimants**.")  A true and correct copy of this letter uncovered during the *Paduano* suit's

spoliation discovery is appended as Exhibit 11 and incorporated herein by reference.  In

this letter, Cahill Gordon states that during an August 1988 face to face meeting at the

Montgomery County, Pennsylvania Courthouse, between the Pennsylvania Tireworker

Claimants' lawyer, Cahill Gordon attorneys, Messrs. Craig Newman and Eric S. Sarner

("**Sarner**"), and BASF's local counsel, BASF's attorneys then and there affirmatively

represented to the Pennsylvania Tireworker Claimants' counsel that "the talc

manufactured by Emtal [sic] did not contain any asbestos."  The copy of the letter, also

establishes that blind copies of it were sent to, among others, Cahill Gordon attorneys,

Defendant Sloane and Mr. Sarner.  Mr. Sarner's office at the time was located in Cahill

Gordon's Washington, D.C. offices. Defendant Sloane's office was in New York City.

149.    According to Cahill Gordon's May 17, 1989 letter (Exhibit 11), between August 1988 and May 17, 1989, a number of in person meetings, telephone calls and letters by and between BASF's local counsel and the Pennsylvania Tireworker Claimants' counsel occurred during which BASF and its attorneys requested that the Pennsylvania Tireworker Claimants' asbestos injury claims be voluntarily ended against BASF.  During these communications BASF's counsel reiterated and repeated the misrepresentations and omissions of material fact regarding absence of any asbestos in Emtal talc and the non existence of any contrary evidence as scripted by the Lawyer Perpetrators.  One letter, according to the May 17, 1989 letter, tendered to the Pennsylvania Tireworker Claimants' lawyer a copy of the Carter Affidavits concerning the location of the Johnson Mine and its alleged closure for "economic reasons."

150.    The purpose and intent of Cahill Gordon's May 17, 1989 letter (Exhibit 11), was to further Cahill Gordon's efforts to convince the Pennsylvania Tireworker Claimants' lawyer to voluntarily dismiss BASF.  In furtherance of this goal, Cahill Gordon's May 17, 1989 letter continued the misrepresentations and misleading omissions of material facts by offering the newly coined Ashton Affidavit.  In previewing the contents of the Ashton Affidavit for claimants' counsel, the Cahill Gordon May 17, 1989 letter twice called out to the claimants' counsel the claimed fact that various assays and tests on Johnson Mine talc referred to in the Ashton Affidavit established that no asbestos was present.

151.    On June 21, 1989, Defendant Dembrow sent via Federal Express yet another letter and enclosures to the Pennsylvania Tireworker Claimants' lawyer with blind copies sent to, *inter alia*, Defendant Sloane and Mr. Sarner.  In this letter, Cahill

Gordon provided the Pennsylvania Tireworker Claimants' counsel with a copy of Dr.

Pooley's purported exculpatory analysis of Johnson Mine talc along with another Carter

Affidavit, this one dated June 19, 1989 (*See* Exhibit 7).  In this June 19, 1989 affidavit,

Mr. Carter avers that the closed Johnson Mine was now filled with water so no samples

could be obtained and, additionally, that Engelhard did not currently possess any samples

of the talc produced by the Johnson Mine.  A copy of the June 21, 1989 letter is appended

as Exhibit 12 and is incorporated herein by reference.

    152.    Subsequently, on or about, July 19, 1989, the Pennsylvania Tireworker

Claimants' lawyer sent a letter to Sarner at Cahill Gordon's Washington D.C office, with

a copy to Defendant Dembrow at Cahill Gordon's New York office, both of which were

sent by U.S. Mail.  Claimants' counsel in this letter questioned BASF's representations to

him that Emtal talc did not contain any asbestos, based upon references to the Johnson

Mine appearing in a report issued by the Mine Health and Safety Administration

("MHSA") that his law firm had obtained through a Freedom of Information Act request.

The MHSA report referred to in the letter indicated that samples of Johnson Mine's talc

that MHSA had obtained and analyzed contained fibrous mineral contaminants.  The

Pennsylvania Tireworker Claimants' lawyer's letter additionally informed Cahill Gordon

that:

> [W]e had obtained definitive product identification evidence of the
> presence of [Engelhard/Eastern Magnesia's] talc at Firestone in Pottstown,
> PA, and [would] name [Engelhard/Eastern Magnesia] in all future
> Firestone cases. If, of course, we ultimately decide to let your client out of
> the B.F. Goodrich litigation, we will also dismiss them from the Firestone
> cases.

A copy of this letter is appended as Exhibit 13 and is incorporated herein by reference.

153.    On or about July 28, 1989, Cahill Gordon attorney Sarner telefaxed a letter on behalf of BASF replying to the Pennsylvania Tireworker Claimants' lawyer's July 17, 1989 letter.  Cahill Gordon's letter purportedly explained how and why the MHSA report was flawed, incorrect, and contrary to the evidence Cahill Gordon had previously provided the Claimants' lawyer by means of the Ashton Affidavit and Pooley Report. Cahill Gordon, in the July 28, 1989 letter, once again falsely represented to Claimants' counsel that BASF's talc did not contain asbestos, stating: "Thus no EmTal [sic] talc was found to contain asbestos fibers," and "[w]e again urge that on the basis of all of the affidavits supplied to you there is no good faith basis for keeping Engelhard and EmTal [sic] in these cases." Appended as Exhibit 14 is a copy of Cahill Gordon's July 28, 1989 letter, which is incorporated herein by reference.

154.    On or about August 21, 1989, Cahill Gordon's Sarner sent another letter via Federal Express to the Pennsylvania Tireworker Claimants' lawyer's Philadelphia office.  In this letter, Cahill Gordon submitted, in lieu of answering interrogatories, the original of another Carter Affidavit, which was dated August 18, 1989.  A copy of Cahill Gordon's letter is appended as Exhibit 15 and incorporated herein by reference.  (The referenced Carter affidavit is appended as Exhibit 8 and incorporated herein by reference.)  In the referenced Carter Affidavit, Mr. Carter under oath states: "In addition, Engelhard does not currently possess any testing data other than the data provided to you by way of the Ashton Affidavit and the report of Dr. Pooley."  The letter also establishes

that copies of it were sent to, *inter alia*, Defendants Sloane and Dembrow at their New York offices.

155.    At no time during or in any of Cahill Gordon's communications or correspondence to the Pennsylvania Tireworker Claimants' counsel, including the affidavits or reports Cahill Gordon provided to him in support of the representation that BASF's talc did not contain asbestos, was there ever any mention or reference by the Lawyer Perpetrators, BASF's local defense counsel, or the BASF Perpetrators to the fact that contrary and inculpatory evidence developed in the *Westfall* case's discovery existed. Neither was there any mention or reference whatsoever to BASF's gathering and spoliation of all contrary and inculpatory evidence in 1984.  These material omissions occurred and were committed despite the fact the Lawyer Perpetrators were aware of these facts and knew and appreciated the relevance of such material information to asbestos injury claimants.

156.    Following the exchange of correspondence and documents described above, and in obvious and reasonable reliance on the communications, correspondence, corroborating affidavits and corroborating reports set forth above, some time in or about September of 1989, the Pennsylvania Tireworker Claimants voluntarily discontinued or dismissed their asbestos injury claims as to the Engelhard Defendants, to their detriment and loss.

157.    As soon as the Pennsylvania Tireworker Claimants' lawyer agreed to have his clients voluntarily dismiss their State and Federal lawsuits against Engelhard, the Lawyer Perpetrators began executing a campaign to extend and parlay this successful

execution of the Fraudulent Asbestos Defense Scheme to other asbestos injury litigations around the country. Even before the dismissals and discontinuances of the Pennsylvania Tireworker Claimants' cases were filed in the presiding courts, starting in late August 1989, Cahill Gordon put in motion what would become, over the years, a systematic pattern and practice to obtain voluntary dismissals or cheap token settlements by writing to other asbestos claimants' counsel directly through its own lawyers or indirectly through local BASF defense counsel it controlled and: (a) providing the asbestos claimants' counsel with copies of the false and misleading Ashton Affidavit, Pooley report and Carter Affidavits; (b) informing the targeted asbestos injury claimant lawyer that the Pennsylvania Tireworker Claimants' counsel (and later other asbestos claimant lawyers as well) had voluntarily dismissed the Engelhard Defendants based upon Engelhard's representations and purported corroborating expert reports stating that there was not any asbestos in Emtal talc (*i.e.*- Ashton Affidavit; and Pooley Report); and (c) requesting that the asbestos injury claimants' counsel likewise voluntarily dismiss their asbestos suits against BASF in order to avoid putting BASF through unnecessary litigation expenses without a good faith basis to sue, thereby intimating that the asbestos injury claimants and their counsel might risk of being assessed sanctions for pursuing a claim not brought in good faith. Exemplifying Cahill Gordon's efforts in this vein are two similar October 2, 1989 letters sent by different BASF local counsel; one mailed to a Cleveland, Ohio tireworker asbestos claimants' lawyer (appended as Exhibit 16) and another mailed to a Kansas City, Missouri tireworker claimants' lawyer (appended as Exhibit 17). Exhibits 16 and 17 are incorporated herein by reference.

**b.  November 19, 1990 Misrepresentations in BASF's Answers to Plaintiffs' Standard Interrogatory Answers in *In Re: All "Asbestos" Cases Presently Pending Before and All Future Cases Assigned to the Honorable James E. Mies, Circuit Court Judge*, (Circuit Court, Wayne County, Michigan).**

158.    BASF's predecessor was a defendant in a number of asbestos injury suits filed and pending in the Wayne County, Michigan, Circuit Court in the late 1980s and/or early 1990s.  In response to standard interrogatories directed to BASF by the asbestos claimants in the Wayne County State Court actions ("**Wayne County Interrogatories**"), which sought disclosure of information about Engelhard's talc products, verified answers on behalf of BASF's predecessor Pita Realty Limited (identified in the Answers to Interrogatories as being successor to Eastern Magnesia) were served on the asbestos claimants' counsel by means of U.S. Mail on or about November 19, 1990.  A copy of the Answers to the Wayne County Interrogatories is appended as Exhibit 18 and incorporated herein by reference.

159.    Cahill Gordon lawyers, including Sarner and Defendant Sloane, whose names appear on the Answers to the Wayne County Interrogatories as co-counsel to Pita Reality Limited, prepared and/or reviewed the interrogatory answers for signing and/or verification by BASF.  The Answers were verified under oath on behalf of BASF by Mr. Carter.

160.    In BASF's "Preliminary Statement" in its Answers to the Wayne County Interrogatories, BASF, through Cahill Gordon and BASF's local counsel, stated in pertinent part:

… Pita, formerly known as Eastern Magnesia Talc Company, was engaged in the mining and milling of talc from a single mine located in

74

Johnson, Vermont from 1967 to 1983. Pita previously has provided to plaintiffs' counsel an affidavit and supporting materials demonstrating that the talc from this mine did not contain asbestos….

***

Pita hereby incorporates by reference this preliminary statement into the response to each interrogatory.

161.    In response to Interrogatory No. 34 of the Wayne County Interrogatories, which inquired into whether any person ever served as a consultant to BASF's Engelhard companies in any manner regarding the potential medical, toxicologic, or industrial hygiene aspects of asbestos or any asbestos-containing product, BASF responded:

Not Applicable. In addition, Defendant has previously supplied documents to plaintiffs' counsel that indicate that its talc products did not contain asbestos, including an affidavit prepared by William Ashton. These documents are in the possession of plaintiffs' counsel.

162.    In response to Interrogatory No. 108 of the Wayne County Interrogatories, which inquired into whether BASF's Engelhard companies pursuant to its record destruction or retention policy, or otherwise, destroyed any documents, records or writings pertaining to health hazards of asbestos, Cahill Gordon's answer on behalf of BASF responded: "Pita does not believe that it destroyed such records."

163.    At no time in any of BASF answers to the Wayne County Interrogatories that Cahill Gordon prepared and/or reviewed for signing and verification by BASF, were the Wayne County asbestos claimants or their counsel ever fairly (or otherwise) informed by the Lawyer Perpetrators, or the BASF Perpetrators, that inculpatory facts and evidence existed which contradicted that which had been represented in the verified interrogatory answers or in the Ashton Affidavit that was referred to in the interrogatory answers, such

as that which had been developed and obtained by the plaintiff in the *Westfall* case prior to Defendants implementing their Fraudulent Asbestos Defense Scheme.  There was no mention or reference in the Answers to the Wayne County Interrogatories to the BASF Perpetrators' gathering and spoliation of all contrary and inculpatory asbestos claim evidence in 1984.  These material omissions occurred and were committed despite the fact the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, despite the fact they knew and appreciated the relevance of the subject information to asbestos injury claimants, and despite the fact they were under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation.

164.    Cahill Gordon and BASF's fraudulent and deceitful efforts aimed at Michigan asbestos injury claimants were successful.  According to an April 23, 1992 Cahill Gordon letter addressed to other asbestos injury claimants' counsel in Ohio, the Michigan State Court Tireworkers' asbestos injury cases against BASF's predecessors were voluntarily dismissed after "the plaintiffs' counsel had been … provided with the Ashton materials…." See Cahill Gordon letter of April 23, 1992, appended as Exhibit 19 and discussion of this letter *infra*. A copy of specific Michigan dismissal orders were not produced in the *Paduano* suit materials.

c.    **November 1990 and October 1991 Misrepresentations in the Answers to Plaintiffs' Master Interrogatories in *In Re: Northern Ohio Tireworker Asbestos Litigation* (C.P. Summit Cty., Ohio).**

165.    In or about the late 1980s and/or early 1990's, BASF's predecessors, Engelhard Corporation, Eastern Magnesia and Pita Realty Limited, were parties to a number of tireworker asbestos injury suits that were filed and pending in the Court of Common Pleas for Summit County, Ohio, and assigned to Judge William H. Victor.  In

connection with these Northern Ohio Tireworker cases, BASF's predecessor responded under oath to Plaintiffs' Questionnaire and First Request for Production of Documents ("**Tireworkers' Questionnaire**") and Plaintiffs' Master Discovery Requests ("**Summit County Master Interrogatories**").

166.     The Tireworkers' Questionnaire sought disclosure of information from BASF's predecessors about Engelhard's talc products used at a number of rubber product manufacturing companies.  On or about November 21, 1990, BASF's counsel served verified responses to this discovery upon Plaintiffs' counsel by regular U.S. Mail.  A copy of BASF's verified Tireworkers' Questionnaire answers is appended as Exhibit 20 and incorporated herein by reference.

167.     BASF's answers to the Tireworkers' Questionnaire identify Cahill Gordon lawyers Defendant Sloane, Mr. Sarner and Michael D. Sullivan, Esq. as being "of counsel" to BASF's predecessors in the Summit County, Ohio, cases.

168.     Cahill Gordon, as national asbestos counsel to BASF, prepared and/or reviewed BASF's predecessors' answers to the Tireworkers' Questionnaire for signing and/or verification by BASF's predecessors.

169.     The answers to the Tireworkers' Questionnaire were verified by Mr. Carter on behalf of BASF on November 15, 1990.  The answers state that Mr. Carter "participated in the gathering of the records for this litigation, which have been turned over to counsel."  *See* Exhibit 20, Interrogatory No. 20(b).

170.    BASF's predecessors' Preliminary Statement to the Tireworkers'

Questionnaire reads in pertinent part:

> …For purposes of simplifying the responses to this Questionnaire, the name Pita when used herein shall refer collectively to Pita, EmTal [Eastern Magnesia], and, Engelhard.
>
> ….Pita, formerly known as Eastern Magnesia Talc Company, was engaged in the mining and milling of talc from a single mine located in Johnson, Vermont from 1967 to 1983. Pita previously has provided to plaintiffs' counsel an affidavit and supporting materials demonstrating that the talc from this mine did not contain asbestos….
>
> ***
>
> Pita hereby incorporates by reference this preliminary statement into the response to each question.

171.    In its answer to Question No. 2 of the Tireworkers' Questionnaire, which

generally sought information about whether BASF's predecessors had been involved in

the mining, milling, manufacture, processing, sale, supplying or distribution of talc,

soapstone, or asbestos-containing products at any time, BASF predecessors stated under

oath:

> With respect to talc only, yes. Pita did not mine, mill, manufacture, process, market, distribute, or sell asbestos or asbestos-containing products.  Pita was engaged in the mining and milling of talc from a single mine located in Johnson, Vermont from 1967 to 1983.  Pita previously has provided to plaintiffs' counsel an affidavit and supporting materials demonstrating that the talc from this mine did not contain asbestos.

172.    In its answer to Question No. 2(e) of the Tireworkers' Questionnaire,

which specifically asked whether BASF's predecessors' products contained crocidolite,

amosite, tremolite or chrysotile asbestos, or any combination of them, and to specify the

qualitative percentage of the particular form of asbestos fiber to the whole amount of asbestos in the product, BASF's predecessors stated under oath:

> (e).   No. Plaintiffs' counsel has previously been provided with evidence, including an affidavit, which proves that Emtal talc did not contain asbestos.

173.    In answer to Question No. 4 of the Tireworkers' Questionnaire, which specifically asked how BASF's predecessors' talc, soapstone, or asbestos-containing products were packaged and shipped, BASF predecessors stated under oath:

> Pita did not mine, mill, manufacture, process, market, distribute, or sell asbestos or asbestos-containing products….

174.    At no time in any of BASF's answers to the Tireworkers' Questionnaire which Cahill Gordon prepared and/or reviewed for signing and verification by BASF, were the Northern Ohio Tireworker claimants or their counsel ever fairly (or otherwise) informed by the Lawyer Perpetrators, or by the BASF Perpetrators, that inculpatory facts and evidence existed that contradicted what was represented on behalf of BASF's predecessors in the answers to the Tireworkers' Questionnaire or in the affidavit referred to in the Tireworkers' Questionnaire, such as that which was developed and obtained by the plaintiff in the *Westfall* case.  There was no mention or reference in the Tireworkers' Questionnaire answers to the BASF Perpetrators' gathering and spoliation of all contrary and inculpatory asbestos claim evidence in 1984.  These material omissions occurred and were committed despite the fact the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, knew and appreciated the relevance of the subject information to

asbestos claimants, and were under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation.

175.    The Summit County Master Interrogatories sought disclosure of information from BASF's predecessors about Engelhard's talc products.  In or about October 1991, verified answers to the Summit County Master Interrogatories on behalf of BASF's predecessors were served on the Northern Ohio Tireworker claimants' counsel. A copy of BASF's answers to the Summit County Master Interrogatories is appended as Exhibit 21 and incorporated herein by reference.  The date alleged is based upon the date of the document's verification by Mr. Carter.

176.    Lawyers at Cahill Gordon, as counsel to BASF's predecessors at the time, prepared and/or reviewed the answers to the Summit County Master Interrogatories for signing and/or verification by BASF.  The answers were verified for BASF under oath by BASF's Mr. Carter based upon, according to his verification, information gathered by others.

177.    BASF's predecessors' "Preliminary Statement" to its answers to the Summit County Master Interrogatories reads in pertinent part:

> …Pita, formerly known as Eastern Magnesia Talc Company, was engaged in the mining and milling of talc from a single mine located in Johnson, Vermont from 1967 to 1983. Pita previously has provided to plaintiffs' counsel an affidavit and supporting materials demonstrating that the talc from this mine did not contain asbestos….
>
> ***
>
> Pita hereby incorporates by reference this preliminary statement into the response to each interrogatory.

178.     In answer to Interrogatory No. 30 of the Summit County Master Interrogatories, which asked about testing, studies or surveys on BASF's products, BASF's predecessors' response lists a number of studies purporting to corroborate BASF's general denial that its talc products contained any asbestos.  However, not one of the contrary and inculpatory studies on Engelhard's talc showing it contained asbestos or any of the contrary and inculpatory statements about the existence of asbestos in Engelhard's talc that were made or discussed during the Hemstock and Triglia *Westfall* case depositions were listed or otherwise disclosed to the Northern Ohio Tireworker claimants' counsel.  There was no qualification or disclosure provided in the answers to the Summit County Master Interrogatories that alerted or informed Northern Ohio Tireworker claimants' counsel of the fact that the BASF Perpetrators had collected all documents relating to Emtal talc in 1984 following the settlement of the *Westfall* case. There also was not any disclosure on what was the fate or the whereabouts of the talc documents and evidence the BASF Perpetrators had collected in 1984 following the *Westfall* case settlement.  These material omissions occurred and were committed despite the fact the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, knew and appreciated the relevance of the subject information to asbestos claimants, and were under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation.

179.     In response to Interrogatory No. 66 of the Summit County Master Interrogatories, which inquired into whether BASF was contending the Northern Ohio Tireworker claimants' injuries were not causally related to asbestos exposure, Cahill Gordon's prepared responses on behalf of BASF stated:

> Pita does not currently make any contentions on the subject, but asserts
> that if plaintiffs have injuries related to asbestos exposure, Pita cannot be
> liable therefore since its talc did not contain asbestos.

Here, once again, not one of the contrary and inculpatory talc studies showing the presence of asbestos in Emtal talc or statements made or discussed during Hemstock's and Triglia's *Westfall* case depositions was disclosed to the Northern Ohio Tireworker claimants' counsel. There were also not any disclosures about BASF's collection of all documents relating to Emtal talc in 1984 following the *Westfall* case settlement, or the existence or fate of the documents and evidence.

180.   The misrepresentations and material omissions embodied in the Answers to the Summit County Master Interrogatories were repeated and renewed years later on or about August 31, 1994, when Cahill Gordon lawyers, Defendant Sloane and his partner, Allen S. Joslyn ("Joslyn"), adopted them in their entirety as the Response of Eastern Magnesia Talc Company to Master Interrogatories in the Summit County case captioned *William F. Clark, et al. v. Owens Corning Fiberglass Corp.*, *et al.*, Case No. ACV-94-04-1107, filed by the Law firm of Bevan & Economus. A copy of Cahill Gordon's filing on behalf of BASF's predecessor is appended as Exhibit 22 and incorporated herein by reference.

> **d.   April 2002 and December 22, 2010 Misrepresentations and
> Material Omissions in Engelhard's Correspondence to Asbestos
> Claimants' Counsel and in Responses to Plaintiffs' First Standard
> Set of Liability Interrogatories in the New York City Asbestos
> Litigation Matter of *Steven Chernick et. al. v. ABB Lumus Global,
> Inc*.**

181.   On or about October 29, 2001, BASF's predecessor Engelhard Minerals and Chemical Corporation was named and joined as a defendant in Plaintiff Chernick's

asbestos injury suit filed in the Supreme Court of New York captioned *Steven Chernick et al. v. ABB Lumus Global, Inc*., Index No. 01-010116741 ("**Chernick case**").  The *Chernick* case contended that Engelhard's talc was used as a component ingredient of "Bondo" auto body repair filler, which product caused Mr. Chernick's case asbestos injury. The *Chernick* case was part of the New York Supreme Court's "New York City Asbestos Litigation Program."

182.    On or about April 15, 2002, Gideon Mark, Esq., a local New York City defense attorney who, had been retained to defend BASF's predecessor, Engelhard, in the *Chernick* case under Cahill Gordon's control, sent the *Chernick* plaintiffs' New York City counsel, Early, Lucarelli, Sweeney & Strauss, a letter and several enclosures, including a copy of the Ashton Affidavit and the Pooley Report.  The purpose of the letter was to convince the *Chernick*'s counsel and the *Chernick* plaintiffs to voluntarily dismiss Engelhard from the case on the claimed, but false, basis that Engelhard's talc did not contain asbestos.  A copy of the letter is appended as Exhibit 23 and incorporated herein by reference.  The letter was sent via Federal Express, and subsequently, on May 10, 2002, a copy was also telefaxed to another recipient.

183.    The April 15, 2002 letter's representations about the nature and content of Engelhard's talc were supported by Mr. Mark's references to the Ashton Affidavit, the Pooley Report, and a third study, all provided to Mr. Marks by BASF and Cahill Gordon, all of which purported to establish, in the letter's own words, "that the talc Engelhard Corporation … or any of its present or former subsidiaries allegedly sold to Bondo Corporation was asbestos free."  After summarizing the purported exculpatory findings of the three studies provided, Mr. Mark's letter then concluded:

> Given the foregoing, there appears to be no basis for your clients to assert claims against Engelhard. We hereby request that you dismiss Engelhard from this action.…

184.    Cahill Gordon, as national asbestos counsel to BASF and its predecessors, assisted in the preparation and/or review of the April 15, 2002 letter prior to it being sent to the *Chernick* plaintiffs' counsel. Acting with intention to deceive, Cahill Gordon and BASF's predecessor, Engelhard, authorized and/or consented to Mr. Mark's sending the letter which contained false and misleading material misrepresentations and omissions. As attorneys representing BASF in a court matter, Cahill Gordon and its lawyers, as well and other lawyers representing BASF at the time, including BASF's in-house lawyers, were under a strict, longstanding statutory duty under New York law, N.Y. Judiciary Law §487, to not commit any deceit or collusion, or consent to any deceit or conclusion, with the intent to deceive the court or any party.

185.    On or about April 16, 2002, BASF's predecessor, Engelhard, responded under oath to "Plaintiffs' First Standard Set of Liability Interrogatories" served within the *Chernick* case ("***Chernick* Interrogatories**").  The Responses to the *Chernick* Interrogatories are attached as (Exhibit 10).  According to the Affirmation of Service appended to the Responses to the *Chernick* Interrogatories, this written discovery was served upon the parties' counsel to the case by U.S. mail.

186.    Engelhard's answers to the *Chernick* Interrogatories were verified on its behalf by Mr. Mark, on April 16, 2002.  His verification states:

> Working in conjunction with Engelhard, I have prepared and reviewed the foregoing Responses to First Standard Set of liability Interrogatories. I know the contents thereof to be true, based on factual analyses conducted with and on behalf of Engelhard.

187.    The response to Interrogatory No. 1 of the *Chernick* Interrogatories states that Michael J. Hassett, Esq., who is identified as Associate General Counsel for Engelhard Corporation, coordinated Engelhard's Responses to the *Chernick* Interrogatories.

188.    Cahill Gordon, as national asbestos counsel to BASF and its predecessors, assisted in the preparation and/or reviewed the Responses to the *Chernick* Interrogatories prior to BASF's local counsel's verification and service of them upon counsel in the *Chernick* case.

189.    The Responses to the *Chernick* Interrogatories repeatedly, and falsely with intention to deceive,  stated and represented that Engelhard had not mined, milled, manufactured, processed, marketed, distributed, or sold asbestos or asbestos containing products. Exemplifying such representations is the response to Interrogatory No. 52, which reads:

> Interrogatory No. 52:
>
> Does your company recognize that it was foreseeable that people working in the same area where your asbestos products were being used or installed would inhale and/or ingest asbestos fibers emitted from your product?
>
> Response to Interrogatory No. 52:
>
> Engelhard recognizes that, in general, it might be foreseeable that people working in the same area where asbestos products are being used or installed might inhale and/or ingest asbestos fibers. However, Engelhard has not mined, milled, manufactured, processed, marketed, distributed, or sold asbestos or asbestos containing products.

190.    The Responses to the *Chernick* Interrogatories referred to the same three purported exculpatory studies on Engelhard's talc that were provided to the *Chernick*

claimants' counsel in the April 15, 2002 letter in support of Engelhard's representations that "the talc supplied to Bondo by Engelhard's former subsidiary, EMTal [sic] was asbestos-free." *See* Exhibit 10, Interrogatories Nos. 3 and 86.

191.     Interrogatory No. 63 of the *Chernick* Interrogatories directly asked BASF's predecessor, Engelhard, about prior depositions of its employees.  Engelhard's answer under oath to this question reads:

Interrogatory No. 63:

If any of your employees or officers have testified at trial or by deposition or before any Congressional Committee or administrative agency concerning asbestos exposure, pulmonary or asbestos-related diseases or Industrial hygiene relating to asbestos use, state:

a. The name, address and title of each person who testified;

b. The date, location and forum of such testimony;

c. Whether the defendant has a copy of such testimony;

d. Whether the defendant will voluntarily produce a copy of such testimony.

Response to Interrogatory No. 63:

No.

192.     Interrogatory No. 81 of the *Chernick* Interrogatories directly asked BASF's predecessor, Engelhard, about the destruction of pertinent documents. Engelhard's answer under oath to this question reads:

Interrogatory No. 81:

Have you destroyed any documents, records or writings pertaining to:

a. Health hazards of asbestos;

b. Workmen's Compensation claims arising out of asbestos, lung cancer, mesothelioma, cor pulmonale, pneumoconiosis, or pulmonary fibrosis;

c. Placing warning labels on your products;

d. Hazardous conditions in your plants or factories;

e. Funding of studies about health hazards of asbestos;

f. Lawsuits arising out of Injuries alleged to have been caused by asbestos.

If so, list every such document destroyed by author, date and subject.

<u>Response to Interrogatory No. 81</u>:

No, so far as Engelhard is able to ascertain - with the possible exception of any documents that might have been routinely destroyed as part of Engelhard's record retention policy.

193.    Mr. Mark's April 15, 2002 letter requesting voluntary dismissal of the *Chernick* case and Engelhard's subsequent and related April 16, 2002 answers to the *Chernick* Interrogatories were false, fraudulent and misleading to one reading and reasonably relying on them regarding BASF's predecessor's liability, such as Plaintiff Chernick's counsel, Early, Lucarelli, Sweeney & Strauss. At no time did these documents timely and fairly reveal or disclose to the *Chernick* plaintiffs' counsel, and through same, Plaintiff Chernock, that evidence existed that was contrary to that which was represented in the letter, in the Responses to Interrogatories and/or contained or referred to in the supplied Ashton Affidavit, Poole Report and the other report mentioned in the documents, such as the inculpatory documents and deposition testimony that had been obtained by the plaintiff in the *Westfall* case. Without disclosure of such information, the affidavit and reports were materially misleading. There was also not any mention or reference in any of these documents or answers to interrogatories to the fact of and the circumstances surrounding BASF's gathering and spoliation of all contrary and

inculpatory asbestos claim evidence relating to Engelhard's talc in 1984 following the settlement of the *Westfall* case.  These misrepresentations and material omissions occurred and were committed despite the fact that the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, knew and appreciated the relevance of the subject information to asbestos claimants, and were under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation, as well the N.Y. Judiciary Law §487 duty imposed upon Cahill  Gordon and other lawyers representing BASF and its predecessors in connection with the *Chernick* case, including BASF's in-house  counsel.

194.     Subsequently, BASF's predecessor moved for summary judgment in the New York Supreme Court asking the Court to dismiss it from the Chernick case.  Relying on the forgoing letter, attachments and Responses to Interrogatories, Chernick's counsel concluded, as it was the BASF and Lawyer Perpetrators intent he do, that there was no evidence or basis to continue the claim against Englehard and oppose the Motion for Summary Judgment.  Plaintiff Chernick was so informed of her attorney's conclusion that Engelhard's talc did not contain asbestos and relying on that information consented to her attorney voluntarily executing and providing to BASF's predecessors' counsel for filing a consent "No Opposition Summary Judgment Motion Order," by which he, on behalf of her and her husband, agreed to the presiding court granting a summary judgment dismissal of the Chernick case's claims as to the Engelhard Defendants.  Had Plaintiff Chernick's counsel known about the spoliation of evidence and/or the truth about the presence of asbestos in Engelhard's talc and talc products, they would not have asked for and obtained her consent to execute the consent without their clients first receiving from BASF's predecessors full, fair and just compensation for their respective asbestos injury

claims. Had Plaintiff Chernick's been informed about the spoliation of evidence and/or the truth about the presence of asbestos in Engelhard's talc and talc products, she would not have given same without their clients first receiving from BASF's predecessors full, fair and just compensation, and consequently her attorneys would not have executed and sent back the requested consent order dismissing BASF or its predecessors from her law suit. Had the true facts been known, her husband's and her case would have obtained a substantial settlement from BASF or went to trial against same.

195.    On or about December 22, 2010, Mr. Mark, BASF's local New York City counsel, sent an e-mail to *Chernick*'s counsel asking them to execute another consent No Opposition Summary Judgment Motion Order which was attached to the email.  The e-mail explained that an earlier No Opposition Summary Judgment Motion Order had not, according to BASF's counsel, been timely filed in accordance with New York State's civil procedure rules.  On or about December 23, 2010, the *Chernick* plaintiffs' counsel's office by e-mail acknowledged that the consent order would be given to the attorney handling the matter.  The requested order was in course executed by *Chernick* plaintiffs' counsel and returned by mail or e-mail to BASF's local counsel's office.  When asking for the consent order, BASF's counsel did not correct any of the previous misrepresentations or material omissions it had made to the *Chernick* plaintiffs' counsel as set forth above.  BASF's counsel also failed to disclose or reveal on December 22, 2010, that there was evidence that Engelhard's talc contained asbestos and/or that evidence relating to same had been spoliated by BASF as set forth above.  Had this been revealed or disclosed on December 22, 2010, *Chernick*'s counsel would have not executed and sent back the requested consent order and would have rescinded his prior

agreement to consent to the dismissal of BASF or its predecessors.  On or about January

18, 2011, BASF's counsel filed the fraudulently obtained consent order with the Supreme

Court of New York City.  The No Opposition Summary Judgment Motion Order was

then in due course signed by New York Supreme Court Justice Sherry Klein Heitler and

then filed with the New York Supreme Court Clerk on February 3, 2011.  A copy of the

e-mails requesting the December 22, 2010 Consent Order, acknowledging receipt of the

request, and acknowledging receipt back of the signed Consent are jointly appended as

Exhibit 24 and incorporated herein by reference.  A copy of the referenced December 22,

2010 Consent Order as filed with the Clerk of Court on February 3, 2011, is appended as

Exhibit 25 and incorporated herein by reference.

> **e.   Cahill Gordon's and BASF's Continuing Fraudulent and
> Misleading Representations to the Representative Plaintiffs'
> Attorneys, Bevan & Economus and Bevan & Associates LPA,
> Inc., Beginning in 1992.**

196.    Representative Plaintiffs Williams, Pease, Holley, Ware, Wengerd and/or

their respective decedents as the case may be, were all represented in asbestos injury

claims by the Northern Ohio law firm of Bevan & Economus or Bevan & Associates

LPA, Inc. (collectively referred to as "**Bevan Law Firm**").  These plaintiffs — and

where and when applicable their respective decedents — each asserted asbestos injury

claims against BASF's predecessors in Northern Ohio federal or state court law suits as

set forth above.

197.    On or about April 23, 1992, Washington D.C. based Cahill Gordon

attorney Scott A. Martin, Esq., sent the Bevan Law Firm a letter (Exhibit 19) and several

enclosures (discussed below) on behalf of BASF.  The letter and enclosures concerned

three (3) then pending Northern Ohio asbestos cases the Bevan Law Firm was handling

that Cahill Gordon referred to as "Cuyahoga County Tireworker Actions."  Among the

three Cuyahoga County Tireworker Actions identified in Cahill Gordon's letter was

Plaintiff Williams' and her late husband's asbestos injury case.

198.    Cahill Gordon's April 23, 1992 letter and enclosures were sent to the

Bevan Law Firm by Federal Express.  The letter states Cahill Gordon's New York based

partners Joslyn and Defendant Sloane were blind copy recipients.  Presumably their

copies were sent to them at their New York office via U.S. Mail in view of the absence of

any stated indication to the contrary in the letter.

199.    Cahill Gordon's purpose in sending the April 23, 1992 letter and

enclosures to the Bevan Law Firm, according to the letter's tenor, was to request the

Bevan Law Firm to voluntarily dismiss Engelhard as a defendant in the three (3)

Cuyahoga County Tireworker Actions "on the basis that the talc produced by EmTal [sic]

contained no asbestos."

200.    The April 23, 1992 letter's representations that Engelhard's talc did not

contain asbestos and the request for voluntary dismissal of BASF's predecessors were

supported with copies of the Ashton Affidavit, the Pooley Report and several Carter

Affidavits.

201.    With respect to the Ashton Affidavit provided to the Bevan Law Firm in

Cahill Gordon's April 23, 1992 letter, Cahill Gordon through Mr. Martin stated and

represented in pertinent part:

…The Affidavit of William H. Ashton summarizes numerous investigations, examinations, and studies of the Johnson mine. The conclusion derived from all these studies is that the talc produced from this mine did not contain asbestos….

202.    As further reason and support for its request that the Bevan Law Firm voluntarily dismiss BASF's predecessors from asbestos injury claim, Cahill Gordon represented that the Pennsylvania Tireworkers Asbestos Claimants, as well as tireworker cases in the District of Kansas and Michigan State Court, were dismissed by their respective counsel after being provided the "Ashton materials."

203.    On or about May 18, 1992, Cahill Gordon's Attorney Martin wrote the Bevan Law Firm again after it had filed a fourth asbestos injury suit, *Gonzalez v. Abex Corp., et al*., naming Engelhard as a defendant.  A copy of Cahill Gordon's May 18, 1992 letter is appended as Exhibit 26 and incorporated herein by reference.

204.    Cahill Gordon's May 18, 1992 letter, which was sent via Federal Express, represented to the Bevan Law Firm again that the various documents sent to it the previous month demonstrated "that the talc produced by Emtal [sic] from its sole mine and mill in Johnson, Vermont contained no asbestos."  Cahill Gordon's letter then again requested that Engelhard be promptly dismissed from the Cuyahoga County Tireworker Actions voluntarily because "under the circumstances there appears to be no basis in fact for maintaining Engelhard as a Defendant."

205.    On or about December 22, 1992, Cahill Gordon's Attorney Martin telephoned attorney Dale Economus, Esq., a principal of the Bevan Law Firm, to discuss BASF's predecessor's requests that it be voluntarily dismissed from what was then five (5) pending tireworker asbestos injury cases that Mr. Economus' law firm had filed in

Cuyahoga County against Engelhard.  During the telephone conversation, Attorney

Martin obtained Mr. Economus' agreement to respond to Cahill Gordon's request for

dismissal of Engelhard in the five cases by December 31, 1992 because an answer to the

complaint in one of the five cases was at the time almost due.

206.    Subsequently, by letter on or about December 21, 1992, Cahill Gordon's

Attorney Martin wrote once more to Mr. Economus, this time to confirm their

conversation.  This correspondence was both telefaxed and sent by U.S. Mail to the

Bevan Law Firm by Cahill Gordon's Washington, D.C. office.  A copy of Cahill

Gordon's December 21, 1992 letter is appended as Exhibit 27 and incorporated herein by

reference.

207.    In his December 21, 1992 letter, Attorney Martin once again renewed and

supported Cahill Gordon and BASF's predecessors' request for a voluntarily dismissal of

the claims against Engelhard and Eastern Magnesia on the basis and representation that

Engelhard/Eastern Magnesia's talc did not contain any asbestos, stating:

> Engelhard was named in these cases solely because its former subsidiary,
> Eastern Magnesia Talc Company ("EMTal") allegedly sold talc to
> plaintiffs' employers. As demonstrated in the various affidavits and other
> documents forwarded to you with my previous correspondence, talc
> produced by EMTal from its sole mine and mill in Johnson, Vermont
> contained no asbestos. The alleged diagnosis of the plaintiff in each of the
> actions in which Engelhard is named as a defendant is an asbestos-related
> disease, which cannot be attributed to EMTal talc.

> (*emphasis in original*).

208.    On or about February 4, 1993, Cahill Gordon's Mr. Martin sent the Bevan

Law Firm another letter regarding dismissal of the five Cuyahoga County Tireworker

Action cases. A copy of this letter is appended as Exhibit 28 and incorporated by

reference. This letter begins with a memorialization of the Bevan Law Firm's request to

Cahill Gordon the prior month (in or about January 1993) that Cahill Gordon draft and

send notices of dismissal for the five asbestos actions referenced in Cahill Gordon's

April, May and December 1992 letters.  According to the February 4, 1993 letter, the

Bevan Law Firm was agreeing to sign and file the voluntary dismissals in the five cases

"on the basis of [Cahill Gordon's] correspondence demonstrating" that Talc produced by

Engelhard's former subsidiary, Eastern Magnesia Talc Company ("EMTal"), contained

no asbestos.

209.    The Bevan Law Firm responded to Cahill Gordon's February 4, 1993

letter in a letter dated February 11, 1993 that was sent to Attorney Martin at his

Washington D.C. office address by regular mail.  In this letter, the Bevan Law Firm

advised Cahill Gordon that it was reconsidering its decision to dismiss Engelhard based

on its recent uncovering of some correspondence dating to 1950 from the State of

Vermont Department of Health that purportedly discussed the propensity of employees at

Eastern Magnesia Talc Company to develop pneumoconiosis and further referenced

therein future employee x-rays and an anticipated publication.  The Bevan Law Firm

invited Cahill Gordon's comments on this information, as well as an opportunity to

review the results of any studies on the Waterbury and Johnson employees and any

publication mentioned in the 1950 Vermont Department of Health correspondence.  The

Bevan Law Firm's letter also requested invoices or purchase orders indicating the years

and volumes of talc sold to the Goodyear, Goodrich and Goodyear Aerospace plants in

Akron.  A copy of the February 11, 1993 letter is appended at Exhibit 29 and

incorporated herein by reference.

210.    On or about February 22, 1993, Cahill Gordon's Martin responded to the Bevan Law Firm's letter, which, according to the letter, was transmitted to the Bevan Law Firm by means of both telefax and certified U.S. Mail.  A copy of this letter is appended as Exhibit 30 and incorporated herein by reference.

211.    In Cahill Gordon's February 22, 1993 letter, Attorney Martin states that the 1950 Vermont Health Department correspondence the Bevan Law Firm inquired about "should in no way alter your previous expressed decision to dismiss Engelhard from these cases."  Cahill Gordon's letter then proceeds to distinguish and deflect the information contained in the subject 1950 Vermont Health Department correspondence by explaining that the 1950 letter referenced workers who were not employed at Engelhard's subsidiary's Johnson Mine, but rather were workers employed at some other company's mine. Cahill Gordon's letter then returned to and reiterated once more BASF's purported uncontradicted exculpatory evidence and information that Cahill Gordon had provided the Bevan Firm previously in furtherance of the Fraudulent Asbestos Defense Scheme, stating:

> Beginning with my first request for dismissal last April I sent your firm voluminous materials concerning the Johnson mine. In reaching your decision to dismiss Engelhard, your firm reviewed, inter alia, the Affidavit of William H. Ashton, which summarizes numerous investigations examinations and studies of the Johnson mine. The conclusions derived from all of these studies is that talc produced from this mine did not contain asbestos. The only analysis which we have not previously forwarded to you is one just completed by the R.J. Lee  Group which showed no evidence of asbestos minerals nor of their non-fibrous analogs, and found the talc to be a platy, non fibrous variety.

> (*emphasis in the original*).

212.     Shortly after receipt of Cahill Gordon's February 22, 1993 letter, and reasonably relying upon Cahill Gordon's representations and supporting materials supplied by it in the various correspondence and communications referred to above, the Bevan Law Firm proceeded to recommend to its asbestos injury clients that Engelhard be voluntarily dismissed from their claims.  Included in those to whom this recommendation was made was Plaintiff Williams.  Based upon the Bevan Law Firm's recommendations and advice, which in turn were based upon the documents and representations made by and on behalf of the defendants that BASF's talc and talc products contained no asbestos, the Bevan Law Firm's clients in the five Cuyahoga County Tireworker Action cases, including Plaintiff Williams and her late husband, each consented and authorized the Bevan Law Firm to voluntarily dismiss their asbestos injury claims against BASF's predecessors.

213.     In or about late February or March, 1993, the Bevan Law Firm, acting and relying upon Cahill Gordon's representations and supplied materials as set out above, filed Notices of Voluntary Dismissal dismissing its clients' asbestos injury claims against BASF's Predecessors in the five Cuyahoga County Tireworker Actions as Cahill Gordon requested.  A copy of the Notice of Dismissal that voluntarily dismissed Plaintiff Williams and her late husband's asbestos case against only BASF's predecessor, which was entered as an order of the Court on or about March 23, 1993 by the Honorable Charles R. Weiner, the presiding federal court Multi-District asbestos litigation judge, is appended as Exhibit 31 and incorporated herein by reference.  Copies of the dismissals of the four other Cuyahoga County Tireworker Action cases are also collectively appended

as Exhibit 31 and incorporated herein by reference.  All five dismissal notices were transmitted to the respective courts and served on defense counsel by regular U.S. Mail.

214.    At no time in any of the aforementioned Cahill Gordon communications or correspondence with or to the Bevan Law Firm during 1992 and 1993, or in any of the affidavits or reports supplied or referred to in Cahill Gordon's communications or letters seeking the voluntary dismissal of Engelhard from the Cuyahoga County Tireworker Action cases, was the Bevan Law Firm, and through this law firm, the Bevan Law Firm asbestos injury clients, including Plaintiff Williams and her late husband, ever fairly (or otherwise) informed by the Lawyer Perpetrators or the BASF Perpetrators that evidence existed that was contrary to that represented in Cahill Gordon's letters and in the supplied Ashton Affidavit, Poole Report, Carter Affidavits or any of other material provided by Cahill Gordon, such as the inculpatory documents and deposition testimony that had been obtained by the plaintiff in the *Westfall* case.  There additionally was no mention or reference in the any of Cahill Gordon's communications or correspondence to the Bevan Law Firm, or in any of the affidavits or reports Cahill Gordon supplied to the Bevan Law Firm, to the fact of and the circumstances surrounding BASF's gathering and spoliation of all contrary and inculpatory asbestos injury claim evidence relating to Engelhard's talc in 1984.  These misrepresentations and material omissions occurred and were committed despite the fact that the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, knew and appreciated the relevance of the subject information to asbestos claimants, and were under a duty to truthfully and fairly answer and provide information and discovery to adverse parties in litigation.

215.    Had the BASF Perpetrators or the Lawyer Perpetrators fully, fairly and timely disclosed the truth about its talc products' asbestos content, the existence of inculpatory and contradictory evidence regarding the existence of asbestos in Engelhard's talc, such as that which had been developed in the *Westfall* case, and/or the facts and the circumstances surrounding BASF's gathering and spoliation of contrary and inculpatory asbestos claim evidence relating to Engelhard's talc to the Bevan Law Firm, the Bevan law firm then would not have recommended to its clients, including Plaintiff Williams and her late husband, that they voluntarily dismiss their asbestos claim against BASF's predecessors without first receiving from BASF's predecessor payment of full, fair and just compensation.  Correspondingly, the Bevan Law Firm's asbestos injury clients, including Ms. Williams and her husband, as well as others similarly situated to them, would not have given their consent or authorization to voluntarily dismiss their asbestos claims against BASF's predecessor without first receiving from BASF's predecessors full, fair and just compensation for their respective asbestos injury claims.

216.    During and throughout the 1990s and continuing into and throughout the 2000s, the Bevan Law Firm also represented thousands of other tireworker and industrial worker clients who were exposed to hazardous workplace dusts and fibrous materials during and at their employment that caused them to develop asbestos and/or other occupational pulmonary diseases and disorders, such as mesothelioma, asbestos induced cancers, asbestosis, pneumoconiosis and pulmonary talcosis.  When and where such clients (or their decedents) were diagnosed with an asbestos and/or industrial dust related exposure and a lawsuit was commenced, Engelhard, Eastern Magnesia and, eventually, BASF were named in such suits as a co-defendant along with other parties in accordance

with the accepted asbestos practice in the Northern Ohio area in view of settlement programs that potentially responsible product manufacturers or suppliers were negotiating or had developed. Among these asbestos injury clients were Plaintiffs Williams, Pease, Holley, Ware, Wengerd and/or their respective decedents.

217.    In connection with the lawsuits filed by the Bevan Law Firm during the 1990s through the 2000s, BASF and its predecessors periodically responded under oath to written discovery relating to Engelhard's talc products.  Cahill Gordon either directly or indirectly through local Ohio counsel prepared the responses to this written discovery on behalf of BASF or its predecessors.  In BASF or its predecessors' responses to written discovery that Cahill Gordon prepared and/or reviewed prior to BASF verifying and serving, BASF or its predecessors continued to uniformly and consistently represent to the Bevan Law Firm, and through that firm its clients, including Plaintiffs Williams, Pease, Holley, Ware, Wengerd and/or their respective decedents, that Engelhard's talc did not contain any asbestos and/or there was no evidence to the contrary.  Representative of such written discovery responses are BASF's and its predecessors 1991 responses to the discovery in the Summit County, Ohio *Clark* case (Exhibit 22) referred to and discussed above, and October 19, 2007, in Answers to Interrogatories in "Bevan Group 14" cases that were electronically filed and served by BASF local counsel via the Internet through the LexisNexis File & Serve system ("**2007 Bevan Group 14 Interrogatories**"). A copy of the 2007 Bevan Group 14 Interrogatories is appended as Exhibit 32 and incorporated herein by reference.

218.    In response to Interrogatory No. 5 of the 2007 Bevan Group 14

Interrogatories, an answer that is thereafter referred to in response to numerous

subsequent questions, BASF states under oath:

## EVER SELL ASBESTOS

5.     Has Defendant ever engaged in the mining, manufacturing, selling, marketing, installation or distribution of asbestos-containing products (including equipment of any kind containing asbestos in any form)? If so, please state the following:

(a) The name of the company engaged in the activity (whether it is Defendant, Defendant's predecessor, or Defendant's subsidiary);

(b) As to each product mined, manufactured, sold, marketed, installed or distributed, please state the following:

　　　1. The trade or brand name.

　　　2. Its identification number (model, serial number, etc.).

　　　3. The time period it was manufactured, mined, marketed, distributed or sold.

　　　4. Its physical description including color, general composition, and form.

　　　5. A detailed description of its intended use and purpose.

　　　6. A detailed description of the type package in which it was sold, listing the dates of each type of package used, a physical description of the package, and a description of any printed material or trademarks that appeared thereon.

　　　7. The percent of asbestos which it contained.

　　　8. The percent of asbestos by asbestos type (amosite, crocidolite, tremolite, anthophyllite).

(c) The time period during which each of these products were on the market;

(d) The material components/ingredients of each such product, giving specific or approximate percentage both by weight and by volume of each

material component/ingredient (this interrogatory is not limited to the asbestos component of the product but seeks information as to the nature, weight and volume of non-asbestos ingredients, as well) of each such product;

(e) How each of these asbestos-containing product [sic] can be distinguished from those of competitors;

(f) A description of the physical appearance of such product;

(g) A detailed description of the intended uses.

ANSWER: No.

219.    Following the dismissal of the Cuyahoga County Tireworker Action cases in early 1993, during and throughout the ensuing mid-1990s and continuing throughout the 2000s, a number of periodic aggregate settlements occurred by and between several talc suppliers and manufacturers and Bevan Law Firm clients. From time to time BASF and its predecessors participated in these talc company aggregate settlements when doing so enabled it or them to cheaply settle and obtain releases of liability from thousands of the Bevan Law Firm's asbestos injury claimants. Among the thousands of asbestos injury claims so settled in this manner were Plaintiff Pease's (whose lawsuit against Engelhard was voluntarily dismissed in or about December 1998 (Exhibit 33)), Plaintiff's Holley's decedent's, Ms. Darnell, (whose lawsuit against Engelhard was voluntarily dismissed in or about May 2001 (Exhibit 34)) and Plaintiff Ware's and her husband's (whose lawsuit, together with slightly under 2,200 other Cuyahoga County, Ohio Court of Common Pleas lawsuits, was voluntarily dismissed in or about April 2003 (Exhibit 35)). Exhibits 33, 34, and 35 are hereby incorporated by reference. The dismissals were all filed with the Cuyahoga Court of Common Pleas and served on the parties to the suit electronically.

220.    When negotiating these aggregate settlements and deciding to recommend and obtain its clients' consent and authorization to participate in them, the Bevan Law Firm reasonably relied and acted upon Cahill Gordon's and BASF's (or its predecessors') representations and the materials provided to it by Cahill Gordon and BASF from 1992 forward that purported to show Engelhard's talc did not contain asbestos and/or that there was absolutely no evidence to the contrary as set out above.

221.    In turn, Plaintiff Pease, Plaintiff Holley's decedent, Ms. Darnell, and Plaintiff Ware, as well as others similarly situated, reasonably relied and acted upon Cahill Gordon's and BASF's (or its predecessors') representations and materials provided by Cahill Gordon and BASF that Engelhard's talc did not contain asbestos and/or that there was absolutely no evidence to the contrary which had been made or supplied to the Bevan Law Firm from 1992 forward, as set out above.

222.    Had the BASF Perpetrators or the Lawyer Perpetrators fully, fairly, honestly  and timely disclosed to the Bevan Law Firm the truth about Engelhard's talc products' asbestos content, the existence of inculpatory and contradictory evidence regarding the existence of asbestos in Engelhard's talc, such as that which had been developed in the *Westfall* case, and/or the facts and the circumstances surrounding BASF's gathering and spoliation of contrary and inculpatory asbestos claim evidence relating to Engelhard's talc in 1984 as was their duty, the Bevan law firm would not have negotiated and agreed to the terms of the aggregate settlements with BASF or its predecessors on the terms that were offered, and, further, it would not have recommended to its clients that they agree to participate in such aggregate settlements with Engelhard and dismiss their cases against it voluntarily as they did. Correspondingly, the Bevan

Law Firm's asbestos injury clients, including Plaintiff Pease, Plaintiff Holley's decedent, Ms. Darnell, and Plaintiff Ware, as well as others similarly situated to them, would not have given their consent or authorization to participate in an aggregate settlement with BASF or its predecessor on the basis of the terms of the agreement nor authorized and consented to the Bevan Law Firm voluntarily dismissing their asbestos claims against BASF's predecessor without first receiving from BASF's predecessors full, fair and just compensation for their respective asbestos injury claims. In each case the settlement demand would have been higher and/or they would have taken their respective case to trial.

223.    As a direct result of the Fraudulent Asbestos Defense Scheme, Plaintiff Pease, Plaintiff Holley's decedent, Ms. Darnell, and Plaintiff Ware, as well as others similarly situated to them, have not received full, fair and just compensation from BASF's predecessors for their respective asbestos injury claims, to their detriment and loss.

224.    On or about November 12, 2008, BASF's Northern Ohio area local defense attorney, Jennifer A. Reister, Esq., mailed a letter with enclosures to the Bevan Law Firm requesting voluntary dismissal of two of the firm's then pending asbestos injury matters it had filed in the Cuyahoga County, Ohio, Court of Common Pleas, namely: Plaintiff Wengerd's decedent's law suit, *Jennifer Graham v. Eastern Magnesia Talc*, and *Russell Young v. Eastern Magnesia Talc*.  Prompting the letter was the Bevan Law Firm's service of discovery requests on BASF in connection with the two cases.  A copy of this letter is appended as Exhibit 36 and incorporated herein by reference.

225.    Ms. Reister's November 12, 2008 letter requested the Bevan Law Firm to "voluntarily dismiss Eastern Magnesia Talc and, in the Young case, both Eastern Magnesia Talc and Engelhard Corporation, from these cases on the basis that talc produced by EmTal contained no asbestos."

226.    In support of both her request for voluntary dismissal and her representation that Engelhard's talc "contained no asbestos," Ms. Reister provided the Bevan Law Firm again with copies of the Ashton Affidavit and Pooley Report, along with other purported analyses that allegedly state or indicate that talc from Engelhard's Johnson talc mine did not contain asbestos.  The letter and enclosures were further intended, according to the letter, to serve as BASF's responses to the Bevan Law Firm's discovery initiatives in the two cases

227.    To further bolster her request for voluntary dismissals of the two cases Ms. Reister's letter noted to the Bevan Law Firm that Engelhard and Emtal had been named as Defendants and subsequently dismissed voluntarily in 567 asbestos claims as a result of the enclosed materials in various jurisdictions including four (4) plaintiffs in Arkansas, 191 plaintiffs in Kansas, forty (40) plaintiffs in Michigan, thirty-one (31) plaintiffs in Mississippi, over 300 plaintiffs in Pennsylvania, and one (1) plaintiff in Florida.

228.    According to BASF's court ordered answers to Question No. 4 of a set interrogatories served on it in the *Paduano* suit, Cahill Gordon supplied Ms. Reister with the information and documents she used in writing and sending her November 2, 2008

letter and enclosures to the Bevan Law Firm.  A copy of these interrogatory answers is appended as Exhibit 37 and incorporated herein by reference.

229.    Just as in the Cahill Gordon correspondence and interrogatory answers set out above, Ms. Reister's November 12, 2008 letter and enclosures on behalf of BASF did not fairly, candidly and truthfully inform the Bevan Law Firm, and through this law firm, its asbestos injury clients, including Plaintiff Wengerd and/or her decedent, Mrs. Graham, that evidence existed that was contrary to that which was represented in Ms. Reister's letter and in the supplied Ashton Affidavit, Poole Report and/or other materials provided by her and Cahill Gordon, such as the inculpatory documents and deposition testimony that had been obtained by the plaintiff in the *Westfall* case.  Neither was there any mention or reference in Ms. Reister's correspondence to the Bevan Law Firm, nor in any of the affidavits or reports that she and Cahill Gordon supplied to the Bevan Law Firm, to the fact of and the circumstances surrounding BASF's gathering and spoliation of all contrary and inculpatory asbestos claim evidence relating to Engelhard's talc in 1984. These misrepresentations and material omissions occurred and were committed despite the fact that the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, knew and appreciated the relevance of the subject information to asbestos claimants, and were under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation.

230.    Neither BASF nor Cahill Gordon took any steps or measures to correct Ms. Reister's misrepresentations.  BASF also did not take any steps or measures to prevent Ms. Reister (or any other counsel representing it) from making such misrepresentations and material omissions in the future.

231.    When Plaintiff Wengerd in her capacity as personal representative of her

mother's estate (Mrs. Graham having died on July 8, 2008) did not voluntary dismiss

BASF from her mother's asbestos injury case as requested by Ms. Reister in her

November 12, 2008 letter, Ms. Reister and her firm thereafter filed a Motion for

Summary Judgment seeking its involuntary dismissal.  Asking the Cuyahoga County

Court of Common Pleas to dismiss this case, BASF claimed to the court that there was no

proof that its predecessor Engelhard's talc was present in Ms. Graham's workplace at the

Goodyear tire and rubber plant she was employed in, and, in any event, there was no

evidence that Engelhard's talc contained asbestos.

232.    The Bevan Firm in or about early 2009 opposed BASF's motion for

Summary Judgment in the *Graham* case by establishing that there was an outstanding

question of fact on Ms. Graham's exposure to Engelhard talc at the Goodyear plant in

which she worked. It was not able, however, due to the Lawyer Perpetrators and the

BASF Perpetrator's misrepresentations and material omissions set forth above, to mount

any opposition to BASF's claim and representations to the presiding court that there was

not any evidence Engelhard's talc contained asbestos. Thus in a reply brief on behalf of

BASF that Ms. Reister electronically filed via the File and Serve System in February,

2009, it was stated to the Cuyahoga Court of Common Pleas:

> Lastly, plaintiff attempts to rely on her own answers to interrogatories. In
> her answers, she states that one of the asbestos containing products she
> was exposed to at Goodyear was talc. She does not identify EMT as the
> seller of the talc. Additionally, plaintiff has provided no evidence that
> EMT's talc is an asbestos-containing product. On the other hand, EMT
> filed numerous materials in response to plaintiff's discovery request that
> indicate that the talc mined by EMT was asbestos-free. (See Letter and to
> John Mismas and attachments filed November 12, 2008) These materials
> included:

1) A copy of an Affidavit prepared by William H. Ashton dated May 8, 1989, with attached Exhibits A through G;

2) A copy of a report prepared by Dr. F.D. Pooley concerning an examination of talc samples taken from EMT's Johnson, Vermont mine;

3) A copy of a 1977 NIOSH study entitled "Analysis of Talc By XRay Diffraction and Polarized Light Microscopy"; and

4) A copy of a letter from RJ Lee Group, Inc. dated January 27, 1993 reporting the results of their analysis of a sample of EMT talc.

It is elementary that plaintiff must show that she was exposed to an asbestos-containing product to survive summary judgment. In this case, plaintiff has failed to produce any evidence that either she was exposed to any talc sold by EMT or that the talc sold by EMT contained asbestos.

(*emphasis added*).

A copy of this reply is appended as Exhibit 38 and incorporated herein by reference.

233.   In the Motion for Summary Judgment filed on behalf of BASF in the *Graham* case, BASF Perpetrators and/or the Lawyer Perpetrators, acting as aforesaid (who were directing and controlling Ms. Reister's actions on BASF's behalf), failed to fairly, honestly and candidly inform the presiding court that evidence that BASF's talc contained asbestos existed and/or that there was contrary evidence to that which was represented in the motion, *i.e.* - BASF's reference to Ms. Reister's November 12, 2008 letter and attachments submitted to the court in connection with the motion, such as the inculpatory documents and deposition testimony that had been obtained by the plaintiff in the *Westfall* case.  Neither was there any mention or reference in Ms. Reister's Motion for Summary Judgment on behalf of BASF, nor in any of the corroborating affidavits or corroborating reports that she filed in support of the motion, to the fact of and the

circumstances surrounding BASF's gathering and spoliation of all contrary and inculpatory asbestos claim evidence relating to Engelhard's talc. These misrepresentations and material omissions occurred and were committed despite the fact that the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, knew and appreciated the relevance of the subject information to asbestos claimants, were under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation, and were under a duty of candor to the presiding court.

234.    As the direct and proximate result of the BASF Perpetrators and the Lawyer Perpetrators misrepresentations and material omissions as set forth above, on June 18, 2009, the Cuyahoga County Court of Common Pleas granted BASF's motion for summary judgment and dismissed Ms. Graham's case as to BASF, thereby depriving Plaintiff Wengerd's deceased mother and her estate of their right to full, fair and just compensation from BASF on the subject asbestos injury claim.

235.    On or about May 15, 2009, a notice of voluntary dismissal of Engelhard, as well as three other defendants, was electronically filed in the lawsuit relating to Mr. Young's asbestos injury through the electronic File and Serve System.  A copy of the dismissal is appended as Exhibit 39 and incorporated herein by reference.  In agreeing to and obtaining its client's consent to this dismissal, the Bevan Law Firm relied and acted upon the misrepresentations and material omissions set forth above.

**H.     The Discovery and Uncovering of the Fraudulent Asbestos Defense Scheme**

236.    The longstanding Fraudulent Asbestos Defense Scheme started to unravel during a June 15, 2009 deposition of Mr. David Swanson, a former a BASF research and

development employee, that was taken in connection with an asbestos injury case

captioned *Paduano v. Ace Scientific Supply Co.*, captioned MID-L-2976-09 (N.J. Super.

Ct.) (the "**Swanson deposition**").  A copy of Mr. Swenson's deposition is attached as

Exhibit 9, and incorporated herein by reference.

237.    Mr. Swanson was a chemist for Engelhard in Menlo Park, New Jersey.

238.    During his tenure at Engelhard, Swanson conducted experiments and

assays with talc in his laboratory.  He also visited the Johnson Mine.

239.    Mr. Swanson's daughter, Donna Paduano, developed mesothelioma and

contended the asbestos causing same was from, *inter alia*, BASF's talc her father worked

with or was exposed to at Engelhard, to which she came into contact.

240.    During his deposition Mr. Swanson testified:

a.    He was aware that Emtal talc contained asbestos fibers based on his work

for the company;

b.    That Engelhard's talc mine was shut down after it was determined that the

talc contained asbestos;

c.    That sometime after the BASF talc mine was shut down, he was given a

directive by the head of Engelhard's research and development department,

Defendant Hemstock, to gather all of his lab notebooks and records regarding

Engelhard's talc;

d.   That Defendant Hemstock explained to him that the directive to gather up the documents  had come from BASF's legal department;

e.   That he understood and believed that the materials gathered were to be shredded or destroyed;

f.   That he complied with the instructions and gathered his documents on Emtal talc, including his laboratory notebooks, and turned over all of his records as directed;

g.   That BASF's legal department checked with all employees to ensure that all documents that revealed that the talc contained asbestos had been recovered and subsequently destroyed or secreted away; and

h.   That he never saw his Emtal talc documents again.

241.   The Swanson Deposition testimony led to an investigation by the *Paduano* suit's plaintiffs' counsel into whether BASF had spoliated material evidence (the "***Paduano* spoliation investigation**").

242.   The *Paduano* spoliation investigation ultimately led to the discovery of evidence that prompted and grounded a successful motion to amend before the New Jersey Superior Court to plead a New Jersey spoliation "Fraudulent Concealment" claim against BASF in the *Paduano* suit, along with three other pending New Jersey state court asbestos laws suits, based upon the spoliation of Emtal talc documents described herein.

243.    The *Paduano* spoliation investigation also eventually led to BASF producing documents relating to its 1984 gathering of documents relating to Emtal talc and portions of some, but not all, of the *Westfall* case's depositions.

244.    During the *Paduano* spoliation investigation plaintiffs' counsel reviewed thousands of pages of documents produced by BASF relating to its corporate knowledge of asbestos in Johnson Mine talc ore and Emtal talc products and what BASF and Cahill Gordon had produced and represented to asbestos claimants' counsel over the years regarding same. Additionally, interrogatories were served and depositions of BASF designated representatives taken on topics relating to the spoliation of evidence and documents.

245.    During the *Paduano* spoliation investigation BASF withheld numerous documents from its production that were responsive to the spoliation investigation on claims of attorney-client privilege. The *Paduano* plaintiffs challenged BASF's withholding of documents based upon the "crime-fraud" exception to the attorney-client privilege. This dispute led to the appointment of retired New Jersey Superior Court Appellate Division Judge Jack L. Lintner ("**Judge Lintner**") as Special Discovery Master in *Paduano* and three related asbestos cases.   A copy of said order is appended as Exhibit 43 and incorporated herein by reference.

246.    Judge Lintner requested briefing from the *Paduano* parties on the applicability of the crime-fraud exception and following his review of same rendered an initial opinion in October, 2010 in which he determined that an *in camera* review of BASF's withheld documents was warranted. On November 4, 2010, following his *in*

*camera* review of the withheld documents, Judge Lintner advised the *Paduano* parties that he was going to report his opinion concerning which documents should be produced by BASF under New Jersey's crime-fraud exception to the attorney-client privilege. Thereafter, on November 10, 2010, and with notice to all *Paduano* parties, Judge Lintner provided BASF s counsel, and only it, with a copy of his tentative report setting forth his determinations in order to allow BASF's counsel to review and make any objections it had to his recommendations as well as to production of his report to the Paduanos' counsel.

247.    After Judge Lintner submitted his tentative report to BASF's counsel, the *Paduano* case settled. Pursuant to the order of the court the tentative report is confidential.

248.    The terms of the *Paduano* settlement and the order appointing Judge Lintner require Judge Lintner and his law firm, Norris McLaughlin & Marcus, P.A., to hold both a copy of his tentative report and the withheld documents he reviewed in escrow for seven (7) years.

249.    Plaintiffs in support of their claims are seeking production of the documents held in escrow.

250.    The *Paduano* spoliation investigation  led to the discovery of the following tests and assays of Emtal talc that found the presence of asbestos fibers in the Emtal talc:

a.  A 1972 Royal Globe Insurance test which established four out of five Emtal talc samples contained asbestos fibers;

b.  A May 1972 Johns Manville test which identified asbestos fibers, including tremolite fibers, in all of the Emtal samples;

c.  A 1977 test by Mr. Triglia, an Engelhard employee, which identified the presence of asbestos in Emtal talc;

d.  A 1978 test which established the presence of asbestos in all Emtal talc;

e.  A 1979 Georgia Tech electron microscope analysis test which found fibers in the Emtal talc.; and,

f.   Three other 1979 tests which all confirmed the presence of asbestos in Emtal talc.

251.    In the twenty five (25) years between the *Westfall* case settlement and the Swanson deposition, upon information and belief, none of the above referenced tests or the underlying data were ever produced to any asbestos injury claimant or their counsel even though they were often well within the scope of discovery requests made by asbestos claimants' counsel.  These tests and their underlying data were also not referred to in correspondence or defense reports sent to claimants' counselor in court submissions that were filed seeking dismissal of BASF.  These tests and data represent only a portion of the original evidence relating to the presence of asbestos in Emtal talc, and are an indication of the once-extensive evidence which Defendants possessed regarding the presence of asbestos in the Emtal talc.

252.    Based upon information and belief, BASF terminated Cahill Gordon as its national counsel in or about 2009 or 2010.

253.    The documents produced during the *Paduano* spoliation investigation after Cahill Gordon was terminated, many of which are stamped by BASF's counsel with the document management prefix "FC," revealed the existence of the BCAD enterprise and how the BASF Perpetrators and the Lawyer Perpetrators used it to repeatedly mislead and deceive asbestos injury claimants, their counsel and presiding courts.

254.    Many of the exhibits and test and assay results referred to in the depositions of Hemstock and Triglia still have not been produced to any asbestos injury claimant lawyer other than counsel in the *Westfall* case who was and is bound to a confidentiality agreement.

a.   The following exhibits from the Hemstock deposition are missing or have otherwise not been produced:  Exhibits 1, 5, 13, 15, 16, 18, 19, 21, 22, 23, 24, 25, 29, 30, 32, 34, 37, 39, 43, 44, 46, 47, 49, 50 (partially), and 51.

b.   The following exhibits from the Triglia deposition are missing or have otherwise not been produced: Exhibits 1, 2, 5, 6, 9, 11, 12, 13, 15, 16, 17, 18, 19, 20, 23, 24, 26, 27, 28 and 30.

255.     Many other presently unknown tests, studies, and other evidence which Defendants conducted, possessed, or had access  to have been destroyed, secreted away and/or due to the passage of time caused by the BASF Perpetrators' and the Lawyer Perpetrators' spoliation and tortious conduct, are no longer accessible or recoverable.

256.    The evidence spoliated by the BASF Perpetrators and the Lawyer

Perpetrators includes the Engelhard internal lab notebooks which have never been located

and/or produced and at this point and may be inferred or presumed to have been

permanently destroyed. Based upon information and belief, these lab notebooks would

have contained testing and assay data regarding the composition of the Emtal talc

including but limited to the asbestos content of the Emtal talc.

257.    Due to the spoliation of this evidence, asbestos victims, their counsel and

courts across the country have been prevented from obtaining or receiving material

evidence and accordingly may never know the full nature, extent and breadth of the

asbestos fibers in BASF's talc and talc products including Emtal talc.

**I.      The BASF Perpetrators Undeterred Attempt to Mislead and Deceive
the *Paduano* Suit's Plaintiffs' Counsel Regarding Emtal Talc's
Asbestos Content**

258.    Less than six months after the Swanson deposition led to the discovery of

the Fraudulent Asbestos Defense Scheme, Mr. Ernest Behm ("**Behm**") was produced by

BASF to testify in the *Paduano* suit as the corporate designee with the most knowledge

concerning BASF-Engelhard's historical knowledge of the dangers of asbestos at a

deposition noticed and taken on November 6, 2009. (A copy of excerpts of Mr. Behm's

deposition transcript is appended as Exhibit 40).

259.    During this deposition, Behm was asked specifically by Ms. Paduano's

counsel to identify the location of documents related to the *Westfall* case which referred

to asbestos containing talc sold by BASF-Engelhard.  Mr. Behm testified that his search

prior to his deposition disclosed no such documents.

260.    Six months after the Swanson deposition led to the uncovering BASF's twenty-five year scheme of fraudulently denying the existence of evidence that its talc contained asbestos fiber, Mr. Behm, as the BASF representative most knowledgeable about the asbestos risks of its products, repeated the misrepresentations and material omissions that were the *modus operandi* of the Fraudulent Asbestos Defense Scheme, stating:  "[I]t is my understanding that Engelhard never sold any asbestos containing product. And when it comes to talc, I have materials which I had available to me which stated that talc does not contain asbestos."  (*See* Exhibit 40 at pg. 107).

261.    BASF's corporate designee's continued misrepresentations under oath in November, 2009 demonstrate how ingrained and persistent the Fraudulent Asbestos Defense Scheme had become.  Its designated representative continued to parrot the misrepresentations even in the face of an investigation that was beginning to unravel BASF's fraud and spoliation of evidence.

**J.      BASF's Admissions That False and Misleading Statements Were Given to Asbestos Claimants Over the Years as Part of BASF's Asbestos Claim Defense**

262.    In connection with the *Paduano* suit*,* BASF designated and produced for deposition Ms. Ellen Poole as its representative with the most knowledge concerning the sale, supply and distribution of BASF-Engelhard's talc to National Gypsum Facilities, as well as its designee to testify on matters relating to the *Paduano* spoliation investigation. (A copy of excerpts of Ms. Poole's deposition transcript is appended as Exhibit 41).

263.     In her deposition on May 25, 2010, Ms. Poole admitted as a designee of BASF:

a.   That there are documents which show the existence of asbestos in Emtal talc (*See* Exhibit 41 at pg. 185-190);

b.   That testing on Emtal talc performed throughout the 1970s showed the presence of asbestos fibers in BASF products (*See* Exhibit 41 at pg. 185-190);

c.   That testing on Emtal talc conducted by Georgia Tech and by BASF  were in agreement that the asbestos fiber count in Emtal talc varied from trace amounts to abundant (*See* Exhibit 41 at pg. 185-190);

d.   That a geologist named "Gale", who it is believed is referring to Peter Gale, a former Engelhard research and development employee who BASF sought to restrain from being retained as an expert by the *Westfall* case's plaintiff, confirmed the existence of asbestos in Emtal talc in 1979 (*See* Exhibit 41 at pg. 252);

e.   That sworn affidavits and statements made and frequently used in the Fraudulent Asbestos Defense Scheme, such as the Ashton Affidavit and Eastern Magnesia's October 19, 2007 answers to interrogatories, which stated that BASF's asbestos knowledge was irrelevant because it never sold asbestos containing products, are contradicted by tests and studies that were known to BASF (*See* Exhibit 41 at pg. 252); and,

f.   That Cahill Gordon had maintained the storage facility where some of the documents establishing the presence of asbestos fibers in the Emtal talc had been secretly held for the past twenty-five years. (Exhibit 42 at  pg. 59).

**K.  Plaintiffs Learn They and Other Asbestos Claimants Similarly
Situated Were Victimized and Harmed by the Fraudulent Asbestos
Defense Scheme**

264.    Plaintiffs first learned that they and others were the victims of the BASF
and Lawyer Perpetrators' Fraudulent Asbestos Defense Scheme, and the BCAD
Enterprise's role in executing it, in or about late 2010 or 2011 when they were first
advised by their respective asbestos counsel of the foregoing alleged facts and
circumstances which their asbestos claim counsel had learned of through being contacted
by the counsel conducting the *Paduano* spoliation investigation as part of that
investigation or the investigation of the instant suit.

265.    The existence and/or scope of the fraudulent concealment, the Fraudulent
Asbestos Defense Scheme and BCAD Enterprise's existence and corrupt activities was
not known  to Plaintiffs prior to that time, and, because of its covert nature, was not
reasonably knowable to them until such time as they were first advised of its existence by
their asbestos counsel.

266.    Due to the nature of the facts and circumstances concerning the Fraudulent
Asbestos Defense Scheme and the BCAD Enterprise's role in executing this scheme,
such are reasonably not known or knowable to members of the Class and will not be
unless and until they are notified of these circumstances, which is an element of relief
sought in this class action.

267.    Plaintiffs and others similarly situated to them have been harmed by the
misrepresentations, omissions of material fact and deceitful conduct involved in the
Fraudulent Asbestos Defense Scheme and the BCAD Enterprise's role in executing it.

268.     As a direct and proximate result of Defendants' acts, omissions and activities, including the BASF and Lawyer Perpetrators' pattern of unlawful activities that violate N.J.S.A. § 2C: 41-1 *et seq.* and Cahill Gordon's violation of N.Y. Judiciary Law  § 487, Plaintiffs and members of the Class similarly situated sustained the loss of their property in the form of the termination or impairment of their asbestos injury claims, their rights under law to pursue and receive full, fair and just compensation for their asbestos injury claims, and/or the taking and deprivation of their Constitutional right to a fair, honest and just judicial proceeding together with the time value monetary loss due to their not timely receiving the full, fair and just compensation in a fair, honest and just judicial proceeding to which they were entitled.

269.     Based upon information in the documents produced during the *Paduano* spoliation investigation, at least several thousand asbestos claimants across the United States have been similarly so injured and harmed. Discovery and appropriate notice to the class may likely reveal the existence of even more.

**L.     Defendants greatly benefited and profited from their participation in the Fraudulent Asbestos Defense Scheme.**

270.     BASF and Cahill Gordon each received substantial revenue or economic benefits from their participation in the Fraudulent Asbestos Defense Scheme and the losses and harm it inflicted upon Plaintiffs and members of the class by depriving them of their asbestos injury claim as well as their Constitutional right to a fair, honest and just judicial proceeding. Cahill Gordon earned professional fees for numerous years for its fraudulent and, indeed criminal (under the law of New York), activities associated with the Fraudulent Asbestos Defense Scheme, including activities that constituted a pattern of

119

activities and conduct that are proscribed and constitute predicate acts or violations under N.J.S.A. § 2C:41-1, *et seq*. Cahill Gordon attorneys also benefited from being able to claim when marketing the firm or themselves that Engelhard, and later on, BASF, was a client for which it (or he/she) had successfully handled complex mass tort litigation. BASF was able to eliminate, avoid or reduce its payments of compensation to asbestos injury claimants and reduce its overall defense transaction costs by the operations and activities of the Fraudulent Asbestos Defense Scheme. All participants in the Fraudulent Asbestos Defense Scheme also gained and were benefitted by the Fraudulent Asbestos Defense Scheme's operations facilitating and maintaining both the continuity and the invisibility of the Fraudulent Asbestos Defense Scheme due to the grave economic and professional consequences that were possible if the scheme became exposed.

**M.**  **Defendants' Clandestine Misconduct and Concealments Prevented Plaintiffs and Class Members From Discovering the Fraudulent Asbestos Defense Scheme Despite the Exercise of Diligence Thereby Warranting Tolling of Any Applicable Statute of Limitations.**

271.   For over twenty-five (25) years, the BASF Perpetrators and the Lawyer Perpetrators were able to successfully keep the Fraudulent Asbestos Defense Scheme secret and unknown by Plaintiffs, their counsel and others similarly situated.

272.   The successful operation of Defendants' Fraudulent Asbestos Defense Scheme, as well as each Defendant's own respective financial, corporate and/or professional well being once execution of the scheme got underway, depended upon: (a) the destruction, secreting and/or concealment of BASF's and its predecessor companies' documents and evidence relating to Class Members' underlying asbestos injury claims beginning in 1984; (b) the concealment and cover-up of this spoliation of documents and

evidence; (c) the secreting and concealment each Defendant's respective role(s), activities and involvement in the spoliation of documents and evidence; and, (d) the secreting and concealment of the Defendants' respective roles and activities in the execution of the subsequent misrepresentation and fraudulent material misrepresentations relating to or based upon the spoliation of documents and evidence.

273.    The successful operation of Defendants' Fraudulent Asbestos Defense Scheme, as well as their own financial, corporate and/or professional well being once execution of the scheme got underway, also depended upon there being continuity and consistency in making the exculpatory misrepresentations and misleading omissions involved in the scheme. Defendants therefore carefully, consistently and, as it turned out, successfully, secreted and concealed the Fraudulent Asbestos Defense Scheme as well as their involvement and activities in its commission until Mr. Swanson happened to come forward and testify in his daughter's mesothelioma case.

274.    As set forth above, BASF, at Cahill Gordon's direction or with its consent, affirmatively misrepresented facts concealing the spoliation of evidence, often under oath, in addition to making material omissions false statements.

275.    In view of the foregoing, Plaintiffs and the members of the Class could therefore not have discovered the Fraudulent Asbestos Scheme alleged herein any earlier despite the exercise of reasonable diligence.  Indeed, as indicated above, over the years that the Fraudulent Asbestos Defense Scheme was in existence the lawyers for Plaintiffs, as well as the lawyers for other similarly situated asbestos injury claimants, did their jobs of investigating and conducting discovery into BASF and its predecessors' talc products,

121

only to be directly or indirectly lied to by the BASF Perpetrators and Lawyer Perpetrators who were closely controlling and conducting BASF's and its predecessors' asbestos claims defense.  As set forth in the preceding paragraphs of this complaint, said investigation included but was not limited to:

    a.  Utilizing means of discovery authorized by rules of civil procedure including interrogatories and requests for production of documents which sought information regarding testing and/or other evidence related to the presence of asbestos in BASF's talc, or talc products, its sale of asbestos and asbestos containing products, its knowledge of the risks of asbestos fibers to those near where asbestos containing products were used in the workplace, and whether it destroyed any evidence pertaining to the hazards of asbestos, warning labels or hazardous conditions at its plants or factories;

    b.  Engaging in written correspondence seeking clarification or comment from the defendants regarding information suggesting possible health risks caused by BASF's talc or conditions at the Johnston Mine found through their investigation as claimants' counsel as described above; and,

    c.  Considering the fact, reported  by defendants, that other leading and experienced asbestos counsel had voluntarily withdrawn their clients' cases against BASF based upon the material provided directly or indirectly by BASF and Cahill Gordon.

Moreover much of the Fraudulent Asbestos Defense Scheme to this day still remains concealed by Defendants and unknown to Plaintiffs and members of the Class.

276.     Once the existence of the Fraudulent Asbestos Defense Scheme was suggested by the deposition testimony of Mr. Swanson in the *Paduano* suit, Ms. Paduano's counsel began the *Paduano* spoliation investigation described above that led to revelation of the fraudulent scheme. Absent Mr. Swanson's testimony, however, there was no reason or indication for asbestos injury claimants or their counsel to suspect or investigate the existence of the Fraudulent Asbestos Defense Scheme.

277.     In view of the foregoing, any applicable statutes of limitations should therefore be held inapplicable or tolled due to and on account of Defendants' knowing and active concealment, suppression and denial of the facts alleged herein.  Plaintiffs and members of the Class have, as a direct result of the conduct of the Defendants, been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.  Plaintiffs could not reasonably have discovered the spoliation and the fraudulent nature of Defendants' conduct.  Accordingly, Defendants should be stopped and/or enjoined from asserting or relying upon any of any statute of limitations, statutes of repose, laches, or defense to any substantive cause of action based upon time limitations, such as those contained in applicable personal injury and/or survival or wrongful death laws, to defeat any of Plaintiffs' claims asserted herein.

## VI. CLASS ACTION ALLEGATIONS

278.     Plaintiffs bring this action on behalf of themselves and pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "**Class**"  or "**Asbestos Claimant Class**") defined as follows:

> All persons in the United States and its territories who were exposed to BASF's talc and talc products and sustained an asbestos related injury, or who have or had

the right to claim damages derivatively based upon such exposed person's asbestos related injury.

For purposes of this class definition **BASF** includes BASF Catalyst, Inc. ("**BASF**") or any of BASF's predecessor companies that mined, manufactured, processed, distributed or sold talc ore or talc products, including but not limited to Engelhard Corporation, Engelhard Industries, Engelhard Minerals & Chemicals Corporation, Minerals & Chemicals Phillip Corporation, Eastern Magnesia Talc Company, Porocel Corporation and Pita Realty Limited (collectively "**BASF Predecessor Companies**")

279.    Plaintiffs are members of the Class that they seek to represent.

280.    Members of the Class can be identified from Defendants' records, court records, records of asbestos claimants' counsel, records of unions in which Class Members belonged, and asbestos claims representatives and claimants' records. Notice can be given to the Class through direct notice and general print and electronic publication means.

281.    Plaintiffs' claims are typical of the claims of the other Class Members' because Plaintiffs and all putative Class Members were and are similarly affected by Defendants' spoliation of asbestos evidence and the subsequent pattern and practice of uniform misrepresentations, concealments and suppression of material fact, and the declaratory and equitable relief sought herein is for the benefit of Plaintiffs and members of the putative Class.

282.    Class Members are so numerous that their individual joinder is impracticable.

283.    Common questions of law and fact predominate over the questions affecting only individual Class Members.  Some of the common legal and factual questions include:

a)   Whether BASF spoliated material evidence relating to Class Members' underlying asbestos claims?

b)   Whether BASF and Cahill Gordon, and their respective employees or members, concealed and covered up the spoliation of material evidence relating to Class Members' underlying asbestos claims?

c)   Whether Defendants Dornbusch, Hemstock and/or Halket and all or some of the Lawyer Perpetrators aided and abetted BASF's spoliation of evidence relating to Class Members' underlying asbestos claims?

d)   Whether BASF and Cahill Gordon, and their respective employees or members, wrongfully, tortiously  and unjustly utilized and exploited the spoliation of evidence relating to Class members' underlying asbestos claims to BASF's and Cahill Gordon's benefit and the Class Members' detriment and harm?

e)   Whether Defendants systematically and uniformly misrepresented to Class Members that BASF's Predecessor Companies' talc ore and talc products did not contained asbestos?

f)   Whether Defendants systematically and uniformly misrepresented to Class Members that there was no evidence that BASF's Predecessor Companies' talc ore and talc products contained asbestos?

g)   Whether Defendants knowingly and purposely withheld material
     information and facts to Class Members concerning the existence,
     whereabouts or fate of documents and other evidence regarding the
     presence of asbestos in BASF's Predecessor Companies' talc ore and talc
     products?

h)   Whether Defendants systematically and uniformly withheld material
     information and facts to Class Members concerning the presence of
     asbestos in BASF's Predecessor Companies' talc ore and talc products?

i)   Whether Defendants execution of the Fraudulent Asbestos Defense
     Scheme was a fraud upon of the court of such nature, degree and extent
     warranting the Court to take jurisdiction and implement curative measures
     restoring class members and BASF back to the *status quo ante* the
     commission of the Fraudulent Asbestos Defense Scheme.

j)   Whether Cahill Gordon and its lawyers under the facts and circumstances
     of this case violated N.Y. Judiciary Code §487 which prohibits attorneys
     from committing deceit or collusion, or consenting to any deceit or
     collusion, with intent to deceive the court or any party?

k)   Whether any of BASF's in-house counsel under the facts and
     circumstances of this case violated N.Y. Judiciary Code §487 which
     prohibits attorneys or counsel from committing deceit or collusion, or
     consenting to any deceit or collusion, with intent to deceive the court or
     any party?

126

l)   Whether all or some of the Defendants conspired or acted in concert with other Defendants to commit the Fraudulent Asbestos Defense Scheme,?

m)   Whether any of the Defendants effectively withdrew from the conspiracy to commit the Fraudulent Asbestos Defense Scheme or any of its elements, and if so when?

n)   Whether Defendants are liable to the Class for punitive damages and other available relief under New Jersey' for committing spoliation and fraudulent concealment of evidence or conspiring to do so?

o)   Whether the Defendants utilized the BCAD Enterprise to conduct, execute and manage BASF's asbestos claim defense?

p)   Whether the BASF Perpetrators and/or the Lawyer Perpetrators obstructed justice in violation of 18 U.S.C. § 1503 (Obstruction of Justice), committed Mail Fraud in violation of 18 U.S.C. § 1341, or committed Wire Fraud in violation of 18 U.S.C. § 1343 in the execution of the Fraudulent Asbestos Defense Scheme?

q)   Whether the BASF Perpetrators and/or Lawyer Perpetrators conducted or participated, directly or indirectly, in the conduct of the BCAD Enterprise through a pattern of unlawful activity, as defined under N.J.S.A. § 2C:41-1?

r)   Whether the BASF Perpetrators and/or Lawyer Perpetrators violated N.J.S.A. § 2C:41-1 *et seq.*?

s)   Whether in light of the extraordinary misconduct giving rise to this case
     Plaintiff's and the class are entitled to equitable relief correcting the harms
     caused by the BASF and/or Lawyer Perpetrators violations of  N.J.S.A. §
     2C:41-1 *et seq.*?

t)   Whether in light of the extraordinary misconduct giving rise to this case
     BASF and/or Lawyer Perpetrators should be required to render an
     accounting of and then disgorge the benefits they reaped by their
     violations of  N.J.S.A. § 2C:41-1 *et seq.*?

u)   Whether Plaintiffs and the Class are entitled to equitable relief based upon
     Defendants committing common law fraud, conspiring to commit
     common law fraud, or aiding and abetting other Defendants' commission
     of common law fraud?

v)   Whether Defendants committed obstructions of justice or a fraud upon the
     court by its commission of the Fraudulent Asbestos Defense Scheme?

w)   Whether by their wrongful acts, activities and omissions Defendants
     unjustly enriched themselves at the expense and to the detriment of
     Plaintiffs and other Class Members?

x)   Whether Plaintiffs and the Class are entitled to declaratory of equitable
     relief that alleviates and cures any impairment, detriment or harm inflicted
     upon them by the spoliation of the evidence relating to Class Members'
     underlying asbestos claims, including any detriment or harm attributable

to the passage of time such as loss of witnesses and documentation needed
to establish a Class Members' underlying asbestos injury claim?

y)  Whether Plaintiffs and the Class are entitled to equitable relief that
alleviates and cures any impairment, detriment or harm inflicted upon
them by the Defendants' fraudulent and deceitful misrepresentations, acts
and omissions in furtherance of the Fraudulent Asbestos Defense Scheme,
including any harm attributable to the passage of time such as loss of
witnesses and other documentation needed to establish Class Members'
underlying asbestos injury claims?

z)  Whether Class Members are entitled the restitution of any moneys or
property unlawfully obtained or retained by any person found to be in
violation of N.J.S.A. § 2C:41-1 *et seq.*?

aa) Whether Defendants should be required to disgorge any moneys that are
found to unjustly enrich them or were illegally earned?

bb)  Whether assessment of punitive damages against the Defendants is
warranted and just under the circumstances?

cc) Whether the spoliation of evidence relating to Class Members' underlying
asbestos injury claims was unknown and unknowable to Plaintiffs and
members of the class due to Defendants' concealment of the spoliation
and its Fraudulent Asbestos Defense Scheme?

dd) Whether in light of the extraordinary misconduct giving rise to this case,
an immediate publication notice to the Class apprising them of the alleged

129

circumstances and their legal rights at Defendants' expense is warranted
and should be ordered as preliminary injunctive relief?

ee) Whether class members are entitled to a declaration that BASF's and
Cahill Gordon's communications relating to the fraudulent conduct and/or
the spoliation of evidence are not privileged attorney-client
communication under the crime fraud exception?

ff) Whether BASF and Cahill Gordon should be required to fund an
independent trust established by the Court to locate, gather and take
custody of BASF and Cahill Gordon documents and evidence relating to
BASF's talc products and thereafter establish and maintain a searchable
archive of such materials for the benefit of the Class members.

284.    The Defendants engaged in a common course of conduct and in a
common, coordinated fraudulent scheme giving rise to the legal rights sought to be
enforced by Plaintiffs and the Class Members.  Similar or identical statutory and common
law violations are involved, and New Jersey's statutory and common law, may be
constitutionally, properly and prudentially applied in this matter to the Class Members'
along with N.Y. Judiciary Law §487. Individual questions, if any, pale in comparison to
the numerous common questions that predominate.

285.    The injuries sustained by Plaintiffs and Class Members flow, in each
instance, from a common nucleus of operative facts — the spoliation of evidence and/or
fraudulent or misleading denial of the existence of and/or withholding of evidence
material to Class Members' underlying asbestos injury claims; the Defendants' uniform

130

pattern practice of misrepresentations and deceitful misconduct and non disclosures regarding the nature of Engelhard's "Emtal" talc products; and the Defendants' false claim of non existence of any evidence that these products contained asbestos.

286.    Plaintiffs and the Class Members have been damaged by the BASF Perpetrators' and the Lawyer Perpetrators' misconduct.  In the absence of the BASF Perpetrators' and the Lawyer Perpetrators' fraudulent scheme, Plaintiffs and the Class Members would not have sustained the economic damages and losses described above and the grave and egregious deprivation of their claim and right to fair and honest judicial proceeding. .

287.    Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are familiar with the basic facts that form the bases of their and the Class Members' claims.  Plaintiffs' interests do not conflict with the interests of the other Class Members that Plaintiffs seek to represent.  Plaintiffs have retained counsel competent and experienced in Class action litigation and intend to prosecute this action vigorously. Plaintiffs' counsel has successfully prosecuted complex asbestos, fraud and misrepresentation cases and class actions.  Plaintiffs' counsel also uncovered the Fraudulent Asbestos Defense Scheme during their representation of the plaintiffs in the *Paduano* suit, which has since resolved.  Plaintiffs and Plaintiffs' counsel will fairly and adequately protect the interests of the Class Members.

288.    The Class is certifiable under Rule 23(b)(1) (A) in that prosecuting separate actions by individual class members against the Defendants could create a risk of inconsistent or varying adjudications with respect to individual class members that

would establish incompatible standards of conduct for the party opposing the class, the Defendants herein.

289.    The Class is certifiable under Rule 23(b)(2) in that all or some of the Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

290.    The Class is certifiable under Rule 23(b)(3) because:

a.    Individual litigation of the legal and factual issues raised by Defendants' wrongful conduct would increase delay and expense to all parties and to the court system, causing a denial of justice to many Class Members.  The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision and management of a complex situation created by Defendants' egregious alleged misconduct by a single court. Given the similar nature of the Class Members' claims, the uniform applicability of N.J.S.A. § 2C:41-1 *et seq.,*  New Jersey common-law and N.Y. Judiciary law §487 in this case is warranted and proper due to, *inter alia*, the following factors: New Jersey's overwhelming significant contacts and government interests to the matter; the location of BASF's and its predecessors' headquarters in New Jersey; the spoliation of evidence occurring in New Jersey;  and the commission of numerous deceitful acts and omissions taking place in New Jersey, where many of BASF's  its predecessor companies alleged fraudulent affirmations under oath were signed and notarized; and the relative absence of material differences in the laws

upon which the Class Members' claims are based. To the extent N.Y. Judiciary Law §487 applies to all or part of the putative class, it provides a complimentary and adjunct basis for providing relief to all or some of the class. A nationwide Class can therefore be easily managed by the Court and the parties; and,

      b.    The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the Class Members. The relief sought per individual members of the Class is small given the burden and expense of hundreds if not thousands of individual prosecution of the potentially extensive litigation necessitated by the Defendants' wrongful conduct.

## VII. CAUSES OF ACTION

### COUNT I
### VIOLATION OF N.J.S.A. § 2C:41-2c
#### (Against BASF Perpetrators and the Lawyer Perpetrators)

291.    Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

292.    Each of the Defendants comprising the BASF Perpetrators (BASF, Halket, Dornbusch and Hemstock) and the Lawyer Perpetrators (Cahill LLP, Cahill Partnership, Sloane, Martin and Dembrow) is a "person" within the meaning of N.J.S.A. § 2C:41-1b.

293.    The BCAD Enterprise is an association-in-fact within the meaning of N.J.S.A. § 2C:41-1, consisting of:

a.   The BASF Perpetrators,  as well as from time to time, other BASF employees and agents who may or may not have been aware or knowledgeable of the Fraudulent Asbestos Defense Scheme; and,

b.   The Lawyer Perpetrators, as well as from time to time, other Cahill Gordon partners, shareholders, members, associates and employees who may or may not have been aware or knowledgeable of the Fraudulent Asbestos Defense Scheme.

294.    The BASF Perpetrators and the Lawyer Perpetrators are "persons" as defined N.J.S.A. § 2C:41-1 who are distinct from the BCAD Enterprise.

295.    The BASF Perpetrators and Lawyer Perpetrators created and maintained the BCAD Enterprise to manage and conduct BASF's and the BASF Predecessor Companies' asbestos injury claim administration and defense.  It was, however, corrupted by the BASF Perpetrators and Lawyer Perpetrators through their operation of it through a continuous pattern of activities and conduct constituting predicate acts or violations under N.J.S.A. § 2C:41-1 *et seq.* which they devised and executed in order to end and/or ward off asbestos injury claims being filed or successfully maintained against BASF and the BASF Predecessor Companies.

296.    The BCAD Enterprise was an ongoing organization that functioned as a continuing unit or association for at least 25 years – 1983 or 1984 to 2009, if not longer.

297.    The BASF Perpetrators and Lawyer Perpetrators used the BCAD Enterprise for two purposes: to lawfully manage and defend asbestos injury lawsuits filed throughout the country, as well as other asbestos injury claims against BASF; and 2) to unlawfully conduct its operations through the suppression and spoliation of inculpatory

134

evidence and documents relating to asbestos in BASF's talc ore or talc products, and/or through false and/or fraudulent misrepresentations and material omissions relating to the existence of asbestos in BASF's talc ore or talc products which were conveyed or transmitted through means of telephone and telefax, the U.S. Mail, the internet and/or private or commercial interstate carriers such as Federal Express; all as set forth above. Any and all of these actions or material omissions were committed to obstruct justice or as a part of an endeavor to obstruct justice.

298.    Each of the Defendants comprising the BASF Perpetrators and the Lawyer Perpetrators, acting as set forth above, thereby conducted the affairs of the BCAD Enterprise through a pattern of activity or conduct proscribed under N.J.S.A. § 2C:41-1, *et seq.,* and thereby violated N.J.S.A. § 2C:41-2c.

299.    The BCAD Enterprise enabled and facilitated the BASF Perpetrators' and the Lawyer Perpetrators' successful and secret execution of the Fraudulent Asbestos Defense Scheme continuously for over twenty-five (25) years.

300.    The BCAD Enterprise had a chain of command structure and was organized into groupings of participants or actors with specific roles, functions and duties. Cahill Gordon, until sometime in 2009 or 2010, the exact time not being known presently, served as BASF's national asbestos defense counsel and in such capacity managed and oversaw the defense of all asbestos claims in the United States involving BASF and its predecessor companies. In this capacity Cahill Gordon shared responsibility with the BASF Perpetrators for devising defense strategy and tactics. Cahill Gordon was then responsible for uniformly executing that strategy throughout the

United States, which task and role included instructing local defense counsel who were directly interacting with asbestos injury claimants' counsel on the strategy and tactics to be employed on behalf of BASF or its predecessor. Cahill Gordon additionally was responsible for providing local counsel with materials to execute same. Cahill Gordon also authored or procured from third parties or BASF employees the false and misleading exculpatory documents and reports routinely provided to and used by local defense counsel when dealing with asbestos injury claimants in BASF's asbestos defense, such as the Ashton Affidavit, Pooley Report, and Carter Affidavits. Cahill Gordon also prepared and supplied to such local defense counsel the templates for requests for voluntary dismissals letters and for interrogatory answers which referred to these false and misleading exculpatory documents. The local defense firms reported to both Cahill Gordon and BASF's in-house counsel. BASF employees provided affidavits and testimony for the defense when needed, and the BASF Perpetrators controlled the information provided to such employees in connection with these activities.  The BASF perpetrators also controlled the BCAD Enterprise via its funding of its operations directly and/or indirectly through its insurance coverage it owned and paid for, as well as by BASF and Engelhard's ability to retain or discharge Cahill Gordon or any of the local law firm's representing it or them.

301.    Each of the participants in the BCAD Enterprise received substantial revenue or economic benefit from the BCAD Enterprise.  Each member of the BCAD Enterprise also benefited from the existence of the other parts or participants in the enterprise.  Cahill Gordon earned lucrative professional fees for numerous years for its activities associated with the BCAD Enterprise, including activities that constituted a

pattern of activities and conduct that are proscribed and constitute predicate acts or violations under N.J.S.A. § 2C:41-1, *et seq*. Cahill Gordon attorneys also benefited from being able to claim when marketing the firm or themselves that Engelhard, and later on, BASF, was a client for which it (or he/she) had successfully handled complex mass tort litigation.  BASF was able to eliminate, avoid or reduce its payments of compensation to asbestos injury claimants and reduce its overall defense transaction costs by the operations and activities of the BCAD Enterprise.  Individual BASF employees involved in the asbestos claims defense were able to maintain their employment and earn favorable employment reviews based on the handling or participation in BASF's asbestos injury claims management.  All participants in the management of the BCAD Enterprise also gained and were benefitted by the BCAD Enterprise's operations facilitating and maintaining both the continuity and the invisibility of the Fraudulent Asbestos Defense Scheme due to the grave economic and professional consequences that were possible if the scheme became exposed.

302.    The BCAD Enterprise engaged in and affected New Jersey and interstate trade and commerce.  It handled and managed the administration and defense of thousands of asbestos injury claims across the United States.  It utilized insurance coverage underwritten by national insurance carriers to fund, in part, its operations.  It regularly utilized interstate communication systems, including the U.S. Mail, interstate telephone/telefax, internet and private or commercial interstate carriers, such as Federal Express, to conduct its operations as set forth above.

303.    The BASF Perpetrators and Lawyer Perpetrators exerted control over the BCAD Enterprise during their tenure and association with it..

304.     The BASF Perpetrators and Lawyer Perpetrators have conducted and managed the BCAD Enterprise's affairs through a pattern of acts and activities that are indictable under 18 U.S.C. § 1503 (Obstruction of Justice), 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud), all of which are defined and proscribed unlawful acts, activities or conduct under N.J.S.A. § 2C:41-1a(2) and which serve as predicate acts in violation of  N.J.S.A. § 2C:41-2c ("**predicate acts**").

305.     The BASF Perpetrators and Lawyer Perpetrators acts of obstruction  of justice  include the spoliation of material evidence and documents as described above, their cover-up and concealment of the spoliation of material evidence and documents as described above, and/or their misrepresentation and material omissions of fact relating to: (a) BASF-Engelhard's claim of "no asbestos" being present in BASF's talc ore or talc products and/or (b) the non-existence of any evidence establishing the presence of asbestos in BASF's talc ore or talc products in verified discovery, in dismissal motions filed with courts, and in law suit related correspondence requesting voluntary dismissals, as described above.

306.     The BASF Perpetrators' and Lawyer Perpetrators' use of the mails, wires and/or private or commercial interstate carriers to perpetrate their Fraudulent Asbestos Defense Scheme through the BCAD Enterprise involved hundreds, if not thousands, of mail, wire or private or commercial interstate carrier communications, including those set forth above, which communications constitute predicate acts and unlawful activities under N.J.S.A. § 2C:41-1a(2), including, but not limited to those mailings, interstate carrier mailings and wire communications which directly or indirectly:

a.   Made and transmitted fraudulent misrepresentations and material omissions of information and fact to asbestos injury claimants and/or their counsel and/ or courts in which it was falsely and deceptively represented to asbestos injury claimants and/or their counsel (and when applicable, courts) that BASF's talc ore or talc products did not contain asbestos fibers, and/or that there was not any evidence that BASF's talc ore or talc products contained asbestos;

b.   Submitted false and misleading sworn statements in the form of affidavits and verified interrogatory answers  to asbestos injury claimants, their counsel and/or presiding courts that that BASF's talc ore or talc products did not contain asbestos fibers and/or that there was not any evidence that BASF's talc ore or talc products contained asbestos;

c.   Served and/or filed motions asserting false, deceitful and fraudulent representations and statements that BASF's talc ore or talc products did not contain asbestos fibers and/or that there was not any evidence that in BASF's talc ore or talc products contained asbestos;

d.   Transmitted and received back releases, settlement agreements and notices, stipulations or consent orders for dismissal or discontinuance fraudulently obtained from asbestos injury claimants and/or their counsel; and/or,

e.   Transmitted or received professional fees and cost reimbursements relating to the Fraudulent Asbestos Defense Scheme.

307.   In addition, in furtherance of BCAD Enterprise's fraudulent and unlawful conduct BASF personnel in New Jersey communicated by United States mail, private or

commercial interstate carriers, telephone, and facsimile with Cahill Gordon in New York, as well with various local BASF asbestos defense counsel and various asbestos injury claimants' counsel around the country.

308.    The BASF Perpetrators' and Lawyer Perpetrators' activities and conduct that related to the BCAD Enterprise amounted to a longstanding common course and pattern of conduct intended to deceive and harm Plaintiffs and Class Members that are proscribed predicate acts under N.J.S.A. § 2C:41-1.  Each such activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and Class Members.

309.    The BASF Perpetrators' unlawful activities and predicate acts violating N.J.S.A. § 2C:41-2(c) still remain a part of BASF's ongoing business affairs and constitute a continuing threat to the property of Class Members in view of BASF's spoliation of material evidence relating to Class Members' underlying asbestos claims and BASF's subsequent longstanding course of misrepresentations about the non existence of asbestos in BASF's talc ore or talc products.  BASF's pattern and practice of misrepresentations continues unabated. As described above, BASF continued to attempt to misrepresent the asbestos content of BASF's talc ore or talc products in the *Paduano* case even after the spoliation and the fraudulent misrepresentations was uncovered. Subsequently, on or about December 22, 2010, BASF's local counsel, in the New York Supreme Court *Chernick* case mentioned above sought and obtained from the defrauded *Chernick* claimants' counsel a replacement consent "No Opposition Summary Judgment Motion and Order" for filing in order to obtain a judicial dismissal with prejudice. It did so without making any disclosures, corrections or retractions regarding previous

misrepresentations and material omissions made years earlier to procure agreement to the

dismissal. That fraudulently obtained consent order was then submitted to the New York

Supreme Court by BASF's local counsel on or about January 18, 2011 and, in course,

was approved, executed and entered by said Court on or about February 3, 2011.

310.     Defendants' predicate acts of mailing by U.S. Mail or private/commercial

interstate carrier and/or by transmitting via wire instrumentalities the misleading material

representations and omissions of fact in furtherance of the Fraudulent Asbestos Defense

Scheme constitutes a pattern of unlawful conduct and predicate acts under N.J.S.A. §

2C:41-1d, which in turn violates N.J.S.A. § 2C:41-2c, based upon both the relationship

between the acts and the continuity over the period of time of the acts.  The relationship

was related because the predicate acts were connected to each other in furtherance of the

Fraudulent Asbestos Defense Scheme. Continuity was reflected by both the long and

repeated nature of the mailed, telefaxed and telephoned misrepresentations and material

omissions during and in furtherance of the Fraudulent Asbestos Defense Scheme and the

threat of similar acts occurring in the future.  The threat was related by the lengthy

continuing and ongoing nature of the predicate acts.

311.     Defendants' unlawful and predicate acts were related, because they: (a)

reflected the same purpose or goal (obstructing, impeding, impairing, disrupting and/or

otherwise defeating the rights of asbestos litigation claimants to full fair and just

compensation as well as their Constitutional right to a fair, honest and just judicial

proceeding in suits in which BASF and/or its predecessor companies was or were a party,

and/or deterring and warding off the filing of asbestos injury claims against BASF and/or

its predecessor companies); (b) obtained the same results (the warding off and

termination of asbestos suits with no or only nominal/token consideration, if any, paid to asbestos claimants); (c) involved the same participants (the BASF Perpetrators', Lawyer Perpetrators', asbestos claimants and their counsel); (d) targeted the same victims (Plaintiffs and the Class Members); and, (e) employed the same methods and means (*modus operandi*) of commission (the Fraudulent Asbestos Defense Scheme and other acts described in this Complaint). The predicate acts were interrelated and not isolated events since they were carried out for the same purposes in a continuous manner and in secret over a substantial period of time- at least twenty-five (25) years.

312.    Plaintiffs and Class Members have been injured in their business and property by reason of the violations of N.J.S.A. § 2C:41-2c in that they either: (a) suffered an involuntary dismissal of their lawsuit because they could not produce evidence contradicting BASF and its predecessor companies assertions and averments that its talc and talc ore did not contain any asbestos and there was no evidence that it did; (b) voluntarily dismissed or discontinued their cases without consideration; (c) voluntarily dismissed or discontinued their cases for a nominal or token consideration instead of full, fair and complete compensation they were entitled to under law; or, (d) refrained from filing a claim or suit against BASF and/or its predecessor companies. In each instance Plaintiffs and member of the Class would not have done so had the BASF Perpetrators and Lawyer Perpetrators not engaged in their patterns of unlawful activity.

313.    The BASF Perpetrators' and Lawyer Perpetrators' above-described unlawful activity directly and proximately caused Plaintiffs and Class Members' to sustain unique ascertainable personal property losses and damage in the nature of the wrongful taking or deprivation of their asbestos injury claim against BASF and as well

the taking and deprivation of Plaintiffs' and each class members' constitutional right to a fair, honest and just judicial proceeding.

314.    Plaintiffs and the class have been irreparably harmed by the defendants' wrongful taking, impairment and/or deprivation of their property rights at issue through conducting the affairs of the BCAD Enterprise in violation of N.J.S.A. § 2C:41-2c for which there is no adequate remedy at law given the extraordinary misconduct of the defendants and the circumstances they created thereby. Equitable relief is appropriate in the nature of, *inter alia*,  (a)  declaratory and injunctive relief  restoring Plaintiff and class members back to the *status quo ante*  the commission of the Fraudulent Asbestos Defense Scheme so they can each make an informed decision regarding any further pursuit of their legal remedies and, should Plaintiff or a class member then elect to proceed with a damages claim against BASF and any of the defendants, further enjoining Defendants from asserting any defenses that would bar or limit the claim such as *res judicata,* statute of limitations, repose limits, laches, judgment merger, release, settlement, collateral estoppels, accord and satisfaction and/or unclean hands; (b)  declaratory  and injunctive relief  curing, as needed and just, any evidentiary harm and proof impediments Defendants' egregious  misconduct is responsible for creating as more particularly set forth below; (2) a decree and injunction imposing a constructive trust upon Defendants' property pending their rendering accountings to the Court of the benefits they unjustly reaped as a result of their spoliation and fraudulent concealment; and (d) a decree ordering disgorgement of such benefits revealed in the accounting which, in all equity and conscious of the Court, Defendants should not retain under the circumstances, together with an equitable distribution of such disgorgement.

315.     By virtue of these violations of N.J.S.A. § 2C:41-2c and injury to Plaintiffs' property rights, the  BASF Perpetrators' and Lawyer Perpetrators are jointly and severally liable to Plaintiffs and Class members for such remedy and relief the Court deems just and available under N.J.S.A. § 2C:41-4, including costs of suit and investigation and this litigation.

## COUNT II
## VIOLATION OF N.J.S.A. § 2C:41-2D BY
## CONSPIRING TO VIOLATE N.J.S.A. § 2C:41-2C

### (Against BASF Perpetrators and the Lawyer Perpetrators)

316.     Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

317.     Section N.J.S.A. § 2C:41-2d provides that it "shall be unlawful for any person to conspire as defined by N.J.S. 2C:5-2 to violate any of the provisions of this section."  N.J.S.A. § 2C:41-2c is one such provision.

318.     The BASF Perpetrators and Lawyer Perpetrators have violated N.J.S.A. § 2C:41-2d by agreeing to and thereby conspiring to violate N.J.S.A. § 2C:41-2c.

319.     The object of the conspiracy has been, and remains to this date, to (a) conduct or participate in, directly or indirectly, the conduct of the affairs of the BCAD Enterprise through a pattern of unlawful activity as described above; and (b) take or perform all actions and measures as are necessary  to conceal  the fraudulent acts, misrepresentations and  suppressions of evidence that had been committed or were being committed in furtherance of the Fraudulent Asbestos Defense Scheme so that the scheme

remained unknown by the public, the judiciary, professional regulators and law enforcement officials.

320.    The co-conspirators, the BASF Perpetrators and Lawyer Perpetrators, have engaged in, or have aided and abetted the commission of, numerous overt and fraudulent predicate acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiffs and Class Members of their asbestos injury claims as described above.

321.    The nature of the above-described co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that the BASF Perpetrators and Lawyer Perpetrators not only agreed to the objective of an N.J.S.A. § 2C:41-2d violation by conspiring to violate N.J.S.A. § 2C:41-2c, but they were aware that their ongoing unlawful and fraudulent acts have been and are part of an overall pattern of activity that was and is unlawful.

322.    Plaintiffs and the class have been irreparably harmed by the defendant's wrongful taking, impairment and/or deprivation of their property rights at issue through the overt acts and the predicate acts in furtherance of violating N.J.S.A. § 2C:41-2d  by conspiring to violate N.J.S.A. § 2C:41-2c for which there is no adequate remedy at law given the extraordinary misconduct of the defendants and the circumstances they created thereby. Equitable relief is appropriate in the nature of, *inter alia*,  (a)  declaratory and injunctive relief  restoring Plaintiff and class members back to the *status quo ante*  the commission of the Fraudulent Asbestos Defense Scheme so they can each make an informed decision regarding any further pursuit of their legal remedies and, should

Plaintiff or a class member then elect to proceed with a damages claim against BASF and any of the defendants, further enjoining Defendants from asserting any defenses that would bar or limit the claim such as *res judicata,* statute of limitations, repose limits, laches, judgment merger, release, settlement, collateral estoppels, accord and satisfaction and/or unclean hands; (b)  declaratory  and injunctive relief  curing, as needed and just, any evidentiary harm and proof impediments Defendants' egregious  misconduct is responsible for creating as more particularly set forth below; (2) a decree and injunction imposing a constructive trust upon Defendants' property pending their rendering accountings to the Court of the benefits they unjustly reaped as a result of their spoliation and fraudulent concealment; and (d) a decree ordering disgorgement of such benefits revealed in the accounting which, in all equity and conscious of the Court, Defendants should not retain under the circumstances, together with an equitable distribution of such disgorgement.

## COUNT III
## FRAUDULENT CONCEALMENT - SPOLIATION
### (Against All Defendants)

323.    Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

324.    On or about March 7, 1984, and continuing thereafter as well, the BASF Perpetrators and Lawyer Perpetrators were cognizant and aware that BASF's Predecessor Companies had been sued by asbestos injury claimants contending Engelhard's Emtal talc mined at the Johnson Mine contained asbestos which caused asbestos personal injuries.

146

325.     On or about March 7, 1984, and continuing thereafter as well, the BASF Perpetrators and Lawyer Perpetrators were cognizant and aware that it was foreseeable and likely that BASF's predecessor companies in the future would be sued by other asbestos injury claimants, including claimants who were injured or residing in New Jersey, who would claim and contend that Engelhard's Emtal talc mined at the Johnson Mine and/or talc products made with same contained asbestos which injured them.

326.     On or about March 7, 1984, and continuing thereafter as well, given their knowledge about the volume and the wide use of Engelhard's talc in the United States in many industries, including the tire and rubber product industry, construction joint compound products, automotive body repair filler products, the latent and progressive nature of asbestos disease, and the state of asbestos litigation at that time, the BASF Perpetrators and Lawyer Perpetrators were aware and understood that it was foreseeable and likely that BASF's Predecessor Companies in the future would be sued by asbestos injury claimants, including claimants who were injured or residing in New Jersey, who would claim and contend that Engelhard's Emtal talc mined at the Johnson Mine and/or products made with same contained asbestos which injured them.

327.     In view of their knowledge that future asbestos injury claims against BASF and the BASF Predecessor Companies were foreseeable and likely, at all times material herein, including March 7, 1984, the BASF Perpetrators were under a duty to preserve evidence and documents that were relevant to such claims and litigation, including a duty to suspend any document retention policies that were in effect or were being put into operation as such related to documents and evidence relevant to asbestos injury claims involving Engelhard's Emtal talc or the Johnson Mine.

328.     At all times material herein, including March 7, 1984, in view of their knowledge that future asbestos injury claims against the BASF Predecessor Companies were foreseeable and likely, the Lawyer Perpetrators were under a duty to counsel and advise BASF and its predecessors to preserve evidence and documents that were relevant to such claims, including the suspension of any document retention policies that were in effect or being put into operation as to such documents and evidence.  The Lawyer Perpetrators were also under a duty to not aid and abet BASF and its predecessors' violation of its or their duty to preserve evidence.

329.     At all times material herein, Defendant BASF and the BASF Predecessor Companies also were under a legal duty of candor and truthfulness towards asbestos litigants suing it or them, as well as to courts presiding over the law suits concerning these claims.  This duty of candor or truthfulness precluded the filing or submission of affidavits and verifications in support of facts, requests or motions where Defendant BASF and the BASF Predecessor Companies knew the facts to be false or where Defendant BASF and the BASF Predecessor Companies had no reasonable and good faith basis to believe and assert the facts as being true.

330.     At all times material herein, the Lawyer Perpetrators, as counsel to BASF and the BASF Predecessor Companies in asbestos injury matters, had a duty to advise, counsel and instruct BASF and the BASF Predecessor Companies to provide candid, truthful and non-misleading factual affidavits, responses to discovery and other factual information in asbestos ligation matters in which they were a party and not submit or file affidavits and verifications in support of claims, defenses, requests or motions where Defendant BASF, the BASF Predecessor Companies, the BASF Perpetrators and/or  the

Lawyer Perpetrators knew that the facts being asserted or claimed  were not true or where Defendant BASF and the BASF Predecessor Companies had no reasonable and good faith basis to believe and assert the facts as being true.

331.    At all times material herein, the Lawyer Perpetrators, as counsel to BASF and the BASF Predecessor Companies in asbestos injury litigation matters, and as officers of the court, were under a duty to prepare and serve documents, and/or monitor and review the preparation and service of documents, that related to the asbestos injury litigation so that the documents fairly, truthfully and candidly disclosed and/or produced material non privileged information and evidence to Plaintiffs and members of the Class relating to their underlying asbestos claims in accordance with the Federal Rules of Civil Procedure and state procedural law counterparts. Under these principles and authorities, as well as N.Y. Judiciary Law §487 (prohibiting attorney misconduct towards  courts and parties in nature of deceit and collusion) and/or  applicable professional responsibility codes or rules, the Lawyer Perpetrators were bound to a duty of fairness and candor to counsel and to courts that required that they not mislead or defraud Plaintiffs' and members of the Class, or their counsel, or the courts in which the asbestos injury litigation cases were filed.

332.    As set forth above, and in violation of their duties regarding the preservation of evidence, beginning on or about March 7, 1984, the BASF Perpetrators and Lawyer Perpetrators, together with all or some of the Fictitious Defendants, began and continued to engage in a uniform and persistent pattern and practice of evidence spoliation by withholding, concealing and/or destroying material evidence relating to the Plaintiffs' and Class Members' underlying asbestos injury claims; all with the purpose

and design of obstructing, impeding, impairing, disrupting and/or otherwise defeating the rights of asbestos injury litigation claimants in suits in which BASF and/or its predecessor companies was or were a party, and/or to deter and ward off the filing of asbestos injury claims against BASF and/or its predecessor companies.

333.    As a result of the discovery in the *Westfall* case, beginning from at least 1983, and continuing forward, the BASF Perpetrators and Lawyer Perpetrators, together with all or some of the Fictitious Defendants, knew that BASF and its predecessor companies possessed material evidence relating to Plaintiffs' and Class Members' underlying asbestos injury claims in its or their possession, including evidence and corporate knowledge that BASF's and its predecessor companies' talc ore and talc products contained asbestos, including that developed in the *Westfall* case's discovery.

334.    At all times material herein, the BASF Perpetrators and Lawyer Perpetrators, together with all or some of the Fictitious Defendants, knew that BASF and the BASF Predecessor Companies' records and corporate knowledge, along with discovery and other litigation materials, including deposition transcripts and related documents, in prior asbestos injury suits or claims, such as the *Westfall* case, were a material and important source of information and evidence regarding BASF's and its predecessor companies' talc ore and talc products. The BASF Perpetrators and Lawyer Perpetrators also knew that said information and evidence as time progressed could not be obtained by Plaintiffs and Class Members from any other source.

335.    Sometime in and around 1983 or 1984, the exact date being presently unknown to Plaintiffs, the BASF Perpetrators and the Lawyer Perpetrators agreed and

conspired with each other, and/or with all or some of the Fictitious Defendants identified above, to commit the Fraudulent Asbestos Defense Scheme in which the material evidence relating to the Plaintiffs' and the Class Members' underlying asbestos injury claims would be gathered together and subsequently and systematically  withheld, concealed and/or destroyed as an integral part of the scheme.

336.    As set forth above, the BASF Perpetrators and the Lawyer Perpetrators, together with all or some of the Fictitious Defendants identified above, either  committed, aided and abetted the commission, and/or acted in concert with each other to commit the Fraudulent Asbestos Defense Scheme, in which the gathering and withholding, concealing and/or destroying material evidence relating to Plaintiffs' and Class Members' underlying asbestos injury claims was an integral part, as well as being overt acts in furtherance of the conspiracy.

337.    As a direct and proximate result of the above described deliberate gathering and withholding, concealment and/or destruction of documents and evidence relating to Plaintiffs' and Class Members' underlying asbestos injury claims, and/or the false and misleading statements thereafter that no such documents or evidence existed, Plaintiffs and others Class Members were harmed and injured in that they were materially hampered, impaired and prevented from proving their claims that BASF's and its predecessor companies' talc ore and talc products contained asbestos and proximately caused their underlying asbestos injury.

338.    As the direct, proximate and naturally occurring result of the above described deliberate gathering and withholding, destruction and/or concealment of

documents and evidence relating to Class Members' underlying asbestos claims, and/or the false and misleading statements thereafter that no such documents or evidence existed, Plaintiffs and members of the Class either: (a) suffered an involuntary dismissal of their lawsuit because they could not produce evidence contradicting BASF and its predecessor companies' assertions and averments that its talc and talc ore did not contain any asbestos and there was no evidence that it did; (b) voluntarily dismissed or discontinued their cases without consideration; (c) voluntarily dismissed or discontinued their cases for a nominal or token consideration instead of full, fair and complete compensation they were entitled to under law; or, (d) refrained from filing a claim or suit against BASF and/or its predecessor companies.

339.    As a the result of the voluntary or involuntary dismissal or discontinuance of asbestos claims against BASF and its predecessor companies, or the forbearance of filing an asbestos claim against BASF and its predecessor companies, Plaintiffs and members of the Class suffered the loss of their asbestos injury claim,  their right under law to pursue and receive full, fair and just compensation for their asbestos injury claim and their Constitutional right to a fair, honest and just judicial proceeding.

340.    As a further proximate result of the above described deliberate gathering and withholding, destruction and/or concealment of documents and evidence relating to Class Members' underlying asbestos claims, and/or the false and misleading statements thereafter that no such documents or evidence existed, Plaintiffs and other Class Members may or will incur, or have already incurred pecuniary losses and damages, including but not limited to the loss of their underlying asbestos injury claim, the expenses and costs of proceeding without this evidence, and/or the expenses and costs

incurred in the effort to replace, locate, or identify evidence, any and all of which Plaintiffs and the members of the Class would not otherwise have suffered or incurred.

341.    Plaintiffs and the class have been irreparably harmed by the defendant's spoliation and fraudulent concealment for which there is no adequate remedy at law given the extraordinary misconduct of the defendants and the circumstances they created thereby.  Equitable relief, is appropriate in the nature of, *inter alia*, (a) declaratory and injunctive relief restoring Plaintiff and class members back to the *status quo ante*  the commission of the Fraudulent Asbestos Defense Scheme so they can each make an informed decision regarding any further pursuit of their legal remedies and, should Plaintiff or a class member then elect to proceed with a damages claim against BASF and any of the defendants, further enjoining Defendants from asserting any defenses that would bar or limit the claim such as *res judicata,* statute of limitations, repose limits, laches, judgment merger, release, settlement, collateral estoppels, accord and satisfaction and/or unclean hands; (b) declaratory  and injunctive relief curing, as needed and just, any evidentiary harm and proof impediments Defendants' egregious  misconduct is responsible for creating as more particularly set forth below; (c) a decree and injunction imposing a constructive trust upon Defendants' property pending their rendering accountings to the Court of the benefits they unjustly reaped as a result of their spoliation and fraudulent concealment; and (d) a decree ordering disgorgement of such benefits revealed in the accounting which, in all equity and conscious of the Court, Defendants should not retain under the circumstances, together with an equitable distribution of such disgorgement.

342.    In addition to the forgoing equitable relief, and incident thereto, Plaintiffs and members of the class are entitled to an assessment of punitive damages against all Defendants under the Law of New Jersey wherein the spoliation of the documents and materials was committed, or such other law the Court  finds applicable, for  spoliating and fraudulently concealing evidence based upon their respective roles in committing, conspiring, aiding and abetting the spoliation of evidence material to Plaintiffs' and Class Members' underlying asbestos injury claims.

**COUNT IV**
**FRAUD AND DECEIT**
**(Against All Defendants)**

343.    Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

344.    As set forth above, beginning on or about March 7, 1984, the BASF Perpetrators and Lawyer Perpetrators, together with and all or some of the Fictitious Defendants, engaged in a continuous, uniform and persistent pattern and practice of falsely misrepresenting to Plaintiffs, members of the Class, their counsel, and presiding courts, that:

   a.   BASF and its predecessor companies' talc ore and talc products did not contain asbestos fibers;  and/or

   b.   That there was not any evidence BASF and its predecessor companies talc ore and talc products contained asbestos.

345.    Each such representation was false and misleading at the time it was made.

154

346.    Defendants, acting as aforesaid, knew each representation was false and misleading or made the representation in reckless disregard as to its truth or falsity.

347.    Each  representation was deliberately made with the purpose and design of obstructing, impeding, impairing, terminating and/or otherwise disrupting asbestos injury litigation in which BASF and/or its predecessor companies was or were a party, and/or deterring and warding off the filing of asbestos injury claims against BASF and/or its predecessor companies.

348.    In addition to the above misrepresentations, the BASF Perpetrators and Lawyer Perpetrators, together with all or some of the Fictitious Defendants, engaged in a continuous, uniform and persistent pattern and practice of directly or indirectly making material omissions of fact, or, alternatively, omitting and withholding facts that they were under a duty to divulge in order make any statements made, in the light of the circumstances under which they were made, not misleading, regarding: (a) the absence of asbestos in BASF's and its predecessor companies' talc ore and talc products; and/or, (b) the non-existence of evidence that BASF's and its predecessor companies' talc ore and talc products contained asbestos.

349.    Among other things Defendants uniformly failed to disclose to, and intentionally withheld from Plaintiffs and others similarly situated, or their legal counsel or courts, was the existence of the facts, deposition transcripts, documents and other evidence developed in the *Westfall* case discovery that established BASF's and its predecessor companies' talc ore and talc products contained asbestos, and/or that the

BASF Perpetrators' gathered and then  withheld, concealed and destroyed material evidence relating to Plaintiffs' and Class Members' underlying asbestos injury claims.

350.    Defendants, acting as aforesaid, knew each represented, omitted or withheld fact and/or their non disclosures, were false and misleading to those they were made or directed to, including Plaintiffs and members of the Class, their respective counsel, and where and when applicable, presiding courts.

351.    As set forth above the BASF Perpetrators and the Lawyer Perpetrators agreed or conspired with each other, and/or with all or some of the Fictitious Defendants identified above, to commit the Fraudulent Asbestos Defense Scheme, in which the fraudulent misrepresentations and material misrepresentations were an integral part as well as constituting an overt act in furtherance of this conspiracy.

352.    Each misrepresentation and omission of material fact was deliberate and committed with the intent, purpose and design of obstructing, impeding, impairing, terminating and/or otherwise disrupting asbestos injury litigation in which BASF and/or its predecessor companies was or were a party, and/or deterring and warding off the future filing of asbestos injury claims against BASF and/or its predecessor companies, as well as to cover up Defendants' wrong doing and conspiracy.

353.    Plaintiffs and members of the Class, as did their counsel, naturally, reasonably and detrimentally relied upon the above misrepresentations and omissions causing Plaintiffs and Class Members to either: (a)  suffer an  involuntary dismissal of their lawsuit because they could not produce evidence contradicting BASF and its predecessor companies' assertions and averments that its talc and talc ore did not contain

any asbestos and/or there was no evidence that it did; (b) suffer a voluntary dismissal or discontinuance of their cases without consideration; (c) suffer a voluntary dismissal or discontinuance of their cases for a nominal or token consideration instead of full, fair and complete compensation they were entitled to under law; or, (d) refrain from filing a claim or suit against BASF and/or its predecessor companies.

354.    Plaintiffs and the class have been irreparably harmed by the defendant's fraudulent misrepresentations and omissions for which there is no adequate remedy at law given the extraordinary misconduct of the defendants and the circumstances they created thereby. Equitable relief, is appropriate in the nature of, *inter alia*,  (a) declaratory and injunctive relief  restoring Plaintiff and class members back to the *status quo ante* the commission of the Fraudulent Asbestos Defense Scheme so they can each make an informed decision regarding any further pursuit of their legal remedies and, should Plaintiff or a class member then elect to proceed with a damages claim against BASF and any of the defendants, further enjoining Defendants from asserting any defenses that would bar or limit the claim such as *res judicata,* statute of limitations, repose limits, laches, judgment merger, release, settlement, collateral estoppels, accord and satisfaction and/or unclean hands; (b) declaratory  and injunctive relief  curing, as needed and just, any evidentiary harm and proof impediments Defendants' egregious  misconduct is responsible for creating as more particularly set forth below; (c) a decree and injunction imposing a constructive trust upon Defendants' property pending their rendering accountings to the Court of the benefits they unjustly reaped as a result of their spoliation and fraudulent concealment; and (d) a decree ordering disgorgement of such benefits revealed in the accounting which, in all equity and conscious of the Court, Defendants

should not retain under the circumstances, together with an equitable distribution of such

disgorgement.

**COUNT V**
**FRAUD UPON THE COURT**
**(Against All Defendants)**

355.     Plaintiffs incorporate and re-allege the preceding paragraphs as if fully

repeated herein.

356.     Defendants' commission of the Fraudulent Asbestos Defense Scheme on

behalf of BASF over two decades of time set forth above not only inflicted harm and

grave injustice upon Plaintiffs and members of the Class, but also was a gross and

egregious fraud and assault upon every presiding asbestos court and administrative

adjudicative body in which an asbestos injury claim involving BASF or its predecessors

was pending, including the asbestos multi-district litigation court, the numerous state

courts systems with specialized asbestos adjudication programs, and workers

compensation board and commissions.

357.     BASF by and through officers of the court, its in-house attorneys

(including Defendants Dornbush and Halket) and  its outside attorneys (including

national counsel, Cahill Gordon), as set forth above, spoliated evidence and then

flagrantly and repeatedly had BASF, acting through its corporate representatives and

litigation attorneys, falsely represent in both sworn and sworn unsworn documents and

statements to litigants and, directly and indirectly through parties, to the presiding courts

that BASF's talc ore and talc products did not contain asbestos and there was no evidence

that its talc ore or products contained asbestos when in fact, as they knew — since they

158

had gathered and stored and/or destroyed it — there was evidence that it contained

asbestos. Further, BASF's attorneys then procured expert testimony that was improperly

and fraudulently biased in BASF's favor by withholding positive finding asbestos test

results, and then compounded the false and misleading expert opinion by depriving

claimants of the data and information needed to challenge and impeach the self-serving

expert opinion. BASF's and its attorney's conduct in these regards was not an accident,

was not a mistake, and was not an inadvertent failure on their part to locate or list a

document. From their involvement in the *Westfall* case BASF's in-house and national

counsel were fully cognizant and aware that there was inculpating evidence showing

BASF's talc ore and products contained asbestos. Nevertheless, BASF's attorney's

consciously and deliberately spoliated that evidence and then had BASF lie outright in

pending asbestos case after case that BASF's talc ore and product did not contain

asbestos and there was not any evidence it did.

358.    BASF's counsel's deliberate and systematic misconduct set forth above

strikes at the very heart of the judicial administration process — the foundational

principles of candor and good faith compliance with the rules of court. These core

principles of the justice system require parties and their counsel to honestly and truthfully

comply with discovery obligations and not outright lie to its adversary about key material

facts at issue, destroy or secret away material evidence, or procure and submit biased and

false expert opinions made possible by the spoliation of evidence; all of which happened

here.

359.    Under these circumstances the Court in all equity and good conscious,

should exercise its inherent power to relieve parties of the injustice of fraud upon the

court and not let BASF's continue to enjoy the benefits it obtained and received thorough its attorney's fraud upon the court on its behalf.

360.    Plaintiffs and the class have been irreparably harmed by the defendants' fraud upon the court for which there is no adequate remedy at law given the extraordinary misconduct of the defendants and the circumstances they created thereby. Equitable relief is appropriate in the nature of, *inter alia*, (a) declaratory and injunctive relief  restoring Plaintiff and class members back to the *status quo ante*  the commission of the Fraudulent Asbestos Defense Scheme so they can each make an informed decision regarding any further pursuit of their legal remedies, and, should Plaintiff or a class member then elect to proceed with a damages claim against BASF and any of the defendants, further enjoining Defendants from asserting any defenses that would bar or limit the claim such as *res judicata,* statute of limitations, repose limits, laches, judgment merger, release, settlement, collateral estoppels, accord and satisfaction and/or unclean hands; and (b) declaratory  and injunctive relief  curing, as needed and just, any evidentiary harm and proof impediments Defendants' egregious  misconduct is responsible for creating as more particularly set forth below.

## COUNT VI
## VIOLATION OF N.Y JUDICIARY LAW §487

**(Against Lawyer Perpetrators and John Doe Lawyers 1 to 500)**

361.    Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

362.    As New York attorneys, Cahill Gordon and its New York admitted lawyers assigned responsibility for handling and managing BASF's asbestos defense, such as Defendant Sloane, together with Fictitious Defendants identified as John Doe Lawyers 1 to 500,  were at all times material herein subject to the provisions of N.Y JUDICIARY LAW §487.

363.    N.Y JUDICIARY LAW §487 (Misconduct by attorney) provides:

An attorney or counselor who:

  1.  Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party; or,

  2. Willfully delays his client's suit with a view to his own gain;  or, wilfully  receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for,

Is guilty of a misdemeanor, and in addition to the punishment prescribed therefor  by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

364.    Based upon Cahill Gordon, Sloane and other Cahill Gordon attorneys participation and roles in the Fraudulent Asbestos Defense Scheme set forth above, including but not limited to events concerning Plaintiff Chernick's asbestos suit before the New York Supreme Court,  Defendant Cahill Gordon and its lawyers assigned responsibility for handling and managing BASF's asbestos defense, such as Defendant Sloane, together with all or some of the Fictitious Defendants identified as John Doe Lawyers 1 to 500,  violated the provisions of N.Y JUDICIARY LAW §487.

365.    Civil relief, and the imposition of treble damages is available for violations of N.Y. Judiciary Law §487 where, as here based on the forgoing facts, the

defendants have engaged in a chronic, extreme pattern of legal delinquency, and though a violation of the provisions of the law is a misdemeanor, a criminal conviction is not a condition precedent to the imposition of said civil relief.

366.     As the direct, proximate and naturally occurring result of defendant Sloane's and other Cahill Gordon attorneys' participation  in the deliberate gathering and withholding, destruction and/or concealment of documents and evidence relating to Class Members' underlying asbestos claims, and/or the false and misleading statements thereafter that no such documents or evidence existed, which acts and omissions were committed with intent to deceive the parties and the courts involved in asbestos litigation brought against BASF, Plaintiffs and members of the Class who are within the protected class under N.Y JUDICIARY LAW §487either: (a) suffered an involuntary dismissal of their lawsuit because they could not produce evidence contradicting BASF and its predecessor companies' assertions and averments that its talc and talc ore did not contain any asbestos and there was no evidence that it did; (b) voluntarily dismissed or discontinued their cases without consideration; or (c) voluntarily dismissed or discontinued their cases for a nominal or token consideration instead of full, fair and complete compensation they were entitled to under law.

367.     As a the result of the voluntary or involuntary dismissal or discontinuance of asbestos claims against BASF and its predecessor companies, Plaintiffs and members of the Class suffered the loss of their asbestos injury claim, their right under law to pursue and receive full, fair and just compensation for their asbestos injury claim and their Constitutional right to a fair, honest and just judicial proceeding, thereby damaging and injuring them.

368.    Plaintiffs and the class have been irreparably harmed by defendant Sloane's and other Cahill Gordon attorneys' participation in the Fraudulent Asbestos Defense Scheme in violation of N.Y JUDICIARY LAW §487, for which there is no adequate remedy at law given the extraordinary misconduct of the defendants and the circumstances they created thereby. Equitable relief is appropriate in the nature of, inter *alia*, (a) declaratory and injunctive relief  restoring Plaintiff and class members back to the *status quo ante*  the commission of the Fraudulent Asbestos Defense Scheme so they can each make an informed decision regarding any further pursuit of their legal remedies, and, should Plaintiff or a class member then elect to proceed with a damages claim against BASF and any of the defendants, further enjoining Defendants from asserting any defenses that would bar or limit the claim such as *res judicata,* statute of limitations, repose limits, laches, judgment merger, release, settlement, collateral estoppels, accord and satisfaction and/or unclean hands; (b) declaratory and injunctive relief curing, as needed and just, any evidentiary harm and proof impediments Defendants' egregious misconduct is responsible for creating as more particularly set forth below; (c) a decree and injunction imposing a constructive trust upon the Lawyer Perpetrators' property pending their rendering accountings to the Court of the benefits they unjustly reaped as a result of their spoliation and fraudulent concealment; and (d) a decree ordering disgorgement of such benefits revealed in the accounting which, in all equity and conscious of the Court, the Lawyer Perpetrators should not retain under the circumstances, together with an equitable distribution of such disgorgement.

## COUNT VII
## UNJUST ENRICHMENT

### (Against Lawyer Perpetrators and John Doe Lawyers 1 to 500)

369.    Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

370.    The Lawyer Perpetrators and the Fictitious Defendants identified as John Doe Lawyers 1 to 500 obtained fees and compensation based upon their committing, or their aiding and abetting others committing, the spoliation of evidence and/or other deceitful, fraudulent, unlawful, wrongful and unethical professional actions as set forth above. By so doing they were unjustly enriched.

371.    The Lawyer Perpetrators and Fictitious Defendants identified as John Doe Lawyers 1 to 500 in all fairness and equity should not be permitted to unjustly retain the proceeds from such misconduct at the expense of Plaintiffs and members of the Class, whose compensation rights and claims were wrongfully taken and deprived by these Defendants' wrongful and deceitful conduct, or by the conduct of others they supervised, directed and controlled.

372.    The Lawyer Perpetrators and Fictitious Defendants identified as John Doe Lawyers 1 to 500 should be ordered to account for and disgorge all fees, bonuses and other compensation received, together with any interest earned thereon, in connection with the Fraudulent Asbestos Defense Scheme, with such funds being paid into Court for fair and just allocation among Plaintiffs and members of the Class as their interests lie.

## COUNT VIII
## UNJUST ENRICHMENT

### (Against BASF Only)

373.    Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

374.    BASF earned or increased its revenues and profits through its employees and managers committing, or aiding and abetting others committing, the spoliation of evidence and/or other deceitful, fraudulent, unlawful, wrongful and unethical professional actions as set forth above.  By so doing they were unjustly enriched at the expense and to the detriment of Plaintiffs and members of the Class who were denied their right to fair, full and just compensation for their asbestos claims.

375.    BASF in all fairness and equity should not be permitted to unjustly retain the revenues and profits from such misconduct at the expense of Plaintiffs and members of the Class, whose compensation rights and claims were wrongfully taken and deprived by BASF's wrongful and deceitful conduct, or by the conduct of others they supervised, directed and controlled.

376.    BASF should be ordered to account for and disgorge all revenues and profits, together with any interest earned thereon, earned in connection with or as a result of the Fraudulent Asbestos Defense Scheme, with such funds being paid into Court for fair and just allocation among Plaintiffs and members of the Class as their interests lie.

**COUNT IX**
**Civil conspiracy**

**(Against All Defendants)**

377.     Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein

378.     Sometime between 1983 and March of 1984, the exact date being unknown to Plaintiffs, the BASF Perpetrators and   Lawyer Perpetrators, as well as all or some of the fictitious John Doe Defendants, entered into a conspiracy by agreeing with each other each to wrongfully and tortiously implement and carry out what is the Fraudulent Asbestos  Defense Scheme described above.

379.     The BASF Perpetrators and Lawyer Perpetrators, as well as all or some of the fictitious John Doe Defendants agreeing to participate, understood the general objectives of the Fraudulent Asbestos Defense Scheme, as described above, accepted them, and agreed to do their part to further them as well as to conceal the Fraudulent Asbestos Defense Scheme and each member's of the conspiracy part and role in same.

380.     The co-conspirators, the BASF Perpetrators, Lawyer Perpetrators, together with all or some of the fictitious John Doe Defendants, have engaged in, or have aided and abetted the commission of, numerous overt and fraudulent predicate acts in furtherance of the conspiracy, including  the spoliation of the documents, the violation of N.Y. Judiciary Act §487, and making material misrepresentations and omissions designed to defraud Plaintiffs and Class Members of their asbestos injury claims as described above.

381.    The nature of the above-described co-conspirators' acts, material misrepresentations, and material omissions in furtherance of the conspiracy gives rise to an inference that the BASF Perpetrators, Lawyer Perpetrators and John Does Defendants involved and part of the conspiracy not only agreed to the objective of the Fraudulent Asbestos Defense Scheme, but were aware that their ongoing unlawful and fraudulent acts have been and are part of an overall pattern of activity that was and is unlawful.

382.    As a direct and proximate result of the BASF Perpetrators' and Lawyer Perpetrators' overt acts and predicate acts in furtherance of the conspiracy, Plaintiffs and members of the Class suffered the loss of their asbestos injury claims, their right under law to pursue and receive full, fair and just compensation for their asbestos injury claims and their Constitutional right to a fair, honest and just judicial proceeding, thereby significantly damaging and injuring them.

383.    Plaintiffs and the class have been irreparably harmed by the defendant's conspiracy to implement and conduct the Fraudulent Asbestos Defense Scheme for which there is no adequate remedy at law given the extraordinary misconduct of the defendants and the circumstances they created thereby. Equitable relief, is appropriate in the nature of, *inter alia*, (a) declaratory and injunctive relief  restoring Plaintiff and class members back to the *status quo ante*  the commission of the Fraudulent Asbestos Defense Scheme so they can each make an informed decision regarding any further pursuit of their legal remedies and, should Plaintiff or a class member then elect to proceed with a damages claim against BASF and any of the defendants, further enjoining Defendants from asserting any defenses that would bar or limit the claim such as *res judicata,* statute of limitations, repose limits, laches, judgment merger, release, settlement, collateral

estoppels, accord and satisfaction and/or unclean hands; (b) declaratory and injunctive relief curing, as needed and just, any evidentiary harm and proof impediments Defendants' egregious misconduct is responsible for creating as more particularly set forth below; (c) a decree and injunction imposing a constructive trust upon Defendants' property pending their rendering accountings to the Court of the benefits they unjustly reaped as a result of their spoliation and fraudulent concealment; and (d) a decree ordering disgorgement of such benefits revealed in the accounting which, in all equity and conscious of the Court, Defendants should not retain under the circumstances, together with an equitable distribution of such disgorgement

## VIII.   DEMAND FOR RELIEF

**WHEREFORE**, Plaintiffs in their own right, and on behalf of others similarly situated, demand judgment against Defendants jointly, severally and in the alternative for the following relief:

    a.   Certification of the matter as a class action under Rule 23 as requested;

    b.   Declaratory and equitable relief restoring members of the Asbestos Claimant Class back, as near as possible, to the position they were in prior to the commission of Defendants' obstruction of justice and fraud, including but not limited to, should the Court find it equitable and just, a declaration or injunction: (i) prohibiting the BASF and Cahill Gordon defendants from asserting or claiming against Plaintiffs and members of the Class the benefit of *res judica* or any other claim preclusion doctrine or right based upon prior litigation or a claim adjudication concerning BASF's talc or talc products; (ii) barring the BASF and Cahill Gordon

defendants from asserting any time passage related defense such as statutes of limitations, laches, repose or death action claim time commencement requirements; and/or (iii) upon a Plaintiff's or any class member's election to file or re-file suit against BASF for his or her asbestos injury related claims, and, where applicable,  the repayment to BASF of any money paid by BASF in consideration of a prior settlement, barring Defendants from asserting any defense based upon the existence of a release of claims, covenants not to sue or settlement agreement or similar defense;

    c.   Declaratory and equitable relief addressing and alleviating any impairment of Plaintiffs' and Class Members' ability to gather and present evidence establishing their underlying asbestos injury claims that Defendants' spoliation and ensuing misrepresentations and material omissions proximately caused, including, but not limited to any detrimental loss or impact on Plaintiffs' and Asbestos Claimant Class Members' ability to: (i) establish the dangerous, defective nature of Engelhard's talc ore or products; (ii) establish harmful exposure to Engelhard's talc ore or products; (iii) establish Engelhard's failure to warn; and/or, (iv) establish the heeding of any proper warning or precautions that should have been given in connection with Engelhard's talc ore or products;

    d.   A determination and declaration of the need for and ordering execution of a notice program paid for by Defendants informing Class Members or their representatives of the pendency of this action, the BASF and Cahill's alleged misconduct and the import and possible impact of same on their present or former asbestos injury claims, and their rights to proceed against Defendants;

e.   A injunction requiring BASF and Cahill Gordon to jointly and severally fund the maintenance of  an independent, perpetual trust established by the court for the purpose of locating, collecting, housing, archiving and making available BASF's asbestos documents and materials to Plaintiffs, class members and other persons or authorities designated  by the Court, and  further ordering and decreeing that BASF and Cahill Gordon shall assist and cooperate fully with the court's appointed trustees in the accomplishment of these remedial objectives, including providing, as needed information, waivers of privilege and waivers of confidentially rights;.

f.   A permanent injunction enjoining the Defendants from further misrepresenting and suppressing evidence relating to BASF's asbestos liability and Engelhard's talc ore or products;

g.   A declaration, injunction or decree imposing a constructive trust upon BASF's and Cahill Gordon's property and requiring BASF and Cahill Gordon to each render an accounting to the Court of all fees, revenues, costs, insurance proceeds, and expense savings relating to Plaintiff s and absent class member's asbestos injury claims.

h.   A determination and declaration of BASF's and Cahill Gordon's liability for disgorgement or restitution of revenues, profits and money unjustly earned from the commission of the frauds upon the courts, upon Plaintiffs' and members of the class and/or  by the commission of proscribed activities described above;

i.   A determination of Defendants' liability for punitive damages to Plaintiffs and the Class relating to the spoliation of evidence relevant and material to establishing asbestos injury claims against BASF;

j.    A determination and declaration that BASF's and Cahill Gordon's communications relating to the their fraudulent conduct and/or the spoliation of evidence are not privileged attorney-client communication under the crime fraud exception and an injunction barring and prohibiting either from asserting same are privileged in any proceeding involving and class members asbestos injury claims;

k.    Entry of an order or orders by the Court determining and declaring Defendants' liability for an accounting and thereafter disgorgement of any and all revenues, profits or money received that derived from or are traceable to, as is applicable, Defendants' violations of N.J.S.A. § 2C:41-1 *et seq.* or NY. Judiciary Law §487, together with a determination by the Court of Plaintiffs' and Class Members interests in the fund so created;

l.    Such other relief as may be available and just.

## JURY DEMAND

Plaintiffs hereby demand trial by Jury on all issues so triable.

Dated: August 4, 2011                    Respectfully Submitted,

                                         **COHEN, PLACITELLA & ROTH, P.C.**

                                         _____/s/ Christopher M. Placitella_____
                                         Christopher M. Placitella, Esq.
                                         Michael Coren. Esq.
                                         Michael Noonan, Esq.
                                         Matthew T. Stone, Esq.
                                         cplacitella@cprlaw.com
                                         mcoren@cprlaw.com
                                         mnoonan@cprlaw.com
                                         mstone@cprlaw.com
                                         127 Maple Ave
                                         Red Bank, New Jersey 07701
                                         (732) 747-9003

                                         Attorneys for Plaintiffs and the Proposed Class

*Of Counsel*:
Stewart L. Cohen, Esq.[*]
Harry M. Roth, Esq.[*]
**COHEN, PLACITELLA & ROTH, P.C.**
Two Commerce Square
2001 Market Street, Suite 2900
Philadelphia, PA 19103
(215) 567-3500

(* *Pro hac vice* admission)

## CERTIFICATION OF SERVICE

I, Matthew T. Stone, Esquire, of full age, hereby certify that on 4th day of August, 2011, a true and correct copy of the foregoing Amended Complaint was filed with the Court's CM/ECF system and will be served on all counsel of record through the ECF system.

                                         ____/s/ Matthew T. Stone_____