# Exhibit 1

RM

*Engelhard -*
*Talc*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

------------------------------------------x

DAVID HOWARD WESTFALL, IN HIS
CAPACITY AS ADMINISTRATOR OF
THE ESTATE OF THOMAS HOWARD          :
WESTFALL AND IN HIS CAPACITY
AS ADMINISTRATOR OF THE ESTATE
OF BETTY E. WESTFALL,                :          C.A. No.
                                                79-0269
              vs.                    :

WHITTACKER, CLARK & DANIELS,         :
METROPOLITAN TALC COMPANY,
INC., PFIZER, INC., WINDSOR
MINERALS INC., itself and as
successor to EASTERN MAGNESIUM
TALC COMPANY INC., and OMYA,         :
INC., itself and as successor to
VERMONT TALC COMPANY, INC.
------------------------------------------x

Deposition of GLENN A. HEMSTOCK,

taken by plaintiff, pursuant to subpoena

and stipulation, at the offices of Cahill

Gordon & Reindel, Esqs., 80 Pine Street,

New York, New York, on Friday, January 28,

1983 at 10:20 A.M., before Joseph R. Danyo,

a Notary Public within and for the State of

New York.



WALTER SHAPIRO, C.S.R.
CHARLES SHAPIRO, C.S.R.

DOYLE REPORTING, INC.
CERTIFIED STENOTYPE REPORTERS
369 LEXINGTON AVENUE
NEW YORK, N.Y.  10017
TELEPHONE 212 — 867-8220

BASF02698

1                                                                    2

2       A p p e a r a n c e s:

3           DECOF & GRIMM, ESQS.
                Attorneys for Plaintiff
4               One Smith Hill
                Providence, Rhode Island   02903

5

6           BY:    DANIEL PRENTISS, ESQ.,
                                              Of Counsel

7

8           ADLER POLLOCK & SHEEHAN, INCORPORATED
                Attorneys for Engelhard Corporation
9               and Glenn A. Hemstock
                2300 Hospital Trust Tower
10              Providence, Rhode Island   02903

11          BY:    PETER LAWSON KENNEDY, ESQ.

12                          -and-

13          CAHILL GORDON & REINDEL, P.C.
                80 Pine Street
14              New York, New York   10005

15          BY:    HOWARD G. SLOANE, ESQ.
                             -and-
16              KATHY SILBERTHAU, ESQ.,
                                              Of Counsel

17

18

19          HANSON CURRAN & PARKS, ESQS.
                Attorneys for Defendant Metropolitan
20              Talc Co., Inc.
                1210 Turks Head Building
21              Providence, Rhode Island   02903

22          BY:    WILLIAM A. CURRAN, ESQ.,
                                              Of Counsel

23

24                                              •

25

3

A p p e a r a n c e s:
    (continued)

        NUTTER McCLENNEN & FISH, ESQS.
            Attorneys for Defendant Windsor
            Minerals Inc.
            Federal Reserve Plaza
            600 Atlantic Avenue
            Boston, Massachusetts  02210

        BY:    EDWARD P. LEIBENSPERGER, ESQ.,

                                              Of Counsel


        RICE DOLAN KIERNAN & KERSHAW, ESQS.
            Attorneys for Defendant Omya, Inc.
            Suite 3A
            101 Dyer Street
            Providence, Rhode Island  02903

        BY:    JOHN F. DOLAN, ESQ.,

                                              Of Counsel



Also Present:

        THOMAS D. HALKET, ESQ.
        Minerals & Chemicals Division
        Engelhard Corporation


        JOHN N. BEIDLER, ESQ.
        General Counsel
        Johnson & Johnson

                            ***

4

IT IS HEREBY STIPULATED AND AGREED that the transcript may be signed before any Notary Public with the same force and effect as if signed before the Court.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, are reserved to the time of the trial.

* * *

BASF02701

5

MR. KENNEDY: My name is Peter Kennedy, and I am representing Eastern Magnesium Talc Company.

A stipulation had been signed by the attorneys for the third-party plaintiff, Windsor Minerals Inc., and just in case everybody here is unaware, that stipulation has been entered by the Magistrate as of last Tuesday, and that stipulation dismisses the third-party claim against Eastern Magnesium Talc Company and Minerals and Chemicals Philip Corporation.

Just earlier this week, I had a conversation with Mr. Prentiss concerning the confidentiality of the documents that are going to be produced pursuant to the subpoena duces tecum, and in that regard, we have prepared a stipulation that I would ask all counsel to read and to sign before we produce those documents.

So, Mr. Prentiss, since you are the plaintiff's attorney, it is probably most logical for you to take a look, and if you agree, would you sign and I will pass copies around the room to other counsel for them to review.

While you are reading that, I would like to make one other statement. I understand Mr.

6

Prentiss has called the attorneys who are repre-

senting Whittaker, Clark & Daniels, and am I

correct they have advised you that they will not

be present today?

MR. PRENTISS:  In a telephone conversation

five minutes ago, Mr. Sarli of the firm Hinckley

& Allen, advised me that neither he nor other

counsel for Whittaker, Clark & Daniels would

attend this morning's deposition.

He requested that his firm be supplied

with a copy of the transcript of this deposition,

and it was understood that the deposition would

proceed in his absence.

MR. KENNEDY:  I would like to state, so that

everybody thinks we're being fair with Whittaker, Clark

& Daniels, before they get a copy, I require

them to also sign the stipulation.

(A discussion was held off the record.)

MR. PRENTISS:  My first difficulty with the

proposed agreement which I am seeing for the first

time this morning, this proposed confidentiality

agreement that is proposed by Englehard and/or

Eastern Magnesium Talc Company is at page four.

The paragraph 4A proposes to restrict any

7

party to this litigation from disclosing the materials to be obtained in this deposition from any person presently or formerly employed by or associated with Engelhard or with any of the parties in this action.  That is in quotes.

The plaintiff has retained the services of a Mr. Peter Gale, who is employed as a consultant with a firm in Oklahoma City, Oklahoma, to perform analytical services and assist in preparation for trial, and presumably to testify at trial.  Mr. Gale at one time was an employee of Engelhard.

Mr. Gale, in the course of his employment with Engelhard and/or a subsidiary of Engelhard signed an agreement that he would not reveal or divulge information, confidential information he obtained as an employee of Engelhard, and Mr. Gale informed me of that agreement in our very first telephone conversation in connection with this case.

He has not divulged any such information to me, and has stated that he will not, and that he will abide by that restriction.

Be that as it may, this proposed con-

8

fidentiality agreement would restrict my providing
any of this information from this deposition to
Mr. Gale for his use in preparation of this
case for trial, and I can't agree to that.

MR. KENNEDY: It is precisely that problem
that gives rise to the stipulation. We became
aware of Mr. Gale's participation in the plaintiff's
case, after we were brought into the case, and I
forget the date of the letter that I wrote to you,
but I stated in that letter that he had signed
the secrecy agreement and I enclosed a copy of it.

It seems inconceivable to me that an expert
witness, hired by the plaintiff, who had intimate
knowledge of what Engelhard considers confidential
information could prepare plaintiff's case or help
prepare the plaintiff's case and forget what he
might have learned as an employee of Engelhard,
so that is precisely why that language is in this
deposition, and we have to insist that it remain
in that.

MR. PRENTISS: Then we're not going any
further. Mr. Gale is hired as an expert for his
credentials and capabilities as a scientist.

His capability includes the ability to use

9

analytical tools, analytical machines to perform
analyses and to form opinions and conclusions
as to chemical constituents, chemical contaminates
in our bodies or materials that he chooses to
analyze.

That ability only has an indirect relation-
ship to his former employment by Engelhard, and
that indirect relationship is only in the sense
that during that employment, he may have furthered
his innate experience and abilities as a scientist.

He has stated to me, and as a condition of
his employment by me, that he would not divulge
to me or utilize in the course of his work in this
case any confidential information that he obtained
while at Engelhard.  In other words, that he
would not use data, information of any sort that
he obtained while at Engelhard.  He would use only
his inherent skills and capabilities and powers as
a scientist to perform analytical tests, to conduct
research in available literature, openly, publicly
available literature, and to prepare expert testi-
mony in this case.

He would not rely on objective information
obtained during the course of his employment at

BASF0270(

10

Engelhard, and in my opinion, expressed to him and I express it on the record here, having seen the confidentiality agreement that he signed as an employee of Engelhard, that is in no way a violation of his employment contract with Engelhard.

What you are proposing this morning for the first time is that the materials to be developed by this deposition will not be available to be used by the plaintiff, at least insofar as one of the experts he has retained in this case.

When you first, by telephone, raised to me the possibility or your request that we sign a confidentiality agreement regarding materials to be produced today, I gave my clear and ready assent to signing of any standard confidentiality agreement, because I have no desire to breach the confidence of Engelhard.  I have no desire to divulge the contents of any materials that we should develop from Engelhard other than strictly in connection with this litigation.  I am perfectly willing to sign a standard confidentiality agreement to that effect.

You did not say in our telephone conversation that you intended to propose more than

11

a standard confidentiality agreement and to restrict my use of these materials and to restrict one of my experts that I have retained and whom you were well aware of at the time of our telephone conversation from use of the materials. I cannot agree to obtaining materials under that crippling circumstance.

If you had made that known at the time, you had the opportunity to go to the Magistrate and seek an appropriate order, and we could have argued this before the Magistrate.

Now, we are all here in New York for the taking of this deposition and you are imposing a condition I cannot accept.

MR. KENNEDY: Of course, you have put yourself into that position by retaining an expert who had signed a confidentiality agreement with Engelhard. Some of the documents that would be produced, were we to produce them at this deposition, might be those documents that Mr. Gale had already seen and had already agreed to hold confidential.

The second point I would like to make is in my opinion, this is a standard confidentiality

12

agreement.  I suppose neither you nor I will be

able to decide that without somebody's help.

I would like to declare a recess for a moment.

(A recess was taken at this time, and upon

returning, the following then ensued:)

MR. KENNEDY:  Mr. Prentiss, simply stated,

if you do not sign this stipulation, we'll not pro-

duce the documents.

MR. PRENTISS:  We have one alternative,

which we discussed in your absence, and that is

calling the Magistrate to see if we can get a ruling

in this matter now.

By stipulation, Mr. Hemstock is here pur-

suant to a valid and effective subpoena duces

tecum, and the documents are here, and I want them,

and it seems to me it is up to you to move for a

protective order.

MR. KENNEDY:  We're not going to produce

them and calling the Magistrate on the telephone

is not satisfactory.

As a matter of fact, what we'll probably do

is try to schedule a deposition of Mr. Gale just

to find out what he has divulged and what his

charge has been by you or by the plaintiff in the

13

preparation of this case.  We don't have the in-
formation at this particular time to know for
certain what he has already divulged.  It will be--
it is unsatisfactory to have a telephone conference
with the Magistrate.

MR. PRENTISS:  You are saying you dispute
my representation as to what Mr. Gale divulged
to me?

MR. KENNEDY:  I don't have sufficient facts
to be able to agree to it or dispute it.  I don't
know.  I don't agree to things until I have
sufficient facts to form an opinion.

MR. PRENTISS:  You are going to --

MR. CURRAN:  You are asking us to though,
right now.

MR. KENNEDY:  Yes.

MR. PRENTISS:  You are going to have to get
an order to get the deposition of Mr. Gale.  It is
a subject that has already been determined by Judge
Boyle.

I am going to ask for costs, for travel to
this deposition, and I would expect every other
party will as well.  I will not go forward because
I am not going to sign that agreement, and I will

14

move for sanctions for refusal to comply with a valid subpoena out of the Federal Court.

MR. KENNEDY:  You do, of course, understand that when that stipulation was signed, Eastern Magnesium Talc Company was a party.  It is no longer a party.  You understand that?

MR. PRENTISS:  That has no bearing on the validity of a subpoena out of Federal District Court.

I would like to have the subpoena and stipulation marked as exhibits to this deposition.

MR. DOLAN:  You won't let the witness testify at all?

MR. KENNEDY:  The witness is perfectly able -- you have to understand that these documents do not belong to Mr. Hemstock.  The only reason that we're producing these documents is out of, if you will, practicality.

If you recall, when Mr. Hemstock was subpoenaed, he was subpoenaed as an officer of a party.  No, I guess he was not.

MR. PRENTISS:  No, he was not.

MR. HALKET:  Off the record.

(A discussion was held off the record.)

BASF02711

15

1

2      MR. PRENTISS:  I would like to proceed

3  with the deposition of Mr. Hemstock, who is

4  appearing here pursuant to subpoena duces tecum.

5      I would like to mark as exhibits for the

6  record, first the subpoena duces tecum, which is

7  dated December 15, 1982, which is directed to

8  Mr. Glenn Hemstock, vice president, research, of

9  the Engelhard Corporation, Menlo Park, Edison,

10  New Jersey.

11      (A subpoena duces tecum dated December

12  15, 1982 was marked as Plaintiff's Exhibit 1 for

13  identification.)

14      MR. PRENTISS:  I would like to mark as the

15  second exhibit a stipulation under the case head-

16  ing Westfall vs. Whittaker, Clark & Daniels, et al,

17  a stipulation executed between myself, as attorney

18  for the plaintiff, and Mr. Peter Lawson Kennedy,

19  attorney to Glenn Hemstock and Engelhard Corpora-

20  tion and its affiliated companies, dated January

21  10, 1983.

22      (A stipulation dated January 10, 1983

23  between Mr. Prentiss and Mr. Kennedy was now

24  marked as Plaintiff's Exhibit 2 for identifica-

25  tion.)

16

MR. PRENTISS:  Mr. Hemstock has been sub-
poenaed, and by the stipulation, that subpoena is
valid and effective, returnable at 10:00 this
morning at the offices of Cahill Gordon & Reindel,
80 Pine Street, New York.

It is now 10:45, and I would like to proceed
with the deposition pursuant to the subpoena.

MR. KENNEDY:  While we're putting items
on the record, I would like to put in the record
as an exhibit for non-party Engelhard the pro-
posed stipulation and order of confidentiality
so we have a full record.

I also would like to make another brief
statement, if I may.

(The proposed stipulation and order of
confidentiality was now marked as Engelhard Exhibit
1 for identification.)

MR. KENNEDY:  The subpoena that was served
on Dr. Hemstock called for the production of
all documents within his possession, custody
or control.

As I understand it, I believe Mr. Hemstock
would so testify, he has no documents that would
be responsive to that subpoena.

17

We had brought to this deposition in order to facilitate the plaintiff's discovery, documents that were in the possession of Dr. Hemstock's employer, Engelhard Corporation, and also any documents that were in the possession of its subsidiaries.

We've already stated on the record that we recently learned that the plaintiff has designated an expert witness, Mr. Gale, who had been a project leader with Engelhard Minerals & Chemicals Corporation, which was a predecessor to Engelhard Corporation in 1978 and 1979, and his duties required him to have responsibility for research and analysis of Eastern Magnesium Talc Company minerals, including those from Emtal's Johnson, Vermont mine. He had access to confidential and proprietary information, and he had signed an agreement where he had covenanted and agreed that in his employment contract to keep such information confidential.

I had spoken with Mr. Prentiss the other day concerning a confidentiality agreement to be stipulated to before the deposition of Mr. Hemstock.

I have been informed -- it has not been

18

confirmed, but I have been informed that Mr. Hemstock himself has signed such a confidentiality agreement, and consequently, any of his testimony may well be in violation of his agreement as well.

Mr. Hemstock is here. He will testify provided a stipulation as far as confidentiality can be agreed to concerning his testimony.

We will not produce any documents that we have before us unless the proposed confidentiality agreement is signed.

MR. PRENTISS: I think my prior statement is on the record, and fully sets forth the plaintiff's position on this.

Mr. Gale's identity as an expert, proposed expert, for the plaintiff, was made known, I believe, before Engelhard was ever named as a party to this case, and Mr. Kennedy was aware of his identity at the time that I subpoenaed Mr. Hemstock for a deposition, and certainly at the time that we stipulated as to the return of the subpoena to this office for the deposition.

The subpoena is effective and valid. I propose to begin the deposition by filling out

19

the record as to exactly what Mr. Hemstock does have in his possession, and I would ask that we proceed.

(A recess was taken at this time, and upon returning, the following then ensued:)

G L E N N      A.      H E M S T O C K,

having first been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY MR. PRENTISS:

Q     My name is R. Daniel Prentiss. I represent the plaintiff in the action David Howard Westfall, in his capacity as Administrator of the Estate of Thomas Howard Westfall, et al. vs. Whittaker, Clark & Daniels, and other defendants, that is pending in the United States District Court for the District of Rhode Island, civil action number 79-0269.

This is a deposition that is being taken pursuant to that case, pursuant to the Rules of Civil Procedure. The deposition is for the purpose of obtaining testimony from you, which is sworn testimony, that may be used at trial in the proceedings that follow in this matter.

Because of the possible use of the

20

transcript of this deposition, it is important that you

understand the questions that I ask you, and understand

what it is that I am asking before you answer.

　　　　For that reason, I will ask that you let me

know if at any time during the course of this deposition

you don't understand my question  or the thrust of

my question, and I will do my best to rephrase it so

that you do understand it.

　　　　Is that an appropriate arrangement?

A    Yes.

Q    Could you state your full name for the

record.

A    Glenn Alton Hemstock.

Q    Where do you live?

A    Princeton, New Jersey.

Q    When were you born?

A    1925.

Q    Where?

A    In Owen Sound, Ontario.

Q    Could you describe your education, past

secondary education?

A    Yes.  I went to the University of Toronto

undergraduate, and Purdue University for graduate

training.

BASF02717

Hemstock                                    21

Q       What degree did you receive from the University of Toronto?

A       It was a bachelor of science in agriculture.

Q       And what did you study at Purdue?

A       I studied chemistry.

Q       What degree did you receive?

A       PhD.

Q       When did you receive your PhD.?

A       1951.

Q       Were you employed following your graduation from Purdue?

A       Yes, I was.

Q       Where?

A       Immediately following graduation, at the University.

Q       In what capacity?

A       I was in charge of the state soil testing laboratory.

Q       How long did you remain there?

A       About one year.

Q       What did you do after that?

A       I went to the Institute of Paper Chemistry.

Q       Where is that located?

A       In Appleton, Wisconsin.

Hemstock                                    22

1

2    Q        What was your employment responsibility

3    there?

4    A        I was a research assistant.

5    Q        How long did you remain there?

6    A        About four and a half years.

7    Q        What was your next employment?

8    A        I went to Minerals & Chemicals Corporation

9    of America.

10   Q        Where is that located?

11   A        Menlo Park, New Jersey.

12   Q        In what capacity were you hired?

13   A        As a senior chemist.

14   Q        What were your activities in that capacity?

15   A        As a project leader to carry out research.

16   Q        What areas did you conduct research in?

17            MR. KENNEDY:  Let me have a moment.

18            (A discussion was held off the record.)

19            MR. KENNEDY:  Just a clarification, are

20   you talking in general or specifically as to

21   certain projects?

22            MR. PRENTISS:  It is hard to tell.  I am

23   asking the question, what areas did he conduct

24   the research in?  Obviously, that calls first for

25   a general answer.  I might follow with a more

Hemstock                                    23

specific question.

     A     Clay minerals.

     Q     When did you go to work?  What year did you go to work for Minerals & Chemicals Corporation?

     A     1956.

     Q     How long did you remain as a project leader, senior chemist?

     A     Approximately one year.

     Q     What did you do after that?

     A     I was advanced to research supervisor.

     Q     How long did you remain as a research supervisor?

     A     Until the end of 1962.

     Q     What were your duties as a research super-visor?

     A     I had oversight of several research projects.

     Q     Were those research projects again in the area of clay minerals?

     A     Generally, yes.

     Q     Did that include talc?

     A     No.

     Q     What position did you assume in 1962?

     A     I left Minerals & Chemicals Corporation of America and went to Union Camp Corporation.

Hemstock                                    24

1

2      Q      To your knowledge, is Minerals & Chemicals

3  Corporation of America a corporate predecessor to

4  Minerals & Chemicals Philip Corporation?

5      A      Yes, I believe so.

6      Q      What did you do at Union Camp Corporation?

7      A      I was a group leader in paper coating

8  research.

9      Q      How long did you remain there?

10      A      Until mid-April, 1967.

11      Q      Did you conduct any research work at

12  Union Camp Corporation?

13      A      Not personally.

14      Q      Did you oversee research?

15      A      Yes.

16      Q      In 1967, where did you go to work?

17      A      I returned to Minerals & Chemicals Philip

18  Corporation.

19      Q      In what capacity?

20      A      The title was manager of fundamental

21  research.

22      Q      What were your duties as manager of funda-

23  mental research?

24      A      This was a staff position in which my

25  role was primarily as an advisor, advisor to project

Hemstock                                    25

1                                    Hemstock                                    25

2     leaders, advisor to administration.

3          Q       The project leaders or by project leaders,

4     are you referring to the position you formerly held at

5     that corporation?

6          A       That is generally correct.

7          Q       Did the project leaders report to you as

8     the manager of fundamental research?

9          A       No, they did not.

10         Q       But you advised project leaders as to the

11    direction of research they would undertake?

12         A       I would make suggestions to them, yes.

13         Q       And you would report to management of the

14    company?

15         A       I reported to the vice president of

16    research.

17         Q       And would you be carrying out the policies

18    as enunciated to you by the vice president of research

19    in your advising the project leaders regarding research?

20         A       Generally, yes.

21         Q       Was one of the areas of research that

22    was being pursued at that time research in talc?

23         A       No, it was not.

24         Q       How long did you remain as manager of

25    fundamental research?

Hemstock                                        26

A       Approximately a year.

Q       What position did you assume after that?

A       I became assistant director of research.

Q       What was your job function in that capacity?

A       This was a line position rather than a
staff position, and as such, I directed group leaders,
research supervisors in the research department.

Q       Directed the areas of research that would
be conducted?

A       Yes.

Q       Made decisions as to what areas of
research would be pursued?

A       Yes.

Q       At this time, what was the business of
Minerals & Chemicals Corporation of America?

MR. KENNEDY:  Objection.

I instruct the witness not to answer unless
you just want a general description.

MR. PRENTISS:  I guess you have to start
somewhere.

MR. KENNEDY:  Okay.

Give him a general description.

(A discussion was held off the record between
the witness and his counsel.)

1       Hemstock    27

2    MR. KENNEDY:  I have been informed that

3   the question is inaccurate and the witness would

4   like an opportunity to point out the inaccuracy.

5   Q  Would you, please.

6   A  In 1967, the time in question, the company's

7 name was Minerals & Chemicals Philip Corporation.

8   Q  Could you tell me generally what was the

9 business of the Minerals & Chemicals Philip Corporation

10 in 1967?

11   A  Clay minerals.

12   Q  What was the corporation's activity in

13 the business of clay minerals?

14   A  Mining and processing.

15   Q  What clay minerals in particular was the

16 corporation involved in mining and processing?

17   A  Kaolinite, attapulgite.

18   Q  For the record, maybe we better spell that.

19   A  K-a-o-l-i-n-i-t-e and a-t-t-a-p-u-l-g-i-t-e

20   Q  Any others?

21   A  There were others that weren't clay

22 minerals that we were involved in.

23   Q  What were those?

24   A  Limestone and bauxite processing.

25   Q  In 1967, was Minerals & Chemicals Philip

Hemstock                           28

Corporation affiliated in any way with Engelhard
Corporation?

           MR. KENNEDY:   If you know.

     A      Not directly.

     Q      Was it indirectly?

     A      There was representation on the board
of directors of the company by representatives from
Engelhard.

     Q      How long did you remain assistant director
of research?

     A      About five years.

     Q      Until about 1973?

     A      Approximately.

     Q.     What position did you assume at that time?

     A      I was director of research.

     Q      In what way did your job functions change
with the assumption of that position?

     A      I had the responsibility for research and
development.

     Q      Can you distinguish between research and
development, as you know those terms in your capacity?

     A      Yes.  Research is developing new products
at the bench scale.  Development is taking those ground
quantities at the bench scale and carrying them into

Hemstock                          29

the development of a process which can be subsequently

commercialized.

Q      What were the products that you were in-

volved with?

MR. KENNEDY:  Objection.

Instruct the witness not to answer.

Q      What products at this time was Minerals

& Chemicals Philip Corporation in the business of selling?

MR. KENNEDY:  Again, are you asking for

a general description?

MR. PRENTISS:  To begin with.

A      We were selling clays to the paper industry,

catalysts to the petroleum industry.

Q      Did any of the research that was undertaken

at Minerals & Chemicals Philip Corporation during the

period that you were assistant director of research or

director of research involve potential safety hazards

of any of the materials with which the corporation was

dealing?

MR. KENNEDY:  Objection to the form of that

question.  I don't, frankly, understand it myself.

MR. PRENTISS:  Could you read it back.

(The last question was read back by the

Reporter.)

Hemstock                30

2    A    No.

3    Q    Did any of the research that was conducted
by the corporation when you were in those capacities
deal with health hazards or potential health hazards
of any of the materials with which the corporation was
dealing?

A    No, it did not.

Q    You, in your capacity as director of re-
search, did you oversee all of the research and develop-
ment activities for the company?

A    That's correct.

MR. HALKET:  Off the record.

(A discussion was held off the record.)

Q    Over the course of your employment with
Minerals & Chemicals Philip Corporation, have there been
corporate changes of name or ownership, to your know-
ledge?

A    Yes.

Q    Are you intimately familiar with all of
the details of the corporate changes over that time?

A    No, I am not.

Q    When I direct my questions to you, I am
asking you to answer the questions with respect to your
employer and to give to the best of your understanding

Hemstock                                            31

and your knowledge regarding what your employer did or
what activities your employer was involved in; is that
satisfactory?

          A     Yes.

                MR. PRENTISS:  Could we go back to the
          last question that was asked.

                (The last question was read back by the
          Reporter.)

          Q     And in that capacity, you made the line
decisions as to what areas of research or excuse me,
what areas into which research would be conducted?

          A     I didn't make those entirely on my own,
so the answer is partially.

          Q     Who else made those decisions?

          A     The vice president of research to whom
I reported.

          Q     How long did you remain director of research?

          A     Approximately a year and a half.

          Q     And what position did you assume after
that?

          A     Vice president of research and development.

          Q     This would be some time during 1974?

          A     1974.

          Q     Is that the position you hold today?

Hemstock                                    32

A       That's correct.

Q       What corporation do you work for today?

A       I work for Engelhard Corporation.

Q       At what point, to the best of your know-
ledge, did your employer change from Minerals & Chemicals
Philip Corporation to the Engelhard Corporation?

        MR. HALKET:  It never did.

A       That is a complex question.

        MR. KENNEDY:  If you don't know the
answer, don't guess.

Q       Over this period of time from 1967 to the
present, has the place of your employment been the same?

A       Yes, it has.

Q       And to whom does the vice president of
research, either you or your predecessor, report?

A       To the president of the division or the
company, depending.

Q       The president of the division or the
company?

A       Today, in Engelhard Corporation, there are
two divisions, and I report to the president of the
minerals & chemicals division.

Q       At an earlier time, there was the
Minerals & Chemicals Company, as an independent corpora-

Hemstock                                    33

tion, if you know?  I am not trying to confuse you on

the corporate legalities.

        A       When we were Minerals & Chemicals Philip

Corporation, there was only one division with one

president, and the vice president of R and D reported to

that president.

        Q       And now that it is Engelhard Corporation,

there are two divisions, one of which is the minerals

& chemicals division, is that correct?

        A       Yes.

        Q       Of Engelhard Corporation?

        A       Of Engelhard Corporation.

        Q       And as to your responsibilities and your

job function, you were always within the minerals &

chemicals entity, whether it was a company on its own

or a division of the Engelhard Corporation, is that

correct?

        A       That is true.

        Q       And it is now, the structure is that it is

a division of the Engelhard Corporation?

        A       That's correct.

        Q       As vice president of research, do you have

the ultimate responsibility, subject to review by the

president, for the research and development activities

Hemstock                    34

of the company?

    A      My role is as an implementer.

    Q      What do you implement?

    A      The programs and projects that are generally agreed to by the management of the division.

    Q      And what is the management of the division?

    A      We have a management committee which operates at the pleasure of the president. I am a member of that committee along with other vice presidents who have other responsibilities.

    Q      And that management -- you carry out the policy of that management committee in the area of research and development for the company?

    A      That's correct.

    Q      So do you have the ultimate decision-making authority within or under that structure of the management committee for determining the areas in which research and development will be conducted?

    A      I certainly have a loud voice.

    Q      And do you review the products of the research and development activities of the company?

    A      I would have familiarity with the new products. I don't understand,the question of reviewing products?

Hemstock                                             35

Q       I meant project.

A       Yes, I do.

Q       So if a project leader within the company carries out a research project,is that project at some point authorized by you?

A       Yes, that's correct.

Q       Is the result of that research project submitted ultimately to you for review?

A       Yes, it would be.

Q       And if that product of that research project is a document or series of documents, is that submitted to you for your review?

A       Yes., I would have an opportunity to review them.

Q       Where does it go from there?

A       It goes into a central filing system.

Q       A central filing system under which vice president?

A       Not specifically under any vice president.

Q       A central filing system for the minerals & chemicals division of the Engelhard Corporation?

A       That's correct.

Q       And you as vice president of research are the one with the most direct authority over that portion

Hemstock                                    36

of the filing system, is that correct?

    A    I suppose one could say that, yes.

    Q    There is no other person who has a more direct authority over that area of the filing system of the company than you, is there?

    A    No official of the company has.

    Q    The only person with more direct control would be people who are at the clerical level or staff or line level, who might have direct hands-on filing responsibilities, is that right?

    A    Yes.

    Q    But as far as the official level of the company, you are the one with the most direct respon- sibility for the custody of the filing that relates to research and development for the company, is that correct?

    A    Yes.

    Q    Did the company that you work for at any time during the period of your employment become in- volved in commerce in talc?

    A    Could you define commerce?

    Q    Engaging in any way in the business of mining, selling, producing, mining or other activity with talc?

Hemstock                                           37

2      A      Yes.

3      Q      When?

4      A      I don't know exactly.

5      Q      Approximately when did -- did you ever be-

6  come involved in any way with talc in your capacities

7  as vice president of research or director of research?

8             MR. KENNEDY:  Is this in any way?

9             MR. PRENTISS:  In any way.

10     A      Yes.

11     Q      When?

12     A      During the late seventies is as accurately

13  as I can express it.

14     Q      What was the nature of your involvement

15  with talc?

16             MR. KENNEDY:  Are we talking generally or

17         specifically?

18             MR. PRENTISS:  We have to start somewhere.

19             MR. KENNEDY:  Generally.

20     A      Generally, my responsibility was as an

21  administrator of all of the things that go on within the

22  department.

23     Q      Did you say that was late seventies?

24     A      That was somewhere in the late seventies.

25     Q      Does that mean then that at some point

Hemstock                                    38

1
2    in the late seventies or thereafter, research and/or
3    development was conducted in the area of talc in the
4    company?
5                MR. KENNEDY:  Objection.
6                Instruct the witness not to answer.
7        Q     At any time --
8                MR. KENNEDY:  Absent a confidentiality
9        stipulation.
10               MR. PRENTISS:  Again, I will state
11       what I stated to Mr. Kennedy by telephone two
12       days ago, I am certainly willing to enter into a
13       standard confidentiality stipulation.
14               I will not enter into the stipulation he
15       has dropped on the table this morning for the rea-
16       son that it --
17               MR. KENNEDY:  It would interfere with your
18       use of a former employee as an expert witness.
19               MR. PRENTISS:  It is an unusual and
20       unacceptable stipulation.
21       Q     What was the nature --
22               MR. KENNEDY:  The situation using the
23       former employee as an expert witness is also an
24       unusual situation too.  That is why it prompts
25       an unusual,   as you have termed, confidentiality

Hemstock                                    39

stipulation.

Q        What was the nature of company involvement in talc?

MR. KENNEDY:  Generally?

MR. PRENTISS:  Yes.

A        Generally, talc was an article of commerce which we mined and processed.

Q        And sold?

A        And sold.

Q        What was the nature of the research that was conducted by the company in the field of talc?

MR. KENNEDY:  Generally?

MR. PRENTISS:  Generally.

MR. KENNEDY:  Objection.  I will instruct you not to answer.  I have been advised that is proprietary.

Q        During the time you were vice president of research, did the company make any investigation regarding potential health or safety hazards of talc?

MR. KENNEDY: Objection.  Same ground.

Q        During the time you worked for the company, did it ever undertake  any studies regarding the possible contaminants of talc?

MR. KENNEDY:  Same objection.  Same

Hemstock                           40

1

2      instruction.

3          Q      Did the company, in the time you have been

4      employed by it, ever conduct any laboratory investiga-

5      tions to determine the contaminant content of talcs

6      mined by the company or by any other  entity?

7                MR. KENNEDY:  Same objection.  Same

8          instruction.

9          Q      Did you receive the subpoena duces tecum

10     which has been marked as Plaintiff's Exhibit 1 for

11     identification?

12                MR. KENNEDY:  There has already been a

13         stipulation.  Mr. Hemstock did not receive that.

14         Mr. Hemstock was out of the country when it

15         was served, and there is a stipulation covering

16         the efficacy of that subpoena.

17         Q      I am asking if you have ever seen that?

18         A      Yes, I have seen it.

19         Q      Could you tell me whether or not there

20     exists in the central files of the company any documents

21     which respond to the following description: " all data

22     including test reports, laboratory results, memoranda,

23     correspondence or other written materials of any

24     description whatsoever regarding any investigation of

25     fibrous materials in talc from Engelhard properties

Hemstock                                    41

(including those properties in the name of Eastern

Magnesium Talc Company, specifically the Johnson Vermont

mine) and others, from any study conducted since 1967."

MR. KENNEDY:  I will answer that.

I have before me documents which we are

ready to produce at this deposition pursuant to

the subpoena duces tecum, but will not, absent a

confidentiality stipulation, namely the one that

we already presented to you and it is now an

exhibit to this deposition.

MR. PRENTISS:  Are you --

MR. LEIBENSPERGER:  I would like to add

something on the record.

On behalf of Windsor Minerals Inc., the

deposition subpoena that Mr. Prentiss just

read from was not served upon Windosr Minerals

or me as counsel for Windsor Minerals, and I have

never seen it, even as to right now, and I never

heard the request until you just read it.

Therefore, I reserve the right to object to

the scope of this subpeona, or at least to the

admissibility of any documents under that subpoena.

MR. HALKET:  The documents that are on the

table belong to Engelhard Corporation.  They do not

Hemstock                                    42

in any way belong to Mr. Hemstock.  They are not

under his custody or control, and they were pro-

duced here as an accommodation to the plaintiff.

    They are not subject to that subpoena,

and as I said, they were produced here solely as

an accommodation to the plaintiff.

BY MR. PRENTISS:

    Q    Are you familiar with the documents that

have been referred to by counsel that are here on the

table?

    A    Generally.

    Q    Do they cover research projects that were

conducted by the company during the time you were vice

president of research?

    MR. KENNEDY:  Objection, and the same

instruction.

    Q    Are those documents a part of the central

file of the company, as you have described the central

file in earlier answers in this deposition?

    A    I don't know.

    Q    Have you ever seen those documents before?

    A    Not all of them.

    Q    Do those documents, any of them, relate

to research that was conducted by the company during the

                                    BASF02739

Hemstock                                                43

time you were either director of research or vice

president of research?

          MR. KENNEDY: Same objection, and same

     instruction.

     Q     Where else in the company -- where else in

Engelhard Corporation, what other division conducts

research and development?

     A     The Engelhard Industry Division does

conduct research and development.

     Q     To your knowledge, did the Engelhard

Industry Division conduct any research regarding chemical

contaminants or contaminant  constituents of talc from

1967 to present?

          MR. KENNEDY:  Same objection, and same

     instruction.

     Q     Who is the head of research for Engelhard

Industries Division?

     A     Mr. Camran Aykan.

     Q     Does Engelhard Industries Division deal in

any way in talc?

     A     Not to my knowledge.

     Q     Are there any other divisions of the

Engelhard Corporation besides the two that you have

identified, Engelhard Industries and Minerals & Chemicals?

1          Hemstock                    44

2     A    No.

3     Q    To your knowledge, is all of the business

4    of talc of the Engelhard Corporation conducted by the

5    minerals & chemicals division of Engelhard?

6     A    To my knowledge.

7     Q    What is the business of Engelhard Industries

8    Division, generally, to your knowledge?

9     A    They are processors of precious metals.

10     Q    Is Eastern Magnesium Company presently

11   associated in any way with the Engelhard Corporation, to

12   your knowledge?

13     A    Yes.

14     Q    To your knowledge, what is the relationship?

15     A    I don't know specifically.

16     Q    I don't have your affidavit in front of me.

17        Can you state for the record just where --

18        MR. KENNEDY:  I am as confused as

19   Mr. Hemstock in that regard.

20        MR. PRENTISS:  Does anybody want to clarify?

21        MR. HALKET:  Off the record.

22        (A discussion was held off the record.)

23        MR. HALKET:  Eastern Magnesium is a separate

24   corporation, all of the stock of which is owned, to

25   the best of my knowledge, by Engelhard Corporation.

Hemstock                                45

Q      To your knowledge, are the activities of Eastern Magnesium Talc Company governed in any way by the minerals & chemicals division of Engelhard Corporation?

MR. KENNEDY:  I don't know that this witness is qualified to give an opinion in that regard.

MR. PRENTISS:  I am asking to his knowledge.

MR. HALKET:  I don't understand the question.  I would like it rephrased.

Q      Do you have any responsibility with regard to Eastern Magnesium Talc Company?

A      No, I do not.

Q      Did you ever?

A      No, I don't.

Q      When, to the best of your knowledge, did Eastern Magnesium Talc Company come into existence as a relative or subsidiary of Engelhard Corporation?

A      During the sixties.

Q      Do you know whether the Eastern Magnesium Talc Company, the subsidiary of Engelhard, ever conducted any studies regarding the chemical constituents or contaminants of talc?

MR. KENNEDY:  Same objection.  Same instruction.

Hemstock                           46

1

Q    Do you know whether there is a head of re-

search and development for the Eastern Magnesium Talc

Company, subsidiary of Engelhard Corporation?

A    Yes.

Q    Who is that?

A    I say yes.  I know that there is not.

(A recess was taken at this time, and upon

returning, the following then ensued:)

BY MR. PRENTISS:

Q    Does minerals & chemicals division conduct

the research and development for Eastern Magnesium Talc

Company?

A    Normally, they would.

Q    In what circumstances would they not?

MR. KENNEDY:  Generally?

(A discussion was held off the record between

the witness and his counsel.)

A    We have never conducted research for Eastern

Magnesium Talc.  We normally would, if there was research

to be done.

Q    So --

A    We have not done any.

Q    So to your knowledge, Eastern Magnesium

Talc has not conducted research and development?

Hemstock                                                  47

1

2       A       That's correct.

3       Q       What other entity besides minerals &

4    chemicals division conducted any research within Engel-

5    hard Corporation, conducted any research regarding talc

6    or potential contaminants or hazards within talc?

7               MR. KENNEDY:  Same objection, and same

8          instruction.

9       Q       Has the minerals & chemicals division

10   or any other division or subsidiary of Engelhard ever

11   sought outside consultation in research into talc or

12   contaminants in talc or chemical constituents in talc

13   or potential health or safety hazards from talc?

14              MR. KENNEDY:  Same objection.  Same

15          instruction.

16      Q       Where did the documents of the Engelhard

17   Corporation, which have been brought here to this deposi-

18   tion with which you say you are not familiar, come from?

19   Do you understand that question?

20              MR. HALKET:  If he does, I don't.

21              MR. PRENTISS:  When I depose you, I will

22          make it clear.

23              MR. HALKET:  It is a compound question.

24      A       Yes, could you clarify it.

25      Q       You stated that you are familiar with some

Hemstock                    50

able to the Magistrate, if the Magistrate wishes
to view them, but you have to understand that our
objection is not that any one particular document
may be privileged for any one of a number of
reasons, so I don't think the Magistrate has to
view the documents.

He just has to understand the legal argu-
ment that we're making and the necessity for
some sort of confidentiality stipulation, so I don't
think you need a page by page reference, so I
will take them all with me, and is that satisfac-
tory?

MR. PRENTISS:  Sure.

Let me ask a couple of more questions.

BY MR. PRENTISS:

Q      Who is the president of Engelhard Corpora-
tion?

A      There are two presidents to Engelhard
Corporation.  There is a president of the Minerals &
Chemicals Division.  There is a president of the Engel-
hard Industries Division, and there is, I guess, the
corporate president, Mr. Irving Isko.

Q      When you say the corporate president,
are you referring to the corporate president of one or

1

2  another of the divisions?

3          A     No.  The presidents of the two divisions

4  report to Mr. Isko.

5          Q     Do you know, can you identify, any person

6  within the corporate structure of Engelhard who is the

7  custodian of the documents of the corporation?

8          A     No, I cannot.

9          Q     Does President Isko have other officers

10  who report to him besides the presidents of the two

11  divisions?

12          A     Yes, he does.

13          Q     Is there a vice president, treasurer,

14  secretary, et cetera of the corporation, of that struc-

15  ture of which Mr. Isko is the head?

16          A     Mr. Isko has a small corporate staff.

17  I can't specifically answer that question.

18                  MR. PRENTISS: I have nothing further.

19                  MR. CURRAN:  No questions.

20                  (Continued on the next page.)

21

22

23

24

25

```
 1                        Hemstock                    52

 2              MR. LEIBENSPERGER:  I have no questions.

 3              MR. DOLAN:  No questions.

 4              MR. KENNEDY:  No questions.

 5              (Time noted:  12:05 P.M.)

 6

 7                                   _____

 8

 9    Subscribed and sworn to

10    before me this     day

11    of            , 1983

12

13

14      ._____          .

15

16

17

18

19

20

21

22

23

24

25
```

53

## CERTIFICATE

STATE OF NEW YORK )
                ) ss:
COUNTY OF NEW YORK )

           I,      JOSEPH R. DANYO         , a

Notary Public within and for the State of New Yor

duly commissioned and qualified and authorized

to administer oaths and to take and certify

depositions, do hereby certify:

       That the foregoing deposition of
Glenn A. Hemstock, taken by plaintiff,

pursuant to subpoena and stipulation, at the

offices of Cahill Gordon & Reindel, Esqs., 80

Pine Street, New York, New York, on Friday,

January 28, 1983 at 10:20 A.M.


       That I was attended upon the taking of said

deposition by counsel as listed on page s 2 and 3;

       That said witness was first by me duly

sworn to tell the truth, the whole truth, and

nothing but the truth, and that he was thereupon

examined by counsel present; that I took down

the testimony of said witness in machine shorthand

and caused the same to be transcribed by a

person under my supervision.

BASF02750

54

I further certify that I am not of counsel or attorney for any of the parties in said deposition and caption named, nor in any way interested in the event of the cause named in said caption; and the same applies to the person who transcribed my stenotype notes.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this ____6____ day of _Fybrvary, 1983;_

JOSEPH R. DANYO

BASF02751

55

E X H I B I T S

PLAINTIFF'S                                                      PAGE
EXHIBIT NO.

   1    Subpoena duces tecum dated
       December 15, 1982                                 15

   2    Stipulation dated January 10,
       1983 signed by Mr. Prentiss
       and Mr. Kennedy                                  15

ENGELHARD
EXHIBIT NO.

   1    Proposed stipulation and order
       of confidentiality                               16

***

BASF02752

1.

UNITED STATES DISTRICT COURT

2

FOR THE DISTRICT OF RHODE ISLAND

3  DAVID HOWARD WESTFALL, IN HIS
   CAPACITY AS ADMINISTRATOR OF
4  THE ESTATE OF THOMAS HOWARD
   WESTFALL AND IN HIS CAPACITY AS
5  ADMINISTRATOR OF THE ESTATE OF
   BETTY E. WESTFALL,
6                            Plaintiff

7            vs.                              C.A. No. 79-0269

8  WHITTAKER, CLARK & DANIELS,
   METROPOLITAN TALC COMPANY, INC.,
9  and OMYA, INC., itself and as
   successor to VERMONT TALC
10 COMPANY, INC.,
                             Defendants
11
   WINDSOR MINERALS, INC., itself
12 and as successor to EASTERN
   MAGNESIA TALC COMPANY, INC.,
13                         Defendant and
                     Third-Party Plaintiff
14
            vs.
15
   MINERALS & CHEMICALS PHILLIP
16 CORPORATION,
                     Third-Party Defendant
17

18              Continued deposition of GLENN HEMSTOCK,

19  taken on behalf of the Plaintiff, pursuant to the Federal

20  Rules of Civil Procedure, on March 16, 1983, at the offices

21  of Decof & Grimm, One Smith Hill, Providence, Rhode Island,

22  convening at 10:00 a.m., before Jeanne M. St. Hilaire-Derha

23  Notary Public.

24              REPORTING ASSOCIATES
                Shorthand   Reporters
25              205  Howard Building
                Providence, RI 02903



DEPOSITION
EXHIBIT
P-68
SCg 11-6-09

RECEIVED

MAR 2 5 1983

ADLER, PULLOCK & SHEEHAN

PADUANO

BASF02291

1    <u>APPEARANCES</u>:

2    Decof & Grimm
     One Smith Hill
3    Providence, Rhode Island  02903
     BY:  DANIEL R. PRENTISS, ESQ.,...On behalf of the Plaintiff

4
     Hinckley & Allen
5    2200 Fleet National Bank Building
     Providence, Rhode Island  02903
6    BY:  MICHAEL G. SARLI, ESQ.,.....On behalf of Whittaker,
                                          Clark & Daniels
7    Hanson, Curran & Parks
     1210 Turks Head Building
8    Providence, Rhode Island  02903
     BY:  WILLIAM A. CURRAN, ESQ.,....On behalf of Metropolitan
9                                         Talc Company, Inc.

     Rice, Dolan, Kiernan & Kershaw
10   101 Dyer Street
     Providence, Rhode Island  02903
11   BY:  JOHN F. DOLAN, ESQ.,........On behalf of Omya, Inc.

12   Nutter, McClennen & Fish
     600 Atlantic Avenue
13   Boston, Massachusetts  02210
     BY:  EDWARD P. LEIBENSPERGER, ESQ.,..On behalf of Windsor
14                                         Minerals, Inc.

     Adler, Pollock & Sheehan
15   2300 Hospital Trust Tower
     Providence, Rhode Island  02903
16   BY:  PETER LAWSON KENNEDY, ESQ.,.
                - and -
17   Cahill, Gordon & Reindel
     80 Pine Street
18   New York, New York  10005
     BY:  HOWARD G. SLOANE, ESQ.,
19              - and -
     THOMAS D. HALKET, ESQ.
20   Menlo Park, CN 28
     Edison, New Jersey  08818........On behalf of Engelhard
21                                        Corporation and
                                          Glenn Hemstock

22

23              * * * * * * * * * *

24

25

PADUANO

i

I N D E X

DEPOSITION OF DR. GLENN HEMSTOCK                PAGE NO.

Examination by Mr. Prentiss                          4

E X H I B I T S

NO.        (All exhibits were marked prior
            to commencement of deposition.)

1        Inter-Department Memorandum dated
         October 9, 1972 from E. J. Triglia

2        A document to the file from J. M.
         Zimmermann dated October 30, 1980

3        A Technical Service Request from
         J. H. Shafer dated February 28, 1973

4        A Technical Service Request from
         J. M. Zimmermann dated January 17, 1979

5        Document entitled "Proposed
         Experimental Design for Fiber
         Distribution"

6        A Technical Service Request from
         J. M. Zimmermann dated September 6, 1977

7        A Technical Service Request from
         R. E. Lomas dated January 29, 1979

8        Letter from Royal-Globe Insurance Co.
         to Mr. Victor A. Backels dated
         August 18, 1972

9        Document entitled "Attachment V"
         from R. A. Nadkarni dated October 27, 1978

10       Letter from Johns-Manville to
         Engelhard Minerals & Chemicals
         Division dated September 5, 1972

11       Document entitled "Mineralogy, Identi-
         fication, and Quantification of Airborne
         Talc Dust"

PADUANO

ii

# E X H I B I T S (Continued)

NO.

12   Inter-Department Memorandum dated
     August 22, 1972 from J. H. Shafer

13   Inter-Department Memorandum dated
     September 16, 1971 from T.D. Oulton

14   Technical Service Request from
     J. H. Shafer dated March 30, 1979

15   Document entitled "History of Asbestos-
     Related Mineralogical Terminology"

16   Inter-Department Memorandum dated
     December 1, 1977 from C. Y. Haas

17   Technical Service Request from
     A. L. Yunko dated October 12, 1973

18   Document to A. L. Yunko dated May 31, 1979

19   Letter from Walter C. McCrone Assoc.,
     Inc., dated June 27, 1977 to Mr. Frank
     J. Dzierzanowski

20   Inter-Department Memorandum dated
     August 18, 1977 from K. Newger

21   Technical Service Request from
     C. Y. Haas dated March 29, 1977

22   Letter from Walter C. McCrone Assoc.,
     Inc. dated April 30, 1979 to Mr.
     Peter N. Gale

23   Document entitled "Talc Investigation"
     containing calculations

24   Document entitled "Petrographic Examina-
     tion of Two Talcose Rock Samples from
     Northern Vermont"

25   Letter from the H.E.W. dated January 19,
     1973 to Mr. A. J. Dankwerth

26   Letter from U.S. Dept. of Labor dated
     July 19, 1979 to Mr. J. Howard Shafer

PADUANO

E X H I B I T S (Continued)

NO.

27        Note from the desk of G.A. Hemstock
          dated September 1, 1972

28        Inter-Department Memorandum dated
          March 13, 1979 from J. M. Zimmermann

29        Purchase Requisition dated May 1, 1973
          for Johns-Manville Research & Engineering
          Center

30        Letter from the Minerals & Chemical
          Division dated November 21, 1977 to
          Bobby F. Craft, Ph.D.

31        Conversation memo dated February 6, 1979

32        Pages of calculations dated January 19, 1977

33        Inter-Department Memorandum dated
          August 3, 1979 from R.E. Lomas

34        Calculations entitled "Waterbury Talc Study"

35        Technical Service Request from R.W. Wert
          dated June 24, 1982

36        Inter-Department Memorandum from E. J.
          Triglia dated May 22, 1979

37        Document entitled "Talc Morphology as
          Revealed by Scanning Electron Microscopy"

38        Note from the office of E. J. Triglia

39        Letter from Fred W. Farwell dated November 10,
          1977 to Mr. Frank J. Dzierzanowski

40        Inter-Department Memorandum dated April 20,
          1978 from K. Newger

41        Technical Service Request dated March 11,
          1982 from R. M. Kazimir

42        Letter from the Minerals & Chemicals
          Division dated October 2, 1980 to
          Mr. Mark Palenik

iv

## E X H I B I T S (Continued)

NO.

43    Document entitled "The Basic Mineralogical
Dichotomy in the Selevan Epidemiology Study"

44    Inter-Department Memorandum dated September 26,
1977 from T. D. Oulton

45    Inter-Department Memorandum dated July 17, 1979
from E. J. Triglia

46    Group of documents, first page of which is
a list of fignures

47    Document entitled "VAG Core Samples"

48    Technical Service Request dated July 27, 1982
from K. L. Kayler

49    Documents contained on pocket of binder

50    Documents contained in binder

51    Letter from Minerals & Chemical Division
dated June 13, 1979 to Mr. John Brown

* * * * * * * * * *

1

(PLAINTIFF'S EXHIBIT NOS. 1 THROUGH 51 WERE RECEIVED IN EVIDENCE FOR IDENTIFICATION)

MR. KENNEDY:   Just to reiterate what we have said during the last deposition session, Dr. Hemstock has no documents in his possession.

Consequently, he could not respond to the subpoena duces tecum.  Engelhard Industries, however, as an accomodation, has searched its records and has provided me with copies of documents or the originals of documents, if the originals existed, which we have brought with us.  They've already been copied so we can mark up the copies rather than mark up the originals that have been provided by Engelhard.  We have withheld very, very few documents which we consider privileged. Those are documents which are between counsel and the client, and at some time later we will provide you with a catalogue of those documents so that you will be able to refer to that in the event you feel that you can force us to divulge those documents.

MR. HALKET:   Engelhard Industries is a name of a division.

MR. KENNEDY:   We also discovered yesterday some records, research records, that are in bound volumes, and those have been culled and there are some pages that have been photostated relative to the call

1    of the subpoena duces tecum.

2              MR. PRENTISS:   Where are those now?

3              MR. KENNEDY:   They're in the batch of

4    documents which you've already copied.

5              MR. PRENTISS:   When will the catalogue of

6    documents for which you claim privilege be made avai-

7    lable?

8              MR. KENNEDY:   Midweek next week, only be-

9    cause everybody is going to be out of town running

10   here and there.  I think it would be a short list.

11             MR. PRENTISS:   Anything further prelimi-

12   narily?

13             MR. KENNEDY:   That does it.

14             MR. HALKET:   I would like to say one more

15   thing for the record.  The records that Engelhard

16   searched were the records of its Research Division

17   only.  It may have searched some other records, but

18   we can only certify that we searched the records of

19   the Research Division.

20             MR. PRENTISS:   Very well.

21             MR. LEIBENSPERGER:   Any stipulations with

22   respect to objections?

23             MR. PRENTISS:   Well, I would suggest that

24   we preserve all objections other than to form of ques-

25   tion until trial unless you propose any other stipula-

1   tion.

2           MR. LEIBENSPERGER:   No.  That's acceptable

3   to me.

4           MR. KENNEDY:   That's fine.

5           MR. PRENTISS:   What about signing of the

6   deposition?  Do you require it?

7           MR. KENNEDY:   I would like the deposition

8   to be reviewed and then signed with or without any

9   corrections as is necessary.

10          MR. PRENTISS:   Shall we proceed?

11          MR. KENNEDY:   All right.  I just want to

12  make one other statement, that we have modified the

13  secrecy stipulations to the extent that it is accep-

14  table to everybody here, and we're going to circulate

15  that during the deposition.

16          MR. PRENTISS:   What I'd like to do is just

17  take an opportunity to look through the amendments and

18  sign it.  I don't anticipate that I'll have any objec-

19  tion, but at the break, I'll sign it and I'll represent

20  -- I don't expect problems, and we can mark that stipu-

21  lation as an exhibit to the deposition at that time.

22  Okay?

23          MR. KENNEDY:   All right, fine.

24          GLENN HEMSTOCK, first having been duly sworn

25  by the Notary Public, testified as follows:

4

EXAMINATION BY MR. PRENTISS:

1

2    Q    Dr. Hemstock, you are the same Glenn A. Hemstock whose

3         deposition was begun in this proceeding on Friday,

4         January 28, 1983 in the offices of Cahill, Gordon &

5         Reindel, 80 Pine Street, New York, New York?

6    A    I am.

7              MR. PRENTISS:    Doctor, I'll remind you that

8         you are again under oath, and that this deposition is

9         a continuation of the deposition that was begun at

10        that time.

11             THE WITNESS:    Yes.

12   Q    Doctor, when did your employer first become involved

13        in the business relating to talc?

14   A    During the late 1960's.

15   Q    How did it become involved in the talc business?

16   A    I don't know.

17   Q    When did your employer first engage in either the

18        production or sale of talc?

19             MR. KENNEDY:    Excuse me.   Could we have a

20        clarification, Dan?  The production is one question,

21        and the sale is another question.

22   Q    Okay.  I'll divide it up.  When did your employer first

23        become involved in the sale of talc?

24   A    I do not know.

25   Q    When did it first become involved in the production of

PADUANO

5

1  talc?

2 A I do not know.

3 Q Do you know when your employer first acquired an in-

4  terest either directly or through any subsidiary

5  corporations in a producing facility of talc?

6 A No, I don't.

7 Q Did your employer ever either directly or through a

8  subsidiary become involved in the production of talc?

9    THE WITNESS:   Would you repeat that ques-

10  tion, please?

11    (PREVIOUS QUESTION READ BY REPORTER)

12 A Yes.

13 Q Did it acquire any talc-producing mines?

14 A Yes.

15 Q Which ones?

16 A The Johnson mine.  I'm not aware of others.

17 Q The Johnson mine, by that you refer to Johnson, Vermont?

18 A Johnson, Vermont.

19 Q And do you know whether your employer either directly

20  or through a subsidiary purchased that mine from any

21  other entity?

22 A I do not know.

23 Q Did your employer ever -- was your employer ever in-

24  volved in any way with a talc mine in Waterbury,

25  Vermont?

6

A    I'm not aware of that.

Q    Was it through a subsidiary that your employer owned
     the Johnson, Vermont mine?

A    I don't know.

Q    Did you personally undertake any involvement with your
     employer's business in talc?

A    No, I did not.

Q    Did you personally oversee any investigations, studies
     or research regarding talc?

A    Only in very general terms.

Q    In what terms were those?

A    The Research Department is a service department for
     the division.  That means that we, at request of other
     departments, will provide service of a technical nature
     relevant to our products.  In that context, I was
     generally involved in activities of a technical nature
     in talc.

Q    When you said division, are you referring to the
     Minerals and Chemicals Division of Engelhard Corpora-
     tion?

A    Yes, I am.

Q    And department, by department, are you referring to
     the Department of Research and Development?

A    Yes, I am.

Q    That is the Department of Research and Development of

1    Engelhard Corporation?

2    A   That is the Department of Research and Development of

3    the Minerals and Chemicals Division of Engelhard

4    Corporation.

5    Q   What was the nature of the research that took place

6    within that department regarding talc?

7    A   Researcher's role was a supporting role.  We did not

8    undertake formal research studies on talc.

9    Q   Did anybody either within Engelhard Corporation or at

10    the behest of Engelhard Corporation undertake research

11    regarding talc?

12    A   Not to my knowledge.

13    Q   To your knowledge, has anybody employed by Engelhard

14    Corporation ever undertaken studies regarding possible

15    contaminants contained in talc?

16           THE WITNESS:   Would you repeat the question,

17    please?

18           (PREVIOUS QUESTION READ BY REPORTER)

19    A   Only in the context that I previously mentioned; that

20    is, research personnel provided a service in a tech-

21    nical consulting role and carried out whatever was

22    necessary in the way of laboratory tests.

23    Q   What were the laboratory tests or other services that

24    were carried out?

25    A   We, at that time, and still do have the capabilities

1     of running total chemical analysis, particle size

2     distribution, x-ray diffraction, oil absorption,

3     surface area. Those are the major ones.

4  Q  Were those facilities used in regard to research on

5     talc?

6  A  They were used as requested by our clients.

7  Q  Who were your clients?

8  A  Our clients in this case were other departments within

9     Engelhard Corporation, within the Minerals and Chemi-

10     cals Division of Engelhard Corporation.

11  Q  Were you ever requested, and by you I mean the Research

12     and Development Department you referred to, to test

13     talc for content of asbestos or possible asbestos

14     contamination?

15  A  Yes.

16  Q  When was the first time, to your knowledge, that your

17     department conducted tests of that nature?

18  A  I don't recall.

19  Q  Would it have been as early as the early seventies?

20  A  It may have been.

21  Q  Over what period of time has that kind of testing taken

22     place?

23  A  It has occurred intermittently over, I suppose, one

24     could say a number of years.

25  Q  Up until the present?

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

9

1   A   Yes, up until the present.

2   Q   Do you know the purpose for which your department was

3       requested to make that kind of research?

4   A   Generally, it was in response to a request from the

5       Marketing or Sales Department.

6   Q   One of the clients that you referred to is the Engel-

7       hard -- excuse me, is Eastern Magnesia Talc Company?

8   A   I don't understand the question.

9   Q   You made reference -- I'll rephrase the question.  You

10      made reference to your department conducting tests

11      and studies as a result of requests of clients.  Do

12      you remember that answer?

13  A   Yes.

14  Q   You state clients.  Is one of those clients the

15      Eastern Magnesia Talc Company?

16  A   To the degree that Eastern Magnesia Talc Company was

17      a -- was the source of the talc which Engelhard

18      Corporation sold.

19  Q   And to what degree is that?

20  A   Well, that is the source of the talc that we produce.

21  Q   Is that the only source of the talc that your employer

22      produces?

23  A   To my knowledge, yes.

24  Q   To your knowledge, is that -- has that always been the

25      only source of talc which your employer produces?

10

1   A   To my knowledge, yes.

2   Q   Are you aware that asbestos or asbestiform minerals

3       sometimes are associated with talc and talc deposits?

4                   (OBJECTION BY ALL DEFENSE COUNSEL)

5                   MR. KENNEDY:   Are you talking about in

6       general?

7                   MR. PRENTISS:   In general.

8   A   In trace quantities in some samples, in some deposits,

9       some areas of some deposits.

10  Q   Is it your testimony, then, that asbestos at maximum

11      is only present in general in talc in trace quantities?

12                  (OBJECTION BY ALL DEFENSE COUNSEL)

13                  MR. CURRAN:   An objection for one Defendant

14      will be an objection for all.

15                  MR. PRENTISS:   Dr. Hemstock, I'm going to

16      ask the Reporter to read back the question just before

17      the last one, and before you answer the question, I

18      want you to understand that I'm asking you from your

19      knowledge in general as to talc, not your knowledge as

20      to any specific talcs produced by your employer.

21                  THE WITNESS:   Yes, I understand.

22                  (PREVIOUS TWO QUESTIONS READ BY REPORTER)

23  Q   Could you answer that question?

24  A   Yes.

25                  MR. KENNEDY:   Yes, you can answer it; or

11

1   yes is the answer?

2        MR. LEIBENSPERGER:  He's answered that one.

3   Q  Your answer to the question, and understanding the

4      question is phrased in general, not with respect to

5      any particular talc, your answer is yes?

6   A  Yes.

7   Q  Is it your understanding that -- let me ask you this.

8      Which types of asbestos is it, to your understanding,

9      that are generally associated with talc or talc de-

10     posits?

11       (OBJECTION BY ALL DEFENSE COUNSEL)

12       MR. SLOANE:  Do you understand the question?

13       THE WITNESS:  I understand the question.

14  A  The only asbestos mineral that I'm aware of that

15     exists in trace quantities in talc is chrysotile.

16  Q  To your knowledge, is tremolite asbestos ever asso-

17     ciated with talc or talc deposits?

18       (OBJECTION BY ALL DEFENSE COUNSEL)

19  A  I don't consider tremolite to be an asbestos mineral.

20  Q  But do you understand that tremolite is sometimes

21     associated with talc?

22       (OBJECTION BY ALL DEFENSE COUNSEL)

23       THE WITNESS:  In general?

24       MR. PRENTISS:  Yes.

25  A  In general, sometimes.

1   Q   Do you know what an amphibole is?

2   A   I can only answer that in general terms.  I'm not a

3       geologist.

4   Q   You have heard the term?

5   A   I have heard the term.

6   Q   Are amphiboles asbestos minerals?

7                   (OBJECTION BY ALL DEFENSE COUNSEL)

8   A   Not to my knowledge.

9   Q   Are amphiboles, to your knowledge, generally asso-

10      ciated with talc?

11                  (OBJECTION BY ALL DEFENSE COUNSEL)

12  A   Not to my knowledge.

13  Q   So, just to recap, do I understand your testimony to

14      be that the only asbestos mineral which, to your know-

15      ledge, is associated with talc in general is chrysotile

16      asbestos?

17                  (OBJECTION BY ALL DEFENSE COUNSEL)

18  A   That is correct.

19  Q   That is your understanding?

20  A   That is my understanding.

21  Q   Was there ever research done or testing done by your

22      department to determine whether chrysotile asbestos

23      was present in talc samples given to your department

24      for analysis?

25  A   Yes.

1     Q    Where, to your knowledge, did the talc come from that

2         was given to your department for such testing?

3     A    Well, generally from the Emtal Plant and mine; occa-

4         sionally from competitive sources.

5     Q    When you refer to the Emtal Plant and mine, can you

6         describe that for the record, what that is?

7     A    Well, again, my description will be general. The talc

8         products produced by Emtal are mined underground from

9         an underground deposit and are hauled a short distance

10        to a plant where the raw ore is processed, processed

11        primarily in two respects: One with respect to changes

12        in particle size and size distribution by grinding;

13        and in some cases also by floatation, primarily to

14        remove colored impurities to improve brightness.

15    Q    Is Emtal an acronym or trade name for Eastern Magnesia

16        Talc Company?

17    A    I believe so.

18    Q    When you say Emtal, are you referring to talc produced

19        by Eastern Magnesia Talc Company?

20    A    I'm referring to talc produced by the Minerals and

21        Chemicals Division of Engelhard Corporation.

22    Q    When you refer to that talc, is that only talc that's

23        produced by Eastern Magnesia Talc Company?

24    A    I believe so.

25    Q    Do you have some doubt about that?

1   A   There is doubt on the accuracy of my knowledge on that.

2   Q   That is to say, there may be talc produced in some

3       other place or from some other mine that is marketed

4       at Emtal?

5   A   I don't know.  I'm not suggesting that.

6   Q   You don't know?  Okay.  In the tests of which you're

7       aware that were run on Emtal talc, was there ever

8       found presence of chrysotile asbestos?

9   A   As indicated earlier, we have found on some samples

10      from some limited areas only trace amounts, like indi-

11      vidual fibers, of chrysotile, what we believe to be

12      chrysotile-type asbestos.

13  Q   When you say from some areas, to what are you refer-

14      ring?

15  A   Samples picked more or less at random either in plant

16      or in mine.

17  Q   Are you talking of samples of processed talc?

18  A   It could be.

19  Q   What else could it be?

20  A   It could be samples pulled from areas of the mine.

21  Q   You mean ore?

22  A   Ore.

23  Q   Raw ore?

24  A   Right.

25  Q   So, your department has tested both processed talc and

15

1    raw ore from the Emtal mine for presence of chryso-

2    tile?

3                    MR. HALKET:    Objection.  That's not what

4    he said.

5                    (OBJECTION BY ALL DEFENSE COUNSEL)

6    Q    Is that accurate, or is that inaccurate?

7                    MR. KENNEDY:    Would you like the question

8    read back?  Would you read the question back, please?

9                    (PREVIOUS QUESTION READ BY REPORTER)

10   A    Yes, on occasion.

11   Q    When you say on occasion, what is it that prompts such

12   an occasion?

13   A    As I indicated earlier, we have had no continuous on-

14   going study of mineral impurities in talc.  It is

15   usually -- well, it has been triggered by requests

16   from some of our research clients for such analyses.

17   Q    Then who are your research clients besides Eastern

18   Magnesia Talc Company?

19   A    Well, I'm referring to other departments within the

20   organization.  I'm referring -- I'm only referring

21   to that.  I'm not referring to organizations outside

22   of the company.

23   Q    And what other departments would those be?

24   A    Well, Manufacturing and Sales and  Marketing.

25   Q    When you say the Manufacturing Department, what does

16

1       that comprehend?

2   A   That's the group that has the responsibility for the

3       mining and processing of the talcs that we sell.

4   Q   Is that Manufacturing Department distinct from Eastern

5       Magnesia Talc Company?

6   A   I don't believe so.  I don't know for certain.

7   Q   Who is it, to your understanding, which entity is res-

8       ponsible for the manufacturing and mining of talc at

9       the Johnson mine today?

10   A   Well --

11             MR. KENNEDY:  That is who individually or --

12             MR. PRENTISS:  No.  I said which entity.

13             MR. SLOANE:  Which corporate entity?

14             MR. PRENTISS:  Whatever entity.

15   A   Well, I look on the Minerals and Chemicals Division as

16       an entity.

17   Q   Yes, sir.

18   A   And the Emtal product line is only one of several

19       product lines that the Minerals and Chemicals Division

20       mines and processes and sells.

21             MR. SLOANE:  Listen to the question and

22       answer the question.  That's not the question he asked.

23             THE WITNESS:  Okay.

24             MR. SLOANE:  Read the question back.

25       (PREVIOUS QUESTION READ BY REPORTER)

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

1   A   To my understanding, it is the Minerals and Chemicals

2       Division.

3   Q   There is a corporation called Eastern Magnesia Talc

4       Company; is that not correct?

5   A   I don't know.

6   Q   Earlier in your testimony, you made reference to the

7       Emtal mine and the Emtal facility for processing talc

8       ore; do you remember that?

9   A   Yes.

10  Q   When you made reference to the Emtal mine, are you

11      referring to the Johnson, Vermont mine?

12  A   Yes, I am.

13  Q   And the Emtal facility is a facility at or near the

14      Johnson, Vermont mine?

15  A   Yes.

16  Q   Now, you testified that your department has tested

17      both processed talc and raw talc ore from the Emtal

18      mine for presence of chrysotile asbestos; is that

19      correct?

20  A   Yes.

21  Q   Has your department in its research found chrysotile

22      asbestos in both processed talc and raw ore from the

23      Emtal mine?

24  A   Yes.

25  Q   In your earlier answer, you referred, I believe, to

18

1     the presence of chrysotile in asbestos that your

2     department found as being trace quantities.  Is that --

3  A  That is correct.

4  Q  What do you define as trace quantities?

5  A  Trace quantity is a level of a component that can be

6     qualitatively identified, but not quantitatively

7     measured.

8  Q  And can you characterize that as being less than some

9     threshold percentage?

10  A  Well, no.  I can characterize it as an individual

11     fiber, but in terms of characterizing it as less than

12     a certain percentage, no, I cannot.

13  Q  Is there a threshold percentage below which the re-

14     search materials that are available to you cannot

15     quantify as to the presence of chrysotile asbestos?

16  A  Obviously, if there were less than a single fiber, we

17     would not be able to characterize -- to quantify it.

18  Q  So you'll understand my question, let me give you a

19     brief explanation.  I'm asking whether there is some

20     percentage below which quantification is impossible;

21     that is, less than one percent or less than five per-

22     cent or less than ten percent.  Do you understand the

23     question?

24            MR. HALKET:   Objection.  I don't.

25            (OBJECTION BY ALL DEFENSE COUNSEL)

1              MR. HALKET:   Are you talking characterized

2    by weight or by molecule number?

3              MR. PRENTISS:   Okay.  I understand.

4  Q  Is there any standard format by which percentage con-

5    tent of a talc, of a contaminant such as chrysotile

6    asbestos, is stated in terms of weight, molecular

7    weight, volume or the like?

8  A  There are two types of tests.  One can use total chemi-

9    cal analysis or x-ray diffraction, and those tests are

10    limited to identifications of perhaps one to two per-

11    cent.  There is another type of test such as the elec-

12    tron microscope in which one can identify an individual

13    particle.

14              MR. HALKET:   Listen to the question again

15    and answer it.  That's not the answer to his question.

16    Why don't we read that question again.

17             (PREVIOUS QUESTION READ BY REPORTER)

18  A  No.

19  Q  In other words, if I were to tell you that I have a

20    sample of talc that contains three percent asbestos,

21    is there a standard usage in the field with which you

22    are familiar that you could determine that that three

23    percent meant three percent by weight, three percent

24    by volume?  How is it commonly stated?

25             (OBJECTION BY ALL DEFENSE COUNSEL)

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

1   A   I'm not sure that I understand your question.

2   Q   How do you commonly state degree of contamination of

3       talc by some other mineral constituent?

4               (OBJECTION BY ALL DEFENSE COUNSEL)

5   A   If there is sufficient there to detect it by any

6       standard methods, then a percent by weight would be

7       one way.

8   Q   Is that the normal way that you would use in charac-

9       terizing a talc?

10              (OBJECTION BY ALL DEFENSE COUNSEL)

11  A   If there were sufficient of the contaminant present

12      that I could express it meaningfully, yes.

13  Q   You would say percentage by weight?

14  A   Percentage by weight would be an acceptable method.

15  Q   For example, the talc from the Emtal mine in Johnson,

16      Vermont, the processed talc is not pure talc; is that

17      correct?

18              (OBJECTION BY ALL DEFENSE COUNSEL)

19  A   I think it is --

20              MR. KENNEDY:   Excuse me, Dan, what do you

21      mean by pure talc?

22              MR. PRENTISS:   Just that, pure talc ore.

23              MR. KENNEDY:   What kind of talc are you

24      talking about?

25              MR. PRENTISS:   Any of the talcs.

1           MR. KENNEDY:   If you can answer it, that's

2  what he wants.

3  A   To the degree that there is basically nothing pure in

4     nature, so any ore that we would dig out of the mine

5     would contain in all probability something other than

6     the major constituent.

7  Q   Does talc from the Emtal mine contain chlorite?

8           MR. HALKET:   The ore or the --

9           MR. PRENTISS:   Processed talc.

10  A   I don't know.

11  Q   Has your department ever tested processed talc from

12     the Emtal mine to determine the constituent minerals

13     in that talc?

14  A   Yes, we have.

15  Q   Are some of the constituent minerals -- is one of the

16     constituent minerals chlorite?

17  A   I don't recall that.

18  Q   You stated earlier in an answer that the x-ray diffrac-

19     tion and one other method of analysis of talc from

20     mineral constituents was limited to one to two percent;

21     do you remember that answer?

22  A   Yes, I do.

23  Q   When you say limited to one to two percent, what do

24     you mean?

25  A   That would be one to two percent by weight.

22

1   Q   By that answer, are you saying that those methods of

2       analyses cannot detect constituents of less than one

3       or two percent composition by weight?

4   A   That is correct.   It depends somewhat upon the consti-

5       tuent one is looking for, but it's in that range.

6   Q   Now, one of the tests that you mentioned was x-ray

7       diffraction.   What was the other test that you grouped

8       with x-ray diffraction as being limited to one to two

9       percent?

10  A   I don't think I said one to two percent in that case.

11      Chemical analysis is another method of identifying

12      mineral or at least a chemical species, and from that

13      you might be able to infer what minerals were present.

14  Q   And what's the limit of chemical analysis for determi-

15      nation of mineral species?

16  A   That depends on the particular combination of minerals

17      that happen to be there.

18  Q   You can't --

19  A   I couldn't answer definitively.

20  Q   But you do say that x-ray diffraction is limited to one

21      to two percent in its determination of mineral species?

22  A   That is my understanding.

23  Q   Has any test that has been done by your department of

24      talc from the Emtal mine found by x-ray diffraction

25      the presence of chrysotile asbestos?

1          (OBJECTION BY ALL DEFENSE COUNSEL)

2     A    Not to my knowledge.

3     Q    Are you aware of all of the -- of the results of all

4          of the tests that have been run by your department on

5          Emtal talc?

6     A    Only generally.

7     Q    Would you be aware if x-ray diffraction methods had

8          determined the presence of chrysotile asbestos in talc

9          from the Emtal mine?

10         (OBJECTION BY ALL DEFENSE COUNSEL)

11    A    Possibly.

12    Q    Dr. Hemstock, has your department ever had outside

13         laboratories or facilities test talc from the Emtal

14         mine?

15    A    Yes, on occasion.

16    Q    By outside laboratories or facilities, I'm referring

17         to a business or a laboratory which is not connected

18         with your employer?

19    A    That is correct.

20    Q    You understand that?  Your answer is that on occasion,

21         your department has sought an outside laboratory to

22         perform some sort of analysis on Emtal talc?

23    A    That is correct.

24    Q    To your knowledge, has any other person within your

25         company -- I'm referring to Engelhard Corporation --

24

1       sought outside analysis on talc from the Emtal mine?

2   A   Not to my knowledge.

3   Q   Has any person, to your knowledge, has any person

4       within your company sought outside analysis of any

5       talc other than talc from the Emtal mine?

6   A   Yes.

7   Q   What was the purpose for seeking outside analysis

8       either of Emtal talc or talc other than Emtal?

9               MR. HALKET:   I'm going to object to that

10      question.. It is ambiguous.

11            (OBJECTION BY ALL DEFENSE COUNSEL)

12  A   The reason was that we either did not have the skills

13      to carry out the tests, or we did not have the instru-

14      mentation in-house.

15   Q   What is the instrumentation that you have in-house

16      that's available for analysis of talc for mineral

17      constituents?

18   A   Could you be more specific?

19   Q   I'll try.  Do you have laboratories at your disposal

20      within your department?

21   A   Yes.

22   Q   What analytical instruments do you have in your labora-

23      tories for the testing of talc for mineral constituents?

24   A   Well, I mentioned x-ray diffraction.

25   Q   Yes.

1   A    If the quantities of mineral present is adequate,

2        differential thermal analysis. We do have light

3        microscopes equipment for looking at particle shape,

4        although that is not a positive identification of

5        mineral species. Today we do have a scanning electron

6        microscope.

7   Q    And when did you obtain the scanning electron micro-

8        scope?

9   A    In 1982.

10   Q    When did you obtain the x-ray diffraction facility?

11   A    I don't recall.

12   Q    Have you had that x-ray diffraction facility since you

13        began -- your department began the testing of Emtal

14        talc?

15   A    We had it prior to that time.

16   Q    Do you have a transmission electron microscope?

17   A    No, we do not.

18   Q    Is the x-ray diffraction machine that you have capable

19        of detecting chrysotile asbestos in talc samples if

20        such mineral were there?

21               (OBJECTION BY ALL DEFENSE COUNSEL)

22   A    Only if present in sufficient quantity.

23   Q    What quantity would that be?

24   A    Oh, perhaps greater than five percent.

25   Q    Are you aware of the state of the art analytical metho

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

1    that are available for the testing for the mineral

2    constituents of talc?

3  A  Generally.

4  Q  Are there x-ray diffraction machines that have a finer

5    sensitivity, if that's the proper word, than the one

6    that you have?

7  A  Not to my knowledge.

8  Q  Do you know of a technique of analysis called electron

9    microprobe?

10  A  Yes, I do.

11  Q  Is that one technique that is used for detection of

12    asbestos minerals?

13  A  Not to my knowledge.

14  Q  Is transmission electron microscope one instrument

15    that is used for detection of mineral constituents

16    of talc?

17  A  Transmission electron microscopy will measure particle

18    shape only.

19  Q  Is that an important part of analysis of talc, to

20    determine its mineral constituents?

21  A  It could be.  It's not definitive.

22  Q  When you speak of particle shape, that's what generally

23    termed morphology?

24  A  Yes, that's correct.

25  Q  Morphology is one of the means of determining whether

1        certain mineral constituents are present; is that

2        correct?

3                (OBJECTION BY ALL DEFENSE COUNSEL)

4  A   Yes.

5  Q   When did your department or when did your company

6        first send out samples for outside analysis?

7  A   I don't recall.

8  Q   Was that at the very beginning of your involvement,

9        your department's involvement, in the testing of talc?

10  A   I don't know.

11  Q   You have no recollection of when it was that you

12        sought outside laboratory facilities?

13  A   No, I don't.

14  Q   Well, you stated in answer to an earlier question that

15        you sought these outside facilities to obtain ana-

16        lytical skills that weren't available within your own

17        department?

18  A   Correct.

19  Q   When did you first determine that your own department

20        did not have sufficient analytical skills or methods

21        to perform the tests?

22  A   Oh, it was generally in the seventies.  I could not be

23        more specific.

24  Q   Would it have been after you had spent some period of

25        time doing your own in-house analysis?

PENCAD CO., BAYONNE, N.J. 07002 · FORM 740

1   A   Perhaps.

2               (RECESS)

3   Q   Dr. Hemstock, is it your testimony that the testing

4       of Emtal talc has found some chrysotile fibers?

5               (OBJECTION BY ALL DEFENSE COUNSEL)

6           MR. KENNEDY:   When one Defendant objects,

7       it counts for everybody.

8   A   No.

9   Q   Has your department ever found chrysotile asbestos

10      in Emtal talc?

11              (OBJECTION BY ALL DEFENSE COUNSEL)

12  A   Yes.

13  Q   What was the form of the chrysotile asbestos that you

14      found?

15              (OBJECTION BY ALL DEFENSE COUNSEL)

16  A   It was present in trace amounts in some samples.

17  Q   What was the morphology of those trace amounts that

18      you found?

19  A   They were fibers.

20  Q   What were the size of the fibers?

21              (OBJECTION BY ALL DEFENSE COUNSEL)

22  A   Variable.

23  Q   What was the maximum size that you recall?

24  A   I don't recall.

25  Q   What was the general range of sizes that was found?

1    A    Generally --

2                (OBJECTION BY ALL DEFENSE COUNSEL)

3    'A    Generally in the one micron range.

4    Q    When you speak of one micron, are you referring to the

5         length of the fiber?

6    A    That's correct.

7    Q    Did you find any greater than one micron in length?

8    A    In some samples.

9    Q    Did you find any less than one micron in length?

10   A    In some samples.

11   Q    What generally was the range of aspect ratios of the

12        fibers that were found?

13                (OBJECTION BY ALL DEFENSE COUNSEL)

14   A    I don't recall.

15   Q    Dr. Hemstock, I'm going to start going through some of

16        the documents that have been provided in connection

17        with this deposition.  These have been marked, and I'm

18        going to ask you just to identify them as I show them

19        to you.  Showing you Plaintiff's Exhibit No. 1, can

20        you identify that, please?

21                MR. KENNEDY:   Can we just get one thing

22        straight.  How would you like him to identify them,

23        by date, by department?

24                MR. PRENTISS:   The most succinct manner he

25        can think of to identify it so that it will be clear

1   for the record. I think that the kind of documents

2   are so diverse --

3           MR. SLOANE:   Just say Plaintiff's Exhibit

4   No. 1.

5           MR. PRENTISS:   What is Plaintiff's Exhibit 1

6           MR. HALKET:   If you're asking him to des-

7   cribe the document by reading its face and saying how

8   many pages it is, I don't have any objection to that;

9   but I want to make it clear that by so doing he's not

10  testifying to the -- that he has the knowledge suffi-

11  cient to lay a foundation as to the accuracy of the

12  information in the document or its admissibility in

13  evidence.   You're just asking him to read a piece of

14  paper that you've given him.

15          MR. PRENTISS:   I'll be asking those ques-

16  tions about each one of the documents.

17          MR. HALKET:   I just wanted to make it clear.

18  Q   Do you know what that document is?

19  A   Generally, yes.

20  Q   Have you ever seen it before?

21          MR. KENNEDY:   Well, let's just clarify this

22  He has seen all these documents within the last two

23  days.   So, why don't we assume that if he says no, he

24  hasn't seen them before, he's really meaning no, I

25  haven't seen them before they were shown to me the

1    other day by counsel in preparation for this deposi-

2    tion.  Okay?

3           MR. PRENTISS:    Fine.

4    A    Not that I recall.

5    Q    And do you know where it came from?

6           MR. KENNEDY:    That's of your own knowledge.

7    A    No.

8           MR. KENNEDY:    He can read the document and

9    tell where it came from.

10          THE WITNESS:    Yes.

11    Q    The face page of that document is a form entitled

12    "Inter-Department Memorandum, Minerals and Chemicals

13    Division."  Do you recognize that form at all?

14    A    Yes, that's a standard memorandum form that our divi-

15    sion uses.

16    Q    Attached to the standard memorandum form is a page

17    which carries at the top the label "TSR NO.: SL 43872D.

18    What is a TSR?

19    A    That's -- a TSR is a Technical Service Request.

20    Q    And what is that?

21    A    That is a document that is used for committing to

22    writing requests that are made by departments outside

23    of Research and Development.

24    Q    By that you mean, would this be a request for analysi

25    by one of the outside laboratories that you discussec

52

1   earlier in your testimony?

2   A   It would be a request for analyses from outside the

3       Research and Development Department, not necessarily

4       an outside laboratory.

5   Q   What services outside the Research and Development

6       Department other than outside laboratories would a

7       TSR be directed to?

8   A   Would you clarify the question, please?

9   Q   Sure.  A TSR can request a service from some person

10      other than the Research and Development Department,

11      is that --

12  A   No.  That's a Technical Service Request.

13  Q   Yes?

14  A   It's filled out by one of the requesting departments

15      outside of R & D for R & D assistance.

16  Q   And so, a TSR, this TSR is something that the -- well,

17      can you tell me from looking at that, is that a request

18      that was received by the Research and Development

19      Department?

20              (OBJECTION BY ALL DEFENSE COUNSEL)

21  A   Yes, I would say so.

22  Q   On what basis would you say so?

23  A   Mr. Triglia is a member of the Research and Development

24      Department, but the -- this form --

25  Q   Now you're referring to page three of four pages of

33

1    Exhibit 1?

2    A    That's correct.

3    Q    Yes?

4    A    This form would have been filled out by the requestor

5         outside of R & D.

6    Q    What is page two of Exhibit 1?

7    A    This is a description of the results of the tests,

8         of the analytical tests.

9    Q    By whom were those tests done?

10             MR. KENNEDY:   Could I just clarify one

11   point?  These answers that you're getting are not

12   from the personal knowledge of Mr. Hemstock, but just

13   by his reviewing the document.   Do you understand that?

14             THE WITNESS:   That is correct.

15             MR. KENNEDY:   He said he hasn't seen the

16   document before.

17             THE WITNESS:   A general knowledge, but not

18   specific knowledge.

19   Q    Are you finished with your answer?

20             THE WITNESS:   Would you repeat the last

21   question, please?

22             (PREVIOUS QUESTION READ BY REPORTER)

23   Q    Are you finished with your answer?

24   A    Yes.

25   Q    Those analytical tests would have been performed by

34

1      the Research and Development Department?

2 A   Not entirely.

3 Q   By whom else would the tests have been run?

4 A   The document states the -- that the scanning electron

5      micrograph were run by a laboratory at the Georgia

6      Institute of Technology.

7 Q   Would the testing by the Georgia Institute of Tech-

8      nology have been done at the request of the Research

9      and Development Department?

10 A   It probably would.

11 Q   Under what circumstances would it not have been?

12              (OBJECTION BY ALL DEFENSE COUNSEL)

13 A   I can't recall a circumstance where it would not have

14      been.

15 Q   When the Research and Development Department receives

16      a TSR, is it the customary practice of the Research

17      and Development Department to keep a copy of that TSR

18      together with whatever response was sent to the TSR?

19              (OBJECTION BY ALL DEFENSE COUNSEL)

20 A   That would be normal procedure.

21 Q   You testified at the deposition on January 28 that you

22      are the official within your company who has the most

23      direct control and custody over those files of the

24      company related to the Research and Development Depart-

25      ment, did you not?

1    (OBJECTION BY ALL DEFENSE COUNSEL)

2    MR. SLOANE:   Are you asking him whether

3    he testified to it, or whether that's true?

4    MR. PRENTISS:   I'm asking if he testified

5    to it.

6    MR. SLOANE:   The record speaks for itself.

7    Whether he testified to it or not is in the record.

8    MR. PRENTISS:   Your objection is noted.

9    MR. KENNEDY:   Do you recall what you --

10   first of all, do we have a copy of the record?   That's

11   the best evidence.

12   MR. PRENTISS:   This is not trial.   This is

13   a deposition, and we'll hear objections.   I don't want

14   to hear instructions; okay?

15   MR. KENNEDY:   I understand, but it is an

16   unfair question to start asking him whether or not he

17   said something some time ago without an opportunity

18   for him to review it.   You're not trying to play games

19   with him, you're trying to get facts.

20   Q    Dr. Hemstock, do you have the question?

21   A    I would need to review the previous testimony to be

22        sure of that.

23   Q    Dr. Hemstock, are you the official within your company

24        who has most direct control and custody over the

25        records related to the Research and Development Depart-

1   ment?

2   A   I do not have direct control.  The documents happen

3       to be filed by personnel, various personnel within my

4       department.  I do not have direct control over them.

5   Q   Who does?

6   A   There has been no one designated as such.

7   Q   Who has access to those records?

8   A   They're accessible to members and are maintained pri-

9       marily for members of the R & D Department.

10  Q   You are the head of the R & D Department?

11  A   That is correct.

12  Q   Are they accessible to anyone else?

13  A   They could be on request.

14  Q   A request to whom?

15  A   It would probably be a secretary who would -- who

16      knows the file coding systems that we use, and if the

17      request were made to her and it -- and the document

18      was not kept in a -- in any special file, it would be

19      available to the requestor.

20  Q   To anybody in the company?

21  A   Within reason.  We might require the department head

22      to indicate whether that document should be made avai-

23      lable to an individual on occasion.

24  Q   Who might require?

25  A   The -- well, my secretary might ask me if there were

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

1   any reason why such and -- so and so should not have

2   access to that file.

3   Q   It would be your decision as to who should have access

4       and who should not have access; isn't that right?

5   A   It could be.

6   Q   Who else would have that decision?

7   A   Our legal department could have that authority as well.

8   Q   Who makes the decision as to who has access to the

9       documents?

10  A   Normally, I would, if it were something that were con-

11      sidered non-routine.

12  Q   You may on occasion consult legal counsel in making

13      your decision; is that right?

14  A   On occasion, I might.

15  Q   Other than that, it's your decision; is that right?

16  A   Generally, that is correct, that's true.

17  Q   Now, Exhibit 1 is a document that -- can you tell me

18      whether that came from the files of the Research and

19      Development Department of your company?

20  A   I have no way of knowing that.

21  Q   Did anybody request of you permission to remove that

22      document or any other documents from the Research and

23      Development Department?

24          MR. KENNEDY:   Are you talking about the

25  documents that we've produced?

38

MR. PRENTISS:   Yes.

MR. KENNEDY:   That was done through legal counsel of Engelhard Corporation.   That's how these documents were gathered.

MR. PRENTISS:   There's a question pending. I'd like an answer.

A   Yes.

Q   Who requested of you?

A   Our legal department.

Q   When?

A   I don't recall.

Q   How long ago?

A   Generally in the last year.

Q   Were you requested to gather up certain documents by legal counsel?

(OBJECTION BY ALL DEFENSE COUNSEL)

MR. KENNEDY:   That goes to attorney-client privilege.   I'm going to instruct him not to answer that.

Q   Did you gather certain documents as a result of your discussion with legal counsel?

MR. KENNEDY:   I'll object to that, too. That's trying to get the same information through the back door.

(OBJECTION BY ALL DEFENSE COUNSEL)

Case 2:11-cv-01754-BRM-AME Document 70-1 Filed 08/04/11 Page 99 of 193 PageID: 2037

1       MR. PRENTISS: Are you instructing him not

2 to answer?

3       MR. KENNEDY: Yes.

4       MR. PRENTISS: Let's call up Judge Boyle.

5       (OFF-THE-RECORD DISCUSSION)

6 Q As I understand it, Engelhard Corporation, Dr. Hem-

7 stock --

8       MR. KENNEDY: Dr. Hemstock won't stipulate.

9 We'll stipulate. Is that what you were going to say?

10       MR. PRENTISS: Well --

11       MR. KENNEDY: Because he doesn't know what

12 I think you want him to stipulate to. What you want

13 to establish is some foundation for these documents.

14       MR. PRENTISS: That's right.

15       MR. KENNEDY: That they were kept in the --

16 you want to stipulate to what, now, that the documents

17 that we have produced were kept in the ordinary course

18 of business?

19       MR. PRENTISS: That's right.

20       MR. KENNEDY: That it was the course of

21 business for Engelhard to keep those documents?

22       MR. PRENTISS: That's right.

23       MR. KENNEDY: We have no problem in stipu-

24 lating to that. We cannot stipulate, and I think you

25 want us to, but we cannot stipulate at this time that

the events recorded on those documents were recorded

contemporaneously with the events. That we cannot do,

not that we're not willing to, we're just unable to

at this time.

MR. PRENTISS: Will you stipulate that

these documents were made in the ordinary course of

business of Engelhard?

MR. KENNEDY: I think I did.

MR. SLOANE: Made by anyone in the ordinary

course of business.

MR. PRENTISS: That's right.

MR. KENNEDY: I don't see the semantic dis-

tinction.

MR. HALKET: All that we can stipulate to

is the fact that we found these in the files of the

company, and that they were company records. I don't

know what went through the minds of the people who

made them when they made them. One of the people who

made them is Peter Gale. You can ask him better than

we can, I suspect, what he did when he wrote up the

document.

MR. LEIBENSPERGER: Moreover, many of the

documents as I saw them were prepared by people not

employed by Engelhard. There's no way of Engelhard

or any of us sitting around the table can stipulate

1    to how they were prepared by them.

2                MR. PRENTISS:   You will stipulate, so we'll

3    be absolutely clear, that all of these documents came

4    from the files of Engelhard Corporation?

5                MR. KENNEDY:   Yes.

6                MR. PRENTISS:   That the documents were kept

7    by Engelhard Corporation in the ordinary course of its

8    business, and that it was the --

9                MR. KENNEDY:   Ordinary course of --

10               MR. PRENTISS:   -- Engelhard's business to

11   keep those documents or keep those records in its

12   files?

13               MR. KENNEDY:   Yes.  That's what we did.  We

14   got them --

15               (OFF-THE-RECORD DISCUSSION)

16               MR. PRENTISS:   Can we add Mr. Kennedy's

17   last statement.  We're stipulating as an ancillary

18   part of the regular course of business of Engelhard

19   Corporation, it kept these records.

20               MR. KENNEDY:   It kept records.

21   Q   So, to go back to Exhibit 1, Dr. Hemstock, do you have

22       any idea as to page four of Exhibit 1 what the original

23       of that stated?

24   A   No, I do not.

25   Q   Dr. Hemstock, was it the practice of the Research and

1        Development Department to prepare reports such as

2        that which appears as page two of Exhibit 1 in res-

3        ponse to a TSR such as this?

4   A    Generally, yes.

5   Q    When you say generally, why do you add the qualifier?

6   A    Because some TSR's are very, very brief, and sometimes

7        one sentence or one line. That's really what this

8        space is for, to record results, and many times the

9        results can all be encompassed within that page. This

10       happened to be one that required more space, and,

11       consequently, received a separate page.

12   Q    So, the practice within the Department would be either

13       to provide the response to the TSR on that form which

14       is at page three of Exhibit 1 below the line labeled

15       "Results of Tests," and if the results of the tests

16       required greater elucidation, an additional page would

17       be provided such as is shown as page two of Exhibit 1;

18       is that correct?

19   A    That is correct.

20   Q    Exhibit 2 I'd like to hand you at this time. Is that

21       another TSR form?

22   A    There is no TSR form in this document.

23   Q    Had you ever seen Exhibit 2 prior to preparation for

24       this deposition?

25   A    Not that I recall.

1  Q    Do you know whether this document came from the files

2       of the Research and Development Department?

3  A    No, I don't.

4  Q    Who is Mr. Michael Zimmermann?

5  A    Mr. Michael Zimmermann is the Product Manager for the

6       Emtal product line.

7  Q    What is x-ray fluorescence analysis?

8  A    X-ray fluorescence analysis is a technique for iden-

9       tification of the chemical elements present in a

10      mineral ore or a product.

11 Q    Is x-ray fluorescence analysis distinct from x-ray

12      diffraction?

13 A    Yes, it is.

14 Q    Is x-ray fluorescence analysis a means for testing for

15      presence of asbestos mineral in a sample of talc?

16 A    No, it is not.

17 Q    Did your department request the B.F. Goodrich Company

18      to perform tests on talc samples for presence of as-

19      bestos?

20 A    Not to my knowledge.

21 Q    What is Exhibit 3?

22 A    This is a Technical Service Request.

23 Q    From whom?

24 A    The document suggests it's from Mr. Shafer.

25 Q    To whom is it addressed?

1   A   It's addressed to Mr. Triglia and myself.

2   Q   And what is the request?

3   A   The -- well, the request is to determine the presence

4       of asbestos-form particles or free silica in four

5       samples of mine rock waste.

6   Q   Do you recall that TSR?

7   A   No, I do not.

8   Q   You don't recall receiving that?

9   A   No, I do not.

10  Q   Was there a report that was rendered as a result of

11      that TSR?

12  A   The report is attached to this document.

13  Q   Do you know who wrote the report that is attached to

14      the TSR?  I'll show it to you, if you like.

15  A   No, I cannot tell.

16  Q   And what's the date of the TSR?

17  A   The date it was initiated was February 28, 1973.

18  Q   And can you determine what the date of the response

19      is?

20  A   Well, the response date at which the report was com-

21      pleted according to this document is June 12, 1973.

22  Q   Did that TSR entail a request by your department for

23      outside laboratory analysis?

24          MR. KENNEDY:   Dan, doesn't the report speak

25  for itself?  I mean, he's only reading it.

45

A   Yes, that's what the report would suggest.

Q   Now showing you page three of Exhibit 3, there is a table.  Can you tell me whether -- can you tell me if this table represents the results of the in-house analysis that was done in response to the TSR?

A   I can't answer that with certainty.

Q   Do you know whether in-house analysis was done in response to this TSR?

A   I don't know with certainty.

Q   Was it the regular practice of your department to prepare a report such as is included in response to the TSR such as is shown on page one of Exhibit 3?

A   Well, page one indicates the report is attached, and that's what these are, attachments.  So, that would be normal.

Q   That would be the normal practice?

A   That's correct.

Q   Would it be normal practice to write up this report at the conclusion of the studies that made up the report?

A   I should think so.

Q   Now, page three of this report contains a table.  On the table is a line item that states "Number Asbestos Fibers Counted," and there's an asterisk which refers to the statement, "Based on a total particle count of

1    five hundred." The number asbestos fibers counted

2    under the four columns are three, four, three, and

3    eight respectively. Is that what you referred to

4    earlier as being trace quantities?

5                (OBJECTION BY ALL DEFENSE COUNSEL)

6    A    Without a detailed study of the Johns-Manville report,

7         I couldn't comment.

8    Q    Is the Johns-Manville report appended to this document?

9    A    Yes, it is.

10               (RECESS)

11   Q    Dr. Hemstock, is 1.6 percent asbestos as a constituent

12        of a talc sample what you would consider trace quantity?

13   A    I would --

14               (OBJECTION BY ALL DEFENSE COUNSEL)

15   A    I would consider -- no, it is not.

16   Q    That's greater than trace quantity?

17   A    Yes.

18   Q    Did you receive -- do you recall whether you received

19        this TSR at the time that it was issued?

20   A    No, I do not.

21   Q    Was it normally the case that when a TSR would be given

22        to your department that you would see that TSR?

23   A    No, I would not normally see it.

24   Q    And would you normally only see it if it had your name

25        on it?

1    A    If it were addressed specifically to me, I would, in

2         all probability, I would see it.

3    Q    Now, this TSR is addressed specifically to you; is

4         that right?

5    A    And to Mr. Triglia.

6    Q    Yes.

7    A    Who is in my department.

8    Q    Under normal circumstances, would you have read that

9         at the time that you received it?

10   A    I might have scanned it and passed it along to Mr.

11        Triglia.

12   Q    Who is Mr. Triglia?

13   A    Mr. Triglia was the group leader of physical measure-

14        ments at that time.

15   Q    And what was your position at that time?

16   A    I was Director of Research.

17   Q    Before you became a Vice President?

18   A    That's correct.

19   Q    Now, where a TSR carried your name as one of the ad-

20        dressees, would you normally read the response that

21        was ultimately given to that TSR?

22   A    I might.

23   Q    Under what circumstances would you read the response?

24   A    I think that the subject matter or my own personal

25        interest, if I wanted to -- if I had a general interes

48

1.      in that area, I might read it.

2   Q   In this case, the request, the TSR request is to

3      determine whether or not there is asbestos or asbesti-

4      form particles or free silica in certain ore samples

5      that were submitted with the TSR; is that correct?

6   A   That's what the document says.

7   Q   Would that be a matter that you would consider of

8      personal interest to you, whether or not there was

9      asbestos in any of those ore samples?

10   A   I might have had general interest, but not particularly

11      high interest in that at that particular time.

12   Q   Those ore samples came from -- is it apparent from

13      that document where those ore samples came from?

14   A   Yes, to the degree that the subject matter is Emtal

15      mine waste rock, I would have to believe they came

16      from the Emtal mine.

17   Q   In 1973, at the time that TSR was prepared, were you

18      aware of any hazardous propensities of asbestos?

19              (OBJECTION BY ALL DEFENSE COUNSEL)

20   A   In a general sense, yes.

21   Q   Was it a matter of any concern to you personally or

22      professionally whether any of the ore that was asso-

23      ciated with the Emtal talc mine contained asbestos?

24              (OBJECTION BY ALL DEFENSE COUNSEL)

25   A   In general terms, yes.

1    Q    Looking at that document, do you have any -- does

2         that refresh any recollection of yours whatsoever as

3         to the events that are portrayed in the document?

4    A    No, it does not.

5    Q    Do you remember the first time that you learned of

6         a test result that found asbestos of any type in

7         Emtal talc or Emtal talc ore?

8              (OBJECTION BY ALL DEFENSE COUNSEL)

9    A    I couldn't identify such time.

10    Q    Was that a matter of some significance to you?

11              (OBJECTION BY ALL DEFENSE COUNSEL)

12    A    Would you clarify the question, please?

13    Q    You were aware generally in 1973 that asbestos was

14         known or suspected to have hazardous health properties,

15         weren't you?

16    A    Generally, yes.

17    Q    And would it not have been a matter of concern to you

18         having that knowledge of asbestos if you were to learn

19         that some of the talc that was produced by your com-

20         pany may come from ore that was associated with asbes-

21         tos?

22    A    Perhaps.

23    Q    Perhaps?

24    A    To the degree that I was generally aware that asbestos

25         was a very minor constituent of talc, generally, yes.

1    Q    Well, is it your opinion that as a very minor consti-

2       tuent of talc, generally asbestos does not pose a

3       health hazard?

4       (OBJECTION BY ALL DEFENSE COUNSEL)

5       MR. KENNEDY:    I'm going to not only object,

6       but I'd like to remind you that Engelhard is not a

7       party to this. This is a discovery deposition, and

8       I think your question is argumentative when you really

9       have no cause to be argumentative with this witness.

10      It's a discovery deposition. That's it.

11    Q    Can you answer the question?

12      THE WITNESS:    Would you repeat the question,

13      please?

14      (PREVIOUS QUESTION READ BY REPORTER)

15    A    That is my general belief.

16    Q    On what do you base that belief?

17      (OBJECTION BY ALL DEFENSE COUNSEL)

18    A    Really on the basis of evidence that we have developed

19       over the past several years. The quantities of as-

20       bestos in general that we have seen are below the

21       level that I would consider to be potentially hazardou

22    Q    What is the level, what is that level that you just

23       referred to?

24      (OBJECTION BY ALL DEFENSE COUNSEL)

25    A    This is a qualitative judgment on my part. I think th

1   levels that are considered hazardous is very much a

2   controversial issue, so I stand by the fact that

3   qualitatively I believe they are below, in my judgment,

4   are below the levels that are to be considered hazard-

5   ous.

6   Q   What in your judgment is a level at which contamination

7   by asbestos would be considered hazardous?

8   (OBJECTION BY ALL DEFENSE COUNSEL)

9   A   I think speaking again very generally without the

10   professional knowledge as an epidemiologist, probably

11   of the order of percents --

12   Q   Of the order of percents?

13   A   Well, let's say two to five percent.

14   Q   Two to five percent?

15   A   Speaking as a -- I'm speaking now as a layman in that

16   area rather than a professional.

17   Q   Thank you.  I'll show you Plaintiff's Exhibit 4 for

18   this deposition.  What is that, Dr. Hemstock?

19   A   This is a Technical Service Request.

20   Q   And do you have any recollection of ever having seen

21   that before other than through counsel?

22   A   No, I do not.

23   Q   Is there a report attached to that TSR?

24   A   Yes, there is.  It's a similar form to those we have

25   previously looked at.

1  Q  As with the other TSR's, was that a form that was

2     customary for your department to prepare in response

3     to such a TSR?

4  A  Yes, it was.

5  Q  Who is Mr. Marchetti?

6  A  Mr. Marchetti was the Manager of Technical Service at

7     that time.

8  Q  Now, the bottom of this TSR, there's a series of ini-

9     tials after the line "Copies to." Can you identify

10    who those initials belong to?

11 A  Yes, I can.

12 Q  Could you do so?

13 A  This one is myself.

14 Q  You're referring to "GAH"?

15 A  That is correct. "EWA" refers to Dr. E.W. Arnold.

16 Q  Who is that?

17 A  He was a Director of Research at this time.

18 Q  Who is "WSS"?

19 A  "WSS" is W.S. Stoy, and he is a group leader of indus-

20    trial products, Technical Service.

21 Q  Who is "EJT"?

22 A  That "EJT" is E.J. Triglia who was the Manager of

23    Analytical and Physical Measurements at that time; an

24    "JVK" refers to Dr. James V. Kennedy who was also a

25    Director of Research at that time.

1   Q  Those initials indicate that you, among these other

2     people, received a copy of this TSR?

3   A  That's what those initials would normally indicate.

4   Q  Does that also indicate that you received a copy of

5     the report that was prepared in response to the TSR?

6   A  That would be normal procedure.

7   Q  And the document shows that it was assigned to a Mr.

8     F.J. -- and I'll ask your help?

9   A  Dzierzanowski.

10   Q  Who is that?

11   A  Mr. Dzierzanowski is or was at that time group leader

12     of Physical Measurements.

13   Q  Would he be the person who would have prepared the

14     report that is appended to this TSR?

15   A  It would in all probability be someone in his group

16     rather than he himself.

17   Q  Could you tell me what is Exhibit 5?

18   A  I cannot identify this document.

19   Q  You've never seen Exhibit 5 before?

20   A  Not to my knowledge.

21   Q  The title of this paper is "Proposed Experimental

22     Design for Fiber Distribution," and the date of the

23     second page of this document is 4/15/1970. Do you kno

24     whether there was concern within your department as of

25     4/15/70 regarding identification of fiber contaminatio

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

1    of talcs that were produced and sold by your company?

2  A    I don't know that.

3  Q    Is there today?

4            (OBJECTION BY ALL DEFENSE COUNSEL)

5  A    I think I've testified earlier the fact that I per-

6       sonally, and I believe the division, believe that the

7       level of asbestos minerals present in our talcs is at

8       a non-hazardous level.

9  Q    When did it first concern you to determine what the

10      fiber levels of your talcs were?

11           (OBJECTION BY ALL DEFENSE COUNSEL)

12           MR. PRENTISS:    Let me restate that ques-

13      tion.

14           THE WITNESS:    Yes, if you would, please.

15  Q    When was it that you first decided to determine the

16      fiber levels of your talc?

17  A    I personally did not make that decision.

18  Q    Who did?

19  A    We -- the Research Department was responding to re-

20      quests from Marketing, Sales and Manufacturing, and

21      if they requested that we carry out such determination

22      we did, or attempted to.

23  Q    You don't recall when that first request was?

24  A    No, I do not.

25  Q    And was it communicated to you what the reason for tha

1    request was?

2    A   I don't recall the circumstances.

3    Q   Do you know whether there was any concern over possible

4    health hazards involved with the talc?

5    A   I can't definitively respond.   I don't know.

6    Q   You simply don't know?

7    A   I don't know.

8    Q   Do you know what Exhibit 6 is?

9    A   This is a Technical Service Request.

10    Q   Have you ever seen that before, prior to preparation

11    for this deposition?

12    A   Not that I recall.

13    Q   It's the same format of Technical Service Request

14    together with responding studies that was the normal

15    course of your department to prepare?

16    A   Yes, it was.

17    Q   To receive and prepare?

18    A   Yes, it was.

19    Q   Now, the TSR is addressed to Mr. Marchetti again?

20    A   That is correct.

21    Q   Underneath that is a notation of the market, rubber.

22    What does that mean?

23    A   I could only speculate.

24          MR. KENNEDY:   Don't.

25    A   I don't know.

1   Q   And what generally is that blank that's labeled

2       "Market" used to denote?

3   A   That is put in by the requestor if he knows what the

4       market is. That would normally be put in that form by

5       the requestor.

6   Q   What do you mean by the market?

7   A   Well, if it were petroleum or paper or plastics or

8       paints, those would be all markets.

9   Q   That would be the general industry to which your com-

10      pany was selling talc?

11   A   I believe so.

12   Q   So, is it your understanding that in the usage of these

13      documents that the designation "Rubber," for example,

14      would mean that this request, this Technical Service

15      Request, had to do with talc sales in the rubber in-

16      dustry by your company?

17              (OBJECTION BY ALL DEFENSE COUNSEL)

18   A   I don't know that specifically.

19   Q   Do you know that -- when you say you don't know that

20      specifically, was that the usage to your understanding

21      the common usage of that designation "Market" on a

22      TSR?

23   A   The normal procedure would be to indicate the market

24      in that particular box on the form.

25   Q   Again, by market we're talking about that industry t

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

1       which your company was selling talc?

2              MR. KENNEDY:    Well, excuse me.   I've got to

3       object if it's in reference to this document because

4       this document shows the product involved is rubber.

5       It's not the rubber industry, but it's a very specific

6       portion, I believe; balloons.

7   Q    I'm asking with respect to the usage of these TSR

8       forms.   Do you have the question or would you like it

9       read?

10              THE WITNESS:    Would you repeat it, please?

11              (PREVIOUS QUESTION READ BY REPORTER)

12   A    Could you elaborate on that question?   I don't under-

13       stand that question.

14   Q    Did your company sell talc to the rubber industry?

15   A    I don't know that.

16   Q    Does your company sell talc to the paint industry?

17   A    I don't know that.

18   Q    Does your company sell talc to the ceramics industry?

19   A    I don't know that.

20   Q    What do you know about whom your company sold talc to?

21   A    The only thing that I know specifically is that we

22       sold talc to the paper industry on a limited basis

23       for pitch control.

24   Q    That's the only thing you know specifically?

25   A    That's the only thing I know for certain.

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

1  Q  For all you know, that's the only talc your company

2      sold?

3  A  No, I couldn't say that. I know that all of the talc

4      we sell doesn't go to the paper industry.

5  Q  You just have no idea to whom else it's sold besides

6      the paper industry?

7  A  That's correct.

8  Q  No idea whatsoever?

9  A  No.

10  Q  Have you answered the question?

11  A  I know in general terms that we do sell talc to a

12      variety of industries. It is outside my province to

13      know in more detail than that.

14  Q  Now, this TSR has your initials down at the bottom

15      also, doesn't it?

16  A  That's correct.

17  Q  Your initials -- first of all, this is Exhibit 6. Up

18      at the top of this TSR, there's a series of initials

19      as well as down at the bottom; is that correct?

20  A  Yes, that's correct.

21  Q  At the top, who are the recipients designated as by

22      those initials?

23  A  This portion of the form, from here down to where this

24      signature is --

25  Q  Now, you're referring just for the record to the top

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

1     of this uppermost box on this form, just beneath the

2     capital letter designation "Technical Service Request";

3     is that right?

4 A   That is correct.

5 Q   From that point down to the end of the box that appears

6     at about two-thirds down the page, you're referring

7     to that as the upper part of the request?

8 A   That is correct.

9 Q   Now, go ahead and finish your answer.

10 A   That portion of the Technical Service Request was

11     filled out by the requestor.

12 Q   Yes?

13 A   In this case, Mr. Zimmermann. These people who re-

14     ceived copies were designated by him to receive them,

15     and they would have some interest, no doubt, in this

16     particular Technical Service Request.

17 Q   Now, down at the bottom in the box beginning at two-

18     thirds of the way down the page to the end, there's

19     another entry for "Copies to"; is that right?

20 A   That is correct.

21 Q   Your initials appear in that entry; is that correct?

22 A   That is correct.

23 Q   They don't appear at the top?

24 A   That is correct.

25 Q   Who makes a determination as to who is to receive the

1    copies of the report as designated in the bottom part

2    of that page?

3  A  That judgment would normally be made by Mr. Marchetti,

4    the man to whom the Technical Service Request was ad-

5    dressed.

6  Q  Did you have any policy within your department that

7    you were to receive copies of all reports that dealt

8    with asbestos in talc?

9  A  In general, I have -- am to receive copies of all

10    Technical Service Requests. They pass my desk as

11    indicated earlier.

12  Q  The question is: Did you have a policy, any particular

13    policy, with respect to reports that dealt with asbes-

14    tos?

15  A  No, I did not.

16  Q  None whatsoever?

17  A  None whatsoever.

18  Q  Have you had a chance to look through Exhibit 6 at all

19  A  No, I have not.

20  Q  And would you do so? Having reviewed that Exhibit

21    No. 6, does that refresh your recollection in any way

22    as to that TSR and the accompanying report?

23  A  No, it does not.

24  Q  You have no recollection of that at all?

25  A  No, I have not.

1  Q  Let me just ask you one question in general. You've

2  looked through these reports in preparation for this

3  deposition?

4  A  That's correct.

5  Q  Do you have any recollection of any of them?

6  A  Some of the more recent ones that we have received

7  or some in which I was directly involved, I could

8  identify. I have -- I receive across my desk each

9  day probably forty to fifty documents, and it's im-

10  possible to remember specifically details of each one.

11  Q  How many of those documents deal with asbestos?

12  MR. SARLI:  What documents now?

13  A  Are you referring to the ones that cross my desk each

14  day?

15  Q  That's right.

16  A  A miniscule number.

17  Q  Is it pretty rare?

18  A  Yes, it is relatively rare.

19  Q  I show you Exhibit 7. Do you have any recollection

20  of that, Dr. Hemstock?

21  A  No, I don't.

22  Q  Who is Mr. Peter Gale?

23  A  Mr. Peter Gale was a geologist mineralogist.

24  Q  Did he ever have any relationship with Engelhard

25  Corporation?

| | | |
|---|---|---|
| 1 | A | Yes, he did. |
| 2 | Q | What was that relationship? |
| 3 | A | He was a project leader in the Research Department. |
| 4 | Q | To whom did he report? |
| 5 | A | He reported to Mr. Dzierzanowski. |
| 6 | Q | And what was his -- what were his duties in his |
| 7 | | capacity as a project leader? |
| 8 | A | His role was to carry out tests in the Physical Mea- |
| 9 | | surements area in response to whatever requests came |
| 10 | | in. |
| 11 | Q | When was he hired? |
| 12 | A | I don't recall exactly. It was in the late seventies. |
| 13 | Q | Did you participate in the decision to hire him? |
| 14 | A | I probably did. |
| 15 | Q | Where was he located while an employee of Engelhard? |
| 16 | A | He was located in Menlo Park. |
| 17 | Q | If you'll read the handwritten notation that's on |
| 18 | | page two of that Exhibit No. 7 -- first, can you tell |
| 19 | | me if you recognize the handwriting? |
| 20 | A | No, I do not. |
| 21 | Q | That handwriting suggests that Mr. Gale at the time |
| 22 | | of preparation of that report was in Georgia; is that |
| 23 | | correct? |
| 24 | | (OBJECTION BY ALL DEFENSE COUNSEL) |
| 25 | A | He would not have been located in Georgia. He may |

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

1    have gone to Georgia Tech to observe the running of

2    these samples.

3  Q  Was that a regular part of Mr. Gale's duties when he

4    worked for Engelhard?

5  A  I would say so.

6  Q  He, as a regular part of his duties, would go to

7    Georgia Tech to either observe or to run tests himself?

8  A  He was far down in the learning curve at this time,

9    and he went to Georgia Tech primarily to learn.  He

10    did not necessarily accompany every sample that went

11    to Georgia Tech.

12  Q  When you say he went to Georgia Tech primarily to learn

13    was he down there for some extended period of time?

14  A  Probably during the duration of running the samples

15    that he had requested to be run.

16  Q  Was Mr. Gale hired for any particular field of research

17    or analysis within your department?

18  A  Well, he was the mineralogist.  Other than the profes-

19    sional skills that he brought with him, no.

20  Q  Was he hired with the idea that he would spend some

21    substantial portion of his time in analyzing materials

22    for asbestos content?

23  A  No, he was not.

24  Q  That was not any part of his job?

25  A  No, it was not.  He was not hired for that reason.

| | | |
|---|---|---|
| 1 | Q | This handwritten notation states that Mr. Gale informed |
| 2 | | the writer that some chrysotile particles were iden- |
| 3 | | tified during the analysis. Does that finding strike |
| 4 | | any recollection of yours at all? |
| 5 | | (OBJECTION BY ALL DEFENSE COUNSEL) |
| 6 | A | No. |
| 7 | Q | You have no recollection of the analysis that Mr. Gale |
| 8 | | did that is memorialized in Exhibit 7? |
| 9 | A | No. |
| 10 | Q | None whatsoever? |
| 11 | A | No, I do not. |
| 12 | Q | The subject matter of this Exhibit 7 is Sample REL-79-1. |
| 13 | | Can you tell me what that code means? |
| 14 | A | This would be a code that was applied by the Manufac- |
| 15 | | turing Department. I have no knowledge of what speci- |
| 16 | | fically it refers to. |
| 17 | Q | Does the Manufacturing Department have a code by which |
| 18 | | -- a standard code that it uses to identify samples? |
| 19 | A | Not to my knowledge. |
| 20 | Q | So, REL has no significance to you whatsoever? |
| 21 | A | Other than the fact that the initials correspond to |
| 22 | | the initiator of the request, no, it does not. |
| 23 | Q | This is a standard TSR form? |
| 24 | A | That's correct. |
| 25 | Q | Now, was it standard practice that the response to the |

1     TSR forms would be handwritten as opposed to typed?

2 A   No, it was not.

3 Q   Now, this TSR is labeled "ASAP, Please Rush." Do you

4     see that up there at the top?

5 A   Yes, I do.

6 Q   Was that the standard request that a TSR would carry

7     about it?

8 A   Not standard.

9 Q   That was unusual?

10 A   It depended upon the rate of response that the requestor

11     expected he was going to get. There were some people

12     who always put "ASAP" or "Rush" on whether they needed

13     it tomorrow or whether they needed it a month from now.

14     There were others who would do it in a routine basis.

15     The standard policy was first in, first out.

16 Q   And was it standard policy that a request, a TSR that

17     dealt with asbestos, would carry the "Rush" or "ASAP"

18     notation?

19 A   No, it was not.

20 Q   This form, Exhibit 7, and the attached report, that

21     was the standard practice of the company to prepare

22     that kind of form and that kind of report in response

23     to it?

24 A   It would be unusual to have this much handwritten in-

25     formation placed on the form. Normally, these come in

1    in a typewritten fashion; but as I testified earlier,

2    the upper two-thirds of the document is filled out by

3    the requestor.

4  Q  Is it your testimony, then, that these handwritten

5    notations in the upper half of the TSR were placed in

6    there by the requestor?

7  A  I don't know.

8  Q  For example, the date of the TSR is January 29, 1979?

9  A  That's correct.

10 Q  Now, there's a notation "Request and Sample to P. Gale

11    2-5-79"?

12 A  That's correct.

13 Q  Would that suggest that this was written on by one of

14    the persons who received this TSR?

15         (OBJECTION BY ALL DEFENSE COUNSEL)

16 A  I can't --

17         MR. CURRAN:   I'm going to object to the

18    whole line of the questions.  What is the relevance or

19    materiality?  The man left the shop in '76.

20         MR. HALKET:   I would also like to make an

21    objection to this kind of question and the previous

22    questions that were drawn before this where the counsel

23    for the Plaintiff is essentially asking the witness to

24    read things from a document which he did not identify

25    and which he does not remember.  He's just reading word

1    from a piece of paper. Counsel for the Plaintiff can

2    read those words just as well as the witness can, and

3    has exactly the same force in testimony.

4  Q  Who is G. Huff?

5  A  G. Huff was the Manager of Plant Technical Service at

6    that time. He was a member of the Research Department.

7  Q  Your initials appear at the bottom portion of this

8    TSR?

9  A  That's correct.

10  Q  Do you recognize Exhibit 8?

11  A  No, I do not.

12  Q  Can you tell me what Exhibit 9 is?

13  A  No, I cannot, other than the document speaks for it-

14    self.

15  Q  The first page of this document on any kind of a form

16    that's used by your company?

17  A  This is not a familiar form to me.

18  Q  Let's go through the names. First, it is addressed to

19    a Mr. Dennis L. Caputo. Do you know who that is?

20  A  No.

21  Q  Have you ever heard of R.A. Nadkarni?

22  A  No, I've never heard of him.

23  Q  Have you ever heard of the persons who are listed as

24    receiving copies of this document at the bottom of the

25    page; R.I. Botto?

1   A   No, I am not.

2   Q   J.B. Cooper?

3   A   No, I'm not.

4   Q   J.H. Karchmer?

5   A   No, I'm not.

6   Q   R.B. Williams?

7   A   No, I'm not.

8   Q   You've never seen this document before in your life?

9   A   No, I have not.

10   Q   Would you take a look at Exhibit 10?  Have you ever

11       seen that before?

12   A   No, I have not.

13   Q   Who again is Mr. Oulton?

14   A   Mr. Oulton was at that time in the Physical Measurement

15       Group.

16   Q   Physical Measurements Group of the Research and Develop

17       ment Department?

18   A   Yes.

19   Q   Of Engelhard?

20   A   Yes.

21   Q   Did he report to you?

22   A   No, he did not.

23   Q   To whom did he report?

24   A   He reported to my predecessor who was the Vice Presi-

25       dent of Research at that time.

1  Q  What was your position at this time?

2  A  That was 1972?

3  Q  Yes.

4  A  I was Director of Research.

5  Q  And was it your company's practice to utilize Johns-

6     Manville as an outside laboratory for analysis of

7     asbestos materials?

8           (OBJECTION BY ALL DEFENSE COUNSEL)

9  A  Not a practice.

10 Q  Did you ever do it, to your knowledge?

11 A  Not to my knowledge.

12 Q  Not to your knowledge?

13 A  Not to my knowledge.

14 Q  You have no knowledge derived from any source that

15    your company ever sent materials to Johns-Manville

16    for testing for asbestos content?

17 A  No, I do not.

18 Q  Look at Exhibit 11, please.

19 A  Yes.

20 Q  Have you ever seen that before?

21 A  I'm generally familiar with it.

22 Q  What is it?

23 A  This is a summary paper that was written by Mr. Oulton

24    for a talc symposium.

25 Q  What is Mr. Oulton's training?

70

1   A   What is his training?

2   Q   Yes.

3   A   He's a physical chemist, but has a -- or had a great

4       many years of experience, and I would say in the lat-

5       ter part of his career was a mineralogist more than a

6       physical chemist.

7   Q   Would you look at Exhibit 12 and tell me whether you

8       have ever seen that before?

9   A   No, I have not.

10   Q   Is that a standard form that's used within your com-

11       pany?

12   A   I can't identify it as such.  It appears so.

13   Q   It carries the name Eastern Magnesia Talc Company?

14   A   That's correct.

15   Q   Johnson operations?

16   A   That's correct.

17   Q   Would this be the Eastern Magnesia Talc Company that

18       owns the mine in Vermont?

19            (OBJECTION BY ALL DEFENSE COUNSEL)

20   A   I believe so.

21   Q   Showing you Exhibit 13, do you know what that is?

22   A   Generally, yes.

23   Q   And what is it?

24   A   This was a request made by Mr. Oulton who was in the

25       R & D of the Minerals and Chemicals Division for an

PENRAD CO., BAYONNE, N.J. 07002 · FORM 740

1    electron microscope evaluation of a sample by the

2    head of the electron microscope lab at Engelhard

3    Industries Division.

4  Q   Do you have any independent recollection of that

5    document?

6  A   No, I do not.

7          MR. SARLI:   What number is this again,

8    please?  I'm sorry.

9          MR. PRENTISS:    13.

10  Q   Did that come to your attention at the time it was

11    prepared?

12  A   I don't know.

13  Q   Do you know what Exhibit 14 is?

14  A   Generally, yes.

15  Q   Had you ever seen that before, prior to preparation

16    for this deposition?

17  A   I don't recall.

18  Q   You never recall seeing that?

19  A   No, I don't.

20  Q   It carries your name at the bottom as a recipient of

21    it?

22  A   Of a copy of it, yes.

23  Q   I show you Exhibit 15. Have you ever seen that before?

24  A   No, I have not.

25  Q   You have no recollection of ever having seen that?

72

1    A    No, I have not.

2    Q    Do you know whether that was in the files of the

3         Research and Development Department at your corpora-

4         tion?

5    A    I don't know.

6    Q    Exhibit 16, I'm handing you, and is that something that

7         you've seen before?

8    A    I don't recall.

9    Q    Can you state what Exhibit 17 is?

10   A    This was a Technical Service Request made by Mr. Yunko

11        for determination of asbestos particles in food and

12        drugs.

13   Q    Do you have any recollection of that document?

14   A    No, I do not.

15   Q    You were the recipient of that, is it?

16   A    That's correct.

17   Q    Did you prepare the report?

18   A    No, I did not.

19   Q    Do you know who did?

20   A    The assignment was made to Mr. Triglia.  I don't know.

21             MR. HALKET:   I'm going to just have a

22        standing objection to instances where it is the case

23        that the witness is testifying by reading the document

24        as opposed to his own personal knowledge.

25             MR. PRENTISS:   Fine.

1  Q   , Who is Mr. Yunko?

2  A   Mr. Yunko was the Director of Sales and Marketing for

3      the Minerals and Chemicals Division at that time.

4  Q   I'll ask you to look at Exhibit 18. Do you have any

5      recollection of that?

6  A   I don't recall this document.

7  Q   Now, that document makes reference to a meeting with

8      Glenn Hemstock and Emil Triglia on Friday. The date

9      of this memorandum is May 31, 1979. Do you have any

10     recollection of a meeting that's referred to?

11  A  Only in general terms.

12  Q  What is your recollection?

13  A  This was a meeting that was held to generally review

14     some of the test results that had been carried out

15     during that time on the analysis of talc samples and

16     air dust samples.

17  Q  This is analysis for content of asbestos?

18  A  Well, really the -- it was broader than that. It was

19     to determine mineralogical content, asbestos or as-

20     bestiform minerals being one.

21  Q  Did the Research and Development Department ever under

22     take a specific study that was not so much in respons

23     to a TSR, but a study on its own to determine asbesto

24     or mineral content of talc?

25  A  There was a general study, a short-term research stud

|   |   |
|---|---|
| 1 | to get a better understanding of the mineralogical |
| 2 | content of our talc, not specifically aimed at asbes- |
| 3 | tos. |
| 4 | Q   When did that take place? |
| 5 | A   Approximately in the 1978-79 period. |
| 6 | Q   Who conducted that study? |
| 7 | A   The study was carried out by people within the Research |
| 8 |     Department.  Mr. Gale, Mr. Dzierzanowski, Mr. Triglia |
| 9 |     were some of the people involved. |
| 10 | Q   And were you involved as well? |
| 11 | A   To the degree that I and Mr. Gale visited the Emtal |
| 12 |     Plant and mine, that was the only direct involvement |
| 13 |     I had. |
| 14 | Q   Was the study generally undertaken under your super- |
| 15 |     vision? |
| 16 | A   Generally under my supervision, yes. |
| 17 | Q   Did you review the results of the study from time to |
| 18 |     time during the course of the study? |
| 19 | A   From time to time, yes. |
| 20 | Q   Is the meeting that's made reference to on Exhibit 18 |
| 21 |     a meeting that was held in connection with that study |
| 22 | A   I believe a part of it was. |
| 23 | Q   A part of what?  I'm not clear on your answer, sir. |
| 24 | A   Our study was aimed at looking at various Emtal pro- |
| 25 |     ducts.  It did not involve looking at competitive |

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

1    samples, and as evidenced by this document, there

2    were competitive samples included.

3  Q  There were competitive samples that were considered

4    at the meeting that's referenced in this document;

5    is that your testimony?

6         (OBJECTION BY ALL DEFENSE COUNSEL)

7  A  Yes, that's correct.

8  Q  In paragraph three of this document, there's a refer-

9    ence to Vermont talcs, Vertal.  What does Vertal refer

10    to?

11  A  I believe that's -- would be a sample.--

12         (OBJECTION BY ALL DEFENSE COUNSEL)

13  A  --of a competitive product.

14  Q  When you say a competitive product, that's a product

15    made by some company other than --

16  A  Other than Engelhard.

17  Q  Do you know what company is associated with Vertal?

18  A  I believe that would be the Vermont Talc Company.

19  Q  Do you know if that's still the name of the company?

20  A  No, I do not.

21  Q  There's a reference here to W.C.D. in caps with

22    periods after each of those initials.  Do you know

23    what that refers to?

24  A  I would assume that was also another -- I believe tha

25    was another competitor.

1     Q     Would that be Whittaker, Clark & Daniels?

2                (OBJECTION BY ALL DEFENSE COUNSEL)

3     A     I believe that's true.

4     Q     Now, there's a reference down here to Windsor. To

5          what does Windsor refer?

6     A     That also, I believe, is a competitive product.

7     Q     Would that be associated with Windsor Minerals, Inc.?

8     A     I believe so.

9     Q     Is it your testimony that the tests that are made

10         reference to in this exhibit -- let me ask you: What

11         tests were being referred to?

12            MR. KENNEDY:    Referring to what's contained

13         in the exhibit?

14            MR. PRENTISS:    That's correct.

15     A     The tests are not specifically defined in this docu-

16         ment.

17     Q     Do you have any recollection of what tests were being

18         referred to?

19     A     I do not know.

20     Q     I'll show you Exhibit 19. Have you ever seen that

21         before?

22     A     No, I have not seen this document.

23     Q     Is it addressed to Mr. Dzierzanowski?

24     A     That is correct.

25     Q     Do you know whether that is a report to Mr. Dzierzan

PENGAD CO., BAYONNE, N.J. 07002 - FORM 740

1       ski from an outside testing laboratory of tests that

2       he requested?

3   A   I believe so.

4   Q   Did you ever see the results of this test that's re-

5       ported on Exhibit 19?

6   A   I can't recall.

7   Q   There's reference to samples.  The samples are num-

8       bered R 72-77B and R 191-77A.  Do you know what those

9       sample numbers refer to?

10  A   Yes.  I can describe generally what those are.

11  Q   What are they?

12  A   We maintain a log book for all samples that are re-

13      ceived by the Research Department, and the "R" stands

14      for received sample.  The number, the second number,

15      refers to the number of samples that we received in

16      that calendar year, and the calendar year is indicated

17      by the third digit, third set of digits.

18  Q   What is the final initial?

19  A   That would merely indicate two samples received at the

20      same time.

21  Q   So, Sample R 72-77B, by your testimony, would be part

22      two of the seventy-second sample received by your

23      department during 1977?

24  A   That would be my judgment.

25  Q   R 191-77A would be part one of the one hundred ninety-

1       first sample received by your department during 1977?

2    A    That would be my judgment.

3    Q    Do you know whether the test results which are por-

4       trayed in Exhibit 19 were ever embodied in any kind

5       of a report prepared by the department?

6    A    I do not know that for a fact.

7    Q    Would it be the normal course of business of your

8       department to incorporate test results received by

9       outside laboratories as a part of a department re-

10      search report?

11    A    Yes, it would.

12    Q    I show you Exhibit 20. Have you ever seen that

13      before? Do you have any recollection of it? That's

14      two questions. Do you have any recollection of that?

15    A    No, I do not recall this document.

16    Q    Now, this document is an inter-department memorandum

17      of the Minerals and Chemicals Division. That means

18      part of -- an internal document for your company; is

19      that correct?

20    A    That's correct.

21    Q    Now, we already identified Mr. Oulton. Who is Mr.

22      Newgar?

23    A    That was Miss Newgar. She was a geologist, a mineral

24      ogist in the Physical Measurements Group.

25    Q    You're listed as a recipient of this memorandum?

| | | |
|---|---|---|
| 1 | A | That is correct. |
| 2 | Q | Now, this memorandum has to do with samples of talc |
| 3 | | from the Waterbury and Johnson mines; is that correct? |
| 4 | A | That's what the document appears to indicate. |
| 5 | Q | What was your company's interest in the Waterbury |
| 6 | | mine? |
| 7 | A | I don't know. |
| 8 | Q | Do you have any idea why your company would be in- |
| 9 | | volved in testing talc or talc ore from the Waterbury |
| 10 | | mine? |
| 11 | A | I only have a general idea of that. |
| 12 | Q | And what is your general idea? |
| 13 | A | I believe that the Waterbury mine was a talc deposit |
| 14 | | that had been largely mined out many, many years ago. |
| 15 | | The reasons why we would be interested in that parti- |
| 16 | | cular sample, other than for comparative purposes, I |
| 17 | | do not know. |
| 18 | Q | Is the Waterbury mine near the Johnson mine? |
| 19 | | (OBJECTION BY ALL DEFENSE COUNSEL) |
| 20 | A | I don't know. |
| 21 | Q | Do you know whether it's in the same geological forma- |
| 22 | | tion as the Johnson mine? |
| 23 | | (OBJECTION BY ALL DEFENSE COUNSEL) |
| 24 | A | No, I do not know that. |
| 25 | Q | Showing you Exhibit 21, do you have any independent |

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

1    recollection of that document?

2  A  No, I do not.

3  Q  Dr. Hemstock, when the -- your Research and Develop-

4    ment Department sent a sample of some material out to

5    an outside laboratory to be tested, would it be the

6    practice of your department to keep in its files what-

7    ever report was received in response to that test?

8  A  Yes, it would.

9  Q  Your department would send the request out to an out-

10    side laboratory as a part of its ongoing business in

11    performing the analyses requested of it by its client

12    department?

13  A  That's correct.

14  Q  Do you know who Mr. J.H. Shafer is?

15  A  He is the Plant Manager of the Emtal operation.

16  Q  Could I see the last report or the last exhibit?  I

17    think it would be 20.  I show you Exhibit 22 for iden-

18    tification.  Do you have any recollection of that docu-

19    ment?

20  A  Only in general terms.

21  Q  And what is your recollection?

22  A  This was, as the document indicates, a request for a

23    transmission electron microscopy and selected area

24    diffraction evaluations on three bulk mineral samples

25    collected in 1979.

1   Q   This letter is a response to a request for that analy-
2       sis; is that right?

3   A   That is correct.

4   Q   Do you recall learning of the results that are re-
5       ported on that Exhibit No. 22?

6   A   No, I do not.

7   Q   You have no recollection of ever being told either by
8       Mr. Gale or by any other person that the laboratory
9       found what it characterized as extremely high levels
10      of chrysotile asbestos in one of the samples tested?

11  A   I do not have a recollection of that fact.

12  Q   You have no recollection of ever being told that?

13  A   Not of this specific instance.

14  Q   Do you have a recollection of ever having been told
15      that analysis of talc samples had found high or ex-
16      tremely high levels of chrysotile asbestos?

17  A   I think that characterization is a relative term, and
18      what might be considered a high level by one indivi-
19      dual may not really in fact be a high level.

20  Q   Do you have any recollecting of being told by any per-
21      son that analysis had shown what any person charac-
22      terized as being high or extremely high levels of as-
23      bestos in the talc?

24              (OBJECTION BY ALL DEFENSE COUNSEL)

25  A   I don't specifically recall that.

1   Q   Are you finished with your answer?

2   A   Yes, I am.

3   Q   When you say you don't specifically recall that, are

4       you saying you don't specifically recall the results

5       reported on Exhibit 22?

6   A   That is correct, I do not.

7   Q   But do you have any recollection without regard to

8       Exhibit 22 of ever receiving information that some

9       analyst had characterized the asbestos content of

10      your company's talc as being high or extremely high?

11          (OBJECTION BY ALL DEFENSE COUNSEL)

12   A   No, I cannot say that.

13   Q   Do you have any recollection of ever having been told

14      by any person that an analyst had determined that the

15      asbestos content of talc sold by your company or from

16      your company's mine was at a greater level than trace

17      quantities?

18          (OBJECTION BY ALL DEFENSE COUNSEL)

19   A   No, I cannot say that.

20   Q   You never were told that there was any more than trace

21      quantities of asbestos in your company's talc?

22          (OBJECTION BY ALL DEFENSE COUNSEL)

23   A   I do not specifically recall any instance of that.

24   Q   Are you saying no person ever told you that?

25          (OBJECTION BY ALL DEFENSE COUNSEL)

1          MR. KENNEDY:   Told him what, trace quanti-

2     ties or --

3  Q  Are you testifying that no person ever told you that

4     analysis had determined that there were more than

5     trace quantities of asbestos in your company's talc?

6          (OBJECTION BY ALL DEFENSE COUNSEL)

7  A  Yes, that is my testimony.

8  Q  Mr. Gale never told you that?

9  A  No, he did not.

10         (OBJECTION BY ALL DEFENSE COUNSEL)

11 Q  Now, showing you Exhibit 23, can you tell me what that

12    is?

13 A  This was a work sheet that was used by the analyst,

14    in this case Mr. Gale, to interpret results from

15    transmission electron microscope analyses.

16 Q  How do you know that was Mr. Gale?

17 A  There's a signature here on the bottom.

18 Q  Have you ever seen those before other than in prepara-

19    tion for this deposition?

20 A  Yes, I believe I have.

21 Q  And when?

22 A  I believe these were -- these data were discussed and

23    reviewed generally at one -- at the meetings referred

24    to earlier.

25 Q  You have a recollection of discussion of these results

84

1          as portrayed on Exhibit 23?

2      A   Not those specific results.

3              MR. HALKET:   I object to the last question

4      and the last answer, because if I understand your

5      question, it was have you ever seen the document; and

6      if I understand Glenn's answer, it beared no relation-

7      ship to whether he had ever seen the document.  This

8      is a problem we've talked about before.  He is testi-

9      fying about documents he's never seen.  It's sheer

10     speculation.

11             THE WITNESS:   Yes, that's --

12     Q   I guess I didn't understand your earlier answer.  Are

13     you testifying you have never seen that document

14     before?

15     A   I have not seen that specific document.  I have seen

16     some of those data before.

17     Q   Are you saying you may have seen this document, but

18     you don't recall whether it was this specific one?

19     A   I do not recall having seen that specific document.

20     Q   But you may have seen it?

21             MR. HALKET:   That's not what he testified

22     to.

23     A   I don't recall having seen it.

24     Q   Was it customary during the course of Mr. Gale's study

25     -- let me back up.  Was this document, to the best of

1   your knowledge, prepared as a part of Mr. Gale's

2   study that you previously testified to that took

3   place during 1978 and 1979?

4   A   I believe --

5                (OBJECTION BY ALL DEFENSE COUNSEL)

6   A   -- to the best of my knowledge.

7   Q   Are you familiar enough with the method of Mr. Gale's

8   research to be able to testify as to what it is that's

9   portrayed on that document?

10               (OBJECTION BY ALL DEFENSE COUNSEL)

11  A   Mr. Gale was carrying out transmission electron micro-

12  scope studies, and his intent here was to identify

13  the number of fibers, fibrous material, in those

14  transmission electron microscope samples.

15  Q   Did you, during the course of Mr. Gale's study, dis-

16  cuss the results of his studies with him as he pro-

17  duced those results?

18  A   Not as he produced them, only in general terms.

19  Q   And would you meet periodically with Mr. Gale to re-

20  view the results that he had achieved as part of his

21  study?

22  A   Not normally with Mr. Gale.

23  Q   With whom would you meet to discuss --

24  A   Well, there were others involved.  Mr. Gale did not

25  report to me directly.  Normally, Mr. Dzierzanowski

1    and Mr. Triglia would also be present.

2    Q    Would Mr. Gale be present, also?

3    A    Normally, he would.

4    Q    Was it your practice at these periodic meetings to

5         sit down and review some of the actual work sheet

6         results that Mr. Gale or others working on the study

7         had prepared as a part of their study?

8    A    Not normally the original documents.  He would sum-

9         marize the significant data that he had obtained, and

10        it would normally be a summary of those data that I

11        would review.

12   Q    Now, across the top of this first page of Exhibit 23

13        are labeled "Emtal 42" and then there's a number

14        79-J-2 underneath that.  Can you tell me what that

15        refers to or what that signifies?

16   A    No, I don't know what that signifies.

17   Q    Have you ever heard of the term "Emtal" before?

18   A    Yes, I have.

19   Q    What is that?

20   A    Emtal refers to products produced from the Johnson

21        mine.

22   Q    Emtal 42, have you ever heard of any talc referred to

23        as Emtal 42 talc?

24   A    Yes.  Emtal 42 is a specific grade of talc produced

25        in the Emtal mine.

1   Q   Column one and three both are headed "Emtal 42"; is

2      that right?

3   A   That's correct.

4   Q   And part of Mr. Gale's responsibility in the course

5      of carrying out this study was to analyze the content,

6      mineral content, of talc including Emtal 42?

7   A   That was one of the commercial samples that was cer-

8      tainly included.

9   Q   Do you know what kind of a talc Emtal 42 is?

10          (OBJECTION BY ALL DEFENSE COUNSEL)

11   A   It's a relatively course particle-sized talc.

12   Q   Is that trial grade talc?

13          (OBJECTION BY ALL DEFENSE COUNSEL)

14   A   Yes, I believe so.

15   Q   Do you know what markets or industries utilize Emtal

16      42 talc?

17   A   No, I do not.

18   Q   There's a notation partway down this document. It

19      says, "Fibers counted per fifteen grid openings minus

20      blank," and then there is an asterisk, and the as-

21      terisk at the bottom states, "Blank equals four fibers

22   A   That's correct.

23   Q   What fibers is it that were being recorded on this

24      document, to the best of your knowledge?

25          (OBJECTION BY ALL DEFENSE COUNSEL)

PENGAD CO., BAYONNE, N.J. 07002 · FORM 749

A    To the best of my knowledge, the mounting of scanning

electron microscope samples is prepared on a screen,

and the screen has openings which are considered to be

grid openings.  In the normal course of counting, you

count -- we would count or Mr. Gale would count fif-

teen grid openings and count the number of fibers that

he saw on that number -- on that field.

Q    Fibers of what, though?

A    Just fibers.

Q    Any fibers?

A    Any fibers.

Q    What fibrous minerals do you know of that were iden-

tified as being constituents of Emtal 42 talc?

(OBJECTION BY ALL DEFENSE COUNSEL)

MR. HALKET:    Do you understand that ques-

tion?

THE WITNESS:    It's a broad question.  Could

you be more definitive?

Q    Emtal 42 talc, to your knowledge, does Emtal 42 talc

contain any minerals other than the pure mineral talc

A    Yes, it does.

Q    Does it contain several other minerals besides pure

talc mineral?

(OBJECTION BY ALL DEFENSE COUNSEL)

A    Yes, it does.

1   Q    How many of those other minerals besides talc are

2        fibrous in nature?

3                    (OBJECTION BY ALL DEFENSE COUNSEL)

4   A    There could be several.

5   Q    And which ones?

6                    (OBJECTION BY ALL DEFENSE COUNSEL)

7   A    Serpentine could be present.  I would make a distinc-

8        tion between asbestiform minerals and asbestos

9        minerals.

10  Q    Fine.

11  A    And asbestiform minerals might also be considered

12       fibrous in the context of this study.

13  Q    What asbestiform minerals are you referring to?

14  A    Things like serpentine, like chlorite.  Those would

15       probably be the main ones.

16  Q    Is it your testimony that chlorite is a fibrous form

17       of mineral particle?

18                   (OBJECTION BY ALL DEFENSE COUNSEL)

19  A    It depends how it fractures and how the sample is

20       prepared.  Chlorite is one of the -- the parent rocks

21       of the deposit.  It is not talc per se, but it is one

22       of the parent rocks derived from talc.  I believe that

23       chlorite normally is platey in shape.

24  Q    What other mineral constituents of Emtal 42 talc be-

25       sides serpentine and chlorite are fibrous in form?

PENGAD CO., BAYONNE, N.J.  07002 · FORM 740

1     (OBJECTION BY ALL DEFENSE COUNSEL)

2 A In the preparation of an electron microscope sample,

3   there is ample opportunity for extraneous fibers to

4   be present just from the ambient air.  So, consequent-

5   ly, one might pick up a cellulose fiber and consider

6   it a fiber in the electron microscope if one didn't

7   attempt to identify it further.

8 Q Do you know whether the analytical techniques that

9   were utilized in this study incorporated any measures

10   to avoid contamination by atmospheric fibers?

11     (OBJECTION BY ALL DEFENSE COUNSEL)

12 A I don't know that.  I do know that there was a period

13   when the electron microscope we were using was con-

14   taminated.  The Georgia Tech instrument was used for

15   a wide variety of samples, and once the contaminant

16   material got inside the barrel of the microscope, it

17   could contaminate the samples almost at random.  There

18   was considerable effort made by Georgia Tech to get

19   their microscope cleaned up.  It's difficult.

20 Q Did your company continue to use that Georgia Tech

21   facility after it knew that the microscope had become

22   contaminated?

23 A Yes, we did.

24 Q And were you not concerned about the effect on the

25   results of your tests?

1   A   Yes, we were, and we verified when they had it cleaned

2       up by submitting duplicate or replicate samples.

3   Q   How did you determine that it had been cleaned up?

4   A   If on two consecutive sampling periods or testing

5       periods we got the same number, that was at least some

6       indication that it had been cleaned up.

7   Q   Did the testing procedures that were undertaken during

8       this study include any other tests to definitely iden-

9       tify or more definitely identify the minerals which

10      were found in fiber form?

11              (OBJECTION BY ALL DEFENSE COUNSEL)

12  A   Well, the only more definitive test of which I'm aware

13      is the selected area electron diffraction.  That was

14      done on some samples.

15  Q   Which samples?

16  A   Only -- well, that is a test which positively iden-

17      tifies the mineral component of a given fiber so that

18      you're really only looking at the mineralogy of a

19      single particle.

20  Q   Did those tests confirm the presence of asbestos in

21      any of the Emtal talcs studied?

22  A   In some cases they did.

23  Q   And do you know whether the test results which show

24      those results are incorporated or included within

25      this stack of documents that have been provided today?

PADUANO

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

1   A   Yes, I believe so.

2   Q   Can you tell me what Exhibit 24 is?

3   A   Yes, in general I can.

4   Q   And what is it?

5   A   This was the results of a petrographic analysis by

6       an outside consulting firm run by an individual by

7       the name of Fred Farwell.

8   Q   When was that completed?

9   A   The document itself suggests that he was looking at

10      1977 material.

11  Q   Is there a date on the document that shows a comple-

12      tion date?

13  A   Yes, July 7, 1977.

14  Q   Do you have an independent recollection of that study?

15  A   Not of this specific study, I do not.

16  Q   Or of the results that were obtained in the study?

17  A   No, I do not.

18  Q   When you say you have no recollection of this specific

19      study, do you have a recollection generally of studies

20      that were conducted by Mr. Farwell?

21  A   Mr. Farwell was a microscopy expert, and we used him

22      for phase contrast microscope evaluations and also

23      for refractive index determinations.

24  Q   Are those testing procedures ones that are utilized

25      to determine asbestos contamination of samples?

PADUANO

BASF02388

(OBJECTION BY ALL DEFENSE COUNSEL)

1

2   A   The phase contrast microscope has been used in an

3       effort to identify asbestos-type minerals.

4   Q   It is not a definitive test procedure?

5   A   It is not a definitive procedure.

6   Q   Do you have any recollection of what Exhibit 25 is?

7   A   No, I do not.

8   Q   You have never seen that before or you have no recol-

9       lection of having seen it?

10  A   I have not seen this before, I do not believe.

11  Q   Have you ever seen Exhibit 26 before?

12  A   No, I have not.

13  Q   Do you know what it is?

14  A   No, I do not.

15  Q   Have you ever seen Exhibit 27 before?

16  A   Yes, I'm generally familiar with it.

17  Q   What is it?

18  A   It was a request to Johns-Manville for determination

19      of fibers by the phase contrast microscope.  This was

20      a technique which at that time, 1972, we did not have

21      in-house.

22  Q   Do you remember your department requesting Johns-

23      Manville to perform tests as an outside laboratory

24      for your department?

25  A   We used many outside laboratories as indicated in the

PADUANO

1    documents you've seen earlier.  I do not specifically

2    recall Johns-Manville as being one of them.

3    Q   You have no recollection of that?

4    A   No, I do not.

5    Q   Who wrote the memorandum that's attached as page two

6    of that exhibit?

7    A   That memorandum is written by me.

8    Q   Does that memorandum make reference to sending samples

9    out to Johns-Manville?

10    A   Yes.

11    Q   For testing?

12    A   Yes, that's strongly indicated.

13    Q   Look at Exhibit 28.  Tell me if you have any recollec-

14    tion of that?

15    A   Generally, yes.

16    Q   This is an inter-department memorandum from your com-

17    pany; is that correct?

18    A   From a member of our company, yes.

19    Q   Within your company?

20    A   That's correct.

21    Q   Down at the bottom it's "Copy to" followed by initials?

22    A   That's correct.

23    Q   Your initials are the first set?

24    A   That's correct.

25    Q   There's a circle around your initials.  Does that mean

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

PAPIIANO

BASE02

PADUANO

1      this was your copy of this memorandum?

2  A  This, I believe, is a copy of a copy, and the fact

3      that this is circled would suggest that it was my

4      file copy that was used to make this copy.

5  Q  So, does that mean that the document from which this

6      copy was made was pulled from your file?

7  A  It would be pulled from the general files that we

8      talked about earlier.  It would not be from my personal

9      file.

10  Q  The circle around it, your initials down here, does

11      that mean that was your copy of this document?

12             (OBJECTION BY ALL DEFENSE COUNSEL)

13  A  This copy was made for my eyes, but --

14  Q  Yes?

15  A  -- but in fact it would go into the general files we

16      talked about earlier.  It would not be retained by me.

17  Q  This document refer to a meeting that was held in con-

18      junction with the 1978-1979 study that you testified

19      to earlier?

20  A  Yes, I believe that's true.

21  Q  Was that early on in the study or late in the study?

22  A  This was fairly early on in the study.

23  Q  Do you have any recollection of the meeting that --

24  A  I have a general recollection of it, yes.

25  Q  -- took place?

96

1   A   Yes.

2   Q   What happened at that meeting?

3   A   Well, this was a review of the results that we obtained

4       to date, and a general discussion of what further work

5       needed to be done.

6   Q   Do you recall what the results were that you received

7       to date?

8   A   No, I do not.

9   Q   I show you Exhibit 29. What is that?

10   A   This was a request by Mr. Oulton to representatives

11       of Johns-Manville for a phase contrast microscopy

12       analysis.

13   Q   It's an invoice for outside laboratory work?

14   A   That's correct.

15   Q   Done by Johns-Manville for your department; is that

16       right?

17   A   That's correct.

18   Q   What is the date on that?

19   A   May 1, 1973.

20   Q   I show you Exhibit 30. Have you ever seen that before?

21   A   No, I have not.

22   Q   Who is C.Y. Haas?

23   A   Mr. Haas was the Vice President of Administration of

24       the Minerals and Chemicals Division at that time.

25   Q   Do you have any recollection of Exhibit 31?

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

PADUANO

1    A    No, I do not.

2    Q    This is a memorandum on the letterhead of your company?

3    A    Yes, I believe so.

4    Q    Your initials appear at the bottom of the page?

5    A    That is correct.

6    Q    As being a recipient of a copy?

7    A    As being a recipient of a copy, correct.

8    Q    There's a circle around your initials there?

9    A    Yes.

10    Q    You have no recollection of having received that?

11    A    No, I do not.

12    Q    Do you remember back when we discussed Exhibit 9, I'd

13         asked you if you'd ever seen the name Mr. Nadkarni

14         before?

15    A    Yes, correct.

16    Q    You've never seen that before?

17    A    I do not know the gentleman.

18    Q    His name appears on this document as well, doesn't it?

19    A    Yes, it does.

20    Q    You received a copy of that document?

21    A    Yes, that's correct.

22    Q    In fact, several of the individuals listed on Exhibit 9

23         are also listed on Exhibit 31, aren't they?

24    A    My interpretation would be that these were Exxon peo-

25         ple, but I do not know other than what's on the docu-

PADUANO

98

1      ment.

2   Q   Do you know what Exhibit 32 is?

3   A   This was a description of a procedure used for looking

4       for fibers in phase contrast microscopy.  At that

5       time, Miss Newgar who had just joined our staff was

6       attempting to learn the technique.

7   Q   Approximately when was that prepared?

8   A   1976, early '77.

9   Q   Do you have any independent recollection of either the

10      preparation of that or what it was used for?

11  A   No, I don't.

12  Q   Who's Daniel A. Jacobs?

13  A   May I see the date?

14  Q   Yes, sir.  It's August 3, 1979.

15  A   Mr. Jacobs was the Production Manager of the Emtal

16      operation.  The Plant Manager at Emtal reported to

17      Jacobs who was located at Menlo Park.

18  Q   Jacobs was located at Menlo Park, and the Plant Manager

19      was located in Johnson, Vermont?

20  A   That is correct.

21  Q   And the Plant Manager was Mr. Shafer?

22  A   That is correct.

23  Q   Who was Mr. C.C. Clarke?

24  A   Mr. Clarke was responsible for environmental activities

25      within the Minerals and Chemicals Division.

**PADUANO**

1    (RECESS)

2    Q    Did you ever see this Exhibit 33 before?

3    A    No, I have not.

4    Q    Do you have any idea what Mr. Jacobs was referring to

5         in the memo at the last page of that where he says,

6         "...the attached report looks like more potential

7         trouble for Emtal"?

8    A    No, I would not know that. I do not know.

9    Q    Have you ever seen Exhibit 34 before?

10   A    This is the continuation of one of the earlier docu-

11        ments in which Miss Newgar was attempting to identify

12        the mineral species that were present in samples of

13        talc by phase contrast microscopy.

14   Q    And would that again date back to 1976?

15   A    Well, this was somewhat later. The dates indicated

16        are April 7, 8.

17   Q    Do you know whether that was prepared as a part of the

18        study that took place during 1978 and 1979 that you've

19        described?

20   A    I do not believe so.

21   Q    Can you tell me what Exhibit 35 is?

22   A    This is a Technical Service Request also for evaluation

23        of samples of competitive talc.

24   Q    Now, this TSR is directed towards you; is that right?

25   A    Yes, that is correct.

100

1  Q   It's from a Mr. Wert?

2  A   Yes.

3  Q   Who is that?

4  A   Mr. Wert is -- he's a -- he's in the Planning and

5      Development Department.  He's basically a marketing

6      man.

7  Q   Now, a response was prepared to this TSR; correct?

8  A   That's correct.

9  Q   Who prepared the response?

10 A   Martha Hamel who is the electron microscopist in R & D.

11     I believe she is the person who signed this Technical

12     Service Request.

13 Q   Did you review the response that was given to that

14     TSR?

15 A   No, I have not.

16 Q   Do you know whether you would have reviewed that at

17     the time it was submitted to Mr. Wert?

18 A   It would probably have crossed my desk.

19 Q   Would you probably have read it when it crossed your

20     desk?

21 A   I might have read it when it crossed my desk.

22 Q   Do you agree with the statements contained at page two

23     in this document, "Although no asbestos was found in

24     these samples, the presence of serpentine requires

25     that a sharp lookout be kept for chrysotile?"

PADUANO

(OBJECTION BY ALL DEFENSE COUNSEL)

A    Would you repeat the question now?

Q    Do you agree, although no asbestos was found in these samples, the presence of serpentine requires that a sharp lookout be kept for chrysotile?

(OBJECTION BY ALL DEFENSE COUNSEL AND MOTION TO STRIKE)

A    I think Dr. Hamel is relatively unfamiliar with the fact that small amounts of chrysotile may have been present in our talc samples in the past.  I think she was identifying this as something that might not have been familiar with her, but was familiar to the rest of us.

Q    Do you agree with this statement, that the presence of serpentine requires that a sharp lookout be kept for chrysotile?

(OBJECTION BY ALL DEFENSE COUNSEL)

A    Yes, I would generally agree with that.

      MR. DOLAN:    Could we have the date of that exhibit, please?

      MR. PRENTISS:    Yes.  This exhibit is dated July 15, 1982.

Q    And can you tell me what is the identification of the source of the talcs that are tested under this TSR?

A    I can only identify the first two.

PADUANO

102

1   Q   And what are they?

2   A   Those are samples from --

3         MR. SARLI:   I object.  If you look inside

4   it says "Vental," not Vertal.

5         THE WITNESS:   I would interpret that as

6   competitive samples of Vermont talc.

7   Q   Vertal, what does that refer to?

8         MR. SARLI:   I object.

9   A   That is a commercial -- a trade name for talcs pro-

10   duced by that company.

11   Q   By the Vermont Talc Company?

12   A   That is my understanding.

13   Q   And could you tell me whether you recall Exhibit 36?

14   Your answer, sir?

15   A   Excuse me.  What was the question?

16         (PREVIOUS QUESTION READ BY REPORTER)

17   A   No, I do not.

18   Q   That's a memorandum, inter-department memorandum within

19   your company?

20   A   That is correct.

21   Q   It's addressed to you from Mr. Triglia?

22   A   That is correct.

23   Q   It's dated May 22, 1979?

24   A   That is correct.

25   Q   You have no recollection of having received this?

**PADUANO**

1    A    No, I do not.

2    Q    Do you know whether you would have read this at the

3         time that you received it?

4    A    I believe I would have.

5    Q    Is that your practice, to read memoranda that were

6         directed to your attention?

7    A    Very much so.

8    Q    Dr. Hemstock, in the first full paragraph of page two

9         of this memorandum, there is a statement from Mr.

10        Triglia that, "The results showed that although there

11        was a variability in the number of fibers counted from

12        week to week, there were, nevertheless, fibers present

13        in every sample of Emtal 42 tested.  A few of the Emtal

14        42 samples showed relatively high fiber counts."  Do

15        you know to what fiber Mr. Triglia is referring in that

16        sentence?

                (OBJECTION BY ALL DEFENSE COUNSEL)

18   A    Those would be fibers observed in the electron micro-

19        scope evaluation of those samples.

20   Q    And do you know whether Mr. Triglia was referring to

21        a particular mineral fiber?

                (OBJECTION BY ALL DEFENSE COUNSEL)

23   A    I do not know that.

24   Q    Mr. Triglia, in paragraph one of the first page states,

25        "Evidence of serpentine fibers were found.  These

**PADUANO**

·104

1    fibers have a very distinctive and unique shape which

2    makes them easy to identify." Does that statement

3    refresh your recollection as to the mineral fibers to

4    which Mr. Triglia referred in the paragraph I read

5    from on page two?

6  A    No, it does not. All this refers to is a specific

7    shape which he generally classifies as a serpentine

8    fiber without any positive mineralogical identification.

9         MR. HALKET:   I'm going to object to that

10    question in that it implies that he had a recollection

11    as to what was in the memo.

12  Q    Do you have any recollection of seeing Exhibit 37

13    before?

14  A    No, I do not.

15  Q    Do you have a recollection of seeing Exhibit 38 before?

16  A    No, I do not have a recollection of having seen this

17    document.

18  Q    In the first page of this Exhibit 38 is a copy of a

19    small memo pad page with the name of Mr. Triglia on

20    it. Is that Mr. Triglia's handwriting?

21  A    I believe it is.

22  Q    You have no recollection of receiving a copy of this

23    TSR and the attached reports?

24  A    No, I do not.

25  Q    Your initials are here and indicate that you did receive

**PADUANO**

BASF02400

105

1        a copy, though?

2   A   That is correct.

3   Q   Do you have any recollection of Exhibit 39?

4   A   No, I do not.

5   Q   Would you state what Exhibit 40 is?

6   A   I believe these are the results of a phase contrast

7        microscopic evaluation of samples of Waterbury talc.

8   Q   This is in 1978 that that was prepared; is that true?

9   A   April 20, 1978.

10   Q   This was prepared by your department, is that --

11   A   Yes, that is correct.

12   Q   Why was your department interested in studying the

13        mineral content of Waterbury talc or Waterbury talc

14        ore?

15             (OBJECTION BY ALL DEFENSE COUNSEL)

16   A   The samples in question were taken by a geologist who

17        was not within the R & D Department, and this was a

18        request by him for work to be done.  I cannot respond

19        to why he was interested in these particular samples.

20   Q   Do you know what Exhibit 41 is?

21   A   This was a request for mineralogical evaluation of

22        air samples collected in various parts of the Emtal

23        Plant.

24   Q   Do you have any recollection whatsoever of seeing that

25        document before?

PADUANO

BASF02401

1   A   Generally, yes, I do.

2   Q   What's your recollection?

3   A   Well, my recollection is that there were small amounts

4       of fibers identified on the filters that were collected

5       from these samples.

6   Q   Do you have an independent recollection of that

7       separate and apart from reference to the document?

8   A   Yes, I'm quite familiar with this.

9   Q   What is it about that test or occurrence that make it

10       stick out in your memory?

11   A   It happened April 19, 1982.  It's more recent than

12       most of the rest of the documents.

13   Q   I show you Exhibit 42.  Do you know what that is?

14   A   This is the request by Mr. Triglia for microscopic

15       examination of a sample of talc.

16   Q   Do you know what the results of that examination were?

17   A   No, I do not.

18   Q   You don't remember having seen that before?

19   A   I don't recall this at all.

20   Q   No. 43, is that something you have any knowledge of?

21   A   No, I do not.

22   Q   You've never seen that before, to the best of your

23       recollection?

24   A   To the best of my recollection, I did not.

25   Q   I show you Exhibit 44.  Do you have any knowledge of

**PADUANO**

BASF02402

1     that?

2   A   No, I don't.

3   Q   That Exhibit 44 appears to make reference to Exhibit 43?

4   A   Yes.

5   Q   Does it not?

6   A   Yes, to the Selevan (Niosh) study, correct.

7   Q   Did you have any involvement in occupational health

8     or safety as part of your work at the company?

9   A   No, I did not.  At this time, Mr. Oulton was not in

10     the Research Department.  He was in the Administration

11     Department.

12   Q   So, your activities did not in any way involve possible

13     compliance with standards of governmental agencies

14     that may be applicable to mining?

15   A   That's correct.

16   Q   You had no involvement whatsoever?

17   A   None whatsoever.

18   Q   Other than requests that might be made to you for

19     analysis of samples?

20   A   Correct, yes.

21   Q   I show you Exhibit 45.  Do you have any recollection

22     of that?

23   A   This was a summary of results that were obtained as

24     a result of a marketing Technical Service Request

25     relative to the fiber content of competitive products.

PADUANO

BASF02403

'108

1            MR. HALKET:   That was not the question he

2    asked. Answer the question he asked.   Would you re-

3    peat it, please?

4    Q    Do you recall this document?

5    A    I do not recall this document.

6    Q    You have no recollection whatsoever of ever having

7    seen this before?

8    A    No, I do not.

9    Q    This is addressed to you?

10    A    That's correct.

11    Q    From Mr. Triglia?

12    A    Yes.

13    Q    And that's 1979?

14    A    Yes.

15    Q    That's too far back for recollection?

16            (OBJECTION BY ALL DEFENSE COUNSEL)

17    A    Yes, it is too far back for my specific recollection.

18    Q    Now, this document shows test results of various talc

19    samples for fiber content; is that true?

20            (OBJECTION BY ALL DEFENSE COUNSEL)

21            THE WITNESS:   Would you repeat the question,

22    please?

23            (PREVIOUS QUESTION READ BY REPORTER)

24            (OBJECTION BY ALL DEFENSE COUNSEL)

25            MR. KENNEDY:   You're asking for the witness'

**PADUANO**

BASF02404

.109

1    interpretation of the witness reading the document?

2                    MR. PRENTISS:   What the document portrays.

3                    MR. KENNEDY:   Doesn't it speak for itself?

4    What probative value does it have if he reads the

5    document and tells you what he thinks it says?

6                    THE WITNESS:   Yes.   Generally, that's what

7    this document purports to do.

8  Q  The document that you reviewed at the time it was

9    submitted to you?

10                    (OBJECTION BY ALL DEFENSE COUNSEL)

11                    THE WITNESS:   Would you repeat the question?

12 Q  Was it your normal practice to review documents that

13   were submitted to you?

14 A  Yes.

15 Q  That was submitted to you?

16 A  Yes, I believe so.

17 Q  Now, the document shows asbestos totals for Emtal

18   samples; for example, Emtal 42, and that refers again

19   to Emtal 42 talc?

20                    (OBJECTION BY ALL DEFENSE COUNSEL)

21 A  Yes, I believe so.

22 Q  Asbestos total, trace, 0 to 5; do you have any idea

23   what the zero to five represents?

24 A  No, I don't.   I don't know what this column refers to

25   at all.

**PADUANO**

BASF02405

110

1   Q   So, you wouldn't know what the line, for example, that

2         shows Emtal 42, across the column, asbestos total,

3         many, 15 to 50 --

4   A   No, I do not.

5   Q   You don't know what that represents?

6   A   No, I do not.

7   Q   There's a reference to laboratory used in one column.

8         The initials are E.I. INST.  Do you know what that

9         refers to?

10   A   That's the Engelhard Industries Instrumentation

11         Laboratory.

12   Q   Where is that located?

13   A   That was located at Menlo Park.

14   Q   The asbestos fiber total on this column is listed as

15         abundant, greater than fifty.  Do you know what that

16         signifies?

17   A   No, I don't.

18   Q   Who would?

19              MR. KENNEDY:   If you know.

20   A   I don't know who would.

21   Q   Well, E.I. Instrument Laboratory, that's Engelhard

22         Industries; is that correct?

23   A   Yes, that's correct.

24   Q   Is that laboratory within the same office building

25         that you work in?

**PADUANO**

BASF02406

1   A   It's in the same building.  This document in 1979,

2         this laboratory had electron microscope capability.

3         We did not.  The people who ran this test were merely

4         providing a service to us when we requested it.

5   Q   Do you have any reason to doubt the accuracy of any

6         of the figures that are portrayed on this sheet?

7              (OBJECTION BY ALL DEFENSE COUNSEL)

8   A   The quality of results that the Engelhard Industries

9         Laboratory in general turned out was not up to the

10       quality of the Georgia Tech Laboratories.  I think the

11       Georgia Tech people had more skills in dealing with

12       mineral species.  The Engelhard Industries group pri-

13       marily dealt with metals.

14   Q   Did the Engelhard Industries Laboratory have a selected

15       area electron diffractometer?

16   A   Electron diffraction capabilities?  I don't know that.

17   Q   Tell me this.  Do you know who performed the tests

18       that are shown on Table 2 that's attached to this

19       exhibit?

20   A   Yes.  The document says that Table 2 results were per-

21       formed by Georgia Tech.

22   Q   Which is a more reliable testing --

23   A   In my general experience with the two groups, yes, I

24       would say so.

25   Q   More reliable testing for mineral identification than

**PADUANO**

BASF02407

·112

1      the E.I. Instrument Laboratory?

2   A   I would think so.

3   Q   That laboratory found asbestos total for Emtal 42 talc

4      at the Sample No. 4026-12 as many, fifteen to fifty?

5                    (OBJECTION BY ALL DEFENSE COUNSEL)

6   A   I can't address the response to that question at all.

7   Q   Now, the bottom of this page, the sentence that, "Most

8      of the fibers were small, but several of the Emtal

9      samples had  a few fibers longer than five microns,"

10     do you recall now having learned that those test re-

11     sults were achieved on Emtal talc?

12                   (OBJECTION BY ALL DEFENSE COUNSEL)

13  A   That's what Table 2 would suggest.  I do not have any

14     independent recollection of that fact.

15  Q   Do you have any reason to doubt the accuracy of the

16     results from the Georgia Tech Laboratory portrayed on

17     Table 2?

18                   (OBJECTION BY ALL DEFENSE COUNSEL)

19  A   I have no opinion.

20  Q   None whatsoever?

21  A   I have no reason to believe that they were in error;

22     but conversely, I can't validate that, either.

23  Q   This memorandum is to you from Mr. Triglia.  Was it at

24     your request that these samples were tested?

25  A   No, it was not.

PADUANO

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

1   Q   At whose request was it?

2   A   Mr. Triglia, I believe, made such decisions on his

3       own.  If he decided that Engelhard·Industries for

4       verification purposes should carry out other tests,

5       he would make that decision.  If he wanted Georgia

6       Tech to do the testing, he would also make that deci-

7       sion.

8   Q   Mr. Triglia reported to you?

9   A   Yes, he did.

10  Q   Do you have any recollection or knowledge why Mr.

11      Triglia would have reported these results to you?

12          (OBJECTION BY ALL DEFENSE COUNSEL)

13  A   He was merely interpreting results that had been made

14      as indicated here at the request of the Marketing

15      Department.  I have no other reason to specifically

16      know.

17  Q   Well, why in the practice of your department would

18      Mr. Triglia report these results to you when he was

19      requested to obtain this information by the Marketing

20      Department?

21          (OBJECTION BY ALL DEFENSE COUNSEL)

22  A   I would say that this was only a routine.  Mr. Triglia,

23      I can only surmise, evidentally thought these results

24      were significant enough to report them in this fashion.

25  Q   Do you know what Exhibit 46 is?

**PADUANO**

BASF02409

1    A    I have no independent knowledge of this.

2    Q    You've never seen this before?

3    A    Not to my knowledge.

4    Q    Do you know what Exhibit 47 is?

5    A    This is a series of samples that were obtained from a

6         potential acquisition candidate.

7    Q    Does that mean a mine that your company was considering

8         purchasing?

9    A    That's correct.

10   Q    When approximately was this prepared?

11            MR. HALKET:    Let the record show that the

12        witness is once again reading the document to find the

13        answer.

14   A    In the period of mid-year, 1977.

15   Q    Do you have any independent recollection of the studies

16        that are represented by that exhibit?

17   A    Only in a very general way.

18   Q    What is your recollection?

19   A    I was aware that the studies were underway to appraise

20        the quality of the deposit for potential acquisition.

21   Q    Do you know whether the deposit was studied for poten-

22        tial asbestos content?

23   A    This was an asbestos deposit.

24   Q    There was consideration of purchasing an asbestos mine?

25   A    There was some consideration given at that time.

PADUANO

BASF02410

1  Q   Was it purchased?

2  A   It was not.

3  Q   Dr. Hemstock, page one of this, the first entry is

4     Emtal 42.  Can you tell me what that means in relation

5     to the potential purchase?

6  A   No, I cannot.

7  Q   What is it on this document that leads you to conclude

8     that it has to do with a potential purchase?

9  A   The title of the document itself, VAG core samples

10 Q   And what does "VAG" refer to?

11 A   VAG refers to Vermont Asbestos Group.

12 Q   I show you Exhibit 48.  Did you ever see that before?

13 A   I have no independent recollection of this.

14 Q   That's July of '82, isn't it?

15 A   That's correct.

16 Q   Did you receive a copy of this?

17 A   Yes, I did.

18 Q   You don't remember this one?

19 A   I don't recall it.

20 Q   The paragraph numbered one here in the body of this,

21     this is a TSR again?

22 A   That's correct.

23 Q   "Fiber content:  This information is required immediate-

24     ly and should be conveyed orally as soon as it is avai-

25     lable," and under or pointing towards the orally is

**PADUANO**

PENGAD CO., BAYONNE, N.J. 07002 · FORM 740

1    the handwritten word "only" underlined.  Do you know

2    why it was that the fiber information was to be trans-

3    mitted only orally?

4  A  No, I do not.

5  Q  Whose direction was it that that information would

6    only be transmitted orally?

7  A  I have no idea.

8  Q  Did you receive a copy of this?

9  A  The document would indicate such.

10           MR. KENNEDY:   With or without the margin-

11    alia.

12  Q  Did you ever receive the information, the study re-

13    sults that are summarized on Exhibit 48?  Refer to it,

14    if you like.

15  A  I had no reason to believe I received any more than

16    what is described here.

17  Q  Now, Exhibit 49 was loose material that was in the

18    pocket of a looseleaf binder.  Do you have any familiar-

19    ity with that material?

20  A  Other than the fact that it appears to be a work sheet,

21    I have no knowledge of this document.

22  Q  Do you know the looseleaf binder that I'm referring

23    to?

24  A  No, not on the basis of information conveyed here, I

25    don't know what you're referring to.

1   Q   Do you know that your counsel came over today with a

2       black looseleaf binder that was filled with documents,

3       and this Exhibit 50 is a bundle of copies of all those

4       documents?

5   A   Yes.

6   Q   Are you familiar with that series of documents?

7   A   I believe this was a record that Mr. Gale kept of some

8       of the raw data that he accumulated.

9   Q   That is the entire contents of the looseleaf binder?

10  A   I'm not specifically familiar with this document.

11  Q   By that you're referring to the entire bundle?

12  A   To the entire bundle.

13  Q   And do you know where that black looseleaf binder came

14      from and the documents contained in it?

15  A   No, I do not.

16  Q   Had you ever seen those before you prepared for this

17      deposition?

18  A   No, I had not.

19  Q   How is it that you know --

20          MR. HALKET:   A point of clarification.

21      You're asking whether he had seen the specific docu-

22      ments in the binder and not copies of them that might

23      have been somewhere else, I take it?

24          MR. PRENTISS:   That's right.

25  Q   How is it that you know that that represents work sheets

BASF02413

1   kept by Mr. Gale during the course of his study?

2           MR. HALKET:   Objection.   He didn't say he

3   knew.   He surmised it.

4           (OBJECTION BY ALL DEFENSE COUNSEL)

5   A   That was only a presumption on my part.

6   Q   On what basis do you make that presumption?

7   A   Some of the earlier documents that we discussed basi-

8   cally had the same kind of calculations in them, and

9   so far as I'm aware, Mr. Gale was the only person in

10   our department who made such calculations.

11   Q   In conjunction with the study?

12   A   Not necessarily in conjunction with the study.   He

13   would -- there were a number, as is evident here from

14   the TSR's, there were a number of small independent

15   requests.   He would use these kinds of calculations in

16   responding to those as well.

17   Q   Now, these work sheets, to your knowledge, do these

18   represent just his work sheets representing the results

19   of his analyses as he obtained them?

20           (OBJECTION BY ALL DEFENSE COUNSEL)

21   A   I don't know that.

22   Q   Was there a report ever made of the study that Mr. Gale

23   and the others conducted?

24           MR. KENNEDY:   Which study?

25           MR. HALKET:   I think the evidence shows

**PADUANO**

BASF02414

1      there were a number of studies.

2              MR. PRENTISS:   I'm talking about the study

3      that Dr. Hemstock has testified to that took place in

4      1978 and 1979 in which Mr. Gale took part.

5  A   Yes, there were, that probably appeared in memoranda.

6      I think we've seen the results of them this afternoon.

7  Q   Well, the memoranda that we've seen are brief memoranda

8      without conclusions or summaries of the results of

9      tests.  Was there any final report that was written

10     regarding that series of tests?

11             (OBJECTION BY ALL DEFENSE COUNSEL)

12  A  I don't recall that there was.

13  Q  You don't recall that there was?

14  A  I don't recall that there was.

15  Q  You mean there could have been, but you wouldn't remem-

16     ber?

17             (OBJECTION BY ALL DEFENSE COUNSEL)

18  A  I just don't recall it.

19  Q  How long did this study take to perform?

20             (OBJECTION BY ALL DEFENSE COUNSEL)

21             MR. HALKET:   What study?

22  Q  Dr. Hemstock, do you have any question about what study

23     I'm asking you about?

24  A  I assume you're talking about the study in which Mr.

25     Gale and I visited the Vermont mine.

PADUANO

BASF02415

1  Q   That's right.

2  A   That study probably occurred over several months, but

3      it was not a dedicated effort on anybody's part.  It

4      was a relatively small study that was almost like a

5      TSR except it was initiated within my department as

6      opposed to being requested by others.

7  Q   And why was it initiated within your department?

8  A   Mr. Gale and I -- I had never been to the Emtal mine

9      or plant, nor had Mr. Gale.  Mr. Gale had just joined

10     the organization, and we were generally interested in

11     learning more about the nature of the Emtal deposit,

12     and I was personally interested in seeing the proces-

13     sing operation.

14 Q   One of the purposes of the study was to determine

15     asbestos content in the talc and the ore; is that

16     correct?

17 A   No, it was not.

18 Q   It was not?

19 A   No, it was not.  It was a broader intent than that.

20     We wanted to see the general geology of the deposit.

21     We wanted to find out what other mineral constituents

22     there were.  If we found asbestos, that was -- so be it.

23     We were really looking for other things like magnesite

24     content, iron carbonate content, other extraneous

25     minerals like chlorite, like sphene.  So, it was a much

**PADUANO**

BASF02416

121

1          broader study than you have indicated.

2     Q    And was asbestos one of the minerals that was looked

3          for?

4     A    We looked for fibers.  We were interested in morphology.

5          We were interested in knowing what our talc -- the

6          basic morphology of the talc deposit.  If we found

7          fibers, when you're looking in an electron microscope,

8          you see what you see.

9     Q    My question was:  Was asbestos one of the minerals

10         that was looked for in the talc?

11    A    Yes, it was one of the minerals.

12    Q    How many other such studies did your department ini-

13         tiate of its own the way that you describe this re-

14         port -- this study as being initiated on its own during

15         the time that you have been associated with the depart-

16         ment?

17    A    To my knowledge, none.

18    Q    This is the only one?

19    A    That is correct.

20    Q    You do not know whether a report was prepared at the

21         end of that study?

22    A    I'm not sure that a final report was ever issued.

23    Q    And was an interim report ever issued?

24    A    In the form of a memoranda, some of which you have

25         seen.

PADUANO

BASF02417

1  Q  Are there any interim or other reports that were pre-
2     pared regarding that study that you have now identi-
3     fied during the course of this deposition?
4  A  Not to my knowledge.
5  Q  To the best of your recollection, just from this depo-
6     sition, do any of the reports that we've identified
7     during the course of this deposition present study
8     results; that is, the results of analyses of the
9     mineral constituents of talc from the Emtal mine ob-
10    tained during that study?
11             (OBJECTION BY ALL DEFENSE COUNSEL)
12             MR. KENNEDY:   You're talking about the
13    field trip?
14             MR. PRENTISS:   That's right.
15             THE WITNESS:   Would you repeat the question,
16    please?
17             (PREVIOUS QUESTION READ BY REPORTER)
18             MR. SLOANE:   Do you understand the question?
19             (PREVIOUS QUESTION READ BY REPORTER)
20             MR. CURRAN:   He's already so testified.
21             MR. PRENTISS:   No, he hasn't.
22             MR. HALKET:   He has testified he isn't
23    familiar with a great number of these documents.  I
24    don't know whether he would know --
25 A  Yes, I believe some of those data are reported in here.

**PADUANO**

BASF0241

1    Q    And where else -- where would the rest of those data

2         be reported?

3              MR. KENNEDY:   We've given you all the

4         documents we had.  We made that representation to you.

5         You've got all the documents.

6    A    If they're not here, they don't exist.

7    Q    Did anybody tell you not to prepare written reports

8         regarding any part of the study?

9    A    No, sir.

10   Q    Did you tell anybody not to prepare written reports

11        regarding any part of the study?

12   A    No, I did not.

13              (RECESS)

14   Q    Dr. Hemstock, I'd like you to look at a memorandum

15        that was included as part of Exhibit 50.  Do you recall

16        ever having seen that before?

17   A    No, I do not.

18   Q    Dr. Hemstock, there's a reference made in this memo-

19        randum to the identification of chrysotile fibers in

20        talc taken from the Baker mine in Southern Quebec.

21        Do you recall that, learning of that identification?

22   A    No, I do not.

23   Q    This memorandum states, and I'll read the paragraph

24        that's relevant, "Transmission electron microscopy

25        investigations were undertaken at the Georgia Institute

**PADUANO**

1 of Technology from February 12 to February 16.   One

2 of the samples (79-J-1) investigated during this time

3 was a talc production sample from the Baker mine in

4 Southern Quebec.   A request had been made (TSR:J-79-1)

5 to examine the sample and determine the mineralogy and

6 possible contaminants present.   A transmission electron

7 microscope examination of this talc production sample

8 showed the presence of chrysotile fibers.   The impli-

9 cations prevalent in this information prompted Mr.

10 Howard Shafer to send four more talc production samples

11 to the Georgia Institute of Technology for transmission

12 electron microscopy investigations."   Do you have any

13 recollection of Mr. Shafer sending these materials out

14 for examination in response to learning of chrysotile

15 in talc from the Quebec mine?

16 A No, I do not.

17 Q Can you tell me whether or not this event that's stated

18 in this memorandum had any effect or was in any way

19 related to the decision of your department to undertake

20 a study of talc in the Emtal mine in '78 and '79?

21 A I believe it was not.

22 Q You believe that your study was undertaken completely

23 independent of any information that's contained in

24 this memorandum?

25 A I believe so.

PENGAD CO., BAYONNE, N.J. 07002 - FORM 740

**PADUANO**

BASF02420

1  Q   On what basis do you state that?

2  A   On the basis that Mr. Gale was a relatively new em-

3      ployee with the company, and I had not visited the mine

4      and completely apart from any involvement in determi-

5      nations of chrysotile, we were interested in learning

6      more of the Emtal mining and processing operation.

7  Q   Now, this memorandum has a stated subject of talc

8      investigation, review and update?

9  A   Um-hmm.

10 Q   Is that talc investigation the study to which you have

11     referred in your testimony as being conducted in 1978

12     and 1979?

13 A   That is Mr. Gale's designation.  We did not designate

14     it as a talc investigation.

15 Q   Do you know, can you state whether or not this memo-

16     randum was prepared in conjunction with the talc study

17     that you have testified to?

18         MR. KENNEDY:   You're talking about the field

19     trip?

20         (OBJECTION BY ALL DEFENSE COUNSEL)

21         MR. PRENTISS:   I'm talking about the talc

22     study that Dr. Hemstock has testified took place during

23     1978 and 1979.

24         (OBJECTION BY ALL DEFENSE COUNSEL)

25 A   I don't believe the two events are related.

PADUANO

BASF0242

1    Q    Which two events?

2    A    The investigation of these specific samples and the

3         visit that Mr. Gale and I made to Emtal.

4    Q    When did you make the visit with Mr. Gale to the Emtal

5         facility?

6                MR. KENNEDY: Didn't we cover this subject

7         already?

8                MR. PRENTISS: No.

9    A    It was in the '78-79 period.

10    Q    Over what period of time did this study take place?

11               MR. KENNEDY: What study, the field trip?

12    A    Can you be more specific on the study? You're still

13         referring to the visit that Gale and I made and the

14         subsequent analyses? That was only one of many, many

15         TSR type of activities that went on over this long

16         time frame. I don't think it should be highlighted

17         to the degree that you have indicated it.

18    Q    Now, there's a memorandum dated March 20, 1979 from

19         Peter Gale to several people including yourself. The

20         subject of that memorandum is talc -- is that talc

21         study or talc investigation?

22    A    Talc investigation.

23    Q    Do you know what Mr. Gale is referring to as the talc

24         investigation?

25               (OBJECTION BY ALL DEFENSE COUNSEL)

PADUANO

1    A    No, I don't.

2    Q    There's a memorandum dated March 23, 1979 from Mr.

3         Triglia to you and Mr. Yunko, and the subject of that

4         memorandum is talc investigation.  Do you know what

5         Mr. Triglia is referring to?

6    A    No, I do not.

7    Q    Here's a memorandum to a Mr. Gale from a Mr. Ojala.

8         Have you ever seen that before?

9    A    No, I have not.

10    Q    Here's a memorandum dated March 1, 1979 from Mr. Yunko

11         to you, subject, Emtal talc.  Do you have any recol-

12         lection of receiving that?

13    A    No, I don't.

14    Q    And so, Mr. Yunko told you in this memorandum that,

15         "The issue of properly defining Emtal talc mineralogy

16         insists on becoming more complicated all of a sudden."

17         Do you have any idea what he was referring to?

18                (OBJECTION BY ALL DEFENSE COUNSEL)

19    A    No, I do not.

20    Q    "I am deferring any action until we have an opportunity

21         to review Peter's findings and recommendations.  We'll

'22         have to decide on a strategy at that time."  Do you

23         have any knowledge or recollection of what strategy

24         he's referring to?

25    A    No, I do not.

**PADUANO**

BASF02423

1            (OBJECTION BY ALL DEFENSE COUNSEL)

2 Q   You don't have any recollection what strategy was

3      decided on?

4 A   No, I do not.

5 Q   Now, I previously showed to you the memorandum dated

6      April 11, 1979 to Mr. Triglia from Mr. Gale and which

7      you received a copy of.  The subject is talc investi-

8      gation, review and update.  Do you have any idea what

9      talc investigation he's referring to?

10            (OBJECTION BY ALL DEFENSE COUNSEL)

11 A   No, I do not.

12 Q   The memorandum dated April 4, 1979.  It is to you among

13      other people from Mr. Gale, subject:  Talc investiga-

14      tion.  Do you have any idea what that talc investiga-

15      tion is?

16            (OBJECTION BY ALL DEFENSE COUNSEL)

17 A   No, I don't.

18 Q   You have no recollection of a talc investigation?

19 A   No, I do not.

20 Q   These documents, Dr. Hemstock, that you have been ques-

21      tioned on at today's deposition, what proportion did

22      you obtain from the files of the Research and Develop-

23      ment Department?

24          MR. SLOANE:   Personally?

25          THE WITNESS:  I personally?

PADUANO

BASF02424

129

| | | |
|---|---|---|
| 1 | | MR. PRENTISS:   Yes. |
| 2 | A | I did not obtain any personally. |
| 3 | Q | Did you direct that any person obtain any of the docu- |
| 4 | | ments that have been identified in this deposition |
| 5 | | prior to this deposition at any time? |
| 6 | A | No, I did not. |
| 7 | Q | Do you know whether any of these documents that have |
| 8 | | been identified in this deposition were obtained from |
| 9 | | the files associated with your department? |
| 10 | A | I believe that is true. |
| 11 | Q | How do you know that? |
| 12 | A | Because I was specifically asked by our legal depart- |
| 13 | | ment to have an opportunity to look at documents, and |
| 14 | | my response—my secretary assisted the legal department |
| 15 | | in generally locating where those files were. |
| 16 | Q | What did she look under? |
| 17 | | (OBJECTION BY ALL DEFENSE COUNSEL) |
| 18 | A | I don't know.   She has her own -- she understands the |
| 19 | | filing. |
| 20 | Q | Did you give her instructions on how to find these |
| 21 | | files? |
| 22 | A | No, I did not. |
| 23 | Q | Did you discuss it with her at all? |
| 24 | A | No, I did not. |
| 25 | Q | None whatsoever? |

**PADUANO**

BASF0242

. 130

1   A   No, I did not.

2   Q   You're familiar with Mr. Gale.  Are you aware that

3       representatives of your company have threatened Mr.

4       Gale with legal action for participating in this law-

5       suit?

6                   (OBJECTION BY ALL DEFENSE COUNSEL)

7   A   I'm not aware of that.

8   Q   Do you know if any person from your company has --

9                   MR. KENNEDY:   I think a judge suggested it

10      himself from the bench.

11  Q   Do you know whether any person from your company has

12      threatened Mr. Gale with any kind of untoward result

13      if he should proceed with participating as an expert

14      in this case?

15                  MR. KENNEDY:   Objection to the word

16      "untoward."

17  A   I have no knowledge.

18  Q   You filed an affidavit in a civil action that was

19      filed in the United States District Court in the Dis-

20      trict of Vermont, did you not?

21  A   Yes, sir, that's true.

22  Q   Do you remember that?

23  A   Yes, I do.

24  Q   In paragraph five of that affidavit, could you read

25      that?

**PADUANO**

BASF02426

.132

1   Q   Now, the x-ray diffraction, the output of an x-ray

2       diffraction test is some sort of a graph; is that

3       right?

4   A   It's a tracing, yes.

5   Q   It's a tracing, a crooked line going across the graph

6       page; is that right?

7   A   That's correct.

8   Q   Was it your intention to state in this paragraph five

9       of this affidavit that Mr. Gale in looking at the

10      tracing of an x-ray diffraction, that he might perform

11      tomorrow or next week, would refresh his recollection

12      as to a tracing that he saw back in 1978 or 1979?

13              MR. KENNEDY:   I'm going to object, and I'm

14      going to instruct the witness not to answer because I

15      think your inquiry now is going to the motion that you

16      have filed.  I think the theories behind that are the

17      theories of counsel.  It's got no purpose in this

18      deposition whatsoever.  So, I'll instruct him not to

19      answer.  If you want to get the judge on the phone,

20      I'm sure he's sitting in his chambers right now.

21              MR. PRENTISS:   Let me state this for the

22      record.  As of this time, this deposition is the con-

23      clusion of the Motion for Contempt because the depo-

24      sition has taken place.  All that's left is my appli-

25      cation for fees and expenses.  I can state for the

**PADUANO**

BASF02428

1   record that I am not pressing any Motion for Contempt

2   to the extent there is still one pending. What I'm

3   stating, there has been filed by Engelhard Corporation,

4   a defendant in a related action, in District Court in

5   Vermont, an affidavit by Dr. Hemstock, and I am per-

6   fectly entitled to cross-examine him on something that

7   he stated under oath which is going to be offered as

8   a part of the defense to that case in Vermont.

9          MR. KENNEDY:   But I think if you want to

10  depose him on that, the action -- that you should do

11  it in the Vermont action, not this action.

12         MR. SLOANE:   There's a Motion to Dismiss

13  pending in that action. You're seeking discovery in

14  an action in which a Motion to Dismiss is pending.

15  The Motion to Dismiss is made. The argument is that

16  there's no jurisdiction in Vermont. What you're doing,

17  what you just candidly explained, is trying to take

18  discovery in this action where you can't take it in

19  Vermont. That's not proper. You know it.

20         MR. PRENTISS:   I can take it in Vermont.

21         MR. KENNEDY:   Then take it in Vermont.

22         MR. PRENTISS:   This affidavit was also filed

23  in this action.

24         MR. SLOANE:   I think the record now is

25  clear on why you're asking these inquiries.

**PADUANO**

BASF02429

134

1      MR. KENNEDY: Not only that, the issue --

2 it was filed and it has already been resolved.  Here

3 we are, the Court's order.

4 Q One last document.  Exhibit 51, Dr. Hemstock, have you

5   ever seen that before?

6 A I have not seen this document before.

7      MR. PRENTISS: No further questions.

8      MR. LEIBENSPERGER: No questions.

9      MR. CURRAN: No questions.

10     MR. DOLAN: No questions.

11     MR. SARLI: No questions.

12     MR. SLOANE: No questions.

13     MR. KENNEDY: No questions.

14      (WHEREUPON, THE DEPOSITION IN THE AFORE-
   MENTIONED MATTER WAS ADJOURNED AT 5:30 P.M.)

15

16

17

18

19

20

21

22

23

24

25

PADUANO