<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| KIMBERLEE WILLIAMS, et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | **Civil Action No. 11-1754 (SRC)** |
| v. | : | |
| | : | **OPINION** |
| BASF CATALYSTS LLC, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

<u>**CHESLER**</u>, District Judge

This matter comes before the Court on several motions to dismiss the Amended Class

Action Complaint ("Amended Complaint").  The motions were filed by Defendants BASF

Catalysts LLC ("BASF") [docket entry 83]; Cahill Gordon & Reindel LLP ("Cahill"), Howard G.

Sloane, Ira J. Dembrow and Scott A. Martin [docket entry 80]; Thomas D. Halket [docket entry

79]; Arthur A. Dornbusch II [docket entry 77]; and Glen Hemstock [docket entry 78].  Plaintiffs

have opposed the motions.  The Court proceeds to rule on the papers submitted and without oral

argument, pursuant to Federal Rule of Civil Procedure 78.  For the reasons that follow, the Court

will grant the motions and dismiss the Amended Complaint in its entirety.


I.    **INTRODUCTION**

This unprecedented lawsuit, filed as a putative class action, seeks nationwide relief for

the alleged misconduct of Defendant BASF (and/or its predecessors) and its then-counsel, Cahill,

in connection with thousands of asbestos exposure lawsuits filed by individuals primarily in state courts throughout the United States over a period of more than 25 years.  The Amended Complaint asserts that this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as a class action lawsuit with minimal diversity between the Plaintiffs and Defendants and the requisite amount in controversy.

The six named Plaintiffs are the representatives of individuals who died as a result of asbestos-related ailments.  Between 1983 and 2010, those individuals, or their respective estates, filed personal injury lawsuits against BASF alleging that their ailments were caused by workplace exposure to a talc product manufactured and sold by BASF predecessor Englehard Corporation ("Englehard") and/or Englehard's subsidiaries, including a company known as Eastern Magnesia Talc Company.[1]  Broadly stated, Plaintiffs contend that those lawsuits were dismissed, voluntarily or otherwise, because BASF and Cahill, the law firm which served as BASF's national counsel in asbestos injury matters, deliberately concealed the fact that the Englehard talc, sold under the trade name "Emtal," contained asbestos.  In the instant lawsuit filed by the decedents' representatives, the Amended Complaint asserts a number of state law causes of action arising out of the alleged scheme by BASF and Cahill to destroy or conceal evidence of the talc's asbestos content and make misrepresentations to asbestos injury litigants, their counsel and/or a presiding court, all with the aim of reducing or eliminating BASF's liability for the asbestos injury claims.  Plaintiffs emphasize that they do not ask this Court to

---

[1] BASF acquired Englehard and its subsidiaries in 2006.  For the sake of simplicity, the Court will generally refer to the company by its current name, BASF, even though most of the actions and events described in the factual recitation will have occurred long before the acquisition of the Englehard companies by BASF.

invalidate any judgment or dismissal order entered by another court in favor of BASF, to order that any action which had been litigated elsewhere be re-opened, or to restrict or direct the actions of any other court.  Rather, Plaintiffs clarify in their opposition papers that, unlike the prayers for relief set forth in the original Complaint, the remedies they seek have been limited to the following: "(1) compel BASF and Cahill to notify their victims and acknowledge their deceit; (2) disgorge the revenues and gains they earned by the fraud; (3) enjoin the Defendants from further lying about the absence of asbestos in BASF's talc; and (4) enjoin Defendants from asserting any defense arising out of the fraud which would prevent claimants from pursuing remedies in courts of their own choosing."  (Pl. Br. at 3-4.)

In spite of their effort to re-draw this action to avoid a confrontation between the respective roles of state and federal courts, Plaintiffs would have this Court impermissibly exercise power over other courts and contravene well-established principles of federalism.  Of the four categories of relief identified by Plaintiffs as the core of this suit, the latter two directly implicate the prohibitions of the Anti-Injunction Act.  The Court will provide factual background based on the allegations of the Amended Complaint and proceed to discuss why this entire action must be dismissed as barred by the Anti-Injunction Act and the prohibition on advisory opinions under Article III of the Constitution, and additionally, for failure to set forth any plausible claims for relief.

## II.   FACTUAL BACKGROUND

Consistent with the standard of review applicable to motions governed by Federal Rule of Civil Procedure 12(b)(6), the following factual synopsis is derived from the Amended Complaint and any documents referenced therein.  In stating these facts, the Court does not making any finding as to their truth.  They are presumed to be true for purposes of this motion only.

From 1967 to 1983, BASF, directly or through a subsidiary, owned or operated a talc mine located in Johnson, Vermont.  (The Court will refer to the mine as the "Johnson Mine.") BASF processed the Johnson Mine's talc ore into products marketed under the trade name Emtal. Emtal products were used for many purposes, including as components in products as diverse as wall board, joint compound, and auto body filler.  Various tests and assays of the talc ore mined at the Johnson Mine and the processed Emtal products conducted throughout the 1970s identified the presence of asbestos fibers in the ore and products.  In 1983, the Johnson Mine was closed. Sometime thereafter, the Johnson Mine flooded with water, preventing any further testing.

The facts relating to the alleged scheme by BASF and Cahill to conceal and misrepresent the asbestos content of Emtal originate with an asbestos injury lawsuit filed against BASF in the United States District Court for the District of Rhode Island in 1979 by the estate of Thomas Westfall, a deceased rubber industry worker who was allegedly exposed to asbestos-containing talc products.  (The Court will refer to that lawsuit as the "Westfall action.")  Cahill represented BASF in the Westfall action.  Defendant Sloane was a Cahill attorney involved in the Westfall action, and Defendant Halket was an in-house attorney with BASF who participated in the defense of that action.  In the course of discovery in the Westfall action, BASF produced, through

its counsel, various documents that, according to the Amended Complaint, established the

existence of asbestos fibers in Emtal talc, including the test and assay results.  The Westfall

action discovery also included the 1983 deposition of Defendant Hemstock, a scientist then

employed by BASF as its Vice President of Research and Development.  According to the

Amended Complaint, Hemstock admitted that Emtal talc contained asbestos when, during a

deposition, he was shown and questioned about various documents concerning Emtal's asbestos

content, including test results characterizing the asbestos fibers found in Emtal as having "high

levels of chrysotile."  (Am. Compl., ¶ 100.)  The transcript of Hemstock's deposition was

produced by BASF many years later in an asbestos injury suit filed in New Jersey state court in

2009, which will be further discussed below, but the many exhibits referenced in the deposition

were not.  The Westfall action also involved the deposition of another BASF employee, Emil

Triglia, who similarly testified that Emtal talc contained asbestos.

Plaintiffs to this lawsuit allege that BASF management was aware of the liability risk

posed by the Westfall action discovery not only to the Westfall action itself but to BASF's

asbestos claim risk management in general.   According to the Amended Complaint, following

the Hemstock and Triglia depositions in 1983, BASF and its counsel, Cahill, devised a strategy

to control and possibly eliminate BASF's exposure to asbestos injury claim liability.  The

Amended Complaint identifies three parts to this alleged scheme: First, BASF secured a

settlement of the Westfall action under a confidentiality agreement preventing discovery relating

to the presence of asbestos fibers in BASF products from disclosure or dissemination to other

asbestos claimants.  Second, in or about March 1984, BASF collected for concealment and/or

destruction all evidence in its possession relating to asbestos in BASF talc products, under the

guise of record retention management, combined with a selective retention of documents

showing that BASF talc was asbestos free.  The Amended Complaint alleges that Hemstock

signed a memorandum dated March 7, 1984 entitled "Document Retrieval – Discontinued

Operations," which instructed employees to gather in boxes marked for discard all documents

related to certain discontinued businesses, including the Johnson Mine.  Third, BASF and its

counsel Cahill together used false and misleading information about the absence of asbestos in

BASF talc to influence other asbestos injury claimants to dismiss their cases against BASF or

forego their right to sue.   The Amended Complaint alleges that in addition to misrepresentations

made by BASF and/or Cahill, Defendants supplied documents purportedly corroborating their

misrepresentations to litigants and/or courts.  These documents included the affidavit of an expert

of asbestos in talc, a report based on an analysis of a Johnson Mine talc sample collected in 1961,

and the affidavit of a BASF employee regarding the closing of the Johnson Mine and non-

availability of testing data or talc samples.

       This latter misconduct, consisting of the misrepresentations, was, according to the

Amended Complaint, the core of the BASF-Cahill "Fraudulent Asbestos Defense Scheme,"

which Plaintiffs allege existed from 1983 or 1984 to at least 2009.  The scheme is described in

the Amended Complaint as follows:

> [W]henever an asbestos injury claim or lawsuit was filed or came to
> BASF's attention, the asbestos injury claimant, their lawyer(s) and, when
> and where applicable, the court in which such claim was pending, were
> systematically and uniformly told (often in identical language authored by
> Cahill Gordon) that Emtal talc ore and products did not contain asbestos
> and/or there was not any evidence that it did.  As a result of the execution
> of the Fraudulent Asbestos Defense Scheme, Defendants were able to
> obtain either dismissal or termination of claims voluntarily or, if required,
> involuntarily by order or judgment, or when circumstances warranted, pay

> a small token settlement amount in exchange for a full release of claims or
> equivalent agreement.

(Am. Compl., ¶ 138.)  Plaintiffs claim that BASF and Cahill made false statements about the

asbestos content of the Emtal talc in letters to plaintiffs' counsel, discovery responses and court-

filed briefs.

The scheme, however, came to light in 2009, during the discovery phase of an asbestos

injury lawsuit filed in New Jersey by Donna Paduano.  (The Court will refer to that suit as the

"Paduano action.")  Paduano is the daughter of a research chemist who had worked for a time for

BASF at its Menlo Park, New Jersey laboratory.  She claimed that she had developed

mesothelioma as a result of exposure to asbestos in her father's work place and from dust he

brought home on his work clothing.  In his June 2009 deposition, Paduano's father testified that

he had performed experiments on BASF talc and stated that the talc contained asbestos.  He also

explained that in the mid-1980s, under the direction of Defendant Hemstock and Defendant

Dornbusch, who was then BASF's general counsel, all documents pertaining to BASF talc were

collected and purged.  Paduano's counsel pursued discovery on this topic, and BASF produced

many documents concerning the Westfall action and the document destruction.  It also produced

a corporate designee witness who testified in deposition about BASF's historical knowledge of

asbestos hazards, its knowledge of the asbestos content of its talc products and its assertions that

its products were asbestos-free despite evidence to the contrary.  The Amended Complaint

alleges that the spoliation investigation conducted in the Paduano action led to the discovery of

numerous tests and assays of Emtal that found the presence of asbestos fibers in the product.

### III.    PROCEDURAL HISTORY AND OVERVIEW OF LAWSUIT

This lawsuit, filed in the New Jersey federal court as a putative class action, was brought by the representatives of six decedents who had each pursued legal claims against BASF to recover for asbestos related illnesses allegedly caused by exposure to asbestos-containing products, including, among many others, BASF talc, and whose cases were allegedly terminated as a result of the Fraudulent Asbestos Defense Scheme.  None of those asbestos injury lawsuits filed by Plaintiffs or their decedents were pursued in the United States District Court for the District of New Jersey.  All of the underlying asbestos injury actions were filed in the state courts of other jurisdictions.

Five of the named Plaintiffs – Williams, Pease, Ware, Holley and Wengerd – allege that their decedents were employed at Goodyear or B.F. Goodrich factories in Akron, Ohio in the 1950s through 1980s.  (The Court will refer to these five Plaintiffs collectively as the "Ohio Plaintiffs.") During the 1990s and 2000s, they or their decedents filed asbestos injury lawsuits in Ohio state court naming tens if not scores of different companies, including BASF, as defendants.  (Williams's case was removed to federal court and subsequently transferred to the multidistrict litigation concerning tire workers' asbestos exposure injuries, which was then pending in the Northern District of Ohio.)  All of the Ohio Plaintiffs were represented by the same law firm, known at varying times by the name of Bevan & Economus or Bevan & Associates (hereinafter, the "Bevan Firm").  (Am. Compl., ¶ 196.) The first Ohio Plaintiff to file an asbestos injury action, Williams, voluntarily dismissed her claim against BASF in March 1993, purportedly in reliance on the false information given by BASF and Cahill regarding the BASF talc.  The other four Ohio Plaintiffs nevertheless initiated their asbestos injury lawsuits

against BASF through the Bevan Firm, which had represented Williams and was therefore involved in the voluntary dismissal of her claim.  Named Plaintiff Chernick, who was not a party to this action when the Complaint was filed, joins the action in the Amended Complaint, alleging that her deceased husband was exposed to products containing asbestos while performing auto body work and brake lining repairs in the course of his employment at locations in New York and Florida.  Chernick and her husband filed a suit against various defendants, including BASF, in the state court of New York.

Plaintiffs filed suit in this Court on March 28, 2011.  The action challenges every dismissal, settlement or other resolution of the presently unknown numbers of talc exposure asbestos injury claims brought against BASF at any time between March 7, 1984 and the commencement of this action.   Both the original Complaint and the Amended Complaint demand declaratory and equitable relief "restoring members of the Asbestos Claimant Class back, as near as possible, to the position they were in prior to the commission of Defendants' obstruction of justice and fraud."  (Compl. at 156; Am. Compl. at 168.)[2]

In the original Complaint, Plaintiffs expressly requested that this Court order, among other relief, the "reopening of cases that were dismissed or closed if the claimant so chooses" and the "setting aside [of] any releases, covenants not to sue or settlement agreements obtained by or for BASF if the claimant so chooses."  (Compl., ¶ 16.)  A round of motions was filed on July 15, 2011 by all Defendants, seeking the dismissal of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  Among other arguments raised in the initial motions to dismiss, Defendants

---

[2] The Complaint does not qualify the relief sought with the phrase "as near as possible." That phrase appears only in the Amended Complaint's Demand for Relief.

maintained that the action was an improper effort to overturn the judgments and final orders of

state courts by challenging them in federal court.

In response, Plaintiffs filed the operative Amended Complaint on August 4, 2011,

pursuant to Federal Rule of Civil Procedure 15(a)(1)(B).  The Amended Complaint alters its

demand for relief slightly, abandoning the request that this Court order other courts to re-open

terminated actions against BASF in favor of the following, purportedly less ambitious demand:

> [A] declaration or injunction (i) prohibiting the BASF and Cahill Gordon
> defendants from asserting or claiming against Plaintiffs and members of
> the Class the benefit of res judica[ta] or any other claim preclusion
> doctrine or right based upon prior litigation or a claim adjudication
> concerning BASF's talc or talc products; (ii) barring the BASF and Cahill
> Gordon defendants from asserting any time passage related defense such
> as statutes of limitations, laches, repose or death action claim time
> commencement requirements; and/or (iii) upon a Plaintiff's or any class
> member's election to file or re-file suit against BASF for his or her
> asbestos injury related claims, and where applicable, the repayment to
> BASF of any money paid by BASF in consideration of a prior settlement,
> barring Defendants from asserting any defense based upon the existence of
> a release of claims, covenants not to sue or settlement agreement or similar
> defense.

(Am. Compl. at 168-69.)  The Amended Complaint asserts nine causes of action in an effort to

attain this relief, as well as a variety of other remedies such as disgorgement of money "unjustly

earned from the commission of the frauds" (Am. Compl. at 170) and injunctions barring

Defendants from further misrepresentation of evidence relating to the asbestos content of BASF

talc.  Those nine claims are as follows: New Jersey Racketeering Influenced and Corrupt

Organizations Act ("New Jersey RICO"), N.J.S.A. § 2C:41-2c (Count I); conspiring to violate

New Jersey RICO, N.J.S.A. § 2C:41-2d (Count II); fraudulent concealment (Count III); fraud

(Count IV); fraud upon the court (Count V); violation of New York Judiciary Law § 487 (Count

VI); unjust enrichment against lawyer perpetrators (Count VII); unjust enrichment against BASF (Count VIII); and civil conspiracy (Count IX).

Defendants again filed motions pursuant to Rule 12(b)(6), now directed at the Amended Complaint. These are the motions presently before the Court. Defendants have in large part challenged the viability of this action on a claim-by-claim basis, arguing that the facts alleged in the Amended Complaint do not suffice to set forth claims under the various legal theories pled. One argument, however, bears attention before the Court may proceed to analyze the sufficiency of the claims because that argument implicates principles of federalism and the very power of this Court to entertain an action which is trained on reviving claims that had been finally disposed of by other courts throughout the country. Cahill has argued that the entire suit is barred by the Anti-Injunction Act. The Court's analysis will first discuss the Anti-Injunction Act's applicability to this action and then turn to a discussion of each claim on its merits.

## IV.   DISCUSSION

### A.   Standard of Review

A complaint will survive a motion under Rule 12(b)(6) only if it states "sufficient factual allegations, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The complaint must contain sufficient factual allegations to raise a right to relief above the speculative level, assuming the factual allegations are true. Twombly, 550 U.S. at 555; Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008). The Supreme Court has made clear that "a formulaic recitation of the elements of a cause of action will not do."

11

Twombly, 550 U.S. at 555; see also Iqbal, 556 U.S. at 679 ("While legal conclusions can provide

the framework of a complaint, they must be supported by factual allegations.").  The Third

Circuit, following Twombly and Iqbal, has held that the pleading standard of Rule 8(a) "requires

not merely a short and plain statement, but instead mandates a statement 'showing that the

pleader is entitled to relief.'"  Phillips. 515 F.3d at 234.  In a Rule 12(b)(6) motion, the Court is

limited in its review to a few basic documents: the complaint, exhibits attached to the complaint,

matters of public record, and undisputedly authentic documents if the complainant's claims are

based upon those documents.  See Pension Benefit Guar. Corp. v. White Consol. Indus., 998

F.2d 1192, 1196 (3d Cir. 1993).

**B.     Court's Authority To Entertain This Suit: The Anti-Injunction Act and
        Article III's Prohibition on Advisory Opinions**

The focus of this lawsuit lies in restoring Plaintiffs to the legal position they had been in

before the asbestos injury claims brought by them, or their decedents, against BASF were

dismissed based, allegedly, on the false information disseminated by BASF and Cahill.

Plaintiffs' verbatim plea, set forth in the Amended Complaint illustrates, this objective:

> Equitable relief is appropriate in the nature of, *inter alia*, (a) declaratory
> and injunctive relief restoring Plaintiff and class members back to the
> *status quo ante* [sic] the commission of the Fraudulent Asbestos Defense
> Scheme so they can make an informed decision regarding any further
> pursuit of their legal remedies, and, should Plaintiff or a class member
> then elect to proceed with a damages claim against BASF and any of the
> defendants, further enjoining Defendants from asserting any defenses that
> would bar or limit the claim such as res judicata, statute of limitations,
> repose limits, laches, judgment merger, release, settlement, collateral
> estoppels [sic], accord and satisfaction and/or unclean hands; . . . ."

(Am. Compl., ¶ 360.)  Cahill argues in its brief in support of the motion to dismiss that such

relief, while nominally directed at the litigants before this Court, essentially would direct how

Plaintiffs' anticipated asbestos injury claims are handled by other courts.  The Court cannot entertain Plaintiffs' claims, Cahill maintains, without violation of the Anti-Injunction Act.  Because this argument goes to the Court's very power over this action, the Court considers it at the outset of its Opinion.

The Anti-Injunction Act dates back to the beginning of this country's history as one united nation.  <u>Atl. Coast Line R. Co. v. Brotherhood of Locomotive Engineers</u>, 398 U.S. 281, 283 (1970).  Enacted by Congress in 1793, the statute, in its current form, provides as follows: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.  The Supreme Court has explained the fundamental importance of the Anti-Injunction Act and its policy as follows:

> The statute, we have recognized, is a necessary concomitant of the Framers' decision to authorize, and Congress' decision to implement, a dual system of federal and state courts.  And the Act's core message is one of respect for state courts. The Act broadly commands that those tribunals shall remain free from interference by federal courts.

<u>Smith v. Bayer Corp.</u>, 131 S.Ct. 2368, 2375-76 (2011) (internal citations and quotations omitted).  To this end, its express prohibition on a federal court's authority to enjoin ongoing state court proceedings has been interpreted by the Supreme Court expansively to deprive a federal district court of the power to prevent enforcement of a completed proceeding's final orders or judgment.  Describing the breadth of the statute, the Supreme Court has held:

> The prohibition of [section 2283] is against a stay of "proceedings in any court of a State." That term is comprehensive. . . . It applies alike to action by the court and by its ministerial officers; *applies not only to an execution issued on a judgment, but to any proceeding supplemental or ancillary taken with a view to making the suit or judgment effective. The prohibition*

> *is applicable whether such supplementary or ancillary proceeding is taken in the court which rendered the judgment or in some other*. And it governs a privy to the state court proceeding . . . as well as the parties of record.

Hill v. Martin, 296 U.S. 393, 403 (1935) (emphasis added); see also Pelfresne v. Village of Williams Bay, 865 F.2d 877, 879 (7th Cir. 1989) ("the term "proceedings" in the Anti-Injunction Act does not merely apply to ongoing litigation before a state tribunal – the Act also bars injunctive relief which prevents a victorious state litigant from executing a state judgment.").

Plaintiffs, through the instant lawsuit, want to revive and preserve their ability to proceed with asbestos injury claims against BASF, in any court of their choosing, notwithstanding the dismissal of those claims by courts other than this one, because, according to Plaintiffs, those dismissals were procured by Defendants' fraud and other alleged wrongdoing.   Whatever the merits of Plaintiffs' allegations that the termination of their claims against BASF should, in essence, be considered a nullity, Plaintiffs fail to explain how this Court possesses the authority to sit as a supercourt and interfere with other court's proceedings, within the broad meaning of the Anti-Injunction Act.  This Court simply lacks authority to grant the declaratory and injunctive relief which would enable Plaintiffs, and presumably thousands of others, to re-file their asbestos claims against BASF in courts across the country.  It can neither invalidate another court's orders nor enjoin any court from giving preclusive effect to the dismissal orders obtained by BASF in the courts of Ohio, New York, or any other jurisdiction.

Plaintiffs' opposition to the motion is completely silent on the impact of the Anti-Injunction Act on their lawsuit.  Rather, Plaintiffs argue that Defendants mischaracterize the relief sought by the Amended Complaint, emphasizing that "Plaintiffs do not seek to open any judgment in BASF's favor or otherwise direct the remedy or judgment of a single state court."

14

(Pl. Br. at 3.)  Their effort to circumvent what would clearly constitute a prohibited exercise of this Court's intrusion into the authority of other courts to make their own rulings fails.  The functional equivalent of a federal court order which would "stay proceedings in a State court" cannot be accomplished by "addressing the order to the parties or prohibiting the utilization of the results of a completed state proceeding." Atl. Coast Line, 398 U.S. at 287. The Supreme Court so held in making it clear that while on its face the Anti-Injunction Act bars a federal court from enjoining state court proceedings, the statute must not be construed so as to evade its objective of protecting "the fundamental constitutional independence of the States and their courts[.]" Id. at 287.  Indeed, the statute encompasses and bans declaratory relief by a federal court where it would produce the same effect as an injunction on state court proceedings.  United States Steel Corp. Plan for Employee Ins. Benefits v. Musisko, 885 F.2d 1170, 1175 (3d Cir. 1989) (citing Thiokol Chem. Corp. v. Burlington Indus., Inc., 448 F.2d 1328, 1332 (3d Cir. 1971)).  Thus, here, Plaintiffs' additional, alternative request for a declaratory judgment from this Court "restoring" Plaintiffs to the position they were in prior to the alleged fraud, that is, prior to the dismissals, is equally beyond the power of this Court to issue.  A declaratory judgment to that effect, which Plaintiffs have asked include declarations that BASF cannot rely on the orders of dismissal, would have the same impact of interfering in other courts' proceedings.

If, on other hand, the injunctive and declaratory relief sought in the Amended Complaint would not functionally serve to invalidate another court's order and/or place restrictions on another court's consideration of certain issues or defenses, then the focus of the Court's inquiry as to its authority to entertain this action shifts from the Anti-Injunction Act to the prohibition on advisory opinions.  The Court must address this issue because in their opposition brief,

responding to Defendants' arguments that the relief sought here is not permitted by a number of federal statutes and legal doctrines, including the Anti-Injunction Act, Plaintiffs appear to disavow their position that this lawsuit aims, directly or indirectly, to impact the functions of any other court.  Plaintiffs insist that they merely seek to put an end to Defendants' alleged misconduct so that they may have the opportunity to pursue a legal remedy for the asbestos exposure injuries they believe were caused by BASF talc products.

Rather than summarize Plaintiffs' revised approach to this lawsuit, the Court will quote directly from their brief.  In a section dedicated in particular to countering Defendants' arguments that this action is barred by the Rooker-Feldman doctrine,[3] Plaintiffs state the following:

> To be clear, the relief Plaintiffs seek includes, among other things, a permanent injunction barring the Defendants from further suppressing and misrepresenting evidence related to BASF's liability; the establishment of a trust for the purpose of collecting and archiving documentary evidence of BASF's asbestos containing products; disgorgement of the illegal profits earned through the Defendants' fraud; and, punitive damages for the spoliation of evidence under New Jersey common law. AC Demand at (c), (f), (g), (i), (k).  As Plaintiffs seek declaratory and injunctive relief to remedy the injuries they have suffered as a result of a [sic] Defendants' longstanding and systemic fraudulent concealment, and [sic] Rooker-Feldman does not apply.

(Pl. Br. at 67.)

---

[3] Rooker-Feldman is a "narrow doctrine" which bars federal jurisdiction over "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  Great Western Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 164 (3d Cir. 2010) (quoting Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005)).  The doctrine takes its name from two Supreme Court cases which "established the principle that federal district courts lack jurisdiction over suits that are essentially appeals from state-court judgments."  Id. at 165.

Plaintiffs make a valid point regarding the non-applicability of the Rooker-Feldman doctrine. Among other reasons this case does not implicate that narrow doctrine, the source of Plaintiffs' alleged injury does not lie in the orders or judgments of the state courts in which their asbestos claims had been pending. Rather, the injuries described in the Amended Complaint stem, allegedly, from Defendants' concealment of evidence and misrepresentations regarding the BASF talc's asbestos content, assuming the facts pled in the Amended Complaint to be true. See Great Western, 615 F.3d at 166-67. That doctrine, moreover, is one that divests a federal court of subject matter jurisdiction which it otherwise would have under a congressional grant of authority. Exxon Mobil, 544 U.S. at 291. Plaintiffs fail to address the more basic, and logically antecedent question raised by Defendants concerning this Court's lack of power, *ab initio*, to issue advisory opinions.

To the extent that Plaintiffs ask this Court to make rulings and grant remedies which do not actually dispose of claims but merely pave the way for Plaintiffs and absent class members to pursue their otherwise extinguished personal injury claims, the Court lacks constitutional authority to do so. Article III of the Constitution limits federal court jurisdiction to "Cases" and "Controversies." "The case or controversy requirement must be met regardless of the type of relief sought, including declaratory relief." Armstrong World Indus., Inc. v. Adams, 961 F.2d 405, 410 (3d Cir.1992) (citation omitted). "No justiciable controversy exists when parties ask for an advisory opinion." Massachusetts v. E.P.A., 549 U.S. 497, 516 (2007). This means that the Court is not empowered to render opinions on legal issues without the antagonistic assertion of rights by one party against another. Muskrat v. United States, 219 U.S. 346, 359 (1911). It is equally well-settled that as the party that invokes federal jurisdiction must establish that it exists,

17

that party bears the burden of establishing that an action satisfies Article III's case-or-controversy requirement.  Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 103 (1998).  Plaintiffs do not explain how their requests that the this Court "enjoin Defendants from further lying about the absence of asbestos in BASF's talc" and compel them "to notify their victims and acknowledge their deceit" would conclusively resolve a dispute concerning their legal rights against Defendants.  The rulings sought in this action would amount to no more than a determination of issues based on a hypothetical set of facts: Specifically, Plaintiffs want this Court to hold that, if these six Plaintiffs chose to initiate asbestos injury claims against BASF, those claims would not be subject to dismissal based on, among other reasons, Defendants' continued assertions that the BASF product is talc-free or the previously entered orders of dismissal.  Before Plaintiffs even attempt to re-file their dismissed asbestos injury claims, they want this Court to pass on questions of law regarding the viability of those claims.   This Court, one of limited jurisdiction, simply lacks authority to issue such advisory opinions.

The Court's concern with its power to entertain Plaintiffs' various claims for relief should not be interpreted to reflect any point of view on the facts which give rise to this action.  The Amended Complaint describes abhorrent and outrageous litigation tactics, and if the allegations about the conduct of BASF, Cahill and their employees are true, the Court would hope that some redress in the fora where the allegedly invalid dismissals were obtained could be pursued.  This Court, however, is not empowered to review other courts' orders, dictate to other courts what claims and/or defenses they may consider or issue rulings on abstract questions not tied to the parties' legal rights and obligations.

Thus, insofar as this action seeks declaratory and/or injunctive relief as described above, or rulings and orders intended to impact Plaintiffs' ability to pursue as-yet unfiled claims, the Amended Complaint must be dismissed with prejudice.

### C.    Sufficiency of Claims

The Court notes that apart from such equitable or injunctive relief, the Amended Complaint also seeks remedies for Defendants' alleged violations of concrete legal rights.  For example, based on the conduct constituting the Fraudulent Asbestos Defense Scheme, Plaintiffs demand the equitable remedy of disgorgement pursuant to New Jersey RICO and punitive damages for spoliation of evidence.  Clearly, there is no jurisdictional impediment, of the nature discussed above, with regard to this Court's adjudication of the legal rights between the allegedly aggrieved Plaintiffs and Defendants as defined by the causes of action asserted in the Amended Complaint.  Each of these causes of action has been challenged by Defendants pursuant to Rule 12(b)(6). Accordingly, the Court will proceed to analyze the sufficiency of the claims pled in the Amended Complaint.  It begins with the statutory claims.  The Court then moves on to the common law claims, which the parties have briefed according to New Jersey law, without raising a conflict of law issue.[4]

---

[4] Were this case to proceed past the instant motion to dismiss, the Court contemplates the possibility that the parties would vigorously contest which states' laws govern each claim, as determined by an appropriate and fully developed choice of law analysis.  It is far from apparent that New Jersey law would apply to each of the named Plaintiffs' common law claims, or, were this case to proceed as a class action, to the claims of the entire national class, in light of the fact that the various tort claims asserted are predicated on conduct which occurred in states throughout the country.

A federal court sitting in diversity determines the substantive law to be applied by looking to the choice of law rules of the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496–97 (1941).  New Jersey applies the "most significant relationship" test to determine which

      1.    <u>New Jersey RICO</u>

Defendants argue that Plaintiffs' New Jersey RICO claims fail because Plaintiffs have failed to allege any facts demonstrating a loss to business or property. Defendants are correct.

Like its federal counterpart, the New Jersey RICO statute confers a private right of action on "any person damaged in his business or property by reason of a violation of a violation of N.J.S. 2C:41-2a," that is, as a result of conduct constituting prohibited racketeering activity as defined by the statute. <u>N.J.S.A.</u> 2C:41-4c (tracking the language of 18 U.S.C. § 1964(c)). The New Jersey Supreme Court has held that the state RICO statute, having been modeled on the federal legislation, should be construed in conformity with the federal RICO statute. <u>See</u> <u>Cetel v. Kirwan Financial Group, Inc.</u>, 460 F.3d 494, 510 (3d Cir. 2006) (citing <u>State v. Ball</u>, 141 N.J.

---

state's law will govern a tort claim. <u>P.V. v. Camp Jaycee</u>, 197 N.J. 132, 141-42 (2008). According to that test, a court must first determine if an actual conflict between potentially applicable laws exists, and then, if it does, proceed to weigh the factors enumerated in the section of the Restatement (Second) of Conflict of Laws which corresponds to the cause of action. <u>Id.</u> at 143-44.

Apart from the parties' failure to raise a conflict of laws issue, the Court will not conduct a choice of law analysis because it would be premature to do so at this point in the case, prior to the development of the factual record. <u>See</u> <u>Harper v. LG Electronics USA, Inc.</u>, 595 F. Supp. 2d 486, 491 (D.N.J. 2009) (declining to engage in fact-intensive choice of law analysis at motion to dismiss stage and deferring analysis until parties presented sufficient factual record). The Court may postpone a choice of law analysis yet proceed to evaluate the sufficiency of the claims on a Rule 12(b)(6) motion under the assumption that New Jersey law applies, given that Plaintiffs have argued that their common law claims are viable under New Jersey law. <u>Id.</u>; <u>see also</u> <u>Snyder v. Farnam Cos., Inc.</u>, 792 F. Supp. 2d 712, 721 (D.N.J. 2011) (finding, on a Rule 12(b)(6) motion, that choice of law determination on tort claims would be premature but nevertheless proceeding to evaluate whether claims survived motion to dismiss by applying New Jersey law because the plaintiffs presented their claims under that state's laws). Given the parties' approach of discussing the sufficiency of the common law claims under New Jersey substantive law, the Court will similarly apply New Jersey law to its Rule 12(b)(6) review of those claims. The Court will, of course, review the statutory claims according to the law of the state which enacted the statute.

142, 155-56 (1995)).  It is well-settled in Third Circuit jurisprudence that to maintain a federal

RICO cause of action, a plaintiff must "make two related but analytically distinct threshold

showings ... (1) that the plaintiff suffered an injury to business or property; and (2) that the

plaintiff's injury was proximately caused by the defendant's violation of 18 U.S.C. § 1962."

Maio v. Aetna, Inc., 221 F.3d 472, 483 (3d Cir.2000).

The Amended Complaint alleges that Defendants' conduct in violation of New Jersey

RICO has caused Plaintiffs the following injuries:

> termination or impairment of their asbestos injury claims, their rights
> under law to pursue and receive full, fair and just compensation for their
> asbestos injury claims, and/or the taking and deprivation of their
> Constitutional right to a fair, honest and just judicial proceeding together
> with the time value monetary loss due to their not timely receiving the full,
> fair and just compensation in a fair, honest and just judicial proceeding to
> which they are entitled.

(Am. Compl., ¶ 268.)  Summed up, the loss claimed by Plaintiffs in this case as a result of

Defendants' alleged racketeering activities consists of the lost opportunity to pursue a personal

injury claim against BASF.  There is no authority that the loss of a cause of action to recover for

a personal injury constitutes an "injury to business or property" under RICO.  Indeed, the relevant

authority indicates that the contrary is true.  First, as Defendants note, it is clear that personal

injuries are not recognized as compensable under RICO.  Maio, 221 F.3d at 492. Second, while a

cause of action could in some circumstances constitute property within the meaning of RICO, the

decisional law on this issue has been careful to identify the underlying harm giving rise to the

cause of action, distinguishing business harm from personal harm.  Compare Malley-Duff &

Assoc., Inc. v. Crown-Life Ins. Co., 792 F.2d 341, 354 (3d Cir. 1986) (holding that where cause

of action arises out of the termination of a business, the loss or impairment of that cause of action

may be considered a business injury within the meaning of RICO) with Magnum v. Archdiocese

of Phila., 253 F. App'x 224, 227-228 (3d Cir. 2007) (holding that the loss of a personal injury

tort claim is not an injury to business or property under RICO).  For example, in an analogous

situation to the one presented in this action, the plaintiffs in the Magnum case were alleged

victims of childhood sexual abuse by priests who had brought RICO claims against the

Archdiocese of Philadelphia asserting that as a result of the defendant's concealment of abuse by

members of the clergy, "it was too late to pursue state law tort remedies." Magnum, 253 F.

App'x at 226.  Reasoning that RICO injury must be construed restrictively so as to avoid the

expansion of RICO "to provide a federal cause of action and treble damages to every tort

plaintiff," the Magnum court rejected the plaintiffs' theory of RICO injury.  Id. at 227-28.  The

Third Circuit distinguished its earlier holding in Malley-Duff, holding that "although a cause of

action indeed may be a form of property, injuries to that property will only be redressable under

civil RICO if the plaintiff can allege that the wrong to be vindicated is itself an injury to

"business or property" within the meaning of RICO."  Id. at 228.  It concluded that the plaintiffs'

underlying loss concerned neither business nor property, as personal injury and losses flowing

from personal injury are not property under RICO.  Id. at 227.

      Though Magnum is a non-precedential opinion, the Court finds it to be directly on point

and follows its reasoning.  The lost cause of action of which Plaintiffs here complain concerns

their tort claims for personal injuries allegedly sustained as a result to exposure to asbestos in

BASF talc.  Plaintiffs cite no authority that "unliquidated personal injury claims" are considered

property under the law of New Jersey (or any state from which a plaintiff hales and in which he had intended to pursue a personal injury claim) or that the "business or property" requirement in the New Jersey RICO statute has been given such an expansive interpretation, in divergence from the applicable federal authority on the matter.  See Magnum, 253 F. App'x at 228 (holding that because the law of the plaintiffs' home state of Pennsylvania did not recognize an unliquidated tort claim as "property," the lost opportunity to bring such a claim was similarly not property); see also Amato v. Amato, 180 N.J. Super. 210, 218 (holding under firmly established principles of New Jersey law, a personal injury claim is not a property right, notwithstanding N.J.S.A. 1:1-2's definition of personal property to include "choses in action" because the statute does not define what types of choses in action it intended to include).

The Court further holds that, as Defendants also argue, even if the personal injury cause of action were to be considered property within the meaning of RICO or New Jersey RICO, the loss claimed by Plaintiffs is too speculative to be cognizable as a redressable injury under the statute.  A cognizable RICO injury must consist of "a concrete financial loss and not mere injury to a valuable intangible property interest."  Maio, 221 F.3d at 483.  Accordingly, in Magnum, the Third Circuit observed that even if an unliquidated personal injury tort claim could give rise to some state property right, it was doubtful that harm to such a right could be vindicated through a civil RICO claim.  Magnum, 253 F. App'x at 228-29. Reasoning that "Congress did not intend to recognize a cause of action in civil RICO where the damages from the injuries alleged are speculative," the Court of Appeals held that the plaintiffs lacked statutory standing to sue under RICO because their personal injury claims could not be valued.  Id. (citing Maio, 221 F.3d at 495

and <u>Doug Grant, Inc. v. Greate Bay Casino Corp.</u>, 3 F. Supp. 2d 518, 534 (D.N.J. 1998)).  In this case, there is no indication any of the Plaintiffs would have prevailed on their asbestos exposure claims against BASF, much less what amount of damages they would have been awarded had they prevailed.  Indeed, any purported financial loss Plaintiffs might attribute to Defendants' alleged fraudulent conduct in violation of New Jersey RICO would be based on no more than conjecture and imagination.  The harm alleged in the Amended Complaint is antithetical to the limited nature of the private cause of action under the statute.

Thus, for the foregoing reasons, the Court will dismiss both the claim for violation of New Jersey RICO and the claim for conspiracy to violate the statute.

2.    <u>New York Judiciary Law § 487</u>

Plaintiffs assert an attorney misconduct claim pursuant to New York Judiciary Law § 487 ("Section 487") against Cahill, a law firm organized under the laws of the State of New York, and individual Defendants Sloane, Martin and Dembrow, who are identified in the Amended Complaint as attorneys employed by Cahill at times relevant to the action.  Section 487 provides that an attorney who engages "deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party" has committed a punishable misdemeanor.  N.Y. Judiciary Law § 487.  Additionally, it creates a private right of action for a party so injured.  <u>Id.</u> Under the law, the injured party may recover treble damages.  <u>Id.</u>

The statute, however, is limited to regulating "through criminal and civil sanctions, the conduct of litigation before the New York courts."  <u>Schertenleib v. Traum</u>, 589 F.2d 1156, 1166 (2d Cir. 1978.  It does not apply to conduct in which an attorney, albeit one admitted to practice

24

in New York, engaged in courts outside the State of New York.  Id. The Second Circuit's holding in Schertenleib was followed by the Southern District of New York to deny a plaintiff's motion for leave to amend its complaint.  See Kaye Scholer LLP v. CNA Holdings, Inc., No. 98 Civ. 5547, 2010 WL 1779917, at *1-2 (S.D.N.Y Apr. 28, 2010).  The Southern District concluded that the plaintiff's proposed section 487 claim against New York attorneys for discovery misconduct in an MDL pending in federal court in North Carolina would not survive a Rule 12(b)(6) motion, reasoning that Second Circuit's holding in Schertenleib and a thirty-year line of authority following it made clear that Section 487 had no extraterritorial application.  Id.  The Southern District considered and expressly rejected as an outlier the case of Cinao v. Reers, the one opinion by a New York state trial court which held that Section 487 applied to the conduct of New York attorneys regardless of where the action is pending.  Id. (rejecting reasoning of Cinao v. Reers, 27 Misc.3d 195 (Sup.Ct. Kings Cty. 2010)).  It held that Schertenleib and its progeny were better-reasoned than Cinao because Cinao failed to consider that Section 487 is a criminal law, which would be strictly construed, and that there is no indication that New York intended to extend criminal liability to attorneys for their acts occurring outside the state.  Id. at *2.

This Court agrees with the reasoning of the Second Circuit in Schertenleib and the Southern District of New York in Kaye Scholer v. CNA Holdings.  In this case, five of the six named Plaintiffs base their claims for violation of Section 487 on the conduct which occurred in Ohio, not New York.  These Plaintiffs – Williams, Pease, Holly, Ware and Wengerd – therefore fail to state a claim for relief under Section 487, and the claim must be dismissed.

Plaintiff Chernick, who does in fact base her Section 487 claim on litigation conduct before a New York court, nevertheless fails to state a plausible Section 487 claim against Cahill and the three Cahill attorneys named as Defendants.  Chernick's claim is based on the representations made in two documents signed by New York attorney Gideon Mark, who was retained by BASF to defend the Chernick action.  Those documents, attached as exhibits to the Amended Complaint, were (1) an April 15, 2002 letter sent to Chernick's counsel stating that there was no basis for Chernick to pursue claims against BASF because its talc was asbestos-free and enclosing documents supporting that representation; and (2) BASF's answers to interrogatories, verified by Mr. Mark on April 16, 2002, which provided similar representations and further represented that there was no evidence indicating that its products contained asbestos. While the Amended Complaint alleges that Cahill "assisted in the preparation and/or review" of these documents, it does not allege that Cahill was counsel of record in the Chernick case or otherwise entered an appearance on behalf of BASF.  In fact, in pleadings and other documents relating to the Chernick action, only Mr. Mark and his firm are listed as counsel for BASF.  The broad allegations regarding the Cahill firm's involvement with the allegedly deceitful conduct in the Chernick litigation fail to set forth a plausible claim.  The Supreme Court held in Iqbal that facts which demonstrate the mere possibility of liability do not suffice to show that the plaintiff is entitled to relief.  Iqbal, 556 U.S. at 679.  The Section 487 claims against the individual Cahill attorneys are not supported by a single allegation.  The Amended Complaint sets forth no facts indicating that Sloane, Martin and/or Dembrow were even involved in the "preparation and/or review" of the allegedly misleading documents.

26

For these reasons, the Section 487 claim of each Plaintiff will be dismissed.

### 3.   Fraudulent Concealment - Spoliation

In the Third Count of the Amended Complaint, Plaintiffs assert a claim for fraudulent concealment and spoliation of evidence against all Defendants.  They predicate this claim on the alleged gathering and withholding and/or destruction of evidence relating to the Plaintiffs' asbestos injury claims against BASF, that is, documents and other materials which purportedly would have enabled Plaintiffs to prove that BASF talc products contained asbestos.  They also predicate the claim on the allegation that Defendants made false statements asserting that no such documents or other evidence of asbestos content in BASF talc existed.  As a result of Defendants' fraudulent concealment of evidence, the Amended Complaint alleges, Plaintiffs either voluntarily dismissed their asbestos injury claims against BASF for no or, at most, nominal consideration, suffered involuntary dismissal of their claims for failure to produce evidence supporting their claims against BASF, or, in the case of some putative class members, refrained form filing a lawsuit against BASF.

New Jersey makes available a tort remedy for conduct consisting of the destruction of litigation evidence, that is, for spoliation, through the claim of fraudulent concealment. Rosenblit v. Zimmerman, 166 N.J. 391, 405 (2001).   To establish a claim of fraudulent concealment based on spoliation, a plaintiff must prove the following five elements:

> (1) That defendant in the fraudulent concealment action had a legal obligation to disclose evidence in connection with an existing or pending litigation;

> (2) That the evidence was material to the litigation;

27

(3) That plaintiff could not reasonably have obtained access to the
evidence from another source;

(4) That defendant intentionally withheld, altered or destroyed the
evidence with purpose to disrupt the litigation;

(5) That plaintiff was damaged in the underlying action by having to rely
on an evidential record that did not contain the evidence defendant
concealed.

Id. at 406-07.  The focus of Defendants' motion to dismiss the fraudulent concealment claim

rests with the inadequate pleading of facts to establish the fifth element of proximate causation.

Plaintiffs fail to state an adequate fraudulent concealment claim, according to Defendants,

because the facts alleged do not plausibly establish that Plaintiffs lost or otherwise refrained from

pursuing a meritorious asbestos claim against BASF as a result of Defendants' alleged spoliation.

The New Jersey Supreme Court has indeed held that when, as is alleged in the instant action, the

spoliation is not discovered until after the underlying action has been lost or inhibited, the

plaintiff asserting a fraudulent concealment claim must prove his claim by reference to the

fundamental elements of the underlying litigation.  Id. at 408.  Defendants emphasize that the

underlying lawsuits brought by Plaintiffs against BASF would have required Plaintiffs to prove

that their personal injuries were caused by exposure to asbestos in BASF products, a causal chain

which in itself presents complex questions of proximate cause.  See Georgine v. Amchem Prods.,

Inc., 83 F.3d 610, 626-27 (3d Cir. 1996).  They point out that a successful asbestos injury claim

against BASF would have entailed proof of a host of elements, including actual exposure to

BASF's talc products, injury that is attributable to asbestos exposure (as opposed to another

cause, such as cigarette smoking), and occurrence of the injury as a result of asbestos in BASF

talc, as opposed to some other company's asbestos-containing product, a causation challenge illustrated by the scores of defendants that the Plaintiffs would typically name in their asbestos suits.  This already complicated and uncertain causal chain, Defendants further argue, presents only a portion of the burden involved in the fraudulent concealment claim.  Plaintiffs must also establish that had they been in possession of the withheld or destroyed information concerning the BASF talc's asbestos content, they would not have voluntarily or involuntarily discontinued their suits against BASF.  Defendants contend that there are any number of reasons why a suit may be terminated and argue that the Amended Complaint's assertions that the alleged spoliation was the proximate cause of the termination of Plaintiffs' suits is conclusory at best.  Defendants thus argue that the facts alleged in the complaint do not and cannot establish that Plaintiffs did not prevail on their asbestos injury claims against BASF as a result of any alleged spoliation.

Defendants are correct that the requisite causal connection between the alleged spoliation of evidence regarding the asbestos content of BASF talc products and harm to the Plaintiffs in their underlying asbestos injury lawsuits lacks any factual predicate in the Amended Complaint. Proximate causation requires "some direct relation between the injury asserted and the injurious conduct." Holmes v. Sec. Investor Protection Corp., 503 U.S. 258, 268 (1992).  While the offending conduct need not be the sole cause of harm, which in this case consists of the frustrated effort by Plaintiffs to obtain a legal recovery from BASF for their respective asbestos injuries, it must be a "substantial contributing factor" of the harm.  See Perez v. Wyeth Labs. Inc., 161 N.J. 1, 26-27 (1999).  To prevail on their underlying claims, Plaintiffs would have to have established not only that BASF talc products contained asbestos – the critical information of which Plaintiffs

were deprived as a result of the alleged spoliation – but also that their decedents were injured as a result of exposure to those products. There is no indication at all in the Amended Complaint that it was a lack of access to the allegedly destroyed evidence which resulted in the termination of Plaintiffs' claims before obtaining a favorable verdict against BASF or in the settlement of such claims for amounts that did not fairly and sufficiently compensate Plaintiffs' decedents for their injuries. Put differently, the Amended Complaint sets forth no facts which support the essential proposition that Plaintiffs would have succeeded in proving their asbestos injury claims against BASF had it not been for the alleged destruction of documents and materials confirming the asbestos content of BASF talc. See Larison v. City of Trenton, 180 F.R.D. 261, 271 (D.N.J. 1998) (holding that fifth element of New Jersey claim to recover for intentional spoliation would require the plaintiff to prove that but for destruction of certain evidence, he would have succeeded in proving his excessive force claim against the defendant); see also Swick v. The New York Times Co., 357 N.J. Super. 371, 379 (App. Div. 2003) (affirming entry of judgment in favor of defendant on fraudulent concealment claim where the plaintiff could not establish that he would have obtained recovery in underlying personal injury claim had it not been for spoliation of evidence).

    At best, the Amended Complaint's assertions that the underlying personal injury suits brought by Plaintiffs against BASF were voluntarily or involuntarily dismissed as a result of the concealment or destruction of evidence are conclusory. Worse, in many regards, the allegations are illogical. As Defendants point out, Plaintiff Williams voluntarily dismissed her asbestos injury claims against BASF in 1993 after being notified by BASF and its counsel Cahill that

there was no evidence that BASF talc contained asbestos.  Williams was represented by the same legal counsel that, subsequent to the Williams dismissal, went on to file asbestos injury claims against BASF on behalf of Plaintiffs Pease, Ware, Holley and Wengerd (or their decedents), in spite of the lack of evidence.  In light of this, it simply makes no sense to conclude, as the Amended Complaint does, that these Plaintiffs failed to pursue claims and obtain recoveries against BASF as a result of the alleged spoliation.   Plaintiff Chernick maintains that she chose not to oppose BASF's motion for summary judgment in reliance on representations concerning the lack of evidence to support her asbestos injury claims against BASF.  Yet, in spite of these misrepresentations, Chernick continued to assert claims against BASF, as demonstrated by two amended complaints she filed in her underlying suit.  Again, these facts contradict Plaintiff Chernick's claims that the alleged destruction or concealment of material evidence relating to the asbestos injury claims against BASF harmed her in the underlying action.

The Supreme Court made clear in Iqbal that a complaint will not survive a motion to dismiss unless it contains sufficient factual matter to render the claim for relief plausible, that is, that would allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  It held that "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 679.  Plaintiffs' allegations that they relied on Defendants' misleading statements about the lack of evidence concerning asbestos fibers in BASF talc, or relatedly that the destruction or concealment of the evidence was the proximate cause of their failure to obtain relief or adequate settlements in their asbestos

injury suits, lack plausibility.  Under Iqbal, where factual allegations defy common sense, or amount to no more than a mere possibility of actionable wrongdoing, a complaint has not "shown" that the plaintiff is entitled to relief as required by Federal Rule of Civil Procedure 8(a)(2).  Id.

      Accordingly, the claim for fraudulent concealment must be dismissed.

          4.     Fraud

      There is no question that, unlike some other claims in the Amended Complaint, which appear to be based on a combination of the conduct and statements which together comprised the alleged Fraudulent Asbestos Defense Scheme, the common law fraud claim is based solely on Defendants' alleged misrepresentations and omissions of material fact relating to the asbestos content of BASF talc products and/or the non-existence of evidence that the talc products contained asbestos.  As such, Defendants have argued that the fraud claim is barred by New Jersey's expansive and well-established litigation privilege, which "generally protects an attorney from civil liability arising from words he has uttered in the course of judicial proceedings." Loigman v. Twp. Comm. of Twp. of Middletown, 185 N.J. 566, 579 (2006).  The New Jersey Supreme Court has held that the litigation privilege applies to "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." Hawkins v. Hawkins, 141 N.J. 207, 216 (1995) (quoting Silberg v. Anderson, 638 P.2d 365, 369 (Cal. S.Ct. 1990)).  Plaintiffs have argued that their fraud claim survives the privilege because the scope of the privilege is limited to statements made in the course of

"legitimate" client representation, that is, made within the bounds of an attorneys' duty of

zealous advocacy.  It does not, they maintain, immunize intentional fraud and deceit by attorneys,

which goes beyond proper and ethical litigation tactics.[5]

The question of whether a defendant is entitled to immunity from a cause of action based

on the litigation privilege is purely legal.  Id.  Thus this Court considers its applicability, before

reaching the question of whether the fraud claim has been sufficiently pled according to the

heightened pleading standard of Federal Rule of Civil Procedure 9(b).

It is clear that the alleged misrepresentations and omissions constituting the alleged fraud

occurred in judicial proceedings.  The allegedly fraudulent statements were made by Cahill,

acting on behalf of BASF in connection with its representation of BASF in the various asbestos

---

[5] On the subject of the litigation privilege, the Court has also received an unsolicited brief
from Public Justice, P.C., a non-party which has moved for leave to appear in this action as
amicus curiae.  Public Justice argues in its brief, which is submitted in support of Plaintiffs'
position regarding the non-applicability of the litigation privilege, that the privilege cannot
immunize Defendants from liability for their conduct in concealing and destroying relevant
evidence because such conduct undermines the truth-seeking objective of litigation.  It relies, in
large part, on caselaw from jurisdictions other than New Jersey.

Whether, and to what extent, an amicus may participate in an action before the district
court is a matter of the court's discretion.  Waste Mgmt. of Pa. v. City of York, 162 F.R.D. 34, 37
(M.D. Pa. 1995)); Yip v. Pagano, 606 F. Supp. 1566, 1568 (D.N.J. 1985)  The purpose of an
amicus curiae is to assist the court in its understanding of an issue, and a court may grant leave to
file an amicus curiae brief "if the information offered is 'timely and useful.'" Waste Mgmt. of
Pa., 162 F.R.D. at 36 (quoting Yip, 606 F. Supp. at 1568.)) This Court does not consider whether
the litigation privilege bars any of Plaintiffs' conduct-based claims against Defendants.
Moreover, the arguments raised by Public Justice in reliance on the law of states other than New
Jersey does not shed light on New Jersey's litigation privilege.  Therefore, the Court concludes
that the amicus brief submitted would not assist the Court in its understanding of how the
litigation privilege applies to Plaintiffs' fraud claim pursuant to New Jersey common law.  In its
discretion, the Court will deny the motion by Public Justice for leave to appear as amicus curiae
and file a brief [docket entry 97].

injury suits filed by Plaintiffs.  Indeed, the statements appeared in letters exchanged by counsel in connection with those lawsuits, in discovery responses and/or in briefs submitted to the presiding courts in connection with motion practice.  To the extent the fraud rests upon alleged omissions, the charged failures to disclose to Plaintiffs evidence developed in the Westfall action concerning asbestos in BASF talc also arose in the context of the litigation filed by the Plaintiffs.  Moreover, the communications went straight to the core of the asbestos injury claims filed by Plaintiffs against BASF, clearly satisfying the requirement that for the litigation privilege to apply, the communications must have "some connection" to the action.  Plaintiffs appear, in fact, to take no issue with the presence of the first, second and fourth elements of the privilege.

Plaintiffs' opposition, regarding the lack of immunity for acts falling outside of lawful representation, would appear to go to the third element.  They argue that the privilege cannot sanction deception perpetrated with the aim of eliminating a client's exposure to liability and expressly take the position that the litigation privilege, as developed in New Jersey jurisprudence, does not cover fraud.  Their arguments, however, rely on caselaw from various other states.

In New Jersey, the litigation privilege has been recognized to have firm roots in the common law dating back to 1871, and as such protects attorneys and other participants in judicial proceedings from a host of tort-related claims.  Loigman, 185 N.J. at 580, 583.  It has been applied broadly, extended even to shield attorneys from claims seeking redress for constitutional violations under 42 U.S.C. § 1983. Id. at 584.  The federal court in the District of New Jersey has noted the expansiveness of the privilege, observing that it covers not only statements made in the courtroom but also attorney interviews and settlement negotiations.  Rickenbach v. Wells Fargo

Bank, 635 F. Supp. 2d 389, 401 (D.N.J. 2009).  In Rickenbach, the district court reviewed the

breadth of the litigation privilege, listing the many causes of action it immunizes, including

specifically material and negligent misrepresentation and fraud.  Id. at 401-02.   The Rickenbach

court so held upon consultation of New Jersey caselaw, including the Appellate Division's

opinion in Ruberton v. Gabage.  Id.

        In Ruberton, the appellate division held that the trial court had properly applied the

litigation privilege to dismiss an action arising out of what the plaintiffs alleged was a

fraudulently obtained settlement. Ruberton v. Gabage, 280 N.J. Super. 125 (App. Div. 1995).

The Ruberton plaintiffs had filed a complaint against an attorney and the client he represented in

the plaintiffs' underlying suit for wrongful discharge.  Id. at 129. The complaint pled a number of

tort claims, including fraud, based on statements made by the attorney during a settlement

conference of the wrongful discharge suit. Id.  According to the Ruberton court, "the gravamen

of the complaint is that Agway Petroleum [the wrongful discharge defendant] and Gabage [its

attorney] fraudulently induced plaintiffs to settle the wrongful discharge action by making

unethical and unlawful threats of criminal prosecution if Ruberton did not settle the case."  Id.

The Appellate Division held that the attorneys' settlement conference statements, even if

characterized as "threats," were indeed protected by the litigation privilege and therefore

affirmed the trial court's order of summary judgment in favor of the defendants.  Id. at 134.

         Plaintiffs' argument that the scope of the privilege is limited to statements made within

the bounds of an attorney's ethical and lawful duties conflicts with the jurisprudence on the

subject and with the New Jersey Supreme Court's express holding which rejects consideration of

the propriety of the attorneys' conduct.  In <u>Loigman</u>, the Supreme Court held that while certain

conduct may subject an attorney to disciplinary action for violation of the court's rules of

conduct, its unethical nature does not deprive the attorney of immunity from civil suit pursuant to

the ligation privilege.  <u>Loigman</u>, 185 N.J. at 586-87.  "In applying the privilege, [a court may]

consider neither the justness of the lawyers' motive nor the sincerity of their communications."

<u>Id.</u> at 586.

According to the Amended Complaint itself, the deceptive, misleading and false

representations and omissions made by Cahill and BASF in the course of litigation were made

with the aim of defeating Plaintiffs' asbestos personal injury claims and shielding BASF from

liability.  They were, in other words, made to achieve the object of the defense of those claims.

The law provides that while such communications may not be condoned – and this Court wishes

to make perfectly clear that it does not approve of obtaining dismissals or other advantages for

litigants based on false information – they may not form the basis of a common law tort claim for

fraud.[6]

Accordingly, the Amended Complaint's fraud claim will be dismissed for failure to state

a claim upon which relief may be granted.

     5.    <u>Fraud Upon the Court</u>

Count V of the Amended Complaint purports to assert a cause of action for "fraud on the

court" against all Defendants.  The Third Circuit has held that the independent cause of action of

---

[6] Indeed, for the same reasons, all of the tort claims pled in the Amended Complaint would be subject to dismissal under the litigation privilege to the extent they are based on the allegedly false statements and omissions regarding the BASF talc products.

fraud on the court is an extraordinary remedy because it "challenges the very principle upon which our judicial system is based: the finality of a judgment." Herring v. United States, 424 F.3d 384, 386 (3d Cir. 2005). The Court notes the remedy Plaintiffs seek in particular illustrates that the claim conflicts with the policy of finality. Under the count dedicated to setting forth the claim for fraud on the court, the Amended Complaint pleads for this Court to exercise its inherent disciplinary power to issue an order barring BASF from relying on other courts' orders of dismissal to preclude Plaintiffs from reactivating those asbestos injury claims in their local courts. The Court has already discussed at length, in Section IV.B above, why it simply lacks the power to order such relief.

In any event, a claim for fraud on the court cannot lie unless it is based on "the most egregious misconduct directed to the court itself." Id. at 386-87. It requires "(1) an intentional fraud; (2) by an officer of the court; (3) which is directed at the court itself; and (4) in fact deceives the court." Id. at 386. The claim in this case is premised upon Defendants' alleged misconduct, as detailed throughout this Opinion, in litigation that occurred before *other* presiding courts. Plaintiffs do not, in their opposition brief, address how the claim could be viable insofar as it does not concern any proceedings before this Court, nor how it could proceed against the various Defendants who are not officers of the court and/or are not alleged to have made an intentionally fraudulent representation to a court, nor how it could be pursued by Plaintiffs who claim that the fraud affecting their cases consisted of misrepresentations made to them (or their

counsel) as opposed to a court.[7]  Indeed, Plaintiffs respond to none of the arguments raised by Defendants in support of dismissing the fraud on the court claim.  As their brief in opposition is completely silent on the issue, Plaintiffs may be understood by the Court to have abandoned their fraud on the court claim.  See Michel v. New Jersey, No. 10-3892 (FSH), 2011 WL 1584287, at *3 (D.N.J. Apr. 25, 2011).

For the foregoing reasons, the claim for fraud on the court will be dismissed.

      6.    <u>Unjust Enrichment</u>

Plaintiffs claim that the various alleged lies, destruction of evidence, and other duplicitous conduct in which Defendants engaged with respect to minimizing or completely eliminating BASF's exposure to asbestos injury liability have resulted in financial benefits to the Defendants.  They seek to disgorge Defendants of those financial benefits under an unjust enrichment theory of relief.  Defendants move to dismiss the unjust enrichment claim as completely inapplicable to the alleged misconduct set forth in the Amended Complaint.

---

[7] Only one of the named Plaintiffs, Wengerd, even alleges that the allegedly misleading information about BASF talc was included in a communication directed at a court, as opposed to correspondence between the parties or answers to interrogatories.  She alleges that in a reply brief submitted by BASF in further support of a summary judgment motion, Cahill and BASF argued that Wengerd's decedent could not prevail on her asbestos injury claims against BASF because she had presented no proof that its talc product contained asbestos whereas BASF had actually come forward with evidence to the contrary.  Missing from the Amended Complaint, the Court notes, is any allegation that the court entertaining that motion granted BASF summary judgment based upon this alleged deception, that is, any indication that the allegedly fraudulent statement in fact deceived the court.  This is not surprising, since on a motion for summary judgment made by the party that does not bear the burden of proof on a claim, a court assesses whether the nonmoving party has come forward with any evidence in support of her claim.  The applicable standard of review renders it dubious that summary judgment in favor of BASF on Wengerd's claim would have been granted in reliance on the affirmative alleged deception by BASF that its talc did not contain asbestos.

The Third Circuit has observed that "[i]n the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim (i.e., if defendant is permitted to keep the benefit of his tortious conduct, he will be unjustly enriched)." Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 936 (3d Cir. 1999). New Jersey, however, does not recognize an unjust enrichment claim to remedy tortious conduct. See Warma Witter Kreisler, Inc. v. Samsung Elec. Am., Inc., No. 08-5380 (JLL), 2009 WL 4730187, at *7 (D.N.J. Dec. 3, 2009) (citing Castro v. NYT Television, 370 N.J. Super. 282, 299 (App. Div. 2004)). It is a quasi-contractual theory, intended to provide relief to a party that has conferred a benefit on another, who has wrongfully retained that benefit without satisfying his own obligation of remuneration. Id. (citing VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994)); Mason v. Coca Cola Co., No. 09-220 (NLH), 2010 WL 2674445, at *7 (D.N.J. June 30, 2010). "The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." VRG Corp., 135 N.J. at 641. Nothing in the Amended Complaint even remotely resembles the elements of the unjust enrichment cause of action, much less gives rise to a plausible claim as required by Rule 8(a) and Iqbal. Indeed, where it is based on tortious conduct, an unjust enrichment claim must be dismissed. Mason v. Coca Cola Co., 2010 WL 2674445, at *7; Warma Witter Kreisler, Inc., 2009 WL 4730187, at *7.

The Court further holds that the claim is subject to dismissal because it has been abandoned by Plaintiffs. Michel, 2011 WL 158287, at *3. Despite the arguments raised by

Defendants in their various briefs supporting the motions to dismiss, Plaintiffs fail to defend the viability of their unjust enrichment claim.

       7.   <u>Civil Conspiracy</u>

The gist of a civil conspiracy claim under New Jersey law is "not the unlawful agreement, but the underlying wrong which, absent the conspiracy, would give a right of action." <u>Am. Corp. Soc. v. Valley Forge Ins. Co.</u>, 424 F. App'x 86, 90 (3d Cir. 2011) (quoting <u>Banco Popular N. Am. v. Gandi</u>, 184 N.J. 161, 178 (2005). The civil conspiracy claim must be dismissed because the Amended Complaint fails to state a cognizable claim for any underlying wrongdoing. <u>Id.</u>

**III.   CONCLUSION**

The Court concludes that the entire Amended Complaint must be dismissed both as barred by the Anti-Injunction Act and for failure to state a claim upon which relief may be granted. The Court holds that a dismissal with prejudice is appropriate. <u>See</u> <u>Phillips</u>, 515 F.3d at 236 (holding that "if a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile."); <u>Grayson v. Mayview State Hosp.</u>, 293 F.3d 103, 108 (3d Cir.2002) (holding that dismissal without leave to amend is appropriate if amendment would be futile). To permit further opportunities to amend, or even to seek leave to amend, would be futile and prejudicial for two reasons. First, for the reasons discussed in the Court's analysis, there is no indication that Plaintiffs could cure the various impediments and deficiencies preventing the claims in the Amended Complaint from surmounting this Rule 12(b)(6) motion. Second, the Amended Complaint was in fact filed in

response to the Defendants' initial round of motions to dismiss in an attempt to address those challenges. Plaintiffs, in short, have already explored revising their claims and nevertheless, for the reasons expressed above, have failed to construct a legally sufficient pleading.

The Court further observes, in the interest of being comprehensive, that pending along with these various motions to dismiss the Amended Complaint is Defendant Cahill's motion to strike the class allegations from the Amended Complaint and deny Plaintiffs class certification. That motion is, of course, rendered moot by the Court's disposition of the motions to dismiss the Amended Complaint. The Court will accordingly order that the motion to strike the class allegations be dismissed as moot.

An appropriate form of Order will be filed.


  s/Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge

Dated: December 12, 2012