## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

**KIMBERLEE WILLIAMS**, individually, as personal representative of the Estate of Charles L. Williams, deceased on behalf of said estate, and as representative of others similarly situated;

**NANCY PEASE**, individually, as personal representative of the Estate of William Clark, deceased on behalf of said estate, and as representative of others similarly situated;

**MARILYN L. HOLLEY,** as personal representative of the Estate of Kathryn Darnell, deceased on behalf of said estate, and as representative of others similarly situated;

**DONNA WARE**, individually, as personal representative of the Estate of Ralph Ware, deceased on behalf of said estate, and as representative of others similarly situated;

**DONNETTE WENGERD,** individually, as personal representative of the Estate of Jennifer Graham, deceased on behalf of said estate, and as representative of others similarly situated, and

**ROSANNE CHERNICK**, individually, as personal representative of the Estate of Steven Chernick, deceased on behalf of said estate, and as representative of others similarly situated,

Plaintiffs,

vs.

**BASF CATALYSTS LLC,**
**CAHILL GORDON & REINDEL LLP,**
**CAHILL GORDON & REINDEL**, A Partnership including a Professional Corporation,
**THOMAS D. HALKET**,
**ARTHUR A. DORNBUSCH II**,
**GLENN HEMSTOCK**,

CIVIL ACTION

No. 11-cv-01754-SRC -MAS

SECOND AMENDED CLASS
ACTION COMPLAINT

Jury Trial Demanded

**HOWARD G. SLOANE (A/K/A "PETER SLOANE"),**
**IRA J. DEMBROW,**
**SCOTT A. MARTIN,**
**JOHN DOE BUSINESS ENTITIES 1 to 100** are fictitious corporations, partnerships, or other business entities or organizations that BASF Catalysts LLC is responsible or liable for and whose identities are not presently known, which entities may have mined, milled, manufactured, sold, supplied, purchased, marketed, installed and/or removed asbestos or asbestos-containing materials, or alternatively, are responsible for, are the alter egos of, or are otherwise responsible for the conduct or liability of such entities;

**JOHN DOE BUSINESS ENTITIES 101 to 200** are the fictitious firms, corporations, partnerships, limited liability companies/associations or other business entities or organizations whose identities are not presently known, and who may have perpetrated, or are responsible for, are the alter egos of, or are otherwise responsible for the conduct or liability of those who perpetrated or acted in concert with, in furtherance of, or in conjunction with the other Defendants in the conduct, activities, acts and omissions set forth herein;

**JOHN DOE LAWYERS 1 to 500** are the fictitious names of lawyers and law firms, legal professional corporations, legal professional partnerships, or other professional business entities or organizations, or their agents, employees, or servants, acting within the course and scope of their employment, or other individuals whose identities are not presently known, and who may have perpetrated, and/ or are responsible for, or are the alter egos of, or are otherwise responsible for the conduct or liability of those who perpetrated, aided and abetted, or acted in concert with, in furtherance of, or in conjunction with the other Defendants in the conduct, activities, acts and omissions set forth herein; and,

**Defendants JOHN DOE 1 to 500** are the fictitious names of individuals whose identities

are not presently known, who may have
perpetrated, aided and abetted, conspired with,
acted in concert with and/or are secondarily
responsible or liable under law for the conduct or
activities of those who may have acted in concert
with, in furtherance of, or in conjunction with
the other Defendants in the conduct, activities,
acts and omissions set forth herein, including but
not limited to employees, officers, agents,
members and partners of named Defendants
herein, jointly, severally and in the alternative,

Defendants.

Plaintiffs, Kimberlee Williams, Nancy Pease, Marilyn L. Holley, Donna Ware,

Donnette Wengerd, and Rosanne Chernick, individually and on behalf of all other

individuals similarly situated, for their claims and causes of action against Defendants

referenced herein, and based upon personal knowledge as to each Plaintiff's own

respective actions and, as to all other matters, upon information and belief based upon the

investigation of counsel[1], state and allege against the Defendants, jointly, severally and in

the alternative the following:

---

[1] The investigation of counsel includes the results of the spoliation claim discovery taken in *Paduano v. Ace Scientific Supply Co.*, MID-L-2976-09 (N.J. Super. Ct. Law Div.) described *infra*. The *Paduano* case was one of several companion asbestos cases filed in Middlesex County, New Jersey in which the trial court permitted amendment of complaints to assert fraudulent concealment claims based upon alleged spoliation of evidence that is the subject of this suit. The Hon. Jack L. Lintner, P.J.A.D. (Ret.) was appointed as Discovery Master in *Paduano* and its companion cases to resolve privilege issues relating to discovery. As observed by Judge Lintner in his initial discovery opinion in these cases:

> "Here, during the hearing on plaintiffs' motion to amend, Judge McCormick specifically noted there was evidence that documents reflecting asbestos content in EMTAL's talc were not produced over a period of twenty years and, as a result, plaintiffs' cases were dismissed. In determining that plaintiffs had pled a *prima facie* case of fraudulent concealment, Judge McCormick intimated that plaintiffs should be able to pursue discovery as to why those documents had been concealed and not produced over the twenty-year period."

Following the settlement of the *Paduano* case, its spoliation discovery was taken over and continued in the matter of *Sampson v. 3M Co., et al.*, Docket No. MID-L-5384-11AS. *Sampson* 's discovery includes a currently sealed Special Discovery Masters proceeding presided over by the Hon. Justice Gary S. Stein (Ret.).

# Table of Contents

I.   INTRODUCTION .................................................................................................. 6

II.   SUMMARY OF THE CASE ................................................................................ 7

III.   PARTIES ........................................................................................................... 19

  A.   Plaintiffs ......................................................................................................... 19

  B.   Defendants ..................................................................................................... 31

    (1) The BASF Defendants .................................................................................. 31

    (2) The Cahill Gordon & Reindel Defendants .................................................... 36

    (3) The Fictitious Defendants .............................................................................. 45

IV. VENUE AND JURISDICTION. .......................................................................... 47

V. FACTS COMMON TO CLASS CERTIFICATION AND ALL COUNTS .............. 47

  A.   Asbestos Background Information ..................................................................... 47

  B.   Engelhard's Emtal Talc Products and Asbestos .................................................. 48

  C.   The *Westfall* Asbestos Lawsuit's Discovery ...................................................... 51

  D.   The *Westfall* Case's Settlement and Confidentiality Agreement and Origins of the BCAD Enterprise ............................................................................................... 58

  E.   The Gathering and Spoliation of Inculpatory Evidence after the Settlement of the *Westfall* Case ....................................................................................................... 61

  F.   BCAD Enterprise's Twenty-Five Years Long Pattern and Practice of Misleading and Deceiving Asbestos Injury Claimants, Asbestos Claimants' Counsel and Asbestos Courts. ..................................................................................................................... 64

  G.   Representative Misrepresentations and Material Omissions in Furtherance of the Fraudulent Asbestos Defense Scheme ...................................................................... 70

    a.   The 1988 and 1989 Misrepresentations and Material Omissions to Counsel for Tireworker Asbestos Injury Litigation Claimants Suing BASF in the United States Eastern District of Pennsylvania and Southeastern Pennsylvania State Courts. ........................................................................................................................ 73

    b.   November 19, 1990 Misrepresentations in BASF's Answers to Plaintiffs' Standard Interrogatory Answers in *In Re: All "Asbestos" Cases Presently Pending Before and All Future Cases Assigned to the Honorable James E. Mies, Circuit Court Judge*, (Circuit Court, Wayne County, Michigan). .................................... 79

    c.   November 1990 and October 1991 Misrepresentations in the Answers to Plaintiffs' Master Interrogatories in *In Re: Northern Ohio Tireworker Asbestos Litigation* (C.P. Summit Cty., Ohio). ..................................................................... 82

    d.   April 2002 and December 22, 2010 Misrepresentations and Material Omissions in Engelhard's Correspondence to Asbestos Claimants' Counsel and in Responses to Plaintiffs' First Standard Set of Liability Interrogatories in the New

York City Asbestos Litigation Matter of *Steven Chernick et. al. v. ABB Lumus Global, Inc.* ................................................................................................ 88

    e.    Cahill Gordon's and BASF's Continuing Fraudulent and Misleading Representations to the Representative Plaintiffs' Attorneys, Bevan & Economus and Bevan & Associates LPA, Inc., Beginning in 1992. ...................................... 95

H.    The Discovery and Uncovering of the Fraudulent Asbestos Defense Scheme .. 113

I.    The BASF Perpetrators Undeterred Attempt to Mislead and Deceive the *Paduano* Suit's Plaintiffs' Counsel Regarding Emtal Talc's Asbestos Content ........................ 120

J.    BASF's Admissions That False and Misleading Statements Were Given to Asbestos Claimants Over the Years as Part of BASF's Asbestos Claim Defense ..... 121

K.    Plaintiffs Learn They and Other Asbestos Claimants Similarly Situated Were Victimized and Harmed by the Fraudulent Asbestos Defense Scheme ...................... 123

L.    Defendants greatly benefited and profited from their participation in the Fraudulent Asbestos Defense Scheme. ....................................................................... 124

M.    Defendants' Clandestine Misconduct and Concealments Prevented Plaintiffs and Class Members From Discovering the Fraudulent Asbestos Defense Scheme Despite the Exercise of Diligence Thereby Warranting Tolling of Any Applicable Statute of Limitations. ............................................................................................................ 125

VI. CLASS ACTION ALLEGATIONS ................................................................. 128

VII. CAUSES OF ACTION ................................................................................... 137

    COUNT I - FRAUDULENT CONCEALMENT AND SPOLIATION .................... 137

    COUNT II - FRAUD AND DECEIT ........................................................................ 145

    COUNT III - CIVIL CONSPIRACY ...................................................................... 149

VIII.    DEMAND FOR RELIEF ............................................................................. 152

JURY DEMAND ..................................................................................................... 154

## I.      INTRODUCTION

1.      Sometime in 1984, having settled an asbestos injury case and recognizing its continued exposure to liability for damages caused by asbestos in its talc ore and talc products ( collectively referred to herein as "talc'), Defendant BASF Catalyst, LLC, then known as Engelhard Corporation (collectively "BASF"), together with the law firm of Cahill Gordon & Reindel, LLP ("Cahill Gordon"), devised and implemented  a strategy to defend itself against asbestos injury claims by gathering all of the evidence of asbestos in its talc, storing or destroying the evidence and thereafter withholding and lying about its existence to mesothelioma, cancer and other victims suffering asbestos induced diseases, their counsel, and those courts presiding over asbestos injury claims. In short, after first gathering up and concealing or destroying documents and evidence establishing BASF's talc contained asbestos, BASF and Cahill Gordon repeatedly lied to claimants and courts by denying BASF's talc contained asbestos and that there ever existed any proof to the contrary.  Because the very foundation of our judicial system is violated and eroded when conspirators like BASF and Cahill Gordon lie, fraudulently withhold evidence, destroy incriminating records, and mislead courts and opposing parties regarding essential facts that are only within their knowledge and control, this class action is essentially one based upon fraud upon the court. The harm these defendants and their confederates have inflicted upon both the numerous judicial systems and the asbestos claimants they targeted requires equitable relief. The scope and breadth of their conduct is extraordinary and such calls for extraordinary relief. There is no adequate remedy at law to address and redress the massive miscarriage of justice defendants' corrupt spoliation of evidence, fraud, and deceit has caused. This action therefore seeks to provide the named plaintiffs and members of a class with an honest and full inquiry and

understanding of what happened, and thereafter a trial of the facts concerning defendants'
misconduct. The relief sought on behalf of the class is necessarily limited because the
underlying asbestos exposure injury claims will need to be assessed in light of the fraud
that BASF and Cahill Gordon perpetrated upon the public, asbestos victims and the
courts.  The class is cohesive in their cause and claims. The plaintiffs and class members,
as well as the courts, relied upon the integrity of the judicial system and parties' duties
towards each other and the courts to abide by the rules of court and the rules of
professional responsibility and perform their discovery obligations in good faith. Both
courts and class members justifiably relied upon the knowing, uniform
misrepresentations and material omissions by BASF and Cahill Gordon and to their
detriment were deceived and harmed. Plaintiffs accordingly submit this Second Amended
Complaint  for equitable relief and for  compensatory and punitive damages they are
entitled to by virtue of the Defendants' fraudulent concealment so that each of them and
every other member of the class ultimately will have an opportunity to receive their
constitutional rights to one fair, honest and just day in court on their respective asbestos
injury claims as well as any compensatory and punitive damages they  are entitled to by
virtue of the Defendants' commission of tortious fraudulent concealment (spoliation).

## II.      SUMMARY OF THE CASE

2.      In 1983, BASF's Vice-President of Research and Development, Dr. Glenn
Hemstock ("Hemstock), acknowledged during a deposition in an asbestos injury suit the
presence of a number of tests BASF had produced during discovery that showed that its
talc contained asbestos.  The case in which he testified subsequently settled under terms
that included a confidentiality order binding the plaintiff and his lawyer to non-disclosure

of discovery obtained in the suit. Dr. Hemstock thereafter circulated a memo directing the collection from BASF scientists and research staff of their entire work product regarding the content of BASF talc and talc products.  The information was collected and then secreted away and/or destroyed by BASF and or its counsel Cahill Gordon.  Over the next 25 years, BASF and Cahill Gordon then deceitfully and falsely denied the existence of evidence which they had in their possession or that they had previously destroyed which demonstrated that BASF talc in fact contained asbestos fiber. Their false denials of the prior or continuing existence of this evidence resulted in the obstruction of justice, a fraud upon courts, a fraud upon Plaintiffs and others similarly situated, and damage to the rights of the plaintiffs.  Defendants engaged in a pattern of fraudulent concealment, spoliation, misrepresentations and failures to truthfully and fully disclose material information concerning asbestos in certain products in asbestos claim matters in which BASF and its predecessors were either a named defendant or a potential party (all of which conduct comprises the "**Fraudulent Asbestos Defense Scheme**").

3.      The Fraudulent Asbestos Defense Scheme at issue in this case was designed to end filed cases and ward off future potential asbestos claims against BASF that were or could be based upon contentions that talc ore and talc products mined or manufactured by BASF's predecessors, Engelhard Corporation, Engelhard Industries, Engelhard Minerals & Chemicals Corporation, Minerals & Chemicals Phillip Corporation, Eastern Magnesia Talc Company, Porocel Corporation and Pita Realty Limited, contained asbestos.  (When context requires, these BASF predecessor companies are collectively referred to herein as "**Engelhard**").

8

4.     The targets and victims of the Fraudulent Asbestos Defense Scheme are and were persons who were: (a) exposed to various forms of asbestos fiber contained in Engelhard's talc ore and talc products and who were injured as a result by an asbestos related disease; and/or, (b) an exposed person's family members or personal representatives who claimed or could claim damages for or through these exposed individuals. (These victims are collectively referred to herein as the "**Asbestos Claimant Class**" or the "**Class**.")

5.     As described in greater detail below, Plaintiffs and the Asbestos Claimant Class, the lawyers representing them, and, in some cases, the courts presiding over class members' lawsuits, were systematically supplied with uniform material misrepresentations and omissions by BASF and its in-house and outside lawyers, including Cahill Gordon, regarding: (a) the existence and dangerous nature of asbestos in Engelhard's talc ore and products; and/or  (b) the existence of evidence that the defendants had in their possession, or destroyed, demonstrating that Engelhard talc or and products contained asbestos. As a direct and proximate result of the Defendants' spoliation, deceptive acts, false statements and material omissions, the constitutional and property rights of the Plaintiffs and others similarly situated to them were lost or significantly impaired when, in natural and reasonable  reliance upon Defendants' deceptions, made as they were in such forms including verified answers to discovery requests or affidavits signed under oath by experts and corporate representatives, they either: (a) did not  pursue their claims against BASF; (b) voluntarily ended their claims against BASF without receiving any or full, fair and just compensation (in some cases Class Members were given a nominal or token settlement in exchange for a full release of

BASF); or (c) based upon the misrepresentations and omissions to courts, suffered an involuntary termination of their asbestos injury claims against BASF.

6.      As a result of Defendants' Fraudulent Asbestos Defense Scheme as more fully set out below, Plaintiffs and members of the Asbestos Claimant Class were purposely deceived and defrauded into believing that there was no evidence that Engelhard's talc contained asbestos and/or that Engelhard's talc did not contain asbestos and consequently either: (a) terminated or abandoned their asbestos injury claims against BASF; (b) accepted a nominal financial settlement of their claim; or (c) suffered a dismissal of their  lawsuits where and when the misrepresentations at issue were submitted by the Defendants to presiding courts in the form of motions seeking dismissal of BASF.  Plaintiffs and each Class Member thereby suffered a significant loss of their property.  Each has been deprived of fair, full and just compensation as was their right under law. Furthermore, Defendants' egregious misconduct in spoliating evidence and thereafter systematically and repeatedly misrepresenting core facts about the existence of asbestos in BASF's talc has seriously undermined and impugned the integrity and validity of the administration of justice, thereby depriving each Plaintiff and Class Member of his or her right to a fair, honest and just judicial proceeding.

7.      A key integral part of Defendants' Fraudulent Asbestos Defense Scheme was BASF's widespread spoliation of material evidence and documents establishing or tending to establish that Engelhard's talc ore and products contained asbestos fibers. This spoliation of material evidence overtly began in and around 1984  At that time internal Engelhard company documents and other evidence relating to the existence and nature of asbestos in Engelhard's talc ore and talc product lines were systematically gathered up

from employees at Engelhard's laboratories and offices by BASF's management at the instigation and direction of BASF's legal department, including its then General Counsel, Arthur A. Dornbusch, II, Esq. This spoliation of evidence, on information and belief, was committed with the knowing aid and assistance of BASF's national asbestos counsel, Cahill Gordon, including then Cahill Gordon associate attorney and later partner Howard G. ("Peter") Sloane, Esq.  This evidence was then either destroyed by the defendants or secreted away.  Despite inquiry in a prior New Jersey state court proceeding in which the existence of the spoliation was first uncovered, the fate and current whereabouts of this evidence remain unaccounted for by BASF.

8.     The collection and spoliation of this evidence occurred following BASF's in-house counsel (e.g.- Dornbusch, Thomas D. Halket, Esq.) and outside defense attorneys (Cahill Gordon, including Sloane) witnessing first hand or otherwise knowing about sworn deposition testimony of Engelhard's research and management employees, including Dr. Hemstock's, that acknowledged the existence and contents of documents and scientific test results that reported the presence of asbestos in Engelhard's talc ore and products, including documents and test results produced by Engelhard in connection with a Rhode Island asbestos injury lawsuit.  In settling the Rhode Island suit, BASF obtained an agreement in the form of a release requiring that the Rhode Island plaintiff and plaintiff's attorney keep the settlement and all discovery obtained during the case confidential.

9.      BASF's collection and spoliation of asbestos evidence in 1984 occurred at a time and under circumstances that BASF's management and its in-house and outside attorneys (including Dornbusch, Sloane and Halket) knew BASF was being currently

sued on asbestos claims and was or would in the future be the subject of additional asbestos injury lawsuits and claims. BASF's management and attorneys also knew that the materials collected in 1984, including the transcripts of the inculpating testimony and documents referenced during the Engelhard employee depositions in the Rhode Island asbestos case, were then or could foreseeably be relevant to such asbestos injury lawsuits and claims. The collection, destruction and/or other disposition of this material was undertaken by BASF in bad faith, with the intent to obstruct justice, with the intent to deceive and harm asbestos claimants, such as Plaintiffs, and not for legitimate document retention management purposes.

10.     With the inculpating evidence relating to Engelhard's talc ore and products destroyed or secreted away, the perpetrators of BASF's Fraudulent Asbestos Defense Scheme then began to uniformly, systematically and repeatedly represent in sworn and unsworn statements in asbestos injury claim matters that: (a) Engelhard's talc ore and talc products did not contain any asbestos; and/or (b) that no evidence existed to the contrary.  Over the ensuing twenty-five (25) years, from 1984 until late 2009—when by chance the spoliation. fraudulent concealment and deceit  were uncovered during a deposition of a former Engelhard chemist whose daughter had developed mesothelioma from exposure to, among other products, BASF's talc ore and products—BASF and its lawyers persistently and uniformly lied to, misled, and withheld material evidence that Engelhard's talc contained asbestos from numerous (in the thousands) asbestos injury claimants, asbestos claimant lawyers, and asbestos injury claimant representatives, as well as to courts presiding over asbestos injury claims. And even when BASF became aware that the Fraudulent Asbestos Defense scheme was beginning to become uncovered

through happenstance, such as it did in or about 2009, the scheme was nevertheless allowed to continue on into 2011 as set forth herein. Notably not one of the defendants herein, including individual defendants who unquestionably knew there was evidence the talc contained asbestos such as  Dornbusch, Sloane and Halket, have ever taken any step or measure whatsoever to affirmatively reveal the existence of, or renounce their participation in, the Fraudulent Asbestos Defense Scheme or to arrest, cure or mitigate the injuries and damage it caused or could cause to the plaintiffs, class members, presiding courts and the administration of justice. The fraud and the harm unleashed by the defendants in furtherance of the Fraudulent Asbestos Defense Scheme thus continues on to this date.

11.     The Fraudulent Asbestos Defense Scheme at issue herein was devised, implemented, managed, directed, and controlled in large and substantial part at BASF's headquarters in the State of New Jersey.  It was executed through the means and mechanisms of a conspiracy and a corrupted association (the "BCAD Enterprise") which was comprised of and operated by, at least so far as is presently known: (a) BASF; (b) BASF management (such as Dr. Hemstock) and in-house attorney employees (including Dornbusch and Halket); and, (c) the law firm and lawyers of Cahill Gordon (including its partner Sloane and its senior associate Ira J. Dembrow, Esq.), which firm and its lawyers until 2010 or so had been BASF's national asbestos claim defense counsel for at least twenty-five years.

12.     The BCAD Enterprise's Fraudulent Asbestos Defense Scheme was highly successful in terminating and warding off numerous asbestos injury claims and lawsuits against BASF, as well as enabling Defendants to settle asbestos injury claims against

BASF with nominal or token payments in exchange for a release or agreement not to sue when doing so was advantageous to BASF.  As was Defendants' design, purpose and intent, the spoliation and fraudulent misrepresentation and omissions scheme misled numerous asbestos injury claimants and their counsel, including the representative Plaintiffs and their counsel, into naturally and reasonably believing there was no evidence that Engelhard's talc products contained asbestos that could support an injury compensation claim against BASF.  The Plaintiffs' and other Class Members' ultimate response to BASF, Cahill Gordon and the BCAD Enterprise's spoliation and deceitful conduct was likewise uniform, natural, and direct, as well as consistent with the intent of the Defendants.  Depending upon the procedural status of their claim, Plaintiffs and members of the Class either dropped their claims, settled for a token amount in exchange for a release or covenant not to sue, suffered an involuntary dismissal of their claim or in some cases did not commence a law suit or other claim (such as workers' compensation) against BASF based upon exposure to BASF talc; all to their substantial economic detriment and loss. In addition to the loss of their asbestos injury claim or chose in action, Plaintiffs and others were not fairly and fully compensated by BASF for their medical expenses, loss of earnings, and other economic and non-economic losses. Defendants' egregious misconduct further seriously undermined and impugned the integrity and validity of the administration of justice, thereby depriving each Plaintiff and Class Member of his or her right to a fair, honest and just judicial proceeding.

13.     Compounding the harm caused to Plaintiffs and the Class by the Defendants' spoliation of evidence and deceptive misconduct, the passage of time has

greatly hampered and impaired, and in some cases eliminated, Plaintiffs' and Class Members' access to evidence needed to establish their underlying asbestos injury claims.

14.     The existence and/or scope of Defendants' Fraudulent Asbestos Defense Scheme and BCAD Enterprise's existence and corrupt activities was neither known nor reasonably knowable to Plaintiffs until 2010 or 2011, when representative Plaintiffs were first advised of the Defendants' Fraudulent Asbestos Defense Scheme through Plaintiffs' asbestos claim counsel who, in turn, had only shortly before that time learned of the scheme as a result of being contacted by other lawyers who were investigating spoliation claims against BASF in connection with then pending litigation in New Jersey state court, or in connection with the investigation of this matter. While the full extent of the fraud and spoliation is still unknown, upon information and belief it involves thousands of asbestos claimants who were the targets and victims of the scheme. This information is known to the Defendants.

15.     The spoliation of evidence and other elements and aspects of the Fraudulent Asbestos Defense Scheme, as well as BCAD Enterprise's existence, all of which date back to the mid-1980's, were uncovered only by chance in 2009 when deposition testimony by a former Engelhard employee chemist, Mr. David Swanson, provided some alarming revelations. His testimony not only contradicted BASF's and its counsel's representations that Engelhard's talc did not contain any asbestos, but revealed the fact that during Swanson's employment with Engelhard material documents relating to the talc were gathered from him and other research department employees and destroyed (or otherwise disposed of or secreted away) at the direction of  Engelhard's legal department. Mr. Swanson was deposed in connection with a New Jersey Superior

Court Law Division asbestos lawsuit captioned *Paduano v. Ace Scientific Supply Co*., MID-L-2976-09 (N.J. Super. Ct. Law Div.) ("***Paduano* suit**"). The *Paduano* suit was filed by Mr. Swanson's daughter, a mesothelioma victim claiming asbestos injury caused by BASF's talc products as well as other exposures.  During his deposition, Mr. Swanson testified that while he was employed in Engelhard's research department, test results, laboratory notebooks and other documents concerning talc products were gathered from all Engelhard research and testing personnel, including his own written materials, and never returned. This testimony generated an investigation into BASF's and Cahill Gordon's spoliation of documents which in turn revealed the facts and conduct that are the subject of this lawsuit. Accordingly, the existence of the Fraudulent Asbestos Defense Scheme, the existence of the BCAD Enterprise's existence and the activities and overt actions of the corrupt scheme are not, and were not, known to members of the Class despite the diligent efforts of their counsel; which ignorance of these wrongs  is a natural consequence of the defendants' fraud and will continue on unless and until Class Members are notified and informed of the circumstances and their potential claims by an appropriate notice.

16.     This suit accordingly seeks classwide declaratory and equitable relief correcting and redressing Defendants' egregious misconduct, obstruction of justice and fraud upon the courts and the corresponding resulting injuries to the judicial process and abridgement of economic and personal rights inflicted upon thousands of members of the Asbestos Claimant Class (excluding those who opt out), including:

a.   A declaratory judgment that a fraud and/or fraudulent concealment and spoliation of material evidence relating to the existence of asbestos BASF's talc has

been committed by the Defendants  to the detriment of the class members with corresponding mandatory injunctive relief requiring Defendants to locate and notify Class Members (or where deceased or incompetent, their personal representatives or their next of kin) of this finding and the corresponding need to promptly consult with counsel regarding their legal rights as a result;

b.   Declaratory and equitable relief addressing and alleviating any impairment of Plaintiffs' and Class Members' ability to gather and present evidence establishing their underlying asbestos injury claims that Defendants' spoliation and ensuing misrepresentations and material omissions proximately caused;

c.   A determination and declaration of the need for and ordering execution of a pending action notice program paid for by Defendants informing Class Members or their representatives of the pendency of this action, BASF's and Cahill's alleged misconduct and the import and possible impact of same on their present or former asbestos injury claims, and their rights to proceed against Defendants;

d.   A declaration, injunction or decree imposing a constructive trust upon BASF's and Cahill Gordon's property and requiring BASF and Cahill Gordon to each render an accounting to the Court of all fees, revenues, costs, insurance proceeds, and expense savings relating to Plaintiff s and absent class member's asbestos injury claims.

e.   A determination and declaration of BASF's and Cahill Gordon's liability for disgorgement of revenues, profits and money unjustly earned or received  from the commission of the frauds upon the courts, Plaintiffs and members of the class

17

and/or  the commission of proscribed activities described below, together with a determination and decree on the disposition and distribution of such disgorgement;

f.   A determination of Defendants' liability for compensatory and  punitive damages to Plaintiffs and the Class relating to the fraudulent concealment and spoliation of evidence relevant and material to establishing asbestos injury claims against BASF;

g.   A determination and declaration that BASF's and Cahill Gordon's communications relating to the their fraudulent conduct and/or the spoliation of evidence are not privileged attorney-client communication under the New Jersey crime-fraud exception and an injunction barring and prohibiting either from asserting same are privileged in any proceeding involving any class members asbestos injury claims;

h.   An injunction requiring BASF and Cahill Gordon to fund the maintenance of  an independent trust established by the Court for the purpose of locating, collecting, housing, archiving and making available BASF's asbestos documents and materials to Plaintiffs, class members and further requiring BASF and Cahill Gordon to assist and cooperate fully with the Court appointed trustees in the accomplishment of these remedial objectives, including providing information, waivers of privilege and waivers of confidentiality rights where applicable;.

i.   A permanent injunction enjoining the Defendants from further misrepresenting and suppressing evidence relating to BASF's asbestos liability; and,

j.   Such other relief as may be available and just.

### III.   PARTIES

#### A.   Plaintiffs

17.   Plaintiff Kimberlee Williams ("**Williams**") is an individual and a citizen of the State of Ohio, residing at 2299 Winter Parkway, Apt. 235, Cuyahoga Falls, Ohio 44221. At all times relevant herein she was married to the late Charles L. Williams, who died on September 7, 1998.  She is the personal representative of Mr. Williams' estate. Plaintiff Williams brings this suit in her individual capacity, as personal representative of the Estate of Charles L. Williams, deceased, on behalf of said Estate, and as a Class representative of a Class of others similarly situated as defined below.

18.   Williams' deceased husband, Charles L. Williams, was a tire worker employed at Goodyear Tire & Rubber in Akron, Ohio from 1950 to 1985.  During that time he was exposed during his employment to asbestos containing talc products mined, manufactured, processed, sold and/or distributed by Engelhard.  That exposure proximately caused him to develop asbestos injuries, including asbestosis and lung cancer, which injuries in turn proximately led to and caused his death on September 7, 1998.  Prior to his death, Plaintiff's decedent suffered and endured great pain and suffering and great mental anguish and emotional distress.  Plaintiff Williams' decedent while alive, and his estate thereafter following his death, as well as Plaintiff Williams herself, incurred substantial costs and expenses in obtaining medical treatment and care of Mr. Williams' asbestos injuries.  Plaintiff Williams and the Estate of Charles L. Williams, deceased, also sustained loss of income, earning capacity, funeral expenses and pecuniary losses.  Plaintiff Williams also suffered a loss of consortium, services and

society of her husband before his death and a loss of services following his death.  All of these injuries, losses and damages were compensable asbestos injury claims.

19.     In 1992, Plaintiff Williams and her husband commenced an asbestos injury lawsuit in the Court of Common Pleas, Cuyahoga County, Ohio, against BASF's predecessor, Eastern Magnesia and Pita Reality; said suit captioned *Charles Williams and Kimberlee Williams v. B. F. Goodrich Company*, *et al.*, Case No. 229108. The case was removed to the United States District Court for the Northern District of Ohio, where it was made a tag-a-long case in the Asbestos Multi-District Litigation case assigned to the late Honorable Charles R. Weiner in the United States District Court of the Eastern District of Pennsylvania.  During the pendency of that lawsuit, and reasonably relying and acting upon the misrepresentations and material omissions  made  by  Defendants  to their attorneys and representatives, Dale S. Economus ,Esq and Thomas W. Bevan ,Esq., regarding Engelhard's talc products, including without limitation the failure to disclose evidence indicating Engelhard's talc contained asbestos fibers, as set forth more particularly below, Plaintiff Williams and her husband, on or about March 2,1993, filed and later served by U.S. Mail a voluntarily partial dismissal of their lawsuit dismissing their asbestos injury claims against Eastern Magnesia without receiving full, fair and adequate compensation for their asbestos injury claims against BASF's predecessors. The partial dismissal was ordered and entered by Judge Weiner on or about March 16, 1993.  At no time thereafter did any of the Defendants take any affirmative step or measure to retract, rescind or cure the misrepresentations and material omissions made to Economus, Bevan or their law firms. Plaintiff Williams and her husband did not know that she and her husband had been the victim of Defendants' Fraudulent Asbestos

Defense Scheme described herein while her husband was alive, and she did not learn of such fact until late 2010/early 2011, when she was first informed of same by her attorney, Thomas W. Bevan, Esquire after he was informed of the Fraudulent Asbestos Defense Scheme by the *Paduano* case's counsel in the course of their investigation into the spoliation and fraudulent defense scheme.  Had Plaintiff's counsel and Plaintiff known about the existence of the spoliation described more particularly herein and the existence of evidence that BASF's talc and talc products contained asbestos, the dismissal would not have been entered as to BASF (Engelhard at the time), and in view of the circumstances Plaintiff would have either had her day in court, or obtained a substantial settlement amount.

20.    Plaintiff Nancy Pease ("**Pease**") is an individual and a citizen of the State of Ohio, residing at 3212 Bent Oak Trail, Ravenna, Ohio 44266.  She is a daughter of the late William F. Clark, deceased, and has been appointed executrix of his Estate. Plaintiff Pease brings this suit in her individual capacity, as personal representative of the Estate of William F. Clark, deceased, on behalf of the Estate, and as a Class representative of a Class of others similarly situated as defined below.

21.    Plaintiff Pease's decedent, William F. Clark, was a tire production worker employed at B. F. Goodrich Company in Akron, Ohio from 1952 to 1983.  During that time he was exposed through his employment to asbestos containing talc products mined, manufactured, processed, sold and/or distributed by Engelhard. That exposure proximately caused him to develop asbestos injuries, including mesothelioma, which injuries proximately led to and caused his death on May 5, 1994.  Prior to his death, Plaintiff Pease's decedent suffered and endured great pain and suffering and great mental

anguish and emotional distress. Plaintiff Pease's Decedent while alive, and his estate following his death, incurred substantial costs and expenses in obtaining medical treatment and care of Mr. Clark's asbestos injuries and mesothelioma.  The Estate of William Clark, deceased sustained loss of income, earning capacity, funeral expenses and pecuniary losses.  All of these injuries, losses and damages were compensable asbestos injury claims.

22.   On or about June 21, 1995, Plaintiff Pease commenced an asbestos injury lawsuit in the Court of Common Pleas, Cuyahoga County, Ohio against BASF's predecessor, Eastern Magnesia, naming same as a defendant in accordance with the accepted asbestos practice in that area in view of settlement programs that potentially responsible product manufacturers or suppliers were negotiating or had developed; said suit captioned *Nancy Pease, executrix of the Estate of William Clark, deceased v. B. F. Goodrich Company, et al.*, Case No. CV-95-291272.  This suit replaced a Summit County, Ohio, Court of Common Pleas asbestos personal injury suit commenced by Plaintiff Pease's parents during their lifetimes which was captioned *William F. Clark et al. v. Owens Corning Fiberglass Corp. et al.*, Case No. ACV-94-04-1107.  During the pendency of Plaintiff Pease's lawsuit, and reasonably relying and acting upon the misrepresentations and material omissions of Defendants regarding Engelhard's talc product and the absence of any evidence indicating Engelhard's talc contained asbestos fibers that were made to her attorney and representative, Thomas W. Bevan, Esq., as set forth more particularly herein, Plaintiff on or about December 4, 1998 voluntarily dismissed the Estate's  lawsuit against Eastern Magnesia, as part of a nominal amount settlement with a group of talc supplier defendants, without receiving full, fair and

adequate compensation for the Estate's asbestos injury claims against BASF's predecessors.  The fraudulently obtained notice of dismissal in her case was served upon all counsel of record, including Defendant Cahill Gordon, on or about December 4, 1996, by U.S. Mail.  Plaintiff did not know that she and her father's estate had been the victims of Defendants' Fraudulent Asbestos Defense Scheme described herein until late 2010/early 2011, when she was first informed of same by her attorney, Thomas W. Bevan, Esquire. Had Plaintiff's counsel and Plaintiff known about the existence of the spoliation described more particularly herein and/or the existence of evidence that BASF's talc and talc products contained asbestos, the settlement demand would have been higher and/or Plaintiff would have taken her case to trial.  Plaintiff is willing and offers to return the portion of the settlement contributed by BASF, or such other amount the Court deems fair and just, in order to be restored to the *status quo ante* the settlement with BASF.

23.    Plaintiff Marilyn L. Holley ("**Holley**") is an individual and a citizen of the State of Ohio, residing at 931 Morningstar, Akron, Ohio 44307. Holley is a daughter of Kathryn Darnell, deceased.  She has been appointed executrix of the Estate of Kathryn Darnell, deceased.  Plaintiff Holley brings this suit in her individual capacity, as personal representative of the Estate of Kathryn Darnell, deceased, on behalf of the estate, and as a Class representative of a Class of others similarly situated as defined below.

24.    Plaintiff Holley's decedent, Kathryn Darnell, was a rubber industry worker employed at B. F. Goodrich Company in Akron, Ohio from 1969 to 1987. During that time she was exposed through her employment to asbestos containing talc products mined, manufactured, processed, sold and/or distributed by Engelhard.  That

exposure proximately caused her to develop asbestos injuries, including mesothelioma, which proximately led to and caused her death on June 7, 2001.  Prior to her death Plaintiff Holley's decedent suffered and endured great pain and suffering and great mental anguish and emotional distress. Plaintiff Holley's decedent while alive and her Estate following her death incurred substantial costs and expenses in obtaining medical treatment and care of her asbestos injuries and mesothelioma.  Plaintiff Holley's decedent, Kathryn Darnell, during her life and her estate following her death sustained loss of income, earning capacity, funeral expenses and pecuniary losses.  All of these injuries, losses and damages were compensable asbestos injury claims.

25.     On or about November 14, 2000, Plaintiff Holley's decedent, Kathryn Darnell, while alive, commenced an asbestos injury lawsuit in the Court of Common Pleas, Cuyahoga County, Ohio against BASF's predecessor, Eastern Magnesia, naming same as a defendant in accordance with the accepted asbestos practice in that area in view of settlement programs that potentially responsible product manufacturers or suppliers were negotiating or had developed; said suit captioned *Kathryn Darnell v. B. F. Goodrich Company, et al.*, Case No. CV-423183. Prior to her death on June 7, 2001, and reasonably relying and acting upon the misrepresentations and material omissions of Defendants regarding Engelhard's talc product and the absence of any evidence indicating Engelhard's talc contained asbestos fibers that were made to her attorney and representative, Thomas W. Bevan, Esquire, as set forth more particularly herein,  Plaintiff Holley's decedent on or about May 8, 2001, voluntarily dismissed her lawsuit against Eastern Magnesia as part of a nominal settlement with a group of talc supplier defendants without receiving full, fair and adequate compensation for her asbestos injury claims

against BASF's predecessors. Kathryn Darnell during her lifetime did not know that she had been the victim of Defendants' Fraudulent Asbestos Defense Scheme described herein.  Plaintiff Holley did not know and learn that her decedent was a victim of Defendants' Fraudulent Asbestos Defense Scheme until late 2010/early 2011, when she was informed of same by her attorney, Thomas W. Bevan, Esquire.  Had Plaintiff's counsel and Plaintiff known about the existence of the spoliation described more particularly herein and/or the existence of evidence that BASF's talc and talc products contained asbestos, the settlement demand would have been higher and/or Plaintiff would have taken her case to trial.  Plaintiff is willing and offers to return the portion of the settlement contributed by BASF, or such other amount the Court deems fair and just, in order to be restored to the status quo ante the settlement with BASF.

26.     Plaintiff Donna Ware ("**Ware**") is an individual and a citizen of the State of Ohio, residing at 441 Randolph Road, Mogadore, Ohio 44260.  At all times relevant herein she was married to Ralph Ware, who died on December 1, 2002.  Plaintiff Ware is the Executrix of Mr. Ware's Estate.  Plaintiff Ware brings this suit in her individual capacity, as personal representative of the Estate of Ralph Ware, deceased, on behalf of said Estate, and as a Class representative of a Class of others similarly situated as defined below.

27.     Plaintiff Ware's deceased husband, Ralph Ware, was employed at Goodyear Aerospace in Akron, Ohio from 1950 to 1985 as, among other things, a compound mixer.  During that time he was exposed in the course of his occupation to asbestos containing talc products mined, manufactured, processed, sold and/or distributed by Engelhard.  That exposure proximately caused him to develop asbestos injuries,

including mesothelioma, which proximately led to and caused his death on December 1, 2002. Prior to his death Plaintiff Ware's decedent suffered and endured great pain and suffering and great mental anguish and emotional distress. Plaintiff Ware's decedent, while alive, his estate thereafter, and Plaintiff Ware herself, also incurred substantial costs and expenses in obtaining medical treatment and care of Mr. Ware's asbestos injuries. Plaintiff Ware's husband's estate sustained loss of income, earning capacity, funeral expenses and pecuniary losses. Plaintiff Ware also suffered a loss of consortium, services and society of her husband. All of these injuries, losses and damages were compensable asbestos injury claims.

28.     On or about May 29, 1997, Plaintiff Ware and her deceased husband commenced an asbestos injury lawsuit in the Court of Common Pleas, Cuyahoga County, Ohio against BASF's predecessors, Eastern Magnesia and Pita Reality, naming same as a defendant in accordance with the accepted asbestos practice in that area in view of settlement programs that potentially responsible product manufacturers or suppliers were negotiating or had developed; said suit captioned *Ralph Ware v. B. F. Goodrich Company, et al.,* Case No. 02-475504. Reasonably relying and acting upon the misrepresentations and material omissions of Defendants regarding Engelhard's talc product and the absence of any evidence indicating Engelhard's talc contained asbestos fibers that were made to their attorney and representative, Thomas W. Bevan, Esquire, as set forth more particularly herein, Plaintiff Ware and her husband's estate in 2003 voluntarily dismissed their lawsuit against Engelhard's predecessors as part of a multi-plaintiff, multi-talc defendant settlement that BASF's predecessors were party to, without receiving any full, fair and adequate compensation for their asbestos injury claims against

26

BASF's predecessors.  Plaintiff Ware and her husband did not know that she and her husband had been the victims of Defendants' Fraudulent Asbestos Defense Scheme described herein while her husband was alive and she did not learn of such fact until late 2110/early2011, when she was informed of same by her attorney, Thomas W. Bevan, Esquire. Had Plaintiff's counsel and Plaintiff known about the existence of the spoliation described more particularly herein and/or the existence of evidence that BASF's talc and talc products contained asbestos, the settlement demand would have been higher and/or Plaintiff would have taken her case to trial.  Plaintiff is willing and offers to return the portion of the settlement contributed by BASF, or such other amount the Court deems fair and just, in order to be restored to the status quo ante the settlement with BASF.

29.     Plaintiff Donnette Wengerd ("**Wengerd**") is an individual and a citizen of the State of Ohio, 3147 S. Medina Line Road, Norton, Ohio 44203.  She is the daughter of the late, Jennifer Graham, deceased, and has been appointed executrix of her estate. Plaintiff Wengerd brings this suit in her individual capacity, as personal representative of the Estate of Jennifer Graham, deceased, on behalf of the estate, and as a Class representative of a Class of others similarly situated as defined below.

30.     Plaintiff Wengerd's decedent, Jennifer Graham, was a tireworker employed at Goodyear Tire and Rubber Company in Akron, Ohio from 1974 to 1978. During that time Plaintiff's decedent was exposed through the decedent's employment to asbestos containing talc products mined, manufactured, processed, sold and/or distributed by Engelhard.  That exposure proximately caused Ms. Graham to develop asbestos injuries, including mesothelioma, which injuries proximately led to and caused her death on July 21, 2008.  Prior to her death, Plaintiff Wengerd's decedent suffered and endured

great pain and suffering and great mental anguish and emotional distress. Plaintiff Wengerd's decedent while alive, and her Estate following her death, incurred substantial costs and expenses in obtaining medical treatment and care of Ms. Graham's asbestos injuries and mesothelioma. The Estate of Jennifer Graham sustained loss of income, earning capacity, funeral expenses and pecuniary losses. All of these injuries, losses and damages were compensable asbestos injury claims.

31.     On or about May 10, 2008, Plaintiff Wengerd's decedent during her life commenced an asbestos injury lawsuit in the Court of Common Pleas, Cuyahoga County, Ohio against BASF, naming same as a defendant in accordance with the accepted asbestos practice in that area in view of settlement programs that potentially responsible product manufacturers or suppliers were negotiating or had developed; said suit captioned *Jennifer Graham et al. v. Goodyear Tire Company, et al.*, Case No. 656405. In or around January, 2009, after Plaintiff Wengerd's decedent had refused to voluntarily dismiss her mesothelioma injury lawsuit against BASF as it had requested through counsel in a letter mailed on or about November 12, 2008, BASF electronically filed and served a Motion for Summary Judgment brief and, later, a reply brief in the Court of Common Pleas in which it misrepresented to the presiding trial court, as set forth more particularly hereinafter, that Plaintiff Wengerd could not establish her case against BASF because, *inter alia*, its predecessor's, Engelhard, talc did not contain any asbestos. On or about June 18, 2009, the Court of Common Pleas of Cuyahoga granted BASF's Motion for Summary Judgment and dismissed Plaintiff Wengerd's mesothelioma lawsuit against BASF, thereby denying her full, fair and adequate compensation for her asbestos injury claims against BASF. Plaintiff Wengerd did not know that she and her mother's estate

had been the victim of Defendants' Fraudulent Asbestos Defense Scheme described herein until 2010/early 2011, when she was first informed of same by her attorney, Thomas W. Bevan, Esquire.

32.     Plaintiff Rosanne Chernick ("**Chernick**") is an individual and a citizen of the State of North Carolina, residing at 1446 Clifton Pond Road, Louisburg, North Carolina 27549.  At all times relevant herein she was married to Steven Chernick, who died on February 24, 2002.  Plaintiff Chernick is the Executrix of Mr. Chernick's Estate. Plaintiff Chernick brings this suit in her individual capacity, as personal representative of the Estate of Steven Chernick, deceased, on behalf of said Estate, and as a Class representative of a Class of others similarly situated as defined below.

33.     Plaintiff Chernick's decedent, Steven Chernick, worked with and/or in the vicinity of asbestos containing products and equipment with asbestos containing components while performing auto body repair work and brake lining repairs. He worked at locations including, but not limited to, Tom's Thumb Collision in the Bronx, New York during the early to mid 1980s and at other locations in the States of New York and Florida after such time.  During that time Plaintiff's decedent was exposed through his employment to asbestos containing talc products mined, manufactured, processed, sold and/or distributed by Engelhard. That exposure proximately caused Mr. Chernick to develop asbestos injuries, including lung cancer, which injuries proximately led to and caused his death on February 24, 2002 at the age of 41.  Prior to his death, Plaintiff Chernick's decedent suffered and endured great pain and suffering and great mental anguish and emotional distress. Plaintiff Chernick's decedent while alive, and his Estate following his death, incurred substantial costs and expenses in obtaining medical

treatment and care of Mr. Chernicks's asbestos injuries and lung cancer.  The Estate of

Steven Chernick sustained loss of income, earning capacity, funeral expenses and

pecuniary losses.  Plaintiff Chernick also suffered a loss of consortium, services and

society of her husband.  All of these injuries, losses and damages were compensable

asbestos injury claims.

34.     On or about August 30, 2001, Plaintiff Chernick and her husband

commenced an asbestos injury lawsuit in the Supreme Court of New York, County of

New York, N.Y. and by amendment to the complaint in that suit filed on or about

October 29, 2001 joined Engelhard Minerals & Chemical Corporation, a predecessor to

BASF, as a defendant; said suit was captioned *Steven Chernick, et al. v. ABB Lummus*

*Global, Inc., et al.*, Case No. 01-116741.  Reasonably relying and acting upon the false

statements of the defendants (as more particularly described herein) that Engelhard's talc

and talc products did not contain asbestos and/or upon the material omissions of

Defendants regarding evidence that they possessed, or destroyed, that demonstrated the

presence of asbestos fiber in Engelhard's talc and talc products made to Plaintiff

Chernick's and her husband's attorneys and representative, Early, Lucarelli, Sweeney &

Strauss, as set forth more particularly herein, Plaintiff Chernick and her husband's estate

authorized her attorney to voluntarily execute and provide a consent "No Opposition

Summary Judgment Motion Order," to BASF's counsel for filing, by which he, on behalf

of his client, agreed to the presiding court granting a summary judgment dismissal of the

Chernick case's claims as to the Engelhard Defendants.  Plaintiff Chernick did not know

that she and her husband's estate had been the victims of Defendants' Fraudulent

Asbestos Defense Scheme described herein and she did not learn of such fact until 2011,

when she was informed of same by her attorney, Early, Lucarelli, Sweeney & Strauss, after it had learned of the fraudulent scheme in connection with the investigation of this matter. Had Plaintiff's counsel and Plaintiff known about the existence of the spoliation described more particularly herein and the existence of evidence that BASF's talc and talc products contained asbestos, the consent order for summary judgment would not have been entered as to BASF (Engelhard at the time), and in view of the circumstances Plaintiff would have issued a substantial settlement demand or would have taken her case to trial.

### B.      Defendants

### (1) The BASF Defendants

35.      Defendant, BASF Catalysts LLC is a limited liability company formed and existing under the laws of the State of Delaware, with its headquarters, principal place of business and managerial control located in the State of New Jersey, at 25 Middlesex/Essex Turnpike, Iselin, New Jersey 08830.

36.      BASF Catalysts LLC is the successor in interest by merger and is responsible and liable for the debts and liabilities of the following companies: Engelhard Corporation, Engelhard Industries, Engelhard Minerals & Chemicals Corporation, Minerals & Chemicals Phillip Corporation, Eastern Magnesia Talc Company, Porocel Corporation and Pita Realty Limited (collectively "**Engelhard**").  Unless context indicates otherwise, "**BASF**" refers to and includes BASF Catalysts LLC and the Engelhard predecessor companies collectively.

37.     At all times material herein, BASF and its predecessor companies, including in particular Engelhard, regularly and continuously transacted business in the State of New Jersey.

38.     BASF and its predecessors, including Engelhard, directed and/or committed the statutorily unlawful and other tortious activities and omissions alleged and complained about herein in the State of New Jersey, even though the impact and harm to Plaintiffs and many of the Class Member victims may have occurred outside of New Jersey.

39.     At all times material herein, Defendant BASF and its predecessors, including Engelhard, acted by and through its officers, employees, servants, attorneys, agents, actual, apparent and/or ostensible, any and all of whom were then and there acting within the course and scope of their authority, duties and employment, actual or apparent.

40.     Defendant BASF, acting as aforesaid, jointly conceived, orchestrated, agreed to participate in, and participated in the Fraudulent Asbestos Defense Scheme alleged herein; became a co-conspirator with others participating in the Fraudulent Asbestos Defense Scheme to defraud Plaintiffs and members of the Class, including the "Lawyer Perpetrators" identified herein; was a member of the BCAD Enterprise and participated in its creation, direction and management, and participated in the execution and commission of the BCAD Enterprise's unlawful activities.

41.     Defendant Thomas D. Halket ("**Halket**") was, at times material herein, an attorney at law employed by BASF as an in-house counsel.  Defendant Halket during his employment with BASF as an in-house attorney responsible for the handling of asbestos claim matters against the company, jointly participated in the creation and operation of

32

the Fraudulent Asbestos Defense Scheme alleged herein; became a co-conspirator with others participating in the Fraudulent Asbestos Defense Scheme to defraud Plaintiffs and members of the Class, including the "Lawyer Perpetrators" identified herein; was a member of the BCAD Enterprise and participated in its creation, direction and management, and participated in the execution and commission of the BCAD Enterprise's unlawful activities, including the spoliation of evidence, either directly or indirectly as a co-conspirator. Halket never expressly or affirmatively advised his co-conspirators or anyone outside of the conspiracy, such as the affected courts, claimants' counsel or claimants, that he withdrew from the conspiracy, and consequently is liable for the acts of his co-conspirators following his termination of employment with BASF. Additionally, despite putting into force a fraudulent evidence concealment scheme intended and designed to impair, hamper and/or eliminate asbestos claims against Engelhard (now BASF), at no time has Halket done anything to arrest, cure or mitigate the harm to Plaintiffs and the Class that his wrongful acts and omissions have caused and will continue to proximately cause in the future.  Due to the covert, clandestine and secretive nature of the Fraudulent Asbestos Defense Scheme, and the activities surrounding and relating to it – including the fact that BASF's in-house and outside counsel attorneys were intimately involved in and responsible for conceiving and implementing the scheme–the dates and full nature and extent of his participation and specific roles and acts beyond that already alleged herein are presently unknown to Plaintiffs, but on information and belief, are known to him  as well as BASF, Cahill Gordon and other named parties (including fictitiously named  parties), and through

discovery conducted under the auspices of this Court can be developed in advance of trial.

42.     Defendant Glenn Hemstock ("**Hemstock**") was, at times material herein, employed by BASF (then Engelhard) as its Vice President of Research and Development. During his employment with BASF he was a top scientist.  He worked there with and tested Engelhard's talc and he managed and directed Engelhard employees and consultants who tested or conducted research on Engelhard's talc.  Defendant Hemstock during his employment with BASF jointly participated in the creation and operation of the Fraudulent Asbestos Defense Scheme alleged herein; became  a co-conspirator with others participating in the Fraudulent Asbestos Defense Scheme to defraud Plaintiffs and members of the Class, including the "Lawyer Perpetrators" identified herein; was a member of the BCAD Enterprise and participated in its creation, direction and management, and participated in the execution and commission of the BCAD Enterprise's unlawful activities either directly or indirectly as a co-conspirator. Hemstock never expressly or affirmatively advised his co-conspirators or anyone outside of the conspiracy, such as the affected courts, claimants' counsel or claimants, that he withdrew from the conspiracy, and consequently is liable for the acts of his co-conspirators following his termination of employment with BASF. Additionally, despite putting into force a fraudulent evidence concealment scheme intended and designed to impair, hamper and/or eliminate asbestos claims against Engelhard (now BASF), at no time has he done anything to arrest, cure or mitigate the harm to Plaintiffs and the Class that his wrongful acts and omissions have caused and will continue to proximately cause in the future.

43.     'Defendant Arthur A. Dornbusch II ("**Dornbusch**") was, at all times material herein, an attorney at law employed by BASF as an in-house counsel. He also was at all times relevant herein a Vice President of BASF, BASF's General Counsel and BASF's Corporate Secretary. Defendant Dornbusch during his employment and tenure with BASF as General Counsel jointly participated in the creation and operation of the Fraudulent Asbestos Defense Scheme alleged herein; became a co-conspirator with others participating in the Fraudulent Asbestos Defense Scheme to defraud Plaintiffs and members of the Class, including the "Lawyer Perpetrators" identified herein; was a member of the BCAD Enterprise and participated in its creation, direction and management, and participated in the execution and commission of the BCAD Enterprise's unlawful activities either directly or indirectly as a co-conspirator. Dornbusch never expressly or affirmatively advised his co-conspirators or anyone outside of the conspiracy, such as the affected courts, claimants' counsel or claimants, that he withdrew from the conspiracy, and consequently is liable for the acts of his co-conspirators following his termination of employment with BASF. Additionally, despite putting into force a fraudulent evidence concealment scheme intended and designed to impair, hamper and/or eliminate asbestos claims against Engelhard (now BASF), at no time has Dornbusch done anything to arrest, cure or mitigate the harm to Plaintiffs and the Class that his wrongful acts and omissions have caused and will continue to proximately cause in the future. Due to the covert, clandestine and secretive nature of the Fraudulent Asbestos Defense Scheme, and the activities surrounding and relating to it – including the fact that BASF's in-house and outside counsel attorneys were intimately involved in and responsible for conceiving and implementing the scheme–the dates and

full nature and extent of his participation and specific roles and acts beyond that already alleged herein are presently unknown to Plaintiffs, but on information and belief, are known to him  as well as BASF, Cahill Gordon and other named parties (including fictitiously named  parties), and through discovery conducted under the auspices of this Court can be developed in advance of trial.

44.     With respect to the activities, conduct, misstatements  and omissions set forth herein, Defendants BASF, Halket, Dornbusch and Hemstock (collectively referred to as the "**BASF Perpetrators**") acted recklessly, knowingly, deliberately and/or intentionally to mislead and deceive courts in which asbestos claims were pending, the Plaintiffs, the Asbestos Claimant Class and Asbestos Claimants' counsel, or, in the alternative, to cause, assist, aid or abet others to mislead and deceive Plaintiffs and the Asbestos Claimant Class and Asbestos Claimants' counsel.

45.     The BASF Perpetrators, including attorney defendants Dornbusch and Halket during their representation of BASF, and, as well, in carrying out the Fraudulent Asbestos Defense Scheme, acted in bad-faith, with ill will, and with intent to harm, deceive and defraud the Plaintiffs, the Asbestos Claimant Class and Asbestos Claimants' Counsel  and, as described more fully below, courts in which asbestos matters were pending, including but not limited to the Asbestos Multi-District Litigation court.

### (2) The Cahill Gordon & Reindel Defendants

46.     Defendant Cahill Gordon & Reindel LLP ("**Cahill LLP**" when referred to separately for context) is a limited liability partnership organized and existing under the laws of the State of New York.  It came into existence on or as of April 29, 2003.  It is

the successor in interest to the law firm partnership known as "Cahill Gordon & Reindel" and is responsible for this predecessor partnership's debts and liabilities.

47.    Defendant Cahill LLP regularly and continuously did and does transact business in the State of New Jersey, as did its predecessor, Cahill Gordon & Reindel.  At all times material to this matter, Cahill LLP also committed unlawful and other tortious conduct in, and directed towards, New Jersey and citizens of New Jersey.

48.    Defendant Cahill Gordon & Reindel ("**Cahill Partnership**" when referred to separately for context) is and was at all times material a New York professional partnership. .

49.    Defendant Cahill Partnership regularly and continuously transacted business in the State of New Jersey and at all times material to this matter committed unlawful and other tortious conduct in, and directed towards, New Jersey and citizens of New Jersey.

50.    From 1919 until April 29, 2003, Cahill Partnership operated as a partnership. For the period of time Cahill Partnership was operating as a partnership, Cahill Partnership and its partners were, are and remain liable for any wrongful or fraudulent act or omission of any partner of the firm, including but not limited to Howard (Peter) Sloane, acting in the ordinary course of the business of the partnership or with the authority of his co-partners, that causes loss or injury to any person, including but not limited to Plaintiffs and Class Members who were not partners in the partnership.

51.     Cahill Partnership further at all times material herein acted by and through its, partners other than Sloane, as well as by and through associate attorneys,

37

officers, employees, servants, and/or, agents, actual, apparent and/or ostensible, any and all of whom were then and there acting within the course and scope of their authority, duties and employment, actual, apparent or ostensible, and/or within the authority of the copartners or members of the partnership.  All Cahill Partnership partners, members, associate attorneys, officers, employees, servants were at all times relevant herein acting in the ordinary course of business of the partnership and/or with the authority of his or her co-partners, members.

52.     Cahill Partnership and its partners are jointly and severally liable to Plaintiffs and the Class herein under the doctrine of *respondeat superior* for the actions of the partnership's partners, associate attorneys, officers, employees, servants, and/or, agents, actual, apparent and/or ostensible.

53.     From and after April 29, 2003, Cahill LLP was operating as a registered limited liability partnership.

54.     When and Cahill LLP was operating as a registered limited liability partnership, Cahill LLP is and was liable for any wrongful or fraudulent act or omission of any partner, including but not limited to Sloane, acting in the ordinary course of the business of the partnership or with the authority of his co-partners, that causes loss or injury to any person, including but not limited to Plaintiffs and the Class Members who were not partners in the partnership.

55.     When Cahill LLP was operating as a registered limited liability partnership, Cahill LLP partner Sloane directly supervised and controlled Cahill LLP attorneys and paralegals working on Engelhard's and later BASF's asbestos claim

defense, including but not limited to defendants Ira J. Dembrow and Scott A. Martin, and others, including fictitiously named defendants.

56. Cahill LLP partner/member Sloane is personally and fully liable and accountable for any negligent, wrongful or fraudulent act or misconduct committed by him and/or by any person under his direct supervision and control while rendering professional services on behalf of Cahill LLP, including but not limited to Cahill LLP associates Ira J. Dembrow and others, including fictitiously named defendants.

57. Cahill LLP partner/member Sloane is personally and fully liable and accountable for any negligent, wrongful or fraudulent act or misconduct committed by him and/or by any person under his direct supervision and control while rendering professional services in his capacity as a partner of Cahill LLP, including but not limited to Cahill LLP associates Ira J. Dembrow and Scott A. Martin, and others, including fictitiously named defendants.

58. Further, at all times material herein, Defendants Cahill LLP and Cahill Partnership (hereinafter collectively referred to as "**Cahill Gordon**" or "**Defendant Cahill Gordon"**) acted by and through their members, partners, shareholders, officers, employees, servants, associate attorneys, or agents, actual, apparent and/or ostensible, any and all of whom were then and there acting within the course and scope of their authority, duties and employment, actual, apparent or ostensible, and/or within the authority of his or her copartners or members of the partnership. All Cahill Gordon partners, members or shareholders were acting in the ordinary course of business of the partnership and/or with the authority of his or her co-partners, members. Cahill Gordon

is liable herein under the doctrine of *respondeat superior* for the actions of its partners, members, shareholders, officers, agents, employees, servants and associate attorneys.

59.     From at least 1983 and continuing to in or about 2010, Cahill Gordon was BASF and its predecessors' national counsel regarding asbestos injury claim defense matters.  Based upon information and belief, Cahill Gordon was terminated by BASF as its national asbestos defense counsel after the spoliation and Fraudulent Asbestos Defense Scheme alleged herein was uncovered during discovery proceedings in the *Paduano* suit.

60.     Defendant Cahill Gordon, through its members, shareholders or partners, officers, agents, employees, servants and associate attorneys, acting as aforesaid, was a member of the BCAD Enterprise and participated in its creation, direction and management, and participated in the execution and commission of the BCAD Enterprise's unlawful activities.

61.     Defendant Cahill Gordon, through its members, shareholders or partners, officers, agents, employees, servants and associate attorneys, acting as aforesaid, jointly conceived, orchestrated, agreed to participate in, or  participated in, and/or or recklessly permitted its members, shareholders or partners, officers, agents, employees, servants and associate attorneys, acting as aforesaid, to orchestrate, agree to participate in and actively participate in, the Fraudulent Asbestos Defense Scheme alleged herein, or was a co-conspirator with, or an aider and abettor of others participating in the Fraudulent Asbestos Defense Scheme, including the BASF Perpetrators. Cahill Gordon never expressly or affirmatively advised its co-conspirators or anyone outside of the conspiracy, such as the affected courts, claimants' counsel or claimants, that it withdrew from the

conspiracy, and consequently is liable for the harmful acts of its co-conspirators following its termination as BASF's National Counsel.

62.     Defendant Howard G. Sloane (a/k/a "Peter Sloane") ("**Sloane**") was, at times material hereto a member of the bar of New York State, an associate and later a partner in the Cahill Partnership and then a member or shareholder of Cahill LLP. Plaintiffs believe Sloane is a citizen of a state or territory different than they are.  Sloane at all material times herein was one of the principal Cahill Gordon attorneys  assigned to, responsible for  and entrusted with the representation of BASF in asbestos claim matters. Defendant Sloane jointly conceived, orchestrated and participated in the fraudulent conduct scheme alleged herein with others including the BASF Perpetrators; became a co-conspirator with others participating in the scheme to defraud Plaintiffs and members of the Class; was a member of the BCAD Enterprise and participated in its creation, direction and management; and participated in the execution and commission of the BCAD Enterprise's unlawful activities.  At all times material herein Sloane was acting in the ordinary course of business of Cahill Gordon and/or with the authority of his Cahill Gordon co-partners, co-members or co-shareholders. Sloane never expressly or affirmatively advised his co-conspirators or anyone outside of the conspiracy, such as the affected courts, claimants' counsel or claimants, that he withdrew from the conspiracy, and consequently is liable for the acts of his co-conspirators. Additionally, despite putting into force a fraudulent evidence concealment scheme intended and designed to impair, hamper and/or eliminate asbestos claims against Engelhard (now BASF), at no time has Sloane done anything to arrest, cure or mitigate the harm to Plaintiffs and the Class that his wrongful acts and omissions have caused and will continue to proximately cause in

the future.  Due to the covert, clandestine and secretive nature of the Fraudulent Asbestos

Defense Scheme, and the activities surrounding and relating to it – including the fact that

BASF's in-house and outside counsel attorneys were intimately involved in and

responsible for conceiving and implementing the scheme–the dates and full nature and

extent of his participation and specific roles and acts beyond that already alleged herein

are presently unknown to Plaintiffs, but on information and belief, are known to him  as

well as BASF, Cahill Gordon and other named parties (including fictitiously

named  parties), and through discovery conducted under the auspices of this Court can be

developed in advance of trial.

63.     Defendant Scott A. Martin ("**Martin**") was, at times relevant hereto, a

member of the bar of the State of New York and an attorney employed by and practicing

with Cahill Gordon.  Plaintiffs believe Martin is a citizen of a state or territory different

than they are.  Martin at times material herein was one of the Cahill Gordon attorneys

assigned to, entrusted with and responsible for the representation of BASF in asbestos

claim matters. Martin, while supervised by Sloane as well as other Cahill partners,

jointly conceived, orchestrated and/or participated in the fraudulent conduct scheme

alleged herein with others including the BASF Perpetrators; was a co-conspirator with

others participating in the scheme to defraud Plaintiffs and members of the Class; was a

member of the BCAD Enterprise and participated in its creation, direction and/or

management; and participated in the execution and commission of the BCAD

Enterprise's unlawful activities.  At all times material herein Martin was acting in the

ordinary course of business of Cahill Gordon and/or with the authority of Cahill Gordon

co-partners, co-members or co-shareholders. Martin never expressly or affirmatively

advised his co-conspirators or anyone outside of the conspiracy, such as the affected

courts, claimants' counsel or claimants, that he withdrew from the conspiracy, and

consequently is liable for the acts of his co-conspirators. Additionally, despite putting

into force a fraudulent evidence concealment scheme intended and designed to impair,

hamper and/or eliminate asbestos claims against Engelhard (now BASF), at no time has

Martin done anything to arrest, cure or mitigate the harm to Plaintiffs and the Class that

his wrongful acts and omissions have caused and will continue to proximately cause in

the future.  Due to the covert, clandestine and secretive nature of the Fraudulent Asbestos

Defense Scheme, and the activities surrounding and relating to it – including the fact that

BASF's in-house and outside counsel attorneys were intimately involved in and

responsible for conceiving and implementing the scheme–the dates and full nature and

extent of his participation and specific roles and acts beyond that already alleged herein

are presently unknown to Plaintiffs, but on information and belief, are known to him  as

well as BASF, Cahill Gordon and other named parties (including fictitiously

named  parties), and through discovery conducted under the auspices of this Court can be

developed in advance of trial.

64.     Defendant Ira J. Dembrow ("**Dembrow**") was, at times relevant hereto, an

attorney at the law firm of Cahill Gordon.  Plaintiffs believe Dembrow is a citizen of a

state or territory different than them.  Dembrow at all times material herein was one of

the Cahill Gordon attorneys assigned to,  entrusted with and responsible for the

representation of BASF in asbestos claim matters.  Dembrow jointly with Sloane and

other defendants conceived, orchestrated and/or participated in the fraudulent conduct

scheme alleged herein with others including the BASF Perpetrators; was a co-conspirator

with others participating in the scheme to defraud Plaintiffs and members of the Class; was a member of the BCAD Enterprise and participated in its creation, direction and/or management; and participated in the execution and commission of the BCAD Enterprise's unlawful activities.  At times material herein Dembrow was acting in the ordinary course of business of Cahill Gordon and/or with the authority of his Cahill Gordon co-partners, co-members or so-shareholders. Dembrow never expressly or affirmatively advised his co-conspirators or anyone outside of the conspiracy, such as the affected courts, claimants' counsel or claimants, that he withdrew from the conspiracy, and consequently is liable for the acts of his co-conspirators. Additionally, despite putting into force a fraudulent evidence concealment scheme intended and designed to impair, hamper and/or eliminate asbestos claims against Engelhard (now BASF), at no time has Dembrow done anything to arrest, cure or mitigate the harm to Plaintiffs and the Class that his wrongful acts and omissions have caused and will continue to proximately cause in the future.  Due to the covert, clandestine and secretive nature of the Fraudulent Asbestos Defense Scheme, and the activities surrounding and relating to it – including the fact that BASF's in-house and outside counsel attorneys were intimately involved in and responsible for conceiving and implementing the scheme–the dates and full nature and extent of his participation and specific roles and acts beyond that already alleged herein are presently unknown to Plaintiffs, but on information and belief, are known to him  as well as BASF, Cahill Gordon and other named parties (including fictitiously named  parties), and through discovery conducted under the auspices of this Court can be developed in advance of trial.

65.     With respect to the activities, conduct and omissions set forth herein, Defendants Cahill Gordon, Sloane, Martin and/or Dembrow (collectively referred to as the "**Lawyer Perpetrators**") acted recklessly, knowingly, deliberately and/or intentionally to mislead and deceive courts in which asbestos claims were pending, Plaintiffs, the Asbestos Claimant Class and Asbestos Claimants' counsel, or, in the alternative, to cause, assist, aid or abet others to mislead and deceive courts, Plaintiffs the Asbestos Claimant Class and Asbestos Claimants' counsel.

66.     The Lawyer Perpetrators, individually and jointly, during their respective representation of BASF, and in carrying out the Fraudulent Asbestos Defense Scheme as well, acted in bad-faith, with ill will, and with intent to harm, deceive and defraud the plaintiffs, class members and, as described more fully below, courts in which asbestos matters were pending, including but not limited to the Asbestos Multi-District Litigation court.

### (3) The Fictitious Defendants

67.     JOHN DOE BUSINESS ENTITIES 1 to 100 are fictitious corporations, partnerships, or other business entities or organizations that BASF is responsible or liable for and whose identities are not presently known, which entities may have mined, milled, manufactured, sold, supplied, purchased, marketed, installed and/or removed asbestos or asbestos-containing materials, or alternatively, are responsible for, are the alter egos of, or are otherwise responsible for the conduct or liability of such entities, as set forth herein.

68.     JOHN DOE BUSINESS ENTITIES 101 to 200 are the fictitious firms, corporations, partnerships, limited liability companies/associations or other business

45

entities or organizations whose identities are not presently known, and who may have perpetrated, or are responsible for, are the alter egos of or are otherwise responsible for the conduct or liability of those who perpetrated or acted in concert with, in furtherance of, or in conjunction with the other Defendants in the conduct, activities, acts and omissions as set forth herein.

69.     JOHN DOE LAWYERS 1 to 500 are the fictitious names of lawyers and law firms, legal professional corporations, legal professional partnerships, or other professional business entities or organizations, or their agents, employees, or servants, acting within the course and scope of their employment, or other individuals whose identities are not presently known, and who may have perpetrated and/or are responsible for, or are the alter egos of, or are otherwise responsible for the conduct or liability of those who perpetrated, aided and abetted, or acted in concert with, in furtherance of, or in conjunction with the other Defendants in the conduct, activities, acts and omissions as set forth herein.

70.     Defendants JOHN DOE 1 to 500 are the fictitious names of individuals whose identities are not presently known, who may have perpetrated, aided and abetted, conspired with, acted in concert with and/or are secondarily responsible or liable under law for the conduct or activities of those who may have acted in concert with, in furtherance of, or in conjunction with the other Defendants in the conduct, activities, acts and omissions set forth herein, including but not limited to employees, officers, agents, members and partners of named Defendants as set forth herein.

## IV. VENUE AND JURISDICTION.

71.     This Court has subject-matter jurisdiction over the individual claims of the

named representative Plaintiffs under 28 U.S.C. § 1332, as there is complete diversity of

citizenship between the plaintiffs and defendants named herein and the amount in

controversy as to each plaintiff's exceeds the sum or value of $75,000, exclusive of

interest and costs. This Court additionally has subject-matter jurisdiction over nationwide

class action claims asserted by Plaintiffs pursuant to 28 U.S.C. § 1332, as amended by the

Class Action Fairness Act of 2005, because the matter in controversy exceeds

$5,000,000, exclusive of interest and costs, and is a class action in which some members

of the class are citizens of states different than the Defendants. 28 U.S.C.§1332(d)(2)(A).

72.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(1) and

1391(b)(2) because numerous Defendants, as described above, reside in, are

headquartered in, and/or conduct business in, this judicial district, and because a

substantial part of the acts or omissions giving rise to the claims set forth herein occurred

in this judicial district, or were directed and controlled from within this judicial district.

## V. FACTS COMMON TO CLASS CERTIFICATION AND ALL COUNTS

**A**.     **Asbestos Background Information**

73.     Asbestos is a naturally occurring mineral and is a human carcinogen.

74.     A common form of asbestos fiber is chrysotile asbestos.  Chrysotile

asbestos is a recognized and regulated human carcinogen.  Chrysotile is the most

common variety of asbestos found in products in the United States.

75.     Other forms of asbestos are amosite, crocidolite, tremolite, actinolite and

anthophyllite.  The United States Environmental Protection Agency, the Occupational

Health and Safety Administration, and the World Health Organization, among others, have stated that there is <u>no</u> known safe level of exposure to asbestos of <u>any</u> type.

76.     Talc is a naturally occurring mineral that is mined and then processed or used in manufacturing by companies in numerous parts of the United States.

77.     Asbestos has been identified as a contaminant of some talc mines.

**B.     Engelhard's Emtal Talc Products and Asbestos**

78.     BASF's predecessor Engelhard either directly or indirectly through a subsidiary owned or operated a talc mine located in Johnson, Vermont (the "**Johnson Mine**") from 1967 until 1983.

79.     The Johnson Mine was closed in 1983.

80.     At some time presently unknown to Plaintiffs, and according to information provided by Defendants in preceding asbestos litigation, the Johnson Mine became flooded with water, thereby preventing the obtaining of any future valid samples of its talc.

81.     BASF's predecessor Engelhard processed or manufactured the Johnson Mine's talc ore into talc products that were marketed under the trade name "Emtal talc". The "Emtal" trademark was owned and utilized by BASF's subsidiary, Eastern Magnesia.  Emtal talc products also included "G&S Talc," talc that contained serpentine asbestos fiber.

82.     Emtal talc ore and products were used across the nation in diverse industries for many purposes.  As examples, it was an ingredient, component of, or

48

coating in or on the following products: wall board, joint compound, auto body "filler," dusting agents and children's balloons.

83.    Emtal talc and talc products produced, processed and/or manufactured by BASF, contained chrysotile asbestos fibers, as well as other asbestos forms including tremolite  and serpentine asbestos.

84.    During the 1970s and continuing through the early 1980s, BASF through its internal personnel, outside consultants  and  internal  laboratories conducted tests and assays on its talc ore and products, as well as in, about  or on areas or environments where the talc was mined, processed, or used.  Other third parties also conducted tests and assays on BASF talc ore and products.  A number of the tests and assays were to determine if the Johnson Mine's talc and processed Emtal talc products contained asbestos fibers.

85.    BASF had knowledge of testing and assays performed on talc obtained from the Johnson Mine and Emtal talc products, and had knowledge of the tests' results, including test findings that the talc and talc products contained asbestos fibers and that certain environments in its facilities, including laboratories, had high levels of airborne asbestos fibers.

86.    The tests and assay results are scientific and business records that BASF and predecessors regularly kept and maintained.

87.    The test and assay results conducted on Johnson Mine talc ore and processed Emtal talc products found asbestos fibers in the ore and products.

88.     Among the tests  and assays of Emtal talc which found the presence of asbestos fibers in the Emtal talc which were uncovered in the *Paduano* suit discovery are:

a.   A 1972 Royal Globe Insurance test with results indicating four out of five Emtal talc samples contained asbestos fibers.

b.   A May 1972 Johns Manville test which identified asbestos fibers, including tremolite fibers, in all of the Emtal talc samples.

c.   A 1977 test by Mr. Triglia, an Engelhard employee, which identified the presence of asbestos in Emtal talc.

d.   A 1978 test which established the presence of asbestos in all Emtal talc sampled.

e.   A 1979 Georgia Tech electron microscope analysis test which found fibers in the Emtal talc.

f.   Three other 1979 tests which all confirmed the presence of asbestos in Emtal talc.

89.     The above identified tests and assays, on information and belief, are not an exhaustive list of the asbestos tests and assays with positive findings for asbestos in Emtal talc.  Plaintiffs believe there are or were other tests and assays of Emtal talc and/or talc from the Johnson Mine that had positive findings of asbestos, which BASF claims are privileged and refuses to divulge or, as will be described below, were reported in documents collected by BASF in or about 1984 and then either destroyed or secreted away once the BASF management or in-house counsel, including Hemstock, Dornbush and Halket, and Cahill Gordon counsel, including Sloane, became aware of the

implications of such positive test and assay findings on BASF's liability exposure and national risk management program regarding asbestos injury claims.

90.     BASF's management and in-house counsel, including Hemstock, Dornbush and Halket, and Cahill Gordon counsel, including Sloane, based upon information and belief, had knowledge and were aware of the test results and other non-publicly available data, opinions, findings and conclusions of experts which established that the Johnson Mine talc and/or Emtal talc products contained asbestos.

91.     Despite the findings from these tests and assays to the contrary, BASF represented to its customers, industry trade groups and the Federal Government that the Emtal talc was asbestos free and even marketed the product as a viable asbestos substitute, thereby causing widespread and unknowing exposure to asbestos to United States citizens nationwide, including workers and workers' spouses and children..

## C.     The *Westfall* Asbestos Lawsuit's Discovery

92.     In 1979, Mr. David Howard Westfall, a family member of a deceased rubber and rubberized product industry worker, filed an asbestos injury lawsuit in the United States District Court for the District of Rhode Island captioned *Westfall v. Whittaker,* C.A. No. 79-0269 (the "***Westfall* case**"), based upon his decedent's exposure to asbestos containing talc products.

93.     In the *Westfall case*, plaintiff identified one of the Engelhard companies, Eastern Magnesia Talc Company, as a company that manufactured the talc his decedent was exposed to and which caused the mesothelioma injury underlying the case.

51

94.     BASF was represented and defended in the *Westfall* case by, among others, Cahill Gordon, its national counsel.

95.     The BASF Perpetrators were aware of the *Westfall* case and participated in and/or oversaw BASF's defense of the case along with Cahill Gordon.

96.     The BASF Perpetrators and the Lawyer Perpetrators were aware of, participated in and/or oversaw the investigation in the defense of the *Westfall* case on behalf of BASF and in such capacity were aware of internal and external investigations, tests and assays relating to the Johnson Mine talc ore and Emtal talc products.

97.     In particular, Defendant Sloane was among the Cahill Gordon attorneys actively representing BASF in the *Westfall* case, and in such capacity was aware of the discovery and evidence relating to BASF that existed in that suit.

98.     In particular, Defendant Halket was among BASF's in-house attorneys actively involved and participating in the *Westfall* case defense, and in such capacity was aware of the discovery and evidence relating to BASF that existed in that suit.

99.     In response to document discovery requests served on BASF by the *Westfall* case's attorneys, documents that established the existence of asbestos fibers in Emtal talc, including test and assay results that were in BASF's possession, were produced in or about 1983 to Westfall's attorneys by BASF through its counsel, Cahill Gordon.

100.    In 1983, as part of the *Westfall* case discovery, Defendant Hemstock was deposed under oath over two days in his capacity as an employee of Engelhard.

Appended as Exhibit 1 is a copy of his deposition transcripts produced to the plaintiff's counsel in the *Paduano* suit only after Mr. Swenson's deposition testimony therein revealed the existence of the spoliation and fraudulent concealment scheme that is the subject of this suit.  The exhibits identified in Defendant Hemstock's depositions were not produced by BASF in the *Paduano* suit discovery despite request. Accordingly, a full and complete copy of the entire Hemstock transcript including all exhibits cannot be appended.

101.    At the time of his deposition in the *Westfall* case, Defendant Hemstock was one of Engelhard's top scientists and held a management (Vice-President of Research and Development) position with Engelhard.

102.    Defendant Sloane was also present at and represented Defendant Hemstock and BASF at Hemstock's deposition in the *Westfall* case.

103.    Defendant Halket was also present at Dr. Hemstock's *Westfall* case deposition in his capacity as BASF in-house counsel.

104.    During his deposition in the *Westfall* case, Defendant Hemstock testified that the Emtal talc did in fact contain asbestos fibers. He was thus aware of the issue over Emtal Talc's asbestos content in asbestos claims and was aware that evidence relating to same was pertinent to asbestos claims against BASF.

105.    During his deposition in the *Westfall* case, Defendant Hemstock was questioned by Mr. Westfall's lawyer about assays and tests on Emtal talc that had been conducted at the Engelhard's laboratory in New Jersey.

106.    During his deposition in the *Westfall* case, Defendant Hemstock admitted that various tests performed throughout the 1970s and 1980s, both by BASF employees and by third parties, indicated the presence of asbestos fibers in Emtal talc that was tested or assayed.

107.    During his deposition in the *Westfall* case, Defendant Hemstock was shown and then questioned about various documents, including what were apparently test or assay results.  These documents were produced to Mr. Westfall's attorney by BASF, through its attorneys Cahill Gordon, during discovery in the *Westfall* case and were marked as exhibits during the course of Defendant Hemstock's deposition.

108.    During his deposition in the *Westfall* case, Defendant Hemstock was shown the results of various tests and assays which characterized the level of asbestos fibers in the Emtal talc as having "high levels of chrysotile."

109.    Defendants Sloane, other Cahill Gordon attorneys present at Hemstock's deposition, and Defendant Halket all heard Hemstock's testimony under oath and all were able to examine and review the exhibits that Defendant Hemstock was shown and testified to or about during Defendant Hemstock's deposition, if not beforehand as well.

110.    Defendants Sloane and the other Cahill Gordon attorneys present at Hemstock's deposition were aware of and appreciated the negative implications on BASF's asbestos injury claim liability and BASF's exposure to future asbestos claims created by Hemstock's testimony and the test and assay results showing the presence of asbestos fiber in BASF products identified during his deposition in the *Westfall* case.

111.    Defendant Halket, Dornbusch and other BASF Perpetrators were aware of and appreciated the negative implications on BASF's asbestos injury claim liability and BASF's exposure to future asbestos  claims created by Hemstock's testimony and the test and assay results showing the presence of asbestos fiber in BASF products identified during his deposition in the *Westfall* case.

112.    Following Defendant Hemstock's deposition, BASF and/or Cahill Gordon obtained a full and complete copy of Hemstock's deposition transcripts as well as a copy of the documents upon which he was examined that were identified in the transcript.

113.    On or about March 29, 1983, Defendant Sloane in the *Westfall* case took the deposition of a former Engelhard research and development employee, Peter Gale ("**Gale**").

114.    Gale, during his employment with Engelhard in the 1970's, had conducted analytical testing research on Emtal talc.  He also during that time visited and took samples of talc ore from the Johnson Mine.

115.    During his deposition, Gale testified in response to Sloane's questioning that he kept laboratory notebooks of his work and analysis which were considered confidential records of Engelhard and were stored in Engelhard's library.  In response to the *Paduano* suit's spoliation investigation discovery, BASF stated that it was not able to produce Gale's laboratory notebooks.

116.    After Gale was identified as a possible expert witness for the plaintiff in the *Westfall* case, BASF through Cahill Gordon objected to his serving as an expert for the *Westfall* plaintiff.  Gale acquiesced to BASF's demand that he not serve as an expert to the *Westfall* case's plaintiff based on the terms of his employment contract with Engelhard and BASF's objection to his voluntarily testifying.

117.    On or about April 7, 1983, a deposition under oath of another employee of Engelhard, Mr. Emil J. Triglia ("**Triglia**"), was taken in the *Westfall* case in Metuchen, New Jersey.  A copy of Mr. Triglia's deposition transcript as produced in the *Paduano* suit is appended as Exhibit 2.

118.    During his deposition in the *Westfall* case, Triglia testified that Emtal talc contained asbestos fibers.

119.    During his deposition in the *Westfall* case, Mr. Triglia was shown various documents relating to Emtal talc which were subsequently identified and marked as exhibits during the deposition.  In response to requests for copies of the marked exhibits in the *Paduano* suit's spoliation investigation discovery, BASF stated that it was not able to produce copies of the actual marked exhibits referred to in the deposition transcript. BASF offered instead an attempted partial reconstruction of the deposition exhibits in which it produced copies of some (but not all) of documents purportedly matching the description of the documents referenced during the deposition.

120.    According to the Triglia deposition transcript produced in the *Paduano* case, Defendant Halket and Cahill Gordon attorneys were identified as being present at the Triglia deposition.

121.    After Triglia's deposition was transcribed, the BASF Perpetrators and and/or the Lawyer Perpetrators obtained a full and complete copy of Triglia's deposition transcripts, as well as a copy of the documents that were identified during the depositions and about which he was questioned during the deposition.

122.    On or about or about May 6, 1983, Defendant Sloane wrote a letter to the court reporter who recorded and transcribed Triglia's deposition and requested that the transcript record be corrected to reflect that Defendant Halket and Defendant Cahill Gordon's attorneys were not present at the deposition as indicated because, according to Defendant Sloane in his letter, they were not invited to attend the deposition.  Defendant Sloane's letter further transmitted to the court reporter for inclusion with the deposition transcripts *errata* sheets by Triglia purporting to correct his testimony or the transcript.

123.    Whether present at the disposition or not, Defendant Sloane did receive the transcript of the Triglia deposition and was aware of its contents as he reviewed it sufficiently to provide the court reporter with *errata* information.

124.    Copies of Triglia's deposition were circulated or mailed to BASF's in-house attorneys, including Defendant Halket, and to the Lawyer Perpetrators.

125.    The BASF Perpetrators and the Lawyer Perpetrators were aware and appreciated the negative implications on BASF's asbestos injury claim liability and BASF's exposure to future asbestos claims of both Triglia's testimony and the test and assay results showing the presence of asbestos fiber in BASF products identified during Triglia's deposition.

126.    At the time of the *Westfall* case, the BASF Perpetrators and the Lawyer

Perpetrators knew that BASF could and would in the future be sued by other asbestos

injury claimants who were exposed to BASF's Emtal talc products.  The existence of

such potential claims created a substantial national asbestos risk management and

liability problem for BASF. By this time, the early to mid-1980s, several major mining

and manufacturing companies had already gone into bankruptcy because of liability for

asbestos claims.

**D.     The *Westfall* Case's Settlement and Confidentiality Agreement and
         Origins of the BCAD Enterprise**

127.    BASF's management had knowledge of the *Westfall* case's discovery at or

about the time it was occurring.  Also, at or about that time BASF's management and in-

house counsel, including Hemstock, Dornbusch and Halket, were aware of the negative

implications that BASF's production of positive test/assay results and internal documents

establishing the fact Emtal talc products contained asbestos produced in the *Westfall* case

had not only upon the *Westfall* case, but also upon BASF's asbestos claim liability

exposure to future asbestos claims and BASF's asbestos liability risk management in

general. This created a significant liability and risk management problem for BASF given

the widespread distribution and use of EMTAL talc products.

128.    Sometime following the depositions of Defendant Hemstock and Mr.

Triglia in 1983 and prior to March 7, 1984, members of BASF's management and in-

house general counsel's office and Cahill Gordon, including but not limited to

Defendants Dornbusch, Hemstock, Halket and Sloane, devised and agreed to a strategy,

plan and scheme to control and even possibly eliminate BASF's (then Engelhard's) future

asbestos injury claim liability and asbestos risk management exposure.  Under this plan and scheme: (a) the *Westfall* case would be resolved by a settlement that required a confidentiality  agreement which prevented the BASF discovery responses, deposition transcripts, and other evidence of asbestos fiber present in BASF talc products gathered in the discovery of that case from becoming disclosed or otherwise known and available to other asbestos claimants and their counsel; (b) steps would then be  taken under the false pretense or guise of record retention management to gather-up and then limit access or conceal or destroy all evidence and documents in Engelhard's possession and control relating to Emtal talc ore and products, including the discovery in *Westfall* case; and, (c) all claimants and experts consulted from that time forward would be told by BASF and/or its attorneys that Emtal talc ore and products did not contain asbestos and/or that there was no evidence to the contrary and in support of these representations only samples, test results or documents consistent with these representations would be provided or referred to in connection with asbestos injury claims, thus corrupting, biasing  and tainting the opinions of such experts. Thus began the Fraudulent Asbestos Defense Scheme and the collusion and conspiracy among BASF and Cahill Gordon to implement the scheme and conceal its existence and operation from all persons and institutions outside of BASF and Cahill Gordon.

129.    On information and belief, sometime following the depositions of Defendant Hemstock and Mr. Triglia in 1983 and prior to March 7, 1984, and all the while Emtal litigation was still pending and predicted to continue, and more asbestos litigation foreseen to come, members of BASF's management and  in-house General Counsel's office, including but not limited to Defendants Dornbusch, Hemstock, and

Halket, obtained BASF's (then Engelhard's) management's consent and authorization to implement and execute the  Fraudulent Asbestos Defense Scheme .

130.    On information and belief, Defendant Sloane and other Cahill Gordon lawyers obtained Defendant Cahill Gordon's management's authorization or acquiescence  to  implement and execute the Fraudulent Asbestos Defense Scheme

131.    To execute, manage and control the Fraudulent Asbestos Defense Scheme, which due to the nature of asbestos injury claims was foreseeably expected to continue on for decades, an association in fact arose in or about 1983 or 1984, the exact date being presently unknown to Plaintiffs, between BASF and Cahill Gordon.  As mentioned, this association in fact is identified and referred to as the "BASF-Cahill Gordon Asbestos Defense Enterprise" or "BCAD Enterprise" for short.

132.    BASF, with the assistance and representation of Cahill Gordon, settled the *Westfall* case.

133.    The terms of the *Westfall* case settlement included a confidentiality agreement that bound the *Westfall* case's plaintiff and his attorneys to not discuss the case or share or otherwise disclose the discovery and evidence obtained in the matter.  Upon information and belief, after the case was settled the inculpating evidence produced or developed in the *Westfall* case was either destroyed or secreted away by the BASF Perpetrators, including, by Hemstock, Dornbuch and  Halket.

134.    The *Westfall* case settlement and confidentiality agreement were parts of the BASF  Perpetrators and Lawyer Perpetrators' plan, scheme and agreement to mislead,

deceive and defraud asbestos injury claimants and their attorneys, and in some circumstances the courts directly, regarding the viability and merit of asbestos injury claims against BASF based upon Emtal talc products.

135.    The *Westfall* case settlement and obtaining the confidentiality agreement that bound the Westfall case's plaintiffs and counsel were overt acts in furtherance of the BASF Perpetrators and Lawyer Perpetrators' agreement and conspiracy to (a) mislead, deceive and defraud asbestos injury claimants, asbestos claimant attorneys and presiding asbestos courts, including the federal District Court handling the asbestos Multi-District Litigation, regarding the viability or the merit of asbestos injury claims against BASF based upon Emtal talc products; and (b) deny and deprive asbestos plaintiffs of the evidence necessary to prosecute their claims and thereby their rights to trials by jury.

**E.      The Gathering and Spoliation of Inculpatory Evidence after the Settlement of the *Westfall* Case.**

136.    After the *Westfall* case was settled, and while other Emtal asbestos litigation was pending and/or additional asbestos suits were foreseeable and likely to come, a memorandum dated March 7, 1984, signed by Defendant Hemstock entitled "DOCUMENT RETRIEVAL – DISCONTINUED OPERATIONS" ("**Document Retrieval Memorandum**") was sent to employees of Engelhard.  A copy of the Document Retrieval Memorandum is appended as Exhibit 3 and incorporated herein by reference.

137.    The Document Retrieval Memorandum directed all Engelhard minerals division employees to search for, retrieve, and gather  "all notebooks, duplicate copies of notebooks, technical service requests and responses, memoranda and reports" relating to

operations of Engelhard Minerals Ltd. and Emtal, among other BASF predecessor companies.

138.    BASF's employees were directed by the Document Retrieval Memorandum and the BASF Perpetrators to place the documents they gathered in response to the memorandum in file boxes for discard, and to make the boxes available for pick-up on March 16, 1984.

139.    All documentary evidence relating to Engelhard's asbestos-containing talc, was immediately  thereafter gathered up, collected by the BASF Perpetrators or their agents, and  was either destroyed or secreted away by the BASF Perpetrators, all with the knowledge, approval and agreement of the Lawyer Perpetrators.

140.    The evidence gathered as a result of the Document Retrieval Memorandum is believed to include, among other things, Emtal talc sales and inventory records, laboratory notebooks, which would include data and test or assay results on Emtal talc products and talc ore from the Johnson Mine, samples, photo micrographs, original depositions, deposition exhibits and test and assay result documents on tests or assays performed by third parties, such as Royal Globe Insurance, Johns Manville and Georgia Institute of Technology ("Georgia Tech").

141.    The collection of the documents in March, 1984 was not for legitimate record retention purposes and any claim that the gathering up of the documents on such basis is and was purely pretextual and performed in bad faith by BASF, Dornbusch, Hemstock and Halket. The collection of documents and other evidence relating to asbestos in Engelhard's talc ore and talc products took place at a time and under

circumstances that both the BASF Perpetrators and the Lawyer Perpetrators knew, or anticipated and foresaw, that BASF was engaged in, threatened with or would be the subject of multiple asbestos injury claims in which it was, or it would be contended, that its talc ore and Emtal talc products contained asbestos fibers causing the claimant harm or putting it a financial responsibility for answering the claims of asbestos claimants. Because of this knowledge, BASF had a duty, of which the BASF Perpetrators and Lawyer Perpetrators were well aware, to preserve evidence and documents relevant to such asbestos claims that were in BASF's possession, custody or control.  The Lawyer Perpetrators as BASF's national counsel in asbestos matters, including the *Westfall* case, had a duty to advise and assist BASF in fulfilling, and not in any way incite, aid, abet or assist BASF in violating that duty.

142.    BASF, the BASF Perpetrators and the Lawyer Perpetrators breached their respective duties regarding the preservation of evidence and documents by not preserving and/or by otherwise spoliating same and/or by gathering such evidence for purposes of denying access to that evidence to those who were then asserting, or could in the future assert claims against BASF for injuries caused by asbestos in its talc and talc products.

143.    Despite being asked in the *Paduano* suit for an inventory of the documents collected pursuant to the Document Retrieval Memorandum and for a clear, unequivocal statement as to the fate and, if applicable, current location of the Engelhard talc and asbestos documents, BASF has to date neither provided an inventory nor stated the fate or current whereabouts of all of the documents collected in 1984.

63

144.    The collection and destruction or secreting away of Engelhard's documents in March 1984 were parts of the BASF Perpetrators  and Lawyer Perpetrators' plan, scheme, collusion  and agreement to mislead, deceive and defraud asbestos claimants and their attorneys regarding the viability or merit of asbestos injury claims against BASF based upon Emtal talc products.

145.    The collection and destruction or secreting away of Engelhard's documents in 1984, and thereafter as well, were overt acts in furtherance of the BASF Perpetrators and Lawyer Perpetrators' agreement and conspiracy to (a) mislead, deceive and defraud asbestos claimants and asbestos claimant attorneys regarding the viability or merit of asbestos injury claims against BASF based upon Emtal talc products; and (b) fraudulently conceal and spoliate material evidence from the plaintiff's, including, but not limited to, evidence showing the existence of asbestos in Emtal talc such as was produced during the Westfall case's discovery.

**F.    BCAD Enterprise's Twenty-Five Years Long Pattern and Practice of Misleading and Deceiving Asbestos Injury Claimants, Asbestos Claimants' Counsel and Asbestos Courts.**

146.    After the collection and subsequent destruction or secreting away of BASF's asbestos documents and other evidence was completed in or about March 1984, the BASF Perpetrators  and Lawyer Perpetrators acting directly or through their co-conspirators, began executing the second related element of the fraudulent plan and scheme to end and ward off asbestos injury claims and lawsuits against BASF,  namely: whenever an asbestos injury claim or lawsuit was filed or came to BASF's attention, the asbestos injury claimant, their lawyer(s) and, when and where applicable, the court  in

which such claim was pending, were systematically and uniformly told (often in identical language authored by Cahill Gordon) that Emtal talc ore and products did not contain asbestos and/or there was not any evidence that it did.  As a result of the execution of the Fraudulent Asbestos Defense Scheme, Defendants were able to obtain either the dismissal or termination of claims voluntarily or, if required, involuntarily by order or judgment, or, when circumstances warranted, pay a small token settlement amount in exchange for a full release of claims or equivalent agreement.

147.    To facilitate and enable the Fraudulent Asbestos Defense Scheme to successfully work over the many years it would necessarily continue, due to the widespread use of the Emtal talc products in the United States and the nature of asbestos disease injuries, including its long latency period, the BASF Perpetrators and Lawyer Perpetrators formed and utilized the BCAD Enterprise, an association in fact which they managed and controlled, to conduct not only BASF's legitimate asbestos defense activities, including among other things the retaining, indoctrination, instruction and direction of local defense law firms involved or assisting in implementing BASF's asbestos defense, but as well the illegal and illegitimate Fraudulent Asbestos Defense Scheme.

148.    The BCAD Enterprise existed from 1983 or 1984, the exact date being presently unknown to Plaintiffs, to at least, 2009.

149.    The BCAD Enterprise was organized to conduct and execute the Fraudulent Asbestos Defense Scheme. The parties organizing it, including Dornbusch,

Hemstock, Halket and Sloane, intended it would continue for the many years to come that asbestos claims would be filed, which in fact it did.

150.    The BASF Perpetrators and Lawyer Perpetrators, as well as others associated with the BCAD Enterprise, had specialized roles and functions in conducting and managing the operation of BCAD Enterprise and in executing the Fraudulent Asbestos Defense Scheme.

151.    Defendant BASF's and the BASF Perpetrators' particular roles, functions and activities in the BCAD Enterprise it, acting as aforesaid performed, included:

a.    Managing and handling asbestos injury claims against BASF in general, including performing the tasks, functions and duties as required or needed in overseeing the administration of the claims or lawsuits;

b.    Making insurance coverage claims;

c.    Retaining and compensating counsel;

d.    Answering discovery or other information requests and verifying the truth of those responses and supplying BASF personnel for discovery as required;

e.    Funding the BCAD Enterprise's asbestos defense and claim resolution activities, including compensating national and local counsel;

f.    Collecting and spoliating evidence that its talc and other products contained asbestos, as described above;

g.   Suborning or otherwise procuring false unsworn and sworn representations from its employees, officers consultants and experts as needed, including obtaining or  assisting in obtaining incorrect, misleading, improperly biased or false affidavits and discovery response verifications by BASF employees, BASF officers, and/or BASF consultants and experts which they knew were to be provided to asbestos claimants, asbestos claimants' counsel and in some cases presiding asbestos courts and other tribunals with the intention that they would be relied upon;

h.   Authorizing, permitting, and aiding and abetting the Lawyer Perpetrators and other asbestos defense lawyers representing  BASF in asbestos defense matters to make false, misleading and incorrect representations and/or material omissions to asbestos claimants, asbestos claimants' counsel, presiding asbestos courts and other tribunals; and

i.   Concealing and covering-up the fraudulent, tortious and/or illegal aspects of the BCAD Enterprises' conduct and operations.

152.   The Lawyer Perpetrators' particular roles, functions and activities it, acting as aforesaid, performed included:

a.   Representing BASF and its predecessors in asbestos claims directly or indirectly through local counsel as necessary;

b.   Collecting and spoliating and/or directing the collection and spoliation of evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos, as described above;

67

c.   Addressing or responding to asbestos insurance matters as required or requested as national counsel;

d.   Retaining, instructing, guiding and managing local defense counsel handling asbestos injury claims lawsuits against BASF. In particular,  Cahill Gordon handled providing the documents and evidence upon which BASF's fraudulent defense was based to local counsel so that they would, in turn, disseminate BASF's fraudulent and unwavering public "no asbestos in Emtal talc" position;

e.   Preparing template and stock pleading, discovery and motions documents for use by local counsel in asbestos injury claim lawsuits that contained information Cahill Gordon knew to be false or misleading regarding the presence of asbestos fiber in BASF's talc ore, Emtal talc and Emtal products and/or the existence of evidence tending to prove the existence of asbestos fiber BASF's talc ore, Emtal talc and Emtal products;

f.   Falsely and incorrectly stating and representing to asbestos claimants, asbestos claimants' counsel and presiding asbestos courts and other tribunals in correspondence, responses to discovery and/or pleadings or motion papers that BASF's talc ore, Emtal talc and Emtal products did not contain asbestos and/or that there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos;

g.   Instructing and directing BASF's local asbestos counsel to, knowingly or unknowingly, falsely state and represent to asbestos claimants, asbestos claimants' counsel and presiding asbestos courts and other tribunals, that BASF's talc ore, Emtal

talc and Emtal products did not contain asbestos and/or that there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos;

    h.  Suborning or otherwise procuring false unsworn and sworn representations, including false affidavits, false and incorrect expert reports  and discovery response verifications by BASF employees, BASF officers, and/or BASF consultants and experts which they knew were to be provided to asbestos claimants, asbestos claimants' counsel and in some cases presiding asbestos courts and other tribunals with the intention that they would be relied upon;

    i.  Threatening asbestos injury claimants and/or their counsel with the possibility of sanctions or penalties if asbestos claims or suits were not discontinued by questioning counsels' good faith basis to continue the claims in the face of the BASF Perpetrators' and/or the Lawyer Perpetrators' false representations that BASF's talc ore, Emtal talc and Emtal products did not contain asbestos and/or that there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos;

    j.  Filing or directing local counsel to file motions or other court documents that they knew, or should have known, falsely and incorrectly stated that BASF's talc ore, Emtal talc and Emtal products did not contain asbestos and/or that there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos as a basis for judicial action in BASF's favor;

    k.  Drafting and obtaining agreements to and execution of the *Westfall* case confidentiality agreement;

l.    Drafting and obtaining agreement to and execution of stipulations or agreements of dismissal, releases and other claim resolution documents from asbestos injury claimants based upon false and incorrect representations that BASF's talc ore, Emtal talc and Emtal products did not contain asbestos and/or that there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos;

m.  Concealing and covering-up BASF's spoliation of evidence; and,

n.   Concealing and covering-up the fraudulent, tortious and/or illegal aspects of the BCAD Enterprise's conduct and operations.

**G.    Representative Misrepresentations and Material Omissions in Furtherance of the Fraudulent Asbestos Defense Scheme**

153.    After the *Westfall* case was settled and BASF's asbestos documents were collected and either destroyed or secreted away, whenever an asbestos claim was made against BASF between 1984 and 2009, the Lawyer Perpetrators would systematically and uniformly communicate with the claimant's counsel either directly through Cahill Gordon personnel or indirectly through BASF's local counsel and state or otherwise represent that: (a) BASF's talc ore, Emtal talc and Emtal products did not contain any asbestos and/or there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos; and, (b) there was in fact no good faith basis to allege or claim that BASF's talc ore, Emtal talc and Emtal products contained asbestos and thereby injured the claimant.

154.    To purportedly support and corroborate these false and misleading representations, the Lawyer Perpetrators, with BASF's knowledge, authorization and/or

assistance, would routinely supply, or would direct BASF's local counsel to supply, asbestos injury claimants' counsel handling cases against BASF with one or more documents which the Defendants knew were false and misleading when considered without the contrary evidence in Defendants' possession or which they had destroyed or otherwise spoliated:

a.   The May 8, 1989 affidavit by Mr. William H. Ashton ("**Ashton Affidavit**").  In this affidavit Mr. Ashton, a purported expert on asbestos in talc, avers that Emtal talc did not contain asbestos fibers based upon data and information he reviewed that was supplied by Cahill Gordon and/or BASF.  While Mr. Ashton cites to a few studies supporting his claimed conclusion, the data and studies he reviewed notably did not include any of the studies with positive asbestos findings that Defendant Hemstock and Mr. Triglia testified about during their 1983 *Westfall* case depositions even though his affidavit cites to, and included as an exhibit, excerpts of deposition testimony of another witness taken in that case which purportedly demonstrated that the talc ore and products did not contain asbestos. A copy of the Ashton Affidavit is appended as Exhibit 4 and incorporated herein by reference;

b.   A report purportedly prepared by Dr. F. D. Pooley ("**Pooley Report**"). Dr. Pooley, based on a purported analysis of two Johnson Mine talc samples that were allegedly collected in 1961, finds and concludes that the two Johnson Mine talc samples made available to him did not contain any fibrous mineral particles.  A copy of the Pooley Report is appended as Exhibit 5 and incorporated herein by reference;

c.   One or more affidavits by Mr. Charles D. Carter, a BASF employee who self-identifies himself in his affidavits as "Director of Joint Ventures and Resources of Engelhard Corporation" ("**Carter Affidavits**").  Similar in content, the Carter Affidavits over the years averred some or all of the following alleged facts: (i) that the Johnson Mine was acquired by Eastern Magnesia Talc Company in 1967; (ii) that Johnson Mine was closed in 1983 for economic reasons; (iii) that the Johnson Mine following its closure and non-use became filled with water making it impossible to obtain any samples of talc from the mine; (iv) that Engelhard did not possess any samples of the Johnson Mine talc; and (v) that "Engelhard does not currently possess any testing data other than the data provided…by way of the Ashton Affidavit and the report of Dr. Pooley."  Exemplifying these Carter Affidavits are Mr. Carter's September 20, 1988 Affidavit (appended as Exhibit 6), his June 19, 1989 Affidavit (appended as Exhibit 7) and his August 18, 1989 Affidavit (appended as Exhibit 8), all of which are incorporated herein by reference;

d.   Interrogatory answers verified by Mr. Carter or other BASF employees, including on occasion members of BASF's in-house counsel, in which BASF, under oath, represented Emtal talc did not contain any asbestos and/or provided selected references to tests or studies indicating Johnson Mine talc did not contain asbestos, such as the Pooley Report or other studies referenced in the Ashton Affidavit, but omits to mention or reference: (1) any of the studies which had positive findings for asbestos that were in BASF's possession or knowledge at the time the *Westfall* case discovery was conducted; or, (2) any of Defendant Hemstock's and Mr. Triglia's *Westfall* case deposition testimony stating that the asbestos was found in tests and

assays of Emtal talc.  Exemplifying these interrogatory responses are BASF's 2002

Reponses to Plaintiff's First Standard Set of Liability Interrogatories in  Plaintiff

Chrenick's New York asbestos injury claim law suit, *Chernick v. ABB*  (appended as

Exhibit 10), all of which are incorporated herein by reference. Additional illustrative

interrogatory responses are also referred to in the paragraphs below.

155.    While the full and entire extent and scope of Defendants' pattern and

practice of conduct and material omissions is not known to Plaintiffs due to the

clandestine nature of their wrongful actions, conduct and concealments, along with

BASF's refusal to provide complete details regarding same in the *Paduano* suit, the

existence, continuity, collusiveness, breadth and longstanding nature of Defendants'

pattern and practice of fraudulent and unlawful activity are indicated, illustrated and

exemplified by the incidents and events set forth in the following paragraphs.

   **a.   The 1988 and 1989 Misrepresentations and Material Omissions to
         Counsel for Tireworker Asbestos Injury Litigation Claimants
         Suing BASF in the United States Eastern District of Pennsylvania
         and Southeastern Pennsylvania State Courts.**

156.    On or about May 17, 1989, Cahill Gordon attorney, Defendant Dembrow,

sent via Federal Express a letter to a Philadelphia, Pennsylvania lawyer who was

representing at the time twenty-eight (28) tireworker plaintiffs in pending Pennsylvania

Federal and State Court asbestos injury lawsuits that had named Engelhard and Eastern

Magnesia as defendants in the suits. (These twenty-eight Pennsylvania tireworker

asbestos claimants are hereinafter referred as the "**Pennsylvania Tireworker**

**Claimants**.")  A true and correct copy of this letter uncovered during the *Paduano* suit's

spoliation discovery is appended as Exhibit 11 and incorporated herein by reference.  In

this letter, Cahill Gordon states that during an August 1988 face to face meeting at the Montgomery County, Pennsylvania Courthouse, between the Pennsylvania Tireworker Claimants' lawyer, Cahill Gordon attorneys, Messrs. Craig Newman and Eric S. Sarner ("**Sarner**"), and BASF's local counsel, BASF's attorneys then and there affirmatively represented to the Pennsylvania Tireworker Claimants' counsel that "the talc manufactured by Emtal [sic] did not contain any asbestos."  The copy of the letter, also establishes that blind copies of it were sent to, among others, Cahill Gordon attorneys, Defendant Sloane and Mr. Sarner.  Mr. Sarner's office at the time was located in Cahill Gordon's Washington, D.C. offices. Defendant Sloane's office was in New York City.

157.    According to Cahill Gordon's May 17, 1989 letter (Exhibit 11), between August 1988 and May 17, 1989, a number of in person meetings, telephone calls and letters by and between BASF's local counsel and the Pennsylvania Tireworker Claimants' counsel occurred during which BASF and its attorneys requested that the Pennsylvania Tireworker Claimants' asbestos injury claims be voluntarily ended against BASF.  During these communications BASF's counsel reiterated and repeated the misrepresentations and omissions of material fact regarding absence of any asbestos in Emtal talc and the non existence of any contrary evidence as scripted by the Lawyer Perpetrators.  One letter, according to the May 17, 1989 letter, tendered to the Pennsylvania Tireworker Claimants' lawyer a copy of the Carter Affidavits concerning the location of the Johnson Mine and its alleged closure for "economic reasons."

158.    The purpose and intent of Cahill Gordon's May 17, 1989 letter (Exhibit 11), was to further Cahill Gordon's efforts to convince the Pennsylvania Tireworker Claimants' lawyer to voluntarily dismiss BASF.  In furtherance of this goal, Cahill

Gordon's May 17, 1989 letter continued the misrepresentations and misleading omissions of material facts by offering the newly coined Ashton Affidavit.  In previewing the contents of the Ashton Affidavit for claimants' counsel, the Cahill Gordon May 17, 1989 letter twice called out to the claimants' counsel the claimed fact that various assays and tests on Johnson Mine talc referred to in the Ashton Affidavit established that no asbestos was present.

159.    On June 21, 1989, Defendant Dembrow sent via Federal Express yet another letter and enclosures to the Pennsylvania Tireworker Claimants' lawyer with blind copies sent to, *inter alia*, Defendant Sloane and Mr. Sarner.  In this letter, Cahill Gordon provided the Pennsylvania Tireworker Claimants' counsel with a copy of Dr. Pooley's purported exculpatory analysis of Johnson Mine talc along with another Carter Affidavit, this one dated June 19, 1989 (*See* Exhibit 7).  In this June 19, 1989 affidavit, Mr. Carter avers that the closed Johnson Mine was now filled with water so no samples could be obtained and, additionally, that Engelhard did not currently possess any samples of the talc produced by the Johnson Mine.  A copy of the June 21, 1989 letter is appended as Exhibit 12 and is incorporated herein by reference.

160.    Subsequently, on or about, July 19, 1989, the Pennsylvania Tireworker Claimants' lawyer sent a letter to Sarner at Cahill Gordon's Washington D.C office, with a copy to Defendant Dembrow at Cahill Gordon's New York office, both of which were sent by U.S. Mail.  Claimants' counsel in this letter questioned BASF's representations to him that Emtal talc did not contain any asbestos, based upon references to the Johnson Mine appearing in a report issued by the Mine Health and Safety Administration ("MHSA") that his law firm had obtained through a Freedom of Information Act request.

75

The MHSA report referred to in the letter indicated that samples of Johnson Mine's talc that MHSA had obtained and analyzed contained fibrous mineral contaminants.  The Pennsylvania Tireworker Claimants' lawyer's letter additionally informed Cahill Gordon that:

> [W]e had obtained definitive product identification evidence of the presence of [Engelhard/Eastern Magnesia's] talc at Firestone in Pottstown, PA, and [would] name [Engelhard/Eastern Magnesia] in all future Firestone cases. If, of course, we ultimately decide to let your client out of the B.F. Goodrich litigation, we will also dismiss them from the Firestone cases.

A copy of this letter is appended as Exhibit 13 and is incorporated herein by reference.

161.    On or about July 28, 1989, Cahill Gordon attorney Sarner telefaxed a letter on behalf of BASF replying to the Pennsylvania Tireworker Claimants' lawyer's July 17, 1989 letter.  Cahill Gordon's letter purportedly explained how and why the MHSA report was flawed, incorrect, and contrary to the evidence Cahill Gordon had previously provided the Claimants' lawyer by means of the Ashton Affidavit and Pooley Report. Cahill Gordon, in the July 28, 1989 letter, once again falsely represented to Claimants' counsel that BASF's talc did not contain asbestos, stating: "Thus no EmTal [sic] talc was found to contain asbestos fibers," and "[w]e again urge that on the basis of all of the affidavits supplied to you there is no good faith basis for keeping Engelhard and EmTal [sic] in these cases." Appended as Exhibit 14 is a copy of Cahill Gordon's July 28, 1989 letter, which is incorporated herein by reference.

162.    On or about August 21, 1989, Cahill Gordon's Sarner sent another letter via Federal Express to the Pennsylvania Tireworker Claimants' lawyer's Philadelphia

office.  In this letter, Cahill Gordon submitted, in lieu of answering interrogatories, the original of another Carter Affidavit, which was dated August 18, 1989.  A copy of Cahill Gordon's letter is appended as Exhibit 15 and incorporated herein by reference.  (The referenced Carter affidavit is appended as Exhibit 8 and incorporated herein by reference.)  In the referenced Carter Affidavit, Mr. Carter under oath states: "In addition, Engelhard does not currently possess any testing data other than the data provided to you by way of the Ashton Affidavit and the report of Dr. Pooley."  The letter also establishes that copies of it were sent to, *inter alia*, Defendants Sloane and Dembrow at their New York offices.

163.    At no time during or in any of Cahill Gordon's communications or correspondence to the Pennsylvania Tireworker Claimants' counsel, including the affidavits or reports Cahill Gordon provided to him in support of the representation that BASF's talc did not contain asbestos, was there ever any mention or reference by the Lawyer Perpetrators, BASF's local defense counsel, or the BASF Perpetrators to the fact that contrary and inculpating evidence developed in the *Westfall* case's discovery existed. Neither was there any mention or reference whatsoever to BASF's gathering and spoliation of all contrary and inculpatory evidence in 1984.  These material misrepresentations and omissions occurred and were committed despite the fact the Lawyer Perpetrators were aware of these facts and knew and appreciated the relevance of such material information to asbestos injury claimants.

164.    Following the exchange of correspondence and documents described above, and in obvious and reasonable reliance on the communications, correspondence, corroborating affidavits and corroborating reports set forth above, some time in or about

September of 1989, the Pennsylvania Tireworker Claimants voluntarily discontinued or dismissed their asbestos injury claims as to the Engelhard Defendants, to their detriment and loss.

165.    As soon as the Pennsylvania Tireworker Claimants' lawyer agreed to have his clients voluntarily dismiss their State and Federal lawsuits against Engelhard, the Lawyer Perpetrators began executing a campaign to extend and parlay this successful execution of the Fraudulent Asbestos Defense Scheme to other asbestos injury litigations around the country.  Even before the dismissals and discontinuances of the Pennsylvania Tireworker Claimants' cases were filed in the presiding courts, starting in late August 1989, Cahill Gordon put in motion what would become, over the years, a systematic pattern and practice to obtain voluntary dismissals or cheap token settlements by writing to other asbestos claimants' counsel directly through its own lawyers or indirectly through local BASF defense counsel it controlled and: (a) providing the asbestos claimants' counsel with copies of the false and misleading Ashton Affidavit, Pooley report and Carter Affidavits; (b) informing the targeted asbestos injury claimant lawyer that the Pennsylvania Tireworker Claimants' counsel (and later other asbestos claimant lawyers as well) had voluntarily dismissed the Engelhard Defendants based upon Engelhard's representations and purported corroborating expert reports stating that there was not any asbestos in Emtal talc (*i.e.*- Ashton Affidavit; and Pooley Report); and (c) requesting that the asbestos injury claimants' counsel likewise voluntarily dismiss their asbestos suits against BASF in order to avoid putting BASF through unnecessary litigation expenses without a good faith basis to sue, thereby intimating that the asbestos injury claimants and their counsel might risk  being assessed sanctions for pursuing a

claim not brought in good faith.  Exemplifying Cahill Gordon's efforts in this vein are two similar October 2, 1989 letters sent by different BASF local counsel; one mailed to a Cleveland, Ohio tireworker asbestos claimants' lawyer (appended as Exhibit 16) and another mailed to a Kansas City, Missouri tireworker claimants' lawyer (appended as Exhibit 17). Exhibits 16 and 17 are incorporated herein by reference.

> **b.    November 19, 1990 Misrepresentations in BASF's Answers to Plaintiffs' Standard Interrogatory Answers in *In Re: All "Asbestos" Cases Presently Pending Before and All Future Cases Assigned to the Honorable James E. Mies, Circuit Court Judge*, (Circuit Court, Wayne County, Michigan).**

166.    BASF's predecessor was a defendant in a number of asbestos injury suits filed and pending in the Wayne County, Michigan, Circuit Court in the late 1980s and/or early 1990s.  In response to standard interrogatories directed to BASF by the asbestos claimants in the Wayne County State Court actions ("**Wayne County Interrogatories**"), which sought disclosure of information about Engelhard's talc products, verified answers on behalf of BASF's predecessor Pita Realty Limited (identified in the Answers to Interrogatories as being successor to Eastern Magnesia) were served on the asbestos claimants' counsel by means of U.S. Mail on or about November 19, 1990.  A copy of the Answers to the Wayne County Interrogatories is appended as Exhibit 18 and incorporated herein by reference.

167.    Cahill Gordon lawyers, including Sarner and Defendant Sloane, whose names appear on the Answers to the Wayne County Interrogatories as co-counsel to Pita Reality Limited, prepared and/or reviewed the interrogatory answers for signing and/or verification by BASF.  The Answers were verified under oath on behalf of BASF by Mr. Carter.

168.    In BASF's "Preliminary Statement" in its Answers to the Wayne County Interrogatories, BASF, through Cahill Gordon and BASF's local counsel, stated in pertinent part:

> … Pita, formerly known as Eastern Magnesia Talc Company, was engaged in the mining and milling of talc from a single mine located in Johnson, Vermont from 1967 to 1983. Pita previously has provided to plaintiffs' counsel an affidavit and supporting materials demonstrating that the talc from this mine did not contain asbestos….
>
> ***
>
> Pita hereby incorporates by reference this preliminary statement into the response to each interrogatory.

169.    In response to Interrogatory No. 34 of the Wayne County Interrogatories, which inquired into whether any person ever served as a consultant to BASF's Engelhard companies in any manner regarding the potential medical, toxicologic, or industrial hygiene aspects of asbestos or any asbestos-containing product, BASF responded:

> Not Applicable. In addition, Defendant has previously supplied documents to plaintiffs' counsel that indicate that its talc products did not contain asbestos, including an affidavit prepared by William Ashton. These documents are in the possession of plaintiffs' counsel.

170.    In response to Interrogatory No. 108 of the Wayne County Interrogatories, which inquired into whether BASF's Engelhard companies pursuant to its record destruction or retention policy, or otherwise, destroyed any documents, records or writings pertaining to health hazards of asbestos, Cahill Gordon's answer on behalf of BASF responded: "Pita does not believe that it destroyed such records."

171.    At no time in any of BASF answers to the Wayne County Interrogatories that Cahill Gordon prepared and/or reviewed for signing and verification by BASF, were the Wayne County asbestos claimants or their counsel ever fairly (or otherwise) informed by the Lawyer Perpetrators, or the BASF Perpetrators, that inculpating facts and evidence existed which contradicted that which had been represented in the verified interrogatory answers or in the Ashton Affidavit that was referred to in the interrogatory answers, such as that which had been developed and obtained by the plaintiff in the *Westfall* case prior to Defendants implementing their Fraudulent Asbestos Defense Scheme.  There was no mention or reference in the Answers to the Wayne County Interrogatories to the BASF Perpetrators' gathering and spoliation of all contrary and inculpating asbestos claim evidence in 1984.  These material misrepresentations and omissions occurred and were committed despite the fact the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, despite the fact they knew and appreciated the relevance of the subject information to asbestos injury claimants, and despite the fact they were under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation.

172.    Cahill Gordon and BASF's fraudulent and deceitful efforts aimed at Michigan asbestos injury claimants were successful.  According to an April 23, 1992 Cahill Gordon letter addressed to other asbestos injury claimants' counsel in Ohio, the Michigan State Court Tireworkers' asbestos injury cases against BASF's predecessors were voluntarily dismissed after "the plaintiffs' counsel had been … provided with the Ashton materials…." See Cahill Gordon letter of April 23, 1992, appended as Exhibit 19 and discussion of this letter *infra*. A copy of specific Michigan dismissal orders were not produced in the *Paduano* suit materials.

**c.  November 1990 and October 1991 Misrepresentations in the Answers to Plaintiffs' Master Interrogatories in *In Re: Northern Ohio Tireworker Asbestos Litigation* (C.P. Summit Cty., Ohio).**

173.    In or about the late 1980s and/or early 1990's, BASF's predecessors, Engelhard Corporation, Eastern Magnesia and Pita Realty Limited, were parties to a number of tireworker asbestos injury suits that were filed and pending in the Court of Common Pleas for Summit County, Ohio, and assigned to Judge William H. Victor.  In connection with these Northern Ohio Tireworker cases, BASF's predecessor responded under oath to Plaintiffs' Questionnaire and First Request for Production of Documents ("**Tireworkers' Questionnaire**") and Plaintiffs' Master Discovery Requests ("**Summit County Master Interrogatories**").

174.    The Tireworkers' Questionnaire sought disclosure of information from BASF's predecessors about Engelhard's talc products used at a number of rubber product manufacturing companies.  On or about November 21, 1990, BASF's counsel served verified responses to this discovery upon Plaintiffs' counsel by regular U.S. Mail.  A copy of BASF's verified Tireworkers' Questionnaire answers is appended as Exhibit 20 and incorporated herein by reference.

175.    BASF's answers to the Tireworkers' Questionnaire identify Cahill Gordon lawyers Defendant Sloane, Mr. Sarner and Michael D. Sullivan, Esq. as being "of counsel" to BASF's predecessors in the Summit County, Ohio, cases.

176.    Cahill Gordon, as national asbestos counsel to BASF, prepared and/or reviewed BASF's predecessors' answers to the Tireworkers' Questionnaire for signing and/or verification by BASF's predecessors.

177.    The answers to the Tireworkers' Questionnaire were verified by Mr. Carter on behalf of BASF on November 15, 1990.  The answers state that Mr. Carter "participated in the gathering of the records for this litigation, which have been turned over to counsel."  *See* Exhibit 20, Interrogatory No. 20(b).

178.    BASF's predecessors' Preliminary Statement to the Tireworkers' Questionnaire reads in pertinent part:

> …For purposes of simplifying the responses to this Questionnaire, the name Pita when used herein shall refer collectively to Pita, EmTal [Eastern Magnesia], and, Engelhard.

> ….Pita, formerly known as Eastern Magnesia Talc Company, was engaged in the mining and milling of talc from a single mine located in Johnson, Vermont from 1967 to 1983. Pita previously has provided to plaintiffs' counsel an affidavit and supporting materials demonstrating that the talc from this mine did not contain asbestos….

> ***

> Pita hereby incorporates by reference this preliminary statement into the response to each question.

179.    In its answer to Question No. 2 of the Tireworkers' Questionnaire, which generally sought information about whether BASF's predecessors had been involved in the mining, milling, manufacture, processing, sale, supplying or distribution of talc, soapstone, or asbestos-containing products at any time, BASF predecessors stated under oath:

> With respect to talc only, yes. Pita did not mine, mill, manufacture, process, market, distribute, or sell asbestos or asbestos-containing products.  Pita was engaged in the mining and milling of talc from a single mine located in Johnson, Vermont from 1967 to 1983.  Pita previously has provided to plaintiffs' counsel an affidavit and supporting materials demonstrating that the talc from this mine did not contain asbestos.

180.    In its answer to Question No. 2(e) of the Tireworkers' Questionnaire,
which specifically asked whether BASF's predecessors' products contained crocidolite,
amosite, tremolite or chrysotile asbestos, or any combination of them, and to specify the
qualitative percentage of the particular form of asbestos fiber to the whole amount of
asbestos in the product, BASF's predecessors stated under oath:

> (e).   No. Plaintiffs' counsel has previously been provided with evidence,
> including an affidavit, which proves that Emtal talc did not contain asbestos.

181.    In answer to Question No. 4 of the Tireworkers' Questionnaire, which
specifically asked how BASF's predecessors' talc, soapstone, or asbestos-containing
products were packaged and shipped, BASF predecessors stated under oath:

> Pita did not mine, mill, manufacture, process, market, distribute, or sell
> asbestos or asbestos-containing products….

182.    At no time in any of BASF's answers to the Tireworkers' Questionnaire
which Cahill Gordon prepared and/or reviewed for signing and verification by BASF,
were the Northern Ohio Tireworker claimants or their counsel ever fairly (or otherwise)
informed by the Lawyer Perpetrators, or by the BASF Perpetrators, that inculpatory facts
and evidence existed that contradicted what was represented on behalf of BASF's
predecessors in the answers to the Tireworkers' Questionnaire or in the affidavit referred
to in the Tireworkers' Questionnaire, such as that which was developed and obtained by
the plaintiff in the *Westfall* case.  There was no mention or reference in the Tireworkers'
Questionnaire answers to the BASF Perpetrators' gathering and spoliation of all contrary

and inculpating asbestos claim evidence in 1984.  These material misrepresentations and omissions occurred and were committed despite the fact the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, knew and appreciated the relevance of the subject information to asbestos claimants, and were under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation.

183.    The Summit County Master Interrogatories sought disclosure of information from BASF's predecessors about Engelhard's talc products.  In or about October 1991, verified answers to the Summit County Master Interrogatories on behalf of BASF's predecessors were served on the Northern Ohio Tireworker claimants' counsel. A copy of BASF's answers to the Summit County Master Interrogatories is appended as Exhibit 21 and incorporated herein by reference.  The date alleged is based upon the date of the document's verification by Mr. Carter.

184.    Lawyers at Cahill Gordon, as counsel to BASF's predecessors at the time, prepared and/or reviewed the answers to the Summit County Master Interrogatories for signing and/or verification by BASF.  The answers were verified for BASF under oath by BASF's Mr. Carter based upon, according to his verification, information gathered by others.

185.    BASF's predecessors' "Preliminary Statement" to its answers to the Summit County Master Interrogatories reads in pertinent part:

> …Pita, formerly known as Eastern Magnesia Talc Company, was engaged in the mining and milling of talc from a single mine located in Johnson, Vermont from 1967 to 1983. Pita previously has provided to plaintiffs' counsel an affidavit and supporting materials demonstrating that the talc from this mine did not contain asbestos….

*\*\**

Pita hereby incorporates by reference this preliminary statement into the response to each interrogatory.

186.    In answer to Interrogatory No. 30 of the Summit County Master Interrogatories, which asked about testing, studies or surveys on BASF's products, BASF's predecessors' response lists a number of studies purporting to corroborate BASF's general denial that its talc products contained any asbestos.  However, not one of the contrary and studies on Engelhard's talc showing it contained asbestos or any of the contrary and inculpating  statements about the existence of asbestos in Engelhard's talc that were made or discussed during the Hemstock and Triglia *Westfall* case depositions were listed or otherwise disclosed to the Northern Ohio Tireworker claimants' counsel. There was no qualification or disclosure provided in the answers to the Summit County Master Interrogatories that alerted or informed Northern Ohio Tireworker claimants' counsel of the fact that the BASF Perpetrators had collected all documents relating to Emtal talc in 1984 following the settlement of the *Westfall* case.  There also was not any disclosure on what was the fate or the whereabouts of the talc documents and evidence the BASF Perpetrators had collected in 1984 following the *Westfall* case settlement. These material misrepresentations and omissions occurred and were committed despite the fact the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, knew and appreciated the relevance of the subject information to asbestos claimants, and were under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation.

187.     In response to Interrogatory No. 66 of the Summit County Master

Interrogatories, which inquired into whether BASF was contending the Northern Ohio

Tireworker claimants' injuries were not causally related to asbestos exposure, Cahill

Gordon's prepared responses on behalf of BASF stated:

> Pita does not currently make any contentions on the subject, but asserts that
> if plaintiffs have injuries related to asbestos exposure, Pita cannot be liable
> therefore since its talc did not contain asbestos.

Here, once again, not one of the contrary and inculpating talc studies showing the presence

of asbestos in Emtal talc or statements made or discussed during Hemstock's and Triglia's

*Westfall* case depositions was disclosed to the Northern Ohio Tireworker claimants'

counsel.  There were also not any disclosures about BASF's collection of all documents

relating to Emtal talc in 1984 following the *Westfall* case settlement, or the existence or

fate of the documents and evidence.

188.     The misrepresentations and material omissions embodied in the Answers

to the Summit County Master Interrogatories were repeated and renewed years later on or

about August 31, 1994, when Cahill Gordon lawyers, Defendant Sloane and his partner,

Allen S. Joslyn ("Joslyn"), adopted them in their entirety as the Response of Eastern

Magnesia Talc Company to Master Interrogatories in the Summit County case captioned

*William F. Clark, et al. v. Owens Corning Fiberglass Corp.*, *et al.*, Case No. ACV-94-04-

1107, filed by the Law firm of Bevan & Economus.  A copy of Cahill Gordon's filing on

behalf of BASF's predecessor is appended as Exhibit 22 and incorporated herein by

reference.

**d.  April 2002 and December 22, 2010 Misrepresentations and Material Omissions in Engelhard's Correspondence to Asbestos Claimants' Counsel and in Responses to Plaintiffs' First Standard Set of Liability Interrogatories in the New York City Asbestos Litigation Matter of *Steven Chernick et. al. v. ABB Lumus Global, Inc*.**

189.    On or about October 29, 2001, BASF's predecessor Engelhard Minerals and Chemical Corporation was named and joined as a defendant in Plaintiff Chernick's asbestos injury suit filed in the Supreme Court of New York captioned *Steven Chernick et al. v. ABB Lumus Global, Inc*., Index No. 01-010116741 ("***Chernick* case**").  The *Chernick* case contended that Engelhard's talc was used as a component ingredient of "Bondo" auto body repair filler, which product caused Mr. Chernick's case asbestos injury. The *Chernick* case was part of the New York Supreme Court's "New York City Asbestos Litigation Program."

190.    On or about April 15, 2002, Gideon Mark, Esq., a local New York City defense attorney who, had been retained to defend BASF's predecessor, Engelhard, in the *Chernick* case under Cahill Gordon's control, sent the *Chernick* plaintiffs' New York City counsel, Early, Lucarelli, Sweeney & Strauss, a letter and several enclosures, including a copy of the Ashton Affidavit and the Pooley Report.  The purpose of the letter was to convince the *Chernick's* counsel and the *Chernick* plaintiffs to voluntarily dismiss Engelhard from the case on the claimed, but false, basis that Engelhard's talc did not contain asbestos.  A copy of the letter is appended as Exhibit 23 and incorporated herein by reference.  The letter was sent via Federal Express, and subsequently, on May 10, 2002, a copy was also telefaxed to another recipient.

191.    The April 15, 2002 letter's representations about the nature and content of Engelhard's talc were supported by Mr. Mark's references to the Ashton Affidavit, the Pooley Report, and a third study, all provided to Mr. Marks by BASF and Cahill Gordon, all of which purported to establish, in the letter's own words, "that the talc Engelhard Corporation … or any of its present or former subsidiaries allegedly sold to Bondo Corporation was asbestos free."  After summarizing the purported exculpatory findings of the three studies provided, Mr. Mark's letter then concluded:

> Given the foregoing, there appears to be no basis for your clients to assert claims against Engelhard. We hereby request that you dismiss Engelhard from this action.…

192.    Cahill Gordon, as national asbestos counsel to BASF and its predecessors, assisted in the preparation and/or review of the April 15, 2002 letter prior to it being sent to the *Chernick* plaintiffs' counsel. Acting with intention to deceive, Cahill Gordon and BASF's predecessor, Engelhard, authorized and/or consented to Mr. Mark's sending the letter which contained false and misleading material misrepresentations and omissions. As attorneys representing BASF in a court matter, Cahill Gordon and its lawyers, as well and other lawyers representing BASF at the time, including BASF's in-house lawyers, were under a strict, longstanding statutory duty under New York law, N.Y. Judiciary Law §487, to not commit any deceit or collusion, or consent to any deceit or conclusion, with the intent to deceive the court or any party.

193.    On or about April 16, 2002, BASF's predecessor, Engelhard, responded under oath to "Plaintiffs' First Standard Set of Liability Interrogatories" served within the *Chernick* case ("***Chernick* Interrogatories**").  The Responses to the *Chernick*

Interrogatories are attached as (Exhibit 10).  According to the Affirmation of Service appended to the Responses to the *Chernick* Interrogatories, this written discovery was served upon the parties' counsel to the case by U.S. mail.

194.    Engelhard's answers to the *Chernick* Interrogatories were verified on its behalf by Mr. Mark, on April 16, 2002.  His verification states:

> Working in conjunction with Engelhard, I have prepared and reviewed the foregoing Responses to First Standard Set of liability Interrogatories. I know the contents thereof to be true, based on factual analyses conducted with and on behalf of Engelhard.

195.    The response to Interrogatory No. 1 of the *Chernick* Interrogatories states that Michael J. Hassett, Esq., who is identified as Associate General Counsel for Engelhard Corporation, coordinated Engelhard's Responses to the *Chernick* Interrogatories.

196.    Cahill Gordon, as national asbestos counsel to BASF and its predecessors, assisted in the preparation and/or reviewed the Responses to the *Chernick* Interrogatories prior to BASF's local counsel's verification and service of them upon counsel in the *Chernick* case.

197.    The Responses to the *Chernick* Interrogatories repeatedly, and falsely with intention to deceive,  stated and represented that Engelhard had not mined, milled, manufactured, processed, marketed, distributed, or sold asbestos or asbestos containing products. Exemplifying such representations is the response to Interrogatory No. 52, which reads:

Interrogatory No. 52:

Does your company recognize that it was foreseeable that people working in the same area where your asbestos products were being used or installed would inhale and/or ingest asbestos fibers emitted from your product?

Response to Interrogatory No. 52:

Engelhard recognizes that, in general, it might be foreseeable that people working in the same area where asbestos products are being used or installed might inhale and/or ingest asbestos fibers. However, Engelhard has not mined, milled, manufactured, processed, marketed, distributed, or sold asbestos or asbestos containing products.

198.    The Responses to the *Chernick* Interrogatories referred to the same three purported exculpatory studies on Engelhard's talc that were provided to the *Chernick* claimants' counsel in the April 15, 2002 letter in support of Engelhard's representations that "the talc supplied to Bondo by Engelhard's former subsidiary, EMTal [sic] was asbestos-free." *See* Exhibit 10, Interrogatories Nos. 3 and 86.

199.    Interrogatory No. 63 of the *Chernick* Interrogatories directly asked BASF's predecessor, Engelhard, about prior depositions of its employees.  Engelhard's answer under oath to this question reads:

Interrogatory No. 63:

If any of your employees or officers have testified at trial or by deposition or before any Congressional Committee or administrative agency concerning asbestos exposure, pulmonary or asbestos-related diseases or Industrial hygiene relating to asbestos use, state:

a. The name, address and title of each person who testified;

b. The date, location and forum of such testimony;

c. Whether the defendant has a copy of such testimony;

d. Whether the defendant will voluntarily produce a copy of such testimony.

Response to Interrogatory No. 63:

No.


200.     Interrogatory No. 81 of the *Chernick* Interrogatories directly asked

BASF's predecessor, Engelhard, about the destruction of pertinent documents.

Engelhard's answer under oath to this question reads:

Interrogatory No. 81:

Have you destroyed any documents, records or writings pertaining to:

    a. Health hazards of asbestos;

    b. Workmen's Compensation claims arising out of asbestos, lung cancer, mesothelioma, cor pulmonale, pneumoconiosis, or pulmonary fibrosis;

    c. Placing warning labels on your products;

    d. Hazardous conditions in your plants or factories;

    e. Funding of studies about health hazards of asbestos;

    f. Lawsuits arising out of Injuries alleged to have been caused by asbestos.

If so, list every such document destroyed by author, date and subject.

Response to Interrogatory No. 81:

No, so far as Engelhard is able to ascertain - with the possible exception of any documents that might have been routinely destroyed as part of Engelhard's record retention policy.


201.     Mr. Mark's April 15, 2002 letter requesting voluntary dismissal of the

*Chernick* case and Engelhard's subsequent and related April 16, 2002 answers to the

*Chernick* Interrogatories were false, fraudulent and misleading to one reading and

reasonably relying on them regarding BASF's predecessor's liability, such as Plaintiff

Chernick's counsel, Early, Lucarelli, Sweeney & Strauss. At no time did these documents

92

timely and fairly reveal or disclose to the *Chernick* plaintiffs' counsel, and through same, Plaintiff Chernock, that evidence existed that was contrary to that which was represented in the letter, in the Responses to Interrogatories and/or contained or referred to in the supplied Ashton Affidavit, Poole Report and the other report mentioned in the documents, such as the inculpatory documents and deposition testimony that had been obtained by the plaintiff in the *Westfall* case. Without disclosure of such information, the affidavit and reports were materially misleading. There was also not any mention or reference in any of these documents or answers to interrogatories to the fact of and the circumstances surrounding BASF's gathering and spoliation of all contrary and inculpatory asbestos claim evidence relating to Engelhard's talc in 1984 following the settlement of the *Westfall* case.  These misrepresentations and material omissions occurred and were committed despite the fact that the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, knew and appreciated the relevance of the subject information to asbestos claimants, and were under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation, as well the N.Y. Judiciary Law §487 duty imposed upon Cahill  Gordon and other lawyers representing BASF and its predecessors in connection with the *Chernick* case, including BASF's in-house  counsel.

202.    Subsequently, BASF's predecessor moved for summary judgment in the New York Supreme Court asking the Court to dismiss it from the Chernick case.  Relying on the forgoing letter, attachments and Responses to Interrogatories, Chernick's counsel concluded, as it was the BASF and Lawyer Perpetrators intent he do, that there was no evidence or basis to continue the claim against Englehard and oppose the Motion for Summary Judgment.  Plaintiff Chernick was so informed of her attorney's conclusion that

Engelhard's talc did not contain asbestos and relying on that information consented to her attorney voluntarily executing and providing to BASF's predecessors' counsel for filing a consent "No Opposition Summary Judgment Motion Order," by which he, on behalf of her and her husband, agreed to the presiding court granting a summary judgment dismissal of the Chernick case's claims as to the Engelhard Defendants.  Had Plaintiff Chernick's counsel known about the spoliation of evidence and/or the truth about the presence of asbestos in Engelhard's talc and talc products, they would not have asked for and obtained her consent to execute the consent without their clients first receiving from BASF's predecessors full, fair and just compensation for their respective asbestos injury claims. Had Plaintiff Chernick's been informed about the spoliation of evidence and/or the truth about the presence of asbestos in Engelhard's talc and talc products, she would not have given same without their clients first receiving from BASF's predecessors full, fair and just compensation, and consequently her attorneys would not have executed and sent back the requested consent order dismissing BASF or its predecessors from her law suit. Had the true facts been known, her husband's and her case would have obtained a substantial settlement from BASF or went to trial against same.

203.    On or about December 22, 2010, Mr. Mark, BASF's local New York City counsel, sent an e-mail to *Chernick*'s counsel asking them to execute another consent No Opposition Summary Judgment Motion Order which was attached to the email.  The e-mail explained that an earlier No Opposition Summary Judgment Motion Order had not, according to BASF's counsel, been timely filed in accordance with New York State's civil procedure rules.  On or about December 23, 2010, the *Chernick* plaintiffs' counsel's office by e-mail acknowledged that the consent order would be given to the attorney

handling the matter.  The requested order was in course executed by *Chernick* plaintiffs' counsel and returned by mail or e-mail to BASF's local counsel's office.  When asking for the consent order, BASF's counsel did not correct any of the previous misrepresentations or material omissions it had made to the *Chernick* plaintiffs' counsel as set forth above.  BASF's counsel also failed to disclose or reveal on December 22, 2010, that there was evidence that Engelhard's talc contained asbestos and/or that evidence relating to same had been spoliated by BASF as set forth above.  Had this been revealed or disclosed on December 22, 2010, *Chernick*'s counsel would have not executed and sent back the requested consent order and would have rescinded his prior agreement to consent to the dismissal of BASF or its predecessors.  On or about January 18, 2011, BASF's counsel filed the fraudulently obtained consent order with the Supreme Court of New York City.  The No Opposition Summary Judgment Motion Order was then in due course signed by New York Supreme Court Justice Sherry Klein Heitler and then filed with the New York Supreme Court Clerk on February 3, 2011.  A copy of the e-mails requesting the December 22, 2010 Consent Order, acknowledging receipt of the request, and acknowledging receipt back of the signed Consent are jointly appended as Exhibit 24 and incorporated herein by reference.  A copy of the referenced December 22, 2010 Consent Order as filed with the Clerk of Court on February 3, 2011, is appended as Exhibit 25 and incorporated herein by reference.

> **e.    Cahill Gordon's and BASF's Continuing Fraudulent and Misleading Representations to the Representative Plaintiffs' Attorneys, Bevan & Economus and Bevan & Associates LPA, Inc., Beginning in 1992.**

204.    Representative Plaintiffs Williams, Pease, Holley, Ware, Wengerd and/or their respective decedents as the case may be, were all represented in asbestos injury

claims by the Northern Ohio law firm of Bevan & Economus or Bevan & Associates LPA, Inc. (collectively referred to as "**Bevan Law Firm**").  These plaintiffs — and where and when applicable their respective decedents — each asserted asbestos injury claims against BASF's predecessors in Northern Ohio federal or state court law suits as set forth above.

205.    On or about April 23, 1992, Washington D.C. based Cahill Gordon attorney Scott A. Martin, Esq., sent the Bevan Law Firm a letter (Exhibit 19) and several enclosures (discussed below) on behalf of BASF.  The letter and enclosures concerned three (3) then pending Northern Ohio asbestos cases the Bevan Law Firm was handling that Cahill Gordon referred to as "Cuyahoga County Tireworker Actions."  Among the three Cuyahoga County Tireworker Actions identified in Cahill Gordon's letter was Plaintiff Williams' and her late husband's asbestos injury case.

206.    Cahill Gordon's April 23, 1992 letter and enclosures were sent to the Bevan Law Firm by Federal Express.  The letter states Cahill Gordon's New York based partners Joslyn and Defendant Sloane were blind copy recipients.  Presumably their copies were sent to them at their New York office via U.S. Mail in view of the absence of any stated indication to the contrary in the letter.

207.    Cahill Gordon's purpose in sending the April 23, 1992 letter and enclosures to the Bevan Law Firm, according to the letter's tenor, was to request the Bevan Law Firm to voluntarily dismiss Engelhard as a defendant in the three (3) Cuyahoga County Tireworker Actions "on the basis that the talc produced by EmTal [sic] contained no asbestos."

208.   The April 23, 1992 letter's representations that Engelhard's talc did not contain asbestos and the request for voluntary dismissal of BASF's predecessors were supported with copies of the Ashton Affidavit, the Pooley Report and several Carter Affidavits.

209.   With respect to the Ashton Affidavit provided to the Bevan Law Firm in Cahill Gordon's April 23, 1992 letter, Cahill Gordon through Mr. Martin stated and represented in pertinent part:

> …The Affidavit of William H. Ashton summarizes numerous investigations, examinations, and studies of the Johnson mine. The conclusion derived from all these studies is that the talc produced from this mine did not contain asbestos….

210.   As further reason and support for its request that the Bevan Law Firm voluntarily dismiss BASF's predecessors from asbestos injury claim, Cahill Gordon represented that the Pennsylvania Tireworkers Asbestos Claimants, as well as tireworker cases in the District of Kansas and Michigan State Court, were dismissed by their respective counsel after being provided the "Ashton materials."

211.   On or about May 18, 1992, Cahill Gordon's Attorney Martin wrote the Bevan Law Firm again after it had filed a fourth asbestos injury suit, *Gonzalez v. Abex Corp., et al.*, naming Engelhard as a defendant.  A copy of Cahill Gordon's May 18, 1992 letter is appended as Exhibit 26 and incorporated herein by reference.

212.   Cahill Gordon's May 18, 1992 letter, which was sent via Federal Express, represented to the Bevan Law Firm again that the various documents sent to it the previous month demonstrated "that the talc produced by Emtal [sic] from its sole mine

and mill in Johnson, Vermont contained no asbestos."  Cahill Gordon's letter then again requested that Engelhard be promptly dismissed from the Cuyahoga County Tireworker Actions voluntarily because "under the circumstances there appears to be no basis in fact for maintaining Engelhard as a Defendant."

213.    On or about December 22, 1992, Cahill Gordon's Attorney Martin telephoned attorney Dale Economus, Esq., a principal of the Bevan Law Firm, to discuss BASF's predecessor's requests that it be voluntarily dismissed from what was then five (5) pending tireworker asbestos injury cases that Mr. Economus' law firm had filed in Cuyahoga County against Engelhard.  During the telephone conversation, Attorney Martin obtained Mr. Economus' agreement to respond to Cahill Gordon's request for dismissal of Engelhard in the five cases by December 31, 1992 because an answer to the complaint in one of the five cases was at the time almost due.

214.    Subsequently, by letter on or about December 21, 1992, Cahill Gordon's Attorney Martin wrote once more to Mr. Economus, this time to confirm their conversation.  This correspondence was both telefaxed and sent by U.S. Mail to the Bevan Law Firm by Cahill Gordon's Washington, D.C. office.  A copy of Cahill Gordon's December 21, 1992 letter is appended as Exhibit 27 and incorporated herein by reference.

215.    In his December 21, 1992 letter, Attorney Martin once again renewed and supported Cahill Gordon and BASF's predecessors' request for a voluntarily dismissal of the claims against Engelhard and Eastern Magnesia on the basis and representation that Engelhard/Eastern Magnesia's talc did not contain any asbestos, stating:

Engelhard was named in these cases solely because its former subsidiary, Eastern Magnesia Talc Company ("EMTal") allegedly sold talc to plaintiffs' employers. As demonstrated in the various affidavits and other documents forwarded to you with my previous correspondence, talc produced by EMTal from its sole mine and mill in Johnson, Vermont <u>contained no asbestos</u>. The alleged diagnosis of the plaintiff in each of the actions in which Engelhard is named as a defendant is an asbestos-related disease, which cannot be attributed to EMTal talc.

*(emphasis in original).*

216.     On or about February 4, 1993, Cahill Gordon's Mr. Martin sent the Bevan Law Firm another letter regarding dismissal of the five Cuyahoga County Tireworker Action cases. A copy of this letter is appended as Exhibit 28 and incorporated by reference. This letter begins with a memorialization of the Bevan Law Firm's request to Cahill Gordon the prior month (in or about January 1993) that Cahill Gordon draft and send notices of dismissal for the five asbestos actions referenced in Cahill Gordon's April, May and December 1992 letters.  According to the February 4, 1993 letter, the Bevan Law Firm was agreeing to sign and file the voluntary dismissals in the five cases "on the basis of [Cahill Gordon's] correspondence demonstrating" that Talc produced by Engelhard's former subsidiary, Eastern Magnesia Talc Company ("EMTal"), contained no asbestos.

217.     The Bevan Law Firm responded to Cahill Gordon's February 4, 1993 letter in a letter dated February 11, 1993 that was sent to Attorney Martin at his Washington D.C. office address by regular mail.  In this letter, the Bevan Law Firm advised Cahill Gordon that it was reconsidering its decision to dismiss Engelhard based on its recent uncovering of some correspondence dating to 1950 from the State of Vermont Department of Health that purportedly discussed the propensity of employees at Eastern Magnesia Talc Company to develop pneumoconiosis and further referenced

99

therein future employee x-rays and an anticipated publication.  The Bevan Law Firm invited Cahill Gordon's comments on this information, as well as an opportunity to review the results of any studies on the Waterbury and Johnson employees and any publication mentioned in the 1950 Vermont Department of Health correspondence.  The Bevan Law Firm's letter also requested invoices or purchase orders indicating the years and volumes of talc sold to the Goodyear, Goodrich and Goodyear Aerospace plants in Akron.  A copy of the February 11, 1993 letter is appended at Exhibit 29 and incorporated herein by reference.

218.    On or about February 22, 1993, Cahill Gordon's Martin responded to the Bevan Law Firm's letter, which, according to the letter, was transmitted to the Bevan Law Firm by means of both telefax and certified U.S. Mail.  A copy of this letter is appended as Exhibit 30 and incorporated herein by reference.

219.    In Cahill Gordon's February 22, 1993 letter, Attorney Martin states that the 1950 Vermont Health Department correspondence the Bevan Law Firm inquired about "should in no way alter your previous expressed decision to dismiss Engelhard from these cases."  Cahill Gordon's letter then proceeds to distinguish and deflect the information contained in the subject 1950 Vermont Health Department correspondence by explaining that the 1950 letter referenced workers who were not employed at Engelhard's subsidiary's Johnson Mine, but rather were workers employed at some other company's mine. Cahill Gordon's letter then returned to and reiterated once more BASF's purported uncontradicted exculpatory evidence and information that Cahill Gordon had provided the Bevan Firm previously in furtherance of the Fraudulent Asbestos Defense Scheme, stating:

100

Beginning with my first request for dismissal last April I sent your firm voluminous materials concerning the Johnson mine. In reaching your decision to dismiss Engelhard, your firm reviewed, <u>inter</u> <u>alia</u>, the Affidavit of William H. Ashton, which summarizes numerous investigations examinations and studies of the Johnson mine. The conclusions derived from all of these studies is that talc produced from this mine <u>did not contain</u> <u>asbestos</u>. The only analysis which we have not previously forwarded to you is one just completed by the R.J. Lee Group which showed no evidence of asbestos minerals nor of their non-fibrous analogs, and found the talc to be a platy, non fibrous variety.

(*emphasis in the original*).

220.    Shortly after receipt of Cahill Gordon's February 22, 1993 letter, and reasonably relying upon Cahill Gordon's representations and supporting materials supplied by it in the various correspondence and communications referred to above, the Bevan Law Firm proceeded to recommend to its asbestos injury clients that Engelhard be voluntarily dismissed from their claims.  Included in those to whom this recommendation was made was Plaintiff Williams.  Based upon the Bevan Law Firm's recommendations and advice, which in turn were based upon the documents and representations made by and on behalf of the defendants that BASF's talc and talc products contained no asbestos, the Bevan Law Firm's clients in the five Cuyahoga County Tireworker Action cases, including Plaintiff Williams and her late husband, each consented and authorized the Bevan Law Firm to voluntarily dismiss their asbestos injury claims against BASF's predecessors.

221.    In or about late February or March, 1993, the Bevan Law Firm, acting and relying upon Cahill Gordon's representations and supplied materials as set out above, filed Notices of Voluntary Dismissal dismissing its clients' asbestos injury claims against BASF's Predecessors in the five Cuyahoga County Tireworker Actions as Cahill Gordon requested.  A copy of the Notice of Dismissal that voluntarily dismissed Plaintiff

Williams and her late husband's asbestos case against only BASF's predecessor, which was entered as an order of the Court on or about March 23, 1993 by the Honorable Charles R. Weiner, the presiding federal court Multi-District asbestos litigation judge, is appended as Exhibit 31 and incorporated herein by reference.  Copies of the dismissals of the four other Cuyahoga County Tireworker Action cases are also collectively appended as Exhibit 31 and incorporated herein by reference.  All five dismissal notices were transmitted to the respective courts and served on defense counsel by regular U.S. Mail.

222.    At no time in any of the aforementioned Cahill Gordon communications or correspondence with or to the Bevan Law Firm during 1992 and 1993, or in any of the affidavits or reports supplied or referred to in Cahill Gordon's communications or letters seeking the voluntary dismissal of Engelhard from the Cuyahoga County Tireworker Action cases, was the Bevan Law Firm, and through this law firm, the Bevan Law Firm asbestos injury clients, including Plaintiff Williams and her late husband, ever fairly (or otherwise) informed by the Lawyer Perpetrators or the BASF Perpetrators that evidence existed that was contrary to that represented in Cahill Gordon's letters and in the supplied Ashton Affidavit, Poole Report, Carter Affidavits or any of other material provided by Cahill Gordon, such as the inculpatory documents and deposition testimony that had been obtained by the plaintiff in the *Westfall* case.  There additionally was no mention or reference in the any of Cahill Gordon's communications or correspondence to the Bevan Law Firm, or in any of the affidavits or reports Cahill Gordon supplied to the Bevan Law Firm, to the fact of and the circumstances surrounding BASF's gathering and spoliation of all contrary and inculpating asbestos injury claim evidence relating to Engelhard's talc in 1984.  These misrepresentations and material omissions occurred and were committed

despite the fact that the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, knew and appreciated the relevance of the subject information to asbestos claimants, and were under a duty to truthfully and fairly answer and provide information and discovery to adverse parties in litigation.

223.    Had the BASF Perpetrators or the Lawyer Perpetrators fully, fairly and timely disclosed the truth about its talc products' asbestos content, the existence of inculpatory and contradictory evidence regarding the existence of asbestos in Engelhard's talc, such as that which had been developed in the *Westfall* case, and/or the facts and the circumstances surrounding BASF's gathering and spoliation of contrary and inculpating asbestos claim evidence relating to Engelhard's talc to the Bevan Law Firm, the Bevan law firm then would not have recommended to its clients, including Plaintiff Williams and her late husband, that they voluntarily dismiss their asbestos claim against BASF's predecessors without first receiving from BASF's predecessor payment of full, fair and just compensation.  Correspondingly, the Bevan Law Firm's asbestos injury clients, including Ms. Williams and her husband, as well as others similarly situated to them, would not have given their consent or authorization to voluntarily dismiss their asbestos claims against BASF's predecessor without first receiving from BASF's predecessors full, fair and just compensation for their respective asbestos injury claims.

224.    During and throughout the 1990s and continuing into and throughout the 2000s, the Bevan Law Firm also represented thousands of other tireworker and industrial worker clients who were exposed to hazardous workplace dusts and fibrous materials during and at their employment that caused them to develop asbestos and/or other occupational pulmonary diseases and disorders, such as mesothelioma, asbestos induced

cancers, asbestosis, pneumoconiosis and pulmonary talcosis.  When and where such clients (or their decedents) were diagnosed with an asbestos and/or industrial dust related exposure and a lawsuit was commenced, Engelhard, Eastern Magnesia and, eventually, BASF were named in such suits as a co-defendant along with other parties in accordance with the accepted asbestos practice in the Northern Ohio area in view of settlement programs that potentially responsible product manufacturers or suppliers were negotiating or had developed. Among these asbestos injury clients were Plaintiffs Williams, Pease, Holley, Ware, Wengerd and/or their respective decedents.

225.    In connection with the lawsuits filed by the Bevan Law Firm during the 1990s through the 2000s, BASF and its predecessors periodically responded under oath to written discovery relating to Engelhard's talc products.  Cahill Gordon either directly or indirectly through local Ohio counsel prepared the responses to this written discovery on behalf of BASF or its predecessors.  In BASF or its predecessors' responses to written discovery that Cahill Gordon prepared and/or reviewed prior to BASF verifying and serving, BASF or its predecessors continued to uniformly and consistently represent to the Bevan Law Firm, and through that firm its clients, including Plaintiffs Williams, Pease, Holley, Ware, Wengerd and/or their respective decedents, that Engelhard's talc did not contain any asbestos and/or there was no evidence to the contrary.  Representative of such written discovery responses are BASF's and its predecessors 1991 responses to the discovery in the Summit County, Ohio *Clark* case (Exhibit 22) referred to and discussed above, and October 19, 2007, in Answers to Interrogatories in "Bevan Group 14" cases that were electronically filed and served by BASF local counsel via the Internet through the LexisNexis File & Serve system ("**2007 Bevan Group 14 Interrogatories**").

A copy of the 2007 Bevan Group 14 Interrogatories is appended as Exhibit 32 and incorporated herein by reference.

226.     In response to Interrogatory No. 5 of the 2007 Bevan Group 14 Interrogatories, an answer that is thereafter referred to in response to numerous subsequent questions, BASF states under oath:

EVER SELL ASBESTOS

5.     Has Defendant ever engaged in the mining, manufacturing, selling, marketing, installation or distribution of asbestos-containing products (including equipment of any kind containing asbestos in any form)? If so, please state the following:

(a) The name of the company engaged in the activity (whether it is Defendant, Defendant's predecessor, or Defendant's subsidiary);

(b) As to each product mined, manufactured, sold, marketed, installed or distributed, please state the following:

1. The trade or brand name.

2. Its identification number (model, serial number, etc.).

3. The time period it was manufactured, mined, marketed, distributed or sold.

4. Its physical description including color, general composition, and form.

5. A detailed description of its intended use and purpose.

6. A detailed description of the type package in which it was sold, listing the dates of each type of package used, a physical description of the package, and a description of any printed material or trademarks that appeared thereon.

7. The percent of asbestos which it contained.

8. The percent of asbestos by asbestos type (amosite, crocidolite, tremolite, anthophyllite).

(c) The time period during which each of these products were on the market;

(d) The material components/ingredients of each such product, giving specific or approximate percentage both by weight and by volume of each material component/ingredient (this interrogatory is not limited to the asbestos component of the product but seeks information as to the nature, weight and volume of non-asbestos ingredients, as well) of each such product;

(e) How each of these asbestos-containing product [sic] can be distinguished from those of competitors;

(f) A description of the physical appearance of such product;

(g) A detailed description of the intended uses.

ANSWER: No.

227.   Following the dismissal of the Cuyahoga County Tireworker Action cases in early 1993, during and throughout the ensuing mid-1990s and continuing throughout the 2000s, a number of periodic aggregate settlements occurred by and between several talc suppliers and manufacturers and Bevan Law Firm clients. From time to time BASF and its predecessors participated in these talc company aggregate settlements when doing so enabled it or them to cheaply settle and obtain releases of liability from thousands of the Bevan Law Firm's asbestos injury claimants. Among the thousands of asbestos injury claims so settled in this manner were Plaintiff Pease's (whose lawsuit against Engelhard was voluntarily dismissed in or about December 1998 (Exhibit 33)), Plaintiff's Holley's decedent's, Ms. Darnell, (whose lawsuit against Engelhard was voluntarily dismissed in or about May 2001 (Exhibit 34)) and Plaintiff Ware's and her husband's (whose lawsuit, together with slightly under 2,200 other Cuyahoga County, Ohio Court of Common Pleas lawsuits, was voluntarily dismissed in or about April 2003 (Exhibit 35)). Exhibits 33, 34, and 35 are hereby incorporated by reference. The dismissals were all filed with the Cuyahoga Court of Common Pleas and served on the parties to the suit electronically.

106

228.    When negotiating these aggregate settlements and deciding to recommend and obtain its clients' consent and authorization to participate in them, the Bevan Law Firm reasonably relied and acted upon Cahill Gordon's and BASF's (or its predecessors') representations and the materials provided to it by Cahill Gordon and BASF from 1992 forward that purported to show Engelhard's talc did not contain asbestos and/or that there was absolutely no evidence to the contrary as set out above.

229.    In turn, Plaintiff Pease, Plaintiff Holley's decedent, Ms. Darnell, and Plaintiff Ware, as well as others similarly situated, reasonably relied and acted upon Cahill Gordon's and BASF's (or its predecessors') representations and materials provided by Cahill Gordon and BASF that Engelhard's talc did not contain asbestos and/or that there was absolutely no evidence to the contrary which had been made or supplied to the Bevan Law Firm from 1992 forward, as set out above.

230.    Had the BASF Perpetrators or the Lawyer Perpetrators fully, fairly, honestly  and timely disclosed to the Bevan Law Firm the truth about Engelhard's talc products' asbestos content, the existence of inculpatory and contradictory evidence regarding the existence of asbestos in Engelhard's talc, such as that which had been developed in the *Westfall* case, and/or the facts and the circumstances surrounding BASF's gathering and spoliation of contrary and inculpatory asbestos claim evidence relating to Engelhard's talc in 1984 as was their duty, the Bevan law firm would not have negotiated and agreed to the terms of the aggregate settlements with BASF or its predecessors on the terms that were offered, and, further, it would not have recommended to its clients that they agree to participate in such aggregate settlements with Engelhard and dismiss their cases against it voluntarily as they did. Correspondingly, the Bevan

Law Firm's asbestos injury clients, including Plaintiff Pease, Plaintiff Holley's decedent, Ms. Darnell, and Plaintiff Ware, as well as others similarly situated to them, would not have given their consent or authorization to participate in an aggregate settlement with BASF or its predecessor on the basis of the terms of the agreement nor authorized and consented to the Bevan Law Firm voluntarily dismissing their asbestos claims against BASF's predecessor without first receiving from BASF's predecessors full, fair and just compensation for their respective asbestos injury claims. In each case the settlement demand would have been higher and/or they would have taken their respective case to trial.

231.    As a direct result of the Fraudulent Asbestos Defense Scheme, Plaintiff Pease, Plaintiff Holley's decedent, Ms. Darnell, and Plaintiff Ware, as well as others similarly situated to them, have not received full, fair and just compensation from BASF's predecessors for their respective asbestos injury claims, to their detriment and loss.

232.    On or about November 12, 2008, BASF's Northern Ohio area local defense attorney, Jennifer A. Reister, Esq., mailed a letter with enclosures to the Bevan Law Firm requesting voluntary dismissal of two of the firm's then pending asbestos injury matters it had filed in the Cuyahoga County, Ohio, Court of Common Pleas, namely: Plaintiff Wengerd's decedent's law suit, *Jennifer Graham v. Eastern Magnesia Talc*, and *Russell Young v. Eastern Magnesia Talc*.  Prompting the letter was the Bevan Law Firm's service of discovery requests on BASF in connection with the two cases.  A copy of this letter is appended as Exhibit 36 and incorporated herein by reference.

233.    Ms. Reister's November 12, 2008 letter requested the Bevan Law Firm to "voluntarily dismiss Eastern Magnesia Talc and, in the Young case, both Eastern Magnesia Talc and Engelhard Corporation, from these cases on the basis that talc produced by EmTal contained no asbestos."

234.    In support of both her request for voluntary dismissal and her representation that Engelhard's talc "contained no asbestos," Ms. Reister provided the Bevan Law Firm again with copies of the Ashton Affidavit and Pooley Report, along with other purported analyses that allegedly state or indicate that talc from Engelhard's Johnson talc mine did not contain asbestos.  The letter and enclosures were further intended, according to the letter, to serve as BASF's responses to the Bevan Law Firm's discovery initiatives in the two cases

235.    To further bolster her request for voluntary dismissals of the two cases Ms. Reister's letter noted to the Bevan Law Firm that Engelhard and Emtal had been named as Defendants and subsequently dismissed voluntarily in 567 asbestos claims as a result of the enclosed materials in various jurisdictions including four (4) plaintiffs in Arkansas, 191 plaintiffs in Kansas, forty (40) plaintiffs in Michigan, thirty-one (31) plaintiffs in Mississippi, over 300 plaintiffs in Pennsylvania, and one (1) plaintiff in Florida.

236.    According to BASF's court ordered answers to Question No. 4 of a set interrogatories served on it in the *Paduano* suit, Cahill Gordon supplied Ms. Reister with the information and documents she used in writing and sending her November 2, 2008

letter and enclosures to the Bevan Law Firm.  A copy of these interrogatory answers is appended as Exhibit 37 and incorporated herein by reference.

237.    Just as in the Cahill Gordon correspondence and interrogatory answers set out above, Ms. Reister's November 12, 2008 letter and enclosures on behalf of BASF did not fairly, candidly and truthfully inform the Bevan Law Firm, and through this law firm, its asbestos injury clients, including Plaintiff Wengerd and/or her decedent, Mrs. Graham, that evidence existed that was contrary to that which was represented in Ms. Reister's letter and in the supplied Ashton Affidavit, Poole Report and/or other materials provided by her and Cahill Gordon, such as the inculpatory documents and deposition testimony that had been obtained by the plaintiff in the *Westfall* case.  Neither was there any mention or reference in Ms. Reister's correspondence to the Bevan Law Firm, nor in any of the affidavits or reports that she and Cahill Gordon supplied to the Bevan Law Firm, to the fact of and the circumstances surrounding BASF's gathering and spoliation of all contrary and inculpatory asbestos claim evidence relating to Engelhard's talc in 1984. These misrepresentations and material omissions occurred and were committed despite the fact that the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, knew and appreciated the relevance of the subject information to asbestos claimants, and were under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation.

238.    Neither BASF nor Cahill Gordon took any steps or measures to correct Ms. Reister's misrepresentations.  BASF also did not take any steps or measures to prevent Ms. Reister (or any other counsel representing it) from making such misrepresentations and material omissions in the future.

110

239.    When Plaintiff Wengerd in her capacity as personal representative of her mother's estate (Mrs. Graham having died on July 8, 2008) did not voluntary dismiss BASF from her mother's asbestos injury case as requested by Ms. Reister in her November 12, 2008 letter, Ms. Reister and her firm thereafter filed a Motion for Summary Judgment seeking its involuntary dismissal.  Asking the Cuyahoga County Court of Common Pleas to dismiss this case, BASF claimed to the court that there was no proof that its predecessor Engelhard's talc was present in Ms. Graham's workplace at the Goodyear tire and rubber plant she was employed in, and, in any event, there was no evidence that Engelhard's talc contained asbestos.

240.    The Bevan Firm in or about early 2009 opposed BASF's motion for Summary Judgment in the *Graham* case by establishing that there was an outstanding question of fact on Ms. Graham's exposure to Engelhard talc at the Goodyear plant in which she worked. It was not able, however, due to the Lawyer Perpetrators and the BASF Perpetrator's misrepresentations and material omissions set forth above, to mount any opposition to BASF's claim and representations to the presiding court that there was not any evidence Engelhard's talc contained asbestos. Thus in a reply brief on behalf of BASF that Ms. Reister electronically filed via the File and Serve System in February, 2009, it was stated to the Cuyahoga Court of Common Pleas:

> Lastly, plaintiff attempts to rely on her own answers to interrogatories. In her answers, she states that one of the asbestos containing products she was exposed to at Goodyear was talc. She does not identify EMT as the seller of the talc. Additionally, plaintiff has provided no evidence that EMT's talc is an asbestos-containing product. On the other hand, EMT filed numerous materials in response to plaintiff's discovery request that indicate that the talc mined by EMT was asbestos-free. (See Letter and to John Mismas and attachments filed November 12, 2008) These materials included:

1) A copy of an Affidavit prepared by William H. Ashton dated May 8, 1989, with attached Exhibits A through G;

2) A copy of a report prepared by Dr. F.D. Pooley concerning an examination of talc samples taken from EMT's Johnson, Vermont mine;

3) A copy of a 1977 NIOSH study entitled "Analysis of Talc By XRay Diffraction and Polarized Light Microscopy"; and

4) A copy of a letter from RJ Lee Group, Inc. dated January 27, 1993 reporting the results of their analysis of a sample of EMT talc.

It is elementary that plaintiff must show that she was exposed to an asbestos-containing product to survive summary judgment. In this case, plaintiff has failed to produce any evidence that either she was exposed to any talc sold by EMT or that the talc sold by EMT contained asbestos.

(*emphasis added*).

A copy of this reply is appended as Exhibit 38 and incorporated herein by reference.

241. In the Motion for Summary Judgment filed on behalf of BASF in the *Graham* case, BASF Perpetrators and/or the Lawyer Perpetrators, acting as aforesaid (who were directing and controlling Ms. Reister's actions on BASF's behalf), failed to fairly, honestly and candidly inform the presiding court that evidence that BASF's talc contained asbestos existed and/or that there was contrary evidence to that which was represented in the motion, *i.e.* - BASF's reference to Ms. Reister's November 12, 2008 letter and attachments submitted to the court in connection with the motion, such as the inculpatory documents and deposition testimony that had been obtained by the plaintiff in the *Westfall* case. Neither was there any mention or reference in Ms. Reister's Motion for Summary Judgment on behalf of BASF, nor in any of the corroborating affidavits or corroborating reports that she filed in support of the motion, to the fact of and the circumstances surrounding BASF's gathering and spoliation of all contrary and inculpatory asbestos claim

evidence relating to Engelhard's talc. These misrepresentations and material omissions occurred and were committed despite the fact that the BASF Perpetrators and the Lawyer Perpetrators were aware of these facts, knew and appreciated the relevance of the subject information to asbestos claimants, were under a duty to truthfully and fairly answer and provide discovery to adverse parties in litigation, and were under a duty of candor to the presiding court.

242.    As the direct and proximate result of the BASF Perpetrators and the Lawyer Perpetrators misrepresentations and material omissions as set forth above, on June 18, 2009, the Cuyahoga County Court of Common Pleas granted BASF's motion for summary judgment and dismissed Ms. Graham's case as to BASF, thereby depriving Plaintiff Wengerd's deceased mother and her estate of their right to full, fair and just compensation from BASF on the subject asbestos injury claim.

243.    On or about May 15, 2009, a notice of voluntary dismissal of Engelhard, as well as three other defendants, was electronically filed in the lawsuit relating to Mr. Young's asbestos injury through the electronic File and Serve System.  A copy the dismissal is appended as Exhibit 39 and incorporated herein by reference.  In agreeing to and obtaining its client's consent to this dismissal, the Bevan Law Firm relied and acted upon the misrepresentations and material omissions set forth above.

**H.    The Discovery and Uncovering of the Fraudulent Asbestos Defense Scheme**

244.    The longstanding Fraudulent Asbestos Defense Scheme started to unravel during a June 15, 2009 deposition of Mr. David Swanson, a former a BASF research and development employee, that was taken in connection with an asbestos injury case

captioned *Paduano v. Ace Scientific Supply Co.*, captioned MID-L-2976-09 (N.J. Super. Ct.) (the "**Swanson deposition**").  A copy of Mr. Swenson's deposition is attached as Exhibit 9, and incorporated herein by reference.

245.   Mr. Swanson was a chemist for Engelhard in Menlo Park, New Jersey.

246.    During his tenure at Engelhard, Swanson conducted experiments and assays with talc in his laboratory.  He also visited the Johnson Mine.

247.   Mr. Swanson's daughter, Donna Paduano, developed mesothelioma and contended the asbestos causing same was from, *inter alia*, BASF's talc her father worked with or was exposed to at Engelhard, to which she came into contact.

248.   During his deposition Mr. Swanson testified:

a.    He was aware that Emtal talc contained asbestos fibers based on his work for the company;

b.   That Engelhard's talc mine was shut down after it was determined that the talc contained asbestos;

c.   That sometime after the BASF talc mine was shut down, he was given a directive by the head of Engelhard's research and development department, Defendant Hemstock, to gather all of his lab notebooks and records regarding Engelhard's talc;

d.   That Defendant Hemstock explained to him that the directive to gather up the documents  had come from BASF's legal department;

114

e.   That he understood and believed that the materials gathered were to be shredded or destroyed;

f.   That he complied with the instructions and gathered his documents on Emtal talc, including his laboratory notebooks, and turned over all of his records as directed;

g.   That BASF's legal department checked with all employees to ensure that all documents that revealed that the talc contained asbestos had been recovered and subsequently destroyed or secreted away; and

h.   That he never saw his Emtal talc documents again.

249.   The Swanson Deposition testimony led to an investigation by the *Paduano* suit's plaintiffs' counsel into whether BASF had spoliated material evidence (the "***Paduano* spoliation investigation***").

250.   The *Paduano* spoliation investigation ultimately led to the discovery of evidence that prompted and grounded a successful motion to amend before the New Jersey Superior Court to plead a New Jersey spoliation "Fraudulent Concealment" claim against BASF in the *Paduano* suit, along with three other pending New Jersey state court asbestos laws suits, based upon the spoliation of Emtal talc documents described herein.

251.   The *Paduano* spoliation investigation also eventually led to BASF producing documents relating to its 1984 gathering of documents relating to Emtal talc and portions of some, but not all, of the *Westfall* case's depositions.

115

252.     During the *Paduano* spoliation investigation plaintiffs' counsel reviewed thousands of pages of documents produced by BASF relating to its corporate knowledge of asbestos in Johnson Mine talc ore and Emtal talc products and what BASF and Cahill Gordon had produced and represented to asbestos claimants' counsel over the years regarding same. Additionally, interrogatories were served and depositions of BASF designated representatives taken on topics relating to the spoliation of evidence and documents.

253.     During the *Paduano* spoliation investigation BASF withheld numerous documents from its production that were responsive to the spoliation investigation on claims of attorney-client privilege. The *Paduano* plaintiffs challenged BASF's withholding of documents based upon the "crime-fraud" exception to the attorney-client privilege. This dispute led to the appointment of retired New Jersey Superior Court Appellate Division Judge Jack L. Lintner ("**Judge Lintner**") as Special Discovery Master in *Paduano* and three related asbestos cases.   A copy of said order is appended as Exhibit 43 and incorporated herein by reference.

254.     Judge Lintner requested briefing from the *Paduano* parties on the applicability of the crime-fraud exception and following his review of same rendered an initial opinion in October, 2010 in which he determined that an *in camera* review of BASF's withheld documents was warranted. On November 4, 2010, following his *in camera* review of the withheld documents, Judge Lintner advised the *Paduano* parties that he was going to report his opinion concerning which documents should be produced by BASF under New Jersey's crime-fraud exception to the attorney-client privilege. Thereafter, on November 10, 2010, and with notice to all *Paduano* parties, Judge Lintner

provided BASF s counsel, and only it, with a copy of his tentative report setting forth his determinations in order to allow BASF's counsel to review and make any objections it had to his recommendations as well as to production of his report to the Paduanos' counsel.

255.    After Judge Lintner submitted his tentative report to BASF's counsel, the *Paduano* case settled. Pursuant to the order of the court the tentative report is confidential.

256.    The terms of the *Paduano* settlement and the order appointing Judge Lintner require Judge Lintner and his law firm, Norris McLaughlin & Marcus, P.A., to hold both a copy of his tentative report and the withheld documents he reviewed in escrow for seven (7) years.

257.    Plaintiffs in support of their claims are seeking production of the documents held in escrow.

258.    The *Paduano* spoliation investigation  led to the discovery of the following tests and assays of Emtal talc that found the presence of asbestos fibers in the Emtal talc:

   a.   A 1972 Royal Globe Insurance test which established four out of five Emtal talc samples contained asbestos fibers;

   b.   A May 1972 Johns Manville test which identified asbestos fibers, including tremolite fibers, in all of the Emtal samples;

117

c.  A 1977 test by Mr. Triglia, an Engelhard employee, which identified the presence of asbestos in Emtal talc;

d.  A 1978 test which established the presence of asbestos in all Emtal talc;

e.  A 1979 Georgia Tech electron microscope analysis test which found fibers in the Emtal talc.; and,

f.   Three other 1979 tests which all confirmed the presence of asbestos in Emtal talc.

259.    In the twenty five (25) years between the *Westfall* case settlement and the Swanson deposition, upon information and belief, none of the above referenced tests or the underlying data were ever produced to any asbestos injury claimant or their counsel even though they were often well within the scope of discovery requests made by asbestos claimants' counsel.  These tests and their underlying data were also not referred to in correspondence or defense reports sent to claimants' counselor in court submissions that were filed seeking dismissal of BASF.  These tests and data represent only a portion of the original evidence relating to the presence of asbestos in Emtal talc, and are an indication of the once-extensive evidence which Defendants possessed regarding the presence of asbestos in the Emtal talc.

260.    Based upon information and belief, BASF terminated Cahill Gordon as its national counsel in or about 2009 or 2010.

261.    The documents produced during the *Paduano* spoliation investigation after Cahill Gordon was terminated, many of which are stamped by BASF's counsel with the document management prefix "FC," revealed the existence of the BCAD enterprise and

how the BASF Perpetrators and the Lawyer Perpetrators used it to repeatedly mislead and deceive asbestos injury claimants, their counsel and presiding courts.

262.   Many of the exhibits and test and assay results referred to in the depositions of Hemstock and Triglia still have not been produced to any asbestos injury claimant lawyer other than counsel in the *Westfall* case who was and is bound to a confidentiality agreement.

a.   The following exhibits from the Hemstock deposition are missing or have otherwise not been produced:  Exhibits 1, 5, 13, 15, 16, 18, 19, 21, 22, 23, 24, 25, 29, 30, 32, 34, 37, 39, 43, 44, 46, 47, 49, 50 (partially), and 51.

b.   The following exhibits from the Triglia deposition are missing or have otherwise not been produced: Exhibits 1, 2, 5, 6, 9, 11, 12, 13, 15, 16, 17, 18, 19, 20, 23, 24, 26, 27, 28 and 30.

263.   Many other presently unknown tests, studies, and other evidence which Defendants conducted, possessed, or had access  to have been destroyed, secreted away and/or due to the passage of time caused by the BASF Perpetrators' and the Lawyer Perpetrators' spoliation and tortious conduct, are no longer accessible or recoverable.

264.   The evidence spoliated by the BASF Perpetrators and the Lawyer Perpetrators includes Engelhard's internal lab notebooks, many of which to date, and despite BASF's search efforts after *Paduano* have never been located and/or produced and at this point and may be inferred or presumed to have been permanently destroyed. Based upon information and belief, these lab notebooks would have contained testing and

assay data regarding the composition of the Emtal talc including but limited to the asbestos content of the Emtal talc.

265.    Due to the spoliation of this evidence, asbestos victims, their counsel and courts across the country have been prevented from obtaining or receiving material evidence and accordingly may never know the full nature, extent and breadth of the asbestos fibers in BASF's talc and talc products including Emtal talc.

I.    **The BASF Perpetrators Undeterred Attempt to Mislead and Deceive the *Paduano* Suit's Plaintiffs' Counsel Regarding Emtal Talc's Asbestos Content**

266.    Less than six months after the Swanson deposition led to the discovery of the Fraudulent Asbestos Defense Scheme, Mr. Ernest Behm ("**Behm**") was produced by BASF to testify in the *Paduano* suit as the corporate designee with the most knowledge concerning BASF-Engelhard's historical knowledge of the dangers of asbestos at a deposition noticed and taken on November 6, 2009. (A copy of excerpts of Mr. Behm's deposition transcript is appended as Exhibit 40).

267.    During this deposition, Behm was asked specifically by Ms. Paduano's counsel to identify the location of documents related to the *Westfall* case which referred to asbestos containing talc sold by BASF-Engelhard.  Mr. Behm testified that his search prior to his deposition disclosed no such documents.

268.    Six months after the Swanson deposition led to the uncovering BASF's twenty-five year scheme of fraudulently denying the existence of evidence that its talc contained asbestos fiber, Mr. Behm, as the BASF representative most knowledgeable about the asbestos risks of its products, repeated the misrepresentations and material

120

omissions that were the *modus operandi* of the Fraudulent Asbestos Defense Scheme, stating: "[I]t is my understanding that Engelhard never sold any asbestos containing product. And when it comes to talc, I have materials which I had available to me which stated that talc does not contain asbestos." (*See* Exhibit 40 at pg. 107).

269.   BASF's corporate designee's continued misrepresentations under oath in November, 2009 demonstrate how ingrained and persistent the Fraudulent Asbestos Defense Scheme had become.  Its designated representative continued to parrot the misrepresentations even in the face of an investigation that was beginning to unravel BASF's fraud and spoliation of evidence.

**J.     BASF's Admissions That False and Misleading Statements Were Given to Asbestos Claimants Over the Years as Part of BASF's Asbestos Claim Defense**

270.   In connection with the *Paduano* suit, BASF designated and produced for deposition Ms. Ellen Poole as its representative with the most knowledge concerning the sale, supply and distribution of BASF-Engelhard's talc to National Gypsum Facilities, as well as its designee to testify on matters relating to the *Paduano* spoliation investigation. (A copy of excerpts of Ms. Poole's deposition transcript is appended as Exhibit 41).

271.   In her deposition on May 25, 2010, Ms. Poole admitted as a designee of BASF:

a.   That there are documents which show the existence of asbestos in Emtal talc (*See* Exhibit 41 at pg. 185-190);

b.   That testing on Emtal talc performed throughout the 1970s showed the presence of asbestos fibers in BASF products (*See* Exhibit 41 at pg. 185-190);

c.   That testing on Emtal talc conducted by Georgia Tech and by BASF were in agreement that the asbestos fiber count in Emtal talc varied from trace amounts to abundant (*See* Exhibit 41 at pg. 185-190);

d.   That a geologist named "Gale", who it is believed is referring to Peter Gale, a former Engelhard research and development employee who BASF sought to restrain from being retained as an expert by the *Westfall* case's plaintiff, confirmed the existence of asbestos in Emtal talc in 1979 (*See* Exhibit 41 at pg. 252);

e.   That sworn affidavits and statements made and frequently used in the Fraudulent Asbestos Defense Scheme, such as the Ashton Affidavit and Eastern Magnesia's October 19, 2007 answers to interrogatories, which stated that BASF's asbestos knowledge was irrelevant because it never sold asbestos containing products, are contradicted by tests and studies that were known to BASF (*See* Exhibit 41 at pg. 252); and,

f.   That Cahill Gordon had maintained the storage facility where some of the documents establishing the presence of asbestos fibers in the Emtal talc had been secretly held for the past twenty-five years. (Exhibit 42 at pg. 59).

**K.**     **Plaintiffs Learn They and Other Asbestos Claimants Similarly Situated Were Victimized and Harmed by the Fraudulent Asbestos Defense Scheme**

272.     Plaintiffs first learned that they and others were the victims of the BASF and Lawyer Perpetrators' Fraudulent Asbestos Defense Scheme, and the BCAD Enterprise's role in executing it, in or about late 2010 or 2011 when they were first advised by their respective asbestos counsel of the foregoing alleged facts and circumstances which their asbestos claim counsel had learned of through being contacted by the counsel conducting the *Paduano* spoliation investigation as part of that investigation or the investigation of the instant suit.

273.     The existence and/or scope of the fraudulent concealment, the Fraudulent Asbestos Defense Scheme and BCAD Enterprise's existence and corrupt activities was not known  to Plaintiffs prior to that time, and, because of its covert nature, was not reasonably knowable to them until such time as they were first advised of its existence by their asbestos counsel.

274.     Due to the nature of the facts and circumstances concerning the Fraudulent Asbestos Defense Scheme and the BCAD Enterprise's role in executing this scheme, such are reasonably not known or knowable to members of the Class and will not be unless and until they are notified of these circumstances, which is an element of relief sought in this class action.

275.     Plaintiffs and others similarly situated to them have been harmed by the misrepresentations, omissions of material fact and deceitful conduct involved in the Fraudulent Asbestos Defense Scheme and the BCAD Enterprise's role in executing it.

276.    As a direct and proximate result of Defendants' acts, omissions and activities,  Plaintiffs and members of the Class similarly situated sustained the loss of their property in the form of the termination or impairment of their asbestos injury claims, their rights under law to pursue and receive full, fair and just compensation for their asbestos injury claims, and/or the taking and deprivation of their Constitutional right to a fair, honest and just judicial proceeding together with the time value monetary loss due to their not timely receiving the full, fair and just compensation in a fair, honest and just judicial proceeding to which they were entitled.

277.    Based upon information in the documents produced during the *Paduano* spoliation investigation, at least several thousand asbestos claimants across the United States have been similarly so injured and harmed. Discovery and appropriate notice to the class may likely reveal the existence of even more.

**L.     Defendants greatly benefited and profited from their participation in the Fraudulent Asbestos Defense Scheme.**

278.    BASF and Cahill Gordon each received substantial revenue or economic benefits from their participation in the Fraudulent Asbestos Defense Scheme and the losses and harm it inflicted upon Plaintiffs and members of the class by depriving them of their asbestos injury claim as well as their Constitutional right to a fair, honest and just judicial proceeding. Cahill Gordon earned professional fees for numerous years for its fraudulent and, indeed criminal (under the law of New York), activities associated with the Fraudulent Asbestos Defense Scheme. Cahill Gordon attorneys also benefited from being able to claim when marketing the firm or themselves that Engelhard, and later on, BASF, was a client for which it (or he/she) had successfully handled complex mass tort

litigation.  BASF was able to eliminate, avoid or reduce its payments of compensation to

asbestos injury claimants and reduce its overall defense transaction costs by the

operations and activities of the Fraudulent Asbestos Defense Scheme. All participants in

the Fraudulent Asbestos Defense Scheme also gained and were benefitted by the

Fraudulent Asbestos Defense Scheme's operations facilitating and maintaining both the

continuity and the invisibility of the Fraudulent Asbestos Defense Scheme due to the

grave economic and professional consequences that were possible if the scheme became

exposed.

**M.**     **Defendants' Clandestine Misconduct and Concealments Prevented
        Plaintiffs and Class Members From Discovering the Fraudulent
        Asbestos Defense Scheme Despite the Exercise of Diligence Thereby
        Warranting Tolling of Any Applicable Statute of Limitations.**

279.     For over twenty-five (25) years, the BASF Perpetrators and the Lawyer

Perpetrators were able to successfully keep the Fraudulent Asbestos Defense Scheme

secret and unknown by Plaintiffs, their counsel and others similarly situated.

280.     The successful operation of Defendants' Fraudulent Asbestos Defense

Scheme, as well as each Defendant's own respective financial, corporate and/or

professional well being once execution of the scheme got underway, depended upon: (a)

the destruction, secreting and/or  concealment of BASF's and its predecessor companies'

documents and evidence relating to Class Members' underlying asbestos injury claims

beginning in 1984; (b) the concealment and cover-up of this spoliation of documents and

evidence; (c) the secreting and concealment each Defendant's respective role(s),

activities and involvement in the spoliation of documents and evidence; and, (d) the

secreting and concealment of the Defendants' respective roles and activities in the

execution of the subsequent misrepresentation and fraudulent material misrepresentations relating to or based upon the spoliation of documents and evidence.

281.    The successful operation of Defendants' Fraudulent Asbestos Defense Scheme, as well as their own financial, corporate and/or professional well being once execution of the scheme got underway, also depended upon there being continuity and consistency in making the exculpatory misrepresentations and misleading omissions involved in the scheme. Defendants therefore carefully, consistently and, as it turned out, successfully, secreted and concealed the Fraudulent Asbestos Defense Scheme as well as their involvement and activities in its commission until Mr. Swanson happened to come forward and testify in his daughter's mesothelioma case.

282.    As set forth above, BASF, at Cahill Gordon's direction or with its consent, affirmatively misrepresented facts concealing the spoliation of evidence, often under oath, in addition to making material omissions false statements.

283.    In view of the foregoing, Plaintiffs and the members of the Class could therefore not have discovered the Fraudulent Asbestos Scheme alleged herein any earlier despite the exercise of reasonable diligence.  Indeed, as indicated above, over the years that the Fraudulent Asbestos Defense Scheme was in existence the lawyers for Plaintiffs, as well as the lawyers for other similarly situated asbestos injury claimants, did their jobs of investigating and conducting discovery into BASF and its predecessors' talc products, only to be directly or indirectly lied to by the BASF Perpetrators and Lawyer Perpetrators who were closely controlling and conducting BASF's and its predecessors' asbestos

claims defense.  As set forth in the preceding paragraphs of this complaint, said

investigation included but was not limited to:

      a.   Utilizing means of discovery authorized by rules of civil procedure

including interrogatories and requests for production of documents which sought

information regarding testing and/or other evidence related to the presence of

asbestos in BASF's talc, or talc products, its sale of asbestos and asbestos containing

products, its knowledge of the risks of asbestos fibers to those near where asbestos

containing products were used in the workplace, and whether it destroyed any

evidence pertaining to the hazards of asbestos, warning labels or hazardous conditions

at its plants or factories;

      b.   Engaging in written correspondence seeking clarification or comment

from the defendants regarding information suggesting possible health risks caused by

BASF's talc or conditions at the Johnston Mine found through their investigation as

claimants' counsel as described above; and,

      c.   Considering the fact, reported  by defendants, that other leading and

experienced asbestos counsel had voluntarily withdrawn their clients' cases against

BASF based upon the material provided directly or indirectly by BASF and Cahill

Gordon.

Moreover much of the Fraudulent Asbestos Defense Scheme to this day still remains

concealed by Defendants and unknown to Plaintiffs and members of the Class.

284.    Once the existence of the Fraudulent Asbestos Defense Scheme was suggested by the deposition testimony of Mr. Swanson in the *Paduano* suit, Ms. Paduano's counsel began the *Paduano* spoliation investigation described above that led to revelation of the fraudulent scheme. Absent Mr. Swanson's testimony, however, there was no reason or indication for asbestos injury claimants or their counsel to suspect or investigate the existence of the Fraudulent Asbestos Defense Scheme.

285.    In view of the foregoing, any applicable statutes of limitations should therefore be held inapplicable or tolled due to and on account of Defendants' knowing and active concealment, suppression and denial of the facts alleged herein.  Plaintiffs and members of the Class have, as a direct result of the conduct of the Defendants, been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.  Plaintiffs could not reasonably have discovered the spoliation and the fraudulent nature of Defendants' conduct.  Accordingly, Defendants should be stopped and/or enjoined from asserting or relying upon any of any statute of limitations, statutes of repose, laches, or defense to any substantive cause of action based upon time limitations, such as those contained in applicable personal injury and/or survival or wrongful death laws, to defeat any of Plaintiffs' claims asserted herein.

## VI. CLASS ACTION ALLEGATIONS

286.    Plaintiffs bring this action on behalf of themselves and pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "**Class**"  or "**Asbestos Claimant Class**") defined as follows:

> All persons in the United States and its territories who were exposed to BASF's talc and/or talc products, sustained an asbestos related injury and

prior to commencement of this litigation either: (a) filed a lawsuit or other claim for compensation against BASF and by reason of BASF's statements that its talc and talc products did not contain asbestos or that there was no evidence its talc and talc products contained asbestos settled, withdrew, voluntarily dismissed or suffered an involuntarily dismissal of such lawsuit or claim for compensation; or (b) by reason of BASF's statements that its talc and talc products did not contain asbestos or that there was no evidence it contained asbestos did not file a lawsuit or other claim for compensation against BASF. The class shall also include those who have or had the right to claim damages derivatively based upon such exposed person's asbestos related injury.

For purposes of this class definition:

"**BASF"** means and includes BASF Catalyst, Inc. ("**BASF**") or any of BASF's predecessor companies that mined, manufactured, processed, distributed or sold talc ore or talc products, including but not limited to Engelhard Corporation, Engelhard Industries, Engelhard Minerals & Chemicals Corporation, Minerals & Chemicals Phillip Corporation, Eastern Magnesia Talc Company, Porocel Corporation and Pita Realty Limited (collectively "**BASF Predecessor Companies**")

287.    Plaintiffs are members of the Class that they seek to represent.

288.    Members of the Class can be identified from Defendants' records, court records, records of asbestos claimants' counsel, records of unions in which Class Members belonged, and asbestos claims representatives and claimants' records. Notice can be given to the Class through direct notice and general print and electronic publication means.

289.    Plaintiffs' claims are typical of the claims of the other Class Members' because Plaintiffs and all putative Class Members were and are similarly affected by Defendants' spoliation of asbestos evidence and the subsequent pattern and practice of uniform misrepresentations, concealments and suppression of material fact, and the declaratory and equitable relief sought and compensatory and punitive damages related to

defendants' fraudulent  concealment under New Jersey law herein is for the benefit of Plaintiffs and members of the putative Class.

290.    Class Members are so numerous that their individual joinder is impracticable.  On information and belief the class numbers in many thousands.

291.    Common questions of law and fact predominate over the questions affecting only individual Class Members.  Some of the common legal and factual questions include:

a)  Whether BASF and/or Cahill Gordon (and their respective officers, employees or partners/members) fraudulently concealed and spoliated material evidence relating to Class Members' underlying asbestos claims?

b)  Whether BASF and Cahill Gordon (and their respective members, officers, employees or partners/members, concealed and covered up the spoliation of material evidence relating to Class Members' underlying asbestos claims?

c)  Whether Defendants Dornbusch, Hemstock and/or Halket and all or some of the Lawyer Perpetrators aided and abetted BASF's spoliation of evidence relating to Class Members' underlying asbestos claims?

d)  Whether BASF and Cahill Gordon, and their respective employees or members, wrongfully, tortiously  and unjustly utilized and exploited the spoliation of evidence relating to Class members' underlying asbestos claims to BASF's and Cahill Gordon's benefit and the Class Members' detriment and harm?

e)  Whether Defendants systematically and uniformly misrepresented to Class Members that BASF's Predecessor Companies' talc ore and talc products did not contained asbestos?

f)  Whether Defendants systematically and uniformly misrepresented to Class Members that there was no evidence that BASF's Predecessor Companies' talc ore and talc products contained asbestos?

g)  Whether Defendants knowingly and purposely withheld material information and facts to Class Members concerning the existence, whereabouts or fate of documents and other evidence regarding the presence of asbestos in BASF's Predecessor Companies' talc ore and talc products?

h)  Whether Defendants systematically and uniformly withheld material information and facts to Class Members concerning the presence of asbestos in BASF's Predecessor Companies' talc ore and talc products?

i)  Whether all or some of the Defendants conspired or acted in concert with other Defendants to commit the Fraudulent Asbestos Defense Scheme?

j)  Whether any of the Defendants effectively withdrew from the conspiracy to commit the Fraudulent Asbestos Defense Scheme or any of its elements, and if so when?

k)  Whether Defendants are liable to the Class for compensatory and punitive damages and other available relief under New Jersey law for committing spoliation and fraudulent concealment of evidence or conspiring to do so?

l)  Whether Plaintiffs and the Class are entitled to declaratory or equitable relief based upon Defendants committing common law fraud, conspiring to commit common law fraud, or aiding and abetting other Defendants' commission of common law fraud?

m)  Whether Defendants committed obstructions of justice or a fraud upon the court by its commission of the Fraudulent Asbestos Defense Scheme?

n)  Whether Plaintiffs and the Class are entitled to declaratory of equitable relief that alleviates and cures any impairment, detriment or harm inflicted upon them by the spoliation of the evidence relating to Class Members' underlying asbestos claims, including any detriment or harm attributable to the passage of time such as loss of witnesses and documentation needed to establish a Class Members' underlying asbestos injury claim?

o)  Whether Plaintiffs and the Class are entitled to equitable relief that alleviates and cures any impairment, detriment or harm inflicted upon them by the Defendants' fraudulent and deceitful misrepresentations, acts and omissions in furtherance of the Fraudulent Asbestos Defense Scheme, including any harm attributable to the passage of time such as loss of witnesses and other documentation needed to establish Class Members' underlying asbestos injury claims?

p)  Whether Defendants should on equitable principles be required to disgorge any moneys that are found to unjustly enrich them or were illegally earned?

q)   Whether assessment of compensatory and punitive damages against the Defendants is warranted and just under the circumstances?

r)   Whether the spoliation of evidence relating to Class Members' underlying asbestos injury claims was unknown and unknowable to Plaintiffs and members of the class due to Defendants' concealment of the spoliation and its Fraudulent Asbestos Defense Scheme?

s)   Whether in light of the extraordinary misconduct giving rise to this case, an immediate publication notice to the Class apprising them of the alleged circumstances and their legal rights at Defendants' expense is warranted and should be ordered as preliminary injunctive relief?

t)   Whether class members are entitled to a declaration that BASF's and Cahill Gordon's communications relating to the fraudulent conduct and/or the spoliation of evidence are not privileged attorney-client communication under the crime fraud exception?

u)   Whether BASF and Cahill Gordon should be required to fund an independent trust established by the Court to locate, gather and take custody of BASF and Cahill Gordon documents and evidence relating to BASF's talc products and thereafter establish and maintain a searchable archive of such materials for the benefit of the Class members?

v)   Whether the fraudulent concealments and misrepresentations of the Defendant deprived Plaintiff's and other Class Members of their rights to trial by jury guaranteed by the 7th Amendment to the United States

Constitution and/or their rights to due process of law under the 14th

Amendment of the United States Constitution?

292.    The Defendants engaged in a common course of conduct and in a

common, coordinated fraudulent scheme giving rise to the legal rights sought to be

enforced by Plaintiffs and the Class Members.  Similar or identical statutory and common

law violations are involved, and New Jersey's statutory and common law, may be

constitutionally, properly and prudentially applied in this matter to the Class Members'.

Individual questions, if any, pale in comparison to the numerous common questions that

predominate.

293.    The injuries sustained by Plaintiffs and Class Members flow, in each

instance, from a common nucleus of operative facts — the spoliation of evidence and/or

fraudulent or misleading denial of the existence of and/or withholding of evidence

material to Class Members' underlying asbestos injury claims; the Defendants' uniform

pattern practice of misrepresentations and deceitful misconduct and non disclosures

regarding the nature of Engelhard's "Emtal" talc products; and the Defendants' false

claim of nonexistence of any evidence that these products contained asbestos.

294.    Plaintiffs and the Class Members have been damaged by the BASF

Perpetrators' and the Lawyer Perpetrators' misconduct.  In the absence of the BASF

Perpetrators' and the Lawyer Perpetrators' fraudulent scheme, Plaintiffs and the Class

Members would not have sustained the economic damages and losses described above

and the grave and egregious deprivation of their claim and right to fair and honest judicial

proceeding. .

134

295.     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are familiar with the basic facts that form the bases of their and the Class Members' claims.  Plaintiffs' interests do not conflict with the interests of the other Class Members that Plaintiffs seek to represent.  Plaintiffs have retained counsel competent and experienced in Class action litigation and intend to prosecute this action vigorously. Plaintiffs' counsel has successfully prosecuted complex asbestos, fraud and misrepresentation cases and class actions.  Plaintiffs' counsel also uncovered the Fraudulent Asbestos Defense Scheme during their representation of the plaintiffs in the *Paduano* suit, which has since resolved.  Plaintiffs and Plaintiffs' counsel will fairly and adequately protect the interests of the Class Members.

296.     The Class is certifiable under Rule 23(b)(1) (A) in that prosecuting separate actions by individual class members against the Defendants could create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class, the Defendants herein.

297.     The Class is certifiable under Rule 23(b)(2) in that all or some of the Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

298.     The Class is certifiable under Rule 23(b)(3) because:

   a.   Individual litigation of the legal and factual issues raised by Defendants' wrongful conduct would increase delay and expense to all parties and to the court

135

system, causing a denial of justice to many Class Members.  The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision and management of a complex situation created by Defendants' egregious alleged misconduct by a single court. Given the similar nature of the Class Members' claims, the uniform applicability New Jersey common-law  in this case is warranted and proper due to, *inter alia*, the following factors: New Jersey's overwhelming significant contacts and government interests to the matter; the location of BASF's and its predecessors' headquarters in New Jersey; the spoliation of evidence occurring in New Jersey;  and the commission of numerous deceitful acts and omissions taking place in New Jersey, where many of BASF's  its predecessor companies alleged fraudulent affirmations under oath were signed and notarized; and the relative absence of material differences in the laws upon which the Class Members' claims are based; and,

b.      The class action device is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the Class Members. The relief sought per individual members of the Class is small given the burden and expense of hundreds if not thousands of individual prosecution of the potentially extensive litigation necessitated by the Defendants' wrongful conduct.

## VII. CAUSES OF ACTION[2]

### COUNT I
### FRAUDULENT CONCEALMENT AND SPOLIATION
### (Against All Defendants)

299.    Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

300.    On or about March 7, 1984, and continuing thereafter as well, the BASF Perpetrators and Lawyer Perpetrators were cognizant and aware that BASF's Predecessor Companies had been sued by asbestos injury claimants contending Engelhard's Emtal talc mined at the Johnson Mine contained asbestos which caused asbestos personal injuries.

301.    On or about March 7, 1984, and continuing thereafter as well, the BASF Perpetrators and Lawyer Perpetrators were cognizant and aware that it was foreseeable and likely that BASF and its predecessor companies in the future would be sued by other asbestos injury claimants, including claimants who were injured or residing in New Jersey, and who would claim and contend that Engelhard's Emtal talc contained asbestos which injured them.

302.    On or about March 7, 1984, and continuing thereafter as well, given their knowledge about the volume and the wide use of Engelhard's talc in the United States in many industries, including the tire and rubber product industry, construction joint

---

[2] Counts that have been dismissed by the Court and not reinstated directly or derivatively by the Third Circuit Court of Appeals" opinion and mandate during Plaintiffs' appeal of the Court's Motion to Dismiss rulings have been omitted. Plaintiffs do not by such deletion concede or admit that the deleted claims were or are in anyway invalid or lacked substantive merit.

compound products, automotive body repair filler products, including the widely distributed "Bondo" brand, the latent and progressive nature of asbestos disease, and the state of asbestos litigation against the company at that time, the BASF Perpetrators and Lawyer Perpetrators were aware and understood that it was foreseeable and likely that BASF and its Predecessor Companies in the future would be sued by asbestos injury claimants, including claimants who were injured or residing in New Jersey, who would claim and contend that Engelhard's Emtal talc mined at the Johnson Mine and/or products made with same contained asbestos which injured them.

303.    In view of their knowledge that talc litigation was pending and that future asbestos injury claims against BASF and the BASF Predecessor Companies were foreseeable and likely, at all times material herein, including March 7, 1984, the BASF Perpetrators were under a duty to preserve evidence and documents that were relevant to such claims and litigation, including a duty to suspend any document retention policies that were in effect or were being put into operation as such related to documents and evidence relevant to asbestos injury claims involving Engelhard's Emtal talc or the Johnson Mine.

304.    At all times material herein, including March 7, 1984, in view of their knowledge that claims against BASF involving personal injury claims currently existed and that  future asbestos injury claims against the BASF Predecessor Companies were foreseeable and likely, the Lawyer Perpetrators were under a duty to counsel and advise BASF and its predecessors to preserve evidence and documents that were relevant to such claims, including the suspension of any document retention policies that were in effect or being put into operation as to such documents and evidence.  The Lawyer

Perpetrators were also under a duty to not incite, assist, aid and abet BASF and its predecessors' violation of its or their duty to preserve evidence.

305.   At all times material herein, Defendant BASF and the BASF Predecessor Companies also were under a legal duty of candor and truthfulness towards asbestos litigants suing it or them, as well as to courts presiding over the law suits concerning these claims.  This duty of candor or truthfulness precluded the filing or submission of affidavits and verifications in support of facts, requests or motions where Defendant BASF and the BASF Predecessor Companies knew the facts to be false or where Defendant BASF and the BASF Predecessor Companies had no reasonable and good faith basis to believe and assert the facts as being true.

306.   At all times material herein, the Lawyer Perpetrators, as counsel to BASF and the BASF Predecessor Companies in asbestos injury matters, had a duty to advise, counsel and instruct BASF and the BASF Predecessor Companies to provide candid, truthful and non-misleading factual affidavits, responses to discovery and other factual information in asbestos ligation matters in which they were a party and not submit or file affidavits and verifications in support of claims, defenses, requests or motions where Defendant BASF, the BASF Predecessor Companies, the BASF Perpetrators and/or  the Lawyer Perpetrators knew that the facts being asserted or claimed  were not true or where Defendant BASF and the BASF Predecessor Companies had no reasonable and good faith basis to believe and assert the facts as being true.

307.   At all times material herein, the Lawyer Perpetrators, as counsel to BASF and the BASF Predecessor Companies in asbestos injury litigation matters, and as

officers of the court, were under a duty to prepare and serve documents, and/or monitor and review the preparation and service of documents, that related to the asbestos injury litigation so that the documents fairly, truthfully and candidly disclosed and/or produced material non privileged information and evidence to Plaintiffs and members of the Class relating to their underlying asbestos claims in accordance with the Federal Rules of Civil Procedure and state procedural law counterparts. Under these principles and authorities, and/or applicable professional responsibility codes or rules, the Lawyer Perpetrators were bound to a duty of fairness and candor to counsel and to courts that required that they not mislead or defraud Plaintiffs' and members of the Class, or their counsel, or the courts in which the asbestos injury litigation cases were filed.

308. As set forth above, and in violation of their duties regarding the preservation of evidence, beginning on or before March 7, 1984, the BASF Perpetrators and Lawyer Perpetrators, together with all or some of the Fictitious Defendants, began and continued to engage in a uniform and persistent pattern and practice of evidence spoliation by withholding, concealing and/or destroying material evidence relating to the Plaintiffs' and Class Members' underlying asbestos injury claims; all with the purpose and design of obstructing, impeding, impairing, disrupting and/or otherwise defeating the rights of asbestos injury litigation claimants in suits in which BASF and/or its predecessor companies was or were a party, and/or to deter and ward off the filing of asbestos injury claims against BASF and/or its predecessor companies.

309. As a result of the discovery in the *Westfall* case, beginning from at least 1983, and continuing forward, the BASF Perpetrators and Lawyer Perpetrators, together with all or some of the Fictitious Defendants, knew that BASF and its predecessor

companies possessed inculpating material evidence relating to Plaintiffs' and Class Members' underlying asbestos injury claims in its or their possession, custody or control, including evidence and corporate knowledge that BASF's and its predecessor companies' talc ore and talc products contained asbestos, including that developed or produced in the *Westfall* case's discovery.

310.    At all times material herein, the BASF Perpetrators and Lawyer Perpetrators, together with all or some of the Fictitious Defendants, knew that BASF and the BASF Predecessor Companies' records and corporate knowledge, along with discovery and other litigation materials, including deposition transcripts and related documents, in prior asbestos injury suits or claims, such as the *Westfall* case, were a material and important source of information and evidence regarding BASF's and its predecessor companies' talc ore and talc products. The BASF Perpetrators and Lawyer Perpetrators also knew that said information and evidence as time progressed could not be obtained by Plaintiffs and Class Members from any other source.

311.    Sometime in and around 1983 or early 1984, the exact date being presently unknown to Plaintiffs, the BASF Perpetrators and the Lawyer Perpetrators agreed and conspired with each other, and/or with all or some of the Fictitious Defendants identified above, to commit the Fraudulent Asbestos Defense Scheme in which the material evidence relating to the Plaintiffs' and the Class Members' underlying asbestos injury claims would be gathered together and subsequently and systematically withheld, concealed and/or destroyed as an integral part of the scheme.

141

312.     As set forth above, the BASF Perpetrators and the Lawyer Perpetrators, together with all or some of the Fictitious Defendants identified above, either  committed, aided and abetted the commission, and/or acted in concert with each other to commit the Fraudulent Asbestos Defense Scheme, in which the gathering and withholding, concealing and/or destroying material evidence relating to Plaintiffs' and Class Members' underlying asbestos injury claims was an integral part, as well as being overt acts in furtherance of the conspiracy.

313.     As a direct and proximate result of the above described deliberate gathering and withholding, concealment and/or destruction of documents and evidence relating to Plaintiffs' and Class Members' underlying asbestos injury claims, and/or the false and misleading statements thereafter that no such documents or evidence existed, Plaintiffs and others Class Members were harmed and injured in that they were materially hampered, impaired and prevented from proving their claims that BASF's and its predecessor companies' talc ore and talc products contained asbestos and proximately caused their underlying asbestos injury.

314.     As the direct, proximate and naturally occurring result of the above described deliberate gathering and withholding, destruction and/or concealment of documents and evidence relating to Class Members' underlying asbestos claims, and/or the false and misleading statements thereafter that no such documents or evidence existed, Plaintiffs and members of the Class either: (a) suffered an involuntary dismissal of their lawsuit because they could not produce evidence contradicting BASF and its predecessor companies' assertions and averments that its talc and talc ore did not contain any asbestos and there was no evidence that it did; (b) voluntarily dismissed or

discontinued their cases without consideration; (c) voluntarily dismissed or discontinued their cases for a nominal or token consideration instead of full, fair and complete compensation they were entitled to under law; or, (d) refrained from filing a claim or suit against BASF and/or its predecessor companies.

315.    As the result of the voluntary or involuntary dismissal or discontinuance of asbestos claims against BASF and its predecessor companies, or the forbearance of filing an asbestos claim against BASF and its predecessor companies, Plaintiffs and members of the Class suffered the loss of their asbestos injury claim,  their right under law to pursue and receive full, fair and just compensation for their asbestos injury claim and their Constitutional right to a fair, honest and just judicial proceeding.

316.    As a further proximate result of the above described deliberate gathering and withholding, destruction and/or concealment of documents and evidence relating to Class Members' underlying asbestos claims, and/or the false and misleading statements thereafter that no such documents or evidence existed, Plaintiffs and other Class Members may or will incur, or have already incurred pecuniary losses and damages, including but not limited to the loss of their underlying asbestos injury claim, the expenses and costs of proceeding without this evidence, the expenses and costs incurred in the effort to replace, locate, or identify evidence, and/or the cost of prosecuting this case to prove fraudulent concealment and spoliation of evidence; any and all of which Plaintiffs and the members of the Class would not otherwise have suffered or incurred.

317.    Plaintiffs and the class have been irreparably harmed by the defendant's spoliation and fraudulent concealment for which there is no adequate remedy at law

given the extraordinary misconduct of the defendants and the circumstances they created thereby. Given the extraordinary circumstances here, together with the matter's overwhelming contacts and connection to New Jersey, declaratory and equitable relief from this Court is needed and warranted to help remedy the widespread injuries, harm and deprivations suffered by Plaintiffs and the Class Members victimized by Defendants' wrongdoing in the form of, *inter alia*: (a) a declaratory judgment determination and finding that the Defendants committed fraudulent concealment and spoliation that targeted persons making asbestos claims against BASF; (b) a robust notification program providing information about Defendants' fraudulent concealment and spoliation, as well as other information designed to enable those victimized and injured by the fraud (or where deceased or incompetent their personal representatives or next of kin) to make an informed decision regarding any further pursuit of their legal remedies from the Defendants; (c) adjunct declaratory and injunctive relief curing, as needed and just, any evidentiary harm and proof impediments Defendants' egregious misconduct is responsible for creating; (d) a decree and injunction imposing a constructive trust upon Defendants' property to fund the creation and maintenance of an archive of BASF's evidence and records that had been fraudulently concealed; and (e) a decree ordering Defendants to render an accounting and thereafter disgorgement of any monetary benefits and funds revealed in the accounting which, in all equity and conscious of the Court, Defendants should not retain under the circumstances, together with an equitable distribution of such disgorgement.

318.    In addition to the forgoing equitable relief, and incident thereto, Plaintiffs and members of the class are entitled to an assessment of compensatory and punitive

damages against all Defendants under the Law of New Jersey wherein the fraudulent concealment of evidence including the spoliation of the documents and materials was committed, or such other law the Court finds applicable, for spoliating and fraudulently concealing evidence based upon their respective roles in committing, conspiring, aiding and abetting the spoliation of evidence material to Plaintiffs' and Class Members' underlying asbestos injury claims.

### COUNT II
### FRAUD AND DECEIT
### (Against All Defendants)

319.    Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein.

320.    As set forth above, beginning on or about March 7, 1984, the BASF Perpetrators and Lawyer Perpetrators, together with and all or some of the Fictitious Defendants, engaged in a continuous, uniform and persistent pattern and practice of falsely misrepresenting to Plaintiffs, members of the Class, their counsel, and presiding courts, that:

a.   BASF and its predecessor companies' talc ore and talc products did not contain asbestos fibers; and/or

b.   That there was not any evidence BASF and its predecessor companies talc ore and talc products contained asbestos.

321.    Each such representation was false and misleading at the time it was made.

145

322.    Defendants, acting as aforesaid, knew each representation was false and misleading or made the representation in reckless disregard as to its truth or falsity.

323.    Each  representation was deliberately made with the purpose and design of obstructing, impeding, impairing, terminating and/or otherwise disrupting asbestos injury litigation in which BASF and/or its predecessor companies was or were a party, and/or deterring and warding off the filing of asbestos injury claims against BASF and/or its predecessor companies.

324.    In addition to the above misrepresentations, the BASF Perpetrators and Lawyer Perpetrators, together with all or some of the Fictitious Defendants, engaged in a continuous, uniform and persistent pattern and practice of directly or indirectly making material omissions of fact, or, alternatively, omitting and withholding facts that they were under a duty to divulge in order make any statements made, in the light of the circumstances under which they were made, not misleading, regarding: (a) the absence of asbestos in BASF's and its predecessor companies' talc ore and talc products; and/or, (b) the non-existence of evidence that BASF's and its predecessor companies' talc ore and talc products contained asbestos.

325.    Among other things Defendants uniformly failed to disclose to, and intentionally withheld from Plaintiffs and others similarly situated, or their legal counsel or courts, was the existence of the facts, deposition transcripts, documents and other evidence developed in the *Westfall* case discovery that established BASF's and its predecessor companies' talc ore and talc products contained asbestos, and/or that the

BASF Perpetrators' had gathered and then withheld, concealed and destroyed material evidence relating to Plaintiffs' and Class Members' underlying asbestos injury claims.

326.   Defendants, acting as aforesaid, knew each represented, omitted or withheld fact and/or their non disclosures, were false and misleading to those they were made or directed to, including Plaintiffs and members of the Class, their respective counsel, and where and when applicable, presiding courts. Defendants knew and intended their misrepresentations and non-disclosures would be repeated or republished amongst the asbestos plaintiffs' bar, be accepted as true and affect the advice given to and decisions made by asbestos claimants regarding asbestos claims against BASF.

327.   As set forth above the BASF Perpetrators and the Lawyer Perpetrators agreed or conspired with each other, and/or with all or some of the Fictitious Defendants identified above, to commit the Fraudulent Asbestos Defense Scheme, in which the fraudulent misrepresentations and material misrepresentations were an integral part as well as constituting an overt act in furtherance of this conspiracy.

328.   Each misrepresentation and omission of material fact was deliberate and committed with the intent, purpose and design of obstructing, impeding, impairing, terminating and/or otherwise disrupting asbestos injury litigation in which BASF and/or its predecessor companies was or were a party, and/or deterring and warding off the future filing of asbestos injury claims against BASF and/or its predecessor companies, as well as to cover up Defendants' wrong doing and conspiracy.

329.   Plaintiffs and members of the Class, as did their counsel, naturally, reasonably and detrimentally relied upon the above misrepresentations and omissions

causing Plaintiffs and Class Members to either: (a)  suffer an  involuntary dismissal of their lawsuit because they could not produce evidence contradicting BASF and its predecessor companies' assertions and averments that its talc and talc ore did not contain any asbestos and/or there was no evidence that it did; (b) suffer a voluntary dismissal or discontinuance of their cases without consideration; (c) suffer a voluntary dismissal or discontinuance of their cases for a nominal or token consideration instead of full, fair and complete compensation they were entitled to under law; or, (d) refrain from filing a claim or suit against BASF and/or its predecessor companies.

330.    Plaintiffs and the class have been irreparably harmed by the defendant's fraudulent misrepresentations and omissions for which there is no adequate remedy at law given the extraordinary misconduct of the defendants and the circumstances they created thereby. Given the extraordinary circumstances here, together with the matter's overwhelming contacts and connection to New Jersey, declaratory and equitable relief from this Court is needed and warranted to help remedy the widespread injuries, harm and deprivations suffered by Plaintiffs and the Class Members victimized by Defendants' wrongdoing in the form of, *inter alia*: (a) a declaratory judgment determination and finding that the Defendants committed fraud that targeted persons making asbestos claims against BASF; (b) a robust notification program providing information about Defendants' fraud as well as other information  designed to enable those victimized and injured by the fraud (or where deceased or incompetent their personal representatives or next of kin) to make an informed decision regarding any further pursuit of their legal remedies from the Defendants; (c) adjunct declaratory  and injunctive relief curing, as needed and just, any evidentiary harm and proof impediments Defendants' egregious

148

misconduct is responsible for creating; (d) a decree and injunction imposing a constructive trust upon Defendants' property to fund the creation and  maintenance of an archive of BASF's evidence and records that had been fraudulently concealed; and (e) a decree ordering Defendants to render an accounting and thereafter disgorgement of any monetary benefits and funds revealed in the accounting which, in all equity and conscious of the Court, Defendants should not retain under the circumstances, together with an equitable distribution of such disgorgement.

## COUNT III
## CIVIL CONSPIRACY

### (Against All Defendants)

331.    Plaintiffs incorporate and re-allege the preceding paragraphs as if fully repeated herein

332.    Sometime between 1983 and March of 1984, the exact date being unknown to Plaintiffs, the BASF Perpetrators and  Lawyer Perpetrators, as well as all or some of the fictitious John Doe Defendants, entered into a conspiracy by agreeing with each other each to wrongfully and tortiously implement and carry out what is the Fraudulent Asbestos  Defense Scheme described above.

333.    The BASF Perpetrators and Lawyer Perpetrators, as well as all or some of the fictitious John Doe Defendants agreeing to participate, understood the general objectives of the Fraudulent Asbestos Defense Scheme, as described above, accepted them, and agreed to do their part to further them as well as to conceal the Fraudulent Asbestos Defense Scheme and each member of the conspiracy's part and role in same.

334.    The co-conspirators, the BASF Perpetrators, Lawyer Perpetrators, together with all or some of the fictitious John Doe Defendants, have engaged in, or have aided and abetted the commission of, numerous overt and fraudulent predicate acts in furtherance of the conspiracy, including the spoliation of the documents, and making material misrepresentations and omissions designed to defraud Plaintiffs and Class Members of their asbestos injury claims as described above.

335.    The nature of the above-described co-conspirators' acts, material misrepresentations, and material omissions in furtherance of the conspiracy gives rise to an inference that the BASF Perpetrators, Lawyer Perpetrators and John Does Defendants involved and part of the conspiracy not only agreed to the objective of the Fraudulent Asbestos Defense Scheme, but were aware that their ongoing unlawful and fraudulent acts have been and are part of an overall pattern of activity that was and is unlawful.

336.    As a direct and proximate result of the BASF Perpetrators' and Lawyer Perpetrators' overt acts and predicate acts in furtherance of the conspiracy, Plaintiffs and members of the Class suffered the loss of their asbestos injury claims, their right under law to pursue and receive full, fair and just compensation for their asbestos injury claims and their Constitutional right to a fair, honest and just judicial proceeding, thereby significantly damaging and injuring them.

337.    Plaintiffs and the class have been irreparably harmed by the defendant's conspiracy to implement and conduct the Fraudulent Asbestos Defense Scheme for which there is no adequate remedy at law given the extraordinary misconduct of the defendants and the circumstances they created thereby. Given the extraordinary circumstances here,

together with the matter's overwhelming contacts and connection to New Jersey, declaratory and equitable relief from this Court is needed and warranted to help remedy the widespread injuries, harm and deprivations suffered by Plaintiffs and the Class Members victimized by Defendants' wrongdoing in the form of, *inter alia*: (a) a declaratory judgment determination and finding that the Defendants committed fraudulent concealment, spoliation of evidence and common law fraud and deceit, that involved and targeted persons making asbestos claims against BASF; (b) a robust notification program providing information about Defendants' tortious wrongdoings,  as well as other information  designed to enable those victimized and injured by Defendants' wrongdoing (or where deceased or incompetent their personal representatives or next of kin) to make an informed decision regarding any further pursuit of their legal remedies from the Defendants; (c) adjunct declaratory  and injunctive relief curing, as needed and just, any evidentiary harm and proof impediments Defendants' egregious  misconduct is responsible for creating; (d) a decree and injunction imposing a constructive trust upon Defendants' property to fund the creation and  maintenance of an archive of BASF's evidence and records that had been fraudulently concealed; and (e) a decree ordering Defendants to render an accounting and thereafter disgorgement of any monetary benefits and funds revealed in the accounting which, in all equity and conscious of the Court, Defendants should not retain under the circumstances, together with an equitable distribution of such disgorgement.

## VIII.   DEMAND FOR RELIEF

**WHEREFORE**, Plaintiffs in their own right, and on behalf of others similarly situated, demand judgment against Defendants jointly, severally and in the alternative for the following relief:

> a.   Certification of the matter as a class action under Rule 23 as requested;

> b.   A declaratory determination  and judgment that fraudulent concealment and spoliation of material evidence relating to the existence  of asbestos BASF's talc has occurred to the detriment of the class members with corresponding mandatory injunctive relief requiring defendants to locate and notify Class members or, if applicable, their personal representatives or their next of kin as of this finding and their corresponding need to promptly consult with counsel regarding their legal rights as a result;

> c.   A declaratory determination  and judgment that BASF, Cahill Gordon and the individual defendants committed fraud and deceit relating to the existence  of asbestos BASF's talc to the detriment and harm of the class members with corresponding mandatory injunctive relief requiring defendants to locate and notify Class members or, if applicable, their personal representatives or their next of kin as of this finding and their corresponding need to promptly consult with counsel regarding their legal rights as a result;

> d.   Such further declaratory and equitable relief addressing and alleviating any impairment of Plaintiffs' and Class Members' ability to gather and present evidence establishing their underlying asbestos injury claims that Defendants'

152

spoliation and ensuing misrepresentations and material omissions proximately caused, including, but not limited to any detrimental loss or impact on Plaintiffs' and Asbestos Claimant Class Members' ability to: (i) establish the dangerous, defective nature of Engelhard's talc ore or products; (ii) establish harmful exposure to Engelhard's talc ore or products; (iii) establish Engelhard's failure to warn; and/or, (iv) establish the heeding of any proper warning or precautions that should have been given in connection with Engelhard's talc ore or products;

e.  A determination and declaration of the need for and ordering execution of a notice program paid for by Defendants informing Class Members or their representatives of the pendency of this action, the BASF and Cahill's alleged misconduct and the import and possible impact of same on their present or former asbestos injury claims, and their rights to proceed against Defendants;

f.  An injunction requiring BASF and Cahill Gordon to jointly and severally fund the maintenance of  an independent, perpetual trust established by the court for the purpose of locating, collecting, housing, archiving and making available BASF's asbestos documents and materials to Plaintiffs, class members and other persons or authorities designated  by the Court, and  further ordering and decreeing that BASF and Cahill Gordon shall assist and cooperate fully with the court's appointed trustees in the accomplishment of these remedial objectives, including providing, as needed information, waivers of privilege and waivers of confidentially rights;.

g.  A permanent injunction enjoining the Defendants from further misrepresenting and suppressing evidence relating to BASF's asbestos liability and Engelhard's talc ore or products;

h.   A declaration, injunction or decree imposing a constructive trust upon BASF's and Cahill Gordon's property and requiring BASF and Cahill Gordon to each render an accounting to the Court of all fees, revenues, costs, insurance proceeds, and expense savings relating to Plaintiff s and absent class member's asbestos injury claims.

i.   A determination and declaration of BASF's and Cahill Gordon's liability for disgorgement or restitution of revenues, profits and money unjustly earned from the commission of the frauds upon the courts, upon Plaintiffs' and members of the class and/or  by the commission of proscribed activities described above;

j.   A determination of Defendants' liability for compensatory and punitive damages to Plaintiffs and the Class relating to the fraudulent concealment and spoliation of evidence relevant and material to establishing asbestos injury claims against BASF;

k.   A determination and declaration that BASF's and Cahill Gordon's communications relating to the their fraudulent conduct and/or the spoliation of evidence are not privileged attorney-client communication under the crime fraud exception and an injunction barring and prohibiting either from asserting same are privileged in any proceeding involving and class members asbestos injury claims;;

l.   Such other relief as may be available and just.

## JURY DEMAND

Plaintiffs hereby demand trial by Jury on all issues so triable.

Dated: July 16, 2015

Respectfully Submitted,

**COHEN, PLACITELLA & ROTH, P.C.**

_____/s/ Christopher M. Placitella_____
Christopher M. Placitella, Esq.
_____/s/ Michael Coren_____
Michael Coren. Esq.
Jared Placitella Esq.
cplacitella@cprlaw.com
mcoren@cprlaw.com
jmplacitella@cprlaw.com
127 Maple Ave
Red Bank, New Jersey 07701
(732) 747-9003

*Of Counsel*:

Stewart L. Cohen, Esq.*
Harry M. Roth, Esq.*
Robert Pratter Esq.**
Two Commerce Square
2001 Market Street, Suite 2900
Philadelphia, PA 19103
(215) 567-3500

(* *Pro hac vice* admission)
(** *Pro hac vice* admission to be
applied for)

**Fox Rothschild LLP**

Jeffrey M. Pollock
Princeton Pike Corp. Center
997 Lennox Drive, Building 3
Lawrenceville, NJ 08648
Telephone: 609-896-7660
Attorneys for Plaintiffs and the Proposed Class

## <u>CERTIFICATION OF SERVICE</u>

I, Michael Coren, Esquire, of full age, hereby certify that on 16th day of July, a true

and correct copy of the foregoing Second Amended Complaint was filed with the Court's

CM/ECF system and will be served on all counsel of record through the ECF system.

_____/s/ Michael Coren_____