**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KIMBERLEE WILLIAMS, et al., | |
| Plaintiffs, | Civil Action No.: 11-1754 (JLL) (JAD) |
| v. | **OPINION** |
| BASF CATALYSTS LLC, et al., | |
| Defendant. | |

**LINARES**, District Judge.

As elaborated by the Third Circuit, this putative class action lawsuit alleges that Defendants conspired to prevent thousands of asbestos-injury victims from obtaining fair tort recoveries for their injuries by developing a scheme to mislead plaintiffs into believing that BASF's talc products did not contain asbestos, when, in fact, they did. *See Williams v. BASF Catalysts LLC*, 765 F.3d 306 (3d Cir. 2014). This matter was remanded by the Third Circuit, *see id.*, and is presently before the Court by way of Motions to Dismiss Plaintiffs'[1] Second Amended Complaint filed by the following Defendants: Thomas D. Halket ("Halket") (ECF No. 166); Arthur A. Dornbusch II ("Dornbusch") (ECF No. 167); BASF Catalysts LLC ("BASF") (ECF No. 168); Cahill Gordon & Reindel LLP (f/k/a Cahill Gordon & Reindel), Ira J. Dembrow ("Dembrow"), and Howard G. Sloane ("Sloane") (collectively "Cahill") (ECF No. 170); and Glenn Hemstock (ECF No. 177). The Court has considered the parties' submissions and decides this matter without oral argument

---

[1] Plaintiffs—Kimberlee Williams, Nancy Pease, Marilyn L. Holley, Donna Ware, Donnette Wengerd, and Rosanne Chernick—are representatives of estates of workers who worked in proximity to asbestos and died of asbestos-related diseases. They are asserting claims individually and on behalf of all other individuals similarly situated. For ease of reference, the Court refers generally to "Plaintiffs" except as otherwise noted.

pursuant to Rule 78 of the Federal Rules of Civil Procedure.  For the reasons set forth below, the

Court denies the Motions to Dismiss.


## PROCEDURAL HISTORY

This putative class action was commenced on March 28, 2011 with the filing of a Class

Action Complaint.  (ECF No. 1.)  Plaintiffs filed a First Amended Class Action Complaint

("FAC") on August 4, 2011, alleging violation of the New Jersey Racketeer Influenced and

Corrupt Organizations Act ("NJ RICO"), fraud, fraudulent concealment, civil conspiracy, fraud

upon the court, unjust enrichment, and violation of New York Judiciary Law § 487.  (ECF No.

70.) Defendants moved to dismiss (ECF Nos. 77-80, 83), and on December 12, 2012, United States

District Court Judge Stanley R. Chesler granted the motions and dismissed the FAC in its entirety.

(ECF Nos. 129, 130.)

Plaintiffs appealed the dismissal of three claims: fraud, fraudulent concealment, and

violation of NJ RICO.  *Williams*, 765 F.3d at 311; *see also* Concise Summary of the Case at 4, 765

F.3d 306 (3d Cir. 2014) (USCA 3d Cir. No. 13-1089, ECF No. 3111143049, Jan 22, 2013).  On

September 3, 2014, the Third Circuit affirmed in part and reversed in part, and remanded for further

proceedings.  (ECF No. 136.)  As an initial matter, the Third Circuit found that New Jersey law

applied and that the parties waived their right to argue otherwise.  *Id.* at 316-17.  Substantively,

the Third Circuit affirmed the District Court's dismissal of the NJ RICO count, *id.* at 323-34, but

reversed with respect to the fraud and fraudulent concealment claims, concluding that the FAC

"properly allege[d]" the requisite elements—"namely that BASF and Cahill lied about and

destroyed the asbestos evidence to plaintiffs' detriment." *Williams*, 765 F.3d at 311, 317-23.

However, the Third Circuit declined to rule on whether the FAC sufficiently stated a claim against the individual Defendants. *Id.* at 324 ("We leave it for the District Court to determine whether the remaining fraud and fraudulent concealment claims have been particularly pled against Halket, Hemstock, and Dornbusch.")  Additionally, with respect to requested relief, the Third Circuit held as follows:

> To the extent that [Plaintiffs'] relief invites the District Court to decide matters to be raised in other litigation, [Plaintiffs] ha[ve] not presented a justiciable controversy for which that relief would be appropriate.  To the extent that [Plaintiffs] seek[] remedies for the alleged fraud and spoliation, including declaratory and injunctive relief, the District Court is not barred by the Anti–Injunction Act from providing them.

*Id.* at 329.  On remand, the case was reassigned to the undersigned.  (ECF No. 142.)

On June 25, 2015, United States Magistrate Judge Joseph A. Dickson held a status conference and permitted Plaintiffs to amend their complaint in accordance with the Third Circuit opinion and mandate.  (*See* ECF No. 156, Tr. of 6/25/15 Status Conf. at 8:24.)

On July 16, 2015, Plaintiffs filed a Second Amended Class Action Complaint ("SAC") alleging three counts—fraudulent concealment, fraud, and civil conspiracy—and seeking equitable and compensatory relief.  (ECF No. 158.)  Defendants moved to dismiss the SAC.  (*See* ECF Nos. 166-1 ("Halket Mov. Br."), 167-1 ("Dornbusch Mov. Br."), 168-1 ("BASF Mov. Br."), 170-1 ("Cahill Mov. Br."), 177-1 ("Hemstock Mov. Br.").) [2]  Plaintiffs filed opposition (ECF Nos. 171 ("Pl. Opp. Halket Br."), 172 ("Pl. Opp. Dornbusch Br."), 173 ("Pl. Opp. BASF Br."), 174 ("Pl. Opp. Cahill Br.")), and Defendants replied (ECF Nos. 178 ("Halket Reply Br."), 175

---

[2] On March 22, 2016, the parties represented on the record to United States Magistrate Judge Joseph A. Dickson that Glenn Hemstock had been dismissed from this action.  (*See* ECF No. 189, Mar. 22, 2016 Tr. at 5:13-11:1.) Accordingly, Mr. Hemstock's motion (ECF No. 177) is denied as moot.

3

("Dornbusch Reply Br."), 176 ("BASF Reply Br."), 179 ("Cahill Reply Br.")).  The motions are ripe for resolution.

## FACTUAL BACKGROUND[3]

The SAC alleges a systemic plot by BASF and its law firm, Cahill Gordon, to mislead actual and potential asbestos-exposure plaintiffs into believing that BASF's talc products did not contain asbestos when, in fact, they did.  Defendants in this case include both Engelhard's successor, BASF, and Engelhard's former employees and attorneys.[4]

BASF, operating under the Engelhard label,[5] operated a talc mine in Johnson, Vermont, from 1967 to 1983 whereby it processed talc into various products, such as "Emtal talc." (SAC ¶¶ 78-81.)  Internal laboratory testing during the 1970s and 1980s revealed that both talc from the Johnson Mine and processed Emtal talc products contained asbestos.  (Id. ¶¶ 84, 87.)  BASF "had knowledge" of the testing and their results concerning asbestos and talc products.  (Id. ¶ 85.)  Further, as scientific and business records, the tests and results were "kept and maintained" by BASF in their records.  (Id. ¶ 86.)  In spite of the test results, BASF "represented to its customers,

---

[3] This background is derived from Plaintiff's Complaint, which the Court must accept as true at this stage of the proceedings.  See Alston v. Countrywide Fin. Corp., 585 F.3d 753, 758 (3d Cir. 2009).  Furthermore, because the Court writes primarily for the parties, and because the Third Circuit aptly set forth the facts already, see Williams, 765 F.3d at 311-14, the Court will set forth only those facts necessary to the present analysis.  See Knox v. Quest Diagnostics, Inc., 522 F. App'x 150, 151 (3d Cir. 2013).

[4] Thomas D. Halket was BASF's in-house counsel assigned to asbestos claims.  (SAC ¶ 41.)  Glenn Hemstock was BASF's Vice President of Research and Development and he supervised those scientists who "tested or conducted research on Engelhard's talc." (Id. ¶ 42.)  Arthur A. Dornbusch II was BASF's General Counsel.  (Id. ¶ 43.)  Cahill Gordon & Reindel LLP represented BASF and its predecessors in asbestos litigation from 1983 to 2010.  (See id. ¶ 59; see also id. ¶¶ 46-61 (noting in part that Cahill Gordon & Reindel LLP came into existence on or as of April 29, 2003, and is successor in interest to the law firm partnership known as "Cahill Gordon & Reindel").)  Howard G. Sloane and Ira J. Dembrow worked for BASF as lawyers at Cahill during the relevant time period. (Id. ¶¶ 62, 64.)

[5] The Engelhard businesses included Engelhard Corp., Engelhard Industries, Engelhard Mineral & Chemical Corp., and Eastern Magnesia Talc Co.  BASF acquired the Engelhard companies in 2006.

industry trade groups and the Federal Government that the Emtal talc was asbestos free and even marketed the product as a viable asbestos substitute." (*Id.* ¶ 90.)

In 1979, a relative of a deceased individual exposed to asbestos brought suit against BASF ("*Westfall*"). (*Id.* ¶ 92.) Cahill Gordon represented BASF in the *Westfall* suit. (*Id.* ¶ 94.) During the course of the *Westfall* litigation, it was demonstrated that the Emtal talc contained asbestos. (*Id.* ¶ 99.) Deposition testimony from Glenn Hemstock, one of BASF's scientists, further revealed the presence of asbestos in Emtal talc as he "admitted that various tests performed throughout the 1970s and 1980s, both by BASF employees and by third parties, indicated the presence of asbestos fibers in Emtal talc." (*Id.* ¶¶ 104-06.) The *Westfall* case ultimately settled,[6] with the inclusion of a confidentiality clause in the agreement prohibiting the parties from discussing the case. (*Id.* ¶¶ 132, 133.)

Engelhard anticipated that the *Westfall* action would be the first of many asbestos lawsuits. On March 7, 1984, however, Hemstock circulated a memorandum entitled "DOCUMENT RETRIEVAL – DISCONTINUED OPERATIONS," which directed employees to gather for discard all materials related to the discontinued operations of the company and Emtal talc. (*Id.* ¶¶ 136-37.) Immediately thereafter, BASF gathered up the documentary evidence relating to the asbestos-containing talc and either "destroyed or secreted away" the materials.[7] (*Id.* ¶ 139.)

Further, as alleged in the SAC, BASF and Cahill began to create and manipulate evidence in their favor. (SAC ¶¶ 146-52.) The Defendants: collected and spoliated evidence that the talc

---

[6] The SAC indicates that settlement occurred sometime between April 1983 and March 1984, but the specific date is not alleged. (*Id.* ¶ 128.)

[7] The SAC alleges that the memorandum directed employees to gather "Emtal talc sales and inventory records, laboratory notebooks, which would include data and test or assay results on Emtal Talc products and talc ore from the Johnson Mine, samples, photo micrographs, original depositions, deposition exhibits, and test and assay result documents on tests or assays performed by third parties." (SAC ¶ 140.)

contained asbestos (*id.* ¶¶ 151(f), 152(b)); procured false unsown and sworn representations from employees and experts (*id.* ¶¶ 151(g), 152(h)); and prepared "template and stock pleading, discovery, and motions documents for use by local counsel in asbestos injury claim lawsuits that contained information . . . [known] to be false or misleading" (*id.* ¶ 152(e)). Between 1984 and 2009, whenever an asbestos claim was brought against BASF, BASF would "systematically and uniformly" represent that "BASF's talc ore, Emtal talc and Emtal products did not contain any asbestos and/or there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos." (*Id.* ¶ 153.) In essence, the SAC alleges that, when lawsuits materialized, BASF and Cahill misled the claimants about the facts in order to frustrate asbestos injury suits.

The Defendants' scheme unraveled in 2009, when a former BASF researcher and employee testified that he was aware that Emtal talc contained asbestos and that the Johnson mine was shut down due to asbestos in the talc. (SAC ¶¶ 244, 248(a) (citing *Paduano v. Ace Scientific Co.*, No. MID-L-2976-09).) The former employee further opined that the document collection that took place in 1984 was for the purpose of destroying the material. (SAC ¶ 248(d)-(h).) Shortly thereafter, plaintiffs' counsel in the *Paduano* case began an investigation into whether BASF had destroyed or concealed material evidence. (*Id.* ¶ 249.) Though the *Paduano* case ultimately settled, the investigation led to the discovery of incriminating tests dated 1972, 1977, 1978, and 1979 that found the "presence of asbestos fibers in the Emtal talc." (*Id.* ¶ 256; 258(a)-(f).) None of the tests or documents were "ever produced to any asbestos injury claimant or their counsel" in any litigation against BASF. (*Id.* ¶ 259.)

The Plaintiffs commenced this action subsequent to the revelations brought about by the *Paduano* case concerning the concealed and destroyed documents. (*See* ECF No. 1.)

6

## LEGAL STANDARD

To withstand a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

To determine the sufficiency of a complaint under *Twombly* and *Iqbal* in the Third Circuit, the court must take three steps: first, the court must take note of the elements a plaintiff must plead to state a claim; second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (citations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

The Court's role is not to determine whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011) (internal citation and

quotation marks omitted).  The Court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 663-64.

## DISCUSSION

### A. Fraudulent Concealment / Spoliation

1. Standard

To prevail on a claim for fraudulent concealment under New Jersey law, a plaintiff must establish five elements:

(1) The defendant had a legal obligation to disclose evidence in connection with an existing or pending litigation;

(2) the evidence was material to the litigation;

(3) the plaintiff could not reasonably have obtained access to the evidence from another source;

(4) the defendant intentionally withheld, altered, or destroyed the evidence with purpose to disrupt the litigation; and

(5) the plaintiff was damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed.

*Rosenblit v. Zimmerman*, 166 N.J. 391, 406-07 (2001).

On its plain language, the tort of fraudulent concealment can be invoked to cover a variety of factual circumstances.  Relevant to this action, it has been applied to concealment of evidence, as well as spoliation.  *See Viviano v. CBS, Inc.*, 251 N.J. Super. 113 (App.Div.1991), *certif. denied*, 127 N.J. 565, 606 A.2d 375 (1992) (approving fraudulent concealment claim where employer hid

8

internal memorandum which "contained the key information plaintiff needed to recover for her injuries"); *Rosenblit*, 166 N.J. at 407 ("[T]he tort of fraudulent concealment, as adopted, may be invoked as a remedy for spoliation where those elements exist. Such conduct cannot go undeterred and unpunished and those aggrieved by it should be made whole with compensatory damages and, if the elements of the Punitive Damages Act are met, punitive damages for intentional wrongdoing.") (internal footnote omitted).

2. Analysis

In reversing Judge Chesler's opinion, the Third Circuit found that Plaintiffs adequately pleaded a claim for fraudulent concealment. *Williams*, 765 F.3d at 320-23; *id.* at 321 ("Taken together, these facts, if proven, establish that BASF and Cahill intentionally destroyed or withheld material evidence that they were duty-bound to disclose and that their adversaries could not otherwise access."). The Third Circuit's opinion focused on the fifth element, concluding that Plaintiffs had adequately alleged injury, but also found that the other elements were satisfied, including the first (a legal obligation to disclose evidence in connection with an existing or pending litigation). "As early as 1979, BASF faced actual or threatened litigation over asbestos injuries caused by its products. BASF, and its lawyers at Cahill, anticipated additional lawsuits in the future." *Id.* at 321. The Third Circuit noted that "[c]ommonsense and judicial experience underscore the plausibility" of the fraudulent concealment claim. *Id.* at 322.

In relevant part, the SAC alleges that as of March 1984, BASF and Cahill were "aware that BASF's Predecessor Companies had been sued by asbestos injury claimants contending Engelhard's Emtal talc mined at the Johnson Mine contained asbestos which caused asbestos personal injuries" and that it was "foreseeable and likely" that they would be sued by other

claimants, such that they were "under a duty to preserve evidence and documents that were relevant to such claims and litigation, including a duty to suspend any document retention policies that were in effect of were being put into operation[.]" (SAC ¶¶ 300-04.) The SAC alleges that despite their preservation duty, Defendants "began and continued to engage in a uniform and persistent pattern and practice of evidence spoliation by withholding, concealing and/or destroying material evidence relating to the Plaintiffs' and Class Members' underlying asbestos injury claims[.]" (*Id.* ¶¶ 308-12.)

Cahill, Halket, and Dornbusch move to dismiss the fraudulent concealment claim. Cahill and Halket primarily argue the first element is not satisfied, and claim that in 1984, when the alleged spoliation occurred, Defendants did not have a duty to preserve evidence as it pertains to Plaintiffs in this action. (*See* Cahill Mov. Br. at 12-22; Halket Mov. Br at 9-10.) In essence, Cahill and Halket argue that *Rosenblit*'s requirement of "existing or pending litigation" is narrower than "reasonably foreseeable" litigation. In other words, according to Cahill and Halket, because the evidence was allegedly destroyed in the interim period after *Westfall* settled and prior to "pending" (*i.e.*, imminent) litigation, Plaintiffs cannot state a claim for fraudulent concealment under *Rosenblit*. Additionally, Cahill argues that a duty to preserve evidence runs to a specific litigant, not just to anyone who might file suit years later, and that there is no general preservation duty to unknown non-clients. (Cahill Mov. Br. at 18-22.) Alternatively, the individual Defendants put forth the following arguments in support of dismissal: the SAC does not allege that Mr. Dembrow worked on talc matters when spoliation occurred (*Id.* Br. at 39); the claim against Mr. Halket rests on "naked speculation" and conclusory allegations (Halket Mov. Br. at 10-11); and the SAC fails to allege that Mr. Dornbusch withheld, altered, or destroyed any evidence, intentionally or

10

otherwise (Dornbusch Mov. Br. at 15-19).

In opposition, Plaintiffs argue that the SAC adequately pleads the fraudulent concealment claim, in that it alleges in part that Defendants had a legal duty to disclose and preserve evidence. (Pl. Opp. Cahill Br. at 10-27.)  Plaintiffs assert that the duty to preserve evidence is fundamentally the same today as it was in 1984, because it is implicit in the fabric of the law: "a putative defendant is obligated to preserve evidence relevant to, at least, reasonably foreseeable litigation." (*Id.* at 12.)  Plaintiffs characterize Defendants' argument as lacking in common sense and fundamental fairness, and contend that the duty to preserve extends to them: "Cahill essentially argues that while it was legally impermissible to destroy evidence with the specific intent to disrupt a single known litigant's claim, that same evidence can be purposely destroyed knowing that it would disrupt, hundreds or thousands of unknown (but foreseen) litigants' claims as alleged here." (*Id.* at 21.)  Plaintiffs also argue that the SAC adequately pleads the fraudulent concealment claim against the moving individual Defendants, in that the duty to preserve ran from the individual Defendants to the Plaintiffs, and that the SAC sets forth sufficient factual allegations to find that the individual Defendants plausibly committed fraudulent concealment.  (*Id.* at 25-27; Pl. Opp. Dornbusch Br. at 15-25; Pl. Opp. Halket Br. at 11-21.)

    a.**Defendants Had a "Legal Obligation to Disclose Evidence in Connection With an Existing or Pending Litigation" and Plaintiffs Have Adequately Stated a Claim in General.**

The parties agree that the existence of a defendant's duty to preserve evidence is an issue of law to be decided by the trial court.  (Pl. Opp. Cahill Br. at 12; Cahill Mov. Br. at 13.)  The Court denies the motions to dismiss this claim and finds that the SAC adequately alleges a claim for fraudulent concealment, in general for three reasons: the Third Circuit already determined that

11

this claim was sufficiently pleaded, the Court is convinced that Defendants had a duty to preserve, and Defendants' continuing course of conduct further supports the claim.

First, the Third Circuit has already established that Plaintiffs have sufficiently pleaded a claim for fraudulent concealment under *Rosenblit*. As noted, although the vast majority of the analysis focused on the fifth prong (damages), the Third Circuit first indicated that the first four prongs were satisfied as well:

> [Plaintiffs] ha[ve] alleged the first four elements of a spoliation claim: As early as 1979, BASF faced actual or threatened litigation over asbestos injuries caused by its products. BASF, and its lawyers at Cahill, anticipated additional lawsuits in the future. BASF possessed evidence that its talc products contained asbestos, including assays, lab notes, and testimony. [Plaintiffs] could not have accessed the evidence—most of which was held exclusively by BASF and Cahill—through any other means. And, [Plaintiffs] now claim[], rather than maintain the evidence, BASF and Cahill concealed or destroyed it. Taken together, these facts, if proven, establish that BASF and Cahill intentionally destroyed or withheld material evidence that they were duty-bound to disclose and that their adversaries could not otherwise access. *Cf. Rosenblit*, 766 A.2d at 758.

*Williams*, 765 F.3d at 321. In sum, the Third Circuit held that "[t]he Complaint alleges a plausible claim for fraudulent concealment" and reversed the district court's dismissal of this claim. *Id.* at 320, 323. This Court is guided accordingly.

Second, the Court finds that Defendants had a duty to preserve. At issue is whether Defendants had a "legal obligation to disclose evidence in connection with an *existing or pending* litigation" at the time of the alleged spoliation. *Rosenblit*, 166 N.J. at 406 (emphasis added). Cahill and Halket, in essence, argue that the fraudulent concealment claim fails because the evidence was allegedly destroyed at an opportune time: after the "existing" *Westfall* case settled but prior to "pending" (*i.e.*, imminent) litigation. In the Court's view, this misses the mark. The Court declines

12

to delineate the precise contours of the duty to preserve as it existed in 1984, but finds that: in 1984, a party had a duty to preserve evidence when it was relevant in a prior lawsuit, and where it was reasonably foreseeable that the evidence would be relevant to anticipated lawsuits of nearly identical subject matter and similarly situated adversaries.  Stated differently, the Court cannot conclude that a window of consequence-free spoliation can be discerned from the legal duty to preserve evidence as it existed in 1984.

This conclusion is in line with case law from the time relied on by Cahill.  For example, in *Struthers Patent Corp. v. Nestle Co.*, the plaintiff patent-holder had destroyed relevant evidence on the eve of filing suit. 558 F. Supp. 747, 758-59, 765 (D.N.J. 1981).  The court, writing in 1981, held that the "applicable rule" for evaluating a party's duty to preserve is "set forth in *Bowmar*," *id.* at 765, which in turn held that the "proper inquiry" is "whether defendant, with knowledge that this lawsuit would be filed, wilfully destroyed documents which it knew or should have known would constitute evidence relevant to this case."  *Id.* (citing *Bowmar Instrument Corp. v. Texas Instruments, Inc.*, 25 Fed. R. Serv. 2d 423, 427 (N.D. Ind. 1977)).  Cahill construes this passage to suggest that, in 1984, the duty to preserve documents in New Jersey was triggered in part when a party knew that a specific claim was likely to be filed by a specific plaintiff. (*See* Cahill Mov. Br. at 16.)  However, the Court disagrees that the identity of a *specific* plaintiff was required, notwithstanding the reference in *Bowmar* to "this case."

The language used in *Struthers* is telling.  There, the district court found that plaintiff had wrongfully destroyed evidence, and emphasized that at the time of the destruction plaintiff was "*contemplating new litigation involving substantially the same subject matter and issues as were involved in the litigation in which the documents had been assembled.  It knew that a substantial*

13

portion of the documents would be relevant in the litigation *about to be instituted*. Yet it nevertheless destroyed those documents." *Struthers*, 558 F. Supp. 747 at 765 (emphasis added); *id.* at 759 ("[A]t the time it caused the destruction of the documents [Struthers] knew or should have known that litigation against Nestle on the patents at issue was a *distinct possibility*.") (emphasis added). Here, at the time of the alleged spoliation, the SAC alleges that Defendants knew it was a "distinct possibility" that as-yet-unidentified plaintiffs were "contemplating new litigation involving substantially the same subject matter and issues as were involved in the [*Westfall*] litigation in which the documents had been assembled" and further knew that a "substantial portion of the documents would be relevant in the litigation about to be instituted." *Id.* at 759, 765.

Moreover, the duty existed even though the precise identity of the specific plaintiffs were unknown, given the unique factual allegations contained in the SAC. Although in general a duty to preserve runs to a specific party, "litigation can help 'sensitize' a defendant to issues that may arise in other lawsuits and trigger a need to preserve in certain instances . . . ." *Brigham Young Univ. v. Pfizer, Inc.*, 282 F.R.D. 566, 572 (D. Utah 2012) (hereinafter "*BYU*"). The Court finds that this is one of those instances. Here, not only were Defendants "sensitized" to a need to preserve, the SAC alleges that they fully understood that preserving evidence would subject them to significant liability, yet they entered into a scheme to intentionally destroy evidence in order to frustrate reasonably foreseeable litigation involving substantially the same subject matter and issues. Defendants had a clear duty to preserve that ran to a specific civil plaintiff, and then allegedly destroyed the evidence that would be required by similar individuals in the numerous lawsuits that were reasonably foreseeable. In contrast, in the cases relied on by Defendants on this

14

point, the duty was owed first and foremost to the federal government—not a similarly situated civil plaintiff. *See BYU*, 282 F.R.D. at 572; *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 770 F. Supp. 2d 1299, 1308 (N.D. Ga. 2011) (when DOJ commenced a confidential investigation, "Delta had a duty to the *DOJ* to preserve and produce all relevant documents.  However, the Court has difficulty accepting the notion that at that time, as a matter of law Delta immediately owed the same duty to *Plaintiffs*.").  Furthermore, the Court finds that the duty ran from Cahill to the "unknown non-clients," since the privity rule that protects attorneys from owing duties to individuals other than their own clients has been relaxed in certain circumstances, as Cahill acknowledges.  Under these facts, for the reasons above and finding no precedent to the contrary, the allegations in the SAC warrant a relaxation of this privity rule.

Finally, even if this Court were to find that Plaintiffs were unable to state a claim for spoliation because Defendants did not owe a duty at the time they allegedly destroyed the evidence (which it does not), Plaintiffs would nevertheless state a claim for fraudulent concealment based on the allegations of continuing activity alleged in the SAC.  In short, although the alleged spoliation occurred sometime in 1984, the SAC specifically alleges that over the next twenty-plus years, Defendants fraudulently concealed the existence of relevant evidence when confronted with personal injury lawsuits concerning Emtal and the Johnson mine.  (*See* SAC ¶ 153 (noting that between 1984 and 2009, whenever an asbestos claim was brought against BASF, Defendants would "systematically and uniformly" represent that "BASF's talc ore, Emtal talc and Emtal products did not contain any asbestos and/or there was no evidence that BASF's talc ore, Emtal talc and Emtal products contained asbestos.").)  When these misrepresentations were made, In light of Hemstock and Triglia's deposition transcripts, for example, Defendants committed the tort

of fraudulent concealment, as (1) the defendant had a legal obligation to disclose evidence in connection with an existing litigation; (2) the evidence was material; (3) the plaintiff could not reasonably have obtained access to the evidence from another source; (4) the defendant intentionally withheld, altered, or destroyed the evidence with purpose to disrupt the litigation; and (5) the plaintiff was damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed. Stated differently, the SAC sufficiently alleges a claim for fraudulent concealment based on allegations that Defendants withheld and/or concealed evidence. These allegations are related to, but ultimately distinct from, the alleged spoliation. Although withholding or concealing evidence is arguably most fundamentally a claim for fraud (*see infra*), such conduct also satisfies the requirements for fraudulent concealment.

Accordingly, the Court finds that, as already decided by the Third Circuit, Plaintiffs have sufficiently stated a claim under *Rosenblit* for fraudulent concealment. In the next section, the Court discusses how the SAC, when giving all inferences in favor of Plaintiffs,[8] adequately states a claim against the individual Defendants.

### b. The SAC Sufficiently Alleges a Claim of Fraudulent Concealment Against the Individual Defendants.

Thomas Halket, Arthur A. Dornbusch II, and Ira J. Dembrow each move to dismiss the fraudulent concealment claim against them for lack of sufficiently particular factual allegations as to them individually. (*See* Halket Mov. Br. at 10-11; Dornbusch Mov. Br. at 15-19; Cahill Mov. Br. at 39 (Dembrow).) The Third Circuit declined to consider such arguments "in the first instance" because the parties did not focus on them during appeal, and left it to the district court

---

[8] On a motion to dismiss, "Courts must accept as true the plaintiffs' allegations and draw inferences in the plaintiffs' favor." *Williams*, 765 F.3d at 323 (3d Cir. 2014).

to determine whether the remaining claims have been pled with the requisite particularity under Federal Rule of Civil Procedure 9(b). *Williams*, 765 F.3d at 324. However, the Third Circuit "reject[ed] the argument raised by Thomas D. Halket that his innocence compels dismissal" under Federal Rule of Civil Procedure 8, because "[t]o accept Halket's argument . . . is to reject the factual allegations of the complaint." *Id.*

> Though Halket may have ended his employment with Engelhard, the Complaint, construed in the light most favorable to Williams, does not support the further inference that Halket bears no responsibility for what he set in motion. Of course, discovery may exonerate Halket and, in any event, he will have the opportunity to contest the truth of those allegations in a later stage of the lawsuit. But on a motion to dismiss, a court may not accept a defendant's factual representations that he has been wrongly accused when the plaintiff has averred otherwise.

*Id.* Furthermore, the Third Circuit noted that "[c]ommonsense and judicial experience underscore the plausibility" of the fraudulent concealment claim. *Id.* at 322.

Under Federal Rule of Civil Procedure 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." In general, "the circumstances of a fraud must be stated with sufficient particularity to put a defendant on notice of the 'precise misconduct with which [it is] charged[.]'" *Fink v. Bishop*, --- F. App'x ---, 2016 WL 670137, at *4 (3d Cir. Feb. 18, 2016) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004)). However, "Courts must be sensitive to the fact that application of Rule 9(b) prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud.'" *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (quoting *Christidis v. First Pennsylvania Mortgage Trust*, 717 F.2d 96, 99-100 (3d Cir. 1983)). Thus, "[t]he heightened standard for pleading fraud is relaxed in circumstances where the information necessary to plead with particularity is concealed

by defendants." *Hunt Const. Grp., Inc. v. Farina*, No. 11-4933, 2012 WL 72286, at \*5 (D.N.J. Jan. 10, 2012) (citing *Craftmatic*, 890 F.2d at 645); *see also Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998) (noting that courts should apply Rule 9 "with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants") (citation omitted).

Upon careful review of the SAC, the Court concludes that the SAC adequately states a claim against the individual Defendants. As an initial matter, the Court relaxes somewhat the heightened pleading standard, given the nature of the claims and the alleged clandestine and secretive nature of the scheme. With respect to Mr. Dembrow, the SAC specifically alleges that, while an attorney at Cahill Gordon, he wrongfully concealed evidence, which as noted above can support a claim of fraudulent concealment as well as fraud. (*See* SAC ¶¶ 64, 65, 152, 156, 158, 159, 163.) In other words, even though the SAC alleges that Mr. Dembrow began working on Engelhard talc matters after the alleged initial destruction of evidence occurred, there are still sufficient allegations in the SAC to show that Plaintiffs are plausibly entitled to relief as to Mr. Dembrow for fraudulently concealing evidence later on. Likewise, with respect to Mr. Halket, the SAC alleges with sufficient particularity that he spoliated evidence while employed as in-house counsel for BASF with the intent to disrupt future lawsuits. (*See* SAC ¶¶ 41, 65, 89, 90, 98, 128, 129, 133, 136-45, 308.) Indeed, the Third Circuit noted that "Plaintiffs have alleged that Halket organized the effort to conceal and destroy evidence after the *Westfall* case." *Williams*, 765 F.3d at 324. Similarly, the SAC sufficiently alleges that Mr. Dornbusch, while employed in part as BASF's General Counsel, knowingly concealed and/or spoliated evidence with the intent to disrupt future lawsuits. (*See* SAC ¶¶ 43, 84-90, 92-96, 100-29, 136-145, 189, 191, 198, 254-64, 302, 305.)

18

In short, the Court finds that the SAC sufficiently provides the individual Defendants with notice of the precise misconduct with which they are charged. The Court reiterates that the individual Defendants will have the opportunity to contest the truth of the allegations in the SAC at a later stage of the lawsuit and that discovery may well exonerate them. Accordingly, the Court shall deny the motions to dismiss this claim.

### B. Fraud

1. Standard

New Jersey recognizes a common-law fraud cause of action. A plaintiff seeking to recover for fraud must allege five elements: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 172-73 (2005) (quotation marks and citation omitted); *see also Williams*, 765 F.3d at 317.

2. Analysis

Judge Chesler initially dismissed Plaintiffs' fraud claim as barred by New Jersey's so-called litigation privilege, which generally protects an attorney from civil liability arising from words uttered in the course of judicial proceedings. The Third Circuit reversed, concluding that the litigation privilege "does not extend immunity to those who manipulate their adversaries in and out of court over a period of decades" and that Plaintiffs had in fact pled a claim for fraud. *Williams*, 765 F.3d at 320. "Taken together, [Plaintiffs] ha[ve] alleged that BASF and Cahill obtained 'an undue advantage by means of some act or omission that is unconscientious or a violation of good faith,' the essence of fraud." *Id.* at 317 (citing *Jewish Ctr. of Sussex County v.*

19

*Whale*, 86 N.J. 619 (1981)).

> Here, the complaint alleges, BASF and Cahill engineered the false statements and evidence in advance of litigation. Then, either directly or through local counsel, BASF and Cahill deployed their prefabricated defense against claimants as they arose. . . . They rigged the game from the beginning. . . . According to the complaint, BASF and Cahill were not mischaracterizing the facts; they were creating them.

*Id.* at 319.

The SAC asserts that BASF and Cahill falsely represented that "BASF and its predecessor companies' talc ore and talc products did not contain asbestos fibers" and "that there was not any evidence BASF and its predecessor companies['] talc ore and talc products contained asbestos." (SAC ¶ 320.) The SAC, like the FAC, "pleads many of these statements precisely, quoting from various letters and faxes sent by Cahill attorneys on behalf of BASF," *Williams*, 765 F.3d at 317. Additionally, the SAC alleges that BASF and Cahill made these representations to Plaintiffs for the purpose of "obstructing, impeding, impairing, [or] terminating" asbestos-injury litigation (SAC ¶ 323), and that Plaintiffs "detrimentally relied" on these communications, settling, dismissing, or abandoning their claims against BASF. (*Id.* ¶ 329.)

Cahill, Halket, and Dornbusch move to dismiss the fraud claim. Cahill argues that the SAC fails to plead a claim of fraud against Mr. Dembrow because it is not fraud for counsel in settlement negotiations to "preview" or characterize a document provided to opposing counsel (Cahill Mov. Br. at 23-28), and that there is no viable claim as to Mr. Sloane because interrogatory answers are not representations by counsel. (*Id.* at 28-30.) Cahill thus argues that, because there is no viable fraud claim against individual Cahill attorneys, there can be no fraud claim against the law firm itself. (*Id.* at 30-31.) Similarly, Mr. Halket and Mr. Dornbusch argue that the SAC does not allege

that they made any misrepresentations regarding Engelhard's talc products and that the SAC fails

to meet Rule 9's heightened pleading requirements.  (Halket Mov. Br. at 11-12; Dornbusch Mov.

Br. at 19-20.)

In opposition, Plaintiffs argue that the fraud claims are plausible and should not be

dismissed.  First, with respect to Mr. Dembrow, Plaintiffs contend that the statements made by Mr.

Dembrow deprived opposing counsel of the opportunity to independently evaluate the evidence.

(Pl. Opp. Cahill Br. at 28-31.)  Second, as to Mr. Sloane, Plaintiffs argue that the SAC adequately

alleges fraud in that he directed other attorneys, including local counsel, to make the

misrepresentations.  (*Id.* at 31-33.)  Third, Plaintiffs argue that they have adequately pled a claim

against Cahill under principles of agency law.  (*Id.* at 33 n. 19.)  Fourth, with respect to Mr. Halket

and Mr. Dornbusch, Plaintiffs contend that the SAC alleges ample and specific facts establishing

their roles in the fraudulent scheme.  (Pl. Opp. Halket Br. at 21-23; Pl. Opp. Dornbusch Br. at 25-

31.)

The Court finds that, for essentially the same reasons discussed in connection with the

fraudulent concealment claims in Part A.2.b, *supra*, the SAC sufficiently states a claim for fraud

against the individual Defendants.  The Court reiterates that it must accept all factual allegations

as true and give all favorable inferences to Plaintiffs.  *Williams*, 765 F.3d at 323 (3d Cir. 2014).

And although Rule 9 requires pleading with particularity for claims of fraud, the standard is relaxed

where the information necessary to plead with particularity is concealed by defendants, *see Farina*,

2012 WL 72286, at *5, which Plaintiffs have alleged here.  (*See* SAC ¶¶ 41, 43, 62.)    Ultimately,

the underlying purpose of Rule 9 is to put the parties on notice of the precise misconduct with

which they are charged.  *See Lum*, 361 F.3d at 224.  The Court finds that the SAC comports with

this goal.

With respect to the former BASF employees, the SAC alleges a claim for fraud with sufficient particularity as to Mr. Halket (*see* SAC ¶¶ 17-34, 41, 65, 128, 136-55, 308) and to Mr. Dornbusch (*see id.* ¶¶ 43, 128, 146, 153-243, 320, 324-25.) The SAC in essence alleges that these individuals—as in-house counsel responsible for handling asbestos claims (Halket), and as Vice President, general counsel, and corporate secretary (Dornbusch)—helped put the fraudulent scheme in to motion, including authorizing Cahill and local counsel to make misrepresentations and material omissions to future litigants, with intent to deceive. Not only does the SAC allege that these individuals participated in the creation and operation of the scheme (SAC ¶¶ 41, 43), it also provides examples of how the scheme operated (*id.* ¶¶ 153-243). Again, given the alleged secretive nature of the scheme, the Court finds that the pleadings sufficiently put these individuals on notice of the precise misconduct alleged and thus sufficiently states a claim.

Similarly, the Court finds that the SAC, when construed in a light most favorable to Plaintiffs, likewise states a claim against the individual Cahill employees, Mr. Dembrow and Mr. Sloane. With respect to Mr. Dembrow, the SAC alleges in part that he helped prepare template and stock pleading, discovery, and motion documents to be served by local counsel, with knowledge that they were false, and that he himself made false representations as to the existence of talc and evidence thereof in BASF's products and instructed local counsel to do the same. (*See* SAC ¶¶ 64, 152, 154, 156-58, 160-64, 327-29.) Similar with Mr. Sloane, the SAC alleges that he made fraudulent misrepresentations and omitted material facts to claimants in part by providing local counsel with fraudulent evidence and documents and instructing them on how to proceed, even after he was aware of Dr. Hemstock's testimony stating that Emtal contained asbestos. (*See*

SAC ¶¶ 62, 100-08, 112, 117-19, 121, 123, 152, 156, 159, 160, 205-12, 320-25.)  Mr. Dembrow

and Mr. Sloane attempt to minimize their roles in the scheme and argue that the SAC identifies

with particularity only two affirmative acts, which do not rise to the level of misrepresentations:

specifically, that Mr. Dembrow sent letters to opposing counsel "characterizing" certain evidence,

and that Mr. Sloane "prepared and/or reviewed" interrogatory answers.  (*See* Cahill Mov. Br. at

23-30.)  However, as indicated by the Third Circuit, the allegations in the SAC are broader than

that, and ultimately amount to a scheme to "engineer[] . . . false statements and evidence in advance

of litigation" which were then "deployed . . . against claimants as they arose." *Williams*, 765 F.3d

at 319.  As noted, Plaintiffs have specifically pointed to the clandestine nature of the scheme,

which, in this Court's view, warrants a relaxation of the need to plead with the utmost particularity.

The evidence may reveal that these individuals played a limited role in the scheme and that they

did not commit fraud.  For example, Sloane's role may well be limited to simply submitting

answers to interrogatories supplied directly from his client.  However, such a decision is not

presently before the Court and is more appropriate on a motion for summary judgment.

     To be clear, keeping in mind that this is a motion to dismiss, the Court here is merely

concluding that Plaintiffs are entitled to offer evidence to support their claims.  *United States ex*

*rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011) (noting that the role of

the court on a motion to dismiss is not to determine whether the non-moving party "will ultimately

prevail" but whether that party is "entitled to offer evidence to support the claims").  The individual

Defendants will ultimately have the opportunity to contest the truth of the allegations in the SAC,

and discovery may well exonerate them.

### C. Civil Conspiracy

1. Standard

In New Jersey, a civil conspiracy is "'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means," the primary element of which "is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.'" *Banco*, 184 N.J. at 177 (quoting *Morgan v. Union Cnty. Bd. of Chosen Freeholders*, 268 N.J. Super. 337, 264 (App. Div. 1993)). The essential component of an action in civil conspiracy "is not the conspiracy itself[,] but the underlying wrong, which, absent the conspiracy, would give a right of action." *Bd. of Ed. of City of Asbury Park v. Hoek*, 38 N.J. 213, 238 (1962).

Due to the circumstantial nature of evidence in a conspiracy action, the "'question of whether an agreement exists should not be taken from the jury'" if there is a possibility that the jury can "'infer from the circumstances that the alleged conspirators had a meeting of the minds and thus reached an understanding' to achieve the conspiracy's objectives." *Morgan*, 268 N.J. at 365 (citation omitted). Further, it is not necessary for a plaintiff to prove that "each participant in a conspiracy knew the 'exact limits of the illegal plan or the identity of all participants.'" *Id.* (citation omitted). It must simply be shown that there was a "'single plan, the essential nature and general scope of which was known to each person who it be held responsible for its consequences.'" *Id.* (citation omitted). As such, "[c]ivil conspirators are jointly liable for the underlying wrong and resulting damages." *Banco*, 184 N.J. at 178.

2. Analysis

In essence, the SAC alleges that, during the period between 1983 and March 1984, BASF

and Cahill "entered into a conspiracy by agreeing with each other each to wrongfully and tortuously implement and carry out … the Fraudulent Asbestos Defense Scheme." (SAC ¶ 332). Described throughout the SAC, the Plaintiffs allege that the "Fraudulent Asbestos Defense Scheme" consisted of conduct whereby BASF and Cahill "secreted away and/or destroyed" test results and information demonstrating the presence of asbestos in BASF talc products (*Id.* ¶ 2) and "falsely denied the existence of evidence" in their possession or previously destroyed that demonstrated the presence of asbestos in BASF talc products. (*Id.*). Plaintiffs assert that BASF and Cahill understood and accepted the objectives of the alleged conspiracy and have "aided and abetted the commission of[] numerous overt and fraudulent predicate acts in furtherance of the conspiracy, including the spoliation of the documents[] and making material misrepresentations and omissions designed to defraud Plaintiffs and Class Members." (*Id.* ¶¶ 333-34). The SAC further alleges that, as a result of Defendants' conspiracy, the Plaintiffs have been "irreparably harmed." (*Id.* ¶¶ 336-37).

Defendants' primary contention is that Plaintiffs are barred from asserting a claim for civil conspiracy in the SAC due to Plaintiffs' failure to appeal the District Court's dismissal with prejudice of the civil conspiracy claim in the FAC. (BASF Mov. Br. at 20-21; Cahill Mov. Br. at 39-40; Dornbusch Mov. Br. at 21 n.6; Halket Mov. Br. at 12-13.) The individual Defendants also argue that the SAC fails to adequately plead that they agreed to participate in a conspiracy. (Dornbusch Mov. Br. at 20-23; Halket Mov. Br. at 13-14.)

In opposition, Plaintiffs contend that once the Third Circuit restored the underlying fraud and fraudulent concealment claims, the "derivative" conspiracy claim was restored as well. (*See* Pl. Opp. BASF Br. at 15-19.) Plaintiffs note that Judge Chesler did not substantively evaluate the

conspiracy claim alleged in the FAC, and instead dismissed it in a single sentence after determining

that Plaintiffs had failed to state a cognizable claim for any underlying wrongdoing.  Accordingly,

Plaintiffs assert that Judge Chesler was in error in dismissing the conspiracy claim, since he was

also in error for dismissing the fraud and fraudulent concealment claims.  (*Id.* at 17.)  Furthermore,

Plaintiffs argue that there is nothing in the Third Circuit's mandate that expressly prohibits them

from re-pleading civil conspiracy.  (*See* ECF No. 136.)  Separately, Plaintiffs contend that when

read holistically, the SAC adequately alleges a claim of conspiracy as to Dornbusch and Halket.

(Pl. Opp. Halket Br. at 23-28; Pl. Opp. Dornbusch Br. at 31-35.)

The Court denies the motion to dismiss the civil conspiracy claim in the SAC and allows

it to proceed.  Below, the Court first concludes that Plaintiffs are not precluded from alleging the

claim despite explicitly failing to appeal its dismissal as part of the FAC, and then concludes that

the SAC adequately pleads a civil conspiracy claim.

Judge Chesler dismissed the FAC in its entirety on December 12, 2012.  (ECF Nos. 129,

130.)  The civil conspiracy claim is addressed beginning at page thirty-nine of the forty-one page

opinion and the entirety of the analysis is as follows:

> The gist of a civil conspiracy claim under New Jersey law is "not
> the unlawful agreement, but the underlying wrong which, absent the
> conspiracy, would give a right of action."  The civil conspiracy
> claim must be dismissed because the Amended Complaint fails to
> state a cognizable claim for any underlying wrongdoing.

(ECF No. 129 at 39 (internal citation omitted).)

Plaintiffs filed a timely notice of appeal on January 8, 2013, which did not identify the

specific issues to be raised on appeal and instead simply referenced the December 12, 2012 Order

"granting the respective motions to dismiss . . . [and] dismissing with prejudice Plaintiffs' claims

set forth in the Amended Complaint." (ECF No. 131.)  On January 22, 2013, Plaintiffs filed a

"Concise Summary of the Case" pursuant to 3d Cir. L. App. R. 33.3, which identified the issues

to be raised on appeal: whether it was reversible error for the district court to apply the Anti-

Injunction Act to bar certain requested relief; whether it was reversible error for the district court

to apply New Jersey's Litigation Privilege to bar a claim for fraud; whether it was reversible error

for the district court to dismiss the FAC for failure to state a claim for fraudulent concealment; and

whether it was reversible error for the district court to dismiss the FAC for failure to state a claim

under NJ RICO.  (Concise Summary of the Case at 4, 765 F.3d 306 (3d Cir. 2014) (USCA 3d Cir.

No. 13-1089, ECF No. 3111143049, Jan 22, 2013); *see also Williams*, 765 F.3d at 311.)  Similarly,

direct discussion of the civil conspiracy claim was absent from Plaintiffs' appellate brief.  (*See*

Brief of Plaintiffs-Appellants, 765 F.3d 306 (3d Cir. 2014) (USCA 3d Cir. No. 13-1089, ECF No.

3111225269, Apr. 11, 2013.)

On December 9, 2014, Third Circuit entered a "certified judgment . . . in lieu of a formal

mandate" and advised this Court that the certified judgment "is to be treated in all respects as a

mandate."  (ECF No. 136-1, Letter from Third Circuit Clerk dated Dec. 9, 2014.)  The certified

judgment reversed Judge Chesler's order dismissing the FAC in part and broadly remanded to this

Court for further proceedings "in accordance with the opinion of [the Third Circuit]."  (ECF No.

136, Cert. Judgment.)  The Third Circuit opinion, in turn, does not discuss the civil conspiracy

claim; it mentions only that the claim was pleaded in the FAC, and that the FAC was dismissed in

its entirety.  *See Williams*, 765 F.3d at 314-15.  Instead, the Third Circuit substantively discussed

the claims for fraud, fraudulent concealment, and NJ RICO only, consistent with the issues actually

identified by Plaintiffs in their Concise Summary of the Case and appellate briefing.  (*Compare*

27

Concise Summary at 4, *with Williams*, 765 F.3d at 317-324.)

As noted, Defendants argue that Plaintiffs abandoned their civil conspiracy claim and cannot re-plead it.  Plaintiffs counter that the civil conspiracy claim is dependent on the viability of an underlying claim, such that remand by the Third Circuit on the fraud and fraudulent concealment claims re-animated the claim for civil conspiracy.

The Third Circuit has held that, "[i]t is axiomatic that on remand for further proceedings after decision by an appellate court, the trial court must proceed in accordance with the mandate and the law of the case as established on appeal." *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 949 (3d Cir. 1985).  In other words, it is the duty of the trial court to "implement both the letter and spirit of the mandate." *Id.* at 949.  Further, "[f]rom the proposition that a trial court must adhere to the decision and mandate of an appellate court there follows the long-settled corollary that upon remand, it may consider, as a matter of first impression, those issues not expressly or implicitly disposed of by the appellate decision." *Id.* at 950.  In other words, a trial court is free to make any order in furtherance of the case on any question not settled by the decision of the appellate court, so long as the district court's order is not inconsistent with the appellate court's mandate. *Id.*

Generally, issues or claims not raised on appeal are deemed waived upon remand.  Indeed, the Third Circuit has "consistently rejected . . . attempts to litigate on remand issues that were not raised in a party's prior appeal and that were not explicitly or implicitly remanded for further proceedings." *Skretvedt v. E.I. Dupont De Nemours*, 372 F.3d 193, 203 (3d Cir. 2004).  In *Skretvedt*, the Third Circuit explained that "'[a]n issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue will not suffice to bring that

issue before this court.'" *Id.* at 202-03 (quoting *Laborers' Int'l Union v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994); *see also id.* at 202 n.12 ("'where important and complex issues of law are presented, a . . . detailed exposition of argument [in a party's appellate brief] is required to preserve an issue.'" (quoting *Frank v. Colt Indus., Inc.*, 910 F.2d 90, 100 (3d Cir. 1990)).   The so-called appellate waiver doctrine is "necessary to the orderly conduct of litigation[.]"  *Cowgill v. Raymark Indus., Inc.*, 832 F.2d 798, 802 n.2 (3d Cir. 1987) (quoting *Laffey v. Northwest Airlines, Inc.*, 740 F.2d 1071, 1089-90 (D.C. Cir. 1984)).   "The judicial system's interest in finality and in efficient administration dictates that, absent extraordinary circumstances, litigants should not be permitted to relitigate issues that they have already had a fair opportunity to contest."  *Id.* at 802 (quoting *Todd & Co., Inc. v. S.E.C.*, 637 F.2d 154, 156 (3d Cir.1980)) (internal quotation marks omitted).

However, the appellate waiver doctrine has exceptions.  *See, e.g., Huber v. Taylor*, 469 F.3d 67, 74, 75 (3d Cir. 2006) (explaining that appellate waiver may be excused "when the parties have had the opportunity to offer all the relevant evidence and when they are not surprised by issues on appeal . . . [and no party] suffer[s] any unfair surprise or disadvantage" from further judicial consideration of the issue); *Bagot v. Ashcroft*, 398 F.3d 252, 256 (3d Cir. 2005) (excusing arguable waiver where it was "questionable" whether appellant had raised an issue in district court, issue was one of law and "closely related to arguments" appellant had clearly raised, and application of waiver doctrine might result in substantial injustice).   Furthermore, at least one district court in the Third Circuit has held that failure to explicitly appeal a "dependent" claim does necessarily result in waiver. *See In re Joy Global, Inc.*, 381 B.R. 603 (D. Del. 2007).

The Court concludes that Plaintiffs did not waive their right to pursue the civil conspiracy claim, given the intertwined nature of a civil conspiracy claim with an underlying wrong.

The dependency of a civil conspiracy on an underlying wrong distinguishes this case from instances where courts have generally applied the appellate waiver doctrine. For example, in the seminal *Skretvedt* case, the appellant-employee was deemed to have waived six of the eight counts in his complaint when the appellant-employee appealed two of the eight claims after the district court granted summary judgment in favor of the employer on all eight counts. 372 F.3d at 203-04. Crucially, the eight-count complaint in the district court sought relief under eight distinct benefit plans, all of which were independently viable in theory. *Id.* at 197-98.[9] In contrast, as indicated in Judge Chesler's opinion, the essential component of a civil conspiracy claim is the underlying wrong. As the court in *in re Joy Global, Inc.* aptly stated, "the cases in which the Third Circuit has found appellate waiver involve situations quite unlike those presented here, such as where a party seeks to press a new and contradictory theory that it had never presented in previous proceedings or had expressly waived." 381 B.R. at 615.

Indeed, the facts before this Court are similar to those presented in *In re Joy*, which in essence centered on the scope of severance benefits owed to non-union employees of a paper-making company. *Id.* at 606. The paper-making company amended its severance policy during the pendency of its bankruptcy petition to a less generous policy. *Id.* at 607. An action was

---

[9] Specifically, Count I sought benefits from the "Incapability Retirement" pension program ("incapability benefits"); Count II claimed medical benefits through a benefits program known as MEDCAP; Count III asserted a right to dental benefits through a benefits program known as DAP; Count IV alleged a right to benefits under a long-term life insurance plan known as the "Noncontributory Plan"; Count V requested benefits from the "Total and Permanent Disability Income Plan" ("T & P benefits"); Count VI sought relief with respect to a tax-deferred savings program known as SIP; Count VII sought relief with respect to stock ownership plan known as TRASOP; and Count VIII contended that plaintiff was improperly denied benefits under the employer's short term disability ("STD") plan. *Skretvedt*, 372 F.3d at 197-98.

commenced the bankruptcy court seeking recovery of benefits under the more generous policy, with two theories of recovery: breach of contract (against the paper-making company) and tortious interference (against a holding company that owned 80% of the stock of the paper-making company). *Id.* at 608. After withdrawing the reference to the bankruptcy court, the district court granted summary judgment in favor of the paper-making company and holding company. *Id.* The district court found no breach of contract under Wisconsin law. *Id.* The district court did not substantively analyze the tortious interference claim, but dismissed it since there was no underlying breach of contract. *Id.* The employees appealed, and the Third Circuit remanded with instructions that the district court first consider whether ERISA preempted the state law contract claims. *Id.* at 608-09. Thereafter, the bankruptcy court approved a settlement with the paper-making company, which eliminated the breach of contract claim. *Id.* at 609. The employees proceeded with their tortious interference claim against the holding company. *Id.*

The holding company moved for summary judgment, arguing in part that the employees had waived the tortious interference claim by failing to appeal its dismissal to the Third Circuit. *Id.* at 610, 612. The district court denied the motion, finding that the employees had (1) raised the tort claim in the appeal and that (2) the claim had been remanded for further proceedings. *Id.* at 613-16. First, the district court found that the employees had raised the tort claim in the appeal. The court based this conclusion on a finding that "[t]he viability of the tort claim was entirely dependent on the viability of the contract claim. . . . Given the intertwined nature of the tort and contract claims, the [employees'] briefing on the viability of the contract claim also served as briefing on the viability of the tort claim." *Id.* at 612-13; *see also id.* at 613 (noting that that throughout the litigation "the tort claim was rarely discussed independent of the contract claim").

Second, after concluding that the employees had sufficiently raised the tort claim in the appeal, the district court found it "plain[]" that the tort claim had been remanded for further proceedings. *Id*. at 615-16.

The Court is persuaded that the underlying logic of *in re Joy* applies to the facts of this case, when read in conjunction with the purpose of the appellate waiver doctrine. If the underlying purpose of the appellate waiver doctrine is efficient administration where a party has had a "fair opportunity to contest" a particular issue, *see Cowgill*, 832 F.2d at 802, it is not clear that logic applies here. Put simply, Judge Chesler's two sentence dismissal of the civil conspiracy claim did not provide Plaintiffs with a "fair opportunity to contest" its dismissal, since the civil conspiracy claim was entirely dependent on the other claims in the FAC. In any event, the utter dependence of the civil conspiracy claim on the underlying claims arguably suggests that appellate briefing on the underlying claims provided adequate notice, when giving all inference in favor of Plaintiffs. Stated differently, briefing on the fraud, fraudulent concealment, and NJ RICO claims served as briefing on the civil conspiracy claim because the district court summarily dismissed the civil conspiracy claim in two sentences for lack of a viable underlying claim. When the Third Circuit overturned dismissal of the fraud and fraudulent concealment claims, the civil conspiracy claim regained a foothold on which to proceed. Thus, the Court finds that when giving all inferences in favor of the Plaintiffs, they sufficiently raised the civil conspiracy claim in the appeal and that the civil conspiracy claim was remanded for further proceedings. Alternatively, when accepting the allegations of the SAC as true, the Court finds that they arguably amount to the type of "extraordinary circumstances" justifying an exception to the appellate waiver doctrine—it would be substantially unjust to dismiss an otherwise properly pleaded civil conspiracy claim in light of

the sensational allegations set forth in the SAC simply for failure to explicitly appeal a dismissal that itself was entirely contingent on the dismissal of other claims.

The Court, in turn, finds that the SAC sufficiently alleges a claim of civil conspiracy. Only Mr. Halket and Mr. Dornbusch move to dismiss the civil conspiracy claim for failure to state a claim. (*See* Halket Mov. Br. at 13-14; Dornbusch Mov. Br. at 20-22.) Their motions shall be denied.

As noted, under New Jersey law, a civil conspiracy is "'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means,'" the primary element of which "is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.'" *Banco*, 184 N.J. at 177 (quoting *Morgan*, 268 N.J. Super. at 264). The essential component of an action in civil conspiracy "is not the conspiracy itself[,] but the underlying wrong, which absent the conspiracy, would give a right of action." *Hoek*, 38 N.J. at 238. First, the Court has already determined that the SAC alleges an actionable underlying claim for both fraudulent concealment and fraud. (*See supra.*) Second, the Court finds that the SAC sufficiently alleges facts to state a claim against Mr. Halket and Mr. Dornbusch for their alleged role in the conspiracy. Indeed, the SAC specifically alleges an agreement to participate in a conspiracy and to inflict a wrong on another with respect to Mr. Halket and Mr. Dornbusch. (*See* SAC ¶¶ 41, 43, 129-289, 332-34.) Again, at this stage, the Court must accept all factual allegations as true and give all favorable inferences to Plaintiffs. *Williams*, 765 F.3d at 323 (3d Cir. 2014). Furthermore, the Court disagrees that Mr. Halket's resignation in 1986 constituted a presumptive withdrawal from the conspiracy. As aptly stated by the Third

Circuit (albeit in a slightly different context), "[t]o accept Halket's argument, however, is to reject the factual allegations of the complaint." *Williams*, 765 F.3d at 324.

> Though Halket may have ended his employment with Engelhard, the Complaint, construed in the light most favorable to [Plaintiffs], does not support the further inference that Halket bears no responsibility for what he set in motion.  Of course, discovery may exonerate Halket and, in any event, he will have the opportunity to contest the truth of those allegations in a later stage of the lawsuit. But on a motion to dismiss, a court may not accept a defendant's factual representations that he has been wrongly accused when the plaintiff has averred otherwise.

*Id.*  Accordingly, the civil conspiracy claim shall proceed as to all Defendants at this time.

### D. This Court is a Proper Forum and the Named Plaintiffs Have Sufficiently Stated a Claim.

Cahill also argues that Plaintiffs improperly seek to adjudicate litigation conduct in this Court that should instead be adjudicated in Ohio and New York courts (where the underlying actions of named Plaintiffs occurred) (Cahill Mov. Br. at 31-33), and that the named Plaintiffs' claims fail as a matter of law. (*id.* at 33-39).  With respect to the individual Plaintiffs' claims, Cahill argues as follows: Ms. Chernick's claims should be dismissed because her original state court action is still pending and she has failed to identify misrepresentations by Cahill (Cahill Mov. Br. at 33-35); Ms. Wengerd's claims fail because her prior suit was dismissed on grounds other than the absence of asbestos in Emtal talc (*id.* at 35-36); Ms. Pease, Holly, and Ware's fraud claims should be dismissed because there is no alleged misrepresentation to them (*id.* at 36-37); and Ms. Williams fraud claim should be dismissed because there is no alleged misrepresentation, reliance, or resulting damage (*id.* at 37-39).

In opposition, Plaintiffs contend that this is an appropriate forum to adjudicate the claims of fraudulent concealment, fraud, and civil conspiracy because Plaintiffs seek redress for

Defendants' tortious acts, not from fraudulently-obtained state court judgments (Pl. Opp. Cahill Br. at 34-35), and also argue that each representative class Plaintiff has alleged plausible claims under New Jersey law (*id.* at 35-41). In response to Cahill's arguments regarding the individual claims, Plaintiffs argue as follows: Ms. Chernick's claim is not "currently pending" as Cahill alleges and she sufficiently alleges claims for fraudulent concealment and fraud (Pl. Opp. Cahill Br. at 36); Ms. Wengerd has alleged a viable fraud claim because Cahill's misrepresentation and material omission of relevant evidence deprived Ms. Wengerd from fully litigating her case (*id.* at 36-37); Ms. Pease, Holly, and Ware's fraud claims are sufficiently pled, as supported by the Third Circuit's decision in *Williams* (*id.* at 38-39); and Ms. Williams sufficiently alleges a claim for fraud, in part because she has in fact plead misrepresentation, reliance, and damage (*id.* at 39-41).

The Court denies Cahill's motion to dismiss on these grounds. As explained by the Third Circuit, "[t]his action is not itself an asbestos injury case, but rather an action about Engelhard and Cahill's conduct when they confronted asbestos injury cases in state courts around the country." *Williams*, 765 F.3d at 310. In short, "this suit does not concern state-court judgments, but rather independent torts committed to obtain them[.]" *Id.* at 315. Accordingly, even though the underlying state court judgments from which this action arose were obtained in state courts outside of New Jersey, Cahill has not sufficiently explained why this case is improperly in New Jersey. Indeed, the Third Circuit previously determined that Plaintiffs had sufficiently alleged claims for fraudulent concealment and fraud in the District of New Jersey, and as explained in Parts A-C, *supra*, this Court has determined that the SAC sufficiently pleads a cause of action against all Defendants to allow it to proceed to discovery.

For similar reasons, the Court finds that the individual Plaintiffs have sufficiently stated a claim. The SAC specifically alleges that each named Plaintiff was victim to Defendants' alleged scheme and that they did not receive adequate compensation as a result. In essence, the SAC states that Plaintiffs either dismissed a BASF predecessor or were unsuccessful in their claims against it after reasonably relying and acting upon the misrepresentations and material omissions by Defendants, including the failure to disclose evidence indicating Engelhard's talc contained asbestos fibers. (SAC ¶ 19 (Williams); ¶ 22 (Pease); ¶ 25 (Holley); ¶ 28 (Ware); ¶ 31 (Wengerd); ¶ 34 (Chernick).)   As explained above, giving all favorable inferences to Plaintiffs, and acknowledging the allegedly clandestine nature of the scheme, the Court concludes that these allegations are sufficient to state a claim. Again, the Court believes that discovery is necessary to ultimately address the sufficiency of the claims, and it may reveal that Plaintiffs are unable to make out a prima facie case for the independent torts alleged in the SAC. Given the early stage of this litigation, however, the Court finds that the individual Plaintiffs have sufficiently stated claims to proceed.

### E.   Demands for Relief

The SAC requests compensatory and punitive damages as well as equitable relief. (SAC ¶ 1; *id.* at 152-54.) BASF moves to dismiss the requests for compensatory damages in their entirety, and portions of the requests for equitable relief. The Court discusses each in turn.

1. Compensatory Damages

BASF argues that Plaintiffs "tacitly abandoned" claims for compensatory damages in the FAC, such that basic principles of judicial estoppel and Federal Rule of Civil Procedure 15 bar them from reinserting damages claims in the SAC. (BASF Mov. Br. at 12-18.) BASF relies on

36

the procedural history to prove its point, noting that the original Complaint sought compensatory and punitive damages (*see* ECF No. 1) and that Cahill moved to strike the class allegations based in part on the argument that individualized damages issues predominated over common issues (precluding certification under Rule 23(b)(3)), and that Plaintiffs' request for monetary relief predominated over their requests for injunctive relief (precluding certification under Rule 23(b)(2)).  (BASF Mov. Br. at 5-6 (citing ECF No. 55 at 6, 23-24, 26-27, 35 n.15).)  BASF states that, instead of responding to the motion to strike the class allegations, Plaintiffs filed the FAC, which "carefully excised the requests for compensatory damages that had appeared in various places of the original complaint[.]"  (BASF Mov. Br. at 6.)  When Cahill again moved to strike Plaintiffs' class allegations (ECF No. 81), BASF characterizes Plaintiffs' response as "repeatedly pointing out that [Plaintiffs] were no longer pursuing compensatory damages."  (BASF Mov. Br. at 7 (citing ECF No. 100).)  BASF asserts that upon remand from the Third Circuit, Plaintiffs inappropriately reinserted requests for damages.  (*Id.* at 9-11; *see also* ECF Nos. 148, 154 (letters from Defendants objecting to renewed requests for compensatory damages).)

     In opposition, Plaintiffs argue that their claim for monetary damages has been present in this case throughout and that they never abandoned or waived any such relief.  (Pl. Opp. BASF Br. at 5-10.)  Plaintiffs first argue that BASF misconstrues the FAC and the position Plaintiffs took in their briefs.  Plaintiffs contrast compensatory damages for the absent class members' underlying asbestos claims with the compensatory damages available for the independent claim of fraudulent concealment under *Rosenblit*.  (*Id.* at 7-8.)  Plaintiffs point to the Third Circuit's affirmation of the fraudulent concealment claim as a basis for their request for compensatory damages in the SAC. Second, Plaintiffs contend that the removal of the request for compensatory damages in the FAC

was an "inadvertent pleading omission" which Plaintiffs duly corrected. (*Id.* at 9-10.)  In sum, Plaintiffs argue that BASF has not shown that judicial estoppel applies or that Rule 15 bars Plaintiffs from requesting compensatory damages in the SAC.

"Judicial estoppel, sometimes called the 'doctrine against the assertion of inconsistent positions,' is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996).  The doctrine "is designed to prevent litigants from 'playing fast and loose with the courts.'"  *Id.* (quoting *Scarano v. Cent. R. Co. of N.J.*, 203 F.2d 510, 513 (3d Cir. 1953)). "'The basic principle . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.'" *Id.* (quoting 18 Charles A. Wright, et al., Federal Practice and Procedure § 4477 (1981)). Similarly, although Federal Rule of Civil Procedure 15 states that a party should be "freely give[n] leave" to amend their pleadings, district courts may "forestall strategies" of gamesmanship and undue delay. *See CMR D.N. Corp. v. City of Philadelphia*, 703 F.3d 612, 630 (3d Cir. 2013).

The Court allows the requests for compensatory damages.  First and foremost, both the Third Circuit and now this Court have determined that Plaintiffs have sufficiently stated a claim for fraudulent concealment under *Rosenblit*. *Rosenblit* specifically contemplates the awarding of compensatory damages as a remedy: "[T]hose aggrieved by [spoliation of evidence] should be made whole [in a fraudulent concealment action] with compensatory damages and, if the elements of the Punitive Damages Act are met, punitive damages for intentional wrongdoing." *Rosenblit v. Zimmerman*, 166 N.J. 391, 407 (2001).  Second, on the facts before it, the Court cannot say that

judicial estoppel or Rule 15 applies to prevent Plaintiffs from asserting a request for compensatory damages, particularly because a fundamental dispute exists between the parties as to whether the removal of compensatory damages from the FAC was done strategically or inadvertently. Accordingly, the Court shall permit the requests for compensatory damages to proceed.

2. Equitable Relief

The Third Circuit made clear that this Court only has power to resolve the claims actually alleged, as opposed to issues that may arise in future cases:

> To the extent that plaintiffs attempt to have the District Court decide, at this point, the statute of limitations, laches, and preclusion issues that will likely arise in future cases, plaintiffs fail to present at Court with a whole or ripe controversy. Plaintiffs may, however, seek injunctive and declaratory relief aimed at resolving the claims alleged.

*Williams*, 765 F.3d at 311; *see also id.* at 328 ("[W]e see no constitutional barrier to the District Court ordering a notice program or enjoining defendants from further spoliation if the proofs warrant the relief.").

BASF contends that certain requests for declaratory and injunctive relief go well beyond the limits set by the Third Circuit. (BASF Mov. Br. at 19-20.)  In particular, BASF takes issue with three requests: "declaratory and equitable relief addressing and alleviating any impairment of Plaintiffs' and Class Members' ability to gather and present evidence establishing their underlying asbestos injury claims," (SAC Demand for Relief ¶ (d)); an injunction ordering Defendants to "provid[e], as needed information, waivers of privilege and waivers of confidentiality rights," (SAC Demand for Relief ¶ (f)); and an "injunction barring and prohibiting" defendants "from asserting" that certain attorney-client communications "are privileged in any proceeding involving any class members asbestos injury claims," (SAC Demand for Relief ¶ (k)).

39

In opposition, Plaintiffs contend that the requested equitable relief is permissible, since it is aimed at resolving the claims alleged, as opposed to "relief targeted at solely legal issues anticipated in future cases." (Pl. Opp. BASF Br. at 10-15.)  For example, with respect to the request seeking "declaratory and equitable relief addressing and alleviating any impairment of Plaintiffs' and Class Members' ability to gather and present evidence establishing their underlying asbestos injury claims," (SAC Demand for Relief ¶ (d)), Plaintiffs claim that "it is for this Court to determine whether, how and to what extent Plaintiffs and absent class members are entitled to access [evidence proving that Defendants fraudulently concealed evidence]" that is unearthed before this Court.  (Pl. Opp. BASF Br. at 13.)   Additionally, Plaintiffs assert that the relief requested in paragraph (f) is aimed generally at requiring Defendants to make the relevant documents unearthed before this Court available to others.  (*Id.* at 13-14.)  Finally, Plaintiffs claim that the relief requested in paragraph (k) (a determination and declaration that relevant documents and communications are not privileged or are subject to the crime-fraud exception) is in accord with the Third Circuit's ruling, since it goes to resolving the claims alleged, and is not an item of relief targeted at solely legal issues anticipated in future cases.  (*Id.* at 14-15.)

The Court need not decide this issue at this time.  In accordance with the Third Circuit's directive, Plaintiffs may "seek injunctive and declaratory relief aimed at resolving the claims alleged" in the SAC, "such as a notice program or enjoining defendants from further spoliation if the proofs warrant the relief", but a grey area exists with respect to "issues that will likely arise in future cases." *Williams*, 765 F.3d at 311, 328.  At present, drawing the appropriate line between the equitable relief requested in this case versus equitable relief aimed at other, future litigation is too abstract.  Although skeptical of the broad nature of these particular requests, the Court will be

able to more clearly determine the appropriate scope of potential equitable relief available in this litigation with the benefit of discovery.   Accordingly, the Court denies this motion without prejudice, with right to revisit in due course.


## **CONCLUSION**

For the reasons above, the Court denies the Motions to Dismiss the SAC.   An appropriate Order accompanies this Opinion.


DATED: April 6th, 2016

_____
JOSE L. LINARES
UNITED STATES DISTRICT JUDGE