# EXHIBIT A

MARILYN HOLLEY - 04/05/2017

```
 1            IN THE UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF NEW JERSEY

 3
     KIMBERLEE WILLIAMS,        )
 4   et al.,                    )
                                )
 5           PLAINTIFFS,         )
                                )
 6                              )
         vs.                    )        CIVIL ACTION
 7                              )        NO. 11-CV-01754
                                )
 8   BASF CATALYSTS LLC,         )
     et al.,                    )
 9                              )
             DEFENDANTS.        )
10

11                   -  -  -  -  -
        THE VIDEOTAPED DEPOSITION OF MARILYN HOLLEY
12             WEDNESDAY, APRIL 5, 2017
                     -  -  -  -  -
13

14       The videotaped deposition of MARILYN HOLLEY,

15   called by the Defendants for examination pursuant

16   to the Federal Rules of Civil Procedure, taken

17   before me, the undersigned, Sarah R. Drown, Notary

18   Public within and for the State of Ohio, taken at

19   the offices of Thompson Hine LLP, 3900 Key Center,

20   127 Public Square, Cleveland, Ohio, commencing at

21   10:01 a.m., the day and date above set forth.

22

23

24

25
```

```
 1    APPEARANCES:

 2

 3         On behalf of the Plaintiffs:

 4             Michael Coren, Esq.
               Jared M. Placitella, Esq.
 5             Cohen, Placitella & Roth, P.C.
               127 Maple Avenue
 6             Red Bank, New Jersey  07701
               (888) 219-3599
 7             Mcoren@cprlaw.com
               Jmplacitella@cprlaw.com
 8

 9
           On behalf of the Defendant
10         BASF Catalysts LLC:

11             Eugene F. Assaf, Esq.
               Peter A. Farrell, Esq.
12             Elizabeth Dalmut, Esq.
               Kirkland & Ellis LLP
13             655 Fifteenth Street, Northwest, Suite 1200
               Washington, D.C.  20005
14             (202) 879-5000
               Eugene.assaf@kirkland.com
15             Peter.farrell@kirkland.com
               Elizabeth.dalmut@kirkland.com
16

17
           On behalf of the Defendants
18         Cahill Gordon & Reindel LLP,
           Howard G. (Peter) Sloane,
19         Ira J. Dembrow:

20             Cassandra Fields, Esq.
               Grant Geyerman, Esq.
21             Williams & Connolly, LLP
               725 Twelfth Street, N.W.
22             Washington, D.C.  20005
               (202) 434-5000
23             Cfields@wc.com
               Ggeyerman@wc.com
24

25
```

```
 1    APPEARANCES CONTINUED:

 2
            On behalf of the Defendant
 3          Thomas D. Halket:

 4              Eric Tunis, Esq. (Via phone)
                Herold Law, PA
 5              25 Independence Boulevard
                Warren, New Jersey  07059
 6              (908) 647-1022
                Etunis@heroldlaw.com
 7

 8
            On behalf of the Defendant
 9          Arthur Dornbusch:

10              Kevin H. Marino, Esq. (Via phone)
                John A. Boyle, Esq. (Via phone)
11              Marino, Tortorella & Boyle PC
                437 Southern Boulevard
12              Chatham Township, New Jersey  07928
                (973) 824-9300
13              Kmarino@khmarino.com
                Jboyle@khmarino.com
14

15
      ALSO PRESENT:
16
            Alex Cook, Videographer
17

18

19

20

21

22

23

24

25
```

```
 1          W I T N E S S   I N D E X

 2                                           PAGE

 3     EXAMINATION
       MARILYN HOLLEY
 4     BY MR. ASSAF........................    7
       EXAMINATION
 5     BY MS. FIELDS.......................  155
       EXAMINATION
 6     BY MR. TUNIS........................  159

 7
             E X H I B I T   I N D E X
 8
       EXHIBIT                               PAGE
 9

10     Defendants' Exhibit 1...............   51

11     Defendants' Exhibit 2...............   81

12     Defendants' Exhibit 3...............   85

13     Defendants' Exhibit 4...............   87

14     Defendants' Exhibit 5...............   94

15     Defendants' Exhibit 6...............   94

16     Defendants' Exhibit 7...............   94

17     Defendants' Exhibit 8...............   94

18     Defendants' Exhibit 9...............   94

19     Defendants' Exhibit 10..............   94

20     Defendants' Exhibit 11..............   94

21     Defendants' Exhibit 12..............   94

22     Defendants' Exhibit 13..............  118

23     Defendants' Exhibit 14..............  121

24     Defendants' Exhibit 15..............  136

25     Defendants' Exhibit 16..............  139
```

 1
      Defendants' Exhibit 17...............   140
 2
      Defendants' Exhibit 18...............   141
 3
      Defendants' Exhibit 19...............   141
 4
      Defendants' Exhibit 20...............   141
 5
      Defendants' Exhibit 21...............   142
 6
      Defendants' Exhibit 22...............   142
 7
      Defendants' Exhibit 23...............   142
 8
      Defendants' Exhibit 24...............   143
 9
      Defendants' Exhibit 25...............   143
10
      Defendants' Exhibit 26...............   143
11
      Defendants' Exhibit 27...............   143
12
      Defendants' Exhibit 28...............   143
13
      Defendants' Exhibit 29...............   143
14
      Defendants' Exhibit 30...............   144
15
      Defendants' Exhibit 31...............   144
16
      Defendants' Exhibit 32...............   145
17
      Defendants' Exhibit 33...............   145
18
      Defendants' Exhibit 34...............   145
19
      Defendants' Exhibit 35...............   145
20
      Defendants' Exhibit 36...............   145
21
      Defendants' Exhibit 37...............   146
22
      Defendants' Exhibit 38...............   146
23

24

25

```
 1                    THE VIDEOGRAPHER: We're on the
 2    record.  This is the beginning of the video
 3    recorded deposition of Marilyn Holley in the
 4    matter of Kimberlee Williams, et al. versus
 5    BASF Catalysts LLC, et al. in the United States
 6    District Court for the District of New Jersey,
 7    civil action number 11-CV-01754.
 8         The time on the video monitor is 10:01.
 9    Today's date is April 5, 2017.  The video
10    operator today is Alex Cook.
11         Will counsel please identify yourselves
12    and who you represent.
13                    MR. COREN:      Good day.  I'm
14    Michael Coren.  I'm representing the plaintiffs
15    in the Williams case, including Ms. Marilyn
16    Holley who is present here today.
17                    MR. PLACITELLA:   Jared
18    Placitella for the plaintiffs.
19                    MR. ASSAF:      Gene Assaf for
20    defendant BASF.
21                    MR. FARRELL:    Peter Farrell
22    for BASF.
23                    MS. DALMUT:     Elizabeth
24    Dalmut for BASF.
25                    MS. FIELDS:     Cassandra
```

```
 1        Fields for Cahill Gordon and the individual
 2        defendants from Cahill Gordon.
 3                      MR. GEYERMAN:    Grant Geyerman,
 4        William & Connolly, for Cahill Gordon &
 5        Reindel, Peter Sloane, Ira Dembrow.
 6                      THE VIDEOGRAPHER: The court
 7        reporter today is Sarah Drown.
 8             Will the reporter please swear in --
 9                      MR. TUNIS:       Eric Tunis --
10        excuse me.  I assume we're supposed to put our
11        appearances in.  Eric Tunis on behalf of Thomas
12        Halket.
13                      MR. MARINO:      Kevin Marino
14        and John Boyle by telephone on behalf of Arthur
15        Dornbusch.
16                      MARILYN HOLLEY
17   of lawful age, called by the Defendants for
18   examination pursuant to the Federal Rules of Civil
19   Procedure, having been first duly sworn, as
20   hereinafter certified, was examined and testified
21   as follows:
22             EXAMINATION OF MARILYN HOLLEY
23   BY MR. ASSAF:
24   Q   Good morning, Ms. Holley.
25   A   Good morning.
```

```
 1   Q   Do you understand you're a class representative
 2       in a lawsuit?
 3   A   Yes.
 4   Q   What's your understanding of your obligations
 5       as a class representative in this case?
 6   A   I represent the estate of my mother, Kathryn
 7       Darnell, and the other class members.
 8   Q   And who are the other class members, if you
 9       know?
10   A   I don't know them by name, no.
11   Q   Do you know who they are?
12   A   Yes.
13   Q   Who are they?
14   A   There are other defendants in this matter.  I
15       mean other plaintiffs in this matter.
16   Q   And do you know how many of them there are?
17   A   No, I don't know how many.
18   Q   Do you know where they are?
19   A   No.
20   Q   Do you know what the circumstances are to make
21       them class members?
22   A   To the best of my knowledge, they're class
23       members because they were also harmed in this
24       matter.
25   Q   Were you harmed in this matter?
```

| | | |
|---|---|---|
| 1 | A | By way of my mother. |
| 2 | Q | And would you describe for me how you believe |
| 3 | | you or your mother were harmed. |
| 4 | A | My mother worked at BFGoodrich in Akron, Ohio, |
| 5 | | where she was exposed to asbestos.  And she is |
| 6 | | a plaintiff in this matter and I represent the |
| 7 | | estate. |
| 8 | Q | Do you think that she was exposed to talc? |
| 9 | A | Yes. |
| 10 | Q | What's your factual basis to believe that? |
| 11 | A | Just by the fact that she worked there and what |
| 12 | | she said. |
| 13 | Q | What she said to you? |
| 14 | A | Yes. |
| 15 | Q | When did she tell you that she was exposed to |
| 16 | | talc? |
| 17 | A | Just in her description of the job and what she |
| 18 | | did. |
| 19 | Q | But did she tell you specifically -- withdrawn. |
| 20 | | I understand she told you she was exposed |
| 21 | | to asbestos. |
| 22 | A | Right. |
| 23 | Q | We're going to get to her deposition later on. |
| 24 | A | Okay. |
| 25 | Q | Have you read her deposition? |

```
 1   A   I have not read her deposition.  I was present
 2       at her deposition, one of them, yes.
 3   Q   And do you recall that she testified that she
 4       was exposed to asbestos?
 5   A   I don't recall exactly what was said.
 6   Q   Do you recall anything about her discussion of
 7       talc at the deposition?
 8   A   No, I can't say that I do.
 9   Q   Apart from the deposition, do you recall her
10       discussion of talc with you?  Not asbestos,
11       talc.
12   A   I don't recall.  I'm not saying that she
13       didn't, but I don't recall.
14   Q   As we sit here today, you don't recall any
15       discussions of talc with her?
16   A   I don't recall.
17   Q   And with respect to conversations with your
18       mother, do you ever -- did you ever discuss a
19       company called R.T. Vanderbilt?
20   A   No.
21   Q   Did you ever discuss a company called Emtal?
22   A   No.
23   Q   Did you ever discuss a company called
24       Engelhard?
25   A   No.
```

| | | |
|---|---|---|
| 1 | Q | Did you ever discuss a company called BASF? |
| 2 | A | No. |
| 3 | Q | Do you think that your mother was exposed to |
| 4 | | products made by BASF? |
| 5 | A | I would have no way of knowing that. |
| 6 | Q | Do you think she was exposed to products made |
| 7 | | by Engelhard? |
| 8 | A | I don't know that personally either. |
| 9 | Q | In terms of your role as class representative, |
| 10 | | what do you want out of the case? |
| 11 | A | What we want from the case is for the Court to |
| 12 | | recognize that there was fraud and deceit in |
| 13 | | what was told to us about talc. |
| 14 | Q | And what was told to you about talc? |
| 15 | A | In this particular instance we were told |
| 16 | | that -- that it was harmful to my mom and other |
| 17 | | class members by way of their employment. |
| 18 | Q | Your mother was told that talc was harmful? |
| 19 | A | Based upon what I know of this case, and my |
| 20 | | mother was the one who did the initial |
| 21 | | conversations with the attorneys, but based |
| 22 | | upon what I have been told, yes, I do believe |
| 23 | | that. |
| 24 | Q | That your mother was told that talc was |
| 25 | | harmful? |

```
 1   A    I'm not saying that she was told that talc was

 2        harmful, what I'm saying is with the defendants

 3        that that matter, as far as talc being harmful,

 4        that would have been discussed with her by the

 5        attorneys.

 6   Q    Okay.

 7   A    And I was not privy to that conversation.

 8   Q    Okay.  So let's leave your mother's discussions

 9        with her attorneys aside.  I'll come back to

10        that in a second.

11   A    Okay.

12   Q    Other than your mother's discussions with

13        attorneys, do you have any basis to believe as

14        to how your mother was harmed by talc?  Other

15        than what your mother and the attorneys

16        discussed.

17   A    Other than what was presented in the complaint,

18        then I have no personal knowledge.

19   Q    And we're going to get to the complaint and

20        what personal knowledge you have of the

21        complaint in a second.

22            But in terms of your harms or your

23        mother's harms, you mentioned that she was

24        harmed because she was told that talc was

25        harmful.  Is that what you said?
```

```
 1   A   Yes.  That's what I said.

 2   Q   Okay.  And if she were told talc was harmful by

 3       her attorney or somebody else, how, then, was

 4       she harmed and why is it she should get money

 5       in this lawsuit?

 6   A   She was harmed because she developed

 7       mesothelioma, which you can only get by

 8       asbestos exposure.

 9   Q   Do you think that this lawsuit, the Williams

10       lawsuit, the reason you're here, is a case to

11       compensate for her asbestos injuries?

12   A   I don't think that I could answer that

13       question.

14   Q   Do you think that the harm that you're seeking

15       money for is because of your mother's asbestos

16       injuries?

17   A   Yes.

18   Q   Are you seeking money for any other reason

19       other than the asbestos injuries?

20                   MR. COREN:        Objection to

21       form.

22   Q   You can answer.

23                   THE WITNESS:    I can answer?

24   A   Repeat the question.

25   Q   Sure.  Other than seeking money for asbestos
```

```
 1         injuries in this case, are you seeking money
 2         for any other reason in this case?
 3   A     Because of fraudulent representation by the
 4         company.
 5   Q     And what fraudulent representations are you
 6         seeking compensation for?
 7   A     Because the company represented that there was
 8         no asbestos in the talc.
 9   Q     What company represented that?
10   A     At this point I guess it would be referred to
11         as BASF or Engelhard.
12   Q     When did that representation occur?
13   A     I don't have those dates.
14   Q     To whom was that representation made?
15   A     To -- to my mom and other plaintiffs.
16   Q     When did -- excuse me.
17             Who made the representation to your
18         mother and other plaintiffs?
19   A     I would not know that, because those were
20         conversations that my mother had with her
21         attorneys.
22   Q     Did your mother -- withdrawn.
23             Other than the conversations with --
24         between your mother and her attorneys, do you
25         have any personal knowledge of representations
```

```
 1        being made to your mother about talc?
 2    A   I have no personal knowledge of that.
 3    Q   The only knowledge you have is from Mr. Bevan
 4        regarding what was said or not said to your
 5        mother, true?
 6    A   Correct.
 7    Q   So you're relying on Mr. Bevan as the source
 8        for the facts in this lawsuit, fair?
 9    A   I'd say fair based upon the complaint filed,
10        yes.
11    Q   Did -- in terms of the harms -- you mentioned
12        that you'd like to be compensated for the harms
13        caused by asbestos, true?
14    A   The harms caused by asbestos and the
15        representation by the company.
16    Q   So you would like to be compensated for the
17        harms caused by asbestos and by the
18        representations by the company, and these
19        representations were the -- are the
20        representations that you know through
21        Mr. Bevan, fair?
22    A   Fair.
23    Q   In terms of the harms, other than compensation
24        for asbestos and compensation for these
25        representations that Mr. Bevan knows about, are
```

```
 1        there any other harms that you're seeking

 2        compensation for?

 3   A    Would you clarify that?

 4   Q    Sure.  Other than the asbestos injury to your

 5        mother and other than the fraud that Mr. Bevan

 6        knows about --

 7   A    Right.

 8   Q    -- are you seeking compensation for any other

 9        harm?

10   A    I'm not certain of that.  I'm not certain of

11        that question.

12   Q    Okay.  Fair enough.

13   A    Okay.

14   Q    Okay.  So you're seeking compensation for the

15        asbestos injuries to your mother?

16   A    Right.

17   Q    True?

18   A    Right.

19   Q    You're seeking compensation for the allegedly

20        fraudulent statements that Mr. Bevan knows

21        about, true?

22   A    True.

23   Q    Are you seeking compensation for anything else?

24   A    I don't know what anything else would be.

25   Q    In this lawsuit, as we sit here today --
```

```
 1   A   Okay.

 2   Q   -- you're going to be asking for money,

 3       correct?

 4   A   Correct.

 5   Q   Okay.  And you would like money for the

 6       asbestos injuries, correct?

 7   A   Yes.

 8   Q   And you would like money for the false

 9       statements known about by Mr. Bevan, correct?

10   A   Yes.

11   Q   Would you like money for anything else?

12   A   I really --

13                   MR. COREN:        Objection to

14       form.

15           Go ahead.

16                   THE WITNESS:      Yeah.  Okay.

17   Q   Would you like money for anything else?

18   A   I really would not know how to answer that

19       question.  That's not clear to me.

20   Q   Okay.  Are there any other injuries as you sit

21       here today that you can identify for me, other

22       than the asbestos injury and the alleged injury

23       of fraud through Mr. Bevan, statements made to

24       Mr. Bevan?

25   A   I think if there were any other injuries or
```

```
 1        anything else asked for that that would be
 2        clarified by my attorneys.  I'm not the legal
 3        representative.
 4    Q   But you're a class representative.
 5    A   I'm a class representative.
 6    Q   So I'm just asking you as you sit here today --
 7        withdrawn.
 8            You prepared for this deposition,
 9        correct?
10    A   Correct.
11    Q   Did you meet with your attorneys yesterday?
12    A   Yes, I did.
13    Q   Who was present?
14    A   Myself and Attorney Coren.
15    Q   Okay.  Was Mr. Bevan present?
16    A   No, he was not present during that time.
17    Q   Okay.  In preparation for your deposition
18        today, have you spoken to Mr. Bevan?
19    A   I spoke to him in greeting him yesterday at the
20        office.
21    Q   And did you speak to him regarding any of the
22        facts in this case in preparation for your
23        deposition?
24    A   No, I did not.
25    Q   By the way, do you have a fee agreement with
```

```
 1       Mr. Coren or Mr. Placitella's firm?
 2   A   I don't recall that.  Our family is represented
 3       by Tom Bevan and his associates, so I don't
 4       recall that.  I think that's taken care of in
 5       our relationship with him.
 6   Q   That as a class representative you have a
 7       relationship with Mr. Bevan?
 8   A   Right.
 9   Q   And you -- any relationship, then, with the
10       Williams lawyers would be through Mr. Bevan?
11   A   It's through Mr. Bevan.
12   Q   And you don't know any of the details of that?
13   A   I'm not aware of the details of that.
14   Q   Were you ever given a written fee agreement
15       outlining what the compensation for --
16   A   I don't recall getting a fee agreement.
17   Q   Well, what's your understanding of what the fee
18       agreement is in this case?
19   A   I don't have a particular understanding of the
20       fee agreement in this case, all I know is that
21       our estate is represented by Tom Bevan.
22   Q   You mentioned you had -- your family and the
23       estate has a relationship with Mr. Bevan.
24   A   Yes.
25   Q   What do you mean by that?
```

```
 1   A   That he is the attorney that represents us in

 2       the asbestos case and the defendants therein.

 3   Q   In any asbestos case?

 4   A   Yes.

 5   Q   Have you sought compensation for asbestos

 6       injuries from companies other than BASF?

 7   A   Yes, we have.

 8   Q   How many cases?

 9   A   There's one case, multiple defendants.

10   Q   Multiple defendants.  How many defendants?

11   A   I'm not sure.  There are a number of.

12   Q   Order of magnitude, three or three, four or

13       five, more than 10?  More than 20?

14   A   More than 20.

15   Q   And have you -- more than 30?

16   A   I'm not sure.

17   Q   Does 98 sound right?

18   A   I really don't know --

19   Q   Okay.

20   A   -- how many defendants there were.

21   Q   Okay.  Would you disagree with the number 98?

22                   MR. COREN:        Objection as to

23       form.

24   A   Not being sure how many defendants there are, I

25       can't agree or disagree.
```

```
 1    Q    Okay.  And have you received compensation from
 2         other defendants for asbestos-related injuries?
 3    A    Yes.
 4    Q    From how many defendants?
 5    A    I'm not sure how many defendants.
 6    Q    Order of magnitude, two or three or more than
 7         20?
 8    A    More than 20.
 9    Q    More than 20?
10    A    More than 20.
11    Q    And have you received compensation in excess
12         of, say, $250,000?
13                    MR. COREN:        Objection.
14         I'll instruct her not to answer that.
15                    MR. ASSAF:        Grounds?
16         Grounds?
17                    MR. COREN:        The grounds
18         are -- one, it's, as we have maintained to you,
19         it's totally irrelevant.  And in the various
20         filings in front of --
21 · · · · · · · · · ·   MR. ASSAF:        Just -- Mike,
22         is it attorney-client privilege or is it some
23         other ground?  No speaking objections, please.
24 · · · · · · · · · ·   MR. COREN:        You asked me
25         the grounds --
```

```
 1                MR. ASSAF:         Grounds.
 2                     MR. COREN:         -- and I gave
 3    you the --
 4                     MR. ASSAF:         Under the
 5    federal rules --
 6                     MR. COREN:         Now you don't
 7    want me to give you the grounds.
 8 · · · · · · ·    MR. ASSAF:        No, under the
 9    federal rules you can instruct a witness not to
10    answer for either attorney-client privilege or
11    some other reason succinctly stated.  If you're
12    going to make a speaking objection, I'm going
13    to ask that the witness be excused.
14         So are you basing it on privilege or some
15    other reason under the federal rules of
16    evidence?
17 · · · · · · ·    MR. COREN:         I'm basing it
18    on confidentiality and for the reasons that we
19    set forth in the various submissions to Judge
20    Dickson.
21 · · · · · · ·    MR. ASSAF:        So it's not a
22    privileged instruction, it's a confidentiality
23    instruction?
24                MR. COREN:         That, as well
25    as relevance too, but yes.
```

MARILYN HOLLEY - 04/05/2017                    Page 23

```
 1                      MR. ASSAF:          You're
 2        instructing a witness not to answer because of
 3        relevance?
 4                      MR. COREN:          It's the same
 5        issues that we had in the answers to
 6        interrogatories and it's the same issue that's
 7        before Judge Dickson that's pending on the
 8        issue of settlements.  It's been very
 9        extensively briefed.
10             As we said, you may know that there are
11        settlements, but as to nature and the amount of
12        settlements, no.
13   Q    We'll get to the amounts later, because I
14        actually have some of the documents.
15             You have submitted documents to trusts,
16        correct?
17   A    To the trust, from what I understand, yes.
18   Q    Correct.  And, to your knowledge, have they
19        been truthful applications?  The information in
20        there has been truthful, correct?
21   A    Truth -- excuse me.  Truthful and to the best
22        of my knowledge, confidential.
23   Q    Did you ever sign a confidentiality agreement?
24   A    I signed confidentiality when I signed the
25        releases.
```

```
 1   Q   You signed confidentiality with the trust?
 2   A   I can't say for sure whether or not it was with
 3       the trust, but Attorney Bevan's office with
 4       settlements provided me as fiduciary of the
 5       estate releases to sign.
 6   Q   And are they releases vis-a-vis Mr. Bevan and
 7       the estate?
 8   A   Yes.
 9   Q   Okay.  And Mr. Bevan's your attorney, correct?
10   A   Mr. Bevan is our attorney.
11   Q   And so the confidentiality agreement between
12       you and Mr. Bevan and the estate, you could
13       change that if you wanted to, correct?  You're
14       the client.
15   A   I really -- I really can't say that.
16   Q   Okay.  So other than the confidentiality with
17       Mr. Bevan, are you aware of any other
18       confidentiality agreement prohibiting you from
19       discussing settlements?
20   A   Not that I can personally recall.
21   Q   Whose idea was it for you to become a class
22       representative in this case?
23   A   I am a class representative in this case based
24       upon being fiduciary of my mother's estate.
25   Q   But I'm saying how did you even find out about
```

| | | |
|---|---|---|
| 1 | | this case? |
| 2 | A | Through our attorneys. |
| 3 | Q | Through Mr. Bevan? |
| 4 | A | Right. |
| 5 | Q | This is the same Mr. Bevan who has knowledge of |
| 6 | | any facts regarding talc and representations |
| 7 | | made to your mother, correct? |
| 8 | | MR. COREN:        Objection to |
| 9 | | form. |
| 10 | A | Correct. |
| 11 | Q | And the same Mr. Bevan who has this |
| 12 | | confidentiality agreement with you, correct? |
| 13 | A | Correct. |
| 14 | Q | And he's the one who first told you about the |
| 15 | | possibility of being a plaintiff in this |
| 16 | | Williams case? |
| 17 | A | Yes. |
| 18 | Q | When was that? |
| 19 | A | I don't have particular dates. |
| 20 | Q | At the time Mr. Bevan spoke to you, did you |
| 21 | | have any facts regarding Emtal, Engelhard, |
| 22 | | BASF, or Cahill Gordon?  Had you ever even |
| 23 | | heard of them? |
| 24 | A | I had not heard of them previous to talking to |
| 25 | | him. |

```
 1   Q   In this case as a class representative, would
 2       you like money from the defendants?
 3   A   Yes.
 4   Q   Other than money, do you want anything else?
 5   A   I would like it to be clarified for my mom and
 6       other class members that this particular
 7       company was not truthful in its representation
 8       as to their product and the effect of their
 9       product on my mother and other class members.
10   Q   You said the company was not truthful as to its
11       product?
12   A   As to the harm its product could do.
13   Q   When you say the company was not truthful as to
14       the harm the product can do, your basis for
15       that is again Mr. Bevan, correct?  You have no
16       independent personal knowledge?
17   A   I have no independent personal knowledge, but
18       based upon the allegations contained in the
19       complaint, I'm privy by that.
20   Q   Other than what's written in the complaint and
21       what Mr. Bevan has told you, you have no
22       independent personal knowledge of the company
23       doing anything wrong, correct?
24   A   If you put it that way, I would say I do -- I
25       do not have any independent personal knowledge.
```

```
 1   Q   And so in terms of the harms and letting people
 2       know about the harms, is that your idea or is
 3       that Mr. Bevan's idea?
 4                   MR. COREN:          Objection.  And
 5       I'm going to instruct her not to extent -- not
 6       to answer to the extent the answer relies upon
 7       advice of counsel.
 8               However, Ms. Holley, if you can answer
 9       the question without incorporating or revealing
10       advice of counsel, please respond.
11   A   I can't answer without revealing advice of
12       counsel.
13   Q   Mr. Bevan gave you advice as to letting other
14       people know about the harms?
15                   MR. COREN:          Once again,
16       same instruction.  To the extent your answer
17       relies upon advice of counsel, we instruct you
18       not to answer.  If you can answer without
19       incorporating or revealing advice of counsel,
20       you can respond.
21   Q   Can you answer?
22   A   I cannot answer, because I believe that that's
23       attorney-client privilege.
24   Q   Did you and Mr. Bevan -- withdrawn.
25               Did you and anybody discuss you receiving
```

```
 1        an incentive award or a bonus for being a class
 2        representative?
 3   A    No.
 4   Q    Do you know -- withdrawn.
 5             In terms of other class members, have you
 6        spoken to any people you believe who are
 7        members of the class?
 8   A    In a meeting at Attorney Bevan's office there
 9        were several of us present.  I don't remember
10        their names, but I think there were three or
11        four other representatives of the class at that
12        meeting.
13   Q    And did they all have a prior relationship with
14        Mr. Bevan?
15                  MR. COREN:        Objection.
16             I instruct you to the answer -- to the
17        extent your answer relies on advice of counsel
18        you're not to answer, but if you have your own
19        personal basis or knowledge of that, then you
20        can respond.
21                  MR. ASSAF:        As to whether a
22        person is represented by an attorney and she
23        knows that?  That's legal advice?
24                  MR. COREN:        It depends how
25        she learns it, Gene.
```

```
 1                    MR. ASSAF:      It's a fact.
 2        Are you instructing her not to answer?
 3                    MR. COREN:      No.  I'm saying
 4        if she has independent knowledge she could
 5        answer.  If she doesn't --
 6                    MR. ASSAF:      It's a fact.
 7        Whether somebody's represented or not is a fact
 8        that you put even on a privilege log.  It's not
 9        revealing advice of counsel.
10   A    Repeat the question.
11   Q    Sure.  Do you have -- do you know whether the
12        other people at this meeting with Mr. Bevan
13        also had prior relationships with him for other
14        asbestos cases?
15   A    I would not have that information.
16   Q    Do you know who they were?
17   A    I don't recall who they were.
18   Q    Well, were they Kimberlee Williams?
19   A    I know there are other plaintiffs, but I don't
20        know them personally.  They were probably
21        identified at that meeting, but I don't
22        remember their names.
23   Q    How long did this meeting occur?
24   A    How long ago --
25   Q    Yeah.
```

```
 1   A   -- or how long was the meeting?

 2   Q   How long ago.

 3   A   Several years.

 4   Q   Before the filing of the complaint?

 5   A   I believe the first meeting was before the

 6       filing of the complaint, but I can't state

 7       unequivocally.

 8   Q   Was Mr. Placitella or anybody from

 9       Mr. Placitella's firm at that meeting?

10   A   Yes.

11   Q   Was Mr. Placitella there?

12   A   I don't recall.

13   Q   How long did the meeting take place?  How long

14       did it go?

15   A   About an hour or two.

16   Q   Without revealing what was said, did

17       Mr. Placitella make a presentation at that

18       case?

19   A   I don't know if it was him specifically, but

20       someone from the law firm did.

21   Q   Made a presentation?

22   A   Right.

23   Q   Was it a PowerPoint presentation?

24   A   No, it was not.

25   Q   Did they show you documents?
```

MARILYN HOLLEY - 04/05/2017                    Page 31

```
 1   A   I don't believe there were documents.
 2   Q   Was there anybody at the meeting who was not a
 3       class representative or an attorney
 4       representing the class?
 5   A   I really couldn't say.
 6   Q   Did you take notes of the meeting?
 7   A   I took a few personal notes.
 8   Q   And do you have those notes?
 9   A   No, I do not.
10   Q   Where are they?
11   A   At home.
12                   MR. ASSAF:        Have they been
13       logged?
14                   MR. COREN:       I don't know.
15                   MR. ASSAF:       Pardon me?
16                   MR. COREN:       I don't know.
17       I can't tell you off the top of my head.
18   A   This was several years ago.
19   Q   Have you given them to your attorneys?
20   A   This was several years ago.  As I said, I took
21       a couple of personal notes.
22   Q   Okay.
23   A   That was it.
24   Q   Okay.  And with respect to at least these
25       personal notes, have you given them to your
```

```
 1       attorneys?
 2   A   They were personal notes for me.  There was --
 3       there was nothing -- to the best of my
 4       knowledge, there was nothing in my notes to
 5       give to the attorney.
 6   Q   Have your attorneys ever asked you for notes
 7       relating in any way to this case?
 8   A   No, they have not.
 9   Q   Really?  They haven't asked you for any
10       documents you have that relate to this
11       complaint or the allegations in this case?
12   A   I'm not certain I understand your question.
13   Q   Okay.  Have your attorneys come to you and
14       said, "Ms. Holley, we'd like you to search your
15       notes and files and computer to see whether
16       there are any documents that relate to this
17       case"?  Have they asked you that in words or in
18       substance?
19   A   I can't say for sure.
20   Q   Well, you've been around the litigation system
21       for years in these asbestos cases, right?
22   A   Correct.
23   Q   And you generally follow your attorneys'
24       advice, correct?
25   A   Correct.
```

```
 1   Q   And if your attorneys had asked you for

 2       documents, you would have told them about the

 3       documents, correct?

 4   A   Personally, I can't think of any documents that

 5       they would have asked me for.  The documents

 6       that I received were from the attorneys.

 7   Q   Well, let's start with the notes that you took

 8       during the Bevan class rep meeting with

 9       Mr. Placitella.  It's clear you haven't given

10       those to the attorneys.

11   A   Clear.

12   Q   Okay.

13   A   True.

14   Q   And they haven't asked you for them?

15   A   No.

16   Q   So are there -- do you have a computer or a

17       laptop?

18   A   Yes.

19   Q   And do you have emails on that?

20   A   Yes.

21   Q   Do you have emails regarding your

22       communications with Mr. Bevan on that?

23   A   No.

24   Q   Do you have any communications on that

25       regarding this case at all?
```

```
 1    A    No.

 2    Q    Do you have any communications with other class

 3         representatives?

 4    A    No.

 5    Q    Has anybody ever asked you to look at your

 6         computer for that information?

 7    A    No.

 8    Q    Do you get copies of the -- withdrawn.

 9              Without revealing what's said, are you

10         kept up to date on what's happening in this

11         case?

12    A    Yes.

13    Q    Do you know whether there were any settlement

14         discussions in this case?

15    A    Yes.

16    Q    When were you told about settlement

17         discussions?

18    A    I just know there were settlement discussions.

19         I have no information on those particular

20         discussions.

21    Q    Well, you were told about the economics, the

22         terms, the money that was being offered,

23         weren't you?

24    A    No.

25    Q    As a class representative, you weren't told how
```

```
 1        much money was being offered to settle the
 2        case?
 3   A    To settle this particular case?
 4   Q    Yeah.
 5   A    No.
 6   Q    Interesting.  As a class representative, do you
 7        think that you're entitled to know whether your
 8        attorneys are negotiating to settle the case
 9        for some sum of money?
10                    MR. COREN:        Objection as to
11        form.
12   A    I have always been advised of relevant
13        settlements in regard to the defendants' end,
14        my mom's asbestos case.
15   Q    Mr. Bevan always tells you that there's a
16        defendant who's willing to pay $10,000, for
17        example, correct?
18   A    Correct.
19   Q    And then you decide --
20   A    I do receive that information.
21   Q    And then you decide whether to take that money,
22        correct?
23   A    Yes.
24   Q    In this case do you expect the same thing to
25        happen?
```

```
 1   A   If there is a reasonable settlement offered, I
 2       do expect that.
 3   Q   You expect to be informed of it, correct?
 4   A   I expect to be informed.
 5   Q   And whose decision would it be to accept the
 6       settlement offer for the class?
 7                   MR. COREN:        Objection as to
 8       form.
 9   A   My attorneys.
10   Q   You mean Mr. Placitella and Mr. Coren would
11       decide on how much money the class should get?
12   A   They would advise me.
13   Q   What about Mr. Bevan?
14   A   I'm -- I'm not sure in this matter.  They're
15       representing the class action, so I'm not
16       certain how that's done.  I can imagine that
17       Attorney Bevan would be privy to it, but I
18       don't know that for certain.
19   Q   But as we sit here today, you've never been
20       informed that there was an opportunity to
21       settle a case for some sum of money that you
22       would receive, correct?
23   A   In some of the others.
24                   MR. COREN:        Objection.
25   Q   Withdrawn.
```

```
 1                  MR. COREN:          Objection.
 2    A    Okay.
 3    Q    Leave aside the individual asbestos cases with
 4         Mr. Bevan, okay?
 5    A    Okay.  Okay.
 6    Q    With respect to this case, the Williams case,
 7         as we sit here today, you've never been
 8         informed that there was a possibility to settle
 9         a case -- settle these cases at some sum of
10         money and that you will receive some specific
11         sum, correct?
12    A    I've only been advised that there have been
13         some settlement discussions.  No money was
14         discussed.
15    Q    It was never --
16    A    With me.
17    Q    Okay.  Well, you're the class representative.
18    A    Right.  Right.  Right.
19    Q    Other than you, is there anybody else --
20    A    Right.
21    Q    -- you think would be privy to these
22         discussions?
23    A    I wouldn't know that.
24    Q    At the end of the day, do you think that
25         Mr. Placitella and Mr. Bevan get to decide how
```

```
 1        much money the class should get?
 2                    MR. COREN:        Objection as to
 3        form.
 4   A    Repeat that.
 5   Q    Sure.  In this class action, do you think the
 6        class representatives decide how much money the
 7        case should be settled for, if it's settled, or
 8        the attorneys, like Mr. Placitella, Mr. Coren,
 9        and Mr. Bevan?
10                    MR. COREN:        Objection as to
11        form.
12   A    I believe that our attorneys would advise us on
13        that.
14   Q    Advise you on who makes the decision?
15   A    No.  Advise on any settlements that have been
16        offered and they feel as though they are
17        settlements that we should take into
18        consideration.
19   Q    And, for example, if somebody had offered
20        you -- withdrawn.
21            If a defendant or a group of defendants
22        in this case had offered you, say, $50,000 to
23        settle the case, would you at least want to
24        know about that?
25                    MR. COREN:        Objection as to
```

```
 1      form.
 2   A  I consider that to be supposition.  As I stated
 3      before, I understand in this particular matter
 4      that there had been some settlement
 5      discussions, but that was with -- that was the
 6      attorneys, the plaintiffs, and the defendants.
 7      As a class action member, I was not privy to
 8      that.
 9   Q  And as a class representative you were not
10      privy to those discussions, correct?
11   A  No, not to those particular discussions.
12   Q  And so -- withdrawn.
13          As we sit here today, do you have any
14      knowledge of whether you had an ability last
15      summer to get a specific sum of money to settle
16      the case?
17   A  I have no knowledge of that.
18                   MR. COREN:       Form objection.
19      I'm sorry, I'm a little slow on the draw.
20   Q  In meeting with Mr. Coren yesterday, was there
21      anybody else present in the room?
22   A  No.
23   Q  And did he show you any documents?
24   A  I had already received documents.
25   Q  From whom?
```

```
 1   A   From Mr. Coren.

 2   Q   Did you review those documents?

 3   A   Yes, I did.

 4   Q   Did they refresh your memory and help you

 5       remember things?

 6   A   Basically they helped in just the review of the

 7       case itself.

 8   Q   Were they documents relating to your mother's

 9       case?

10   A   Yes.  Relating to this particular case.

11   Q   Were they documents relating to the Williams

12       class action?

13   A   Yes.

14   Q   Could you estimate how many documents you got?

15       Was it five, 10, 15, 20?

16   A   I know how many documents I received.

17   Q   Oh.  How many?

18   A   It was -- there were three documents.

19   Q   And those documents helped you both prepare for

20       today and refresh your memories as to the

21       events, correct?

22   A   Yes.

23   Q   What three documents refreshed your memories as

24       to the events?

25   A   The complaint, amended complaint, and the
```

```
 1      judge's -- the judge's opinion.
 2   Q  So the pleadings with the allegations in this
 3      case and the Court of Appeals' decisions --
 4   A  Correct.
 5   Q  -- are what you reviewed to prepare you for
 6      today's deposition?
 7   A  That along with the meeting with Mr. Coren.
 8   Q  And were any other documents shown to you?
 9              MR. COREN:       Asked and
10      answered.
11   Q  Other than those three.
12   A  Not at this time.  I had received documents
13      before.
14   Q  In preparation for your deposition or just as a
15      class representative?
16   A  These -- the documents I reviewed were for
17      preparation of this deposition.
18   Q  The three documents you reviewed?
19   A  Those three documents.
20   Q  Okay.  Did you review any other documents in
21      preparation for your deposition?
22   A  No, I did not.
23   Q  Okay.  In terms of your role as class
24      representative, do you believe that other class
25      members are interested in receiving money for
```

```
 1      alleged injuries?
 2                    MR. COREN:        Objection as to
 3      form.
 4   A  Do I believe that other --
 5   Q  Class members --
 6   A  -- class members --
 7   Q  -- want money.
 8   A  I'd say yes.
 9   Q  Okay.  In terms of, say, things that aren't
10      money, all right, instead of money, whatever
11      else, say an apology, do you think other class
12      members would prefer money or an apology?
13                    MR. COREN:        Objection as to
14      form.
15   A  I couldn't say what they would prefer.
16   Q  What about you?
17   A  I think I've already stated it, what I -- what
18      my expectation is.
19   Q  Money?
20   A  Monetary compensation and admission of
21      fraudulent representation.
22   Q  Admission of fraudulent representation.
23          The admission of fraudulent
24      representation, we talked about that earlier,
25      that's what --
```

```
 1   A   Right.

 2   Q   -- Mr. Bevan knows about, not you, right?

 3   A   I know about it through Mr. Bevan.

 4   Q   You know -- anything you know, you know about

 5       it through Mr. Bevan, fair?

 6   A   Mr. Bevan and Mr. Coren.

 7   Q   Anything you know about the alleged fraudulent

 8       misrepresentation you know either through

 9       Mr. Bevan or Mr. Coren?

10   A   Through the attorneys, yes.

11   Q   All right.  Do you think that members of the

12       class should get money if they were not harmed?

13                   MR. COREN:       Form objection.

14           You can respond.

15                   THE WITNESS:      Did you say I

16       could respond?

17                   MR. COREN:       Yes.  Yes.

18   A   Actually, I don't think I would be able to

19       answer that question.  Because you're talking

20       about expectations of other people, right?

21   Q   Well, I'm talking about your role as class

22       representative in approving or I guess hearing

23       about a settlement from your attorneys.

24           Do you expect that class members who were

25       not injured should get money?
```

```
 1                    MR. COREN:        Objection to
 2          form.
 3    A     And I don't know exactly what you mean by
 4          "class members who were not injured."  Why
 5          would they be class members?
 6    Q     Okay.  Good question.
 7                So if somebody, let's say, actually
 8          didn't have exposure to Emtal talc and yet
 9          filed a complaint against Emtal and had it
10          dismissed, do you think they should get money?
11                    MR. COREN:        Objection as to
12          form.
13    A     And had it dismissed?
14    Q     Yeah.  Even though they had never worked with
15          Emtal talc.
16    A     Why would they be a party to the class if they
17          had never worked for -- if they had never been
18          exposed to or harmed?
19    Q     Well, your -- you mentioned earlier you had
20          filed a complaint against dozens of companies,
21          correct?
22    A     Other companies, correct.
23    Q     And do you know whether all of them actually
24          had asbestos that your mother was exposed to?
25    A     No, I would not.  I would not know that.
```

```
 1   Q    And if you found out later that one of the
 2        companies was listed as a defendant but
 3        actually didn't have any product at the place
 4        where your mother worked, would you want money
 5        from them?
 6   A    Wouldn't that be a legal issue?
 7   Q    Well, I think it's actually just a matter of
 8        ethics, isn't it?
 9                    MR. COREN:        Objection as to
10        form.
11   A    I don't think it's anything that I can answer.
12        If you repeat the question --
13   Q    Sure.
14   A    -- and I get a better understanding, maybe I
15        can answer you.
16   Q    If you found out that there's a lawsuit against
17        the company and the company actually didn't
18        have any products with asbestos that your
19        mother was exposed to, they were named by
20        mistake, do you think that company still owes
21        you or your estate money?
22   A    Where the company's still in the lawsuit or
23        were they dismissed?
24   Q    Let's say they're still in the lawsuit.
25   A    I still -- I don't think it's anything that I
```

```
 1       can answer.

 2   Q   Well, let's say they were dismissed.

 3   A   Not based upon the way that you presented it.

 4   Q   Do you think that any company that's sued in an

 5       asbestos case needs to pay money to the

 6       plaintiff?

 7   A   Isn't that speculation?

 8   Q   You can answer the question.

 9   A   I don't see how I could answer that question.

10       I don't see how -- why I should answer that

11       question, because you're talking about other

12       people and I think you're bringing up legal

13       issues.  And I'm not -- I'm not qualified to

14       answer that.

15   Q   If you found out in this case --

16   A   Okay.

17   Q   -- that your mother was not ever exposed to

18       Emtal talc, do you think you should still get

19       money in this case?

20   A   I don't think we'll find that out.

21   Q   Why --

22   A   She was exposed to Emtal talc.

23   Q   And you know that through Mr. Bevan?

24   A   Yes.

25   Q   Well, if Mr. Bevan's wrong for some reason and
```

```
 1        I am able to show you Mr. Bevan is wrong, will

 2        you still want money in this case?

 3   A    I think that's speculative.  I don't see how I

 4        could answer a question based upon

 5        probabilities.  Now, if you ask me a question

 6        based upon something in this particular case,

 7        yes, but I'm not understanding that question as

 8        my being able to give you a substantive answer.

 9        If you repeat it or if you phrase it a

10        different way, maybe, but based upon the way

11        that you put the question, I don't see how I

12        can answer that.

13   Q    You've been involved in numerous lawsuits

14        against asbestos companies, true?

15   A    Yes.  Since the death of my mom.

16   Q    Okay.

17   A    Uh-huh.

18   Q    Dozens of them, correct?

19   A    Correct.

20   Q    Okay.  And based upon your experience in dozens

21        of asbestos cases, do you think that you should

22        receive money even if you later learn that the

23        company that you sued did nothing wrong?

24   A    I can't --

25                    MR. COREN:       Form objection.
```

```
 1   A   I cannot answer that question.

 2   Q   You don't understand that concept?

 3   A   It's not a matter of not understanding the

 4       concept, it's a matter of what are you really

 5       asking me to answer?

 6   Q   I'm asking if you found out a company did

 7       nothing wrong and you sued them any way, would

 8       you let them out of the lawsuit?

 9   A   I guess what stops me in this question, when

10       you start off with "if."  So to me that's

11       speculative.  I don't know how to answer that.

12   Q   Well, the "if" has to do with proof that the

13       company did not have any asbestos that your

14       mother was exposed to.  That's the "if."

15   A   You said if there were other companies that

16       were claimed to have asbestos --

17   Q   Withdrawn.

18   A   -- were not -- yeah --

19   Q   Withdrawn.

20   A   -- because I'm not understanding --

21   Q   Okay.

22   A   -- that question.

23   Q   Fair enough.

24   A   Okay.

25   Q   Withdrawn.
```

```
 1   A   Okay.

 2   Q   Do you know whether you've ever dismissed a

 3       company from any of your dozens of lawsuits

 4       without taking any money?

 5                   MR. COREN:        Objection as to

 6       form.

 7   A   I can't recall.  I really -- I can't recall.

 8       There are a number of defendants, so I

 9       really -- I cannot recall.

10   Q   Can you think of any reason why you would allow

11       a company out of a lawsuit without paying

12       money?

13   A   I would -- I would actually expect my attorney

14       to handle that.

15   Q   Here's what I'm trying to get at --

16   A   Please.

17   Q   -- Ms. Holley.  And it's not a legal question,

18       it's actually just a basic fairness question.

19   A   Okay.

20   Q   If you found out you sued a company that wasn't

21       responsible for any harm to you, would you

22       still want them to pay you money?  Can you

23       answer that question "yes" or "no"?

24   A   I would rely on advice of counsel.

25   Q   Okay.  Without -- you can't answer the question
```

```
 1        of whether you expect money from companies even
 2        though they did nothing wrong without talking
 3        to your attorneys?  You need to talk to your
 4        attorneys about that question?
 5   A    I don't need to talk to my attorneys about that
 6        question, but in my mind, in my way of
 7        thinking, the way you are phrasing the
 8        question, it doesn't seem to me that it's a
 9        question I can answer.  Do you want to repeat
10        it again?
11   Q    Sure.
12   A    Okay.  Please do.
13   Q    Do you think it's fair for people to get money
14        if they were not harmed?
15   A    No, I don't think that's fair.
16   Q    Okay.  And if when a person -- withdrawn.
17            When a person files a lawsuit against a
18        company that actually never harmed the person,
19        do you think that company should pay the person
20        money?
21   A    I'm still not understanding the basis of your
22        question.
23   Q    The basis is that you've sued somebody who did
24        nothing wrong and you want them to pay you
25        money.
```

```
 1   A   No.

 2   Q   Do you think that's fair?

 3   A   No, it would not be fair.

 4   Q   Is that something you would want to do?

 5   A   In terms of what would I want to do?

 6   Q   Take money from a company that actually didn't

 7       cause you any harm.

 8   A   First of all, I would not expect my attorneys

 9       to file against a company or persons that did

10       not do me harm.  That's my first inclination.

11   Q   Okay.  So as far as you know, Mr. Bevan hasn't

12       filed against companies that he knew were

13       uninvolved with your mother, correct?

14   A   To the best of my knowledge.

15   Q   Okay.  Let's get out the complaint, D Ex. 1.

16           (Defendants' Exhibit 1 was marked.)

17   Q   I'm showing you what's been marked D Ex. 1.

18       This is the second amended complaint, and I

19       think you mentioned earlier that you had

20       reviewed this as one of the three documents you

21       reviewed in preparation for your deposition.

22           Do you recognize this document?

23   A   Yes.

24   Q   By the way, did you review this document before

25       it was initially filed?
```

```
 1   A   Yes, I would have.

 2   Q   And how would you have gotten that document?

 3   A   Through Mr. Bevan.

 4   Q   By email?

 5   A   Hard copy.

 6   Q   Do you still have it?

 7   A   Probably.

 8   Q   You have files regarding your --

 9   A   Right.

10   Q   -- Bevan cases at --

11   A   Right.

12   Q   -- home, don't you?

13   A   Right.

14   Q   And when I asked you earlier about whether you

15       looked for documents -- withdrawn.

16           When I asked you earlier about whether

17       your attorneys asked you to look for documents,

18       did your attorneys ask you to look for

19       documents in your Bevan files at home?

20   A   No, they did not.

21   Q   Okay.

22                   MR. ASSAF:        Interesting

23       approach.

24   Q   Okay.  Paragraph 25, could you turn to that,

25       please?
```

```
 1   A    Uh-huh.  I'm not there yet.

 2   Q    Okay.

 3   A    Okay.

 4   Q    Paragraph 25.  I'd like to talk to you about

 5        the first sentence.  "On or about November 14,

 6        2000, Plaintiff Holley's decedent, Kathryn

 7        Darnell, while alive, commenced an asbestos

 8        injury lawsuit in the Court of Common Pleas,

 9        Cuyahoga County, against BASF's predecessor,

10        Eastern Magnesia, naming same as a defendant in

11        accordance with the accepted asbestos practice

12        in that area in view of settlement programs

13        that potentially responsible product

14        manufacturers or suppliers were negotiating or

15        had developed."

16             Do you see that?

17   A    Yes.

18   Q    What is the "accepted asbestos practice in that

19        area in view of settlement programs that

20        potentially responsible product manufacturers

21        or suppliers were negotiating or had

22        developed"?

23                 MR. COREN:      Ms. Holley, I

24        instruct you not to answer to the extent your

25        answer relies upon advice of counsel.  If you
```

```
 1        could answer the question without incorporating

 2        or revealing advice of counsel, please answer.

 3    Q   Okay.  Ms. Holley, going forward, any question

 4        I ask you that you have to reveal advice of

 5        counsel you should pause and say I would need

 6        to -- advice of counsel, otherwise Mr. Coren

 7        will continue to interrupt and try to prompt

 8        you not to answer questions like that --

 9                    MR. COREN:        Objection.

10    Q   -- okay?

11                    MR. COREN:        I'm stating

12        an --

13    Q   So --

14                    MR. COREN:        -- objection

15        for the record and I'll continue to state an

16        objection for the record.

17    Q   Ms. Holley, what does that sentence mean to

18        you?

19                    MR. COREN:        Once again my

20        same instruction.

21    A   What it means to me is that on or about that

22        date that a lawsuit was filed against BASF's

23        predecessor, Eastern Magnesia.

24    Q   We're actually focused on the second part, I

25        apologize.
```

```
 1    A    Okay.

 2    Q    The second part, what are -- what were --

 3         what's the accepted asbestos practice in

 4         Cuyahoga County of a settlement program where

 5         potentially responsible product manufacturers

 6         were negotiating or had developed?  What does

 7         that mean?

 8    A    I have no knowledge of what that means.

 9    Q    Well, you reviewed it in the complaint under

10         the paragraph that talks about your claims,

11         correct?

12    A    Okay.

13                   MR. COREN:         And, once

14         again, my same instruction applies.

15    Q    You just mentioned you reviewed the complaint

16         before filing, correct?

17    A    Yes.

18    Q    And this is a paragraph about your underlying

19         lawsuit and Mr. Bevan and your mother's

20         lawsuits, correct?

21    A    Correct.

22    Q    So you would have read this carefully, correct,

23         and wanted to understand it?

24    A    Correct.  I do understand it.

25    Q    Okay.  And so could you -- since you do
```

```
 1        understand paragraph 25, could you explain to
 2        me what the accepted asbestos practice was
 3        that's referenced in paragraph 25?
 4                     MR. COREN:        And once again
 5        I instruct you not to answer to the extent your
 6        answer relies upon advice of counsel.  If you
 7        can answer it without incorporating or
 8        revealing advice of counsel, please respond.
 9   A    The particular -- the particular words that you
10        are pointing out in referring to "Eastern
11        Magnesia, naming same as a defendant in
12        accordance with the accepted asbestos practice
13        in that area," I believe that my attorney would
14        have made that decision.  I personally would
15        not know what the accepted practice is in our
16        area.
17   Q    So that first sentence in paragraph 25
18        regarding the accepted asbestos practice for
19        settlement programs that were either being
20        negotiated or developed, Mr. Bevan would be the
21        person who has knowledge of that?
22   A    Well, the paragraph starts off:  On or about
23        November 14, 2000, my mom, Kathryn Darnell,
24        commenced an asbestos injury lawsuit.  She was
25        the one who dealt with her attorney, Tom Bevan,
```

```
 1        regarding this particular lawsuit.  I am not
 2        privy to that information.
 3   Q    Okay.
 4   A    I was not at that meeting.
 5   Q    You don't have any facts about the first
 6        sentence of paragraph 25 and the person who
 7        does have the facts would be Mr. Bevan?
 8   A    The person who does have the facts would be
 9        Mr. Bevan, as indicated on November 14, that
10        Kathryn Darnell, while alive, commenced.  So
11        that would have been between my mother and
12        Attorney Bevan.  And I was not a party to any
13        conferences or meetings to develop this
14        particular lawsuit.
15   Q    And so if I wanted to know what's meant by the
16        accepted asbestos practice in Cuyahoga County
17        for settlement program, I would be best to talk
18        to Mr. Bevan, fair?
19   A    Or review the accepted practices.
20   Q    But in terms of this complaint, you have, and
21        as -- withdrawn.
22             As a class representative, in paragraph
23        25 can you refer me to anybody whom I could
24        talk to to get answers about paragraph 25?
25   A    Okay.  The lawsuit was brought in the Common
```

```
 1        Pleas Court of Cuyahoga County and it says in
 2        accordance with the accepted asbestos
 3        practices.  So I don't understand how I would
 4        even be able to answer that question, really.
 5   Q    And let's step back.
 6   A    Okay.
 7   Q    When you reviewed the complaint, did you have
 8        any questions about what that meant?
 9   A    This particular complaint was done by Attorney
10        Bevan with meetings with my mother.
11   Q    Withdrawn.
12             With respect to reviewing the Williams
13        complaint, the second complaint that's in
14        front --
15   A    Right.
16   Q    -- of you.
17   A    Right.
18   Q    When you read it for the first time, did you
19        have any questions about what that meant?
20   A    No.  No, I did not.
21   Q    Did you review the complaint for accuracy?
22   A    Yes, however, I don't see anything that I would
23        question in this particular paragraph.
24   Q    Well, you just -- withdrawn.
25             You don't know what -- the accepted
```

```
 1        asbestos practices for settlements in Cuyahoga
 2        County, do you?
 3   A    No, I don't know the accepted in Cuyahoga
 4        County.
 5   Q    And if I wanted to find out from anybody
 6        involved in this case, do you think Mr. Bevan
 7        might be the person to talk to?  Or somebody
 8        else?
 9   A    You're talking about the complaint filed in
10        2000?
11   Q    No.  I'm talking about that -- who -- this --
12        withdrawn.
13             Paragraph 25 --
14   A    Okay.
15   Q    -- in your complaint against my client says
16        that there's an accepted asbestos practice in
17        Cuyahoga County for settlement programs.  You
18        say you don't know anything about that,
19        correct?
20   A    About what, the accepted practices?
21   Q    Yes.
22   A    To the best of my knowledge and understanding
23        based upon your question, I don't know why I
24        personally would know about accepted practices
25        in Cuyahoga County.
```

```
 1   Q   And as a class representative, could you point
 2       me to the person who would know anything about
 3       those practices as referenced in the complaint?
 4                 MR. COREN:        Objection to
 5       the form.
 6   Q   Could I talk to Mr. Bevan?  Would he be a
 7       better person to talk to?
 8   A   Yes.  Because I consider accepted practices to
 9       be an issue that the attorneys would know
10       about, not an issue that I would know about
11       personally.
12   Q   So it's something --
13   A   In spite of reviewing -- I review the complaint
14       based upon -- based upon facts that I know of.
15       The legal issues I rely on the attorneys.  I
16       consider that to be a legal issue when you say
17       "accepted practices."  How would I know about
18       accepted practices as a layperson?
19   Q   That would be Mr. Bevan?
20   A   Right.
21   Q   Okay.  And turn to the next sentence.  It says,
22       "reasonably relying upon and acting upon the
23       misrepresentations and material omissions of
24       Defendants regarding Engelhard's talc products
25       and the absence of any evidence indicating
```

```
 1      Engelhard's talc contained asbestos fibers that
 2      were made to her attorney and representative,
 3      Thomas Bevan, as set forth more particularly
 4      herein."
 5           Do you see that?
 6   A  Yes.
 7   Q  I think you mentioned earlier that the alleged
 8      representations were made to or known about by
 9      Mr. Bevan, not you, correct?
10   A  That would be correct.
11   Q  So if I want to ask somebody about that
12      sentence, I would have to ask Mr. Bevan,
13      correct?
14   A  Yes.  It says, "that were made to her attorney
15      and representative, Thomas Bevan."
16   Q  And then going to the next sentence, it says,
17      "Plaintiff voluntarily dismissed her lawsuit
18      against Eastern Magnesia as part of a nominal
19      settlement with a group of talc supplier
20      defendants without receiving full, fair and
21      adequate compensation for her asbestos injury
22      claims against BASF's predecessors."
23           Do you know anything about that sentence
24      and the facts underlying it?
25   A  That my mom accepted settlement based upon the
```

```
 1        facts that her attorneys had at that time.
 2   Q    And you know about that through Mr. Bevan,
 3        correct?
 4   A    Yes, I do.
 5   Q    Other than what you know from Mr. Bevan, you
 6        don't have any personal knowledge?
 7   A    I have no personal knowledge.
 8   Q    Turning to the next page, still paragraph 25.
 9        "Plaintiff Holley did not know and learn that
10        her decedent was a victim of Defendants'
11        Fraudulent Asbestos Defense Scheme until late
12        2010/early 2011, when she was informed of the
13        same by her attorney, Tom Bevan."
14             Do you see that?
15   A    Yes.
16   Q    Do you have any papers, documents, emails, that
17        could put a more specific date on when
18        Mr. Bevan informed you of this fraudulent
19        asbestos defense scheme?
20   A    To the best of my recollection, it was late
21        2010, early 2011 when I met with -- when I met
22        at Attorney Bevan's office.
23   Q    Okay.  And was that the same meeting
24        Mr. Placitella was at?
25   A    Yes.
```

```
 1   Q   So the first time you heard of this alleged

 2       scheme and filing a class action complaint was

 3       a meeting with Mr. Bevan and Mr. Placitella

 4       that lasted about two hours at Mr. Bevan's

 5       office?

 6   A   One or two hours.  And let me -- let me

 7       clarify.  It was -- Mr. Coren was there.

 8   Q   And Mr. Coren too?

 9   A   Uh-huh.  Yeah.

10   Q   And after that the complaint was filed?

11   A   Sometime after that.  I don't remember exactly

12       when, but sometime after that meeting the

13       complaint was filed.

14   Q   Did you have any other meetings between that

15       first meeting and the time the complaint was

16       filed?

17   A   I can't recall for sure.  I know that there

18       were at least one or two more meetings, but I

19       can't say specifically if they were before or

20       after the complaint was filed.

21   Q   And at any of those meetings were there people

22       besides your attorneys or other class

23       representatives?

24   A   At the first meeting for sure.

25   Q   The other class reps were at the meeting?
```

```
 1   A   Yes.
 2   Q   Were there people who weren't class
 3       representatives at the meeting?
 4   A   I would not know that.
 5   Q   Okay.  After -- withdrawn.
 6           After that first meeting, were there
 7       other meetings where people attended who were
 8       not class reps or attorneys?
 9   A   Not that I can recall.  I won't say
10       unequivocally, but not that I can recall.
11   Q   And at this first meeting, did Mr. Placitella
12       in words or in substance, or any of his
13       colleagues, tell you to make sure you
14       maintained all of your documents relating to
15       the underlying Bevan cases against Emtal?
16   A   No, I was not specifically told that.
17   Q   Were you ever told that?
18   A   Not specifically, no.
19   Q   Turning to the next sentence of paragraph 25.
20       "Had Plaintiff's counsel and Plaintiff known
21       about the existence of spoliation described
22       more particularly herein and/or the existence
23       of evidence that BASF's talc and talc products
24       contained asbestos, the settlement demand would
25       have been higher and/or the Plaintiff would
```

```
 1        have taken her case to trial."
 2             Do you see that?
 3   A    Yes.
 4   Q    Do you have any knowledge of the facts
 5        surrounding the settlement demand and whether
 6        you would have taken the case to trial or is
 7        that a Mr. Bevan topic as well?
 8   A    I have no personal knowledge of that, no.
 9   Q    And it says here plaintiffs would have taken
10        the case to trial.
11             Do you see that?
12   A    Yes.
13   Q    Out of the 98 or so cases -- withdrawn.
14             Out of the 98 or so defendants that
15        you've sued, have any of those cases gone to
16        trial?
17   A    We did not go --
18                     MR. COREN:      Form objection.
19             You can answer it.
20                     THE WITNESS:     Okay.
21   A    We did not go to trial.
22   Q    In any of them?
23   A    We did not go to trial.
24   Q    But Mr. Bevan would know whether this was the
25        case that you were going to take to trial?
```

```
 1        He's the person I should ask?
 2    A   He would know that.  I specifically personally
 3        recall that BFGoodrich defendant settled within
 4        a week before the trial date.
 5    Q   And then the next sentence says, "Plaintiff is
 6        willing and offers to return the portion of the
 7        settlement contributed by BASF, or such amount
 8        the Court deems fair and just, in order to be
 9        restored to the status quo ante the settlement
10        with BASF."
11            So the plaintiff, that's you, correct?
12    A   Correct.
13    Q   And that means you're willing to return the
14        money you've already gotten from BASF or
15        Engelhard?
16    A   If I'm not mistaken in the way I read this
17        paragraph, the money would have been returned
18        if there had not been a problem with BASF.
19    Q   Do you know how much money you or the estate
20        received from BASF or Engelhard?
21    A   I don't know.  I don't remember the amount.  I
22        don't remember.
23    Q   Okay.  In settling these cases -- by the way,
24        you've dealt with various settlements of people
25        who had asbestos, correct?
```

```
 1   A   Correct.

 2   Q   And have you dealt with defendants who didn't

 3       have asbestos?

 4   A   I can't recall.

 5   Q   By the way, with respect to -- withdrawn.

 6           You've been acting as a representative

 7       for your mother's estate since 2000 in these

 8       asbestos cases?

 9   A   No.  No.  2000 was prior to her death.

10   Q   Okay.

11   A   Okay.  She passed June 7, 2001.

12   Q   Correct.

13   A   Okay.

14   Q   So since that time you've been responsible for

15       handling the asbestos cases?

16   A   Since that time -- in 2001 we did open up an

17       estate with the local Probate Court.

18   Q   And you mentioned before that you've received

19       hard copies of documents from Mr. Bevan?

20   A   Correct.

21   Q   And you say you haven't received any emails

22       from Mr. Bevan?

23   A   No.  We usually deal with the documents

24       themselves via hard copy.

25   Q   Okay.  So Mr. -- if Mr. Bevan has emails to
```

```
 1      you --
 2   A  Mr. Bevan doesn't have emails to me.
 3   Q  Okay.
 4   A  Not specifically, no.
 5   Q  Generally?
 6   A  No, not generally.  No.
 7   Q  All right.
 8   A  No.  We either met or I received copies from
 9      his office.
10   Q  And then in terms of these various documents
11      for your underlying asbestos cases since 2001,
12      have you ever discarded or destroyed any of
13      them?
14   A  No.
15   Q  So you still have them all?
16   A  Yes.
17   Q  Could you describe for me what those files look
18      like?  Is it 6 inches, is it a couple boxes?
19   A  It's a lot of paper.  It's quite a bit, but I
20      could not give you a general idea because there
21      were a number of documents having been received
22      at various times.  I did not receive all of the
23      documents at one time.  Okay.
24   Q  But you have some sort of file system?
25   A  Yes.
```

```
 1   Q   Okay.

 2   A   From receiving documents from the office, yes.

 3   Q   And then these notes we referenced before of

 4       your meetings with other class representatives,

 5       would those notes be in the same file system?

 6   A   And I'm not even sure of that.  I mean, they

 7       were just some cursory notes that I made, yeah.

 8       Not putting down facts or anything, but

 9       basically the date of the meeting, who -- maybe

10       who was there and how long it took, but not any

11       extensive notes, no.

12   Q   Well, whether they're extensive or not, these

13       notes, are they in the same file system as your

14       Bevan litigation files?

15   A   Pretty much, yes.

16   Q   And in order to find out whether the notes are

17       extensive or not and whether they have actual

18       facts that might be relevant to the case, we

19       wouldn't know actually until an attorney

20       reviewed them, correct?

21   A   Correct.

22   Q   And Mr. Placitella and Mr. Coren haven't asked

23       to review them, correct?

24   A   No.  No.

25   Q   Could I ask you just -- I know you'll do this
```

```
 1        any way, but please don't discard them.  Keep
 2        hold of them, okay?
 3   A    Well, I keep all the --
 4   Q    Because I think -- I think --
 5   A    I keep the material I receive.
 6   Q    Good.  I think they're going to ask you now to
 7        review them.
 8   A    Okay.
 9   Q    Okay.  I might be wrong on that, but I think
10        I'm right.
11             Okay.  Let's go to paragraph 228 of the
12        complaint.  I'm going to ask you about 228 to
13        230.
14   A    Okay.
15   Q    So if you take a minute and review those.
16   A    Okay.  228 to 230?
17   Q    Yes, ma'am.
18             Okay.
19   A    Okay.
20   Q    All right.  So in paragraph 228, and then I'm
21        going to continue on to 230, there's the phrase
22        in the first sentence, "When negotiating these
23        aggregate settlements and deciding to recommend
24        and obtain its clients' consent and
25        authorization to participate in them, the Bevan
```

1       Law Firm reasonably relied upon Cahill Gordon's

2       and BASF's (or its predecessors')

3       representations" and it continues.

4              Do you see that?

5   A   Yes.

6   Q   Based upon your experience with Mr. Bevan and

7       over the last 15 years of asbestos litigation

8       with 98 or so defendants, do you have any

9       understanding of what the phrase "aggregate

10      settlement" means?

11                  MR. COREN:        And,

12      Mrs. Holley, once again I need to instruct

13      you --

14                  MR. ASSAF:        Oh, please.

15      Michael.

16                  MR. COREN:        Stop it.

17                  MR. ASSAF:        No.  This is

18      not -- there's no advice to go here.  I'm

19      asking her if she knows what it means.  It's a

20      yes or no question.  There's no legal advice

21      that can conceivably impact this answer.

22                  MR. COREN:        Well, you and I

23      seem to have a disagreement, Gene, on putting

24      my objection on the record.

25              I instruct you not to answer to the

```
 1        extent your answer relies upon advice of

 2        counsel.  If you can answer the question

 3        without incorporating or revealing advice of

 4        counsel, please respond to Mr. Assaf's

 5        question.

 6   Q    And to be clear, Ms. Holley, I'm asking you yes

 7        or no do you know what that means.

 8                    MR. ASSAF:       And, Mr. Coren,

 9        I'd ask you to stop coaching and suggesting

10        answers to the witness.

11                    MR. COREN:       I'm not

12        coaching.  I'm putting an objection on the

13        record.

14   Q    Do you know what the term "aggregate

15        settlement" means?

16   A    I believe I do.

17   Q    Okay.  What is it?

18   A    That it would be the collective group of

19        settlements.

20   Q    So with other plaintiffs?

21   A    With other plaintiffs.

22   Q    And have you participated in aggregate

23        settlements?

24   A    Participated in what way?

25   Q    Have you settled as part of an aggregate
```

 1      settlement?

 2  A   Yes.

 3  Q   And did you -- withdrawn.

 4          And has Mr. Bevan represented you in

 5      these aggregate settlements?

 6  A   Yes.

 7  Q   Now, if you turn to paragraph 230, at the very

 8      bottom of the page, it says, "Correspondingly."

 9      Do you see it at the bottom right?

10  A   Uh-huh.

11  Q   "Correspondingly, the Bevan Law Firm asbestos

12      injury clients, including Plaintiff Pease,

13      Plaintiff Holley's decedent, Ms. Darnell, and

14      Plaintiff Ware, as well as others similarly

15      situated to them, would not have given their

16      consent or authorization to participate in an

17      aggregate settlement with BASF."

18          Do you see that?

19  A   Yes.

20  Q   Do you have any knowledge of whether or not you

21      would have given authorization to participate

22      in a settlement with BASF?

23  A   I have no knowledge of that.

24  Q   If I wanted -- the person who would have

25      knowledge of that would be Mr. Bevan, correct?

1    A    Yes, it would have been Mr. Bevan.

2    Q    All right.  Could you turn to page -- to

3         paragraph 289.

4    A    Okay.

5    Q    It says, "Plaintiffs' claims are typical of the

6         claims of other Class Members'."

7              Do you see that?

8    A    Yes.

9    Q    Do you know what that means?

10   A    Yes.

11   Q    What does that mean to you?

12   A    It says because we were similarly affected by

13        Defendants' spoliation of asbestos evidence.

14   Q    And do you have any facts to that or is that a

15        Mr. Bevan issue?

16   A    That's a Mr. Bevan issue.

17   Q    Okay.  Could you turn to paragraph 316.

18   A    I'm there.

19   Q    Okay.  It says, "As a further proximate" cause

20        "of the above described deliberate gathering

21        and withholding, destruction and/or concealment

22        of documents and evidence relating to Class

23        Members' underlying asbestos claims, and/or the

24        false and misleading statements thereafter that

25        no documents or evidence existed, Plaintiffs

```
 1        and other Class Members may or will incur, or
 2        have already incurred pecuniary losses and
 3        damages, including but not limited to the loss
 4        of their underlying asbestos injury claim, the
 5        expenses and costs of proceeding without this
 6        evidence incurred in the effort to replace,
 7        locate, or identify evidence, and the cost of
 8        prosecuting this case to prove the fraudulent
 9        concealment and spoliation of evidence."
10             Do you see that?
11   A    Yes.
12   Q    Okay.  First of all, the pecuniary damages,
13        what pecuniary damages, what money damages have
14        you suffered?
15   A    What money damages?
16   Q    Yeah.
17   A    Are you asking are there money damages that I
18        have suffered personally?
19   Q    Yes.
20   A    I'd have to give thought to that question.  I'm
21        not certain what's involved in money damages
22        for me.  Are you talking about time?  Are you
23        talking about any kind of material loss that I
24        have had?  I'm not sure what that means.
25   Q    What about in terms of your mother's estate,
```

```
 1        what money damages has that incurred?
 2   A    What do you mean?
 3   Q    Well, it says that class members, plaintiffs --
 4   A    Right.
 5   Q    -- have -- may or will incur or may have
 6        already incurred pecuniary or monetary losses
 7        and damages, including but not limited to the
 8        loss of their underlying asbestos injury
 9        claims, and then it goes on.
10   A    Uh-huh.
11   Q    So let's start there.  With respect to the loss
12        of the underlying asbestos injury claim, do you
13        think that that's a loss that you or your
14        mother's estate has incurred?
15   A    Yes.
16   Q    Okay.  And how much?
17   A    How much?
18   Q    Is that loss?
19                   MR. COREN:         Objection as to
20        form.
21   A    As in a monetary value?
22   Q    Yes.
23   A    I would not be able to answer that.
24   Q    Well, you now have testified you've been
25        involved with Mr. Bevan for 15 years settling
```

```
 1        cases against asbestos defendants, including,

 2        as we're going to see, people who actually

 3        created asbestos piping where your mother

 4        worked.

 5   A    Right.

 6   Q    And you settled those cases?

 7   A    Right.

 8   Q    So you have some understanding of what cases

 9        settle for, correct?

10   A    I have some understanding of what cases settled

11        for, but I do not know how the figures were

12        derived.

13   Q    Well, as we sit here today, do you have any

14        amount of money that you could identify for me

15        as your loss for having your mother's claim

16        dismissed or settled against BASF?

17                    MR. COREN:        Objection as to

18        form.

19                    You can respond.

20   A    I have -- I have no idea.  That has not been

21        discussed.

22   Q    Well, do you know that you or your mother's

23        estate have settled with other talc

24        manufacturers?

25   A    I know that they have settled with other
```

```
 1      defendants, whether or not they were talc

 2      manufacturers, I'm not certain.  I particularly

 3      remember defendants like BFGoodrich, Cooper,

 4      that sort of thing.

 5  Q   And you said you understood the term "aggregate

 6      settlements" --

 7  A   Right.

 8  Q   -- right?

 9  A   Right.

10  Q   That's where maybe a bunch of defendants --

11  A   Right.

12  Q   -- were settling --

13  A   Right.

14  Q   -- with a bunch of plaintiffs --

15  A   Right.

16  Q   -- correct?

17  A   Right.  Right.

18  Q   And would you agree with me, would it be fair

19      if I can show you that your mother or your

20      mother's estate settled with talc manufacturers

21      who admitted they had asbestos in the talc,

22      that would be instructive for you in

23      understanding what the damages are in having

24      settled with Engelhard, correct?

25  A   I think it's instructive to a certain extent.
```

```
 1   Q   Because if you have two talc manufacturers and
 2       you're settling with them, you would think,
 3       based upon your experience with Mr. Bevan, that
 4       the talc manufacturer who has asbestos in the
 5       talc would pay more than the talc manufacturer
 6       who doesn't have asbestos in the talc, fair?
 7               MR. COREN:        Form objection.
 8           You can respond.
 9   A   Fair to a certain extent, because in this
10       particular matter there was fraud involved.
11   Q   Based on what Mr. Bevan told you?
12   A   Based upon what -- yes.  Based upon what
13       Mr. Bevan said and the basis -- the very basis
14       of this lawsuit.
15   Q   Okay.  But in terms of the underlying cases
16       back in 2000 and 2001, 2002, you understood
17       that those cases were being settled against
18       defendants who both had asbestos in their
19       product and didn't have asbestos in their
20       product, correct?
21   A   My understanding is based upon those that had
22       asbestos.  I cannot recall those who did not.
23       If there were those who did not.
24   Q   Well, you settled -- your mother's estate
25       settled with Engelhard, and one of the reasons
```

```
 1        Mr. Bevan told you there was fraud is because

 2        she heard that Engelhard didn't have asbestos

 3        in the talc, right?

 4    A   No.

 5    Q   No.

 6    A   Well, based upon my understanding of this

 7        particular case, the information given to them

 8        at that time was that Engelhard did not have

 9        asbestos in the talc.

10    Q   And at the time -- withdrawn.

11             Based upon your litigation experience

12        with Mr. Bevan, you have come to learn that you

13        have settled with defendants who actually did

14        have asbestos in the talc, right?

15    A   Yes.

16    Q   And you would agree with me that's going to be

17        relevant information, to see how much a

18        defendant owed somebody who was around talc,

19        correct?

20    A   Correct only if -- only if they admitted that

21        they had asbestos in the talc.  I don't think

22        it -- I don't think it's fair to lump that in

23        with someone who said that they did not have

24        asbestos in the talc but in fact did.  I think

25        that's a -- there's the difference there.
```

```
 1   Q   Okay.  And we'll get to that.  I'm going to

 2       show you --

 3   A   Right.

 4   Q   -- a listing of defendants.

 5   A   Okay.

 6   Q   Some with asbestos, some without.

 7   A   All right.  All right.

 8   Q   All right.  Let's see.

 9                   MR. ASSAF:      Can I have the

10       interrogatory?

11          (Defendants' Exhibit 2 was marked.)

12   A   I think they're right in front of you.  This is

13       D Ex. 2.  "Plaintiff --"

14                   MR. COREN:      Gene, when you

15       get to a good spot --

16                   MR. ASSAF:      Yeah, I think

17       this will take five minutes or so and then --

18                   MR. COREN:      Yeah.

19                   MR. ASSAF:      -- we'll take a

20       break.

21   Q   Marilyn Holley's -- withdrawn.

22          D Ex. 2 is entitled:  Plaintiff Marilyn

23       Holley's answers to BASF's first set of

24       interrogatories.

25          Do you see these?
```

```
 1   A   Yes.

 2   Q   Okay.  When did you first see these?

 3   A   I first saw these after they were prepared for

 4       me, but I can't give you an exact time when

 5       they were -- when it was done.  Let's see.

 6           Based upon the certificate of service, it

 7       looks like it was the end of last year.  Okay.

 8   Q   And did you review these interrogatories before

 9       they were finalized?  Or did you review them

10       after they were already filed?

11   A   No.  I reviewed them after they were finalized.

12       We discussed them prior to submission.

13   Q   And did you ever sign what's called a

14       verification?

15   A   Yes.

16               MR. ASSAF:       I'm going to

17       ask counsel for a copy of that verification.

18               MR. COREN:       Yes.

19               MR. ASSAF:       If you could

20       email it to me during the dep, that would be

21       useful.  Okay?

22               MR. GEYERMAN:    Same goes for

23       the verifications for the other defendants.

24   Q   So you remember signing the verification?

25   A   I believe so.  I won't say unequivocally, but I
```

```
 1      believe so.

 2   Q  And because you've signed verifications for

 3      other interrogatory responses in other

 4      litigations, correct?

 5   A  Correct.

 6   Q  And so you know what a verification is?

 7   A  Yes.

 8   Q  Let's start at the back, actually, 11 and 12.

 9          In 11 the second paragraph reads,

10      "Subject to and without waiving the foregoing

11      Objections, Plaintiff possesses no personal

12      information responsive to this request."

13          This is a question --

14   A  Do we have -- oh, I wasn't at the

15      interrogatories.  I'm sorry.

16   Q  Sorry.  Withdrawn.

17          Let's start again.

18   A  Okay.  Interrogatory number 11?

19   Q  11, yep.  Describe in detail the process behind

20      the Decedent's decision to settle or dismiss

21      Engelhard in the Underlying Actions, including

22      the Persons involved, the information reviewed,

23      and the basis for the decisions.

24          Do you see that?

25   A  Uh-huh.
```

1   Q   And then the response, the second paragraph,

2       says, "Plaintiff possesses no personal

3       information responsive to this request."

4           Do you see that?

5   A   Yes.

6   Q   And I think you and I talked about this in the

7       beginning of the deposition, the information --

8       personal -- withdrawn.

9           You have no personal information

10      regarding why the underlying case was settled,

11      what happened in the underlying case, what was

12      said regarding Engelhard in the underlying

13      case, correct?

14  A   I have no personal information of that, that's

15      true.

16  Q   And the person who does have that personal

17      information --

18  A   Would be --

19  Q   -- is -- would be?

20  A   Attorney Bevan.

21  Q   Attorney Bevan.  Okay.

22          Interrogatory 12, I think the same thing.

23      "Describe all efforts made by Decedent and her

24      counsel in the Underlying Action to develop and

25      prosecute claims under Engelhard."

```
 1                   And, again, just to be clear, the person

 2        who would have the factual information to

 3        address why the case was settled, what was said

 4        by Engelhard would be?

 5    A   Attorney Bevan.

 6    Q   And on that note, we'll take a break.

 7                        THE VIDEOGRAPHER: Off the record.

 8        The time is 11:36.

 9                        (Recess taken.)

10                        THE VIDEOGRAPHER: Back on the

11        record.  The time is 11:48.

12            (Defendants' Exhibit 3 was marked.)

13    BY MR. ASSAF:

14    Q   Okay.  In front of you, Ms. Holley, is

15        exhibit -- Defendants' Exhibit 3, the response

16        to the Cahill Gordon interrogatories.

17            Do you see these?

18    A   Yes.

19    Q   Did you also review these at some point?

20    A   Yes.

21    Q   Okay.

22    A   I'm certain that I did.  Uh-huh.

23    Q   Did you sign a verification?

24    A   I believe I did, yes.

25    Q   Okay.
```

```
 1                      MR. ASSAF:        Counsel, may we
 2         also have a copy of that verification?
 3                      MR. PLACITELLA:    Sure.
 4                      MS. FIELDS:       We join in that
 5         request.
 6                      MR. ASSAF:        I don't think
 7         it was attached.
 8    Q    All right.  And in terms of filling out the
 9         disclosed -- the interrogatories, fair to say
10         that you also -- you relied on the facts that
11         you knew from Mr. Bevan?  Withdrawn.
12              In terms of responding to the
13         interrogatories, I know you said that you had
14         no personal knowledge of many of the facts in
15         there, correct?
16    A    Yes.
17    Q    And with respect to the facts you did know, is
18         it fair to say that many of those facts came
19         from Mr. Bevan?
20    A    Many, but I believe in this interrogatories we
21         talked about residences.
22    Q    Yes.
23    A    Okay.  So that would have been personal
24         knowledge.
25    Q    So other things like residences, I guess it's
```

```
 1        your brother and Linda Neal whom also you
 2        identified as potential witnesses?
 3    A   Linda Neal, not necessarily my brother.
 4    Q   Okay.  All right.
 5    A   Uh-uh.
 6    Q   But other than that purely personal
 7        information --
 8    A   Yes.
 9    Q   -- the facts of the underlying case and the
10        facts of the alleged fraud, all that's
11        Mr. Bevan?
12    A   Yes.
13    Q   "Go talk to Mr. Bevan"?
14    A   Yes.
15            (Defendants' Exhibit 4 was marked.)
16    Q   May I have put in front of the witness
17        Defendants' Exhibit 4, please.
18            Defendants' Exhibit 4 is entitled "Class
19        Plaintiffs Rule 26(a) Disclosures."
20            Have you ever seen this before?
21    A   I can't recall for sure.  This document goes
22        back to October 2015.
23    Q   Okay.
24    A   And I don't remember -- I can't say yea or nay.
25    Q   Okay.  It's something filed by your --
```

```
 1      plaintiffs' --
 2   A  Right.
 3   Q  -- lawyers --
 4   A  Right.
 5   Q  -- in the Williams case?
 6   A  Right.
 7   Q  And I would like to turn your attention to
 8      paragraph 2.
 9   A  Paragraph 2.  Okay.
10   Q  Yep.
11            I'm sorry.  Page 2.  Page 2.
12   A  Page 2.
13   Q  Where it says "Thomas Bevan."
14   A  Uh-huh.
15   Q  Do you see that?
16   A  Yes.
17   Q  And I'm going to read this under "Subject."
18   A  Okay.
19   Q  "Mr. Bevan is an attorney in the Akron, Ohio
20      area who has represented the five Ohio-venued
21      Named Class Representative Plaintiffs.  He has
22      knowledge of their asbestos claims, the
23      representations that he and his firm were given
24      by Defendant BASF Catalysts, Cahill, Gordon and
25      the individual attorneys affiliated with these
```

```
 1       Defendants, and the actions taken as a result
 2       of Defendants' misrepresentations, half-truth
 3       statements, material omissions concerning Emtal
 4       talc and the evidence of asbestos in Emtal
 5       talc.  He has knowledge about the involuntary
 6       dismissal of his clients' claims due to the
 7       defendants' misrepresentations, half-truth
 8       statements and material omissions concerning
 9       Emtal talc and the evidence of asbestos in
10       Emtal talc."
11            Do you see that?
12   A   Yes.
13   Q   Do you think that's true?
14   A   Yes.
15   Q   Yes.  And do you have -- have you ever told
16       Mr. Bevan that he cannot provide facts in this
17       case?
18            MR. COREN:       Objection as to
19       form.
20            Also to the extent that you're relying
21       upon advice of counsel, I'm going to instruct
22       you not to answer.  However, to the extent that
23       you have personal knowledge, you may --
24       without -- you can answer without revealing
25       advice of counsel, please respond.
```

 1    A    I have no personal knowledge.

 2    Q    Okay.  Let me try it this way:  You've known

 3         Mr. Bevan for 15 years?

 4    A    Yes.

 5    Q    He has a relationship with you and your

 6         mother's estate and helping you in all of these

 7         asbestos cases, right?

 8    A    Correct.

 9    Q    You trust him, correct?

10    A    Yes.

11    Q    You think he's a good guy, good lawyer?

12    A    Yes.

13    Q    Okay.  If he has information that would help

14         out your case here, you wouldn't have any

15         objection to him giving it to you to help you

16         out, correct?

17                        MR. COREN:        I'm going to

18         instruct you not to answer the question.   It

19         deals with a matter of privilege.  We are

20         asserting at this time the privilege.  Until

21         the Court takes appropriate action under law,

22         I'm instructing the witness not to answer.

23                        MR. ASSAF:        On whether she

24         has an objection to him providing us

25         information?

```
 1                    MR. COREN:        Yes, because
 2      it's a matter of privilege and we're
 3      instructing her not to answer.  It's a very
 4      complicated issue.  It's an issue that's
 5      pending before Magistrate Judge Dickson.
 6   Q  So let's try it this way:  We've identified --
 7      you've identified Mr. Bevan as a guy who
 8      understands the facts of the underlying action,
 9      the alleged representations, and other issues,
10      fair?
11   A  True.
12   Q  As we sit here today, as a class representative
13      and somebody who's known Mr. Bevan for 15
14      years, can you think of any reason why you as a
15      class rep wouldn't want him to provide those
16      facts to the Court?
17                    MR. COREN:        Once again,
18      it's a matter of privilege.  I'm --
19                    MR. ASSAF:        It's not
20      privileged, Michael.
21                    MR. COREN:        Excuse me.  It
22      is.  It's the assertion of a privilege which we
23      are asserting.
24                    MR. ASSAF:        What legal
25      advice or legal communication is at issue,
```

```
 1        Mr. Coren?

 2                      MR. COREN:      Many.  Many.

 3                      MR. ASSAF:      What identified

 4     by that question?

 5             Court reporter, could you read back the

 6        question, please?

 7                      MR. COREN:      You know, I'm

 8        not going to respond.  I've asserted my --

 9                      MR. ASSAF:      Please read

10        back the question.

11          (Requested portion of the record was read.)

12                      MR. COREN:      Okay.  And,

13        once again, the issue is a matter of assertion

14        of privilege, which is a complicated one in New

15        Jersey.  It's not an automatic one in New

16        Jersey.  We have asserted the privilege.  It's

17        a matter under submission to judge --

18        Magistrate Judge Dickson.  I'm instructing the

19        client not to answer.

20    Q    Have you had -- yes or no:  Have you had

21        discussions with Mr. Bevan regarding the facts

22        in this case, the Williams case?  Just answer

23        it "yes" or "no" without revealing what was

24        said.

25    A    Yes.
```

```
 1   Q   Okay.  Could you answer yes or no whether
 2       you've had discussions with Mr. Bevan as to
 3       whether he would be willing to testify in this
 4       case?  Don't say what he said, just have you
 5       had those discussions?
 6   A   I have not had those discussions with him.
 7   Q   Okay.  Do you have any written agreement with
 8       Mr. Bevan prohibiting him from testifying in
 9       this case?
10   A   No.
11   Q   We talked about the arrangements when we
12       started, by the way, and it was your
13       recollection you did not have a written fee
14       arrangement with Mr. Placitella's firm?
15   A   I'm not going to say that I don't have one, I
16       just don't recall that particular document.
17   Q   Would this be in your files that the
18       plaintiffs' counsel haven't reviewed yet?
19   A   Either in my files or Mr. Bevan's.
20   Q   And do you have a separate agreement with
21       Mr. Bevan in writing for compensation in this
22       case, the Williams case?
23   A   I'm not sure.  Really I'm not sure.
24   Q   Would that be in your files as well?
25   A   If it's -- if I have it, if I was given that,
```

```
 1       yes, it would be.
 2   Q   Do you have any idea of how Mr. Placitella's
 3       going to be compensated in this case as the
 4       class representative?
 5   A   No, I don't.  Not personally, no.
 6   Q   So he could get 10 percent, 30 percent, 50
 7       percent, you wouldn't know?
 8   A   I'm not aware.  I'm not aware.  I don't know.
 9   Q   That was never discussed with you?
10   A   I don't know.
11   Q   Okay.  Now if you take in front of you D Ex. --
12                   MR. ASSAF:         Can you give
13       the witness D Ex. 5 through D Ex. 12?
14            (Defendants' Exhibit 5 was marked.)
15            (Defendants' Exhibit 6 was marked.)
16            (Defendants' Exhibit 7 was marked.)
17            (Defendants' Exhibit 8 was marked.)
18            (Defendants' Exhibit 9 was marked.)
19           (Defendants' Exhibit 10 was marked.)
20           (Defendants' Exhibit 11 was marked.)
21           (Defendants' Exhibit 12 was marked.)
22   Q   We're going to try to get through these in
23       fairly short order.
24            May I help you?
25   A   I just want to make certain that I have 12.
```

```
 1   Q   Oh, I think --

 2   A   Okay.

 3   Q   Yeah, I think they're all here.

 4   A   Okay.  Okay.

 5   Q   Here they are.  9, 10, 11, 12.

 6   A   Okay.

 7   Q   And I'm going to try to do these in order,

 8       Ms. Holley --

 9   A   Okay.

10   Q   -- okay?

11   A   All right.

12   Q   All right.  First of all, D Ex. 5 is a November

13       14, 2000 filing of a complaint by Ms. Darnell

14       against who I count to be 98 defendants.

15           Do you recognize this document?

16   A   Yes.

17   Q   And these are the 95 defendants from whom

18       you've been pursuing compensation over the last

19       15 years?

20   A   To the best of my knowledge, yes.

21   Q   And some have paid and some haven't?

22   A   Yes.

23   Q   In addition to this lawsuit, were there any

24       other lawsuits filed against any other

25       defendant that you can think of?
```

```
 1   A   When you say "in addition to this lawsuit,"
 2       were you referring to --
 3   Q   In addition to the lawsuit against 98 asbestos
 4       defendants --
 5   A   Oh, I see.
 6   Q   -- did you file any other asbestos case?
 7   A   No, not -- not except the one that we're
 8       presently talking about.
 9   Q   Okay.  So that's November 14, 2000, okay?
10   A   Uh-huh.
11   Q   Then we're going to go to the very next page --
12       the very next document, D Ex. 6.  It is a
13       letter entitled -- or dated February 15, 2001
14       from Mr. Bevan to Sam Martillotta.
15            Do you see this document?
16   A   Yes.
17   Q   And if you turn to the second page of D Ex. 6,
18       there's a reference to Ms. Darnell.  Do you see
19       this?  Do you see that?
20   A   Yes.
21   Q   The document says, "I have enclosed the above
22       captioned Master Consolidated Complaints.  As I
23       indicated to you previously, most of these
24       Plaintiffs did not work in facilities where
25       they would have been exposed to talc."
```

```
 1              Do you see that?

 2    A    Yes.

 3    Q    Okay.  "The following Plaintiffs did work in

 4         facilities where they were exposed to talc."

 5         And then he lists --

 6    A    Yes.

 7    Q    -- 14 --

 8    A    Yes.

 9    Q    -- plaintiffs.  Do you see that?

10    A    Yes.

11    Q    And do you see that they have different

12         employers?  Firestone, Goodyear, General Tire?

13    A    Yes.

14    Q    And do you see where they have different years

15         in which they were working at these employers?

16    A    Yes.

17    Q    And that they have different diagnoses?

18    A    Yes.

19    Q    Do you think those -- withdrawn.

20              Based upon your 15 years of dealing with

21         asbestos litigation with Mr. Bevan, do you

22         understand that the differences in exposure and

23         diseases matter in terms of compensation?

24    A    Yes.

25    Q    What's your understanding of the reason for
```

```
 1       that?
 2   A   The severity of the illnesses.  Basically
 3       mesothelioma, which my mother had which we know
 4       is a lung disease only contracted by exposure
 5       to asbestos.
 6   Q   So mesothelioma should be the disease for which
 7       the greatest compensation is allowed, as
 8       opposed to asbestosis?
 9   A   To the best of my knowledge and belief, that is
10       true.
11   Q   So the complaint is November of 2010, and in
12       roughly three months later, there's a letter
13       from Mr. Bevan to Mr. Martillotta, whom I'll
14       represent to you was defense counsel for talc
15       defendants group.
16   A   Okay.
17   Q   Okay.  Regarding these 14 cases.
18           And at the end, Mr. Bevan says -- the
19       very last paragraph, I'm also enclosing -- "I
20       have also enclosed diagnosing medical records
21       for each of these cases.  Please let me know if
22       the talc defendants would like to resolve these
23       cases along with the plaintiffs from the
24       Breckenridge complaint.  Obviously, we would
25       also dismiss the defendants from other cases on
```

```
 1        these complaints as well."
 2             Do you see that?
 3   A    Dismiss the talc defendants.
 4   Q    Yes.
 5   A    Uh-huh.
 6   Q    Okay.  So Mr. Bevan's asking Mr. Martillotta
 7        whether we could resolve all of these cases
 8        three months after the complaint's filed,
 9        right?
10   A    According to the record, yes.
11   Q    Okay.  Now let's go to D Ex. 7, which is the
12        very next document.  And it is in fact a
13        dismissal by Mr. Bevan of your mother's lawsuit
14        against a number of defendants.
15             Do you see that?
16   A    Yes.
17   Q    And included in these defendants are companies
18        like the Asbestos Corporation.  Do you see
19        that?
20   A    Yes.
21   Q    And Bell Asbestos Mines.
22   A    Uh-huh.
23   Q    And Federal Mogul.
24   A    Uh-huh.
25   Q    Do you see that?
```

```
 1    A    Yes.

 2    Q    And Georgia-Pacific.  Do you see that?

 3    A    Yes.

 4    Q    And R.T. Vanderbilt and Company.  Do you see

 5         that?

 6    A    R.T. Vanderbilt.

 7    Q    Yeah, down towards the end.

 8    A    Yes.

 9    Q    And if you go back up to the E's, Eastern

10         Magnesia Talc Company, do you see that?

11    A    Yes.

12    Q    So in May of 2001, all of the claims against

13         those defendants are dismissed by your mother,

14         do you see that?

15    A    Yes.

16    Q    Okay.  Then a few weeks later -- I'd like to

17         turn your attention to D Ex. 8.

18    A    Okay.

19    Q    D Ex. 8 is a document dated May 25, 2001 from

20         Mr. Martillotta to Mr. Bevan.

21    A    Yes.

22    Q    And it's entitled "Settlement with 7 Talc

23         Defendants."

24              Do you see that?

25    A    Yes.
```

```
1    Q    By the way, have you seen this document before?

2    A    I can't say that I have.  I may have, but there

3         have been so many documents.  I cannot identify

4         them individually.

5    Q    Okay.  Let's see if I can refresh your

6         recollection on this.

7    A    Okay.

8    Q    Thank you for forwarding to me the release.

9         Please revise the name of Harwick Chemical

10        Corporation to read 'Harwick Chemical Corp. now

11        known as Harwick Standard Distribution

12        Corporation'.  With that change, the talc

13        defendants agree to the language of the Release

14        and urge you to obtain them for the Grant

15        Breckenridge plaintiffs with whom we are

16        settling for a total of $14,000, and the

17        fourteen plaintiffs from the other cases,

18        specifically including Kathryn Darnell.

19             Do you see that?

20   A    Yes.

21   Q    Tom, as soon as you have the executed Releases,

22        please forward them to me and I will forward to

23        you the drafts.

24   A    Uh-huh.

25   Q    In the meantime, prepare and serve on the CLAD
```

```
 1        the dismissal of the seven talc defendants with
 2        whom you are settling in each of these cases.
 3             Do you see that?
 4   A    Yes.
 5   Q    And then if you turn to the second -- or I
 6        guess it's page 3 under "Bevan 14 Plaintiffs."
 7             Do you see that?
 8   A    Yes.
 9   Q    And it says $19,000 and Kathryn Darnell.
10             So do you see that?
11   A    Yes.
12   Q    All right.  Does that refresh your recollection
13        that all seven talc defendants were settling
14        for a total of $14,000?
15   A    No, it does not.  It does not refresh my
16        recollection.  And, actually, this is dated May
17        25, 2001.  It was literally only two weeks
18        before my mom passed away.
19   Q    In terms of understanding the facts of this
20        settlement with seven talc defendants for
21        $14,000, would Mr. Bevan be the person that you
22        would encourage me to talk to?
23   A    Yes.  He would definitely have the information
24        on this.  I did not.  I was not a party to
25        this.
```

| | | |
|---|---|---|
| 1 | Q | Okay.  Then if you turn to D Ex 9.  It's dated |
| 2 | | May 16, 2001. |
| 3 | A | Yes. |
| 4 | Q | So now I'm showing you this because it's a |
| 5 | | voluntary dismissal of defendants Georgia Talc, |
| 6 | | Harwick Chemical, Emtal, R.T. Vanderbilt, |
| 7 | | Johnson & Johnson, and Southern Talc Companies, |
| 8 | | which seems to be, by my count, seven talc |
| 9 | | companies. |
| 10 | A | Okay. |
| 11 | Q | Okay.  Now, remember in the beginning of the |
| 12 | | deposition I asked you whether talc companies |
| 13 | | who have asbestos in the talc were paying money |
| 14 | | different from talc companies that didn't have |
| 15 | | asbestos in the talc? |
| 16 | A | Yes, I recall that. |
| 17 | Q | And you said you would expect the talc |
| 18 | | companies with asbestos to actually pay more, |
| 19 | | fair? |
| 20 | A | Fair. |
| 21 | Q | Now, here we have seven talc defendants |
| 22 | | dismissing the case against your mother and |
| 23 | | let's assume it's for $14,000, per Mr. Bevan's |
| 24 | | letter, okay? |
| 25 | A | Okay. |

```
 1   Q   All right.  So did you know that R.T.

 2       Vanderbilt in fact had asbestos in its talc?

 3   A   No, I did not know that.  Personally, no.

 4   Q   Okay.  Well, can you dispute that Mr. Bevan

 5       knew that?

 6                   MR. COREN:         Objection as to

 7       form.

 8   A   I wouldn't be able to dispute that.  That's

 9       based upon his knowledge and belief and it's

10       nothing that I discussed with him.

11   Q   Okay.

12   A   Because this, as I say, this was prior to my

13       mom's passing.  And so this particular

14       defendant -- then she would have had the

15       relationship with Mr. Bevan.

16   Q   Well, this is actually -- this is August 16,

17       2001.

18   A   Okay.

19   Q   This is the dismissal of all seven talc

20       defendants.

21   A   That was the dismissal --

22   Q   Yep.

23   A   -- of all seven and it was -- I have it at

24       home.  I don't remember -- let me see -- the

25       date of my becoming --
```

```
 1   Q   Okay.

 2   A   -- executrix of the estate.

 3   Q   Okay.  But as we sit here today, do you know

 4       whether Southern Talc had asbestos in its talc?

 5   A   I have no idea.

 6   Q   And could you dispute that Mr. Bevan in fact

 7       knew that Southern Talc had asbestos in the

 8       talc?

 9   A   I would not --

10                   MR. COREN:          Objection.

11   A   -- be able to dispute that.

12   Q   Could you turn to D Ex. 10?

13   A   Okay.

14   Q   January 7, 2002 from Mr. Bevan to Sam

15       Martillotta.

16   A   Right.

17   Q   And dated January 7, 2002.

18   A   Uh-huh.

19   Q   Entitled "Talc Settlement."

20   A   Right.

21   Q   "Dear Sam:

22           I have enclosed executed release for the

23       following clients."

24           And then on the next page it says, "The

25       following clients were previously paid."
```

```
 1              "We have not filed claim for the
 2       following individuals."
 3              We are waiting releases from the
 4       following clients.
 5              "Per your release, I have enclosed death
 6       certificates for the following clients."
 7              And then on page 3 it says, "According to
 8       our records, we have previously settled and
 9       dismissed, but not yet been paid for the
10       following clients."  Do you see where it says
11       Kathryn Darnell?
12  A    Yes, which includes my mom, yes.
13  Q    Which includes your mom.
14  A    Uh-huh.
15  Q    And it says for the talc defendants that she
16       was paid $2,000.  Do you see that?
17  A    I see that.
18  Q    And that $2,000 included money from talc
19       defendants who had asbestos in the talc,
20       correct?
21                    MR. COREN:        Objection as to
22       form.
23  A    Does it say that?
24  Q    I'm asking if you know.
25  A    I don't know.
```

MARILYN HOLLEY - 04/05/2017                    Page 107

```
 1   Q   Mr. Bevan would know, correct?

 2   A   Okay.  Right.

 3   Q   And would you be surprised, based on what you

 4       know of Mr. Bevan and the allegations in this

 5       case, if Mr. Bevan recommended a settlement

 6       from talc defendants who had asbestos in the

 7       talc for a total of $2,000?  Would that

 8       surprise you?

 9                   MR. COREN:      Objection as to

10       form.

11   A   Based upon the way you put your question, I

12       don't know why I would be surprised or not

13       surprised, because we're talking about

14       settlement issues.  Okay.

15   Q   So as we sit here today, you can't think of any

16       reason you would object to settling with a talc

17       defendant who had asbestos in the talc for

18       $2,000?

19   A   I can think --

20                   MR. COREN:      Objection as to

21       form.

22   A   -- of no reason for me to object.

23   Q   You can think of no reason you would object to

24       a settlement of $2,000 from a talc defendant

25       with asbestos?
```

```
 1    A    No, not with -- understanding the underlying

 2         issues.

 3    Q    Could you turn to D Ex. 11, the very next

 4         document.  This is January 10, 2002.

 5              It says:  Enclosed is a settlement draft

 6         from the Mansour Trust Account payable to Bevan

 7         & Associates on behalf of the Breckenridge

 8         Plaintiffs and 14 additional Plaintiffs listed

 9         below, in the amount of $33,000.

10              It says:  Specifically, the settlement is

11         with Defendants Emtal, Georgia Talc -- put a --

12         just remember Georgia Talc.

13    A    Right.

14    Q    Harwick Chemical, Johnson & Johnson, R.T.

15         Vanderbilt -- let's remember R.T. Vanderbilt

16         too -- Southern Talc -- remember them --

17         St. Lawrence Liquidating Company, and Trustee

18         for International Talc Companies.

19              And then it goes through the claims of

20         the Breckenridge complaint.

21              And then the next page, on page 2, says,

22         "In addition, the settlement is with the

23         following Plaintiffs (along with their spouses

24         and/or estates, where applicable) who have

25         filed actions separately in the Cuyahoga County
```

```
 1       Court of Common Pleas."  And you see Kathryn
 2       Darnell listed?
 3   A   I see it.
 4   Q   Correct?
 5   A   Uh-huh.
 6   Q   Now, we're going to come back to page 2 in a
 7       second, but I want to show you -- if you could
 8       keep D Ex. 11 in front of you.
 9   A   Yes.
10   Q   And then I'm going to show you something filed
11       by Mr. Bevan regarding the Southern Talc
12       company --
13   A   Okay.
14   Q   -- and whether it had asbestos in the talc,
15       okay?
16   A   Oh, okay.
17   Q   So, again, remember, to set this up:  Settling
18       with seven defendants, seven talc defendants,
19       and we're trying to figure out whether they had
20       asbestos in the talc or didn't have asbestos in
21       the talc, okay?
22           So now if you turn to D Ex. 12, this is
23       entitled "Plaintiffs' Responses to Motions for
24       Summary Judgment Filed on Behalf of the
25       BFGoodrich Company."  And it's filed by
```

```
 1        Mr. Bevan.

 2   A    Uh-huh.

 3   Q    Okay.  Now, first of all, it says, if you turn

 4        to page 2 --

 5   A    Okay.

 6   Q    -- "The BFGoodrich plant contained many miles

 7        of asbestos insulated steam pipes, asbestos

 8        insulated tanks, boilers, and asbestos

 9        insulated machinery."

10   A    Where is that?

11   Q    On page 2.  Do you see that right there?

12   A    Okay.

13   Q    "In the late 1980s, BFGoodrich engaged in a

14        major asbestos abatement project in its Akron

15        plant.  One job involved the removal of an

16        astounding 22 miles of asbestos pipe

17        insulation."

18            Do you see that?

19   A    Yes.

20   Q    And your mom had worked at BFGoodrich --

21   A    Yes.

22   Q    -- correct?

23   A    Yes.

24   Q    And then on the next page Mr. Bevan talks about

25        "Between 1950 and 1977, BFGoodrich purchased
```

```
 1        millions of pounds of raw asbestos fiber."
 2        During that -- "During said time, BFGoodrich
 3        purchased over seven million pounds of raw
 4        asbestos fiber from Johns Manville and over
 5        seven million pounds of raw asbestos from The
 6        C.P. Hall Company."
 7             Do you see that?
 8   A    Yes.
 9   Q    And it says, "Talc/soapstone was commonly
10        contaminated with asbestos as was evidenced by
11        BFGoodrich's only laboratory analyses."
12             Do you see that?
13   A    Where is that?
14   Q    That's right there.
15   A    Okay.
16   Q    Okay.
17   A    Okay.
18                  MR. ASSAF:      By the way,
19        counsel, we would very much like, if Mr. Bevan
20        has them, the analyses done by BFGoodrich's own
21        laboratory analyses on the talc that he
22        references in these papers.
23   Q    Okay.  Then I'm going to ask you to flip to
24        page 14.
25   A    Of this same document?
```

```
 1   Q   Of Mr. Bevan's document.

 2   A   Okay.  Okay.

 3   Q   Okay.  And may I just point you to this?

 4   A   Uh-huh.

 5   Q   Right there.

 6   A   Right here.

 7   Q   "Soapstone/talc was used extensively all over

 8       the BFGoodrich plant.  (See affidavit of James

 9       Clark.)  Talc/soapstone was commonly

10       contaminated with asbestos as was evidenced by

11       BFGoodrich's own laboratory analyses.  Robert

12       Moddrell, a former BFGoodrich Industrial

13       Hygienist has testified that the talc used at

14       BFGoodrich contained asbestos."

15            Do you see that?

16   A   Yes.

17   Q   Okay.  And it says, if you go to the bottom of

18       page 15, "BFGoodrich did not create a 'no

19       asbestos' talc specification until seven years

20       later.  Also, BFGoodrich did not remove

21       asbestos-containing 'White Talc' from Southern

22       Talc Company --" withdrawn.

23            It says, "Also, BFGoodrich did not remove

24       asbestos-containing 'White Talc' from Southern

25       Talc Company from its supplier list until
```

```
 1    1980."
 2         Do you see that?
 3  A  Yes.
 4  Q  So there's Southern Talc.  So Mr. Bevan knows
 5     that there's talc used at BFGoodrich, knows
 6     that some of the talc has asbestos, and in fact
 7     knows that Southern Company has asbestos in it.
 8         In fact, if you turn to Exhibit 26 -- may
 9     I turn it for you?
10  A  Yes, please.
11  Q  If you turn to Exhibit 26, Mr. Bevan -- it's
12     Exhibit 12A, for the record.
13         Mr. Bevan includes a document showing --
14     that states "Recent Raw Materials investigation
15     has found that all talc supplied by Southern
16     Talc Company contain significant amounts of
17     asbestos-like particles (tremolite)."
18         Do you see that?
19  A  Yes.
20  Q  Okay.  So does that refresh your recollection,
21     going back to D Ex. 11, as to whether Southern
22     Talc Company, which supplied BFGoodrich, had
23     asbestos in its talc?
24  A  It does not refresh my recollection, no.
25  Q  But you know now that Southern Talc Company was
```

```
 1        one of the seven defendants that settled with
 2        your mother's estate for $2,000, correct?
 3    A   Yes.
 4    Q   Even though Southern Talc was known by
 5        Mr. Bevan to have asbestos in its talc,
 6        correct?
 7    A   Yes.
 8    Q   Turning back to Exhibit 11, the second page of
 9        this letter.
10    A   This is 10.
11    Q   This is 10.  I think it's right there.
12    A   Oh, okay.
13            Okay.
14    Q   The second to last paragraph says, "Tom, I have
15        noticed on CLAD that in the past week you have
16        filed numerous Master Consolidated Complaints
17        naming this group of Defendants.  From the
18        information you previously provided to me, it
19        is apparent that nearly all, if not all, of the
20        Plaintiffs represented on these new Master
21        Consolidated Complaints were employees where
22        there were obviously no talc exposures."
23            Do you see that?
24    A   I see that.
25    Q   So as a class representative, do you have any
```

```
 1        understanding about whether Mr. Bevan and

 2        Mr. Placitella think that people who filed

 3        cases against talc companies in which there was

 4        no talc exposure are part of this class?

 5                    MR. COREN:          Objection as to

 6        form.

 7   A    And I have no information on it.

 8   Q    Who would know that, Mr. Bevan?

 9   A    Mr. Bevan and/or Mr. Coren.

10   Q    But you and I talked earlier about people,

11        other class members, and being paid when they

12        weren't harmed.  Do you remember we had that

13        whole back and forth about "if" and you were

14        having --

15   A    Yes.

16   Q    -- trouble understanding the "if"?  Okay.

17             So here's a document in which it's saying

18        that people are filing complaints against talc

19        companies where the people where actually never

20        exposed to talc.  Do you see that?

21   A    That's what it says.

22   Q    Okay.  And so now we don't have a hypothetical,

23        we have a situation where you as a class

24        representative know people are filing cases in

25        which they were never even exposed to talc.
```

```
 1              MR. COREN:        Objection.
 2        Where does it say that?
 3   Q    Do those people get compensation as part of the
 4        class?
 5              MR. COREN:        Objection as to
 6        form.
 7   A    You're saying that based upon the documentation
 8        that these particular plaintiffs were not --
 9   Q    Exposed to talc.
10   A    Exposed to talc.  So what do you want from me?
11        What are you asking?
12   Q    Well, as the class representative, let's say
13        you have a pile of money at the end.
14   A    Uh-huh.
15   Q    Let's say you have a million dollars and you
16        have to divide it up amongst class members.  So
17        do you think that people who are class members
18        who were actually never exposed to talc deserve
19        to get some money?
20   A    If they were in fact never exposed to talc, but
21        based upon the basis of the lawsuit, I
22        really -- I really don't see me being able to
23        answer that question, I really don't.
24   Q    Well, let's say -- let's put it the other way.
25   A    Okay.
```

```
 1    Q    For people who were exposed to asbestos and
 2         talc, like Georgia -- Southern's talc --
 3    A    Right.
 4    Q    -- because we now know that Southern Talc
 5         Company is rife with asbestos.
 6    A    Right.
 7    Q    Okay.  So somebody works with that talc for 20
 8         years and develops meso and you have a limited
 9         amount of money at the end.  Do you think the
10         meso victim should get less money because
11         people who were never exposed to talc are going
12         to make claims?  How is that fair?
13                    MR. COREN:         Objection to
14         form.
15    A    I'm still not certain how I would factually be
16         able to answer about fairness, in particular --
17         you know, we know that the basis is if they're
18         exposed to talc.  But to me, again, this is
19         what I say, the supposition questions, I mean,
20         I just don't see how I can fairly answer them.
21    Q    But you're the class representative.
22    A    I'm the class representative on this particular
23         case.  Are you saying that in this particular
24         case we're not talking about being harmed by
25         asbestos?
```

```
 1   Q   I'm asking you as a class rep do you think that
 2       people who were never exposed to talc --
 3   A   If they were never exposed to talc, based upon
 4       accepted practices, then no, I don't think they
 5       would be entitled to compensation, but to add
 6       to that, I don't see how I really would make
 7       that determination.
 8   Q   You would need the Court to help you?
 9   A   There you go.  Yes.
10   Q   Okay.  And if the Court were to determine that
11       people were never exposed to my client's talc,
12       Emtal talc, and the Court determined that, you
13       would agree that, yeah, they shouldn't get
14       money either?
15   A   If the Court determined that?
16   Q   Yes.  Correct?
17   A   Yes.
18          (Defendants' Exhibit 13 was marked.)
19   Q   Let's go to D Ex. 13.
20   A   Okay.
21   Q   D Ex. 13 is the deposition of Kathryn Darnell
22       on June 18, 2001.
23   A   Okay.
24   Q   Okay.
25   A   The date again?
```

| | | |
|---|---|---|
| 1 | Q | January 18, 2001. |
| 2 | A | January. |
| 3 | Q | Yes, sorry. |
| 4 | A | It wouldn't have been June, no. |
| 5 | Q | Sorry.  Could you turn to page 47? |
| 6 | A | 47? |
| 7 | Q | Yep. |
| 8 | A | Okay. |
| 9 | Q | And it's their question to Ms. Darnell about |
| 10 | | her exposure to real asbestos in the BFGoodrich |
| 11 | | plant. |
| 12 | | Line 6, question, "What were in the bags, |
| 13 | | ma'am?" |
| 14 | | Answer, "Asbestos." |
| 15 | | Question, "Just raw asbestos?" |
| 16 | | Answer, "Raw asbestos, 50-pound bags. |
| 17 | | And it was written right on the bags what it |
| 18 | | was, heck, we didn't know that it was dangerous |
| 19 | | or anything like that." |
| 20 | | Do you see that? |
| 21 | A | Yes. |
| 22 | Q | Okay.  You understood that Ms. Darnell was in |
| 23 | | fact exposed to real asbestos in the BFGoodrich |
| 24 | | plant? |
| 25 | | MR. COREN:     Objection as to |

```
 1      form.
 2   A  Yes.
 3   Q  And that's part of the reason why for the last
 4      15 or so years you've helped Mr. Bevan recover
 5      money from various companies for
 6      asbestos-related injuries, correct?
 7   A  That's correct.
 8   Q  Now would you turn to page 113?
 9   A  In the same document?
10   Q  Yes, ma'am.
11          And line 23, page 113 at the bottom.
12   A  Uh-huh.
13   Q  It says, "Do you draw a distinction, ma'am,
14      between soapstone and talc?"
15          Answer, "And talcum?"
16          Question, "Talc, do you know what talc
17      is?"
18          Answer, "No."
19          Question, "Okay."
20          "You're talking about talcum?"
21          Question, "I'm talking about a material
22      that is used in some industries that is
23      referred to as talc, T-A-L-C."
24          Answer, "I've never heard of it."
25          Do you see that?
```

MARILYN HOLLEY - 04/05/2017          Page 121

```
 1   A    Yes.

 2            (Defendants' Exhibit 14 was marked.)

 3   Q    And then if we go to D Ex. 14, the next

 4        deposition, January 22, 2001.

 5   A    Okay.

 6   Q    And if you turn to page 226, I want to refer

 7        you to a statement by Mr. Bevan at the bottom.

 8   A    Page 226?

 9   Q    Yes.

10   A    Okay.

11   Q    Mr. Bevan says, "Brent, we stipulated and we

12        will stipulate again that she doesn't know the

13        brand name, manufacturer, distributor or

14        supplier of any insulation products, as well as

15        any soapstone products as well."

16            Do you see that?

17   A    No.  Where is it?  You said on 226?

18   Q    Right at the bottom.

19   A    Oh, okay.  Okay.

20            Yes.

21   Q    Does that refresh your recollection as to

22        whether your mother didn't know the name of any

23        of the talc manufacturers that she was exposed

24        to?

25   A    Again, I was not part of those conversations.
```

```
 1   Q    Would Mr. Bevan be the best person to talk to?

 2   A    Yes, he would be.

 3   Q    It's time for lunch.

 4   A    Okay.

 5   Q    We're taking a lunch break.

 6   A    Okay.

 7   Q    Okay.  Is that okay with you?

 8   A    That's fine with me.

 9   Q    Okay.  Great.

10                   MR. ASSAF:        Let's go off

11        the record.

12                   THE VIDEOGRAPHER: Off the record.

13        The time is 12:30.

14                   (Recess taken.)

15                   THE VIDEOGRAPHER: We're back on

16        the record.  The time is 1:08.

17   BY MR. ASSAF:

18   Q    Good afternoon.

19   A    Good afternoon.

20   Q    Did you discuss your deposition testimony over

21        lunch?

22   A    No.

23   Q    Did you review any documents --

24   A    No.

25   Q    -- over lunch?  Okay.
```

```
 1            I'm going to show you again Defendants'
 2       Exhibit 6 and Defendants' Exhibit 8, the
 3       correspondence to and from Bevan regarding
 4       settlement with seven top defendants and
 5       regarding the Kathryn Darnell complaint.
 6   A   You said 6?
 7   Q   I'm going to give it to you.
 8   A   Okay.
 9   Q   So let's start with D Ex. 6.
10   A   All right.
11   Q   D Ex. 6 is February 15, 2001 and it's entitled
12       Re:  Kathryn Darnell Complaint.  Do you see
13       that?
14   A   Yes.
15   Q   So would this be part of your files?  Would
16       Mr. Bevan have sent you a copy of this?
17   A   No.  This was February 15, '01.  Mom passed --
18   Q   Right.
19   A   -- in June of '01.  So it would have been with
20       her.
21   Q   But did you take her files, her litigation
22       files --
23   A   No.
24   Q   -- when she passed?
25   A   No.
```

MARILYN HOLLEY - 04/05/2017                Page 124

```
 1    Q    Where are they?

 2    A    I think they're at the family home.  I'm not

 3         sure.  I'm not sure, but I think they're at the

 4         family home where one of my sisters lives.

 5    Q    Okay.  Do they still exist?

 6    A    Oh, yes.  Yes.

 7    Q    Okay.  And could you -- could you work with

 8         Mr. Coren to get those -- to have somebody

 9         review those documents?

10    A    Yes, I would be able to do that.

11    Q    Great.  Thank you.

12    A    Uh-huh.

13    Q    Now, and also -- so you see it's entitled

14         Kathryn Darnell Complaint?

15    A    Uh-huh.

16    Q    The re line.

17    A    Uh-huh.

18              MR. ASSAF:       Mr. Coren and

19         Mr. Placitella, do you have any reason why this

20         wasn't produced or logged?  D Ex. 6.  The

21         letter entitled Kathryn Darnell Complaint.

22              MR. COREN:       Is this 6?

23              MR. ASSAF:       Yes, that's 6.

24              MR. COREN:       Your question

25         is, I'm sorry, what?
```

```
 1                    MR. ASSAF:       Why that wasn't
 2        produced or logged.  I just checked over the
 3        lunch break and it hasn't been produced and it
 4        hasn't been logged.
 5                    MR. COREN:       I'll have to
 6        look into it, Gene, I don't know.
 7                    MR. ASSAF:       Okay.
 8    Q   And also, then, D Ex. 8, which I'm going to put
 9        also in front of you, which again, is Bevan
10        correspondence settlement with seven talc
11        defendants.
12                    MR. ASSAF:       And as we said,
13        Ms. Darnell's mentioned throughout the letter,
14        and I just don't -- I'm now concerned.
15            It just dawned on me over lunch that this
16        wasn't produced or logged and how could that
17        be?  There's only six named plaintiffs and this
18        is -- you met with Bevan prior to the
19        complaint, you've met with Bevan since.  She --
20        Bevan is Ms. Holley's lawyer.  He has all the
21        files.  How could it be that this isn't
22        produced or logged?
23                    MR. COREN:       Gene, we'll
24        take a look into it, whether the document still
25        exists or not, because of the date and the
```

```
 1        timing of the things, I'll have to look into it
 2        and see.
 3                      MR. ASSAF:        And will you
 4        also agree to look at Ms. Holley's documents,
 5        both at her home and at the family home, the
 6        underlying -- I hesitate to say what I really
 7        think, but how could they not be even reviewed,
 8        yet alone put aside so that nothing happens to
 9        them?  It's one of the named plaintiffs in the
10        case.
11                      MR. COREN:        Gene, we'll
12        talk about this later.
13  BY MR. ASSAF:
14   Q    Now, you mentioned when you met with
15        Mr. Placitella and Mr. Bevan when you first
16        heard about the case and you took notes that
17        you hopefully still have at home, do those
18        notes have who else was at the meeting?
19   A    No.
20   Q    Okay.  How did you find out about the meeting?
21   A    I was either contacted by phone or mail to come
22        to the meeting.
23   Q    By Mr. Bevan or Mr. Placitella?
24   A    By Mr. Bevan's office.
25   Q    Did you know what the topic of the meeting was?
```

```
 1    A    Not at the time that I received notice.

 2    Q    Have you ever been in Mr. Placitella's offices

 3         in Pennsylvania or New Jersey?

 4    A    No.

 5    Q    Are you willing to come to New Jersey for court

 6         proceedings?

 7    A    Yes.  We discussed that.

 8    Q    Okay.  Have you had any meetings with the class

 9         representatives without the attorneys present?

10    A    Not without attorneys present, no.

11    Q    Do you know whether any of the other

12         attorneys -- withdrawn.

13              Do you know whether any of the other

14         class representatives have written fee

15         agreements with Mr. Placitella?

16    A    I would not have that information.

17                    MR. ASSAF:       I'll reiterate

18         this request.  We've looked over lunch, and the

19         written fee agreement, which I understand is a

20         requirement under New Jersey, but you can tell

21         me --

22                    MR. COREN:       Yes, but --

23                    MR. ASSAF:       -- is neither

24         logged, nor produced.

25                    MR. COREN:       Nor are they
```

```
 1      filed with the Court until the Court asks to
 2      see them.
 3                  MR. ASSAF:       Do you have
 4      one?
 5                  MR. COREN:       What, a fee
 6      agreement?
 7                  MR. ASSAF:       Yeah.
 8                  MR. COREN:       Yes.  My
 9      understanding we do, yes.
10                  MR. ASSAF:       Okay.
11                  MR. COREN:       Okay.
12  Q   So you do have a written fee agreement.
13  A   Okay.
14  Q   Okay.
15                  MR. ASSAF:       Could
16      Ms. Holley have a copy of it?
17                  MR. COREN:       She probably
18      does but doesn't recollect.
19  A   That could possibly be the case.
20  Q   Okay.  Do you have any understanding of the
21      terms?
22  A   Understanding based on that particular fee
23      agreement or do I understand a fee agreement?
24  Q   Well, let's do both.
25  A   Okay.
```

MARILYN HOLLEY - 04/05/2017                    Page 129

```
 1   Q   Do you understand a fee agreement?
 2   A   Yes, I do.
 3   Q   What's that?
 4   A   The fee agreement is the document between an
 5       attorney and client, okay, stipulating how
 6       they're going to handle the case and possibly
 7       the amount or if it's contingency.
 8   Q   Contingency.  And do you know whether the
 9       Williams case is a contingency case?
10   A   I'm not certain.  I really am not certain.  I
11       don't recall -- I just don't recall in this
12       particular defendant.  I don't recall any of
13       the documents or anything that was presented.
14       Because I think that was -- I believe it was
15       all done while my mom was still living.
16   Q   But with respect to this Williams case, the
17       case in New Jersey.
18   A   Oh, okay.  Okay.
19   Q   What do you recall about the fee agreements in
20       that case?
21   A   I have no recollection of the fee agreement in
22       this particular case.
23   Q   Do you even have a general understanding of how
24       much you're entitled to recover?
25   A   Those things have not been discussed with me
```

MARILYN HOLLEY - 04/05/2017                    Page 130

1        either by them or Mr. Bevan.  We have not -- I

2        have not discussed fees in this case.

3    Q   Or your recovery?

4    A   No.

5    Q   So --

6    A   If I understand what you're saying.

7    Q   Let's make it clear, though.

8    A   Okay.

9    Q   As we sit here today, you have not had any

10       discussions with Mr. Placitella and Mr. Coren's

11       firm or Mr. Bevan's firm about what the fee

12       arrangements are, in terms of the fees and the

13       recovery in this case?

14   A   No.

15   Q   And how do you think that's all going to get

16       sorted out?

17                    MR. COREN:        Objection.

18       Gene, you know, you're now --

19                    MR. ASSAF:        No speaking

20       objections.  Do you have an objection?

21                    MR. COREN:        Yeah, I have an

22       objection --

23                    MR. ASSAF:        What is it --

24                    MR. COREN:        -- because

25       you're --

MARILYN HOLLEY - 04/05/2017          Page 131

 1                    MR. ASSAF:          -- form,
 2    foundation, or privilege?
 3                    MR. COREN:          Form,
 4    foundation, and privilege.
 5                    MR. ASSAF:          Okay.  You're
 6    instructing her not to answer?
 7                    MR. COREN:          Correct.
 8                    MR. ASSAF:          Okay.  Basis?
 9                    MR. COREN:          You know,
10    privilege.
11                    MR. ASSAF:          Attorney-client
12    privilege?
13                    MR. COREN:          Yeah.
14    Attorney-client privilege, because now you need
15    to invade into discussions that occurred
16    regarding, you know, aspects of the fees.
17                    MR. ASSAF:          She doesn't --
18    she has no -- she has no -- there are no
19    discussions because she has no -- she says
20    she --
21                    MR. COREN:          That's right,
22    she has no recollection.  She doesn't recall
23    it.
24                    MR. ASSAF:          Of any
25    discussions regarding fees?

```
 1                    MR. COREN:       She just
 2       doesn't recollect --
 3                    MR. ASSAF:       And the fee
 4       agreement isn't logged or produced?
 5                    MR. COREN:       You don't log
 6       and you don't produce fee agreements, Gene.
 7       It's not my experience, okay?
 8                    MR. ASSAF:       Even Jared is
 9       raising his eyebrows at that one.  You better
10       check that.
11                    MR. PLACITELLA:    No --
12   Q   Okay.  So --
13                    MR. PLACITELLA:    -- based on
14       your comment, Gene but --
15   Q   -- Ms. Holley, in terms of Mr. Bevan's
16       relationship to this Williams case in New
17       Jersey, do you have a written fee agreement
18       with him?
19   A   I don't recall doing the written -- I don't
20       recall doing a fee agreement with regard to
21       this case.
22   Q   Okay.  Do you have any understanding of how
23       Mr. Bevan will get paid, if at all?
24   A   I can't recall ever discussing that or seeing
25       anything in writing.
```

```
 1   Q   Is that something you would -- withdrawn.

 2           You seem pretty savvy and you've been

 3       around litigation for 15 years.  It seems like

 4       something you would recall?

 5   A   Probably.

 6   Q   Let's see.

 7                   MR. ASSAF:         And

 8       verifications, have we gotten them?

 9                   MR. PLACITELLA:   I have someone

10       in my office getting them.  We'll get those to

11       you soon.

12                   MR. ASSAF:         Great.

13   Q   All right.  So let's turn to settlements with

14       other asbestos defendants.

15           Could you tell me in order of magnitude

16       how much you've received for asbestos-related

17       injuries since filing that lawsuit that we saw

18       against 98 defendants?

19                   MR. COREN:         I'm going to

20       instruct her not to answer for the reasons we

21       explained earlier, that the issue of the

22       settlement with other parties outside of the

23       settlements with the asbestos trust is an issue

24       that is before the Court on scope of discovery,

25       and I'm going to advise her not to respond
```

MARILYN HOLLEY - 04/05/2017                    Page 134

```
 1        until that issue is sorted out with magistrate
 2        judge --
 3    A   And I consider that confidential.
 4    Q   You consider it confidential?
 5    A   I do.  I consider it confidential.
 6    Q   Have you discussed your settlements with
 7        anybody other than lawyers?
 8    A   No.
 9    Q   Like your family members?
10    A   Not discussed settlements, just as fiduciary.
11        When there were settlements, I distribute the
12        checks.
13    Q   And you've distributed checks over the last 15
14        years?
15    A   Yes.
16    Q   Do you have a -- withdrawn.
17            If your attorneys allowed you to answer,
18        would you be able to tell me how much you've
19        recovered from asbestos -- for asbestos-related
20        injuries?
21    A   I would not be able to say that on the top of
22        my head, no.
23    Q   But do you have documentation --
24    A   I have --
25    Q   -- to show it?
```

MARILYN HOLLEY - 04/05/2017                 Page 135

```
 1   A   -- documentation.

 2   Q   Would this be in the files at your home?

 3   A   It would be in my files.

 4   Q   And let's talk about trusts.

 5           You mentioned that you have settled with

 6       or made claims against asbestos trusts,

 7       correct?

 8   A   I believe so, yes.

 9   Q   And which attorney, if anyone, has helped you

10       with those?

11   A   That would also be Attorney Bevan.

12   Q   And have you filled out documentation regarding

13       those asbestos trusts and claims to them?

14   A   Yes, through the Probate Court, which has to

15       certify.

16   Q   And as we sit here today, you understand that

17       the information contained in those submissions

18       to the Court and to the trust have to be -- has

19       to be true and accurate?

20   A   Yes.

21   Q   And do you know whether your mother had

22       submitted information to trusts prior to her

23       death?

24   A   She did.

25   Q   And do you know whether that was true and
```

```
 1      accurate?

 2   A  To the best of my knowledge it would have been.

 3   Q  Would that have been reviewed by Mr. Bevan to

 4      ensure that it was true and accurate?

 5   A  To the best of my knowledge it would have been.

 6         (Defendants' Exhibit 15 was marked.)

 7   Q  Let me show you D Ex. 15, which I think is the

 8      next document --

 9   A  Okay.

10   Q  -- to your right, Ms. Holley.

11   A  Okay.

12   Q  D Ex. 15 is a claim form for discounted cash

13      payment dated September 6, 2000.

14   A  Uh-huh.

15   Q  And the attorney name on the front is Tom

16      Bevan.  Do you see that?

17   A  Yes.

18   Q  Have you seen this document before?

19   A  I don't recall seeing this document before.

20   Q  Would this be in your files or your mother's

21      files at the family home?

22   A  Because it was 2000, it would probably be at

23      the family home.

24   Q  Okay.  Could you turn to page 13 of the form?

25      This right here.  That's it.
```

```
 1                And number five, paragraph 5, states
 2          "Injured party may write a narrative statement
 3          below (or on a separate page) describing in
 4          greater detail injured party's most significant
 5          asbestos exposure."
 6                It says, "Ms. Darnell was exposed to J-M
 7          pipe covering, cement, and raw asbestos fiber
 8          while employed by the BFGoodrich Company from
 9          1969 to 1987."
10                Do you see that?
11     A    Yes.
12     Q    There's no mention of talc.
13     A    Okay.
14     Q    Do you know why?
15     A    No.  I wouldn't know why.
16     Q    Would Mr. Bevan know?
17     A    I'm not sure.
18     Q    If anybody knows the reason why this says what
19          it says, it would be Mr. Bevan, not you?
20     A    It would be him, not me.
21     Q    And if you turn to page 17.
22     A    Of the same document?
23     Q    Yes.
24                And the first question says, "Has any
25          asbestos-related lawsuit been filed on behalf
```

```
 1       of this injured party?"

 2           Do you see this?

 3   A   Yes.

 4   Q   It says "No."

 5           Do you see that?

 6   A   Yes.

 7   Q   Is that correct?

 8   A   This was in 2000?

 9   Q   Yes.  Yes.

10   A   I wouldn't know for sure.  I wouldn't know for

11       sure, because my mom was still living and the

12       interaction with the attorney would have been

13       between her and Attorney Bevan.

14   Q   Who, if anyone, would know whether this

15       statement is correct?

16   A   Attorney Bevan's office.

17   Q   And you would expect it to be true and

18       accurate, correct?

19   A   I would expect it to be true and accurate, yes.

20   Q   And when you've submitted forms to other

21       trusts, have you disclosed the fact that you

22       have in fact filed other lawsuits against other

23       asbestos companies?

24   A   I can't recall that.

25   Q   But you would expect that if that question were
```

```
 1        asked by other trusts that you would in fact

 2        disclose the other lawsuits, correct?

 3   A    I would expect so if that were the case.

 4   Q    And you've never received advice to do

 5        something other than that?

 6   A    No, I have not.

 7   Q    That's something you would remember?

 8   A    I believe so.

 9   Q    The -- by the way, if you -- withdrawn.

10            Did you file a claims form with the

11        Kaiser Asbestos Trust?  Do you know?

12   A    I can't say for sure.

13   Q    Okay.  Roughly how many trusts have you filed

14        against?

15   A    I couldn't begin to say.  I know that there

16        were a number of defendants sued and there are

17        a number that have been settled, but I really

18        couldn't even give you a ballpark figure.

19        (Defendants' Exhibit 16 was marked.)

20   Q    Let's go to D Ex. 16, the very next document.

21   A    Okay.

22   Q    D Ex. 16 appears to be a document entitled

23        "Kaiser Aluminum & Chemical Corporation

24        Asbestos Personal Injury Trust Release."

25            Do you see this?
```

MARILYN HOLLEY - 04/05/2017                    Page 140

```
 1    A    Uh-huh.  Yes.

 2    Q    Do you recognize this document?

 3    A    Well, by just looking at it now I see that I

 4         signed in 2012.

 5    Q    And would you tell me the process that you

 6         would go through before signing a document like

 7         this?  Did you talk to Mr. Bevan?  Did you

 8         review documents?

 9    A    I would talk to Mr. Bevan and we would discuss

10         the particular offer from the company.  And I

11         also -- if it were accepted, I also would have

12         received a release.

13    Q    Okay.  All right.  Now the rest of the

14         documents I'm going to go through pretty

15         quickly.  You can put them all in front of you

16         if you'd like --

17    A    Right.

18    Q    -- to --

19    A    Right.

20    Q    -- Ms. Holley.

21    A    Right.

22         (Defendants' Exhibit 17 was marked.)

23    Q    D Ex. 17 is a document entitled -- or a

24         document that appears to be a release relating

25         to Johns-Manville of Travelers.
```

MARILYN HOLLEY - 04/05/2017                    Page 141

```
 1    A    Uh-huh.  Uh-huh.

 2    Q    Do you recognize this document?

 3    A    Yes, I recall it.

 4         (Defendants' Exhibit 18 was marked.)

 5    Q    D Ex. 18 appears to be a claims resolution form

 6         for Kathryn Darnell for $20,000 for Manville.

 7    A    When was this?  This was executed when?

 8    Q    This looks like it was executed in 2000.  10 --

 9         November 11, 2000.

10    A    If it were 2000, my mother would have handled

11         it.

12    Q    Okay.  All right.

13         (Defendants' Exhibit 19 was marked.)

14    Q    D Ex. 19 is from The Plibrico Asbestos Trust in

15         Hopewell, New Jersey.  A settlement -- a

16         liquidated value of $350,000 and a settlement

17         amount of $29,000.  Do you recognize this

18         document?

19    A    It appears I executed this in September of '07.

20    Q    Okay.

21         (Defendants' Exhibit 20 was marked.)

22    Q    D Ex. 20 is a release agreement for Owens

23         Corning/Fibreboard Asbestos Injury Trust.

24    A    I executed this in '09.

25    Q    And -- let me finish these.
```

```
 1           (Defendants' Exhibit 21 was marked.)
 2   Q   D Ex. 21 is for Owens Corning Personal Injury
 3       Trust again dated November 18, 2009.  Do you
 4       see that?
 5   A   Uh-huh.  Uh-huh.
 6           (Defendants' Exhibit 22 was marked.)
 7   Q   D Ex. 22 is for United Gypsum Asbestos Personal
 8       Injury Trust.
 9   A   Okay.
10   Q   Dated March 23, 2009.
11   A   Okay.
12   Q   Do you see that?
13   A   Yes.
14   Q   You signed that?
15   A   Yes.
16           (Defendants' Exhibit 23 was marked.)
17   Q   D Ex. 23 is from the Probate Court of Summit,
18       Ohio regarding the approval of a proffered
19       settlement of $257,000.  And included in that
20       is -- it looks like attorney's fees of $88,000.
21   A   Right.  Uh-huh.
22   Q   Is that to Mr. Bevan?
23   A   It would have been Mr. Bevan and the estate
24       attorney, who at that time was Donald Walker.
25   Q   Okay.
```

```
 1            (Defendants' Exhibit 24 was marked.)
 2    Q    D Ex. 24 is a settlement amount of $60,000,
 3         again with 20,000 to Mr. Bevan in 2004.  Do you
 4         see this?
 5    A    Yes.
 6            (Defendants' Exhibit 25 was marked.)
 7    Q    D Ex. 25 is a settlement amount of $172,000
 8         with attorney's fees of $59,000 dated April 20,
 9         2005.
10    A    Yes.
11            (Defendants' Exhibit 26 was marked.)
12    Q    D Ex. 26 is $16,000 dated -- or I'm sorry.
13         $16,000 dated August 4, 2006.  Do you see that?
14    A    Uh-huh.
15            (Defendants' Exhibit 27 was marked.)
16    Q    D Ex. 27.  $40,000 settlement dated May 21,
17         2007.  Do you see that?
18    A    Yes.
19            (Defendants' Exhibit 28 was marked.)
20    Q    D Ex. 28, a settlement amount of $29,000 dated
21         November 15, 2007.  Do you see that?
22    A    Yes.
23            (Defendants' Exhibit 29 was marked.)
24    Q    December 22, 2008, a settlement amount of
25         $11,000.  Do you see that?
```

```
 1    A    Is that 29?

 2    Q    Yes.

 3    A    Okay.  Yes.

 4         (Defendants' Exhibit 30 was marked.)

 5    Q    D Ex. 30.  $26,000, April 16, 2010.  Do you see

 6         that?

 7    A    Yes.

 8         (Defendants' Exhibit 31 was marked.)

 9    Q    D Ex. 31.  Settlement amount of $8,600 dated

10         May 12, 2012.  Do you see that?

11    A    Yes.

12    Q    And, by the way, so for a settlement like that

13         of $8,000, do you know whether that settlement

14         has anything to do with whether the company

15         produced a product with or without asbestos and

16         how much asbestos it had and how much exposure

17         your mom had to that product?

18                   MR. COREN:       Objection.

19         I'll instruct her not to answer.  Once again,

20         the issue of settlements and the issues going

21         into settlements is a matter before Magistrate

22         Dickson, and we're retaining our objections and

23         instructing the witness not to answer on that

24         basis.

25    Q    Could you answer the question but for the
```

MARILYN HOLLEY - 04/05/2017                    Page 145

```
 1      instruction?
 2                   MR. COREN:        It's a "yes" or
 3      "no" answer, Ms. Darnell -- Ms. Holley.  Sorry.
 4  Q   You would be able to answer the question unless
 5      Mr. Coren hadn't instructed you?
 6  A   I believe I would be able to.
 7  Q   Okay.
 8          (Defendants' Exhibit 32 was marked.)
 9  Q   D Ex. 32.  $34,000.  Another settlement amount.
10      Do you recognize that?
11  A   Yes.
12          (Defendants' Exhibit 33 was marked.)
13  Q   D Ex. 33.  $16,000.  Do you recognize that?
14  A   Yes.
15          (Defendants' Exhibit 34 was marked.)
16  Q   D Ex. 34.  An amended probate order for a
17      settlement amount of $2,300.  Do you recognize
18      that?
19  A   Yes.
20          (Defendants' Exhibit 35 was marked.)
21  Q   D Ex. 35.  A settlement amount of $11,000 dated
22      April 13, 2015.  Do you recognize that?
23  A   Yes.
24          (Defendants' Exhibit 36 was marked.)
25  Q   D Ex. 36.  A settlement amount of $19,000 dated
```

```
 1        April 15, 2004.  Do you recognize that?
 2   A    Yes.
 3            (Defendants' Exhibit 37 was marked.)
 4   Q    D Ex. 37.  A settlement amount of $24,000 dated
 5        April 27, 2010.  Do you recognize that?
 6   A    Yes.
 7            (Defendants' Exhibit 38 was marked.)
 8   Q    January 20, 2010, a settlement amount of
 9        $113,000.  Do you recognize that?
10   A    Is that --
11   Q    D Ex. 38.
12   A    Yes, I see it's 38.
13   Q    Okay.
14   A    Yes.
15   Q    In terms of the various settlements, did you
16        rely on Mr. Bevan's advice before consenting to
17        settlements with other asbestos-related
18        defendants?
19   A    Is the question did I rely on that with
20        relation to other settlements or just one
21        particular settlement at a time?
22   Q    One particular settlement at a time.
23   A    We did one particular settlement at a time.
24   Q    So for each settlement you would have a
25        discussion with him regarding whether you
```

```
 1       should settle or not?
 2   A   I'd say yes, that would be a basis of our
 3       conversation.
 4   Q   Would it be in person or over the phone?
 5   A   Either.
 6   Q   And would a factor in the settlement be whether
 7       in fact the defendant had produced a product
 8       with asbestos?
 9                   MR. COREN:        Objection.
10       Once again you're asking about settlements
11       beyond BASF.
12               And I'm instructing you not to answer.
13               The matter is an issue before the judge
14       on settlements with other parties other than
15       BASF.
16               Engelhard is a matter before Magistrate
17       Judge Dickson and until that is resolved, I'm
18       instructing you not to answer.
19   Q   Was it always Bevan or were there other lawyers
20       or paralegals involved in the recommendation to
21       settle cases?
22   A   To the best of my knowledge, it was always
23       Attorney Bevan.
24   Q   And did you keep notes of those conversations?
25   A   No.
```

```
 1   Q    Since the BASF complaint was filed in two
 2        thousand -- in early 2011, have you settled
 3        with other defendants for asbestos-related
 4        claims?
 5   A    Yes.
 6   Q    And in settling with those, have you, in light
 7        of the BASF complaint, asked specific questions
 8        about the asbestos content in the products that
 9        you were settling?
10   A    No, I have not asked specific questions with
11        regard to asbestos.
12   Q    Why not?
13   A    No.  Because I --
14                     MR. COREN:        Excuse me.
15                     THE WITNESS:      Okay.
16                     MR. COREN:        Work-product.
17                     THE WITNESS:      Yeah.
18                     MR. COREN:        Okay.  I'm
19        asserting an objection.
20   Q    And you can answer.
21                     MR. COREN:        No.  It's
22        work-product.  She can't answer.  I'm
23        instructing her not to answer.
24                     MR. ASSAF:        Why she didn't
25        ask questions?
```

```
 1    A    No.  No.
 2                    MR. COREN:       It's her mental
 3         processes.
 4                    MR. ASSAF:       Her mental
 5         processes?
 6                    MR. COREN:       Yes.  You're
 7         trying to invade into her work-product
 8         regarding a settlement and why she made -- and
 9         what was on her mind as to things other than
10         BASF.  You're not entitled to it, Gene.  And
11         that's our position and we said that regarding
12         the other settlements.
13              It's a matter before Magistrate Judge
14         Dickson and until all of those issues are
15         resolved, I'm instructing her not to go into
16         details regarding other settlements.
17    Q    After the BASF case was filed in 2011, you had
18         understood from Mr. Bevan that there had been a
19         fraud with Engelhard, fair?
20    A    Yes.  That was my understanding.
21    Q    That -- according to Mr. Bevan, that Engelhard
22         led him to believe that there was no asbestos
23         in the talc, correct?
24    A    That is my understanding.
25    Q    Okay.  In light of that understanding, did you,
```

MARILYN HOLLEY - 04/05/2017                Page 150

 1        after the filing of the BASF complaint in 2011,

 2        ask specific questions about whether a product

 3        contained asbestos so that you wouldn't run

 4        into another Engelhard situation?

 5                    MR. COREN:        And it's the

 6        same question that you had asked before, just a

 7        little bit different when addressing, and I'm

 8        giving her the same instruction.  We're not

 9        here to answer questions about her thought

10        processes regarding other settlements.  It's an

11        issue that is before Magistrate Judge Dickson

12        and until it is resolved, we are not -- I'm

13        instructing her not to answer.

14                    MR. MARINO:        Michael, could

15        I ask you to speak up when you're talking?

16        It's hard to hear you over the phone.

17                    MR. COREN:        Sorry about

18        that.  And I will try.

19    Q   You mentioned that you believe the settlements

20        are confidential?

21    A   Yes.

22    Q   Do you have any written confidentiality

23        agreements in your custody, control, or

24        possession?

25    A   I may have.

MARILYN HOLLEY - 04/05/2017          Page 151

```
 1   Q   And where would they be?

 2   A   They probably would be with my records.

 3   Q   The records that are at your house --

 4   A   At my house.  The ones that I have, yes.

 5   Q   That Mr. Coren hasn't reviewed yet?

 6   A   I don't know if he's reviewed them or not.

 7   Q   Okay.  Well, earlier you said he hadn't asked

 8       you for them?

 9   A   Right.  Yeah.

10              MR. ASSAF:        And, Mr. Coren,

11       was she wrong there?  Because let's correct the

12       record.

13              MR. COREN:        What?

14              MR. ASSAF:        Have you asked

15       her for her records?

16              MR. COREN:        Yes, we have.

17              MR. ASSAF:        Oh.

18   Q   So he has asked you for your records?

19   A   I don't recall it, that's what I'm saying.  I

20       don't recall that he asked for specific

21       records.  No, I don't recall that.

22   Q   Because you've dealt with Mr. Bevan and

23       attorneys for 15 years, and if an attorney

24       asked you for records, it would be your normal

25       practice to tell them about the records, fair?
```

```
 1   A    To give whatever they asked for if I had it.

 2   Q    Correct.  So if you still -- if you haven't

 3        given the records to Mr. Coren, based upon your

 4        normal practice, doesn't that tell you he

 5        hasn't asked for them?

 6                    MR. COREN:        Objection.

 7        It's argumentative.

 8                    MR. ASSAF:        Not

 9        argumentative.  She said earlier you didn't ask

10        her for them and now after lunch you say you

11        did ask.  Did you review them?

12                    MR. COREN:        I'm saying

13        we -- they were requested.  Have we reviewed

14        them yet, I have to ask my staff who handled

15        it.  I don't know.

16                    MR. ASSAF:        Well,

17        Mr. Coren, when is this going to happen?

18        Discovery's supposed to end in four months.

19        We've already been in front of the judge.  You

20        filed your -- we've had extensive discovery

21        briefing and her deposition's today.  When

22        exactly are you going to decide whether you're

23        going to review these documents or not?

24                    MR. COREN:        I'm not here to

25        argue with you, Gene.  You're trying to, you
```

MARILYN HOLLEY - 04/05/2017                    Page 153

```
 1        know, and I'm not going to let you goad me into
 2        an argument with you.
 3                      MR. ASSAF:        It's not an
 4        argument.  I just want to know:  When are you
 5        going to review these documents?
 6                      MR. COREN:        Well, I'm not
 7        responding to you today.
 8   Q    By the way, going back to the Williams
 9        settlement discussions that you heard about,
10        that there were the fact of discussions, would
11        you have anything in your materials so you're
12        able to put a date of when you heard about
13        those discussions?
14   A    No, I wouldn't.
15   Q    Okay.  How would you have heard of them?  By
16        phone or by mail or?  By meeting?
17   A    Probably by conversation, either in a meeting
18        or phone, but I don't -- I don't recall that.
19   Q    And in terms of the settlement discussions in
20        the Williams case, as we sit here today --
21   A    This particular case we're discussing?
22   Q    Yes.
23   A    Okay.
24   Q    With respect to the settlement discussions in
25        this particular case, the Williams case, you
```

```
 1      were never told what the proposed economic
 2      settlements were and how much you would
 3      receive, correct?
 4                    MR. COREN:       Objection.
 5            Don't answer.
 6            Now you're trying to invade
 7      communications by and between attorney-clients,
 8      including regarding something that was in
 9      mediation.  So I'm --
10                    MR. ASSAF:       Instructing
11      her --
12                    MR. COREN:       -- asserting
13      a --
14                    MR. ASSAF:       -- not to
15      answer?
16                    MR. COREN:       -- privilege.
17      Yeah.
18                    MR. ASSAF:       Instructing her
19      not to answer?
20                    MR. COREN:       That's correct.
21   A   I consider that confidential.
22                    MR. ASSAF:       I am done
23      questioning for today, with the exception that
24      we haven't received the verifications.  We
25      received a lot of documents last night.  We've
```

 1   identified at least two locations of documents

 2   today, and there have been numerous

 3   instructions not to answer.

 4        So I'm done with my questioning for

 5   today, but I'm holding open the deposition at

 6   least on those topics and on any other

 7   discovery issues that will arise, including

 8   after Mr. Bevan's deposition.

 9        Counsel, any questions?

10             MS. FIELDS:     I have a few

11   questions on behalf of --

12             THE VIDEOGRAPHER: Get a

13   microphone on before you start.

14             MS. FIELDS:     Oh.

15             MR. COREN:      Excuse me.  I

16   need to use the facility.  I apologize.  Can we

17   take a break for five?

18             MR. ASSAF:      Sure.

19             MR. COREN:      Thanks.

20             THE VIDEOGRAPHER: Off the record.

21   The time is 1:43.

22             (Recess taken.)

23             THE VIDEOGRAPHER: We're back on

24   the record.  The time is 1:47.

25        EXAMINATION OF MARILYN HOLLEY

```
 1   BY MS. FIELDS:
 2   Q   Ms. Holley, I have a few questions on behalf of
 3       my clients, Cahill Gordon & Reindel and Ira
 4       Dembrow and Peter Sloane.
 5           When you talked with Mr. Assaf earlier, I
 6       believe he asked you if other than what you've
 7       learned from Mr. Bevan if you had any personal
 8       knowledge that his client had done anything
 9       wrong, and I'd like to ask you that same
10       question with respect to my client.
11           So other than what you've learned from
12       Mr. Bevan, do you have any personal knowledge
13       of any wrongdoing by Cahill Gordon & Reindel?
14   A   I have no personal knowledge, no.
15   Q   And other than what you've learned from
16       Mr. Bevan, do you have any personal knowledge
17       of any wrongdoing by Mr. Peter Sloane?
18   A   No.
19   Q   And I'll ask you the same question.  Other than
20       what you've learned from Mr. Bevan, do you have
21       any personal knowledge of any wrongdoing by
22       Mr. Ira Dembrow?
23   A   No.
24   Q   Do you know who Peter Sloane is?
25   A   I believe he's an attorney.
```

```
 1   Q   Uh-huh.
 2   A   That was involved in this originally.  I'm not
 3       sure.
 4   Q   Have you had any personal contact with
 5       Mr. Sloane?
 6   A   No.  No.
 7   Q   And what is the factual basis for your belief
 8       that Mr. Sloane's an attorney?
 9   A   In review of documents I saw his name.
10   Q   Okay.  Which documents were those?
11   A   The documents I've reviewed recently.  I think
12       he was referred to in the complaint.
13   Q   Okay.  And with respect to the complaint, do
14       you have any personal knowledge concerning any
15       allegations in the complaint about Cahill
16       Gordon & Reindel?
17   A   No personal knowledge, no.
18   Q   And do you have any personal knowledge of any
19       allegations in the complaint concerning Peter
20       Sloane?
21   A   No.
22   Q   And then I take it that you also have no
23       personal knowledge of any allegations in the
24       complaint concerning Ira Dembrow?
25   A   No.
```

```
 1   Q   Okay.  Oh, just a few clean up questions.
 2            Can you tell me the address of your
 3       family home?
 4   A   1000 Moeller Avenue.  Moeller is spelled
 5       M-O-E-L-L-E-R.  It's avenue.  And that's Akron,
 6       Ohio  44307.
 7   Q   44307?
 8   A   Correct.
 9   Q   And is that where you reside?
10   A   No.  One of my sisters resides there.
11   Q   Okay.  And what is her name?
12   A   Cheryl with a -- C-H-E-R-Y-L.  Last name is
13       Woolridge, W-O-O-L-R-I-D-G-E.
14   Q   Okay.  And that's the location that you
15       referred to before where you think that maybe
16       your mother's documents from her legal affairs
17       might be kept?
18   A   Yes.
19   Q   At this time that's the questions that I can
20       ask you today.
21            MS. FIELDS:      We're going to
22       hold open, obviously, our questions.  We came
23       prepared to depose the witness, but since we've
24       learned that there are additional documents
25       that we weren't aware of, we're obviously going
```

1      to wait to ask the balance of our questions

2      until we have all of the material.

3          Additionally, there were plenty of

4      objections, the validity of which will be ruled

5      upon at a later date and we may find ourselves

6      back here.

7  Q  So at this point that's all that I have for

8      you.

9  A  Okay.

10  Q  So thank you.

11  A  Uh-huh.

12              MR. COREN:      Eric or John.

13              MR. TUNIS:      This is Eric.

14      I have a few questions for Ms. Holley.

15              THE WITNESS:    Okay.

16          EXAMINATION OF MARILYN HOLLEY

17  BY MR. TUNIS:

18  Q  Good afternoon, Ms. Holley.

19  A  Good afternoon.

20  Q  My name's Eric Tunis.  I represent Thomas

21      Halket in connection with the Williams

22      litigation.

23          Are you familiar with the name Thomas

24      Halket?

25  A  Only I think by seeing it on documents, but I

```
 1         don't know if he's a plaintiff or what his role
 2         is.
 3    Q    I see.  Okay.
 4             Do you recall approximately -- the
 5         approximate date in which your mother was
 6         diagnosed with mesothelioma?
 7    A    No, not exactly.  Actually, I believe it would
 8         have been sometime in 2000, but I'm not certain
 9         of the date, no.
10    Q    Was she working at BFGoodrich at the time?  Do
11         you recall that?
12    A    No.  She had retired.
13    Q    Okay.  She retired in 1987, is that correct?
14    A    Correct.  In 1987.
15    Q    And was Mr. Bevan or his law firm the first
16         firm that she retained in connection with her
17         claims relating to her exposure to asbestos?
18    A    To the best of my knowledge, he is the first
19         one.
20    Q    And do you know when your mother retained
21         Bevan's firm?
22    A    I could only guess '99 or 2000.  I'm not sure.
23         I'm not sure.
24    Q    Well, do you think that she retained Mr. Bevan
25         before she was diagnosed with mesothelioma?
```

```
 1   A   I don't know.  I'd hate to say.  I don't know.
 2   Q   But it would have been around the time that she
 3       was diagnosed, is that fair to say?
 4   A   I would say that's fair to say.
 5   Q   Do you know whether she personally contacted
 6       anyone, either with BFGoodrich or any of the
 7       manufacturers of asbestos products that you
 8       believe she was exposed to?
 9   A   I could only speculate.  I have no personal
10       knowledge of that.
11   Q   Okay.  And do you have any idea when the Bevan
12       firm might have contacted Engelhard regarding
13       your mother's claims related to her exposure to
14       asbestos?
15   A   Again, because I was not involved in the
16       Engelhard settlement, I could only guess that
17       it was 2000, 2001.  I'm really not certain.
18   Q   All right.  I don't have any questions -- any
19       other questions at this time.
20                       MR. COREN:       John.
21                       MR. BOYLE:       Hi.  This is
22       John Boyle.  We don't have any other questions
23       at this time, although we reserve for the same
24       reasons as everyone else does.
25                       MR. PLACITELLA:   Just for the
```

```
 1   record, counsel, we sent over the verifications

 2   to BASF's answers to interrogatories.  I sent

 3   the emails.  Did you guys receive that?

 4                   MR. FARRELL:     I see an email

 5   now with Ms. Holley's verifications.  I don't

 6   see them for the other plaintiffs.

 7                   MR. PLACITELLA:  Right.  For

 8   Ms. Holley's.

 9                   MR. FARRELL:     Do you have the

10   ones for the other plaintiffs?

11                   MR. PLACITELLA:  I'll have to

12   track down.  I just asked my office for

13   Ms. Holley's.

14                   MR. TUNIS:       Have you sent

15   them to the other defendants?

16                   MR. PLACITELLA:  Yes, you should

17   have a copy there.

18                   MS. FIELDS:      Not the

19   verifications to the other defendants' --

20                   MR. PLACITELLA:  Right.

21                   MS. FIELDS:      -- discovery

22   but to BASF's.

23                   MR. PLACITELLA:  Correct.

24                   MR. FARRELL:     Was this sent

25   to us before?
```

1                      MR. PLACITELLA:   We sent those

2    just now.

3                      MR. FARRELL:     Had you

4    previously sent it to us?

5                      MR. PLACITELLA:   Not that I

6    recall.

7                      MR. GEYERMAN:    So on behalf of

8    the Cahill defendants, we want the verification

9    to the Cahill defendants' interrogatories when

10   you locate the verification, if there is a

11   verification.

12                     MR. PLACITELLA:   Of course.

13                     MR. TUNIS:      Same with

14   respect to Mr. Halket.

15                     MR. COREN:      Well, there

16   being no other questions, I guess that's it for

17   today.

18                     THE VIDEOGRAPHER: We're off the

19   record at 1:55.

20     (Deposition was concluded at 1:55 p.m.)

21              (Signature reserved.)

22

23

24

25

```
 1    THE STATE OF OHIO,    )    SS:

 2    COUNTY OF CUYAHOGA.   )

 3

 4        I, Sarah R. Drown, a Notary Public within and

 5    for the State of Ohio, duly commissioned and

 6    qualified, do hereby certify that MARILYN HOLLEY,

 7    was first duly sworn to testify the truth, the whole

 8    truth and nothing but the truth in the cause

 9    aforesaid; that the testimony then given by her was

10    by me reduced to stenotypy in the presence of said

11    witness, afterwards transcribed on a

12    computer/printer, and that the foregoing is a true

13    and correct transcript of the testimony so given by

14    her as aforesaid.

15        I do further certify that this deposition was

16    taken at the time and place in the foregoing caption

17    specified.  I do further certify that I am not a

18    relative, counsel or attorney of either party, or

19    otherwise interested in the event of this action.

20        IN WITNESS WHEREOF, I have hereunto set my hand

21    and affixed my seal of office at Cleveland, Ohio, on

22    this 11th day of April, 2017.

23                        Sarah R. Drown, Notary Public
                          within and for the State of Ohio
24                        My Commission expires April 22, 2017.

25
```

```
 1   THE STATE OF              )
                               )      SS:
 2   COUNTY OF                 )

 3

 4

 5

 6        Before me, a Notary Public in and for said

 7   state and county, personally appeared the

 8   above-named MARILYN HOLLEY, who acknowledged that

 9   she did sign the foregoing transcript and that the

10   same is a true and correct transcript of the

11   testimony so given.

12        IN TESTIMONY WHEREOF, I have hereunto affixed

13   my name and official seal at

14                         this           day of

15                  , 2016.

16

17

18

19                         MARILYN HOLLEY

20

21                         Notary Public

22   My Commission expires:

23

24

25
```

```
 1                   DEPOSITION ERRATA SHEET

 2   Page No.          Line No.          Change to:

 3   Reason for change:
     Page No.          Line No.          Change to:
 4
     Reason for change:
 5   Page No.          Line No.          Change to:

 6   Reason for change:
     Page No.          Line No.          Change to:
 7
     Reason for change:
 8   Page No.          Line No.          Change to:

 9   Reason for change:
     Page No.          Line No.          Change to:
10
     Reason for change:
11   Page No.          Line No.          Change to:

12   Reason for change:
     Page No.          Line No.          Change to:
13
     Reason for change:
14   Page No.          Line No.          Change to:

15   Reason for change:
     Page No.          Line No.          Change to:
16
     Reason for change:
17   Page No.          Line No.          Change to:

18   Reason for change:
     Page No.          Line No.          Change to:
19
     Reason for change:
20   Page No.          Line No.          Change to:

21   Reason for change:
     Page No.          Line No.          Change to:
22
     Reason for change:
23

24   SIGNATURE:                         DATE:

25
```

MARILYN HOLLEY - 04/05/2017                                    i1

---

**$**

**$10,000**
  35:16
**$11,000**
  143:25 145:21
**$113,000**
  146:9
**$14,000**
  101:16 102:14,21
  103:23
**$16,000**
  143:12,13 145:13
**$172,000**
  143:7
**$19,000**
  102:9 145:25
**$2,000**
  106:16,18 107:7,18,24
  114:2
**$2,300**
  145:17
**$20,000**
  141:6
**$24,000**
  146:4
**$250,000**
  21:12
**$257,000**
  142:19
**$26,000**
  144:5
**$29,000**
  141:17 143:20
**$33,000**
  108:9
**$34,000**
  145:9
**$350,000**
  141:16
**$40,000**
  143:16
**$50,000**
  38:22

**$59,000**
  143:8
**$60,000**
  143:2
**$8,000**
  144:13
**$8,600**
  144:9
**$88,000**
  142:20

---

**0**

**01**
  123:17,19
**07**
  141:19
**09**
  141:24

---

**1**

**1**
  51:15,16,17
**10**
  20:13 40:15 94:6,19
  95:5 105:12 108:4
  114:10,11 141:8
**1000**
  158:4
**10:01**
  6:8
**11**
  83:8,9,18,19 94:20 95:5
  108:3 109:8 113:21
  114:8 141:9
**11-CV-01754**
  6:7
**113**
  120:8,11
**11:36**
  85:8
**11:48**
  85:11
**12**
  83:8 84:22 94:13,21,25

95:5 109:22 144:10
**12:30**
  122:13
**12A**
  113:12
**13**
  118:18,19,21 136:24
  145:22
**14**
  53:5 56:23 57:9 95:13
  96:9 97:7 98:17 102:6
  108:8 111:24 121:2,3
**15**
  40:15 71:7 76:25 90:3
  91:13 95:19 96:13
  97:20 112:18 120:4
  123:11,17 133:3 134:13
  136:6,7,12 143:21
  146:1 151:23
**16**
  103:2 104:16 139:19,
  20,22 144:5
**17**
  137:21 140:22,23
**18**
  118:22 119:1 141:4,5
  142:3
**19**
  141:13,14
**1950**
  110:25
**1969**
  137:9
**1977**
  110:25
**1980**
  113:1
**1980s**
  110:13
**1987**
  137:9 160:13,14
**1:08**
  122:16
**1:43**
  155:21

**1:47**
  155:24
**1:55**
  163:19,20

---

**2**

**2**
  81:11,13,22 88:8,9,11,
  12 108:21 109:6 110:4,
  11
**20**
  20:13,14 21:7,8,9,10
  40:15 117:7 141:21,22
  143:8 146:8
**20,000**
  143:3
**2000**
  53:6 56:23 59:10 67:7,9
  79:16 95:13 96:9
  136:13,22 138:8 141:8,
  9,10 160:8,22 161:17
**2001**
  67:11,16 68:11 79:16
  96:13 100:12,19 102:17
  103:2 104:17 118:22
  119:1 121:4 123:11
  161:17
**2002**
  79:16 105:14,17 108:4
**2004**
  143:3 146:1
**2005**
  143:9
**2006**
  143:13
**2007**
  143:17,21
**2008**
  143:24
**2009**
  142:3,10
**2010**
  62:21 98:11 144:5
  146:5,8
**2010/early**
  62:12

---

MARILYN HOLLEY - 04/05/2017                    i2

**2011**
    62:12,21 148:2 149:17
    150:1

**2012**
    140:4 144:10

**2015**
    87:22 145:22

**2017**
    6:9

**21**
    142:1,2 143:16

**22**
    110:16 121:4 142:6,7
    143:24

**226**
    121:6,8,17

**228**
    70:11,12,16,20

**23**
    120:11 142:10,16,17

**230**
    70:13,16,21 73:7

**24**
    143:1,2

**25**
    52:24 53:4 56:1,3,17
    57:6,23,24 59:13 62:8
    64:19 100:19 102:17
    143:6,7

**26**
    113:8,11 143:11,12

**26(a)**
    87:19

**27**
    143:15,16 146:5

**28**
    143:19,20

**289**
    74:3

**29**
    143:23 144:1

--- 3 ---

**3**
    85:12,15 102:6 106:7

**30**
    20:15 94:6 144:4,5

**31**
    144:8,9

**316**
    74:17

**32**
    145:8,9

**33**
    145:12,13

**34**
    145:15,16

**35**
    145:20,21

**36**
    145:24,25

**37**
    146:3,4

**38**
    146:7,11,12

--- 4 ---

**4**
    87:15,17,18 143:13

**44307**
    158:6,7

**47**
    119:5,6

--- 5 ---

**5**
    6:9 94:13,14 95:12
    137:1

**50**
    94:6

**50-pound**
    119:16

--- 6 ---

**6**
    68:18 94:15 96:12,17
    119:12 123:2,6,9,11
    124:20,22,23 136:13

--- 7 ---

**7**
    67:11 94:16 99:11
    100:22 105:14,17

--- 8 ---

**8**
    94:17 100:17,19 123:2
    125:8

--- 9 ---

**9**
    94:18 95:5 103:1

**95**
    95:17

**98**
    20:17,21 65:13,14 71:8
    95:14 96:3 133:18

**99**
    160:22

--- A ---

**abatement**
    110:14

**ability**
    39:14

**able**
    43:18 47:1,8 58:4 76:23
    104:8 105:11 116:22
    117:16 124:10 134:18,
    21 145:4,6 153:12

**absence**
    60:25

**accept**
    36:5

**accepted**
    53:11,18 55:3 56:2,12,
    15,18 57:16,19 58:2,25
    59:3,16,20,24 60:8,17,
    18 61:25 118:4 140:11

**Account**
    108:6

**accuracy**
    58:21

**accurate**
    135:19 136:1,4 138:18,
    19

**acting**
    60:22 67:6

**action**
    6:7 36:15 38:5 39:7
    40:12 63:2 84:24 90:21
    91:8

**actions**
    83:21 89:1 108:25

**actual**
    69:17

**add**
    118:5

**addition**
    95:23 96:1,3 108:22

**additional**
    108:8 158:24

**Additionally**
    159:3

**address**
    85:3 158:2

**addressing**
    150:7

**adequate**
    61:21

**admission**
    42:20,22,23

**admitted**
    78:21 80:20

**advice**
    27:7,10,11,13,17,19
    28:17,23 29:9 32:24
    49:24 53:25 54:2,4,6
    56:6,8 71:18,20 72:1,3
    89:21,25 91:25 139:4
    146:16

**advise**
    36:12 38:12,14,15
    133:25

**advised**
    35:12 37:12

MARILYN HOLLEY - 04/05/2017

i3

**affairs**
158:16

**affidavit**
112:8

**affiliated**
88:25

**afternoon**
122:18,19 159:18,19

**age**
7:17

**aggregate**
70:23 71:9 72:14,22,25
73:5,17 78:5

**ago**
29:24 30:2 31:18,20

**agree**
20:25 78:18 80:16
101:13 118:13 126:4

**agreement**
18:25 19:14,16,18,20
23:23 24:11,18 25:12
93:7,20 127:19 128:6,
12,23 129:1,4,21 132:4,
17,20 141:22

**agreements**
127:15 129:19 132:6
150:23

**ahead**
17:15

**Akron**
9:4 88:19 110:14 158:5

**Alex**
6:10

**alive**
53:7 57:10

**allegations**
26:18 32:11 41:2 107:4
157:15,19,23

**alleged**
17:22 42:1 43:7 61:7
63:1 87:10 91:9

**allegedly**
16:19

**allow**
49:10

**allowed**
98:7 134:17

**Aluminum**
139:23

**amended**
40:25 51:18 145:16

**amount**
23:11 66:7,21 77:14
108:9 117:9 129:7
141:17 143:2,7,20,24
144:9 145:9,17,21,25
146:4,8

**amounts**
23:13 113:16

**analyses**
111:11,20,21 112:11

**and/or**
64:22,25 74:21,23
108:24 115:9

**answer**
13:12,22,23 17:18
21:14 22:10 23:2 27:6,
8,11,16,18,21,22 28:16,
17,18 29:2,5 43:19
45:11,15 46:1,8,9,10,14
47:4,8,12 48:1,5,11
49:23,25 50:9 53:24,25
54:1,2,8 56:5,6,7 58:4
65:19 71:21,25 72:1,2
76:23 89:22,24 90:18,
22 91:3 92:19,22 93:1
116:23 117:16,20
119:14,16 120:15,18,24
131:6 133:20 134:17
144:19,23,25 145:3,4
147:12,18 148:20,22,23
150:9,13 154:5,15,19
155:3

**answered**
41:10

**answers**
23:5 57:24 72:10 81:23
162:2

**ante**
66:9

**anybody**
27:25 30:8 31:2 34:5
37:19 39:21 57:23 59:5
134:7 137:18

**Apart**
10:9

**apologize**
54:25 155:16

**apology**
42:11,12

**apparent**
114:19

**Appeals'**
41:3

**appearances**
7:11

**appears**
139:22 140:24 141:5,19

**applicable**
108:24

**applications**
23:19

**applies**
55:14

**approach**
52:23

**appropriate**
90:21

**approval**
142:18

**approving**
43:22

**approximate**
160:5

**approximately**
160:4

**April**
6:9 143:8 144:5 145:22
146:1,5

**area**
53:12,19 56:13,16
88:20

**aren't**
42:9

**argue**
152:25

**argument**
153:2,4

**argumentative**
152:7,9

**arrangement**
93:14

**arrangements**
93:11 130:12

**Arthur**
7:14

**asbestos**
9:5,21 10:4,10 13:8,11,
15,19,25 14:8 15:13,14,
17,24 16:4,15 17:6,22
20:2,3,5 29:14 32:21
35:14 37:3 44:24 45:18
46:5 47:14,21 48:13,16
53:7,11,18 55:3 56:2,
12,18,24 57:16 58:2
59:1,16 61:1,21 62:11,
19 64:24 66:25 67:3,8,
15 68:11 71:7 73:11
74:13,23 75:4 76:8,12
77:1,3 78:21 79:4,6,18,
19,22 80:2,9,14,21,24
81:6 88:22 89:4,9 90:7
96:3,6 97:21 98:5
99:18,21 103:13,15,18
104:2 105:4,7 106:19
107:6,17,25 109:14,20
110:7,8,14,16 111:1,4,
5,10 112:10,14 113:6,7,
23 114:5 117:1,5,25
119:10,14,15,16,23
133:14,23 134:19
135:6,13 137:5,7
138:23 139:11,24
141:14,23 142:7
144:15,16 147:8 148:8,
11 149:22 150:3 160:17
161:7,14

**asbestos'**
112:19

**asbestos-containing**
112:21,24

**asbestos-like**
113:17

**asbestos-related**
21:2 120:6 133:16
134:19 137:25 146:17
148:3

**asbestosis**
98:8

MARILYN HOLLEY - 04/05/2017                     i4

**aside**
12:9 37:3 126:8

**asked**
18:1 21:24 32:6,9,17
33:1,5,14 34:5 41:9
52:14,16,17 69:22
103:12 139:1 148:7,10
150:6 151:7,14,18,20,
24 152:1,5 156:6
162:12

**asking**
17:2 18:6 48:5,6 71:19
72:6 75:17 99:6 106:24
116:11 118:1 147:10

**asks**
128:1

**aspects**
131:16

**Assaf**
6:19 7:23 21:15,21
22:1,4,8,21 23:1 28:21
29:1,6 31:12,15 52:22
71:14,17 72:8 81:9,16,
19 82:16,19 85:13 86:1,
6 90:23 91:19,24 92:3,9
94:12 111:18 122:10,17
124:18,23 125:1,7,12
126:3,13 127:17,23
128:3,7,10,15 130:19,
23 131:1,5,8,11,17,24
132:3,8 133:7,12
148:24 149:4 151:10,
14,17 152:8,16 153:3
154:10,14,18,22 155:18
156:5

**Assaf's**
72:4

**asserted**
92:8,16

**asserting**
90:20 91:23 148:19
154:12

**assertion**
91:22 92:13

**associates**
19:3 108:7

**assume**
7:10 103:23

**astounding**

110:16

**attached**
86:7

**attended**
64:7

**attention**
88:7 100:17

**attorney**
13:3 18:14 20:1 24:3,9,
10 28:8,22 31:3 32:5
36:17 49:13 56:13,25
57:12 58:9 61:2,14
62:13,22 69:19 84:20,
21 85:5 88:19 129:5
135:9,11 136:15
138:12,13,16 142:24
147:23 151:23 156:25
157:8

**attorney's**
142:20 143:8

**attorney-client**
21:22 22:10 27:23
131:11,14

**attorney-clients**
154:7

**attorneys**
11:21 12:5,9,13,15
14:21,24 18:2,11 25:2
31:19 32:1,6,13 33:1,6,
10 35:8 36:9 38:8,12
39:6 43:10,23 50:3,4,5
51:8 52:17,18 60:9,15
62:1 63:22 64:8 88:25
127:9,10,12 134:17
151:23

**attorneys'**
32:23

**August**
104:16 143:13

**authorization**
70:25 73:16,21

**automatic**
92:15

**avenue**
158:4,5

**award**
28:1

**aware**
19:13 24:17 94:8
158:25

---

**B**

**back**
12:9 58:5 79:16 83:8
85:10 87:22 92:5,10
100:9 109:6 113:21
114:8 115:13 122:15
153:8 155:23 159:6

**bags**
119:12,16,17

**balance**
159:1

**ballpark**
139:18

**based**
11:19,21 15:9 24:23
26:18 46:3 47:4,6,10,20
59:23 60:14 61:25 71:6
79:3,11,12,21 80:6,11
82:6 97:20 104:9 107:3,
11 116:7,21 118:3
128:22 132:13 152:3

**BASF**
6:5,20,22,24 11:1,4
14:11 20:6 25:22 66:7,
17 73:17,22 77:16 88:24 147:11,15
148:1,7 149:10,17
150:1

**BASF'S**
53:9 54:22 61:22 64:23
71:2 81:23 162:2,22

**basic**
49:18

**basically**
40:6 69:9 98:2

**basing**
22:14,17

**basis**
9:10 12:13 26:14 28:19
50:21,23 79:13 83:23
116:21 117:17 131:8
144:24 147:2 157:7

**becoming**
104:25

**beginning**
6:2 84:7 103:11

**behalf**
7:11,14 108:7 109:24
137:25 155:11 156:2
163:7

**belief**
98:9 104:9 157:7

**believe**
9:2,10 11:22 12:13
27:22 28:6 30:5 31:1
38:12 41:24 42:4 56:13
72:16 82:25 83:1 85:24
86:20 129:14 135:8
139:8 145:6 149:22
150:19 156:6,25 160:7
161:8

**Bell**
99:21

**best**
8:22 23:21 32:3 51:14
57:17 59:22 62:20
95:20 98:9 122:1 136:2,
5 147:22 160:18

**better**
45:14 60:7 132:9

**Bevan**
15:3,7,21,25 16:5,20
17:9,23,24 18:15,18
19:3,7,10,11,21,23
24:6,10,12,17 25:3,5,
11,20 26:15,21 27:13,
24 28:14 29:12 33:8,22
35:15 36:13,17 37:4,25
38:9 43:2,3,5,6,9 46:23
47:1 51:11 52:3,10,19
55:19 56:20,25 57:7,9,
12,18 58:10 59:6 60:6,
19 61:3,9,12,15 62:2,5,
13,18 63:3 64:15 65:7,
24 67:19,22,25 68:2
69:14 70:25 71:6 73:4,
11,25 74:1,15,16 76:25
79:3,11,13 80:1,12
84:20,21 85:5 86:11,19
87:11,13 88:13,19
89:16 90:3 91:7,13
92:21 93:2,8,21 96:14
97:21 98:13,18 99:13
100:20 102:6,21 104:4,
15 105:6,14 107:1,4,5
108:6 109:11 110:1,24

111:19 113:4,11,13
114:5 115:1,8,9 120:4
121:7,11 122:1 123:3,
16 125:9,18,19,20
126:15,23 130:1 132:23
135:11 136:3,16
137:16,19 138:13
140:7,9 142:22,23
143:3 147:19,23
149:18,21 151:22
156:7,12,16,20 160:15,
24 161:11

**Bevan's**
24:3,9 27:3 28:8 46:25
62:22 63:4 93:19 99:6
103:23 112:1 126:24
130:11 132:15 138:16
146:16 155:8 160:21

**beyond**
147:11

**BFGOODRICH**
9:4 66:3 78:3 109:25
110:6,13,20,25 111:2
112:8,12,14,18,20,23
113:5,22 119:10,23
137:8 160:10 161:6

**BFGOODRICH'S**
111:11,20 112:11

**bit**
68:19 150:7

**boilers**
110:8

**bonus**
28:1

**bottom**
73:8,9 112:17 120:11
121:7,18

**boxes**
68:18

**Boyle**
7:14 161:21,22

**brand**
121:13

**break**
81:20 85:6 122:5 125:3
155:17

**Breckenridge**
98:24 101:15 108:7,20

**Brent**
121:11

**briefed**
23:9

**briefing**
152:21

**bringing**
46:12

**brother**
87:1,3

**brought**
57:25

**bunch**
78:10,14

---

**C**

**C-h-e-r-y-l**
158:12

**C.P.**
111:6

**Cahill**
7:1,2,4 25:22 71:1
85:16 88:24 156:3,13
157:15 163:8,9

**called**
7:17 10:19,21,23 11:1
82:13

**can't**
10:8 20:25 24:2,15
27:11 30:6 31:17 32:19
33:4 47:24 49:7,25
63:17,19 67:4 82:4
87:21,24 101:2 107:15
132:24 138:24 139:12
148:22

**captioned**
96:22

**care**
19:4

**carefully**
55:22

**case**
6:15 8:5 11:10,11,19
13:10 14:1,2 18:22
19:18,20 20:2,3,9
24:22,23 25:1,16 26:1

30:18 32:7,11,17 33:25
34:11,14 35:2,3,8,14,24
36:21 37:6,9 38:7,22,23
39:16 40:7,9,10 41:3
46:5,15,19 47:2,6 59:6
65:1,6,10,25 69:18 75:8
80:7 84:10,11,13 85:3
87:9 88:5 89:17 90:14
92:22 93:4,9,22 94:3
96:6 103:22 107:5
117:23,24 126:10,16
128:19 129:6,9,16,17,
20,22 130:2,13 132:16,
21 139:3 149:17
153:20,21,25

**cases**
20:8 29:14 32:21 37:3,9
47:21 52:10 64:15
65:13,15 66:23 67:8,15
68:11 77:1,6,8,10
79:15,17 90:7 98:17,21,
23,25 99:7 101:17
102:2 115:3,24 147:21

**cash**
136:12

**Cassandra**
6:25

**Catalysts**
6:5 88:24

**cause**
51:7 74:19

**caused**
15:13,14,17

**cement**
137:7

**certain**
16:10 32:12 36:16,18
75:21 78:2,25 79:9
85:22 94:25 117:15
129:10 160:8 161:17

**certificate**
82:6

**certificates**
106:6

**certified**
7:20

**certify**
135:15

**change**
24:13 101:12

**check**
132:10

**checked**
125:2

**checks**
134:12,13

**Chemical**
101:9,10 103:6 108:14
139:23

**Cheryl**
158:12

**circumstances**
8:20

**civil**
6:7 7:18

**CLAD**
101:25 114:15

**claim**
75:4 76:12 77:15 106:1
136:12

**claimed**
48:16

**claims**
55:10 61:22 74:5,6,23
76:9 84:25 88:22 89:6
100:12 108:19 117:12
135:6,13 139:10 141:5
148:4 160:17 161:13

**clarified**
18:2 26:5

**clarify**
16:3 63:7

**Clark**
112:9

**class**
8:1,5,7,8,21,22 11:9,17
18:4,5 19:6 24:21,23
26:1,6,9 28:1,5,7,11
31:3,4 33:8 34:2,25
35:6 36:6,11,15 37:17
38:1,5,6 39:7,9 40:12
41:15,23,24 42:5,6,11
43:12,21,24 44:4,5,16
57:22 60:1 63:2,22,25
64:2,8 69:4 74:6,22

75:1 76:3 87:18 88:21
91:12,15 94:4 114:25
115:4,11,23 116:4,12,
16,17 117:21,22 118:1
127:8,14

**clean**
158:1

**clear**
17:19 33:9,11 72:6 85:1
130:7

**client**
24:14 59:15 92:19
129:5 156:8,10

**client's**
118:11

**clients**
73:12 105:23,25 106:4,
6,10 156:3

**clients'**
70:24 89:6

**coaching**
72:9,12

**colleagues**
64:13

**collective**
72:18

**come**
12:9 32:13 80:12 109:6
126:21 127:5

**commenced**
53:7 56:24 57:10

**comment**
132:14

**Common**
53:8 57:25 109:1

**commonly**
111:9 112:9

**communication**
91:25

**communications**
33:22,24 34:2 154:7

**companies**
20:6 44:20,22 45:2
47:14 48:15 50:1 51:12
99:17 103:7,9,12,14,18
108:18 115:3,19 120:5

138:23

**company**
10:19,21,23 11:1 14:4,
7,9 15:15,18 26:7,10,
13,22 45:17,20 46:4
47:23 48:6,13 49:3,11,
20 50:18,19 51:6,9
100:4,10 108:17
109:12,25 111:6
112:22,25 113:7,16,22,
25 117:5 137:8 140:10
144:14

**company's**
45:22

**compensate**
13:11

**compensated**
15:12,16 94:3

**compensation**
14:6 15:23,24 16:2,8,
14,19,23 19:15 20:5
21:1,11 42:20 61:21
93:21 95:18 97:23 98:7
116:3 118:5

**complaint**
12:17,19,21 15:9 26:19,
20 30:4,6 32:11 40:25
44:9,20 51:15,18 55:9,
15 57:20 58:7,9,13,21
59:9,15 60:3,13 63:2,
10,13,15,20 70:12
95:13 98:11,24 108:20
123:5,12 124:14,21
125:19 148:1,7 150:1
157:12,13,15,19,24

**complaint's**
99:8

**complaints**
96:22 99:1 114:16,21
115:18

**complicated**
91:4 92:14

**computer**
32:15 33:16 34:6

**concealment**
74:21 75:9

**conceivably**
71:21

**concept**
48:2,4

**concerned**
125:14

**concerning**
89:3,8 157:14,19,24

**concluded**
163:20

**conferences**
57:13

**confidential**
23:22 134:3,4,5 150:20
154:21

**confidentiality**
22:18,22 23:23,24 24:1,
11,16,18 25:12 150:22

**connection**
159:21 160:16

**Connolly**
7:4

**consent**
70:24 73:16

**consenting**
146:16

**consider**
39:2 60:8,16 134:3,4,5
154:21

**consideration**
38:18

**Consolidated**
96:22 114:16,21

**contact**
157:4

**contacted**
126:21 161:5,12

**contain**
113:16

**contained**
26:18 61:1 64:24 110:6
112:14 135:17 150:3

**contaminated**
111:10 112:10

**content**
148:8

**contingency**
129:7,8,9

**continue**
54:7,15 70:21

**continues**
71:3

**contracted**
98:4

**contributed**
66:7

**control**
150:23

**conversation**
12:7 147:3 153:17

**conversations**
10:17 11:21 14:20,23
121:25 147:24

**Cook**
6:10

**Cooper**
78:3

**copies**
34:8 67:19 68:8

**copy**
52:5 67:24 82:17 86:2
123:16 128:16 162:17

**Coren**
6:13,14 13:20 17:13
18:14 19:1 20:22 21:13,
17,24 22:2,6,17,24 23:4
25:8 27:4,15 28:15,24
29:3 31:14,16 35:10
36:7,10,24 37:1 38:2,8,
10,25 39:18,20 40:1
41:7,9 42:2,13 43:6,9,
13,17 44:1,11 45:9
47:25 49:5 53:23 54:6,
9,11,14,19 55:13 56:4
60:4 63:7,8 65:18 69:22
71:11,16,22 72:8,11
76:19 77:17 79:7 81:14,
18 82:18 89:18 90:17
91:1,17,21 92:1,2,7,12
104:6 105:10 106:21
107:9,20 115:5,9 116:1,
5 117:13 119:25 124:8,
18,22,24 125:5,23
126:11 127:22,25
128:5,8,11,17 130:17,

21,24 131:3,7,9,13,21
132:1,5 133:19 144:18
145:2,5 147:9 148:14,
16,18,21 149:2,6 150:5,
17 151:5,10,13,16
152:3,6,12,17,24 153:6
154:4,12,16,20 155:15,
19 159:12 161:20
163:15

**Coren's**
130:10

**Corning**
142:2

**Corning/fibreboard**
141:23

**Corp**
101:10

**Corporation**
99:18 101:10 139:23

**Corporation'**
101:12

**correct**
15:6 17:3,4,6,9 18:9,10
23:16,18,20 24:9,13
25:7,10,12,13 26:15,23
32:22,24,25 33:3 35:17,
18,22 36:3,22 37:11
39:10 40:21 41:4 44:21,
22 47:18,19 51:13
55:11,16,20,21,22,24
59:19 61:9,10,13 62:3
66:11,12,25 67:1,12,20
69:20,21,23 73:25 77:9
78:16,24 79:20 80:19,
20 83:4,5 84:13 86:15
90:8,9,16 106:20 107:1
109:4 110:22 114:2,6
118:16 120:6,7 131:7
135:7 138:7,15,18
139:2 149:23 151:11
152:2 154:3,20 158:8
160:13,14 162:23

**correspondence**
123:3 125:10

**Correspondingly**
73:8,11

**cost**
75:7

**costs**
75:5

**couldn't**
31:5 42:15 139:15,18

**counsel**
6:11 27:7,10,12,17,19
28:17 29:9 49:24 53:25
54:2,5,6 56:6,8 64:20
72:2,4 82:17 84:24 86:1
89:21,25 93:18 98:14
111:19 155:9 162:1

**count**
95:14 103:8

**County**
53:9 55:4 57:16 58:1
59:2,4,17,25 108:25

**couple**
31:21 68:18

**course**
163:12

**court**
6:6 7:6 11:11 41:3 53:8
58:1 66:8 67:17 90:21
91:16 92:5 109:1 118:8,
10,12,15 127:5 128:1
133:24 135:14,18
142:17

**covering**
137:7

**create**
112:18

**created**
77:3

**cursory**
69:7

**custody**
150:23

**Cuyahoga**
53:9 55:4 57:16 58:1
59:1,3,17,25 108:25

_____

**D**

**Dalmut**
6:23,24

**damages**
75:3,12,13,15,17,21
76:1,7 78:23

**dangerous**

119:18

**Darnell**
8:7 53:7 56:23 57:10
73:13 95:13 96:18
101:18 102:9 106:11
109:2 118:21 119:9,22
123:5,12 124:14,21
137:6 141:6 145:3

**Darnell's**
125:13

**date**
6:9 34:10 54:22 62:17
66:4 69:9 104:25
118:25 125:25 153:12
159:5 160:5,9

**dated**
96:13 100:19 102:16
103:1 105:17 136:13
142:3,10 143:8,12,13,
16,20 144:9 145:21,25
146:4

**dates**
14:13 25:19

**dawned**
125:15

**day**
6:13 37:24

**deal**
67:23

**dealing**
97:20

**deals**
90:19

**dealt**
56:25 66:24 67:2
151:22

**Dear**
105:21

**death**
47:15 67:9 106:5
135:23

**decedent**
53:6 62:10 73:13 84:23

**Decedent's**
83:20

**deceit**
11:12

**December**
143:24

**decide**
35:19,21 36:11 37:25
38:6 152:22

**deciding**
70:23

**decision**
36:5 38:14 56:14 83:20

**decisions**
41:3 83:23

**deems**
66:8

**defendant**
6:20 35:16 38:21 45:2
53:10 56:11 66:3 80:18
88:24 95:25 104:14
107:17,24 129:12 147:7

**defendants**
7:2,17 8:14 12:2 20:2,9,
10,20,24 21:2,4,5 26:2
38:21 39:6 49:8 60:24
61:20 65:14 67:2 71:8
77:1 78:1,3,10 79:18
80:13 81:4 82:23 89:1
95:14,17 96:4 98:15,22,
25 99:3,14,17 100:13,
23 101:13 102:1,13,20
103:5,21 104:20
106:15,19 107:6 108:11
109:18 114:1,17 123:4
125:11 133:14,18
139:16 146:18 148:3
162:15 163:8

**defendants'**
35:13 51:16 62:10
74:13 81:11 85:12,15
87:15,17,18 89:2,7
94:14,15,16,17,18,19,
20,21 118:18 121:2
123:1,2 136:6 139:19
140:22 141:4,13,21
142:1,6,16 143:1,6,11,
15,19,23 144:4,8 145:8,
12,15,20,24 146:3,7
162:19 163:9

**defense**
62:11,19 98:14

**definitely**
102:23

deliberate
74:20

demand
64:24 65:5

Dembrow
7:5 156:4,22 157:24

dep
82:20

depends
28:24

depose
158:23

deposition
6:3 9:23,25 10:1,2,7,9
18:8,17,23 41:6,14,17,
21 51:21 84:7 103:12
118:21 121:4 122:20
155:5,8 163:20

deposition's
152:21

derived
77:12

describe
9:2 68:17 83:19 84:23

described
64:21 74:20

describing
137:3

description
9:17

deserve
116:18

destroyed
68:12

destruction
74:21

detail
83:19 137:4

details
19:12,13 149:16

determination
118:7

determine
118:10

determined
118:12,15

develop
57:13 84:24

developed
13:6 53:15,22 55:6
56:20

develops
117:8

diagnosed
160:6,25 161:3

diagnoses
97:17

diagnosing
98:20

Dickson
22:20 23:7 91:5 92:18
144:22 147:17 149:14
150:11

didn't
10:13 44:8 45:3,17 51:6
67:2 79:19 80:2 103:14
109:20 119:18 121:22
148:24 152:9

difference
80:25

differences
97:22

different
47:10 97:11,14,17
103:14 150:7

disagree
20:21,25

disagreement
71:23

discard
70:1

discarded
68:12

disclose
139:2

disclosed
86:9 138:21

Disclosures
87:19

discounted
136:12

discovery
133:24 152:20 155:7
162:21

Discovery's
152:18

discuss
10:18,21,23 11:1 27:25
122:20 140:9

discussed
12:4,16 37:14 77:21
82:12 94:9 104:10
127:7 129:25 130:2
134:6,10

discussing
24:19 132:24 153:21

discussion
10:6,10 146:25

discussions
10:15 12:8,12 34:14,17,
18,20 37:13,22 39:5,10,
11 92:21 93:2,5,6
130:10 131:15,19,25
153:9,10,13,19,24

disease
98:4,6

diseases
97:23

dismiss
83:20 98:25 99:3

dismissal
89:6 99:13 102:1 103:5
104:19,21

dismissed
44:10,13 45:23 46:2
49:2 61:17 77:16
100:13 106:9

dismissing
103:22

dispute
104:4,8 105:6,11

distinction
120:13

distribute
134:11

distributed
134:13

Distribution
101:11

distributor
121:13

District
6:6

divide
116:16

document
51:22,24 52:2 87:21
93:16 95:15 96:12,15,
21 99:12 100:19 101:1
108:4 111:25 112:1
113:13 115:17 120:9
125:24 129:4 136:8,18,
19 137:22 139:20,22
140:2,6,23,24 141:2,18

documentation
116:7 134:23 135:1,12

documents
23:14,15 30:25 31:1
32:10,16 33:2,3,4,5
39:23,24 40:2,8,11,14,
16,18,19,23 41:8,12,16,
18,19,20 51:20 52:15,
17,19 62:16 64:14
67:19,23 68:10,21,23
69:2 74:22,25 101:3
122:23 124:9 126:4
129:13 140:8,14 152:23
153:5 154:25 155:1
157:9,10,11 158:16,24
159:25

doesn't
29:5 50:8 68:2 79:6
121:12 128:18 131:17,
22 132:2 152:4

doing
26:23 132:19,20

dollars
116:15

don't
8:10,17 10:5,12,13,14,
16 11:8 13:12 14:13
16:24 19:2,3,12,16,19
20:18 22:6 25:19 28:9
29:17,19,21 30:12,19
31:1,14,16 36:18 43:18

44:3 45:11,25 46:9,10,
20 47:3,11 48:2,11
50:5,15 52:12 57:5
58:3,22,25 59:3,18,23
62:6 63:11 66:21,22
70:1 80:21,22 86:6
87:24 93:4,15,16 94:5,
8,10 104:24 106:25
107:12 115:22 116:22,
23 117:20 118:4,6
125:6,14 129:11,12
132:5,6,19 136:19
151:6,19,20,21 152:15
153:18 154:5 160:1
161:1,18,22 162:5

**Donald**
142:24

**Dornbusch**
7:15

**dozens**
44:20 47:18,20 49:3

**draft**
108:5

**drafts**
101:23

**draw**
39:19 120:13

**Drown**
7:7

**due**
89:6

**duly**
7:19

---

**E**

**E's**
100:9

**earlier**
42:24 44:19 51:19
52:14,16 61:7 115:10
133:21 151:7 152:9
156:5

**early**
62:21 148:2

**Eastern**
53:10 54:23 56:10
61:18 100:9

**economic**
154:1

**economics**
34:21

**effect**
26:8

**effort**
75:6

**efforts**
84:23

**either**
11:8 22:10 43:8 56:19
68:8 93:19 118:14
126:21 130:1 147:5
153:17 161:6

**Elizabeth**
6:23

**email**
52:4 82:20 162:4

**emails**
33:19,21 62:16 67:21,
25 68:2 162:3

**employed**
137:8

**employees**
114:21

**employers**
97:12,15

**employment**
11:17

**Emtal**
10:21 25:21 44:8,9,15
46:18,22 64:15 89:3,4,
9,10 103:6 108:11
118:12

**enclosed**
96:21 98:20 105:22
106:5 108:5

**enclosing**
98:19

**encourage**
102:22

**engaged**
110:13

**Engelhard**
10:24 11:7 14:11 25:21

66:15,20 78:24 79:25
80:2,8 83:21 84:12,25
85:4 147:16 149:19,21
150:4 161:12,16

**Engelhard's**
60:24 61:1

**ensure**
136:4

**entitled**
35:7 81:22 87:18 96:13
100:22 105:19 109:23
118:5 123:11 124:13,21
129:24 139:22 140:23
149:10

**Eric**
7:9,11 159:12,13,20

**estate**
8:6 9:7 19:21,23 24:5,7,
12,24 45:21 66:19 67:7,
17 75:25 76:14 77:23
78:20 79:24 90:6 105:2
114:2 142:23

**estates**
108:24

**estimate**
40:14

**et al**
6:4,5

**ethics**
45:8

**events**
40:21,24

**evidence**
22:16 60:25 64:23
74:13,22,25 75:6,7,9
89:4,9

**evidenced**
111:10 112:10

**Ex**
51:15,17 81:13,22
94:11,13 95:12 96:12,
17 99:11 100:17,19
103:1 105:12 108:3
109:8,22 113:21
118:19,21 121:3 123:9,
11 124:20 125:8 136:7,
12 139:20,22 140:23
141:5,14,22 142:2,7,17
143:2,7,12,16,20 144:5,

9 145:9,13,16,21,25
146:4,11

**exact**
82:4

**exactly**
10:5 44:3 63:11 152:22
160:7

**examination**
7:18,22 155:25 159:16

**examined**
7:20

**example**
35:17 38:19

**exception**
154:23

**excess**
21:11

**excuse**
7:10 14:16 23:21 91:21
148:14 155:15

**excused**
22:13

**executed**
101:21 105:22 141:7,8,
19,24

**executrix**
105:2

**exhibit**
51:16 81:11 85:12,15
87:15,17,18 94:14,15,
16,17,18,19,20,21
113:8,11,12 114:8
118:18 121:2 123:2
136:6 139:19 140:22
141:4,13,21 142:1,6,16
143:1,6,11,15,19,23
144:4,8 145:8,12,15,20,
24 146:3,7

**exist**
124:5

**existed**
74:25

**existence**
64:21,22

**exists**
125:25

**expect**
35:24 36:2,3,4 43:24
49:13 50:1 51:8 103:17
138:17,19,25 139:3

**expectation**
42:18

**expectations**
43:20

**expenses**
75:5

**experience**
47:20 71:6 79:3 80:11
132:7

**explain**
56:1

**explained**
133:21

**exposed**
9:5,8,15,20 10:4 11:3,6
44:18,24 45:19 46:17,
22 48:14 96:25 97:4
115:20,25 116:9,10,18,
20 117:1,11,18 118:2,3,
11 119:23 121:23 137:6
161:8

**exposure**
13:8 44:8 97:22 98:4
115:4 119:10 137:5
144:16 160:17 161:13

**exposures**
114:22

**extensive**
69:11,12,17 152:20

**extensively**
23:9 112:7

**extent**
27:5,6,16 28:17 53:24
56:5 72:1 78:25 79:9
89:20,22

**eyebrows**
132:9

_____

**F**

_____

**facilities**
96:24 97:4

**facility**

155:16

**fact**
9:11 29:1,6,7 80:24
99:12 104:2 105:6
113:6,8 116:20 119:23
138:21,22 139:1 147:7
153:10

**factor**
147:6

**facts**
15:8 18:22 25:6,21
57:5,7,8 60:14 61:24
62:1 65:4 69:8,18 74:14
86:10,14,17,18 87:9,10
89:16 91:8,16 92:21
102:19

**factual**
9:10 85:2 157:7

**factually**
117:15

**fair**
15:8,9,21,22 16:12 43:5
48:23 50:13,15 51:2,3
57:18 61:20 66:8 78:18
79:6,9 80:22 86:9,18
91:10 103:19,20 117:12
149:19 151:25 161:3,4

**fairly**
94:23 117:20

**fairness**
49:18 117:16

**false**
17:8 74:24

**familiar**
159:23

**family**
19:2,22 124:2,4 126:5
134:9 136:21,23 158:3

**far**
12:3 51:11

**Farrell**
6:21 162:4,9,24 163:3

**February**
96:13 123:11,17

**federal**
7:18 22:5,9,15 99:23

**fee**
18:25 19:14,16,17,20
93:13 127:14,19 128:5,
12,22,23 129:1,4,19,21
130:11 132:3,6,17,20

**feel**
38:16

**fees**
130:2,12 131:16,25
142:20 143:8

**fiber**
111:1,4 137:7

**fibers**
61:1

**fiduciary**
24:4,24 134:10

**Fields**
6:25 7:1 86:4 155:10,14
156:1 158:21 162:18,21

**figure**
109:19 139:18

**figures**
77:11

**file**
51:9 68:24 69:5,13 96:6
139:10

**filed**
15:9 44:9,20 51:12,25
54:22 59:9 63:10,13,16,
20 82:10 87:25 95:24
99:8 106:1 108:25
109:10,24,25 114:16
115:2 128:1 137:25
138:22 139:13 148:1
149:17 152:20

**files**
32:15 50:17 52:8,19
68:17 69:14 93:17,19,
24 123:15,21,22 125:21
135:2,3 136:20,21

**filing**
30:4,6 55:16 63:2 95:13
115:18,24 133:17 150:1

**filings**
21:20

**filled**
135:12

**filling**
86:8

**finalized**
82:9,11

**find**
24:25 46:20 59:5 69:16
126:20 159:5

**fine**
122:8

**finish**
141:25

**Firestone**
97:12

**firm**
19:1 30:9,20 71:1 73:11
88:23 93:14 130:11
160:15,16,21 161:12

**first**
7:19 25:14 30:5 51:8,10
53:5 56:17 57:5 58:18
63:1,15,24 64:6,11
70:22 75:12 81:23 82:2,
3 95:12 110:3 126:15
137:24 160:15,18

**five**
20:13 40:15 81:17
88:20 137:1 155:17

**flip**
111:23

**focused**
54:24

**follow**
32:23

**following**
97:3 105:23,25 106:2,4,
6,10 108:23

**follows**
7:21

**foregoing**
83:10

**form**
13:21 17:14 20:23 25:9
35:11 36:8 38:3,11
39:1,18 42:3,14 43:13
44:2,12 45:10 47:25
49:6 60:5 65:18 76:20
77:18 79:7 89:19 104:7

106:22 107:10,21 115:6
116:6 117:14 120:1
131:1,3 136:12,24
139:10 141:5

**former**
112:12

**forms**
138:20

**forth**
22:19 61:3 115:13

**forward**
54:3 101:22

**forwarding**
101:8

**found**
45:1,16 46:15 48:6
49:20 113:15

**foundation**
131:2,4

**four**
20:12 28:11 152:18

**fourteen**
101:17

**fraud**
11:12 16:5 17:23 79:10
80:1 87:10 149:19

**fraudulent**
14:3,5 16:20 42:21,22,
23 43:7 62:11,18 75:8

**front**
21:20 58:14 81:12
85:14 87:16 94:11
109:8 125:9 136:15
140:15 152:19

**full**
61:20

**further**
74:19

---

**G**

---

**gathering**
74:20

**Gene**
6:19 28:25 71:23 81:14
125:6,23 126:11 130:18
132:6,14 149:10 152:25

**general**
68:20 97:12 129:23

**generally**
32:23 68:5,6

**Georgia**
103:5 108:11,12 117:2

**Georgia-pacific**
100:2

**getting**
19:16 133:10

**Geyerman**
7:3 82:22 163:7

**give**
22:7 32:5 47:8 68:20
75:20 82:4 94:12 123:7
139:18 152:1

**given**
19:14 31:19,25 33:9
73:15,21 80:7 88:23
93:25 152:3

**giving**
90:15 150:8

**go**
17:15 30:14 65:17,21,
23 70:11 71:18 87:13
96:11 99:11 100:9
112:17 118:9,19 121:3
122:10 139:20 140:6,14
149:15

**goad**
153:1

**goes**
76:9 82:22 87:21
108:19

**going**
9:23 12:19 17:2 22:12
27:5 54:3 61:16 65:25
70:6,12,21 77:2 80:16
81:1 82:16 88:17 89:21
90:17 92:8 93:15 94:3,
22 95:7 96:11 109:6,10
111:23 113:21 117:11
123:1,7 125:8 129:6
130:15 133:19,25
140:14 144:20 152:17,
22,23 153:1,5,8 158:21,
25

**good**
6:13 7:24,25 44:6 70:6

81:15 90:11 122:18,19
159:18,19

**Goodyear**
97:12

**Gordon**
7:1,2,4 25:22 85:16
88:24 156:3,13 157:16

**Gordon's**
71:1

**gotten**
52:2 66:14 133:8

**Grant**
7:3 101:14

**Great**
122:9 124:11 133:12

**greater**
137:4

**greatest**
98:7

**greeting**
18:19

**ground**
21:23

**grounds**
21:15,16,17,25 22:1,7

**group**
38:21 61:19 72:18
98:15 114:17

**guess**
14:10 43:22 48:9 86:25
102:6 160:22 161:16
163:16

**guy**
90:11 91:7

**guys**
162:3

**Gypsum**
142:7

---

**H**

---

**hadn't**
145:5 151:7

**half-truth**
89:2,7

**Halket**
7:12 159:21,24 163:14

**Hall**
111:6

**handle**
49:14 129:6

**handled**
141:10 152:14

**handling**
67:15

**happen**
35:25 152:17

**happened**
84:11

**happening**
34:10

**happens**
126:8

**hard**
52:5 67:19,24 150:16

**harm**
13:14 16:9 26:12,14
49:21 51:7,10

**harmed**
8:23,25 9:3 12:14,24
13:4,6 43:12 44:18
50:14,18 115:12 117:24

**harmful**
11:16,18,25 12:2,3,25
13:2

**harms**
12:22,23 15:11,12,14,
17,23 16:1 27:1,2,14

**Harwick**
101:9,10,11 103:6
108:14

**hasn't**
51:11 125:3,4 151:5
152:5

**hate**
161:1

**haven't**
32:9 33:9,14 67:21
69:22 93:18 95:21
152:2 154:24

---

Case 2:11-cv-01754-BRM-ESK   Document 303-1   Filed 05/01/17   Page 179 of 192 PageID: 12324

**he's**
25:14 66:1 90:11 151:6
156:25 160:1

**head**
31:17 134:22

**hear**
150:16

**heard**
25:23,24 63:1 80:2
120:24 126:16 153:9,
12,15

**hearing**
43:22

**heck**
119:18

**help**
40:4 90:13,15 94:24
118:8

**helped**
40:6,19 120:4 135:9

**helping**
90:6

**here's**
49:15 115:17

**hereinafter**
7:20

**hesitate**
126:6

**Hi**
161:21

**higher**
64:25

**hold**
70:2 158:22

**holding**
155:5

**Holley**
6:3,16 7:16,22,24 27:8
32:14 49:17 53:23 54:3,
17 62:9 71:12 72:6
85:14 95:8 128:16
132:15 136:10 140:20
145:3 155:25 156:2
159:14,16,18

**Holley's**
53:6 73:13 81:21,23

125:20 126:4 162:5,8,
13

**home**
31:11 52:12,19 104:24
124:2,4 126:5,17 135:2
136:21,23 158:3

**hopefully**
126:17

**Hopewell**
141:15

**hour**
30:15

**hours**
63:4,6

**house**
151:3,4

**Hygienist**
112:13

**hypothetical**
115:22

_____

**I**

**I'd**
15:9 42:8 53:4 72:9
75:20 100:16 147:2
156:9 161:1

**I'll**
12:9 21:14 54:15 98:13
125:5 126:1 127:17
144:19 156:19 162:11

**I'm**
6:13,14 10:12 12:1,2
16:10 18:2,5,6 19:13
20:11,16 21:5 22:12,17
24:25 26:19 27:5 29:3
32:12 36:14,15 39:19
43:21 46:13 47:7 48:6,
20 49:15 50:21 51:17
53:1 54:11 59:11 66:16
69:6 70:10,12,20 71:18
72:6,11,12 74:18 75:20,
24 78:2 81:1 82:16
83:15 85:22 88:11,17
89:21 90:17,22 91:18
92:7,18 93:15,23 94:8
95:7 98:19 103:4
106:24 109:10 111:23
117:15,22 118:1 120:21

123:1,7 124:2,3,25
125:8,14 129:10
133:19,25 137:17
140:14 143:12 147:12,
17 148:18,22 149:15
150:7,12 151:19
152:12,24 153:1,6
154:9 155:4,5 157:2
160:8,22,23 161:17

**I've**
37:12 42:17 92:8
120:24 157:11

**idea**
24:21 27:2,3 68:20
77:20 94:2 105:5
161:11

**identified**
29:21 87:2 91:6,7 92:3
155:1

**identify**
6:11 17:21 75:7 77:14
101:3

**illnesses**
98:2

**imagine**
36:16

**impact**
71:21

**incentive**
28:1

**inches**
68:18

**inclination**
51:10

**included**
99:17 106:18 142:19

**includes**
106:12,13 113:13

**including**
6:15 73:12 75:3 76:7
77:1 83:21 101:18
154:8 155:7

**incorporating**
27:9,19 54:1 56:7 72:3

**incur**
75:1 76:5

**incurred**
75:2,6 76:1,6,14

**independent**
26:16,17,22,25 29:4

**indicated**
57:9 96:23

**indicating**
60:25

**individual**
7:1 37:3 88:25

**individually**
101:4

**individuals**
106:2

**Industrial**
112:12

**industries**
120:22

**information**
23:19 29:15 34:6,19
35:20 57:2 80:7,17
83:12,22 84:3,7,9,14,17
85:2 87:7 90:13,25
102:23 114:18 115:7
127:16 135:17,22

**informed**
36:3,4,20 37:8 62:12,18

**initial**
11:20

**initially**
51:25

**injured**
43:25 44:4 137:2,4
138:1

**injuries**
13:11,16,19 14:1 16:15
17:6,20,25 20:6 21:2
42:1 120:6 133:17
134:20

**injury**
16:4 17:22 53:8 56:24
61:21 73:12 75:4 76:8,
12 139:24 141:23
142:2,8

**instance**
11:15

MARILYN HOLLEY - 04/05/2017                    i13

**instruct**
21:14 22:9 27:5,17 28:16 53:24 56:5 71:12, 25 89:21 90:18 133:20 144:19

**instructed**
145:5

**instructing**
23:2 29:2 90:22 91:3 92:18 131:6 144:23 147:12,18 148:23 149:15 150:13 154:10, 18

**instruction**
22:22,23 27:16 54:20 55:14 145:1 150:8

**instructions**
155:3

**instructive**
78:22,25

**insulated**
110:7,8,9

**insulation**
110:17 121:14

**interaction**
138:12

**interested**
41:25

**Interesting**
35:6 52:22

**International**
108:18

**interrogatories**
23:6 81:24 82:8 83:15 85:16 86:9,13,20 162:2 163:9

**interrogatory**
81:10 83:3,18 84:22

**interrupt**
54:7

**invade**
131:15 149:7 154:6

**investigation**
113:14

**involuntary**
89:5

**involved**
47:13 59:6 75:21 76:25 79:10 83:22 110:15 147:20 157:2 161:15

**Ira**
7:5 156:3,22 157:24

**irrelevant**
21:19

**isn't**
45:8 46:7 125:21 132:4

**issue**
23:6,8 45:6 60:9,10,16 74:15,16 91:4,25 92:13 133:21,23 134:1 144:20 147:13 150:11

**issues**
23:5 46:13 60:15 91:9 107:14 108:2 144:20 149:14 155:7

**it's**
19:11 21:18,19 22:21, 22 23:4,6,8 29:1,6,8 33:9 38:7 45:7,11,25 48:3,4 49:17,18 50:8,13 60:12 68:19 71:19 78:25 80:22 86:25 87:25 91:2,3,4,18,19,22 92:15,16 93:25 100:22 102:6 103:1,4,23 104:9 109:25 113:11 114:11 115:17 119:9 122:3 123:11 124:13 126:9 129:7 132:7 145:2 146:12 148:21 149:2,13 150:5,10,16 152:7 153:3 158:5

**its**
26:7,10,12 70:24 71:2 104:2 105:4 110:14 112:25 113:23 114:5

**J**

**J-m**
137:6

**James**
112:8

**January**
105:14,17 108:4 119:1, 2 121:4 146:8

**Jared**
6:17 132:8

**Jersey**
6:6 92:15,16 127:3,5,20 129:17 132:17 141:15

**job**
9:17 110:15

**John**
7:14 159:12 161:20,22

**Johns**
111:4

**Johns-manville**
140:25

**Johnson**
103:7 108:14

**join**
86:4

**judge**
22:19 23:7 91:5 92:17, 18 134:2 147:13,17 149:13 150:11 152:19

**judge's**
41:1

**Judgment**
109:24

**June**
67:11 118:22 119:4 123:19

**K**

**Kaiser**
139:11,23

**Kathryn**
8:6 53:6 56:23 57:10 101:18 102:9 106:11 109:1 118:21 123:5,12 124:14,21 141:6

**keep**
70:1,3,5 109:8 147:24

**kept**
34:10 158:17

**Kevin**
7:13

**Kimberlee**
6:4 29:18

**kind**
75:23

**knew**
51:12 86:11 104:5 105:7

**know**
8:9,10,11,16,17,18,20 11:8,19 14:19 15:20 16:24 17:18 19:12,20 20:18 23:10 27:2,14 28:4 29:11,16,19,20 30:19 31:14,16 34:13, 18 35:7 36:18 37:23 38:24 40:16 43:3,4,7,8 44:3,23,25 46:23 48:11 49:2 51:11 56:15 57:15 58:25 59:3,18,23,24 60:2,9,10,14,17 61:23 62:2,5,9 63:17 64:4 65:24 66:2,19,21 69:19, 25 72:7,14 74:9 77:11, 22,25 83:6 86:13,17 92:7 94:7,8,10 98:3,21 104:1,3 105:3 106:24, 25 107:1,4,12 113:25 115:8,24 117:4,17 119:18 120:16 121:12, 22 125:6 126:25 127:11,13 129:8 130:18 131:9,16 135:21,25 137:14,15,16 138:10,14 139:11,15 144:13 151:6 152:15 153:1,4 156:24 160:1,20 161:1,5

**knowing**
11:5

**knowledge**
8:22 12:18,20 14:25 15:2,3 23:18,22 25:5 26:16,17,22,25 28:19 29:4 32:4 39:14,17 51:14 55:8 56:21 59:22 62:6,7 65:4,8 73:20,23, 25 86:14,24 88:22 89:5, 23 90:1 95:20 98:9 104:9 136:2,5 147:22 156:8,12,14,16,21 157:14,17,18,23 160:18 161:10

**known**
17:9 61:8 64:20 90:2 91:13 101:11 114:4

**knows**
15:25 16:6,20 28:23
43:2 71:19 113:4,5,7
137:18

**L**

**laboratory**
111:11,21 112:11

**language**
101:13

**laptop**
33:17

**lasted**
63:4

**late**
62:11,20 110:13

**law**
30:20 71:1 73:11 90:21
160:15

**lawful**
7:17

**Lawrence**
108:17

**lawsuit**
8:2 13:5,9,10 15:8
16:25 45:16,22,24 48:8
49:11 50:17 53:8 54:22
55:19 56:24 57:1,14,25
61:17 79:14 95:23 96:1,
3 99:13 116:21 133:17
137:25

**lawsuits**
47:13 49:3 55:20 95:24
138:22 139:2

**lawyer**
90:11 125:20

**lawyers**
19:10 88:3 134:7
147:19

**layperson**
60:18

**learn**
47:22 62:9 80:12

**learned**
156:7,11,15,20 158:24

**learns**
28:25

**leave**
12:8 37:3

**led**
149:22

**legal**
18:2 28:23 45:6 46:12
49:17 60:15,16 71:20
91:24,25 158:16

**let's**
12:8 33:7 44:7 45:24
46:2 51:15 58:5 70:11
76:11 81:8 82:5 83:8,17
91:6 99:11 101:5
103:23 108:15 116:12,
15,24 118:19 122:10
123:9 128:24 130:7
133:6,13 135:4 139:20
151:11

**letter**
96:13 98:12 103:24
114:9 124:21 125:13

**letting**
27:1,13

**light**
148:6 149:25

**limited**
75:3 76:7 117:8

**Linda**
87:1,3

**line**
119:12 120:11 124:16

**liquidated**
141:16

**Liquidating**
108:17

**list**
112:25

**listed**
45:2 108:8 109:2

**listing**
81:4

**lists**
97:5

**literally**

102:17

**litigation**
32:20 69:14 71:7 80:11
97:21 123:21 133:3
159:22

**litigations**
83:4

**little**
39:19 150:7

**lives**
124:4

**living**
129:15 138:11

**LLC**
6:5

**local**
67:17

**locate**
75:7 163:10

**location**
158:14

**locations**
155:1

**log**
29:8 132:5

**logged**
31:13 124:20 125:2,4,
16,22 127:24 132:4

**long**
29:23,24 30:1,2,13
69:10

**look**
34:5 52:17,18 68:17
125:6,24 126:1,4

**looked**
52:15 127:18

**looking**
140:3

**looks**
82:7 141:8 142:20

**loss**
75:3,23 76:8,11,13,18
77:15

**losses**
75:2 76:6

**lot**
68:19 154:25

**lump**
80:22

**lunch**
122:3,5,21,25 125:3,15
127:18 152:10

**lung**
98:4

**M**

**M-o-e-l-l-e-r**
158:5

**ma'am**
70:17 119:13 120:10,13

**machinery**
110:9

**magistrate**
91:5 92:18 134:1
144:21 147:16 149:13
150:11

**Magnesia**
53:10 54:23 56:11
61:18 100:10

**magnitude**
20:12 21:6 133:15

**mail**
126:21 153:16

**maintained**
21:18 64:14

**major**
110:14

**Mansour**
108:6

**manufacturer**
79:4,5 121:13

**manufacturers**
53:14,20 55:5 77:24
78:2,20 79:1 121:23
161:7

**Manville**
111:4 141:6

**March**
142:10

**Marilyn**
6:3,15 7:16,22 81:21,22
155:25 159:16

**Marino**
7:13 150:14

**marked**
51:16,17 81:11 85:12
87:15 94:14,15,16,17,
18,19,20,21 118:18
121:2 136:6 139:19
140:22 141:4,13,21
142:1,6,16 143:1,6,11,
15,19,23 144:4,8 145:8,
12,15,20,24 146:3,7

**Martillotta**
96:14 98:13 99:6
100:20 105:15

**Master**
96:22 114:16,20

**material**
60:23 70:5 75:23 89:3,8
120:21 159:2

**materials**
113:14 153:11

**matter**
6:4 8:14,15,24,25 9:6
12:3 36:14 39:3 45:7
48:3,4 79:10 90:19
91:2,18 92:13,17 97:23
144:21 147:13,16
149:13

**mean**
8:15 19:25 36:10 44:3
54:17 55:7 69:6 74:11
76:2 117:19

**means**
54:21 55:8 66:13 71:10,
19 72:7,15 74:9 75:24

**meant**
57:15 58:8,19

**mediation**
154:9

**medical**
98:20

**meet**
18:11

**meeting**
28:8,12 29:12,21,23

30:1,5,9,13 31:2,6 33:8
39:20 41:7 57:4 62:23
63:3,12,15,24,25 64:3,
6,11 69:9 126:18,20,22,
25 153:16,17

**meetings**
57:13 58:10 63:14,18,
21 64:7 69:4 127:8

**member**
39:7

**members**
8:7,8,21,23 11:17 26:6,
9 28:5,7 41:25 42:5,6,
12 43:11,24 44:4,5 75:1
76:3 115:11 116:16,17
134:9

**Members'**
74:6,23

**memories**
40:20,23

**memory**
40:4

**mental**
149:2,4

**mention**
137:12

**mentioned**
12:23 15:11 19:22
44:19 51:19 55:15 61:7
67:18 125:13 126:14
135:5 150:19

**meso**
117:8,10

**mesothelioma**
13:7 98:3,6 160:6,25

**met**
62:21 68:8 125:18,19
126:14

**Michael**
6:14 71:15 91:20
150:14

**microphone**
155:13

**Mike**
21:21

**miles**
110:6,16

**million**
111:3,5 116:15

**millions**
111:1

**mind**
50:6 149:9

**Mines**
99:21

**minute**
70:15

**minutes**
81:17

**misleading**
74:24

**misrepresentation**
43:8

**misrepresentations**
60:23 89:2,7

**mistake**
45:20

**mistaken**
66:16

**Moddrell**
112:12

**Moeller**
158:4

**Mogul**
99:23

**mom**
11:16 14:15 26:5 47:15
56:23 61:25 102:18
106:12,13 110:20
123:17 129:15 138:11
144:17

**mom's**
35:14 104:13

**monetary**
42:20 76:6,21

**money**
13:4,15,18,25 14:1
17:2,5,8,11,17 26:2,4
34:22 35:1,9,21 36:11,
21 37:10,13 38:1,6
39:15 41:25 42:7,10,12,
19 43:12,25 44:10 45:4,
21 46:5,19 47:2,22

**million**
49:4,12,22 50:1,13,20,
25 51:6 66:14,17,19
75:13,15,17,21 76:1
77:14 103:13 106:18
116:13,19 117:9,10
118:14 120:5

**monitor**
6:8

**months**
98:12 99:8 152:18

**morning**
7:24,25

**mother**
8:6 9:1,3,4 10:18 11:3,
18,20,24 12:14,15
14:18,20,22,24 15:1,5
16:5,15 25:7 26:9 44:24
45:4,19 46:17 48:14
51:13 57:11 58:10 77:3
78:19 98:3 100:13
103:22 121:22 135:21
141:10 160:5,20

**mother's**
12:8,12,23 13:15 24:24
40:8 55:19 67:7 75:25
76:14 77:15,22 78:20
79:24 90:6 99:13 114:2
136:20 158:16 161:13

**Motions**
109:23

**multiple**
20:9,10

---

**N**

**name**
8:10 101:9 121:13,22
136:15 157:9 158:11,12
159:23

**name's**
159:20

**named**
45:19 88:21 125:17
126:9

**names**
28:10 29:22

**naming**
53:10 56:11 114:17

**narrative**
137:2

**nature**
23:11

**nay**
87:24

**Neal**
87:1,3

**nearly**
114:19

**necessarily**
87:3

**need**
50:3,5 54:5 71:12 118:8
131:14 155:16

**needs**
46:5

**negotiated**
56:20

**negotiating**
35:8 53:14,21 55:6
70:22

**neither**
127:23

**never**
36:19 37:7,15 44:14,17
50:18 94:9 115:19,25
116:18,20 117:11
118:2,3,11 120:24
139:4 154:1

**new**
6:6 92:14,15 114:20
127:3,5,20 129:17
132:16 141:15

**night**
154:25

**nominal**
61:18

**normal**
151:24 152:4

**note**
85:6

**notes**
31:6,7,8,21,25 32:2,4,6,
15 33:7 69:3,5,7,11,13,
16 126:16,18 147:24

**notice**
127:1

**noticed**
114:15

**November**
53:5 56:23 57:9 95:12
96:9 98:11 141:9 142:3
143:21

**number**
6:7 20:11,21 49:8 68:21
83:18 99:14 137:1
139:16,17

**numerous**
47:13 114:16 155:2

---

**O**

**object**
107:16,22,23

**objection**
13:20 17:13 20:22
21:13 22:12 25:8 27:4
28:15 35:10 36:7,24
37:1 38:2,10,25 39:18
42:2,13 43:13 44:1,11
45:9 47:25 49:5 54:9,
14,16 60:4 65:18 71:24
72:12 76:19 77:17 79:7
89:18 90:15,24 104:6
105:10 106:21 107:9,20
115:5 116:1,5 117:13
119:25 130:17,20,22
144:18 147:9 148:19
152:6 154:4

**objections**
21:23 83:11 130:20
144:22 159:4

**obligations**
8:4

**obtain**
70:24 101:14

**obviously**
98:24 114:22 158:22,25

**occur**
14:12 29:23

**occurred**
131:15

**October**

87:22

**offer**
36:6 140:10

**offered**
34:22 35:1 36:1 38:16,
19,22

**offers**
66:6

**office**
18:20 24:3 28:8 62:22
63:5 68:9 69:2 126:24
133:10 138:16 162:12

**offices**
127:2

**oh**
40:17 71:14 83:14 95:1
96:5 109:16 114:12
121:19 124:6 129:18
151:17 155:14 158:1

**Ohio**
9:4 88:19 142:18 158:6

**Ohio-venued**
88:20

**okay**
9:24 12:6,8,11 13:2
16:12,13,14 17:1,5,16,
20 18:15,17 20:19,21
21:1 24:9,16 31:22,24
32:13 33:12 37:2,4,5,17
41:20,23 42:9 44:6
46:16 47:16,20 48:21,
24 49:1,19,25 50:12,16
51:11,15 52:21,24 53:2,
3 54:3,10 55:1,12,25
57:3,25 58:6 59:14
60:21 62:23 64:5 65:20
66:23 67:10,11,13,25
68:3,23 69:1 70:2,8,9,
11,14,16,18,19 72:17
74:4,17,19 75:12 76:16
79:15 81:1,5 82:2,7,21
83:18 84:21 85:14,21,
25 86:23 87:4,23,25
88:9,18 90:2,13 92:12
93:1,7 94:11 95:2,4,6,9,
10 96:9 97:3 98:16,17
99:6,11 100:16,18
101:5,7 103:1,10,11,24,
25 104:4,11,18 105:1,3,
13 107:2,14 109:13,15,
16,21 110:3,5,12

111:15,16,17,23 112:2,
3,17 113:20 114:12,13
115:16,22 116:25 117:7
118:10,20,23,24 119:8,
22 120:19 121:5,10,19
122:4,6,7,9,25 123:8
124:5,7 125:7 126:20
127:8 128:10,11,13,14,
20,25 129:5,18 130:8
131:5,8 132:7,12,22
136:9,11,24 137:13
139:13,21 140:13
141:12,20 142:9,11,25
144:3 145:7 146:13
148:15,18 149:25 151:7
153:15,23 157:10,13
158:1,11,14 159:9,15
160:3,13 161:11

**omissions**
60:23 89:3,8

**once**
27:15 54:19 55:13 56:4
71:12 91:17 92:13
144:19 147:10

**ones**
151:4 162:10

**open**
67:16 155:5 158:22

**operator**
6:10

**opinion**
41:1

**opportunity**
36:20

**opposed**
98:8

**order**
20:12 21:6 66:8 69:16
94:23 95:7 133:15
145:16

**originally**
157:2

**outlining**
19:15

**outside**
133:22

**owed**
80:18

**Owens**
141:22 142:2

**owes**
45:20

---

**P**

**p.m.**
163:20

**page**
62:8 73:8 74:2 88:11,12
96:11,17 102:6 105:24
106:7 108:21 109:6
110:4,11,24 111:24
112:18 114:8 119:5
120:8,11 121:6,8
136:24 137:3,21

**paid**
95:21 105:25 106:9,16
115:11 132:23

**paper**
68:19

**papers**
62:16 111:22

**paragraph**
52:24 53:4 55:10,18
56:1,3,17,22 57:6,22,24
58:23 59:13 62:8 64:19
66:17 70:11,20 73:7
74:3,17 83:9 84:1 88:8,
9 98:19 114:14 137:1

**paralegals**
147:20

**Pardon**
31:15

**part**
54:24 55:2 61:18 72:25
115:4 116:3 120:3
121:25 123:15

**participate**
70:25 73:16,21

**participated**
72:22,24

**particles**
113:17

**particular**
11:15 19:19 25:19 26:6
34:19 35:3 39:3,11

40:10 47:6 56:9 57:1,14
58:9,23 79:10 80:7
93:16 104:13 116:8
117:16,22,23 128:22
129:12,22 140:10
146:21,22,23 153:21,25

**particularly**
61:3 64:22 78:2

**parties**
133:22 147:14

**party**
44:16 57:12 102:24
137:2 138:1

**party's**
137:4

**passed**
67:11 102:18 123:17,24

**passing**
104:13

**pause**
54:5

**pay**
35:16 46:5 49:22 50:19,
24 79:5 103:18

**payable**
108:6

**paying**
49:11 103:13

**payment**
136:13

**Pease**
73:12

**pecuniary**
75:2,12,13 76:6

**pending**
23:7 91:5

**Pennsylvania**
127:3

**people**
27:1,14 28:6 29:12
43:20 46:12 50:13
63:21 64:2,7 66:24 77:2
115:2,10,18,19,24
116:3,17 117:1,11
118:2,11

**percent**

94:6,7

**person**
28:22 50:16,17,18,19
56:21 57:6,8 59:7 60:2,
7 66:1 73:24 84:16 85:1
102:21 122:1 147:4

**personal**
12:18,20 14:25 15:2
26:16,17,22,25 28:19
31:7,21,25 32:2 62:6,7
65:8 83:11 84:2,8,9,14,
16 86:14,23 87:6 89:23
90:1 139:24 142:2,7
156:7,12,14,16,21
157:4,14,17,18,23
161:9

**personally**
11:8 24:20 29:20 33:4
56:14 59:24 60:11 66:2
75:18 94:5 104:3 161:5

**persons**
51:9 83:22

**Peter**
6:21 7:5 156:4,17,24
157:19

**phone**
126:21 147:4 150:16
153:16,18

**phrase**
47:9 70:21 71:9

**phrasing**
50:7

**pile**
116:13

**pipe**
110:16 137:7

**pipes**
110:7

**piping**
77:3

**place**
30:13 45:3

**Placitella**
6:17,18 30:8,11,17 33:9
36:10 37:25 38:8 62:24
63:3 64:11 69:22 86:3
115:2 124:19 126:15,23
127:15 130:10 132:11,

13 133:9 161:25 162:7,
11,16,20,23 163:1,5,12

**Placitella's**
19:1 30:9 93:14 94:2
127:2

**plaintiff**
9:6 25:15 46:6 53:6
61:17 62:9 64:20,25
66:5,11 73:12,13,14
81:13,22 83:11 84:2
160:1

**Plaintiff's**
64:20

**plaintiffs**
6:14,18 8:15 14:15,18
29:19 39:6 65:9 72:20,
21 74:25 76:3 78:14
87:19 88:21 96:24 97:3,
9 98:23 101:15,17
102:6 108:8,23 114:20
116:8 125:17 126:9
162:6,10

**plaintiffs'**
74:5 88:1 93:18 109:23

**plant**
110:6,15 112:8 119:11,
24

**pleadings**
41:2

**Pleas**
53:8 58:1 109:1

**please**
6:11 7:8 21:23 27:10
49:16 50:12 52:25 54:2
56:8 70:1 71:14 72:4
87:17 89:25 92:6,9
98:21 101:9,22 113:10

**plenty**
159:3

**Plibrico**
141:14

**point**
14:10 60:1 85:19 112:3
159:7

**pointing**
56:10

**portion**
66:6 92:11

**position**
149:11

**possesses**
83:11 84:2

**possession**
150:24

**possibility**
25:15 37:8

**possibly**
128:19 129:6

**potential**
87:2

**potentially**
53:13,20 55:5

**pounds**
111:1,3,5

**Powerpoint**
30:23

**practice**
53:11,18 55:3 56:2,12,
15,18 57:16 59:16
151:25 152:4

**practices**
57:19 58:3 59:1,20,24
60:3,8,17,18 118:4

**predecessor**
53:9 54:23

**predecessors**
61:22

**predecessors'**
71:2

**prefer**
42:12,15

**preparation**
18:17,22 41:14,17,21
51:21

**prepare**
40:19 41:5 101:25

**prepared**
18:8 82:3 158:23

**present**
6:16 10:1 18:13,15,16
28:9 39:21 127:9,10

**presentation**
30:17,21,23

**presented**
12:17 46:3 129:13

**presently**
96:8

**pretty**
69:15 133:2 140:14

**previous**
25:24

**previously**
96:23 105:25 106:8
114:18 163:4

**prior**
28:13 29:13 67:9 82:12
104:12 125:18 135:22

**privilege**
21:22 22:10,14 27:23
29:8 90:19,20 91:2,18,
22 92:14,16 131:2,4,10,
12,14 154:16

**privileged**
22:22 91:20

**privy**
12:7 26:19 36:17 37:21
39:7,10 57:2

**probabilities**
47:5

**probably**
29:20 52:7 128:17
133:5 136:22 151:2
153:17

**probate**
67:17 135:14 142:17
145:16

**problem**
66:18

**Procedure**
7:19

**proceeding**
75:5

**proceedings**
127:6

**process**
83:19 140:5

**processes**
149:3,5 150:10

**produce**
132:6

**produced**
124:20 125:2,3,16,22
127:24 132:4 144:15
147:7

**product**
26:8,9,11,12,14 45:3
53:13,20 55:5 79:19,20
144:15,17 147:7 150:2

**products**
11:4,6 45:18 60:24
64:23 121:14,15 148:8
161:7

**proffered**
142:18

**program**
55:4 57:17

**programs**
53:12,19 56:19 59:17

**prohibiting**
24:18 93:8

**project**
110:14

**prompt**
54:7

**proof**
48:12

**proposed**
154:1

**prosecute**
84:25

**prosecuting**
75:8

**prove**
75:8

**provide**
89:16 91:15

**provided**
24:4 114:18

**providing**
90:24

**proximate**
74:19

**purchased**

110:25 111:3

**purely**
87:6

**pursuant**
7:18

**pursuing**
95:18

**put**
7:10 26:24 29:8 47:11
62:17 87:16 107:11
108:11 116:24 125:8
126:8 140:15 153:12

**putting**
69:8 71:23 72:12

---

**Q**

**qualified**
46:13

**question**
13:13,24 16:11 17:19
27:9 29:10 32:12 43:19
44:6 45:12 46:8,9,11
47:4,5,7,11 48:1,9,22
49:17,18,23,25 50:4,6,
8,9,22 54:1,3 58:4,23
59:23 71:20 72:2,5
75:20 83:13 90:18 92:4,
6,10 107:11 116:23
119:9,12,15 120:16,19,
21 124:24 137:24
138:25 144:25 145:4
146:19 150:6 156:10,19

**questioning**
154:23 155:4

**questions**
54:8 58:8,19 117:19
148:7,10,25 150:2,9
155:9,11 156:2 158:1,
19,22 159:1,14 161:18,
19,22 163:16

**quickly**
140:15

**quite**
68:19

**quo**
66:9

**R**

**R.T.**
10:19 100:4,6 103:6
104:1 108:14,15

**raising**
132:9

**raw**
111:1,3,5 113:14
119:15,16 137:7

**read**
9:25 10:1 55:22 58:18
66:16 88:17 92:5,9,11
101:10

**reads**
83:9

**real**
119:10,23

**really**
17:12,18 20:18 24:15
31:5 32:9 48:4 49:7,9
58:4 93:23 116:22,23
118:6 126:6 129:10
139:17 161:17

**reason**
13:10,18 14:2 22:11,15
46:25 49:10 91:14
97:25 107:16,22,23
120:3 124:19 137:18

**reasonable**
36:1

**reasonably**
60:22 71:1

**reasons**
22:18 79:25 133:20
161:24

**recall**
10:3,5,6,9,12,13,14,16
19:2,4,16 24:20 29:17
30:12 49:7,9 63:17
64:9,10 66:3 67:4 79:22
87:21 93:16 103:16
129:11,12,19 131:22
132:19,20,24 133:4
136:19 138:24 141:3
151:19,20,21 153:18
160:4,11 163:6

**receive**
35:20 36:22 37:10
47:22 68:22 70:5 154:3
162:3

**received**
21:1,11 33:6 39:24
40:16 41:12 66:20
67:18,21 68:8,21 127:1
133:16 139:4 140:12
154:24,25

**receiving**
27:25 41:25 61:20 69:2

**recess**
85:9 122:14 155:22

**recognize**
11:12 51:22 95:15
140:2 141:2,17 145:10,
13,17,22 146:1,5,9

**recollect**
128:18 132:2

**recollection**
62:20 93:13 101:6
102:12,16 113:20,24
121:21 129:21 131:22

**recommend**
70:23

**recommendation**
147:20

**recommended**
107:5

**record**
6:2 54:15,16 71:24
72:13 85:7,11 92:11
99:10 113:12 122:11,
12,16 151:12 155:20,24
162:1 163:19

**recorded**
6:3

**records**
98:20 106:8 151:2,3,15,
18,21,24,25 152:3

**recover**
120:4 129:24

**recovered**
134:19

**recovery**
130:3,13

**refer**
57:23 121:6

**reference**
96:18

**referenced**
56:3 60:3 69:3

**references**
111:22

**referred**
14:10 120:23 157:12
158:15

**referring**
56:10 96:2

**refresh**
40:4,20 101:5 102:12,
15 113:20,24 121:21

**refreshed**
40:23

**regard**
35:13 132:20 148:11

**regarding**
15:4 18:21 25:6,21
33:21,25 52:8 56:18
57:1 60:24 84:10,12
92:21 98:17 109:11
123:3,5 131:16,25
135:12 142:18 146:25
149:8,11,16 150:10
154:8 161:12

**Reindel**
7:5 156:3,13 157:16

**reiterate**
127:17

**relate**
32:10,16

**related**
161:13

**relating**
32:7 40:8,10,11 64:14
74:22 140:24 160:17

**relation**
146:20

**relationship**
19:5,7,9,23 28:13 90:5
104:15 132:16

**relationships**

29:13

**release**
101:8,13 105:22 106:5
139:24 140:12,24
141:22

**releases**
23:25 24:5,6 101:21
106:3

**relevance**
22:25 23:3

**relevant**
35:12 69:18 80:17

**relied**
71:1 86:10

**relies**
27:6,17 28:17 53:25
56:6 72:1

**rely**
49:24 60:15 146:16,19

**relying**
15:7 60:22 89:20

**remember**
28:9 29:22 40:5 63:11
66:21,22 78:3 82:24
87:24 103:11 104:24
108:12,15,16 109:17
115:12 139:7

**removal**
110:15

**remove**
112:20,23

**rep**
33:8 91:15 118:1

**repeat**
13:24 29:10 38:4 45:12
47:9 50:9

**replace**
75:6

**reporter**
7:7,8 92:5

**represent**
6:12 8:6 9:6 98:14
159:20

**representation**
14:3,12,14,17 15:15
26:7 42:21,22,24

**representations**
14:5,25 15:18,19,20,25 25:6 61:8 71:3 88:23 91:9

**representative**
8:1,5 11:9 18:3,4,5 19:6 24:22,23 26:1 28:2 31:3 34:25 35:6 37:17 39:9 41:15,24 43:22 57:22 60:1 61:2,15 67:6 88:21 91:12 94:4 114:25 115:24 116:12 117:21, 22

**representatives**
28:11 34:3 38:6 63:23 64:3 69:4 127:9,14

**represented**
14:7,9 19:2,21 28:22 29:7 73:4 88:20 114:20

**representing**
6:14 31:4 36:15

**represents**
20:1

**reps**
63:25 64:8

**request**
83:12 84:3 86:5 127:18

**requested**
92:11 152:13

**requirement**
127:20

**reserve**
161:23

**reserved**
163:21

**reside**
158:9

**residences**
86:21,25

**resides**
158:10

**resolution**
141:5

**resolve**
98:22 99:7

**resolved**

147:17 149:15 150:12

**respect**
10:17 31:24 37:6 58:12 67:5 76:11 86:17 129:16 153:24 156:10 157:13 163:14

**respond**
27:10,20 28:20 43:14, 16 56:8 72:4 77:19 79:8 89:25 92:8 133:25

**responding**
86:12 153:7

**response**
84:1 85:15

**responses**
83:3 109:23

**responsible**
49:21 53:13,20 55:5 67:14

**responsive**
83:12 84:3

**rest**
140:13

**restored**
66:9

**result**
89:1

**retained**
160:16,20,24

**retaining**
144:22

**retired**
160:12,13

**return**
66:6,13

**returned**
66:17

**reveal**
54:4

**revealing**
27:9,11,19 29:9 30:16 34:9 54:2 56:8 72:3 89:24 92:23

**review**
40:2,6 41:20 51:24 57:19 58:21 60:13

69:23 70:7,15 82:8,9 85:19 122:23 124:9 140:8 152:11,23 153:5 157:9

**reviewed**
41:5,16,18 51:20,21 55:9,15 58:7 69:20 82:11 83:22 93:18 126:7 136:3 151:5,6 152:13 157:11

**reviewing**
58:12 60:13

**revise**
101:9

**rife**
117:5

**right**
9:22 16:7,16,18 19:8 20:17 25:4 30:22 32:21 37:18,20 42:10 43:1,2, 11,20 52:9,11,13 58:15, 17 60:20 68:7 70:10,20 73:9 74:2 76:4 77:5,7 78:7,8,9,11,13,15,17 80:3,14 81:3,7,8,12 86:8 87:4 88:2,4,6 90:7 95:11,12 99:9 102:12 104:1 105:16,20 107:2 108:13 110:11 111:14 112:5,6 114:11 117:3,6 119:17 121:18 123:10, 18 131:21 133:13 136:10,25 140:13,17, 19,21 141:12 142:21 151:9 161:18 162:7,20

**Robert**
112:11

**role**
11:9 41:23 43:21 160:1

**room**
39:21

**roughly**
98:12 139:13

**Rule**
87:19

**ruled**
159:4

**rules**
7:18 22:5,9,15

**run**
150:3

---

**S**

**Sam**
96:14 105:14,21

**Sarah**
7:7

**savvy**
133:2

**saw**
82:3 133:17 157:9

**saying**
10:12 12:1,2 24:25 29:3 115:17 116:7 117:23 130:6 151:19 152:12

**says**
58:1 59:15 60:21 61:14, 16 65:9 66:5 73:8 74:5, 12,19 76:3 84:2 88:13 96:21 98:18 102:9 105:24 106:7,10,15 108:5,10,21 110:3 111:9 112:17,23 114:14 115:21 120:13 121:11 131:19 137:6,18,19,24 138:4

**scheme**
62:11,19 63:2

**scope**
133:24

**search**
32:14

**second**
12:10,21 51:18 54:24 55:2 58:13 83:9 84:1 96:17 102:5 109:7 114:8,14

**see**
32:15 46:9,10 47:3,11 53:16 58:22 61:5 62:14 65:2,11 71:4 73:9,18 74:7 75:10 77:2 80:17 81:8,25 82:2,5 83:24 84:4 85:17 88:15 89:11 96:5,15,18,19 97:1,9, 11,14 99:2,15,18,25 100:2,4,10,14,24 101:5,

19 102:3,7,10 104:24
106:10,16,17 109:1,3
110:11,18 111:7,12
112:8,15 113:2,18
114:23,24 115:20
116:22 117:20 118:6
119:20 120:25 121:16
123:12 124:13 126:2
128:2 133:6 136:16
137:10 138:2,5 139:25
140:3 142:4,12 143:4,
13,17,21,25 144:5,10
146:12 160:3 162:4,6

**seeing**
132:24 136:19 159:25

**seeking**
13:14,18,25 14:1,6
16:1,8,14,19,23

**seen**
87:20 101:1 136:18

**sent**
123:16 162:1,2,14,24
163:1,4

**sentence**
53:5 54:17 56:17 57:6
60:21 61:12,16,23
64:19 66:5 70:22

**separate**
93:20 137:3

**separately**
108:25

**September**
136:13 141:19

**serve**
101:25

**service**
82:6

**set**
22:19 61:3 81:23
109:17

**settle**
35:1,3,8 36:21 37:8,9
38:23 39:15 77:9 83:20
147:1,21

**settled**
38:7 66:3 72:25 77:6,
10,16,23,25 78:20,24
79:17,24,25 80:13
84:10 85:3 106:8 114:1

135:5 139:17 148:2

**settlement**
34:13,16,18 36:1,6
37:13 39:4 43:23 53:12,
19 55:4 56:19 57:17
59:17 61:19,25 64:24
65:5 66:7,9 71:10 72:15
73:1,17,22 100:22
102:20 105:19 107:5,
14,24 108:5,10,22
123:4 125:10 133:22
141:15,16 142:19
143:2,7,16,20,24 144:9,
12,13 145:9,17,21,25
146:4,8,21,22,23,24
147:6 149:8 153:9,19,
24 161:16

**settlements**
23:8,11,12 24:4,19
35:13 38:15,17 59:1
66:24 70:23 72:19,23
73:5 78:6 133:13,23
134:6,10,11 144:20,21
146:15,17,20 147:10,14
149:12,16 150:10,19
154:2

**settling**
66:23 76:25 78:12 79:2
101:16 102:2,13 107:16
109:17 148:6,9

**seven**
102:1,13,20 103:8,21
104:19,23 109:18
111:3,5 112:19 114:1
123:4 125:10

**severity**
98:2

**short**
94:23

**shouldn't**
118:13

**show**
30:25 39:23 47:1 78:19
81:2 109:7,10 123:1
134:25 136:7

**showing**
51:17 103:4 113:13

**shown**
41:8

**sign**
23:23 24:5 82:13 85:23

**signature**
163:21

**signed**
23:24 24:1 83:2 140:4
142:14

**significant**
113:16 137:4

**signing**
82:24 140:6

**similarly**
73:14 74:12

**sisters**
124:4 158:10

**sit**
10:14 16:25 17:20 18:6
36:19 37:7 39:13 77:13
91:12 105:3 107:15
130:9 135:16 153:20

**situated**
73:15

**situation**
115:23 150:4

**six**
125:17

**Sloane**
7:5 156:4,17,24 157:5,
20

**Sloane's**
157:8

**slow**
39:19

**soapstone**
120:14 121:15

**Soapstone/talc**
112:7

**somebody**
13:3 38:19 44:7 50:23
59:7 61:11 80:18 91:13
117:7 124:8

**somebody's**
29:7

**soon**
101:21 133:11

**sorry**
39:19 83:15,16 88:11
119:3,5 124:25 143:12
145:3 150:17

**sort**
68:24 78:4

**sorted**
130:16 134:1

**sought**
20:5

**sound**
20:17

**source**
15:7

**Southern**
103:7 105:4,7 108:16
109:11 112:21,24
113:4,7,15,21,25 114:4
117:4

**Southern's**
117:2

**speak**
18:21 150:15

**speaking**
21:23 22:12 130:19

**specific**
37:10 39:15 62:17
148:7,10 150:2 151:20

**specifically**
9:19 30:19 63:19 64:16,
18 66:2 68:4 101:18
108:10

**specification**
112:19

**speculate**
161:9

**speculation**
46:7

**speculative**
47:3 48:11

**spelled**
158:4

**spite**
60:13

**spoke**
18:19 25:20

**spoken**
18:18 28:6

**spoliation**
64:21 74:13 75:9

**spot**
81:15

**spouses**
108:23

**St**
108:17

**staff**
152:14

**Standard**
101:11

**start**
33:7 48:10 76:11 83:8,
17 123:9 155:13

**started**
93:12

**starts**
56:22

**state**
30:6 54:15

**stated**
22:11 39:2 42:17

**statement**
121:7 137:2 138:15

**statements**
16:20 17:9,23 74:24
89:3,8

**states**
6:5 113:14 137:1

**stating**
54:11

**status**
66:9

**steam**
110:7

**step**
58:5

**stipulate**
121:12

**stipulated**
121:11

**stipulating**
129:5

**stop**
71:16 72:9

**stops**
48:9

**Subject**
83:10 88:17

**submission**
82:12 92:17

**submissions**
22:19 135:17

**submitted**
23:15 135:22 138:20

**substance**
32:18 64:12

**substantive**
47:8

**succinctly**
22:11

**sued**
46:4 47:23 48:7 49:20
50:23 65:15 139:16

**suffered**
75:14,18

**suggesting**
72:9

**sum**
35:9 36:21 37:9,11
39:15

**Summary**
109:24

**summer**
39:15

**Summit**
142:17

**supplied**
113:15,22

**supplier**
61:19 112:25 121:14

**suppliers**
53:14,21

**supposed**
7:10 152:18

**supposition**
39:2 117:19

**sure**
13:25 16:4 20:11,16,24
21:5 24:2 29:11 32:19
36:14 38:5 45:13 50:11
63:17,24 64:13 69:6
75:24 86:3 87:21 93:23
124:3 137:17 138:10,11
139:12 155:18 157:3
160:22,23

**surprise**
107:8

**surprised**
107:3,12,13

**surrounding**
65:5

**swear**
7:8

**sworn**
7:19

**system**
32:20 68:24 69:5,13

---

**T**

**T-a-l-c**
120:23

**take**
30:13 31:6 35:21 38:17
51:6 65:25 70:15 81:17,
19 85:6 94:11 123:21
125:24 155:17 157:22

**taken**
19:4 65:1,6,9 85:9 89:1
122:14 155:22

**takes**
90:21

**talc**
9:8,16 10:7,10,11,15
11:13,14,18,24 12:1,3,
14,24 13:2 14:8 15:1
25:6 44:8,15 46:18,22
60:24 61:1,19 64:23
77:23 78:1,20,21 79:1,
4,5,6 80:3,9,14,18,21,
24 89:4,5,9,10 96:25
97:4 98:14,22 99:3
100:10,22 101:12

102:1,13,20 103:5,7,8,
12,13,14,15,17,21
104:2,19 105:4,7,8,19
106:15,18,19 107:6,7,
16,17,24 108:11,12,16,
18 109:11,14,18,20,21
111:21 112:13,19,21,
22,24,25 113:4,5,6,15,
16,22,23,25 114:4,5,22
115:3,4,18,20,25 116:9,
10,18,20 117:2,4,7,11,
18 118:2,3,11,12
120:14,16,23 121:23
125:10 137:12 149:23

**Talc/soapstone**
111:9 112:9

**talcum**
120:15,20

**talk**
50:3,5 53:4 57:17,24
59:7 60:6,7 87:13
102:22 122:1 126:12
135:4 140:7,9

**talked**
42:24 84:6 86:21 93:11
115:10 156:5

**talking**
25:24 43:19,21 46:11
50:2 59:9,11 75:22,23
96:8 107:13 117:24
120:20,21 150:15

**talks**
55:10 110:24

**tanks**
110:8

**telephone**
7:14

**tell**
9:15,19 31:17 64:13
127:20 133:15 134:18
140:5 151:25 152:4
158:2

**tells**
35:15

**term**
72:14 78:5

**terms**
11:9 12:22 15:11,23
27:1 28:5 34:22 41:23

42:9 51:5 57:20 68:10
75:25 79:15 86:8,12
97:23 102:19 128:21
130:12 132:15 146:15
153:19

**testified**
7:20 10:3 76:24 112:13

**testify**
93:3

**testifying**
93:8

**testimony**
122:20

**thank**
101:8 124:11 159:10

**Thanks**
155:19

**there's**
20:9 35:15 45:16 59:16
70:21 71:18,20 80:25
96:18 98:12 113:4,5
125:17 137:12

**they're**
8:22 36:14 45:24 69:12
70:6 81:12 95:3 117:17
124:2,3 129:6

**thing**
35:24 78:4 84:22

**things**
40:5 42:9 86:25 126:1
129:25 149:9

**think**
9:8 11:3,6 13:9,12,14
17:25 19:4 28:10 33:4
35:7 37:21,24 38:5
42:11,17 43:11,18
44:10 45:7,11,20,25
46:4,12,18,20 47:3,21
49:10 50:13,15,19 51:2,
19 59:6 61:7 70:4,6,9
76:13 78:25 79:2 80:21,
22,24 81:12,16 84:6,22
86:6 89:13 90:11 91:14
95:1,3,25 97:19 107:15,
19,23 114:1 115:2
116:17 117:9 118:1,4
124:2,3 126:7 129:14
130:15 136:7 157:11
158:15 159:25 160:24

**thinking**
50:7

**Thomas**
7:11 61:3,15 88:13
159:20,23

**thought**
75:20 150:9

**thousand**
148:2

**three**
20:12 21:6 28:10 40:18,
23 41:11,18,19 51:20
98:12 99:8

**time**
6:8 18:16 25:20 41:12
58:18 62:1 63:1,15
67:14,16 68:23 75:22
80:8,10 82:4 85:8,11
90:20 111:2 122:3,13,
16 127:1 142:24
146:21,22,23 155:21,24
158:19 160:10 161:2,
19,23

**times**
68:22

**timing**
126:1

**Tire**
97:12

**today**
6:10,16 7:7 10:14 16:25
17:21 18:6,18 36:19
37:7 39:13 40:20 77:13
91:12 105:3 107:15
130:9 135:16 152:21
153:7,20 154:23 155:2,
5 158:20 163:17

**today's**
6:9 41:6

**told**
9:20 11:13,14,15,18,22,
24 12:1,24 13:2 25:14
26:21 33:2 34:16,21,25
64:16,17 79:11 80:1
89:15 154:1

**Tom**
19:3,21 56:25 62:13
101:21 114:14 136:15

**top**
31:17 123:4 134:21

**topic**
65:7 126:25

**topics**
155:6

**total**
101:16 102:14 107:7

**totally**
21:19

**track**
162:12

**Travelers**
140:25

**tremolite**
113:17

**trial**
65:1,6,10,16,21,23,25
66:4

**trouble**
115:16

**true**
15:5,13 16:17,21,22
33:13 47:14 84:15
89:13 91:11 98:10
135:19,25 136:4
138:17,19

**trust**
23:17 24:1,3 90:9 108:6
133:23 135:18 139:11,
24 141:14,23 142:3,8

**Trustee**
108:17

**trusts**
23:15 135:4,6,13,22
138:21 139:1,13

**Truth**
23:21

**truthful**
23:19,20,21 26:7,10,13

**try**
54:7 90:2 91:6 94:22
95:7 150:18

**trying**
49:15 109:19 149:7
152:25 154:6

**Tunis**
7:9,11 159:13,17,20
162:14 163:13

**turn**
52:24 60:21 73:7 74:2,
17 88:7 96:17 100:17
102:5 103:1 105:12
108:3 109:22 110:3
113:8,9,11 119:5 120:8
121:6 133:13 136:24
137:21

**Turning**
62:8 64:19 114:8

**two**
21:6 30:15 63:4,6,18
79:1 102:17 148:1
155:1

**typical**
74:5

---

**U**

**Uh-huh**
47:17 53:1 63:9 73:10
76:10 83:25 85:22
88:14 96:10 99:5,22,24
101:24 105:18 106:14
109:5 110:2 112:4
116:14 120:12 124:12,
15,17 136:14 140:1
141:1 142:5,21 143:14
157:1 159:11

**Uh-uh**
87:5

**underlying**
55:18 61:24 64:15
68:11 74:23 75:4 76:8,
12 79:15 83:21 84:10,
11,12,24 87:9 91:8
108:1 126:6

**understand**
8:1 9:20 23:17 32:12
39:3 48:2 55:23,24 56:1
58:3 97:22 127:19
128:23 129:1 130:6
135:16

**understanding**
8:4 19:17,19 45:14 47:7
48:3,20 50:21 59:22
71:9 77:8,10 78:23

79:21 80:6 97:25
102:19 108:1 115:1,16
128:9,20,22 129:23
132:22 149:20,24,25

**understands**
91:8

**understood**
78:5 79:16 119:22
149:18

**unequivocally**
30:7 64:10 82:25

**uninvolved**
51:13

**United**
6:5 142:7

**urge**
101:14

**use**
155:16

**useful**
82:21

**usually**
67:23

**V**

**validity**
159:4

**value**
76:21 141:16

**Vanderbilt**
10:19 100:4,6 103:6
104:2 108:15

**various**
21:19 22:19 66:24
68:10,22 120:5 146:15

**verification**
82:14,17,24 83:6 85:23
86:2 163:8,10,11

**verifications**
82:23 83:2 133:8
154:24 162:1,5,19

**versus**
6:4

**victim**
62:10 117:10

**video**
6:2,8,9

**VIDEOGRAPHER**
6:1 7:6 85:7,10 122:12,
15 155:12,20,23 163:18

**view**
53:12,19

**vis-a-vis**
24:6

**voluntarily**
61:17

**voluntary**
103:5

**W**

**W-o-o-l-r-i-d-g-e**
158:13

**wait**
159:1

**waiting**
106:3

**waiving**
83:10

**Walker**
142:24

**want**
11:10,11 22:7 26:4
38:23 42:7 45:4 47:2
49:22 50:9,24 51:4,5
61:11 91:15 94:25
109:7 116:10 121:6
153:4 163:8

**wanted**
24:13 55:23 57:15 59:5
73:24

**Ware**
73:14

**wasn't**
49:20 83:14 124:20
125:1,16

**way**
9:1 11:5,17 18:25 26:24
32:7 46:3 47:10 48:7
50:6,7 51:24 66:16,23
67:5 70:1 72:24 90:2
91:6 93:12 101:1

107:11 111:18 116:24
139:9 144:12 153:8

**we'd**
32:14

**we'll**
23:13 46:20 81:1,19
85:6 125:23 126:11
133:10

**we're**
6:1 7:10 9:23 12:19
54:24 77:2 91:2 94:22
96:7,11 107:13 109:6,
19 117:24 122:5,15
144:22 150:8 153:21
155:23 158:21,25
163:18

**we've**
91:6 127:18 152:19,20
154:25 158:23

**week**
66:4 114:15

**weeks**
100:16 102:17

**weren't**
34:23,25 64:2 115:12
158:25

**what's**
8:4 9:10 19:17 26:20
34:9,10 51:17 55:3
57:15 75:21 82:13
97:25 129:3

**White**
112:21,24

**who's**
35:16 91:13

**William**
7:4

**Williams**
6:4,15 13:9 19:10 25:16
29:18 37:6 40:11 58:12
88:5 92:22 93:22 129:9,
16 132:16 153:8,20,25
159:21

**willing**
35:16 66:6,13 93:3
127:5

**withdrawn**
9:19 14:22 18:7 27:24

28:4 34:8 36:25 38:20
39:12 48:17,19,25
50:16 52:15 57:21
58:11,24 59:12 64:5
65:13 67:5 73:3 80:10
81:21 83:16 84:8 86:11
97:19 112:22 127:12
133:1 134:16 139:9

**withholding**
74:21

**witness**
13:23 17:16 22:9,13
23:2 43:15 65:20 72:10
87:16 90:22 94:13
144:23 148:15,17
158:23 159:15

**witnesses**
87:2

**won't**
64:9 82:25

**Woolridge**
158:13

**words**
32:17 56:9 64:12

**work**
96:24 97:3 124:7

**work-product**
148:16,22 149:7

**worked**
9:4,11 44:14,17 45:4
77:4 110:20

**working**
97:15 160:10

**works**
117:7

**wouldn't**
37:23 45:6 69:19 90:14
91:15 94:7 104:8 119:4
137:15 138:10 150:3
153:14

**write**
137:2

**writing**
93:21 132:25

**written**
19:14 26:20 93:7,13
119:17 127:14,19

128:12 132:17,19
150:22

**wrong**
26:23 46:25 47:1,23
48:7 50:2,24 70:9
151:11 156:9

**wrongdoing**
156:13,17,21

———————

**Y**

———————

**yea**
87:24

**yeah**
17:16 29:25 35:4 44:14
48:18 63:9 69:7 75:16
81:16,18 95:3 100:7
118:13 128:7 130:21
131:13 148:17 151:9
154:17

**year**
82:7

**years**
30:3 31:18,20 32:21
71:7 76:25 90:3 91:14
95:19 97:14,20 112:19
117:8 120:4 133:3
134:14 151:23

**yep**
83:19 88:10 104:22
119:7

**yesterday**
18:11,19 39:20

**yet alone**
126:8

**you'd**
15:12 140:16

**you'll**
69:25

**you're**
8:1 13:10,14 15:7 16:1,
14,19 17:2 18:4 22:11
23:1 24:13 28:18 35:7
37:17 43:19 46:11,12
59:9 66:13 79:2 89:20
116:7 117:21 120:20
129:24 130:6,18,25
131:5 147:10 149:6,10
150:15 152:22,25

153:11 154:6

**you've**
32:20 36:19 37:7 47:13
49:2 50:23 65:15 66:14,
24 67:6,14,18 76:24
83:2 90:2 91:7 93:2
95:18 120:4 125:19
133:2,16 134:13,18
138:20 139:4 151:22
156:6,11,15,20