# EXHIBIT B

DONNETTE WENGERD - 04/06/2017

```
 1
              IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF NEW JERSEY

 3

 4    KIMBERLEE WILLIAMS,        )
      et al.,                    )
 5                               )
              Plaintiffs,        )
 6                               )
      vs.                        )  Case No. 11-cv-01754
 7                               )
      BASF CATALYSTS, LLC,       )
 8    et al.,                    )
                                 )
 9            Defendants.        )

10

11                        - - - - -
12     THE VIDEO RECORDED DEPOSITION OF DONNETTE WENGERD
                    THURSDAY, APRIL 6, 2017
13                        - - - - -

14

15

16         The video recorded deposition of DONNETTE

17    WENGERD, called by the Defendants for examination

18    pursuant to the Ohio Rules of Civil Procedure, taken

19    before me, the undersigned, Jill A. Kulewsky, RPR

20    and Notary Public within and for the State of Ohio,

21    taken at the offices of Thompson Hine, LLP, 3900 Key

22    Tower, 127 Public Square, Cleveland, Ohio,

23    commencing at 9:44 a.m., the day and date above set

24    forth.

25
```

```
 1    APPEARANCES:

 2
              On behalf of the Plaintiffs:
 3
                    Michael Coren, Esq.
 4                  Jared Placitella, Esq.
                    Cohen, Placitella & Roth, P.C.
 5                  Two Commerce Square
                    2001 Market Street, Suite 2900
 6                  Philadelphia, PA   19103
                    (215) 567-3500
 7                  mcoren@cprlaw.com
                    jplacitella@cprlaw.com
 8

 9            On behalf of the Defendant BASF Catalysts, LLC:

10                  Peter A. Farrell, Esq.
                    Elizabeth Dalmut, Esq.
11                  Kirkland & Ellis, LLP
                    655 Fifteenth Street, N.W.
12                  Washington, D.C.   20005
                    (202) 879-5959
13                  peter.farrell@kirkland.com
                    elizabeth.dalmut&kirkland.com
14

15             On behalf of the Defendant Cahill, Gordon
               & Reindel, LLP:
16
                    Grant A. Geyerman, Esq.
17                  Williams & Connolly, LLP
                    725 Twelfth Street, N.W.
18                  Washington, D.C.   20005
                    (202) 434-5833
19                  ggeyerman@wc.com

20
               On behalf of the Defendant Thomas D.
21             Halket (via telephone):

22                  Eric Tunis, Esq.
                    Herold Law, P.A.
23                  25 Independence Boulevard
                    Warren, NJ   07059
24                  (908) 647-1022
                    etunis@heroldlaw.com
25
```

```
 1   APPEARANCES, continued:

 2
             On behalf of the Defendant Arthur
 3           Dornbusch (via telephone):

 4                 John A. Boyle, Esq.
                   Marino, Tortorella & Boyle, P.C.
 5                 437 Southern Boulevard
                   Chatham, NJ  07928
 6                 (973) 824-9300
                   Jboyle@khmarino.com
 7

 8   ALSO PRESENT:
          Alex Cook, Videographer
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    TRANSCRIPT INDEX

 2    EXAMINATION OF DONNETTE WENGERD:
        By Mr. Farrell.............................   8
 3      By Mr. Geyerman...........................  142
        By Mr. Tunis..............................  185
 4
      EXHIBIT CUSTODY
 5    EXHIBITS RETAINED BY COURT REPORTER

 6                  INDEX OF EXHIBITS
      NUMBER                                 MARKED
 7
        Exhibit 1  .............................   87
 8
        Exhibit 39 .............................   92
 9
        Exhibit 40 .............................   98
10
        Exhibit 41 ............................. 108
11
        Exhibit 42 ............................. 127
12
        Exhibit 43 ............................. 132
13
        Exhibit 44 ............................. 135
14
        Exhibit 45 ............................. 142
15
        Exhibit 46 ............................. 170
16
        Exhibit 47 ............................. 174
17

18

19

20

21

22

23

24

25
```

```
 1   INDEX OF OBJECTIONS WITH INSTRUCTION NOT TO ANSWER

 2   OBJECT                                           PAGE
     instruct...................................   8
 3   instruct...................................   9
     instruct...................................  10
 4   instruct...................................  12
     answer.....................................  17
 5   instruction................................  17
     answer.....................................  19
 6   objection..................................  22
     objection..................................  23
 7   objection..................................  23
     objection..................................  24
 8   objection..................................  25
     objection..................................  25
 9   objection..................................  28
     object.....................................  36
10   objection..................................  36
     objection..................................  40
11   objection..................................  40
     objection..................................  40
12   objection..................................  42
     objection..................................  42
13   objection..................................  42
     instructed.................................  42
14   answer.....................................  45
     objection..................................  47
15   objection..................................  48
     objection..................................  52
16   instruction................................  52
     objection..................................  54
17   objection..................................  54
     objection..................................  55
18   objection..................................  55
     asserted...................................  56
19   objection..................................  56
     objection..................................  56
20   objection..................................  60
     instruction................................  62
21   instructing ...............................  62
     objection..................................  63
22   objection..................................  65
     objection..................................  65
23   objection..................................  66
     objection..................................  68
24   objection..................................  69
     objection..................................  70
25   objection..................................  70
```

DONNETTE WENGERD - 04/06/2017          Page 6

```
 1    objection.................................   71
      objection.................................   72
 2    objection.................................   73
      objection.................................   73
 3    objection.................................   74
      don't answer..............................   74
 4    objection.................................   75
      objection.................................   75
 5    objection.................................   75
      objection.................................   76
 6    objection.................................   76
      objection.................................   77
 7    objection.................................   77
      objection.................................   77
 8    objection.................................   78
      objection.................................   79
 9    objection.................................   80
      objection.................................   81
10    objection.................................   81
      objection.................................   82
11    Objection.................................   82
      objection.................................   86
12    objection.................................   95
      objection.................................   96
13    objection.................................  108
      objection.................................  108
14    objection.................................  108
      objection.................................  111
15    objection.................................  112
      objection.................................  113
16    objection.................................  113
      objection.................................  114
17    objection.................................  114
      instruct..................................  115
18    objection.................................  116
      objection.................................  126
19    objection.................................  126
      objection.................................  126
20    instruct..................................  140
      answer....................................  154
21    answer....................................  155
      objection.................................  161
22    instruct..................................  163
      objection.................................  169
23    objection.................................  178

24

25
```

```
 1                    THE VIDEOGRAPHER:  This is the
 2    beginning of the video-recorded deposition of
 3    Donnette Wengerd in the case of Kimberlee
 4    Williams, et al. versus BASF Catalysts, LLC, et
 5    al., in the United States District Court for
 6    the District of New Jersey, Civil Action Number
 7    11-CV-01754.
 8        My name is Alex Cook.  I'm the video
 9    operator.  Would counsel please identify
10    yourselves and state whom you represent.
11                    MR. COREN:  Good day.  I am
12    Michael Coren.  I represent the Plaintiffs in
13    this case, including the witness today,
14    Donnette Wengerd.
15                    MR. PLACITELLA:  John Placitella
16     for the Plaintiffs.
17                    MR. FARRELL:  Peter Farrell of
18    Kirkland & Ellis for Defendant BASF Catalysts.
19                    MS. DALMUT:  Elizabeth Dalmut,
20    Kirkland & Ellis, on behalf of BASF Catalysts.
21                    MR. GEYERMAN:  Grant Geyerman
22    from Williams & Connolly on behalf --
23                    MR. TUNIS:  I'm sorry.
24                    MR. GEYERMAN:  -- of the Cahill
25    Defendants.
```

```
 1                     MR. COREN:  Eric.
 2                     MR. TUNIS:  Eric Tunis on the
 3        phone on behalf of Thomas Halket.
 4                     MR. BOYLE:  John Boyle by phone
 5        on behalf of Defendant Arthur Dornbusch.
 6                     MR. COREN:  I think that's it.
 7                     DONNETTE WENGERD
 8     of lawful age, called for examination, as provided
 9     by the Ohio Rules of Civil Procedure, being by me
10     first duly sworn, as hereinafter certified, deposed
11     and said as follows:
12                 EXAMINATION OF DONNETTE WENGERD
13     BY MR. FARRELL:
14     Q   Good morning, Mrs. Wengerd.  Can you describe
15         the claims you're pursuing in this case?
16     A   I'm pursuing claims against BASF for fraud.
17     Q   And what is the fraud?
18     A   Fraud was against the claim that was brought on
19         my mother's behalf, that there was evidence
20         left out or not provided toward her claim, and
21         it was therefore thrown out.
22     Q   And what is the source of that information?
23                     MR. COREN:  Donnette, I'm going
24         to instruct you not to answer to the extent
25         your answer relies upon the advice of counsel.
```

DONNETTE WENGERD - 04/06/2017                    Page 9

```
 1          If you can answer the question without
 2          incorporating or revealing advice of counsel,
 3          please respond to Mr. Farrell's question.
 4    A     I'm unable to add anything other than the
 5          advice of counsel.
 6    Q     So you have no personal knowledge of the fraud
 7          committed by BASF, other than what you learned
 8          through counsel?
 9    A     That is correct.
10    Q     Do you know when this alleged fraud began?
11    A     Not to my knowledge of an exact date, no.
12    Q     Did it end on a particular date?
13    A     Not to my knowledge.
14    Q     Who was involved in the alleged fraud by BASF?
15                      MR. COREN:   Once again, I
16          instruct you not to answer to the extent your
17          answers rely upon advice of counsel.   If you
18          can answer the question without incorporating
19          or revealing advice of counsel, please respond.
20    A     I cannot respond without advice of counsel.
21    Q     So you have no personal knowledge of who was
22          involved in an alleged fraud by BASF other than
23          information provided to you by counsel?
24    A     That is correct.
25    Q     What is the Westfall case?
```

```
 1   A   The Westfall case was a case where information
 2       was provided regarding BASF and some of the
 3       evidence of asbestos in their talc, and that is
 4       part of what the fraud is, that that was not
 5       supplied.
 6   Q   And where did you learn about the Westfall
 7       case?
 8                       MR. COREN:   The same instruction.
 9   A   Through my attorney.
10   Q   So other than conversations with your counsel,
11       you have no personal knowledge of the Westfall
12       case?
13   A   That's correct.
14   Q   Do you know how the Westfall case connects to
15       the case that your mother filed?
16   A   The information that was provided to the
17       Westfall case was not provided in my mother's
18       case, and the evidence of such information even
19       existing was denied by BASF.
20   Q   And where did that information come from?
21                       MR. COREN:   Once again, I
22       instruct you not to answer to the extent your
23       answer relies upon the advice of counsel.   If
24       you can answer the question without
25       incorporating or revealing the advice of
```

```
 1        counsel, please respond.
 2   A    The information would come from my attorney.  I
 3        can't answer without their advice.
 4   Q    So other than information you learned from
 5        counsel, you can't tell me how the Westfall
 6        case relates to the case that your mother
 7        filed?
 8   A    That's correct.
 9   Q    Which attorney told you about the Westfall
10        case?
11   A    That would be Mr. Cohen, as well as Mr. Bevan.
12   Q    Who is Mr. Bevan?
13   A    Thomas Bevan is another one of my attorneys.
14   Q    Is Mr. Bevan representing you in this case?
15   A    He is a part of the legal team.
16   Q    So he's counsel for you in the Williams case?
17   A    He would be a part of the team.  There are
18        quite a few attorneys representing me.
19   Q    Who are the other attorneys?
20   A    Mr. Cohen, Mr. Placitella.  There are also a
21        few others that I have not met, but I do
22        understand that they are involved in helping.
23   Q    Do you know which law firms they are associated
24        with?
25   A    Cohen and Placitella is one.  Bevan and
```

```
 1        Mr. Walsh, I believe, is also -- Pat Walsh is a
 2        part of his firm as well.
 3    Q   When did you last communicate with Mr. Bevan?
 4    A   That would have been Tuesday.
 5    Q   And what was the nature of that communication?
 6                    MR. COREN:  To the extent that
 7        it was a counsel meeting, I'm going to instruct
 8        her not to answer on the basis of
 9        attorney-client privilege.
10    Q   Did you speak to Mr. Bevan on Tuesday about the
11        Williams case or something else?
12    A   I couldn't speak to what we spoke of because
13        it's under attorney-client privilege.
14    Q   Did you discuss with Mr. Bevan your deposition
15        today?
16    A   Again, anything we discussed would be
17        attorney-client privilege.
18    Q   So you can't tell me whether you discussed
19        preparation for your deposition with Mr. Bevan?
20                    MR. COREN:  She's just asserted
21        her attorney-client privilege, Peter.  I don't
22        understand the difference between the first and
23        second question.
24    Q   Do you know the answer to the question that I'm
25        asking?
```

```
 1    A    Yes.
 2    Q    Which product is at issue in this case?
 3    A    I'm sorry.  I don't understand your question.
 4    Q    Is there a particular product that's at issue
 5         in the Williams case?
 6    A    The issue would be the fraud that I allege, as
 7         well as my attorneys, that happened during my
 8         mother's case, which caused it to be thrown
 9         out.
10    Q    And which product was at issue?
11    A    As to the exact paperwork that was fraudulent,
12         is that what I'm understanding?
13    Q    Was there a particular product that you think
14         is at issue in the Williams case?
15    A    I'm sorry.  I don't understand what you're
16         asking.
17    Q    What do you think the fraud relates to?
18    A    Evidence that there was asbestos within the
19         talc.
20    Q    What talc?
21    A    The talc used at Goodyear that my mother was
22         exposed to and worked with.
23    Q    Do you know the brand name of the talc?
24    A    There were several.
25    Q    Several brand names?
```

```
 1   A   There were several products within that company
 2       that were used that did contain asbestos and
 3       talc, and I do believe that BASF was a supplier
 4       of those products.
 5   Q   So your mother was exposed to multiple brands
 6       of asbestos-containing talc at Goodyear?
 7   A   I understand that --
 8                 MR. COREN:  Excuse me.  Well, to
 9       the extent that you knew that from personal
10       knowledge, you can respond.  To the extent that
11       your answer relies upon information and
12       discussions with counsel, don't answer.
13            So if you could separate those two and
14       respond to Mr. Farrell, please do so.
15   A   I understand that talc was used in various
16       places throughout the company and throughout
17       the production process.
18            Without more information and discussing
19       it with my attorney, I couldn't say which brand
20       or which product was used in which placement
21       throughout the production process.
22   Q   So you have no personal knowledge about the
23       brands of talc that would have been used at
24       Goodyear?
25   A   That is correct.  I do not know them all.
```

```
 1   Q   Do you know any of them?
 2   A   I do believe Manville was one.  I do believe
 3       there were several others, but I don't recall
 4       at this time.
 5   Q   Do you know what EMTAL talc is?
 6   A   I understand how it was used in the process.
 7       I've never seen it personally.
 8   Q   Do you know anything else about EMTAL talc?
 9   A   No.  Only what I've learned through speaking
10       with my attorneys, as well as a general
11       understanding of the process and how it was
12       used from my mother.
13   Q   How was it used in the process?
14   A   Some of the processes that it was used was to
15       help so that the rubber would not stick to
16       various equipment, as well as it was used
17       within a mixing capacity to help make, I
18       believe, the rubber itself.  I'm not exactly
19       sure on all the different ways that it was
20       used.
21   Q   Because you don't have personal knowledge?
22   A   Correct.
23   Q   Your understanding comes from where?
24   A   From both my mother and my attorneys.
25   Q   How did it come from your mother?
```

```
 1   A   I was present during her depositions and
 2       overheard through those depositions how the
 3       product was used.
 4   Q   Anything else?
 5   A   Not that I recall at this time.
 6   Q   Do you know what the Ashton Affidavit is?
 7   A   I do believe it was a part of the complaint
 8       that it was mentioned in there.
 9   Q   Mentioned in the complaint in this case?
10   A   Yes.
11   Q   Do you have any knowledge of the Ashton
12       Affidavit apart from the fact that it's
13       mentioned in the complaint in this case?
14   A   Only through the information provided by my
15       attorney.
16   Q   So other than the fact that the Ashton
17       Affidavit is mentioned in the complaint in this
18       case and conversations with counsel, you have
19       no personal knowledge of the Ashton Affidavit?
20   A   That's correct.
21   Q   Do you know what the Ashton Affidavit says?
22   A   Not without reading it in front of me.  I would
23       not want to quote it.
24   Q   Did you do anything to prepare for your
25       deposition?
```

```
 1    A    I did meet with counsel.

 2    Q    Who was there?

 3    A    Mr. Cohen, also Mr. Placitella, and I also saw

 4         Mr. Bevan.

 5    Q    And I take it when you say "Mr. Cohen", you

 6         mean Mr. Coren?

 7    A    Coren, I'm sorry.

 8    Q    That's okay.

 9    A    I mispronounced it.  My bad.

10    Q    When did the meeting occur?

11    A    One was on Tuesday, and one was prior to that,

12         and I do not know the date.

13    Q    The day before, a week before, how far before

14         Tuesday?

15    A    Several weeks.

16    Q    Several weeks.

17              How long did the meeting on Tuesday last?

18                   MR. COREN:  Don't answer.

19    A    On advice of counsel, I'm not answering that

20         question.

21                   MR. FARRELL:  What's the basis

22         for the instruction not to answer?

23                   MR. COREN:  Privilege.

24                   MR. FARRELL:  The length of the

25         meeting is privileged?
```

DONNETTE WENGERD - 04/06/2017          Page 18

```
 1                        MR. COREN:  Yeah.
 2   Q   Do you know how long the meeting lasted?
 3   A   Yes.
 4   Q   So you would be able to answer the question but
 5       for the instruction from Mr. Coren?
 6   A   That's correct.
 7   Q   Where did the meeting occur?
 8   A   At Mr. Bevan's office.
 9   Q   That was the meeting on Tuesday?
10   A   That is correct.
11   Q   Other than you, Mr. Coren, Placitella,
12       Mr. Bevan, was anybody else present at the
13       meeting?
14   A   No.
15   Q   Did anybody else participate in the meeting?
16   A   No.
17   Q   Did you review any documents as part of the
18       meeting on Tuesday?
19   A   I was provided previously with a copy of the
20       complaint, as well as a copy of the Judge's
21       decision, but other than that, I can't recall
22       if there was any other specific documents that
23       I reviewed.
24   Q   So just those two documents on Tuesday?
25   A   There may have been others.  I was provided
```

```
 1     quite a bit of information from my attorneys
 2     through --
 3                    MR. COREN:  We're not talking
 4     about what -- he just wants to know what you
 5     reviewed.
 6  A  That's part of what I reviewed.  I don't recall
 7     what the names of the other documents may have
 8     been.
 9  Q  On what other occasions were you provided
10     documents by your attorneys?
11  A  Various times.  I was kept abreast of their
12     investigation through letters, as well as any
13     copies of anything that would have been filed
14     was also sent to me.
15  Q  How many letters have you received from your
16     attorneys?
17  A  I do not recall.
18  Q  How frequently do they send you letters?
19  A  I don't recall.
20  Q  Do you still have all the letters?
21                    MR. COREN:  Don't answer.
22  A  On advice of counsel, I'm not answering.
23                    MR. FARRELL:  What's the basis
24     for the instruction not to answer whether she
25     still has the letters from her attorneys?
```

DONNETTE WENGERD - 04/06/2017          Page 20

```
 1                    MR. COREN:  They have no
 2      relevance at all to the case, a client's
 3      correspondence within connection of this
 4      matter.
 5                    MR. FARRELL:  So you're
 6      instructing her not to answer based on a
 7      relevance objection?
 8                    MR. COREN:  And also
 9      attorney-client privilege.
10                    MR. FARRELL:  How is it
11      privileged whether she still has --
12                    MR. COREN:  Because the last time
13      I looked, a letter was communication.
14                    MR. FARRELL:  I didn't ask about
15      the substance of the letters.  I asked whether
16      she still possesses the letters.
17                    MR. COREN:  I've asserted the
18      objection.  Please let's move on.
19   Q  Mrs. Wengerd, would you be able to tell me
20      whether you still have the letters but for the
21      objection asserted by Mr. Coren?
22   A  I may.
23   Q  Do you keep a file at home?
24   A  Yes.
25   Q  The file contains information related to the
```

```
 1        Williams case?
 2    A   Anything that I would have provided would have
 3        come from my attorney.
 4    Q   Do you keep a file at home of documents related
 5        to the Williams case?
 6    A   Not specifically to the Williams case.  There
 7        is a file that is in regards to all of my
 8        mother's affairs.
 9    Q   Does that include information related to the
10        Williams case?
11    A   Yes, it may.
12    Q   What else is in the file at home that relates
13        to your mother's affairs?
14    A   I believe any information that would be in the
15        file would be communication between me and my
16        attorney and, therefore, covered under
17        privilege.
18    Q   Well, I'm not asking you to tell me what the
19        documents say.  Can you give me the subject
20        matter of the documents?
21                     MR. COREN:  She just did.
22    A   It would be attorney-client privilege to give
23        you any of the substance or subjects that we
24        discussed.
25    Q   How many documents do you still have from your
```

```
 1        mother's original asbestos case?

 2    A   I couldn't say with any certainty.

 3    Q   One document?

 4    A   Definitely more than one document.

 5    Q   More than ten?

 6                    MR. COREN:  We're not here to

 7        speculate.  She knew it was more than one.

 8    Q   Does it fill a box?

 9    A   It fills a file folder for sure, but I couldn't

10        say with any certainty how many documents are

11        in that file.

12    Q   More than a file folder?

13    A   I'd have to look to be accurate.

14    Q   Have you looked?

15    A   Not recently.

16    Q   Have you looked at any time in connection with

17        the Williams case?

18    A   Not that I recall.

19    Q   Did your attorneys ever ask you to search the

20        file you keep at home --

21                    MR. COREN:  Objection.

22    Q   -- for documents?

23                    MR. COREN:  Objection.  Don't

24        answer.

25    A   On advice of my attorney, I am not answering.
```

DONNETTE WENGERD - 04/06/2017          Page 23

```
 1    Q    Do you know the answer to that question?

 2    A    Yes.

 3    Q    Have you provided the documents that you keep

 4         at home related to your mother's affairs to

 5         your attorneys in this case?

 6                        MR. COREN:  Privilege.  Move on.

 7         Objection.

 8    Q    Do you know the answer to that question?

 9    A    Yes.

10    Q    You'd be able to answer it but for the

11         objection that's been asserted?

12    A    That's correct.

13    Q    Have any of the documents kept in the file you

14         have at home been produced to BASF in this

15         case?

16                        MR. COREN:  Objection.

17         Privilege.  Move on.

18                        MR. FARRELL:  How is that

19         privileged?

20                        MR. COREN:  The work product.

21         Attorney-client and work product.

22                        MR. FARRELL:  The fact whether

23         documents have been produced to us in this case

24         is work product and privileged?

25                        MR. COREN:  Yeah.  You're making
```

```
 1        a number of suppositions.  I've made my
 2        objection and instructed her not to answer.
 3   Q    Other than the file that you keep at home
 4        related to your mother's affairs, are you aware
 5        of any other documents that relate to your
 6        mother's asbestos case?
 7   A    Not within my personal possession.
 8   Q    What about documents outside of your personal
 9        possession?
10   A    That would be speculation.  I don't know what
11        else exists out there.
12   Q    Do you have any personal knowledge of documents
13        related to your mother's asbestos case other
14        than the file you keep at home?
15   A    I would assume that my attorneys have documents
16        in their files.
17   Q    Which attorneys?
18   A    I would think that my entire attorney team
19        would have access to all of that information.
20   Q    Have you spoken to Mr. Bevan about whether he
21        has documents related to your mother's asbestos
22        case?
23                        MR. COREN:  Objection.
24        Privilege.  Do not respond.
25   Q    Do you know one way or the other whether
```

```
 1        Mr. Bevan has documents in his possession
 2        related to your mother's asbestos case?
 3                        MR. COREN:   Objection.
 4        Privilege.   Don't respond.
 5   A    According to my attorney, I am choosing not to
 6        respond.
 7   Q    Do you know the answer to that question?
 8   A    Yes.
 9   Q    You mentioned a second meeting to prepare for
10        your deposition.   Who was at that second
11        meeting?
12   A    Mr. Placitella.   And there was also another
13        person from his firm, but I can't recall her
14        name at the moment.
15   Q    It was a woman from the Cohen Placitella firm?
16   A    That's correct.
17   Q    When you say "Mr. Placitella", do you mean
18        Jared or --
19   A    I do.
20   Q    -- Chris?
21             Were you provided any documents at that
22        meeting?
23                        MR. COREN:   Objection.
24   A    Per my attorney, I'm not answering the question
25        due to his objection.
```

```
 1   Q   At the meeting you had on Tuesday to prepare
 2       for your deposition, you told me you had
 3       reviewed some documents, correct?
 4   A   They were documents that were previously
 5       provided to me.
 6   Q   When were they provided to you?
 7   A   Several weeks, if not a month or more prior to.
 8   Q   Did any of the documents you've reviewed
 9       refresh your recollection?
10   A   No, not particularly.
11   Q   Did any one document refresh your recollection
12       about this case?
13   A   No, not particularly.
14   Q   Have you spoken to anybody about your
15       deposition other than counsel?
16   A   No.
17   Q   Other than meeting with counsel, did you do
18       anything else to prepare for your deposition?
19   A   No.
20   Q   Have you looked at any documents to prepare for
21       your deposition other than the complaint and
22       the Judge's decision you mentioned?
23   A   No.
24   Q   When you say "the Judge's decision", do you
25       mean the Court of Appeals' decision in the
```

```
 1        Williams case?
 2   A    I believe that is it.
 3   Q    Other than the Williams complaint and the Court
 4        of Appeals' decision, you've received
 5        additional documents from counsel, correct?
 6   A    The information that I received from counsel
 7        has been mostly letters updating me on the
 8        status of how things are going, as well as the
 9        original complaint that was filed, which was
10        provided quite some time ago.  The one that I
11        reviewed was the amended.
12   Q    The first or the second?  The First Amended
13        Complaint or the Second Amended Complaint?
14   A    I don't recall.
15   Q    How many complaints have been filed in this
16        case?
17   A    I would have to check my records to be certain.
18   Q    Have you seen all of them?
19   A    I believe they have provided me with all of
20        them.
21   Q    Who did the letters from counsel come from?
22   A    They were from a variety of my different
23        attorneys.  There was no one name on all of the
24        letters or all of the documents.
25   Q    Which attorneys have sent you letters related
```

DONNETTE WENGERD - 04/06/2017          Page 28

 1          to the Williams case?
 2                          MR. COREN:  Objection.  Don't
 3          answer.
 4                          MR. FARRELL:  What's the basis
 5          for the objection?
 6                          MR. COREN:  Attorney-client
 7          communication.
 8                          MR. FARRELL:  The identity of the
 9          lawyer is attorney-client privilege?
10                          MR. COREN:  The whole
11          communication is in our view.  Move on.
12     Q    Do you know the names of the attorneys who sent
13          you letters?
14     A    No.  Not without looking at the letters
15          themselves.
16     Q    But you would be able to answer that question
17          by checking the letters?
18     A    Yes.
19     Q    Do you still have the letters?
20     A    I would have to check the file to be certain.
21     Q    How many letters are we talking about?
22     A    Again, without checking the file, I would be
23          guessing.
24     Q    More than ten?
25     A    Again, I would be guessing.

```
 1    Q    More than 20?
 2    A    Would you like me to guess?
 3              MR. COREN:  No.
 4    Q    Yes.
 5              MR. COREN:  And the answer is no.
 6         We're not here to guess.  We're here to provide
 7         facts.
 8    Q    Could you give me a ballpark?
 9    A    No.
10    Q    Have you ever been deposed before?
11    A    I don't recall.
12    Q    You don't know one way or the other whether
13         this is your first deposition?
14    A    No.  I don't recall.
15    Q    It doesn't seem like the sort of thing you'd
16         remember if you had been deposed before?
17    A    I was a guardian ad litem for eight-and-a-half
18         years and represented over 30 children, as well
19         as I have also been involved with my mother's
20         entire affairs, so no.
21    Q    Were you deposed in connection with your
22         mother's asbestos case?
23    A    It's been almost ten years.  I don't think so,
24         but I couldn't be certain.
25    Q    Have you ever been a Plaintiff in a case other
```

DONNETTE WENGERD - 04/06/2017                    Page 30

```
 1        than the Williams case?
 2   A    Yes.
 3   Q    Which cases were you a Plaintiff in?
 4   A    I would have to check my files for certainty of
 5        the names of the cases.
 6   Q    So multiple cases?
 7   A    Well, in accordance with my mother's business
 8        and with her estate, yes, there have been
 9        multiple.  As well as there has been, I
10        believe, one personally.
11   Q    What was the one you were involved in
12        personally?
13   A    It was on my husband's behalf when he was in an
14        accident.
15   Q    How many -- withdrawn.
16             In how many cases were you the Plaintiff
17        because of an issue related to your mother's
18        injuries?
19   A    I couldn't say with any certainty.
20   Q    Do you still have all of those records?
21   A    I would have to check my file to see what
22        exactly is in there.
23   Q    And that's the same file that you keep at home?
24   A    Yes.
25   Q    But it's fair to say you've been a Plaintiff in
```

```
 1      a case related to your mother's asbestos
 2      exposure on more than one instance?
 3   A  Yes.
 4   Q  Have you ever been a Defendant in a case?
 5   A  No.  Not to my knowledge.
 6   Q  How many -- withdrawn.
 7          And how many cases was your mother the
 8      Plaintiff?
 9   A  I would have to check with my attorneys for an
10      accurate answer to that.
11   Q  But it's something you could determine?
12   A  No.  It's information my attorneys would have
13      to provide.
14   Q  But somebody could determine the answer of how
15      many cases your mother was a Plaintiff in?
16   A  My attorneys could provide that information if
17      it didn't go against attorney-client privilege.
18   Q  Is there anyone other than your attorneys who
19      would know how many cases your mother filed
20      related to her asbestos injuries?
21   A  Not that I'm aware.
22   Q  Is it more than one case?
23   A  That she filed?  Yes.  I believe so.
24   Q  More than two cases?
25   A  Yes.  I believe so.
```

```
 1   Q   More than five cases?
 2   A   I wouldn't know without seeking information
 3       from my attorney.
 4   Q   Was your mother the Plaintiff in any case
 5       unrelated to asbestos exposure?
 6   A   I'm not sure, other than perhaps her divorce.
 7   Q   Was your mother the Plaintiff in a case related
 8       to exposure to a drug called DES?
 9   A   She may have been.  That was something, I
10       believe, my grandmother was provided during her
11       pregnancy.  But I don't have any information as
12       to any legal action.
13   Q   Do you know anything about the case?
14   A   I don't know if there was a case.
15   Q   Do you know anything about your mother's
16       potential exposure to DES?
17   A   I don't know much about DES, other than it was
18       something provided during pregnancy to women
19       that often caused issues within the birth or
20       the child.  I'm afraid I'm not an expert on the
21       subject, so I don't know more.
22   Q   Do you know whether your mother believed that
23       she had been harmed by exposure to DES?
24   A   It's very possible, but I couldn't say with any
25       certainty.  I know it was something that was
```

```
 1        somewhat discussed, that she was exposed during

 2        my grandmother's pregnancy.  But without

 3        reviewing medical records or consulting with

 4        someone more knowledgeable, I couldn't say if

 5        she was or was not.

 6   Q    Do you know whether your mother disclosed in

 7        her asbestos cases that she was exposed to DES?

 8   A    She may have, but I don't recall.

 9   Q    Do you know of somebody who would know the

10        answer to that question?

11   A    I think the transcripts from any of her

12        depositions would provide that information.

13   Q    What if it was disclosed in a context other

14        than her deposition, who would know about that?

15   A    That would be under attorney-client privilege.

16   Q    If it was disclosed to the Defendants in the

17        case, that would be privileged?

18   A    Then it should be in some of the documentation

19        that's on file with the Court or within her

20        deposition itself.

21   Q    But I'm asking a slightly different question.

22        If I wanted to talk to somebody about whether

23        information about your mother's exposure to DES

24        had been disclosed to the Defendants in your

25        mother's asbestos case, who would I talk to?
```

DONNETTE WENGERD - 04/06/2017          Page 34

```
 1                      MR. COREN:  Objection.  Do you
 2         have any knowledge of that?
 3                      THE WITNESS:  Not that I recall.
 4                      MR. COREN:  Next question.
 5    Q    Can you identify one person?
 6                      MR. COREN:  Next question.  We're
 7         not here to speculate.
 8    A    I would have to check with my attorneys to see
 9         if there's any information on file.  Other than
10         that, I have no other information.
11    Q    Which attorney would you check with?
12    A    I would check with primarily Thomas Bevan.
13    Q    Why would you check with Mr. Bevan?
14    A    He's been one of my main points of contact with
15         the attorneys.
16    Q    How long have you known Mr. Bevan?
17    A    Since 2008.
18    Q    How did you come to meet him?
19    A    Through my mother's claims of asbestos
20         exposure.
21    Q    Did you retain Mr. Bevan, or did your mother
22         retain him?
23    A    I believe she retained him initially.
24    Q    Do you know how your mother came to know
25         Mr. Bevan?
```

```
 1   A   I'm not sure how she was given his name or if
 2       that was something she sought.
 3   Q   But Mr. Bevan handled her asbestos cases?
 4   A   Yes.  He has handled quite a bit of her estate
 5       affairs, yes.
 6   Q   So he handles her asbestos cases and her estate
 7       affairs?
 8   A   He has definitely helped with the asbestos
 9       cases, which are a part of her estate affairs.
10   Q   So if we wanted to know more information about
11       your mother's asbestos case, Mr. Bevan would be
12       the person to talk to?
13   A   I'm sure he or any of my legal
14       representation -- representatives could provide
15       the information you request.
16   Q   Do you interact with anybody at the Bevan firm
17       other than Mr. Bevan himself?
18   A   I do interact with Erin, who is -- you know,
19       I'm not exactly sure of her title, but I
20       believe she's a paralegal.
21   Q   Other than Mr. Bevan and Erin, who you think is
22       a paralegal, do you communicate with anybody
23       else at the Bevan firm?
24   A   Early on in the case I spoke with Pat Walsh,
25       who was involved in helping with my mother's
```

```
 1        legal cases.
 2              I believe Mr. Moskowitz, who was another
 3        attorney at the firm, has sent me some
 4        communication, but that's all I can recall.
 5   Q    And when you say "this case", do you mean the
 6        Williams case or your mother's asbestos case?
 7   A    My mother's asbestos claims in general.
 8   Q    Why do you say "in general"?
 9   A    Because it not only speaks of the Williams
10        case, but it can also speak to any of the other
11        legal matters that they have dealt with for me
12        or my mother.
13   Q    Have you spoken to Mr. Walsh about the Williams
14        case?
15                     MR. COREN:  Object.  I instruct
16        you not to answer.
17                     MR. FARRELL:  What's the basis
18        for the instruction?
19                     MR. COREN:  Attorney-client
20        communication.
21   Q    Without revealing what was said between you and
22        Mr. Walsh, have you discussed the subject of
23        the Williams case with him?
24                     MR. COREN:  Objection.
25   A    Per my attorney's advice, I choose not to
```

```
 1        answer the question.

 2   Q    What about Mr. -- did you say Moskowitz?

 3   A    Yes.

 4   Q    Have you discussed the subject of the Williams

 5        case with Mr. Moskowitz?

 6   A    No.

 7   Q    Do you know one way or the other whether you

 8        have discussed the Williams case with

 9        Mr. Walsh?

10   A    Yes.

11   Q    So but for the objection and instruction not to

12        answer, you could tell me the answer to that

13        question?

14   A    Yes.

15   Q    How many times have you spoken to Mr. Walsh?

16   A    Do you have a specific time period?

17   Q    You tell me.  How many times do you communicate

18        with him?

19   A    I would be guessing at how many times I've

20        spoken to the man.

21   Q    Well, when did you first meet him?

22   A    2008.

23   Q    Have you spoken to him this year?

24   A    No.

25   Q    When was the last time you talked to him?
```

```
 1   A   I don't recall.

 2   Q   What about Mr. Moskowitz?

 3   A   Usually -- I don't think I've ever spoken to

 4       him personally.  I just received communication

 5       from him.

 6   Q   In what form?

 7   A   A letter.

 8   Q   Do you receive e-mails from the Bevan firm?

 9   A   I may have.  Typically everything is in letter

10       form received via snail mail.

11   Q   Your mother's case was filed in 2008, correct?

12   A   Yes.

13   Q   Were you using e-mail in 2008?

14   A   I don't remember.

15   Q   Have you ever received e-mail communications

16       from anybody at the Bevan firm?

17   A   That is possible.

18   Q   Have you checked?

19   A   I'm terrible at checking my e-mails.  So I'm

20       afraid I don't remember.

21   Q   At any time during the pendency of the Williams

22       case, have you looked to see whether you have

23       e-mail communications from somebody at the

24       Bevan firm?

25   A   Yes.  I think so.
```

```
 1    Q    When was that?
 2    A    That I checked my e-mail for that?  I was sent
 3         something by Mr. Cohen's office -- Coren's
 4         office about the date change and time change of
 5         attending here.
 6    Q    When was that?
 7    A    A few days ago.
 8    Q    At any time after the Williams case was filed,
 9         have you checked your e-mails to see whether
10         you have received e-mails from anybody at the
11         Bevan firm?
12    A    I don't recall.  I may have.
13    Q    You don't know one way or the other?
14    A    No.  I'm terrible at checking my e-mails.  So
15         they tend to send me a hardcopy sometimes.
16    Q    Have you searched your e-mails at any time
17         since the Williams case was filed to see
18         whether you have e-mail communications from
19         someone at the Bevan firm?
20    A    Yes.
21    Q    When was that?
22    A    When I was told that this meeting was changed
23         and there was a new address.
24    Q    Have you searched your e-mails to see whether
25         you have any e-mail communications from the
```

DONNETTE WENGERD - 04/06/2017                    Page 40

```
 1        Bevan firm so that you could provide those
 2        e-mails to Plaintiff's counsel?
 3                      MR. COREN:  Objection.  It's work
 4        product.  Don't answer.
 5   A    On the advice of my attorney, I'm not
 6        answering.
 7   Q    Has Plaintiff's counsel asked you whether you
 8        have e-mail communications from the Bevan firm
 9        that relate to your mother's asbestos case?
10                      MR. COREN:  Objection.  Same
11        instruction.  Don't answer.  Work product.
12   A    Again, based on my attorney's information not
13        to answer the question.
14   Q    Do you know the answer to that question?
15   A    Yes.
16   Q    Have you provided any e-mails you received from
17        the Bevan firm to the Cohen Placitella firm?
18                      MR. COREN:  Objection.  Same
19        instruction.  Work product.
20                      MR. GEYERMAN:  Court reporter,
21        could you mark every time there's an
22        instruction not to answer, please.  Thank you.
23   A    Per my attorney's advice, I'm choosing not to
24        answer.
25   Q    You're following the direction not to answer
```

DONNETTE WENGERD - 04/06/2017                    Page 41

```
 1      the question?
 2   A  That's correct.
 3   Q  Do you know the answer to the question?
 4   A  Yes.
 5   Q  Have you seen requests for the production of
 6      documents in this case?
 7   A  I don't recall.
 8   Q  Do you know whether BASF has asked you to
 9      produce documents in this case?
10   A  I don't recall seeing anything of that nature.
11   Q  As you sit here today, you don't recall ever
12      seeing requests for production that BASF served
13      in this case?
14   A  I'm pretty sure that those do exist, but if
15      you're asking me if I remember seeing those
16      specific documents, I do not.
17   Q  Has anybody discussed with you your obligation
18      to produce documents in response to those
19      requests?
20   A  Any documents that would have been requested
21      have been provided to my attorneys.  Nor do I
22      have anything to provide at this time that has
23      not been provided to my attorney.
24   Q  So you provided -- did you provide the whole
25      file related to your mother's affairs to the
```

DONNETTE WENGERD - 04/06/2017                    Page 42

```
 1        Cohen Placitella firm?
 2                    MR. COREN:  Objection.  Same
 3        instruction.
 4    A   That is under attorney-client privilege, and
 5        I'm choosing not to answer.
 6    Q   Do you know the answer to that question?
 7    A   Yes.
 8    Q   Have you provided the whole file you keep at
 9        home related to your mother's affairs to the
10        Bevan firm?
11                    MR. COREN:  Objection.
12    A   Again, per attorney-client privilege, I'm not
13        answering the question.
14    Q   Do you know whether any of the documents you
15        keep in your file at home related to your
16        mother's affairs have been produced to the
17        Defendants in the Williams case?
18                    MR. COREN:  Objection.
19    A   Per my attorney's suggestion, I am not
20        answering the question.
21    Q   I didn't hear an instruction not to answer.
22                    MR. COREN:  Well, I will.  So
23        instructed.
24                    MR. FARRELL:  What is the basis
25        for the instruction?
```

DONNETTE WENGERD - 04/06/2017          Page 43

1                      MR. COREN:  Work product.

2                      MR. FARRELL:  You're asserting a

3          work product objection to whether she knows

4          whether documents in her file at home have been

5          produced to the Defendants?

6                      MR. COREN:  The answer -- yes,

7          work product.  How does a client know what is

8          in part of the production or not without -- so

9          the answer is work product.

10               Also, attorney-client privilege to some

11          extent.

12    Q    Do you know the answer to that question?

13    A    Yes.

14    Q    So you would be able to answer it but for the

15         objection and instruction not to answer?

16    A    That's correct.

17    Q    Did you have any meeting with your attorneys

18         before your complaint in this case was filed?

19    A    Yes.  I believe so.

20    Q    How many times did you meet with the Cohen

21         Placitella firm before the Williams case was

22         first filed?

23    A    I believe only once when I met him.

24    Q    Who is the "him"?

25    A    Mr. Coren.

```
 1   Q   To your knowledge, there was only one meeting
 2       with the Cohen Placitella firm before the
 3       Williams case was filed?
 4   A   Yes.
 5   Q   How many times did you communicate with the
 6       Cohen Placitella firm before the Williams case
 7       was filed?
 8   A   I don't remember.
 9   Q   Are there any instances you can recall?
10   A   No.
11   Q   How did you come to know the Cohen Placitella
12       firm?
13   A   I was introduced by Thomas Bevan.
14   Q   So Mr. Bevan referred you to the Cohen
15       Placitella firm?
16   A   Correct.
17   Q   When was that?
18   A   Sometime after my mother's death.  Possibly
19       2009.
20   Q   Before the Williams case was filed, did you
21       meet with anybody at the Bevan firm to discuss
22       filing the Williams case?
23   A   I don't recall.
24   Q   Did you communicate with anybody at the Bevan
25       firm before the Williams case was filed to
```

```
 1      discuss filing this case?
 2   A  I don't recall, other than the one meeting to
 3      introduce me to Mr. Coren's firm.
 4   Q  So you met with the Cohen Placitella firm the
 5      one time, and then they filed this case on your
 6      behalf?
 7   A  I believe there may have been phone calls or
 8      letters, but to say how many or when, I don't
 9      recall.
10   Q  Do you still have those letters?
11   A  I may.  I would have to check my file.
12   Q  Have you checked your file to see if you have
13      those letters before today?
14   A  No.
15   Q  When did this one meeting with the Cohen
16      Placitella firm occur?
17   A  I think it might have been in 2009, but I don't
18      recall exactly.
19   Q  Where did the meeting occur?
20   A  Mr. Bevan's office.
21   Q  How long did the meeting last?
22                   MR. COREN:  Don't answer.
23   A  I don't recall.
24   Q  Who was at the meeting?
25   A  Mr. Coren, I believe, and Mr. Bevan.  I don't
```

```
 1       remember if Mr. Walsh was in attendance or not.
 2   Q   Anyone else?
 3   A   Not that I can recall.
 4   Q   Was there anybody at this meeting at
 5       Mr. Bevan's office who was not an attorney?
 6   A   I don't recall.
 7   Q   Were any of the other Plaintiffs in the
 8       Williams case at the meeting at Mr. Bevan's
 9       office?
10   A   No.
11   Q   How many people were at the meeting?
12   A   I believe there were just the three.  Possibly
13       Mr. Walsh, but I don't recall.
14   Q   Were you the only Plaintiff at this meeting
15       with Mr. Bevan and Mr. Coren?
16   A   Yes.
17   Q   Were you shown any documents at that meeting
18       with Mr. Bevan and Mr. Coren?
19   A   I don't recall.
20   Q   Did they give you a presentation?
21   A   I don't recall.
22   Q   Did they explain the nature of the Williams
23       case to you?
24   A   Yes.  I believe so.
25   Q   Is that --
```

```
 1                    MR. TUNIS:  Hello.  This is Eric
 2       Tunis.  I just want to say that my phone
 3       connection cut off for about a minute or two.
 4       I don't need for you to summarize the testimony
 5       I missed, and you can proceed.  I'm just --
 6                    MR. FARRELL:  You're interrupting
 7       my questioning.  Thank you.
 8    Q   At that meeting with Mr. Bevan and Mr. Coren,
 9        was that when you first learned about the
10        allegations that are in the Williams complaint?
11                    MR. COREN:  Objection.
12        Privilege.
13    A   That would be privileged information.  I'm
14        choosing not to answer.
15    Q   Did you have any knowledge of the factual
16        allegations in the Williams case before you met
17        with Mr. Coren?
18    A   Not to my knowledge.
19    Q   Have you met any of the other Plaintiffs in the
20        Williams case?
21    A   No.
22    Q   Have you spoken to them?
23    A   No.
24    Q   Other than -- have you communicated with them
25        in any way?
```

```
 1   A    No.

 2   Q    Other than this meeting with Mr. Bevan and

 3        Mr. Coren, have you had any other

 4        communications with them concerning the basis

 5        for the Williams case?

 6                    MR. COREN:  Objection.  Don't

 7        answer.

 8   A    Per my attorney's suggestion not to answer, I'm

 9        choosing not to answer the question.

10                    MR. FARRELL:  So you're

11        instructing her not to answer the question --

12                    MR. COREN:  Correct.

13                    MR. FARRELL:  -- of whether the

14        communications exist?

15                    MR. COREN:  Yes.

16   Q    Do you know the answer to that question?

17   A    I'm confused who you are asking it between.

18        Myself and the other Plaintiffs?

19   Q    We talked about a meeting that you had where

20        Mr. Bevan was present and Mr. Coren was

21        present, right?

22   A    Right.

23   Q    What I'm asking is, other than that meeting,

24        have you had any other communications with the

25        Cohen Placitella firm concerning the basis for
```

DONNETTE WENGERD - 04/06/2017                    Page 49

```
 1        the Williams case?
 2   A    Oh.  Then yes, I could answer it.  But on the
 3        advice of my attorney, I'm not answering the
 4        question.
 5   Q    Other than the one meeting you've told me
 6        about, have you had any other communications
 7        with the Bevan firm concerning the basis for
 8        the Williams case?
 9   A    I don't recall.
10   Q    Which allegations in the Williams complaint are
11        based on your personal knowledge?
12   A    None of them would be from my personal
13        knowledge.
14   Q    So all of the information that's contained in
15        the Williams complaint came from counsel?
16   A    Correct.
17   Q    Some of them came from Mr. Bevan?
18   A    I couldn't say without any certainty.
19   Q    Do you know which allegations in the Williams
20        complaint came from Mr. Bevan as opposed to the
21        Cohen Placitella firm?
22   A    No.  I'm sorry.  I don't know.
23   Q    Did you have any role in drafting the Williams
24        complaint?
25   A    No.
```

```
 1   Q   Was it shown to you before it was filed?

 2   A   Yes.  I believe I received a copy either prior

 3       to or just after it was filed, but I'm not

 4       certain which.

 5   Q   You don't know one way or the other whether the

 6       first time you saw the complaint was before or

 7       after it was filed?

 8   A   Not without looking at my file or consulting

 9       with my attorney.

10   Q   Do you still have those records?

11   A   Anything that I would have in my files at home

12       would be under attorney-client privilege.

13   Q   Well, I'm not asking you to tell me what they

14       say.  I'm just asking whether you still have

15       them.  Do you still have the copy of the

16       complaint you received?

17   A   I may.  I would have to check my file.

18   Q   Do you keep files related to the Williams case

19       in any location other than your home?

20   A   No.

21   Q   Do you have electronic files at home related to

22       the Williams case?

23   A   No.

24   Q   Do you have electronic files at home related to

25       your mother's asbestos case?
```

```
 1   A   No.

 2   Q   So everything is in hardcopy?

 3   A   Yes.

 4   Q   So you told me earlier that you had also

 5       seen -- or that you had seen the amended

 6       complaint in this case.

 7           Do you recall that?

 8   A   Correct.

 9   Q   Did you see the original complaint that was

10       filed?

11   A   Yes.

12   Q   Which amended complaint did you see?

13                   MR. COREN:  Asked and answered.

14   A   Again, I can't recall.

15   Q   Do you know whether you saw the amended

16       complaint before or after it was filed?

17   A   Again, I don't recall if it was before or

18       after.

19   Q   Did you have any role in drafting either of the

20       amended complaints that were filed in the

21       Williams case?

22   A   No.

23   Q   Were either of the amended complaints based on

24       your personal knowledge?

25   A   No.
```

```
 1    Q    During this meeting with Mr. Bevan and
 2         Mr. Coren, did you take any notes?
 3    A    No.
 4    Q    Did they take any notes?
 5                    MR. COREN:  Objection.  Don't
 6         answer.
 7                    MR. FARRELL:  What is the basis
 8         for the instruction not to answer?
 9                    MR. COREN:  Work product.
10         Attorney-client privilege.
11                    MR. FARRELL:  The fact that
12         whether you took notes is privileged?
13                    MR. COREN:  Everything is, yes.
14         Move on.
15                    MR. FARRELL:  Everything is
16         privileged.
17    Q    Do you know the answer to whether Mr. Coren or
18         Mr. Bevan took notes at their meeting with you?
19    A    Yes.
20    Q    You could answer that question but for the
21         instruction not to answer?
22    A    That is correct.
23                    MR. COREN:  Peter, I look forward
24         to seeing all your notes with your meetings
25         with your clients.
```

```
 1                        MR. FARRELL:  I didn't ask to see
 2        the notes, Michael.  I asked whether they
 3        existed.
 4   Q    Do you still -- withdrawn.
 5             Have you signed a retention letter
 6        retaining the Cohen Placitella firm in the
 7        Williams case?
 8   A    Yes.  I believe I have.
 9   Q    Do you have a copy of that letter?
10   A    I would have to check my file for certainty.
11   Q    You don't know one way or the other whether you
12        still have the retention letter?
13   A    I couldn't tell you if my electric bill is in
14        that file, sir, without looking at the file
15        itself.
16   Q    Well, I'm not asking whether it's in the file.
17        I'm just asking do you know, as you sit here
18        today, one way or the other whether you still
19        have the retention letter that you signed
20        retaining the Cohen Placitella firm?
21   A    I don't know.
22   Q    Did you sign a retention letter retaining the
23        Bevan firm in connection with the Williams
24        case?
25   A    I don't know.  I can't recall if there was one
```

```
 1      with Bevan.  I do know that I do believe that I
 2      signed one with Mr. Coren's firm.
 3   Q  When you first spoke to the Cohen Placitella
 4      firm about potentially being a Plaintiff in the
 5      Williams case, did they tell you to preserve
 6      all of the documents related to your mother's
 7      asbestos case?
 8                     MR. COREN:  Objection.
 9      Privilege.  Move on.
10   A  Per my attorney's suggestion not to answer the
11      question.
12   Q  Is it your understanding, Mrs. Wengerd, that
13      you're supposed to preserve all of the
14      documents related to your mother's asbestos
15      case?
16                     MR. COREN:  Objection.
17      Privilege.  Move on.
18   A  Again, per my attorney's information, I'm
19      choosing not to answer.
20   Q  Do you know the answer to that question?
21   A  Yes.
22   Q  Does the retention letter you have with the
23      Cohen Placitella firm address the fees that
24      they would receive for acting as counsel in
25      this case?
```

```
 1                      MR. COREN:  Objection.  Don't
 2       answer.
 3    A   That would be attorney-client privilege, I
 4       believe.
 5    Q   You believe, or it is?
 6                      MR. COREN:  It is.  Move on.  I'm
 7       asserting it for her.
 8                      MR. FARRELL:  Your position is
 9       that your fee arrangement with the Plaintiffs
10       in this class action is privileged?
11                      MR. COREN:  Yes.  It's a fee --
12       it's a client communication, a fee retainer.
13       If His Honor would like to see it, we will
14       provide it.  Move on.
15    Q   Do you know the answer to the question I asked?
16    A   I'm not sure without looking at the document
17       itself.
18    Q   Without looking at the retention letter, you
19       don't know the nature of the fee arrangement
20       you have with the Cohen Placitella firm?
21                      MR. COREN:  Objection.
22    A   Per my attorney's suggestion not to answer the
23       question, I'm choosing not to answer.
24    Q   Do you know the answer to that question?
25    A   No.  I'm not sure.
```

DONNETTE WENGERD - 04/06/2017                 Page 56

```
 1   Q   What is the fee arrangement you have with the
 2       Bevan firm?
 3   A   That would be attorney-client privileged
 4       information.
 5   Q   Do you know the answer to that question?
 6   A   Yes.
 7   Q   What's the answer?
 8                    MR. COREN:  Excuse me --
 9   A   It's attorney-client privileged.
10                    MR. COREN:  She asserted it.
11   Q   Are you paying the Cohen Placitella firm right
12       now?
13                    MR. COREN:  Objection.  Don't
14       answer.
15   A   It would be attorney-client privileged
16       information, any fee agreement that I may have
17       with the firm.
18   Q   Have you paid any money to the Bevan firm to
19       represent you in the Williams case?
20                    MR. COREN:  Objection.  Same.
21   A   Again, same.  I'm choosing not to answer.
22   Q   Is any other law firm representing you in
23       connection with the Williams case other than
24       Cohen Placitella and the Bevan firm?
25   A   I believe there is another attorney on the team
```

```
 1      that is a part of another firm.  But I couldn't
 2      say with any certainty his name.
 3   Q  Do you know the name of the firm?
 4   A  I don't recall.
 5   Q  Have you signed any other retention letters
 6      retaining other counsel in connection with the
 7      Williams case?
 8   A  No.
 9   Q  What's the difference between a class action
10      and an individual action?
11   A  The difference is --
12                   MR. COREN:  To the extent --
13      you're asking her for a legal distinction?
14   Q  I'm asking for your -- do you have an
15      understanding of whether there's a difference
16      between a class action and an individual
17      action?
18   A  Yes.
19   Q  What's the difference?
20   A  A class action would be representation of
21      several parties, and a single party would be a
22      lone representation of one person or client or
23      entity.
24   Q  So you understand that the Williams case is a
25      class action case?
```

```
 1    A    Yes.
 2    Q    Do you have duties to the members of the class
 3         in the Williams case?
 4    A    I do.
 5    Q    What are those duties?
 6    A    I have a fiduciary duty to represent those
 7         parties within this class, to represent them
 8         and to make the best decisions as a part of the
 9         group for this case.
10    Q    And you view that as an important role?
11    A    I do.
12    Q    Who is in the Williams class?
13    A    I'm sorry.  I don't know their names, and I
14         haven't met them all, without looking at the
15         documents themselves.
16    Q    Well, how many people are in the Williams
17         class?
18    A    I believe it's an et al., so it's quite a few.
19         It's an open-ended, I believe, correct?
20    Q    I'm asking for your understanding.  Do you know
21         how many people are in the Williams class?
22    A    I believe there's six that are representatives,
23         but again, because it's an et al., it could be
24         open to a number of different people.
25    Q    Why do you say it's an open number of people?
```

```
 1   A   Because under more investigation, there may be
 2       more that could be found and represented
 3       through this firm or through this case.
 4   Q   Who do you think is in the Williams class?
 5   A   For the Plaintiffs?
 6   Q   Yes.
 7   A   People who were wronged by BASF through their
 8       fraud.
 9   Q   What do you mean by that?
10   A   People who had other cases that are separate
11       from mine and who were wronged in the same
12       fraudulent way as my own case.
13   Q   What do you mean "the same fraudulent way"?
14   A   That information was not provided or was not
15       disclosed or there were actions taken that they
16       were also harmed through their cases, as was my
17       mother's.
18   Q   Do you think people who never sued BASF at all
19       are within the Williams class?
20   A   I wouldn't know.  I wouldn't know if there --
21       I'm not familiar enough with the other members
22       in the class to know their cases well enough to
23       speak to that.
24   Q   Well, if there were compensation available as
25       part of this class action, do you think people
```

DONNETTE WENGERD - 04/06/2017                    Page 60

```
 1        who never filed a case against BASF should get
 2        a portion of that money?
 3                     MR. COREN:  Objection.
 4   A    Per my attorney's suggestion not to answer, I'm
 5        choosing not to answer.
 6   Q    Well, he's hasn't instructed you not to answer.
 7                     MR. COREN:  If you have -- I'm
 8        going to instruct you not to answer that to the
 9        extent that your answer relies on the advice of
10        counsel.  If you could answer this question
11        without incorporating or revealing advice of
12        counsel, then you can respond.
13   A    I have no personal information to respond other
14        than advice of counsel.
15   Q    Well, you mentioned earlier that you were
16        acting as a fiduciary on behalf of members of
17        the class.
18             Do you recall that?
19   A    Correct.
20   Q    Do you feel as though you're acting as a
21        fiduciary for people who have never sued BASF
22        or Engelhard?
23   A    I believe that I am acting on behalf of those
24        who have and those who may still come to light
25        who have not been sick yet, who may not have
```

```
 1        been identified as of yet and may be in the
 2        future.
 3   Q    So people who have not yet become sick are a
 4        part of the Williams class in your view?
 5   A    It is possible.
 6   Q    Do you know one way or the other?
 7   A    No, because I'm not an expert.
 8   Q    Do you think that people who weren't exposed to
 9        talc at all are part of the Williams class?
10   A    No.  I believe if they were not exposed to talc
11        and the asbestos in the talc, that they
12        wouldn't have a claim in this specific
13        instance.
14   Q    So if somebody wasn't exposed to talc at all,
15        they shouldn't get any money from the Williams
16        case; is that fair?
17                     MR. COREN:  Objection.
18   A    I'm not an expert on the subject.  So
19        unfortunately, I'm unable to answer that.
20   Q    I'm just asking you whether you think it would
21        be fair for somebody who wasn't exposed to talc
22        at all to receive money in connection with the
23        Williams case?
24                     MR. COREN:  We're not here for
25        her mental impressions for what is fair or
```

```
 1      fairness on a distribution plan.  Move on, next
 2      question.
 3                      MR. FARRELL:  What is the basis
 4      for the instruction not to answer the question?
 5                      MR. COREN:  It has no relevance
 6      whatsoever.  Two, you're asking her for her
 7      mental impressions and her work product.
 8                      MR. FARRELL:  Is your instruction
 9      not to answer based on relevance or on work
10      product?
11                      MR. COREN:  Both.
12   Q  Do you know the answer to that question?
13   A  I'm not sure.
14   Q  Would you be able to tell me whether you think
15      it's fair for somebody who wasn't exposed to
16      talc at all to receive money in connection with
17      the Williams case?
18                      MR. COREN:  The answer -- it's a
19      back door way of asking the same question,
20      Peter, and to invade her work product, and
21      relevance.  Next question.
22                      MR. FARRELL:  You're instructing
23      her not to answer?
24                      MR. COREN:  That is correct.
25   Q  Are all of the people in the Williams class
```

```
 1        individuals who used to work at tire plants?
 2   A    No.  Not to my knowledge.
 3   Q    So what occupations would have been held by
 4        people who are in the Williams class?
 5   A    I don't know their cases well enough to speak
 6        to them or their cases.
 7   Q    Some of them were tire workers?
 8   A    I'm not sure.
 9   Q    Have you looked into it?
10   A    No.  I've only looked into my specific case.  I
11        have not researched the other Plaintiffs in the
12        case or their complaints.
13   Q    You don't have any information about the other
14        cases or complaints that have been filed
15        against BASF or Engelhard in the past?
16   A    No.  That would be something that my attorneys
17        would do.
18   Q    Which attorney would have done that?
19   A    Any one of them.
20   Q    Do you know of any one of them who has done
21        that?
22                     MR. COREN:  Objection.  Now
23        you're getting back -- once again, it's work
24        product.  Now you're getting into
25        attorney-client communication.  So I'm
```

1       instructing her not to answer.

2   Q   Let me ask you it this way, Mrs. Wengerd:  If I

3       wanted to know information about what happened

4       in your mother's original asbestos case, Tom

5       Bevan would have some of that information,

6       correct?

7   A   That's correct.

8   Q   He would have a lot of that information,

9       correct?

10  A   Correct.

11  Q   If I wanted to know what actually happened in

12      your mother's original asbestos case, Tom Bevan

13      would be the best person to talk to about that,

14      correct?

15  A   Correct.

16              MR. COREN:  Objection.

17  Q   If I wanted to know --

18              MR. COREN:  That's a form one, by

19      the way.

20  Q   If I wanted to know information about other

21      cases that had been filed against Engelhard or

22      BASF related to talc, the best person to talk

23      to to get information about those cases would

24      be the Plaintiffs' lawyer who filed them,

25      correct?

```
 1                        MR. COREN:  Objection.  Calls for

 2        speculation.

 3   A    I'm not sure that I could answer that, and

 4        especially on the advice of my attorney, I

 5        choose not to --

 6                        MR. COREN:  I'm not advising you.

 7        I'm just making a form objection.

 8   A    I'm not sure I could answer that.

 9   Q    What is your understanding of the

10        attorney-client privilege, Mrs. Wengerd?

11                        MR. COREN:  Objection.  Don't

12        answer.

13   A    I'm choosing not to answer that question.

14   Q    Did you discuss objections not to answer based

15        on the attorney-client privilege when you were

16        preparing for this deposition?

17                        MR. COREN:  Objection.

18        Objection.  Don't answer.

19   Q    How many people in the Williams class suffered

20        from mesothelioma?

21   A    Again, since I'm not an expert on their cases,

22        I couldn't speak to them.

23   Q    You don't know what percentage of the class has

24        mesothelioma?

25   A    No.
```

```
 1   Q   What about the percentage of the class that
 2       suffered from some other type of cancer?
 3   A   I can only speak to my mother's case, not to
 4       the other members in the class.
 5   Q   What condition did your mother have?
 6   A   Mesothelioma.
 7   Q   Is that significant in your mind?
 8   A   Yes.
 9   Q   Why is it significant in your mind that she had
10       mesothelioma?
11   A   Because it was caused by being exposed to
12       asbestos.
13   Q   Do you think that people who develop
14       mesothelioma should receive more compensation
15       than people who developed other types of
16       injuries from asbestos?
17               MR. COREN:  Objection.  Don't
18       answer.  We're here not for her mental
19       impressions or evaluation.
20   A   I'm choosing not to answer on the advice of
21       counsel.
22               MR. FARRELL:  What's the basis
23       for the instruction not to answer that
24       question?
25               MR. COREN:  Work product, mental
```

```
 1        impression, and if any of it is

 2        attorney-client, to that extent.

 3   Q    Do you believe that your mother was entitled to

 4        greater compensation because she had

 5        mesothelioma as opposed to some other condition

 6        caused by asbestos exposure?

 7   A    I do believe that because she was exposed to

 8        asbestos, that there -- she is and should have

 9        been compensated.

10             As to a greater amount, I have no idea

11        what anyone else would get.  I'm not an expert

12        on the subject of who gets what dollar figure,

13        so I couldn't speak to it.

14   Q    I'm not asking about other people.  I'm just

15        trying to focus on your mother's case for now.

16             Do you think that your mother should have

17        received the same amount of compensation

18        regardless of the type of disease that she had

19        developed?

20                     MR. COREN:  Asked and answered.

21   A    I don't know the other -- the extent of the

22        other diseases.  I know that watching her

23        suffer in such a horrible way should definitely

24        be compensated.

25             I don't know all of the different
```

```
 1      diseases that asbestos exposure causes, nor am
 2      I an expert, medical expert, at all, but I do
 3      believe she should have been compensated for
 4      the absolute anguish that she went through.
 5   Q  Well, if she had developed lung cancer instead
 6      of mesothelioma, do you think that would have
 7      had an effect on the amount of money that she
 8      had recovered in her case?
 9                   MR. COREN:  Objection.  Mental
10      impression.  Don't answer.
11   A  I'm choosing not to answer on the advice of my
12      attorney.
13   Q  Do all of the members of the Williams class
14      live in Ohio?
15   A  I don't believe so.
16   Q  What other states do they live in?
17   A  I don't recall.
18   Q  Do you know anything about where they live?
19   A  I don't recall.
20   Q  Do you know of any other Plaintiffs' firm other
21      than Mr. Bevan who represented individuals in
22      litigation against Engelhard or BASF?
23   A  No.
24   Q  What damages are you seeking in this case?
25   A  I'm looking for a judicial decision that
```

```
 1        acknowledges BASF's fraud in my mother's case.

 2   Q    Is that it?

 3   A    I'm also looking for compensation for the

 4        exposure to asbestos.

 5   Q    Anything else?

 6   A    No.

 7   Q    How much compensation do you believe you're

 8        entitled to because of your mother's exposure

 9        to asbestos --

10                      MR. COREN:  Objection.

11   Q    -- attributable to BASF?

12                      MR. COREN:  Objection.  Don't

13        answer.

14   A    On the advice of my attorney, I'm not

15        answering.

16                      MR. FARRELL:  You're instructing

17        her not to answer the question of how much

18        damages she is entitled to in this case?

19                      MR. COREN:  You're asking her for

20        a valuation of the case.  You're not entitled

21        to that.  Move on.

22   Q    When you say that you're looking for a judicial

23        decision acknowledging fraud by BASF, what do

24        you mean by that?

25   A    I would like the Court to find that fraud
```

```
 1        was -- did happen on -- from BASF or the

 2        attorneys representing them at the time that

 3        did in fact, unfortunately, hurt my mother's

 4        case.

 5   Q    And why would you like to see that happen in

 6        the judicial decision?

 7   A    So that companies like BASF don't do it again.

 8        So that they are held accountable for their

 9        actions.

10   Q    Would you take less money in this case in order

11        to get that judicial decision?

12                    MR. COREN:  Objection.

13        Privilege.  It's her work product.  It's a

14        valuation.  And you're not entitled to that

15        information.

16                    MR. FARRELL:  You're instructing

17        her not to answer that question?

18                    MR. COREN:  That is correct.  I

19        am.  Thank you.

20   Q    What is more important to you to receive in

21        this case, financial compensation or the

22        judicial decision you were describing?

23                    MR. COREN:  Objection.  Same

24        instruction; same reasons.

25   A    I think both have merit, and --
```

```
 1                         MR. COREN:  I instructed you not
 2         to answer.
 3    A    And I'm choosing not to answer further.
 4    Q    But you could answer that question but for the
 5         instruction?
 6    A    I'm not sure.
 7    Q    You could or you couldn't?
 8                         MR. COREN:  She just said she's
 9         not sure.
10    Q    Do you believe that you're entitled to greater
11         damages than members of the class?
12    A    Not necessarily, no.
13    Q    Do you believe that somebody who had very brief
14         exposure to EMTAL talc should receive the same
15         compensation as somebody who has significant
16         exposure to the talc?
17                         MR. COREN:  Objection.  Going
18         into the mental processes, valuation, class --
19         you know, issues of class distributions that
20         are not yet before the Court.  Don't answer.
21                         MR. FARRELL:  You're instructing
22         her not to answer that question?
23                         MR. COREN:  That's right.
24         Because you're now asking -- invading into her
25         mental processes, which is her work product and
```

```
 1        our work product.  Move on.
 2   Q    Do you know who Layn Phillips is?
 3   A    No.  I don't believe so.
 4   Q    Do you know whether there was a mediation in
 5        the Williams case?
 6                  MR. COREN:  That's a yes or no
 7        answer.
 8   A    Yes.
 9   Q    Was there a mediation in the Williams case?
10                  MR. COREN:  That's a yes or no
11        answer, ma'am.
12   A    Yes.
13   Q    When did the mediation occur?
14                  MR. COREN:  Objection.  At this
15        point in time the -- we're instructing her not
16        to answer.
17            The mediation, it was supposed to be
18        privileged, number one, and number two, to the
19        extent that she knows anything about the
20        mediation, it's attorney-client communication.
21            We will let you know the fact that she
22        was aware of it, had knowledge of it, and
23        that's it.  There will be no more -- you could
24        put your questions on the record, but I'm just
25        advising you in advance that we're not going
```

```
 1       into this.

 2                       MR. FARRELL:  Your position is

 3       that when the mediation occurred is privileged?

 4                       MR. COREN:  I just said so,

 5       Peter.  Repeating the question to me isn't

 6       going to change my mind.

 7   Q   When did you learn that a mediation occurred in

 8       the Williams case?

 9                       MR. COREN:  Objection.  Don't

10       answer.  Attorney --

11   A   Per my attorney, I'm choosing not to answer.

12   Q   Do you know when you learned that a mediation

13       occurred in this case?

14   A   Yes.

15   Q   You would be able to answer the question but

16       for the instruction not to answer?

17   A   That's correct.

18   Q   What was your role in the mediation, if any?

19                       MR. COREN:  Objection.  Don't

20       answer.  Attorney-client communication.

21   A   I'm choosing not to answer on the advice of

22       counsel.

23                       MR. COREN:  And work product,

24       too.  I apologize.

25   Q   Without getting into the substance of the
```

```
 1          mediation discussions, can you describe the

 2          process for me?

 3                        MR. COREN:   Objection.   Do not

 4          answer.

 5     A    I'm choosing not to answer on the advice of

 6          counsel.

 7     Q    Which of your attorneys did you speak to about

 8          the mediation in the Williams case?

 9     A    Mr. Coren.

10     Q    Anyone else?

11     A    No.

12     Q    Did you ever speak to Chris Placitella about

13          the mediation in the Williams case?

14                        MR. COREN:   Objection.   She just

15          answered who she spoke to.

16     Q    Just Mr. Coren?

17     A    Correct.

18     Q    When was the last time you spoke to Mr. Coren

19          about the mediation in the Williams case?

20                        MR. COREN:   Don't answer.   Next

21          question.

22                        MR. FARRELL:   What's the basis

23          for the instruction not to answer?

24                        MR. COREN:   Attorney-client

25          communication, mediation privilege, work
```

```
 1          product privilege.  Next question.
 2     Q    Is it your understanding that proposals were
 3          exchanged between the parties in the course of
 4          the mediation in the Williams case?
 5                    MR. COREN:  Objection.  Once
 6          again, attorney-client privilege, work product
 7          privilege, mediation privilege.  Please do not
 8          answer.
 9     Q    Do you know the answer to that question?
10     A    Per my attorney's suggestion not to answer, I'm
11          choosing not to answer.
12     Q    I'm just asking if you know the answer to the
13          question.
14     A    I do know that there was a mediation, and
15          that's the extent of my knowledge.
16     Q    Other than the fact that a mediation occurred,
17          you don't know anything else about it?
18                    MR. COREN:  Objection.  Don't
19          answer.
20     A    I'm choosing not to answer on the advice of
21          counsel.
22     Q    Did you understand that money had been offered
23          to settle the Williams case?
24                    MR. COREN:  Objection.  Same
25          instruction.
```

DONNETTE WENGERD - 04/06/2017                Page 76

```
 1   A   On the advice of counsel, I'm choosing not to
 2       answer.
 3   Q   Do you know the answer to that question?
 4   A   Yes.
 5   Q   Your attorneys spoke to you about whether there
 6       was money offered to settle the Williams case?
 7                   MR. COREN:  Objection.  Don't
 8       answer.
 9   A   Again, per advice of counsel, I'm choosing not
10       to answer.
11   Q   I'm not asking you what they told you, I'm just
12       asking --
13                   MR. COREN:  Yes.  You are asking
14       what we told her.
15                   MR. FARRELL:  Excuse me.  I'm
16       not.
17   Q   Was the subject of the amount of money that had
18       been offered to settle this case discussed with
19       you?
20                   MR. COREN:  Objection.
21       Privilege.  Attorney-client communication.
22   A   That would be attorney-client communication.
23   Q   Do you know the answer to that question?
24                   MR. COREN:  That's a yes or no
25       answer, ma'am.
```

```
 1    A    No.  I do not know.

 2    Q    You don't know whether the amounts of money

 3         that had been discussed during the mediation

 4         process was communicated to you?

 5                        MR. COREN:  Objection.  She just

 6         told you.  It's attorney-client privilege.

 7    A    It's attorney-client privilege.

 8    Q    I'm asking whether you know the answer to that

 9         question.

10    A    Yes.  I do know.

11                        MR. COREN:  That's it.

12    Q    Did you decide to end the mediation discussions

13         in this case?

14                        MR. COREN:  Objection.  Do not

15         answer.

16    A    Per my attorney's suggestion not to answer, I'm

17         choosing not to answer.

18    Q    Did you discuss the mediation in this case with

19         anyone other than your attorneys?

20    A    No.

21    Q    Was there any meeting with the class

22         representatives in this case to discuss

23         settlement?

24                        MR. COREN:  Objection.  Don't

25         answer.  Move on.
```

```
 1   A    I'm choosing not to answer on the advice of
 2        counsel.
 3   Q    I'm just asking whether a meeting occurred,
 4        Mrs. Wengerd.
 5                    MR. COREN:  We understood.
 6   Q    Do you know the answer to the question?
 7   A    I previously answered that I have not met the
 8        other members, so I couldn't have had a meeting
 9        with them.
10   Q    When you spoke about the mediation with
11        Mr. Coren, who else was involved in that
12        conversation?  Just the two of you?
13   A    That's correct.
14   Q    Was it a telephone call?
15                    MR. COREN:  Objection.  No need
16        to understand how or the manner or mechanism of
17        the communication, just that there was.  We've
18        answered your question.  Privilege.  Move on.
19                    MR. FARRELL:  You're asserting a
20        privilege objection to whether Mrs. Wengerd
21        communicated with you by phone or another
22        means?
23                    MR. COREN:  Yes.  Move on.
24   Q    Have you spoken with any other person regarding
25        the damages that you're seeking in this case
```

```
 1        other than counsel?

 2   A    No.

 3   Q    Have you spoken to any other person other than

 4        counsel about the mediation that occurred in

 5        this case?

 6   A    No.

 7   Q    Do you have any documents related to the

 8        mediation that occurred in this case?

 9   A    No.

10   Q    Did you take any notes of your conversation

11        with Mr. Coren regarding the mediation?

12   A    No.

13   Q    Did you have an understanding that money had

14        been offered to settle the case?

15                      MR. COREN:  Objection.  You've

16        asked it twice or three times now already,

17        Peter.  Let's move on.  We're just wasting

18        time.  I'm instructing the witness not to

19        answer.  Now it's badgering.

20   Q    Do you know the answer?

21   A    I'm sorry?

22   Q    Do you know the answer to that question?

23   A    You have to repeat the question.  I'm sorry.  I

24        was listening to Mr. Coren.

25   Q    Do you know the answer to the question, do you
```

DONNETTE WENGERD - 04/06/2017                 Page 80

```
 1       have an understanding of whether money had been
 2       offered to settle the Williams case?
 3                      MR. COREN:  Objection.  I
 4       instruct you not to answer.
 5    A  Per advice of counsel, I'm choosing not to
 6       answer.
 7                      MR. FARRELL:  Let's take a break.
 8                      THE VIDEOGRAPHER:  Off the
 9       record.  The time is 11:01.
10                      (Recess taken.)
11                      THE VIDEOGRAPHER:  We're back on
12       the record.  The time is 11:17.
13    BY MR. FARRELL:
14    Q  Mrs. Wengerd, are you aware that a deposition
15       occurred in this case yesterday?
16    A  Yes.
17    Q  Who was deposed yesterday?
18    A  I'm not sure.
19    Q  How did you know that somebody was deposed
20       yesterday?
21    A  Because my attorney said he would be in town
22       for that reason for two days.
23    Q  Which attorney was that?
24    A  Mr. Coren.
25    Q  Did you speak to Mr. Coren last night?
```

```
 1   A   Yesterday afternoon, yes.

 2   Q   What time yesterday afternoon?

 3   A   I don't recall.

 4   Q   4 o'clock?

 5   A   I don't remember.  I'm sorry.

 6   Q   It was after the deposition yesterday?

 7   A   I assume.

 8   Q   Did Mr. Coren address the subject matter of

 9       yesterday's deposition with you?

10                    MR. COREN:  Objection.  Do not --

11       attorney-client privilege.

12   A   Per the advice of counsel, I'm choosing not to

13       answer.

14   Q   I'm not asking what he said or what you said,

15       just did the subject matter of the deposition

16       yesterday come up in your conversation with

17       Mr. Coren yesterday afternoon?

18                    MR. COREN:  Objection.  I

19       instruct you not to answer.  Work product,

20       attorney-client privilege.

21   A   I'm choosing not to answer on the advice of

22       counsel.

23   Q   Would you be able to answer that question but

24       for the instruction?

25   A   Yes.
```

DONNETTE WENGERD - 04/06/2017                Page 82

```
 1   Q   How long was your conversation with Mr. Coren
 2       yesterday afternoon?
 3                       MR. COREN:  Objection.  Don't
 4       answer.  Attorney-client privilege, work
 5       product.
 6   A   Per advice of counsel, I'm choosing not to
 7       answer.
 8   Q   Would you be able to answer that question but
 9       for the instruction not to answer?
10   A   No.
11   Q   Did you speak in person or by telephone?
12   A   Telephone.
13   Q   He called you?
14   A   Yes.
15   Q   Was anybody else involved in this discussion?
16   A   Jared was also on the line.
17   Q   Anyone other than Jared Placitella and Michael
18       Coren?
19   A   No.
20   Q   Did you speak to anybody else yesterday
21       afternoon or last night about your deposition
22       today?
23   A   No.
24   Q   Did they call you at home or on the cell phone?
25                       MR. COREN:  Objection.  Don't
```

DONNETTE WENGERD - 04/06/2017          Page 83

```
 1       answer.
 2   A   On the advice of counsel, I'm choosing not to
 3       answer.
 4                     MR. FARRELL:  What's the basis
 5       for the instruction not to answer?
 6                     MR. COREN:  What basis?
 7       Relevance, attorney-client privilege, work
 8       product.
 9            Peter, can we get into the subject matter
10       of the case already?
11                     MR. FARRELL:  Mr. Coren, we spent
12       90 minutes this morning covering the same
13       ground that we covered with a witness yesterday
14       where the witness responded to the questions.
15       The same material we've covered.  That witness
16       gave a whole variety of answers and information
17       in response to those questions.
18            The deposition ended yesterday.  You
19       called this witness.  You spoke to her on the
20       telephone about the deposition yesterday.
21            We've now come into the deposition today,
22       and by our count, we have approximately 50,
23       maybe 60 instructions not to answer just about
24       every question we've asked, including the same
25       questions that were asked yesterday, on grounds
```

```
 1   as frivolous as to whether a communication
 2   occurred by telephone or through other means,
 3   about whether she had been told to preserve
 4   documents, on whether she provided documents to
 5   you to produce them to us in this case.
 6           There have got to be no fewer than three
 7   dozen instructions not to answer that have no
 8   basis at all, including work product objections
 9   as to her views and information about the class
10   in this case, the damages in this case and
11   other subjects.
12           Now, it seems awfully funny to me that
13   the witness yesterday answered all of those
14   questions with no objections from you, and
15   today I'm hearing six dozen different
16   instructions not to answer the same subject.
17           So I happen to view the questions I'm
18   asking right now related to the length of the
19   conversation you had, when it occurred, how it
20   occurred, where it occurred and the subject of
21   that call to be particularly relevant to the
22   deposition that's occurring today.
23           We're going to raise all of these issues
24   with the Court, with Judge Dickson.  We're
25   going to come back, we're going to get answers
```

```
 1      to all of these questions, and we're going to
 2      have a motion for fees and costs, because all
 3      of the objections you've asserted so far have
 4      been baseless and improper.  You know that
 5      they're baseless and improper.  You just don't
 6      want to hear the answers that are going to come
 7      out today.  So that's why I'm asking these
 8      questions, and I'm going to continue to ask
 9      them.
10   Q  Did he call you --
11                  MR. COREN:  Objection.  First of
12      all, one, I disagree with the content, and I'm
13      not going to go over it one by one, but let me
14      just say I dispute and disagree with you.
15              Two, we maintain our objections are based
16      upon the facts and based upon the law.
17              You can proceed.
18                  MR. GEYERMAN:  I just want to --
19      for the Cahill Defendants, I join in the
20      comments by BASF's counsel.  This is Federal
21      Court.  There is a very limited number of bases
22      to instruct the witness not to answer, and we
23      too will be moving for fees and costs when we
24      have to reconvene for another deposition.
25   Q  Did Mr. Coren call you yesterday on your home
```

DONNETTE WENGERD - 04/06/2017                Page 86

```
 1        phone or on your cell phone?
 2                        MR. COREN:  Objection.  Don't
 3        answer.
 4   A    Per advice of counsel, I'm choosing not to
 5        answer.
 6   Q    Do you know the answer to that question?
 7   A    Yes.
 8   Q    So you told me earlier in the deposition that
 9        you prepared for the deposition on Tuesday and
10        there was a meeting, what you thought to be
11        several weeks ago, but you didn't mention this
12        call yesterday afternoon.  Do you recall that?
13   A    That's correct.
14   Q    Have you had any other discussions you haven't
15        yet told me about in the deposition with your
16        counsel related to your preparation for this
17        deposition?
18   A    Not that I recall.
19   Q    Have you spoken to Mr. Bevan since yesterday
20        afternoon?
21   A    No.
22   Q    Have you spoken to anybody at the Bevan firm
23        since yesterday afternoon?
24   A    No.
25                        -  -  -  -  -
```

```
 1              (Defendants' Exhibit 1 was marked.)
 2                      -  -  -  -  -
 3    Q    Mrs. Wengerd, I'm showing you what we've marked
 4         yesterday as Defense Exhibit Number 1, and
 5         we'll make it Exhibit Number 1 to your
 6         deposition today.
 7                      MR. FARRELL:  And for the record,
 8         this is the Seconded Amended Class Action
 9         Complaint in the Williams case.
10    Q    Do you see that?
11    A    Yes.
12    Q    Have you seen this document before?
13    A    Yes.
14    Q    When did you see it?
15    A    It was provided to me quite a few weeks ago.  I
16         don't recall the exact date that I received it.
17    Q    Did you see it before it was filed?
18    A    No.  I don't think so.
19    Q    So the first time the Second Amended Complaint
20         in the Williams case was provided to you was
21         after it was filed?
22    A    I believe that's correct.
23    Q    Who provided it to you?
24    A    I received it in the mail from Mr. Coren.
25    Q    From Mr. Coren.
```

```
 1              Can you turn to paragraph 31 in the
 2         complaint.  It's on page 28.
 3              Before I get to that, did your mother
 4         keep a file of documents related to her
 5         exposure to asbestos?
 6    A    I believe anything that she would have kept
 7         would have gone right in to become my file, but
 8         it was -- anything that she had of relevance
 9         was turned over to Mr. Bevan, and anything that
10         she had that came subsequently to me would have
11         been from Mr. Bevan, just letters or documents
12         that were produced from his office.
13    Q    So let's take that apart a bit.  When you say
14         that your mother had documents that would have
15         been provided to Mr. Bevan, are you talking
16         about back when her case was first filed?
17    A    Correct.
18    Q    What sort of documents did she provide to
19         Mr. Bevan?
20    A    I'm not sure without checking with Mr. Bevan
21         what the entirety was that was provided to him.
22    Q    So if we wanted to know which documents your
23         mother provided to Mr. Bevan, we would have to
24         ask him?
25    A    Correct.
```

```
 1   Q   What sort of file did your mother keep --
 2       withdrawn.
 3           What sort of documents did your mother
 4       keep related to her asbestos case?
 5   A   It would have been communications between her
 6       and her attorney.  She passed away so quickly
 7       that I don't think there was anything even
 8       filed as far as any complaint for any case.
 9           So anything that would have been in that
10       file would have been just communication back
11       and forth.
12   Q   What happened to your mother's file after she
13       passed away?
14   A   It became my file, which I just continued to
15       add to.
16   Q   So all of the documents that your mother had
17       related to her case are now in your possession?
18   A   Correct.
19   Q   And those are kept at your house?
20   A   Correct.
21   Q   Any other location?
22   A   No.
23   Q   If you look at paragraph 31 of the complaint,
24       do you see it says, "On or about May 10th,
25       2008, Plaintiff Wengerd's decedent" -- that's
```

```
 1        you, and decedent is your mother, correct?
 2     A  Correct.
 3     Q  "During her life commenced an asbestos injury
 4        lawsuit in the Court of Common Pleas, Cuyahoga
 5        County, Ohio against BASF, naming same as a
 6        Defendant in accordance with the accepted
 7        asbestos practice in that area in view of
 8        settlement programs that potentially
 9        responsible product manufacturers or suppliers
10        were negotiating or had developed."
11             Do you see that?
12     A  Yes.
13     Q  Did Mr. Bevan file the case that's referenced
14        in paragraph 31?
15     A  I don't recall if he did or Mr. Coren did.
16     Q  You don't know which attorney filed the case
17        that's referenced in paragraph 31 of the
18        Williams case?
19     A  That would have been Mr. Bevan.  I'm sorry.
20        That's correct.
21     Q  What does the phrase "in accordance with the
22        accepted asbestos practice in that area" mean?
23     A  That would be for my attorneys to have
24        interpreted because I'm not familiar enough
25        with asbestos practices.
```

DONNETTE WENGERD - 04/06/2017                    Page 91

```
 1   Q   So if I wanted to know what the accepted
 2       asbestos practice in Cuyahoga County was, I
 3       would need to talk to Mr. Bevan?
 4   A   Yes.
 5   Q   What are the settlement programs in Cuyahoga
 6       County?
 7   A   I'm afraid I would have to confer with my
 8       attorney for an answer to that.
 9   Q   Do you have any personal knowledge related to
10       the settlement programs in Cuyahoga County?
11   A   No.
12   Q   If I wanted to know about the settlement
13       programs in Cuyahoga County for asbestos cases,
14       I would need to talk to Mr. Bevan?
15   A   Correct.
16   Q   What does it mean when the complaint says
17       "potentially responsible product manufacturers
18       or suppliers"?
19   A   I think it means exactly what it says.  It's
20       potential responsibility.  So I think putting
21       this -- filing this specific motion was an
22       allegation of responsibility for asbestos
23       within the products.
24   Q   And so "potentially responsible" means some of
25       the Defendants who were sued might not actually
```

```
 1      have been responsible for the injury alleged in
 2      the complaint that was filed?
 3                      MR. COREN:  Objection to form.
 4      You can answer.
 5   A  That would be for my attorney -- that would
 6      have been up to my attorney to understand and
 7      to advise me of that.
 8   Q  So the person who determined whether a
 9      Defendant was or wasn't responsible and should
10      be sued in the case was Mr. Bevan?
11   A  Correct.
12   Q  How many companies did Mr. Bevan sue in your
13      mother's original asbestos case?
14   A  I don't know without conferring with my
15      attorney.
16   Q  Does the number 90 sound right to you?
17   A  I --
18                      MR. COREN:  Objection as to form.
19      You can respond.
20   A  I don't know.
21                      -  -  -  -  -
22      (Defendants' Exhibit 39 was marked.)
23                      -  -  -  -  -
24   Q  Mrs. Wengerd, I'm showing you what we've marked
25      for identification as Defense Exhibit 39.
```

```
 1              Have you seen this document before?
 2   A   I may have.  I don't recall.
 3   Q   This is the complaint that your mother
 4       originally filed in 2008, correct?
 5   A   Yes.
 6   Q   Which Mr. Bevan filed on her behalf?
 7   A   Correct.
 8   Q   And there are approximately 90 Defendants
 9       listed in the case caption of the case?
10                   MR. COREN:  Objection.  You can
11       respond.
12   A   I haven't counted them, but that's possible.
13   Q   And Mr. Bevan decided which companies to sue as
14       Defendants in the case, right?
15   A   That's correct.
16   Q   Do you know what the basis for the claims were
17       against any of these Defendants?
18   A   Without conferring with my attorney, I couldn't
19       say.
20   Q   You don't have any personal knowledge of the
21       basis for the claims against any of the
22       Defendants in the case?
23   A   No.  That would have been up to my attorneys'
24       discretion.
25   Q   Do you know any of the products that --
```

```
 1        withdrawn.
 2             Do you know the list of products that
 3        were at issue in your mother's original
 4        asbestos case?
 5    A   I know that there were several, all containing
 6        asbestos, but no, I could not list them all.
 7    Q   And what you know about that comes either from
 8        your mother or Mr. Bevan?
 9    A   Correct.
10    Q   So if I wanted more information about that, I
11        would need to talk to Mr. Bevan?
12    A   Correct.
13    Q   Do you know what the resolution of your
14        mother's claim against each of these companies
15        was?
16    A   Not without conferring with my attorney.
17    Q   If I wanted to know the answer to that
18        question, I would talk to Mr. Bevan?
19    A   Correct.
20    Q   Anyone else?
21    A   I don't know what other members of counsel that
22        represent me would know.
23    Q   To your knowledge, the only person who would
24        have that information is Tom Bevan?
25    A   Again, I'm not sure what other members of my
```

```
 1        counsel team may have that information, but
 2        definitely Mr. Bevan would.
 3   Q    How many of the Defendants in your mother's
 4        original asbestos case settled their claims?
 5   A    I don't know without conferring with my
 6        attorney.
 7   Q    More than five?
 8   A    I don't know without conferring with my
 9        attorney.
10   Q    At least one?
11   A    I believe so, yes.
12   Q    And you've -- withdrawn.
13             You're aware that at least some
14        settlement money has been paid in connection
15        with your mother's asbestos case, correct?
16   A    Correct.
17   Q    How much money?
18                  MR. COREN:  Objection as to the
19        amount.
20             I'll instruct you not to witness (sic) on
21        the basis that the issue of settlement with
22        other Defendants is not pertinent and not a
23        part of the case.  So it's a matter before and
24        pending before Judge Dickson.  So until that
25        issue is resolved, I'm instructing her not to
```

DONNETTE WENGERD - 04/06/2017                Page 96

```
 1        respond to the amount of the settlement with

 2        anybody.

 3   Q    The amount of money that has been paid in

 4        settlement in connection with your mother's

 5        original case is something that could be

 6        determined, correct?

 7   A    It could be with the aid of counsel.

 8   Q    There are records that discuss how much money

 9        your mother or you received in connection with

10        your mother's asbestos case?

11   A    Yes.

12   Q    Have you been receiving settlement money since

13        your mother passed away?

14   A    I have received some.

15   Q    When was the last time you received a

16        settlement payment in connection with your

17        mother's asbestos exposure?

18   A    I don't recall.

19   Q    Have you received more than $250,000 in

20        settlement?

21                    MR. COREN:  Objection.  Same

22        instruction.  Do not answer.

23             Issues regarding settlement with other

24        parties is not a matter within this scope of

25        Discovery in this case per our motions in front
```

DONNETTE WENGERD - 04/06/2017          Page 97

1          of Judge -- per our motions and position in

2          front of Judge Dickson.

3                          MR. FARRELL:  You're instructing

4          her not to answer?

5                          MR. COREN:  Yes, as to the amount

6          as you're posing the question.

7    Q    Was your mother's asbestos case filed before or

8         after she passed away?

9    A    Well, this was filed before.  She died July

10        21st, 2008, and it looks like this was filed

11        April 11th, 2008.

12   Q    So the case was filed on behalf of your mother,

13        correct?

14   A    Uh-huh.

15   Q    And then she sat for a deposition in the case?

16   A    Yes.

17   Q    Do you remember how many days of deposition

18        testimony she gave?

19   A    I think it was two or three.

20   Q    Were you present for all of those days?

21   A    Yes.

22   Q    Any time your mother was deposed, you were

23        there?

24   A    Yes.

25   Q    Now, do you recall after your mother --

```
 1      withdrawn.
 2            While your mother's case was pending, she
 3      was receiving medical treatment, correct?
 4   A  Yes.
 5   Q  And then she passed away while the case was
 6      pending?
 7   A  Yes.  I believe so.
 8   Q  And then while she was receiving medical
 9      treatment and after she passed away, doctors
10      were looking at what conditions she had,
11      correct?
12   A  Yes.
13   Q  At least one of the doctors who was consulted
14      in connection with your mother's case thought
15      she didn't have mesothelioma, correct?
16            MR. COREN:  Objection.  You can
17      answer if you know the answer.
18   A  I don't recall.
19                 - - - - -
20      (Defendants' Exhibit 40 was marked.)
21                 - - - - -
22   Q  Mrs. Wengerd, I'm showing you what we've marked
23      for identification as Defense Exhibit 40.  This
24      is a document that the Plaintiffs produced to
25      us in this case bearing Bates stamp PWMS-2393.
```

```
 1        It's dated October 10th, 2008.
 2             Have you seen this before?
 3   A    Yes.
 4   Q    When did you see it?
 5   A    It would have been, I don't know, sometime in
 6        the months that followed my mother's death.
 7   Q    This is a medical record from Akron General
 8        Medical Center, correct?
 9   A    Correct.
10   Q    Is that where your mother was receiving care?
11   A    Yes.
12   Q    Who is Dr. Anne Caveny?
13   A    The pathologist that this report is produced
14        from.
15   Q    She was one of the doctors who was consulted in
16        connection with your mother's case?
17   A    I don't recall.
18   Q    This is a medical record related to your
19        mother's condition, correct?
20   A    Yes.  She is --
21   Q    And the document says, "The patient, a
22        53-year-old woman, was found to have numerous
23        pleural-based masses of the left hemithorax on
24        a CT scan of the chest performed January 28th,
25        2008."
```

```
 1              Do you see that?

 2    A    Yes.

 3    Q    Is that approximately when your mother first

 4         began to notice symptoms of her condition?

 5    A    She began to notice symptoms of her condition

 6         around Christmas and therefore went --

 7    Q    Went to the doctor?

 8    A    Uh-huh.

 9    Q    Now, halfway down the paragraph, this is under

10         the section called Clinical Summary, do you see

11         the line "The immunohistochemical studies and

12         histologic features?"

13              Do you see that sentence that says that?

14         It's around two-thirds of the way down.

15    A    I'm sorry.  I don't see it.

16    Q    (Indicating.)

17    A    Oh, yes.

18    Q    Got it?

19    A    Thank you.

20    Q    The doctor says, "The immunohistochemical

21         studies and histologic features of the tumor

22         were non-specific and the case was forwarded to

23         the Cleveland Clinic for outside expert

24         consultation."

25              Do you see that?
```

DONNETTE WENGERD - 04/06/2017          Page 101

```
 1   A    Yes.

 2   Q    Do you know the Cleveland Clinic?

 3   A    I'm familiar.

 4   Q    It's a medical center?

 5   A    Yes.

 6   Q    It's a very reputable one?

 7   A    Yes.

 8   Q    One of the best hospitals in the world?

 9                    MR. COREN:  Objection to form.

10   A    I don't know how they rank.

11   Q    You consider it to be a reputable medical

12        center?

13   A    Yes.

14   Q    Then you see later down in the paragraph it

15        says, "The Cleveland Clinic diagnosis of the

16        core biopsy of lung was "malignant sarcomatoid

17        and epithelioid neoplasm".  Despite the

18        extensive workup, a more specific diagnosis

19        could not be made."

20            Do you see that?

21   A    Yes.

22   Q    So the medical record is saying they couldn't

23        be more specific than saying malignant

24        sarcomatoid and epithelioid neoplasm?

25                    MR. COREN:  So you're asking her
```

```
1      if this is what the document says, because
2      she's not a medical expert?  You haven't
3      qualified her as that, so I don't understand
4      the point of asking her about --
5                  MR. FARRELL:  I don't need a
6      speaking objection.  Do you have a form or a
7      foundation objection?
8                  MR. COREN:  I just gave you the
9      form.  Objection, Peter.
10                 MR. FARRELL:  Then please say
11     form.  I don't need this speech, Michael.
12                 MR. COREN:  I have a right to
13     give you the form, too.  Go ahead.
14  Q  The medical record says that a more specific
15     diagnosis of her condition could not be made,
16     correct?
17  A  That's correct.
18  Q  And then you see the next section of the
19     document, Final Summary?
20  A  Yes.
21  Q  And that sections says, "Sections from the
22     tumor nodules of the left parietal and visceral
23     pleura, chest wall and subpleural parenchyma
24     were somewhat obscured by necrosis and
25     postmortem autolysis.  The histologic features
```

```
 1        of the tumor, however, are not consistent with
 2        mesothelioma."
 3             Do you see that?
 4   A    Yes.
 5   Q    So this medical report is saying that the
 6        histologic features of the tumor were not
 7        consistent with mesothelioma, correct?
 8                  MR. COREN:  So you're asking her
 9        to read it and agree with you that that's what
10        it says?
11   Q    That's what the document says, yes?
12   A    That is what the document says.
13   Q    Were you aware that at least one medical record
14        had concluded that your mother's condition was
15        not consistent with mesothelioma?
16                  MR. COREN:  Objection as to form.
17        You may answer.
18   A    I've seen it before, so I have read it.
19   Q    So you were aware of this?
20   A    Yes.
21   Q    And then further down in the paragraph towards
22        the end of Final Summary, it says, "The
23        possibility of a metaplastic or sarcomatoid
24        carcinoma, including a giant cell carcinoma of
25        lung, also cannot be entirely excluded.
```

```
 1        Despite the extensive battery of immunostains
 2        and electron microscopy, it is not possible to
 3        arrive at a definite diagnosis."
 4             Do you see that?
 5   A    I do see it.
 6   Q    So you were aware in 2008 that at least one
 7        doctor had thought your mother's condition was
 8        not consistent with mesothelioma, correct?
 9                  MR. COREN:  Objection to form.
10        You can answer.
11   A    Per the document, that was their opinion.
12   Q    And you're also aware that in 2008 at least one
13        doctor had thought it wasn't possible to arrive
14        at a definite diagnosis of mesothelioma, true?
15                  MR. COREN:  Objection as to form.
16        You can answer.
17   A    Yes.  I see that is their opinion in this
18        document.
19   Q    Now, as part of your mother's litigation, do
20        you know whether she disclosed to the
21        Defendants in those cases that at least one
22        doctor thought she didn't have mesothelioma?
23                  MR. COREN:  Objection as to form.
24   A    I wouldn't be aware.  I'm sorry.
25   Q    Who would know that?
```

```
 1    A    If there was any communication with any
 2         Defendants, Mr. Bevan would have that
 3         information.
 4    Q    I would need to talk to Mr. Bevan?
 5    A    Yes.
 6    Q    Now, your mother also submitted claims on
 7         bankruptcy trusts, correct?
 8    A    Yes.
 9    Q    And you've submitted claims on bankruptcy
10         trusts on your mother's behalf?
11    A    Yes.
12    Q    How many bankruptcy trust claims have you
13         submitted claims against?
14    A    I don't know without conferring with my
15         attorney.
16    Q    More than five?
17    A    I don't know.  Possibly.
18    Q    More than ten?
19    A    I don't know without conferring with my
20         attorney.
21    Q    Do you recall when you were filling out the
22         bankruptcy trust forms, they would ask you to
23         check a box as to the injury that your mother
24         had developed?
25    A    I don't recall.  They were not all uniform, so
```

```
1          I couldn't say for certain.
2     Q    Do you remember if any of the bankruptcy trust
3          forms asked you to identify the conditions she
4          developed?
5     A    I don't believe that was something that I
6          particularly filled out.  That would have been
7          filled out by my attorney.
8     Q    So all of the bankruptcy trust forms that you
9          completed, Mr. Bevan filled out on your behalf?
10    A    Yes.
11    Q    Did you fill out any of them personally?
12    A    I don't believe so.  There were portions that I
13         was to sign or have notarized or witnessed, but
14         I did not fill them out myself.
15    Q    Did you review them to confirm they were
16         accurate?
17    A    I did look them over.
18    Q    Yes?
19    A    Yes.  I did review them.
20    Q    To confirm they were accurate?
21    A    Some of them are quite written in legalese, so
22         it would have been above my knowledge how to
23         interpret some of them.  So I conferred to my
24         attorney's discretion and his information
25         provided to me.
```

```
 1   Q   On all of the bankruptcy trust forms that you
 2       submitted, did you indicate that your mother
 3       had mesothelioma?
 4   A   Again, I didn't fill them out, so I didn't
 5       indicate anything on the form itself.  That
 6       would have been filled out by my attorney.
 7   Q   Did any of the bankruptcy trust forms that you
 8       reviewed to confirm their accuracy indicate
 9       that your mother had mesothelioma?
10   A   I don't recall.
11   Q   Would seeing the forms refresh your
12       recollection?
13   A   I could read the form to you and confirm my
14       signature on it, but other than that, I can't
15       recall what was on all of the forms since they
16       were not necessarily uniform.
17   Q   I would need to talk to Mr. Bevan?
18   A   Correct.
19   Q   Who has the actual forms that were submitted to
20       the trusts?
21   A   Mr. Bevan would have a copy of anything that
22       would have been submitted.
23   Q   Do you know whether all of Mr. Bevan's files
24       related to the bankruptcy trust claims that
25       were submitted on behalf of your mother were
```

DONNETTE WENGERD - 04/06/2017          Page 108

```
 1        produced to the Defendants in this case?
 2                      MR. COREN:  Objection.
 3        Privileged.  Work product.
 4   A    On advice of counsel, I'm choosing not to
 5        answer.
 6   Q    Do you know the answer to the question?
 7   A    No.
 8   Q    Have you authorized Mr. Bevan to produce his
 9        documents to Defendants in this case?
10                      MR. COREN:  Objection.  Instruct
11        her not to answer.  Attorney-client.
12   A    On advice of counsel, I'm choosing not to
13        answer.
14   Q    Has the subject matter of whether Mr. Bevan
15        should produce his files to Defendants in this
16        case been discussed with you?
17                      MR. COREN:  Objection.  Instruct
18        her not to answer.  Attorney-client privilege,
19        work product privilege.
20   A    On advice of counsel, I'm choosing not to
21        answer.
22   Q    Do you know the answer to the question?
23   A    I believe so.
24                      -  -  -  -  -
25        (Defendants' Exhibit 41 was marked.)
```

```
 1                - - - - -
 2   Q   Mrs. Wengerd, this is a document we've marked
 3       for identification as Defense Exhibit Number
 4       41.
 5            Have you seen this document before?
 6   A   I don't recall.
 7   Q   And I'll state for the record that the document
 8       has the Bates stamp PWMS-0002616 and also
 9       2616_0002.
10            Do you see that on the document?
11   A   Yes.
12   Q   So on the page you're looking at now, the page
13       that has underscore 2, this is a document from
14       the Celotex Asbestos Settlement Trust.
15            Do you see that?
16   A   I do.
17   Q   And it's dated April 28th, 2009, right?
18   A   Correct.
19   Q   So after the medical record we were just
20       looking at a few minutes ago?
21   A   That's correct.
22   Q   And it's addressed to Bevan & Associates, yes?
23   A   Correct.
24   Q   That's where Mr. Bevan works?
25   A   Yes.
```

```
 1   Q   And about halfway down on the page it says

 2       Injured Person Name:  Jennifer Graham.

 3             That's your mother?

 4   A   Correct.

 5   Q   And then it says Confirmed Injury:

 6       Mesothelioma.

 7             Do you see that?

 8   A   Correct.

 9   Q   Do you know whether Mr. Bevan informed the

10       Celotex Asbestos Settlement Trust that at least

11       one doctor thought your mother might not have

12       mesothelioma?

13                    MR. COREN:  Objection.

14   A   I do not know.

15                    MR. FARRELL:  Basis?

16                    MR. COREN:  I have an objection

17       to form, Peter.  Go ahead.  You didn't hear me

18       say --

19   A   I don't know.

20   Q   Did you inform the Celotext Asbestos Settlement

21       Trust that at least one doctor thought your

22       mother might not have mesothelioma?

23   A   No.  I expected my attorney to represent me.

24       So I would not have contacted anyone directly.

25   Q   You relied on Mr. Bevan?
```

```
 1   A   Correct.
 2   Q   Do you think that the Celotext Asbestos
 3       Settlement Trust would have wanted to know that
 4       your mother might not have had mesothelioma?
 5                  MR. COREN:  Objection.  Instruct
 6       her not to answer.  You're asking her to
 7       speculate into the mind of another third party.
 8       It's beyond the scope of Discovery.
 9                  Also, number two, you're invading her
10       work product and her mental processes.  I
11       instruct her not to answer.
12                  MR. FARRELL:  What's the basis
13       for the instruction not to answer?
14                  MR. COREN:  I just said it,
15       Peter.
16                  MR. FARRELL:  Is it work product
17       or relevance?
18                  MR. COREN:  Yes.
19                  MR. GEYERMAN:  Attorney work
20       product or layperson work product?
21                  MR. COREN:  A, she has a work
22       product privilege; two, Mr. Bevan has a work
23       product privilege; two -- three, there is an
24       attorney-client privilege aspect, and four,
25       relevance because it's calling for her to
```

DONNETTE WENGERD - 04/06/2017          Page 112

1          speculate into the mind of a third party.

2                  We're here to get facts, not

3          speculations.

4                        MR. GEYERMAN:  We're here to get

5          answers to questions, but you're blocking them

6          repeatedly.

7                        MR. COREN:  I'm not blocking

8          them.  I'm asserting.

9                        MR. GEYERMAN:  This is a

10         deposition in Federal Court.

11    Q    If someone had asked you to pay compensation

12         because somebody had mesothelioma, would you

13         have wanted to know that at least one of their

14         doctors thought that they didn't have

15         mesothelioma?

16                        MR. COREN:  Objection.  Same

17         instruction.

18                        MR. FARRELL:  You're instructing

19         her not to answer that question?

20    A    It's a hypothetical question.

21    Q    Are you answering it or not?

22    A    On advice of counsel, I'm choosing not to

23         answer.

24    Q    Do you think in fairness that the contrary

25         diagnosis your mother received regarding her

```
 1        condition should have been provided to the

 2        Celotext Asbestos Settlement Trust before they

 3        paid compensation for your mother's injury?

 4                        MR. COREN:  Objection as to form.

 5        Instruct her not to answer.  Once again, same

 6        basis, privilege.

 7    A   On advice of counsel, I'm choosing not to

 8        answer.

 9    Q   At any time after you received this money from

10        the Celotex Asbestos Settlement Trust, did you

11        tell them about the contrary diagnosis that

12        your mother had received indicating that she

13        might not have mesothelioma?

14    A   As previously answered, I was represented by

15        counsel and would have expected them to

16        interact with anyone on my behalf.  I would not

17        have contacted this person on my own.

18    Q   Well, would you have expected Mr. Bevan to

19        provide the medical record to the Celotext

20        Asbestos Settlement Trust?

21                        MR. COREN:  Objection.  Don't

22        answer.  Privilege.

23    A   Per advice of counsel, I'm choosing not to

24        answer.

25    Q   Do you think in fairness that the medical
```

```
 1      record indicating that your mother may not have
 2      had mesothelioma should have been provided to
 3      the bankruptcy trust who was paying you
 4      compensation for her asbestos injury?
 5                  MR. COREN:  Same objection.  Same
 6      instruction.
 7   A  I'm choosing not to answer on advice of
 8      counsel.
 9   Q  Do you know whether the October 2008 medical
10      record that we've marked as Defense Exhibit 40
11      has been provided to any of the bankruptcy
12      trusts that have paid compensation because of
13      your mother's exposure to asbestos?
14   A  That would be something that I would have to
15      confer with my attorney.  I would have expected
16      him and do expect him to act upon my behalf.
17      So I would not know if he sent that or not.
18   Q  Mr. Bevan would know the answer to that
19      question?
20   A  Correct.
21   Q  When you say you expect him to act on your
22      behalf, does he consult with you about
23      submitting these forms?
24                  MR. COREN:  Objection.
25      Attorney-client privilege, work product.
```

```
 1   A   Per advice of counsel, I choose not to answer.
 2   Q   Do you know the answer to that question?
 3   A   Yes.
 4   Q   You could answer it but for the instruction not
 5       to answer?
 6   A   Correct.
 7   Q   Is it your understanding, Mrs. Wengerd, that
 8       the amount of compensation that these
 9       bankruptcy trusts pay is in part determined by
10       the injury that the person has developed?
11   A   I don't know enough about how they work to say
12       yes or no to that.
13   Q   Nobody has explained to you the condition that
14       a person has developed is a part of how these
15       trusts determine how much money to pay in
16       settlement?
17                   MR. COREN:  Mrs. Wengerd, I
18       instruct you not to answer to the extent your
19       answer relies upon the advice of counsel.  If
20       you could answer the question without
21       incorporating or revealing advice of counsel,
22       please respond to Mr. Farrell's question.
23   A   I have no personal information to add to the
24       question -- to the answer.
25   Q   If your mother didn't -- withdrawn.
```

DONNETTE WENGERD - 04/06/2017          Page 116

```
 1              If you had indicated that your mother had
 2         a condition other than mesothelioma on these
 3         bankruptcy trust forms, do you think the trust
 4         would have paid you more or less money?
 5                        MR. COREN:  Objection.
 6    A    I have no information.  I don't know.
 7    Q    Would Mr. Bevan know?
 8    A    Yes.
 9    Q    Were you involved in the conversations between
10         your mother and Mr. Bevan regarding her
11         decision to file an asbestos injury lawsuit?
12    A    I don't know that I was present for all of
13         their conversations.
14    Q    Do you know whether Mr. Bevan discussed with
15         you or your mother which companies he was going
16         to file a lawsuit against on her behalf?
17                        MR. COREN:  Objection.
18         Attorney-client privilege, work product
19         privilege.  Do not answer.
20    A    It would be attorney-client privilege of what
21         we discussed.
22    Q    Do you know the answer to that question?
23    A    I'm not sure I recall.
24    Q    Can you turn to paragraph 232 in Williams
25         Second Amended Complaint.
```

DONNETTE WENGERD - 04/06/2017          Page 117

```
 1   A   Okay.

 2   Q   You're there?

 3   A   Yes.

 4   Q   Paragraph 232 of the Williams Second Amended

 5       Complaint begins, "On or about November 12th,

 6       2008 BASF's Northern Ohio area local defense

 7       attorney, Jennifer A. Riester, Esquire, mailed

 8       a letter with enclosures to the Bevan law firm

 9       requesting voluntary dismissal of two of the

10       firm's then pending asbestos injury matters it

11       had filed in Cuyahoga County, Ohio, Court of

12       Common Pleas," and then it references your

13       mother's case as one of the two cases, correct?

14   A   Correct.

15   Q   Do you know who Jennifer Riester is?

16   A   I believe she was the attorney representing

17       BASF.

18   Q   And where did you learn that fact?

19   A   I believe she was discussed --

20               MR. COREN:  If it's from

21       attorney-client, to the extent your answer --

22   A   On 233, where it represents the Engelhard

23       Corporation in regard to a continuation on of

24       this.  It may have been discussed with counsel.

25       I don't recall.
```

```
 1   Q   Do you have any personal knowledge of Jennifer
 2       Riester's role in your mother's asbestos case?
 3   A   Other than what's quoted in this document, no.
 4   Q   So the only source of information that you have
 5       about Jennifer Riester's role in your mother's
 6       asbestos case is the complaint itself?
 7   A   Correct.
 8   Q   Have you ever seen the November 12th, 2008
 9       letter that is referenced in paragraph 232 of
10       the Williams complaint?
11   A   I don't recall.
12   Q   As you sit here today, you have no recollection
13       of having seen it?
14   A   No.
15   Q   Paragraph 233 states, "Ms. Riester's November
16       12th, 2008 letter requested the Bevan law firm
17       to "voluntarily dismiss Eastern Magnesia Talc
18       and, in the Young case, both Eastern Magnesia
19       Talc and Engelhard Corporation, from these
20       cases on the basis that talc produced by EMTAL
21       contained no asbestos."
22           Do you see that?
23   A   Yes, I see it.
24   Q   Do you know what the Eastern Magnesia Talc is?
25   A   I believe it's a company.
```

```
 1   Q   What is the basis for that answer?
 2   A   It would have been just either from this
 3       document or discussions with my attorney.
 4   Q   Other than seeing it in the Williams complaint
 5       or talking to the Cohen Placitella firm, you've
 6       got no independent knowledge of Eastern
 7       Magnesia Talc?
 8   A   No.  I have no personal knowledge, other than
 9       what was advised by counsel.
10   Q   Are you aware of any statements by BASF or
11       Engelhard that are fraudulent other than the
12       statements identified in the Williams
13       complaint?
14   A   I have no personal knowledge.
15   Q   So paragraph 233 talks about the request to
16       voluntarily dismiss the case.
17           Do you see that?
18   A   I do.
19   Q   Did you know that your mother had been asked to
20       voluntarily dismiss her case?
21   A   Since it was almost ten years ago, it's
22       possible, but I don't recall specifically.
23   Q   As you sit here today, you have no recollection
24       of having been aware of this fact?
25   A   No.  That would have been something that I may
```

```
 1        have discussed with my attorney at the time.
 2   Q    And your mother didn't voluntarily dismiss her
 3        case, correct?
 4   A    That is correct.
 5   Q    So receiving this letter from Ms. Riester
 6        didn't cause her to dismiss her complaint?
 7   A    No.  I don't believe so.
 8   Q    Paragraph 234 of the Williams complaint says,
 9        "In support of both her request for voluntary
10        dismissal and her representation that
11        Engelhard's talc contained no asbestos, Ms.
12        Riester provided the Bevan law firm again with
13        copies of the Ashton Affidavit and Pooley
14        Report, along with other purported analyses
15        that allegedly state or indicate that talc from
16        Engelhard's Johnson talc mine did not contain
17        asbestos."
18             Do you see that?
19   A    I do.
20   Q    Have you ever seen the Ashton Affidavit before?
21   A    I don't recall.
22   Q    Have you ever seen the Pooley Report before?
23   A    Again, I don't recall.
24   Q    Was this the sort of correspondence that
25        Mr. Bevan would have provided to you or your
```

```
 1        mother at the time he received it?
 2   A    It may have been.  I don't recall.
 3   Q    If Mr. Bevan had provided this November 12th,
 4        2008 letter to your mother or you, would it be
 5        in the file that you keep at home?
 6   A    It might be.  I don't know.
 7   Q    Do you know whether it's in that file?
 8   A    I don't know offhand.
 9   Q    At the time that the letter was sent, November
10        2008, your mother had already passed away,
11        correct?
12   A    Correct.
13   Q    So Mr. Bevan would have been communicating with
14        you about her case?
15   A    Correct.
16   Q    Anyone else other than you?
17   A    No.
18   Q    Do you recall discussing the subject of the
19        Ashton Affidavit or the Pooley Report with
20        Mr. Bevan?
21   A    I don't recall.
22   Q    Paragraph 235 says, "To further bolster her
23        request for voluntary dismissals of the two
24        cases, Ms. Riester's letter noted to the Bevan
25        law firm that Engelhard and EMTAL had been
```

```
 1        named as Defendants and subsequently dismissed
 2        voluntarily in 567 asbestos claims."
 3             Do you see that?
 4   A    Yes.
 5   Q    And then it goes on to discuss cases in Kansas
 6        and Michigan and other places.
 7             Do you see that?
 8   A    I do.
 9   Q    Did you know those facts?
10   A    Only through the complaint.
11   Q    So other than the fact that this was described
12        in the complaint, you had no knowledge of the
13        facts described in paragraph 235?
14   A    If the information was previously provided, I
15        don't recall.
16   Q    Were you aware that Engelhard had been
17        dismissed from other asbestos cases?
18   A    I don't know.
19   Q    Can you turn to Page 111 of the Williams
20        complaint, paragraph 239.
21             Do you see that?
22   A    Yes.
23   Q    It says, "When Plaintiff Wengerd in her
24        capacity as personal representative of her
25        mother's estate (Mrs. Graham having died on
```

```
 1        July 8th, 2008) did not voluntarily dismiss

 2        BASF from her mother's asbestos injury case as

 3        requested by Ms. Riester in her November 12th,

 4        2008 letter, Ms. Riester and her firm

 5        thereafter filed a Motion For Summary Judgment

 6        seeking its involuntary dismissal."

 7             Do you see that?

 8   A    I do.

 9   Q    Do you know what a Motion For Summary Judgment

10        is?

11   A    I believe that is when a Judge makes a ruling

12        if it's worth saying -- worth pursuing or not.

13   Q    Did you see BASF's Motion For Summary Judgment

14        in your mother's case?

15   A    I don't recall.

16   Q    Paragraph 239 goes on to state, "Asking the

17        Cuyahoga County Court of Common Pleas to

18        dismiss this case, BASF claimed to the court

19        that there was no proof that its predecessor

20        Engelhard's talc was present in Ms. Graham's

21        workplace at the Goodyear Tire & Rubber Plant

22        she was employed in, and in any event, there

23        was no evidence that Engelhard's talc contained

24        asbestos."

25             Do you see that?
```

```
 1   A   Yes.

 2   Q   So the complaint is saying BASF had made two

 3       arguments.  One was that your mother wasn't

 4       exposed to EMTAL talc, and two, there was no

 5       asbestos in the talc, right?

 6   A   That is what it says.

 7   Q   Is that your understanding of what BASF's

 8       Motion For Summary Judgment said?

 9   A   That's my understanding of that is what they

10       claimed.

11   Q   Both that your mother had not been exposed to

12       the talc, correct?

13   A   That is what it says.

14   Q   So you're aware that BASF moved for summary

15       judgment on the grounds that your mother wasn't

16       exposed to its talc at all?

17                   MR. COREN:  Form.  Objection.

18   A   Yes.  That is my understanding.

19   Q   BASF's Motion For Summary Judgment doesn't

20       actually argue at all that there was no

21       asbestos in EMTAL talc, correct?

22                   MR. COREN:  Objection as to the

23       form.  You can respond if you know.

24   A   I have no personal information to add to that,

25       other than what would be advised by my
```

```
 1      attorney.
 2   Q  Only Mr. Bevan would know?
 3   A  I would say Mr. Bevan would be apprised of
 4      that.
 5   Q  You have no basis to dispute that the only
 6      argument that BASF made in its opening brief
 7      for summary judgment was that your mother
 8      hadn't been exposed to EMTAL talc?
 9                  MR. COREN:  Form.  Objection.
10   A  I would have no other personal information
11      other than what was provided by my attorney.
12   Q  Paragraph 240 says, "The Bevan firm in or about
13      early 2009 opposed BASF's Motion for Summary
14      Judgement."
15          Do you see that?
16   A  Yes.
17   Q  Do you have a copy of that brief?
18   A  I don't know without checking my file.
19   Q  It's possible you have it at home?
20   A  It's possible.
21   Q  So you could check that?
22   A  Yes.
23   Q  Do you know whether Mr. Bevan has a copy of the
24      early 2009 opposition brief he filed?
25   A  I would expect that he would have any copy of
```

 1      anything he produced.

 2   Q   Did the Cohen Placitella firm ask you for a

 3       copy of the Bevan firm's opposition to BASF's

 4       Motion For Summary Judgment?

 5                    MR. COREN:   Objection.  Don't

 6       answer.  Privilege.

 7   A   On the advice of counsel, I choose not to

 8       answer.

 9   Q   Did you ask Mr. Bevan whether he had a copy of

10       the brief?

11                    MR. COREN:   Objection.  Same.

12   A   On advice of counsel, I choose not to answer.

13   Q   Well, you read this document, correct?

14   A   Correct.

15   Q   When you were reading these paragraphs, 232,

16       233, so on, and now we're up to 244 regarding

17       your mother's original case, did you at any

18       time ask the lawyers, "Hey, can I see the

19       documents that are referenced in here?"

20   A   No.

21   Q   Why not?

22                    MR. COREN:   Objection.  Don't

23       answer.

24                    MR. FARRELL:   What's the basis

25       for the instruction?

DONNETTE WENGERD - 04/06/2017          Page 127

```
 1                      MR. COREN:  Work product.

 2        Attorney-client.

 3   A   On advice of counsel, I choose not to answer.

 4                  - - - - - -

 5        (Defendants' Exhibit 42 was marked.)

 6                  - - - - - -

 7   Q   Mrs. Wengerd, I'm showing you what we've marked

 8        for identification as Defense Exhibit 42.

 9            Do you have that in front of you?

10   A   Yes.

11   Q   And this is a copy of BASF's Motion For Summary

12        Judgment in your mother's original case,

13        correct?

14   A   Yes.

15   Q   Have you seen this document before?

16   A   I don't recall.

17   Q   If you turn to the page at the bottom of BASF's

18        Motion for Summary Judgment, I see a Bates

19        stamp BASF_Williams and then the number is

20        20427?

21   A   Yes.

22   Q   Could you turn to that page?  I think it's the

23        third page of the document.

24   A   20427, you said?

25   Q   20427, correct.
```

DONNETTE WENGERD - 04/06/2017          Page 128

```
 1   A   Okay.  I have that.

 2   Q   The second paragraph says, "Jennifer Graham was

 3       deposed over several days.  She did not

 4       identify EMT as the manufacturer of any talc

 5       products at Goodyear."

 6            Do you see that?

 7   A   I do.

 8   Q   "Her father, David Wertheimer, was deposed in

 9       his own case and as a co-worker in other cases

10       prior to his death."

11            Who is David Wertheimer?

12   A   David Wertheimer was my mother's father.

13   Q   And was he a tire worker?

14   A   He was.

15   Q   Which plant did he work at?

16   A   I believe he was at Goodrich.

17   Q   Did he file a personal injury case related to

18       asbestos exposure?

19   A   I believe he may have.

20   Q   Do you know whether he sued Engelhard or BASF

21       in his case?

22   A   I wouldn't know.

23   Q   Do you know whether Mr. Wertheimer is in or out

24       of the Williams class?

25   A   I don't know.  He would -- my assumption would
```

```
 1         be that he is not since he is deceased, but

 2         again, I would have to confer with my attorney

 3         to know.

 4    Q    Your view is that anybody who has passed away

 5         is no longer in the Williams class?

 6    A    I don't know that.  That is not true, actually.

 7    Q    That was what you had just told me, that you

 8         thought he was -- that that's the reason he

 9         wouldn't be in the class?

10    A    I don't know that he would be or would not be.

11         Again, I would have to confer with my attorney.

12    Q    You don't know one way or the other?

13    A    I have no personal information to add, other

14         than what my attorney would advise.

15    Q    BASF's Motion For Summary Judgment goes on to

16         say, "He did not identify EMT as a manufacturer

17         of talc.  Plaintiff has offered no testimony

18         that she was ever exposed to an EMT product.

19         Plaintiff has not provided any evidence that

20         she was ever exposed to a product manufactured

21         or supplied by EMT."

22             Do you see that?

23    A    I do.

24    Q    So BASF's Motion For Summary Judgement is

25         arguing they should be dismissed from the case
```

```
 1      because there was no evidence your mother

 2      actually used EMTAL talc, correct?

 3   A  That is what it says, yes.

 4   Q  And then on the cover of the first page of the

 5      MSJ, this is the page marked BASF_Williams

 6      20426, there's a stamp on the top that says

 7      "Granted", right?

 8   A  I see.

 9   Q  So it's possible the Court granted BASF's

10      Motion For Summary Judgment because your mother

11      wasn't exposed to EMTAL talc at all, correct?

12                   MR. COREN:  Objection.  Because

13      you're asking her to speculate to the Court,

14      and she has no basis to speculate on the Court.

15   Q  You can answer the question.

16   A  I believe that based on the information that

17      the Court was provided, that was the decision

18      that the Court came to at that time.

19   Q  That BASF should be dismissed because there was

20      no evidence your mother was exposed to EMTAL

21      talc?

22                   MR. COREN:  Objection to form.

23      Same.  Speculating into the Court's reason that

24      the opinion was issued.

25   A  I don't know why they would have made that
```

```
 1        other than what I previously said, that that
 2        was information that was provided to the Court.
 3   Q    As you sit here today, you don't know why the
 4        Court granted BASF's Motion For Summary
 5        Judgment, correct?
 6   A    I wouldn't know the mind of the Judge that made
 7        the decision.
 8   Q    It's possible that the Judge granted the motion
 9        because he thought there was no evidence your
10        mother was actually exposed to EMTAL talc,
11        correct?
12                    MR. COREN:  Form.  Objection.
13   A    It's possible.
14   Q    If your mother wasn't actually exposed to EMTAL
15        talc at all, then it wouldn't matter whether
16        there was asbestos in the talc, correct?
17                    MR. COREN:  Objection to form.
18   A    It wouldn't matter if she was exposed to the
19        talc?  I don't know that I agree with that.  I
20        think if she was exposed to the talc and it
21        contained asbestos, it would definitely be
22        prudent to this case.
23   Q    I'm asking a slightly different question.  If
24        your mother wasn't exposed to EMTAL talc at
25        all, it wouldn't matter to her case whether
```

```
 1        there was asbestos in the talc, correct?
 2                    MR. COREN:  Form objection.  You
 3        can answer.
 4   A    That's correct.
 5   Q    Now, your mother also filed claims against the
 6        company called RT Vanderbilt, right?
 7   A    That name sounds familiar.
 8   Q    Do you recall having to address issues related
 9        to your mother's claims against RT Vanderbilt?
10   A    I don't recall.
11   Q    RT Vanderbilt is a manufacturer of talc?
12   A    I don't recall exactly what they manufacture.
13   Q    Your mother was asked during her deposition
14        whether she associated a brand name with the
15        talc that she worked with at Goodyear, correct?
16   A    I believe that's correct.
17   Q    And she identified Vanderbilt, correct?
18   A    I don't recall without reviewing her
19        deposition.
20                    -  -  -  -  -
21        (Defendants' Exhibit 43 was marked.)
22                    -  -  -  -  -
23                    MR. COREN:  Liz, what number are
24        we up to?
25                    MS. DALMUT:  43.
```

```
 1   A   Is there a specific line that you're requesting
 2       that I look at?
 3   Q   Yes.  One moment.
 4           So, Mrs. Wengerd, I've put in front of
 5       you a portion of your mother's deposition
 6       transcript that we've marked as Defense Exhibit
 7       43.  This is the July 3rd, 2008 session of the
 8       deposition.
 9           Do you see that?
10   A   I don't see the date.  Oh, yes.
11   Q   And you told me earlier that you were present
12       for all of the days of her deposition?
13   A   That's correct.
14   Q   Have you ever seen the transcript before, or
15       were you just present while she was giving
16       testimony?
17   A   I don't think I've seen the transcript before.
18   Q   Can you turn to page 35 of the transcript.
19   A   Okay.
20   Q   And towards the bottom of page 35, do you see
21       there's a question there by Mr. Bevan,
22       "Jennifer, earlier in your testimony you
23       mentioned talc.
24           Do you recall that?"
25           Answer:  "Yes, I do."
```

DONNETTE WENGERD - 04/06/2017          Page 134

```
 1                 Question:  "Do you recall the names of
 2        that talc?"
 3                 Answer:  "I associate that name with
 4        Vanderbilt."
 5                 Do you see that?
 6    A   Yes.
 7    Q   And that was your mother's testimony in her
 8        deposition?
 9    A   Yes.
10    Q   So she had said she had -- the brand talc she
11        worked with was Vanderbilt talc, correct?
12                         MR. COREN:  Objection as to form.
13    A   That is one name she recalled.
14    Q   The only name she identified in response to
15        Mr. Bevan's question about the brands she
16        worked with, correct?
17    A   That is what it says, yes.
18    Q   Were you aware that Mr. -- withdrawn.
19                 Are you aware that Vanderbilt also filed
20        a Motion For Summary Judgment?
21    A   I don't recall.
22    Q   Do you know whether Vanderbilt was dismissed
23        from your mother's case?
24    A   I don't recall.
25    Q   Do you know what the final outcome of your
```

```
 1       mother's claim against RT Vanderbilt was?

 2   A   Not without conferring with my attorney.  I

 3       don't remember.

 4   Q   Mr. Bevan would know the answer to that

 5       question?

 6   A   Correct.

 7   Q   We would need to talk to him to know?

 8   A   Correct.

 9                    -  -  -  -  -

10       (Defendants' Exhibit 44 was marked.)

11                    -  -  -  -  -

12   Q   Mrs. Wengerd, I'm showing you what we've marked

13       as Defense Exhibit 44, which is a copy of your

14       interrogatory responses in the Williams case.

15       Have you seen this document before?

16   A   Yes.  I believe so.

17   Q   When did you see it?

18   A   I don't recall.  It may have been a part of the

19       packet with the complaint that I was provided.

20   Q   Who sent it to you?

21   A   It would have been from Mr. Coren's office.

22   Q   From Mr. Coren or somebody in his office?

23   A   I don't know who actually sent the envelope.

24   Q   Did you write the responses to these

25       interrogatories?
```

DONNETTE WENGERD - 04/06/2017          Page 136

```
 1    A    No.  I did not write all of them.  There were
 2         some that I believe I wrote and some that were
 3         asked verbally.
 4    Q    Which ones did you write the responses to?
 5    A    I don't recall.
 6    Q    Which ones did you respond to verbally?
 7    A    I don't recall.
 8    Q    Can you identify one response that you wrote
 9         yourself?
10    A    Let me look.  Do you have a specific one that
11         you're asking if I wrote since most of these
12         are noted with objections?
13    Q    Well, you said you wrote some of them.  I don't
14         know which ones you wrote.  So can you identify
15         for me which of your interrogatory responses
16         you wrote?
17    A    Interrogatory number 7 would have been
18         something that I would have been asked
19         verbally.
20              I can't recall if I wrote Interrogatory
21         number 9 or not or if it was asked verbally.
22              I can't recall.
23    Q    As you sit here today, you can't identify even
24         one interrogatory response you wrote yourself?
25    A    Again, the one that provided the addresses, I
```

```
 1        may have written that, but I can't remember

 2        offhand since it was some time ago.  It's

 3        possible.

 4    Q   As you sit here today, you don't know?

 5    A   That's right.

 6    Q   Who would have written the responses if it

 7        wasn't you?

 8    A   I believe it would have been the -- I believe

 9        she was a paralegal from the Cohen firm, but I

10        cannot recall her name.

11    Q   She wrote the responses?

12    A   I believe, because she was writing as I was

13        talking trying to tell her.

14    Q   How long did the conversation last?

15    A   I don't remember.

16    Q   When did the conversation occur?

17    A   I don't recall the date.

18    Q   So you spoke to a paralegal from the Cohen

19        Placitella firm on the phone, she wrote the

20        responses and --

21    A   No.  We met in person.

22    Q   You met in person.

23            Where did that happen?

24    A   At Mr. Bevan's firm.

25    Q   So you met with a paralegal from the Cohen
```

```
 1        Placitella firm at Mr. Bevan's office?
 2    A   Correct.  Mr. Placitella was also there at the
 3        time.  Jared.
 4    Q   Anybody else?
 5    A   No.  Not that I recall.
 6    Q   Was Mr. Bevan there?
 7    A   I may have said hello to him, but that's --
 8    Q   Did he participate in the meeting?
 9    A   No.
10    Q   Did he provide any input into your
11        interrogatory responses?
12    A   No.
13    Q   So after this paralegal from the Cohen
14        Placitella firm drafted your responses, did
15        they hand you a draft on the spot at the
16        meeting, or did you receive them sometime
17        later?
18    A   I believe I received them sometime later.  She
19        may have e-mailed them at some point as well.
20    Q   So you have at least one e-mail from the Cohen
21        Placitella firm?
22    A   I believe so.
23    Q   When was that?
24    A   I don't recall.
25    Q   Last month, last year?
```

```
 1   A   I barely remember what I had for breakfast.
 2       I'm sorry.  I don't recall the date.
 3   Q   Before or after Christmas?
 4   A   I think it was after.
 5   Q   Before or after New Year's?
 6   A   I think after.
 7   Q   So the first time you saw the responses to
 8       these interrogatories you believe was after New
 9       Year's?
10   A   I would be guessing at the date.  I don't
11       recall.
12   Q   After you received a copy of the draft
13       interrogatory responses from the Cohen
14       Placitella firm, did you tell them you had any
15       changes to make?
16   A   No.  I don't recall making any changes.
17   Q   The first draft you saw you thought was
18       accurate?
19   A   I do.
20   Q   Can you turn to Interrogatory number 5.
21       Interrogatory 5 asks you to "Identify all
22       evidence, including any documents (and
23       excluding your own testimony) that support your
24       contention that decedent was exposed to EMTAL
25       talc."
```

```
 1              Do you see that?
 2   A   I do.
 3   Q   And then the response says, "Subject to and
 4       without waiving the foregoing objections,
 5       Plaintiff, in her document production, will
 6       provide any non-privileged information and
 7       documentation responsive to this request."
 8            Which documents in your document
 9       production contain evidence that your mother
10       was exposed to EMTAL talc?
11                    MR. COREN:  I instruct you not to
12       answer to the extent your answer relies upon
13       the advice of counsel.  If you could answer the
14       question without incorporating or revealing the
15       advice of counsel, please respond to
16       Mr. Farrell's question.
17   A   Per advice of counsel, I choose not to answer.
18   Q   You can't answer that question?
19   A   On advice of counsel, I choose not to answer
20       the question.
21   Q   You're refusing to answer that question?
22   A   On advice of counsel, correct.
23                    MR. FARRELL:  At this time we're
24       going to stop for today.  There have been five,
25       six dozen instructions not to answer that are
```

```
 1   improper, including to the last answer that I
 2   just asked.
 3         We're going to have to come back and
 4   continue this deposition after we've taken this
 5   up with Judge Dickson and we can get answers to
 6   the questions.
 7         As I said earlier, we're holding the
 8   deposition open.  We reserve the right to seek
 9   fees and costs and to come back to ask the
10   questions again, and also to continue the
11   deposition on the topics of information and
12   documents we still haven't received in the
13   case.
14               MR. GEYERMAN:  The Cahill
15   Defendants have some questions.  Do we want to
16   take our lunch break, or do we want to go right
17   to it?
18               MR. COREN:  Go right to it.
19               MR. GEYERMAN:  All right.  Why
20   don't we take five minutes so we can switch
21   chairs.
22               THE VIDEOGRAPHER:  Off the
23   record.  The time is 12:25.
24               (Recess taken.)
25                    -  -  -  -  -
```

```
 1        (Defendants' Exhibit 45 was marked.)
 2                   -  -  -  -  -
 3                    THE VIDEOGRAPHER:  Back on the
 4        record.  The time is 12:40.
 5             EXAMINATION OF DONNETTE WENGERD
 6   BY MR. GEYERMAN:
 7   Q   Good morning, Ms. Wengerd.  My name is Grant
 8       Geyerman, I'm from Williams & Connolly, and I
 9       represent the Cahill Defendants.
10            I've put in front of you what's been
11       marked as Defense Exhibit 45.  Can you please
12       take a look at that document and tell me if
13       you've ever seen this before?
14   A   Yes.
15   Q   What is this document?
16   A   These are the interrogatories and my responses.
17   Q   And these are the answers to the
18       interrogatories propounded by Cahill, Gordon &
19       Reindel, specifically?
20   A   I'm sorry.  One more time.
21   Q   Sure.  These are the answers to the
22       interrogatories posed to you by Cahill, Gordon
23       & Reindel?
24   A   I don't recall who initiated them.  You might
25       say it's a friend.
```

DONNETTE WENGERD - 04/06/2017          Page 143

```
 1   Q   Yeah.  Take a look at the front page.  It says
 2       Plaintiff Donnette Wengerd's Answers To Cahill,
 3       Gordon & Reindel's First Set of
 4       Interrogatories?
 5   A   Okay.
 6   Q   And just to clarify, Defense Exhibit 45 are the
 7       answers to Cahill's interrogatories, and
 8       Defense Exhibit 44 are your answers to BASF's
 9       Interrogatories?
10   A   Yes.
11   Q   Do you remember that during the course of this
12       case there were multiple sets of
13       interrogatories that you were asked to answer?
14   A   Yes.
15   Q   Okay.  And were there more than two sets of
16       interrogatories?
17   A   I don't remember.
18   Q   You had mentioned during Mr. Farrell's
19       questioning that there was a meeting where
20       Jared was there, a paralegal from the
21       Placitella firm was there, and you orally went
22       over your answers to the interrogatories posed
23       by BASF.
24   A   Correct.
25   Q   Do you remember that back and forth?
```

DONNETTE WENGERD - 04/06/2017                    Page 144

```
 1   A    Uh-huh.

 2   Q    Did you go over the interrogatories posed by

 3        Cahill during that same meeting?

 4   A    They weren't distinguished if one was for

 5        Cahill and one was for BASF that I recall.

 6   Q    Have there been -- has there been more than one

 7        meeting where people have communicated with you

 8        about information for purposes of answering

 9        interrogatories?

10   A    There was only one meeting.  I don't recall if

11        there was anything about them over the phone.

12   Q    So sitting here today, to the best of your

13        recollection, you supplied information to

14        answer Cahill, Gordon & Reindel's

15        interrogatories during the same meeting when

16        you provided answers to BASF's interrogatories;

17        is that accurate?

18   A    Yes.  That is what I think, yes.

19   Q    You testified earlier as to the BASF

20        interrogatories that after the in-person

21        meeting, a draft of the responses was sent to

22        you for review.

23   A    Correct.

24   Q    Was that same process followed as to the

25        answers to the Cahill interrogatories?
```

DONNETTE WENGERD - 04/06/2017                Page 145

```
 1   A   I don't remember if they were segregated from
 2       one to the other.
 3   Q   Do you remember being supplied DX-45 for your
 4       review at all?
 5   A   I believe it was e-mailed to me.
 6   Q   Was it e-mailed to you at the same time as the
 7       answers to the BASF interrogatories?
 8   A   I don't recall.
 9   Q   Who e-mailed it to you?
10   A   I believe the paralegal that originally had
11       written down my responses.
12   Q   Do you have more than one e-mail address?
13   A   Yes.
14   Q   What e-mail address did the answers to the
15       Cahill interrogatories get sent to?
16   A   I believe they sent them to happyfam@me.com.
17   Q   That's H-A-P-P-Y-F-A-M@M-E.com?
18   A   Right.
19   Q   But you have other e-mail addresses?
20   A   Yes.
21   Q   What are your other e-mail addresses?
22   A   Mrpuddlesohio@yahoo.com,
23       Mrpuddlesohio@gmail.com, and then my children
24       each have an e-mail address, but I couldn't
25       even tell you what they were.
```

| | | |
|---|---|---|
| 1 | Q | So the two that you have, not your children's, |
| 2 | | but that's M-R-P-U-D-D-L-E-S-O-H-I-O and then |
| 3 | | dot Yahoo and then separately dot Gmail? |
| 4 | A | Right. |
| 5 | Q | Have you heard of a form called a verification |
| 6 | | form? |
| 7 | A | Yes.  That sounds familiar. |
| 8 | Q | Tell me what your understanding of a |
| 9 | | verification form is. |
| 10 | A | That I'm verifying the information that's |
| 11 | | provided to me, and I do that by typically |
| 12 | | signing.  Sometimes it could be witnessed or |
| 13 | | the stamp.  I'm sorry.  I can't remember what |
| 14 | | it's called. |
| 15 | Q | Do you remember verification saying that by you |
| 16 | | signing the verification form, you're attesting |
| 17 | | to the best of your knowledge the truth of the |
| 18 | | information of the document that you're |
| 19 | | verifying? |
| 20 | A | Correct. |
| 21 | Q | In substance that's basically what it is? |
| 22 | A | Yes. |
| 23 | Q | Okay.  Did you fill out a verification form |
| 24 | | concerning your answers to the interrogatories |
| 25 | | posed by Cahill? |

```
 1    A    I don't remember.
 2    Q    Have you -- have you signed a verification
 3         concerning anybody's, any Defendant's
 4         interrogatories in this case?
 5    A    I don't remember.
 6    Q    If you did, would you have provided that to
 7         your lawyers after you signed it?
 8    A    I would have given it back to my attorneys.
 9         They would have provided it, I would have
10         signed it and handed it back.  I wouldn't have
11         a copy, that I'm aware of.
12    Q    Your practice would be if you signed it, you
13         would give it to them.  You wouldn't just sign
14         it and hold on to it yourself?
15    A    Correct.
16    Q    Are the answers in Defense Exhibit 45 true,
17         accurate and complete?
18    A    Yes.  From what I can see.
19    Q    And are you saying that based on your review of
20         it sitting here right now, or is it based on
21         your having reviewed the document at some prior
22         point in time?
23    A    Both.
24    Q    Have you looked at every page of that document
25         in front of you?
```

```
 1   A   Not at this moment, but yes, I believe I have
 2       previously.
 3   Q   Look at Interrogatory number 3, if you would.
 4   A   Okay.
 5   Q   This is about your mother's employers.
 6   A   Yes.
 7   Q   Is the response accurate?
 8   A   Yes, to the best of my knowledge.
 9   Q   What was the last employer your mother had
10       before she passed away?
11   A   Land O'Lakes.
12   Q   This response says in the third sentence,
13       "Decedent was next employed at Land O'Lakes
14       where she worked on machines and shipping."
15       Next sentence, "Lastly, the Defendant was
16       employed at Goodyear Tire & Rubber Company,"
17       correct?
18   A   Since no dates were provided, I did not see
19       that that was a problem.  The places of
20       employment were listed, although they may not
21       be in perfect order.
22   Q   The last place that she worked was not Goodyear
23       Tire & Rubber, correct?
24   A   That is correct.
25   Q   She worked at Land O'Lakes for over 25 years?
```

```
 1    A    It was a long time.  I don't know how many
 2         years exactly.
 3    Q    Go to Interrogatory 4, if you would.  This is
 4         concerning asbestos exposure, correct?
 5    A    Correct.
 6    Q    And specifically, the asbestos exposure of your
 7         mother?
 8    A    Correct.
 9    Q    The second paragraph starts, "Subject to and
10         without waiving the foregoing objections upon
11         information and belief."
12              What's your understanding of what "upon
13         information and belief" means?
14    A    Upon information that was provided to me or the
15         beliefs that I held from conversations with
16         attorneys.
17    Q    So is that language, "upon information and
18         belief", a way of saying these aren't your --
19         these aren't facts that you personally know,
20         but they're facts that have been supplied to
21         you?
22    A    It could be either or because if it's a belief,
23         it could be just something that was provided to
24         me and has become my opinion.
25    Q    Well, tell me -- I guess I want to know which
```

```
 1        of the factual allegations in the second and
 2        third paragraph you have personal knowledge of
 3        as opposed to facts that have been provided to
 4        you by counsel in this case?
 5   A    The fact that my mother was in a supervision or
 6        supervisor program, that would have been
 7        provided by my mother.
 8             And as far as her going to the different
 9        positions or different departments, that was
10        information that was discussed during her
11        previous -- forgive me, I can't -- deposition.
12        So that's something that I overheard from her.
13             Again, the same with hearing that the
14        larger bags about the talc.
15   Q    That was -- where did you get that information?
16   A    That would have been something that would have
17        been discussed between she and I, as well as --
18                      MR. COREN:  If it's about
19        conversations with an attorney, please don't
20        answer.  If it's from your mother, please go
21        ahead.
22   A    That would have been something as well that was
23        in her deposition that I was present for.
24             Again, hearing that from the rubber
25        stretching rooms, the benzine.  The information
```

```
 1        regarding my grandfather and my mother working
 2        on brakes again was something that was covered
 3        in her deposition.
 4   Q    So if I'm hearing you right, either the facts
 5        in here come from sitting in the deposition
 6        with your mom or prior discussions with your
 7        mom?
 8   A    Yes.
 9   Q    And in neither of -- in neither the deposition,
10        nor in discussions with your mom did she ever
11        say that she was exposed to EMTAL talc, right?
12   A    I don't remember the exact phrasing, but it
13        would be in her deposition if she did say that.
14   Q    Right.  And as to conversations with your mom,
15        she never mentioned EMTAL talc to you, that you
16        can remember, correct?
17   A    You're referring to the fourth paragraph?
18   Q    I'm referring to the fact that you've
19        identified basically two bases for your
20        information here.  Either having sat in the
21        deposition of your mother, or separately you
22        mentioned discussions with your mother.  And my
23        question is, do you have a recollection of any
24        discussion with your mother where she said she
25        was exposed to EMTAL talc?
```

```
 1   A   Yes, I believe that was something that she was

 2       saying that she was exposed to.

 3   Q   EMTAL talc specifically?

 4   A   I believe.

 5   Q   What was the date of that conversation?

 6   A   I wouldn't remember.

 7   Q   Is there a reason that she wouldn't have

 8       disclosed exposure to EMTAL talc in her

 9       underlying case if she discussed it with you?

10   A   My mother was under extremely heavy narcotics,

11       and that's something that definitely could have

12       been discussed prior to or after the

13       deposition.

14   Q   But you can't give me any specific facts about

15       that conversation that supposably occurred?

16   A   No.  Those were -- that was ten years.

17   Q   You're not even sure that it did occur?

18   A   If I -- if I put it down that that was

19       something, then yes, it would be.

20   Q   Put it down where?

21   A   If it was a response to the answer.

22   Q   But you didn't put that in the response to this

23       answer.

24   A   It says that in the fourth paragraph that it

25       does.  That that's something that was noted.
```

```
 1   Q   The paragraph says, "In addition to the
 2       evidence indicating that Plaintiff's Decedent
 3       was exposed to asbestos contaminated (sic) in
 4       EMTAL talc."
 5           That doesn't say that you had a
 6       conversation with your mom about her being
 7       exposed to EMTAL talc, correct?
 8   A   No.  It doesn't.
 9   Q   So I'm asking you, where is there any evidence
10       that your mom and you ever discussed her being
11       exposed to EMTAL talc?
12   A   I wouldn't have any physical evidence.
13   Q   You mentioned earlier -- strike that.
14           Go to Interrogatory 5, please.
15   A   Okay.
16   Q   The second paragraph of that answer refers to a
17       personal injury lawsuit in 2001.  That was a
18       lawsuit brought by your mother and her husband?
19   A   Are you talking about where it says, "Subject
20       to" -- I'm sorry.  You're talking about the
21       paragraph before?
22   Q   No, that paragraph.  You're in that right
23       paragraph.
24   A   Okay.
25   Q   It says, "Plaintiff advises the Decedent was a
```

```
 1       named Plaintiff, along with her husband, in a
 2       personal injury lawsuit in 2001.  Decedent's
 3       husband was run over by a tow motor and the
 4       case was settled?"
 5            Do you see that?
 6    A  Yes.
 7    Q  So this is referring to a lawsuit that your
 8       mother and her late husband filed?
 9    A  That is inaccurately worded.  It was my
10       husband, not my mother's husband.
11    Q  Well, when you reviewed this, why didn't you
12       change that?
13    A  I didn't catch it at the time.
14    Q  Were you injured in connection with that tow
15       motor accident?
16    A  I was not.
17    Q  Was Tom Bevan the lawyer in that case?
18    A  No.
19    Q  Who was the lawyer representing you and your
20       husband?
21    A  I don't recall his name.
22    Q  The case was settled for a financial amount?
23    A  Yes.
24    Q  How much?
25                      MR. COREN:  Don't answer.
```

```
 1                    MR. GEYERMAN:  On what basis?
 2                    MR. COREN:  It's totally
 3       irrelevant.  Once again, it goes to issues of
 4       settlement.  It has no bearing at all of what a
 5       third party, her husband, settled a tow motor
 6       case, Grant.
 7                    MR. GEYERMAN:  Relevance isn't a
 8       basis to instruct a witness not to answer in a
 9       deposition in Federal Court.
10                    MR. COREN:  It has to lead to
11       something admissible, and that is clearly not
12       going to lead to anything that is potentially
13       admissible in this particular case.  Even
14       Discovery has relevance limits.  You stepped
15       over it.
16    Q  Ma'am, how much did that prior personal injury
17       case settle for?
18                    MR. COREN:  Don't answer.
19    A  Per the advice of my attorney, I choose not to
20       answer.
21    Q  Do you know how much it settled for?
22    A  I believe it says, "Plaintiff does not recall,"
23       and I do not.
24    Q  Regardless of what it says on this piece of
25       paper, I'm asking you today, do you know
```

```
 1        approximately how much that case settled for?
 2   A    No.
 3   Q    Go to Interrogatory 8, please.  This is asking
 4        about alleged misrepresentations that were made
 5        in connection with your mother's personal
 6        injury lawsuit, correct?
 7   A    Correct.
 8   Q    Do you -- if I asked you to identify what the
 9        misrepresentation was, the false statement that
10        you claim was made in connection with your
11        mother's case, could you identify that?
12   A    No.  Not specifically.
13   Q    Who could identify it?
14   A    I would have to confer with my attorneys.
15   Q    And could you give me the names of the people
16        specifically that could identify the
17        misrepresentations allegedly made in your
18        mother's case?
19   A    Mr. Coren, Mr. Placitella.
20   Q    Anybody else?
21   A    Possibly Mr. Bevan.
22   Q    Anybody else other than those three?
23   A    There may be other people that are a part of
24        the attorney team, but those specifically come
25        to mind as far as names.
```

DONNETTE WENGERD - 04/06/2017                    Page 157

```
 1   Q    Sitting here today, you're not able to identify
 2        anyone other than those three lawyers who could
 3        identify the misrepresentation made in your
 4        mother's case, fair?
 5   A    That's fair.
 6   Q    Do you see in the second to last paragraph of
 7        your answer to Interrogatory number 8, it
 8        starts, "Plaintiff refers this Defendant to the
 9        complaint and documents?"  That's how it
10        starts.  Are you with me?
11   A    Yes.
12   Q    There is a reference to Sampson v. BASF, et
13        al., and then a case number.
14             Do you know what that is?
15   A    No.
16   Q    Did you ask any questions about it when you
17        were reviewing your interrogatory answers?
18   A    No.  I expect my attorney to put in the correct
19        references to some of the cases.
20   Q    But -- I'm sorry, finish your answer.
21   A    No.  That's it.
22   Q    You personally can't vouch for the accuracy of
23        what's in this answer?
24   A    In that specific reference, no, I cannot.
25   Q    And in a lot of other parts of your
```

```
 1        interrogatory answers, you don't know them to
 2        be inaccurate, but you also don't know them to
 3        be true; is that fair?
 4     A  Anything that was asked of me was to the best
 5        of my knowledge.
 6     Q  In the paragraph right before the one we were
 7        just looking at, it says, "On information and
 8        belief, Plaintiff believes Engelhard and BASF
 9        admit that her mother's and numerous other talc
10        asbestos cases against Engelhard/BASF were
11        dismissed or resolved cheaply without just
12        compensation based upon Engelhard/BASF's and
13        this Defendant's representations to attorneys,
14        such as her mother's attorneys in the
15        underlying action, that there was no asbestos
16        in EMTAL talc and there was no evidence that
17        there was any asbestos in EMTAL talc."
18             Did I read that accurately?
19     A  Yes.
20     Q  In this case you're not alleging that with
21        respect to your mother's case, there were
22        misrepresentations made to attorneys, correct?
23     A  From myself?
24     Q  As the representative of your mother's estate,
25        it is not your contention that
```

```
 1      misrepresentations were made to attorneys in
 2      your mother's case, but rather, that
 3      misrepresentations were made to a Court,
 4      correct?
 5   A  Yes.
 6   Q  So this paragraph doesn't have anything to do
 7      with your mother's case, correct?
 8               MR. COREN:  Objection to form.
 9   A  No.  I believe that being exposed to the talc
10      from Engelhard or BASF does have a link to her
11      case.
12   Q  Well, this interrogatory is asking about each
13      and every misrepresentation in connection with
14      your mother's case, and the answer talks about
15      misrepresentations to attorneys.  But you just
16      told me that your mother's case, the alleged
17      misrepresentation was supposably made to a
18      Court?
19   A  Yes.  That is correct.  Not from necessarily my
20      mother.
21   Q  Why didn't you change this answer then when you
22      were reviewing the answers to interrogatories?
23               MR. COREN:  Objection to form.
24   A  Because hindsight is 20/20.
25   Q  If you were going to rewrite it, you would
```

```
 1        change it now, right?
 2                    MR. COREN:  Objection to form.
 3   A    Possibly.
 4   Q    Can you go to -- strike that.
 5             Can you go to Interrogatory number 12.
 6   A    Okay.
 7   Q    This asks, "For each civil action and asserted
 8        claim identified in response to Interrogatory
 9        number 6 above, identify each and every
10        attorney or other representative or employee of
11        Engelhard that you, Decedent, or anyone acting
12        on you or Decedent's behalf, including counsel,
13        ever communicated with concerning the action or
14        claim, including," and then it asks for certain
15        information about the individual attorneys.
16             And your answer is cross-referencing the
17        answer to Interrogatory 8.
18   A    Okay.
19   Q    And then it says, "By way of further response,
20        Plaintiff does not personally recall any
21        communications with specific attorneys or other
22        representatives or employees of Engelhard,"
23        right?
24   A    That's what it says.
25   Q    You aren't aware of any statements made by the
```

```
 1        Cahill, Gordon & Reindel law firm to your mom
 2        or you or your mom's lawyers in connection with
 3        her lawsuit, fair?
 4    A   I have no personal information other than that
 5        provided by my attorneys.
 6    Q   Well -- and you don't even have any information
 7        provided by attorneys that people from the
 8        Cahill Gordon firm made statements,
 9        representations to you, your mom or your
10        attorney in connection with her case, right?
11                    MR. COREN:  Objection.  I'm going
12        to instruct her not to answer to the extent her
13        answer relies upon advice of counsel.  If she
14        can answer your question, Grant, without
15        incorporating or revealing advice of counsel,
16        then I would ask her to respond to your
17        question.
18    A   I have no -- nothing else to add other than
19        upon advice of counsel.
20    Q   Do you know who the law firm of Cahill, Gordon
21        & Reindel is?
22    A   I know of it.  I don't --
23    Q   What do you know of the firm?
24    A   I know that it's the firm named in part of
25        some of the fraudulent charges regarding my
```

DONNETTE WENGERD - 04/06/2017                Page 162

```
 1        mother's case.
 2   Q    They're a Defendant in the case?
 3   A    Correct.
 4   Q    And allegations have been made against them
 5        that are in the Second Amended Complaint, for
 6        example?
 7   A    Correct.
 8   Q    Apart from that general notion, do you know
 9        anything about the law firm?
10   A    I don't.
11   Q    You've never had any interaction with them
12        yourself?
13   A    Not that I'm aware of.
14   Q    Your mom never had any interaction with them?
15   A    Not that I'm aware of.
16   Q    And your mom's attorneys, the Bevan firm,
17        didn't have any interaction with them
18        concerning your mom's case, correct?
19                  MR. COREN:  Objection to form.
20   A    I don't know.
21   Q    Sitting here today, you can't identify any
22        evidence that anyone from the Cahill, Gordon &
23        Reindel firm interacted with the Bevan firm
24        concerning your mom's case, correct?
25   A    I don't know.
```

```
 1   Q   Well, I'm just asking whether you know of any
 2       evidence.  If you don't know of evidence, you
 3       can say that.
 4           Do you know of any evidence sitting here
 5       today that anyone from the Cahill, Gordon &
 6       Reindel form interacted in any way with people
 7       from the Bevan firm concerning your mom's case?
 8                   MR. COREN:  And once again, to
 9       the extent that your answer relies upon advice
10       of counsel, I instruct you not to answer.
11       However, if you can independently of advice of
12       counsel answer the question without
13       incorporating or revealing advice of counsel,
14       you may respond.
15   A   I don't know.
16   Q   Well, let's go to that document that you're
17       looking at.  That's a fair thing.
18                   MR. GEYERMAN:  And for the
19       record, the witness pulled out Defense Exhibit
20       42, which is titled Defendant Eastern Magnesia
21       Talc Company's Motion For Summary Judgment.
22   Q   Is that right?
23   A   Yes.
24   Q   Is that the document you pulled out in response
25       to my last question?
```

DONNETTE WENGERD - 04/06/2017                    Page 164

```
 1    A    Yes.

 2    Q    Do you see anywhere on this document the

 3         Cahill, Gordon & Reindel firm listed as being

 4         involved at all?

 5    A    Without reading it word by word, I don't see it

 6         called out, no.

 7    Q    Do you see on the first page that the lawyer

 8         submitting the brief is a Jennifer A. Riester

 9         from Weston Hurd in Cleveland, Ohio?

10    A    Correct.

11    Q    And is it your understanding that the Cahill

12         Gordon firm is a law firm based in New York

13         City?

14    A    Correct.

15    Q    So obviously, the Weston Hurd firm is not the

16         Cahill firm, right?

17    A    Right.

18    Q    If you go to Interrogatory 11, please.

19    A    Okay.

20    Q    This asks for an identification of each

21         occasion and instance on which you or your

22         mother were harmed, is that correct, in

23         connection with the allegations in this case?

24    A    That is correct.

25    Q    And I think you answered some questions earlier
```

```
 1      from Mr. Farrell about there are really two

 2      things that you're seeking in this case.  One

 3      is compensation for your mom's asbestos

 4      injuries, and the other is a judicial

 5      determination of wrongdoing?

 6   A  Correct.

 7   Q  You understand that the law firm Cahill, Gordon

 8      & Reindel didn't cause your mom to get

 9      mesothelioma, right?

10   A  I do understand that.

11   Q  So the compensation that you're seeking has

12      nothing to do with the Cahill, Gordon & Reindel

13      firm, correct?

14              MR. COREN:  Object to form.

15   A  I disagree with that.

16   Q  Tell me how the asbestos injuries that you're

17      seeking compensation for are caused by the law

18      firm?

19   A  Because I believe that the law firm did not act

20      in full propriety with giving all of the

21      evidence that was requested and did not

22      represent -- did not represent the evidence

23      that did harm my mother's case.

24   Q  And as I understood what you're seeking in the

25      case, there would be two buckets.  One was a
```

```
 1        judicial determination of wrongdoing, and the

 2        other was compensation for the personal

 3        injuries that were allegedly undercompensated

 4        for before; is that right?

 5   A    Correct.

 6   Q    So you want compensation to be of the amount

 7        that your mom should have been compensated back

 8        in 2000 -- the late 2000s; is that right?

 9                   MR. COREN:  Objection to form.

10        You can answer.

11   A    I believe that should a Judge find that the law

12        firm did act in a fraudulent way, whether

13        withholding, destroying, not providing evidence

14        that should have been provided and was

15        requested in my mother's case, that the law

16        firm should not be able to keep the proceeds

17        that they earned during that case as a way of

18        profiting for themselves.

19             I believe that my mother's case was

20        harmed, and that the law office was a part of

21        that as well.

22   Q    So I just want to make sure I understand what

23        you're seeking.  I understood you before to be

24        saying that you wanted compensation for your

25        mom's asbestos injuries.  As a part of that,
```

```
 1        are you saying that involves the legal fees
 2        earned by the law firm?
 3   A    That is correct.
 4   Q    So does the compensation for personal injuries,
 5        does that bucket that you testified to earlier,
 6        does that include anything other than the law
 7        firm's attorneys -- strike that.  Poorly
 8        worded.
 9            I'm trying to understand from the law
10        firm's perspective what monies, if any, you
11        consider to be part of the compensation for
12        asbestos injuries that you're interested in
13        obtaining in this case.  And you just told me
14        one of the things is the attorney's fees that
15        they earned in connection with your mother's
16        case.
17   A    Right.
18   Q    Is there any other monies from the law firm
19        that you consider to be encompassed within the
20        category of damages for compensation that
21        you're seeking?
22   A    I don't know specifically.  I think that's
23        something I would confer to my attorney.
24   Q    But insofar as the money is to compensate for
25        the mesothelioma that your mother developed,
```

```
 1       you're not interested -- you're not -- you
 2       understand that that's not money that the law
 3       firm should be paying?
 4    A  I understand --
 5                    MR. COREN:  Objection.
 6    A  -- that the law firm did not cause my mother's
 7       mesothelioma.
 8    Q  And you're not asking for money from the law
 9       firm to compensate for the mesothelioma injury?
10    A  No, just damage to her case.
11    Q  And the damage to her case that you just talked
12       to us about is the attorney's fees that the law
13       firm made for that case?
14                    MR. COREN:  Objection as to form.
15    A  I think that's something that -- to the extent
16       of the fees or compensation would be something
17       that I would have to confer with my attorney
18       about.
19    Q  If, in fact, it turns out that the Cahill,
20       Gordon & Reindel firm made no attorney's fees
21       in connection with your mother's case, then you
22       wouldn't be seeking monetary damages from them,
23       the Cahill Gordon firm, fair?
24                    MR. COREN:  Objection as to form.
25    A  Again, that's something I would confer with my
```

```
 1       attorney.

 2   Q   But sitting here today as the class

 3       representative with fiduciary duties to the

 4       class, you can't identify for me any pool of

 5       damages other than Cahill Gordon's attorney's

 6       fees earned in connection with individual cases

 7       that you would be seeking; is that true?

 8                  MR. COREN:  Objection as to form.

 9   A   I don't necessarily know that.

10   Q   Well, I want to know what you as a class

11       representative are seeking from my client.

12       What money damages are you seeking from my

13       client other than the return of attorney's

14       fees?

15   A   I think that would be something that could also

16       encompass other damages, but again, without

17       conferring with my attorney, I couldn't name

18       specific types of damages.

19   Q   How much money would Engelhard have paid your

20       mom had there not been false statements made in

21       her case?

22                  MR. COREN:  Objection.  I'm going

23       to instruct the client not to answer.  One, it

24       deals with issues of the settlement.  Two, it

25       deals with her and her attorneys' work product.
```

DONNETTE WENGERD - 04/06/2017          Page 170

```
 1        Three, it calls for speculation.  Four, it was
 2        a jury matter.
 3                        MR. GEYERMAN:  Is attorney-client
 4        privilege or attorney work product the basis of
 5        that instruction?
 6                        MR. COREN:  Yes, it is.  That is
 7        the basis.  I'm just going over other issues
 8        that were part of your form problem.
 9    Q   Do you know -- could you answer that question
10        if counsel would allow you to answer the
11        question?
12    A   No, because it would call for speculation.
13    Q   Are you certain about that?
14    A   I believe so.
15                      -  -  -  -  -
16        (Defendants' Exhibit 46 was marked.)
17                      -  -  -  -  -
18    Q   Ma'am, I'm handing you what I have marked as
19        Defense Exhibit 46.
20                        MR. GEYERMAN:  Mr. Coren.
21    Q   Do you remember earlier when counsel was asking
22        you about the Second Amended Complaint, he
23        asked about its reference to a November 12th,
24        2008 letter?
25    A   Yes.
```

```
 1   Q    And I'm marking -- or I have marked Defense

 2        Exhibit 46, which is a November 12th, 2008

 3        letter addressed to John Mismas, Esquire at

 4        Bevan & Associates; is that right?

 5   A    Yes.

 6   Q    Who is John Mismas?

 7   A    I don't know.

 8   Q    You've never heard that name before?

 9   A    No.

10   Q    You don't remember ever receiving

11        correspondence that involved Mr. Mismas before?

12   A    No.

13   Q    But Bevan & Associates is Tom Bevan's law firm,

14        right?

15   A    That's correct.

16   Q    Have you seen this letter before?

17   A    I don't recall.

18   Q    When you were provided the complaint in this

19        case, either the original one or the most

20        recent amendment, did -- were you supplied the

21        exhibits to those complaints?

22   A    I don't -- I'm not sure.

23   Q    If you were supplied them, would you have read

24        them?

25   A    Possibly.
```

DONNETTE WENGERD - 04/06/2017          Page 172

```
 1   Q   Is it your practice to review everything that
 2       your lawyers send you?
 3   A   It depends how large it is, but usually, yes.
 4   Q   How about with respect to the complaint in this
 5       case?  And I'm focusing on that because it's
 6       the starting document of a lawsuit, so maybe
 7       you would be even more apt to review everything
 8       on the document that initiates the lawsuit.
 9   A   Yes.
10   Q   Would you have read everything concerning the
11       complaint that was provided to you?
12   A   Yes.
13   Q   So this letter is dated November 12th, 2008.
14       Is that four months after your mother passed
15       away?
16   A   That sounds right.
17   Q   She passed away in July of 2008?
18   A   Correct.
19   Q   So by November of 2008 you would have been the
20       person making decisions on behalf of her
21       estate?
22   A   Correct.
23   Q   And by the time she passed away in July of
24       2008, her husband had passed away?
25   A   Correct.
```

```
 1   Q   And are you an only child?

 2   A   Yes.

 3   Q   And you were the Executor of her estate?

 4   A   I am the Executrix, yes.

 5   Q   This letter is from Jennifer Riester, correct?

 6   A   Correct.

 7   Q   Jennifer Riester is the attorney from Weston

 8       Hurd that we just saw on the Motion For Summary

 9       Judgement filed in your mother's case?

10   A   Correct.

11   Q   There is no lawyer or other representative from

12       Cahill Gordon listed on this letter, correct?

13   A   No.  It doesn't appear to be.

14   Q   Was there any false statement that was

15       contained in this letter, to your knowledge?

16                    MR. COREN:  Form.  Objection.

17       You may respond.

18   A   That's something that I would have conferred

19       with my attorney about.

20   Q   Sitting here today looking at Defense Exhibit

21       46, are you independently able to identify

22       whether there's any false statement in this?

23   A   I have no personal information other than how

24       I've been advised by my attorneys.

25   Q   Well, I'm not sure I understand what that
```

```
 1      answer means.
 2   A  That means --
 3   Q  I'm not asking you to tell me what lawyers told
 4      you about this document, if they told you
 5      anything.
 6          I'm simply asking you, as Donnette
 7      Wengerd sitting here, is there any false
 8      statement that you see in this letter?
 9   A  I do not know.
10   Q  For all you know, there's no false statement in
11      this letter?
12                  MR. COREN:  Objection as to form.
13   A  I do not know.
14   Q  You have no opinion one way or the other
15      whether there are false statements in this
16      letter; is that accurate?
17                  MR. COREN:  Form.  Objection.
18   A  Again, I do not know.
19                  - - - - -
20      (Defendants' Exhibit 47 was marked.)
21                  - - - - -
22   Q  I'm going to hand you what I'm marking as
23      Defense Exhibit 47.  I just have a quick
24      question on this document.
25          For the record, this has a Bates stamp of
```

```
 1        PWMS-2319 and continuing through 2342.  Is that
 2        your mother's signature on the first page of
 3        this document?
 4    A   Yes.
 5    Q   You recognize her signature?
 6    A   Yes.
 7    Q   And that first page is a verification of
 8        Plaintiff's second amended answers, correct?
 9    A   Yes.
10    Q   And these are answers to interrogatories that
11        your mother made and verified in connection
12        with her underlying asbestos case, correct?
13    A   Yes.
14    Q   Do you know who Peter Sloane is?
15    A   That name sounds familiar, but I don't recall
16        off the top of my head.
17    Q   But what do you associate Peter Sloane with?
18    A   I don't associate him with anything.  It just
19        sounds familiar.
20    Q   You don't necessarily associate him with this
21        case?
22    A   I don't know.
23    Q   How about Ira Dembrow, does that name sound
24        familiar?
25    A   I don't know.
```

DONNETTE WENGERD - 04/06/2017                    Page 176

```
 1   Q   Do you associate Ira Dembrow with anything in

 2       particular?

 3   A   I don't remember the name.

 4   Q   Do you associate Ira Dembrow with this case?

 5   A   I don't know.

 6   Q   Do you have any factual knowledge that Peter

 7       Sloane did anything wrong in connection with

 8       this case?

 9   A   I don't know.

10   Q   Do you have any factual knowledge that Ira

11       Dembrow did anything wrong in connection with

12       this case?

13   A   I don't know.

14   Q   Do you have any factual knowledge that Peter

15       Sloane did anything wrong in connection with

16       your mother's underlying asbestos case?

17   A   I don't know.

18   Q   Do you have any factual knowledge that Ira

19       Dembrow did anything wrong in connection with

20       your mother's underlying asbestos case?

21   A   I don't know.

22   Q   Same question with respect to Cahill Gordon?

23   A   I don't know.

24   Q   If Cahill Gordon, Ira Dembrow or Peter Sloane

25       did anything wrong, who would know?
```

```
 1   A   My attorneys.

 2   Q   And those people would be who?

 3   A   Thomas Bevan.

 4   Q   Anybody else?

 5   A   Again, any number of the team that represent

 6       me.

 7   Q   "The team" meaning other people at Bevan &

 8       Associates?

 9   A   Also Mr. Placitella and Mr. -- I'm sorry.  I'm

10       having a total --

11                   MR. COREN:  Coren.

12   A   Coren.  It could be anyone at their firm as

13       well.

14                   THE VIDEOGRAPHER:  Excuse me,

15       sir.  We have about five minutes left before we

16       need to change the tape.

17                   MR. GEYERMAN:  Okay.  I'm almost

18       done.

19   Q   A couple of questions.  You mentioned at one

20       point during Mr. Farrell's questioning that

21       there was another firm that you believed was

22       involved apart from the Placitella firm and

23       apart from Bevan & Associates firm.  Do you

24       know if that's another Ohio law firm?

25   A   I don't believe so.
```

DONNETTE WENGERD - 04/06/2017            Page 178

```
 1   Q   You believe that the law firm is based
 2       somewhere other than Ohio?
 3   A   New Jersey or New York, I believe.
 4   Q   Would you know the name of it if I said it to
 5       you?
 6   A   No.  I'm sorry.
 7   Q   Is it the Fox Rothschild firm?
 8   A   I don't remember.
 9   Q   Have you ever spoken or in any way communicated
10       with any lawyer from that law firm?
11   A   Not that I'm aware of.
12   Q   You were asked questions about a phone call
13       that you had yesterday with Mr. Coren and
14       Mr. Placitella.
15   A   Yes.
16   Q   Who called who?
17   A   Mr. Coren called me.
18   Q   Was that call planned in advance of yesterday?
19                        MR. COREN:  Objection.  Don't
20       answer.
21   A   On advice of my attorney, I choose not to
22       answer.
23   Q   Could you answer that question if he would
24       allow you to?
25   A   Yes.
```

```
 1   Q   In connection with this Williams case, what is
 2       your best estimate as to the amount of time
 3       that the Bevan law firm versus the Placitella
 4       law firm has spent working on this case?
 5                   MR. COREN:  Objection.
 6   A   I don't know.
 7   Q   What's your impression as to which firm has
 8       spent more time on this case, the Placitella
 9       firm or the Bevan firm?
10                   MR. COREN:  Objection.
11   A   Placitella.
12   Q   Is the amount of time that your impression is
13       that they have worked on these cases, that
14       they're roughly equal and that's why you can't
15       answer my question as to who has worked more in
16       terms of a percentage?
17                   MR. COREN:  Objection as to form.
18   A   Since I don't sit on their shoulder and watch
19       what they do all day, I don't know who is doing
20       more of what.  I know that they are a team.
21       Therefore, I don't know how the work product is
22       distributed.
23   Q   And I'm not asking for you to provide the end
24       all answer to how much each of them has worked.
25       I'm asking for your impression based on them
```

```
 1      representing you in this case.  Give me the
 2      percentage of the role that -- and I'm not
 3      asking for fees or anything like that.  I'm
 4      simply asking in terms of your impressions,
 5      your personal impressions as to the relative
 6      amount of time that the Placitella firm has
 7      worked on this case versus the Bevan firm has
 8      worked on this case?
 9                  MR. COREN:  You're asking for
10      speculation.  Form.
11  A   I don't know.  I don't know.  I think
12      Mr. Coren's law firm would definitely, at least
13      currently, be more involved and spending more
14      time.
15  Q   And when you say "currently", is that because
16      of who has been involved in the preparation of
17      your deposition?
18  A   No.  Because I believe that Mr. Bevan also had
19      a hand in it, especially when the original
20      files were -- the complaint was made for my
21      mother's original case.
22  Q   Right.  And Ms. Williams' case, I'll represent
23      to you, was filed in March of 2011.
24  A   Right.
25  Q   Mr. Bevan had more of a role in the case as of
```

```
 1      March of 2011?
 2   A  No.  It would have been in my mother's personal
 3      case.
 4                    THE VIDEOGRAPHER:  Sir, we have
 5      like 30 seconds.
 6                    MR. GEYERMAN:  Okay.  Let's take
 7      a break.
 8                    THE VIDEOGRAPHER:  Off the
 9      record.  The time is 1:33.
10                    (Recess taken.)
11                    THE VIDEOGRAPHER:  Back on the
12      record.  The time is 1:38.
13   MR. GEYERMAN:
14   Q  Ma'am, when you -- strike that.
15          When your mother's estate receives a
16      payment from the underlying asbestos case, you
17      told us earlier that you personally receive
18      distributions in connection with that.
19          Do you remember that testimony?
20   A  Yes.
21   Q  Does that money go into a dedicated bank
22      account?
23   A  No, not necessarily.
24   Q  Does it go into your personal checking account?
25   A  No, not necessarily.
```

```
 1   Q   Where does it go?
 2   A   Usually it goes into a savings account.
 3   Q   Is it -- I'm just wondering if there's a
 4       standard process.  I'm not asking for any
 5       dollar amounts or anything like that.  But when
 6       there's a settlement with a particular company,
 7       does the Bevan firm release that to you into a
 8       dedicated savings account?
 9   A   No.  We have several, so it doesn't necessarily
10       go into one dedicated.
11   Q   Okay.  Can you tell me all the accounts that
12       the settlements go into?
13   A   We have two savings accounts at this time and
14       one checking account.  It could go in any of
15       them.
16   Q   Who are the savings accounts with?
17   A   Currently all the accounts would be with
18       Towpath Credit Union.
19   Q   Towpath?
20   A   Uh-huh, T O W.
21   Q   And both -- there's two savings accounts with
22       Towpath?
23   A   Yes.
24   Q   Where is the checking account?
25   A   Towpath.
```

```
 1   Q   Why do you have two savings accounts?

 2   A   Because we pay certain bills out of one, our

 3       taxes, and we pay -- we call it our SOL fund.

 4   Q   What's SOL stand for in this context?

 5   A   Shit out of luck.  If something happens and the

 6       car breaks down, that's the account we go to.

 7   Q   Why would a given settlement distribution go

 8       into one of those three accounts and not --

 9                   MR. COREN:  Grant, you're going

10       to have to enlighten me how this possibly could

11       be relevant.

12                   MR. GEYERMAN:  You know what,

13       this is Discovery.

14                   MR. COREN:  I understand that.

15       But it has to be relevant.  Okay?

16                   MR. GEYERMAN:  Well, look, maybe

17       we'll get to a point when we're going to be

18       able to get documentation on this.  So I want

19       to find out, if we have trouble getting it --

20       there's been lots of documents that in the last

21       two days we've discovered you guys haven't

22       provided to us.  So I'm finding out a few basic

23       facts to help you out if we ultimately get

24       Discovery on this issue.

25                   MR. COREN:  Knowing what goes
```

DONNETTE WENGERD - 04/06/2017                Page 184

```
 1        into what particular bank account, I think, is
 2        beyond the pail of reason.
 3   Q    The question, ma'am, is what would determine
 4        why a particular settlement distribution would
 5        go into one account versus another?
 6   A    If I have the card to one account and not the
 7        other.  Literally.  I've gone over a year
 8        without any access to the checking account, per
 9        my choice.
10             So if I happen to have the savings card
11        and I can drop it off, or if I stop at the bank
12        or --
13   Q    Well --
14   A    There's no rhyme or reason to it.
15   Q    Every time there's a settlement, you have to go
16        in and give Bevan a card to allow him to make
17        the deposit?
18   A    No.  If I'm making a deposit to my bank, I
19        would need the card.
20   Q    So Mr. Bevan writes you the check, and then you
21        make the deposit into the account, is that the
22        process?
23   A    Yes.
24   Q    Got it.
25             Your grandfather is David Wertheimer?
```

```
 1   A    Wertheimer.

 2   Q    Wertheimer.

 3             Did he work at Goodrich or Goodyear?

 4   A    Goodrich, I believe.

 5                  MR. GEYERMAN:  I don't have any

 6        further questions today.

 7                  As BASF's counsel indicated,

 8        we're keeping the deposition open in light of

 9        all of the instructions not to answer, the lack

10        of production of documents and the lack of

11        production of a verification form as to her

12        answers to my client's interrogatories.

13                  MR. COREN:  Eric, do you have

14        anything?

15                  MR. TUNIS:  Yeah, I have a few

16        questions.

17             EXAMINATION OF DONNETTE WENGERD

18   BY MR. TUNIS:

19   Q    Good afternoon, Ms. Wengerd.

20   A    Hello.

21   Q    I represent Thomas Halket in connection with

22        this litigation.  Are you familiar with the

23        name Thomas Halket?

24   A    It does sound familiar.

25   Q    And in what context?
```

```
 1    A    It sounds like I've heard that name in

 2         accordance with this complaint.

 3    Q    Okay.  Do you know anything more specific?

 4    A    No.  I don't have any personal knowledge other

 5         than what I would have discussed with my

 6         attorney.

 7    Q    I believe you previously testified that your

 8         mother complained of symptoms which she

 9         ultimately associated with the exposure to

10         asbestos in December of 2007; is that correct?

11    A    Correct.

12    Q    Were you present when she complained of those

13         symptoms?

14    A    I was.  And I don't believe at that time that

15         she linked her symptoms to any specific ailment

16         other than just not feeling well.

17    Q    I understand.

18             Are you aware of whether she had

19         expressed any similar symptoms prior to that

20         day?

21    A    No.  They -- these symptoms were different than

22         any that she had previously commented about

23         that I can recall.

24    Q    I see.  And I believe you testified that after

25         she experienced these symptoms in December, she
```

```
 1        consulted with a doctor in January; is that
 2        correct?
 3   A    That's correct.
 4   Q    Prior to December of 2007, had your mother
 5        expressed any concern about having been exposed
 6        to asbestos on the work site?
 7   A    Not that I recall.
 8   Q    Did she know of anybody who had filed a lawsuit
 9        claiming that he or she had sustained injuries
10        as a result of exposure to asbestos?
11   A    No, not that I know of.
12   Q    What was the last -- when did your mother stop
13        working for Goodyear?
14   A    I don't recall the date without looking.  I
15        think it was 1978.
16   Q    And ultimately she hired the Bevan law firm to
17        represent her with respect to her claim related
18        to her exposure to asbestos; is that correct?
19   A    That's correct.
20   Q    Do you know when she retained the Bevan law
21        firm?
22   A    I don't recall.  It would have -- it would have
23        been sometime after February of 2008.
24   Q    And at that time had she received a diagnosis
25        of mesothelioma?
```

```
 1   A   She received her diagnosis of mesothelioma, I
 2       believe, on Valentine's Day of 2008.
 3   Q   Do you know if she retained any law firm
 4       related to her claim prior to the Bevan law
 5       firm?
 6   A   I don't know.  I don't think so.
 7                   MR. TUNIS:  I don't have any
 8       further questions.
 9                   MR. COREN:  John?
10                   MR. BOYLE:  This is John Boyle.
11       We don't have any further questions at this
12       time, subject to the same reservations that
13       have been stated by counsel for the other
14       Defendants.
15                   MR. COREN:  Well, I believe
16       that's a wrap.
17                   THE VIDEOGRAPHER:  We're off the
18       record.  The time is 1:47.
19          (Deposition was adjourned at 1:47 p.m.)
20                   (Signature reserved.)
21
22
23
24
25
```

```
 1    THE STATE OF OHIO,    )    SS:

 2    COUNTY OF CUYAHOGA.    )

 3

 4         I, Jill A. Kulewsky, a Notary Public within and
      for the State of Ohio, duly commissioned and
 5    qualified, do hereby certify that Donnette Wengerd,
      was first duly sworn to testify the truth, the whole
 6    truth and nothing but the truth in the cause
      aforesaid; that the testimony then given by her was
 7    by me reduced to stenotypy in the presence of said
      witness, afterwards transcribed on a
 8    computer/printer, and that the foregoing is a true
      and correct transcript of the testimony so given by
 9    her as aforesaid.

10         I do further certify that this deposition was
      taken at the time and place in the foregoing caption
11    specified.  I do further certify that I am not a
      relative, counsel or attorney of either party, or
12    otherwise interested in the event of this action.

13         IN WITNESS WHEREOF, I have hereunto set my hand
      and affixed my seal of office at Cleveland, Ohio, on
14    this 10th day of April, 2017.

15

16

17

18
                    Jill Kulewsky Rn
19

20                  Jill A. Kulewsky, Notary Public
                    within and for the State of Ohio
21                  My Commission expires August 31,
                    2020.
22

23

24

25
```

```
 1   U.S DISTRICT COURT        )
                               )     SS:
 2   DISTRICT OF COLORADO      )

 3

 4

 5

 6        Before me, a Notary Public in and for said

 7   state and county, personally appeared the

 8   above-named Donnette Wengerd, who acknowledged that

 9   she did sign the foregoing transcript and that the

10   same is a true and correct transcript of the

11   testimony so given.

12        IN TESTIMONY WHEREOF, I have hereunto affixed

13   my name and official seal at

14                        this            day of

15              , 2017.

16

17

18

19                   Donnette Wengerd

20

21                   Notary Public

22                   My Commission expires:

23

24

25
```

```
 1                    DEPOSITION ERRATA SHEET

 2     Page No.          Line No.          Change to:
       Reason for change:
 3
       Page No.          Line No.          Change to:
 4     Reason for change:

 5     Page No.          Line No.          Change to:
       Reason for change:
 6
       Page No.          Line No.          Change to:
 7     Reason for change:

 8     Page No.          Line No.          Change to:
       Reason for change:
 9
       Page No.          Line No.          Change to:
10     Reason for change:

11     Page No.          Line No.          Change to:
       Reason for change:
12
       Page No.          Line No.          Change to:
13     Reason for change:

14     Page No.          Line No.          Change to:
       Reason for change:
15
       Page No.          Line No.          Change to:
16     Reason for change:

17     Page No.          Line No.          Change to:
       Reason for change:
18
       Page No.          Line No.          Change to:
19     Reason for change:

20     Page No.          Line No.          Change to:
       Reason for change:
21
       Page No.          Line No.          Change to:
22     Reason for change:

23
       SIGNATURE:                          DATE:
24
                   Donnette Wengerd
25
```

**Exhibits**

**Exhibit 1**
 4:7 87:1,4,5

**Exhibit 39**
 4:8 92:22,25

**Exhibit 40**
 4:9 98:20,23 114:10

**Exhibit 41**
 4:10 108:25 109:3,4

**Exhibit 42**
 4:11 127:5,8 163:19,20

**Exhibit 43**
 4:12 132:21 133:6,7

**Exhibit 44**
 4:13 135:10,13 143:8

**Exhibit 45**
 4:14 142:1,11 143:6 147:16

**Exhibit 46**
 4:15 170:16,19 171:2 173:20,21

**Exhibit 47**
 4:16 174:20,23

**$**

**$250,000**
 96:19

**1**

**1**
 87:1,4,5

**10th**
 89:24 99:1

**11**
 164:18

**11-CV-01754**
 7:7

**111**
 122:19

**11:01**
 80:9

**11:17**
 80:12

**11th**
 97:11

**12**
 160:5

**12:25**
 141:23

**12:40**
 142:4

**12th**
 117:5 118:8,16 121:3 123:3 170:23 171:2 172:13

**1978**
 187:15

**1:33**
 181:9

**1:38**
 181:12

**1:47**
 188:18,19

**2**

**2**
 109:13

**20**
 29:1

**20/20**
 159:24

**2000**
 166:8

**2000s**
 166:8

**2001**
 153:17 154:2

**2007**
 186:10 187:4

**2008**
 34:17 37:22 38:11,13 89:25 93:4 97:10,11 99:1,25 104:6,12 114:9 117:6 118:8,16 121:4, 10 123:1,4 133:7 170:24 171:2 172:13,

17,19,24 187:23 188:2

**2009**
 44:19 45:17 109:17 125:13,24

**2011**
 180:23 181:1

**20426**
 130:6

**20427**
 127:20,24,25

**21st**
 97:10

**232**
 116:24 117:4 118:9 126:15

**233**
 117:22 118:15 119:15 126:16

**234**
 120:8

**2342**
 175:1

**235**
 121:22 122:13

**239**
 122:20 123:16

**240**
 125:12

**244**
 126:16

**25**
 148:25

**2616_0002**
 109:9

**28**
 88:2

**28th**
 99:24 109:17

**3**

**3**
 148:3

**30**
 29:18 181:5

**31**
 88:1 89:23 90:14,17

**35**
 133:18,20

**39**
 92:22,25

**3rd**
 133:7

**4**

**4**
 81:4 149:3

**40**
 98:20,23 114:10

**41**
 108:25 109:4

**42**
 127:5,8 163:20

**43**
 132:21,25 133:7

**44**
 135:10,13 143:8

**45**
 142:1,11 143:6 147:16

**46**
 170:16,19 171:2 173:21

**47**
 174:20,23

**5**

**5**
 139:20,21 153:14

**50**
 83:22

**53-year-old**
 99:22

**567**
 122:2

**6**

**6**
 160:9

**60**
83:23

**7**

**7**
136:17

**8**

**8**
156:3 157:7 160:17

**8th**
123:1

**9**

**9**
136:21

**90**
83:12 92:16 93:8

**A**

**able**
18:4 20:19 23:10 28:16
43:14 62:14 73:15
81:23 82:8 157:1
166:16 173:21 183:18

**abreast**
19:11

**absolute**
68:4

**accepted**
90:6,22 91:1

**access**
24:19 184:8

**accident**
30:14 154:15

**account**
181:22,24 182:2,8,14,
24 183:6 184:1,5,6,8,21

**accountable**
70:8

**accounts**
182:11,13,16,17,21
183:1,8

**accuracy**
107:8 157:22

**accurate**
22:13 31:10 106:16,20
139:18 144:17 147:17
148:7 174:16

**accurately**
158:18

**acknowledges**
69:1

**acknowledging**
69:23

**act**
114:16,21 165:19
166:12

**acting**
54:24 60:16,20,23
160:11

**action**
7:6 32:12 55:10 57:9,
10,16,17,20,25 59:25
87:8 158:15 160:7,13

**actions**
59:15 70:9

**actual**
107:19

**ad**
29:17

**add**
9:4 89:15 115:23
124:24 129:13 161:18

**addition**
153:1

**additional**
27:5

**address**
39:23 54:23 81:8 132:8
145:12,14,24

**addressed**
109:22 171:3

**addresses**
136:25 145:19,21

**adjourned**
188:19

**admissible**
155:11,13

**admit**
158:9

**advance**
72:25 178:18

**advice**
8:25 9:2,5,17,19,20
10:23,25 11:3 17:19
19:22 22:25 36:25 40:5,
23 49:3 60:9,11,14 65:4
66:20 68:11 69:14
73:21 74:5 75:20 76:1,9
78:1 80:5 81:12,21 82:6
83:2 86:4 108:4,12,20
112:22 113:7,23 114:7
115:1,19,21 126:7,12
127:3 140:13,15,17,19,
22 155:19 161:13,15,19
163:9,11,13 178:21

**advise**
92:7 129:14

**advised**
119:9 124:25 173:24

**advises**
153:25

**advising**
65:6 72:25

**affairs**
21:8,13 23:4 24:4 29:20
35:5,7,9 41:25 42:9,16

**Affidavit**
16:6,12,17,19,21
120:13,20 121:19

**afraid**
32:20 38:20 91:7

**afternoon**
81:1,2,17 82:2,21
86:12,20,23 185:19

**age**
8:8

**ago**
27:10 39:7 86:11 87:15
109:20 119:21 137:2

**agree**
103:9 131:19

**agreement**
56:16

**ahead**

102:13 110:17 150:21

**aid**
96:7

**ailment**
186:15

**Akron**
99:7

**al**
7:5 157:13

**Alex**
7:8

**allegation**
91:22

**allegations**
47:10,16 49:10,19
150:1 162:4 164:23

**allege**
13:6

**alleged**
9:10,14,22 92:1 156:4
159:16

**allegedly**
120:15 156:17 166:3

**alleging**
158:20

**allow**
170:10 178:24 184:16

**amended**
27:11,12,13 51:5,12,15,
20,23 87:8,19 116:25
117:4 162:5 170:22
175:8

**amendment**
171:20

**amount**
67:10,17 68:7 76:17
95:19 96:1,3 97:5 115:8
154:22 166:6 179:2,12
180:6

**amounts**
77:2 182:5

**analyses**
120:14

**anguish**
68:4

**Anne**
99:12

**answer**
8:24,25 9:1,16,18
10:22,23,24 11:3 12:8,
24 14:11,12 17:18,22
18:4 19:21,24 20:6
22:24 23:1,8,10 24:2
25:7 28:3,16 29:5
31:10,14 33:10 36:16
37:1,12 40:4,11,13,14,
22,24,25 41:3 42:5,6,21
43:6,9,12,14,15 45:22
47:14 48:7,8,9,11,16
49:2 52:6,8,17,20,21
54:10,19,20 55:2,15,22,
23,24 56:5,7,14,21
60:4,5,6,8,9,10 61:19
62:4,9,12,18,23 64:1
65:3,8,12,13,14,18
66:18,20,23 68:10,11
69:13,17 70:17 71:2,3,
4,20,22 72:7,11,16
73:10,11,15,16,20,21
74:4,5,20,23 75:8,9,10,
11,12,19,20 76:2,3,8,
10,23,25 77:8,15,16,17,
25 78:1,6 79:19,20,22,
25 80:4,6 81:13,19,21,
23 82:4,7,8,9 83:1,3,5,
23 84:7,16 85:22 86:3,
5,6 91:8 92:4 94:17
96:22 97:4 98:17
103:17 104:10,16
108:5,6,11,13,18,21,22
111:6,11,13 112:19,23
113:5,8,22,24 114:7,18
115:1,2,4,5,18,19,20,24
116:19,22 117:21 119:1
126:6,8,12,23 127:3
130:15 132:3 133:25
134:3 135:4 140:12,13,
17,18,19,21,25 141:1
143:13 144:14 150:20
152:21,23 153:16
154:25 155:8,18,20
157:7,20,23 159:14,21
160:16,17 161:12,13,14
163:9,10,12 166:10
169:23 170:9,10 174:1
178:20,22,23 179:15,24
185:9

**answered**
51:13 67:20 74:15 78:7,

18 84:13 113:14 164:25

**answering**
17:19 19:22 22:25
25:24 40:6 42:13,20
49:3 69:15 112:21
144:8

**answers**
9:17 83:16 84:25 85:6
112:5 141:5 142:17,21
143:2,7,8,22 144:16,25
145:7,14 146:24 147:16
157:17 158:1 159:22
175:8,10 185:12

**anybody**
18:12,15 26:14 35:16,
22 38:16 39:10 41:17
44:21,24 46:4 82:15,20
86:22 96:2 129:4 138:4
156:20,22 177:4 187:8

**anybody's**
147:3

**apart**
16:12 88:13 162:8
177:22,23

**apologize**
73:24

**Appeals'**
26:25 27:4

**appear**
173:13

**apprised**
125:3

**approximately**
83:22 93:8 100:3 156:1

**April**
97:11 109:17

**apt**
172:7

**area**
90:7,22 117:6

**aren't**
149:18,19 160:25

**argue**
124:20

**arguing**
129:25

**argument**
125:6

**arguments**
124:3

**arrangement**
55:9,19 56:1

**arrive**
104:3,13

**Arthur**
8:5

**asbestos**
10:3 13:18 14:2 22:1
24:6,13,21 25:2 29:22
31:1,20 32:5 33:7,25
34:19 35:3,6,8,11 36:6,
7 40:9 50:25 54:7,14
61:11 64:4,12 66:12,16
67:6,8 68:1 69:4,9 88:5
89:4 90:3,7,22,25 91:2,
13,22 92:13 94:4,6
95:4,15 96:10,17 97:7
109:14 110:10,20 111:2
113:2,10,20 114:4,13
116:11 117:10 118:2,6,
21 120:11,17 122:2,17
123:2,24 124:5,21
128:18 131:16,21 132:1
149:4,6 153:3 158:10,
15,17 165:3,16 166:25
167:12 175:12 176:16,
20 181:16 186:10
187:6,10,18

**asbestos-containing**
14:6

**Ashton**
16:6,11,16,19,21
120:13,20 121:19

**asked**
20:15 40:7 41:8 51:13
53:2 55:15 67:20 79:16
83:24,25 106:3 112:11
119:19 132:13 136:3,
18,21 141:2 143:13
156:8 158:4 170:23
178:12

**asking**
12:25 13:16 21:18
33:21 41:15 48:17,23
50:13,14 53:16,17
57:13,14 58:20 61:20
62:6,19 67:14 69:19

71:24 75:12 76:11,12,
13 77:8 78:3 81:14
84:18 85:7 101:25
102:4 103:8 111:6
123:16 130:13 131:23
136:11 153:9 155:25
156:3 159:12 163:1
168:8 170:21 174:3,6
179:23,25 180:3,4,9
182:4

**asks**
139:21 160:7,14 164:20

**aspect**
111:24

**asserted**
12:20 20:17,21 23:11
56:10 85:3 160:7

**asserting**
43:2 55:7 78:19 112:8

**associate**
134:3 175:17,18,20
176:1,4

**associated**
11:23 132:14 186:9

**Associates**
109:22 171:4,13 177:8,
23

**assume**
24:15 81:7

**assumption**
128:25

**attendance**
46:1

**attending**
39:5

**attesting**
146:16

**attorney**
10:9 11:2,9 14:19 16:15
21:3,16 22:25 24:18
25:5,24 32:3 34:11 36:3
40:5 41:23 46:5 49:3
50:9 56:25 63:18 65:4
68:12 69:14 73:10,11
80:21,23 89:6 90:16
91:8 92:5,6,15 93:18
94:16 95:6,9 105:15,20
106:7 107:6 110:23
111:19 114:15 117:7,16

119:3 120:1 125:1,11 129:2,11,14 135:2 150:19 155:19 156:24 157:18 160:10 161:10 167:23 168:17 169:1,17 170:4 173:7,19 178:21 186:6

**attorney's**
36:25 40:12,23 42:19 48:8 54:10,18 55:22 60:4 75:10 77:16 106:24 167:14 168:12, 20 169:5,13

**attorney-client**
12:9,13,17,21 20:9 21:22 23:21 28:6,9 31:17 33:15 36:19 42:4, 12 43:10 50:12 52:10 55:3 56:3,9,15 63:25 65:10,15 67:2 72:20 73:20 74:24 75:6 76:21, 22 77:6,7 81:11,20 82:4 83:7 108:11,18 111:24 114:25 116:18,20 117:21 127:2 170:3

**attorneys**
11:13,18,19 13:7 15:10, 24 19:1,10,16,25 22:19 23:5 24:15,17 27:23,25 28:12 31:9,12,16,18 34:8,15 41:21 43:17 63:16 70:2 74:7 76:5 77:19 90:23 147:8 149:16 156:14 158:13, 14,22 159:1,15 160:15, 21 161:5,7 162:16 167:7 173:24 177:1

**attorneys'**
93:23 169:25

**attributable**
69:11

**authorized**
108:8

**autolysis**
102:25

**available**
59:24

**aware**
24:4 31:21 72:22 80:14 95:13 103:13,19 104:6, 12,24 119:10,24 122:16 124:14 134:18,19 147:11 160:25 162:13, 15 178:11 186:18

**awfully**
84:12

**B**

**back**
62:19 63:23 80:11 84:25 88:16 89:10 141:3,9 142:3 143:25 147:8,10 166:7 181:11

**bad**
17:9

**badgering**
79:19

**bags**
150:14

**ballpark**
29:8

**bank**
181:21 184:1,11,18

**bankruptcy**
105:7,9,12,22 106:2,8 107:1,7,24 114:3,11 115:9 116:3

**barely**
139:1

**based**
20:6 40:12 49:11 51:23 62:9 65:14 85:15,16 130:16 147:19,20 158:12 164:12 178:1 179:25

**baseless**
85:4,5

**bases**
85:21 151:19

**BASF**
7:4,18,20 8:16 9:7,14, 22 10:2,19 14:3 23:14 41:8,12 59:7,18 60:1,21 63:15 64:22 68:22 69:11,23 70:1,7 90:5 117:17 119:10 123:2,18 124:2,14 125:6 128:20 130:19 143:23 144:5,19 145:7 157:12 158:8 159:10

**BASF'S**
69:1 85:20 117:6 123:13 124:7,19 125:13 126:3 127:11,17 129:15,24 130:9 131:4 143:8 144:16 185:7

**BASF_WILLIAMS**
127:19 130:5

**basic**
183:22

**basically**
146:21 151:19

**basis**
12:8 17:21 19:23 28:4 36:17 42:24 48:4,25 49:7 52:7 62:3 66:22 74:22 83:4,6 84:8 93:16,21 95:21 110:15 111:12 113:6 118:20 119:1 125:5 126:24 130:14 155:1,8 170:4,7

**Bates**
98:25 109:8 127:18 174:25

**battery**
104:1

**bearing**
98:25 155:4

**began**
9:10 100:4,5

**beginning**
7:2

**begins**
117:5

**behalf**
7:20,22 8:3,5,19 30:13 45:6 60:16,23 93:6 97:12 105:10 106:9 107:25 113:16 114:16, 22 116:16 160:12 172:20

**belief**
149:11,13,18,22 158:8

**beliefs**
149:15

**believe**
12:1 14:3 15:2,18 16:7 21:14 27:2,19 30:10 31:23,25 32:10 34:23 35:20 36:2 43:19,23 45:7,25 46:12,24 50:2 53:8 54:1 55:4,5 56:25 58:18,19,22 60:23 61:10 67:3,7 68:3,15 69:7 71:10,13 72:3 87:22 88:6 95:11 98:7 106:5,12 108:23 117:16,19 118:25 120:7 123:11 128:16,19 130:16 132:16 135:16 136:2 137:8,12 138:18, 22 139:8 145:5,10,16 148:1 152:1,4 155:22 159:9 165:19 166:11,19 170:14 177:25 178:1,3 180:18 185:4 186:7,14, 24 188:2,15

**believed**
32:22 177:21

**believes**
158:8

**benzine**
150:25

**best**
58:8 64:13,22 101:8 144:12 146:17 148:8 158:4 179:2

**Bevan**
11:11,12,13,14,25 12:3, 10,14,19 17:4 18:12 24:20 25:1 34:12,13,16, 21,25 35:3,11,16,17,21, 23 38:8,16,24 39:11,19 40:1,8,17 42:10 44:13, 14,21,24 45:25 46:15, 18 47:8 48:2,20 49:7, 17,20 52:1,18 53:23 54:1 56:2,18,24 64:5,12 68:21 86:19,22 88:9,11, 15,19,20,23 90:13,19 91:3,14 92:10,12 93:6, 13 94:8,11,18,24 95:2 105:2,4 106:9 107:17, 21 108:8,14 109:22,24 110:9,25 111:22 113:18 114:18 116:7,10,14 117:8 118:16 120:12,25 121:3,13,20,24 125:2,3,

12,23 126:3,9 133:21
135:4 138:6 154:17
156:21 162:16,23 163:7
171:4,13 177:3,7,23
179:3,9 180:7,18,25
182:7 184:16,20
187:16,20 188:4

**Bevan's**
18:8 45:20 46:5,8
107:23 134:15 137:24
138:1 171:13

**beyond**
111:8 184:2

**bill**
53:13

**bills**
183:2

**biopsy**
101:16

**birth**
32:19

**bit**
19:1 35:4 88:13

**blocking**
112:5,7

**bolster**
121:22

**bottom**
127:17 133:20

**box**
22:8 105:23

**Boyle**
8:4 188:10

**brakes**
151:2

**brand**
13:23,25 14:19 132:14
134:10

**brands**
14:5,23 134:15

**break**
80:7 141:16 181:7

**breakfast**
139:1

**breaks**
183:6

**brief**
71:13 125:6,17,24
126:10 164:8

**brought**
8:18 153:18

**bucket**
167:5

**buckets**
165:25

**business**
30:7

---

**C**

**Cahill**
7:24 85:19 141:14
142:9,18,22 143:2
144:3,5,14,25 145:15
146:25 161:1,8,20
162:22 163:5 164:3,11,
16 165:7,12 168:19,23
169:5 173:12 176:22,24

**Cahill's**
143:7

**call**
78:14 82:24 84:21
85:10,25 86:12 170:12
178:12,18 183:3

**called**
8:8 32:8 82:13 83:19
100:10 132:6 146:5,14
164:6 178:16,17

**calling**
111:25

**calls**
45:7 65:1 170:1

**can't**
11:3,5 12:18 18:21
25:13 51:14 53:25
107:14 136:20,22,23
137:1 140:18 146:13
150:11 152:14 157:22
162:21 169:4 179:14

**cancer**
66:2 68:5

**capacity**
15:17 122:24

**caption**
93:9

**car**
183:6

**carcinoma**
103:24

**card**
184:6,10,16,19

**care**
99:10

**case**
7:3,13 8:15 9:25 10:1,7,
12,14,15,17,18 11:6,10,
14,16 12:11 13:2,5,8,14
16:9,13,18 20:2 21:1,5,
6,10 22:1,17 23:5,15,23
24:6,13,22 25:2 26:12
27:1,16 28:1 29:22,25
30:1 31:1,4,22 32:4,7,
13,14 33:17,25 35:11,
24 36:5,6,10,14,23
37:5,8 38:11,22 39:8,17
40:9 41:6,9,13 42:17
43:18,21 44:3,6,20,22,
25 45:1,5 46:8,23
47:16,20 48:5 49:1,8
50:18,22,25 51:6,21
53:7,24 54:5,7,15,25
56:19,23 57:7,24,25
58:3,9 59:3,12 60:1
61:16,23 62:17 63:10,
12 64:4,12 66:3 67:15
68:8,24 69:1,18,20
70:4,10,21 72:5,9 73:8,
13 74:8,13,19 75:4,23
76:6,18 77:13,18,22
78:25 79:5,8,14 80:2,15
83:10 84:5,10 87:9,20
88:16 89:4,8,17 90:13,
16,18 92:10,13 93:9,14,
22 94:4 95:4,15,23
96:5,10,25 97:7,12,15
98:2,5,14,25 99:16
100:22 108:1,9,16
117:13 118:2,6,18
119:16,20 120:3 121:14
123:2,14,18 126:17
127:12 128:9,17,21
129:25 131:22,25
134:23 135:14 141:13
143:12 147:4 150:4
152:9 154:4,17,22
155:6,13,17 156:1,11,

18 157:4,13 158:20,21
159:2,7,11,14,16
161:10 162:1,2,18,24
163:7 164:23 165:2,23,
25 166:15,17,19
167:13,16 168:10,11,
13,21 169:21 171:19
172:5 173:9 175:12,21
176:4,8,12,16,20 179:1,
4,8 180:1,7,8,21,22,25
181:3,16

**cases**
30:3,5,6,16 31:7,15,19,
24 32:1 33:7 35:3,6,9
36:1 59:10,16,22 63:5,
6,14 64:21,23 65:21
91:13 104:21 117:13
118:20 121:24 122:5,17
128:9 157:19 158:10
169:6 179:13

**Catalysts**
7:4,18,20

**catch**
154:13

**category**
167:20

**cause**
120:6 165:8 168:6

**caused**
13:8 32:19 66:11 67:6
165:17

**causes**
68:1

**Caveny**
99:12

**cell**
82:24 86:1 103:24

**Celotex**
109:14 110:10 113:10

**Celotext**
110:20 111:2 113:2,19

**center**
99:8 101:4,12

**certain**
27:17 28:20 29:24 50:4
106:1 160:14 170:13
183:2

**certainty**

DONNETTE WENGERD - 04/06/2017                                        i6

22:2,10 30:4,19 32:25
49:18 53:10 57:2

**certified**
8:10

**chairs**
141:21

**change**
39:4 73:6 154:12
159:21 160:1 177:16

**changed**
39:22

**changes**
139:15,16

**charges**
161:25

**cheaply**
158:11

**check**
27:17 28:20 30:4,21
31:9 34:8,11,12,13
45:11 50:17 53:10
105:23 125:21 184:20

**checked**
38:18 39:2,9 45:12

**checking**
28:17,22 38:19 39:14
88:20 125:18 181:24
182:14,24 184:8

**chest**
99:24 102:23

**child**
32:20 173:1

**children**
29:18 145:23

**children's**
146:1

**choice**
184:9

**choose**
36:25 65:5 115:1 126:7,
12 127:3 140:17,19
155:19 178:21

**choosing**
25:5 40:23 42:5 47:14
48:9 54:19 55:23 56:21
60:5 65:13 66:20 68:11

71:3 73:11,21 74:5
75:11,20 76:1,9 77:17
78:1 80:5 81:12,21 82:6
83:2 86:4 108:4,12,20
112:22 113:7,23 114:7

**Chris**
25:20 74:12

**Christmas**
100:6 139:3

**City**
164:13

**civil**
7:6 8:9 160:7

**claim**
8:18,20 61:12 94:14
135:1 156:10 160:8,14
187:17 188:4

**claimed**
123:18 124:10

**claiming**
187:9

**claims**
8:15,16 34:19 36:7
93:16,21 95:4 105:6,9,
12,13 107:24 122:2
132:5,9

**clarify**
143:6

**class**
55:10 57:9,16,20,25
58:2,7,12,17,21 59:4,
19,22,25 60:17 61:4,9
62:25 63:4 65:19,23
66:1,4 68:13 71:11,18,
19 77:21 84:9 87:8
128:24 129:5,9 169:2,4,
10

**clearly**
155:11

**Cleveland**
100:23 101:2,15 164:9

**client**
43:7 55:12 57:22
169:11,13,23

**client's**
20:2 185:12

**clients**

52:25

**Clinic**
100:23 101:2,15

**Clinical**
100:10

**co-worker**
128:9

**Cohen**
11:11,20,25 17:3,5
25:15 40:17 42:1 43:20
44:2,6,11,14 45:4,15
48:25 49:21 53:6,20
54:3,23 55:20 56:11,24
119:5 126:2 137:9,18,
25 138:13,20 139:13

**Cohen's**
39:3

**come**
10:20 11:2 15:25 21:3
27:21 34:18 44:11
60:24 81:16 83:21
84:25 85:6 141:3,9
151:5 156:24

**comes**
15:23 94:7

**commenced**
90:3

**commented**
186:22

**comments**
85:20

**committed**
9:7

**Common**
90:4 117:12 123:17

**communicate**
12:3 35:22 37:17 44:5,
24

**communicated**
47:24 77:4 78:21 144:7
160:13 178:9

**communicating**
121:13

**communication**
12:5 20:13 21:15 28:7,
11 36:4,20 38:4 55:12
63:25 72:20 73:20

74:25 76:21,22 78:17
84:1 89:10 105:1

**communications**
38:15,23 39:18,25 40:8
48:4,14,24 49:6 89:5
160:21

**companies**
70:7 92:12 93:13 94:14
116:15

**company**
14:1,16 118:25 132:6
148:16 182:6

**Company's**
163:21

**compensate**
167:24 168:9

**compensated**
67:9,24 68:3 166:7

**compensation**
59:24 66:14 67:4,17
69:3,7 70:21 71:15
112:11 113:3 114:4,12
115:8 158:12 165:3,11,
17 166:2,6,24 167:4,11,
20 168:16

**complained**
186:8,12

**complaint**
16:7,9,13,17 18:20
26:21 27:3,9,13 43:18
47:10 49:10,15,20,24
50:6,16 51:6,9,12,16
87:9,19 88:2 89:8,23
91:16 92:2 93:3 116:25
117:5 118:6,10 119:4,
13 120:6,8 122:10,12,
20 124:2 135:19 157:9
162:5 170:22 171:18
172:4,11 180:20 186:2

**complaints**
27:15 51:20,23 63:12,
14 171:21

**complete**
147:17

**completed**
106:9

**concern**
187:5

**concerning**
48:4,25 49:7 146:24
147:3 149:4 160:13
162:18,24 163:7 172:10

**concluded**
103:14

**condition**
66:5 67:5 99:19 100:4,5
102:15 103:14 104:7
113:1 115:13 116:2

**conditions**
98:10 106:3

**confer**
91:7 114:15 129:2,11
156:14 167:23 168:17,
25

**conferred**
106:23 173:18

**conferring**
92:14 93:18 94:16 95:5,
8 105:14,19 135:2
169:17

**confirm**
106:15,20 107:8,13

**Confirmed**
110:5

**confused**
48:17

**connection**
20:3 22:16 29:21 47:3
53:23 56:23 57:6 61:22
62:16 95:14 96:4,9,16
98:14 99:16 154:14
156:5,10 159:13 161:2,
10 164:23 167:15
168:21 169:6 175:11
176:7,11,15,19 179:1
181:18 185:21

**connects**
10:14

**Connolly**
7:22 142:8

**consider**
101:11 167:11,19

**consistent**
103:1,7,15 104:8

**consult**

114:22

**consultation**
100:24

**consulted**
98:13 99:15 187:1

**consulting**
33:3 50:8

**contact**
34:14

**contacted**
110:24 113:17

**contain**
14:2 120:16 140:9

**contained**
49:14 118:21 120:11
123:23 131:21 173:15

**containing**
94:5

**contains**
20:25

**contaminated**
153:3

**content**
85:12

**contention**
139:24 158:25

**context**
33:13 183:4 185:25

**continuation**
117:23

**continue**
85:8 141:4,10

**continued**
89:14

**continuing**
175:1

**contrary**
112:24 113:11

**conversation**
78:12 79:10 81:16 82:1
84:19 137:14,16 152:5,
15 153:6

**conversations**
10:10 16:18 116:9,13
149:15 150:19 151:14

**Cook**
7:8

**copies**
19:13 120:13

**copy**
18:19,20 50:2,15 53:9
107:21 125:17,23,25
126:3,9 127:11 135:13
139:12 147:11

**core**
101:16

**Coren**
7:11,12 8:1,6,23 9:15
10:8,21 12:6,20 14:8
17:6,7,18,23 18:1,5,11
19:3,21 20:1,8,12,17,21
21:21 22:6,21,23 23:6,
16,20,25 24:23 25:3,23
28:2,6,10 29:3,5 34:1,4,
6 36:15,19,24 40:3,10,
18 42:2,11,18,22 43:1,
6,25 45:22,25 46:15,18
47:8,11,17 48:3,6,12,
15,20 51:13 52:2,5,9,
13,17,23 54:8,16 55:1,
6,11,21 56:8,10,13,20
57:12 60:3,7 61:17,24
62:5,11,18,24 63:22
64:16,18 65:1,6,11,17
66:17,25 67:20 68:9
69:10,12,19 70:12,18,
23 71:1,8,17,23 72:6,
10,14 73:4,9,19,23
74:3,9,14,16,18,20,24
75:5,18,24 76:7,13,20,
24 77:5,11,14,24 78:5,
11,15,23 79:11,15,24
80:3,24,25 81:8,10,17,
18 82:1,3,18,25 83:6,11
85:11,25 86:2 87:24,25
90:15 92:3,18 93:10
95:18 96:21 97:5 98:16
101:9,25 102:8,12
103:8,16 104:9,15,23
108:2,10,17 110:13,16
111:5,14,18,21 112:7,
16 113:4,21 114:5,24
115:17 116:5,17 117:20
124:17,22 125:9 126:5,
11,22 127:1 130:12,22
131:12,17 132:2,23
134:12 135:22 140:11
141:18 150:18 154:25

155:2,10,18 156:19
159:8,23 160:2 161:11
162:19 163:8 165:14
166:9 168:5,14,24
169:8,22 170:6,20
173:16 174:12,17
177:11,12 178:13,17,19
179:5,10,17 180:9
183:9,14,25 185:13
188:9,15

**Coren's**
39:3 45:3 54:2 135:21
180:12

**Corporation**
117:23 118:19

**correct**
9:9,24 10:13 11:8 14:25
15:22 16:20 18:6,10
23:12 25:16 26:3 27:5
38:11 41:2 43:16 44:16
48:12 49:16 51:8 52:22
58:19 60:19 62:24 64:6,
7,9,10,14,15,25 70:18
73:17 74:17 78:13
86:13 87:22 88:17,25
89:18,20 90:1,2,20
91:15 92:11 93:4,7,15
94:9,12,19 95:15,16
96:6 97:13 98:3,11,15
99:8,9,19 102:16,17
103:7 104:8 105:7
107:18 109:18,21,23
110:4,8 111:1 114:20
115:6 117:13,14 118:7
120:3,4 121:11,12,15
124:12,21 126:13,14
127:13,25 130:2,11
131:5,11,16 132:1,4,15,
16,17 133:13 134:11,16
135:6,8 138:2 140:22
143:24 144:23 146:20
147:15 148:17,23,24
149:4,5,8 151:16 153:7
156:6,7 157:18 158:22
159:4,7,19 162:3,7,18,
24 164:10,14,22,24
165:6,13 166:5 167:3
171:15 172:18,22,25
173:5,6,10,12 175:8,12
186:10,11 187:2,3,18,
19

**correspondence**
20:3 120:24 171:11

DONNETTE WENGERD - 04/06/2017

i8

**costs**
85:2,23 141:9

**couldn't**
12:12 14:19 22:2,9
29:24 30:19 32:24 33:4
49:18 53:13 57:1 65:22
67:13 71:7 78:8 93:18
101:22 106:1 145:24
169:17

**counsel**
7:9 8:25 9:2,5,8,17,19,
20,23 10:10,23 11:1,5,
16 12:7 14:12 16:18
17:1,19 19:22 26:15,17
27:5,6,21 40:2,7 49:15
54:24 57:6 60:10,12,14
66:21 73:22 74:6 75:21
76:1,9 78:2 79:1,4 80:5
81:12,22 82:6 83:2
85:20 86:4,16 94:21
95:1 96:7 108:4,12,20
112:22 113:7,15,23
114:8 115:1,19,21
117:24 119:9 126:7,12
127:3 140:13,15,17,19,
22 150:4 160:12
161:13,15,19 163:10,
12,13 170:10,21 185:7
188:13

**count**
83:22

**counted**
93:12

**County**
90:5 91:2,6,10,13
117:11 123:17

**couple**
177:19

**course**
75:3 143:11

**court**
7:5 26:25 27:3 33:19
40:20 69:25 71:20
84:24 85:21 90:4
112:10 117:11 123:17,
18 130:9,13,14,17,18
131:2,4 155:9 159:3,18

**Court's**
130:23

**cover**

**130:4**

**covered**
21:16 83:13,15 151:2

**covering**
83:12

**Credit**
182:18

**cross-referencing**
160:16

**CT**
99:24

**currently**
180:13,15 182:17

**cut**
47:3

**Cuyahoga**
90:4 91:2,5,10,13
117:11 123:17

---

**D**

**Dalmut**
7:19 132:25

**damage**
168:10,11

**damages**
68:24 69:18 71:11
78:25 84:10 167:20
168:22 169:5,12,16,18

**date**
9:11,12 17:12 39:4
87:16 133:10 137:17
139:2,10 152:5 187:14

**dated**
99:1 109:17 172:13

**dates**
148:18

**David**
128:8,11,12 184:25

**day**
7:11 17:13 179:19
186:20 188:2

**days**
39:7 80:22 97:17,20
128:3 133:12 183:21

**deals**
169:24,25

**dealt**
36:11

**death**
44:18 99:6 128:10

**deceased**
129:1

**decedent**
89:25 90:1 139:24
148:13 153:2,25 160:11

**Decedent's**
154:2 160:12

**December**
186:10,25 187:4

**decide**
77:12

**decided**
93:13

**decision**
18:21 26:22,24,25 27:4
68:25 69:23 70:6,11,22
116:11 130:17 131:7

**decisions**
58:8 172:20

**dedicated**
181:21 182:8,10

**Defendant**
7:18 8:5 31:4 90:6 92:9
148:15 157:8 162:2
163:20

**Defendant's**
147:3 158:13

**Defendants**
7:25 33:16,24 42:17
43:5 85:19 91:25 93:8,
14,17,22 95:3,22
104:21 105:2 108:1,9,
15 122:1 141:15 142:9
188:14

**defendants'**
87:1 92:22 98:20
108:25 127:5 132:21
135:10 142:1 170:16
174:20

**defense**
87:4 92:25 98:23 109:3

**114:10** 117:6 127:8
133:6 135:13 142:11
143:6,8 147:16 163:19
170:19 171:1 173:20
174:23

**definite**
104:3,14

**definitely**
22:4 35:8 67:23 95:2
131:21 152:11 180:12

**Dembrow**
175:23 176:1,4,11,19,
24

**denied**
10:19

**departments**
150:9

**depends**
172:3

**deposed**
8:10 29:10,16,21 80:17,
19 97:22 128:3,8

**deposit**
184:17,18,21

**deposition**
7:2 12:14,19 16:25
25:10 26:2,15,18,21
29:13 33:14,20 65:16
80:14 81:6,9,15 82:21
83:18,20,21 84:22
85:24 86:8,9,15,17 87:6
97:15,17 112:10
132:13,19 133:5,8,12
134:8 141:4,8,11
150:11,23 151:3,5,9,13,
21 152:13 155:9 180:17
185:8 188:19

**depositions**
16:1,2 33:12

**DES**
32:8,16,17,23 33:7,23

**describe**
8:14 74:1

**described**
122:11,13

**describing**
70:22

DONNETTE WENGERD - 04/06/2017                    i9

**Despite**
101:17 104:1

**destroying**
166:13

**determination**
165:5 166:1

**determine**
31:11,14 115:15 184:3

**determined**
92:8 96:6 115:9

**develop**
66:13

**developed**
66:15 67:19 68:5 90:10
105:24 106:4 115:10,14
167:25

**diagnosis**
101:15,18 102:15
104:3,14 112:25 113:11
187:24 188:1

**Dickson**
84:24 95:24 97:2 141:5

**didn't**
20:14 31:17 42:21 53:1
86:11 98:15 104:22
107:4 110:17 112:14
115:25 120:2,6 152:22
154:11,13 159:21
162:17 165:8

**died**
97:9 122:25

**difference**
12:22 57:9,11,15,19

**different**
15:19 27:22 33:21
58:24 67:25 84:15
131:23 150:8,9 186:21

**direction**
40:25

**directly**
110:24

**disagree**
85:12,14 165:15

**disclosed**
33:6,13,16,24 59:15
104:20 152:8

**discovered**
183:21

**Discovery**
96:25 111:8 155:14
183:13,24

**discretion**
93:24 106:24

**discuss**
12:14 44:21 45:1 65:14
77:18,22 96:8 122:5

**discussed**
12:16,18 21:24 33:1
36:22 37:4,8 41:17
76:18 77:3 108:16
116:14,21 117:19,24
120:1 150:10,17 152:9,
12 153:10 186:5

**discussing**
14:18 121:18

**discussion**
82:15 151:24

**discussions**
14:12 74:1 77:12 86:14
119:3 151:6,10,22

**disease**
67:18

**diseases**
67:22 68:1

**dismiss**
118:17 119:16,20
120:2,6 123:1,18

**dismissal**
117:9 120:10 123:6

**dismissals**
121:23

**dismissed**
122:1,17 129:25 130:19
134:22 158:11

**dispute**
85:14 125:5

**distinction**
57:13

**distinguished**
144:4

**distributed**
179:22

**distribution**
62:1 183:7 184:4

**distributions**
71:19 181:18

**District**
7:5,6

**divorce**
32:6

**doctor**
100:7,20 104:7,13,22
110:11,21 187:1

**doctors**
98:9,13 99:15 112:14

**document**
22:3,4 26:11 55:16
87:12 93:1 98:24 99:21
102:1,19 103:11,12
104:11,18 109:2,5,7,10,
13 118:3 119:3 126:13
127:15,23 135:15
140:5,8 142:12,15
146:18 147:21,24
163:16,24 164:2 172:6,
8 174:4,24 175:3

**documentation**
33:18 140:7 183:18

**documents**
18:17,22,24 19:7,10
21:4,19,20,25 22:10,22
23:3,13,23 24:5,8,12,
15,21 25:1,21 26:3,4,8,
20 27:5,24 41:6,9,16,
18,20 42:14 43:4 46:17
54:6,14 58:15 79:7 84:4
88:4,11,14,18,22 89:3,
16 108:9 126:19 139:22
140:8 141:12 157:9
183:20 185:10

**doesn't**
29:15 124:19 153:5,8
159:6 173:13 182:9

**doing**
179:19

**dollar**
67:12 182:5

**don't**
12:21 13:3,15 14:12
15:3,21 17:18 19:6,19,
21 22:23 24:10 25:4

27:14 28:2 29:11,12,14,
23 32:11,14,17,21 33:8
38:1,3,14,20 39:12,13
40:4,11 41:7,10,11
44:8,23 45:2,8,17,22,
23,25 46:6,13,19,21
47:4 48:6 49:9,22 50:5
51:17 52:5 53:11,21,25
55:1,19 56:13 57:4
58:13 63:5,13 65:11,18,
23 66:17 67:21,25
68:10,15,17,19 69:12
70:7 71:20 72:3 73:9,19
74:20 75:17,18 76:7
77:2,24 81:3,5 82:3,25
85:5 86:2 87:16,18 89:7
90:15,16 92:14,20 93:2,
20 94:21 95:5,8 96:18
98:18 99:5,17 100:15
101:10 102:3,5,11
105:14,17,19,25 106:5,
12 107:10 109:6 110:19
113:21 115:11 116:6,12
117:25 118:11 119:22
120:7,21,23 121:2,6,8,
21 122:15,18 123:15
125:18 126:5,22 127:16
128:25 129:6,10,12
130:25 131:3,19
132:10,12,18 133:10,17
134:21,24 135:3,18,23
136:5,7,13 137:4,15,17
138:24 139:2,10,16
141:20 142:24 143:17
144:10 145:1,8 147:1,5
149:1 150:19 151:12
154:21,25 155:18
158:1,2 161:6,22
162:10,20,25 163:2,15
164:5 167:22 169:9
171:7,10,17,22 175:15,
18,20,22,25 176:3,5,9,
13,17,21,23 177:25
178:8,19 179:6,18,19,
21 180:11 185:5 186:4,
14 187:14,22 188:6,7,
11

**Donnette**
7:3,14 8:7,12,23 142:5
143:2 174:6 185:17

**door**
62:19

**Dornbusch**
8:5

DONNETTE WENGERD - 04/06/2017                    i10

**dot**
146:3

**dozen**
84:7,15 140:25

**Dr**
99:12

**draft**
138:15 139:12,17
144:21

**drafted**
138:14

**drafting**
49:23 51:19

**drop**
184:11

**drug**
32:8

**due**
25:25

**duly**
8:10

**duties**
58:2,5 169:3

**duty**
58:6

**DX-45**
145:3

---

**E**

**e-mail**
38:13,15,23 39:2,18,25
40:8 138:20 145:12,14,
19,21,24

**e-mailed**
138:19 145:5,6,9

**e-mails**
38:8,19 39:9,10,14,16,
24 40:2,16

**earlier**
51:4 60:15 86:8 133:11,
22 141:7 144:19 153:13
164:25 167:5 170:21
181:17

**early**
35:24 125:13,24

**earned**
166:17 167:2,15 169:6

**Eastern**
118:17,18,24 119:6
163:20

**effect**
68:7

**eight-and-a-half**
29:17

**either**
50:2 51:19,23 94:7
119:2 149:22 151:4,20
171:19

**electric**
53:13

**electron**
104:2

**electronic**
50:21,24

**Elizabeth**
7:19

**Ellis**
7:18,20

**employed**
123:22 148:13,16

**employee**
160:10

**employees**
160:22

**employer**
148:9

**employers**
148:5

**employment**
148:20

**EMT**
128:4 129:16,18,21

**EMTAL**
15:5,8 71:14 118:20
121:25 124:4,21 125:8
130:2,11,20 131:10,14,
24 139:24 140:10
151:11,15,25 152:3,8
153:4,7,11 158:16,17

**enclosures**
117:8

**encompass**
169:16

**encompassed**
167:19

**ended**
83:18

**Engelhard**
60:22 63:15 64:21
68:22 117:22 118:19
119:11 121:25 122:16
128:20 158:8 159:10
160:11,22 169:19

**Engelhard's**
120:11,16 123:20,23

**Engelhard/basf**
158:10

**Engelhard/basf's**
158:12

**enlighten**
183:10

**entire**
24:18 29:20

**entirely**
103:25

**entirety**
88:21

**entitled**
67:3 69:8,18,20 70:14
71:10

**entity**
57:23

**envelope**
135:23

**epithelioid**
101:17,24

**equal**
179:14

**equipment**
15:16

**Eric**
8:1,2 47:1 185:13

**Erin**
35:18,21

**especially**
65:4 180:19

**Esquire**
117:7 171:3

**estate**
30:8 35:4,6,9 122:25
158:24 172:21 173:3
181:15

**estimate**
179:2

**et**
7:4 157:12

**et al**
7:4 58:18,23

**evaluation**
66:19

**event**
123:22

**evidence**
8:19 10:3,18 13:18
123:23 129:19 130:1,20
131:9 139:22 140:9
153:2,9,12 158:16
162:22 163:2,4 165:21,
22 166:13

**exact**
9:11 13:11 87:16
151:12

**exactly**
15:18 30:22 35:19
45:18 91:19 132:12
149:2

**examination**
8:8,12 142:5 185:17

**example**
162:6

**exchanged**
75:3

**excluded**
103:25

**excluding**
139:23

**Excuse**
14:8 56:8 76:15 177:14

**Executor**
173:3

**Executrix**
173:4

DONNETTE WENGERD - 04/06/2017                                    i11

**Exhibit**
87:1,4,5 92:22,25
98:20,23 108:25 109:3
114:10 127:5,8 132:21
133:6 135:10,13 142:1,
11 143:6,8 147:16
163:19 170:16,19 171:2
173:20 174:20,23

**exhibits**
171:21

**exist**
41:14 48:14

**existed**
53:3

**existing**
10:19

**exists**
24:11

**expect**
114:16,21 125:25
157:18

**expected**
110:23 113:15,18
114:15

**experienced**
186:25

**expert**
32:20 61:7,18 65:21
67:11 68:2 100:23
102:2

**explain**
46:22

**explained**
115:13

**exposed**
13:22 14:5 33:1,7 61:8,
10,14,21 62:15 66:11
67:7 124:4,11,16 125:8
129:18,20 130:11,20
131:10,14,18,20,24
139:24 140:10 151:11,
25 152:2 153:3,7,11
159:9 187:5

**exposure**
31:2 32:5,8,16,23 33:23
34:20 67:6 68:1 69:4,8
71:14,16 88:5 96:17
114:13 128:18 149:4,6
152:8 186:9 187:10,18

**expressed**
186:19 187:5

**extensive**
101:18 104:1

**extent**
8:24 9:16 10:22 12:6
14:9,10 43:11 57:12
60:9 67:2,21 72:19
75:15 115:18 117:21
140:12 161:12 163:9
168:15

**extremely**
152:10

___

**F**

**fact**
16:12,16 23:22 52:11
70:3 72:21 75:16
117:18 119:24 122:11
150:5 151:18 168:19

**facts**
29:7 85:16 112:2 122:9,
13 149:19,20 150:3
151:4 152:14 183:23

**factual**
47:15 150:1 176:6,10,
14,18

**fair**
30:25 61:16,21,25
62:15 157:4,5 158:3
161:3 163:17 168:23

**fairness**
62:1 112:24 113:25

**false**
156:9 169:20 173:14,22
174:7,10,15

**familiar**
59:21 90:24 101:3
132:7 146:7 175:15,19,
24 185:22,24

**far**
17:13 85:3 89:8 150:8
156:25

**Farrell**
7:17 8:13 14:14 17:21,
24 19:23 20:5,10,14
23:18,22 28:4,8 36:17
42:24 43:2 47:6 48:10,

13 52:7,11,15 53:1 55:8
62:3,8,22 66:22 69:16
70:16 71:21 73:2 74:22
76:15 78:19 80:7,13
83:4,11 87:7 97:3
102:5,10 110:15
111:12,16 112:18
126:24 140:23 165:1

**Farrell's**
9:3 115:22 140:16
143:18 177:20

**father**
128:8,12

**features**
100:12,21 102:25 103:6

**February**
187:23

**Federal**
85:20 112:10 155:9

**fee**
55:9,11,12,19 56:1,16

**feel**
60:20

**feeling**
186:16

**fees**
54:23 85:2,23 141:9
167:1,14 168:12,16,20
169:6,14 180:3

**fewer**
84:6

**fiduciary**
58:6 60:16,21 169:3

**figure**
67:12

**file**
20:23,25 21:4,7,12,15
22:9,11,12,20 23:13
24:3,14 28:20,22 30:21,
23 33:19 34:9 41:25
42:8,15 43:4 45:11,12
50:8,17 53:10,14,16
88:4,7 89:1,10,12,14
90:13 116:11,16 121:5,
7 125:18 128:17

**filed**
10:15 11:7 19:13 27:9,
15 31:19,23 38:11 39:8,

17 43:18,22 44:3,7,20,
25 45:5 50:1,3,7 51:10,
16,20 60:1 63:14 64:21,
24 87:17,21 88:16 89:8
90:16 92:2 93:4,6 97:7,
9,10,12 117:11 123:5
125:24 132:5 134:19
154:8 173:9 180:23
187:8

**files**
24:16 30:4 50:11,18,21,
24 107:23 108:15
180:20

**filing**
44:22 45:1 91:21

**fill**
22:8 106:11,14 107:4
146:23

**filled**
106:6,7,9 107:6

**filling**
105:21

**fills**
22:9

**final**
102:19 103:22 134:25

**financial**
70:21 154:22

**find**
69:25 166:11 183:19

**finding**
183:22

**finish**
157:20

**firm**
12:2 25:13,15 35:16,23
36:3 38:8,16,24 39:11,
19 40:1,8,17 42:1,10
43:21 44:2,6,12,15,21,
25 45:3,4,16 48:25
49:7,21 53:6,20,23
54:2,4,23 55:20 56:2,
11,17,18,22,24 57:1,3
59:3 68:20 86:22 117:8
118:16 119:5 120:12
121:25 123:4 125:12
126:2 137:9,19,24
138:1,14,21 139:14
143:21 161:1,8,20,23,

24 162:9,16,23 163:7
164:3,12,15,16 165:7,
13,18,19 166:12,16
167:2,18 168:3,6,9,13,
20,23 171:13 177:12,
21,22,23,24 178:1,7,10
179:3,4,7,9 180:6,7,12
182:7 187:16,21 188:3,
5

**firm's**
117:10 126:3 167:7,10

**firms**
11:23

**first**
8:10 12:22 27:12 29:13
37:21 43:22 47:9 50:6
54:3 85:11 87:19 88:16
100:3 130:4 139:7,17
143:3 164:7 175:2,7

**five**
32:1 95:7 105:16
140:24 141:20 177:15

**focus**
67:15

**focusing**
172:5

**folder**
22:9,12

**followed**
99:6 144:24

**following**
40:25

**follows**
8:11

**foregoing**
140:4 149:10

**forgive**
150:11

**form**
38:6,10 64:18 65:7
92:3,18 101:9 102:6,9,
11,13 103:16 104:9,15,
23 107:5,13 110:17
113:4 124:17,23 125:9
130:22 131:12,17 132:2
134:12 146:5,6,9,16,23
159:8,23 160:2 162:19
163:6 165:14 166:9
168:14,24 169:8 170:8

173:16 174:12,17
179:17 180:10 185:11

**forms**
105:22 106:3,8 107:1,7,
11,15,19 114:23 116:3

**forth**
89:11 143:25

**forward**
52:23

**forwarded**
100:22

**found**
59:2 99:22

**foundation**
102:7

**four**
111:24 170:1 172:14

**fourth**
151:17 152:24

**Fox**
178:7

**fraud**
8:16,17,18 9:6,10,14,22
10:4 13:6,17 59:8 69:1,
23,25

**fraudulent**
13:11 59:12,13 119:11
161:25 166:12

**frequently**
19:18

**friend**
142:25

**frivolous**
84:1

**front**
16:22 96:25 97:2 127:9
133:4 142:10 143:1
147:25

**full**
165:20

**fund**
183:3

**funny**
84:12

**further**

71:3 103:21 121:22
160:19 185:6 188:8,11

**future**
61:2

_____

**G**

**general**
15:10 36:7,8 99:7 162:8

**getting**
63:23,24 73:25 183:19

**Geyerman**
7:21,24 40:20 85:18
111:19 112:4,9 141:14,
19 142:6,8 155:1,7
163:18 170:3,20 177:17
181:6,13 183:12,16
185:5

**giant**
103:24

**give**
21:19,22 29:8 46:20
102:13 147:13 152:14
156:15 180:1 184:16

**given**
35:1 147:8 183:7

**giving**
133:15 165:20

**Gmail**
146:3

**go**
31:17 85:13 102:13
110:17 141:16,18 144:2
149:3 150:20 153:14
156:3 160:4,5 163:16
164:18 181:21,24
182:1,10,12,14 183:6,7
184:5,15

**goes**
122:5 123:16 129:15
155:3 182:2 183:25

**going**
8:23 12:7 27:8 60:8
71:17 72:25 73:6 84:23,
25 85:1,6,8,13 116:15
140:24 141:3 150:8
155:12 159:25 161:11
169:22 170:7 174:22
183:9,17

**Good**
7:11 8:14 142:7 185:19

**Goodrich**
128:16 185:3,4

**Goodyear**
13:21 14:6,24 123:21
128:5 132:15 148:16,22
185:3 187:13

**Gordon**
142:18,22 143:3 144:14
161:1,8,20 162:22
163:5 164:3,12 165:7,
12 168:20,23 173:12
176:22,24

**Gordon's**
169:5

**Graham**
110:2 122:25 128:2

**Graham's**
123:20

**grandfather**
151:1 184:25

**grandmother**
32:10

**grandmother's**
33:2

**Grant**
7:21 142:7 155:6
161:14 183:9

**granted**
130:7,9 131:4,8

**greater**
67:4,10 71:10

**ground**
83:13

**grounds**
83:25 124:15

**group**
58:9

**guardian**
29:17

**guess**
29:2,6 149:25

**guessing**
28:23,25 37:19 139:10

guys
  183:21

---

**H**

H-a-p-p-y-f-a-m@m-e.
com
  145:17

hadn't
  125:8

halfway
  100:9 110:1

Halket
  8:3 185:21,23

hand
  138:15 174:22 180:19

handed
  147:10

handing
  170:18

handled
  35:3,4

handles
  35:6

happen
  70:1,5 84:17 137:23
  184:10

happened
  13:7 64:3,11 89:12

happens
  183:5

happyfam@me.com.
  145:16

hardcopy
  39:15 51:2

harm
  165:23

harmed
  32:23 59:16 164:22
  166:20

hasn't
  60:6

haven't
  58:14 86:14 93:12
  102:2 141:12 183:21

he's
  11:16 34:14 60:6

head
  175:16

hear
  42:21 85:6 110:17

heard
  146:5 171:8 186:1

hearing
  84:15 150:13,24 151:4

heavy
  152:10

held
  63:3 70:8 149:15

hello
  47:1 138:7 185:20

help
  15:15,17 183:23

helped
  35:8

helping
  11:22 35:25

hemithorax
  99:23

hereinafter
  8:10

Hey
  126:18

hindsight
  159:24

hired
  187:16

histologic
  100:12,21 102:25 103:6

hold
  147:14

holding
  141:7

home
  20:23 21:4,12 22:20
  23:4,14 24:3,14 30:23
  42:9,15 43:4 50:11,19,
  21,24 82:24 85:25
  121:5 125:19

Honor
  55:13

horrible
  67:23

hospitals
  101:8

house
  89:19

Hurd
  164:9,15 173:8

hurt
  70:3

husband
  153:18 154:1,3,8,10,20
  155:5 172:24

husband's
  30:13

hypothetical
  112:20

---

**I**

I'd
  22:13

I'll
  95:20 109:7 180:22

I'm
  7:8,23 8:16,23 9:4 12:7,
  24 13:3,12,15 15:18
  17:7,19 19:22 21:18
  25:24 31:21 32:6,20
  33:21 35:1,13,19 38:19
  39:14 40:5,23 41:14
  42:5,12 47:5,13 48:8,
  17,23 49:3,22 50:3,13,
  14 53:16,17 54:18 55:6,
  16,23,25 56:21 57:14
  58:13,20 59:21 60:4,7
  61:7,18,19,20 62:13
  63:8,25 65:3,6,7,8,13,
  21 66:20 67:11,14
  68:11,25 69:3,14 71:3,6
  72:24 73:11,21 74:5
  75:10,12,20 76:1,9,11,
  15 77:8,16 78:1,3
  79:18,21,23 80:5,18
  81:5,12,14,21 82:6 83:2
  84:15,17 85:7,8,12 86:4
  87:3 88:20 90:19,24

91:7 92:24 94:25 95:25
98:22 100:15 101:3
104:24 108:4,12,20
112:7,8,22 113:7,23
114:7 116:23 127:7
131:23 135:12 139:2
142:8,20 146:10,13
147:11 151:4,18 153:9,
20 155:25 157:20
161:11 162:13,15 163:1
167:9 169:22 170:7,18
171:1,22 172:5 173:25
174:3,6,22 177:9,17
178:6,11 179:23,25
180:2,3 182:3,4 183:22
184:18

I've
  15:7,9 20:17 24:1 37:19
  38:3 63:10 103:18
  133:4,17 142:10 173:24
  184:7 186:1

idea
  67:10

identification
  92:25 98:23 109:3
  127:8 164:20

identified
  61:1 119:12 132:17
  134:14 151:19 160:8

identify
  7:9 34:5 106:3 128:4
  129:16 136:8,14,23
  139:21 156:8,11,13,16
  157:1,3 160:9 162:21
  169:4 173:21

identity
  28:8

immunohistochemic
al
  100:11,20

immunostains
  104:1

important
  58:10 70:20

impression
  67:1 68:10 179:7,12,25

impressions
  61:25 62:7 66:19 180:4,
  5

improper
85:4,5 141:1

in-person
144:20

inaccurate
158:2

inaccurately
154:9

include
21:9 167:6

including
7:13 83:24 84:8 103:24
139:22 141:1 160:12,14

incorporating
9:2,18 10:25 60:11
115:21 140:14 161:15
163:13

independent
119:6

independently
163:11 173:21

indicate
107:2,5,8 120:15

indicated
116:1 185:7

indicating
100:16 113:12 114:1
153:2

individual
57:10,16 160:15 169:6

individuals
63:1 68:21

inform
110:20

information
8:22 9:23 10:1,16,18,20
11:2,4 14:11,18 16:14
19:1 20:25 21:9,14
24:19 27:6 31:12,16
32:2,11 33:12,23 34:9,
10 35:10,15 40:12
47:13 49:14 54:18 56:4,
16 59:14 60:13 63:13
64:3,5,8,20,23 70:15
83:16 84:9 94:10,24
95:1 105:3 106:24
115:23 116:6 118:4

122:14 124:24 125:10
129:13 130:16 131:2
140:6 141:11 144:8,13
146:10,18 149:11,13,
14,17 150:10,15,25
151:20 158:7 160:15
161:4,6 173:23

informed
110:9

initially
34:23

initiated
142:24

initiates
172:8

injured
110:2 154:14

injuries
30:18 31:20 66:16
165:4,16 166:3,25
167:4,12 187:9

injury
90:3 92:1 105:23 110:5
113:3 114:4 115:10
116:11 117:10 123:2
128:17 153:17 154:2
155:16 156:6 168:9

input
138:10

insofar
167:24

instance
31:2 61:13 164:21

instances
44:9

instruct
8:24 9:16 10:22 12:7
36:15 60:8 80:4 81:19
85:22 95:20 108:10,17
111:5,11 113:5 115:18
140:11 155:8 161:12
163:10 169:23

instructed
24:2 42:23 60:6 71:1

instructing
20:6 48:11 62:22 64:1
69:16 70:16 71:21
72:15 79:18 95:25 97:3

112:18

instruction
10:8 17:22 18:5 19:24
36:18 37:11 40:11,19,
22 42:3,21,25 43:15
52:8,21 62:4,8 66:23
70:24 71:5 73:16 74:23
75:25 81:24 82:9 83:5
96:22 111:13 112:17
114:6 115:4 126:25
170:5

instructions
83:23 84:7,16 140:25
185:9

interact
35:16,18 113:16

interacted
162:23 163:6

interaction
162:11,14,17

interested
167:12 168:1

interpret
106:23

interpreted
90:24

interrogatories
135:25 139:8 142:16,
18,22 143:4,7,9,13,16,
22 144:2,9,15,16,20,25
145:7,15 146:24 147:4
159:22 175:10 185:12

interrogatory
135:14 136:15,17,20,24
138:11 139:13,20,21
148:3 149:3 153:14
156:3 157:7,17 158:1
159:12 160:5,8,17
164:18

interrupting
47:6

introduce
45:3

introduced
44:13

invade
62:20

invading
71:24 111:9

investigation
19:12 59:1

involuntary
123:6

involved
9:14,22 11:22 29:19
30:11 35:25 78:11
82:15 116:9 164:4
171:11 177:22 180:13,
16

involves
167:1

Ira
175:23 176:1,4,10,18,
24

irrelevant
155:3

isn't
73:5 155:7

issue
13:2,4,6,10,14 30:17
94:3 95:21,25 183:24

issued
130:24

issues
32:19 71:19 84:23
96:23 132:8 155:3
169:24 170:7

it's
12:13 16:12 29:23
30:25 31:11,12 32:24
40:3 53:16 55:11,12
56:9 58:18,19,23,25
62:15,18 63:23 70:13
72:20 77:6,7 79:19 88:2
91:19 95:23 99:1
100:14 101:4,6 109:17,
22 111:8,25 112:20
117:20 118:25 119:21
121:7 123:12 125:19,20
127:22 130:9 131:8,13
137:2 142:25 146:14
149:22 150:18,20 155:2
161:24 172:5

its
123:6,19 124:16 125:6
170:23

**J**

**January**
99:24 187:1

**Jared**
25:18 82:16,17 138:3
143:20

**Jennifer**
110:2 117:7,15 118:1,5
128:2 133:22 164:8
173:5,7

**Jersey**
7:6 178:3

**John**
7:15 8:4 171:3,6 188:9,
10

**Johnson**
120:16

**join**
85:19

**Judge**
84:24 95:24 97:1,2
123:11 131:6,8 141:5
166:11

**Judge's**
18:20 26:22,24

**Judgement**
125:14 129:24 173:9

**judgment**
123:5,9,13 124:8,15,19
125:7 126:4 127:12,18
129:15 130:10 131:5
134:20 163:21

**judicial**
68:25 69:22 70:6,11,22
165:4 166:1

**July**
97:9 123:1 133:7
172:17,23

**jury**
170:2

**K**

**Kansas**
122:5

**keep**
20:23 21:4 22:20 23:3
24:3,14 30:3 42:8,15
50:18 88:4 89:1,4 121:5
166:16

**keeping**
185:8

**kept**
19:11 23:13 88:6 89:19

**Kimberlee**
7:3

**Kirkland**
7:18,20

**knew**
14:9 22:7

**know**
9:10 10:14 11:23 12:24
13:23 14:25 15:1,5,8
16:6,21 17:12 18:2 19:4
23:1,8 24:10,25 25:7
28:12 29:12 31:19 32:2,
13,14,15,17,21,22,25
33:6,9,14 34:24 35:10,
18 37:7 39:13 40:14
41:3,8 42:6,14 43:7,12
44:11 48:16 49:19,22
50:5 51:15 52:17 53:11,
17,21,25 54:1,20 55:15,
19,24 56:5 57:3 58:13,
20 59:20,22 61:6 62:12
63:5,20 64:3,11,17,20
65:23 67:21,22,25
68:18,20 71:19 72:2,4,
21 73:12 75:9,12,14,17
76:3,23 77:1,2,8,10
78:6 79:20,22,25 80:19
85:4 86:6 88:22 90:16
91:1,12 92:14,20 93:16,
25 94:2,5,7,13,17,21,22
95:5,8 98:17 99:5
101:2,10 104:20,25
105:14,17,19 107:23
108:6,22 110:9,14,19
111:3 112:13 114:9,17,
18 115:2,11 116:6,7,12,
14,22 117:15 118:24
119:19 121:6,7,8 122:9,
18 123:9 124:23 125:2,
18,23 128:20,22,23,25
129:3,6,10,12 130:25
131:3,6,19 134:22,25
135:4,7,23 136:14

137:4 149:1,19,25
155:21,25 157:14
158:1,2 161:20,22,23,
24 162:8,20,25 163:1,2,
4,15 167:22 169:9,10
170:9 171:7 174:9,10,
13,18 175:14,22,25
176:5,9,13,17,21,23,25
177:24 178:4 179:6,19,
20,21 180:11 183:12
186:3 187:8,11,20
188:3,6

**Knowing**
183:25

**knowledge**
9:6,11,13,21 10:11
14:10,22 15:21 16:11,
19 24:12 31:5 34:2 44:1
47:15,18 49:11,13
51:24 63:2 72:22 75:15
91:9 93:20 94:23
106:22 118:1 119:6,8,
14 122:12 146:17 148:8
150:2 158:5 173:15
176:6,10,14,18 186:4

**knowledgeable**
33:4

**known**
34:16

**knows**
43:3 72:19

**L**

**lack**
185:9,10

**Land**
148:11,13,25

**language**
149:17

**large**
172:3

**larger**
150:14

**lasted**
18:2

**Lastly**
148:15

**late**
154:8 166:8

**law**
11:23 56:22 85:16
117:8 118:16 120:12
121:25 161:1,20 162:9
164:12 165:7,17,19
166:11,15,20 167:2,6,9,
18 168:2,6,8,12 171:13
177:24 178:1,10 179:3,
4 180:12 187:16,20
188:3,4

**lawful**
8:8

**lawsuit**
90:4 116:11,16 153:17,
18 154:2,7 156:6 161:3
172:6,8 187:8

**lawyer**
28:9 64:24 154:17,19
164:7 173:11 178:10

**lawyers**
126:18 147:7 157:2
161:2 172:2 174:3

**Layn**
72:2

**layperson**
111:20

**lead**
155:10,12

**learn**
10:6 73:7 117:18

**learned**
9:7 11:4 15:9 47:9
73:12

**left**
8:20 99:23 102:22
177:15

**legal**
11:15 32:12 35:13 36:1,
11 57:13 167:1

**legalese**
106:21

**length**
17:24 84:18

**let's**
20:18 79:17 80:7 88:13

163:16 181:6

**letter**
20:13 38:7,9 53:5,9,12, 19,22 54:22 55:18 117:8 118:9,16 120:5 121:4,9,24 123:4 170:24 171:3,16 172:13 173:5,12,15 174:8,11, 16

**letters**
19:12,15,18,20,25 20:15,16,20 27:7,21,24, 25 28:13,14,17,19,21 45:8,10,13 57:5 88:11

**life**
90:3

**light**
60:24 185:8

**limited**
85:21

**limits**
155:14

**line**
82:16 100:11 133:1

**link**
159:10

**linked**
186:15

**list**
94:2,6

**listed**
93:9 148:20 164:3 173:12

**listening**
79:24

**litem**
29:17

**Literally**
184:7

**litigation**
68:22 104:19 185:22

**live**
68:14,16,18

**Liz**
132:23

**LLC**
7:4

**local**
117:6

**location**
50:19 89:21

**lone**
57:22

**long**
17:17 18:2 34:16 45:21 82:1 137:14 149:1

**longer**
129:5

**look**
22:13 52:23 89:23 106:17 133:2 136:10 142:12 143:1 148:3 183:16

**looked**
20:13 22:14,16 26:20 38:22 63:9,10 147:24

**looking**
28:14 50:8 53:14 55:16, 18 58:14 68:25 69:3,22 98:10 109:12,20 158:7 163:17 173:20 187:14

**looks**
97:10

**lot**
64:8 157:25

**lots**
183:20

**luck**
183:5

**lunch**
141:16

**lung**
68:5 101:16 103:25

---

**M**

**M-r-p-u-d-d-l-e-s-o-h-i-o**
146:2

**ma'am**
72:11 76:25 155:16 170:18 181:14 184:3

**machines**
148:14

**Magnesia**
118:17,18,24 119:7 163:20

**mail**
38:10 87:24

**mailed**
117:7

**main**
34:14

**maintain**
85:15

**making**
23:25 65:7 139:16 172:20 184:18

**malignant**
101:16,23

**man**
37:20

**manner**
78:16

**manufacture**
132:12

**manufactured**
129:20

**manufacturer**
128:4 129:16 132:11

**manufacturers**
90:9 91:17

**Manville**
15:2

**March**
180:23 181:1

**mark**
40:21

**marked**
87:1,3 92:22,24 98:20, 22 108:25 109:2 114:10 127:5,7 130:5 132:21 133:6 135:10,12 142:1, 11 170:16,18 171:1 174:20

**marking**
171:1 174:22

**masses**
99:23

**material**
83:15

**matter**
20:4 21:20 81:8,15 83:9 95:23 96:24 108:14 131:15,18,25 170:2

**matters**
36:11 117:10

**mean**
17:6 25:17 26:25 36:5 59:9,13 69:24 90:22 91:16

**meaning**
177:7

**means**
78:22 84:2 91:19,24 149:13 174:1,2

**mechanism**
78:16

**mediation**
72:4,9,13,17,20 73:3,7, 12,18 74:1,8,13,19,25 75:4,7,14,16 77:3,12,18 78:10 79:4,8,11

**medical**
33:3 68:2 98:3,8 99:7,8, 18 101:4,11,22 102:2, 14 103:5,13 109:19 113:19,25 114:9

**meet**
17:1 34:18 37:21 43:20 44:21

**meeting**
12:7 17:10,17,25 18:2, 7,9,13,15,18 25:9,11,22 26:1,17 39:22 43:17 44:1 45:2,15,19,21,24 46:4,8,11,14,17 47:8 48:2,19,23 49:5 52:1,18 77:21 78:3,8 86:10 138:8,16 143:19 144:3, 7,10,15,21

**meetings**
52:24

**members**
58:2 59:21 60:16 66:4 68:13 71:11 78:8 94:21,

25

**mental**
61:25 62:7 66:18,25
68:9 71:18,25 111:10

**mention**
86:11

**mentioned**
16:8,9,13,17 25:9 26:22
60:15 133:23 143:18
151:15,22 153:13
177:19

**merit**
70:25

**mesothelioma**
65:20,24 66:6,10,14
67:5 68:6 98:15 103:2,
7,15 104:8,14,22 107:3,
9 110:6,12,22 111:4
112:12,15 113:13 114:2
116:2 165:9 167:25
168:7,9 187:25 188:1

**met**
11:21 43:23 45:4 47:16,
19 58:14 78:7 137:21,
22,25

**metaplastic**
103:23

**Michael**
7:12 53:2 82:17 102:11

**Michigan**
122:6

**microscopy**
104:2

**mind**
66:7,9 73:6 111:7 112:1
131:6 156:25

**mine**
59:11 120:16

**minute**
47:3

**minutes**
83:12 109:20 141:20
177:15

**Mismas**
171:3,6,11

**mispronounced**
17:9

**misrepresentation**
156:9 157:3 159:13,17

**misrepresentations**
156:4,17 158:22 159:1,
3,15

**missed**
47:5

**mixing**
15:17

**mom**
151:6,7,10,14 153:6,10
161:1,9 162:14 165:8
166:7 169:20

**mom's**
161:2 162:16,18,24
163:7 165:3 166:25

**moment**
25:14 133:3 148:1

**monetary**
168:22

**money**
56:18 60:2 61:15,22
62:16 68:7 70:10 75:22
76:6,17 77:2 79:13 80:1
95:14,17 96:3,8,12
113:9 115:15 116:4
167:24 168:2,8 169:12,
19 181:21

**monies**
167:10,18

**month**
26:7 138:25

**months**
99:6 172:14

**morning**
8:14 83:12 142:7

**Moskowitz**
36:2 37:2,5 38:2

**mother**
10:15 11:6 13:21 14:5
15:12,24,25 31:7,15,19
32:4,7,22 33:6 34:21,24
36:12 66:5 67:3,16
88:3,14,23 89:1,3,16
90:1 93:3 94:8 96:9,13
97:12,22,25 99:10
100:3 105:6,23 107:2,9,
25 110:3,11,22 111:4

112:25 113:12 114:1
115:25 116:1,10,15
119:19 120:2 121:1,4,
10 124:3,11,15 125:7
130:1,10,20 131:10,14,
24 132:5,13 140:9
148:9 149:7 150:5,7,20
151:1,21,22,24 152:10
153:18 154:8 159:20
164:22 167:25 172:14
175:11 186:8 187:4,12

**mother's**
8:19 10:17 13:8 21:8,13
22:1 23:4 24:4,6,13,21
25:2 29:19,22 30:7,17
31:1 32:15 33:23,25
34:19 35:11,25 36:6,7
38:11 40:9 41:25 42:9,
16 44:18 50:25 54:6,14
59:17 64:4,12 66:3
67:15 69:1,8 70:3 89:12
92:13 94:3,14 95:3,15
96:4,10,17 97:7 98:2,14
99:6,16,19 103:14
104:7,19 105:10 113:3
114:13 117:13 118:2,5
122:25 123:2,14 126:17
127:12 128:12 132:9
133:5 134:7,23 135:1
148:5 154:10 156:5,11,
18 157:4 158:9,14,21,
24 159:2,7,14,16 162:1
165:23 166:15,19
167:15 168:6,21 173:9
175:2 176:16,20 180:21
181:2,15

**motion**
85:2 91:21 123:5,9,13
124:8,19 125:13 126:4
127:11,18 129:15,24
130:10 131:4,8 134:20
163:21 173:8

**motions**
96:25 97:1

**motor**
154:3,15 155:5

**move**
20:18 23:6,17 28:11
52:14 54:9,17 55:6,14
62:1 69:21 72:1 77:25
78:18,23 79:17

**moved**

124:14

**moving**
85:23

**Mrpuddlesohio@
gmail.com**
145:23

**Mrpuddlesohio@
yahoo.com**
145:22

**MSJ**
130:5

**multiple**
14:5 30:6,9 143:12

---

**N**

**name**
7:8 13:23 25:14 27:23
35:1 57:2,3 110:2
132:7,14 134:3,13,14
137:10 142:7 154:21
169:17 171:8 175:15,23
176:3 178:4 185:23
186:1

**named**
122:1 154:1 161:24

**names**
13:25 19:7 28:12 30:5
58:13 134:1 156:15,25

**naming**
90:5

**narcotics**
152:10

**nature**
12:5 41:10 46:22 55:19

**necessarily**
71:12 107:16 159:19
169:9 175:20 181:23,25
182:9

**necrosis**
102:24

**need**
47:4 78:15 91:3,14
94:11 102:5,11 105:4
107:17 135:7 177:16
184:19

**negotiating**

DONNETTE WENGERD - 04/06/2017                    i18

90:10

**neither**
151:9

**neoplasm**
101:17,24

**never**
15:7 59:18 60:1,21
151:15 162:11,14 171:8

**new**
7:6 39:23 139:5,8
164:12 178:3

**night**
80:25 82:21

**nodules**
102:22

**non-privileged**
140:6

**non-specific**
100:22

**Northern**
117:6

**notarized**
106:13

**noted**
121:24 136:12 152:25

**notes**
52:2,4,12,18,24 53:2
79:10

**notice**
100:4,5

**notion**
162:8

**November**
117:5 118:8,15 121:3,9
123:3 170:23 171:2
172:13,19

**number**
7:6 24:1 58:24,25 72:18
85:21 87:4,5 92:16
109:3 111:9 127:19
132:23 136:17,21
139:20 148:3 157:7,13
160:5,9 177:5

**numerous**
99:22 158:9

---

**O**

**o'clock**
81:4

**O'lakes**
148:11,13,25

**Object**
36:15 165:14

**objection**
20:7,18,21 22:21,23
23:7,11,16 24:2,23
25:3,23,25 28:2,5 34:1
36:24 37:11 40:3,10,18
42:2,11,18 43:3,15
47:11 48:6 52:5 54:8,16
55:1,21 56:13,20 60:3
61:17 63:22 64:16 65:1,
7,11,17,18 66:17 68:9
69:10,12 70:12,23
71:17 72:14 73:9,19
74:3,14 75:5,18,24
76:7,20 77:5,14,24
78:15,20 79:15 80:3
81:10,18 82:3,25 85:11
86:2 92:3,18 93:10
95:18 96:21 98:16
101:9 102:6,7,9 103:16
104:9,15,23 108:2,10,
17 110:13,16 111:5
112:16 113:4,21 114:5,
24 116:5,17 124:17,22
125:9 126:5,11,22
130:12,22 131:12,17
132:2 134:12 159:8,23
160:2 161:11 162:19
166:9 168:5,14,24
169:8,22 173:16
174:12,17 178:19
179:5,10,17

**objections**
65:14 84:8,14 85:3,15
136:12 140:4 149:10

**obligation**
41:17

**obscured**
102:24

**obtaining**
167:13

**obviously**
164:15

---

**occasion**
164:21

**occasions**
19:9

**occupations**
63:3

**occur**
17:10 18:7 45:16,19
72:13 137:16 152:17

**occurred**
73:3,7,13 75:16 78:3
79:4,8 80:15 84:2,19,20
152:15

**occurring**
84:22

**October**
99:1 114:9

**offered**
75:22 76:6,18 79:14
80:2 129:17

**offhand**
121:8 137:2

**office**
18:8 39:3,4 45:20 46:5,
9 88:12 135:21,22
138:1 166:20

**Oh**
49:2 100:17 133:10

**Ohio**
8:9 68:14 90:5 117:6,11
164:9 177:24 178:2

**okay**
17:8 117:1 128:1
133:19 143:5,15 146:23
148:4 153:15,24 160:6,
18 164:19 177:17 181:6
182:11 183:15 186:3

**once**
9:15 10:21 43:23 63:23
75:5 113:5 155:3 163:8

**ones**
136:4,6,14

**open**
58:24,25 141:8 185:8

**open-ended**
58:19

---

**opening**
125:6

**operator**
7:9

**opinion**
104:11,17 130:24
149:24 174:14

**opposed**
49:20 67:5 125:13
150:3

**opposition**
125:24 126:3

**orally**
143:21

**order**
70:10 148:21

**original**
22:1 27:9 51:9 64:4,12
92:13 94:3 95:4 96:5
126:17 127:12 171:19
180:19,21

**originally**
93:4 145:10

**outcome**
134:25

**outside**
24:8 100:23

**overheard**
16:2 150:12

---

**P**

**p.m.**
188:19

**packet**
135:19

**page**
88:2 109:12 110:1
122:19 127:17,22,23
130:4,5 133:18,20
143:1 147:24 164:7
175:2,7

**paid**
56:18 95:14 96:3 113:3
114:12 116:4 169:19

**pail**
184:2

**paper**
155:25

**paperwork**
13:11

**paragraph**
88:1 89:23 90:14,17
100:9 101:14 103:21
116:24 117:4 118:9,15
119:15 120:8 121:22
122:13,20 123:16
125:12 128:2 149:9
150:2 151:17 152:24
153:1,16,21,22,23
157:6 158:6 159:6

**paragraphs**
126:15

**paralegal**
35:20,22 137:9,18,25
138:13 143:20 145:10

**parenchyma**
102:23

**parietal**
102:22

**part**
10:4 11:15,17 12:2 16:7
18:17 19:6 35:9 43:8
57:1 58:8 59:25 61:4,9
95:23 104:19 115:9,14
135:18 156:23 161:24
166:20,25 167:11 170:8

**participate**
18:15 138:8

**particular**
9:12 13:4,13 155:13
176:2 182:6 184:1,4

**particularly**
26:10,13 84:21 106:6

**parties**
57:21 58:7 75:3 96:24

**parts**
157:25

**party**
57:21 111:7 112:1
155:5

**passed**
89:6,13 96:13 97:8
98:5,9 121:10 129:4
148:10 172:14,17,23,24

**Pat**
12:1 35:24

**pathologist**
99:13

**patient**
99:21

**pay**
112:11 115:9,15 183:2,
3

**paying**
56:11 114:3 168:3

**payment**
96:16 181:16

**pendency**
38:21

**pending**
95:24 98:2,6 117:10

**people**
46:11 58:16,21,24,25
59:7,10,18,25 60:21
61:3,8 62:25 63:4 65:19
66:13,15 67:14 144:7
156:15,23 161:7 163:6
177:2,7

**percentage**
65:23 66:1 179:16
180:2

**perfect**
148:21

**performed**
99:24

**period**
37:16

**person**
25:13 34:5 35:12 57:22
64:13,22 78:24 79:3
82:11 92:8 94:23 110:2
113:17 115:10,14
137:21,22 172:20

**personal**
9:6,21 10:11 14:9,22
15:21 16:19 24:7,8,12
49:11,12 51:24 60:13
91:9 93:20 115:23
118:1 119:8,14 122:24
124:24 125:10 128:17
129:13 150:2 153:17
154:2 155:16 156:5

161:4 166:2 167:4
173:23 180:5 181:2,24
186:4

**personally**
15:7 30:10,12 38:4
106:11 149:19 157:22
160:20 181:17

**perspective**
167:10

**pertinent**
95:22

**Peter**
7:17 12:21 52:23 62:20
73:5 79:17 83:9 102:9
110:17 111:15 175:14,
17 176:6,14,24

**Phillips**
72:2

**phone**
8:3,4 45:7 47:2 78:21
82:24 86:1 137:19
144:11 178:12

**phrase**
90:21

**phrasing**
151:12

**physical**
153:12

**piece**
155:24

**place**
148:22

**placement**
14:20

**places**
14:16 122:6 148:19

**Placitella**
7:15 11:20,25 17:3
18:11 25:12,15,17
40:17 42:1 43:21 44:2,
6,11,15 45:4,16 48:25
49:21 53:6,20 54:3,23
55:20 56:11,24 74:12
82:17 119:5 126:2
137:19 138:1,2,14,21
139:14 143:21 156:19
177:9,22 178:14 179:3,
8,11 180:6

**Plaintiff**
29:25 30:3,16,25 31:8,
15 32:4,7 46:14 54:4
89:25 122:23 129:17,19
140:5 143:2 153:25
154:1 155:22 157:8
158:8 160:20

**Plaintiff's**
40:2,7 153:2 175:8

**Plaintiffs**
7:12,16 46:7 47:19
48:18 55:9 59:5 63:11
98:24

**Plaintiffs'**
64:24 68:20

**plan**
62:1

**planned**
178:18

**plant**
123:21 128:15

**plants**
63:1

**Pleas**
90:4 117:12 123:17

**please**
7:9 9:3,19 11:1 14:14
20:18 40:22 75:7
102:10 115:22 140:15
142:11 150:19,20
153:14 156:3 164:18

**pleura**
102:23

**pleural-based**
99:23

**point**
72:15 102:4 138:19
147:22 177:20 183:17

**points**
34:14

**pool**
169:4

**Pooley**
120:13,22 121:19

**Poorly**
167:7

**portion**
60:2 133:5

**portions**
106:12

**posed**
142:22 143:22 144:2
146:25

**posing**
97:6

**position**
55:8 73:2 97:1

**positions**
150:9

**possesses**
20:16

**possession**
24:7,9 25:1 89:17

**possibility**
103:23

**possible**
32:24 38:17 61:5 93:12
104:2,13 119:22
125:19,20 130:9 131:8,
13 137:3

**possibly**
44:18 46:12 105:17
156:21 160:3 171:25
183:10

**postmortem**
102:25

**potential**
32:16 91:20

**potentially**
54:4 90:8 91:17,24
155:12

**practice**
90:7,22 91:2 147:12
172:1

**practices**
90:25

**predecessor**
123:19

**pregnancy**
32:11,18 33:2

**preparation**
12:19 86:16 180:16

**prepare**
16:24 25:9 26:1,18,20

**prepared**
86:9

**preparing**
65:16

**present**
16:1 18:12 48:20,21
97:20 116:12 123:20
133:11,15 150:23
186:12

**presentation**
46:20

**preserve**
54:5,13 84:3

**pretty**
41:14

**previous**
150:11

**previously**
18:19 26:4 78:7 113:14
122:14 131:1 148:2
186:7,22

**primarily**
34:12

**prior**
17:11 26:7 50:2 128:10
147:21 151:6 152:12
155:16 186:19 187:4
188:4

**privilege**
12:9,13,17,21 17:23
20:9 21:17,22 23:6,17
24:24 25:4 28:9 31:17
33:15 42:4,12 43:10
47:12 50:12 52:10 54:9,
17 55:3 65:10,15 70:13
74:25 75:1,6,7 76:21
77:6,7 78:18,20 81:11,
20 82:4 83:7 108:18,19
111:22,23,24 113:6,22
114:25 116:18,19,20
126:6 170:4

**privileged**
17:25 20:11 23:19,24
33:17 47:13 52:12,16
55:10 56:3,9,15 72:18
73:3 108:3

**problem**
148:19 170:8

**Procedure**
8:9

**proceed**
47:5 85:17

**proceeds**
166:16

**process**
14:17,21 15:6,11,13
74:2 77:4 144:24 182:4
184:22

**processes**
15:14 71:18,25 111:10

**produce**
41:9,18 84:5 108:8,15

**produced**
23:14,23 42:16 43:5
88:12 98:24 99:13
108:1 118:20 126:1

**product**
13:2,4,10,13 14:20 16:3
23:20,21,24 40:4,11,19
43:1,3,7,9 52:9 62:7,10,
20 63:24 66:25 70:13
71:25 72:1 73:23 75:1,6
81:19 82:5 83:8 84:8
90:9 91:17 108:3,19
111:10,16,20,22,23
114:25 116:18 127:1
129:18,20 169:25 170:4
179:21

**production**
14:17,21 41:5,12 43:8
140:5,9 185:10,11

**products**
14:1,4 91:23 93:25 94:2
128:5

**profiting**
166:18

**program**
150:6

**programs**
90:8 91:5,10,13

**proof**
123:19

**proposals**

75:2

**propounded**
142:18

**propriety**
165:20

**provide**
29:6 31:13,16 33:12
35:14 40:1 41:22,24
55:14 88:18 113:19
138:10 140:6 179:23

**provided**
8:8,20 9:23 10:2,16,17
16:14 18:19,25 19:9
21:2 23:3 25:21 26:5,6
27:10,19 32:10,18
40:16 41:21,23,24 42:8
59:14 84:4 87:15,20,23
88:15,21,23 106:25
113:1 114:2,11 120:12,
25 121:3 122:14 125:11
129:19 130:17 131:2
135:19 136:25 144:16
146:11 147:6,9 148:18
149:14,23 150:3,7
161:5,7 166:14 171:18
172:11 183:22

**providing**
166:13

**prudent**
131:22

**pulled**
163:19,24

**purported**
120:14

**purposes**
144:8

**pursuing**
8:15,16 123:12

**put**
72:24 133:4 142:10
152:18,20,22 157:18

**putting**
91:20

**PWMS-0002616**
109:8

**PWMS-2319**
175:1

**PWMS-2393**
98:25

## Q

**qualified**
102:3

**question**
9:1,3,18 10:24 12:23,24
13:3 17:20 18:4 23:1,8
25:7,24 28:16 33:10,21
34:4,6 37:1,13 40:13,14
41:1,3 42:6,13,20 43:12
48:9,11,16 49:4 52:20
54:11,20 55:15,23,24
56:5 60:10 62:2,4,12,
19,21 65:13 66:24
69:17 70:17 71:4,22
73:5,15 74:21 75:1,9,13
76:3,23 77:9 78:6,18
79:22,23,25 81:23 82:8
83:24 86:6 94:18 97:6
108:6,22 112:19,20
114:19 115:2,20,22,24
116:22 130:15 131:23
133:21 134:1,15 135:5
140:14,16,18,20,21
151:23 161:14,17
163:12,25 170:9,11
174:24 176:22 178:23
179:15 184:3

**questioning**
47:7 143:19 177:20

**questions**
72:24 83:14,17,25
84:14,17 85:1,8 112:5
141:6,10,15 157:16
164:25 177:19 178:12
185:6,16 188:8,11

**quick**
174:23

**quickly**
89:6

**quite**
11:18 19:1 27:10 35:4
58:18 87:15 106:21

**quote**
16:23

**quoted**
118:3

## R

**raise**
84:23

**rank**
101:10

**read**
103:9,18 107:13 126:13
158:18 171:23 172:10

**reading**
16:22 126:15 164:5

**really**
165:1

**reason**
80:22 129:8 130:23
152:7 184:2,14

**reasons**
70:24

**recall**
15:3 16:5 18:21 19:6,
17,19 22:18 25:13
27:14 29:11,14 33:8
34:3 36:4 38:1 39:12
41:7,10,11 44:9,23
45:2,9,18,23 46:3,6,13,
19,21 49:9 51:7,14,17
53:25 57:4 60:18 68:17,
19 81:3 86:12,18 87:16
90:15 93:2 96:18 97:25
98:18 99:17 105:21,25
107:10,15 109:6 116:23
117:25 118:11 119:22
120:21,23 121:2,18,21
122:15 123:15 127:16
132:8,10,12,18 133:24
134:1,21,24 135:18
136:5,7,20,22 137:10,
17 138:5,24 139:2,11,
16 142:24 144:5,10
145:8 154:21 155:22
160:20 171:17 175:15
186:23 187:7,14,22

**recalled**
134:13

**receive**
38:8 54:24 61:22 62:16
66:14 70:20 71:14
138:16 181:17

**received**
19:15 27:4,6 38:4,10,15
39:10 40:16 50:2,16
67:17 87:16,24 96:9,14,
15,19 112:25 113:9,12
121:1 138:18 139:12
141:12 187:24 188:1

**receives**
181:15

**receiving**
96:12 98:3,8 99:10
120:5 171:10

**recess**
80:10 141:24 181:10

**recognize**
175:5

**recollection**
26:9,11 107:12 118:12
119:23 144:13 151:23

**reconvene**
85:24

**record**
72:24 80:9,12 87:7
99:7,18 101:22 102:14
103:13 109:7,19 113:19
114:1,10 141:23 142:4
163:19 174:25 181:9,12
188:18

**records**
27:17 30:20 33:3 50:10
96:8

**recovered**
68:8

**reference**
157:12,24 170:23

**referenced**
90:13,17 118:9 126:19

**references**
117:12 157:19

**referred**
44:14

**referring**
151:17,18 154:7

**refers**
153:16 157:8

**refresh**
26:9,11 107:11

**refusing**
140:21

**regard**
117:23

**regarding**
10:2 78:24 79:11 96:23
112:25 116:10 126:16
151:1 161:25

**regardless**
67:18 155:24

**regards**
21:7

**Reindel**
142:19,23 161:1,21
162:23 163:6 164:3
165:8,12 168:20

**Reindel's**
143:3 144:14

**relate**
24:5 40:9

**related**
20:25 21:4,9 23:4 24:4,
13,21 25:2 27:25 30:17
31:1,20 32:7 41:25
42:9,15 50:18,21,24
54:6,14 64:22 79:7
84:18 86:16 88:4 89:4,
17 91:9 98:18 107:24
128:17 132:8 187:17
188:4

**relates**
11:6 13:17 21:12

**relative**
180:5

**release**
182:7

**relevance**
20:2,7 62:5,9,21 83:7
88:8 111:17,25 155:7,
14

**relevant**
84:21 183:11,15

**relied**
110:25

**relies**
8:25 10:23 14:11 60:9
115:19 140:12 161:13

163:9

**rely**
9:17

**remember**
29:16 38:14,20 41:15
44:8 46:1 81:5 97:17
106:2 135:3 137:1,15
139:1 143:11,17,25
145:1,3 146:13,15
147:1,5 151:12,16
152:6 170:21 171:10
176:3 178:8 181:19

**repeat**
79:23

**repeatedly**
112:6

**Repeating**
73:5

**report**
99:13 103:5 120:14,22
121:19

**reporter**
40:20

**represent**
7:10,12 56:19 58:6,7
94:22 110:23 142:9
165:22 177:5 180:22
185:21 187:17

**representation**
35:14 57:20,22 120:10

**representations**
158:13 161:9

**representative**
122:24 158:24 160:10
169:3,11 173:11

**representatives**
35:14 58:22 77:22
160:22

**represented**
29:18 59:2 68:21
113:14

**representing**
11:14,18 56:22 70:2
117:16 154:19 180:1

**represents**
117:22

**reputable**
101:6,11

**request**
35:15 119:15 120:9
121:23 140:7

**requested**
41:20 118:16 123:3
165:21 166:15

**requesting**
117:9 133:1

**requests**
41:5,12,19

**researched**
63:11

**reservations**
188:12

**reserve**
141:8

**reserved**
188:20

**resolution**
94:13

**resolved**
95:25 158:11

**respect**
158:21 172:4 176:22
187:17

**respond**
9:3,19,20 11:1 14:10,14
24:24 25:4,6 60:12,13
92:19 93:11 96:1
115:22 124:23 136:6
140:15 161:16 163:14
173:17

**responded**
83:14

**response**
41:18 83:17 134:14
136:8,24 140:3 148:7,
12 152:21,22 160:8,19
163:24

**responses**
135:14,24 136:4,15
137:6,11,20 138:11,14
139:7,13 142:16 144:21
145:11

**responsibility**
91:20,22

**responsible**
90:9 91:17,24 92:1,9

**responsive**
140:7

**result**
187:10

**retain**
34:21,22

**retained**
34:23 187:20 188:3

**retainer**
55:12

**retaining**
53:6,20,22 57:6

**retention**
53:5,12,19,22 54:22
55:18 57:5

**return**
169:13

**revealing**
9:2,19 10:25 36:21
60:11 115:21 140:14
161:15 163:13

**review**
18:17 106:15,19 144:22
145:4 147:19 172:1,7

**reviewed**
18:23 19:5,6 26:3,8
27:11 107:8 147:21
154:11

**reviewing**
33:3 132:18 157:17
159:22

**rewrite**
159:25

**rhyme**
184:14

**Riester**
117:7,15 120:5,12
123:3,4 164:8 173:5,7

**Riester's**
118:2,5,15 121:24

**right**
48:21,22 56:11 71:23

84:18 88:7 92:16 93:14
102:12 109:17 124:5
130:7 132:6 137:5
141:8,16,18,19 145:18
146:4 147:20 151:4,11,
14 153:22 158:6 160:1,
23 161:10 163:22
164:16,17 165:9 166:4,
8 167:17 171:4,14
172:16 180:22,24

**role**
49:23 51:19 58:10
73:18 118:2,5 180:2,25

**rooms**
150:25

**Rothschild**
178:7

**roughly**
179:14

**RT**
132:6,9,11 135:1

**rubber**
15:15,18 123:21
148:16,23 150:24

**Rules**
8:9

**ruling**
123:11

**run**
154:3

_____

**S**

**Sampson**
157:12

**sarcomatoid**
101:16,24 103:23

**sat**
97:15 151:20

**savings**
182:2,8,13,16,21 183:1
184:10

**saw**
17:3 50:6 51:15 139:7,
17 173:8

**saying**
101:22,23 103:5 123:12

DONNETTE WENGERD - 04/06/2017                    i23

124:2 146:15 147:19
149:18 152:2 166:24
167:1

**says**
16:21 89:24 91:16,19
99:21 100:13,20 101:15
102:1,14,21 103:10,11,
12,22 110:1,5 120:8
121:22 122:23 124:6,13
125:12 128:2 130:3,6
134:17 140:3 143:1
148:12 152:24 153:1,
19,25 155:22,24 158:7
160:19,24

**scan**
99:24

**scope**
96:24 111:8

**search**
22:19

**searched**
39:16,24

**second**
12:23 25:9,10 27:12,13
87:19 116:25 117:4
128:2 149:9 150:1
153:16 157:6 162:5
170:22 175:8

**Seconded**
87:8

**seconds**
181:5

**section**
100:10 102:18

**sections**
102:21

**see**
30:21 34:8 38:22 39:9,
17,24 45:12 51:9,12
53:1 55:13 70:5 87:10,
14,17 89:24 90:11 99:4
100:1,10,13,15,25
101:14,20 102:18 103:3
104:4,5,17 109:10,15
110:7 118:22,23 119:17
120:18 122:3,7,21
123:7,13,25 125:15
126:18 127:18 128:6
129:22 130:8 133:9,10,
20 134:5 135:17 140:1

147:18 148:18 154:5
157:6 164:2,5,7 174:8
186:24

**seeing**
41:10,12,15 52:24
107:11 119:4

**seek**
141:8

**seeking**
32:2 68:24 78:25 123:6
165:2,11,17,24 166:23
167:21 168:22 169:7,
11,12

**seen**
15:7 27:18 41:5 51:5
87:12 93:1 99:2 103:18
109:5 118:8,13 120:20,
22 127:15 133:14,17
135:15 142:13 171:16

**segregated**
145:1

**send**
19:18 39:15 172:2

**sent**
19:14 27:25 28:12 36:3
39:2 114:17 121:9
135:20,23 144:21
145:15,16

**sentence**
100:13 148:12,15

**separate**
14:13 59:10

**separately**
146:3 151:21

**served**
41:12

**session**
133:7

**Set**
143:3

**sets**
143:12,15

**settle**
75:23 76:6,18 79:14
80:2 155:17

**settled**
95:4 154:4,22 155:5,21

156:1

**settlement**
77:23 90:8 91:5,10,12
95:14,21 96:1,4,12,16,
20,23 109:14 110:10,20
111:3 113:2,10,20
115:16 155:4 169:24
182:6 183:7 184:4,15

**settlements**
182:12

**she's**
12:20 35:20 71:8 102:2

**shipping**
148:14

**Shit**
183:5

**shoulder**
179:18

**shouldn't**
61:15

**showing**
87:3 92:24 98:22 127:7
135:12

**shown**
46:17 50:1

**sic**
95:20 153:3

**sick**
60:25 61:3

**sign**
53:22 106:13 147:13

**signature**
107:14 175:2,5 188:20

**signed**
53:5,19 54:2 57:5
147:2,7,10,12

**significant**
66:7,9 71:15

**signing**
146:12,16

**similar**
186:19

**simply**
174:6 180:4

**single**

57:21

**sir**
53:14 177:15 181:4

**sit**
41:11 53:17 118:12
119:23 131:3 136:23
137:4 179:18

**site**
187:6

**sitting**
144:12 147:20 151:5
157:1 162:21 163:4
169:2 173:20 174:7

**six**
58:22 84:15 140:25

**slightly**
33:21 131:23

**Sloane**
175:14,17 176:7,15,24

**snail**
38:10

**SOL**
183:3,4

**somebody**
31:14 33:9,22 38:23
61:14,21 62:15 71:13,
15 80:19 112:12 135:22

**somewhat**
33:1 102:24

**sorry**
7:23 13:3,15 17:7 49:22
58:13 79:21,23 81:5
90:19 100:15 104:24
139:2 142:20 146:13
153:20 157:20 177:9
178:6

**sort**
29:15 88:18 89:1,3
120:24

**sought**
35:2

**sound**
92:16 175:23 185:24

**sounds**
132:7 146:7 172:16
175:15,19 186:1

source
  8:22 118:4

speak
  12:10,12 36:10 59:23
  63:5 65:22 66:3 67:13
  74:7,12 80:25 82:11,20

speaking
  15:9 102:6

speaks
  36:9

specific
  18:22 37:16 41:16
  61:12 63:10 91:21
  101:18,23 102:14 133:1
  136:10 152:14 157:24
  160:21 169:18 186:3,15

specifically
  21:6 119:22 142:19
  149:6 152:3 156:12,16,
  24 167:22

speculate
  22:7 34:7 111:7 112:1
  130:13,14

Speculating
  130:23

speculation
  24:10 65:2 170:1,12
  180:10

speculations
  112:3

speech
  102:11

spending
  180:13

spent
  83:11 179:4,8

spoke
  12:12 35:24 54:3 74:15,
  18 76:5 78:10 83:19
  137:18

spoken
  24:20 26:14 36:13
  37:15,20,23 38:3 47:22
  78:24 79:3 86:19,22
  178:9

spot
  138:15

stamp
  98:25 109:8 127:19
  130:6 146:13 174:25

stand
  183:4

standard
  182:4

starting
  172:6

starts
  149:9 157:8,10

state
  7:10 109:7 120:15
  123:16

stated
  188:13

statement
  156:9 173:14,22 174:8,
  10

statements
  119:10,12 160:25 161:8
  169:20 174:15

states
  7:5 68:16 118:15

status
  27:8

stepped
  155:14

stick
  15:15

stop
  140:24 184:11 187:12

stretching
  150:25

strike
  153:13 160:4 167:7
  181:14

studies
  100:11,21

subject
  21:19 32:21 36:22 37:4
  61:18 67:12 76:17 81:8,
  15 83:9 84:16,20
  108:14 121:18 140:3
  149:9 153:19 188:12

subjects
  21:23 84:11

submitted
  105:6,9,13 107:2,19,22,
  25

submitting
  114:23 164:8

subpleural
  102:23

subsequently
  88:10 122:1

substance
  20:15 21:23 73:25
  146:21

sue
  92:12 93:13

sued
  59:18 60:21 91:25
  92:10 128:20

suffer
  67:23

suffered
  65:19 66:2

suggestion
  42:19 48:8 54:10 55:22
  60:4 75:10 77:16

summarize
  47:4

summary
  100:10 102:19 103:22
  123:5,9,13 124:8,14,19
  125:7,13 126:4 127:11,
  18 129:15,24 130:10
  131:4 134:20 163:21
  173:8

supervision
  150:5

supervisor
  150:6

supplied
  10:5 129:21 144:13
  145:3 149:20 171:20,23

supplier
  14:3

suppliers
  90:9 91:18

support
  120:9 139:23

supposably
  152:15 159:17

supposed
  54:13 72:17

suppositions
  24:1

sure
  15:19 22:9 32:6 35:1,
  13,19 41:14 55:16,25
  62:13 63:8 65:3,8 71:6,
  9 80:18 88:20 94:25
  116:23 142:21 152:17
  166:22 171:22 173:25

sustained
  187:9

switch
  141:20

sworn
  8:10

symptoms
  100:4,5 186:8,13,15,19,
  21,25

---
T
---

take
  17:5 52:2,4 70:10 79:10
  80:7 88:13 141:16,20
  142:12 143:1 181:6

taken
  59:15 80:10 141:4,24
  181:10

talc
  10:3 13:19,20,21,23
  14:3,6,15,23 15:5,8
  61:9,10,11,14,21 62:16
  64:22 71:14,16 118:17,
  19,20,24 119:7 120:11,
  15,16 123:20,23 124:4,
  5,12,16,21 125:8 128:4
  129:17 130:2,11,21
  131:10,15,16,19,20,24
  132:1,11,15 133:23
  134:2,10,11 139:25
  140:10 150:14 151:11,
  15,25 152:3,8 153:4,7,
  11 158:9,16,17 159:9

163:21

**talk**
33:22,25 35:12 64:13,
22 91:3,14 94:11,18
105:4 107:17 135:7

**talked**
37:25 48:19 168:11

**talking**
19:3 28:21 88:15 119:5
137:13 153:19,20

**talks**
119:15 159:14

**tape**
177:16

**taxes**
183:3

**team**
11:15,17 24:18 56:25
95:1 156:24 177:5,7
179:20

**telephone**
78:14 82:11,12 83:20
84:2

**tell**
11:5 12:18 20:19 21:18
37:12,17 50:13 53:13
54:5 62:14 113:11
137:13 139:14 142:12
145:25 146:8 149:25
165:16 174:3 182:11

**ten**
22:5 28:24 29:23
105:18 119:21 152:16

**tend**
39:15

**terms**
179:16 180:4

**terrible**
38:19 39:14

**testified**
144:19 167:5 186:7,24

**testimony**
47:4 97:18 129:17
133:16,22 134:7 139:23
181:19

**Thank**
40:22 47:7 70:19

100:19

**there's**
34:9 40:21 57:15 58:22
130:6 133:21 173:22
174:10 182:3,6,21
183:20 184:14,15

**they're**
85:5 149:20 162:2
179:14

**thing**
29:15 163:17

**things**
27:8 165:2 167:14

**think**
8:6 13:13,17 24:18
29:23 33:11 35:21 38:3,
25 45:17 59:4,18,25
61:8,20 62:14 66:13
67:16 68:6 70:25 87:18
89:7 91:19,20 97:19
111:2 112:24 113:25
116:3 127:22 131:20
133:17 139:4,6 144:18
164:25 167:22 168:15
169:15 180:11 184:1
187:15 188:6

**third**
111:7 112:1 127:23
148:12 150:2 155:5

**Thomas**
8:3 11:13 34:12 44:13
177:3 185:21,23

**thought**
86:10 98:14 104:7,13,
22 110:11,21 112:14
129:8 131:9 139:17

**three**
46:12 79:16 84:6 97:19
111:23 156:22 157:2
170:1 183:8

**thrown**
8:21 13:8

**time**
15:4 16:5 20:12 22:16
27:10 37:16,25 38:21
39:4,8,16 40:21 41:22
45:5 50:6 70:2 72:15
74:18 79:18 80:9,12
81:2 87:19 96:15 97:22
113:9 120:1 121:1,9

126:18 130:18 137:2
138:3 139:7 140:23
141:23 142:4,20 145:6
147:22 149:1 154:13
172:23 179:2,8,12
180:6,14 181:9,12
182:13 184:15 186:14
187:24 188:12,18

**times**
19:11 37:15,17,19
43:20 44:5 79:16

**tire**
63:1,7 123:21 128:13
148:16,23

**title**
35:19

**titled**
163:20

**today**
7:13 12:15 41:11 45:13
53:18 82:22 83:21
84:15,22 85:7 87:6
118:12 119:23 131:3
136:23 137:4 140:24
144:12 155:25 157:1
162:21 163:5 169:2
173:20 185:6

**told**
11:9 26:2 39:22 49:5
51:4 76:11,14 77:6 84:3
86:8,15 129:7 133:11
159:16 167:13 174:3,4
181:17

**Tom**
64:4,12 94:24 154:17
171:13

**top**
130:6 175:16

**topics**
141:11

**total**
177:10

**totally**
155:2

**tow**
154:3,14 155:5

**town**
80:21

**Towpath**
182:18,19,22,25

**transcript**
133:6,14,17,18

**transcripts**
33:11

**treatment**
98:3,9

**trouble**
183:19

**true**
104:14 129:6 147:16
158:3 169:7

**trust**
105:12,22 106:2,8
107:1,7,24 109:14
110:10,21 111:3 113:2,
10,20 114:3 116:3

**trusts**
105:7,10 107:20 114:12
115:9,15

**truth**
146:17

**trying**
67:15 137:13 167:9

**Tuesday**
12:4,10 17:11,14,17
18:9,18,24 26:1 86:9

**tumor**
100:21 102:22 103:1,6

**Tunis**
7:23 8:2 47:1,2 185:15,
18 188:7

**turn**
88:1 116:24 122:19
127:17,22 133:18
139:20

**turned**
88:9

**turns**
168:19

**twice**
79:16

**two**
14:13 18:24 31:24 47:3
62:6 72:18 78:12 80:22

DONNETTE WENGERD - 04/06/2017                    i26

85:15 97:19 111:9,22,
23 117:9,13 121:23
124:2,4 143:15 146:1
151:19 165:1,25 169:24
182:13,21 183:1,21

**two-thirds**
100:14

**type**
66:2 67:18

**types**
66:15 169:18

**typically**
38:9 146:11

_____

**U**

**Uh-huh**
97:14 100:8 144:1
182:20

**ultimately**
183:23 186:9 187:16

**unable**
9:4 61:19

**undercompensated**
166:3

**underlying**
152:9 158:15 175:12
176:16,20 181:16

**underscore**
109:13

**understand**
11:22 12:22 13:3,15
14:7,15 15:6 57:24
75:22 78:16 92:6 102:3
165:7,10 166:22 167:9
168:2,4 173:25 183:14
186:17

**understanding**
13:12 15:11,23 54:12
57:15 58:20 65:9 75:2
79:13 80:1 115:7 124:7,
9,18 146:8 149:12
164:11

**understood**
78:5 165:24 166:23

**unfortunately**
61:19 70:3

**uniform**
105:25 107:16

**Union**
182:18

**United**
7:5

**unrelated**
32:5

**updating**
27:7

**usually**
38:3 172:3 182:2

_____

**V**

**Valentine's**
188:2

**valuation**
69:20 70:14 71:18

**Vanderbilt**
132:6,9,11,17 134:4,11,
19,22 135:1

**variety**
27:22 83:16

**various**
14:15 15:16 19:11

**verbally**
136:3,6,19,21

**verification**
146:5,9,15,16,23 147:2
175:7 185:11

**verified**
175:11

**verifying**
146:10,19

**versus**
7:4 179:3 180:7 184:5

**video**
7:8

**video-recorded**
7:2

**VIDEOGRAPHER**
7:1 80:8,11 141:22
142:3 177:14 181:4,8,
11 188:17

**view**
28:11 58:10 61:4 84:17
90:7 129:4

**views**
84:9

**visceral**
102:22

**voluntarily**
118:17 119:16,20 120:2
122:2 123:1

**voluntary**
117:9 120:9 121:23

**vouch**
157:22

_____

**W**

**waiving**
140:4 149:10

**wall**
102:23

**Walsh**
12:1 35:24 36:13,22
37:9,15 46:1,13

**want**
16:23 47:2 85:6,18
141:15,16 149:25
166:6,22 169:10 183:18

**wanted**
33:22 35:10 64:3,11,17,
20 88:22 91:1,12 94:10,
17 111:3 112:13 166:24

**wants**
19:4

**wasn't**
61:14,21 62:15 92:9
104:13 124:3,15 130:11
131:14,24 137:7

**wasting**
79:17

**watch**
179:18

**watching**
67:22

**way**
24:25 29:12 37:7 39:13
47:25 50:5 53:11,18

59:12,13 61:6 62:19
64:2,19 67:23 100:14
129:12 149:18 160:19
163:6 166:12,17 174:14
178:9

**ways**
15:19

**we'll**
87:5 183:17

**we're**
19:3 22:6 29:6 34:6
61:24 66:18 72:15,25
79:17 80:11 84:23,24,
25 85:1 112:2,4 126:16
140:23 141:3,7 183:17
185:8 188:17

**we've**
78:17 83:15,21,24 87:3
92:24 98:22 109:2
114:10 127:7 133:6
135:12 141:4 183:21

**week**
17:13

**weeks**
17:15,16 26:7 86:11
87:15

**Wengerd**
7:3,14 8:7,12,14 20:19
54:12 64:2 65:10 78:4,
20 80:14 87:3 92:24
98:22 109:2 115:7,17
122:23 127:7 133:4
135:12 142:5,7 174:7
185:17,19

**Wengerd's**
89:25 143:2

**went**
68:4 100:6,7 143:21

**weren't**
61:8 144:4

**Wertheimer**
128:8,11,12,23 184:25
185:1,2

**Westfall**
9:25 10:1,6,11,14,17
11:5,9

**Weston**
164:9,15 173:7

DONNETTE WENGERD - 04/06/2017                    i27

**what's**
17:21 19:23 28:4 36:17
56:7 57:9,19 66:22
74:22 83:4 111:12
118:3 126:24 142:10
149:12 157:23 179:7
183:4

**whatsoever**
62:6

**Williams**
7:4,22 11:16 12:11
13:5,14 21:1,5,6,10
22:17 27:1,3 28:1 30:1
36:6,9,13,23 37:4,8
38:21 39:8,17 42:17
43:21 44:3,6,20,22,25
46:8,22 47:10,16,20
48:5 49:1,8,10,15,19,23
50:18,22 51:21 53:7,23
54:5 56:19,23 57:7,24
58:3,12,16,21 59:4,19
61:4,9,15,23 62:17,25
63:4 65:19 68:13 72:5,9
73:8 74:8,13,19 75:4,23
76:6 80:2 87:9,20 90:18
116:24 117:4 118:10
119:4,12 120:8 122:19
128:24 129:5 135:14
142:8 179:1

**Williams'**
180:22

**withdrawn**
30:15 31:6 53:4 89:2
94:1 95:12 98:1 115:25
134:18

**withholding**
166:13

**witness**
7:13 34:3 79:18 83:13,
14,15,19 84:13 85:22
95:20 155:8 163:19

**witnessed**
106:13 146:12

**woman**
25:15 99:22

**women**
32:18

**wondering**
182:3

**word**
164:5

**worded**
154:9 167:8

**work**
23:20,21,24 40:3,11,19
43:1,3,7,9 52:9 62:7,9,
20 63:1,23 66:25 70:13
71:25 72:1 73:23 74:25
75:6 81:19 82:4 83:7
84:8 108:3,19 111:10,
16,19,20,21,22 114:25
115:11 116:18 127:1
128:15 169:25 170:4
179:21 185:3 187:6

**worked**
13:22 132:15 134:11,16
148:14,22,25 179:13,
15,24 180:7,8

**worker**
128:13

**workers**
63:7

**working**
151:1 179:4 187:13

**workplace**
123:21

**works**
109:24

**workup**
101:18

**world**
101:8

**worth**
123:12

**wouldn't**
32:2 59:20 61:12
104:24 128:22 129:9
131:6,15,18,25 147:10,
13 152:6,7 153:12
168:22

**wrap**
188:16

**write**
135:24 136:1,4

**writes**
184:20

**writing**
137:12

**written**
106:21 137:1,6 145:11

**wrong**
176:7,11,15,19,25

**wrongdoing**
165:5 166:1

**wronged**
59:7,11

**wrote**
136:2,8,11,13,14,16,20,
24 137:11,19

---

## Y

**Yahoo**
146:3

**Yeah**
18:1 23:25 143:1
185:15

**year**
37:23 138:25 184:7

**Year's**
139:5,9

**years**
29:18,23 119:21 148:25
149:2 152:16

**yesterday**
80:15,17,20 81:1,2,6,
16,17 82:2,20 83:13,18,
20,25 84:13 85:25
86:12,19,23 87:4
178:13,18

**yesterday's**
81:9

**York**
164:12 178:3

**you'd**
23:10 29:15

**you're**
8:15 13:15 20:5 23:25
40:25 41:15 43:2 47:6
48:10 54:13 57:13
60:20 62:6,22 63:23,24
69:7,16,19,20,22 70:14,
16 71:10,21,24 78:19,

25 95:13 97:3,6 101:25
103:8 104:12 109:12
111:6,9 112:5,18 117:2
124:14 130:13 133:1
136:11 140:21 146:16,
18 151:17 152:17
153:20,22 157:1 158:20
163:16 165:2,11,16,24
166:23 167:12,21
168:1,8 180:9 183:9

**you've**
26:8 27:4 30:25 49:5
79:15 85:3 95:12 105:9
119:5 142:13 151:18
162:11 171:8

**Young**
118:18