# EXHIBIT A

**302**

-------------------------------------------------------------------------------------------------------

**This report with recommendation was received after the November 20 filing
deadline and therefore has not been reviewed by the Committee on Rules and
Calendar.  Pursuant to §45.5 of the House Rules of Procedure, this late report will
be considered by the House if the Committee on Rules and Calendar
recommends a waiver of the time requirement and the recommendation is
approved by a two-thirds vote of the delegates voting.**

-------------------------------------------------------------------------------------------------------

AMERICAN BAR ASSOCIATION

COMMISSION ON ASBESTOS LITIGATION

REPORT TO THE HOUSE OF DELEGATES

RECOMMENDATION

1   RESOLVED, That the American Bar Association adopts the "ABA Standard For Non-
2   Malignant Asbestos-Related Disease Claims" dated February 2003.

3
4   FURTHER RESOLVED, That the American Bar Association supports enactment of
5   federal legislation consistent with the ABA Standard that would: 1) allow those alleging non-
6   malignant asbestos-related disease claims to file a cause of action in state or federal court only if
7   they meet the medical criteria in the ABA Standard; 2) toll all applicable statutes of limitations
8   until such time as the medical criteria in the ABA Standard are met.
9
10  FURTHER RESOLVED, That the American Bar Association recommendation does not
11  in any way address issues associated with claims for asbestos-related malignancies.
12
13  FURTHER RESOLVED, This recommendation is not intended to preempt legal
14  definitions for claiming or impairment as they may be found in regulations relating to the
15  Occupational Safety and Health Administration (OSHA), the Americans with Disability Act, the
16  federal Rehabilitation Act, their state and local counterparts, Workers Compensation statutes in
17  the 50 states and the District of Columbia, and their regulations, and federal and state laws
18  regulating employee benefit plans and employer health care coverage plans.

**302**

### ABA Standard For Non-Malignant Asbestos-Related Disease Claims

### February 2003

I.   The filing of any civil action alleging personal injury for asbestos related non-malignant disease must be accompanied by a detailed narrative Medical Report and Diagnosis signed by the diagnosing doctor, that:

1.   Verifies that the doctor or a medical professional employed by and under the direct supervision and control of the diagnosing doctor has taken:

a.   A detailed occupational and exposure history from the person ("claimant") whose alleged injury forms the basis for the action or, if that person is deceased, from the person most knowledgeable about the exposures that form the basis for the action. The history shall include all of the principal employments and exposures of the claimant involving exposures to airborne contaminants. It should indicate whether each employment involved exposure to airborne contaminants (including, but not limited to, asbestos fibers, and other disease causing dusts) that can cause pulmonary impairment and the nature, duration, and level of any such exposure; and

b.   A detailed medical and smoking history that includes a thorough review of claimant's past and present medical problems, and their most probable cause.

2.   Sets out the details of the occupational, medical and smoking history, and verifies that at least 15 years have elapsed between the claimant's first exposure to asbestos and the time of diagnosis.

3.   Verifies that the claimant has:

a.   A quality 1 chest x-ray taken in accordance with all applicable state and federal regulatory standards (in a death case where no pathology is available, the necessary radiologic findings may be made with a quality 2 film if a quality 1 film is not available), and that the x-ray has been read by a certified B-reader according to the ILO system of classification as showing bilateral small irregular opacities (s, t, or u) graded 1/0 or higher or bilateral diffuse pleural thickening graded b2 or higher including blunting of the costophrenic angle; or

b.   Pathological asbestosis graded 1(B) or higher under the criteria published in the *Asbestos-Associated Diseases,* Special Issue of the Archives of Pathology and Laboratory Medicine, Volume 106, Number 11, Appendix 3 (October 8, 1982).

4.   Verifies that the claimant has asbestos-related pulmonary impairment as demonstrated by Pulmonary Function Testing, performed using equipment, methods of calibration and technique that meet the criteria incorporated in the

**302**

AMA Guides to the Evaluation of Permanent Impairment (5th Ed.) and reported as set forth in 20 CFR 404, Subpt. P, App 1, Part (A)§3.00 (E) and (F), and the interpretative standards set forth in the Official Statement of the American Thoracic Society entitled "Lung Function Testing:  Selection of Reference Values And Interpretative Strategies" as published in Am. Rev. Resp. Dis. 1991:144:1202-1218 that shows:

a.      Forced Vital Capacity below the lower limit of normal and FEV1/FVC ratio (using actual values) at or above the lower limit of normal; or

b.      Total Lung Capacity, by plethysmography or timed gas dilution, below the lower limit of normal.

c.      Where the Pulmonary Function Test results do not meet the requirements of (a) or (b), above, a claimant may submit an additional report, by a board certified pulmonologist, internist or occupational physician that states:

1.      That the doctor has a doctor/patient relationship with the claimant; and

2)      That the claimant has a quality 1 chest x-ray taken in accordance with all applicable state and federal regulatory standards (in a death case where no pathology is available, the necessary radiologic findings may be made with a quality 2 film if a quality 1 film is not available), and that the x-ray has been read by a certified B-reader according to the ILO system of classification as showing bilateral small irregular opacities (s, t, or u) graded 2/1 or higher; and

3)      That the claimant has restrictive impairment from asbestosis and sets forth in detail the specific pulmonary function test findings that the doctor relies upon to establish that the claimant has restrictive impairment; and

4)      That the physician shall submit the reports and readouts from all pulmonary function, lung volume, diffusing capacity or other testing relied upon for the report's conclusions.  Such tests must comply with the equipment, quality and reporting standards set forth herein.

5.      Verifies that the doctor has concluded that the claimant's medical findings and impairment were not more probably the result of other causes revealed by claimant's employment and medical history.

II.      Copies of the B-reading, the pulmonary function tests (including printouts of the flow volume loops and all other elements required to demonstrate compliance with the equipment, quality, interpretation and reporting standards set forth herein) and the diagnosing physician's detailed narrative Medical Report and Diagnosis shall be attached

**302**

to any complaint alleging non-malignant, asbestos-related disease.  Failure to attach the required reports or demonstration by any party that the reports do not satisfy the standards set forth herein shall result in the dismissal of the action, without prejudice, upon motion of any party.

III.     No state or federal statute of limitations governing personal injury tort actions arising from exposure to asbestos shall commence as a result of a purported diagnosis or finding of a non-malignant disease related to asbestos that does not meet the criteria set forth herein.

**302**

## REPORT

The Commission was created in November 2002 by the Board of Governors, at the request of President-Elect Dennis Archer, to bring a recommendation to the House of Delegates at its February 2003 meeting concerning widely reported and longstanding problems in asbestos litigation. The recommendation was to address dual concerns: 1) protecting the right of claimants with impairing asbestos-related injuries to obtain fair compensation efficiently in the tort system, and 2) preventing scarce judicial and party resources from being misdirected by a flood of premature claims by individuals who have been exposed to asbestos but do not have, and may never get, any functional impairment from asbestos-related disease.

By way of background, the ABA, beginning in 1981 and in numerous subsequent policies adopted over the years, has been on record generally opposing federal product liability legislation. In February 1983, it reaffirmed its opposition to broad federal product liability legislation. In the same resolution, however (hereinafter identified as the February 1983 policy), the ABA adopted a policy in support of narrowly drawn federal legislation in two discrete areas of product liability law. One of those areas was victim compensation for certain occupational diseases such as asbestosis.

In the early 1980's, courts, policymakers and lawyers were concerned that the volume of asbestos claims was threatening to overwhelm the court system. The February 1983 policy supported federal legislation that addresses the issues of liability and damages with respect to claims for damages against manufacturers by those who contract an occupational disease (such as asbestosis) when: a) there is a long latency period between exposure to the product and manifestation of the disease; b) the number of such claims and the liability for such damages in fact threaten the solvency of a significant number of manufacturers engaged in interstate commerce; and c) the number of such claims have become clearly excessive burdens upon the state and federal judicial systems.

In its report, the Committee sponsoring the February 1983 policy stated that it "believes that the current social problem presented by occupational latent diseases, such as asbestosis, is unique and has been a catastrophic phenomenon on a national scale to asbestos workers and to the asbestos industry. While this Committee is reluctant to recommend federal intervention in the tort liability and common law systems of the several states, the Committee believes that the unique national scope and magnitude of the problems for adequate compensation to injured parties and liability for occupational latent diseases as they affect the financial stability of the specific industry, such as asbestos, warrants attention at the federal level. The Committee also believes that federal attention to such a unique and urgent national problem is neither premature nor precipitous, and would not result in harmful violation of the inherent values of this country's common law tort liability systems of the several states." (Emphasis added)

The February 1983 policy is silent as to what type of federal legislation might be appropriate in the area of asbestos. To date, no subsequent ABA policy has been adopted to address asbestos litigation or legislation.

302

For the reasons discussed in this Report, the Commission believes that Congressional action on asbestos litigation is urgently needed. The Commission proposes that Congress enact a Standard that would (a) identify non-malignant claims that are entitled to compensation and defer those that do not currently belong in the courts, and (b) ensure that state and federal statutes of limitations do not run against individuals who do not yet (and may never) meet the medical criteria in the Standard. **The Commission's Standard deals only with non-malignant claims and does not in any way deal with claims for asbestos-related cancers or malignancies.** The Commission's recommendation is designed to establish a minimum impairment threshold in order to file a non-malignant asbestos claim, and is not intended to change the law of causation that exists from state to state. The Commission's recommendation is also not intended to in any way affect the ABA's long-standing policy against the broad federalization of tort law.

## I.      Background

Asbestos litigation is not a new phenomenon.  It is the tragic legacy of extensive industrial use of asbestos in the workplace, predominantly from the 1930s to the early 1970s. Significant numbers of industrial workers began developing disabling, and sometimes fatal, asbestos-related diseases decades later (a delay attributable to the long latency between exposure and manifestation of disease).  They brought suit against a relatively small number of former manufacturers of asbestos-containing industrial insulation products.

By the 1980s, what had once been a series of isolated cases turned into a steady flow. Claimants began regularly obtaining significant awards.  In 1982, Johns-Manville Corporation -- the single largest supplier of asbestos-containing insulation products in the U.S. and the primary target of the early claims -- declared bankruptcy due to the burden of the asbestos litigation.  At that point, it had approximately 16,000 pending claims. By comparison, today it is common for some defendants to have more than 100,000 cases pending.

The asbestos litigation paused only briefly, if at all, as a result of the Manville bankruptcy.  Heavily exposed industrial workers continued to get sick from asbestos-related diseases and to bring claims in the tort system throughout the 1980s and into the 1990s. Asbestos dockets in certain jurisdictions swelled.   Several other former manufacturers of asbestos-containing insulation declared bankruptcy (e.g., Unarco, Eagle-Picher, Raybestos Manhattan, Celotex).

As the litigation expanded, calls for a national solution intensified. In 1991 the Judicial Conference Ad Hoc Committee on Asbestos Litigation appointed by Chief Justice Rehnquist found that "the situation has reached critical dimensions and is getting worse." The Ad Hoc Committee 'recognize[d] that virtually all of the issues relating to a so-called 'national solution' are primarily matters of policy for the Congress" and stated that it "firmly believes that the ultimate solution should be legislation recognizing the national proportions of the problem...". U.S. Judicial Conference Ad Hoc Committee on Asbestos Litigation, p.2 (March 1991) (emphasis added).

In the continued absence of legislative action, some courts and parties attempted to craft creative solutions to the growing body of asbestos claims, including litigation class actions,

settlement class actions, mass trial consolidations, joint defense claims handling organizations, and "global" settlement negotiations. None succeeded. Class actions failed because the factual disparity among the various claims and the disparate interests of present and future claimants precluded proper treatment under Federal Rules of Civil Procedure 23. The Supreme Court in 1997 and 1999 reviewed and struck down two proposed class action settlements known as the *Amchem* settlement and the *Ortiz* settlement. In both cases, however, the Supreme Court called upon Congress to correct the problem. Justice Ginsberg delivered the opinion for the Court in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed. 2d 689 (1997), in which she noted that the Judicial Conference had urged Congress to act on the situation and "no Congressional response has emerged." In *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S. Ct. 2295, 144 L.Ed. 2d 715 (1999), Justice Souter delivered the opinion for the Court and said "this case is a class action prompted <u>by the elephantine mass of asbestos cases, and our discussion in</u> <u>*Amchem* will suffice to show how this litigation defies customary judicial administration and</u> <u>calls for national legislation</u>" 527 U.S. at 821 (emphasis added). Chief Justice Rehnquist's concurring opinion stated that asbestos litigation "cries out for a legislative solution" 527 U.S. at 865.

Mass consolidations, at least in the eyes of some courts, suffered similar shortcomings. *See, e.g., Cimino v. Raymark Industries, Inc.,* 151 F.3d 297, 320-21 (5th Cir. 1998); *Malcolm v. National Gypsum Co.,* 995 F.2d 346, 350-353 (2d Cir.1993); *Cain v. Armstrong World Industries*, 785 F.Supp. 1448, 1454-56 (S.D.Ala. 1992). Joint defense claims handling organizations dissolved over various strategic and liability share issues, as did "global" settlement negotiations.

Despite the failure of efforts to find a new solution to the asbestos litigation, the tort system appeared to be relatively stable in the early 1990s. The flow of new claims was substantial (RAND estimates it was 15,000 to 20,000 per year), but fairly predictable. (*Asbestos Litigation Costs and Compensation, An Interim Report*, RAND Institute for Civil Justice, 2002, hereinafter the "RAND report"). More importantly, it appeared that by the mid-1990s there was a downward trend in new filings, reflecting the fact that the period of most intensive industrial use of asbestos had drifted further into the past and the occurrence of disabling non-malignant diseases was falling in corresponding fashion.

In retrospect, however, it is clear that a countervailing trend was emerging and accelerating in the 1990s: for-profit litigation screenings began systematically generating tens of thousands of new non-malignant claims each year by individuals who had some degree of occupational asbestos exposure, but did not have, and probably would never get an impairing asbestos-related disease. These individuals may or may not have markings on lung x-rays "consistent with" exposure to asbestos (and dozens of other possible causes) but do not, and may never, experience any symptoms of asbestos disease or develop any asbestos-related conditions that would impair or affect their life or daily functions. (In this Report, such individuals are referred to as being asymptomatic or without functional impairment.)

Asbestos exposure can affect the body in a number of ways. It can cause mesothelioma, a cancer of the exterior lining of the lung and peritoneum. It can also cause cancer inside the

**302**

lung.  Although there is an ongoing debate about the issue, some believe that it can cause cancer at other sites in the body.

Asbestos exposure can also cause non-malignant pulmonary disease.  Asbestosis is a fibrosis (scarring) of tissue inside the lung, particularly in the walls surrounding the alveolar spaces at the end of the airways.  Significant fibrosis in this area reduces the elasticity of the lung and interferes with the lung's ability to oxygenate the blood.  Asbestotic lungs are characterized by reduced capacity, i.e., they can process only a reduced volume of air compared to normal lungs.  Workers who suffer from significant asbestosis generally have shortness of breath on exertion.

Asbestosis can be a progressive disease.  In its milder forms, it may not cause any symptoms.  It may or may not progress to the point of causing functional impairment detectable on objective pulmonary function tests.

Asbestos exposure may also cause non-malignant changes in the pleura, the tissue that lines the outside of the lung and the inside of the rib cage.  The purpose of the pleura is to facilitate the smooth, constant movement of the lungs as they expand and contract.  Asbestos exposure can cause circumscribed thickening of pleural tissue (called "pleural plaques") as well as diffuse pleural thickening.  Ordinarily, these conditions -- which occur outside the lung -- do not result in any functional impairment.  Significant diffuse pleural thickening, however, can restrict the ability of the lung to expand and may result in objective impairment that can be identified by pulmonary function testing.

While pleural plaques and diffuse pleural thickening involve the same tissue that is involved in the malignant disease mesothelioma, they are different physiological processes.  Pleural plaques and pleural thickening do not become or lead to mesothelioma.  Mesothelioma incidence is a function of exposure and individual susceptibility, not the presence or absence of non-malignant pleural changes.

By virtually all accounts, contemporary asbestos litigation is no longer driven solely, or even primarily, by the occurrence of disabling asbestos-related diseases.  Asbestos-related cancer and impairing asbestosis continue to occur, but they represent a small fraction of annual new filings.  According to the recent RAND report, somewhere between two-thirds and 90% of new claims are now brought by individuals who have radiographically detectable changes in their lungs that are "consistent with" asbestos-related disease (and with dozens of other causes), but have no demonstrated functional impairment from those changes:  "In sum, it appears that a large and growing proportion of the claims entering the system in recent years were submitted by individuals who have not incurred an injury that affects their ability to perform activities of daily life."  RAND report at pg. vi; and, pg. 20.  The Commission conducted numerous interviews with some of the nation's leading medical authorities in asbestos-related pulmonary function analysis.  Virtually all of them stated that their clinical experience confirmed the RAND data.

The asymptomatic claimants find their way into the tort system due to a confluence of factors.  Key among them are the activities of for-profit litigation screening companies and the manner in which statutes of limitations operate under some states' laws.

**302**

## A.   Litigation Screenings

For-profit litigation "screening" companies have developed that actively solicit asymptomatic workers who may have been occupationally exposed to asbestos to have "free" testing done -- usually only chest x-rays. Promotional ads declare that "You May Have Million $ Lungs" and urge the workers to be screened even if they have no breathing problems because "you may be sick with no feeling of illness." The x-rays are usually taken in "x-ray mobiles" that are driven to union halls or hotel parking lots. There is evidence that many litigation screening companies commonly administer the x-rays in violation of state and federal safety regulations. In order to get an x-ray taken, workers are ordinarily required to sign a retainer agreement authorizing a lawsuit if the results are "positive."

The x-rays are generally read by doctors who are not on site and who may not even be licensed to practice medicine in the state where the x-rays are taken or have malpractice insurance for these activities. According to these doctors, no doctor/patient relationship is formed with the screened workers and no medical diagnoses are provided. Rather, the doctor purports only to be acting as a litigation consultant and only to be looking for x-ray evidence that is "consistent with" asbestos-related disease. Some x-ray readers spend only minutes to make these findings, but are paid hundreds of thousands of dollars -- in some cases, millions -- in the aggregate by the litigation screening companies due to the volume of films read.

Despite the fact that there are approximately 500 qualified B readers (experts in reading x-rays for the presence of occupational disease pursuant to the International Labor Office standard, discussed more fully below) in the United States, the litigation screening companies often use only a handful of them to read their x-rays. According to the Manville Trust, 49.6% of the tens of thousands of non-malignancy claims it receives that identify a doctor are based on the B reads of just ten doctors. A single doctor accounted for over 30,000 non-malignancy claims submitted to the Trust over a six-year period.

The rate of "positive" findings by these doctors can be startlingly high, often upwards of 50% and in some studies as high as 90%. In one case, a "positive" rate of 94% was reported. *Raymark Indus. v. Stemple*, 1990 WL 72588, *10 (D. Kan.). While those readings do not purport to be medical diagnoses and the B readers make no assertion that their findings establish actual breathing abnormality, the findings serve as the basis for new lawsuits.

Independent audits of the results of litigation screenings have produced disturbing results. A National Institute for Occupational Safety and Health (NIOSH) audit evaluating the "positive" x-rays of 795 tire workers, for example, showed "only two had any signs of parenchymal change and only 19 showed pleural abnormalities." *Raymark Indus. v. Stemple* at *15. The Manville Trust audit of non-malignancy claims showed that certain B readers, responsible for thousands of claims, failed independent review more than 50% of the time.

Some litigation screening companies purport to go beyond x-rays, offering pulmonary function testing and the opportunity to see a physician. Even there, however, the participating doctors assert they are not practicing medicine. They often examine the workers in hotel rooms and meeting halls, not hospitals or doctors' offices. Medical and occupational histories are taken

8

**302**

by non-medical personnel who work for the litigation screening companies, not the doctors. The examinations are completed in minutes; "reports" are written by assistants who are not on site. One such litigation screening doctor has testified that he has been paid over $1 million to examine approximately 14,000 workers in this fashion. He found that all 14,000 have asbestosis. Another litigation screening company acknowledges that it was paid more for "positive" findings than for "negative" findings.

### B.   Statute of Limitations Concerns

A worker put on notice that he or she has x-ray changes "consistent with" asbestos-related disease may face a legal dilemma. It could be and frequently is argued that this finding triggers the running of the statute of limitations, despite the fact that the worker does not have any breathing problems and does not consider himself to be "sick." State law generally requires a claimant to sue within a certain period after he knew or had reason to know of an "injury" and its possible wrongful cause.

A number of states have expressly adopted a "two disease" rule for asbestos-related claims. Under this rule, a claimant who suffers from disabling asbestosis must timely file a claim for that disease, but is not automatically barred from bringing a separate claim many years later should he or she develop an asbestos-related cancer. The statute of limitations runs separately for the "second" disease.

The two disease rule is not uniformly embraced by state law. More importantly, some states have not expressly decided whether a litigation screening x-ray finding of non-disabling changes "consistent with" asbestos-related disease triggers the statute of limitations for a non-malignancy claim. If it does, a worker who has asymptomatic pleural plaques could be time-barred from bringing a claim if many years later he or she develops impairing asbestosis. As a result, even states that have adopted the two disease rule have found that it has not stopped the high levels of filings by asymptomatic plaintiffs.

### C.   The Impact of Screenings and Statute of Limitations Concerns

The result of the legal dilemma created by screenings and statues of limitations is the wholesale filing of premature non-impairment claims. The statistics are startling. In 2001, the Manville Trust received over 90,000 new claims -- more than in any prior year and nearly six times the total number of claims pending against Manville when it declared bankruptcy twenty years before. Between 2000 and 2002, the Trust received more than 200,000 claims. The Trust has reported that more than 90% of the claims allege only non-malignant changes.

The experience of the Manville Trust is not unique. According to the RAND report, there has been a substantial increase in annual new filings for all defendants since the mid-1990s, and the increase is almost entirely attributable to non-malignancy filings. The vast majority of those non-malignancy claims, RAND reports, do not involve functional, objectively measurable impairment from asbestos-related disease.

9

**302**

The financial impact of this flood of non-impairment claims has been profound. According to the RAND report, <u>more than sixty otherwise financially viable companies have gone bankrupt due to asbestos-related liabilities, over twenty in the last two years. None has claimed an inability to pay fair compensation to truly sick claimants.</u> Virtually all point to the same problem: tens of thousands of non-impairment claims filed each year, with no end in sight.

Nobel Laureate Professor Joseph Stiglitz of Columbia University recently issued a report, commissioned by the American Insurance Association, that calculates the economic impact of these bankruptcies on the employees of the bankrupt companies. He estimates that 60,000 workers have lost their jobs as a result of asbestos-related bankruptcies. (The RAND report estimates job losses at approximately 128,000.) Stiglitz concludes that "[e]ach displaced worker at the bankrupt firms will lose, on average, an estimated $25,000 to $50,000 in wages over his or her career" and will suffer "roughly $8,300 in pension losses, which represent[s], on average, a roughly twenty-five percent reduction in the value of the 401(k) account." Joseph E. Stiglitz, Jonathan M. Orszag, & Peter R. Orszag, "The Impact of Asbestos Liabilities on Workers in Bankrupt Firms" (December 2002) at 3.

The direct costs of asbestos-related bankruptcies can be very substantial. Owens Corning, for example, recently disclosed that, in approximately two years, it has incurred $200 million in legal and consulting fees. These costs directly reduce the funds available to pay claimants.

Bankruptcy has not helped seriously ill asbestos claimants, either. Claims payments stop immediately when bankruptcy is declared and do not resume for several years, and then at significantly reduced values. The Manville Trust is currently paying only five cents on the dollar to claimants. Due to the flood of non-impairment claims, the Trust reports that, over the last five years, it has paid more money to claimants who describe themselves as unimpaired than it has to mesothelioma claimants.

Once a lawsuit is filed, unimpaired claimants may choose to resolve their claims for minimal values, executing a complete release. For the vast majority who never develop a disabling asbestos-related disease, the money is arguably a windfall. For those who later develop mesothelioma, the filing and resolution of a premature claim and execution of a full release can become a haunting mistake.

It is for these reasons, as well as concerns over the availability of fair compensation for seriously ill asbestos disease victims, that many disparate voices have joined in the call for change. The flood of non-impairment claims generated by litigation screenings crowd active litigation dockets, lengthening delays in the disposition of mesothelioma and other serious injury claims. The President-Elect of the ABA, Dennis W. Archer, and the members of the Commission believe that the flood of asbestos cases fully justifies limited Federal intervention with respect to statutes of limitation and impairment criteria. However, this Commission has not addressed broader legislative solutions that have been discussed by others. The ABA's present policy believes that any asbestos legislation should infringe on state law only to the extent necessary to achieve the goal of ensuring that the justice system operates to equitably compensate those who

# 302

are injured by asbestos.  We believe the Commission's recommendations are consistent with this policy.

## II.      The Commission's Process

Guided by the foregoing principles, the Commission began its arduous task and after careful study and deliberation, with the help of the medical profession, developed its recommendation and report. The Commission held 4 one-day meetings in the Chicago headquarters office and numerous lengthy conference calls.  The Commission reviewed voluminous materials including, but by no means limited to, court orders from state and federal courts, medical and legal articles, including studies from organizations such as RAND, settlement agreements covering non-malignant claims, and statements of medical organizations such as the American Medical Association and the American Thoracic Society.

With the assistance of the American Medical Association, in addition to the individual experience of Commission members, a group of ten of the nation's most prominent physicians in the area of pulmonary function were identified and interviewed at length at the Chicago offices and in numerous subsequent telephone conferences. These physicians volunteered their time and energy to explain not only their clinical experience in the care and treatment of individuals with asbestos related disease, but to discuss their personal involvement in the medical/legal issues surrounding asbestos injury claims. The doctors interviewed by the Commission represented a cross-section of experts in this area – some had testified for plaintiffs in asbestos litigation, some had testified for defendants, some for both and some for neither. The physicians are: Dr. Robert Crapo, Pulmonologist at the University of Utah School of Medicine; Dr. David W. Cugell, Professor of Medicine of the Feinberg School of Medicine, Northwestern University; Dr. Paul Epstein, Clinical Professor of Medicine, Pulmonary Medicine at Penn Medicine at Radnor; Dr. Gary Friedman of the Texas Occupational Medicine Institute in Houston, Texas; Dr. Edwin Holstein, Environmental Health Associates, Boston; Dr. Paul Kvale, Chairman of the Pulmonary Medicine Department of the Henry Ford Hospital, in Detroit; Dr. Stephen Levin from the Occupational Medicine Department at Mount Sinai Hospital in New York; Dr. Neil MacIntyre, Professor of Medicine at Duke University; Dr. Albert Miller, who had been with the Mount Sinai Hospital and is now with St. Vincent Catholic Medical Center of Brooklyn and Queens; and Dr. Christine Oliver, Occupational Health Initiative, Boston.   Additionally, the Commission members separately interviewed other physicians with whom their personal and professional experience provided a consulting relationship, including experts in internal medicine and epidemiology.

The Commission is aware of, and considered, the situation of the residents of Libby, MT. Their plight is exacerbated by the fact that their recourse is limited to claims against W.R. Grace, which has filed for bankruptcy reorganization due to asbestos claims. The Commission reviewed reports suggesting that the Libby exposure causes an unusually aggressive and progressive form of asbestos pleural disease that rapidly produces increasing pulmonary function impairment. The Commission believes that its recommendations, by curtailing the flow of money to claimants who have no present functional impairment, will help preserve the assets of W.R. Grace for persons such as Libby residents both now and in the future.

**302**

### III.    The Standard Recommended By the Commission

The bulk of the Commission's work focused on developing objective medical criteria that identify individuals with non-malignant asbestos-related disease causing functional impairment and separate out cases where either the individual has no functional impairment or is impaired solely by some other cause, such as asthma, emphysema or smoking. The physicians interviewed by the Commission almost uniformly agreed that this can be done and substantially contributed to the development of the Commission's proposed Standard.

Similar criteria have been in use in many areas of the asbestos litigation for years. Several courts (including courts in Massachusetts, Chicago, Baltimore and, most recently, New York City) have used medical criteria to place unimpaired claimants on "pleural registries" or inactive dockets that keep such cases dormant until the claimant becomes impaired. Many private settlement agreements between defendants and plaintiffs' firms use such criteria, and courts have found such criteria to be fair. However, rather than adopt existing criteria from some other source, the Commission based its criteria on the input from the pulmonologists it interviewed, which included doctors who had testified for both plaintiffs and defendants in asbestos litigation. As a result, while the Commission's recommended criteria are similar to many of those already in use, it is not identical to any of them.

Each of the doctors interviewed by the Commission independently stated that the diagnosis of asbestos-related pleural disease, and particularly asbestosis, requires assessment of a number of factors including the review of chest x-rays, pulmonary function tests, latency, and the taking of a complete occupational, exposure, medical and smoking history. Because many symptoms and findings are not specific to asbestos-related disease, this approach is necessary to enable a physician to exclude other more probable causes for various findings. This then enables the physician to support a conclusion that the patient's medical condition is the result of asbestos exposure. These types of requirements are typical for assessment of disability or impairment under various legislative and regulatory systems, including Social Security, the Federal Employees Compensation Act (FECA), and state worker compensation programs.

As a result, the Commission's medical criteria in the recommended Standard include several elements. There was virtually unanimous agreement among the doctors that diagnosis of asbestosis that causes functional impairment requires several components, including (1) a history of occupational and other asbestos exposure, as well as a complete medical and smoking history, (2) a latency period of at least 15 years between asbestos exposure and the onset of disease, (3) an x-ray or other radiographic reading that suggests the presence of asbestosis, and (4) pulmonary function test ("PFT") results that establish decreased lung function and rule out the probability that the impairment was caused solely by something other than asbestos. Each of these requirements is incorporated into the Commission's recommended Standard, but certain key issues are discussed more fully below.

In drafting this Standard, the Commission has attempted to achieve its goal of deferring only those claims involving individuals who have no functional impairment as a result of exposure to asbestos. As will be seen below, in several instances the Standard adopts less restrictive alternatives than some physicians recommended. The Commission recognizes that the

12

**302**

effect of this may be to allow claims that do not really belong in the tort system, but prefers to take that approach rather than to unfairly exclude any significant number of deserving claims. As a result, however, the Commission strongly feels that to weaken the Standard further would render it ineffective in achieving its goal of ending the flood of premature claims that clog the courts and sap resources from the system and from truly sick claimants. Accordingly, the Commission believes that its Standard should be adopted "as is."

### A.    X-ray Standards

A positive x-ray reading is almost always viewed as a necessary component of the diagnosis of asbestosis. It is not by itself a finding of functional impairment or a diagnosis of asbestos-related disease. X-ray readings have governing standards, but often depend upon the judgment of the individual doing the reading. All of the doctors interviewed by the Commission believed, and most had seen extensive examples, that x-ray readings can be subject to bias and have been increasingly abused in many of the litigation screenings discussed earlier in this report.

1.    **ILO Readings**: The International Labor Office, in an attempt to standardize the classification of chest x-rays involving pneumoconiosis, created the ILO scale as a means of grading dust-related changes on chest x-rays. The ILO scale attempts to gauge the severity of the irregularities found by the reader, using a scale from 0 (normal) to 3. A grade of 0/0 would indicate a normal lung. A grade of 1/0 indicates that the reader found evidence of lung irregularities – the "1" – but also considered whether the x-ray should be read as normal, or "0." A reading of 1/1 means that the reader found clear evidence of lung irregularities, and is a stronger finding than a 1/0. A 2/1 or greater normally indicates more extensive lung abnormalities.

The ILO has stated that a 1/1 reading is an important factor in the diagnosis of asbestosis, but allows a diagnosis of mild asbestosis based upon a chest x-ray reading graded 1/0 in the presence of other confirming diagnostic findings. However, some settlement agreements and court orders creating "inactive dockets" have used 1/1 as an appropriate standard. The doctors interviewed by the Commission agreed that there have been numerous instances of probable bias and over-diagnosis, primarily based on x-ray readings from mass screenings. Most doctors interviewed had seen hundreds or even thousands of examples of over-reading of x-rays for litigation purposes. One doctor concluded after reviewing 15,000 cases of asbestos disease previously diagnosed on x-ray readings alone that only 10% of the persons could validly be diagnosed with asbestosis. Another doctor reported a 62% error rate on review of x-ray screening results previously read as "consistent with asbestosis." Another doctor's research of 22,000 asbestos-related bankruptcy claims found a presumptive x-ray review error rate of up to 86% among 5 readers, none of whose results matched the general patterns in epidemiological studies.

These and similar anecdotes, as well as the findings of courts and audits discussed in section I.A., clearly illustrate a widespread pattern of x-ray over-reading in litigation screenings. A number of doctors described the negative impact on patients of these misdiagnoses. They had dealt with many instances of unnecessary distress and confusion caused in individuals who had

been given "diagnoses" of asbestosis (or conditions "consistent with" asbestosis) through litigation-based x-ray screenings, when the individuals had no evidence of disease at all.

As a result of this evidence, the Commission gave strong consideration to requiring a reading of 1/1 to offset the inherent litigation bias associated with litigation-based x-ray readings. Several of the doctors consulted by the Commission recommended that a 1/1 standard be implemented. Others, although favoring a 1/0, cautioned that such a standard assumes impartial readings that are conservative and unbiased, and preferred a system that would utilize an impartial panel of B readers who had no financial incentive in the litigation or diagnosis process. However, the Commission recognized the many issues inherent in establishing an independent panel of B readers and did not consider the creation of such a panel to be either necessary or feasible.

After extensive discussion, the Commission elected to incorporate a 1/0 standard into its medical criteria, for several reasons. First, as stated above, the Commission intends that its standards not be unfairly exclusionary. Second, some doctors indicated that there appears to be little difference in the error rate whether one looks at 1/0 or 1/1 readings. Stated another way, B readers who over-read x-rays as 1/0 for litigation purposes might just as easily over-read them as 1/1 if necessary to meet a medical standard. Finally, properly administered PFT's (discussed below) are the most important screening tool to determine significant asbestos-related functional impairment, and x-ray readings are of lesser importance.

2.      **B readers:** The minimum standard recommended by the Commission requires a positive chest x-ray finding by a NIOSH certified B reader. A B reader is a person, usually but not necessarily a doctor, who has passed the tests necessary for certification that he or she is qualified to read x-rays according to ILO standards. The requirement of a B reading in the proposed medical criteria reflects the Commission's attempt to create a uniform standard for the diagnosis of nonmalignant asbestos-related disease. The Commission also notes that B readings are already prevalent in asbestos litigation.   The Commission acknowledges that many physicians who are not certified B readers are still qualified to read chest x-rays for the presence or absence of asbestos-related disease, but the Standard adopts the B reader requirement in an attempt to obtain uniform standards.

3.      **CT Scans:** A number of medical experts consulted by the Commission felt that both computer tomography scans and high-resolution computer tomography scans (CT & HRCT) can be useful diagnostic tools in distinguishing asbestosis and asbestos-related pleural disease from other chest abnormalities.  However, these doctors acknowledged that no objective standard analogous to the ILO B reading scale for grading chest x-rays exists for the grading of CT and HRCT Scans. The lack of applicable standards compelled the Commission to require a positive B reading of a chest x-ray as the minimum radiologic diagnostic standard, rather than positive CT or HRCT Scans.

**B.      Pulmonary Function Tests**

The Commission's proposed Standard requires that a claimant meet certain requirements on pulmonary function tests. The PFTs in the Standard demonstrate functional impairment, and

**302**

also demonstrate that the impairment is of the type (restrictive impairment) that can be caused by asbestos exposure.

1. **Testing methodology:** It is generally accepted that pulmonary function testing provides the primary objective basis for assessment of functional impairment. However, the results of such testing can be affected by patient effort as well as technical deficiencies. Many of the doctors who met with the Commission believe that adherence to test quality standards has eroded in the asbestos litigation arena.

The American Thoracic Society (ATS) in their 1991 and 1994 Official Statements published technical standards for pulmonary function testing, including equipment, methods of calibration, technique and interpretation. Virtually all of the physicians consulted by the Commission agreed that PFT's used for purposes of satisfying the medical criteria should meet the ATS technical criteria. This includes attachment of all test results and appropriately labeled spirometric tracings. One physician who met with the Commission, who has never testified in asbestos litigation, has evaluated tens of thousands of pulmonary function test results. He believes that ATS technical criteria are met in only 1% of the cases he has seen arising from litigation; in contrast, pulmonary function results outside the litigation/claims arena meet ATS technical criteria 90% of the time.

The Commission strongly believes that PFT's must be conducted according to ATS testing standards to be reliable for use in medical criteria. In addition, to ensure compliance with quality standards, the Standard requires that all PFT reports be included as attachments. This should not be an undue burden on claimants since, under the proposed Standard, they are required to have had these tests prior to filing their claim.

2. **Impairment measures:** The proposed criteria include several measures of impairment. These are discussed below.

*Forced Vital Capacity*: Asbestosis can cause *restrictive* lung disease. The scarring of the lung caused by asbestosis reduces the capacity of the lung to retain and expel air. This type of lung condition is normally measured by Forced Vital Capacity (FVC), the amount of air that the lung exhales during a standard pulmonary function test. The proposed criteria require that to demonstrate impairment, a claimant demonstrate Forced Vital Capacity "below the lower limit of normal." The Commission considered whether to select a particular standard to use as "normal," but elected not to do so in order to allow medical science to continue to develop in this area. The Commission does note, however, that some standards suggest the use of racial adjustment factors in determining the measure of lung capacity. The Commission expressly intends that racial adjustment factors not be used in applying its medical criteria. Omitting these racial adjustments will have the effect of qualifying additional claims, rather than excluding claims, but is consistent with fairness and the Commission's desire that its standard be inclusive rather than overly exclusive.

*FEV1/FVC ratio*: It is critical to distinguish *restrictive* lung disease, which can be caused by asbestos, from *obstructive* lung disease, which is normally associated with smoking and is not associated with asbestos exposure. (Although some physicians believed that asbestosis causes a lung abnormality known as small airways obstruction, this is distinct from large airways obstruction, or chronic obstructive pulmonary disease, associated with smoking.) This is important because the population of persons exposed to asbestos includes a high percentage of

15

**302**

smokers. When obstructive lung disease is present, the amount of air that can be expelled in the first second of a pulmonary function test falls faster than the amount that can be exhaled in the entire test. As a result, a low ratio of FEV1 (the amount of air that can be exhaled in the first second of the test) to FVC (the total amount of air exhaled during the test) indicates obstructive, rather than restrictive, lung disease. A ratio that is within normal limits is consistent with restrictive disease, assuming other tests of restrictive disease are also met, because the amount of air expelled in the first second does not fall faster than the total amount of air that can be expelled. Thus, the criteria adopt a commonly used measure that requires the FEV1/FVC ratio to be above the lower limit of normal, in order to exclude cases where the impairment is obstructive rather than restrictive.

*Total Lung Capacity:* An alternative method of determining restrictive impairment is Total Lung Capacity ("TLC"). Restrictive lung disease (which can be asbestos-related) reduces the total capacity of the lung, while obstructive disease (usually associated with smoking) usually does not. Thus, a TLC below the lower limit of normal would be consistent with restrictive disease but not with obstructive disease. Many doctors believe TLC's are more accurate in screening out obstructive cases than the FEV1/FVC ratio discussed above, which can result in "false positives" – findings of restriction in individuals that do not have it. However, TLC tests can be slightly more costly and less widely available than the other tests described above, and the Commission's Standard does not require them, notwithstanding that they may be the best evidence of restrictive impairment. Rather, in keeping with the Commission's goal of being overly inclusive rather than unduly strict, the Standard allows claimants to meet the impairment definition through the use of *either* FEV1/FVC ratio or TLC test results.

*Paragraph 4c ("Backstop" provision):* There were additional pulmonary function findings suggested by one or more of the doctors as possible ways to identify asbestos-related restriction in a small minority of individuals who have other unrelated lung problems, such as chronic obstructive pulmonary disease.  Other doctors rejected these suggested findings as unreliable, non-specific, or otherwise inappropriate.  Rather than attempt to resolve these disputes, the Commission drafted a provision (paragraph 4c)) that would allow some claimants to file suit even if they fail to meet the criteria set forth in paragraphs 4a) or 4b).

The physicians agreed that the overwhelming majority of persons who were functionally impaired as a result of non-malignant asbestos disease would meet the criteria of either paragraph 4a) or 4b).  However, it is possible that in unusual cases, some legitimate claim might be excluded. In view of the overwhelming consensus of the doctors on the fairness of the basic criteria, the Commission felt it inappropriate to draft the general Standard based on these rare cases. Instead, the Commission adopted a "backstop" provision so that in cases of clear disease (defined in the Standard as a person whose x-ray grades at 2/1 or higher under the ILO system), a treating physician's detailed opinion that the person suffers from restrictive impairment due to asbestosis is sufficient to allow the claimant to proceed.

## C.    Medical Report and Diagnosis

The Commission heard extensive evidence, some of which is discussed above, that the huge increase in claims from unimpaired claimants is caused by litigation screenings that do not comply with generally accepted clinical standards. In many cases, claimants are never seen by a licensed physician and no "diagnosis" has been made. The Commission believes that cases of

16

**302**

abuse will be minimized if true medical standards are observed. In addition to the requirement discussed above that PFT tests meet ATS standards and that supporting documentation be filed with the complaint, the Commission's proposed criteria require a detailed narrative Medical Report and Diagnosis signed by the diagnosing doctor. The Commission believes that such a requirement will dramatically enhance the integrity of the process by requiring that a licensed physician take responsibility for the diagnosis. Similar requirements exist today in many state statutes relating to medical malpractice and have helped to raise the standard for filing such cases. The Commission believes that the indisputable impact of for-profit litigation screenings that lack appropriate medical oversight justifies the simple requirement proposed in the Commission's criteria. The Commission believes that the integrity of the physician community, perhaps even more than the tests described above, is a key safeguard against the abuses that have been prevalent in the asbestos litigation.

**IV.   Recommended Changes to the Statute of limitations**

The Commission strongly believes that it would be unfair to require that claimants wait to file suit until they develop the level of functional impairment required by the Standard, if a statute of limitations could simultaneously be running against them. Thus, in any legislation deferring asbestos-related claims involving no functional impairment, the Commission recommends that there be a concomitant provision tolling any otherwise applicable statute of limitations until the required level of diagnosis is met.  No other changes in state statute of limitations are proposed.

**V.   Scope of the Commission's Recommendations**

With few exceptions, the American Bar Association has long and consistently opposed the enactment of federal legislation that would attempt to create a national body of tort law that would apply in the fifty state justice systems.  In addition to the February 1981 and February 1983 policies discussed earlier in this report, the ABA has adopted numerous other policies over the years that oppose the federalization of the tort laws in a host of areas.  It has been the ABA's position that the state courts and legislatures are normally the appropriate bodies to develop product liability laws and that, *except in discrete circumstances*, Congress should not substitute its judgment for systems that have evolved in each state.  However, the ABA has supported limited federal legislation in such circumstances when there exists a legitimate concern that can best be addressed by narrow federal legislation – and has since 1983 identified asbestos litigation as one such area. Asbestos litigation presents unique challenges for this country's civil justice system, and requires a national solution.

The Commission on Asbestos Litigation has drafted its recommendation with the intention that the ABA should support federal legislation that establishes medical criteria and provide for a waiver of the statute of limitations until those criteria are met. The Commission's recommendations do not propose to create original federal jurisdiction for the prosecution of asbestos claims to the extent that such jurisdiction does not currently exist.   This recommendation is also not intended in any way to create artificial barriers to the filing of a cause of action.

**302**

**VI.    The Need for the House of Delegates to Adopt Policy on this Issue at the February Midyear Meeting**

In the 107th Congress, the Senate Judiciary Committee held hearings on asbestos litigation on September 25, 2002.  The hearings were held to lay the groundwork for attention to the issue in the 108th Congress.  In this 108th Congress, Congressional leaders from both parties are currently working to address the situation.  Senate Judiciary Committee Chairman Orrin Hatch (R-UT) and Ranking Minority Member Patrick Leahy (D-VT) are reported to be working together to develop legislation in this area. Legislation is likely to be introduced well before the Annual Meeting of the American Bar Association in August.  In fact, on January 15, 2003, the *Congressional Daily AM* reported that Senator Hatch is "apt to introduce a bill in March, possibly in conjunction with Senate Judiciary ranking member Patrick Leahy (VT). Leahy's and Hatch's staffs have been working together to seek consensus on a 'medical criteria' bill that puts those already sick in line for compensation ahead of those with only an exposure to asbestos." In the House, it has been reported that Representatives Christopher Cannon (R-UT) and Calvin Dooley (D-CA) are working together on asbestos legislation.

In order for the ABA to have a voice in the Congressional debate, it is imperative that the House of Delegates adopt this policy at this Midyear Meeting.  ABA leaders and ABA Governmental Affairs staff have been told by members of Congress and their staffs that ABA views on this legislation would be most welcome.

The Members of Commission on Asbestos Litigation are:  Honorable Nathaniel R. Jones, Ret., Chair; Harold S. Barron; Paulette Brown; David Christensen; Robert A. Clifford; Stanley Ferguson; Julia Bennett Jagger; Steven Kazan; Peter A. Kraus; Robert S. Krause; and Philip McWeeny.

Respectfully submitted,


Honorable Nathaniel R. Jones, Ret., Chair
Commission on Asbestos Litigation


February 2003

18

**302**

GENERAL INFORMATION FORM

Submitting Entities:       Commission on Asbestos Litigation

Submitted By:           Honorable Nathaniel R. Jones, Ret., Chair, Commission on
                                   Asbestos Litigation

1.      <u>Summary of the Recommendation</u>

That the American Bar Association supports enactment of federal legislation
consistent with the ABA Standard that would: 1) allow those alleging non-
malignant asbestos-related disease claims to file a cause of action in state or
federal court only if they meet the medical criteria in the ABA Standard; 2) toll all
applicable statutes of limitations until such time as the medical criteria in the
ABA Standard are met.

2.      <u>Approval by Submitting Entity.</u>

The Commission on Asbestos Litigation approved the recommendation on
Sunday, January 26, 2003.

3.      <u>Has this or a similar recommendation been submitted to the House of Delegates
or Board of Governors previously?</u>

No

4.      <u>What existing Association policies are relevant to this recommendation and how
would they be affected by its adoption?</u>

In February 1983, the ABA adopted policy supporting federal legislation which
addresses the issues of liability and damages with respect to claims for damages
against manufacturers by those who contract an occupational disease (such as
asbestosis) when: a) there is a long latency period between exposure to the
product and manifestation of the disease; b) the number of such claims and the
liability for such damages in fact threaten solvency of a significant number of
manufacturers engaged in interstate commerce; and c) the number of such claims
have become clearly excessive burdens upon the state and federal judicial
systems.  If this recommendation is adopted it would not affect the February 1983
policy.

5.      <u>What urgency exists which requires action at this meeting of the House?</u>

19

**302**

Senate Judiciary Committee Chairman, Orrin Hatch, (R-UT) and Ranking Minority Member Patrick Leahy (D-VT) are working together to develop legislation in this area. They are expected to introduce their legislation well before the Annual Meeting of the American Bar Association in August. In order for the ABA to have a voice in the Congressional debate, it is imperative that the House of Delegates adopt policy at this Midyear Meeting.

6.   Status of Legislation. (If applicable.)

In the 107th Congress, the Senate Judiciary Committee held hearings on asbestos litigation on September 25, 2002. No legislation has yet been introduced in the 108th Congress.

7.   Cost to the Association. (Both direct and indirect costs.)

There are no costs to the Association

8.   Disclosure of Interest. (If applicable.)

Members of the Commission on Asbestos Litigation represent clients who would be affected by enactment of the legislation. Adoption of the proposed resolution contained herein may benefit these clients, whether plaintiffs or defendants, and may benefit all litigants by protecting the rights of claimants when they suffer from asbestos-related diseases and preventing scarce judicial and party resources from being misdirected because of a flood of premature claims.

9.   Referrals.

A copy of the recommendation has been submitted to the chairs of all ABA Sections and Divisions and Standing and Special Committees and Commissions.

10.   Contact person. (Prior to the meeting).

Dennis W. Archer
Dickinson Wright PLLC
500 Woodward Ave., Suite 4000
Detroit, MI  48226
313/223-3630
Fax: 313/964-2437
Email: darcher@dickinson-wright.com

**302**

11. <u>Contact Person</u>. (Who will present the report to the House).

Honorable Nathaniel R. Jones, Ret.
Blank Rome Comisky McCauley LLP
201 E. Fifth Street, Suite 1700
Cincinnati, OH  45202-4156
513/362-8772
Fax:  513/362-8773
jones-n@blankrome.com