# EXHIBIT A

THOMAS W. BEVAN, ESQ. - 02/21/2018

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF NEW JERSEY

 3

 4   KIMBERLEE WILLIAMS,        ) CASE NO. 2:11-CV-01754
     et al.,                   ) (JLL)(JAD)
 5                             )
              Plaintiffs,       )
 6                             )
     versus                    )
 7                             ) DEPOSITION OF
     BASF CATALYSTS, LLC,       )
 8   et al.,                   ) THOMAS W. BEVAN, ESQ.
                               )
 9              Defendants.     )

10
                    - - - - - - - -
11

12        Deposition of THOMAS W. BEVAN, ESQ., a Witness

13   herein, called by the Defendants for Cross-Examination

14   pursuant to the Federal Rules of Civil Procedure, taken

15   before me, the undersigned, Anika W. Patrick, a

16   Registered Merit Reporter, Certified Realtime Reporter

17   and Notary Public in and for the State of Ohio, at the

18   offices of Thompson Hine, LLP, 3900 Key Center, 127

19   Public Square, Cleveland, Ohio, on Wednesday, February

20   21, 2018, at 11:49 a.m.

21

22

23

24

25
```

THOMAS W. BEVAN, ESQ. - 02/21/2018          Pages 2..5

Page 2

1   APPEARANCES:
2
3        On Behalf of the Plaintiffs:
4            Harry M. Roth, Esq.
             Jared M. Placitella, Esq.
5            Cohen, Placitella & Roth
             Two Commerce Square
6            2001 Market Street, Suite 2900
             Philadelphia, Pennsylvania 19103
7            215.567.3500
             hroth@cprlaw.com
8            jmplacitella@cprlaw.com
9        On Behalf of the Defendant BASF Catalysts, LLC:
10           Peter A. Farrell, Esq.
             Eugene F. Assaf, Esq.
11           Elizabeth Dalmut, Esq.
             Kirkland & Ellis, LLP
12           655 Fifteenth Street, Northwest, Suite 1200
             Washington, D.C. 20005
13           202.879.5000
             Peter.farrell@kirkland.com
14           Eugene.assaf@kirkland.com
             Elizabeth.dalmut@kirkland.com
15
16       On Behalf of the Defendants Cahill Gordon &
         Reindel, LLP, Howard G. (Peter) Sloane, and Ira J.
17       Dembrow:
18           Anthony Vale, Esq.
             Pepper Hamilton, LLP
19           3000 Two Logan Square
             Eighteenth and Arch Streets
20           Philadelphia, Pennsylvania 19103-4750
             215.981.4000
21           valea@pepperlaw.com
22
23
24
25

Page 3

1   APPEARANCES (Continued):
2
3        On Behalf of the Defendant Thomas D. Halket: (Via
         Telephone):
4            Eric Tunis, Esq.
             Herold Law, PA
5            25 Independence Boulevard
             Warren, New Jersey 07059
6            908.647.1022
             Etunis@heroldlaw.com
7
8        On Behalf of the Defendant Arthur Dornbusch (Via
         Telephone):
9
10           John A. Boyle, Esq.
             Marino, Tortorella & Boyle, PC
11           437 Southern Boulevard
             Chatham Township, New Jersey 07928
12           973.824.9300
             Jboyle@khmarino.com
13
14       On Behalf of the Bevan Law Firm:
15           Brendan Little, Esq.
             Levy Konigsberg, LLP
16           800 Third Avenue, 11th Floor
             New York, New York 10022
17           212.605.6200
             blittle@levylaw.com
18
                    - - - - - - -
19
20
21
22
23
24
25

Page 4

1                    I N D E X
2
3   EXAMINATION BY                              PAGE
4   Mr. Farrell                                   5
5
6   PLAINTIFF'S EXHIBITS MARKED
7   None
8
9   DEFENDANT'S EXHIBITS MARKED                 PAGE
10  60, November 2016 Subpoena to Bevan Law Firm  9
11  61, Order ECF number 381 and 382             12
12                   - - - - - - -
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1   WHEREUPON,
2                    THOMAS W. BEVAN, ESQ.,
3        after being first duly sworn, as hereinafter
4        certified, testified as follows:
5                    CROSS-EXAMINATION
6   BY MR. FARRELL:
7   Q.   Good morning, Mr. Bevan.  I see you have some
8        documents and materials with you.  Can you tell me
9        what you brought with you today?
10  A.   My newspaper, my calendar, my pad of paper, a
11       bunch of business cards, a bunch of political
12       stuff.
13  Q.   Any documents that relate to the Williams case?
14  A.   No.
15  Q.   Have you ever been deposed before?
16  A.   Yes.
17  Q.   Can you tell me every case in which you've given
18       deposition testimony?
19  A.   I gave -- I gave a deposition in a case involving
20       a lawsuit against a former attorney in my law
21       firm.  I gave a deposition in a malpractice case
22       against my law firm, and I gave a deposition in a
23       case that my law firm had filed against the Ohio
24       Bureau of Workers' Compensation.
25  Q.   What was the subject matter of the malpractice

THOMAS W. BEVAN, ESQ. - 02/21/2018          Pages 6..9

Page 6

1    case?
2         MR. ROTH:  If -- I mean, we're taking a
3    corporate -- not a corporate, a records
4    deposition here, so if you want to ask these
5    substantive questions about his experience as
6    a witness, that's fine, but this could be
7    anybody.
8         MR. FARRELL:  We're two minutes in a
9    deposition where you were noting the length
10   of time and we're already into speaking
11   objections.  I'm setting up a question as to
12   whether it relates to this case and whether
13   there are documents.
14   Q.  Do you have a copy of the deposition testimony you
15   gave in the three cases you listed?
16   A.  I don't know.
17        MR. BOYLE:  Hi, this is John Boyle.  Has
18   the deposition started?
19        MR. FARRELL:  Yes.
20   Q.  Is that something you can check on, as to whether
21   you have the deposition transcripts from any of
22   those three cases?
23   A.  Yes.  And to be clear, I doubt that I have the
24   transcript on the first two depositions that I
25   mentioned.  The last deposition in the case

Page 7

1    against the Bureau of Workers' Compensation I may
2    have, but I could check on that fairly easily.
3    Q.  Did the litigation relating to the former attorney
4    of your firm or the malpractice case relate to
5    your handling of asbestos litigation matters?
6    A.  The malpractice case involved an asbestos workers'
7    compensation claim that a former associate of the
8    law firm was handling.
9    Q.  You know the name of that case?
10   A.  The individual's name was Clayton Cook.
11   Q.  And he alleged that your firm had mishandled the
12   case in some way?
13   A.  Yeah, the former associate had not filed something
14   that he was supposed to file on the workers'
15   compensation claim.
16   Q.  Did the case relate to the tire worker litigation
17   at all?
18   A.  I don't know what you mean by "tire worker
19   litigation," but this man was not a tire worker.
20   Q.  You don't know what I mean by the tire worker
21   litigation?
22   A.  I don't know what you mean by tire worker
23   litigation.
24   Q.  You've been filing cases on behalf of current and
25   former tire workers for more than two decades,

Page 8

1    correct?
2    A.  I have filed probably in the neighborhood of in
3    excess of a thousand, maybe 2- or 3,000 cases of
4    people that were tire workers at one point in
5    time.  I call them rubber workers.
6    Q.  So you can check and then let Mr. Roth know
7    whether you have the deposition transcripts from
8    any of these three cases?
9    A.  Sure.
10   Q.  Has anybody else from your firm given deposition
11   testimony?
12   A.  I think in the case involving the Bureau of
13   Workers' Compensation, that yes, Pat Walsh gave a
14   deposition in that case.
15   Q.  So same request there, you'll check if you have
16   the transcript and provide it to Mr. Roth?
17   A.  Yes.
18   Q.  Has anybody from your firm given testimony as a
19   records custodian?
20   A.  I don't believe so.
21   Q.  Have you ever given live testimony outside of a
22   deposition?  A trial, a hearing, anything like
23   that?
24        MR. ROTH:  Objection.
25   A.  I believe in a hearing, yes.

Page 9

1    Q.  What hearing was that?
2    A.  I believe that involved the case of a former
3    attorney of our law firm.
4    Q.  The first case you mentioned?
5    A.  The first case I mentioned, yes.
6    Q.  Do you know the name of that case?
7    A.  I believe it was something along the lines of
8    Bevan & Associates versus Raymond Powell.
9    Q.  Okay.  Where was that filed?
10   A.  Summit County, Ohio.
11   Q.  So was the hearing in the Summit County
12   Courthouse?
13   A.  Yes.
14        (Whereupon, Defendant's Exhibit 60 was
15        marked for identification.)
16   Q.  Let me show you what we've premarked for
17   identification as Defense Exhibit 60.  This is a
18   copy of the November 21st, 2016 subpoena that BASF
19   served on the Bevan Law Firm in the Williams case.
20   I take it you've seen this before?
21   A.  I believe I've seen this, yes.
22   Q.  You have seen this before?
23   A.  I believe I have.  Just looking at it, just looked
24   at the first few pages, I think I've seen this.
25   Q.  But you're not sure if you've seen it before?

THOMAS W. BEVAN, ESQ. - 02/21/2018     Pages 10..13

Page 10

1   A.   I am not positive, but I think I have.
2   Q.   Were you the person at the Bevan Law Firm who was
3        responsible for responding to the subpoena on
4        behalf of your firm?
5   A.   I was the head person responsible, yes.
6   Q.   Why do you say "the head person"?
7   A.   Well, I didn't do everything involved in it, but I
8        oversaw it all.
9   Q.   Who else was involved in responding to the BASF
10       subpoena?
11  A.   It would be Erin Clark in my firm and Pat Walsh.
12  Q.   Erin Clark is a paralegal at your firm?
13  A.   Yes.
14  Q.   And Mr. Walsh is an associate?
15  A.   Well, he's my partner in the law firm.
16  Q.   He's a partner.  Anyone else?
17  A.   I don't recall anyone else.
18  Q.   Are there any documents in the possession, custody
19       or control of the Bevan Law Firm that are
20       responsive to that subpoena that have not yet been
21       produced or logged?
22  A.   No.
23  Q.   So that's not correct, right?  We know there's at
24       least some e-mails that have not yet been logged
25       that were just produced to BASF last night,

Page 11

1        correct?
2   A.   I don't know what you're talking about.
3   Q.   You weren't aware that a batch of Bevan Law Firm
4        e-mails were produced to BASF last night in the
5        Williams case?
6   A.   I don't know what was produced last night.
7   Q.   Who would know that?
8   A.   Well, it sounds like you know it and I assume
9        whoever -- if somebody produced something to you,
10       they would know it.
11  Q.   Okay.  We'll get back to that.  So to your
12       knowledge, every document that your firm has in
13       its possession, custody or control that's
14       responsive to BASF's subpoena has either been
15       produced to BASF or put on a privilege log?
16  A.   I will say that it's been -- as I have not had
17       direct involvement with you, I have not given
18       anything to BASF or any of the defense counsel.
19       Anything that I've given, I have given to counsel
20       that's representing the plaintiffs or that's
21       representing the firm.
22  Q.   Okay.  But you're here in the capacity as the
23       records custodian of your law firm, correct?
24  A.   Yes.
25  Q.   So as far as you're aware as the records custodian

Page 12

1        of your law firm, all documents that are
2        responsive to BASF's subpoena have either been
3        provided to Mr. Roth's law firm or put on a
4        privilege log?
5   A.   Correct.
6             (Whereupon, Defendant's Exhibit 61 was
7        marked for identification.)
8   Q.   Let me show you what we've premarked as Exhibit
9        Number 61.  This is actually two documents
10       together.  A November 30th, 2017 order from the
11       special master in the Williams case with ECF
12       number 381 on it and then a December 6th, 2017
13       amendment to that order with ECF number 382.  Have
14       you seen these documents before?
15  A.   I believe I have.
16  Q.   If you turn to page 3 of the first document,
17       ECF381, I'm looking at paragraph 4.
18            MR. ROTH:  I have two copies of 372.
19            MR. ASSAF:  Keep going.  We'll get you a
20       copy.
21  Q.   Paragraph 4 calls for the deposition that brings
22       us here today, correct?
23  A.   What I'm looking at, yes.  Exhibit 61, correct.
24  Q.   You have an ECF381 at the top, correct?
25  A.   I -- this says ECF372 at the top.

Page 13

1   Q.   The header, sir.
2   A.   Oh, up top.  Okay.  Document 381 at the very
3        center top, yes.
4   Q.   Okay.  Can you turn to paragraph 6 on page 4 of
5        the document we've marked as Exhibit 61?
6        Paragraph 6 says, "Further ordered that to the
7        extent written policies regarding document
8        retention exist, the request for an order
9        commanding the production of any document
10       retention policies or memoranda from Plaintiffs'
11       counsel and Bevan and the same hereby is granted."
12       Do you see that?
13  A.   Yes.
14  Q.   So there's -- this is a paragraph ordering the
15       production of document retention policies from the
16       Bevan Law Firm, correct?
17  A.   Yes.
18  Q.   And there's actually three components here.  One
19       is the Bevan Law Firm's document retention
20       policies, right?
21  A.   That's the way I read it, yes.
22  Q.   Two is any memoranda from Plaintiffs' counsel,
23       Mr. Roth's firm, sent to you calling for the
24       preservation of documents, correct?
25  A.   Yes.

THOMAS W. BEVAN, ESQ. - 02/21/2018        Pages 14..17

Page 14

1  Q.  And three is any memoranda from the Bevan firm
2      itself calling for the preservation of documents?
3  A.  I'm not sure where you're getting at that.
4  Q.  The third line from Plaintiffs' counsel and Bevan,
5      right?  So there's a separate memoranda from
6      Bevan.
7  A.  Okay.
8  Q.  So it's your understanding that paragraph 6 of
9      this order called for the production of any
10     memoranda that the Bevan Law Firm prepared calling
11     for the preservation of documents?
12         MR. ROTH:  Objection.  Form and
13         foundation.
14 A.  I -- you know, I can view it that way, sure.  I
15     don't have any objection to your characterization
16     of it.
17 Q.  You don't dispute it?
18 A.  No.
19 Q.  Okay.  No documents have been produced in response
20     to this paragraph 6 by the Bevan firm, correct?
21 A.  I don't believe so because I know we do not have a
22     document retention policy.  I don't recall ever
23     receiving a memoranda from Plaintiffs' counsel,
24     and I know I've never issued a memoranda regarding
25     preservation of any documents.

Page 15

1  Q.  So no one at the Bevan Law Firm issued a written
2      document hold notice in anticipation of filing the
3      Williams class action, correct?
4  A.  I'm not sure what a document hold notice is, but
5      nobody from my law firm ever issued any kind of a
6      written document saying not to destroy any
7      documents.
8  Q.  You're not even sure what a memoranda like that
9      would look like?
10 A.  I've never seen one in my firm.  We don't operate
11     that way.
12 Q.  How long has your firm been in existence?
13 A.  Well, in its formal version, since 1994, I think.
14 Q.  Since 1994?  Since 1994, has your firm ever sent
15     out a memorandum calling for the preservation of
16     documents?
17 A.  Not that I recall.
18 Q.  Does the professional responsibility insurer for
19     the Bevan Law Firm require a document retention
20     policy?
21 A.  I don't recall that ever being a requirement.
22 Q.  Is there any policy at the Bevan Law Firm
23     regarding the retention or destruction of
24     electronic documents?
25 A.  There's no formal policy, no.

Page 16

1  Q.  What is the informal policy?
2  A.  Well, I don't recall us ever destroying electronic
3      documents.
4  Q.  Is there any auto delete function in your e-mail
5      system, for example?
6  A.  I'm not sure what an auto delete function is, so I
7      don't know.  I don't believe.
8  Q.  Does the e-mail system at the Bevan Law Firm
9      automatically discard e-mails after a certain
10     period of time?
11 A.  I don't know.
12 Q.  Did you look into that before you came here to
13     testify as the Bevan records custodian?
14 A.  I don't think I did, no.
15 Q.  Is it something you could determine after the
16     deposition today?
17 A.  I'm not sure what you're asking for, so I don't
18     know the answer to that.
19 Q.  You're not familiar with the concept of an e-mail
20     system automatically deleting e-mails after a
21     certain period of time?
22 A.  No.
23 Q.  So your e-mail system at the Bevan firm retains
24     every e-mail that is sent and received for all
25     time?

Page 17

1  A.  I don't know.
2  Q.  Can you find out the answer to that question?
3  A.  I can try to find out the answer to that question.
4      I don't use a firm e-mail, if that's what
5      you're --
6  Q.  What e-mail do you use?
7  A.  I use AOL.  Same thing I've been using since 2000
8      or 2001.
9  Q.  Since 2000 you've been using an AOL e-mail
10     address?
11 A.  Maybe more recently.  I don't know.  Whenever I
12     started using e-mail.
13 Q.  Was your AOL e-mail account searched for e-mails
14     in response to BASF's subpoena?
15 A.  I searched it, yes.
16 Q.  How did you search it?
17 A.  I searched it for titles, Eastern Magnesia Talc,
18     talc, any word that I thought could have been
19     associated with it.
20 Q.  Did you prepare a list of search terms that were
21     used?
22 A.  No.
23 Q.  So it was just something you did on the spot?
24 A.  Something I did, yes.
25 Q.  What other search terms did you use other than

THOMAS W. BEVAN, ESQ. - 02/21/2018      Pages 18..21

Page 18

1  Eastern Magnesia Talc?
2  A.  I don't recall.  I'm sure talc would have been one
3      of them, just talc.
4  Q.  Any other -- other than those two, any other
5      search terms?
6  A.  I don't recall other search terms that I used.
7  Q.  BASF as a search term?
8  A.  I probably used BASF.
9  Q.  When did you do this search for e-mails in your
10     AOL account?
11 A.  Some time ago.  I don't recall when.
12 Q.  The last month?  The last three months?
13 A.  I would say the last six months.
14 Q.  Did you find any responsive documents in your AOL
15     e-mail account?
16 A.  I don't recall.  I don't recall.
17 Q.  Another thing that you could check on and find the
18     answer to?
19 A.  I could do it again.  I mean, I don't know -- I
20     don't have any paper trail.  I can do it again.
21 Q.  There's no paper trail at all regarding your
22     search for responsive e-mails in your AOL e-mail
23     account?
24 A.  Not that I'm aware of.  I don't know what kind of
25     paper trail there would be.

Page 19

1  Q.  You use this AOL e-mail account for all aspects of
2      your law practice?
3  A.  I do.
4  Q.  You communicate with clients through the AOL
5      e-mail account?
6  A.  Very rarely, but on occasion, yes.
7  Q.  Have you communicated with any of the five class
8      representatives in this case who had been
9      represented by the Bevan firm via your AOL e-mail
10     account?
11 A.  I don't believe so.
12 Q.  Do you communicate with any of your colleagues at
13     the Bevan firm through your AOL e-mail account?
14 A.  Probably occasionally.
15 Q.  Occasionally?  What sort of -- withdrawn.
16         Why do you say only occasionally?
17 A.  I don't know -- we're a small firm, so if I'm
18     going to talk to somebody, I usually go down the
19     hall and talk to them.  You know, there's probably
20     an occasional e-mail, hey, let's all meet at
21     such-and-such time or something like that.
22 Q.  Do you send and receive AOL e-mails on your phone?
23 A.  Yeah.
24 Q.  Did you check your --
25 A.  Well, I receive them.  I don't know if I ever

Page 20

1      send.  I may have sent something.
2  Q.  Did you check your phone for responsive e-mails?
3  A.  I didn't do anything on my phone.  I don't know
4      how I would do that.
5  Q.  So you haven't checked your phone to see whether
6      it contains e-mails that are responsive to BASF's
7      subpoena?
8          MR. ROTH:  Objection.
9  A.  I don't think so.  But my phone is AOL, so I check
10     it on my computer at work.
11 Q.  Does anybody else at the Bevan firm use an e-mail
12     account that's outside of the Bevan e-mail system?
13 A.  I think Pat Walsh uses AOL.  You know, probably
14     most of the attorneys are using something, you
15     know, private e-mail account.
16 Q.  Most of the attorneys at your firm are using
17     private e-mail accounts?
18 A.  We only have eight -- eight or ten attorneys, yes,
19     so I think most of them are.  I think.
20 Q.  Do all of the attorneys at your firm have a formal
21     Bevan firm e-mail account?
22 A.  I think so.
23 Q.  And then in addition to that, they all use a
24     private e-mail account of some sort to communicate
25     regarding firm business?

Page 21

1  A.  As best I know, yes.
2  Q.  Were all of the personal e-mail accounts of the
3      lawyers at the Bevan firm searched to determine
4      whether they had e-mails that are responsive to
5      BASF's subpoena?
6  A.  Anybody that would have had any relationship to
7      this asbestos litigation.
8  Q.  So who would that -- which custodians?
9  A.  It would be -- I don't know what you mean by which
10     custodian?
11 Q.  Which attorneys at the Bevan firm would have been
12     involved in the asbestos cases and therefore had
13     their e-mails checked?
14 A.  I believe it was Josh Grunda and Dave Bates, Pat
15     Walsh, and myself.
16 Q.  Just the four of you?
17 A.  As far as I know, yes.
18 Q.  What about the paralegals at the Bevan firm?  Do
19     they use private e-mail accounts?
20 A.  I think they're probably using Bevan Law e-mail
21     accounts.
22 Q.  But you don't know for sure one way or the other?
23 A.  I'm -- I'm not positive, but I think.
24 Q.  But it's possible they too use private e-mail
25     accounts?

THOMAS W. BEVAN, ESQ. - 02/21/2018       Pages 22..25

Page 22

| 1 | A. | It's possible.  I don't know. |
| 2 | Q. | Have you asked Erin Clark whether she uses a |
| 3 | | private e-mail account? |
| 4 | A. | I don't know I've ever specifically asked her |
| 5 | | that. |
| 6 | Q. | If you look further down -- I'm sorry.  If you |
| 7 | | look at the second document that's attached to |
| 8 | | Exhibit 61, this is the one that has the ECF |
| 9 | | heading 382 on it.  Do you see that? |
| 10 | A. | Okay.  Yes. |
| 11 | Q. | This is an amendment of the November 30th, 2017 |
| 12 | | order and you see on the bottom of page 2 onto |
| 13 | | page 3 there's amended language for paragraph 8. |
| 14 | | Do you see that? |
| 15 | A. | Yes. |
| 16 | Q. | I won't read this whole thing in the interest of |
| 17 | | time.  You can read it if you'd like to.  But it |
| 18 | | says in words and substance that the Bevan firm |
| 19 | | shall review their perspective and physical |
| 20 | | electronic files of the named class |
| 21 | | representatives and the Bevan firm's physical and |
| 22 | | electronic files to determine whether e-mails |
| 23 | | exist.  Do you see that at the top of page 3? |
| 24 | A. | Yes. |
| 25 | Q. | And then further down in the paragraph after Roman |

Page 23

| 1 | | v, it says, "Immediately transfer to BASF copies |
| 2 | | of all documents where no privilege is being |
| 3 | | claimed."  Do you see that? |
| 4 | A. | Yes. |
| 5 | Q. | What steps did the Bevan firm take to comply with |
| 6 | | this order of the court? |
| 7 | A. | We searched e-mails, like I talked about earlier. |
| 8 | Q. | So whose e-mails did you search? |
| 9 | A. | Mine, Pat Walsh, Erin Clark, Josh Grunda, Dave |
| 10 | | Bates.  I think Brenda Germ.  Anybody that would |
| 11 | | have been involved in the asbestos litigation. |
| 12 | Q. | Anyone else? |
| 13 | A. | I don't recall. |
| 14 | Q. | Which search terms did you use to identify e-mails |
| 15 | | from those individuals? |
| 16 | A. | I'm sure clients' names, you know, BASF, Eastern |
| 17 | | Magnesia Talc, talc. |
| 18 | Q. | Is there a written list? |
| 19 | A. | Not that I recall. |
| 20 | Q. | Did you confer with Mr. Roth or anybody from |
| 21 | | Mr. Roth's law firm about search terms that should |
| 22 | | be used to identify e-mails called for by the |
| 23 | | court's order? |
| 24 | A. | I don't recall if I told them what we were going |
| 25 | | to search for.  I'm sure we told them that we were |

Page 24

| 1 | | going to do a search, so I don't know if I gave |
| 2 | | them the details or not. |
| 3 | Q. | Did they provide search terms to you? |
| 4 | A. | I don't recall. |
| 5 | Q. | So they left the process of identifying e-mails up |
| 6 | | to you and your law firm; is that fair? |
| 7 | | MR. ROTH:  Objection.  Form and |
| 8 | | foundation. |
| 9 | A. | We talked about it, so I don't really recall how |
| 10 | | we talked about it.  They were involved, I know |
| 11 | | that. |
| 12 | Q. | Mr. Roth's firm was involved? |
| 13 | A. | Whether it was Mr. Roth or whether it was Brendan, |
| 14 | | I don't recall. |
| 15 | Q. | As you sit here today, was there any document |
| 16 | | describing the steps that were taken to identify |
| 17 | | e-mails that are responsive to BASF's subpoena? |
| 18 | A. | I'm -- I had a hard time following that one.  I |
| 19 | | apologize.  Could you say that again? |
| 20 | Q. | As we sit here today, is there any document that |
| 21 | | describes the steps that your law firm took to |
| 22 | | identify e-mails that are responsive to BASF's |
| 23 | | subpoena? |
| 24 | A. | Not that I recall. |
| 25 | Q. | So after you received the court's order in late |

Page 25

| 1 | | November and early December, you undertook steps |
| 2 | | to identify e-mails? |
| 3 | A. | Yes. |
| 4 | Q. | Before receiving the court's November 30th, 2017 |
| 5 | | order, had the Bevan firm done anything to try to |
| 6 | | identify e-mails that are responsive to BASF's |
| 7 | | subpoenas? |
| 8 | A. | I believe so, but I'm -- I'm not sure on the |
| 9 | | timing of all that. |
| 10 | Q. | So it's possible that before these orders, you |
| 11 | | hadn't searched for e-mails yet? |
| 12 | | MR. ROTH:  Objection. |
| 13 | A. | I guess it's possible.  I'm not -- I'm not sure. |
| 14 | Q. | In 2010 or 2011, before the Williams case was |
| 15 | | filed, did the Cohen Placitella law firm tell you |
| 16 | | to preserve the Bevan firm's e-mails that might |
| 17 | | relate to this case? |
| 18 | A. | I don't recall if we had a conversation about it |
| 19 | | or not.  Prior -- excuse me, prior to this lawsuit |
| 20 | | being filed, I don't know if we had a |
| 21 | | conversation about it or not. |
| 22 | Q. | What about after this lawsuit was filed?  Has |
| 23 | | there ever been a conversation with Cohen |
| 24 | | Placitella regarding the preservation of Bevan Law |
| 25 | | Firm e-mails? |

THOMAS W. BEVAN, ESQ. - 02/21/2018      Pages 26..29

Page 26

1  A.  I'm sure there has been and I'm sure they told us
2      to, you know, preserve everything.  Don't destroy
3      anything.
4  Q.  Is there any written document that discusses the
5      Bevan Law Firm's preservation of e-mails?
6  A.  Not that I recall.
7  Q.  No e-mail confirmation from them to you regarding
8      document preservation?
9  A.  I really don't know.
10 Q.  When did the conversation you're thinking of
11     occur?
12 A.  I don't recall.  I'm sure it would have been
13     sometime in the last ten years, but I don't
14     recall.
15 Q.  2010?  2015?  2018?
16          MR. ROTH:  Objection.
17 A.  I -- oh, I'm sure it was before 2018.  I don't
18     recall when, though.  It was some time ago.
19 Q.  Who was involved in the conversation?
20 A.  Chris Placitella.
21 Q.  You and Chris Placitella?
22 A.  Yes.
23 Q.  Anyone else?
24 A.  I don't recall anybody else.
25 Q.  What was said in the conversation?

Page 27

1  A.  I recall Chris Placitella telling me not to
2      destroy anything.
3  Q.  Anything else?
4  A.  I don't recall anything else.
5  Q.  What did you say?
6  A.  I said we would not.
7  Q.  So what steps did you take to ensure that nothing
8      was destroyed?
9  A.  I didn't destroy anything, I guess would be the
10     best way to put it.
11 Q.  Did you take any steps to override any systems you
12     might have that would otherwise result in the
13     deletion of electronic information?
14          MR. ROTH:  Objection.
15 A.  I don't know what systems those would be, so I --
16 Q.  You don't know?
17 A.  I don't know what you're talking about, so no, I
18     don't know.
19 Q.  How many e-mails were identified in the process of
20     the searches you undertook in November or December
21     2017?
22 A.  I don't recall.
23 Q.  Does it sound right to you that before this week,
24     fewer than 20 e-mails were identified by the Bevan
25     Law Firm and produced to BASF in response to its

Page 28

1      subpoena?
2  A.  That would not surprise me.  I mean, we're talking
3      about a time when we did not use e-mail very
4      often, so no, that wouldn't surprise me.
5  Q.  When did you -- when did your law firm start using
6      e-mail?
7  A.  I don't know.  I would say probably in the early
8      2000s somewhere.
9  Q.  And you said you used AOL as of 2000, correct?
10 A.  I don't know when I first started using AOL, but
11     AOL is what I've always used.
12 Q.  But 2000 give or take sounds roughly correct to
13     you?
14 A.  You know, give or take, you know, years.  But
15     yeah.
16 Q.  So Ms. Darnell's case would have been within the
17     period that you -- your law firm has used e-mail,
18     correct?
19 A.  I don't know.  Her -- her case would have
20     concluded in 2002, so whether I was using e-mail
21     to communicate on a business side, I don't think I
22     was at that point, but I don't know.
23 Q.  Ms. Holley, who is the representative of
24     Ms. Darnell, is still filing claims today,
25     correct?

Page 29

1  A.  Yes.
2  Q.  Were you aware that not a single e-mail has been
3      produced by your law firm related to Ms. Holley's
4      claims?
5  A.  It wouldn't surprise me.
6  Q.  So nobody at the Bevan firm, in the course of the
7      15 to 20 years that Mr. Darnell or Ms. Holley has
8      been litigating asbestos cases, has ever used
9      e-mail in connection with those cases?
10          MR. ROTH:  Objection.
11 A.  I cannot recall ever using an e-mail, and I was
12     the one handling the case.  So I don't think I've
13     ever communicated by e-mail with Marilyn Holley.
14     I'm certain I never communicated by e-mail with
15     her mother, Kathryn Darnell.  So --
16 Q.  What about any of the parties in that case?
17 A.  As far as the litigation, that was completed in
18     2002 and I don't recall using e-mail for that
19     purpose.  But, you know, maybe we did, but I don't
20     recall it.
21 Q.  How about e-mails related to the bankruptcy trust
22     claims that have been filed?
23 A.  I don't know that there would be any e-mails
24     related to that.
25 Q.  Not a single e-mail sent within the Bevan firm,

THOMAS W. BEVAN, ESQ. - 02/21/2018          Pages 30..33

**Page 30**

1       hey, what's the status of Ms. Holley's claim
2       against this bankruptcy trust?
3   A.  Yeah, not that I know of.
4   Q.  Did you look for those sorts of e-mails?
5   A.  I believe those would have turned up in the
6       search.
7   Q.  What search terms would have identified e-mails
8       related to the bankruptcy trust filings?
9   A.  Darnell.
10  Q.  That's the only one?
11  A.  I assume it would be Darnell.
12  Q.  Does your AOL e-mail account automatically delete
13      any of your e-mails?
14  A.  I don't know.  I don't think so, but I don't know.
15  Q.  So all of the e-mails you've sent or received from
16      your AOL e-mail account going back to when you
17      first started using it are still available to you?
18  A.  Unless I deleted them.
19  Q.  Let's set aside the e-mails you've intentionally
20      deleted for a minute.  Are there any e-mails
21      you've sent or received from your AOL account that
22      have been deleted automatically by some computer
23      system?
24  A.  I don't know that it does that, I don't think, but
25      I don't know.

**Page 31**

1   Q.  You don't know one way or the other?
2   A.  I believe not, but I don't know.
3   Q.  But you've deleted e-mails from your AOL account?
4   A.  Sure.
5   Q.  What's your normal practice for deciding to delete
6       an e-mail?
7   A.  If it's an irrelevant e-mail that I don't need to
8       keep, then I get rid of it.
9   Q.  What do you mean by "irrelevant e-mail"?
10  A.  It's, you know, a junk e-mail.  It's an e-mail
11      regarding subject matter that doesn't concern me.
12      If there's no purpose for keeping it.
13  Q.  Do you keep all of the e-mails that you send or
14      receive related to cases you're handling?
15  A.  I don't think so.
16  Q.  So you routinely discard those?
17  A.  If it's not something that needs to be kept, yes.
18  Q.  Did you continue doing that after the end of 2010?
19  A.  I do it to this day.  If it's not an e-mail I need
20      to keep, I would delete it.
21  Q.  Do you recall deleting any e-mails relating to the
22      subject matter of the Williams case since 2010?
23  A.  I do not recall, no.
24  Q.  I think you told me earlier, Mr. Bevan, that you
25      weren't aware that additional e-mails were

**Page 32**

1       produced to BASF last night; is that correct?
2   A.  Yeah, I don't know what was produced.  Yes -- no.
3   Q.  Do you know why these additional e-mails were
4       produced last night?
5   A.  I don't know anything about it.
6   Q.  Were you aware that they were being produced?
7   A.  Not until you told me.
8   Q.  Do you know why they weren't produced to BASF in
9       December of 2017?
10  A.  I don't know what they are, so I don't know.
11  Q.  Have you taken any steps to audit the searches
12      that you've done to confirm that you actually
13      found the documents you were looking for?
14  A.  I don't know what you mean by that.
15  Q.  Did you do anything to test, hey, did the search
16      terms that I used actually find the documents that
17      relate to Ms. Darnell's case, for example?
18  A.  I don't -- I don't know other than we found
19      documents when we did a search, so --
20  Q.  Other than doing the search itself, you didn't
21      take any additional steps to confirm that your
22      searches were actually identifying the documents
23      that were called for by BASF's subpoena?
24  A.  I guess I looked at the documents that came up on
25      that search and they were, in fact, you know,

**Page 33**

1       documents that were properly identified.
2   Q.  Did you take any steps to see whether the search
3       terms you used were not identifying some of the
4       documents that were responsive to BASF's subpoena?
5           MR. ROTH:  Objection.
6   A.  I don't know what steps I could have taken.  I
7       don't know.
8   Q.  But you didn't take any?
9           MR. ROTH:  Objection.
10  A.  I don't know what would qualify for that, so I
11      don't know really.
12  Q.  We haven't yet received a privilege log related to
13      the e-mails that were produced to BASF last night.
14      Do you know the status of that privilege log?
15  A.  No.
16  Q.  Are you responsible for preparing it?
17  A.  No.
18  Q.  Who is preparing the privilege logs on behalf of
19      the Bevan firm?
20  A.  I would assume either Brandon or the Placitella
21      firm.
22  Q.  Will we get the privilege log before the end of
23      this week?
24  A.  I leave that to them.
25  Q.  So you don't know?

THOMAS W. BEVAN, ESQ. - 02/21/2018      Pages 34..37

Page 34

| 1  | A. | I don't know. |
| 2  | Q. | Do you keep your AOL e-mails in the new mail |
| 3  |    | folder in AOL or to an old mail folder on your AOL |
| 4  |    | account? |
| 5  | A. | If -- if it's something that I'm -- if I don't |
| 6  |    | want to lose sight of it, I would keep it in the |
| 7  |    | new mail.  If I don't think it's something that I |
| 8  |    | need to have within sight, then I would let it go |
| 9  |    | to the old e-mail. |
| 10 | Q. | So there are some e-mails that you do move to |
| 11 |    | the -- to a folder? |
| 12 | A. | I don't move anything, no.  I believe if you open |
| 13 |    | it up and if I want to keep it in new mail, I then |
| 14 |    | have to hit "mark as unread."  If I want it |
| 15 |    | to -- if I just don't need it at all, I can hit |
| 16 |    | "delete" and it goes away, as far as I know.  If I |
| 17 |    | don't hit "delete" and I don't hit "mark as |
| 18 |    | unread," then it goes into old, I believe is the |
| 19 |    | way it works. |
| 20 | Q. | Okay.  For the e-mails that go into the old |
| 21 |    | folder, do you dispute that e-mails in that old |
| 22 |    | folder are automatically deleted after 30 days? |
| 23 | A. | Oh, yeah, I would dispute that for sure. |
| 24 | Q. | So you have e-mails going back more than 30 days |
| 25 |    | in the old mail folder? |

Page 35

| 1  | A. | Oh, I -- when I search, when I searched e-mails |
| 2  |    | more than 30 days come up for sure.  So whether |
| 3  |    | that's being held in old mail or somewhere else, I |
| 4  |    | guess I really don't know, but they don't |
| 5  |    | disappear, I know that.  You know, if I don't |
| 6  |    | delete it, it doesn't disappear, as far as I know. |
| 7  |    | Because if I search it, I can find e-mails from |
| 8  |    | three years ago. |
| 9  | Q. | So we talked a bit about the Darnell case.  You |
| 10 |    | were saying at that period of time you didn't know |
| 11 |    | to what extent e-mails were used.  What about the |
| 12 |    | Catherine Graham case, which was 2008, give or |
| 13 |    | take?  I assume your firm was using e-mails by |
| 14 |    | 2008? |
| 15 | A. | I assume, yes. |
| 16 | Q. | Did you search your AOL e-mail account for e-mails |
| 17 |    | related to the Graham case? |
| 18 | A. | Yes. |
| 19 | Q. | And you searched the Bevan Law Firm e-mails for |
| 20 |    | e-mails related to the Graham case? |
| 21 | A. | Yes. |
| 22 | Q. | What about the personal e-mail accounts of |
| 23 |    | attorneys at the Bevan firm? |
| 24 | A. | We searched those, too.  Yes. |
| 25 | Q. | Do you know why there are only a couple of dozen |

Page 36

| 1  |    | e-mails that have been produced to BASF concerning |
| 2  |    | the Graham case? |
| 3  |    |         MR. ROTH:  Objection. |
| 4  | A. | That's all we were able to locate. |
| 5  | Q. | How many defendants were in the Graham case when |
| 6  |    | it was filed? |
| 7  | A. | I don't know.  I would say 20 or 30, but I don't |
| 8  |    | really know. |
| 9  | Q. | Does north of 90 sound correct to you? |
| 10 | A. | You know, it could have been.  I don't really |
| 11 |    | know. |
| 12 | Q. | So the Bevan firm filed litigation against a |
| 13 |    | couple of dozen defendants at least on behalf of |
| 14 |    | Mrs. Graham, correct? |
| 15 | A. | Yes. |
| 16 | Q. | And that case was pending for several months, if |
| 17 |    | not years, correct? |
| 18 | A. | Yes. |
| 19 | Q. | And then after the formal litigation was over, |
| 20 |    | your firm continued to file bankruptcy trust |
| 21 |    | claims on behalf of Mrs. Graham or her estate, |
| 22 |    | correct? |
| 23 | A. | Yes. |
| 24 | Q. | So we're talking about multiple years of |
| 25 |    | litigation or bankruptcy trust filings, right? |

Page 37

| 1  | A. | Yes. |
| 2  | Q. | So in the multiple years of litigation or |
| 3  |    | bankruptcy trust filings, again, several dozen |
| 4  |    | defendants or bankruptcy trusts, your firm has |
| 5  |    | only identified a couple of dozen e-mails?  Is |
| 6  |    | that your testimony? |
| 7  |    |         MR. ROTH:  Objection. |
| 8  | A. | I'm basing it on your representation that we |
| 9  |    | produced -- we produced what we had.  Okay.  So |
| 10 |    | that's what we found.  I don't -- I didn't count |
| 11 |    | them, so I don't know how many. |
| 12 | Q. | What did you do to prepare for this deposition, |
| 13 |    | Mr. Bevan? |
| 14 | A. | I looked at the deposition notice, thought about |
| 15 |    | what we did in response to the document request. |
| 16 | Q. | Did you talk to anybody about what you did? |
| 17 | A. | No. |
| 18 | Q. | Did you review any of the documents that had been |
| 19 |    | produced? |
| 20 | A. | I did not. |
| 21 | Q. | Did you review correspondence related to materials |
| 22 |    | that had been produced by your firm? |
| 23 |    |         MR. ROTH:  Well, object to the form. |
| 24 | A. | No. |
| 25 | Q. | So you looked at the deposition notice and you |

THOMAS W. BEVAN, ESQ. - 02/21/2018      Pages 38..41

Page 38

1    thought about what had been done and that was the
2    extent of your preparation for today?
3  A. Yes.  I didn't know what else I could have done,
4    so --
5  Q. Well, you could have talked to the people who
6    participated in the collection of documents,
7    correct?
8  A. I didn't need to.  I did it at the time.  I know
9    what we talked about.
10 Q. Well, so if you did it at the time and you didn't
11   need to talk to anybody, then you can tell me how
12   many e-mails were produced by your firm, correct?
13 A. I never counted them, and I'm sure they didn't
14   count them either.
15 Q. But it was not something you looked into before
16   coming here today to testify as the records
17   custodian of your firm?
18         MR. ROTH:  Objection.
19 A. I wasn't asked to testify about how many e-mails
20   we produced or the number of e-mails we produced
21   to the relation to the Graham case.
22 Q. You thought that was beyond the scope of this
23   deposition?
24         MR. ROTH:  Objection.
25 A. I don't see the importance of it, but --

Page 39

1  Q. You don't see the importance of identifying
2    e-mails related to the Graham case in response to
3    BASF's subpoena?
4  A. That's not what I said.
5  Q. You tell me, sir.  What did you mean, you didn't
6    see the importance of it?
7  A. I didn't see the importance of the number of
8    e-mails that we produced on the Graham case.
9  Q. Before October 27, 2017, had you, in words or in
10   substance, conveyed to your counsel, Mr. Little,
11   or the Plaintiffs' counsel, the Cohen Placitella
12   firm, that the Bevan Law Firm's documents
13   concerning asbestos litigation had been scanned
14   and converted into electronic files?
15 A. I don't know when we conveyed that to them.  I
16   don't know.  I know we conveyed it to them.  When,
17   I just don't know.
18 Q. You can't tell me one way or the other?
19 A. No.
20 Q. Do you dispute that you told them that before
21   October of 2017?
22         MR. ROTH:  Objection.
23 A. I really don't know when we -- I told them that.
24 Q. Are there any documents on that?
25 A. I doubt it.

Page 40

1  Q. Did you tell them by e-mail?
2  A. I don't recall telling them by e-mail.
3  Q. How do you recall telling them that?
4  A. I know we've had oral conversations on it.
5  Q. Who was involved in those conversations?
6  A. I'm certain Mike Coren.
7  Q. Anyone else?
8  A. I believe Jared Placitella.
9  Q. Anyone else?
10 A. I don't recall.
11 Q. When did you take the hard copy Bevan files
12   concerning asbestos cases and convert them to
13   electronic files?
14 A. I believe it started in 2005, but I'm not positive
15   of that.
16 Q. When did you finish?
17 A. Well, we do it on a regular basis.  Anything new
18   that comes in gets scanned and preserved
19   electronically.
20 Q. So even today you're doing that?
21 A. Yes.
22 Q. Have you been doing it -- have you been converting
23   hard copy documents to electronic documents
24   basically continuously since you started in 2005?
25 A. Yes.

Page 41

1  Q. What happens to the original hard copy documents
2    after you scan them?
3  A. They get discarded.
4  Q. Why do you do that?
5  A. Because the purpose of having electronic copies is
6    for easier access and easier storage, and so it
7    wouldn't make any sense to have both an electronic
8    copy and a hard copy.
9  Q. In your mind, is there any material difference
10   between an electronic version of a document and
11   the original hard copy of a document?
12         MR. ROTH:  Objection.
13 A. In my mind, no.
14 Q. Do you think that when you first
15   started -- withdrawn.
16         When you first started communicating with
17   the Cohen Placitella firm in the late 2010, 2011
18   time period regarding the filing of the Williams
19   case, did you tell them at that time that you had
20   scanned your hard copy files into electronic
21   files?
22 A. I don't recall.
23 Q. You don't know one way or the other?
24 A. No.
25 Q. Did they ask you about your files?

THOMAS W. BEVAN, ESQ. - 02/21/2018       Pages 42..45

Page 42

1   A.   I don't recall.
2   Q.   Any e-mail correspondence about that?
3   A.   Not that I recall.
4   Q.   Why did you start scanning hard copy files in
5        2005?
6             MR. ROTH:  Objection.
7   A.   We were running out of storage space.  We were
8        adding as much as a file cabinet a week to our
9        client files and it was becoming too complicated
10       to keep track of files, too complicated to keep
11       track of the contents of the files, and we decided
12       we needed to go a better way, and that's why we
13       went electronic.
14  Q.   Did you scan every piece of paper that you had in
15       hard copy form as of 2005?
16  A.   I believe we did, yes.
17  Q.   So nothing was -- withdrawn.
18            To your knowledge, were there any hard
19       copy documents that have not been scanned by the
20       Bevan Law Firm?
21  A.   Well, since we went electronic, I don't recall
22       anything that hasn't been scanned.
23  Q.   What were your file storage practices before 2005?
24  A.   We had a physical file for every client, and as
25       things came in pertaining to that client's case,

Page 43

1        things were stuck into that physical file.
2   Q.   And how long would they -- withdrawn.
3             How long would the documents put in
4        client files be kept?
5   A.   There was no formal policy, so from time to time,
6        you know, I would thin out a file or if we
7        concluded a case, I would destroy everything that
8        I thought wasn't necessary to keep.  Just try to
9        shrink it down just for space reasons.
10  Q.   Would you thin out a file, to use your words,
11       while bankruptcy trust claims were still being
12       filed on behalf of that client?
13  A.   I don't know.
14  Q.   Do you dispute that client files of the Bevan firm
15       would have been discarded in some respect while
16       bankruptcy trust claims were being filed or were
17       pending on behalf of clients?
18            MR. ROTH:  Objection.
19  A.   I don't know, and the reason why is because
20       primarily that bankruptcy filing started in 2005
21       or sometime around there is when 75 or 90 percent
22       of the bankruptcy trusts went online and we
23       started filing those claims.  So whether we had
24       gotten to the point of electronic storage by the
25       time we started filing all those bankruptcy

Page 44

1        claims, I'm not sure because I'm not sure of the
2        time frame.
3             So once we got to the electronic storage,
4        nothing was being destroyed, even while bankruptcy
5        claims were being filed.  But from a time
6        standpoint, I don't know on the timing on that.
7   Q.   Okay.  So if I understand you correctly, for
8        anything done after 2005 on behalf of a client,
9        you have all of their documents, correct?
10  A.   I'm going to again preface that and say I'm not
11       sure of the exact date.  I'm saying around 2005
12       would have been the earliest.
13  Q.   Okay.
14  A.   It may have been 2006.  You know, I don't know.
15  Q.   You tell me if I have this wrong, but sometime
16       around 2005 or 2006, your firm started a process
17       of scanning all documents received relating to
18       cases you were handling, correct?
19  A.   Yeah, documents that we would receive, yes.
20  Q.   And since you started --
21  A.   Let me preface that.  You know, if it was a case
22       that we were litigating and somebody sent us a
23       pleading in the mail, we wouldn't scan that if it
24       was an irrelevant pleading or something that we
25       didn't need.  We wouldn't scan that.

Page 45

1   Q.   How did you determine whether it was worth
2        scanning or not?
3   A.   I looked at it and determined whether I wanted to
4        scan it or not.
5   Q.   You were the one who decided that or did somebody
6        else decide it?
7   A.   It would be mostly me.
8   Q.   So for cases that were pending after you started
9        the scanning project, some of the documents
10       related to those cases may have been discarded,
11       correct?
12  A.   If it would be court pleadings, correct.
13  Q.   Where do you keep the scanned version of these
14       documents?
15  A.   Scanned -- I'm assuming that it is on our server.
16       I'm not a computer expert, but I believe that's
17       where they would be.
18  Q.   You're not sure, though?
19  A.   You're talking about where the computer is or -- I
20       mean, it's on a computer, so it's --
21  Q.   Well, you have to save electronic data someplace,
22       correct?
23  A.   Yes.
24  Q.   It has to be saved to a drive someplace?
25  A.   Yes.

THOMAS W. BEVAN, ESQ. - 02/21/2018          Pages 46..49

Page 46

```
1   Q.   What drive are your electronic files saved to?
2   A.   It's on some -- on the computer somewhere.  I
3        don't know what the name of the drive is.
4   Q.   Okay.  But you have -- withdrawn.
5             The Bevan firm has a server that contains
6        client documents, correct?
7   A.   Yes.
8   Q.   Did your firm search that server for documents
9        that are responsive to BASF's subpoena?
10  A.   Yes.
11  Q.   How did you do that?
12  A.   Again, we searched terms.  You know, whether it
13       would be BASF, talc, Eastern Magnesia Talc, we did
14       a search on the computer to see what documents
15       came up with those terms in it.
16  Q.   Are the documents word searchable?
17  A.   There's -- and I want to be clear, there's two
18       different things.  There's the client files.  I
19       don't know whether those are word searchable or
20       not.  They're in a program called Intact.  Other
21       documents would be, as far as I know, searchable
22       because we did a search for that and pulled up
23       documents related to that.
24  Q.   So some of the documents are word searchable and
25       some are not?
```

Page 47

```
1             MR. ROTH:  Objection.
2   A.   I don't know the answer to that.
3   Q.   You don't know?
4   A.   I do not know.
5   Q.   Who would know?
6   A.   I don't know.
7   Q.   Is there anybody at the Bevan Law Firm who could
8        tell us whether some portion of the Bevan Law Firm
9        electronic documents are word searchable?
10  A.   You're going to have to be a bit more clear.
11       Okay.  We have the client files, okay.  So for
12       instance, these specific client files that we
13       talked about, which is Graham and Darnell and
14       Clark and Williams and, I think Weir, we didn't
15       search those client files because we produced the
16       whole file.  So we didn't do a search on it.
17       Their stuff wouldn't be in somebody else's file.
18            With respect to documents, primarily
19       pleadings, it could be correspondence or
20       pleadings, we did a search on that and pulled up
21       documents on that.  Those aren't documents that
22       are part of the client file.  They're just
23       documents that are, you know, in the computer.
24  Q.   So to take an example, if a defendant in
25       Mrs. Darnell's asbestos case filed a motion in
```

Page 48

```
1        that case --
2   A.   Okay.
3   Q.   -- would your firm have saved that motion in
4        Ms. Darnell's client file or in the other file
5        you're referring to?
6   A.   Most likely neither.  If the defendant filed a
7        motion, it would be on the electronic court
8        docketing.  At the time of the Darnell, it was
9        probably the Clad system.  So we wouldn't have
10       saved anything, we would have just went to the
11       Clad system if we wanted to find a motion that was
12       filed.
13  Q.   What if it wasn't a filing?  Let's take a
14       different example.  What if defense counsel sent
15       you a letter concerning the Darnell case --
16  A.   Okay.
17  Q.   -- what would you do with that letter?
18  A.   That, at the time I was litigating the Darnell
19       case, I would have had a hard file and I would
20       have had a correspondence file in that hard file
21       and I would have stuck it in there, if I thought
22       it was worthy to save.  You know, if it was just,
23       hey, nice seeing you at the deposition, no, I
24       would throw it away.  But if it was something I
25       thought needed to be saved, I would put it in
```

Page 49

```
1        that.
2   Q.   And when you say "in that," this correspondence
3        file, is that separate from the client file?
4             MR. ROTH:  Objection.
5   A.   And again, I'm speaking of when we litigated
6        Darnell, but the same goes for, you know, Williams
7        and Clark.  And at the time we didn't have an
8        electronic filing, so I would have put it in the
9        hard file.  When the litigation part of the
10       Darnell case was over, that's when I would have
11       culled that file to, you know, save what I thought
12       needed to be saved.
13  Q.   Does the Bevan Law Firm have a file related to the
14       National Tire Worker Litigation Project?
15  A.   And to be clear, you're talking about the project
16       started by Attorney Stemple in the 1980s?
17  Q.   I'm talking about the project known as the
18       National Tire Worker Litigation Project.  You've
19       heard that before, correct?
20  A.   I've heard it in terms of a project started by
21       Attorney Gordon Stemple from California, and he
22       started that in the mid-1980s.  So I've heard of
23       that, yes.
24  Q.   In fact, your firm has handled cases alongside
25       Mr. Stemple, right?
```

THOMAS W. BEVAN, ESQ. - 02/21/2018          Pages 50..53

Page 50

1   A.   I would -- I would say definitely not alongside
2        Mr. Stemple.  I would say that -- so I would say
3        no in answer to your specific question.
4   Q.   You haven't seen court filings that has your
5        firm's name right next to the Stemple firm's name?
6   A.   I don't recall if I've seen court filings that had
7        Stemple's name on it.
8   Q.   Okay.  Based on your understanding of what the
9        National Tire Worker Litigation Project is, has
10       your firm ever had a file on the National Tire
11       Worker Litigation Project?
12  A.   Not that I know of.  A file dedicated to the
13       National Tire Worker Litigation Program?  No.
14  Q.   Have you ever had a file related to the National
15       Tire Worker Litigation Project?
16  A.   Well, when I started as a law firm in 1989, we had
17       approximately 180 cases or so, and those cases had
18       originated through the Stemple firm, which
19       titled the National Tire Litigation Project.
20  Q.   Okay.  My question was, has your firm ever had a
21       file related to the National Tire Worker
22       Litigation Project?
23  A.   Not that I know of.
24  Q.   Is there a person at the Bevan firm who is
25       responsible for your electronic server?

Page 51

1   A.   What do you mean by "responsible"?
2   Q.   Do you have an IT person?
3   A.   We have, not in the house, an IT person.
4   Q.   Is there somebody responsible for organizing the
5        files on your server?
6   A.   I guess the best way I can answer that is when we
7        scan a file, the computer program Intact organizes
8        those files.  So when we scan a file, it's got a
9        cover sheet on there, identifies what the document
10       is and the computer program -- program
11       automatically sticks it in that file.  So I would
12       say Intact is responsible for organizing those
13       files.
14  Q.   Okay.  No human being?
15  A.   Well, the human being puts the documents in the
16       scanner, but then the document gets automatically
17       placed in that file by the program, as far as I
18       know.
19  Q.   Over the course of your career, Mr. Bevan, you
20       filed asbestos cases on behalf of multiple
21       plaintiffs at the same time, correct?
22  A.   Correct.
23  Q.   So you'd have five, ten, whatever the number is
24       plaintiffs, co-plaintiffs who were all in the same
25       case?

Page 52

1   A.   Correct.
2   Q.   If you received a piece of correspondence relating
3        to that case, how would you file that
4        correspondence?  Would it go into client A's file?
5        Client B's file?  All of their files?  Ten copies
6        of the same letter?  How would you handle that?
7   A.   I don't -- I don't think it would go in into each
8        file.  I guess I would look at it and determine if
9        it was a letter that I even needed to save.  If it
10       was thanks for agreeing to a 30-day continuance,
11       I'm going to toss it in the trash.  I never saved
12       a piece of paper like that.
13  Q.   What if it was something more substantive?
14  A.   I -- you know, I can't think of it.  I'm trying to
15       think of an instance.  If it was -- the best I can
16       do is give you an example.  Okay.  So if it was a
17       letter pertaining to a settlement of cases, I may
18       have a settlement file.  For instance, I had a
19       talc settlement file, and if I had a letter
20       pertaining to that and I thought it was something
21       I should keep, I would stick it in my talc
22       settlement file.
23  Q.   Has the entirety of talc settlement file been
24       produced to BASF?
25  A.   It was produced to counsel.

Page 53

1   Q.   So Mr. Roth's firm has the whole talc settlement
2        file?
3   A.   Correct.
4   Q.   How many documents were in the talc settlement
5        file?
6   A.   I don't know.  I didn't count them.
7   Q.   An inch?  Two inches?  Six boxes?
8   A.   I would say -- I would say anywhere from 6 inches
9        to 12 inches.
10  Q.   Okay.  And Mr. Roth has all of those documents?
11  A.   Correct.
12  Q.   Do you have any what I would call a general
13       file --
14  A.   Actually, let me -- I'm not sure if Mr. Roth has
15       it or Mr. Little.  I'm not sure which one has it.
16            MR. ROTH:  So by my count, when we were
17       interrupted a couple of seconds ago, it was
18       an hour.  I don't know whether you've had a
19       time on here.
20            MR. FARRELL:  I just have two more
21       questions.  Are we calling it an hour or not?
22            MR. ROTH:  I'm calling it an hour, but I
23       don't know what time -- what -- whether, you
24       know, somebody's got it -- I don't want to
25       have a dispute, no longer than an hour.

THOMAS W. BEVAN, ESQ. - 02/21/2018          Pages 54..57

Page 54

1      MR. FARRELL:  Can I ask my one more
2   question or no?
3      MR. ROTH:  You can ask the question.
4   I'll decide whether he can answer it.  Let me
5   see the document.
6      MR. FARRELL:  Sure.
7      MR. ROTH:  Does this relate to your last
8   question in terms of where it's stored?
9      MR. FARRELL:  Yeah.
10 Q.  Let me show you, Mr. Bevan, what we have
11    previously marked as Defendant's Exhibit 8.  It
12    was marked at Ms. Holley's deposition in this case
13    from last April.  And you see this is a May 25,
14    2001 letter from the Mansour Law Firm to you
15    concerning Ms. Darnell's case and others.
16 A.  Uh-huh.
17 Q.  My question for you, you received this letter at
18    the time in 2001, right?
19 A.  I don't recall the letter, but, you know, it looks
20    like a communication that I could have received
21    from Sam Martillotta.
22 Q.  Do you know why this letter wasn't produced from
23    the Bevan Law Firm's files?  Response to BASF's
24    subpoena?
25      MR. ROTH:  Objection, but --

Page 55

1 A.  I could give you a couple different possibilities.
2 Q.  Go ahead.
3 A.  The likely possibility is I didn't save it, okay,
4    and so I wouldn't have had it to produce.  That's
5    the most likely possibility.  The second
6    possibility is I passed it on to counsel and they
7    didn't produce it to BASF.
8 Q.  All right.  Thank you, Mr. Bevan.
9      MR. BEVAN:  Do you guys want me to read
10    this or can I waive?
11      MR. ROTH:  I think you can read it.
12         - - - - - -
13    (Signature was not waived by the Witness.)
14         - - - - - -
15    (The deposition was concluded at 12:52 p.m.)
16         - - - - - -
17
18
19
20
21
22
23
24
25

Page 56

1      W I T N E S S   C E R T I F I C A T E
2
3      I, THOMAS W. BEVAN, ESQ., do hereby certify that I
4   have read my deposition taken on February 21, 2018, in
5   the case of Kimberlee Williams, et al., versus BASF
6   Catalysts, LLC, et al., consisting of 58 pages, and
7   that said deposition is a true and correct
8   transcription of my testimony with changes as noted on
9   the errata sheet.
10
11    _____
12         Thomas W. Bevan, Esq.
13 Dated this _____ day of _____, 2018.
14
15
16
         Sworn to and subscribed before me this _____
17
18 day of _____, 2018.
19
20
         _____
21         Notary Public
22
My commission expires _____.
23
24
25

AP

Page 57

1           ERRATA SHEET
2   Witness Name:  Thomas W. Bevan, Esq.
3   Date of Deposition:  February 21, 2018
4   Case:  Kimberlee Williams, et al. Versus BASF
    Catalysts, LLC, et al.
5
6   Page    Line    Change and Reason for Change
7   _____  _____   _____
8   _____  _____   _____
9   _____  _____   _____
10  _____  _____   _____
11  _____  _____   _____
12  _____  _____   _____
13  _____  _____   _____
14  _____  _____   _____
15  _____  _____   _____
16  _____  _____   _____
17  _____  _____   _____
18  _____  _____   _____
19  _____  _____   _____
20  _____  _____   _____
21  _____  _____   _____
22  _____  _____   _____
23  _____  _____   _____
24  _____  _____   _____
25  _____  _____   _____

AP

```
                          Page 58
1                   C E R T I F I C A T E
2    STATE OF OHIO, )
                    ) SS:
3    SUMMIT COUNTY. )
4         I, Anika W. Patrick, a Registered Merit Reporter,
     Certified Realtime Reporter and Notary Public within
5    and for the State of Ohio, duly commissioned and
     qualified, do hereby certify that the within-named
6    Witness, THOMAS W. BEVAN, ESQ., was by me first duly
     sworn to testify the truth, the whole truth and nothing
7    but the truth in the cause aforesaid; that the
     testimony so given by him was by me reduced to
8    Stenotypy in the presence of said witness; afterwards
     prepared and produced by means of Computer-Aided
9    Transcription, and that the foregoing is a true and
     correct transcription of the testimony so given by him
10   as aforesaid.
11        I do further certify that this deposition was
     taken at the time and place in the foregoing caption
12   specified, and was completed without adjournment.
13        I do further certify that I am not a relative,
     employee of or attorney for any party or counsel, or
14   otherwise financially interested in this action.
15        I do further certify that I am not, nor is the
     court reporting firm with which I am affiliated, under
16   a contract as defined in Civil Rule 28(D).
17
          IN WITNESS WHEREOF, I have hereunto set my hand
18   and affixed my seal of office at Akron, Ohio, this 28th
     day of February, 2018.
19
20
21        _____
          Anika W. Patrick, RMR, CRR & Notary Public
          My commission expires March 13, 2020
22
23
24
25
```

THOMAS W. BEVAN, ESQ. - 02/21/2018                    i1

---

**1**

**12**
  53:9
**12:52**
  55:15
**15**
  29:7
**180**
  50:17
**1980s**
  49:16
**1989**
  50:16
**1994**
  15:13,14

---

**2**

**2**
  22:12
**2-**
  8:3
**20**
  27:24 29:7 36:7
**2000**
  17:7,9 28:9,12
**2000s**
  28:8
**2001**
  17:8 54:14,18
**2002**
  28:20 29:18
**2005**
  40:14,24 42:5,15,23
  43:20 44:8,11,16
**2006**
  44:14,16
**2008**
  35:12,14
**2010**
  25:14 26:15 31:18,22
  41:17
**2011**

25:14 41:17
**2015**
  26:15
**2016**
  9:18
**2017**
  12:10,12 22:11 25:4
  27:21 32:9 39:9,21
**2018**
  26:15,17
**21st**
  9:18
**25**
  54:13
**27**
  39:9

---

**3**

**3**
  12:16 22:13,23
**3,000**
  8:3
**30**
  34:22,24 35:2 36:7
**30-day**
  52:10
**30th**
  12:10 22:11 25:4
**372**
  12:18
**381**
  12:12 13:2
**382**
  12:13 22:9

---

**4**

**4**
  12:17,21 13:4

---

**6**

**6**
  13:4,6 14:8,20 53:8

**60**
  9:14,17
**61**
  12:6,9,23 13:5 22:8
**6th**
  12:12

---

**7**

**75**
  43:21

---

**8**

**8**
  22:13 54:11

---

**9**

**90**
  36:9 43:21

---

**A**

**A's**
  52:4
**able**
  36:4
**access**
  41:6
**account**
  17:13 18:10,15,23 19:1,
  5,10,13 20:12,15,21,24
  22:3 30:12,16,21 31:3
  34:4 35:16
**accounts**
  20:17 21:2,19,21,25
  35:22
**action**
  15:3
**adding**
  42:8
**addition**
  20:23
**additional**
  31:25 32:3,21

**address**
  17:10
**ago**
  18:11 26:18 35:8 53:17
**agreeing**
  52:10
**ahead**
  55:2
**alleged**
  7:11
**alongside**
  49:24 50:1
**amended**
  22:13
**amendment**
  12:13 22:11
**answer**
  16:18 17:2,3 18:18 47:2
  50:3 51:6 54:4
**anticipation**
  15:2
**anybody**
  6:7 8:10,18 20:11 21:6
  23:10,20 26:24 37:16
  38:11 47:7
**AOL**
  17:7,9,13 18:10,14,22
  19:1,4,9,13,22 20:9,13
  28:9,10,11 30:12,16,21
  31:3 34:2,3 35:16
**apologize**
  24:19
**approximately**
  50:17
**April**
  54:13
**aren't**
  47:21
**asbestos**
  7:5,6 21:7,12 23:11 29:8
  39:13 40:12 47:25 51:20
**aside**
  30:19
**asked**
  22:2,4 38:19

---

THOMAS W. BEVAN, ESQ. - 02/21/2018                    i2

asking
16:17

aspects
19:1

ASSAF
12:19

associate
7:7,13 10:14

associated
17:19

Associates
9:8

assume
11:8 30:11 33:20 35:13,
15

assuming
45:15

attached
22:7

attorney
5:20 7:3 9:3 49:16,21

attorneys
20:14,16,18,20 21:11
35:23

audit
32:11

auto
16:4,6

automatically
16:9,20 30:12,22 34:22
51:11,16

available
30:17

aware
11:3,25 18:24 29:2 31:25
32:6

─────────────
                B
─────────────

B's
52:5

back
11:11 30:16 34:24

bankruptcy
29:21 30:2,8 36:20,25
37:3,4 43:11,16,20,22,25

44:4

Based
50:8

BASF
9:18 10:9,25 11:4,15,18
18:7,8 23:1,16 27:25
32:1,8 33:13 36:1 46:13
52:24 55:7

BASF's
11:14 12:2 17:14 20:6
21:5 24:17,22 25:6 32:23
33:4 39:3 46:9 54:23

basically
40:24

basing
37:8

basis
40:17

batch
11:3

Bates
21:14 23:10

becoming
42:9

behalf
7:24 10:4 33:18 36:13,21
43:12,17 44:8 51:20

believe
8:20,25 9:2,7,21,23
12:15 14:21 16:7 19:11
21:14 25:8 30:5 31:2
34:12,18 40:8,14 42:16
45:16

best
21:1 27:10 51:6 52:15

better
42:12

Bevan
5:2,7 9:8,19 10:2,19 11:3
13:11,16,19 14:1,4,6,10,
20 15:1,19,22 16:8,13,23
19:9,13 20:11,12,21
21:3,11,18,20 22:18,21
23:5 25:5,16,24 26:5
27:24 29:6,25 31:24
33:19 35:19,23 36:12
37:13 39:12 40:11 42:20
43:14 46:5 47:7,8 49:13

50:24 51:19 54:10,23
55:8,9

beyond
38:22

bit
35:9 47:10

bottom
22:12

boxes
53:7

Boyle
6:17

Brandon
33:20

Brenda
23:10

Brendan
24:13

brings
12:21

brought
5:9

bunch
5:11

Bureau
5:24 7:1 8:12

business
5:11 20:25 28:21

─────────────
                C
─────────────

cabinet
42:8

calendar
5:10

California
49:21

call
8:5 53:12

called
14:9 33:22 32:23 46:20

calling
13:23 14:2,10 15:15
53:21,22

calls
12:21

can't
39:18 52:14

capacity
11:22

cards
5:11

career
51:19

case
5:13,17,19,21,23 6:1,12,
25 7:4,6,9,12,16 8:12,14
9:2,4,5,6,19 11:5 12:11
19:8 25:14,17 28:16,19
29:12,16 31:22 32:17
35:9,12,17,20 36:2,5,16
38:21 39:2,8 41:19 42:25
43:7 44:21 47:25 48:1,
15,19 49:10 51:25 52:3
54:12,15

cases
6:15,22 7:24 8:3,8 21:12
29:8,9 31:14 40:12 44:18
45:8,10 49:24 50:17
51:20 52:17

Catherine
35:12

center
13:3

certain
16:9,21 29:14 40:6

certified
5:4

characterization
14:15

check
6:20 7:2 8:6,15 18:17
19:24 20:2,9

checked
20:5 21:13

Chris
26:20,21 27:1

Clad
48:9,11

claim
7:7,15 30:1

THOMAS W. BEVAN, ESQ. - 02/21/2018                    i3

**claimed**
23:3

**claims**
28:24 29:4,22 36:21
43:11,16,23 44:1,5

**Clark**
10:11,12 22:2 23:9 47:14
49:7

**class**
15:3 19:7 22:20

**Clayton**
7:10

**clear**
6:23 46:17 47:10 49:15

**client**
42:9,24 43:4,12,14 44:8
46:6,18 47:11,12,15,22
48:4 49:3 52:4,5

**client's**
42:25

**clients**
19:4 43:17

**clients'**
23:16

**co-plaintiffs**
51:24

**Cohen**
25:15,23 39:11 41:17

**colleagues**
19:12

**collection**
38:6

**come**
35:2

**comes**
40:18

**coming**
38:16

**commanding**
13:9

**communicate**
19:4,12 20:24 28:21

**communicated**
19:7 29:13,14

**communicating**
41:16

**communication**
54:20

**compensation**
5:24 7:1,7,15 8:13

**completed**
29:17

**complicated**
42:9,10

**comply**
23:5

**components**
13:18

**computer**
20:10 30:22 45:16,19,20
46:2,14 47:23 51:7,10

**concept**
16:19

**concern**
31:11

**concerning**
36:1 39:13 40:12 48:15
54:15

**concluded**
28:20 43:7 55:15

**confer**
23:20

**confirm**
32:12,21

**confirmation**
26:7

**connection**
29:9

**contains**
20:6 46:5

**contents**
42:11

**continuance**
52:10

**continue**
31:18

**continued**
36:20

**continuously**
40:24

**control**
10:19 11:13

**conversation**
25:18,21,23 26:10,19,25

**conversations**
40:4,5

**convert**
40:12

**converted**
39:14

**converting**
40:22

**conveyed**
39:10,15,16

**Cook**
7:10

**copies**
12:18 23:1 41:5 52:5

**copy**
6:14 9:18 12:20 40:11,23
41:1,8,11,20 42:4,15,19

**Coren**
40:6

**corporate**
6:3

**correct**
8:1 10:23 11:1,23 12:5,
22,23,24 13:16,24 14:20
15:3 28:9,12,18,25 32:1
36:9,14,17,22 38:7,12
44:9,18 45:11,12,22 46:6
49:19 51:21,22 52:1
53:3,11

**correctly**
44:7

**correspondence**
37:21 42:2 47:19 48:20
49:2 52:2,4

**counsel**
11:18,19 13:11,22 14:4,
23 39:10,11 48:14 52:25
55:6

**count**
37:10 38:14 53:6,16

**counted**
38:13

**County**
9:10,11

**couple**
35:25 36:13 37:5 53:17
55:1

**course**
29:6 51:19

**court**
23:6 45:12 48:7 50:4,6

**court's**
23:23 24:25 25:4

**Courthouse**
9:12

**cover**
51:9

**CROSS-
EXAMINATION**
5:5

**culled**
49:11

**current**
7:24

**custodian**
8:19 11:23,25 16:13
21:10 38:17

**custodians**
21:8

**custody**
10:18 11:13

**D**

**Darnell**
28:24 29:7,15 30:9,11
35:9 47:13 48:8,15,18
49:6,10

**Darnell's**
28:16 32:17 47:25 48:4
54:15

**data**
45:21

**date**
44:11

THOMAS W. BEVAN, ESQ. - 02/21/2018                    i4

**Dave**
21:14 23:9

**day**
31:19

**days**
34:22,24 35:2

**decades**
7:25

**December**
12:12 25:1 27:20 32:9

**decide**
45:6 54:4

**decided**
42:11 45:5

**deciding**
31:5

**dedicated**
50:12

**defendant**
47:24 48:6

**Defendant's**
9:14 12:6 54:11

**defendants**
36:5,13 37:4

**defense**
9:17 11:18 48:14

**definitely**
50:1

**delete**
16:4,6 30:12 31:5,20
34:16,17 35:6

**deleted**
30:18,20,22 31:3 34:22

**deleting**
16:20 31:21

**deletion**
27:13

**deposed**
5:15

**deposition**
5:18,19,21,22 6:4,9,14,
18,21,25 8:7,10,14,22
12:21 16:16 37:12,14,25
38:23 48:23 54:12 55:15

**depositions**
6:24

**describes**
24:21

**describing**
24:16

**destroy**
15:6 26:2 27:2,9 43:7

**destroyed**
27:8 44:4

**destroying**
16:2

**destruction**
15:23

**details**
24:2

**determine**
16:15 21:3 22:22 45:1
52:8

**determined**
45:3

**didn't**
10:7 20:3 27:9 32:20
33:8 35:10 37:10 38:3,8,
10,13 39:5,7 44:25
47:14,16 49:7 53:6 55:3,
7

**difference**
41:9

**different**
46:18 48:14 55:1

**direct**
11:17

**disappear**
35:5,6

**discard**
16:9 31:16

**discarded**
41:3 43:15 45:10

**discusses**
26:4

**dispute**
14:17 34:21,23 39:20
43:14 53:25

**docketing**

48:8

**document**
11:12 12:16 13:2,5,7,9,
15,19 14:22 15:2,4,6,19
22:7 24:15,20 26:4,8
37:15 41:10,11 51:9,16
54:5

**documents**
5:8,13 6:13 10:18 12:1,9,
14 13:24 14:2,11,19,25
15:7,16,24 16:3 18:14
23:2 32:13,16,19,22,24
33:1,4 37:18 38:6 39:12,
24 40:23 41:1 42:19 43:3
44:9,17,19 45:9,14 46:6,
8,14,16,21,23,24 47:9,
18,21,23 51:15 53:4,10

**doesn't**
31:11 35:6

**doing**
31:18 32:20 40:20,22

**don't**
6:16 7:18,20,22 8:20
10:17 11:2,6 14:15,17,
21,22 15:10,21 16:2,7,
11,14,17 17:1,4,11 18:2,
6,11,16,19,20,24 19:11,
17,25 20:3,9 21:9,22
22:1,4 23:13,24 24:1,4,9,
14 25:18,20 26:2,9,12,
13,17,24 27:4,15,16,17,
18,22 28:7,10,19,21,22
29:12,18,19,23 30:14,24,
25 31:1,2,7,15 32:2,5,10,
14,18 33:6,7,10,11,25
34:1,5,7,12,15,17 35:4,5
36:7,10 37:10,11 38:25
39:1,15,16,17,23 40:2,10
41:22,23 42:1,21 43:13,
19 44:6,14 46:3,19 47:2,
3,6 50:6 52:7 53:6,18,23,
24 54:19

**doubt**
6:23 39:25

**dozen**
35:25 36:13 37:3,5

**drive**
45:24 46:1,3

**duly**
5:3

_____
E
_____

**e-mail**
16:4,8,19,23,24 17:4,6,9,
12,13 18:15,22 19:1,5,9,
13,20 20:11,12,15,17,21,
24 21:2,19,20,24 22:3
26:7 28:3,6,17,20 29:2,9,
11,13,14,18,25 30:12,16
31:6,7,9,10,19 34:9
35:16,22 40:1,2 42:2

**e-mails**
10:24 11:4 16:9,20 17:13
18:9,22 19:22 20:2,6
21:4,13 22:22 23:7,8,14,
22 24:5,17,22 25:2,6,11,
16,25 26:5 27:19,24
29:21,23 30:4,7,13,15,
19,20 31:3,13,21,25 32:3
33:13 34:2,10,20,21,24
35:1,7,11,13,16,19,20
36:1 37:5 38:12,19,20
39:2,8

**earlier**
23:7 31:24

**earliest**
44:12

**early**
25:1 28:7

**easier**
41:6

**easily**
7:2

**Eastern**
17:17 18:1 23:16 46:13

**ECF**
12:11,13 22:8

**ECF372**
12:25

**ECF381**
12:17,24

**eight**
20:18

**either**
11:14 12:2 33:20 38:14

**electronic**
15:24 16:2 22:20,22

27:13 39:14 40:13,23
41:5,7,10,20 42:13,21
43:24 44:3 45:21 46:1
47:9 48:7 49:8 50:25

**electronically**
40:19

**else's**
47:17

**ensure**
27:7

**entirety**
52:23

**Erin**
10:11,12 22:2 23:9

**ESQ**
5:2

**estate**
36:21

**exact**
44:11

**example**
16:5 32:17 47:24 48:14
52:16

**excess**
8:3

**excuse**
25:19

**Exhibit**
9:14,17 12:6,8,23 13:5
22:8 54:11

**exist**
13:8 22:23

**existence**
15:12

**experience**
6:5

**expert**
45:16

**extent**
13:7 35:11 38:2

--------
**F**

**fact**
32:25 49:24

**fair**
24:6

**fairly**
7:2

**familiar**
16:19

**far**
11:25 21:17 29:17 34:16
35:6 46:21 51:17

**FARRELL**
5:6 6:8,19 53:20 54:1,6,9

**fewer**
27:24

**file**
7:14 36:20 42:8,23,24
43:1,6,10 47:16,17,22
48:4,19,20 49:3,9,11,13
50:10,12,14,21 51:7,8,
11,17 52:3,4,5,8,18,19,
22,23 53:2,5,13

**filed**
5:23 7:13 8:2 9:9 25:15,
20,22 29:22 36:6,12
43:12,16 44:5 47:25
48:6,12 51:20

**files**
22:20,22 39:14 40:11,13
41:20,21,25 42:4,9,10,11
43:4,14 46:1,18 47:11,
12,15 51:5,8,13 52:5
54:23

**filing**
7:24 15:2 28:24 41:18
43:20,23,25 48:13 49:8

**filings**
30:8 36:25 37:3 50:4,6

**find**
17:2,3 18:14,17 32:16
35:7 48:11

**fine**
6:6

**finish**
40:16

**firm**
5:21,22,23 7:4,8,11 8:10,
18 9:3,19 10:2,4,11,12,
15,19 11:3,12,21,23
12:1,3 13:16,23 14:1,10,

20 15:1,5,10,12,14,19,22
16:8,23 17:4 19:9,13,17
20:11,16,20,21,25 21:3,
11,18 22:18 23:5,21
24:6,12,21 25:5,15,25
27:25 28:5,17 29:3,6,25
33:19,21 35:13,19,23
36:12,20 37:4,22 38:12,
17 39:12 41:17 42:20
43:14 44:16 46:5,8 47:7,
8 48:3 49:13,24 50:10,
16,18,20,24 53:1 54:14

**firm's**
13:19 22:21 25:16 26:5
39:12 50:5 54:23

**first**
5:3 6:24 9:4,5,24 12:16
28:10 30:17 41:14,16

**five**
19:7 51:23

**folder**
34:3,11,21,22,25

**following**
24:18

**follows**
5:4

**form**
14:12 24:7 37:23 42:15

**formal**
15:13,25 20:20 36:19
43:5

**former**
5:20 7:3,7,13,25 9:2

**found**
32:13,18 37:10

**foundation**
14:13 24:8

**four**
21:16

**frame**
44:2

**function**
16:4,6

**further**
13:6 22:6,25

--------
**G**

**general**
53:12

**Germ**
23:10

**getting**
14:3

**give**
28:12,14 35:12 52:16
55:1

**given**
5:17 8:10,18,21 11:17,19

**go**
19:18 34:8,20 42:12
52:4,7 55:2

**goes**
34:16,18 49:6

**going**
12:19 19:18 23:24 24:1
30:16 34:24 44:10 47:10
52:11

**Good**
5:7

**Gordon**
49:21

**gotten**
43:24

**Graham**
35:12,17,20 36:2,5,14,21
38:21 39:2,8 47:13

**granted**
13:11

**Grunda**
21:14 23:9

**guess**
25:13 27:9 32:24 35:4
51:6 52:8

**guys**
55:9

--------
**H**

**hadn't**
25:11

**hall**
19:19

**handle**
52:6

**handled**
49:24

**handling**
7:5,8 29:12 31:14 44:18

**happens**
41:1

**hard**
24:18 40:11,23 41:1,8,
11,20 42:4,15,18 48:19,
20 49:9

**hasn't**
42:22

**haven't**
20:5 33:12 50:4

**he's**
10:15,16

**head**
10:5,6

**header**
13:1

**heading**
22:9

**heard**
49:19,20,22

**hearing**
8:22,25 9:1,11

**held**
35:3

**hereinafter**
5:3

**hey**
19:20 30:1 32:15 48:23

**Hi**
6:17

**hit**
34:14,15,17

**hold**
15:2,4

**Holley**
28:23 29:7,13

**Holley's**
29:3 30:1 54:12

**hour**
53:18,21,22,25

**house**
51:3

**human**
51:14,15

**I**

**I'LL**
54:4

**I'M**
6:11 12:17,23 14:3 15:4
16:6,17 18:2,24 19:17
21:23 22:6 23:16,25
24:18 25:8,13 26:1,12,17
29:14 34:5 37:8 38:13
40:6,14 44:1,10,11
45:15,16 49:5,17 52:11,
14 53:14,15,22

**I'VE**
9:21,24 11:19 14:24
15:10 17:7 22:4 28:11
29:12 49:20,22 50:6

**identification**
9:15,17 12:7

**identified**
27:19,24 30:7 33:1 37:5

**identifies**
51:9

**identify**
23:14,22 24:16,22 25:2,6

**identifying**
24:5 32:22 33:3 39:1

**Immediately**
23:1

**importance**
38:25 39:1,6,7

**inch**
53:7

**inches**
53:7,8,9

**individual's**
7:10

**individuals**
23:15

**informal**
16:1

**information**
27:13

**instance**
47:12 52:15,18

**insurer**
15:18

**Intact**
46:20 51:7,12

**intentionally**
30:19

**interest**
22:16

**interrupted**
53:17

**involved**
7:6 9:2 10:7,9 21:12
23:11 24:10,12 26:19
40:5

**involvement**
11:17

**involving**
5:19 8:12

**irrelevant**
31:7,9 44:24

**issued**
14:24 15:1,5

**it's**
11:16 14:8 21:24 22:1
25:10,13 31:7,10,17,19
34:5,7 45:20 46:2 51:8
54:8

**its**
11:13 15:13 27:25

**J**

**Jared**
40:8

**John**
6:17

**Josh**
21:14 23:9

**junk**
31:10

**K**

**Kathryn**
29:15

**keep**
12:19 31:8,13,20 34:2,6,
13 42:10 43:8 45:13
52:21

**keeping**
31:12

**kept**
31:17 43:4

**kind**
15:5 18:24

**know**
6:16 7:9,18,20,22 8:6 9:6
10:23 11:2,6,7,8,10
14:14,21,24 16:7,11,18
17:1,11 18:19,24 19:17,
19,25 20:3,13,15 21:1,9,
17,22 22:1,4 23:16 24:1,
10 25:20 26:2,9 27:15,
16,17,18 28:7,10,14,19,
22 29:19,23 30:3,14,24,
25 31:1,2,10 32:2,3,5,8,
10,14,18,25 33:6,7,10,
11,14,25 34:1,16 35:4,5,
6,10,25 36:7,8,10,11
37:11 38:3,8 39:15,16,
17,23 40:4 41:23 43:6,
13,19 44:6,14,21 46:3,
12,19,21 47:2,3,4,5,6,23
48:22 49:6,11 50:12,23
51:18 52:14 53:6,18,23,
24 54:19,22

**knowledge**
11:12 42:18

**known**
49:17

**L**

**language**
22:13

**late**
24:25 41:17

THOMAS W. BEVAN, ESQ. - 02/21/2018                    i7

**law**
  5:20,22,23 7:8 9:3,19
  10:2,15,19 11:3,23 12:1,
  3 13:16,19 14:10 15:1,5,
  19,22 16:8 19:2 21:20
  23:21 24:6,21 25:15,24
  26:5 27:25 28:5,17 29:3
  35:19 39:12 42:20 47:7,8
  49:13 50:16 54:14,23

**lawsuit**
  5:20 25:19,22

**lawyers**
  21:3

**leave**
  33:24

**left**
  24:5

**length**
  6:9

**let's**
  19:20 30:19 48:13

**letter**
  48:15,17 52:6,9,17,19
  54:14,17,19,22

**line**
  14:4

**lines**
  9:7

**list**
  17:20 23:18

**listed**
  6:15

**litigated**
  49:5

**litigating**
  29:8 44:22 48:18

**litigation**
  7:3,5,16,19,21,23 21:7
  23:11 29:17 36:12,19,25
  37:2 39:13 49:9,14,18
  50:9,11,13,15,19,22

**Little**
  39:10 53:15

**live**
  8:21

**locate**

**log**
  36:4

**log**
  11:15 12:4 33:12,14,22

**logged**
  10:21,24

**logs**
  33:18

**long**
  15:12 43:2,3

**longer**
  53:25

**look**
  15:9 16:12 22:6,7 30:4
  52:8

**looked**
  9:23 32:24 37:14,25
  38:15 45:3

**looking**
  9:23 12:17,23 32:13

**looks**
  54:19

**lose**
  34:6

_____

                    **M**
_____

**Magnesia**
  17:17 18:1 23:17 46:13

**mail**
  34:2,3,7,13,25 35:3
  44:23

**malpractice**
  5:21,25 7:4,6

**man**
  7:19

**Mansour**
  54:14

**Marilyn**
  29:13

**mark**
  34:14,17

**marked**
  9:15 12:7 13:5 54:11,12

**Martillotta**
  54:21

**master**
  12:11

**material**
  41:9

**materials**
  5:8 37:21

**matter**
  5:25 31:11,22

**matters**
  7:5

**mean**
  6:2 7:18,20,22 18:19
  21:9 28:2 31:9 32:14
  39:5 45:20 51:1

**meet**
  19:20

**memoranda**
  13:10,22 14:1,5,10,23,24
  15:8

**memorandum**
  15:15

**mentioned**
  6:25 9:4,5

**mid-1980s**
  49:22

**Mike**
  40:6

**mind**
  41:9,13

**Mine**
  23:9

**minute**
  30:20

**minutes**
  6:8

**mishandled**
  7:11

**month**
  18:12

**months**
  18:12,13 36:16

**morning**
  5:7

**mother**
  29:15

**motion**
  47:25 48:3,7,11

**move**
  34:10,12

**multiple**
  36:24 37:2 51:20

_____

                    **N**
_____

**name**
  7:9,10 9:6 46:3 50:5,7

**named**
  22:20

**names**
  23:16

**National**
  49:14,18 50:9,10,13,14,
  19,21

**necessary**
  43:8

**need**
  31:7,19 34:8,15 38:8,11
  44:25

**needed**
  42:12 48:25 49:12 52:9

**needs**
  31:17

**neighborhood**
  8:2

**neither**
  48:6

**never**
  14:24 15:10 29:14 38:13
  52:11

**new**
  34:2,7,13 40:17

**newspaper**
  5:10

**nice**
  48:23

**night**
  10:25 11:4,6 32:1,4
  33:13

**normal**
  31:5

THOMAS W. BEVAN, ESQ. - 02/21/2018                    i8

north
36:9

notice
15:2,4 37:14,25

noting
6:9

November
9:18 12:10 22:11 25:1,4
27:20

number
12:9,12,13 38:20 39:7
51:23

O

object
37:23

objection
8:24 14:12,15 20:8 24:7
25:12 26:16 27:14 29:10
33:5,9 36:3 37:7 38:18,
24 39:22 41:12 42:6
43:18 47:1 49:4 54:25

objections
6:11

occasion
19:6

occasional
19:20

occasionally
19:14,15,16

occur
26:11

October
39:9,21

oh
13:2 26:17 34:23 35:1

Ohio
5:23 9:10

okay
9:9 11:11,22 13:2,4 14:7,
19 22:10 34:20 37:9
44:7,13 46:4 47:11 48:2,
16 50:8,20 51:14 52:16
53:10 55:3

old
34:3,9,18,20,21,25 35:3

once
44:3

online
43:22

open
34:12

operate
15:10

oral
40:4

order
12:10,13 13:8 14:9 22:12
23:6,23 24:25 25:5

ordered
13:6

ordering
13:14

orders
25:10

organizes
51:7

organizing
51:4,12

original
41:1,11

originated
50:18

outside
8:21 20:12

override
27:11

oversaw
10:8

P

p.m.
55:15

pad
5:10

page
12:16 13:4 22:12,13,23

pages
9:24

paper
5:10 18:20,21,25 42:14
52:12

paragraph
12:17,21 13:4,6,14 14:8,
20 22:13,25

paralegal
10:12

paralegals
21:18

part
47:22 49:9

participated
38:6

parties
29:16

partner
10:15,16

passed
55:6

Pat
8:13 10:11 20:13 21:14
23:9

pending
36:16 43:17 45:8

people
8:4 38:5

percent
43:21

period
16:10,21 28:17 35:10
41:18

person
10:2,5,6 50:24 51:2,3

personal
21:2 35:22

perspective
22:19

pertaining
42:25 52:17,20

phone
19:22 20:2,3,5,9

physical
22:19,21 42:24 43:1

piece
42:14 52:2,12

placed
51:17

Placitella
25:15,24 26:20,21 27:1
33:20 39:11 40:8 41:17

plaintiffs
11:20 51:21,24

Plaintiffs'
13:10,22 14:4,23 39:11

pleading
44:23,24

pleadings
45:12 47:19,20

point
8:4 28:22 43:24

policies
13:7,10,15,20

policy
14:22 15:20,22,25 16:1
43:5

political
5:11

portion
47:8

positive
10:1 21:23 40:14

possession
10:18 11:13

possibilities
55:1

possibility
55:3,5,6

possible
21:24 22:1 25:10,13

Powell
9:8

practice
19:2 31:5

practices
42:23

preface
44:10,21

THOMAS W. BEVAN, ESQ. - 02/21/2018                    i9

**premarked**
9:16 12:8

**preparation**
38:2

**prepare**
17:20 37:12

**prepared**
14:10

**preparing**
33:16,18

**preservation**
13:24 14:2,11,25 15:15
25:24 26:5,8

**preserve**
25:16 26:2

**preserved**
40:18

**previously**
54:11

**primarily**
43:20 47:18

**prior**
25:19

**private**
20:15,17,24 21:19,24
22:3

**privilege**
11:15 12:4 23:2 33:12,
14,18,22

**probably**
8:2 18:8 19:14,19 20:13
21:20 28:7 48:9

**process**
24:5 27:19 44:16

**produce**
55:4,7

**produced**
10:21,25 11:4,6,9,15
14:19 27:25 29:3 32:1,2,
4,6,8 33:13 36:1 37:9,19,
22 38:12,20 39:8 47:15
52:24,25 54:22

**production**
13:9,15 14:9

**professional**
15:18

**program**
46:20 50:13 51:7,10,17

**project**
45:9 49:14,15,17,18,20
50:9,11,15,19,22

**properly**
33:1

**provide**
8:16 24:3

**provided**
12:3

**pulled**
46:22 47:20

**purpose**
29:19 31:12 41:5

**put**
11:15 12:3 27:10 43:3
48:25 49:8

**puts**
51:15

─────── **Q** ───────

**qualify**
33:10

**question**
6:11 17:2,3 50:3,20 54:2,
3,8,17

**questions**
6:5 53:21

─────── **R** ───────

**rarely**
19:6

**Raymond**
9:8

**read**
13:21 22:16,17 55:9,11

**really**
24:9 26:9 33:11 35:4
36:8,10 39:23

**reason**
43:19

**reasons**
43:9

**recall**
10:17 14:22 15:17,21
16:2 18:2,6,11,16 23:13,
19,24 24:4,9,14,24 25:18
26:6,12,14,18,24 27:1,4,
22 29:11,18,20 31:21,23
40:2,3,10 41:22 42:1,3,
21 50:6 54:19

**receive**
19:22,25 31:14 44:19

**received**
16:24 24:25 30:15,21
33:12 44:17 52:2 54:17,
20

**receiving**
14:23 25:4

**records**
6:3 8:19 11:23,25 16:13
38:16

**referring**
48:5

**regarding**
13:7 14:24 15:23 18:21
20:25 25:24 26:7 31:11
41:18

**regular**
40:17

**relate**
5:13 7:4,16 25:17 32:17
54:7

**related**
29:3,21,24 30:8 31:14
33:12 35:17,20 37:21
39:2 45:10 46:23 49:13
50:14,21

**relates**
6:12

**relating**
7:3 31:21 44:17 52:2

**relation**
38:21

**relationship**
21:6

**representation**
37:8

**representative**
28:23

**representatives**
19:8 22:21

**represented**
19:9

**representing**
11:20,21

**request**
8:15 13:8 37:15

**require**
15:19

**requirement**
15:21

**respect**
43:15 47:18

**responding**
10:3,9

**response**
14:19 17:14 27:25 37:15
39:2 54:23

**responsibility**
15:18

**responsible**
10:3,5 33:16 50:25 51:1,
4,12

**responsive**
10:20 11:14 12:2 18:14,
22 20:2,6 21:4 24:17,22
25:6 33:4 46:9

**result**
27:12

**retains**
16:23

**retention**
13:8,10,15,19 14:22
15:19,23

**review**
22:19 37:18,21

**rid**
31:8

**right**
10:23 13:20 14:5 27:23
36:25 49:25 50:5 54:18
55:8

**Roman**
22:25

THOMAS W. BEVAN, ESQ. - 02/21/2018                    i10

**Roth**
6:2 8:6,16,24 12:18
14:12 20:8 23:20 24:7,13
25:12 26:16 27:14 29:10
33:5,9 36:3 37:7,23
38:18,24 39:22 41:12
42:6 43:18 47:1 49:4
53:10,14,16,22 54:3,7,25
55:11

**Roth's**
12:3 13:23 23:21 24:12
53:1

**roughly**
28:12

**routinely**
31:16

**rubber**
8:5

**running**
42:7

**S**

**Sam**
54:21

**save**
45:21 48:22 49:11 52:9
55:3

**saved**
45:24 46:1 48:3,10,25
49:12 52:11

**saying**
15:6 35:10 44:11

**says**
12:25 13:6 22:18 23:1

**scan**
41:2 42:14 44:23,25 45:4
51:7,8

**scanned**
39:13 40:18 41:20 42:19,
22 45:13,15

**scanner**
51:16

**scanning**
42:4 44:17 45:2,9

**scope**
38:22

**search**
17:16,20,25 18:5,6,7,9,
22 23:8,14,21,25 24:1,3
30:6,7 32:15,19,20,25
33:2 35:1,7,16 46:8,14,
22 47:15,16,20

**searchable**
46:16,19,21,24 47:9

**searched**
17:13,15,17 21:3 23:7
25:11 35:1,19,24 46:12

**searches**
27:20 32:11,22

**second**
22:7 55:5

**seconds**
53:17

**see**
5:7 13:12 20:5 22:9,12,
14,23 23:3 33:2 38:25
39:1,6,7 46:14 54:5,13

**seeing**
48:23

**seen**
9:20,21,22,24,25 12:14
15:10 50:4,6

**send**
19:22 20:1 31:13

**sense**
41:7

**sent**
13:23 15:14 16:24 20:1
29:25 30:15,21 44:22
48:14

**separate**
14:5 49:3

**served**
9:19

**server**
45:15 46:5,8 50:25 51:5

**set**
30:19

**setting**
6:11

**settlement**
52:17,18,19,22,23 53:1,4

**sheet**
51:9

**show**
9:16 12:8 54:10

**shrink**
43:9

**side**
28:21

**sight**
34:6,8

**signature**
55:13

**single**
29:2,25

**sir**
13:1 39:5

**sit**
24:15,20

**six**
18:13 53:7

**small**
19:17

**somebody**
11:9 19:18 44:22 45:5
47:17 51:4

**somebody's**
53:24

**someplace**
45:21,24

**sorry**
22:6

**sort**
19:15 20:24

**sorts**
30:4

**sound**
27:23 36:9

**sounds**
11:8 28:12

**space**
42:7 43:9

**speaking**
6:10 49:5

**special**

12:11

**specific**
47:12 50:3

**specifically**
22:4

**spot**
17:23

**standpoint**
44:6

**start**
28:5 42:4

**started**
6:18 17:12 28:10 30:17
40:14,24 41:15,16 43:20,
23,25 44:16,20 45:8
49:16,20,22 50:16

**status**
30:1 33:14

**Stemple**
49:16,21,25 50:2,5,18

**Stemple's**
50:7

**steps**
23:5 24:16,21 25:1 27:7,
11 32:11,21 33:2,6

**stick**
52:21

**sticks**
51:11

**storage**
41:6 42:7,23 43:24 44:3

**stored**
54:8

**stuck**
43:1 48:21

**stuff**
5:12 47:17

**subject**
5:25 31:11,22

**subpoena**
9:18 10:3,10,20 11:14
12:2 17:14 20:7 21:5
24:17,23 28:1 32:23 33:4
39:3 46:9 54:24

**subpoenas**

THOMAS W. BEVAN, ESQ. - 02/21/2018                    i11

25:7

**substance**
22:18 39:10

**substantive**
6:5 52:13

**such-and-such**
19:21

**Summit**
9:10,11

**supposed**
7:14

**sure**
8:9 9:25 14:3,14 15:4,8
16:6,17 18:2 21:22
23:16,25 25:8,13 26:1,
12,17 31:4 34:23 35:2
38:13 44:1,11 45:18
53:14,15 54:6

**surprise**
28:2,4 29:5

**sworn**
5:3

**system**
16:5,8,20,23 20:12 30:23
48:9,11

**systems**
27:11,15

_____

T

**take**
9:20 23:5 27:7,11 28:12,
14 32:21 33:2,8 35:13
40:11 47:24 48:13

**taken**
24:16 32:11 33:6

**talc**
17:17,18 18:1,2,3 23:17
46:13 52:19,21,23 53:1,4

**talk**
19:18,19 37:16 38:11

**talked**
23:7 24:9,10 35:9 38:5,9
47:13

**talking**
11:2 27:17 28:2 36:24
45:19 49:15,17

**tell**
5:8,17 25:15 38:11 39:5,
18 40:1 41:19 44:15 47:8

**telling**
27:1 40:2,3

**ten**
20:18 26:13 51:23 52:5

**term**
18:7

**terms**
17:20,25 18:5,6 23:14,21
24:3 30:7 32:16 33:3
46:12,15 49:20 54:8

**test**
32:15

**testified**
5:4

**testify**
16:13 38:16,19

**testimony**
5:18 6:14 8:11,18,21
37:6

**Thank**
55:8

**thanks**
52:10

**there's**
10:23 13:14,18 14:5
15:25 18:21 19:19 22:13
31:12 46:17,18

**they're**
21:20 46:20 47:22

**thin**
43:6,10

**thing**
17:7 18:17 22:16

**things**
42:25 43:1 46:18

**think**
8:12 9:24 10:1 15:13
16:14 20:9,13,19,22
21:20,23 23:10 28:21
29:12 30:14,24 31:15,24
34:7 41:14 47:14 52:7,
14,15 55:11

**thinking**

26:10

**third**
14:4

**THOMAS**
5:2

**thought**
17:18 37:14 38:1,22 43:8
48:21,25 49:11 52:20

**thousand**
8:3

**three**
6:15,22 8:8 13:18 14:1
18:12 35:8

**throw**
48:24

**time**
6:10 8:5 16:10,21,25
18:11 19:21 22:17 24:18
26:18 28:3 35:10 38:8,10
41:18,19 43:5,25 44:2,5
48:8,18 49:7 51:21
53:19,23 54:18

**timing**
25:9 44:6

**tire**
7:16,18,19,20,22,25 8:4
49:14,18 50:9,10,13,15,
19,21

**titled**
50:19

**titles**
17:17

**today**
5:9 12:22 16:16 24:15,20
28:24 38:2,16 40:20

**told**
23:24,25 26:1 31:24 32:7
39:20,23

**top**
12:24,25 13:2,3 22:23

**toss**
52:11

**track**
42:10,11

**trail**
18:20,21,25

**transcript**
6:24 8:16

**transcripts**
6:21 8:7

**transfer**
23:1

**trash**
52:11

**trial**
8:22

**trust**
29:21 30:2,8 36:20,25
37:3 43:11,16

**trusts**
37:4 43:22

**try**
17:3 25:5 43:8

**trying**
52:14

**turn**
12:16 13:4

**turned**
30:5

**two**
6:8,24 7:25 12:9,18
13:22 18:4 46:17 53:7,20

_____

U

**Uh-huh**
54:16

**understand**
44:7

**understanding**
14:8 50:8

**undertook**
25:1 27:20

**unread**
34:14,18

**use**
17:4,6,7,25 19:1 20:11,
23 21:19,24 23:14 28:3
43:10

**uses**
20:13 22:2

THOMAS W. BEVAN, ESQ. - 02/21/2018                    i12

**usually**
19:18

_____

**V**

_____

**version**
15:13 41:10 45:13

**versus**
9:8

**view**
14:14

_____

**W**

_____

**waive**
55:10

**waived**
55:13

**Walsh**
8:13 10:11,14 20:13
21:15 23:9

**want**
6:4 34:6,13,14 46:17
53:24 55:9

**wanted**
45:3 48:11

**wasn't**
38:19 43:8 48:13 54:22

**way**
7:12 13:21 14:14 15:11
21:22 27:10 31:1 34:19
39:18 41:23 42:12 51:6

**We'll**
11:11 12:19

**we're**
6:2,8,10 19:17 28:2
36:24

**we've**
9:16 12:8 13:5 40:4

**week**
27:23 33:23 42:8

**Weir**
47:14

**went**
42:13,21 43:22 48:10

**weren't**
11:3 31:25 32:8

**what's**
30:1 31:5

**Williams**
5:13 9:19 11:5 12:11
15:3 25:14 31:22 41:18
47:14 49:6

**withdrawn**
19:15 41:15 42:17 43:2
46:4

**witness**
6:6 55:13

**won't**
22:16

**word**
17:18 46:16,19,24 47:9

**words**
22:18 39:9 43:10

**work**
20:10

**worker**
7:16,18,19,20,22 49:14,
18 50:9,11,13,15,21

**workers**
7:25 8:4,5

**workers'**
5:24 7:1,6,14 8:13

**works**
34:19

**worth**
45:1

**worthy**
48:22

**wouldn't**
28:4 29:5 41:7 44:23,25
47:17 48:9 55:4

**written**
13:7 15:1,6 23:18 26:4

**wrong**
44:15

_____

**Y**

_____

**yeah**
7:13 19:23 28:15 30:3

32:2 34:23 44:19 54:9

**years**
26:13 28:14 29:7 35:8
36:17,24 37:2

**you'd**
22:17 51:23

**you'll**
8:15

**you're**
9:25 11:2,22,25 14:3
15:8 16:17,19 17:5 26:10
27:17 31:14 40:20 45:18,
19 47:10 48:5 49:15

**you've**
5:17 7:24 9:20,25 17:9
30:15,19,21 31:3 32:12
49:18 53:18