# EXHIBIT F

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF NEW JERSEY

3

4   KIMBERLEE WILLIAMS,     ) CASE NO. 2:11-CV-01754
    et al.,              ) (JLL)(JAD)
5                        )
        Plaintiffs,    )
6                       )
    versus              )
7                        ) CONTINUED DEPOSITION OF
    BASF CATALYSTS, LLC,     )
8   et al.,             ) THOMAS W. BEVAN, ESQ.
                        )
9        Defendants.    )

10

                - - - - - - -
11                 VOLUME II
                - - - - - - -

12

13      Continued Deposition of THOMAS W. BEVAN, ESQ., a

14   Witness herein, called by the Defendants for

15   Cross-Examination pursuant to the Federal Rules of

16   Civil Procedure, taken before me, the undersigned,

17   Anika W. Patrick, a Registered Merit Reporter,

18   Certified Realtime Reporter and Notary Public in and

19   for the State of Ohio, at the offices of Thompson Hine,

20   LLP, 3900 Key Center, 127 Public Square, Cleveland,

21   Ohio, on Thursday, April 5, 2018, at 1:15 p.m.

22

23

24

25

THOMAS W. BEVAN, ESQ. - 04/05/2018     Pages 60..63

Page 60

1  APPEARANCES:
2
3    On Behalf of the Plaintiffs:
4      Harry M. Roth, Esq.
         Cohen, Placitella & Roth
         Two Commerce Square
5        2001 Market Street, Suite 2900
         Philadelphia, Pennsylvania 19103
6        215.567.3500
         hroth@cprlaw.com
7      - - - and - - -
         Jared M. Placitella, Esq.
8        Cohen, Placitella & Roth
         127 Maple Avenue
9        Red Bank, New Jersey 07701
         732.747.9003
10       jmplacitella@cprlaw.com
11   On Behalf of the Defendant BASF Catalysts, LLC:
       Peter A. Farrell, Esq.
12     Eugene F. Assaf, Esq.
       Brandon Stone, Esq.
13     Kirkland & Ellis, LLP
       655 Fifteenth Street, Northwest, Suite 1200
14     Washington, D.C. 20005
       202.879.5000
15     Peter.farrell@kirkland.com
       Eugene.assaf@kirkland.com
16     Brandon.stone@kirkland.com
17
18
     On Behalf of the Defendants Cahill Gordon &
19   Reindel, LLP, Howard G. (Peter) Sloane, and Ira J.
     Dembrow:
20
       Kyle A. Dolinsky, Esq.
21     Pepper Hamilton, LLP
       3000 Two Logan Square
22     Eighteenth and Arch Streets
       Philadelphia, Pennsylvania 19103-4750
23     215.981.4000
       dolinskyk@pepperlaw.com
24
25

Page 61

1  APPEARANCES (Continued):
2
3    On Behalf of the Defendant Thomas D. Halket: (Via
     Telephone):
4      Eric Tunis, Esq.
       Herold Law, PA
5      25 Independence Boulevard
       Warren, New Jersey 07059
6      908.647.1022
       Etunis@heroldlaw.com
7
8    On Behalf of the Defendant Arthur Dornbusch (Via
     Telephone):
9
       John A. Boyle, Esq.
10     Marino, Tortorella & Boyle, PC
       437 Southern Boulevard
11     Chatham Township, New Jersey 07928
       973.824.9300
12     Jboyle@khmarino.com
13
     On Behalf of the Bevan Law Firm:
14
       Kevin McDermott, Esq.
15     McDermott & Hickey, LLC
       20525 Center Ridge Road, Suite 200
16     Rocky River, Ohio 44116
       216.712.7452
17     kevin@mcdermotthickeylaw.com
       - - - and - - -
18     (Via Telephone)
       Brendan Little, Esq.
19     Levy Konigsberg, LLP
       800 Third Avenue, 11th Floor
20     New York, New York 10022
       212.605.6200
21     blittle@levylaw.com
22
              - - - - - - -
23
24
25

Page 62

1              I N D E X
2
3  EXAMINATION BY                    PAGE
4  Mr. Farrell              63
5
6  PLAINTIFF'S EXHIBITS MARKED
7  None
8
9  DEFENDANT'S EXHIBITS MARKED          PAGE
10 143, Transcript of Mr. Bevan 2/21/18      84
11 144, Letter to Justice Rivera-Soto    105
12 145, Declaration by Mr. Bevan       111
13            - - - - - - -
14
15
16
17
18
19
20
21
22
23
24
25

Page 63

1  WHEREUPON,
2        THOMAS W. BEVAN, ESQ.,
3    after being first duly sworn, as hereinafter
4    certified, testified as follows:
5        CROSS-EXAMINATION
6  BY MR. FARRELL:
7  Q.  Good afternoon, Mr. Bevan.
8  A.  Good afternoon.
9  Q.  Welcome back.
10       MR. ROTH:  Sorry.  Brendan, did you say
11   you were on the phone?  Brendan Little?
12       MR. LITTLE:  Yes, Brendan Little is on
13   the phone.
14       MR. FARRELL:  Two minutes in and Mr. Roth
15   is already interrupting me.
16       MR. ROTH:  Just getting started.
17 Q.  Is the Bevan Law Firm under a duty to preserve
18   documents related to the Williams case?
19 A.  Whether I have a duty or not, we've preserved
20   documents.
21 Q.  Does the Bevan Law Firm have a duty to preserve
22   documents related to the Williams case?
23 A.  I don't know.
24 Q.  You can't answer that question?
25 A.  No.

THOMAS W. BEVAN, ESQ. - 04/05/2018      Pages 64..67

Page 64

1   Q.  Are you familiar with the concept of a duty to
2       preserve documents under the law?
3   A.  Explain what concept you're talking about and I'll
4       let you know if I'm familiar with it.
5   Q.  Well, you've been -- I think last time we were
6       together you told me you had been practicing law
7       for more than 20 years, correct?
8   A.  Yes, 27 years.
9   Q.  Twenty-seven years. In your 27 years of
10      practicing law, you've not encountered the concept
11      of a duty to preserve documents that are relevant
12      to litigation?
13  A.  I guess defendants that I have sued or expect to
14      be sued, I have a duty to preserve documents and
15      I'm familiar with that concept, yes.
16  Q.  So the defendants have a duty to preserve, but you
17      view the plaintiff's duty differently?
18          MR. ROTH: Objection. Form, foundation.
19          MR. McDERMOTT: Objection. Yeah.
20  A.  I didn't say -- I didn't say that.
21  Q.  Okay. So --
22  A.  I'm saying what I'm familiar with. You asked me
23      what I was familiar with.
24  Q.  You're familiar with the concept of defendants
25      having a duty to preserve, yes?

Page 65

1   A.  Yes.
2   Q.  Are you familiar with the concept of a plaintiff
3       having a duty to preserve documents that are
4       relevant to litigation?
5   A.  It's never come up that I've had to deal with.
6   Q.  In your 27 years of practicing law, you've never
7       encountered the issue of whether a plaintiff had
8       to preserve documents?
9           MR. ROTH: Objection. Form, foundation.
10  A.  No.
11  Q.  When your clients come up to you in your cases, you
12      don't routinely tell them they need to preserve
13      documents that are relevant to the case they're
14      about to file?
15  A.  I ask them to give me documents that are relevant
16      to the case, and if they have anything that's
17      relevant to the case, then they give them to me
18      and I hold them.
19  Q.  Anything other than that?
20  A.  I can't think of an instance other than that where
21      I've had -- come across that.
22  Q.  What is the defendant's duty to preserve
23      documents?
24  A.  I believe the defendant has a duty to preserve
25      documents that would be relevant to a case in

Page 66

1       which they've been sued or which they expect that
2       they're going to get sued.
3   Q.  So a duty attaches when they've actually been
4       sued, correct?
5           MR. ROTH: Object to form and foundation.
6   A.  I believe so.
7   Q.  Do you believe the duty attaches before they've
8       been sued?
9   A.  I believe if they expect to get sued, yes.
10  Q.  If they expect to get sued. Okay. Now, if you're
11      a plaintiff in the case, do you believe that the
12      plaintiff has a duty to preserve documents when
13      they expect to file a case?
14  A.  I guess it depends on what documents you're
15      talking about. If it's documents that are
16      relevant to the case, I would recommend that my
17      clients, you know, preserve any of those
18      documents, sure.
19  Q.  So you would --
20  A.  I would ask them to give them to me and then I
21      would preserve them.
22  Q.  You agree that the plaintiff who is going to file
23      a case has a duty to preserve documents that are
24      relevant to the case that is going to be filed,
25      correct?

Page 67

1   A.  I certainly believe that that's the best practice.
2       Whether there's a legal duty to that or not, I
3       don't know, Peter.
4   Q.  So you think it's a good idea, but you're just not
5       sure if it's required?
6   A.  Correct.
7           MR. ROTH: Objection. Form, foundation.
8   Q.  What types of documents would a defendant need to
9       preserve in litigation?
10  A.  If they tested their talc to determine if it
11      contained asbestos and had test results of that,
12      those should have been preserved.
13  Q.  Any other documents?
14  A.  If they had sales records, those should be
15      preserved. If they had records regarding their
16      knowledge about -- historical knowledge about
17      asbestos hazards or about asbestos in their
18      product, those should be preserved. I'm sure
19      there's more. That's what comes to mind right
20      now.
21  Q.  What time period is at issue in the Williams case?
22  A.  When you say "the Williams case," can you be a
23      Little bit more specific what you're referring to?
24  Q.  The case that brings us here today, the class
25      action, Kimberlee Williams and others versus BASF

THOMAS W. BEVAN, ESQ. - 04/05/2018    Pages 68..71

Page 68

1    and others.
2  A.   The time period that I think would be at issue
3       would be, you know -- you know, as far as my
4       specific clients, I think some of them went back
5       to the 1940s.  So I would say 1940s to present
6       would be at issue.
7  Q.   Well, this case is about litigation that was filed
8       by plaintiffs, correct?
9  A.   That's my understanding, yes.
10 Q.   Some of the -- you represented some of those
11      plaintiffs?
12 A.   Yes.
13 Q.   The cases don't go back to the 1940s, correct?
14 A.   The facts surrounding the case go back to the
15      1940s.
16 Q.   Let me ask it this way:  What is the earliest case
17      that you filed on behalf of a plaintiff against
18      Engelhard or an Engelhard entity related to EMTAL
19      talc?
20 A.   I believe it goes back to probably around 1991.
21 Q.   Was the first case you filed?
22 A.   Yes.
23 Q.   Okay.  And what was the last case that you filed
24      against Engelhard or BASF related to EMTAL talc?
25 A.   I don't know.  It might be in the past year.  I'm

Page 69

1       not sure.  I'm sure -- we have the Ross case,
2       which, you know, you're very familiar with.  I
3       don't -- I think we filed that in '17.  Whether we
4       filed anything in '18 or not, I'm not sure yet.
5  Q.   Okay.  When did Chris Placitella first tell you
6       that he was contemplating filing the case that
7       became the Williams case?
8  A.   I think it was probably 2011.
9  Q.   Do you know when in 2011?
10 A.   I think it was early 2011, but I'm not sure.
11 Q.   Do you know when the Williams case was filed?
12 A.   I think it was filed in 2011, but I don't recall
13      the exact date.
14 Q.   When you spoke to Mr. Placitella in early 2011
15      about the possibility of filing the Williams case,
16      did he tell you anything about preserving
17      documents?
18 A.   You know, whether he said it in the first
19      conversation or not, I'm not sure.  I know it was
20      early in the process, which -- when he said
21      preserve documents, but I can't give you a date on
22      that.
23 Q.   So it may not have been the first conversation
24      with him?
25 A.   It may not have been.  I -- I don't recall.  I

Page 70

1       just know it was early in the process.  That's the
2       best I could tell you.
3  Q.   Then when you were here last time when we
4       discussed the concept of document retention
5       notices, do you remember that?
6  A.   Yes.
7  Q.   And you confirmed that your firm didn't issue a
8       document hold notice in anticipation of the
9       Williams case, right?
10 A.   I think I -- yeah, I think I indicated that I
11      don't know what a document hold notice is, but
12      that we hadn't destroyed any documents.
13 Q.   When Mr. Placitella contacted you in early 2011
14      about the possibility of filing this case, did you
15      contact any of your clients to tell them that they
16      should preserve documents?
17 A.   To tell them they should preserve documents?
18 Q.   Correct.
19 A.   I did not.
20 Q.   Do you know whether Mr. Placitella contacted any
21      of your clients to tell them to preserve
22      documents?
23 A.   I do not know.
24 Q.   Did anyone -- has there been any point in time
25      since 2011 when you've told clients of the Bevan

Page 71

1       firm to preserve documents that are relevant to
2       the Williams case?
3  A.   I do not think I've had that conversation with any
4       clients.
5  Q.   Has anyone from your firm told current or former
6       clients of the Bevan firm to preserve documents
7       that are relevant to the Williams case?
8  A.   I don't know.
9  Q.   Did Mr. Placitella call the other employees of the
10      Bevan firm and tell them to preserve documents
11      that are relevant to the Williams case?
12 A.   Not that I know of, but I don't really know.
13 Q.   And you didn't send a document hold notice,
14      correct?
15          MR. ROTH:  Objection.  Form, foundation.
16 A.   Again, I don't know what a document hold notice
17      is, but I told my staff not to destroy anything.
18 Q.   In writing?
19 A.   No.
20 Q.   So you had conversations?
21 A.   Yeah.
22 Q.   When was that?
23 A.   Over the years.  Multiple times.  I don't recall
24      exactly when.
25 Q.   Did you have a specific conversation with the

THOMAS W. BEVAN, ESQ. - 04/05/2018    Pages 72..75

Page 72

1    employees of the Bevan Law Firm to tell them they
2    had a duty to preserve documents that are relevant
3    to the Williams case?
4         MR. ROTH: Objection. Form, foundation.
5  A. I think what I would have told them is do not
6    destroy any documents related to these cases and
7    Eastern Magnesia Talc.
8  Q. When was that?
9  A. I don't recall.
10 Q. Was it in 2011?
11       MR. McDERMOTT: Objection. Asked and
12       answered.
13 A. I don't recall.
14 Q. So as you sit here today, you can't say one way or
15    the other whether that was before or after the
16    Williams complaint was filed?
17       MR. McDERMOTT: Objection.
18 A. I don't know. Yeah, I don't know.
19 Q. The conversation you referenced with your
20    employees about preserving documents, was that one
21    meeting with all employees?
22 A. No.
23 Q. You had multiple conversations?
24 A. I'm sure I told Erin Clark, my paralegal. I'm
25    sure I told Pat Walsh, my partner. They would

Page 73

1    have been the only ones that I would have had to
2    say anything to.
3  Q. Just the two of them?
4  A. (Witness nodding head up and down.)
5  Q. Did you tell any IT person or somebody responsible
6    for your e-mail and electronic document systems to
7    make sure that no documents were discarded from
8    the Bevan firm?
9  A. I don't know -- I guess I'm not understanding or
10    maybe you're not understanding the way my office
11    works, so that's not a question that makes any
12    sense to me.
13 Q. Do you personally administer the Bevan firm e-mail
14    system?
15 A. No.
16 Q. Who does that?
17 A. I don't think anybody personally administers it.
18    It's set up and it runs.
19 Q. Okay. What about your electronic document system?
20 A. What about it?
21 Q. Who administers your electronic document system?
22 A. Again, that's a system that's set -- is set up.
23    We have an employee that does most of the scanning
24    for that system.
25 Q. Who is that?

Page 74

1  A. Her name is Marietta. And if there's something to
2    be scanned, it's given to her and she scans it and
3    gives it back to the person that gave it to her to
4    scan to review. That person reviews it, makes
5    sure it got scanned and gets rid of the hard copy
6    and the electronic copy is preserved.
7  Q. When was your conversation with Erin Clark about
8    preservation of documents?
9  A. I don't know.
10 Q. Before or after the Williams complaint was filed?
11 A. I don't know.
12 Q. When was your conversation with Mr. Walsh about
13    preservation of documents?
14 A. I don't know.
15 Q. Before or after the Williams complaint was filed?
16 A. I don't know.
17 Q. When you were here last time, we talked about the
18    automatic deletion of e-mails. Do you remember
19    that discussion?
20 A. Yes.
21 Q. Have you had an opportunity to look into the
22    questions I asked you about the automatic deletion
23    of e-mails at the Bevan Law Firm?
24 A. I did.
25 Q. Does the Bevan Law Firm e-mail system

Page 75

1    automatically delete e-mails after a certain
2    period of time?
3  A. No. Well, let me explain how that works. The
4    e-mails will come in to an outside server. Those
5    get forwarded to the recipient. When the
6    recipient receives it, opens the e-mail, the
7    outside server deletes it. The e-mail is now on
8    the recipient's computer on their Outlook program,
9    and it will stay on their computer until that
10    individual deletes it. There's no auto delete.
11 Q. Okay. So it sound like there are two steps.
12    There's some central server and then individual
13    computers by employees, correct?
14 A. Yes.
15 Q. And when an e-mail hits the central server after
16    it's forwarded to somebody, it's deleted on the
17    central server?
18 A. Yes.
19 Q. When Mr. Placitella told you that he was
20    contemplating filing the Williams case, did you
21    take any steps to stop that central server from
22    automatically deleting e-mails?
23 A. No.
24       MR. ROTH: Objection. Form, foundation.
25 Q. Once the e-mails are forwarded from the central

THOMAS W. BEVAN, ESQ. - 04/05/2018     Pages 76..79

Page 76

1   server to the actual recipient, you said it's
2   saved locally on their computer; is that correct?
3   A.  Correct.
4   Q.  After the Williams – withdrawn.
5        When Mr. Placitella told you that he was
6   contemplating filing the Williams case, did you
7   take any steps to ensure that the e-mails on
8   individual Bevan employee computers were not
9   deleted?
10  A.  No.
11  Q.  So the individual employee e-mails – withdrawn.
12       The system you're describing, the central
13  server and then the forwarding to individual
14  computers, how long has your e-mail system worked
15  that way?
16  A.  It's, I would estimate, ten years.
17  Q.  Is that when you first adopted e-mail or did you
18  have a different system before then?
19  A.  Well, I've always used AOL, as I told you in great
20  detail the last time, so – and as far as people
21  having Bevan Law e-mails, I would say that's been
22  about ten years, I would estimate.
23  Q.  So before ten years ago, give or take, there was
24  no formal Bevan Law Firm e-mail system?
25  A.  That is correct.

Page 77

1   Q.  All of the litigation – withdrawn.
2        Any e-mails sent or received from a Bevan
3   Law Firm employee before ten years ago would have
4   been on some personal e-mail system?
5   A.  Correct.
6   Q.  When Mr. Placitella called you in early 2011 to
7   say he was contemplating filing the Williams case,
8   what steps did the Bevan Law Firm take to ensure
9   that the e-mails on the personal e-mail accounts
10  of Bevan employees were preserved?
11  A.  What e-mails are you talking about?
12  Q.  Well, you've told me that every employee –
13  A.  I mean, are you talking – let me make my question
14  a Little bit clearer.  Are you talking everybody's
15  e-mails that they get or e-mails from
16  Mr. Placitella?
17  Q.  Any e-mail they have that is relevant to the
18  Williams case.
19  A.  Okay.  All right.  Now you can answer
20  the – now – I'm sorry.  Now you can tell me what
21  the question was again.
22  Q.  Let's take it in two steps.  When Mr. Placitella
23  called you in early 2011 to say he was
24  contemplating filing the Williams case, what steps
25  did the Bevan Law Firm take to ensure that e-mails

Page 78

1   in the personal e-mail accounts of Bevan employees
2   were preserved?
3   A.  The personal ones that we're talking about would
4   be my account, and so I have e-mails from Chris
5   Placitella.  E-mails that could be relevant to
6   this I don't delete, so I guess I ceased to delete
7   any e-mails that could be relevant.
8   Q.  Let's try to take it in steps so we're on the same
9   page.  There have been multiple Bevan firm
10  employees who worked on cases that were filed
11  against Engelhard or BASF related to EMTAL talc,
12  correct?
13  A.  I'm sorry.  Repeat that again.
14  Q.  There have been multiple Bevan firm employees who
15  worked on cases that your firm filed against
16  Engelhard or BASF related to EMTAL talc, correct?
17  A.  Correct.
18  Q.  You didn't handle every single case by yourself?
19  A.  Correct.
20  Q.  And the Bevan employees, before ten years ago,
21  would have used personal e-mail accounts as part
22  of their job at the Bevan firm?
23       MR. ROTH:  Objection.  Form, foundation.
24  A.  Some employees, correct.
25  Q.  And then even after ten years ago when you

Page 79

1   instituted a formal Bevan e-mail system, employees
2   of the Bevan firm continued to use personal e-mail
3   accounts to conduct firm business like
4   representing clients, correct?
5   A.  Some, yes.
6   Q.  So my question to you was, when Mr. Placitella
7   called you in early 2011 to tell you he was
8   contemplating filing the Williams case, what steps
9   did the Bevan Law Firm take to ensure that e-mails
10  in the personal e-mail accounts of Bevan firm
11  employees were preserved?
12  A.  I guess the answer to that question would be the
13  only one that would have been using a personal
14  e-mail account on this would be me, and I saved or
15  did not delete my e-mails.  So that would be the
16  steps that I would have taken.
17  Q.  The only steps to preserve e-mails in personal
18  e-mail accounts that the Bevan Law Firm took were
19  e-mails in your personal e-mail account?
20  A.  Correct.
21  Q.  Not Tom Walsh – Pat Walsh?
22  A.  I think he uses a firm e-mail account.
23  Q.  You told me a few minutes ago that all of the
24  employees used personal e-mail accounts.
25       MR. ROTH:  Objection.  Form, foundation.

THOMAS W. BEVAN, ESQ. – 04/05/2018     Pages 80..83

Page 80

1   A.  No, I said some.  I didn't say all.
2   Q.  Let's stick with Mr. Walsh.  At your deposition on
3       February 21st, you told me that Mr. Walsh uses an
4       AOL e-mail account to conduct Bevan firm business.
5   A.  I think he uses both.
6   Q.  What steps did the Bevan Law Firm take in early
7       2011 to preserve e-mails that Mr. Walsh has in his
8       AOL e-mail account that are relevant to the
9       Williams case?
10  A.  I think Mr. Walsh, if he has any -- first of all,
11      I don't think he would have anything going back
12      that far, but if he did, he would have those.
13  Q.  What's your basis for that statement?
14  A.  He wasn't involved in it at all in the beginning.
15  Q.  Well, have you checked?
16  A.  Yeah.
17  Q.  You checked his AOL e-mail account?
18  A.  We checked his e-mails, yes.
19  Q.  Did you tell him to preserve all of his e-mails
20      that are relevant to the Williams case?
21  A.  I think so, yes.
22  Q.  You think so or you did?
23  A.  I think I did.
24  Q.  When would that have been?
25  A.  I don't recall.

Page 81

1   Q.  Can you point to any writing that memorializes you
2       telling Mr. Walsh to preserve his e-mails?
3   A.  His office is -- adjoins my office, so I would not
4       have put anything in writing to him.
5   Q.  So you think you had a conversation with him?
6   A.  Oh, I'm sure.
7   Q.  As you sit here today, are you sure you had a
8       conversation with him?
9   A.  I'm sure I did, yeah.
10  Q.  When was that?
11  A.  I don't recall.
12  Q.  What would you have told him about his obligation
13      to preserve e-mails?
14  A.  I said, "Preserve anything related to Eastern
15      Magnesia Talc.  We're not destroying anything."
16  Q.  Anything else?
17  A.  No.
18  Q.  What about, like, plaintiffs' settlements with
19      other parties in asbestos cases?
20          MR. ROTH:  Objection to form, foundation.
21  A.  What about it?  What are you asking me?
22  Q.  I'm trying to understand, Mr. Bevan, the scope of
23      the documents that you thought your firm and its
24      employees has a duty to preserve.
25  A.  Okay.

Page 82

1   Q.  So you told me documents related to Eastern
2       Magnesia Talc, right?
3   A.  Yes.
4   Q.  There are many other documents related to past
5       cases you filed against Engelhard that aren't
6       related to Eastern Magnesia Talc, correct?
7   A.  You're going to have to repeat that question
8       again, because you're not making sense.  So please
9       try to rephrase the question and maybe I'll
10      understand it.
11  Q.  In your past cases where you have sued Engelhard
12      or BASF --
13  A.  Okay.
14  Q.  -- you also sued other defendants, correct?
15  A.  Yes.
16  Q.  Sometimes as many as 90 or 100 defendants, right?
17  A.  Yes.
18  Q.  And in those cases there are a whole variety of
19      documents, correct?
20  A.  Yes.
21  Q.  Some of them relate to EMTAL talc?
22  A.  Probably, yeah.
23  Q.  And some of them do not?
24  A.  Yes.
25  Q.  You told me a few minutes ago you understood your

Page 83

1       duty to preserve was limited to Eastern Magnesia
2       Talc.
3           MR. ROTH:  Objection.
4   Q.  So my question for you was --
5           MR. ROTH:  Sorry.
6   Q.  -- did you tell Mr. Walsh or anyone else at the
7       Bevan firm that they had a duty to preserve
8       documents other than documents related to Eastern
9       Magnesia Talc?
10          MR. ROTH:  Objection.  Form, foundation.
11  A.  I don't think I've told anybody to preserve
12      documents that are unrelated to this case against
13      Eastern Magnesia Talc, if that's what you're
14      asking me.
15  Q.  What are the subject matter of the
16      cases -- withdrawn.
17          What is the subject matter of the
18      documents that you believe your firm has a duty to
19      preserve because of the Williams case?
20  A.  You know, first of all, we're not destroying
21      documents.  Okay?  Our clients' files get scanned
22      and they stay there forever.  Okay?  So maybe it
23      clears things up that we're not destroying
24      anything.  Okay?  If that's what you're getting
25      at.  But, you know, if a document's related to

THOMAS W. BEVAN, ESQ. - 04/05/2018    Pages 84..87

Page 84

1    Eastern Magnesia Talc, we're not destroying them.
2 Q. My question was a bit different, Mr. Bevan. You
3    were telling me that you -- first you said you
4    thought that you had a conversation with Mr. Walsh
5    and then you said no. Now you're sure you had a
6    conversation with Mr. Walsh about preserving
7    documents. And then you said, well, I would have
8    told him to preserve documents related to Eastern
9    Magnesia Talc.
10 A. Correct.
11 Q. Is that -- are those the only documents you told
12    him to preserve?
13       MR. ROTH: Objection. Form, foundation.
14 A. Yeah.
15       (Whereupon, Defendant's Exhibit 143 was
16       marked for identification.)
17 Q. When you first spoke to Mr. Placitella in early
18    2011, did you tell him that many of the Bevan Law
19    Firm files had been converted to electronic form?
20 A. I don't recall. I doubt it that that would have
21    come up, but I don't recall.
22 Q. Have you -- I'm sorry.
23 A. But I don't recall.
24 Q. Have you ever told the Cohen Placitella firm that
25    the Bevan Law Firm scanned its historical files?

Page 85

1 A. Oh, yes.
2 Q. When was that?
3 A. I'm sure we talked about it when we were doing
4    this original production. I don't recall what
5    year that was. Producing the Williams file and
6    the Clark and the Graham, Darnell and Ware files,
7    I'm sure we went over it with them at that time.
8 Q. When was that?
9 A. I don't -- I don't know. Whenever
10    that -- whenever that original production took
11    place.
12 Q. Did you tell him that at any point in 2011?
13 A. I don't recall if I did or not in 2011.
14 Q. Well, when Mr. Placitella was contemplating filing
15    the Williams case, did he ask you to see any of
16    the documents related to the lawsuits you filed
17    against Engelhard or BASF?
18 A. Did he ask me to see any of the documents? Of my
19    documents or his documents? Whose documents?
20 Q. When Mr. Placitella contacted you in 2011 to
21    discuss filing the Williams case, did he ask you
22    for the opportunity to review any of the Bevan Law
23    Firm's documents related to cases that your firm
24    filed against Engelhard or BASF?
25 A. I don't recall him asking me that.

Page 86

1 Q. You don't recall that?
2 A. That he asked me to review my clients' documents?
3 Q. That Mr. Placitella asked to have the opportunity
4    to review your documents related to cases you
5    filed against Engelhard or BASF.
6 A. I don't recall if he asked that or not. I don't
7    recall.
8 Q. You talked a few minutes ago about your -- the
9    original production of documents in this case. Do
10    you remember that?
11 A. Yes.
12 Q. Mr. Placitella contacted you to say that you would
13    need to produce certain documents in the Williams
14    case?
15 A. Yes.
16 Q. That would have been sometime in 2016?
17 A. Boy, I thought it was longer ago than that, but I
18    don't know exactly when it was.
19 Q. It could have been before 2016?
20 A. I don't recall when it was, Peter. It was a long
21    time ago.
22 Q. When he talked to you about preserving
23    document -- withdrawn.
24       When Mr. Placitella spoke to you about
25    the production of documents in this case on behalf

Page 87

1    of the five class representatives in the Williams
2    case, did you tell him at that point that the
3    Bevan Law Firm had scanned its historical files?
4 A. I'm sure during that production that was made
5    clear, yes. I don't recall the specific
6    conversation, but I'm sure it was made clear
7    during that production.
8 Q. So when he first spoke to you about producing
9    documents related to the five class
10    representatives in the Williams case, who your
11    firm represented, you would have told him that
12    your firm had scanned its historical files?
13       MR. ROTH: Objection. Form, foundation.
14 A. You know, you said when he first talked to me
15    about it. Again, it was during that production
16    process. Whether it was in the first conversation
17    we had or the second or the third or the fourth, I
18    don't know. But at some point we made it clear
19    that our files were electronic.
20 Q. When was the first time that you provided Bevan
21    Law Firm documents to the Cohen Placitella firm?
22 A. I don't recall.
23 Q. Did you provide any documents -- withdrawn.
24       Did you provide any Bevan Law Firm
25    documents to the Cohen Placitella firm before the

THOMAS W. BEVAN, ESQ. - 04/05/2018    Pages 88..91

Page 88

1    Williams complaint was filed?
2  A.  Yeah, I don't recall.
3  Q.  At any point before the original document
4      production in this case that you referenced a few
5      minutes ago, did your firm provide Bevan Law Firm
6      documents to the Cohen Placitella firm?
7  A.  I'm sorry.  Can you repeat that?
8  Q.  A few minutes ago you were discussing the original
9      document production in the Williams case on behalf
10     of the five class representatives whom your firm
11     represented, correct?
12 A.  Yes.
13 Q.  At any point in time before that original document
14     production did your law firm provide Bevan firm
15     documents to the Cohen Placitella firm?
16 A.  I would say probably.  I'm not sure, but probably.
17 Q.  What documents did you provide to them?
18 A.  I would assume we provided, you know, medical
19     records or some information of some sort regarding
20     the five plaintiffs.
21 Q.  Do you know whether all of those documents have
22     been produced to the defendants in the Williams
23     case?
24 A.  I don't know what they produced to you.
25 Q.  Do you have a log of the documents that you sent

Page 89

1      to the Cohen Placitella firm?
2  A.  We have a scanned copy of some sort, yeah, but I
3      don't have a log.
4  Q.  You have a record of the doc -- all the documents
5      that you've provided to Cohen, Placitella & Roth?
6  A.  I believe I know what we've provided, yes.
7  Q.  Something you could still access today?
8  A.  I assume.  I would check with my paralegal, Erin
9      Clark.  She's the one that, you know, put them on
10     whatever she did, if she put them on a disk,
11     however.  But she would be the one I would consult
12     with on that.
13 Q.  I've handed you what I've marked for
14     identification as Defendant's Exhibit 143.  That's
15     the transcript of your deposition from two months
16     ago in this case.  Have you had a chance to review
17     that transcript?
18 A.  I did.
19 Q.  Is there any testimony that you gave in that last
20     deposition that you'd like to amend or correct in
21     any way?
22 A.  I can think of one for sure.
23 Q.  What's the one?
24 A.  At the end of that deposition, you told me that we
25     didn't produce a letter from Sam Martillotta to me

Page 90

1      and you weren't being truthful about that, Peter,
2      because we did produce that letter.  And I was
3      told we produced it three times, and I looked at
4      my settlement files and I found it in about 20
5      seconds or so, that letter.  And it frankly upset
6      me that you would be that deceitful and dishonest.
7  Q.  Mr. Bevan, I wasn't --
8  A.  So I would change your testimony to say that there
9      was a third option why you wouldn't have it, and
10     the third option was that you were lying to me.
11 Q.  Oh, I see.  I wasn't --
12 A.  That was the third option.  I gave you two
13     possibilities, but that would be the third one.
14 Q.  I'm not --
15 A.  There's a couple other things I would add, too.
16 Q.  What else?
17 A.  I think I told you my talc settlement files were
18     between six and twelve inches, and I measured them
19     and it was eight and a half inches.
20 Q.  Okay.  Have all of those been produced?
21 A.  Yes, in that letter that you introduced as an
22     exhibit in that deposition was in that file -- in
23     those files.
24 Q.  So the multi-hundred-page PDF that the Plaintiffs
25     produced to us where the Martillotta letter was

Page 91

1      stuck in the middle, that's the file you're
2      talking about?
3  A.  Well, I reject your suggestion that somehow it was
4      stuck in the middle to be hidden.  I assume it was
5      produced in the same way that it was in my file.
6  Q.  I'm not suggesting anything was stuck anywhere,
7      Mr. Bevan.  I'm not trying to --
8  A.  By the way, it wasn't in the middle.  It was about
9      the 20th page in.
10        MR. McDERMOTT:  Can I interpose an
11     objection?
12 Q.  I'm not trying to have an argument with you, sir.
13        MR. McDERMOTT:  Can I interpose an
14     objection?  Peter, if you want to testify,
15     we'll swear you in.  Let's just ask
16     questions, please.
17        MR. FARRELL:  I've only asked questions.
18        MR. McDERMOTT:  I don't know what you're
19     asking anymore.  Keep going.
20 Q.  Is there any other testimony from your deposition
21     last time you'd like to correct, sir?
22 A.  Well, you know, I told you about the e-mail
23     server.  That's not a correction in my testimony.
24     I just got more detail and gave it to you already.
25 Q.  Okay.  Anything else?

THOMAS W. BEVAN, ESQ. - 04/05/2018      Pages 92..95

Page 92

1  A. I think you asked me about a copy of a deposition
2     which I didn't have. I looked for it and didn't
3     have it.
4  Q. So other than the questions where I asked you to
5     check on something, those are the things you're
6     alluding to you didn't know the answer last time?
7        MR. ROTH: Objection. Form, foundation.
8  A. Yeah, you know, I – I had some notes, but yeah, I
9     think that was it.
10 Q. Is the Bevan Law Firm's document production in
11    response to BASF's subpoena complete?
12 A. Yes.
13 Q. Are – is your personal document production in
14    response to BASF's subpoena complete?
15 A. Is my personal document production? I'm –
16 Q. You understood that BASF's subpoena asked for
17    documents in the possession, custody or control of
18    the Bevan firm and you personally?
19 A. Oh, okay. Yeah, so the answer would be the same,
20    yes. There's no difference.
21 Q. Okay. Are you – are you or the Bevan firm
22    withholding any documents not on a privilege log?
23 A. No.
24 Q. No document's being withheld on burden grounds or
25    any other objection?

Page 93

1  A. Not that I recall. You know, we gathered up
2     whatever documents that we had and we forwarded
3     them to Mr. Little, and whatever objections they
4     made, you know, they made. But we provided all
5     those documents.
6  Q. Is Mr. Little's firm withholding any documents
7     that aren't on a privilege log?
8        MR. ROTH: Objection. Form, foundation.
9  A. I don't know.
10 Q. What did you do to prepare for your deposition
11    today?
12 A. I reviewed in detail the e-mail that you sent to
13    Mr. Little and he forwarded it to me and you gave
14    ten topics of inquiry. I reviewed those topics.
15    I had a, you know, final meeting with Erin Clark
16    and Pat Walsh just to make sure I wasn't missing
17    anything. You know, similar to what I did in
18    preparation the last time.
19 Q. Did you meet with counsel?
20 A. I met with Mr. McDermott. I've talked with
21    Mr. Little.
22 Q. When was that?
23 A. I don't recall the last time I talked to
24    Mr. Little. I talked to Mr. McDermott right
25    before we came up here today.

Page 94

1  Q. Did you speak to the Cohen Placitella firm?
2  A. I've spoken to them several times.
3  Q. What did you discuss with Cohen, Placitella &
4     Roth?
5        MR. McDERMOTT: Objection.
6     Attorney-client privilege.
7        MR. FARRELL: What's the basis for the
8     privilege objection as between Mr. Bevan and
9     Cohen Placitella?
10       MR. McDERMOTT: You can go ahead and
11    answer, Tom.
12       MR. FARRELL: Are you withdrawing the
13    objection?
14       MR. McDERMOTT: No, I'm not withdrawing
15    the objection. The objection stands.
16 Q. Do you have an attorney-client relationship with
17    Cohen, Placitella & Roth?
18       MR. McDERMOTT: He's an agent of that.
19       MR. FARRELL: I'm sorry?
20       MR. McDERMOTT: He's an agent of for his
21    clients. The clients are being represented
22    by Mr. Placitella's firm.
23       MR. FARRELL: Mr. Bevan is an agent of
24    the Cohen Placitella firm?
25       MR. McDERMOTT: No, for his clients who

Page 95

1     are also clients of Mr. Placitella.
2  Q. What did you discuss with the Cohen Placitella
3     firm?
4  A. The logistics of this deposition.
5  Q. When was that?
6  A. As recently as last night.
7  Q. Who participated in the conversation?
8  A. Last night I talked to Harry Roth and Jared
9     Placitella.
10       MR. McDERMOTT: Continuing objection to
11    this line of questioning.
12 Q. What did Mr. Roth tell you?
13 A. That the Gayle Williams deposition may end sooner
14    and that maybe we'll be able to start earlier than
15    1:30.
16 Q. Anything else?
17 A. No.
18 Q. Did you discuss the substance of the Williams case
19    with the Cohen Placitella firm?
20 A. No. Well, I guess I ranted a Little bit again on
21    what I perceived to be your untruthful statement
22    in the last deposition about the letter from
23    Mr. Martillotta to me. I know I brought that up
24    with them.
25 Q. I have a sense, Mr. Bevan, that you misunderstood

THOMAS W. BEVAN, ESQ. - 04/05/2018    Pages 96..99

Page 96

1    my question from last time. I don't need to
2    debate it with you.
3  A.  I understood it very well, and I read it again and
4      I understood it when I read it again, and you said
5      it wasn't produced and you asked me why it wasn't
6      produced.
7  Q.  Sir --
8          MR. McDERMOTT: Objection to this line of
9      questioning.
10         MR. ROTH: Just move on.
11         MR. McDERMOTT: Move to strike.
12 Q.  I'm not here to argue with you. I wasn't
13     dishonest with you last time. Who else was in
14     your conversation with Mr. Roth last night?
15         MR. McDERMOTT: Continuing objection.
16 A.  Mr. Walsh was there.
17 Q.  What did Mr. Walsh say?
18 A.  I introduced him or he introduced himself to
19     Mr. Roth.
20 Q.  So you, Mr. Roth, Mr. Walsh. Anybody else?
21 A.  Mr. Placitella. Jared Placitella.
22 Q.  Anybody else?
23 A.  Maybe Erin Clark. I'm not sure if she was still
24     in the room or not.
25 Q.  Was this a phone conversation or in person?

Page 97

1  A.  It was an in-person meeting.
2  Q.  Did you ever review any documents to prepare for
3      today?
4  A.  The deposition, I reviewed.
5  Q.  Anything else?
6  A.  I don't think so.
7  Q.  Did you review any of the documents that your firm
8      produced in the Williams case?
9  A.  I have not reviewed them a second time. I
10     reviewed them originally, but I have not reviewed
11     them again.
12 Q.  Have you had any communications with the Cohen
13     Placitella firm since your last deposition other
14     than the discussion last night?
15 A.  I am -- yes, I have.
16 Q.  When?
17 A.  At various times. I couldn't give you the days.
18 Q.  So you've had multiple communications with the
19     Cohen Placitella firm since your February 21st
20     deposition?
21         MR. McDERMOTT: Objection.
22         MR. ROTH: Objection.
23         MR. McDERMOTT: Mischaracterization.
24     Move to strike.
25 A.  I have had -- certainly have had multiple

Page 98

1      conversations with somebody from the Placitella
2      firm.
3  Q.  Who?
4  A.  I know I've talked to Jared Placitella and I know
5      I've talked to Chris Placitella and I know I've
6      talked to Harry Roth.
7  Q.  Have you communicated -- withdrawn.
8          Have you personally communicated with
9      attorneys from the Cohen Placitella firm in
10     writing?
11 A.  By e-mail.
12 Q.  So you've --
13 A.  Yes.
14 Q.  -- exchanged -- are you finished?
15 A.  Yes.
16 Q.  You've exchanged e-mail correspondence with Cohen,
17     Placitella & Roth?
18 A.  Yes.
19 Q.  Do those e-mails appear on the Bevan Law Firm's
20     privilege log?
21 A.  I don't know.
22 Q.  Who would know that?
23 A.  I assume either people from the Placitella firm or
24     people from Mr. Little's office.
25 Q.  How many e-mails have you exchanged with Cohen,

Page 99

1      Placitella & Roth?
2  A.  Many dozens, probably.
3  Q.  Going back to early 2011?
4  A.  I don't know when I first communicated with them
5      by e-mail.
6  Q.  It's fair to say over the course of multiple
7      years, though?
8  A.  Yes.
9  Q.  Has anyone else from the Bevan firm communicated
10     with Cohen, Placitella & Roth via e-mail?
11 A.  I am -- Mr. Walsh would have.
12 Q.  Are Mr. Walsh's communications with the Cohen
13     Placitella firm on any privilege log that have
14     been produced to the defendants?
15 A.  I don't know. I haven't seen any privilege logs.
16 Q.  Have you collected Mr. Walsh's communications with
17     the Cohen Placitella firm?
18 A.  I -- yes, I believe so.
19 Q.  What did you do with Mr. Walsh's e-mail
20     communications with the Cohen Placitella firm?
21 A.  They would have been turned over to our counsel.
22 Q.  So Mr. Little has Mr. Walsh's e-mail
23     communications with the Cohen Placitella firm?
24 A.  I believe so.
25 Q.  Who has your e-mail communications with the

THOMAS W. BEVAN, ESQ. - 04/05/2018   Pages 100..103

Page 100

1   Placitella firm?
2   A. I believe counsel does.
3   Q. Mr. Little?
4   A. I believe so.
5   Q. Anyone else – withdrawn.
6       Has anyone else from the Bevan Law Firm
7   had e-mail communications with Cohen, Placitella &
8   Roth?
9   A. Probably Erin Clark.
10  Q. Anyone other than Erin Clark?
11  A. I don't think so.
12  Q. Have Ms. Clark's e-mail communications with Cohen
13  Placitella been provided to Mr. Little?
14  A. I believe so.
15  Q. Do you have any agreements – withdrawn.
16      Does your law firm have any agreements
17  with the Cohen Placitella firm regarding the
18  referral of clients to Cohen Placitella?
19      MR. ROTH: Objection. Form, foundation,
20  privilege.
21      MR. McDERMOTT: Objection. I instruct
22  you not to answer that, Tom.
23      THE WITNESS: Okay.
24  Q. I'm not asking you for the substance of the
25  agreements, Mr. Bevan. I'm just asking whether

Page 101

1   they exist. Can you tell me "yes" or "no" whether
2   your firm has agreements with the Cohen Placitella
3   firm regarding the referral of clients?
4       MR. ROTH: Same objection.
5       MR. McDERMOTT: Same objection.
6       THE WITNESS: Same instruction?
7       MR. FARRELL: Are you instructing him not
8   to answer that question?
9       MR. McDERMOTT: Let's take a minute.
10      THE WITNESS: Okay.
11      MR. McDERMOTT: Let's walk out.
12      MR. FARRELL: We're off the record.
13      (Discussion off the record.)
14      MR. FARRELL: Back on.
15      MR. McDERMOTT: I'll withdraw my last
16  objection.
17      MR. FARRELL: Back on the record. So I'm
18  sorry, Counsel, you were withdrawing the last
19  objection?
20      MR. McDERMOTT: Last objection.
21  BY MR. FARRELL:
22  Q. Okay. So my question to you, Mr. Bevan, was, does
23  your law firm have agreements with the Cohen
24  Placitella firm regarding the referral of clients?
25  A. Yes.

Page 102

1   Q. Are any of those agreements reflected on a
2   privilege log that has been prepared on behalf of
3   the Bevan Law Firm?
4   A. I don't know.
5   Q. Does the Bevan Law Firm have any agreements with
6   the Cohen Placitella firm regarding compensation
7   that might be paid to your firm if the plaintiffs
8   in the Williams case receive compensation?
9       MR. ROTH: Objection. Form and
10  foundation.
11      MR. McDERMOTT: Same objection. You can
12  go ahead and answer, Tom.
13  A. Yes.
14  Q. Are those agreements reflected on a privilege log
15  that has been produced to the defendants in the
16  Williams case?
17  A. I don't know.
18  Q. Are your law firm's agreements with the Cohen
19  Placitella firm regarding compensation that might
20  be paid to your firm in writing?
21      MR. ROTH: Objection.
22      MR. McDERMOTT: Same objection. You can
23  go ahead and answer, Tom.
24  A. Yes.
25  Q. Does the Bevan Law Firm have agreements with the

Page 103

1   Cohen Placitella firm regarding apportionment of
2   attorneys' fees that might be paid in the Williams
3   case?
4       MR. ROTH: Objection. Move to strike.
5       MR. McDERMOTT: Same objection.
6       MR. ROTH: We're way beyond a –
7       MR. McDERMOTT: 30(B)(5).
8       MR. ROTH: – records custodian
9   deposition. This is the subject of a motion
10  that's been disputed and I'm going to ask
11  that he be instructed not to answer.
12      MR. FARRELL: You're instructing him not
13  to answer on the basis of scope?
14      MR. ROTH: I asked his counsel to
15  instruct him not to answer.
16      MR. McDERMOTT: Repeat the question,
17  please.
18      (Whereupon, the Reporter read the record
19  as requested.)
20      MR. McDERMOTT: I'm going to object to
21  that. It's privileged material. Don't
22  answer it.
23      THE WITNESS: Okay.
24  Q. You're following the instruction not to answer?
25  A. Yes.

THOMAS W. BEVAN, ESQ. - 04/05/2018   Pages 104..107

Page 104

1  Q.  Whether the agreements exist?
2  A.  Yes.
3  Q.  Last time we were together, I asked you a number
4      of questions about your personal AOL e-mail
5      account.  Do you remember that?
6  A.  Yes.
7  Q.  And I asked you whether your AOL e-mail account
8      automatically deletes e-mails.
9  A.  Yes.
10 Q.  And I think your answer last time was that you
11     didn't know, correct?
12 A.  I think my answer was I don't think it does.
13 Q.  You don't think -- so --
14 A.  And I have --
15 Q.  Either way, Mr. Bevan, my question for you today
16     is, have you looked into that?
17 A.  My AOL does not have an auto delete, so I have
18     e-mails going back to 2007.
19 Q.  Back to 2007, okay.  Including
20     e-mails -- withdrawn.
21        Do you have e-mails going back to 2007
22     related to cases that your firm has filed against
23     Engelhard or BASF concerning EMTAL talc?
24        MR. ROTH:  Objection.  Form, foundation.
25 A.  That, I can't answer.

Page 105

1  Q.  Why not?
2  A.  I just looked back to see what the oldest e-mail I
3      had was and I have one from 2007.
4  Q.  But you did a search of your AOL e-mail account
5      for e-mails --
6  A.  Yes.
7  Q.  -- that are responsive to the court order in this
8      case, correct?
9  A.  Yes.
10 Q.  So did you determine whether you had e-mails going
11     back to 2007 that relate to cases your firm filed
12     against Engelhard or BASF related to EMTAL talc?
13 A.  I don't -- I don't know when the earliest was,
14     earliest e-mail was related to Eastern Magnesia
15     Talc.
16     (Whereupon, Defendant's Exhibit 144 was
17      marked for identification.)
18 Q.  Mr. Bevan, I've handed your counsel what we've
19     marked for identification as Defense Exhibit 144.
20     While counsel is looking at it for a moment, I'll
21     state for the record that this is a November 29th,
22     2017 brief that your counsel filed on your behalf
23     and on behalf of the Early Lucarelli firm in the
24     Williams case bearing ECF number 380.  Have you
25     seen this document before?

Page 106

1  A.  I don't recall if I did or not.
2  Q.  If you keep flipping towards the back, you'll see
3      in the last handful of pages there's a declaration
4      that you signed.  I assume you've seen the
5      declaration before, but let me know if that's not
6      the case.
7  A.  Yes.
8  Q.  So you've seen -- withdrawn.
9         The declaration you signed is dated
10     November 29th, 2017, correct?
11 A.  Yes.
12 Q.  And you've seen that before?
13 A.  Yes.
14 Q.  It was signed the same day that the brief was
15     filed?
16 A.  I don't know.
17 Q.  The ECF number on the brief is November 29th,
18     2017, correct?
19 A.  If that's the number that you're --
20 Q.  And it's the date on the document.
21 A.  On the top.  Yes.
22 Q.  You hadn't seen the brief before today?
23 A.  No, I don't recall if I saw it or not.
24 Q.  Okay.  Mr. Little didn't send it to you before it
25     was filed with the court?

Page 107

1         MR. ROTH:  Objection.  Form, foundation.
2  A.  I don't know that.
3  Q.  If you turn to page 10 of the exhibit, page 10 of
4      the brief, you see there's a heading number 6?
5  A.  Uh-huh.  Yes.
6  Q.  The first sentence says, "The
7      communications" -- withdrawn.
8         Heading 6 says, "Order the immediate
9      production of e-mails in the named Plaintiffs'
10     client files from the Bevan and Early law firms."
11     Do you see that?
12 A.  Yes.
13 Q.  And then under it, the first sentence is, "The
14     communications contained in the case files of the
15     Bevan and Early firms that were selected for
16     production have been provided to Plaintiffs'
17     counsel."  Do you see that?
18 A.  Yes.
19 Q.  Was that an accurate statement as of November
20     29th, 2017?
21 A.  November of -- I believe so.  We turned over the
22     complete files.  Yes.
23 Q.  What do you understand the phrase "case files" to
24     mean?
25 A.  The client's file.

THOMAS W. BEVAN, ESQ. - 04/05/2018   Pages 108..111

Page 108

1 Q. Is that distinct from some other file that your
2    firm maintains?
3 A. No.
4 Q. The brief says, "The communications contained in
5    the case files." Is that limited to hard copy
6    documents or electronic documents as well?
7 A. Everything is electronic, so it would be
8    electronic copies.
9 Q. If you turn to the declaration you signed that's
10   attached to the brief, do you see paragraph 4?
11 A. Yes.
12 Q. The first sentence of paragraph 4 says, "I
13   estimate that my firm maintains more than 3,000
14   files for current and former clients that are
15   arguably responsive to the subpoena." Do you see
16   that?
17 A. Yes.
18 Q. What documents were you referring to in that
19   sentence?
20 A. My client files.
21 Q. What documents or information did you use to
22   arrive at the 3,000 files estimate?
23 A. I think that was an estimate on the number of
24   clients that we had that would have been exposed
25   to Eastern Magnesia Talc.

Page 109

1 Q. Do you know how you arrived at the estimate of
2    3,000?
3 A. I believe based on where they worked.
4 Q. What do you mean by that?
5 A. Well, for instance, if a client worked at Goodyear
6    or Firestone or Goodrich or General Tire, they
7    would have been exposed to Eastern Magnesia Talc.
8 Q. How many of the 3,000 client files referenced in
9    this November 29th, 2017 declaration you signed
10   have been produced to BASF?
11 A. Well –
12      MR. ROTH: I'm sorry. Excuse me. Could
13   you give me that question back?
14      (Whereupon, the Reporter read the record
15      as requested.)
16      MR. ROTH: Okay.
17 A. I believe the five representative client files
18   have been produced, and then I was given a list of
19   clients, of cases to produce files on and we
20   produced those. And I don't recall if that list
21   was 20 or 30. I don't recall the number. So
22   that's the best I can answer you on that.
23 Q. Does 30 sound right to you?
24      MR. ROTH: Objection. Form, foundation.
25 A. I'm giving you a range. I said 20 to 30.

Page 110

1 Q. Fair enough. You recall there coming a time in
2    the Williams case where your firm was asked to
3    produce a sample of client files in response to
4    BASF's subpoena?
5 A. Yes.
6 Q. And whatever that number was, I'll tell you it was
7    30, but regardless of what the number was, my
8    question to you is, what documents or information
9    did you reference to identify the 30 client files
10   that were produced to BASF?
11      MR. ROTH: Objection to form and
12      foundation.
13 A. I'm not sure I understand your question, but let
14   me just say, you know, I was given a list and we
15   produced the files for the clients on that list.
16 Q. So counsel gave you a list?
17 A. Yes.
18 Q. Do you know what documents or information your
19   counsel used to identify the 30 client files that
20   were produced to BASF?
21 A. I don't know how those clients were identified,
22   whether you did it, whether plaintiffs did it,
23   whether the court did it. I don't know.
24 Q. Do you know what universe of client files the 30
25   sample files were selected from?

Page 111

1 A. I think it may have been the universe of all my
2    clients, but I'm not sure.
3 Q. If it came from the universe of all your clients,
4    how would they have determined whether the client
5    had a case against Engelhard?
6      MR. ROTH: Objection. Form, foundation.
7    I'm not – why don't the three of us go
8    outside instead of –
9      MR. FARRELL: Is it form or foundation?
10     MR. ROTH: It's both.
11     MR. FARRELL: Understood.
12 Q. You can answer the question.
13 A. Can you repeat that, please?
14     MR. FARRELL: Can you read it back?
15     (Whereupon, the Reporter read the record
16     as requested.)
17 A. I know how I would determine it. How somebody
18   else would determine it, I – you know, it's up to
19   them.
20 Q. As you sit here today, do you know that the 30
21   client files that were produced to us relate to
22   EMTAL talc?
23     MR. ROTH: Objection. Form, foundation.
24 A. I don't know.
25     (Whereupon, Defendant's Exhibit 145 was

THOMAS W. BEVAN, ESQ. - 04/05/2018   Pages 112..115

Page 112

1    marked for identification.)
2        MR. ROTH: Do you have some question
3    about that process that we, with BASF's
4    counsel, entered into and agreed about how
5    they would be randomly picked?
6        MR. FARRELL: I'm asking the witness
7    if --
8        MR. ROTH: I'm asking whether there was
9    some problem with the process. He was not
10   involved with it, as you know. The court
11   directed us how to do it and we randomly came
12   up with names. And what I'm asking is, is
13   there some problem now you're raising about
14   that process?
15       MR. FARRELL: Harry, I have limited time
16   here.
17       MR. ROTH: I understand.
18       MR. FARRELL: I'm not going to debate it
19   with you. I'm not raising questions about
20   the process, I'm asking about information
21   used to identify the clients.
22       MR. ROTH: Okay.
23 Q. Mr. Bevan, I've handed you what we've marked as
24   Defendant's Exhibit 145, which is a January 26,
25   2018 declaration that you signed in connection

Page 113

1    with the Williams case. Do you see that?
2  A. Yes.
3  Q. Did you draft this?
4  A. I don't know that I drafted it, I don't think. I
5    may have --
6  Q. Do you know who draft --
7  A. -- reviewed it and made changes to it, but --
8  Q. Do you know who did draft it?
9        MR. ROTH: Objection. Form, foundation.
10 A. I don't think -- I'm assuming Brendan Little, but
11   I don't know.
12 Q. You see in paragraph 3 there's a reference to the
13   fact that you've been informed that the proposed
14   class definition in the Williams class
15   certification motion is, and then there's a
16   paragraph with a class definition. Do you see
17   that?
18 A. Yes.
19 Q. And then on the next page, you see paragraph 6?
20   "I have asked an attorney member of the firm who
21   manages my firm's client database to determine
22   which of our clients would meet the above criteria
23   in addition to the five class representatives
24   whose decedents were represented by the Bevan Law
25   Firm in their underlying claims." Do you see

Page 114

1    that?
2  A. Yes.
3  Q. Who is the attorney member of the Bevan firm who
4    manages your firm's client database?
5  A. That would be Pat Walsh.
6  Q. So Mr. Walsh is the person who did the research or
7    the legwork underlying the declaration?
8  A. With -- in consult -- consultation with me, yes.
9  Q. And then you pointed out in paragraph 6, right,
10   "which results I have examined and believe." So
11   you --
12 A. Yes.
13 Q. You checked his work, basically?
14       MR. ROTH: Objection to form and
15   foundation.
16 Q. Further down in paragraph 6, this is at the very
17   bottom, you see the reference to 2,653 Bevan Law
18   Firm clients who would meet the proposed class
19   definition?
20 A. Yes.
21 Q. What documents or data were used to arrive at the
22   figure 2,653 Bevan Law Firm clients?
23 A. I believe they were clients that had filed suit
24   against Eastern Magnesia Talc and/or could have
25   filed suit against Eastern Magnesia Talc and

Page 115

1    either settled their claims with Eastern Magnesia
2    Talc or had their claims dismissed against Eastern
3    Magnesia Talc. And they were at sites where there
4    was a high likelihood of Eastern Magnesia Talc
5    exposure. I believe those were the criteria that
6    we were looking at.
7  Q. So the figure 2,653 includes clients who did file
8    and clients who could have filed?
9        MR. ROTH: Objection. Form and
10   foundation.
11 A. I believe so, yes.
12 Q. Which documents or information at the Bevan firm
13   was consulted to arrive at the 2,653 figure?
14 A. I believe it was our database was the primary
15   thing, which is why I had Pat Walsh working on it.
16 Q. Anything other than the Bevan firm database?
17 A. We may have reviewed complaints to determine if
18   Eastern Magnesia Talc had been sued.
19 Q. How many complaints do you recall reviewing?
20 A. I don't recall.
21 Q. Do you know whether all of the complaints you
22   reviewed to arrive at the 2,653 figure have been
23   produced to BASF?
24       MR. ROTH: Objection. Form, foundation.
25 A. I believe the only complaints we produced were the

THOMAS W. BEVAN, ESQ. - 04/05/2018   Pages 116..119

Page 116

1  complaints related to the files of -- that we
2  produced.
3  Q.  Okay.  So it's fair to say that the 2,653 Bevan
4     Law Firm clients figure is primarily based on the
5     Bevan firm database.
6        MR. ROTH:  Objection.  Form, foundation.
7  A.  Yes.
8  Q.  Does the Bevan firm database reflect -- withdrawn.
9        Does the Bevan Law Firm database identify
10    firm clients who could have filed complaints
11    against Engelhard or BASF?
12  A.  To the extent that it would reflect where they
13    worked, yes.
14  Q.  So the "could have filed" category is based on
15    just where the person worked?
16  A.  Yes.
17  Q.  Anything else?
18  A.  No.
19  Q.  So if BASF wanted to check the 2,653 figure
20    itself, it would need access to the Bevan firm
21    database?
22  A.  I think what we gave you already, I think we
23    already gave it to you and it would be in there,
24    yes.
25  Q.  Your understanding is that the Bevan firm produced

Page 117

1  the entirety of the Bevan database?
2  A.  There was a few agreed-on redactions, but
3    otherwise, yes.
4  Q.  For all 2,653 clients?
5  A.  It was more than that, I think, that we gave you.
6  Q.  The database that your firm maintains is
7    searchable, correct?
8  A.  Yes.
9  Q.  Is the version of the Bevan database entries that
10    were produced to BASF searchable?
11        MR. ROTH:  Objection.  Form, foundation.
12  A.  I don't know how it was produced.  I know it was
13    produced.  Whether it was in a searchable form, I
14    don't know.
15  Q.  It's fair to say that the Bevan Law Firm database
16    is in a more functional condition in your
17    possession than it is in BASF's possession?
18  A.  Oh, I don't know if that's fair to say.  I don't
19    know.
20  Q.  You don't know?  Do you have any objection to
21    being -- to BASF being able to run the same
22    searches that you or Mr. Walsh ran to arrive at
23    the 2,653 client figure?
24        MR. ROTH:  Objection.
25        MR. McDERMOTT:  Objection.

Page 118

1  A.  I guess you'd have to give me a little more detail
2    as far as how you're going to do it.  But if you
3    want to take the data that I gave you and do your
4    own analysis, I have no objection to you doing
5    whatever it is that you want to do with that.
6    Subject, of course, to the agreed confidentiality
7    order.
8  Q.  Does the Bevan Law Firm have any communications
9    with attorneys who were affiliated with the
10    National Tire Worker Litigation Project?
11        MR. McDERMOTT:  Could you read that
12    question back again, please?  I don't think I
13    quite -- sorry.
14        (Whereupon, the Reporter read the record
15    as requested.)
16        MR. ROTH:  I'm not sure, are you -- I'd
17    like to place an objection on the record.  I
18    didn't know whether you were?
19        MR. McDERMOTT:  No.
20        MR. ROTH:  Okay.
21  A.  I guess maybe if you can tell me what you mean by
22    "affiliated"?
23  Q.  When we were together in February, we discussed
24    the National Tire Worker Litigation Project,
25    correct?

Page 119

1  A.  Yes.
2  Q.  And you initially said you weren't sure what I
3    meant by that?
4        MR. ROTH:  Objection.
5  Q.  And then you said if you mean the project that was
6    started by Attorney Stemple in California.  Do you
7    recall that?
8  A.  I'm not sure if I agree with your description of
9    the conversation, but I know I asked you, do you
10    mean the project started by Gordon Stemple out of
11    California, and I am familiar with that.
12  Q.  You are familiar with that?
13  A.  Yes.
14  Q.  Okay.  So you are familiar with the organization
15    that Mr. Stemple started that was known as the
16    National Tire Worker Litigation Project?
17  A.  Somewhat.
18  Q.  Just somewhat?
19  A.  Yeah, I'd say just somewhat.
20  Q.  Do you or the Bevan Law Firm have any
21    communications with the attorneys who were part of
22    the National Tire Worker Litigation Project?
23  A.  And if you're referring to the Stemple firm or the
24    Gerry firm, no.  I mean, not -- you know, I had
25    one conversation with the Stemple firm probably as

THOMAS W. BEVAN, ESQ. - 04/05/2018   Pages 120..123

Page 120

1    a law clerk in 1989, and so nothing since then,
2    that I've had in conversation.
3  Q.  You've only spoken to the Stemple firm one time?
4  A.  Yes.
5  Q.  And the Gerry firm one time?
6  A.  I don't think I ever spoke to the Gerry firm.
7  Q.  Okay.
8  A.  But I may have, but I certainly don't recall ever
9    speaking to the Gerry firm.
10 Q.  Was the Bevan Law Firm -- withdrawn.
11     Did you file cases that were affiliated
12   with the National Tire Worker Litigation Project?
13 A.  Me --
14     MR. ROTH:  Objection to the --
15 A.  Me personally, no.
16     MR. ROTH:  Excuse me.  I just want to put
17   an objection on the record.  I'm not seeing
18   where this is a records custodian deposition.
19     MR. FARRELL:  I'm trying to lay the
20   foundation to ask the next question, which
21   is, where are the documents?
22     MR. ROTH:  Okay.
23     MR. FARRELL:  So if he didn't file the
24   cases, there are no documents.
25     MR. ROTH:  That makes it very easy.  I'm

Page 121

1    just --
2  Q.  So, Mr. Bevan?
3  A.  Me personally, I never filed a case that had
4    anything to do with the Stemple firm.
5  Q.  Did the Bevan Law Firm file any cases that were
6    associated with the National Tire Worker
7    Litigation Project?
8  A.  And prior to Bevan & Associates, there was an
9    office sharing arrangement called Bevan &
10   Economus, and the Bevan in Bevan & Economus was
11   Keith Bevan, who was my father, the Economus was
12   Dale Economus, who's of counsel to our firm now.
13   They filed 181 cases back in approximately 1988
14   that had originated from the Stemple firm through
15   the National Tire Worker Litigation Project.
16 Q.  Where are those documents?
17     MR. ROTH:  Objection.
18 A.  What documents?
19 Q.  The Bevan & Economus firm documents related to the
20   National Tire Worker Litigation Project.
21 A.  I do not believe we have those client files
22   anymore.  I think those were destroyed long ago.
23   Probably 20 years ago or, you know, 15, 18 years
24   ago.  Long before we went electronic.  If there's
25   any historical records, you know, there may be

Page 122

1    documents that I have that would be historical
2    records, letters between Stemple and/or Dale
3    Economus or my father.  That would probably be all
4    that would be available.  It's possible that we
5    have the complaints.  I don't know for sure on
6    that.  I can go to the courthouse and probably
7    find the old complaints.
8  Q.  Were any of the complaints or correspondence that
9    you referenced produced by the Bevan firm to the
10   defendants in the Williams case?
11     MR. ROTH:  Objection.  Form, foundation.
12 A.  No.
13 Q.  Why not?
14 A.  Because those cases didn't involve Eastern
15   Magnesia Talc.  Eastern Magnesia Talc was not sued
16   in those cases, was not a defendant in those
17   cases.
18 Q.  You said that Mr. Economus is of counsel to the
19   Bevan firm today?
20 A.  Yes.
21 Q.  Did you ask Mr. Economus whether he has documents
22   that are responsive to BASF's subpoena?
23     MR. ROTH:  Objection.  Form, foundation.
24 A.  I did not.
25 Q.  What does the acronym TWLP mean when it appears in

Page 123

1    the Bevan database under the category "Referring
2    Attorney"?
3  A.  Yeah, the original asbestos cases, this dates back
4    to when I was a law clerk starting in '89, refers
5    to TWLP, which stands for Tire Worker Litigation
6    Project.  When I first came out of law school back
7    in 1991, I signed up a handful of cases.  I would
8    say eight or ten, maybe.  And I referred to those
9    as TWLP2.  They didn't have anything to do with
10   the National Tire Worker Litigation Project or
11   Gordon Stemple, but I just called it TWLP2 just to
12   kind of keep track of groups of cases.  Then I had
13   a group of cases started in 1995 or '6 that I
14   referred to as TWLP3.  So it may indicate there in
15   the origination column, that might be what you're
16   referring to.
17     And so we put those into our database
18   just to kind of keep track of when those cases
19   started, where they came from.  There was a group
20   that we called TWLP4, which was a handful, and
21   then we just stopped using that name altogether.
22 Q.  Were all of those files, TWLP2, 3, 4, were they
23   all searched in response to BASF's subpoena?
24 A.  Well, if any of those -- well, if any of those
25   cases were part of the whatever it was, the 20 or

THOMAS W. BEVAN, ESQ. - 04/05/2018   Pages 124..127

Page 124

1   30 files that we turned over, yes. If any of
2   those cases were part of the five, you know, they
3   would have been part of that five. You know, so
4   Williams would have been a TWLP2 case. Same with,
5   I believe same with Clark – you know, so they
6   would have been – you know, yeah.
7          MR. FARRELL: Let's take a short break.
8          (Recess was taken and Attorney Assaf left
9      the deposition.)
10         MR. FARRELL: Back on the record.
11  BY MR. FARRELL:
12  Q.  Mr. Bevan, who enters the information that appears
13     in the Bevan client database that was produced in
14     part to BASF?
15  A.  Oh, over the years various staff members.
16     I -- you know, who is currently doing it, I'm not
17     sure. I think maybe Gwen, but I don't know.
18  Q.  Gwen who?
19  A.  I think her last name is Schenk.
20  Q.  Okay.
21  A.  But I'm not positive. We -- you know, as people
22     are doing intakes, you know, and they enter it in,
23     I don't know who our individual person is that
24     does it now.
25  Q.  What are the entries in the Bevan Law Firm

Page 125

1   database based on?
2   A.  Well, the initial –
3          MR. ROTH: Objection. Excuse me.
4      Objection. Form and foundation.
5   A.  The initial entry would be based on the client
6     intake. So client name, address, you know, date
7     of birth, Social Security number, you know, where
8     he or she worked, the years that he or she worked.
9     Maybe their job classification. The death
10    certificate would, you know, give us an entry for
11    the cause of death or date of death. If we have a
12    medical report, that would give us information for
13    the date of diagnosis, what the diagnosis was.
14    And then if we – if a settlement is entered in,
15    it would be based on the settlement information.
16  Q.  So on the subject of the settlement information,
17     does the firm take any steps to confirm that the
18     settlement number that's in the Bevan database
19     matches the actual settlement in cases?
20  A.  You know, that's something that evolved over the
21     years. For the older cases, a lot of that
22     information isn't in there. For the newer cases,
23     we're probably a little more accurate on it.
24  Q.  So you couldn't use the Bevan database to
25     determine amounts paid in settlement to all of the

Page 126

1   Bevan Law Firm clients? Is that fair?
2   A.  Yeah, I would go to the client files to get a more
3     accurate statement.
4   Q.  The actual client documents are a more reliable
5     source of settlement numbers than the database
6     itself?
7          MR. ROTH: Objection. Form, foundation.
8   A.  You know, in some cases, yeah. Yes, in some
9     cases.
10  Q.  Why do you say "in some cases"?
11  A.  Well, if you're looking at an older case, like the
12     Williams case, we didn't even have that database
13     when that case was being handled. Even the Clark
14     case, I think the same goes for that. So there
15     might be some more recent stuff that's in there,
16     but a lot of the early stuff isn't in there.
17  Q.  But it's fair to say that the database is at least
18     in some respects incomplete on amounts of
19     settlements paid?
20         MR. ROTH: Objection.
21  A.  Yes, I -- again, I would go to the client files to
22     get -- to make sure that it was accurate.
23  Q.  And so if you wanted the accurate information
24     about settlements paid to Bevan Law Firm clients,
25     you would need to check the client files to

Page 127

1   confirm?
2   A.  In some cases, yes.
3   Q.  Most cases?
4   A.  I don't think, not most cases, no.
5   Q.  Older cases yes?
6   A.  Older cases, yes.
7   Q.  Okay. Did the Cohen Placitella firm provide the
8     Bevan Law Firm with any search terms to run to
9     identify documents in response to BASF's subpoena?
10  A.  I don't recall them ever doing that. I think
11     that's what I testified to the last time.
12  Q.  I don't think I have anything else. Thank you,
13     Mr. Bevan.
14         MR. ROTH: I have no questions.
15         MR. McDERMOTT: Tom, you have the ability
16     to read this.
17         THE WITNESS: I read the last one.
18         MR. ROTH: Before we're done, Jared wants
19     to tell me some stuff.
20         (Discussion off the record.)
21         MR. ROTH: I have no questions.
22         MR. McDERMOTT: We'll read, please.
23         MR. ROTH: Anybody on the phone have any
24     questions?
25         MR. TUNIS: No.

THOMAS W. BEVAN, ESQ. - 04/05/2018   Pages 128..131

Page 128

```
1        MR. BOYLE:  No.
2        - - - - - - -
3        (Signature was not waived by the Witness.)
4        - - - - - - -
5        (The deposition was concluded at 2:41 p.m.)
6        - - - - - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 130

```
1             ERRATA SHEET
2    Witness Name:  Thomas W. Bevan, Esq.
3    Date of Deposition:  April 5, 2018
4    Case:  Kimberlee Williams, et al. Versus BASF
         Catalysts, LLC, et al.
5
6    Page   Line   Change and Reason for Change
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25   ____  ____  _____
     AP
```

Page 129

```
1         W I T N E S S   C E R T I F I C A T E
2
3        I, THOMAS W. BEVAN, ESQ., do hereby certify that I
4    have read my deposition taken on April 5, 2018, in the
5    case of Kimberlee Williams, et al. Versus BASF
6    Catalysts, LLC, et al., consisting of 73 pages, and
7    that said deposition is a true and correct
8    transcription of my testimony with changes as noted on
9    the errata sheet.
10
11    _____
           Thomas W. Bevan, Esq.
12
13   Dated this _____ day of _____, 2018.
14
15
16
           Sworn to and subscribed before me this _____
17
18   day of _____, 2018.
19
20
     _____
21          Notary Public
22
     My commission expires _____.
23
24
25
     AP
```

Page 131

```
1              C E R T I F I C A T E
2    STATE OF OHIO, )
                    ) SS:
3    SUMMIT COUNTY. )
          I, Anika W. Patrick, a Registered Merit Reporter,
     Certified Realtime Reporter and Notary Public within
4    and for the State of Ohio, duly commissioned and
     qualified, do hereby certify that the within-named
5    Witness, THOMAS W. BEVAN, ESQ., was by me first duly
6    sworn to testify the truth, the whole truth and nothing
     but the truth in the cause aforesaid; that the
7    testimony so given by him was by me reduced to
     Stenotypy in the presence of said witness; afterwards
8    prepared and produced by means of Computer-Aided
     Transcription, and that the foregoing is a true and
9    correct transcription of the testimony so given by him
     as aforesaid.
10        I do further certify that this deposition was
     taken at the time and place in the foregoing caption
11   specified, and was completed without adjournment.
12        I do further certify that I am not a relative,
     employee of or attorney for any party or counsel, or
13   otherwise financially interested in this action.
14        I do further certify that I am not, nor is the
     court reporting firm with which I am affiliated, under
15   a contract as defined in Civil Rule 28(D).
16
          IN WITNESS WHEREOF, I have hereunto set my hand
17   and affixed my seal of office at Akron, Ohio, this 6th
     day of April, 2018.
18
19
20   _____
21        Anika W. Patrick, RMR, CRR & Notary Public
     My commission expires March 13, 2020
22
23
24
25
```

THOMAS W. BEVAN, ESQ. - 04/05/2018                    i1

---

**1**

**10**
107:3

**100**
82:16

**143**
84:15 89:14

**144**
105:16,19

**145**
111:25 112:24

**15**
121:23

**17**
69:3

**18**
69:4 121:23

**181**
121:13

**1940s**
68:5,13,15

**1988**
121:13

**1989**
120:1

**1991**
68:20 123:7

**1995**
123:13

**1:30**
95:15

---

**2**

**2,653**
114:17,22 115:7,13,22
116:3,19 117:4,23

**20**
64:7 90:4 109:21,25
121:23 123:25

**2007**
104:18,19,21 105:3,11

**2011**

69:8,9,10,12,14 70:13,25
72:10 77:6,23 79:7 80:7
84:18 85:12,13,20 99:3

**2016**
86:16,19

**2017**
105:22 106:10,18 107:20
109:9

**2018**
112:25

**20th**
91:9

**21st**
80:3 97:19

**26**
112:24

**27**
64:8,9 65:6

**29th**
105:21 106:10,17 107:20
109:9

---

**3**

**3**
113:12 123:22

**3,000**
108:13,22 109:2,8

**30**
109:21,23,25 110:7,9,19,
24 111:20 124:1

**30(B)(5)**
103:7

**380**
105:24

---

**4**

**4**
108:10,12 123:22

---

**6**

**6**
107:4,8 113:19 114:9,16
123:13

---

**8**

**89**
123:4

---

**9**

**90**
82:16

---

**A**

**able**
95:14 117:21

**access**
89:7 116:20

**account**
78:4 79:14,19,22 80:4,8,
17 104:5,7 105:4

**accounts**
77:9 78:1,21 79:3,10,18,
24

**accurate**
107:19 125:23

**acronym**
122:25

**action**
67:25

**actual**
76:1 125:19

**add**
90:15

**addition**
113:23

**address**
125:6

**adjoins**
81:3

**administer**
73:13

**administers**
73:17,21

**adopted**
76:17

**affiliated**
118:9,22 120:11

**afternoon**
63:7,8

**agent**
94:18,20,23

**ago**
76:23 77:3 78:20,25
79:23 82:25 86:8,17,21
88:5,8 89:16 121:22,23,
24

**agree**
66:22 119:8

**agreed**
112:4 118:6

**agreed-on**
117:2

**agreements**
100:15,16,25 101:2,23
102:1,5,14,18,25 104:1

**ahead**
94:10 102:12,23

**alluding**
92:6

**altogether**
123:21

**amend**
89:20

**amounts**
125:25

**analysis**
118:4

**and/or**
114:24 122:2

**answer**
63:24 77:19 79:12 92:6,
19 94:11 100:22 101:8
102:12,23 103:11,13,15,
22,24 104:10,12,25
109:22 111:12

**answered**
72:12

**anticipation**
70:8

**anybody**
73:17 83:11 96:20,22

---

**anymore**
91:19 121:22

**AOL**
76:19 80:4,8,17 104:4,7,
17 105:4

**appear**
98:19

**appears**
122:25 124:12

**apportionment**
103:1

**approximately**
121:13

**aren't**
82:5 93:7

**arguably**
108:15

**argue**
96:12

**argument**
91:12

**arrangement**
121:9

**arrive**
108:22 114:21 115:13,22
117:22

**arrived**
109:1

**asbestos**
67:11,17 81:19 123:3

**asked**
64:22 72:11 74:22 86:2,
3,6 91:17 92:1,4,16 96:5
103:14 104:3,7 110:2
113:20 119:9

**asking**
81:21 83:14 85:25 91:19
100:24,25 112:6,8,12,20

**Assaf**
124:8

**associated**
121:6

**Associates**
121:8

**assume**

**assuming**
113:10

**attached**
108:10

**attaches**
66:3,7

**attorney**
113:20 114:3 119:6
123:2 124:8

**attorney-client**
94:6,16

**attorneys**
98:9 118:9 119:21

**attorneys'**
103:2

**auto**
75:10 104:17

**automatic**
74:18,22

**automatically**
75:1,22 104:8

**available**
122:4

— **B** —

**back**
63:9 68:4,13,14,20 74:3
80:11 99:3 101:14,17
104:18,19,21 105:2,11
106:2 109:13 111:14
118:12 121:13 123:3,6
124:10

**based**
109:3 116:4,14 125:1,5,
15

**BASF**
67:25 68:24 78:11,16
82:12 85:17,24 86:5
104:23 105:12 109:10
110:10,20 115:23
116:11,19 117:10,21
124:14

**BASF's**
92:11,14,16 110:4 112:3

88:18 89:8 91:4 98:23
106:4

117:17 122:22 123:23

**basically**
114:13

**basis**
80:13 94:7 103:13

**bearing**
105:24

**beginning**
80:14

**behalf**
68:17 86:25 88:9 102:2
105:22,23

**believe**
65:24 66:6,7,9,11 67:1
68:20 83:18 89:6 99:18,
24 100:2,4,14 107:21
109:3,17 114:10,23
115:5,11,14,25 121:21
124:5

**best**
67:1 70:2 109:22

**Bevan**
63:2,7,17,21 70:25 71:6,
10 72:1 73:8,13 74:23,25
76:8,21,24 77:2,8,10,25
78:1,9,14,20,22 79:1,2,9,
10,18 80:4,6 81:22 83:7
84:2,18,25 85:22 87:3,
20,24 88:5,14 90:7 91:7
92:10,18,21 94:8,23
95:25 98:19 99:9 100:6,
25 101:22 102:3,5,25
104:15 105:18 107:10,15
112:23 113:24 114:3,17,
22 115:12,16 116:3,5,8,
9,20,25 117:1,9,15 118:8
119:20 120:10 121:2,5,8,
9,10,11,19 122:9,19
123:1 124:12,13,25
125:18,24

**beyond**
103:6

**birth**
125:7

**bit**
67:23 77:14 84:2 95:20

**bottom**
114:17

**Boy**
86:17

**break**
124:7

**Brendan**
63:10,11,12 113:10

**brief**
105:22 106:14,17,22
107:4 108:4,10

**brings**
67:24

**brought**
95:23

**burden**
92:24

**business**
79:3 80:4

— **C** —

**California**
119:6,11

**call**
71:9

**called**
77:6,23 79:7 121:9
123:11,20

**can't**
63:24 65:20 69:21 72:14
104:25

**case**
63:18,22 65:13,16,17,25
66:11,13,16,23,24 67:21,
22,24 68:7,14,16,21,23
69:1,6,7,11,15 70:9,14
71:2,7,11 72:3 75:20
76:6 77:7,18,24 78:18
79:8 80:9,20 83:12,19
85:15,21 86:9,14,25
87:2,10 88:4,9,23 89:16
95:18 97:8 102:8,16
103:3 105:8,24 106:6
107:14,23 108:5 110:2
111:5 113:1 121:3
122:10 124:4

**cases**
65:11 68:13 72:6 78:10,
15 81:19 82:5,11,18

83:16 85:23 86:4 104:22
105:11 109:19 120:11,24
121:5,13 122:14,16,17
123:3,7,12,13,18,25
124:2 125:19,21,22

**category**
116:14 123:1

**cause**
125:11

**ceased**
78:6

**central**
75:12,15,17,21,25 76:12

**certain**
75:1 86:13

**certainly**
67:1 97:25 120:8

**certificate**
125:10

**certification**
113:15

**certified**
63:4

**chance**
89:16

**change**
90:8

**changes**
113:7

**check**
89:8 92:5 116:19

**checked**
80:15,17,18 114:13

**Chris**
69:5 78:4 98:5

**claims**
113:25 115:1,2

**Clark**
72:24 74:7 85:6 89:9
93:15 96:23 100:9,10
124:5

**Clark's**
100:12

**class**
67:24 87:1,9 88:10

113:14,16,23 114:18

**classification**
125:9

**clear**
87:5,6,18

**clearer**
77:14

**clears**
83:23

**clerk**
120:1 123:4

**client**
107:10 108:20 109:5,8,
17 110:3,9,19,24 111:4,
21 113:21 114:4 117:23
121:21 124:13 125:5,6

**client's**
107:25

**clients**
65:11 66:17 68:4 70:15,
21,25 71:4,6 79:4 94:21,
25 95:1 100:18 101:3,24
108:14,24 109:19
110:15,21 111:2,3
112:21 113:22 114:18,
22,23 115:7,8 116:4,10
117:4

**clients'**
83:21 86:2

**Cohen**
84:24 87:21,25 88:6,15
89:1,5 94:1,3,9,17,24
95:2,19 97:12,19 98:9,
16,25 99:10,12,17,20,23
100:7,12,17,18 101:2,23
102:6,18 103:1

**collected**
99:16

**column**
123:15

**come**
65:5,11,21 75:4 84:21

**comes**
67:19

**coming**
110:1

**communicated**
98:7,8 99:4,9

**communications**
97:12,18 99:12,16,20,23,
25 100:7,12 107:7,14
108:4 118:8 119:21

**compensation**
102:6,8,19

**complaint**
72:16 74:10,15 88:1

**complaints**
115:17,19,21,25 116:1,
10 122:5,7,8

**complete**
92:11,14 107:22

**computer**
75:8,9 76:2

**computers**
75:13 76:8,14

**concept**
64:1,3,10,15,24 65:2
70:4

**concerning**
104:23

**condition**
117:16

**conduct**
79:3 80:4

**confidentiality**
118:6

**confirm**
125:17

**confirmed**
70:7

**connection**
112:25

**consult**
89:11 114:8

**consultation**
114:8

**consulted**
115:13

**contact**
70:15

**contacted**
70:13,20 85:20 86:12

**contained**
67:11 107:14 108:4

**contemplating**
69:6 75:20 76:6 77:7,24
79:8 85:14

**continued**
79:2

**Continuing**
95:10 96:15

**control**
92:17

**conversation**
69:19,23 71:3,25 72:19
74:7,12 81:5,8 84:4,6
87:6,16 95:7 96:14,25
119:9,25 120:2

**conversations**
71:20 72:23 98:1

**converted**
84:19

**copies**
108:8

**copy**
74:5,6 89:2 92:1 108:5

**correct**
64:7 66:4,25 67:6 68:8,
13 70:18 71:14 75:13
76:2,3,25 77:5 78:12,16,
17,19,24 79:4,20 82:6,
14,19 84:10 88:11 89:20
91:21 104:11 105:8
106:10,18 117:7 118:25

**correction**
91:23

**correspondence**
98:16 122:8

**couldn't**
97:17 125:24

**counsel**
93:19 99:21 100:2
101:18 103:14 105:18,
20,22 107:17 110:16,19
112:4 121:12 122:18

**couple**
90:15

THOMAS W. BEVAN, ESQ. - 04/05/2018                    i4

**course**
99:6 118:6

**court**
105:7 106:25 110:23
112:10

**courthouse**
122:6

**criteria**
113:22 115:5

**CROSS-
EXAMINATION**
63:5

**current**
71:5 108:14

**currently**
124:16

**custodian**
103:8 120:18

**custody**
92:17

**D**

**Dale**
121:12 122:2

**Darnell**
85:6

**data**
114:21 118:3

**database**
113:21 114:4 115:14,16
116:5,8,9,21 117:1,6,9,
15 123:1,17 124:13
125:1,18,24

**date**
69:13,21 106:20 125:6,
11,13

**dated**
106:9

**dates**
123:3

**day**
106:14

**days**
97:17

**deal**
65:5

**death**
125:9,11

**debate**
96:2 112:18

**decedents**
113:24

**deceitful**
90:6

**declaration**
106:3,5,9 108:9 109:9
112:25 114:7

**defendant**
65:24 67:8 122:16

**defendant's**
65:22 84:15 89:14
105:16 111:25 112:24

**defendants**
64:13,16,24 82:14,16
88:22 99:14 102:15
122:10

**Defense**
105:19

**definition**
113:14,16 114:19

**delete**
75:1,10 78:6 79:15
104:17

**deleted**
75:16 76:9

**deletes**
75:7,10 104:8

**deleting**
75:22

**deletion**
74:18,22

**depends**
66:14

**deposition**
80:2 89:15,20,24 90:22
91:20 92:1 93:10 95:4,
13,22 97:4,13,20 103:9
120:18 124:9

**describing**
76:12

**description**
119:8

**destroy**
71:17 72:6

**destroyed**
70:12 121:22

**destroying**
81:15 83:20,23 84:1

**detail**
76:20 91:24 93:12 118:1

**determine**
67:10 105:10 111:17,18
113:21 115:17 125:25

**determined**
111:4

**diagnosis**
125:13

**didn't**
64:20 70:7 71:13 78:18
80:1 89:25 92:2,6 104:11
106:24 118:18 120:23
122:14 123:9

**difference**
92:20

**different**
76:18 84:2

**differently**
64:17

**directed**
112:11

**discarded**
73:7

**discuss**
85:21 94:3 95:2,18

**discussed**
70:4 118:23

**discussing**
88:8

**discussion**
74:19 97:14 101:13

**dishonest**
90:6 96:13

**disk**
89:10

**dismissed**
115:2

**disputed**
103:10

**distinct**
108:1

**doc**
89:4

**document**
70:4,8,11 71:13,16 73:6,
19,21 86:23 88:3,9,13
92:10,13,15 105:25
106:20

**document's**
83:25 92:24

**documents**
63:18,20,22 64:2,11,14
65:3,8,13,15,23,25
66:12,14,15,18,23 67:8,
13 69:17,21 70:12,16,17,
22 71:1,6,10 72:2,6,20
73:7 74:8,13 81:23 82:1,
4,19 83:8,12,18,21 84:7,
8,11 85:16,18,19,23
86:2,4,9,13,25 87:9,21,
23,25 88:6,15,17,21,25
89:4 92:17,22 93:2,5,6
97:2,7 108:6,18,21
110:8,18 114:21 115:12
120:21,24 121:16,18,19
122:1,21

**doing**
85:3 118:4 124:16,22

**don't**
63:23 65:12 67:3 68:13,
25 69:3,12,25 70:11
71:8,12,16,23 72:9,13,18
73:9,17 74:9,11,14,16
78:6 80:11,25 81:11
83:11 84:20,21,23 85:4,
9,13,25 86:1,6,18,20
87:5,18,22 88:2,24 89:3
91:18 93:9,23 96:1 97:6
98:21 99:4,15 100:11
102:4,17 103:21 104:12,
13 105:13 106:1,16,23
107:2 109:20,21 110:21,
23 111:7,24 113:4,10,11
115:20 117:12,14,18,20
118:12 120:6,8 122:5
124:17,23

THOMAS W. BEVAN, ESQ. - 04/05/2018                    i5

**doubt**
84:20

**dozens**
99:2

**draft**
113:3,6,8

**drafted**
113:4

**duly**
63:3

**duty**
63:17,19,21 64:1,11,14,
16,17,25 65:3,22,24
66:3,7,12,23 67:2 72:2
81:24 83:1,7,18

---

E

**e-mail**
73:6,13 74:25 75:6,7,15
76:14,17,24 77:4,9,17
78:1,21 79:1,2,10,14,18,
19,22,24 80:4,8,17 91:22
93:12 98:11,16 99:5,10,
19,22,25 100:7,12 104:4,
7 105:2,4,14

**e-mails**
74:18,23 75:1,4,22,25
76:7,11,21 77:2,9,11,15,
25 78:4,5,7 79:9,15,17,
19 80:7,18,19 81:2,13
98:19,25 104:8,18,20,21
105:5,10 107:9

**earlier**
95:14

**earliest**
68:16 105:13,14

**early**
69:10,14,20 70:1,13
77:6,23 79:7 80:6 84:17
99:3 105:23 107:10,15

**Eastern**
72:7 81:14 82:1,6 83:1,8,
13 84:1,8 105:14 108:25
109:7 114:24,25 115:1,2,
4,18 122:14,15

**easy**
120:25

**ECF**
105:24 106:17

**Economus**
121:10,11,12,19 122:3,
18,21

**eight**
90:19 123:8

**either**
98:23 104:15 115:1

**electronic**
73:6,19,21 74:6 84:19
87:19 108:6,7,8 121:24

**employee**
73:23 76:8,11 77:3,12

**employees**
71:9 72:1,20,21 75:13
77:10 78:1,10,14,20,24
79:1,11,24 81:24

**EMTAL**
68:18,24 78:11,16 82:21
104:23 105:12 111:22

**encountered**
64:10 65:7

**Engelhard**
68:18,24 78:11,16 82:5,
11 85:17,24 86:5 104:23
105:12 111:5 116:11

**ensure**
76:7 77:8,25 79:9

**enter**
124:22

**entered**
112:4 125:14

**enters**
124:12

**entirety**
117:1

**entity**
68:18

**entries**
117:9 124:25

**entry**
125:5,10

**Erin**
72:24 74:7 89:8 93:15
96:23 100:9,10

**ESQ**
63:2

**estimate**
76:16,22 108:13,22,23
109:1

**everybody's**
77:14

**evolved**
125:20

**exact**
69:13

**exactly**
71:24 86:18

**examined**
114:10

**exchanged**
98:14,16,25

**Excuse**
109:12 120:16 125:3

**exhibit**
84:15 89:14 90:22
105:16,19 107:3 111:25
112:24

**exist**
101:1 104:1

**expect**
64:13 66:1,9,10,13

**explain**
64:3 75:3

**exposed**
108:24 109:7

**exposure**
115:5

**extent**
116:12

---

F

**fact**
113:13

**facts**
68:14

**fair**
99:6 110:1 116:3 117:15,
18

**familiar**
64:1,4,15,22,23,24 65:2
69:2 119:11,12,14

**far**
68:3 76:20 80:12 118:2

**FARRELL**
63:6,14 91:17 94:7,12,
19,23 101:7,12,14,17,21
103:12 111:9,11,14
112:6,15,18 120:19,23
124:7,10,11

**father**
121:11 122:3

**February**
80:3 97:19 118:23

**fees**
103:2

**figure**
114:22 115:7,13,22
116:4,19 117:23

**file**
65:14 66:13,22 85:5
90:22 91:1,5 107:25
108:1 115:7 120:11,23
121:5

**filed**
66:24 68:7,17,21,23
69:3,4,11,12 72:16
74:10,15 78:10,15 82:5
85:16,24 86:5 88:1
104:22 105:11,22
106:15,25 114:23,25
115:8 116:10,14 121:3,
13

**files**
83:21 84:19,25 85:6
87:3,12,19 90:4,17,23
107:10,14,22,23 108:5,
14,20,22 109:8,17,19
110:3,9,15,19,24,25
111:21 116:1 121:21
123:22 124:1

**filing**
69:6,15 70:14 75:20 76:6
77:7,24 79:8 85:14,21

**final**
93:15

**find**
122:7

---

THOMAS W. BEVAN, ESQ. - 04/05/2018                     i6

**finished**
98:14

**Firestone**
109:6

**firm**
63:17,21 70:7 71:1,5,6,
10 72:1 73:8,13 74:23,25
76:24 77:3,8,25 78:9,14,
15,22 79:2,3,9,10,18,22
80:4,6 81:23 83:7,18
84:19,24,25 85:23 87:3,
11,12,21,24,25 88:5,6,
10,14,15 89:1 92:18,21
93:6 94:1,22,24 95:3,19
97:7,13,19 98:2,9,23
99:9,13,17,20,23 100:1,
6,16,17 101:2,3,23,24
102:3,5,6,7,19,20,25
103:1 104:22 105:11,23
108:2,13 110:2 113:20,
25 114:3,18,22 115:12,
16 116:4,5,8,9,10,20,25
117:6,15 118:8 119:20,
23,24,25 120:3,5,6,9,10
121:4,5,12,14,19 122:9,
19 124:25 125:17

**firm's**
85:23 92:10 98:19
102:18 113:21 114:4

**firms**
107:10,15

**first**
63:3 68:21 69:5,18,23
76:17 80:10 83:20 84:3,
17 87:8,14,16,20 99:4
107:6,13 108:12 123:6

**five**
87:1,9 88:10,20 109:17
113:23 124:2,3

**flipping**
106:2

**following**
103:24

**follows**
63:4

**forever**
83:22

**form**
64:18 65:9 66:5 67:7
71:15 72:4 75:24 78:23

79:25 81:20 83:10 84:13,
19 87:13 92:7 93:8
100:19 102:9 104:24
107:1 109:24 110:11
111:6,9,23 113:9 114:14
115:9,24 116:6 117:11,
13 122:11,23 125:4

**formal**
76:24 79:1

**former**
71:5 108:14

**forwarded**
75:5,16,25 93:2,13

**forwarding**
76:13

**found**
90:4

**foundation**
64:18 65:9 66:5 67:7
71:15 72:4 75:24 78:23
79:25 81:20 83:10 84:13
87:13 92:7 93:8 100:19
102:10 104:24 107:1
109:24 110:12 111:6,9,
23 113:9 114:15 115:10,
24 116:6 117:11 120:20
122:11,23 125:4

**fourth**
87:17

**frankly**
90:5

**functional**
117:16

**Further**
114:16

---

**G**

**gathered**
93:1

**Gayle**
95:13

**General**
109:6

**Gerry**
119:24 120:5,6,9

**getting**

63:16 83:24

**give**
65:15,17 66:20 69:21
76:23 97:17 109:13
118:1 125:10,12

**given**
74:2 109:18 110:14

**gives**
74:3

**giving**
109:25

**go**
68:13,14 94:10 102:12,
23 111:7 122:6

**goes**
68:20

**going**
66:2,22,24 80:11 82:7
91:19 99:3 103:10,20
104:18,21 105:10 112:18
118:2

**good**
63:7,8 67:4

**Goodrich**
109:6

**Goodyear**
109:5

**Gordon**
119:10 123:11

**Graham**
85:6

**great**
76:19

**grounds**
92:24

**group**
123:13,19

**groups**
123:12

**guess**
64:13 66:14 73:9 78:6
79:12 95:20 118:1,21

**Gwen**
124:17,18

**H**

**hadn't**
70:12 106:22

**half**
90:19

**handed**
89:13 105:18 112:23

**handful**
106:3 123:7,20

**handle**
78:18

**hard**
74:5 108:5

**Harry**
95:8 98:6 112:15

**haven't**
99:15

**hazards**
67:17

**He's**
94:18,20

**head**
73:4

**heading**
107:4,8

**hereinafter**
63:3

**hidden**
91:4

**high**
115:4

**historical**
67:16 84:25 87:3,12
121:25 122:1

**hits**
75:15

**hold**
65:18 70:8,11 71:13,16

**I**

**I'D**
118:16 119:19

THOMAS W. BEVAN, ESQ. - 04/05/2018                    i7

**I'LL**
    64:3 82:9 101:15 105:20
    110:6

**I'M**
    64:4,15,22 67:18 68:25
    69:1,4,10,19 72:24 73:9
    77:20 78:13 81:6,9,22
    84:22 85:3,7 87:4,6 88:7,
    16 90:14 91:6,7,12 92:15
    94:14,19 96:12,23
    100:24,25 101:17
    103:10,20 109:12,25
    110:13 111:2,7 112:6,8,
    12,18,19,20 113:10
    118:16 119:8 120:17,19,
    25 124:16,21

**I'VE**
    65:5,21 71:3 76:19 83:11
    89:13 91:17 93:20 94:2
    98:4,5 105:18 112:23
    120:2

**idea**
    67:4

**identification**
    84:16 89:14 105:17,19
    112:1

**identified**
    110:21

**identify**
    110:9,19 112:21 116:9

**immediate**
    107:8

**in-person**
    97:1

**inches**
    90:18,19

**includes**
    115:7

**Including**
    104:19

**indicate**
    123:14

**indicated**
    70:10

**individual**
    75:10,12 76:8,11,13
    124:23

**information**
    88:19 108:21 110:8,18
    112:20 115:12 124:12
    125:12,15,16,22

**informed**
    113:13

**initial**
    125:2,5

**initially**
    119:2

**inquiry**
    93:14

**instance**
    65:20 109:5

**instituted**
    79:1

**instruct**
    100:21 103:15

**instructed**
    103:11

**instructing**
    101:7 103:12

**instruction**
    101:6 103:24

**intake**
    125:6

**intakes**
    124:22

**interpose**
    91:10,13

**interrupting**
    63:15

**introduced**
    90:21 96:18

**involve**
    122:14

**involved**
    80:14 112:10

**isn't**
    125:22

**issue**
    65:7 67:21 68:2,6 70:7

**it's**
    65:5 66:15 67:4,5 73:18
    74:2 75:16 76:1,16 99:6

103:21 106:20 111:10,18
116:3 117:15 122:4

**its**
    81:23 84:25 87:3,12

---

**J**

**January**
    112:24

**Jared**
    95:8 96:21 98:4

**job**
    78:22 125:9

---

**K**

**keep**
    91:19 106:2 123:12,18

**Keith**
    121:11

**Kimberlee**
    67:25

**kind**
    123:12,18

**know**
    63:23 64:4 66:17 67:3
    68:3,25 69:2,9,11,18,19
    70:1,11,20,23 71:8,12,16
    72:18 73:9 74:9,11,14,16
    83:20,25 85:9 86:18
    87:14,18 88:18,21,24
    89:6,9 91:18,22 92:6,8
    93:1,4,9,15,17 95:23
    98:4,5,21,22 99:4,15
    102:4,17 104:11 105:13
    106:5,16 107:2 109:1
    110:14,18,21,23,24
    111:17,18,20,24 112:10
    113:4,6,8,11 115:21
    117:12,14,18,19,20
    118:18 119:9,24 121:23,
    25 122:5 124:2,3,5,6,16,
    17,21,22,23 125:6,7,10,
    20

**knowledge**
    67:16

**known**
    119:15

---

**L**

**law**
    63:17,21 64:2,6,10 65:6
    72:1 74:23,25 76:21,24
    77:3,8,25 79:9,18 80:6
    84:18,25 85:22 87:3,21,
    24 88:5,14 92:10 98:19
    100:6,16 101:23 102:3,5,
    18,25 107:10 113:24
    114:17,22 116:4,9
    117:15 118:8 119:20
    120:1,10 121:5 123:4,6
    124:25

**lawsuits**
    85:16

**lay**
    120:19

**left**
    124:8

**legal**
    67:2

**legwork**
    114:7

**Let's**
    77:22 78:8 80:2 91:15
    101:9,11 124:7

**letter**
    89:25 90:2,5,21,25 95:22

**letters**
    122:2

**likelihood**
    115:4

**limited**
    83:1 108:5 112:15

**line**
    95:11 96:8

**list**
    109:18,20 110:14,15,16

**litigation**
    64:12 65:4 67:9 68:7
    77:1 118:10,24 119:16,
    22 120:12 121:7,15,20
    123:5,10

**little**
    63:11,12 67:23 77:14
    93:3,13,21,24 95:20

99:22 100:3,13 106:24
113:10 118:1 125:23

**Little's**
93:6 98:24

**locally**
76:2

**log**
88:25 89:3 92:22 93:7
98:20 99:13 102:2,14

**logistics**
95:4

**logs**
99:15

**long**
76:14 86:20 121:22,24

**longer**
86:17

**look**
74:21

**looked**
90:3 92:2 104:16 105:2

**looking**
105:20 115:6

**lot**
125:21

**Lucarelli**
105:23

**lying**
90:10

---

**M**

**Magnesia**
72:7 81:15 82:2,6 83:1,9,
13 84:1,9 105:14 108:25
109:7 114:24,25 115:1,3,
4,18 122:15

**maintains**
108:2,13 117:6

**making**
82:8

**manages**
113:21 114:4

**Marietta**
74:1

**marked**
84:16 89:13 105:17,19
112:1,23

**Martillotta**
89:25 90:25 95:23

**matches**
125:19

**material**
103:21

**matter**
83:15,17

**Mcdermott**
64:19 72:11,17 91:10,13,
18 93:20,24 94:5,10,14,
18,20,25 95:10 96:8,11,
15 97:21,23 100:21
101:5,9,11,15,20 102:11,
22 103:5,7,16,20 117:25
118:11,19

**mean**
77:13 107:24 109:4
118:21 119:5,10,24
122:25

**meant**
119:3

**measured**
90:18

**medical**
88:18 125:12

**meet**
93:19 113:22 114:18

**meeting**
72:21 93:15 97:1

**member**
113:20 114:3

**members**
124:15

**memorializes**
81:1

**met**
93:20

**middle**
91:1,4,8

**mind**
67:19

**minute**
101:9

**minutes**
63:14 79:23 82:25 86:8
88:5,8

**Mischaracterization**
97:23

**missing**
93:16

**misunderstood**
95:25

**moment**
105:20

**months**
89:15

**motion**
103:9 113:15

**move**
96:10,11 97:24 103:4

**multi-hundred-page**
90:24

**multiple**
71:23 72:23 78:9,14
97:18,25 99:6

---

**N**

**name**
74:1 123:21 124:19
125:6

**named**
107:9

**names**
112:12

**National**
118:10,24 119:16,22
120:12 121:6,15,20
123:10

**need**
65:12 67:8 86:13 96:1
116:20

**never**
65:5,6 121:3

**newer**
125:22

**night**
95:6,8 96:14 97:14

**nodding**
73:4

**notes**
92:8

**notice**
70:8,11 71:13,16

**notices**
70:5

**November**
105:21 106:10,17
107:19,21 109:9

**number**
104:3 105:24 106:17,19
107:4 108:23 109:21
110:6,7 125:7,18

---

**O**

**object**
66:5 103:20

**objection**
64:18,19 65:9 67:7 71:15
72:4,11,17 75:24 78:23
79:25 81:20 83:3,10
84:13 87:13 91:11,14
92:7,25 93:8 94:5,8,13,
15 95:10 96:8,15 97:21,
22 100:19,21 101:4,5,16,
19,20 102:9,11,21,22
103:4,5 104:24 107:1
109:24 110:11 111:6,23
113:9 114:14 115:9,24
116:6 117:11,20,24,25
118:4,17 119:4 120:14,
17 121:17 122:11,23
125:3,4

**objections**
93:3

**obligation**
81:12

**office**
73:10 81:3 98:24 121:9

**Oh**
81:6 85:1 90:11 92:19
117:18 124:15

**okay**

THOMAS W. BEVAN, ESQ. - 04/05/2018                    i9

64:21 66:10 68:23 69:5
73:19 75:11 77:19 81:25
82:13 83:21,22,24 90:20
91:25 92:19,21 100:23
101:10,22 103:23 104:19
106:24 109:16 112:22
116:3 118:20 119:14
120:7,22 124:20

**old**
122:7

**older**
125:21

**oldest**
105:2

**Once**
75:25

**ones**
73:1 78:3

**opens**
75:6

**opportunity**
74:21 85:22 86:3

**option**
90:9,10,12

**order**
105:7 107:8 118:7

**organization**
119:14

**original**
85:4,10 86:9 88:3,8,13
123:3

**originally**
97:10

**originated**
121:14

**origination**
123:15

**Outlook**
75:8

**outside**
75:4,7 111:8

———————————

**P**

———————————

**page**
78:9 91:9 107:3 113:19

**pages**
106:3

**paid**
102:7,20 103:2 125:25

**paragraph**
108:10,12 113:12,16,19
114:9,16

**paralegal**
72:24 89:8

**part**
78:21 119:21 123:25
124:2,3,14

**participated**
95:7

**parties**
81:19

**partner**
72:25

**Pat**
72:25 79:21 93:16 114:5
115:15

**PDF**
90:24

**people**
76:20 98:23,24 124:21

**perceived**
95:21

**period**
67:21 68:2 75:2

**person**
73:5 74:3,4 96:25 114:6
116:15 124:23

**personal**
77:4,9 78:1,3,21 79:2,10,
13,17,19,24 92:13,15
104:4

**personally**
73:13,17 92:18 98:8
120:15 121:3

**Peter**
67:3 86:20 90:1 91:14

**phone**
63:11,13 96:25

**phrase**
107:23

**picked**
112:5

**place**
85:11 118:17

**Placitella**
69:5,14 70:13,20 71:9
75:19 76:5 77:6,16,22
78:5 79:6 84:17,24
85:14,20 86:3,12,24
87:21,25 88:6,15 89:1,5
94:1,3,9,17,24 95:1,2,9,
19 96:21 97:13,19 98:1,
4,5,9,17,23 99:1,10,13,
17,20,23 100:1,7,13,17,
18 101:2,24 102:6,19
103:1

**Placitella's**
94:22

**plaintiff**
65:2,7 66:11,12,22 68:17

**plaintiff's**
64:17

**plaintiffs**
68:8,11 88:20 90:24
102:7 110:22

**plaintiffs'**
81:18 107:9,16

**please**
82:8 91:16 103:17
111:13 118:12

**point**
70:24 81:1 85:12 87:2,18
88:3,13

**pointed**
114:9

**positive**
124:21

**possession**
92:17 117:17

**possibilities**
90:13

**possibility**
69:15 70:14

**possible**
122:4

**practice**
67:1

**practicing**
64:6,10 65:6

**preparation**
93:18

**prepare**
93:10 97:2

**prepared**
102:2

**present**
68:5

**preservation**
74:8,13

**preserve**
63:17,21 64:2,11,14,16,
25 65:3,8,12,22,24
66:12,17,21,23 67:9
69:21 70:16,17,21 71:1,
6,10 72:2 79:17 80:7,19
81:2,13,14,24 83:1,7,11,
19 84:8,12

**preserved**
63:19 67:12,15,18 74:6
77:10 78:2 79:11

**preserving**
69:16 72:20 84:6 86:22

**primarily**
116:4

**primary**
115:14

**prior**
121:8

**privilege**
92:22 93:7 94:6,8 98:20
99:13,15 100:20 102:2,
14

**privileged**
103:21

**probably**
68:20 69:8 82:22 88:16
99:2 100:9 119:25
121:23 122:3,6 125:23

**problem**
112:9,13

**process**
69:20 70:1 87:16 112:3,
9,14,20

THOMAS W. BEVAN, ESQ. - 04/05/2018                    i10

**produce**
86:13 89:25 90:2 109:19
110:3

**produced**
88:22,24 90:3,20,25 91:5
96:5,6 97:8 99:14 102:15
109:10,18,20 110:10,15,
20 111:21 115:23,25
116:2,25 117:10,12,13
122:9 124:13

**producing**
85:5 87:8

**product**
67:18

**production**
85:4,10 86:9,25 87:4,7,
15 88:4,9,14 92:10,13,15
107:9,16

**program**
75:8

**project**
118:10,24 119:5,10,16,
22 120:12 121:7,15,20
123:6,10

**proposed**
113:13 114:18

**provide**
87:23,24 88:5,14,17

**provided**
87:20 88:18 89:5,6 93:4
100:13 107:16

**put**
81:4 89:9,10 120:16
123:17

_____

                  Q

**question**
63:24 73:11 77:13,21
79:6,12 82:7,9 83:4 84:2
96:1 101:8,22 103:16
104:15 109:13 110:8,13
111:12 112:2 118:12
120:20

**questioning**
95:11 96:9

**questions**
74:22 91:16,17 92:4

104:4 112:19

**quite**
118:13

_____

                  R

**raising**
112:13,19

**ran**
117:22

**randomly**
112:5,11

**range**
109:25

**ranted**
95:20

**read**
96:3,4 103:18 109:14
111:14,15 118:11,14

**really**
71:12

**recall**
69:12,25 71:23 72:9,13
80:25 81:11 84:20,21,23
85:4,13,25 86:1,6,7,20
87:5,22 88:2 93:1,23
106:1,23 109:20,21
110:1 115:19,20 119:7
120:8

**receive**
102:8

**received**
77:2

**receives**
75:6

**recess**
124:8

**recipient**
75:5,6 76:1

**recipient's**
75:8

**recommend**
66:16

**record**
89:4 101:12,13,17
103:18 105:21 109:14

111:15 118:14,17 120:17
124:10

**records**
67:14,15 88:19 103:8
120:18 121:25 122:2

**redactions**
117:2

**reference**
110:9 113:12 114:17

**referenced**
72:19 88:4 109:8 122:9

**referral**
100:18 101:3,24

**referred**
123:8,14

**referring**
67:23 108:18 119:23
123:1,16

**refers**
123:4

**reflect**
116:8,12

**reflected**
102:1,14

**regarding**
67:15 88:19 100:17
101:3,24 102:6,19 103:1

**regardless**
110:7

**reject**
91:3

**relate**
82:21 105:11 111:21

**related**
63:18,22 68:18,24 72:6
78:11,16 81:14 82:1,4,6
83:8,25 84:8 85:16,23
86:4 87:9 104:22 105:12,
14 116:1 121:19

**relationship**
94:16

**relevant**
64:11 65:4,13,15,17,25
66:16,24 71:1,7,11 72:2
77:17 78:5,7 80:8,20

**remember**
70:5 74:18 86:10 104:5

**repeat**
78:13 82:7 88:7 103:16
111:13

**rephrase**
82:9

**report**
125:12

**Reporter**
103:18 109:14 111:15
118:14

**representative**
109:17

**representatives**
87:1,10 88:10 113:23

**represented**
68:10 87:11 88:11 94:21
113:24

**representing**
79:4

**requested**
103:19 109:15 111:16
118:15

**required**
67:5

**research**
114:6

**response**
92:11,14 110:3 123:23

**responsible**
73:5

**responsive**
105:7 108:15 122:22

**results**
67:11 114:10

**retention**
70:4

**review**
74:4 85:22 86:2,4 89:16
97:2,7

**reviewed**
93:12,14 97:4,9,10 113:7
115:17,22

**reviewing**

THOMAS W. BEVAN, ESQ. - 04/05/2018                    i11

115:19

**reviews**
74:4

**rid**
74:5

**right**
67:19 70:9 77:19 82:2,16
93:24 109:23 114:9

**room**
96:24

**Ross**
69:1

**Roth**
63:10,14,16 64:18 65:9
66:5 67:7 71:15 72:4
75:24 78:23 79:25 81:20
83:3,5,10 84:13 87:13
89:5 92:7 93:8 94:4,17
95:8,12 96:10,14,19,20
97:22 98:6,17 99:1,10
100:8,19 101:4 102:9,21
103:4,6,8,14 104:24
107:1 109:12,16,24
110:11 111:6,10,23
112:2,8,17,22 113:9
114:14 115:9,24 116:6
117:11,24 118:16,20
119:4 120:14,16,22,25
121:17 122:11,23 125:3

**routinely**
65:12

**run**
117:21

**runs**
73:18

___

**S**

**sales**
67:14

**Sam**
89:25

**sample**
110:3,25

**saved**
76:2 79:14

**saw**
106:23

**saying**
64:22

**says**
107:6,8 108:4,12

**scan**
74:4

**scanned**
74:2,5 83:21 84:25 87:3,
12 89:2

**scanning**
73:23

**scans**
74:2

**Schenk**
124:19

**school**
123:6

**scope**
81:22 103:13

**search**
105:4

**searchable**
117:7,10,13

**searched**
123:23

**searches**
117:22

**second**
87:17 97:9

**seconds**
90:5

**Security**
125:7

**see**
85:15,18 90:11 105:2
106:2 107:4,11,17
108:10,15 113:1,12,16,
19,25 114:17

**seeing**
120:17

**seen**
99:15 105:25 106:4,8,12,
22

**selected**
107:15 110:25

**send**
71:13 106:24

**sense**
73:12 82:8 95:25

**sent**
77:2 88:25 93:12

**sentence**
107:6,13 108:12,19

**server**
75:4,7,12,15,17,21 76:1,
13 91:23

**set**
73:18,22

**settled**
115:1

**settlement**
90:4,17 125:14,15,16,18,
19,25

**settlements**
81:18

**sharing**
121:9

**She's**
89:9

**short**
124:7

**signed**
106:4,9,14 108:9 109:9
112:25 123:7

**similar**
93:17

**single**
78:18

**sir**
91:12,21 96:7

**sit**
72:14 81:7 111:20

**sites**
115:3

**six**
90:18

**Social**
125:7

**somebody**
73:5 75:16 98:1 111:17

**somewhat**
119:17,18,19

**sooner**
95:13

**sorry**
63:10 77:20 78:13 83:5
84:22 88:7 94:19 101:18
109:12 118:13

**sort**
88:19 89:2

**sound**
75:11 109:23

**speak**
94:1

**speaking**
120:9

**specific**
67:23 68:4 71:25 87:5

**spoke**
69:14 84:17 86:24 87:8
120:6

**spoken**
94:2 120:3

**staff**
71:17 124:15

**stands**
94:15 123:5

**start**
95:14

**started**
63:16 119:6,10,15
123:13,19

**starting**
123:4

**state**
105:21

**statement**
80:13 95:21 107:19

**stay**
75:9 83:22

**Stemple**
119:6,10,15,23,25 120:3
121:4,14 122:2 123:11

**steps**
75:11,21 76:7 77:8,22,24

THOMAS W. BEVAN, ESQ. - 04/05/2018                    i12

78:8 79:8,16,17 80:6
125:17

**stick**
80:2

**stop**
75:21

**stopped**
123:21

**strike**
96:11 97:24 103:4

**stuck**
91:1,4,6

**subject**
83:15,17 103:9 118:6
125:16

**subpoena**
92:11,14,16 108:15
110:4 122:22 123:23

**substance**
95:18 100:24

**sued**
64:13,14 66:1,2,4,8,9,10
82:11,14 115:18 122:15

**suggesting**
91:6

**suggestion**
91:3

**suit**
114:23,25

**sure**
66:18 67:5,18 69:1,4,10,
19 72:24,25 73:7 74:5
81:6,7,9 84:5 85:3,7
87:4,6 88:16 89:22 93:16
96:23 110:13 111:2
118:16 119:2,8 122:5
124:17

**surrounding**
68:14

**swear**
91:15

**sworn**
63:3

**system**
73:14,19,21,22,24 74:25
76:12,14,18,24 77:4 79:1

**systems**
73:6

---

**T**

**take**
75:21 76:7,23 77:8,22,25
78:8 79:9 80:6 101:9
118:3 124:7 125:17

**taken**
79:16 124:8

**talc**
67:10 68:19,24 72:7
78:11,16 81:15 82:2,6,21
83:2,9,13 84:1,9 90:17
104:23 105:12,15 108:25
109:7 111:22 114:24,25
115:2,3,4,18 122:15

**talked**
74:17 85:3 86:8,22 87:14
93:20,23,24 95:8 98:4,5,
6

**talking**
64:3 66:15 77:11,13,14
78:3 91:2

**tell**
65:12 69:5,16 70:2,15,
17,21 71:10 72:1 73:5
77:20 79:7 80:19 83:6
84:18 85:12 87:2 95:12
101:1 110:6 118:21

**telling**
81:2 84:3

**ten**
76:16,22,23 77:3 78:20,
25 93:14 123:8

**test**
67:11

**tested**
67:10

**testified**
63:4

**testify**
91:14

**testimony**
89:19 90:8 91:20,23

**there's**
67:2,19 74:1 75:10,12

90:15 92:20 106:3 107:4
113:12,15 121:24

**they're**
65:13 66:2

**they've**
66:1,3,7

**thing**
115:15

**things**
83:23 90:15 92:5

**think**
64:5 65:20 67:4 68:2,4
69:3,8,10,12 70:10 71:3
72:5 73:17 79:22 80:5,
10,11,21,22,23 81:5
83:11 89:22 90:17 92:1,9
97:6 100:11 104:10,12,
13 108:23 111:1 113:4,
10 116:22 117:5 118:12
120:6 121:22 124:17,19

**third**
87:17 90:9,10,12,13

**THOMAS**
63:2

**thought**
81:23 84:4 86:17

**three**
90:3 111:7

**time**
64:5 67:21 68:2 70:3,24
74:17 75:2 76:20 85:7
86:21 87:20 88:13 91:21
92:6 93:18,23 96:1,13
97:9 104:3,10 110:1
112:15 120:3,5

**times**
71:23 90:3 94:2 97:17

**Tire**
109:6 118:10,24 119:16,
22 120:12 121:6,15,20
123:5,10

**today**
67:24 72:14 81:7 89:7
93:11,25 97:3 104:15
106:22 111:20 122:19

**told**
64:6 70:25 71:5,17 72:5,
24,25 75:19 76:5,19

77:12 79:23 80:3 81:12
82:1,25 83:11 84:8,11,24
87:11 89:24 90:3,17
91:22

**Tom**
79:21 94:11 100:22
102:12,23

**top**
106:21

**topics**
93:14

**track**
123:12,18

**transcript**
89:15,17

**truthful**
90:1

**try**
78:8 82:9

**trying**
81:22 91:7,12 120:19

**turn**
107:3 108:9

**turned**
99:21 107:21 124:1

**twelve**
90:18

**Twenty-seven**
64:9

**TWLP**
122:25 123:5

**TWLP2**
123:9,11,22 124:4

**TWLP3**
123:14

**TWLP4**
123:20

**two**
63:14 73:3 75:11 77:22
89:15 90:12

**types**
67:8

THOMAS W. BEVAN, ESQ. - 04/05/2018                  i13

**U**

**Uh-huh**
107:5

**underlying**
113:25 114:7

**understand**
81:22 82:10 107:23
110:13 112:17

**understanding**
68:9 73:9,10 116:25

**understood**
82:25 92:16 96:3,4
111:11

**universe**
110:24 111:1,3

**unrelated**
83:12

**untruthful**
95:21

**upset**
90:5

**use**
79:2 108:21 125:24

**uses**
79:22 80:3,5

**V**

**variety**
82:18

**various**
97:17 124:15

**version**
117:9

**versus**
67:25

**view**
64:17

**W**

**walk**
101:11

**Walsh**
72:25 74:12 79:21 80:2,
3,7,10 81:2 83:6 84:4,6
93:16 96:16,17,20 99:11
114:5,6 115:15 117:22

**Walsh's**
99:12,16,19,22

**want**
91:14 118:3,5 120:16

**wanted**
116:19

**Ware**
85:6

**wasn't**
80:14 90:7,11 91:8 93:16
96:5,12

**way**
68:16 72:14 73:10 76:15
89:21 91:5,8 103:6
104:15

**we'll**
91:15 95:14

**we're**
78:3,8 81:15 83:20,23
84:1 101:12 103:6
125:23

**we've**
63:19 89:6 105:18
112:23

**Welcome**
63:9

**went**
68:4 85:7 121:24

**weren't**
90:1 119:2

**What's**
80:13 89:23 94:7

**who's**
121:12

**Williams**
63:18,22 67:21,22,25
69:7,11,15 70:9 71:2,7,
11 72:3,16 74:10,15
75:20 76:4,6 77:7,18,24
79:8 80:9,20 83:19 85:5,
15,21 86:13 87:1,10
88:1,9,22 95:13,18 97:8

102:8,16 103:2 105:24
110:2 113:1,14 122:10
124:4

**withdraw**
101:15

**withdrawing**
94:12,14 101:18

**withdrawn**
76:4,11 77:1 83:16 86:23
87:23 98:7 100:5,15
104:20 106:8 107:7
116:8 120:10

**withheld**
92:24

**withholding**
92:22 93:6

**witness**
73:4 100:23 101:6,10
103:23 112:6

**work**
114:13

**worked**
76:14 78:10,15 109:3,5
116:13,15 125:8

**Worker**
118:10,24 119:16,22
120:12 121:6,15,20
123:5,10

**working**
115:15

**works**
73:11 75:3

**wouldn't**
90:9

**writing**
71:18 81:1,4 98:10
102:20

**Y**

**yeah**
64:19 70:10 71:21 72:18
80:16 81:9 82:22 84:14
88:2 89:2 92:8,19 119:19
123:3 124:6

**year**
68:25 85:5

**years**
64:7,8,9 65:6 71:23
76:16,22,23 77:3 78:20,
25 99:7 121:23 124:15
125:8,21

**you'd**
89:20 91:21 118:1

**you'll**
106:2

**you're**
64:3,24 66:10,14 67:4,23
69:2 73:10 76:12 82:7,8
83:13,24 84:5 91:1,18
92:5 103:12,24 106:19
112:13 118:2 119:23
123:15

**you've**
64:5,10 65:6 70:25 77:12
89:5 97:18 98:12,16
106:4,8,12 113:13 120:3