# EXHIBIT B

THOMAS W. BEVAN, ESQ. - 05/15/2018

1                 IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF NEW JERSEY

3

    KIMBERLEE WILLIAMS,        )
4   et al.,                    )
                               )
5             PLAINTIFFS,      )
                               )
6                              )
          vs.                  )        CIVIL ACTION
7                              )        NO. 11-CV-01754
                               )
8   BASF CATALYSTS LLC,        )
    et al.,                    )
9                              )
              DEFENDANTS.      )
10

11                  -  -  -  -  -
    THE VIDEOTAPED DEPOSITION OF THOMAS W. BEVAN, ESQ.
12                TUESDAY, MAY 15, 2018
                    -  -  -  -  -
13

14        The videotaped deposition of THOMAS W. BEVAN,

15   ESQ., called by the Defendants for examination

16   pursuant to the Federal Rules of Civil Procedure,

17   taken before me, the undersigned, Sarah R. Drown,

18   Registered Professional Reporter and Notary Public

19   within and for the State of Ohio, taken at the

20   offices of Thompson Hine LLP, 3900 Key Center, 127

21   Public Square, Cleveland, Ohio, commencing at 9:03

22   a.m., the day and date above set forth.

23

24

25

THOMAS W. BEVAN, ESQ. - 05/15/2018      Pages 82..85

Page 82

1  identified, did you talk to anybody from Cohen,
2  Placitella & Roth regarding today's deposition?
3  A  No.
4  Q  Did you have any communications with Cohen,
5     Placitella & Roth regarding today's deposition?
6  A  No.  I said hi to them this morning.
7  Q  Did you bring any documents with you today?
8  A  Nothing related to this case.
9  Q  Going back to 236.  Or I'm sorry, 237, the
10    Bloomberg article.
11 A  Yes.
12 Q  Did you tell the reporter that you were
13    involved in the Williams case?
14 A  I don't recall.
15 Q  Okay.  Or did you tell them you were involved
16    in a federal court case involving six people in
17    New Jersey that may or may not be Williams?
18            MR. ROTH:      Objection.
19 A  I don't recall.
20 Q  All right.  So could you just turn to the
21    second page of the Bloomberg printout.
22            It says, "'This has really opened a
23    Pandora's Box,' said Tom Bevan, a lawyer in
24    Boston Heights, Ohio, who represented hundreds
25    of people who sued Engelhard in the 1990s and

Page 83

1     is involved in a current federal case against
2     BASF."
3            Do you see that?
4  A  Yes.
5  Q  Do you have any idea of what -- withdrawn.
6            When you read the article, did you have
7     any understanding of what the "current federal
8     case against BASF" referred to?
9  A  I assume it's this class action but ...
10 Q  Williams?
11 A  Yeah.
12 Q  Okay.  And when you read that, you knew it had
13    to do with Williams, correct?
14 A  You know, I don't know that I really gave it
15    much thought.
16 Q  Are you involved in any other federal case
17    against BASF?
18 A  I'm involved in the Ross case, and I don't
19    recall -- I know it's filed in New Jersey.
20    Whether that's a state court or federal court,
21    I'm not sure.
22 Q  Was the Ross case even filed at this time?
23 A  I don't know when the Ross case was filed.
24    That was probably filed in -- I don't know.
25    I'm not sure when the Ross case was -- '16 or

Page 84

1     '15.
2  Q  The quote "This has really opened a Pandora's
3     Box," is that an accurate quote?
4  A  I think it is.
5  Q  You said that to the reporter?
6  A  I assume I said it.  I don't recall saying it,
7     but I would agree with that statement.
8  Q  And did you tell him you were involved in the
9     federal case?
10 A  I don't recall.  I know I -- I know I told them
11    I was representing Mrs. Holley, who's the
12    executrix of the Darnell estate.
13 Q  How are you involved in the federal case?
14 A  Well, I still represent thousands of people
15    that potentially are class members.  I'm not
16    handling the federal case in any way.  I'm not
17    counsel of record, but I am still the attorneys
18    for these -- for Mrs. Williams, for Marilyn
19    Holley, for the Ware family.  I'm the attorney
20    for the Clark family.
21 Q  But independent of your relationships with
22    Holley, Ware, and the other plaintiffs, you
23    have a fee agreement with Cohen, Placitella &
24    Roth, correct?
25            MR. ROTH:      Objection.

Page 85

1  A  Say that again.  Independent of?
2  Q  Independent of your relationships with the
3     named plaintiffs, you have a separate
4     relationship with Cohen, Placitella & Roth --
5            MR. McDERMOTT:     Objection.
6  Q  -- correct?
7  A  I have relationships, yes.
8  Q  You have a fee arrangement with Cohen,
9     Placitella & Roth, correct?
10            MR. McDERMOTT:     Objection.
11            MR. ROTH:      Objection.
12 A  Yes.
13 Q  Has that been disclosed to your individual
14    clients?
15            MR. ROTH:      Objection.
16            MR. McDERMOTT:     Same objection.
17            MR. ROTH:      Privilege.
18            MR. McDERMOTT:     Continuing
19    objection about these questions.
20 A  I'm -- I'm fairly certain that, for instance,
21    on the Ross case, I assume that the client
22    signed a fee agreement with both our firm on
23    there and the Placitella firm.
24 Q  Regarding the Williams case, have you disclosed
25    your arrangements with Cohen, Placitella & Roth

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 114..117

Page 114

1    you did with the named plaintiffs?  Fair?
2         MR. ROTH:        Objection to
3    form.
4  A  Certainly from Mr. Placitella's end.  You know,
5    he knew more than, you know, my clients knew.
6  Q  You provided Mr. Placitella with more facts
7    than you provided to your clients, fair?
8         MR. ROTH:        Objection.
9  A  I think so.
10 Q  Well, since you never spoke to Ms. Wengerd or
11   Ms. Williams regarding the facts, by definition
12   you had to provide Mr. Placitella with more
13   facts, fair?
14        MR. ROTH:        Objection.
15 A  Me personally, yeah, sure.
16 Q  And in providing these facts, some of the facts
17   were in emails, correct?
18 A  I think.  I'm not positive, but I think.
19 Q  Have you reviewed these emails?
20 A  I -- no.  I got a stack of emails, but I have
21   not reviewed them.
22 Q  When did you get a stack of emails?
23 A  Some -- some time ago.  I printed out a stack
24   of my emails.
25 Q  A week, a month, two months?

Page 115

1  A  I don't recall when it was.
2  Q  And did you review them in the context of this
3    case?
4  A  I did not review them, I just printed them.
5  Q  Why did you print them?
6  A  In case I was going to have to turn them over.
7  Q  You weren't curious as to what were on the
8    emails?
9  A  It's a lot of emails.  I didn't have the time.
10   I'm not going to review them if I don't have
11   to.
12 Q  What do you mean "a lot"?
13 A  It's, you know, dozens of emails.  I mean it's
14   probably a four-inch, five-inch stack of
15   emails.
16 Q  To and from Mr. Placitella and his colleagues?
17 A  Yes.
18 Q  And those emails, again, contain information
19   that your clients don't have --
20        MR. ROTH:        Objection.
21 Q  -- correct, the five --
22        MR. ROTH:        Form and
23   foundation.
24 A  I wouldn't agree with that.
25 Q  Well, those emails contain facts that you

Page 116

1    didn't discuss with your clients, correct?
2         MR. ROTH:        Objection.
3  A  I don't know.
4  Q  You never discussed anything with Ms. Williams?
5  A  Me personally?
6  Q  Correct.  Correct.
7  A  No.
8  Q  And she's the named plaintiff in this case,
9    correct?
10 A  I think she's the lead plaintiff.
11        MR. ROTH:        Objection.
12 Q  So if there are any facts in those emails,
13   Mr. Placitella would have greater access to
14   those facts than Ms. Williams, true?
15 A  I can't answer that.  I don't -- I don't know.
16 Q  Did you provide Mr. Placitella with facts
17   regarding the underlying Engelhard cases?
18 A  Again, I'm not sure what I put in the email.
19 Q  Well, you said previously you did put facts in
20   the --
21 A  I said I think I did, but I don't know exactly
22   what I put in.
23 Q  And you wouldn't know until you or somebody
24   reviewed them as to whether there are facts in
25   those emails?

Page 117

1  A  That's true.
2  Q  Okay.  And would it -- would there be some
3    reason why you wouldn't convey to
4    Mr. Placitella facts in those emails?
5         MR. ROTH:        Objection.
6  A  Yeah, if it didn't come up.  If there wasn't a
7    need at the time.
8  Q  Well, in this four-inch stack of dozens and
9    dozens of emails, can you think of any reason
10   why you wouldn't convey to him a fact that
11   would be relevant to the case?
12 A  If it didn't come up, I didn't put it in an
13   email.
14 Q  Well, what type of communications would you
15   have with Mr. Placitella if you weren't
16   conveying to him facts regarding the underlying
17   action?
18 A  Well, first of all, I've had communications
19   with Mr. Placitella and people of his -- from
20   his firm on things unrelated to this case.
21   I've had conversations in email communications
22   with them with respect to the Ross case.  That
23   would all be in that same stack of emails.
24 Q  So let's put the Ross case and other cases --
25   let's just talk about the Williams case.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 190..193

Page 190

1  suggestion.
2            MR. ASSAF:       No.
3            MR. McDERMOTT:   You ask such
4  vague questions.
5            MR. ASSAF:       You have form
6  or foundation.
7            MR. McDERMOTT:   All right.
8            MR. ASSAF:       Let's get the
9  judge on again.  We have form and foundation.
10 That's it.  You want --
11           MR. ROTH:        Okay.  Well,
12 now we're off the record, why don't --
13           MR. ASSAF:       No, let's go on
14 the record.
15           MR. ROTH:        We're now out
16 of the hearing of the witness.
17       Mr. McDermott, can you explain to
18 Mr. Assaf what your issue is, and maybe --
19           MR. McDERMOTT:   My issue
20 is that --
21           MR. ROTH:        -- you can
22 clarify the question.
23           MR. McDERMOTT:   My issue is
24 this, is that it depends upon the disease to
25 answer that question.  Your question wasn't

Page 191

1  clear.  For me to interpose a correct
2  objection, just tell me what disease you're
3  talking about, that's all.  That's all I --
4            MR. ASSAF:       Then make a
5  form or foundation objection.
6            MR. McDERMOTT:   But you can't
7  clear it up by form and foundation --
8            MR. ASSAF:       You're not
9  litigating the case --
10           MR. McDERMOTT:   -- Mr. Assaf,
11 because you've been asking vague and
12 hypothetical questions all day.
13           MR. ASSAF:       It's not.  He's
14 one of the most experienced plaintiffs asbestos
15 lawyers in the country.  I think he understands
16 my question.
17           MR. McDERMOTT:   I think I take
18 issue with that.
19           MR. ASSAF:       All right.
20 Let's bring him back in.  Form or -- well,
21 let's not.
22       Anything except form or foundation, let's
23 get the judge on the line.
24           MR. McDERMOTT:   Just continue
25 the deposition.

Page 192

1            MR. ASSAF:       All right.
2            - - - - -
3            (Mr. Bevan now present.)
4            - - - - -
5  BY MR. ASSAF:
6  Q   By the way, Mr. Bevan, did you discuss your
7      testimony during the prior breaks?
8  A   No.
9  Q   In terms of --
10           MR. ROTH:        There was only
11 one break.
12 Q   In terms of -- yeah, the prior break.
13      In terms of your settlement of asbestos
14      talc cases, how long have you been doing that?
15 A   I think the first time I did a settlement with
16     any talc defendant was in 1997 and I think the
17     last time was probably in I want to say 2011
18     maybe.
19 Q   Could you tell me roughly how many talc cases
20     you've settled?  Round numbers.
21           MR. ROTH:        Objection to
22 form.  Form and foundation.
23 A   Boy, I'm not sure.  1 to 2,000.
24 Q   And could you tell me how many -- on behalf of
25     how many plaintiffs you've settled asbestos

Page 193

1  cases apart from talc?
2  A   How many individual plaintiffs I have settled
3      asbestos cases for.  Probably I'm going to
4      estimate 20 to 30,000.
5  Q   All right.  Do you think you have a good
6      understanding of strengths and weaknesses of
7      matters when you're recommending settlements to
8      your clients?
9  A   When I have all of the evidence.
10 Q   Let's take a break.  Lunch.
11           THE VIDEOGRAPHER: Off the record.
12 The time is 12:49.
13           - - - - -
14           (Recess taken.)
15           - - - - -
16           THE VIDEOGRAPHER:  We're back on
17 the record.  The time is 1:29.
18 BY MR. ASSAF:
19 Q   Do you think that BASF spoliated documents?
20 A   My understanding is that they did.
21 Q   What's your understanding from?
22 A   My understanding is that Eastern Magnesia
23     tested their talc in the 1970s, found that it
24     contained asbestos, and destroyed any documents
25     related to that.

Page 194

1  Q  What's your understanding from?  What source?
2  A  From what I've heard from Mr. Placitella and
3     what I've read in the complaint.  I'm not sure
4     if I've seen any documents to that extent, but
5     that's what I've been told.
6  Q  Did Mr. Placitella talk to you about any state
7     court proceedings regarding spoliation or
8     crime-fraud?
9              MR. ROTH:        Objection.
10    Form.
11             Hold on for a second.
12             That's a yes or no.
13 A  I don't recall what's in state court, what's in
14    federal court.
15 Q  Did he tell you about any spoliation or
16    crime-fraud hearings, period?
17 A  I assume there was one in this case, because I
18    thought that was one of the issues that was up
19    at the circuit court, but I don't recall.
20 Q  Has he talked to you about any -- withdrawn.
21             Regarding the spoliation allegations,
22    what do you understand the facts alleged are?
23 A  My understanding of the facts was what I just
24    said and that sometime in the 1980s, they
25    gathered up the documents and destroyed them.

Page 195

1  Q  And when did Mr. Placitella convey that to you
2     in words or in substance?
3              MR. ROTH:        Objection to
4     form and foundation.
5  A  It would have been 2010 or '11.  I believe it
6     was in the complaint as well.
7  Q  Other than that, have you had any conversations
8     with Mr. Placitella regarding spoliation
9     allegation?
10             MR. McDERMOTT:    Objection.
11 A  No.
12 Q  Have you initiated any efforts in Ohio to
13    reopen any cases?
14 A  No.
15 Q  Why not?
16 A  Because that's being handled by the Placitella
17    firm as part of the class action.
18 Q  Could you?  Withdrawn.
19             Do you have the capability and experience
20    and resources to try to reopen individual cases
21    here?
22 A  I certainly have the resources.  You know, as
23    far as the ability and experience, I think
24    Mr. Placitella knows things that I don't know,
25    and so I would think that he would be in a

Page 196

1     better position to do that than I would.
2  Q  Well, you know the facts better than he does,
3     in terms of the underlying cases, true?
4  A  Yes.
5  Q  And you're barred in Ohio?  You're a member of
6     the Bar?
7  A  Yeah, I'm a member of the Bar in Ohio.
8  Q  And you can associate with Mr. Placitella to
9     bring a case here, correct?
10 A  Yeah.  Yeah.  Yeah, sure.
11 Q  Is there any impediment to doing so?
12 A  I don't know.  I haven't researched it to
13    determine if there's any impediment, but we
14    chose to pursue it the way it's being pursued.
15 Q  Do you view yourself as kind of co-counsel in
16    Williams?
17 A  If -- I guess it depends if -- for instance,
18    take the Darnell case and if the Darnell case,
19    if we're set back to square one and Darnell's
20    able to pursue the -- her claim against Eastern
21    Magnesia Talc with all of the relevant
22    evidence, than I would assume that I would be
23    co-counsel because I know a tremendous amount
24    of the Darnell case.
25             I wouldn't be able to do it by myself, I

Page 197

1     would need the assistance of the Placitella
2     firm because they know more about BASF and what
3     BASF knew, when they knew it, what they did
4     with the evidence, those things.
5  Q  Do you view yourself as having a co-counsel
6     relationship with Mr. Placitella?
7  A  Certainly in the Ross case and certainly --
8     yeah, if we get to that point that I described,
9     then yes.
10 Q  At trial, would you be co-counsel?
11             MR. ROTH:        Trial of what
12    case?
13 A  It depends on what issue's being tried.
14 Q  The Williams case.
15 A  It depends on what issue's being tried in the
16    Williams case.
17 Q  Well, what issue can you imagine you would be
18    co-counsel?
19             MR. ROTH:        Objection to
20    form and foundation.
21 A  If, again, the Williams case was set back to
22    square one and we were permitted to try our
23    case, I'm familiar with the medical and the
24    facts of the case.  I would assume that I would
25    have a role in that as co-counsel.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 418..421

Page 418

1    Q   Let me show you -- and again this may have been
2        marked too and I apologize.  It's Exhibit 131.
3    A   I don't think this one was.
4    Q   And this is a letter to you from Scott Martin
5        dated July 24, 1996?
6    A   Yes.
7    Q   In the context of requesting the voluntary
8        dismissal of the Strickland case, what is
9        Mr. Martin telling you about whether Emtal has
10       asbestos in it?
11   A   He indicated there is no evidence whatsoever
12       that talc mined or milled by Emtal contained
13       asbestos.
14   Q   I only mean to be a little bit glib, but do you
15       need to be a scientist or do you need a
16       scientist or did you need an expert in 1996 to
17       decipher what Mr. Martin meant when he wrote to
18       you that there is no evidence whatsoever that
19       talc mined and milled by Emtal contained
20       asbestos?
21   A   It's clear what he meant.
22   Q   I don't have any other questions.  And I think
23       we're done.
24           MR. ASSAF:        Whoa.  Whoa.
25       Whoa.  I have a couple.

Page 419

1            MR. ROTH:         You're at seven
2        hours.  What are you --
3            MR. ASSAF:        I don't think
4        so.
5            MR. ROTH:         Well, what was
6        the time before we went to plaintiffs' side?
7            THE VIDEOGRAPHER: He was at 6:51.
8        REEXAMINATION OF THOMAS W. BEVAN, ESQ.
9    BY MR. ASSAF:
10   Q   Ready?
11   A   Sure.
12   Q   Mr. Roth asked you a bunch of questions about
13       how to prove product ID based on all of your
14       experience.  Right?
15           MR. ROTH:         Objection.
16   A   He asked me a couple questions, sure.
17   Q   By the way, you never had any problems
18       answering Mr. Roth's questions, did you?
19           MR. McDERMOTT:    Objection.
20   A   His questions were much more direct and simpler
21       than your questions.
22           MR. ROTH:         Thank you very
23       much.
24   A   They were better questions.
25   Q   You would like to see Mr. Roth win, correct?

Page 420

1            MR. McDERMOTT:    Objection.
2            MR. ROTH:         Move to strike.
3    Q   Well, is that not true?
4    A   I think --
5            MR. McDERMOTT:    Objection.
6    A   And I'm not sure what you mean by that.
7    Q   You'd like to see the plaintiffs win this case?
8    A   The plaintiffs should win this case --
9            MR. McDERMOTT:    Objection.
10   A   -- yes.  Absolutely.
11   Q   In terms of showing product ID, one of the ways
12       you show it is from interrogatory responses
13       from the defendant, correct?
14   A   Yes.
15   Q   Sales records from the defendants, correct?
16   A   Yes.
17   Q   The sales -- or I'm sorry.  The purchasing
18       records from facilities, for example,
19       BFGoodrich purchasing records, correct?
20   A   If they exist, yes.
21   Q   And you also show it through your own client
22       recollection by showing them pictures of
23       various products to see if they could identify
24       it --
25           MR. ROTH:         Asked and

Page 421

1        answered.
2    Q   -- correct?
3    A   Sometimes we show them pictures.  Usually not.
4    Q   And do you have any evidence -- withdrawn.
5            Over the 15 years you were litigating
6        with Emtal over product ID for its talc, did
7        you ever feel as though you weren't getting the
8        proper information from Emtal, in terms of
9        their sales records?
10           MR. McDERMOTT:    Objection.
11   A   As I sit here today, I don't believe I did.  I
12       think they approached it that we had no
13       asbestos in our talc so we're not giving you
14       anything.
15   Q   Okay.  So prior to talking to Mr. Placitella in
16       2010, did you have any reason to believe that
17       you weren't getting the sales information from
18       Emtal that you were seeking?
19   A   Prior to --
20           MR. ROTH:         Objection.
21           MR. McDERMOTT:    Objection.
22   A   Prior to the conversation with Mr. Placitella,
23       I had no reason to believe that Eastern
24       Magnesia wasn't being forthright.
25   Q   And you got all the sales information you