Exhibit 2

**KIMBERLEE WILLIAMS, et al.,**

Plaintiffs,

vs.

**BASF CATALYSTS LLC, et al.,**

Defendants.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

DOCKET NO. 11-cv-1754 (JLL) (JAD)
CIVIL ACTION

**NOTICE OF APPEAL OF THE COST-
SHIFTING ORDER (CM/ECF # 534)**

ELECTRONICALLY FILED

**PLEASE TAKE NOTICE** that on July 2, 2018, or as soon thereafter as counsel may be heard, the undersigned attorneys for Representative Plaintiffs and the Proposed Class ("Plaintiffs"), shall move before the Honorable Jose L. Linares, United States District Court, District of New Jersey, Martin Luther King Building & U.S. Courthouse, 50 Walnut Street, Newark, New Jersey 07101, for an Order vacating CM/ECF # 534 to the extent it mandates cost-shifting.

**PLEASE TAKE FURTHER NOTICE** that in support of its motion, Plaintiffs will rely on its Memorandum of Law.

**PLEASE TAKE FURTHER NOTICE** that oral argument is not requested.

Date:  June 8, 2018

Respectfully Submitted,

/s/ *Christopher M. Placitella*
Christopher M. Placitella, Esq.
Michael Coren, Esq.
Jared M. Placitella, Esq.
Eric S. Pasternack, Esq.
Cohen, Placitella & Roth, P.C.
127 Maple Ave.
Red Bank, NJ 07701
(Tel.): (732) 747-9003
(Fax): (732) 747-9004

Jeffrey M. Pollock, Esq.
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, NJ 08648
(Tel): (609) 896-3600
(Fax): (609) 896-1469

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**KIMBERLEE WILLIAMS, et al.**

> Plaintiffs,

vs.

**BASF CATALYSTS LLC, et al.**

> Defendants.

No. 2:11-cv-01754 (JLL) (JAD)
CIVIL ACTION

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF THE APPEAL OF THE ORDER MANDATING COST-SHIFTING (CM/ECF # 534)

**FOX ROTHSCHILD LLP**

Jeffrey M. Pollock, Esq.
Princeton Pike Corporate Center
997 Lenox Drive, Building 3
Lawrenceville, NJ 08648
(Tel): (609) 896-3600
(Fax): (609) 896-1469

**COHEN, PLACITELLA & ROTH, P.C.**

Christopher M. Placitella, Esq.
Michael Coren, Esq.
Jared M. Placitella, Esq.
Eric S. Pasternack, Esq.
127 Maple Ave
Red Bank, New Jersey 07701
(Tel): (732) 747-9003
(Fax): (732) 747-9004

*Attorneys for Plaintiffs and the Proposed Class*

Dated: June 8, 2018

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ........................................................................1

II.   STATEMENT OF THE CASE ........................................................................3

III.  STANDARD OF REVIEW..............................................................................7

IV.  ARGUMENT...................................................................................................8

   A.  The Order allowing cost-shifting is contrary to law and clearly erroneous because the Special Discovery Master did not find that the data necessary for BASF to respond to Interrogatory Nos. 9-11 is "inaccessible" and would have had no basis to do so. ...........................................................................8

   B.  Even if BASF could prove that data sought is "inaccessible," the consideration of the *Zubulake* factors weighs against cost-shifting..............13

V.   CONCLUSION .............................................................................................21

# TABLE OF AUTHORITIES

## Cases

*Control Screening, LLC v. Integrated Trade Sys.*,
  Civil Action No. 10-499,
  2011 U.S. Dist. LEXIS 85202 (D.N.J. Aug. 3, 2011) ..........................................7

*Haines v. Liggett Group, Inc.*,
  974 F.2d 81 (3d Cir. 1992) ...................................................................................7

*MacNaughton v. Equity Res. Mgmt.*,
  Civil Action No. 10-4807,
  2011 U.S. Dist. LEXIS 129532 (D.N.J. Nov. 9, 2011) ........................................7

*McPeek v. Ashcroft*,
  202 F.R.D. 31 (D.D.C. 2001) ..............................................................................14

*Williams v. BASF Catalysts LLC*,
  Civil Action No. 11-1754,
  2016 U.S. Dist. LEXIS 46273 (D.N.J. Apr. 5, 2016) .........................................19

*Williams v. BASF Catalysts, LLC*,
  Civil Action No. 11-1754,
  2017 U.S. Dist. LEXIS 122053 (D.N.J. Aug. 3, 2017) .......................................15

*Young v. Lukens Steel Co.*,
  Civil Action No. 92-6490,
  1994 U.S. Dist. LEXIS 1462 (E.D. Pa. 1994) .....................................................15

*Zubulake v. UBS Warburg LLC*,
  216 F.R.D. 280 (S.D.N.Y. 2003) ....................................................... 8, 14, 16, 20

*Zubulake v. UBS Warburg LLC*,
  217 F.R.D. 309 (S.D.N.Y. 2003) ...........................................................................8

## Rules

Fed. R. Evid. 401 ....................................................................................15

Local Civil Rule 72.1(c)(1)(A) ................................................................7

# I.    PRELIMINARY STATEMENT

This case seeks remedies, including disgorgement of ill-gotten gains for those defrauded from the right to fairly litigate asbestos injury claims because Defendants falsely claimed there was no evidence of asbestos in BASF's talc. To fully develop that remedy, Plaintiffs have sought all data from Defendants identifying the plaintiffs who sued Engelhard and the outcome of those cases. Plaintiffs' first efforts to obtain the data through an electronic database provided by BASF were met with frustration because certain keys in the so called "Cahill database" had been removed in the copy BASF gave Plaintiffs, which are necessary to search the database and aggregate information for each plaintiff. *See* discussion at pages 17-18 *infra*. Plaintiffs then sought information, which should have been discoverable in the database given to them, in alternative ways, including the interrogatories before the Court. Defendants refusal again to respond to these requests led to motions to produce. CM/ECF # 516, 525. The Special Discovery Master's Order at issue here granted Plaintiffs' motion to compel BASF to respond to three interrogatories, seeking information on the defense costs BASF paid to defend Emtal talc claims, (Interrogatory No. 9), the number of cases settled or dismissed, (Interrogatory No. 10), and the total amount of payments BASF made to claimants from 1979 to 2017. (Interrogatory No. 11). Exhibit A, CM/ECF # 534. In so concluding, the Order found that the information requested is relevant

and proportional but also unduly burdensome. *Id.* The Order did not however find that the information sought in Interrogatory Nos. 9-11 is "inaccessible." And for that reason alone, the Order is contrary to law and clearly erroneous because cost-shifting is appropriate only when "inaccessible" data is sought. In any event, even if the requested data is "inaccessible," cost-shifting remains inappropriate given the importance of this information to these proceedings, the stakes here, and the lack of functionality of the so-called Cahill database produced by BASF to Plaintiffs, which Plaintiffs believe could have provided at large portion of the data necessary to respond to these interrogatories.

For these reasons, this Court should reverse the Special Discovery Master's Order to the extent that it mandates cost-shifting.

## II.   STATEMENT OF THE CASE

On March 15, 2018, Plaintiffs served the Third Set of Interrogatories and

Fifth Requests for Production on BASF. Exhibit B. Among other areas of inquiry,

Plaintiffs' interrogatories sought information relating to defense costs BASF paid

to defend EMTAL talc claims from 1979 through 2017, (Interrogatory No. 9), the

number of Emtal claims that BASF resolved or terminated between 1979-2017,

(Interrogatory No. 10), and the total amount of claim payments BASF paid relating

to Emtal claims for those years, (Interrogatory No. 11).

On April 16, 2018, BASF served numerous objections to Plaintiffs'

interrogatories. Exhibit C. In response, Plaintiffs moved to compel on May 15,

2018, Exhibit D, CM/ECF # 516, to which BASF responded on May 21, 2018.

Exhibit E, CM/ECF # 529. In opposition to the motion to compel, BASF submitted

a Declaration of Kevin Wood, a manager with BASF. Exhibit F, CM/ECF # 529-

14. Plaintiffs thereafter submitted their reply brief on May 24, 2018. Exhibit G,

CM/ECF # 533.

Mr. Wood certified that he is "not aware of any reporting capability that

would generate the information requested in the *form* that plaintiffs seek in an

automated fashion for any portion of the time period covered by plaintiffs'

requests." *Id.* at ¶ 4 (emphasis added). Mr. Wood also explained that "[a]s a result,

assembling the information that plaintiffs requested in the form they seek would

3

require a manual review of historical documents, such as periodic invoices and

associated correspondence regarding Emtal litigation and settlements from 1979

through 2017 for each law firm that BASF and Engelhard retained in each personal

injury case related to Emtal talc." *Id.* Mr. Wood further certified that "[b]ecause

Emtal talc was a legacy Engelhard business, the annual legal spending and

settlement amounts prior to 2006[1] for matters related to Emtal talc are not

maintained in current systems and, if they are maintained at all, they would be

maintained in applications that are no longer supported commercially and reside on

an offsite server from which information would need to be extracted and

reviewed." *Id.* at ¶ 5.

On May 25, 2018, the Special Discovery Master granted Plaintiffs' motion

to compel BASF to respond to Interrogatory Nos. 9-11. Exhibit A, CM/ECF # 534.

However, the Special Discovery Master made no findings relating to whether the

documents necessary for BASF to respond to the subject interrogatories are

"inaccessible." Instead, the Special Discovery Master observed "that any concerns

in respect of relevance, proportionality to the needs of the case, and undue burden

may be cured by allowing the requested discovery to go forward but, at the same

time and as a condition precedent thereto, by shifting from BASF to plaintiffs the

cost of responding to interrogatories 9, 10 and 11." *Id.* The Special Discovery

---

[1]      The interrogatories spanned the time-period ending in 2017.

Master thus ordered that Plaintiffs are "solely responsible for all reasonable costs and expenses, including reasonable counsel fees, incurred by BASF in responding to interrogatories 9, 10, and 11." *Id.*

Following the entry of the Special Discovery Master's Order, the parties had an informal meet-and-confer by telephone, wherein there was a general discussion of the costs with the expectation of a more fulsome discussion to follow. A second meet-and-confer thereafter took place on June 7, 2018. During that discussion, BASF—for the first time—indicated, without specifying which interrogatory they were referring to, that to respond to the interrogatories, BASF would need to restore legacy computer systems and examine paper documents. As to the former, BASF estimated that the cost of restoring the electronic information would be in the range of $ 65,000 to $ 165,000, with another $ 30,000 added on for attorney review, for a total cost of $ 95,000 to $ 195,000.[2] And as to the latter, BASF indicated that it has approximately 11,000 outside counsel invoices (information responsive to Interrogatory No. 9), and 5,000 settlement-related documents (information relevant to Interrogatory No. 11), in its possession that may be responsive, and that it anticipates that it would take approximately 300-400 hours to review those documents by either lawyers from Kirkland & Ellis LLP for

---

[2]     BASF noted during the meet and confer that this was only an estimate and the final cost could not be determined until after the start of the restoration efforts.

approximately $ 110,00 or contract lawyers for $ 60,000, with additional time needed for training the reviewers. So in sum, the total estimated cost for both portions of the project would range from approximately $ 155,000 to $ 305,000. BASF also expressed no opinion on what the computer data or paper documents would contain. That left Plaintiffs in the position of having to commit substantial resources to obtain the requested discovery with no ability to control the costs associated with the production or any assurance of the relevance of the documents to be restored.

During the meet-and-confer, Plaintiffs voiced the concern that these costs are not reasonable. Plaintiffs as a result inquired about possible alternative methods to retrieve more generalized information responsive to the interrogatories, as opposed to the information in the stratified grid requested. For example, Plaintiffs asked about producing the aggregate fees paid to outside defense counsel in Emtal talc cases year by year. Plaintiffs also inquired about sampling the information or obtaining just the bills or amounts paid to certain firms, such as the ones in Ohio and Pennsylvania. BASF rejected all of these suggestions.

## III.   STANDARD OF REVIEW

Under Local Civil Rule 72.1(c)(1)(A), the District Court "shall consider the appeal . . . and set aside any portion of the [Special Discovery Master's] order found to be clearly erroneous or contrary to law." *MacNaughton v. Equity Res. Mgmt.*, Civil Action No. 10-4807, 2011 U.S. Dist. LEXIS 129532, *6 (D.N.J. Nov. 9, 2011) (Linares, C.J.); *see also* (CM/ECF # 335) (appointing Special Discovery Master).  "A ruling is 'contrary to law' if the [Special Discovery Master] has misinterpreted or misapplied applicable law." *Id.* at *7 (quoting *Control Screening, LLC v. Integrated Trade Sys.*, Civil Action No. 10-499 2011 U.S. Dist. LEXIS 85202, *16 (D.N.J. Aug. 3, 2011)). The Special Discovery Master's legal conclusions on a non-dispositive motion such as the one here are reviewed "de novo." *Id.* (citing *Haines v. Liggett Group, Inc.*, 974 F.2d 81, 91 (3d Cir. 1992)). "A finding is 'clearly erroneous' when, 'although there is no evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.*

# IV.   ARGUMENT

**A. The Order allowing cost-shifting is contrary to law and clearly erroneous because the Special Discovery Master did not find that the data necessary for BASF to respond to Interrogatory Nos. 9-11 is "inaccessible" and would have had no basis to do so.**

There is a presumption that "the responding party must bear the expense of complying with discovery requests." *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 283 (S.D.N.Y. 2003). The responding party accordingly "has the burden of proof on a motion for cost-shifting." *Id.* As a result, courts only consider cost-shifting when discovery imposes an undue burden or expense on the responding party, meaning that "[c]ost-shifting is potentially appropriate only when *inaccessible* data is sought." *Id.* at 284 (emphasis added).

Even though a court may enter a cost-shifting protective order only upon motion of the responding party to a discovery request and "for good cause shown," *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 315-16 (S.D.N.Y. 2003), the Special Discovery Master *sua sponte* ordered cost-shifting here.[3] CM/ECF # 534.

The Special Discovery Master's Order is contrary to the law in that it orders cost-shifting without first making a finding that the discovery sought is

---

[3]     This stands in sharp contrast to the Special Discovery Master's denial of the motions filed by non-parties to this matter for cost-shifting in response to burdensome discovery requests by BASF. Exhibit H, CM/ECF # 362; Exhibit I, 10/26/2017 Hr'g Tr., T151:19-24.

"inaccessible." The record moreover supports no finding that the information

necessary for BASF to respond to Interrogatory Nos. 9-11 is "inaccessible."

In support of its opposition to Plaintiffs' Motion to Compel, BASF

submitted a Declaration of Kevin Wood. Exhibit F, CM/ECF # 529-14. He

certified that he is "not aware of any reporting capability that would generate the

information requested in the form that plaintiffs seek in an automated fashion for

any portion of the time period covered by plaintiffs' requests." *Id.* at ¶ 4. Mr.

Wood continued, explaining that "[a]s a result, assembling the information that

plaintiffs requested in the form they seek it would require a manual review of

historical documents, such as periodic invoices and associated correspondence

regarding Emtal litigation and settlements from 1979 through 2017 for each law

firm that BASF and Engelhard retained in each personal injury case related to

Emtal talc." *Id.*

While the declaration provides that the information cannot be automated in

the "***form***" Plaintiffs seek, it does not state that the information needed to complete

a good faith response to the interrogatories cannot be automated at all or at the very

least obtained through manual review. *Id.* at ¶¶ 4-7. Mr. Wood thus does not claim

that the information is "inaccessible." To the contrary, he suggests that the

information is available.

Further, Mr. Wood's statement, which is the only evidence BASF offered in opposition to the Motion to Compel, did not address Interrogatory Nos. 10 and 11 with any specificity, which asked, respectively, about the number of claims resolved or terminated by year from 1979 -2017 and the claim payments in each of those years. BASF offered no evidentiary support that such information is unavailable, burdensome or inaccessible. In fact, BASF's corporate representative testified on June 6, 2018, to exactly the opposite—that BASF's counsel had demonstrated to him only a week or so before the deposition that the Cahill database in its possession is operable. *See* Exhibit M, T42:14-18 ("Elizabeth went through it . . . and generated some reports from the information and tables that are included in that."); *id.*, T42:21 to T43:1 (testifying that the database generated "summary reports regarding litigation that was handled by Cahill for Engelhard and it listed [and] included columns showing different pieces of information related to . . . each of those lawsuits."), *id.*, T306:10 to T306:23 (testifying that the Cahill database could generate reports linking the client to the injury alleged). BASF offers no explanation why it cannot use the same database it used to prepare Mr. Steinmetz for the BASF30 (b)(6) deposition to answer Interrogatory Nos. 10 and 11 for sure, and even perhaps Interrogatory No. 9, with a minimum of fuss and expense.

Addressing only in particular Interrogatory Nos. 9 and 11, Mr. Wood states that "[b]ecause Emtal talc was a legacy Engelhard business, the annual legal spending, (Interrogatory No. 9), and settlement amounts, (Interrogatory No. 11), prior to 2006[4] for matters related to Emtal talc are not maintained in current systems and, if they are maintained at all, they would be maintained in applications that are no longer supported commercially and reside on an offsite server from which information would need to be extracted and reviewed." *Id.* at ¶ 5. Again though, even though some of Engelhard's accounts payable records are saved in applications that "are no longer supported commercially and would require specialized hardware and software to operate," *id.* at ¶ 6, that does not mean the records necessary to respond to Interrogatory No. 9 are "inaccessible." That is because the information necessary to respond to these interrogatories is available for the period from 2006 to 2017 or available elsewhere. Mr. Wood made no such statement about any difficulties identifying claims and closures in answer to Interrogatory No. 10.

Arthur Dornbusch, former general counsel of Engelhard, testified at his deposition that Engelhard received separate monthly bills for each legal matter and a general memorandum of the work done for each matter that he would review and

---

[4]    Mr. Wood did not indicate in his Declaration that information from 2006 to 2017 is not readily accessible in BASF's current computer systems.

approve for payment. *See* Exhibit J, 5/14/2018 Dornbusch Tr., T107:19-108:11;

*see* Exhibit K, 4/24/2018 Hasset Tr., T52:8-18 ("[Engelhard] in general maintained

records of legal expenses and all expenses. It's, you know, a big company with

good financial statements…."). The bill would then go to accounts payable.

Exhibit J, Dornbush Tr., T108:12-17. The financial department at Engelhard would

also give Mr. Dornbusch sheets with analysis of legal expenditures broken down

by matter. *Id.* at T109:13-110:7. Mr. Dornbusch also testified that if he wanted to

know how much Cahill Gordon billed Engelhard from 2003 to 2005 he could

obtain that information. *Id.* at T111:7-13. Mr. Dornbusch's testimony thus

confirms the undeniable fact that corporations the size of, and with the

sophistication and resources of BASF and its predecessors, including Engelhard,

have many accounting, financial, and budgetary procedures and controls to know

what they are spending on legal defense costs, and especially the fees charged by

outside law firms. In the end, BASF has only claimed that one means of retrieving

the data necessary to respond to Interrogatory No. 9 is inaccessible; it does not

suggest that it lacks other ways to retrieve the data, just that it would be

inconvenient for it to do so.

The Special Discovery Master's Order directing cost-shifting is contrary to

law and clearly erroneous as the Order does not find that the documents necessary

to respond to Interrogatory Nos. 9-11 are "inaccessible," or that the responses to

Interrogatory Nos. 10 and 11 are burdensome or unavailable, and would have had no basis in the record to do so.

## B. Even if BASF could prove that data sought is "inaccessible," the consideration of the *Zubulake* factors weighs against cost-shifting.

Because the Order did not find that the documents necessary to respond to Interrogatory Nos. 9-11 are "inaccessible," the Order should be reversed to the extent that it mandates cost-shifting. All the same, even if the data is "inaccessible," cost-shifting would still be inappropriate.

In *Zubulake*, the seminal decision on cost-shifting, the district court found that "to determine whether cost-shifting is appropriate for the discovery of inaccessible data, 'the following factors should be considered, weighted more-or-less in the following order'":

1. The extent to which the request is specifically tailored to discover relevant information;

2. The availability of such information from other sources;

3. The total cost of production, compared to the amount in controversy;

4. The total cost of production, compared to the resources available to each party;

     5. The relative ability of each party to control costs and its incentive
       to do so;

     6. The importance of the issues at stake in the litigation;

     7. The relative benefits to the parties of obtaining the information.

*Zubulake*, 216 F.R.D. at 284 (quoting *Zubulake*, 217 F.R.D. at 322); *see also*

*Major Tours, Inc. v. Colorel*, 720 F. Supp. 2d 587, 620 (D.N.J. 2010); *Juster*

*Acquisition Co., LLC v. N. Hudson Sewerage Auth.*, Civil Action No. 12-3427,

2013 U.S. Dist. LEXIS 18372, *9 (D.N.J. 2013).

Together, the first two factors compromise what is called the "marginal

utility test":

> The more likely it is that the [discovery] contains information that is
> relevant to a claim or defense, the fairer it is that the [responding party]
> search at its own expense. The less likely it is, the more unjust it would
> be to make the [responding party] search at its own expense. The
> difference is "at the margin."

*Zubulake*, 216 F.R.D. at 284 (quoting *McPeek v. Ashcroft*, 202 F.R.D. 31, 34

(D.D.C. 2001)). These two factors are weighted the most heavily, *id.*, and here,

compel a determination that cost-shifting is not appropriate.

There can be no question that the information sought in Interrogatory Nos. 9-

11 is pertinent to the parties' claims and defenses here. In determining whether

evidence is relevant, the Court considers whether the evidence has "a tendency to

make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action." *See Williams v. BASF Catalysts, LLC*, Civil Action No. 11-1754, 2017 U.S. Dist. LEXIS 122053, at *10 (D.N.J. Aug. 3, 2017) (citing Fed. R. Evid. 401) (internal quotations omitted). Federal Rule of Civil Procedure 26 "is to be construed liberally in favor of disclosure, as relevance is a broader inquiry at the discovery stage than at trial." *See Williams,* 2017 U.S. Dist. LEXIS 122053, at *10 (citations omitted); *Young v. Lukens Steel Co.*, Civil Action No. 92-6490, 1994 U.S. Dist. LEXIS 1462, *3 (E.D. Pa. 1994) (recognizing that because of the Rule 26's purpose of allowing the parties to obtain the fullest possible knowledge of the issues and facts before trial, wide latitude should be afforded to the party seeking discovery).

In the Brief in Support of their Motion for Class Certification, Plaintiffs explain the remedies they seek, including disgorgement of monies saved by BASF in defense costs and liability payments not paid to the Plaintiffs and putative Class Members because of the dismissals and settlement of claims based on fraudulent concealment, fraud, and conspiracy, as well as why disgorgement is a proper remedy here. ECF # 418-1. The information sought by Interrogatories Nos. 9, 10 and 11 specifically relate to the amount of monies Defendants should disgorge if Plaintiffs are successful. The information is also relevant as to BASF's intent and motive in employing the fraudulent asbestos defense scheme.

Factors three, four and five address cost issues with those focusing on "how expensive will the production be?" and "who can handle that expense?" *Zubulake*, 216 F.R.D. at 287. "In an ordinary case, a responding party should not be required to pay for the restoration of inaccessible data if the cost of that restoration is significantly disproportionate to the value of the case." *Id.* at 288. So in a "multi-million dollar case, the cost of restoration is surely not 'significantly disproportionate' to the projected value of [the] case," which "weighs against cost-shifting." *Id.*

In its opposition below, BASF did not provide an estimate of what it expects the total cost of production necessary to respond to Interrogatory No. 9 to be, which BASF provided for the first time on June 7, 2018, in a meet-and-confer with Plaintiffs. Their presentation was focused on information about defense costs in financial records and paper copies of legal bills and payments responsive to Interrogatory 9; they estimated (1) the costs of restoring the electronic information for defense costs responsive to Interrogatory 9 would be in the range of $ 65,000 to $ 165,000, with another $ 30,000 for attorney review; and (2) that it would take approximately 300-400 hours to review the paper records of legal bills and payments with additional time to train the reviewers. BASF further estimated that it would cost $ 60,000 for contract attorneys and $ 110,00 for attorneys from Kirkland & Ellis to review the paper documents. They also cautioned that the costs

16

for the electronic information could range higher depending on what was discovered once the restoration process began. That said, given the stakes in this litigation with there being approximately 13,000 class members, the cost of responding to Interrogatory Nos. 9-11 is not disproportionate to the value of this case, which weighs against cost-shifting.

As to factor four, BASF is a multi-national company and the largest chemical producer in the world. Under such circumstances, BASF is not without sufficient resources to respond to the subject interrogatories.

As for factor five, Defendants alone can control costs of production. Although BASF ultimately produced two historical electronic databases originally compiled by Cahill (the "Cahill database"), the main and key one which was given to the Plaintiffs, which is denominated as "EC_ProductsCases" (FRE_408_000000003), does not function as a relational database. This means that the database was originally structured to recognize relations among stored items of information. However, the copy of the Cahill database given to Plaintiffs can no longer be searched to link individual data fields. For example, using the database provided, Plaintiffs cannot select a claimant by name, and pull up from separate data tables the claimant's disease, place of employment, date of claim, payments or other key information as to that plaintiff.  On the other hand, BASF's corporate representative testified two days ago that he was shown a database that could do

the very thing that Plaintiffs have been asking for months, and asked for again in

Interrogatory 10. Exhibit M, T42:14 to T43:1; T301:18 to T306:23. BASF cannot

continue to refuse to produce information which its own witness says he saw two

days ago.

According to Michael Sullivan, a paralegal with Cahill and the primary

custodian of the databases, the purpose of the databases was "[t]o track complaints

that were being brought against Engelhard and various types of litigation[.]"

Exhibit L, 3/23/2018 Sullivan Tr., T172:7-9. In fact, as Mr. Sullivan testified, the

databases went well beyond just tracking complaints:

> It would track basically information that we—the complaints
> themselves, plaintiffs and any information that was contained therein
> or any other document received thereafter about plaintiffs, to the
> extent it could be coded. Other pleadings, answers, amended
> complaints, if certain information we received in some jurisdictions
> from plaintiff's counsel, questionnaires and whatnot, that information
> would go in there, so that would include work history, including years
> of employment, exposures, military history, prior work history, that
> type of information. Also, about counsel representing various
> defendants and plaintiffs.

*Id.*, T172:13 to T173:5. Mr. Sullivan also testified that at around the time this

litigation began, the then-counsel for Cahill, Williams & Connelly, removed the

database, *id*. at T181:18-14, and that afterwards, the databases were no longer

functional. *Id.*, T190:13:19.

18

When Plaintiffs asked BASF why the databases were not operable, BASF's counsel reported that its vendor may have removed the necessary "forms" that provided the linking mechanism between the many data tables in the database. As a result, even if the information in the Cahill databases is necessary for BASF to respond to Interrogatory Nos. 9-11 and contrary to Mr. Steinmetz's testimony that the databases are truly not relational, the fault for that inaccessibility rests with Defendants. This is not the typical case when information is lost long before litigation is anticipated; but rather, one where information is lost or spoliated by Defendants who had a duty to preserve the information. *See Williams v. BASF Catalysts LLC*, Civil Action No. 11-1754, 2016 U.S. Dist. LEXIS 46273, *21-22 (D.N.J. Apr. 5, 2016) (finding that Defendants had a duty to preserve information about asbestos in the talc beginning as late as 1984).

Moreover, as BASF indicated during the meet-and-confer on June 7, 2018, it has identified three vendors to restore the electronic documents, and that it would be responsible for training the reviewers on the project. So, too, the fifth factor weighs in favor of having BASF bear the costs of responding to the subject interrogatories as it has the exclusive ability to control costs.

The sixth factor, which concerns the importance of the issues at stake in the litigation, also weighs against cost-shifting. The central issue in this class action is whether BASF and its national asbestos defense counsel, Cahill Gordon, as well as

the individual defendants, conspired to deceive some 13,000 putative Class Members who brought asbestos claims against BASF by denying them access to the single most important piece of evidence in an asbestos case: evidence of asbestos. *See Williams v. BASF Catalysts LLC*, 765 F.3d 306, 322 (3d Cir. 2014) (asking "[w]hat could be more important to a claim that talc caused asbestos disease than proof that talc contained asbestos?"). Resolving this case would accordingly end this fraud on the courts and litigants; and so, the issues involved here are of sufficient import that cost-shifting should not be allowed with respect to BASF's responses to Interrogatory Nos. 9-11.

By any measure then, all the factors weigh against cost-shifting here, and the Special Discovery Master's Order should be reversed to the extent that it mandates cost-shifting. [5]

---

[5] "As a general rule, where cost-shifting is appropriate, only the costs of restoration and searching should be shifted." *Zubulake*, 216 F.R.D. at 290. The responding party consequently "should ***always*** bear the costs of reviewing and producing electronic data once it has been converted into an accessible form." *Id.* So for that reason too, the Special Discovery Master's Order is also contrary to the law as it mandates that Plaintiffs are responsible not just for the costs associated with restoring the electronic information, but all "costs and expenses, including reasonable counsel fees, incurred by BASF in responding to interrogatories 9, 10, and 11." Exhibit A, CM/ECF # 534.

# V.      CONCLUSION

For all these reasons, the Special Discovery Master's Order mandating cost-shifting is contrary to law and clearly erroneous as it did not find that the documents necessary to respond to Interrogatory Nos. 9-11 are "inaccessible," and would have had no basis to do so in any event.

Respectfully Submitted,

**COHEN, PLACITELLA & ROTH, P.C.**

/s/ *Christopher M. Placitella*
Christopher M. Placitella, Esq.
(NJ Atty #: 027781981)
Michael Coren, Esq.
(NJ Atty #: 024871979)
Jared M. Placitella, Esq.
(NJ Atty #: 068272013)
Eric S. Pasternack, Esq.
(NJ Atty #: 015132011)
127 Maple Avenue
Red Bank, NJ 07701
(732) 747-9003


**FOX ROTHSCHILD LLP**

Jeffrey M. Pollock, Esq.
(NJ Atty #: 015751987)
Princeton Pike Corp. Center
997 Lennox Drive,
Building 3
Lawrenceville, NJ 08648
(609) 896-7660

*Attorneys for Plaintiffs and the Putative Class*