Exhibit 9

LAW OFFICES

## COHEN, PLACITELLA & ROTH

A PENNSYLVANIA PROFESSIONAL CORPORATION

127 MAPLE AVENUE

RED BANK, NEW JERSEY 07701

———

(732) 747-9003

FAX (732) 747-9004

www.cprlaw.com

PHILADELPHIA, PA
LEMOYNE, PA
BALA CYNWYD, PA
PITTSBURGH, PA
CHERRY HILL, NJ

CHRISTOPHER M. PLACITELLA
MANAGING NJ ATTORNEY

May 24, 2018

**VIA ECF**

The Honorable Justice Roberto A. Rivera-Soto (ret.)
Special Discovery Master
Ballard Spahr LLP
210 Lake Drive East, Suite 200
Cherry Hill, New Jersey 08002-1163

RE:     *Kimberlee Williams, et al. v. BASF Catalysts LLC, et al.*
        **Civil Action No. 11-cv-01754 (JLL) (JAD)**

Dear Justice Rivera-Soto:

Plaintiffs served their Third Set of Interrogatories on BASF generally directed to developing evidence bearing upon Plaintiffs' disgorgement remedy claim as well bearing upon defendants' motive and intent. *See* BASF's Ex. E (ECF # 529-6) (Ps Third Set of Interrogatories). BASF objected to the interrogatories. *See* P's Ex. A (ECF # 516-2) (BASF's Objections). The parties met and conferred, during which Plaintiffs did not withdraw the full set of interrogatories but offered to narrow its request to the information sought in Interrogatories 9, 10 and 11 generally dealing with defense costs that BASF paid to defend EMTAL talc claims from 1979 through 2017, (Interrogatory No. 9); the number of Emtal claims that BASF resolved or

Justice Robert A. Rivera-Soto (ret.)
May 24, 2018
Page 2

terminated at or during certain stages of the claim or litigation for the years 1979-

2017, (Interrogatory No. 10); the total amount of claim payments BASF paid relating

to Emtal claims for the years 1979-2017, (Interrogatory No. 11); and the number of

the claims resolved by the payment, (*id*.). Each of these are relevant and important

metrics in this matter. BASF, however, continues to object to this more focused

inquiry. *See* P's Ex. A (ECF # 516-2) (BASF's Objections). Thereafter, Plaintiffs

filed a Motion to Compel (ECF # 516), and to which BASF has filed its response

(ECF # 529). Plaintiffs now submit this reply to BASF's Opposition to Plaintiffs'

Motion to Compel Further Responses to Interrogatories. (ECF # 529).

Interrogatories 9, 10 and 11 in Plaintiffs' Third Set of Interrogatories directed to

BASF are (1) appropriate in number and scope, (2) relevant to the parties' claims

and defenses, (3) not duplicative as the information has not already been produced

and (4) are not unduly burdensome. Indeed, these three interrogatories are the most

appropriate means to obtain these metrics, which surely must have been tracked by

BASF for several business reasons. BASF should be compelled to respond.

Justice Robert A. Rivera-Soto (ret.)
May 24, 2018
Page 3

## **ARGUMENT**

### **A. Plaintiffs' First Set of Interrogatories Does Not Count Towards the 25 Interrogatory Limit and Plaintiffs Have Not Exceeded their 25 Interrogatory Limit.**

BASF mischaracterizes the number of interrogatories served by Plaintiffs as well as which interrogatories count towards the additional 25 interrogatory limit imposed by Judge Dickson's October 16, 2017 Order. Throughout the course of this case, Plaintiffs served a total of three sets of interrogatories on BASF. *See* BASF's Ex. A (ECF # 529-2) (Ps First Set of Interrogatories), BASF's Ex. B (ECF # 529-3) (Ps Second Set of Interrogatories, BASF's Ex. E (ECF # 529-6) (Ps Third Set of Interrogatories). All in all, Plaintiffs served 34 interrogatories on BASF. However, Plaintiffs First Set of Interrogatories were served on October 23, 2015. *See* BASF's Ex. A (ECF # 529-2). *After* Plaintiffs First Set of Interrogatories were served, on October 17, 2016, Judge Dickson entered a scheduling Order providing for a "[m]aximum of twenty-five (25) *additional* interrogatories by *each* party to *each* other party" in this action. *See* (ECF 221); *see also* BASF's Ex. L (ECF 529-13) (10/14/16 Hr'g Tr. at 15:6-15) (emphasis added). The plain language of the Order as well as the hearing transcript shows that *each party* (or each of the six Representative Plaintiffs) could serve 25 interrogatories *in addition to* interrogatories already served, i.e, the First Set of Interrogatories propounded by Plaintiffs. Thus, the

Justice Robert A. Rivera-Soto (ret.)
May 24, 2018
Page 4

number of interrogatories in Plaintiffs' First Set of Interrogatories, whether it be 17

or 26[1], does not count towards the 25 additional interrogatory limit provided for in

Judge Dickson's Order and BASF's implications that it does should be ignored.

Accordingly, the only interrogatories that count towards the 25-interrogatory

limit are Plaintiffs' Second Set of Interrogatories containing 4 interrogatories and

---

[1]     BASF claims that Plaintiffs' First Set of Interrogatories were "closer to 26 separate questions" as opposed to 17. *See* BASF Opp. (ECF 529) at 14. While Plaintiffs do not concede that any of the First Set of Interrogatories contained "discrete subparts", the fact of the matter is that BASF substantively answered some of those interrogatories "without waiving" its objections and, therefore, any objection to those interrogatories based on the number was and is waived. *See* BASF's Ex. C (ECF 529-4); *Knit With v. Knitting Fever, Inc.*, 2010 U.S. Dist. LEXIS 147695, at 5-6, n. 2 (E.D. Pa. Jan. 22, 2010) (finding defendant waived objection as to exceeding the interrogatory limit where it answered some interrogatories "without waiving" its objection).

By the same token, BASF should be deemed to have waived its objection to Plaintiffs' Second and Third Sets of Interrogatories on grounds that Plaintiffs exceeded the 25-interrogatory limit because it provided substantive answers to Plaintiffs' Second Set of Interrogatories "without waiving" its objection on numerosity grounds. Based on BASF's answers to the Second Set of Interrogatories, its claim that "plaintiffs' Second Set of Interrogatories, although styled as 4 interrogatories, is in fact closer to 52 separate questions" rings hollow. *See* BASF Opp. (ECF 529) at 14. Finally, and as a result of answering Plaintiffs' Second Set of Interrogatories, BASF has waived any objection to answering Interrogatories 9, 10 and 11 on the grounds the interrogatories served by Plaintiffs exceeded the 25-interrogatory limit here and BASF should be compelled to respond. *See Knit With*, 2010 U.S. Dist. LEXIS 147695, at 5-6, n. 2 (requiring defendant to answer interrogatories in excess of 25 where the defendant answered some interrogatories without waiving the objection while declining to provide any answer to others based on the same objection because a party cannot selectively answer interrogatories).

Justice Robert A. Rivera-Soto (ret.)
May 24, 2018
Page 5

Plaintiffs' Third Set of Interrogatories containing 11 interrogatories. Plaintiffs are only moving to compel a response to 3 of the 11 interrogatories (numbers 9, 10 and 11) propounded in Plaintiffs' Third Set of Interrogatories for a total of 14 interrogatories to be answered by BASF since the time of Judge Dickson's October 17, 2016 scheduling order. Plaintiffs are will within their limit of 25 interrogatories each[2].

Contrary to BASF's assertion, the format that Plaintiffs requested BASF's answers to interrogatory nos. 9, 10 and 11 in does not turn the interrogatories into hundreds of "discrete subparts" for the purposes of Rule 33(a)(1)'s and/or Judge Dickson's scheduling order's 25 interrogatory limit. Whether a subpart of an interrogatory should be counted as a "discrete subpart" and therefore, a separate interrogatory depends on whether the subpart is logically or factually subsumed within and necessarily related to the primary question. *Engage Healthcare Communs., LLC v. Intellisphere, LLC*, 2017 U.S. Dist. LEXIS 83068, at *10 (D.N.J. Feb. 10, 2017). This Court takes a pragmatic approach that "requires application of the related question framework with an eye to the competing purposes of Rule 33(a)(1): allowing reasonable latitude in formulating an inquiry to elicit as complete

---

[2] As set forth in Plaintiffs' Motion to Compel, Plaintiffs would be entitled to serve 125 interrogatories total.

Justice Robert A. Rivera-Soto (ret.)
May 24, 2018
Page 6

an answer as possible, while at the same time not allowing the multiplication of interrogatories to the point that it defeats the purposes underlying the 25-interrogatory limit." *Id.* at *11 (internal quotations omitted). Whether an interrogatory is sufficiently discrete to be considered a separate interrogatory depends on the particular circumstances of the case. *Id.*

Plaintiffs' three interrogatories collectively seek information relating to defense costs BASF paid to defend EMTAL talc claims from 1979 through 2017, the number of Emtal claims resolved or terminated during this time period and the total amount of claim payments BASF paid in respect to the same (Interrogatory Nos. 9, 10 and 11). A brief review of these interrogatories shows that any subparts to these questions are logically and factually subsumed in the main interrogatory, and therefore, are not discrete subparts, particularly in a complex class action case involving allegations of BASF's decades long fraud on litigants and courts nationwide: the table format is simply a way to obtain this requested information in a structured and organized fashion.

Further, requesting that BASF break down by year its answer to the question posed, for a number of years does not automatically turn the interrogatory into hundreds of discrete subparts as BASF suggests. *See Medigus Ltd. v. Endochoice, Inc.*, Civil Action No. 15-505, 2016 U.S. Dist. LEXIS 156752, at *7, n.5 (D. De.

Justice Robert A. Rivera-Soto (ret.)
May 24, 2018
Page 7

July 19, 2016) (finding interrogatories were not discrete subparts where the same question was being asked for each year for eight years); *High Point SARL v. Spring Nextel Corp*., Civil Action No. 09-2269, 2011 U.S. Dist. LEXIS 103118, at *18 (D. Kan. Sept. 12, 2011) (finding an interrogatory that requested all revenue on a monthly basis from 2002 forward, with such revenue broken down by category of revenue, was one interrogatory). Again, this is particularly true in light of the facts of this case and the decades long fraud Plaintiffs' allege that BASF engaged in.

### B. The Requests Seek Information Relevant to the Parties' Claims or Defenses and are Proportional to the Needs of the Case.

BASF has not already produced responsive information that could be used by Plaintiffs to generate the information Plaintiffs seek here. BASF specifically refers to the Cahill database, which was an electronic database established to track complaints that were being brought against Engelhard and various types of litigation, including talc litigation. *See* Excerpt of Deposition of Michael Sullivan attached hereto as Exhibit 1 at 171:18-173:18. However, as Plaintiffs have previously informed BASF and Cahill, the Cahill database is inoperable as it does not link and interrelate the various record information. *See* Correspondence re: Cahill Database

Justice Robert A. Rivera-Soto (ret.)
May 24, 2018
Page 8

attached hereto as Exhibit 2.[3] Further, despite Plaintiffs' requests, neither BASF nor

Cahill have produced the other documents, the talc case indices, that may provide

some of this information. The talc indices are also the subject of an outstanding

motion to compel. *See* ECF # 525.

The information sought in these three interrogatories is relevant to Plaintiffs'

claims (including damages) and BASF's defenses. In determining whether evidence

is relevant the Court considers whether the evidence has "a tendency to make a fact

more or less probable than it would be without the evidence and the fact is of

consequence in determining the action." *See Williams v. BASF Catalysts, LLC*, Civil

Action No. 11-1754, 2017 U.S. Dist. LEXIS 122053, at *10 (D.N.J. Aug. 3, 2017)

(citing Fed. R. Evid. 401) (internal quotations omitted). Federal Rule of Civil

Procedure 26 "is to be construed liberally in favor of disclosure, as relevance is a

---

[3] Cahill's Michael Sullivan testified that Cahill's Access relational database worked
prior to it being downloaded and removed by Cahill's former counsel in connection
with this case. *See* Ex. 1 at 171:2-173:18; 181:18-182:14. He further testified it
contained "objects", that is forms, from which related information could be
conveniently assembled from the many various tables of information and viewed.
*See* Ex. 1 at 171:2-173:18. The database provided however did not contain the forms
and relational "links" between numerous tables which allow queries and the
generation of reports. Requests for explanations why this is so continue to go
unanswered by BASF and Cahill. *See* Ex. 2. In any event, the Cahill database is not
one intended or designed to collect the information that is the subject of these
interrogatories, Ex. 1 at 171:2-173:18.

Justice Robert A. Rivera-Soto (ret.)
May 24, 2018
Page 9

broader inquiry at the discovery stage than at trial." *See Williams,* 2017 U.S. Dist. LEXIS 122053, at *10 (citations omitted); *Young v. Lukens Steel Co.*, Civil Action No. 92-6490, 1994 U.S. Dist. LEXIS 1462, *3 (E.D. Pa. 1994) (recognizing that in light of the Rule 26's purpose of allowing the parties to obtain the fullest possible knowledge of the issues and facts before trial, wide latitude should be afforded to the party seeking discovery).

In the Brief in Support of their Motion for Class Certification, Plaintiffs explain the disgorgement remedy they will seek — i.e., disgorgement of, *inter alia*, monies saved by Engelhard in defense costs and liability payments — and why disgorgement is a proper remedy in this case. (ECF # 418-1). The information sought by Interrogatories 9, 10 and 11 specifically relate to and go towards proving the amount of monies BASF should disgorge if Plaintiffs' are successful. The information is also relevant as to BASF's intent and motive in employing the fraudulent asbestos defense scheme. Interrogatory Nos. 10 and 11 are also pertinent to a number of issues such as numerosity and ascertainability, which are fundamental to the issue of class certification. *See, e.g.*, *Younes*, 312 F.R.D. at 705 ("Although 7-Eleven believes Project P is immaterial, there is no legitimate question that plaintiffs are entitled to pursue discovery to support their theory of the case, especially in light of the allegations in their complaint.").

Justice Robert A. Rivera-Soto (ret.)
May 24, 2018
Page 10

### C. Whether BASF has to Engage in a Manual Review of Onsite and/or Offsite Documents Does Not Make the Request Unduly Burdensome and BASF has failed to Meet its Burden to Show Otherwise.

Similarly, BASF's arguments that the requests are unduly burdensome also fail. As an initial matter, and contrary to BASF's assertions, Plaintiffs do have record evidence that the evidence it seeks exists or existed. Arthur Dornbusch, former general counsel of Engelhard, testified at his deposition that Engelhard received separate monthly bills for each legal matter and a general memorandum of the work that was done for each matter that he would review and approve for payment. *See* Excerpted Deposition of Arthur Dornbusch attached hereto as Ex. 3 at 107:19-108:11; *see also* Excerpted Deposition of Michael Hasset attached hereto as Ex. 4 at 52:8-18 (testifying: "[Engelhard] in general maintained records of legal expenses and all expenses. It's, you know, a big company with good financial statements…."). The bill would then go to accounts payable. Ex. 2 at 108:12-17. The financial department at Engelhard would also give Mr. Dornbusch sheets with analysis of legal expenditures broken down by matter. *Id.* at 109:13-110:7. Mr. Dornbusch further testified that if he wanted to know how much Cahill Gordon billed Engelhard from 2003 to 2005 he could obtain that information. *See* Ex. 2 at 111:7-13. Mr. Dornbusch's testimony confirms the undeniable fact that corporations the size of, and with the sophistication and resources of BASF and its predecessors, including

Justice Robert A. Rivera-Soto (ret.)
May 24, 2018
Page 11

Engelhard, have numerous accounting, financial, and budgetary procedures and controls to know what they are spending on legal defense costs, and especially the fees charged by outside law firms. Nothing in BASF's Response or accompanying declaration support a finding that the information sought is truly burdensome or no longer exists — BASF just does not want to look for it.

To show an undue burden, BASF had to demonstrate with "specificity and factual detail" the nature and extent of the burden Plaintiffs' requests would pose. *Parks, LLC v. Tyson Foods, Inc.*, Civil Action No. 15-00946, 2015 U.S. Dist. LEXIS 112861 at * 15-16, n. 3 (E.D. Pa. Aug. 25, 2005). In *Clark v. Mellon Bank, N.A.*, Civil Action No. 92-4823, 1993 U.S. Dist. LEXIS 2924, at *6-7 (E.D. Pa. 1993), the court required the defendants' to answer the plaintiff's request to compile highly personal information concerning hundreds of employees from departments and divisions other than plaintiff's department/division because the defendant did not produce evidence to suggest that defendants' agents could not go to a single or even various locations to quickly and efficiently search the files to uncover the necessary information to respond to plaintiff's requests. *Id.* at *6-7.

BASF further bases its undue burden claim on the fact that the information is not readily available to it as it cannot generate the information requested in the exact *form* Plaintiffs seek in an automated fashion. BASF supports this argument with the

Case 2:11-cv-01754-BRM-AME   Document 600-11   Filed 06/25/18   Page 13 of 53 PageID:
Case 2:11-cv-01754-JLL-JAD   Document 539   Filed 05/24/18   Page 12 of 14 PageID: 9663
43286

Justice Robert A. Rivera-Soto (ret.)
May 24, 2018
Page 12

declaration of a manager "generally familiar" with BASF's current and historical accounting. *See* Ex. M to BASF's Opp. (ECF 529-14) at ¶¶ 1-2. While the declaration provides that the information cannot be automated in the "*form*" Plaintiffs seek, it does not state that the information needed to complete the interrogatory cannot be automated at all or at the very least obtained through manual review. *Id.* at ¶¶ 4-7. As in *Clark, supra*, the fact that BASF will have to engage in a manual review of information onsite and/or offsite does not make the request unduly burdensome. There is nothing in the declaration stating that the information cannot be automated, just that it cannot be automated into the exact grid-type form Plaintiffs' requested the answers be provided in. Further, the declaration is completely devoid of any indication as to how much time the review would take or how expensive the review would be and therefore, BASF cannot meet its burden of showing the request is unduly burdensome. *Parks, LLC,* 2015 U.S. Dist. LEXIS 1128861 at * 15-16, n. 3.

Finally, the fact that Plaintiffs' requests span a number of years, in this class action case alleging a decades long fraud, is not grounds for finding a request unduly burdensome. *Parks, LLC,* 2015 U.S. Dist. LEXIS 1128861 at * 15-16, n. 3; *Roseberg v. Johns-Manville Corp*., 85 F.R.D. 292, 296 (E.D.Pa. 1980) (in an asbestos case, a request was not unduly burdensome, unreasonable or irrelevant by virtue of spanning

Justice Robert A. Rivera-Soto (ret.)
May 24, 2018
Page 13

fifty years). Moreover, current defense expenditures on Emtal talc litigation and BASF's liability in an environment where the suppressed facts are known to at least some plaintiffs are germane to the valuation issues in this matter.

BASF cannot evade responding to Plaintiffs' relevant discovery requests simply because it does not want to make an effort to respond.

## CONCLUSION

In sum, BASF should be compelled to respond to Interrogatory Nos. 9, 10 and 11 of Plaintiffs' Third Set of Interrogatories directed to BASF as the service of those interrogatories complied with Fed. R. Civ. P. 33(a)(1), and BASF did not carry its burden to object to them.

Respectfully Submitted,

**COHEN, PLACITELLA & ROTH, P.C.**          **FOX ROTHSCHILD LLP**

/s/ Christopher M. Placitella
Christopher M. Placitella, Esq.
(NJ Atty #: 027781981)
Michael Coren, Esq.
(NJ Atty #: 024871979)
Jared M. Placitella, Esq.
(NJ Atty #: 068272013)
Eric S. Pasternack, Esq.
(NJ Atty #: 015132011)
127 Maple Avenue
Red Bank, NJ 07701

Jeffrey M. Pollock, Esq.
(NJ Atty #: 015751987)
Princeton Pike Corp. Center
997 Lennox Drive,
Building 3
Lawrenceville, NJ 08648
(609) 896-7660

Case 2:11-cv-01754-BRM-AME   Document 600-11   Filed 06/25/18   Page 15 of 53 PageID:
Case 2:11-cv-01754-JLL-JAD   Document 533   Filed 05/24/18   Page 14 of 14 PageID: 36838
43288

Justice Robert A. Rivera-Soto (ret.)
May 24, 2018
Page 14

(732) 747-9003

*Attorneys for Plaintiffs and the Putative
Class*

cc:     All Counsel of Record (via ECF)

COHEN, PLACITELLA & ROTH, P.C. Christopher M. Placitella, Esq.
(027781981) Michael Coren, Esq. (024871979)
Jared M. Placitella, Esq. (068272013)
Eric S. Pasternack, Esq. (015132011)
127 Maple Avenue
Red Bank, NJ 07701
(732) 747-9003

FOX ROTHSCHILD LLP
Jeffrey M. Pollock, Esq. (015751987)
997 Lenox Drive, Building 3
Princeton Pike Corporate Ctr. Lawrenceville, NJ 08648
(609) 896-3600
Attorneys for Plaintiffs

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **KIMBERLEE WILLIAMS, et al.** | No. 2:11-cv-01754 (JLL) (JAD) |
| Plaintiffs, | CIVIL ACTION |
| vs. | **CERTIFICATION OF COUNSEL** |
| **BASF CATALYSTS LLC, et al.** | |
| Defendants. | |

CHRISTOPHER M. PLACITELLA, of full age, hereby certifies as follows:

1.      I am an attorney at law in the State of New Jersey and a shareholder with the law

firm of Cohen, Placitella and Roth, P.C.

2.      I am familiar with the facts and circumstances of the within action.

3.    Attached as Exhibit 1 is a true and correct copy of excerpts from the March 23, 2018 deposition of Michael Sullivan.

4.    Attached as Exhibit 2 is a true and correct copy of the compilation of correspondence between counsel in *Williams v. BASF Catalysts, LLC.*, Civil Action No. 11-1754.

5.    Attached as Exhibit 3 is a true and correct copy of excerpts from the May 14, 2018 deposition of Arthur Dornbusch.

6.    Attached as Exhibit 4 is a true and correct copy of excerpts from the April 24, 2018 deposition of Michael Hassett.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements by me are willfully false, I am subject to punishment.

COHEN, PLACITELLA & ROTH, P.C.
*/s/ Christopher M. Placitella*
CHRISTOPHER M. PLACITELLA

Dated: May 15, 2018

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - x

KIMBERLEE WILLIAMS, et al.,

       Plaintiffs,

                 Civil Action No.

   -against-         11-1754(JLL)(JAD)

BASF CATALYSTS, LLC, et al.,

       Defendants.

- - - - - - - - - - - - - - - - - - - x


       Videotaped oral deposition of
MICHAEL SULLIVAN, taken pursuant to
notice, was held at the law offices of
PEPPER HAMILTON LLP, 620 Eighth Avenue,
New York, New York, commencing March 23,
2018, 10:05 a.m., on the above date,
before Leslie Fagin, a Court Reporter
and Notary Public in the State of New
York.

               - - -

MAGNA LEGAL SERVICES
320 West 37th Street, 12th Floor
New York, New York 10018
(866) 624-6221



| Page 2 | Page 4 |
|---|---|

**Page 2**

```
 1
 2   APPEARANCES:
 3
 4   COHEN PLACITELLA & ROTH, P.C.
     Attorneys for Plaintiffs
         124 Maple Avenue
 5       Red Bank, New Jersey 07701
     BY:    CHRISTOPHER M. PLACITELLA, ESQUIRE
 6          MICHAEL COREN, ESQUIRE
 7
 8   PEPPER HAMILTON LLP
     Attorneys for Cahill Gordon and the Witness
 9   Michael Sullivan
         3000 Two Logan Square
10       Eighteenth and Arch Streets
         Philadelphia, Pennsylvania 19103
11   BY:    BARRY H. BOISE, ESQUIRE
            KYLE DOLINSKY, ESQUIRE
12       (Appearing via telephone.)
13
14   KIRKLAND & ELLIS, LLP
     Attorneys for Defendant BASF Catalysts, LLC
15       655 15th Street, N.W.
         Washington, D.C. 20005
16   BY:    PETER FARELL, ESQUIRE
17
18   MARINO, TORTORELLA & BOYLE, P.C.
     Attorneys for Defendant Arthur Dornbusch
19       437 Southern Boulevard
         Chatham, New Jersey 07928
20   BY:    JOHN A. BOYLE, ESQUIRE
         (Appearing via telephone.)
21
22
23
24
25
```

**Page 3**

```
 1
 2   APPEARANCES:
 3
 4   HEROLD LAW, P.A.
     Attorneys for Defendant Thomas Halkett
 5       25 Independence Boulevard
         Warren, New Jersey 07059
 6   BY:    ERIC TUNIS, ESQUIRE
         (Appearing via telephone.)
 7
 8
     ALSO PRESENT:
 9
         RAY MOORE, Videographer
10       Magna Legal Services
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1
 2           (Exhibit P-1-A, notice of
 3   deposition, marked for identification.)
 4       THE VIDEOGRAPHER:  We are now on
 5   the record.
 6       This begins DVD No. 1 in the
 7   deposition of Michael Sullivan in the
 8   matter of Kimberlee Williams, et al.
 9   versus BASF Catalysts, LLC, et al. in
10   the United States District Court, for
11   the District of New Jersey, civil action
12   11-1754.
13       Today is March 23, 2018 and the
14   time is 10:05 a.m.
15       This deposition is being taken 620
16   Eighth Avenue, New York New York at the
17   request of Cohen, Placitella & Roth.
18       The videographer is Ray Moore of
19   Magna Legal Services and the court
20   reporter is Leslie Fagin of Magna Legal
21   Services.
22       Will the court reporter please
23   swear in the witness.
24   M I C H A E L   S U L L I V A N,  called as
25   a witness, having been duly sworn by a
```

**Page 5**

```
 1       M. Sullivan
 2   Notary Public, was examined and testified
 3   as follows:
 4   EXAMINATION BY
 5   MR. PLACITELLA:
 6       Q.  Good morning, Mr. Sullivan.  How
 7   are you?
 8       A.  I'm doing well.  Thank you.
 9       Q.  I'm Chris Placitella.  I'm here for
10   purposes of taking your deposition.
11       Have you ever had your deposition
12   taken before?
13       A.  No.
14       Q.  Have you ever attended any
15   depositions?
16       A.  No.
17       Q.  So I'm going to ask you a series of
18   questions, which I ask that you respond to --
19       MR. BOISE:  Those on the phone, can
20   you please mute the phones, there is
21   some background noise.
22       MR. PLACITELLA:  Heavy breathing,
23   to be exact.
24       MR. TUNIS:  Before you start your
25   questioning, you are breaking up and I'm
```



| Page 166 | Page 168 |
|---|---|

**Page 166**

M. Sullivan

1      Q. Do you have knowledge that there
2  was a database used at Cahill Gordon
3  concerning the EMTAL Talc litigation?
4      MR. FARELL: Objection to form.
5      A. Yes.
6      Q. Did you have any role in the
7  construction or use of that database?
8      MR. FARELL: Objection to form.
9      MR. BOISE: Compound.
10     A. Yes.
11     Q. What was your role?
12     A. At any particular point in time?
13     Q. Yes.
14     A. Because the databases kind of
15 evolved.
16     Q. Tell me what your understanding is
17 of the evolution of the database, maybe that
18 will help.
19     A. It started out in one form with one
20 particular software and it expanded and
21 everything from that database at that time
22 was then converted and imported into the next
23 platform, which was Advanced Revelation and
24 then that expanded out beyond, when Advanced

**Page 167**

M. Sullivan

1  Revelation was no longer a company, it was
2  converted to Microsoft Access database.
3      Q. What was the original platform?
4      MR. FARELL: Objection to form.
5      A. From my knowledge, because it was
6  in existence before I started in Nutshell.
7      Q. And were you there when it
8  converted over to the second platform?
9      A. Yes.
10     Q. Was all the information in the
11 first platform transferred to the second
12 platform?
13     A. Yes.
14     Q. And when it was converted over to
15 the Access database, was all the information
16 that was contained in the second platform
17 imported and made accessible in the Access
18 database?
19     A. Yes.
20     Q. Was this a database created
21 specifically for the EMTAL Talc litigation or
22 was it broader than that?
23     MR. FARELL: Objection to form.
24     MR. BOISE: Which database?

**Page 168**

M. Sullivan

1      MR. PLACITELLA: The Access
2  database.
3      A. By that time, it was broader than
4  that.
5      Q. What did it entail, did it involve
6  all of the litigation in your office or
7  specific litigations?
8      MR. FARELL: Objection to form.
9      A. Specific.
10     Q. Which ones?
11     A. Involving Engelhard.
12     Q. So this was an Engelhard database?
13     A. Yes, that was the only client that
14 we had in there, yes.
15     Q. Who was in charge of that database?
16     MR. FARELL: Objection to form.
17     A. Me.
18     Q. You were?
19     A. Yes.
20     Q. Were you involved in the
21 construction of that database?
22     A. To a certain degree, but like I
23 said, it was a conversion of one platform to
24 another, so that structure, so to speak, was

**Page 169**

M. Sullivan

1  carried over and conformed to fit and work
2  with Access.
3      Q. And this was now a database, the
4  Access database that involved all work that
5  was being done for Engelhard, including the
6  EMTAL Talc litigation, correct?
7      MR. BOISE: Objection to form,
8  foundation.
9      A. All, I mean all -- I don't know,
10 but cases that I know that I was working on.
11     Q. When you say, cases, which cases?
12     MR. FARELL: Objection to form.
13     A. Just the talc cases certainly and
14 then there were other cases involving another
15 subsidiary of Engelhard which we considered
16 to be premises cases and then there were
17 other types of cases, silica cases, cases
18 involving other products.
19     Q. Did any of the insurance-related
20 litigation get put in that database?
21     MR. BOISE: Objection to form,
22 foundation.
23     MR. FARELL: Objection to form.
24     A. Insurance-related litigation.

**MAGNA**
LEGAL SERVICES

| Page 170 | Page 172 |
|---|---|

**Page 170**

M. Sullivan

1           M. Sullivan
2    Q.  Was there insurance-related
3  litigation in that database?
4        MR. FARELL:  Objection to form,
5  foundation.
6    A.  No.
7    Q.  Was it a relational database?
8    A.  Yes.
9    Q.  Do you know what I mean by
10  relational -- could you define what you
11  understand relational to be?
12    A.  A relational database is a database
13  where there are various instances of a  one
14  to many relationship.
15    Q.  Were there tables in that database?
16    A.  Yes.
17    Q.  I'm talking about the Access
18  database.
19    A.  Yes.
20    Q.  That's the one you have the most
21  familiarity with, correct?
22        MR. BOISE:  As opposed to what?
23    Q.  As it relates to Engelhard
24  litigation.
25    A.  Sure.

**Page 171**

M. Sullivan

1           M. Sullivan
2    Q.  When it was put into the Access
3  database and you turned on the computer
4  screen, what would you see?  They all think
5  it's funny.
6    A.  There are various things you can
7  see, but the way I created it was so that
8  there was a screen that would give a list of
9  the primary tables that you could go into
10  and, actually, not tables, but forms that
11  would provide information.
12    Q.  So when you turned on the screen,
13  would you see the list of the tables, would
14  you see a form, what would you see?
15    A.  You can consider that to be a form
16  with a list of the primary parts to the
17  relational database.
18    Q.  What was the purpose of the
19  database?
20        MR. FARELL:  Objection to form,
21  foundation, privileged, to the extent
22  it's going to get into the substance of
23  communications.  If there is a general
24  purpose or subject matter that you can
25  speak to, that's fine, but specific

**Page 172**

M. Sullivan

1           M. Sullivan
2  conversations between you and your
3  colleagues may be privileged.
4    Can you give kind of a high level
5  answer?
6        THE WITNESS:  Yes.
7    A.  To track complaints that were being
8  brought against Engelhard and various types
9  of litigations.
10    Q.  Did it track more than just
11  complaints?  What did it track?
12        MR. FARELL:  Objection to form.
13    A.  It would track basically
14  information that we -- the complaints
15  themselves, plaintiffs and any information
16  that was contained therein or any other
17  document received thereafter about
18  plaintiffs, to the extent it could be coded.
19  Other pleadings, answers, amended complaints,
20  if certain information we received in some
21  jurisdictions from plaintiff's counsel,
22  questionnaires and whatnot, that information
23  would go in there, so that would include work
24  history, including years of employment,
25  exposures, military history, prior work

**Page 173**

M. Sullivan

1           M. Sullivan
2  history, that type of information.  Also,
3  about counsel representing various defendants
4  and plaintiffs.  That's all I remember right
5  now.
6    Q.  This was done for every case
7  involving EMTAL Talc?
8        MR. FARELL:  Objection to form and
9  foundation.
10        MR. BOISE:  Mischaracterizes
11  testimony.
12    Q.  I'm asking.
13    A.  To the extent I was aware of the
14  cases, I don't know if --
15        THE COURT REPORTER:  I'm sorry, I
16  didn't hear you.
17    A.  To the extent I was aware of the
18  cases.
19    Q.  Was it your intent in administering
20  the database that it capture all information
21  that was provided concerning the cases you
22  were involved in?
23        MR. FARELL:  Did you get the second
24  half of the witness' answer?
25    Can you read back his last answer

MAGNA
LEGAL SERVICES

Case 2:11-cv-01754-BRM-AME Document 600-11 Filed 06/25/19 Page 23 of 53 PageID:
43296
Case 2:11-cv-01754-JLL-JAD Document 58912-1 Filed 08/24/15 Page 8 of 23 PageID: 36046

| Page 174 | Page 176 |
|---|---|

**Page 174**

```
1          M. Sullivan
2   as you recorded it, please?
3          MR. BOISE:  Off the record for a
4   moment.
5          (Record read.)
6          THE VIDEOGRAPHER:  The time is now
7   2:32 p.m. and we are going off the
8   record.
9          (Off the record.)
10         THE VIDEOGRAPHER:  The time is now
11  2:41 p.m.  We are back on the record.
12         MR. FARELL:  Before we resume, I
13  wanted to note the conversation that was
14  had off the record following the last
15  Q&A with the witness, which is that Mr.
16  Sullivan was asked about the content and
17  the completeness of the Cahill
18  databases, and only a portion of his
19  answer was recorded on the stenographic
20  record due to some cross talk and
21  distractions.
22     I noted off the record that Mr.
23  Sullivan -- the second half of Mr.
24  Sullivan's answer was he did not know
25  whether the Cahill database contained
```

**Page 176**

```
1          M. Sullivan
2   Q.  It wasn't the intent.
3      So you created a database and you
4   didn't intend on it to capture the
5   information for all the EMTAL Talc cases?
6          MR. FARELL:  Objection to form and
7   foundation.
8          MR. BOISE:  You are arguing with
9   him.
10  A.  Not at all.
11  Q.  What cases did you intend to leave
12  out?
13         MR. BOISE:  Objection to form.
14         MR. FARELL:  Objection to form,
15  foundation.
16         MR. BOISE:  Your questions leading
17  to this issue is confusing nature and
18  objectionable nature of your question.
19  Q.  What cases did you intend to leave
20  out when you were creating and administering
21  the database used for the EMTAL Talc
22  litigation?
23         MR. FARELL:  Objection to form and
24  foundation.
25  A.  I didn't intend to leave any out
```

| Page 175 | Page 177 |
|---|---|

**Page 175**

```
1          M. Sullivan
2   all of the EMTAL Talc related cases that
3   had filed against Engelhard.
4      Mr. Placitella initially disputed
5   that, then said the video record could
6   confirm whether the second half of his
7   answer did, in fact, state what I have
8   just said it stated, so it sounds like
9   the plaintiffs are agreeing that in this
10  instance, the video record will confirm
11  what the witness' testimony was.
12     I will say that while I was here
13  listening to the answer, I heard the
14  answer that he did not know whether the
15  database contained all cases.
16     Go ahead, Mr. Placitella.
17         MR. PLACITELLA:  I appreciate you
18  saying that multiple times, but whatever
19  is on the video, is on the video.
20  Q.  Was it the intent for the database
21  to capture information for all cases?
22         MR. FARELL:  Objection to form and
23  foundation.
24         MR. BOISE:  Objection to form.
25  A.  No.
```

**Page 177**

```
1          M. Sullivan
2   that I --
3          MR. BOISE:  Finish your answer.
4   A.  That I became aware of.
5   Q.  To the extent that you were aware
6   to put everything in there, correct?
7          MR. FARELL:  Objection to form.
8   A.  I don't know what you mean by,
9   everything, and you are saying all
10  information, I don't know what you mean by
11  that.
12  Q.  Let me back up.
13     Was it your intent to capture
14  information for all of the people who sued
15  Engelhard or BASF in an EMTAL Talc case?
16         MR. BOISE:  Objection to form.
17  A.  If I got a copy of the complaint,
18  the names of the plaintiffs would be
19  captured.
20  Q.  Were there systems put in place to
21  assure that the complaint was sent to you
22  when a complaint was filed to make sure it
23  was captured?
24         MR. FARELL:  Objection to form,
25  foundation.
```

**MAGNA**
LEGAL SERVICES

| Page 178 | Page 180 |
|---|---|
| M. Sullivan | M. Sullivan |
| 1 | 1 |

**Page 178**

M. Sullivan

1
2    A.  I don't know about any specific
3 procedures put in place.
4    Q.  Well, the intent wasn't to just do
5 it on a happenstance basis, right?  The
6 intent was every time Engelhard was sued in
7 an EMTAL talc case or BASF was sued in an
8 EMTAL Talc case, was to capture information
9 on that plaintiff in your database?
10    MR. FARELL:  Objection to form and
11  foundation.
12    A.  Plaintiff's names and associations
13 with complaint numbers, sure.
14    Q.  Who had access to this database
15 besides you?
16    MR. FARELL:  Objection to form.
17    A.  Other legal assistants and
18 attorneys, if they wanted it.
19    Q.  Did anybody outside the firm have
20 access to the database?
21    MR. BOISE:  You are talking the
22  last Access database?
23    MR. PLACITELLA:  Yes.
24    MR. FARELL:  Objection to form.
25    A.  Not that I recall.

**Page 179**

M. Sullivan

1
2    Q.  Was the database used to prepare
3 reports for the client?
4    MR. FARELL:  Objection to form.
5    A.  No.
6    Q.  You said before there was -- prior
7 to the Access database, there was a database
8 called Revelation?
9    A.  Advanced Revelation, yes.
10    Q.  When did that changeover take
11 place?
12    A.  I don't remember specifically, I
13 don't remember.
14    Q.  Were you the official custodian of
15 the database?
16    MR. BOISE:  Objection to form.
17    MR. FARELL:  Objection to form.
18    A.  I mean, yes.  I don't know if
19 official is the right word, but, yes, I
20 always knew where it was.
21    Q.  Was it networked?
22    A.  It's not like a -- no, it was on
23 the network, but it was not a
24 networkable-type database where multiple
25 people could...

**Page 180**

M. Sullivan

1
2    Q.  Was there a manual or training
3 materials that explained to people how to use
4 this database?
5    A.  No.
6    Q.  Did you log -- first of all, you
7 did some of the coding in the database
8 yourself, correct?
9    A.  Correct.
10    Q.  When we say coding, what do you
11 mean by that, so the record is clear?
12    A.  Reviewing a complaint, for example,
13 and taking the information from the complaint
14 and entering into it into specific fields in
15 the database.
16    Q.  Or if there was an interrogatory
17 answer, someone would look at it and extract
18 information and put into the database?
19    MR. FARELL:  Objection to form,
20  foundation.
21    A.  No.
22    Q.  We will get to that.  Maybe the
23 easier way to do this...
24    (Exhibit P-1-C, database tables,
25  marked for identification.)

**Page 181**

M. Sullivan

1
2    Q.  C-1, I gave you, is what we printed
3 out from the database that was given to us.
4    Is this an accurate
5 characterization of the tables that are in
6 the database?
7    MR. BOISE:  Take a look at the
8  whole document.
9    MR. FARELL:  What's the pending
10  question?
11    (Record read.)
12    MR. FARELL:  Of the tables?
13    MR. PLACITELLA:  Correct.
14    MR. FARELL:  Objection to form.
15    A.  I don't know if this is absolutely
16 every table, but a lot of these tables do
17 look familiar.
18    Q.  Do you still have the database?
19    A.  No.
20    Q.  What happened to it?
21    A.  It was collected by counsel.
22    Q.  Counsel, being, who?
23    A.  Williams & Connelly.
24    Q.  And when was that?
25    A.  Somewhere around the litigation.  I

Page 182

```
1              M. Sullivan
2   don't know exactly.
3        Q.  Up until that point in time, was
4   the database functional?
5        MR. FARELL:  Objection to form.
6        A.  To my recollection, yes.
7        Q.  Did you delete your copy of the
8   database from the network?
9        MR. BOISE:  Objection to form.
10       A.  It was collected and removed.  I
11  had nothing to do with that part of it.
12       Q.  Was it physically removed from the
13  Cahill premises, the entire database?
14       A.  I don't know what happened to it.
15       Q.  Do you have a list of all the
16  tables in the database somewhere?
17       A.  No.
18       Q.  Does such a list exist?
19       A.  I don't recall ever creating one.
20       Q.  How would we know whether the
21  database we received contained all of the
22  tables?
23       MR. FARELL:  Objection to form and
24  foundation.
25       A.  I don't know.
```

Page 183

```
1              M. Sullivan
2        Q.  So the exhibit -- if you go to the
3   last page of the exhibit in front of you --
4        MR. FARELL:  Did this get marked
5   with a number?
6        MR. PLACITELLA:  It did.
7        MR. BOISE:  C-1.
8        MR. PLACITELLA:  I think she marked
9   it 1-C.
10       MR. BOISE:  The record will reflect
11  that you said C-1.
12       MR. PLACITELLA:  It's fine.
13       Q.  This is a list of the tables that
14  we construct from reviewing the database.
15       Can you look at it and tell me
16  whether you think there are any tables
17  missing?
18       MR. FARELL:  Objection to form.
19       Q.  For the record, I have 87 separate
20  tables listed.
21       A.  I have no -- this was a long time
22  ago and I really have no knowledge of every
23  table.
24       MR. PLACITELLA:  Can we mark this
25  the next in line.
```

Page 184

```
1              M. Sullivan
2        (Exhibit P-1-D, database tables,
3   marked for identification.)
4        Q.  So you have in front of you what's
5   been marked 1-D and what I tried to do, in
6   preparation for today's deposition, is drill
7   down into some of the tables to see what kind
8   of information is in there, okay?
9        A.  Okay.
10       Q.  The very first page is just what it
11  would look like blank without looking at any
12  tables specifically.  You got me?
13       A.  Yes.
14       Q.  So then if you go to the next page,
15  I went into the case table.
16       Do you see that?
17       A.  Yes.
18       Q.  And when I look at the case table,
19  and this is just a screen shot of -- it's not
20  the entire table, it's just a screen shot,
21  but I want to ask you some information.
22       A.  Okay.
23       Q.  The first column is case number.
24       What does that represent?
25       MR. FARELL:  Objection to form.
```

Page 185

```
1              M. Sullivan
2        A.  The case number from the complaint.
3        Q.  So when a case comes in -- a
4   complaint comes in, you record that under
5   this column, case number?
6        A.  Yes.
7        Q.  Then the next column is case name.
8        Do you see that?
9        A.  Yes.
10       Q.  And does that mean that's what the
11  caption said in the complaint?
12       A.  Yes, generally.
13       Q.  And then there is a column for the
14  court, correct?
15       A.  Yes.
16       Q.  And then you record who the judge
17  was, right?
18       A.  Yes.
19       Q.  You record what happened to the
20  case, correct?
21       MR. BOISE:  Objection to form.
22       MR. FARELL:  Objection to form and
23  foundation.
24       Q.  You write for case status, there is
25  a list of cases, they all say dismissed, with
```

MAGNA
LEGAL SERVICES

Case 2:11-cv-01754-BRM-AME   Document 600-1   Filed 06/25/18   Page 26 of 53 PageID:
43299
Case 2:11-cv-01754-JLL-JAD   Document 533-90   Filed 05/24/18   Page 1 of 14 PageID: 36649

# EXHIBIT 2

LAW OFFICES

## COHEN, PLACITELLA & ROTH

A PENNSYLVANIA PROFESSIONAL CORPORATION

127 MAPLE AVENUE

RED BANK, NEW JERSEY 07701

(732) 747-9003
FAX (732) 747-9004
www.cprlaw.com

PHILADELPHIA, PA
LEMOYNE, PA
BALA CYNWYD, PA
PITTSBURGH, PA
CHERRY HILL, NJ

CHRISTOPHER M. PLACITELLA
MANAGING NJ ATTORNEY

March 26, 2018

*Via email only*
Barry Boise, Esquire
PEPPER HAMILTON
3000 Two Logan Square
Philadelphia, PA 19103
boiseb@pepperlaw.com

Peter Farrell, Esquire
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
peter.farrell@kirkland.com

**RE:   Williams v. BASF Catalysts, LLC.,**
**USDC NJ No: 2:11-cv-1754**

Dear Barry and Peter:

This is to invite and schedule with you a meet and confer conference call concerning the Cahill Access databases produced to us by BASF in response to discovery requests.

BASF produced two MS Access datafiles to Plaintiffs purporting to be relational databases Cahill created and maintained on Emtal products liability claims in its role as Engelhard/BASF's national coordinating counsel. Per Cahill's Michael Sullivan's testimony on March 23, 2018, one of the two databases, the one concerning the Bevan firm's cases, was a sub-database of Cahill's general or main Access database (EC_ProductsCases(FRE_408_000000003)), that was created in connection with a multiple plaintiff settlement with the Bevan law firm.

Based on Mr. Sullivan's testimony the "EC_Products Cases" database produced does not appear to be a complete copy as it existed on Cahill's network and maintained and used by the firm. Moreover, the main database file produced is not fully operational in so far as its ability to link and interrelate the various recorded information it apparently was once able to while in Mr. Sullivan's and Cahill's hands. We therefore want to follow up on Mr. Sullivan's testimony and obtain an understanding if the Cahill database BASF has in its possession, custody or control is operational as it was in Cahill's hands prior to its termination, and if so to what degree and capability. If not, we ask if any lack of operability or capability is the result of its removal or the means or manner of removal from Cahill's custody, possession or control?

Barry Boise, Esquire
March 26, 2018
Page 2

We additionally want to discuss with you: (1) the identities of persons involved in producing, gathering and removing the main database from Cahill's custody, possession and control; (2) the process and means by which it was gathered' (3) the identities of persons involved in producing the datafile ultimately produced to us by BASF; and (4) the whereabouts of any listing on each of your clients' privilege logs about any things that may have been withheld from the production of the databases. Mr. Sullivan testified that there were objects in the EC_ProductsCases Database, such as forms, when it was in Cahill's hands that were not on the screen shots of objects of the main database's contents he was given to review.

We are available tomorrow (Tuesday) or Wednesday to discuss this. Could your offices please confer and propose a time please?

Very truly yours,

ROBERT L. PRATTER
CHRISTOPHER M. PLACITELLA
MICHAEL COREN

RLP/CMP/MC
cc: All counsel of record via email only

# KIRKLAND & ELLIS LLP

#### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Peter A. Farrell
To Call Writer Directly:
(202) 879-5959
peter.farrell@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

March 28, 2018

**VIA EMAIL**

Robert L. Pratter
Cohen, Placitella & Roth, P.C.
2001 Market Street, Ste. 2900
Philadelphia, PA 19103

Re:     *Williams, et al. v. BASF Catalysts LLC, et al.*

Dear Bob:

I write in response to your letter dated March 22, 2018, which you sent on March 23, and your letter dated March 26, 2018. Those letters concern BASF's recent document productions and the Cahill databases.

With respect to BASF's recent document productions, those documents primarily fall into three categories: (1) documents you informally asked BASF to produce regarding the 30 sample Bevan plaintiffs and 18 sample Rothenberg plaintiffs; (2) documents that BASF may use to support its defenses; and (3) documents BASF cited or referred to in its response to plaintiffs' Appendix E.

As to the Cahill databases, BASF received them in two formats: Microsoft Access and AREV. As we understand it from Cahill, "AREV" is proprietary software from a company called Advanced Revolution, which went out of business in the 1990s. BASF has not been able to access the databases in AREV format. BASF further understands from Cahill that after Advanced Revolution went out of business, Cahill converted the databases to Microsoft Access and maintained the databases in that format. Michael Sullivan confirmed these points in his March 23, 2018 deposition.

When BASF produced the "Bevan Actions" and "EC Products Cases" databases in Microsoft Access format to plaintiffs on May 25, 2016, BASF explained that it was removing fields from the databases that contained social security numbers and addresses (just as Bevan and plaintiffs did when producing limited portions of the Bevan database). BASF instructed its vendor to retain all of the other information. As I explained in my letter last week, despite BASF's instruction, the vendor inadvertently omitted a table from the Bevan Actions database. We therefore produced the table to you when we realized a mistake had been made.

Beijing  Boston  Chicago  Hong Kong  Houston  London  Los Angeles  Munich  New York  Palo Alto  San Francisco  Shanghai

# KIRKLAND & ELLIS LLP

Robert L. Pratter
March 27, 2018
Page 2

    Your March 26, 2018 letter asks a number of other questions concerning, for example, the process by which Cahill's counsel collected the databases from Cahill. I will confer with Cahill's counsel regarding those other questions. I will also check the transcript of Mr. Sullivan's deposition, since I do not recall him testifying that the "'EC_Products Cases' database produced does not appear to be a complete copy as it existed on Cahill's network." Mr. Placitella did not show Mr. Sullivan the databases that BASF produced—he showed him excerpts that your firm created—so I do not see how Mr. Sullivan could have answered that question anyway. The same would be true of your question concerning "screen shots" that Mr. Placitella showed Mr. Sullivan.

    If you would like to schedule a time to discuss these issues, I am available on Friday at 3:00 p.m. Alternatively, we could speak in person after the hearing that is scheduled for April 2, 2018.

Sincerely,

/s/ Peter A. Farrell

Peter A. Farrell

cc:    All defense counsel

Case 2:11-cv-01754-JLL-JAD Document 3309 Filed 05/24/18 Page 8 of 14 PageID: 30654

LAW OFFICES

# COHEN, PLACITELLA & ROTH
A PENNSYLVANIA PROFESSIONAL CORPORATION

127 MAPLE AVENUE

RED BANK, NEW JERSEY 07701

(732) 747-9003
FAX (732) 747-9004
www.cprlaw.com

PHILADELPHIA, PA
LEMOYNE, PA
BALA CYNWYD, PA
PITTSBURGH, PA
CHERRY HILL, NJ

CHRISTOPHER M. PLACITELLA
MANAGING NJ ATTORNEY

April 11, 2018

**VIA EMAIL**
Barry Boise, Esquire
PEPPER HAMILTON
3000 Two Logan Square
Philadelphia, PA 19103
boiseb@pepperlaw.com

Peter Farrell, Esquire
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
peter.farrell@kirkland.com

    **RE:**    **Williams v. BASF Catalysts, LLC.,**
        **USDC NJ No: 2:11-cv-1754**

Dear Barry and Peter:

    I am following up on our March 26, 2018 letter to you concerning issues and deficiencies in the Cahill database BASF produced to Plaintiffs, EC_ProductsCases (FRE_408_000000003).

    Peter's letter to us of March 28, 2018, noted that he would be conferring with Cahill's counsel regarding outstanding questions in our March 26, 2018 letter. Peter also noted that he wanted to check Mr. Sullivan's transcript on what was said about the completeness of the database produced in comparison to how it existed on Cahill's network prior to its removal and forwarding to Cahill's then counsel, Williams & Connolly.

    Now that the transcript is available, we ask for a response to our outstanding issues with the Cahill database copy BASF produced. Even allowing for the redactions of Social Security numbers and addresses Peter describes in his letter (which may an issue here if these fields provide needed links between data tables that cannot presently be linked), we believe you will both see that Mr. Sullivan testified that what was provided to plaintiffs is incomplete. We refer you to, for example, pages 190-191 of his transcript where he states that Access database "objects" (which he explained were forms) which he used to link together data tables were not appearing on the screen shots of the EC Products database he was shown at the deposition. If you kindly check your copies of the Access data file provided Plaintiffs you will see that there are no form "objects" in it. Just tables. Plaintiffs look forward to an explanation why that is so, in addition to a full response to the issues raised our prior correspondence on this subject.

Barry Boise, Esquire
March 26, 2018
Page 2


There is a minor typographical error in Peter's letter. The software company Mr. Sullivan identified that published the database system Cahill used before Access is American Revelation. We understand from our database consultant that the Revelation data file BASF has (per Peter's letter) may still be able to be opened and operated using software that is available. Since what has been produced is not operable as, according to Mr. Sullivan, it was when last in Cahill's possession at or around time when the litigation began, Plaintiffs request that BASF forthwith produce a cloned copy of the AREV Database so our database consultant can see if it is in working order and data linked together and extracted.

Thank you for your attention to our questions and requests. We look forward to discussing these issues with you. Could your offices please confer and propose a time?



Very truly yours,



CHRISTOPHER M. PLACITELLA
MICHAEL COREN
ROBERT L. PRATTER

*Counsel for Plaintiffs*
*and the Proposed Class*


CMP/MC/RLP/bad
cc:     Defense Counsel of Record (*via email*)

| From: | Robert Pratter |
|-------|----------------|
| To: | pfarrell |
| Cc: | boiseb |
| Date: | Monday, April 16, 2018 5:33:52 PM |
| Attachments: | 2018-04-11 CPR ltr BB and PAF (Sullivan testimony) .pdf |

## Dear Peter :

Could you kindly let me know when we can expect BASF's reply to the attached letter dated April 11, 2018 regarding deficiencies in the Cahill database. Thank you.

Robert L Pratter
C / P / R
Cohen, Placitella & Roth, P.C.
Two Commerce Square
2001 Market Street, Suite 2900 / Philadelphia, PA 19103
215.567.3500 / 215.567.6019 (fax)
rpratter@cprlaw.com

IMPORTANT CONFIDENTIALITY NOTICE

PRIVILEGED ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT. This message and attachments may contain privileged and confidential information. If you are not an intended recipient of this message, any use, distribution or copying is prohibited; please notify Cohen, Placitella & Roth, P.C. immediately at (215) 567-3500 or by email reply; and permanently delete all copies. Any tax advice contained in this message and attachments may not be used for purposes of (i) avoiding penalties under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

Case 2:11-cv-01754-BRM-AME Document 600-11 Filed 06/25/18 Page 34 of 53 PageID:
Case 2:11-cv-01754-JLL-JAD Document 583-90 Filed 05/24/18 Page 9 of 14 PageID: 36057
43307

| From: | Robert Pratter |
|-------|----------------|
| To: | Barbara Driscoll |
| Subject: | FW: |
| Date: | Tuesday, April 17, 2018 3:31:41 PM |

**Robert L Pratter**

C / P / R

Cohen, Placitella & Roth, P.C.

Two Commerce Square

2001 Market Street, Suite 2900 / Philadelphia, PA 19103

215.567.3500 / 215.567.6019 (fax)

rpratter@cprlaw.com

IMPORTANT CONFIDENTIALITY NOTICE

PRIVILEGED ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT. This
message and attachments may contain privileged and confidential information. If you are not an intended
recipient of this message, any use, distribution or copying is prohibited; please notify Cohen, Placitella &
Roth, P.C. immediately at (215) 567-3500 or by email reply; and permanently delete all copies. Any tax
advice contained in this message and attachments may not be used for purposes of (i) avoiding penalties
under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person
any tax-related matter.

---

**From:** Farrell, Peter A. [mailto:pfarrell@kirkland.com]
**Sent:** Tuesday, April 17, 2018 2:01 PM
**To:** Robert Pratter <RPratter@cprlaw.com>
**Cc:** boiseb <boiseb@pepperlaw.com>
**Subject:** RE:

We are working on a response and will get back to you.

**Peter A. Farrell**

---

KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W., Washington, D.C. 20005
T +1 202 879 5959  F +1 202 879 5200

peter.farrell@kirkland.com

---

**From:** Robert Pratter <RPratter@cprlaw.com>
**Sent:** Monday, April 16, 2018 5:34 PM
**To:** Farrell, Peter A. <pfarrell@kirkland.com>
**Cc:** boiseb <boiseb@pepperlaw.com>
**Subject:**

Dear Peter :

Could you kindly let me know when we can expect BASF's reply to the attached letter dated April 11, 2018 regarding deficiencies in the Cahill database. Thank you.

Robert L Pratter
C / P / R
Cohen, Placitella & Roth, P.C.
Two Commerce Square
2001 Market Street, Suite 2900 / Philadelphia, PA 19103
215.567.3500 / 215.567.6019 (fax)
rpratter@cprlaw.com

IMPORTANT CONFIDENTIALITY NOTICE

PRIVILEGED ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT. This message and attachments may contain privileged and confidential information. If you are not an intended recipient of this message, any use, distribution or copying is prohibited; please notify Cohen, Placitella & Roth, P.C. immediately at (215) 567-3500 or by email reply; and permanently delete all copies. Any tax advice contained in this message and attachments may not be used for purposes of (i) avoiding penalties under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

Peter A. Farrell
To Call Writer Directly:
(202) 879-5959
peter.farrell@kirkland.com

(202) 879-5000

www.kirkland.com

Facsimile:
(202) 879-5200

April 19, 2018

**VIA EMAIL**

Robert L. Pratter
Cohen Placitella & Roth, P.C.
2001 Market Street
Philadelphia, PA 19103

Re:     *Kimberlee Williams, et al. v. BASF Catalysts LLC, et al.*

Dear Bob:

I write in response to your April 11, 2018 letter, which followed my March 28, 2018 letter concerning Cahill databases and Mr. Sullivan's deposition testimony.

As an initial matter, I reviewed the two pages of Mr. Sullivan's testimony identified in your April 11, 2018 letter. At 190:13-19, Mr. Sullivan states that the Access databases are relational databases with links between certain information. We have not disputed that point and note that the same is true of the Bevan database, which has functionality that plaintiffs and Bevan are relying on but have not produced to BASF. *See, e.g.*, 4/5/18 T. Bevan Dep. at 116:3-7. At 190:20-191:9, Mr. Sullivan states that the screenshots plaintiffs created and showed to Mr. Sullivan were not complete. That is the point I made in my March 28, 2018 letter—plaintiffs did not show Mr. Sullivan the databases that BASF produced to plaintiffs. Finally, at 191:15-23, Mr. Sullivan states that the Cahill databases did not include transaction logs.

Perhaps I am missing the point you have been trying to make in your letters, but overall it seems to me that plaintiffs have received from BASF and Cahill substantially more database information than BASF and Cahill have received from plaintiffs. If you would like to schedule a time to discuss the production of databases—including the Bevan firm's database(s), which we received only partially as incomplete Excel spreadsheets—I would be happy to do so. Indeed, in my March 28, 2018 letter I offered to speak with you on March 30, 2018 but never received a response from plaintiffs. In advance of any discussion, please identify the particular searches or queries plaintiffs have been trying to perform in the Access databases BASF produced so that we can try them ourselves. My understanding is that the Access databases BASF produced are searchable, even after Social Security Numbers and personal identifiers were removed pursuant to our agreement with plaintiffs.

Beijing     Boston     Chicago     Hong Kong     Houston     London     Los Angeles     Munich     New York     Palo Alto     San Francisco     Shanghai

# KIRKLAND & ELLIS LLP

Robert L. Pratter
April 19, 2018
Page 2

If you would like to schedule a time to discuss, please let me know your availability.

Sincerely,

/s/ Peter A. Farrell

Peter A. Farrell

cc:    All Defense Counsel

| From: | Robert Pratter |
|-------|----------------|
| To: | pfarrell; eassaf |
| Subject: | Plaintiffs" request re : claimant information |
| Date: | Wednesday, May 09, 2018 2:40:05 PM |
| Attachments: | BASF indexes (privilege).pdf |

Dear Peter:

Following up on our meet and confer of yesterday, May 8th, for some time Plaintiffs have been asking for documents that list, tally or record the names of Emtal talc claimants , the result of the claims and any record of dismissals, settlements or payments and reason therefor. Our request for this information has not been limited to the "Cahill data base," and in any event, we have informed you several times that the "Cahill data base" is not functioning to provide the above information we have requested.

Yesterday we reiterated our request that BASF identify and produce any documents with respect to claimants, the result of the claim, including any dismissals, settlements or payments, and reason therefor. We made it clear that our request is not limited to the words "data base" which may have different connotations to different persons, but was a broad request which included indices, lists, spreadsheets, tallies, compilations letters, memoranda or any other document in paper, electronic , computer or any other form with respect to such information. Your answer that "there is no other data base "is not responsive to our request.

We note that the BASF privilege log contains the attached 137 entries for "*index* containing mental impressions of counsel regarding talc litigation" (emphasis added) or other words to that effect. (see the attached table). Given the use of the word "index", the number of entries, the reporting intervals (many daily, weekly, semi-weekly and/or monthly), and the general description of the subject matter, we believe that these documents may contain the information we have been requesting.

We therefore kindly ask that you remove these documents from the privilege log by Monday, May 14, and thereafter promptly produce the documents, absent which we shall move to ask the SDM to inspect the documents *in camera* to determine if they and the information contained therein are entitled to be withheld, or shall be turned over to the plaintiffs.

Thank you for your consideration.

Robert L Pratter
C / P / R
Cohen, Placitella & Roth, P.C.
Two Commerce Square
2001 Market Street, Suite 2900 / Philadelphia, PA 19103
215.567.3500 / 215.567.6019 (fax)
rpratter@cprlaw.com

IMPORTANT CONFIDENTIALITY NOTICE

PRIVILEGED ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT. This

message and attachments may contain privileged and confidential information. If you are not an intended recipient of this message, any use, distribution or copying is prohibited; please notify Cohen, Placitella & Roth, P.C. immediately at (215) 567-3500 or by email reply; and permanently delete all copies. Any tax advice contained in this message and attachments may not be used for purposes of (i) avoiding penalties under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

- - -

KIMBERLEE WILLIAMS,      :   CIVIL ACTION
et al.,                  :
          Plaintiffs,  :
                         :
          vs.            :
                         :
BASF CATALYSTS, LLC,   :
et al.,                  :
          Defendants  :  NO. 2:11-CV-1754

- - -

MONDAY, MAY 14, 2018

- - -

Videotaped deposition of

ARTHUR DORNBUSCH, was held at the law offices

of Littleton, Park, Joyce, Ughetta & Kelly,

141 West Front Street, Suite 120, Red Bank,

New Jersey, commencing at 9:06 a.m., on the

above date, before Deborah A. Brazukas, a

Registered Professional Reporter, Certified

Shorthand Reporter of New Jersey, License No.

XI 01938, and Notary Public.

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



---

**Page 2**

```
 1   APPEARANCES:
 2      COHEN, PLACITELLA & ROTH, P.C.
        BY: CHRISTOPHER M. PLACITELLA, ESQUIRE
 3         MICHAEL COREN, ESQUIRE
        127 Maple Avenue
 4      Red Bank, New Jersey  07701
        732.747.9003
 5      cplacitella@cprlaw.com
        mcoren@cprlaw.com
 6         Counsel for Plaintiffs
 7
 8      KIRKLAND & ELLIS, LLP
        BY:  PETER FARRELL, ESQUIRE
 9      655 Fifteenth Street, N.W.
        Washington, D.C.  20005
10      202.879.5959
        peter.farrell@kirkland.com
11         Counsel for BASF Catalysts, LLC
12
13      PEPPER HAMILTON, LLP
        BY:  BARRY BOISE, ESQUIRE
14      3000 Two Logan Square
        18th and Arch Streets
15      Philadelphia, Pennsylvania  19103
        215.981.4591
16      boiseb@pepperlaw.com
           Counsel for Cahill, Gordon; Peter
17         Sloane; Ira Dembrow
18
19      MARINO, TORTORELLA & BOYLE, P.C.
        BY:  KEVIN MARINO, ESQUIRE
20         JOHN BOYLE, ESQUIRE
        437 Southern Boulevard
21      Chatham Township, New Jersey  07928
        973.824.9300
22      khmarino@khmarino.com
        jboyle@khmarino.com
23         Counsel for Arthur Dornbusch
24
```

---

**Page 3**

```
 1   APPEARANCES (Continued):
 2
 3      HEROLD LAW, P.A.
        BY:  ERIC TUNIS, ESQUIRE
 4      25 Independence Boulevard
        Warren, New Jersey  07059
 5      908.484.1153
        etunis@herold.com
 6         Counsel for Thomas Halket
 7   ALSO PRESENT:
 8      Sneha Desai, Esquire
        Robert Pratter, Esquire (via telephone)
 9      Lea Callahan
        Ray Moore, The Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

**Page 4**

```
 1              INDEX
 2              - - -
 3   TESTIMONY OF:            PAGE
 4   ARTHUR DORNBUSCH
 5      BY MR. PLACITELLA      11
 6
 7              - - -
 8            EXHIBITS
 9              - - -
10   NO.       DESCRIPTION      PAGE
11   Dornbusch1  United States Securities
           and Exchange Commission,
12         Washington, D.C.,
           Schedule 14A          *
13
     Dornbusch2  Excerpt from BASF Privilege
14         Log - Dornbusch         *
15   Dornbusch3  Excerpt from BASF Privilege
           Log - O'Shaughnessy Ashton
16         Entries              *
17   1     Cahill Collection of Testing
           Document (Excluding
18         Privileged Documents)      *
19   3     Transcript of deposition of
           Glenn Hemstock, March 16,
20         1983, Re:  Westfall vs.
           Whittaker, Clark & Daniels,
21         et al.              *
22
23
24
```

---

**Page 5**

```
 1   EXHIBITS (Continued):
 2              - - -
 3   NO.       DESCRIPTION      PAGE
 4   4     Transcript of deposition of
           Peter Gale, April 26, 1983,
 5         Re:  Westfall vs. Wittacker,
           Clark & Daniels, et al.     *
 6
 7   5     Affidavit of William H.
           Ashton              *
 8   6     Affidavit of Charles D.
           Carter              *
 9
10   13    Excerpt of transcript of
           deposition of Daniel
11         Steinmetz, July 18, 2017,
           Re:  Sampson vs. 3M Company,
12         et al.              *
13   14    Summary of Activities
           Related to Services Rendered
14         for Decof & Grimm in the case
           of David H. Westfall vs.
15         Whittaker, Clark & Daniels,
           et al.              *
16   15    Inter-Department Memorandum,
           Minerals & Chemical Division,
17         Document Retrieval -
           Discontinued Operations,
18         March 7, 1984           *
19   41    Answers of BASF Catalysts
           LLC ton Interrogatories
20         Propounded by the Plaintiffs,
           Re:  Williams, et al. vs.
21         BASF Catalysts, LLC, et al.   *
22
23
24
```


MAGNA LEGAL SERVICES

Page 6

EXHIBITS (Continued)

- - -

NO.    DESCRIPTION    PAGE

50    Answers, Objections and
      Responses of Pita Realty
      Limited, Formerly Known as
      Eastern Magnesia Talc Company,
      and Englehard Corporation to
      Owens-Corning Fiberglas
      Corporation's Interrogatories
      and Request for Production,
      Re: Asbestos Products
      Liability Litigation    *

57    Responses by Engelhard
      Corporation to Plaintiffs'
      First Standard Set of
      Liability Interrogatories,
      Re: Chernick vs. ABB Lummus
      Global, Inc., et al.    *

108   Letter from Eric S. Sarner
      to Mr. Hobson, January 22,
      1990    *

121   Letter from Eric S. Sarner
      to Dear Jim, April 23, 1990   *

123   Letter from Sarner to Dear
      Peter, April 24, 1990    *

148   Letter from Francis Patrick
      Newell to Signe O'Brien
      Rudberg, Esquire, November
      18, 2003    *

176   BASF Catalysts LLC's
      Responses and Objections to
      Plaintiffs' First Request for
      Admissions, Re: Williams,
      et al. vs. BASF Catalysts,
      LLC, et al.    *

Page 7

EXHIBITS (Continued):

- - -

NO.    DESCRIPTION    PAGE

203   Defendant Arthur A. Dornbusch
      II's Disclosures Under Rule
      26(a)(1), Re: Williams, et
      al. vs. BASF Catalysts, LLC,
      et al.    *

210   Letter from Eric S. Sarner
      to Dear David, July 16, 1991  *

214   "Englehard Corp. William
      Salling" with attachments    *

215   Letter from Harriet
      Vasilopoulos to Ms. Nancy
      Remundo, January 24, 1985,
      with attachment    *

(* Exhibit marked prior to start of
deposition.)

Page 8

- - -

## DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer

| Page | Line | Page | Line | Page | Line | Page | Line |
|------|------|------|------|------|------|------|------|
| 16 | 14 | 118 | 2 | 238 | 9 | 267 | 19 |
| 35 | 5 | 121 | 23 | 239 | 15 | 272 | 20 |
| 35 | 11 | 125 | 1 | 242 | 9 | 274 | 20 |
| 35 | 17 | 126 | 16 | 245 | 6 | 275 | 3 |
| 36 | 1 | 127 | 2 | 246 | 5 | 276 | 10 |
| 36 | 14 | 127 | 15 | 246 | 13 | 278 | 3 |
| 41 | 12 | 130 | 17 | 250 | 11 | 280 | 7 |
| 42 | 12 | 132 | 1 | 252 | 18 | 286 | 17 |
| 43 | 14 | 132 | 6 | 253 | 3 | 287 | 6 |
| 45 | 2 | 146 | 22 | 253 | 12 | 288 | 9 |
| 46 | 6 | 191 | 2 | 256 | 12 | 289 | 1 |
| 51 | 24 | 207 | 1 | 257 | 7 | | |
| 55 | 17 | 208 | 4 | 257 | 17 | | |
| 56 | 22 | 219 | 13 | 258 | 10 | | |
| 114 | 10 | 228 | 6 | 258 | 20 | | |
| 116 | 10 | 230 | 11 | 259 | 5 | | |
| 117 | 10 | 237 | 21 | 263 | 7 | | |

Page 9

DEPOSITION SUPPORT INDEX (Continued):

- -

Request for Production of Document
Page  Line
None

Stipulations
Page  Line
None

Question Marked
Page  Line
None



| Page 10 | Page 12 |
|---|---|
| 1    THE VIDEOGRAPHER: We are now | 1 any -- the New Jersey bar? |
| 2 on the record. This begins DVD No. 1 in | 2    A.    No. |
| 3 the deposition of Arthur Dornbusch in the | 3    Q.    Okay. Am I correct that your -- |
| 4 matter of Kimberlee Williams, et al. | 4 that you started with Engelhard in 1976? |
| 5 versus BASF Catalysts, LLC, et al., in | 5    A.    Yes, December '96. |
| 6 the United States District Court for the | 6    Q.    And your first job was |
| 7 District of New Jersey, Civil Action No. | 7 assistant -- |
| 8 2:11-cv-1754. | 8    A.    '76. |
| 9    Today is May 14th, 2018, and | 9    Q.    -- general counsel? |
| 10 the time is 9:06 a.m. This deposition | 10    A.    Yes. |
| 11 is being taken at 141 West Front Street, | 11    Q.    Okay. At that time, what were |
| 12 Red Bank, New Jersey, at the request of | 12 your job responsibilities? |
| 13 Cohen, Placitella and Roth. | 13    A.    I was responsible for the general |
| 14    The videographer is Ray Moore | 14 legal support of certain of the business -- |
| 15 of Magna Legal Services and the court | 15 sub business groups. I don't recall |
| 16 reporter is Debbie Brazukas of Magna | 16 specifically which ones. I know that one of |
| 17 Legal Services. Counsel will be noted | 17 them was the systems, air -- air and systems |
| 18 on the stenographic record. | 18 water group located in Union, New Jersey. |
| 19    Will the court reporter please | 19 And there were other groups too, but at that |
| 20 swear in the witness. | 20 time, I'm not sure what they were. |
| 21    - - - | 21    Q.    Okay. And am I -- in 1980, you |
| 22    ARTHUR DORNBUSCH, after having | 22 became the vice president and general counsel |
| 23    been duly sworn, was examined and | 23 of Minerals and Chemicals -- |
| 24    testified as follows: | 24    A.    Yes. |

| Page 11 | Page 13 |
|---|---|
| 1    - - - | 1    Q.    -- is that fair? |
| 2    EXAMINATION | 2    And what were your |
| 3    - - - | 3 responsibilities as vice president and |
| 4 BY MR. PLACITELLA: | 4 general counsel for Mineral and Chemicals? |
| 5    Q.    Good morning, Mr. Dornbusch. How | 5    A.    I was responsible for all of the |
| 6 are you? | 6 legal affairs of that division. That was one |
| 7    A.    Good morning. | 7 of three divisions of Engelhard, Minerals and |
| 8    Q.    I can make you a promise before | 8 Chemicals Corporation. |
| 9 we start. This will be a lot shorter than | 9    Q.    Okay. In that capacity, did you |
| 10 the last time we were together. | 10 do work on the talc litigation? |
| 11    A.    That would be good. | 11    MR. FARRELL: Objection to |
| 12    Q.    As you know, I'm Chris | 12 form. |
| 13 Placitella, and I'm here to get your | 13    THE WITNESS: Yes. I'm not |
| 14 testimony today. | 14 sure at what point talc litigation |
| 15    You currently reside where? | 15 ensued, but yes. |
| 16    A.    Six Harbor Drive in Rumson, New | 16 BY MR. PLACITELLA: |
| 17 Jersey. | 17    Q.    Okay. And in 1984, did you |
| 18    Q.    And you went to Yale to get your | 18 become the corporate secretary for Engelhard? |
| 19 bachelor of arts? | 19    A.    Yes. |
| 20    A.    I did. | 20    Q.    All right. And as corporate |
| 21    Q.    And then University of | 21 secretary, did you attend board meetings? |
| 22 Pennsylvania Law School? | 22    A.    Yes, I did. |
| 23    A.    Yes. | 23    Q.    Okay. In 1984, did you become |
| 24    Q.    All right. Did you ever sit for | 24 vice president and general counsel for the |

**MAGNA**
LEGAL SERVICES

Page 106

1    Q.    If you know.
2    A.    Yes.
3    Q.    Okay.  And who would that person
4  be?  Who would they get the authorization
5  from?
6          MR. FARRELL:  Objection to form
7    and foundation.
8          THE WITNESS:  They'd get it
9    from me.
10 BY MR. PLACITELLA:
11   Q.    Okay.  Would they have to provide
12 you with a reason for their recommendation
13 for a particular settlement amount?
14         MR. FARRELL:  Objection to form
15   and foundation.
16         THE WITNESS:  We'd have a
17   discussion about it.
18 BY MR. PLACITELLA:
19   Q.    Okay.  And were records kept
20 concerning the settlements and the reasons
21 for the settlements --
22         MR. FARRELL:  Objection to form
23   and foundation.
24 BY MR. PLACITELLA:

Page 107

1    Q.    -- as it relates specifically to
2  the Engelhard talc litigation?
3          MR. FARRELL:  Same objections.
4          THE WITNESS:  Not to my
5    knowledge.
6  BY MR. PLACITELLA:
7    Q.    Okay.  Did Cahill Gordon have a
8  defense budget for their -- for the defense
9  of the talc litigation?
10         MR. FARRELL:  Objection to
11   form.
12         THE WITNESS:  No.
13 BY MR. PLACITELLA:
14   Q.    So their budget was unlimited?
15         MR. PLACITELLA:  Objection to
16   form.
17         THE WITNESS:  Yes.
18 BY MR. PLACITELLA:
19   Q.    Okay.  In terms of -- how did the
20 billing occur, just for the talc litigation?
21         MR. FARRELL:  Objection to form
22   and foundation.
23 BY MR. PLACITELLA:
24   Q.    If you know.

Page 108

1    A.    Well, we would receive a bill
2  monthly.  And there would be -- when I say a
3  bill, there would be actually a series of
4  bills, a separate one for each matter.  And
5  there would be a general memorandum that
6  would summarize the work that was done for
7  each matter.  Talc -- the talc litigation
8  would be one of them.
9          And I would review those.  If
10 I had any questions, I would discuss it with
11 Cahill and then approve it for payment.
12   Q.    Okay.  And when that bill was
13 approved for payment, where did it physically
14 go?
15         MR. FARRELL:  Objection to form
16   and foundation.
17         THE WITNESS:  To accounts
18   payable, I guess.
19 BY MR. PLACITELLA:
20   Q.    Okay.  And who was that person in
21 charge, if you remember?
22   A.    I don't know.
23   Q.    Okay.  And do you know what
24 ultimately happened to the bills that were

Page 109

1  submitted?
2          MR. FARRELL:  Objection to
3    form.
4          THE WITNESS:  No, I don't.
5  BY MR. PLACITELLA:
6    Q.    Did the counts -- the accounts
7  payable have a separate ledger for the
8  defense of the Emtal talc litigation?
9          MR. FARRELL:  Objection to
10   form; foundation.
11         THE WITNESS:  I don't know.
12 BY MR. PLACITELLA:
13   Q.    Did accounts payable ever provide
14 you with summaries of what the legal defense
15 costs were for the defense of the Emtal talc
16 litigation?
17         MR. FARRELL:  Objection to
18   form.
19         THE WITNESS:  I received a
20 number of things from our finance people
21 that consisted of the -- I call them IBM
22 printouts, but it was -- in those days,
23 you got things on paper with perforations
24 on both margins.  And it would have an

28 (Pages 106 to 109)

MAGNA
LEGAL SERVICES

Page 110

```
1    analysis of legal department
2    expenditures. I believe it was probably
3    broken down, litigation costs were
4    probably broken down by matter.
5            I didn't pay much attention to
6    it because I had reviewed it in more
7    detail on a monthly basis.
8    BY MR. PLACITELLA:
9    Q.   Were they permanent business
10   records that -- reports that you're referring
11   to?
12           MR. FARRELL: Objection to form
13   and foundation.
14           THE WITNESS: Well, they would
15   have been covered by the document
16   retention policy. I -- I'm not sure how
17   permanent you would be. Probably after a
18   year or so, they wouldn't be required to
19   be retained.
20   BY MR. PLACITELLA:
21   Q.   Now, in terms of the accounts
22   payable records, how did they figure into
23   the -- the accounts -- accounts payable
24   ledgers, how did they figure into the
```

Page 111

```
1    document retention policy?
2            MR. FARRELL: Objection to
3    form.
4            THE WITNESS: I don't -- I
5    don't recall.
6    BY MR. PLACITELLA:
7    Q.   Okay. If -- when you were there
8    in, say, 2005 and you wanted to know how
9    much Cahill Gordon billed you from two --
10   2003 to 2005, could you get that information?
11           MR. FARRELL: Objection to form
12   and foundation.
13           THE WITNESS: I'm sure I could.
14   BY MR. PLACITELLA:
15   Q.   Okay. And if you were there in
16   2005 and you wanted to know how much Cahill
17   Gordon billed you from 2000 to 2005, could
18   you secure that information?
19           MR. FARRELL: Objection to form
20   foundation.
21           THE WITNESS: I would think I
22   could. I -- but I don't know for a fact.
23           MR. PLACITELLA: Okay.
24           THE WITNESS: I never -- never
```

Page 112

```
1    had occasion to find out.
2    BY MR. PLACITELLA:
3    Q.   And how -- who would you ask or
4    what would you -- if you had to make that
5    request, what would you do?
6            MR. FARRELL: Same objections.
7            THE WITNESS: Well, in the
8    first instance, I would ask Mike
9    Sperduto, who was our chief financial
10   officer. And he would put me in touch
11   with somebody in his finance organization
12   who could give me the answer.
13   BY MR. PLACITELLA:
14   Q.   Okay. Now, as corporate
15   secretary and general counsel, were you
16   required to keep the board of directors
17   apprized of what was going on in the Emtal
18   talc litigation?
19           MR. FARRELL: Objection to
20   form.
21           THE WITNESS: I don't know that
22   I was required to. I did on an
23   occasional basis.
24   BY MR. PLACITELLA:
```

Page 113

```
1    Q.   Okay. And what sort of
2    information would you be reporting to the
3    board of directors about the Engelhard talc
4    litigation?
5            MR. FARRELL: Objection to
6    form; foundation. And I'd also caution
7    you, Mr. Dornbusch, not to reveal the
8    substance of any communications that
9    preserve privileges and work product that
10   would apply to such communications with
11   the board.
12           THE WITNESS: I would give them
13   an overview of where we stood.
14   BY MR. PLACITELLA:
15   Q.   And when you say "overview," what
16   do you mean by that?
17   A.   Well, I'd tell them how many
18   cases, how many since the last period had
19   been settled; if they were settled for money,
20   how much. That sort of thing.
21   Q.   And if they were dismissed with
22   no money, would you tell them that?
23   A.   Yes.
24   Q.   Okay. Would you tell them the
```

**MAGNA**
**LEGAL SERVICES**

Case 2:11-cv-01754-BRM-AME   Document 600-11   Filed 06/25/18   Page 47 of 53 PageID:
43320
Case 2:11-cv-01754-JLL-JAD   Document 589-5   Filed 05/29/18   Page 1 of 7 PageID: 36670

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO:  11-cv-1754 (JLL) (JAD)

- - - - - - - - - - - - - - - - :
 KIMBERLEE WILLIAMS, et al,      :
                                 :
                Plaintiffs,      :   DEPOSITION UPON
                                 :   ORAL EXAMINATION
        vs.                      :
                                 :        of
 BASF CATALYSTS, LLC, et al,     :
                                 :     MICHAEL JAMES
                Defendants.      :        HASSETT
                                 :
- - - - - - - - - - - - - - - - :


West Orange, New Jersey
Tuesday, April 24, 2018


DEPOSITION of MICHAEL JAMES HASSETT

in the above-entitled action by and before PATRICIA J.

RUSSONIELLO, a Certified Court Reporter and Notary

Public of the State of New Jersey, at the office of

ARLEO & DONOHUE, LLC, 622 Eagle Rock Avenue,

commencing at 10:11 a.m.




Magna Legal Services
866-624-6221
www.MagnaLS.com



## Page 2

```
 1   A P P E A R A N C E S :
 2       COHEN PLACITELLA ROTH, PC
         By  JARED M. PLACITELLA, ESQ.
 3         CHRISTOPHER M. PLACITELLA, ESQ.
         Two Commerce Square
 4       2001 Market Street, Suite 2900
         Philadelphia, Pennsylvania 19103
 5       127 Maple Avenue
         Red Bank, New Jersey 07701
 6       Tel: (732) 747-9003  Fax: (215) 567-9003
 7       jmplacitella@cprlaw.com
         Attorneys for Plaintiffs
 8       KIRKLAND & ELLIS, LLP
         By  DANIEL A. BRESS, ESQ.
 9         RONALD K. ANGUAS, JR., ESQ.
         655 Fifteenth Street, N.W.
10       Washington, D.C. 20005
         Tel: (202) 879-5152
11       daniel.bress@kirkland.com
         ronald.anguas@kirkland.com
12       Attorneys for BASF Catalysts, LLC
13       PEPPER HAMILTON, LLP
         By ANTHONY VALE, ESQ.
14       3000 Two Logan Square
         18th and Arch Streets
15       Philadelphia, Pennsylvania 19103-2799
         Tel: (215) 981-4000  Fax: (215) 981-4750
16       valea@pepperlaw.com
         Attorneys for Defendants, Cahill Gordon,
17       Peter Sloane and Ira Dembrow
18       ARLEO & DONOHUE, LLC
         By TIMOTHY M. DONOHUE, ESQ.
19       622 Eagle Rock Avenue
         West Orange, New Jersey 07052
20       Tel: (973) 736-8660  Fax: (973) 736-1712
         Attorneys for Deponent
21
22
         A P P E A R A N C E S : (Continued on next page)
23
24
25
```

## Page 3

```
 1   A P P E A R A N C E S : (Continued)
 2       MARINO, TORTORELLA & BOYLE, P.C.
         By PHILLIP S. PAVLICK, ESQ. (via telephone)
 3       437 Southern Boulevard
         Chatham, New Jersey 07928
 4       Tel: (973) 824-9300  Fax:  (973) 824-8425
         ppavlick@khmarino.com
 5       Attorneys for Defendant, Arthur Dornbusch
 6       HEROLD LAW, P.A.
         By ERIC TUNIS, ESQ. (via telephone)
 7       25 Independence Boulevard
         Warren, New Jersey 07059-6747
 8       Tel: (908) 647-1022  Fax: (908) 647-7721
         etunis@herold.com
 9       Attorneys for Defendant, Thomas Halket
10
     A L S O   P R E S E N T :
11
         Thomas Karwacki, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                  I N D E X
 2   WITNESS              EXAMINATION BY
 3   MICHAEL JAMES HASSETT
     By Mr. Jared Placitella        8
 4
 5
 6
 7
 8                 E X H I B I T S
 9   NUMBER        DESCRIPTION         PAGE
```

```
Hassett-1  Six-page Notice Of Video       9
10         Deposition Of Michael Hassett,
           Esq., and attached Certificate
11         of Service
12  Hassett-1A  One-page Interoffice Memorandum   186
           12/23/91 and attached Engelhard
13         Record Retention Manual
           (BASF_Sampson 39958-39998)
14
    Exhibit 2  Multi-page Cahill Collection    86
15         Of Testing Document (Excluding
           Privileged Documents) (P-15)
16
    Exhibit 3  Transcript (Glenn Hemstock)   91
17         3/16/83 (BASF-Sampson 14462-
           14601)
18
    Exhibit 4  Transcript (Peter Gale)      94
19         4/26/83 (JNJ-Ros 9712-9792)
20  Hassett 5  One-page letter, 8/20/02     58
           and attached settlement list
21         (BASF-Williams 390446-390460)
22  Hassett 7  One-page letter, 5/9/06 and   175
           attached Release (BASF FC 12168-
23         12171)
24  Hassett 10  Two-page Merten to Cuzzone   168
           letter, 8/2/04 and attachments
25
```

## Page 5

```
 1           E X H I B I T S (continued)
 2   NUMBER       DESCRIPTION       PAGE
 3   Exhibit 11  Multi-page document, re,   69
           Excerpted Entries from
 4         Privilege Log of BASF
           Catalysts LLC
 5
     Exhibit 14  Multi-page Summary Of    167
 6         Activities Related To Services
           Rendered For Decof & Grimm
 7         (BASF-Lopez 21666-21681)
 8   Exhibit 15  One-page Interoffice      105
           Memorandum, 3/7/84 (BASF 00157)
 9
     Exhibit 57  Responses By Engelard     114
10         Corporation To Plaintiffs'
           First Standard Set Of Liability
11         Interrogatories (BASF FC 14202-
           14256)
12
     Exhibit 60  Multi-page Defendant Eastern   155
13         Magnesia Talc Company's Answers
           To Plaintiff's Interrogatories
14         (BASF FC 12190-12204)
15   Exhibit 124  Two-page letter, 5/3/02    147
           (BASF-Williams 40099-40100)
16
     Exhibit 203  Defendant Arthur A. Dornbusch   72
17         II's Disclosures Under Rule
           26(a)(1)
18
     Exhibit 205  Seven-page Plaintiff Theresa   161
19         Martin's More Responsive Answers
           To Interrogatories Propounded By
20         Eastern Magnesia Company
           (BASF_Williams 334310-334316)
21
22   (Reporter retains all exhibits except Exhibit 7.)
23
24
25
```



| Page 6 | Page 8 |
|---|---|

**Page 6**

```
 1    REQUEST FOR PRODUCTION OF DOCUMENTS:
 2         PAGE LINE
 3         66  17  (copies of documents)
 4
 5
 6
 7    DIRECTIONS NOT TO ANSWER QUESTIONS:
 8         PAGE LINE
 9         13   1
           13   4
10         47  21
           50  20
11         51   2
           77  21
12         80   1
           80   8
13        127   1
          146  13
14        152  19
          184   8
15
16
17
18
19
20
21
22
23
24
25
```

**Page 8**

```
 1    Ellis, for BASF.
 2         MR. ANGUAS:  Ronald Anguas, Kirkland and
 3    Ellis, for BASF.
 4         MR. VALE:  Anthony Vale for Cahill
 5    Gordon, Peter Sloane and Ira Dembrow.
 6         MR. PAVLICK:  Phillip Pavlick of Marino,
 7    Tortorella & Boyle for Arthur Dornbusch.
 8         MR. TUNIS:  Eric Tunis on behalf of
 9    Thomas Halket.
10         THE VIDEOGRAPHER:  Will the court
11    reporter please swear in the witness.
12    M I C H A E L   J A M E S   H A S S E T T, having been
13    duly sworn by the Notary, testifies as follows:
14    EXAMINATION BY MR. JARED PLACITELLA:
15    Q.    Good morning, Mr. Hassett.
16    A.    Good morning.
17    Q.    My name is Jared Placitella.  It's nice
18    to meet you.
19    A.    Good to meet you.
20    Q.    You understand that we're here today for
21    the purposes of taking your deposition?
22    A.    Yes.
23    Q.    Have you ever had your deposition taken
24    before?
25    A.    Yes.
```

| Page 7 | Page 9 |
|---|---|

**Page 7**

```
 1         THE VIDEOGRAPHER:  We are now on the
 2    record.  This begins videotape number 1 in the
 3    deposition of Michael Hassett in the matter of
 4    Kimberlee Williams, et al, versus BASF Catalysts, LLC,
 5    et al, in the United States District Court for the
 6    District of New Jersey.
 7         Today is Tuesday April 24th, 2018 and
 8    the time is 10:11 a.m.
 9         This deposition is being taken at 622
10    Eagle Rock Avenue, West Orange, New Jersey, at the
11    request of Cohen, Placitella and Roth.
12         The Videographer is Thomas Karwacki of
13    Magna Legal Services and the court reporter is
14    Patricia Russoniello of Magna Legal Services.
15         Will counsel and all parties present
16    state their appearances and whom they represent,
17    please.
18         MR. JARED PLACITELLA:  Sure.  I'll
19    start.
20         Jared Placitella for the plaintiffs.
21         MR. CHRISTOPHER PLACITELLA:  Chris
22    Placitella.
23         MR. DONOHUE:  Tim Donohue, Arleo and
24    Donohue, for the witness, Michael Hassett.
25         MR. BRESS:  Dan Bress, Kirkland and
```

**Page 9**

```
 1    Q.    When was that?
 2    A.    Probably very late '90s.
 3    Q.    And what was the circumstances under
 4    which you had your deposition taken?
 5    A.    It was a case that went to litigation
 6    about an insurance claim by Engelhard against AIG.
 7    Q.    And do you recall what the insurance
 8    claim was over?
 9    A.    Yes.  It was a loss of -- a loss
10    relating to base metal inventory held at an Engelhard
11    subsidiary in Japan.
12    Q.    And that was the only time you ever had
13    your deposition taken before today?
14    A.    That's the only one I can remember.
15    Q.    Sure.
16         I'm going to show you what I've marked
17    as Hassett Exhibit 1 for identification; well, Exhibit
18    Hassett-1.  Sorry.
19         Have you ever seen this Notice before
20    today?
21    A.    Yes.
22    Q.    And when was the first time that you --
23    well, when did you see this Notice of your deposition?
24    A.    Recently.  Within the past five or six
25    days.
```

3 (Pages 6 to 9)



MAGNA
LEGAL SERVICES

| Page 50 | Page 52 |
|---|---|

**Page 50**

1    (At this time the witness and counsel
2  leave the deposition room at 11:21 a.m.)
3    MR. DONOHUE: Everybody's there on the
4  phone, right?
5    THE VIDEOGRAPHER: The time is --
6    MR. TUNIS: Yes.
7    THE VIDEOGRAPHER: -- 11:28 a.m. We're
8  on the record.
9  BY MR. JARED PLACITELLA:
10    Q.  So, Mr. Hassett, before we took a short
11  break I believe my last question was what were the
12  nature of the interactions that you had with insurance
13  carriers in the context of the Martin case?
14    MR. BRESS: And I'll instruct you not
15  to -- go ahead. I think you can give the answer.
16    A.  We were inquiring into coverage issues.
17    Q.  And what were those coverage issues?
18    MR. BRESS: Well, I don't -- I don't
19  know if you know the answer to that but -- but I'm
20  not -- I'm going to ask you and instruct you not to
21  reveal specific communications.
22    THE WITNESS: Well, first I think to the
23  extent that I discussed that, it was with the local
24  counsel and not -- that part of it at least was not
25  directly with the carrier so that -- does that change

**Page 51**

1  your view on the...
2    MR. BRESS: Oh, yes. I do instruct you
3  not to disclose communications with local counsel on
4  the basis of privilege.
5    Q.  But for the instruction not to answer
6  would you be able to answer that question?
7    A.  Only in an extremely general way.
8    Q.  But yes?
9    MR. BRESS: Objection to form.
10    A.  I could give a very general answer, yes.
11    Q.  In the context of the Emtal talc
12  litigation did you have any interactions with
13  insurance brokers?
14    A.  No.
15    Q.  Did Engelhard set budgets on attorneys
16  fees and expenses in individual matters?
17    MR. BRESS: Objection. Form.
18    A.  In general, no. I don't remember an
19  exception I was involved in.
20    Q.  Do you know approximately how much it
21  cost Engelhard to defend an Emtal talc case?
22    MR. BRESS: Objection. Form.
23    A.  And I -- I don't know there was a
24  typical case you could answer based on. I don't
25  really remember much of anything about the fee numbers

**Page 52**

1  at this point.
2    Q.  Instead of a typical number how about --
3  let's take two cases.
4    You said the Chernick case.
5    Do you recall how much it cost Engelhard
6  to defend the Chernick case?
7    A.  I don't remember.
8    Q.  And do you recall how much it cost
9  Engelhard to defend the Martin case?
10    A.  I do not remember.
11    Q.  Did Engelhard keep records of how much
12  it cost it to defend Emtal talc cases?
13    A.  The company in general maintained
14  records of legal expenses and all expenses. It's, you
15  know, a big company with good financial statements.
16    I don't recall seeing reports that were
17  specific to -- specific breakdowns for talc cases
18  or -- and -- and certainly didn't ask for them.
19    Q.  If those records existed who would --
20  what department in Engelhard would be responsible for
21  maintaining them?
22    MR. BRESS: Objection. Foundation.
23    THE WITNESS: Answer anyway?
24    MR. DONOHUE: You may answer.
25    A.  Well, accounting would have records on

**Page 53**

1  expenses generally including legal fees and I don't
2  know if there would be any supplemental reports
3  that -- you know, that Arthur saw but I didn't.
4    Q.  Have you ever attended any seminars
5  pertaining to the defense of asbestos or talc cases?
6    A.  No.
7    Q.  What role did Engelhard's Legal
8  Department have in deciding whether to settle a talc
9  case?
10    MR. BRESS: Objection to form.
11    A.  In general a settlement would be
12  approved by the in-house Legal Department.
13    The tire worker cases I just didn't get
14  involved -- I'm not sure what the approval -- tire
15  workers were different. Not sure what the approval
16  process was exactly there.
17    Q.  Who in the Engelhard Legal Department
18  approved settlements? Would that be Arthur Dornbusch?
19    A.  In general, yes.
20    Q.  I'd like to go back to the tire workers
21  cases for a minute.
22    Do you recall what tire worker cases,
23  you know, were within your purview?
24    A.  Well, I would -- in theory, all. In
25  practice, none. I -- I -- I just...

MAGNA
LEGAL SERVICES

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **KIMBERLEE WILLIAMS**, et al., | HONORABLE JOSE L. LINARES |
| Plaintiffs, | CIVIL ACTION NO. 11-1754 (JLL) (JAD) |
| vs. | **CERTIFICATE OF SERVICE** |
| **BASF CATALYSTS, LLC**, et al., | |
| Defendants. | |

I hereby certify a true and accurate copy of the foregoing attached Reply Brief is being served on all counsel for the parties of record listed below on this 24th day of May 2018 date via electronic delivery only.

Eugene F. Assaf, P.C.
Kirkland & Ellis, LLP
655 15th St., N.W.
Washington, D.C. 20005
eassaf@kirkland.com

Peter A. Farrell, Esq.
Kirkland & Ellis, LLP
655 15th St., N.W.
Facsimile: (202) 879-5200
pfarrell@kirkland.com

Justin T. Quinn, Esq.
Robinson Miller LLC
One Newark Center, 19th Floor
Newark, New Jersey 07102
jquinn@rwmlegal.com
*Attorneys for Defendant, BASF Catalysts, LLC*

Kevin H. Marino, Esq.
Marino, Tortorella & Boyle, P.C.
437 Southern Boulevard
Chatham, New Jersey 07928
kmarino@khmarino.com

John A. Boyle, Esq.
Marino, Tortorella & Boyle, P.C.
437 Southern Boulevard
Chatham, New Jersey 07928
jboyle@khmarino.com
*Attorneys for Defendant Arthur Dornbusch*

Eric Tunis, Esq.
Herold Law, P.A.
25 Independence Boulevard
Warren, New Jersey 07059
etunis@heroldlaw.com
*Attorneys for Defendant Thomas Halkett*

Barry H. Boise, Esquire
Anthony Vale, Esquire
Nina M. Gussack, Esquire
Pepper Hamilton LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103
boiseb@pepperlaw.com
valea@pepperlaw.com
gussackn@pepperlaw.com

Angelo A. Stio, III, Esquire
Pepper Hamilton LLP
301 Carnegie Center, Suite 400
Princeton, New Jersey 08543
stioa@pepperlaw.com

Jessica S. Russell, Esquire
Pepper Hamilton LLP
333 Twin Dolphin Drive, Suite 400
Redwood City, CA 94065
russellj@pepperlaw.com
*Attorneys for Cahill Defendants*

COHEN PLACITELLA & ROTH PC

*/s/ CHRISTOPHER M. PLACITELLA*

_____
CHRISTOPHER M. PLACITELLA
Attorneys for Plaintiffs

Dated:  May 24, 2018