Exhibit 11

1                   UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
2                    Civil No. 11-01754(JLL)


3
       - - - - - - - - - - - - - - -X
4                                   :
       KIMBERLEE WILLIAMS, et al.,   :      TRANSCRIPT OF
5                                    :       PROCEEDINGS
              Plaintiffs,            :
6                                    :      October 26, 2017
              -vs-                   :
7                                    :
       BASF CATALYSTS, LLC, et al.,  :
8                                    :
              Defendants.            :      Newark, New Jersey
9                                    :
       - - - - - - - - - - - - - - -X
10

11

12

13
       B E F O R E:
14
                  SPECIAL MASTER ROBERTO A. RIVERA-SOTO
15

16

17

18

19

20          Pursuant to Section 753 Title 28 United States Code, the
       following transcript is certified to be an accurate record
21     as taken stenographically in the above-entitled proceedings.

22     s/Phyllis T. Lewis, CCR, CRCR
       - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
23                 PHYLLIS T. LEWIS, C.C.R., C.R.C.R.
           Official Court Reporter - United States District Court
24                 Newark, New Jersey  07101
                        (732) 735-4522
25


PHYLLIS T. LEWIS, CCR, CRCR, OFFICIAL COURT REPORTER

```
 1        A P P E A R A N C E S:

 2                COHEN PLACITELLA ROTH, PC
                  127 Maple Avenue
 3                Red Bank, New Jersey 07701
                  732-747-9004
 4                BY:  CHRISTOPHER M. PLACITELLA, ESQ.
                       JARED M. PLACITELLA, ESQ.
 5                     MICHAEL COREN, ESQ.
                       HARRY M. ROTH, ESQ.
 6                Attorneys for Plaintiffs.

 7

                  ROBINSON MILLER, LLC
 8                One Newark Center
                  Newark, New Jersey 07102
 9                973-690-5400
                  BY:  JUSTIN T. QUINN, ESQ.
10                     -and-
                  KIRKLAND & ELLIS, LLP
11                601 Lexington Avenue
                  New York, New York 10022
12                212-446-4930
                  BY:  EUGENE F. ASSAF, ESQ.
13                     DANIEL A. BRESS, ESQ.
                       PETER A. FARRELL, ESQ.
14                     RONALD K. ANGUAS, JR., ESQ.
                       ELIZABETH S. DALMUT, ESQ.
15                Attorneys for Defendant,
                  BASF Catalysts, LLC.
16

17                CONNELL FOLEY, LLP
                  85 Livingston Avenue
18                Roseland, New Jersey 07068
                  973-535-0500
19                BY:  ROBERT E. RYAN, ESQ.
                       -and-
20                WILLIAMS & CONNOLLY, LLP
                  725 12th Street NW
21                Washington, DC 20005
                  BY:  DAVID BLATT, ESQ.
22                     GRANT A. GEYERMAN, ESQ.
                       JOHN K. VILLA, ESQ.
23                Attorneys for Defendant,
                  Cahill, Gordon & Reindel, LLP
24

25
```

```
 1       A P P E A R A N C E S (Continued):

 2               HEROLD LAW
                 25 Independence Boulevard
 3               Warren, New Jersey 07058
                 908-647-1022
 4               BY:  ERIC TUNIS, ESQ.
                 Attorneys for Defendant,
 5               Thomas D. Halket.

 6

                 MARINO, TORTORELLA & BOYLE, PC
 7               437 Southern Boulevard
                 Chatham, New Jersey 07928
 8               973-824-9300
                 BY:  KEVIN H. MARINO, ESQ.
 9               Attorneys for Defendant,
                 Arthur A. Dornbusch, II
10

11               LEVY KONIGSBERG, LLP
                 800 Third Avenue (11th Floor)
12               New York, New York 10022
                 212-605-6282
13               BY:  BRENDAN E. LITTLE, ESQ.
                 Attorneys for Respondents,
14               Thomas W. Bevan & Bevan & Associates, LPA, Inc.

15

                 WILENTZ
16               90 Woodbridge Center Drive (Suite 900)
                 Woodbridge, New Jesey 07095
17               732-636-8000
                 BY:  LYNNE M. KIZIS, ESQ.
18                  -ad-
                 ROBERT SOKOLOVE, ESQ.
19               Attorney for Interested Party,
                 Alan Rothenberg.
20

21               MC CARTER & ENGLISH, LLP
                 100 Mulberry Street
22               Newark, New Jesey 07102
                 973-622-4444
23               BY:  ZANE C. RIESTER, ESQ.
                 Attorneys for Respondent,
24                Johnson & Johnson Consumer Products, Inc.

25
```

```
 1        A P P E A R A N C E S  (Continued):

 2            O'TOOLE SCRIVO, LLC
              14 Village Park Road
 3            Cedar Grove,  New Jersey 07009
              973-239-5700
 4            BY:  STEVEN A. WEINER, ESQ.
              Attorneys for R. T. Vanderbilt
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    SPECIAL MASTER RIVERA-SOTO:  Good morning.

 2             I see that even those who were behind me in line

 3     got here before me.  I won't hold that against you.

 4             Is everyone here?

 5                    MR. ASSAF:  Yes, your Honor.

 6                    SPECIAL MASTER RIVERA-SOTO:  All right.  Everyone

 7     has met Mr. Reilly from my law firm.  He is going to try to

 8     make sure I keep my errors to a minimum.  We have our work

 9     cut out for us today.  We have a few motions that need to be

10     addressed.

11             Mr. Assaf, did I pronounce that correctly?

12                    MR. ASSAF:  Yes.

13                    SPECIAL MASTER RIVERA-SOTO:  I wanted to thank you

14     ahead of time.  The binder that you prepared was

15     particularly helpful.  There has been some add-ons to it,

16     and I will mention those as we go along in the hearing, but

17     I intend to follow the order in which the motions are listed

18     in the index, and I am going to follow Jersey procedures.

19             For those of you who are unfamiliar with Jersey

20     procedure on motions is I will call the motion.  I will ask

21     for the appearances, and in this case what I am going to ask

22     is that I only get the appearances of those lawyers who are

23     actually going to address me, and then I will summarize what

24     the motion is about, and then I will ask counsel if there is

25     anything that they would like to add or amend or change in
```

```
 1       respect to what I just summarized.  So hopefully we don't
 2       get a lot of repetition in the argument.
 3              I can assure you, I read every single page.  My
 4       wife wanted to know where I was all of the evenings of this
 5       week, except for Monday, which was the most profitable
 6       evening, where I went to the Eagles game.  It was spent --
 7       those of you from Washington, we did defeat the Redskins.
 8              (Laughter)
 9              MR. COREN:  They banged us up a bit, though.
10              SPECIAL MASTER RIVERA-SOTO:  Well, yeah, but we got
11       the 49ers, so that is an easy week.
12              So let's get started, if we may.
13              And also, after the motions are heard, as I
14       mentioned to everyone, we are going to do a formal
15       scheduling conference and try to get everything moving as
16       quickly as we can, okay?
17              So we have nothing else.  The first matter is --
18              MR. TUNIS:  Excuse me, your Honor.
19              SPECIAL MASTER RIVERA-SOTO:  I'm sorry.  Sure.
20              MR. TUNIS:  Eric Tunis for Tom Halket.
21              If you don't mind, I am going to sit in the jury
22       box.
23              SPECIAL MASTER RIVERA-SOTO:  Wherever it is
24       convenient for you, please.
25              MR. TUNIS:  Thank you.
```

1              SPECIAL MASTER RIVERA-SOTO:  I may call on you to

2    decide a few of these.

3              MR. TUNIS:  Happy to do that, your Honor.

4              (Laughter)

5              SPECIAL MASTER RIVERA-SOTO:  Somehow I thought that

6    would be the case.

7              We start off with the January 25, 2017 letter

8    motion by BASF seeking a number of forms of relief.  They

9    are ECF Number 228, and the response is ECF Number 230.

10             Can I get the appearances of counsel on that?

11             MR. ASSAF:  Gene Assaf on behalf of BASF.

12             MR. C. PLACITELLA:  Good morning, your Honor.

13             Christopher Placitella on behalf of the plaintiffs.

14             SPECIAL MASTER RIVERA-SOTO:  Good morning.

15   Welcome.

16             As I understand it, BASF is concerned about a

17   number of things.  Number one is the privilege log that was

18   prepared by the plaintiffs.  They produced it in January of

19   this year, and the real question that I have is that is

20   still a problem, given that we are now ten months later.

21             In respect of the plaintiffs' privilege, it is

22   BASF's position that it has been waived.  BASF raises some

23   questions about plaintiffs' failure to produce documents.

24   BASF also questions when will the plaintiffs file their Rule

25   23 certification motion.

```
 1              There is a tender for a "science" day.  There is an
 2    issue that has been raised concerning a protective order,
 3    but one was, in fact, entered on March 31st.  That is ECF
 4    260.
 5              There was a question about the deposition of a
 6    Victor Komarnicki.  I hope I pronounced that correctly.  She
 7    was a lawyer for Engelhard, and that deposition it appears
 8    was, in fact, taken on January 19th, 2017.
 9              There is a question about third-party subpoenas and
10    discovery, plaintiffs' spoliation allegations, communication
11    protocols, and a request for a discovery hearing.  You are
12    getting your discovery hearing today.
13              In response to that, plaintiffs state that much has
14    been resolved, but plaintiffs request there be some
15    coordination between the State and Federal proceedings, and
16    that there be a motion to modify the State Court's
17    protective order, that we provide a procedure for addressing
18    privileged documents, that their procedure be determined for
19    privilege assertions at depositions, that the production --
20    that defendants be required to produce indemnity or
21    forbearance agreements among them, and that the defendants
22    also be ordered to complete their document productions.
23              Did I miss anything as to what has been presented?
24              MR. C. PLACITELLA:  Your Honor, Chris Placitella.
25              As I understand it, a few things have been
```

```
 1    resolved.  The protective order issue has been resolved.
 2    The Kormarnicki deposition has been resolved.
 3              We have had -- the issue of class certification was
 4    addressed, and I thought it was resolved until some point in
 5    the future, but you will hear from Mr. Assaf.
 6              The issue of "science" day was raised and rejected
 7    by Judge Dickson.
 8              So a lot of -- and we met and conferred on a lot of
 9    these issues --
10              SPECIAL MASTER RIVERA-SOTO:  So what is left?
11              MR. C. PLACITELLA:  Well, it is interesting because
12    some of these things obviously overflow into the more
13    detailed filings.
14              SPECIAL MASTER RIVERA-SOTO:  And in respect to
15    those, we will address them as they come up.
16              MR. C. PLACITELLA:  Right.
17              SPECIAL MASTER RIVERA-SOTO:  But is there
18    anything -- and perhaps this question is more to Mr. Assaf,
19    who is the movant here.
20              Is there anything left on this laundry list that
21    needs to be addressed, but is not addressed in the
22    subsequent filings?
23              MR. ASSAF:  Yes, your Honor.
24              I think there is one issue that is left to be
25    addressed.  Mr. Placitella mentioned it and said it may be
```

1    resolved, it may not be resolved, and that is the Rule 23

2    issue, which I am prepared to address.

3              SPECIAL MASTER RIVERA-SOTO:  We are going to get to

4    that, because that is going to be under in my scheduling

5    order book, under the rubric of the scheduling order.

6              MR. ASSAF:   So on that issue, your Honor, just for

7    the record, let me go through your list, and I will put our

8    position on.

9              In terms of the privilege log --

10             SPECIAL MASTER RIVERA-SOTO:  Are you going to say

11   anything other than what is in your papers?

12             MR. ASSAF:   No.  I am going to address -- I'm

13   not -- I am going to say something different than is in our

14   papers, because I think on the privilege log, the plaintiffs

15   have represented to us that they are still correcting the

16   privilege log.

17             On the production of documents, after the

18   Judge Linares' August 3rd order, plaintiffs have said they

19   are going back to confirm that documents are being produced.

20             Science day was rejected without prejudice because

21   it is too early.

22             Your Honor is right, on the protective order,

23   Kormarnicki and communication protocol, they've all been

24   resolved.

25             And the other topics, I think the third-party

1    discovery is topics 2 and 7, and spoliation is topic 3, and

2    so I do think the issue, though, and I was going to set the

3    table, but I will go however you want, your Honor.   I was

4    going to take five minutes and just say where we are on the

5    case in terms of class discovery because you mentioned in

6    your hearing, your Honor, that telephonic hearing of October

7    16th, you mentioned Hydrogen Peroxide, and I would just like

8    to use that for five minutes as a jumping-off point, because

9    what I tried to do today in organizing our presentations is

10   to look at this through the judicial lens of Hydrogen

11   Peroxide, Chief Judge Linares' Class Third Order to Synapse,

12   recent Third Circuit case in Widener and try to then apply

13   that to the discovery issues that are in front of your

14   Honor.

15         So I'm happy to proceed however you like, your

16   Honor, but I think I could get through this in five to six

17   minutes in terms of Hydrogen Peroxide and its progeny and

18   why I think the class motion, an early class motion is

19   critical to everything we do today.

20               SPECIAL MASTER RIVERA-SOTO:   Okay.

21               MR. ASSAF:   Thank you.

22         So, your Honor, Paragraph 286, and I will do this

23   for the record, because I know we have a court reporter,

24   thank you so much.

25               SPECIAL MASTER RIVERA-SOTO:   Actually I wanted to

1    thank you.  The court reporter is here because I am too much

2    of a dinosaur to do it without a court reporter.  Thank you

3    very much.

4              THE REPORTER:  Thank you, your Honor.

5              MR. ASSAF:  So, for the record, 286, and I will

6    get you these slides afterwards, so you can fill in the

7    record.

8              So 286 is the plaintiffs' class definition of:

9    "All persons in the United States" who have "filed a

10   lawsuit," and "by reason of BASF's statements that its talc

11   and talc products did not contain asbestos, or that there

12   was no evidence its talc" withdrew, dismissed, or suffered a

13   dismissal of such lawsuit.

14             And (b), all people --

15             SPECIAL MASTER RIVERA-SOTO:  Actually --

16             MR. ASSAF:  -- by reason of BASF's statements did

17   not file a lawsuit.

18             So just to like put this in perspective, half of

19   the class here, (b), of people who never filed a lawsuit.

20             Then it says at the end:  "The class shall include

21   those who have had the right to claim damages derivatively

22   based" on that "exposed person's asbestos injury."

23             So your Honor, brought up Chief Judge Scirica's

24   opinion in Hydrogen Peroxide, and I was thinking today, I

25   was like that's interesting being a Former Justice, does he

```
1    like -- does it matter who wrote the opinion.  It will be
2    interesting.  We will get to figure out as we get to know
3    you.  But on this one I actually think Chief Judge
4    Scirica --
5         SPECIAL MASTER RIVERA-SOTO:  I am only concerned
6    whether it's a majority or dissenting opinion --
7         MR. ASSAF:  And this one --
8         SPECIAL MASTER RIVERA-SOTO:  -- since I wrote a lot
9    of the latter, and some of them have come back to haunt me.
10        (Laughter)
11        MR. ASSAF:  Well, on this one, though, Chief Judge
12   Scirica has been very active in the Rules Committee and on
13   Rule 23 for a long time, as your Honor knows.
14        And Hyrdrogen Peroxide is a Watershed decision, and
15   for this case, and why I think the early motion, early,
16   early now, we are six years into it, and I think a year
17   after the formal start of discovery, I think ironically
18   discovery was supposed to end today under the schedule.
19        "A party's assurance" --
20        SPECIAL MASTER RIVERA-SOTO:  Well, then we are
21   ready to go to trial, aren't we?
22        MR. ASSAF:  -- "A party's assurance to the court
23   that it intends or plans to meet the requirements is
24   insufficient."
25        And "It is incorrect to state that a plaintiff need
```

1    only demonstrate an 'intention' to try the case in a manner

2    that satisfies the predominance" in this case.

3          And then this is a recent case, Judge Chagares, in

4    the Widener University case, where there were uniform

5    statements on the Widener website regarding data of their

6    success of applicants and getting jobs, and a Third

7    Circuit -- a recent Third Circuit case.

8          "The plaintiffs do not purport to have classwide

9    proof of reliance, in the traditional sense, on the part of

10   every single class member.  Nor could they; reliance is

11   nearly always an individualized question, requiring

12   case-by-case determinations of what effect, if any, the

13   misrepresentation had on" the "decision-making," which I

14   think again, we are going to get to, your Honor, very

15   quickly today, because we are under Chief Judge Linares'

16   order, I think we get now discovery as to the plaintiffs'

17   decision-making and the impact of the alleged

18   misrepresentation, so Scirica, Chagares and Chief Judge

19   Linares.

20         In an opinion in 2009, in Synapse, the Chief

21   addressed again the common -- a common uniform

22   misrepresentation.

23         The "causation argument is simply:  If we can show

24   a common course of conduct by Synapse," the defendant, "a

25   presumption of causation is appropriate.  This is the type

```
 1          of unadorned causation allegation that the Hydrogen Peroxide
 2          court indicated would be insufficient under Rule 23. "
 3                    So that is I think our landscape, and at least for
 4          this discovery conference, I don't know if there's going to
 5          be -- I think these are the three of the key Third Circuit
 6          and District of New Jersey, Chief Judge Linares in the Third
 7          Circuit, but in this court that opinion will have special
 8          weight in terms of his analysis.
 9                    So how did we get to where we are today?
10                    For the past year, defendants or plaintiffs said
11          Rule 26 doesn't permit discovery.  The Court of Appeals
12          wrote reliance out of the torts and that we forfeited.  That
13          is now rejected.
14                    Also rejected Rosenblit, also rejected --
15                    SPECIAL MASTER RIVERA-SOTO:  They didn't reject
16          Rosenblit --
17                    MR. ASSAF:  Correct.  Rejected plaintiffs' reading
18          of Rosenblit.  Sorry.  I was trying to pick up speed.  I
19          always tell people, when you start to pick up speed, you
20          make mistakes, so I will slow down again, your Honor.
21                    SPECIAL MASTER RIVERA-SOTO:  Take your time.
22                    MR. ASSAF:  Yes, your Honor.
23                    Chief Judge Linares said:  A plain reading of the
24          Supreme Court's decision makes clear that exposition of the
25          underlying litigation is required.
```

1            And then the privilege issue, which I know your

2    Honor is familiar with, that there is an at-issue privilege

3    waiver.  Chief Judge Linares has found that, and we are

4    going to come back today to this citation, which is

5    critical, Paragraphs 12, 19, 228, 230, and 329.  We are

6    going to come back to those.

7            I think on virtually every topic in front of you in

8    terms of the at-issue, because whether it be law of the case

9    or just now good procedure in this court, I think Chief

10   Judge Linares has already said at least these are in play

11   and are subject to full discovery.

12           And so what did we do?

13           To get here, your Honor, over the last month, we

14   proposed two protocols, okay, and I think we submitted this

15   in our papers to you on October 11th, a protocol on what

16   exposition the case means, and then a protocol on what

17   limited waiver means.

18           Why did we do this?

19           I think why we did this, your Honor, I don't want

20   to go through another deposition like Wengerd, and I

21   think --

22           SPECIAL MASTER RIVERA-SOTO:  That is not going to

23   happen.

24           MR. ASSAF:  -- and I think what we are going to do

25   is put up some guideposts.  We as lawyers will always have

```
 1          different views of the world, but there are some things we
 2          should be able to agree on.
 3                  Again, I come back and leverage off Hydrogen
 4          Peroxide in the Third Circuit, which I know is going to
 5          guide this Court.
 6                  Prior to Hydrogen Peroxide, in the mid '90s there
 7          were two important cases.  One was Castano, the tobacco case
 8          from the Fifth Circuit, where there were fraud claims
 9          brought against the tobacco companies for
10          misrepresentations, and then Amchem.  So in Amchem, the
11          Third Circuit said why they couldn't certify a class.
12          "Beyond these broad issues, the class members' claims vary
13          widely in character."  They "were exposed to different"
14          "products, for different amounts of time, in different ways,
15          and over different periods.  Some" members had "no physical
16          injury or have" "pleural changes, while others suffer from
17          lung cancer," "asbestosis, or" meso.  "Each has a different
18          history of cigarette smoking, a factor that complicates the
19          causation inquiry," which again, coming back to Hydrogen
20          Peroxide, causation and reliance are somewhat tied up.
21                  In fact, Chief Judge Linares in his opinion
22          analytically groups the two together and then separates them
23          later on.
24                  So we took this, and we are saying, okay, we are in
25          the Third Circuit.  We are entitled to this amongst the
```

```
 1    class here, because eventually they are going to have to

 2    prove this up, and part of our defense will be this is a

 3    class of over 10,000 people according to the plaintiffs'

 4    over 25 years, and I think 20 different states with

 5    different diseases, different causations, and different

 6    reasons coming back to Widener, different reasons why they

 7    not went to law school, but why they resolved their cases.

 8          So I think we are entitled on something more than

 9    what the plaintiffs are suggesting, that we just get why

10    they settled their case, a simple statement, because I tend

11    to think what they are going to say, I get to press that and

12    probe it in order for when we have our Rule 23 hearing, and

13    I suspect again under the Third Circuit, I think we are

14    going to get an evidentiary hearing in terms of rigorous

15    analysis, whether it be the experts or the class reps.

16          This is what I am going to like to go through, and

17    again, your Honor, just to put this in context, the

18    plaintiffs here, we have six plaintiffs --

19          SPECIAL MASTER RIVERA-SOTO:  You have six

20    representatives.

21          MR. ASSAF:  Six representatives, correct, sorry.

22    Six representatives in this case, and now this is going to

23    become important throughout the day.

24          Two representatives last week we're told have

25    withdrawn for various reasons.  I think this was in the
```

```
1          submissions to the Court.

2                    Two other representatives have been deposed.

3                    One deposition of Ms. Holley, with all due respect,

4          your Honor, I don't think she is going to be adequate or

5          typical based on her deposition testimony.

6                    The other, Wengerd, we are going to talk about

7          later.

8                    So there is one representative left in Ohio, one.

9                    Then there is one left in New York.  New York, now

10         why New York?

11                   This one representative in New York actually has a

12         pending case, so how we started off this presentation, that

13         it was people who had their cases dismissed and are now out

14         of court, this person actually has a pending case in New

15         York.  So I am suggesting respectfully that person is not

16         going to be at least a class representative in terms of

17         typicality or adequacy.

18                   So we are down to one Ohio class representative,

19         and then we get to the question Mr. Placitella has rightly

20         raised, that there are people in Mississippi, hundreds, if

21         not thousands of cases.

22                   I think I would like to leave here today saying:

23         How do I test Hydrogen Peroxide for those Mississippi

24         plaintiffs?

25                   Because I mentioned Castano.  This isn't a case,
```

```
 1    where I am going to be expected just to take the

 2    Mississippi's plaintiffs' word.  This is actually Castano

 3    squared, because what Mr. Placitella's theory is that it's

 4    what defendants told plaintiffs' lawyers, who then told

 5    their clients.

 6            So I don't even know who the plaintiff lawyer is I

 7    am supposed to depose in Mississippi.

 8            Now, if Mr. Placitella at the end of the day -- end

 9    of the day, not really -- but when he files his class motion

10    says, you know what, there is nobody from Mississippi, it is

11    an Ohio class, I have these three people.  It's a much

12    different case.  But if it is Missipi and Illinois and

13    Florida, I have to find out the lawyers who represented

14    them, what they think they heard from BASF and Cahill, and

15    then depose them and find out why these people settled and

16    what the differences are.

17            SPECIAL MASTER RIVERA-SOTO:  But don't most of the

18    concerns you are raising really have to abide the filing of

19    the class certification motions?

20            MR. ASSAF:  Yes, your Honor.

21            SPECIAL MASTER RIVERA-SOTO:  So isn't the important

22    condition precedent to figure out when that is going to

23    happen understanding that Rule 23 says that the class

24    determination is to be made at the earliest practicable

25    time?
```

1              I think that is a correct quote.  So isn't that

2      really what we are talking about?

3              MR. ASSAF:  Your Honor, that is a correct quote,

4      and if I didn't know better, I would think that you were

5      sitting on various judicial conferences where lot of courts

6      have now employed and said 90 days is a good mark.

7              SPECIAL MASTER RIVERA-SOTO:  I don't think 90 days

8      is a good mark for this case, and I think you agree with

9      me --

10             MR. ASSAF:  I agree.

11             SPECIAL MASTER RIVERA-SOTO:  -- because this has

12     arms and legs that a quintessential class action does not

13     normally have.

14             MR. ASSAF:  I agree with that, and I think that was

15     also the other inclination that I put up now, Slide 12,

16     roughly a year ago, your Honor, when we were here.

17             Another judge's inclination was I think similar to

18     yours.  What I am saying in a nutshell -- I'm rambling -- is

19     that we are not going to decide it today, but I do think the

20     defendants' points on getting some more definitive

21     understanding of who the class is going to be and theories

22     under which the class is going to be proposed to the

23     District Court is well taken.  I agree.

24             Then fast forward four months, Mr. Placitella at

25     the February hearing said:  I am mindful of that.

```
 1              And I think we all left there, your Honor, it is
 2     not as clean in the transcript as I would like, but we all
 3     left there with the thought that, okay, the Court was
 4     interested in saying you get some document discovery and
 5     about halfway through the discovery period, you have to put
 6     pen to paper, so that we know what discovery is left.
 7              So, yes, that is my jumping off point today that I
 8     think we need pen to paper as to what is in the class and
 9     what is not the class.
10              Your Honor, I do want to put on the record, and I
11     want to be fair on this issue, and I think this is the
12     purpose those comments you're reading on Rule 23, this isn't
13     a be all end all that he can't file an amended motion.  This
14     is just correct.
15              So I think you actually leave as liberally granted,
16     if he shows you got to come on with these new facts, et
17     cetera, there is intervening case law, et cetera, so I am
18     not trying to box him.  I'm not trying to say got you --
19              SPECIAL MASTER RIVERA-SOTO:  The thought process as
20     far as I am concerned in respective motions for class
21     certification is the rules require that it be done at the
22     earliest practicable moment.  But the operative word there
23     is "practicable," and so as I view it, and this is not your
24     first rodeo either, there is sort of a lifespan to a
25     lawsuit, and when the complaint gets filed, you always end
```

1    up with the broadest definition of a class anyone can

2    imagine, and that is the right thing to do.

3          And then as discovery happens, and facts are

4    ascertained, the class tends to get smaller.  It may be that

5    it stops being a nationwide class as it is alleged in the

6    second amended complaint, and it becomes a much smaller

7    class, or you end up with sub classes.  But that is part of

8    the learning curve of going through a lawsuit.

9          And so at least as far as I am concerned, the

10   discovery that is to be done in this case has to really

11   start focusing on how do you start narrowing that

12   definition, so that when Mr. Placitella files his Rule 23

13   motion, he has got a good sense of what the class should be

14   defined as, and that will allow you then the opportunity to

15   take your shots at it, which I am sure you will --

16          MR. ASSAF:  Right.

17          SPECIAL MASTER RIVERA-SOTO:  -- and it's going to

18   give them and the Court the opportunity to make a

19   determination in respect to that.

20          During the telephone conference, I actually went

21   further than that and said there might be a determination

22   that we are talking about, not just smaller classes, but

23   classes as to liability only and not damages, and that is a

24   judgment that is for plaintiffs' counsel to make, but it is

25   a judgment that has to be informed by discovery, because you

```
 1    have to assume, as I do, that the amount of knowledge
 2    plaintiffs' counsel has at the beginning of the case when
 3    they filed their complaint is a fraction of what they will
 4    have after some discovery has been conducted.
 5              So we are looking for a better informed motion, and
 6    in order to have a better informed motion, we have to have
 7    some discovery, and the discovery part is really why we are
 8    here today.
 9              MR. ASSAF:  Your Honor, yes.  I appreciate your
10    comments, and I tend to think that you actually now put this
11    agenda together with forethought because that leads into the
12    Bevan --
13              SPECIAL MASTER RIVERA-SOTO:  We are following your
14    agenda, so --
15              (Laughter)
16              MR. ASSAF:  -- but the next discussion is Bevan in
17    Ohio --
18              SPECIAL MASTER RIVERA-SOTO:  Before we get to that,
19    okay?
20              MR. ASSAF:  Yes.
21              SPECIAL MASTER RIVERA-SOTO:  Mr. Placitella, would
22    you like to speak?
23              MR. C. PLACITELLA:  Yes.
24              Thank you, your Honor.
25              MR. ASSAF:  Thank you, your Honor, for your time.
```

```
1                  SPECIAL MASTER RIVERA-SOTO:  Sure.

2                  I am here for you guys, so don't thank me for my

3        time.

4                  MR. C. PLACITELLA:  Good morning, your Honor.

5                  SPECIAL MASTER RIVERA-SOTO:  Good morning.

6                  MR. C. PLACITELLA:  So I did listen to Mr. Assaf.

7        I couldn't follow his PowerPoint so well, but we seem to

8        still to have a disconnect on some issues.

9                  SPECIAL MASTER RIVERA-SOTO:  Okay.

10                 MR. C. PLACITELLA:  I think the core question here

11       is:  How broad is the permissible discovery in this issues

12       class action based on a tort of fraudulent concealment.

13       This is not a typical class of plaintiffs, like Vioxx or

14       Fenfen or an MDL.  It is an issue class, where all we claim,

15       all of the plaintiffs or putative plaintiffs were issued in

16       a common way, and the Third Circuit has told us what this

17       case is and what it can't be, right?

18                 The Third Circuit has dictated what we can't do.

19       The Third Circuit, although we tried in the beginning, said

20       under Rooker-Feldman, we cannot litigate the underlying

21       claims.  We can't do that.  We can't prosecute the

22       underlying actions.

23                 Similarly, by the same token, if we can't prosecute

24       the underlying actions, then the defendants don't get a redo

25       of the underlying case either.
```

```
1                SPECIAL MASTER RIVERA-SOTO:  I don't think that
2       that is correct.
3                MR. C. PLACITELLA:  Well, I am going to get to why
4       I say that in a second.
5                SPECIAL MASTER RIVERA-SOTO:  And I say it because I
6       would like you to address that.
7                MR. C. PLACITELLA:  I absolutely will.
8                The issue here ultimately, you know, I didn't
9       just -- I read some of your Honor's opinions on the issue of
10      fraudulent concealment and in the cases you were involved
11      with, and the one issue that -- and --
12               SPECIAL MASTER RIVERA-SOTO:  Pretty much all of
13      them except for Rosenblit, which preceded my --
14               MR. C. PLACITELLA:  Yes, your Honor, but it was
15      cited liberally.
16               (Laughter)
17               So -- and we have five elements we have to prove
18      under fraudulent concealment.  But really the element -- the
19      element we have to wrestle with is the fifth element really,
20      and the fifth element is critical, and the Third Circuit has
21      cited the fifth element.  Judge Linares has cited the fifth
22      element, and it comes down to this:  Did the defendants
23      possess information that either destroyed or withheld that
24      harmed the plaintiffs' case.  That is the fifth element.
25                Now, it is interesting because -- and I actually
```

```
 1      saw last night when I was looking at this for the 50th time,
 2      the wisdom of how that was articulated and actually saw a
 3      little bit of a light in what Judge Linares actually held,
 4      because the fifth element does not really go to reliance on
 5      a misrepresentation, but rather the reliance on the
 6      unavailability of proof.
 7              SPECIAL MASTER RIVERA-SOTO:  Is it that or isn't
 8      that last element just the quintessential tort element of
 9      causation?
10              MR. C. PLACITELLA:  Absolutely, that is absolutely
11      correct.
12              SPECIAL MASTER RIVERA-SOTO:  Because I have to tell
13      you, I look at it from a much more elementary point of view.
14              MR. C. PLACITELLA:  That is absolutely correct.
15              SPECIAL MASTER RIVERA-SOTO:  That is, you are
16      alleging torts, civil torts, and there is something that
17      every civil tort has in common with every other civil tort,
18      and that is you have to have a duty, a breach of duty,
19      causation and damages --
20              MR. C. PLACITELLA:  Absolutely correct.
21              SPECIAL MASTER RIVERA-SOTO:  -- and don't you bear
22      the burden as the plaintiff of proving that there is a
23      causal link?  And I am just taking the allegations in the
24      complaint as being true, so nobody on the defense side
25      should have a heart attack at this point.
```

```
1                The false representations made to the plaintiffs,

2       however many there may be, actually caused them injury, and

3       isn't that right there, where the gravamen of the

4       defendants' argument is?

5                    MR. C. PLACITELLA:  Yes and no.  If you look --

6                    SPECIAL MASTER RIVERA-SOTO:  Well, the yes, I

7       understand, but I don't understand the no.

8                    (Laughter)

9                    MR. C. PLACITELLA:  It is partially correct.  It's

10      partially correct.

11               Under the Third Circuit ruling after they go

12      through the elements, and they say that the last element,

13      the plaintiff was damaged in the underlying action by having

14      to rely on the evidential record that did not contain the

15      evidence defendants concealed.

16               It goes on to say:  The tort - and I didn't

17      actually get this, and I am going to go to Judge Linares in

18      a second - the tort does not require reliance on the

19      adversary's representations, indeed a lawyer or litigant who

20      destroys or conceals evidence may be liable even if he or

21      she makes no representations to his or her adversaries at

22      all --

23                   SPECIAL MASTER RIVERA-SOTO:  Can I stop you there

24      for one second?

25                   MR. C. PLACITELLA:  Yes.
```

```
1                    SPECIAL MASTER RIVERA-SOTO:  Because this is one of
2         the ironies I need you to reconcile for me.
3                    You are talking about the tort of fraudulent
4         concealment --
5                    MR. C. PLACITELLA:  Yes, your Honor.
6                    SPECIAL MASTER RIVERA-SOTO:  -- which is what us
7         old dogs call spoliation.
8                    MR. C. PLACITELLA:  Yes, your Honor.
9                    SPECIAL MASTER RIVERA-SOTO:  But you also alleged
10        fraud.
11                   MR. C. PLACITELLA:  Yes.
12                   SPECIAL MASTER RIVERA-SOTO:  And reliance is an
13        element of fraud --
14                   MR. C. PLACITELLA:  Absolutely.  There are two
15        different issues --
16                   SPECIAL MASTER RIVERA-SOTO:  Two different causes
17        of action.
18                   MR. C. PLACITELLA:  -- absolutely, and they may
19        require a different treatment in a class certification
20        process.
21                   SPECIAL MASTER RIVERA-SOTO:  That may very well be,
22        but what I am concerned about right now, which is I thought
23        where you were going, is how do we handle the discovery,
24        because you may very well have, if your theory is correct,
25        you may very well have documents and the like that are not
```

```
1    relevant to your fraudulent concealment claim, but are very

2    relevant in respect of your fraud claim, and how do you

3    slice that baby in half?

4         I don't know how you do that.

5         MR. C. PLACITELLA:  They do overlap because there

6    are common elements to both torts.

7         Under fraudulent concealment, I get through

8    elements one through five pretty easily on a global basis, I

9    submit.  It becomes a little bit different in a fraud case

10   because reliance actually matters in that case, okay?

11        SPECIAL MASTER RIVERA-SOTO:   It has to be

12   reasonable reliance.

13        MR. C. PLACITELLA:  Absolutely, and I agree with

14   that.

15        SPECIAL MASTER RIVERA-SOTO:  So --

16        MR. C. PLACITELLA:  Then the issue becomes in the

17   context of when we get to class cert, how that all gets

18   ferreted out and what kind of classes.  You may have a class

19   defined in fraudulent concealment that's different than a

20   class defined in fraud based on the elements.

21        SPECIAL MASTER RIVERA-SOTO:  And now you're

22   dovetailing right into what Mr. Assaf was saying, because

23   then the question becomes:  If we are going to have

24   something, other than what you alleged as the class in your

25   complaint, shouldn't we know that sooner rather than later,
```

```
 1        so that we can tailor the discovery accordingly?
 2                MR. C. PLACITELLA:  I think, your Honor, absolutely
 3        we should do it as soon as we can, but we still need some
 4        discovery to get there.
 5                SPECIAL MASTER RIVERA-SOTO:  Okay, and that's fair.
 6                MR. C. PLACITELLA:  Okay?
 7                So if they made the same exact, which I think they
 8        did, the same exact representation to everybody, we are
 9        entitled to all of that.
10                If there is information that they are withholding,
11        that goes to these issues, we are entitled to that, and you
12        are going to have to weigh in on that.
13                We know, we know, it's undisputed, that they kept a
14        scorecard of who was dismissed and the reasons why.  We are
15        entitled to that scorecard.  That may cut through a lot of
16        what we have to do.
17                If they actually kept a scorecard of every case and
18        internally said, dismissed for product I.D. versus dismissed
19        because there was no asbestos, and they have that, and we
20        know it.
21                SPECIAL MASTER RIVERA-SOTO:  Well, Mr. Placitella,
22        help me out, because this is part of what I read --
23                MR. C. PLACITELLA:  Yes, your Honor.
24                SPECIAL MASTER RIVERA-SOTO:  -- and I don't recall
25        seeing the word "scorecard" in any of this, so please help
```

1    me.

2         MR. C. PLACITELLA:  Okay.  This is just to give you

3    an example.

4         SPECIAL MASTER RIVERA-SOTO:  Thank you.

5         SPECIAL MASTER RIVERA-SOTO:  For the record, I have

6    been handed a letter, dated November 12th, 2008, to John

7    Mismas, M-i-s-m-a-s, of Bevan & Associates from a Jennifer

8    Reister.  It looks like the electronic version of a letter

9    that was printed on letterhead, but it doesn't tell me what

10   the letterhead is.  That's okay.

11        MR. C. PLACITELLA:  This is how it was produced to

12   us.

13        SPECIAL MASTER RIVERA-SOTO:  Okay.

14        MR. C. PLACITELLA:  So if you look at the second

15   page, your Honor, the second -- the bottom paragraph, second

16   to the bottom paragraph --

17        SPECIAL MASTER RIVERA-SOTO:  The one starting with

18   "Engelhard"?

19        MR. C. PLACITELLA:  "Engelhard."

20        You see that there are actually representations

21   made by an officer of the court in an attempt to secure a

22   dismissal about the number of cases that were dismissed in

23   each jurisdiction on the exact same representations that are

24   being made here, so somebody back at Cahill or Engelhard --

25        SPECIAL MASTER RIVERA-SOTO:  Actually it looks like

```
1       Ms. Reister, R-e-i-s-t-e-r, is at the law firm of West &
2   Herd.
3               MR. C. PLACITELLA:  Right.  She is the local
4   counsel in Ohio.
5               So we know that they were keeping a scorecard of
6   why cases were dismissed by state, and in fact --
7               SPECIAL MASTER RIVERA-SOTO:  Was this letter in any
8   of the materials?
9               MR. C. PLACITELLA:  I believe it was, your Honor.
10              MR. COREN:  Your Honor, I understand it's Exhibit
11  36 to the second amended complaint.
12              SPECIAL MASTER RIVERA-SOTO:  To the second amended
13  complaint?
14              MR. COREN:  Yes, your Honor.
15              MR. ASSAF:  I don't want to interrupt, but just for
16  the record, is there anything, though, in the briefs, so
17  that I could pull out --
18              SPECIAL MASTER RIVERA-SOTO:  That is what I was
19  sort of looking for it.
20              MR. ASSAF:  -- that is what I was asking.
21              SPECIAL MASTER RIVERA-SOTO:  That is okay.  As long
22  as we know it is somewhere in the record.
23              MR. C. PLACITELLA:  So my only point is that we
24  need discovery because if they in fact have a scorecard for
25  every state and every case, that cuts through --
```

```
1              SPECIAL MASTER RIVERA-SOTO:  Mr. Placitella, let me

2      tell you, you are going to get discovery, and the defendants

3      are going to get discovery.  It is really the scope of the

4      discovery that we are talking about --

5              MR. C. PLACITELLA:  Absolutely.

6              SPECIAL MASTER RIVERA-SOTO:  -- and in respect of

7      that, the big issue, it seems to me, that we kind of danced

8      around this morning is the privilege issue, and you have

9      privilege claims.  They have privilege claims.

10             You have arguments why their privilege claims don't

11     apply.  They have arguments why your privilege claims don't

12     apply.

13             Some of those, in fact, in my view, all of them

14     have on a global basis been already determined by Chief

15     Judge Linares, and it is my job to then take the

16     instructions we have all been given by Chief Judge Linares

17     and apply it to the nitty gritty of this case, and in that I

18     am going to need everyone's help.

19             I have got some ideas, but we are going to talk

20     about that in the scheduling conference at the end of today,

21     but we have now been at this for almost 40 minutes, and we

22     still haven't gotten to the first motion, not that I am

23     rushing you.  Take your time.

24             MR. C. PLACITELLA:  I just want to end with what I

25     thought was the essence, and it goes right to your question,
```

```
 1        the essence of Judge Linares' decision on scope, and I will

 2        sit and answer other questions later.

 3                First, on the issue of reliance, you know, he

 4        states:  First, plaintiffs' focus on reliance -- this is

 5        where he is telling me I am wrong, and I think he is correct

 6        by the way -- ignores that causation, something that you are

 7        talking about --

 8                SPECIAL MASTER RIVERA-SOTO:  It is always good to

 9        agree that the Judge is right and you are wrong.

10                MR. C. PLACITELLA:  -- and element of every tort

11        still creates an issue of discovery.  Defendants are

12        entitled to explore in discovery linked by causation between

13        defendants' conduct and plaintiffs' damages.

14                SPECIAL MASTER RIVERA-SOTO:  That is on Page 17 of

15        his opinion --

16                MR. C. PLACITELLA:  Yes.

17                SPECIAL MASTER RIVERA-SOTO:  -- and it happens to

18        be the highlighted page that I have open.

19                MR. C. PLACITELLA:  Yes.

20                The analysis of the Court of Appeals clearly

21        acknowledges the need for discovery and to how the

22        defendants in light of this conduct in the underlying

23        cases -- I think that is what you are focusing on.

24                And here is the issue:  Answering that question,

25        and I am going to go right to the heart of his decision I
```

1          believe.

2                    Did the withholding or destruction of evidence harm

3          the plaintiffs' case?

4                    That is your Honor's decision.   That is Rosenblit,

5          and that's the Third Circuit.

6                    If you go to Judge Linares' decision, and you

7          probably know the exact page, he said:   The scope of

8          discovery will focus on the alleged wrongful conduct --

9                    SPECIAL MASTER RIVERA-SOTO:   That is the bottom

10         paragraph on Page 19.

11                   (Laughter)

12                   MR. C. PLACITELLA:   -- and any alleged harm

13         following from that conduct, okay?

14                   So did the destruction or withholding of

15         evidence --

16                   SPECIAL MASTER RIVERA-SOTO:   Read the last

17         sentence.

18                   MR. C. PLACITELLA:   I am going right to the last

19         sentence.

20                   He says in the last sentence:   The scope of

21         discovery may include inquiry as to why the plaintiffs

22         settled or dismissed their underlying claims.   To fully

23         explore this issue, defendants will be entitled to discover

24         what plaintiffs and their counsel knew, were told, and

25         whether any knowledge or lack thereof contributed to their

1      decisions.

2              So I actually think we --

3              SPECIAL MASTER RIVERA-SOTO:   Decisions on resolving

4      the underlying case.

5              MR. C. PLACITELLA:   Absolutely.

6              SPECIAL MASTER RIVERA-SOTO:   Okay.

7              So we have now been told by Chief Judge Linares

8      that this is the scope of discovery in respect of

9      defendants' request of plaintiffs for what is, for lack of a

10     better word, privileged material.

11             And the conclusion that Judge Linares reached,

12     Chief Judge Linares reached is that because of the way the

13     matter has been pled, those issues have been put directly at

14     issue, and therefore the privilege does not apply.

15             Now, that is the overarching conclusion that he

16     reached.   In respect of each individual one, he has charged

17     me with the obligation of taking that overarching conclusion

18     and applying it to the specifics --

19             MR. C. PLACITELLA:   Absolutely.

20             SPECIAL MASTER RIVERA-SOTO:   -- which means we are

21     going to have to work out a system to do that, because if

22     you are talking about 10,000 plaintiffs, I know you don't

23     propose that I look at 10,000 different files.   That is

24     something that you folks need to work out among yourselves

25     first.

```
 1                  But isn't that really sort of the direction that we
 2       have to be going in?
 3                  MR. C. PLACITELLA:  I would say no for the
 4       following reason.  The issue is on an individual file, what
 5       did the plaintiffs' counsel know.
 6                  I believe in an individual case, so, for example,
 7       and Mr. Assaf may be shocked to think that I actually might
 8       agree with him, although he has a hard time getting there,
 9       that is --
10                  SPECIAL MASTER RIVERA-SOTO:  I expect you agree on
11       a lot more than you are willing to agree on.
12                  (Laughter)
13                  MR. C. PLACITELLA:  That may be right.
14                  SPECIAL MASTER RIVERA-SOTO:  And if you understood
15       that, that is great, because I didn't.
16                  (Laughter)
17                  MR. C. PLACITELLA:  So I think that they are
18       entitled to ask Mr. Bevan:  What did you know?
19                  What went into your decision in Ms. Williams' case?
20                  What communications did you have with Ms. Williams,
21       if you can recall them?
22                  I think under Judge Linares' decision that is fair.
23                  SPECIAL MASTER RIVERA-SOTO:  Aren't they also able
24       to ask:  Are there any documents that reflect any of the
25       foregoing?
```

```
 1              MR. C. PLACITELLA:  Absolutely.

 2              SPECIAL MASTER RIVERA-SOTO:  Have you produced

 3     those documents for us?

 4              MR. C. PLACITELLA:  Absolutely, absolutely.  We are

 5     on the same page.

 6              SPECIAL MASTER RIVERA-SOTO:  Okay.

 7              MR. C. PLACITELLA:  Where we differ is --

 8              SPECIAL MASTER RIVERA-SOTO:  You now made Mr. Assaf

 9     a little bit happy.

10              MR. C. PLACITELLA:  Right.

11              Where we differ significantly, and I actually think

12     this is part of the whole class issue, is where do the

13     absent class members discovery come in.

14              I know we're going to address that.  From our

15     perspective, just as an overview, we are not there yet

16     because until people know that they're members of the class,

17     until they are notified, and they make decisions about

18     whether they want to participate or get out, going through

19     their files which are privileged, we are not there yet.

20     That I think has to await class certification to see where

21     we come out on the other side of that, and I am happy to

22     address the issue when you're ready about absent class

23     member discovery.  A lot of people have a lot of things to

24     say about that.

25              But I respectfully submit to you that the first
```

```
 1        part of discovery in this case does not get there, because
 2        we have to focus.  This is a common issues class.  The
 3        common issues, I don't think there is -- you know, we'll
 4        talk about certification another day, but --
 5                SPECIAL MASTER RIVERA-SOTO:  No.  We are going to
 6        talk about certification today.
 7                MR. C. PLACITELLA:  -- but you are right to raise
 8        these issues, but how they come up in discovery really comes
 9        down to how the class is ultimately structured.
10                You raised the issue, is it an issues class.
11                Maybe,
12                Is it a -- are there common damages to everybody on
13        fraudulent concealment only?
14                I would say yes.
15                Are there common damages on fraud?
16                That is a little more dicey question, so, you know,
17        these issues about where we are going on reliance really
18        have to be flushed out in the process.
19                SPECIAL MASTER RIVERA-SOTO:  Well, but the process
20        doesn't start until you file your class certification.
21                MR. C. PLACITELLA:  That is correct.
22                SPECIAL MASTER RIVERA-SOTO:  So we are going to
23        talk about when that is going to happen.
24                MR. C. PLACITELLA:  As soon as I get the discovery
25        that I need, I am ready to go.
```

```
 1                SPECIAL MASTER RIVERA-SOTO:  I don't know.  What
 2        does that mean?
 3                I don't know what that means, "the discovery that I
 4        need." What does that mean?
 5                MR. C. PLACITELLA:  There is some basic discovery
 6        for class certification only that I believe that we would
 7        request --
 8                SPECIAL MASTER RIVERA-SOTO:  Can I ask that
 9        question a little bit differently?
10                MR. C. PLACITELLA:  Sure.
11                SPECIAL MASTER RIVERA-SOTO:  The motions that you
12        have filed that are returnable today, do they address the
13        waterfront of the discovery that you think you need in order
14        to file your class cert motion?
15                MR. C. PLACITELLA:  I don't believe so, your Honor,
16        not in its entirety.  I think our proposed plan addresses
17        some of that, but I do not believe that we have gotten into
18        what exactly we need.
19                SPECIAL MASTER RIVERA-SOTO:  I have your proposed
20        plan here.
21                MR. C. PLACITELLA:  Yes.
22                SPECIAL MASTER RIVERA-SOTO:  And I don't remember
23        clearly, but I do not recall that those issues were
24        addressed with the kind of clarity that we are putting on
25        them today.
```

```
1              MR. C. PLACITELLA:  I am happy to have that

2        discussion and flush those things out.

3              SPECIAL MASTER RIVERA-SOTO:  All right.

4              Is there anything else that you would like to add

5        with respect to this?

6              MR. C. PLACITELL:  Just to summarize.

7              Under the fraudulent concealment claim, element

8        number five is about causation.  It's not about reliance.

9        It is about whether there was evidence that was destroyed or

10       withheld that hurt the plaintiffs' case.

11             Different on the fraud count.  Fraud, to get to the

12       end of fraud, I have to demonstrate reasonable reliance --

13             SPECIAL MASTER RIVERA-SOTO:  And causation.

14             MR. C. PLACITELLA:  -- and causation.  I understand

15       that.  So they are distinguished, and in approaching this,

16       that is the distinction that I raise for your Honor.

17             SPECIAL MASTER RIVERA-SOTO:  Okay.

18             Now, I want you and Mr. Assaf to take two minutes

19       and answer the very first question, which is:  Is there

20       anything left in the motion that is docketed under ECF 228

21       that I need to decide, because the sense that I have is no,

22       which will make denying the motion as moot really easy, and

23       hopefully I telegraph where I would like to go.

24             So take a moment and talk to Mr. Assaf, who is

25       already smiling.
```

```
 1                    MR. ASSAF:  Going out a limb, your Honor, I agree
 2          with you.
 3                    MR. C. PLACITELLA:  That you are smiling?
 4                    Sometimes it's hard to tell.
 5                    (Laughter)
 6                    I don't really see it on this issue.
 7                    SPECIAL MASTER RIVERA-SOTO:  On anything that has
 8          been raised under Docket ECF 228 with the response of 230,
 9          is there anything there that you don't think we are going to
10          address, that is, anything there that is not already moot or
11          that you don't think we are going to address later on in the
12          scheduling conference?
13                    MR. C. PLACITELLA:  No.  I think everything has
14          either been decided or is on the table.
15                    SPECIAL MASTER RIVERA-SOTO:   It has either been
16          decided or it will be addressed?
17                    MR. C. PLACITELLA:  Correct.
18                    SPECIAL MASTER RIVERA-SOTO:  Okay.  So just for the
19          record, and by the way, for those of you unfamiliar with
20          Jersey practice, there will be an order following this.  The
21          statement of reasons is what I'm going with --
22                    MR. C. PLACITELLA:  I think I just have to put the
23          time and the date for Mr. Assaf and I agreeing.
24                    SPECIAL MASTER RIVERA-SOTO:  It is going to have a
25          really big red mark on it on the record.
```

```
 1                   It is hopefully like the last scene in Casablanca,
 2        the beginning of a beautiful relationship.
 3                   (Laughter)
 4                   So the motion that was filed by BASF under ECF 228
 5        and responded to by plaintiffs under ECF 230 is denied as
 6        moot, and an appropriate order will follow.
 7                   All right.  Moving right along, we get to agenda
 8        item two.  This deals with subpoenas duces tecum to third
 9        parties.  There are actually three separate third parties,
10        and I have a sneaking suspicion that there are people out
11        there in respect of each one of those subpoenas, so I think
12        it is better if we handle them separately understanding that
13        there is a fairly significant amount of overlap among them.
14        Okay?  So let's start with --
15                   MR. ASSAF:  Your Honor, may I take one minute for a
16        housekeeping issue with Mr. Placitella?
17                   SPECIAL MASTER RIVERA-SOTO:  Absolutely.
18                   (Counsel confer)
19                   MR. ASSAF:  May we go off the record for a minute?
20                   SPECIAL MASTER RIVERA-SOTO:  Absolutely, please.
21                   (Discussion held off the record)
22                   SPECIAL MASTER RIVERA-SOTO:  Can we go back on the
23        record?
24                   All right.  Back on the record.
25                   The next motion is a motion that actually saw its
```

1    genesis in the Northern District of Ohio, where it was

2    docketed as ECF Number 1 in the Ohio docket, which is BASF's

3    motion to enforce a subpoena duces tecum to Thomas Bevan and

4    Bevan & Associates.   That's B-e-v-a-n.

5         An opposition was filed by plaintiffs in the

6    District of Ohio under their Docket ECF 009.

7         The matter was then transferred to this Court and

8    under Docket Number ECF 279, Mr. Bevan on his behalf and on

9    behalf of his law firm filed a response to the motion to

10   enforce, and under ECF 295, BASF filed its consolidated

11   reply.

12        Specifically, what the motion alleges is that

13   Thomas Bevan and Bevan & Associates, and I am going to refer

14   to them collectively as Bevan, represented five out of the

15   six named plaintiffs in the case.

16        The motion sought through a subpoena duces tecum

17   documents in Bevan's files concerning litigations against

18   Engelhard and the resolution of the underlying asbestos

19   claims by the named Ohio plaintiffs' decedents.

20        It is argued by BASF that these documents are

21   relevant, that any assertion of privilege has been waived,

22   and that it does not create an undue burden on the third

23   party to produce these documents.

24        In opposition, again, that is Docket Number 9 in

25   the Northern District of Ohio case, the plaintiffs state

1        that the request falls outside of the boundaries of

2        permitted discovery, that it poses an undue burden on Bevan,

3        that it is an improper attempt to get discovery from absent

4        class members, and that in order to grant the relief

5        requested, the defendants must show -- I should say the BASF

6        defendants must show that there is a compelling need that

7        there are reasons for the request, and that appropriate

8        procedural protections have been put in place.

9               I will note that in respect to this application,

10       the Cahill defendants did not join in it.

11              Now, in respect of that opposition, the plaintiffs

12       argue relevance.  They say no showing of particularized

13       need, that in order to determine waiver, you have to apply

14       the In re Kozlov test of their need -- a showing of

15       legitimate need, relevance and materiality, and it cannot

16       be -- that it is unable to be secured from a less intrusive

17       source.

18              The argument in respect to burden is that they

19       point out that apparently Bevan had approximately 3000

20       files, where they represented plaintiffs, and therefore it

21       would require that the Bevan firm search 3000 files in order

22       to respond to the subpoena duces tecum.

23              Bevan filed its response under ECF 279, saying that

24       the subpoena seeks privilege and confidential documents that

25       are outside of the scope of discovery, and that compliance

```
 1    with the subpoena would put an undue burden on the Bevan

 2    firm.  They propose that BASF pay for the costs of

 3    production.  They have some estimates.  Let's leave it at

 4    that.  They have some estimates as to what that entailed.

 5         BASF filed a reply, again at ECF 295, saying that

 6    the documents are relevant.  There is no undue burden, and

 7    specifically that all they are asking for is documents.

 8    They are not seeking any deposition or testimony at this

 9    point.

10         Mr. Assaf, your application.

11         MR. ASSAF:  Mr. Farrell is going to argue this one,

12    your Honor.

13         SPECIAL MASTER RIVERA-SOTO:  Mr. Farrell, come on

14    up.

15         MR. FARRELL:  Thank you, your Honor.

16         MR. BLATT:  Your Honor, may I note one thing in the

17    interim just as a correction?

18         THE REPORTER:  Could you state your name on the

19    record?

20         MR. BLATT:  David Blatt on behalf of the Cahill

21    defendants.

22         In our April 14th scope of discovery brief, ECF

23    Number 291-1, we did actually on Page 26 devote a section

24    to -- in support of the BASF application seeking discovery

25    from the three third-party law firms.
```

```
 1                    SPECIAL MASTER RIVERA-SOTO:  291?

 2                    MR. BLATT:  291-1.

 3                    SPECIAL MASTER RIVERA-SOTO:  I don't have that at

 4          all.

 5                    MR. BLATT:  Because those briefs, which were filed

 6          by Mr. Placitella and also by BASF, were actually the ones

 7          that were decided by Chief Judge Linares, so they are not

 8          one of the pending motions, but we did actually -- I just

 9          wanted to make sure on the record that --

10                    SPECIAL MASTER RIVERA-SOTO:  So you are now

11          unjoining your non joinder anyway?

12                    (Laughter)

13                    MR. BLATT:  We are simply saying that we support

14          the application.

15                    SPECIAL MASTER RIVERA-SOTO:  Okay.  Thank you.

16                    Well, are you joining in the application or just

17          supporting it?

18                    MR. BLATT:  We support it, and I am happy to join

19          as well.

20                    SPECIAL MASTER RIVERA-SOTO:  Okay.

21                    Go ahead.

22                    MR. FARRELL:  Peter Farrell.

23                    SPECIAL MASTER RIVERA-SOTO:  Just as a preclude,

24          there are couple of other spots where it is noted that you

25          joined, but the Cahill defendants filed a separate filing,
```

```
1     ECF 266, that listed five different items that you joined.

2     Some of them don't match to what you are being said to have

3     joined, but we will jump off that bridge when we get to it,

4     okay?

5                 MR. BLATT:  Thank you, your Honor.

6                 SPECIAL MASTER RIVERA-SOTO:  Mr. Farrell, with all

7     of that introduction.

8                 MR. FARRELL:  Thank you, your Honor.

9                 For the record, Peter Farrell on behalf of BASF.

10                I'm mindful of your Honor's comments not to repeat

11    our briefs, and I don't intend to do that, but I do think

12    there have been significant developments since the briefing

13    was submitted that merit discussion and highlighting today.

14                I think probably the most significant one to start

15    with is point one on the slide that I have up, which is that

16    the primary argument that was raised by all three of the law

17    firms has been rejected by the Court in Chief Judge Linares'

18    August 3rd opinion.

19                I also want to talk about the undue burden issue

20    that your Honor had raised, not to simply state what is

21    already in the briefs, but to note that since we received

22    Chief Judge Linares' opinion, we again reached out to all

23    three law firms in an effort to see if there were any

24    remaining issues, and we made progress on this.  And, again,

25    no specific details were cited in terms of the undue burden
```

```
1     objection.   It was simply reasserted again, and in fact, the
2     firms have declined to participate in the meet and confer
3     process that all of the parties were engaged in, so that we
4     could come here and talk to your Honor about the discovery
5     schedule.
6            So I still think we are left at a point where there
7     isn't actually any substantiation for that argument, and we
8     are left basically just with the conclusory claim that it
9     would be burdensome to comply, but without anything that
10    really supports it.
11           The third point that I want to make is that it
12    underscores I think the points that both Mr. Assaf and Mr.
13    Placitella made this morning about the class issues that we
14    have to deal with, because I think that the arguments raised
15    by all three firms, including the Bevan firm, underscore the
16    problems that class certification would have here.
17           I think Mr. Placitella called this not a typical
18    class case, and I agree with him, and I think that these
19    three motions illustrate several of the ways or the many
20    ways that it's not typical, including the problems that we
21    would have actually trying to identify the supposed class
22    members in this case in light of the arguments that the
23    three law firms are raising.
24           So on the first point, all three --
25           SPECIAL MASTER RIVERA-SOTO:  You can skip that
```

1      point.

2              MR. FARRELL:  -- all three points firms have raised

3      the scope of discovery issues.  The reason I wanted to call

4      it to your Honor's attention is the Bevan's firm's point

5      that they had raised simply the common sense proposal that

6      we wait for the guidance, and that would resolve the

7      subpoenas.

8              They have since I think changed their minds on that

9      and are taking a simple tact as plaintiffs' counsel, which

10     is to say, well, there are still open questions about the

11     scope of discovery.  Chief Judge Linares really didn't tell

12     us what we need to know.

13             I don't agree with that, as you might imagine.  It

14     sounds like your Honor doesn't agree with it either, but I

15     think the key line for purposes of the three subpoenas I did

16     want to call to your Honor's attention to from the August

17     3rd opinion is this sentence from Page 19 of the opinion

18     that points out that the defendants are entitled to

19     discovery, not just of the plaintiffs' knowledge, but of

20     their counsel's knowledge, given the central role that

21     counsel play in this case by the nature of the claims.

22             That supports why we served these subpoenas on

23     these three law firms because of the central role that all

24     three of them have in the case.

25             Bevan and Early obviously as being the former

```
1      counsel for the six class representatives, but the
2      Rothenberg firm as well since they were --
3                SPECIAL MASTER RIVERA-SOTO:  Let's get to
4      Rothenberg when we get to Rothenberg --
5                MR. FARRELL:  Understood, your Honor.
6                SPECIAL MASTER RIVERA-SOTO:  -- because I don't see
7      on the sign-in sheet anyone on behalf of either Bevan or
8      Early, but there is somebody here on behalf of Rothenberg.
9                MR. LITTLE:  Yes, sir.  The sign-in sheet right
10     here for Rothenberg.
11               THE REPORTER:  I'm sorry.  What is your name?
12               MR. LITTLE:  Brendan Little from Levy Konigsberg,
13     L-i-t-t-l-e.
14               SPECIAL MASTER RIVERA-SOTO:  Mr. Little, would you
15     sign this?
16               MR. LITTLE:  Yes.
17               SPECIAL MASTER RIVERA-SOTO:  Just so that I'm
18     clear, Mr. Little, you are here for both Bevan and Early?
19               MR. LITTLE:  Yes, that is correct.
20               SPECIAL MASTER RIVERA-SOTO:  I'm sorry.  Mr.
21     Farrell, go ahead.
22               MR. FARRELL:  Thank you, your Honor.
23               So that takes me I think to point two because the
24     primary argument raised has already been rejected, and I
25     assume we will discuss it in greater detail when we talk
```

```
1           about the scheduling of the case.
2                   The rest of their arguments are simply the undue
3           burden arguments that they've made, and I think there are
4           two points that I want to emphasize there.
5                   The first is the critical and unique nature of the
6           information that these firms have, especially in light of
7           Chief Judge Linares' opinion and the fact that there isn't
8           actually any support for the undue burden arguments that
9           have been made.
10                  I wanted to point out, again, these are not people
11          that we picked -- that the defendants picked at random.
12          They are law firms that the plaintiffs put at issue in their
13          complaint, and I wanted to emphasize, and I thought it was
14          worth noting that plaintiffs' initial disclosures, in fact,
15          identify all three firms, the very first witness the
16          plaintiffs identified under their Rule 26A disclosures,
17          where they state that the following individuals are likely
18          to have discoverable information, so people who have
19          discoverable information, the first name listed is Tom
20          Bevan of the Bevan Law Firm.
21                  And so when the defendants said, well, we would now
22          like that discoverable information, we are told, no, it is
23          off limits to you, both because of their discovery
24          objections, but also the undue burden point.
25                  SPECIAL MASTER RIVERA-SOTO:  So let's talk about
```

1     undue burden.

2           MR. FARRELL:  We also know that there are 3,000

3     cases that the law firms have alluded to, and I think the

4     reason --

5           SPECIAL MASTER RIVERA-SOTO:  I am sorry, but I am

6     trying very hard to distinguish between Bevan, Early and

7     Rothenberg.  And when you talk about 3,000 cases, that is

8     the Early firm, is it not?

9           MR. FARRELL:  That is the Bevan firm, your Honor.

10          SPECIAL MASTER RIVERA-SOTO:  The Bevan firm.

11          And how many did the Early firm have?

12          MR. FARRELL:  Four cases according to their papers.

13          SPECIAL MASTER RIVERA-SOTO:  And Rothenberg had

14    1800?

15          MR. FARRELL:  According to their papers, yes.  I

16    think that is an issue we should discuss as well, because

17    there is some disconnect between the law firm's numbers and

18    what our records have reflected so far.

19          But let me focus on the Bevan point because I think

20    it is an important one, and it illustrates a number of the

21    issues here.

22          Again, this goes to the point of undue burden is

23    not something that can be evaluated in a vacuum.  The

24    question is:  Well, how important is the information you are

25    seeking, and do we actually really need it under Chief Judge

1    Linares' opinion and the claims and allegations in the

2    complaint.

3         And I think that we certainly do.  The way I wanted

4    to try to illustrate this is just by taking two of the class

5    representatives, both of whom are represented -- were

6    represented by Mr. Bevan.

7         One of them is Williams, who filed a case in 1993

8    and voluntarily dismissed it, and the other is Mrs. Graham

9    who is now represented by the plaintiff Wengerd in this

10   case, whose claim came 15 years later, so there is a 15-year

11   gap between the two individuals.

12        We know from Chief Judge Linares, we are entitled

13   to discovery of what the plaintiffs' lawyers knew about

14   these claim and why they pursued them, and so we naturally

15   asked the question:  Well, what happened in the intervening

16   15 years?

17        How can it be that Tom Bevan, according to

18   plaintiffs' allegations, believed and were convinced in 1993

19   that there was no asbestos in the talc, but then continued

20   filing, according to Mr. Bevan, thousands of additional

21   asbestos cases, including the Graham case 15 years later,

22   and then not only did not voluntarily dismiss it, but

23   pursued it all the way through summary judgment, and so we

24   sought that discovery from the law firms.

25        It also raises the point of why we had to do that,

```
 1      and Mr. Placitella alluded to this in his remarks earlier
 2      today, which is to say, he said -- and I wrote this down --
 3      that he checked the individual files of the six class
 4      representatives, and I think that point bears emphasis,
 5      because when we met and conferred with plaintiffs' counsel
 6      about our discovery requests in this case, he was very clear
 7      in saying, he went to, for the Bevan plaintiffs, the five
 8      Bevan plaintiffs, the individual files for the five named
 9      people, and if there was any other information that might be
10      relevant to the claims and defenses in this case, he didn't
11      even look for it.  Those files were not searched.  They were
12      not checked.  They went to the Williams' file, the Darnell
13      file and so on for five people, and everything else is just
14      left to the side.
15              That is why we had to serve the subpoenas that we
16      did and why to now hear that it would be burdensome to
17      comply is really something that we really have to question.
18              The plaintiffs put the firms at issue, and then
19      they are saying, Well, we don't have the documents.  You
20      need to go ask the law firms.
21              So then we went and we asked the law firms, and the
22      law firms are now telling us:  It is burdensome to comply,
23      and most recently they were telling us:  Well, you need to
24      talk to Mr. Placitella.  He calls the shots on all the
25      document issues in the case, and whatever the Court and the
```

1    plaintiffs in this case decide to do, we will comply with

2    that.

3          So the defendants are left in the position of

4    saying:  We don't know who has the documents.  We don't know

5    what the documents are.  Nobody has identified a privilege

6    log.  Nobody has told us how many documents there are, what

7    they address, what they cover.

8          We are in the dark on all of these issues because

9    of this game of Whack A Mole that's going on between

10   plaintiffs' counsel and the counsel for the law firms.

11         SPECIAL MASTER RIVERA-SOTO:  And as a result, you

12   cannot address in an informed way whether there would be an

13   undue burden or not?

14         MR. FARRELL:  That is exactly correct, your Honor.

15         And if there truly were some unique burden, we

16   would be happy to discuss that with the firms, but we have

17   not been given any of the details that would substantiate

18   those claims.

19         The other point I wanted to raise, because it came

20   up, is this absent class member argument that has been

21   raised, and to be clear, none of the subpoenas were directed

22   to absent class members.  They were directed to the law

23   firms, who are frankly interested parties in this case,

24   given the nature of their relationships with the plaintiffs

25   and the fact that they were put at issue in the initial

```
 1        disclosures, so on and so forth.  We wanted to cite and call
 2        your Honor's attention to the Fashiola case that is cited in
 3        our papers because it recognized this exact point.
 4              It may well be that these third parties have
 5        information that pertains to absent class members, but that
 6        is a different thing than actually seeking discovery from
 7        the absent class members.  No person sitting at home in Ohio
 8        has received a subpoena from BASF.  We sent them to the law
 9        firms that were involved in the case.
10              I also wanted to note plaintiffs' own discovery
11        plan, because I think it makes the point we are trying to
12        make for us.  They have served subpoenas on BASF's former
13        lawyers, and not just any lawyers, but the lawyers who were
14        opposed to Mr. Bevan, Mr. Early and Mr. Rothenberg, and we
15        see that in their discovery plan.
16              Victorian Komarnicki, who we discussed this
17        morning, was in the Rothenberg cases and so on, and in fact
18        the letter that Mr. Placitella handed you this morning, the
19        November 12, 2008 letter from Jennifer Reister, your Honor
20        may have noted that it was addressed to the Bevan law firm,
21        and Mr. Mismas at the Bevan law firm.
22              So we don't understand how it can be that
23        plaintiffs are saying, they can serve subpoenas on third
24        party former law firms involved in these litigation matters,
25        and that is perfectly appropriate.  It is not an undue
```

1    burden in their view.  It is relevant in their view, and

2    it's not absent class member discovery in their view.

3         But when the defendants served subpoenas on

4    plaintiffs' lawyers, who sat across the table from them in

5    those cases, and in fact, had the more critical information,

6    given the focus that we all need to have on reliance,

7    causation, so on and so forth, the plaintiffs and the

8    lawyers say:  It is not relevant.  It is abusive.  It is an

9    undue burden, and it's absent class member discovery.

10        I just don't see how they can have it both ways on

11   that issue.  The plaintiffs have already deposed Victoria

12   Komarnicki.  And at the time, we even said to Mr.

13   Placitella, we would like the Rothenberg documents because

14   how are you going to take this testimony without a full

15   evidentiary record.

16        He declined to postpone the deposition, and we went

17   forward with it, and, you know, we have told him we would

18   like to talk him about avoiding that same issue going

19   forward, but I think the goose-gander principle needs to

20   apply here.  If they believe they are entitled to the

21   discovery from these lawyers, we are, too.

22        SPECIAL MASTER RIVERA-SOTO:  Well, Mr. Placitella's

23   choice to go ahead with the Komarnicki deposition is his

24   choice.  It is an informed choice that is informed by the

25   rules that say:  Deposition is limited to seven hours in one

```
 1     day, and if you find something out later on, he is going to

 2     have to ask for leave of Court to redepose Ms. Komarnicki.

 3              MR. FARRELL:  I agree, your Honor.

 4              SPECIAL MASTER RIVERA-SOTO:  We will cross that

 5     bridge when we get to it.  But I think everybody ought to be

 6     bearing in mind the notion that this is not State Court.

 7     There are limits to depositions, and they are in the rules.

 8              MR. FARRELL:  I agree, your Honor.

 9              The last point I want to make on the undue burden

10     issue is again the nature of the claim of undue burden.  We

11     are simply just told it would take thousands of hours to

12     comply.  I actually tried to do some of the math here, and I

13     think I landed at somewhere north of $20 million is the

14     claim that it would take to comply with our subpoena.

15              I have to say I find that a little bit hard to

16     believe since I think that the discovery that the parties

17     have engaged in probably doesn't cost that much, but be that

18     as it may --

19              SPECIAL MASTER RIVERA-SOTO:  I think Kirkland &

20     Ellis, you guys have gone north of that number by now, and

21     if you haven't, shame on you.

22              (Laughter)

23              MR. FARRELL:  I appreciate your Honor's comments.

24     While our client is sitting here, I am sure that he would

25     appreciate it.
```

```
 1              SPECIAL MASTER RIVERA-SOTO:  Oh, I'm sorry.  Your

 2     client is here?

 3              (Laughter)

 4          MR. FARRELL:  But the point, your Honor, is that

 5     there has been no substantiation --

 6              SPECIAL MASTER RIVERA-SOTO:  It is money well

 7     spent.

 8              (Laughter)

 9          MR. FARRELL:  Thank you, your Honor.

10              There has been no substantiation provided for any

11     of this.  We don't know what the documents are.  There is no

12     privilege log.  There's no explanation --

13              SPECIAL MASTER RIVERA-SOTO:  Typically when there

14     is an application concerning undue burden, it is accompanied

15     by an affidavit or a certification in respect of it, and

16     it's not in this record, but we will get to hear from, I am

17     sure, both Mr. Placitella and Mr. Little in respect to that.

18              Anything else?

19          MR. FARRELL:  The very last point I wanted to make

20     was the point I made about the class issues that this

21     presents and why we need the discovery, and I wanted to pick

22     up on the comments that Mr. Placitella and Mr. Assaf made.

23              We pulled out this one citation to the Bello case

24     from the District of New Jersey, but the same concept is in

25     Third Circuit case law from Carrera and other cases on the
```

```
 1          fact that a class can't be certified unless you can actually

 2          figure out who is in it, and that is an administratively

 3          feasible way to do that, and I know we are going to be

 4          discussing all of those issues later today, and I don't mean

 5          to get into them in detail, but I did want to note the

 6          arguments that the law firms are raising because I think

 7          they underscore those points.

 8                  I put up here a portion from the Rothenberg brief.

 9          I know we are going to get to that later, but Bevan has made

10          the same point as have plaintiffs, which is to say:   We

11          don't know who these people are.   There was a plaintiff 25

12          years ago.   They have since passed away.   They now have an

13          heir.

14                  Mr. Assaf alluded to the fact that in plaintiffs'

15          discovery plan, two of the class representatives here are on

16          to their second or third or fourth heirs in this case, and

17          plaintiffs' counsel is struggling to figure out who they

18          are.

19                  So I think that this ties back into the class

20          points we are making, and Mr. Placitella's arguments about a

21          purported scorecard, which by the way, I am not actually

22          aware of any such scorecard.   But be that as it may --

23                  SPECIAL MASTER RIVERA-SOTO:   But you will be

24          looking for it.

25                  MR. FARRELL:   We will be happy to look again for
```

1         it, your Honor.

2                 But the point is even if there were a scorecard,

3         and there was a person's name written down 25 years ago, the

4         plaintiffs and the law firms are making the point that that

5         is not the person that you would contact today.  That is not

6         the person who would receive notice today.  That is not the

7         person who would opt in or opt out of the class today.  It

8         would be a heir.  It would be a third party.

9                 None of that information is available to

10        defendants.  It is only available to the plaintiffs or the

11        plaintiffs' law firms to the extent that anybody has it, and

12        I think it is another factor we all need to keep in mind in

13        terms of pursuing this discovery and why it needs to be done

14        is it is not a question that's going to be answered from the

15        defendants.  It's going to be answered by the law firms and

16        by plaintiffs' counsel.

17                Thank you, your Honor.

18                SPECIAL MASTER RIVERA-SOTO:  Thank you.

19                Mr. Placitella?

20                MR. C. PLACITELLA:  Thank you, your Honor.

21                So there are two issues distinct here, but related.

22        One is the discovery of Mr. Bevan and the plaintiffs in the

23        individual cases, and the discovery of Mr. Bevan as it

24        relates to the absent class members or putative class

25        members.

```
 1              SPECIAL MASTER RIVERA-SOTO:  I prefer the term
 2    putative class members --
 3              MR. C. PLACITELLA:  Putative.
 4              SPECIAL MASTER RIVERA-SOTO:  -- because they are
 5    not absent, they're just putative.
 6              MR. C. PLACITELLA:  Putative.
 7              SPECIAL MASTER RIVERA-SOTO:  No one is lost.
 8              MR. C. PLACITELLA:  As it relates to the
 9    representative class members, we may have agreement.
10              I believe that they are entitled to at least some
11    of the information that they are seeking, not all of it, not
12    to relitigate the merits of the underlying case, but I
13    believe they are entitled to any documents that we have
14    related to what was told to Mr. Bevan or what Mr. Bevan knew
15    or what Mr. Bevan communicated to the six representative
16    plaintiffs.  I believe they are entitled to that.
17              Now, it is a whole other issue of whether it exists
18    or not, but theoretically I believe they are entitled to
19    that, and I may not love it, but I accept the decision of
20    the Court, and I understand that that is our obligation, and
21    that we are carrying out that obligation.
22              So that I don't think is really the thing that we
23    are -- I think we can kind of agree on that.  We might go
24    back and forth on what the parameters actually mean, and we
25    can do that later on, but in a global sense first.  They
```

```
1        have an electronic database of every case that is word

2        searchable that they have ever been in, okay?

3               I took their corporate representative, and that is

4        what he said to me in the State Court, that every case

5        they've ever been in, they have scanned an OCR.  So if they

6        want to find the case -- the information on a given

7        plaintiff, they can do that.

8               SPECIAL MASTER RIVERA-SOTO:  But what they don't

9        have access to, I don't think, is the communications that

10       the Court has already determined are discoverable --

11              MR. C. PLACITELLA:  Yes.

12              SPECIAL MASTER RIVERA-SOTO:  -- and in respect of

13       the putative class members, at some point or another --

14              MR. C. PLACITELLA:  Well, at some point --

15              SPECIAL MASTER RIVERA-SOTO:  -- well, but the

16       problem is that in order for the defendants to properly

17       prepare to oppose the motion for class certification, that

18       information is going to have to be made available to you --

19              MR. C. PLACITELLA:  Well, I totally --

20              SPECIAL MASTER RIVERA-SOTO:  -- and if that is the

21       case, then why are we here?

22              MR. C. PLACITELLA:  -- I totally disagree with that

23       for the -- and I want to give you my analysis --

24              SPECIAL MASTER RIVERA-SOTO:  Okay.

25              MR. C. PLACITELLA:  -- of why.
```

```
 1              That issue only becomes ripe, the reliance issue in
 2       the fraud case, if it is ever even certified, right?
 3              Only becomes ripe at the point in time that that
 4       client or that putative class member decides he is going to
 5       participate.
 6              SPECIAL MASTER RIVERA-SOTO:  But forget about
 7       reliance, because the common issue throughout your entire
 8       case, whether it's your fraudulent concealment claim, your
 9       fraud claim, or your civil conspiracy claim is causation,
10       and you have to tie A to B --
11              MR. C. PLACITELLA:  Yes.
12              SPECIAL MASTER RIVERA-SOTO:  -- and it seems to me
13       that the Court has already determined, Chief Judge Linares
14       has said very clearly that in respect to causation, there
15       will be discovery of plaintiffs' lawyers' files concerning
16       the communications with their clients as to why they settled
17       or dismissed or did whatever they did in respect to the
18       cases.
19              Now, we know that that is at least the boundaries
20       of what we need to discuss.  We also need to draw into the
21       notion that at least in respect of defending against your
22       class certification application, they are going to need to
23       know whether the elements of Rule 23, as the Third Circuit
24       has defined in Hydrogen Peroxide, and has more recently
25       defined in respect to ascertainability, that these are
```

```
1     actual proper class members because let's take a
2     hypothetical.
3             You have six representative plaintiffs, and they
4     may have commonality of issues and commonality of facts and
5     all of that other stuff that you need under Rule 23, but
6     when folks start digging into the class members themselves,
7     which are reasonably identifiable, and it may turn out that
8     there is no commonality in respect of them.
9             Aren't they able to then bring that to the Court's
10    attention to say, the class as it has been defined by the
11    plaintiffs is too broad because, look, you have all of these
12    people who do not satisfy the same criteria as the
13    representative plaintiffs?
14            I mean, that is -- I am not speaking sand script.
15    That is a pretty basic Rule 23-101 type of analysis.
16            MR. C. PLACITELLA:  But the question first is, and
17    I am happy to answer that question and come back to the
18    Bevan issue, I am happy to answer your question now.
19            You don't get to -- so let's just talk about who
20    these people are because I think it matters, okay, in terms
21    of the class, the putative class members.  They don't know
22    the case exists.  They don't know they were defrauded --
23            SPECIAL MASTER RIVERA-SOTO:  But they are not
24    asking the putative class members anything --
25            MR. C. PLACITELLA:  They are --
```

1             SPECIAL MASTER RIVERA-SOTO:   -- they are asking the

2        lawyers.

3             MR. C. PLACITELLA:   -- they are asking them for

4        their files, which are owned by the class members.  Those

5        files belong to the class members, right --

6             SPECIAL MASTER RIVERA-SOTO:  No --

7              MR. C. PLACITELLA:   -- the putative class

8        members --

9             SPECIAL MASTER RIVERA-SOTO:   -- it seems to me then

10       you have a choice to make, because if you are seeking to

11       represent those people at some point or another, you are

12       going to have to be able to produce that information, and it

13       is not going to be after the class is certified because all

14       of that is going to produce is a motion to decertify the

15       class later on, after the discovery has been had.

16             So at some point or another, that information is

17       going to have to be produced, if you insist that they belong

18       in your class.

19             If you choose to say no, they don't, then there is

20       no basis for the discovery.

21             But to the extent, as I read Chief Judge Linares'

22       decision, to the extent that these people are included in

23       your class, and with all due respect, your class definition

24       is incredibly wrong, so all of these people fall under it,

25       and again, I don't blame you for that.  That is how you have

```
1        to start out, and then you narrow it along the way.  But

2        right now the state of the record is you have a huge

3        definition in respective class members, and the defendants

4        are entitled to nitpick.

5                MR. C. PLACITELLA:  They may be entitled to

6        nitpick, but here is the issue.  The people don't know they

7        are members or putative class members.  Part of the relief

8        that we seek is notice, so those people can make a decision,

9        right?

10               That is part of the relief.  That is part of the

11       relief that was addressed and recognized by the Third

12       Circuit.  They said:  One of the things we may be entitled

13       to as class relief is notice to the people who are affected,

14       so --

15               SPECIAL MASTER RIVERA-SOTO:  Well, there is nothing

16       about notice, unless I totally missed it, there is nothing

17       about notice in your opposition to the Bevan application or

18       for that matter to the Early or Rothenberg matters.  There

19       is nothing about notice, and you have not filed a Rule 23

20       motion yet, so the whole notion of notice to potential class

21       members is not before me.

22               MR. C. PLACITELLA:  But, your Honor, the problem

23       here is that they want access to people's files that are

24       privileged.  They own that privilege.

25               SPECIAL MASTER RIVERA-SOTO:  They want access to
```

```
1     people's files that you say are part of your class, and if
2     so, the privilege has been waived.  That is what Chief Judge
3     Linares said.
4               MR. C. PLACITELLA:  They write in their scope
5     brief:  BASF does not understand how plaintiffs could
6     purport to do so, which itself is another reason why the
7     class can't be certified.
8               They say that the people did not waive their
9     privilege.  They say it themselves.  The mere fact that we
10    identify somebody as a putative chance member doesn't mean
11    that their privilege is waived.  There is no law that would
12    support that.  They have a right first, and we did ask, as
13    part of our class, once we prove the basic elements, the
14    people have a right to know whether they are in or they're
15    out and to make a decision.
16              There is no client consent here.  Mr. Rothenberg
17    can't just turn around and hand over client files.  Mr.
18    Bevan can't just turn around and hand over client files.
19              SPECIAL MASTER RIVERA-SOTO:  Well, they can, if
20    they are ordered to.
21              MR. C. PLACITELLA:  That would be a violation of
22    their client's rights --
23              SPECIAL MASTER RIVERA-SOTO:  I don't understand
24    that, I really don't, and I am trying to get my head around
25    it, because it seems to me that it may be a Hobson's choice,
```

1      but it is a choice nonetheless.  If you want to assert the

2      claim, then your privilege is waived.  But if you don't want

3      to waive your privilege, you can't assert the claim.

4              MR. C. PLACITELLA:  Well, we waived it, your Honor,

5      under Judge Linares's ruling for the representative class

6      members.  We can't, I submit, waive it for putative class

7      members.  Even BASF says that that is so.

8              We can't waive it.  Just because we identify

9      somebody as a putative class member does not mean that we

10     have the capacity or the authority to do that.  That was

11     not -- that was not the intent.

12             SPECIAL MASTER RIVERA-SOTO:  So if I agree with

13     you, this is the net result, there will be discovery only in

14     respect of the six class representatives.

15             You will file a motion for class certification

16     saying that those six representative plaintiffs are

17     representative plaintiffs.  They are adequate.  You are

18     adequate as counsel.  You have commonality of issues and

19     facts.  All of this other stuff, and there is a defined

20     class that you are seeking to have certified.

21             If that class gets certified, doesn't discovery

22     have to reopen?

23             MR. C. PLACITELLA:  The discovery, if people decide

24     to come forward -- I am just --

25             SPECIAL MASTER RIVERA-SOTO:  That is not how it

```
 1    works.  That is not how it works, because the way it works
 2    is once you have a class certification decision, you send
 3    notices out, and it is the obligation of the individual
 4    plaintiff to opt out --
 5              MR. C. PLACITELLA:  I agree with you --
 6              SPECIAL MASTER RIVERA-SOTO:  -- if they don't opt
 7    out, they are in.
 8              MR. C. PLACITELLA:  -- I agree with that.  But we
 9    don't get to the putative class members until we have a
10    certified class that you've ruled upon.  We elected to make
11    these six people the representative plaintiffs.
12              I do agree, they get to ask Mr. Bevan some broad
13    questions.  His counsel can speak for himself, but we don't
14    get to discovery of putative class members until we know
15    there is a class.  That is why they are putative class
16    members.
17              SPECIAL MASTER RIVERA-SOTO:  So your short answer
18    to my short question is:  Under your theory, we don't get to
19    the discovery of those files until such time as the class
20    has been certified.
21              MR. C. PLACITELLA:  Under the individual files, I
22    believe that that is correct.
23              SPECIAL MASTER RIVERA-SOTO:  Other than those of
24    the representative class members.
25              MR. C. PLACITELLA:  I believe that is correct,
```

1       but --

2                   SPECIAL MASTER RIVERA-SOTO:  And at that point, it

3       would then be the obligation of the defendants, if they find

4       material in those files that shows that any one or more of

5       these now class members are not really members of the class,

6       they then have to file a motion to decertify?

7                   MR. C. PLACITELLA:  No.

8                   If those people don't qualify, they don't qualify.

9                   If they don't -- if they can't prove causation in

10      their case, they can't prove causation in their case, they

11      don't participate, but -- but --

12                  SPECIAL MASTER RIVERA-SOTO:  That is not the way

13      class actions work, Counsel.

14                  MR. C. PLACITELLA:  Well, in cases I have been

15      involved with, there is a distinction between an issues

16      class and damages, and you can have a certified issues

17      class, and then you can deal with individual damages.  It's

18      done all of the time --

19                  SPECIAL MASTER RIVERA-SOTO:  I understand that --

20                  MR. C. PLACITELLA:  -- there are many cases --

21                  SPECIAL MASTER RIVERA-SOTO:  -- but as far as I am

22      concerned, the only class I have seen here is a class for

23      both liability and damages.  There is no distinction drawn

24      in your second amended complaint.

25                  MR. C. PLACITELLA:  We have not filed our class

```
1    certification motion, where we would flush that out, and we

2    wouldn't be in the position to do that until such time as we

3    get the discovery from the defendants, so we can make our

4    best case on that.

5              SPECIAL MASTER RIVERA-SOTO:  And what discovery

6    from the defendants is it that you are lacking?

7              MR. C. PLACITELLA:  I am lacking the information --

8    the representations or the communications that they had with

9    the various plaintiffs' counsel from around the country.  I

10   only have a handful of it.  I am lacking information that

11   they are holding under seal.  I am lacking some limited --

12             SPECIAL MASTER RIVERA-SOTO:  They are holding it

13   under seal, but not disclosed to you under --

14             MR. C. PLACITELLA:  I know there are things on

15   privilege logs that I have identified that I think that you

16   need to deal with.

17             SPECIAL MASTER RIVERA-SOTO:  I misunderstood what

18   you were saying.

19             When you say "under seal," that to me means

20   under --

21             MR. C. PLACITELLA:  Understood.

22             SPECIAL MASTER RIVERA-SOTO:  -- under a discovery

23   confidentiality order --

24             MR. C. PLACITELLA:  No, no, no --

25             SPECIAL MASTER RIVERA-SOTO:  -- the rest of the
```

```
 1    world doesn't see it, but you do.
 2              MR. C. PLACITELLA:  -- no, no, no.  I misspoke.
 3              SPECIAL MASTER RIVERA-SOTO:  Okay.
 4              MR. C. PLACITELLA:  I believe in looking at the
 5    privilege logs, that there is information that you need to
 6    take a look at.  I believe I need some limited discovery on
 7    class action -- on class certification of the defendants,
 8    not much, probably five or six depositions, including the
 9    ones, you know, that have been noticed, not a lot, to get
10    there.  Then we are in a much more ripe place.
11              But, for example, when you talk about burden, and
12    you talk about what do you have to prove, Mr. Placitella.
13              If, for example, in the Rothenberg case they had
14    represented --
15              SPECIAL MASTER RIVERA-SOTO:  I am trying really,
16    really hard to deal with each one of them individually.
17              MR. C. PLACITELLA:  -- okay.
18              Well, this is an example, but it could exist for
19    Mr. Bevan as well.  We don't know.
20              If there is a database, where they admit who is in
21    and who is out based upon the representations that were made
22    or the unavailability of evidence, that would dramatically
23    curtail whatever would be looked for from the defendants.
24              SPECIAL MASTER RIVERA-SOTO:  Has a specific request
25    for production been made for the database?
```

```
 1              MR. C. PLACITELLA:  I believe Michael says yes.  I
 2      know we had conversations about it.  For example, with
 3      respect to --
 4              SPECIAL MASTER RIVERA-SOTO:  Let me interrupt.  I'm
 5      sorry to interrupt you.
 6              Mr. Assaf, is that correct?
 7              Mr. Farrell, I'm sorry.
 8              MR. FARRELL:  The question of whether it has been
 9      asked for?
10              SPECIAL MASTER RIVERA-SOTO:  Yes.  Has it been
11      requested?
12              MR. FARRELL:  It has been requested, your Honor.
13      We have met and conferred about it, and in fact it's already
14      been provided to plaintiffs' counsel.
15              MR. C. PLACITELLA:  I don't have such a database.
16              SPECIAL MASTER RIVERA-SOTO:  See, that is a
17      problem, because when a lawyer stands in front of me and
18      says I have X, and another lawyer says, non X, I have a
19      problem because I start from the proposition that whatever a
20      lawyer tells me, I can take to the bank.
21              MR. C. PLACITELLA:  I don't know of any database,
22      your Honor, where the defendants articulate that this case
23      was dismissed and the reason for it, and if that exists,
24      then someone should show it to me because I have been asking
25      for it.
```

1          SPECIAL MASTER RIVERA-SOTO:  Mr. Farrell I think is
2      going to help you.
3          MR. FARRELL:  I would be happy to answer the
4      question.  I have already answered it for Mr. Placitella
5      probably half a dozen times, but this is the circumstance,
6      your Honor.
7          SPECIAL MASTER RIVERA-SOTO:  Answer it once for me.
8          MR. FARRELL:  I would be happy to.
9          To my knowledge, there is no such comprehensive
10     database of all plaintiffs, that includes the reasons why
11     their cases were dismissed.
12          There are, I believe, two databases, both of which
13     have been produced to plaintiffs' counsel in the context of
14     the mediation and the settlement discussions that occurred
15     in this case.  Those databases are of marginal utility, I
16     would submit to your Honor.  Mr. Placitella knows that.
17     They don't indicate why cases were dismissed and why they
18     were or were not settled.
19          They just have some information about some cases
20     from some jurisdictions.  It is not comprehensive, and it
21     doesn't answer the question that he has raised.
22          SPECIAL MASTER RIVERA-SOTO:  Well, whatever you
23     have, you have turned it over?
24          MR. FARRELL:  It has been produced to him in the
25     context of the mediation, and we have met and conferred with

```
 1    them about producing to them again in this case under
 2    appropriate confidentiality provisions.  Yes, your Honor.
 3            SPECIAL MASTER RIVERA-SOTO:  Well, there is a
 4    discovery confidentiality order, which doesn't take a great
 5    deal of lift for the lawyers to be able to say, we are
 6    producing this either confidential or attorneys' eyes only,
 7    or whatever it is, the category that you want to put it
 8    under.  So I am not getting why we are talking about this
 9    today.
10            MR. FARRELL:  Well, we are talking about it today
11    because Mr. Placitella has raised it.
12            The reason that it has not been produced yet
13    despite there being a discovery confidentiality order is
14    that frankly, the database contains work product.  It was
15    prepared by outside counsel in the context of the
16    litigation.  We had talked to Mr. Placitella about --
17            SPECIAL MASTER RIVERA-SOTO:  In the context of this
18    litigation?
19            MR. FARRELL:  No.  In the context of the 25 years
20    of historical litigation that was conducted, and so we have
21    talked about a process for producing it under appropriate
22    protections that would preserve work product, so on and so
23    forth, and that is the issue, something I suspect we will
24    discuss again later today.
25            SPECIAL MASTER RIVERA-SOTO:  Yes, we will.
```

```
1              MR. C. PLACITELLA:  Yes, your Honor.

2              So I don't know what I am allowed to talk about

3    with the mediation.  I guess it's been --

4              SPECIAL MASTER RIVERA-SOTO:  Hopefully not a lot.

5    The local rules are pretty clear --

6              MR. C. PLACITELLA:  That is what I thought.

7              SPECIAL MASTER RIVERA-SOTO:  -- about what you can

8    or cannot talk about in respect to mediation.

9              All I know is that it has been produced in a

10   different context.  They have had discussions with you about

11   producing in this context.  That is what I am told.  If that

12   is not correct, then I certainly hope that those discussions

13   are going to happen fairly soon, and that a resolution is

14   going to be reached fairly soon, but let me make it clear.

15   If the documents exist, they are to being produced.

16             MR. C. PLACITELLA:  So, your Honor --

17             SPECIAL MASTER RIVERA-SOTO:  Does that get you

18   where you need to go, Mr. Placitella?

19             MR. C. PLACITELLA:  Almost.

20             So they say it is all not in this database --

21             SPECIAL MASTER RIVERA-SOTO:  You are going to get

22   whatever they have.

23             MR. C. PLACITELLA:  -- but they do have records,

24   otherwise they could not write that letter that I put before

25   you, where they kept track by state of why cases were
```

```
 1          dismissed.
 2                    SPECIAL MASTER RIVERA-SOTO:  Well, a lawyer in Ohio
 3          had a list.  That is all that letter tells me.
 4                    MR. C. PLACITELLA:  Well, I think, your Honor, that
 5          lawyer was local counsel, and as I understand it, all of
 6          that information came directly from defendant Cahill.  There
 7          was no way the lawyer in Ohio would have had that
 8          information.  That came from a central place.
 9                    Example:  You say why do you need this information
10          for Mr. Bevan?
11                    Well, if you look -- if you look, for example, I
12          know I'm not allowed to say the word Rothenberg, so I'm
13          going to say it as an example --
14                    SPECIAL MASTER RIVERA-SOTO:  The "R" word, the "R"
15          word.
16                    MR. C. PLACITELLA:  Okay.
17                    Mr. R., okay, but they have certified as officers
18          of the court, on at least six occasions that I could locate
19          based on their limited production so far, that all of the
20          Rothenberg cases were dismissed because they accepted BASF's
21          and Engelhard's representation that there was no asbestos in
22          the talc.
23                    They accepted it.  They as officers of the court
24          went to other lawyers and said that.  There is no reason for
25          discovery of Mr. Rothenberg's files.  As officers of the
```

```
 1          court, they are bound by those representations.
 2                    SPECIAL MASTER RIVERA-SOTO:  I think you are mixing
 3          apples and oranges --
 4                    MR. C. PLACITELLA:  Well, we're talking --
 5                    SPECIAL MASTER RIVERA-SOTO:  -- respectfully,
 6          because you are focusing on the alleged misdeeds by the
 7          defendants when what we really should be talking about is
 8          the plaintiffs' claims of privilege in respect of the lawyer
 9          files held by third parties --
10                    MR. C. PLACITELLA:  Yes, your Honor.  But what
11          I'm --
12                    SPECIAL MASTER RIVERA-SOTO:  -- and the two are
13          separate in my head --
14                    MR. C. PLACITELLA:  -- but one of issues that you
15          have to address is relative burden --
16                    SPECIAL MASTER RIVERA-SOTO:  Okay.
17                    MR. C. PLACITELLA:  -- and the relative burden, you
18          have to look at what is in their files first.  Did they get
19          to go have Mr. Rothenberg, who is not a party to this case,
20          who runs an independent law firm, do they get to make him go
21          through all of that, if they have files in their possession
22          that say Mr. Jones from the Rothenberg case was dismissed,
23          they accepted the representation there was no asbestos in
24          the talc.
25                    SPECIAL MASTER RIVERA-SOTO:  That is fine, but that
```

```
1      doesn't go as far as I think is necessary under the

2      circumstances, because they may have whatever their files

3      may have.

4              What they do not have is then what was communicated

5      by Mr. Rothenberg to -- I know I shouldn't be using the "R"

6      word -- but to whomever, to Mr. Bevan staying with him, by

7      him to his clients, that caused the acceptance of either a

8      low or no money settlement or dismissal, and isn't that --

9              MR. C. PLACITELLA:  No.  Rothenberg is easy,

10     because Rothenberg's cases were all dismissed and --

11             SPECIAL MASTER RIVERA-SOTO:  But based on what?

12             MR. C. PLACITELLA:  Based upon --

13             SPECIAL MASTER RIVERA-SOTO:  You can't just say --

14             MR. C. PLACITELLA:  -- based upon their --

15             SPECIAL MASTER RIVERA-SOTO:  You can say that.

16             MR. C. PLACITELLA:  -- I don't have to say it, your

17     Honor.  It is in -- and I'll hand you these -- it's in the

18     letters that they wrote to six different lawyers saying that

19     every one of Mr. Rothenberg's cases were dismissed because

20     of the representation that there was no asbestos in the

21     talc.

22             Why did they get to even ask Mr. Rothenberg?

23     They --

24             SPECIAL MASTER RIVERA-SOTO:  Because Mr.

25     Rothenberg's file may contain --
```

1            MR. C. PLACITELLA:  But they didn't --

2            SPECIAL MASTER RIVERA-SOTO:  -- bear with me,

3     please.

4            Mr. Rothenberg's files may contain communications

5     between Mr. Rothenberg and his clients that say something

6     different than that --

7            MR. C. PLACITELLA:  But they admitted it otherwise,

8     your Honor.  They are bound by their conduct.

9            They can't as officers of the court go and make

10    those representations to courts and to other lawyers and

11    say, oh, we want to test whether that happened.

12           They already admitted it.  Causation, as it relates

13    to Rothenberg, is proven by admission, so you can prove --

14           SPECIAL MASTER RIVERA-SOTO:  I don't agree with

15    you, Mr. Placitella.

16           MR. C. PLACITELLA:  -- so what I would like for

17    your Honor before you make a decision is I'm just going to

18    hand you up a -- and I have one for everybody -- the group

19    of letters and representations, and there are probably many

20    more, and this is just what I could find, you know, during

21    late night searches.

22           (Document handed to the Court)

23           SPECIAL MASTER RIVERA-SOTO:  Can I ask that you

24    produce only those that were the result of searches done

25    during daylight hours?

```
 1                    (Laughter)

 2              MR. C. PLACITELLA:  Yes, your Honor, but --

 3              SPECIAL MASTER RIVERA-SOTO:  And I say that because

 4       I was getting letters last night from people, who like my

 5       wife, think that I have nothing else to do.

 6              MR. C. PLACITELLA:  I have been accused of the same

 7       thing of not having a life, so I understand that.

 8              But in addressing the issue of burden, before we

 9       get to Rothenberg, Early, Bevan, we should see what is in

10       their files, because if their files demonstrate like those

11       letters do, that they -- and I highlighted it, so it would

12       be easy to find the representations, they say --

13              SPECIAL MASTER RIVERA-SOTO:   It's lost on the --

14              MR. C. PLACITELLA:  Yes, yes.

15              Well, I'll have to remember that for the next

16       time --

17              SPECIAL MASTER RIVERA-SOTO:  -- I can tell shapes.

18       That is okay.

19              MR. C. PLACITELLA:  -- so if their records admit

20       that, then when you are weighing the burden under Rule 26,

21       you have to make that judgment.  At least let them come

22       forward with some other showing to say, you know what, all

23       of those things that we said, all of the things that we said

24       to judges about why Rothenberg's cases were dismissed, all

25       of those things that we said to other lawyers as officers of
```

```
 1          the court, that really wasn't -- we knew that wasn't true,
 2          and we still get to test the proposition and make Mr.
 3          Rothenberg stop his law practice as a non party to this
 4          case, or make Mr. Bevan, because he represented the six
 5          plaintiffs, produced everything else, and when you are
 6          making these decisions --
 7                    SPECIAL MASTER RIVERA-SOTO:  I thought Mr. Bevan
 8          represented five --
 9                    MR. C. PLACITELLA:  Five.  Five.  I'm sorry.
10          You're correct.
11                    SPECIAL MASTER RIVERA-SOTO:  You said five, and you
12          showed me four fingers, so --
13                    (Laughter)
14                    MR. C. PLACITELLA:  Well, you are right.
15                    SPECIAL MASTER RIVERA-SOTO:  -- you know, I am
16          enumerating, so you are making it hard for me.
17                    (Laughter)
18                    MR. C. PLACITELLA:  I understand.
19                    So we have core issues here.  There are people who
20          are absent class members or putative class members, they
21          don't know the case exists.  One of the pieces of relief we
22          ask is to let them know.
23                    So maybe if you really -- and we can talk this
24          through, and I don't want to be held to this, but maybe the
25          issue is we look at the issues class for the first four
```

```
1    elements and see if it is certifiable.  And if it is, then

2    give Rothenberg notice and give Bevan's clients notice and

3    anybody else who has notice, and then we will get to whether

4    it is appropriate or not.

5              I don't want to be bound by that.  I'm just having

6    a conversation, but --

7              SPECIAL MASTER RIVERA-SOTO:  That application is

8    not before me --

9              MR. C. PLACITELLA:  It's not before you.

10             SPECIAL MASTER RIVERA-SOTO:  -- the only

11   application that is before me is a motion to enforce a

12   third-party subpoena.

13             MR. C. PLACITELLA:  Correct.

14             And the motion to enforce a third-party subpoena is

15   to have lawyers turn over files of people they represent,

16   some of whom they have had no contact for many years, some

17   of whom, many of whom, as Mr. Assaf said or Mr. Farrell

18   said, may be heirs that own the privilege, and the issue is:

19   Can those lawyers be made to turn over what would otherwise

20   be privileged information, just because the people they

21   represent are putative class members.

22             And in that context, you have to look at Rule 26

23   and proportionality.  It does not matter that it is just

24   relevant because arguably it is relevant.  It matters under

25   proportionality, and in deciding proportionality, you first
```

```
 1        off have to figure out what is in the possession of the
 2        defendant.
 3              They say that they gave me this database.  I guess
 4        it is out in the open now, but that -- there is more.
 5        There has to be more or they couldn't have written the
 6        scorecard letter.  They couldn't have made the
 7        representations about -- they have to have more.
 8              So before we burden these law firms, I will sit
 9        down, because I know I'm trying your patience --
10              SPECIAL MASTER RIVERA-SOTO:  No, you are not.
11              MR. C. PLACITELLA:  -- before we burden these law
12        firms, we need to know what is in their files, because --
13              SPECIAL MASTER RIVERA-SOTO:  Well, I --
14              MR. C. PLACITELLA:  -- if it's redundant, don't
15        forget, and I will tell you, for example, I'll tell you what
16        happened at one of the plaintiffs' depositions.
17              They had I think it was Mrs. Holley, they asked
18        questions of Mrs. Holley, and they had all kinds of
19        documents from Mrs. Holley's file that the plaintiffs'
20        lawyer didn't have, that Mrs. Holley didn't have, but they
21        had --
22              SPECIAL MASTER RIVERA-SOTO:  Well, they are better
23        at record keeping --
24              MR. C. PLACITELLA:  -- because they have -- because
25        they have an electronic database of every file.
```

1              SPECIAL MASTER RIVERA-SOTO:  But an electronic

2      database by definition will not include the communications

3      between the then plaintiffs' lawyers and their clients --

4              MR. C. PLACITELLA:  Well, that's true.

5              SPECIAL MASTER RIVERA-SOTO:  -- it's not going to

6      include that.

7              MR. C. PLACITELLA:  That's true.

8              SPECIAL MASTER RIVERA-SOTO:  So -- then that's what

9      they are asking for --

10             MR. C. PLACITELLA:  That's true.

11             SPECIAL MASTER RIVERA-SOTO:  -- when the rubber

12     meets the road here, they are not asking for, let me go

13     through your entire file.  You know, they don't want to look

14     at the complaint that was filed in Cuyahoga County.  They're

15     not interested ---

16             MR. C. PLACITELLA:  No.  They want the medical

17     records.  They want the exposure --

18             SPECIAL MASTER RIVERA-SOTO:  -- they want the

19     information that they don't already have.  That's all

20     they're asking for.

21             MR. C. PLACITELLA:  The only information they don't

22     have access to, if it exists, and I would propose that it

23     probably doesn't exist, it probably does not exist, but, you

24     know, we are not there, whether there was a written

25     communication between, for example, Mr. Bevan and Mrs. Jones

```
1          about the reason for that dismissal.

2                    SPECIAL MASTER RIVERA-SOTO:  Or handwritten notes

3          to that effect or an email or whatever.

4                    MR. C. PLACITELLA:  I understand.

5                    SPECIAL MASTER RIVERA-SOTO:  Mr. Placitella, you

6          and I have been at this for a long time, and you and I in

7          every single case, I am sure, have come to the conclusion

8          when we are going through a production of documents, looked

9          at it and said, how did this ever survive and find its way

10         here.

11                   I think that is what they are looking for, and I

12         think they are entitled to it.

13                   SPECIAL MASTER RIVERA-SOTO:  I agree with you on

14         the representative cases.  I don't agree respectfully on the

15         putative cases.

16                   I believe that they need to put up their

17         information first, so you can make an evaluation as to

18         whether the burden on these people is justified, because if

19         they admit it internally, and those are the representations

20         that they made, then that should complete element number

21         five in the fraudulent concealment element.

22                   SPECIAL MASTER RIVERA-SOTO:  Only as to those

23         plaintiffs, not as to the entire class.

24                   MR. C. PLACITELLA:  That's correct.

25                   SPECIAL MASTER RIVERA-SOTO:  Mr. Little?
```

1           And, again, Mr. Little, we're just talking about

2    Bevan's motion to enforce --

3           MR. LITTLE:  I understand.

4           SPECIAL MASTER RIVERA-SOTO:  -- so if you can

5    address that, that would be great.

6           MR. LITTLE:  Of course.

7           First of all, I would like to correct two matters

8    BASF has represented about the meet and confer process and

9    the offer to avoid expense.

10          The meet and confer process that he is referring to

11   that we declined to engage in had to do with the scheduling

12   order in the case.  I don't think non parties have a reason

13   to be there, so we were not present at those conversations.

14          Regarding the offer to avoid expense, this was an

15   offer that was made, a proposal, to avoid the expense of

16   having to brief these motions.  Once the motions were filed,

17   the reason to undertake this effort went away, so those two

18   things are non issues.

19          Regarding the burden, I think that counsel can make

20   representations about facts within their own knowledge, but

21   I would be happy to supplement the details that have already

22   been provided about the burden that it places on the Bevan

23   firm with an affidavit.  I would actually make an

24   application that we be allowed to do that, if that is

25   something that's --

Case 2:11-cv-01754-BRM-AME   Document 600-13   Filed 06/25/18   Page 92 of 258 PageID:91
43423

```
 1                SPECIAL MASTER RIVERA-SOTO:  Well, wasn't the time
 2      for that back in January and April?
 3                MR. LITTLE:  Again, I think that the question is
 4      whether there is a burden, and whether it's substantial, and
 5      I think that counsel can make representations in their
 6      briefing, and that would be considered factual
 7      representations about matters that are within their own
 8      knowledge.
 9                SPECIAL MASTER RIVERA-SOTO:  I couldn't disagree
10      with you more.
11                Counsel don't get to make factual representations
12      in briefs that are not supported by affidavits or
13      certifications, because facts are supposed to be supported
14      by personal knowledge, and I could not --
15                MR. LITTLE:  Correct.
16                SPECIAL MASTER RIVERA-SOTO:  -- and if it's the
17      lawyer who has got the personal knowledge, then it is that
18      lawyer's obligation to submit a supporting certification or
19      affidavit.
20                There were none submitted here, so all I have are
21      naked assertions of burden, that I can't remember in respect
22      of which one of these it was.  It might apply to all of
23      them.  When I looked at them, I thought to myself, this is
24      crazy.  I can't possibly take that much time to go through a
25      file that you ended up dismissing.
```

```
 1                    MR. LITTLE:  Right.

 2                    And I think that the problem is that the burden

 3       that we are talking about here is really hypothetical, and

 4       so in terms of estimating, you have the amount of time, and

 5       I think that is something that counsel for a party or a non

 6       party can do, and it's my fault, and that should have been

 7       in a declaration as opposed to in the briefing, and I would

 8       be happy to supplement the record, if that would ease the

 9       burden analysis.  But the facts are not really --

10                    SPECIAL MASTER RIVERA-SOTO:  It is a little late

11       for that, isn't it?

12                    MR. LITTLE:  -- the facts are not really in dispute

13       and --

14                    SPECIAL MASTER RIVERA-SOTO:  I don't agree with

15       you, because one of the facts that you bear the burden of

16       showing, you have objected to the motion to enforce by

17       saying that it would involve an undue burden on your client.

18       Part of your burden of production and of persuasion is to

19       submit to the Court factual bases for that allegation.

20                    It is only an allegation that is made in a brief.

21       It is not supported anywhere, and the reason for that is

22       really very simple.  Courts make decisions on facts.  Facts

23       get proven in a certain way.

24                    When people make representations in respect to

25       facts, if it's done in a proper way, there is a guarantee
```

1        that it is correct because there are penalties attached to

2        incorrect statements.  If you submit an affidavit, that is

3        under oath, that is perjury,

4               If you use the certification process that is

5        permitted under Title 28 of the United States Code, you are

6        making a certification under penalties of perjury, even

7        though it is unsworn, so there are penalties that attach

8        there.  The same is true in respect to the declaration,

9        because that is the same thing as a certification under our

10       rules.

11              So when I looked at this application, I kept asking

12       myself, I understand they are arguing undue burden, but

13       where is the proof of it, and that is your burden to show,

14       and it's not there.

15              Now, I can assume that asking someone to review

16       3,000 files is burdensome.  I don't think there is anyone in

17       this courtroom that would disagree on that.  That is

18       burdensome, particularly in a matter in which you don't have

19       a dog in the fight, which you said you don't, but I am not

20       so sure that that's correct.  But, be that as it may, what

21       am I going to base the decision on?

22              I can't make a decision on burden.  I really can't,

23       and the only thing that I can do candidly is say:  I am

24       going to grant the relief that is requested, and I am going

25       to deny without prejudice the application for cost shifting

1        for sometime later on.

2              After it is all said and done, and you have kept

3        the records of the time that was in fact expended and the

4        expenses that were in fact incurred in making this

5        production, you are coming back and saying this is what it

6        cost us.  It is disproportionate to what it should have

7        been.  It's an undue burden.  Someone should pay.

8              But right now I have nothing on which to decide,

9        and it is an infirmity that you represent also Mr. Early and

10       his law firm, and I have the same problem there.

11             MR. LITTLE:  I would be happy to provide additional

12       information on it.

13             I think that I have seen case law that says counsel

14       when they're representing a party can make representations

15       about things like the amount of time that it takes.  I think

16       there are statements I could give now --

17             SPECIAL MASTER RIVERA-SOTO:  I have been a lawyer

18       for 40 years.  I have never seen that happen, never.  And I

19       don't mean to be harsh about it, but I never seen that

20       happen.  In 40 years, I don't think there are many people in

21       this courtroom who have been at it longer than me.

22             MR. LITTLE:  Would you be willing to accept a

23       supplement to the record?

24             SPECIAL MASTER RIVERA-SOTO:  I will make that

25       determination later.

```
1                    MR. LITTLE:  Okay.

2                    SPECIAL MASTER RIVERA-SOTO:  But I understand.  I

3      will take your application for leave to follow something up.

4      And take that into consideration.

5                    MR. LITTLE:  Thak you.

6                    SPECIAL MASTER RIVERA-SOTO:  Anything else you

7      would like to add?

8                    MR. LITTLE:  Yes.

9                    Moving past the issue of burden, the key problem

10     here is that our client, the Bevan firm, as well as the

11     Early firm, they're between a rock and a hard place, okay?

12                   The layers of privilege and confidentiality and --

13                   SPECIAL MASTER RIVERA-SOTO:  Are not their concern.

14     They are my concern.

15                   MR. LITTLE:  Right.

16                   And physician -- physician-patient privilege --

17                   SPECIAL MASTER RIVERA-SOTO:  They're their concern.

18     Privilege issues are my concern.

19                   MR. LITTLE:  I understand.

20                   SPECIAL MASTER RIVERA-SOTO:  Your client's concern

21     is compliance with the subpoena duces tecum.

22                   If there are matters within that compliance that

23     are privileged, you could mark them as such, create a

24     privilege log.  You have them available, and somebody else

25     will make the decision whether they are to be disclosed or
```

1    not, and the mechanism for how we are going to do that is

2    something that we are going to talk about later on, but that

3    is really not your concern.

4           Your concern is just producing the information, if

5    it's privileged, you put it on a privilege log.  You

6    segregate the privileged information, and you have it really

7    available for disclosure.

8           MR. LITTLE:  If there is one case that I can

9    present to you on that issue, and this is a unique situation

10    because we are not just talking about one file or a party

11    that has received a subpoena that does not have an

12    independent obligation to that client, and that is the

13    Sonoma County case that I cited in the brief on Page 9.

14           And there the Court held that the burden of

15    producing the privilege log, again, we are going back to

16    burden, but the amount of time that it would take to create

17    a privilege log in itself requires the cost shifting to

18    occur before that can even occur.

19           So in this case, especially with regard to putative

20    class members, you know, before that process can even occur,

21    we would -- our position is there has to be cost shifting

22    that is awarded, that is ordered, before that process can

23    occur, and there is another case I cited earlier in the

24    brief --

25           SPECIAL MASTER RIVERA-SOTO:  Why?  I don't

1     understand why.

2           MR. LITTLE:  Well, for predictability.  Once the

3     scope of what is ordered is decided, that is really the only

4     time when you are going to know how much burden it's going

5     to cost, and you know, they could make the decision whether

6     they are going to incur that or not.

7           SPECIAL MASTER RIVERA-SOTO:  I find that difficult

8     to comprehend.  Let me tell you why.  It would require

9     making a decision in a vacuum, and I don't think courts like

10    to make decisions in a vacuum.  You make decisions based

11    upon facts.

12          MR. LITTLE:  Would you like to hear more

13    information about what is in these files and what exists as

14    to the responsive documents?

15          SPECIAL MASTER RIVERA-SOTO:  I am assuming that

16    whatever is in the files, particularly since these are

17    25-year-old files, that before they were sent to storage,

18    they were purged because that is common practice in every

19    courtroom.  You take out all extraneous documents and you

20    only preserve that which is important.  As far as I am

21    concerned, there is already a determination made by the

22    record custodian as to what is important and what isn't.

23    What is left is what's important, and somebody needs to look

24    at that.

25          The way that you do that, at least the way that

1    I've always done it, is lawyers take a customary review.

2    They determine what they think might be privileged or might

3    not be privileged.  They segregate out what they think is

4    privileged, and they create a privilege log, and then they

5    take all of the other stuff, and they put Bates numbers on

6    them and they produce it.

7          You know, we are not doing magic here.

8          MR. LITTLE:  I understand.  I think I can provide a

9    lot information about different categories and different

10   layers of --

11         SPECIAL MASTER RIVERA-SOTO:  And I would have loved

12   to have had that, so that I could have reviewed it before I

13   came here today.

14         MR. LITTLE:  Well, I think that we're able to talk

15   about it even hypothetically because it is uniform across

16   the entire universe of documents that we are talking about,

17   but if you need that information in front of you, I

18   understand that, and again, we would just ask leave to

19   supplement the record --

20         SPECIAL MASTER RIVERA-SOTO:  See, my problem, Mr.

21   Little, is that it is not only unfair to me, but it is

22   unfair to the parties, because they have not had the

23   opportunity to look at what it is that you want to present

24   now and address it in an informed way.

25         That's not how our system works.  We give people

1        notice and the opportunity to reply.

2                You don't come in at the 11th hour and say, oh, by

3        the way, there is all this stuff, and maybe I should have

4        given it to you three weeks ago, but here it is now.

5                I will tell you 99.999 percent of the time, you do

6        that to a Court, and that judge is going to get really

7        cranky with you.  I hopefully have not been really cranky

8        with you, but I am concerned.

9                MR. LITTLE:  And we hear your concerns.

10               I would just say that the cases that we cited in

11       our brief stand for the proposition that the award of costs

12       should happen before that process takes place.

13               And this case is a better example of that than

14       either of the cases that we cited.  I know it's unusual, and

15       I know that it doesn't fall in line with a lot of the other

16       production that you may have had in your experience, but

17       that is what these cases say, and we would ask for the same

18       thing, your Honor.

19               SPECIAL MASTER RIVERA-SOTO:  Is there anything else

20       you would like to address?

21               MR. LITTLE:  That is it.

22               SPECIAL MASTER RIVERA-SOTO:  Well, you are going to

23       get two more chances, though -- one more chance, sorry.

24               MR. C. PLACITELLA:  I did forget one thing,

25       which --

```
 1                SPECIAL MASTER RIVERA-SOTO:  We can't have that,
 2     Mr. Placitella.  You cannot be forgetting things.
 3                Come on up.
 4                (Laughter)
 5                MR. C. PLACITELLA:  So I wrote it down, and I
 6     forgot to address it.
 7                SPECIAL MASTER RIVERA-SOTO:  You and I are entitled
 8     to senior minds --
 9                MR. C. PLACITELLA:  Thank you.  More and more --
10                SPECIAL MASTER RIVERA-SOTO:  -- no one else in this
11     courtroom, but Mr. Placitella and I are.
12                (Laughter)
13                MR. C. PLACITELLA:  So obviously you know how we
14     feel about discovery of putative class members.
15                In the event that the Court disagrees with me, and
16     I have some sense that that might be the case --
17                (Laughter)
18                -- that the issue still comes down to Rule 26 with
19     proportionality, and I would suggest, if that's where you
20     are going, the following:
21                That a select group of files name a select sub set
22     be looked at, rather than put, you know, these firms through
23     this kind of burden, because that will give you a view about
24     whether more than that will be productive.
25                So, you know, pick files.  If there's 3,000 files,
```

```
 1          pick 30 random files, whatever the Court thinks is required
 2          to satisfy your concerns and deal with the issue of
 3          proportionality.  Then give the plaintiffs' counsel the
 4          mission of what to look for, and what I mean by that is if
 5          the issue here is what was communicated to the plaintiffs,
 6          what is the available evidence that was communicated, that
 7          is a much easier burden to determine whether ten files, 20
 8          files or 30 files have it.
 9                  You may see after 30 files, that that is just not
10          the kind of information that's in these files.  But if they
11          have a specific mission directed by your Honor for what they
12          are looking for versus give me all the medical records --
13                  SPECIAL MASTER RIVERA-SOTO:  The specific mission
14          has been defined by Chief Judge Linares.  He says:
15          Defendants will be entitled to discovery what plaintiffs and
16          their counsel knew and were told and whether any knowledge
17          or lack thereof contributed to plaintiffs' decision on
18          developing the underlying case --
19                  MR. C. PLACITELLA:  I agree with exactly that, so
20          we are on the same page.
21                  SPECIAL MASTER RIVERA-SOTO:  I might be able to put
22          it better, but I am not going to.
23                  MR. C. PLACITELLA:  No.  I agree with exactly that,
24          so that does not mean that they are going to produce medical
25          records or old depositions that have nothing -- what we are
```

```
 1   talking about is what was known about Emtal talc, and if
 2   anything, was communicated about that issue.
 3           SPECIAL MASTER RIVERA-SOTO:  Now, you are talking
 4   relevancy.
 5           MR. C. PLACITELLA:  Well, correct, I am addressing
 6   directly Justice -- Judge -- not Justice -- Chief Judge
 7   Linares' argument and specific direction on scope.
 8           So if that is the charge, and your Honor picks some
 9   sub set of files, that would be consistent with Rule 26, and
10   if there is some demonstration at that point, you know, we
11   can revisit it.  But that to me seems like it would make a
12   lot of sense.  That is what I wrote down, should have
13   argument number one, and I am not saying I lost it yet, but
14   I am feeling not that comfortable about it.
15           SPECIAL MASTER RIVERA-SOTO:  Neither have I.
16           MR. C. PLACITELLA:  So that is what I wrote down,
17   and I appreciate the opportunity to talk about it.
18           Thank you.
19           MR. FARRELL:   May I respond, your Honor?
20           SPECIAL MASTER RIVERA-SOTO:  Mr. Farrell, of
21   course.
22           MR. FARRELL:  So I will try to keep my response
23   brief, but there was a lot just said and frankly a lot --
24           SPECIAL MASTER RIVERA-SOTO:  Please don't try.
25   Please do.
```

1          MR. FARRELL:  Let me just say I think the

2    overarching issue that we just saw from Mr. Placitella's

3    comments is that what he has in mind would entirely defeat

4    the purpose of a class action.  The supposed deficiencies of

5    a class action and the way one is supposed to work, it is

6    something that's 180 degrees from what he seems to be

7    envisioning.

8          SPECIAL MASTER RIVERA-SOTO:  Why is that?

9          MR. FARRELL:  Because this isn't an MDL.  It's not

10   an individual action.

11         He is contemplating a scenario, where individual

12   plaintiffs, one by one in his view, will be given individual

13   notice of the case.  Then come forward, they'll decide

14   whether they want to waive their the privilege or not.  They

15   will decide whether and how they are going to prove

16   causation or not.

17         That isn't the class action, and he has brought a

18   class action case.  He's now offered --

19         SPECIAL MASTER RIVERA-SOTO:  But what he just

20   proposed was something a little bit different than that, and

21   maybe you can tell us.

22         What I understood Mr. Placitella to be saying, and

23   correct me if I'm wrong, Mr. Placitella, but what I

24   understood him to be saying is clearly you are entitled to

25   discovery in respect with the named class representatives,

```
1    so we can take those and put those to the side.

2              In respect of the putative class members, what he

3    was saying is, look, the universe of those files can be as

4    many as 3,000 for one lawyer.  Do we really need to look at

5    all 3,000 files?

6              How about if we select a number of those files, and

7    we do the kind of analysis that needs to be done on them and

8    determine whether there is material that is discoverable,

9    and among that whether there is material that is privileged

10   and which ought to be asserted.

11             The one thing that I did not like as to what Mr.

12   Placitella said is that -- and maybe I just understood it

13   wrong -- but I understood it to be that someone on the

14   plaintiffs' side pick the files to look at.  It seems to me

15   that for anything like that to work, it has to be entirely

16   random, and how the privilege questions would be handled may

17   very well also be applied on how the file itself is reviewed

18   in order to determine relevancy.

19             So the question then becomes to you:  Do you really

20   need to look at all 1800 Early files -- I'm sorry -- all

21   3,000 Early files and all 1500 Rothenberg files, and Bevan,

22   I think it's just five or the other way around.

23             MR. FARRELL:  It is four, one of whom is the class

24   representative, Chernick --

25             SPECIAL MASTER RIVERA-SOTO:  Whatever it is,
```

1     whoever has got the small number, they are going to have to

2     produce all of them.

3          MR. FARRELL:  Well, I think, your Honor, that with

4     all due respect to Mr. Placitella, the selection of

5     plaintiffs that we do test cases has already occurred in

6     this case.  It already occurred because Mr. Placitella went

7     to Mr. Bevan and went to Mr. Early and said, I need some

8     class representatives, and he chose five from Ohio, and he

9     chose one from New York, and the selection process of Mr.

10    Bevan's files already occurred.  Mr. Placitella already got

11    a pass at deciding what was relevant, what was reasonable

12    from those documents --

13         SPECIAL MASTER RIVERA-SOTO:  But that is not --

14    that is not, I don't think that that meets what I just

15    described, because what I just described is whoever is a

16    representative plaintiff, produce it.

17         As to the putative class members, instead of

18    looking at all of them, and a number has been bandied about

19    that could be as many as 10,000.  Instead of doing that, in

20    respect of the three applications that are before me for

21    three law firms, that instead someone look at randomly

22    selected sample files.

23         Then we can talk about that, look at those and

24    determine whether there is information in there that is both

25    relevant and to be produced, because you would have to go

```
 1    with the privilege issues, and that would determine whether
 2    you go and look at the remainder.
 3              For example, if you have a lawyer who has 3000
 4    files, you say, okay, in order for this to be statistically
 5    significant, we need to look at ten percent of the files.
 6    That is 300 files.
 7              And in those 300 files, you found absolutely
 8    nothing.  Do you really need to go look at the other 2700?
 9              MR. FARRELL:  I think the issue, your Honor --
10              SPECIAL MASTER RIVERA-SOTO:  I think Mr. Assaf
11    wants to pull on your coat tail for a second.
12              (Laughter)
13              And, Mr. Farrell, I am not saying that is where I
14    am going.  I am trying to explore with you how we can cut
15    through this --
16              MR. FARRELL:  I think we are happy to discuss, and
17    frankly, that is why we invited the meet and confer to extra
18    law firms to try to discuss these sort of issues.
19              Happy to discuss a rolling sampling production.
20    Let's start with ten people.  Let's start with 30 people.
21    We will do it randomly and look at the materials.  As long
22    as it's clear we are not losing sight of the fact that there
23    is still individual reliance on the other elements that we
24    need to deal with for anyone who is going to participate in
25    the case.  Your Honor put it as a choice to make, and I
```

1       agree.

2               In our view, the price of admission for this class

3       action is putting individual reliance at issue and privilege

4       waivers, so on and so forth.

5               We are happy to discuss whether and to what extent

6       there's a way to streamline this, and if there is no

7       information available from the law firms, we can deal with

8       that in a way that we do it in a smaller sample than a

9       larger sample, but we need to not lose sight of the fact

10      that I think the individual files construct that Mr.

11      Placitella is advancing may not fully answer the questions

12      we need to answer in terms of what Mr. Bevan knew about

13      files and so on and so forth.

14              SPECIAL MASTER RIVERA-SOTO:  What if Mr. Placitella

15      has an epiphany and decides that for class certification

16      purposes, he really only wants to certify the class as to

17      liability?

18              MR. FARRELL:  I think that if he makes that choice,

19      he still needs to meet the requirements of Rule 23.

20              SPECIAL MASTER RIVERA-SOTO:  I understand that.

21              But your concern, which really goes to causation,

22      because I gather, and maybe I am wrong, but I gather that no

23      one on the defendants' side is saying that the defendants

24      did not make the representations for that, Emtal talc, that

25      did in fact make the representations that the Emtal talc did

1    not contain asbestos, and that as a result, cases were

2    either outright dismissed or settled for token amounts of

3    money.

4          The question then becomes:  What is the causation

5    between that representation and the plaintiffs' claim to

6    damages.

7          Now, if you file a Rule 23 motion that says we only

8    want to certify the class as to liability, then there are a

9    zillion ways to skin a cat in respect to damages,

10   and you can have a separate damages trial, where you have

11   everybody walk into the courtroom, start saying what they

12   want to say.  And if they don't, then they haven't proven

13   their damages.

14         You can have a claims proceeding, which frankly is

15   a personal favorite of mine, because it is a clean way to

16   handle differing damages of claims of respective plaintiffs

17   who may have commonality of issues.

18         Those are all things that can come later.  But for

19   today's purposes, what is wrong with doing in respect of the

20   putative class members, doing some statistically significant

21   discovery that does not mean a hundred percent?

22         MR. FARRELL:  Well, we are happy to discuss the

23   statistically significant sampling from the law firms, but I

24   think that is a different issue than what your Honor was

25   just raising on a liability class versus causation.

```
1              Causation is liability.  There is no liability
2      without causation.  There's no liability in this case simply
3      for saying X.  It's saying X and causing something to occur
4      because of that, and that is frankly the focus of Chief
5      Judge Linares' opinion and what discovery needs to focus on
6      is that connection.
7              That is the reason we need discovery from the
8      plaintiffs and from the plaintiffs' law firms is the
9      causation question, because I think just to pick up on what
10     Mr. Placitella was saying about the supposed admissions of
11     defense counsel, first of all, the letter that he showed
12     your Honor with respect to the Rothenberg firm, the Reister
13     letter you saw this morning, talks about 300 Pennsylvania
14     cases, when the Rothenberg says there are 1800.  The letter
15     doesn't even get to the numbers that the plaintiffs are
16     talking about.
17             So let's assume even that the letter is correct,
18     that the defense lawyer has said, these cases were dismissed
19     because of X.  That would be akin to me offering to settle
20     this case with Mr. Placitella --
21             SPECIAL MASTER RIVERA-SOTO:  Let me help you on
22     that.
23             The November 12th, 2008 letter is not carrying a
24     lot of weight for me.
25             MR. FARRELL:  So it leaves then the question, your
```

1       Honor, of how we get to the issue of causation.  Whether you

2       call it reliance, relying on an evidential record that was

3       incomplete, at the end of the day, I think your Honor's --

4       one of the first things you said this morning was every tort

5       has causation as an element, and you will never prove

6       liability in a case without proving causation.

7               Everything you have heard from Mr. Placitella this

8       morning is frankly a very creative way of trying to avoid

9       that issue, to avoid what Judge Linares has already ruled,

10      and to avoid the critical issue in this case, which is that

11      the question of causation can really only be answered from

12      the plaintiffs' side of these equations because only the

13      plaintiffs and their lawyers know what they believed about

14      their cases, whether they were meritorious cases or not

15      meritorious cases, whether they actually intended to take

16      them to trial, whether dismissing the case wasn't a big deal

17      to them, because they didn't really have an injury in the

18      first place.

19              And that's an issue we haven't gotten into yet,

20      your Honor, and something we will need to account for in

21      this statistically significant sample size if that is the

22      road we go down, which is to say that plaintiffs' counsel

23      has selected five cancer patients -- plaintiffs from the

24      Bavan firm, but 90 percent of this class didn't have cancer

25      when they filed their cases.

1              They were the plaintiffs who simply had a chest

2       x-ray and claimed they had a -- and were basically just

3       filing mass actions for a period of 25 years, and this is

4       why we have asked for things like medical records and so on

5       and so forth, because even in addition to the question of

6       causation, I think it's going to be a real issue for the

7       people who frankly didn't have a legitimate basis for their

8       injury and for their claim.  You have the question of

9       whether or not this really is one class.  Are the people who

10      had mesothelioma truly representative of the people who did

11      not.

12              Are there common questions between the people who

13      had mesothelioma and who did not?

14              The people in Ohio versus other states and the

15      other points that Mr. Assaf was making this morning.

16              So I think those two things are the things we need

17      to be focusing on.  Whether we're doing this as a rolling

18      production, a sample production, so on and so forth, I'm

19      happy to discuss all of that this afternoon when we talk

20      about the discovery plan, but it needs to be something that

21      is shooting at the thing that everybody here needs to be

22      shooting at, which is proving causation and figuring out

23      whether there is actually a certifiable claim here, which in

24      our view, there is not.

25              SPECIAL MASTER RIVERA-SOTO:  Do you have anything

```
1          different to argue in respect to Early and Rothenberg?
2                    MR. FARRELL:  Only to say that I think that the
3          burden claims there are even weaker than they are for the
4          Bevan firm, the number of plaintiffs are smaller.
5                    I do think it is noteworthy that the Early firm
6          made the identical burden claim, even though they have only
7          four files, and one of whom is a class representative, who,
8          of course, has an obligation to produce the documents in her
9          possession, custody and control, so I think it illustrates
10         the conclusory nature of the burden objections.  But beyond
11         that, no, your Hoor.
12                   SPECIAL MASTER RIVERA-SOTO:  Mr. Little, do you
13         have something else you want to add?
14                   MR. LITTLE:  I don't have anything else to add.
15                   SPECIAL MASTER RIVERA-SOTO:  Okay.
16                   Mr. Placitella, anything else?
17                   MR. C. PLACITELLA:  I think -- well, I don't know
18         when you want to hear from Mr. Rothenberg --
19                   SPECIAL MASTER RIVERA-SOTO:  We're going to get to
20         them in a moment.
21                   MR. C. PLACITELLA:  So --
22                 SPECIAL MASTER RIVERA-SOTO:  I'm sorry, Mr. Sokolove.
23                   MR. C. PLACITELLA:   It's the same for all three.
24                   SPECIAL MASTER RIVERA-SOTO:  Okay.  That is a good
25         argument.  Stop.
```

1              (Laughter)

2              MR. C. PLACITELLA:  They are not asking for in

3    their subpoenas, give me the communications between Mr.

4    Rothenberg or Mr. Bevan and the client about this issue.

5    It's --

6              SPECIAL MASTER RIVERA-SOTO:  Give me the entire

7    file.

8              MR. C. PLACITELLA:  -- give me the entire file.

9    Give me everything, even though Judge Linares was extremely

10   clear that that is not what this case is about, that the

11   scope is limited to that issue, so -- and that also goes

12   to --

13             SPECIAL MASTER RIVERA-SOTO:  Well, but normal

14   discovery would involve discovery as to whether a plaintiff

15   has damages that are causally related to the breach of the

16   duty, and here the claim is that the breach of the duty was

17   the failure to provide information, and in fact, make an

18   affirmative misrepresentation concerning the information.

19   You still have to connect those dots.

20             MR. C. PLACITELLA:  Absolutely.  I am not fighting

21   that.  What I'm saying is --

22             SPECIAL MASTER RIVERA-SOTO:  That is important

23   because if the claim is, I lied to you about the content of

24   asbestos in my talc, but you don't have asbestosis --

25             MR. C. PLACITELLA:  See, now we're going to a

```
1        different place.  That is specifically what the Third

2        Circuit and Judge Linares said we can't do.  All right?

3               There was a well-pled complaint by these people.

4        It was never dismissed on motion.  Whether or not somebody

5        has asbestosis, that can't be litigated here.  They

6        forfeited that when they had these cases dismissed

7        fraudulently.  Whether or not someone had -- if there is an

8        allegation --

9               SPECIAL MASTER RIVERA-SOTO:  If your argument is

10       forfeiture, I have to tell you very candidly, I don't think

11       that argument is --

12              MR. C. PLACITELLA:  It's not forfeiture, your

13       Honor.  It is that the merits of the underlying claims are

14       not at issue here.  The Third Circuit has said that, and

15       Judge Linares has said that two different times.

16              So whether or not somebody actually had -- they

17       filed a complaint on a good faith basis saying they had

18       asbestosis, they had whatever their expert -- it is not a

19       battle of the experts here about whether the person had

20       asbestosis.  That ship has sailed, right?

21              The issue -- they have -- excuse me -- they have

22       the information already about what injury was claimed and

23       what their position was on that.

24              This is not, and I will get my book, if I need to,

25       to cite chapter and verse, but according to Judge Linares on
```

```
 1    multiple occasions and the Third Circuit, this is net a redo
 2    of the underlying case.  We are not here to litigate whether
 3    the person had asbestosis or not.
 4            They made that allegation, and the case was
 5    dismissed.  That is not something that would be tried here,
 6    because Rooker-Feldman told us we can't do that, and if we
 7    can't go in and say, pay this person because they had
 8    mesothelioma, and this is everything that they've gone
 9    through, and this is all the bad things in the underlying
10    case, we can't litigate that defense now, so there is a
11    common harm.
12            SPECIAL MASTER RIVERA-SOTO:  I understand that, but
13    how are you going to prove your damages?
14            MR. C. PLACITELLA:  The common harm here --
15            SPECIAL MASTER RIVERA-SOTO:  I'm not asking you
16    about common harm.
17            How are you going to prove your damages?
18            MR. C. PLACITELLA:  Well, there are, I believe,
19    classwide damages, and I believe there are individual
20    damages.
21            SPECIAL MASTER RIVERA-SOTO:  Let's start with an
22    individual.  Let's start with one of the named
23    representative plaintiffs, Ms. Williams.
24            MR. C. PLACITELLA:  Right.
25            SPECIAL MASTER RIVERA-SOTO:  How are you going to
```

1    prove her damages?

2            MR. C. PLACITELLA:  There are a number of elements

3    of damages that I would be entitled to prove.

4            SPECIAL MASTER RIVERA-SOTO:  Tell me.

5            MR. C. PLACITELLA:  One, I would be entitled to

6    prove the money, expense and time it took to expose the

7    fraud and attempt to reconstruct a record that was

8    destroyed.

9            That is a damage specifically recognized by the

10   Third Circuit available in this case.  That is a damage to

11   Ms. Williams to the class.  That is a classwide damage.

12           SPECIAL MASTER RIVERA-SOTO:  I asked you, please,

13   if you could just address the damages of Mrs. Williams.

14           MR. C. PLACITELLA:  Well, Mrs. Williams would have

15   whatever extra costs and burden it would be to assemble her

16   claim.  That would be one damage.  The inability to present

17   her case is a damage.  She was deprived --

18           SPECIAL MASTER RIVERA-SOTO:  How are you going to

19   quantify that?

20           MR. C. PLACITELLA:  -- she was deprived -- well, a

21   jury is going to have to answer some of these questions.

22           She was deprived of the information necessary to

23   make informed choices in her case.  She was not provided the

24   information that would help her prove her case.  That is an

25   element of her damage.

1        She also --

2              SPECIAL MASTER RIVERA-SOTO:  Work with me --

3              MR. C. PLACITELLA:  -- she also --

4              SPECIAL MASTER RIVERA-SOTO:  -- work with me on

5    this one.

6              Let us say, and this is just pure hypothetical:

7    Mrs. Williams' damages in the underlying case were $10,000,

8    and she settled her underlying case against all other

9    defendants for $10,000.  What are her damages?

10             MR. C. PLACITELLA:  Her damages are focused on the

11   case against BASF.  No one has made --

12             SPECIAL MASTER RIVERA-SOTO:  She's been made whole.

13             MR. C. PLACITELLA:  -- well, there will never be a

14   determination that she has been made whole by settlements

15   under our law --

16             SPECIAL MASTER RIVERA-SOTO:  What additional damage

17   did she incur that was not already compensated for --

18             MR. C. PLACITELLA:  She lost -- first of all --

19             SPECIAL MASTER RIVERA-SOTO:  -- under my

20   hypothetical?

21             MR. C. PLACITELLA:  -- under your hypothetical, if

22   she took a hundred dollars from all the other defendants,

23   she is still, for whatever reasons, she didn't think her

24   proof was good against them.  They were about to go

25   bankrupt.  They -- they -- the product I.D. was poor --

1          SPECIAL MASTER RIVERA-SOTO:  You are changing my

2     facts.  My facts are very simple.

3          Her recoverable damages, if all of the gods smiled

4     on her for $10,000, and she settled for $10,000 from all

5     defendants except for Engelhard --

6          MR. C. PLACITELLA:  Well, we don't know what her

7     recoverable damages are because they have never been tried

8     to a jury, and under our law you can settle with a defendant

9     and still make a determination to go to trial against

10    another defendant, okay?

11         SPECIAL MASTER RIVERA-SOTO:  Provided you still

12    have damages.

13         MR. C. PLACITELLA:  Well, her damages are, if it

14    was in our underlying case, that she suffered and died from

15    mesothelioma that was caused by exposure to asbestos from

16    the products of the defendant at issue.  That is her

17    damages.

18         SPECIAL MASTER RIVERA-SOTO:  But we can't

19    relitigate that --

20         MR. C. PLACITELLA:  We're not allowed to do that --

21         SPECIAL MASTER RIVERA-SOTO:  Because of

22    Rooker-Feldman.

23         MR. C. PLACITELLA:  That's exactly right.  We can't

24    do that, right?

25         The only thing we can say is, and we can't look at

1       what somebody else paid here below, because Mrs. Williams

2       was never given the opportunity to quantify those damages.

3               So it is irrelevant what she got from another

4       defendant, because she had the right below, which was taken

5       from her to decide whether or not she was going to try her

6       case again Engelhard because --

7               SPECIAL MASTER RIVERA-SOTO:  I am not sure I

8       understand that.

9               Let me give you a different sort of a set of facts.

10      Let us assume that Mrs. Williams had $10,000 worth of

11      damages, and she settles against all of the other

12      defendants, other than Engelhard for $15,000.

13              Does she still have a cause of action against

14      Engelhard?

15              MR. C. PLACITELLA:  Yes, because under our law, if

16      I am trying that case below, let's just talk about the case

17      below, I can still try that case because under New Jersey

18      law, I get the benefit of the bargain when I am making a

19      settlement.

20              If I make a bad settlement, and the defendant is

21      apportioned a certain percentage, then that's on me.

22              If I make a good settlement, I get the benefit of

23      that, and Mrs. Williams has the right --

24              SPECIAL MASTER RIVERA-SOTO:  So you can get double

25      recovery?

```
1              MR. C. PLACITELLA:  It is not a double recovery.
2     The law says I can settle with everybody, and I can still go
3     to trial against Engelhard and ask a jury for a
4     determination on what is the value of loss of services, my
5     pain and suffering, my economic losses --
6              SPECIAL MASTER RIVERA-SOTO:  See, you're not
7     changing my hypothetical.
8              My hypothetical is her provable damages are
9     $10,000 --
10             MR. C. PLACITELLA:  Her provable damages are only a
11    function of what a jury would say they are, your Honor.
12    It is not what somebody else said --
13             SPECIAL MASTER RIVERA-SOTO:  She is going to have
14    to say at some point or another, okay, at least in New
15    Jersey, she is going to have to say these are my damages,
16    because I will tell you right now, even if you plead
17    unliquidated damages in your complaint, Rule 4:5-2, as a
18    provision for a written request for the amount of damages
19    claimed that the plaintiff must respond to within five days.
20             So at some point or another, a number is going to
21    have to be attached to her damages.
22             My hypothetical to you is:  Assume that she had
23    recoverable damages from across the board, $10,0000.  She
24    settles for $15,000 from all other defendants except from
25    Engelhard.  Does she still have a cause of action against
```

1    Engelhard?

2              MR. C. PLACITELLA:  Absolutely.  Absolutely.

3    Because she had the right to bring that case, and she had

4    the right to go to a jury and say it was --

5              SPECIAL MASTER RIVERA-SOTO:  What are her damages

6    against Engelhard?

7              MR. C. PLACITELLA:  Her damages against

8    Engelhard --

9              SPECIAL MASTER RIVERA-SOTO:  She recovered $15,000

10   from a ten-thousand-dollar case.  What are her damages?

11             MR. C. PLACITELLA:  Who made the determination it

12   was a ten-thousand-dollar case?

13             SPECIAL MASTER RIVERA-SOTO:  That's all she can

14   prove.  She can prove $10,000.

15             MR. C. PLACITELLA:  To who?

16             SPECIAL MASTER RIVERA-SOTO:  To anybody.

17             MR. C. PLACITELLA:  But she was never given that

18   right.  It was taken from her.

19             SPECIAL MASTER RIVERA-SOTO:  Well, let's --

20             MR. C. PLACITELLA:  So let's have her come in this

21   courtroom --

22             SPECIAL MASTER RIVERA-SOTO:  -- I will make it

23   easier.

24             Somebody issued a Rule 4:5-2 written request, and

25   she puts in there that her damages are $10,000, her

```
 1        admission.

 2                 She then settles for fifteen.

 3                 What damages does she have against a non settling

 4        defendant?

 5                 MR. C. PLACITELLA:  She has the damages.  She has a

 6        right unless there is an enforcement, she has a right to go

 7        to trial against that defendant.

 8                 SPECIAL MASTER RIVERA-SOTO:  To prove what damages?

 9                 MR. C. PLACITELLA:  To prove her pain and

10        suffering, loss of services, all of the things that she

11        would be entitled to --

12                 SPECIAL MASTER RIVERA-SOTO:  We are going around

13        and around.

14                 MR. C. PLACITELLA:  -- under New Jersey -- yeah.

15        We definitely have a disconnect.

16                 The issue here is that was taken from her, that

17        choice was taken from her.

18                 She has a right, if I read your Honor's opinions,

19        if I read Judge Linares' opinions, if I read the Third

20        Circuit's opinions, she has a right to be made whole.

21                 Part of being made whole is to be able to bring the

22        case that she was derived of, and she is entitled, and a

23        jury is entitled to hear what that is, and we will prove

24        that at the time of trial.

25                 She is not limited upfront.  I've never seen a tort
```

```
 1    case that I tried in, I won't go to 40 years yet, but I am
 2    pushing it --
 3         SPECIAL MASTER RIVERA-SOTO:  Now you are making me
 4    feel old.
 5         (Laughter)
 6         MR. C. PLACITELLA:  -- I've never seen a tort case,
 7    where I walked into the courtroom and been limited by a
 8    piece of paper that was filed early in a case.
 9         That has never happened.  It's never happened, and
10    there has to be, if it was an underlying case apportionment
11    because if she settled, let's say she settled for $15,000,
12    the jury determined she was entitled to ten.  She settled
13    with everybody else for $15,0000.  There was no
14    apportionment to liability other than the defendant at trial
15    for the 10,000.  She gets the 10,000 from that defendant at
16    trial.
17         The fact that she settled for 15,000 is of no
18    moment in terms of what she is allowed to take home.
19         SPECIAL MASTER RIVERA-SOTO:  Is there anything else
20    that you would like to add in respect to the third-party
21    witnesses and subpoenas duces tecum?
22         THE REPORTER:  Judge, can we take a short break?
23         SPECIAL MASTER RIVERA-SOTO:  Yes.  Please let me
24    know.
25         We are going to take a short break, because the
```

 1        court reporter needs it.

 2                   MR. C. PLACITELLA:   Thank you.

 3                   (Recess taken)

 4                   SPECIAL MASTER RIVERA-SOTO:   Mr. Assaf, did you

 5        lose your opponents?

 6                   MR. ASSAF:   They are coming, your Honor.

 7                   SPECIAL MASTER RIVERA-SOTO:   We are back on the

 8        record.

 9                   Before you come up, Mr. Sokolove, is there anything

10        else that you wanted to say, Mr. Farrell?

11                   MR. FARRELL:   Yes, your Honor, very briefly.

12                   SPECIAL MASTER RIVERA-SOTO:   You now only have two

13        cards instead of the three that you had before.

14                   MR. FARRELL:   We are making progress, fewer cards.

15                   A few points just in response to what Mr.

16        Placitella just said.

17                   First, the answer to your Honor's question, the

18        hypothetical, $10,000 in damages, the answer is zero.   The

19        plaintiff would have zero damages.

20                   Two:   We are not trying to prove different facts in

21        the historical cases, but we are entitled to know what the

22        relevant facts of those cases are, and there are at least

23        two reasons we need to know that.

24                   First:   What the plaintiffs and the lawyers

25        believed about their claims is obviously relevant and was

1          addressed by Chief Judge Linares.  If the plaintiffs

2     believed they did not actually have an injury, if the

3     plaintiffs believed they were not in fact exposed to

4     Emtal talc, if they believed their case was going to be

5     dismissed for lack of product identification, statute of

6     limitations, so on and so forth, that is clearly relevant to

7     whether there is a causal connection between statements by

8     the defendants and why the case was dismissed or settled.

9          Beyond that, it is also frankly just relevant

10    whether these plaintiffs have an actual connection to

11    Engelhard.

12         Was there product I.D.?

13         Did they actually have an injury?

14         What injury did they have?

15         Many of these cases, as I am sure your Honor has

16    seen in our papers, have been determined to have been

17    fraudulent the first time around.  How can that not be

18    relevant for the reasons why a case was or was not

19    dismissed, settled and so on and so forth?

20         The last point I wanted to make is when your Honor

21    started to push Mr. Placitella about, well, how are you

22    going to prove your damages here, he kept trying to go this

23    way and that way, but ultimately ended up exactly where we

24    all knew he was going to end up, which is that he wants to

25    stand up in front of a jury and say plaintiff X had

```
 1    mesothelioma, and she suffered and died and she is entitled

 2    to substantial damages.

 3              But even though that is what he would say to the

 4    jury, he wants to prevent the defendants from taking any

 5    discovery as to whether she actually had mesothelioma,

 6    whether she was actually exposed to Emtal talc, whether

 7    there was a connection between statements the defendants

 8    made, and why the case was dismissed, so on and so forth.

 9              He can't have it both ways on the issue.  If that

10    is where we are heading with damages, then we are entitled

11    to take discovery on those issues, on the damages question,

12    and then independently because of the causation issues we

13    have already talked about.

14              Thank you, your HOnor.

15              SPECIAL MASTER RIVERA-SOTO:  Thank you.

16              Mr. Sokolove, are you speaking in lieu of Ms.

17    Kizis?

18              MR. SOKOLOVE:  Yes, your Honor.

19              SPECIAL MASTER RIVERA-SOTO:  Did I pronounce that

20    correctly?

21              MS. KIZIS:  You did, your Honor.

22              Lynne Kizis, local counsel for Mr. Sokolove.

23              SPECIAL MASTER RIVERA-SOTO:  Thank you, Ms. Kizis.

24              Have you been admitted pro hac vice?

25              MR. SOKOLOVE:  Yes, your Honor.
```

```
 1                    THE REPORTER:  Can you just spell your last name?

 2                    MR. SOKOLOVE:  S-o-k-o-l-o-v-e, and I am not

 3          related to the guy on TV.

 4                    SPECIAL MASTER RIVERA-SOTO:  Well, now that we have

 5          cleared that up.

 6                    (Laughter)

 7                    MR. SOKOLOVE:  At the risk of bringing this back to

 8          the mundane, I am here just to talk about Mr. Rothenberg and

 9          his firm.  I think that's --

10                    SPECIAL MASTER RIVERA-SOTO:  I just walked past his

11          building on Monday.

12                    MR. SOKOLOVE:  Oh, the other day?

13                    SPECIAL MASTER RIVERA-SOTO:  Yes, and I hear his

14          advertisements on KYW.

15                    MR. SOKOLOVE:  No, that's not him.

16                    SPECIAL MASTER RIVERA-SOTO:  Is that a different

17          Rothenberg?

18                    MR. SOKOLOVE:  Yes, it is.

19                    I think you are hearing Mr. Rothman.

20                    SPECIAL MASTER RIVERA-SOTO:  No, Rothenberg.

21                    MR. SOKOLOVE:  Not his.

22                    In any event, your Honor, he is -- at this point

23          he's a 78-year-old man.  He was in his prime back 25 years

24          ago when these cases were there.  I want to try to bring --

25                    SPECIAL MASTER RIVERA-SOTO:  Does that mean that I
```

```
 1        am no longer in my prime?

 2                 (Laughter)

 3                 MR. SOKOLOVE:  I don't think you are that old, your

 4        Honor, and he didn't include me on the list of older guys,

 5        and he should have.

 6                 (Laughter)

 7                 You know, I want to talk for a minute about some

 8        real people, and I am going to quote three people, twice,

 9        your Honor, and once Mr. Farrell.

10                 I heard the words "decision in a vacuum, normal

11        discovery consideration and price of admission." I would

12        like to address them for a minute.

13                 First of all, this is not normal discovery.  This

14        is abnormal discovery.  This is discovery of a law firm

15        about a case that today this law firm is not involved with.

16        They are the absent whatever we want to call them.

17                 In fact, I would go so far as to say that, you

18        know, 25 years ago we were probably dealing with mostly

19        middle-aged men, most of whom are dead by now whether by

20        asbestosis or natural causes.  We have no idea, none of us

21        in this courtroom, we have no idea whether their heirs,

22        which heir, some who might not be alive either by the way,

23        we have no idea which one, if any of them, would choose to

24        go forward with this case or not.  But some of them perhaps

25        don't want Dad's files to be out there exposed, don't want
```

```
1    the medical records of Dad or Mom to be exposed, but we just

2    don't know.

3               We have no idea about what the view of the heirs

4    probably of Dad or Mom are.

5               SPECIAL MASTER RIVERA-SOTO:  Well, wouldn't we get

6    the opportunity to hear that once --

7               MR. SOKOLOVE:  Well, not if one's -- oh, I' sorry.

8               SPECIAL MASTER RIVERA-SOTO:  -- once if a class

9    does get in fact certified and they get notice?

10              MR. SOKOLOVE:  Well, yes, except the discovery

11   proceeding, the files that we are asking to open are right

12   now and --

13              SPECIAL MASTER RIVERA-SOTO:  But how is that not --

14              MR. SOKOLOVE:  -- well, because they have

15   legitimate privacy rights.  They have lawyer-client --

16              SPECIAL MASTER RIVERA-SOTO:  Well, privacy rights

17   are the decedent's, and the decedent is dead, and so you

18   don't have privacy rights after you are dead.

19              MR. SOKOLOVE:  I am not sure, your Honor, under any

20   number of statutes or court cases that an heir would not

21   have the right to say, "I don't want Mom's or Dad's medical

22   records to go out there in the public domain."

23              I don't think --

24              SPECIAL MASTER RIVERA-SOTO:  They are not going

25   into the public domain.
```

1              They are being handled by reputable lawyers and

2       reputable law firms pursuant to a discovery

3       confidentiality --

4              MR. SOKOLOVE:  That may be --

5              SPECIAL MASTER RIVERA-SOTO:  -- that has sanctions

6       attached to it --

7              MR. SOKOLOVE:  -- that I understand, your Honor,

8       but nonetheless, they do have -- there are privileges here,

9       and the point of this, what I want to get to here, but I

10      think the most important thing here is that it is not normal

11      discovery, first of all.

12             So what we are really talking about is in this

13      particular case, I mean, it has not been a motion to enforce

14      that I know of with respect to Rothman -- Rothenberg even

15      though we are here talking about this --

16             SPECIAL MASTER RIVERA-SOTO:  Well, Rothenberg filed

17      a motion to quash.

18             MR. SOKOLOVE:  He did, and Judge Linares

19      specifically said:  Effectively we are going to hold the

20      issue in abeyance.

21             I asked His Honor in open court, I said I want to

22      understand your ruling.  Does this mean we are required to

23      turn over?

24             And his specific response on the record here was,

25      no, no, no.  Right now, you know, things are going to stay

```
1        status quo, and I was very happy --

2              SPECIAL MASTER RIVERA-SOTO:  I am changing the

3        status quo --

4              MR. SOKOLOVE:  -- well, I understand.  So now let's

5        talk about where we are.  It is not normal discovery.

6              When your Honor raised the question or made the

7        comment about, you know, it is not normal for decisions to

8        be undertaken in a vacuum, I couldn't agree more.

9              On the other hand -- not on the other hand --

10             SPECIAL MASTER RIVERA-SOTO:  On the same hand.

11             MR. SOKOLOVE:  -- I was saying that being

12       consistent with that, you know, your Honor, to put down an

13       amount of money it would cost, just think about what this

14       means.

15             First of all, Mr. Rothenberg has to go find the

16       files.  They are in storage somewhere, not that big a cost.

17       He is responsible for keeping his files not for 25 years,

18       but keeping his files, fine.

19             He gets them.  The cost of having to go out to each

20       and every one of these individual heirs, first, you have to

21       figure out who the heirs are.  You have to probably do a

22       tremendous amount of search work, and then what happens when

23       the sister and the brother disagree?

24             One says:  Sure, turn the files over.

25             The other one says:  I am going to get a lawyer.  I
```

1        don't want the files turned over.

2                We don't even know who represents this file at this

3        point because they are not Rothenberg's clients any more,

4        but he is in physical possession of somebody else's private

5        material, so that is bad enough.

6                But when we get to the question of quantifying how

7        much it would cost, I can't imagine that one at this point

8        could put a real number in an affidavit that is an honest

9        number as to how much it would cost per file to reach the

10       heirs or the heirs of heirs who maybe are in different

11       states at this point.  How could one quantify that number

12       except for to say, as we did in our papers, it is going to

13       be damn expensive?

14               SPECIAL MASTER RIVERA-SOTO:  Well, but why not, why

15       not take one, and go through the process in respect to that

16       one file and then say, look, I did one.  This is how much it

17       costs.  And if I have 3000 files or 1800 files in the case

18       of your client, multiply that by 1800, and I am looking at a

19       motion to quash that was filed in January.  It is now

20       October.  There was a lot of time between then and now to at

21       least try to provide some kind of factual basis on which to

22       decide.

23               MR. SOKOLOVE:  Your Honor, I don't disagree there

24       has been a passage of time.

25               I believe that our client understood.  I certainly

     1    understood that at this juncture, since there wasn't an
     2    outstanding motion with respect to Rothenberg to produce
     3    those files now.  I thought we were kind of in this
     4    in-between stage, where when the issues involving the
     5    questions of privilege and the other items came to pass, and
     6    we had a better view of what the potential size and scope
     7    and nature of the type of material.
     8         So, for example, I wouldn't know on behalf of Mr.
     9    Rothenberg today, I wouldn't know for certain and certainly
    10    until this hearing is over today, I wouldn't even know what
    11    information specifically is being requested or required to
    12    be pulled from a file to then go to the heir of Mr. Smith
    13    and say, this is what we are looking to pull out, and now
    14    that we found you, how do you feel about it, are we going to
    15    be able to produce it or not.
    16         There is a cost involved with each and every
    17    individual, and I can't imagine what that would be as a
    18    whole, so we weren't about to go on that kind of a search in
    19    a vacuum.
    20         SPECIAL MASTER RIVERA-SOTO:  Mr. Sokolove, help me
    21    out here.
    22         MR. SOKOLOVE:  Yes, sir.
    23         SPECIAL MASTER RIVERA-SOTO:  Okay.  There is a
    24    subpoena duces tecum that was served on your client.  Your
    25    client filed a motion to quash.

```
 1                I think I have made it abundantly clear that my job

 2       is very simply summarized as getting this case moving.

 3       This case is six years old, and we are talking about

 4       discovery.

 5                It boggles the mind.  But be that as it may, that's

 6       where we are, and my charter from Chief Judge Linares and

 7       Magistrate Judge Dickson is get the case trial ready, so

 8       that is my prime directive.

 9                MR. SOKOLOVE:  So may I make a suggestion?

10                SPECIAL MASTER RIVERA-SOTO:  How do I address your

11       motion?

12                MR. SOKOLOVE:  So let me take one other quote and

13       work around it from there.

14                Mr. Farrell made reference to the price of

15       admission.  It is an interesting term.  It's certainly a

16       term perhaps with respect to the parties and the attorneys

17       who were involved in this case.

18                Mr. Rothenberg and his client are neither, and to

19       conflate the price of admission with a non party's clients,

20       it is just simply wrong.

21                SPECIAL MASTER RIVERA-SOTO:  See, I don't agree

22       with you on that, because I start from a far more mental

23       process, and that is:  I was taught in law school back when

24       they said these things, that everyone owes his testimony to

25       the sovereign.
```

1           You may remember that.

2           MR. SOKOLOVE:  I do.

3           SPECIAL MASTER RIVERA-SOTO:  Isn't this testimony

4    that is owed to the sovereign?

5           MR. SOKOLOVE:  Perhaps, but the question of price

6    of admission was not resolved anywhere in any of that

7    context, because unfortunately sometimes when you have to

8    come before the sovereign, there is a price of admission,

9    and very often somebody has to pay it.

10          But here is the problem, your Honor.  My client at

11   least at this point, Mr. Rothenberg and his firm, let alone

12   the associate who used to work with him 15 years ago, who

13   has been the individual subpoenaed to come testify, okay,

14   they have not asked for admission, and they aren't --

15          SPECIAL MASTER RIVERA-SOTO:  But they owe their

16   testimony.

17          MR. SOKOLOVE:  Perhaps.

18          SPECIAL MASTER RIVERA-SOTO:  No perhaps.  They owe

19   their testimony.

20          MR. SOKOLOVE:  No.  What I mean is, yes, under

21   certain circumstances.  But if there is a price of admission

22   to help the sovereign, the question is:  What is fair and

23   who should pay for it.

24          I think in this set of circumstances --

25          SPECIAL MASTER RIVERA-SOTO:  Isn't that something

1       we should determine after the fact?

2               MR. SOKOLOVE:  Well, except for if it is going to

3       bankrupt a law firm before the fact, your Honor, I don't

4       think that is fair, and we're --

5               SPECIAL MASTER RIVERA-SOTO:  Do you really think

6       this will bankrupt the law firm?

7               MR. SOKOLOVE:  Well, your Honor, it could cost

8       perhaps thousands of dollars per file just to find the

9       heirs, and then what happens if the heirs then go get an

10      attorney and say, "You are not authorized, Mr. Rothenberg,

11      to release this" and if some --

12              SPECIAL MASTER RIVERA-SOTO:  Then they may hear

13      from me saying, then you have a choice.

14              MR. SOKOLOVE:  Yeah.  The problem is they may get a

15      judge in Ohio who makes that ruling --

16              SPECIAL MASTER RIVERA-SOTO:  We don't want judges

17      in Ohio making rulings, do we?

18              MR. SOKOLOVE:  Right.

19              But if that is what where they live or perhaps they

20      live in California or perhaps they live somewhere else

21      because they are the heirs.

22              What I am trying to say to your Honor is it is a

23      quagmire that we don't know the answers to at this point, so

24      therefore, we can't put a price tag on it right now as much

25      as we would like to.

```
1          I would love to be able to come to your Honor and
2     say, here is what it is going to cost.  They ought to pay
3     for it.
4          I would love that.  I think that would move things
5     quicker and probably get us to the bottom line real quickly
6     as to how many files they want --
7          SPECIAL MASTER RIVERA-SOTO:  It would be where the
8     rubber meets the road.
9          MR. SOKOLOVE:  I think so.
10         So here is a suggestion I have for your Honor,
11    two-fold.
12         One:  Allow us the opportunity to go back and try
13    to give you some more of this information now that it
14    appears to be what your Honor believes is ripe.
15         Second of all:  I do subscribe to the concept of
16    just taking some basic representatives statistically
17    significant files.  I do not know enough about this case,
18    nor does Mr. Rothenberg at this point, to know for certain
19    what will happen relative to your Honor's ruling, to Chief
20    Justice Linares' ruling as to what has to be provable or not
21    given the underlying case.
22         But I think it is pretty clear that at this point,
23    that at least a representative or a statistically correct
24    significant, whatever you want to call it, sub set of files
25    is probably the way to go for everybody.  Otherwise, we got
```

```
 1      third parties out here, your Honor, just putting aside the

 2      burden, there are real serious real live people who I think

 3      their lives are going to be further burdened.

 4              They already lost mom or dad once, but now we are

 5      going to put them through the burden of having to give up

 6      their files without having any say whatsoever, and I think

 7      that is unfortunate.

 8              SPECIAL MASTER RIVERA-SOTO:  I agree with you.  I

 9      think it is unfortunate if they choose not to press the

10      claim.

11              MR. SOKOLOVE:  Well, we're talking about now --

12              SPECIAL MASTER RIVERA-SOTO:  But right now they

13      are --

14              MR. SOKOLOVE:  -- no, none of my clients --

15              SPECIAL MASTER RIVERA-SOTO:  -- you have got a

16      representative claimant who claims that they represent a

17      class.

18              MR. SOKOLOVE:  The representative, that is their

19      position.

20              SPECIAL MASTER RIVERA-SOTO:  They claim they

21      represent a class, which would include the 1800 people that

22      Mr. Rothenberg would represent.  That is what they claim.

23              If they want to say, no, we do not want to be part

24      of that class action, then fine.

25              MR. SOKOLOVE:  Your Honor, they are not required to
```

1       make that determination right now --

2                   SPECIAL MASTER RIVERA-SOTO:  Not now, but they will

3       be once we get a motion for certification.

4                   (Laughter)

5                   MR. SOKOLOVE:  But until we are there, your Honor,

6       they are being asked to turn over -- more importantly, Mr.

7       Rothenberg, who has no dog in this fight yet, except for me

8       standing here, is being asked to potentially put out huge

9       amounts of dollars for something that he knows nothing about

10      in terms of his clients' interest.

11                  For that, your Honor, I am simply appealing.  Let's

12      consider the difference between the named plaintiffs, the

13      other folks out there who will be the heirs and the heirs of

14      the other folks and a small law firm that right now does not

15      have a dog in this fight, except for what is going on right

16      here.

17                  Thank you very much.

18                  SPECIAL MASTER RIVERA-SOTO:  Thank you.

19                  MR. C. PLACITELLA:  Am I allowed to talk about

20      Rothenberg?

21                  I wasn't allowed to say the word before --

22                  SPECIAL MASTER RIVERA-SOTO:  You can talk about

23      Rothenberg, yes.  I was wondering whether you were standing

24      up for a sur-reply.

25                  MR. C. PLACITELLA:  No.

```
 1              So when Rothenberg says 1800 clients, there is
 2      things we don't know.
 3              We don't know if those 1800 are amongst another
 4      3,000 clients who have nothing to do with this.  I am not
 5      sure all 1800 -- I mean, we don't know.  There is a first
 6      segregation process here, which is significant --
 7              SPECIAL MASTER RIVERA-SOTO:  But isn't that why the
 8      good Lord created discovery?
 9              MR. C. PLACITELLA:  Yes, your Honor.
10              SPECIAL MASTER RIVERA-SOTO:  Okay.
11              And isn't that what the subpoenas seek?
12              MR. C. PLACITELLA:  That is why we are talking
13      about, if you are going to do this, doing it on a
14      statistical sampling to see what we are --
15              SPECIAL MASTER RIVERA-SOTO:  That was just a
16      suggestion that I made.  It seems to be gathering some
17      currency, depending on which way the people think the wind
18      is blowing.
19              (Laughter)
20              MR. C. PLACITELLA:  Well, no, I actually, if you
21      remember, I was the one who -- well, I guess I felt the wind
22      and brought up my piece of paper, so I guess that's somewhat
23      accurate.
24              But in terms of Mr. Rothenberg, his -- the
25      discovery of him and others like him really should wait
```

1       until the issue of certification is decided.  I mean, that

2       is the logical way to do this.  And maybe I have to come

3       around to the fact that certification will have to be dealt

4       with sooner rather than later.

5              Once we get our basic information, and then you can

6       revisit, you know, what the scope of discovery would be as

7       to those people.

8              SPECIAL MASTER RIVERA-SOTO:  To be very candid with

9       you, Mr. Placitella, I would be far more inclined to go that

10      way if we had a motion on the docket, a motion for a class

11      cert on the docket, because that would inform everybody as

12      to what the boundaries of the inquiries are supposed to

13      be --

14             MR. C. PLACITELLA:  Right, and maybe --

15             SPECIAL MASTER RIVERA-SOTO:  -- but the problem, I

16      will tell you very candidly is, given the breadth of the

17      class definition in the complaint, and again, it is the way

18      you have to do it, so I am not arguing with you about it,

19      but given its breadth, you are putting everything in the

20      world at issue.

21             But I think it might be time or actually we may be

22      past the time that you should be coming forward and saying,

23      this is what we are looking for in the way of class cert,

24      which will define the boundaries of what is relevant

25      discovery, and within that what is proportional and what is

```
 1      not --

 2                  MR. C. PLACITELLA:  Right, I agree.

 3                  SPECIAL MASTER RIVERA-SOTO:  -- and that's really

 4      where we are going --

 5                  MR. C. PLACITELLA:  I understand that perspective.

 6      But keep in mind, although the history has been slow, here

 7      is the history.

 8                  Up until Judge Linares ruled on the scope, we had a

 9      different perspective on what we were required to prove even

10      to get to class certification.

11                  SPECIAL MASTER RIVERA-SOTO:  But that was August.

12      That was two months ago, actually almost three months ago.

13                  MR. C. PLACITELLA:  But we have been here, and we

14      went through the issue of, you know, other issues that got

15      us here.

16                  So before that, it was an open issue.  Whether I

17      agree with his decision or not, and I have seen some of the

18      wisdom in it and really focusing here, but whether I agree

19      with his decision or not --

20                  SPECIAL MASTER RIVERA-SOTO:  Focus on it some more

21      and see all of the wisdom in it.

22                  (Laughter)

23                  MR. C. PLACITELLA:  Right.

24                  Whether I agree with it or not, he has more

25      accurately defined what the class could be, so regardless of
```

1      what --

2                   SPECIAL MASTER RIVERA-SOTO:   He helped you out.

3                   MR. C. PLACITELLA:   -- right -- so regardless of

4      what is in the original pleading, he has brought some focus

5      to this case.

6                   So I think the class discovery can be limited and

7      limited in time, and I probably will get shot from my

8      co-counsel, but we are probably at a point, where we have to

9      sit down and really get to that.   It really does not seem

10     fair to third parties, who are kind of waiting for us to get

11     there, to open up their files and stop their law firms, if

12     we can get there.

13                  So what is past is prologue, but I would suggest

14     that that is a conversation that maybe we will have over

15     lunch, maybe we need another session on, but before you get

16     to the issue of this broad third-party discovery, in light

17     of what Judge Linares' -- only recent in the history of this

18     case, two months is not long, given everything that

19     happened, he has focused on what we can prove and not prove.

20     He has told us what is in the case and what is not in the

21     case, and you have I think, although not have ruled, have

22     sent some fairly clear signals about where you think this is

23     going.

24                  So with that said, I think the parties should have

25     the opportunity to think about what you said, take a lesson

```
1        from what you said about where you are going and come back
2        to you with a proposal before we would burden these third
3        parties.  And, you know, it is not going to stop there.
4        They already put in one of their papers, and when we are
5        done with them, we are going here.  When we are done with
6        them, we're going there, and maybe that doesn't have to be
7        ever the case.
8             So I am listening to you, and I'm trying to absorb
9        some of your wisdom, and I would say give us the
10       opportunity --
11            SPECIAL MASTER RIVERA-SOTO:  If you expect wisdom,
12       you are setting the bar way too high.
13            (Laughter)
14            MR. C. PLACITELLA:  Well, no.
15            The Third Circuit said actually that BASF was
16       setting the bar way too high when they said we have to prove
17       the elements of our underlying claim.
18            But I would ask that we look at it through that
19       lens, figure out what we need for class certification
20       discovery.  If that means they need some very limited focus
21       on third parties, because they feel like they want to be
22       heard, I understand that is your perspective, but before
23       people start opening up all kinds of files, and we start
24       going to all of these other places, it makes a lot of sense
25       to drill down and figure out what we are doing and where we
```

1     are going.

2                Thank you.

3                SPECIAL MASTER RIVERA-SOTO:   Thank you.

4                Is there anyone here who has a scheduling conflict

5     that they are concerned about?

6                MR. TUNIS:  I have one at 6:30.

7                SPECIAL MASTER RIVERA-SOTO:  6:30, where?

8                MR. TUNIS:  In Long Hills -- Long Valley, excuse

9     me.

10               SPECIAL MASTER RIVERA-SOTO:  Long Valley.

11               MR. TUNIS:  If I have to make phone calls, I will

12    do what I can.

13               SPECIAL MASTER RIVERA-SOTO:  What I told Mr. Assaf

14    before we took the break was that we would finish this set

15    of motions, grab some lunch, which I understand is here, and

16    then we would go back.

17               What I want you folks to think about while you are

18    taking lunch is can we shorten the arguments, please.  We

19    have six more motions to address, some of which really ought

20    to go very quickly, so I'm going to rule on the Bevan, Early

21    and Rothenberg motions when you come back from lunch.

22               Do you have something else you want to say now, Mr.

23    Farrell?

24               MR. FARRELL:  Just very briefly.

25               SPECIAL MASTER RIVERA-SOTO:  Now you only have one

```
 1      card.
 2              MR. FARRELL:  More progress, your Honor.
 3              I think this is very brief because it sounds like
 4      Mr. Placitella has come around to some of the points that we
 5      have been making on class motions, so on and so forth.
 6              The two things I wanted to say is my comment about
 7      the price of admission was not referenced to economic or
 8      financial cost.  It was:  Are you in this class or are you
 9      not in this class.
10              Are the Rothenberg plaintiffs in or not?
11              If they are in, their knowledge and their lawyers'
12      knowledge is clearly discoverable and at issue.
13              If they are out, maybe we have a different
14      conversation.  That's why we need the class motion.
15              Point two I wanted to make --
16              SPECIAL MASTER RIVERA-SOTO:  I think everybody got
17      that.
18              MR. FARRELL:  -- point two I wanted to make is
19      whether or not there is some discussion as to Mr.
20      Rothenberg.  I think there is no doubt that the Bevan firm
21      and Early firm clients are in this case, you know, unless
22      Mr. Placitella tells me I am wrong about that, and so there
23      is a basis for any delay of their response to the subpoenas
24      because they are going to be in the class one way or the
25      other.
```

```
 1                 SPECIAL MASTER RIVERA-SOTO:  Well, all of the Early
 2      clients are named as class representatives --
 3                 MR. FARRELL:  One of the four.
 4                 SPECIAL MASTER RIVERA-SOTO:  -- one of the four and
 5      four of the 3,000 Bevan are class representatives --
 6                 MR. FARRELL:  Five.
 7                 SPECIAL MASTER RIVERA-SOTO:  -- five.
 8                 I thought there was one New York?
 9                 MR. FARRELL:  That is the one Early client.
10                 SPECIAL MASTER RIVERA-SOTO:  Oh, that's the one
11      Early client.  So the remaining five of the six are all
12      Bevan clients?
13                 MR. FARRELL:  Correct.
14                 SPECIAL MASTER RIVERA-SOTO:  Okay.  Thank you.
15                 MR. FARRELL:  Thank you, your Honor.
16                 SPECIAL MASTER RIVERA-SOTO:  Why don't you guys
17      have some lunch, give some thought about shortening things
18      up.  Your lunch is here.
19                 So can we start at two o'clock?
20                 MR. ASSAF:  Yes.
21                 SPECIAL MASTER RIVERA-SOTO:  Okay.  Two o'clock it
22      is.
23                 Thank you.
24                 (Whereupon, a 15-minute luncheon recess was taken)
25                 (Afternoon session)
```

```
 1                 SPECIAL MASTER RIVERA-SOTO:  Is everybody here?

 2                 MR. ASSAF:  Yes.

 3                 SPECIAL MASTER RIVERA-SOTO:  As long as they are

 4       within hand grenade distance, we're fine.

 5                 A VOICE:  Everybody is represented.

 6                 SPECIAL MASTER RIVERA-SOTO:  Thank you.

 7                 Back on the record, please.

 8                 For consideration are the motions of BASF to

 9       enforce the third-party duces tecum subpoena on Thomas Bevan

10       and Bevan & Associates.  It has been represented that Mr.

11       Bevan represents or has represented 3000 or so potential

12       class members in this case.  That is under Docket ECF Number

13       1 in the action that was filed in the Northern District of

14       Ohio, and that was later transferred to this Court.

15                 Also under consideration is a motion of BASF to

16       enforce a third-party subpoena duces tecum served on Mr.

17       Early and his law firm.  That is under ECF Number 259.

18                 The third motion is the motion of the Rothenberg

19       law firm to quash the subpoena duces tecum served upon them

20       by BASF -- I'm sorry, I should say Mr. Early has been

21       represented as having four of the named plaintiffs in this

22       case.  Mr. Rothenberg, it has been represented, has 1800 of

23       the putative class members in this case.

24                 The subpoenas sought to look at the files that each

25       of these lawyers had with their clients, the purpose for
```

1    which is for defendants to be able to determine what the

2    plaintiffs were told by whom, when and what in respect of

3    the Emtal talc contents of asbestos and whether that had

4    ultimately a determination in respect of that plaintiffs'

5    decision to either settle their action against Engelhard for

6    a small amount of money or to dismiss it outright.

7            The plaintiff and the three law firms have opposed

8    that application saying that at the very least, it is beyond

9    the scope of permissible discovery, and that it would impose

10   an undue burden on the third-party witnesses to be able to

11   respond.

12           There are valid considerations at play on both

13   sides, and as a result, it is my conclusion that the motions

14   to enforce, that would be a motion to enforce the subpoena

15   against the Bevan law firm and the motion to enforce the

16   subpoena against the Early law firm should be granted in

17   part.  By the same token, the Rothenberg motion to quash

18   should be denied in part.

19           It is clear to me that Chief Judge Linares has

20   defined the scope of discovery, at least for the purposes of

21   what we are addressing today.  In it he said in his August

22   3rd opinion, he said and I quote:  Defendants will be

23   entitled to discover what plaintiffs and their counsel knew

24   and were told and whether any knowledge or lack thereof

25   contributed to plaintiffs' decisions on resolving the

1          underlying case.

2                    He further determined that, and I quote:  That the

3          attorney-client privilege is waived when, quote, the client

4          has made a conscious decision to inject the advice of

5          counsel as an issue in the litigation, unquote, citing

6          Glenmede Trust Company versus Thompson.

7                    He said, however, such information should be

8          tightly confined and controlled pursuant to Federal Rule of

9          Evidence 502(d), and he committed to me the obligation to

10         apply all relevant law to the documents and objections

11         concerning the attorney/client privilege to determine what

12         discovery plaintiffs shall produce.

13                   It is my ruling that the plaintiffs shall produce

14         the following:  The complete files in respect of each named

15         representative claimant.  Those are to be reviewed by

16         plaintiffs' counsel.  The privilege log is to be made as to

17         those items that despite the finding of waiver plaintiffs

18         believe are still otherwise protected, that privilege log

19         and copies of the documents are to be provided directly to

20         me, and I will make the determination as to whether the

21         documents are, in fact, to be privileged and are out or are

22         not privileged and are to be disposed.  So even the

23         privileged documents should be Bates numbered, so we can

24         identify them by number.

25                   In respect of the putative class members, there is

```
 1     much to be said for delaying discovery in respect to them
 2     until after class certification.  The motion has either been
 3     filed or determined.  But by the same token, a great deal of
 4     time has elapsed in this case, and we need to move it
 5     forward.
 6             So as a middle ground, it is my conclusion that in
 7     respect of the Bevan files and the Rothenberg files,
 8     plaintiffs shall arbitrarily select 30 of the Bevan files
 9     and 18 of the Rothenberg files totally arbitrarily and
10     conduct the same kind of analysis.  That is to say,
11     determine what is discoverable, what is privileged, prepare
12     a privilege log and send the privilege log with the
13     privileged documents to me for review.  If, in fact, that
14     exercise proves futile, then that will define whether
15     additional discovery will occur.
16             If, however, there are some that are there, inside
17     that discovery, then we are going to have to expand it, but
18     it is a bridge we will cross when we get to it.
19             The three law firms have all argued undue burden
20     and argued the cost.  Hopefully by doing a representative
21     sampling in respect of those issues have been, if not
22     ameliorated, then totally removed.  That said, the
23     application for costs and expenses is denied, but it is
24     denied without prejudice.
25             If at a later date anyone in those law firms feels
```

```
 1        that an undue burden has been placed on them, then they
 2        should submit a motion following our local court rules,
 3        please, supporting their application with appropriate
 4        certifications or affidavits.  It is not going to be done
 5        solely on the representation of counsel.
 6              As to the timing, I expect that the files
 7        concerning the named plaintiffs will be produced within a
 8        week's time of today.  As to the representative samples from
 9        both the Bevan law firm and the Rothenberg law firm, I
10        expect those to be produced within two weeks from today.
11              If that causes unnecessary agida, let me know, but
12        again, I think that should be more than enough time to get
13        this on the road.
14              Is there anything else in respect to those three
15        applications that I've addressed?
16              MR. ASSAF:  Yes. The clarification on the arbitrary
17        selections, your Honor, it would seem that Mr. Placitella
18        and --
19              SPECIAL MASTER RIVERA-SOTO:  That is Mr.
20        Placitella.  You are the one who is going to select the
21        files.
22              MR. SOKOLOVE:  That was about to be my question,
23        your Honor.  I mean physically, we have files sitting in
24        storage somewhere.  How --
25              SPECIAL MASTER RIVERA-SOTO:  Mr. Placitella is
```

```
 1    going to go to that storage somewhere and arbitrarily pull
 2    out as to Mr. Rothenberg 18 files, totally arbitrary.  I
 3    don't want you to look at the files before that.
 4    Arbitrarily stick your hand in the box and pull out a file.
 5              MR. C. PLACITELLA:  So is it unbecoming of me to
 6    ask for a couple extra weeks to do that, because I have to
 7    go to Ohio, and there are things -- can I have 30 days to
 8    get that done?
 9              SPECIAL MASTER RIVERA-SOTO:  You can have 30 days.
10              MR. C. PLACITELLA:  Thank you.
11              SPECIAL MASTER RIVERA-SOTO:  Mr. Little?
12              MR. LITTLE:  With regard to the Early files, there
13    is one who is a named plaintiff, and there is four
14    additional in the class.  Are we just are requiring the
15    production of those --
16              SPECIAL MASTER RIVERA-SOTO:  No, all five.
17              MR. LITTLE:  All five.
18              SPECIAL MASTER RIVERA-SOTO:  All five.
19              Is that correct, there is one who is a named a
20    plaintiff and four additional attorneys?
21              MR. COREN:  I am just working off of my head, but I
22    think there is four.
23              SPECIAL MASTER RIVERA-SOTO:  I thought there were
24    four altogether.
25              MR. COREN:  Four all told, your Honor --
```

1            SPECIAL MASTER RIVERA-SOTO:  That's what I thought.

2            MR. COREN:  Yeah.  But if it is five, it will be

3       five.  If it's four, it will be four.

4            SPECIAL MASTER RIVERA-SOTO:  Unless the number goes

5       from four or five to 400 or 500, all of them.

6            MR. COREN:  Thank you, your Honor.

7            SPECIAL MASTER RIVERA-SOTO:  Anything else.

8       Counsel?

9            Okay.  That is some progress.

10           I have been informed that we do have a hard stop at

11      six o'clock, and our court reporter is going to abandon us

12      at 4:30, although she is looking for a replacement.

13           So let us try to get through the remaining motions

14      with a little more alacrity than we managed up until now.

15      Everybody is going to get a chance to say something.  It is

16      just let's not say it over and over and over again, right?

17           Next on the docket is BASF's letter motion for

18      leave to file, quote:  A motion seeking judicial findings on

19      the documents relating to Emtal talc that BASF has located.

20      Those are ECF Docket Numbers 231, 241, and 246.

21           Let me get my notes.  Motion ECF 231, what BASF has

22      filed, it is kind of odd, but they filed a motion for leave

23      to file a motion for judicial findings on documents relating

24      to Emtal talc that BASF has in fact located, and I assume

25      has turned over to the other side.

1           They assert that tens of thousands of documents in

2      fact were preserved, that the issue of spoliation is

3      reserved in respect of the documents that have not been

4      produced, but they seek a determination of the fact that a

5      document is missing does not mean that it is spoliated.

6           They have asserted that there was no selective

7      destruction of adverse documents, and they also say that the

8      absence of an original does not mean spoliation.

9           In opposition at ECF 241, the plaintiffs state that

10     the motion asks the Court to decide what is really an

11     ultimate issue in this case on an incomplete record.

12     Plaintiffs assert they have no knowledge of the documents

13     that have been withheld, no knowledge as to the fate of the

14     originals, and no expert proofs regarding the absence of

15     originals.

16          By way of reply in ECF 246, BASF asserts that

17     plaintiffs' opposition, quote, is replete with inaccuracies

18     and mischaracterizations.

19          I guess if you are going to go there, you might as

20     well be replete.

21          They assert there was no widespread purge of

22     documents, that there is some confusion as to what documents

23     are there, and no additional discovery is needed for the

24     purposes of this motion.  They say they are not asking for

25     summary judgment, but only a finding that certain documents

1    in fact do exist, and they argue that it works for both

2    sides of the case.

3            That is what has been presented, and I have a very

4    simple question:  Is this application premature?

5            And if the answer is no, I want to know why not.

6            MR. FARRELL:  The application is not premature,

7    your Honor, and let me explain why briefly.

8            The reason it was presented as a motion for leave

9    to do this is, of course, because plaintiffs oppose us

10   filing the motion at all.

11           The reason that we want to raise the issue now and

12   believe it is appropriate to raise the motion, I think you

13   heard earlier today, which was when Mr. Placitella was

14   pressed by your Honor for what his damages would be, the

15   only truly concrete example I heard him cite was the costs

16   of constructing an evidentiary record, the costs of the

17   missing evidence, so on and so forth.

18           So we made the proposal, actually we, BASF, have

19   already reconstructed the evidence.  We have already found

20   dozens and hundreds of documents on testing, on sales

21   records, laboratory notebooks, all sorts of other materials

22   that plaintiffs, like the class representatives and others,

23   would use to prove that there was asbestos in the talc and

24   product identification, so on and so forth.

25           So if we can bring it to the Court, and your Honor

1    makes findings, yes, Mr. Placitella claimed X was missing,

2    BASF has in fact found that evidence --

3              SPECIAL MASTER RIVERA-SOTO:  How does he know

4    what's missing when he doesn't know what is there?

5              MR. FARRELL:  Well, first of all, he has taken

6    extensive discovery already on this issue, three days of

7    30(b)(6) PMK deposition testimony from Sampson.  But the

8    point is we are not asking for findings on what is missing.

9    We are asking for findings on what has been found because

10   that at least takes those issues off the table.

11             I am sure that if Mr. Placitella opposes the

12   motion, he will point out his belief that other documents

13   are still missing, but all we are asking about is the narrow

14   question of the complaint alleges that certain documents are

15   gone, we have them, here they are.

16             Mr. Placitella claims exhibits to the deposition of

17   Len Hemstock of 1983 are missing.  We have found the

18   majority of them.

19             SPECIAL MASTER RIVERA-SOTO:  But not all of them.

20             MR. FARRELL:  Not all of them, but we have found

21   the majority of them, and that is why I am saying it's a

22   very narrow motion.  It's not a question of, well, there's a

23   whole other category of documents we haven't even looked at

24   yet.  Let's just focus on what we have already done.

25             We have substantial documents on a variety of

```
 1     information related to Emtal talc.  They have been found.

 2     They have been produced to plaintiffs' counsel.  They negate

 3     a large portion of the damages claim in this case, and we

 4     believe therefore streamlined the case by taking an issue in

 5     the case out, and that is what we were proposing.  All we

 6     frankly had asked for was the opportunity to file the

 7     motion, not even to have it granted or for your Honor to

 8     actually issue findings.

 9             So all we are asking for is:  Can we file this

10     motion because we believe it would advance the case to do

11     so.

12             Mr. Placitella --

13             SPECIAL MASTER RIVERA-SOTO:  How is this motion any

14     different than a summary judgment motion?

15             MR. FARRELL:  Well, it is different, your Honor,

16     because we are asking only about the existence of documents.

17     To reach summary --

18             SPECIAL MASTER RIVERA-SOTO:  But if you are saying

19     these documents were not spoliated, because, look, here they

20     are, isn't that a application for summary judgment?

21             Isn't that saying, look, we didn't commit a fraud

22     and, look, we didn't commit a conspiracy, and look, we

23     didn't engage in fraudulent concealment.  Here they are.

24             How is that not a summary judgment motion, not a

25     complete summary judgment, but it could be partial in
```

1    respect to those documents, but it sure talks like, acts

2    like and quacks like a summary judgment motion.

3         MR. FARRELL:  I certainly think that the Court

4    could grant summary judgment for BASF in saying there was no

5    spoliation given the number of documents we have.

6         The question is:  Would a summary judgment motion

7    in the other direction be appropriate, meaning that Mr.

8    Placitella has now raised summary judgment in support of the

9    plaintiffs, that summary judgment should be entered for the

10   plaintiffs on spoliation, and that is the issue that I think

11   we cannot get reached because to get to the --

12        SPECIAL MASTER RIVERA-SOTO:  Well, but he hasn't

13   done that.

14        MR. FARRELL:  But he is now proposing it, and your

15   Honor asked about how this is different than summary

16   judgment.  It is different because we are not getting into

17   the issues --

18        SPECIAL MASTER RIVERA-SOTO:  Mr. Farrell, we are in

19   Federal Court --

20        MR. FARRELL:  Yes.

21        THE COURT:  -- and in Federal Court, if you make a

22   motion for summary judgment, you run the risk of having

23   judgment entered against you even without a cross motion,

24   because when you make a representation to the Court, as you

25   must in a summary judgment application, you are making a

1    representation that there are no material issues of fact,

2    that all that is left is the application of law to the

3    facts.

4            That, contrary to New Jersey State Court, permits a

5    Federal Court to enter summary judgment against you, because

6    you have now judicially admitted that there are no issues of

7    fact.  If the Court does not agree with your legal analysis,

8    they can enter summary judgment against you.

9            I have not heard more nor have I seen in any of the

10   papers Mr. Placitella saying for one moment that he is going

11   to file a motion for summary judgment.  I think Mr.

12   Placitella is a good enough lawyer to know that this case is

13   all about the facts.  This is not a summary judgment case.

14           MR. FARRELL:  The reference to summary judgment by

15   the plaintiffs was in their proposed discovery plan, not in

16   their opposition to our motion.

17           The reason that I think what we are proposing is

18   distinct from summary judgment is that to reach the question

19   of summary judgment, you would also need to have resolved

20   the exposition issues that are discussed in Chief Judge

21   Linares' opinion.

22           You would need to know:  Were these documents that

23   allegedly were not made available to plaintiffs, was it

24   actually material to their case?

25           Did they rely on an evidential record that didn't

1      include those documents?

2                Were they harmed by it, so on and so forth.

3                SPECIAL MASTER RIVERA-SOTO:  But what if they

4      relied solely on those letters that I have been shown, where

5      lawyers representing Engelhard said there is no asbestos in

6      the Emtal talc, and look, all of these other people have

7      dismissed their claims against Engelhard.  Isn't that

8      enough?

9                MR. FARRELL:  No, your Honor.  It is still not

10     enough.  That raises the question of the discovery we need

11     to get in of what the plaintiffs believed and what they

12     didn't believe.

13               SPECIAL MASTER RIVERA-SOTO:  We are not into your

14     discovery.  We are into your application for a finding --

15     well, your application for leave to file a motion, whereby

16     you want the Court to make a legal finding that in respect

17     to the documents that you still have, no spoliation claim

18     can be made.  That is how I understand your motion.

19               If I misunderstand it, please correct me.

20               MR. FARRELL:  I do think it is slightly different

21     and it's the very last portion of what you say.  The only

22     finding we want is that the documents have now been found.

23     That is all.

24               I think spoliation, unless I am misunderstanding,

25     is somewhat of a loaded word in that it carries with it a

1      duty to preserve breach of that duty, so on and so forth,

2      and that was why we very careful or tried to be very careful

3      to say we don't want to get to those issues.  We want a very

4      limited and focused opportunity to simply say the

5      plaintiffs' claim document X is gone.  We have it.

6            That is not a question of spoliation.  It's not a

7      question of fraudulent concealment.  It's not a question of

8      how does the presence or absence of these documents affect

9      historical cases.

10           It's just they said the document is gone.  In fact,

11     it's not gone.  That's all we're asking for is an

12     opportunity to brief that issue.  We think it is something

13     that's limited and focused in nature that can be done

14     concurrently with all of the other matters we're talking

15     about in discovery we are about to undertake, because

16     frankly, the documents that have been found have been

17     produced, and I don't know that there is much more to do on

18     it, other than submit the brief.

19           Then the questions of spoliation, meaning duty to

20     preserve, not producing documents, so on and so forth, would

21     be taken up later.

22           So if that -- that is the place where the

23     disconnect is, I want to emphasize, we are only asking for

24     findings that documents exist, full stop, not questions on

25     intent, materiality, so on, so forth.

1              SPECIAL MASTER RIVERA-SOTO:  Where does that get

2      you?

3              MR. FARRELL:  It gets us to the point of saying

4      that the claim for damages that you heard about this morning

5      from Mr. Placitella is not a viable claim in this case.  If

6      the evidence, the record had already been reconstructed, to

7      use the plaintiffs' word --

8              SPECIAL MASTER RIVERA-SOTO:  But you missed my

9      question, and maybe I will try to ask it again.

10             If none of the documents that you have now secured

11     were ever communicated to the plaintiffs' lawyers way back

12     when, but they were in your files, not yours, your clients',

13     excuse me, and they totally contradicted the representations

14     that were being made, how does that change the case?

15             I don't see how it does.

16             MR. FARRELL:  Because of the plaintiffs' claim for

17     damages of the costs associated with reconstructing the

18     evidence that your Honor's hypothetical presupposes was in

19     our files --

20             SPECIAL MASTER RIVERA-SOTO:  But if they didn't

21     spend a penny in reconstructing it, then they have incurred

22     no damages.

23             MR. FARRELL:  And that is exactly the point we

24     would be making.

25             SPECIAL MASTER RIVERA-SOTO:  Okay.  But it seems to

1      me that we are, number one, making it in a procedurally hard

2      way and at a procedurally odd time.  Those are my two

3      concerns.

4           I am not saying you don't have a valid motion in

5      there somewhere, but when I look at it, it's sure as hell

6      sounds to me like it's a summary judgment motion, and you

7      can file a summary judgment motion whenever you want.  That

8      is up to you.  I have been known to file them in lieu of

9      motions to dismiss even before I file an answer because the

10     rules allow them.

11          You can file whenever you want.  I don't think you

12     want to file one just yet.  I don't think you know enough

13     about the case just yet.  You haven't had complete

14     discovery, but it is up to you, but I just think it is

15     little odd.

16          MR. FARRELL:  I appreciate that.

17          The reason that it was presented the way it was,

18     your Honor, was that this came up ten months ago now, when

19     all other discovery in the case had came to a halt because

20     of plaintiffs' objections about scope -- all of the matters

21     that you are now hearing, and we were trying to propose a

22     way to get the case moving forward because we completely

23     agree with your your Honor that it needs to move forward.

24          This was a proposal we had to try to move the case

25     forward.  Let's narrow it.  Let's take one issue off the

```
1       table.  This reconstruction claim of the evidence is not a

2       viable issue because BASF has done the work, and the

3       plaintiffs don't need to do it.  That is why we filed the

4       motion that we did.

5              We still think it makes sense to do it.  I hear

6       your Honor on what you're saying in terms of it feels sort

7       of like summary judgment, do we need to wait.

8              All we are asking for is the opportunity to brief

9       it.  Obviously, if your Honor believes this doesn't feel

10      like the sort of thing I can do right now, that would be

11      your call to make.  But, again, all we are asking for is the

12      opportunity to submit a brief.  The plaintiffs can oppose

13      it, as I am sure they will, and then your Honor can rule on

14      it.

15             Thank you.

16             SPECIAL MASTER RIVERA-SOTO:  Mr. Placitella?

17             MR. C. PLACITELLA:  I'll be very brief, your Honor.

18             The answer is yes, they are asking for summary

19      judgment without any discovery --

20             SPECIAL MASTER RIVERA-SOTO:  That is not a bad

21      thing.  It's permissible under the rules.

22             MR. C. PLACITELLA:  They could do it, but I am

23      guaranteeing you they will lose, okay?

24             SPECIAL MASTER RIVERA-SOTO:  Okay.

25             MR. C. PLACITELLA:  I believe I am entitled to the
```

1    information before we go there.  This has got to be two

2    sides of the coin, right?

3              I have to be armed with the information --

4              SPECIAL MASTER RIVERA-SOTO:  But Mr. Farrell told

5    me that he has provided you that information.

6              MR. C. PLACITELLA:  Well, Judge, I took their

7    corporate rep for three days, and at the end of three days,

8    you know what he told me?

9              They have two documents, two that are originals out

10   of all of the testing documents that ever happened.

11             What does that mean?

12             And, you know, to say you have a document, when it

13   has attachments and they are not there, that is not the

14   document, so we need information.

15             I say let's put this up front.  We can get this

16   issue out of the way long before anything else.  This is

17   what I propose.  Let me take Cahill on the spoliation issue,

18   on the destruction issue.

19             I have already taken BASF, so I don't really think

20   I need to do that unless they are going to change their

21   position, and let me identify for you 20 documents or less

22   that I believe are on their privilege log that go directly

23   to this issue, and you can make the call about whether they

24   are material in terms of Mr. Assaf's -- I'm sorry -- Mr.

25   Farrell's assertion to you that no spoliation took place.

```
 1                 SPECIAL MASTER RIVERA-SOTO:  Well, I think we are
 2       mixing a little bit of apples and oranges, because the fact
 3       that a document is on a privilege log doesn't mean it has
 4       been spoliated.
 5                 MR. C. PLACITELLA:  No, your Honor.
 6                 But let's say there were documents on a privilege
 7       log that would illuminate that issue without going any
 8       further.
 9                 SPECIAL MASTER RIVERA-SOTO:  But aren't we going to
10       get the tests and all of that?
11                 MR. C. PLACITELLA:  What?
12                 SPECIAL MASTER RIVERA-SOTO:  I started out the day
13       by saying there are privilege questions on both sides --
14                 MR. C. PLACITELLA:  Correct.
15                 SPECIAL MASTER RIVERA-SOTO:  -- on your side it is
16       a question of whether you waive the privilege by putting the
17       matters in issue.
18                 On the defendants' side there's a question of
19       whether the crime fraud exception eliminates the privilege,
20       and at some point or another, somebody will have to make
21       those decisions --
22                 MR. C. PLACITELLA:  I agree.
23                 SPECIAL MASTER RIVERA-SOTO:   -- and it looks like
24       that somebody is going to be me.
25                 MR. C. PLACITELLA:  Happy to have you do it.
```

```
1            SPECIAL MASTER RIVERA-SOTO:  So if I have to do it,
2    I will do it.  But I will tell tell you, I am not excited
3    about --
4            MR. C. PLACITELLA:  That is why I want to keep it
5    to less than 20, but that's my whole point.
6            How can they make in effect what is a motion for
7    summary judgment on that issue without you looking at the
8    critical documents and the critical facts?
9            It's premature, and I believe that when we get that
10   discovery, we will meet their motion, and they will have
11   wished they never made it.
12           SPECIAL MASTER RIVERA-SOTO:  Okay.
13           MR. C. PLACITELLA:  Thank you.
14           SPECIAL MASTER RIVERA-SOTO:  Mr. Farrell?
15           It's not necessarily an invitation, but --
16   only one card.  Okay.  One card left.
17           (Laughter)
18           MR. FARRELL:  Very two minor points, your Honor.
19           We don't need to derail the class discovery and
20   other merits discovery when we're talking about doing this.
21   There is no basis to put summary judgment or any special
22   discovery on this question before anything else.
23           The last thing we want to do because of this motion
24   is to delay the class and merits discovery that has to
25   happen here.  So if we need to discuss this when we discuss
```

```
 1    the schedule later today, happy to do that, but there is no
 2    cause to change the schedule or put spoliation first, and we
 3    definitely should not do that.  The whole point of this is
 4    that we thought it was something narrow that could be done
 5    concurrently with that.  There's no basis to look at
 6    documents on a privilege log or to look at this or look at
 7    that.  We either have the documents or we don't.  That is
 8    the only question that is being presented.
 9            Whether Mr. Placitella thinks there is a document
10    that refers to something else that is missing and so on, I
11    am sure we are going to get to that in this case at this
12    point, but it's not the question --
13            SPECIAL MASTER RIVERA-SOTO:  But do you have the
14    document or not is an issue of fact.
15            MR. FARRELL:  Correct.
16            SPECIAL MASTER RIVERA-SOTO:  Now, what the effect
17    of it is is an issue of law, though.  Whether you have the
18    document or not is an issue of fact.  You are asking the
19    Court to allow you to file an application where factual
20    findings will be made.
21            MR. FARRELL:  Correct, your Honor.
22            SPECIAL MASTER RIVERA-SOTO:  It smells like a
23    summary judgment motion.
24            MR. FARRELL:  It's solely as to the existence of
25    documents, not as to the elements of anybody's claims,
```

```
 1          whether it's spoliation, fraudulent concealment or not.

 2                  Again, all we are asking for is the opportunity to

 3          submit the brief.  If your Honor decides it feels like

 4          summary judgment, if plaintiffs convince you it feels like

 5          summary judgment, so on and so forth, then we can deal with

 6          that issue when it comes up.

 7                  All we would like to do is submit a brief on the

 8          matter explaining the documents that we found.  Plaintiff

 9          can oppose it, and we can go from there.  We can also then

10          proceed with all of the other discovery we are talking about

11          at the same time.

12                  SPECIAL MASTER RIVERA-SOTO:  Thank you.

13                  MR. FARRELL:  Thank you.

14                  SPECIAL MASTER RIVERA-SOTO:  Before the Court is

15          the application of BASF for leave to file a motion to make

16          judicial findings on the documents related to Emtal talc

17          that BASF has located.

18                  It is my conclusion that that application as it

19          stands is premature.  If it is the desire of BASF to file a

20          motion for partial summary judgment, it is free to do so

21          whenever it thinks it is appropriate.  But for immediate

22          purposes, I do not see the logic or frankly the good common

23          sense behind filing a motion to seek judicial findings to

24          documents related to the Emtal talc that have in fact been

25          located.  If they have been located, they've been located.
```

1        They have not been spoliated.  It is that simple.

2              I don't know why we need to go all out on a limb on

3        that, and I don't think that Mr. Placitella is saying

4        anything different.  If you have them, and you produce them,

5        they can't make claims for spoliation.  They may still have

6        a fraud count, saying you should have disclosed this, but

7        you didn't, and in reliance on your false representation, we

8        acted to our detriment.

9              That is a different story all together.  But with

10       respect to the fraudulent concealment claim, fraudulent

11       concealment requires that something not be retrievable, and

12       these were retrieved, so the application is denied but

13       without prejudice.

14             The next item on the agenda is plaintiffs' letter

15       motion concerning the 30(b)(6) deposition notices to -- oh,

16       I'm sorry -- one thing I need to say with respect to the

17       prior application.

18             Cahill did not join in that application.

19             MR. BLATT:  Correct, your Honor.

20             SPECIAL MASTER RIVERA-SOTO:  I knew I was going to

21       get one of those right.

22             MR. BLATT:  You got it.

23             SPECIAL MASTER RIVERA-SOTO:  Okay.  The next

24       application is plaintiffs' letter motion for two things,

25       30(b)(6) deposition notices to BASF and Cahill and

1      attorney-client privilege issues.

2              This one had a lot of paper attached to it.  It

3      started with plaintiffs' letter of March 1, 2017 under ECF

4      247, BASF's response under ECF 264, plaintiffs' reply under

5      ECF 302, BASF's sur-reply under ECF 3317.

6              Then there was a separate letter from BASF under

7      ECF 330, and plaintiffs' response to that under ECF 333.

8              And I will note, Mr. Placitella, that you sent me a

9      copy of ECF 333 late or early this week saying that had not

10     been included when, in fact, it was included in this

11     package.

12             MR. C. PLACITELLA:  My error.

13             SPECIAL MASTER RIVERA-SOTO:  That is okay.  I just

14     wanted to make sure that your letter of October 23rd made

15     that representation, speaking of which, in addition to that,

16     we have a letter of October 19th from Cahill saying, yes, we

17     join, and then the letter from Mr. Placitella of October

18     23rd.

19             Essentially the applications are as follows:  It is

20     claimed by the plaintiffs that they have been stiff armed in

21     respect of the 30(b)(6) depositions, that attorney-client

22     privileges or issues among BASF, Cahill and the individual

23     attorney, defendants need to be resolved, and they requested

24     a Federal Rule of Evidence 502(d)(4).

25             In opposition, BASF at ECF 264 has said as follows:

1   With respect to the 30(b)(6) depositions, that plaintiffs

2   aborted the meet and confer process and that only one

3   30(b)(6) deposition is allowed without leave of Court, and

4   finally, that you don't need a 30(b)(6) deposition on

5   documents that, in fact, have been produced.

6          In respect of the attorney-client privilege, BASF

7   says that they object to any potential 502(b) order absent a

8   motion and hearing, and that plaintiffs must prove that the

9   crime fraud exception applies before you get to pierce the

10  privilege.

11         In respect to that, plaintiffs have filed a reply

12  under ECF 302, stating that two notices were needed to

13  address separate issues, the destruction and the hiding of

14  evidence and the fraudulent misrepresentations in respect of

15  that evidence.  They request leave to take two depositions

16  or allow leave to return after they take the depositions in

17  the parallel New Jersey State Court in Sampson.

18         Finally, in respect to the Rule 502(d) order,

19  plaintiffs assert it is not a shortcut, but it is a

20  mechanism by which issues be preserved.

21         BASF filed a sur-reply, hopefully the last

22  sur-reply they file in this case, under ECF 317, where they

23  assert that Sampson does not apply to this case, and that

24  the Rule 502(d) order is not a vehicle to pierce the

25  privilege.

1          Then at ECF 330, BASF files a letter concerning

2     mootness.  They say that BASF offered a 30(b)(6) deposition,

3     and plaintiffs refused.  They asked that it be cross noticed

4     for here and in Sampson, and plaintiffs took the position

5     that only the Sampson court decisions should govern the

6     deposition.  The problem there is, as BASF notes, that only

7     BASF is a party, and that Sampson and the Cahill defendants

8     are not.

9          ECF 333 was plaintiffs' response to ECF 330, they

10    say that the 30(b)(6) deposition is in Sampson only and, in

11    fact, the deposition was taken.

12         In the October 19th, 2017 letter, Cahill takes the

13    position that there is no quarrel with plaintiffs, at least

14    no quarrel between the Cahill defendants and plaintiffs

15    concerning the 30(b)(6) deposition notice, but surprise of

16    surprises on October 23, 2017, plaintiffs sent a letter

17    saying that, in fact, there is some quarrel between

18    plaintiffs and Cahill, and therefore the issue applies to

19    both BASF and Cahill.

20         MR. BLATT:  We never received a copy of that last

21    letter.

22         SPECIAL MASTER RIVERA-SOTO:  You did not?

23         Well, let me see.  I may have an extra copy.

24         Would you hand this to Mr. Blatt?

25         MR. BLATT:  Thank you, your Honor.

```
 1                SPECIAL MASTER RIVERA-SOTO:  Did you not receive
 2       that?
 3                MR. BLATT:  No, it was never received by us.
 4                SPECIAL MASTER RIVERA-SOTO:  Okay.  Well, you will
 5       get a chance to read it now.
 6                SPECIAL MASTER RIVERA-SOTO:  Mr. Placitella, it is
 7       your motion.
 8                MR. C. PLACITELLA:  The better looking Mr.
 9       Placitella will argue, your Honor.
10                SPECIAL MASTER RIVERA-SOTO:  Finally, finally.
11                (Laughter)
12                MR. J. PLACITELLA:  Good afternoon, your Honor.
13                SPECIAL MASTER RIVERA-SOTO:  You have big shoes to
14       fill.
15                MR. J. PLACITELLA:  I do.
16                Jared Placitella for the plaintiffs, your Honor.
17                Your Honor, you just went through a lot of paper
18       for what I think is a very simple issue.
19                SPECIAL MASTER RIVERA-SOTO:  I agree.
20                MR. J. PLACITELLA:  The 502(d) order, I could
21       address that, but it sounds like that is an issue that
22       applies to more than one motion in this case, and that we
23       are going to get to later.  So unless you would like me to
24       address it, I just want to focus on the two 30(b)(6)
25       deposition notices.
```

```
 1                SPECIAL MASTER RIVERA-SOTO:  Let's do that.

 2                MR. J. PLACITELLA:  Okay.

 3            So the two 30(b)(6) deposition notices, we are not

 4      here to discuss, you know, BASF's or Cahill's objections,

 5      specific objections to the notices or production with the

 6      notice.  We are simply here about the number of deposition

 7      notices that the plaintiffs can serve and the amount of days

 8      of testimony that BASF's and Cahill's corporate

 9      representatives must provide.

10                I think it is an open issue in this Court whether

11      leave of Court is required.  I didn't see any authority from

12      this case, I mean, from this Court or this jurisdiction or

13      the Third Circuit on the issue, but if leave of Court is

14      required, I think clearly good cause is met here in our over

15      300 paragraph complaint --

16                SPECIAL MASTER RIVERA-SOTO:  But you have already

17      taken a 30(b)(6) deposition.  How many more do you think you

18      can take?

19                MR. J. PLACITELLA:  So the 30(b)(6) deposition that

20      we were talking about in the Sampson case went specifically

21      only to BASF, and it was only on the issue of document

22      destruction.

23                SPECIAL MASTER RIVERA-SOTO:  And it wasn't cross

24      noticed?

25                MR. J. PLACITELLA:  It was not cross noticed, and I
```

1    didn't see any law supporting from BASF's side that by not

2    cross noticing it, we somehow waived our ability to take

3    depositions in this case, so I kind of think that's an

4    irrelevant issue.

5              SPECIAL MASTER RIVERA-SOTO:  I think the opposite

6    would be the conclusion --

7              MR. J. PLACITELLA:  I think so, too, your Honor.

8              So the deposition notice in Sampson related only to

9    document destruction by BASF.  It did not relate to the 30

10   years of misrepresentations, you know, fraud that there was

11   made to litigant, courts through motion practice, discovery

12   materials, affidavits, you know, that there was --

13             SPECIAL MASTER RIVERA-SOTO:  I am aware of the

14   extent --

15             MR. J. PLACITELLA:  -- right.  So you are aware to

16   the scope that is alleged and that we intend to prove.

17             But those were both that -- those representations

18   were both made there is no asbestos in Emtal talc and no

19   evidence of asbestos in Emtal talc, and that makes a

20   difference because especially BASF says now they have 10,000

21   documents that exist.  Then what was the basis of the

22   representation that there is no evidence of asbestos in

23   Emtal talc?

24             SPECIAL MASTER RIVERA-SOTO:  What I am grappling

25   with is it is fairly standard that we get one 30(b)(6)

1    deposition per case, not two or three, and you can't just

2    divide it up and say, I want to do 30(b)(6) in respect of X,

3    and then another 30(b)(6) in respect to Y, and another

4    30(b)(6) in respect to Z.

5         You issue your 30(b)(6) notice.  You say the

6    subject matter that you need to address, and it is upon the

7    responding party to say, well, in respect to the first part,

8    we need to bring in Mr. Jones.  In respect to the second

9    part we need to bring in Ms. Smith.  And you arrange that as

10   you arrange it.

11        There is nothing special, at least not that I know

12   of, on a 30(b)(6) deposition that exempts it from the

13   one-day seven-hour limitation --

14        MR. J. PLACITELLA:  I think --

15        SPECIAL MASTER RIVERA-SOTO:  -- so my question to

16   you is:  Are we putting the cart before the proverbial

17   horse?

18        Have you notice a 30(b)(6) deposition here listing

19   the subject matters that you want the 30(b)(6) deponent to

20   testify to?

21        Have you gotten a response from whomever it is that

22   you served the 30(b)(6) notice as to who needs to appear in

23   order to respond to your notice of deposition, and if you

24   think it's going to take more than a day or more than seven

25   straight hours in the one day, whether you can agree with

```
1    counsel to make it longer or lack in agreement, or do you
2    think you need to come to me to get additional time, or am I
3    misreading this completely?
4              MR. J. PLACITELLA:  No, you are not.
5              We did receive responses to our 30(b)(6) notices to
6    both BASF and Cahill, but neither designated a person most
7    knowledgeable to the issues that were listed.  So after a
8    meet and confer session, when we were told both by BASF and
9    Cahill essentially that you have to choose which deposition
10   notice you are going to move forward on, and that we are
11   only going to produce a witness for one eight-hour day, we
12   brought this to the Court's attention.
13             SPECIAL MASTER RIVERA-SOTO:  Okay.
14             Anything else you need to add to this?
15             MR. J. PLACITELLA:  Just to say that there is good
16   cause to exist to have more than one of a 30(b)(6)
17   deposition because of the 30-year nature, it is hard to
18   unwind a 30-year fraud from the only witness that could bind
19   a company in an eight-hour day, so all we ask is --
20             SPECIAL MASTER RIVERA-SOTO:  Well, eight hours is
21   longer than what the rules provide.
22             MR. J. PLACITELLA:  I'm sorry, your Honor, whatever
23   the rule provides --
24              SPECIAL MASTER RIVERA-SOTO:  Seven hours.
25             MR. J. PLACITELLA:  I know, I'm overreaching
```

```
1    already.

2              Thank you.

3              SPECIAL MASTER RIVERA-SOTO:  That is okay.  If you

4    don't ask, you don't get.

5              SPECIAL MASTER RIVERA-SOTO:  Okay.  On your side,

6    who is responding?

7              MR. BRESS:  Good afternoon, your Honor.

8              Daniel Bress for BASF.

9              SPECIAL MASTER RIVERA-SOTO:  Good afternoon, Mr.

10   Bress.  Nice to hear from you.

11             MR. BRESS:  Thank you for holding this hearing,

12   your Honor.

13             I guess I am a little confused as to what the issue

14   is now because we had offered to put up a 30(b)(6) witness.

15   What we said, we are not required to do under Rule 30 was

16   put up two 30(b)(6) witnesses, so they will be able to have

17   their Rule 30(b)(6) witness.

18             SPECIAL MASTER RIVERA-SOTO:  Again, I have been at

19   this for 40 years.  You get a 30(b)(6) notice.  It outlines

20   the areas of inquiry, and if you as the respondent need to

21   have more than one person respond, you tell them that you

22   need to have more than one person respond, because one

23   person cannot answer all of those things.  But it is still

24   one deposition, one day, seven hours.

25             So do you have anything to say other than that?
```

```
 1                  I don't mean to cut you off.

 2                  MR. BRESS:  No, your Honor.

 3                  Well, I do have a few other things to say on the

 4       502(d) part of this just to finish off the 30(b)(6), I would

 5       say two things.

 6                  Number one:  There is not an application presently

 7       in front of you for more than seven hours, and so what they

 8       are entitled to now is one deposition of BASF for seven

 9       hours.  If they need more time, they can raise that with us,

10       but I don't think they have done so at this point.

11                  The second thing I would say is that I do think

12       that the time for taking a Rule 30(b)(6) deposition on the

13       issue of documents has passed, because that deposition we

14       offered, we offered to have that deposition cross notice in

15       this case, and as your Honor referenced, the position came

16       back, well, to do that it should be subject to Judge Viscomi

17       in Middlesex County under New Jersey Rules, and if there

18       are any issues at the deposition, she should decide them.

19                  We didn't have at the time an issue with her

20       deciding the issues that came up in the context of this

21       case, but we did think this Federal Court had authority over

22       a deposition taking place in a case that was crossed at

23       least in Federal Court.  I think it was plaintiffs' decision

24       not to move forward with that, and so I don't think it would

25       be a proper rule 30(b)(6) deposition at this point after our
```

```
 1    witnesses sat for three full days of deposition testimony on

 2    that issue in the State Court case.

 3                SPECIAL MASTER RIVERA-SOTO:  Talk to me about the

 4    proposal for a 502(d) order.

 5                MR. BRESS:  Absolutely, your Honor.

 6                We have a few slides on this, and I am going to

 7    click through to get there.  You will see we have quite a

 8    few things.

 9                SPECIAL MASTER RIVERA-SOTO:  Good --

10                MR. BRESS:  So with respect to 502(d) --

11                SPECIAL MASTER RIVERA-SOTO:  --  I think everybody

12    in the audience appreciates it, too.

13                MR. BRESS:  -- with respect to 502(d), what the

14    plaintiffs are proposing is essentially that everyone would

15    agree to a 502(d) order, which would then allow presumably

16    under seal testimony and discovery of all BASF's privilege,

17    and the point we want to make to your Honor is that that is

18    not an appropriate use of Rule 502(d) when we don't consent

19    to that, and we do not.

20                The purpose of 502(d) is to provide, and we can

21    pull up the text of it here, is to provide protection in the

22    course of a proceeding.

23                I see your Honor is looking at me strange, so I'm

24    going to ask what's on your mind.

25                SPECIAL MASTER RIVERA-SOTO:  I am, because I got to
```

1    my copy of 502(d) before you pulled it up on your screen,

2    because I heard you say there was an absence of consent, and

3    I don't recall there's anything in the rule that requires

4    your consent.  If it's ordered, it's ordered.

5              MR. BRESS:  Your Honor, I think this is critical,

6    and I don't think respectfully that that is correct.

7              I think that in the case of a 502(d) order, the way

8    it's typically used is in the context of clawback documents,

9    the inadvertent disclosure privileged documents.  That is

10   sort of the classical situation, in which the rules

11   committee envisioned this, that if you are making a mass

12   production of documents, and you think there may possibly be

13   privileged documents, you can enter a 502(d) order that

14   provides protection on the back end from any kind of

15   privilege waiver.

16             When it is not, though, your Honor, there's a

17   method of piercing the privilege, and that's what the

18   plaintiffs are trying to do here.

19             SPECIAL MASTER RIVERA-SOTO:  Where in the language

20   of 502(d) does it say that it is limited only to inadvertent

21   disclosures?

22             MR. BRESS:  It's not limited to inadvertent

23   disclosures, your Honor, to be clear, but it is limited to

24   consensual disclosures.  That is the key point.

25             If you look, there it no case incidentally that

 1        allows plaintiffs to do what they are trying to do with
 2        502(d), but we do have the guidance of the Sedona
 3        conference, which is a pretty well-known conference on these
 4        e-discovery and rules issues, and they make this point in a
 5        2014 publication and clearly, where they say:  "Although
 6        Rule 502(d) provides broad power to a federal court, it does
 7        not give the court the power to order parties to produce
 8        privileged information, where there has been no findings of
 9        waiver."
10             And it goes on to make the same point in a couple
11        other parts of that report, and so our position, your Honor,
12        is that if there is going to be discovery of BASF's
13        privileged information, there is a process that the
14        plaintiffs have to undertake.  They need to file the
15        appropriate motion seeking our privileged documents.  There
16        are then additional processes under the Supreme Court and
17        Third Circuit precedent that would allow us to respond to
18        that and to protect our privilege in the process.
19             But what 502(d) cannot be used for is to have a
20        proceeding in which former BASF lawyers or Cahill lawyers
21        testify under oath to privileged information when that is
22        not a procedure that we agreed to, and so that is the
23        distinction on 502(d).
24             SPECIAL MASTER RIVERA-SOTO:  But what if it is a
25        procedure that you are ordered to follow, if there is a

```
1        finding that the crime fraud exception applies with respect
2        to BASF and Cahill, wouldn't you want a 502(d) order in that
3        circumstance that says, well, you have to disclose it, but
4        your privilege is not waived by the disclosure, which is all
5        502(d) says?
6                MR. BRESS:  Correct.
7                But I think your Honor made the key point about
8        sequence, which is if the crime fraud exception is found to
9        apply, then a 502(d) order at that point would be something
10       that we want to protect what we would believe to be our
11       privilege, or at least at the time, if there was not a
12       certain scope of the privilege.  But at this time there has
13       been no finding that the crime fraud exception has been met,
14       and that is not a simple finding to make.
15               It requires plaintiffs to come forward with
16       evidence and argument in support of that.  It is a
17       significant intrusion on the privilege to breach it under
18       the crime fraud exception is a very serious and limited
19       exception to the attorney-client privilege, and so if
20       plaintiffs were to go through that process, and the process,
21       as your Honor no doubt knows from the Sampson case, is
22       typically not a short one.
23               If the plaintiffs are to go through that process,
24       and if at the end of that process, after BASF takes
25       advantage of whatever procedural rights and avenues it has,
```

```
1        that at the end of that, if the crime fraud exception were
2        to be found to apply, then at that point your Honor I think
3        is correct, that the 502(d) order may well be an appropriate
4        mechanism.  But what is not an appropriate mechanism is to
5        put in a 502(d) order and then without any finding that the
6        privilege has been waived or breached, to have lawyers
7        testify under oath about privileged information or have
8        privileged documents exchanged.  That's the distinction.
9               SPECIAL MASTER RIVERA-SOTO:  Thank you.
10              MR. BRESS:  Thank you, your HOnor.
11              SPECIAL MASTER RIVERA-SOTO:  Do you want to join
12       this group here, given that you just were reading what was
13       said about you?
14              MR. BLATT:  Just for 30 seconds.
15              SPECIAL MASTER RIVERA-SOTO:  I liked your letter.
16       It was very brief.
17              MR. BLATT:  Thank you, your Honor.
18              David Blatt representing the Cahill Defendants.
19              In the October 23rd submission that I was just
20       provided, the last exhibit is Exhibit C, where we wrote to
21       the plaintiffs in response to their 30(b)(6) notice, where
22       we said:  I wanted to advise you that Cahill objects to
23       appearing for more than one deposition under Rule 30(b)(6).
24       Rule 30 subsections requires a party to obtain leave of
25       court to depose a person or entity more than once in a case,
```

1    and that applies to Rule 30(b)(6).

2              Therefore, Cahill will appear for a deposition to

3    testify to non privileged matters concerning the topics in

4    plaintiffs' two pending notices in a single deposition of up

5    to seven hours, subject to its objections and responses

6    absent a court order, this is the only 30(b)(6) witness

7    Cahill will tender in this case.

8              If after reviewing our objections and responses,

9    you still wish to proceed with the deposition, let us know.

10             So I am not sure -- they didn't file their letter

11   motion.  There was nothing about the Cahill objections or

12   responses attached to it.  Your Honor will observe from the

13   attachment of my October 19th letter that we emailed them

14   and said:  If you want to go forward, let us know.  I mean,

15   we are happy to talk, and that is where things stand today.

16             SPECIAL MASTER RIVERA-SOTO:  You may keep my copy.

17   I can reproduce it.

18             MR. BLATT:  Thank you, your Honor.

19             I could ask them to serve it.

20             (Laughter)

21             SPECIAL MASTER RIVERA-SOTO:  Mr. Placitella?

22             MR. J. PLACITELLA:  I will keep it brief, your

23   Honor.

24             SPECIAL MASTER RIVERA-SOTO:  Everybody tells me

25   they're going to be brief.

```
1              MR. J. PLACITELLA:  Mr. Blatt, I don't know how you
2         did not get a copy.  You have one, but we'll get you one.
3         Sorry for the oversight.
4              SPECIAL MASTER RIVERA-SOTO:  He did, and he has
5         mine.  That is done.  Let's go on.
6              MR. J. PLACITELLA:  Quickly about 502(d), I was
7         going to address it, and it was raised, and I'll make this
8         brief.
9              As you said, the discretion of whether to enter a
10        502(d) order is within the Court's discretion, and under a
11        502(d) order the privilege is not waived, it's preserved,
12        and here especially would permit as the rule provides to
13        conduct and respond to discovery expeditiously.  Otherwise,
14        maybe questions such as, you know, BASF's or Cahill's
15        representative saying what is your basis for the
16        representation that there is no asbestos in Emtal talc when
17        there's no evidence of asbestos in Emtal talc, could that be
18        objectionable.
19             And if we are going to run into those kind of road
20        blocks, a 502(d) order that protects BASF's privilege would
21        be --
22             SPECIAL MASTER RIVERA-SOTO:  You can be rest
23        assured you are going to run into those road blocks in the
24        absence of a determination by the Court that you can ask
25        those questions, so that brings me to what I think is my
```

 1      condition precedent.

 2              We know, because Chief Judge Linares has decided

 3      that plaintiffs' claims of privilege have been waived, so

 4      that is now fair game subject to review as to what can or

 5      cannot be produced.  But the overarching issue of does the

 6      privilege apply has been resolved.

 7              We don't have that same kind of closure on the

 8      other side because there has been no judicial determination

 9      that the crime fraud exception applies to viciitiate the

10      assertions of attorney-client and attorney work product

11      privilege that are asserted by the defendants.

12              So don't you first have to move for a finding that

13      their claims of privilege are viciated by the crime fraud

14      exception, and then we can get into getting into discovery

15      in respect to it?

16              MR. J. PLACITELLA:  Well, I think there is some

17      discovery that we need first, your Honor, and the easiest

18      way to do that discovery is under a 502(d) order that

19      protects everybody.

20              SPECIAL MASTER RIVERA-SOTO:  But you're going to --

21      that may be putting the cart before the proverbial horse,

22      because if you have a 502(d) order, it means that privileged

23      information is disclosed, and that is the old how do you

24      close the barn door after the horse is gone quandary.

25              So the way to avoid that is to get some kind of

1    determination ahead of time that says:  Here's the

2    boundaries of what you can ask.  In respect of those

3    boundaries, you can now go and take a 30(b)(6) deposition or

4    issue a request for production of documents or issue a

5    notice of deposition or request for admission that deal with

6    that.  Now, that the determination has been made as to what

7    is or was not privileged, but we need to get past that

8    threshold first.

9         MR. J. PLACITELLA:  I think in order to get to that

10   threshold, though, we need some certain discovery.

11        SPECIAL MASTER RIVERA-SOTO:  What do you mean?

12        MR. J. PLACITELLA:  If we move on a crime fraud

13   exception for a prima facie case, BASF or Cahill is going to

14   say we have not met our burden.

15        I don't know what we need.  I need facts and part

16   of those facts are the 30(b)(6) depositions.

17        SPECIAL MASTER RIVERA-SOTO:  Stay with me for a

18   minute, okay?

19        MR. J. PLACITELLA:  Sure.

20        SPECIAL MASTER RIVERA-SOTO:  You have alleged in

21   your complaint that representations were made that were

22   false representations, and that therefore it logically

23   follows any of those representations that are trying to be

24   protected by the attorney-client or work product privilege

25   are viciated because of the crime fraud exception.

```
 1              You have proof because Mr. Placitella, Sr. Gave me
 2    a bunch of letters that were highlighted where those
 3    representations in fact were made.
 4              I am told that you have been provided with the
 5    record that counsel has recreated documents that purportedly
 6    have been spoliated that I assume at some point or another
 7    back up or will back up one of two things, either the
 8    representations in the letters that there was no asbestos in
 9    the Emtal talc or back up the allegations that are in the
10    complaint that, in fact, there were and everybody was lying
11    about it.  One or the other is going to happen.
12              Based on that factual record, I will tell you, I
13    would feel comfortable enough making a determination as to
14    whether the crime fraud exception applies, and since that
15    application is going to come to me, I think that gives you a
16    pretty good idea that I am not going to have a problem with
17    the record being incomplete.
18              Now, the legal conclusion are a different story all
19    together, but I don't think you have to concern yourself
20    with the --
21              MR. J. PLACITELLA:  Fair enough, your Honor.
22              Before we discuss the record, and I want to leave
23    that to the side, and we will take that course of action
24    under advisement when the time occurs.
25              SPECIAL MASTER RIVERA-SOTO:  So what do you want me
```

1        to do about your motion?

2                    MR. C. PLACITELLA:  For our motion for two 30(b)(6)

3        depositions?

4                    SPECIAL MASTER RIVERA-SOTO:  Yes.

5                    MR. J. PLACITELLA:  We would like two 30(b)(6)

6        depositions to go forward at a time after the Court

7        determines what is appropriate discovery and under the

8        appropriate protection.

9                    SPECIAL MASTER RIVERA-SOTO:  Okay.

10                   Anything else?

11                   MR. J. PLACITELLA:  That is it.

12                   SPECIAL MASTER RIVERA-SOTO:  At issue is the

13       application of the plaintiffs under ECF 247 for the ability

14       to take two 30(b)(6) depositions of a corporate

15       representative of BASF, and by that I mean two depositions

16       on two different days concerning different topics.

17                   To the extent that that application is being

18       presented, that application is denied.

19                   The procedure that should be followed is a 30(b)(6)

20       notice of deposition should issue that lists the areas of

21       inquiry that the proponent of the deposition is seeking to

22       have covered in the deposition.  If the receiving party

23       thinks that more than one person is necessary to

24       appropriately respond to the deposition, and that is a good

25       faith evaluation, then they are to notify the plaintiffs and

```
 1    say:  We don't have one person that can answer all three of
 2    your categories - I am just making the numbers up - but we
 3    have three individuals who can do so.
 4           That said, it is one deposition, and it is one
 5    deposition, one day, seven-hour maximum.
 6           If you find that that is not enough time, then I
 7    would strongly urge you to discuss it with your opponents,
 8    who I am sure will be very reasonable about it and will try
 9    to accommodate you as beset they can.
10           If that does not provide the amount of time that
11    you think is needed, let me know, and I will help you.
12           I will, however, tell you that in 40 years of
13    practicing law, I have only taken one deposition that lasted
14    more than four and a half hours.  It's a matter of
15    preparation, Counsel.
16           Now, that said, there is a separate part of this
17    application that deals with the attorney-client privilege
18    issues.  That portion of your motion is also denied without
19    prejudice to the filing of a motion for a determination as
20    to whether the crime fraud exception applies to any
21    privileged claim made by the defendants.
22           Make sure that that application is properly
23    supported with facts.  I know that the defendants will
24    respond appropriately, and I will address it in due course,
25    and I think you all learned that my due course tends to be
```

1        pretty quick.

2                Finally, there was the request for a 502(d) order.

3        I think that is a little premature, so that is also denied,

4        but, again, without prejudice.

5                I think that although I do not agree that a consent

6        is necessary for a 502(d) order, it is always better if

7        counsel work that out, just like they work out discovery and

8        confidentiality orders.  The concern in respect of that is

9        that privilege, once you open that door, it's impossible to

10       close it, and giving it the breadth that the plaintiffs

11       would like me to give it, it's I think just a recipe for

12       mischief, and so I would prefer if you try to work it out

13       between you.

14               If you are unable to do so, then, if necessary, I

15       will address it, and I will address it quickly.

16               I think that covers all of the matters that are at

17       issue under that motion.

18               Did I leave anything out, Counsel?

19               MR. ASSAF:  No.

20               SPECIAL MASTER RIVERA-SOTO:  The next motion is

21       plaintiffs' letter motion to compel BASF's production of

22       agreements with co-defendants concerning this litigation and

23       related matters.  That is ECF 248, 265 and 294.

24               Mr. Blatt, they have you listed as joining in on

25       this one under 266, but I don't see that in 266, so can you

```
1      help me there?
2                  MR. BLATT:  It's not in 266, we have not.
3                  SPECIAL MASTER RIVERA-SOTO:  I don't see it in 266,
4      but I am an old guy, and my eyes may not be working right.
5                  Here is 266 for you.
6                  MR. BLATT:  We could join, but I don't know what is
7      in 266.
8                  SPECIAL MASTER RIVERA-SOTO:  Okay.
9                  Is it somewhere else?
10                 MR. BLATT:  Because I don't think the motion was
11     directed to us.
12                 SPECIAL MASTER RIVERA-SOTO:  No.  It was directed
13     to BASF.
14                 MR. BLATT:  Yes.  So we have joined in BASF's
15     motions --
16                 SPECIAL MASTER RIVERA-SOTO:  Right.  But this is
17     not BASF's motion, it's plaintiffs' motion.
18                 MR. BLATT:  That's correct, your Honor, and so we
19     did not file something joining it because it was not a
20     motion directed to us.  We do, however, support BASF's
21     position in it.
22                 SPECIAL MASTER RIVERA-SOTO:  So you are joining
23     now?
24                 MR. BLATT:  Correct.
25                 SPECIAL MASTER RIVERA-SOTO:  Okay.
```

```
1              I say that because on the agenda that Mr. Assaf was
2         kind enough to prepare for us, he has you listed as a
3         joinder under ECF 266.  I just couldn't find it there.
4         Maybe I can't find it because it is not there.
5              All right.  So you are in this, too?
6              MR. BLATT:  Yes.
7              SPECIAL MASTER RIVERA-SOTO:  So then we are talking
8         about ECF 246, 265, 294, and as modified today, 266.
9              In ECF 248, which is plaintiffs' letter request to
10        compel BASF to produce agreements with its co-defendants
11        concerning this litigation and other matters, plaintiffs had
12        requested an indemnity forbearance standstill settlement
13        arbitration, joint defendants for like agreements between
14        BASF and any or all of its co-defendants.
15             Plaintiffs assert that the agreements are relevant.
16        They are not privileged.  They are within BASF's control,
17        that the existence of those agreements is demonstrated by
18        the absence of any cross-claims between the defendants, that
19        the agreements are proof of potential bias, and therefore,
20        they are relevant.
21             The plaintiffs assert that they are not privileged
22        because they were not prepared in anticipation of
23        litigation, and either BASF has copies or the ability to
24        secure copies to those agreements, and therefore no undue
25        burden in production.
```

```
 1              In opposition at ECF 265, BASF asserts that first
 2      the documents are unavailable, if they are the result of a
 3      mediation that plaintiffs, BASF and Cahill conducted in
 4      2016, and referring to the local rules.
 5              Second:  That is not relevant.  Those agreements
 6      are not relevant to the claims or defenses in this case.
 7              Third:  They assert that the common interest
 8      privilege, or what us old people call the joint defense
 9      privilege, applies in this case.  They assert the irony that
10      plaintiffs refuse to produce documents concerning their
11      agreements with the Bevan law firm and like, and that the
12      same should apply here, which by that way that kind of
13      argument holds no weight with me whatsoever.  I don't think
14      tit for tat works at all.
15              Third:  That the Court must distinguish among
16      indemnity, standstill or joint defense agreements that joint
17      defense agreements are not relevant, that settlement
18      agreements are not relevant, and you need to show a
19      particularized showing that admissible evidence will result
20      from disclosure, and that indemnity agreements only show
21      bias, that is not overwise shown by another readily apparent
22      source, and BASF asserts that the attorney-client bias
23      between BASF and Cahill is readily apparent.
24              It then addresses the common interest privilege and
25      at the request for joint defense or indemnity agreements are
```

1    interdicted by the common interest privilege that plaintiffs

2    must show that the parties share a common legal interest or

3    represented by counsel, and that they have taken steps to

4    protect their communications, all of which BASF asserts they

5    have done, and therefore, the common interest privilege

6    applies.

7           By way of reply, which is at ECF 294, plaintiffs

8    refer to Cahill's joinder, which is interesting, because no

9    one knows where that came from.  They claim that portions --

10   that the protection under the -- that BASF's claim that

11   protection under the mediation privilege and common interest

12   privilege or relevance do not apply, that these documents

13   are relevant as a proof of bias, and particularly in respect

14   to the civil conspiracy claim, and that the common interest

15   privilege does not apply as there is no proof of a joint

16   defense agreement, even though they requested a copy of the

17   joint defense agreement.

18          Who is coming up?

19          MR. COREN:  I am your Honor, plaintiff.  Michael

20   Coren for plaintiffs.

21          Your Honor has put on the record I think a very,

22   very fine summary that the parties have argued and briefly

23   we feel that we are entitled to get the indemnity agreement,

24   and if there is a settlement agreement, we are entitled to

25   know the lay of the land.

```
1              SPECIAL MASTER RIVERA-SOTO:  Why?

2              MR. COREN:  Because, your Honor, these parties

3    before were at odds with each other, and if they were at

4    odds with each other --

5              SPECIAL MASTER RIVERA-SOTO:  Well, you claim that

6    they were in a civil conspiracy, so which one is it?

7              MR. COREN:  Understood.  But when things fell

8    apart, when things fell apart, and they started to become

9    unraveled, were they at somewhat odds with each other?

10             Did they have claims against each other that bear

11   upon that they have resolved because, your Honor, we got the

12   entire controversy doctrine here, and under the entire

13   controversy doctrine, if BASF had a malpractice claim

14   against Cahill hypothetically, and you know, we are entitled

15   to know if that has been litigated, and if it has been

16   litigated, resolved in a settlement or if it's a pending

17   claim, it has to be listed because all of the transactions

18   have to at least be brought to the Court's attention, so it

19   could decide whether it will allow them to piecemeal --

20             SPECIAL MASTER RIVERA-SOTO:  I don't understand

21   that, because if there is a pending claim between BASF and

22   Cahill, they can decide between them that the entire

23   controversy doctrine does not apply, and you really don't

24   have a dog in that fight.

25             MR. COREN:  I'm not so sure about that, your Honor,
```

```
1        with all due respect.

2                SPECIAL MASTER RIVERA-SOTO:  Because it doesn't

3        affect you.  You know, you are not part of that fight

4        between them.  You have a right with them, but not between

5        them.

6                MR. COREN:  But if they try to come back to court,

7        that will be a defense that gets, you know, interjected and

8        you can't contract the realm.  It's a --

9                SPECIAL MASTER RIVERA-SOTO:  You can waive the

10       entire controversy doctrine.  You can.

11               MR. COREN:  I have to tell you, your Honor, that's

12       news to me.  I always, as I read Conjo (phonetic) and its

13       progeny that you could waive --

14               SPECIAL MASTER RIVERA-SOTO:  The rule has

15       changed --

16               MR. COREN:  -- that this is where the Court had to

17       have control.

18               Be that as it may, your Honor, Courts have -- there

19       are legends of cases, we cite them to you, that said an

20       indemnification agreement changes the relationships between

21       the parties, and it is a fact that they get to take into

22       account.

23               If somebody has been absolved of liability, it is a

24       fact that they get to take it upon -- it bears upon

25       veracity.  It bears upon bias.  It bears upon credibility,
```

```
 1    and that is why the Courts gives that.  The problem child

 2    case, your Honor, let's cut to the nuts, is the joint

 3    defense agreement.  There the Courts says, hum, maybe, maybe

 4    not, let me take a look at it.

 5            First of all, we have to right to know if there is

 6    one.  There has not yet been a corporate statement there is

 7    one, we have one in writing, this is the part.  And even the

 8    cases that say you don't get it, say you get that

 9    information, and they are stonewalling us on that

10    information --

11            SPECIAL MASTER RIVERA-SOTO:  Mr. Coren, maybe I am

12    a little more Pollyanna than you are, but I look at the

13    defense side, and I see it being led on one side by Kirkland

14    & Ellis, and on the other side by Williams & Connolly.

15            You would be able to knock me over with a feather,

16    and I am a pretty dense guy, if they don't have a joint

17    defense agreement going between them.  You don't have to

18    admit it.  I am just saying, I would be stunned beyond

19    words.

20            MR. COREN:  Yeah.  But we have a right to know that

21    for a fact because earlier today you said we go on facts.

22    We don't go on what we as lawyers know should be, just as

23    you just described, so taking the cue from you, your Honor,

24    I want the facts.

25            SPECIAL MASTER RIVERA-SOTO:  I hate it when people
```

```
1        cite my own words back to me.  It's terrible.
2                (Laughter)
3                MR. COREN:  It's got wisdom.
4                Anyway, your Honor, we are entitled to know if they
5        exist, who, when, and what the parties are.
6                SPECIAL MASTER RIVERA-SOTO:  How does that advance
7        the ball for you?
8                That is the part I am not getting.  So they have a
9        joint defense agreement, how does that advance the ball for
10       you?
11               MR. COREN:  Because, when -- your Honor, earlier,
12       last week, we offered you Justice Stein's report if you
13       would -- and all of a sudden, you said, look, I will only do
14       it if the parties -- if the parties say I could see it, all
15       agree, because somebody has some privileged elements
16       there --
17               SPECIAL MASTER RIVERA-SOTO:  Actually that is not
18       why I said it.
19               I said it because I was told that on the emergent
20       application made to the Appellate Division from Judge
21       Viscomi's order, which provided that the stay would still
22       remain pending the application, the Appellate Division had
23       denied the emergent application, but I was also told that
24       the very next morning that the defendants had moved for
25       either reconsideration or were going to file a position for
```

```
1    certification before the Supreme Court of the state.
2              It struck me that under those circumstances, we
3    shouldn't be looking at this tiny little window of
4    opportunity, but we should honor the spirit of what Judge
5    Viscomi ordered, and that therefore, I did not want to look
6    at Justice Stein's report unless, and that is what I said,
7    well, I put it, provided all parties agree.
8              Well, all parties did not agree, so I didn't want
9    to see it.
10             MR. COREN:  I understand that.
11             And Judge Viscomi last year modified the April 5,
12   2013 order, that's the sealing order, and to allow at that
13   time -- either or both Chief Judge Linares and Magistrate
14   Judge Dickson to see it, if they wanted to.  Just like I
15   would like to see it.
16             Judge Dickson felt he couldn't see it because there
17   were two parties here who don't have access to it.
18   Ironically, both are BASF former lawyers, defendant
19   Dornbusch and defendant Halket.
20             The point here is in the joint defense agreement,
21   they have cooperation clauses or access clauses, don't know,
22   but it is not unheard of.  Then that sort of cuts to the
23   chase.
24             What do you mean, they can't see it?
25             They have a right to see it under the agreement,
```

```
 1    and therefore, you have a right to say under those
 2    circumstances, please give me the Stein recommendations and
 3    opinions.  I'm just giving you one hypothetical of where and
 4    how and why it matters.
 5              We have the right to see who is paying the money.
 6    Follow the money we were taught, breaker two.
 7              And, you know, that is one of the ways you follow
 8    the money.  That is one of the reasons the Courts find the
 9    indemnification in the settlement agreements, and those
10    issues bear upon credibility and veracity.
11              Your Honor, you know, I think you got a grasp, you
12    know, of the knowledge.  If there are any questions I could
13    answer for you, if not, I am going to resume my chair.
14              SPECIAL MASTER RIVERA-SOTO:  Let me ask you about
15    what you just said, which was follow the money.
16              Is there any basis for the assertion that somebody,
17    other than a specific defendant, is paying for the cost of
18    that specific defendant's defense?
19              MR. COREN:  Once again, it is that practical
20    portion of me, that when I look at the way lock step
21    Dornbusch and lock step so far Halket have been following
22    BASF's leads, notwithstanding the fact you can see some
23    intentions in that relationship, I would tend to think that
24    maybe that their defenses are being paid for, but once
25    again, I don't have the facts.  I only have the intuition,
```

1    and that's not good enough for you, your Honor.  We need the

2    facts.  I'm asking you to make them produce the facts.

3              In the worst case produce it in camera, and you

4    tell us if it is privileged.  If not, then, you know, we

5    move on.

6              SPECIAL MASTER RIVERA-SOTO:  This may be an unfair

7    question to you, but the New Jersey Supreme Court issued an

8    opinion called In Re Grand Jury Proceedings that addressed

9    the issue of the representation of parties being paid for by

10   other parties in the case.

11             Are you familiar with that case?

12             MR. COREN:  I am not, your Honor?

13             SPECIAL MASTER RIVERA-SOTO:  It breaks my heart

14   because I wrote it.

15             (Laughter)

16             MR. COREN:  I apologize, but I assure you the next

17   time I'm here, I will be fluent in it, well versed.

18             SPECIAL MASTER RIVERA-SOTO:  You might want to take

19   a look at that to determine what, if anything, in respect of

20   these agreements, because I think you find the scope, or at

21   least, as I understand it, it is a bit narrower than what

22   you are asserting, so -- but that is just my suggestion.

23             MR. COREN:  All right.

24             Thank you, your Honor.

25             SPECIAL MASTER RIVERA-SOTO:  Thank you.

```
 1                Who do I have?

 2                Mr. Bress, welcome back.

 3                MR. BRESS:  Thank you, your Honor.

 4                I will be brief, your Honor, based on your

 5      comments, but I don't think the plaintiffs have put forward

 6      a proper basis for any agreements among defendants related

 7      to this case.

 8                The basis they put forward are generic allegations,

 9      bias or generic allegations of civil conspiracy.  I think

10      either of those justifications would warrant production of

11      these kinds of agreements in every single case, and that is

12      not what happens.

13                I think that, as your Honor pointed out, perhaps

14      there is some fact or piece of information within this that

15      they would be entitled to.  They have not made that request,

16      although, as your Honor pointed out, it is clear that there

17      are agreements among the defendants in a joint defense

18      capacity, and I think we made that clear to the plaintiffs.

19                I think the only thing to add, your Honor, is that

20      where the record currently is, I think the information they

21      provided you is not sufficient, and I think there are also

22      privilege concerns that exist as well.

23                Thank you.

24                SPECIAL MASTER RIVERA-SOTO:  Thank you.

25                Mr. Coren, anything else?
```

```
1              MR. COREN:  I think the fields are pretty well

2       plowed, your Honor.

3              SPECIAL MASTER RIVERA-SOTO:  Thank you.

4              At issue is plaintiffs' motion to compel BASF's

5       production of agreements -- oh, I'm sorry, before I go

6       there.

7              Mr. Blatt?

8              MR. BLATT:  No, your Honor.

9              Thank you.

10             SPECIAL MASTER RIVERA-SOTO:  You are being very

11      quiet over there.  I don't blame you.

12             MR. BLATT:  I will fully subscribe to what Mr.

13      Bress said.

14             SPECIAL MASTER RIVERA-SOTO:  Okay.

15             At issue is plaintiffs' letter motion to compel

16      BASF's production of agreements with the co-defendants

17      concerning this for litigation and related matters.  The

18      original motion was filed on ECF 248.  For the reasons that

19      follow, that application will be denied without prejudice.

20             As the record stands right now, there has been an

21      insufficient showing of a particularized need to get any of

22      these agreements.

23             I don't know if there are indemnity agreements.  I

24      don't know if there forbearance agreements.  I don't know

25      whether there are standstill agreements.  I don't know if
```

1    there are any settlement agreements.  I don't know if there

2    are any arbitration agreements.  I don't know, but I am

3    pretty damn sure that there is at least one joint defense

4    agreement between BASF and any and all of the other

5    defendants.  The existence of those agreements alone is not

6    enough to justify their disclosure.

7         Specifically talking about joint defense

8    agreements, the whole purpose of a joint defense agreement

9    is to allow lawyers representing different clients to be

10   able to speak with each other as if they were within the

11   same law firm.  You know, somebody put it differently, but

12   that is the way I have always cognitively thought of it, so

13   that discussions are always privileged among those lawyers.

14        It is not unusual, and I would dare say it is

15   commonplace that in litigation like this, that the

16   defendants will enter into joint defense agreements to

17   provide that kind of free flow of information that assists

18   in the preparation of the defense for everyone, so that

19   lawyers who really have interests that are aligned don't

20   have to be cautious in what they communicate to avoid

21   violating any kind of privilege.

22        I will tell you that it has its salutary effect,

23   because when you have multiple defendants, and there is a

24   joint defense privilege, it allows the defendants to speak

25   with one voice, which means that the Court will then hear

1       only one voice in respect to their position instead of

2       hearing four, five or six voices.

3               I will tell you from my own personal experience,

4       that that is incredibly valuable for everybody who is

5       involved, because you get a moderation of the positions that

6       are being advanced, and the Court gets to listen to one

7       consistent line instead of people with variations on a

8       theme.

9               So the presumption at least in respect to joint

10      defense agreements is absolutely against their disclosure,

11      and the proof needed to be able to overcome that presumption

12      is very high, and it is just not here.  Under Third Circuit

13      law, settlement agreements are not disclosable unless one of

14      two things happen.

15              Number one:  Somebody makes a mistake of putting

16      them as part of the record, which some people mistakenly do,

17      and once they do that, they are open season, or there is a

18      showing of particularized need for their disclosure, and

19      there has been none here.

20              So to the extent that this application seeks any of

21      those agreements, it is denied, but it is denied without

22      prejudice.  If there is something more that you have that

23      tells me that there is a particularized need for you to get

24      these documents, then bring it to me, and I will give it all

25      fair and due consideration.

1          Which takes us to our next application, and that is

2     BASF's letter motion, re the discovery of documents and

3     information concerning plaintiffs' decedents' settlements of

4     underlying asbestos cases both with Engelhard and other

5     defendants.  That is ECF 250, 266, and Cahill did join in

6     that one, 267 and 287.

7          In addition to that, last night I received a letter

8     on behalf of who I just stated -- I received a letter from

9     Mr. Weiner.  Did I pronounce that correctly?

10         Mr. Weiner from O'Toole Scrivo representing

11    Vanderbilt Materials.

12         I was told Mr. Weiner was going to be here.

13         MR. C. PLACITELLA:  Your Honor, he was here, but he

14    had to catch a plane.  He didn't get to participate in this.

15         SPECIAL MASTER RIVERA-SOTO:  Okay.  I wish he had

16    told me that.  I would have taken him out of order.

17         In any event, in ECF 250, BASF moves for the

18    disclosure of this information asserting that it is neither

19    privileged nor confidential, that the settlement that the

20    plaintiffs' decedents entered into are directly at issue in

21    this case and therefore relevant, and that any privilege

22    that might exist has been waived, and the production does

23    not cause an undue burden.

24         At ECF 266, Cahill joins in that application.

25         At ECF 267, plaintiffs oppose the application.

1     They generally say that these matters are not relevant.

2     They are privileged.  They are confidential, and producing

3     them would cause an undue burden.  They state that the

4     information concerning unrelated defendants is not relevant,

5     that settlement information is prohibited under Federal Rule

6     of Evidence 408, that in respect of putative class members,

7     BASF has failed to make a heightened showing of

8     particularized need, that in respect to disclosure of the

9     representative plaintiffs, it should be limited to basic

10    information concerning the proceeding, nature and claims

11    against BASF, BASF's representations to counsel and the

12    courts, and the outcome of litigation in respect of BASF.

13         Plaintiffs also raise the issue of a protective

14    order, but I do note that on the same day that they filed

15    ECF 267, the Court entered a discovery confidentiality

16    order, which I think moots that point.

17         Plaintiffs assert that the issue here is

18    defendants' conduct, not plaintiffs, that there has been no

19    ruling as to whether the privilege must yield, but again, I

20    note that Chief Judge Linares' August 3rd, 2017 opinion

21    addresses that point.

22         Plaintiffs assert there has been no waiver in

23    respect to the putative class members.  They assert that the

24    information is privileged, it's irrelevant, wholly

25    inadmissible, and not proportional to the needs of the case,

1        and therefore unduly burdensome.

2                By way of reply at ECF 287, BASF asserts that the

3        deposition of plaintiff, Marilyn Holley, shows that her

4        decedent entered into identical aggregate settlement with

5        co-defendants whose products did contain asbestos.

6        Therefore, belying the notion that she would have reached a

7        different settlement, but for misrepresentations.

8                They also argue that the settlements are not

9        privileged or confidential.  They argue at some points that

10       New York or Ohio privilege law applies, although I think we

11       are past that, and we're all talking about New Jersey at

12       this point.

13               They say even if New Jevery law applies, there is

14       no privilege because plaintiffs placed the privileged

15       communications at issue.

16               They assert that the settlement information is

17       relevant to plaintiffs' allegations, that BASF did not

18       forfeit its right to discovery, and that Rule 408 is not

19       purported discovery.

20               Finally, they say the discovery is proportional and

21       not an undue burden.

22               Late last night I received a letter that I

23       mentioned before from Mr. Weiner of O'Toole Scrivo

24       representing Vanderbilt Minerals.  In it they assert that

25       Vanderbilt has a substantial interest in maintaining the

1          confidentiality of settlement information and documents.

2                  The Third Circuit opinions rendered discovery

3          irrelevant, that Rule 408 prohibits disclosure, and that the

4          discovery confidentiality order does not cover non parties.

5                  BASF, it is your motion.

6                  One card, good.

7                  MR. ASSAF:  Two, your Honor.

8                  MR. ROTH:  It's small writing.

9                  MR. ASSAF:  Gene Assaf on behalf of BASF.

10                 Your Honor, with respect to the settlement

11         agreements, I hope that some of that may have been taken up

12         in your earlier ruling on the Bevan, et al. Issues.

13         But to try to address the landscape, I think after Judge

14         Linares' ruling, there is no privilege or scope defense left

15         as to the settlement issues.

16                 I think the Bevan issues, I would ask for some

17         clarification on that, as to whether Mr. Placitella I think

18         is still saying that things in the Bevan files that are

19         settlement documents with other defendants are going to be

20         produced.  He is not logging them as privileged, but I think

21         he is just withholding them, so I just would --

22                 SPECIAL MASTER RIVERA-SOTO:  Well, that is not an

23         option.  My order is fairly clear.

24                 MR. ASSAF:  Correct.

25                 SPECIAL MASTER RIVERA-SOTO:  You are going to have

1    two sets of documents coming out of those reviews, documents

2    that you produced and are Bates numbered, and documents that

3    appear on a privilege log that are also Bates numbered, and

4    those documents on a privilege log are to be provided to me

5    to decide whether they are in fact privileged.

6         Those are the only two categories, and if I need to

7    make that any further clear, I don't know how.

8         MR. ASSAF:  Well, I am still a little unclear,

9    though, because I don't think settlement with other

10   defendants are by any definition privileged, and yet --

11        SPECIAL MASTER RIVERA-SOTO:  Whether Mr. Placitella

12   says that they are or not, they are either going to be

13   produced to you as not privileged, or they're going to be

14   produced to me as privileged, and I will make my judgment,

15   but everything in those files is to be produced, one way or

16   the other.

17        MR. ASSAF:  Thank you for the clarification, your

18   Honor.

19        So on that issue then, so not privileged, there is

20   still an argument that they have on custom and practice,

21   that there's a custom and practice in Ohio and not to -- or

22   to keep these confidential, and I think the Vanderbilt --

23        SPECIAL MASTER RIVERA-SOTO:  We are litigating this

24   case in New Jersey.

25        MR. ASSAF:  -- the Vanderbilt argument was that

```
1        there are also confidentiality concerns.  I think both of
2        those issues are addressed, your Honor, by protective order
3        issues, attorneys' eyes only, however they want to do it,
4        but I don't think that should be a stop.
5              The real issue, though, is relevance after the
6        Judge Linares' scope issue, because your hypothetical today
7        to Mr. Placitella on the $10,000 that was settled to claims,
8        that's out of their complaint, right, that they said they
9        would have settled for more, if they had known X.  So how do
10       we know that?
11             And one of the things we are going to know is we
12       will have control cases.  As we point out in our brief, we
13       now know that one named plaintiff settled with talc
14       companies who admitted there was asbestos in the talc for
15       roughly $300.  At the same time they were settling with us
16       for $300.  I would think that under any definition of
17       relevance, I get to now test that proposition.
18             We also know that plaintiffs were settling with
19       asbestos manufacturers for larger amounts, but incrementally
20       larger, not hundreds of thousands of dollars, but thousands.
21       Again, so that tests the proposition.  Would plaintiff have
22       really taken the case to trial against us, if they had known
23       there were trace amounts of asbestos, and they had worked
24       with our product for a couple of months versus settling with
25       other defendants, BF Goodrich, that they worked there with
```

1    asbestos for 30 years and they took $10,000.

2              Obviously, I think that's relevant, but it is also

3    I think covered by Chief Judge Linares' order, and this

4    might be a further clarification on the Bevan issue,

5    because --

6              SPECIAL MASTER RIVERA-SOTO:  You have to make sure

7    we are not mixing our apples and oranges.

8              When you say to me an employee settled his claim

9    against his employer for X number of dollars based upon an

10   allegation of environmental exposure, there is a lot that

11   goes into that determination.

12             MR. ASSAF:   Correct.

13             SPECIAL MASTER RIVERA-SOTO:  I mean, I can tell you

14   I don't know about Ohio, but one of the issues that would be

15   raised in New Jersey is whether the claim is entirely barred

16   by your Worker's Compensation Act, and New Jersey has an

17   exemption for intentional wrongs, but the case law says that

18   in order to vault the non litigation bar in the Worker's

19   Compensation Act, the plaintiff has to show that serious

20   injury or death will result from the employer's actions, so

21   it's an awfully high bar, which means that a lot of times

22   employers settle cases for pennies on the dollar because it

23   is cheaper than defending them and ending up with a

24   determination that the Worker's Compensation Act bars.

25             MR. ASSAF:  Fair point, your Honor.

1            But in these cases, we know, for example, plaintiff

2      Holley, sued not just her employer and the seven talc

3      manufacturers, but 137 defendants.  So those numbers as to

4      what she settled with the 136 who were not her employers,

5      would clearly be relevant, and the other additional

6      relevancy, and I know you're going to address this in the

7      Bevan analysis, but in 228 they talk about aggregate

8      settlements.  We haven't spoken a lot about those today, but

9      they are in our papers.

10           I don't think that those settlements should even be

11     logged at this point.  I think that Judge Linares' order

12     covered those aggregate settlements.  He said, you put that

13     at issue, you reduce them.  So I don't think Mr. Placitella

14     could log those from that --

15           SPECIAL MASTER RIVERA-SOTO:  Well --

16           MR. ASSAF:  -- if he does, you're going -- you will

17     have it, I get it.

18           SPECIAL MASTER RIVERA-SOTO:  If he does, I will get

19     it, and I will apportion the costs of my doing so

20     accordingly.

21           MR. ASSAF:  These were in our briefs, your Honor,

22     but here is where I want to end up on the substance, and

23     then I have one procedural point.

24           On the substance, your Honor, we talked a lot about

25     class today, and we've had interesting discussions, and I

1    appreciate your Honor's raising the questions for both sides

2    to think about.

3           We haven't talked about Comcast, and Comcast makes

4    it pretty clear that the evidence of damages will have to

5    obviously be part of the expert testimony.  We were talking

6    about Comcast yesterday, and then I was saying at the break

7    the Judge was in our conversations regarding the

8    hypotheticals and how you model to this, and what you say to

9    the jury about this.

10          So, your Honor, even if it weren't relevant at some

11   stage for the claims, it's going to be relevant for a

12   damages analysis under Comcast in the Third Circuit,

13   and so I want to put out a marker that if they're saying

14   you're not getting any of this information, it's only what

15   BASF settled for, I don't think their damages expert is

16   going to have any reliable model under Daubert and Comcast

17   to come here and so I don't want to then six months from now

18   hear, oh, now we're going to go back and dump this

19   information on you, so I think under Comcast we're going to

20   get it.

21          Then finally, your Honor, I'm going back to the

22   Bevan issue, unless you have any questions.  I did have a

23   procedural question on that.  I asked you about whether Mr.

24   Placitella would pick this randomly, and you indicated he

25   should.  I wonder whether --

1          SPECIAL MASTER RIVERA-SOTO:  I also said that the

2     selection should be sticking your hand in a box and pulling

3     things out --

4          MR. ASSAF:  Correct, your Honor, and again, I'm

5     doing --

6          SPECIAL MASTER RIVERA-SOTO:  -- not picking the

7     first five.  You just --

8          MR. ASSAF:  -- this is actually just for the

9     integrity of the process, I have no question about Mr.

10    Placitella for sure.  But I'm wondering whether we should

11    just say, you know, the first 30 names in the alphabet in

12    the files we should take, or have, you know, a glamorous

13    trip for an associate to Ohio with Mr. Placitella, because

14    this is such -- we know -- we know --

15         SPECIAL MASTER RIVERA-SOTO:  We don't need to do

16    that.  Mr. Placitella knows what to do, and I have every

17    confidence that he will do that.

18         MR. ASSAF:  Okay.

19         So on settlement documents, your Honor, I would

20    argue that all of these settlement documents are covered by

21    the order.  We think they are important for class issues.

22    We think they're important for admissions and individualized

23    issues as well.

24         If you have any questions, your Honor, I am pleased

25    to respond.

```
1              SPECIAL MASTER RIVERA-SOTO:  Thank you very much.

2              Mr. Placitella, you're back.

3              MR. C. PLACITELLA:  I am back.

4              I'm sorry that Mr. Weiner left.  He would have been

5    I think shocked to hear that his client admitted there was

6    asbestos in the talc since they are litigating all over the

7    United States that there never was and never is.  But,

8    unfortunately, he's not here to address it.  They will have

9    to fight it out at some point I guess.

10             So I go back to Chief Judge Linares' decision and a

11   key issue, the essence of his decision.  The scope of

12   discovery will focus on the alleged wrongful conduct and any

13   alleged harm following that conduct.

14             He goes on later:  To fully explore this issue,

15   defendants will be entitled to discover what the plaintiffs

16   and their counsel knew, were told, and whether any knowledge

17   or lack thereof contributed to their decisions --

18             SPECIAL MASTER RIVERA-SOTO:  In resolving the

19   underlying --

20             MR. C. PLACITELLA:  -- in resolving the claim with

21   BASF.

22             The direction from the Third Circuit has been

23   clear.  As I said this morning, we're not relitigating the

24   underlying claim, and what somebody else may settle with is

25   relitigating the underlying claim.
```

```
 1              Why they settled, for example, with Owen Corning

 2      Fiberglass because they might have been going bankrupt, or

 3      because the exposure was tangential is not at issue here.

 4              What's at issue here is the case against BASF.  All

 5      of these co-defendants that they say they want settlement

 6      documents about, they had their cross claims dismissed

 7      fraudulently.  They can't bring them back in the case

 8      through the back door now.  They dismissed their cross

 9      claims against these co-defendants on the same basis these

10      people lost their rights.

11              Now, they want to come back in and say, oh, well,

12      that -- we want to put that back in the case even though we

13      got rid of them fraudulently.

14              SPECIAL MASTER RIVERA-SOTO:  What is the harm in

15      requiring a production of these agreements?

16              MR. C. PLACITELLA:  Because the settlements are

17      confidential when the plaintiffs --

18              SPECIAL MASTER RIVERA-SOTO:  Are they all

19      confidential?

20              MR. C. PLACITELLA:  The overwhelming majority are

21      confidential.

22              I believe actually the settlement -- they can pull

23      one of their joint releases.  I actually believe that the

24      settlements that BASF has with the other defendants are

25      confidential, and that's why Mr. Weiner wrote his letter,
```

```
 1        because it was saying, Oh, wait a second.  We were part of a
 2        joint settlement with you.  You don't -- we don't want that
 3        disclosed.  That's confidential.  The settlements are
 4        confidential.
 5                  Are there one or two that are not?
 6                  I can't speak to that right now, but I know
 7        generally, I've been in this a long time, almost every
 8        defendant requests a confidentiality order, and I am not
 9        allowed to disclose that, and they guard that very, very
10        carefully.  And the plaintiffs guard that very, very
11        carefully because there are a lot of things that go into
12        those decisions, and you can't equate one with the other.
13                  SPECIAL MASTER RIVERA-SOTO:  But that is exactly
14        the point that BASF is making, that there is a great deal
15        that goes into the decision of settling a case, and that
16        they are entitled to know whether part of that thought
17        process was the information, the representations that were
18        made by BASF either directly or through their counsel to the
19        underlying plaintiffs' counsel.
20                  MR. C. PLACITELLA:  We have no issue with that.
21                  SPECIAL MASTER RIVERA-SOTO:  I hope not --
22                  MR. C. PLACITELLA:  No.  We have no issue with
23        that.  We have no issue with that --
24                  SPECIAL MASTER RIVERA-SOTO:  -- Judge Linares
25        has --
```

```
1                MR. C. PLACITELLA:  -- we are on the same page with

2       that.

3                SPECIAL MASTER RIVERA-SOTO:  -- but if it's

4       reflected in the settlement, don't you think they get to

5       know that?

6                MR. C. PLACITELLA:  They get the settlement

7       agreements with BASF.  Absolutely, they get turned over or

8       Engelhard at the time.  They get those.  I believe that's

9       what the order is.  What they don't get --

10               SPECIAL MASTER RIVERA-SOTO:  I think you are giving

11      them the sleeves off your vest.

12               (Laughter)

13               MR. ASSAF:  I think we might, your Honor --

14               SPECIAL MASTER RIVERA-SOTO:  That's my point.

15               (Laughter)

16               Given you have this huge electronic database of

17      documents --

18               MR. C. PLACITELLA:  -- that is kind of my point why

19      are we doing this.  But what they don't get --

20               SPECIAL MASTER RIVERA-SOTO:  Well, they are not

21      asking -- well, they're asking for settlements with

22      Engelhard, but also those other defendants.

23               MR. C. PLACITELLA:  -- but what they don't get is

24      the settlement with Owen Corning Fiberglass.  They were a

25      defendant in the underlying case.  We don't get to
```

 1    relitigate that.  Whatever they got in the underlying case

 2    with Owen Corning Fiberglass, they can't ask Mr. Bevan about

 3    his mental impressions for settling with Owen Corning

 4    Fiberglass, if he could even remember them at this point.

 5            Justice -- I mean, I keep calling him "Justice."  I

 6    keep trying to elevate him quickly.

 7            But Chief Judge Linares is very clear.  They get to

 8    ask about the claims against BASF and why they were settled

 9    or resolved, not the claims against Owen Corning Fiberglass,

10    not the claims against Fiberboard or whoever else it is.

11            He says, and he's very clear, this is the

12    circumscribed scope of discovery.

13            He never says, and you get to ask about all of the

14    other things.  In fact, if you look back at the Third

15    Circuit, Judge Linares, over and over, and it keeps saying,

16    this is not about the relitigation of the underlying case,

17    bringing in settlements that are confidential entered into

18    the underlying case unrelated to BASF violates that exact

19    tenent.  And there is a heightened standard of relevance

20    here that they must demonstrate, and they have not

21    demonstrated it.

22            I believe that they are entitled, and eventually

23    they're going to take Mr. Bevan's deposition, I assume,

24    they're entitled to ask him:  Tell me everything you knew

25    about Engelhard talc.  What was told to you, you know, what

1    did you -- what went into that decision, why did you settle

2    it for what you did, why did you dismiss it, why did you not

3    oppose summary judgment.

4              I think they can ask him those questions.

5              What they can't ask him is:  What about Owen

6    Corning Fiberglass?

7              What were your thought processes and what were your

8    communications with your clients as to why they should

9    accept that settlement?

10             One, it's likely going to be a fruitless exercise,

11   but two, that's exactly what Owen Corning Fiberglass

12   envisioned would never ever happen when they entered into

13   that agreement.

14             When they entered into a settlement agreement with

15   the plaintiff, they took the plaintiff at its word, and they

16   relied on the court system to hold those settlements

17   sacrosanct, and it's really incumbent I submit on the court

18   system to respect that agreement.

19             So, yes, they are entitled to the settlements and

20   the information related to BASF.  They are not entitled, and

21   they're under confidentiality.  They're contracts between

22   people blessed by courts.  Lawyers had a right to rely upon

23   those representations.  They had the right to expect that

24   that confidentiality would be respected, regardless of

25   whether Engelhard committed a fraud and hurt these

1    plaintiffs.

2            Engelhard cannot get the benefit of their fraud

3    here.  They dismissed these co-defendants by fraud.  They

4    lost -- these people lost their rights by fraud.  They can't

5    come in now and undue agreements that were entered in good

6    faith, not by fraud, because they say, oh, we get to hear

7    what happened.

8            Thank you, your Honor.

9            SPECIAL MASTER RIVERA-SOTO:  You wrote on both

10    sides of that, though.

11            MR. ASSAF:  I'm only using one, your Honor.

12            SPECIAL MASTER RIVERA-SOTO:  Okay.

13            MR. ASSAF:  To correct the record first, I think I

14    was correct.  I didn't say it was Vanderbilt that settled.

15    It is Southern Talc.  It's in our papers, and so if I was

16    wrong, I will correct the record.  Southern Talc had the

17    asbestos in it and settled for $300.

18            And then a couple points, interestingly as a

19    threshold matter, and we're going to come back to this when

20    we have Mr. Bevan's deposition, but Mr. Placitella says it

21    will be a fruitless exercise because he won't remember,

22    quote, won't remember who settled for what and why, which is

23    exactly I think the water he's expected to carry in this

24    case about who settled what for why.

25            On confidentiality, your Honor --

1          SPECIAL MASTER RIVERA-SOTO:  That is an issue that

2    Mr. Placitella is going to have to deal with, because it is

3    his burden to prove it.

4          MR. ASSAF:  Correct.

5          On confidentiality, your Honor, an (a) and a (b).

6    On (a), I'm learning.  I may be slow on the uptake, but once

7    I figure it out, you're a fact record guy, and there is

8    nothing in this record, if you look at plaintiffs' brief,

9    Footnote 4, they say that while this information may have

10   been privileged at some point, it is the custom and practice

11   to maintain the confidentiality of it.

12         Mr. Placitella just talked about how there are

13   scores in confidentiality agreements and court orders, and,

14   your Honor, there's nothing attached to their brief.

15   There's nothing in the record, and the reason I remember

16   this is because we went back and forth because originally

17   their position was that there were court orders barring it.

18         And then they said, no, not court orders, it's

19   really the custom and practice of Ohio.

20         So in either event, your Honor, even if there were

21   a confidentiality agreement --

22         SPECIAL MASTER RIVERA-SOTO:  But Footnote 4 cites

23   to no Ohio cases.

24         MR. ASSAF:  Correct, and nothing in the record,

25   and so even if there were a confidentiality agreement, as

```
 1      your Honor well knows, that's exactly what Rules of Civil
 2      Procedure are designed to address.
 3              We have a protective order in the case.  They can
 4      mark it for attorneys' eyes only.  And so, again, your
 5      Honor, I come back to where we started, I don't know, around
 6      11:15 to the hypothetical, how I'm ever going to get the
 7      information regarding a plaintiff's damages and how he or
 8      she has been compensated in order to test that both for an
 9      expert class cert damage analysis and for the admissions in
10      the case.
11              If there are any questions, your Honor, I would be
12      happy to answer them.
13              MR. C. PLACITELLA:  Just one short thought.
14              Mr. Weiner, who is not here, said that there was a
15      confidentiality agreement, and they were part of it, and
16      every settlement they entered into today is confidential.
17      But I guess from this point forward, they won't.
18              SPECIAL MASTER RIVERA-SOTO:  Well, no.  I don't --
19      because we have a discovery confidentiality order here, and
20      if they argue that it's confidential, their disclosure could
21      be --
22              MR. C. PLACITELLA:  Your Honor --
23              SPECIAL MASTER RIVERA-SOTO:  -- so I don't think
24      that one follows necessarily from the other.
25              But be that as it may, that issue is BASF's letter
```

1    motion seeking discovery and documents, as well as

2    information from plaintiffs' decedents concerning

3    settlements in the underlying asbestos cases both with

4    Engelhard and other defendants.  That motion will be granted

5    in part and denied in part.

6         To the extent that BASF is seeking settlement

7    agreements entered into by the representative plaintiffs,

8    they are to receive copies of all settlement agreements

9    entered into by the representative plaintiffs.

10        In respect that they are seeking settlement

11   agreements entered into by putative plaintiffs, they are to

12   receive only copies of the settlement agreements entered

13   into by BASF, no other ones.

14        If we get to that point and a class is certified

15   that exceeds the number of representative plaintiffs, then

16   BASF will be entitled to get the additional discovery from

17   all other class members.

18        Are we okay with that?

19        MR. ASSAF:  Yes, your Honor.

20        MR. SOKOLOVE:  Your Honor, could I ask a question

21   on that?

22        SPECIAL MASTER RIVERA-SOTO:  Certainly.

23        MR. SOKOLOVE:  With respect to the putative

24   plaintiffs, is that --

25        SPECIAL MASTER RIVERA-SOTO:  To the extent that Mr.

```
1        Placitella is looking at representative samples --
2                MR. SOKOLOVE:  Of those 18?
3                SPECIAL MASTER RIVERA-SOTO:  Right.
4                MR. SOKOLOVE:  Thank you, your Honor.
5                SPECIAL MASTER RIVERA-SOTO:  Your 18, his 30, and
6    somebody else's four.
7                MR. SOKOLOVE:  I just wanted to make sure that that
8    wasn't suddenly broader than the smaller sub set.
9                SPECIAL MASTER RIVERA-SOTO:  I wouldn't do that to
10   you, Mr. Sokolove.
11               MR. SOKOLOVE:  Thank you, your Honor.
12               SPECIAL MASTER RIVERA-SOTO:  The next motion is
13   plaintiffs' motion to compel documents from Johnson &
14   Johnson.
15               Before we go there, is there someone here from
16   McCarter?
17               MR. RIESTER:  I am here.
18               SPECIAL MASTER RIVERA-SOTO:  Oh, there you go.  Now
19   you're going to have to come up.
20               Can you make room for counsel?
21               MR. RIESTER:  I am here.
22               SPECIAL MASTER RIVERA-SOTO:  Are you good?
23               MR. RIESTER:  Yes, I'm good.  I can go here.  I'm
24   good.
25               SPECIAL MASTER RIVERA-SOTO:  The next matter is
```

```
 1    plaintiffs' motion to compel documents from Johnson &
 2    Johnson.  It's ECF 268, 276, 290 and 293.
 3            In ECF 268, plaintiffs seek documents from Johnson
 4    & Johnson asserting that Engelhard purchased the Johnson
 5    line from Johnson & Johnson, and that it's the Johnson line,
 6    which is I think in Johnson, New York, right?
 7            MR. COREN:  Johnson, Vermont.
 8            SPECIAL MASTER RIVERA-SOTO:  Vermont, I'm sorry.
 9    It's the one from which the Emtal talc came from.
10            They point out that William Ashton, who executed
11    the affidavit that was sent to everybody saying that the
12    Emtal talc did not contain asbestos, was a Johnson & Johnson
13    employee.
14            They say that Johnson & Johnson has refused to
15    respond to a subpoena that was issued by the plaintiffs, and
16    they request an order for disclosure of all documents
17    responsive to the January 4th, 2017 subpoena, and that
18    Johnson & Johnson be directed that only documents falling
19    within the discovery confidentiality order's boundaries for
20    confidential or attorneys' eyes only be so marked.
21            In opposition, Johnson & Johnson at ECF 276,
22    states that it is willing to comply, but that it needs a
23    different discovery confidentiality order, that they want
24    the limit disclosure pursuant to their proposal, that they
25    want limited disclosure only in this case, and they want a
```

```
1        provision with respect to clawback with respect to common

2        interest documents.

3               At ECF 290, plaintiffs reply by saying that the

4        current discovery confidentiality order meets Johnson &

5        Johnson's concerns, and by way of sur-reply, which I hope

6        this is the last, at ECF 293, Johnson & Johnson states that

7        the changes they propose are modest and that plaintiffs have

8        provided no valid reason in opposition.

9               Mr. Placitella, is this yours or --

10              MR. C. PLACITELLA:  It is the other Placitella.

11              SPECIAL MASTER RIVERA-SOTO:  Mr. Placitella?

12              MR. J. PLACITELLA:  Yes, your Honor.

13              Phyllis, Jared Placitella for the record.

14              Your Honor, I mean, I think the last one was a

15       simple issue and hopefully this one is even more so.

16              Like you said, there is a discovery confidentiality

17       order in this case.

18              SPECIAL MASTER RIVERA-SOTO:  Let me ask you a

19       simple question.

20              MR. J. PLACITELLA:  Sure.

21              SPECIAL MASTER RIVERA-SOTO:  Do you have a problem

22       with the changes that have been proposed?

23              MR. J. PLACITELLA:  I think they are excessive, and

24       I think they could put a burden on this litigation, and here

25       is why.
```

```
 1              Johnson & Johnson I think is maybe one of ten maybe

 2    non parties that have been subpoenaed to this point, and if

 3    each non party is going to require their own custom tailored

 4    discovery confidentiality order, in order for them to

 5    produce documents and make a party wait six months for those

 6    documents until that discovery confidentiality order is

 7    entered, that will really bring this litigation to a halt.

 8              I think Johnson & Johnson's concerns are already

 9    taken care of in the current order.  I mean, Paragraph 3

10    specifically says:  The confidential material shall be used

11    by the receiving party solely for the purposes of the

12    prosecution for defense of this action, being this case.

13              Paragraph 11 already has a clawback procedure for

14    privileged information.

15              I agree with Johnson & Johnson that the matter of

16    whether the common interest privilege applies to Johnson &

17    Johnson or it could seek protection under that doctrine,

18    it's not at issue.  But its concerns about -- I just don't

19    see a need that the common interest privilege needs to be

20    specifically carved out when there is already a privilege

21    clawback provision.

22              So I don't see any prejudice to Johnson & Johnson

23    by the current discovery confidentiality order, and I think

24    it would be expedient to the litigation to have one

25    confidentiality order that governs both parties and non
```

```
1       parties.

2                   SPECIAL MASTER RIVERA-SOTO:  Thank you.

3                   Mr. Riester?

4                   MR. RIESTER:    Mr. Riester.

5                   SPECIAL MASTER RIVERA-SOTO:  Riester.

6                   Well, I had two choices, and I picked the wrong

7       one.

8                   MR. RIESTER:  Well, I'm not related to Jennifer

9       Reister who came up earlier today, so she's an Ohio native.

10                  (Laughter)

11                  I mean, we had two very simple changes to the

12      protective order.  We're a non party, and we are involved in

13      litigation with Placitella in other forms, so we are

14      particularly sensitive to those documents being produced to

15      those other forums.  That is one of thee reasons why we

16      wanted those changes, and to be clear on the language, that

17      it was for this litigation in this case only in this matter.

18                  SPECIAL MASTER RIVERA-SOTO:  Doesn't it say that?

19                  MR. RIESTER:  You know, we tried to get that

20      assurance from plaintiffs' counsel multiple times, and I've

21      never heard them articulate it like they did today, and so

22      if they are going to abide by that --

23                  SPECIAL MASTER RIVERA-SOTO:  Well, what they did

24      articulate was the language of the discovery --

25                  MR. RIESTER:  Yes, they only --
```

 1                SPECIAL MASTER RIVERA-SOTO:  -- which even I was

 2       able to pull off of Pacer, so if I could do it, you can do

 3       it.

 4                MR. RIESTER:  Yes.

 5                SPECIAL MASTER RIVERA-SOTO:  So if the scope of it

 6       is being used only in this litigation, which quite frankly,

 7       it's a fairly common provision, and in fact, I think it

 8       might even be part of the form discovery confidentiality

 9       order that is at Appendix S of our local rules.  But even

10       putting that to the side, if that is taken care of, then

11       your other concern is of the clawback provision, and my

12       response to that is I can ask an obnoxious question, which I

13       will do only rhetorically.

14                MR. RIESTER:  Okay.

15                SPECIAL MASTER RIVERA-SOTO:  You are aware

16       obviously of RPC 4.4(b), which, of course, you're not.

17                But RPC 4.4(b) says that if documents are

18       inadvertently disclosed to somebody else, the recipient has

19       the obligation to immediately stop reviewing them and to

20       immediately return them.

21                And as you know, under the local rules of this

22       court, the New Jersey RPCs apply to conduct in this case --

23       in this court.

24                So aren't you taking -- if your concern is about

25       clawback of inadvertently disclosed documents, isn't that

1        taken care of?

2                MR. RIESTER:   I guess it is, your Honor.

3                I mean, I think that the small changes we have in

4        having a separate distinct order for our production, given

5        our history and other litigation involving the Placitella

6        firm is warranted, and I would ask that our order be entered

7        with its modest changes, but that's for your decision.

8                SPECIAL MASTER RIVERA-SOTO:   Thank you.

9                MR. J. PLACITELLA:   Very brief.

10               SPECIAL MASTER RIVERA-SOTO:   Very brief is ten

11       seconds.

12               MR. J. PLACITELLA:   Yes.   I was looking for some

13       preemptive relief in other litigation that we are involved

14       in in State Court asbestos cases.

15               Johnson & Johnson under our protective order

16       designated all documents that are produced as confidential,

17       because it claimed that those documents came from its

18       confidential litigation files.

19               The only thing I would ask is that Johnson &

20       Johnson in this matter take a careful review to determine

21       which documents under Pansy and for what good cause actually

22       should be designated as confidential.

23               SPECIAL MASTER RIVERA-SOTO:   Mr. Placitella, I

24       would extend to Mr. Riester the same courtesy I extend to

25       you, which is an expectation that counsel will act the way

1       that counsel ought to act.

2                   MR. J. PLACITELLA:  Thank you, your Honor.

3                   SPECIAL MASTER RIVERA-SOTO:  At issue is ECF 268,

4       which is plaintiffs' motion to compel the production of

5       documents from Johnson & Johnson.

6                   Johnson & Johnson's opposition is more technical

7       than substantive.  It states that it is willing to comply,

8       but that they need a different discovery confidentiality

9       order.

10                  The two issues that they raise is that they wanted

11      disclosure to be limited for use only in this case, and they

12      wanted a separate clawback provision that applied to

13      inadvertently disclosed documents.

14                  Through the colloquy with counsel, it has become

15      clear that the discovery confidentiality order that was

16      entered in this case on March 20th, 2017 limits disclosure

17      to this case, and it is also clear from that discussion that

18      whatever clawback concerns Johnson & Johnson may have are

19      covered by RPC 4.4(b), and therefore are not at issue.  For

20      that reason, the motion to compel is granted.

21                  The last motion is BASF's motion compelling

22      additional documents and deposition testimony from

23      plaintiffs and sanctions for obstructive and inappropriate

24      conduct during the Wengerd deposition by Mr. Coren.  That's

25      ECF 303 and 304, 312 and 318.

1              Mr. Placitella, you are standing.

2              MR. C. PLACITELLA:  Would you consider a

3      five-minute break?

4              SPECIAL MASTER RIVERA-SOTO:  Yes.

5              MR. C. PLACITELLA:  We had 15 minutes for lunch,

6      but this will only take five.

7              SPECIAL MASTER RIVERA-SOTO:  Yes.  Take your break.

8              MR. C. PLACITELLA:  Thank you.

9              (Recess taken)

10             SPECIAL MASTER RIVERA-SOTO:  Back on the record.

11             The next matter and the last motion of the day is

12     BASF's motion compelling additional documents and deposition

13     testimony from plaintiffs and for sanctions for obstructive

14     and inappropriate conduct.  These are ECF 303, 304, 312, and

15     318.

16             In ECF 303, BASF asserts that the deposition of

17     plaintiff, Holley, H-o-l-l-e-y, occurred on April the 5th,

18     2017 without any meaningful objection.  But the very next

19     day during the deposition of plaintiff, Wengerd,

20     W-e-n-g-e-r-d, that there were nearly 90 instructions not to

21     answer the very same questions that plaintiff Holley was

22     allowed to answer the day before.  As a result, BASF

23     requests the following relief:

24             That they be allowed to reopen the Wengerd

25     deposition, that the objections that had been made be

 1    overruled and prohibited any further, and that sanctions

 2    issue, and that plaintiffs collect, review and either

 3    produce or log all relevant documents being held by the

 4    named plaintiffs.

 5              Under ECF 304, the Cahill defendants join, and they

 6    ask for sanctions under Rule 30(d)(2), and that gave a smile

 7    to Mr. Blatt's face.

 8              In ECF 312, plaintiffs oppose the application

 9    saying that the plaintiffs' decedents past asbestos cases

10    are not relevant, and that the motion for sanctions is

11    baseless, that BASF had failed to prove a discovery

12    violation must have sanctions, that retainer agreements do

13    exist and anyway are irrelevant that a rolling production of

14    documents does not equal sanctions, that the Holley

15    deposition does not support sanctions, but the objections

16    that were interposed were proper, that Wengerd's

17    understanding of the facts is understandable.

18              And I did understand that analogy that Wengerd's

19    understanding of the damages is really not relevant, that

20    Wengerd's understanding as to the Williams' case is not

21    relevant, and the time and the form of communication of

22    counsel needs to be addressed.

23              By way of reply, BASF says that the objections that

24    were interposed were frivolous, that the objections based on

25    Wengerd's own work product and mental impressions also are

```
 1        frivolous and more robustly expounds on its original motion.
 2              This is BASF's application.
 3              MR. ASSAF:  Gene Assaf for BASF.
 4              Your Honor, I would like to start off with another
 5        one of your questions of Mr. Placitella, your questions
 6        posed on damages.  It has been a focus of mine over the last
 7        several months, and it was a focus at the deposition, and I
 8        am not going to spend a lot of time on scope because I
 9        agree, apples and oranges.
10              Scope has now been decided, okay, but there were
11        improper instructions regardless of scope.  And why I am
12        here is not to be punitive, but recently we got a letter and
13        a submission to your Honor in which plaintiffs' lawyer said
14        that the conduct at this deposition was, in their words, not
15        mine, wholly proper with one possible exception.
16              So, your Honor, rather than have this repeat
17        itself, I would like to just talk about the non scope
18        issues.
19              SPECIAL MASTER RIVERA-SOTO:  Let me just help
20        everybody out here.
21              As I think you have gotten a sense already, I read
22        everything.  I read both depositions, and I will tell you
23        candidly I am troubled by the conduct in the second
24        deposition, so maybe it makes a whole lot more sense if we
25        hear from Mr. Placitella at this point.
```

1          MR. C. PLACITELLA:  Thank you, your Honor.

2          Starting from your perspective that you had

3    concerns, that deposition was defended in good faith based

4    upon the law as Mr. Coren understood it at the time and the

5    facts.

6          SPECIAL MASTER RIVERA-SOTO:  But I don't understand

7    how Mr. Coren made objections and instructed the witness not

8    to answer to questions that were for all intents and

9    purposes identical to questions that had been asked the day

10   before without objection and without an instruction not to

11   answer.

12         MR. C. PLACITELLA:  Well, your Honor, frankly the

13   day before, I think there were a lot of questions asked that

14   he should have objected to.

15         SPECIAL MASTER RIVERA-SOTO:  But he didn't.

16         MR. C. PLACITELLA:  He didn't, but that doesn't

17   mean that the next day he can't go back that night and think

18   about the mistakes that he might have made because once --

19   if he doesn't make the objections that he thinks are

20   relevant and appropriate, an argument would be made by BASF

21   and maybe appropriately, that he had waived the ability to

22   make those objections especially on privilege.

23         So just because he went back to the hotel room that

24   night and frankly spoke to some of us, and the next day he

25   took a different position does not mean the position that he

```
 1    was taking was wrong.

 2              I think Mr. Coren would tell you that if he had to

 3    do the -- and I don't want to speak for him, but I am I

 4    guess --

 5              SPECIAL MASTER RIVERA-SOTO:  You better.

 6              MR. C. PLACITELLA:  -- that he let a lot of

 7    questions be asked the first day that could only be -- the

 8    information could only be supplied by a lawyer were within

 9    what he thought at the time outside the bounds of discovery.

10              If you recall, and I actually have the quote, we

11    didn't want these depositions to go forward, because we knew

12    the scope issue was still an issue, and we had a view of

13    what the Third Circuit had decided, and they had a different

14    view, and it was not on the same page, and we had

15    conversations about it and --

16              SPECIAL MASTER RIVERA-SOTO:  I understand that --

17              MR. C. PLACITELLA:  -- but this is what --

18              SPECIAL MASTER RIVERA-SOTO:  -- but you still had

19    the deposition of Ms. Holley on the day before, on the 5th

20    of April, where questions were asked that resulted in no

21    objection, and then the same questions asked to a different

22    plaintiff the very next day, and you get not only

23    objections, but instructions not to answer.

24              In context, that I have to tell you, I am a little

25    confused about, because I don't understand how you have a
```

```
 1        lay person interpose a work product objection.  That lay

 2        person does not have a cognizable work product privilege.

 3               MR. C. PLACITELLA:  There were some articulations

 4        of objections that if it wasn't under the heat of the moment

 5        might have been articulated differently.

 6               SPECIAL MASTER RIVERA-SOTO:  A little less

 7        elegantly?

 8               MR. C. PLACITELLA:  A little less elegantly.

 9               Some of this frankly was a reaction, to be honest,

10        to pretty aggressive questioning of an elderly person over

11        issues that weren't relevant to this case, like where did

12        she keep her bank accounts, did her mother -- grandmother

13        have, you know, take the -- I mean, this was not a friendly

14        circum --

15               SPECIAL MASTER RIVERA-SOTO:  But you see, the

16        answer to that is "Objection as to form."

17               MR. C. PLACITELLA:  I understand.

18               SPECIAL MASTER RIVERA-SOTO:  You know, those of us

19        who have done thousands of depositions --

20               MR. C. PLACITELLA:  I am painting the flavor for

21        what was going on --

22               SPECIAL MASTER RIVERA-SOTO:  -- but, Mr.

23        Placitella, you and I have been, not together, but I am sure

24        that you have been in depositions, where things get a little

25        heated.  Lawyers act in not the manner in which we would
```

1        like them to act.

2              That doesn't change the rules.  The rules are still

3        objections, except as to privilege, are waived until the

4        time of trial.  So the only objection that you could make --

5        there are only two objections that you can make.  Objection

6        as to form, to which the witness still must answer, and

7        objection as to privilege and an instruction not to answer,

8        and you have to give the basis for it.

9              You don't have to give the basis for an objection

10        to form.  It could be anything, but you do have to give a

11        basis for the objection as to privilege, and particularly if

12        you are going to instruct the witness not to answer.

13              The difficulty that I have is I am sure that there

14        were frustrated people in that deposition.  I have no doubt

15        about that, and I think there were frustrated people on both

16        sides.

17              One of the things that I always tell people is that

18        when you read a transcript, and it says "I object," you read

19        it, and it says "I object," but you weren't in the courtroom

20        when the person jumped to his feet and at the top of their

21        lungs, they yelled, "I object."  That doesn't come across in

22        the transcript, but there is enough that is in this

23        transcript that it came across to me as telling me something

24        went badly askew here --

25              MR. C. PLACITELLA:  Well, Your Honor, so --

```
 1                  SPECIAL MASTER RIVERA-SOTO:   -- and let me make
 2      myself clear.
 3                  I am not blaming Mr. Coren, and I am not putting
 4      any blame on anybody.   I have nothing but the utmost respect
 5      for all of the lawyers who are involved in this case.   Some
 6      of them I know from before; some of them I don't.
 7                  Mr. Coren is in the category of folks that I don't
 8      know from before, but I know of your law firm, and I know
 9      the respect in which your law firm is held, and you are
10      entitled to all of that from me --
11                  MR. C. PLACITELLA:   I appreciate that --
12                  SPECIAL MASTER RIVERA-SOTO:   -- until proven wrong,
13      so, you know --
14                  MR. C. PLACITELLA:   -- I appreciate that, your
15      Honor, and I have to tell you that probably if Mr. Coren
16      just did the deposition the next day and never spoke to me,
17      Holley might have gone, the Wengerd might have gone exactly
18      the same way.
19                  SPECIAL MASTER RIVERA-SOTO:   So it is your fault.
20                  MR. C. PLACITELLA:   It's my fault.   It's my fault,
21      because when we discussed the parameters of what happened in
22      the Holley deposition, it was my conclusion that there were
23      a lot of questions that were not proper, that were way
24      beyond the relevance as we read the law, and that the only
25      way many of those questions could ever been answered, many,
```

```
 1      you know, you could say there were 90 questions, but I bet
 2      you I can count 70, where the only way that question could
 3      be answered was through the information obtained through us,
 4      and from our perspective, that is privileged.
 5              There were a lot of questions, frankly, that we
 6      just thought were way out of bounds.  Some were way, way out
 7      of bounds, but --
 8              SPECIAL MASTER RIVERA-SOTO:  I hope when you say
 9      that you thought were privileged, that is before Chief Judge
10      Linares' August 3rd opinion.
11              MR. C. PLACITELLA:  Well, yes, because what
12      happened was, and BASF -- actually Judge Dickson at the
13      conference that objection -- he expected there was going to
14      be an objection to a whole host of issues at the
15      depositions, and what the scope is of any of the discovery
16      as to relevancy, and we might as well take the deposition
17      and tee it up, so we can come back here.
18              Everybody knew there was an issue going into that,
19      and what Mr. Coren did is he read the decision of the Third
20      Circuit, and he acted with respect to the Wengerd
21      deposition, after consulting with me to be openly and honest
22      about it, and he acted zealously in representing his client
23      under the Lobiondo case, and then we got direction from
24      Judge Linares, and frankly, if we had that opinion first, a
25      lot of those objections would have gone a different way, and
```

```
 1          the deposition may have gone a different way.

 2                  But I have to say that when we are doing these

 3          depositions, there is a kind way to do them and a not so

 4          kind way to do them.  And putting, you know, older people on

 5          the spot about what they understand of the damages for

 6          fraudulent concealment, when we were still debating them

 7          here, is not a very kind way --

 8                  SPECIAL MASTER RIVERA-SOTO:   It may have not be

 9          kind, but it is perfectly appropriate.

10                  MR. C. PLACITELLA:   Okay.

11                  So we believe that most of the objections, and

12          there were a couple I went back and looked at them that I

13          might have done differently, to be honest, but there's

14          some --

15                  SPECIAL MASTER RIVERA-SOTO:   I think we all can do

16          that in respect to any transcript we look at.  "My goodness,

17          why did I say that."

18                  MR. C. PLACITELLA:   -- but frankly, I think Mr.

19          Coren was reacting to my reaction about what I heard

20          happened in the Holley deposition based on our reading of

21          the law, and he was zealous, you know, after that

22          conversation.

23                  SPECIAL MASTER RIVERA-SOTO:   So how do we fix this?

24                  MR. C. PLACITELLA:   We fix it by, if they want to

25          ask Mrs. Wengerd real questions, a list of relevant
```

1    information, they can do that, and they are going to go back

2    out to Ohio --

3              SPECIAL MASTER RIVERA-SOTO:  I don't know what that

4    means.

5              MR. C. PLACITELLA:  Well, depositions that

6    aren't -- I mean, questions that aren't really protected.  I

7    mean, there were some questions about the retainer between

8    lawyer and client, I think that is privileged, and I guess,

9    but there are questions based on what Judge Linares said and

10   reading Rule 26, that they would probably get to answer now.

11             So when they go back out to take another one of the

12   class representative's depositions, we will make

13   arrangements, and if they want to ask questions that they

14   should legitimately ask, we will make her available on the

15   very same day, no extra trip for anybody else, and that is

16   how I see it.

17             SPECIAL MASTER RIVERA-SOTO:  This is what we are

18   going to do.

19             Mr. Assaf wants to speak.

20             MR. ASSAF:  Your Honor, I know it is late.  I am

21   sorry, and I know you asked me to sit down, but --

22             SPECIAL MASTER RIVERA-SOTO:  You don't look sorry.

23             (Laughter)

24             MR. ASSAF:  Well, I am a little upset because, one,

25   I totally disagree with the characterization of the flavor

1    of this deposition.  And, your Honor, I will forward to you

2    the DVD of these depositions, and I ask you to randomly pick

3    out sections of that them and watch them.

4         I have been doing for this almost 30 years, and

5    after my deposition of Mrs. Holley, she thanked me.  We

6    chatted.  It was perfectly appropriate.  And I have been in

7    some tough, tough fire fights.  This was not one of them.

8         Then with respect to Ms. Wengerd, I listened in for

9    the deposition, and by the way, she is not even, and it

10   won't matter, but Mr. Placitella just said she is an elderly

11   woman who came into the dep.

12        She is a 45-year-old woman, a very nice woman.  She

13   is not an elderly woman.  She is 45, and she was very

14   engaged, and so, your Honor --

15        SPECIAL MASTER RIVERA-SOTO:  If you told my wife at

16   age 45 that she was elderly, you would be in big trouble.  I

17   just want you to know that.  She is Irish Catholic, so it is

18   big trouble.

19        (Laughter)

20        MR. ASSAF:  -- I would ask that you --

21        MR. C. PLACITELLA:  Do it to his wife and see what

22   happens.

23        MR. ASSAF:  -- pick any portion --

24        SPECIAL MASTER RIVERA-SOTO:  We will strike that

25   from the record.  He doesn't need to be in any more trouble

```
 1        than he is right now.

 2                 (Laughter)

 3        MR. ASSAF:  I would pick any portion of those

 4   depositions, okay, and I stake my reputation on this, okay?

 5             You watch those, and I did a classic

 6   cross-examination for trial purposes that would be shown to

 7   a jury, because it might be shown to a jury, so I don't

 8   appreciate the notion that I was in there browbeating some

 9   elderly woman.  That didn't happen --

10        SPECIAL MASTER RIVERA-SOTO:  I don't think --

11   well --

12        MR. ASSAF:  -- and neither was Mr. Farrell.

13        SPECIAL MASTER RIVERA-SOTO:  -- well, I read both

14   of the depositions.  I didn't get the sense that any of the

15   questions by defendants were anything close to browbeating.

16   But, again, I wasn't there.

17             But be that as it may, I don't think that watching

18   the video is going to be all that helpful in light of the

19   potential resolution I think of this motion.

20        MR. ASSAF:  Well, I also want to clarify, your

21   Honor, that Mr. Placitella just got up here and said, well,

22   with all the Linares -- you know, now we have clarity.  It

23   was all about the Linares' scope objection.

24             That is not it, your Honor.  You read our briefs,

25   okay, but these are very basic Federal Court practitioner
```

1       issues, okay?

2               Do you have these letters?

3               Do you have documents?

4               Instruction not to answer.  It has no relevance

5       whatsoever.

6               That is not a Linares' issue whether you have

7       documents in your possession.

8               SPECIAL MASTER RIVERA-SOTO:  You can't make an

9       instruction not to answer based on relevance.

10              MR. ASSAF:  Correct.

11              SPECIAL MASTER RIVERA-SOTO:  Okay.  Let's just get

12      there, which is one of the things that I found troublesome.

13              You can instruct not to answer based on privilege,

14      nothing else --

15              MR. ASSAF:  Correct.

16              So, your Honor, again --

17              SPECIAL MASTER RIVERA-SOTO:  -- and I know Mr.

18      Coren knows that.  I know that in my heart of hearts, which

19      tells me that something else was at play here, but I don't

20      want to -- I can't undo what has been done, okay?

21              What I want to be able to do is to come up with

22      something that fixes what has been done.

23              Let me ask you the question that I asked Mr.

24      Placitella.  What do you want me to do?

25              MR. ASSAF:  Well, I think there are two things that

1     you can do, your Honor, and the reason I said I am not doing

2     this for punitive purposes is this class rep issue.  I think

3     they are down to a couple, okay?

4          I don't think that this class rep should now,

5     having sat through a mock deposition, should now come in.

6     She has been through it all.  She's going to come in.  She

7     will re-read it again, and they'll say:  Remember when he

8     asked you that, now here is how you answer that.

9          That's not fair at all.  It's not fair for the jury

10    at all to hear that, so I think she should be --

11         SPECIAL MASTER RIVERA-SOTO:  I can address that.

12         MR. ASSAF:  -- stricken, or if they want to try to

13    use her, I think at a minimum, your Honor, I am not asking

14    for fees, but they need to pay the expenses of the

15    videographer and the expenses of the travel out there.  I

16    don't want to have to rush in this deposition, okay?  I

17    don't want to tack it on to another deposition.

18         They should pay the expenses.  I am not asking for

19    fees, but they need to pay for the deposition, because what

20    you are hearing today, oh, it was all in the heat of the

21    moment, we are going to continue this way, okay?

22         I think the message of Clifton Precision in 1993 to

23    today within this Circuit is that you don't ask.  You don't

24    say move on, objection.

25         That is not permitted.

```
 1              This is class counsel that eventually may come here

 2      to this Court and say we're sophisticated class counsel, we

 3      want millions of dollars for this case, and you should pay

 4      us.

 5              So it's no answer to say, we don't actually know

 6      the rules, and we don't abide by them.

 7              If this were me, your Honor, I think the Court

 8      would come down hard, and there shouldn't be a double

 9      standard, so I think we should just strike this witness or

10      give us the expenses.

11              MR. C. PLACITELLA:  Your Honor, it would be unfair

12      to strike the witness who had gone through all of this --

13              SPECIAL MASTER RIVERA-SOTO:  That is not going to

14      happen.

15              Next?

16              MR. C. PLACITELLA:  I believe that if they want to

17      take her deposition and ask her supplemental questions, we

18      will make her available.

19              If they really want the cost of the videographer,

20      that's really what -- fine --

21              SPECIAL MASTER RIVERA-SOTO:  He is asking for the

22      cost of the videographer as well as the transportation

23      costs.

24              MR. C. PLACITELLA:  I think that is a little over

25      the top given the fact that they are going to have to go
```

1    back out there anyhow and take other class representative

2    depositions, but I understand your concerns.  It's frankly

3    on me.

4          I will apologize to the Court, if you think that it

5    was wayward --

6          SPECIAL MASTER RIVERA-SOTO:  No apology is

7    necessary.

8          MR. C. PLACITELLA:  -- but we did at a point

9    believe as lawyers it was the right thing to do given the

10   circumstances and the posture of the case.

11         Things have changed now.  The rules are different.

12   The law is different.  There is a lot of clarity and, you

13   know, we will do that accordingly.

14         SPECIAL MASTER RIVERA-SOTO:  Thank you.

15         At issue is a motion under ECF 303, a motion by

16   BASF to compel additional documents and deposition testimony

17   from the plaintiffs and for sanctions.  That motion will be

18   granted in part and denied in part.

19         In respect to the motion being granted, BASF will

20   be entitled to redepose representative plaintiff Wengerd.

21         Before that happens, Mr. Placitella, you are to

22   look through the transcript of the Wengerd deposition and

23   every single objection and every single instruction not to

24   answer, and you are going to let Mr. Assaf know which one of

25   those objections you intend to continue to press.

1              If he disagrees with you, you are to bring those to

2       me, and I will make a decision as to whether the question is

3       proper or not.

4              But the burden first falls upon you, Mr.

5       Placitella.  Otherwise, Mr. Assaf or Mr. Farrell, whoever

6       takes that deposition will be entitled to ask each and every

7       question to which an objection or an instruction not to

8       answer was interposed.  That is step one.

9              Step two:  Ms. Wengerd will be made available for

10      an additional deposition at the convenience of counsel for

11      BASF.  I know counsel from BASF are professional.  They will

12      try to make it also convenient to counsel for plaintiff, but

13      the overriding concern here is the convenience of counsel

14      for BASF.

15             To the extent that BASF has asked for the cost of

16      the videographer, as well as the transportation costs, that

17      is denied without prejudice.

18             If the second deposition proves to be difficult,

19      then you can bring it back up.

20             With that said, Ms. Wengerd is to be considered as

21      if she were still at the deposition.  That means you may not

22      talk to her about her testimony.  You may not go over her

23      questions and answers with her.  If you have sent her a copy

24      of the transcript, you are to retrieve it immediately.  It

25      is to be addressed as if there was a short recess during the

1   deposition, at which time you would not be allowed to talk
2   to her about her testimony as you well know.
3          That is the way this is going to be treated, so no
4   one is to talk to her about her testimony on the plaintiffs'
5   side.  And if I hear that there is a problem with that, then
6   I will impose sanctions.  But it is to be treated as if this
7   was just a five-minute break in that original deposition.
8   It is not an opportunity to get her any more informed or any
9   better educated about the questions that were asked.  You
10  can talk to her about scheduling.  That is it.
11         MR. C. PLACITELLA:  Are we allowed to tell her what
12  your Honor ruled?
13         SPECIAL MASTER RIVERA-SOTO:  You can tell her that
14  I instructed you were not to talk to her about her
15  testimony, which, Mr. Placitella, as you well know, would be
16  the rule in any deposition anyway.  So there should be no
17  advantage taken over the fact this deposition was taken on
18  April 5th or April 6th, and we are now at the end of
19  October.
20         The request for sanctions is denied, but again
21  without prejudice.
22         Mr. Coren, I have nothing but the utmost respect
23  for you, and there but for the grace of God go all of us.  I
24  understand your reaction.  I wish it hadn't happened, and
25  hopefully it will not happen again, at least not in this

```
1      case.

2              MR. COREN:  Thank you, your Honor.

3              SPECIAL MASTER RIVERA-SOTO:  Thank you.

4              Is there anything else we need to address in

5      respect to this motion?

6              Okay.  Our court reporter needs to leave in five

7      minutes, so what I am going to propose is that we do our

8      scheduling conference off the record, and I will then reduce

9      that to a scheduling order.

10             We also have a hard stop here at six o'clock

11     because Judge Dickson needs the courtroom for a class that

12     he teaches.

13             (Counsel confers)

14             MR. C. PLACITELLA:  Never mind.

15             SPECIAL MASTER RIVERA-SOTO:  Okay, we're good?

16             MR. C. PLACITELLA:  Yes.

17             SPECIAL MASTER RIVERA-SOTO:  Thank you very much.

18             (The matter concluded at 5:15 p.m. and a discussion

19     was held off the record)

20

21

22

23

24

25
```