Exhibit 13

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

CIVIL ACTION NO:  11-cv-1754 (JLL) (JAD)

- - - - - - - - - - - - - - - -:

KIMBERLEE WILLIAMS, et al,      :

                                :

                 Plaintiffs,    :   DEPOSITION UPON

                                :   ORAL EXAMINATION

       vs.                      :

                                :          of

BASF CATALYSTS, LLC, et al,     :

                                :   MICHAEL JAMES

                 Defendants.    :       HASSETT

                                :

- - - - - - - - - - - - - - - -:


West Orange, New Jersey

Tuesday, April 24, 2018


DEPOSITION of MICHAEL JAMES HASSETT
in the above-entitled action by and before PATRICIA J.
RUSSONIELLO, a Certified Court Reporter and Notary
Public of the State of New Jersey, at the office of
ARLEO & DONOHUE, LLC, 622 Eagle Rock Avenue,
commencing at 10:11 a.m.


Magna Legal Services

866-624-6221

www.MagnaLS.com



```
 1   A P P E A R A N C E S:
 2        COHEN PLACITELLA ROTH, PC
          By   JARED M. PLACITELLA, ESQ.
 3             CHRISTOPHER M. PLACITELLA, ESQ.
          Two Commerce Square
 4        2001 Market Street, Suite 2900
          Philadelphia, Pennsylvania 19103
 5        127 Maple Avenue
          Red Bank, New Jersey 07701
 6        Tel: (732) 747-9003  Tel: (215) 567-9003
          jmplacitella@cprlaw.com
 7        Attorneys for Plaintiffs
 8        KIRKLAND & ELLIS, LLP
          By   DANIEL A. BRESS, ESQ.
 9             RONALD K. ANGUAS, JR., ESQ.
          655 Fifteenth Street, N.W.
10        Washington, D.C. 20005
          Tel: (202) 879-5152
11        daniel.bress@kirkland.com
          ronald.anguas@kirkland.com
12        Attorneys for BASF Catalysts, LLC
13        PEPPER HAMILTON, LLP
          By ANTHONY VALE, ESQ.
14        3000 Two Logan Square
          18th and Arch Streets
15        Philadelphia, Pennsylvania 19103-2799
          Tel: (215) 981-4000  Fax: (215) 981-4750
16        valea@pepperlaw.com
          Attorneys for Defendants, Cahill Gordon,
17        Peter Sloane and Ira Dembrow
18        ARLEO & DONOHUE, LLC
          By TIMOTHY M. DONOHUE, ESQ.
19        622 Eagle Rock Avenue
          West Orange, New Jersey 07052
20        Tel: (973) 736-8660  Fax: (973) 736-1712
          Attorneys for Deponent
21
22
     A P P E A R A N C E S: (Continued on next page)
23
24
25
```



```
 1   A P P E A R A N C E S: (Continued)
 2          MARINO, TORTORELLA & BOYLE, P.C.
            By PHILLIP S. PAVLICK, ESQ. (via telephone)
 3          437 Southern Boulevard
            Chatham, New Jersey 07928
 4          Tel: (973) 824-9300  Fax:  (973) 824-8425
            ppavlick@khmarino.com
 5          Attorneys for Defendant, Arthur Dornbusch
 6          HEROLD LAW, P.A.
            By ERIC TUNIS, ESQ. (via telephone)
 7          25 Independence Boulevard
            Warren, New Jersey 07059-6747
 8          Tel: (908) 647-1022  Fax: (908) 647-7721
            etunis@herold.com
 9          Attorneys for Defendant, Thomas Halket
10
     A L S O   P R E S E N T:
11
            Thomas Karwacki, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 4

```
 1                    I N D E X
 2   WITNESS                  EXAMINATION BY
 3   MICHAEL JAMES HASSETT
     By Mr. Jared Placitella              8
 4
 5
 6
 7
                    E X H I B I T S
 8
     NUMBER          DESCRIPTION                PAGE
 9
     Hassett-1   Six-page Notice Of Video        9
10               Deposition Of Michael Hassett,
                 Esq., and attached Certificate
11               of Service
12   Hassett-1A  One-page Interoffice Memorandum 186
                 12/23/91 and attached Engelhard
13               Record Retention Manual
                 (BASF_Sampson 39958-39998)
14
     Exhibit 1   Multi-page Cahill Collection    86
15               Of Testing Document (Excluding
                 Privileged Documents) (P-15)
16
     Exhibit 3   Transcript (Glenn Hemstock)     91
17               3/16/83 (BASF-Sampson 14462-
                 14601)
18
     Exhibit 4   Transcript (Peter Gale)         94
19               4/26/83 (JNJ-Ros 9712-9792)
20   Hassett 5   One-page letter, 8/20/02        58
                 and attached settlement list
21               (BASF-Williams 390446-390460)
22   Hassett 7   One-page letter, 5/9/06 and    175
                 attached Release (BASF FC 12168-
23               12171)
24   Hassett 10  Two-page Merten to Cuzzone     168
                 letter, 8/2/04 and attachments
25
```



Page 5

```
 1                E X H I B I T S (continued)
 2    NUMBER       DESCRIPTION                  PAGE
 3    Exhibit 11   Multi-page document, re,       69
                   Excerpted Entries from
 4                 Privilege Log of BASF
                   Catalysts LLC
 5
      Exhibit 14   Multi-page Summary Of         167
 6                 Activities Related To Services
                   Rendered For Decof & Grimm
 7                 (BASF-Lopez 21666-21681)
 8    Exhibit 15   One-page Interoffice          105
                   Memorandum, 3/7/84 (BASF 00157)
 9
      Exhibit 57   Responses By Engelard         114
10                 Corporation To Plaintiffs'
                   First Standard Set Of Liability
11                 Interrogatories (BASF FC 14202-
                   14256)
12
      Exhibit 60   Multi-page Defendant Eastern  155
13                 Magnesia Talc Company's Answers
                   To Plaintiff's Interrogatories
14                 (BASF FC 12190-12204)
15    Exhibit 124  Two-page letter, 5/3/02       147
                   (BASF-Williams 40099-40100)
16
      Exhibit 203  Defendant Arthur A. Dornbusch  72
17                 II's Disclosures Under Rule
                   26(a)(1)
18
      Exhibit 205  Seven-page Plaintiff Theresa  161
19                 Martin's More Responsive Answers
                   To Interrogatories Propounded By
20                 Eastern Magnesia Company
                   (BASF_Williams 334310-334316)
21
22      (Reporter retains all exhibits except Exhibit 7.)
23
24
25
```



```
                                                         Page 6
 1   REQUEST FOR PRODUCTION OF DOCUMENTS:

 2           PAGE LINE

 3            66   17  (copies of documents)

 4

 5

 6

 7   DIRECTIONS NOT TO ANSWER QUESTIONS:

 8           PAGE LINE

 9            13    1

              13    4

10            47   21

              50   20

11            51    2

              77   21

12            80    1

              80    8

13           127    1

             146   13

14           152   19

             184    8

15

16

17

18

19

20

21

22

23

24

25
```



Page 7

1            THE VIDEOGRAPHER:  We are now on the

2   record.  This begins videotape number 1 in the

3   deposition of Michael Hassett in the matter of

4   Kimberlee Williams, et al, versus BASF Catalysts, LLC,

5   et al, in the United States District Court for the

6   District of New Jersey.

7            Today is Tuesday April 24th, 2018 and

8   the time is 10:11 a.m.

9            This deposition is being taken at 622

10  Eagle Rock Avenue, West Orange, New Jersey, at the

11  request of Cohen, Placitella and Roth.

12            The Videographer is Thomas Karwacki of

13  Magna Legal Services and the court reporter is

14  Patricia Russoniello of Magna Legal Services.

15            Will counsel and all parties present

16  state their appearances and whom they represent,

17  please.

18            MR. JARED PLACITELLA:  Sure.  I'll

19  start.

20            Jared Placitella for the plaintiffs.

21            MR. CHRISTOPHER PLACITELLA:  Chris

22  Placitella.

23            MR. DONOHUE:  Tim Donohue, Arleo and

24  Donohue, for the witness, Michael Hassett.

25            MR. BRESS:  Dan Bress, Kirkland and



Page 8

1   Ellis, for BASF.

2            MR. ANGUAS:  Ronald Anguas, Kirkland and

3   Ellis, for BASF.

4            MR. VALE:  Anthony Vale for Cahill

5   Gordon, Peter Sloane and Ira Dembrow.

6            MR. PAVLICK:  Phillip Pavlick of Marino,

7   Tortorella & Boyle for Arthur Dornbusch.

8            MR. TUNIS:  Eric Tunis on behalf of

9   Thomas Halket.

10            THE VIDEOGRAPHER:  Will the court

11   reporter please swear in the witness.

12   M I C H A E L   J A M E S   H A S S E T T, having been

13   duly sworn by the Notary, testifies as follows:

14   EXAMINATION BY MR. JARED PLACITELLA:

15         Q.    Good morning, Mr. Hassett.

16         A.    Good morning.

17         Q.    My name is Jared Placitella.  It's nice

18   to meet you.

19         A.    Good to meet you.

20         Q.    You understand that we're here today for

21   the purposes of taking your deposition?

22         A.    Yes.

23         Q.    Have you ever had your deposition taken

24   before?

25         A.    Yes.



Page 9

1          Q.      When was that?

2          A.      Probably very late '90s.

3          Q.      And what was the circumstances under

4    which you had your deposition taken?

5          A.      It was a case that went to litigation

6    about an insurance claim by Engelhard against AIG.

7          Q.      And do you recall what the insurance

8    claim was over?

9          A.      Yes.  It was a loss of -- a loss

10   relating to base metal inventory held at an Engelhard

11   subsidiary in Japan.

12         Q.      And that was the only time you ever had

13   your deposition taken before today?

14         A.      That's the only one I can remember.

15         Q.      Sure.

16                 I'm going to show you what I've marked

17   as Hassett Exhibit 1 for identification; well, Exhibit

18   Hassett-1.  Sorry.

19                 Have you ever seen this Notice before

20   today?

21         A.      Yes.

22         Q.      And when was the first time that you --

23   well, when did you see this Notice of your deposition?

24         A.      Recently.  Within the past five or six

25   days.



Page 10

1          Q.      Okay.  So Exhibit Hassett-1 is the

2    Notice of your videotape deposition of Michael

3    Hassett.

4                  I want to turn your page -- turn your

5    attention -- excuse me -- to I guess it's Page 4 where

6    it says Requested Documents.

7          A.      Yes.

8          Q.      Do you have any documents that are

9    responsive to these requests?

10         A.      Review them once more.

11                 (Pause.)

12         A.      No, I do not.

13         Q.      Did you look for documents that were

14   responsive to these requests before today?

15         A.      Yes.

16         Q.      And when did you do that?

17         A.      Shortly after I saw this.  Again, maybe

18   five days ago, four days ago; whatever.

19         Q.      Okay.  Mr. Hassett, what do you know

20   about this case?

21                 MR. DONOHUE:  Object to the form of the

22   question.

23         A.      It's a claim alleging injury due to

24   exposure to asbestos in talc sold by Engelhard.

25         Q.      And when did you first become aware of



1    this case; Williams versus BASF Federal?

2           A.    Some time within the past few years --

3    I -- I don't -- I don't really remember exactly.

4           Q.    Do you recall how you became aware of

5    this case?

6           A.    Yes.  Attorneys representing BASF

7    arranged to interview me.

8           Q.    And who were those attorneys for BASF?

9           A.    Well, I'm not sure exactly when this

10   case was initiated.

11          Q.    Mm'mm.

12          A.    But I -- I think that the first

13   interview after this case was started was actually led

14   by Dan.

15          Q.    And do you recall when that interview

16   was?

17          A.    Wow.  Well, again, I'm not sure exactly

18   when the case started.

19          Q.    Mm'mm.

20          A.    The -- the first interview with -- with

21   Dan and his firm was -- it was right after a big

22   snowstorm that had created a power failure which is

23   why I remember it.  There was no power but that was

24   probably roughly six years ago maybe.

25          Q.    All right.  And if I told you that this



Page 12

1    case was filed in 2011 does that help you place the

2    time of that -- the time of this meeting?

3         A.    Well, I -- yeah.  The -- roughly six

4    would fit with that to some extent.

5         Q.    Sure.  We have had a lot of snowstorms

6    up here lately, unfortunately.

7         A.    This was a -- this was an October

8    snowstorm --

9         Q.    Oh, October snow --

10        A.    -- that created a lot of power line

11   failures because the trees still had their leaves.

12        Q.    Yeah.  October snowstorms to April and

13   March snowstorms we can't get away from.

14              Who else besides Mr. Bress was at this

15   meeting?

16        A.    There was an associate from Kirkland

17   Ellis whose name I don't remember and I don't think

18   there was anyone else.

19        Q.    Did the attorneys from Kirkland and

20   Ellis show you any documents at this meeting?

21        A.    I don't remember.

22        Q.    What was discussed at this meeting?

23              MR. DONOHUE:  All right.  At this point

24   I'm going to object on the grounds of attorney-client

25   privilege.  I know Mr. -- I didn't mean to interrupt



Page 13

```
 1    Mr. Bress, but I'm going to instruct the witness not

 2    to answer that question.

 3                    MR. BRESS:  I'll join.  Attorney-client

 4    privilege and instruct you not to answer.

 5                    MR. JARED PLACITELLA:  All right.

 6          Q.      Do you know the answer to that question,

 7    Mr. Hassett?

 8                    MR. DONOHUE:  You can answer that.

 9          A.      What was the question again, sir?

10          Q.      What was discussed at this meeting six

11    years ago with Kirkland attorneys?

12                    MR. DONOHUE:  Just to clarify --

13                    MR. JARED PLACITELLA:  Mm'mm.

14    Absolutely.

15                    MR. DONOHUE:  -- you're not to answer

16    what was discussed but --

17                    THE WITNESS:  I can --

18                    MR. DONOHUE:  -- I believe --

19                    THE WITNESS:  -- answer that.

20                    MR. DONOHUE:  -- the question is are you

21    able to answer that if you weren't instructed?

22          A.      I -- I have a --

23                    MR. DONOHUE:  Do you recall what was --

24          A.      I have a --

25                    MR. DONOHUE:  -- discussed?
```



Page 14

```
 1          A.      I have a very general recollection of
 2   what was discussed.
 3          Q.      What -- did you meet with counsel to
 4   prepare for today's deposition?
 5          A.      Yes.
 6          Q.      And who did you meet with?
 7          A.      It -- well, I met with Tim, Dan, Ronald,
 8   and in an earlier session I think there was one of the
 9   associates from Tim's firm, Gianna, and there was an
10   associate from Kirkland Ellis, Tia, maybe at one of
11   the prep sessions.
12          Q.      All right.  Let's take this one at a
13   time.
14                  When -- Mr. Hassett, when was the first
15   prep session?
16          A.      I'm not sure.  It was not that long ago
17   but...
18          Q.      Okay.  And when was the second prep
19   session?
20                  MR. DONOHUE:  Object to the form.
21          A.      I met Monday -- Monday a week ago I
22   think it was.
23          Q.      And a week ago Monday that was your last
24   prep session before today's prep session?
25          A.      No.   Yesterday was the last prep
```



Page 15

1    session.

2         Q.      How long did these sessions last?

3         A.      Yesterday ran from -- yeah.  We really

4    got started around 10:30 or 10:45 and went to a little

5    before 3 I think.

6         Q.      Mm'mm.

7         A.      And the session the preceding Monday

8    was -- I started at 10 and again I think we -- I think

9    we ended earlier.  We might have ended at 1 or

10   something like that.

11        Q.      During the prep session last Monday on

12   April 16th were you shown any documents?

13        A.      I don't recall any.

14        Q.      Okay.  And how about yesterday?  Were

15   you shown any documents?

16        A.      Yes.  Let me think.  I'm trying to think

17   which -- was which day.  Give me one second.

18               Yes.  Definitely.  Yes.

19        Q.      And what documents did you review?

20        A.      It was a copy of the replies to

21   Interrogatories in the Chernick case.

22               There was a couple of letters from

23   outside counsel Engelhard employed that appeared to

24   transmit information on talc, Engelhard talc, and

25   there was a copy of Engelhard's old record retention



Page 16

1   policy.

2          Q.     Do you recall which letters from outside

3   counsel you reviewed?

4          A.     Well, one was from a firm that a lawyer

5   named Mel Bergstein worked for and his name appeared

6   on the letterhead but I don't remember the firm name.

7                 One was from -- or two -- a firm in

8   Washington County, Pennsylvania, but I can't remember

9   the names involved.

10         Q.     Do you recall any other letters?

11         A.     That's all I can remember about the

12   documents I reviewed yesterday.

13         Q.     Besides being with your attorneys did

14   you -- have you conducted any other investigation into

15   this case?

16         A.     No.

17         Q.     Have you reviewed the Second Amended

18   Complaint?

19         A.     No.

20         Q.     Have you reviewed the exhibits to the

21   Second Amended Complaint?

22         A.     Not -- it -- not that I know of.

23         Q.     Okay.  Besides speaking with counsel

24   have you spoken with anybody else in preparation for

25   today's deposition?



Page 17

1          A.      No.

2          Q.      Mr. Hassett, can you provide us with the

3     benefit of your education?  Where did you go to

4     undergraduate?  Where did you go to law school?

5          A.      Undergraduate I -- I went to MIT.  Law

6     School I went to Columbia.  And I have a second law

7     degree, an LLM, from NYU.

8          Q.      And when did you receive your law degree

9     from Columbia?

10         A.      1977.

11         Q.      And when did you receive your LLM from

12    NYU?

13         A.      1984.

14         Q.      Are you still licensed to practice law?

15         A.      I'm on retired status in both New York

16    and New Jersey.

17         Q.      Besides New York and New Jersey at any

18    time during your professional career were you licensed

19    in any other state?

20         A.      No.

21         Q.      Besides the Courts in the states of New

22    York and New Jersey were you admitted to practice in

23    any other Court?

24         A.      No.

25         Q.      Mr. Hassett, can you take me through



Page 18

1  your career path following after you graduated law

2  school, Columbia, in 1977?

3          A.      For approximately two years I worked in

4  the corporate department of a New York City firm,

5  Breed, Abbott and Morgan, which has merged several

6  times.  It may still be around as a collaboration

7  with Whitman Ransom.  I'm not sure.

8                  Then I -- for approximately two years I

9  worked for a smaller firm in New York City; Spitzer

10  and Feldman.  I first joined -- which was also

11  basically corporate and real estate deal-type duties.

12          Q.      Mm'mm.

13          A.      In 1981 I first joined the Engelhard

14  Industries Legal Department and some time in '84 I

15  became the Engelhard Corporation Legal Department but

16  my role didn't real change.

17          Q.      Mm'mm.

18          A.      Then also in 1984 I joined another

19  industrial firm, Research-Cottrell, which had its

20  headquarters in Bedminster, New Jersey, again as a --

21  you know, sort of a general corporate lawyer.

22                  And I think -- it was 1988 I went back

23  to Engelhard again as a, you know, corporate lawyer in

24  their corporate department -- their Legal Department

25  and stayed at Engelhard until -- well, I went off


MAGNA
LEGAL SERVICES

Page 19

1    active duty in 2006 and my salary continuation ended

2    in 2007 I believe.

3            Q.      When did you go off active duty in 2006?

4            A.      I'm not really sure.  It was not too

5    long after the BASF acquisition.

6            Q.      And what do you mean by "active duty"?

7            A.      Instead of severance pay Engelhard took

8    the approach of offering what they call salary

9    continuation so an employee who was being -- whose

10   employment was being terminated essentially was able

11   to stay on the benefit plans but -- the health benefit

12   plans and receive their base salary until the end of

13   what you might think of as the severance period.

14           Q.      Right.

15           A.      They were not expected to report for

16   work although at least in theory if anyone wanted to

17   consult with you you were supposed to be available.

18           Q.      And during this nonactive period -- I'll

19   call it that -- did BASF ever consult with you?

20           A.      I don't remember a single occasion.

21           Q.      Did you take any employment after you

22   left BASF?

23           A.      No employment.  I did a couple of

24   hobby-type things on a freelance basis that weren't

25   law-related, didn't produce any significant income.



Page 20

```
 1          Q.      So you haven't practiced since 2006,

 2     2007?

 3          A.      Right.

 4          Q.      So I want to go back to the beginning of

 5     when you joined the Engelhard Industries Legal

 6     Department in 1981.

 7                  What areas were you working in in 1981?

 8          A.      Well, at the time the lawyer's job was

 9     determined by assignment of specific clients, specific

10     businesses within the larger division so I can't -- I

11     don't remember exactly what my clients were when I

12     first -- who my -- which departments were my clients

13     when I first started but in general I would help them

14     with negotiating and drafting contracts for deals they

15     wanted to get into and responding to questions they

16     had and on a -- on occasion if a lawsuit related to a

17     specific business unit I was assigned to take the, you

18     know, lead in getting outside counsel to -- to defend

19     the suit and coordinating any -- anything involved in

20     the lawsuit with the outside counsel in the business

21     unit.

22          Q.      If you don't remember the specific

23     client do you remember the industries that those

24     clients were serving?

25          A.      Well, it -- if you look to that '81-'84
```



Page 21

1    period as a whole --

2           Q.      Mm'mm.

3           A.      -- at different times I think I

4    represented systems department which made these

5    cathodic protection systems that were based on

6    platinum catalysts.

7                   Oh, man.

8                   I think I -- I represented the Hanovia

9    liquid gold business based in East Newark at times.

10   Part of it.

11                  You know, I think there were others but

12   those are the only two I can think of right now.

13          Q.      In 1981 to 1984 what was your formal

14   title?

15          A.      I believe I started as assistant counsel

16   and it may have changed to associate counsel or

17   something like that.  I'm not -- I'm not positive

18   about those.

19          Q.      And from 1981 to 1984 as an assistant or

20   associate general -- general counsel who did you

21   report to?

22          A.      For most of that period up until '84 I

23   reported to Ben Campo who was the general counsel of

24   Engelhard Industries division.  When the two

25   divisional departments consolidated I began to report



1    to Arthur Dornbusch.

2           Q.      And do you recall about when in 1984

3    that consolidation was?

4           A.      I don't remember the specific month.   I

5    think it was early in the year.

6           Q.      When did you leave Engelhard for the

7    first time in 1984?

8           A.      I don't remember specifically.   I think

9    roughly the middle of '84 maybe.

10          Q.      Some time in the summer?

11          A.      Pos -- possibly, you know.   A couple of

12   months on either side.

13          Q.      And then in 1988 you said you came back

14   to Engelhard.   Is that right?

15          A.      Yes.

16          Q.      What were the circumstances in which

17   that occurred?

18          A.      Well, why did I change?   What --

19          Q.      Well, did Engelhard recruit you back?

20   Did you go back to Engelhard?

21          A.      Well, I had stayed in touch with

22   another -- the Engelhard lawyer named Les Fliegel,

23   while I was working at Research-Cottrell, and I -- and

24   I mentioned to Les that thanks to a -- mostly to a

25   leveraged buy-out my duties had changed at Research-



Page 23

1    Cottrell and I wasn't as happy with the job as I had

2    been originally, and he -- recruit would be a little

3    strong, but he said there might be an opening at

4    Engelhard if I was interested.

5                    He probably had mixed feelings about it.

6                    So I -- so I --

7            Q.       Fair enough.

8            A.       -- saw a chance to make a change I

9    thought might work out.

10           Q.       And when you came back to Engelhard

11   in -- you said 1988?

12           A.       I believe that was '88.

13           Q.       Do you recall when in 1988?

14           A.       I do not -- no, I don't really remember

15   the month clearly.

16           Q.       What were your responsibilities when you

17   came back to Engelhard starting in 1988?

18           A.       Well, there was still a similar system

19   where you were assigned to a specific business group

20   or groups, and I was assigned to the -- I think it was

21   called the Precious Metals Management Department at

22   that time.  The name changed a few times but it was

23   essentially the group within the company that both

24   managed the physical inventories of precious metal and

25   also ran a trading operation in precious metals.



Page 24

1          Q.       And what business units were your

2     clients during this time?

3          A.       Just -- that was it.

4          Q.       Just precious metals?

5          A.       Yes.   That -- that was a business which

6     required a fair amount of legal services.  It just had

7     one -- one lawyer.

8          Q.       And how long were you working in the

9     precious metals business unit?

10         A.       Well, that -- other units in Engelhard

11    Industries also worked with precious metals but that

12    specific trading unit I'll call it I was assigned to

13    that duty for -- let's see.  '88 to -- that seems

14    long.  Wow.  '88 to '02?  Maybe.  I -- I'm not sure.

15    Something along that year.  From -- when I first

16    rejoined Engelhard until roughly '02.

17         Q.       And then from '02 to 0 --

18         A.       Maybe 0 -- maybe '01.

19         Q.       '01.

20                  From 2001 to 2006 which business unit

21    was your client?

22         A.       During that period I was assigned to

23    support the corporate departments rather than a

24    business unit.

25         Q.       Okay.



Page 25

1                    THE VIDEOGRAPHER:  Sir, your microphone

2      slipped off.  Can you put that back?

3                    THE WITNESS:  Yup.  Yup.  Sorry.

4                    (Pause.)

5                    THE WITNESS:  Okay?

6                    THE VIDEOGRAPHER:  Thank you.

7           Q.      And what was the corporate department?

8           A.      Well, it -- it was departments so that

9      would be the Treasury, Human Resources, Account --

10     Accounting or the Controllers Office.  The R and D

11     functions that were done at a corporate level rather

12     than departmental or business unit level.

13          Q.      Right.  Now, let's go back to 1988 to

14     the 2001 time frame.

15                   What was your official title?

16          A.      Well, I think I started as associate

17     general counsel and at some point I also became an

18     assistant secretary but I'm -- I got -- I have no --

19     no recollection of exactly when.

20          Q.      And assistant secretary, do you mean to

21     the Board?

22          A.      Well, as a -- to the corporation.  You

23     know, it's a -- you know, it's a title.  Assist...

24          Q.      And how about from 2001 to 2006?  What

25     was your official title?



Page 26

1          A.       I think it was the same.

2          Q.       Okay.  And from 1988 through the

3     duration of your time at Engelhard in 2006 who did you

4     report to?

5          A.       It was Arthur Dornbusch the entire time.

6          Q.       So he knew what you did?

7               MR. BRESS:  Objection to form.

8          A.       In general, yes.

9          Q.       Did you and Mr. Dornbusch have offices

10    in the same building?

11         A.       Throughout that time we did I believe.

12         Q.       And was that at the Engelhard

13    headquarters in Menlo Park?

14         A.       Oh, I'm sorry.  You know, there's one --

15    I'm not sure about one date and everything was always

16    in the Menlo Park area.

17         Q.       Mm'mm.

18         A.       For a time -- and it may have extended

19    past 1988 -- there was a separate corporate executive

20    suite of offices in a separate building and I was not

21    in that building.

22         Q.       Okay.

23         A.       Then at some point they sold that

24    building and the land around it and moved into a tall

25    building next to the -- what was then the Hilton Hotel



Page 27

1    on Wood Avenue and from that point on I was in the

2    same building as Arthur and that -- that's where we

3    were.

4          Q.      And do you recall when Engelhard sold

5    that other executive building?

6          A.      I'm not sure.  It might have been after

7    1988.

8          Q.      Late '80s, early '90s?

9          A.      I -- I'm not -- I'm really not sure.

10         Q.      That's fine.

11                 And, Mr. Hassett, did there come a time

12   when you worked on the Emtal talc litigation?

13         A.      Well, from the switch in my duties in

14   2001 until the -- just after the BASF acquisition.

15         Q.      Okay.

16         A.      2 -- '01, late 01; whatever.

17         Q.      But before 2001 you never did any work

18   on the Emtal talc litigation?

19         A.      Not that I can recall.

20         Q.      Pertaining to the Emtal talc litigation

21   what were your job responsibilities as assistant

22   associate general counsel -- well, I should say --

23   scratch that.

24                 From 2001 to 2006 pertaining to the

25   Emtal talc litigation what were your job



Page 28

1   responsibilities as associate general counsel,

2   assistant secretary?

3        A.      Well, the assistant secretary function

4   wasn't related but the --

5        Q.      Okay.

6        A.      -- for talc complaints in general the

7   tire workers cases were handled under a mechanism

8   where I had very limited responsibility.  I would see

9   summary reports of some kind I think once in awhile

10  but I didn't get involved in seeing or responding to

11  complaints or anything.

12              For -- the few other talc cases we

13  learned of a -- you know, if a complaint came into the

14  company it would reach me and I would retain outside

15  counsel.  You -- usually with advice from Cahill

16  Gordon on which counsel he'd select and coordinate the

17  response by the local counsel with information that

18  Cahill Gordon maintained for us.

19       Q.      You're saying you were provided with

20  status reports of litigation.  Who provided you with

21  those status reports?

22       A.      On the tire workers litigation

23  information came from Cahill Gordon and more

24  specifically Mike Sullivan generally.

25       Q.      Did you receive status reports on any



Page  29

1   other Emtal talc-related litigation?

2        A.     I don't recall any, and on the tire

3   workers it was a settle -- like a settlement status

4   reports sort of thing.  I -- it wasn't really the

5   details of the cases.

6        Q.     Besides Michael Sullivan who else did

7   you speak with at Cahill Gordon in the context of

8   defending the Emtal talc litigation?

9        A.     Peter Sloane, for a time Ira Dembrow was

10  involved for a little bit in Emtal talc and -- I know

11  it but it won't come -- there's another partner who

12  was involved in the talc litigation for a time and I

13  can't think of his name right now.

14       Q.     Does Len Spivak sound familiar?

15       A.     Yes.  Len.  Sorry.  I know the name

16  well.  It just wouldn't -- wouldn't come to me.

17       Q.     Without disclosing specific

18  communications what were the nature of the

19  communications you had with personnel from Cahill

20  Gordon?

21              MR. BRESS:  So, Mike, I'm going to -- I

22  think you can answer the topics generally that you

23  discussed but I think beyond that we would start

24  getting into some privileged issues.

25              MR. DONOHUE:  Agreed.



Page 30

1      A.      So one topic was the referrals -- what

2    outside counsel to refer matters to locally and I --

3    you know, the system's already sort of up and running.

4            That's really the only specific thing I

5    can remember.

6      Q.      What was your understanding of Cahill's

7    role in defending out Engelhard in the Emtal talc

8    litigation?

9      A.      Well, my -- they were our national

10   counsel and I understood that they had a collection of

11   information relating to Emtal talc that really was the

12   company's only records left at this point.  The -- the

13   business had been shut down and would -- would provide

14   that to local counsel as needed to respond to

15   complaints and they also had a more active role in

16   managing the tire workers cases and the settlements in

17   the tire workers cases.

18     Q.      What do you mean by that; they had a

19   more active role in managing settlements in the tire

20   workers cases?

21     A.      Well, the -- I don't even remember

22   seeing Complaints in the tire workers cases.  I mean,

23   I think that they had some arrangement where service

24   went to either directly to local counsel or -- and

25   whatever information was exchanged with plaintiffs



Page 31

1    counsel they did on their own.  They didn't -- I

2    didn't get involved in it.

3         Q.     So I believe you said you did have a

4    role in retaining local defense counsel?

5         A.     Yes.

6         Q.     What was the role -- what were the

7    responsibilities of the local defense counsel in

8    defending the Emtal litigation?

9         A.     Well, depended on the nature and status

10   of the Complaint but local counsel would need to get

11   the information from Cahill Gordon and transmit it in

12   whatever form the proceedings required to the

13   plaintiffs counsel.

14        Q.     Besides receiving the information from

15   Cahill and transmitting it to I guess the plaintiff do

16   you recall any other job responsibilities that local

17   defense counsel would have had as opposed to Cahill?

18        A.     No.

19        Q.     Did you ever interact with the local

20   defense counsel?

21        A.     Yes.

22        Q.     Under what circumstances would you

23   interact with local defense counsel?

24        A.     In general the initial engagement.

25   Anything to do with fees and it -- and I think other



Page 32

1   than that it was generally reactive.

2          Q.     Reactive mean they reach out to you --

3          A.     If --

4          Q.     -- you answer --

5          A.     If --

6          Q.     -- any inquiries --

7          A.     If they -- exactly.  If they -- if they

8   reached out to me I would respond.

9          Q.     So local counsel had direct access to

10  Engelhard internal Legal Department?

11         A.     Local -- yes.  The local counsel knew

12  who I was from the initial engagement and could call

13  me.  In some cases they were counsel we had used on

14  nontalc matters and I knew them already.

15         Q.     Which local defense counsel do you

16  recall interacting with?

17         A.     Well, I knew Jack Kluznik who was

18  involved in the tire workers cases but I -- I don't

19  remember talking with him about anything other than

20  fees as to business.

21                I -- I knew him personally from a prior

22  job, too.

23                I knew Mel Bergstein's firm from other

24  litigation and I -- I knew Tony Paduano from other

25  litigation.



Page 33

1           What was -- I'm sorry.  What was the

2    question again?

3        Q.     Which local counsel do you recall

4    interacting with?

5        A.     I did react with Howard Merten.

6               That's all I can think of right now.

7        Q.     I just want to nail down the

8    jurisdictions that they covered.

9               So Jack Kluznik covered Ohio?

10       A.     I'm not sure.

11              Jack -- Jack -- Jack Kluznik was

12   involved in the tire workers cases and I think his

13   office was in Ohio but how the response -- I don't

14   know the details of the tire workers cases.

15       Q.     Okay.  How about Mel Bergstein's firm?

16   What jurisdictions were they responsible for?

17       A.     Well, they -- we didn't have assigned

18   territories or anything like that.  It was

19   case-by-case.

20              Mel's office was in New Jersey.  He sort

21   of -- he had actually moved to different firms and

22   different offices within New Jersey over time.  He --

23   he had done work for Engelhard for years but it wasn't

24   like he -- he had a specific territory or anything.

25   We would have sent him a New Jersey case.



Page 34

1          Q.      Right.  Besides New Jersey cases do you
2    recall any other cases that Mel Bergstein's firm would
3    have -- well, that Mel Bergstein's firm handled?
4          A.      Talc cases?
5          Q.      Correct.
6          A.      No.
7          Q.      And I'm sorry.  When I talk about your
8    interactions with your local defense counsel in the
9    talc cases --
10         A.      Yes.
11         Q.      -- so would you have interaction with
12   Mel Bergstein's firm in the context of New Jersey talc
13   cases?
14         A.      I -- I don't really specifically
15   remember any interaction with Mel's firm on any talc
16   case.
17                 I do remember interactions with Mel in
18   general but that's several litigations over many
19   years.
20         Q.      One of the letters you looked at in
21   preparation for today was from Mel Bergstein's --
22         A.      Yeah --
23         Q.      -- firm, correct?
24         A.      -- in fact, without that letter I never
25   would have remembered he did a talc case.



Page 35

1          Q.      Does that refresh your recollection that
2     he worked on the talc litigation?
3          A.      Yeah.
4          Q.      How about Tony Paduano?  What -- in what
5     areas would Engelhard retain him for talc cases?
6          A.      Well, as far as I recall Tony -- Tony's
7     firm --
8          Q.      Mm'mm.
9          A.      -- handled one talc case.
10         Q.      And which case was that?
11         A.      The Chernick case.
12         Q.      And how about Howard Merten?  What
13    juris -- well, what areas do you recall interacting?
14         A.      Howard's firm --
15         Q.      What cases?
16         A.      -- was in Rhode Island and he -- as far
17    as I can recall Howard handled just one talc case for
18    Engelhard and I don't remember working with him on
19    anything else.
20         Q.      And what was that one talc case?
21         A.      The Martin case.
22         Q.      What was the general division of labor
23    between Engelhard in-house counsel, Cahill Gordon and
24    the local defense counsel in defending the Emtal talc
25    litigation?



1                     MR. BRESS:  Objection.  Form.

2          A.      In general I would be the one -- in --

3    in general with the exception of the tire workers

4    cases.  There weren't that many.

5                     I don't -- it's...

6                     The Complaint or letter, whatever, would

7    reach me.  I would talk to Cahill about selection of a

8    local counsel and engage the counsel and explain to

9    them that Cahill had the relevant records and asked

10   them to respond -- you know, get in touch with Cahill

11   for information and respond accordingly, and at that

12   point my role would become responsive rather than

13   proactive until the -- the billing.

14         Q.      And how about Cahill?  What was their

15   general role after you passed off litigation?

16         A.      Well, I wasn't -- I wasn't involved --

17   when -- local counsel could communicate directly with

18   Cahill.  I -- I was not trying to stay involved in

19   every discussion so I don't always know the details.

20         Q.      And either Cahill or local counsel would

21   then reach out to you when needed?

22         A.      Yes.

23         Q.      Can you tell me everybody that you

24   recall within the Engelhard Legal Department that

25   worked on the Emtal talc litigation?



Page 37

```
 1            A.     Well --
 2                   MR. BRESS:  Objection to form.
 3            A.     Les Fliegel had that role before I did
 4    and, you know, Arthur was involved at least as a
 5    supervisor.  You know, I don't know about the early
 6    talc cases.  I've heard Tom Halket's name in this
 7    introduction.  I know he was an Engelhard lawyer but
 8    I -- I don't actually know his involvement in the talc
 9    litigation.
10                   And for in-house I don't know of anyone
11    else.
12            Q.     Do you know what Les Fliegel's job
13    responsibilities were?
14            A.     Well, at what point in time?  Just in
15    relation to talc litigation?
16            Q.     Relating to talc litigation.
17            A.     I would say essentially the same as I
18    described for myself.
19            Q.     And when you were speaking with Les
20    Fliegel in around 1988 when you were coming back to
21    Engelhard was he working on the talc litigation at
22    that time?
23            A.     I don't know.  I don't remember.
24                   Oh, I'm sorry.  I do...
25                   If he was, he was brand new to it
```



Page 38

1   because the duties I took on when I went to Engelhard

2   were essentially replacing his old duties.

3                      He -- he had been working for that

4   metals trading group.

5           Q.       Mm'mm.

6           A.       And was shifting out of that and that's

7   the job that I got assigned to when I went back.

8           Q.       Do you recall any other Engelhard

9   in-house attorneys that worked on the Emtal talc

10  litigation?

11          A.       I do not.  Not that I -- there's -- you

12  know, I don't -- I don't have knowledge of every time

13  period but I don't know of any others.

14          Q.       And from 2001 to 2006 besides yourself

15  and Arthur Dornbusch do you recall anybody else who's

16  working on the Em -- any other Engelhard in-house

17  attorneys that were working on the Emtal talc

18  litigation?

19                      MR. BRESS:   Objection to form.

20          A.       Well, that could be late -- my start

21  might have been late in '01 so earlier in '01 it could

22  have been Les.

23          Q.       Okay.

24          A.       But other than that I can't think of any

25  others.



Page 39

1          Q.      Do you know who took over the

2    responsibility in the Engelhard legal -- in-house

3    Legal Department of defending the Emtal talc

4    litigation after your role ended in around 2006-2007?

5          A.      Yeah.  Not long after the -- BASF

6    completed its acquisition of Engelhard all product

7    liability litigation was transferred to an in-house

8    BASF lawyer who was their products liability

9    specialist essentially, and I just -- her first name

10   was Maura.  I don't remember her last name.

11         Q.      Do you recall any -- which nonattorney

12   personnel from the Engelhard Legal Department worked

13   on the Emtal talc litigation?

14         A.      From the Legal Department, you know, we

15   had I think one shared paralegal and shared

16   assistants.

17                 I don't know what -- I'm not sure what

18   work they would have done on the talc cases honestly.

19   I don't remember anything specifically.

20         Q.      Do you recall their names?

21         A.      Well, I can remember the names of my

22   assistants when there was one or two lawyers per

23   assistant but by the time we got to thousand, 2001...

24                 I can't think of them right now.

25         Q.      I'm going to focus in a little bit more



Page 40

1   now on what your responsibilities were of the

2   Engelhard in-house lawyers' responsibilities were in

3   the Emtal talc litigation.

4           So I believe you said you reviewed

5   Complaints when they were filed against Engelhard.  Is

6   that fair?

7       A.      I received them.  I didn't necessarily

8   review them carefully.

9       Q.      Did you review Answers to Complaints

10  that were filed on behalf of Engelhard?

11      A.      I don't recall specifically.

12      Q.      Okay.  Could those Answers have been

13  served without Engelhard's authorization?

14          MR. BRESS:  Objection form.

15          MR. DONOHUE:  Join.

16      A.      I would be surprised if there wasn't

17  some form of authorization.

18          These were firms that we -- first, they

19  were reputable firms.  These were firms we had often

20  worked with over previous cases and if they wanted to

21  work with us again it would be very surprising.

22      Q.      Did you draft letters to opposing

23  counsel in the Emtal talc litigation?

24      A.      No.

25      Q.      Did you draft letters to Courts in the



Page 41

1    Emtal talc litigation?

2           A.      No.

3           Q.      Did you review any letters to plaintiffs

4    counsel or Courts before they were transmitted?

5           A.      I don't recall.

6           Q.      Would Engelhard lawyers have the

7    authority or authorization to transmit letters to

8    Courts without the client's authorization?

9                   MR. BRESS:  Objection.  Form.

10          A.      Generally I would say not without some

11   form of authorization.  Not necessarily reviewing

12   specific clearance but some form of authorization.

13          Q.      And same question for letters to

14   opposing counsel.  Could Engelhard's lawyers transmit

15   letters to opposing counsel without some form of

16   Engelhard authorization?

17                  MR. BRESS:  Objection.  Form.  Foundation.

18          A.      I would say for the case of a letter, a

19   cover letter type of thing, the authorization might be

20   a very general one but there would still be some kind

21   of authorization.

22          Q.      Did you review discovery requests

23   propounded on behalf of Engelhard?

24          A.      Outgoing discovery --

25          Q.      Outgoing.



Page 42

1          A.       -- requests in talc cases?

2          Q.       Mm'mm.

3          A.       I don't remember doing that.

4          Q.       Would there need to be some form of
5      authorization from Engelhard before an Engelhard
6      attorney representing Engelhard could propound
7      discovery requests?

8                   MR. BRESS:   Objection.  Form and
9      foundation.

10         A.       You know, I want to go back to what I
11     said about general authorizations on the letters.

12                  I think there's some -- if we engaged
13     counsel and the routine thing to do was to send out a
14     relatively standard discovery request I'm not sure
15     that anything more than the engagement would have been
16     needed to authorize it.

17                  I -- I just -- I don't remember doing
18     anything on outgoing discovery requests, authorization
19     or review or anything else.

20         Q.       How about incoming discovery requests?
21     Did you participate in answering discovery requests on
22     behalf of Engelhard?

23                  MR. BRESS:   Objection.  Form.

24         A.       On talc litigation where the -- there
25     was no new information or files, my participation was



Page 43

1    limited to steering the local counsel to Cahill Gordon

2    to get the -- to get the information needed to

3    respond.

4              Other types of litigation, different

5    story.

6         Q.    So in your role in answering discovery

7    requests would you talk to any former employees?

8         A.    On talc litigation --

9              MR. BRESS:  Objection to form.

10             THE WITNESS:  Sorry.

11        A.    On talc litigation I don't recall

12   talking to former employees.

13        Q.    Did you talk to any current employees in

14   answering discovery requests in the talc litigation?

15        A.    On talc litigation I don't recall

16   talking to current employees -- then-current

17   employees.

18        Q.    In answering discovery requests on

19   behalf of Engelhard in the talc litigation would you

20   review any files?

21             MR. BRESS:  Objection.  Form.

22        A.    On talc litigation I don't recall

23   reviewing any files.

24        Q.    Would you review Answers to discovery

25   before they were served in the talc litigation?



Page 44

```
 1          A.      I don't recall.
 2          Q.      Could Answers to discovery requests be
 3   served without Engelhard's authorization?
 4                  MR. BRESS:  Objection.  Form.  Foundation.
 5                  MR. DONOHUE:  Join.
 6          A.      I think at least a general authorization
 7   would have been normal.
 8          Q.      Where did the factual information
 9   contained in the Answers to discovery requests come
10   from?
11          A.      For talc litigation?
12          Q.      For talc litigation?
13          A.      I believe it came from the records
14   maintained at Cahill Gordon.
15          Q.      And where did Cahill get those records
16   from?
17          A.      I wasn't involved in -- I could -- I
18   could guess but...
19          Q.      They were Engelhard's records, correct?
20          A.      Yes.
21                  MR. BRESS:  Objection.
22          Q.      Besides Engelhard's records that were
23   maintained at Cahill Gordon where else did the factual
24   information responsive to discovery requests come
25   from?
```



Page 45

1        A.      For talc --

2                MR. BRESS:  Objection to form.

3        Q.      For talc litigation.

4        A.      For talc litigation I don't recall any

5    other source -- I don't recall any other source of

6    information.

7        Q.      Did you ever review transcripts of

8    depositions taken in the talc litigation?

9        A.      I did not.

10       Q.      Did you ever attend depositions taken in

11   the Em -- in the talc litigation?

12       A.      I did not.

13       Q.      Did you participate or did your office

14   participate in drafting motions for Summary Judgment

15   in the talc litigation?

16               MR. BRESS:  Objection to form.

17       A.      I don't recall drafting or participating

18   in any talc motion for Summary Judgment.

19       Q.      Would you or your office review motions

20   for Summary Judgment before they were filed in the

21   talc litigation?

22               MR. BRESS:  Objection.  Form.  Foundation.

23       A.      I don't recall participating in drafting

24   or reviewing any motion for Summary Judgment.

25       Q.      Did Engelhard's lawyers have the



Page 46

1    authority to file motions for a Summary Judgment

2    without some form of authorization from Engelhard?

3                   MR. BRESS:  Objection.  Form.  Foundation.

4                   MR. DONOHUE:  Join.

5         A.    Well, I don't -- if we talk about

6    litigation in general I would say there would be some

7    sort of authorization.  If we talk just about talc

8    litigation I don't remember motions for Summary

9    Judgment so I don't have a procedure to...

10        Q.    That's fine.

11              And I wanted to ask one other question

12   about the status reports you received regarding the

13   talc litigation.

14        A.    On tire worker settlements -- status

15   reports on tire worker settlements?

16        Q.    Mm'mm.

17        A.    Is that what we're talking about?

18        Q.    Yeah.  Is -- is that the only status

19   reports that you recall?

20        A.    Yes.

21        Q.    And besides settlement information is

22   there any other topics covered in the status reports?

23        A.    Well --

24              MR. BRESS:  Mike, you can answer that I

25   think at a high level but be careful not to disclose



1   privileged information.

2        A.      You know, the reports were -- that I --

3   I don't remember the -- them well, first of all.

4        Q.      Mm'mm.

5        A.      They included some quantitative

6   information on the settlements and they may have

7   included some --

8               MR. BRESS:  Mike, I think this is now

9   getting to be too detailed so if you want I can talk

10  to the witness about it but I think this is getting

11  too deep into the privilege.

12              MR. JARED PLACITELLA:  If you want to.

13  I'm just trying to separate topics but if you need to

14  talk to a witness --

15              MR. BRESS:  So you can talk --

16              MR. JARED PLACITELLA:  -- that's no

17  problem.

18              MR. BRESS:  -- about general topics but

19  I think where we're starting to go is too detailed and

20  is getting close to revealing privileged information

21  which I instruct you not to do.

22        A.      Well, the -- the general topic of these

23  reports that I vaguely remember was the -- to -- to

24  keep the company updated on the status of settlements

25  in the tire workers litigation and I would add again



Page 48

1    just as a general -- they did not include details of

2    any of -- any particular case.

3           Q.      Without disclosing specific information

4    did these status reports have the reasons why cases

5    were settled?

6                   MR. BRESS:  I'm going to instruct you

7    not to answer that, Mike, unless I -- can you read

8    back the question, again.

9                   (Last question read back by the

10   reporter.)

11                  MR. BRESS:  Yeah.  I think you're

12   starting to get into the content of the communication

13   so maybe there's a way to reframe the question.

14                  Mike, if you're -- if you're able to

15   answer that without disclosing privileged information

16   you can let us know.

17          A.      Well, I don't want to decipher myself

18   what's privileged on this one.  We could have a short

19   conversation outside the room if you want.

20                  MR. DONOHUE:  Can -- if I might.

21                  Can you answer it with a yes or no

22   question (sic)?  Did the communication indicate --

23                  THE WITNESS:  I -- I -- close enough.

24          A.      I can say that I don't recall anything

25   about reasons for settlement.



Page 49

```
 1          Q.      In the context of the Emtal talc
 2    litigation did you interact with Engelhard's insurance
 3    carriers?
 4          A.      In general, no.  There's one possible
 5    exception.
 6          Q.      And what's that one possible exception?
 7          A.      I -- we -- we did look into insurance in
 8    the Martin case and I don't -- I don't remember
 9    whether I interacted directly with the carrier or not
10    and I'm also not even positive it was Engelhard's
11    carrier.  It might have been the distributor's
12    carrier.
13          Q.      Well, what do you recall about the
14    nature of those interactions in the context with
15    insurance carriers in the Martin case?
16                  MR. BRESS:  Well, are you asking him to
17    disclose communications with carriers or...
18                  MR. JARED PLACITELLA:  First, just
19    topics.
20                  MR. BRESS:  I need to -- I need to talk
21    to the witness outside.
22                  MR. JARED PLACITELLA:  Sure.
23                  All right.  Take a quick break.
24                  THE VIDEOGRAPHER:  The time is 11:21
25    a.m.  We're off the record.
```



Page 50

```
 1              (At this time the witness and counsel

 2    leave the deposition room at 11:21 a.m.)

 3              MR. DONOHUE:  Everybody's there on the

 4    phone, right?

 5              THE VIDEOGRAPHER:  The time is --

 6              MR. TUNIS:  Yes.

 7              THE VIDEOGRAPHER:  -- 11:28 a.m.  We're

 8    on the record.

 9    BY MR. JARED PLACITELLA:

10         Q.    So, Mr. Hassett, before we took a short

11    break I believe my last question was what were the

12    nature of the interactions that you had with insurance

13    carriers in the context of the Martin case?

14              MR. BRESS:  And I'll instruct you not

15    to -- go ahead.  I think you can give the answer.

16         A.    We were inquiring into coverage issues.

17         Q.    And what were those coverage issues?

18              MR. BRESS:  Well, I don't -- I don't

19    know if you know the answer to that but -- but I'm

20    not -- I'm going to ask you and instruct you not to

21    reveal specific communications.

22              THE WITNESS:  Well, first I think to the

23    extent that I discussed that, it was with the local

24    counsel and not -- that part of it at least was not

25    directly with the carrier so that -- does that change
```



Page 51

1    your view on the...

2              MR. BRESS:  Oh, yes.  I do instruct you

3    not to disclose communications with local counsel on

4    the basis of privilege.

5         Q.    But for the instruction not to answer

6    would you be able to answer that question?

7         A.    Only in an extremely general way.

8         Q.    But yes?

9              MR. BRESS:  Objection to form.

10        A.    I could give a very general answer, yes.

11        Q.    In the context of the Emtal talc

12   litigation did you have any interactions with

13   insurance brokers?

14        A.    No.

15        Q.    Did Engelhard set budgets on attorneys

16   fees and expenses in individual matters?

17             MR. BRESS:  Objection.  Form.

18        A.    In general, no.  I don't remember an

19   exception I was involved in.

20        Q.    Do you know approximately how much it

21   cost Engelhard to defend an Emtal talc case?

22             MR. BRESS:  Objection.  Form.

23        A.    And I -- I don't know there was a

24   typical case you could answer based on.  I don't

25   really remember much of anything about the fee numbers



Page 52

1    at this point.

2          Q.      Instead of a typical number how about --

3    let's take two cases.

4                  You said the Chernick case.

5                  Do you recall how much it cost Engelhard

6    to defend the Chernick case?

7          A.      I don't remember.

8          Q.      And do you recall how much it cost

9    Engelhard to defend the Martin case?

10         A.      I do not remember.

11         Q.      Did Engelhard keep records of how much

12   it cost it to defend Emtal talc cases?

13         A.      The company in general maintained

14   records of legal expenses and all expenses.  It's, you

15   know, a big company with good financial statements.

16                 I don't recall seeing reports that were

17   specific to -- specific breakdowns for talc cases

18   or -- and -- and certainly didn't ask for them.

19         Q.      If those records existed who would --

20   what department in Engelhard would be responsible for

21   maintaining them?

22                 MR. BRESS:  Objection.  Foundation.

23                 THE WITNESS:  Answer anyway?

24                 MR. DONOHUE:  You may answer.

25         A.      Well, accounting would have records on



Page 53

1    expenses generally including legal fees and I don't

2    know if there would be any supplemental reports

3    that -- you know, that Arthur saw but I didn't.

4           Q.    Have you ever attended any seminars

5    pertaining to the defense of asbestos or talc cases?

6           A.    No.

7           Q.    What role did Engelhard's Legal

8    Department have in deciding whether to settle a talc

9    case?

10                MR. BRESS:  Objection to form.

11          A.    In general a settlement would be

12   approved by the in-house Legal Department.

13                The tire worker cases I just didn't get

14   involved -- I'm not sure what the approval -- tire

15   workers were different.  Not sure what the approval

16   process was exactly there.

17          Q.    Who in the Engelhard Legal Department

18   approved settlements?  Would that be Arthur Dornbusch?

19          A.    In general, yes.

20          Q.    I'd like to go back to the tire workers

21   cases for a minute.

22                Do you recall what tire worker cases,

23   you know, were within your purview?

24          A.    Well, I would -- in theory, all.  In

25   practice, none.  I -- I -- I just...



Page 54

1          Cahill had an effective system set up

2   and I didn't really do anything that I can recall

3   other than see these periodic reports we mentioned

4   earlier, and I think I spoke with Jack Kluznik on a

5   couple of billing issues, and that's all I can

6   remember doing personally on the tire worker cases.

7          Q.    And so I understand, what do you mean

8   but -- when you say tire worker cases?  What cases --

9   what realm of cases are encompassed in tire worker

10  cases?

11         A.    Well, there was a -- I don't know it was

12  a class action.

13              There's a -- there were many cases.  I'm

14  not -- I'm not sure if they were -- some of them were

15  class actions or just a bunch of individual plaintiff

16  cases brought in the -- brought in Ohio with -- many

17  of the plaintiffs were represented by a few law firms

18  that would appear as plaintiffs counsel in -- in

19  multiple actions and there were also multiple

20  defendants and the parties or -- to some extent the

21  counsel had a -- repetitive relationships and had

22  formed kind of a settlement procedure is my

23  understanding.

24         Q.    What's your understanding of the

25  settlement procedure?



Page 55

 1         A.      I don't know that much about it.  You

 2    know, I never -- never met or spoke with any of the

 3    plaintiffs counsel.  I didn't give any instructions to

 4    Cahill or Mike Sullivan --

 5                 MR. BRESS:  Mike, just be careful what

 6    your -- I don't want you to --

 7                 THE WITNESS:  All right.

 8         A.      My short answer is that my understanding

 9    is very limited.  You pretty -- you pretty much have

10    heard my understanding.

11         Q.      Who would know about the settlement

12    procedures in the tire worker litigation?

13         A.      Our -- our reports came from Mike

14    Sullivan.

15         Q.      All right.  And Michael Sullivan was a

16    paralegal, correct?

17         A.      Yes.

18         Q.      What attorneys would know about the

19    settlement procedures?

20         A.      Well, I -- I -- I think that at

21    different times Peter Sloane and Ira and Len would

22    have been probably technically responsible.

23         Q.      I believe you said that the

24    authorization to settle a case had to come from

25    Engelhard, correct?



Page 56

1          A.      I think I said --

2                  MR. BRESS:  Wait.

3                  THE WITNESS:  Okay.

4          Q.      From Engelhard's Legal Department.

5          A.      I think I said --

6                  MR. BRESS:  Hold on.  Hold on.

7                  THE WITNESS:  Okay.

8                  MR. BRESS:  Objection to form.

9          A.      And I -- I said in general that's true

10    but the tire worker cases might be something of an

11    exception.

12         Q.      Was -- how about the decision -- I mean

13    the amount to settle for?  Was that also up to

14    Engelhard in the talc litigation?

15                 MR. BRESS:  Objection.  Form.

16                 MR. DONOHUE:  Are you separating out

17    talc litigation versus tire worker --

18                 MR. JARED PLACITELLA:  Sure.

19                 MR. DONOHUE:  -- subset?

20                 MR. JARED PLACITELLA:  We'll ask that

21    question first.

22                 MR. DONOHUE:  Okay.  So general?

23                 MR. JARED PLACITELLA:  General, right.

24                 MR. BRESS:  Objection.  Form.

25         A.      In talc litigation generally but not



Page 57

1    tire worker, the decision to seek settlement or

2    whatever and the amount would be approved by the Legal

3    Department generally.

4            Q.    And in the tire worker litigation the

5    decision of the amount to settle for was that -- had

6    to be authorized by the Legal Department?

7            A.    There's a process there.  I'm just not

8    as familiar with it.  I don't know the answer to that.

9            Q.    By "process" do you mean agreements with

10   other defendants?

11           A.    H'mm.

12                 I don't -- I don't know the answer to

13   that.

14           Q.    And who would know the answer to that?

15           A.    Well, I think the same group at Cahill

16   that we mentioned would know for different times.

17           Q.    Mm'mm.

18           A.    I think Arthur would probably know.

19                 MR. JARED PLACITELLA:  Could we go off

20   the record for one second.

21                 THE VIDEOGRAPHER:  The time is 11:41 a.m.

22   Off the record.

23                 (Discussion off the record.)

24                 THE VIDEOGRAPHER:  The time is 11:44 a.m.

25   We're on the record.



Page 58

1  BY MR. JARED PLACITELLA:

2          Q.    So, Mr. Hassett, I'm showing you what's

3  been marked as Exhibit Hassett-5 for identification.

4  It is two letters; an August 20, 2002, letter from a

5  SherryLynn to a Michael Sullivan copying Sam

6  Martillotta, and if you scroll, the second letter is a

7  letter from Sherry --

8                    THE WITNESS:  Would --

9          Q.    -- Lynn to Michael --

10                   THE WITNESS:  Would it be all right if I

11  worked with a hard copy?

12                   MR. BRESS:  The hard copy?

13                   MR. DONOHUE:  Use mine.

14                   MR. BRESS:  You can -- he can use mine.

15  Yeah.

16                   MR. JARED PLACITELLA:  That's fine.

17                   (Pause.)

18          A.    I skimmed through it at least.

19          Q.    Have you ever seen this document before?

20                   MR. BRESS:  And just so you know -- you

21  heard this.  This is two separate letters that have

22  been combined together as one exhibit.

23          A.    And I don't recall specifically seeing

24  either one of these letters before although I do note

25  I'm cc'd on one of them.



Page 59

1      Q.      Would this be one of the settlement

2  procedures that you were describing in the tire worker

3  cases?

4              MR. BRESS:  Objection to form.

5      A.      I would say no.

6              The summaries I was talking about were

7  prepared for Engelhard as opposed to being a copy of a

8  letter written to a third party.

9      Q.      And do you see that in both letters

10 there are about 300 cases that are settled for around

11 a thousand dollars each give or take a few?

12     A.      Well, I noticed that in the first letter.

13             The second one seems to be mostly about

14 trying to make sure the lists aren't duplicates and

15 whatnot.

16     Q.      Right.  And you see -- if you turn to

17 Bates number 39045 it is the second to last page of

18 the second letter.

19     A.      The second to the last page of the whole

20 package?

21     Q.      Mm'mm.  Yeah.

22     A.      5-9?

23     Q.      Yes.

24     A.      Okay.  I'm with you.

25     Q.      And you see in the first paragraph



Page 60

```
 1    starting with "Accordingly"?

 2         A.     Yes.

 3         Q.     "The above-referenced plaintiffs should

 4    be included in the current settlement which increases

 5    the total amount of 309 or 310,000 including William

 6    Turner"?

 7         A.     Yes.

 8         Q.     And if you review the rest of these

 9    documents you see that on average the cases are

10    settled for a thousand dollars as the settlement

11    amount either goes up or go down by a thousand

12    depending on how many people are in the settlement?

13         A.     Well, is that --

14                MR. BRESS:  Objection to form.

15         A.     Yeah.  I see -- is -- my understanding

16    was that that thousand was Engelhard's contribution.

17                Is that -- is that all defendants?

18         Q.     Well, I'm reading on the second -- the

19    paragraph below that.  It says, "Please call me

20    directly" -- sorry.  Second to last page.

21                Michael Sullivan saying to SherryLynn of

22    Bevan and Associates.

23                He says, "Please call me directly if you

24    have any questions" --

25         A.     Right.
```



Page 61

1          Q.      -- "otherwise" --

2          A.      Okay.  So that -- all I'm --

3                  MR. BRESS:  Hold it.  Let's -- what's

4     the question?

5                  MR. JARED PLACITELLA:  Sure.

6          Q.      It says, "I look forward to hearing from

7     you with respect to the above issues at your

8     convenience in order to finalize the settlement with

9     the talc defendants."

10                 And then the copy is Talc Defense

11    Counsel.

12                 So would this be a settlement agreement

13    between Bevan and the talc defense counsel?

14                 MR. BRESS:  Objection.  Form.

15         Q.      Or talc defendants?

16                 MR. BRESS:  Objection.  Form.

17         A.      Yeah.  My answer is pretty simple

18    anyway.  I don't know.

19         Q.      Okay.  Do you know who the talc defense

20    counsel were?

21         A.      No.  All I know is -- all I know about

22    that is the specific that Cahill Gordon and local

23    counsel which I guess varied over time were involved

24    in defending Engelhard.  As to counsel or the other

25    defendants, don't know anything.



Page 62

1          Q.      So do you recall having any interactions

2   with the talc defense counsel?

3          A.      No.

4          Q.      Okay.  Do you know how it was determined

5   how much Engelhard was going to pay in this settlement

6   with talc defendants?

7          A.      I do not and I -- you know, I'm not -- I

8   still am not sure whether that was Engelhard's

9   contribution or the counsel as a whole honestly from

10  the --

11         Q.      Mm'mm.

12         A.      -- letter but my -- my answer is I don't

13  know.

14         Q.      Do you know who would know how -- what

15  Engelhard paid in a group settlement with talc

16  defendants?

17         A.      Well, I think --

18                 THE VIDEOGRAPHER:  Fix your microphone,

19  sir.

20                 THE WITNESS:  Where'd it go?  See if I

21  can get it on better.

22                 (Pause.)

23                 MR. BRESS:  Can you repeat the question?

24         A.      Who would --

25         Q.      Sure.



Page 63

1          A.      I'm sorry.  Go ahead.

2          Q.      Sure.

3                  Mr. Hassett, do you know who would know

4    what Engelhard or how Engelhard determined what it was

5    going to pay in a group settlement with other talc

6    defendants?

7          A.      No.

8          Q.      Would it be Arthur Dornbusch?

9          A.      It was -- I think Arthur would be aware

10   of it in a general way --

11         Q.      Mm'mm.

12         A.      -- but I'm not sure about the specifics

13   of anything that -- you know, I'm not sure about the

14   specifics of any given settlement.

15         Q.      Before we leave this document I want to

16   turn you back to the first letter beginning on the

17   second page.  It looks like it's the attachment.  It

18   says Page 1 of 8 on 447.

19         A.      I'm with you.

20         Q.      And that goes through Bates 454.

21         A.      Okay.

22         Q.      Are you aware that the names on these

23   lists include both plaintiffs that were claiming

24   mal -- you know, suffering from malignant diseases and

25   nonmalignant diseases as a result of exposure to Emtal



Page 64

1    talc?

2                    MR. BRESS:  Objection.  Form.  Foundation.

3         A.     I don't remember this letter at all and

4    the first part I'm not sure if I've seen before today.

5         Q.     Mm'mm.

6         A.     I -- I don't know anything about this

7    specific group of plaintiffs and the injuries they

8    allege.

9         Q.     Do you know if Engelhard ever

10   distinguished between malignant and nonmalignant

11   claims in deciding to settle in group settlements such

12   as this?

13                   MR. BRESS:  Objection to form.

14        A.     You know, I could surmise that more

15   severe injury claims would justify a larger settlement

16   but I don't really know the process.  I don't have any

17   recollection of it.  I don't think I knew the details

18   at the time.

19        Q.     Did --

20                   MR. JARED PLACITELLA:  I think I'm done

21   with that document.

22        Q.     Did Engelhard keep records of the

23   disposition of each Emtal talc case?

24                   MR. BRESS:  Objection.  Form.  Foundation.

25        A.     Well, for the tire worker cases I don't



Page 65

1    know if we had any records at the company other than

2    whatever reports Mike provided and probably some

3    accounting and records of payments.

4              For nontire worker talc cases, you know,

5    you'd have correspondence files like the -- the couple

6    of letters I saw in my prep yesterday that we

7    mentioned.  They would have gone into a file and

8    stayed for at least the period in the record retention

9    policy.

10              To the extent there were any Pleadings

11    that reached the Legal Department.  Same sort of

12    thing.  They would have gone into a file and stayed

13    around for awhile.

14         Q.    Mm'mm.

15         A.    But I don't remember the specifics of

16    the retention policy or the file on the cases I

17    handled.

18         Q.    In general did the records you reviewed

19    yesterday refresh your recollection?

20              MR. BRESS:  Object to the form.

21         A.    Okay.  So the two cover letter-type

22    things were unfamiliar to me when I first saw them.

23         Q.    Mm'mm.

24         A.    After looking at one of them for a

25    minute I realized it was Mel Bergstein's firm because



Page 66

1    I saw his name on the letterhead and a little bit of

2    it came back to me.

3             The other cover letter-type thing I

4    really didn't have much recollection of even after

5    seeing the letter.

6        Q.    Mm'mm.

7        A.    The record retention policy I had an

8    extremely vague recollection of.  I mean, I knew --

9    certainly I knew clearly that it existed but the

10   specifics of it I -- I didn't remember.

11            The Chernick Interrogatory responses,

12   again, I -- I knew it existed.  I didn't have a

13   specific recollection of it without the -- the more

14   recent look at it.

15       Q.    All right.

16            MR. JARED PLACITELLA:  Tim, at a break

17   can we get a copy of those documents?  Or Dan?

18            MR. BRESS:  They've been provided to

19   you.

20            MR. JARED PLACITELLA:  Can you let me

21   know what the Bates stamps are?  So I know

22   specifically what he was looking at.

23            I don't know which letter, you know, Mel

24   Bergstein's firm was so at a break if you could just

25   pull those up and send those?



Page 67

1           MR. BRESS:  They should be obvious but

2    we'll look in -- we'll -- we'll think about it.

3           MR. JARED PLACITELLA:  Thank you.

4      Q.     And the records we were just discussing

5    about, what cases settled for, you said there were

6    tire worker records.  And there were other records?

7           MR. BRESS:  Objection.  Form.

8      A.     Yes.  For nontire worker cases there

9    would have been in some cases at least correspondence

10   and in some cases maybe a Pleading.

11     Q.     All right.  Well, records specifically

12   what cases settled for, those had to be shared with

13   your carriers, correct?

14          MR. BRESS:  Objection.  Form.  Foundation.

15     A.     That may be true but I was not involved

16   in making the claim to the carrier and I don't know

17   how it was documented.

18     Q.     Who would have -- well, who would know

19   that how claims were made to the insurance carrier?

20     A.     Well, the company had an insurance

21   department actually which was a small -- very small --

22     Q.     Mm'mm.

23     A.     -- group at -- at times as few as one,

24   but the -- I don't know if they were involved in

25   making claims on the talc or tire worker cases.



Page 68

```
 1               I -- I don't know.
 2       Q.      Did Accounting keep records of case
 3  settlements and amounts --
 4               MR. BRESS:  Objection.
 5       Q.      -- in the talc litigation?
 6               MR. BRESS:  Objection.  Form.  Foundation.
 7       A.      My understanding is that accounting had
 8  some kind of record of payments generally for all
 9  purposes, not just legal settlements.  Whether they
10  did a break-out or, you know, a printout or special
11  break-out on talc case expenses or talc case
12  settlements, I don't know.
13       Q.      Have you ever seen any talc litigation
14  indexes?
15               MR. BRESS:  Objection.  Form.
16       A.      I don't -- I mean, I know in general
17  what an index is.
18       Q.      Mm'mm.
19       A.      I don't remember seeing anything I would
20  characterize as a -- a talc litigation index.
21       Q.      Well, let me ask you a question about
22  something.
23               MR. DONOHUE:  Thank you.
24               MR. JARED PLACITELLA:  Sure.
25               Tony?
```



Page 69

```
 1                   MR. VALE:  Thank you.

 2          A.     All right.  So do I need to go through

 3    this?

 4          Q.     No.  I'll --

 5                   MR. DONOHUE:  There's no question

 6    pending.

 7          A.     Okay.

 8          Q.     So, Mr. Hassett, in front of you is what

 9    I've marked as Exhibit Hassett-11.  It's excerpts from

10    BASF privilege log in this case that we created, and I

11    want to direct your attention on Page 5.

12          A.     Okay.

13          Q.     The first entry, it says privilege,

14    1210.  So 4/12/2002 document.  Do you see that?

15          A.     The first entry?

16          Q.     Yeah.

17          A.     4/12 of '02.

18          Q.     Right.

19          A.     Yes?

20          Q.     And it's from Michael Sullivan to Arthur

21    Dornbusch, yourself and Peter Sloane.  Do you see

22    that?

23          A.     Yes.

24          Q.     And it says, "A letter attaching index

25    containing mental impressions of counsel regarding
```



Page 70

1    talc litigations."

2          A.      Yes.

3          Q.      Do you know what these indexes are of

4    talc litigations are?

5                  MR. BRESS:   I think that's just a yes or

6    no, Mike.

7          A.      And I don't remember this at all.   I

8    don't know what this is.   Mental -- I don't remember it.

9          Q.      Do you recall any other -- any type of

10   talc indexes?

11         A.      No.   The only -- the only thing I could

12   tell you is that I talked earlier about a summary

13   report kind of thing.

14         Q.      Mm'mm.

15         A.      It's possible that's the same thing.   I

16   would not think of that as an index personally but...

17         Q.      Okay.   And I think I asked this but I

18   want to make sure.

19                 Do you recall how often you received

20   those reports?

21         A.      I do not.

22         Q.      Based on your experience with the Emtal

23   talc litigation do you understand that without

24   evidence that a product contains asbestos a plaintiff

25   cannot prove a claim alleging asbestos disease from



Page 71

```
 1    that product?

 2                   MR. BRESS:  Objection.

 3                   MR. DONOHUE:  Object to the form of the

 4    question.  You can answer.

 5                   MR. BRESS:  Join.

 6         A.        Could -- could you repeat that, please?

 7         Q.        Sure.

 8                   Based on your experience in the Emtal

 9    talc litigation do you understand that without

10    evidence that a product contains asbestos that a

11    plaintiff cannot prove a claim alleging asbestos

12    disease from that product?

13                   MR. BRESS:  Object to form.

14         A.        Well, I think I may have understood that

15    as a matter of general rules of causation.  I'm not

16    sure if I learned it in my connection with the

17    Engelhard talc litigation.

18         Q.        But generally you understand that to be

19    true?

20                   MR. BRESS:  Objection.  Form.

21                   MR. DONOHUE:  Same objection.

22         A.        General -- in most cases at least -- in

23    almost all cases that would seem to be a correct

24    statement of the law to me.

25                   (Pause.)
```



Page 72

1                    MR. VALE:   Thank you.

2           Q.      Mr. Hassett, in front of you is what

3    I've marked as Exhibit 203 for identification.   It's

4    defendant Arthur Dornbusch's Rule 26 Disclosures in

5    this action, Williams versus BASF Catalysts.

6                    Have you ever seen this document before

7    the today?

8           A.      No.   In fact, I might need a primer on

9    Rule 26.

10          Q.      Well --

11                   MR. VALE:   Probably everybody else.

12          Q.      Well, if we take it to the second page

13   Mr. Dornbusch identifies -- under Section A Mr.

14   Dornbusch identifies witnesses that may have

15   discoverable information in this lawsuit.

16                   Do you see that?

17          A.      Discoverable information.   I got it.

18          Q.      Right.   And I want to turn to the

19   seventh page.

20          A.      Okay.

21          Q.      And do you see your name listed, Michael

22   J. Hassett --

23          A.      Yes --

24          Q.      -- Esquire?

25          A.      -- I do.



Page 73

1       Q.      And it says Potential Areas of Knowledge.

2               You see the top column?

3       A.      Yes.

4       Q.      All right.  And it says, "Engelhard BASF

5    legal defenses and actions in various asbestos-related

6    litigations, tests and/or inspections of the mine in

7    Johnson, Vermont, asbestos tests and/or studies of

8    Engelhard's BASF talc and the retention of records and

9    documents related to Engelhard BASF talc and

10   asbestos-related litigation."

11              Do you see that?

12      A.      Yes.

13      Q.      And this is from Arthur Dornbusch.

14              You said before he generally knew what

15   you did.  You reported to him.  Is that fair?

16              MR. BRESS:  Objection.  Form.

17      A.      Yes.

18      Q.      I want to go through each of these four

19   categories and we'll take them one at a time.

20              So Mr. Dornbusch says that you have

21   knowledge about "Engelhard/BASF legal defenses and

22   actions in various asbestos-related litigations."

23              What do you know about that?

24      A.      Well, for talc we were talking about

25   tire workers as -- and I -- and I think you asked me



Page 74

1    to describe those cases.  I forgot to mention the

2    plaintiff plaintiffs were, in fact, tire workers to

3    state the obvious, but for the tire worker cases I

4    can't really add much to what we've already discussed

5    probably.

6              For nontire worker talc cases we would

7    periodically receive a complaint, small -- you know,

8    over the years I was in that job it might have been

9    one a year, possibly even less.  It wasn't a big part

10   of the job or -- and -- and I guess a -- you know,

11   formal -- sometimes I think things might be initiated

12   with a letter rather than a formal Complaint, and I

13   was -- well, again, it's the same thing we talked

14   about earlier.

15             I had to arrange defense -- local

16   defense counsel which was a referral for Cahill and

17   try to make sure they had access to the information

18   that Cahill had collected previously.

19             I'm not -- what else do you want to know

20   in this first category?

21             Maybe a more specific question would be

22   helpful.  I feel I'm just going to be repeating

23   everything we've discussed.

24        Q.    Sure.  Maybe we could follow up on

25   something we talked about earlier and interactions



Page 75

1    with local counsel.

2            Did Engelhard provide any kind of

3    briefing book or materials to local counsel to get

4    them up to speed on the litigation?

5            MR. BRESS:  Objection.  Form.

6        A.    Not directly.

7        Q.    What do you mean by that?

8        A.    I understood Cahill had materials.  I --

9    I didn't have them.

10        Q.    Do you know what materials Cahill

11   provided to local counsel?

12        A.    I never reviewed the package that are

13   more recently.

14        Q.    You understood it to be a package,

15   though, of materials?

16        A.    Yeah.  A pack -- I just used the term

17   "package," but it wasn't with a -- you know, I don't

18   knowing if it was a three-ring binder.  I really don't

19   know.

20        Q.    Okay.  I'm assuming that attorneys from

21   Cahill may know what they provided?

22        A.    I would probably make the same

23   assumption --

24        Q.    Okay.

25        A.    -- but...



Page 76

```
 1          Q.    Well, are you aware that in defending
 2   Emtal talc litigations Engelhard's lawyers asserted
 3   that there was no asbestos in Emtal talc?
 4               MR. BRESS:  Objection.  Form.
 5               MR. DONOHUE:  Yeah.  Just to clarify,
 6   you're referring to outside lawyers?
 7               MR. JARED PLACITELLA:  Outside lawyers.
 8               MR. BRESS:  Objection.  Form.
 9          A.    My -- my understanding was that the
10   materials that Cahill had included tests and other
11   materials that showed Engelhard's -- Engelhard's talc
12   was harmless, asbestos-free.
13          Q.    And do you know where those materials
14   came from?
15          A.    No.
16          Q.    Besides those materials do you know what
17   the factual basis was for that assertion that there
18   was no asbestos in Emtal talc?
19               MR. BRESS:  So to the extent you would
20   have to divulge privileged information to answer that
21   question I have to instruct you not to answer.
22               If you can answer that question without
23   divulging privileged information you can do so.
24               THE WITNESS:  I -- well, especially
25   since I want to use the men's room anyway could we
```



Page 77

1    take a short -- a very short break?

2                    MR. JARED PLACITELLA:  Sure.

3    Absolutely.

4                    THE VIDEOGRAPHER:  Time is 12:13 p.m.

5    We're off the record.

6                    (Recess taken at 12:13 p.m.)

7                    THE VIDEOGRAPHER:  The time is 12:24 p.m.

8    We're on the record.

9                    MR. JARED PLACITELLA:  All right.  And,

10   Mr. Hassett, before we took a break I believe I had a

11   question pending.

12                    Pat, can you read it back for us, please.

13                    (The following question is read back by

14   the reporter:

15                    "Question:  Besides those materials do

16   you know what the factual basis was for that assertion

17   that there was no asbestos in Emtal talc?")

18                    MR. BRESS:  And I will give you the same

19   instruction which is that you can answer to the extent

20   you're not revealing privileged information but to the

21   extent you would reveal privileged information I would

22   instruct you not to answer.

23        A.    I -- I can't provide any answer without --

24   without including privileged information.

25                    MR. JARED PLACITELLA:  So, Dan, my



Page 78

1    question calls for factual basis.  Not legal advice or

2    communications.

3                 Is that still your instruction for him

4    not to answer what the factual basis for the assertion

5    that there was no asbestos in Emtal talc?

6                 MR. BRESS:  So he's testified that he

7    was aware of materials that Cahill had.

8                 You asked a question and I told him that

9    he could answer to the extent that doing so would not

10   reveal privileged information.

11                I understood his answer to be that he

12   could not.

13                MR. JARED PLACITELLA:  Okay.

14   BY MR. JARED PLACITELLA:

15        Q.    So, Mr. Hassett, but for the instruction

16   not to answer you would be able to tell me besides the

17   materials that were provided to local counsel what

18   were the factual basis for the assertion by Engelhard

19   attorneys that there was no asbestos in Emtal talc --

20                MR. BRESS:  Object --

21        Q.    -- is that correct?

22                MR. BRESS:  Objection to form.

23                MR. DONOHUE:  And in order to protect

24   the privilege I'm just going to instruct him to answer

25   yes or no to that.



Page 79

1                    MR. JARED PLACITELLA:  Yeah.

2      Absolutely.

3                    THE WITNESS:  I'm -- I'm sorry.  Could

4      you give me the question one more time?

5                    MR. JARED PLACITELLA:  Sure.

6                    Pat, do you -- thanks.

7                    (The following question is read back by

8      the reporter:

9                    "Question:  So, Mr. Hassett, but for the

10     instruction not to answer you would be able to tell me

11     besides the materials that were provided to local

12     counsel what were the factual basis for the assertion

13     by Engelhard attorneys that there was no asbestos in

14     Emtal talc.  Is that correct?")

15                   MR. BRESS:  Do you understand the

16     question?

17                   THE WITNESS:  I -- I'm not sure if I do,

18     honestly.

19          Q.    Sure.  How about then -- how about just

20     this then?

21                   Can you provide me all factual basis for

22     the assertion that there is no asbestos in Emtal talc?

23                   MR. BRESS:  So to the extent you know

24     the answer to this you can provide it but you -- to

25     the extent it would require you to reveal privileged



Page 80

1    communications I would instruct you not to answer.

2         A.    I don't think I have any factual basis

3    other than through privileged communications.  I...

4         Q.    Okay.

5               MR. JARED PLACITELLA:  And it's BASF's

6    position that the facts contained in those privileged

7    communications are not disclosable?

8               MR. BRESS:  Well, you're not asking

9    about facts.

10              He's -- he's saying that to answer the

11   question as you framed it he would have to disclose

12   privileged information so perhaps there's a different

13   way of framing the question that wouldn't lead to that

14   instruction of that answer.

15              MR. JARED PLACITELLA:  Sure.

16        Q.    Without divulging legal advice or

17   privileged communications can you give me what the

18   factual basis is for the assertion that there's no

19   asbestos in Emtal talc?

20        A.    I think the answer to that is no.

21        Q.    Okay.  Did Engelhard -- did Engelhard

22   authorize its attorneys to assert there's no asbestos

23   in Emtal talc?

24              MR. BRESS:  Objection to form.  I think

25   that's calling for a privileged communication.



Page 81

```
 1           Q.      That's a yes or no.
 2                   MR. BRESS:  Well, you're asking did
 3      someone authorize.  That's asking about the content --
 4           Q.      Did Engelhard authorize its attorneys to
 5      assert there is no asbestos in Emtal talc?
 6                   MR. BRESS:  I'm going to -- I think that
 7      question calls for you to disclose privileged
 8      communication so I need to instruct you not to answer.
 9                   Maybe there's a different way to rephrase
10      it but I don't see how you can answer without --
11           A.      Well --
12                   MR. BRESS:  -- disclosing privileged
13      communication.
14                   MR. DONOHUE:  Hold on.  He's -- he's
15      asked you not to answer.
16                   THE WITNESS:  Yeah.  I was trying to
17      come up with a --
18                   MR. DONOHUE:  Wait for a question.
19           Q.      How about this way?
20                   Could Engelhard's attorneys have
21      asserted to Courts and litigants that there was no
22      asbestos in Emtal talc without Engelhard's
23      authorization?
24                   MR. DONOHUE:  Object to the form.
25                   MR. BRESS:  Object to the form.
```



Page 82

1               MR. DONOHUE:  You can answer.

2       A.      Well, for the cases I was involved in,

3    the nontire worker talc cases, the local counsel were

4    authorized to -- to communicate to plaintiffs counsel

5    based on what was in the materials at Cahill.

6       Q.      And were Cahill -- was Cahill authorized

7    to provide materials to local counsel purporting to

8    show that there's no asbestos in Emtal talc without

9    Engelhard's authorization?

10              MR. BRESS:  Objection to form.

11   Foundation.

12      A.      When -- without authorization I -- well,

13   I -- I would ask the local counsel to get the

14   materials from Cahill so they -- they had

15   authorization.

16      Q.      You are aware that in defending the

17   Emtal talc litigation Engelhard lawyers asserted that

18   there was no evidence of asbestos in Emtal talc,

19   correct?

20              MR. BRESS:  Objection.  Form.

21      A.      It was my understanding that the local

22   counsels would assert that there was no -- that the

23   Engelhard talc was safe and that there was no asbestos

24   in it.

25              I -- I'm trying to focus on the word



Page 83

1    "evidence" in your last question, and I don't remember

2    specifics authorizing or using that phrase.

3           Q.     Could Engelhard attorneys assert in

4    litigation that there was no evidence of asbestos in

5    Emtal talc without Engelhard's authorization?

6                  MR. BRESS:  Objection.  Form.  Foundation.

7           A.     In your -- first, the only cases I can

8    speak to are the -- the few I was involved in.

9                  Second, I want to put the tire workers

10   aside because I wasn't really involved in the

11   communications between counsel and those cases.

12                 In the other talc -- the nontire worker

13   talc cases, the -- you know, the -- the general thing

14   that I can recall was -- was a cover letter-type --

15   you know, a transmittal of these materials that were

16   coming from Cahill.  So that was authorized.  That's

17   what we wanted them to do, but I didn't review the

18   specifics of the materials so I'm not sure if I can

19   answer your question fully.

20          Q.     Okay.  For the tire worker cases is it

21   fair to say that Engelhard's Legal Department pretty

22   much outsourced the defense of those cases to Cahill?

23          A.     By the time I got involved that was

24   true.  I'm not sure that it's true for the entire

25   period the company was involved in the tire worker



1    cases.

2          Q.     Do you know when that occurred; when

3    Engelhard outsourced the defense litiga -- of the tire

4    worker litigation to Cahill?

5          A.     No.

6          Q.     We'll move on to the second point on

7    this attached -- of -- sorry.  It's Exhibit 203;

8    Arthur Dornbusch's initial disclosure.

9                 It says you have knowledge of the tests

10   and/or inspections of the mine in Johnson, Vermont.

11                What do you know about tests or

12   inspections of the mine in Johnson, Vermont?

13         A.     I don't know.

14         Q.     Did you ever visit the Johnson mine?

15         A.     No.

16         Q.     Did you ever oversee tests of ore taken

17   from the Johnson mine?

18         A.     No.

19         Q.     Do you know why Engelhard closed the

20   Johnson mine?

21         A.     No.

22         Q.     Do you know when that was?

23         A.     I'm sure it happened before I returned

24   to Engelhard in '88.  I -- I don't know.  It might

25   even have happened before the Legal Departments



Page 85

1    consolidated in '84 but I'm not sure.

2          Q.    Well, let's move on to the next subject

3    then of Arthur Dornbusch.

4                He says -- Arthur Dornbusch says you

5    have knowledge of asbestos tests and/or studies of

6    Engelhard's/BASF's talc.

7                MR. BRESS:  Objection.  Form.

8          Q.    Do you see that?

9          A.    Well, I think it says may have

10   discoverable information but asbestos testing and/or

11   studies.

12               In preparation for this deposition I

13   learned that the Cahill package we've been talking

14   about included some study-type materials but I -- I

15   still haven't seen them or really don't know much

16   about them.

17         Q.    Mr. Hassett, are you aware that evidence

18   exists indicating there was asbestos in Emtal talc?

19               MR. BRESS:  Objection.  Form.  Foundation.

20         A.    No.  I know there's allegations.  I

21   don't know the evidence.

22         Q.    Are you aware that testing data exists

23   concerning the asbestos content of Emtal talc?

24               MR. BRESS:  Object to form.

25         A.    And, again, the answer is no, I'm not.



Page 86

1    I've heard of allegations.  I haven't seen or heard

2    the tests.

3                    (Pause.)

4                    MR. JARED PLACITELLA:  Sorry.  I only

5    have two copies here so you guys could share one from

6    the witness.

7                    Tony, can you see this?  You know what

8    this is.

9                    Sorry.  I only have two copies.

10                   THE WITNESS:  Should I take the clip off?

11                   MR. BRESS:  Why don't you wait for him

12   to --

13                   THE WITNESS:  Yeah.

14                   MR. BRESS:  -- ask you questions.

15       Q.    Please.  Why don't you just -- you can

16   flip through it.  I want to ask you if you've ever

17   seen this document before?

18                   THE WITNESS:  Have you seen this?

19                   MR. DONOHUE:  (Indicates.)

20                   You look.  I got one here.

21                   (Pause.)

22   BY MR. JARED PLACITELLA:

23       Q.    Mr. Hassett, while you're flipping

24   through, for the record I'll say it in front of you is

25   what's been marked as Exhibit 1 for identification.



1              It is a Cahill collection of testing

2    documents excluding privileged documents.

3              I'll represent to you that this was a

4    collection of testing documents assembled by Cahill

5    that was found in the files of Arthur Dornbusch.

6              I'm not going to ask you about every

7    single document but I'd like you just to look through

8    it to see if you have seen this compilation before?

9         A.    Well...

10             And this is a pretty thick package.

11        Q.    I agree.

12             MR. DONOHUE:  The question is have you

13   seen that compilation of documents, correct?

14             MR. JARED PLACITELLA:  Yup.

15        A.    Well, no.  I mean, I've never seen a

16   collection like this.  I'm about a third of the way

17   through and I haven't found a single document that

18   looks familiar.  I'll go through the whole thing

19   somewhat more carefully if you want.

20        Q.    No.  We can start and maybe later we'll

21   come back through it.

22             Have you ever heard of something called

23   the Hyde memo before?

24        A.    No.

25        Q.    If Arthur Dornbusch had relevant



Page 88

1   evidence in his files would you have -- expect that to

2   share -- would you expect him to share that with you?

3                 MR. DONOHUE:  Object to the form.

4                 MR. BRESS:  Object to the form.

5                 MR. DONOHUE:  You can answer.

6         A.      If it was relevant to a specific request

7   that he was legally obliged to respond to and he had

8   no, you know, defense of privilege or anything that

9   would relieve him of that obligation, then I would

10  expect him to.

11        Q.      Maybe over lunch you could go through

12  the materials but I want to direct you to --

13        A.      I'm down to a 20-minute lunch already.

14  Come on.

15        Q.      Sorry.  Bagel --

16        A.      When do I eat?

17                MR. DONOHUE:  You lost your microphone.

18                THE WITNESS:  That's okay.  That remark

19  was better off the record.

20                MR. JARED PLACITELLA:  Fair.  Bagel in

21  one hand, book in the other.

22        Q.      I want to -- I'll direct your attention

23  to Tab 29.  Just point out one of these documents.

24        A.      Okay.  That was the tabs.  All right.  I

25  see.  All right.  Cool.  All right.



Page 89

```
 1          Q.      It begins at Bates stamp 13157?  If
 2    you're using the same --
 3          A.      Yeah.  I've got -- yeah.  Okay.
 4          Q.      Tab 29 is a memo from E.J. Triglia to a
 5    G.A. Hemstock dated May 22nd, 1979.  Subject:  Talc
 6    investigation.
 7                  Do you see that?  The very top.
 8                  THE WITNESS:  All right.  Make it
 9    easier.
10          A.      Got it.  Even -- yeah.  Okay.
11          Q.      Do you know who G.A. Hemstock is?
12          A.      I've heard the name but that's all.
13          Q.      Okay.  Do you know who an E.J. Triglia
14    is?
15          A.      No.
16          Q.      Okay.
17          A.      I've heard the name -- I've heard his
18    name in prep but I -- other than that I know nothing.
19          Q.      Well, I'll direct you to the second
20    paragraph that's highlighted.
21          A.      "With the realization."
22          Q.      Correct.
23                  It says, "With the realization that we
24    have found fibers in one of our Emtal samples several
25    more samples of Emtal 42 were submitted to Georgia
```



Page 90

```
1    Tech for assay; one from recent and the other from

2    earlier 1977 production.

3                    "Each sample showed traces of fiber that

4    were mostly smaller than 5 microns in length.

5                    "These same samples were subsequently

6    sent to two other independent laboratories for

7    confirmation.  Their results were in general agreement

8    with those reported by the Georgia Institute of

9    Technology."

10                   Do you see that?

11        A.      Yup.  Yes, I do.

12        Q.      Is today the first time that you are

13   learning that Engelhard and Cahill had evidence that

14   three separate laboratories had found asbestos in

15   Emtal talc?

16                   MR. DONOHUE:  Object to the form.

17                   MR. BRESS:  Object.

18                   MR. DONOHUE:  You can answer.

19                   MR. BRESS:  Objection to form.

20   Misstates the document.

21        A.      Well, first, the paragraph we just read

22   doesn't say there was asbestos but I had not seen this

23   document and was not aware of it.

24        Q.      Okay.  Mr. Hassett, you can put that

25   over to the side.  We'll come back to that later.
```



Page 91

1          MR. DONOHUE:  I'll do it.

2          THE WITNESS:  Thank you.

3     Q.     Are you aware generally that Engelhard's

4 scientists found asbestos in Emtal talc?

5     A.     No.

6     Q.     Are you aware that Engelhard's

7 scientists testified about the testing of Emtal talc

8 for asbestos?

9     A.     I'm only aware of -- only recently

10 became aware of allegations to that effect.

11    Q.     Sure.  Are you aware that Engelhard

12 scientists testified that there were test results

13 showing asbestos in Emtal talc?

14    A.     No.

15    Q.     Okay.

16          (Pause.)

17          (Exhibit 3 marked for identification.)

18          MR. JARED PLACITELLA:  One copy.

19          Tim, you're getting excerpts.

20          MR. DONOHUE:  Objection.  Sorry.

21    Q.     Mr. Hassett, in front of you is what's

22 been marked as Exhibit 3 for identification.

23          If you see on the first page it says

24 it's a deposition in the District Court for the

25 District of Rhode Island in the Westfall case.



Page 92

1                  Do you see that up top?

2          A.      Yup.

3          Q.      And it says it's the continued

4    deposition of Glenn Hemstock on March 16th, 1983.  Do

5    you see that?

6          A.      Yeah.

7          Q.      Are you aware that Dr. Hemstock was the

8    vice-president of research and development for

9    Engelhard?

10         A.      I did not know his title or his job.

11         Q.      Did you recall him when you were at

12   Engelhard?

13         A.      No.

14         Q.      I'm going to direct your attention to

15   Bates stamp page 14484 to the highlighted portion and

16   it says:

17                 "Question:  Now, you testified that your

18   department has tested both processed talc and raw talc

19   ore from the Emtal mine for the presence of chrysotile

20   asbestos.  Is that correct?

21                 "Answer:  Yes.

22                 "Question:  Has your department in its

23   research found chrysotile asbestos in both processed

24   talc and raw ore from the Emtal mine?

25                 "Answer:  Yes."



Page 93

1               Do you see that?

2        A.      Yes.

3        Q.      Did I read that correctly?

4        A.      Yes.

5        Q.      Have you ever seen the testimony before

6    today where Dr. Hemstock testified that his department

7    found asbestos in both the Johnson mine ore and the

8    Emtal product?

9               MR. BRESS:  Objection.  Form.

10       A.      I have never seen this testimony or any

11   other from Glenn Hemstock on any subject including

12   those.

13       Q.      Did -- did you know before today that

14   Glenn Hemstock ever gave a deposition in the 1980s?

15       A.      No.

16       Q.      You know what?  Before I put this

17   document down could you please turn to the second

18   page.  You see it says Appearances.  These are

19   appearances of counsel?

20       A.      Yes.

21       Q.      And on the bottom is -- highlighted is

22   Cahill, Gordon and Reindel by Howard G. Sloane and

23   Thomas Halket on behalf of Engelhard Corporation and

24   Glenn Hemstock.

25               Do you see that?



Page 94

1          A.      Yes.

2          Q.      Howard G. Sloane you understand to be

3     Peter Sloane?

4          A.      Yes.

5          Q.      Peter Sloane that you interacted with in

6     defense of the Emtal litigation?

7          A.      Yes.

8          Q.      And Thomas Halket I believe you said

9     earlier that that name was familiar to you?

10          A.      Yes.  Well, we heard it on the

11     introduction to the call but I did know Thomas.  We

12     briefly overlapped at Engelhard, too.

13          Q.      You worked together -- both worked

14     together for a brief time in the Legal Department at

15     Engelhard?

16          A.      Right.  We were both -- yes.

17                  (Pause.)

18                  (Exhibit 4 marked for identification.)

19                  MR. JARED PLACITELLA:  This is my

20     version.  I guess I only have my version but it's

21     okay.  Here you go.

22                  MR. DONOHUE:  For the witness?

23                  MR. JARED PLACITELLA:  Yup.  Here's

24     excerpts.

25          Q.      Mr. Hassett, in front of you what I've



Page 95

1    marked as Exhibit 4 for identification is a deposition

2    of Peter N. Gale taken on April 26, 1983 in that same

3    Westfall case.

4                    Do you see that?

5         A.      Yes.

6         Q.      Did you know that Peter Gale was a

7    geologist who worked for Engelhard?

8         A.      No.

9         Q.      I'm going to direct your attention to

10   Page 21 of the transcript.  It's Bates stamped 9732.

11        A.      I'm with you.

12        Q.      So starting at line 9.  If you could

13   follow along with me.

14                    The question is, "As I understand it

15   you've testified this morning that your first studies

16   on Johnson, Vermont, talc were done in the fall of

17   1978 utilizing x-ray diffraction instruments at

18   Engelhard Laboratories.  Is that correct?

19                    "Answer:  That's correct.

20                    "Question:  You testified that the

21   studies revealed the presence of talc, magnesite and

22   chlorite.  Is that correct?

23                    "Answer:  That's correct.

24                    "Question:  You testified next as I

25   understand it the following -- that following that



Page 96

1    study you performed a further study utilizing scanning

2    electron microscopy, transmission electron microscopy

3    and selected -- select area electron defraction at

4    Georgia Tech laboratories.  Is that correct?

5                    "Answer:  That's correct.

6                    "Question:  Was that just one study you

7    performed at Georgia Tech?

8                    "Answer:  I was at Georgia Tech on a

9    number of occasions" -- turn to the next page --

10   "looking at a sam -- number of samples each time.

11                   "Question:  You testified that your

12   analysis at Georgia Tech revealed the presence of

13   fibers and that the fibers were identified by you as

14   being chrysotile.  Is that correct?

15                   "Answer:  That's correct."

16                   Have you ever seen this testimony before

17   today where Mr. Gale testifies that he tested Johnson,

18   Vermont, talc at Georgia Tech and found chrysotile

19   asbestos?

20        A.    No.

21        Q.    Is today the first time you are ever

22   seeing the deposition of Peter Gale in the Westfall

23   case?

24        A.    Yes.

25        Q.    When was the first time you became aware



Page 97

1    of the Westfall case?

2         A.    I believe it was shortly after I learned

3    of the Martin case.

4         Q.    And under what circumstances in the

5    context of the Martin case did you learn about the

6    Westfall case?

7               MR. BRESS:  Do you need to speak with us?

8               THE WITNESS:  I may need some privilege

9    guidance, I'm sorry, to...

10              MR. BRESS:  Don't have to apol --

11              MR. JARED PLACITELLA:  Short break.

12              THE VIDEOGRAPHER:  The time is 12:54 p.m.

13   Off the record.

14              (At this time the witness and counsel

15   leave the deposition room at 12:54 p.m.)

16              THE VIDEOGRAPHER:  The time is 1 p.m.

17   We're on the record.

18              MR. JARED PLACITELLA:  Pat, can we have

19   that last question read back?  Thank you.

20              (The following question is read back by

21   the reporter:

22              "Question:  And under what circumstances

23   in the context of the Martin case did you learn about

24   the Westfall case?")

25        A.    Plaintiffs or their counsel raised some



Page 98

1   allegations that referred back to the Westfall case

2   and anything else I could say about this would be

3   subject to attorney-client privilege.

4          Q.    Without getting into specific

5   communications who did you communicate with about the

6   Westfall case in the context of the Martin case?

7          A.    In the context of?

8          Q.    The Martin case?

9          A.    Well, I -- I -- who did I communicate

10  about the Westfall case?

11         Q.    Right.

12               MR. DONOHUE:  Who did you communicate

13  with?

14         A.    Arthur and Howard Merten.

15               That's all I can specifically remember.

16         Q.    What were the allegations of the

17  plaintiffs counsel that you're referring to?

18               Sorry.  In your previous answer you said

19  there was allegations made by the plaintiffs counsel

20  in the Martin case that referred to the Westfall case.

21               What were those allegations?

22         A.    I don't -- I don't think I can go into

23  that without running into the same privilege issue.

24         Q.    Okay.  I'm not asking what, you know,

25  Arthur Dornbusch, Cahill or anybody else told you, but



Page 99

1    what's your understanding of the allegations raised by

2    the plaintiff counsel?

3           A.      But my understanding even -- even the

4    allegations themselves all came through Howard Merten

5    so I don't -- I don't have a --

6                  MR. DONOHUE:  Can you say generally what

7    the allegations were?

8                  MR. BRESS:  Do you -- maybe you could

9    ask if he knows the answer to the question you're

10   asking?

11          A.      I do know some -- some -- at least one

12   item that would be responsive.

13                 MR. BRESS:  Can I find out?

14                 MR. JARED PLACITELLA:  Sure.

15                 MR. BRESS:  Trying to help you

16   guys here.

17                 MR. JARED PLACITELLA:  Sure.  Why

18   don't -- do we have to go off the record or...

19                 MR. BRESS:  Well, yeah.  Go off just so

20   the tape's not running.

21                 MR. JARED PLACITELLA:  Sure.

22                 THE VIDEOGRAPHER:  Our time is 1:03 p.m.

23   Off the record.

24                 (At this time the witness and counsel

25   leave the deposition room at 1:03 p.m.)



Page 100

1          THE WITNESS:  Okay.

2          THE VIDEOGRAPHER:  The time is 1:04 p.m.

3    On the record.

4    BY MR. JARED PLACITELLA:

5          Q.    Okay.  Mr. Hassett, before we broke I

6    believe the question I raised to you was what is your

7    understanding of the allegations raised by the

8    plaintiffs counsel relating to the Westfall case in

9    the context of the Martin case?

10         A.    My understanding was that plaintiffs

11   were alleging they had an expert with some kind of

12   ties to the Westfall case who was prepared to offer

13   some sort of evidence of asbestos content in the

14   Engelhard -- in the Emtal talc.

15         Q.    And was this the first time that you --

16   you heard of evidence that someone had -- that

17   Engelhard's Emtal talc contained asbestos?

18              MR. BRESS:  Objection to form.

19         A.    All I heard was an allegation and this

20   was the -- the first specific allegation of that kind.

21         Q.    Okay.  There is one more area that Mr.

22   Dornbusch discusses in his disclosures.  Maybe we

23   could go through that and then take a lunch break --

24              MR. DONOHUE:  Sure.

25         Q.    -- if that's okay.  Figured that would



Page 101

```
 1   be a clean break.

 2              So if we turn back to Exhibit 203,

 3   please.

 4              THE WITNESS:  Thanks.

 5        Q.    The fourth area that Mr. Dornbusch

 6   believes you have knowledge of is the retention of

 7   records and documents related to Engelhard's BASF --

 8   Engelhard/BASF talc and asbestos-related litigation.

 9   Do you see that?

10        A.    Yup --

11        Q.    What do --

12        A.    -- I do.

13        Q.    What do you recall about that?

14              MR. BRESS:  Objection.  Form.

15        A.    Well, I don't have anything to add to

16   what we discussed earlier about files on the specific

17   cases --

18        Q.    Mm'mm.

19        A.    -- I was involved in, and there -- you

20   know, the only other thing I -- I can think of that

21   would be responsive here is the company had a general

22   policy on retaining records and it included the

23   requirement to the maintain litigation records for a

24   certain period of time and then destroy them at the

25   end of that period and, of course, everybody
```



Page 102

1    understood there was a -- you know, for pending

2    litigation had to preserve records.

3         Q.      Mm'mm.

4         A.      But none of that was talc-specific.   It

5    was just general like the other types of records.

6         Q.      And in particular to the Emtal talc

7    litigation was it Engelhard's position that once a

8    case concluded that litigation files pertained to that

9    case could be destroyed?

10                MR. BRESS:  Objection.  Form.  Foundation.

11   I think you're also asking him for work product and

12   mental impression.

13                MR. JARED PLACITELLA:  I'm asking for

14   the general policy.

15                MR. BRESS:  Well, I don't -- I don't --

16   I don't know that you've established that he knows the

17   answer to that question but the way the question was

18   phrased I think called for him to offer you what is

19   essentially a legal conclusion on behalf of the

20   company so maybe there's a different way to rephrase

21   it.

22                MR. JARED PLACITELLA:  Sure.

23        Q.      Was it Engelhard's policy that

24   litigation records pertaining to a talc litigation

25   could be destroyed after that particular case



Page 103

1   concluded?

2                    MR. BRESS:  Objection.  Form.  Foundation.

3                    THE WITNESS:  Should I answer?

4                    MR. DONOHUE:  You could answer.

5        A.      First, there was no -- a no policy of

6   any kind specific to talc litigation.

7        Q.      Okay.

8        A.      There were policies applicable to

9   litigation generally and they did allow -- you know,

10  they had both preservation and then permitted

11  destruction but the understanding that -- that you

12  needed to preserve documents for any open claim would

13  override the permitted destruction.

14       Q.      Was it Engelhard's policy that following

15  the conclusion of a specific litigation that doc --

16  litigation documents pertaining to that litigation

17  could be discarded?

18                   MR. BRESS:  Objection.  Form.  Foundation.

19       A.      I -- yeah.  I'm not -- I'm not sure I

20  fully understand the question.

21                   The policy had a -- a preservation

22  period and then at the end of that, you know,

23  destruction.

24       Q.      That preservation period would be at

25  least until the end of the litigation.  Is that fair?



Page 104

1           MR. BRESS:  Objection to form.

2      A.      Yeah.  I -- I believe it was for a

3  period after that but I -- I don't really remember the

4  specifics of the retention policy.

5      Q.      Okay.  And when you said in your prep I

6  believe that you reviewed an Engelhard record

7  retention policy.  Is that fair?

8      A.      Yeah.  Reviewed the way I reviewed the --

9  the 50 -- 50-page thing.

10              I saw it was there.

11     Q.      Okay.  What was the date of this record

12 retention policy?

13     A.      I don't remember.

14     Q.      Okay.  When do you recall a record

15 retention policy at Engelhard first being implemented?

16     A.      I don't remember.

17     Q.      Okay.  Do you recall at whose direction

18 a record retention policy was initiated?

19     A.      You know, I don't -- I just don't

20 remember anything about the initiation of the policy.

21 It might even have occurred when I wasn't -- before I

22 started at Engelhard.

23              MR. JARED PLACITELLA:  You know what?

24 Let me show you one document before we take a break.

25              (Pause.)



Page 105

1          A.      Okay.

2          Q.      In front of you, Mr. Hassett, is what's

3    been marked as Exhibit 15 for identification.  It's a

4    memoranda from a G.A. Hemstock to all R and D

5    personnel dated March 7, 1984.  Subject:  Document

6    Retrieval Discontinued Operations.

7                  Do you see that?

8          A.      Yes.

9          Q.      Have you ever seen this document before?

10         A.      No.

11         Q.      Okay.  Were you still at Engelhard when

12   this document was issued?

13         A.      Poss -- I'm not sure.

14         Q.      Okay.  And it says, "It is the policy of

15   Engelhard Corporation to avoid the undue accumulation

16   of documents that are no longer likely to be needed in

17   our business operation.  The regular discarding of

18   outdated business records," and it goes on further --

19   three more lines.

20                  Do you see that?

21         A.      Yes.

22         Q.      Okay.  And it talks about -- at the end

23   of that paragraph it says -- pertains to the

24   "following discontinued operations," and Emtal is

25   listed.



Page 106

1          A.     Yes.

2          Q.     All right.  The first paragraph of -- I

3   mean, the first sentence of the second paragraph below

4   says, "All information contained in your files

5   pertaining to these operations should be withdrawn and

6   placed in files for discard."

7                 Do you see that?

8          A.     For discard -- yes.  I see the whole

9   thing, yes.

10         Q.     Okay.  And at the very bottom, the last

11  sentence says, "Please understand that it is our

12  intent to retain copies of those documents to be

13  preserved from discontinued operations only in our

14  central files and can be accessed there should the

15  need arise."

16                Do you see that?

17         A.     Yes.

18         Q.     When you were working at Engelhard in

19  the early 1980s were you aware of a document retention

20  policy specifically for discontinued operations?

21         A.     I -- I don't remember.

22         Q.     Okay.  Do you -- are you aware of any

23  Emtal-related documents that were collected pursuant

24  to this memo?

25         A.     No.



Page 107

1          Q.      Do you know who would have been in
2    charge of collecting such documents?
3          A.      No.  I mean, other than what's on the
4    face of the memo.
5          Q.      Would it surprise you if the memo was
6    drafted by the Legal Department?
7          A.      No.
8                  MR. BRESS:  Objection.  Form.
9          A.      No.
10          Q.      Do you know what documents pertaining to
11    Emtal were discarded pursuant to this memo?
12                  MR. BRESS:  Objection to form.
13          A.      No.
14          Q.      And do you know who would have discarded
15    documents related to Emtal pursuant to this memo?
16          A.      No.
17          Q.      Are you aware of any document retention
18    policies before this one in Exhibit 15?
19          A.      Before this memo that --
20          Q.      Yeah.
21          A.      -- we're looking at right now?
22                  No, I don't remember when the policy was
23    initiated.
24          Q.      Okay.  In the document retention policy
25    that you reviewed did the Legal Department have any



Page 108

1    role in drafting that policy?

2          A.      Yes.

3          Q.      Do you know who had a role in drafting

4    that policy within the Legal Department?

5          A.      I don't -- I think that Al McWilliams

6    who was the in-house lawyer who was the -- the sort

7    of -- the guy to go to on records retention questions

8    for the business departments would occasionally change

9    it to accommodate changes in the law or new

10   developments in records or whatever.

11         Q.      Do you know -- have you spoken with Al

12   McWilliams in any recent time?

13         A.      Al McWilliams passed away several years

14   ago.

15         Q.      Do you recall anybody else in the Legal

16   Department who would have input in what should be

17   included in an Engelhard's document retention policy?

18         A.      I -- no.

19         Q.      Two more questions before lunch.

20                 Was it Engelhard's policy to retain

21   documents pertaining to a certain business unit if

22   litigation was pending?

23                 MR. BRESS:  Objection.  Form.

24         A.      Well, certainly our policy and practice

25   in -- maintain documents relating to a pending



Page 109

1    litigation, how -- how far -- you know, relating

2    didn't necessarily include all documents for a

3    business unit.

4          Q.     Turning back to Exhibit 15.  You see

5    that it's to all R and D personnel, and one of the

6    business units that's listed is Emtal, correct?

7          A.     Okay.

8          Q.     If there was litigation pending

9    pertaining to Emtal was it Engelhard's retention --

10   was it Engelhard's policy to retain documents in the R

11   and D Department?

12               MR. DONOHUE:  Object to the form.

13               MR. BRESS:  Objection to form.

14   Foundation.

15         A.     And I think that when it came to

16   retention for pending claims or known claims the scope

17   of the claim was -- you can't answer that question

18   without understanding the scope of the claim.

19               I don't -- I don't really know the

20   details of the scope of Emtal's business.

21         Q.     But -- well, I'm just -- you understand

22   then in a general Emtal talc case the allegation is

23   that Emtal talc, you know, causes asbestos disease.

24   Is that fair?

25         A.     I understand that's alleged.



Page 110

```
 1          Q.      Right.  That's alleged.

 2                  So when those types of cases -- if that --

 3     if that case is pending was it Engelhard's policy to

 4     retain R and D documents relating to Emtal?

 5                  MR. BRESS:  Object to the form.

 6                  MR. DONOHUE:  Object to the form.

 7                  MR. BRESS:  Foundation.

 8          A.      Well, I mean, I don't know when, what

 9     case was pending or open.  I don't know what -- was

10     the research about a great potential new use for talc

11     that had nothing to do with asbestos cases?

12                  I don't know.

13                  I mean, the scope of the retention for

14     pending claims depends on the scope of the claims and

15     the scope of the records.

16          Q.      So --

17          A.      You're ask -- you're asking me to make

18     up all this stuff and I feel like I -- I don't know

19     anything about.

20          Q.      That's fair.  That's fair.

21                  If the Emtal talc claim alleges injury --

22     well -- alleges asbestos injury from Emtal talc --

23          A.      Right?

24          Q.      -- was it Engelhard's policy to retain R

25     and D documents relating to asbestos and Emtal?
```



Page 111

1                MR. BRESS:  Objection.

2                MR. DONOHUE:  Object to the form.

3                MR. BRESS:  Objection to form.

4        Q.     I --

5                MR. BRESS:  Asked and answered.

6        A.     And I don't -- the -- the policy

7   specifics relating to Emtal I was not involved in.  I

8   don't know the policy.

9                The specifics relating to Emtal I was

10  not involved in and don't know.

11               The knowledge I have of Engelhard's

12  retention policy and its practice on pending claims

13  I've already tried to describe as best I can.

14       Q.     Would you have expected working in the

15  in-house Legal Department at Engelhard that if cases --

16  Emtal cases pertaining to asbestos -- alleging asbestos

17  exposure were pending that R and D documents involving

18  Emtal and asbestos would be retained?

19               MR. BRESS:  Objection to form.

20               MR. DONOHUE:  Objection to form.

21               MR. BRESS:  Objection to form.

22               Hold on a second, Mike.

23               I think you're essentially asking him

24  for a legal judgment here so perhaps there's a way to

25  rephrase this without inviting a work product



Page 112

1   objection.

2                   MR. JARED PLACITELLA:  It's kind of the

3   pattern and process in the Legal Department.  I'm not

4   asking for his work product.

5                   MR. BRESS:  Well, you asked him if he

6   would expect something.  That's a little bit

7   different.

8                   MR. JARED PLACITELLA:  Sure.  Let me try

9   it this way.

10          Q.     Was it the pattern or practice of the

11   Legal Department to retain R and D -- Emtal R and D

12   documents that discussed asbestos if there were --

13   Emtal claims pending alleging injury from asbestos?

14                  MR. BRESS:  Objection.  Form.  Foundation.

15          A.     Well, I -- I think I've already said

16   our -- our practice was not to destroy documents

17   relating to a pending claim.

18          Q.     Okay.

19          A.     Without knowing the claim and without

20   knowing what happened to these documents that were to

21   be preserved I -- I just don't know how this -- I

22   don't know the claim.  I don't know the -- the scope

23   of what was actually supposed to be destroyed versus

24   retained.

25          Q.     I've got one question and I'll try and



Page 113

1    word it in an artfully way around the same context.

2              If litigation was reasonably foreseeable

3    involving allegations of injury -- asbestos injury

4    from Emtal talc was it the pattern and practice of the

5    Legal Department to retain R and D documents of Emtal

6    and asbestos?

7              MR. BRESS:  Objection.  Form.  Foundation.

8         A.    And --

9              MR. BRESS:  Calls for a legal conclusion.

10        A.    Yeah.  The specifics of how the -- I

11   don't even know if the regular policy existed in '84

12   and I don't know if I was working at Engelhard at this

13   time.

14        Q.    Mm'mm.

15        A.    And how pending claims and relevant

16   documents would have been assessed I -- I'd just be

17   guessing.  I...

18              MR. JARED PLACITELLA:  Okay.  Well,

19   let's break for lunch.

20              THE VIDEOGRAPHER:  The time is 1:23 p.m.

21   Off the record.

22              (Luncheon recess taken at 1:23 p.m.)

23              AFTERNOON SESSION

24              THE VIDEOGRAPHER:  Time is 2:03 p.m.

25   We're on the record.



Page 114

```
 1   BY MR. JARED PLACITELLA:

 2          Q.      All right.  Mr. Hassett, we are back

 3   after lunch.

 4                  I want to show you next what's been

 5   marked as Exhibit 57 for identification.

 6                  MR. VALE:  Thank you.

 7                  MR. JARED PLACITELLA:  Sure.

 8                  THE WITNESS:  Wait.  All -- all the

 9   other lawyers are telling me I'm not allowed to take

10   anything.

11          Q.      Mr. Hassett, what's in front of you is

12   what's been marked as Exhibit 57 for identification.

13   These are responses by Engelhard Corporation to

14   Plaintiff's First Set -- First Standard Set of

15   Liability Interrogatories in the Chernick case and

16   they are dated April 16th, 2002 if you look at the

17   last -- the second -- the last and second to last

18   pages.

19          A.      Okay.  I do -- I do see the two dates,

20   yes.

21          Q.      Have you ever seen these responses

22   before today?

23          A.      Yes.

24          Q.      Were these the responses that were

25   presented to you yesterday?
```



Page 115

1          A.      At least the significant portion of it.

2     I'm not sure if I had the whole thing yesterday.

3          Q.      I'd like to go through these with you.

4                  If you turn to the second page and the

5     response to Interrogatory 1.

6                  It says, "State the full name, address,

7     telephone number, position of the corporate officer

8     answering these Interrogatories."

9                  And response, "Michael J. Hassett,

10    Esquire, Associate General Counsel for Engelhard

11    Corporation, coordinated Engelhard's responses to the

12    second set."

13                 Do you see that?

14         A.      Yes.

15         Q.      Michael J. Hassett.  That's you?

16         A.      Yes.

17         Q.      What does it mean to coordinate

18    Engelhard's responses?

19         A.      In this particular case --

20         Q.      Mm'mm.

21         A.      -- it meant -- before we responded we

22    had retained the firm of Paduano and Weintraub as

23    counsel, and I asked them to work with Cahill to get

24    whatever information they needed to reply and that was

25    pretty much the extent of my coordination in a -- in



1    this case.

2          Q.     Did you have any personal knowledge when

3    answering these Interrogatories?

4                 MR. BRESS:  Objection.  Form.

5          A.     I did not.

6          Q.     So coordinates generally means that you

7    were the funnel of the information.  Is that fair?

8    And -- that your local counsel and Cahill would work

9    together and give you the information that was needed --

10         A.     No.

11         Q.     -- for these Interrogatories?

12         A.     That -- that is not --

13                MR. BRESS:  Objection to form.

14         A.     -- correct.

15         Q.     Then please explain it to me.

16         A.     They were able to work directly with one

17   another.  I wasn't necessarily a funnel or in the

18   middle of that communication.

19         Q.     So coordinates means you just put them

20   in touch and they responded to the Interrogatories?

21         A.     In this case, yes.

22         Q.     In this case.

23                And did you review the answers before

24   they were verified and served?

25         A.     I don't recall reviewing these specific



Page 117

1    Answers in this particular case.

2          Q.      Why was it decided that you'd be the one

3    to coordinate the Interrog -- coordinate the responses

4    to the Interrogatories?

5          A.      I don't remember.

6          Q.      Do you recall who tasked you with the

7    assignment to coordinate the Interrogatories?

8                  MR. BRESS:  Objection.

9          Q.      These Interrogatories?

10                 MR. BRESS:  Objection.  Form.

11         A.      In -- and I do not remember the answer --

12   I don't know the answer to that question.

13         Q.      Sure.

14         A.      I don't recall.

15         Q.      I want you to turn your attention to the

16   last page, please.

17         A.      Okay.  Is that the affirmation of

18   service?

19         Q.      Oh, sorry.  The Verification.

20         A.      Got it.

21         Q.      You see the third sentence, "Gideon Mark

22   verifies or affirms"?

23                 "Working in conjunction with Engelhard I

24   have prepared and reviewed the foregoing responses to

25   first standard set liability Interrogatories.  I know



1    the contents thereof to be true based on the factual

2    analysis conducted with and on behalf of Engelhard."

3                   Do you see that?

4         A.    Yes.

5         Q.    What factual analysis did Gideon Mark

6    conduct with Engelhard?

7                   MR. BRESS:  Objection.  Form.

8         A.    Well, I -- I don't know.

9                   I do remember speaking with Gideon on

10   the phone.

11                  My only knowledge was that the

12   available -- the records available at Cahill were I

13   thought all the company had so --

14        Q.    Mm'mm.

15        A.    -- you know, the -- but I think that's --

16   that's all -- all the analysis I'm aware of.

17        Q.    Okay.  So you coordinated the lawyers to

18   work together; not necessarily the responses.  Is that

19   fair?

20                  MR. BRESS:  Objection to form.

21        A.    I don't really --

22                  THE WITNESS:  I'm sorry.

23                  MR. BRESS:  Objection to form.

24                  MR. DONOHUE:  It was an objection to

25   form.  I'll join.



1          A.     And I don't -- I don't remember this

2     specific response that well.  That might be true but

3     I -- you know, I just don't remember it that well.

4          Q.     Did you ever read the actual

5     Interrogatories?

6          A.     I don't remember.

7          Q.     Okay.  So fair to say that you yourself

8     did not consult any records or speak to any

9     nonattorney personnel in answering these questions?

10         A.     Yes.

11         Q.     Would you agree with me that as an

12    officer of the Court it would be a violation of the

13    duty of candor to intentionally provide discovery

14    responses that a lawyer had reason to believe were

15    incomplete or misleading?

16              MR. DONOHUE:  Objection to form.

17              MR. BRESS:  Objection to form.

18              MR. DONOHUE:  You could answer.

19         A.     Yes.

20         Q.     Would you agree with me that plaintiffs

21    would make decisions and value cases based on the

22    information disclosed to them in discovery responses

23    such as in Exhibit 57?

24              MR. DONOHUE:  Objection to form.

25              MR. BRESS:  Join.



Page 120

```
 1          A.      I would say that's a logical surmise but
 2   I've never actually been involved in that process and
 3   I don't have any firsthand information.
 4          Q.      Would you expect that lawyers with
 5   historical knowledge of information would disclose the
 6   information to individuals certifying Interrogatories
 7   or coordinating Answers To Interrogatories --
 8                  MR. DONOHUE:  Object.
 9          Q.      -- like this to insure that they are
10   complete and accurate?
11                  MR. DONOHUE:  Objection to form.
12                  MR. BRESS:  Join.
13                  MR. DONOHUE:  You may answer.
14          A.      Could you repeat that -- the beginning --
15   read the question please.
16          Q.      Sure.
17                  (Last question read back by the reporter.)
18          A.      So if a lawyer was in possession of
19   information and was asked to participate in some way
20   in the response would they disclose relevant
21   information?
22          Q.      Would you expect that they would disclose
23   that to you?  Yes.
24                  MR. BRESS:  Objection.  Form.
25          A.      And I -- I believe in general they
```



Page 121

1    should.

2          Q.     So if Mr. Dornbusch had information in

3    his possession that contradicted responses to these

4    Interrogatories would you believe that he had an

5    obligation to disclose that information to you so that

6    you could provide honest and complete answers as the

7    corporate officer coordinating these responses?

8                 MR. DONOHUE:  Objection to form.

9                 MR. BRESS:  Objection to form.

10         A.     If Mr. Dornbusch knew of the response

11   and read it closely enough to realize it was incorrect

12   I believe he should have and would have said

13   something.

14         Q.     If Peter --

15         A.     And -- and it was -- I mean, assuming it

16   was incorrect as well.

17         Q.     If Peter Sloane had information in his

18   possession contradicting responses to these

19   Interrogatories would you -- do you believe that he

20   had an obligation to disclose that information to you

21   so that you could provide honest and complete answers

22   as the corporate officer coordinating these responses?

23                MR. DONOHUE:  Objection to form.

24                MR. BRESS:  Objection to form.

25         A.     Well -- you know, as with Arthur, if --



Page 122

1    if he knew about the inquiry and the response and knew

2    that it was incorrect and he had information that he

3    felt he was not required to withhold because of

4    privilege or anything else -- but -- you know, I don't

5    have any reason to believe that either Peter Sloane or

6    Arthur saw this.

7              Q.      Okay.

8              A.      So I -- you're asking me a hypothetical

9    question.

10                     My answer is generally if somebody has

11   information and they're -- it's within the control of

12   the Respondent and they know -- they're being asked

13   whether it's correct or not and they know it's not,

14   yeah, they should -- they should advise the -- the

15   Respondent that it's incorrect but that -- that's a

16   general hypothetical answer.

17                     I -- I don't have any knowledge of what --

18   what either of those people saw in this matter.

19             Q.      So if Arthur Dornbusch had the Westfall

20   deposition transcripts that we went over earlier in

21   his possession or he knew about them do you believe

22   that he had an obligation to disclose that information

23   to you so that you could provide an honest and

24   complete answer as the corporate officer coordinating

25   these responses?



Page 123

```
 1                    MR. BRESS:  Objection --

 2                    MR. DONOHUE:  Objection to form.

 3                    MR. BRESS:  -- to form.

 4                    You're now also just -- you're asking

 5      for basically legal judgments and mental conclusions,

 6      mental impressions.

 7                    MR. JARED PLACITELLA:  That's fine.  He

 8      could answer.

 9                    MR. BRESS:  I'm not sure he can the way

10      you phrased that.

11                    MR. JARED PLACITELLA:  Let's see if he

12      can.  You don't have to instruct him.

13                    MR. DONOHUE:  Well -- okay.

14                    I -- I think what Mr. Bress was getting

15      at was -- if he's talking about mental impressions and

16      conclusions that it could be attorney work product

17      but --

18                    MR. BRESS:  Correct.

19                    MR. DONOHUE:  -- so that would be

20      something that I would not want the witness to divulge.

21            Q.      If Dornbusch had -- if Mr. Dornbusch had

22      the Westfall deposition -- depositions that we

23      discussed earlier in his possession or was aware of

24      them would you hope that he would disclose that

25      information to you so that you can provide honest and
```



Page 124

1    complete answers as the corporate officer coordinating

2    these Interrogatory responses?

3                    MR. BRESS:  I have to --

4                    MR. DONOHUE:  Objection to form.

5                    MR. BRESS:  I have --

6                    MR. DONOHUE:  You can answer that.

7                    MR. BRESS:  I have to object to form but

8    I also think that as phrased I don't see how you can

9    answer that without disclosing work product.  If

10   you're able to...

11                   MR. JARED PLACITELLA:  It's not attorney

12   work product.

13         Q.    You can answer?

14                   MR. DONOHUE:  Well, I'm going to -- I'm

15   not going to --

16                   MR. BRESS:  I need -- I need to talk --

17   I -- I...

18                   I'm going to have to step outside with

19   the witness then.  I'm going -- if you're going to

20   persist with the line of questioning.

21                   MR. JARED PLACITELLA:  Be my guest.

22                   MR. DONOHUE:  All right.

23                   MR. JARED PLACITELLA:  Do what you got

24   to do.

25                   MR. DONOHUE:  Let's go.



Page 125

1                       THE VIDEOGRAPHER:   The time is 2:18 p.m.

2    Off the record.

3                       (At this time the witness and counsel

4    leave the deposition room at 2:18 p.m.)

5                       THE VIDEOGRAPHER:   The time is now 2:34

6    p.m.   On the record.

7                       MR. JARED PLACITELLA:   Before our break

8    I believe I had a question pending.

9                       Pat, would you mind reading it back for

10   us.

11                      (The following question is read back by

12   the reporter:

13                      "Question:   If Mr. Dornbusch had the

14   Westfall depositions that we discussed earlier in his

15   possession or was aware of them would you hope that he

16   would disclose that information to you so that you can

17   provide honest and complete answers as the corporate

18   officer coordinating those Interrogatory responses?")

19          A.       So I --

20                      MR. BRESS:   Objection to form.

21                      MR. DONOHUE:   Join.

22          A.       I mean, you're -- you're asking me to

23   assume that Mr. Dornbusch had these depositions, that

24   he was aware of the Interrogatory, that he knew the

25   depositions would be responsive to something in the



Page 126

1    Interrogatory and that he consulted me about whether

2    to include them or not, and I just -- I don't know.

3    It's -- it's too many ifs.

4              I cannot answer the -- the question.

5         Q.    So let's turn to Page 35 of the

6    Interrogatories.

7         A.    35.  Okay.

8         Q.    Interrogatory 63.  Do you see that?

9         A.    Yes.

10        Q.    It says, "If any of your employees or

11   officers have testified at trial or by deposition or

12   before any Congressional committee or administrative

13   agency concerning asbestos exposure, pulmonary or

14   asbestos-related diseases or industrial hygiene

15   relating to asbestos, state," and it says A through D.

16             Do you see that?

17        A.    Yes.

18        Q.    And you see the response to number 63

19   says "no."  Do you see that?

20        A.    Yes.

21        Q.    Would you agree with me that Exhibits 3

22   and 4, the depositions of Dr. Hemstock and Mr. Gale in

23   the Westfall case, would be responsive to this

24   Interrogatory?

25             MR. BRESS:  Okay.  That I'm going to



Page 127

1    instruct you not to answer.  That really is asking for

2    his legal judgment.

3                    MR. JARED PLACITELLA:  He coordinated

4    the responses.  He's the corporate officer answering

5    the questions on behalf of the company.  He should --

6                    MR. BRESS:  He's testified that when you

7    said he coordinated the responses he put two outside

8    counsel together.

9                    MR. JARED PLACITELLA:  But he's

10   ultimately responsible --

11                   MR. DONOHUE:  Wait a minute.  He didn't

12   sign the Verification.

13                   MR. JARED PLACITELLA:  Right.  Fair.

14                   MR. DONOHUE:  So -- and, you know,

15   certainly I don't want to mischaracterize what his

16   role was in --

17                   MR. JARED PLACITELLA:  Sure.

18                   MR. DONOHUE:  -- coordinating.

19                   MR. JARED PLACITELLA:  How about this?

20        Q.    Mr. Hassett, reading that Interrogatory

21   and now knowing about Exhibits 3 and 4, the Hemstock

22   deposition and Mr. Gale's deposition from the Westfall

23   case, would you have expected that those answering

24   these Interrogatories on behalf of the company would

25   include -- would identify those transcripts in



Page 128

1   response to our -- Interrogatory 63?

2                    MR. BRESS:  Can you repeat the question?

3   Or read it back, please.

4                    MR. DONOHUE:  Read it back.

5                    (Last question read back by the

6   reporter.)

7                    MR. BRESS:  Again, I think maybe there's

8   some other way to rephrase it but I think you're

9   asking for his mental impressions about how he regards

10  certain documents as relevant to a certain

11  Interrogatory.

12       Q.    Do you know the answer to my question,

13  Mr. Hassett?

14       A.    Well, I think your question is asking

15  for my opinion.

16                    Are you asking for my opinion or my --

17  what my course of conduct would have been?  I'm not

18  quite sure...

19       Q.    Well, how about this question?

20                    If you knew about the Hemstock and Gale

21  depositions would you have insured that they would

22  have been identified in response to Interrogatory

23  Number 63?

24                    MR. BRESS:  Objection to form.

25                    MR. DONOHUE:  Same.



Page 129

1          A.      You know, I -- I still am not fully

2    familiar with those documents although we did look at

3    excerpts today.

4                  Based on what I saw in the excerpts I

5    would certainly consult experienced litigation counsel

6    and possibly get some technical assistance before I

7    give a simple no in response to this question but

8    beyond that I don't know.

9          Q.      Okay.  If Cahill Gordon had possession,

10   custody or control of Exhibits 3 and 4, the Hemstock

11   and Gale Westfall transcripts, would you have expected

12   them as your lawyers -- as Engelhard's lawyers to

13   disclose those deposition transcripts to you when

14   coordinating the responses to Interrogatory Number 63?

15                  MR. BRESS:  Objection form.

16                  MR. DONOHUE:  I have an objection to

17   form and -- and a continuing objection.

18                  And I've let this go for awhile but --

19   but this witness is a fact witness.

20                  You've asked a series now of

21   hypothetical questions about which this witness has no

22   factual knowledge so, you know, I'm -- I'm hoping at

23   some point you're going to cut off this line of

24   hypotheticals.

25                  MR. JARED PLACITELLA:  Okay.



Page 130

1          Q.     You can answer.

2          A.     What was the question again?

3                 (The following question is read back by

4     the reporter:

5                 "Question:  If Cahill Gordon had

6     possession, custody or control of Exhibits 3 and 4,

7     the Hemstock and Gale Westfall transcripts, would you

8     have expected them as your lawyers -- as Engelhard's

9     lawyers to disclose those deposition transcripts to

10    you when coordinating the responses to Interrogatory

11    Number 63?")

12         A.     So I have to assume they had -- assume

13    that the lawyer working on -- assuming the division of

14    labor between Tony Paduano's firm and Cahill was such

15    that a Cahill lawyer was looking at these

16    Interrogatories, that it was the same Cahill lawyer

17    who knew about the Affidavits or the -- excuse me --

18    the -- deposition transcripts and -- and make some

19    judgment about whether I'm supposed to make my

20    judgment about whether there was any privilege or not

21    and then answer?

22                I -- it seems -- it's -- I can't do it.

23    It's too much.

24         Q.     Well, we saw the -- Exhibit 3, the

25    Hemstock deposition Peter Sloane was present for,



Page 131

1    right?

2              MR. BRESS:  Objection.

3         Q.    He was on the Appearance list?

4         A.    We can -- I don't remember that.  I --

5         Q.    Would you like to look at that again?

6         A.    If you want, sure.

7              MR. DONOHUE:  Exhibit 3.

8         A.    So this is deposition -- this is Peter

9    Sloane.  Okay.

10             Yes.  He was on -- yes, he was on the

11   appearances for the Hemstock deposition we looked at.

12        Q.    And do you recall that Peter Sloane

13   helped coordinate with you these Answers To

14   Interrogatories?

15             MR. DONOHUE:  Objection to form.

16             MR. BRESS:  Join.

17        A.    And in -- in any specific case including

18   the Chernick case --

19        Q.    Mm'mm.

20        A.    -- I am not sure if Peter Sloane was

21   involved and I -- I hope -- I don't think I said that.

22             Cahill -- Cahill did provide counsel

23   referrals and they did maintain some records but, you

24   know, as to exactly who did what within Cahill on this

25   particular case I do not know.



Page 132

1          Q.      Sure.  But Cahill, the law firm, knew

2     about the Hemstock deposition.  Is that fair?

3                    MR. BRESS:  Objection to form.

4                    MR. DONOHUE:  Objection to form.

5          A.      The only reason I know -- the only

6     reason I know anything about that is because you just

7     showed me the appearance by Peter Sloane in the

8     deposition.

9          Q.      Right.  And Cahill helped answer these

10    Interrogatories with the Paduano and Weintraub law

11    firm.  Is that fair?

12                   MR. DONOHUE:  Objection to form.

13         A.      I -- yeah.  I did ask Tony -- Tony

14    Paduano's firm to get information from Cahill and I

15    don't know anything about the division of labor that --

16    or the communications that occurred after that between

17    the two.

18         Q.      So what information in these

19    Interrogatories would have been in the possession of

20    Paduano and Weintraub?

21                   MR. BRESS:  Objection.  Form.

22         A.      None that I know of.

23         Q.      Right.  All the information had to have

24    come from Cahill Gordon.  Is that fair?

25         A.      As far as I know.



Page 133

1           Q.      Right.  So Cahill Gordon provided
2    Paduano Weintraub law firm with the information to
3    respond to these Interrogatories, correct?
4           A.      I -- you know, I -- as far as I know,
5    yes.
6           Q.      Right.  So would you as the corporate
7    officer answering these Interrogatories that Cahill
8    provided the factual basis for expect that Cahill
9    would disclose the Hemstock deposition and the Gale
10   deposition when you answer Interrogatory Number 63?
11                  MR. DONOHUE:  Same objection to form.
12                  MR. BRESS:  Objection to form.
13                  MR. DONOHUE:  Asked and answered.
14          A.      And, again, I have to -- you -- you're
15   assuming...
16                  I mean, I don't know who at Cahill
17   worked on what, who knew about the Hemstock deposition.
18   I don't know what if any privilege they might have
19   been considering.  I just -- I don't know -- I don't
20   know as a factual matter what happened.
21                  You're asking me I think to make some
22   guesses about what might have happened.
23                  I could make guesses but it wouldn't be
24   knowledge.
25          Q.      So I was going to go through all these --



Page 134

1    many of these Interrogatories and ask what the factual

2    basis was for the response.

3              Is it fair that you do not know what the

4    factual basis is for any response to these

5    Interrogatories that you coordinated the Answers for?

6              MR. BRESS:  Objection.  Form.

7        A.    It -- it is fair to say that I don't

8    have firsthand knowledge of any of these responses I

9    believe and I haven't read the replies in detail.

10       Q.    Mm'mm.

11       A.    And I didn't -- I didn't recall them --

12   the -- I've just seen parts of them as of the last few

13   days but in general I didn't have any personal

14   knowledge of the talc business.

15             MR. JARED PLACITELLA:  Pat, I'm sorry.

16   Could you read back my question.

17             (Last question read back by the reporter.)

18       Q.    Can you answer that question?

19             MR. BRESS:  Objection.  Form.

20             I think he did answer the question.

21       A.    Yeah.  Maybe I -- I don't know.  Maybe I

22   misunderstood part of the question.

23             I didn't have personal knowledge of the

24   talc business.

25             My understanding was that information



Page 135

1    about the -- the talc business and the talc had been

2    collected at Cahill Gordon and the factual source that

3    I was -- the factual source that I was aware of would

4    have been that information.

5         Q.    In answering these specific

6    Interrogatories no one at Cahill provided factual

7    information responses.  Is that fair?

8              MR. BRESS:  Objection --

9              MR. JARED PLACITELLA:  Wait.  Scratch

10   that.

11        Q.    Is it fair that --

12             MR. DONOHUE:  You mean to say is it fair

13   to say?

14        Q.    Is it fair to say that no one at

15   Engelhard provided factual information responding to

16   these Interrogatories?

17             MR. BRESS:  Objection to form.

18        A.    Well, again, maybe I -- I haven't read

19   all those Interrogatories and I don't remember

20   anything about them from 16, 17 years ago, whenever it

21   was, but as it -- as it relates to the talc business

22   which I think is probably what you're interested in, I

23   don't recall doing any canvassing within Engelhard to

24   answer these Interrogatories.

25        Q.    Do you know of -- not just these -- of



Page 136

1    any Interrogatories where Engelhard provided the

2    factual information that was called for in response?

3                    MR. BRESS:   Objection to form.

4          A.     Well, we're just talking about the --

5    you're not talking about litigation.  You're just

6    talking about the handful of talc -- nontire worker

7    talc cases --

8          Q.     Right.

9          A.     -- I was involved with, right?  Okay.

10                I -- I don't recall -- you know, other

11   than information I might have been able to provide

12   about when was the company incorporated or something,

13   but when we're talking about the talc business I don't

14   recall the -- you know, canvassing within the company

15   for information because I -- the business had been

16   closed for years, the mine had been closed for years.

17                My understanding was the information had

18   already been collected.  I didn't -- I didn't think

19   there was anything to -- to get.  It was different

20   than other litigations because of that.

21         Q.     Right.

22                Cahill had the documents you said in

23   its --

24         A.     I --

25         Q.     -- possession?



Page 137

1          A.      My -- my understanding was Cahill had

2     the information on the talc business.

3          Q.      And you never spoke to a former or

4     current employee to get information to respond to a

5     discovery response in a talc case.  Is that fair?

6          A.      That -- that is my recollection.

7          Q.      Do you know whether Engelhard -- I mean,

8     do you know whether Cahill ever spoke to a current or

9     former employee to get information to respond to a

10     discovery request in a talc case?

11          A.      Ever or the ones I handled?

12          Q.      Well, let's start with the ones you

13     handled first.

14          A.      Not that I know of.

15          Q.      How about ever?

16          A.      I don't have personal knowledge.  I -- I

17     could surmise something but the short answer is I

18     don't know.

19          Q.      Okay.  Could we turn to Page 37, please,

20     or 36.

21                  In response to Interrogatory Number 65

22     on Page 37 the first full paragraph, all right?

23                  It says that...

24                  MR. JARED PLACITELLA:  Next.

25          A.      Page 37?



Page 138

1         Q.      Yeah.

2         A.      The talc that Engelhard sold to Bondo?

3         Q.      Exactly right.

4         A.      Okay.

5         Q.      It says, "The talc that Engelhard sold

6    to Bondo was sold through Engelhard's former

7    subsidiary Emtal later known as Pita.  The only talc

8    mine operated by Emtal and accordingly Engelhard was

9    located in Johnson, Vermont.  Emtal produced talc from

10   that mine from October 1967 when Emtal acquired the

11   mine until 1983 when the mine was closed for economic

12   reasons.  A number of analysis of the Johnson mine

13   have been conducted and all of them have concluded

14   that the talc produced from this mine did not contain

15   asbestos."

16              Do you see that?

17        A.      Yes.

18        Q.      After reviewing the excerpts from the

19   Westfall deposition shown to you today is "a number of

20   analysis of the Johnson mine have been conducted and

21   all of them have concluded that talc produced from

22   this mine did not contain asbestos," is that a true

23   statement?

24              MR. BRESS:  Objection to form.

25   Foundation.



Page 139

1           A.      Well, at the time this Interrog -- at

2     the time of this response to the Interrogatories it

3     was true to my knowledge.  It may be -- it may be

4     inconsistent with some of the stuff we looked at

5     earlier today.

6           Q.      Mm'mm.

7           A.      But I am not really an expert on

8     asbestos and I did not really read any of those things

9     fully or carefully so I'm not -- I'm not in a great

10    position to give you an opinion on whether it's true

11    in light of everything that everybody knows about

12    today except me basically.

13          Q.      Right.  I'm not saying that you knew

14    about that evidence when you -- when these

15    Interrogatories was coordinated.

16          A.      Yeah, but I -- I -- it's hard for me to

17    assess the --

18                  THE WITNESS:  I'm sorry.

19          Q.      Sure.

20          A.      Sorry.

21          Q.      So I'm saying a number of analysis of

22    the Johnson mine have been conducted and all of them

23    have concluded that the talc produced from this mine

24    did not contain asbestos.

25                  Knowing now that Engelhard scientists



1  testified that they had found asbestos in the Johnson

2  mine do you believe that to be a true statement?

3              MR. BRESS:  He's already answered this

4  question.

5       A.    Again --

6              MR. BRESS:  Objection to form and

7  foundation.

8       A.    I looked at the stuff you showed me

9  earlier today and it suggests that there's more to

10 this than I realized 17 years ago, 16 -- whatever --

11 but I -- I'm not an expert.  I don't know of looking

12 at three paragraphs in an 80-page pile is enough to --

13 for me to start drawing conclusions.

14      Q.    Okay.  And it's fair to say that in your

15 plain reading of this Interrogatory there is no

16 equivocation in that sentence?

17             MR. BRESS:  Objection to form.

18             MR. DONOHUE:  Object.

19             MR. BRESS:  Now I think you're -- you're

20 crossing the line into getting him to interpret an

21 offer work product of -- of this document.

22             MR. JARED PLACITELLA:  A work product

23 that was -- that he coordinated the Answers to and was

24 served by Engelhard and served in litigation?

25             MR. BRESS:  If you want to try to -- if



Page 141

```
 1   you want to try to rephrase the question a different

 2   way, but I think now you're starting to -- you're

 3   before asking him hypotheticals.  You're assuming

 4   facts.  You're asking him to assume facts that he

 5   doesn't know.

 6              MR. JARED PLACITELLA:  I'm not asking --

 7              MR. BRESS:  Now you're asking him a

 8   different type of question.

 9              You're asking him for -- for something --

10   for his mental impressions and legal judgment on

11   something that was written.

12              We've let you go on with the

13   hypotheticals which are completely improper.  We've

14   let you asked them.  We've given you plenty of time to

15   ask them and he's done his best to answer, but I think

16   now you're turning the corner and you need to rephrase

17   the question or more likely engage in a more line -- a

18   different line of questioning because this question to

19   me is not appropriate.

20              MR. JARED PLACITELLA:  Is that a form or

21   foundation objection?

22              MR. BRESS:  I've objected --

23              MR. DONOHUE:  Form.

24              MR. BRESS:  -- on a work product and

25   form and foundation.
```



Page 142

1              If there's a way to rephrase the

2    question --

3              MR. JARED PLACITELLA:  So are you not

4    going to allow him to answer the question?

5              MR. BRESS:  What is the question again?

6         Q.    The question is in this sentence a

7    number of analysis of the Johnson mine have been

8    conducted and all of them have concluded that the talc

9    produced from this mine do not contain asbestos.

10             Is there any equivocation in that

11   statement?

12             MR. BRESS:  You're -- hold on a second.

13             (Pause.)

14             MR. DONOHUE:  The problem I have with it

15   is it's argumentative and it -- it's asking for his

16   opinion of somebody else's sentence if there's

17   equivocation, right?  I mean, how evidential is that

18   or likely to lead to evidence?

19             MR. JARED PLACITELLA:  Well, I'm not

20   trying to be -- I'm not trying to be argumentative

21   with Mr. Hassett at all and I understand --

22             THE WITNESS:  You've been very courteous

23   about that.  I'm not complaining.

24             MR. JARED PLACITELLA:  I understand that

25   he did not write this.  I'm not even sure if he ever


MAGNA
LEGAL SERVICES

Page 143

1  saw it before it was served so I'm just asking because

2  he was the corporate officer who was supposed to be

3  responding to these Interrogatories -- and my

4  understanding of Interrogatories is they have to be

5  certified or responded to by the client and not a

6  lawyer.  I want to know if there's any equivocation in

7  that sentence.

8            MR. DONOHUE:  Well, my understanding is

9  that's not what happened in this case; that somebody

10  else certified the Answers.

11            So the questions you're asking about

12  whether this witness can interpret a sentence that

13  somebody else apparently wrote is an improper

14  question.

15            MR. JARED PLACITELLA:  Well, I don't

16  know.  He -- I don't need to argue --

17            MR. DONOHUE:  He didn't certify it, Jared.

18            MR. JARED PLACITELLA:  Yeah, but he

19  worked with -- in conjunction with Engelhard --

20            MR. DONOHUE:  And he told you what that

21  limited role was.  Come on.

22            MR. JARED PLACITELLA:  Okay.

23            THE WITNESS:  Doesn't the thing sort of

24  speak for itself anyway?

25            MR. JARED PLACITELLA:  Can I have my



1    question back one more time.  Sorry.

2                    (The following question is read back by

3    the reporter:

4                    "Question:  The question is in this

5    sentence a number of analysis of the Johnson mine have

6    been conducted and all of them have concluded that the

7    talc produced from this mine do not contain asbestos.

8    Is there any equivocation in that statement?"}

9                    MR. BRESS:  So, look.  If you're going

10   to -- if you're going to persist I got to take a quick

11   break.

12                   MR. JARED PLACITELLA:  What's the break?

13   Is it discussing a privilege issue?

14                   MR. BRESS:  I need to think about the

15   privilege issue, yeah, so I need to take a quick

16   break.

17                   This is all improper questioning.  It's

18   not asking anybody's factual knowledge or anything.

19   It's asking him for some kind of legal opinion,

20   possibly work product.  So let me go off the record.

21                   MR. JARED PLACITELLA:  Fine.

22                   THE VIDEOGRAPHER:  The time is 3 p.m.

23   Off the record.

24                   (Recess taken at 3:00 p.m.)

25                   THE VIDEOGRAPHER:  The time is now 3:04



Page 145

1    p.m.  On the record.

2                   MR. JARED PLACITELLA:  Before -- I

3    believe before the break there was a question pending,

4    Pat.  Can you read that back for us, please.

5                   (Same last question read back by the

6    reporter.)

7                   MR. BRESS:  So are you asking him for

8    his mental impressions of the statement?

9                   MR. JARED PLACITELLA:  I think the

10   question stands.

11                  MR. BRESS:  So what are you asking for

12   if you're not asking for his mental impressions?

13   That's the -- that's the issue I'm having because I

14   don't understand how he can answer that question without

15   giving you his mental impressions so the question to

16   you is what are you asking for here?

17        Q.     Mr. Hassett, do you understand my

18   question?

19                  MR. BRESS:  Well, that's --

20        A.     I believe I understand the question.

21        Q.     Are you able to answer my question?

22        A.     Yes, I could answer the question.

23                  MR. JARED PLACITELLA:  Are you going to

24   let him answer the question?

25                  MR. BRESS:  But I've asked you my



Page 146

1   question which is --

2               MR. JARED PLACITELLA:  I'm asking the

3   questions here.

4               MR. BRESS:  Well, I've asked for

5   clarification on the question because I --

6               MR. JARED PLACITELLA:  He understands

7   the question.

8               MR. BRESS:  That's not the issue.

9               The issue is that the question I think

10  is asking for his mental impression.

11              I've asked you to clarify how it -- how

12  it may not be and you haven't done so so on that basis

13  I have to instruct him not to answer.

14              MR. JARED PLACITELLA:  Okay.

15  BY MR. JARED PLACITELLA:

16      Q.    But for that instruction you would be

17  able to answer the question.  Is that fair?

18      A.    If I -- I think so.

19      Q.    Okay.  All right.

20              MR. JARED PLACITELLA:  Before I go any

21  further how much time will you need?

22              MR. BRESS:  I'm not planning to...

23              MR. JARED PLACITELLA:  Okay.

24              Here's 24.

25              MR. DONOHUE:  I need about two hours.



Page 147

```
 1                MR. JARED PLACITELLA:  And, Tony, do you
 2    need any time?
 3                MR. VALE:  To ask questions?
 4                MR. JARED PLACITELLA:  Yeah.
 5                MR. VALE:  I don't think so.
 6                MR. JARED PLACITELLA:  Okay.
 7                MR. VALE:  I'm sorry.  What -- what was
 8    your answer, Dan?
 9                MR. BRESS:  I'm -- I'm not planning to.
10    See what happens with the rest.
11                MR. JARED PLACITELLA:  Tony, you want a
12    copy of this?
13    BY MR. JARED PLACITELLA:
14         Q.    In front of you, Mr. Hassett, is what's
15    been marked as Exhibit 124 for identification and it's
16    a May 3rd, 2002 letter from Gideon Mark to Mark Strauss.
17                Do you see that?
18         A.    Yes.
19         Q.    Have you ever seen this letter before
20    today?
21         A.    It -- I don't remember it.
22         Q.    Okay.  This letter's dated May 3rd,
23    2002.  So about three weeks after the Interrogatories
24    were verified and served that we just discussed in
25    Exhibit 57.
```



Page 148

1        A.      The letter comes after the

2   Interrogatories.

3        Q.      Right.

4        A.      Okay.

5        Q.      The first paragraph of the letter,

6   Exhibit 124, it says, "As you know prior to that

7   conference" -- this is the third sentence -- "we had

8   furnished various materials to you which we believe

9   conclusively demonstrates that the talc supplied to

10  Bondo by Engelhard Corporation, Engelhard, or its

11  former subsidiaries contained no asbestos.  These

12  materials were supplied, summarized in Engelhard's

13  responses to your claim -- client's First Standard Set

14  of Liability Interrogatories," and then it lists

15  certain documents.

16              Do you see that?

17       A.      Yes.

18       Q.      And then if you go down to the third

19  paragraph, the last paragraph on the page, it says,

20  "Your letter" -- referring to I guess a letter from

21  the early Strauss firm -- "identifies five types of

22  sales by Emtal; Emtal Bulk (T), Emtal 40190 up to

23  1985, Emtal 42 talc bags, Emtal 500 and Emtal 42 Bulk?

24              "Engelhard does not deny that sales of

25  these products from Emtal to Bondo occurred but there



Page 149

1    is absolutely no evidence that this talc contained

2    asbestos regardless of how long it might have been

3    held in inventory by Bondo."

4               Did I read that correctly?

5    A.      I read it the same way you do.

6    Q.      Based on -- after -- scratch that.

7               After reviewing the excerpts from the

8    Hemstock and Gale Westfall depositions that we

9    discussed this morning is that a true statement?

10              MR. DONOHUE:  Object to form.

11              MR. BRESS:  Object to form.

12              Once again, are you asking him for his

13   mental impressions as a lawyer?  Because I don't

14   understand how the question wouldn't call for that.

15   Q.      What is your understanding of absolutely

16   no evidence, Mr. Hassett?

17              MR. BRESS:  That's the same -- the same

18   question, Jared.  Are you asking him for his mental

19   impressions as a lawyer?

20              MR. JARED PLACITELLA:  I'm asking for

21   his plain reading and understanding of the words

22   "absolutely no evidence."

23              You tell me what legal impressions or

24   mental impressions are needed to read that statement.

25              MR. BRESS:  Well, the problem is that



Page 150

1    you're deposing a former in-house lawyer about a

2    statement made in litigation so it -- it's -- it's

3    hard -- it's necessarily asking for that unless you

4    can explain to me how it's not.

5                    MR. JARED PLACITELLA:  Right.  That was

6    served to a plaintiff's counsel.

7                    MR. BRESS:  He's not on --

8                    MR. JARED PLACITELLA:  It's not --

9                    MR. BRESS:  -- this letter.

10                   MR. JARED PLACITELLA:  -- internal.

11                   MR. BRESS:  He didn't write this letter.

12        Q.    Right.  What is your understanding of

13   the words "absolutely no evidence," Mr. Hassett?

14                   MR. BRESS:  Are you asking as a general

15   matter --

16                   MR. JARED PLACITELLA:  Yes.

17                   MR. BRESS:  -- or in the context of

18   this --

19                   MR. JARED PLACITELLA:  Yes.

20                   MR. DONOHUE:  As a general matter.

21        A.    As a general matter, absolutely no

22   evidence would mean no material information that would

23   tend to prove whatever proposition was in issue.

24        Q.    So if a letter says absolutely no

25   evidence that Emtal talc contained asbestos, as a



1    general matter does that mean to you that there was

2    asbestos but below a certain threshold?

3                    MR. BRESS:  Objection to form.  I think

4    you're now asking for some kind of legal opinion or

5    legal judgment.  I need to understand how you're not

6    so explain to me --

7                    MR. JARED PLACITELLA:  I asked as a

8    general matter.  What does no -- no evidence mean?  Is

9    it...

10                   MR. DONOHUE:  No.  No.  You added

11   something at the end there.

12        Q.    Does absolutely no evidence as a general

13   matter mean no reliable evidence?

14                   MR. BRESS:  Objection to form.

15                   Again, are you asking...

16        A.    Tony's ready to eat his magic marker

17   down there.  We got to do something.

18                   MR. VALE:  I'm keeping my mouth shut.

19                   MR. BRESS:  What's the question, Jared?

20                   (The following question is read back by

21   the reporter:

22                   "Question:  Does absolutely no evidence

23   as a general matter mean no reliable evidence?")

24                   MR. BRESS:  Again, Jared, are you asking

25   him to form some kind of legal judgment or legal



Page 152

1    opinion here?  Because it's -- it's hard to understand

2    how -- when you're questioning an in-house lawyer

3    about this particular statement that's what you're --

4    seems what you're getting at.

5                   MR. JARED PLACITELLA:  Are you going to

6    instruct him not to answer?

7                   MR. BRESS:  Well, I asked you to give

8    me a --

9                   MR. JARED PLACITELLA:  This is my

10   question.  Are you instructing him not to answer?

11                  MR. BRESS:  So are you -- are you saying

12   that you're asking for something other than a mental

13   impression?

14                  MR. JARED PLACITELLA:  I asked my

15   question.  You could either instruct him not to answer

16   or not.

17                  MR. BRESS:  Based on the way you phrase

18   the question I'm not sure how I can allow him to

19   answer without revealing mental impression.

20                  MR. JARED PLACITELLA:  That's fine.

21        Q.      But for the instruction not to answer

22   could you answer my question, Mr. Hassett?

23        A.      The question was is -- I'm sorry.  Hang

24   on a second.

25                  MR. DONOHUE:  The question was does



Page 153

1    absolutely no evidence mean no reliable evidence?  Or

2    words to that effect.

3                   THE WITNESS:  Yeah.

4                   MR. DONOHUE:  Mr. Placitella said it

5    much nicer.

6         A.     I believe I could answer that.

7         Q.     What was intended by Engelhard when it

8    states there's absolutely no evidence that this talc

9    contained asbestos?

10                  MR. DONOHUE:  I'm going to object to the

11   form of the question.

12                  MR. BRESS:  I need to object to the form

13   of the question and I don't -- you have to let us know

14   if you can answer that question without disclosing

15   privileged information.

16        A.     Well, the only way I could answer the

17   question would be just to interpret the letter with

18   the same information that anyone who has got the

19   letter in front of them has.

20               I mean, I'm not -- you know, I don't --

21   I don't have any recollection of this particular

22   letter or any discussion that led up to it.

23               I -- I don't have a -- I don't have a

24   particular -- I don't have a factual gloss to offer on

25   top of the -- the language of the letter itself.



Page 154

1          Q.      Okay.  Do you know what the factual

2    source of that representation is?

3                  MR. BRESS:  Again, I would instruct you

4    you can -- not to reveal privileged communications in

5    the course of answering that question so you can

6    answer it to the extent you can.

7          A.      You know, the only -- I -- I believe I

8    directed the Paduano Weintraub firm to communicate

9    with Cahill for the factual background materials and

10   beyond that I have no recollection of -- of any other

11   specific involvement in providing or -- being the

12   middleman in any exchange of factual information.

13         Q.      How you doing?  All right?  I'm going to

14   switch gears.  Do you want to take a break or are you

15   okay to keep going?

16         A.      I'm okay for awhile.

17                 Hey, I'm not answering any of the

18   questions.  It's easy.

19                 MR. VALE:  Not through the lack of...

20         Q.      Earlier we talked a little bit about the

21   Martin case.  Do you recall that?

22         A.      Yes.

23         Q.      And during your time in the house

24   counsel's office at Engelhard you worked on the Martin

25   case?



Page 155

```
 1         A.      Yes.
 2         Q.      And what was your role and
 3  responsibilities in the context of defending the
 4  Martin case?
 5         A.      Well, I don't actually remember how the
 6  case was initiated, whether there was a complaint or a
 7  letter, whatever, and I -- I know I -- we had local
 8  counsel, Howard Merten.
 9                 The case was a Rhode Island case.
10  Howard Merten was local counsel in Rhode Island.  I
11  don't really remember the exact process that led to
12  his retention.
13                 Early in the case there was a I believe
14  mandatory mediation that required the attendance of
15  the company representative and I -- and I attended as
16  the company representative.
17                 You know, that -- that describes most of
18  my role there.
19                 If you have more specifics I can try to
20  respond.
21         Q.      Sure.
22                 In front of you, Mr. Hassett, is what
23  I've marked as Exhibit 60 for identification.  They
24  are Defendant Eastern Magnesia Talc Company's Answers
25  to Plaintiff's Interrogatories in the Martin case
```



Page 156

1  dated I believe August 22nd, 2002?

2            Do you see that?

3       A.    Yup.

4       Q.    During your defense of the Martin case

5  do you recall reviewing Engelhard's Answers To

6  Interrogatories?

7       A.    I do not remember this specifically.

8  No, I don't.  I'm not saying it didn't happen.  I

9  don't remember it.

10      Q.    Sure.

11            Turn to Interrogatory Number 3.

12            It says, "State the names of each person

13  who was spoken to or who provided information to

14  assist in answering these Interrogatories."

15            Do you see that?

16      A.    Yes.

17      Q.    And the Answer is "Defendant's counsel

18  assisted in answering these Interrogatories."

19            Do you know who defendant's counsel is?

20      A.    In that sentence I do not.

21      Q.    Would that be you?

22      A.    I don't know.

23            THE VIDEOGRAPHER:  Sir, you're covering

24  your microphone.

25            THE WITNESS:  Sorry.



Page 157

1          Q.       And if we turn to the preliminary

2     statement it says on the second sentence, "Pita

3     formerly known as Eastern Magnesia Talc Company was

4     engaged in the mining and milling of talc from a

5     single mine located in Johnson, Vermont, from 1967 to

6     1983.  Talc from this mine did not contain asbestos

7     and was not fibrous in nature."

8                    Do you see that?

9          A.       Yes.

10         Q.       What is the factual source or the

11    factual basis for the statement "the talc from this

12    mine did not contain asbestos" --

13                   MR. DONOHUE:  Object --

14         Q.       -- "was not fibrous in nature"?

15                   MR. DONOHUE:  Objection to form.

16                   MR. BRESS:  And I would just --

17                   MR. DONOHUE:  And foundation.

18                   MR. BRESS:  I would just caution you,

19    Mr. Hassett, not to reveal any privileged

20    communication so you should answer without providing

21    that information.

22         A.       Well, I don't remember or don't know the

23    source for that information.

24                   MR. DONOHUE:  Okay.

25         Q.       Did it come from your personal



Page 158

1    knowledge?

2              MR. DONOHUE:  Objection.

3              THE WITNESS:  Should I answer if I --

4              MR. DONOHUE:  Yes.

5         A.   No.

6         Q.   The next sentence says, "Pita has

7    already provided plaintiff's counsel with various

8    documentation of this fact including the Ashton

9    Affidavit and supporting documents."

10             Do you see that?

11        A.   Yes.

12        Q.   Whose decision was it to provide the

13   Ashton Affidavit and supporting documents to the

14   plaintiff's counsel?

15        A.   I don't know.

16        Q.   Was it your decision?

17        A.   I don't remember.

18        Q.   Would it have been authorized by

19   Engelhard?

20             MR. BRESS:  Objection to form.

21             MR. DONOHUE:  Object to form.

22        A.   I -- I don't remember the decision and I

23   can't remember any specifics of authorization or

24   anything else about it.  I just -- I don't know.

25        Q.   Okay.  Go to the second paragraph.



Page 159

```
 1              The first whole paragraph on the second

 2   page.  The second sentence says, "The plant manager

 3   for those operations is deceased and no one directly

 4   involved with those operations is currently in Pita's

 5   employ."

 6              Do you see that?

 7   A.     Yes.

 8   Q.     Do you know who the plant manager was?

 9   A.     No.

10   Q.     Would it be Howard Shafer?

11   A.     I don't know.

12   Q.     Okay.  Can you review these

13   Interrogatories and tell me which Answers Engelhard

14   provided the factual basis for?

15              MR. DONOHUE:  Objection to form and

16   foundation.

17              MR. BRESS:  Join.

18   Q.     If any?

19   A.     Yeah.  I just -- I don't remember

20   anything about preparing these Interrogatories at all.

21   I mean, when you asked me about my role in the case I

22   jumped from opening letter, a Complaint, to mediation.

23   That was because that's what I remember.

24              I -- I just -- I don't know what -- I

25   don't -- I don't remember what came from Engelhard or
```



1    any other particular source.

2         Q.    Who would know the answer to that

3    question?

4         A.    Well, I don't really remember anything

5    from preparing or putting these in.  You know, maybe --

6    I see Craig Stoneback and Howard Merten are on here as

7    verifying and signing as to objections.  They may

8    remember more than I do.  I don't know.

9         Q.    Did you ever work with Craig Stoneback

10   in responding to Interrogatories?

11        A.    Not that I recall but...

12        Q.    Do you know if Cahill or Engelhard's

13   local counsel had direct access to Engelhard

14   executives like Mr. Stoneback?

15             MR. BRESS:  Objection to form.

16        A.    Yeah.  I -- I don't recall any but I

17   don't know for sure in -- are you talking about this

18   case or just in general?

19        Q.    In general.

20        A.    To Stoneback.

21             I still can't recall any.

22             (Pause.)

23             MR. DONOHUE:  Thank you.

24             MR. JARED PLACITELLA:  Tony?

25        Q.    Mr. Hassett, in front of you is what's



Page 161

1    been marked as Exhibit 205 for identification.  It is

2    plaintiff Theresa Martin's More Responsive Answers To

3    Interrogatories propounded by Eastern Magnesia Company

4    in the Martin case and it's dated June 10th, 2004

5    Bates number 334310 through 334316.

6                    Do you see that?

7        A.    I'm sorry.  I lost focus there for a

8    second.

9                    See which specific part of this?

10       Q.    Well, have you ever seen these Answers

11   before?

12       A.    I don't remember them.

13       Q.    Okay.  I want to turn your attention to

14   Page 2 which is the More Responsive Answer to

15   Interrogatory 15.

16                    You see that?  It's...

17       A.    Yes.

18       Q.    The -- the paragraph that begins with

19   "Analysis was performed"?

20       A.    Yes.

21       Q.    It says, "Analysis was performed in 1983

22   on talc samples from the Johnson mine by Dr. William

23   Glassley, a geologist at Middlebury College.  Mr.

24   Glassley collected talc samples from the Johnson mine

25   and identified asbestiform chrysotile which occurred



Page 162

1    in aggregates forming small flakes.  The small flakes

2    were observed in talc samples from the Johnson mine by

3    Mr. Glassley.  He examined the rocks.  The

4    petrographic and electron micro -- microbe (sic) was

5    used by Rudolph Van Huene in Pasadena, California."

6              Did I read that correctly?

7        A.    You -- well, I think there's a typo in

8    here which is fairly hard to read -- but microprobe or

9    whatever but -- but, yes.

10       Q.    I struggled with that.

11             Earlier in today's deposition when you

12   said in the context of the Martin case you became

13   aware that plaintiff have retained an expert who was

14   ready to opine that he found asbestos in the Johnson

15   mine.  Is this what you were referring to?

16             MR. BRESS:  Objection.  Form.

17       A.    No.  My recollection was not as specific

18   as this.

19             I -- I was not referring to this item.

20       Q.    When did you first become aware that Dr.

21   Glassley found -- reported finding asbestos in the

22   Johnson mine?

23             MR. DONOHUE:  Object to the form.

24             MR. BRESS:  Join.

25       A.    Yeah.  I -- I do not remember the name



Page 163

1    Glassley from back in 2004 and I didn't remember the

2    specifics of these responses.

3              I -- and I -- I don't remember how

4    exactly I first learned of how or when I first learned

5    of plaintiff's assertion that they had some sort of

6    expert so I -- you know, when -- other than just

7    saying it was within the context of the Martin case I

8    can't nail down the time any more carefully.

9         Q.    Was the fact that the plaintiff in

10   Martin had an expert who was prepared to opine that he

11   found asbestos in the Johnson mine discussed within

12   Engelhard?

13             MR. BRESS:  So...

14        Q.    No specific conversations.  Was it

15   discussed?

16        A.    Yes.

17        Q.    Was Cahill aware that the plaintiffs

18   counsel in the Martin case had purportedly found an

19   expert who was ready to opine that he found asbestos

20   in the Johnson mine?

21             MR. BRESS:  Objection to form.

22             MR. DONOHUE:  Object to the form.

23        A.    I don't know.

24        Q.    Was the fact that the plaintiff's expert

25   in the Martin case had retained an expert who had



Page 164

1    found or purported to find asbestos in the Johnson

2    mine ever discussed with any Cahill personnel?

3            A.      By me?

4            Q.      By you.

5            A.      I don't -- I don't recall specific -- I

6    don't specifically recall any discussion with Cahill --

7    with anyone from Cahill.

8            Q.      Do you know if any other personnel at

9    Engelhard discussed the fact that the plaintiffs

10   counsel in the Martin case retained an expert who

11   purported to find asbestos in the Johnson mine with --

12   was that discussion had with anybody in Cahill?

13                  MR. BRESS:   Objection.   Form.

14           A.      Yeah.   I don't know of any such

15   discussion.

16           Q.      Did Engelhard have any discussions with

17   the local defense lawyer that the plaintiffs expert in

18   the Martin case purported to find asbestos in the

19   Johnson mine?

20                  MR. DONOHUE:   That's a yes or no in

21   order to protect any privilege.

22                  MR. BRESS:   I would say the same thing.

23           A.      Okay.   I need -- I need to hear that

24   question again.

25                  (Last question read back by the reporter.)



Page 165

1           MR. BRESS:  Objection to form as well.

2      A.      Well -- yes.

3      Q.      Without revealing specific

4  communications who did you discuss with the fact that

5  the plaintiffs counsel in the Martin case retained an

6  expert who purported to find asbestos in the Johnson

7  mine?

8           MR. DONOHUE:  Object to form.  You can

9  answer.

10     A.      Who within local counsel or who -- who --

11     Q.      Who within Engelhard?

12          MR. BRESS:  You're asking who within

13  Engelhard talked to local counsel?

14          MR. JARED PLACITELLA:  Scratch that.

15     Q.      Who did you -- within Engelhard who did

16  you discuss with the fact that the plaintiffs counsel

17  in the Martin case had retained an expert who

18  purported to find asbestos in the Johnson mine?

19     A.      I don't -- I discussed the case with

20  Arthur Dornbusch.  I don't -- I don't know about the

21  retention of the expert but we -- the --

22          MR. BRESS:  Don't reveal any

23  communications with Arthur.

24          I think he just asked you did you --

25     A.      Yes.  Arthur -- Arthur Dornbusch.



Page 166

1          MR. JARED PLACITELLA:  Just to make it

2     clear.

3          Q.     Did you discuss the fact that the

4     plaintiffs expert in the Martin case purported to find

5     asbestos in the Johnson mine with Arthur Dornbusch?

6               THE WITNESS:  Could I -- am I --

7               MR. DONOHUE:  Yes or no?

8          A.     Yes.

9          Q.     Do you recall how you were made aware of

10    the fact that the plaintiff's counsel in the Martin

11    case -- the plaintiffs expert in the Martin case

12    purported to find asbestos of Emtal talc?

13               MR. DONOHUE:  I'm going to caution him

14    not to reveal any privileged communications with his

15    counsel.

16               MR. BRESS:  Same instruction.

17          A.     Well, I don't recall how I learned it

18    so...

19          Q.     Do you recall that Dr. Glassley served

20    an expert report in the Martin case?

21          A.     No.

22               (Pause.)

23               MR. JARED PLACITELLA:  Sorry.  I only

24    have two.

25               MR. DONOHUE:  Thanks.



Page 167

1          Q.      Mr. Hassett, in front of you is what's

2     been marked as Exhibit 14 for identification and it's

3     Bates stamped beginning Lopez 2166 (sic) to 21681.

4               Can you please review this document and

5     let me know if you recall seeing it before?

6               (Pause.)

7          A.      I do not recall seeing this document

8     before.

9          Q.      Okay.

10              MR. JARED PLACITELLA:  For the record

11    it's titled Summary Of Activities Related To Services

12    Rendered For Decof and Grimm in the case of David H.

13    Westfall versus Whittaker, Clark and Daniels.

14              And, Mr. Hassett, if you see -- if you

15    go to the first sentence it says, "On November 7th,

16    Sunday, 1982 I drove to the Johnson talc mine from

17    Middlebury, Vermont.  I collected a suite of samples

18    of talc ore, talc-carbonate grit, serpentine,

19    blackwall and schist from the large mine tailings dump

20    adjacent to the mine operation."

21              Do you see that?

22         A.      Yes.

23         Q.      And if you go to Page 5, the Conclusion.

24              It says, "Asbestiform chrysotile occurs

25    in serpentine intermingled with talc at the Johnson



Page 168

1   mine."

2              Do you see that?

3        A.    Yes.

4        Q.    Do you recall whether this report is

5   something that was discussed within Engelhard?

6        A.    I do not recall any discussion of this

7   report.

8        Q.    Do you recall any discussions of this

9   report with Cahill Gordon?

10       A.    No.

11       Q.    Do you recall any discussions of this

12   report with the local defense counsel, Mr. Merten?

13       A.    No.

14              (Pause.)

15              MR. VALE:   Thank you.

16       Q.    Mr. Hassett, in front of you is now

17   what's been marked as Exhibit Hassett-10 for

18   identification.   It is an August 2nd, 2004 letter from

19   Howard Merten to Elizabeth Cuzzone.

20              Do you see that?

21       A.    Yes.

22       Q.    It also has some attachments.

23              MR. DONOHUE:   I should say.

24       Q.    Do you recall that Elizabeth Cuzzone was

25   that the plaintiff's lawyer in the Martin case?



Page 169

```
 1          A.      Yes.

 2          Q.      And do you see that the letter is dated

 3   August 2nd, 2004 which is about six weeks -- almost

 4   six, seven weeks after the Interrogatories that we

 5   reviewed previously were certified; the

 6   Interrogatories at Exhibit 205?

 7          A.      Yes.

 8          Q.      And if we turn to the last paragraph of

 9   the letter Mr. Merten says, "With the body of

10   independent and consistent evidence Engelhard is

11   confident that a jury would find that the talc from

12   the Johnson mine is and was asbestos-free.  That said,

13   Engelhard is willing to make some adjustment in its

14   settlement position in light of the increased defense

15   costs it appears it will likely face.  At this point

16   I'm not sure where you stand on a demand.  Please give

17   me a call to discuss the matters raised in this letter

18   and the possible resolution of this matter."

19                  Do you see that?

20          A.      Yes.

21          Q.      Do you recall that once Engelhard was

22   presented with the fact that the plaintiffs counsel in

23   the Martin case had found asbestos in the Johnson mine

24   it was willing to adjust its settlement position?

25                  MR. BRESS:  Objection.  Form.
```



Page 170

1        A.      I don't remember this specific letter,

2    but I do the remember we -- it did -- it tried to

3    reach a settlement with the plaintiff in the Martin's

4    case.

5        Q.      And is it fair to say that that attempt

6    to seek a settlement in the Martin case came after the

7    fact was presented that the plaintiffs expert in the

8    Martin case purported to have found asbestos in the

9    Johnson mine?

10               MR. BRESS:  Do you understand the

11   question?

12       A.      Well, it's the chronology of which came

13   first, the --

14       Q.      Mm'mm.

15       A.      -- evidence or the settlement, and I --

16   I don't really remember.  I mean, you know, the

17   correspondence suggested it but I don't remember.

18       Q.      All right.  You said that in the Martin

19   case you participated in a mediation as the corporate

20   representative.  Is that fair?

21       A.      Yes.

22       Q.      Do you recall about time-wise when that

23   mediation was?  Date?

24       A.      You know, beyond -- beyond knowing it

25   was the Martin case so I can place it in this era, no,



Page 171

1    I couldn't give you a date.

2         Q.    Well, was it disclosed in the mediation

3    that the -- the fact that the plaintiffs counsel had

4    an expert who purported to find asbestos in the

5    Johnson mine?

6              MR. BRESS:  I'm sorry.  I'm not sure I

7    follow -- was it disclosed by the plaintiff?

8              MR. JARED PLACITELLA:  Right.

9         A.    Well, I didn't speak -- other than a

10   brief introduction and good-bye, I didn't speak

11   directly to the plaintiff or even the plaintiff's

12   counsel in the mediation and I don't know if the

13   information about the expert evidence -- I don't

14   remember when it was dis -- it was known at that time

15   if not disclosed at that time.

16        Q.    Okay.  So fair to say that in the

17   mediation it was addressed the fact that -- well,

18   scratch that.

19              Is it fair to say that in the -- in the

20   mediation the fact that the plaintiffs lawyer had an

21   expert who purported to find asbestos in the Johnson

22   mine was discussed?

23        A.    Well, we have my discussions with local

24   counsel which are privileged and the discussions that

25   plaintiff -- the plaintiffs counsel had with Mr.



MAGNA
LEGAL SERVICES

Page 172

1  Merten which I wasn't there for.

2        Q.     Right.  Did Mr. Merten ever tell you

3  about -- scratch that.

4              MR. JARED PLACITELLA:  That's why I said

5  scratch that.

6              MR. DONOHUE:  That was good.  Save a

7  page of transcript.

8        Q.     Do you recall how that mediation

9  resolved?

10       A.     The mediation did not resolve the case.

11             I'm not sure how much more I can say

12  without getting into some privilege issues.

13       Q.     So do you recall the circumstances in

14  which the case resolved if it was not at mediation?

15             MR. BRESS:  You can answer that I think.

16  Just don't reveal privileged communications in the

17  course of doing so.

18       A.     Well, ultimately the case was resolved

19  by settlement.

20       Q.     I'm going to turn back to Exhibit

21  Hassett-10 for a minute; the one in front of you.

22             The first sentence of the last paragraph

23  on Page 2 has an opening clause and says, "Engelhard

24  is confident that any jury would find that talc from

25  the Johnson mine is and was asbestos-free."



Page 173

1          Do you see that?

2     A.     Yes.

3     Q.     Did Engelhard expect that it would not

4  be able to prevail on Summary Judgment on the question

5  of whether Emtal talc contained asbestos?

6          MR. BRESS:  So there I think you are

7  asking -- asking for work product and mental

8  impressions and very likely attorney-client

9  communications so I think you have to explain to us

10  how -- how you think he could answer that without

11  revealing that information.

12          MR. JARED PLACITELLA:  Sure.

13     Q.     In communicating that sentence to Miss

14  Cuzzone do you know if that's what Mr. Howard Merten

15  intended?

16          MR. BRESS:  Intended what?

17     Q.     What -- do you know what that sentence

18  means?

19          MR. BRESS:  Objection to form.

20          MR. DONOHUE:  Same.

21     A.     Yeah.  I -- I don't really know the

22  specifics of Howard's intention in this letter.

23     Q.     Okay.

24     A.     I don't -- I don't remember -- remember

25  the letter.



Page 174

1          Q.      Do you recall what the terms were of the

2     Martin settlement?

3          A.      I believe Engelhard ended up paying

4     approximately 400,000 but I -- that's not a rock solid

5     number.

6          Q.      And to your knowledge had Engelhard ever

7     paid that much money to settle a talc case either a

8     tire worker case or other Emtal talc case before?

9          A.      To my knowledge, no.

10          Q.      After the Martin settlement was reached

11     until the time you left the company are you aware of

12     any other instance where Engelhard agreed to settle for

13     $400,000 in any talc case; tire worker or otherwise?

14          A.      Well, if you -- I'm not aware of any

15     settlements and I'm not actually aware of any cases

16     after Martin.

17                  (Pause.)

18          Q.      Who had to approve the Martin settlement

19     within Engelhard?

20          A.      Arthur Dornbusch.

21          Q.      Would -- to your knowledge was that

22     settlement ever reported outside of the Legal

23     Department?

24                  MR. BRESS:  Objection to form.

25          A.      Well, I don't know.  Reported is a --



Page 175

1   certainly other people in the company would have been

2   aware of the payment.  Beyond that I don't -- I don't

3   know of any special reporting.

4        Q.    Who within Engelhard would have been

5   aware of the payment?

6        A.    I mean, I don't -- I don't know the

7   details.  I -- you know, somebody had to cut the

8   checks, somebody had to -- had to log it in as a debit

9   or credit in the books.

10             It's just a -- routine stuff.

11       Q.    Do you know whether the Martin

12  settlement was known to the Engelhard Board of

13  Directors?

14       A.    I do not.

15       Q.    I'm going to show you what I've marked

16  as Exhibit 7 for identification.

17             (Pause.)

18             MR. JARED PLACITELLA:  Tony?

19             For the record Exhibit 7 is a May 9th,

20  2006 cover letter from Elizabeth Cuzzone to Howard

21  Merten enclosing a settlement release in the Martin

22  case.

23       Q.    Have you ever seen this cover letter and

24  release before?

25       A.    I don't remember.



Page 176

```
 1          Q.      And if you turn to the first page of the
 2    release it says that -- you were right.  It says that
 3    the Martin case was resolved for $400,000.
 4                  Do you see that?
 5          A.      Yup.
 6          Q.      I want to direct your attention -- well,
 7    first, I want to direct your attention to the --
 8    begin -- the last sentence beginning on the second
 9    page of the release.
10                  (Pause.)
11                  MR. JARED PLACITELLA:  And I'm sorry.
12    For the record this is Hassett-7 if I didn't say that.
13          Q.      The last sentence on this -- the second
14    page of the release continuing onto the third page
15    reads, "Finally, each of the parties agrees that he,
16    she or it will not disclose any of the facts related
17    to -- to the lawsuit to anyone including without
18    limitation the information contained in any discovery
19    documents and the facts related to the settlement
20    discussions surrounding this agreement."
21                  Do you see that?
22          A.      Yes.
23          Q.      Why did Engelhard insist on that clause
24    in the agreement?
25                  MR. BRESS:  So --
```



Page 177

1                    MR. DONOHUE:  Objection to form.

2                    MR. BRESS:  Yeah.  I have to object to

3      form but I also think you're now asking for work

4      product and mental impressions since you're asking

5      this of an in-house lawyer so I think the question

6      needs to be rephrased.  Maybe you can rephrase it?

7           Q.    Well, let's start this way.

8                    Did Engelhard insist that this clause be

9      in the settlement agreement?

10          A.    I don't remember the negotiation around

11     inclusion of this clause at all or -- or the

12     communication that led to it.

13          Q.    Under this agreement Elizabeth Cuzzone

14     is the plaintiffs lawyer, was -- her client was paid

15     $400,000 on the condition that she did not tell anyone

16     what Dr. Glassley had found.  True?

17                   MR. BRESS:  Objection.

18          A.    She was paid 400 --

19                   MR. BRESS:  Objection to the form.

20                   THE WITNESS:  Sorry.

21                   MR. DONOHUE:  Join.

22                   THE WITNESS:  Should -- should I answer?

23                   MR. DONOHUE:  Read it back, please.

24                   (The following question is read back by

25     the reporter:



Page 178

1                    "Question:   Under this agreement
2      Elizabeth Cuzzone is the plaintiffs lawyer, was -- her
3      client was paid $400,000 on the condition that she did
4      not tell anyone what Dr. Glassley had found.  True?")
5                    MR. DONOHUE:  Objection to form.
6                    MR. JARED PLACITELLA:  Let me rephrase
7      that so it's clear.
8           Q.    Miss Martin, Elizabeth Cuzzone's client,
9      was paid $400,000 by Engelhard on the condition that
10     Miss Martin or Elizabeth Cuzzone not tell anyone about
11     the fact that Dr. Glassley had found asbestos in the
12     Johnson mine.
13                   MR. DONOHUE:  Object to form.
14          Q.    Isn't that true?
15                   MR. BRESS:  Objection to form but I also
16     think, Jared -- maybe there's a way to rephrase this
17     but I think you're asking him now to interpret as a
18     lawyer the settlement agreement.
19          Q.    Mr. Hassett?
20                   MR. BRESS:  I think you're asking him to
21     give you his mental impressions.
22          Q.    This is a contract that Engelhard
23     entered into with Miss Martin, correct?
24          A.    Yes.
25          Q.    And you worked in the Engelhard Legal



Page 179

1    Department during the time this contract was executed.

2    Is that fair?

3            A.    Yes.

4            Q.    Can you tell me what are the terms of

5    this contract as it pertains to the final sentence on

6    Page 2 going on to Page 3 and how that relates to the

7    payment that Miss Cuzzone -- that Miss Martin

8    received?

9            A.    Well --

10           MR. DONOHUE:   You can...

11           A.    -- that clause and all the other

12   consideration mentioned on the side of Miss Martin in

13   the agreement were in exchange for the payment of

14   400,000.

15           Q.    Right.   And that's fair.

16           So part of the consideration for the

17   400,000 was that Miss Martin or Miss Cuzzone could not

18   tell anybody about the fact that Dr. Glassley had

19   found asbestos in the Johnson mine?

20           MR. DONOHUE:   Object to the form of the

21   question.

22           MR. BRESS:   Yeah.   Object as well.   And

23   I think again, Jared, you're now asking him to provide

24   mental impressions and to interpret the agreement as a

25   former lawyer of the company.



1              MR. JARED PLACITELLA:  I want to know

2     his understanding.

3         Q.     So you -- could you please answer that

4     question?

5              MR. BRESS:  I'm sorry.  You want -- but,

6     again, you're now -- you're now asking him to provide

7     you with his understanding from the time of whether a

8     particular clause covered something.

9              I don't understand how this isn't asking

10    for his mental impressions as a lawyer.

11        Q.     Well, that clause precluded Miss Martin

12    from telling anyone about the fact that Dr. Glassley

13    had found asbestos in the Johnson mine.  Is that true?

14             MR. BRESS:  Again, I -- I think you're

15    asking him to provide his mental impressions as a

16    lawyer.  Maybe the first question is whether he would

17    even know the answer to your question.

18        Q.     I would like my answer, please.

19             MR. BRESS:  Well, I need --

20             MR. JARED PLACITELLA:  If you want to

21    instruct him not to answer that question you can

22    instruct him not to answer that question.

23             I'm asking him what is the effect of a

24    clause in the contract that a company that he used to

25    work for executed with Miss Martin.



1              MR. BRESS:  Right.  But you're asking

2    him as a lawyer from the company to provide what is

3    essentially a mental impression about --

4              MR. JARED PLACITELLA:  No, it's --

5              MR. BRESS:  -- in terms of an agreement.

6              MR. JARED PLACITELLA:  I'm not going to

7    get that question.

8              MR. BRESS:  So maybe there's a -- a way,

9    Jared, to rephrase this or you can explain how you're

10   not asking for the mental impressions but...

11        Q.     Engelhard would have the right to

12   enforce the terms of this contract.  Is that correct,

13   Mr. Hassett?

14             MR. DONOHUE:  Object to the form.  You

15   could answer.

16             MR. BRESS:  Object to the form as well.

17        A.     Yes.

18        Q.     Right.  And enforcing -- if Miss Cuzzone

19   told anyone about the fact that Dr. Glassley had found

20   asbestos in the Johnson mine would that be a violation

21   of this contract?

22             MR. BRESS:  Now, I --

23             MR. DONOHUE:  Object --

24             MR. BRESS:  -- think you're asking him

25   again for a legal opinion on the meaning of this



Page 182

1    contract that draws on his mental impressions and work

2    product as a former Engelhard lawyer.

3         A.    I also -- wasn't in the mine.  It was in

4    the tailings which is some issue as to the validity of

5    the sample that creates a whole different

6    concentration but I think that's --

7         Q.    So Dr. Glassley didn't even find

8    asbestos in the mine and Engelhard was willing to

9    pay --

10        A.    The stuff --

11        Q.    -- Miss Cuzzone --

12        A.    -- I read -- the stuff --

13        Q.    -- $400,000?

14        A.    -- I read said he --

15             MR. DONOHUE:  Whoa, whoa, whoa.

16        A.    -- said he found it --

17             MR. DONOHUE:  Two -- two people --

18        A.    -- in the tailings.

19             MR. DONOHUE:  -- talking at the same

20   time.

21             MR. JARED PLACITELLA:  Sorry.

22        A.    This -- the material --

23             MR. DONOHUE:  Wait.  Wait.

24             MR. JARED PLACITELLA:  I'll withdraw my

25   question.  I'll withdraw my question.



Page 183

```
 1              I apologize.  I got my Italian up.
 2              THE WITNESS:  Well, we're -- we both
 3    have had a -- everybody has had kind of a long day
 4    here.
 5         Q.    So I just want the answer to this
 6    question.
 7              Did Miss Cuzzone told anyone about the
 8    fact that Dr. Glassley had purported to find asbestos
 9    in the Johnson mine would that be a violation of this
10    settlement agreement?
11              MR. BRESS:  Jared, again, I don't -- I
12    think you need to explain how you're not asking for
13    his mental impressions as a lawyer here with this
14    question as phrased.
15              MR. JARED PLACITELLA:  If you want to
16    the instruct him not to answer, then you're going to
17    instruct him not to answer.
18              I like my question as it's phrased.
19              MR. BRESS:  Well, you haven't explained
20    how it's not --
21              MR. JARED PLACITELLA:  I don't need to
22    explain it so --
23              MR. BRESS:  But I've asked for the
24    clarification to help --
25              MR. JARED PLACITELLA:  No.  Then no.
```



Page 184

1    Answer --

2              MR. BRESS:  -- in assessing the

3    instruction not to answer.

4              MR. JARED PLACITELLA:  You have my

5    question.  You make your decision whether you're going

6    to instruct him not to answer.

7              MR. BRESS:  Yeah.  You left me no choice

8    but to instruct him not to answer.

9              MR. JARED PLACITELLA:  That's fine.

10   BY MR. JARED PLACITELLA:

11        Q.    But for the instruction not to answer

12   could you answer that question, Mr. Hassett?

13        A.    Well, I think the --

14        Q.    It's a yes or a no.

15             MR. BRESS:  Or -- or you don't know.

16   There are other answers one can give.  You should give

17   the correct one.

18        A.    I -- I can -- I could answer that

19   question.

20        Q.    During your experience in the Engelhard

21   in-house Legal Department had you ever seen a similar

22   clause to the sentence that's in the end of Page 2 and

23   into Page 3 in the context of an Emtal talc case?

24        A.    I don't recall any others.

25        Q.    And do you know when Miss Martin entered



Page 185

1    into this settlement agreement do you know whether she

2    even had the depositions from the Westfall case marked

3    as Exhibits 3 and 4 that we discussed today?

4                MR. BRESS:   Objection to form.

5          A.    I -- I -- if I understood the question I

6    do not know what Mrs. -- Mrs. Martin said or her

7    counsel.

8          Q.    Okay.   Besides this case, the Martin

9    case, what is the most amount of money that you know

10   of that Engelhard paid to settle an Emtal talc case?

11         A.    I don't...

12               I don't -- I don't know the answer to

13   that.

14         Q.    We saw today in Exhibit Hassett-5 which

15   was the correspondence between Michael Sullivan of the

16   Cahill firm and SherryLynn of the Bevin firm in the

17   context of the tire worker cases --

18         A.    Yes.

19         Q.    -- that those cases settled generally

20   for about a thousand dollars on average apiece.   Is

21   that fair?

22         A.    I saw that number in that

23   correspondence.

24         Q.    And that would be the Martin -- the

25   settlement in the Martin case was 400 times more than



Page 186

1    the settlements discussed in -- in Exhibit

2    Hassett-5 --

3              MR. DONOHUE:  Object to the form.

4         Q.    -- true?

5              MR. BRESS:  Object to the form.

6         A.    You're asking me if 400,000 equals 400

7    times 1,000?

8         Q.    Yes.

9         A.    I believe that's correct.

10        Q.    Okay.

11             MR. DONOHUE:  Good job.

12             MR. JARED PLACITELLA:  You know what?

13   Do you mind -- let's take a short break.  Thanks.

14             THE VIDEOGRAPHER:  The time is 4:10 p.m.

15   We are off the record.

16             (Recess taken at 4:10 p.m.)

17             THE VIDEOGRAPHER:  The time is 4:33 p.m.

18   On the record.

19             (Exhibit Hassett-1A marked for

20   identification.)

21   BY MR. JARED PLACITELLA:

22        Q.    All right.  Mr. Hassett, I'm showing you

23   what I've marked as Exhibit Hassett-1A for

24   identification.

25        A.    Okay.



Page 187

1          Q.      You don't have it --

2          A.      It's new.

3          Q.      Yup.

4          A.      Okay.

5          Q.      I got one copy so we may have to

6     share but...

7                  MR. BRESS:  Can you publish it or maybe

8     you don't have that many questions?

9                  MR. JARED PLACITELLA:  Yeah.

10                 THE WITNESS:  Have to share.

11                 MR. DONOHUE:   Okay.

12         Q.      In front of you is what I marked as

13    Exhibit Hassett-1A for identification.

14                 MR. PRESS:  Okay.

15         A.      Okay.

16         Q.      And it looks like a 1991 Engelhard

17    docket retention policy.  Have you ever seen this

18    document before?

19         A.      Yes.

20         Q.      Okay.  And did you see it in preparation

21    for today's deposition?

22         A.      Possibly a different edition of the very

23    similar document.  Possibly exactly the same.

24         Q.      Now, this retention policy is dated

25    1991.



Page 188

1                    Are you aware of any other earlier
2    versions of an Engelhard document retention policy.
3         A.    I can't remember when the updates
4    occurred.  The policy existed before '91.
5         Q.    Okay.  Do you remember when the policy
6    was initially put in place?
7         A.    I do not.
8         Q.    Okay.  Can you turn to Page 19 I believe
9    it is.
10                   And I'm correct that should be the
11   litigation documents.  Is that correct?
12                   MR. BRESS:  I need to see the document
13   real quick so can I...
14        A.    Yeah.  I -- I'm not getting -- maybe I
15   went to the wrong page.  I'm not picking up the
16   litigation stuff.
17                   MR. DONOHUE:  What --
18                   MR. BRESS:  You're talking about --
19                   MR. DONOHUE:  -- are we looking at?
20                   MR. BRESS:  -- Page 18, Jared?
21                   MR. JARED PLACITELLA:  I think it's Page
22   19 if I -- but I could have just totally forgot.
23                   MR. BRESS:  This?
24                   THE WITNESS:  Yeah.
25                   MR. JARED PLACITELLA:  Yeah.  Legal



Page 189

1    records.  Page 18.  Thank you.  18.

2                  THE WITNESS:  All right.

3                  MR. DONOHUE:  Good.

4         Q.    Do you see where it says under Lawsuit/

5    Claims?

6         A.    Yup.

7         Q.    It says "AS plus 3."  Do you know what

8    that means?

9         A.    I don't remember.

10        Q.    And then it says the exception is P --

11   oh, "precedent" and it says P.  Do you see that?

12        A.    Yes.

13        Q.    I'm assuming P means permanent?  Is that

14   your understanding?

15        A.    I don't really remember it.  There's a

16   code in here somewhere if you want me to refresh my

17   recollection, fine.

18        Q.    I was more interested, what's precedent

19   mean?

20        A.    I don't know.

21        Q.    Do you know who would know what -- what

22   lawsuit/claims files were precedent?

23        A.    I -- I don't -- I do not know.  I don't

24   remember this.

25        Q.    Do you know who I could ask who would



Page 190

1    know?

2          A.    Well, no.  I mean, not anybody who's

3    still at the company.  I don't know who's left so...

4          Q.    I believe you said Al McWilliams had

5    knowledge about the document retention policies.  Is

6    that fair?

7          A.    Right.

8          Q.    Do you recall anybody else either with

9    the company or used to be employed by the company who

10   would have knowledge of the document retention policy?

11         A.    No.

12               MR. JARED PLACITELLA:  That's all the

13   questions I have for now.  I'll pass the witness.

14               MR. VALE:  No questions.

15               MR. BRESS:  Anybody on the phone?

16               MR. TUNIS:  Nothing for Halket.

17               MR. PAVLICK:  Nothing for Dornbusch.

18               MR. BRESS:  Okay.  I think we're

19   concluded.

20               MR. JARED PLACITELLA:  All right.  Thank

21   you very much --

22               MR. DONOHUE:  Thank you all.

23               MR. JARED PLACITELLA:  -- Mr. Hassett.

24               THE VIDEOGRAPHER:  This concludes the

25   deposition of Michael Hassett.



Page 191

1                    The time is 4:38 p.m.  We're off the

2     record.

3                    (Reporter retains all exhibits except

4     Exhibit 7.)

5                    (4:38 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 192

```
 1                CERTIFICATE    OF     OFFICER

 2

 3

 4

 5                    I, PATRICIA J. RUSSONIELLO, a

 6    Certified Court Reporter and a Notary Public of the

 7    State of New Jersey, do hereby certify that prior to

 8    the commencement of the examination the witness was

 9    duly sworn by me.

10                    I DO FURTHER CERTIFY that the

11    following is a true and accurate transcript of the

12    testimony as taken stenographically by and before me

13    at the date, time and place aforementioned.

14                    I DO FURTHER CERTIFY that I am

15    neither a relative nor employee, nor attorney or

16    counsel to any parties involved; that I am neither

17    related to nor employed by any such attorney or

18    counsel, and that I am not financially interested in

19    the action.

20

21    Patricia J. Russoniello

22

23

      \\PATRICIA J. RUSSONIELLO

24    NOTARY PUBLIC OF THE STATE OF NEW JERSEY

      My Commission Expires: 4/20/2020

25    C.C.R. License No. XI00517
```



## A

**Abbott** 18:5
**able** 13:21 19:10
 48:14 51:6 78:16
 79:10 116:16
 124:10 136:11
 145:21 146:17
 173:4
**above-entitled** 1:14
**above-referenced**
 60:3
**absolutely** 13:14
 77:3 79:2 149:1
 149:15,22 150:13
 150:21,24 151:12
 151:22 153:1,8
**access** 32:9 74:17
 160:13
**accessed** 106:14
**accommodate**
 108:9
**Account** 25:9
**accounting** 25:10
 52:25 65:3 68:2,7
**accumulation**
 105:15
**accurate** 120:10
 192:11
**acquired** 138:10
**acquisition** 19:5
 27:14 39:6
**action** 1:2,14 54:12
 72:5 192:19
**actions** 54:15,19
 73:5,22
**active** 19:1,3,6
 30:15,19
**Activities** 5:6
 167:11
**actual** 119:4
**add** 47:25 74:4
 101:15
**added** 151:10
**address** 115:6
**addressed** 171:17

**adjacent** 167:20
**adjust** 169:24
**adjustment** 169:13
**administrative**
 126:12
**admitted** 17:22
**advice** 28:15 78:1
 80:16
**advise** 122:14
**Affidavit** 158:9,13
**Affidavits** 130:17
**affirmation** 117:17
**affirms** 117:22
**aforementioned**
 192:13
**AFTERNOON**
 113:23
**agency** 126:13
**aggregates** 162:1
**ago** 10:18,18 11:24
 13:11 14:16,21,23
 108:14 135:20
 140:10
**agree** 87:11 119:11
 119:20 126:21
**agreed** 29:25
 174:12
**agreement** 61:12
 90:7 176:20,24
 177:9,13 178:1,18
 179:13,24 181:5
 183:10 185:1
**agreements** 57:9
**agrees** 176:15
**ahead** 50:15 63:1
**AIG** 9:6
**al** 1:3,6 7:4,5 108:5
 108:11,13 190:4
**allegation** 100:19
 100:20 109:22
**allegations** 85:20
 86:1 91:10 98:1
 98:16,19,21 99:1
 99:4,7 100:7
 113:3
**allege** 64:8

**alleged** 109:25
 110:1
**alleges** 110:21,22
**alleging** 10:23
 70:25 71:11
 100:11 111:16
 112:13
**allow** 103:9 142:4
 152:18
**allowed** 114:9
**Amended** 16:17,21
**amount** 24:6 56:13
 57:2,5 60:5,11
 185:9
**amounts** 68:3
**analysis** 96:12
 118:2,5,16 138:12
 138:20 139:21
 142:7 144:5
 161:19,21
**and/or** 73:6,7 84:10
 85:5,10
**Anguas** 2:9 8:2,2
**answer** 6:7 13:2,4,6
 13:8,15,19,21
 29:22 32:4 46:24
 48:7,15,21 50:15
 50:19 51:5,6,10
 51:24 52:23,24
 55:8 57:8,12,14
 61:17 62:12 71:4
 76:20,21,22 77:19
 77:22,23 78:4,9
 78:11,16,24 79:10
 79:24 80:1,10,14
 80:20 81:8,10,15
 82:1 83:19 85:25
 88:5 90:18 92:21
 92:25 95:19,23
 96:5,8,15 98:18
 99:9 102:17 103:3
 103:4 109:17
 117:11,12 119:18
 120:13 122:10,16
 122:24 123:8
 124:6,9,13 126:4

 127:1 128:12
 130:1,21 132:9
 133:10 134:18,20
 135:24 137:17
 141:15 142:4
 145:14,21,22,24
 146:13,17 147:8
 152:6,10,15,19,21
 152:22 153:6,14
 153:16 154:6
 156:17 157:20
 158:3 160:2
 161:14 165:9
 172:15 173:10
 177:22 180:3,17
 180:18,21,22
 181:15 183:5,16
 183:17 184:1,3,6
 184:8,11,12,18
 185:12
**answered** 111:5
 133:13 140:3
**answering** 42:21
 43:6,14,18 115:8
 116:3 119:9 127:4
 127:23 133:7
 135:5 154:5,17
 156:14,18
**answers** 5:13,19
 40:9,12 43:24
 44:2,9 116:23
 117:1 120:7 121:6
 121:21 124:1
 125:17 131:13
 134:5 140:23
 143:10 155:24
 156:5 159:13
 161:2,10 184:16
**Anthony** 2:13 8:4
**anybody** 16:24
 38:15 98:25
 108:15 164:12
 179:18 190:2,8,15
**anybody's** 144:18
**anyway** 52:23
 61:18 76:25

 143:24
**apiece** 185:20
**apol** 97:10
**apologize** 183:1
**apparently** 143:13
**appear** 54:18
**appearance** 131:3
 132:7
**appearances** 7:16
 93:18,19 131:11
**appeared** 15:23
 16:5
**appears** 169:15
**applicable** 103:8
**approach** 19:8
**appropriate** 141:19
**approval** 53:14,15
**approve** 174:18
**approved** 53:12,18
 57:2
**approximately**
 18:3,8 51:20
 174:4
**April** 1:11 7:7
 12:12 15:12 95:2
 114:16
**Arch** 2:14
**area** 26:16 96:3
 100:21 101:5
**areas** 20:7 35:5,13
 73:1
**argue** 143:16
**argumentative**
 142:15,20
**Arleo** 1:17 2:18
 7:23
**arrange** 74:15
**arranged** 11:7
**arrangement** 30:23
**artfully** 113:1
**Arthur** 3:5 5:16 8:7
 22:1 26:5 27:2
 37:4 38:15 53:3
 53:18 57:18 63:8
 63:9 69:20 72:4
 73:13 84:8 85:3,4



87:5,25 98:14,25
121:25 122:6,19
165:20,23,25,25
166:5 174:20
**asbestiform** 161:25
167:24
**asbestos** 10:24 53:5
70:24,25 71:10,11
73:7 76:3,18
77:17 78:5,19
79:13,22 80:19,22
81:5,22 82:8,18
82:23 83:4 85:5
85:10,18,23 90:14
90:22 91:4,8,13
92:20,23 93:7
96:19 100:13,17
109:23 110:11,22
110:25 111:16,16
111:18 112:12,13
113:3,6 126:13,15
138:15,22 139:8
139:24 140:1
142:9 144:7
148:11 149:2
150:25 151:2
153:9 157:6,12
162:14,21 163:11
163:19 164:1,11
164:18 165:6,18
166:5,12 169:23
170:8 171:4,21
173:5 178:11
179:19 180:13
181:20 182:8
183:8
**asbestos-free** 76:12
169:12 172:25
**asbestos-related**
73:5,10,22 101:8
126:14
**Ashton** 158:8,13
**aside** 83:10
**asked** 36:9 70:17
73:25 78:8 81:15
111:5 112:5

115:23 120:19
122:12 129:20
133:13 141:14
145:25 146:4,11
151:7 152:7,14
159:21 165:24
183:23
**asking** 49:16 80:8
81:2,3 98:24
99:10 102:11,13
110:17 111:23
112:4 122:8 123:4
125:22 127:1
128:9,14,16
133:21 141:3,4,6
141:7,9 142:15
143:1,11 144:18
144:19 145:7,11
145:12,16 146:2
146:10 149:12,18
149:20 150:3,14
151:4,15,24
152:12 165:12
173:7,7 177:3,4
178:17,20 179:23
180:6,9,15,23
181:1,10,24
183:12 186:6
**assay** 90:1
**assembled** 87:4
**assert** 80:22 81:5
82:22 83:3
**asserted** 76:2 81:21
82:17
**assertion** 76:17
77:16 78:4,18
79:12,22 80:18
163:5
**assess** 139:17
**assessed** 113:16
**assessing** 184:2
**assigned** 20:17
23:19,20 24:12,22
33:17 38:7
**assignment** 20:9
117:7

**assist** 25:23 156:14
**assistance** 129:6
**assistant** 21:15,19
25:18,20 27:21
28:2,3 39:23
**assistants** 39:16,22
**assisted** 156:18
**associate** 12:16
14:10 21:16,20
25:16 27:22 28:1
115:10
**associates** 14:9
60:22
**assume** 125:23
130:12,12 141:4
**assuming** 75:20
121:15 130:13
133:15 141:3
189:13
**assumption** 75:23
**attached** 4:10,12,20
4:22 84:7
**attaching** 69:24
**attachment** 63:17
**attachments** 4:24
168:22
**attempt** 170:5
**attend** 45:10
**attendance** 155:14
**attended** 53:4
155:15
**attention** 10:5
69:11 88:22 92:14
95:9 117:15
161:13 176:6,7
**attorney** 42:6
123:16 124:11
192:15,17
**attorneys** 2:7,12,16
2:20 3:5,9 11:6,8
12:19 13:11 16:13
38:9,17 51:15
55:18 75:20 78:19
79:13 80:22 81:4
81:20 83:3
**attorney-client**

12:24 13:3 98:3
173:8
**August** 58:4 156:1
168:18 169:3
**authority** 41:7 46:1
**authorization**
40:13,17 41:7,8
41:11,12,16,19,21
42:5,18 44:3,6
46:2,7 55:24
81:23 82:9,12,15
83:5 158:23
**authorizations**
42:11
**authorize** 42:16
80:22 81:3,4
**authorized** 57:6
82:4,6 83:16
158:18
**authorizing** 83:2
**available** 19:17
118:12,12
**Avenue** 1:17 2:5,19
7:10 27:1
**average** 60:9
185:20
**avoid** 105:15
**aware** 10:25 11:4
63:9,22 76:1 78:7
82:16 85:17,22
90:23 91:3,6,9,10
91:11 92:7 96:25
106:19,22 107:17
118:16 123:23
125:15,24 135:3
162:13,20 163:17
166:9 174:11,14
174:15 175:2,5
188:1
**awhile** 28:9 65:13
129:18 154:16
**a.m** 1:18 7:8 49:25
50:2,7 57:21,24

_____
**B**
_____
**B** 4:7 5:1

**back** 18:22 20:4
22:13,19,20 23:10
23:17 25:2,13
37:20 38:7 42:10
48:8,9 53:20
63:16 66:2 77:12
77:13 79:7 87:21
90:25 97:19,20
98:1 101:2 109:4
114:2 120:17
125:9,11 128:3,4
128:5 130:3
134:16,17 144:1,2
145:4,5 151:20
163:1 164:25
172:20 177:23,24
**background** 154:9
**Bagel** 88:15,20
**bags** 148:23
**Bank** 2:5
**base** 9:10 19:12
**based** 21:5,9 51:24
70:22 71:8 82:5
118:1 119:21
129:4 149:6
152:17
**BASF** 1:6 2:12 4:22
5:4,8,11,14 7:4
8:1,3 11:1,6,8
19:5,19,22 27:14
39:5,8 69:10 72:5
73:4,8,9 101:7
**BASF's** 80:5
**BASF-Lopez** 5:7
**BASF-Sampson**
4:17
**BASF-Williams**
4:21 5:15
**BASF_Sampson**
4:13
**BASF_Williams**
5:20
**basically** 18:11
123:5 139:12
**basis** 19:24 51:4
76:17 77:16 78:1



78:4,18 79:12,21
80:2,18 133:8
134:2,4 146:12
157:11 159:14
**Bates** 59:17 63:20
66:21 89:1 92:15
95:10 161:5 167:3
**Bedminster** 18:20
**began** 21:25
**beginning** 20:4
63:16 120:14
167:3 176:8
**begins** 7:2 89:1
161:18
**behalf** 8:8 40:10
41:23 42:22 43:19
93:23 102:19
118:2 127:5,24
**believe** 13:18 19:2
21:15 23:12 26:11
31:3 40:4 44:13
50:11 55:23 77:10
94:8 97:2 100:6
104:2,6 119:14
120:25 121:4,12
121:19 122:5,21
125:8 134:9 140:2
145:3,20 148:8
153:6 154:7
155:13 156:1
174:3 186:9 188:8
190:4
**believes** 101:6
**Ben** 21:23
**benefit** 17:3 19:11
19:11
**Bergstein** 16:5
**Bergstein's** 32:23
33:15 34:2,3,12
34:21 65:25 66:24
**best** 111:13 141:15
**better** 62:21 88:19
**Bevan** 60:22 61:13
**Bevin** 185:16
**beyond** 29:23 129:8
154:10 170:24,24

175:2
**big** 11:21 52:15
74:9
**billing** 36:13 54:5
**binder** 75:18
**bit** 29:10 39:25
66:1 112:6 154:20
**blackwall** 167:19
**Board** 25:21
175:12
**body** 169:9
**Bondo** 138:2,6
148:10,25 149:3
**book** 75:3 88:21
**books** 175:9
**bottom** 93:21
106:10
**Boulevard** 3:3,7
**Boyle** 3:2 8:7
**brand** 37:25
**break** 49:23 50:11
66:16,24 77:1,10
97:11 100:23
101:1 104:24
113:19 125:7
144:11,12,16
145:3 154:14
186:13
**breakdowns** 52:17
**break-out** 68:10,11
**Breed** 18:5
**Bress** 2:8 7:25,25
12:14 13:1,3 26:7
29:21 36:1 37:2
38:19 40:14 41:9
41:17 42:8,23
43:9,21 44:4,21
45:2,16,22 46:3
46:24 47:8,15,18
48:6,11 49:16,20
50:14,18 51:2,9
51:17,22 52:22
53:10 55:5 56:2,6
56:8,15,24 58:12
58:14,20 59:4
60:14 61:3,14,16

62:23 64:2,13,24
65:20 66:18 67:1
67:7,14 68:4,6,15
70:5 71:2,5,13,20
73:16 75:5 76:4,8
76:19 77:18 78:6
78:20,22 79:15,23
80:8,24 81:2,6,12
81:25 82:10,20
83:6 85:7,19,24
86:11,14 88:4
90:17,19 93:9
97:7,10 99:8,13
99:15,19 100:18
101:14 102:10,15
103:2,18 104:1
107:8,12 108:23
109:13 110:5,7
111:1,3,5,19,21
112:5,14 113:7,9
116:4,13 117:8,10
118:7,20,23
119:17,25 120:12
120:24 121:9,24
123:1,3,9,14,18
124:3,5,7,16
125:20 126:25
127:6 128:2,7,24
129:15 131:2,16
132:3,21 133:12
134:6,19 135:8,17
136:3 138:24
140:3,6,17,19,25
141:7,22,24 142:5
142:12 144:9,14
145:7,11,19,25
146:4,8,22 147:9
149:11,17,25
150:7,9,11,14,17
151:3,14,19,24
152:7,11,17
153:12 154:3
157:16,18 158:20
159:17 160:15
162:16,24 163:13
163:21 164:13,22

165:1,12,22
166:16 169:25
170:10 171:6
172:15 173:6,16
173:19 174:24
176:25 177:2,17
177:19 178:15,20
179:22 180:5,14
180:19 181:1,5,8
181:16,22,24
183:11,19,23
184:2,7,15 185:4
186:5 187:7
188:12,18,20,23
190:15,18
**brief** 94:14 171:10
**briefing** 75:3
**briefly** 94:12
**broke** 100:5
**brokers** 51:13
**brought** 54:16,16
**budgets** 51:15
**building** 26:10,20
26:21,24,25 27:2
27:5
**Bulk** 148:22,23
**bunch** 54:15
**business** 20:17,20
21:9 23:19 24:1,5
24:9,20,24 25:12
30:13 32:20
105:17,18 108:8
108:21 109:3,6,20
134:14,24 135:1
135:21 136:13,15
137:2
**businesses** 20:10
**buy-out** 22:25

————————
**C**
————————
**C** 2:1,22 3:1 8:12
**Cahill** 2:16 4:14 8:4
28:15,18,23 29:7
29:19 31:11,15,17
35:23 36:7,9,10
36:14,18,20 43:1

44:14,15,23 54:1
55:4 57:15 61:22
74:16,18 75:8,10
75:21 76:10 78:7
82:5,6,6,14 83:16
83:22 84:4 85:13
87:1,4 90:13
93:22 98:25
115:23 116:8
118:12 129:9
130:5,14,15,16
131:22,22,24
132:1,9,14,24
133:1,7,8,16
135:2,6 136:22
137:1,8 154:9
160:12 163:17
164:2,6,7,12
168:9 185:16
**Cahill's** 30:6
**California** 162:5
**call** 19:8,19 24:12
32:12 60:19,23
94:11 149:14
169:17
**called** 23:21 87:22
102:18 136:2
**calling** 80:25
**calls** 78:1 81:7
113:9
**Campo** 21:23
**candor** 119:13
**canvassing** 135:23
136:14
**career** 17:18 18:1
**careful** 46:25 55:5
**carefully** 40:8
87:19 139:9 163:8
**carrier** 49:9,11,12
50:25 67:16,19
**carriers** 49:3,15,17
50:13 67:13
**case** 9:5 10:20 11:1
11:5,10,13,18
12:1 15:21 16:15
33:25 34:16,25



35:9,10,11,17,20
35:21 41:18 48:2
49:8,15 50:13
51:21,24 52:4,6,9
53:9 55:24 64:23
68:2,11,11 69:10
91:25 95:3 96:23
97:1,3,5,6,23,24
98:1,6,6,8,10,20
98:20 100:8,9,12
102:8,9,25 109:22
110:3,9 114:15
115:19 116:1,21
116:22 117:1
126:23 127:23
131:17,18,25
137:5,10 143:9
154:21,25 155:4,6
155:9,9,13,25
156:4 159:21
160:18 161:4
162:12 163:7,18
163:25 164:10,18
165:5,17,19 166:4
166:11,11,20
167:12 168:25
169:23 170:4,6,8
170:19,25 172:10
172:14,18 174:7,8
174:8,13 175:22
176:3 184:23
185:2,8,9,10,25
**cases** 28:7,12 29:5
30:16,17,20,22
32:13,18 33:12,14
34:1,2,4,9,13 35:5
35:15 36:4 37:6
39:18 40:20 42:1
48:4 52:3,12,17
53:5,13,21,22
54:6,8,8,9,10,13
54:16 56:10 59:3
59:10 60:9 64:25
65:4,16 67:5,8,9
67:10,12,25 71:22
71:23 74:1,3,6

82:2,3 83:7,11,13
83:20,22 84:1
101:17 110:2,11
111:15,16 119:21
136:7 174:15
185:17,19
**case-by-case** 33:19
**catalysts** 1:6 2:12
5:4 7:4 21:6 72:5
**categories** 73:19
**category** 74:20
**cathodic** 21:5
**causation** 71:15
**causes** 109:23
**caution** 157:18
166:13
**cc'd** 58:25
**central** 106:14
**certain** 101:24
108:21 128:10,10
148:15 151:2
**certainly** 52:18
66:9 108:24
127:15 129:5
175:1
**Certificate** 4:10
192:1
**certified** 1:15 143:5
143:10 169:5
192:6
**certify** 143:17
192:7,10,14
**certifying** 120:6
**chance** 23:8
**change** 18:16 22:18
23:8 50:25 108:8
**changed** 21:16
22:25 23:22
**changes** 108:9
**characterize** 68:20
**charge** 107:2
**Chatham** 3:3
**checks** 175:8
**Chernick** 15:21
35:11 52:4,6
66:11 114:15

131:18
**chlorite** 95:22
**choice** 184:7
**Chris** 7:21
**CHRISTOPHER**
2:3 7:21
**chronology** 170:12
**chrysotile** 92:19,23
96:14,18 161:25
167:24
**circumstances** 9:3
22:16 31:22 97:4
97:22 172:13
**City** 18:4,9
**CIVIL** 1:2
**claim** 9:6,8 10:23
67:16 70:25 71:11
103:12 109:17,18
110:21 112:17,19
112:22 148:13
**claiming** 63:23
**claims** 64:11,15
67:19,25 109:16
109:16 110:14,14
111:12 112:13
113:15 189:5
**clarification** 146:5
183:24
**clarify** 13:12 76:5
146:11
**Clark** 167:13
**class** 54:12,15
**clause** 172:23
176:23 177:8,11
179:11 180:8,11
180:24 184:22
**clean** 101:1
**clear** 166:2 178:7
**clearance** 41:12
**clearly** 23:15 66:9
**client** 20:23 24:21
143:5 177:14
178:3,8
**clients** 20:9,11,12
20:24 24:2
**client's** 41:8 148:13

**clip** 86:10
**close** 47:20 48:23
**closed** 84:19 136:16
136:16 138:11
**closely** 121:11
**code** 189:16
**Cohen** 2:2 7:11
**collaboration** 18:6
**collected** 74:18
106:23 135:2
136:18 161:24
167:17
**collecting** 107:2
**collection** 4:14
30:10 87:1,4,16
**College** 161:23
**Columbia** 17:6,9
18:2
**column** 73:2
**combined** 58:22
**come** 27:11 29:11
29:16 44:9,24
55:24 81:17 87:21
88:14 90:25
132:24 143:21
157:25
**comes** 148:1
**coming** 37:20 83:16
**commencement**
192:8
**commencing** 1:18
**Commerce** 2:3
**Commission**
192:24
**committee** 126:12
**communicate**
36:17 82:4 98:5,9
98:12 154:8
**communicating**
173:13
**communication**
48:12,22 80:25
81:8,13 116:18
157:20 177:12
**communications**
29:18,19 49:17

50:21 51:3 78:2
80:1,3,7,17 83:11
98:5 132:16 154:4
165:4,23 166:14
172:16 173:9
**company** 5:20
23:23 28:14 47:24
52:13,15 65:1
67:20 83:25
101:21 102:20
118:13 127:5,24
136:12,14 155:15
155:16 157:3
161:3 174:11
175:1 179:25
180:24 181:2
190:3,9,9
**company's** 5:13
30:12 155:24
**compilation** 87:8
87:13
**complaining**
142:23
**complaint** 16:18,21
28:13 31:10 36:6
74:7,12 155:6
159:22
**complaints** 28:6,11
30:15,22 40:5,9
**complete** 120:10
121:6,21 122:24
124:1 125:17
**completed** 39:6
**completely** 141:13
**concentration**
182:6
**concerning** 85:23
126:13
**concluded** 102:8
103:1 138:13,21
139:23 142:8
144:6 190:19
**concludes** 190:24
**conclusion** 102:19
103:15 113:9
167:23



**conclusions** 123:5
123:16 140:13
**conclusively** 148:9
**condition** 177:15
178:3,9
**conduct** 118:6
128:17
**conducted** 16:14
118:2 138:13,20
139:22 142:8
144:6
**conference** 148:7
**confident** 169:11
172:24
**confirmation** 90:7
**Congressional**
126:12
**conjunction** 117:23
143:19
**connection** 71:16
**consideration**
179:12,16
**considering** 133:19
**consistent** 169:10
**consolidated** 21:25
85:1
**consolidation** 22:3
**consult** 19:17,19
119:8 129:5
**consulted** 126:1
**contain** 138:14,22
139:24 142:9
144:7 157:6,12
**contained** 44:9
80:6 100:17 106:4
148:11 149:1
150:25 153:9
173:5 176:18
**containing** 69:25
**contains** 70:24
71:10
**content** 48:12 81:3
85:23 100:13
**contents** 118:1
**context** 29:7 34:12
49:1,14 50:13

51:11 97:5,23
98:6,7 100:9
113:1 150:17
155:3 162:12
163:7 184:23
185:17
**continuation** 19:1,9
**continued** 2:22 3:1
5:1 92:3
**continuing** 129:17
176:14
**contract** 178:22
179:1,5 180:24
181:12,21 182:1
**contracts** 20:14
**contradicted** 121:3
**contradicting**
121:18
**contribution** 60:16
62:9
**control** 122:11
129:10 130:6
**Controllers** 25:10
**convenience** 61:8
**conversation** 48:19
**conversations**
163:14
**Cool** 88:25
**coordinate** 28:16
115:17 117:3,3,7
131:13
**coordinated** 115:11
118:17 127:3,7
134:5 139:15
140:23
**coordinates** 116:6
116:19
**coordinating** 20:19
120:7 121:7,22
122:24 124:1
125:18 127:18
129:14 130:10
**coordination**
115:25
**copies** 6:3 86:5,9
106:12

**copy** 15:20,25
58:11,12 59:7
61:10 66:17 91:18
147:12 187:5
**copying** 58:5
**corner** 141:16
**corporate** 18:4,11
18:21,23,24 24:23
25:7,11 26:19
115:7 121:7,22
122:24 124:1
125:17 127:4
133:6 143:2
170:19
**corporation** 5:10
18:15 25:22 93:23
105:15 114:13
115:11 148:10
**correct** 34:5,23
44:19 55:16,25
67:13 71:23 78:21
79:14 82:19 87:13
89:22 92:20 95:18
95:19,22,23 96:4
96:5,14,15 109:6
116:14 122:13
123:18 133:3
178:23 181:12
184:17 186:9
188:10,11
**correctly** 93:3
149:4 162:6
**correspondence**
65:5 67:9 170:17
185:15,23
**cost** 51:21 52:5,8
52:12
**costs** 169:15
**Cottrell** 23:1
**counsel** 7:15 14:3
15:23 16:3,23
20:18,20 21:15,16
21:20,23 25:17
27:22 28:1,15,16
28:17 30:2,10,14
30:24 31:1,4,7,10

31:13,17,20,23
32:9,11,13,15
33:3 34:8 35:23
35:24 36:8,8,17
36:20 40:23 41:4
41:14,15 42:13
43:1 50:1,24 51:3
54:18,21 55:3
61:11,13,20,23,24
62:2,9 69:25
74:16 75:1,3,11
78:17 79:12 82:3
82:4,7,13 83:11
93:19 97:14,25
98:17,19 99:2,24
100:8 115:10,23
116:8 125:3 127:8
129:5 131:22
150:6 155:8,10
156:17,19 158:7
158:14 160:13
163:18 164:10
165:5,10,13,16
166:10,15 168:12
169:22 171:3,12
171:24,25 185:7
192:16,18
**counsels** 82:22
**counsel's** 154:24
**County** 16:8
**couple** 15:22 19:23
22:11 54:5 65:5
**course** 101:25
128:17 154:5
172:17
**court** 1:1,15 7:5,13
8:10 17:23 91:24
119:12 192:6
**courteous** 142:22
**Courts** 17:21 40:25
41:4,8 81:21
**cover** 41:19 65:21
66:3 83:14 175:20
175:23
**coverage** 50:16,17
**covered** 33:8,9

46:22 180:8
**covering** 156:23
**Craig** 160:6,9
**created** 11:22
12:10 69:10
**creates** 182:5
**credit** 175:9
**crossing** 140:20
**current** 43:13,16
60:4 137:4,8
**currently** 159:4
**custody** 129:10
130:6
**cut** 129:23 175:7
**Cuzzone** 4:24
168:19,24 173:14
175:20 177:13
178:2,10 179:7,17
181:18 182:11
183:7
**Cuzzone's** 178:8
**C.C.R** 192:25

## D

**D** 4:1 25:10 105:4
109:5,11 110:4,25
111:17 112:11,11
113:5 126:15
**Dan** 7:25 11:14,21
14:7 66:17 77:25
147:8
**DANIEL** 2:8
**Daniels** 167:13
**daniel.bress@kir...**
2:11
**data** 85:22
**date** 26:15 104:11
170:23 171:1
192:13
**dated** 89:5 105:5
114:16 147:22
156:1 161:4 169:2
187:24
**dates** 114:19
**David** 167:12
**day** 15:17 183:3



**days** 9:25 10:18,18 134:13
**deals** 20:14
**deal-type** 18:11
**debit** 175:8
**deceased** 159:3
**decided** 117:2
**deciding** 53:8 64:11
**decipher** 48:17
**decision** 56:12 57:1 57:5 158:12,16,22 184:5
**decisions** 119:21
**Decof** 5:6 167:12
**deep** 47:11
**defend** 20:18 51:21 52:6,9,12
**defendant** 3:5,9 5:12,16 72:4 155:24
**defendants** 1:7 2:16 54:20 57:10 60:17 61:9,15,25 62:6,16 63:6
**defendant's** 156:17 156:19
**defending** 29:8 30:7 31:8 35:24 39:3 61:24 76:1 82:16 155:3
**defense** 31:4,7,17 31:20,23 32:15 34:8 35:24 53:5 61:10,13,19 62:2 74:15,16 83:22 84:3 88:8 94:6 156:4 164:17 168:12 169:14
**defenses** 73:5,21
**Definitely** 15:18
**defraction** 96:3
**degree** 17:7,8
**demand** 169:16
**Dembrow** 2:17 8:5 29:9
**demonstrates**

**148:9
**deny** 148:24
**department** 18:4 18:14,15,24,24 20:6 21:4 23:21 25:7 32:10 36:24 39:3,12,14 52:20 53:8,12,17 56:4 57:3,6 65:11 67:21 83:21 92:18 92:22 93:6 94:14 107:6,25 108:4,16 109:11 111:15 112:3,11 113:5 174:23 179:1 184:21
**departmental** 25:12
**departments** 20:12 21:25 24:23 25:8 84:25 108:8
**depended** 31:9
**depending** 60:12
**depends** 110:14
**Deponent** 2:20
**deposing** 150:1
**deposition** 1:4,13 4:10 7:3,9 8:21,23 9:4,13,23 10:2 14:4 16:25 50:2 85:12 91:24 92:4 93:14 95:1 96:22 97:15 99:25 122:20 123:22 125:4 126:11 127:22,22 129:13 130:9,18,25 131:8 131:11 132:2,8 133:9,10,17 138:19 162:11 187:21 190:25
**depositions** 45:8,10 123:22 125:14,23 125:25 126:22 128:21 149:8 185:2

**describe** 74:1 111:13
**described** 37:18
**describes** 155:17
**describing** 59:2
**DESCRIPTION** 4:8 5:2
**destroy** 101:24 112:16
**destroyed** 102:9,25 112:23
**destruction** 103:11 103:13,23
**detail** 134:9
**detailed** 47:9,19
**details** 29:5 33:14 36:19 48:1 64:17 109:20 175:7
**determined** 20:9 62:4 63:4
**development** 92:8
**developments** 108:10
**different** 21:3 33:21,22 43:4 53:15 55:21 57:16 80:12 81:9 102:20 112:7 136:19 141:1,8,18 182:5 187:22
**diffraction** 95:17
**direct** 32:9 69:11 88:12,22 89:19 92:14 95:9 160:13 176:6,7
**directed** 154:8
**direction** 104:17
**DIRECTIONS** 6:7
**directly** 30:24 36:17 49:9 50:25 60:20,23 75:6 116:16 159:3 171:11
**Directors** 175:13
**dis** 171:14
**discard** 106:6,8

**discarded** 103:17 107:11,14
**discarding** 105:17
**disclosable** 80:7
**disclose** 46:25 49:17 51:3 80:11 81:7 120:5,20,22 121:5,20 122:22 123:24 125:16 129:13 130:9 133:9 176:16
**disclosed** 119:22 171:2,7,15
**disclosing** 29:17 48:3,15 81:12 124:9 153:14
**disclosure** 84:8
**disclosures** 5:17 72:4 100:22
**discontinued** 105:6 105:24 106:13,20
**discoverable** 72:15 72:17 85:10
**discovery** 41:22,24 42:7,14,18,20,21 43:6,14,18,24 44:2,9,24 119:13 119:22 137:5,10 176:18
**discuss** 165:4,16 166:3 169:17
**discussed** 12:22 13:10,16,25 14:2 29:23 50:23 74:4 74:23 101:16 112:12 123:23 125:14 147:24 149:9 163:11,15 164:2,9 165:19 168:5 171:22 185:3 186:1
**discusses** 100:22
**discussing** 67:4 144:13
**discussion** 36:19 57:23 153:22

**164:6,12,15 168:6
**discussions** 164:16 168:8,11 171:23 171:24 176:20
**disease** 70:25 71:12 109:23
**diseases** 63:24,25 126:14
**disposition** 64:23
**distinguished** 64:10
**distributor's** 49:11
**District** 1:1,1 7:5,6 91:24,25
**division** 20:10 21:24 35:22 130:13 132:15
**divisional** 21:25
**divulge** 76:20 123:20
**divulging** 76:23 80:16
**doc** 103:15
**docket** 187:17
**document** 4:15 5:3 58:19 63:15 64:21 69:14 72:6 86:17 87:7,17 90:20,23 93:17 104:24 105:5,9,12 106:19 107:17,24 108:17 140:21 167:4,7 187:18,23 188:2 188:12 190:5,10
**documentation** 158:8
**documented** 67:17
**documents** 4:15 6:1 6:3 10:6,8,13 12:20 15:12,15,19 16:12 60:9 66:17 73:9 87:2,2,4,13 88:23 101:7 103:12,16 105:16 106:12,23 107:2 107:10,15 108:21 108:25 109:2,10



MAGNA ›
LEGAL SERVICES

110:4,25 111:17
112:12,16,20
113:5,16 128:10
129:2 136:22
148:15 158:9,13
176:19 188:11
**doing** 42:3,17 54:6
78:9 135:23
154:13 172:17
**dollars** 59:11 60:10
185:20
**Donohue** 1:17 2:18
2:18 7:23,23,24
10:21 12:23 13:8
13:12,15,18,20,23
13:25 14:20 29:25
40:15 44:5 46:4
48:20 50:3 52:24
56:16,19,22 58:13
68:23 69:5 71:3
71:21 76:5 78:23
81:14,18,24 82:1
86:19 87:12 88:3
88:5,17 90:16,18
91:1,20 94:22
98:12 99:6 100:24
103:4 109:12
110:6 111:2,20
118:24 119:16,18
119:24 120:8,11
120:13 121:8,23
123:2,13,19 124:4
124:6,14,22,25
125:21 127:11,14
127:18 128:4,25
129:16 131:7,15
132:4,12 133:11
133:13 135:12
140:18 141:23
142:14 143:8,17
143:20 146:25
149:10 150:20
151:10 152:25
153:4,10 157:13
157:15,17,24
158:2,4,21 159:15

160:23 162:23
163:22 164:20
165:8 166:7,13,25
168:23 172:6
173:20 177:1,21
177:23 178:5,13
179:10,20 181:14
181:23 182:15,17
182:19,23 186:3
186:11 187:11
188:17,19 189:3
190:22
**Dornbusch** 3:5
5:16 8:7 22:1 26:5
26:9 38:15 53:18
63:8 69:21 72:13
72:14 73:13,20
85:3,4 87:5,25
98:25 100:22
101:5 121:2,10
122:19 123:21,21
125:13,23 165:20
165:25 166:5
174:20 190:17
**Dornbusch's** 72:4
84:8
**Dr** 92:7 93:6
126:22 161:22
162:20 166:19
177:16 178:4,11
179:18 180:12
181:19 182:7
183:8
**draft** 40:22,25
**drafted** 107:6
**drafting** 20:14
45:14,17,23 108:1
108:3
**drawing** 140:13
**draws** 182:1
**drove** 167:16
**due** 10:23
**duly** 8:13 192:9
**dump** 167:19
**duplicates** 59:14
**duration** 26:3

**duties** 18:11 22:25
27:13 38:1,2
**duty** 19:1,3,6 24:13
119:13
**D.C** 2:10

—————————
E
—————————

**E** 2:1,1,22,22 3:1,1
3:10,10 4:1,7 5:1
8:12,12,12
**Eagle** 1:17 2:19
7:10
**earlier** 14:8 15:9
38:21 54:4 70:12
74:14,25 90:2
94:9 101:16
122:20 123:23
125:14 139:5
140:9 154:20
162:11 188:1
**early** 22:5 27:8
37:5 106:19
148:21 155:13
**easier** 89:9
**East** 21:9
**Eastern** 5:12,20
155:24 157:3
161:3
**easy** 154:18
**eat** 88:16 151:16
**economic** 138:11
**edition** 187:22
**education** 17:3
**effect** 91:10 153:2
180:23
**effective** 54:1
**either** 22:12 30:24
36:20 58:24 60:11
122:5,18 152:15
174:7 190:8
**electron** 96:2,2,3
162:4
**Elizabeth** 168:19
168:24 175:20
177:13 178:2,8,10
**Ellis** 2:8 8:1,3

12:17,20 14:10
**else's** 142:16
**Em** 38:16 45:11
**employ** 159:5
**employed** 15:23
190:9 192:17
**employee** 19:9
137:4,9 192:15
**employees** 43:7,12
43:13,16,17
126:10
**employment** 19:10
19:21,23
**Emtal** 27:12,18,20
27:25 29:1,8,10
30:7,11 31:8
35:24 36:25 38:9
38:17 39:3,13
40:3,23 41:1 49:1
51:11,21 52:12
63:25 64:23 70:22
71:8 76:2,3,18
77:17 78:5,19
79:14,22 80:19,23
81:5,22 82:8,17
82:18 83:5 85:18
85:23 89:24,25
90:15 91:4,7,13
92:19,24 93:8
94:6 100:14,17
102:6 105:24
107:11,15 109:6,9
109:22,23 110:4
110:21,22,25
111:7,9,16,18
112:11,13 113:4,5
138:7,8,9,10
148:22,22,22,23
148:23,23,25
150:25 166:12
173:5 174:8
184:23 185:10
**Emtal's** 109:20
**Emtal-related**
106:23
**enclosing** 175:21

**encompassed** 54:9
**ended** 15:9,9 19:1
39:4 174:3
**enforce** 181:12
**enforcing** 181:18
**engage** 36:8 141:17
**engaged** 42:12
157:4
**engagement** 31:24
32:12 42:15
**Engelard** 5:9
**Engelhard** 4:12 9:6
9:10 10:24 15:23
15:24 18:13,15,23
18:25 19:7 20:5
21:24 22:6,14,19
22:20,22 23:4,10
23:17 24:10,16
26:3,12 27:4 30:7
32:10 33:23 35:5
35:18,23 36:24
37:7,21 38:1,8,16
39:2,6,12 40:2,5
40:10 41:6,16,23
42:5,5,6,22 43:19
46:2 51:15,21
52:5,9,11,20
53:17 55:25 56:14
59:7 61:24 62:5
62:15 63:4,4 64:9
64:22 71:17 73:4
73:9 75:2 78:18
79:13 80:21,21
81:4 82:17,23
83:3 84:3,19,24
90:13 91:11 92:9
92:12 93:23 94:12
94:15 95:7,18
100:14 104:6,15
104:22 105:11,15
106:18 111:15
113:12 114:13
115:10 117:23
118:2,6 135:15,23
136:1 137:7 138:2
138:5,8 139:25



140:24 143:19
148:10,10,24
153:7 154:24
158:19 159:13,25
160:13 163:12
164:9,16 165:11
165:13,15 168:5
169:10,13,21
172:23 173:3
174:3,6,12,19
175:4,12 176:23
177:8 178:9,22,25
181:11 182:2,8
184:20 185:10
187:16 188:2
**Engelhard's** 15:25
40:13 41:14 44:3
44:19,22 45:25
49:2,10 53:7 56:4
60:16 62:8 73:8
76:2,11,11 81:20
81:22 82:9 83:5
83:21 91:3,6
100:17 101:7
102:7,23 103:14
108:17,20 109:9
109:10 110:3,24
111:11 115:11,18
129:12 130:8
138:6 148:12
156:5 160:12
**Engelhard's/BAS...**
85:6
**Engelhard/BASF**
73:21 101:8
**entered** 178:23
184:25
**entire** 26:5 83:24
**Entries** 5:3
**entry** 69:13,15
**equals** 186:6
**equivocation**
140:16 142:10,17
143:6 144:8
**era** 170:25
**Eric** 3:6 8:8

**especially** 76:24
**Esq** 2:2,3,8,9,13,18
3:2,6 4:10
**Esquire** 72:24
115:10
**essentially** 19:10
23:23 37:17 38:2
39:9 102:19
111:23 181:3
**established** 102:16
**estate** 18:11
**et** 1:3,6 7:4,5
**etunis@herold.c...**
3:8
**everybody** 36:23
72:11 101:25
139:11 183:3
**Everybody's** 50:3
**evidence** 70:24
71:10 82:18 83:1
83:4 85:17,21
88:1 90:13 100:13
100:16 139:14
142:18 149:1,16
149:22 150:13,22
150:25 151:8,12
151:13,22,23
153:1,1,8 169:10
170:15 171:13
**evidential** 142:17
**exact** 155:11
**exactly** 11:3,9,17
20:11 25:19 32:7
53:16 131:24
138:3 163:4
187:23
**examination** 1:5
4:2 8:14 192:8
**examined** 162:3
**exception** 36:3 49:5
49:6 51:19 56:11
189:10
**Excerpted** 5:3
**excerpts** 69:9 91:19
94:24 129:3,4
138:18 149:7

**exchange** 154:12
179:13
**exchanged** 30:25
**excluding** 4:15 87:2
**excuse** 10:5 130:17
**executed** 179:1
180:25
**executive** 26:19
27:5
**executives** 160:14
**exhibit** 4:14,16,18
5:3,5,8,9,12,15,16
5:18,22 9:17,17
10:1 58:3,22 69:9
72:3 84:7 86:25
91:17,22 94:18
95:1 101:2 105:3
107:18 109:4
114:5,12 119:23
130:24 131:7
147:15,25 148:6
155:23 161:1
167:2 168:17
169:6 172:20
175:16,19 185:14
186:1,19,23
187:13 191:4
**exhibits** 5:22 16:20
126:21 127:21
129:10 130:6
185:3 191:3
**existed** 52:19 66:9
66:12 113:11
188:4
**exists** 85:18,22
**expect** 88:1,2,10
112:6 120:4,22
133:8 173:3
**expected** 19:15
111:14 127:23
129:11 130:8
**expenses** 51:16
52:14,14 53:1
68:11
**experience** 70:22
71:8 184:20

**experienced** 129:5
**expert** 100:11
139:7 140:11
162:13 163:6,10
163:19,24,25
164:10,17 165:6
165:17,21 166:4
166:11,20 170:7
171:4,13,21
**Expires** 192:24
**explain** 36:8 116:15
150:4 151:6 173:9
181:9 183:12,22
**explained** 183:19
**exposure** 10:24
63:25 111:17
126:13
**extended** 26:18
**extent** 12:4 50:23
54:20 65:10 76:19
77:19,21 78:9
79:23,25 115:25
154:6
**extremely** 51:7
66:8
**E.J** 89:4,13

**F**

**face** 107:4 169:15
**fact** 34:24 72:8 74:2
129:19 158:8
163:9,24 164:9
165:4,16 166:3,10
169:22 170:7
171:3,17,20
178:11 179:18
180:12 181:19
183:8
**facts** 80:6,9 141:4,4
176:16,19
**factual** 44:8,23
76:17 77:16 78:1
78:4,18 79:12,21
80:2,18 118:1,5
129:22 133:8,20
134:1,4 135:2,3,6

135:15 136:2
144:18 153:24
154:1,9,12 157:10
157:11 159:14
**failure** 11:22
**failures** 12:11
**fair** 23:7 24:6 40:6
73:15 83:21 88:20
103:25 104:7
109:24 110:20,20
116:7 118:19
119:7 127:13
132:2,11,24 134:3
134:7 135:7,11,12
135:14 137:5
140:14 146:17
170:5,20 171:16
171:19 179:2,15
185:21 190:6
**fairly** 162:8
**fall** 95:16
**familiar** 29:14 57:8
87:18 94:9 129:2
**far** 35:6,16 109:1
132:25 133:4
**Fax** 2:15,20 3:4,8
**FC** 4:22 5:11,14
**Federal** 11:1
**fee** 51:25
**feel** 74:22 110:18
**feelings** 23:5
**fees** 31:25 32:20
51:16 53:1
**Feldman** 18:10
**felt** 122:3
**fiber** 90:3
**fibers** 89:24 96:13
96:13
**fibrous** 157:7,14
**Fifteenth** 2:9
**Figured** 100:25
**file** 46:1 65:7,12,16
**filed** 12:1 40:5,10
45:20
**files** 42:25 43:20,23
65:5 87:5 88:1



101:16 102:8
106:4,6,14 189:22
**final** 179:5
**finalize** 61:8
**Finally** 176:15
**financial** 52:15
**financially** 192:16
**find** 99:13 164:1,11
164:18 165:6,18
166:4,12 169:11
171:4,21 172:24
182:7 183:8
**finding** 162:21
**fine** 27:10 46:10
58:16 123:7
144:21 152:20
184:9 189:17
**firm** 11:21 14:9
16:4,6,7 18:4,9,19
32:23 33:15 34:2
34:3,12,15,23
35:7,14 65:25
66:24 115:22
130:14 132:1,11
132:14 133:2
148:21 154:8
185:16,16
**firms** 33:21 40:18
40:19,19 54:17
**first** 5:10 9:22
10:25 11:12,20
14:14 18:10,13
20:12,13 22:7
24:15 39:9 40:18
47:3 49:18 50:22
56:21 59:12,25
63:16 64:4 65:22
69:13,15 74:20
83:7 90:12,21
91:23 95:15 96:21
96:25 100:15,20
103:5 104:15
106:2,3 114:14,14
117:25 137:13,22
148:5,13 159:1
162:20 163:4,4

167:15 170:13
172:22 176:1,7
180:16
**firsthand** 120:3
134:8
**fit** 12:4
**five** 9:24 10:18
148:21
**Fix** 62:18
**flakes** 162:1,1
**Fliegel** 22:22 37:3
37:20
**Fliegel's** 37:12
**flip** 86:16
**flipping** 86:23
**focus** 39:25 82:25
161:7
**follow** 74:24 95:13
171:7
**following** 18:1
77:13 79:7 95:25
95:25 97:20
103:14 105:24
125:11 130:3
144:2 151:20
177:24 192:11
**follows** 8:13
**foregoing** 117:24
**foreseeable** 113:2
**forgot** 74:1 188:22
**form** 10:21 14:20
26:7 31:12 36:1
37:2 38:19 40:14
40:17 41:9,11,12
41:15,17 42:4,8
42:23 43:9,21
44:4 45:2,16,22
46:2,3 51:9,17,22
53:10 56:8,15,24
59:4 60:14 61:14
61:16 64:2,13,24
65:20 67:7,14
68:6,15 71:3,13
71:20 73:16 75:5
76:4,8 78:22
80:24 81:24,25

82:10,20 83:6
85:7,19,24 88:3,4
90:16,19 93:9
100:18 101:14
102:10 103:2,18
104:1 107:8,12
108:23 109:12,13
110:5,6 111:2,3
111:19,20,21
112:14 113:7
116:4,13 117:10
118:7,20,23,25
119:16,17,24
120:11,24 121:8,9
121:23,24 123:2,3
124:4,7 125:20
128:24 129:15,17
131:15 132:3,4,12
132:21 133:11,12
134:6,19 135:17
136:3 138:24
140:6,17 141:20
141:23,25 149:10
149:11 151:3,14
151:25 153:11,12
157:15 158:20,21
159:15 160:15
162:16,23 163:21
163:22 164:13
165:1,8 169:25
173:19 174:24
177:1,3,19 178:5
178:13,15 179:20
181:14,16 185:4
186:3,5
**formal** 21:13 74:11
74:12
**formed** 54:22
**former** 43:7,12
137:3,9 138:6
148:11 150:1
179:25 182:2
**formerly** 157:3
**forming** 162:1
**forward** 61:6
**found** 87:5,17

89:24 90:14 91:4
92:23 93:7 96:18
140:1 162:14,21
163:11,18,19
164:1 169:23
170:8 177:16
178:4,11 179:19
180:13 181:19
182:16
**foundation** 41:17
42:9 44:4 45:22
46:3 52:22 64:2
64:24 67:14 68:6
82:11 83:6 85:19
102:10 103:2,18
109:14 110:7
112:14 113:7
138:25 140:7
141:21,25 157:17
159:16
**four** 10:18 73:18
**fourth** 101:5
**frame** 25:14
**framed** 80:11
**framing** 80:13
**freelance** 19:24
**front** 69:8 72:2
86:24 91:21 94:25
105:2 114:11
147:14 153:19
155:22 160:25
167:1 168:16
172:21 187:12
**full** 115:6 137:22
**fully** 83:19 103:20
129:1 139:9
**function** 28:3
**functions** 25:11
**funnel** 116:7,17
**furnished** 148:8
**further** 96:1 105:18
146:21 192:10,14

--- G ---
**G** 93:22 94:2
**Gale** 4:18 95:2,6

96:17,22 126:22
128:20 129:11
130:7 133:9 149:8
**Gale's** 127:22
**gears** 154:14
**general** 14:1 18:21
20:13 21:20,20,23
25:17 26:8 27:22
28:1,6 31:24
34:18 35:22 36:2
36:3,15 41:20
42:11 44:6 46:6
47:18,22 48:1
49:4 51:7,10,18
52:13 53:11,19
56:9,22,23 63:10
65:18 68:16 71:15
71:22 83:13 90:7
101:21 102:5,14
109:22 115:10
120:25 122:16
134:13 150:14,20
150:21 151:1,8,12
151:23 160:18,19
**generally** 28:24
29:22 32:1 41:10
53:1 56:25 57:3
68:8 71:18 73:14
91:3 99:6 103:9
116:6 122:10
185:19
**geologist** 95:7
161:23
**Georgia** 89:25 90:8
96:4,7,8,12,18
**getting** 20:18 29:24
47:9,10,20 91:19
98:4 123:14
140:20 152:4
172:12 188:14
**Gianna** 14:9
**Gideon** 117:21
118:5,9 147:16
**give** 15:17 50:15
51:10 55:3 59:11
77:18 79:4 80:17



116:9 129:7
139:10 152:7
169:16 171:1
178:21 184:16,16
**given** 63:14 141:14
**giving** 145:15
**Glassley** 161:23,24
162:3,21 163:1
166:19 177:16
178:4,11 179:18
180:12 181:19
182:7 183:8
**Glenn** 4:16 92:4
93:11,14,24
**gloss** 153:24
**go** 17:3,4 19:3 20:4
22:20 25:13 42:10
47:19 50:15 53:20
57:19 60:11 62:20
63:1 69:2 73:18
87:18 88:11 94:21
98:22 99:18,19
100:23 108:7
115:3 124:25
129:18 133:25
141:12 144:20
146:20 148:18
158:25 167:15,23
**goes** 60:11 63:20
105:18
**going** 9:16 12:24
13:1 29:21 39:25
48:6 50:20 62:5
63:5 74:22 78:24
81:6 87:6 92:14
95:9 124:14,15,18
124:19,19 126:25
129:23 133:25
142:4 144:9,10
145:23 152:5
153:10 154:13,15
166:13 172:20
175:15 179:6
181:6 183:16
184:5
**gold** 21:9

**good** 8:15,16,19
52:15 172:6
186:11 189:3
**good-bye** 171:10
**Gordon** 2:16 8:5
28:16,18,23 29:7
29:20 31:11 35:23
43:1 44:14,23
61:22 93:22 129:9
130:5 132:24
133:1 135:2 168:9
**graduated** 18:1
**great** 110:10 139:9
**Grimm** 5:6 167:12
**grit** 167:18
**grounds** 12:24
**group** 23:19,23
38:4 57:15 62:15
63:5 64:7,11
67:23
**groups** 23:20
**guess** 10:5 31:15
44:18 61:23 74:10
94:20 148:20
**guesses** 133:22,23
**guessing** 113:17
**guest** 124:21
**guidance** 97:9
**guy** 108:7
**guys** 86:5 99:16
**G.A** 89:5,11 105:4

**H**

**H** 4:7 5:1 8:12,12
167:12
**Halket** 3:9 8:9
93:23 94:8 190:16
**Halket's** 37:6
**HAMILTON** 2:13
**hand** 88:21
**handful** 136:6
**handled** 28:7 34:3
35:9,17 65:17
137:11,13
**Hang** 152:23
**Hanovia** 21:8

**happen** 156:8
**happened** 84:23,25
112:20 133:20,22
143:9
**happens** 147:10
**happy** 23:1
**hard** 58:11,12
139:16 150:3
152:1 162:8
**harmless** 76:12
**Hassett** 1:7,13 4:3
4:10,20,22,24 7:3
7:24 8:15 9:17
10:3,19 13:7
14:14 17:2,25
27:11 50:10 58:2
63:3 69:8 72:2,22
77:10 78:15 79:9
85:17 86:23 90:24
91:21 94:25 100:5
105:2 114:2,11
115:9,15 127:20
128:13 142:21
145:17 147:14
149:16 150:13
152:22 155:22
157:19 160:25
167:1,14 168:16
178:19 181:13
184:12 186:22
190:23,25
**Hassett-1** 4:9 9:18
10:1
**Hassett-1A** 4:12
186:19,23 187:13
**Hassett-10** 168:17
172:21
**Hassett-11** 69:9
**Hassett-5** 58:3
185:14 186:2
**Hassett-7** 176:12
**headquarters**
18:20 26:13
**health** 19:11
**hear** 164:23
**heard** 37:6 55:10

58:21 86:1,1
87:22 89:12,17,17
94:10 100:16,19
**hearing** 61:6
**held** 9:10 149:3
**help** 12:1 20:13
99:15 183:24
**helped** 131:13
132:9
**helpful** 74:22
**Hemsoth** 4:16
89:5,11 92:4,7
93:6,11,14,24
105:4 126:22
127:21 128:20
129:10 130:7,25
131:11 132:2
133:9,17 149:8
**HEROLD** 3:6
**Hey** 154:17
**high** 46:25
**highlighted** 89:20
92:15 93:21
**Hilton** 26:25
**historical** 120:5
**hobby-type** 19:24
**hold** 56:6,6 61:3
81:14 111:22
142:12
**honest** 121:6,21
122:23 123:25
125:17
**honestly** 39:18 62:9
79:18
**hope** 123:24 125:15
131:21
**hoping** 129:22
**Hotel** 26:25
**hours** 146:25
**house** 154:23
**Howard** 33:5 35:12
35:17 93:22 94:2
98:14 99:4 155:8
155:10 159:10
160:6 168:19
173:14 175:20

**Howard's** 35:14
173:22
**Huene** 162:5
**Human** 25:9
**Hyde** 87:23
**hygiene** 126:14
**hypothetical** 122:8
122:16 129:21
**hypotheticals**
129:24 141:3,13
**H'mm** 57:11

**I**

**identification** 9:17
58:3 72:3 86:25
91:17,22 94:18
95:1 105:3 114:5
114:12 147:15
155:23 161:1
167:2 168:18
175:16 186:20,24
187:13
**identified** 96:13
128:22 161:25
**identifies** 72:13,14
148:21
**identify** 127:25
**ifs** 126:3
**II's** 5:17
**implemented**
104:15
**impression** 102:12
146:10 152:13,19
181:3
**impressions** 69:25
123:6,15 128:9
141:10 145:8,12
145:15 149:13,19
149:23,24 173:8
177:4 178:21
179:24 180:10,15
181:10 182:1
183:13
**improper** 141:13
143:13 144:17
**include** 48:1 63:23



109:2 126:2
127:25
**included** 47:5,7
60:4 76:10 85:14
101:22 108:17
**including** 53:1 60:5
77:24 93:11
131:17 158:8
176:17
**inclusion** 177:11
**income** 19:25
**incoming** 42:20
**incomplete** 119:15
**inconsistent** 139:4
**incorporated**
136:12
**incorrect** 121:11,16
122:2,15
**increased** 169:14
**increases** 60:4
**Independence** 3:7
**independent** 90:6
169:10
**index** 68:17,20
69:24 70:16
**indexes** 68:14 70:3
70:10
**indicate** 48:22
**Indicates** 86:19
**indicating** 85:18
**individual** 51:16
54:15
**individuals** 120:6
**industrial** 18:19
126:14
**industries** 18:14
20:5,23 21:24
24:11
**information** 15:24
28:17,23 30:11,25
31:11,14 36:11
42:25 43:2 44:8
44:24 45:6 46:21
47:1,6,20 48:3,15
72:15,17 74:17
76:20,23 77:20,21

77:24 78:10 80:12
85:10 106:4
115:24 116:7,9
119:22 120:3,5,6
120:19,21 121:2,5
121:17,20 122:2
122:11,22 123:25
125:16 132:14,18
132:23 133:2
134:25 135:4,7,15
136:2,11,15,17
137:2,4,9 150:22
153:15,18 154:12
156:13 157:21,23
171:13 173:11
176:18
**initial** 31:24 32:12
84:8
**initially** 188:6
**initiated** 11:10
74:11 104:18
107:23 155:6
**initiation** 104:20
**injuries** 64:7
**injury** 10:23 64:15
110:21,22 112:13
113:3,3
**input** 108:16
**inquiries** 32:6
**inquiring** 50:16
**inquiry** 122:1
**insist** 176:23 177:8
**inspections** 73:6
84:10,12
**instance** 174:12
**Institute** 90:8
**instruct** 13:1,4
47:21 48:6 50:14
50:20 51:2 76:21
77:22 78:24 80:1
81:8 123:12 127:1
146:13 152:6,15
154:3 180:21,22
183:16,17 184:6,8
**instructed** 13:21
**instructing** 152:10

**instruction** 51:5
77:19 78:3,15
79:10 80:14
146:16 152:21
166:16 184:3,11
**instructions** 55:3
**instruments** 95:17
**insurance** 9:6,7
49:2,7,15 50:12
51:13 67:19,20
**insure** 120:9
**insured** 128:21
**intended** 153:7
173:15,16
**intent** 106:12
**intention** 173:22
**intentionally**
119:13
**interact** 31:19,23
49:2
**interacted** 49:9
94:5
**interacting** 32:16
33:4 35:13
**interaction** 34:11
34:15
**interactions** 34:8
34:17 49:14 50:12
51:12 62:1 74:25
**interested** 23:4
135:22 189:18
192:18
**intermingled**
167:25
**internal** 32:10
150:10
**Interoffice** 4:12 5:8
**interpret** 140:20
143:12 153:17
178:17 179:24
**Interrog** 117:3
139:1
**Interrogatories**
5:11,13,19 15:21
114:15 115:8
116:3,11,20 117:4

117:7,9,25 119:5
120:6,7 121:4,19
126:6 127:24
130:16 131:14
132:10,19 133:3,7
134:1,5 135:6,16
135:19,24 136:1
139:2,15 143:3,4
147:23 148:2,14
155:25 156:6,14
156:18 159:13,20
160:10 161:3
169:4,6
**Interrogatory**
66:11 115:5 124:2
125:18,24 126:1,8
126:24 127:20
128:1,11,22
129:14 130:10
133:10 137:21
140:15 156:11
161:15
**interrupt** 12:25
**interview** 11:7,13
11:15,20
**introduction** 37:7
94:11 171:10
**inventories** 23:24
**inventory** 9:10
149:3
**investigation** 16:14
89:6
**inviting** 111:25
**involved** 16:9 20:19
28:10 29:10,12
31:2 32:18 33:12
36:16,18 37:4
44:17 51:19 53:14
61:23 67:15,24
82:2 83:8,10,23
83:25 101:19
111:7,10 120:2
131:21 136:9
159:4 192:16
**involvement** 37:8
154:11

**involving** 111:17
113:3
**in-house** 35:23
37:10 38:9,16
39:2,7 40:2 53:12
108:6 111:15
150:1 152:2 177:5
184:21
**Ira** 2:17 8:5 29:9
55:21
**Island** 35:16 91:25
155:9,10
**issue** 98:23 144:13
144:15 145:13
146:8,9 150:23
182:4
**issued** 105:12
**issues** 29:24 50:16
50:17 54:5 61:7
172:12
**Italian** 183:1
**item** 99:12 162:19

---

**J**

**J** 1:14 8:12 72:22
115:9,15 192:5,23
**Jack** 32:17 33:9,11
33:11,11 54:4
**JAD** 1:2
**JAMES** 1:7,13 4:3
**Japan** 9:11
**Jared** 2:2 4:3 7:18
7:20 8:14,17 13:5
13:13 47:12,16
49:18,22 50:9
56:18,20,23 57:19
58:1,16 61:5
64:20 66:16,20
67:3 68:24 76:7
77:2,9,25 78:13
78:14 79:1,5 80:5
80:15 86:4,22
87:14 88:20 91:18
94:19,23 97:11,18
99:14,17,21 100:4
102:13,22 104:23



112:2,8 113:18
114:1,7 123:7,11
124:11,21,23
125:7 127:3,9,13
127:17,19 129:25
134:15 135:9
137:24 140:22
141:6,20 142:3,19
142:24 143:15,17
143:18,22,25
144:12,21 145:2,9
145:23 146:2,6,14
146:15,20,23
147:1,4,6,11,13
149:18,20 150:5,8
150:10,16,19
151:7,19,24 152:5
152:9,14,20
160:24 165:14
166:1,23 167:10
171:8 172:4
173:12 175:18
176:11 178:6,16
179:23 180:1,20
181:4,6,9 182:21
182:24 183:11,15
183:21,25 184:4,9
184:10 186:12,21
187:9 188:20,21
188:25 190:12,20
190:23
**Jersey** 1:1,10,16
2:5,19 3:3,7 7:6
7:10 17:16,17,22
18:20 33:20,22,25
34:1,12 192:7,24
**JLL** 1:2
**jmplacitella@cp...**
2:6
**JNJ-Ros** 4:19
**job** 20:8 23:1 27:21
27:25 31:16 32:22
37:12 38:7 74:8
74:10 92:10
186:11
**Johnson** 73:7 84:10

84:12,14,17,20
93:7 95:16 96:17
138:9,12,20
139:22 140:1
142:7 144:5 157:5
161:22,24 162:2
162:14,22 163:11
163:20 164:1,11
164:19 165:6,18
166:5 167:16,25
169:12,23 170:9
171:5,21 172:25
178:12 179:19
180:13 181:20
183:9
**join** 13:3 40:15
44:5 46:4 71:5
118:25 119:25
120:12 125:21
131:16 159:17
162:24 177:21
**joined** 18:10,13,18
20:5
**JR** 2:9
**judgment** 45:14,18
45:20,24 46:1,9
111:24 127:2
130:19,20 141:10
151:5,25 173:4
**judgments** 123:5
**jumped** 159:22
**June** 161:4
**juris** 35:13
**jurisdictions** 33:8
33:16
**jury** 169:11 172:24
**justify** 64:15

---
### K

**K** 2:9
**Karwacki** 3:11
7:12
**keep** 47:24 52:11
64:22 68:2 154:15
**keeping** 151:18
**Kimberlee** 1:3 7:4

**kind** 28:9 41:20
54:22 68:8 70:13
75:2 100:11,20
103:6 112:2
144:19 151:4,25
183:3
**Kirkland** 2:8 7:25
8:2 12:16,19
13:11 14:10
**Kluznik** 32:17 33:9
33:11 54:4
**knew** 26:6 32:11,14
32:17,21,23,24
64:17 66:8,9,12
73:14 121:10
122:1,1,21 125:24
128:20 130:17
132:1 133:17
139:13
**know** 10:19 12:25
13:6 16:22 18:21
18:23 20:18 21:11
22:11 25:23,23
26:14 28:13 29:10
29:15 30:3 33:14
36:10,19 37:4,5,5
37:7,8,10,12,23
38:12,13 39:1,14
39:17 42:10 47:2
48:16 50:19,19
51:20,23 52:15
53:2,3,23 54:11
55:1,2,11,18 57:8
57:12,14,16,18
58:20 61:18,19,21
61:21,25 62:4,7
62:13,14,14 63:3
63:3,13,24 64:6,9
64:14,16 65:1,4
66:21,21,23,23
67:16,18,24 68:1
68:10,12,16 70:3
70:8 73:23 74:7
74:10,19 75:10,17
75:19,21 76:13,16
77:16 79:23 83:13

83:15 84:2,11,13
84:19,22,24 85:15
85:20,21 86:7
88:8 89:11,13,18
92:10 93:13,16
94:11 95:6 98:24
99:11 101:20
102:1,16 103:9,22
104:19,23 107:1
107:10,14 108:3
108:11 109:1,19
109:23 110:8,9,12
110:18 111:8,10
112:21,22,22
113:11,12 117:12
117:25 118:8,15
119:3 121:25
122:4,12,13 126:2
127:14 128:12
129:1,8,22 131:24
131:25 132:5,6,15
132:22,25 133:4,4
133:16,18,19,20
134:3,21 135:25
136:10,14 137:7,8
137:14,18 140:11
141:5 143:6,16
148:6 153:13,20
154:1,7 155:7,17
156:19,22 157:22
158:15,24 159:8
159:11,24 160:2,5
160:8,12,17 163:6
163:23 164:8,14
165:20 167:5
170:16,24 171:12
173:14,17,21
174:25 175:3,6,7
175:11 180:1,17
184:15,25 185:1,6
185:9,12 186:12
189:7,20,21,21,23
189:25 190:1,3
**knowing** 75:18
112:19,20 127:21
139:25 170:24

**knowledge** 38:12
73:1,21 84:9 85:5
101:6 111:11
116:2 118:11
120:5 122:17
129:22 133:24
134:8,14,23
137:16 139:3
144:18 158:1
174:6,9,21 190:5
190:10
**known** 109:16
138:7 157:3
171:14 175:12
**knows** 99:9 102:16
139:11

---
### L

**L** 3:10 8:12
**labor** 35:22 130:14
132:15
**laboratories** 90:6
90:14 95:18 96:4
**lack** 154:19
**land** 26:24
**language** 153:25
**large** 167:19
**larger** 20:10 64:15
**late** 9:2 27:8,16
38:20,21
**lately** 12:6
**law** 3:6 17:4,5,6,8
17:14 18:1 54:17
71:24 108:9 132:1
132:10 133:2
**lawsuit** 20:16,20
72:15 176:17
189:4
**lawsuit/claims**
189:22
**lawyer** 16:4 18:21
18:23 22:22 24:7
37:7 39:8 108:6
119:14 120:18
130:13,15,16
143:6 149:13,19



150:1 152:2
164:17 168:25
171:20 177:5,14
178:2,18 179:25
180:10,16 181:2
182:2 183:13
**lawyers** 39:22 40:2
41:6,14 45:25
76:2,6,7 82:17
114:9 118:17
120:4 129:12,12
130:8,9
**lawyer's** 20:8
**law-related** 19:25
**lead** 20:18 80:13
142:18
**learn** 97:5,23
**learned** 28:13
71:16 85:13 97:2
163:4,4 166:17
**learning** 90:13
**leave** 22:6 50:2
63:15 97:15 99:25
125:4
**leaves** 12:11
**led** 11:13 153:22
155:11 177:12
**left** 19:22 30:12
174:11 184:7
190:3
**legal** 1:23 7:13,14
18:14,15,24 20:5
24:6 32:10 36:24
39:2,3,12,14
52:14 53:1,7,12
53:17 56:4 57:2,6
65:11 68:9 73:5
73:21 78:1 80:16
83:21 84:25 94:14
102:19 107:6,25
108:4,15 111:15
111:24 112:3,11
113:5,9 123:5
127:2 141:10
144:19 149:23
151:4,5,25,25

174:22 178:25
181:25 184:21
188:25
**legally** 88:7
**Len** 29:14,15 55:21
**length** 90:4
**Les** 22:22,24 37:3
37:12,19 38:22
**letter** 4:20,22,24
5:15 34:24 36:6
41:18,19 58:4,6,7
59:8,12,18 62:12
63:16 64:3 66:5
66:23 69:24 74:12
147:16,19 148:1,5
148:20,20 150:9
150:11,24 153:17
153:19,22,25
155:7 159:22
168:18 169:2,9,17
170:1 173:22,25
175:20,23
**letterhead** 16:6
66:1
**letters** 15:22 16:2
16:10 34:20 40:22
40:25 41:3,7,13
41:15 42:11 58:4
58:21,24 59:9
65:6
**letter's** 147:22
**letter-type** 65:21
66:3 83:14
**let's** 14:12 24:13
25:13 52:3 61:3
85:2 113:19
123:11 124:25
126:5 137:12
177:7 186:13
**level** 25:11,12
46:25
**leveraged** 22:25
**liability** 5:10 39:7,8
114:15 117:25
148:14
**License** 192:25

**licensed** 17:14,18
**light** 139:11 169:14
**limitation** 176:18
**limited** 28:8 43:1
55:9 143:21
**line** 6:2,8 12:10
95:12 124:20
129:23 140:20
141:17,18
**lines** 105:19
**liquid** 21:9
**list** 4:20 131:3
**listed** 72:21 105:25
109:6
**lists** 59:14 63:23
148:14
**litiga** 84:3
**litigants** 81:21
**litigation** 9:5 27:12
27:18,20,25 28:20
28:22 29:1,8,12
30:8 31:8 32:24
32:25 35:2,25
36:15,25 37:9,15
37:16,21 38:10,18
39:4,7,13 40:3,23
41:1 42:24 43:4,8
43:11,14,15,19,22
43:25 44:11,12
45:3,4,8,11,15,21
46:6,8,13 47:25
49:2 51:12 55:12
56:14,17,25 57:4
68:5,13,20 70:23
71:9,17 73:10
75:4 82:17 83:4
84:4 94:6 101:8
101:23 102:2,7,8
102:24,24 103:6,9
103:15,16,16,25
108:22 109:1,8
113:2 129:5 136:5
140:24 150:2
188:11,16
**litigations** 34:18
70:1,4 73:6,22

76:2 136:20
**little** 15:4 23:2
29:10 39:25 66:1
112:6 154:20
**LLC** 1:6,17 2:12,18
5:4 7:4
**LLM** 17:7,11
**LLP** 2:8,13
**local** 28:17 30:14
30:24 31:4,7,10
31:16,19,23 32:9
32:11,11,15 33:3
34:8 35:24 36:8
36:17,20 43:1
50:23 51:3 61:22
74:15 75:1,3,11
78:17 79:11 82:3
82:7,13,21 116:8
155:7,10 160:13
164:17 165:10,13
168:12 171:23
**locally** 30:2
**located** 138:9 157:5
**log** 5:4 69:10 175:8
**Logan** 2:14
**logical** 120:1
**long** 14:16 15:2
19:5 24:8,14 39:5
149:2 183:3
**longer** 105:16
**look** 10:13 20:25
49:7 61:6 66:14
67:2 86:20 87:7
114:16 129:2
131:5 144:9
**looked** 34:20
131:11 139:4
140:8
**looking** 65:24
66:22 96:10
107:21 130:15
140:11 188:19
**looks** 63:17 87:18
187:16
**Lopez** 167:3
**loss** 9:9,9

**lost** 88:17 161:7
**lot** 12:5,10
**lunch** 88:11,13
100:23 108:19
113:19 114:3
**Luncheon** 113:22
**Lynn** 58:9

---

**M**

**M** 2:2,3,18 8:12,12
**magic** 151:16
**Magna** 1:23 7:13
7:14
**Magnesia** 5:13,20
155:24 157:3
161:3
**magnesite** 95:21
**maintain** 101:23
108:25 131:23
**maintained** 28:18
44:14,23 52:13
**maintaining** 52:21
**making** 67:16,25
**mal** 63:24
**malignant** 63:24
64:10
**man** 21:7
**managed** 23:24
**Management** 23:21
**manager** 159:2,8
**managing** 30:16,19
**mandatory** 155:14
**Manual** 4:13
**Maple** 2:5
**March** 12:13 92:4
105:5
**Marino** 3:2 8:6
**Mark** 117:21 118:5
147:16,16
**marked** 9:16 58:3
69:9 72:3 86:25
91:17,22 94:18
95:1 105:3 114:5
114:12 147:15
155:23 161:1
167:2 168:17



175:15 185:2
186:19,23 187:12
**marker** 151:16
**Market** 2:4
**Martillotta** 58:6
**Martin** 35:21 49:8
49:15 50:13 52:9
97:3,5,23 98:6,8
98:20 100:9
154:21,24 155:4
155:25 156:4
161:4 162:12
163:7,10,18,25
164:10,18 165:5
165:17 166:4,10
166:11,20 168:25
169:23 170:6,8,18
170:25 174:2,10
174:16,18 175:11
175:21 176:3
178:8,10,23 179:7
179:12,17 180:11
180:25 184:25
185:6,8,24,25
**Martin's** 5:19
161:2 170:3
**material** 150:22
182:22
**materials** 75:3,8,10
75:15 76:10,11,13
76:16 77:15 78:7
78:17 79:11 82:5
82:7,14 83:15,18
85:14 88:12 148:8
148:12 154:9
**matter** 7:3 71:15
122:18 133:20
150:15,20,21
151:1,8,13,23
169:18
**matters** 30:2 32:14
51:16 169:17
**Maura** 39:10
**McWilliams** 108:5
108:12,13 190:4
**mean** 12:25 19:6

25:20 30:18,22
32:2 54:7 56:12
57:9 66:8 68:16
75:7 87:15 106:3
107:3 110:8,13
115:17 121:15
125:22 133:16
135:12 137:7
142:17 150:22
151:1,8,13,23
153:1,20 159:21
170:16 175:6
189:19 190:2
**meaning** 181:25
**means** 116:6,19
173:18 189:8,13
**meant** 115:21
**mechanism** 28:7
**mediation** 155:14
159:22 170:19,23
171:2,12,17,20
172:8,10,14
**meet** 8:18,19 14:3,6
**meeting** 12:2,15,20
12:22 13:10
**Mel** 16:5 32:23
33:15 34:2,3,12
34:17,21 65:25
66:23
**Mel's** 33:20 34:15
**memo** 87:23 89:4
106:24 107:4,5,11
107:15,19
**memoranda** 105:4
**Memorandum** 4:12
5:8
**Menlo** 26:13,16
**mental** 69:25 70:8
102:12 123:5,6,15
128:9 141:10
145:8,12,15
146:10 149:13,18
149:24 152:12,19
173:7 177:4
178:21 179:24
180:10,15 181:3

181:10 182:1
183:13
**mention** 74:1
**mentioned** 22:24
54:3 57:16 65:7
179:12
**men's** 76:25
**merged** 18:5
**Merten** 4:24 33:5
35:12 98:14 99:4
155:8,10 160:6
168:12,19 169:9
172:1,2 173:14
175:21
**met** 14:7,21 55:2
**metal** 9:10 23:24
**metals** 23:21,25
24:4,9,11 38:4
**Michael** 1:7,13 4:3
4:10 7:3,24 10:2
29:6 55:15 58:5,9
60:21 69:20 72:21
115:9,15 185:15
190:25
**micro** 162:4
**microbe** 162:4
**microns** 90:4
**microphone** 25:1
62:18 88:17
156:24
**microprobe** 162:8
**microscopy** 96:2,2
**middle** 22:9 116:18
**Middlebury** 161:23
167:17
**middleman** 154:12
**Mike** 28:24 29:21
46:24 47:8 48:7
48:14 55:4,5,13
65:2 70:6 111:22
**milling** 157:4
**mind** 125:9 186:13
**mine** 58:13,14 73:6
84:10,12,14,17,20
92:19,24 93:7
136:16 138:8,10

138:11,11,12,14
138:20,22 139:22
139:23 140:2
142:7,9 144:5,7
157:5,6,12 161:22
161:24 162:2,15
162:22 163:11,20
164:2,11,19 165:7
165:18 166:5
167:16,19,20
168:1 169:12,23
170:9 171:5,22
172:25 178:12
179:19 180:13
181:20 182:3,8
183:9
**mining** 157:4
**minute** 53:21 65:25
127:11 172:21
**mischaracterize**
127:15
**misleading** 119:15
**Misstates** 90:20
**misunderstood**
134:22
**MIT** 17:5
**mixed** 23:5
**Mm'mm** 11:11,19
13:13 15:6 18:12
18:17 21:2 26:17
35:8 38:5 42:2
46:16 47:4 57:17
59:21 62:11 63:11
64:5 65:14,23
66:6 67:22 68:18
70:14 101:18
102:3 113:14
115:20 118:14
131:19 134:10
139:6 170:14
**Monday** 14:21,21
14:23 15:7,11
**money** 174:7 185:9
**month** 22:4 23:15
**months** 22:12
**Morgan** 18:5

**morning** 8:15,16
95:15 149:9
**motion** 45:18,24
**motions** 45:14,19
46:1,8
**mouth** 151:18
**move** 84:6 85:2
**moved** 26:24 33:21
**multiple** 54:19,19
**Multi-page** 4:14
5:3,5,12

---
**N**
---

**N** 2:1,22 3:1,10 4:1
95:2
**nail** 33:7 163:8
**name** 8:17 12:17
16:5,6 23:22
29:13,15 37:6
39:9,10 66:1
72:21 89:12,17,18
94:9 115:6 162:25
**named** 16:5 22:22
**names** 16:9 39:20
39:21 63:22
156:12
**national** 30:9
**nature** 29:18 31:9
49:14 50:12 157:7
157:14
**necessarily** 40:7
41:11 109:2
116:17 118:18
150:3
**need** 31:10 42:4
47:13 49:20,20
69:2 72:8 81:8
97:7,8 106:15
124:16,16 141:16
143:16 144:14,15
146:21,25 147:2
151:5 153:12
164:23,23 180:19
183:12,21 188:12
**needed** 30:14 36:21
42:16 43:2 103:12



105:16 115:24
116:9 149:24
**needs** 177:6
**negotiating** 20:14
**negotiation** 177:10
**neither** 192:15,16
**never** 27:17 34:24
55:2,2 75:12
87:15 93:10 120:2
137:3
**new** 1:1,10,16 2:5
2:19 3:3,7 7:6,10
17:15,16,17,17,21
17:22 18:4,9,20
33:20,22,25 34:1
34:12 37:25 42:25
108:9 110:10
187:2 192:7,24
**Newark** 21:9
**nice** 8:17
**nicer** 153:5
**nonactive** 19:18
**nonattorney** 39:11
119:9
**nonmalignant**
63:25 64:10
**nontalc** 32:14
**nontire** 65:4 67:8
74:6 82:3 83:12
136:6
**normal** 44:7
**Notary** 1:15 8:13
192:6,24
**note** 58:24
**Notice** 4:9 9:19,23
10:2
**noticed** 59:12
**November** 167:15
**number** 4:8 5:2 7:2
52:2 59:17 96:9
96:10 115:7
126:18 128:23
129:14 130:11
133:10 137:21
138:12,19 139:21
142:7 144:5

156:11 161:5
174:5 185:22
**numbers** 51:25
**NYU** 17:7,12
**N.W** 2:9

---

## O

**O** 3:10
**object** 10:21 12:24
14:20 65:20 71:3
71:13 78:20 81:24
81:25 85:24 88:3
88:4 90:16,17
109:12 110:5,6
111:2 120:8 124:7
140:18 149:10,11
153:10,12 157:13
158:21 162:23
163:22 165:8
177:2 178:13
179:20,22 181:14
181:16,23 186:3,5
**objected** 141:22
**objection** 26:7 36:1
37:2 38:19 40:14
41:9,17 42:8,23
43:9,21 44:4,21
45:2,16,22 46:3
51:9,17,22 52:22
53:10 56:8,15,24
59:4 60:14 61:14
61:16 64:2,13,24
67:7,14 68:4,6,15
71:2,20,21 73:16
75:5 76:4,8 78:22
80:24 82:10,20
83:6 85:7,19
90:19 91:20 93:9
100:18 101:14
102:10 103:2,18
104:1 107:8,12
108:23 109:13
111:1,3,19,20,21
112:1,14 113:7
116:4,13 117:8,10
118:7,20,23,24

119:16,17,24
120:11,24 121:8,9
121:23,24 123:1,2
124:4 125:20
128:24 129:15,16
129:17 131:2,15
132:3,4,12,21
133:11,12 134:6
134:19 135:8,17
136:3 138:24
140:6,17 141:21
151:3,14 157:15
158:2,20 159:15
160:15 162:16
163:21 164:13
165:1 169:25
173:19 174:24
177:1,17,19 178:5
178:15 185:4
**objections** 160:7
**obligation** 88:9
121:5,20 122:22
**obliged** 88:7
**observed** 162:2
**obvious** 67:1 74:3
**occasion** 19:20
20:16
**occasionally** 108:8
**occasions** 96:9
**occurred** 22:17
84:2 104:21
132:16 148:25
161:25 188:4
**occurs** 167:24
**October** 12:7,9,12
138:10
**offer** 100:12 102:18
140:21 153:24
**offering** 19:8
**office** 1:16 25:10
33:13,20 45:13,19
154:24
**officer** 115:7
119:12 121:7,22
122:24 124:1
125:18 127:4

133:7 143:2 192:1
**officers** 126:11
**offices** 26:9,20
33:22
**official** 25:15,25
**oh** 12:9 21:7 26:14
37:24 51:2 117:19
189:11
**Ohio** 33:9,13 54:16
**okay** 10:1,19 14:18
15:14 16:23 24:25
25:5 26:2,22
27:15 28:5 33:15
38:23 40:12 56:3
56:7,22 59:24
61:2,19 62:4
63:21 65:21 69:7
69:12 70:17 72:20
75:20,24 78:13
80:4,21 83:20
88:18,24 89:3,10
89:13,16 90:24
91:15 94:21 98:24
100:1,5,21,25
103:7 104:5,11,14
104:17 105:1,11
105:14,22 106:10
106:22 107:24
109:7 112:18
113:18 114:19
117:17 118:17
119:7 122:7
123:13 126:7,25
129:9,25 131:9
136:9 137:19
138:4 140:14
143:22 146:14,19
146:23 147:6,22
148:4 154:1,15,16
157:24 158:25
159:12 161:13
164:23 167:9
171:16 173:23
185:8 186:10,25
187:4,11,14,15,20
188:5,8 190:18

**old** 15:25 38:2
**once** 10:10 28:9
102:7 149:12
169:21
**ones** 137:11,12
**One-page** 4:12,20
4:22 5:8
**open** 103:12 110:9
**opening** 23:3
159:22 172:23
**operated** 138:8
**operation** 23:25
105:17 167:20
**operations** 105:6
105:24 106:5,13
106:20 159:3,4
**opine** 162:14
163:10,19
**opinion** 128:15,16
139:10 142:16
144:19 151:4
152:1 181:25
**opposed** 31:17 59:7
**opposing** 40:22
41:14,15
**ORAL** 1:5
**Orange** 1:10 2:19
7:10
**order** 61:8 78:23
164:21
**ore** 84:16 92:19,24
93:7 167:18
**originally** 23:2
**outdated** 105:18
**outgoing** 41:24,25
42:18
**outside** 15:23 16:2
20:18,20 28:14
30:2 48:19 49:21
76:6,7 124:18
127:7 174:22
**outsourced** 83:22
84:3
**overlapped** 94:12
**override** 103:13
**oversee** 84:16



**P**

**P** 2:1,1,22,22 3:1,1
3:10 189:10,11,13
**pack** 75:16
**package** 59:20
75:12,14,17 85:13
87:10
**Paduano** 32:24
35:4 115:22
132:10,20 133:2
154:8
**Paduano's** 130:14
132:14
**page** 2:22 4:8 5:2
6:2,8 10:4,5 59:17
59:19 60:20 63:17
63:18 69:11 72:12
72:19 91:23 92:15
93:18 95:10 96:9
115:4 117:16
126:5 137:19,22
137:25 148:19
159:2 161:14
167:23 172:7,23
176:1,9,14,14
179:6,6 184:22,23
188:8,15,20,21
189:1
**pages** 114:18
**paid** 62:15 174:7
177:14,18 178:3,9
185:10
**paragraph** 59:25
60:19 89:20 90:21
105:23 106:2,3
137:22 148:5,19
148:19 158:25
159:1 161:18
169:8 172:22
**paragraphs** 140:12
**paralegal** 39:15
55:16
**Park** 26:13,16
**part** 21:10 50:24
64:4 74:9 134:22

161:9 179:16
**participate** 42:21
45:13,14 120:19
**participated**
170:19
**participating** 45:17
45:23
**participation** 42:25
**particular** 48:2
102:6,25 115:19
117:1 131:25
152:3 153:21,24
160:1 180:8
**parties** 7:15 54:20
176:15 192:16
**partner** 29:11
**parts** 134:12
**party** 59:8
**Pasadena** 162:5
**pass** 190:13
**passed** 36:15
108:13
**Pat** 77:12 79:6
97:18 125:9
134:15 145:4
**path** 18:1
**Patricia** 1:14 7:14
192:5,23
**pattern** 112:3,10
113:4
**Pause** 10:11 25:4
58:17 62:22 71:25
86:3,21 91:16
94:17 104:25
142:13 160:22
166:22 167:6
168:14 174:17
175:17 176:10
**Pavlick** 3:2 8:6,6
190:17
**pay** 19:7 62:5 63:5
182:9
**paying** 174:3
**payment** 175:2,5
179:7,13
**payments** 65:3 68:8

**PC** 2:2
**pending** 69:6 77:11
102:1 108:22,25
109:8,16 110:3,9
110:14 111:12,17
112:13,17 113:15
125:8 145:3
**Pennsylvania** 2:4
2:15 16:8
**people** 60:12
122:18 175:1
182:17
**PEPPER** 2:13
**performed** 96:1,7
161:19,21
**period** 19:13,18
21:1,22 24:22
38:13 65:8 83:25
101:24,25 103:22
103:24 104:3
**periodic** 54:3
**periodically** 74:7
**permanent** 189:13
**permitted** 103:10
103:13
**persist** 124:20
144:10
**person** 156:12
**personal** 116:2
134:13,23 137:16
157:25
**personally** 32:21
54:6 70:16
**personnel** 29:19
39:12 105:5 109:5
119:9 164:2,8
**pertained** 102:8
**pertaining** 27:20
27:24 53:5 102:24
103:16 106:5
107:10 108:21
109:9 111:16
**pertains** 105:23
179:5
**Peter** 2:17 4:18 8:5
29:9 55:21 69:21

94:3,5 95:2,6
96:22 121:14,17
122:5 130:25
131:8,12,20 132:7
**petrographic** 162:4
**Philadelphia** 2:4,15
**Phillip** 3:2 8:6
**phone** 50:4 118:10
190:15
**phrase** 83:2 152:17
**phrased** 102:18
123:10 124:8
183:14,18
**physical** 23:24
**picking** 188:15
**pile** 140:12
**Pita** 138:7 157:2
158:6
**Pita's** 159:4
**place** 12:1 170:25
188:6 192:13
**placed** 106:6
**Placitella** 2:2,2,3
4:3 7:11,18,20,21
7:22 8:14,17 13:5
13:13 47:12,16
49:18,22 50:9
56:18,20,23 57:19
58:1,16 61:5
64:20 66:16,20
67:3 68:24 76:7
77:2,9,25 78:13
78:14 79:1,5 80:5
80:15 86:4,22
87:14 88:20 91:18
94:19,23 97:11,18
99:14,17,21 100:4
102:13,22 104:23
112:2,8 113:18
114:1,7 123:7,11
124:11,21,23
125:7 127:3,9,13
127:17,19 129:25
134:15 135:9
137:24 140:22
141:6,20 142:3,19

142:24 143:15,18
143:22,25 144:12
144:21 145:2,9,23
146:2,6,14,15,20
146:23 147:1,4,6
147:11,13 149:20
150:5,8,10,16,19
151:7 152:5,9,14
152:20 153:4
160:24 165:14
166:1,23 167:10
171:8 172:4
173:12 175:18
176:11 178:6
180:1,20 181:4,6
182:21,24 183:15
183:21,25 184:4,9
184:10 186:12,21
187:9 188:21,25
190:12,20,23
**plain** 140:15
149:21
**plaintiff** 5:18 31:15
54:15 70:24 71:11
74:2 99:2 161:2
162:13 163:9
170:3 171:7,11,25
**plaintiffs** 1:4 2:7
5:10 7:20 30:25
31:13 41:3 54:17
54:18 55:3 60:3
63:23 64:7 74:2
82:4 97:25 98:17
98:19 100:8,10
119:20 163:17
164:9,17 165:5,16
166:4,11 169:22
170:7 171:3,20,25
177:14 178:2
**plaintiff's** 5:13
114:14 150:6
155:25 158:7,14
163:5,24 166:10
168:25 171:11
**planning** 146:22
147:9



**plans** 19:11,12
**plant** 159:2,8
**platinum** 21:6
**Pleading** 67:10
**Pleadings** 65:10
**please** 7:17 8:11
  60:19,23 71:6
  77:12 86:15 93:17
  101:3 106:11
  116:15 117:16
  120:15 128:3
  137:19 145:4
  167:4 169:16
  177:23 180:3,18
**plenty** 141:14
**plus** 189:7
**point** 12:23 25:17
  26:23 27:1 30:12
  36:12 37:14 52:1
  84:6 88:23 129:23
  169:15
**policies** 103:8
  107:18 190:5
**policy** 16:1 65:9,16
  66:7 101:22
  102:14,23 103:5
  103:14,21 104:4,7
  104:12,15,18,20
  105:14 106:20
  107:22,24 108:1,4
  108:17,20,24
  109:10 110:3,24
  111:6,8,12 113:11
  187:17,24 188:2,4
  188:5 190:10
**portion** 92:15
  115:1
**Pos** 22:11
**position** 80:6 102:7
  115:7 139:10
  169:14,24
**positive** 21:17
  49:10
**Poss** 105:13
**possession** 120:18
  121:3,18 122:21

123:23 125:15
  129:9 130:6
  132:19 136:25
**possible** 49:4,6
  70:15 169:18
**possibly** 22:11 74:9
  129:6 144:20
  187:22,23
**potential** 73:1
  110:10
**power** 11:22,23
  12:10
**ppavlick@khma...**
  3:4
**practice** 17:14,22
  53:25 108:24
  111:12 112:10,16
  113:4
**practiced** 20:1
**precedent** 189:11
  189:18,22
**preceding** 15:7
**precious** 23:21,24
  23:25 24:4,9,11
**precluded** 180:11
**preliminary** 157:1
**prep** 14:11,15,18
  14:24,24,25 15:11
  65:6 89:18 104:5
**preparation** 16:24
  34:21 85:12
  187:20
**prepare** 14:4
**prepared** 59:7
  100:12 117:24
  163:10
**preparing** 159:20
  160:5
**presence** 92:19
  95:21 96:12
**present** 7:15
  130:25
**presented** 114:25
  169:22 170:7
**preservation**
  103:10,21,24

**preserve** 102:2
  103:12
**preserved** 106:13
  112:21
**PRESS** 187:14
**pretty** 55:9,9 61:17
  83:21 87:10
  115:25
**prevail** 173:4
**previous** 40:20
  98:18
**previously** 74:18
  169:5
**primer** 72:8
**printout** 68:10
**prior** 32:21 148:6
  192:7
**privilege** 5:4 12:25
  13:4 47:11 51:4
  69:10,13 78:24
  88:8 97:8 98:3,23
  122:4 130:20
  133:18 144:13,15
  164:21 172:12
**privileged** 4:15
  29:24 47:1,20
  48:15,18 76:20,23
  77:20,21,24 78:10
  79:25 80:3,6,12
  80:17,25 81:7,12
  87:2 153:15 154:4
  157:19 166:14
  171:24 172:16
**proactive** 36:13
**probably** 9:2 11:24
  23:5 55:22 57:18
  65:2 72:11 74:5
  75:22 135:22
**problem** 47:17
  142:14 149:25
**procedure** 46:9
  54:22,25
**procedures** 55:12
  55:19 59:2
**proceedings** 31:12
**process** 53:16 57:7

57:9 64:16 112:3
  120:2 155:11
**processed** 92:18,23
**produce** 19:25
**produced** 138:9,14
  138:21 139:23
  142:9 144:7
**product** 39:6 70:24
  71:1,10,12 93:8
  102:11 111:25
  112:4 123:16
  124:9,12 140:21
  140:22 141:24
  144:20 173:7
  177:4 182:2
**production** 6:1
  90:2
**products** 39:8
  148:25
**professional** 17:18
**proposition** 150:23
**propound** 42:6
**propounded** 5:19
  41:23 161:3
**protect** 78:23
  164:21
**protection** 21:5
**prove** 70:25 71:11
  150:23
**provide** 17:2 30:13
  75:2 77:23 79:21
  79:24 82:7 119:13
  121:6,21 122:23
  123:25 125:17
  131:22 136:11
  158:12 179:23
  180:6,15 181:2
**provided** 28:19,20
  65:2 66:18 75:11
  75:21 78:17 79:11
  133:1,8 135:6,15
  136:1 156:13
  158:7 159:14
**providing** 154:11
  157:20
**Public** 1:16 192:6

192:24
**publish** 187:7
**pull** 66:25
**pulmonary** 126:13
**purported** 164:1,11
  164:18 165:6,18
  166:4,12 170:8
  171:4,21 183:8
**purportedly** 163:18
**purporting** 82:7
**purposes** 8:21 68:9
**pursuant** 106:23
  107:11,15
**purview** 53:23
**put** 25:2 83:9 90:24
  93:16 116:19
  127:7 188:6
**putting** 160:5
**P-15** 4:15
**P.A** 3:6
**P.C** 3:2
**p.m** 77:4,6,7 97:12
  97:15,16 99:22,25
  100:2 113:20,22
  113:24 125:1,4,6
  144:22,24 145:1
  186:14,16,17
  191:1,5

---

**Q**

**quantitative** 47:5
**question** 10:22 13:2
  13:6,9,20 33:2
  41:13 46:11 48:8
  48:9,13,22 50:11
  51:6 56:21 61:4
  62:23 68:21 69:5
  71:4 74:21 76:21
  76:22 77:11,13,15
  78:1,8 79:4,7,9,16
  80:11,13 81:7,18
  83:1,19 87:12
  92:17,22 95:14,20
  95:24 96:6,11
  97:19,20,22 99:9
  100:6 102:17,17



103:20 109:17
112:25 117:12
120:15,17 122:9
125:8,11,13 126:4
128:2,5,12,14,19
129:7 130:2,3,5
134:16,17,18,20
134:22 140:4
141:1,8,17,18
142:2,4,5,6
143:14 144:1,2,4
144:4 145:3,5,10
145:14,15,18,20
145:21,22,24
146:1,5,7,9,17
149:14,18 151:19
151:20,22 152:10
152:15,18,22,23
152:25 153:11,13
153:14,17 154:5
160:3 164:24,25
170:11 173:4
177:5,24 178:1
179:21 180:4,16
180:17,21,22
181:7 182:25,25
183:6,14,18 184:5
184:12,19 185:5
**questioning** 124:20
141:18 144:17
152:2
**questions** 6:7 20:15
60:24 86:14 108:7
108:19 119:9
127:5 129:21
143:11 146:3
147:3 154:18
187:8 190:13,14
**quick** 49:23 144:10
144:15 188:13
**quite** 128:18

———————
**R**
**R** 2:1,22 3:1,10
25:10 105:4 109:5
109:10 110:4,24

111:17 112:11,11
113:5
**raised** 97:25 99:1
100:6,7 169:17
**ran** 15:3 23:25
**Ransom** 18:7
**raw** 92:18,24
**reach** 28:14 32:2
36:7,21 170:3
**reached** 32:8 65:11
174:10
**react** 33:5
**reactive** 32:1,2
**read** 48:7,9 77:12
77:13 79:7 90:21
93:3 97:19,20
119:4 120:15,17
121:11 125:11
128:3,4,5 130:3
134:9,16,17
135:18 139:8
144:2 145:4,5
149:4,5,24 151:20
162:6,8 164:25
177:23,24 182:12
182:14
**reading** 60:18
125:9 127:20
140:15 149:21
**reads** 176:15
**ready** 151:16
162:14 163:19
**real** 18:11,16
188:13
**realization** 89:21
89:23
**realize** 121:11
**realized** 65:25
140:10
**really** 11:3 15:3
19:4 23:14 27:9
29:4 30:4,11
34:14 51:25 54:2
64:16 66:4 74:4
75:18 83:10 85:15
104:3 109:19

118:21 127:1
139:7,8 155:11
160:4 170:16
173:21 189:15
**realm** 54:9
**reason** 119:14
122:5 132:5,6
**reasonably** 113:2
**reasons** 48:4,25
138:12
**recall** 9:7 11:4,15
13:23 15:13 16:2
16:10 22:2 23:13
27:4,19 29:2
31:16 32:16 33:3
34:2 35:6,13,17
36:24 38:8,15
39:11,20 40:11
41:5 43:11,15,22
44:1 45:4,5,17,23
46:19 48:24 49:13
52:5,8,16 53:22
54:2 58:23 62:1
70:9,19 83:14
92:11 101:13
104:14,17 108:15
116:25 117:6,14
131:12 134:11
135:23 136:10,14
154:21 156:5
160:11,16,21
164:5,6 166:9,17
166:19 167:5,7
168:4,6,8,11,24
169:21 170:22
172:8,13 174:1
184:24 190:8
**receive** 17:8,11
19:12 28:25 74:7
**received** 40:7 46:12
70:19 179:8
**receiving** 31:14
**recess** 77:6 113:22
144:24 186:16
**recollection** 14:1
25:19 35:1 64:17

65:19 66:4,8,13
137:6 153:21
154:10 162:17
189:17
**record** 4:13 7:2
15:25 49:25 50:8
57:20,22,23,25
65:8 66:7 68:8
77:5,8 86:24
88:19 97:13,17
99:18,23 100:3
104:6,11,14,18
113:21,25 125:2,6
144:20,23 145:1
167:10 175:19
176:12 186:15,18
191:2
**records** 30:12 36:9
44:13,15,19,22
52:11,14,19,25
64:22 65:1,3,18
67:4,6,6,11 68:2
73:8 101:7,22,23
102:2,5,24 105:18
108:7,10 110:15
118:12 119:8
131:23 189:1
**recruit** 22:19 23:2
**Red** 2:5
**refer** 30:2
**referral** 74:16
**referrals** 30:1
131:23
**referred** 98:1,20
**referring** 76:6
98:17 148:20
162:15,19
**reframe** 48:13
**refresh** 35:1 65:19
189:16
**regarding** 46:12
69:25
**regardless** 149:2
**regards** 128:9
**regular** 105:17
113:11

**Reindel** 93:22
**rejoined** 24:16
**related** 5:6 20:16
28:4 73:9 101:7
107:15 167:11
176:16,19 192:17
**relates** 135:21
179:6
**relating** 9:10 30:11
37:16 100:8
108:25 109:1
110:4,25 111:7,9
112:17 126:15
**relation** 37:15
**relationships** 54:21
**relative** 192:15
**relatively** 42:14
**release** 4:22 175:21
175:24 176:2,9,14
**relevant** 36:9 87:25
88:6 113:15
120:20 128:10
**reliable** 151:13,23
153:1
**relieve** 88:9
**remark** 88:18
**remember** 9:14
11:3,23 12:17,21
16:6,8,11 19:20
20:11,22,23 22:4
22:8 23:14 30:5
30:21 32:19 34:15
34:17 35:18 37:23
39:10,19,21 42:3
42:17 46:8 47:3
47:23 49:8 51:18
51:25 52:7,10
54:6 64:3 65:15
66:10 68:19 70:7
70:8 83:1 98:15
104:3,13,16,20
106:21 107:22
117:5,11 118:9
119:1,3,6 131:4
135:19 147:21
155:5,11 156:7,9



157:22 158:17,22 158:23 159:19,23 159:25 160:4,8 161:12 162:25 163:1,3 170:1,2 170:16,17 171:14 173:24,24 175:25 177:10 188:3,5 189:9,15,24
**remembered** 34:25
**Rendered** 5:6 167:12
**repeat** 62:23 71:6 120:14 128:2
**repeating** 74:22
**repetitive** 54:21
**rephrase** 81:9 102:20 111:25 128:8 141:1,16 142:1 177:6 178:6 178:16 181:9
**rephrased** 177:6
**replacing** 38:2
**replies** 15:20 134:9
**reply** 115:24
**report** 19:15 21:21 21:25 26:4 70:13 166:20 168:4,7,9 168:12
**reported** 21:23 73:15 90:8 162:21 174:22,25
**reporter** 1:15 5:22 7:13 8:11 48:10 77:14 79:8 97:21 120:17 125:12 128:6 130:4 134:17 144:3 145:6 151:21 164:25 177:25 191:3 192:6
**reporting** 175:3
**reports** 28:9,20,21 28:25 29:4 46:12 46:15,19,22 47:2 47:23 48:4 52:16

53:2 54:3 55:13 65:2 70:20
**represent** 7:16 87:3
**representation** 154:2
**representative** 155:15,16 170:20
**represented** 21:4,8 54:17
**representing** 11:6 42:6
**reputable** 40:19
**request** 6:1 7:11 42:14 88:6 137:10
**Requested** 10:6
**requests** 10:9,14 41:22 42:1,7,18 42:20,21 43:7,14 43:18 44:2,9,24
**require** 79:25
**required** 24:6 31:12 122:3 155:14
**requirement** 101:23
**research** 22:25 92:8,23 110:10
**Research-Cottrell** 18:19 22:23
**resolution** 169:18
**resolve** 172:10
**resolved** 172:9,14 172:18 176:3
**Resources** 25:9
**respect** 61:7
**respond** 30:14 32:8 36:10,11 43:3 88:7 133:3 137:4 137:9 155:20
**responded** 115:21 116:20 143:5
**Respondent** 122:12 122:15
**responding** 20:15 28:10 135:15 143:3 160:10

**response** 28:17 33:13 115:5,9 119:2 120:20 121:10 122:1 126:18 128:1,22 129:7 134:2,4 136:2 137:5,21 139:2
**responses** 5:9 66:11 114:13,21,24 115:11,18 117:3 117:24 118:18 119:14,22 121:3,7 121:18,22 122:25 124:2 125:18 127:4,7 129:14 130:10 134:8 135:7 148:13 163:2
**responsibilities** 23:16 27:21 28:1 31:7,16 37:13 40:1,2 155:3
**responsibility** 28:8 39:2
**responsible** 33:16 52:20 55:22 127:10
**responsive** 5:19 10:9,14 36:12 44:24 99:12 101:21 125:25 126:23 161:2,14
**rest** 60:8 147:10
**result** 63:25
**results** 90:7 91:12
**retain** 28:14 35:5 106:12 108:20 109:10 110:4,24 112:11 113:5
**retained** 111:18 112:24 115:22 162:13 163:25 164:10 165:5,17
**retaining** 31:4 101:22

**retains** 5:22 191:3
**retention** 4:13 15:25 65:8,16 66:7 73:8 101:6 104:4,7,12,15,18 106:19 107:17,24 108:7,17 109:9,16 110:13 111:12 155:12 165:21 187:17,24 188:2 190:5,10
**retired** 17:15
**Retrieval** 105:6
**returned** 84:23
**reveal** 50:21 77:21 78:10 79:25 154:4 157:19 165:22 166:14 172:16
**revealed** 95:21 96:12
**revealing** 47:20 77:20 152:19 165:3 173:11
**review** 10:10 15:19 40:8,9 41:3,22 42:19 43:20,24 45:7,19 60:8 83:17 116:23 159:12 167:4
**reviewed** 16:3,12 16:17,20 40:4 65:18 75:12 104:6 104:8,8 107:25 117:24 169:5
**reviewing** 41:11 43:23 45:24 116:25 138:18 149:7 156:5
**Rhode** 35:16 91:25 155:9,10
**right** 11:21,25 12:23 13:5 14:12 19:14 20:3 21:12 22:14 25:13 29:13 33:6 34:1 39:24 49:23 50:4 55:7

55:15 56:23 58:10 59:16 60:25 66:15 67:11 69:2,18 72:18 73:4 77:9 88:24,25,25 89:8 94:16 98:11 106:2 107:21 110:1,23 114:2 124:22 127:13 131:1 132:9,23 133:1,6 136:8,9,21 137:22 138:3 139:13 142:17 146:19 148:3 150:5,12 154:13 170:18 171:8 172:2 176:2 179:15 181:1,11 181:18 186:22 189:2 190:7,20
**rock** 1:17 2:19 7:10 174:4
**rocks** 162:3
**role** 18:16 30:7,15 30:19 31:4,6 36:12,15 37:3 39:4 43:6 53:7 108:1,3 127:16 143:21 155:2,18 159:21
**Ronald** 2:9 8:2 14:7
**ronald.anguas@...** 2:11
**room** 48:19 50:2 76:25 97:15 99:25 125:4
**Roth** 2:2 7:11
**roughly** 11:24 12:3 22:9 24:16
**routine** 42:13 175:10
**Rudolph** 162:5
**Rule** 5:17 72:4,9
**rules** 71:15
**running** 30:3 98:23 99:20
**Russoniello** 1:15



7:14 192:5,23

**S**

**S** 2:1,22 3:1,2,10,10
  4:7 5:1 8:12,12,12
**safe** 82:23
**salary** 19:1,8,12
**sales** 148:22,24
**sam** 58:5 96:10
**sample** 90:3 182:5
**samples** 89:24,25
  90:5 96:10 161:22
  161:24 162:2
  167:17
**Save** 172:6
**saw** 10:17 23:8 53:3
  65:6,22 66:1
  104:10 122:6,18
  129:4 130:24
  143:1 185:14,22
**saying** 28:19 60:21
  80:10 139:13,21
  152:11 156:8
  163:7
**says** 10:6 60:19,23
  61:6 63:18 69:13
  69:24 73:1,4,20
  84:9 85:4,4,9
  89:23 91:23 92:3
  92:16 93:18
  105:14,23 106:4
  106:11 115:6
  126:10,15,19
  137:23 138:5
  148:6,19 150:24
  156:12 157:2
  158:6 159:2
  161:21 167:15,24
  169:9 172:23
  176:2,2 189:4,7
  189:10,11
**scanning** 96:1
**schist** 167:19
**school** 17:4,6 18:2
**scientists** 91:4,7,12
  139:25

**scope** 109:16,18,20
  110:13,14,15
  112:22
**scratch** 27:23 135:9
  149:6 165:14
  171:18 172:3,5
**scroll** 58:6
**second** 14:18 15:17
  16:17,21 17:6
  57:20 58:6 59:13
  59:17,18,19 60:18
  60:20 63:17 72:12
  83:9 84:6 89:19
  93:17 106:3
  111:22 114:17,17
  115:4,12 142:12
  152:24 157:2
  158:25 159:1,2
  161:8 176:8,13
**secretary** 25:18,20
  28:2,3
**Section** 72:13
**see** 9:23 24:13 28:8
  54:3 59:9,16,25
  60:9,15 62:20
  69:14,21 72:16,21
  73:2,11 81:10
  85:8 86:7 87:8
  88:25 89:7 90:10
  91:23 92:1,5 93:1
  93:18,25 95:4
  101:9 105:7,20
  106:7,8,16 109:4
  114:19 115:13
  117:21 118:3
  123:11 124:8
  126:8,16,18,19
  138:16 147:10,17
  148:16 156:2,15
  157:8 158:10
  159:6 160:6 161:6
  161:9,16 167:14
  167:21 168:2,20
  169:2,19 173:1
  176:4,21 187:20
  188:12 189:4,11

**seeing** 28:10 30:22
  52:16 58:23 66:5
  68:19 96:22 167:5
  167:7
**seek** 57:1 170:6
**seen** 9:19 58:19
  64:4 68:13 72:6
  85:15 86:1,17,18
  87:8,13,15 90:22
  93:5,10 96:16
  105:9 114:21
  134:12 147:19
  161:10 175:23
  184:21 187:17
**select** 28:16 96:3
**selected** 96:3
**selection** 36:7
**seminars** 53:4
**send** 42:13 66:25
**sent** 33:25 90:6
**sentence** 106:3,11
  117:21 140:16
  142:6,16 143:7,12
  144:5 148:7
  156:20 157:2
  158:6 159:2
  167:15 172:22
  173:13,17 176:8
  176:13 179:5
  184:22
**separate** 26:19,20
  47:13 58:21 90:14
**separating** 56:16
**series** 129:20
**serpentine** 167:18
  167:25
**served** 40:13 43:25
  44:3 116:24
  140:24,24 143:1
  147:24 150:6
  166:19
**service** 4:11 30:23
  117:18
**services** 1:23 5:6
  7:13,14 24:6
  167:11

**serving** 20:24
**session** 14:8,15,19
  14:24,24 15:1,7
  15:11 113:23
**sessions** 14:11 15:2
**set** 5:10 51:15 54:1
  114:14,14 115:12
  117:25 148:13
**settle** 29:3 53:8
  55:24 56:13 57:5
  64:11 174:7,12
  185:10
**settled** 48:5 59:10
  60:10 67:5,12
  185:19
**settlement** 4:20
  29:3 46:21 48:25
  53:11 54:22,25
  55:11,19 57:1
  59:1 60:4,10,12
  61:8,12 62:5,15
  63:5,14 64:15
  169:14,24 170:3,6
  170:15 172:19
  174:2,10,18,22
  175:12,21 176:19
  177:9 178:18
  183:10 185:1,25
**settlements** 30:16
  30:19 46:14,15
  47:6,24 53:18
  64:11 68:3,9,12
  174:15 186:1
**seven** 169:4
**seventh** 72:19
**Seven-page** 5:18
**severance** 19:7,13
**severe** 64:15
**Shafer** 159:10
**share** 86:5 88:2,2
  187:6,10
**shared** 39:15,15
  67:12
**Sherry** 58:7
**SherryLynn** 58:5
  60:21 185:16

**shifting** 38:6
**short** 48:18 50:10
  55:8 77:1,1 97:11
  137:17 186:13
**shortly** 10:17 97:2
**show** 9:16 12:20
  82:8 104:24 114:4
  175:15
**showed** 76:11 90:3
  132:7 140:8
**showing** 58:2 91:13
  186:22
**shown** 15:12,15
  138:19
**shut** 30:13 151:18
**sic** 48:22 162:4
  167:3
**side** 22:12 90:25
  179:12
**sign** 127:12
**significant** 19:25
  115:1
**signing** 160:7
**similar** 23:18
  184:21 187:23
**simple** 61:17 129:7
**single** 19:20 87:7
  87:17 157:5
**sir** 13:9 25:1 62:19
  156:23
**six** 9:24 11:24 12:3
  13:10 169:3,4
**Six-page** 4:9
**skimmed** 58:18
**slipped** 25:2
**Sloane** 2:17 8:5
  29:9 55:21 69:21
  93:22 94:2,3,5
  121:17 122:5
  130:25 131:9,12
  131:20 132:7
**small** 67:21,21 74:7
  162:1,1
**smaller** 18:9 90:4
**snow** 12:9
**snowstorm** 11:22



12:8
**snowstorms** 12:5
  12:12,13
**sold** 10:24 26:23
  27:4 138:2,5,6
**solid** 174:4
**somebody** 122:10
  142:16 143:9,13
  175:7,8
**somewhat** 87:19
**sorry** 9:18 25:3
  26:14 29:15 33:1
  34:7 37:24 43:10
  60:20 63:1 79:3
  84:7 86:4,9 88:15
  91:20 97:9 98:18
  117:19 118:22
  134:15 139:18,20
  144:1 147:7
  152:23 156:25
  161:7 166:23
  171:6 176:11
  177:20 180:5
  182:21
**sort** 18:21 29:4
  30:3 33:20 46:7
  65:11 100:13
  108:6 143:23
  163:5
**sound** 29:14
**source** 45:5,5 135:2
  135:3 154:2
  157:10,23 160:1
**Southern** 3:3
**speak** 29:7 83:8
  97:7 119:8 143:24
  171:9,10
**speaking** 16:23
  37:19 118:9
**special** 68:10 175:3
**specialist** 39:9
**specific** 20:9,9,17
  20:22 22:4 23:19
  24:12 29:17 30:4
  33:24 41:12 48:3
  50:21 52:17,17

61:22 64:7 66:13
  74:21 88:6 98:4
  100:20 101:16
  103:6,15 116:25
  119:2 131:17
  135:5 154:11
  161:9 162:17
  163:14 164:5
  165:3 170:1
**specifically** 22:8
  28:24 34:14 39:19
  40:11 58:23 66:22
  67:11 98:15
  106:20 156:7
  164:6
**specifics** 63:12,14
  65:15 66:10 83:2
  83:18 104:4 111:7
  111:9 113:10
  155:19 158:23
  163:2 173:22
**speed** 75:4
**Spitzer** 18:9
**Spivak** 29:14
**spoke** 54:4 55:2
  137:3,8
**spoken** 16:24
  108:11 156:13
**Square** 2:3,14
**stamp** 89:1 92:15
**stamped** 95:10
  167:3
**stamps** 66:21
**stand** 169:16
**standard** 5:10
  42:14 114:14
  117:25 148:13
**stands** 145:10
**start** 7:19 29:23
  38:20 87:20
  137:12 140:13
  177:7
**started** 11:13,18
  15:4,8 20:13
  21:15 25:16
  104:22

**starting** 23:17
  47:19 48:12 60:1
  95:12 141:2
**state** 1:16 7:16
  17:19 74:3 115:6
  126:15 156:12
  192:7,24
**statement** 71:24
  138:23 140:2
  142:11 144:8
  145:8 149:9,24
  150:2 152:3 157:2
  157:11
**statements** 52:15
**states** 1:1 7:5 17:21
  153:8
**status** 17:15 28:20
  28:21,25 29:3
  31:9 46:12,14,18
  46:22 47:24 48:4
**stay** 19:11 36:18
**stayed** 18:25 22:21
  65:8,12
**steering** 43:1
**stenographically**
  192:12
**step** 124:18
**Stoneback** 160:6,9
  160:14,20
**story** 43:5
**Strauss** 147:16
  148:21
**Street** 2:4,9
**Streets** 2:14
**strong** 23:3
**struggled** 162:10
**studies** 73:7 85:5
  85:11 95:15,21
**study** 96:1,1,6
**study-type** 85:14
**stuff** 110:18 139:4
  140:8 175:10
  182:10,12 188:16
**subject** 85:2 89:5
  93:11 98:3 105:5
**submitted** 89:25

**subsequently** 90:5
**subset** 56:19
**subsidiaries** 148:11
**subsidiary** 9:11
  138:7
**suffering** 63:24
**suggested** 170:17
**suggests** 140:9
**suit** 20:19
**suite** 2:4 26:20
  167:17
**Sullivan** 28:24 29:6
  55:4,14,15 58:5
  60:21 69:20
  185:15
**summaries** 59:6
**summarized**
  148:12
**summary** 5:5 28:9
  45:14,18,20,24
  46:1,8 70:12
  167:11 173:4
**summer** 22:10
**Sunday** 167:16
**supervisor** 37:5
**supplemental** 53:2
**supplied** 148:9,12
**support** 24:23
**supporting** 158:9
  158:13
**supposed** 19:17
  112:23 130:19
  143:2
**sure** 7:18 9:15 11:9
  11:17 12:5 14:16
  18:7 19:4 24:14
  26:15 27:6,9
  33:10 39:17 42:14
  49:22 53:14,15
  54:14 56:18 59:14
  61:5 62:8,25 63:2
  63:12,13 64:4
  68:24 70:18 71:7
  71:16 74:17,24
  77:2 79:5,17,19
  80:15 83:18,24

84:23 85:1 91:11
  99:14,17,21
  100:24 102:22
  103:19 105:13
  112:8 114:7 115:2
  117:13 120:16
  123:9 127:17
  128:18 131:6,20
  132:1 139:19
  142:25 152:18
  155:21 156:10
  160:17 169:16
  171:6 172:11
  173:12
**surmise** 64:14
  120:1 137:17
**surprise** 107:5
**surprised** 40:16
**surprising** 40:21
**surrounding**
  176:20
**swear** 8:11
**switch** 27:13
  154:14
**sworn** 8:13 192:9
**system** 23:18 54:1
**systems** 21:4,5
**system's** 30:3

---

**T**

**T** 3:10 4:7 5:1 8:12
  8:12 148:22
**Tab** 88:23 89:4
**tabs** 88:24
**tailings** 167:19
  182:4,18
**take** 14:12 17:25
  19:21 20:17 49:23
  52:3 59:11 72:12
  73:19 77:1 86:10
  100:23 104:24
  114:9 144:10,15
  154:14 186:13
**taken** 7:9 8:23 9:4
  9:13 45:8,10 77:6
  84:16 95:2 113:22



144:24 186:16
192:12
**talc** 5:13 10:24
15:24,24 27:12,18
27:20,25 28:6,12
29:8,10,12 30:7
30:11 34:4,9,12
34:15,25 35:2,5,9
35:17,20,24 36:25
37:6,8,15,16,21
38:9,17 39:3,13
39:18 40:3,23
41:1 42:1,24 43:8
43:11,14,15,19,22
43:25 44:11,12
45:1,3,4,8,11,15
45:18,21 46:7,13
49:1 51:11,21
52:12,17 53:5,8
56:14,17,25 61:9
61:10,13,15,19
62:2,6,15 63:5
64:1,23 65:4
67:25 68:5,11,11
68:13,20 70:1,4
70:10,23 71:9,17
73:8,9,24 74:6
76:2,3,11,18
77:17 78:5,19
79:14,22 80:19,23
81:5,22 82:3,8,17
82:18,23 83:5,12
83:13 85:6,18,23
89:5 90:15 91:4,7
91:13 92:18,18,24
95:16,21 96:18
100:14,17 101:8
102:6,24 103:6
109:22,23 110:10
110:21,22 113:4
134:14,24 135:1,1
135:21 136:6,7,13
137:2,5,10 138:2
138:5,7,9,14,21
139:23 142:8
144:7 148:9,23

149:1 150:25
153:8 155:24
157:3,4,6,11
161:22,24 162:2
166:12 167:16,18
167:25 169:11
172:24 173:5
174:7,8,13 184:23
185:10
**talc-carbonate**
167:18
**talc-related** 29:1
**talc-specific** 102:4
**talk** 34:7 36:7 43:7
43:13 46:5,7 47:9
47:14,15 49:20
124:16
**talked** 70:12 74:13
74:25 154:20
165:13
**talking** 32:19 43:12
43:16 46:17 59:6
73:24 85:13
123:15 136:4,5,6
136:13 160:17
182:19 188:18
**talks** 105:22
**tall** 26:24
**tape's** 99:20
**tasked** 117:6
**Tech** 90:1 96:4,7,8
96:12,18
**technical** 129:6
**technically** 55:22
**Technology** 90:9
**Tel** 2:6,6,10,15,20
3:4,8
**telephone** 3:2,6
115:7
**tell** 36:23 70:12
78:16 79:10
149:23 159:13
172:2 177:15
178:4,10 179:4,18
**telling** 114:9
180:12

**tend** 150:23
**term** 75:16
**terminated** 19:10
**terms** 174:1 179:4
181:5,12
**territories** 33:18
**territory** 33:24
**test** 91:12
**tested** 92:18 96:17
**testified** 78:6 91:7
91:12 92:17 93:6
95:15,20,24 96:11
126:11 127:6
140:1
**testifies** 8:13 96:17
**testimony** 93:5,10
96:16 192:12
**testing** 4:15 85:10
85:22 87:1,4 91:7
**tests** 73:6,7 76:10
84:9,11,16 85:5
86:2
**Thank** 25:6 67:3
68:23 69:1 72:1
91:2 97:19 114:6
160:23 168:15
189:1 190:20,22
**thanks** 22:24 79:6
101:4 166:25
186:13
**then-current** 43:16
**theory** 19:16 53:24
**thereof** 118:1
**Theresa** 5:18 161:2
**thick** 87:10
**thing** 29:4 30:4
41:19 42:13 65:12
66:3 70:11,13,15
74:13 83:13 87:18
101:20 104:9
106:9 115:2
143:23 164:22
**things** 19:24 65:22
74:11 139:8
**think** 11:12 12:17
14:8,22 15:5,8,8

15:16,16 18:22
19:13 21:3,8,11
21:12 22:5,8
23:20 25:16 26:1
28:9 29:13,22,23
30:23 31:25 33:6
33:12 38:24 39:15
39:24 42:12 44:6
46:25 47:8,10,19
48:11 50:15,22
54:4 55:20 56:1,5
57:15,18 62:17
63:9 64:17,20
67:2 70:5,16,17
71:14 73:25 74:11
80:2,20,24 81:6
85:9 98:22 101:20
102:11,18 108:5
109:15 111:23
112:15 118:15
123:14 124:8
128:7,8,14 131:21
133:21 134:20
135:22 136:18
140:19 141:2,15
144:14 145:9
146:9,18 147:5
151:3 162:7
165:24 172:15
173:6,9,10 177:3
177:5 178:16,17
178:20 179:23
180:14 181:24
182:6 183:12
184:13 188:21
190:18
**third** 59:8 87:16
117:21 148:7,18
176:14
**Thomas** 3:9,11
7:12 8:9 93:23
94:8,11
**thought** 23:9
118:13
**thousand** 39:23
59:11 60:10,11,16

185:20
**three** 90:14 105:19
140:12 147:23
**three-ring** 75:18
**threshold** 151:2
**Tia** 14:10
**ties** 100:12
**Tim** 7:23 14:7
66:16 91:19
**time** 7:8 9:12,22
11:2 12:2,2 14:13
17:18 18:14 20:8
22:7,10 23:22
24:2 25:14 26:3,5
26:11,18 27:11
29:9,12 33:22
37:14,22 38:12
39:23 49:24 50:1
50:5 57:21,24
61:23 64:18 73:19
77:4,7 79:4 83:23
90:12 94:14 96:10
96:21,25 97:12,14
97:16 99:22,24
100:2,15 101:24
108:12 113:13,20
113:24 125:1,3,5
139:1,2 141:14
144:1,22,25
146:21 147:2
154:23 163:8
171:14,15 174:11
179:1 180:7
182:20 186:14,17
191:1 192:13
**times** 18:6 21:3,9
23:22 55:21 57:16
67:23 185:25
186:7
**time-wise** 170:22
**TIMOTHY** 2:18
**Tim's** 14:9
**tire** 28:7,22 29:2
30:16,17,19,22
32:18 33:12,14
36:3 46:14,15



47:25 53:13,14,20
53:22 54:6,8,9
55:12 56:10,17
57:1,4 59:2 64:25
67:6,25 73:25
74:2,3 83:9,20,25
84:3 174:8,13
185:17
**title** 21:14 25:15,23
25:25 92:10
**titled** 167:11
**today** 7:7 8:20 9:13
9:20 10:14 34:21
64:4 72:7 90:12
93:6,13 96:17,21
114:22 129:3
138:19 139:5,12
140:9 147:20
185:3,14
**today's** 14:4,24
16:25 162:11
187:21
**told** 11:25 78:8
98:25 143:20
181:19 183:7
**Tom** 37:6
**Tony** 32:24 35:4,6
68:25 86:7 130:14
132:13,13 147:1
147:11 160:24
175:18
**Tony's** 35:6 151:16
**top** 73:2 89:7 92:1
153:25
**topic** 30:1 47:22
**topics** 29:22 46:22
47:13,18 49:19
**Tortorella** 3:2 8:7
**total** 60:5
**totally** 188:22
**touch** 22:21 36:10
116:20
**traces** 90:3
**trading** 23:25
24:12 38:4
**transcript** 4:16,18

95:10 172:7
192:11
**transcripts** 45:7
122:20 127:25
129:11,13 130:7,9
130:18
**transferred** 39:7
**transmission** 96:2
**transmit** 15:24
31:11 41:7,14
**transmittal** 83:15
**transmitted** 41:4
**transmitting** 31:15
**Treasury** 25:9
**trees** 12:11
**trial** 126:11
**tried** 111:13 170:2
**Triglia** 89:4,13
**true** 56:9 67:15
71:19 83:24,24
118:1 119:2
138:22 139:3,10
140:2 149:9
177:16 178:4,14
180:13 186:4
192:11
**try** 74:17 112:8,25
140:25 141:1
155:19
**trying** 15:16 36:18
47:13 59:14 81:16
82:25 99:15
142:20,20
**Tuesday** 1:11 7:7
**Tunis** 3:6 8:8,8
50:6 190:16
**turn** 10:4,4 59:16
63:16 72:18 93:17
96:9 101:2 115:4
117:15 126:5
137:19 156:11
157:1 161:13
169:8 172:20
176:1 188:8
**Turner** 60:6
**turning** 109:4

141:16
**two** 2:3,14 16:7
18:3,8 21:12,24
39:22 52:3 58:4
58:21 65:21 86:5
86:9 90:6 108:19
114:19 127:7
132:17 146:25
166:24 182:17,17
**Two-page** 4:24
5:15
**type** 41:19 70:9
141:8
**types** 43:4 102:5
110:2 148:21
**typical** 51:24 52:2
**typo** 162:7

_____

**U**
**ultimately** 127:10
172:18
**undergraduate**
17:4,5
**understand** 8:20
54:7 70:23 71:9
71:18 79:15 94:2
95:14,25 103:20
106:11 109:21,25
142:21,24 145:14
145:17,20 149:14
151:5 152:1
170:10 180:9
**understanding**
30:6 54:23,24
55:8,10 60:15
68:7 76:9 82:21
99:1,3 100:7,10
103:11 109:18
134:25 136:17
137:1 143:4,8
149:15,21 150:12
180:2,7 189:14
**understands** 146:6
**understood** 30:10
71:14 75:8,14
78:11 102:1 185:5

**undue** 105:15
**unfamiliar** 65:22
**unfortunately** 12:6
**unit** 20:17,21 24:9
24:12,20,24 25:12
108:21 109:3
**United** 1:1 7:5
**units** 24:1,10 109:6
**updated** 47:24
**updates** 188:3
**use** 58:13,14 76:25
110:10
**usually** 28:15
**utilizing** 95:17 96:1

_____

**V**
**vague** 66:8
**vaguely** 47:23
**Vale** 2:13 8:4,4
69:1 72:1,11
114:6 147:3,5,7
151:18 154:19
168:15 190:14
**valea@pepperla...**
2:16
**validity** 182:4
**value** 119:21
**Van** 162:5
**varied** 61:23
**various** 73:5,22
148:8 158:7
**Verification** 117:19
127:12
**verified** 116:24
147:24
**verifies** 117:22
**verifying** 160:7
**Vermont** 73:7
84:10,12 95:16
96:18 138:9 157:5
167:17
**version** 94:20,20
**versions** 188:2
**versus** 7:4 11:1
56:17 72:5 112:23
167:13

**vice-president** 92:8
**Video** 4:9
**Videographer** 3:11
7:1,12 8:10 25:1,6
49:24 50:5,7
57:21,24 62:18
77:4,7 97:12,16
99:22 100:2
113:20,24 125:1,5
144:22,25 156:23
186:14,17 190:24
**videotape** 7:2 10:2
**view** 51:1
**violation** 119:12
181:20 183:9
**visit** 84:14
**vs** 1:5

_____

**W**
**wait** 56:2 81:18
86:11 114:8
127:11 135:9
182:23,23
**want** 10:4 20:4 33:7
42:10 47:9,12
48:17,19 55:6
63:15 69:11 70:18
72:18 73:18 74:19
76:25 83:9 86:16
87:19 88:12,22
114:4 117:15
123:20 127:15
131:6 140:25
141:1 143:6
147:11 154:14
161:13 176:6,7
180:1,5,20 183:5
183:15 189:16
**wanted** 19:16 20:15
40:20 46:11 83:17
**Warren** 3:7
**Washington** 2:10
16:8
**wasn't** 23:1 28:4
29:4 33:23 36:16
36:16 40:16 44:17



74:9 75:17 83:10
104:21 116:17
172:1 182:3
**way** 48:13 51:7
63:10 80:13 81:9
81:19 87:16
102:17,20 104:8
111:24 112:9
113:1 120:19
123:9 128:8 141:2
142:1 149:5
152:17 153:16
177:7 178:16
181:8
**week** 14:21,23
**weeks** 147:23 169:3
169:4
**Weintraub** 115:22
132:10,20 133:2
154:8
**went** 9:5 15:4 17:5
17:6 18:22,25
30:24 38:1,7
122:20 188:15
**weren't** 13:21
19:24 36:4
**West** 1:10 2:19
7:10
**Westfall** 91:25 95:3
96:22 97:1,6,24
98:1,6,10,20
100:8,12 122:19
123:22 125:14
126:23 127:22
129:11 130:7
138:19 149:8
167:13 185:2
**we'll** 56:20 67:2,2,2
73:19 84:6 87:20
90:25
**we're** 8:20 46:17
47:19 49:25 50:7
57:25 77:5,8
97:17 107:21
113:25 136:4,13
183:2 190:18

191:1
**we've** 74:4,23 85:13
141:12,13,14
**whatnot** 59:15
**Where'd** 62:20
**Whitman** 18:7
**Whittaker** 167:13
**whoa** 182:15,15,15
**William** 60:5
161:22
**Williams** 1:3 7:4
11:1 72:5
**willing** 169:13,24
182:8
**withdraw** 182:24
182:25
**withdrawn** 106:5
**withhold** 122:3
**witness** 4:2 7:24
8:11 13:1,17,19
25:3,5 43:10
47:10,14 48:23
49:21 50:1,22
52:23 55:7 56:3,7
58:8,10 62:20
76:24 79:3,17
81:16 86:6,10,13
86:18 88:18 89:8
91:2 94:22 97:8
97:14 99:24 100:1
101:4 103:3 114:8
118:22 123:20
124:19 125:3
129:19,19,21
139:18 142:22
143:12,23 153:3
156:25 158:3
166:6 177:20,22
183:2 187:10
188:24 189:2
190:13 192:8
**witnesses** 72:14
**Wood** 27:1
**word** 82:25 113:1
**words** 149:21
150:13 153:2

**work** 19:16 23:9
27:17 33:23 39:18
40:21 102:11
111:25 112:4
115:23 116:8,16
118:18 123:16
124:9,12 140:21
140:22 141:24
144:20 160:9
173:7 177:3
180:25 182:1
**worked** 16:5 18:3,9
24:11 27:12 35:2
36:25 38:9 39:12
40:20 58:11 94:13
94:13 95:7 133:17
143:19 154:24
178:25
**worker** 46:14,15
53:13,22 54:6,8,9
55:12 56:10,17
57:1,4 59:2 64:25
65:4 67:6,8,25
74:3,6 82:3 83:12
83:20,25 84:4
136:6 174:8,13
185:17
**workers** 28:7,22
29:3 30:16,17,20
30:22 32:18 33:12
33:14 36:3 47:25
53:15,20 73:25
74:2 83:9
**working** 20:7 22:23
24:8 35:18 37:21
38:3,16,17 106:18
111:14 113:12
117:23 130:13
**wouldn't** 29:16,16
80:13 133:23
149:14
**Wow** 11:17 24:14
**write** 142:25
150:11
**written** 59:8 141:11
**wrong** 188:15

**wrote** 143:13
**www.MagnaLS.c...**
1:24

**X** 4:1,7 5:1
**XI00517** 192:25
**x-ray** 95:17

**yeah** 12:3,12 15:3
34:22 35:3 39:5
46:18 48:11 58:15
59:21 60:15 61:17
69:16 75:16 76:5
79:1 81:16 86:13
89:3,3,10 92:6
99:19 103:19
104:2,8 107:20
113:10 122:14
132:13 134:21
138:1 139:16
143:18 144:15
147:4 153:3
159:19 160:16
162:25 164:14
173:21 177:2
179:22 184:7
187:9 188:14,24
188:25
**year** 22:5 24:15
74:9
**years** 11:2,24 13:11
18:3,8 33:23
34:19 74:8 108:13
135:20 136:16,16
140:10
**yesterday** 14:25
15:3,14 16:12
65:6,19 114:25
115:2
**York** 17:15,17,22
18:4,9
**Yup** 25:3,3 87:14
90:11 92:2 94:23
101:10 156:3

176:5 187:3 189:6

**$**
**$400,000** 174:13
176:3 177:15
178:3,9 182:13

**0**
**0** 24:17,18
**00157** 5:8
**01** 24:18,19 27:16
27:16 38:21,21
**02** 24:14,16,17
69:17
**07052** 2:19
**07059-6747** 3:7
**07701** 2:5
**07928** 3:3

**1**
**1** 4:14 6:9,12,13 7:2
9:17 15:9 63:18
86:25 97:16 115:5
**1,000** 186:7
**1:03** 99:22,25
**1:04** 100:2
**1:23** 113:20,22
**10** 4:24 15:8
**10th** 161:4
**10:11** 1:18 7:8
**10:30** 15:4
**10:45** 15:4
**105** 5:8
**11** 5:3
**11-cv-1754** 1:2
**11:21** 49:24 50:2
**11:28** 50:7
**11:41** 57:21
**11:44** 57:24
**114** 5:9
**12/23/91** 4:12
**12:13** 77:4,6
**12:24** 77:7
**12:54** 97:12,15
**1210** 69:14
**12168** 4:22



**12171** 4:23
**12190-12204** 5:14
**124** 5:15 147:15 148:6
**127** 2:5 6:13
**13** 6:9,9,13
**13157** 89:1
**14** 5:5 167:2
**14202** 5:11
**14256** 5:11
**14462** 4:17
**14484** 92:15
**146** 6:13
**14601** 4:17
**147** 5:15
**15** 5:8 105:3 107:18 109:4 161:15
**152** 6:14
**155** 5:12
**16** 135:20 140:10
**16th** 15:12 92:4 114:16
**161** 5:18
**167** 5:5
**168** 4:24
**17** 6:3 135:20 140:10
**175** 4:22
**18** 188:20 189:1,1
**18th** 2:14
**184** 6:14
**186** 4:12
**19** 6:14 188:8,22
**19103** 2:4
**19103-2799** 2:15
**1967** 138:10 157:5
**1977** 17:10 18:2 90:2
**1978** 95:17
**1979** 89:5
**1980s** 93:14 106:19
**1981** 18:13 20:6,7 21:13,19
**1982** 167:16
**1983** 92:4 95:2 138:11 157:6

161:21
**1984** 17:13 18:18 21:13,19 22:2,7 105:5
**1985** 148:23
**1988** 18:22 22:13 23:11,13,17 25:13 26:2,19 27:7 37:20
**1991** 187:16,25

_____
**2**
**2** 6:11 27:16 161:14 172:23 179:6 184:22
**2nd** 168:18 169:3
**2:03** 113:24
**2:18** 125:1,4
**2:34** 125:5
**20** 6:10 58:4
**20-minute** 88:13
**20005** 2:10
**2001** 2:4 24:20 25:14,24 27:14,17 27:24 38:14 39:23
**2002** 58:4 114:16 147:16,23 156:1
**2004** 161:4 163:1 168:18 169:3
**2006** 19:1,3 20:1 24:20 25:24 26:3 27:24 38:14 175:20
**2006-2007** 39:4
**2007** 19:2 20:2
**2011** 12:1
**2018** 1:11 7:7
**202** 2:10
**203** 5:16 72:3 84:7 101:2
**205** 5:18 161:1 169:6
**21** 6:10,11 95:10
**215** 2:6,15,15
**2166** 167:3
**21666-21681** 5:7

**21681** 167:3
**22nd** 89:5 156:1
**24** 1:11 146:24
**24th** 7:7
**25** 3:7
**26** 72:4,9 95:2
**26(a)(1)** 5:17
**29** 88:23 89:4
**2900** 2:4

_____
**3**
**3** 4:16 15:5 91:17 91:22 126:21 127:21 129:10 130:6,24 131:7 144:22 156:11 179:6 184:23 185:3 189:7
**3rd** 147:16,22
**3/16/83** 4:17
**3/7/84** 5:8
**3:00** 144:24
**3:04** 144:25
**300** 59:10
**3000** 2:14
**309** 60:5
**310,000** 60:5
**334310** 161:5
**334310-334316** 5:20
**334316** 161:5
**35** 126:5,7
**36** 137:20
**37** 137:19,22,25
**390446-390460** 4:21
**39045** 59:17
**39958-39998** 4:13

_____
**4**
**4** 4:18 6:9 10:5 94:18 95:1 126:22 127:21 129:10 130:6 185:3
**4/12** 69:17
**4/12/2002** 69:14

**4/20/2020** 192:24
**4/26/83** 4:19
**4:10** 186:14,16
**4:33** 186:17
**4:38** 191:1,5
**400** 177:18 185:25 186:6
**400,000** 174:4 179:14,17 186:6
**40099-40100** 5:15
**40190** 148:22
**42** 89:25 148:23,23
**437** 3:3
**447** 63:18
**454** 63:20
**47** 6:10

_____
**5**
**5** 4:20 69:11 90:4 167:23
**5-9** 59:22
**5/3/02** 5:15
**5/9/06** 4:22
**50** 6:10 104:9
**50-page** 104:9
**500** 148:23
**51** 6:11
**567-9003** 2:6
**57** 5:9 114:5,12 119:23 147:25
**58** 4:20

_____
**6**
**60** 5:12 155:23
**622** 1:17 2:19 7:9
**63** 126:8,18 128:1 128:23 129:14 130:11 133:10
**647-1022** 3:8
**647-7721** 3:8
**65** 137:21
**655** 2:9
**66** 6:3
**69** 5:3

_____
**7**

**7** 4:22 5:22 105:5 175:16,19 191:4
**7th** 167:15
**72** 5:16
**732** 2:6
**736-1712** 2:20
**736-8660** 2:20
**747-9003** 2:6
**77** 6:11

_____
**8**
**8** 4:3 6:12,14 63:18
**8/2/04** 4:24
**8/20/02** 4:20
**80** 6:12,12
**80s** 27:8
**80-page** 140:12
**81** 20:25
**824-8425** 3:4
**824-9300** 3:4
**84** 18:14 20:25 21:22 22:9 85:1 113:11
**86** 4:14
**866-624-6221** 1:24
**879-5152** 2:10
**88** 23:12 24:13,14 84:24

_____
**9**
**9** 4:9 95:12
**9th** 175:19
**90s** 9:2 27:8
**908** 3:8,8
**91** 4:16 188:4
**94** 4:18
**9712-9792** 4:19
**973** 2:20,20 3:4,4
**9732** 95:10
**981-4000** 2:15
**981-4750** 2:15

