# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**KIMBERLEE WILLIAMS, et al.**

Plaintiffs,

vs.

**BASF CATALYSTS LLC, et al.**

Defendants.

No. 2:11-cv-01754 (ES) (JAD)

CIVIL ACTION

# PLAINTIFFS' MEMORANDUM OF LAW
# IN SUPPORT OF PRELIMINARY APPROVAL OF
# THE CLASS ACTION SETTLEMENT

**COHEN, PLACITELLA & ROTH, P.C.**
Christopher M. Placitella, Esq.
Michael Coren, Esq.
Jared M. Placitella, Esq.
Eric S. Pasternack, Esq.
127 Maple Ave
Red Bank, New Jersey 07701
(Tel): (732) 747-9003
(Fax): (732) 747-9004

*Attorneys for Plaintiffs and the Proposed Class*

## **TABLE OF CONTENTS**

I.  Introduction ...................................................................................................1

II.  Factual Background .......................................................................................3

    A.  Emtal Talc and the Johnson Mine ...............................................................3

    B.  Historical asbestos litigation. ......................................................................3

    C.  Plaintiffs' class action claims. .....................................................................4

    D.  The initial proceedings in this Court. ..........................................................5

    E.  The Third Circuit decision. ..........................................................................6

    F.  The proceedings in this Court following remand..........................................7

    G.  Mediation efforts. .....................................................................................10

III.  Material Terms of the Settlement ................................................................15

    A.  The Settlement Class definition. ................................................................15

    B.  Benefits to the Settlement Class Members.................................................16

    C.  Class Counsel Fees and Litigation Cost Reimbursement. ..........................16

    D.  Non-monetary benefits to the settlement Class..........................................17

    E.  The Plan of Distribution. ...........................................................................18

      1. Establishment of a settlement claims facility and appointment of a Settlement Trustee, Claims Administrator and Lien Administrator. ................19

      2.  Proposed distribution of the Settlement Fund among Class Members.....22

        a.  Payments under the Plan's Part A program. ........................................23

        b.  Payments under the Plan's Part B program. ........................................25

      Table 1 .......................................................................................................29

      Hypothetical Part B Payment Share Estimates*...........................................29

        c.  Payments under the Plan's Part C discretionary EIF program. ............29

    F.  The Plan of Notice......................................................................................33

IV.  Argument ....................................................................................................38

    A.  The Parties are entitled to a presumption that the settlement is fair. ..........41

      1.  The proposed settlement is the product of good faith, extensive arm's length negotiations. .....................................................................................41

      2.  Extensive discovery and proceedings before the Third Circuit, District Court, and Special Discovery Master preceded the settlement. ......................43

3.    The proponents of the settlement are experienced in similar litigation...44

B.    The complexity of these proceedings and advanced stage of litigation support approving the Settlement. ...................................................................44

   1.    Complexity, Expense, and Likely Duration of the Litigation.................46

   2.    Reaction of the Class to the Settlement. ...............................................48

   3.    Stage of the Proceedings and Amount of Discovery Completed.............49

C.    Risks to continued litigation also support approving the Settlement..........50

   1.    The availability of witnesses at trial. ...................................................51

   2.    Defenses relating to Underlying Lawsuits. ............................................53

   3.    Establishing Damages. .........................................................................55

   4.    Ascertaining the Proposed Class............................................................58

   5.    "Science Day" And The Emtal Talc Testing Record...............................59

D.    Other factors also support approving the Settlement. ................................61

   1.    Ability of Defendants to Withstand a Greater Judgment.........................61

   2.    Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and All Attendant Risks of Litigation. ............................................62

   3.    *Prudential* Factors. ..........................................................................64

C.    The Court should conditionally certify the Settlement Class. ....................67

   1.    Numerosity. ...........................................................................................69

   2.    Commonality..........................................................................................70

   3.    Typicality. .............................................................................................71

   4.    The Representative Plaintiffs' interests fully align with those of the putative Settlement Class as they made the same fraud, fraudulent concealment and conspiracy claims under New Jersey law..................................................73

      a.    Representative Plaintiffs. ....................................................................73

      b.    Class Counsel.....................................................................................77

   5.    The Court should conditionally certify a settlement class under Rule 23(b)(3) for monetary relief. .........................................................................78

      a.    Common questions of law and fact predominate................................78

      b.    Superiority..........................................................................................82

D.    The proposed form and method of class notice satisfy due process. ..........83

E.    The plan of distribution treats class members equitably relative to each other ........................................................................................................86

V.    Conclusion ...................................................................................................89

# TABLE OF CONTENTS

## Cases

*Amchem Prods v. Windsor*,
  521 U.S. 591 (1997) ................................................................ 75, 79, 81

*Baby Neal v. Casey*,
  43 F.3d 48 (3d Cir. 1994) ................................................................ 72, 73

*Class Plaintiffs v. City of Seattle*,
  955 F.2d 1268 (9th Cir. 1992) ...............................................................87

*County of Essex v. First Union Nat'l Bank*,
  89 A.2d 600 (N.J. 2006) ....................................................................56

*Dewey v. Volkswagen Aktiengesellschaft*,
  681 F.3d 170 (3d Cir. 2012) ..................................................................74

*Ehrheart v. Verizon Wireless*,
  609 F.3d 590 (3d Cir. 2010) ..................................................................39

*Gates v. Rohm & Haas Co.*,
  248 F.R.D. 434, 439 (E.D. Pa. 2008) .........................................................42

*Girsh v. Jepson*,
  541 F.2d 153 (3d Cir. 1975) ........................................................... passim

*Grunewald v. Kasperbauer*,
  235 F.R.D. 599 (E.D.Pa. 2006) ...............................................................85

*In re Baby Prods. Antitrust Litig.*,
  708 F.3d 163 (3d Cir. 2013) ..................................................................46

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001) ...................................................... 41, 46, 66, 76

*In re CIGNA Corp. Sec. Litig.*,
  No. 02-8088,
  2007 U.S. Dist. LEXIS 51089 (E.D. Pa. July 13, 2007) .......................................42

v

*In re Community Bank of Northern Virginia*,
    418 F.3d 277 (3d Cir. 2005)................................................................73

*In re Computron Software*,
    6 F. Supp. 2d 313 (D.N.J. 1998) ........................................................87

*In re Federal Skywalk Cases*,
    97 F.R.D. 380 (W.D. Mo. 1983).........................................................87

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F3d 768 (3d Cir. 1995).................................................................74

*In re GMC Truck Fuel Tank Prods. Litig.*,
    55 F.3d 768 (3d Cir. 1995).................................................................63

*In re IGI Secs. Litig.*,
    122 F.R.D. 451 (D.N.J. 1988)............................................................72

*In re Modafinil Antitrust Litig.*,
    837 F.3d 238 (3d Cir. 2016)...............................................................69

*In re NFL Players Concussion Injury Litig.*,
    821 F.3d 410 (3d Cir. 2016)................................................ 41, 66, 71

*In re Omnivision Techs.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2007) .............................................87

*In re Oracle Sec. Litig.*,
    No. 90-931,
    1994 U.S. Dist. LEXIS 21593 (N.D. Cal. 1994) ...............................87

*In re Pet Foods Products Liability Litigation*,
    629 F.3d 333 (3d Cir. 2010)....................................................... 75, 76

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998)........................................................ passim

*In re Royal Dutch/Shell Transp. Sec. Litig.*,
    No. 04-374, 2008 U.S. Dist. LEXIS 124269 (D.N.J. 2008)...............88

*In re Schering Plough Corp.*,
   589 F.3d 585 (3d Cir. 2009)......................................................................72

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004)............................................................... passim

*Krell v. Prudential Ins. Co. of Am.*,
   148 F.3d 283 (3d Cir. 1998)......................................................................39

*Lipuma v. Am. Express Co.*,
   406 F. Supp. 2d 1298 (S.D. Fla. 2005) ......................................................48

*Maley v. Del Global Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002) .......................................................87

*Mullane v. Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950)..................................................................................84

*NFL Players Concussion Injury Litig.*,
   821 F.3d 410 (3d Cir. 2016)............................................................... passim

*Petrovic v. Amoco Oil Corp.*,
   200 F.3d 1140 (8th Cir. 1999) ..................................................................76

*Platinum Mgmt., Inc. v. Dahms*,
   666 A.2d 1028 (N.J. Law Div. 1995) ........................................................56

*Rodriguez v. Nat'l City Bank*,
   726 F.3d 372 (3d Cir. 2013)......................................................................70

*Saini v. BMW of N. Am., LLC*,
   No. 12-6105,
   2015 U.S. Dist. LEXIS 66242 (D.N.J. May 21, 2015)................................62

*Stewart v. Abraham*,
   275 F.3d 220 (3d Cir. 2001)......................................................................69

*Tartaglia v. UBS PaineWebber, Inc.*,
   961 A.2d 1167 (N.J. 2008)........................................................................53

*Turner v. NFL (In re NFL Players' Concussion Injury Litig.),*
  301 F.R.D. 191 (E.D. Pa. 2014) ................................................................ 41, 66

*Tyson Foods, Inc. v. Bouaphakeo,*
  __ U.S. __, 136 S. Ct. 1036 (2016) ...................................................................79

*Williams v. BASF Catalysts LLC,*
  765 F.3d 306 (3d Cir. 2014) .............................................................................7

*Williams v. BASF Catalysts LLC,*
  No. 11-1754,
  2012 U.S. Dist. LEXIS 175918 (D.N.J. Dec. 12, 2012) ......................................6

*Williams v. BASF Catalysts LLC,*
  No. 11-1754,
  2016 U.S. Dist. LEXIS 46273 (D.N.J. Apr. 5, 2016) ..........................................7

*Williams v. BASF Catalysts, LLC,*
  No. 11-1754,
  2017 U.S. Dist. LEXIS 122053 (D.N.J. Aug. 3, 2017) .............................. 8, 9, 53

*Winoff Industries v. Stone Container Corp. (In re Linerboard Antitrust Litig.),*
  305 F.3d 145 (3d Cir. 2002) ...........................................................................81

*Zippertubing Co. v. Teleflex Inc.,*
  757 F.2d 1401 (3d Cir. 1985) ..........................................................................56

**Statutes**

N.J.S.A. § 2C:41-1 .............................................................................................5

N.Y.J.L. § 487 ...................................................................................................5

**Rules**

Fed. Civ. P. 23(e) ................................................................................. 41, 42, 43

Fed. R. Civ. P. 23(a) ................................................................................. 71, 72

Fed. R. Civ. P. 23(a)(1) .................................................................. 71, 72

Fed. R. Civ. P. 23(a)(2) ......................................................................72

Fed. R. Civ. P. 23(a)(3) ......................................................................74

Fed. R. Civ. P. 23(c)(2)(B) .................................................................86

Fed. R. Civ. P. 23(e)(1) ......................................................................86

Fed. R. Civ. P. 23(e)(2) ......................................................................42

Fed. R. Civ. Pro. 53 ...........................................................................19

## Treatises

*Restatement (Third) Restitution and Unjust Enrichment* § 51 (2011) ....................58

## I.    Introduction

After more than nine years of contentious litigation and extensive discovery, the parties, with the assistance of mediators, have reached a proposed class action settlement that is fair, reasonable and adequate for Class Members. The settlement recognizes that the Plaintiffs and the Defendants each face substantial risks and costs in proceeding further with this litigation, and that resolving the case now provides benefits to both sides.

Under the terms of the Settlement Agreement, Defendants BASF Catalysts LLC ("BASF") and Cahill Gordon & Reindel LLP ("Cahill") (collectively "Defendants") will establish a non-reversionary $72.5 million settlement fund ("Settlement Fund") to compensate members of a proposed Settlement Class. Exhibit A.[1] In addition, BASF and Cahill will pay up to $3.5 million for the costs of providing a notice program to the proposed Settlement Class and for the administration of the claims submitted to the Settlement Fund. Defendants have further agreed that, subject to Court approval, the six Representative Plaintiffs ("Representative Plaintiffs" or "Plaintiffs") will be paid representation service awards from the Settlement Fund in an amount not to exceed $50,000 each ($300,000 in the aggregate). Defendants BASF and Cahill have also agreed to not

---

[1] Capitalized terms have the same meaning as in the parties' Class Action Settlement Agreement.

1

oppose the petition for attorney's fees and litigation expenses by Class Counsel to be awarded by the Court up to a maximum of $22.5 million and $1.2 million, respectively. All told, the proposed class settlement provides a substantial benefit package of nearly $100 Million to the Settlement Class Members in exchange for releasing Defendants along with the individual co-defendants named in the *Williams* Action, thereby ending the present litigation for all time.

The proposed class settlement is fair, reasonable and adequate, and it readily satisfies the elements of Rule 23 of the Federal Rules of Civil Procedure. The proposed settlement includes a notice program that satisfies Rule 23 as well as constitutional and judicial guidelines. The proposed settlement's terms and structure, moreover, provide the proposed Settlement Class with a substantial cash payment.

Plaintiffs, without opposition from Defendants, now seek preliminary approval of the Class Action Settlement, a stay of this litigation and all Related Actions as defined in the Settlement Agreement, conditional certification of the putative Settlement Class, approval and authorization of the Notice Program, authorization to commence Interim Claims Processing under the proposed Plan of Distribution, and the setting of a schedule for final approval.

## II.     Factual Background

### A.     Emtal Talc and the Johnson Mine

From 1967 to 1983, a subsidiary of Engelhard Corporation mined talc from a single mine in Johnson, Vermont. This mine was known as the Johnson Mine, and the talc produced from it was sold under the brand name Emtal Talc. Emtal Talc was sold and used for certain industrial and commercial purposes. This lawsuit does not involve exposure to any personal cosmetic products such as baby or body powder. In 1983, Engelhard closed the Johnson Mine. In 2006, BASF acquired Engelhard and renamed it BASF Catalysts LLC.

### B.     Historical asbestos litigation.

In the late 1980s and continuing for many years, numerous plaintiffs began filing bodily injury actions against dozens of corporate defendants, alleging that asbestos in the defendants' products or facilities caused the plaintiffs to develop asbestos-related injuries. Many of the plaintiffs worked in tire plants or other manufacturing facilities where they worked around raw asbestos and multiple asbestos-containing products.

Although talc is not asbestos, plaintiffs in various jurisdictions named Engelhard and other talc companies among dozens of other defendants, alleging that the talc companies' talc contained asbestos. Engelhard retained Cahill, a premier New York law firm and Engelhard's longtime outside counsel, to defend

3

Engelhard in these lawsuits. Cahill served as Engelhard's national counsel in asbestos litigation from the late 1980s until 2009.

**C.      Plaintiffs' class action claims.**

In 2009, Plaintiffs' Counsel obtained evidence, which they believe contradicted the claims made by Defendants in the Underlying Lawsuits about Emtal Talc. On March 28, 2011, five of the current six Representative Plaintiffs filed this Class Action Lawsuit. The sixth Representative Plaintiff, Mrs. Rosanne Chernick, joined in the matter when the First Amended Class Action Complaint ("FAC") was filed on August 3, 2011, after Defendants filed several Motions to Dismiss the initial complaint. Plaintiffs' Second Amended Complaint ("SAC") was filed on July 16, 2015.

The SAC alleges that from 1984 to 2009, Engelhard and Cahill defended asbestos bodily injury cases in state and federal courts in part by (1) denying that Emtal Talc contained asbestos, (2) by denying the existence of any evidence that it did and/or (3) by stating that no Engelhard employee had ever testified about the presence of asbestos in its talc. Plaintiffs allege that Engelhard and Cahill employed this defense for 25 years, allegedly resulting in thousands of dismissals, either voluntarily, by court order, or through Engelhard's participation in nuisance-value group settlements with other talc defendants (including talc defendants whose products were known at the time to contain asbestos).

4

Defendants have vigorously denied these allegations. In addition to denying that they committed the alleged fraud or that Emtal Talc contained injurious amounts of asbestos, Defendants argue that the Underlying Lawsuits were settled or dismissed for a variety of legitimate reasons. For example, Defendants point to evidence that many plaintiffs could not prove they were exposed to Emtal Talc, that some plaintiffs could not prove they suffered an asbestos-related injury, that some plaintiffs' claims were time-barred, and so on. Defendants have also argued that Plaintiffs in this action did not suffer monetary damages given evidence that many plaintiffs accepted similar settlement values from other talc defendants for whom plaintiffs had evidence of asbestos contamination and exposure.

**D.      The initial proceedings in this Court.**

The FAC, as did the original complaint, alleged claims under New Jersey law for common-law fraud in various forms, fraudulent concealment (which encompasses New Jersey's stand-alone "spoliation" tort), violation of New Jersey's Racketeer Influenced and Corrupt Organizations Act (NJ-RICO), N.J.S.A. § 2C:41-1, *et seq.*, conspiracy to violate New Jersey's RICO statute, unjust enrichment, and common law conspiracy. In addition, with respect to Cahill and the co-defendant individual attorneys, the FAC pleaded a statutory claim for violation of New York Judiciary Law §487 (Misconduct by attorney) ("N.Y.J.L. § 487 Claim").

Defendants moved to dismiss the FAC claiming: (1) the District Court lacked jurisdiction over the case because of the *Rooker-Feldman* doctrine; (2) Plaintiffs had not adequately pleaded their claims; and (3) the District Court lacked the authority to provide Plaintiffs their requested relief because of the Anti-Injunction Act and the principles of justiciability. The District Court rejected the challenge to its jurisdiction, but otherwise fully granted the Motions to Dismiss. The Court ruled that Plaintiffs' fraud and fraudulent concealment claims were not actionable mainly because New Jersey's litigation privilege immunized Defendants from tort liability for alleged misstatements made in the Underlying Lawsuits. The District Court further found that Plaintiffs failed to plead an actionable RICO claim, reasoning that the Underlying Lawsuits were personal injury claims, and that Plaintiffs' requested relief would impermissibly undermine prior state court judgments in the Underlying Lawsuits. *Williams v. BASF Catalysts LLC*, No. 11-1754, 2012 U.S. Dist. LEXIS 175918 (D.N.J. Dec. 12, 2012). The Court also held that an actionable N.Y.J.L. § 487 Claim was not alleged.

## E.     The Third Circuit decision.

Plaintiffs appealed the decision dismissing the FAC to the Third Circuit, which reversed in part. It held that: (1) New Jersey's litigation privilege does not bar Plaintiffs' fraud and fraudulent concealment claims in view of what was alleged to have occurred; and (2) the FAC adequately alleged the elements of fraud

6

and fraudulent concealment under New Jersey law. The Third Circuit also affirmed in part, upholding the District Court's decision to dismiss Plaintiffs' RICO claim.[2] *Williams v. BASF Catalysts LLC*, 765 F.3d 306 (3d Cir. 2014).

**F.    The proceedings in this Court following remand.**

Following the Third Circuit's remand, Plaintiffs filed a 155-page SAC, with 43 appended exhibits, again alleging claims against BASF and Cahill for fraudulent concealment, fraud, and civil conspiracy under New Jersey law. The District Court denied Defendants' motions to dismiss the SAC and ordered the case to continue to discovery. *Williams v. BASF Catalysts LLC*, No. 11-1754, 2016 U.S. Dist. LEXIS 46273, *23-27 (D.N.J. Apr. 5, 2016). To facilitate and expedite the discovery process and related disputes, the Court appointed retired New Jersey Supreme Court Justice Roberto A. Rivera-Soto as a Special Discovery Master ("SDM"). The SDM presided over and decided more than 50 discovery motions, as the parties engaged in what would become two years of extensive and hard-fought discovery. During this discovery phase, the parties also exchanged over 300 pieces of meet-and-confer correspondence, produced and reviewed hundreds of thousands of pages of documents and ESI equivalents, and completed 28 depositions.

---

[2]    The Third Circuit also affirmed in part and reversed in part the District Court's opinion regarding justiciability of certain of the FAC's claims for relief, which are not germane to the Class Action Settlement.

7

One of the first significant disputes between the parties centered on the scope of discovery. Specifically, the parties vigorously disagreed about the extent, if any, to which Defendants were entitled to delve into the merits of the Underlying Lawsuits and discover plaintiffs' and their original attorneys' files and confidential attorney-client communications from those suits. Plaintiffs argued that the Defendants had forfeited the right to discovery regarding the Underlying Lawsuits and sought a protective order precluding that review.

After several rounds of briefing and argument, the District Court rejected Plaintiffs' arguments, in part, regarding the scope of discovery and ruled that "exposition" of the Underlying Lawsuits was necessary. *Williams v. BASF Catalysts, LLC*, No. 11-1754, 2017 U.S. Dist. LEXIS 122053, *30, 33 (D.N.J. Aug. 3, 2017). To that end, the District Court ruled that the "scope of discovery will focus on the alleged wrongful conduct and any alleged harm following from that conduct" including "why Plaintiffs settled or dismissed their underlying claims." *Id.* at *31. Chief Judge Linares ruled that "[t]o fully explore this issue, Defendants will be entitled to discover what Plaintiffs and their counsel knew, and were told, and whether any knowledge, or lack thereof, contributed to Plaintiffs' decisions on resolving the underlying case." *Id.* That inquiry, the Court explained, permitted a waiver of Plaintiffs' attorney-client privilege and therefore warranted

8

review of the files and correspondence related to the Underlying Lawsuits. *Id.* at *32-33.

The second key issue addressed during discovery was Plaintiffs' motion to compel the production of BASF's privileged documents under the crime-fraud exception. Plaintiffs filed their initial crime-fraud brief on November 2, 2017. After considering that brief and Defendants' opposition, the SDM held multiple days of oral argument regarding the threshold inquiry of whether Plaintiffs' had made a *prima facie* showing that Defendants engaged in a crime or fraud. He eventually stated that he would like additional information concerning the scientific testing in order to help him decide the crime-fraud motion. Accordingly, and although Defendants' first request for such a "Science Day" had been denied by the Court without prejudice, the SDM ordered that the parties provide expert testimony concerning the testing record. Plaintiffs objected to the SDM's order providing for a Science Day, sought an emergency stay of and appealed the SDM's order to the District Court. The appeal remained pending when, on June 26, 2018, Chief Judge Linares stayed the Action and ordered that the parties continue settlement discussions before Magistrate Judge Dickson. CM/ECF # 602.

The parties also addressed a third key issue during discovery: Plaintiffs' communications with Ohio attorney Thomas Bevan. Mr. Bevan represented five of the six class representatives in their underlying lawsuits. At deposition, most of the

Plaintiffs themselves indicated that they had no personal knowledge of their underlying cases and would rely on Mr. Bevan to provide testimony in support of their claims.

Defendants moved for discovery of Mr. Bevan's communications with Plaintiffs and Class Counsel, in light of Mr. Bevan's status as a key fact witness. Plaintiffs opposed Defendants' motion, claiming that those communications were privileged. The SDM ultimately ordered *in camera* review of the requested materials, including any communications between Mr. Bevan and Class Counsel. Plaintiffs appealed the SDM's order and sought a stay from the District Court. Plaintiffs' request for a stay was denied.

The SDM ruled that certain internal testing documents BASF claimed as privileged were discoverable. The Defendants appealed these rulings to the District Court. With appeals of all of the parties pending, the District Court stayed the *Williams* Action in its entirety and ordered that the parties participate in mediation.

## G.    Mediation efforts.

The parties engaged in four rounds of mediation prior to reaching the present proposed settlement. Following remand from the Third Circuit, the parties agreed to pause and explore settlement through mediation. In February 2015, the parties participated in a mediation session before retired United States District Court

Judge Layn R. Phillips. The mediation did not result in a settlement and the parties thereafter resumed active litigation.

In 2016, the parties agreed to again pause and return to mediation before Judge Phillips. Despite several mediation sessions with Judge Phillips throughout the summer of 2016, the parties again could not reach agreement on material terms and mediation ended. The parties once more resumed the litigation.

In July 2018, after the parties completed significant discovery and with several appeals by Plaintiffs and Defendants of the SDM's rulings on discovery disputes pending before him, Chief Judge Linares entered an order staying this matter, including the appeals from SDM orders then pending, and directed the parties to appear before Magistrate Judge Dickson for a settlement conference. CM/ECF # 602. Judge Dickson thereafter actively supervised and participated in the mediation process, which included four in-person sessions before him, as well as telephone conferences with the parties.

Once the parties made some progress with Judge Dickson's assistance toward the broad outlines of a potential settlement, the parties agreed to return once again to Judge Phillips for another round of mediation. After two intense, arms-length sessions conducted in the fall and winter of 2018, the parties in January 2019 forged an accord on the elements of a settlement. With an agreement in principle to settle the case, the parties negotiated and executed a term sheet.

11

Over the succeeding thirteen months, the parties had extensive discussions over telephone and e-mail in addition to many in-person meetings to draft the settlement agreement. And with the assistance of expert consultants and after considering suggestions from Defendants, Plaintiffs designed the proposed Plan of Distribution.

As described in Judge Phillips' Declaration, throughout the three rounds of mediation before him, he observed that "the parties vigorously asserted their respective positions on all material issues" and that these "discussions were often difficult, though both sides remained respectful and professional." Exhibit B. Judge Phillips has further stated his view that the parties were "represented by highly experienced, competent, and committed counsel" who were "extremely well-versed in the complex issues involved in this class action and were therefore able to appreciate the merits of the case and risks of continued litigation." *Id.*

Judge Phillips recognized that the proposed Settlement Agreement reflects a compromise between the parties. In that regard, Judge Phillips first noted that, based on his supervision of the settlement discussions, it is his view that "Plaintiffs' Counsel weighed the risks of litigation against the need to provide timely benefits to the members of the proposed Settlement Class," which might be delayed for years, if not altogether, without the settlement. *Id.* Judge Phillips next noted that Plaintiffs' Counsel have argued that damages can be determined on a

12

class-wide basis. But as he observed, they have "acknowledged the risk that proof of these damages might entail review of individual cases to some extent, which owing to the passage of time since Defendants' alleged fraudulent activity began nearly 30 years ago, could prove highly difficult." *Id.* Judge Phillips also observed that based on the disclosures in the sample of underlying plaintiffs' files produced, "plaintiffs at the time often accepted modest settlement amounts much like what Engelhard/BASF paid to those same plaintiffs." *Id.* There is also some possibility that Plaintiffs' motion to compel privileged documents under the crime-fraud exception could be denied, which would impact the proofs Plaintiffs could offer at trial. And lastly, Judge Phillips recognized that, in all events, "Plaintiffs would have to contend with other defenses such as (1) the lack of evidence of a particular plaintiff's exposure to Emtal talc; (2) that some plaintiffs relied upon allegedly since-discredited experts to prove the diagnosis of their claimed asbestos diseases; (3) that some claims were dismissed for other reasons, such as being untimely filed; (4) that some cases were filed in the wrong jurisdiction; or (5) were dismissed because of some other procedural or substantive reason unrelated to the asbestos-content of Emtal talc." *Id.*

On the other side of the coin, Judge Phillips noted the risks that Defendants might face if this litigation were to continue, observing that "Plaintiffs claim to have identified documents and testimony that contradict the representations that

Defendants made in the underlying cases to plaintiffs and the courts that: (1) Emtal talc did not contain asbestos; (2) no evidence existed that Emtal talc contained asbestos; and (3) no Engelhard employee had ever testified about whether Emtal talc contained asbestos." *Id.* He also noted the possibility that this Court could grant Plaintiffs' crime-fraud motion, which would result in the disclosure of communications that Defendants have long-claimed are protected from discovery. *Id.* Judge Phillips accordingly found that the parties "assessed and balanced the substantial risks if this litigation continues" and that the Class Action Settlement thus "reflects a sound compromise by experienced, competent counsel." *Id.*

Judge Phillips further recognized that the "proposed Class Action Settlement resulted from arm's-length—and indeed, often contentious—negotiations which were in his opinion, fair, reasonable, and adequate and produced an outstanding result for the thousands of members of the proposed Settlement Class as it would, if approved, provide timely compensation to them." *Id.* In reaching this conclusion, Judge Phillips "found it significant that Plaintiffs would be unlikely to have obtained more money and benefits to the class without years more of discovery, trial, and appellate proceedings, where at each stage, Plaintiffs would face substantial risks relating to the ability to obtain class certification and the merits of their claim." *Id.* Judge Phillips at the same time also recognized that "providing the benefits to the Settlement Class now would itself be a significant benefit to the

Class due to the passage of time since the alleged fraud began." *Id.* Judge Phillips thus found that the Class Action Settlement is "fair, reasonable, and adequate" as it resulted "from an arm's length and often contentious mediation process" and would provide "substantial benefits to the proposed Settlement Class in light of the risks of the litigation." *Id.*

Judge Phillips' declaration also confirms that Class Counsel's attorney's fees, cost reimbursements and class representative service fees were neither discussed nor negotiated until all material substantive terms had been negotiated and agreed to in principle.

## III.   Material Terms of the Settlement

The Class Action Settlement provides substantial benefits to the members of the putative Settlement Class by accelerating a resolution of the Action and providing significant monetary compensation.

### A. The Settlement Class definition.

The Settlement Class is defined to include

all Persons within the United States and its territories who after March 7, 1984 and before March 30, 2011 filed and served a lawsuit against Engelhard/BASF seeking asbestos-related bodily injury compensation or other relief arising from exposure to Emtal Talc products, and who before March 30, 2011 either: (A) had voluntarily dismissed or terminated the lawsuit as to Engelhard/BASF after the suit was filed, including any voluntary dismissal or release of claims due to settlement; or (B) had their lawsuit as to Engelhard/BASF involuntarily dismissed.

For the purposes of this definition, the date on which a voluntary dismissal or termination occurred for purposes of determining class membership is deemed to be the earlier of either (i) the date on which the agreement or consent by the plaintiff or his/her counsel to dismiss or terminate the lawsuit occurred; or (ii) the date on which the dismissal or termination of the lawsuit was entered by or in the court in which it was pending.

### B.  Benefits to the Settlement Class Members.

The Class Action Settlement, if approved by the Court, would establish a non-reversionary Settlement Fund of $72,500,000 paid by BASF and Cahill. BASF and Cahill will also pay $3,500,000 for administrative expenses incurred in designing, establishing and carrying out the Plan of Notice and the Plan of Administration.

### C. Class Counsel Fees and Litigation Cost Reimbursement.

In addition to paying the direct benefits to the Settlement Class Members and administration costs, BASF and Cahill have relieved the proposed Settlement Class of any responsibility to pay Class Counsel's fees by agreeing, subject to Court approval, to pay Class Counsel's attorney's fees up to $22,500,000 and reimbursement of costs up to $1,200,000, the application for which Defendants have agreed to not oppose. Class Counsel's fee, if approved, is 22.5% of the total

amount paid by the Defendants to the Settlement Fund, Cost Fund and Class Counsel's fee, all of which benefit the Class.

### D. Non-monetary benefits to the settlement Class.

The Settlement Agreement provides that, subject to any operative protective and/or sealing orders, non-privileged Emtal Talc litigation materials shall be made available to anyone requesting them at no expense to Defendants. Those materials include (a) the *Williams* Action's pleadings; (b) the *Williams* Action's non-privileged depositions (including non-privileged exhibits); (c) non-privileged documents produced or subpoenaed during discovery in the *Williams* Action, and (d) copies of the public non-privileged depositions (including non-privileged exhibits) taken in the New Jersey Superior Court *Sampson*, *Comandini*, *Fuschino*, *Paduano* and *Volk* actions.[3] This discovery represents the culmination of nine years of hard-fought litigation and thus provides a significant, non-economic benefit to the Class.

---

[3]   *Sampson v. 3M Co.*, No. MID-L-5384-11AS (N.J. Sup. Ct. Middlesex Cnty.); *Comandini v. Asbestos Corp. Ltd., et al.*, No. MID-L-10899-07AS (N.J. Sup. Ct. Middlesex Cnty.); *Fuschino v. Asbestos Corp. Ltd., et al.*, No. MID-L-4398-07AS (N.J. Sup. Ct. Middlesex Cnty.); *Paduano v. Ace Scientific Supply Co., et al.*, No. MID-L-2976-09AS (N.J. Sup. Ct. Middlesex Cnty.); *Volk v. Asbestos Corp. Ltd.*, No. MID-L-10012-07AS (N.J. Sup. Ct. Middlesex Cnty.).

### E.  The Plan of Distribution.

The $72.5 million Settlement Fund being established under the proposed

Settlement will be distributed according to a Plan of Distribution ("Plan" or

"POD") approved by the Court. The terms of the Settlement Agreement give Class

Counsel the sole responsibility and right for designing the Plan and obtaining court

approval. None of the Defendants accordingly have any responsibility for the

Plan's distribution scheme, any claim adjudications required under the Plan to

implement it, nor for any of the payments or amounts of payment from it.

Class Counsel with the assistance of consultants on asbestos claims facility

design and operations and lien administration have developed a proposed POD,

which is annexed to this Motion for Preliminary Approval as Exhibit C. A copy of

the Plan if preliminarily approved will be published on the Settlement's Website as

part of the Notice.  By way of overview, the proposed Plan calls for the

establishment of a Settlement Fund claims facility, the filing of claims submissions

by class members who want to receive compensation from the fund, compensation

awarded according to three separate but complementary compensation programs

(including one based on existence and severity of asbestos disease) and

mechanisms for supporting and adjudication of claims. The claims facility's

operations will be managed and conducted by a Settlement Trustee, an

Administrator and a Lien Administrator, each of which are each required to at all

times administer the Plan and distribute the Settlement Fund according to its terms under the auspices of the Court.

In many respects the Plan is similar to a Section 524(g) Asbestos Bankruptcy Claims Resolution Trust facility, but due to the unique circumstances of this case is not by design and intent exactly the same in operation. Class counsel, together with their consulting experts, Verus LLC (asbestos claims facilities) believe the proposed Plan, its allocation scheme and its eligibility requirements fairly, appropriately and equitably distributes the Settlement Fund to eligible Settlement Class Members, taking into account the foreseeable difficulties that Settlement Class Members may encounter in locating and marshalling information and evidence to support a claim given the passage of time since the Underlying Suits were actively prosecuted. *See* Declarations of Daniel Myers and Mark Zabel annexed as Exhibits D and E.

## 1. Establishment of a settlement claims facility and appointment of a Settlement Trustee, Claims Administrator and Lien Administrator.

The Settlement Fund's claims facility and allocation and distribution processes will be overseen and managed by a Settlement Trustee appointed by the Court as a Special Master under Fed. R. Civ. Pro. 53. The Settlement Trustee will be imbued with Special Master adjudicatory powers regarding the fund's awards and payments as necessary to carry out the Plan.

19

Class Counsel is nominating the Honorable Marina Corodemus, J.S.C (Retired) as the Settlement Trustee/Special Master position and a motion for her appointment is being made contemporaneously with this instant Motion for Preliminary Approval. Class Counsel requests that the Court in its Preliminary Approval Order appoint Judge Corodemus to serve as Interim Settlement Trustee during the Settlement's Interim Claims Period (*i.e.* – from the date of preliminary approval to the settlement's Effective Date). As Interim Settlement Trustee, Judge Corodemus would be responsible for setting up and conducting the interim claim administration operations and performing the duties required to be performed under the Settlement Agreement and the Court's Preliminary Approval Order during the time the Court is considering the pending request for final approval of the settlement.

Judge Corodemus's qualifications for these positions are set forth in her Declaration in Support of Appointment as Settlement Trustee and Special Master which is annexed to Plaintiffs' Motion for Preliminary Approval. Exhibit F. To briefly summarize, she is a former New Jersey Superior Court judge who presided over New Jersey's Mass Tort Program for many years. Since leaving the bench, Judge Corodemus has served in the capacity of special master or settlement trustee in a number of major mass tort claims resolution facilities. From that she has substantial experience and expertise in overseeing, and administering mass tort

20

settlements, including the adjudication of disputes involving claims. Currently she serves as one of the trustees of the G-I Holdings Inc. Asbestos Personal Injury Settlement Trust, a 524(g) settlement claims facility that serves as one of the models examined in designing the proposed Plan.

The Settlement Trustee/Special Master will be assisted in executing the Plan of Distribution by a third-party claims administration company appointed by the Court (the "Administrator"). The Administrator under the Plan is authorized to receive, process and make provisional determinations of claims to the Fund (which are all subject to review, modification or approval by the Settlement Trustee), establish and maintain the Settlement Fund's claims processes, books, records and internal controls, handle the Fund's routine inquiries and communications, and make claim disbursements once claim distribution schedules are approved by the Court. The Claims Administrator will also serve as the Interim Administrator to perform certain administration operations and duties relating to the proposed settlement that are required to be performed under the parties' Settlement Agreement and the Court's Preliminary Approval Order.

Class Counsel is requesting the Court appoint Verus LLC as the Administrator. Its qualifications for this appointment are set out in the Declaration of Daniel Myers. Verus, as mentioned above, served as a consultant to Class Counsel in the design of the Plan and is familiar with the plan's intent and

requirements. Verus performed many of the requisite tasks needed to design the Plan, such as estimations of the class size and disease level distributions; developing class member mailing lists; deriving claim compensation ratios and advising Class Counsel on appropriate and feasible claims administration procedures. The annexed declarations of Daniel Myers and Mark Zabel (Exhibits D and E) explain Verus' roles and work in developing the Plan and its qualifications to serve as the Settlement's Administrator.

Under both the Plan and Settlement Agreement, the Settlement Trustee is authorized to retain, subject to Court approval, a lien resolution company ("Lien Administrator"). The Lien Administrator will, as a settlement benefit, assist each Claimant to determine the existence of Government Liens and the amounts needed to clear and resolve such liens. The terms of the Settlement Agreement require that a claimant to the Fund must clear these Government Liens.

Class Counsel is requesting the Court appoint Edgar C. Gentle, III, Esq. and his law firm, Gentle, Turner, Sexton & Harbison, LLC, to collectively serve as Lien Administrator. The firm's qualifications are set out in the declaration of Edgar C. Gentle. Exhibit G.

### 2.  Proposed distribution of the Settlement Fund among Class Members.

The Plan establishes three compensation programs to which Settlement Class Members meeting defined eligibility criteria may apply for compensation

award payments (each program being referred to as a "Part"). The Settlement

Fund's Part A program provides Base Compensation Payments to Settlement Class

Members who can establish that the Claimant or Claimant's decedent during the

Class Period filed an Underlying Lawsuit against Engelhard/BASF which credibly

asserted in good faith an asbestos injury caused by alleged exposure to Emtal Talc

("**Base Payments**"). The Plan's Part B program provides compensation payments

to Settlement Class Members who satisfy Part A and also present sufficient

evidence of an asbestos bodily injury sustained by them (or if applicable, their

decedent). The Plan's Part C program establishes an Extraordinary Injury Fund or

"EIF" from which the Settlement Trustee may, in exceptional cases, make a

discretionary supplemental compensation payment to mesothelioma injury

claimants subject to eligibility guidelines and limitations as set forth in this Plan.

> a.   **Payments under the Plan's Part A program.**

The Plan's Part A program provides Base Payments from a $6.25 million

sub-fund allocation of the Settlement Fund amount to Settlement Class Members

whose Underlying Lawsuits were dismissed and who are releasing all claims

related to the Underlying Lawsuits, including the Williams Class Action Claims,

against the Released Parties. Settlement Class Members who were Injured Persons

(which includes the personal representatives of a deceased Injured Person) in the

Underlying Lawsuits are referred to as "Primary Claimants". Each Primary

Claimant who timely submits a claim for Part A compensation and establishes that his or her subject Underlying Lawsuit presented a good faith credible claim for injuries allegedly caused by exposure to Emtal Talc will receive a payment of up to $500 from the Part A sub-fund. Generally speaking, claims on behalf of a deceased Injured Person must be filed by the deceased person's estate representative (who is considered to be a "Primary Claimant" under the Plan). However, where the only claim to the Settlement Fund being applied for with respect to a deceased Injured Person are Part A compensation shares and no claims are made for compensation under Parts B or C, the claim may be submitted by the Injured Person's surviving spouse if any, or if none, by an Injured Person's surviving child with the written consent of all other surviving children, if any.

Where there are one or more Settlement Class Members associated with a Primary Claimant as a Derivative Claimant, that is, the Settlement Class Member's claim in the Underlying Lawsuit was based upon the Primary Claimant's asbestos injury and not theirs, then the Primary Claimant (or in the limited circumstances where a Derivative Claimant is making only the Part A Claim) will also be eligible to receive one additional Part A payment of up to $500, for a total Part A award of up to $1,000.

Part A base payments are subject to proration downward if more than 12,500 Part A base payments are awarded, counting each Primary and Derivative

24

Claimant base payment award separately. Any funds in the Part A sub-fund remaining after payment of all eligible Part A share claims will be reallocated by the Settlement Trustee first to Part C to pay allowed EIF claims, if any, or otherwise to Part B or Part C in her discretion with the advice and consent of Class Counsel (such reallocation being referred to as a "spillover"). The Settlement Trustee has discretion to reallocate residual Part C (EIF) funds to Part A if there is a shortfall.

### b. Payments under the Plan's Part B program.

The Plan's Part B program provides additional compensation to the Injured Persons in the Underlying Lawsuits (or their estates if deceased) out of an initial sub-fund allocation from the Settlement Fund of $59.75 million. The Part B sub-fund will be distributed in its entirety among the Part B Claimants adjudicated during the claims process to be eligible to share in Part B distributions. The amount of the Part B sub-fund may change during the course of the Settlement Fund's administration based on the Settlement Trustee's application of a spillover of unused allocations of the Part A or Part C programs' sub-funds, accrued interest earned on the Settlement Fund's assets, or the need to pay administration costs and expenses that cannot be paid or fully paid from the Settlement Cost Fund. The amount a Primary Claimant will receive depends upon the nature of the disease

allegedly sustained from exposure to Emtal Talc and the number of other persons who make Part B claims and the nature of their diseases.

Part B compensation claims may be submitted only by Primary Claimants, including the Injured Person in the Underlying Lawsuit or by the Injured Person's estate if such person is deceased. Class Members who apply and meet the eligibility requirements for a Plan B program award will receive a proportionate share of the Part B sub-fund based upon a system of points awarded for the asbestos disease the Injured Person sustained and was diagnosed.

Eligibility for Part B compensation requires that a Primary Claimant establish (a) entitlement to Part A compensation; and (b) through credible, competent proof that the Injured Person sustained an asbestos-related injury falling into one of four defined categories of asbestos disease levels: (1) Non-malignant asbestos pulmonary disease (a "**Part B Level 1 claim**"); (2) Malignant Asbestos Disease Other Than Mesothelioma or Level 3 Claim Lung Cancer (a "**Part B Level 2 claim**"); (3) either: (i) Primary Lung Cancer with evidence of underlying Bilateral Asbestos-Related Nonmalignant Disease; or (ii) Severe Asbestosis (a "**Part B Level 3 claim**"); or (4) Mesothelioma (a "**Part B Level 4 claim**"). A Part B claim may be based on the highest degree of the Injured Person's disease progression provable as of the time of the claim submission to the Plan. Claimants may establish proof of medical injury through a certification of a prior equivalent

26

asbestos disease level adjudication by one of several designated Qualified Asbestos Trusts or through individual adjudication of satisfactory medical evidence provided by the Claimant to the Administrator.

The Part B sub-fund will be allocated among and paid to those Part B Claimants adjudicated to be eligible according to the disease level sustained using an assigned number of "Qualifying Claim Points" based on whether they have a Part B Level 1, 2, 3 or 4 disease. Part B sub-fund compensation will be the claimant's *pro rata* share of the Part B sub-fund calculated according to the formula $X/Y$ x $Z$, where $X$ represents the number of the individual eligible Claimant's adjudicated Qualifying Claim Points; $Y$ represents the aggregate of all eligible Claimants' adjudicated Qualifying Claim Points, and $Z$ represents the Part B sub-fund dollar amount (including any spillovers from Part A or Part C sub-funds). The number of Qualifying Claim Points for each Part B claim level is set forth in the following Table 1. The number of Qualifying Claim Points assigned to each asbestos disease category in Table 1 is based upon a survey and analysis conducted by Verus LLC of compensation programs employed by eighteen relatively comparable bankruptcy asbestos trust claims facilities to allocate their asbestos claim trust funds among claimants suffering from different levels of asbestos disease. The declaration of Mark Zabel explains how Verus derived the values. Exhibit E.

Precise amounts of compensation for each Claim Level cannot be stated presently because a number of key factors are not yet known, including the actual number and disease level distribution of Part B claims received, whether there will be spillover from Parts A and C, and other variables in the Plan of Distribution. Table 1 below, however, provides a range of hypothetical Part B gross payment estimates based on (a) receipt and approval by the Settlement Fund of 7,000, 8,000 and 8,500 Part B claims; and (b) an asbestos disease distribution rate equal to the historical asbestos disease rates experienced by the Johns Manville Asbestos Trust (which rates are stated for each disease level in the table).[4]

[Balance of Page Intentionally Blank]

---

[4] The actual payment received by a class member may be less due to charges by other attorneys and payment of any liens associated with award. Individual class member's attorneys may charge fees or expenses for having represented him or her or their decedent in an Underlying Lawsuit or in their Settlement Fund claim submission at the Claimant's request. Such fees will reduce the amount of money a class member will receive. For example, should an attorney charge a class member a 33.3% contingency fee, and the class member is eligible for a Part A payment of $500 and a Level 2 Part B Claim payment of $10,824 as provided in Table 1 above (this example assumes there are 8,000 approved claims) for a total amount of $11,324, the net recovery to the class member after payment of personal attorneys' fees would be $7,550 ($11,324 – $3,774). In recent years, courts in class action cases have considered if and to what extent fees may be charged by non-Class Counsel. The Court in this case has jurisdiction to consider and will make a determination about the fees and the amounts which may be charged to Class Members by non-Class Counsel, individual counsel and former counsel. *See, e.g.*, *In re NFL Players' Concussion Injury Litig.,* 2018 WL 1658808 (E.D. Pa. 2018).

28

| Table 1 Hypothetical Part B Payment Share Estimates* | | | | |
|---|---|---|---|---|
| **Part B Claim Levels** | **Qualifying Claim Points** (Assumed disease rate %) | **Estimated Payment** (Estimated number of claims) | | |
| | | **7,500** approved claimants | **8,000** approved claimants | **8,500** approved claimants |
| **Level 1 Claim** Non-Malignant Asbestos disease other than Severe Asbestosis. (Bilateral Asbestos-Related Nonmalignant Disease Injuries other than Severe Asbestosis) | **1** (86.3 %) | $1,283 (6,473) | $1,203 (6,904) | $1,132 (7,336) |
| **Level 2 Claim** Malignant Asbestos Disease Other Than Mesothelioma or Level 3 Claim Lung Cancer. | **9** (2.1 %) | $11,546 (158) | $10,824 (168) | $10,188 (179) |
| **Level 3 Claim** Either: (a) Primary lung cancer with evidence of underlying Bilateral Asbestos-Related Nonmalignant Disease; or (b) Severe Asbestosis. | **20** (7.3 %) | $25,658 (548) | $24,054 (584) | $22,639 (621) |
| **Level 4 Claim** Mesothelioma | **86** (4.3 %) | $110,327 (323) | $103,432 (344) | $97,348 (366) |

\* Due to rounding, the numbers presented may not add up precisely to the totals indicated and payment estimates may not precisely reflect the absolute figures.

**c.      Payments under the Plan's Part C discretionary EIF program.**

The Plan's Part C EIF program allocates $6.5 million of the Settlement Fund for an Extraordinary Injury Fund under which the Settlement Trustee has discretionary authority to award bounded additional supplemental compensation payments to a Primary Claimant with mesothelioma who establishes to the Settlement Trustee's satisfaction that the Primary Claimant sustained an

extraordinary physical injury and/or economic loss allegedly as a result of exposure to Emtal Talc mined, milled, sold or distributed by Engelhard/BASF that is materially and substantially beyond that sustained by typical other Part B mesothelioma Primary Claimants.

To qualify for an EIF award, a Primary Claimant, in addition to establishing Class membership under Part A and Part B, must satisfy specific eligibility requirements that: (1) the subject Injured Person developed mesothelioma; (2) the Primary Claimant has not received appropriate and sufficient compensation for the subject mesothelioma injury; (3) the subject mesothelioma injury and resulting losses were allegedly a result of frequent, regular and proximate exposure to Emtal Talc; and (4) the Underlying Lawsuit's plaintiff lawyer or firm received direct representations from an Engelhard/BASF attorney regarding the absence of asbestos in Emtal Talc. No award made pursuant to the discretionary EIF program may exceed $175,000. The Part C EIF sub-fund may be increased by unallocated or unclaimed fund spillovers from the Part A. The Settlement Trustee is not required to make any EIF awards or to make awards sufficient to exhaust the EIF fund. The Settlement Trustee also has the discretion to re-allocate the unused portion of the Part C EIF sub-fund to the Part A or Part B funds in its discretion with the advice and consent of Class Counsel.

> **d.** **Liens and personal attorney's fees that could reduce individual claim awards**

The Plan of Distribution includes provisions establishing a Lien Resolution program. Plaintiffs nominate Edgar C. Gentle III, Esquire to serve as the Lien Administrator who will be charged with establishing processes to identify healthcare-related liens and the means of resolving those liens all at no cost to Settlement Class Members.

Notice to the Class Members will advise them that there are no filing or other administrative fees that will reduce any award to which they are eligible from the Settlement Fund.

Regarding attorneys and fees for which Class Members may be responsible to pay, the Notice will advise Class Members that Class Counsel represents all Class Members regarding the issues common to all Class Members. Class Counsel are Cohen Placitella & Roth, P.C. Class Counsel have represented the named Plaintiffs and the Class for over nine years and have undertaken significant efforts in this litigation, including motions practice and briefing, an appeal to the Third Circuit, multiple court appearances, depositions and written discovery, and settlement negotiations. Class Counsel is seeking $22.5 million for their work. Defendants have agreed not to oppose Class Counsel's request which represents approximately 23% of the Settlement Fund, Cost Fund and Class Counsel fee the Defendants have agreed to pay to settle this case. Class Members will be told they

31

will not pay, nor have the Settlement Fund reduced by, fees paid to Class Counsel. The Class Notice also informs Class Members that Class Counsel are not responsible for and will not represent Class Members in the submission of claims to the Settlement Fund for monetary payments.

Class Members will be advised in the Notice that they have the right to hire their own lawyer to represent them in the Class Action and/or to file their claim for payment from the Settlement Fund. The Notice makes clear that should a Class Member hire their own lawyer, they are responsible for paying that lawyer's attorney's fee which, in turn, will reduce the net compensation they receive from this Class Action.

The Notice also alerts Class Members that some lawyers may assert an entitlement to a fee based upon agreements entered into with Class Members or their decedents to prosecute claims in the Underlying Lawsuits.

Class Members are advised in the Notice that the fees charged by lawyers they hire, or claimed by those under fee agreements entered with Class Members or their decedents to prosecute the Underlying Lawsuits, may be a percentage of the amount of money awarded to the them, thereby reducing the amount of money the Class Member will receive as a result of this Class Action. The notice provides the following hypothetical for purposes of example only:

Should an attorney charge a class member a 33.3% contingency fee, and the class member is eligible for a Part A payment of $500 and a Level 2 Part B Claim payment of $10,824 as provided in Table 1 above (this example assumes there are 8,000 approved claims) for a total amount of $11,324, the net recovery to the class member after payment of personal attorneys' fees would be $7,550 ($11,324 – $3,774).

Class members are advised in the Notice that the net recovery for the Class Member would vary depending on the fee percentage the attorney would charge. It is also made clear that this fee, which is their responsibility, is separate and apart from the fee that Class Counsel will be paid pursuant to approval of the Court.

Class Members are additionally informed in the Notice that courts in class action cases have considered if and to what extent fees may be charged by non-Class Counsel and that the Court in this case has retained jurisdiction to consider and will make a determination about the fees and the amounts which may be charged to Class Members by non-Class Counsel, individual counsel and former counsel.

F.     **The Plan of Notice.**

The Class will be given notice of the proposed Settlement together with an explanation of their rights as Class Members, in a clear, direct manner that fully satisfies the requirements of Rule 23, the standards set out in the Federal Judicial Center's *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* ("**FJC Checklist**"), and due process.

33

To accomplish this goal, the *Williams* Plaintiffs engaged Verus LLC, their nominee for Claims Administrator, and BrownGreer PLC, their nominee for Notice Agent. Verus developed a list of potential class members based on litigation claim data and documents produced through the *Williams* case discovery. BrownGreer fashioned a Notice Plan designed to reach and inform these Class Members (or their heirs where the Class Member is deceased) about the settlement and their rights thereunder.

As described in the declarations of Mark Zabel, Verus' Director of Analytics, and Orran Brown Sr., Chairman and a founding partner of BrownGreer, both companies went to great lengths to capture necessary information about the potential Class Members' identities, next of kin when and where a potential Class Member was known to be deceased, current or last known locations of residence, and the identities and current addresses of their attorneys in the Underlying Lawsuits. With this information in hand, BrownGreer developed a Notice Plan described in the annexed Declaration of Orran L. Brown, Sr. in Support of Notice Plan. Exhibit M.

The key elements of BrownGreer's Notice Plan are:

**(a)**    ***Direct Notice.***  Copies of the proposed long-form Notice explaining the settlement, the class certification and the Class Members' rights, substantially in the form of Exhibit K, will be mailed to all presumed living Class Members

34

identified through Verus and BrownGreer's work. Where the potential Class Member is known to be dead, a copy of the long-form Notice will be mailed to either (1) the deceased's personal representative if that identity is known and an address is available; or (2) both the deceased's last known address and to the Presumed Living Relatives of the deceased who may be or may know the deceased class member's personal representatives.[5]

(b)     ***Notice through mailings to the Class Members' Attorneys and Law Firms in Underlying Lawsuits.*** The Notice Agent will mail a copy of the long-form Notice to every attorney and law firm (including known successor law firms where the attorney has died or retired, or the law firm has dissolved or reconstituted) for which there is an address available. In addition, the Notice Agent will provide these lawyers with a list of potential Class Members who Verus' research suggests were the lawyers who had represented potential Class Members in the Underlying Lawsuits and a letter substantially in the form of Exhibit 3 to the Brown Declaration. Verus' experience as the administrator for several asbestos 524(g) trusts shows that asbestos claimant law firms (or their firm's successors),

---

[5] The rationale for mailing a copy to the deceased's last known address is explained by BrownGreer as follows: "[w]hile notices mailed to these persons' last known addresses, of course, will not reach the actual Class Members, they may, at minimal cost, reach family members or other persons who are or may know personal representatives of the Deceased." Exhibit M, ¶ 17(3).

which had represented potential Class Members in the Underlying Lawsuits continued over years to maintain contact with putative Class Members or their surviving families on legal matters, including continuing to handle their ongoing claims with asbestos company bankruptcy trusts. Thus, notice to these law firms will likely increase the reach of direct notice to the Class because the Exhibit 3 letter asks that each lawyer do two things: (1) mail the Notice to his or her clients who were plaintiffs in the Underlying Lawsuits; and (2) provide the Notice Agent with the names of those clients to whom notice was mailed. Plaintiffs' Counsel has every confidence that these lawyers will fulfill these tasks.

(c)      ***Publication Notice.*** A summary version of the Notice will be published in three national print publications targeted to the Class Members' demographic characteristics: *AARP Bulletin, Conquer* and *Coping with Cancer.* The summary version will also be published in 41 regional newspapers located in Ohio, Mississippi, Georgia, and Alabama based upon BrownGreer's analysis of pertinent addresses showing that nearly 82% of the Presumed Living Class Members and 72.5% of the Presumed Living Relatives reside in these four states. The names of the publications along with their locations and circulation information are listed in the Brown Declaration ("Exhibit M") at ¶ 20(1) (Table).

In addition to the print media publications, the Notice Plan will also employ digital (internet) notice components. These include (1) "banner" advertisements

36

placed on the online version of *People* magazine; and (2) paid internet search terms ads responding to targeted keywords on top Internet search engines, such as Google. The internet search terms aspect of the Notice Plan alone aims to achieve approximately 10,000 impressions and 300 click-throughs to the Settlement Website each month. According to BrownGreer, these digital components of the Notice Plan will be targeted to reach audiences that include the Class Members and their next of kin's demographics, as well as to offer media encounters to audiences who are avoiding or are less exposed to print media due to the COVID-19 Pandemic. Exhibit M, ¶ 20(2).

(d)     *A Press Release.* The Notice Agent will issue a joint press release substantially in the form of Exhibit 4 to the Brown Declaration through Cision/PR Newswire, which is a leading provider of multimedia platforms and distribution. The press release is designed to explain the core aspects of the proposed settlement and provide the address for the Settlement Website, as well as a toll-free number.

Plaintiffs respectfully submit the Notice Plan developed by BrownGreer fully meets Rule 23's and the Federal Judicial Center's requirements and satisfies due process. Mr. Brown states in his declaration, "With an estimated direct notice reach exceeding 77% of Presumed Living Class Members or their attorneys in the Underlying Lawsuits and at least one Relative of deceased Class Members, a regional public notice campaign that targets Presumed Living Class Members

37

and Presumed Living Relatives, national print publication ads that will expose Presumed Living Class Members and Relatives outside of the four primary states of residence to the notice, and a digital component targeting those Class Members and their residents who consume media electronically and actively search for information relevant to this matter, the Notice Plan is likely to provide the same or better reach than courts have approved in other similar class matters." Exhibit M, ¶ 21. The record developed in this case demonstrates that the attorneys identified have been active with their clients and surviving family members in filing trust claims since the Underlying Lawsuits were dismissed. As such, the parties believe that BrownGreer's estimates of the reach of this notice plan are conservative.

Based on Class Counsel's long experience in handling asbestos claims and knowledge of the asbestos bar and nature of asbestos claimants, the 77% reach statistic is conservative; a point with which BrownGreer in its declaration concurs. *Id.* at ¶ 21. The Notice Plan accordingly should be approved and ordered executed and carried out by the Notice Agent.

## IV.   Argument

Federal Rule of Civil Procedure 23(e) requires judicial approval for the settlement of class actions. Fed. Civ. P. 23(e) (a class action "may be settled, voluntarily dismissed, or compromised only with the court's approval"). "The

decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *Krell v. Prudential Ins. Co. of Am.*, 148 F.3d 283, 317 (3d Cir. 1998). But, as the Third Circuit has recognized, there is a "strong presumption" in favor of class action settlements, *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594 (3d Cir. 2010), because of the "overriding public interest in settling class action litigation[.]" *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004).

Settling a class action involves a two-step approval process under Rule 23. In the first stage, preliminary approval, the Court needs to make a threshold determination that the settlement could be finally approved after a future fairness hearing and, if so preliminarily found, ordering notice to the Class in accordance with an approved notice plan. Fed. R. Civ. P. 23(e)(1). In the second phase, final approval, the Court must hold a fairness hearing to determine whether to approve the settlement and order its implementation. Fed. R. Civ. P. 23(e)(2).

In considering whether to proceed forward with a settlement and authorize notice to the putative Class Members, Rule 23(e)(1), as amended, requires the Court to consider whether providing notice "is justified by the parties showing that the Court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). To ultimately approve the settlement, the Court must find that it is

"fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). This fairness inquiry requires the Court to consider whether:

> (A) the class representative and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
> > i.   the costs, risks, and delay of trial and appeal;
> >
> > ii.  the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> >
> > iii. the terms of any proposed award of attorney's fees, including timing of payment; and
> >
> > iv.  any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

For the reasons discussed below, this Court should approve the sending of notice to the Class because the settlement is "fair, reasonable, and adequate" and the certification of a settlement class is appropriate here.

**A. The Parties are entitled to a presumption that the settlement is fair.**

The proposed settlement is entitled to a presumption of fairness because (1) the negotiations here occurred at arm's length; (2) the parties engaged in extensive discovery; and (3) the proponents of the settlement are experienced in similar litigation.[6] *See In re NFL Players Concussion Injury Litig.*, 821 F.3d 410 (3d Cir. 2016) (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 231, 232 n.18 (3d Cir. 2001)).

**1. The proposed settlement is the product of good faith, extensive arm's length negotiations.**

"Whether a settlement arises from arm's length negotiations is a key factor in deciding whether to grant preliminary approval." *Turner v. NFL (In re NFL Players' Concussion Injury Litig.)*, 301 F.R.D. 191, 198 (E.D. Pa. 2014). Courts in the Third Circuit have found the presumption of fairness applicable when a mediator assists the parties, *In re CIGNA Corp. Sec. Litig.*, No. 02-8088, 2007 U.S. Dist. LEXIS 51089, *12 (E.D. Pa. July 13, 2007), and the mediation occurred over

---

[6]     In *NFL*, the Third Circuit cited an additional fourth requirement for triggering a presumption of fairness, *i.e.*- that "only a small fraction of the class objected." *Id.* This requirement is not however part of the present preliminary evaluation analysis as notice to the Class has not yet been disseminated and no putative class members have had an opportunity to object or express an opinion to the Court.

several days, *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 439, 444 (E.D. Pa. 2008).

The parties to the proposed settlement participated in four, often contentious, rounds of settlement discussions ultimately leading to the present proposed settlement. The first occurred in 2015 with a session before Judge Phillips. The second round, also before Judge Phillips, spanned the entire summer of 2016 before an impasse over material terms ended the negotiations. The third occurred in 2018 before Judge Dickson following Chief Judge Linares' Order staying this matter in June 2018. And the fourth and final one, again took place before Judge Phillips in late 2018 and early 2019. In between all the rounds of mediation, the parties engaged in extensive discovery and pressed their legal positions through hard fought motion practice before the SDM and appeals of SDM decisions before the District Court.

Based on his observations during the three rounds of mediation before him over three years, Judge Phillips found that "the parties vigorously asserted their respective positions on all material issues" and that these "discussions were often difficult, though both sides remained respectful and professional." Exhibit B. Judge Phillips also explained that given his understanding of the proceedings before this Court, the Third Circuit and the Special Discovery Master, he is "satisfied that the positions of the parties were thoroughly advanced, explored, and defended

42

against." *Id.* Judge Phillips further explained that "over the course of the three rounds of mediation, the proposed terms of the settlement changed substantially and were refined as the parties worked toward the common goal of achieving a fair, reasonable, and adequate settlement." *Id.*

### 2. Extensive discovery and proceedings before the Third Circuit, District Court, and Special Discovery Master preceded the settlement.

This settlement was reached after the parties had engaged in lengthy and heated litigation, including Third Circuit review of the initial dismissal of the Action, from which each side (as well as the mediators) gained insight into and awareness of the others' positions.

In fact, the parties produced and reviewed hundreds of thousands of pages of documents and completed 28 depositions.[7] Counsel are thus well aware of the

---

[7]     With so much formal discovery, this Court should presume that the settlement is fair as the Third Circuit has found the presumption applicable in cases with far less discovery. For example, in *NFL*, objectors argued against applying the presumption of fairness because class counsel did not conduct formal discovery before reaching the settlement. *NFL*, 821 F.3d at 436. The district court rejected this argument, as did the Third Circuit. In explaining why, the Third Circuit recognized that class counsel had undertaken "significant informal discovery." *Id.* "As part of that, class counsel obtained a database of claims and symptoms by retired players, consulted medical experts, and understood the legal hurdles claimants would face on dispositive issues such as preemption." *Id.* The Third Circuit thus observed that class counsel "were aware of the strengths and weaknesses of their case." *Id.* (internal citations omitted).

strengths and weaknesses of their respective cases. And for that reason, too, this Court should presume the settlement fair.

### 3.  The proponents of the settlement are experienced in similar litigation.

Plaintiffs' Counsel not only have decades of experience in complex litigation representing catastrophically injured clients and the families of deceased victims, but also have served in leadership roles and prosecuted modern mass tort cases involving breast implants, Vioxx, diet drugs, toxic chemical releases, talc, and other product liability cases. Exhibit BB, Firm Resume. CPR's lawyers have also in the past and continue to represent governmental entities in major complex litigation matters involving suppression and misrepresentation claims, such as New Jersey's tobacco litigation and Pennsylvania's current MTBE gasoline release litigation. CPR has extensive asbestos injury and complex litigation practices. Indeed, Plaintiffs' Counsel in a New Jersey state court case first developed the evidence that led to the filing of this Action.

### B.  The complexity of these proceedings and advanced stage of litigation support approving the Settlement.

Third Circuit jurisprudence requires that district courts consider two sets of factors in determining the fairness, adequacy, and reasonableness of a settlement: the *Girsh* nine-prong test and the *Prudential* considerations.

In *Girsh v. Jepson* the Third Circuit outlined nine factors to be considered in determining the fairness of a proposed class settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

521 F.2d 153, 157 (3d Cir. 1975).

Following *Girsh*, the Third Circuit determined that a "sea-change [had occurred] in the nature of class actions," and thought it useful to expand on *Girsh* to include several permissive, non-exhaustive factors (the so called "prudential" factors or considerations):

> (1) the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; (2) the existence and probable outcome of claims by other classes and subclasses; (3) the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; (4) whether class or subclass members are accorded the right to opt-out of the settlement; (5) whether any provisions for attorneys' fees are reasonable; and (6) whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 311, 323 (3d Cir. 1998). Unlike the *Girsh* factors, "the *Prudential* considerations are just that, prudential." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013).

These factors support approving a settlement here, especially in light of the complexity of this case, its advanced discovery, the significant challenges inherent in further litigation, and the size of the Settlement Fund.

### 1.  Complexity, Expense, and Likely Duration of the Litigation.

"The first [*Girsh*] factor captures the probable costs, in both time and money, of continued litigation.'" *Warfarin*, 391 F.3d 535-36 (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001)).

In *NFL*, the Third Circuit recognized that the probable costs of litigation were significant and supported approving the settlement because with "[o]ver 5,000 retired NFL players in the MDL alleg[ing] a multi-decade fraud by the NFL," litigating the claims "would have been an enormous undertaking." *NFL*, 821 F.3d at 438. In that regard, the Third Circuit noted that the discovery needed to prove the "fraudulent concealment of risks of concussions was extensive" and that the District Court would need to resolve "many issues of causation and medical science." *Id.*

46

As in *NFL*, this matter involves thousands of putative Class Members and allegations that stretch back many years. To date, the prosecution of this matter has involved an enormous undertaking with the filing of three complaints, several motions to dismiss, an appeal to the Third Circuit, the appointment of a SDM to oversee discovery, nearly 50 discovery motions, seven days of oral argument before the SDM, the exchange of over 300 pieces of meet-and-confer correspondence, the review and production of hundreds of thousands of pages of documents, and 28 fact depositions. And absent the proposed settlement, significantly more expert and fact discovery would remain before the Court could reach any decision on Plaintiffs' motion for class certification and Defendants' motions for summary judgment. In view of this history, further litigation will be very costly and only increase the risks to all the parties.

Moreover, if the Court denies this Motion for Preliminary Approval, Plaintiffs expect that the Court would need to resolve the appeal of the SDM's decision on Science Day, Plaintiffs' crime-fraud motion, Plaintiffs' and Defendants' appeals of the SDM's other discovery and attorney-client privilege rulings as well as other complex issues. In addition, given the prior course of the litigation, it is reasonable to anticipate appeals by the losing party to the Third Circuit regarding many or all those decisions. Expert discovery would also need to proceed. And there would eventually be dispositive motion practice and,

potentially, trial. *See, e.g., Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1322

(S.D. Fla. 2005) (the potential that appellate proceedings could delay class

recovery "strongly favor[s]" approval of the settlement). All in all, guided by the

lengthy and intense history of this litigation to date, the complexity, expense, and

likely duration of this litigation amply supports approval.

### 2.  Reaction of the Class to the Settlement.

The second *Girsh* factor requires that the Court "'gauge whether members of

the class support the settlement.'" *Warfarin*, 391 F.3d at 536 (quoting *Prudential*,

148 F.3d at 318). At this stage of the proceedings—*i.e.*, preliminary approval—

formal notice of the settlement has not yet been disseminated, and this factor

therefore cannot be assessed.

However, Plaintiffs expect a positive reaction to this proposed Settlement.

The proposed Settlement Agreement would fairly and adequately compensate these

putative Settlement Class Members, with virtually all putative Settlement Class

Members receiving multiples of the compensation they had received from other

talc defendants. The proposed Plan of Distribution allocates compensation based

on the severity of the claimants' injuries, along with providing an extraordinary

injury fund for mesothelioma cases that warrant, in the Settlement Trustee's

discretion, an additional compensation award where specified criteria are met.

### 3.  Stage of the Proceedings and Amount of Discovery Completed.

"The third *Girsh* factor 'captures the degree of case development that class counsel [had] accomplished prior to settlement." *Warfarin*, 391 F.3d at 537 (quoting *Cendant*, 264 F.3d at 235). As the Third Circuit has explained, "[t]hrough this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Id.*

In *Warfarin*, the Third Circuit found that class counsel adequately appreciated the merits of the case before negotiating the settlement when there had been three years of litigation, discovery of hundreds of thousands of pages of documents, many depositions, and consultations with experts. *Id.* The same appreciation can and should be found here.

As in *Warfarin*, Plaintiffs' Counsel have completed a substantial amount of discovery and consulted with experts. They have reviewed hundreds of thousands of pages of documents and taken and defended numerous depositions of party and third-party witnesses. Among other things, this discovery included the review of Representative Plaintiffs' files and a sampling of putative class members' file materials, testing data and documents from the *Westfall* litigation,[8] BASF's

---

[8] The first case against Engelhard alleging asbestos-related injury from exposure to Emtal Talc was filed in 1979 by the Estate of Thomas Westfall. In that mesothelioma case, several Engelhard scientists testified about test results that Plaintiffs allege suggested that Emtal Talc contained asbestos.

49

extensive document production, litigation files and other documents produced by Cahill, documents produced by Engelhard's insurers, and the files of several law firms that represented plaintiffs in the Underlying Lawsuits, including Bevan & Associates, LPA ("Bevan Law Firm"), Early, Lucarelli, Sweeney & Meisenkothen LLC ("Early Law Firm") and The Law Firm of Allen L. Rothenberg. Discovery also included depositions of the individually named Plaintiffs, counsel for various plaintiffs in the Underlying Lawsuits, BASF's local counsel in the Underlying Lawsuits, current and former employees of BASF and Cahill, and designated representatives of BASF and Cahill. Plaintiffs moreover have filed appeals with both this Court and the Third Circuit, briefed issues on class certification and crime-fraud, and produced expert reports. So, just as the Third Circuit found in *Warfarin*, this Court should find that Plaintiffs' Counsel adequately appreciated the merits of this case before negotiating the proposed Settlement Agreement.

## C.    Risks to continued litigation also support approving the Settlement.

"The fourth and fifth *Girsh* factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *Prudential*, 148 F.3d at 319. While Plaintiffs are confident in the strength of their case, they are also pragmatic, especially considering the zealous defense which Defendants have mounted since day one of this Action. As such, Plaintiffs are

50

sensitive to the risks inherent in this complex litigation. Some of these risks are discussed below.

### 1.  The availability of witnesses at trial.

Plaintiffs' claims face significant risk because the named Plaintiffs themselves lack personal knowledge to support certain necessary elements of their claims. Plaintiffs' allegations turn on the positions taken in Underlying Lawsuits that were concluded decades ago. The named Plaintiffs, all of whom are non-lawyers and some of whom are only heirs to the plaintiffs in the Underlying Lawsuits, thus have little personal knowledge of their decedents' communications with their lawyers and defenses raised by Engelhard. *See*, *e.g.*, Exhibit W (4/5/17 Holley Dep. Tr.) at 14:24–15:1 ("[D]o you have any personal knowledge of representations made to your mother about talc? A. I have no personal knowledge of that."); Exhibit Y (4/5/18 Williams Dep. Tr.) at 28:16-23 (explaining that her understanding of the underlying suit comes from her deceased husband's lawyer); *see also id.* at 30:21-24 ("It's been so long ago, originally, you know, many, many years ago when this whole thing started. I don't recall a lot.").

Plaintiffs have accordingly relied on lawyers, including Thomas Bevan, an Ohio attorney, who brought a substantial number of the Underlying Lawsuits, including those on behalf of several named Plaintiffs, and Mark Bibro, a New York attorney who represents another named Plaintiff to substantiate their allegations.

*See* Exhibit H, 1/15/18 Hr'g Tr. at 132:21–133:3 ("SPECIAL MASTER: What are you going to do at trial, produce a plaintiff that says I don't know? MR. ROTH: Yes, your Honor. . . and we're going to have their family's lawyer testify and describe what happened."); Exhibit I, 10/23/15 Pls.' Initial Disclosures ("[Mr. Bevan] has knowledge of the involuntary dismissal of his clients' claims due to defendants' . . . material omissions concerning Emtal talc."); Exhibit J, 1/29/18 M. Holley Supplemental Resp. to BASF Interrog. No. 12, Set 1 ("The Bevan Law Firm would likely know more about this evidence.").

However, Defendants raise many challenges to the lawyers' testimony. For example, Mr. Bevan testified at deposition that he had little personal knowledge of the class-wide spoliation allegations apart from what he read in the *Williams* complaint, *see* Exhibit V, (5/15/18 Bevan Dep. Tr.) at 193:21–194:5. Although Mr. Bevan has portions of old files relating to these claims, his ability to verify that he had complete files about the Underlying Lawsuits was limited. Discovery from other lawyers representing plaintiffs in Underlying Lawsuits confirmed, given the age of the cases, that they too cannot produce complete files of their cases. Defendants have also challenged Plaintiffs' ability to prove their decisions were the result of fraud. Mr. Bevan acknowledged at deposition that he continued to file asbestos injury claims against Engelhard even after having concluded, based upon

52

evidence provided by the Defendants, that there was no asbestos in Emtal talc. 5/15/18 Bevan Dep. Tr. 139:13–141:25.

### 2. Defenses relating to Underlying Lawsuits.

Plaintiffs' "potential damage award if the case were taken to trial," *Prudential*, 148 F.3d at 319, may also face risk on account of the strength of Engelhard's defenses in the Underlying Lawsuits. Although the parties disagree as to the relevance of these defenses in a fraud/fraud concealment action, prior opinions in this case have recognized that, in order to prove their fraudulent concealment claims, "Plaintiffs must prove that decisions were made in the underlying case that would have been different if they had known evidence had been destroyed[.]" *See Williams*, 2017 U.S. Dist. LEXIS 122053, *28.

While Plaintiffs believe that they do not have to prove in a fraudulent concealment case that they would have won their Underlying Lawsuits, Defendants pointed to potential weaknesses in the Underlying Lawsuits[9] as a way of attempting to show that the plaintiffs' decisions in those cases would have been the same no matter what. For example, Defendants have pointed out that many underlying litigants, despite filing lawsuits against Engelhard, lacked evidence of exposure to Emtal Talc. Named Plaintiff Holley's decedent, for example, did not

---

[9]     *See, e.g., Williams*, 765 F.3d at 321; *Tartaglia v. UBS PaineWebber, Inc.*, 961 A.2d 1167, 1190 (N.J. 2008).

"know the brand name, manufacturer, distributor or supplier" of any talc products she was allegedly exposed to. Exhibit W (4/5/17 Holley Dep. Tr.) at 121:11-15. Other Named Plaintiffs' cases had similar exposure issues. *See* Exhibit X, (3/12/18 Wengerd Dep. Tr.) at 287:13-22 ("Q. So in your mother's original case, she identified Vanderbilt as the company whose talc she was exposed to, correct? [Objection] A. Yes. Q. No mention of EMTAL talc there? [Objection] A. Correct."); Exhibit Y, (4/5/18 G. Williams Dep.) at 41:7-11 (acknowledging that she had "no understanding of whether [her] father was exposed to talc from Southern Talc or Georgia Talc or Vanderbilt talc or EMTAL talc."); Exhibit Z, (4/17/18 Ware Dep. Tr. 48:2-17) (acknowledging that based on sales records, her decedent's employer had purchased only three bags of talc over a 30-year period). Other litigation defenses, including class members' lack of proof of asbestos-related disease, alternative causes of the disease (history of exposure to raw asbestos, not just talc, for example), and jurisdictional, statute of limitations, or other various arguments, could also have been—and were—raised by Defendants.

The potential weaknesses in the Underlying Lawsuits also extend to how those matters were settled. In particular, many class members' suits were dismissed after mass group settlements that did not distinguish between defendants having asbestos in their talc and defendants not having asbestos in their talc. *See*, *e.g.*, Exhibit V, T90:21–91:1, 103:21–104:3, 303:6-22 (discussing group settlements);

Exhibit W, T113:25–114:3 ("Q. But you know now that Southern Talc Company was one of the seven defendants that settled with your mother's estate for $2,000, correct? A. Yes. Q. Even though Southern Talc was known by Mr. Bevan to have asbestos in its talc, correct? A. Yes."). This practice—treating talc manufacturers alike, regardless of whether their products were known to contain asbestos—could undermine Plaintiffs' ability to show that but for the alleged conduct, class members' decisions would actually "have been different"—as the Court had indicated would be necessary in order to hold Defendants liable on Plaintiffs' fraudulent concealment claims.

### 3. Establishing Damages.

Defendants also challenged the legal basis for recovering damages on a class wide basis. The SAC proposed to recover class wide damages on a theory of disgorgement, including disgorgement of "(a) the fees that Engelhard/BASF paid to Cahill," and "(b) savings in liability and settlement payments, attorneys' fees, other defense costs and expenses Engelhard/BASF realized" as a result of alleged wrongdoing in those litigations. *See* Exhibit J (1/29/18 Pls.' Interrogatory Answers), at 11.

Establishing these damages, however, would have required overcoming legal challenges and factual obstacles. First, while Plaintiffs continue to believe

that disgorgement damages would be available against all Defendants,[10] the Defendants have argued that disgorgement is "a form of [r]estitution measured by the defendant's wrongful gain." *Kokesh v. S.E.C.*, 137 S. Ct. 1635, 1640 (2017). In Defendants' view, Engelhard experienced no "gain" here, where it only paid money to someone else (Cahill) during these lawsuits. On the other hand, Plaintiffs believe that Engelhard saved the cost of defense and liabilities it would have had to pay in the Underlying Lawsuits if the allegedly hidden evidence about Engelhard had been known. Cahill also argued that it did not gain anything from its alleged wrongdoing and could not be held responsible for disgorgement damages. Plaintiffs, however, believe at a bare minimum that Cahill could be held liable to the extent of its received legal fees and other damages based on the Defendants' joint activities. Resolution of these complex and novel legal issues would have demanded extensive effort and time, and there is no assurance that Plaintiffs' legal theories would have been upheld.

---

[10] *See, e.g., Zippertubing Co. v. Teleflex Inc.*, 757 F.2d 1401, 1411–12 (3d Cir. 1985) ("when one has unlawfully deprived another of a contract or a business opportunity and has made the opportunity his own, he is not to be permitted to retain any of the profits, any of the benefits of his unlawful conduct."); *County of Essex v. First Union Nat'l Bank*, 89 A.2d 600, 607 (N.J. 2006); *Platinum Mgmt., Inc. v. Dahms*, 666 A.2d 1028 (N.J. Law Div. 1995); *Restatement (Third) Restitution and Unjust Enrichment* § 51 (2011).

Second, even if Plaintiffs were to prevail and establish that disgorgement is available here as a matter of law, the parties remained engaged in difficult debate over how much money Engelhard actually saved in the Underlying Lawsuits, or whether that number would even be ascertainable. As noted above, many cases against Engelhard ended in mass settlements with multiple talc manufacturers, with payments from those manufacturers being the same whether their products were known to contain asbestos or not. Defendants argue that fact suggests that Engelhard's alleged denial of evidence of asbestos might not have actually saved it much money in legal fees or otherwise and that disgorgement damages could thus be hard to prove at trial.

Plaintiffs sought discovery about Engelhard's highest, lowest, and average Emtal talc expenditures and defense costs for each year of underlying talc litigation, *see* Exhibit J (Pls.' Interrogatories Numbers 9, 10, 11), but the SDM agreed with BASF that the extraordinary difficulty of calculating these long-ago figures would be "unduly burdensome." *See* Dkt. No. 534 (5/25/18 Order) at 3. He ordered Plaintiffs to share the costs of developing this information. *Id.* at 3-4, Plaintiffs objected to the cost sharing and the SDM denied their motion to compel, *see* CM/ECF # 565 (6/12/18 Order) at 6-7. Plaintiffs filed an appeal before that second order was issued, *see* CM/ECF # 562, and have contended that the first cost-sharing order was wrongly decided and that the second denial order should be

57

considered moot on account of the appeal, which remains pending. But in any event, these issues—no matter how they were to ultimately be decided—illustrate the continuing burden and risks Plaintiffs could endure in developing their damage arguments and marshalling the facts necessary to support them at trial.

### 4.  Ascertaining the Proposed Class.

Defendants also challenged the ability of Plaintiffs to ascertain and identify members of the proposed class, a prerequisite to class certification over Defendants' objections. Many of the original complaints in the Underlying Lawsuits had very terse allegations against Engelhard that lacked reference to Emtal Talc and instead contained boilerplate recitations of non-specific personal injury claims against dozens of defendants.  Defendants point to discovery in this case that in their view shows that documentation supporting the Class Members' underlying claims against Engelhard at the time they were dismissed was thin or non-existent. Moreover, it is unclear how such proofs would be reconstructed today, if they existed in the first place. Consequently, Plaintiffs faced significant risks to a contested class certification from this lack of verifiable evidence.

By agreeing to the settlement, however, Plaintiffs no longer face these risks, because Plaintiffs and Defendants have agreed to establish eligibility standards that will allow the Settlement Administrator to determine class membership using readily available, objective criteria. These eligibility standards ensure that the

Settlement Class is ascertainable while providing significant safeguards against fraudulent and erroneous claims.

### 5.  "Science Day" And The Emtal Talc Testing Record.

Defendants argue that Plaintiffs' allegations turn in part on alleged concealment of test results that Plaintiffs believe show Emtal Talc contained asbestos and that a Science Day is needed to assess the validity of these test results. The Court denied their first request for a Science Day. CM/ECF # 261. Defendants continued to challenge Plaintiffs' view of what the underlying testing revealed arguing that a Science Day could be relevant to showing the absence of fraudulent intent. Defendants therefore asked the SDM to hold a "Science Day" and hear expert testimony on the matter. Defendants' request was a subject of considerable disagreement between the parties—Plaintiffs argued before the SDM that expert testimony on the testing record is not relevant to the merits of a fraud and fraudulent concealment case, the issue being whether evidence was concealed, not the weight of that evidence. The SDM, however, eventually came to believe that scientific testimony would be relevant to the case and to his decision on Plaintiffs' pending motion to invoke the crime-fraud exception to BASF's attorney-client privilege. *See* Exhibit AA (2/23/18 Hr'g Tr.) at 121:12-13 ("SPECIAL MASTER: … I don't know, nor have I been given the type of expert information I would need

in order to judge whether X number of fibers per million is a good thing or a bad thing.").

Over Plaintiffs' objections, the SDM scheduled a Science Day hearing, calling for expert testimony on topics including "the overall testing record concerning Emtal talc to determine whether and to what extent it contained asbestos," and "the relevant capabilities and limitations of the testing methods then used by BASF (and its predecessors)," among others. *See* CM/ECF # 485 (4/23/18 Order) at 3. Plaintiffs filed an appeal of this order, *see* CM/ECF # 506, and the parties continue to disagree over whether the requested testimony would be relevant, with Plaintiffs believing that it would be immaterial. The Science Day order, however, again illustrates the risks and costs Plaintiffs could face in further litigating these complex proceedings, which Defendants believe could turn in part on complicated issues of state of mind, as informed by scientific understanding and capabilities from a different time.

*       *       *

In sum, although Plaintiffs are confident in the strength of their case, they are aware that protracted litigation carries inherent risks that would delay and potentially endanger the monetary recovery of the putative Class Members. At the same time, if the Court approves the proposed Settlement Agreement, Plaintiffs and the putative Class Members would receive immediate and substantial relief.

60

Similarly, although litigation classes can sometimes be decertified when they prove unmanageable, *see Krell*, 148 F.3d at 321, manageability risks are greatly reduced in the settlement context, where "a district court need not inquire whether the case if tried, would present intractable management problems[,] . . . for the proposal is that there be no trial." *NFL*, 821 F.3d at 440 (quoting *Prudential*, 148 F.3d at 321). Consequently, considering this Settlement's great and immediate value against the uncertain litigation road ahead thus weighs strongly in favor of approving the Class Action Settlement proposed here under the fourth and fifth *Girsh* factors.

## D.   Other factors also support approving the Settlement.

### 1.   Ability of Defendants to Withstand a Greater Judgment.

"The seventh *Girsh* factor is most relevant when the defendant's professed inability to pay is used to justify the amount of the settlement." *NFL*, 821 F.3d at 440.

With respect to Cahill, its and its named members' ability to withstand a class action judgment involving thousands of claims is significantly tied to its insurance coverage. Under the circumstances of this case, there are coverage issues and limits associated with Cahill's insurance. Cahill has however represented to Plaintiffs that its insurance carriers support the settlement, and that there is no issue about Cahill's ability to fund its share of the Settlement.

With respect to BASF, as the Third Circuit has recognized, "in any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the settlement." *Id.* (quoting *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 323 (3d Cir. 2011)). Indeed, as this Court has recognized, even if a company "could afford a greater amount than the settlement would require, that doesn't support 'rejecting an otherwise reasonable settlement.'" *Halley v. Honeywell Int'l*, No. 10-3345, 2016 U.S. Dist. LEXIS 55765, *40 (D.N.J. April 26, 2016) (Salas, J.) (quoting *Saini v. BMW of N. Am., LLC*, No. 12-6105, 2015 U.S. Dist. LEXIS 66242, *26 (D.N.J. May 21, 2015)).

The seventh *Girsh* factor is thus of no moment here.

### 2. Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and All Attendant Risks of Litigation.

As to the eighth and ninth *Girsh* factors, courts ask "whether the settlement represents a good value for a weak case or a poor value for a strong case." *Warfarin*, 391 F.3d at 538. "The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Id.* "[T]he present value of the damages plaintiffs would likely recover if successful, appropriately discounted

62

for the risk of not prevailing, should be compared with the amount of the proposed settlement." *Prudential*, 148 F.3d at 322. The settlement moreover must be judged "against the realistic, rather than theoretical potential for recovery after trial." *Sullivan*, 667 F.3d at 323. And in conducting the analysis, the court must "guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *In re GMC Truck Fuel Tank Prods. Litig.*, 55 F.3d 768, 806 (3d Cir. 1995).

The proposed settlement here is certainly "reasonable … in light of the best possible recovery and … in light of the risks the parties would face if the case went to trial," *Warfarin*, 391 F.3d at 538, particularly given that discovery revealed many Settlement Class Members settled with other talc defendants (including those whose products were known to contain asbestos) for as little as $3,000 for a mesothelioma claim, $2,000 for a lung cancer claim, and $1,000 for an asbestosis claim. In ascertaining the reasonableness of the settlement amount in this matter, the Parties considered claims data from asbestos settlement trusts to determine credible estimates of the incidence rates of various asbestos diseases and compensation paid by disease level. Based on this review, the Parties were aware of the potential range of claim values in the Underlying Lawsuits and the losses allegedly sustained by the members of the putative Settlement Class as a result of

the dismissal of their cases. This analysis, in conjunction with the Parties' consideration of the litigation risks identified above, provided a framework for settlement discussions. With the guidance of Judge Dickson and Judge Phillips, the Parties, as part of the proposed Settlement Agreement, mutually agreed to the creation of a non-reversionary $72.5 million Settlement Fund.

Plaintiffs also turned to Verus, the leading Section 524(g) asbestos trust claims administrator in the asbestos bankruptcy field, to assist Plaintiffs in developing the Plan of Distribution, which compensates Settlement Class Members based on four different asbestos disease levels. The monetary awards to the putative Settlement Class Members, as a result, take into account and reflect the values of the alleged injuries that had been at issue in the Underlying Lawsuits, which Plaintiffs allege were fatally compromised as a result of the alleged fraudulent concealment of the facts regarding Emtal Talc.

The Class Action Settlement accordingly affords members of the putative Settlement Class with immediate compensation that provides them with a fair value for their claims considering the significant risks Class Members may have in establishing all the elements of fraud and fraudulent concealment.

### 3. *Prudential* Factors.

Third Circuit jurisprudence also requires that district courts consider the *Prudential* factors in assessing the reasonableness of class settlement. These are (1)

the maturity of the underlying substantive issues in the case and other factors that "bear on the ability to assess the probable outcome of a trial on the merits," (2) the "existence and probable outcome of claims by other classes and subclasses," (3) the comparison between the results achieved by settlement and the results likely to be achieved for other claimants, (4) whether class members have the right to opt-out of the settlement, (5) whether any provisions for attorneys' fees are reasonable, and (6) whether the procedure for processing individual claims under the settlement is fair and reasonable. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 311, 323 (3d Cir. 1998). The relevant *Prudential* factors weigh in favor of approving the Settlement in this case.

First, given the maturity of the underlying substantive issues and discovery in this case, the Parties possess adequate information concerning the strengths and weaknesses of Plaintiffs' claims, and thus the probable outcome of a trial on the merits. Counsel here thoroughly investigated the claims raised in the Complaints, conducted extensive document discovery, took 28 depositions, and exchanged information during negotiation and mediation sessions. Notably, the parties only reached settlement terms following the close of fact discovery. Moreover, Plaintiffs' counsel not only retained various experts and other professionals to serve as experts in this matter, but also served expert reports on the subjects of causation and damages. The case proceeded against the backdrop of decades of

65

asbestos litigation. Given the advanced stage of discovery in this case, the first *Prudential* factor is thus more than satisfied. *See, e.g.*, *In re Cendant Corp. Litig.*, 264 F.3d 201, 235-36 (3d Cir. 2001) (affirming approval of settlement even though litigation was "settled at an early stage" after only "informal" discovery).

Second, there are no other classes or subclasses and as such, this factor is not relevant to these proceedings.

Third, with respect to the results achieved by the settlement for individual class or subclass members and the results achieved for other claimants, Plaintiffs submit that this factor favors approval of the Settlement as well given that Settlement Class Members stand to receive substantial compensation that is, in some cases, orders of magnitude higher than what similarly situated plaintiffs recovered in their Underlying Lawsuits against other talc defendants.

Fourth, the proposed Settlement Agreement accords members the right to opt out of the settlement. *NFL*, 821 F.3d at 441.

Fifth, "[w]hether any provisions for attorney's fees are reasonable is a neutral factor because Class Counsel have not yet moved for a fee award." *Turner*, 307 F.R.D. at 396. Under the Settlement Agreement, the Defendants have agreed not to oppose Class Counsel's Fee and Costs Petition not to exceed $22.5 million and $1.5 million respectively, which will be filed for the Court's consideration

66

before the Fairness Hearing and entry of the Final Approval Order. Further, the Court retains jurisdiction of the case after the Final Approval Order and throughout the execution of the Plan of Distribution so it can address the reasonableness of fees that may subsequently be claimed by non-class counsel if that issue should arise.

Sixth, the procedure for processing individual claims under the settlement is fair and reasonable. For instance, required proof of disease and disease level for injury level-based compensation (called a Part B claim in the Plan of Distribution) may be established through a certification of a disease adjudication from one of several designated asbestos trusts, which the claims administrator will obtain on request. The audit process contains appropriate and adequate protections against fraud, allowing certifications only from those trusts that themselves maintain reliable anti-fraud standards. All in all, the claims process is fair, relatively simple (in comparison to litigation), and familiar to the asbestos claimant bar.

For these reasons, other than two neutral factors, all the *Prudential* factors support approval of the proposed Settlement Agreement.

## C. The Court should conditionally certify the Settlement Class.

Plaintiffs request that the Court conditionally certify the Settlement as set forth in the Settlement Agreement.

When confronted with a request for a settlement-only class certification, "a district court need not inquire whether the case if tried, would present intractable management problems . . . for the proposal is that there will be no trial." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004). A court should certify a settlement-only class where: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

Once satisfied that the requirements of Rule 23(a) are met, the Court must then look to Rule 23(b) for more prerequisites. Under that provision, the certification of a class seeking monetary compensation requires a showing that "questions of law and fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

In conducting a "rigorous analysis" of the "factual and legal allegations" underpinning this request for certification, *Comcast v. Behrend*, 569 U.S. 27, 33 (2013), this Court can and should find that each of the requirements of Rule 23(a) and (b)(3) are easily met for the proposed Settlement Class.

### 1.    Numerosity.

Rule 23(a)(1) sets forth what is commonly known as the "numerosity" requirement. The "numerosity requirement is satisfied when 'the class is so numerous that joinder of all members is impracticable.'" *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249 (3d Cir. 2016) (quoting Fed. R. Civ. P. 23(a)(1)). This "calls for an inherently fact-based analysis." *Id.* at 249–250 (citing *Stewart v. Abraham*, 275 F.3d 220, 226–227 (3d Cir. 2001)). In the Third Circuit, the numerosity requirement is generally met if "the potential number of plaintiffs exceeds 40[.]" *Id.*

The numerosity requirement is easily satisfied here as there are thousands of putative Class Members connected with the Underlying Lawsuits which meet the class definition based on the Bevan Law Firm's Emtal Talc cases alone. Based on an analysis by Verus LLC, the proposed claims administrator, of litigation documents produced in discovery by Defendants, Engelhard's insurers and the Bevan Law Firm, in which parties named in Underlying Lawsuits are matched to Verus' asbestos claims database and TransUnion LLC's proprietary database, Plaintiffs estimate that there are somewhere between approximately 7,500 to 8,500 physically injured asbestos plaintiffs who filed Underlying Lawsuits against BASF during the class period. Adding to this class population of primary claimants are spouses and wrongful death/survival claim derivative plaintiffs who over the years

69

sued Engelhard/BASF based on a physically injured person's injury ("Derivative Claimants").

In view of these numbers, joinder of all parties would be impracticable, thus satisfying Rule 23(a)(1).

### 2.    Commonality.

The second prong of Rule 23(a)—commonality—requires "consideration of whether there are 'questions of law or fact common to the class[.]" *Reyes v. Netdeposit, LLC*, 802 F.3d 359, 482 (3d Cir. 2015) (citing Fed. R. Civ. P. 23(a)(2)). "A putative class satisfies Rule 23(a)'s commonality requirement if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Id.* (quoting *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013)). The court's focus must be "on whether the **defendant's conduct** [is] common as to all class members[.]" *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298 (3d Cir. 2011) (emphasis added). And that "bar is not a high one." *Reyes*, 802 F.3d at 486 (quoting *Rodriguez*, 726 F.3d at 382). The Third Circuit has "acknowledged commonality to be present even when not all plaintiffs suffered an actual injury, when plaintiffs did not bring identical claims, and, most dramatically, when plaintiffs' claims may not have been legally viable[.]" *Id*.

The commonality requirement is easily satisfied here. Questions and answers surrounding the asbestos content of Emtal Talc, the knowledge of

Defendants, what Defendants represented to plaintiffs in the Underlying Lawsuits, the legal obligation of Defendants to disclose the evidence of asbestos in Emtal Talc, and whether Defendants concealed such evidence as alleged in the SAC are common to Plaintiffs and the putative members of the Settlement Class.

The Court should therefore find the commonality requirement met as Defendants allegedly injured the putative Settlement Class Members through the "same course of conduct." *See NFL*, 821 F.3d at 427 (finding that the commonality requirement satisfied because "the NFL Parties allegedly injured retired players through the same course of conduct."). Indeed, even if the members of the Settlement Class sustained different degrees of bodily injury, their claims for fraud and fraudulent concealment nevertheless "still depend on the same questions regarding" Defendant's conduct. *Id.* And with that being the case, the commonality requirement is satisfied here.

### 3.    Typicality.

Rule 23(a)(3) requires that the claims of representative plaintiffs be "typical of the claims...of the class." In evaluating typicality, courts ask "whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994). The purpose of that inquiry is

"to uncover conflicts of interest between named parties and the class they seek to represent." *In re Prudential*, 148 F.3d at 312.

The Third Circuit has "set a 'low threshold' to meet typicality." *NFL Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016) (quoting *Newton*, 259 F.3d at 183). The typicality requirement "does not mandate that all putative class members share identical claims." *Newton*, 259 F.3d at 184. To the contrary, the class still passes muster even if the class members' injuries vary. *NFL Players Concussion*, 821 F.3d at 428.

The inquiry into typicality "focuses on the similarity of the legal theory and legal claims; the similarity of the individual circumstances on which those theories and claims are based; and the extent to which the proposed representative may face significant unique or atypical defenses to her claims." *In re Schering Plough Corp.*, 589 F.3d 585, 597–98 (3d Cir. 2009). Moreover, the typicality analysis focuses on the conduct of the defendants, not that of the class representatives. *In re IGI Secs. Litig.*, 122 F.R.D. 451, 456 (D.N.J. 1988). Thus, "factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Baby Neal*, 43 F.3d at 58.

The claims of the Representative Plaintiffs typify those of the putative Settlement Class Members. The Representative Plaintiffs represent six deceased

Emtal claimants ("Decedents"), each of whom, had sued Engelhard or BASF for asbestos-injury. As a result, Defendants' conduct, according to Plaintiffs, rendered all claims brought by members of the putative Class virtually valueless because the inability to prove that Emtal Talc contained asbestos made all such claims defective, in the first instance. The Representative Plaintiffs' claims typify every other putative Settlement Class Member because Defendants defended every lawsuit the same way by denying that Emtal Talc contained asbestos and that there was any evidence that it did.

### 4. The Representative Plaintiffs' interests fully align with those of the putative Settlement Class as they made the same fraud, fraudulent concealment and conspiracy claims under New Jersey law.

The final prong of Rule 23 "encompasses two distinct inquiries designed to protect the interests of absentee class members: 'it considers whether the named plaintiffs' interests are sufficiently aligned with the absentees', and it tests the qualification of the counsel to represent the class." *In* re *Community Bank of Northern Virginia*, 418 F.3d 277, 203 (3d Cir. 2005) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F3d 768, 800 (3d Cir. 1995)).

### a. Representative Plaintiffs.

Class representatives "must be part of the class and possess the *same interest* and suffer the *same injury* as the class members." *Id.* at 625-26. As the Third

Circuit has explained, the "linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012).

The interests of the Representative Plaintiffs and putative Class Members are closely aligned here. They all brought lawsuits against Engelhard, or its corporate successor, BASF, which were dismissed, either voluntarily or not. They all also allege that from 1984 to 2010, Engelhard and its former law firm, Cahill, made misstatements or concealed evidence about the existence of asbestos in Emtal Talc, which caused (either voluntarily or not) the dismissal of their cases. In other words, all members of the putative Settlement Class allege that their injuries arose from one cause—the fraudulent concealment of evidence—by BASF and Cahill over a defined time-period. Representative Plaintiffs and the putative Class Members thus possess the *same interest* and suffered the *same injury.*

Indeed, the Settlement Class proposed here avoids the sort of fundamental conflict that might defeat a finding of adequacy: a futures problem. *See NFL*, 821 F.3d at 431. Unlike the "sprawling" proposed class in *Amchem*, which involved hundreds of thousands and perhaps millions of people who were or someday may be adversely affected by past exposure to asbestos products manufactured by one or more of twenty companies, the proposed Settlement Class compensates Class Members for injuries and losses suffered years ago by a defined group who had

74

filed suits against one company (Engelhard/BASF), which were dismissed during the class period (and hence there are no future claimants to consider as all Class Members have already had an alleged manifest asbestos disease qualifying them), and utilizes a rational means of distributing the settlement proceeds. In other words, this class has a great deal of cohesion given that, unlike *Amchem* and *Ortiz*, there are no "exposure-only plaintiffs" in the putative class that have not already filed claims that were dismissed based on the alleged past conduct of the Defendants. Here, in contrast to *Amchem* and *Ortiz*, claimants either brought and had their lawsuit dismissed by March 30, 2011, or not. No divide exists between holders of present and future claims here. And lacking that, no conflict could be found between the putative class members, much less a fundamental one. *See In re Pet Foods Products Liability Litigation*, 629 F.3d 333, 346 (3d Cir. 2010) (rejecting argument that subclasses were necessary because "all class members . . . have present claims").

While the proposed Settlement Agreement features a claims process that will differentiate payment shares between Class Members based on the degree of their underlying asbestos-injuries and disease, "differences in settlement value do not, without more, demonstrate conflicting or antagonistic interests within the class." *Pet Foods*, 629 F.3d at 346. After all, "varied relief among class members with differing claims in class settlements is not unusual." *Id.* (citing *Petrovic v. Amoco*

*Oil Corp.*, 200 F.3d 1140, 1146 (8th Cir. 1999) ("[A]lmost every settlement will involve different awards for various class members."). And more fundamentally, "if subclassing is required for each material legal or economic difference that distinguishes class members, the Balkanization of the class action is threatened." *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2005).[11]

No subclasses are necessary here. The Plan of Distribution's use of four different levels of allocation from the Settlement Fund reflect the relative value of the different injuries, which drive the value of the alleged fraud and concealment damages allegedly sustained by members of the Settlement Class. Plaintiffs developed the Plan of Distribution by drawing on the experience and expertise of Verus as well as historical information on the resolution of asbestos-injury claims from several sources, including asbestos settlement trusts. The Plan of Distribution

---

[11] The Settlement's release will release all class members' personal injury claims against the Released Parties (which includes BASF) based on prior exposure to Emtal Talc, including any claim for possible future disease progression from a non-malignant asbestos disease to a malignant asbestos disease (a/k/a "second asbestos disease claims"). The Plan of Distribution will make its Part B Fund allocations based on the Primary Claimant's (*i.e.*- the physically injured person) asbestos disease severity level as of the time of the claim submission to the Settlement Fund. The class Notice advises currently living class members with a non-malignant asbestos disease that there will be no further right to claim for a malignancy against either the Released Parties or the Settlement Fund should a malignant asbestos disease manifest in the future. Of course, those Class Members retain all other existing rights and claims against other parties who are not defendants in this Action who are potentially liable.

therefore fairly reflects the extent of the injury that the Settlement Class Members incurred and which they could not prosecute without the evidence of asbestos in Emtal Talc that Defendants allegedly denied to them. The Court should therefore find that the interests of the Representative Plaintiffs and putative Class Members are closely aligned, and that establishing subclasses would have risked slowing down and even halting settlement discussions. *See N.F.L.*, 821 F.3d at 432 n.9 (agreeing that additional subclasses "were unnecessary and risked slowing down or even halting the settlement negotiations").

### b. Class Counsel.

In connection with this motion, Plaintiffs provide firm biographies for Cohen, Placitella & Roth P.C, which include the qualifications and accomplishments of its members. Exhibit BB. Plaintiffs' Counsel devoted themselves to this case for over nine years. Indeed, throughout the lengthy and hotly contested proceedings Defendants were represented by highly able and experienced counsel. Plaintiffs' Counsel, moreover, have proved themselves to be more than adequate to represent the Class throughout this intense litigation, which included extensive pre-suit investigation about Emtal Talc and the Underlying Lawsuits after discovering the initial information from *Westfall*; development of a claim for relief based on fraud and fraudulent concealment which had occurred decades in the past; several rounds of significant motions to dismiss; a successful

Third Circuit appeal; extensive discovery and intense motion practice on remand to the District Court; and multiple rounds of mediation.

**5. The Court should conditionally certify a settlement class under Rule 23(b)(3) for monetary relief.**

To gain certification under Rule 23, the named plaintiffs must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating controversy." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008). Plaintiffs meet both of these Rule 23(b)(3) "predominance and superiority" requirements.

**a. Common questions of law and fact predominate.**

Common questions of law and fact predominate in this Action. Here, Plaintiffs alleged that all the Underlying Lawsuits were truncated as a result of Defendants' alleged fraud, namely that Defendants purportedly concealed the presence of asbestos in their talc products.[12]

---

[12]     Defendants do not admit this to be the case and claim the allegations against them are unfounded and not true, and that, in fact, they did nothing wrong or improper. The settlement before the Court is a genuine compromise of intensely different views that is being proposed to bring nine years of constant litigation to an end and avoid the further burden, distraction and considerable expense of continuing with the litigation.

The predominance inquiry "calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods, Inc. v. Bouaphakeo*, __ U.S. __, 136 S. Ct. 1036, 1045 (2016). It "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *NFL*, 821 F.3d at 434 (quoting *Amchem Prods v. Windsor*, 521 U.S. 591, 623 (1997)). Compared to the commonality test of Rule 23(a), Rule 23(b)'s predominance test is more demanding. *Id.* (citing *Warfarin*, 391 F.3d at 528). But significantly, courts are "inclined to find the predominance test met in the settlement context." *Id.* (quoting *Sullivan*, 667 at 304 n.29).

"Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem*, 521 U.S. at 625. The principle readily extends to this fraud and fraudulent concealment action. Recognizing this principle, the Third Circuit held in *Warfarin* that common issues predominated because plaintiffs alleged that DuPont "engaged in a broad-based campaign, in violation of federal and state consumer fraud and antitrust laws, to deceive consumers, TPPs, health care professionals, and regulatory bodies into believing that generic warfarin sodium was not an equivalent alternative to Coumadin." *Warfarin*, 391 F.3d at 528. These allegations, as the Third Circuit explained, raised several questions of law and fact that predominated over any individual issues, "including the unlawfulness of DuPont's conduct under federal

antitrust laws as well as state law, the causal linkage between DuPont's conduct and the injury suffered by the class members, and the nature of the relief to which class members are entitled." *Id.* The Third Circuit also noted that proof of DuPont's liability "depends on evidence which is common to the class members, such as evidence that DuPont made misrepresentations about Coumadin and generic warfarin sodium . . . ." *Id.* Or put another way, as the Third Circuit noted, "while liability depends on the conduct of DuPont, and whether it conducted a nationwide campaign of misrepresentation and deception, it does not depend on the conduct of individual class members." *Id.*

The Third Circuit similarly found in *NFL* that common issues focusing on the "NFL's knowledge and conduct as well as common scientific questions regarding causation" predominated over individual ones. *NFL*, 821 F.3d at 434. As the Third Circuit recognized, the negligence claims there "depend[ed] on establishing that the NFL . . . knew of the dangers of concussive hits yet failed to modify the rules of NFL Football to mitigate them, or even to warn [r]etired [p]layers that they were risking serious cognitive injury by continuing to play." *Id.* The fraud claims, according to the Third Circuit, likewise "suggest a similarly far-reaching scheme, alleging that the . . . MTBI Committee repeatedly obfuscated the link between football play and head trauma." *Id.*

80

The objectors in *NFL* argued that "damage claims in mass-tort class action[s] . . . are too individualized to satisfy the requirements of predominance." *Id.* The Third Circuit disagreed, noting that "*Amchem* itself warned that it does not mean that a mass tort case will never clear the hurdle of predominance." *Id.* (citing *Amchem*, 521 U.S. at 624). To the contrary, as the Third Circuit explained, the "class of retired NFL players does not present the same obstacles for predominance as the *Amchem* class of hundreds of thousands (maybe millions) of persons exposed to asbestos." *Id.*

The Third Circuit has held that fraudulent concealment by a defendant "is a common question, subject to being uniformly resolved on behalf of all members of the class." *Winoff Industries v. Stone Container Corp. (In re Linerboard Antitrust Litig.)*, 305 F.3d 145, 160–61 (3d Cir. 2002). It does not matter that there may be individual questions in an action for fraud and fraudulent concealment, such as on damages. *Id.; see also Newton v. Merrill Lynch, Pierce, Fenner & Smith*, 259 F.3d 154 (3d Cir. 2001) ("obstacles to calculating damages may not preclude class certification"). What matters is that Plaintiffs have alleged the existence of a common scheme to defraud all putative members of the Settlement Class in the same manner with the same result. Thus, as in *Warfarin* and *NFL*, liability here depends on whether Defendants allegedly denied Class Members an evidential record containing evidence that Emtal Talc contained asbestos.

81

### b. Superiority.

Rule 23(b)(3)'s superiority requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *NFL*, 821 F.3d at 434. In performing this task, courts "consider the class members' interests in individually controlling litigation, the extent and nature of any litigation, the desirability or undesirability of concentrating the litigation, and the likely difficulties in managing a class action." *Id.* (citing Fed. R. Civ. P. 23(b)(3)(A)-(D)).

In *NFL*, the district court found the superiority requirement "satisfied because 'the [s]ettlement avoids thousands of duplicative lawsuits and enables fast processing of a multitude of claims.'" *NFL*, 821 F.3d at 435 (citing *Turner*, 307 F.R.D. at 382). In much the same vein, this proposed Settlement would avoid thousands of duplicative lawsuits that as the experience in this case demonstrates, would involve lengthy and costly proceedings.

If each member of the putative Settlement Class were left to litigate his or her claims individually, decades of litigation would likely ensue at significant expense in many different state and federal courts throughout the country, potentially resulting in conflicting rulings. Compensation resulting from such individual litigation is highly uncertain given the disputes over product identification and the attorney-client privilege, which may not be resolved before

82

lengthy, duplicative and costly trial and appellate proceedings are complete. The approval of a Settlement Class here is superior to individual litigation as the Plan of Distribution provides a coherent, fair, and economical process for a claims administrator to resolve all claims without the need for individual trials. The Settlement Agreement also provides that the Defendants will pay $3.5 million to cover the costs of administration.

### D. The proposed form and method of class notice satisfy due process.

After preliminarily approving a class action, the Court "must direct notice in reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). The Court must ensure that class members receive the "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

In "plain, easily understood language," the notice must "clearly and concisely state": "(i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B). In addition to the

requirements of Rule 23, the notice must satisfy due process requirements that the notice be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

The proposed long-form and short-form notices satisfy these requirements. *See* Exhibits K and L, respectively. Both of these notices are written in plain and straightforward language. They also objectively and neutrally apprise all Settlement Class Members that of the nature of action; the benefits of the proposed Settlement, the definition of the Settlement Class to be certified; the claims, issues and defenses in the *Williams* Action; that the Court will exclude from the Class anyone who opts out of the Settlement pursuant to procedures and deadlines for doing so; the binding effect of a class judgment on Settlement Class Members; and the procedures and deadlines for the submission of objections to any aspect of the proposed Class Action Settlement. Complete as these disclosures are, this Court should approve the proposed long-form and short-form notices.

To deliver the best notice practicable to the putative Class, the Parties together with their notice agent, Orran L. Brown, Sr., of BrownGreer PLC, have developed a comprehensive Notice Plan that more than satisfies the requirements of Rule 23 and due process. Exhibit M. As described earlier, through extensive

84

data analysis, BrownGreer was able to identify deceased putative Class Members, their first-degree relatives, and the last known addresses for these relatives and putative Class Members presumed to be living. BrownGreer will mail the long-form notice to all these individuals and estimates that in excess 77% of the putative Settlement Class can be reached directly or through at least one living relative. *See Grunewald v. Kasperbauer*, 235 F.R.D. 599, 609 (E.D. Pa. 2006) (approving direct notice plan that would reach 55% of the class).

To supplement the direct notice program, BrownGreer has also designed a constructive notice program designed to expose potential Class Members to the notice. In so doing, BrownGreer considered the characteristics of the putative Class Members and how those audience members are most likely to see and respond to the notice.

To provide supplemental notice to these putative Class Members, BrownGreer will (1) place advertisements in both national publications as well as regional ones in Ohio, Mississippi, Georgia, and Alabama; (2) place banner advertisements in the online version of *People* magazine and through a paid search component involving the use of targeted keywords on top Internet search engines, such as Google; and (3) release a press release through Cision/PR Newswire that BrownGreer expects will be picked up by hundreds of media outlets. *See Turner*, 307 F.R.D. at 385-86 (approving notice program that included direct notice to

putative class members and supplemental notice through paid media advertisements and internet ads on websites).

The Notice Plan as designed provides the best notice practicable under the circumstances; and therefore, this Court should approve the Notice Plan as it satisfies the requirements of Rule 23 and due process.

### E. The plan of distribution treats class members equitably relative to each other.

The Plan of Distribution of the Settlement Fund is fair and reasonable and should therefore be approved.

"Approval of a plan of allocation of a settlement fund in a class action is governed by the same standard of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate." *In re Computron Software*, 6 F. Supp. 2d 313, 321 (D.N.J. 1998) (citing *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284-85 (9th Cir.), *cert. denied sub nom* 506 U.S. 953 (1992)). "A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable." *Id.* (internal citations omitted). *See also In re Omnivision Techs.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2007) ("It is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits.")."It is also reasonable to allocate more of the settlement to class members with stronger claims on the

merits." *In re Oracle Sec. Litig.*, No. 90-931, 1994 U.S. Dist. LEXIS 21593, *3-4 (N.D. Cal. 1994).

"An allocation formula need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002) (quoting *White v. NFL*, 822 F. Supp. 1389, 1420-24 (D. Minn. 1993), *aff'd*, 41 F.3d 402 (8th Cir. 1994)). The Court cannot "blindly accept the recommendation of class counsel[.]" *In re Federal Skywalk Cases*, 97 F.R.D. 380, 389 (W.D. Mo. 1983). But it "is entitled to and [should] place considerable weight on their recommendations." *Id.* Indeed, as this Court has recognized, "courts give great weight to the opinion of qualified counsel" in determining the fairness, reasonableness and adequacy of a proposed plan of distribution." *In re Royal Dutch/Shell Transp. Sec. Litig.*, No. 04-374, 2008 U.S. Dist. LEXIS 124269, *66 (D.N.J. 2008).

As discussed above, the Plan of Distribution calls for the establishment of three compensation programs to which Settlement Class Members meeting defined eligibility criteria may apply for compensation award payments based on the existence and severity of asbestos disease. The first program, Part A, provides Base Payments of up to $500 to Settlement Class Members from a $ 6.25 million sub-fund.

The Plan's Part B program would provide additional compensation to Injured Persons in the Underlying Lawsuits from a $ 59.75 million sub-fund to be allocated among and paid to those Claimants adjudicated to be eligible according to the disease level sustained using an assigned number of "Qualifying Claim Points" based on whether they have a Part B Level 1, 2, 3, or 4 disease. Verus determined the number of Qualifying Claim Points" for each asbestos disease category based upon a survey and analysis of the compensation programs employed by eighteen relatively comparable bankruptcy asbestos trust claims facilities. *See* Declaration of Mark Zabel, Exhibit E.

Lastly, the Plan's Part C program features a $ 6.5 million Extraordinary Injury Fund, under which the Settlement Trustee has discretionary authority to award additional compensation to claimants with mesothelioma who can also establish that they sustained an extraordinary physical injury and/or economic loss.

As Plan of Distribution would reimburses class members based on the extent of their injuries, the Plan is reasonable and should be preliminarily approved.

## V.    Conclusion

For these reasons, the Court should preliminarily approve the Class Action Settlement, conditionally certify the proposed Settlement Class, authorize the proposed Notice Program, allow Interim Claims Processing under the proposed Plan of Distribution, and set a schedule for final approval of the Class Action Settlement.

Respectfully Submitted,

**COHEN, PLACITELLA & ROTH, P.C.**

 /s/ *Christopher M. Placitella*
Christopher M. Placitella, Esq
(NJ Atty #: 027781981)
Michael Coren, Esq.
(NJ Atty #: 024871979)
Jared M. Placitella, Esq.
(NJ Atty #: 068272013)
Eric S. Pasternack, Esq.
(NJ Atty #: 015132011)
127 Maple Avenue
Red Bank, NJ 07701
(732) 747-9003

*Attorneys for Plaintiffs and the Putative Class*

Dated: July 16, 2020