Exhibit A

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **KIMBERLEE WILLIAMS,** *et al.* | No. 2:11-cv-01754 (ES) (JAD) |
| Plaintiffs, | |
| vs. | CIVIL ACTION |
| **BASF CATALYSTS LLC,** *et al.* | |
| Defendants. | |

# Class Action Settlement Agreement

# Table of Contents

RECITALS ...................................................................................................................... 1

1. DEFINITIONS............................................................................................................. 2

   1.1. Application and Construction......................................................................... 2

   1.2. Definitions of the Class, Class Member and Settlement Class Member........................... 3

   1.3. General Definitions. .......................................................................................... 3

2. Class Benefits and Relief ......................................................................................... 16

   2.1. Consideration for the Settlement's Benefits and Relief. .................................... 16

   2.2. The Settlement Amount and the Settlement Fund ............................................. 16

   2.3. The Cost Fund ................................................................................................. 17

   2.4. Class Counsel Fees and Litigation Cost Reimbursement................................... 17

   2.5. Information regarding Emtal Talc Litigation ..................................................... 18

   2.6. No Additional Payments by Defendants. ........................................................... 19

   2.7. No Reversion of Settlement Fund Amount. ....................................................... 19

3. Plan of Distribution ................................................................................................. 20

   3.1. Establishment of the Settlement Fund in Full Satisfaction ................................ 20

   3.2. The Plan of Distribution ................................................................................... 21

   3.3. Extraordinary Injury Fund Requirement on Plan of Distribution's Design ........................ 22

   3.4. Lien Administration ......................................................................................... 23

   3.5. Proposed Plan's Implementation and Operations During the Interim Claims Period........ 26

   3.6. Defendants' relationship and position relating to the Plan's operations ........................... 26

   3.7. Consultants ...................................................................................................... 27

   3.8. Class Members' Responsibility Relating to Any Allocations and Claims on Plan Distributions to Them ....................................................... 27

   3.9. Appointment of the Settlement Trustee, Settlement Administrator, Lien Administrator, Notice Agent, Cost and Settlement Funds Financial Institutions and Other Personnel Necessary to Implement the Settlement Agreement and Plan of Distribution.................. 28

   3.10. Settlement Statistics and Reporting................................................................ 29

4. Audit Rights and Detection and Prevention of Fraud ................................................ 33

   5.1. Cost Fund Provisions ...................................................................................... 38

      5.1.1. Creation and Funding of the Cost Fund ................................................... 38

      5.1.2. Permitted Payments from the Cost Fund.................................................. 40

      5.1.3. Cost Fund Budget and Accounting.......................................................... 41

5.2. Settlement Fund Provisions ................................................................................... 42

    5.2.1. Creation of the Settlement Fund .................................................................. 42

    5.2.2. Settlement Fund Operations During Interim Claims Period ........................ 43

    5.2.3. Payment of the Settlement Amount into the Settlement Fund ..................... 43

    5.2.4. Settlement Fund Assets ................................................................................ 43

6. Releases ...................................................................................................................... 44

6.1. Release of Released Claims ................................................................................... 44

    6.2. Covenant Not to Sue ......................................................................................... 45

    6.3. Effect and Scope of Release; Waiver of Protective Statutes and Rules; and Assumption of Risk ............................................................................................................. 45

    6.4. Additional Releases ........................................................................................... 47

    6.5. Stay of Proceedings ........................................................................................... 48

7. Deadlines .................................................................................................................... 49

8. Preliminary Approval and Class Certification ........................................................... 50

    8.1. Motion for Preliminary Approval and Class Certification ................................ 50

    8.2. Parties' Positions With Respect to the Motion .................................................. 50

    8.3. Reservation of Rights with Respect to Class Certification. ............................... 51

9. Class Action Notices .................................................................................................. 51

    9.1. Preparation and Submission of a Notice Plan ................................................... 51

    9.2. Designation of Vendor Responsibility for Notice Plan Elements ..................... 52

    9.3. Notice Plan Budget and Payment of Notice Plan Costs .................................... 52

    9.4. Proposed Notice Agent ..................................................................................... 53

    9.5. Best Notice Practicable ...................................................................................... 53

    9.6. CAFA Public Official Notification .................................................................... 53

    9.7. Declaration of Compliance ................................................................................ 53

10. Class Members' Opt-Out and Objection Rights and Procedures ............................. 54

    10.1. Class Members' Exclusion (Opt-Out) Rights and Procedures to Opt Out; Effect of Not-Opting Out .......................................................................................................... 54

    10.2. Objections ........................................................................................................ 56

11. Termination .............................................................................................................. 58

    11.1. Defendants' Walk-Away Right ......................................................................... 58

    11.2. Class Representatives' Walk-Away Right ......................................................... 59

    11.3. Parties' Termination Rights .............................................................................. 59

11.4. Post-Termination Actions ........................................................ 60

12. Final Approval Order and Dismissal with Prejudice ........................... 62

13. Attorneys' Fees and Costs; Class Representative Service Awards .......... 63

    13.1. Class Counsel Attorney Fees and Litigation Cost Reimbursement ......... 63

    13.2. Class Representative Service Awards ..................................... 65

14. Enforceability of Settlement Agreement and Dismissal and Barring of Claims ......... 65

15. Denial of Wrongdoing; No Admission of Liability ............................. 66

16. Representations and Warranties .................................................. 67

    16.1. Class Counsel and Class Representatives. ............................... 67

    16.2. Defendants. ............................................................ 68

17. Treatment of Confidential Information ......................................... 68

18. Communications to the Public .................................................. 69

19. Cooperation ...................................................................... 70

20. Continuing Jurisdiction of the Court .......................................... 71

21. Choice of Law ................................................................... 72

22. Miscellaneous Provisions ....................................................... 72

Schedule of Exhibits ................................................................ 78

# SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "**Agreement**" or "**Settlement Agreement**") is entered into as of this 13th day of March, 2020, by and between the Class Representatives, on behalf of themselves and as proposed class representatives in the above action, by and through Class Counsel, and the Defendants.

## RECITALS

**WHEREAS,** on March 28, 2011, the Class Representatives filed a Complaint in the *Williams* Action; and

**WHEREAS**, the Class Representatives allege on behalf of themselves and Class Members that Engelhard Corporation (a predecessor to BASF Catalysts LLC) and thereafter BASF Catalysts LLC, together and in concert with Cahill Gordon & Reindel, their former law firm, made misstatements or concealed evidence in connection with the Underlying Lawsuits; and

**WHEREAS**, Defendants have denied, and continue to deny, each and every claim filed in the *Williams* Action and all claims of wrongdoing or liability asserted against them arising out of any conduct, statements, acts or omissions alleged, or that could have been alleged, in the *Williams* Action, and believe that the claims asserted against them are without merit; and

**WHEREAS**, since the filing of the *Williams* Action, Plaintiffs and Defendants have thoroughly investigated, advanced, and defended their respective positions and assessed the various risks of continued litigation; and

**WHEREAS**, on June 26, 2018, the Court entered a stay order and directed the Parties to attend a settlement conference before the Hon. Joseph Dickson, U.S.M.J.; and

**WHEREAS**, the Parties since then through their respective counsel have engaged in protracted, extensive, and, at times contentious, arms-length settlement negotiations under the

auspices and guidance of Judge Dickson and the Hon. Layn Phillips (retired United States District Judge); and

**WHEREAS,** Class Counsel have concluded, after extensive factual examination and investigation and after careful consideration of the circumstances, including the claims asserted in the *Williams* Action, and the possible legal and factual defenses thereto, that it would be in the Class Members' best interests to enter into this Agreement to avoid the uncertainties, burdens, risks, and delays inherent in litigation and subsequent appeals and to assure that the substantial benefits reflected in this Agreement are obtained for Class Members in an expeditious manner; and, further, that this Agreement is fair, reasonable, adequate, and in the best interests of the Class Representatives and the Class Members; and

**WHEREAS**, Defendants, despite their belief that they have strong defenses to the claims described in this Agreement, have agreed to enter into this Agreement to reduce and avoid the further expense, burden, risks, and inconvenience of protracted litigation and subsequent appeals and to resolve finally and completely Class Representatives' and other Class Members' claims;

**NOW, THEREFORE**, subject to the Court's approval as required herein and under Federal Rule of Civil Procedure 23, and in consideration of the mutual promises set forth below, the Parties agree as follows:

**1. DEFINITIONS**

**1.1. Application and Construction.**

1.1.1. As used in this Settlement Agreement and the documents related to it and its implementation and enforcement, the following capitalized terms shall have the meanings set forth below. Whenever the context so requires, the masculine gender includes the feminine and neuter gender, and the singular includes the plural and vice-versa.

2

1.2. **Definitions of the Class, Class Member and Settlement Class Member.**

1.2.1. "**Class**" means, refers to, and includes all Persons within the United States and its territories who after March 7, 1984 and before March 30, 2011 filed and Served a lawsuit against Engelhard/BASF seeking asbestos-related bodily injury compensation or other relief arising from exposure to Emtal Talc products, and who before March 30, 2011 either: (A) had voluntarily dismissed or terminated the lawsuit as to Engelhard/BASF after the suit was filed, including any voluntary dismissal or release of claims due to settlement; or (B) had their lawsuit as to Engelhard/BASF involuntarily dismissed.  The date on which a voluntary dismissal or termination occurred for purposes of determining class membership is deemed to be the earlier of either (i) the date on which the agreement or consent by the plaintiff or his/her counsel to dismiss or terminate the lawsuit occurred; or (ii) the date on which the dismissal or termination of the lawsuit was entered by or in the court in which it was pending.

1.2.2. "**Class Member**" means any Person who meets the criteria of the Class definition.

1.2.3. "**Settlement Class Member**" means any Class Member who has not submitted a valid, timely, and final Opt-Out.

1.3. **General Definitions.**

1.3.1. "**BASF**" or "**Engelhard/BASF**" shall each mean and include BASF Catalysts LLC, Engelhard Corporation, Engelhard Industries, Engelhard Minerals & Chemicals Corporation, Minerals & Chemicals Phillipp Corporation, Eastern Magnesia Talc Company, Porocel Corporation, and Pita Realty Limited, along with each of their successors, affiliates, direct and indirect parent(s) (including BASF Corporation and BASF SE), and any predecessor(s) who owned and/or operated the Emtal Talc mine in Johnson, Vermont at any point on or after October 1, 1967.

3

1.3.2. "**Bilateral Asbestos-Related Nonmalignant Disease**" means a disease evidenced by either (a) a chest X-ray read by a qualified B reader of 1/0 or higher on the ILO scale, or (b) (i) a chest X-ray read by a qualified B reader or other Qualified Physician, (ii) a CT scan read by a Qualified Physician, or (iii) pathology, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification.

1.3.3. "**Cahill**" means Cahill Gordon & Reindel LLP and its predecessors, including the partnership Cahill Gordon & Reindel, together with its partners, associates, members, managers, agents and employees.

1.3.4. "**Claimant**" means a Settlement Class Member who timely submits a Claim Submission either in paper form delivered to the Settlement Administrator or electronically through the Settlement Website.

1.3.5. "**Claim Form**" means the paper or electronic form to be filed, along with other elements of the Claim Submission, to initiate a claim.

1.3.6. "**Claim Submission**" means the paper or electronic Claims Form, required certifications, required elections, required documents, required verifications and other supporting evidential documents by which Settlement Class Members apply under the Settlement Agreement's Plan of Distribution.

1.3.7. "**Claims Filing Deadline**" means the final date to submit a Claim Submission to initiate a claim, which is 120 days after the Notice is first published to the Class pursuant to the Notice Plan, unless otherwise modified by the Court.

1.3.8. "**Claims Determination Deadline**" means the date by which the Settlement Administrator is expected to issue a determination on the validity all Claim Submissions, which is expected to be 10 days after the Document Submission Deadline.

1.3.9. "**Class Counsel**" means the following attorneys:

Christopher M. Placitella  
Michael Coren  
Jared M. Placitella  
Eric S. Pasternack  
**Cohen Placitella & Roth, P.C.**  
127 Maple Ave  
Red Bank, New Jersey 07701  
cplacitella@cprlaw.com  
mcoren@cprlaw.com  
jmplacitella@cprlaw.com  
epasternack@cprlaw.com  

Stewart L. Cohen  
Harry M. Roth  
Robert L. Pratter  
**Cohen Placitella & Roth, P.C.**  
2001 Market Street  
Philadelphia, PA 19103  
scohen@cprlaw.com  
hroth@cprlaw.com  
rpratter@cprlaw.com  

1.3.10. "**Class Period**" means March 8, 1984 through March 29, 2011, inclusive.

1.3.11. "**Class Representatives**" means Kimberlee Williams, Gayle Williams, Marilyn L. Holley, Sheila Ware, Donnette Wengerd, and Rosanne Chernick, each a named plaintiff in the *Williams* Action.

1.3.12. **"CMS"** means the Centers for Medicare & Medicaid Services, the agency within the United States Department of Health and Human Services responsible for administration of the Medicare Program.

1.3.13. "**Complaint**" means the Second Amended Class Action Complaint, as well as the preceding complaint and amended complaint filed by the Class Representatives in the *Williams* Action.

1.3.14. "**Confidential Information**" shall have the meaning defined in § 17.1 of this Agreement.

1.3.15. "**Cost Fund**" and "**Cost Fund Amount**" shall have the meanings defined in § 2.3.1 of this Agreement.

1.3.16. "**Cost Fund Financial Institution**" shall mean PNC Bank, National Association.

1.3.17. "**Cost Reimbursement Amount**" shall have the meaning set forth in § 2.6.2.4 of this Agreement.

1.3.18. "**Court**" means the United States District Court for the District of New Jersey.

1.3.19. "**Defendants**" shall mean BASF and Cahill.

1.3.20. "**Defendants' Counsel**" shall mean the following attorneys:

Peter A. Farrell, P.C.
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
peter.farrell@kirkland.com

Eugene F. Assaf, P.C.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
eugene.assaf@kirkland.com

Justin T. Quinn
Robinson Miller LLC
One Newark Center, 19th Floor
Newark, New Jersey 07102
jquinn@rwmlegal.com

*Attorneys for BASF*

Nina M. Gussack
Barry H. Boise
Anthony Vale
Pepper Hamilton LLP
3000 Two Logan Square
18th & Arch Streets Philadelphia,
Pennsylvania 19103
gussackn@pepperlaw.com
boiseb@pepperlaw.com
valea@pepperlaw.com

Angelo A. Stio, III
Pepper Hamilton LLP
301 Carnegie Center, Suite 400
Princeton, New Jersey 08543
stioa@pepperlaw.com

*Attorneys for Cahill*

1.3.21. "**Derivative Claimant**" means a Settlement Class Member (or personal representative if deceased) who was a spouse, parent, or child of an Injured Person, or any other person who under applicable state law, by reason of their relationship to the Injured Person claimed damages in an Underlying Lawsuit against Engelhard/BASF such as, for illustration purposes, a loss of consortium or a wrongful death claim.

1.3.22. "**DHA**" shall mean Defense Health Agency (formally known as TRICARE), the federal program managed and administered by the United States Department of Defense under which certain medical items and/or services are furnished to eligible members of the military services,

6

military retirees, and military dependents under 10 U.S.C. § 1071, *et seq.*, as amended from time to time.

1.3.23. "**Document Submission Deadline**" means the final date to submit any documents to cure any deficiency in the Claims Submission, which is 155 days after the Notice is first published to the Class pursuant to the Notice Plan, unless otherwise modified by the Court.

1.3.24. "**Dollars**" or "**$**" means U.S. dollars.

1.3.25. "**Effective Date**" means the first date by which all of the following events shall have occurred: (a) the Court has entered the Preliminary Approval Order; (b) the Court has entered the Final Approval Order; and (c) the Final Approval Order has become Final.

1.3.26. "**Emtal Talc Claim**" means a tort claim based upon an asbestos bodily injury alleged to be caused by exposure to Emtal Talc.

1.3.27. "**Emtal Talc**" means both the talc ore and resulting industrial talc products mined from the Johnson, Vermont talc mine operated by Engelhard/BASF.

1.3.28. "**Entity**" shall mean any corporation, limited liability entity, partnership, association, trust and any other entity (including any estate, guardian or beneficiary thereof), or organization, including, without limitation, any federal, state or local government, or quasi-governmental body or political subdivision, department, agency or instrumentality thereof, or any Person.

1.3.29. "**Extraordinary Injury Fund**" or "**EIF**" means the discretionary supplemental compensation program component of the Plan of Distribution described in § 3.3 of this Agreement.

1.3.30. "**Fairness Hearing**" means the hearing scheduled by the Court to take place after the entry of the Preliminary Approval Order at which the Court shall be asked to: (a) consider the fairness, reasonableness, and adequacy of this Settlement Agreement under Federal Rule of Civil Procedure 23(e); (b) consider any timely objections to this Settlement Agreement and all responses

7

thereto; (c) rule on the fee and cost application filed by Class Counsel; (d) rule on the Class Representatives' service award application; and (e) certify the Class for settlement purposes only.

1.3.31. "**Fee Amount**" shall have the meaning set forth in § 13.1 of this Agreement.

1.3.32. "**Final**" means that the Final Approval Order has been entered on the docket in the *Williams* Action, and all of the following shall have occurred: (i) the expiration of the time to file a motion to alter or amend the Final Approval Order under Federal Rule of Civil Procedure 59(e) without any such motion having been filed or, if such a motion is filed, the entry of an order denying such motion; and (ii) the time in which to appeal the Final Approval Order has passed without any appeal having been taken or, if an appeal is taken, immediately after (a) the date of the final dismissal of any appeal or the final dismissal of any proceeding on certiorari, or (b) the date of affirmance of the Final Approval Order on appeal and the expiration of time for any further judicial review whether by appeal, reconsideration, or petition for a writ of certiorari and, if certiorari is granted, the date of final affirmance of the Final Approval Order following review pursuant to the grant.

1.3.33. "**Final Approval Order**" means the order described in § 12 in which the Court, among other things, grants final approval of this Settlement Agreement, certifies the Class for settlement purposes, authorizes the entry of a final judgment and dismissal of the Action with prejudice, enters a bar order, and rules on Class Counsel's fee and cost application and on the Class Representatives' service award application.

1.3.34. "**Fraud Prevention Provisions**" has the meaning set forth in § 4.1.

1.3.35. "**Governmental Payer**" shall mean the Medicare Program and Medicaid Program.

1.3.36. "**HIPAA**" shall mean the administrative simplification provisions of the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996)

and the implementing regulations issued thereunder, 45 C.F.R. Parts 106, 162, and 164, and shall incorporate by reference the provisions of the Health Information Technology for Economic and Clinical Health Act (Title XIII of Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5 (2009)) pertaining to Protected Health Information.

1.3.37. "**Injured Person**" means the person identified in an Underlying Lawsuit who was alleged to have suffered physical injury, illness or death as a result of exposure to Emtal Talc.

1.3.38. "**Interim Claims Period**" means the time period commencing upon the Court's entry of the Preliminary Approval Order and ending on the Effective Date.

1.3.39. "**Level 1 Injury**" means a non-malignant asbestos disease injury, which requires a diagnosis of Bilateral Asbestos-Related Nonmalignant Disease.

1.3.40. "**Level 2 Injury**" means an asbestos disease injury diagnosis of Malignant Asbestos Disease Other Than Mesothelioma and Level 3 Claim Lung Cancer.

1.3.41. "**Level 3 Injury**" means an asbestos disease injury diagnosis of either: (a) Primary lung cancer with evidence of underlying Bilateral Asbestos-Related Nonmalignant Disease; or (b) Severe Asbestosis.

1.3.42. "**Level 4 Injury**" means an asbestos disease injury diagnosis of Mesothelioma.

1.3.43. "**Lien**" shall mean any legally enforceable claim, lien, and/or reimbursement right arising by statute, contract or otherwise.

1.3.44. "**Lien Administrator**" means a third party engaged by the Settlement Trustee to perform the duties and responsibilities assigned to the Lien Administrator in the Settlement Agreement and the Plan of Distribution.

1.3.45. "**Malignant Asbestos Diseases Other than Mesothelioma and Level 3 Claim Lung Cancer**" means the following:

    (a)    A diagnosis of a primary lung cancer without evidence of underlying Bilateral Asbestos-Related Nonmalignant Disease and supporting medical documentation; or;

    (b)    A diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus (a) evidence of underlying Bilateral Asbestos-Related Nonmalignant Disease; and (b) supporting medical documentation.

1.3.46. "**Medicaid Program**" means the federal program administered by the states under which certain medical items, services, and/or prescription drugs are furnished to Medicaid beneficiaries under Title XIX of the Social Security Act, 42 U.S.C. § 1396–1, *et seq*., as amended from time to time.

1.3.47. "**Medicare Program**" means the Medicare Parts A and B federal program administered by CMS under which certain medical items, services, and/or prescription drugs are furnished to Medicare beneficiaries under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq*., as amended from time to time.

1.3.48. "**Medicare Part C or Part D Program**" means the program(s) under which Medicare Advantage, Medicare cost, and Medicare health care prepayment plan benefits and Medicare Part D prescription drug plan benefits are administered by private entities that contract with CMS.

1.3.49. "**Motion for Preliminary Approval**" shall have the meaning set forth in § 8.1 of this Agreement.

1.3.50. "**MSP**" means the Medicare Secondary Payer Act set forth at 42 U.S.C. § 1395y(b), as amended from time to time, and implementing regulations, and other applicable written CMS guidance.

1.3.51. "**Notice**" means the long-form notice to Class Members of this Agreement to be submitted to the Court for approval and, once approved by the Court, to be disseminated to Class Members pursuant to the Notice Plan.  The Notice shall be in substantially the form of the proposed long-form notice attached as Exhibit A.

1.3.52. "**Notice Agent**" means the individual or company engaged to design the Notice Plan and thereafter, in conjunction with the Settlement Administrator, to execute the Notice Plan.

1.3.53. "**Notice Plan**" means the plan to be approved by the Court for providing Notice to Class Members in accordance with Federal Rule of Civil Procedure 23(e).

1.3.54. "**Opt-Out**" means any Class Member that timely and properly submits a request for exclusion from the Class in accordance with the procedures set forth in this Agreement and approved by the Court, and therefore, after the Final Approval Date, is not a Settlement Class Member

1.3.55. "**Opt-Out Deadline**" means 90 days after the date the dissemination of Notice begins pursuant to the Notice Plan.

1.3.56. "**Opt-Out Revocation Deadline**" means 14 days after the Opt-Out Deadline.

1.3.57. "**Other Governmental Payer**" shall mean certain other governmental health care programs with statutory reimbursement or subrogation rights, limited to DHA, Department of Veterans Affairs, and Indian Health Services benefits.

1.3.58. "**Other Party**" means every Person, Entity, or Party other than the Released Parties.

1.3.59. "**Parties**" means the Class Representatives and the Defendants collectively.

1.3.60. "**Person**" means and includes any individual or Entity (excluding Released Parties) who has or had the right to claim damages relating to Emtal Talc exposure either in their own right because of an asbestos bodily injury he or she sustained as result of claimed exposure to Emtal Talc in any form or manner, or as an individual or entity who may have had a right to damages derivatively during the Class Period based on an Injured Person's injury or death such as, without limitation, spouses, heirs, legatees, personal representatives, and wrongful death beneficiaries and assignees.

11

1.3.61. "**Plan of Distribution**" or "**Plan**" means the plan for distributing the Settlement Fund assets that Class Counsel intends to present to the Court in the Motion for Preliminary Approval. The proposed Plan of Distribution is attached to this Agreement as Exhibit C.

1.3.62. "**Preliminary Approval Order**" means the order described in § 8 of this Agreement in which the Court, among other things, grants preliminary approval of this Settlement Agreement, authorizes dissemination of Notice to Class Members, and schedules the Fairness Hearing, and establishes the Claims Period commencement date to enable the Settlement Administrator to perform the Interim Claims Period administration tasks.

1.3.63. "**Primary Claimant**" means a Settlement Class Member who is an Injured Person, or his or her personal representative if deceased, who submits, or is eligible to submit, a claim for compensation to the Settlement Fund.

1.3.64. "**Presumed Class Member List**" means a confidential list, available only to the Court, the Settlement Administrator, the Settlement Trustee, Defendants, and Class Counsel, of those individuals who filed lawsuits against Engelhard/BASF alleging bodily injuries resulting from exposure to Emtal Talc that was compiled based upon discovery undertaken by Plaintiffs in the *Williams* Action.

1.3.65. "**Private Third Party Payer/Provider**" shall mean any healthcare provider, employer, workers' compensation carrier (including a state workers' compensation fund), group health plan, non-group health plan, insurer, Federal Employees Health Benefit plan (such as Blue Cross Federal or Blue 365), or other entity (other than a Governmental Payer, Other Governmental Payer, or Medicare Part C or Part D Program sponsor) that administers, funds, pays, contracts for, or provides medical items, services, and/or prescription drugs to a Settlement Class Member receiving compensation from the Settlement Fund under the Plan of Distribution.

1.3.66. "**Qualified Asbestos Trust**" means any one of the following asbestos claims trusts and related claims resolution facilities from which the Settlement Administrator may request and accept information concerning one or more claimants in support of their Claims for a distribution:

    (a)  AcandS Asbestos Settlement Trust;

    (b)  ASARCO Asbestos Personal Injury Settlement Trust;

    (c)  Combustion Engineering Trust;

    (d)  G-I Holdings Inc. Asbestos Personal Injury Settlement Trust;

    (e)  KACC Asbestos PI Trust;

    (f)  TH Agriculture and Nutrition, L.L.C. Asbestos Personal Injury Trust;

    (g)  The Manville Personal Injury Settlement Trust dated as of November 28, 1988; and

    (h)  The Travelers Common Law Direct Action Settlement Fund (Donald Ward, Administrator).

The identified trusts above that are listed as items (a), (b), (c), (d), (e) and (f) are "**Preferred Qualified Asbestos Trusts**" and those listed as items (g) and (h) are "**Alternative Qualified Asbestos Trusts**".

1.3.67. "**Qualified Settlement Fund**" shall mean a trust, escrow, or similar account as defined under Treasury Regulation § 1.468-B-1, *et seq.*, as amended from time to time.

1.3.68. "**Released Claims**" means all claims (including without limitation, claims for personal injuries, fraudulent concealment, fraud, spoliation, and attorneys' fees and costs), causes of action, actions, damages, costs, or suits, by or on behalf of any Releasing Party, whether liquidated or unliquidated, known or unknown, whether or not concealed or hidden, whether arising by statute, law, or in equity, whether direct, derivative (*e.g.*, loss of support, services, consortium, companionship, society, or affection, or damage to familial relations), representative, class, or individual in nature, under the law of any jurisdiction, which were asserted, could have been asserted, or could in the future be asserted against the Released Parties, that in any way relate to,

13

in whole or in part, or arise out of: (a) any of the allegations, defenses, claims, motions and/or theories raised in or that could have been raised in the *Williams* Action, (b) Underlying Lawsuits, or (c) prior exposure to Emtal Talc.

1.3.69. "**Released Parties**" means BASF, Cahill, Arthur A. Dornbusch II, Thomas D. Halket, Howard G. Sloane, Ira J. Dembrow, and each of their past, present, or future officers, directors, shareholders, owners, affiliates, parents, employees, representatives, agents, principals, insurers, attorneys, partners, subsidiaries, members, administrators, legatees, executors, heirs, estates, successors, and/or assigns.

1.3.70. "**Releasing Parties**" means all Class Representatives, all Settlement Class Members, and each of their past, present, or future administrators, legatees, trustees, executors, heirs, estates, personal representatives, successors, and assigns.

1.3.71. "**Related Lawsuits**" means all past, present, and future actions brought by one or more Settlement Class Members against one or more Released Parties pending in the Court, other than the Action, or in any other federal court, state court, arbitration, regulatory agency, or other tribunal or forum that in any way relate to, in whole or in part, or arise out of: (a) any of the allegations, defenses, claims, motions and/or theories raised in or that could have been raised in the *Williams* Action, (b) Underlying Lawsuits, or (c) prior exposure to Emtal Talc.

1.3.72. "**Settlement Administrator**" or "**Administrator**" means a third party employed to handle and oversee (a) receipt and tallying of opt-outs; (b) receipt and response to class member inquiries and requests for assistance; (c) receipt and processing of claims submissions; and (d) ministerial administration of the settlement.

1.3.73. "**Settlement Amount**" means the settlement consideration defined in § 2.2 of this Agreement.

1.3.74. "**Settlement Fund**" means the non-reversionary Qualified Settlement Fund created pursuant to § 5.2.1 of this Agreement, for the use and benefit of the Settlement Class.

1.3.75. "**Settlement Fund Financial Institution**" shall mean PNC Bank, National Association.

1.3.76. "**Settlement Trustee**" means the person appointed by the Court to (a) serve as the individual trustee of the Settlement Fund who is empowered and charged with the responsibility to administer and distribute the Settlement Fund according to the Plan of Distribution approved by the Court; and (b) serve as Special Master appointed under Federal Rule of Civil Procedure 53 with respect to issues relating to the Plan of Distribution.

1.3.77. "**Settlement Website**" means the secured internet website established and maintained by the Settlement Administrator with the URL "www.EmtalTalcSettlement.com".

1.3.78. "**Served**" with respect to an Underlying Lawsuit's complaint or similar initial pleading shall include, in addition to the means of process service provided by the suit's forum's applicable court rules, the acceptance of service by Engelhard/BASF attorneys or inclusion of the plaintiff in the Presumed Plaintiff List prepared and maintained by the Settlement Trustee.

1.3.79. "**Severe Asbestosis**" means a disease evidenced by (a) a diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological evidence of asbestos, plus (i) TLC less than 65%, or (ii) FVC less than 65% and FEV1/FVC ratio greater than 65%; and (b) supporting medical documentation.

1.3.80. "**Supplemental Agreement**" shall have the meaning set forth in § 11.1 of this Agreement.

1.3.81. "**Underlying Lawsuit**" means a lawsuit filed by or on behalf of a Class Member after March 7, 1984 and prior to March 30, 2011 against Engelhard/BASF based upon an alleged asbestos-related injury arising from exposure to Emtal Talc.

1.3.82. "*Williams* **Action**" or "**Action**" means the class action lawsuit filed in the Court under Civil Action No. 2:11-cv-01754.

## 2.    Class Benefits and Relief

2.1. **Consideration for the Settlement's Benefits and Relief.**

2.1.1. The Class Representatives, by and through Class Counsel, and Defendants, agree that, in consideration for the release of the Released Claims set forth in § 6 of this Agreement, the dismissal with prejudice of the Complaint, and the entry of a bar order by the Court against further suits, the Defendants will, subject to the terms and conditions of this Settlement Agreement, provide the benefits contained in this Section for the use and benefit of Settlement Class Members as well as discharge other obligations imposed on Defendants in this Settlement Agreement.

2.2. **The Settlement Amount and the Settlement Fund**

2.2.1. At the time specified by § 5.2.3 of this Agreement, Defendants shall severally, and not jointly, pay an aggregate sum of Seventy-Two Million Five-Hundred Thousand Dollars ($72,500,000) (the "**Settlement Amount**") in payment for the Releasing Parties' release of the Released Claims, as such are defined in this Settlement Agreement and as ordered in the Final Approval Order, with BASF to pay 60% of the Settlement Amount ($43,500,000) and Cahill to pay 40% of the Settlement Amount. ($29,000,000). The Settlement Amount shall be deposited in the Settlement Fund pursuant to the provisions of § 5.2 herein, to be used for the payment of claims pursuant to, and in accordance with, the Plan of Distribution approved by the Court in the Final Approval Order. BASF shall not, under any circumstances, be responsible for, or liable for, payment of any amount to the Settlement Fund, or to any Settlement Class Members, in excess of

16

Forty-Three Million Five-Hundred Thousand Dollars ($43,500,000), and Cahill shall not, under any circumstances, be responsible for, or liable for, payment of any amount to the Settlement Fund, or to any Settlement Class Members, in excess of Twenty-Nine Million Dollars ($29,000,000).

2.3. **The Cost Fund**

2.3.1. In addition to the Settlement Amount, and at the times specified in § 5.1.1 of this Agreement, Defendants shall severally, and not jointly, pay Three Million, Five-Hundred Thousand Dollars ($3,500,000) (the "**Cost Fund Amount**") for reasonable and necessary costs incurred in designing, establishing, and carrying out the Notice Plan and the Plan of Distribution pursuant to § 3 of this Agreement. BASF and Cahill shall each pay 50% of the Cost Fund Amount. This fund (the "**Cost Fund**") is reversionary, and any unused portion of the Cost Fund, including any interest earned on the unused portion of the Cost Fund, will revert to the Defendants in the proportion of their original funding payment. BASF shall not, under any circumstances, be responsible for, or liable for, payment of any amount to the Cost Fund or any amount related to the designing, establishing, and carrying out the Notice Plan and the Plan of Distribution, in excess of One Million Seven-Hundred-Fifty Thousand Dollars ($1,750,000). Cahill shall not, under any circumstances, be responsible for, or liable for, payment of any amount to the Cost Fund or any amount related to the designing, establishing, and carrying out the Notice Plan and the Plan of Distribution, in excess of One Million Seven-Hundred-Fifty Thousand Dollars ($1,750,000).

2.4. **Class Counsel Fees and Litigation Cost Reimbursement**

2.4.1. In addition to paying the Settlement Amount and Cost Fund Amount, Defendants have agreed to pay for the benefit of the Class as detailed in § 13.1 below, the Class Counsel's attorneys' fees as approved by the Court.

2.5. **Information regarding Emtal Talc Litigation**

2.5.1. The Parties agree that the following documents are and will remain in the public domain, subject to any restrictions imposed by any operative protective orders and/or sealing orders: (a) the *Williams* Action's pleadings; (b) the *Williams* Action's non-privileged depositions (including non-privileged exhibits); (c) non-privileged documents produced or subpoenaed during discovery in the *Williams* Action, and (d) copies of the public non-privileged depositions (including non-privileged exhibits) taken in the New Jersey Superior Court *Sampson*, *Comandini*, *Fuschino*, *Paduano* and *Volk* actions. Such documents may be made available to anyone requesting same at no expense to Defendants, provided however that all parties are bound by, and shall act in compliance with, all operative protective orders and/or sealing orders in making these materials available.

2.5.2. Access to Underlying Lawsuit Documents. Subject to § 2.5.3, at no expense to Defendants, access to non-confidential documents produced in discovery comprising Underlying Lawsuit pleadings and documents shall be restricted to verified Class Members and their attorneys, the Settlement Trustee and its employees, the Administrator, Lien Administrator, Class Counsel, the Court and Court personnel and such other persons that the Settlement Trustee, Class Counsel or the Court in their respective discretion permit.

2.5.3. Qualification Searches. During the Claims Period where a member of the public has a credible good faith belief that he may be a Class Member but is reasonably unable to secure necessary information to determine if he is a Class Member, on request to the Administrator certifying such fact along with stating the basis for the good faith belief he is a class member and providing appropriate identification information, including social security numbers, the Administrator will make a reasonable computer word search of the Underlying Lawsuit

Documents to see if there is match and if so, allow limited time access and download capability to the archival record to search for documents supporting the person's claim to class membership. For avoidance of doubt, the costs of Qualification Searches shall be permitted payments from the Cost Fund under § 5.1.2.

2.6. **No Additional Payments by Defendants.**

2.6.1. Notwithstanding anything to the contrary in this Settlement Agreement, the Notice Plan, the Plan of Distribution, or any other associated documents or agreements, the Defendants will have no additional payment obligations in connection with this Settlement Agreement other than those set forth in § 2.6.2.

2.6.2. For avoidance of doubt, the Defendants shall be required to make only the following payments under this Settlement Agreement:

2.6.2.1. the Settlement Amount ($72,500,000), at the time specified by § 5.2.3;

2.6.2.2. the Cost Fund Amount ($3,500,000), in three payments as specified in § 5.1.1;

2.6.2.3. An amount equal to the attorneys' fee award granted by the Court pursuant to § 13.1, not to exceed the Fee Amount ($22,500,000), at the time specified in § 13.1;

2.6.2.4. An amount equal to the cost reimbursement award granted by the Court pursuant to § 13.1, not to exceed the Cost Reimbursement Amount ($1,200,000), at the time specified in § 13.1.

2.7. **No Reversion of Settlement Fund Amount.**

Defendants shall not assert any claim to, or be entitled to, any refund, remittitur, reversion, return or diminution of the Settlement Fund, or any interest earned thereon, once the Settlement Fund Amount is deposited into the Settlement Fund, except as otherwise expressly provided in this Settlement Agreement in § 11.4.4.

19

**3. Plan of Distribution**

3.1. **Establishment of the Settlement Fund in Full Satisfaction**

3.1.1. The Class Representatives and Settlement Class Members shall look solely to the Settlement Fund being established by this Settlement Agreement for settlement and satisfaction from the Defendants and other Released Parties for any and all Released Claims, provided however, no payments from the Settlement Fund will be paid to any Class Representative or Settlement Class Member prior to the Effective Date.

3.1.2. On and after the Effective Date, the Settlement Fund will be responsible for fully satisfying any and all Released Claims in accordance with the Plan of Distribution approved by the Court. This Settlement Agreement and the Plan of Distribution will be the exclusive remedy for any and all Released Claims by or on behalf of any and all Settlement Class Members against any and all Released Parties, and no Settlement Class Member will recover, directly or indirectly, any sums from any Released Parties for Released Claims other than those received for the Released Claims under the terms of this Settlement Agreement, if any.

3.1.3. Except as may be provided by order of the Court, no Class Representative or Settlement Class Member shall have any individual ownership interest in the Settlement Fund or any portion thereof.

3.1.4. Apart from the payments agreed to and provided in this Settlement Agreement, Defendants shall not be responsible or otherwise liable for any additional payments to the Class Representatives, to Settlement Class Members, to Class Counsel, or to any person or entity who provides administrative, notice, consulting, or other services described in this Settlement Agreement.

3.2. **The Plan of Distribution**

3.2.1. The proposed Plan of Distribution that Class Counsel intends to present to the Court in the Motion for Preliminary Approval is attached to this Agreement as Exhibit C.

3.2.2. Multiple payments to Derivative Claimants shall not be permitted in any Plan of Distribution.  The Plan of Distribution shall contain a "One Derivative Share Rule" provision, meaning no matter how many Derivative Claimants may exist, a family will be entitled to a single derivative payment for Part A compensation.

3.2.3. Subject to provisions of § 11.3, in the event that the Court does not preliminarily approve the proposed Plan of Distribution presented in the Motion for Preliminary Approval, or a proposed Plan that the Court preliminarily approves does not obtain final approval, Class Counsel shall promptly propose a revised or amended Plan, and diligently continue to develop revised and proposed Plans pursuant to the procedures outlined until a Plan is approved and adopted by the Court that becomes final and in effect.  Following consultation in good faith with the Defendants for their suggestions and input on appropriate allocations and claims processes for the Plan of Distribution, Class Counsel shall have the right, responsibility and discretion to design, propose, defend and, if necessary revise or amend, the Plan of Distribution for the allocation and distribution of the Settlement Fund among Class Members, including, but not limited to, devising the Plan's distribution scheme, its eligibility criteria, its claims processes, its lien clearance processes, its dispute resolution mechanisms, and its EIF program elements in order to achieve a fair, reasonable, practicable allocation and distribution of the Settlement Fund to eligible Settlement Class Members that will obtain Court approval.  Plaintiffs will consult with Defendants for their suggestions and input on any proposed revisions, although the parties acknowledge that Plaintiffs, in the exercise of good faith, are not bound to accept them.

3.2.4. Should the Court direct any modification of the Plan of Distribution that requires funding from the Defendants, or either of them, beyond the amounts referenced in § 2.6.2 of this Agreement, then the Defendants shall each have the absolute and unconditional option and right, in their sole discretion, to unilaterally terminate and render null and void this Settlement Agreement.

3.2.5. Defendants agree they will take no adverse position before the Court to any proposed Plan of Distribution by Class Counsel or instigate and/or support any objection to the Plan of Distribution by anyone. Defendants further shall obtain the agreement of co-defendants in the *Williams* Action who are Released Parties to be bound by this term.

3.3. **Extraordinary Injury Fund Requirement on Plan of Distribution's Design**

3.3.1. The Plan of Distribution proposed by Class Counsel to the Court shall allocate Six Million, Five Hundred Thousand Dollars ($6.5 million) of the Settlement Fund into a sub-fund from which the Settlement Trustee may in exceptional and extraordinary cases of mesothelioma injury suffering or economic loss make bounded, discretionary supplemental compensation awards to claimants who timely request consideration for a supplemental award and support their Claims as provided in the Plan of Distribution. Any plan must also provide for the EIF sub-fund to be augmented by any amount of the Settlement Fund Part A sub-fund that is not distributed under the Plan (which reallocation of Settlement Fund assets is referred to as a "**spillover**").

3.3.2. No individual EIF compensation award by the Settlement Trustee may exceed One Hundred Seventy-five Thousand Dollars ($175,000).

3.3.3. In furtherance of the equitable purpose of the EIF, where, for good cause, the Settlement Trustee recognizes extraordinary circumstances exist for doing so, she may waive any EIF

Eligibility Criteria established in the Plan where good cause and equitable reason are found to exist.

3.3.4. The Settlement Trustee's discretion to make or not make an EIF award is full, unfettered and absolute, and there will be no appeal or challenge of her discretionary decision allowed. For avoidance of doubt, the Settlement Trustee shall not be required to make any EIF awards or make awards sufficient to exhaust the EIF sub-fund.

3.3.5. If the EIF (including any "spillover") is not exhausted, the amounts remaining in the EIF sub-fund will then be reallocated to Part B, and used for the payment of Class Representative service awards approved by the Court and approved Part B claims.

3.4. **Lien Administration**

3.4.1. The Motion for Preliminary Approval of the Settlement Agreement will request that the Court appoint a Lien Administrator who shall be responsible to implement and administer processes and procedures as provided in the Plan of Distribution in order to protect the Settlement Fund, the Parties, counsel for the Parties, the Settlement Trustee, the Settlement Administrator and the Lien Administrator against liabilities relating to notice requirements and satisfaction of any Liens on payments being made to class members from the Settlement Fund.

3.4.2. The Plan of Distribution will establish processes and procedures which the Lien Administrator will carry out to (1) identify Liens that may be held or asserted by Governmental Payers, Other Governmental Payers, Medicare Part C or Part D Program sponsors, and Private Third Party Payers/Providers; and (2) satisfy the Lien obligations of BASF, Cahill, Settlement Class Members, and the Settlement Fund, including any relevant reporting obligations under a global lien resolution approach, or facilitating the relevant reporting by providing all necessary reporting information for submission under Defendants' standard operating procedures (whether pursuant to MSP or otherwise), provided however, that each Settlement Class Member receiving

an award from the Settlement Fund (and his or her respective counsel, if applicable) will be solely responsible for the payment, satisfaction and discharge of any all Liens.

3.4.3. Notwithstanding any other provision of this Settlement Agreement relating to timely payment, the Settlement Administrator will not pay any monetary award to a Settlement Class Member who is or was entitled to benefits under a Governmental Payer program, Other Governmental Payer program, or Medicare Part C or D Program prior to either (i) the Lien Administrator's determination of the final amount needed to satisfy the reimbursement obligation that any Government Payer or Medicare Part C or Part D Program sponsor states is due and owing (as reflected in a final demand letter or other formal written communication), and satisfaction and discharge of that reimbursement obligation as evidenced by the Lien Administrator's receipt of a written satisfaction and discharge from the applicable Governmental Payer, Other Governmental Payer, or Medicare Part C and Part D program sponsor or other written proof of satisfaction reasonably acceptable to the Defendants (such as correspondence from each lienholder with the Settlement Class Member's final lien amount and proof of payment); or (ii) the Lien Administrator's determination of the "holdback" amount to be deducted from the monetary award under which such reimbursement obligation will be resolved.

3.4.4. All compensation and payments to the Lien Administrator shall be paid solely from the Cost Fund as permitted payments under § 5.1.2 of this Agreement.  The Lien Administrator may be paid from the Cost Fund: (i) reasonable compensation for its services as agreed to by Defendants and Class Counsel; and (ii) reasonable out-of-pocket costs and expenses directly incurred as a result of the Lien Administrator's responsibilities under the Plan of Distribution.  The Lien Administrator shall submit periodic budgets pursuant to § 5.1.3.4. The Lien Administrator's compensation agreement will be embodied in a signed proposal for services from the Lien

24

Administrator, which will be submitted to the Court in connection with the Lien Administrator's appointment.

3.4.5. Within seven (7) days after the Effective Date, the Settlement Trustee will retain the Lien Administrator appointed by the Court. Class Counsel shall be responsible for negotiating the engagement contract consistent with the charges contained in the Lien Administrator's proposal for services. The Lien Administrator's retention agreement shall further require that it maintain at all times appropriate and sufficient bonding insurance in connection with its performance of its responsibilities under the Settlement Agreement and the Plan of Distribution.

3.4.6. The Settlement Trustee will oversee the Lien Administrator and may request reports or information from the Lien Administrator from time to time.

3.4.7. Each Settlement Class Member, on his or her own behalf, and on behalf of his or her estate, predecessors, successors, assigns, representatives, heirs, beneficiaries, executors, and administrators, in return for the benefits and consideration provided in this Settlement Agreement, will indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities of, the Released Parties against any and all claims by Other Parties arising from, relating to, or resulting from any Lien relating to, or resulting from, compensation or benefits received by a Settlement Class Member pursuant to this Settlement Agreement or the Plan of Distribution.  The amount of indemnification will not exceed the total compensation awarded to the Settlement Class Member under this Agreement for the Settlement Class Member's claim.  **CLASS REPRESENTATIVES AND SETTLEMENT CLASS MEMBERS ACKNOWLEDGE THAT THIS SECTION COMPLIES WITH ANY REQUIREMENT TO EXPRESSLY STATE THAT LIABILITY FOR SUCH CLAIMS IS**

**INDEMNIFIED AND THAT THIS SECTION IS CONSPICUOUS AND AFFORDS FAIR AND ADEQUATE NOTICE.**

3.5. **Proposed Plan's Implementation and Operations During the Interim Claims Period**

3.5.1. During the Interim Claims Period, in order for the Settlement Trustee and Settlement Administrator to perform certain required tasks and functions assigned to them, the proposed Plan preliminarily approved by the Court in its Preliminary Approval Order shall be considered operational and in effect unless amended or superseded by a subsequent Plan or Court order during the Interim Claims Period; provided however that during the Interim Claims Period (a) the Settlement Trustee or Settlement Administrator shall not make any distribution or payment to anyone from the Settlement Fund; (b) the Lien Administrator shall not commence active lien resolution activities beyond those necessary to establish necessary lien administration information systems and processes within the Plan's claims administration or assist the Settlement Administrator or Settlement Trustee in responding to questions or issues relating to lien administration they may be called upon to respond or address.

3.6. **Defendants' relationship and position relating to the Plan's operations**

3.6.1. Defendants shall in good faith cooperate with Class Counsel, the Settlement Trustee, the Administrator and the Lien Administrator in their carrying out the approved Plan of Distribution, provided however that Defendants shall have no obligation to provide information or documents pursuant to this § 3.6.1. Defendants and any other Released Parties shall have no right to object to the payment of any claim to a Settlement Class Member under the approved Plan of Distribution, provided however that Defendants shall be permitted to exercise their rights described in § 3.10.3 of this Agreement.

3.7. **Consultants**

3.7.1. Class Counsel may employ consultants and professionals to assist them in the design, testing, and implementation of the Plan of Distribution and claims processes. The reasonable and necessary costs incurred by Class Counsel any time prior to the Final Approval Order in connection with the design, testing and implementation of the Plan of Distribution for Court approval shall be deemed allowable costs for which Class Counsel may request reimbursement as part of its expense reimbursement award if paid out of pocket, or if deferred by the consultant until the Cost Fund is established, shall be recognized and paid as an settlement administration cost from the Cost Fund.

3.8. **Class Members' Responsibility Relating to Any Allocations and Claims on Plan Distributions to Them**

3.8.1. The Parties agree the proposed Plan of Distribution shall provide that Class Members receiving payments under the Plan of Distribution shall be solely responsible for any legal or contractual duty to which they may be subject to share a distribution received under the Plan of Distribution, including any payments required to extinguish Liens, to pay attorneys' fees and costs, if any, to their lawyers in the Underlying Lawsuits, or to their personal attorneys representing them in the presentation of their claims under the Plan of Distribution, or for allocation and payment of any distribution shares relating to derivative claims, such as for consortium or wrongful death beneficiaries.

3.8.2. The Parties agree the proposed Plan of Distribution shall provide that neither the Parties, the Released Parties, Class Counsel, Defendants' Counsel, the Settlement Trustee, the Administrator, nor the Lien Administrator shall have any responsibility or liability to any other Person regarding the allocation or distribution payments paid to and received by a Settlement Class Member pursuant to this Agreement or the Plan of Distribution, or any claim to share in such payment as described above or otherwise.

27

3.9. **Appointment of the Settlement Trustee, Settlement Administrator, Lien Administrator, Notice Agent, Cost and Settlement Funds Financial Institutions and Other Personnel Necessary to Implement the Settlement Agreement and Plan of Distribution**

3.9.1. The Settlement Trustee, Settlement Administrator, Notice Agent, Lien Administrator, Cost Fund and Settlement Fund Financial Institution and other professionals necessary to implement and carry out the Settlement Agreement and Plan of Distribution shall each look to the Cost Fund as their sole source of compensation and payment, and shall not be entitled to any additional compensation or payment whatsoever from the Defendants.

3.9.2. The Settlement Trustee, Settlement Administrator, Notice Agent, Lien Administrator, and Cost Fund and Settlement Fund Financial Institution and other professionals necessary to implement and carry out the Settlement Agreement and Plan of Distribution shall be subject to Court approval, and all shall serve at the Court's pleasure.  Subject to approval of the candidates by the Defendants, which shall not be unreasonably withheld, Class Counsel shall identify, vet, and nominate candidates for these positions to the Court for appointment who are free from conflicts of interest and shall negotiate the contracts relating to their engagement and compensation.

3.9.3. Without prejudice, Class Counsel intends to nominate to Court the following persons or companies: the Hon. Marina Corodemus, J.S.C. (retired) as the Settlement Trustee; PNC Bank, National Association as the Settlement Fund Financial Institution; Verus LLC as the Settlement Administrator; BrownGreer, PLC as the Notice Agent, Edgar Gentile, III, Esquire as the Lien Administrator and PNC Bank as the Cost Fund and Settlement Fund Financial Institution..

3.9.4. Class Counsel, Defendants' Counsel, the Settlement Trustee, and the Settlement Administrator will establish and implement procedures to promptly detect and resolve possible conflicts of interest between the Settlement Administrator, including, without limitation, its executive leadership team and all employees working on the Plan of Distribution, on the one hand,

and Settlement Class Members and their counsel (if any), Defendants, Defendants' Counsel, or the Settlement Trustee, on the other hand.  Class Counsel, Defendants' Counsel, and the Settlement Administrator may modify such procedures in the future, if appropriate.

3.10. **Settlement Statistics and Reporting**

3.10.1. The Settlement Administrator shall compile and make available to Class Counsel, Defendants, Defendants' Counsel, and the Settlement Trustee, at their request, reports containing summary statistics detailing the implementation of the Plan of Distribution. Such reports shall include information regarding the status of the Plan of Distribution including, without limitation, the Settlement Administrator's fees and expenses, the number of proper and timely Opt-Outs and the identities of such Opt-Outs, the number and type of Claim Submissions received, the number and type of Claim Submissions fully processed and the number and type of Claim Submissions in process.  Class Counsel or Defendants may request an independent certified public accountant, to be appointed by the Court and compensated from the Cost Fund, to audit the fees and expenses charged by the Settlement Administrator.

3.10.2. In addition to the reporting described in Section 3.10.1, the Settlement Administrator shall provide to the Defendants and Class Counsel a monthly report of Claim Submissions adjudicated for eligibility pursuant to the Plan of Distribution as well as the material relied upon by Verus to determine eligibility of the claim, including the claim form.  Defendants and Class Counsel will receive for each Claim Submission adjudicated: (i) the date the Claim Submission was received; (ii) the name and address of the Claimant; (iii) the name and address of counsel for the Claimant, if any; (iv) the name and date of birth of the Injured Person associated with the Claim Submission; (v) the disease or diagnosis of the Injured Person on which the Claim Submission is based; (vi) the name and address of all physicians or medical professionals whose reports or

documentation were included in the Claim Submission; and (vii) the dates of the Injured Person's alleged exposure to Emtal Talc.

3.10.3.   Either Defendant may ask the Settlement Administrator to review a specific approved claim or claims other than EIF claims based upon assertions of fraud in the claim submission or mistake in the adjudication of the claim. Such requests must be in writing, with a copy to Class Counsel and the Other Defendant and provide a good faith basis stating with particularity the circumstances constituting fraud or mistake.

3.10.3.1. The total number of review requests from both Defendants is limited to no more than ten percent (10%) of the total number approved claims by the Settlement Administrator during the Plan's entire administration. Fraudulent claims found in audits conducted under this section shall not count towards the ten percent (10%) limit established in this paragraph. A Defendant's or its insurer's disagreement with a claim's qualifying injury level diagnosis that is correctly based upon a source allowed by the Plan shall not be grounds for requesting that a specific claim be reviewed.

3.10.3.2. Alleged Mistake Reviews. The Settlement Administrator shall review claims of mistake in the adjudication including, if in its discretion such is necessary, requesting additional information about or auditing the claim to make a determination of claim eligibility. The Settlement Administrator will report its finding to the Settlement Trustee, Defendants, and Class Counsel. The determination of the Settlement Administrator is final and non-appealable.

3.10.3.3. Alleged Fraud Reviews. The Settlement Administrator shall review claims of fraud in the claims submission, including, if in its discretion such is necessary, requesting additional information about, or auditing the claim, and report its finding to the Settlement Trustee who, upon review of the claim material and report of the Settlement Administrator, will

make a determination of eligibility of the claim. The Settlement Trustee will report her finding to the Defendants and Class Counsel. This determination by the Settlement Trustee is final and non-appealable.  If either the Settlement Administrator or the Settlement Trustee determines that a claim submission is fraudulent, the Settlement Administrator or Settlement Trustee, as the case may be, shall report the finding to the District Judge and/or Magistrate Judge presiding over the *Williams* Action.

3.10.3.4. The results of all audits under this section shall be reported to all Parties.

3.10.3.5. All requests by a Defendant for a review under this section shall be submitted to the Settlement Administrator no later than 60 days after the Claims Determination Deadline.

3.10.3.6. The Settlement Trustee and Administrator will maintain time records for time spent on Defendants' audits under this section. If Defendants jointly request an audit under this section, the costs shall be paid from the Cost Fund, to the extent possible, with the Defendants each severally responsible for half of the remaining amount. If only one Defendant requests an audit under this section, that Defendant shall be solely responsible for paying those costs.

3.10.4. Following the Effective Date and completion of claims processing and prior to the submission of any application to the Court under the Plan for approval of proposed claim distributions, the Settlement Trustee in consultation with the Settlement Administrator shall provide to the Class Counsel and Defendants a report of payments to be made from the Settlement Fund and claims for payment from the Settlement Fund that were denied.  The report shall include, for each claim to be paid or denied upon Court Approval of the schedule of distributions: (i) the date the Claim Submission was received; (ii) the name and address of the Claimant; (iii) the name and address of counsel for the Claimant on the Claim, if any; (iv) the name and date of birth of the Injured Person associated with the Claim Submission; (v) the disease or diagnosis of the Injured

Person on which the Claim Submission is based; (vi) the name and address of all physicians or medical professionals whose reports or documentation were included in the Claim Submission; and; (vii) the dates of the Injured Person's alleged exposure to Emtal Talc; and (viii) the amount of the payment to be made to the Claimant or, if payment was denied, the reason for the denial.

3.10.5.   Defendants and/or their counsel, as well as any of Defendants' insurers or the insurers' counsel,  shall maintain the confidentiality and shall not reveal or divulge in any way or means the contents of all material and reports provided as described in this Section to anyone except (i) as may be required to enforce its release rights under this Settlement Agreement, (ii) to resolve Defendants' and their respective insurance carrier's insurance coverage issues related to the specific claims of the Class Members against the Defendants, provided the Defendants and their insurers agree to maintain such material as confidential and its use strictly limited to resolving Defendants' claims for insurance coverage. Without limiting the generality of the foregoing, and to avoid any doubt, the information obtained under this section shall not be divulged or used by Defendants or their insurers in any matter or for any use or purpose other than in connection with insurance dispute coverage actions between Defendants and their respective insurance carriers relating to coverage of the claims asserted by Class Members against Defendants. Defendants shall prior to providing this information to any of their insurers or counsel for insurers, obtain their written agreement(s) to abide by this confidentiality covenant and the Court's jurisdiction over them to enforce it, and deliver a copy of such agreement(s) to Class Counsel, the Settlement Administrator and the Settlement Trustee. The Defendants further acknowledge and agree that Class Members may or will be irreparably injured upon a breach of the covenants of this section, and that in the event of an actual or threatened breach, any one or more Class Members shall be jointly and severally entitled to seek and obtain an injunction in addition to any other available

remedy and regardless of whether or not there is an adequate remedy at law available. Defendants shall, within 30 days of the Effective Date, certify that all copies of any material provided pursuant to this Agreement have been destroyed and electronic versions permanently deleted. The Settlement Administrator shall maintain all claims data for 180 days after the Effective Date.

3.10.6. For avoidance of doubt, and notwithstanding anything to the contrary in this Settlement Agreement, no provision of this Settlement Agreement shall be read to limit any person or entity's ability in good faith to report suspected fraud to the Court, subject to the Rules of Professional Conduct.

**4. Audit Rights and Detection and Prevention of Fraud**

4.1. The Settlement Fund's Plan of Distribution will contain anti-fraud and audit procedures ("Fraud Prevention Provisions"), at least meeting the standards described in Section 4.3 below, to be followed by the Administrator and the Settlement Trustee in order to prevent fraudulent submissions to, and payment of fraudulent claims from the Settlement Fund. The Plan's Fraud Prevention Provisions may not be deviated from or changed by the Settlement Trustee or Administrator without first obtaining leave from the Court to do so, with notice of such request to, and right to be heard on, by Class Counsel before changes are implemented. Where the Settlement Trustee, in her discretion, deems it reasonable and necessary, she may request the Court to permit modification of or additional Fraud Prevention Provisions to protect the Settlement Fund and the Claims Process. Class Counsel where good cause exists may also suggest to the Settlement Trustee modification of or additional provisions be added to the Fraud Prevention Provisions to protect the Settlement Fund and the Claims Process. If the Settlement Trustee rejects such requests, Class Counsel may request that the Court consider and order the suggested change(s). Defendants shall have no role in nor any responsibility for the administration of the Plan's Fraud Prevention Provisions.

4.2. All statements made in Claim Submissions submitted to the Settlement Administrator and to the Court shall be and are deemed sworn statements under penalty of perjury that the information provided is true and correct to the best of the Claimants' knowledge, information, and belief.  All statements and documentary proof in a Claim Submission are subject to verification, investigation, review, and/or audit by the Settlement Administrator.

4.3. The Proposed Plan of Distribution will include the following initial Fraud Prevention Provisions to be established and implemented by the Settlement Trustee and Administrator to prevent fraudulent submissions to, and payment of fraudulent claims from the Settlement Fund:

4.3.1. **A statement of purpose, general description and timing of the Audit Program.** The purpose of the Plan's Fraud Prevention Provisions is to ensure (A) that the Settlement Fund accepts and pays only legitimate claims presented by or on behalf of legitimate claimants that are eligible to share in the Settlement Fund under the Plan; and (B) that each claimant or law firm representing a claimant shall maintain during and through the claims administration process any documentation they possess that supports the claim submitted electronically or via hard copy claim form.  The Settlement Administrator's audit of claims will be performed prior to distribution to claimants.

4.3.2. **Claim Audit Sample Selection.**

4.3.2.1. The Settlement Administrator will randomly select from the population of reviewed and qualified claims filed with the Settlement Fund a sample of claims for audit. The sample size will be based upon achieving a confidence level of 95% and a maximum margin of error (ME) of 5%.

4.3.2.2. Each Claimant and Claimant's law firm, if any, of each claim selected for inclusion in the audit sample will be informed that their claim has been selected for audit under the Plan of

Distribution as part of the Settlement's Fund's claim integrity program. Claimants and/or Claimant law firms will be afforded a twenty (20) day opportunity from the date of notice to satisfactorily provide any requested claim documentation for each claimant selected.  If a Claimant or law firm fails to comply with the audit request, the Settlement Trustee may at her discretion direct the Administrator to reject the claim, or if a law firm is involved and represents more than one Claimant before the Settlement Fund, suspend payment of all claims filed by such non-responsive law firm, or take such other action as the Settlement Trustee deems appropriate, including, but not limited to, recommending imposition of any sanctions available under Rule 11 of the Federal Rules of Civil Procedure. The Administrator will complete the audit of a selected claim within thirty (30) days following submission by the Claimant or his or her law firm of all requested claim information to it.

4.3.3. **Audit Documentation Requirements.**

4.3.3.1. For each claim sampled, the claimant or law firm as the case may be, will be required to provide any or all non-privileged documents of the types listed below, as may be specified by the Settlement Administrator, that the claimant or law firm possesses and relied upon in submitting the subject claim to the Settlement Fund:

A.      Complaint or Amended Complaint showing an Underlying Lawsuit filed and Served against Engelhard/BASF (b) which lawsuit credibly asserted in good faith an asbestos injury caused by alleged exposure to Emtal Talc and (c) which lawsuit was dismissed as to Engelhard/BASF voluntarily or involuntarily

B.      Answers to interrogatories

C.      Transcripts of depositions of the claimant and/or co-workers

D.      Verified work histories

E.      Social Security records

F.      All exposure affidavits executed by the claimant, co-workers, or family members related to the claim.

G.      All B-reading interpretations and ILO forms (except for mesothelioma claims).

H.      All chest x-ray/chest CT scan reports (except for mesothelioma claims).

I.      All pulmonary function tests (including tracings and flow volume loops) for Severe Asbestosis and Asbestosis/Pleural Disease with reduced pulmonary function claims only.

J.      All pathology or autopsy reports documenting asbestosis, asbestos-related pleural disease, malignant mesothelioma or a primary carcinoma of the lung, colon, esophagus, larynx, pharynx or stomach.

K.      Admission, history and physical and discharge summaries of any hospitalizations for asbestos-related disease and/or any malignant disease which is recognized as compensable under the Plan.

L.      All physical examination or pulmonary consultation reports.

M.      All non-privileged interpretive reports provided by experts retained by counsel or the claimant to review tests, x-rays, or diagnostic reports in order to render an opinion.

4.3.3.2. The Settlement Administrator will not require the production of original x-ray films and will not be re-reading such films or retesting claimants in the normal course of the claims audit.  However, the Settlement Administrator will reserve the right to request such original evidence and to expand the scope of the audit for targeted populations of claims in the event a pattern of submitting misleading or potentially fraudulent information is found. The standard of analysis for such a pattern shall not be based on the existence of questions of fact among the various testimonial sources, but rather on evidence of an actual intent to deceive or defraud the Settlement Fund. Both the Settlement Administrator and any individual claimant/attorney shall be afforded all due process by the Settlement Trustee in resolving any merits issues on existence of such evidence.

4.3.4. **Review.** The Administrator will review all documentation provided by the claimant or law firms in a timely manner in order to answer the following questions relative to each claim:

36

4.3.4.1. Is there documentation in the Claimant's, Claimant's law firm's or Settlement Fund's database, including the archive documents referred to in the *Williams* Action Settlement Agreement, to support the legitimacy of the claim submitted to the Settlement Fund, including proof that the Claimant is either the Injured Person in the Underlying Lawsuit on which class membership is based or the personal representative or heir of such Injured Person?

4.3.4.2. Where applicable, is the medical documentation submitted consistent with established medical guidelines for establishing a diagnosis of an asbestos-related disease and supportive of the disease level submitted to the Settlement Fund?

4.3.5. **Claimant Counsel's Management Representation Requirement**. Each lawyer, or his or her law firm, representing claimants before the Settlement Fund in connection with claims submitted to the Settlement Fund will be required to sign a law firm management representation letter in a form developed and adopted by the Settlement Trustee in which the law firm represents to the Settlement Fund at least the following:

A. An acknowledgment by the lawyer or its law firm of its responsibility, as the filing law firm, to comply with the requirements of Rule 11(b) of the Federal Rules of Civil Procedure in presenting information to the Settlement Fund and to provide all non-privileged documentation required by the Settlement Fund's claims audit programs; and

B. That all of the claimants to the Settlement Fund the lawyer or law firm are representing before the Settlement Fund, including any claimants selected for audit the lawyer or law firm represents, are either the Injured Person in the Underlying Lawsuit on which class membership is based or the personal representative or heir of such Injured Person. That in making this representation the lawyer or law firm has either first-hand knowledge of the Claimant's identity and relationship to the Injured Person in the Underlying Lawsuit or has taken sufficient and appropriate investigatory measures to verify their identity and relationship of the Claimant to the Injured Person in the Underlying Lawsuit; and

C. To the best of the lawyer or law firm's knowledge and belief, as of the date of the representation letter that lawyer or law firm has provided the Settlement Fund with complete and accurate copies of all of the non-privileged documents requested and required by the audit of the audited claimant(s) pursuant to the terms of the claims audit program.

4.4. If the Settlement Administrator at any time has reason to believe that a Class Member has made an intentional misrepresentation, omission, or concealment of a material fact in a Claim Submission, or has provided fraudulent proof in support of a Claim Submission, the Settlement Administrator shall discontinue processing the Claim Submission and report the alleged intentional misrepresentation, omission, or concealment of material fact and/or alleged fraudulent proof to the Settlement Trustee and Class Counsel.

## 5. Establishment of the Cost Fund and Settlement Fund

### 5.1. Cost Fund Provisions

#### 5.1.1. Creation and Funding of the Cost Fund

5.1.1.1. Within fourteen (14) days of the Court's entry of the Preliminary Approval Order, Class Counsel will obtain a taxpayer identification number for the Cost Fund and thereafter open an interest-bearing escrow account under New Jersey law at the Cost Fund Financial Institution, titled "Emtal Talc Settlement Cost Fund."

5.1.1.2. Upon notification of the account's existence, Defendants shall within thirty (30) days each deposit 30% of their respective shares of the Cost Fund Amount, for a total of One-Million Fifty Thousand Dollars ($1,050,000), by wire transfer into the Cost Fund account at the Cost Fund Bank as the Cost Fund's initial funding.  Should the Settlement Administrator and/or the Settlement Trustee report the amount of the Cost Fund is insufficient to cover current expenses, the next payment may be accelerated upon receipt by Defendants of at least 30 days' notice, with such notice to include explanation from the Settlement Administrator and/or Settlement Trustee of the need for the accelerated payment.

5.1.1.3. Upon entry of the Final Approval Order, Defendants shall within thirty (30) days each deposit an additional 30% of their respective shares of the Cost Fund Amount, for a total of

One-Million Fifty Thousand Dollars ($1,050,000), by wire transfer into the Cost Fund account at the Cost Fund Financial Institution as the second Cost Fund Payment.

5.1.1.4. Within thirty (30) days of this Final Approval Order becoming Final, Defendants shall each deposit the remaining 40% of their respective shares of the Cost Fund Amount, for a total of One-Million Four-Hundred Thousand Dollars ($1,400,000), by wire transfer into the Cost Fund account at the Cost Fund Financial Institution, as the Final Cost Fund Payment.

5.1.1.5. Notwithstanding anything in this Agreement to the contrary, until the Final Approval Order becomes Final and while the Settlement Agreement is in effect, Defendants will be continuously obligated to fund their shares of the entire Cost Fund up to its entire limit so that the Cost Fund and Settlement Trustee may and can timely pay when due all necessary and required Cost Fund expenses incurred for Settlement Notices, Claims Administration, Lien Administration, Settlement Trustee compensation and expenses and other costs permitted from the Cost Fund.  The Defendants will make such additional payments needed to fund such expenses within thirty (30) days of notice of the amount required from the Settlement Trustee, with such notice to include explanation from the Settlement Administrator and/or Settlement Trustee of the need for the accelerated payment. Where such advanced payments are required, the remaining Second and Third Cost Fund payments shall be ratably adjusted to reflect the advanced payments.

5.1.1.6. Defendants' Cooperation Covenant. Defendants agree to cooperate with Class Counsel and the Settlement Trustee in establishing the Cost Fund and in executing the Class Notice, including by providing non-privileged information in their possession reasonably required to carry out notice to the Class Members in accordance with the Preliminary Approval Order, the Notice Plan and the Plan of Distribution. The Cost Fund account shall be treated as a Qualified

Settlement Fund, and any taxes due as a result of income earned by the Cost Fund will be paid from the Cost Fund.

5.1.1.7. The Cost Fund account shall be deemed and considered to be in custodia legis of the Court and remain subject to the Court's jurisdiction until such time as the funds therein have been fully expended or unused funds remitted back to the Defendants according to their interests pursuant to the terms of the Settlement Agreement.

5.1.1.8. The Settlement Trustee shall be authorized to order transfers or withdrawals from the Cost Fund to make permitted payments from the Cost Fund authorized under § 5.1.2.

5.1.2. **Permitted Payments from the Cost Fund**

5.1.2.1. The Cost Fund, together with any income earned thereon, shall be used to pay the reasonable and necessary costs, expenses, and fees of or incurred by:

(a) the Settlement Trustee, Settlement Administrator and Notice Agent pursuant to the terms of the Notice Plan to be submitted and approved by the Court in the Preliminary Approval Order as set forth in § 5.1.3.3 hereof;

(b) the Settlement Trustee, Settlement Administrator and Lien Administrator in connection with their duties and functions during the Interim Claims Period pursuant to the Preliminary Approval Order and under and pursuant to the proposed Plan of Distribution under consideration by the Court or the Plan approved by the Court following entry of the Final Approval Order prior to the Effective Date; and

(c) the Settlement Trustee, Settlement Administrator and Lien Administrator in connection with their carrying out the terms of the Plan of Distribution and the administration of the Settlement Fund as set forth in § 3 hereof.

5.1.2.2. The Settlement Trustee shall have the authority to draw funds on demand from the Cost Fund to pay such costs, expenses and fees.

5.1.2.3. Any fees or costs levied by the Cost Fund Financial Institution in connection with the creation or maintenance of the Cost Fund account will be paid from the Cost Fund as a permitted payment.

5.1.2.4. If, following the Effective Date, permitted payments from the Cost Fund exceed the available balance in the Cost Fund, Class Counsel may petition the Court to authorize the transfer of any necessary amounts from the Settlement Fund to the Cost Fund.  In no event shall the Defendants, or either of them, be required to deposit any funds into the Cost Fund in excess of the Cost Fund Amount.

5.1.3. **Cost Fund Budget and Accounting**

5.1.3.1. The Settlement Trustee shall be responsible for all accounting and internal controls relating to the Cost Fund and for preparing tax returns and paying any taxes on income earned by the Cost Fund.  The Settlement Trustee may delegate the ministerial aspects of these duties to the Settlement Administrator and may engage professionals to prepare tax returns relating to the Cost Fund.  The costs and fees for these functions shall be permitted payments from the Cost Fund authorized under § 5.1.2.1 and paid or reimbursed from the Cost Fund.

5.1.3.2. The Settlement Trustee, with the assistance of the Settlement Administrator who shall be responsible for its preparation, shall provide a monthly accounting to Class Counsel and Defendants' Counsel of amounts paid from the Cost Fund and a final accounting to the Court, Class Counsel, and Defendants' Counsel after final completion of the Notice Plan and the Plan of Distribution.

5.1.3.3. Prior to seeking the Preliminary Approval Order, Class Counsel and Defendants' Counsel shall jointly develop and agree upon an initial Cost Fund budget addressing the expenses of the Notice Plan and the operation of the Settlement Fund administration during the Interim Claims Period. Items on the budget shall be permitted payments from the Cost Fund authorized under § 5.1.2 and the Settlement Trustee shall be authorized to direct withdrawals and transfers from the Cost Fund Account to the Administrator's disbursement account.

5.1.3.4. Following the entry of the Final Approval Order, the Settlement Trustee and Settlement Administrator shall prepare and submit a Cost Fund budget for the next quarter to Class Counsel and Defendants' Counsel. Thereafter, proposed budgets will be due 30 days prior to the beginning of each quarter. Class Counsel and Defendants' Counsel shall review each proposed budget and, within 14 days of submission, either approve the budget as submitted or notify the Settlement Trustee, Settlement Administrator, and opposing counsel of any issues with or objections to the proposed budget. The Settlement Trustee, Settlement Administrator, and counsel will then work promptly and in good faith to resolve them, and, if unable to do so, then promptly apply to the Court for a summary ruling.

5.1.3.5. Once a budget is approved by Class Counsel and Defendants' Counsel, or if a dispute exists and is resolved by the Court, the Settlement Trustee is authorized to transfer funds from the Cost Fund to the Settlement Administrator's disbursement account to pay permitted payments from the Cost Fund authorized under § 5.1.2 in accordance with the budget.

5.1.3.6. After the Settlement Trustee has filed the final accounting with the Court, the Defendants may file a motion with the Court for the return of any unused balance to be shared between them in proportion to the percentage each funded the Cost Fund.

5.2. **Settlement Fund Provisions**

5.2.1. **Creation of the Settlement Fund**

5.2.1.1. Within fourteen (14) days of the entry of the Preliminary Approval Order, Class Counsel and Defendants will take the steps necessary to create the Settlement Fund.

5.2.1.2. The Settlement Trustee, Class Counsel, the Settlement Fund Financial Institution and the Defendants will execute an escrow agreement for the Settlement Fund as approved by the Court, substantially in the form attached as Exhibit E to this Agreement.

5.2.1.3. The Settlement Fund will be treated as a Qualified Settlement Fund, and any taxes due as a result of income earned by the Settlement Fund will be paid from the Settlement Fund.

5.2.2. **Settlement Fund Operations During Interim Claims Period**

5.2.2.1. The Settlement Trustee and Settlement Administrator, once appointed by the Court in the Preliminary Order, shall be empowered to act and serve during the Interim Claims Period as provided in the Preliminary Order and this Settlement Agreement.

5.2.3. **Payment of the Settlement Amount into the Settlement Fund**

5.2.3.1. Within thirty (30) days of the Final Approval Order becoming Final, the Defendants shall fully fund the Settlement Fund by wire transfer of the Settlement Amount ($72,500,000). BASF shall pay 60% of the Settlement Amount ($43,500,000) and Cahill shall pay 40% of the Settlement Amount ($29,000,000).

5.2.3.2. Defendants' payment of the Settlement Amount to the Settlement Fund shall relieve Defendants of any liability with respect to the authentication of claims to payment from the Settlement Fund, the allocation of the Settlement Fund among the Settlement Class Members, and the timing and method of Settlement Fund distributions.

5.2.4. **Settlement Fund Assets**

5.2.4.1. The Settlement Fund will be held in escrow by the Settlement Fund Financial Institution and used by the Settlement Trustee for the use and benefit of Settlement Class Members in accordance with the Plan of Distribution approved by the Court.

5.2.4.2. Interest earned on the Settlement Fund in the escrow account will be added to the balance of the Settlement Fund and distributed in accordance with the Settlement Agreement or the Plan of Distribution approved by the Court, whichever is controlling distributions at the time.

5.2.5. **Settlement Fund's Distribution to Settlement Class Members**

5.2.5.1. Monies from the Settlement Fund shall be distributed to Settlement Class Members in accordance with the Plan of Distribution as approved by the Court only after the Final Approval Order becomes Final and the Effective Date occurs.

5.2.5.2. Settlement Class Members must look solely to the Settlement Fund for settlement and satisfaction of all Released Claims, and only to the extent and as provided in the Settlement Agreement and the approved Plan of Distribution.

**6. Releases**

6.1. **Release of Released Claims**

6.1.1. On the Effective Date, the Releasing Parties shall, by operation of this Settlement Agreement and the terms of the Final Approval Order, fully, finally, and forever release, relinquish, and discharge the Released Parties from any and all of the Released Claims, including without limitation Released Claims based on any injuries or diseases that the Releasing Parties may at any time in the future claim were caused in whole or in part by Emtal Talc.  For clarification purposes and without limiting the foregoing, on the Effective Date, the Releasing Parties specifically release any and all Released Claims that could in the future be asserted against the Released Parties for any injuries, diseases, or damages that have not yet developed, been diagnosed, or been incurred at the time of this Agreement or the Effective Date, including but not limited to asbestosis, lung cancer, mesothelioma, and any other cancer or bodily injury, or any damages therefrom.  To the extent that any law, statute, ordinance, rule, regulation, case, or other legal provision or authority may at any time purport to preserve any Releasing Party's right to hereinafter assert any such unknown and/or unanticipated claims, the Releasing Parties specifically

44

and expressly waive, to the fullest extent permitted by applicable law, each Releasing Party's rights under such law.  The Parties acknowledge that New Jersey law governs the scope of this release.

6.1.2. The Parties agree that upon the Effective Date, all Released Claims shall be dismissed with prejudice in accordance with the Final Approval Order entered by the Court.

6.2. **Covenant Not to Sue**

6.2.1. From and after the Effective Date, for the consideration provided for herein and by operation of the Final Approval Order, the Settlement Class and Class Representatives, and each Settlement Class Member, on behalf of the Releasing Parties, and each of them, covenant, promise, and agree that they will not, at any time, continue to prosecute, commence, file, initiate, institute, cause to be instituted, assist in instituting, or permit to be instituted on their, his, her, or its behalf, or on behalf of any other individual or entity, any proceeding: (a) alleging or asserting any of the Released Claims against the Released Parties in any federal court, state court, arbitration, regulatory agency, or other tribunal or forum; or (b) challenging the validity of the releases contained in this Agreement.  To the extent any such proceeding exists in any court, tribunal, or other forum on the Effective Date, the Releasing Parties covenant, promise, and agree to withdraw, and seek a dismissal with prejudice of, such proceeding forthwith.

6.3. **Effect and Scope of Release; Waiver of Protective Statutes and Rules; and Assumption of Risk**

6.3.1. Any release herein or bar order in favor of the Released Parties shall be, and shall be construed as, a joint tortfeasor release under and pursuant to the laws of New Jersey, including the Comparative Negligence Act, N J. Stat. Ann. § 2A; § 15-5.2, and the Joint Tortfeasors Contribution Law, N.J. Stat. Ann. § 2A:53A-2.

6.3.2. Without limitation of the generality of the foregoing, and for purposes of avoiding any doubt, any Settlement Class Member subject to a verdict or judgment reduction of any claim in

any way related to the Released Claims is not, unless otherwise released in and by this Settlement Agreement or Final Approval Order, releasing any claim or demand that he/she/it has or may have against any individual and/or Entity other than the Released Parties. Unless otherwise provided in this Settlement Agreement and the Final Approval Order, the rights of the Releasing Parties are specifically reserved and preserved to make claims against any and every other individual and/or Entity other than the Released Parties, with such rights reserved to the fullest extent possible and which reserved claims include, without limitation, any and all rights, claims and remedies against Other Parties, and to make claims that said Other Parties are not released and are solely liable to Releasing Parties for injuries, losses and damages. This reservation shall take precedence and be controlling over any provision or term to the contrary.

6.3.3. On the Effective Date, the Releasing Parties shall be deemed to have, and by operation of this Settlement Agreement and the Final Approval Order, in which this provision is incorporated into, shall have, with respect to the subject matter of the Released Claims, expressly waived the benefits of any statutory provisions or common law rules that provide, in sum or substance, that a general release does not extend to claims which the party does not know or suspect to exist in its favor at the time of executing the release, which if known by it, would have materially affected its settlement with any other party. In particular, but without limitation, the Releasing Parties waive the provisions of California Civil Code § 1542 (or any like or similar statute or common law doctrine) and do so understanding the significance of that waiver. Section 1542 provides:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

46

Neither this paragraph nor any other provision of this Settlement Agreement shall be construed to effectuate a general release of claims. The releases provided for in this Settlement Agreement are limited to the Released Claims, as defined above. The Class Representatives acknowledge, and the Releasing Parties shall be deemed by operation of the Final Approval Order to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the Settlement Agreement of which this release is a part.

6.3.4. Each Releasing Party may hereafter discover facts other than or different from those which he, she, or it knows or believes to be true with respect to the Released Claims which are the subject matter of this § 6, but each Releasing Party hereby, expressly waives and fully, finally, and forever settles and releases, upon the Effective Date, any known or unknown, suspected or unsuspected, contingent or non-contingent Released Claims whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional facts.

6.4. **Additional Releases**

6.4.1. On the Effective Date, in consideration of the benefits described and the agreements and covenants contained in this Settlement Agreement, the Releasing Parties shall be deemed to, and by operation of this Settlement Agreement and the Final Approval Order, release, forever discharge, and hold harmless the Released Parties from any and all claims, including unknown claims, arising from, relating to, or resulting from the reporting, transmittal of information, or communications between or among the Defendants, Defendants' Counsel, the Settlement Trustee, the Settlement Administrator, the Lien Administrator, and any Governmental Payer and/or Medicare Part C or Part D Program sponsor regarding any claim for benefits under this Settlement Agreement, including any consequences in the event that this Settlement Agreement impacts,

limits, or precludes ant Settlement Class Member's right to benefits under Social Security or from any Governmental Payer or Medicare Part C or Part D Program sponsor.

6.4.2. On the Effective Date, in consideration of the benefits described and the agreements and covenants contained in this Settlement Agreement, the Releasing Parties shall be deemed to, and by operation of this Settlement Agreement and the Final Approval Order in which this provision is incorporated into, shall, release, forever discharge, and hold harmless the Released Parties from any and all claims, including unknown claims, pursuant to the MSP, or other similar causes of action, arising from, relating to, or resulting from the failure or alleged failure of any of the Released Parties to provide for a primary payment or appropriate reimbursement to a Governmental Payer or Medicare Part C or Part D Program sponsor with a Lien in connection with claims for medical items, services, and/or prescription drugs provided in connection with compensation or benefits claimed or received by a Settlement Class Member pursuant to this Settlement Agreement.

6.5. **Stay of Proceedings**

6.5.1. The Parties agree to request that the Court, in the Preliminary Approval Order, stay this Action and all Related Lawsuits, and enjoin all Settlement Class Members, unless and until they have been excluded from the Class by action of the Court, or until the Court denies approval of this settlement, or until the Settlement Agreement is otherwise terminated, from filing, commencing, prosecuting, intervening in, participating in, and/or maintaining, as plaintiffs, claimants, or class members, any Related Lawsuit.

**7. Deadlines**

7.1. Unless otherwise ordered by the Court, the following deadlines shall apply.  In the case of a discrepancy between the table below and the text of this Agreement, the dates in the following table shall control:

| ACTION | TIMING |
|---|---|
| CAFA Notice Deadline | 10 days after Motion for Preliminary Approval is filed |
| Cost Fund and Settlement Fund Created | 14 days after issuance of the Preliminary Approval Order |
| Notice First Published | 14 days after issuance of the Preliminary Approval Order |
| Defendants' First Payment to the Cost Fund | 30 days after the Cost Fund created |
| Fee and Expense Applications Deadline | 30 days after Notice is first published |
| Opt-Out Deadline | 90 days after the Notice is first published |
| Objection Filing Deadline | 90 days after the Notice of first published |
| Opt-Out Revocation Deadline | 14 days after the Opt-Out Deadline |
| Final Opt-Out List Generated | 6 days after the Opt-Out Revocation Deadline |
| Claims Filing Deadline | 120 days after the Notice is first published |
| Notice Completion Date | 90 days after the Notice is first published |
| Document Submission Deadline | 155 days after the Notice is first published |
| Claims Determination Deadline | 10 days after Document Submission Deadline |
| Defendants' Walk-Away Right Expires | 30 days after the Claims Determination Deadline |
| Class Representatives' Walk-Away Right Expires | 30 days after the Claims Determination Deadline |
| Objection Response Deadline | 60 days after the Claims Determination Deadline |
| Defendants' Deadline for Audit Requests to Settlement Administrator | 60 days after the Claims Determination Deadline |

| ACTION | TIMING |
|---|---|
| Motion for Final Approval | 90 days after the Claims Determination Deadline |
| Fairness Hearing | As determined by the Court |
| Defendants' Second Payment to the Cost Fund | 30 days after issuance of the Final Approval Order |
| Defendants' Third Payment to the Cost Fund | 30 days after the Final Approval Order becomes Final |
| Defendants' Payment of the Settlement Amount to the Settlement Fund | 30 days after the Final Approval Order becomes Final |
| Defendants' Payment of Fee and Cost Awards | 30 days after the Final Approval Order becomes Final |
| Distributions Begin | 45 days after the Final Approval Order becomes Final |

## 8. Preliminary Approval and Class Certification

8.1. **Motion for Preliminary Approval and Class Certification**

8.1.1. Promptly after execution of this Agreement, Class Counsel shall file with the Court a motion for preliminary approval of this Agreement and for certification of the Class for settlement purposes (the "**Motion for Preliminary Approval**").  Class Counsel shall include this Settlement Agreement, the Notice Plan proposed by the Parties, and the proposed Plan of Distribution as exhibits.  The motion shall request that the Court preliminarily approve the Settlement Agreement and enter a Preliminary Approval Order in the form of Exhibit F attached hereto.

8.1.2. The Motion for Preliminary Approval will request the Court appoint the Settlement Trustee, Settlement Administrator, Notice Agent, Lien Administrator and the Cost fund and Settlement Fund Financial Institution required by the Settlement Agreement, and Class Counsel shall present in the motion the qualifications and cost proposals of its nominees for these positions.

8.2. **Parties' Positions With Respect to the Motion**

8.2.1. Defendants will not oppose preliminary or final approval of the Settlement and may file papers to support an Order seeking approval of the Settlement and to respond to arguments that

50

the settlement is not fair or reasonable. Nothing in this section waives or affects the Defendants' rights provided in this Settlement Agreement.

8.3. **Reservation of Rights with Respect to Class Certification.**

8.3.1. The Parties agree that any certification of the Class will be for settlement purposes only pursuant to Federal Rule of Civil Procedure 23(e). The Parties do not waive or concede any position or arguments they have for or against certification of any class for any other purpose in any action or proceeding.

8.3.2. Any class certification order entered in connection with this Settlement Agreement will not constitute an admission by the Defendants, or finding, or evidence, that the Class claims, or the claims of any other Settlement Class Member, are appropriate for class treatment if the claims were contested in this or any other federal, state, arbitral, or foreign forum.

8.3.3. If the Court enters the proposed form of Preliminary Approval Order, the Final Approval Order will provide for vacatur of the Final Approval Order and the Preliminary Approval Order in the event that this Settlement Agreement does not become effective.

**9. Class Action Notices**

9.1. **Preparation and Submission of a Notice Plan**

9.1.1. In connection with the Motion for Preliminary Approval, Class Counsel will submit the Notice Plan to the Court that satisfies the requirements of Fed R. Civ. P. 23 and the Federal Judicial Center ("FJC") guidelines for adequate notice to provide Class Members with notice of the (a) class certification for settlement purposes; (b) proposed settlement; (c) proposed Plan of Distribution; (d) Class Counsel's applications for fees and cost reimbursement awards; (e) Class Members' rights to Opt-Out and/or appear in the matter; (f) Class Members' rights to object to the settlement, to the Plan of Distribution, or to the fee/cost applications; and (g) pertinent hearing and deadline dates.

51

9.1.2. All Parties agree to cooperate with each other, the Settlement Administrator, and the Notice Agent, in the design and execution of the Notice Plan to satisfy applicable due process requirements.

9.1.3. The Notice Agent shall be responsible for researching and preparing the Notice Plan. The Notice Plan and all associated creative and media content is subject to Class Counsel's and Defendants' concurrence, which will be designed and executed to satisfy applicable due process. If Class Counsel, Defendants, and/or the Notice Agent cannot reach agreement on the content of the Notice Plan or the associated creative and media content, the Parties will present the dispute to the Court in connection with the Motion for Preliminary Approval.  For avoidance of doubt, in no event shall Defendants be required to pay any amounts related to the Notice Plan in excess of Defendants' aggregate contribution of $3,500,000 to the Cost Fund as provided by Section 2.3 of this Agreement.

9.2. **Designation of Vendor Responsibility for Notice Plan Elements**

9.2.1. All media and publication elements' creative content, design, production, placements and buys for the Class Notice shall be performed by the Notice Agent. All other elements of the Notice Plan will be performed by the Administrator.

9.3. **Notice Plan Budget and Payment of Notice Plan Costs**

9.3.1. All compensation and payments to the Notice Agent shall be paid solely from the Cost Fund as permitted payments under § 5.1.2 of this Agreement.  The Notice Agent, in conjunction with the Settlement Administrator, shall prepare a budget and proposed schedule for executing the Notice Plan for Class Counsel and Defendants' approval, which shall not be unreasonably withheld.  Compensation and payments to the Notice Agent or the Settlement Administrator that

are within the approved budget shall be deemed permitted payments from the Cost Fund under §

5.1.2.

9.4. **Proposed Notice Agent**

9.4.1. Without prejudice, Class Counsel intends to nominate BrownGreer PLC as the Notice

Agent. BrownGreer will obtain Class Counsel's consent as to all notice subcontractors or

consultants prior to their retention,

9.5. **Best Notice Practicable**

9.5.1. The Parties agree, and the proposed Preliminary Approval Order shall state, that

compliance with the procedures described in this section and embodied in the Notice Plan is the

best notice practicable under the circumstances of the Action and the factual circumstances

surrounding the Class Members and their counsel, and shall constitute due and sufficient notice to

the Class of the pendency of the Action, certification of the Class, the terms of the Settlement

Agreement, and the Fairness Hearing, and shall satisfy the requirements of the Federal Rules of

Civil Procedure, the United States Constitution, and any other applicable law.

9.6. **CAFA Public Official Notification**

9.6.1. Not later than 10 days after this Settlement Agreement is filed with the Court,

Defendants at their expense shall send or cause to be sent to the Attorney General of the United

States and the attorneys general of each State notice of the Settlement Agreement pursuant to 28

U.S.C. § 1715(b).

9.7. **Declaration of Compliance**

9.7.1. The Notice Agent, with the assistance of the Settlement Administrator, shall prepare a

declaration attesting to compliance with the mailing, address-updating, and publication

requirements set forth above. Such declaration shall be provided to Class Counsel and Defendants'

Counsel and filed with the Court no later than 14 days prior to the Fairness Hearing.

**10. Class Members' Opt-Out and Objection Rights and Procedures**

10.1. **Class Members' Exclusion (Opt-Out) Rights and Procedures to Opt Out; Effect of Not- Opting Out**

10.1.1. The Notice will provide instructions regarding the procedures that must be followed to Opt-Out of the Class pursuant to Federal Rule of Civil Procedure 23(c)(2)(B)(v).

10.1.2. The Parties agree that to Opt-Out from the Class, a Class Member must submit a written request to Opt-Out stating to the effect that: "I wish to exclude myself from the Class in *Williams et al. v. BASF Catalysts, LLC.*"—or substantially similar clear and unambiguous expression of intention to exclude oneself from the class action—to the Settlement Administrator postmarked or actually delivered on or before the Opt-Out Deadline. Written requests for exclusion should also contain (a) the Class Member's printed name; (b) the Class Member's address, telephone number; (c) the Class Member's claim identifier number (which will be printed on mailed notices); —or if there is not a claim identifier number or it is not known, then additionally the following—(d) the court, caption and docket number of the Underlying Lawsuit on which class membership is based; (e) the relationship of class member to the Underlying Lawsuit (*e.g.*, Class Member is the Injured Person named in the lawsuit; or is the personal representative of a deceased Injured Person named in the lawsuit; or is the spouse of an Injured Person named in the lawsuit (who may also be class member in his or her own right)); (f) the date of birth and last four digits of the Injured Person's social security number, if known; and (g) the nature of the Injured Person's claimed asbestos-related bodily injury or disease.

10.1.3. For recordkeeping and claims administration purposes, the Settlement Administrator may contact a Class Member directly or through its attorney to obtain missing information items identified in § 10.1.2.

10.1.4. A written request to Opt-Out may not be signed using any form of electronic signature. It must contain the dated personal signature of the Class Member (or personal representative of the Class Member) seeking to exclude himself or herself from the Class. Attorneys for Class Members may submit a written request to Opt-Out on behalf of a Class Member, but such request must also contain the personal signature of the Class Member (or personal representative of the Class Member).  Opt-Outs signed only by attorneys are not permitted.

10.1.5. No person or entity or other Class Member may Opt-Out the interest of, or on behalf of, any other Class Member.  No class-wide, mass, batch, or cohort Opt-Outs are permitted under this Agreement.

10.1.6. All requests to Opt-Out that fail to satisfy the requirements of this § 10.1, as well as any additional requirements that the Court may impose, shall be void.

10.1.7. The Settlement Administrator will create a schedule of Opt-Outs for administrative purposes and provide a copy of all requests to Opt-Out to Class Counsel and Defendants' Counsel within one business day of receipt of each such request.

10.1.8. Valid requests to Opt-Out from the Class will become effective on the date the Final Approval Order is entered. No later than the Opt-Out Revocation Deadline, any Class Member may seek to revoke his or her Opt-Out from the Class and thereby receive the benefits of this Settlement Agreement by submitting a written request to the Settlement Administrator stating "I wish to revoke my request to be excluded from the Class" (or substantially similar clear and unambiguous language), and also containing the Class Member's printed name, address, phone number and date of birth. The written request to revoke an Opt-Out must contain the personal signature of the Class Member seeking to revoke his or her Opt-Out.

10.1.9. No later than seven days after the Opt-Out Revocation Deadline, the Settlement Administrator shall prepare and deliver to Class Counsel and Defendants' Counsel a report stating the total number of individuals who have submitted timely, valid, and final Opt-Outs. Such individuals will not be entitled to receive any relief under this Settlement Agreement, or to object to the Settlement Agreement unless they irrevocably revoke their opt-out as provided in § 10.1.8.

10.1.10. Class Counsel shall promptly file with the Court the report provided for in § 10.1.9 of this Agreement.

10.1.11. Any Class Member that does not properly and timely submit a request to Opt-Out as required in this Agreement shall be deemed to have waived all rights to Opt-Out, shall be deemed a Settlement Class Member for all purposes under this Agreement, will in all respects be bound by all terms of this Settlement Agreement and the Final Approval Order upon the Effective Date, will be entitled to all procedural opportunities and protections described in this Settlement Agreement and provided by the Court, and to all compensation and benefits for which they qualify under its terms, and will be barred permanently and forever from commencing, filing, initiating, prosecuting, asserting, and/or maintaining any and all Released Claims against any Released Parties in any court of law or equity, arbitration tribunal, or administrative or other forum.

10.2. **Objections**

10.2.1. Provided a Class Member has not submitted a written request to Opt-Out as set forth in § 10.1.2, the Settlement Class Member may present written objections, if any, explaining why he or she believes (a) the Settlement Agreement should not be approved by the Court as fair, reasonable, and adequate; or (b) that the proposed Plan of Distribution should not be approved and adopted; or (c) that Class Counsel's applications for fees and cost reimbursement awards should not be granted; or (d) that the Class Representatives' application for service  awards should not be granted. No later than 90 days after the Notice is first published, a Settlement Class Member who

wishes to object must file with the Court, or as the Court otherwise may direct, a written statement of the objection(s). The written statement of objection(s) must include a detailed statement of the Settlement Class Member's objection(s), as well as the specific reasons, if any, for each such objection, including any evidence and legal authority the Settlement Class Member wishes to bring to the Court's attention. That written statement also must contain the Settlement Class Member's printed name, address, telephone number, and date of birth, and provide evidence establishing that the objector is a Settlement Class Member (such as a claim identifier number, or reference to or a copy of Underlying Lawsuit paper and evidence of relationship or connection to the suit), and any other supporting papers, materials, or briefs the Settlement Class Member wishes the Court to consider when reviewing the objection. A written objection may not be signed using any form of electronic signature. It must contain the dated personal signature of the Settlement Class Member making the objection. The Court shall determine whether any Settlement Class Members who do not follow the procedures will have waived any objections they may have.

10.2.2. A Settlement Class Member may object on his or her own behalf or through an attorney hired at that Settlement Class Member's own expense, provided the Settlement Class Member has not submitted a written request to Opt-Out, as set forth in § 10.1.2. Attorneys asserting objections on behalf of Settlement Class Members must: (i) file a notice of appearance with the Court by the date set forth in the Preliminary Approval Order, or as the Court otherwise may direct; (ii) file a sworn declaration attesting to his or her representation of each Settlement Class Member on whose behalf the objection is being filed or a copy of the representation contract (to be filed *in camera*) between that attorney and each such Settlement Class Member; and (iii) comply with the procedure described in this Section and any other procedures established by the Court.

10.2.3. A Settlement Class Member (or counsel individually representing him or her, if any) seeking to make an appearance at the Fairness Hearing must file with the Court, by the date set forth in the Preliminary Approval Order, or as the Court otherwise may direct, a written notice of his or her intention to appear at the Fairness Hearing, in accordance with the requirements set forth in the Preliminary Approval Order.

10.2.4. Any Settlement Class Member who fails to comply with the provisions of this Section will waive and forfeit any and all rights he or she may have to object.

10.2.5. Class Counsel and/or Defendants, with leave of Court, may take discovery of an objector in connection with their objection.

## 11. Termination

11.1. **Defendants' Walk-Away Right**

11.1.1. Without limiting any other rights set forth in this Settlement Agreement, if the number of timely, valid, and final Opt-Out submitted to the Settlement Administrator in accordance with § 10.1 exceed the termination right option number specified in a separate, confidential supplemental agreement between the Class Representatives and Defendants of even date with this Agreement (the "**Supplemental Agreement**"), BASF and Cahill shall each have the absolute and unconditional option and right, in their sole good faith discretion, to unilaterally terminate and render null and void this Settlement Agreement by written notice of election to terminate to the Court and the Parties. The Supplemental Agreement will not be filed with the Court unless required by the Court or unless and until a dispute as between the Class Representatives and the Defendants concerning its interpretation or application arises. Should the Supplemental Agreement be filed with the Court, the Parties agree such filing shall be made under seal.  The Fairness Hearing will be scheduled so as to permit the determination of this condition subsequent event and Defendants'

right to terminate.  An election to terminate under this section must be exercised, if at all, no later than thirty (30) days after the Claims Determination Deadline.

11.2. **Class Representatives' Walk-Away Right**

11.2.1. Without limiting any other rights set forth in this Settlement Agreement, the Class Representatives will have the absolute and unconditional right, in the Class Representatives' sole good faith discretion, through Class Counsel, to unilaterally terminate and render null and void this Settlement Agreement if the Settlement Administrator determines the payment amount under the Plan of Distribution to each qualified mesothelioma claimant will be less than $100,000. The Fairness Hearing will be scheduled so as to permit the determination of this condition subsequent event and Class Representatives' right to terminate, through Class Counsel.  An election to terminate under this section must be exercised, if at all, no later than thirty (30) days after the Claims Determination Deadline.

11.3. **Parties' Termination Rights**

11.3.1. Class Representatives collectively, through Class Counsel, and the Defendants individually have the absolute and unconditional right, in their respective sole discretion to terminate and render null and void this class action settlement and Settlement Agreement if (i) the Court, or any appellate court(s), rejects, modifies, or denies approval of any portion of this Settlement Agreement that the Class Representatives, through Class Counsel, or the Defendants determine is material, including, without limitation, the Releases, the definition of the Settlement Class, or the payment amounts set forth in § 2 of this Settlement Agreement, or (ii) the Court, or any appellate court(s), does not enter or completely affirm, or alters or expands, any portion of the proposed Preliminary Approval Order or the proposed Final Approval Order that the Class Representatives, through Class Counsel, or the Defendants, in their sole discretion, believe is

material. Such written election to terminate this Settlement Agreement must be made to the Court within thirty (30) days of such Court order.

11.3.2. Class Representatives have the absolute and unconditional right to terminate and void this Settlement and Settlement Agreement if either BASF or Cahill fails to pay their respective share of the Settlement Fund or the Cost Fund on the due date specified in this Agreement.

11.3.3. Notwithstanding anything to the contrary in Section 11.3.1, Class Representatives and Defendants may not terminate and render null and void this Class Action Settlement and Settlement Agreement on the basis of any Class Representative service award or any attorneys' fees and costs award that is ordered, or modified, by the Court or any appellate court(s), unless the Court awards a Class Representative service award or attorneys' fees and costs award that exceeds the respective amounts set forth in Section 2 of this Agreement. Any order or proceeding relating to the Class Representative service award or any attorneys' fees and costs award, or any appeal from any order relating thereto or reversal or modification thereof, shall not operate to terminate or cancel the Settlement, or affect or delay the finality of the Final Approval Order Judgment approving the Agreement and settlement of the *Williams* Action set forth herein.

11.4. **Post-Termination Actions**

11.4.1. In the event this Settlement Agreement is terminated or becomes null and void, this Settlement Agreement will not be offered into evidence or used in this or in any other action in the Court, or in any other federal court, state court, arbitration, regulatory agency, or other tribunal or forum for any purpose, including, but not limited to, the existence, certification, or maintenance of any purported class. In addition, in such event, this Agreement and all negotiations, proceedings, documents prepared and statements made in connection with this Agreement, including the Supplemental Agreement, will be without prejudice to all Parties and will not be admissible into

60

evidence and will not be deemed or construed to be an admission or concession by any of the Parties of any fact, matter, or proposition of law and will not be used in any manner for any purpose, and all Parties will stand in the same position as if this Settlement Agreement had not been negotiated, made, or filed with the Court.

11.4.2. In the event this Settlement Agreement is terminated or becomes null and void, then no class shall be deemed certified by or as a result of this Agreement, and the Parties will jointly move the Court to vacate the Preliminary Approval Order and any other orders certifying the Class.  It is the Parties' intent that they shall then be returned to the status quo in the Action, as it existed at the time Court issued its stay order of June 26, 2018 in the Action.  The Parties agree that all stayed proceedings shall resume in a reasonable manner.  In such event, Defendants shall not be deemed to have consented to class certification, and shall retain all rights to oppose class certification, including, without limitation, to certification of the identical class provided for in this Agreement.

11.4.3. If this Settlement Agreement is terminated or becomes null and void after notice has been given, the Parties will provide Court-approved notice of termination to the Settlement Class Members as directed by the Court, the costs of which shall be deemed permitted payments from the Cost Fund authorized under § 2.3 and paid or reimbursed from the Cost Fund. If there is insufficient money in the Cost Fund to pay the costs of such notice, the Court will determine and order which Parties should pay the costs of the required notice.

11.4.4. In the event this Settlement Agreement is terminated or becomes null and void, any unspent and uncommitted monies in the Cost Fund and any or all of the Settlement Fund and the escrow account holding Class Counsel fees and litigation costs, including any interest or income earned, will revert to the Defendants in accordance with their respective allocations in creating the funds.

**12. Final Approval Order and Dismissal with Prejudice**

12.1. The Class Representatives, through Class Counsel, will seek a Final Approval Order from the Court that:

(a) Approves the class action settlement in its entirety pursuant to Federal Rule of Civil Procedure 23(e) as fair, reasonable, and adequate;

(b) Finds that this Settlement Agreement is fair, reasonable, and adequate;

(c) Confirms the certification of the Class for settlement purposes only;

(d) Confirms the appointments of the Class Representatives;

(e) Confirms the appointments of Class Counsel;

(f) Finds that the Notice satisfied the requirements set forth in Federal Rule of Civil Procedure 23(c)(2)(B);

(g) Approves and adopts the Plan of Distribution and directs and decrees the Settlement Trustee, Settlement Administrator and Lien Administrator to execute the Plan;

(h) Directs the parties to establish the Settlement Fund's escrow account to carry out the Plan of Distribution;

(i) Appoints the Settlement Trustee as a Special Master under Federal Rule of Civil Procedure 53 with respect to her duties regarding the execution of the Plan of Distribution;

(j) Permanently bars, enjoins and restrains the Settlement Class Members (and each of them) from commencing, filing, initiating, prosecuting, asserting, and/or maintaining any and all Released Claims against any Released Party;

(k) Dismisses with prejudice the Complaint, without further costs, including claims for interest, penalties, costs and attorneys' fees, except for any pending motion or application for an award of attorneys' fees and reasonable costs and Class Representative service awards;

(l) Permanently bars and enjoins the commencement, assertion, and/or prosecution of any claim for contribution and/or indemnity in the Court, in any other federal court, state

court, arbitration, regulatory agency, or other tribunal or forum between the Released Parties and all alleged joint tortfeasors, together with an appropriate judgment reduction provision;

(m) Confirms the appointment of the Settlement Trustee and the Settlement Administrator, Lien Administrator, Notice Agent, and Cost Fund and Settlement Fund Financial Institution and confirms that the Court retains continuing jurisdiction over those appointed;

(n) Confirms that the Court retains continuing jurisdiction over the Qualified Settlement Fund, created under the Settlement Agreement;

(o) Expressly incorporates the terms of this Settlement Agreement and provides that the Court retains continuing and exclusive jurisdiction over the Parties, the Settlement Class Members and this Settlement Agreement, to interpret, implement, administer and enforce the Settlement Agreement in accordance with its terms; and

(p) Adjudicates Class Counsel's application for fees and costs and Class Representatives' application for service awards.

12.2. The Parties agree that they will consent to adjudication of the motion seeking the Preliminary Approval Order and a Final Approval Order by the Hon. Joseph A. Dickson, U.S.M.J.

12.3. The Parties agree that they will consent to the Hon. Joseph A. Dickson, U.S.M.J. presiding over the Fairness Hearing.

## 13. Attorneys' Fees and Costs; Class Representative Service Awards

13.1. **Class Counsel Attorney Fees and Litigation Cost Reimbursement**

13.1.1. As part of the settlement, the Parties agree that Class Counsel may make fee and expense applications to the Court for an award of attorneys' fees, costs, and expenses to be paid separate and apart from the Settlement Fund and Cost Fund. The motion must be filed no later than 30 days after Notice is first published. The request for an award of attorneys' fees shall not exceed twenty-two million, five hundred thousand dollars ($22,500,000) and the request for an award of

costs shall not exceed one million, two hundred thousand dollars ($1,200,000). The Parties negotiated the amount of these fees, costs, and expenses with the assistance of a mediator and only after they had reached an agreement on the substantive terms of the Settlement on behalf of the Class Members. The Parties agree that these amounts are fair, reasonable and commensurate with the risks and efforts of Class Counsel in undertaking the litigation and the results they achieved for the Class in the settlement. Defendants further agree not to oppose Class Counsel's application for attorneys' fees and costs, or to undermine, or solicit others to do so as long as they do not exceed the foregoing amounts. BASF and Cahill shall each pay severally, and not jointly, 50% of the total of the Fee Amount and the Cost Reimbursement Amount awarded by the Court. Defendants shall not, under any circumstances, be responsible for, or liable for, payment of any fees in excess of Twenty-Two Million, Five-Hundred Thousand Dollars ($22,500,000) or costs in excess of One Million, Two-Hundred Thousand Dollars ($1,200,000). Each of BASF and Cahill shall not, under any circumstances, be responsible for, or liable for, payment of any fees in excess of Eleven Million, Two Hundred Fifty Thousand Dollars ($11,250,000) or costs in excess of Six Hundred Thousand Dollars ($600,000).

13.1.2. Any fee and expense award in conjunction with this Settlement Agreement shall be issued by the Court in a written order. The Court's fee and expense award, however, shall be separate from its determination of whether to approve the Settlement Agreement. In the event the Court approves the Settlement Agreement, but denies, in whole or in part, the fee and expense applications by Class Counsel, the Settlement Agreement shall nevertheless be binding on the Parties. If the Court declines to approve the Settlement Agreement, no fee and expense award shall be paid.

13.1.3. The Defendants shall pay the amount of attorneys' fees and expenses approved by the Court no later than thirty (30) days after the Effective Date, by wire transfer of the full approved amount of such fees and costs into an interest-bearing escrow account as Cohen Placitella & Roth P.C. shall direct.

13.1.4. Defendants shall have no responsibility for, interest in, or liability whatsoever with respect to any allocation among Class Counsel of attorneys' fees and expenses awarded by the Court.

13.1.5. The finality or effectiveness of the Settlement will not be dependent on the Court awarding Class Counsel any particular amount of attorneys' fees and expenses. In the event the Court declines to approve, in whole or in part, the payment of the attorneys' fees and expenses in the amounts requested, the remaining provisions of this Agreement shall remain in full force and effect. No decision by the Court, or modification or reversal or appeal of any decision by the Court, concerning the amount of attorneys' fees and expenses shall constitute grounds for cancellation or termination of this Agreement provided it does not exceed the amounts set forth in §13.1.1. above

13.2. **Class Representative Service Awards**

13.2.1. The Parties agree that Class Representatives and Class Counsel may seek service awards to the Class Representatives not to exceed Fifty Thousand Dollars ($50,000) per Class Representative for a total amount of requested service awards of Three Hundred Thousand Dollars ($300,000), to be paid from the Settlement Fund as provided in the Plan of Distribution.

**14. Enforceability of Settlement Agreement and Dismissal and Barring of Claims**

14.1. It is a condition of this Settlement Agreement that the Court approve and enter the Preliminary Approval Order and a Final Approval Order substantially in accordance with §§ 8 and 12 of this Agreement.

14.2. As a condition to this Settlement Agreement, the Class Representatives and Class Counsel agree to move the Court for, and the Court must grant and enter, a bar order (substantially in the form provided in § 14.3), as part of the Final Approval Order, as set forth in § 12 of this Agreement.

14.3. The Parties agree that on and after the Effective Date, for the consideration provided for herein and by operation of the Final Approval Order, each and every Releasing Party will be permanently barred and enjoined from commencing, filing, initiating, instituting, prosecuting, and/or maintaining any judicial, arbitral, or regulatory action against any Released Party with respect to any and all Released Claims.

14.4. The Parties agree that this Settlement Agreement is not final and enforceable until the Effective Date, except that—

(a) Upon entry of the Preliminary Approval Order, the Defendants will be obligated to establish the Settlement Fund and the Cost Fund and make the payment to the Cost Fund as set forth in § 5.1.1.2 of this Agreement; and

(b) Upon entry of the Preliminary Approval Order, the Stay of Proceedings provided for in § 6.5 shall be effective; and

(c) Upon entry of the Final Approval Order, the Defendants will be obligated to make the second payment to the Cost Fund as required under § 5.1.1.3 .

**15. Denial of Wrongdoing; No Admission of Liability**

15.1. This Settlement Agreement, whether or not it becomes Final or effective, is for settlement purposes only and is to be construed solely as a reflection of the Parties' desire to facilitate a resolution of the Complaint and of the Released Claims.

15.2. The Defendants expressly deny that they have violated any duty to, breached any obligation to, committed any fraud on, or otherwise engaged in any wrongdoing with respect to, the Class Representatives, the Class, any Class or Settlement Class Member, and the courts and

attorneys involved in the Underlying Lawsuits, and expressly deny the allegations asserted in the Complaint, and deny any and all liability related thereto.

15.3. Neither this Settlement Agreement nor any statement, transaction, or proceeding in connection with the negotiation, execution, or implementation of this Settlement Agreement is intended to be or may be construed as or deemed to be evidence of an admission or concession by the Released Parties of (i) the validity of any claim made by the Class Representatives, the Settlement Class, any Class or Settlement Class Member, or any Opt-Out, in this or any other action or proceeding; (ii) any liability or wrongdoing or the truth of any allegations in the Complaint against the Released Parties, or (iii) the infirmity of, or strength of any alleged defense against, the allegations in the Complaint; and neither this Settlement Agreement nor any statement, transaction, or proceeding in connection with the negotiation, execution, or implementation of this Settlement Agreement shall be admissible in evidence for any such purpose in any proceeding.

## 16. Representations and Warranties

16.1. **Class Counsel and Class Representatives.**

16.1.1. Class Counsel represent and warrant that, as of the date of the Settlement Agreement, they have authority to enter into this Settlement Agreement on behalf of the Class Representatives.

16.1.2. Each of Class Representatives, represents and warrants as of the date of the Settlement Agreement that she: (a) has agreed to serve as a representative of the Class proposed to be certified herein; (b) is willing, able, and ready to perform all of the duties and obligations as a representative of the Class; (c) is familiar with the pleadings in *Williams*; (d) has reviewed this Settlement Agreement, including the exhibits attached to it or has received a description of the Settlement Agreement, including the exhibits attached to this Settlement Agreement from Class Counsel, and is familiar with the terms of this Settlement Agreement, including the exhibits attached to this Settlement Agreement and has agreed to its terms; (e) has consulted with, and received legal advice

from, Class Counsel about the litigation, this Settlement Agreement (including the advisability of entering into this Settlement Agreement and its releases and the legal effects of this Settlement Agreements and its releases), and the obligations of a representative of the Class; (f) has authorized Class Counsel to execute this Settlement Agreement; and (g) will remain in and not request exclusion from the Class and will serve as a representative of the Settlement Class until the terms of this Settlement Agreement are effectuated, this Settlement Agreement is terminated in accordance with its terms, or the Court at any time determines that such Class Representative cannot represent the Class.

16.2. **Defendants**.

16.2.1. Each of the Defendants represents and warrants as of the date of the Settlement Agreement that: (a) he, it and they have all requisite individual, corporate or partnership, power and authority to execute, deliver, and perform this Settlement Agreement; (b) the execution, delivery, and performance by the Defendants of this Settlement Agreement has been duly authorized by all necessary action required by law and if applicable the bylaws of the entity; (c) this Settlement Agreement has been duly and validly authorized, executed and delivered by the Defendants; (d) no consent or approval of any person or entity is necessary for such Party to enter into this Agreement; (e) funding has been secured and is and will be available to Defendants to make the financial payments required under this Agreement; and (f) this Settlement Agreement constitutes each Defendants' legal, valid, and binding obligation.

**17. Treatment of Confidential Information**

17.1. Confidentiality of Information Relating to the Settlement Agreement. The Parties will treat all confidential or proprietary information, including claims administration reports and schedules provided the Parties or their counsel by the Settlement Trustee or Settlement Administrator, shared hereunder, or in connection herewith, either prior to, on or after the Effective

Date, and any and all prior or subsequent drafts, representations, negotiations, conversations, correspondence, understandings, analyses, proposals, and letters, whether oral or written, of any kind or nature, with respect to the settlement hereof (**"Confidential Information"**) in conformity with strict confidence and will not disclose Confidential Information to any non-Party without the prior written consent of the Party or Settlement Trustee that shared the Confidential Information, except: (i) as required by applicable law, regulation, or by order or request of a court of competent jurisdiction, regulator, or self-regulatory organization (including subpoena or document request), provided that the Party or Settlement Trustee that shared the Confidential Information is given prompt written notice thereof and, to the extent practicable, an opportunity to seek a protective order or other confidential treatment thereof, provided further that the Party subject to such requirement or request cooperates fully with the Party or Settlement Trustee that shared the Confidential Information in connection therewith, and only such Confidential Information is disclosed as is legally required to be disclosed in the opinion of legal counsel for the disclosing Party; (ii) under legal (including contractual) or ethical obligations of confidentiality, on an as-needed and confidential basis to such Party's present and future accountants, counsel, insurers, or reinsurers; or (iii) with regard to any information that is already publicly known through no fault of such Party or Settlement Trustee. This Settlement Agreement, all exhibits hereto, any other documents filed in connection with the class action settlement, and any information disclosed through a public court proceeding shall not be deemed Confidential Information.

## 18. Communications to the Public

18.1. Public Announcement. The form, content, and timing of any public statement announcing the filing of this Settlement Agreement will be subject to mutual agreement by Class Counsel and Counsel for Defendants. The Parties and their counsel agree not to make any public statements, including statements to the media, that are inconsistent with the Settlement Agreement.

Any communications to the public or the media made by or on behalf of the Parties and their respective counsel regarding the class action settlement will be made in good faith and will be consistent with the Parties' agreement to take all actions reasonably necessary for preliminary and final approval of this class action settlement. Any information contained in such communications will be balanced, fair, accurate, and consistent with the content of the Notice. Neither the Parties nor their respective counsel shall make any false or misleading statements regarding this class action settlement.

18.2. Nothing herein is intended or will be interpreted to inhibit or interfere with the ability of Class Counsel or Defendants' Counsel to communicate with the Court, their clients, or Settlement Class Members and/or their counsel.

**19. Cooperation**

19.1. The Parties and their counsel will use their best efforts to undertake all reasonable actions to accomplish the steps contemplated by this Settlement Agreement and to implement the Class Action Settlement on the terms and conditions provided herein. Nothing in this section waives or affects the Plaintiffs' and/or Defendants' rights provided in this Settlement Agreement.

19.2. The Defendants shall obtain and produce to Class Counsel signed agreements from Released Party co-defendants in the *Williams* Action agreeing to be bound to and abide by the terms of this Settlement Agreement.

19.3. Class Counsel and Defendants' Counsel, subject to ethical obligations owed their respective clients, agree to cooperate and use reasonable efforts to respond to reasonable inquiries relating to the approval of this Settlement Agreement from the United States Department of Justice or any state attorney general. Class Counsel and Defendants' Counsel agree that they shall notify

each other if they receive  any such inquiries and will provide a copy of the inquiry and their response to each other.

19.4. Neither the Parties nor their counsel, directly or indirectly, will instigate or encourage any person to Opt-Out or to object to the class action settlement or assist them in doing so.

19.5. Before filing any motion or petition in the Court raising a dispute arising out of or related to this Settlement Agreement, Class Counsel and Defendants' Counsel will consult with each other in good faith and certify to the Court that they have conferred in good faith.

**20. Continuing Jurisdiction of the Court**

20.1. Following and pursuant to the Final Approval Order, the Court will retain continuing and exclusive jurisdiction, to the fullest extent allowed under the law, over the Settlement, the Settlement Fund, the Cost Fund, the Parties and their counsel, all Class and Settlement Members and any person making a claim against any part of the Settlement Fund or Cost Fund, the Settlement Trustee, the Administrator , the Notice Agent, and the  Lien Resolution Administrator, with respect to the terms of the Settlement Agreement and the Plan of Distribution.

20.2. Any disputes or controversies arising out of, or related to, the interpretation, implementation, administration, and enforcement of this Settlement Agreement will be made by motion to the Court.

20.3. The Court will be requested to appoint the Settlement Trustee as a Special Master under Federal Rule of Civil Procedure 53 charged and empowered to oversee and handle the Plan of Distribution on the Court's behalf.

20.4. All Parties, Settlement Class Members, Class Counsel, any person making a claim against any part of the Settlement Fund or Cost Fund, the Settlement Trustee, the Administrator and Lien Administrator are hereby deemed to have submitted to the exclusive jurisdiction of this

Court for any suit, action, proceeding, or dispute arising out of, or relating to this Settlement Agreement or the Plan of Distribution.

20.5. The terms of the Settlement Agreement will be incorporated into the Final Approval Order of the Court, which will allow that Final Approval Order to serve as an enforceable injunction by the Court for purposes of the Court's continuing jurisdiction related to the Settlement Agreement.

## 21. Choice of Law

21.1. This Settlement Agreement, the Releases hereunder and the Plan of Distribution will be interpreted and enforced in accordance with the laws of the State of New Jersey, without regard to conflict of law principles and notwithstanding any contrary law applicable to the Underlying Lawsuits.

## 22. Miscellaneous Provisions

22.1. Incorporation of Recitals. The Recitals to this Agreement are incorporated into and shall constitute a part of this Agreement.

22.2. No Assignment of Claims. Neither the Class nor any Class Representative or Settlement Class Member has assigned, will assign, or will attempt to assign, to any person or entity any rights or claims relating to the subject matter of the Complaint. Any such assignment, or attempt to assign, to any person or entity any rights or claims relating to the subject matter of the Complaint will be void, invalid, and of no force and effect and the Settlement Administrator shall not recognize any such action.

22.3. Integration. This Settlement Agreement and its exhibits will constitute the entire agreement and understanding among the Parties and supersedes all prior proposals, negotiations, letters, conversations, agreements, term sheets, and understandings, whether written or oral, relating to the subject matter of this Settlement Agreement. The Parties acknowledge, stipulate,

and agree that no covenant, obligation, condition, representation, warranty, inducement, negotiation, agreement, arrangement, or understanding, whether written or oral, concerning any part or all of the subject matter of this Settlement Agreement has been made or relied on except as expressly set forth in this Settlement Agreement.

22.4. Headings. The headings used in this Settlement Agreement are intended for the convenience of the reader only and will not affect the meaning or interpretation of this Settlement Agreement in any manner. Any inconsistency between the headings used in this Settlement Agreement and the text of the sections of this Settlement Agreement will be resolved in favor of the text.

22.5. Incorporation of Exhibits. All of the exhibits attached hereto are hereby incorporated by reference as though fully set forth herein. Notwithstanding the foregoing, any inconsistency between this Settlement Agreement and any exhibits or attachments will be resolved in favor of this Settlement Agreement.

22.6. Amendment. This Settlement Agreement will not be subject to any change, modification, amendment, or addition without the express written consent of Class Counsel and Defendants' Counsel, on behalf of all Parties to this Settlement Agreement, and upon Court approval.

22.7. Mutual Preparation. The Parties have negotiated all of the terms and conditions of this Settlement Agreement at arm's length. Neither the Class or Settlement Class Members nor the Defendants, nor any one of them, nor any of their counsel will be considered to be the sole drafter of this Settlement Agreement or any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Settlement Agreement. This Settlement Agreement will be deemed to

have been mutually prepared by the Parties and will not be construed against any of them by reason of authorship.

22.8. Beneficiaries. This Settlement Agreement will be binding upon and inure to the benefit of the heirs, successors and assigns of the Parties and will inure to the benefit of the Settlement Class Members' and the Released Parties' their respective heirs, successors and assigns. All Released Parties who are not the Defendants are intended third party beneficiaries who are entitled to enforce the terms of the Releases set forth in § 6 of this Agreement. No provision in this Settlement Agreement is intended to create any third-party beneficiary to this Settlement Agreement other than the Released Parties. Nothing expressed or implied in this Settlement Agreement is intended to or will be construed to confer upon or give any person or entity other than Class Representatives, the Settlement Class Members, Class Counsel, the Defendants, the Released Parties, and Defendants' Counsel, any right or remedy under or by reason of this Settlement Agreement.

22.9. Extensions of Time. Class Counsel and Defendants' Counsel may agree in writing, subject to approval of the Court where required, to reasonable extensions of time to implement the provisions of this Settlement Agreement.

22.10. Computing Dates.  For all deadlines under this Agreement, to compute deadlines (a) exclude the day of the event that triggers the period; (b) count every calendar day, including intermediate Saturdays, Sundays, and legal holidays; and (c) include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.

22.11. Execution in Counterparts and Facsimile and Electronic Mail. This Settlement Agreement may be executed in counterparts, and a facsimile signature will be deemed an original

signature for purposes of this Settlement Agreement. Transmission of a signed Agreement by facsimile or electronic mail shall constitute receipt of an original signed Agreement by mail.

22.12. Force Majeure. The Parties will be excused from any failure to perform timely any obligation hereunder to the extent such failure is caused by war, acts of public enemies or terrorists, strikes or other labor disturbances, fires, floods, acts of God, or any causes of the like or different kind beyond the reasonable control of the Parties.

22.13. Waiver. Any failure of any Party to comply with any obligation, covenant, agreement, or condition herein may be expressly waived only in writing, to the extent permitted under applicable law, by the Party or Parties entitled to the benefit of such obligation, covenant, agreement, or condition. The waiver by any Party of any breach of this Settlement Agreement by another Party will not be deemed or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, of this Settlement Agreement.

22.14. Tax Consequences. No opinion regarding tax consequences of this Settlement Agreement or of the compensation payments to Settlement Class Members pursuant to the Plan of Distribution to any individual Settlement Class Member is being given or will be given by the Defendants, Defendants' Counsel, Class Representatives, Class Counsel, the Settlement Trustee, the Settlement Administrator, or Lien Administrator, nor is any representation or warranty in this regard made by virtue of this Settlement Agreement or the Plan of Distribution. Settlement Class Members must consult their own tax advisors regarding the tax consequences of the Settlement Agreement, including any payments provided hereunder and any tax reporting obligations they may have with respect thereto. Each Settlement Class Member's tax obligations, and the determination thereof, are his or her sole responsibility, and it is understood that the tax consequences may vary depending on the particular circumstances of each individual Settlement

Class Member.  The Defendants, Defendants' Counsel, Class Representatives, and Class Counsel, will have no liability or responsibility whatsoever for any such tax consequences resulting from payments under this Settlement Agreement.  To the extent required by law, the Settlement Administrator will report payments made under this Settlement Agreement to the appropriate authorities.

22.15. Government or Private Benefits Consequences. No opinion regarding consequences of this Settlement Agreement or of the compensation payments to Settlement Class Members pursuant to the Plan of Distribution on government or private benefits (such as income or disability payments or health coverage) to any individual Class or Settlement Class Member is being given or will be given by the Defendants, Defendants' Counsel, Class Representatives, Class Counsel, the Settlement Trustee, the Administrator or Lien Administrator, nor is any representation or warranty in this regard made by virtue of this Settlement Agreement or the Plan of Distribution. Settlement Class Members must consult their own advisors regarding any benefits consequences of the Settlement Agreement, including any reporting obligations they may have with respect thereto.

22.16. **Notices.**

22.16.1. All notices to Class Counsel provided for in this Agreement shall be sent by

email and First-Class mail to the following:

| | |
|---|---|
| Christopher M. Placitella | **With copy to:** |
| Cohen Placitella & Roth, P.C. | Harry M. Roth |
| 127 Maple Ave | Michael Coren |
| Red Bank, New Jersey 07701 | Robert L. Pratter |
| cplacitella@cprlaw.com | Cohen Placitella & Roth, P.C. |
| | 2001 Market St., Suite 2900 |
| | Philadelphia, PA 19103 |
| | hroth@cprlaw.com |
| | mcoren@cprlaw.com |
| | rpratter@cprlaw.com |

All notices to Defendants provided for in this Agreement shall be sent by email and First-Class

mail to the following:

| | |
|---|---|
| Peter A. Farrell, P.C. | Nina M. Gussack |
| Kirkland & Ellis LLP | Barry H. Boise |
| 1301 Pennsylvania Avenue, N.W. | Anthony Vale |
| Washington, D.C. 20004 | Pepper Hamilton LLP |
| pfarrell@kirkland.com | 3000 Two Logan Square |
| | 18th & Arch Streets Philadelphia, |
| Eugene F. Assaf, P.C. | Pennsylvania 19103 |
| Kirkland & Ellis LLP | |
| 601 Lexington Avenue | gussackn@pepperlaw.com |
| New York, New York 10022 | boiseb@pepperlaw.com |
| eassaf@kirkland.com | valea@pepperlaw.com |
| | |
| Justin T. Quinn | Angelo A. Stio, III |
| Robinson Miller LLC | Pepper Hamilton LLP |
| One Newark Center, 19th Floor | 301 Carnegie Center, Suite 400 |
| Newark, New Jersey 07102 | Princeton, New Jersey 08543 |
| jquinn@rwmlegal.com | stioa@pepperlaw.com **Attorneys** |
| | **for Cahill** |
| **Attorneys for BASF** | |

22.16.2. All notices to the Settlement Administrator provided for in this Agreement shall

be sent by email and First-Class mail to the following:

Dan Myer

Verus LLC
3967 Princeton Pike
Princeton, NJ 08540
DMyer@verusllc.com

22.16.3. The notice recipients and addresses designated in this Section may be changed by written notice.

**IN WITNESS WHEREOF** the parties hereof have caused this Agreement to be executed by their duly authorized representatives as March 13,  2020

*On behalf of the Class Representatives and the Class:*

_____
Christopher M. Placitella
Harry M. Roth
Cohen, Placitella & Roth PC

| *BASF Catalysts LLC* | *Cahill Gordon & Reindel LLP* |
|---|---|
| By:_____ | By:_____ |
| Its:_____ | Its:_____ |

## Schedule of Exhibits

A.  Notice

B.  Plan of Distribution

C.  Cost Fund Escrow Agreement

D.  Settlement Fund Escrow Agreement

E.  Preliminary Approval Order

78

BASF Catalysts LLC                      Cahill Gordon & Reindel LLP

By: _____      By: _____

Its: _S V P, Global-Legal_         Its: _____

## Schedule of Exhibits

A.  Notice

B.  Notice Plan

C.  Plan of Distribution

D.  Cost Fund Escrow Agreement

E.  Settlement Fund Escrow Agreement

F.  Preliminary Approval Order

Verus LLC
3967 Princeton Pike
Princeton, NJ 08540
DMyer@verusllc.com

22.16.3. The notice recipients and addresses designated in this Section may be changed by written notice.

**IN WITNESS WHEREOF** the parties hereof have caused this Agreement to be executed by their duly authorized representatives as _____, 2020

*On behalf of the Class Representatives and the Class:*

_____
Christopher M. Placitella
Harry M. Roth
Cohen, Placitella & Roth PC

| *BASF Catalysts LLC* | *Cahill Gordon & Reindel LLP* |
|---|---|
| By:_____ | By:_____ |
| Its:_____ | Its: Partner |

## Schedule of Exhibits

A.  Notice

B.  Notice Plan

C.  Plan of Distribution

D.  Cost Fund Escrow Agreement

E.  Settlement Fund Escrow Agreement

F.  Preliminary Approval Order

78

Exhibit A

**UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY**

*Williams v. BASF Catalysts LLC, et al, C.A. No. 2:11-cv-01754.*

# If you or a close relative were ever a plaintiff in a lawsuit against Eastern Magnesia Talc Company, Engelhard Corporation or BASF Catalysts, LLC based on an asbestos-related personal injury or wrongful death due to exposure to Emtal Talc, you could receive a payment from a proposed Class Action Settlement.

*A Federal Court has authorized this Notice. This is not a solicitation from a lawyer.*

- A proposed Class Action Settlement ("the Settlement") will provide a Settlement Fund of $72.5 million to pay claims submitted by asbestos-related personal injury claimants or their surviving heirs, if deceased, who are Class Members. The fund will be established by the Court authorizing this Notice.

- To qualify for monetary compensation, a person must:

  - at any time between March 8, 1984 and March 29, 2011, have filed and served a lawsuit against Engelhard Corporation ("Engelhard"), or one of its subsidiaries (such as Eastern Magnesia Talc Company), or BASF Catalysts, LLC ("BASF"), which acquired Engelhard and its subsidiaries in June 2006, seeking asbestos bodily injury compensation or other relief arising from exposure to Emtal Talc, and

  - before March 30, 2011, have either:

    (A) voluntarily dismissed or terminated the lawsuit as to Engelhard/BASF after the suit was filed, including any voluntary dismissal or release of claims due to settlement; **OR**

    (B) had their lawsuit as to Engelhard/BASF involuntarily dismissed by the presiding Court.

  "Person" includes any individual or entity who has or had the right to claim damages relating to Emtal Talc exposure either in their own right because of an asbestos bodily injury allegedly sustained as result of claimed exposure to Emtal Talc in any form or

manner, or as an individual who may had have a right to damages based on an asbestos injured person's injury or death such as, spouses, heirs, legatees, personal representatives, or wrongful death beneficiaries.

Authorized representatives of deceased, legally incapacitated or incompetent person qualifying as a Class Member and family members of deceased persons qualifying as a Class Member who meet certain criteria may also file claims for monetary awards.

- Engelhard mined, milled, and marketed Emtal talc in the United States from 1967 through 1984, and sold and distributed it to companies for various industrial and commercial applications. Exposure to Emtal Talc may have happened in a variety of manners and occurred occupationally.  This lawsuit, however, ***does not*** involve exposure to any personal cosmetic product such as baby, body, or talcum powder.

- Your or your family member's asbestos personal injury claim lawyer or law firm may have information to assist you in determining if you qualify as class member.

- Your legal rights are affected whether you act or don't act. **Read this Notice carefully**.

- These rights and options—and the deadlines within which to exercise them—are explained in this Notice.

- The Court in charge of this case still has to decide whether to approve the Settlement. Payments will be made only if the Court approves the Settlement and after any appeals are resolved. Please be patient.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT: | |
|---|---|
| **STAY IN THE SETTLEMENT CLASS AND SUBMIT A CLAIM BY _____** | **The only way to get a payment**.<br><br>To receive monetary benefits, you will need to timely submit a claim to the Settlement Fund's Administrator. However, if the Court approves the Settlement you will be bound by the terms and release contained in the Settlement even if you do not submit a claim, unless you exclude yourself as described below. |
| **EXCLUDE YOURSELF** | **Get no payment.**<br><br>This option allows you to pursue a lawsuit against defendant BASF, defendant Cahill Gordon & Reindel LLP and any of their co-defendants about the legal claims in this case. It also is the only option that allows you to ever be part of any other lawsuit against BASF or the other parties being released under the Settlement Agreement for any asbestos-related personal injury or wrongful death claim, whether the injury or claim is known or unknown, including any potential subsequent asbestos-related personal injury or wrongful death claim that may arise in the future. |
| **OBJECT** | Write to the Court if you do not like the Settlement. |

2

| GO TO A HEARING | Ask to speak in Court about the fairness of the Settlement. |
|---|---|
| DO NOTHING | If you do nothing you will remain in the Class Action as a Class Member and will not, in the future, be able to pursue any other lawsuit against BASF, Cahill or the other parties being released under the Settlement Agreement for any asbestos injury or wrongful death claim, known, unknown or potential, including any possible secondary disease or second asbestos injury claim that may arise in the future.  **If you do not timely file a complete Claim Submission with the Administrator, you will not receive compensation.**<br><br>**The deadline to file a Claim Submission is _____.** |

| Important dates and deadlines: | |
|---|---|
| **Class Membership Exclusion (opt-out) Deadline** | (To be added) |
| **Claim Submission Deadline** | (To be added) |
|  |  |
| Objection and Intervention Submission Deadline | (To be added) |
| Fairness Hearing | (To be added) |

This Notice is only a summary of the Settlement Agreement, the Plan of Distribution and your rights. You are encouraged to carefully review the complete Settlement Agreement and Plan of Distribution at www.EmtalTalcSettlement.com. The Settlement Agreement and Plan of Distribution are also on file in the office of the Clerk of the Court for the U.S. District Court for the District of New Jersey in Newark, New Jersey (see Question __for the address). You can also get this information by calling 1-8XX-000-0000 and requesting copies.

*Please do not write, email or call the Court or Clerk of Court for additional information.*

## What This Notice Contains

1.   Why did I get this Notice? .................................................................................. 5

2.   What is this lawsuit? ........................................................................................... 5

3.   What is a class action? ....................................................................................... 6

4.   What are the claims, issues and defenses in this class action? ........................... 7

5.    How many class members are there? ..................................................................... 8

6.    Why is there a settlement? ................................................................................... 9

**WHO IS INCLUDED IN THE SETTLEMENT?** ................................................................. 10

7.    How do I know I am a class member? ............................................................... 10

8.    What if I am not sure whether I am included in the Settlement Class? ............. 11

9.     Do I need to hire a lawyer to represent me in the Settlement? ....................... 12

**THE SETTLEMENT'S BENEFITS—WHAT YOU GET AND WHAT YOU GIVE UP** ........................... 12

10.    What does the Settlement provide? .................................................................. 12

11.    When and how will the Settlement Fund be distributed to Settlement Class Members?. 12

12.     How much money will I receive in the Settlement? ....................................... 13

13.    What am I surrendering by staying in the Settlement Class? ........................... 19

**HOW TO GET A PAYMENT—SUBMITTING A CLAIM FORM** ............................................ 19

14.    What must be done to get a monetary payment from the Settlement Fund? ................ 19

15.    How can I submit a claim to get a monetary payment? .................................... 20

16.    Is there a time limit to file claims for monetary awards or to complete Claim Submissions? ................................................................................................ 20

17.    When would I get my payment if eligible? ....................................................... 21

18.    Can I challenge or dispute the Administrator's determination of my monetary award claim? 21

19.    How do I get out, or exclude myself (opt out) of the Settlement? ................... 21

20.    If I do not exclude myself (opt out), can I sue BASF, Cahill and the other released Parties for the same thing later? ...................................................................................... 22

21.     If I exclude myself, can I still get a payment? ................................................ 22

**THE LAWYERS REPRESENTING YOU** ....................................................................... 22

22.    Do I have a lawyer in this case? ....................................................................... 22

23.    How will the lawyers be paid? ......................................................................... 23

24.    Are the class representatives being paid any compensation for their services? ............. 24

25.    What's the difference been objecting to the Settlement and excluding yourself from the Settlement? ................................................................................................. 25

**THE COURT'S FAIRNESS HEARING** ......................................................................... 25

26.    When and where will the Court decide whether to approve the Settlement? .................. 25

27.    Do I need to come to the hearing? .................................................................... 25

28.    May I speak at the hearing? .............................................................................. 26

**IF YOU DO NOTHING** ............................................................................................. 26

**GETTING MORE INFORMATION** ............................................................................... 27

29.   Are there more details about this Settlement? ................................................................. 27

30.   How do I get more information? ..................................................................................... 27

**BASIC INFORMATION**

### 1.   Why did I get this Notice?

You, someone in your family, or someone for whom you were a personal representative may have been a party in an asbestos injury or wrongful death lawsuit filed between March 8, 1984 and March 29, 2011, that named as a defendant Engelhard Corporation ("**Engelhard**") or BASF Catalysts, LLC ("**BASF**") or one of their subsidiary or affiliated companies (identified later on in this document), which lawsuit was voluntarily or involuntarily dismissed. BASF acquired Engelhard Corporation in June 2006 through a merger transaction. (Collectively Engelhard, BASF and its subsidiary/affiliates are referred to as "**Engelhard/BASF**"). During this period of time, numerous lawsuits were filed against Engelhard/BASF alleging that asbestos injuries were caused through exposure to Emtal Talc, the brand name under which Engelhard's subsidiaries marketed the talc it produced.  These now-dismissed lawsuits together involved thousands of individuals-and are referred to as the "**Underlying Lawsuits**."

After the Underlying Lawsuits were dismissed or resolved, a dispute developed about whether information concerning the existence of asbestos in Emtal Talc was concealed or misrepresented by Engelhard/BASF and its national defense coordination law firm, Cahill Gordon & Reindel ("**Cahill**"), which in turn may have led to the unfair dismissal of asbestos lawsuits against Engelhard/BASF. The dismissals of these Underlying Lawsuits as to Engelhard/BASF are presently the subject of a proposed class action lawsuit pending in the United States District Court for the District of New Jersey (the "**Court**"). The case is known as *Williams, et al v BASF Catalysts, LLC, et. al*, C.A. No. 2:11-cv-01754.

The people who sued are called the **Plaintiffs**. The people or companies they sued are called the **Defendants**. They are more fully identified below.

The Court sent you this Notice because you have a right to know about a proposed settlement of a class action lawsuit and about your options before the Court decides whether to give final approval of the Settlement. If the Court approves the Settlement and after any objections and appeals are resolved, an Administrator appointed by the Court will make the payments that the Settlement allows.

This package explains the lawsuit, the Settlement, your legal rights, what benefits are available, who is eligible for them, and how to get them, along with what claims and rights you would surrender in exchange if the Settlement is approved by the Court and implemented.

### 2.   What is this lawsuit?

This is a federal court class action pending in the United States District Court for the District of New Jersey since 2011. The Plaintiffs contend that the Defendants named in the lawsuit

misled the attorneys representing them or their respective deceased family members in Underlying Lawsuits against Engelhard/BASF about the existence of asbestos in Emtal Talc to support Engelhard/BASF's defense that Emtal Talc did not contain asbestos. Plaintiffs contend these actions led to unfair settlements and/or dismissals of their or their deceased relatives' Underlying Lawsuits as to Engelhard/BASF, as well as to unfair settlements and dismissals of other asbestos claimants' lawsuits against Engelhard/BASF similar to theirs.

"**Emtal Talc**," was a brand of industrial talc sold by a subsidiary of Engelhard that was used in the manufacturing of various industrial products, such as tires and other rubber goods, paints, plaster, caulking, and auto-body repair compounds. This lawsuit ***does not*** involve exposure to any personal cosmetic product such as baby, body or talcum powder.

Engelhard was a chemical company that closed its talc mine in 1984. The Emtal Talc business was a small business within Engelhard, itself a large mining and minerals trading company. BASF bought Engelhard in June 2006.

Plaintiffs claim that from 1984 until 2009, Engelhard (BASF acquired Engelhard in 2006), its former national law firm Cahill, and employees of the two companies, made misstatements or concealed evidence about the existence of alleged asbestos in Emtal Talc and failed to disclose related information to plaintiffs, their lawyers, and courts in the Underlying Lawsuits. Plaintiffs claim that due to these misstatements and omissions, the plaintiffs in the Underlying Lawsuits either (1) voluntarily agreed to dismiss or settle their cases for less than they otherwise would have accepted or (2) had their cases involuntarily dismissed by court order upon motions filed by the Defendants. Defendants deny Plaintiffs' allegations and dispute that any statements about Emtal Talc affected the outcome of the Underlying Lawsuits because (1) the claims in the Underlying Lawsuits were without merit, (2) the amount of asbestos in Emtal Talc, as reported in historical documents, could not have caused harm to human health, and (3) many of the Underlying Lawsuits were resolved for fixed amounts irrespective of the alleged asbestos content of the talc or the number of talc defendants. Defendants further contend that many of the complaints merely named Engelhard without any specific allegation**s** regarding product identification, exposure, or damages. Plaintiffs dispute these arguments.

### 3.     What is a class action?

In a class action, one or more persons, the named plaintiffs (who are also called proposed "class representatives") sue on behalf of themselves and other persons with similar claims. All of these people together are the proposed "Class" or "Class Members." When a class action is settled, one Court resolves the issues for all Class Members (in the settlement context, "Settlement Class Members"), except for those who exclude themselves (opt out) from the Settlement. U.S. Magistrate Judge Joseph A. Dickson is in charge of this class action. In this case, the proposed class representatives are Kimberlee Williams, Gayle Williams, Marilyn L. Holley, Sheila Ware, Donnette Wengerd, and Rosanne Chernick, who are heirs to the persons who originally sued Engelhard in the Underlying Lawsuits. Excluding yourself (opting out) means that you will not receive any benefits from the Settlement. The process for excluding yourself (opting out) is described in Question 19.

6

4.      **What are the claims, issues and defenses in this class action?**

Plaintiffs claim that the Defendants caused harm to Class Members through misstatements or concealing evidence in connection with the Underlying Lawsuits brought against Engelhard/BASF after March 7, 1984 and before March 29, 2011. Plaintiffs allege that, in defending these cases, Defendants claimed through communications to courts and plaintiffs' lawyers, discovery responses, affidavits, and pleadings that:

- Emtal Talc did not contain asbestos;

- No evidence existed that Emtal Talc contained asbestos; and

- No Engelhard employee had ever testified about whether Emtal Talc contained asbestos.

Through discovery in this lawsuit, Class Counsel obtained documents that purported to identify asbestos in some samples of Emtal Talc as well as testimony from former Engelhard scientists and reports from outside laboratories that purported to show asbestos in Emtal Talc. Plaintiffs claim that this information and the documents identified were wrongly concealed from plaintiffs in the Underlying Lawsuits in answers to discovery, in communications with Engelhard's lawyers, and in motions filed with courts seeking dismissal of the Underlying Lawsuits. Plaintiffs further claim that Defendants supported these statements with affidavits they drafted and disseminated to convince plaintiffs in the Underlying Lawsuits and courts that Emtal Talc did not contain asbestos. Plaintiffs claim that, as a result of these misstatements and Defendants' failure to disclose this evidence, plaintiffs in the Underlying Lawsuits (1) agreed to dismiss their personal injury claims against Engelhard (and later BASF); (2) settled them for less than they otherwise would have accepted; or (3) had their cases dismissed by court order for lack of proof that Emtal Talc contained asbestos.

For their part, BASF and Cahill deny these contentions. They claim that the amount of asbestos reported to be found in the documents identified by class counsel are insufficient to cause harm to human health, dispute the merit of the Underlying Lawsuits, dispute the validity of some tests that Plaintiffs claim identify asbestos in certain samples of Emtal Talc, and dispute that any statements about Emtal Talc affected the outcome or settlement amounts of the Underlying Lawsuits. BASF also claims that it was not aware of the facts alleged by the Plaintiffs in this case when it bought Engelhard in 2006 and that BASF did not learn of the circumstances giving rise to Plaintiffs' allegations in this case until 2009. Upon discovery of certain documents and information concerning Emtal Talc in 2009, BASF and its former counsel separated, and BASF retained new counsel which has represented it since 2009. BASF also states that it no longer defends Emtal Talc cases on the basis that there is no evidence that Emtal Talc contained asbestos. Nevertheless, BASF believes and continues to defend these cases on various grounds, including that there is no evidence that the reported levels of asbestos in Emtal Talc could cause harm to human health.

The *Williams* Plaintiffs acknowledge the challenges to succeeding in this litigation. For instance, Class Members would need to prove that plaintiffs in the Underlying Lawsuits were damaged by an evidential record in those cases that did not contain the evidence Defendants are alleged to have concealed or made misstatements about. In addition, the District Court has ruled

that plaintiffs would be required to waive their attorney-client privilege to allow for discovery of otherwise confidential communications with their counsel in their Underlying Lawsuits as to what effect, if any, the alleged misrepresentations had on the plaintiffs or their lawyers in deciding to dismiss or settle with Engelhard in the Underlying Lawsuits. The District Court in *Williams* has already ordered discovery and disclosure by the named Plaintiffs and certain other class members of these types of attorney-client communications.

Defendants also point to evidence developed during discovery in this case of modest settlements amounts (including in the hundreds of dollars) that some plaintiffs accepted in Underlying Lawsuits from other talc manufacturers despite evidence that their talc contained asbestos. These modest settlement amounts accepted from defendants for whom there was proof that their products contained asbestos were similar to what Engelhard paid some plaintiffs. Defendants also claim that case files from the Underlying Lawsuits produced during discovery give rise to other defenses that they could assert to support their contention that Defendants' actions did not cause the settlement or dismissal of the Underlying Lawsuits, such as (1) the absence of evidence of a plaintiff's exposure to Emtal Talc; (2) that some claims were dismissed as untimely filed; (3) that other claims were filed in the wrong jurisdiction; or (4) claims were dismissed due to some other procedural or substantive reason not related to the asbestos content of Emtal Talc.

Earlier in this litigation, Plaintiffs also claimed that Engelhard and Cahill had destroyed documents relating to Emtal Talc. This assertion was made on Plaintiffs' good-faith belief at the time that documents that should have existed no longer exist. However, Plaintiffs acknowledge that, through BASF's efforts to address Plaintiffs' allegations, BASF has since located thousands of documents relating to Emtal Talc, including testing documents that Plaintiffs believe show there was asbestos in Emtal Talc, documents that Plaintiffs claim were not provided to the plaintiffs in the Underlying Lawsuits. BASF has also located various other documents that Plaintiffs had believed were destroyed. Plaintiffs acknowledge that if they were to continue to allege document destruction, they would have to contend with the fact that BASF has located many additional documents since this litigation began. Plaintiffs further acknowledge that the essential key facts are now in the public domain from discovery in *Williams* and other litigation. On the other hand, BASF would have to contend with Plaintiffs' assertion that some number of documents still have not been located and, therefore, were not produced in the Underlying Lawsuits.

### 5. How many class members are there?

A precise number of potential Class Members is not known due to the passage of time since the Underlying Lawsuits were first filed and dismissed, the deaths of many plaintiffs and their lawyers in the Underlying Lawsuits and the state or loss of records. Based on case census information obtained in discovery in *Williams*, case information provided by some of the law firms that represented claimants in the Underlying Lawsuits, and the review of other lawsuit complaints in which hundreds or thousands of purported asbestos claimants were joined into one lawsuit, Verus LLC, the asbestos claims administration firm that is advising Class Counsel, has estimated that there are 19,128 potential class members. This estimated number includes both the individuals who were the persons in the Underlying Lawsuits claiming to have suffered an asbestos-related personal injury or death ("**Injured Persons**") as well as persons who sued

8

Engelhard/BASF derivatively based upon the Injured Person's asbestos-related personal injury or death, such as a spouse or the children or personal representative a deceased Injured Person (these are defined as "**Derivative Claimants**"). Based on an analysis of information produced in discovery, social security numbers and claim records of potential class members who have filed asbestos bodily injury claims against defendants other than Engelhard/BASF, Verus estimates the number of class members who are Injured Persons is in the range of 7,500 to 8,500 persons.

**6.     Why is there a settlement?**

After extensive litigation spanning more than eight years, which included an appeal to the Third Circuit Court of Appeals, extensive discovery (including the production of hundreds of thousands of pages of documents), many depositions, several protracted discovery disputes, and previously failed settlement initiatives, the Plaintiffs and Defendants have agreed to this Settlement.

A settlement is an agreement between a plaintiff and a defendant to resolve a lawsuit. Settlements conclude without the court or a jury ruling in favor of the plaintiff or the defendant. A settlement allows the parties to avoid the cost and risk of a trial, as well as the delays of litigation.

If the Court approves this Settlement, the litigation between the Settlement Class Members and the Defendants is concluded. Only Settlement Class Members are eligible for the benefits summarized in this Notice. The Defendants will no longer be legally responsible to defend against the claims by Settlement Class Members made in this litigation.

The Court has not and will not decide in favor of the Plaintiffs or the Defendants. By reviewing this Settlement, the Court is not making and will not make any findings that any law was broken or that the Defendants did anything wrong. By entering into the Settlement Defendants are not admitting any of the claims made against them, which they continue to completely deny. Conversely, the Plaintiffs are not conceding that any of their claims against Defendants are invalid or without merit.

Under the Settlement, BASF and Cahill will contribute a total of $72.5 million to a Settlement Fund for the benefit of the class identified in Question 7. The monetary awards to Settlement Class Members will vary based on the type of asbestos-related injury that the individual claimant developed. Details on how this Settlement Fund will be allocated and disbursed is described in a proposed Plan of Distribution that has been submitted to the Court in connection with the Settlement. In addition to funding the Settlement Fund, BASF and Cahill will pay the costs of providing notice to the class up to certain limits stated in Settlement Agreement, administration of the claims process, incentive awards to the Class Representatives, and will pay Class Counsel's attorneys' fees and cost reimbursement allowed by the Court.

The Class Representatives and Class Counsel (see Question 22) believe that the proposed Settlement is best for everyone involved. The factors that Class Counsel considered included the uncertainty and delay associated with continued litigation, including trial and appeals, as well as the uncertainty of particular legal issues that are yet to be determined by the Court. Class Counsel balanced these and other substantial risks in determining that the Settlement is fair, reasonable and adequate in light of all circumstances and in the best interests of the Settlement Class Members.

**WHO IS INCLUDED IN THE SETTLEMENT?**

To get money from the Settlement, you must first qualify as a Class Member.

**7.      How do I know I am a class member?**

For settlement purposes the Court has defined the Class in this case to consist of the following:

> All Persons within the United States and its territories who after March 7, 1984 and before March 30, 2011 filed and served a lawsuit against Engelhard/BASF seeking asbestos bodily injury or other relief arising from its Emtal Talc products, and who before March 30, 2011 either: (A) had voluntarily dismissed or terminated the lawsuit as to Engelhard/BASF either before or after the suit was filed, including any voluntary dismissal or release of claims due to settlement; or (B) had their lawsuit as to Engelhard/BASF involuntarily dismissed.

The date on which a voluntary dismissal or termination occurred for purposes of determining class membership is the earlier of either (i) the date on which the agreement or consent by the plaintiff or his/her counsel to dismiss or terminate the lawsuit occurred; or (ii) the date on which the dismissal or termination of the lawsuit was entered by or in the court in which it was pending.

**A.   Which Engelhard/BASF companies had to be named in the Underlying Lawsuits in order to qualify as a Class Member?**

In determining if a prior asbestos lawsuit qualifies  a person as a Class Member, "Engelhard/BASF" means and includes the following companies: BASF Catalysts LLC, BASF Corporation, BASF CE, BASF SE, Engelhard Corporation, Engelhard Industries, Engelhard Minerals & Chemicals Corporation, Minerals & Chemicals Philip Corporation, Eastern Magnesia Talc Co., Porocel Corporation and Pita Realty Ltd.

**B.   What if the injured claimant named in the Underlying Lawsuit is dead?**

The word "Person" in the definition includes any individual (or their estate if deceased) who claimed damages relating to an asbestos bodily injury allegedly sustained from exposure to Emtal Talc in any form or matter. This exposed, injured party (or his or her estate) is referred to in the Settlement as the "Injured Party" and in the Plan of Distributions as the "Primary Claimant".

Where the Injured Party is deceased, his or her personal representative--e.g.- Executor(trix) or Administrator(trix)--is a Class Member and is authorized to submit a claim submission for monetary compensation to the Settlement Fund.

**C.   Do parties who sued Engelhard/BASF in Underlying Lawsuits as spouses or wrongful death claim beneficiaries qualify as class members?**

Yes. The word "Person" in the class definition includes the spouse, personal representative and wrongful death beneficiaries of the individual in the Underlying Lawsuits who is claimed to

have developed an asbestos-related injury where the person was named in the Underlying Lawsuit or the suit brought on his behalf in such capacity. Such parties are referred to as Derivative Claimants in the Settlement and there is a compensation component provided in the proposed Plan of Distribution for Derivative Claimants.

For claims administration purposes all Derivative Claimants of an Injured Person who is the subject of an Underlying Lawsuit are treated as a group under the proposed Plan of Distribution.

### D. Are the attorneys who represented the claimants in the Underlying Lawsuits also class members?

No. The word "Person" in the class definition does not include any attorney or law firm represented plaintiffs in Underlying Lawsuits against Engelhard/BASF.

### 8. What if I am not sure whether I am included in the Settlement Class?

If you are not sure whether you are included, you can obtain information or assistance in a number of ways.

You may contact the attorneys who represented you or your family member in the Underlying Lawsuit and see if they can assist you. Where the Settlement's Administrator, Verus LLC, has information that a lawyer or law firm which filed Emtal Talc asbestos suits is still in practice or has a known and confirmed successor, the Administrator has taken steps to notify the lawyer and law firm (or known successors) of this class action lawsuit and proposed Settlement. Verus has taken steps to provide these lawyers with details on the Settlement and, where known, which of the lawyer's or law firm's clients may qualify as a class member.

You can contact Verus LLC free of charge with questions or for more information by calling 1-888-401-1929 and asking for help regarding the Emtal Talc Settlement. You may also write with questions to Emtal Talc Settlement c/o Verus LLC, 3967 Princeton Pike, Princeton, NJ 08540. During the time period that claims may be submitted to the Administrator, if a member of the public has a credible and good faith reason and belief that he or she may be a class member but is reasonably unable to secure necessary information to determine if he or she is, on written request to the Administrator providing and certifying these facts, along with appropriate identification information, including social security numbers, the Administrator, in turn, will make a reasonable computer word search of a searchable set of Underlying Lawsuit documents provided by the Defendants during discovery in the class action to determine if a possible match exists. If there is a match, the Administrator will provide the person requesting assistance with access for a limited amount of time to search and download documents supporting the person's claim to class membership. There is a form for making such requests available on the Settlement's website or that can be obtained by calling or writing the Administrator.

For more information you can also visit the Settlement's website, www.EmtalTalcSettlement.com.

You also may fill out and submit the Settlement claim submission form described at Questions 14 and 15, to see if you qualify.

**9.     Do I need to hire a lawyer to represent me in the Settlement?**

Class Counsel who are identified at Question 22 below are responsible for all of the common interests of the Class Members. Class Counsel filed and prosecuted this lawsuit, negotiated the Settlement and represent all of the common interests of the Class. However, Class Counsel are **not** responsible for and will not represent you individually in the class action or in making your individual claim to the Settlement Fund for the monetary payments that are described below.

You have the right but are not required to hire your own lawyer to represent you in this class action or in making your individual claim to the Settlement Fund for monetary payments that are described below. Should you hire a lawyer you will be responsible for paying the fee you agree upon with that lawyer which may reduce the amount of any payment to which you may be entitled from the Settlement Fund. For more information on compensation to be paid to lawyers please refer to Question 23 below.

**THE SETTLEMENT'S BENEFITS—WHAT YOU GET AND WHAT YOU GIVE UP**

**10.     What does the Settlement provide?**

Defendants BASF and Cahill have agreed to create and fully fund a non-reversionary Settlement Fund of $72.5 million for use and benefit of Settlement Class Members which will be used for the payment of claims to Settlement Class Members pursuant to, and in accordance with a Plan of Distribution approved by the Court. (See Question 11 for a summary of the Plan.) In addition to the Settlement Amount, these two Defendants have agreed to pay up to $3.5 million to cover the reasonable and necessary costs of designing, establishing and carrying out the Plan of Notice and the Plan of Administration. BASF and Cahill have further agreed for the benefit of the Settlement Class Members to pay Class Counsel's attorneys' fees as approved by Court up to $22.5 million together with reimbursement of Class Counsel's litigation costs approved by the Court up to the sum of $1.2 million.

Defendants BASF and Cahill have additionally agreed as part of the Settlement that copies of the following Emtal Talc litigation materials are and will remain in the public domain: (a) the *Williams Action's* pleadings; (b) the *Williams Action's* non-privileged depositions (including non-privileged exhibits); (c) non-privileged documents produced or subpoenaed during discovery in the *Williams Action* and (d) copies of the public non-privileged depositions (including non-privileged exhibits) taken in the New Jersey Superior Court Asbestos Program's *Sampson, Comandini, Fuschino, Paduano* and *Volk* lawsuits. Such documents may be made available by Class Counsel or their designee to any person, except as limited by any operative sealing orders or confidentiality orders.

**11.     When and how will the Settlement Fund be distributed to Settlement Class Members?**

If the Settlement is approved and becomes final, the Settlement Fund will be distributed according to a Plan of Distribution approved by the Court. As part of the class action settlement approval proceedings, the Court is considering a proposed Plan of Distribution which is described in this Notice. A copy of the Proposed Plan is available on the Settlement's website or can be

obtained from the Administrator by calling or writing it to request a copy. The Plan of Distribution was designed by Class Counsel with the assistance of consultants on asbestos claims facility design and operations, including Verus LLC. The Defendants are not responsible for the Settlement Fund's distribution design, allocations, adjudications or payments and will have no role in the Settlement Fund's distribution once the Settlement is approved.

The Settlement Fund's claims facility and allocation and distribution processes will be managed by a Settlement Trustee appointed by the Court who will also be appointed to serve as a Special Master with adjudicatory powers regarding the fund's awards and payments as is necessary to carry out the Plan. The Court has been asked to appoint the Honorable Marina Corodemus, J.S.C (Retired) to fill this position. She is a former New Jersey Superior Court judge who presided over New Jersey's Mass Tort Program. A biography of Judge Corodemus is available on the Settlement's website. Currently Judge Corodemus is serving as the Court's Interim Settlement Trustee. In this capacity, she is setting up and conducting the interim claim administration operations and performing the duties required to be performed under the parties Settlement Agreement and the Court's Preliminary Approval Order during the time the Court is considering the pending request for final approval of the Settlement.

The Settlement Trustee will be assisted in its execution of the Plan of Distribution by a third-party claims administration company appointed by the Court. The Court has been asked to appoint Verus LLC of Princeton, New Jersey, as the Administrator. Verus LLC has served as a consultant to Class Counsel in designing the Plan of Distribution. The Settlement Fund's administrator is authorized to receive, process and make provisional determinations of claims to the Fund (which are all subject to review, modification or approval by the Settlement Trustee), establish and maintain the Settlement Fund's claims processes, books, records and internal controls, handle the Fund's routine inquiries and communications, and make claim disbursements once claim distribution schedules are approved by the Court. Verus is currently serving as the Interim Administrator to perform certain administration operations and duties relating to the proposed Settlement that are required to be performed under the parties' Settlement Agreement and the Court's Preliminary Approval Order.

The Settlement Trustee under the Plan and Settlement Agreement is authorized, subject to Court approval, to retain a lien resolution company ("Lien Administrator"). The Lien Administrator will, as a settlement benefit, assist each Settling Class Member claimant to determine the existence of Government Liens and the amounts needed to clear and resolve such liens. The terms of the Settlement Agreement require that a claimant to the Fund must clear these Government Liens. The Court has been asked to appoint Edgar C. Gentle, III, Esq. and his law firm, Gentle, Turner, Sexton & Harbison, LLC, to serve as Lien Administrator.

The Settlement Trustee, Administrator and Lien Administrator are each required to at all times administer the Plan and distribute the Settlement Fund according to its terms under the auspices of the Court.

**12.    How much money will I receive in the Settlement?**

The following sections summarize the Plan of Distribution, but you should read and refer to the Plan for details as that is the controlling document. A copy of the proposed plan is available

on the Settlement Fund's website or a hard copy may be obtained from the Administrator on request by writing or calling.

### A. How will Settlement Fund payment award amounts be determined?

The Plan establishes three compensation programs to which Settlement Class Members meeting defined eligibility criteria may apply for compensation award payments (each program being referred to as a "Part"). The Settlement Fund's Part A program provides Base Compensation Payments to Settlement Class Members who can establish that the claimant or claimant's decedent during the Class Period filed an Underlying Lawsuit against Engelhard/BASF which credibly asserted in good faith an asbestos injury caused by alleged exposure to Emtal Talc ("**Base Payments**"). The Plan's Part B program provides compensation payments to Settlement Class Members who satisfy Part A and also present sufficient evidence of an asbestos bodily injury sustained by them (or if applicable, their decedent). The Plan's Part C program establishes an Extraordinary Injury Fund or "EIF" from which the Settlement Trustee may, in exceptional cases, make a discretionary supplemental compensation payment to mesothelioma injury claimants subject to eligibility guidelines and limitations as set forth in this Plan.

There are criteria and rules in the Plan as to who can make a claim and how. You should read the Plan for the details on these compensation programs and Settlement Class Members' rights under the Plan.

### B. How Much Money will I receive under the Plan?

The Settlement's Plan of Distribution has three parts for allocating the Settlement Fund which are described below. The amount of money a Settlement Class Member will receive depends upon which parts he or she qualifies for and the total number of claims that are approved under each part.

### 1. Payments under the Plan's Part A program.

The Plan's Part A program provides Base Payments from a $6.25 million sub-fund allocation of the Settlement Fund Amount to Settlement Class Members whose Underlying Lawsuits were dismissed and who are releasing all claims related to the Underlying Lawsuits, including the *Williams* Class Action Claims, against the Released Parties. Settlement Class Members who were Injured Persons (which includes the personal representatives of a deceased Injured Person) in the Underlying Lawsuits are referred to as "Primary Claimants". Each Primary Claimant who timely submits a claim for Part A compensation and establishes that his or her subject Underlying Lawsuit presented a good faith credible claim for injuries allegedly caused by exposure to Emtal Talc will receive a payment of up to $500 from the Part A sub-fund. Generally speaking, claims on behalf of a deceased Injured Person must be filed by the deceased person's estate representative (who is considered to be a "Primary Claimant" under the Plan). However, where the only claim to the Settlement Fund being applied for with respect to a deceased Injured Person are Part A compensation shares and no claims are made for compensation under Parts B or C, the claim may be submitted by the Injured Person's surviving spouse if any, or if none, by an Injured Person's surviving child with the written consent of all other surviving children, if any.

14

Where there are one or more Settlement Class Members associated with a Primary Claimant as a Derivative Claimant, that is, the Settlement Class Member's claim in the Underlying Lawsuit was based upon the Primary Claimant's asbestos injury and not theirs, then the Primary Claimant (or in the limited circumstances where a Derivative Claimant is making only the Part A Claim) will also be eligible to receive one additional Part A payment of up to $500, for a total Part A award of up to $1,000.

Part A Base Payments are subject to proration downward if more than 12,500 Part A Base payments are awarded, counting each Primary and Derivative Claimant Base Payment award separately. Any funds in the Part A sub-fund remaining after payment of all eligible Part A share claims will be reallocated by the Settlement Trustee first to Part C to pay allowed EIF claims, if any, or otherwise to Part B . (Such reallocation being referred to as a "spillover").

**2.   Payments under the Plan's Part B program.**

The Plan's Part B program provides additional compensation to the Injured Persons in the Underlying Lawsuits (or their estates if deceased) out of an initial sub-fund allocation from the Settlement Fund of $59.75 million. The Part B sub-fund will be distributed in its entirety among the Part B Claimants adjudicated during the claims process to be eligible to share in Part B distributions. The amount of the Part B sub-fund may change during the course of the Settlement Fund's administration based on the Settlement Trustee's application of a spillover of unused allocations of the Part A or Part C programs' sub-funds, accrued interest earned on the Settlement Fund's assets, payment of Class Representative service awards,  or the need to pay administration costs and expenses that cannot be paid or fully paid from the Settlement Cost Fund. The amount a Primary Claimant will receive depends upon the nature of the disease allegedly sustained from exposure to Emtal Talc and the number of other persons who make Part B claims and the nature of their diseases.

Part B compensation claims may be submitted only by Primary Claimants, including the Injured Person in the Underlying Lawsuit or by the Injured Person's estate if such person is deceased. Class Members who apply and meet the eligibility requirements for a Plan B program award will receive a proportionate share of the Part B sub-fund based upon a system of points awarded for the asbestos disease the Injured Person sustained and was diagnosed.

Eligibility for Part B compensation requires a Primary Claimant establish (a) entitlement to Part A compensation; and (b) through credible, competent proof that the Injured Person sustained an asbestos-related injury falling into one of four defined categories of asbestos disease levels: (1) Non-malignant asbestos pulmonary disease (a "**Part B Level 1 claim**"); (2) Malignant Asbestos Disease Other Than Mesothelioma or Level 3 Claim Lung Cancer ( a "**Part B Level 2 claim**"); (3) either: (i) Primary Lung Cancer with evidence of underlying Bilateral Asbestos-Related Nonmalignant Disease; or (ii) Severe Asbestosis ( a "**Part B Level 3 claim**"); or (4) Mesothelioma (a "**Part B Level 4 claim**"). A Part B claim may be based on the highest degree of the Injured Person's disease progression provable as of the time of the claim submission to the Plan. Claimants may establish proof of medical injury through a certification of a prior equivalent asbestos disease level adjudication by one of several designated Qualified Asbestos Trusts or through individual adjudication of satisfactory medical evidence provided by the Claimant to the

15

Administrator.  Please review the Plan of Distribution for details as this Notice is only a summary of the Plan's Distribution Procedures.

The Part B sub-fund will be allocated among and paid to those Part B Claimants adjudicated to be eligible according to the disease level sustained using an assigned number of "Qualifying Claim Points" based on whether they have a Part B Level 1, 2, 3 or 4 disease.  Part B sub-fund compensation will be the claimant's *pro rata* share of the Part B sub-fund calculated according to the formula $X/Y$ x $Z$, where $X$ represents the number of the individual eligible Claimant's adjudicated Qualifying Claim Points; $Y$ represents the aggregate of all eligible Claimants' adjudicated Qualifying Claim Points, and $Z$ represents the Part B sub-fund dollar amount (including any spillovers from Part A or Part C sub-funds). The number of Qualifying Claim Points for each Part B claim level is set forth in the following Table 1. The number of Qualifying Claim Points assigned to each asbestos disease category in Table 1 is based upon a survey and analysis conducted by Verus LLC of compensation programs employed by eighteen relatively comparable bankruptcy asbestos trust claims facilities to allocate their asbestos claim trust funds among claimants suffering from different levels of asbestos disease.

Precise amounts of compensation for each Part B Claim Level cannot be determined presently because a number of key factors are not yet known, including the number and disease level distribution of Part B claims, whether there will be spillover from Parts A and C, and other variables in the Plan of Distribution. Table 1 below, however, provides a range of hypothetical Part B payment estimates based on (a) receipt and approval by the Settlement Fund of 7,500, 8,000 and 8,500 Part B claims; and (b) an asbestos disease distribution rate equal to the historical asbestos disease rates experienced by the Johns Manville Asbestos Trust (which rates are stated for each disease level in the table).

[Balance of page intentionally blank]

| Table 1 Hypothetical Part B Payment Share Estimates* | | | | |
|---|---|---|---|---|
| **Part B Claim Levels** | **Qualifying Claim Points** (Assumed disease rate %) | **Estimated Payments** (Estimated number of claims) | | |
| | | **7,500** approved claimants | **8,000** approved claimants | **8,500** approved claimants |
| **Level 1 Claim** Non-Malignant Asbestos disease other than Severe Asbestosis. (Bilateral Asbestos-Related Nonmalignant Disease Injuries other than Severe Asbestosis) | **1** (86.3 %) | $1,283 (6,473) | $1,203 (6,904) | $1,132 (7,336) |
| **Level 2 Claim** Malignant Asbestos Disease Other Than Mesothelioma or Level 3 Claim Lung Cancer. | **9** (2.1 %) | $11,546 (158) | $10,824 (168) | $10,188 (179) |
| **Level 3 Claim** Either: (a) Primary lung cancer with evidence of underlying Bilateral Asbestos-Related Nonmalignant Disease; or (b) Severe Asbestosis. | **20** (7.3 %) | $25,658 (548) | $24,054 (584) | $22,639 (621) |
| **Level 4 Claim** Mesothelioma | **86** (4.3 %) | $110,327 (323) | $103,432 (344) | $97,348 (366) |
| * Due to rounding, the numbers presented may not add up precisely to the totals indicated and payment estimates may not precisely reflect the absolute figures. | | | | |

***Caveats:***

Table 1 is for illustration purposes only. The actual Part B payment amounts to Settlement Class Members will likely be different than any of the estimated hypothetical payments appearing in the table based upon the Settlement Fund's actual claim experience.

The hypothetical payment share estimates shown on Table 1 do not reflect deductions for any liens or fees charged by personal attorneys hired by class members described in Question 12(3)(C) (liens) and Question 23 (individually retained attorney's fees) below. As described in those Questions, class members eligible for a settlement payment are responsible for paying from that settlement payment any liens or any fees charged by personal attorneys should they hire one.

### 3.  Payments under the Plan's Part C Discretionary EIF program.

The Plan's Part C EIF program allocates $6.5 million of the Settlement Fund for an Extraordinary Injury Fund under which the Settlement Trustee has discretionary authority to award bounded supplemental compensation payments to a Primary Claimant with mesothelioma who establishes to the Settlement Trustee's satisfaction that the Primary Claimant sustained an extraordinary physical injury and/or economic loss allegedly as a result of exposure to Emtal Talc mined, milled, sold or distributed by Engelhard/BASF that is materially and substantially beyond that sustained by typical other Part B mesothelioma Primary Claimants.

To qualify for an EIF award, a Primary Claimant, in addition to establishing Class Membership under Part A and Part B, must satisfy specific eligibility requirements that: (1) the subject Injured Person developed mesothelioma; (2) the Primary Claimant has not received appropriate and sufficient compensation for the subject mesothelioma injury; (3) the subject mesothelioma injury and resulting losses were allegedly a result of frequent, regular and proximate exposure to Emtal Talc; and (4) the Underlying Lawsuit's plaintiff lawyer or firm received direct representations from an Engelhard/BASF attorney regarding the absence of asbestos in Emtal Talc. No Part C award made pursuant to the discretionary EIF program may exceed $175,000. The Part C EIF sub-fund may be increased by unallocated or unclaimed fund spillovers from the Part A fund. The Settlement Trustee is not required to make any EIF awards or to make awards sufficient to exhaust the EIF fund. The Settlement Trustee shall re-allocate the unused portion of the Part C sub-fund to the Part B sub-fund.

### C.  Are there any individual filing fees, case fees, administration charges or liens that could reduce my specific individual claim awards?

- There is no filing fee or charge to submit a claim to the Settlement Fund for compensation.

- Any and all liens relating to a claimant's settlement distribution are the sole responsibility of the claimant. The Plan of Distribution requires that certain liens imposed by a government entity, such as those relating to Social Security Medicare payments, be determined, resolved and, where existing, fully paid (or payment secured through deductions or withholdings from the claim proceeds by the Administrator) prior to the Administrator paying the claimant's claim. The Settlement Trustee as part of its administration will retain a lien resolution company (Lien Administrator) who, as a settlement benefit, will assist each Settling Class Members claimant in determining the existence of a Government Lien and the amounts to clear and resolve the lien. Government Lien resolution services assigned to the Lien Administrator under the Settlement shall be at the expense of the Settlement administration.

- The Lien Administrator may also assist claimants as to other medical or other benefit lien resolution with the claimant to pay the reasonable cost of such additional services out of his monetary award. Payment of such lien amounts, are the claimant's sole responsibility, will not be paid by the Settlement Fund, and may reduce the amount of the claimant's monetary award.

18

- Any attorneys' fees due to claimant's or claimant's decedent's attorneys in the Underlying Lawsuits with respect to monetary award distributions from the settlement are the sole responsibility of the claimant. While liens against a claimant's monetary award may also include a claim for attorneys' fees by the lawyers or law firms that had represented the claimant or the claimant's decedent in the Underlying Lawsuit, the determination and resolution of this lien is the individual Settlement Class Member claimant's sole responsibility. This will not be the responsibility of the Lien Administrator to negotiate or resolve and will not be paid or satisfied by the Settlement Fund.

**13.    What am I surrendering by staying in the Settlement Class?**

Unless you exclude yourself (opt out) from the Settlement (see Question 19), you cannot sue BASF, Cahill, any of the other named Defendants in the *Williams* Action, or any party that is a Released Party as defined in the Settlement Agreement, which includes related individuals and entities to BASF, Cahill and the other named defendants, or be part of any other lawsuit against these persons and companies, about the issues and factual matters alleged in this case.  This means you give up your right to continue to litigate any claims related to this Settlement, or file new claims, in any court or in any proceeding at any time. If you stay in the Class and presently have a non-malignant asbestos-related injury (such as asbestosis or pleural disease), you cannot in the future sue any of these released persons and companies for compensation or damages should you later develop a malignant asbestos-related injury such as cancer or mesothelioma, even if the law of your jurisdiction permits such claims.

The Settlement does not release or end any claims a Settlement Class Member may have now or in the future against Johnson and Johnson or any other talc company relating to talc or asbestos personal injuries. They are not parties to this Settlement nor are they Released Parties as that term is defined in the Settlement Agreement and claims against them are expressly not released by this Settlement.

Section 12 of the Settlement Agreement contains the complete text and details of what Settlement Class Members give up unless they exclude themselves (opt out) from the Settlement, including who and what are included as Released Parties, so please read it carefully.  The Settlement Agreement is available at www.emtaltalcsettlement.com. The Settlement Agreement is also on file with the Clerk of the Court for the District of New Jersey (see Question 28 for the address).  You can also get this information by calling 1-8XX-000-0000.  If you have any questions you can talk to the law firms listed in the chart at the end of this Notice for free or you can talk to your own lawyer if you have questions about what this means.

**HOW TO GET A PAYMENT—SUBMITTING A CLAIM FORM**

**14.    What must be done to get a monetary payment from the Settlement Fund?**

To be eligible to receive a payment from the Settlement Fund, you must complete and submit a valid and timely Claim Submission to commence a claim. If you do not submit a valid Claim Submission Form by the deadline of _____, you will not receive a payment. All proofs and forms must be submitted by this deadline.

**15.     How can I submit a claim to get a monetary payment?**

You can complete and submit your Claim Submission Form online at the Settlement Website, www.EmtalTalcSettlement.com. The Claim Submission Forms along with related certification and authorization forms, can be downloaded from the Settlement Website and submitted via mail, as well. You can request the Claim Submission certification form and authorization forms be sent to you by sending a written request to the Administrator by mail or by email or calling the Administrator to request these forms. A registered personal lawyer authorized by you to represent you and your family may complete and file the claim. There are, however, required verification forms and possible authorization forms that will be required to be signed by hand or electronically on the Settlement Website claims portal.

Please read the claim instructions carefully, and fully fill out the Claim Form. If you are submitting the Claim Submission Form in paper format, please mail it postmarked no later than 11:59 P.M. _____, 2020 to: Emtal Talc Settlement c/o Verus LLC, Administrator, 3967 Princeton Pike, Princeton, NJ 08540. If you are submitting your Claim Submission Form online at the Settlement Website's claim portal, ____, you must complete and submit the electronic claims by 11:59 P.M. (Eastern Standard Time), _____ 2020.

All claimants must provide a copy of a pleading, an interrogatory answer, or a deposition testimony excerpt describing the Injured Person's alleged exposure to Emtal Talc unless no supporting document exists or can be found after Claimant has conducted a reasonable search and inquiry, in which case a certification under oath of diligent search must be provided instead. Claimants wanting to receive compensation under the Plan's Part B and/or Part C programs will also be required to submit documents or other acceptable forms of proof described in the Plan to establish (1) the existence and level of an eligible asbestos disease and, (2) the Injured Person's Underlying Lawsuit (or that brought by an Injured Person's estate where applicable) must have asserted a good faith, credible asbestos injury claim based on an injury believed to be caused by exposure to Emtal Talc. Please follow all the instructions on the claim form relating to that claim. You may be asked for additional documentation and certifications. Claims are subject to audits and you may be asked to provide additional documentation and certifications related to the audit.

**16.     Is there a time limit to file claims for monetary awards or to complete Claim Submissions?**

Yes. The Court has set a deadline date to file a claim of _____ 2020.  If you do not submit a valid Claim Submission (which includes a completed claim form and necessary supporting documents) by both this date and one of the times listed below, you will not receive a payment:

(1) If submitted by mail, express mail or hand delivery, the Claims Submission must actually be received by the Administrator in its offices by no later than 5 P.M., prevailing Eastern time in effect; or

(2) If submitted electronically submitted through the Settlement Fund's website or other electronic portal established by the Administrator, the Claims Submission

must actually be received by the Administrator's system by no later than 11:59 P.M., prevailing Eastern time in effect.

**17.     When would I get my payment if eligible?**

The Administrator intends to complete its adjudication of claims before the Court grants "final approval" of the Settlement. Payment, however, will not be made until after the Court grants "final approval" of the Settlement and after any appeals are resolved. All Claims must be adjudicated and any disputes or challenges regarding a claim determination resolved in accordance with the dispute and contest procedures in the Plan of Distribution. Required lien resolutions must also be completed before an individual claimant's funds can be distributed. This may take a substantial amount of time to accomplish. Additionally, if the Court approves the Settlement after a hearing on _____, there may be appeals. This will delay payment awards. It is always uncertain whether these appeals can be resolved and resolving them can take time.  Everyone who submits a Claim Submission Form will be kept informed of the progress of the Settlement through the Settlement website or other means as appropriate. Please be patient.

**18.     Can I challenge or dispute the Administrator's determination of my monetary award claim?**

Yes. The Settlement's Plan of Distribution procedures establishes a process for a Settlement Class Member to challenge or dispute the denial of a monetary award claim or the amount of the monetary award to the Settlement Trustee who will adjudicate the dispute.

**19.     How do I get out, or exclude myself (opt out) of the Settlement?**

If you don't want a payment from the Settlement, but you want to keep the right to sue or continue to sue BASF, Cahill or any of the other defendants in the *Williams* Action on your own about the legal and factual issues and claims in this case, then you must take steps to get out. This is called excluding yourself—or is sometimes referred to as opting out of the Settlement Class.

On or before ____, 2020, you must mail a letter or other written document to the Administrator (Verus LLC) requesting exclusion from the Settlement Class. Your request must include:

- Your name, address, telephone number, Social Security or Tax Identifier Number and date of birth;

- A copy of your driver's license, other government issued identification and if applicable to a deceased or incompetent person, documentation establishing authority to act such estate letters or power of attorney;

- A statement that "I wish to exclude myself from the Settlement Class in Williams v BASF Catalysts LLC, C.A. No. 2:11-cv-01754" (or substantially similar clear and unambiguous language); and

- Your signature by hand, and the date on which you signed it (even if represented by an attorney at law).

You must mail your exclusion (opt out) request, postmarked on or before _____, addressed to:

Emtal Talc Settlement
c/o Verus LLC
3967 Princeton Pike
Princeton, NJ 08540

A husband and wife or entire family of heirs where applicable, can opt-out on one form provided all sign the form and provide the information and documents set out above.

Your request to exclude yourself (opt out) is not effective unless and until the District Court grants Final Approval and the order approving the Settlement becomes Final.

You can't exclude yourself on the phone or by e-mail. If you ask to be excluded, you will not get any settlement payment, and you cannot object to the Settlement. You will not be legally bound by anything that happens in this lawsuit. You may be able to sue (or continue to sue) BASF, Cahill and the other defendants named in the *Williams* Action in the future.

**20.     If I do not exclude myself (opt out), can I sue BASF, Cahill and the other released Parties for the same thing later?**

No. Unless you exclude yourself, you give up any right to sue BASF, Cahill or any other Released Person as defined in the Settlement Agreement for the claims that this Settlement resolves. If you have a pending asbestos lawsuit, speak to your lawyer in that lawsuit immediately. You must exclude yourself from this Settlement Class to pursue or continue your own lawsuit against BASF, Cahill, the other Defendants in the *Williams* Action or any other Released Person concerning the labeling, marketing, composition, or advertising of Emtal Talc or the defense or resolution of asbestos injury claims relating to Emtal Talc. If you properly exclude yourself from the Settlement Class, you shall not be bound by any orders or judgments entered in the *Williams* Action relating to the Settlement. Remember, the exclusion (opt-out) deadline is **_____, 2020**.

**21.     If I exclude myself, can I still get a payment?**

No. You will not get any money from the Settlement if you exclude yourself. If you exclude yourself from the Settlement, do not complete on-line or send in a Claim Submission Form asking for benefits. You may, however, sue, continue to sue, or be part of a different lawsuit against BASF, Cahill or the other Released Parties in the Settlement.

THE LAWYERS REPRESENTING YOU

**22.     Do I have a lawyer in this case?**

Yes. "Class Counsel" are listed below, represent all of the common interests of the Class Members. They are the lawyers who filed and prosecuted the lawsuit and negotiated the Settlement. You will not be charged any fee for the services provided by these lawyers. See Question 23 below.

Christopher M. Placitella            Stewart L. Cohen
Michael Coren                        Harry M. Roth
Jared M. Placitella                  Robert L. Pratter
Eric S. Pasternack                   **Cohen Placitella & Roth, P.C.**
**Cohen Placitella & Roth, P.C.**    2001 Market Street
127 Maple Ave                        Philadelphia, PA 19103
Red Bank, NJ 07701                   scohen@cprlaw.com
cplacitella@cprlaw.com               hroth@cprlaw.com
mcoren@cprlaw.com                    rpratter@cprlaw.com.
jmplacitella@cprlaw.com
epasternack@cprlaw.com.

To be clear, however, Class Counsel listed above, **are not** responsible for and will not represent you in your individual claim to the Settlement Fund for monetary payments.

You are not obligated to hire your own lawyer. However, if you want to be represented by your own lawyer, you may hire one at your own expense.  See Question 23 below.

### 23.    How will the lawyers be paid?

There are three groups of lawyers who may seek compensation.

The first is Class Counsel. Class counsel will ask the Court for an award of attorneys' fees and reasonable costs.  BASF and Cahill have agreed not to oppose or object to the request for attorneys' fees and reasonable incurred costs if the requests does not exceed $22.5 million for attorneys' fees and $1.2 million for cost reimbursement. These fees and incurred costs will be paid separately by the BASF and Cahill and not from the $72.5 million Settlement Fund. Settlement Class Members will have an opportunity to comment on and/or object to this request at an appropriate time. Ultimately, the award of attorneys' fees and reasonable costs to be paid by BASF and Cahill is subject to the approval of the Court. BASF and Cahill will also separately pay the reasonable and necessary costs of administering the Settlement, including notice costs up to a limit of $3.5 million. Class Counsel's fee, if approved, is 22.5% of the total amount paid by the Defendants to the Settlement Fund, Cost Fund and Attorneys' Fee Fund, all of which benefit the Class.

The second group ("Second Group") of lawyers are those who may be retained by you to represent you individually in this class action or submit your claim to the Claims Administrator. YOU DO NOT NEED TO HIRE A LAWYER.  However, if you decide to do so, that lawyer will likely seek compensation for his or her services.

The third group of lawyers ("Third Group") are those who may claim an entitlement to a fee based upon agreements entered with Class Members or their decedents in the Underlying Lawsuits.

The fees, if any, for the Second and Third Group of lawyers are separate and district from the fees that will be paid to Class Counsel. The Second and Third Group of lawyers are also referred to as Non-Class Counsel. Typically, these fees are paid on a percentage of the recovery basis.

A fee paid to the Second or Third Group of lawyers referenced above would be the sole responsibility of the Class Member.  By way of example only, should an attorney charge a class member a 33.3% contingency fee, and the class member is eligible for a Part A payment of $500 and a Level 2 Part B Claim payment of $10,824 as provided in Table 1 above (this example assumes there are 8,000 approved claims) for a total amount of $11,324, the net recovery to the class member after payment of personal attorneys' fees would be $7,550 ($11,324 – $3,774). The net recovery for the Class member in this example would vary depending on the fee percentage the attorney would charge and whether the Class Member is obligated to pay any liens (See Question 12 (3)(C). This example is for illustrative purposes only; the Court has not made any determination regarding fees charged by non-Class Counsel. And, as noted below, the Court will decide any fee to be awarded to the Second and Third Group of lawyers.

In recent years, courts in class action cases have considered the extent to which fees may be charged to non-Class Counsel. The Court in this case has retained jurisdiction to consider and will make a determination about the fees and the amounts which may be charged to Class Members by non-Class Counsel, individual counsel and former counsel.

### 24.     Are the class representatives being paid any compensation for their services?

Class Counsel will ask the Court to award each of the six named Plaintiffs $50,000 each for or their class representative service in view of their efforts in bringing the *Williams* Action and helping the lawyers on behalf of the whole Class over the eight years of hard-fought litigation leading to the Settlement. The awards will be paid from the Settlement Fund as provided in the Plan of Distribution. The award of class representative service awards is subject to the approval of the Court. Settlement Class Members will have an opportunity to comment on and/or object to this request at an appropriate time.

**OBJECTING TO THE SETTLEMENT**

If you're a Class Member, you can object to the Settlement if you don't like any part of it. You can give reasons why you think the Court should not approve it. The Court will consider your views. To object, you must send a letter saying that you object to *Williams v. BASF Catalysts LLC.* Be sure to include your name, address, telephone number, your signature, and the reasons you object to the Settlement. Mail the objection to the addresses listed below. Objections must be postmarked no later than ____ ___, **2020**:

Office of the Clerk
U.S. District Court, District of New Jersey
MLK Building & U.S. Courthouse
50 Walnut Street, Room 4015
Newark, NJ 07102

Michael Coren, Esq.
Cohen, Placitella & Roth, P.C.
2001 Market Street, Suite 2900
Philadelphia, PA 19103

Peter Farrell, Esq.
Kirkland & Ellis LLP
1301 Pennsylvania Ave. N.W.
Washington, DC 20004

Nina Gussack, Esq.
Troutman Pepper Hamilton
Sanders LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103

**25.** **What's the difference been objecting to the Settlement and excluding yourself from the Settlement?**

Objecting is simply telling the Court that you don't like something about the Settlement. You can object only if you stay in the Class. Excluding yourself is telling the Court that you don't want to be part of the Class. If you exclude yourself, you have no basis to object because the case no longer affects you.

THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement. You may attend and you may ask to speak, but you don't have to.

**26.** **When and where will the Court decide whether to approve the Settlement?**

The Court will hold a Fairness Hearing at ____ A.M. on _____, ____ ___, 2020, at the United States District Court for the District of New Jersey, 50 Walnut Street, Newark, N.J., in Courtroom MLK 2D. At this hearing the Court will consider whether the settlement is fair, reasonable, and adequate. If there are objections, the Court will consider them. Magistrate Judge Dickson will listen to people who have asked to speak at the hearing. The Court may also decide how much to pay Class Counsel and determine the Class Representatives application for Service Fee awards. After the hearing, the Court will decide whether to approve the settlement. We do not know how long these decisions will take.

**27.** **Do I need to come to the hearing?**

No. Class Counsel will answer questions Judge Dickson may have. But you are welcome to come at your own expense. If you send an objection, you don't have to come to Court to talk

25

about it. As long as you mailed your written objection on time, the Court will consider it. You may also pay your own lawyer to attend, but it's not necessary.

**28.    May I speak at the hearing?**

You may ask the Court for permission to speak at the Fairness Hearing. To do so, you must send a letter saying that it is your "Notice of Intention to Appear in *Williams v. BASF Catalysts LLC*." Be sure to include your name, address, telephone number, and your signature. Your Notice of Intention to Appear must be postmarked no later than **Month __, 2020,** and be sent to the Clerk of the Court, Class Counsel, and Defense Counsel, at the addresses listed below. You cannot speak at the hearing if you excluded yourself.

Office of the Clerk
U.S. District Court, District of New Jersey
MLK Building & U.S. Courthouse
50 Walnut Street, Room 4015
Newark, NJ 07102

Michael Coren, Esq.
Cohen, Placitella & Roth, P.C.
2001 Market Street, Suite 2900
Philadelphia, PA 19103

Peter Farrell, Esq.
Kirkland & Ellis LLP
1301 Pennsylvania Ave. N.W.
Washington, DC 20004

Nina Gussack, Esq.
Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103

**IF YOU DO NOTHING**

If you do nothing and do not file a claim, you will be deemed a Settlement Class Member, but you'll get no money from this Settlement. If you are a Settlement Class Member and do not exclude yourself, then you won't be able to start a lawsuit against the Defendants (BASF and Cahill) for asbestos injuries ever again.

**GETTING MORE INFORMATION**

29.    **Are there more details about this Settlement?**

This Notice summarizes the proposed Settlement. More details are in the Settlement Agreement. You can get a copy of the Settlement Agreement by writing to Michael Coren, Esq., Cohen, Placitella & Roth, P.C., Philadelphia, PA 19103, or by visiting www.EmtalTalcSettlement.com.

30.    **How do I get more information?**

You can call 1-888-401-1929 toll free; write to Emtal Talc Settlement, c/o Verus LLC, 3967 Princeton Pike, Princeton, NJ 08540; or visit the website at www.EmtalTalcSettlement.com. where you will find answers to common questions about the settlement, a claim form, plus other information to help you determine whether you are a Class Member and whether you are eligible for a payment.

| IMPORTANT DATES & CONTACT INFORMATION | | |
|---|---|---|
| **EXCLUSION (OPT OUT DEADLINE)** | TBD | |
| **OBJECTION DEADLINE** | TBD | |
| **DEADLINE TO REQUEST TO SPEAK AT THE FAIRNESS HEARING** | TBD | |
| **START OF THE CLAIMS PERIOD** | TBD | |
| **DEADLINE TO SUBMIT A CLAIM** | TBD | |
| **CLAIMS ADMINISTRATOR** | Emtal Talc Settlement<br>c/o Verus LLC<br>3967 Princeton Pike<br>Princeton, NJ 08540 | |
| **COURT** | Clerk of the District Court<br>U.S. District Court for the District of New Jersey<br>MLK Building & U.S. Courthouse<br>50 Walnut Street<br>Newark, NJ 07102 | |
| **CLASS COUNSEL** | Christopher M. Placitella<br>Michael Coren<br>Jared M. Placitella<br>Eric S. Pasternack<br>**Cohen Placitella & Roth, P.C.**<br>127 Maple Ave<br>Red Bank, NJ 07701 | Harry M. Roth<br>Robert L. Pratter<br>**Cohen Placitella & Roth, P.C.**<br>2001 Market Street<br>Suite 2900<br>Philadelphia, PA 19103 |

**QUESTIONS? CALL 1-888-401-1929 TOLL FREE, OR VISIT EMTALTALCSETTLEMENT.COM**

Exhibit B

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **KIMBERLEE WILLIAMS, *et al.*** | No. 2:11-cv-01754 (ES) (JAD) |
| Plaintiffs, | |
| vs. | CIVIL ACTION |
| **BASF CATALYSTS LLC, *et al.*** | |
| Defendants. | |

## DECLARATION OF ORRAN L. BROWN, SR.
## IN SUPPORT OF NOTICE PLAN

I, ORRAN L. BROWN, SR., hereby declare and state as follows:

### I.    INTRODUCTION

1.    ***Personal Information.***  My name is Orran L. Brown, Sr.  I am the Chairman and a founding partner of BrownGreer PLC, located at 250 Rocketts Way, Richmond, Virginia 23231.

2.    ***The Capacity and Basis of this Declaration.***  I am over the age of 21.  Unless otherwise noted, the matters set forth in this Declaration are based upon my personal knowledge, information received from the parties in this proceeding (the "Parties"), and information provided by my colleagues at BrownGreer.  The opinions presented and recommendations made in this Declaration rest on my training and experience.

3.    ***The Purpose of this Declaration.***  I submit this Declaration to describe my experience, the notice plan being developed for the proposed class action settlement of this litigation (the "Notice Plan"), and why my professional opinion is that the Notice Plan will be effective and will constitute the best notice that is practicable under the circumstances to the members of the class involved in this settlement, pursuant to Fed. R. Civ. P. 23(c)(2)(B).

1

## II.    BACKGROUND AND EXPERIENCE

**4.**    *Summary of My Personal Experience.*  I have worked in the mass claims area, including class actions, for over 30 years.  I have extensive experience as a lawyer handling class action proceedings, settlements and notices; as a claims administrator designing and implementing class action settlements, notice plans and notices to claimants and counsel; as a notice administrator; as a trustee or special master involved in multiple claim proceedings; and as an educator on class actions and other complex litigation.  My personal biography is attached to this Declaration as Exhibit 1.

**5.**    *General Description of BrownGreer.*  BrownGreer has specialized in notice administration and settlement administration since my partner, Lynn Greer, and I founded the firm in 2002.  We are experts in the legal and administrative aspects of the design, approval, and implementation of notice plans, settlement programs and the design, staffing and operation of claims facilities to provide damages payments, medical monitoring, or other benefits for the resolution of multiple claims through class action settlement, bankruptcy reorganization, voluntary agreement, or other aggregation vehicles. We have played major roles in many of the largest and most complex multiple claim proceedings and multiple claim settlement programs in history, serving as administrators, special masters, trustees, or settlement counsel.  The BrownGreer summary attached as Exhibit 2 to this Declaration provides detail on our firm.

**6.**    *Summary of Experience with Notices and Notice Programs.*  BrownGreer has performed crucial administration or review roles in more than 75 major programs involving the disposition of over $33 billion in payments to qualifying claimants.  In the course of the implementation of claims programs, BrownGreer has designed, written and issued over 14 million notices to claimants and counsel on the outcome of the review of their claims.  My work

as a lawyer and claims administrator regularly involves drafting the text of notices to known and unknown claimants or members of a class or settlement group, designing the appearance of such notices to make them concise, clear and understandable, and designing and implementing the method of distributing such notices in the best practicable manner to the persons or entities affected by them.  In its capacity as a notice administrator, BrownGreer has sent more than 41 million direct notices by mail and email and has designed and implemented print and internet publication notice campaigns achieving hundreds of millions of exposures.  We have extensive experience in all aspects of notice and settlement design and implementation, including:

(a)   On countless occasions, I have drafted and overseen the implementation of specific campaigns to certain groups of claimants before an existing claims facility to accelerate the disposition of stalled claims, to alert claimants to information and materials needed to complete their claims to be reviewed for eligibility determinations, and to advise claimants of the results of processing steps on their claims.

(b)   I have designed, and we have programmed, tested, hosted and maintained, many settlement websites to provide information on programs and containing complex functionality permitting claimants and their counsel to submit claims materials, receive notices on claim outcomes, take action on claims, and request materials.

(c)   We have designed, staffed, trained and operated call center systems and automated call systems for claimants and counsel to hear information on settlement programs, request information on notices and programs, or speak with specialists in the programs.

(d)   I have advised and participated in the implementation of notice programs to known and unknown potential claimants or class members, assessed the reasonableness and sufficiency of such notice programs, from both practical and legal perspectives, and worked with marketing consultants to place public notice in written and broadcast media.

(e)   I regularly advise companies and claims administrators and draft individual group notices to conform to applicable legal requirements and to make the text and instructions provided in such notices comprehensible and as simple as possible.

**7.**     ***Highlights of Major Notice Plan Projects.***  Here are some of our more extensive projects regarding notice programs:

(a)  **Notice of Final Dalkon Shield Claim Filing Deadline**:  I drafted the notices and designed the entire notice campaign issued by the Dalkon Shield Claimants Trust to provide public notice of the final deadline for the submission of any claim relating to the Dalkon Shield device to the claims facility.  This campaign included a publication in mid-April 1994, in sixty-eight newspapers in the United States and internationally, of a quarter-page notice explaining the final claims deadline and the steps necessary to submit a claim before the deadline.  The supervisory court found this notice to be sufficient to advise potential claimants, whose identities could not be determined through due diligence, of the deadline and the opportunity to receive compensation through the claims resolution process.  *See In re A.H. Robins Co. (Smith v. Dalkon Shield Claimants Trust)*, 197 B.R 495 (E.D. Va.1995); *In re A.H. Robins Co. (Allen v. Dalkon Shield Claimants Trust)*, 197 B.R 501 (E.D. Va. 1995); *In re A.H. Robins Co. (Warren v. Dalkon Shield Claimants Trust)*, 197 B.R 503 (E.D. Va. 1995); *In re A.H. Robins Co. (Rothbard v. Dalkon Shield Claimants Trust)*, 197 B.R 509 (E.D. Va. 1996); *In re A.H. Robins Co. (Bennett v. Dalkon Shield Claimants Trust)*, 204 B.R 194 (E.D. Va. 1996).

(b)  **Initial Notice of Diet Drug Settlement**:  I participated in the implementation of the notice campaign to provide notice of the preliminary approval of the national class action settlement of the diet drug litigation in 2000.  This campaign included a television commercial broadcast 106 times over a period of five weeks on network television and 781 times, for six consecutive weeks, on various cable networks.  It also included a summary notice that appeared repeatedly in several magazines between January and March 2000, and as a one-third page black and white advertisement in four national newspapers, 77 local newspapers, three newspapers distributed throughout the United States territories and four newspapers targeted to the Hispanic market.  This summary notice was also published in a variety of publications targeted to health care providers and pharmacists.  The notice was mailed to all pharmacists in the United States, physicians who were likely to have prescribed the diet drug to patients, and to a mailing list of known diet drug users.  The actual notice was an extensive packet of materials that included an Official Court Notice, a simpler Guide to Class Members, and claim forms that were all mailed to over 1,175,750 known class members.  This notice campaign was approved by the supervisory court as sufficient in *Brown v. American Home Products Corporation, (In re Diet Drugs Products Liability Litigation)*, MDL No.1203, 2000 WL 1222042 (E.D. Pa. 2000).

(c)  **Notice of Final Judicial Approval of the Diet Drug Settlement**:  As required by the Settlement Agreement in the diet drug litigation, I, along with Class Counsel and other parties, drafted the Official Court Notice mailed in February 2002 to over 830,500 persons on the official notice list, of the final judicial approval of the settlement, the claims filing and medical diagnosis deadline dates affected by the date of final approval, the terms of the Settlement Agreement and benefits available, the steps required to seek benefits or opt out of the settlement, and the consequences of failing to act by the deadlines.

(d)   **Notice of Nextel Communications Settlement:**  In January of 2004, I served as an expert witness in the class action field and advisor to the court on the adequacy of notification procedures in a large consumer class action involving alleged improper monthly billing by Nextel Communications.  The notice campaign included a combination of print publication and direct mail notice and reached nearly five million class members.

(e)   **Notice of Seventh Amendment to the Diet Drug Settlement:**  In June 2004 through September 2004, I, Class Counsel, and other counsel drafted and designed the Official Court Notice of the Seventh Amendment to the Settlement Agreement, which required new notice to all known Diet Drug class members.  This notice described the terms of the Seventh Amendment, explained what benefits were available to class members under the agreement and provided direction to class members intending to object to or opt out of the new agreement, and consisted of both a detailed notice and a concise summary notice.  I testified regarding the Seventh Amendment and the notice plan during the fairness hearing on the Seventh Amendment before the United States District Court for the Eastern District of Pennsylvania on January 19, 2005.  The United States District Court for the Eastern District of Pennsylvania approved this notice plan as compliant with due process and Rule 23 in PTO 3880 - Preliminarily Approving the Seventh Amendment to the Nationwide Class Action Settlement Agreement with American Home Products Corporation, Approving the Form of Notice, and Scheduling a Hearing Regarding the Amendment (Document No. 104343), (August 26, 2004).  BrownGreer mailed these notices from September – November 2004 to over 525,000 class members in the Trust's claims database and handled all aspects of returned and re-issued mail.  The United States District Court for the Eastern District of Pennsylvania approved the Seventh Amendment in PTO 4567 (Document No. 105062) (March 15, 2005).

(f)   **Notice of NFL Concussion Settlement.**  In June 2014, my firm produced the notice mailing list of the NFL Concussion Settlement Program.  The goals of this effort were to identify and include on the list: (1) as many living NFL Football Players as possible, whether currently playing or not playing at that time; (2) as many deceased NFL Football Players as possible; (3) the family members of deceased NFL Football Players; and (4) the best known mailing address of living NFL Football Players and the family members of deceased NFL Football Players.  As part of this analysis, we identified 7,126 deceased NFL Football Players.  To obtain the most current list of family relations of deceased players, BrownGreer coordinated with a commercial data curator to identify known first degree relatives based upon their association with the player in national address lists, credit applications, and other data sources, and to obtain best known addresses for those relatives.  Through this effort, we identified 10,987 family members with available mailing addresses, which we used in compiling the final mailing list for the program.  The supervisory court approved the notice campaign as sufficient on April 22, 2015 in *In re: National Football League Players' Concussion Injury Litigation*, MDL No. 2323, No. 14-cv-00029 (E.D. Pa. 2015).

(g) **Notice of Telephone Consumer Protection Act Class Action Settlement.**  In July 2014, my firm and I were appointed by the United States District Court for the Northern District of Illinois to serve as the Notice and Claims Administrator for the $75,455,098.74 nationwide settlement program for alleged violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*.  We advised the parties on the notice plan for that action, and I submitted a Declaration in support of the Motion for Preliminary Approval regarding the settlement.  BrownGreer implemented the notice campaign to provide notice of the class action settlement to users of approximately 21,200,000 unique cell phone numbers.  This campaign primarily occurred in August 2014 through September 2014 and included individual emails, direct mailing of postcards, internet banner notice, and paid search terms.  To inform the internet notice campaign, BrownGreer developed a comprehensive target audience profile for the class and designed a program tailored to that profile.  BrownGreer sent over 16,500,000 notices, and the banner notice campaign enjoyed over 19,000,000 impressions throughout the display period.  BrownGreer successfully reached over 96% of the known Settlement Class and nearly 92% of the estimated total Settlement Class.  The supervisory court approved the notice campaign as sufficient on February 12, 2015 in *In re Capital One Telephone Consumer Protection Act Litigation*, MDL No.2416, 12 C 10064 (N.D. Ill. 2015).

(h) **Notice of Court Ordered Victim Compensation Program.**  On August 19, 2016, my firm and I were appointed by the United States District Court for the District of Arizona in the Court's Order Re Victim Compensation (*Melendres v. Arpaio*, Case No 2:06-cv-02513-GMS (D. Ariz)) to serve as the Third-Party Administrator managing a mass Notice and Claims Processing Plan.  The Maricopa County Board of Supervisors created a fund of $500,000 to compensate individuals who claimed that their constitutional rights were violated as a result of detention by the Maricopa County Sheriff's Office.  For that matter, we designed a multi-faceted notice plan in Spanish and English that includes (1) letters mailed directly to known potential class members; (2) outreach to local and international community organizations and government consulate offices; (3) print publication notice in relevant periodicals; (4) radio advertisements on regional stations; (5) a dedicated settlement website; (6) internet banner ads; (7) paid search terms; (8) Facebook ads; and (9) a national press release.

(i) **Notice of Nationwide Consumer Product Settlement.**  In September 2017, my firm and I were appointed by the United States District Court for the Eastern District of Washington to serve as the Notice and Claims Administrator for a $3,800,000 nationwide class settlement related to allegedly defective instant hot water filters sold and installed throughout the United States.  For that matter, we designed a multi-faceted notice plan that included (1) letters mailed directly to known potential class members; (2) postcards mailed to businesses that may have sold, installed, or serviced the subject product; (3) print publication notice in a national consumer magazine, a national newspaper, a national newspaper supplement, and a national trade magazine; (4) a dedicated settlement website; (5) internet banner ads; (6) paid search terms; (7) Facebook ads; and (8) a national press release.  On September 8, 2017, the supervisory court approved the notice campaign in *Desio v. Emerson Electric Co. d/b/a InSinkErator*, No. 2:15-cv-00346-SJM (E.D. Wash. 2017).

**(j)**   **Notice of Nationwide Corn Seed Settlement.**   In April 2018, my firm and I were appointed by the United States District Court of Kansas to serve as the Notice and Claims Administrator for a $1.51 billion nationwide class settlement related to the sale and marketing of Syngenta's genetically modified corn seeds and the alleged harm that Syngenta's conduct caused corn producers, grain handling facilities, and ethanol production facilities.  We designed, executed, and managed a comprehensive notice plan that included (1) letters mailed directly to known potential class members; (2) two reminder postcard notices mailed to known potential class members who had not yet filed a claim; (3) print publication notice in several national and regional trade magazines; (4) a dedicated settlement website; (5) initial and reminder radio advertisements on regional and nationally syndicated radio programs; (6) Facebook ads; (7) fliers sent to state and national organizations relevant to corn production; and (8) three national press releases.  BrownGreer successfully reached over 99% of the known Settlement Class and over 94% of the estimated total Settlement Class.  The supervisory court approved the notice campaign on April 10, 2018 in *In re Syngenta AG MIR 162 Corn Litigation*, MDL No.2491, 2:14-MD-02591 (D. Kan. 2018).

**8.**   *Other Relevant Experience.*   In addition to the notice plan projects highlighted in Paragraph 7, BrownGreer has administered, served as experts, and/or otherwise consulted with settled parties on many other notice programs approved as sufficient by the overseeing court, such as the programs implemented in these cases:

(1) *Acosta v. Tyson Foods, Inc.*, No. 8:08-cv-86 (D. Neb.) (direct mail notice);

(2) *Bartell, et al. v. LTF Club Operations Company, Inc.*, Case No. 2:14-cv-00401 (S.D. Ohio) (direct mail notice);

(3) *Bessey v. Packerland Plainwell, Inc.*, No. 4:06-cv-0095 (W.D. Mich.) (direct mail notice);

(4) *Beecroft v. Altisource Business Solutions Pvt. Ltd.*, No. 0:15-cv-02184 (D. Minn.) (direct mail notice; social media ads);

(5) *Betts v. National Cash Advance/Advance America*, Nos. 502001CA000320OCAI-MB and 502004CA008164XXXXI-MB (Palm Beach County Cir. Ct.) (direct mail notice)

(6) *Brown & Szaller, Co., L.P.A., et al., v. Waste Management of Ohio, Inc.,* Case No. CV-16-859588.

(7) *Churchill v. Farmland Foods, Inc.*, No. 4:06-cv-4023 (C.D. Ill.) (direct mail notice);

(8) *Clark v. Grp. Hosp. & Med. Servs., Inc.*, No. 3:10-CIV-00333-BEN-BLM (S.D. Cal.) (direct mail notice);

(9) *Cohen v. Foothill/E. Transp. Corridor Agency, et al.*, No. SACV 15-01698 (C.D. Cal.) (direct mail and email notice);

(10)   *Cohen v. Warner Chilcott Pub. Ltd. Co.*, No. 1:06-cv-00401-CKK (D.D.C) (national print publications, internet banner ads, and paid internet search);

(11)   *Collins v. Sanderson Farms, Inc.*, No. 2:06-cv-02946 (E.D. La.) (direct mail notice);

(12)   *Conerly v. Marshall Durbin Food Corp.*, No. 2:06-cv-205 (N.D. Ala.) (direct mail notice);

(13)   *Contreras v. PM Beef Holdings, LLC*, No. 07-CV-3087 (D. Minn.) (direct mail notice);

(14)   *Cook v. Columbia Freightliner, LLC*, No. 10-CP-02-1987 (Aiken County S.C. Jud. Dist.) (direct mail notice);

(15)   *Flores v. Zorbalas*, No. 27-CB-16-14225 (Hennepin County District Court, Fourth Judicial District of Minnesota) (direct mail notice);

(16)   *Ene v. Maxim Healthcare Servs., Inc.*, No. 4:09-cv-02453 (S.D. Tex.) (direct mail notice);

(17)   *Ferguson v. Food Lion, LLC*, No. 12-C-861 (Cir. Ct., Berkeley Cnty., W. Va.) (regional print publications and direct mail notice);

(18)   *Gales v. Capital One, N.A.*, No. 8:13-cv-01624 (D. Md.) (direct mail notice);

(19)   *Gregorio v. Premier Nutrition Corp.*, No. 17-cv-05987-AT (S.D.N.Y.) (direct mail and email notice and internet banner ads);

(20)   *Gomez v. Tyson Foods, Inc.*, No. 08-021 (D. Neb.) (direct mail notice);

(21)   *Graham v. Capital One Bank (USA), N.A.*, 8:13-cv-00743 (C.D. Cal.) (direct mail notice);

(22)   *Gray, Ritter & Graham P.C. v. Goldmann Phipps PLLC*, No. 4:13-cv-00206-CDP (E.D. Mo.) (direct mail notice);

(23)   *Hall v. Capital One Auto Fin., Inc.*, No. 1:08-cv-01181 (N.D. Ohio) (direct mail notice);

(24)   *Hankins v. Carmax Inc.*, No. 03-C-07-005893 CN (Baltimore County Md. Cir. Ct.) (direct mail notice);

(25)   *Hanna v. Agape Senior, LLC*, No. 12-CP-40-5950 (S.C. St. Ct., Richland Cnty., S.C.) (direct mail notice and print publications);

(26)   *Herron v. Carmax Auto Superstores, Inc.*, No. 2006-CP-02-1230 (Aiken County S.C. Jud. Dist.) (direct mail notice);

(27)   *In re Bhatia v. 3M Co.*, No. 0:16-cv-01304 (D. Minn.) (direct mail notice and calling campaign);

(28)    *In Re Children's Ibuprofen Oral Suspension Antitrust Litig.-Indirect Purchaser Action*, No. 1:04-mc-0535-ESH (D.D.C.) (national print publications, internet banner ads, and paid internet search);

(29)    *In Re De Bernardi v. City and County of San Francisco.*, No. 4:2018-cv-04597 (N.D. Ca) (direct mail notice and email notice);

(30)    *In Re Moyer Packing Co.*, P. & S. Docket No. D-07-0053 (U.S. Dep't Agric.) (direct mail notice);

(31)    *In Re Oxycontin Litig.*, No. 02-CP-18-1756 (S.C. Eq., Dorchester Cnty., S.C.) (regional print publications and direct mail notice);

(32)    *In Re Wazwaz v. City and County of San Francisco.*, No. 3:2018-cv-05580 (N.D. Ca) (direct mail notice and email);

(33)    *Lycan, et. al., v. City of Cleveland*, No. CV 09686044 (Ct. of C.P., Cuyahoga County, OH) (direct mail notice, print publication)

(34)    *McCoy v. North State Aviation, LLC*, Case No. 1:17-cv-00346-CCE-LPA (M.D.N.C).  (direct mail notice);

(35)    *Morales v. Greater Omaha Packing Co. Inc.*, No. 8:08-cv-0161 (D. Neb.) (direct mail notice);

(36)    *Morgan v. Richmond Sch. of Health & Tech.*, No. 3:12-cv-00373-JAG (E.D. Va.) (regional print publications and direct mail notice);

(37)    *Nader v. Capital One Bank (U.S.A.), N.A.*, No. 2:12-cv-01265-DSF-RZ (C.D. Cal.) (national print publication and direct mail and email notice);

(38)    *Orrin S. Anderson v. Capital One Bank*, No. 7:19-cv-03981 (S.D. NY) (direct mail notice);

(39)    *Polanco v. Moyer Packing Co.*, No. C.P., 1852 (Philadelphia County Pa.) (direct mail notice);

(40)    *Rubenstein v. The Neiman Marcus Group LLC*, No. 2:14-cv-07155-SJO-JPR (C.D. Ca.).  (direct mail notice, digital notice, print publication notice);

(41)    *Runton et al. v. Brookdale Senior Living, Inc.,* No. 0:17-cv-60664-CMA (S.D. Fla.) (direct mail notice)

(42)    *Samuel v. EquiCredit Corp.*, No. 00-cs-6196 (E.D. Pa.) (direct mail notice);

(43)    *Santiago v. GMAC Mortg. Grp.*, Inc., No. 784574 (E.D. Pa.) (direct mail notice);

(44)    *Spinelli v. Capital One Bank (USA)*, No. 8:08-cv-132 (M.D. Fla.) (direct mail notice);

(45)    *Stout v. JELD-WEN, Inc.*, No. 1:08-cv-0652 (N.D. Ohio) (national and regional print publications, internet banner ads, paid internet search, and direct mail notice);

(46)    Travel Insurance Refund Program in the matter of Jefferson Insurance Company NAIC #11630 and in the matter of BCS Insurance Company NAIC #38245 (direct mail notice);

(47)    *United States v. Capital One, N.A.*, No. 1:12-cv-828 (E.D. Va.) (direct mail notice);

(48)    *United States v. Chevy Chase Bank, F.S.B.*, No. 1:13-cv-1214 (E.D. Va.) (direct mail notice);

(49)    *United States v. National Treasury Employees Union*, No. 93-1170 (D.C. App.) (direct mail notice)

(50)    *Watts v. Capital One Auto Finance, Inc.*, No. CCB-07-03477 (D. Md.) (direct mail notice); and

(51)    *Wilder v. Triad Fin. Corp.*, No. 3:03-cv-863 (E.D. Va.) (direct mail notice).

## III.    THE GOALS OF A SUCCESSFUL NOTICE PLAN

**9.    *Required Notice to the Class.*** As advised in the Manual for Complex Litigation, "[n]otice is a critical part of class action practice," for it "provides the structural assurance of fairness that permits representative parties to bind absent class members." *See Manual for Complex Litigation*, § 21.31 (4th ed. 2010).  The proposed settlement in this proceeding involves a common issues class under Fed. R. Civ. P 23(b)(3).  For any matter certified as a Rule 23(b)(3) class, Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  For the settlement of such a class, Rule 23(e)(1) requires the court to examine at the notice stage whether it would be likely to approve the proposed settlement after considering many of the same procedural and substantive factors that it will consider at the final approval stage.  If after "frontloading" its examination the court determines it would be likely to (1) approve the proposed settlement and (2) certify the class, it must then "direct notice in a reasonable manner to all class members who would be bound by the proposal."  The Advisory Committee notes that

it is standard practice to send one combined notice to the class under both Rule 23(e)(1) and Rule 23(c)(2)(B). Fed. R. Civ. P. 23 advisory committee's note.  This combined notice should adhere to the "best notice practicable" standard of Rule 23(c)(2)(B), thereby satisfying both these provisions.

 10. ***How the Notice is to be Delivered to the Class.*** The delivery methods selected for the notice must fulfill the essential requisites of due process by alerting affected parties to the pendency of the resolution and affording them the opportunity to be heard.  "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  Indeed, as the Advisory Committee acknowledges, "[t]he ultimate goal of giving notice is to enable class members to make informed decisions about whether to opt out or, in instances where a proposed settlement is involved, to object or to make claims." Fed. R. Civ. P. 23 advisory committee's note.  Rule 23 and due process mandate individual notice to known and reasonably knowable class members. "[E]ach class member who can be identified through reasonable effort must be notified that he may request exclusion from the action and thereby preserve his opportunity to press his claim separately or that he may remain in the class and perhaps participate in the management of the action." *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176-77 (1974).  There is, however, no one preferred means of delivering notice when considering what is the "best notice practicable." In 2018, Rule 23(c)(2)(B) was amended to permit notice to be made by one or a combination of means, including "United States mail, electronic means, or other appropriate means."  As explained in the Advisory Committee Notes, while the rule continues to call for "the best notice

11

that is practicable," the court should consider whether a certain method of giving notice is "appropriate" in light of the nature of the case and characteristics of the class. "Instead of preferring any one means of notice, [] the amended rule relies on courts and counsel to focus on the means or combination of means most likely to be effective in the case before the court. The court should exercise its discretion to select appropriate means of giving notice." Fed. R. Civ. P. 23 advisory committee's note. In making those selections, courts should be conscious of the Supreme Court's reminder in *Mullane* that "process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.* at 315.

        **11.**    ***The Content and Format of the Notice.***  The Advisory Committee Notes instruct that, "[i]n determining whether the proposed means of giving notice is appropriate, the court should also give careful attention to the content and format of the notice[.]" Fed. R. Civ. P. 23 advisory committee's note. Rule 23(c)(2)(B) requires that the notice of a Rule 23(b)(3) class action "must clearly and concisely state in plain, easily understood language" these seven messages:

> (1) the nature of the action;
> (2) the definition of the class certified;
> (3) the class claims, issues, or defenses;
> (4) that a class member may enter an appearance through an attorney if the member so desires;
> (5) that the court will exclude from the class any member who requests exclusion;
> (6) the time and manner for requesting exclusion; and
> (7) the binding effect of a class judgment on members under Rule 23(c)(3).

According to the Court in *Mullane:*

> The notice must be of such nature as reasonably to convey the required information . . . and it must afford a reasonable time for those interested to make their appearance . . . . But if, with due regard for the practicalities and peculiarities of the case, these conditions are reasonably met, the constitutional requirements are satisfied.

339 U.S. at 314-15.  "The notice should describe the action and the plaintiffs' rights in it."  *See*

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).   Two of the four Major Checkpoints

in the Federal Judicial Center's *Judges' Class Action Notice and Claims Process Checklist and*

*Plain Language Guide* (the "FJC Checklist") address the need to make the notices themselves

both noticeable and understandable:

> ***Will the notices come to the attention of the class?***  Notices should be designed
> using page-layout techniques (e.g., headlines) to command class members'
> attention when the notices arrive in the mail or appear on the Internet or in printed
> media.

> ***Are the notices informative and easy to understand?***  Notices should carry all of
> the information required by Rule 23 and should be written in clear, concise, easily
> understood language.

A notice plan must ensure that each notice sent to a class member individually or by publication

conveys in clear, non-legalistic words and a reader-friendly format the information that the class

member needs to make an informed decision about whether to accept, opt out, or object to the

proposed settlement, how to effect any such decision, the deadlines by which to act, and the

consequences of taking or not taking action.  The Advisory Committee notes that it is "important

to include details about the proposed method of giving notice and to provide the court with a

copy of each notice the parties propose to use."  Fed. R. Civ. P. 23 advisory committee's note.

**12.**     ***Timing of the Notice.***  The notice must be transmitted on dates that allow

potential class members sufficient time to receive the notice, realize a need to react to it, and take

the actions necessary to, if they so choose, participate in the settlement, be excluded from it, or

object to it.  The assessment and significance of these criteria vary depending upon the nature of

the claims involved in the settlement, the sophistication of potential class members, the

information available on known class members, and the complexity of the actions required to

seek benefits under the settlement.

## IV.   THE SETTLEMENT CLASS

**13.**    ***The Proposed Settlement Class.***  The Parties' March 13, 2020 Settlement

Agreement defines the proposed Settlement Class as the following:

> [A]ll Persons within the United States and its territories who after March 7, 1984 and
> before March 30, 2011 filed and Served a lawsuit against Engelhard/BASF seeking
> asbestos-related bodily injury compensation or other relief arising from exposure to
> Emtal Talc products, and who before March 30, 2011 either: (A) had voluntarily
> dismissed or terminated the lawsuit as to Engelhard/BASF after the suit was filed,
> including any voluntary dismissal or release of claims due to settlement; or (B) had their
> lawsuit as to Engelhard/BASF involuntarily dismissed.

(Agreement § 1.2.1.)  The "Persons" are comprised of two groups of people: (1) the Class

Members with a right to claim damages related to their own Emtal Talc exposure (the "Injured

Persons"); and (2) the Derivative Claimants with a right to damages based on an Injured Person's

injury or death, including such groups as spouses, heirs, legatees, personal representatives, and

wrongful death beneficiaries and assignees (the "Derivative Claimants"). (Agreement § 1.3.60.)

**14.**    ***The Class Data.***  The Parties gave the Settlement Administrator in this matter,

Verus LLC ("Verus"), access to a number of data sources, including databases and spreadsheets

of plaintiff data from several plaintiff law firms, copies of complaints containing plaintiff names

as well as addresses and/or Social Security Numbers ("SSNs") for some of these plaintiffs,

copies of pleadings, interrogatories, depositions and other documents from the underlying

lawsuits, and other non-privileged material discovered in the *Williams v. BASF Catalysts, LLC*,

No. 2:11-cv-01754, litigation (the *Williams* matter) (collectively, the "Class Data").  Verus

provided BrownGreer with an aggregated list of unique series of different Class Member lists

extracted from the Class Data, and where such information was available, also provided details

about whether the Class Members were deceased, relatives of those deceased Class Members,

recent contact information for these relatives and Class Members who are presumed to be living,

14

through TransUnion proprietary database searches, and the names and addresses of certain Class Members' attorneys from the underlying lawsuits.  We consulted with Verus and the Parties to develop a final Class Member list  and updated information for a number of Class Members in collaboration with LexisNexis, a global provider of information and analytics.  We ran the names and additional data points available for the Class Members through LexisNexis' proprietary database of over 83 billion public records to further identify deceased Class Members, their first-degree relatives, and a last known address for these relatives and the Class Members presumed to be living.  After we incorporated the results from LexisNexis, we created two distinct lists: (1) the Class Member List containing 18,721 Class Members, 7,055 of whom LexisNexis and/or Verus' data source(s) identified as deceased (the "Deceased") and 11,666 of whom are presumed to living (the "Presumed Living"); and (2) the Relative List containing 30,350 known first-degree relatives[1], grandparents, and grandchildren of deceased Class Members (the "Relatives").  We further culled the Relative List to include only those 27,803 Relatives for whom there was no indication of being deceased, belonging to 5,525 of the Deceased Class Members, forming the "Presumed Living Relative List."

Having identified the Class Members and the above identified cohorts of Deceased, Presumed Living, and Relatives, our next task was to compile addresses or other contact information to be able to provide direct notice to Class Members.  Through the material provided regarding the underlying lawsuits, we were initially able to identify addresses for all but 5,371 of the potential Class Members.

15.   ***Additional Efforts to Obtain Class Data from Asbestos Trusts.***  We understood from discussions with Verus and the Parties that there is a high likelihood that the Class

---

[1] First-Degree Relatives includes spouses, siblings, children, and parents.

Members in this case may have filed claims with one or more asbestos bankruptcy trusts established under 11 U.S.C. § 524(g) (the "Trusts").  After numerous discussions with the Parties on possible steps to find contact information for known Class Members, on February 14, 2020, BrownGreer emailed 10 Trust Counsel and Trustees who collectively represent and serve 38 of the largest Trusts, 20 of which are administered by Verus, and invited a phone conversation to discuss conceptually how the Trusts might be able to assist in effecting direct notice to potential class members who match to a name in their claimant databases.

Between February 17 and March 3, 2020, we had calls with the eight Trusts Counsel and Trustees, representing and serving 34 Trusts, who had responded to our initial email and agreed to speak with us over the phone.  We explained on those calls that there are approximately 5,000 potential Class Members for whom we have no information from which we can ascertain a mailing address for the Class Member or contact information for a relative, making us hopeful that the Trusts would be willing to help us and the Parties here by disclosing such data to us, or disseminating the class notice themselves to such persons.

The Trusts tended to take the same position in response to our entreaties, though the level of support they were willing to provide varied.  No Trust was willing to disclose claimant data voluntarily, citing to Trust claimant rights of confidentiality.  All Trust Counsel and Trustees with whom we spoke also indicated that the addresses they maintained were of claimants' counsel and not the Trust claimants.  Many expressed concerns about the unreliability of matches based on only a full name.  However, while several Trust Counsel and Trustees were less amenable to supporting the notice process in any way because of concerns with confidentiality, Trust resources, and false name matches, a number of them indicated an initial potential willingness to send the notice to matching claimants' attorneys on behalf of this settlement.

Between March 13, 2020 and March 31, 2020, we engaged the Trusts in several follow-up discussions over phone and email, during which we shared more information about the potential settlement, and in a few instances, a copy of the complaint and the draft class notice. Ultimately, Trust Counsel and Trustees with whom we spoke declined to assist in the notice process. It was around this time that we learned that Class Counsel and Verus had discovered an alternative approach to identifying Class Member contact information and reaching those potential Class Members. Accordingly, we terminated our pursuit of potential Class Member data from the Trust databases or any additional support in providing notice to these 5,371 persons for whom we had no address and instead relied on the Class Data provided by the Parties and Verus and the efforts they undertook to supplement the Class Data to develop the Notice Plan.

16.     ***Additional Efforts to Obtain Class Data from Discovery Documents.*** While communication with the Trusts was on-going, Class Counsel's data management vendor forwarded to Verus the document images produced by defendants in the *Williams* matter and third parties in response to subpoenas relating to the underlying cases in anticipation of preparing them for use as outlined in the Plan of Distribution. Verus and Class Counsel reviewed these documents using data science name matching techniques and other technology assisted document search and review techniques to further identify class members identities and location information, and by doing so, identified mailing addresses for 2,871 of the 5,371 persons for whom we previously had no address. The documents also revealed that 241 persons on the original Class List were lay or expert witnesses, and accordingly, we removed them from the Class List. As a result, we have narrowed it down to 2,500 Class Members whom we are unable

to attempt to notice directly or through a relative because of a lack of address or other identifying information.

## V.    THE NOTICE PLAN

17.    *Direct Notice.*  The first goal of this Notice Plan is to provide direct notice to all Settlement Class Members who can be identified through reasonable effort.  Indeed, the Parties, Verus, and BrownGreer have undertaken considerable effort to identify as many known Settlement Class Members as reasonably possible.  We will mail the long-form Notice substantially in the form of Exhibit K to the plaintiff's motion for preliminary approval in the following manner:

(1) *Presumed Living Class Members.*  We will mail the long-form Notice to every Presumed Living Class Member for whom we have a name and address.  We will attempt to verify and update all addresses against the United States Postal Service's ("USPS") National Change of Address ("NCOA")[2] database prior to mailing.  If a Notice is returned by the USPS as undeliverable but with a forwarding address, we will re-mail the Notice to the updated address provided by the USPS.  If the returned Notice does not identify any updated address from the USPS, we will submit the Class Member's mailing information to the LexisNexis compendium of domestic addresses for updated address information, if available.  In addition, we will update addresses based on requests received from Class Members.  We estimate that we will target through direct notice approximately 9,356 (80%) of the Presumed Living Class Members directly, representing 50.0% of the total Settlement Class.

(2) *Presumed Living Relatives of Deceased Class Members.*  We have names and addresses for 27,803 Relatives in the Presumed Living Relative List associated with 5,525 distinct Deceased Class Members.  The Settlement Agreement permits a personal representative to submit a claim on behalf of a deceased Class Member and such personal representatives release their claims against the defendants regardless of whether they file a claim.  (Agreement § 1.3.63, § 1.3.70)  We will mail notice to these known Presumed Living Relatives who may be or may know deceased Class Members' personal representatives.  We estimate that we will target directly

---

[2] The NCOA database contains records of all permanent change of address submissions received by the USPS from individuals and businesses. The Settlement Potential Claimant list is submitted against the database, and a Potential Claimant's address is automatically updated with the new address from USPS data based on a comparison with the Potential Claimant's name and last known address.

approximately 27,803 known Presumed Living Relatives belonging to 5,525 (78.3% of) total deceased Class Members, or 25% of the total Settlement Class.

(3) ***Deceased Class Members.*** Of the 7,055 Class Members who are deceased, we have a name and mailing address for 6,825 (96.7%). While notices mailed to these persons' last known addresses, of course, will not reach the actual Class Members, they may, at minimal cost, reach family members or other persons who are or may know personal representatives of the Deceased.

(4) ***Attorneys and Law Firms in Underlying Lawsuits.*** As described above, Verus provided to us the names and mailing addresses of 50 attorneys and law firms who collectively represented 4,929 Class Members in their underlying lawsuits, 2,212 for whom search efforts did not yield direct contact or other identifying information. We understand from Verus and the Parties that the majority of these attorneys or their successors are still active and, we believe it is reasonable to conclude that many are in active communication with the living Class Members who they represented during the class period or may be a reliable source from whom we can update contact information for these clients. Therefore, we will mail a long-form Notice to every attorney and law firm for whom we have an address in the same manner described above for Presumed Living Class Members and Relatives. We will provide the lawyers with a list of potential Class Members for whom our research suggests they filed underlying lawsuits, and we will enclose a letter prepared by Class Counsel substantially in the form of Exhibit 3 to this Declaration that will provide background about the matter, request that the recipient mail the Notice to his or her clients who were plaintiffs in the underlying lawsuits, and ask the attorneys to respond to BrownGreer with confirmation that they mailed the Notice to their clients.

18. ***Estimated Direct Notice Reach.*** Through direct notice alone, we feel we can target through mailed notice nearly 80% of the Settlement Class either directly or through at least one relative of the Deceased, and just over 90% after including notice through plaintiffs' firms. Because of anticipated undeliverable notices, which we estimate will be no more than 15% of notices sent, we project that we can reach at least 77.5% of Class Members and their Relatives directly. We understand from defense and plaintiffs' counsel that the attorneys for whom we have information in this case from depositions and other discovery documents are highly engaged with their clients, and therefore, the attorneys are likely to disseminate the message to their former and current clients. Accordingly, we believe the 77.5% estimated reach percentage may be conservative. Under the circumstances, and thanks to the considerable data culling,

19

cleansing, and enhancing efforts undertaken, we expect to achieve a meaningful and important reach percentage that rises above the 70% reach target suggested by the FJC Checklist.

19. ***Need for Publication Notice***.  Although a reach percentage of at least 70% is probable in this matter, there are a few unpredictable factors that could reduce the reach of Class Members, such as the strength of addresses we received for this aging population of Class Members from various data sources and the fact that the Relatives to whom we are sending Notice may not be or notify the personal representatives of the Deceased.  Accordingly, we plan to supplement the direct notice efforts with a carefully planned public notice campaign to target those Class Members, Relatives, and other potential personal representatives we cannot reach by mail because their identities are unknown, mailing addresses of those persons are unavailable, or mailed notices are returned to us by USPS as undeliverable.  This public notice will also reach Presumed Living Class Members and Relatives already notified by direct mail.  By reaching these persons again, the public notice will serve alternative goals of strengthening Class Member and Relative awareness of the Settlement and engaging those persons to become more likely to participate in the settlement program.

20. ***Developing a Publication Notice Plan.***  Notice by publication in the class settlement context refers to the practice of exposing potential members of a Settlement Class whom you cannot contact directly to a class settlement notice by strategically placing the notice in places where the Settlement Class Members will have the opportunity to see, read and react to the notice.  A publication notice campaign is effectively an advertising campaign for the proposed class settlement.  A publication notice strategy, therefore, must consider characteristics of the audience and how those audience members are most likely to see and respond to the notice.  The publication notice strategy in the Notice Plan proposed for this case

obviously must target the Settlement Class.  We will also aim to reach Relatives of the Deceased for the reasons described in Paragraph 17(b) of this Declaration.  Based on our analysis of the available last known addresses for Class Members and known Presumed Living Relatives, we estimate that nearly 82% of the Presumed Living Class Members and 72.5% of the Presumed Living Relatives reside in Ohio, Mississippi, Georgia, and Alabama.  An analysis of available dates of birth for the Presumed Living Relatives reveals that more than 50% are ages 45-70.  While there is limited date of birth information available for the Presumed Living Class Members, we know from the high percentage of deceased Class Members and representations of the Parties nearly all Presumed Living Class Members are over 55.  Therefore, the publication notice strategy will use geographic, age, and other industry standard targeting techniques to try to reach potential Settlement Class Members.

**(1)** ***Print Publication.***  We will adapt the long-form Notice into a summary notice format, substantially in the form of Exhibit L to the plaintiff's motion for preliminary approval that can be placed as ads in various print publications.  We will implement a regional print publication campaign focused on the four states where the vast majority of Presumed Living Class Members and Presumed Living Relatives reside.  We will supplement that campaign with three carefully selected national print ads chosen to reach Class Members and Relatives outside these four states.  The table below shows the print publications where we will place summary versions of the long-form Notice.

| Print Publications | | | |
|---|---|---|---|
| National | | | |
| | **Publication** | **Description** | **Circulation** |
| 1. | *AARP Bulletin* | Provides timely insights and in-depth analysis important to Americans 50-plus on topics including health, Medicare, Social Security, finances, and consumer protection. | 23,109,129 |
| 2. | *Conquer* | Magazine that is the forum for patients with cancer initiated by the Academy of Oncology Nurse & Patient Navigators. It features articles written by and for patients with cancer, survivors, nurse navigators, and other oncology team members. The magazine addresses the issues that patients, their family members, and caregivers face every day in an easy-to-read format. Issues include interviews with patients with cancer, information on access to care, and articles on lifestyle topics such as nutrition, stress management, personal finance, and legal and employer issues. | 90,000 |

| 3. | *Coping with Cancer* | Magazine is edited for people whose lives have been touched by cancer. It provides the knowledge patients, survivors or professionals need to cope with the many issues confronting their daily lives, including assuming greater responsibility for, and participation in, the many facets of the disease. It includes information on research, treatment, survivor profiles, and latest news. | 285,000 |
|---|---|---|---|

| Regional | | |
|---|---|---|
| | **Publication** | **Location** | **Circulation** |
| 1. | *Akron Beacon Journal* | Akron, OH | 56,951 |
| 2. | *Albany Herald* | Albany, GA | 14,526 |
| 3. | *Columbus Ledger-Enquirer* | Columbus, GA | 12,359 |
| 4. | *Delta Democrat Times* | Greenville, MS | 9,722 |
| 5. | *East Liverpool Review* | East Liverpool, OH | 3,514 |
| 6. | *Montgomery Advertiser* | Montgomery, AL | 12,013 |
| 7. | *Northeast Mississippi Daily Journal* | Tulepo, MS | 18,348 |
| 8. | *Portsmouth Daily Times* | Portsmouth, OH | 8,574 |
| 9. | *Savannah Morning News* | Savannah, GA | 16,799 |
| 10. | *Sun Herald* | Gulfport, MS | 12,655 |
| 11. | *The Anniston Star* | Anniston, AL | 8,985 |
| 12. | *The Atlanta Journal-Constitution* | Atlanta, GA | 238,343 |
| 13. | *The Augusta Chronicle* | Augusta, GA | 16,418 |
| 14. | *The Cincinnati Enquirer* | Cincinnati, OH | 79,440 |
| 15. | *The Clarion-Ledger & Hattiesburg American* | Jackson, MS/Hattiesburg, MS | 106,422 |
| 16. | *The Commercial Dispatch* | Columbus, MS | 13,500 |
| 17. | *The Decatur Daily* | Decatur, AL | 10,980 |
| 18. | *The Dothan Eagle* | Dothan, AL | 12,357 |
| 19. | *The Greenwood Commonwealth* | Greenwood, MS | 3,005 |
| 20. | *The Marietta Times* | Marietta, OH | 5,730 |
| 21. | *The Meridian Star* | Meridian, MS | 7,691 |
| 22. | *The Plain Dealer* | Cleveland, OH | 138,938 |
| 23. | *The Selma Times-Journal* | Selma, AL | 10,043 |
| 24. | *The Telegraph* | Macon, GA | 16,759 |
| 25. | *The Tuscaloosa News* | Tuscaloosa, AL | 12,169 |
| 26. | *Times Daily* | Florence, AL | 12,271 |
| 27. | *Delta Democrat Times* | Greenville, MS | 9,722 |
| 28. | *East Liverpool Review* | East Liverpool, OH | 3,514 |
| 29. | *Montgomery Advertiser* | Montgomery, AL | 12,013 |
| 30. | *Northeast Mississippi Daily Journal* | Tulepo, MS | 18,348 |

| 31. | *Portsmouth Daily Times* | Portsmouth, OH | 8,574 |
|---|---|---|---|
| 32. | *Savannah Morning News* | Savannah, GA | 16,799 |
| 33. | *Sun Herald* | Gulfport, MS | 12,655 |
| 34. | *The Anniston Star* | Anniston, AL | 8,985 |
| 35. | *The Atlanta Journal-Constitution* | Atlanta, GA | 238,343 |
| 36. | *The Augusta Chronicle* | Augusta, GA | 16,418 |
| 37. | *The Cincinnati Enquirer* | Cincinnati, OH | 79,440 |
| 38. | *The Clarion-Ledger & Hattiesburg American* | Jackson, MS/Hattiesburg, MS | 106,422 |
| 39. | *The Commercial Dispatch* | Columbus, MS | 13,500 |
| 40. | *The Decatur Daily* | Decatur, AL | 10,980 |
| 41. | *The Dothan Eagle* | Dothan, AL | 12,357 |

**(2) *Digital Advertising.*** In addition to the print media publications listed above, we will incorporate a digital notice component into the Notice Plan.

**(a) Banner Advertisements.** In fashioning the components of the public notice program, we have taken into account the changes in media consumption as a result of the COVID-19 pandemic, during which far fewer people are traveling, staying in hotels, and visiting physician and other offices where magazines are often read, as well as the reality that many such locations, even though partially re-opened, have removed high-touch items like newspapers and magazines from their lounge and waiting areas. To accommodate such changes, we will adapt the long-form Notice into a banner ad that can be placed on the online version of *People* magazine. The banner ad will expose the notice to Class Members, and importantly some of the younger Relatives, who may prefer to consume media electronically or have less opportunity now to consume print media. Viewers of the ad can click on the ad and be routed directly to the Settlement Website, where they are able to download a copy of the long-form Notice.

**(b) Paid Internet Search Terms.** The paid search component of the Notice campaign involves the use of targeted keywords on top Internet search engines, such as Google. We will purchase terms that are narrowly related to the subject matter and Parties to this settlement for at least a period of thirty days following the date the class notice commences. A link to the Settlement Website will appear when there is high relevance between the search and our selected keywords, and is then ranked by a computed value based on the dollar amount of the bid. When Internet visitors search for these keywords or keyword combinations, the Settlement Website will be displayed at the top of the list of results for the search query. The internet search terms aspect of the Notice Plan aims to achieve approximately 10,000 impressions and 300 click-throughs to the Settlement Website each month.

**(3) *Press Release*.** We will issue a joint press release substantially in the form of Exhibit 4 through Cision/PR Newswire, a leading provider of multimedia platforms

and distribution.  The press release will explain the core aspects of the proposed settlement and provide the address for the Settlement Website, as well as the toll-free number.  We expect that the press release will be picked-up by hundreds of media outlets with a combined potential audience of tens of millions of people.

## VI.    CONCLUSION

**21.    *The Notice Plan is the Best Notice Practicable Under the Circumstances.***

The Notice Plan provides direct, individual notice by mail to potential Class Members and

their known Relatives to the extent reasonably possible.  The proposed Notice Plan satisfies

due process and Rule 23's requirement of the best notice practicable under the

circumstances, including giving individual notice to all Class Members who can be identified

with reasonable effort and supplementing those efforts with notice to persons associated with

the Class Members and paid media elements.  With an estimated direct notice reach

exceeding 77% of Presumed Living Class Members or their attorneys of underlying lawsuits

and at least one Relative of deceased Class Members, a regional public notice campaign that

targets Presumed Living Class Members and Presumed Living Relatives, national print

publication ads that will expose Presumed Living Class Members and Relatives outside of

the four primary states of residence to the notice, and a digital media component targeting

those Class Members and their Relatives who consume media electronically and actively

search for information relevant to this matter, the Notice Plan is likely to provide the same or

better reach than courts have approved in other similar class matters.  The Notice Plan is also

generally consistent with the aims of the FJC Checklist.

I, Orran L. Brown, Sr., declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.  Executed on this 2nd day of July, 2020.


_____

Orran L. Brown, Sr.

# Exhibit 1

**Orran Brown Sr. Biography**

**BROWNGREER**

*Founding Partner*

# ORRAN L. BROWN, SR.



Orran develops and implements the best practices and strategies for the negotiation and drafting of resolution plans, legal proceedings to obtain court approval, the efficient design and operation of group claims facilities and compliance with the agreements and court orders governing the claims resolution process to provide a program a successful start and timely and efficient progress to a successful completion.  He has served as a claims administrator, as a trustee directing the implementation of a settlement program and as a Special Master presiding over discovery, records collection and deposition scheduling and calendaring in coordinated multidistrict proceedings.

Orran has served in these fields since 1990.  He and Lynn Greer founded BrownGreer in September 2002 to devote themselves to providing these services and to assist parties and the courts in handling the information and issues presented in management and resolution of multidistrict litigation and multiple claim situations.

## Education & Honors

- Harvard Law School, Cambridge, Massachusetts, J. D. *cum laude*, 1981
- Hampden-Sydney College, Hampden Sydney, Virginia, B.A., Government and Foreign Affairs, *summa cum laude*, 1978 (GPA 4.0 out of 4.0; Phi Beta Kappa; Omicron Delta Kappa; Eta Sigma Phi; Pi Sigma Alpha; Chairman of the Student Court)
- Law Clerk to the Hon. Robert R. Merhige, Jr., United States District Court for the Eastern District of Virginia, Richmond, Virginia, 1981-1982
- *Super Lawyers Magazine's* 2007 - 2019 Annual List of Top Attorneys in Virginia
- AV Preeminent™ Rating, Martindale-Hubbell® 2016-2017

## Professional Activities

- Wheat Professor, Hampden Sydney College 2018-Present; Leadership and Ethics Class
- Adjunct Professor, University of Richmond School of Law 1997-2005 (Taught trial and appellate practice and an upper-level course on mass torts, MDL class actions, and complex litigation)
- Frequent speaker at conferences and continuing legal education events
- Permanent Member, Fourth Circuit Judicial Conference

## Service Activities

- Board of Trustees, Hampden-Sydney College
- Board of Trustees, Roller-Bottimore Foundation
- Board of Visitors, St. Christopher's School
- Vestry, St. Stephen's Episcopal Church
- City of Richmond Charter Review Commission
- Boy Scouts Troop 444, Assistant Scout Master

## Bar Admissions

- Virginia, 1986
- Texas, 1983

# Exhibit 2

**BrownGreer Summary of Experience**



# FIRM EXPERIENCE

**BROWNGREER PLC**

250 Rocketts Way

Richmond, VA 23231

(8040 521-7200

information@BrownGreer.com

WWW.BROWNGREER.COM

## PERSONAL INJURY SETTLEMENT PROGRAMS

| | PROGRAM DESCRIPTION | ROLE | PROGRAM SIZE | SETTLEMENT FUND |
|---|---|---|---|---|
| 1. | *In re National Football League Players' Concussion Injury Litigation*, MDL Docket No. 2323 (E.D. Pa). Class action settlement to resolve claims by retired National Football League players relating to repetitive head impacts. | Claims Administrator | TBD | Fund Uncapped |
| 2. | *Confidential.* Voluntary settlement program of claims arising from the use of a prescription medication. | Claims Administrator | 12,000 Claimants | Fund Uncapped; $1.4 Billion Disbursed |
| 3. | *Confidential.* Voluntary settlement program of claims arising from the use of a prescription medication. | Claims Administrator | 2,700 Claimants | Fund Uncapped; $279 Million Disbursed |
| 4. | *Catholic Diocese of Richmond Independent Reconciliation Program.* Private Settlement to resolve sexual abuse claims in the Richmond Catholic Diocese. | Claims Administrator | TBD | TBD |
| 5. | *In re: Just For Men® Mass Tort Litigation,* Case No. 3:16 cv-00638-SMY (S.D. IIL.). Private Settlement to resolve cases arising out of the use of a male-oriented hair coloring product designed to cover grey hair. | Claims Administrator | TBD | TBD |
| 6. | *In re Vioxx Products Liability Litigation*, MDL Docket No. 1657 (E.D. La.). Voluntary settlement program to resolve claims arising from the use of prescription painkillers. | Claims Administrator | 60,000 Claimants | $4.85 Billion |
| 7. | *In re Diet Drugs (Phentermine/Fenfluramine/ Dexfenfluramine) Products Liability Litigation*, MDL Docket No. 1203 (E.D. Pa.). Class action settlement to resolve claims arising from the use of "Fen-Phen" diet drugs. | Liaison for the Defendant to the Settlement Trust | 600,000 Claimants | $3.55 Billion |
| 8. | *In re A.H. Robins Company Inc., Debtor (In re Dalkon Shield Claimants Trust)*, MDL Docket No. 211 (Bankr. E.D. Va.). Settlement program created in the Chapter 11 bankruptcy proceeding of the A.H. Robins Company to resolve claims arising from use of the Dalkon Shield intrauterine device. | Counsel to the Settlement Trust | 400,000 Claimants | $3 Billion |
| 9. | *In re DePuy Orthopaedics, Inc., ASR Hip Implant Products*, MDL Docket No. 2197 (N.D. Ohio). Voluntary settlement program for claims relating to metal-on-metal hip implant devices. | Claims Administrator | 9,300 Claimants | $2.8 Billion |



## PERSONAL INJURY SETTLEMENT PROGRAMS

| | PROGRAM DESCRIPTION | ROLE | PROGRAM SIZE | SETTLEMENT FUND |
|---|---|---|---|---|
| 10. | *In re Diet Drugs (Phentermine/Fenfluramine/ Dexfenfluramine) Products Liability Litigation,* MDL Docket No. 1203 (E.D. Pa.). Voluntary settlement program to resolve opt outs from the class action settlement of claims arising from use of "Fen-Phen" diet drugs. | Claims Administrator | 66,000 Claimants | $2.63 Billion |
| 11. | *In re Actos (Pioglitazone) Products Liability Litigation,* MDL Docket No. 2299 (W.D. La). Voluntary settlement program to resolve claims arising from the use of a diabetes medication. | Claims Administrator | 10,800 Claimants | $2.37 Billion |
| 12. | *In re Sulzer Orthopedics and Knee Prosthesis Products Liability Litigation,* MDL Docket No. 1401 (N.D. Ohio). Class action settlement of claims relating to hip and knee implants. | Claims Administrator | 27,000 Claimants | $1.15 Billion |
| 13. | *October 1 Fund.* Private Settlement to resolve cases arising from the October 1, 2017 Las Vegas shooting at Mandalay Bay during an outdoor concert. | Claims Processor | 4,300 | $800 Million |
| 14. | *In Re Xarelto® Litigation Settlement Program.* Private settlement to resolve cases arising out of the use of a prescription blood thinner. | Claims Administrator | 33,000 | $775 Million |
| 15. | *In re Pradaxa (Dabigatran Etexilate) Products Liability Litigation,* MDL Docket No. 2385 (S.D. Illinois). Voluntary settlement program to resolve claims arising from the use of a blood thinning medication. | Claims Administrator | 4,800 Claimants | $650 Million |
| 16. | *In re: Benicar (Olmesartan) Products Liability Litigation,* MDL No. 2606 (N.J.). Voluntary settlement program to resolve claims arising from the use of prescription hypertension medication. | Claims Administrator | 8,500 Claimants | $358 Million |
| 17. | *In re Wright Medical Technology, Inc., Conserve Hip Implant Products Liability Litigation,* MDL Docket No. 2329, (N.D. Ga.). Private settlement program established to resolve claims related to CONSERVE®, DYNASTY®, and LINEAGE® metal-on-metal hip replacement devices. | Claims Administrator | 1,233 Claimants | $249 Million |
| 18. | *In re Reglan®/Metoclopramide Mass Tort Litigation,* No. 01997 (Philadelphia County Ct. of C.P.); *In re Reglan® Litigation,* Case No. ATL-L-3865-10 (Super Ct. NJ); *Reglan®/Metoclopramide Cases,* CJC-10-004631 (Cal. Super Ct.). Private settlement program consolidating PA, NJ, and CA class action settlements to resolve claims arising out of the use of a prescription medication. | Notice and Claims Administrator | 5,263 Claimants | $240 Million |



## PERSONAL INJURY SETTLEMENT PROGRAMS

| | PROGRAM DESCRIPTION | ROLE | PROGRAM SIZE | SETTLEMENT FUND |
|---|---|---|---|---|
| 19. | *In re Guidant Implantable Defibrillators Products Liability Litigation Settlement*, MDL Docket No. 1708 (D. Minn.). Voluntary settlement program to resolve claims related to a medical device company's cardiac resynchronization therapy devices, implantable cardiac defibrillators and pacemakers. | Advised Defendant and Defense Counsel | 26,000 Class Members | $240 Million |
| 20. | *In re Nuvaring Products Liability Litigation*, MDL Docket No. 1964 (W.D. Mo.). Voluntary settlement program to resolve claims related to the use of a contraceptive device. | Claims Administrator | 3,800 Claimants | $100 Million |
| 21. | *In re: Abilify (Aripiprazole) Products Liability Litigation*, MDL No. 2734 Settlement Program. Private settlement program to resolve cases arising out of the use of a prescription medication. | Claims Processor | 3,955 Claimants | $60 Million |
| 22. | *In re Phenylpropanolamine (PPA) Products Liability Litigation*, MDL Docket No. 1407 (W.D. Wash.). Class action settlement trust established to resolve claims related to an over-the-counter weight loss product. | Claims Administrator | 500 Claimants | $60 Million |
| 23. | *In re: Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Products Liability Litigation*, MDL Docket No. 2100 (S.D. Ill.). Private voluntary settlement program to resolve claims alleging an arterial thromboembolism ("ATE"), either alone or in combination with some other injury, resulting from the use of drospirenone-containing oral contraceptives manufactured by Bayer or marketed by Barr Laboratories, Inc., or Teva Pharmaceuticals USA, Inc. | Claims Administrator | 1,275 Claimants | $57 Million |
| 24. | *In re Yasmin and YAZ (Drospirenone) Marketing, Sales Practices and Products Liability Litigation*, MDL Docket No. 2100 (S.D. Ill.). Private settlement program to resolve claims alleging gallbladder disease or a gallbladder injury from the use of drospirenone-containing oral contraceptives manufactured by Bayer or marketed by BarrTeva. | Claims Administrator | 9,000 Claimants | $24 Million |
| 25. | *In re OxyContin Litigation - All Cases*, No. 2002-CP-18-1756 (Cir. Ct. Dorchester County, S.C.). Class action settlement by a pharmaceutical company regarding a prescription pain killer. | Notice and Claims Administrator | 3,600 Class Members | $4.25 Million |
| 26. | *In re Seroquel Products Liability Litigation*, MDL Docket No. 1769 (M.D. Fla.). Multidistrict litigation proceedings involving the antipsychotic prescription drug Seroquel. | Special Master; Project Manager | Not Disclosed | $150,000 |



250 ROCKETTS WAY, RICHMOND, VA 23231  |  (804) 521-7200
INFORMATION@BROWNGREER.COM  |  WWW.BROWNGREER.COM

© 2020 BROWNGREER PLC

| PERSONAL INJURY SETTLEMENT PROGRAMS | | | | |
|---|---|---|---|---|
| | PROGRAM DESCRIPTION | ROLE | PROGRAM SIZE | SETTLEMENT FUND |
| 27. | *In re Pittsburgh Corning Corporation*, No. 00-22876-TPA (Bankr. W.D. Pa.). Class action settlement to resolve personal injury claims relating to exposure to asbestos made by refinery and chemical plant workers with individual asbestos cases pending in the Eastern District of Texas. | Notice Administrator | 2,272 Class Members | Not Applicable |



# ECONOMIC LOSS SETTLEMENT PROGRAMS

| | PROGRAM DESCRIPTION | ROLE | PROGRAM SIZE | SETTLEMENT FUND |
|---|---|---|---|---|
| 1. | *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL Docket No. 2179 (E.D. La).  Class action settlement to resolve economic loss and property damage claims arising from the April 20, 2010 oil spill in the Gulf of Mexico. | Claims Administration Services | 260,000 Claimants | Uncapped Fund; $11.6 Billion Disbursed |
| 2. | *Gulf Coast Claims Facility.*  Voluntary claims program to resolve economic loss and physical injury claims arising from the April 20, 2010 oil spill in the Gulf of Mexico. | Claims Administration Services; Transition Coordinator | 600,000 Claimants | $20 Billion cap; $6.5 Billion Disbursed |
| 3. | *Ortega Melendres, et. al., v. Paul Penzone, et. al.,* No. CV-07-2513-PHX-GMS (D. Az.).  Voluntary program to resolve claims that individuals were stopped or held by the Maricopa County Sheriff's Office in violation of a court order. | Notice and Claims Administrator | 200 Class Members | Uncapped Fund |
| 4. | *Hanna v. Agape Senior, LLC,* No. 12-CP-40-5950 (S.C. St. Ct., Richland Cnty., S.C.).  Class action settlement resolving claims of certain residents of senior and assisted living facilities related to alleged improper delivery of medical treatment. | Notice and Claims Administrator | 600 | Uncapped Fund; ~$480,000 Disbursed |
| 5. | *Confidential.* Conciliation agreement between a financial institution and the U.S. Department of Housing & Urban Development related to alleged discriminatory acts in mortgage loan application handling. | Notice and Claims Administrator | Class Size Unknown | Fund Uncapped |
| 6. | *In re Syngenta AG MIR 162 Corn Litigation,* MDL Docket No. 2591, (D. Kansas).  Class action settlement to resolve claims concerning genetically modified corn and crop values. | Notice and Claims Administrator | Estimated more than 600,000 Class Members | $1.51 Billion |
| 7. | *Travel Insurance Refund Program in the matter of Jefferson Insurance Company NAIC #11630 and in the matter of BCS Insurance Company NAIC #38245.*  Regulatory settlement program between certain travel insurance companies and State regulators to issue refunds to policy holders who purchased travel insurance through an Opt-Out Marketing Plan. | Program Administrator | 504,927 | To Be Determined |
| 8. | *In re Black Farmer's Discrimination Litigation,* No. 08-mc-0511 PLF (D.D.C.).  Class action settlement to resolve claims of discrimination against African-American farmers by the U.S. Department of Agriculture regarding farm loans and loan servicing for claimants who had missed deadlines in a prior settlement. | Claims Review and Evaluation | 40,000 Claimants | $1.25 Billion |



250 ROCKETTS WAY, RICHMOND, VA 23231  |  (804) 521-7200
INFORMATION@BROWNGREER.COM   |   WWW.BROWNGREER.COM

© 2020 BROWNGREER PLC

## ECONOMIC LOSS SETTLEMENT PROGRAMS

| | PROGRAM DESCRIPTION | ROLE | PROGRAM SIZE | SETTLEMENT FUND |
|---|---|---|---|---|
| 9. | *United States Securities and Exchange Commission v. American International Group, Inc.*, No. 06-Civ. 100-LAP (S.D.N.Y.).  Securities enforcement action settlement between the SEC and a multinational insurance corporation over allegations of accounting fraud and related shareholder litigation. | Audited the Claims Administrator | 260,000 Class Members | $843 Million |
| 10. | *In re Genetically Modified Rice Litigation*, MDL Docket No. 1811 (E.D. Mo.).  Voluntary claims program to resolve claims concerning genetically modified rice and crop values. | Claims Administrator | 12,000 Claimants | $750 Million |
| 11. | *In re Chinese-Manufactured Drywall Products Liability Litigation*, MDL Docket No. 2047 (E.D. La.).  Class action settlement for the remediation of homes containing defective drywall manufactured in China. | Claims Administrator; Lynn Greer, Special Master | 25,000 Claimants | Blend of Uncapped and Capped Funds; $610 Million Disbursed |
| 12. | *Confidential.*  Settlement program reached by the Department of Homeland Security, U.S. Customs and Border Protection (CBP) and the National Treasury Employees Union (NTEU) to resolve certain grievances filed by NTEU. | Settlement Administrator | 25,000 Class Members | $184.1 Million |
| 13. | *United States v. National Treasury Employees Union*, No. 93-1170 (D.C. App.).  Class action settlement between a federal employees' union and the U.S. Government for back payment of wages. | Trustee of Settlement Trust | 212,000 Class Members | $173 Million |
| 14. | *Blando v. Nextel West Corp.*, No. 02-0921-FJG (W.D. Mo.).  Class action settlement by a wireless telecommunications provider to resolve claims under Missouri law involving "cost recovery fees" charged to customers. | Advisor to the Court | 5,000,000 Class Members | $165 Million |
| 15. | *Wildfire Assistance Program.*  Voluntary program providing financial assistance to individuals experiencing urgent needs as a result of the 2017 and 2018 California Wildfires. | Claims Administrator | To Be Determined | $100 Million |
| 16. | *In re Capital One Telephone Consumer Protection Act Litigation,* MDL Docket No. 2416 (N.D. Ill.).  Class action settlement to resolve claims arising from alleged violations of the Telephone Consumer Protection Act. | Notice and Claims Administrator | 17,500,000 Class Members | $75.4 Million |
| 17. | *In re Vioxx MDL Settlement Agreement Related to Consumer Class Actions*, MDL Docket No. 1657 (E.D. La.).  Class action settlement to resolve consumer protection claims arising from the marketing of prescription painkillers. | Claims Administrator | 8,000 Claimants | $23 Million |



250 ROCKETTS WAY, RICHMOND, VA 23231  |  (804) 521-7200
INFORMATION@BROWNGREER.COM  |  WWW.BROWNGREER.COM

© 2020 BROWNGREER PLC

## ECONOMIC LOSS SETTLEMENT PROGRAMS

| | PROGRAM DESCRIPTION | ROLE | PROGRAM SIZE | SETTLEMENT FUND |
|---|---|---|---|---|
| 18. | *Yarger v. ING Bank, FSB*, No. 11-154-LPS (D. Del.).  Class action settlement to resolve claims related to advertising fixed rate mortgages under Delaware consumer law. | Notice and Claims Administrator | 115,000 Class Members | $20 Million |
| 19. | *Acosta v. Tyson Foods, Inc.*, No. 8:08-cv-86 (D. Neb.).  Class action settlement by a poultry producer to resolve claims under the Fair Labor Standards Act and Nebraska law for employee compensation for time spent donning/doffing protective equipment. | Notice Administrator | 3,700 Class Members | $19 Million |
| 20. | *Flores v. Zorbalas*, No. 27-CV-16-14225 (Minn. St. Ct., Hennepin Cnty., Minn.).  Class certification notice program and subsequent class action settlement program resolving claims of tenants of certain apartments in Minneapolis, MN whose landlords allegedly rented out the properties without proper licenses and failed to maintain the properties as required by health and safety laws. | Notice and Claims Administrator | 5,500 Class Members | $18.5 Million |
| 21. | *United States of America v. Capital One, N.A.*, No. 1:12-cv-828 (E.D. Va.).  Consent decrees between a financial services company and the Department of Justice and Office of Comptroller of the Currency to resolve alleged violations of the Servicemembers Civil Relief Act. | Notice and Claims Administrator | 44,000 Claimants | $15 Million |
| 22. | *Ene v. Maxim Healthcare Services, Inc.*, No. 4:09-cv-02453 (S.D. Tex.).  Class action settlement by a healthcare provider to resolve claims under the Fair Labor Standards Act concerning the classification of healthcare recruiters as exempt from overtime pay. | Notice Administrator | 1,600 Class Members | $12.3 Million |
| 23. | *Gregorio v. Premier Nutrition Corporation*, Civil Action No: 17-cv-05987 (S.D.N.Y.).  Class action settlement to resolve claims concerning the misleading advertising of protein shake products. | Notice and Claims Administrator | 9,360,000 Class Members | $9 Million |
| 24. | *Spinelli v. Capital One Bank (USA)*, No. 8:08-cv-132 (M.D. Fla.).  Class action settlement by a financial services company with credit card holders to resolve claims under the Truth in Lending Act. | Notice and Claims Administrator | 9,000,000 Class Members | $5 Million |
| 25. | *Hankins v. Carmax Inc.*, No. 03-C-07-005893 CN (Baltimore County Md. Cir. Ct.).  Class action settlement to resolve claims that a retail car company sold used vehicles without disclosing that the vehicles had been used previously as short-term rentals. | Notice and Claims Administrator | 7,300 Class Members | $8 Million |



## ECONOMIC LOSS SETTLEMENT PROGRAMS

| | PROGRAM DESCRIPTION | ROLE | PROGRAM SIZE | SETTLEMENT FUND |
|---|---|---|---|---|
| 26. | *Cohen v. Warner Chilcott Public Ltd. Co.,* No. 1:06-cv-00401-CKK (D.D.C.). Class action settlement to resolve antitrust claims against two pharmaceutical companies regarding the sale of an oral contraceptive. | Notice Administrator | 2,000,000 Class Members | $6 Million |
| 27. | *Peg Bouaphekeo, et. al., v. Tyson Foods, Inc.,* No. 5:07-cv-04009-JAJ (N.D. Iowa Western Division). Class action settlement by a poultry producer to resolve claims under the Fair Labor Standards Act and Iowa law for employee compensation for time spent donning/doffing protective equipment. | Notice Administrator | 2,523 Class Members | $5.78 Million |
| 28. | *Morgan v. Richmond School of Health and Technology, Inc.,* No. 3:12-cv-00373-JAG (E.D. Va.). Class action settlement by a for-profit vocational college to resolve claims under the Equal Credit Opportunity Act, Title VI of the Civil Rights Act of 1964 and the Virginia Consumer Protection Act. | Notice and Claims Administrator | 4,200 Class Members | $5 Million |
| 29. | *Gomez v. Tyson Foods, Inc.,* No. 08-021 (D. Neb.). Class action settlement by a poultry processing company to resolve claims under the Fair Labor Standards Act and Nebraska law for employee compensation for time spent donning/doffing protective equipment. | Notice Administrator | 5,300 Class Members | $5 Million |
| 30. | *Rogers v. City of Richmond, Virginia*, No. 3:11-cv-00620 (E.D. Va.). Class action settlement under the Fair Labor Standards Act and Virginia law involving current and former city police officers alleging unpaid overtime wages. | Claims Administrator | 600 Claimants | $4.6 Million |
| 31. | *Gales v. Capital One, N.A.,* No. 8:13-cv-01624 (D. Md). Class action settlement by a financial services company to resolve claims related to the sale of certain repossessed motor vehicles. | Claims Administrator | 9,000 Class Members | $4.4 million |
| 32. | *Betts v. National Cash Advance/Advance America,* Nos. 502001CA0003200CAI-MB and 502004CA008164XXXXI-MB (Palm Beach County Cir. Ct.). Class action settlement to resolve claims alleging violates of the Florida Lending Practices Act, the Florida Consumer Finance Act, the Florida Deceptive and Unfair Trade Practices Act, and the Civil Remedies for Criminal Practices Act. | Notice and Claims Administrator | 18,500 Class Members | $4.32 Million |
| 33. | *Llewellyn v. Big Lots Stores, Inc.,* No. 09-cv-5085 (E.D. La.). Class action settlement by a retailer to resolve claims under the Fair Labor Standards Act regarding the classification of assistant store managers. | Claims Administrator | 200 Class Members | $4 Million |



## ECONOMIC LOSS SETTLEMENT PROGRAMS

| | PROGRAM DESCRIPTION | ROLE | PROGRAM SIZE | SETTLEMENT FUND |
|---|---|---|---|---|
| 34. | *Desio v. Emerson Electric Co. d/b/a InSinkErator,* No. 2:15-cv-00346 (E.D. Wa.). Class action settlement to resolve claims that certain filters used in water filtration systems could crack and leak water, causing property damage. | Notice and Claims Administrator | Estimated 455,000 or fewer Class Members | $3.8 Million |
| 35. | *Herron v. CarMax Auto Superstores, Inc.,* No. 2006-CP-02-1230 (Aiken County S.C. Jud. Dist.). Class action settlement to resolve claims related to document processing fees charged to customers by a car dealer. | Notice and Claims Administrator | 27,000 Class Members | $3.8 Million |
| 36. | *Collins v. Sanderson Farms, Inc.,* No. 2:06-cv-02946 (E.D. La.). Class action settlement by a poultry processing company to resolve claims under the Fair Labor Standards Act regarding employee compensation for time spent donning/doffing protective equipment. | Notice and Claims Administrator | 21,000 Class Members | $3.1 Million |
| 37. | *Nader v. Capital One Bank (USA),* No. CV-12-01265-DSF (RZx) (C.D. Cal.). Class action settlement by a financial institution to resolve claims under state privacy and wiretapping laws concerning the alleged recording of outbound customer service calls. | Settlement Administrator | 1,800,000 Class Members | $3 Million |
| 38. | *In re Children's Ibuprofen Oral Suspension Antitrust Litigation,* No. 1:04-mc-0535 (D.D.C.). Class action settlement to resolve claims of antitrust violations by two manufacturers of over-the-counter children's pain relievers. | Notice Administrator | 10,000 Class Members | $3 Million |
| 39. | *Rubenstein v. The Neiman Marcus Group LLC,* No. 2:14-cv-07155-SJO-JPR (C.D. Ca.). Proposed settlement program to resolve allegations that consumers were misled by the "Compared To" price tags on merchandise sold by the Defendant. | Notice and Claims Administrator | To Be Determined | $2.9 Million |
| 40. | *United States of America v. Chevy Chase Bank, F.S.B.,* No. 1:13-cv-1214 (E.D. Va.). Consent decree between a financial services company and a federal regulatory agency involving allegations under the Equal Credit Opportunity and Fair Housing Acts. | Notice and Claims Administrator | 3,500 Class Members | $2.85 Million |
| 41. | *Samuel v. EquiCredit Corp.,* No. 00-cs-6196 (E.D. Pa.). Class action settlement by a financial services institution to resolve claims under the Real Estate Settlement Procedures Act regarding the application of loan proceeds to pay mortgage broker fees. | Notice and Claims Administrator | 13,000 Class Members | $2.5 Million |



# ECONOMIC LOSS SETTLEMENT PROGRAMS

| | PROGRAM DESCRIPTION | ROLE | PROGRAM SIZE | SETTLEMENT FUND |
|---|---|---|---|---|
| 42. | *Beecroft v. Altisource Business Solutions PVT LTD.,* No. 0:15-cv-02184 (D. Minn). Class action settlement to resolve claims arising from alleged violations of the Telephone Consumer Protection Act. | Notice and Claims Administrator | 56,104 Class Members | $1.8 Million |
| 43. | *Hall v. Capital One Auto Finance, Inc.,* No. 1:08-cv-01181 (N.D. Ohio). Class action settlement by a financial services company to resolve claims related to automobile repossession under Ohio consumer statutes. | Notice and Claims Administrator | 3,400 Class Members | $1.5 Million |
| 44. | *McCoy v. North State Aviation, LLC,* Case No. 1:17-cv-00346-CCE-LPA (M.D.N.C.). Class action settlement to resolve claims that Defendant violated the federal Worker Adjustment and Retraining Notification Act (the WARN Act), which requires certain employers to give 60-day advance notification of plant closings and mass layoffs. | Settlement Administrator | 339 | $1.5 Million |
| 45. | *Watts v. Capital One Auto Finance, Inc.,* No. CCB-07-03477 (D. Md.). Class action settlement by a financial services company to resolve claims related to automobile repossession under Maryland consumer statutes. | Notice and Claims Administrator | 2,700 Class Members | $990,000 |
| 46. | *Churchill v. Farmland Foods, Inc.,* No. 4:06-cv-4023 (C.D. Ill.). Class action settlement by a pork processing company to resolve claims under the Fair Labor Standards Act and Illinois law regarding employee compensation for time spent donning/doffing protective equipment. | Notice and Claims Administrator | 2,300 Class Members | $980,000 |
| 47. | *Polanco v. Moyer Packing Company,* No. C.P., 1852 (Philadelphia County Pa.). Class action settlement by a beef processing company to resolve claims under the Fair Labor Standards Act and Pennsylvania law regarding employee compensation for time spent donning/doffing protective equipment. | Notice and Claims Administrator | 4,500 Class Members | $850,000 |
| 48. | *Cohen v. Foothill/Eastern Transportation Corridor Agency, et. al.,* No. SACV 15-01698 DDP (C.D. Ca.). Class action settlement to resolve alleged violations of the Fair and Accurate Credit Transactions Act (FACTA) by a toll-road operator. | Notice and Claims Administrator | 25,762 Class Members | $850,000 |
| 49. | *Bessey v. Packerland Plainwell, Inc.,* No. 4:06-cv-0095 (W.D. Mich.). Class action settlement by a pork processing company to resolve claims under the Fair Labor Standards Act and Michigan law regarding employee compensation for time spent donning/doffing protective equipment. | Notice and Claims Administrator | 3,000 Class Members | $700,000 |



## ECONOMIC LOSS SETTLEMENT PROGRAMS

| | PROGRAM DESCRIPTION | ROLE | PROGRAM SIZE | SETTLEMENT FUND |
|---|---|---|---|---|
| 50. | *Santiago v. GMAC Mortgage Group, Inc.,* No. 784574 (E.D. Pa.).  Class action settlement by a financial services company to resolve claims under the Real Estate Settlement Procedures Act concerning charges for mortgage settlement services. | Notice and Claims Administrator | 84,000 Class Members | $650,000 |
| 51. | *Contreras v. PM Beef Holdings, LLC,* No. 07-CV-3087 (D. Minn.).  Class action settlement by a beef processing company to resolve claims under the Fair Labor Standards Act and Minnesota law for employee compensation for time spent donning/doffing protective equipment. | Notice and Claims Administrator | 3,000 Class Members | $500,000 |
| 52. | *Morales v. Greater Omaha Packing Co. Inc.,* No. 8:08-cv-0161 (D. Neb.).  Class action settlement by a beef processing company to resolve claims under the Fair Labor Standards Act and Nebraska law regarding employee compensation for time spent donning/doffing protective equipment. | Notice and Claims Administrator | 4,000 Class Members | $490,000 |
| 53. | *Graham v. Capital One Bank* (USA), N.A., 8:13-cv-00743 (C.D. Cal.).  Class action settlement related to claims under the California Unfair Competition Law regarding alleged improper disclosures and charges assessed on credit card accounts. | Notice and Claims Administrator | 22,500 Class Members | $460,000 |
| 54. | *In re Moyer Packing Co., P. & S.* Docket No. D-07-0053 (U.S. Dep't Agric.).  Consent decision involving a beef processing company to compensate cattle producers for goods sold based on weights derived using an allegedly malfunctioning weight calculation system. | Notice and Claims Administrator | 1,100 Claimants | $325,000 |
| 55. | *Confidential.*  Voluntary payment program by a city government to compensate current and former city police officers for unpaid overtime wages. | Claims Administrator | 175 Class Members | $300,000 |
| 56. | *Dapice v. Capital One Bank* (USA), N.A. No. 14-cv-6961 GW (AGRx). Class action settlement by a financial institution to resolve claims related to interest rates charged on balance transfers for certain credit card accounts. | Settlement Administrator | 2,564 Class Members | $350,000 |
| 57. | *Confidential.*  Voluntary program by a financial institution to refund customers for payments subsequently discharged in bankruptcy. | Program Administrator | 457 payees | $233,000 |
| 58. | *Wilder v. Triad Financial Corp.,* No. 3:03-cv-863 (E.D. Va.). Class action settlement by a financial services company to resolve claims associated with automobile loan applications under the Fair Credit Reporting Act. | Notice and Claims Administrator | 80,000 Class Members | $200,000 |



# ECONOMIC LOSS SETTLEMENT PROGRAMS

| | PROGRAM DESCRIPTION | ROLE | PROGRAM SIZE | SETTLEMENT FUND |
|---|---|---|---|---|
| 59. | *Conerly v. Marshall Durbin Food Corp.*, No. 2:06-cv-205 (N.D. Ala.). Class action settlement by a poultry processing company to resolve claims under the Fair Labor Standards Act regarding employee compensation for time spent donning/doffing protective equipment. | Notice and Claims Administrator | 1,900 Class Members | $150,000 |
| 60. | *Ferguson v. Food Lion, LLC*, No. 12-c-861 (Berkeley County W. Va. Cir. Ct.). Class action settlement by a retail company to resolve claims under the West Virginia Wage Payment and Collection Act regarding timing of paychecks issued to discharged employees. | Notice and Claims Administrator | 185 Class Members | $150,000 |
| 61. | *Confidential.* Voluntary settlement by a food processing company to resolve claims regarding employee compensation for donning/doffing protective equipment. | Notice Administrator | 670 Class Members | $125,000 |
| 62. | *Confidential.* Voluntary check remittance program by an investment fund to distribute proceeds from numerous settlements to beneficiaries of the fund. | Settlement Administrator | 1,049 | $117,000 |
| 63. | *Confidential HUD Compensation Program.* Compensation fund established to pay damages to persons allegedly discriminated against by financial institution on basis of pregnancy or parental leave. | Notice and Claims Administrator | <100 Class Members | $50,000 |
| 64. | *Cook v. Columbia Freightliner, LLC*, No. 10-CP-02-1987 (Aiken County S.C. Jud. Dist.). Class action settlement to resolve claims regarding a trucking company and the collection of administrative fees in the sale of motor vehicles. | Notice and Claims Administrator | 380 Class Members | $17,000 |
| 65. | *Confidential.* Voluntary payments by a financial institution to reimburse fees charged to the credit card accounts of small business owners. | Payment Administrator | 656 Class Members | $16,000 |
| 66. | *Clark v. Group Hospitalization and Medical Services, Inc.*, No. 3:10-CIV-00333-BEN-BLM (S.D. Cal.). Class action settlement by a health insurance provider to resolve claims under the Employee Retirement Income Security Act and California's Unfair Competition Law. | Notice and Claims Administrator | 80 Class Members | $1,300 Disbursed |
| 67. | *Quinn v. BJC Health System*, No. 052-00821A (City of St. Louis Mo. Cir. Ct.). Class action settlement by a healthcare system to resolve claims associated with hospital fees charged to uninsured patients. | Claims Administrator | 26,000 Class Members | Debt Reduction/ Forgiveness to Qualifying Class Members |



## ECONOMIC LOSS SETTLEMENT PROGRAMS

| | PROGRAM DESCRIPTION | ROLE | PROGRAM SIZE | SETTLEMENT FUND |
|---|---|---|---|---|
| 68. | *In re Record Company Infringement Litigation,* No. 6:15-cv-00708 (M. D. Fla.). Consolidated proceedings involving 65+ parties and alleged violations of copyrights and contracts. | Orran Brown, Special Master; Project Manager | Not Applicable | Not Applicable |
| 69. | *Gray, Ritter & Graham P.C., et al. v. Goldman Phipps PLLC, et al.,* No. 4:13-cv-00206-CDP (E.D. Mo.). Three separate but related claims programs (Watts Group Settlement, Banks Group Settlement, and GP/Murray Group Settlement), established to resolve a class action lawsuit involving claimants who settled claims against Bayer arising out of the presence of Bayer's genetically-modified rice seed in the United States rice supply or lawyers who were paid common-benefit attorneys' fees or paid common-benefit expenses in that litigation. | Notice Administrator | 27,000 Class Members | Not Applicable |
| 70. | *In re Lehman Brothers Holdings Inc.,* No. 08-13555-JMP (Bankr. S.D.N.Y.). Program to track, monitor and evaluate fees being charged by bankruptcy lawyers in the Lehman Brothers Chapter 11 bankruptcy proceeding. | Fee Committee Assistant | Not Applicable | Not Applicable |
| 71. | *Jerry Parker, et al. vs. Smithfield Packing Company, Inc.,* No. 7:07-cv-00176-H. Class action settlement to resolve claims related to overtime pay for employees of a processing facility in Clinton, North Carolina. | Notice Administrator | 2,656 Class Members | Not Applicable |
| 72. | *Lee Lewis, et al. vs. Smithfield Packing Company, Inc.,* No. 7:07-cv-00166-H. Class action settlement to resolve claims related to overtime pay for employees of a processing facility in Tarheel, North Carolina. | Notice Administrator | 12,136 Class Members | Not Applicable |
| 73. | *Lycan, et. al., v. City of Cleveland,* No. CV 09686044 (Court of Common Pleas, Cuyahoga County, OH). Class action lawsuit to resolve claims that the City of Cleveland, Ohio, assessed traffic fines against non-vehicle owners (including lessees and renters) whose vehicles were photographed by automatic enforcement cameras operating in city limits, in violation of a city ordinance. | Notice and Claims Administrator | 31,937 | To Be Determined |
| 74. | *Mercier, et al v. The United States,* No. 12-920C. Class action to resolve alleged claims of unpaid wages for nurses and physician assistants. | Notice and Claims Administrator | To Be Determined | To Be Determined |
| 75. | *In Re De Bernardi v. City and County of San Francisco.* Served as Court-approved Third Party Notice Administrator for a collective action lawsuit regarding Compensatory Time Off earned in lieu of paid overtime. | Notice Administrator | 26,000 | Not Applicable |



## ECONOMIC LOSS SETTLEMENT PROGRAMS

| | PROGRAM DESCRIPTION | ROLE | PROGRAM SIZE | SETTLEMENT FUND |
|---|---|---|---|---|
| 76. | *In Re Wazwaz v. City and County of San Francisco*. Served as Court-approved Third Party Notice Administrator for a collective action lawsuit regarding Compensatory Time Off earned in lieu of paid overtime. | Notice Administrator | 1,000 | Not Applicable |
| 77. | *In Re Donofrio v. IKEA,* No. 2:2018-cv-00599. Served as Court-appointed Third-Party Administrator, responsible for tracking and maintaining Opt-in Consent Forms for a collective action lawsuit involving alleged age-discrimination in the workplace. | Third Party Administrator | 500 | Not Applicable |
| 78. | *Runton et al. v. Brookdale Senior Living, Inc.,* No. 0:17-cv-60664-CMA (S.D. Fla.). Class action settlement resolving claims of certain residents of senior and assisted living facilities related to staffing determinations. | Notice and Claims Administrator | 29,760 | To Be Determined |



# Exhibit 3

**Letter to Underlying Attorneys**

Template Letter to Underlying Counsel Pursuant to Preliminary Approval Order ¶ 11(c)

Dear Counsel,

BrownGreer has been appointed by the United States District Court for the District of New Jersey to serve as the Class Action Notice Agent in the captioned above class action matter (the "*Williams Action*") There is a class action settlement pending in the *Williams Action* and the attached long form notice explains the case, the settlement and  relevant deadlines.

Based on underlying litigation records provided to Verus, LLC, the Court-appointed Claims Administrator, we believe that you, your firm or predecessors to your current law practice either currently represent or previously represented clients who may be members of the *Williams Action* class. Since the settlement may afford these clients the opportunity to receive monetary compensation and otherwise affect their rights  the Court  has ordered that we send you this letter and the long-form notice and request you  to notify your living clients who are class members or their heirs/personal representative if deceased about the settlement.

To assist you, we have enclosed a list prepared by the Claims Administrator of potential Class Members associated with you or whom we believe is a predecessor to your current law practice. To assist Class Members, we ask that you (1) provide us with any known  corrections to the list and provide the names and

addresses of other clients (or personal representatives or next of kin of clients who are deceased) that are not on the list who may be Class Members for purposes of further disseminating class notice, and (2) inform your clients who may be potential Class Members of the pendency of the Class and the proposed settlement and that they may obtain information concerning the proposed settlement from the Claims Administrator and how to do so, all of which is explained in the attached long form notice.

If you prefer to send copies of the long form notice under your own cover letter, we will provide you with enough copies of the notice on request. We will also reimburse you for the cost of U.S. mail postage incurred if you agree to provide us the names and addresses of the persons you sent copies of the notice and the date of mailing

If you have any questions, please feel free to contact the undersigned, or Verus at 800-XXX-YYY, or Class Counsel, Christopher M. Placitella, Harry M. Roth or Michael Coren, Cohen Placitella and Roth, P.C. at 888-375-7600.

Thank you for your anticipated cooperation in this effort.

# Exhibit 4

**Press Release**

## $72.5 Million Class Action Settlement Fund Announced Covering Past Emtal Industrial Talc Litigation For Up To 19,000 Potential Claimants

NEWS PROVIDED BY
Emtal Talc Settlement Notice Agent
___, 2020

RICHMOND, Va., __, 2020 /PRNewswire/ -- The Notice Agent of the settlement reached in *Williams v. BASF Catalysts LLC, et al.*, C.A. No. 2:11-cv-01754 (D.N.J.) releases this information about the settlement.

Defendants BASF Catalysts, LLC ("BASF") and Cahill Gordon & Reindel LLP ("Cahill") and Plaintiffs have announced a class action settlement to resolve claims relating to prior Emtal Talc litigation by creating a non-reversionary fund of $72.5 million to pay up to 19,000 potential claimants and agreeing to pay fees and other expenses as described in the Settlement Agreement.

Emtal Talc was used in the manufacturing of industrial products. **This settlement does not involve any kind of personal cosmetic product such as baby, body, or talcum powder.** The settlement resolves a class action lawsuit in which Plaintiffs claim that from 1984 until 2009 Engelhard (BASF acquired Engelhard in 2006), its former national law firm Cahill, and employees of the two companies, made misstatements or concealed evidence about the existence of alleged asbestos in Emtal Talc and failed to disclose related information to plaintiffs, their lawyers, and courts in the Underlying Lawsuits. Plaintiffs claim that due to these misstatements and omissions, Plaintiffs in the Underlying Lawsuits either (1) voluntarily agreed to dismiss or settle their cases for less than they otherwise would have accepted or (2) had their cases involuntarily dismissed by court order upon motions filed by the Defendants. Defendants deny Plaintiffs' allegations and dispute that any statements about Emtal Talc affected the outcome of the Underlying Lawsuits because Defendants contend that (1) the claims in the Underlying Lawsuits were without merit, (2) the amount of asbestos in Emtal Talc, as reported in historical documents, could not have caused harm to human health and (3) many of the Underlying Lawsuits were resolved for fixed amounts irrespective of the alleged asbestos content of the talc or the number of talc defendants. Defendants further contend that many of the complaints merely named Engelhard without any specific allegations regarding product identification, exposure, or damages. Plaintiffs dispute these arguments.

BASF also claims that it was not aware of the facts alleged by the Plaintiffs in this case when it bought Engelhard in 2006 and that BASF did not learn of the circumstances giving rise to Plaintiffs' allegations in this case until 2009.

BASF and Cahill have nevertheless agreed to settle this lawsuit in the interest of avoiding further costs and the uncertainty of litigation.

If the United States District Court for the District of New Jersey approves the settlement, then BASF and Cahill will pay $72.5 million into a Settlement Fund to pay Class Members as follows: (a) $6.25 million to those who prove they are Class Members; (b) $59.75 million to those who sustained an asbestos-related injury; and (c) $6.5 million to those who experienced an

extraordinary physical injury and/or economic loss allegedly as a result of exposure to Emtal Talc, as well as an incentive award of $300,000 to six plaintiffs who helped bring the case. BASF and Cahill have also agreed to pay court-approved attorneys' fees up to $22.5 million, court-approved attorneys' expenses up to $1.2 million, and up to $3.5 million in notice and settlement administration costs.

Class Members may submit claims online at www.EmtalTalcSettlement.com. The website also provides instructions for how to file a claim in hard copy through the mail. Upon preliminary approval, the Court will provide the dates by which Class Member must submit claims, exclude themselves or object to the settlement.

For more information, visit www.EmtalTalcSettlement.com or call 1-888-401-1929.

Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

**KIMBERLEE WILLIAMS, et al.**

Plaintiffs,

vs.

**BASF CATALYSTS LLC, et al.**

Defendants.

No. 2:11-cv-01754 (ES) (JAD)
CIVIL ACTION

[Proposed]
**Williams Emtal Talc Settlement Fund**
# Plan of Distribution

*Williams* **Emtal Talc Settlement Fund**

# Plan of Distribution

This document sets forth the Plan of Distribution ("**Plan**") for implementing the provisions of the *Williams* Class Action Settlement Agreement ("**Settlement Agreement**") relating to the allocation and distribution of the Williams Emtal Class Action Settlement Fund ("**Settlement Fund**") established therein in trust for the use and benefit of eligible Class Members, along with the processes, procedures, presumptions, rights, rules and deadlines (referred to as "**Plan Distribution Procedures**" or "**PDPs**") for determining and resolving all claims and rights relating to the allocation and distribution of the Settlement Fund to eligible Class Members. The Settlement Trustee, the Administrator and the Lien Administrator appointed by the Court will execute this Plan consistent with its terms as well as the terms of the Settlement Agreement, the Preliminary Approval Order, the Final Order and Judgment, the *Williams* Emtal Settlement Fund Trust Escrow Agreement and any Court Approved Procedure ("**CAP**") amendment the Court may enter regarding the administration of the Plan and distributions made pursuant to it.

## Table of Contents

1. Definitions...................................................................................................................... 3

2. Summary of Plan........................................................................................................... 3

3. Settlement Fund Distribution Programs........................................................................ 4

    3.1. Part A – Base Compensation Payments............................................................... 4

        3.1.1.    Description........................................................................................ 4

        3.1.2.    Eligibility. ....................................................................................... 4

        3.1.3.    Part A Plan Distribution Procedures (PDPs). ................................ 5

        3.1.7.    Part A Distributions. ..................................................................... 13

        3.1.8.    Reallocation. ................................................................................. 15

    3.2. Part B – Supplemental Injury Severity Based Compensation Program............................ 15

        3.2.1.    Description..................................................................................... 15

        3.2.2.    Eligibility. ..................................................................................... 16

        3.2.3.    Part B Claim Levels, Qualifying Points and Qualifying Asbestos Trusts. ............. 16

        3.2.4.    Part B PDPs.................................................................................... 18

        3.2.5.    Part B Distribution Formula........................................................... 23

3.3. Part C – Extraordinary Injury Fund (EIF) Compensation Program.................................. 25

    3.3.1.   Description.................................................................................................. 25

    3.3.2.   Eligibility.................................................................................................. 26

    3.3.3.   Reallocation.............................................................................................. 27

4. Claim Administration Procedures and Policies. ...................................................................... 27

    4.1. Claim Form and Eligibility Proof Requirements. ............................................................ 27

    4.2. Claim Initiation and Claim Support Submission Requirements and Procedures. ............ 29

    4.3. Claim Submission Supporting Documentation Deadline. ................................................. 31

    4.4. Claim Submission Reviews. ............................................................................................. 32

    4.5. Claim Substantive Review Processes and Procedures....................................................... 32

    4.6. Claim Determination Notice, Cure and Contest Processes and Procedures. ..................... 34

5. Rules, Processes and Procedures Relating to Attorney Representation of Claimants. ............. 37

6. Filing Fees and Settlement Trustee's Costs and Sanction Assessment Authority.................... 39

7. Lien Resolution Requirements and Procedures. ...................................................................... 39

8. Settlement Fund Claim Audits and Anti-Fraud Plan; Settlement Agreement § 3.10.3 Claim Reviews.................................................................................................................................. 44

9. Settlement Fund Allocations, Adjudication Schedules, Payments and Distributions. ............. 47

    9.1. Allocation of the Settlement Funds. ................................................................................. 47

    9.2. Payment of Unfunded Administration Costs and Expenses and Class Representative Service Awards.................................................................................................................. 48

    9.3. Compensation Parts Sub-Funds and Sub-Fund Allocations. ............................................ 48

    9.6. Residual Settlement Funds................................................................................................ 53

10. Governance and operation of the Settlement Fund................................................................. 53

11. Settlement Trustee's Adjudicative Powers. ........................................................................... 56

    Appendix A ............................................................................................................................. 1

**1. Definitions.**

In addition to the terms defined above and in the body of the Plan below, the Plan incorporates by reference the definitions of the Settlement Agreement and capitalized terms appearing herein shall have the same meanings. Whenever context so requires, the masculine gender includes the feminine and neutral gender, and the singular includes the plural and vice versa.

**2. Summary of Plan.**

*This Summary is intended for convenience only and is qualified in its entirety by the full description of the Plan of Distribution beginning on page 4. In the event of any discrepancy between this Summary and the Plan, the Plan's provision will govern.*

The goal of the Plan is to fairly and equitably distribute the Settlement Fund to eligible Class Members who were alleged to have been deprived of the fair opportunity to pursue their claims for asbestos physical injuries in the Underlying Lawsuits.

The Plan establishes three compensation programs to which Settlement Class Members meeting defined eligibility criteria may apply for compensation award payments (each program being referred to as a "**Part**"). The Settlement Fund's Part A program provides Base Compensation Payments to Settlement Class Members who can establish that the claimant or claimant's decedent filed an Underlying Lawsuit against Engelhard/BASF during the Class Period which asserted in good faith an asbestos injury caused by alleged exposure to Emtal Talc ("**Base Payments**"). The Plan's Part B program provides compensation payments to Settlement Class Members who satisfy Part A and also present sufficient evidence of an asbestos bodily injury sustained by them (or if applicable, their decedent). The Plan's Part C program establishes an Extraordinary Injury Fund or "EIF" from which the Settlement Trustee may, in exceptional

3

cases, make a discretionary supplemental compensation payment to mesothelioma injury Claimants subject to eligibility guidelines and limitations as set forth in this Plan.

The Plan has requirements concerning resolution of certain health care provider liens. While the Lien Administrator appointed by the Court will aid a Claimant in determining and negotiating the amount needed to clear liens related to a payment from the Fund, the satisfaction or clearance of liens relating to a Claimant's payment is the Claimant's sole responsibility.

**3. Settlement Fund Distribution Programs.**

### 3.1. Part A – Base Compensation Payments.

#### 3.1.1.  Description.

3.1.1.1. The Settlement Fund provides base compensation payments (referred to as "**Base Compensation Payments**" or "**Part A" Payments**") to Settlement Class Members who in accordance with the Plan's PDPs timely submit a complete Claim Submission that satisfies the Plan's Part A eligibility requirements. Eligibility for compensation under Part A is also an eligibility prerequisite under the Plan's Parts B and C compensation programs.

#### 3.1.2.  Eligibility.

3.1.2.1.  To be eligible for Part A Payments, the Claimant, or the Claimant's decedent where applicable, must have during the Class Period: (a) filed and Served an Underlying Lawsuit against Engelhard/BASF (b) which lawsuit credibly asserted at the time, and in good faith, an asbestos injury caused by alleged exposure to Emtal Talc and (c) which lawsuit was dismissed as to Engelhard/BASF voluntarily or involuntarily ("**Part A Eligibility Requirements**"). For avoidance of doubt, all three elements, (a), (b) and (c), must have occurred during the Class Period.

4

### 3.1.3.  **Part A Plan Distribution Procedures (PDPs).**

3.1.3.1. All Part A claims require establishing class membership through (a) submitting documents and materials that establish all of the Part A Eligibility Requirements, or (b) providing proof the Claimant can rely upon the Settlement Fund's administrative presumption lists described in this Plan. Where it is established that a Claimant is a person identified on the Presumed Class Member List, or the personal representative, spouse or heir of a person identified on the Presumed Class Member List, Class membership will be presumed to exist.

3.1.3.2. **Part A Documentation Requirement**. A copy of a pleading, an interrogatory answer, or a deposition testimony excerpt describing the Injured Person's alleged exposure to Emtal Talc must be supplied to the Settlement Administrator as part of every Claim Submission unless no supporting document exists or can be found after Claimant has conducted a reasonable search and inquiry. Where documentation is not available the Claimant must then certify under oath that no supporting document is available. Claimants may use the certification form available on the Settlement's Website form page for this purpose. For avoidance of doubt, this documentation requirement applies to Claimants appearing on the Presumed Class Member List as well as to claimants who do not.

3.1.3.3. The date on which a voluntary dismissal or termination occurred for purposes of determining Class membership and Part A Payment eligibility is the earlier of either (a) the date on which the agreement or consent by the plaintiff or his/her counsel in the Underlying Lawsuit to dismiss or terminate the lawsuit occurred; or (b) the date on which the dismissal or termination of the Underlying Lawsuit was entered by or in the court in which it was pending.

3.1.3.4. "**Served**" with respect to an Underlying Lawsuit's complaint or similar initial pleading shall include, in addition to the means of process service provided by the suit's forum's applicable court rules, the acceptance of service or other notice or acknowledgement of the suit's existence by Engelhard/BASF attorneys, including, but not limited to the identification of the suit or action in the materials obtained in discovery by Plaintiffs and provided to the Settlement Administrator.

3.1.3.5. **Primary Claimant Rule.**

3.1.3.5.1.  A claim for compensation to the Settlement Fund may be submitted only by or on behalf of the Injured Person in an Underlying Lawsuit. Where the Injured Person in an Underlying Lawsuit is deceased, or the Underlying Lawsuit asserted a survival or wrongful death claim on behalf of the estate of an Injured Person, the claim may then be submitted only by the Injured Person's personal representative, such as its executor or administrator, subject to the exception in §3.1.3.5.3, which person is referred as a "**Primary Claimant**". This PDP is referred to as the "**Primary Claimant Rule**".

3.1.3.5.2. Except as provided in §3.1.3.5.3, any claim submitted by a spouse, child or parent of an Injured Person in an Underlying Lawsuit who has died, or where the Underlying Lawsuit asserted a wrongful death claim on behalf of the estate of an Injured Person, will be denied and not processed by the Settlement Fund and a Notice of Claim Determination will be sent to that Claimant by the Administrator. On request to the Administrator by a denied Claimant under this PDP, and assuming the information is readily available to the Administrator, the Settlement Fund will provide the denied Claimant with the contact information for the Primary Claimant and either the attorney representing the Primary Claimant in a pending claim to the

Settlement Fund or the attorney and/or law firm representing the Injured Person or their Estate in the Underlying Lawsuit.

3.1.3.5.3. **Exception for Part A only claims where Primary Claimant is deceased and no estate open**. Where the Injured Person is deceased and has no estate open, the spouse of the deceased Injured Person, if living, or if such spouse is deceased, then a child (which includes a child who is adopted) of the deceased Injured Person acting with written unanimous consent of all other living children of the deceased Injured Person, may apply for the deceased Primary Claimant's Part A share along with any Derivative Claimant's Part A Share that may be due. The claim to the Settlement Fund under this exception must be limited by the Claimant to a request only for Part A compensation. Where the claim is otherwise determined eligible for Part A payments the claim may be allowed and paid by the Settlement Fund to the applicant upon such further terms and conditions the Settlement Trustee establishes to protect the Settlement Fund against any liability or claims relating to the direct payment of the compensation payment to the spouse or child. The Settlement Fund shall establish a special claim form for such applications.

3.1.3.6. **Presumed Qualified Class Members**.

3.1.3.6.1. Eligibility for Part A Payments will be presumed by the Settlement Fund where the Primary Claimant establishes to the Settlement Fund's satisfaction that he or his decedent is the person on the Settlement Fund's Presumed Class Members List. Where the presumption applies to a Claimant, no additional proof of Class Membership is required. The documentation requirement of §3.1.3.2 however applies and must be satisfied.

3.1.3.6.2. A confidential "**Presumed Class Member List**" available only to the Court, the Settlement Administrator, the Settlement Trustee, Defendants, and Class Counsel, of

7

those individuals who filed lawsuits against Engelhard/BASF alleging bodily injuries resulting from exposure to Emtal Talc was compiled based upon discovery undertaken by Plaintiffs in the *Williams* Action. A person or Estate on that list satisfies all of the Plan's Part A Eligibility Requirements as to known and identified Primary and Derivative Claimants. In addition to discovery the following sources were used to develop this list:

(A) Bevan Law Firm's client data produced by the Bevan Law Firm during discovery in the Class Action;

(B) The Qualified Occupation Location Sites List;

(C) The contents of Underlying Lawsuits' complaints and/or other litigation documents identified to the Administrator for consideration by Class Counsel and Defendants; and.

(D) The Class Action Complaint. All named plaintiffs in the Complaint shall be included on the Presumed Class Member List.

    3.1.3.7. **Supporting Documentary Proof Requirement where Claimant or Claimant's decedent is Not Listed on Presumed Class Member List.**

      3.1.3.7.1. Where an Injured Person (or his/her estate) whom a claim is based upon is not listed on the Presumed Class Member List, the following documentary proof is required in support of the Claim Submission:

(A) A legible copy of pleadings, other litigation document or court records from the Underlying Lawsuit which satisfactorily establishes that the Claimant (or his decedent) filed and Served an asbestos injury lawsuit against Engelhard/BASF arising out of Emtal Talc exposure within the Class Period and the suit was thereafter terminated by a voluntary or involuntary dismissal within the Class Period. A copy of the subject suit's pertinent docket entries or a copy of a timestamped order or pleading will suffice to establish the dismissal of the lawsuit; and

(B) Documentary proof satisfactorily establishing that the Claimant (or his decedent) is the Injured Person in the underlying lawsuit satisfying §3.1.4 along with, if applicable, claimant's standing proof such as a death certificate, appropriate estate papers and/or proof of marriage or kinship relating to a decedent; and

(C) Documentary proof satisfactorily establishing that the Underlying Lawsuit was asserting a good faith, credible injury claim based on an injury believed to be caused by exposure Emtal Talc.

3.1.3.7.2. For avoidance of doubt, if a Claimant submits any or all of the items listed above in §3.1.3.7.1 , the Administrator and Settlement Trustee may still deny the Claim Submission if, in the exercise of their discretion and judgment, they determine that the Claimant is not eligible for payment from the Settlement Fund.

3.1.3.8. **Good Faith Credible Emtal Talc Claim Requirement.**

3.1.3.8.1. Where a Claimant is not on the Presumed Class Member List, in order for a claim to be eligible to receive compensation under the Plan, the Injured Person's Underlying Lawsuit (or that brought by an Injured Person's estate where applicable) must have asserted a good faith, credible asbestos injury claim based on an injury believed to be caused by exposure to Emtal Talc. In making this determination the following PDPs of §3.1.3.8 will apply to determining that the Injured Person's Underlying Lawsuit (or that brought by an Injured Person's estate where applicable) was asserting a good faith, credible asbestos injury claim based on an injury believed to be caused by exposure to Emtal Talc.

3.1.3.8.2. The basis of the claimed talc exposure involved in the Underlying Litigation may be to Emtal Talc in either or both its raw form—such as its use as an ingredient for a product, as a processing agent, or as a detackifier—or in the form of dust generated in or by the use, application, alteration, cutting, sanding, scraping, removal or cleanup of a product manufactured with Emtal Talc.

3.1.3.8.3. The "*good faith, credible asbestos injury claim*" element may be satisfied through any of the following:

(A) Meaningful and credible proof that, after 1966, and prior to commencing the Underlying Lawsuit, the Injured Party had meaningful employment or occupational related presence at a facility or company appearing on the Administration's Qualified Occupation Location Sites List or was

employed at that facility or company in a role identified on the Plan's Qualified Occupation List. Based on information provided in the Claims Submission the Administrator will determine if an identified occupation or occupational location of the Injured Person appears on one or both of these lists;

(B) Providing a competent and meaningful affidavit or sworn statement from the Underlying Lawsuit's attorney attesting that the subject suit was based on a good faith, credible claim of the Injured Person's exposure to Emtal Talc;

(C) Providing a competent and meaningful affidavit or sworn statement of a co-worker which specifically names the Injured Person and provides the basis for a good faith claim or a competent and meaningful affidavit or sworn statement of a family member in the case of a deceased Injured Person (providing the Administrator or Settlement Trustee finds such evidence reasonably reliable);

(D) Employment or occupational related presence in a facility or company where credible records show EMTAL talc was sold, shipped or delivered; or

(E) Providing credible evidence generated before the conclusion of the Underlying Lawsuit of meaningful exposure to Emtal Talc after 1966, including but not limited to invoices, employment records, construction records, or interrogatory responses.

3.1.3.8.4. The Administrator or Settlement Trustee can require submission of other or additional evidence of a Claimant's qualifying good faith credible Emtal Talc Claim when it deems such to be necessary, including for purposes of audits or claims reviews under § 8 of this Plan.

3.1.3.8.5. Evidence submitted and/or accepted to establish proof of a good faith credible Emtal Talc claim is for the sole benefit of the Settlement Trustee and Administrator, and not third parties or defendants in the tort system.

3.1.3.9. **Qualified Occupations and Qualified Occupation Location Sites Lists.**

3.1.3.9.1. Class Counsel will compile and provide to the Administrator a list of occupations ("**Qualified Occupations List**") which the Settlement Fund may, for purposes of determining Part A eligibility, and solely for this purpose, presume there was exposure to Emtal

Talc where there is meaningful and credible evidence provided to the Administrator, including but not limited to pleadings and discovery in the Underlying Lawsuits, that the Injured Person was employed in the occupation after 1966. This shall be a confidential list, available only to the Court, the Settlement Administrator, the Settlement Trustee, Defendants and Class Counsel. By way of illustration, the list may include such occupations where EMTAL marketing documents show that EMTAL was marketed to and used, such as, by way of illustration and not limitation: workers employed in the tire and rubber industry, auto body repair, or the manufacture or application/finishing of drywall joint or patching compound.

3.1.3.9.2. Class Counsel will compile and provide to the Administrator a list of specific companies, facilities or job sites ("**Qualified Occupation Location Sites List**") which the Settlement Fund may, for purposes of determining Part A eligibility, and solely for this purpose, presume there was exposure to Emtal Talc where there is meaningful and credible evidence provided to the Administrator, including pleadings and discovery in the Underlying Lawsuits, that the Injured Person was meaningfully employed or occupationally present at the site, facility or location.

3.1.3.9.3. The Qualified Occupations and Qualified Occupation Location Sites Lists are deemed to be confidential internal administrative and Special Master adjudicative and Class Counsel work product materials which will be held by the Administrator and Settlement Trustee in strict confidence, will not be published, and be deemed subject to Court protective order prohibiting their or their contents disclosure by the Administrator or Settlement Trustee as privileged and non-discoverable documents unless disclosure is ordered by the Court.

3.1.3.9.4. For avoidance of doubt, other than for purposes of satisfying the prerequisite requirement of Part A Eligibility, the Qualified Occupations List and Qualified

11

Occupation Location Sites List, shall not be offered or used by a Claimant as evidence or support of any of the EIF Eligibility Requirement set forth in §3.3.2., nor shall the lists be used as evidence in connection with any other lawsuit or claim against the Defendants.

3.1.4.  **Identity Validation**: A Claimant must establish to the Settlement Fund's satisfaction its identity and relationship to an Underlying Lawsuit by meaningful and credible evidence that (a) the Claimant (and Claimant's decedent if applicable) is the person or is the personal representative or heir of the person named in the Underlying Lawsuit the claim is based upon; or (b) is the person, personal representative or heir of a person listed on the Presumed Class Member List. The identity of a Claimant will be presumed by the Settlement Fund where the Claimant is on the Presumed Class Member List and establishes it is the person to whom a class action Notice was addressed, and that it was received at the address to which it was sent or forwarded to the Claimant by the U.S. Post Office. Examples of possible satisfactory evidence when and where this mailed notice presumption does not apply include: (a) a meaningful and credible declaration from the law firm or a lawyer who handled the Underlying Lawsuit vouching for the claimant's identity; or (b) a meaningful and credible declaration by the Claimant attesting to the fact that Claimant (or his decedent) is the referenced person on the presumption list along with some accompanying form of documentary corroborating proof. During the Settlement Fund's claims review process the Settlement Fund will be applying identity validation techniques for which Claimants are required to cooperate and comply with. An inability or failure to cooperate or comply with the Settlement Fund's identity validation efforts will result in the denial and termination of the Claim Submission.

3.1.5.  **Class Membership Qualification Searches.** Where prior to the Claim Filing Deadline a member of the public has a credible good faith reason to believe that he may be a

Class Member but is reasonably unable to secure necessary information to establish he is a Class Member, on request to the Administrator certifying such fact along with stating the basis for the good faith belief he is a class member and providing appropriate identification information, including pertinent social security numbers, the Administrator will make a reasonable computer word search of the information it possesses to see if there is match. If so, the Administrator may allow the person limited time access and download capability to the Restricted Collection to search for documents supporting the person's claim to class membership. A request for a Class Membership Qualification Search does not constitute initiation of a Claim Submission with the Settlement Fund and does not toll any time deadlines relating to the initiation a claim. <u>For avoidance of doubt, the Claim Filing Deadline is not, and will not be, extended by a qualification search request, by the results of the request or by any inability of the Administrator to complete a search or searches prior to the deadline</u>.

      3.1.6.   **Claimant Standing documentation**. Where a Claimant is the personal representative of a Class Member, it must provide to the Administrator a copy of authority to act, such as a copy of a probate short certificate, estate administration letters or a power of attorney, in the Claim Submission.

      3.1.7.   **Part A Distributions.**

        3.1.7.1.   *Primary Claimant Shares*. Each Primary Claimant (or other claimant pursuant to Plan §3.1.3.5.3) timely submitting an approved Claim is entitled to receive one (1) Part A Base Compensation payment of up to $500 from the Part A Allocation, referred to as a "**Primary Claimant Part A Share**".

        3.1.7.2.   *Derivative Claimant Shares*.

3.1.7.2.1. Where a Primary Claimant (or other claimant pursuant to Plan §3.1.3.5.3) timely submits a claim determined to be eligible for Part A Base Compensation and there exists one or more Settlement Class Members who are a Derivative Claimant associated with the Underlying Lawsuit, then in addition to the Primary Claimant Part A Share awarded in §3.1.7.1, the Primary Claimant is entitled to claim one (1) additional Part A share of equal amount to the Primary Claimant Part A Share with respect to any and all such Derivative Claimants, for a total Part A Base Compensation award of up to $1,000. This PDP is referred to as the "**One Derivative Share Rule.**"

3.1.7.2.2. The Settlement Fund will pay the Part A Compensation Derivative Claimant Share to the Primary Claimant (or if deceased, to his or her Personal Representative or the other claimant pursuant to §3.1.3.5.3). The Claimant receiving the payment shall be solely responsible for any allocation and distribution of the Derivative Claimant Share to all associated Derivative Claimants. The Settlement Fund shall have no further responsibility or liability whatsoever to any Derivative Claimants as to the payment or distribution of this share once payment is distributed to the Claimant receiving it.

3.1.7.2.3. *Examples*: The following illustrate the operation of the *One Derivative Share Rule*. If an Underlying Lawsuit was a bodily injury claim in which the Primary Claimant's spouse was also named as a plaintiff in the Underlying Lawsuit with a claim for consortium loss or similar derivative damages, the spouse of the Primary Claimant would qualify for a Derivative Claimant Part A compensation share. The share would be paid by the Settlement Fund to the Primary Claimant as part of his distribution. If the Underlying Lawsuit was a wrongful death and survival action and the deceased Injured Person was survived by a spouse and two children who at the time of the litigation were all entitled to claim derivative wrongful death damages, there

14

would be a single Part A compensation share paid on account of this family group. The single share would be paid by the Settlement Fund to the Primary Claimant as part the claim distribution for the benefit of the Derivative Claimants as their interests may appear.

3.1.7.3. **Proration:** The amount of compensation paid to Qualified Class Members under Part A may be reduced on a *prorated* basis if there are more than 12,500 Part A compensation shares, including both Primary Claimant Part A Shares and Derivative Claimant Part A Shares, determined to be eligible for payment.

3.1.8.   **Reallocation.**

3.1.8.1. Any funds remaining in the Part A sub-fund after payments are determined will be reallocated by the Settlement Trustee as follows: first to the Part C sub-fund to pay allowed EIF claims, if any, or used otherwise in the Settlement Trustee's reasonable discretion to augment Part C awards, if needed and then to the Part B sub-fund.  Such reallocation being referred to as a "**spillover**".

## 3.2. **Part B – Supplemental Injury Severity Based Compensation Program.**

3.2.1.   **Description.**

3.2.1.1.  The Plan's Part B program provides additional compensation to eligible Claimants who establish in accordance with the Plan's PDPs the Plan's Part B eligibility requirements which are based on, and on account of, defined physical asbestos injuries sustained by the Injured Person on which a claim is based. Part B payments are made out of a Settlement Fund sub-fund with an initial allocation of $59.75 Million. Class Members who meet the requirements for a Plan B Supplemental Compensation award will receive a proportionate share of the entire Part B sub-fund based upon a system of points awarded for the asbestos disease sustained and diagnosed. The amount of the Part B points and compensation payments vary

15

based upon the type and severity level of asbestos disease injury sustained and medically diagnosed. The Part B sub-fund's monetary amount may change in the course of the Settlement Fund's administration based on any spillovers from the Part A or Part C sub-funds, to pay Class Representative service awards or to pay administration costs and expenses that either are ineligible to be paid from the Settlement's Cost Fund or, if eligible, cannot be fully paid from the Settlement Cost Fund.

    3.2.2.  **Eligibility**.

        3.2.2.1.  To be eligible for a Part B Supplemental Compensation share payment, a Claimant must (a) qualify for Part A Compensation; (b) timely make a claim for Part B compensation in his Claims Submission; and (c) establish by credible, competent proof that the Injured Person sustained an asbestos disease injury falling into one of four defined categories of asbestos disease levels described in Table 1 of §3.2.3. Proof of asbestos disease and level may be satisfied through a certification of prior asbestos disease adjudication by a Qualified Asbestos Trust.

    3.2.3.  **Part B Claim Levels, Qualifying Points and Qualifying Asbestos Trusts.**

        3.2.3.1. Part B's Claim Levels along with Qualifying Points are defined in the following Table 1 and accompanying notes.

[Balance of Page is Intentionally Blank]

| Table 1<br>Part B Claim Levels | Qualifying Claim Points[1] |
|---|---|
| **Level 1 Claim**<br><br>Non-Malignant Asbestos disease.[2]<br><br>(Bilateral Asbestos-Related Nonmalignant Disease Injuries other than Severe Asbestosis) | 1 |
| **Level 2 Claim**<br>Malignant Asbestos Disease Other Than Mesothelioma or Level 3 Claim Lung Cancer.[3] | 9 |
| **Level 3 Claim**<br>Either: (a) Primary lung cancer with evidence of underlying Bilateral Asbestos-Related Nonmalignant Disease; or (b) Severe Asbestosis.[4] | 20 |
| **Level 4 Claim**<br>Mesothelioma | 86 |

---

[1] The number of qualifying points for each claim Level was determined by Verus LLC based on an analysis of compensation payment levels paid for typical and generally accepted asbestos disease categories by eighteen asbestos compensation trusts.

[2] "**Non-Malignant Asbestos Disease**" means what is commonly referred to as "Bilateral Asbestos-Related Nonmalignant Disease" and is defined as a disease evidenced by either: (a) a chest X-ray read by a qualified B reader of 1/0 or higher on the ILO scale, or (b) (i) a chest X-ray read by a qualified B reader or other Qualified Physician, (ii) a CT scan read by a Qualified Physician, or (iii) pathology, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification. A "Qualified Physician" is (a) a physician who is board-certified in one or more relevant specialized fields of medicine such as pulmonology, radiology, internal medicine or occupational medicine; and (b) where claimant is not relying on a disease certification from a Qualified Asbestos Trust not on the Administrator's Ineligible Diagnostician List published on the Settlement Website.

[3] "**Malignant Asbestos Diseases Other than Mesothelioma and Level 3 Claim Cancer**" means the following:

- A diagnosis of a primary lung cancer without evidence of evidence of underlying Bilateral Asbestos-Related Nonmalignant Disease and supporting medical documentation; or

- A diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus (a) evidence of underlying Bilateral Asbestos-Related Nonmalignant Disease; and (b) supporting medical documentation.

[4] "**Severe Asbestosis**" means by a disease evidenced by (a) a diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological evidence of asbestos, plus (i) TLC less than 65%, or (ii) FVC less than 65% and FEV1/FVC ratio greater than 65%; and (b) supporting medical documentation.

3.2.3.2. "**Qualified Asbestos Trusts**" are the following asbestos claims trusts or claims resolution facilities which are categorized as either "Preferred Qualified Asbestos Trusts" and "Alternative Qualified Asbestos Trusts".

3.2.3.3. "**Preferred Qualified Asbestos Trusts.**" The following asbestos trusts are Preferred Qualified Asbestos Trusts:

(A)  AC&S Asbestos Settlement Trust.

(B)  ASARCO Asbestos Personal Injury Settlement Trust.

(C)  Combustion Engineering Trust.

(D)  G-I Holdings Inc. Asbestos Personal Injury Settlement Trust.

(E)  KACC Asbestos PI Trust.

(F) TH Agriculture and Nutrition, L.L.C. Asbestos Personal Injury Trust.

3.2.3.3.1. **Alternative Qualified Asbestos Trusts**. The following asbestos trusts are alternative Qualified Asbestos Trusts:

(G) The Manville Personal Injury Settlement Trust dated as of November 28, 1988.

(H)  The Travelers Common Law Direct Action Settlement Fund.

3.2.4.  **Part B PDPs.**

3.2.4.1. **Highest Provable Asbestos Disease Progression Rule**. A Claimant may claim and be awarded compensation based upon the highest level of asbestos disease progression actually suffered by the Injured Person that can be established by either credible medical proof submitted to the Administrator or by a certification of disease award adjudication from a Qualified Asbestos Trust. Where such proof establishes a higher category of disease than claimed in the Claim Submission, the higher proven level will apply to the claim.

3.2.4.2.  **Part B required Documentation.** All Claims for Part B Supplemental Compensation must supply a medical record or a medical report that documents the Injured

Person's asbestos injury to the Settlement Administrator as part of the Claim Submission unless no supporting document exists or can be found after Claimant has conducted a reasonable search and inquiry. Where documentation is not available the Claimant must then certify under oath that no supporting medical record or report document is available. Claimants may use the certification form for this purpose available on the Settlement's Website form page. For avoidance of doubt, this medical document or report submission requirement applies even where the Qualifying Asbestos Disease Level is being established through a certified adjudication from one of the Qualified Asbestos Trusts.

3.2.4.3. **Establishing Part B Asbestos Disease Level**

3.2.4.3.1. The Claimant has the burden of establishing the existence and level of a qualifying asbestos disease's existence and severity level by meaningful and credible medical proof.

3.2.4.3.2. A Claimant who otherwise meets the requirements of this Plan for payment of a Part B Claim shall be paid irrespective of the results in any litigation at any time between the Injured Person (or their estate where applicable) and any defendant in the judicial tort system.

3.2.4.4. **Establishing Qualifying Asbestos Disease and Claim Level through a Certification of Prior Qualified Asbestos Trust Disease Adjudication.**

3.2.4.4.1. A Claimant may establish the existence and level of a qualifying asbestos disease through a certified prior Qualified Asbestos Trust adjudication that supports the Part B claim. The Settlement Fund will accept and apply the certification of highest disease level adjudication received from the Qualified Asbestos Trusts, even if higher than what the Claimant requested in his/her Claim Submission.

3.2.4.4.2. The Administrator will first attempt to obtain and use an adjudicated disease level certified by one of the Preferred Qualified Asbestos Trusts to support a claim unless a qualifying prior disease level adjudication is not available from one of the Preferred Qualified Asbestos Trusts, in which case the Administrator will then request and accept an adjudication certification from one of the Alternative Qualified Asbestos Trusts to support the claim.

3.2.4.4.3.  Where a Claimant elects to rely on a Qualified Asbestos Trust Adjudication it must in its Claims Submission: (a) identify for the Administrator, if requested, a specific Qualified Asbestos Trust to be contacted; (b) provide sufficient claim identification information to enable the Administrator to obtain certification of the disease adjudication; and (c) provide such written release authorization as necessary (including executing a multi-trust information release authorization form) to enable the Administrator to obtain certification of the disease adjudication from a Qualified Asbestos Trust.

3.2.4.4.4.  Where the Administrator is unable to obtain a certified adjudication from a designated trust, or the certified adjudication received fails to support the Part B Level claimed on the Claim Submission, the Administrator will notify the Claimant of such fact. The Claimant may then:

(A)   accept a lower level of prior adjudicated disease certified to the Administrator if there is one; or

(B)   request an alternative trust certification, from one or more other specified Qualified Asbestos Trust along with providing the Administrator with any required information and release authorization (including executing a multi-trust information release authorization form) to enable it to request a certification, in which case the Administrator will request certification from the alternative specific trust;

20

(C)     amend the Claim Submission to state it will attempt to establish the medical injury element by submitting medical evidence to the Administrator and proceed accordingly; or

(D)     withdraw the Part B claim, which will be deemed the default election if one of the preceding alternatives is not timely taken and implemented.

3.2.4.4.5. The Settlement Fund will not dispute or reject any adjudication of disease level certified and provided to it from a Qualified Asbestos Trust.

3.2.4.4.6.  Where the disease level certified from a Qualified Asbestos Trust is higher than what is claimed in the Claimant's Claim Submission form, the Administrator will notify the Claimant and the Claim Submission will be automatically deemed amended by the Claimant to request the higher established disease Claim level and the claim processed on that basis.

3.2.4.5. **Qualified Asbestos Trust Polling Assistance.** Prior to the Claims Filing Deadline, a Claimant who satisfies Part A Eligibility but lacks sufficient information and means to support the medical proof element of a Part B Claim may request the Administrator to poll the Qualified Asbestos Trusts on Claimant's behalf to determine if any possesses information or documents relating to the Injured Person which can support a Part B claim. If a positive response is received, the Claimant may authorize the Administrator to obtain the information from the Trust in support of the Claim. The Claimant must provide appropriate authorizations and identification information, including social security numbers. For avoidance of doubt, the Claim Filing Deadline is not, and will not be, extended by a polling request, by the results of a polling request or by any inability of the Administrator to complete a polling request or requests prior to the deadline.

### 3.2.4.6. **Establishing Qualifying Asbestos Disease and Claim Level by submitting medical proof.**

3.2.4.6.1. Where a Claimant either chooses not to rely on a prior Qualified Asbestos Trust adjudication to support their Part B claim or is unable to, the existence and level of the Qualifying Asbestos Disease must be established through submission of meaningful and credible medical proof of the asbestos disease claimed. If a claimant wants to seek a higher level of disease than prior asbestos trust adjudications, it may establish the level through submission of meaningful and credible medical proof of the higher asbestos disease claimed.

3.2.4.6.2.  Medical proof supporting a Part B claim must be submitted along with the Claim Form in order for a Claim Submission to be complete and eligible for adjudication by the Settlement Fund. (*See* § 4.2 of this Plan.)

3.2.4.7. The Settlement Fund will consider medical proof evidence submitted to it in support of a claim for evaluation from only Qualified Physicians and diagnosticians and will not accept and consider as medical proof submitted to it in support of a claim for evaluation by or from anyone appearing on the Administrator's Ineligible Diagnostician List published on the Settlement Website. A Qualified Physician is a physician who is board-certified in one or more relevant specialized fields of medicine such as pulmonology, radiology, internal medicine or occupational medicine and is not on the Administrator's Ineligible Diagnostician List published on the Settlement Website. Medical evidence (a) that is of a kind shown to have been received in evidence by a state or federal judge at trial, or (b) that is a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state or federal judge, is presumptively reliable, although the Settlement Fund may seek to rebut the presumption.

22

3.2.4.8. In reviewing and weighing medical proof submitted in support of a Part B claim the Settlement Fund will consider and take into account evidence that the dismissal of the Underlying cases and the passage of time may have hampered, impaired or diverted the Injured Person or the Underlying Lawsuit's attorneys developing or preserving medical causation proof.

3.2.4.9. Medical proof provided in support of a Part B Claim from a Qualified Physician or other competent diagnostician will be viewed in a light favorable to the Claimant when and where the Settlement Fund has reasonable confidence that it is credible and consistent with recognized medical standards.

3.2.4.10. As to any Part B Level 2, Level 3 or Level 4 claim based upon submission of medical proof, the Settlement Fund claim may require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence and will require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedures to assure that such evidence is reliable.

3.2.5.   **Part B Distribution Formula.**

3.2.5.1. The Settlement Fund's Part B sub-fund will be distributed to those eligible Part B Claimants according to their severity level of asbestos disease. The amount of eligible Part B Claimants' share of the Part B sub-fund distribution will be calculated according to the formula $X/Y \ x \ Z$, where $X$ represents the number of the individual eligible Claimant's adjudicated Qualifying Claim Points awarded; $Y$ represents the aggregate of all eligible Claimants' adjudicated Qualifying Claim Points, and $Z$ represents the Part B sub-fund.

3.2.5.1.1. **Illustration:** The following table of hypothetical claims distribution calculations illustrates the application of the formula. They hypothetical distributions assume: (a)

23

that 7,500, 8,000 or 8,500 Primary Claimants submit Part B claims and are found eligible; (b) that the disease rate distribution for the adjudicated Part B claimants is the same as the Johns Manville Asbestos Trust's disease rate experience (*i.e.* – mesothelioma – 4.3%; Malignant Asbestos Diseases Other Than Mesothelioma or Claim Level 3 Lung Cancer and Severe Asbestosis - 2.1 %; Claim Level 3 Lung Cancer and Severe Asbestosis – 7.3 %, and non-malignant asbestos disease 86.3%); and (c) that the amount of the Part B sub-fund available for distribution is $59,750,000. Applying the formula to these parameters yields the results stated in Table 2.

| Table 2 Hypothetical Part B Payment Share Estimates* | | | | |
|---|---|---|---|---|
| **Part B Claim Levels** | **Qualifying Claim Points** (Assumed disease rate %) | **Estimated Payments** (Estimated number of claims) | | |
| | | **7,500** approved claimants | **8,000** approved claimants | **8,500** approved claimants |
| **Level 1 Claim** Non-Malignant Asbestos disease other than Severe Asbestosis. (Bilateral Asbestos-Related Nonmalignant Disease Injuries other than Severe Asbestosis) | **1** (86.3 %) | $1,283 (6,473) | $1,203 (6,904) | $1,132 (7,336) |
| **Level 2 Claim** Malignant Asbestos Disease Other Than Mesothelioma or Level 3 Claim Lung Cancer. | **9** (2.1 %) | $11,546 (158) | $10,824 (168) | $10,188 (179) |
| **Level 3 Claim** Either: (a) Primary lung cancer with evidence of underlying Bilateral Asbestos-Related Nonmalignant Disease; or (b) Severe Asbestosis. | **20** (7.3 %) | $25,658 (548) | $24,054 (584) | $22,639 (621) |
| **Level 4 Claim** Mesothelioma | **86** (4.3 %) | $110,327 (323) | $103,432 (344) | $97,348 (366) |
| * Due to rounding, the numbers presented may not add up precisely to the totals indicated and payment estimates may not precisely reflect the absolute figures. | | | | |

3.2.5.1.2. **Caveats**:

(A)      Table 2 is for illustration purposes only. The actual Part B payment amounts to Settlement Class Members will likely be different than any of the estimated hypothetical payments appearing in the table based upon the Settlement Fund's actual claim experience.

(B)      The hypothetical payment share estimates shown on Table 2 do not reflect deductions for any liens or fees charged by personal attorneys hired by class members. Class members eligible for a settlement payment are responsible for paying from that settlement payment any liens or any fees charged by personal attorneys should they have hired one.

3.3. **Part C – Extraordinary Injury Fund (EIF) Compensation Program.**

   3.3.1.  **Description.**

3.3.1.1. The Plan's Part C compensation program provides a discretionary Extraordinary Injury Fund ("EIF") from which the Settlement Trustee may award a Level 4 (mesothelioma) Primary Claimant who proves extraordinary and exceptional circumstances, and who meets the EIF's Eligibility Criteria set forth in § 3.3.2, an additional compensation payment of up to $175,000. For avoidance of doubt, an EIF payment is over and above any Part A and Part B Payments awarded a Claimant. EIF payments are made from the Settlement Fund's Part C EIF sub-fund, which has an initial Settlement Fund allocation of $6.5 Million. The Part C EIF sub-fund's size may change in the course of the Settlement Fund's administration based on the Settlement Trustee's application of a spillover from the Part A sub-fund to it. Any unused EIF allocation shall be used in accordance with to § 3.1.8 above.

3.3.1.2. **Limit on EIF individual awards.** No EIF award shall exceed $175,000.

3.3.2.   **Eligibility.**

3.3.2.1.   A Claimant who (a) qualifies under Part B for a Level 4 (mesothelioma) award (the "**EIF Mesothelioma Requiremen**t") and (b) meets all of the following additional eligibility requirements (the "**EIF Eligibility Criteria**") may apply for and submit evidentiary proof for consideration by the Settlement Fund for a discretionary Part C EIF award:

(A) The Injured Person (or their estate where applicable) together with any Derivative Claimants associated with the Underlying Lawsuit received in the aggregate less than $250,000 from all other potentially responsible asbestos defendant settlements, including any asbestos trust or other outside of litigation payments; and

(B) The Claimant has competent, meaningful and credible evidence establishing the Injured Person had significant exposure to Emtal Talc, either in raw form and/or in the form of dust emitted from a product containing Emtal Talc as an ingredient, that was a substantial factor in causing the asbestos injury. This may be established by an affidavit or sworn statement of the Claimant; by an affidavit or sworn statement of a co-worker or the affidavit or sworn statement of a family member in the case of a deceased Injured Person (providing the Settlement Fund finds such evidence reasonably reliable); by depositions, photographs, interrogatories, invoices, shipping records, employment, construction or similar records; or by other credible evidence; and

(C) The Claimant has competent, meaningful and credible evidence through one or more Qualified Physicians establishing the Injured Person's exposure to Emtal Talc was a substantial contributing factor to causing the mesothelioma; and

(D) The Claimant has competent, meaningful and credible evidence the Injured Person's lawyer in the Underlying Litigation was the recipient of discovery, correspondence, motion papers or affidavits served or sent to him or his law firm, by an attorney or agent of Engelhard/BASF that stated or represented in words or substance that Emtal talc ore or products did not contain asbestos and/or there was no evidence it contained asbestos (including any representation or statement there were no depositions of Engelhard/BASF personnel relating to asbestos in Emtal talc); and

(E) The Claimant is able to credibly establish extraordinary loss or injury circumstances that meaningfully distinguish Claimant's situation and circumstances from the general population of successful Part B claimants to the Settlement Fund warranting an equitable adjustment award.

3.3.2.2. **Relaxation of EIF Eligibility Criteria:** The Settlement Trustee in her sole, absolute and unfettered discretion may equitably relax or dispense with an EIF Eligibility Criteria

requirement where she finds exceptional extraordinary circumstances present in the EIF claim that provide good cause for such relief.

### 3.3.3. **Reallocation.**

3.3.3.1. The Settlement Trustee is not required to make any EIF awards or awards sufficient to exhaust the EIF fund. Any unused funds in the Part C sub-fund shall be used in accordance with to § 3.1.8 above.

## 4. Claim Administration Procedures and Policies.

### 4.1. Claim Form and Eligibility Proof Requirements.

4.1.1.   In order to obtain a compensation award from the Settlement Fund a Class Member must do each of the following: (a) initiate a timely Claim Submission with the Settlement Fund prior to the Claims Filing Deadline by completing and submitting under penalty of perjury, either on-line or in paper form, a Claim Form provided by the Administrator bearing the Class Member's handwritten signature either on the Claims Submission Form itself or on a separate form available from the Administrator (which manually signed document may be submitted by mail, fax or in the form of a pdf uploaded to the Claims Administration Website); (b) along with the Claim Form, timely and completely provide all supporting certifications, authorizations, information and documentation required by the Plan to adjudicate the compensation requests made in the Claim Form; and (c) meet the eligibility requirements of the Plan for the compensation program Part or Parts applied for.

4.1.2.   A Claimant must identify in their Claim Submission Form each Settlement Fund program Part under which compensation is sought other than a request for Part A Primary Claimant Shares. A Part A Primary Share request will be automatic upon making a Claim Submission. For clarity, if a claimant wants to apply for and receive a Part A Derivative Claimant Share, a Part B

27

Supplement Compensation Award and/or a Part C EIF Discretionary Compensation award, then the claim for such compensation must be specifically made in the Claim Submission form where indicated and supporting information and documentation relating to the application for such compensation provided in the Claim Submission.

4.1.3.   Where Part B Supplemental Compensation is requested, the Claimant must also state in the Claims Submission form the Part B Claim Level claimed to be applicable. Alternatively, Claimant can indicate it requires Qualified Asbestos Trust Polling Assistance to determine disease and disease level under §3.2.4.5.

4.1.4.   All Part A Claimants must satisfy the Part A documentation requirement of §3.1.3.2, and all Part B Claimants must satisfy the Part B documentation requirement of § 3.2.4.2.

4.1.5.   Claim Submissions by or on behalf of individual Class Members may be submitted to the Settlement Fund either electronically through the Settlement Fund's secured claims administration portal located on the Settlement Fund's official website or in paper form. Claims on behalf of multiple Claimants represented by a Registered Law Firm may be submitted to the Administrator thorough a Claims Submission spreadsheet option. For avoidance of doubt, every Claim Submission must include a Claim verification under penalty of perjury manually signed the Claimant on the form provided by the Administrator to be deemed Complete. The Claim Verification may be separately submitted to the Administrator.

4.1.6.   If a claim form or supporting evidence is submitted in paper form, it must be mailed to the Settlement Fund Administrator's claims processing facility at Verus LLC ("Verus"), 3967 Princeton Pike, Princeton, NJ 08540. For deadline purposes, a physically mailed item will be deemed received by the Settlement Fund on the date it is actually received by the Administrator and not on the date mailed.

4.1.7.   Any Claim Submission Form or electronic equivalent submitted to initiate a Claim that is received by the Settlement Fund after the expiration of the Claims Filing Deadline will not be processed and a Notice of Claim Determination issued denying the claim as untimely.

4.1.8.   Information, documents and certifications supplied to cure Parts A, B or C deficiencies received by the Administrator after the Claims Filing Deadline has expired but prior to the Documents Submission Deadline will not affect the timeliness of the claim.[5] For avoidance of doubt, submission of lien administration information and materials required by the Lien Administrator in connection with an individual Claimant's distribution payment(s) is not subject to the Documents Submission Deadline. A separate Lien Administration Document Deadline applies to lien administration information and materials, which deadline occurs on the first business day 45 days after the Effective Date.

 4.2. **Claim Initiation and Claim Support Submission Requirements and Procedures.**

4.2.1.   **Required Claim Information for a Claim to be Considered "Complete"**.

4.2.1.1. To be deemed complete for purposes of § 4.1.1, all of the items of information set forth in § 4.2.1.2 below are required to be supplied to the Settlement Fund on the Claimant's Claims Submission Form ("**Required Claim Information**") along with timely submission of all necessary supporting documents, certifications, and verification required by the Plan's PDPs.

---

[5] The Settlement's Preliminary Approval Order provides a "**Claims Filing Deadline**" by which a Claim Form and all other required Claim Submission documents and items must be filed by a Claimant with the Administrator in order to timely initiate a claim. The proposed deadline date is  120 days from when the Notice is first published to the Class pursuant to the Notice Plan unless otherwise modified by the Court. The Preliminary Approval Order also provides a "**Documents Submission Deadline**" by which a Claimant must submit all documents necessary to cure any deficiency in its Claims Submission. This deadline is 155 days from when the Notice is first published to the Class pursuant to the Notice Plan unless otherwise modified by the Court.

4.2.1.2. **Required Claim Information** are all of the following items:

(A) Name, current mailing address and Email of Claimant and the law firm (if any) representing claimant in connection with claim to the Settlement Fund;

(B) Court and docket number of the Underlying Lawsuit on which the claim is based;

(C) The date of birth, date of death (if applicable), residence addresses during the Class Period (if known), and social security number of the Injured Person in the Underlying Lawsuit on which the claim is based.

(D) A certification on the form, under penalty of perjury, that the Claimant qualifies based upon one of the following:

  (1)  Claimant is the Injured Person who was named in the Underlying Lawsuit identified on the form; or

  (2)  Claimant is the personal representative of the Injured Person named in the Underlying Lawsuit identified on the form and that the Claimant's decedent was the Injured Person referred to or named in the Underlying Lawsuit identified on the form; or

  (3) The Claimant (a) is applying for Part A Base Compensation based upon being an eligible surviving spouse or the surviving child of a deceased Injured Person eligible to make the claim for Part A Base Compensation Benefits; (b) the claim is based upon the Injured Person identified in the Underlying Lawsuit listed and that the Claimant's decedent was the Injured Person referred to or named in the Underlying Lawsuit; (d) that no estate was ever created for the deceased Injured Person and (c) the claim is limited to a request for only Part A Base Compensation;

(E) An election on the form where indicated on whether Part A Derivative Claimant Base Compensation is being requested and if so, the name(s) of the Class Member(s) who are Derivative Claimant(s) related to the Injured Person the claim is based upon;

(F) An election on the form where indicated on whether Claimant is requesting Part B compensation. If Claimant requests Part B compensation it must further:

  (1) Indicate where provided on the form that Claimant will be submitting medical proof supporting the Part B Claim;

  (2) Indicate where provided on the form if Claimant will be relying on a certification of prior asbestos disease adjudication by one of the Qualified Asbestos Trusts; or

(3) Indicate where provided on the form that Claimant requires Administrator assistance.

(G) An election on the form where provided whether Claimant is requesting Part C EIF compensation. If a Claimant is requesting Part C EIF compensation, a statement of the basis for the EIF claim, certification that eligibility requirements are or will be met, and if requesting waiver of an EIF Eligibility Requirement, identification of the requirement and the reasons why the Settlement Trustee should waive the requirement.

(H) Completion of a Written Release Authorization Form enabling the Administrator to obtain certification of the disease adjudication from one of the specified Preferred Qualified Asbestos Trusts or if necessary, one of the Alternative Qualified Asbestos Trusts.

(I) , Certification that Claimant has not opted out and is not opting out of Class Membership.

(J) Where applicable certification that after a diligent search was made for documents satisfying the required Part A documentation requirement of § 3.1.3.2. and the Part B documentation requirement of § 3.2.4.2 no documents could be located; and

(K) Written certification electronically or manually signed by the Claimant under penalty of perjury that all information provided in and in support of the Claim Submissions is true, accurate, and complete to best of their knowledge and belief.

4.3. **Claim Submission Supporting Documentation Deadline.**

4.3.1.   Claim Submission supporting documentation, certifications and authorizations should be submitted along with the Claim Submission Form and must be submitted to the Settlement Fund no later than the earlier of: (a) 20 days from the date the Claimant is given Notice of Deficiency or Notice of Administrator's Claim Adjudication which identifies curable missing or deficient supporting documentation; or (b) the Documents Submission Deadline.

4.3.2.   A Claim Submission will not be deemed Complete and eligible for processing, review and adjudication by the Settlement Fund Administrator until all Required Claim Information is provided, including all required or applicable supporting certifications, verifications, elections, required Part A documentation/certification, required Part B

31

documentation/certification, medical records (if applicable to supporting claim), employment records (if applicable to supporting a claim), and Qualified Asbestos Trust authorizations. Incomplete claims will not be processed.

4.3.3.   Lien Information. For avoidance of doubt, completion of the Lien Administration questionnaire or providing lien information to resolve lien obligations is not part of a claim's Required Claim Information and non-completion of or missing lien information/documents will not render a Claim Submission incomplete for claim adjudication purposes. It will however, delay payment and distribution of a Claimant's individual claim until required Lien Resolution Requirements are satisfied. A separate Lien Administration deadline will be set by the Settlement Trustee, which generally will be 45 days following the Effective Date of the Settlement.

4.4. **Claim Submission Reviews.**

4.4.1.   Generally, Claim Submission reviews will occur in the order they are received, and the review will determine if the Required Claim Information and supporting documentation and certifications have been supplied. Where the Claim Submission is determined to be incomplete the Administrator will identify each deficiency in a Notice of Deficiency sent to Claimant or Claimant's Registered Law Firm. A Claimant or Claimant's Registered Law Firm will have 20 days from the date of notice to cure deficiencies identified in the Notice of Deficiency. Failure to cure the deficiencies identified in the Notice of Deficiency shall result in no further processing of claim and an administrative denial of claim.

4.5. **Claim Substantive Review Processes and Procedures.**

4.5.1.   The Administrator will perform all substantive claim reviews. During the substantive claim review the Administrator will determine eligibility of Claimant under each Plan Part for which compensation is requested in the Claimant's Claim Submission form.

32

4.5.2.   The Administrator will generally process complete Claims Submissions on a first in, first out (FIFO) basis as they are determined to be complete for review. Claim Submissions requesting Part C EIF compensation may be placed into a separate processing queue by the Settlement Fund for administrative convenience.

4.5.3.   The Settlement Fund implements both automated and manual quality control steps that are implemented prior to any claim being processed for review and payment. The quality control program assures that no duplicate claims are processed and that claims meet all applicable criteria before payment.

4.5.4.   Claim Submissions which do not request Part C EIF compensation (referred to as a "**Standard Claim**") will be processed as follows:

4.5.4.1. When a Standard Claim's Claim Submission is determined to be eligible for compensation with respect to each of the program Parts requested in the Claims Submission form, including, if applicable, eligible for Part B compensation at the Part B Claim Level disease claimed in the form, the claim will then be deemed a "**Qualified Standard Claim**" and a Notice of Administrator's Claim Adjudication sent to the Claimant or Claimant's Registered Law Firm informing it of the Administrator's claim determinations. The claim will thereafter be processed and paid in accordance with applicable Plan provisions to the qualified claims.

4.5.4.2. When a Standard Claim's Claim Submission is determined to be eligible for compensation for some of the Plan Parts requested but not eligible as to others requested in the Claim Submission form, including if applicable, determined to be eligible for Part B compensation but at a lower Part B Claim Level claim than requested in the form, the claim will be deemed a "**Partially Qualified Standard Claim**" and the Settlement Fund will then follow the applicable Claim Determination Notice, Cure and Contest Processes and Procedures in § 4.6.

33

4.5.5.   When a Standard Claim's Claim Submission is determined to be not eligible for compensation under any Plan Part requested in the Claim Submission form, the claim will be deemed a "**Non-Qualified Standard Claim**" and the Settlement Fund will then follow the applicable Claim Determination Notice, Cure and Contest Processes and Procedures in § 4.6. A Claim Submission that contains a request for Part C EIF compensation (referred to as an "**EIF Claimant Claim**"), will not be reviewed for EIF eligibility until it has been determined that the Claimant is eligible under Parts A and under Part B as a Claim Level 4 (mesothelioma) claim pursuant to 4.5.4 above. Once the EIF Claimants' Claim Submission is determined to meet the eligibility requirements of Part A and a Part B, Claim Level 4 claim, the Administrator will then proceed to determine the EIF claims eligibility, and if determined eligible, the Administrator will make an EIF award amount recommendation to the Settlement Trustee based upon the circumstances presented in the Claim Submission, which recommendation will be conveyed to the Claimant or Claimant's Registered Law Firm as provided in § 4.6.2. Where the EIF Claimant requests an EIF Eligibility Criteria waiver or relaxation, the Settlement Trustee will be notified and asked by the Administrator to rule upon the waiver/relaxation request and the Administrator will apply the Settlement Trustee's ruling on the waiver or relaxation request in determining eligibility. Once the EIF and Claim Submission adjudication is complete the Settlement Fund will follow the Claim Determination Notice, Cure and Contest Processes and Procedures in § 4.6 applicable to the circumstances.

4.6. **Claim Determination Notice, Cure and Contest Processes and Procedures.**

4.6.1.   Where the Administrator determines a Standard Claim is either a **Partially Qualified Standard Claim** or **Non-Qualified Standard Claim**, or determines that an EIF Claimant claim should be processed as a **Qualified Standard Claim** or **Non-Qualified Standard**

**Claim**, or modifies an approved claim pursuant to any of the provisions of § 8 relating to claim audits and claim reviews, the Administrator will send Claimant or Claimant's Registered Law firm a Notice of Administrator's Claim Adjudication informing it or them of the determination and the reason(s) for such determination and of applicable cure or contest rights the Claimant has. Within 20 days of the date of the notice, a Claimant or Claimant's Registered Law Firm may either (a) attempt to cure any deficiencies in the Claim Submission identified in the notice or provide additional information, documentation or certifications to be reviewed by the Settlement Fund for a reconsideration; or (b) inform the Settlement Fund that the Claimant is requesting review and determination of any contested issue(s) before the Settlement Trustee and submit a Settlement Trustee Adjudication request which request shall specify the reasons for the appeal or challenge. To the extent that any Claimant or law firm fails to make one of the two available elections in clauses (a) or (b) in this paragraph within 20 days of the date of the Settlement Fund's Notice of Administrator's Claim Adjudication, the Claimant's Claim Submission shall be deemed to be finally adjudicated as stated in the notice and the claim further processed for payment or terminated accordingly.

4.6.2.   Where the Administrator determines an EIF Claim Submission is eligible it will send Claimant or Claimant's Registered Law Firm a Notice of Administrator's Claim Adjudication informing it or them of the Settlement Fund's determinations as to the Parts A, B and C claims and the reason(s) for such determination along with the Administrator's recommended EIF award amount. Within 20 days of the date of the notice, a Claimant or Claimant's Registered Law Firm may either (a) attempt to cure any deficiencies in the Claim Submission identified in the notice or provide additional information, documentation or certifications to be reviewed by the Settlement Fund for a reconsideration; or (b) inform the Settlement Fund that the Claimant is requesting

review and determination of any contested issue(s) before the Settlement Trustee and submit a Settlement Trustee Adjudication Request which specifies the reasons for the appeal or challenge. To the extent that any Claimant or law firm fails to make one of the two available elections in clauses (a) or (b) in this section within 20 days of the date of the Settlement Fund's Notice of Administrator's Claim Adjudication, the Claimant's Claim Submission shall be deemed to be provisionally adjudicated as stated in the notice and the claim further processed for payment accordingly.

4.6.3.   Where a Claimant elects under §§ 4.6.1(a) or 4.6.2(a) to provide additional reasons, information or documents in response the Notice of Administrator's Claim Adjudication the Administrator will review the material and determine whether it changes the Administrator's prior determination(s). The Administrator will inform the Claimant or the Claimant's Registered Law Firm of the outcome of this review and its reasons for such determination(s). The Claimant shall, within 10 days of such notice, inform the Settlement Fund that the Claimant is requesting an adjudication of the issue or claim and submit a Settlement Trustee Adjudication Request, specifying the issue(s) and the reasons for the appeal to her for an adjudication. The adjudication by the Settlement Trustee in response to the request shall be final, binding and non-appealable. To the extent that no Settlement Trustee Adjudication Request is timely served on the Settlement Fund, the Claimant's Claim Submission shall then be deemed by the Settlement Fund to be fully and finally adjudicated as stated in the reconsideration notice (which may incorporate the prior notice by reference) and the Claim Submission further processed for payment or terminated accordingly.

4.6.4.   **Settlement Trustee's power and discretion to modify or reject award determinations**. Prior to the submission of the Settlement Fund's proposed distribution schedules

to the Court for approval under § 9.4.2 of this Plan, the Settlement Trustee upon notice to the Claimant or Claimant's Registered Law Firm, and affording Claimant a reasonable opportunity to be heard, may for good cause modify, rescind or decline to ratify any Part A or Part B award determination that is mistaken or fraudulent or in her sole discretion modify, rescind or decline to ratify any EIF award determination.

**5. Rules, Processes and Procedures Relating to Attorney Representation of Claimants.**

5.1.1.   Each Class Member has the right to representation by their own retained attorney to represent their claim to the Settlement Fund for compensation. The Claimant is solely responsible for the fees and expenses of their attorney. Any attorney licensed in a United States jurisdiction may represent a Class Member in connection with their claim submission to the Settlement Fund.

5.1.2.    To be eligible and recognized as a Claimant's attorney and representative, the attorney's law firm must register with the Settlement Fund by submission of a registration form (in which it will consent in writing to the Court's jurisdiction over it), an electronic filer agreement (EFA) if submitting electronically, a W-9 form and an Automated Clearing House (ACH) form if receiving funds electronically. Once these are submitted and accepted by the Settlement Fund, the firm and all of its attorneys associated with it will be deemed (and referred to as) a "Registered Law Firm." The Settlement Fund will provide a spreadsheet form or other means for a Registered Law Firm to submit multiple claimants' claims.

5.1.3.   Registered Law Firms must fully assist and comply with the Settlement Fund's claim and financial audits procedures. A Registered Law Firm must provide the Settlement Fund with an email address and in so doing consents to service of notices from the Settlement Fund by email sent to such address.

5.1.4.  **Law Firm Electronic Access.**

5.1.4.1. A law firm may request the Administrator to register and allow it to access its online filing system by executing an EFA. Once a Registered Law Firm has been granted access to the electronic filing system, the Registered Law Firm may simultaneously file claims. The Settlement Fund strongly recommends that law firms use the online filing system.

5.1.4.2. For all claims filed with the Settlement Trust, each Registered Law Firm is obligated to maintain copies of any document relied upon in connection with the claims.

5.1.5.  **Recognition of Attorney Fee Agreements and resolution of any disputes over attorney's fees and cost reimbursement.**

5.1.5.1. The Settlement Funds policy is to recognize individual attorney fee agreements that apply to a claim payment being awarded from the Settlement Fund and therefore allow a Claimant's Registered Attorney to receive and distribute the claimants' compensation payments in order to expedite distributions.

5.1.5.2. In the event there is a dispute concerning attorney fees or cost reimbursement relating to a Settlement Fund payment in which the Settlement Fund is on notice, no distribution will be made by the Settlement Fund to the parties connected with the dispute until they agree to resolve the dispute and provide the Settlement Fund with written confirmation of the resolution of the dispute. The Settlement Trustee may also enter a Special Master's Fed. Rule Civ. P. 53 Recommendation providing for the deposit of any Settlement Funds in dispute into an escrow account or into Court in order to facilitate the Settlement Fund's administration or winding up and closure, any costs or expenses of which shall be borne solely by the parties involved in the dispute.

**6. Filing Fees and Settlement Trustee's Costs and Sanction Assessment Authority.**

6.1. The Settlement Fund does not require a filing fee in order to submit a claim.

6.2. The Settlement Trustee may assess charges for any administration costs incurred by the Settlement Fund, including the Settlement Trustee's hourly fees, against any portion of a Claimant's award where the Trustee finds a claim or appeal demand to be in whole or in part fraudulent or frivolous.

6.3. The Settlement Trustee may assess (through a Special Masters' Fed. Rule Civ. P. 53 Recommendation) sanctions against a Claimant or Claimant's attorney, including but not limited to any administration costs incurred by the Settlement Fund and/or the Settlement Trustee's hourly fees, where the Trustee finds a claim or an appeal demand to be fraudulent or frivolous.

**7. Lien Resolution Requirements and Procedures.**

7.1.  The Settlement Fund will not make any payment awards to a Claimant until all Liens related to the Claimant's Settlement Fund award are resolved and/or provided for to the satisfaction of the Settlement Trustee where there exists a legal obligation on the Defendants, the Settlement Trustees, Class Counsel, or the Settlement Fund to withhold payment of a monetary award or settlement payment, or some portion thereof to a Settlement Class Member under applicable federal or state law. By way of illustration and not limitation, it will not pay any monetary award to a Claimant who is or was entitled to benefits under a Governmental Payer program, Other Governmental Payer program, or Medicare Part C or D Program prior to either (i) the Lien Administrator's determination of the final amount needed to satisfy the reimbursement obligation that any Government Payer or Medicare Part C or Part D Program sponsor states is due and owing (as reflected in a final demand letter or other formal written communication), and satisfaction and discharge of that reimbursement obligation as evidenced

by the Lien Administrator's receipt of a written satisfaction and discharge from the applicable Governmental Payer, Other Governmental Payer, or Medicare Part C and Part D program sponsor or other written proof of satisfaction reasonably acceptable to the Defendants (such as correspondence from each lienholder with the Settlement Class Member's final lien amount and proof of payment); or (ii) the Lien Administrator's determination of the "holdback" amount to be deducted from the monetary award under which such reimbursement obligation will be resolved.

7.2. **Court Appointed Lien Administrator**

7.2.1.   The Court has appointed _____[6] as the Plan's Lien Administrator to perform certain functions in connection with Liens that may be asserted by certain healthcare payers in order to protect the Plan and the Parties to the Settlement Agreement establishing the Plan.

7.3. **Duties of the Lien Administrator**

7.3.1.   The Lien Administrator will perform certain functions in connection with Liens that may be asserted to assure these Liens, if any, are properly addressed prior to the Settlement Fund making a payment to a Claimant.

7.3.2.   The Lien Administrator's general duties include acting on behalf of Claimants, the Settlement Fund, the Settlement Trustees, the Defendants, and/or their respective counsel for purposes of: (1) establishing processes to identify Liens that may be held or asserted by Governmental Payers and Other Governmental Payers (collectively "Government Payer Liens); (2) satisfying certain Government Payer Lien obligations, including any relevant reporting

---

[6] The Court is being asked to appoint Edgar C. Gentle, III, Esq. and his law firm, Gentle, Turner, Sexton & Harbison, LLC, to serve as Lien Administrator.

obligations (whether Medicare Secondary Payer Act ("MSP") or otherwise) under an alternative aggregate (global/mass management) lien resolution approach or assisting the Defendants with reporting obligations under a traditional (claim-by-claim) lien resolution approach by providing them with all necessary reporting information required to comply with reporting obligations; and (3) resolving Government Payer Liens related to medical items and/or services whether through a traditional (claim-by-claim) and/or alternative aggregate (global/mass management) process in each case associated with the Class Action Settlement and/or this Plan.

7.4. **Claimant Lien Identification Obligation**.

7.4.1. Each Claimant, on his or her own behalf, and on behalf of his or her estate, predecessors, successors, assigns, representatives, heirs, beneficiaries, executors, and administrators, in return for the benefits and consideration provided in the Settlement Agreement and this Plan of Distribution, will indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities, including the costs of defense and attorneys' fees of, the Released Parties against any and all claims by Other Parties arising from, relating to, or resulting from (A) compensation or benefits received by a Settlement Class Member pursuant to this Settlement Agreement or the Plan of Distribution; (B) any undisclosed Lien relating to, or resulting from, compensation or benefits received by a Claimant pursuant to the Settlement Agreement or this Plan of Distribution and/or (C) the failure of a Claimant timely and accurately to report or provide information that is necessary for compliance with MSP, or for the Lien Administrator to identify and/or satisfy all Governmental Payers or Medicare Part C or Part D Program sponsors who may hold or assert a reimbursement right. The amount of indemnification will not exceed the total compensation awarded to the Claimant under this Plan of Distribution for the Claimant's claim. CLAIMANTS

41

ACKNOWLEDGE THAT THIS SECTION COMPLIES WITH ANY REQUIREMENT TO EXPRESSLY STATE THAT LIABILITY FOR SUCH CLAIMS IS INDEMNIFIED AND THAT THIS SECTION IS CONSPICUOUS AND AFFORDS FAIR AND ADEQUATE NOTICE.

7.5. **Governmental Payer Procedures**

7.5.1. **Identification of Governmental Payers**

7.5.1.1. The Lien Administrator will affirmatively verify whether each Claimant (or his decedent if applicable) who will be paid a benefit under Part B and/or Part C of the Plan is or was entitled to benefits pursuant to the Medicare Program and/or the Medicaid Program. Claimants will cooperate with the Lien Administrator by providing information necessary to make these determinations by the Lien Administration Document Deadline, which is on the first Business Day 45 days after the Effective Date.

7.5.2. **Satisfaction of Governmental Payer Obligations**

7.5.2.1. The Lien Administrator shall verify and resolve all liens, claims, and or reimbursement interests of all Governmental Payers identified pursuant to § 7.5.1.1 for medical items and/or services which are related to or arise from each Claimant's compensable injury.

7.5.2.2. **Medicare Program Specific Rules**: With respect to liens and/or reimbursement claims of the Medicare Program, each Claimant and such Claimant's counsel agree to comply with the Lien Administrator's protocols for resolution of the Medicare Program's MSP claims, which specify that every Claimant is bound to the terms of those resolution agreements with the agency.

7.6. **Other Governmental Payer Procedures**

7.6.1.   **Identification of Other Governmental Payers**

7.6.1.1. Claimants and Claimants' counsel will be solely responsible for self-identifying to the Lien Administrator through the use of a Lien Administrator Questionnaire or otherwise all known Other Governmental Payers from which they are entitled to benefits that may have made any payments on behalf of such Claimant in relation to Claimant's compensable injury. Claimants are required to complete and provide the Lien Administrator Questionnaire as part of their Claims Submission.

7.6.2.   **Satisfaction of Other Governmental Payers**

7.6.2.1. For all Other Governmental Payers Identified pursuant to § 7.6.1.1, the Lien Administrator shall work with the applicable Claimant of Claimant's Counsel to verify the resolution of all liens or reimbursement claims related to a Claimant's compensable injury. Any Other Governmental Payers which are not identified as required pursuant to § 7.6.1.1 (Undisclosed Healthcare Payers Liens) are the sole responsibility of Claimant and such Claimant's counsel to resolve and the Claimant shall defend indemnity and hold harmless (including attorneys' fees) the Plan, the Settlement Trustees, the Parties to the Settlement Agreement, the Administrator and Lien Administrator against any claims or liability relating to Undisclosed Healthcare Payers Liens.

7.7. **Cooperation**

7.7.1.   Claimants and Claimant's counsel agree to cooperate with procedures and protocols established by the Lien Administrator, including, but not limited to, providing the requested information and authorizations to the Lien Administrator in the timeframe specified for doing so, as a prerequisite to receiving compensation and/or settlement benefits.

7.8. **Distribution Holdbacks for Liens**

7.8.1.   If requested by the Settlement Trustee, the Lien Administrator will provide instructions to the Administrator regarding the amounts of Claimant's Settlement Fund Awards the Settlement Fund should hold back from distributions until such time as the Lien Administrator determines: (A) the amount to resolve any and all reimbursement interests of Governmental Payers, or (B) the "holdback" amount under which such Governmental Payers and Other Healthcare Payers claims shall be resolved ("Holdback Amount") to allow for the partial release of Settlement Fund award payments to Claimants.

7.9. **Scope of Lien Administrator Engagement**

7.9.1.   The Lien Administrator shall be responsible for identifying and resolving only the Government Payer Liens described in §7.3.2. Any other Liens not described in §7.3.2, including Private Third Party Payer/Provider liens, shall be the sole responsibility of the Claimant and/or Claimant's counsel to resolve and provide sufficient proof to the Settlement Trustee thereof.

7.10. **Language Does Not Expand/Create Rights**

7.10.1. Nothing in this Plan or in the Settlement Agreement or Final Order in the Williams Action shall be construed as expanding the legal rights of any claim or lien holder for reimbursement of any lien, assignment, or claim or any portion of same thereof asserted against a Claimant and a Claimant's counsel beyond those rights currently provided under applicable law.

**8. Settlement Fund Claim Audits and Anti-Fraud Plan; Settlement Agreement § 3.10.3 Claim Reviews.**

8.1. The Settlement Fund shall adopt and maintain policies, procedures and protocols for auditing the integrity of the claims process. The Settlement Fund's initial Anti-Fraud Plan is

annexed to this Plan and will be published on the Settlement Fund's website. The Anti-Fraud Plan will be implemented fairly, fully and without deviation.

8.2. The Settlement Trustee and/or the Administrator, after consultation with Class Counsel, may in their respective discretion request that the Court permit modification of, or additions to the Anti-Fraud Plan in order to protect the integrity of the Settlement Fund and the Claims Process. Class Counsel shall have a right to be heard by the Court regarding any modifications. Court approved modifications to the Anti-Fraud Plan will be published on the Settlement Fund's website.

8.3. The Settlement Trustee and/or the Administrator may suspend the processing of one or more individual or categories of Claims Submissions during audits or during its consideration of whether to implement or take action pursuant to the Settlement Fund's audit rights. If either the Settlement Trustee or Administrator determines that a claim submission is fraudulent, the Settlement Trustee and/or Administrator, as the case may be, shall report the finding to the District Judge and/or Magistrate Judge presiding over the *Williams* Action. Further, in the event the Settlement Trustee and/or Administrator determines that fraudulent claims, information or evidence has been provided to the Settlement Fund, the Settlement Trustee may, in addition to other sanctions or remedies available under law, and after giving the subject Claimant and claimant's attorney notice and opportunity to be heard, penalize the subject Claimant or the claimant attorney by any or all of the following actions: (A) disallow the Claim Submission or Claim Submissions submitted by subject Claimant or the claimant attorney; (B) impose the costs associated with the audit and any future audit or audits of such Claimant or claimant attorney's Claim submissions; (C) refuse to accept additional claims, information or evidence from the subject Claimant or claimant attorney; (D) recommend or seek the prosecution of the Claimant or

claimant's attorney for presenting a fraudulent declaration in violation of 18 U.S.C. §§ 1621, 1746; and/or (E) seek sanctions from the Court.

8.4. Defendants will have no role in nor any responsibility for the administration of the Plan's Fraud Prevention Provisions. However, pursuant to § 3.10.3 of the Settlement Agreement Defendants may during the claims review process ask the Administrator to review a specific approved claim or claims other than EIF claims based upon assertions of fraud in the claim submission or mistake in the adjudication of the claim. Such requests to the Administrator by Defendants must be in writing, with a copy to Class Counsel, and provide a good faith basis stating with particularity the circumstances constituting fraud or mistake. The number of review requests is limited to no more than ten percent (10%) of the total number approved claims by the Settlement Administrator during the Plan's entire administration, with any fraudulent claims found in audits conducted pursuant to a request or requests not counting towards the ten percent (10%) limit. A disagreement by Defendant or any insurer of a Defendant with an approved claim's qualifying injury level diagnosis that is correctly based upon a source allowed by the Plan shall not be grounds for requesting that a specific claim be reviewed. All requests by Defendants for a review under this Section shall be submitted to the Settlement Administrator no later than 60 days after the Claims Determination Deadline. Valid, substantiated review requests will be processed according to its type as follows:

8.4.1. **Alleged Mistake Reviews**: The Administrator shall review the claim of mistake in the subject adjudication including, if in its discretion such is necessary, requesting additional information about or auditing the claim to make a determination of claim eligibility. The Settlement Administrator will report its finding to the Settlement Trustee, Defendants, and Class Counsel. Where the Claimant or Claimant's Registered Law Firm was requested to provide

46

information in connection with the review and/or the claim adjudication is modified as a result of the review, the Claimant or Claimant's Registered Law firm will also be informed of the finding. The review determination of the Administrator under this section of the Plan is final and non-appealable as to Defendants. Any modification of adjudication of an approved claim will proceed in accordance with § 4.6.1 of this Plan.

8.4.2.   **Alleged Fraud Reviews**: The Administrator shall review claims of fraud in the claims submission, including, if in its discretion such is necessary, requesting additional information about, or auditing the claim, and report its finding to the Settlement Trustee. The Settlement Trustee upon review of the claim material and report of the Administrator, will make a determination of eligibility of the claim. The Settlement Trustee will report her finding to the Defendants and Class Counsel. Where the Claimant or Claimant's Registered Law Firm was requested to provide information in connection with the review and/or the claim adjudication is modified as a result of the review, the Claimant or Claimant's Registered Law firm will also be informed of the finding. This determination by the Settlement Trustee is final and non-appealable as to the Defendants.

8.4.2.1. The results of all audits under this section shall be reported to all Parties.

**9. Settlement Fund Allocations, Adjudication Schedules, Payments and Distributions.**

9.1. **Allocation of the Settlement Funds.**

9.1.1.   The Settlement Fund will be held and used for the benefit of Settlement Class Members and distributed to them under the provisions of this Plan. The Settlement Fund will make the allocations in the order they are listed below. The Settlement Trustee will make payments to eligible Claimants from the Settlement Fund and Sub-Funds in accordance with the provisions of this Plan.

9.1.2.   In executing the provisions of the Plan, references to "Settlement Fund" shall refer to the Settlement Fund net of the reserves for expense payments, the reserves for payment of Class Representative service awards, and the respective payments thereof, and shall include any net income earned on investment of the Settlement Fund.

9.2. **Payment of Unfunded Administration Costs and Expenses and Class Representative Service Awards.**

9.2.1.   Prior to making any compensation payments to Settlement Class Members as provided in this Plan, the Settlement Trustee shall create a reserve allocation from the Settlement Fund sufficient to pay Class Representative service awards as approved by the Court and all known or forecasted unfunded liabilities and expenses of the Settlement Fund and its administration which were not paid or reserved for from the Settlement Cost Fund ("**Unfunded expense/liability**").

9.2.2.   The Settlement Trustee shall pay all unfunded liabilities and expenses of the Settlement Fund and Administration out of the Settlement Fund.

9.2.3.   Prior to the submission of the Settlement Fund's proposed distribution schedules to the Court for approval under § 9.4.2 of this Plan, the Settlement Trustee will make provision for payment of the Class Representative service awards granted by the Court in accordance with § 9.2.1. above.

9.3. **Compensation Parts Sub-Funds and Sub-Fund Allocations.**

9.3.1.   **Part A Base Compensation Payments Allocation:** The sum of $6.25 million is allocated from the Settlement Fund for payment of Part A Payments Base Compensation Payments. This allocation shall be the "**Part A Sub-Fund**".

48

9.3.2.   **Part B Supplemental Compensation Payments Allocation:** The sum of $59.75 million is allocated from the Settlement Fund for payment of Part B Payments Supplemental Compensation Payments. This allocation shall be the "**Part B Sub-Fund initial allocation**". In determining the amount of the Part B Sub-Fund available for Part B awards, the Settlement Fund will deduct from the Part B Sub-Fund initial allocation the aggregate amount of payments or reserves for Class Representative service awards as approved by the Court and unfunded administration expenses required in § 9.2.1 above.

9.3.3.   **Part C Supplemental Compensation Payments Allocation:** The sum of $6.5 million is allocated from the Settlement Fund for the Plan's Extraordinary Injury Fund ("EIF"). This allocation shall be the "**Part C EIF Sub-Fund initial allocation**". In determining the amount of the Part C Sub-fund available for Part C awards, the Settlement Fund will add any spillover reallocations of the Part A Sub-fund under § 3.1.8 to the Part C Sub-fund.

9.4.   **Schedules of Approved and Disapproved Claimants.**

9.4.1.   **Master Claims Adjudication Report**.

9.4.1.1. Following the Effective Date and completion of claims processing and prior to the submission of any application to the Court under the Plan for approval of proposed claim distributions, the Settlement Administrator will prepare and submit to the Settlement Trustee a confidential report of payments to be made from the Settlement Fund and claims for payment from the Settlement Fund that were denied (the "Master Claims Adjudication Report"). The report will include, for each claim to be paid or denied upon Court Approval of the schedules of distributions: (a) the date the Claim Submission was received; (b) the name and address of the Claimant; (c) the name and address of counsel for the Claimant on the Claim, if any; (d) the name and date of birth of the Injured Person associated with the Claim Submission; (e) the

disease or diagnosis of the Injured Person on which the Claim Submission is based; (f) the name and address of all physicians or medical professionals whose reports or documentation were included in the Claim Submission; (g) the dates of the Injured Person's alleged exposure to Emtal Talc; and (h) the amount of the payment to be made to the Claimant or, if payment was denied, the reason for the denial.

9.4.1.2. The Master Claims Adjudication Report is an internal administrative report for the Settlement Trustee's administrative use, shall be deemed and maintained a Confidential document under the Court's Discovery Confidentiality Order, and shall not be publicly available or disclosed. The Settlement Trustee, however, will provide a copy of the report to Class Counsel and Defendants pursuant to Settlement Agreement § 3.10.4, which copies or contents Defendants may use or disclose only as provided in Settlement Agreement § 3.10.5.

9.4.2. **Distribution Schedules.**

9.4.2.1. Following the Effective Date and completion of claims processing and adjudication of all claims, the Administrator shall compile and provide to Settlement Trustee, with a copy to Class Counsel:

(A)   A schedule of approved Part A Claimants including the number of Part A shares awarded each;

(B)   A schedule of disallowed Part A Claimants;

(C)   A statistical summary of the number of Part A claims approved and disallowed and the amount of a Part A shares;

(D)   A schedule of approved Part B Claimants and claims including the Part B Claim Level awarded their claim;

(E)   A schedule of disallowed Part B claims;

(F)   A statistical summary of the number of Part B claims approved and disallowed and the dollar amount applicable to each Part B Level;

(G)   A schedule of approved Part C EIF Claimants including the amount of EIF compensation awarded each;

(H)   A schedule of disallowed Part C claims; and

(I)   A statistical summary of the number of Part C EIF claims approved and disallowed and the range and average of the EIF payments.

9.5. **Court Distribution Authorization and Payment of Approved Claims.**

9.5.1.   **Court Distribution Authorization Process**

9.5.1.1. Following the Settlement Trustee's review and approval of the Administrator's claim schedules and statistical summaries she will publicly file copies of the statistical summaries identified in § 9.4.2.1 with the Court along with entering on the *Williams* Action's record one or more Settlement Trustee's Recommendations under Fed. R. Civ Pro. 53 relating to Court approval of each Plan Parts' respective distribution and disallowed claims schedules ("**Distribution Recommendations**"). The Distribution Recommendation(s) shall be filed under seal to the extent necessary to protect Class Members' and Claimants' personally identifiable information from disclosure. The Settlement Trustee in her discretion may make separate Distribution Recommendations and/or disbursements as to each Part in order to expedite payments as to Parts that are administratively ready to make distribution.

9.5.2.   **Payment of Approved Claims.**

9.5.2.1. **Payment of Approved Part A Claims:** Upon the Court's approval and adoption of the Settlement Trustee's Part A Distribution Recommendation, the Settlement Fund shall pay each approved Part A Claimant his or her Base Compensation Award(s) in accordance with the approved distribution schedule as soon as practicable. The payment may be aggregated and paid along with a Claimants' other Plan Part claim awards. No payments will be made prior

to the Settlement's Effective Date. Individual claims will not be paid until cleared for payment by the Lien Administrator.

       9.5.2.2. **Payment of Approved Part B Claims:** Upon the Court's approval and adoption of the Settlement Trustee's Part B Distribution Recommendation, the Settlement Fund shall pay each approved Part B Claimant his or her Part B Part Supplemental Compensation share award in accordance with the approved distribution schedule as soon as practicable. In the Settlement Trustee's discretion, the Part B payments may be in multiple or partial disbursements and/or aggregated and paid along with a Claimants' other Plan Part claim awards. No payments will be made prior to the Settlement's Effective Date. Individual claims will not be paid until cleared for payment by the Lien Administrator.

       9.5.2.3. **Payment of Approved Part C Claims.** Upon the Court's acceptance and adoption of the Settlement Trustee's Part C EIF awards Recommendation, the Settlement Fund shall pay each approved Part C Claimant his or her EIF award as soon as practicable. In the Settlement Trustee's discretion, the Part C payments may be in multiple or partial disbursements and/or aggregated and paid along with a Claimants' other Plan Part claim awards. No payments will be made prior to the Settlement's Effective Date. Individual claims will not be paid until cleared for payment by the Lien Administrator.

       9.5.2.4. Where a Claimant is represented by a Registered Law Firm, the claims payment will remitted to Claimant's Registered Law Firm through either electronic funds transfer into the law firm's trust or escrow account or a check drawn to both Claimant and Claimant's Registered Law Firm as the Administrator is instructed by Claimant's Registered Law Firm.

9.6. **Residual Settlement Funds.**

9.6.1.   Should there be residual money left in the Settlement Fund following distributions or attempted distribution according to the Court approved Claimant lists, including any investment income or uncashed distribution remittances, which in the Trustee's sole, unfettered and complete discretion believes would be uneconomical or impracticable to further distribute to Class Members under Part B, the funds shall be  donated to an educational, research or medical institution or organization dedicated to the advancement of treating, reducing or eradicating asbestos or talc disease selected jointly by the Settlement Trustee and Class Counsel.

**10. Governance and operation of the Settlement Fund.**

10.1. The Settlement Fund together with the income earned thereon shall be held in trust by the Settlement Trustee for the use and benefit of the Settlement Class Members as provided in this Plan.

10.2. The Settlement Trustee is authorized and directed to distribute the Settlement Fund's assets in accordance with the provisions of the Settlement Agreement, this Plan and any CAP entered by the Court. In addition to the powers expressly stated in this Plan, the Settlement Agreement, the Preliminary Approval Order and The Final Approval Order, the Settlement Trustee shall have all powers, authorities and rights reasonably necessary or appropriate to carry out the provisions of this Plan.

10.3. The Settlement Trustee, Administrator and Lien Administrator shall administer the provisions of the Plan, as well as perform their respective duties, in favor of Settlement Class Members with the goal of achieving the fair, timely, equitable and efficient determination of claims submitted to the Settlement Fund. In adjudicating claims, all reasonable inferences of

evidence and/or any reasonable doubt will be resolved in favor of allowing a claim or increasing an injury category.

10.4. The Settlement Trustee may delegate to the Administrator and the Lien Administrator such powers and authorities permitted to the Settlement Trustee which the Settlement Trustee, in the Settlement Trustee's discretion, deems advisable or necessary in order to carry out the terms and purposes of the Plan.

10.5. Subject to the limitations set forth in this Plan, the Administrator is authorized, empowered and directed to perform all administrative and ministerial activities and functions of the Settlement Fund necessary to carry out the Plan, including the authority to make in the first instance all adjudications on a claimant's eligibility for and/or the amount of compensation to be awarded for an injury where determinations of eligibility and/or a claim level or monetary amount is required to determine a claim (referred to as "**Administrator Adjudications**").

10.6. Unless and until the Trustee directs otherwise, or the Plan assigns the function to another entity, all ministerial and administrative functions, including accounting, information technology and implementation of internal controls necessary to carry out the Plan, are delegated to the Administrator and shall be its responsibility to perform, implement or maintain.

10.7. The Settlement Trustee, the Administrator, or Class Counsel may not offer or provide Claimants, Claimants' attorneys or Class Members with any advice or guidance on tax, probate or benefit matters, including eligibility for future Medicare, Medicaid or state welfare programs, or workers compensation other than to advise Claimants that they should discuss and consider tax, probate and benefits matters in connection with the Claim and seek appropriate expert advice.

10.8.    The Settlement Trustee or Administrator may not extend the Claim Filing Deadline, the Documents Submission Deadline, Opt-out Deadline or any other deadlines set by the Court relating to the Settlement or POD, time being of the essence for these deadlines. The Settlement Trustee may for good cause modify the deadline for Lien Administration matters by Recommendation entered of Record and published on the Settlement Website.

10.9.    All Claim submission, documents, authorizations, communications, notices or evidence submitted to the Administrator are submitted in confidence and pursuant to settlement negotiations and are deemed confidential and privileged. They shall not be released to any party or entity without approval of the Court, except as provided in the Settlement Agreement. Nothing herein shall be construed to entitle any party or entity to discovery of any Claim Submission or group of claim submissions; nor shall any provision herein be cited in support of any request for discovery in any proceeding. Absent consent or authorization of a Claimant or its Registered Attorney or Law Firm, or direction from the Court, the Settlement Trustee and the Administrator will reasonably contest and resist any effort to subpoena records, documents or information in the Settlement Fund's possession, custody or control.

10.10. Class Counsel has the exclusive right to nominate to the Court for approval the Settlement Trustee, the Administrator, the Lien Administrator and any successor of these should one be necessary.

10.11.  Class Counsel may offer or provide advice to the Settlement Trustee and Administrator on general administration matters and processes and may take positions they deem proper before the Court on any administration matters where Court action is requested or involved.

10.12. Where necessary to address Plan distribution issues that arise and are not provided for in the Plan's terms, the Settlement Trustee, with the advice and consent of Class Counsel, may enter a recommendation to the Court for a Court Approved Procedure (CAP) addressing the issue.

10.13. **Consent and Consultation Procedures:** Where advice, consultation or consent of Class Counsel is required under the Plan or Settlement Agreement, the Settlement Trustee shall provide notice to Class Counsel of the specific action, policy or amendment that is proposed. The Trustee shall not take any action on the proposal unless and until the Settlement Trustee and Class Counsel have engaged in the advice, consultation or consent process. Any disagreements shall be brought to the Court's attention by either requesting a CAP, and the Court shall summarily determine the issue or refer the issue to a Magistrate Judge for determination.

10.14. All Settlement Class Members, Claimants Law Firms and their attorneys or any person making a claim against any part of the Settlement Fund or Cost Fund, shall be deemed to have submitted to the exclusive jurisdiction of the Court for any suit, action, proceeding, or dispute arising out of, or relating to this Settlement Agreement or the Plan of Distribution.

**11. Settlement Trustee's Adjudicative Powers.**

11.1. **Claim and claim dispute and challenge adjudications:** The Settlement Trustee shall have the full and complete, and non-reviewable authority and power to determine any and all issues, disputes, contests, disagreements or challenges of Claimants relating to the Administrator determination, adjudication or any action relating to one or more claims, including but not limited to the determining any dispute or disagreement on the eligibility of Claimant to participate in the Plan, a Claimant's compensation entitlement (including an Administrator's EIF claim recommendation) or the Administrator's valuation or categorization of claim. The Parties

to the dispute proceeding shall be only the aggrieved Claimant and the Administrator. The Settlement Trustee determinations shall be final, conclusive and not appealable.

11.2. **Individual Claimant's Attorneys' Representation, Fees and Cost Issues**: The Settlement Trustee shall also have the power and authority as a Special Master to hear, determine and resolve any and all controversies or disputes concerning individual claimants' attorney's representation of claimants or claims that are connected to or arising out of claim payments from the Settlement Fund, including but not limited to the power to determine any dispute, disagreement or controversy as to entitlement to an attorneys fee, which attorney represents an individual claim or claimant where multiple attorneys claim to represent an particular claimant or claim; the amount of fee or the allocation of the among competing counsel representing a Claimant. The Parties to the proceeding shall be only the subject Claimant if aggrieved, and the attorney or attorneys involved in the controversy or dispute. The Special Master and the Court will have jurisdiction over such parties and the claim. The Settlement Trustee will enter a Recommendation award on matters submitted to it which unless the parties appeal to the District Court in accordance with the Rules of Court shall be final and conclusive.

11.3. The Settlement Trustee shall determine, set and inform the parties before it on the process and record for any dispute or contest proceedings. Hearings, if any, may be conducted in person, telephonically or through videoconferencing. The Trustee shall decide each dispute with a written award served upon the parties to the proceeding and, if not a party, the Administrator.

11.4. The Settlement Trustee in addition to its authority under § 6 of this Plan, may in its discretion establish and require payment of a reasonable filing fee should the number or nature of

disputes, challenges or controversies brought to it warrant imposition of such fees to protect the Settlement Fund.

11.5. Notwithstanding anything to the contrary in this Plan, the Settlement Trustee shall not have the authority nor any responsibility to hear, determine or adjudicate in any way the allocation among family members, heirs, personal representatives, or any other persons relating to Derivative Claim Shares paid in accordance with the Plan. That obligation and responsibility is solely the Primary Claimant's and Claimant's attorneys.

[Balance of Page Intentionally Blank]

# Appendix A

## to

## Williams Emtal Talc Settlement Fund Trust Plan of Distribution

## ANTI-FRAUD CLAIMS AUDIT PROGRAM

## Settlement Fund Claims Audit Program

Pursuant to Section 8.1 of the Williams Emtal Talc Settlement Fund Trust Plan of Distribution (the **"Plan")**, the Settlement Trustee of the Williams Emtal Class Action Settlement Fund Trust (the "**Settlement Fund**") authorizes and adopts the following "Settlement Fund Claim Audit Program" setting forth the procedures and protocols for auditing the integrity of the claims and/or claims procedures application process ") in order to ensure that claims to the Settlement Fund are legitimate and in compliance with all terms and conditions of the Plan, Plan PDPs and the Electronic Filer Agreement ("EFA").

### Purpose, General Description and timing of the Audit Program

The purpose of the Audit Program is to ensure (1) that the Settlement Fund accepts and pays only legitimate claims presented by or on behalf of legitimate claimants that are eligible to share in the Settlement Fund under the Plan; and (2) that each claimant or law firm representing a claimant maintains during and through the claims administration process any documentation they possess that supports the claim submitted electronically or via hard copy claim form. The audit of claims will be performed prior to distribution to claimants.

### Audit Sample Selection

The Settlement Administrator, Verus LLC ("Verus"), will randomly select from the population of reviewed and qualified claims filed with the Settlement Fund a sample of claims for audit. The sample size will be based achieving a confidence level of 95% and a maximum margin of error (ME) of 5%.

Each Claimant and Claimant's Law Firm, if any, of each claim selected for inclusion in the audit sample will be informed that their claim has been selected for audit under this PDP as part of the Settlement's Fund's claim integrity program. Law Firms will be afforded a twenty (20) day opportunity from the date of notice to satisfactorily provide any requested claim documentation for each claimant selected. If a claimant or Law Firm fails to comply with the audit request, the Settlement Trustee may at her discretion direct Verus to reject the claim, or if a Law Firm is involved and represents more than one claimant before the Settlement Fund, suspend payment of all claims filed by such non-responsive Law Firm, or take such other action as the Settlement Trustee deems appropriate, including, but not limited to, recommending imposition of any sanctions available under Rule 11 of the Federal Rules of Civil Procedure. Verus will complete the audit of a selected claim within thirty (30) days following submission by the claimant or Law Firm of all requested claim information to Verus.

### Documentation Requirements

For each claim sampled, the claimant or Law Firm as the case may be will be required to provide any or all non-privileged documents of the types listed below, as may be specified by the Settlement Administrator, that the claimant or law firm possesses and relied upon in submitting the subject claim to the Settlement Fund:

2

1. Complaint or Amended Complaint showing Underlying Lawsuit filed and served against Engelhard/BASF (b) which lawsuit credibly asserted in good faith an asbestos injury caused by alleged exposure to Emtal Talc and (c) which lawsuit was dismissed as to Engelhard/BASF voluntarily or involuntarily

2. Answers to interrogatories

3. Transcripts of depositions of the claimant and/or co-workers

4. Verified work histories

5. Social Security records

6. All exposure affidavits executed by the claimant, co-workers, or family members related to the claim.

7. All B-reading interpretations and ILO forms (except for mesothelioma claims).

8. All chest x-ray/chest CT scan reports (except for mesothelioma claims).

9. All pulmonary function tests (including tracings and flow volume loops) for Severe Asbestosis and Asbestosis/Pleural Disease with reduced pulmonary function claims only.

10. All pathology or autopsy reports documenting asbestosis, asbestos-related pleural disease, malignant mesothelioma or a primary carcinoma of the lung, colon, esophagus, larynx, pharynx or stomach.

11. Admission, history and physical and discharge summaries of any hospitalizations for asbestos-related disease and/or any malignant disease which is recognized as compensable under the Plan.

12. All physical examination or pulmonary consultation reports.

13. All non-privileged interpretive reports provided by experts retained by counsel or the claimant to review tests, x-rays, or diagnostic reports in order to render an opinion.

The Settlement Fund will not require the production of original x-ray films and will not be re-reading such films or retesting claimants in the normal course of the claims audit. However, the Settlement Fund will reserve the right to request such original evidence and to expand the scope of the audit for targeted populations of claims in the event a pattern of submitting misleading or potentially fraudulent information is found. The standard of analysis for such a pattern shall not be based on the existence of questions of fact among the various testimonial sources, but rather on evidence of an actual intent to deceive or defraud the Settlement Fund. Both the Settlement Fund and the claimant/attorney shall be afforded all due process by the Settlement Trustee in resolving any merits issues on existence of such evidence.

**Review**

Verus will review all documentation provided by the claimant or law firms in a timely manner in order to answer the following questions relative to each claim:

1. Is there documentation in the Claimant's, Claimant's Law Firm's or Settlement Fund's database, including the archive documents referred to in the *Williams* Action Settlement Agreement, to support the legitimacy of the claim submitted to the Settlement Fund,

including proof that the Claimant is either the Injured Person in the Underlying Lawsuit on which class membership is based or the personal representative or heir of such Injured Person?

2. Where applicable, is the medical documentation submitted consistent with established medical guidelines for establishing a diagnosis of an asbestos-related disease and supportive of the disease level submitted to the Settlement Fund?

**Issue Resolution**

In the event of any findings of concern, Verus will communicate the details of the findings to the Claimant and Claimant's Law Firm and request additional information, explanation or response. If the Claimant or Claimant's Law Firm fails to provide additional information, or successfully dispute the findings within a twenty (20) day period, Verus will inform the Settlement Trustee and obtain instruction on the appropriate course of action to be followed to resolve the issue.

Audit processing and status and any issues observed or encountered will be discussed with the Settlement Trustee on a regular basis throughout the course of the audit. If any patterns of particular concern are discovered, the scope of the audit may be expanded and/or focused through additional targeted sampling to determine the extent of the issue.

*The Trustee reserves the right to adopt any other reasonable, or generally accepted audit procedures that the Trustee deems appropriate and warranted as circumstances may dictate.*

**Management Representation Requirement**

Upon conclusion of the audit, each Law Firm will be required to sign a law firm management representation letter in the form attached hereto as Exhibit A.

**Reporting of Results**

Upon the conclusion of the audit, Verus will produce a confidential report to the Settlement Trustee summarizing the findings and recommending specific actions to be taken as a result of any systemic issues identified or adverse findings that require corrective and/or disciplinary action. Depending on the nature of the issue to be addressed, such action may involve revisions to claims materials, filing requirements or the electronic filing system, or possible sanctions in the event of findings of fraud or abuse. Verus will communicate any potentially adverse findings to the Law Firm and the Settlement Trustee, and the firm will be given an opportunity to resolve any concerns before any follow-up actions or imposition of sanctions are taken by the Settlement Trustee. The particular nature of any sanctions to be imposed will be discussed as the need arises.

Date

Via Regular Mail or E-mail (_____@verusllc.com)

Verus Claims Services, LLC
3967 Princeton Pike
Princeton, NJ 08540

Attention: _____

       **Re:**    **Verus Claims Audit, Claimant (Insert Claimant Name, Claim ID)**

To Verus Claims Services, LLC:

On behalf of the law firm of _____ the we are providing this management representation letter in connection with the claims audit performed by Verus Claims Services, LLC ("Verus") covering **Claim ID # (INSERT CLAIM ID NUMBER)** for **(INSERT CLAIMANT NAME)**.

The undersigned is competent and authorized to make the representations set forth herein.

We understand that the claims audit was to be conducted pursuant to the claims audit program adopted by the Settlement Fund pursuant to the Williams Emtal Talc Settlement Fund Trust Plan of Distribution. We further understand that the Williams Emtal Talc Settlement Fund (Settlement Fund) has conducted this audit through Verus to ensure (1) that the Settlement Fund accepts and pays only legitimate claims presented by or on behalf of legitimate claimants that are eligible to share in the Settlement Fund under the Plan; and (2) that each claimant or law firm representing a claimant maintains during and through the claims administration process any documentation they possess that grounds or supports the claim submitted electronically or via hard copy claim form.

We acknowledge our responsibility, as the filing law firm, to comply with the requirements of Rule 11(b) of the Federal Rules of Civil Procedure in presenting information to the Settlement Fund and to provide all non-privileged documentation required by the Settlement Fund's claims audit programs.

We confirm that all of the claimants to the Settlement Fund we are representing, including the Claimants selected for audit that we represent, are either the Injured person in the Underlying Lawsuit on which class membership is based or the personal representative or heir of such Injured Person. In making this representation we have either first-hand knowledge of the Claimant's identity and relationship to the Injured Person in the Underlying Lawsuit or have taken sufficient and appropriate investigatory measures to verify their identity and relationship of the Claimant to the Injured Person in the Underlying Lawsuit.

We confirm, to the best of our knowledge and belief, as of the date of this letter, that we have provided the Settlement Fund with complete and accurate copies of all of the non-privileged documents requested and required by the audit of the above-named claimant(s) pursuant to the terms of the claims audit program.

We acknowledge that Verus on behalf of and at the direction of the Settlement Fund may, to the extent permitted by the Settlement Fund's claims audit program, request additional non-privileged information or explanations.

Yours truly,

_____
(Signature)

_____
(Title)

Exhibit D

# *WILLIAMS* EMTAL TALC SETTLEMENT COST FUND

## ESCROW AGREEMENT

This Cost Fund Escrow Agreement (the "**Escrow Agreement**") is entered pursuant to the Class Action Settlement Agreement by and between the Class Representatives in *Williams, et al. v. BASF Catalysts LLC, et al*., Civil Action No: 2:11-cv-01754 (ES)(JAD) ("**Williams Action**"), on behalf of themselves and as proposed class representatives, by and through Cohen, Placitella & Roth, P.C. ("**Class Counsel**"), and defendants in the Williams Action, BASF Catalysts LLC and Cahill Gordon & Reindel LLP ("**Defendants**"), dated as of March 13, 2020 ("**Settlement Agreement**"). This Escrow Agreement is entered by and among Class Counsel, Defendants, Hon. Marina Corodemus, J.S.C. (retired), who the United States District Court for the District of New Jersey ("**Court**") has appointed as the Settlement Trustee ("**Settlement Trustee**") pursuant to the terms of the Settlement Agreement, Verus LLC, which the Court has appointed as Settlement Administrator pursuant to the terms of the Settlement Agreement ("**Settlement Administrator**"), and PNC Bank, National Association, which the Court has appointed as Settlement Fund Financial Institution ("**Escrow Agent**") (all of the forgoing collectively referred to as the "**Escrow Agreement Parties**").

### DEFINITIONS

In addition to the terms defined above and in the body of the Escrow Agreement below, the Settlement Agreement definitions are incorporated by reference and capitalized terms appearing herein shall have the same meanings. Whenever context so requires, the masculine gender includes the

feminine and neutral gender, and the singular includes the plural and vice versa.

**RECITALS**

**WHEREAS**, the plaintiffs in the Williams Action commenced a class action against Defendants, Arthur A. Dornbusch II, Thomas D. Halket, Howard G. Sloane, and Ira J. Dembrow; and

**WHEREAS**, the Settlement Agreement requires the creation of a Cost Fund following the Court's entry of the Preliminary Approval Order, which is to be funded by Defendants, as specified in the Settlement Agreement and held in an interest-bearing escrow account ("**Cost Fund Account**"); and

**WHEREAS**, the Settlement Agreement further authorizes and allows the Settlement Trustee to order withdrawals and transfers from the Cost Fund Account to the Administrator's disbursement bank account to pay reasonable and necessary costs, expenses and fees identified in § 5.1.2.1; and

**WHEREAS**, the Settlement Agreement requires that the Cost Fund and the Cost Fund Escrow Account shall be, and be operated as, a "qualified settlement fund" within the meaning of Section 1.468B-1, *et seq.*, of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code ("**Qualified Settlement Fund**"); and

**WHEREAS**, after or contemporaneous with the Settlement Trustee's filing of a final accounting relating to the Cost Fund with the Court, the Defendants may file a motion with the Court for the return of any unused balance in the Cost Fund Account to be shared between them in proportion to the percentage each funded the Cost Fund.

**NOW, THEREFORE**, in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Escrow Agreement Parties agree as follows:

**AGREEMENT**

1.      **Purpose of the Escrow Agreement.** This Escrow Agreement is established pursuant to the Court's Preliminary Approval Order to: (A) carry out the terms of the Settlement Agreement under which the Defendants will be depositing the Cost Fund Amount into the Cost Fund Escrow Account in accordance with the Settlement Agreement, including the schedule in § 5.1, to pay the reasonable and necessary costs, expenses and fees identified in § 5.1.2.1; (B) provide the authority, terms and conditions under which the Escrow Agent shall hold, invest and manage the funds in the Cost Fund Account; and (C) to provide for the periodic release and transfer of the escrowed Cost Fund to the Administrator for payment of the costs, fees and expenses as specified in the Settlement Agreement on the order and instructions of the Settlement Trustee and her accompanying certification that the transfer is authorized by and in accordance with the Settlement Agreement and approved Settlement Cost Fund budgets.

2.      **Creation of the Cost Fund Account and Appointment of the Escrow Agent**. The Escrow Agreement Parties hereby establish an escrow account for the Cost Fund under the name "*Williams Emtal Talc Settlement Cost Fund*", with the Escrow Agent. The Settlement Trustee, the Settlement Administrator, Class Counsel and Defendants designate the Escrow Agent for the purposes set forth herein. The Escrow Agent accepts the agency

-3-

created under this Escrow Agreement and agrees to perform the obligations imposed hereby.

3.    **Appointment of the Settlement Administrator.** The Settlement Administrator is also hereby appointed and shall serve as the "administrator" of the Cost Fund Account within the meaning of Treasury Regulation §1.468B-2(k)(3). Consistent with the terms of the Settlement Agreement and this Escrow Agreement, the Settlement Administrator shall take any action or cause the Cost Fund to take any action necessary to create and maintain its status as a Qualified Settlement Fund, and the Settlement Administrator agrees not to take any action that will adversely affect the qualification of the Cost Fund as a Qualified Settlement Fund.

4.    **No Authority to Conduct Business**. The purposes of the Cost Fund and Cost Fund Account are limited to the matters set forth in ¶1 hereof, and this Escrow Agreement shall not be construed to confer upon the Settlement Administrator or the Escrow Agent any authority to carry on any business or activity for profit other than the holding, investment, and distribution of the Cost Fund Account in accordance with the terms of the Settlement Agreement, the Preliminary Approval Order, the Final Approval Order, the Notice Plan, and the Plan of Distribution.

5.    **Defendants' Deposit of the Cost Fund Amount into the Cost Fund Account**. Defendants will be making deposits into the Cost Fund Account pursuant to the terms of the Settlement Agreement as implemented and required by the Court's Preliminary Approval Order and, if and when entered, the Court's Final Approval Order, none of which shall be modified or changed in any way by this Escrow Agreement.

6.     **Cost Fund as a Qualified Settlement Fund**. The Cost Fund shall be operated in a manner so that it qualifies as a Qualified Settlement Fund. Specifically, (1) the establishment of the Cost Fund under the terms and conditions of this Escrow Agreement is subject to Court approval, and no deposits shall be made until requisite preliminary Court approval of the Settlement Agreement has been obtained and no distributions from the Cost Fund Account shall be made until distribution of funds is so instructed and ordered by the Settlement Trustee as authorized by the Settlement Agreement; (2) the Cost Fund and Cost Fund Account are subject to the continuing jurisdiction and supervision of the Court; (3) among the costs, expenses and fees to be paid from the Cost Fund are the reasonable and necessary costs, expenses and fees identified in Settlement Agreement § 5.1.2.; and (4) the Cost Fund Account is in an escrow account, and its assets are, and will be, segregated from the general assets of the Escrow Agent.

7.     **Tax Preparation, Payment, Reporting, Election, and Withholding Requirements and Provisions**.

A.     The Settlement Administrator shall be responsible for the timely and proper performance of the undertakings specified in the regulations promulgated under § 468B of the Internal Revenue Code, including, but not limited to:

i)  Obtaining an employer identification number for the Cost Fund Escrow Account;

ii) Handling all tax return and payment matters relating to the Cost Fund and Cost Fund Account, including the preparation and filing of all required federal, state and local tax and information returns in accordance with the provisions of Treasury Regulation

§ 1.468B-2(k) and Treasury Regulation § 1.468B-2(1); determining and making any required withholding of tax; making the payment of any federal, state and local taxes (including estimated taxes) and associated tax-related penalties and interest for which the Cost Fund Account may be liable.

iii) Responding to any questions from or audits regarding such taxes by the Internal Revenue Service or any state or local tax authority.

B.     The Settlement Administrator is authorized to and shall, with the joint consent of the Settlement Trustee, Class Counsel and Defendants, retain and compensate one or more independent, certified public accountant(s) or tax attorney(s), as is necessary and reasonable, to consult with and advise the Settlement Administrator with respect to the preparation of any and all appropriate income tax returns, information returns and compliance withholding requirements. The Settlement Administrator is authorized to retain and compensate an independent, certified public accountant firm to prepare the Cost Fund Account's tax returns.

C.     All taxes on the income of the Cost Fund Account and expenses and costs incurred in connection with the taxation of the Cost Fund Account including, without limitation, the expenses of tax attorneys and accountants, shall be paid out of the Cost Fund Account, shall be considered to be a cost of administration of the Cost Fund and the Cost Fund Account, and funds necessary to pay such expenses and tax shall be disbursed from the Cost Fund Account by the Escrow Agent and paid to or as instructed by the Settlement Administrator on written request by the

Settlement Administrator, which shall be countersigned by the Settlement Trustee, Class Counsel and Defendants.

D.     On any Defendants' request, the Settlement Administrator shall file a "relation back election" as described in Treasury Regulation § 1.468B-1(j) and take all appropriate actions as may be necessary to this end, including executing a "relation back election" statement that such Defendant may choose to file with respect to the Cost Fund and compliance with any other tax-related requirements.

E.     **Savings Provision**. The Settlement Administrator shall be empowered to take all actions as the Settlement Administrator deems necessary to ensure that the Cost Fund continues to qualify as a Qualified Settlement Fund. Notwithstanding anything to the contrary herein, in the event that any provision of this Escrow Agreement shall at any time be considered cause for the Cost Fund to fail to qualify as a Qualified Settlement Fund, such offending provision shall be considered null, void, and of no effect, without any action by any court or by the Settlement Administrator, so that the Cost Fund continues to qualify as a Qualified Settlement Fund. In the event that this section applies to render an offending provision null, void, or of no effect, the remainder of this Escrow Agreement shall not be affected thereby, and each remaining provision of this Escrow Agreement shall be valid and enforced to the fullest extent permitted by law.

8.     **Investment of the Cost Fund Account**

A. The Escrow Agent shall have no investment direction over the Cost Fund Account and shall follow the joint instructions of the

Settlement Trustee, Class Counsel and Defendants and accepted by the Escrow Agent, such that the following investment policy is implemented: (i) safety of principal; (ii) zero bank balance exposure; and/or (iii) the use of zero sweep distribution accounts to ensure funds remain in custodial or fully insured accounts to avoid an impermissible risk of loss should the financial institution holding the funds fail.

B.      All monies received by the Cost Fund Escrow Account, which include all principal and interest earned thereon, shall be held by the Escrow Agent, titled in the name of the Cost Fund and invested in appropriate safe, secured and liquid instruments/securities recommended by the Escrow Agent or its affiliate and thereafter approved, authorized and directed by the Settlement Trustee, Class Counsel and Defendants. The investments shall be consistent with the Settlement Fund's investment policy stated in subparagraph 8A, and may be comprised of: (i) United States Agency, Government Sponsored Enterprises or Treasury securities or obligations (or a mutual fund invested solely in such instruments); (ii) cash equivalent securities including SEC registered money market funds and collateralized money market accounts; and/or (iii) deposit and similar interest-bearing, or non-interest bearing accounts subject to full protection by the Federal Depository Insurance Corporation, including a PNC Money Market Deposit Account (**MMDA**").

C.  Any changes to the investments once they are initially determined and implemented in accordance with sub-paragraphs A and B above must be approved by the Settlement Trustee, Class Counsel and Defendants.

D. Any investment earnings and income on the funds held in the Cost Fund Account shall become part of the Cost Fund and shall be disbursed in accordance with this Escrow Agreement.

E. The Escrow Agent shall not be liable or responsible for any loss resulting from any deposits or investments made pursuant to this paragraph 8 other than as a result of the gross negligence, bad faith or willful misconduct of the Escrow Agent.

9. **Settlement Class Members' Interests in the Cost Fund Account.** This Escrow Agreement shall not operate to make any portion of the funds in the Cost Fund Account available to Settlement Class Members in any fashion. To the extent possible, the terms of this Escrow Agreement shall be construed so as to prevent Settlement Class Members from being in constructive receipt, as determined under federal income tax principles, of any amounts held by or in the Cost Fund.

10. **Distribution of the Cost Fund**. The Escrow Agent shall hold and only distribute from the Cost Fund Account as follows:

A. The Escrow Agent shall distribute funds from the Cost Fund Account necessary to pay the Cost Fund's tax obligations and tax preparation fees incurred by the Settlement Administrator as provided in ¶ 7C of this Escrow Agreement. The Escrow Agent is authorized to liquidate Cost Fund Account investments to the extent necessary to make such payments.

B. The Escrow Agreement Parties acknowledge and agree that the Settlement Agreement, the Notice Plan and the Plan of Distribution approved by the Court and incorporated in the Settlement's Preliminary

Approval Order and, if and when entered, the Final Approval Order, together with Cost Fund budgets approved by Class Counsel and Defendants, shall govern and determine the distributions that are allowed.

C. The Settlement Trustee shall have the authority to draw funds on demand from the Cost Fund to pay permitted payments under Settlement Agreement § 5.1.2.1 in accordance with the budgets.

D. After or contemporaneous with the Settlement Trustee's filing with the Court a final accounting relating to the Cost Fund, the Defendants may file a motion with the Court for the return of any unused balance to be shared between them in proportion to the percentage each funded the Cost Fund.

11. **Escrow Account Statements.**

A. During the term of this Escrow Agreement, the Escrow Agent shall provide Settlement Trustee, the Settlement Administrator, Class Counsel and Defendants with monthly statements containing the beginning balance in the Cost Fund Account as well as all principal and income transactions for the statement period ("**Periodic Account Statements**"). The Settlement Administrator shall be responsible for reconciling the Periodic Account Statements. In the absence of the Escrow Agent's gross negligence or willful misconduct, the Escrow Agent shall be forever released and discharged from all liability with respect to the accuracy of the Periodic Account Statements and the transactions listed therein, except with respect to any such act or transaction as to which any of the Settlement Trustee, the Settlement Administrator, Class Counsel or Defendants shall, within ninety (90)

days after the Escrow Agent makes the Periodic Account Statement available, file written objections with the Escrow Agent.

B.  The Periodic Account Statements shall include a listing of all receipts and distributions during the statement period, together with a current listing of the assets held in the Cost Fund Account. The Settlement Trustee, the Settlement Administrator, Class Counsel and Defendants agree to accept the Periodic Account Statements in satisfaction of the Escrow Agent's obligation to provide written notification required by federal regulations; provided that, upon any request by the Settlement Trustee, the Settlement Administrator, Class Counsel or Defendants, the Escrow Agent will provide to such parties within a reasonable time and at no additional cost any information required by federal regulations or state taxing authorities.

12.     **Rights, Responsibilities and Liabilities of the Escrow Agent**.

A. The Escrow Agent shall act hereunder as an escrow agent only, and it shall not be responsible or liable in any manner whatever for the sufficiency, correctness, genuineness or validity of any document furnished to the Escrow Agent or any asset deposited with it.

B.  The Escrow Agent may rely and shall be protected in acting or refraining from acting upon (and shall incur no liability for following the instructions contained therein) any written notice, instruction or request furnished to it hereunder and believed by it to be genuine and to have been signed or presented by the proper party or parties. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document.

C.  The Escrow Agent shall have no duty to solicit any payments which may be due to be paid into the Cost Fund Account by any party or entity.

D.  The Escrow Agent shall not be liable for any action taken or omitted by it unless the Court determines that the Escrow Agent's gross negligence or willful misconduct was the primary cause of any loss. In the administration of the Cost Fund Account, the Escrow Agent may execute any of its powers and perform its duties hereunder directly or through agents or attorneys and may consult with counsel, including in-house counsel, accountants and other skilled persons to be selected and retained by it. The Escrow Agent shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons, including in-house counsel.

E.  The Escrow Agent shall not make, be required to make, or be liable in any manner for its failure to make, any determination under any agreement or document any of the Escrow Agreement Parties may be parties to or responsible for, even if same is referenced herein, including any determination whether any party thereto has complied with its terms or is entitled to payment or to any other right or remedy thereunder. To avoid any doubt, the Escrow Agent shall have no responsibility for determining the validity or conformity of any costs, expenses and fees and may accept the certification of the Settlement Trustee that ordered distributions are for valid and conforming Settlement costs, expenses and fees.

13.     **Fund in Court Status**. Both the Cost Fund and the Cost Fund Account holding it shall be deemed and considered to be in *custodia legis* of the Court and shall remain subject to the Court's exclusive jurisdiction until such time as the funds therein have been fully distributed pursuant to the terms of the Settlement Agreement, Notice Plan and the Plan of Distribution. The Escrow Agent is authorized, in its sole discretion, to comply with any order issued or process entered by the Court with respect to the Cost Fund or Cost Fund Account ("**Order**"), without determination by the Escrow Agent of such court's jurisdiction in the matter. If any portion of the Cost Fund is at any time attached, garnished or levied upon under any order of a court other than the Court, or in case the payment, assignment, transfer, conveyance or delivery of all or any portion of the Cost Fund or Cost Fund Account shall be stayed or enjoined by any such order, then and in any such event, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with only any Order of the Court which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Escrow Agent complies with any such Order, it shall not be liable to any of the Escrow Parties or to any other person or entity by reason of such compliance even though such Order may be subsequently reversed, modified, annulled, set aside or vacated. The Escrow Agent shall immediately inform the Settlement Trustee, the Settlement Administrator, Class Counsel and Defendants of any action by another court against or regarding the Cost Fund or Cost Fund Account, and either one or more of these parties or the Escrow Agent shall then obtain instructions from the Court as to the action to be taken with respect to such an order, if any.

14.     Anything in this Escrow Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, indirect, incidental, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

15.     If, at any time, the Escrow Agent is unable to determine, to the Escrow Agent's sole satisfaction, the proper disposition of all or any portion of the Cost Fund Account or the Escrow Agent's proper actions with respect to its obligations hereunder, or should any dispute arise between or involving the Escrow Agreement Parties, it is understood and agreed that the Escrow Agent may petition (by means of an interpleader or any other appropriate measure) the Court for instructions with respect to such uncertainty or dispute and the Cost Fund will hold the Escrow Agent harmless and indemnify it against all consequences and expenses that may be incurred by the Escrow Agent in connection therewith, which indemnity shall survive the termination of this Escrow Agreement or the resignation or removal of the Escrow Agent for any reason.

16.     **Indemnification of the Escrow Agent**. The Escrow Agent and its affiliates and each of their respective directors, officers, agents and employees (collectively, the "Indemnitees") shall have the right to be defended and held harmless by the Cost Fund, and solely by the Cost Fund and not by the Settlement Trustee, the Settlement Administrator, Class Counsel, Defendants from and against any and all claims, liabilities, losses, damages, fines, penalties, and expenses, including out-of-pocket and incidental expenses and legal fees and expenses that may be imposed on,

incurred by, or asserted against, the Indemnitees or any of them: (A) for following any instructions or other directions upon which the Escrow Agent is authorized to rely pursuant to the terms of this Escrow Agreement; or (B) in connection with or arising out of the Escrow Agent's performance under this Escrow Agreement provided, with respect to this clause (B) only, the Indemnitees have not acted with gross negligence or engaged in willful misconduct. The provisions of this section shall survive the termination of this Escrow Agreement and the resignation or removal of the Escrow Agent for any reason.

17. **Resignation/Removal of the Escrow Agent**.

A. The Escrow Agent may resign at any time by giving thirty (30) days written notice of such resignation to the Court, the Settlement Trustee, the Settlement Administrator, Class Counsel and Defendants. If no successor Escrow Agent has been named approved by the Court at the expiration of the thirty (30) day period, the Escrow Agent shall have no further obligation hereunder except to hold the Cost Fund as a depository. Upon notification by the Escrow Agreement Parties of the appointment of a successor by the Court, the Escrow Agent shall, upon payment of any and all fees and expenses then due to Escrow Agent, promptly deliver the Cost Fund and all materials in its possession relating to the Cost Fund Account to such successor, and the duties of the resigning Escrow Agent shall thereupon in all respects terminate, and the Escrow Agent shall be released and discharged from all further obligations hereunder.

B.  The Escrow Agent may be discharged from its duties as Escrow Agent under this Escrow Agreement only upon Order by the Court, which may discharge the Escrow Agent at any time in its discretion.

C.  In the event of the termination of this Escrow Agreement or the resignation or removal of the Escrow Agent, the Escrow Agent, subject to Court approval, shall have the right to retain for itself from the Cost Fund Account any reasonable costs and expenses the Escrow Agent shall reasonably believe may be incurred by the Escrow Agent in connection with the termination of the Escrow Agreement or the transfer of the Cost Fund.

18.  **Compensation of the Escrow Agent**. The Escrow Agent has agreed to waive its customary fees for its services under this Agreement.

19.  **Information to be Provided to the Escrow Agent**. The Settlement Trustee, the Settlement Administrator, Class Counsel and Defendants shall provide the Escrow Agent with such information in their possession or control as the Escrow Agent shall reasonably require in order to **permit** the Escrow Agent to comply with its obligations under the USA Patriot Act (the "**Patriot Act**").

20.  **Termination of this Escrow Agreement**. Except for terms which expressly survive the termination of this Escrow Agreement as set forth herein, this Escrow Agreement shall terminate upon the distribution of all funds within the Cost Fund Account by the Escrow Agent in accordance with the Class Counsel's and Defendants' instructions pursuant to ¶10.B 10 above and the Settlement Trustee's Certification and the Court Order described in ¶10.D.

21.    **Notices and Phone Calls**.

A. All notices and communications hereunder shall be (i) given to the Escrow Agreement Parties at the addresses below, (ii) in writing, and (iii) delivered to the Escrow Agreement Parties by registered mail (return receipt requested), certified mail (postage prepaid), personal delivery, delivery by overnight delivery service (with receipt thereof), facsimile transmission (with evidence of receipt) or electronic mail (with confirmation from the recipient). All notices shall be effective upon receipt; provided, however any instruction, direction, approval, consent, or similar communication from an Escrow Agreement Party with respect to the Cost Fund Account ("Instruction") given to Escrow Agent by facsimile transmission or electronic mail shall not be effective, and the Escrow Agent shall not be obligated to act upon such Instruction, until the Escrow Agent's employee assigned responsibility for the Escrow Account and identified below has confirmed to the sending Escrow Agreement Party that the Instruction has been received and accepted by the Escrow Agent. Instructions sent by electronic mail shall be deemed signed by the sending Escrow Party (or a person authorized to act on behalf of such Escrow Agreement Party if authorized under this Escrow Agreement) if sent from an e-mail address previously provided to Escrow Agent by such Escrow Agreement Party or authorized person. Telephone, telephone voice messaging, and other forms of telephonic or oral communication shall not constitute written Instructions. Notwithstanding the foregoing, the Escrow Agent may, in its sole discretion, rely and act upon any form of written Instruction which it believes to be genuine.

B.  For the purposes of this Escrow Agreement, the Escrow Agreement Parties' addresses and other contact information shall be as set forth below, or at such other address or contact information of which each Escrow Agreement Party shall notify the other Escrow Agreement Parties in accordance with this Section:

**Settlement Trustee**:

**Hon. Marina Corodemus, J.S.C. (retired)**:
120 Wood Avenue South
Suite 500
Iselin, New Jersey 08830
Facsimile: (732) 603-8933
Email: mc@ccesqs.com
Phone No.: (732) 603-0005

**Class Counsel**:

**Stewart L. Cohen, Esq**.
**Christopher M. Placitella, Esq**.
**Harry Roth, Esq**.
**Cohen, Placitella & Roth PC**
Two Commerce Square
Suite 2900
2001 Market Street
Philadelphia, PA 19103
(215) 567-6019 (f)
scohen@cplaw.com cplacitella@cprlaw.com,
hroth@cprlaw.com
(215) 567-3500 (p)

and:

Michael Coren, Esq.
Cohen, Placitella & Roth PC
Two Commerce Square
Suite 2900
2001 Market Street
Philadelphia, PA 19103
(215) 567-6019
mcoren@cplaw.com
(215) 567-3500


**Administrator**:

**Verus LLC**
3967 Princeton Pike
Princeton, NJ 08540
Attention: Mark Eveland
(609) 466-1449
meveland@verusllc.com
(609) 979-8004


**PNC Bank, National Association**:

80 South Eighth St, Ste 1450
IDS Building
Minneapolis MN 55402
Attention: James Baughman
Email: james.baughman@pnc.com
Phone No.: 412-768-7010

and:

PNC Bank, National Association
PNC Bank Legal Department
Attn: Treasury Management
1600 Market Street, 8th Floor
Philadelphia, PA 19103

**BASF Catalysts LLC**:

Eugene F. Assaf, P.C.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Email: eassaf@kirkland.com

And:

Peter A. Farrell, P.C.
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
pfarrell@kirkland.com


**Cahill Gordon & Reindel LLP**

Nina M. Gussack
Troutman Pepper Hamilton
Sanders LLP
3000 Two Logan Square
18th & Arch Streets Philadelphia,
Pennsylvania 19103
Nina.Gussack@Troutman.com

C. The Settlement Trustee, the Settlement Administrator, Class Counsel and Defendants each agrees that by providing telephone number(s) to Escrow Agent, now or at any later time, such party authorizes Escrow Agent and its affiliates and designees to contact such party regarding the Cost Fund Account at such number(s) using any means, including, but not limited to placing calls using an automated dialing system to cell, VoIP or other wireless phone number, or leaving prerecorded messages or sending text messages, even if charges may be incurred for the calls or text messages. Each Escrow Agreement Party

consents that any phone call with the Escrow Agent may be monitored or recorded by Escrow Agent.

22.     **Authorized Signatories**. The following persons are authorized signatories for purposes of providing instructions and distributions to the Escrow Agent under this agreement regarding the Cost Fund Account, provided that this section may be revised or rescinded only by writing from the applicable party and be accompanied by additional documentation satisfactory to the Escrow Agent. Such revisions or rescissions shall be effective only after actual receipt and following such period of time as may be necessary to afford the Escrow Agent reasonable opportunity to act on it:

A.     **On behalf of the Settlement Trustee:** Hon. Marina Corodemus, J.S.C. (retired)

B.     **On behalf of the Settlement Administrator:** Mark Eveland or Daniel Myer.

C.     **On behalf of Class Counsel:** Stewart L. Cohen, Esq., Christopher M. Placitella, Esq. or Harry M. Roth Esq.

D.     **On behalf of BASF Catalysts LLC:**

E.     **On behalf of Cahill Gordon & Reindel LLC:**

23.     **Miscellaneous**.

A.     The recitals are incorporated in and made a part of this Escrow Agreement.

B.     All signatories to this Escrow Agreement warrant that they have full and complete authority to enter into and sign this Escrow Agreement

on behalf of themselves and/or the entity on whose behalf they are signing.

C. **This agreement shall be enforced only in the Court before the Judge assigned to the Williams Action** or **before the Magistrate Judge assigned the case if referred to him or her by the Court. The parties all consent to the jurisdiction of the Court over them.**

D.     The rights or interests of any of the Escrow Agreement Parties in the Cost Fund Account or any portion thereof, shall not be assignable or transferrable (other than by operation of law) except with the prior written consent of all the Escrow Agreement Parties. Notwithstanding the foregoing, any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion or consolidation to which the Escrow Agent shall be a party, or any entity succeeding to all or a substantial portion of the escrow business of the Escrow Agent shall be the successor of the Escrow Agent hereunder without the execution by or filing of any document with any Escrow Agreement Party or any further act on the part of any of the Escrow Agreement Parties, except where an instrument of transfer or assignment is required by applicable law to effect such succession.

E.     This Escrow Agreement shall be binding upon and inure to the benefit of and be enforceable by, the respective heirs, legal representatives, and permitted successors and assigns of the Escrow Agreement Parties, and nothing herein, express or implied, is intended to or shall confer upon any other person or entity (other than the

Indemnitees) any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Escrow Agreement.

F.      This Escrow Agreement shall be governed by and construed in accordance with the State of New Jersey without regard to its conflict of laws principles.

G.      **"Business Day"** shall mean every day other than Saturday, Sunday and any other day on which the Escrow Agent is not open for business for carrying on substantially all of the Escrow Agent's business functions. If the date on which any distribution or notice is to be made under the terms of this Escrow Agreement is not a Business Day, then the distribution or notice shall be made on the following Business Day.

H.      This Escrow Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

I.      This Escrow Agreement constitutes the entire agreement among the Escrow Agreement Parties relating to the holding, investment and distribution of the Cost Fund and sets forth in its entirety the obligations and duties of the Escrow Agent with respect to the Cost Fund Account. This Escrow Agreement may be amended, modified, superseded or canceled, and any of the terms or conditions hereof may be waived, only by a written instrument executed by each Escrow Agreement Party hereto, or in the case of a waiver, by an Escrow Agreement Party (for whose benefit compliance is intended) waiving compliance, and any such waiver will be effective only in the specific instance and for the purpose for which given.

J.      The headings in this Escrow Agreement are for convenience of reference only and shall neither be considered as part of this Escrow Agreement, nor limit or otherwise affect the meaning hereof.

IN WITNESS WHEREOF, this Escrow Agreement has been executed as of the day and year set forth above.

**SETTLEMENT TRUSTEE**               **VERUS LLC**

By: _____         By: _____

Name:  Hon. Marina Corodemus,       Name:_____
       J.S.C. (retired)
                                     Title:_____

**COHEN, PLACITELLA &**              **PNC BANK, NATIONAL**
**ROTH, PC**                         **ASSOCIATION**

By: _____         By: _____

Name:_____        Name: _____

Title: Shareholder                  Title: _____

Class Counsel for the Class in the
*Williams Action*

**BASF CATALYSTS LLC**               **CAHILL GORDON & REINDEL**
                                     **LLP**

By: _____         By: _____

Name:_____        Name:_____

Title: _____      Title: _____

Exhibit E

# WILLIAMS EMTAL TALC SETTLEMENT FUND

## ESCROW AGREEMENT

This Escrow Agreement (the "**Escrow Agreement**") is entered pursuant to the Class Action Settlement Agreement by and between the Class Representatives in *Williams, et al. v. BASF Catalysts LLC, et al*., Civil Action No: 2:11-cv-01754 (ES)(JAD) ("**Williams Action**"), on behalf of themselves and as proposed class representatives, by and through Cohen, Placitella & Roth, P.C. ("**Class Counsel**"), and defendants in the Williams Action, BASF Catalysts LLC and Cahill Gordon & Reindel LLP ("**Defendants**"), dated as of March 13, 2020 ("**Settlement Agreement**"). This Escrow Agreement is entered by and among Class Counsel, Defendants, Hon. Marina Corodemus, J.S.C. (retired), who the United States District Court for the District of New Jersey ("**Court**") has appointed as the Settlement Trustee ("**Settlement Trustee**") pursuant to the terms of the Settlement Agreement, Verus LLC, which the Court has appointed as Settlement Administrator pursuant to the terms of the Settlement Agreement ("**Settlement Administrator**"), and PNC Bank, National Association, which the Court has appointed as Settlement Fund Financial Institution ("**Escrow Agent**") (all of the forgoing collectively referred to as the "**Escrow Agreement Parties**").

## DEFINITIONS

In addition to the terms defined above and in the body of the Escrow Agreement below, the Settlement Agreement definitions are incorporated by reference and capitalized terms appearing herein shall have the same

meanings. Whenever context so requires, the masculine gender includes the feminine and neutral gender, and the singular includes the plural and vice versa.

## RECITALS

**WHEREAS**, the plaintiffs in the Williams Action commenced a class action against Defendants, Arthur A. Dornbusch II, Thomas D. Halket, Howard G. Sloane, and Ira J. Dembrow; and

**WHEREAS**, the Settlement Agreement requires the Settlement Trustee, Class Counsel and Defendants to execute an escrow agreement for the Settlement Fund upon entry of the Court's Preliminary Approval Order ("**Settlement Fund Escrow Account**"), for the purpose of establishing an escrow account to hold the Settlement Fund until the Settlement Fund is distributed to Claimants pursuant to the terms of the Settlement Agreement and Plan of Distribution; and

**WHEREAS**, the Settlement Agreement requires that the Settlement Fund Escrow Account shall be, and be operated as, a qualified settlement fund within the meaning of Section 1.468B-1, *et seq.*, of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code ("**Qualified Settlement Fund**");

**NOW, THEREFORE**, in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Escrow Agreement Parties agree as follows:

2

# AGREEMENT

1.     **Purpose of the Escrow Agreement.** This Escrow Agreement is established pursuant to the Preliminary Approval Order to: (A) carry out the terms of the Settlement Agreement under which, upon entry of the Final Approval Order, the Defendants will be depositing the Settlement Amount into the Settlement Fund Escrow Account for the use and benefit of the Settlement Class Members, as more fully described in the Settlement Agreement and the Plan of Distribution; (B) provide the authority, terms and conditions under which the Escrow Agent shall hold, invest and manage the funds in the Settlement Fund Escrow Account; and (C) to provide for the release and transfer of the escrowed Settlement Fund to the Settlement Administrator following the conclusion of the Plan of Distribution's claim processing and adjudications and the receipt of the Court approval of the Settlement Trustee's recommended claims distribution schedules in accordance with the Plan of Distribution.

2.     **Creation of the Settlement Fund Escrow Account and Appointment of the Escrow Agent**. The Escrow Agreement Parties hereby are establishing an escrow account for the Settlement Fund under the name "*Williams Emtal Talc Settlement Fund*", with PNC as the Escrow Agent. The Settlement Trustee, Class Counsel and Defendants designate the Escrow Agent for the purposes set forth herein. The Escrow Agent accepts the agency created under this Escrow Agreement and agrees to perform the obligations imposed hereby.

3.     **APPOINTMENT OF SETTLEMENT ADMINISTRATOR**. The Settlement Administrator is also hereby appointed and shall serve as the "administrator" of the Settlement Fund

Escrow Account within the meaning of Treasury Regulation §1.468B-2(k)(3). Consistent with the terms of the Settlement Agreement and this Escrow Agreement, the Settlement Administrator shall take any action or cause the Settlement Fund Escrow Account to take any action necessary to create and maintain its status as a Qualified Settlement Fund, and the Settlement Administrator agrees not to take any action that will adversely affect the qualification of the Settlement Fund as a Qualified Settlement Fund.

4.    **No Authority to Conduct Business**. The purpose of the Settlement Fund Escrow Account is limited to the matters set forth in ¶1 hereof, and this Escrow Agreement shall not be construed to confer upon the Settlement Administrator or the Escrow Agent any authority to carry on any business or activity for profit other than the holding, investment, and distributing the Settlement Fund Escrow Account in accordance with the terms of the Settlement Agreement, the Final Approval Order and the Plan of Distribution.

5.    **Defendants' Deposit of the Settlement Amount into the Settlement Fund Escrow Account.** Defendants will be depositing the Settlement Amount pursuant to the terms of the Settlement Agreement and Final Approval Order, none of which are modified or changed in any way by this Escrow Agreement.

6.    **Settlement Fund as a Qualified Settlement Fund**. The Settlement Fund shall be operated in a manner so that it qualifies as a Qualified Settlement Fund. Specifically, (1) the establishment of the Settlement Fund Escrow Account under the terms and conditions of this Escrow Agreement is subject to Court approval, and no deposits shall be

made until the requisite Final Approval Order has been obtained and no distributions from the Settlement Fund Escrow Account shall be made to the Settlement Administrator for payment of claims under the Plan of Distribution until distribution of funds is so instructed and ordered by both the Settlement Trustee and Class Counsel in writing; (2) the Settlement Fund is subject to the continuing jurisdiction and supervision of the Court; (3) the Settlement Fund is being established to resolve or satisfy claims against the Defendants of alleged tort or violation of law as set forth in the Settlement Agreement; and (4) the Settlement Fund is in an escrow account, and its assets are, and will be, segregated from the general assets of PNC and deposited herein.

7.  **Tax Preparation, Payment, Reporting, Election, and Withholding Requirements and Provisions**.

C.  The Settlement Administrator shall be responsible for the timely and proper performance of the undertakings specified in the regulations promulgated under § 468B of the Internal Revenue Code, including, but not limited to:

i)  Obtaining an employer identification number for the Settlement Fund Escrow Account;

ii)  Handling all tax return and payment matters relating to the Settlement Fund and Settlement Fund Escrow Account, including the preparation and filing of all required federal, state and local tax and information returns in accordance with the provisions of Treasury Regulation § 1.468B-2(k) and Treasury Regulation § 1.468B-2(1); determining and making any required withholding of tax; making the payment of any federal, state and local taxes

(including estimated taxes) and associated tax-related penalties and interest for which the Settlement Fund escrow account may be liable.

iii) Responding to any questions from or audits regarding such taxes by the Internal Revenue Service or any state or local tax authority.

D.     The Settlement Administrator is authorized to and shall, with the joint consent of the Settlement Trustee and Class Counsel, retain and compensate one or more independent, certified public accountant(s) or tax attorney(s), as is necessary and reasonable, to consult with and advise the Settlement Administrator with respect to the preparation of any and all appropriate income tax returns, information returns and compliance withholding requirements. The Settlement Administrator is authorized to retain and compensate an independent, certified public accountant firm to prepare the Settlement Fund Escrow Account's tax returns.

E.     All taxes on the income of the Settlement Fund Escrow Account and expenses and costs incurred in connection with the taxation of the Settlement Fund Escrow Account including, without limitation, the expenses of tax attorneys and accountants, shall be paid out of the Settlement Fund Escrow Account, shall be considered to be a cost of administration of the Settlement Fund and the Settlement Fund Escrow Account, and funds necessary to pay such expenses and tax, shall be disbursed from the Settlement Fund Escrow Account by the Escrow Agent and paid to or as instructed by the Settlement Administrator on written request by the Settlement Administrator, which shall be countersigned by the Settlement Trustee and Class Counsel.

F.     On any Defendant's request, the Settlement Administrator shall file a "relation back election" as described in Treasury Regulation § 1.468B-1(j) and take all appropriate actions as may be necessary to this end, including executing a "relation back election" statement that such Defendant may chooses to file with respect to the Settlement Fund and compliance with any other tax-related requirements.

G.     **Savings Provision**. The Settlement Administrator shall be empowered to take all actions as the Settlement Administrator deems necessary to ensure that the Settlement Fund continues to qualify as a Qualified Settlement Fund. Notwithstanding anything to the contrary herein, in the event that any provision of this Agreement shall at any time be considered cause for the Settlement Fund to fail to qualify as a Qualified Settlement Fund, such offending provision shall be considered null, void, and of no effect, without any action by any court or by the Settlement Administrator, so that the Settlement Fund continues to qualify as a Qualified Settlement Fund. In the event that this section applies to render an offending provision null, void, or of no effect, the remainder of this Agreement shall not be affected thereby, and each remaining provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

8.     **Investment of the Settlement Fund Escrow Account**

A. The Escrow Agent shall have no investment direction over the Escrow account and shall follow the joint instructions of the Settlement Trustee and Class Counsel and accepted by the Escrow Agent, such that the following investment policy is implemented: (i) safety of principal; (ii) zero bank balance exposure; and/or (iii) the use of zero sweep

distribution accounts to ensure funds remain in custodial or fully insured accounts to avoid an impermissible risk of loss should the financial institution holding the funds fail.

B.      All monies received by the Settlement Fund Escrow Account, which include all principal and interest earned thereon, shall be held by the Escrow Agent for the use and benefit of the Settlement Class Members, titled in the name of the Settlement Fund and invested in appropriate safe, secured and liquid instruments/securities recommended by the Escrow Agent or its affiliate and thereafter approved, authorized and directed by the Settlement Trustee and Class Counsel. The investments shall be consistent with the Settlement Fund's investment policy stated in subparagraph 8A, and may be comprised of: (i) United States Agency, Government Sponsored Enterprises or Treasury securities or obligations (or a mutual fund invested solely in such instruments); (ii) cash equivalent securities including SEC registered money market funds and collateralized money market accounts; and/or (iii) deposit and similar interest-bearing, or non-interest bearing accounts subject to full protection by the Federal Depository Insurance Corporation, including  a PNC Money Market Deposit Account ("**MMDA**").

C. Any changes to the investments once they are initially determined and implemented in accordance with sub-paragraphs A and B above must be approved by both the Settlement Trustee and Class Counsel.

D. Any investment earnings and income on the funds held in the Settlement Fund Escrow Account shall become part of the Settlement Fund and shall be disbursed in accordance with this Escrow Agreement.

E.  The Escrow Agent shall not be liable or responsible for any loss resulting from any deposits or investments made pursuant to this paragraph 8 other than as a result of the gross negligence, bad faith or willful misconduct of the Escrow Agent.

9.     **Settlement Class Members' Interests in the Settlement Fund Escrow Account**. This Escrow Agreement shall not operate to make any portion of the funds in the Settlement Fund Escrow Account available to Settlement Class Members in any fashion, except as specifically set forth in the Plan of Distribution. To the extent possible, the terms of this Escrow Agreement shall be construed so as to prevent Settlement Class Members from being in constructive receipt, as determined under federal income tax principles, of any amounts held by or in the Settlement Fund Escrow Account prior to the time when funds have been released from the Settlement Fund Escrow Account and thereafter paid by the Settlement Administrator to eligible Settlement Claimants in accordance with the terms of the Plan of Distribution.

10.     **Distribution of the Settlement Fund**. The Escrow Agent shall hold and only disburse from the Settlement Fund Escrow Account as follows:

A. The Escrow Agent shall disburse funds from the account necessary to pay the Settlement's Fund's tax obligations and tax preparation fees incurred by the Settlement Administrator as provided in ¶ 7.E of this Escrow Agreement. The Escrow Agent is authorized to liquidate Settlement Fund Escrow Account investments to the extent necessary to make such payments;

B.  The Escrow Agreement Parties acknowledge and agree that the Settlement Agreement and Plan of Distribution as approved and incorporated in the Final Approval Order define the process by which the Settlement Trustee and the Settlement Administrator shall determine the Settlement Class Members' entitlements to and the amounts of compensation they will receive as distributions of the Settlement Fund. The Escrow Agent therefore shall not be responsible for nor participate in the execution of the Plan of Distribution relating to allocation and distribution of the Settlement Fund, but shall be responsible for distribution of the funds in the Settlement Fund Escrow Account to the Settlement Administrator in accordance with the Plan of Distribution, which requires both: (1) the Court's approval of the Settlement Trustee's claim adjudication recommendations prior to the Settlement Administrator making payments of claims; and (2) written instructions delivered to the Escrow Agent signed by both the Settlement Trustee and one of Class Counsel's authorized signatories ordering and instructing the release of the funds in the Settlement Fund Escrow Account to the Settlement Administrator for distribution to approved Settlement Class Members in accordance with the Plan of Distribution and the Court's approved claim schedules. The Escrow Agent shall, upon receipt of such signed order and instructions by the Settlement Trustee and one of Class Counsel's authorized signatories, wire transfer the funds to the Settlement Administrator's account identified in the order and instructions within five (5) business days.

11.    **Escrow Account Statements.**

A. During the term of this Escrow Agreement, the Escrow Agent shall provide Settlement Trustee, the Settlement Administrator, Class Counsel and the Defendants with monthly statements containing the beginning balance in the Settlement Fund Escrow Account as well as all principal and income transactions for the statement period ("**Periodic Account Statements**"). The Settlement Administrator shall be responsible for reconciling the Periodic Account Statements. In the absence of the Escrow Agent's gross negligence or willful misconduct, the Escrow Agent shall be forever released and discharged from all liability with respect to the accuracy of the Periodic Account Statements and the transactions listed therein, except with respect to any such act or transaction as to which any of Class Counsel, the Settlement Trustee or the Settlement Administrator shall, within ninety (90) days after the Escrow Agent makes the Periodic Account Statement available, file written objections with the Escrow Agent.

B. The Periodic Account Statements shall include a listing of all receipts and distributions during the statement period, together with a current listing of the assets held in the Settlement Fund Escrow Account. The Settlement Trustee, the Settlement Administrator, Class Counsel and Defendants agree to accept the Periodic Account Statements in satisfaction of the Escrow Agent's obligation to provide written notification required by federal regulations; provided that, upon any request by the Settlement Trustee, the Settlement Administrator, Class Counsel, or Defendants, the Escrow Agent will provide to such parties

within a reasonable time and at no additional cost any information required by federal regulations or state taxing authorities.

12.   **Rights, Responsibilities and Liabilities of the Escrow Agent**.

A. The Escrow Agent shall act hereunder as an escrow agent only, and it shall not be responsible or liable in any manner whatever for the sufficiency, correctness, genuineness or validity of any document furnished to the Escrow Agent or any asset deposited with it.

B. The Escrow Agent may rely and shall be protected in acting or refraining from acting upon (and shall incur no liability for following the instructions contained therein) any written notice, instruction or request furnished to it hereunder and believed by it to be genuine and to have been signed or presented by the proper party or parties. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document.

C. The Escrow Agent shall have no duty to solicit any payments which may be due to be paid into the Settlement Fund Escrow Account by any party or entity.

D. The Escrow Agent shall not be liable for any action taken or omitted by it unless the Court determines that the Escrow Agent's gross negligence or willful misconduct was the primary cause of any loss. In the administration of the Settlement Fund Escrow Account, the Escrow Agent may execute any of its powers and perform its duties hereunder directly or through agents or attorneys and may consult with counsel, including in-house counsel, accountants and other skilled persons to be selected and retained by it. The Escrow Agent shall not be liable for

anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons, including in-house counsel.

E.  The Escrow Agent shall not make, be required to make, or be liable in any manner for its failure to make, any determination under any agreement or document any of the Escrow Agreement Parties may be parties to or responsible for, even if same is referenced herein, including any determination whether any party thereto has complied with its terms or is entitled to payment or to any other right or remedy thereunder.

13.   **Fund in Court Status**. Both the Settlement Fund and the Settlement Fund Escrow Account holding it shall be deemed and considered to be in *custodia legis* of the Court and shall remain subject to the Court's exclusive jurisdiction until such time as the funds therein have been fully disbursed or distributed pursuant to the terms of the Settlement Agreement and Plan of Distribution. The Escrow Agent is authorized, in its sole discretion, to comply with any order issued or process entered by the Court with respect to the Settlement Fund or Settlement Fund Escrow Account ("**Order**"), without determination by the Escrow Agent of such court's jurisdiction in the matter. If any portion of the Settlement Fund is at any time attached, garnished or levied upon under any order of a court other than the Court, or in case the payment, assignment, transfer, conveyance or delivery of all or any portion of the Settlement Fund or Settlement Fund Escrow Account shall be stayed or enjoined by any such order, then and in any such event, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with only any Order of the Court which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other

action; and if the Escrow Agent complies with any such Order, it shall not be liable to any of the Escrow Agreement Parties or to any other person or entity by reason of such compliance even though such Order may be subsequently reversed, modified, annulled, set aside or vacated. The Escrow Agent shall immediately inform the Settlement Trustee, the Settlement Administrator, Class Counsel and Defendants of any action by another court against or regarding the Settlement Fund or Settlement Fund Escrow Account, and either one or more of these parties or the Escrow Agent shall then obtain instructions from the Court as to the action to be taken with respect to such an order, if any.

14.    Anything in this Escrow Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for special, indirect, incidental, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

15.    If, at any time, the Escrow Agent is unable to determine, to the Escrow Agent's sole satisfaction, the proper disposition of all or any portion of the Settlement Fund Escrow Account or the Escrow Agent's proper actions with respect to its obligations hereunder, or should any dispute arise between or involving the Escrow Agreement Parties, it is understood and agreed that the Escrow Agent may petition (by means of an interpleader or any other appropriate measure) the Court for instructions with respect to such uncertainty or dispute and the Settlement Fund will hold the Escrow Agent harmless and indemnify it against all consequences and expenses that may be incurred by the Escrow Agent in connection therewith, which

indemnity shall survive the termination of this Escrow Agreement or the resignation or removal of the Escrow Agent for any reason.

16.    **Indemnification of the Escrow Agent**. The Escrow Agent and its affiliates and each of their respective directors, officers, agents and employees (collectively, the "Indemnitees") shall have the right to be defended and held harmless by the Settlement Fund, and solely by the Settlement Fund and not by the Settlement Trustee, the Settlement Administrator, Class Counsel and/or Defendants, from and against any and all claims, liabilities, losses, damages, fines, penalties, and expenses, including out-of-pocket and incidental expenses and legal fees and expenses that may be imposed on, incurred by, or asserted against, the Indemnitees or any of them: (A) for following any instructions or other directions upon which the Escrow Agent is authorized to rely pursuant to the terms of this Escrow Agreement; or (B) in connection with or arising out of the Escrow Agent's performance under this Escrow Agreement; provided, with respect to this clause (B) only, the Indemnitees have not acted with gross negligence or engaged in willful misconduct. The provisions of this section shall survive the termination of this Escrow Agreement and the resignation or removal of the Escrow Agent for any reason.

17.    **Resignation/Removal of the Escrow Agent**.

A. The Escrow Agent may resign at any time by giving thirty (30) days written notice of such resignation to the Court, the Settlement Trustee, the Settlement Administrator, Class Counsel and Defendants. If no successor Escrow Agent has been approved by the Court at the expiration of the thirty (30) day period, the Escrow Agent shall have no further obligation hereunder except to hold the Settlement Fund as a

depository. Upon notification by the Escrow Agreement Parties of the appointment of a successor by the Court, the Escrow Agent shall, upon payment of any and all fees and expenses then due to Escrow Agent, promptly deliver the Settlement Fund and all materials in its possession relating to the Settlement Fund Escrow Account to such successor, and the duties of the resigning Escrow Agent shall thereupon in all respects terminate, and the Escrow Agent shall be released and discharged from all further obligations hereunder.

B.  The Escrow Agent may be discharged from its duties as Escrow Agent under this Escrow Agreement only upon Order by the Court, which may discharge the Escrow Agent at any time in its discretion.

C.  In the event of the termination of this Escrow Agreement or the resignation or removal of the Escrow Agent, the Escrow Agent, subject to Court approval, shall have the right to retain for itself from the Settlement Fund Escrow Account any reasonable costs and expenses the Escrow Agent shall reasonably believe may be incurred by the Escrow Agent in connection with the termination of the Escrow Agreement or the transfer of the Settlement Fund.

18.     **Compensation of the Escrow Agent**. The Escrow Agent has agreed to waive its customary fees for its services under this Agreement.

19.     **Information to be Provided to the Escrow Agent**. The Settlement Trustee, the Settlement Administrator and Class Counsel shall provide the Escrow Agent with such information in their possession or control as the Escrow Agent shall reasonably require in order to **permit** the Escrow Agent to comply with its obligations under the USA Patriot Act (the "**Patriot Act**").

20.   **Termination of this Escrow Agreement**. Except for terms which expressly survive the termination of this Escrow Agreement as set forth herein, this Escrow Agreement shall terminate upon the distribution of all funds within the Settlement Amount Fund Account by the Escrow Agent in accordance with the Settlement Trustee's and Class Counsel's instructions pursuant to ¶ 10.B 10 above.

21.   **Notices and Phone Calls**.

A. All notices and communications hereunder shall be (i) given to the Escrow Agreement Party at the address below, (ii) in writing, and (iii) delivered to the Escrow Agreement Party by registered mail (return receipt requested), certified mail (postage prepaid), personal delivery, delivery by overnight delivery service (with receipt thereof), facsimile transmission (with evidence of receipt) or electronic mail (with confirmation from the recipient). All notices shall be effective upon receipt; provided, however any instruction, direction, approval, consent, or similar communication from an Escrow Agreement Party with respect to the Settlement Fund Escrow Account ("Instruction") given to Escrow Agent by facsimile transmission or electronic mail shall not be effective, and the Escrow Agent shall not be obligated to act upon such Instruction, until the Escrow Agent's employee assigned responsibility for the Escrow Account and identified below has confirmed to the sending Escrow Party that the Instruction has been received and accepted by the Escrow Agent. Instructions sent by electronic mail shall be deemed signed by the sending Escrow Agreement Party (or a person authorized to act on behalf of such Escrow Agreement Party if authorized under this Escrow Agreement) if sent from an e-mail address previously provided to

Escrow Agent by such Escrow Agreement Party or authorized person. Telephone, telephone voice messaging, and other forms of telephonic or oral communication shall not constitute written Instructions. Notwithstanding the foregoing, the Escrow Agent may, in its sole discretion, rely and act upon any form of written Instruction which it believes to be genuine.

B. For the purposes of this Escrow Agreement, the Escrow Agreement Parties' addresses and other contact information shall be as set forth below, or at such other address or contact information of which each Escrow Agreement Party shall notify the other Escrow Agreement Parties in accordance with this section:

**Settlement Trustee**:

**Hon. Marina Corodemus, J.S.C. (retired)**:
120 Wood Avenue South
Suite 500
Iselin, New Jersey 08830
Facsimile: (732) 603-8933
Email: mc@ccesqs.com
Phone No.: (732) 603-0005

**Settlement Administrator**:

**Verus LLC**
3967 Princeton Pike
Princeton, NJ 08540
Attention:    Mark Eveland
Facsimile:    (609) 466-1449
Email: meveland@verusllc.com
Phone No.:  (609) 979-8004

**Class Counsel**:

**Stewart L. Cohen, Esq**.
**Christopher M. Placitella, Esq**.
**Harry Roth, Esq**.
**Cohen, Placitella & Roth PC**
Two Commerce Square
Suite 2900
2001 Market Street
Philadelphia, PA 19103
Facsimile: (215) 567-6019
Email: scohen@cplaw.com cplacitella@cprlaw.com, hroth@cprlaw.com
Phone No.: (215) 567-3500

and:

**Michael Coren, Esq.**
Cohen, Placitella & Roth PC
Two Commerce Square
Suite 2900
2001 Market Street
Philadelphia, PA 19103
Facsimile: (215) 567-6019
Email: mcoren@cplaw.com
Phone No.: (215) 567-3500

**BASF Catalysts LLC**:

**Peter A. Farrell, P.C.**
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
pfarrell@kirkland.com

**Eugene F. Assaf, P.C.**
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
eassaf@kirkland.com

**Justin T. Quinn**
Robinson Miller LLC
One Newark Center, 19th Floor
Newark, New Jersey 07102
jquinn@rwmlegal.com


**Cahill Gordon & Reindel LLP**:

**Nina M. Gussack**
**Barry H. Boise**
**Anthony Vale**
Troutman Pepper Hamilton
Sanders LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, Pennsylvania 19103
Nina.Gussack@Troutman.com
Barry.Boise@Troutman.com
Anthony.Vale@Troutman.com

**Angelo A. Stio, III**
Troutman Pepper Hamilton
Sanders LLP
301 Carnegie Center, Suite 400
Princeton, New Jersey 08543
Angelo.Stio@Troutman.com


**PNC Bank, National Association**:

80 South Eighth St, Ste 1450
IDS Building
Minneapolis MN 55402
**Attention: James Baughman**
Email: james.baughman@pnc.com
        pncpaidsupport@pnc.com
Phone No.: 412-768-7010

and:

20

PNC Bank, National Association
PNC Bank Legal Department
**Attn: Treasury Management Legal**
1600 Market Street, 8th Floor
Philadelphia, PA 19103

C.  The Settlement Trustee, the Settlement Administrator and Class Counsel each agrees that by providing telephone number(s) to Escrow Agent, now or at any later time, such party authorizes Escrow Agent and its affiliates and designees to contact such party regarding the Settlement Fund Escrow Account at such number(s) using any means, including, but not limited to placing calls using an automated dialing system to cell, VoIP or other wireless phone number, or leaving prerecorded messages or sending text messages, even if charges may be incurred for the calls or text messages. Each Escrow Party consents that any phone call with the Escrow Agent may be monitored or recorded by Escrow Agent.

22.  **Authorized Signatories**. The following persons are authorized signatories for purposes of providing instructions and distributions to the Escrow Agent under this agreement regarding the Settlement Fund Escrow Account, provided that this section may be revised or rescinded only by writing from the applicable party and be accompanied by additional documentation satisfactory to the Escrow Agent. Such revisions or rescissions shall be effective only after actual receipt and following such period of time as may be necessary to afford the Escrow Agent reasonable opportunity to act on it:

A.  **On behalf of the Settlement Trustee:**  Hon. Marina Corodemus, J.S.C. (retired)

21

B.    **On behalf of the Settlement Administrator:** Mark Eveland or Daniel Myer.

C.    **On behalf of Class Counsel:** Stewart L. Cohen, Esq., Christopher M. Placitella, Esq. or Harry M. Roth Esq.

23.    **Miscellaneous**.

A.    The recitals are incorporated in and made a part of this Escrow Agreement.

B.    All signatories to this Escrow Agreement warrant that they have full and complete authority to enter into and sign this Escrow Agreement on behalf of themselves and/or the entity on whose behalf they are signing.

C.    **This agreement shall be enforced only in the Court before the Judge assigned to the Williams Action** or **before the Magistrate Judge assigned the case if referred to him or her by the Court. The parties all consent to the Jurisdiction of the Court over them.**

D.    The rights or interests or in the Settlement Fund Escrow Account or any portion thereof, shall not be assignable or transferrable (other than by operation of law) except with the prior written consent of all the Escrow Agreement Parties. Notwithstanding the foregoing, any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion or consolidation to which the Escrow Agent shall be a party, or any entity succeeding to all or a substantial portion of the escrow business of the Escrow Agent shall be the successor of the Escrow Agent hereunder without the execution by or filing of any document with any

22

Escrow Agreement Party or any further act on the part of any of the Escrow Agreement Parties, except where an instrument of transfer or assignment is required by applicable law to effect such succession.

E.     This Escrow Agreement shall be binding upon and inure to the benefit of and be enforceable by, the respective heirs, legal representatives, and permitted successors and assigns of the Escrow Agreement Parties, and nothing herein, express or implied, is intended to or shall confer upon any other person or entity (other than the Indemnitees) any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Escrow Agreement.

F.     This Escrow Agreement shall be governed by and construed in accordance with the State of New Jersey without regard to its conflict of laws principles.

G.     "Business Day" shall mean every day other than Saturday, Sunday and any other day on which the Escrow Agent is not open for business for carrying on substantially all of the Escrow Agent's business functions. If the date on which any distribution or notice is to be made under the terms of this Escrow Agreement is not a Business Day, then the distribution or notice shall be made on the following Business Day.

H.     This Escrow Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

I.     This Escrow Agreement constitutes the entire agreement among the Escrow Agreement Parties relating to the holding, investment and distribution of the Settlement Fund and sets forth in its entirety the

obligations and duties of the Escrow Agent with respect to the Settlement Fund Escrow Account. This Escrow Agreement may be amended, modified, superseded or canceled, and any of the terms or conditions hereof may be waived, only by a written instrument executed by each Escrow Agreement Party hereto, or in the case of a waiver, by an Escrow Agreement Party (for whose benefit compliance is intended) waiving compliance, and any such waiver will be effective only in the specific instance and for the purpose for which given.

J.      The headings in this Escrow Agreement are for convenience of reference only and shall neither be considered as part of this Escrow Agreement, nor limit or otherwise affect the meaning hereof.

IN WITNESS WHEREOF, this Escrow Agreement has been executed as of the day and year set forth above.

**SETTLEMENT TRUSTEE**              **VERUS LLC**

By: _____        By: _____

Name:  Hon. Marina Corodemus,      Name:_____
          J.S.C. (retired)

                                   Title:_____

**COHEN, PLACITELLA & ROTH, PC**

By: _____

Name:_____

Title: Shareholder

Class Counsel for the Class in the *Williams Action*

**PNC BANK, NATIONAL ASSOCIATION**

By: _____

Name: _____

Title: _____

**BASF CATALYSTS LLC**

By: _____

Name:_____

Title: _____

**CAHILL GORDON & REINDEL LLP**

By: _____

Name:_____

Title: _____

Exhibit F

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

**KIMBERLEE WILLIAMS, *et al.***

Plaintiffs,

vs.

**BASF CATALYSTS LLC, *et al.***

Defendants.

No. 2:11-cv-01754 (ES) (JAD)

CIVIL ACTION

## [Proposed]

# PRELIMINARY APPROVAL ORDER

This matter having been opened to the Court on the unopposed

motion for Preliminary Approval of a proposed Class Action Settlement

dated July 16, 2020 (the "**Settlement Agreement**") (ECF No. \_\_\_\_), by

Plaintiffs Kimberlee Williams, Gayle Williams, Marilyn L. Holley, Sheila

Ware, Donnette Wengerd, and Rosanne Chernick, each a named plaintiff

in the *Williams* Action (together "Plaintiffs" or "Class Representatives"),

acting through their counsel, Cohen, Placitella & Roth, P.C. ("**Class**

**Counsel**") to completely settle the above-captioned lawsuit (the

"***Williams* Action**") according to its proposed terms (the "**Settlement**")

as to all parties named therein and a settlement class to be certified by

the Court for settlement purposes only. The Settlement Agreement sets forth the terms and conditions for the Settlement and dismissal with prejudice of the *Williams* Action upon approval of the Settlement Agreement. All capitalized terms and phrases used in this Preliminary Approval Order that are otherwise not defined shall have the same meaning as in the Settlement Agreement.

The Court finds that it has jurisdiction over this action and each of the Parties under 28 U.S.C. § 1332, as amended by the Class Action Fairness Act, and that venue is proper in this district.

The Parties, together with the other co-defendants named in the *Williams* Action ("**Co-defendants**"), have all consented to United States Magistrate Judge Joseph A. Dickson conducting, in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, all proceedings relating to the approval of the Settlement, including entering this Preliminary Approval Order and a Final Approval Order entering judgment, as well as to presiding over any and all other matters or proceedings related to or associated with the Settlement, including but not limited to construing, implementing and enforcing the Settlement's terms and releases and the Settlement's Plan of Distribution. The Court has duly referred all such

matters and proceedings to the undersigned United States Magistrate Judge.

The Court has carefully considered Plaintiffs' unopposed Motion for Preliminary Approval and supporting Memorandum of Law; the Parties' Settlement Agreement (including all exhibits); the Parties' Notice Plan; the Parties' proposed forms of Long-Form and Short-Form (summary) notices which are annexed to this Order; and the declarations and other memoranda submitted in support of the proposed Settlement. The Court further has considered Class Counsel's unopposed nominations for persons or companies requiring appointment by the Court to execute and administer the Settlement Agreement and Plan of Distribution, namely: (a) the Hon. Marina Corodemus, J.S.C. (Retired) as the Settlement's "Settlement Trustee and Special Master" (which appointment is consented to by the Parties and Co-defendants); (b) Verus LLC as the "Settlement Administrator" of the Settlement and its Qualified Settlement Fund (the "Administrator"); (c) BrownGreer PLC as the Settlement's "Notice Agent"; (c) Edgar C. Gentle, III, Esq., and the firm of Gentle, Turner, Sexton & Harbison, LLC, as the Settlement's "Lien Administrator"; and (d) PNC Bank National Association, as the

Settlement Cost Fund's and Settlement Fund's "Financial Institution", all as defined in the Settlement Agreement.

The Court is familiar with and has reviewed in detail the record in this vigorously litigated case, and, for good cause shown, finds in accordance with Fed. R. Civ. P. 23(e) that the Settlement Agreement could, following due notice to the Class, be finally approved after a future fairness hearing. It further determines and finds that the Settlement Agreement and Plan of Distribution on preliminary review appear to be sufficiently fair, reasonable, rational and adequate to warrant and allow dissemination of notice of the proposed class settlement to Class Members concerning the Settlement and to schedule and hold a Final Approval Hearing. The Court further finds that the Settlement Agreement was entered into at arm's length by experienced counsel after extensive discovery and mediation negotiations over a period of several years. It additionally finds that Class Counsel's nominees to implement and execute the Settlement and its Plan of Distribution possess the qualifications and abilities required to perform their assigned duties and functions and should be approved and appointed as requested.

Accordingly, the Court is directing that notice be published and disseminated to Class Members in accordance with the Parties' Notice Plan and the deadlines being established in this Order. It further is scheduling a Final Approval Hearing to make a final determination as to whether the Settlement Agreement is fair, reasonable and adequate, to make a final determination as to whether distribution of the Settlement Fund in accordance with the proposed Plan of Distribution is fair and reasonable, and to make determinations on forthcoming applications by Class Counsel for awards of attorney's fees and litigation cost reimbursements and for class representative service awards as are provided for in the Settlement Agreement.

**THEREFORE, IT IS** on this _____ day of _____, 2020 **HEREBY ORDERED** as follows:

1) **Preliminary Approval of the Settlement Agreement**. The Settlement Agreement is hereby preliminarily approved. The Parties shall forthwith begin execution of the Settlement Agreement's terms necessary to obtain its final approval, including by entering into necessary contracts relating to administration and class notice and the Defendants making their required Cost Fund payments. The Parties'

requests that the Court set a date for the Final Approval Hearing and approve issuance of Notice to the Class in the manner, means and forms set forth in the Notice Plan are also hereby granted.

2) **Conditional Class Certification**: The Court finds on a preliminary basis and for settlement purposes only, that all requirements of Fed. R. Civ. P 23(a) and (b)(3) have been satisfied for the reasons stated in Plaintiffs' Motion for Preliminary Approval. The Court conditionally certifies a settlement class (hereinafter, the "**Class**") as follows:

> All Persons within the United States and its territories who after March 7, 1984 and before March 30, 2011 filed and Served a lawsuit against Engelhard/BASF seeking asbestos-related bodily injury compensation or other relief arising from exposure to Emtal Talc products, and who before March 30, 2011 either: (A) had voluntarily dismissed or terminated the lawsuit as to Engelhard/BASF after the suit was filed, including any voluntary dismissal or release of claims due to settlement; or (B) had their lawsuit as to Engelhard/BASF involuntarily dismissed (the "Class").

> **"Engelhard/BASF"** means and includes: BASF Catalysts LLC, Engelhard Corporation, Engelhard Industries, Engelhard Minerals & Chemicals Corporation, Minerals & Chemicals Philipp Corporation, Eastern Magnesia Talc Company, Porocel Corporation, and Pita Realty Limited, along with each of their successors, affiliates, direct and indirect parent(s) (including BASF Corporation and BASF SE), and any predecessor(s) who owned and/or operated the Emtal Talc mine in Johnson, Vermont at any point on or after October 1, 1967.

6

The date on which a voluntary dismissal or termination occurred for purposes of determining class membership is deemed to be the earlier of either (i) the date on which the agreement or consent by the plaintiff or his/her counsel to dismiss or terminate the lawsuit occurred; or (ii) the date on which the dismissal or termination of the lawsuit was entered by or in the court in which it was pending.

3)   **Appointment of Class Representatives and Class Counsel**.

The Court preliminarily appoints Plaintiffs Kimberlee Williams, Gayle Williams, Marilyn L. Holley, Sheila Ware, Donnette Wengerd, and Rosanne Chernick as representatives for the Class. The Court finds that Christopher M. Placitella (who is designated as "Lead Class Counsel"), together with Stewart L. Cohen, Harry M. Roth, Michael Coren, Robert L. Pratter, Eric S. Pasternack, Jared M. Placitella and the law firm of Cohen Placitella & Roth, P.C., can and will fairly and adequately represent the interests of Plaintiffs and the Class and therefore hereby appoints them as Class Counsel to represent the Class pursuant to Fed. R. Civ. P. 23(g).

4)   **Preliminary Approval of Proposed Plan of Distribution.** The Court preliminarily approves the proposed Plan of Distribution, submitted by Class Counsel and attached as Exhibit C to the Settlement Agreement. Unless and until ordered otherwise, the proposed Plan shall

be deemed in effect and shall be applied by the Settlement Trustee, Administrator and Lien Administrator in determining and administering claims relating to the Settlement Fund and the allocation of distributions to be made from the Settlement Fund; provided however, that no Settlement Funds shall be distributed until the Settlement's Effective Date.

5)    **Deadlines.** All deadlines set out in the Settlement Agreement and Plan of Distribution (which are summarized in Section 7 of the Settlement Agreement) relating to establishing the Cost Fund, publishing notice, opting out from the Class and Settlement, objecting to the Settlement or to the fee/cost award applications, the Parties' termination rights and for submitting claims for compensation from the Settlement Fund are hereby approved and shall be deemed ordered by the Court if not otherwise specified in this Order. The dates in this Order are controlling in the event of a conflict.

6)    **Appointment of Settlement Trustee and Special Master; Settlement Trustee/Special Master's powers and responsibilities**.

A.    With the consent of all parties appearing in the *Williams* Action, the Court hereby appoints the Hon. Marina Corodemus, J.S.C.

8

(Retired) to the position of Settlement Trustee and Special Master ("**Settlement Trustee/Special Master**") under Fed. Rule 53. The Court finds that Judge Corodemus possesses the requisite experience and qualifications to fulfill the tasks specified in the Settlement Agreement and Plan of Distribution as well as to perform those responsibilities contemplated by the Court as being necessary for a court master under Fed. R. Civ. P. 53 in order to expeditiously execute the Settlement. Judge Corodemus has filed of record a declaration stating that no grounds exist for disqualification and the Court accepts her representations.

B.     The Settlement Trustee/Special Master is hereby charged with the responsibility and duty to oversee and carry out the administration of the Settlement Agreement and Plan of Distribution as approved by the Court, including the authority to make all adjudications necessary under the Plan of Distribution assigned to her in the Plan or that may arise out of and relate to the administration of the Settlement. In executing her duties and responsibilities the Settlement Trustee/Special Master will have to the fullest extent allowed by law all powers and authority of a court appointed master under Fed. R. Civ. P Rule 53. With respect to the Settlement Fund she further will have all

fiduciary powers, rights, duties and responsibilities of a trustee under the laws of the State of New Jersey.

C.     The Settlement Trustee/Special Master shall receive, have and hold the Settlement Fund being established under the Settlement Agreement in trust for the use and benefit of the Settlement Class Members, and shall distribute the Settlement Fund only in accordance with the Plan of Distribution as approved by the Court in its Final Approval Order.

D.     The Settlement Fund entrusted to the Settlement Trustee/Special Master is a fund in court and until distributed to Settlement Class Members shall be deposited into an income-generating escrow account with PNC National Association according to the terms of the proposed Settlement Fund Escrow Agreement attached to the Settlement Agreement as Exhibit E. The Settlement Trustee/Special Master is authorized to enter and execute the Settlement Fund Escrow Agreement on behalf of the Settlement Fund. In addition, the Settlement Trustee/Special Master is authorized to be a party to and execute the Cost Fund Escrow Account being established under the Settlement Agreement at PNC National Association in accordance with the proposed

Cost Fund Escrow Agreement attached to the Settlement Agreement as Exhibit D.

E.     The Settlement Trustee/Special Master is further authorized to enter into agreements with the Administrator, Notice Agent and Lien Administrator relating to services and goods necessary to carry out the Settlement and Plan of Distribution as provided in the Settlement Agreement. Class Counsel shall be responsible for negotiating the terms of the agreements on behalf of the Settlement Trustee/Special Master. The resulting agreements shall be subject to this Order.

F.     The Settlement Trustee/Special Master shall serve as an officer and agent of the Court, and at the Court's will and pleasure. She will be further subject to the following general terms and conditions:

(1)   The Settlement Trustee/Special Master must proceed with all reasonable diligence and dispatch;

(2)   The Settlement Trustee/Special Master must be guided by the appropriate law in this Circuit;

(3)   The Settlement Trustee/Special Master will have authority to take all appropriate measures to perform the assigned duties fairly, efficiently, and justly;

11

(4)    The Settlement Trustee/Special Master may communicate *ex parte* with Class Counsel on administrative matters she is allowed or required under the Plan of Distribution to review with them, be assisted by them or obtain their advice and consent;

(5)    The Settlement Trustee/Special Master may communicate *ex parte* with the Court;

(6)    In addition to the reports required under the Settlement Agreement and Plan of Distribution, the Settlement Trustee/Special Master may submit reports or information to the Court as warranted in her discretion. However, at least once every six months until the Plan of Distribution is concluded, the Settlement Trustee/Special Master will provide a brief written progress report to the Court on the implementation and administration of the Settlement. The Settlement Trustee/Special Master will also provide any other information requested by the Court on a timely basis.

(7)    The Court retains the authority to alter the Settlement Trustee/Special Master's duties and responsibilities, as

12

necessary, after providing the Parties notice and an opportunity to be heard.

(8)    The Settlement Trustee/Special Master shall obtain and provide insurance coverage with respect to the duties to be performed by her under the Settlement Agreement and the Plan of Distribution in the amount of $5 million in a form and from a surety or insurance company that is satisfactory to Class Counsel.

(9)    **Settlement Trustee/Special Master's Compensation**.

(i)    The Settlement Trustee/Special Master's compensation shall be $125,000 per year.  That compensation shall be paid via equal monthly installments on the last day of each calendar month, with the fee prorated as to any period in which she ceases or no longer is required to serve. The Settlement Trustee/Special Master will also receive reimbursement for any insurance or surety bond premiums associated with her roles, reasonable and necessary travel expenses, necessary out-of-pocket, secretarial or clerical costs and expenses incurred in performing her work, which

will be invoiced without any mark-up and shall be paid on a monthly basis as incurred.

(ii)   For services rendered under the Plan or by order or referral of Court which are not to be paid from the Cost Fund, but rather, are to be paid or taxed against a Defendant, a claimant, or other person under Section 3.10.3.6. of the Settlement Agreement, or Sections 6 and 11 of the Plan of Distribution, the Settlement Trustee/Special Master's hourly fee is set at $600 per hour.

7)   **Appointment of Settlement Administrator.** The Court hereby appoints Verus LLC, Princeton, New Jersey, as the Settlement Administrator. Verus is charged with the duty and responsibility to implement and carry out the duties, tasks and responsibilities assigned to the Settlement Administrator in the Settlement Agreement and Plan of Distribution approved by the Court. The Administrator is further authorized to enter and execute the Cost Fund and Settlement Fund Escrow Agreements with PNC National Association in the forms attached as Exhibits D and E to the Settlement Agreement as the Funds' designated "Administrator" required to qualify the funds as Qualified

14

Settlement Funds under Internal Revenue Service regulations. The Administrator shall be reasonably compensated for its services from the Cost Fund and, if necessary, from the Settlement Fund to the extent permitted by the Settlement Agreement. The Settlement Administrator shall serve as an officer and agent of the Court, at the Court's will and pleasure. The Settlement Administrator's contract for services shall be subject to this Order.

8) **Appointment of Lien Administrator**. The Court hereby appoints Edgar C. Gentle, III, Esq., Hoover, Alabama, as the Settlement Lien Administrator. Mr. Gentle is charged with the duty and responsibility to implement and carry out the ministerial duties, tasks and responsibilities assigned to the Lien Administrator in the Lien Agreement and Plan of Distribution approved by the Court. The Lien Administrator shall be reasonably compensated for its services in the total amount of $500,000, to be paid from the Cost Fund and, if necessary, from the Settlement Fund to the extent permitted by the Settlement Agreement. The Lien Administrator shall serve as an officer and agent of the Court, and at the Court's will and pleasure. His and his law firm's

(Gentle, Turner, Sexton & Harbison, LLC) contract for services shall be subject to this Order.

9) **Appointment of Notice Agent**. The Court hereby appoints BrownGreer PLC, Richmond, VA, as the Settlement Notice Agent. BrownGreer is charged with the duty and responsibility to design, implement and carry out the duties, tasks and responsibilities assigned to the Notice Agent concerning Notice to the Class relating to the Settlement, but may delegate certain aspects of the Notice Plan to sub-contractors with the prior consent of the Settlement Trustee and the Parties. The Notice Administrator shall be reasonably compensated for its services and expenses, including the costs of mailings and media placements and buys, solely from the Cost Fund as provided in the Settlement Agreement. The Notice Agent shall serve as an officer and agent of the Court, and at the Court's will and pleasure. The Notice Agent's contract for services shall be subject to this Order.

10) **Approval and authorization of the Notice Plan and Long-Form Notice**. The Court finds that the form, content, and methods of dissemination as described in the proposed Notice Plan: (A) are the best practicable notice; (B) are reasonably calculated, under the

circumstances, to apprise Class Members of the pendency of the Action and of their right to object or to exclude themselves from the Settlement; (C) are reasonably calculated, under the circumstances, to apprise Class Members of the necessity, manner and deadlines to make a Claim Submission application to the Settlement Fund in order to receive compensation benefits from the Settlement Fund if the Settlement Agreement is approved following the Fairness Hearing and becomes Final; (D) are reasonable and constitutes due, adequate, and sufficient notice to all persons entitled to receive notice; and (E) meets all applicable requirements of Fed. R. Civ. P. 23, and due process. The Court therefore approves the Notice Plan and the Long-Form and Short-Form notice templates annexed to this order,[1] and orders that Notice to the class be given and proceed in the manner called for in the Notice Plan. The Notice Agent, with the assistance of the Settlement Administrator, shall prepare a declaration attesting to compliance with the mailing, address-

---

[1] The attached Long-Form and Short-Form (summary) notices are only templates because additional information must be inserted by the Administrator and Notice Agent to conform it to this Order before its dissemination. The size, format, and/or layout of the Notice may be modified by mutual agreement of the Parties without the need for Court approval, provided that any such modifications are consistent with the general intent of the Settlement Agreement and Notice Plan.

17

updating, and publication requirements set forth above. Such declaration shall be provided to Class Counsel and Defendants' Counsel and filed with the Court no later than 14 days prior to the Fairness Hearing.

11) **Notice Publication Commencement Date.** Notice to the Class shall commence on_____, 2020[2], with the execution of the following initial elements of the Notice Plan: (A) posting on the Settlement Website copies of the  Long-Form Notice (conformed to the dates set forth herein), the Settlement Agreement, the Plan of Distribution, the Motion for Preliminary Approval, the Claims Submission Form and this Order; (B) mailing a copy of the Notice and claim form to all potential Class Members known to the Administrator and Notice Agent at the best last known address available to them; and (C) mailing copies of the Long-Form Notice to the attorneys and law firms (or their successors) who previously represented Class Members in the Underlying Lawsuits who are known by the Administrator and Notice Agent to still exist, along with: (i) a list prepared by the Administrator of potential Class Members associated with the attorney or law firm; and

_____

[2] Settlement Agreement § 7 provides Class Notice efforts shall commence fourteen days after issuance of the Preliminary Approval Order.

(ii) requesting that the attorney or law firm provide the Notice Administrator with any corrections to the list and names and addresses of other clients (or personal representatives or next of kin of clients who are deceased) not on the list who may be Class Members for purposes of further disseminating class notice; and (iii) requesting that they inform their clients who may be potential Class Members of the pendency of the Class and the proposed Settlement and that they may obtain information concerning the proposed Settlement from the Administrator and how to do so. For purposes of clarity and avoidance of doubt, in calculating time periods and deadlines under the Settlement Agreement, the above date is the date "Notice is first published" as such phrase is used in the Settlement Agreement.

12) **Requests for Exclusion process and deadlines**.

A.    A Class Member who wants to be excluded from the Class Action and proposed Settlement must in a signed writing request to be excluded (or "Opt-Out") by the Opt-Out deadline of _____, 2020 being established herein.[3] Unless a Class Member individually, timely and

---

[3] Settlement Agreement § 7 provides the Opt-Out Deadline should be 90 days after the Notice is first published.

properly exercises his or her opt-out right, he or she will be deemed a Class Member and bound to the Settlement Agreement's terms if approved by the Court. The Opt-Out procedure, writing and content requirements and restrictions on who may submit a request for exclusion are set forth in Section 10.1 of the Settlement Agreement, which provisions the Court approves and incorporates by reference into this Order. All requests to Opt-Out that fail to satisfy these requirements shall be void. The attached Long-Form Notice explains the Opt-Out procedures and requirements.

B.   **Opt-Out Revocation right.** A Class Member may revoke his or her opt-out from the Class and thereby receive the benefits of this Settlement Agreement by submitting a written request to the Settlement Administrator on or before the Opt-Out Revocation Deadline of _____, 2020 being established herein.[4] The procedure and requirements to revoke an Opt-Out are set forth in Section 10.1.8 of the Settlement Agreement.

---

[4] Settlement Agreement § 7 provides the Opt-Out revocation deadline should be 14 days after the Opt-Out Deadline.

C. **Opt-Out and Opt-Out Revocation Deadlines**: Written requests to Opt-Out must be postmarked on or before_____, 2020. Written requests to revoke an Opt-Out must be postmarked on or before _____, 2020.[5]

D. **Opt-Out list.** The Administrator shall compile and serve the Parties with a list of valid opt-outs in accordance with §10.1.9 of the Settlement Agreement no later than by_____, 2020.[6] Class Counsel is responsible for promptly thereafter filing a copy of the list with the Court.

13) **Fee and Cost Applications Deadline**. Class Counsel shall file applications and supporting materials for awards of Class Counsel's attorney's fees and costs reimbursement and Class Representative

---

[5] See notes 3 and 4, *supra*. Settlement Agreement § 10.1.2 requires Opt-Outs to be postmarked by the Opt-Out Deadline. Settlement Agreement § 10.1.8 requires Opt-Out revocations to be submitted by the Opt-Out Revocation Deadline.

[6] Settlement Agreement § 7 provides the deadline for the Administrator to generate the Final Opt-Out List is six days after the Opt-Out Revocation Deadline. Settlement Agreement § 10.1.9 requires the Settlement Administrator to deliver the list no later than seven days after the Opt-Out Revocation Deadline.

service awards on or before _____, 2020.[7]

14)   **Plan of Distribution Deadlines**.

A.   **Claims Filing Deadline.**   All Claim Submission forms and documents necessary to initiate and support a claim to the Settlement Fund by or on behalf of a Claimant must be must be submitted and actually received by the Administrator on or before _____, 2020[8] by one of the following time deadlines depending upon the means of submission used:

(1) If submitted by mail, express mail or hand delivery, the Claims Submission must actually be received by the Administrator in its offices by no later than 5 P.M., prevailing Eastern time in effect; or

(2) If submitted electronically submitted through the Settlement Fund's website or other electronic portal established by the Administrator, the Claims Submission must actually be received

---

[7] Settlement Agreement §7 provides the deadline for filing Class Counsel's Fee, Expense Reimbursement Petition and Class representative Service Award petition should be 30 days after Notice is first published.

[8] Settlement Agreement § 7 provides the Claims Filing Deadline should be 120 days after Notice is first published.

by the Administrator's system by no later than 11:59 P.M., prevailing Eastern time in effect.

B.     **Documents Submission Deadline.** Any and all documents necessary to cure Claims Submission deficiencies identified by the Administrator must be submitted by or on behalf of the Claimant and actually received by the Administrator on or before _____, 2020[9] by one of the following time deadlines depending upon the means of submission used:

(1) If submitted by mail, express mail or hand delivery, the Claims Submission must actually be received by the Administrator in its offices by no later than 5 P.M., prevailing Eastern time in effect; or

(2) If submitted electronically submitted through the Settlement Fund's website or other electronic portal established by the Administrator, the Claims Submission must actually be received by the Administrator's system by no later than 11:59 P.M., prevailing Eastern time in effect.

---

[9] Settlement Agreement § 7 provides the Documents Submission Deadline should be 155 days after Notice is first published.

15)   **Objections by Class Members**.

A.     A Settlement Class Member (that is, a Class Member who has not opted-out) may present written objections, if any, explaining why he or she believes (a) the Settlement Agreement should not be approved by the Court as fair, reasonable, and adequate; or (b) that the proposed Plan of Distribution should not be approved and adopted; or (c) that Class Counsel's applications for fees and cost reimbursement awards should not be granted; or (d) that the Class Representatives' application for service fees awards should not be granted. The objection procedure, writing and content requirements and restrictions on who may submit them are set forth in Section 10.2 of the Settlement Agreement, which the Court approves and incorporates by reference into this Order. The attached Long-Form Notice explains the objection procedures and requirements.

B.     **Objection Submission Deadline**: Settlement Class Members' written objections must be postmarked on or before

_____, 2020.[10] Responses to objections should be filed no later than

_____, 2020.[11]

16) **Motion for Final Approval and Supporting Materials**. A motion for Final Approval of the Settlement and Plan of Distribution shall be filed on or before _____, 2021,[12] together with any memoranda or submissions of the Parties in support of final approval of the Settlement and the Plan of Distribution. A copy of the motion and supporting materials shall be posted on the Settlement's Website.

17) **Final Approval**. A Final Approval Fairness Hearing is hereby scheduled before this Court on _____,2021, at _____ for the following purposes: (A) to consider whether to finally certify the Class;

---

[10] Settlement Agreement § 7 provides the deadline for Class Members to file any objections to the proposed settlement or to any ancillary petitions should be 90 days after Notice is first published.

[11] Settlement Agreement § 7 provides the deadline for any responses to Class Member objections should be 60 days from the Plan of Distribution's Claims Determination Deadline. Settlement Agreement §7 provides the Claims Determination Deadline should be 10 days after the Document Submission Deadline. *See* note 9 *supra.*

[12] Settlement Agreement § 7 provides the deadline for the Motion for Final Approval and Supporting Materials should be 90 days from the Plan of Distribution's Claims Determination Deadline, which §7 in turn provides should be 10 days after the Document Submission Deadline. Settlement Agreement § 7 provides the Document Submission Deadline should be 155 days after Notice is first published.

(B) to determine finally whether the Settlement Agreement is fair, reasonable, and adequate; (C) to consider whether to finally approve the proposed Plan of Distribution; (E) to consider any objections to the Settlement Agreement or Plan of Distribution; (F) to determine whether the Final Approval Order as provided for under the terms of the Settlement Agreement should be entered; (G) to consider any application(s) which Class Counsel may file for an award of Class Counsel's attorneys' fees and costs and for an award of Class Representative service fees; and (H) to rule upon such other matters as the Court may deem appropriate. The Court may continue or adjourn the Final Approval Hearing from time to time, by oral announcement prior to or at the hearing or at any adjournment thereof, without further notice to Class Members. At the Final Approval Hearing, Settlement Class Members may be heard orally in support of, or, if they have timely submitted written objections, in opposition to the Settlement. If a Class Member hires an attorney to represent him or her at the Final Approval Hearing, he or she must do so at his or her own expense. This hearing will be held at the Martin Luther King Building & U.S. Courthouse 50 Walnut Street Newark, NJ 07102, Court Room 2D.

18)   **Termination or Disapproval**. The Court finds that preliminary class certification and preliminary approvals of the Settlement Agreement and Plan of Distribution, and all actions associated with them, are undertaken on the condition that they shall be vacated if the Settlement Agreement is terminated or disapproved in whole or in material part by the Court, or any appellate court and/or other court of review, or if any of the parties invokes a right to terminate the Settlement Agreement as provided by its terms, in which case the Settlement Agreement and the fact that it was entered into shall not be offered, received, or construed as evidence for any purpose, including but not limited to, an admission by any party of liability or non-liability or of any misrepresentation or omission in any statement or written document approved or made by Defendants, or the certifiability or non-certifiability of any class. Moreover, if the Settlement Agreement is terminated or disapproved in whole or in material part by the Court, or any appellate court and/or other court of review, or if any of the Parties invokes the right to terminate the Settlement as provided in the Settlement Agreement, all proceedings that have taken place with regard to the Settlement Agreement shall be without prejudice to the rights and

contentions of the Parties; all orders entered in connection with the Settlement, including the certification of a settlement Class and discovery orders entered after June 26, 2018 in the Action shall be vacated and without prejudice to any party's position on the issue of class certification or any other issue, in this Action or any other action; and the Parties and the Action shall be restored to their status existing on June 26, 2018. In such event, the Court shall reestablish a schedule for further proceedings with the Parties.

19) **Stay and Injunction Order**. All proceedings in the *Williams* Action shall continue to be stayed until further order of the Court except as may be necessary to implement the Settlement and Plan of Distribution; or to comply with this Preliminary Approval Order; or to comply with the terms of the Settlement Agreement. Further, all Class Members, and anyone who acts or purports to act on their behalf, are hereby enjoined until further order of the Court from instituting, continuing, commencing, intervening in or prosecuting any action against any of the Defendants and/or Co-Defendants which asserts claims that are to be settled in the Settlement Agreement, or any other Related Lawsuits as defined in the Settlement Agreement. The stay and

injunction will remain in effect unless and until a Class Member's Opt-Out becomes effective on the date this Court grants Final Approval, approval of the Settlement Agreement is denied, or the Settlement Agreement is otherwise terminated.

20) **No Admission**. Neither this Order nor the Settlement Agreement nor any other settlement-related document nor anything contained herein or therein or contemplated hereby or thereby nor any proceedings undertaken in accordance with the terms set forth in the Settlement Agreement or herein or in any other settlement-related document shall constitute, be construed as or deemed to be evidence of an admission or concession of (A) the validity or lack of validity of any claim made by the Class Representatives, the Class, any Class or Settlement Class Member, or any Opted-Out Class Member, in this or any other action or proceeding; (B) any liability or wrongdoing or the truth of any allegations in the Complaint against the Released Parties, or (C) the infirmity of, or strength of any alleged defense against, the allegations in the Complaint. The Settlement Agreement, any other settlement-related document, and/or any statement, transaction, or proceeding in connection with the negotiation, execution, or implementation of the Settlement Agreement

and its Plan of Distribution shall not be admissible in evidence for any purpose in any proceeding for or against anyone other than as necessary and relevant to execute or enforce the terms of this Settlement and Plan of Distribution.

21) **Qualified Settlement Fund Status of the Cost Fund and Settlement Fund**. To the extent permitted by law, both the Cost Fund and Settlement Fund being established under the Settlement Agreement and authorized by this Order may be treated as a qualified settlement fund pursuant to applicable United States Treasury Regulations.

22) The Court may, for good cause, extend, but not reduce in time, any of the deadlines set forth in this Preliminary Approval Order without further notice to Class Members.

23) **Qualified Immunity Protection of Settlement Entities**. The Settlement Trustee/Special Master, Settlement Administrator, Notice Agent, and Lien Administrator appointed herein (each referred to as "**Settlement Entity"**) shall be deemed to have immunity in the performance of its respective tasks and duties in the Settlement and Plan of Distribution, except with respect to a Settlement Entity's willful misconduct. No person or entity shall have the right to institute any

action against any Settlement Entity for any matter covered by this immunity, except with respect to the Settlement Entity's willful misconduct. However, this provision shall not affect the right of a party in privity of contract with a Settlement Entity to institute and maintain actions against the Settlement Entity for breach of the Settlement Agreement or breach of the Settlement Entity's contractual responsibilities in connection with the Settlement.

BY THE COURT

_____

 Hon. Joseph A. Dickson
United States Magistrate Judge