Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **KIMBERLEE WILLIAMS, et al.**<br><br>Plaintiffs,<br><br>vs.<br><br>**BASF CATALYSTS LLC, et al.**<br><br>Defendants. | No. 2:11-cv-01754 (ES) (JAD)<br><br>CIVIL ACTION |

### DECLARATION OF MEDIATOR AND FORMER UNITED STATES DISTRICT COURT JUDGE LAYN R. PHILLIPS IN SUPPORT OF THE PRELIMINARY APPROVAL OF THE CLASS ACTION SETTLEMENT

Layn R. Phillips declares:

1. I am a former United States District Court Judge and have served as a mediator in this matter over the last four years. I submit this declaration in support of preliminary approval of the proposed class action settlement between Plaintiffs and the members of the proposed Settlement Class and Defendants, BASF Catalysts, LLC ("BASF"), Cahill Gordon & Reindel ("Cahill") and the named individual defendants.

2. In December of 2014, the parties agreed to mediation before me. After providing extensive submissions, the first round of face-to-face mediation took place on February 27, 2015. Although some progress was

1

made during the early sessions and over numerous phone calls, the parties could not agree on material terms to any settlement, and the mediation ended.

3. Mediation discussions resumed in April of 2016 after the District Court denied Defendants' motions to dismiss Plaintiffs' Second Amended Complaint. Despite face-to-face and telephonic sessions that lasted through the summer of 2016, the mediation again ended when the parties could not agree on material terms to any settlement.

4. After nearly two years of contentious discovery and significant disputes over the scope thereof and with pending appeals of decisions by the Court-appointed Special Discovery Master, Chief Judge Linares entered an order dated June 26, 2018 staying this litigation and directing the parties to appear before the Honorable Joseph A. Dickson, M.J. for settlement discussions. Following their appearance before Judge Dickson, the parties agreed to return to my supervision for further settlement discussions, which ultimately led to the proposed Class Action Settlement.

5. The settlement discussions under my supervision were vigorous, often contentious, and always conducted in good faith.

6.     Based on my experience as a former United States District Court Judge and mediator, as well as my frequent, detailed discussions with the parties over the past four years, and the information provided to me during the three previous rounds of mediation, it is my opinion that the $72.5 Million proposed settlement (plus attorneys' fees, administration costs and reasonable costs of litigation) represents a fair, reasonable, and adequate settlement given the substantial risks involved for both sides if this litigation continues.

7.     Without waiver of the mediation privilege, I describe below my reasons for this view.

## Qualifications and Experience

8.     I am the founder of Phillips ADR Enterprises, and a member of the bars of Oklahoma, California, and the District of Columbia, as well as the United States Courts of Appeal for the Ninth and Tenth Circuits.

9.     Before founding Phillips ADR Enterprises, I was a partner at Irell & Manella LLP, where I specialized in alternative dispute resolution, complex litigation, and internal investigations.

10.  I am also a former United States District Court Judge for the Western District of Oklahoma and a former United States Attorney for the Northern District of Oklahoma.

## The Mediation Process

11.  The parties engaged in three rounds of mediation before me, in between which the parties conducted extensive discovery and litigated nearly fifty motions before the Court-appointed Special Discovery Master, several of which the parties appealed to Chief Judge Linares.

12.  Mediation sessions consisted of simultaneous, face-to-face meetings with both sides, and separate individual meetings with each side.

13.  In addition, between the mediation sessions, I reviewed voluminous materials submitted by the parties and engaged in significant follow-up work with the parties, as well as with Magistrate Judge Dickson.

14.  Counsel for the parties also negotiated outside my presence.

15. All in all, I devoted 6 full days to mediate this matter in addition to the considerable time I spent in discussions with the parties outside of in-person mediation sessions.

16. Throughout the three rounds of mediation, I observed that the parties vigorously asserted their respective positions on all material issues. Many of these discussions were difficult and forced each side to carefully examine its own strongly held views of this case, but both sides always remained respectful and professional.

17. The parties were, in my view, represented by highly experienced, competent, and committed counsel. Indeed, given my understanding of the proceedings before this Court, the Third Circuit and the Special Discovery Master that included motion practice, fact and expert discovery and appeals, I am satisfied that the positions of the parties were well represented.  Besides having highly-experienced counsel, the parties retained experts on causation and liability to assist them in the litigation and the settlement negotiations. It is thus my opinion that the parties had mastered the complex substantive issues involved in this class action and were therefore able to appreciate the merits of the case and risks of continued litigation.

18. Predictably, the proposed terms of the settlement evolved over the course of the three rounds of mediation and as the parties worked toward the common goal of achieving a fair, reasonable, and adequate settlement. And to that end, I presented recommendations and potential solutions in order to develop the construct that led to the proposed settlement.

### The Class Action Settlement Reflects a Compromise

19. The parties' third and successful round of mediation began in the summer of 2018, following a period of particularly hard-fought litigation. In late spring and early summer 2018, the parties litigated well over a dozen motions. Special Master Rivera-Soto issued several significant orders, including those requiring the parties to hold an evidentiary hearing or "Science Day" considering the Emtal Talc testing record, ECF No. 485, requiring *in camera* review of correspondence plaintiffs' counsel had with counsel in underlying litigations, ECF No. 555, and resolving various discovery motions filed in the case, ECF Nos. 500, 565, 591, 592. Plaintiffs filed an appeal on three issues, ECF Nos. 506, 566, 600, and Defendants filed an appeal regarding one discovery issue, ECF No. 521. Plaintiffs also asked for an emergency stay pending

6

appeal, ECF No. 566-1. By June 2018, both sides were submitting several briefs or informal letter briefs per week, *see* ECF Nos. 537-601. On June 26, 2018, Chief Judge Linares entered an order indicating that the parties might benefit from continued settlement discussions and temporarily stayed the case. ECF No. 602. As this history suggests, the resulting settlement arises from what was a particularly fierce litigation, with counsel vigorously representing both sides.

20. Plaintiffs' Counsel in particular has proven themselves willing to zealously represent the proposed Settlement Class. They have litigated this matter for many years against Defendants' own determined defense, achieving notable and difficult victories, including a successful appeal of the dismissal of the First Amended Complaint to the Third Circuit, as well as significant progress in discovery and motion practice during the two years between the rounds of mediation. I found that this history, along with their advocacy during mediation, suggests that Plaintiffs' Counsel were prepared to litigate this case through trial, and face the risk of losing without any recovery for years of hard work.

21. Significantly, however, while firm in the strength of their positions, Plaintiffs' Counsel also recognized that this case's complexity,

7

as well as certain rulings and discovery developments, created litigation risks should the matter proceed further.

22. First, because of the complexity of this case and the size of the proposed Settlement Class, this case, which has already been pending for almost nine years, could last for years more as the parties would still need to complete expert discovery, the appeals of several decisions by the Special Discovery Master, class certification, trial, and appeals that would likely follow to the Third Circuit by either side which did not prevail on any given issue. The complexity and size of this litigation therefore means that any compensation that class members might receive could be delayed for years, if not altogether. As a result, it is my view, based on my supervision of the settlement discussions, that Plaintiffs' Counsel weighed the risks of litigation against the need to provide timely benefits to the members of the proposed Settlement Class.

23. Second, under the New Jersey law on fraudulent concealment, class members would need to prove that plaintiffs in the underlying cases were damaged by an evidential record in those cases that did not contain the evidence Defendants are alleged to have concealed or made misstatements about. Plaintiffs' Counsel have argued that this could be

done on a class-wide basis. While firm in their opinion, they have acknowledged the risk that proof of these damages might entail review of individual cases to some extent, which owing to the passage of time since Defendants' alleged fraudulent activity began nearly 30 years ago, could prove highly difficult. Indeed, some counsel, witnesses and records pertaining to the underlying cases are no longer available.

24. Third, to recover here, plaintiffs would need to overcome various arguments that Defendants have raised based on the specific facts of the underlying litigations. On Defendants' motion, the District Court ordered the disclosure of attorney-client communications between the Representative Plaintiffs and their counsel in their underlying actions, which the Special Discovery Master has extended to a sample of absent class members. Based on these disclosures, Defendants have pointed to evidence that some plaintiffs in the underlying cases sued many asbestos and talc defendants, in some cases without evidence that they were exposed to any particular manufacturer's products. Several named plaintiffs in this litigation, for example, can no longer remember to which talc manufacturer's products their decedents or family members were purportedly exposed.

9

25. Similarly, discovery into the underlying litigations has also revealed that plaintiffs at the time often accepted modest settlement amounts much like what Engelhard/BASF paid to those same plaintiffs. Notably, these underlying plaintiffs accepted such modest settlements even from defendants for which there was evidence that their products contained asbestos. Defendants have thus argued that the alleged conduct here caused no harm to the underlying litigations and settlements. For example, at least one named plaintiff settled talc claims against Engelhard for the same amount as she settled claims against a talc manufacturer whose products admittedly did contain asbestos. Defendants have thus argued that even if they had wrongly withheld information about asbestos in their talc, plaintiffs might still lack evidence sufficient to prove damages.

26. Fourth, continued litigation would entail risk on account of the difficulty of ascertaining the universe of class members. Many decades-old lawsuits were filed against many talc manufacturers, for example, and determining which persons had verifiable claims against Engelhard in continued litigation would be a hard task. While these issues in some respects parallel Defendants' arguments against the idea

that their conduct actually caused any underlying damages, they could pose another challenge in litigation. However, I agree with the parties that the class eligibility standards, discussed in Section 1.2 of the Settlement Agreement, both render the class ascertainable and ensure that it is not subject to fraudulent claims.

27. Fifth, if this litigation continues, Plaintiffs would have to contend with other alleged defenses such as (1) the lack of evidence of a particular plaintiff's exposure to Emtal talc; (2) a claim that some plaintiffs relied upon experts since-discredited to prove the diagnosis of their claimed asbestos diseases: (3) that some claims were dismissed for other reasons, such as being untimely filed; (4) that some cases were filed in the wrong jurisdiction; or (5) that some cases were dismissed because of some other procedural or substantive reason unrelated to the asbestos-content of Emtal talc.

28. While Plaintiffs' counsel advanced the evidentiary and legal responses to each of these issues, it is evident to me that they appropriately appreciated the litigation risks they faced based on the record developed in the case thus far.

29. Defendants, in turn, have acknowledged that they too face significant risks if the Court does not approve the proposed Class Action Settlement. Plaintiffs, for example, claim to have identified documents and testimony that contradict the representations that Defendants made in the underlying cases to plaintiffs and the courts that (1) Emtal talc did not contain asbestos; (2) no evidence existed that Emtal talc contained asbestos; and (3) no Engelhard employee had ever testified about whether Emtal talc contained asbestos. If this litigation continues, there is also the possibility that the Court could grant Plaintiffs' crime-fraud motion, which would result in the disclosure of communications that Defendants have claimed are protected from discovery by the attorney-client privilege. Defendants also recognized their exposure to punitive damages in addition to compensatory damages as well as the reputational harm that could result.

30. In sum, counsel for both sides assessed and balanced the substantial risks if this litigation continues. The Class Action Settlement, as a result, reflects a sound compromise by experienced, competent counsel.

## **The Fairness, Reasonableness, and Adequacy of the Settlement**

31. The proposed Class Action Settlement resulted from arm's length—and indeed, often contentious—negotiations and is, in my opinion, fair, reasonable, and adequate and achieves an outstanding result for the thousands of members of the proposed Settlement Class as it would, if approved, provide timely compensation to them.

32. If approved by the Court, the Class Action Settlement would establish a non-reversionary Settlement Trust Fund of $72,500,000. In addition, BASF and Cahill have agreed to pay up to $3,500,000 for administrative expenses incurred in designing, establishing and carrying out the Plan of Notice and the Plan of Administration. And in addition to paying benefits directly to the Settlement Class, BASF and Cahill have agreed to pay Class Counsel's attorney's fees, as approved by the Court, up to $22,500,000 and for the reimbursement of costs, as approved by the Court, up to $1,200,000.

33. Given my experience as a federal judge and years of mediating other complex actions, I believe the proposed Class Action Settlement to be fair, reasonable, and adequate in light of the parties' claims and defenses, and the uncertainty inherent in litigation as complex as this.

13

34. In reaching this conclusion, I found it significant that obtaining more money and benefits to the class would, even if it were possible, entail years more of discovery, trial, and appellate proceedings, where at each stage, Plaintiffs would face substantial risks relating to the ability to obtain class certification and the merits of their claim. At the same time, I recognized that providing the benefits to the Settlement Class now would itself be a significant benefit to the Class due to the passage of time since the alleged fraud began and its discovery nearly 30 years later. Conversely, the Defendants face risks in their ability to defeat class certification and to prevail on the merits of the case, and face exposure to both compensatory and punitive damages claimed by the Plaintiffs.

35. As to the value of the benefits that would be provided to members of the proposed Settlement Class if the Class Action Settlement is approved, I believe that they are fair, reasonable, and adequate. Throughout the mediation proceedings, the parties presented expert analyses and historical data from asbestos settlement trusts that confirm my assessment that $72,500,000 is sufficient compensation. What's more, the Class Action Settlement provides that if each qualified

14

mesothelioma claimant would receive less than $100,000 because of a higher than expected response rate to the Class Notice, Class Counsel could, in good faith, unilaterally terminate the settlement.

36. Finally, there are two aspects of the agreement on Class Counsels' application for attorneys' fees that also weigh in favor of the conclusion that the Class Action Settlement is fair, reasonable, and adequate. First, the parties only negotiated the amount of attorneys' fees and expenses to be reimbursed after an agreement had been reached on the other material terms of the settlement, including the creation of a $72,500,000 Settlement Trust Fund. And second, Defendants agreed to not object to an award of attorneys' fees and reasonable costs up to $22,500,000 and $1,200,000, respectively, that is *in addition* to the $72,500,000 Settlement Trust Fund.

37. All in all, if approved, the Class Action Settlement will provide the Settlement Class with a total benefit of $100 Million.

## Conclusion

For all these reasons, the proposed Class Action Settlement is fair, reasonable, and adequate. It resulted from an arm's length and often contentious mediation process and provides substantial benefits to the

15

proposed Settlement Class in light of the risks of litigation. In my view, the settlement is a fair way of resolving difficult litigation, and I therefore support its approval.

    I declare that the foregoing to be true and correct.

_____
Layn R. Phillips
Former U.S. District Judge

Dated: December 11, 2019