Exhibit D

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **KIMBERLEE WILLIAMS, et al.** | No. 2:11-cv-01754 (ES) (JAD) |
| Plaintiffs, | CIVIL ACTION |
| vs. | **DECLARATION OF DANIEL MYER** |
| **BASF CATALYSTS LLC, et al.** | |
| Defendants. | |

I, DANIEL MYER, being of majority age do pursuant to 28 USCS § 1746 declare as follows:

1. I reside and have worked in New Jersey since 1981. I am employed with Verus LLC ("**Verus**"), which I co-founded. My title is Vice President of Client Services.

2. Verus is a claims administration and litigation support services provider firm serving members and institutions in the mass tort field nationally. The firm provides a full suite of services, including the administration of approximately twenty-five Section 524 (g) asbestos trusts, asbestos claims and mass tort settlement administration, case management and medical review services, business and advisory services, analytics and document management services. The firm is located in Princeton, New Jersey. Since its founding in 2003, Verus has administered over 5 million asbestos personal injury claims and disbursed billions

in settlement funds related to asbestos claims. While known and well regarded for its work in the asbestos mass tort field, Verus also provides litigation support services to law firms working on other types of mass torts involving toxic exposures, including defective medical devices and dangerous drugs.

3. For several decades I have been directly involved in the handling, administration and resolution of asbestos bodily disease claims. Over the years I personally provided asbestos claims handling and claims management services to a wide array of clients, including various asbestos defendants, bankrupt corporations, and law firms nationwide representing defendants and insurance carriers in asbestos injury litigation. In the course of my professional activities I have personally been involved in numerous mass tort asbestos settlement negotiations with numerous law firms, special masters and state and federal judges across the country. Over the years I have been doing this work I developed many working relationships with the key participants and facilities in the asbestos field and believe I have a full understanding of the variables and factors that support the successful resolution and administration of portfolios of asbestos claims.

4. Based on my education, knowledge and experience in the asbestos claims field I am able and competent to offer opinions on the fairness and adequacy of the pending proposed settlement in the *Williams v BASF Catalysts, LLC* lawsuit before the Court as well as on the proposed Plan of Distribution, which Verus helped design. I also will describe to the Court Verus' capabilities and experience in support of the application being made by Class Counsel for Verus to be appointed by

the Court to serve as the Administrator of the proposed settlement's proposed Plan of Distribution (which I will refer to as the "**POD**" or the "**Plan**").

5. Verus and I have been retained by Cohen Placitella & Roth, PC to provide consultation and other forensics services to it and its colleagues at Fox Rothschild LLP, who together have been prosecuting the *Williams* Action. I refer to both firms as "Class Counsel".

6. In the capacity as a Principal in a Third Party Administrator, who has been involved in the handling of asbestos litigation for well in excess of 30 years, both in the Asbestos Tort system and in the Asbestos PI Bankruptcy Trust system, and having served as an expert on Class Action certification on behalf of the putative class in the *Williams* action, I have gained familiarity with the allegations and the defenses being asserted by each side in the case, as well as with the *Williams* Actions' discovery pertinent to the identity of the asbestos suits and the asbestos claimants in the Underlying Lawsuits that are its subject. As consultants to Class Counsel on their development of the Plan of Distribution, my Verus colleagues and I are familiar with the POD, the informational sources available to execute the POD, and the POD's operational requirements and needs.

7. With respect to my personal qualifications, my education, work history and forensic testimony work are set out in the resume attached as Exhibit "A". Briefly, my experience pertinent to *Williams* v *BASF Catalysts, LLC* includes:

(a) Employment with Continental Insurance Company as a home office environmental claim department ("ECD") senior analyst, supervisor, and claim manager.

(b) Tenure with the Asbestos Claims Facility ("ACF") beginning in 1986. The ACF was established in 1985 as a claims management organization responsible for the management of asbestos personal injury claims on behalf of numerous asbestos defendants on a national level. My responsibilities included development of a strategic plan to handle asbestos bodily injury claims in a geographic region of the country.

(c) I served as a Director of Claims for the Center for Claims Resolution ("CCR"), which was another claims management organization entrusted with the management of thousands of active asbestos personal injury claims on behalf of numerous national asbestos defendants. My responsibilities as a member of the Senior Management of this organization included administration of the claim handling policies and procedures on a national level, the preparation and implementation of jurisdictional strategy plans, and total cost projections for approximately thirty-eight states. I also had responsibility for the oversight of litigation and litigation cost expenditures. Ultimately, my colleagues and I at CCR were responsible for processing over 450,000 personal injury claims, as well as billing, collecting, managing, and disbursing over $6 billion in settlement funds, litigation expenses, and operating expenses.

(d)     I was a Principal of CMC Claims Management Services, a claims services company focusing on asbestos litigation, which eventually evolved into Verus Claims Services in February 2003. CMC was an organization that provided asbestos claims management services to various clients, mainly asbestos defendants of various types. Our services included the evaluation, negotiation, and settlement of asbestos personal injury claims for various defendants, as well as participating in the coordination of case handling with defense counsel and defendants.

(e)     In 2003 I co-founded Verus where I currently serve as one its Directors and its Vice President of Client Services.

8.     With respect to Verus' qualifications, it is a third-party administrator that currently provides claims analysis, claims reserve projections and claims administration services for approximately twenty-five asbestos trusts as well as claims administration, case management and other services to clients.

(a)     In its capacity as a third-party claims administrator, Verus is frequently tasked with developing policies, procedures, and software systems for the intake, review, and settlement of asbestos personal injury claims, as well as claims resolution systems for other mass tort matters. In performing these duties, Verus performs the following services for our clients:

- Designing claim valuation models for valuing individual claims consistently and accurately;
- Developing risk management strategies;
- Developing policies, recommendations and procedures for evaluating and liquidating claims;

- Developing customized claims portals for the intake and review of claims filings;
- Developing detailed profiles of the history of each defendant's involvement in the manufacture, distribution, and or installation of asbestos;
- Providing liability forecasts, data analytics, claims estimations and cash flow projections for purposes of managing settlement fund assets to ensure availability of funds for future claimants;
- Processing all claims submissions and communicate reviewer (claim processor) decisions to claimants and/or claimants counsel;
- Disbursing funds to qualifying claimants;
- Overseeing Alternative Dispute Resolution proceedings; and
- Supporting outside counsel with respect to insurance recoveries and litigation matters.

(b) Since 2003, Verus has resolved in excess of five million personal injury claims filed with our asbestos bankruptcy trust clients. These clients consist of a diverse mix of former asbestos defendants, including raw fiber suppliers; installers of asbestos-containing products; distributors of asbestos containing products; manufacturers of thermal insulation, insulating cements, joint compounds, construction materials, cement-asbestos pipe, gaskets, friction products, and many other products.

(c) In managing such a diversity of defendants over decades of litigation, Verus' personnel, including myself and the other Verus personnel actively working on the *Williams* Action engagement matters, Mark Eveland, Chief Executive Officer, and Mark Zabel, Director of Analytics, have developed a breadth and depth of knowledge of the elements of asbestos personal injury claims, the medical proofs necessary to support such claims, causation, and the valuation of claims both for litigation and settlement purposes.

9. Through our review of the data and information made available to us and our experience in providing the aforementioned services, my Verus colleagues and I have been able to counsel and assist Class Counsel in their development of the Plan of Distribution before the Court to administer and distribute the Settlement Fund. From this I can also opine on the fairness, reasonableness, and adequacy of the settlement subject to the Court's approval.

10. Versus is able and ready to take on the role of the Plan Administrator and faithfully execute its provisions. Verus' proposed cost estimate for the administration and distribution of the settlement as the Plan Administrator is attached as Exhibit B.

11. For the reasons that follow, it is my opinion that the proposed settlement if approved by the Court would provide fair, reasonable and adequate compensation to Class Members in exchange for the Release of the Released Claims identified in the Settlement Agreement. Projected class member distributions under the proposed POD, which Verus has calculated based on available data and making reasonable assumptions as more fully described in the Mark Zabel Declaration, offer Class Members the prospect of receiving substantial payments based on the Injured Person's severity level of asbestos disease. The POD projected claim payments by level of disease also compare favorably to the payments provided by numerous comparable Bankruptcy §524(g) asbestos claims trusts. The Plan of Distribution proposed by Class Counsel provides a fair, reasonable, efficient, rational and practical allocation scheme and claims process,

12. To arrive at these conclusions, I rely on Verus' work in deriving the estimates of the class size, disease incidence rates and comparative compensation levels for each of the POD's disease levels based upon our analysis of claim data and the internal payment relationships of eighteen representative trusts' payment amounts for the equivalent disease levels. This work is described in detail in the Declaration of Mark Zabel, who as Versus' Director of Analytics, managed these aspects of our engagement in this case. From this analytical work, and making reasonable claim assumptions explained below, we are able to determine projected values of Part B payments to be made from the Settlement Fund under the proposed Plan of Distribution, which I will explain and discuss below. I note that the actual precise value of the Part B payments I discuss will ultimately be determined by the actual number of eligible Class Members who file compensable claims and the actual distribution of the approved claims by type of injury covered by the Plan of Distribution. The actual payment numbers therefore will likely not be the same.

13. The proposed POD designed by Class Counsel now before the Court in my opinion is a fair, reasonable and rational allocation of the Settlement Fund. Its various compensation components working together aptly fit the nature of the *Williams* Action claims and follow and apply conventional asbestos claim valuation factors. The claims processing, adjudication and distribution procedures in the Plan are similar to numerous equivalent asbestos trust distribution procedures ("TDPs") that Verus administers or with which I am familiar. Based on my expertise and

experience in asbestos claims administration, the Plan's processes and procedures for administering and distributing the Settlement Fund are efficient, practical, reasonable and fair. They appropriately take into account the expected nature and volume of claims. They fairly and practically address the anticipated problems many of the Class Members—some of whom will be relatives of former Underlying Lawsuit plaintiffs— will face in locating information and documents needed to submit a claim because it is no longer available or difficult to obtain due to the passage of time or the current situation of the lawyers or law firms who handled the Underlying Lawsuits (e.g., retirement or deaths of the attorneys or the closure of the law firms).

14. The Plan creates three compensation programs—what the Plan calls "Parts"—to allocate and distribute the Proposed Settlement Agreements' $72.5 million Settlement Fund among the Settlement Class Members. The following explains and provides my comments and opinions on each Part:

(a) The Plan's Part A provides Base Compensation Payments to Settlement Class Members who establish they are Class Members ("**Base Payments**") out of an $6.25 million allocation of the Settlement Fund. Each Primary Claimant who timely submits a claim for Part A compensation and establishes that his Underlying Lawsuit presented a good faith credible claim for injuries caused by exposure to Emtal Talc will receive a payment of up to $500 from the Part A sub-fund. If there are one or more Settlement Class Members associated with a Primary Claimant as a Derivative Claimant, that is, the Class Member claim

in the Underlying Lawsuit was based upon the Primary Claimant's asbestos injury and not theirs such as a spouse or a child, then the Primary Claimant will also be eligible to receive one additional Part A payment of up to $500, for a total Part A award of up to $1,000. Part A Base Payments are subject to proration downward if more than 12,500 Part A Base payments are awarded (which number is based on the estimated class size using claims data information regarding the Underlying Lawsuits that was obtained during discovery), counting each Primary and Derivative Base Payment separately. The POD also has provisions for Part A only claims where the Injured Person is deceased, there is no estate open and all that the claimant wants to apply for is Part A shares. It is my opinion and belief that Part A provides class members with fair and appropriate "base" compensation. These payments are comparable to the modest but appropriate base amount awards available to claimants in many asbestos trust TDPs who are filed with the trust as expedited review claims. These equal share payment amounts along with information and documentation necessary to make a Part A claim are fair, reasonable and appropriate in my judgment.

(b)     The Plan's Part B program, through which the bulk of the Settlement Fund will be distributed, is intended to provide additional compensation to the physically injured class members (Primary Claimants) out of an initial sub-fund allocation of $59.75 Million based on, and on account of, defined physical asbestos injuries sustained by the Injured Person. The Part B sub-fund's allocation amount may change in the course of the Settlement Fund's administration based on the

Settlement Trustee's application of a spillover (unused funds) from the Part A or Part C sub-funds (which I discuss next) or the need to pay administration costs and expenses that cannot be paid or fully paid from the Settlement Cost Fund. Primary Claimants' compensation under Part B is based upon the type and severity of asbestos disease injury sustained and medically diagnosed. Class Members who meet the requirements for a Plan B award will receive a proportionate share of the Part B sub-fund based upon a system of points awarded for the asbestos disease sustained and diagnosed. The Declaration of my colleague Mark Zabel explains how the number of points awarded were determined based on his analysis of 18 asbestos trusts whose claimants were reasonably comparable to Emtal talc claimants in the *Williams* Action Class. The 18 Trusts examined are identified in Exhibit C to my declaration. I am familiar with the trusts listed as well as the general characteristics of the asbestos claims and claimants they were created to compensate. Verus presently administers sixteen of those trusts. It is my opinion these trusts are reasonably comparable to the Emtal talc claims and claimants involved in the *Williams* Action's Underlying Lawsuits.

(c) The proposed Part B's eligibility criteria require a Primary Claimant requesting injury level based compensation to establish by credible, competent proof (1) entitlement to Part A compensation; and (2) that the Primary Claimant sustained an asbestos disease injury falling into one of four defined categories of asbestos disease levels: (1) non-malignant asbestos pulmonary disease (a **Part B Level 1 claim**); (2) Malignant Asbestos Disease Other Than Mesothelioma or Level

3 Claim Lung Cancer ( **Part B Level 2 claim**); (3) Either: (a) Primary lung cancer with evidence of underlying Bilateral Asbestos-Related Nonmalignant Disease; or (b) Severe Asbestosis **( Part B Level 3 claim**); or (4) mesothelioma (**Part B Level 4 claim**). A Part B claim will be based on the highest degree of the Injured Person's disease progression provable as of the time of the claim submission to the Plan. It is my opinion these four categories provide a fair, rational and appropriate injury level scheme for the POD's allocation of the Settlement Fund. These categories fairly capture the key essence of the many possible distributions schemes by appropriately differentiating between non-malignant asbestos disease claims and malignant asbestos disease and placing them in a logical ascending severity order.

(d) Part B Claimants may establish proof of medical injury through a certification of a prior equivalent asbestos disease level adjudication by a Qualified Asbestos Trust or through individual adjudication of satisfactory medical evidence provided by the Claimant to the Administrator. Verus has recommended the following Qualified Asbestos Trusts based on their administration TDPs, their sound operation and the depth and characteristics of their claimant pool. Each of these trusts has informed Versus it is willing to cooperate in the POD's administration by providing adjudication information when appropriate authorizations are provided it:

(A) AC&S Asbestos Settlement Trust
(B) ASARCO Asbestos Personal Injury Settlement Trust
(C) Combustion Engineering Trust
(D) G-I Holdings Inc. Asbestos Personal Injury Settlement Trust;
(E) KACC Asbestos PI Trust
(F) TH Agriculture and Nutrition, L.L.C. Asbestos Personal Injury Trust

   (G) The Manville Personal Injury Settlement Trust dated as of November 28, 1988;

   (H) The Travelers Common Law Direct Action Settlement Fund.

  (e)  The Settlement Fund's Part B sub-fund under the Plan will be distributed in its entirety by the Settlement Trustee to those Part B Claimants adjudicated to be eligible and allocated among them according to proof that they suffered a compensable disease. The actual allocation formula for this is described in the Declaration of Mark Zabel which I refer to. The number of qualifying points for each Part B claim level used in the allocation formula is presented in Table 1, along with hypothetical payout shares Verus has calculated for each disease claim level based on: (A) the proposed initial Part B allocation of $59,750,000; (B) Part B claim submission rates of 7,500, 8,000 and 8,500 claims; and (C) using an assumed disease distribution among claims received that followed the Manville Trust's claims experience. My Verus colleagues and I believe that using the Manville Trust disease distribution rates for the calculating the hypothetical payout shares is reasonable due to this Trust's long history, the large number of claims it has received and processed, and the diversity of its claimants.

  (f)  Based upon my many years of experience as an asbestos disease claims administrator I believe the Plan's Part B program provides a fair, rational and appropriate method for allocating the majority of the Settlement Fund among Settlement Class Members.

[Balance of page is intentionally blank]

| Table 1 Hypothetical Part B Payment Share Estimates* ||||| 
|---|---|---|---|---|
| **Part B Claim Levels** | Qualifying Claim Points<br><br>(Assumed disease rate %) | 7,500 approved claimants | 8,000 approved claimants | 8,500 approved claimants |
|  |  | (Estimated number of claims) |||
| **Level 1 Claim**<br><br>Non-Malignant Asbestos disease other than Severe Asbestosis.<br><br>(Bilateral Asbestos-Related Nonmalignant Disease Injuries other than Severe Asbestosis) | 1<br><br>(86.3 %) | $1,283<br><br>(6,473) | $1,203<br><br>(6,904) | $1,132<br><br>(7,336) |
| **Level 2 Claim**<br><br>Malignant Asbestos Disease Other Than Mesothelioma or Level 3 Claim Lung Cancer. | 9<br><br>(2.1 %) | $11,546<br><br>(158) | $10,824<br><br>(168) | $10,188<br><br>(179) |
| **Level 3 Claim**<br><br>Either: (a) Primary lung cancer with evidence of underlying Bilateral Asbestos-Related Nonmalignant Disease; or (b) Severe Asbestosis. | 20<br><br>(7.3 %) | $25,658<br><br>(548) | $24,054<br><br>(584) | $22,639<br><br>(621) |
| **Level 4 Claim**<br><br>Mesothelioma | 86<br><br>(4.3 %) | $110,327<br><br>(323) | $103,432<br><br>(344) | $97,348<br><br>(366) |
| * Due to rounding, the numbers presented may not add up precisely to the totals indicated and payment estimates may not precisely reflect the absolute figures. |||||

(g) In addition, the Plan provides in its allocations Part C a discretionary Extraordinary Injury Fund ("**EIF**") into which $6.5 Million of the Settlement Fund is initially allocated. Out of this sub-fund the Settlement Trustee has discretionary authority to award bounded additional supplemental compensation payments to a Primary Claimant with mesothelioma disease who establishes to the Settlement Trustee's satisfaction that the Primary Claimant sustained an extraordinary physical injury and/or economic loss as a result of exposure to Emtal Talc beyond that sustained by the other, and typical, mesothelioma Primary Claimants applying to the Settlement Fund. To qualify for an EIF award a Primary Claimant, in addition to establishing Class Membership under Part A, must satisfy specific eligibility requirements that: (1) the subject Injured Person developed mesothelioma; (2) the Primary Claimant has not received appropriate and sufficient compensation for the subject mesothelioma injury; (3) the subject mesothelioma injury and resulting losses were a result of frequent, regular and proximate exposure to Emtal Talc ; and (4) the Underlying Lawsuit's plaintiff lawyer or firm was directly misled by an Engelhard/BASF attorney regarding the existence of asbestos in Emtal Talc. An individual discretionary EIF award may not exceed $175,000. The EIF allocated moneys may be increased by unallocated or unclaimed funds spillovers from the Part A and Part B programs. The Settlement Trustee is not required to make any EIF awards or to make awards sufficient to exhaust the EIF fund. The Settlement Trustee also has the discretion to re-allocate the unused

portion of the Part C sub-fund to the Part A or Part B funds in its discretion with the advice and consent of Class Counsel.

(h) The EIF feature of the Plan is a common place one found in many Section 524(g) asbestos injury TDPs. The proposed Plan's EIF's limited access structure and its additional, more stringent eligibility requirements are likewise common aspects to comparable asbestos trusts' EIF features. This feature of the proposed Plan is designed to award compensation only where an extraordinary injury situation exists, taking into account the other compensation entitlements available to the applicant. Based on my experience in administering asbestos claims programs such as the proposed Plan, as well as my knowledge of the actual claims experience of comparable asbestos trusts as to their EIFs, I believe the proposed Plan's EIF is appropriately sized and designed to achieve its purpose in the PODs distribution scheme. It is my further opinion that the Plan's proposed EIF feature adds to the overall reasonableness, rationality and fairness of the proposed POD before the Court.

15. Based on the above referenced analysis and projections, combined with my years of experience in resolving asbestos claims and administering asbestos claims resolution facilities, I believe that the proposed Plan of Distribution provides fair and reasonable allocations of the Settlement Agreement's Settlement Fund as well as a fair, reasonable and rational methodology to determine payment shares for eligible Settlement Class Members with Part B claims. I also believe that the resulting payment shares to Class Members available under all three Parts of the

POD will provide fair and adequate compensation to the putative Settlement Class members.

16. To the extent any of what I state above is an opinion, it is expressed by me within a reasonable degree of certainty or probability within my fields of expertise, which include asbestos claim handling, asbestos claims valuation, and asbestos claims facility procedures and management.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:

JANUARY 6, 2020

_____
Daniel Myer

Exhibit "C"

| Asbestos Trust List | |
|---|---|
| **Trusts** | **Products** |
| A&I Asbestos Trust | Asbestos Thermal Insulation Products |
| AC&S Asbestos Trust | Asbestos Thermal Insulation Products |
| ARTRA Asbestos Trust | Asbestos Joint Compound Products |
| ASARCO Asbestos Trust | Asbestos Fiber |
| Brauer Supply Company Asbestos Trust | Asbestos Thermal Insulation Products |
| Burns & Roe Asbestos Trust | Asbestos Thermal Insulation Products |
| Christy Refractories Asbestos Trust | Asbestos Refractory Products |
| Combustion Engineering Asbestos Trust | Asbestos Thermal Insulation, Cements, Adhesives |
| Congoleum Asbestos Trust | Asbestos Flooring Products |
| G-I Holdings Asbestos Trust | Asbestos Thermal Insulation Products |
| KACC Asbestos Trust | Asbestos Refractory Products |
| Manville Asbestos Trust | Asbestos Thermal Insulation Products |
| NARCO Asbestos Trust | Asbestos Refractory Products |
| Plibrico Asbestos Trust | Asbestos Refractory Products |
| Porter Hayden Asbestos Trust | Asbestos Thermal Insulation Products |
| Quigley Asbestos Trust | Asbestos Refractory Products |
| T H Agriculture and Nutrition Asbestos Trust | Asbestos Fiber |
| Yarway Asbestos Trust | Asbestos Valves, Steam Traps, Gages, Gaskets |