Exhibit E

### 34UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| **KIMBERLEE WILLIAMS, et al.** | No. 2:11-cv-01754 (ES) (JAD) |
| Plaintiffs, | CIVIL ACTION |
| vs. | **DECLARATION OF MARK ZABEL** |
| **BASF CATALYSTS LLC, et al.** | |
| Defendants. | |

I, MARK ZABEL, being of majority age do pursuant to 28 USCS § 1746 declare as follows:

1. I have worked for Verus, LLC since 2014, and have served in the capacity of Director of Analytics from 2016 through July 2019. Prior to that I was president of Straight Line Performance Solutions, LLC, a company that provided business decision making analysis and consulting services.

2. My qualifications and experience are set forth in Exhibit A. To briefly summarize, I hold two Masters of Science Degrees from the Ohio State University, one in the fields of Statistics and one in Electrical Engineering. I have developed over my career considerable knowledge, training and experience in information and data systems, computer programing and software applications (especially that pertinent to analytical forecasting and data mining) and business decision analysis techniques. I am certified in Six Sigma methodology.

3.      Among the consulting and claims administration services/resolution services Verus offers to industry, regulators, insurance carriers and claimant or defense counsel involved in asbestos injury litigation and/or claims management is liability forecasting. These are statistical and analytically based predictions or estimates of liability and/or claims and in particular are often forecasts or estimates of asbestos liability claim volume and/or transactional or indemnity (liability) exposure. These forecasts or predictions are germane to finance and risk management, structuring settlements, ensuring equitable payouts to claimants and effectively managing the operations of a business. Verus' estimates are regularly performed and used to develop, support, justify or evaluate business or financial transactions, Chapter 11 bankruptcy plans, Section 524(g) asbestos claims resolution facilities, insurance claim or coverage dispute positions or mass tort settlements. Since joining Verus I have been responsible for both performing the analytical and forecasting work on these projects as well as managing Verus' staff members who perform or assist in providing its services in this area. I have lectured at professional seminars on liability forecasting and claim estimation.

4.      Verus was asked by the Plaintiffs' Counsel in *Williams* to estimate class size, identify class members from records and databases for purposes of developing class notice mailing lists and claims administration processes, and assist counsel in their devising a proposed Plan of Distribution ("POD" or "Plan") to distribute the proposed settlement's proceeds in a fair, equitable and efficient manner. The latter task required development of liability claim forecasting models

to enable testing of assumptions going into the Plan design and estimating the Plan payouts under various scenarios. As all of the aforementioned tasks required data acquisition or data development, data/information organization, data modeling and application of analytical and modeling techniques that my work group at Verus regularly performs for Verus' liability and claims forecasting engagements, I was assigned and undertook responsibility for assembling, obtaining, deriving where necessary, processing and analyzing the data and information necessary to make the lists, estimates, forecasts and computations requested by Plaintiffs' Counsel to support the proposed class action settlement and the development of a Plan of Distribution. The work on these assignments was done either by me personally—especially with respect to deriving relative asbestos disease payment ratios and designing the claims forecast models that Verus produced—or done under my direction and review by Verus analytical staff members. The latter involved tasks that were mainly data acquisition and assembly, processing and mining. As to these Robert Koehl, a Verus data analyst in my work group, mainly did the work.

5. My colleagues and I estimate that the *Williams* Class could include as many as **18,721** potential Class Members who meet the Class Definition. The estimate of 18,721 potential Class Members includes both the plaintiffs who developed an asbestos disease injury and derivative plaintiffs such as spouses or the children/parents of deceased asbestos claimants who died due to their asbestos disease.

6. We derived this estimate starting from information obtained in the *Williams* Action discovery that identified plaintiffs filed cases against Engelhard Corporation or later BASF Catalysts LLC after it acquired Engelhard that alleged an asbestos injury caused by exposure to Emtal Talc. We also looked at other asbestos claim datasets supplied to Verus on a confidential basis by law firms that had previously represented individual plaintiffs in Underlying Lawsuits against Engelhard or BASF based on Emtal talc, such as electronic claimant data supplied by Bevan and Associates. The dataset supplied by the Bevan firm included information on asbestos claimants represented by four Ohio law asbestos claimant firms: the Bevan, Cooley, Smith and Spangenberg law firms (referred to collectively in our analysis as "**BCSS**"). Verus further reviewed and extracted names and other identifying information from certain asbestos injury complaints filed in Mississippi and Texas against Engelhard/BASF in which either hundreds or thousands of plaintiffs were named and joined into a single massive suit.

7. After compiling and analyzing the above information Verus undertook to eliminate duplicate individuals through several steps:

(a) In the first phase, we aggregated all of the available plaintiff database information provided to Verus purporting to identify plaintiffs who had sued Engelhard/BASF, including the BCSS claimant datasets, along with information that was derived from the Mississippi/Texas complaints. This was done to identify the number of unique or separate individuals who had sued Engelhard/BASF. Through this process, we identified **14,336** unique plaintiffs.

(b)     In the second phase of determining the overall size of the putative Settlement Class, we compared the list of plaintiffs generated in the first phase with a claimant list of **12,494** plaintiffs who according to BASF and Cahill's records were known to have sued Engelhard/BASF obtained from Defendants under a Rule 502(d) court order allowing Verus access and use of the information. We then used data science name matching techniques to determine the likelihood that individuals identified in the Defendants' list were already included in the list of plaintiffs' names developed and identified in the first phase. Any likely duplicates were excluded. After Verus received, mounted and processed the document image files comprising the Emtal Talc Litigation archive, which is a part of the Settlement Administration, we did additional research into the remaining unique **4,792** individuals using technology assisted document search and review techniques. From that research we were able to exclude 407 individuals that we could reasonably identify as non-plaintiffs (i.e. – they determined to be doctors, expert witnesses, co-workers, etc.) or where a last name only was given and no other information could be found.  The remaining unique **4,385** individuals were included in our total final count of **18,721** potential Settlement Class Members.

8.      In a third phase—which also happened to be part of the work necessary to complete our second assignment, estimating the class members' asbestos disease level distribution or prevalence rates—we estimated how many of the **18,721** potential Settlement Class Members were Injured Persons (*i.e.*- those who contracted an asbestos related disease ) who, for Plan design purposes, are the

"Primary Claimants" who can apply for shares of the Plan's Part B Fund (the component that distributes the fund based on asbestos disease severity). While claimant data from some of the sources we used to calculate class size distinguished between Injured Persons and Derivative Claimants (e.g., spouses, children of deceased asbestos victims), for the most part the information available to us did not allow a ready distinction between the two categories of claimants. From years of claims experience it is well known that not every injured asbestos claimant has an associated derivative claimant, although clearly many do. So, to estimate the number of Injured Persons in the Settlement Class we took the names we had which also had a valid social security number and searched data available to and managed by Verus regarding asbestos claims submitted to asbestos bankruptcy trusts that Verus manages for matches. Where we found a match, we looked to see if an asbestos disease was identified. Where that occurred, we assumed the matched claimant was an Injured Person. From this analysis we determined that between 40% to 45% of identified potential class members with an available, valid social security number had claimed they had contracted an asbestos disease. The percentages vary because we compared our class member list to Verus' records that show compensation was paid, as well as to a broader group of all asbestos claims that were made, whether or not the claim was paid compensation. This second cohort is larger in size because it includes claims that were withdrawn or adjudicated to not be qualified for payment. Applying these percentages to the

various datasets we used in making the class size estimate yields an estimated number of Primary Claimants falling in the range of 7,500 to 8,500 persons.

9. The proposed Plan of Distribution ("POD") calls for the entire distribution of the Settlement Fund's Part B claims fund (which will have an initial allocation of $59,750,000) among qualified class members based upon four categories of disease: (1) non-malignant asbestos pulmonary disease (what is called a "Part B Level 1 claim"); (2) Malignant Asbestos Disease Other Than Mesothelioma or Level 2 Lung Cancer (a "Part B Level 2 claim"); (3) either Primary lung cancer with evidence of underlying Bilateral Asbestos-Related Nonmalignant Disease or Severe Asbestosis (a "Part B Level 3 claim"); or (4) mesothelioma (a "Part B Level 4 claim"). Based on my experience in asbestos liability forecasting and evaluation of asbestos claims facilities' distribution schemes, these four categories are fair, rational, reasonable and efficient groupings of asbestos disease claims for allocating the proposed Settlement Fund; especially where, as here, the cohort sharing it is a discrete, finite group.

10. To verify the reasonableness of the Plan of Distribution and potential compensation for class members, it was necessary to determine prevalence rates for the four categories of disease upon which the POD is based. To do so, Verus conducted the analysis of potential Settlement Class Members that could be linked to previously approved and paid claims in the Verus administered trusts by Social Security Number ("SSN") I refer to in ¶8.

11. For each SSN, using this four-disease level category scheme, we identified the highest disease level of a previously approved, paid claim that we could link to the SSN. By doing so, we were able to identify the claimed and paid disease level for **7,719** potential class members and determine a disease incidence rate accordingly. Table 1 presents the results of this analysis:

| Table 1 | | |
|---|---|---|
| **Part B Disease Level** | **Total Number Matched SSNs** | **Disease Rate** |
| Level 1 | 7,280 | 94.31% |
| Level 2 | 90 | 1.17% |
| Level 3 | 262 | 3.39% |
| Level 4 | 87 | 1.13% |
| **Grand Total** | **7,719** | **100%** |

12. To develop an appropriate division of the Plan's component dedicated to awarding injury severity-based compensation shares among the class members, I performed an analysis of 18 representative asbestos compensation trusts whose claim data is available to Verus in which I examined and compared their payment structures. The purpose of the analysis was to derive ratios for payment allocation among the four disease categories used in the *Williams* POD to allocate the Part B Fund based on these trusts' payment structures.

13. By way of background, asbestos diseases fall into medically diagnosable categories based upon the malignancy and severity of the disease. For example, pleural thickening is a non-malignant bodily injury, whereas mesothelioma is an advanced malignant disease for which there is no medical cure. The compensation paid for asbestos diseases in both the tort system and Chapter 11

Section 524(g) trusts commonly track the morbidity and mortality of the disease severity. In all of the 18 trusts I examined non-malignant disease claims are paid substantially less than cancer claims, and cancer claims are paid substantially less than mesothelioma claims.

14. The 18 trusts examined are listed in Table 2. They all have similar asbestos liability exposure characteristics to Emtal Talc claims with respect to claimant composition and the time frames of the claimants' exposure. Many of them, like Emtal talc claims, involved situations of alleged harmful exposure to finished products that asbestos was claimed to be either an ingredient, a component or natural contaminant. My colleagues and I at Verus view these 18 trusts as providing a useful, fair and reasonable points of reference for this settlement.

| Table 2 | |
|---|---|
| **Trusts** | **Products** |
| A&I Asbestos Trust | Asbestos Thermal Insulation Products |
| AC&S Asbestos Trust | Asbestos Thermal Insulation Products |
| ARTRA Asbestos Trust | Asbestos Joint Compound Products |
| ASARCO Asbestos Trust | Asbestos Fiber |
| Brauer Supply Company Asbestos Trust | Asbestos Thermal Insulation Products |
| Burns & Roe Asbestos Trust | Asbestos Thermal Insulation Products |
| Christy Refractories Asbestos Trust | Asbestos Refractory Products |
| Combustion Engineering Asbestos Trust | Asbestos Thermal Insulation, Cements, Adhesives |
| Congoleum Asbestos Trust | Asbestos Flooring Products |
| G-I Holdings Asbestos Trust | Asbestos Thermal Insulation Products |
| KACC Asbestos Trust | Asbestos Refractory Products |
| Manville Asbestos Trust | Asbestos Thermal Insulation Products |
| NARCO Asbestos Trust | Asbestos Refractory Products |
| Plibrico Asbestos Trust | Asbestos Refractory Products |
| Porter Hayden Asbestos Trust | Asbestos Thermal Insulation Products |
| Quigley Asbestos Trust | Asbestos Refractory Products |
| T H Agriculture and Nutrition Asbestos Trust | Asbestos Fiber |

| Yarway Asbestos Trust | Asbestos Valves, Steam Traps, Gages, Gaskets |

15. My analysis of the 18 trusts looked at their "Average Values" payment levels as stated in their respective "trust distribution processes" ("TDP"). I then evaluated the relationship between each Trust's compensation levels. Specifically, I reviewed: (1) the distribution of paid claims for the trusts, (2) the TDP Average Values as specified in the Trust Distribution Procedures for the trusts, and (3) a mapping of the disease levels for the trusts to the four Part B Claim Levels so they corresponded.

16. My analysis determined there was a consistent pattern of compensation relativities in the above trusts within the categories of disease payments which, in turn, could be reasonably and fairly used by Class Counsel to determine payment relativities for the Williams Settlement POD.

17. Using the relativities (or ratios) derived from my analysis, I together with my colleagues at Verus involved in the project determined and recommended that the POD should use the following Part B share allocation points for the four disease Part B categories to fairly divide the Part B fund among eligible claims:

- Part B Level 1 Claim: 1 point

- Part B Level 2 Claim: 9 points

- Part B Level 3 Claim: 20 points

- Part B Level 4 Claim: 86 points

18. The Plan's design for distributing its Part B compensation sub-fund, which is the bulk of the Settlement Fund, is to award proportionate shares of the entire fund to eligible claimants. Thus, proportionate payment shares from the Settlement Fund set aside for Part B claims ($59.75 million) is based upon a proportion of the points awarded to the individual for his disease divided by the sum of all points associated with all qualified class members as determined using the following formula:

$$Payment_x = TotalFundB \times \frac{Points(DiseaseLevel_x)}{\sum_{y \in AllClassMembers} Points(DiseaseLevel_y)}$$

**Definitions**:

- **"$Payment_x$"** is the payment to be paid out to the individual qualified class member "x".

- **"TotalFundB"** is the total settlement set aside for payments to Part B Claims.

- **"Points(DiseaseLevel$_x$)"** are the points associated with the Part B Claim Level of the class member "x" for the qualified disease level (i.e. DiseaseLevel$_x$).

- **"$\sum_{y \in AllClassMembers} Points(DiseaseLevel_y)$"** is the sum of all points associated to all qualified class members for their respective qualified disease level.

19. In order to test the fairness of this methodology as well as forecast the resulting payments if used in the POD, I created a computer model from which

hypothetical values of Part B payments to be made from the Settlement Fund could be computed. The model uses the Fund B four disease category structure and the distribution share points I set out above and allows one to calculate Part B Fund distribution share amounts based on various key claim factors, such as the number of qualified Part B claims received, the amount of the Settlement Fund allocation to Part B claims, and the applicable disease prevalence (distribution) rates.

20.     To assist Class Counsel in their designing the POD, based on Verus' experience in liability forecasting we recommended that they run the model using the assumption the Settlement Fund' distribution of claims by disease severity would generally follow the disease distribution of the Manville Personal Injury Settlement Trust ("Manville Trust"). Our reasons for the recommendation are the Manville Trust is one of the largest and oldest asbestos settlement trusts and over the years has adjudicated over one million asbestos claims since its establishment in 1988. The claims it received have come in from all of the country and Manville's product line has generated thousands of claims involving essentially every type of possible route or means of asbestos exposure, such as claims based on a claimants' direct asbestos fiber exposure as insulation sold by Manville to claims based on exposure to a one of Manville many finished products containing asbestos. Due to its long history and large number and variety of asbestos claims, it is reasonable and fair to assume Manville's claim distribution applies for purposes of assessing the fairness of the settlement amounts, particularly as how use of the Manville

Trust would yield a conservative forecast based on our observation of the rates of diseases appearing in several of the Emtal claimant datasets I describe above.

21. Accordingly, by using this model we are able to calculate for the Court and the Class Members payment levels based on (1) the total corpus of the settlement; (2) the estimate of the class size; (3) the disease incidence rates; and (4) the "Single Payment Ratio." For example, under the assumptions the Manville disease rates apply and using 8,000 claimants as the number of persons submitting valid Part B compensation claims, the payment distributions under the proposed POD would be as shown in Table 3:

Table 3

|  |  | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|---|
| Calculation |  |  |  | = A*B | = C/SumC | = D*Corpus | =A*#Claimants | =E/F |
|  | Disease | Incidence | Single Payment Ratio | Exp Pay Normalized | Exp Pay Per $ | Exp Pay Total | Expected Claims | Exp Avg Pay |
|  | Meso | 4.3% | 86 | 3.70 | $ 0.60 | $35,580,596 | 344 | $ 103,432 |
|  | Lung 1, Sev Asb | 7.3% | 20 | 1.46 | $ 0.24 | $14,047,504 | 584 | $ 24,054 |
| #Claimants 8,000 | Lung 2, Oth Canc | 2.1% | 9 | 0.19 | $ 0.03 | $ 1,818,478 | 168 | $ 10,824 |
| Corpus 59,750,000 | Non-malig Cat B | 86.3% | 1 | 0.86 | $ 0.14 | $ 8,303,422 | 6904 | $ 1,203 |
|  | All Diseases |  | 100.0% |  |  |  |  |  |

22. Using the model, I have computed estimated hypothetical Part B Fund payments using the bottom, middle and top of the estimated range of Primary Claimants (*i.e.*- 7,500, 8,000 and 8,500) as assumed number of received valid and approved Part B claims. Table 4 below presents the results:

[Balance of page intentionally blank]

## Table 4

## Hypothetical Part B Payment Share Estimates*

| Part B Claim Levels | Qualifying Claim Points (Assumed disease rate %) | Estimated Payment (Estimated number of claims) | | |
|---|---|---|---|---|
| | | 7,500 approved claimants | 8,000 approved claimants | 8,500 approved claimants |
| **Level 1 Claim** Non-Malignant Asbestos disease other than Severe Asbestosis. (Bilateral Asbestos-Related Nonmalignant Disease Injuries other than Severe Asbestosis) | 1 (86.3 %) | $1,283 (6,473) | $1,203 (6,904) | $1,132 (7,336) |
| **Level 2 Claim** Malignant Asbestos Disease Other Than Mesothelioma or Level 3 Claim Lung Cancer. | 9 (2.1 %) | $11,546 (158) | $10,824 (168) | $10,188 (179) |
| **Level 3 Claim** Either: (a) Primary lung cancer with evidence of underlying Bilateral Asbestos-Related Nonmalignant Disease; or (b) Severe Asbestosis. | 20 (7.3 %) | $25,658 (548) | $24,054 (584) | $22,639 (621) |
| **Level 4 Claim** Mesothelioma | 86 (4.3 %) | $110,327 (323) | $103,432 (344) | $97,348 (366) |

\* Due to rounding, the numbers presented may not add up precisely to the totals indicated and payment estimates may not precisely reflect the absolute figures.

23.   In my opinion, given the foregoing analysis, I believe that the proposed Class Action Settlement and its proposed Plan of Distribution provides (a) a fair and reasonable amount of compensation for the entire class when compared to other asbestos mass settlement programs I am familiar with, including the asbestos

trusts identified in Table 2; (b) a fair, reasonable and rational methodology to determine the payment shares to eligible Settlement Class Members with Part B claims, and (c) that the resulting payment shares under Part B provide fair and adequate compensation to the putative Settlement Class members for the injuries sustained by type of disease.

24. To the extent any of what I state above is an opinion, it is expressed by me within a reasonable degree of certainty or probability within my fields of expertise, which include asbestos claims, asbestos claims valuation, and asbestos claims management.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 5, 2020

_____
Mark Zabel