Exhibit V

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF NEW JERSEY

3

    KIMBERLEE WILLIAMS,     )
4     et al.,              )
                           )
5         PLAINTIFFS,      )
                           )
6                          )
        vs.        )    CIVIL ACTION
7                  )    NO. 11-CV-01754
                           )
8     BASF CATALYSTS LLC,     )
    et al.,              )
9                          )
        DEFENDANTS.     )
10

11            - - - - -
    THE VIDEOTAPED DEPOSITION OF THOMAS W. BEVAN, ESQ.
12            TUESDAY, MAY 15, 2018
                - - - - -
13

14       The videotaped deposition of THOMAS W. BEVAN,

15    ESQ., called by the Defendants for examination

16    pursuant to the Federal Rules of Civil Procedure,

17    taken before me, the undersigned, Sarah R. Drown,

18    Registered Professional Reporter and Notary Public

19    within and for the State of Ohio, taken at the

20    offices of Thompson Hine LLP, 3900 Key Center, 127

21    Public Square, Cleveland, Ohio, commencing at 9:03

22    a.m., the day and date above set forth.

23

24

25

THOMAS W. BEVAN, ESQ. - 05/15/2018          Pages 2..5

Page 2

```
 1   APPEARANCES:
 2
         On behalf of the Plaintiffs:
 3
         Harry M. Roth, Esq.
 4         Cohen, Placitella & Roth, P.C.
           Two Commerce Square
 5         2001 Market Street, Suite 2900
           Philadelphia, Pennsylvania  19103
 6         (215) 567-3500
           Hroth@cprlaw.com
 7
             - and -
 8
         Jared M. Placitella, Esq.
 9         Cohen, Placitella & Roth, P.C.
           127 Maple Avenue
10         Red Bank, New Jersey  07701
           (732) 747-9003
11         Jmplacitella@cprlaw.com
12
13   On behalf of the Defendant
     BASF Catalysts LLC:
14
         Eugene F. Assaf, Esq.
15         Elizabeth Dalmut, Esq.
           Kirkland & Ellis LLP
16         655 Fifteenth Street, Northwest, Suite 1200
           Washington, D.C.  20005
17         (202) 879-5000
           Eugene.assaf@kirkland.com
18         Elizabeth.dalmut@kirkland.com
19
20   On behalf of the Defendants
     Cahill Gordon & Reindel LLP,
21     Howard G. (Peter) Sloane,
     Ira J. Dembrow:
22
         Kyle A. Dolinsky, Esq. (Via phone)
23         Pepper Hamilton, LLP
           3000 Two Logan Square
24         Eighteenth and Arch Streets
           Philadelphia, Pennsylvania  19103
25         (215) 981-4000
           Dolinskyk@pepperlaw.com
```

Page 3

```
 1   APPEARANCES CONTINUED:
 2
 3   On behalf of the Defendant
     Thomas D. Halket:
 4     Eric Tunis, Esq. (Via phone)
       Herold Law, PA
 5     25 Independence Boulevard
       Warren, New Jersey  07059
 6     (908) 647-1022
       Etunis@heroldlaw.com
 7
 8     On behalf of the Defendant
     Arthur Dornbusch:
 9
10     John D. Tortorella, Esq. (Via phone)
       John A. Boyle, Esq. (Via phone)
11     Marino, Tortorella & Boyle PC
       437 Southern Boulevard
12     Chatham Township, New Jersey  07928
       (973) 824-9300
13     Jtortorella@khmarino.com
       Jboyle@khmarino.com
14
15     On behalf of the Deponent,
16     Thomas W. Bevan, Esq.:
17       Kevin McDermott, Esq.
         Anthony Gallucci, Esq.
18       McDermott & Hickey, LLC
         20525 Center Ridge Road, Suite 200
19       Rocky River, Ohio  44116
         (216) 712-7452
20       Kevin@mcdermotthickeylaw.com
         Ag@mcdermotthickeylaw.com
21
22
23   ALSO PRESENT:
24     Alex Cook, Videographer
25
```

Page 4

```
 1          W I T N E S S   I N D E X
 2                              PAGE
 3   EXAMINATION
     THOMAS W. BEVAN, ESQ.
 4     BY MR. ASSAF......................    6
     EXAMINATION
 5     BY MR. ROTH......................  387
     REEXAMINATION
 6     BY MR. ASSAF.....................  419
     REEXAMINATION
 7     BY MR. ROTH......................  423
     FURTHER EXAMINATION
 8     BY MR. ASSAF.....................  425
 9
10
11          E X H I B I T   I N D E X
12
     EXHIBIT                    PAGE
13
     Defendants' Exhibit 288.............  263
14   Defendants' Exhibit 289.............  264
15   Defendants' Exhibit 290.............  267
16   Defendants' Exhibit 291.............   17
17   Defendants' Exhibit 291A...........   70
18   Defendants' Exhibit 292.............  281
19   Plaintiffs' Exhibit 1...............  411
20   Plaintiffs' Exhibit 2...............  414
21
22
23
24
25
```

Page 5

```
 1          THE VIDEOGRAPHER: We're on the
 2   record. Today's date is May 15, 2018. The
 3   time is 9:03 a.m.
 4          We're here in the case Kimberlee
 5   Williams, et al., versus BASF Catalysts LLC, et
 6   al., Case Number 11-CV-01754.
 7          The video operator is Alex Cook. The
 8   deposition is taking place at the law offices
 9   of Thompson Hine in Cleveland, Ohio.
10          Counsel, could you please identify
11   yourselves and state whom you represent.
12          MR. McDERMOTT:  For Tom Bevan,
13   Kevin McDermott.
14          MR. GALLUCCI:   Anthony
15   Gallucci on behalf of Kevin -- or on behalf of
16   Tom Bevan.
17          MR. ROTH:      I'm Harry Roth
18   on behalf of the class plaintiffs.
19          MR. PLACITELLA:  Jared
20   Placitella for the plaintiffs.
21          MR. ASSAF:      Gene Assaf for
22   BASF.
23          MS. DALMUT:     Elizabeth
24   Dalmut for BASF.
25          MR. TORTORELLA:  On the phone is
```

THOMAS W. BEVAN, ESQ. - 05/15/2018       Pages 6..9

Page 6

1   John Tortorella for Arthur Dornbusch.
2        MR. TUNIS:     On the phone,
3   Eric Tunis on behalf of Tom Halket.
4        MR. DOLINSKY:     On the phone,
5   Kyle Dolinsky on behalf of Cahill Gordon &
6   Reindel.
7        THOMAS W. BEVAN, ESQ.
8   of lawful age, called by the Defendants for
9   examination pursuant to the Federal Rules of Civil
10  Procedure, having been first duly sworn, as
11  hereinafter certified, was examined and testified
12  as follows:
13       EXAMINATION OF THOMAS W. BEVAN, ESQ.
14  BY MR. ASSAF:
15  Q   Good morning, Mr. Bevan.
16  A   Good morning.
17  Q   Could you identify for me all of the times
18      you've testified under oath?
19  A   Twice in this case in the last few months; in a
20      lawsuit against the Bureau of Workers'
21      Compensation, I think that was last year; and I
22      believe in a lawsuit against a former attorney
23      in my firm probably 12, 13 years ago.  I think
24      that's all that I recall.
25  Q   Okay.  Any in court testimony?

Page 7

1   A   In a hearing in the case against the former
2       attorney in our office, there was in court
3       testimony.
4   Q   What --
5   A   It was not a trial.  It was a hearing.
6   Q   Was there a deposition as well?
7   A   Yes.
8   Q   And then where was that -- what was the name of
9       that case?
10  A   I believe it was titled Bevan versus -- or
11      Bevan & Associates versus Powell.
12  Q   And you've never had any criminal charges filed
13      against you?
14  A   No.
15  Q   What's your reputation for honesty within the
16      community?
17  A   You would have to ask people in the community.
18  Q   What do you think your reputation for
19      truthfulness is within the --
20  A   I would think it would be good.
21  Q   Have you ever been accused of a crime?
22  A   I guess a traffic ticket.
23  Q   Other than that, nothing?
24  A   Other than that, no.
25  Q   Have you ever had your pro hac vice denied?

Page 8

1   A   No.
2   Q   Have you ever had your pro hac vice withdrawn?
3   A   No.
4   Q   Have you ever been censured by any bar
5       association?
6   A   No.
7   Q   Have you ever been sanctioned by any court?
8   A   Sanctioned by a court?
9   Q   Yeah.
10  A   We had a case probably 15 years ago, it was a
11      Workers' Compensation appeal case in -- I
12      believe it was in Butler County, and I believe
13      there was a sanction order in that case.
14  Q   Was it against your firm, or were you
15      personally involved?
16  A   I wasn't personally involved in the case.  I
17      don't handle the Workers' Comp cases typically.
18      So I don't recall how the order read.
19  Q   Did you have involvement, though, in the --
20      were you sanctioned by the court, Tom Bevan?
21  A   I don't -- it was a sanction order for attorney
22      fees, and I don't recall how the order read.
23  Q   And you didn't have any involvement in the
24      underlying offense?
25  A   I was involved in my name would have been on

Page 9

1   the pleadings, but I wasn't handling it at all.
2   Q   Okay.  You had no involvement in the pleadings
3       or the actions that led up to the sanction, it
4       just happened to be your firm?
5   A   It was my firm and my name was on the
6       pleadings, yes.
7   Q   Other than that, any other sanctions?
8   A   Not that I can recall.
9   Q   What was the -- what was the cause of the
10      sanctions by the Butler Court?
11  A   The -- it was a Workers' Compensation death
12      claim that had been pending for some time is my
13      recollection.  Our client's husband had died
14      from an asbestos-related cancer.  We had filed
15      the case administratively.
16          During the time it's pending, the widow
17      had died, and so we filed the appeal on behalf
18      of the widow's estate for the accrued Workers'
19      Compensation death benefits, something we've
20      done successfully in numerous other
21      jurisdictions, and the court in Butler County
22      said we weren't allowed to do it and sanctioned
23      us for it.
24          It surprised us because we had won that
25      exact issue many times before in other

THOMAS W. BEVAN, ESQ. - 05/15/2018      Pages 10..13

Page 10

1    jurisdictions. We were sanctioned and we
2    appealed it and lost on appeal as well.
3    Q  Was the reason an issue of law, or was it any
4      attorney -- allegation of attorney misconduct?
5    A  It was an issue of law, at least in my view, as
6      to whether or not the widow's estate was able
7      to pursue the Workers' Compensation death
8      claim, the accrued benefits. And I think there
9      was an issue as to whether or not the widow's
10     estate had been opened or not. It had to do
11     with those issues, the best I can recall.
12   Q  Was there an issue regarding whether your
13     client had actually signed and dated the
14     pleadings that you were submitting to the
15     court?
16   A  I don't -- my recollection was that the client
17     had signed the Compensation claim form and then
18     died subsequently. Something along those
19     lines. I don't recall.
20   Q  Was there a -- was it a Rule 11 sanction
21     against you for submitting a claim upon
22     documents that were not signed by your client?
23     Does that sound familiar?
24   A  I don't recall.
25   Q  You don't recall?

Page 11

1    A  No.
2    Q  We'll refresh your recollection a little later
3      on that.
4    A  Sure.
5    Q  Regarding the National Tire Workers lit --
6      withdrawn.
7        Back to the sanction issue. And did you
8      end up paying the sanction?
9    A  I think. There may have been a settlement, but
10     I don't recall. I assume, but I don't know for
11     sure.
12   Q  You appealed to the appellate court and the
13     appellate court affirmed the sanction?
14   A  Yes.
15   Q  And then you sought certiorari from the Supreme
16     Court and the Supreme Court denied cert?
17   A  I don't recall if we did that, took it to that
18     level or not.
19   Q  And so in terms of you mentioned before that it
20     was an issue of law and that you had done it
21     many times, that argument would be in your
22     brief to the appellate court, correct, I mean
23     if that were the basis of your defense to the
24     sanction?
25   A  I don't know. I recall attaching at some stage

Page 12

1    orders where we had won that issue in the past.
2    Q  Okay. Maybe we'll look at the brief later and
3      see if we can refresh your recollection on
4      that.
5        Have you ever been a defendant in a
6      lawsuit? Other than the ones that you
7      mentioned with your former attorney.
8    A  There was -- we had a -- twice we've had a
9      malpractice claim filed against the firm.
10   Q  Okay. And in the litigation with your former
11     attorney, were you a defendant, were you the
12     plaintiff?
13   A  We were the plaintiff.
14   Q  Okay. So other than the two malpractice cases,
15     you have never been a defendant in a lawsuit?
16   A  I don't recall at this time any other ones.
17       MR. McDERMOTT:  Can we have a
18     clarification? Do you mean Mr. Bevan or the
19     firm, the Bevan Firm?
20       MR. ASSAF:   Let me try it
21     both ways.
22       MR. McDERMOTT:  All right.
23     Just wanted to clarify that.
24   Q  What did you understand my question -- how were
25     you answering my question, Mr. Bevan?

Page 13

1    A  I'll answer it both ways, which I don't recall
2      any others other than those two.
3    Q  Okay.
4    A  That's all I can recall at this time.
5    Q  Were you involved in a lawsuit -- withdrawn.
6        Bevan and Economus?
7    A  Economus.
8    Q  Economus.
9        Is that your former firm?
10   A  Bevan & Economus was an office sharing
11     arrangement that involved my father and Dale
12     Economus. For my first several years of
13     practicing, I was an independent attorney that
14     practiced within that office sharing agreement.
15     I would not say that was a predecessor of Bevan
16     & Associates. Bevan & Associates was formed in
17     I believe 1995, I think.
18   Q  And Bevan & Economus was the firm, though, that
19     you were working with when, for example, you
20     started representing Kimberlee Williams --
21   A  Yes.
22   Q  -- in the talc cases?
23   A  Yes.
24   Q  Okay. So what was your arrangement at that
25     point, when you started on the talc cases?

THOMAS W. BEVAN, ESQ. - 05/15/2018    Pages 14..17

Page 14

1  A  My arrangement was that I was self-employed and
2     I worked on asbestos cases with Dale Economus.
3     And initially I received a weekly draw, I
4     believe it was $400 a week.  And then not long
5     after that, I received a percentage of the fees
6     that were generated on those asbestos cases.  I
7     believe it started out at 5 percent and worked
8     its way up.
9  Q  When you started off representing plaintiffs in
10    the talc cases with Bevan & Economus, you
11    signed pleadings on behalf of –
12       MR. McDERMOTT:  Excuse me.
13    Economus.
14 Q  Economus.  Sorry.  Withdrawn.
15       When you started off representing talc
16    plaintiffs when working with Bevan & Economus,
17    you signed pleadings on behalf of Bevan &
18    Economus, correct?
19 A  I don't recall it.  I'm sure I signed
20    pleadings.  How it read, I'm not sure.  It
21    probably said "Bevan & Economus" on there, I
22    imagine, in the signature section.
23 Q  Well, you didn't have your own law office that
24    you were signing pleadings on behalf of for the
25    talc plaintiffs, did you?

Page 15

1        MR. ROTH:  Objection to
2     form.
3  A  I'm not sure what that means, but I was a
4     self-employed attorney.  I didn't have a law
5     firm.
6  Q  You didn't have a law firm when you started
7     representing talc plaintiffs?
8        MR. McDERMOTT:  Objection.
9     Asked and answered.
10 A  I was a self-employed attorney.
11 Q  And were you a self-employed attorney with
12    Bevan & Economus?
13 A  I practiced within the office sharing of
14    Bevan –
15       MR. McDERMOTT:  Objection.
16    Asked and answered.
17 Q  With respect to the Ohio Bar and the Ohio Bar
18    records from 1994, would you be listed as
19    associated with Bevan & Economus?  Withdrawn.
20       Would you expect the Ohio Bar records to
21    be true and accurate regarding your association
22    with law firms?
23 A  I don't know.
24 Q  Okay.  In 1994, what law firm, in any, were you
25    associated with?

Page 16

1  A  I would have been associated with Bevan &
2     Economus.  It was an office sharing
3     arrangement.
4  Q  So you understand that Bevan & Economus was
5     also a defendant in some litigation, don't you,
6     when you were there?
7        MR. ROTH:  Objection to
8     form.
9  A  I'm not sure.  Maybe you could enlighten me and
10    give me – refresh my recollection.
11 Q  Have you heard of the National Tire Workers
12    Litigation Project?
13 A  Yes.
14 Q  In your last deposition, you seemed unclear of
15    that term.
16 A  I was not –
17       MR. ROTH:  Objection to –
18 A  I was not unclear –
19       MR. ROTH:  – form and
20    foundation.
21 A  – in the last deposition.  If you want to show
22    me a point where I said I was unclear –
23 Q  Sure.
24 A  – please do so.
25       -----

Page 17

1     (Defendants' Exhibit 291 was marked.)
2       -----
3  Q  Will you look at page 119 of day two of the
4     custodian deposition and read it to yourself?
5        MR. McDERMOTT:  Hang on one
6     second, Mr. Assaf.
7        Let me just take a look at that, Tom,
8     please, before you do.
9        MR. ASSAF:  Sure.
10       MR. McDERMOTT:  Thanks,
11    Mr. Assaf.
12       There you go, Tom.
13       And what page, I'm sorry?
14       MR. ASSAF:  You can start
15    at 119.
16 A  I've read page 119.
17 Q  Okay.  Does that refresh your recollection as
18    to whether you had any recollection our last
19    time regarding the National Tire Workers
20    Litigation Project?
21 A  I believe I said I knew what it was.
22 Q  Okay.
23 A  Yes.
24 Q  Did you work with the National Tire Workers
25    Litigation Project in any way?

THOMAS W. BEVAN, ESQ. - 05/15/2018     Pages 18..21

Page 18

1  A  I believe -- at the bottom of that page, I
2     called the Stemple law firm one time when I was
3     a law clerk, probably in 1989, realized that
4     they had no idea what was going on and no
5     involvement.  And that was the only involvement
6     I had starting in May of 1989 with the Stemple
7     firm.
8  Q  And in 1989, Bevan & Economus was also a
9     defendant with the Stemple law firm, correct?
10        MR. McDERMOTT:  Objection.  No
11     foundation.
12  A  I don't -- I don't know.  I started in May of
13     1989.  I have heard that there was a lawsuit
14     that was filed, I believe by Raymark.  And that
15     was certainly -- I don't know the details of
16     it, other than I'm sure Bevan & Economus and/or
17     Dale Economus or Keith Bevan were dismissed
18     from that lawsuit, because by May of 1989, that
19     wasn't going on.
20        So you said 1989.  I don't know when that
21     involvement --
22  Q  Okay.  So when --
23        MR. McDERMOTT:  Move to strike.
24  Q  When you start --
25        MR. ASSAF:     Move to strike

Page 19

1     your answer?
2        MR. McDERMOTT:  Both.  Question
3     and answer.
4        MR. ASSAF:     Basis?
5        MR. McDERMOTT:  Foundation.
6     You're asking hypotheticals, Counselor.  Get to
7     the facts.
8  Q  Was the Raymark versus Stemple a hypothetical
9     case, in your mind?
10  A  I don't really know anything about it.
11     Certainly I've heard about it, but as of May of
12     1989, that case did not exist, as far as I
13     know.
14  Q  Did you ever have any discussions with lawyers
15     for Bevan & Economus regarding the Stemple, the
16     Raymark versus Stemple litigation?
17  A  I recall either Dale Economus or my father,
18     Keith, or both of them telling me that Raymark
19     had filed a suit, they were very unhappy that
20     they got named in a suit, but that they were
21     dismissed from the suit.
22  Q  And when your father or Mr. Economus told you
23     that, did they tell you that they had been sued
24     for fraud?
25  A  I don't recall what the lawsuit was about.

Page 20

1  Q  Have you ever reviewed it?
2  A  No.
3  Q  Did you ever review any of the allegations in
4     the lawsuit with anyone?
5  A  No.
6  Q  Did you have any understanding of whether any
7     doctors were sued?
8  A  I don't know that.
9  Q  Do you know whether you had any relationship
10     with any of the doctors in the Raymark versus
11     Stemple lawsuit?
12        MR. McDERMOTT:  Objection.
13        MR. ROTH:      Objection.
14  A  I don't know anything about the doctors in the
15     lawsuit.  So I don't know.
16  Q  Have you ever worked with Dr. Gelbard?
17  A  I've seen Dr. Gelbard's reports.  I've never
18     spoken with her or done anything with her other
19     than review some of her reports.
20  Q  With respect to talc plaintiffs, have you used
21     Dr. Gelbard's reports?
22  A  No.
23  Q  Have you used any reports for Dr. Rao?
24  A  If you're talking -- which Dr. Rao?
25  Q  Let's find out.  Dr. Rao.

Page 21

1        Are there multiple Dr. Raos?
2  A  I know of two.
3  Q  Okay.  Which two?
4  A  There was B. Rama Rao, who was associated with
5     Stemple, because I've seen his reports, and
6     there's a L.C. Rao, who's a pulmonologist and B
7     reader in the Cleveland area.
8  Q  With regard to B. Rama Rao, have you used those
9     reports with respect to any talc litigation
10     plaintiffs?
11  A  No.
12  Q  And what about Dr. Krishan Bharadwaja?
13  A  I believe that name was on the same reports as
14     B. Rama Rao and -- yes.  So I've heard that
15     name before.
16  Q  And have you used that doctor with respect to
17     any talc plaintiff?
18  A  No.
19  Q  Have you ever heard the name Dr. Ray Harron?
20  A  Yes.
21  Q  Have you used that doctor with respect to any
22     talc plaintiffs?
23  A  I've used him as a B reader, yes.
24  Q  Do you have any understanding of whether
25     Dr. Harron was ever sanctioned or censured by

THOMAS W. BEVAN, ESQ. - 05/15/2018      Pages 22..25

Page 22

1   any court?
2   A  I believe sometime in approximately 2004. I
3       don't know if he was sanctioned, but he
4       withdrew from the litigation and we didn't use
5       him again after that.
6   Q  Do you have any understanding of why he
7       withdrew from litigation?
8   A  I don't know all the details.
9   Q  Do you know any details?
10  A  My recollection is it had to do with silicosis
11      cases in Texas and x-rays that he had reviewed
12      and came to different conclusions on either the
13      same person or same x-ray. That was my
14      recollection of it.
15  Q  Did you have any role in trying to help
16      Dr. Harron in any of his legal troubles?
17  A  No.
18  Q  Do you think that Dr. Harron's legal issues had
19      anything to do with legislation that was later
20      passed in Ohio?
21      MR. McDERMOTT:  Objection.
22      Vague.
23  A  I don't recall that name coming up during the
24      legislative process.
25      MR. McDERMOTT:  Move to strike.

Page 23

1   Q  Were you involved at all in House Bill 292?
2   A  Yes.
3   Q  Did you oppose House Bill 292?
4   A  Yes.
5   Q  Did you attend any hearings regarding House
6       Bill 292?
7   A  Yes.
8   Q  Did any of the hearings that you attended
9       include a discussion of Dr. Ray Harron and the
10      diagnosis that he gave?
11  A  I do not recall that being discussed at the
12      time.
13  Q  Do you agree that it's important for attorneys
14      when signing pleadings to be truthful and
15      accurate with the Court?
16  A  Yes.
17  Q  And do you believe that it's important not to
18      mislead litigants or judges when attorneys are
19      signing pleadings?
20  A  Yes.
21  Q  When an attorney's submitting an affidavit, do
22      you believe that it's important to be accurate
23      with the Court?
24  A  Yes.
25  Q  Did you submit an affidavit in this case?

Page 24

1   A  I believe so.
2   Q  Was it accurate?
3       MR. McDERMOTT:  Objection.
4       What affidavit are you talking about,
5       Counselor?
6   Q  How many affidavits did you submit in this
7       case, Mr. Bevan?
8   A  I don't recall.
9   Q  Have you submitted more than one?
10  A  I don't recall.
11      MR. ROTH:  Objection.
12  A  I know -- I know you showed me one at the
13      last -- or other counsel showed me one at the
14      last deposition. I don't recall the --
15  Q  Well, let's start this way: In any affidavit
16      that you've submitted in this case, are you
17      aware of it being inaccurate?
18  A  Am I aware of being inaccurate?
19  Q  Correct.
20  A  No.
21  Q  Okay. No matter how many affidavits you
22      submitted, you believe that they are accurate?
23  A  I --
24      MR. ROTH:  Objection.
25  A  I believe they're accurate.

Page 25

1   Q  Let me show you an affidavit previously marked
2       as exhibit -- Defendants' Exhibit 145.
3       MR. McDERMOTT:  Tom, let me
4       just take a look at it and make sure we're not
5       having apples and oranges.
6       Okay. Thanks much, Mr. Assaf.
7   Q  Now, you understood -- have you had a moment to
8       review this, Mr. Bevan?
9   A  Sure.
10  Q  You understood that it was being submitted to a
11      federal court, correct?
12  A  Yes.
13  Q  And you understood that it was being submitted
14      in support of a motion for class certification,
15      correct?
16  A  I don't know what it was being submitted --
17      what the purpose of it was, but the affidavit
18      says what it says.
19  Q  Well, how did it come that you did an
20      affidavit?
21  A  I talked --
22      MR. ROTH:  Objection.
23  Q  You can answer.
24  A  I talked to people from, and I forget who it
25      was, from the Placitella firm, and they

THOMAS W. BEVAN, ESQ. - 05/15/2018      Pages 26..29

Page 26

1  prepared a draft, I made some changes to the
2  draft, and then I signed it.
3  Q  Did you keep the draft that you originally got
4  from the Placitella firm?
5  A  I don't know.
6  Q  Well, in our previous discussion, we asked you
7  about your email retention policies, right?
8  A  Yes.
9  Q  And I think -- well, let me ask you:  Since the
10  beginning of this case, have you deleted emails
11  regarding the Williams case?
12  A  I don't think so.
13  Q  Okay.  So since January of 2018, have you
14  deleted any emails that you received from the
15  Placitella firm?
16  A  I don't believe so.
17  Q  Okay.  So you would have it in your email, if
18  you received it by email?
19  A  I assume.
20  Q  Okay.  And did you mark up a draft physically,
21  or did you do it on your computer?
22      MR. ROTH:     Objection to
23  form.
24  A  I don't recall.  I don't know.
25  Q  Did you talk to anybody about your changes?

Page 27

1  A  I believe, but I don't -- whatever changes I
2  made, I think it just had to do with a number,
3  I think, that's down here.
4  Q  Okay.  I'll talk to you about that.  What
5  number?
6      MR. ROTH:     I'm going to
7  object to any questions about conversations
8  with -- between Mr. Bevan and lawyers from the
9  Cohen, Placitella & Roth firm.
10     MR. McDERMOTT:     I'll join that
11  objection.
12     MR. ROTH:     This is of
13  course -- in the order, those are privileged.
14  A  2,653.
15  Q  Okay.  Was that a number --
16     MR. ROTH:     Objection.  I
17  think I'm actually going to instruct you not to
18  answer.
19     THE WITNESS:     Okay.
20     MR. ROTH:     If I can.
21  Q  Did the plaintiffs provide you with that
22  number, or did you provide that number to them?
23  A  The number --
24     MR. ROTH:     Same objection.
25  Excuse me.

Page 28

1      Mr. Assaf, we will agree to a 502(d).
2      MR. ASSAF:     Sure.
3  Q  You can answer.
4      MR. McDERMOTT:     Continuing
5  objection to this line of questioning.
6  A  The number 2,653 was a number that was arrived
7  at by me and my partner, Pat, based on the
8  review of our client data and based on the
9  parameters of -- and I believe it's described
10  in here.  The parameters of what the class
11  certification, what it says here.
12  Q  Okay.  Did they have a different number in
13  there when you received it?
14     MR. ROTH:     Objection.
15  A  It may have been a blank number.  I'm not sure,
16  but I know we went through our data numerous
17  times and finally came up with that number,
18  2,653.
19     MR. McDERMOTT:     Continuing
20  objection to this line of questioning.
21  Q  Okay.  And when you said "based on the
22  parameters," the parameters are in paragraph 3,
23  correct?
24  A  I think so, yes.
25  Q  So paragraph 3, what did you understand the

Page 29

1  parameters to be for the number that you were
2  searching for to give to the Court in an
3  affidavit?
4  A  These were clients that we represented where we
5  filed a lawsuit against BASF's predecessors and
6  had either settled those suits or dismissed
7  them and they worked at sites where we believed
8  that they had exposure to Eastern Magnesia Talc
9  product.
10  Q  Really?  So could you turn to paragraph 3 and
11  tell me where it is in the parameters that you
12  understood that it would include people who
13  worked at sites who never filed lawsuits?
14     MR. ROTH:     It doesn't say
15  that.  Excuse me.  Objection.
16      Can I have the last answer read back,
17  please.
18      -----
19  (Requested portion of the record was read.)
20      -----
21     MR. ROTH:     Right.
22  Objection.  Move to strike the question.
23  Without foundation.
24     MR. McDERMOTT:     I join in that
25  objection.  No foundation, misleading.

THOMAS W. BEVAN, ESQ. - 05/15/2018          Pages 30..33

Page 30

1   Q  You can answer, Mr. Bevan.
2          MR. ROTH:      No, I'm
3   instructing you not to answer.
4   A  I'm not sure I understand what your question
5      is, so maybe --
6          MR. McDERMOTT:   Continuing
7      objection to this.
8   Q  The parameters that you -- the parameters that
9      you were looking at included people who had
10     voluntarily dismissed or terminated their
11     lawsuit, correct?  That's A.
12  A  I'm reading.  You read that correctly.
13  Q  Or B, had their lawsuit involuntarily
14     dismissed, correct?
15  A  Yes.
16  Q  Okay.  Does it have anything to do with sites
17     where people worked?
18  A  Well, it indicates in the proceeding prior to
19     A, "filed a lawsuit against BASF."  Of course I
20     assume that to include Eastern Magnesia Talc or
21     any of its other names.
22          And the way we filed our cases during
23     this relevant time frame was in bulk master
24     consolidated complaints.  So, for instance, we
25     would have -- for example, we would have U.S.

Page 31

1      Steel people mixed into the same complaint as
2      BFGoodrich people.
3          Now, we didn't intend to file or pursue a
4      case against BASF, against -- or its
5      predecessors, on the U.S. Steel cases.  We were
6      intending to do on the Goodrich cases.  So
7      that's how I interpreted that and came up with
8      that number of 2,653 cases.
9   Q  Where is there in the definition a reference to
10     people who worked at locations?
11  A  It's not defined one way or the other, but we
12     weren't pursing an Eastern Magnesia Talc case
13     for a site where our client would not have had
14     any exposure to Eastern Magnesia Talc.
15  Q  How would a Court know that you were including
16     in the definition people who worked at a
17     facility?
18  A  Because it says it's a lawsuit against BASF.
19  Q  And where -- did you include in your 2,653
20     number those clients who could have filed but
21     didn't file?
22  A  No.
23  Q  You didn't?
24  A  No.
25  Q  Okay.  Could you pull open your deposition from

Page 32

1      the last -- turn your attention to page 115.
2          MR. McDERMOTT:  Mr. Assaf, in
3      the future, before you hand the witness a
4      document, I'd like to look at it, please.
5          MR. ASSAF:     Well, I think
6      you have a copy.
7          MR. McDERMOTT:  I don't have a
8      copy.
9          MR. ASSAF:     You do.  It's
10     sitting right in front of you.
11         MR. McDERMOTT:  I want to make
12     sure that my copy is accurate because two times
13     it hasn't been accurate, all right?
14         MR. ASSAF:     The
15     deposition's not accurate?
16         MR. McDERMOTT:  No, the copy
17     that has been furnished to me.  So show it to
18     me first before you show it to the witness.
19     That's how you do things up in Ohio.
20         There you go, Tom.
21  Q  Let's try it this way, Mr. Bevan.  I'm going to
22     give you what's been previously marked as
23     exhibit -- or what's been premarked as
24     Defendants' Exhibit 244, and I'll give it to
25     counsel too, because I think I'm going to be

Page 33

1      using this today.  Okay.
2          MR. ASSAF:     So this is
3      Defendants' Exhibit 244, Counsel.  Take a
4      moment to recognize it and see if you have any
5      objections to it in terms of authenticity.
6          MR. McDERMOTT:  Let's go off
7      the record, please.
8          THE VIDEOGRAPHER: Off the record.
9      The time is 9:36.
10         -----
11     (Discussion held off the record.)
12         -----
13         THE VIDEOGRAPHER: We're back on
14     the record.  The time is 9:37.
15         MR. McDERMOTT:  Excuse me.  I'm
16     just going to interpose an objection to
17     document Exhibit 244.  Is that correct?
18         MR. ASSAF:     That's correct.
19         MR. McDERMOTT:  This is the
20     deposition of Thomas Bevan given on April 5,
21     2018 in the Kimberlee Williams versus BASF
22     Catalysts case, is that correct, and I'm
23     looking at -- I've been given pages 63
24     through --
25         MR. ASSAF:     No, you've been

THOMAS W. BEVAN, ESQ. - 05/15/2018      Pages 34..37

Page 34

1    given the entire --
2        MR. McDERMOTT:   No, I have not
3    been given the entire deposition, I've been
4    given pages 63 through 131. Don't tell me what
5    I've been given. There is no errata sheet in
6    this exhibit.
7        MR. ASSAF:      Okay. No.
8    You've been given day two, the entirety of day
9    two of the deposition.
10       MR. McDERMOTT:   I'm
11   identifying --
12       MR. ASSAF:      You've been
13   given --
14       MR. McDERMOTT:   -- the pages of
15   what --
16       MR. ASSAF:      You have been
17   given --
18       MR. McDERMOTT:   -- I have been
19   given.
20       MR. ASSAF:      -- day two of
21   the deposition.
22       MR. McDERMOTT:   Don't raise
23   your voice. I've been given the pages I just
24   outlined.
25       MR. ASSAF:      Correct.

Page 35

1        MR. McDERMOTT:   All right. And
2    there is no errata sheet on this. It is
3    incomplete.
4        MR. ASSAF:      Do you have an
5    errata sheet?
6        MR. McDERMOTT:   I do not.
7        MR. ASSAF:      Okay.
8    BY MR. ASSAF:
9    Q  Well, let's --
10       MR. McDERMOTT:   Apparently you
11   don't either.
12   Q  Okay. Mr. Bevan, could you turn to page 114?
13   A  Yes.
14   Q  It says, Question, "Further down in paragraph
15       6, this is at the very bottom, you see the
16       reference to 2,653 Bevan Law Firm clients who
17       would meet the proposed class definition?"
18       Answer, "Yes."
19       "What documents or data were used to
20       arrive at the figure of 2,653 Bevan Law Firm
21       clients?"
22       Answer, "I believe they were clients that
23       had filed suit against Eastern Magnesia Talc
24       and/or could have filed suit against Eastern
25       Magnesia Talc and either settled their claims

Page 36

1    with Eastern Magnesia Talc or had their claims
2    dismissed against Eastern Magnesia Talc. And
3    they were at sites where there was a high
4    likelihood of Eastern Magnesia Talc exposure.
5    I believe those were the criteria that we were
6    looking at."
7        Question, "So the figure 2,653 includes
8    clients who did file and clients who could have
9    filed?"
10       "Objection. Form and foundation."
11       Answer, "I believe so, yes."
12       Do you see that?
13   A  Yes.
14   Q  Is that testimony an error?
15   A  To the extent that it says "and/or could have
16       filed suit against Eastern Magnesia Talc," I
17       went back and checked and I do not believe that
18       number of 2,653 includes people who could have
19       filed suit against Eastern Magnesia Talc, it
20       only included those that had in fact filed suit
21       against Eastern Magnesia, and I believe that's
22       what I indicated on the errata sheet.
23   Q  When did you go back and check that?
24   A  When I reviewed -- at the time when I reviewed
25       the deposition transcript.

Page 37

1    Q  Prior to reviewing the deposition transcript,
2        did anybody raise that issue with you?
3        MR. McDERMOTT:   Objection.
4    A  I don't --
5        MR. McDERMOTT:   Don't answer
6        that.
7    Q  Definitely answer that question.
8        MR. McDERMOTT:   That's
9        attorney-client privilege. Don't answer that
10       question.
11       MR. ASSAF:      Any basis for
12   changing sworn testimony is not attorney-client
13   privilege, my friend.
14       MR. McDERMOTT:   Listen, I'm
15   not your friend, number one. Number two, the
16   objection stands.
17       MR. ASSAF:      Let's get the
18   judge on the phone.
19       Go off the record.
20       THE VIDEOGRAPHER:  Off the
21   record. The time is 9:40.
22       -----
23       (Off the record.)
24       -----
25       (Telephone call.)

THOMAS W. BEVAN, ESQ. - 05/15/2018      Pages 38..41

Page 38

1      -----
2      JUDGE RIVERA-SOTO: Good morning.
3 Roberto Rivera-Soto speaking.
4      MR. ASSAF:      Good morning,
5 your Honor. This is Gene Assaf and I'm here
6 with a number of lawyers at the Attorney Bevan
7 deposition.
8      JUDGE RIVERA-SOTO: Ah. Mazel
9 Tov, as we say in Puerto Rico.
10      MR. ASSAF:      Well, thank
11 you, your Honor.
12      JUDGE RIVERA-SOTO: How is
13 everyone this morning?
14      MR. ASSAF:      I think
15 everybody is very well. We just started.
16      JUDGE RIVERA-SOTO: Okay.
17      MR. ASSAF:      I think we
18 need a little guidance.
19      JUDGE RIVERA-SOTO: Okay.
20      MR. ASSAF:      There's a --
21 as you know, Mr. Bevan previously sat as a
22 document custodian and in a prior deposition
23 regarding an affidavit that he had submitted to
24 the Court for class certification.
25      He was -- he said in the affidavit to the

Page 39

1 Court that there were 2,653 people who met the
2 class definition.
3      In his deposition as a document
4 custodian, he said that that 2,653 included
5 clients who filed and clients who could have
6 filed. He then after that deposition did an
7 errata sheet that clarifies that it doesn't
8 include the could have filed.
9      I think I'm entitled to ask him why he
10 did the errata sheet, what caused him, whether
11 there were any conversations regarding that,
12 and there's an instruction for privilege. But
13 my understanding is that when a witness does an
14 errata sheet and has changes to sworn
15 testimony, that one can inquire as to the basis
16 for those changes and what conversations caused
17 them, because it's just like a witness being on
18 the stand.
19      MR. McDERMOTT: Are you done,
20 Mr. Assaf?
21      MR. ASSAF:      Yes.
22      MR. McDERMOTT: Judge, this is
23 Attorney Kevin McDermott. You don't know me,
24 I'm just a small --
25      JUDGE RIVERA-SOTO: Is that a good

Page 40

1 thing or a bad thing?
2      MR. McDERMOTT: I was going to
3 say I think it's a good thing for most people.
4      JUDGE RIVERA-SOTO: Okay.
5      MR. McDERMOTT: My wife would
6 say so. And I want to thank you for taking our
7 phone call.
8      JUDGE RIVERA-SOTO: I'm happy to
9 do it.
10      MR. McDERMOTT: Mr. Assaf is
11 incorrect in a couple of ways. First of all,
12 he's handed Mr. Bevan, my client, a deposition
13 that doesn't contain the errata sheet, and so
14 the document is incomplete. Okay. And so the
15 questions, which have kind of -- a little bit
16 I've objected to on those grounds for lack of
17 foundation and accuracy.
18      Also, two, he's begun to ask questions
19 about what I believe could have been
20 attorney-client privilege. I really don't
21 understand the ambit of the questions.
22      If he would produce the errata sheet and
23 we would have a complete document, I think that
24 he could then question Mr. Bevan accurately and
25 fairly. That's all I'm asking.

Page 41

1      JUDGE RIVERA-SOTO: Well, and let
2 me just stop you there for a moment.
3      MR. McDERMOTT: Sure.
4      JUDGE RIVERA-SOTO: Mr. Assaf.
5      MR. ASSAF:      Yes.
6      JUDGE RIVERA-SOTO: Do you have
7 the errata sheet handy?
8      MR. ASSAF:      Not only do I
9 not have it, your Honor, but I'm seeing emails
10 and texts where nobody at Kirkland has it.
11 Now, maybe --
12      JUDGE RIVERA-SOTO: Okay.
13      MR. ASSAF:      Maybe we're
14 missing it.
15      JUDGE RIVERA-SOTO: Where is this
16 deposition being taken?
17      MR. ASSAF:      In Cleveland.
18      MR. McDERMOTT: In Cleveland,
19 Ohio, your Honor.
20      JUDGE RIVERA-SOTO: And is it
21 Mr. Bevan's office or somewhere else?
22      MR. McDERMOTT: No, it's not.
23 It's in the defendant's co-counsel's office,
24 Judge.
25      JUDGE RIVERA-SOTO: Who's that?

THOMAS W. BEVAN, ESQ. - 05/15/2018      Pages 42..45

Page 42

1    MR. McDERMOTT:   Thompson Hine
2  & Flory.
3       JUDGE RIVERA-SOTO: Okay.  Well, I
4  would assume, unless I'm totally, totally
5  crazed, which I try not to be, in fact, the
6  errata sheet should be readily available from
7  Mr. Bevan.  He can either have someone email it
8  to where you guys are located or hand deliver
9  it or, you know, Pony Express it there, but
10  somehow get it there so that this sideshow can
11  be put to rest.
12       MR. McDERMOTT:   That would be
13  great, your Honor.
14       MR. ASSAF:     That would be
15  great, yeah.
16       MR. McDERMOTT:   Thank you so
17  much.
18       MR. ASSAF:     Because none
19  of the attorneys in the --
20       JUDGE RIVERA-SOTO: Mr. Bevan --
21  I'm sorry.  Mr. Bevan, are you there?
22       THE WITNESS:    I am, your
23  Honor.
24       JUDGE RIVERA-SOTO: Mr. Bevan, can
25  you do that for us, please?

Page 43

1       THE WITNESS:    I will try my
2  hardest.  I'm going to send a text right now to
3  my paralegal.  And I assume she still has it.
4  She mailed and emailed it, whatever you do,
5  with the court reporter.  I know I completed it
6  and signed it and gave it to her to handle.
7  So ...
8       JUDGE RIVERA-SOTO: Well, if she
9  doesn't have it, please have her retrieve it
10  from the court reporter.
11       THE WITNESS:    Yes.
12       JUDGE RIVERA-SOTO: It's got to be
13  some place.
14       THE WITNESS:    Yes.
15       JUDGE RIVERA-SOTO: And it's got
16  to be some place that can readily retrievable
17  so it can be used at the deposition.
18       To answer the second question -- is it
19  Mr. McDermott?  Did I get that correct?
20       MR. McDERMOTT:   Yes, Judge.
21       JUDGE RIVERA-SOTO: I'm sorry, I
22  didn't want to call you by a different names.
23       MR. McDERMOTT:   That's okay.
24  I'll answer to anything, your Honor.
25       JUDGE RIVERA-SOTO: Well, as long

Page 44

1  as you're not called later for dinner, I'm sure.
2       But, Mr. McDermott, you had a second
3  question about whether the attorney-client
4  privilege applies.
5       Just so that you know, the presiding
6  district court judge is Chief Judge Linares
7  here in the District of New Jersey, has ruled
8  that those privileges have been waived because
9  they've put the issue -- the matter into issue.
10       So I would hope that someone has given
11  you the benefit of those earlier rulings, I'm
12  thinking in particular of an August 3, 2017
13  opinion that judge -- Chief Judge Linares
14  issued in this case that sort of provides the
15  blueprint of the deposition that Mr. Assaf is
16  trying to take of Mr. Bevan.
17       So I would suggest to you that if you
18  haven't had a chance to look at that, that you
19  find some time before you make an
20  attorney-client privilege objection, because it
21  seems to me that it likely would not be
22  well-founded and it also seems to me that
23  interposing that objection at this stage might
24  result in the imposition of sanctions in this
25  case, because the issue, that's been litigated,

Page 45

1  frankly, fairly well, and it doesn't need to be
2  revisited again is my view.  So ...
3       MR. ROTH:       Your Honor,
4  it's Harry Roth.
5       JUDGE RIVERA-SOTO: Good morning,
6  Mr. Roth.  How are you?
7       MR. ROTH:       I'm doing
8  great.  How are you?
9       JUDGE RIVERA-SOTO: I'm not in
10  Cleveland, so I'm okay.
11       MR. ROTH:       Okay.  But the
12  number of times I find myself saying yeah, but
13  we won a Super Bowl, so it doesn't matter.
14       JUDGE RIVERA-SOTO: That's the
15  only --
16       MR. ROTH:       Right.
17       And I think the issue of Judge Linares'
18  ruling about the limited waiver of
19  attorney-client privilege has been gone over
20  extensively with counsel.
21       The objection being raised now is one
22  that would affect Mr. McDermott's communication
23  with Mr. Bevan, which is a separate issue and
24  well beyond the scope, in my view, of what
25  Chief Judge Linares ruled with respect to

THOMAS W. BEVAN, ESQ. - 05/15/2018    Pages 46..49

Page 46

1  privilege between Mr. Bevan and his clients in
2  the underlying cases or in facts, in discussion
3  of facts, as it may arise in the Williams case.
4      And I would also add --
5      JUDGE RIVERA-SOTO: But work with
6  me here, Mr. Roth.
7      MR. ROTH:    Yes.
8      JUDGE RIVERA-SOTO: Because if the
9  discussions that Mr. Bevan is having with
10 Mr. McDermott are really about the subject
11 matter that Chief Judge Linares has already
12 determined is waived, you don't get to then
13 repackage it under a privilege because you're
14 talking to a different lawyer in respect to it.
15     MR. ROTH:    I don't
16 disagree with that, your Honor.  The square --
17     JUDGE RIVERA-SOTO: Okay.
18     MR. ROTH:    The square
19 question posed by Mr. Assaf was whether there
20 was any -- sorry, I shouldn't say "the square
21 question."
22     The paraphrasing of the question was
23 whether there was any discussion between
24 Mr. Bevan and anyone that led to his reviewing
25 the number of case files that satisfied the

Page 47

1  class definition.  So that --
2      JUDGE RIVERA-SOTO: I mean, that's
3  a yes or a no answer.  Whether there was any
4  discussion is a yes or no answer.  With whom.
5      MR. McDERMOTT:    Well, Judge --
6      JUDGE RIVERA-SOTO: Well, with my
7  lawyer.  Oh, okay.  Then the privilege gets
8  into the --
9      MR. ROTH:    Fair enough,
10 Judge.
11     JUDGE RIVERA-SOTO: -- mix, but
12 the question that was asked is did this happen?
13 Yes or no, it didn't.
14     MR. McDERMOTT:    Judge --
15 Judge, if I could just add to what Mr. Roth
16 said.  The question was much broader than that,
17 but it just -- to me, it was asking about any
18 and all matters that I may have had
19 conversations with my client regarding my job
20 here, which is just to defend this deposition,
21 again, nothing to do with the lawsuit in New
22 Jersey, Judge, and that's why I objected,
23 because privilege is privilege.  And I --
24     JUDGE RIVERA-SOTO: Well, I
25 understand that, Mr. McDermott, but the problem

Page 48

1  is that you're representing your client at a
2  deposition because he's been subpoenaed to
3  testify in a New Jersey District Court case.
4      In that New Jersey District Court case,
5  rulings in respect of privilege dealing with
6  the earlier cases and what was known and what
7  was not known and what lead the clients then to
8  either not bring a case, bring a case and then
9  dismiss it, or bring a case and then settle it
10 for a nominal value is at issue in this case
11 and, therefore, waived by the plaintiffs' own
12 actions.
13     So I understand what you're saying, but
14 in the end, it doesn't strike me as being all
15 that relevant.
16     MR. ASSAF:    So, your
17 Honor, I think -- yes, I think we're all --
18 we're now all level set here.
19     The specific question that caused this
20 is -- and it goes to your comment that, you
21 know, did he talk to somebody about changing
22 this.  But when a witness, whether on the stand
23 or after he gives sworn testimony, changes that
24 testimony, then a lawyer's entitled to inquire
25 into what was said to -- if anything, to cause

Page 49

1  him to change that testimony, because it's --
2  it's just like being on the stand.
3      If he went out into the hallway and then
4  came back and changed his testimony, a lawyer
5  would be entitled to find out what was
6  discussed regarding the reasons for the change.
7  And that's what I think I'm entitled to.
8      He had -- he had submitted an affidavit
9  to Chief Judge Linares that had a very specific
10 number in it.  He then testified where that
11 specific number came from and the basis for
12 that number.  Then in the errata sheet, which
13 nobody here has yet, he's changed that and
14 clarified it.  I think I'm entitled to now find
15 out why the affidavit and the testimony
16 regarding the affidavit has been clarified and
17 what caused him to clarify it.
18     MR. McDERMOTT:    Judge, I can
19 tell the Court I did not inform my client to
20 change any bit of his testimony.  I informed my
21 client to review his deposition and make
22 changes as necessary.
23     And so these questions go outside that
24 ambit.  They weren't that specific.  And maybe
25 we just need to rephrase them, but the

THOMAS W. BEVAN, ESQ. - 05/15/2018     Pages 50..53

Page 50

1  questions were so broad that I had to interpose
2  that objection, Judge.
3      And I don't mean to get sideways with you
4  or with prior rulings down there in New Jersey,
5  but it was kind of outside of that fence.
6      MR. ASSAF:     So if
7  Mr. Bevan's attorney is now saying that he
8  didn't discuss anything regarding the changes
9  with him except to review it, then I think it's
10 a pretty easy answer, because if somebody else
11 discussed it with him –
12     JUDGE RIVERA-SOTO: Stop right
13 there.  It's a pretty easy answer, period.
14     It strikes me that -- Mr. McDermott, I of
15 course will take your representations as an
16 officer of the court that you have not had any
17 discussions concerning the errata sheet with
18 Mr. Bevan.
19     And so, Mr. Bevan, you're ordered to
20 answer those questions.  It's not any more
21 complicated than that.
22     MR. McDERMOTT:    Judge, just to
23 be specific, we never got the deposition and I
24 told Mr. Bevan that if he had any changes, to
25 sign them on the errata sheet.  And that's all

Page 51

1  I told him.
2      JUDGE RIVERA-SOTO: Okay.
3      MR. McDERMOTT:    I didn't -- I
4  personally did not review the deposition,
5  because I didn't get it, and he hadn't gotten
6  it either.
7      JUDGE RIVERA-SOTO: Well, how did
8  he prepare an errata sheet if he didn't have
9  the deposition?
10     MR. McDERMOTT:    I had to go
11 hunt for it, because I kept asking the court
12 reporter where it was and it never came.
13 I thought the original -- usually in Ohio
14 when a witness asks to read, the original is
15 sent to the witness, and then -- that's kind of
16 pro forma how it's done, but apparently that
17 was lost in translation here.
18     JUDGE RIVERA-SOTO: Well, I will
19 tell you, in the jurisdictions in which I'm
20 licensed, when a witness says that he'd like to
21 read and sign a deposition, the transcript is
22 sent directly to the witness.
23     MR. McDERMOTT:    Yes.  It was
24 not in this case.
25     JUDGE RIVERA-SOTO: It's sent to

Page 52

1  everybody else, but it's sent directly to the
2  witness.  Or it's sent to the lawyer
3  representing him with instructions to get it to
4  the witness, otherwise how is the witness going
5  to read and sign and/or provide an errata
6  sheet?  It just doesn't -- it's just not –
7  it's just not that complicated.
8      MR. McDERMOTT:    I thought so
9  too, Judge, but maybe -- I thought New Jersey
10 rules are different.
11     JUDGE RIVERA-SOTO: Well, there's
12 a lot about New Jersey that is unique, I will
13 concede that, but there's a great deal about it
14 that is pretty run of the wheel –
15 run-of-the-mill.  So this is one of those
16 run-of-the-mill matters.
17     MR. ASSAF:     So now that
18 Mr. McDermott has made the representation, then
19 if Mr. Bevan did have discussions with anybody,
20 it would -- a fortiori or with somebody other
21 than his lawyer and that's subject to
22 examination.
23     MR. McDERMOTT:    That's not
24 been -- well, all right.  Judge.
25     Why don't you rephrase the question,

Page 53

1  Mr. Assaf, all right?  Let's not try to try the
2  case in front of the judge here.
3      JUDGE RIVERA-SOTO: We're not -- I
4  can tell you right now we're not going to try
5  the case over the phone today.
6      MR. ASSAF:     Okay.
7      MR. McDERMOTT:    I think I
8  understand you, your Honor.
9      JUDGE RIVERA-SOTO: Okay.  You
10 know, we'll -- hopefully you folks will be able
11 to get through at least the next 45 minutes of
12 this deposition without having to call me.  Not
13 that I mind, I enjoy hearing from all of you,
14 but let's try to get this deposition moving and
15 completed.
16     MR. McDERMOTT:    Judge, in 35
17 years of being a lawyer, this is the second
18 time I ever had to call a judge at a
19 deposition.  I apologize.
20     JUDGE RIVERA-SOTO: No apology
21 necessary.  You did what you thought you needed
22 to do and I'm absolutely fine with that.  And I
23 can also claim to be your senior, because I've
24 been a lawyer for 41 years.  So I know I look
25 and sound much younger, but ...

THOMAS W. BEVAN, ESQ. - 05/15/2018     Pages 54..57

Page 54

1    MR. McDERMOTT:   You do.
2         JUDGE RIVERA-SOTO: That's where
3   we are.
4    MR. McDERMOTT:   All right.
5   Thank you, your Honor.
6         MR. ASSAF:    Thank you.
7         JUDGE RIVERA-SOTO: Thank you.
8   Bye-bye.
9         -----
10    (End of telephone call.)
11        -----
12        MR. ASSAF:    Let's put on
13  the record that that was a 16-minute telephone
14  conference with your Honor.  I'm not counting
15  that against my time.
16        MR. ROTH:    I thought you
17  were going somewhere else with that.
18        MR. ASSAF:    No.
19        -----
20    (Off the record.)
21        -----
22        THE VIDEOGRAPHER: We're back on
23   the record.
24  BY MR. ASSAF:
25   Q  While we're waiting, Mr. Bevan, for the errata

Page 55

1   sheet to be printed, let's go back to the
2   sanctions issue that you and I discussed
3   briefly.
4        I'm showing you a case called Baker
5   versus AK Steel from the Ohio Court of Appeals.
6        Do you recognize this case?
7        MR. McDERMOTT:   This is Exhibit
8   228, correct?
9        MR. ASSAF:    228.
10  A  Yeah.  This is the case I mentioned earlier.
11  Q  Okay.  And in this case, it says that -- if you
12   turn to the second page, headnote 13, it says,
13   "Furthermore, Attorney Bevan violated Civil
14   Rule 11 when he submitted a complaint based
15   upon documents that were not signed and dated
16   by Mrs. Cundiff."
17       Do you see that?
18  A  Yes.
19  Q  Do you disagree with that court finding?
20  A  My recollection is that that -- I have to look
21   at the pleadings again, because I believe when
22   we filed that case in court, it was filed by
23   the daughter who we believed to be the
24   executrix of the estate, Amber Baker, which is
25   the title of the case, not by Mrs. Cundiff.  So

Page 56

1   I guess that -- that statement doesn't make any
2   sense.
3   Q  You think the Court's wrong?
4   A  On that line, yeah, I think so.  I'm not
5   positive.  I have to take a look at the file
6   again, but my recollection was the lawsuit was
7   filed by Amber Baker as executrix of the estate
8   of Mrs. Cundiff.  It was acknowledged in the
9   lawsuit that Mrs. Cundiff was deceased.
10  Q  Do you acknowledge that the Court found that
11   you violated Rule 11?
12  A  It says that here.
13  Q  Do you disagree with that finding?
14  A  I -- yes, I certainly do.
15  Q  Could you turn to headnote 15 on page 3?
16       It says, "Because Attorney Bevan
17   willfully filed Mrs. Cundiff's claim in bad
18   faith, the trial court did not abuse its
19   discretion when it awarded attorney's fees to
20   AK Steel on the basis of Civil Rule 11."
21       Do you see that?
22  A  I see that.
23  Q  Do you disagree with the Court's finding there?
24  A  Oh, I certainly do.  I won that issue in other
25   cases.  So in this jurisdiction, that is not a

Page 57

1   winning argument, but in other jurisdictions it
2   is.
3   Q  In "this jurisdiction," you mean Ohio?
4   A  No, I mean in whatever this -- the 12th
5   District of Butler County.  I would not do it
6   in Butler County, but I've successfully pursued
7   cases on behalf of deceased widows on Workers'
8   Compensation death claims and successfully done
9   it in the past.
10  Q  In other jurisdictions within Ohio, have you
11   then -- have you signed and initialed on behalf
12   of clients?
13        MR. ROTH:     Objection.
14  A  I -- I'm not sure what you're talking about.
15  Q  Sure.
16       You understand in the Baker case one of
17   the issues was that it wasn't the client's
18   actual signature on certain papers, correct?
19  A  Yes.
20  Q  Okay.  And do you do that -- withdrawn.
21       Have you done that on behalf of talc
22   plaintiffs?
23  A  I guess I'm not sure.  I don't know what you
24   mean by that, I guess.
25  Q  Sure.

THOMAS W. BEVAN, ESQ. - 05/15/2018      Pages 58..61

Page 58

1      Earlier you said and except for Butler
2    County, you continue this practice that you
3    were sanctioned for in Butler County.
4        MR. ROTH:      Objection to
5    the form.
6    Q   Okay.
7        MR. ROTH:      And -- excuse
8    me. I'm sorry, Mr. Assaf.
9        Objection to --
10   A   I don't think that's what I said.
11   Q   All right. So what --
12       MR. ROTH:      Can I --
13   Q   What do you --
14       MR. ROTH:      Excuse me.
15   Gentlemen, can I make my objection?
16       MR. ASSAF:     Sure. Sure.
17   Objection. I heard you.
18       MR. ROTH:      I don't know
19   that the court reporter did and then there was
20   an answer. So if we could slow down a little
21   bit.
22       MR. ASSAF:     Sure.
23       MR. ROTH:      Thanks.
24   BY MR. ASSAF:
25   Q   So what practice do you continue that you think

Page 59

1    was -- got you into trouble in Butler County?
2        MR. ROTH:      Objection to
3    form and foundation.
4    A   The practice of pursuing Workers' Compensation
5    death benefit claims on behalf of a widow that
6    has died after her husband in attempting to
7    recover benefits for the period between her
8    husband's death and her death on behalf of the
9    estate.
10   Q   Turning to footnote -- to note 13.
11       It says, "According, to Attorney Bevan,
12   this practice serves to avoid unnecessary
13   delays or rejection in the event that the
14   documents are submitted to medical providers
15   months after they are signed by the client.
16   The firm dates the documents once they are
17   forwarded to the requesting party. In
18   addition, Attorney Bevan admits that the FROI-1
19   form, a BWC document used to initiate a
20   workers' compensation claim in Ohio, was signed
21   and dated by another member of the firm's
22   staff. However, in an attempt to counter the
23   appearance of bad faith, Attorney Bevan
24   emphasizes that the form contained the initials
25   'MP' by Mrs. Cundiff's name to acknowledge that

Page 60

1    it was not her signature."
2    Q   Do you see that?
3    A   Yes.
4    Q   Okay. Does the Bevan Firm have a practice of
5    encouraging clients to sign but not date forms?
6    A   Typically -- no, not typically, but in
7    situations, for instance, for medical releases,
8    because some providers won't take them after 60
9    days. And so, you know, we'll ask them to sign
10   a blank medical release, and then we'll put the
11   date on there when we send it off to defense
12   counsel.
13   Q   Do you ask them to sign legal pleadings, such
14   as affidavits or claims forms, and not date
15   them?
16   A   Certainly not an affidavit, because that's got
17   to be notarized and dated at the time that it's
18   signed by the fiant.
19       With Workers' Compensation forms, the
20   FROI-1 form -- or actually, to file a Workers'
21   Comp claim does not require the claimant's
22   signature. In fact, a lot of that stuff can be
23   done electronically. It does not require
24   claimant's signature.
25       So we've had many instances where maybe

Page 61

1    the statute's coming up and we'll just, you
2    know, sign the form for the client, you know,
3    initial it and we indicate that it's not the
4    client signing it, but ...
5    Q   With respect to talc plaintiffs, have you
6    submitted claims to trusts with a signature by
7    somebody in the Bevan Firm that's then
8    initialed?
9    A   I don't believe the trust claims require a
10   signature from anybody. So the answer would be
11   no.
12       The releases require a signature by the
13   claimant, and those would be signed by the
14   claimant, not by anybody from the Bevan Firm,
15   but the claim that you file with the trust does
16   not require a signature that I know of.
17   Q   In terms of the talc plaintiffs, did any of the
18   talc plaintiffs provide you with -- withdrawn.
19       Did you provide any of the talc
20   plaintiffs with documents that you asked them
21   to sign and not date?
22   A   Not that I recall.
23   Q   Would there be anything wrong with that?
24   A   I don't know what documents you would be
25   referring to. You know, we don't always

THOMAS W. BEVAN, ESQ. – 05/15/2018     Pages 62..65

Page 62

1    require a client date his or her signature.
2    Q  Have you talked to reporters about this case,
3       the Williams case?
4    A  A reporter called me a week or two ago and I
5       talked to her briefly.
6    Q  What reporter?
7    A  I believe she was from Reuters and I do not
8       recall the name.
9    Q  What did she ask you about the case?
10   A  She was asking about Johnson & Johnson and
11      whether or not this issue, these issues,
12      involved Johnson & Johnson and -- that was my
13      recollection.
14   Q  What did you tell her, if anything?
15   A  I believe it does involve Johnson & Johnson,
16      because I believe that Johnson & Johnson had
17      the liabilities up until a certain point in
18      time for this, the talc that came out of that
19      mine, Eastern Magnesia Talc.  So I believe
20      these -- the issues in this case affects
21      Johnson & Johnson as well, they have the
22      liabilities.
23   Q  Other than that recent conversation with the
24      Reuters reporter, have you talked to any other
25      reporters about this case?

Page 63

1    A  I believe there was another -- I think, yes.
2       There was a man.  I don't recall which -- who
3       he was with, but I believe so.  I believe that
4       was quite a while ago.
5    Q  Okay.  I'm going to show you this and see if I
6       can refresh your recollection.  I'll show you
7       what's been marked as Exhibit 237.
8          Exhibit 237 is a printout of a Bloomberg
9       article from September 3, 2015.
10         Do you recognize this, Mr. Bevan?
11   A  Jef Feeley, that's the name I think I
12      recognize, yes.
13   Q  Did you talk to Mr. Feeley at some point?
14   A  I believe Mr. Feeley came to my office.  We
15      probably talked on the phone as well.
16   Q  Did you talk on the phone before, after, or
17      both, the office visit?
18   A  Certainly before.  Whether we talked after the
19      office visit, I don't recall.
20   Q  Prior to talking to Mr. Feeley and meeting with
21      him, had you known him?
22   A  No.
23   Q  How did you come to contact Mr. Feeley?  Or did
24      he contact you?
25         MR. ROTH:     Objection to

Page 64

1    the form.
2    A  He called me and I returned his phone call.
3    Q  What did he say when he called you?
4    A  That he was doing a story on this particular
5       case having to do with BASF.
6    Q  Do you know how he got your name?
7    A  No.  I assume he got it from the Placitella
8       firm, but I don't know.
9    Q  Did the Placitella firm email you about this?
10         MR. ROTH:     Objection.
11   A  I don't recall.
12   Q  And then the article came out, correct,
13      Bloomberg?
14   A  I believe I read this article when it came out,
15      yes.
16   Q  Did any of your friends read it?
17   A  I --
18   Q  Any of your friends in the Bar say, "Gee, I saw
19      you quoted in Bloomberg today"?
20   A  I've never had anybody comment that they saw me
21      quoted in Bloomberg, no.
22   Q  Anybody email it to you?
23   A  I think maybe the reporter did.  I think.
24   Q  Okay.  He emailed you the article?
25   A  I think so.

Page 65

1    Q  Okay.  Well, where is that document, sir?
2    A  I don't know that I would have saved that
3       document.
4    Q  I thought that had to do with the Williams
5       case.  Didn't it?
6          MR. ROTH:     Objection.
7    A  It's this article.
8    Q  And the article's about the Williams case,
9       right?
10   A  It's mentioned.
11         I don't see "Williams" mentioned.  Is it
12      mentioned in here?
13   Q  Well, let's try it this way.
14   A  I see --
15   Q  You gave a quote, didn't you, "This has really
16      opened a Pandora's Box"?
17   A  Yes.
18   Q  And there's a reference to Cahill Gordon and
19      the talc litigation.
20         Is it your testimony that you didn't
21      think this had anything to do with Williams?
22   A  I don't see Williams' name mentioned in here.
23      Am I missing it?
24         Point it out to me.  I'm missing it there.
25   Q  If you turn to the last page.  The second to

THOMAS W. BEVAN, ESQ. – 05/15/2018     Pages 66..69

Page 66

1  last paragraph on page 6 of 7, it says,
2  "Placitella filed a federal lawsuit in New
3  Jersey against BASF on behalf of six
4  plaintiffs."
5      Do you see that?
6  A  Yes.
7  Q  Do you have any idea what that might relate to?
8      MR. ROTH:     Objection.
9  A  I don't know. I mean, it may involve the
10     Williams case. I -- it doesn't say "Williams"
11     in there, so ...
12 Q  Okay. So as an experienced practicing lawyer
13     who's been involved with the Williams case,
14     when you read this article, you weren't sure
15     whether it had anything to do with Williams?
16 A  I didn't see "Williams" mentioned in here at
17     all and it talks about Paduano -- or Paduano.
18     MR. ROTH:     Paduano.
19 A  Paduano.
20 Q  When it says the six plaintiffs of a federal
21     lawsuit in New Jersey, you have no idea what
22     that refers to, do you, Mr. Bevan?
23     MR. ROTH:     Objection.
24 A  I said that might involve this case. I -- you
25     know, you'll have to ask Mr. Feeley.

Page 67

1  Q  You didn't discuss Williams with Mr. Feeley?
2  A  I don't know if I discussed Williams or not
3      with Mr. Feeley. I know I discussed Darnell
4      with Mr. Feeley. If I discussed Williams, I
5      don't know.
6  Q  Darnell's a plaintiff in Williams, isn't she?
7  A  I believe Darnell's a plaintiff, yes.
8  Q  Okay. So in terms of your approach, though, to
9      saving documents or producing documents, if an
10     article like this doesn't mention the word
11     "Williams," you're not sure whether you would
12     have saved or produced this?
13 A  I don't know whether I saved or produced it. I
14     may have it in my computer, you know.
15     MR. ROTH:     Note my
16     objection to that question, please.
17 Q  Okay. Well, we don't have it.
18     MR. ROTH:     I'm just
19     objecting to the question.
20 A  I think it's in your hand right now. How are
21     you saying you don't have it?
22 Q  We don't have the email from Mr. Feeley.
23      Do you have it on your computer?
24 A  I don't know.
25 Q  Could you look?

Page 68

1  A  On my computer? I don't have my computer.
2  Q  Do you have your phone?
3  A  I've got my phone.
4  Q  Can you look for it?
5  A  Sure.
6      MR. ROTH:     While he's
7      looking, I'll just make a foundation objection
8      in terms of scope of discovery requests.
9  Q  Do you have multiple emails from Mr. Feeley?
10 A  I don't know.
11 Q  Are you searching for the name "Feeley"?
12 A  I don't know how to search on this thing, so
13     I'm going through every -- I've got about a
14     thousand emails. I'll go through every one if
15     you want me to. I don't know how to search on
16     my phone.
17 Q  You don't have a search function?
18 A  If I do, I don't know how it --
19 Q  What kind of operating system do you have,
20     Mr. Bevan?
21 A  This is an iPhone. I can search --
22     MR. McDERMOTT:  Objection.
23 A  -- at my office. Okay?
24 Q  Okay. Could you do that?
25 A  Is this really funny to you?

Page 69

1  Q  Well, I just -- I find it difficult --
2  A  If you went -- if you asked me to search in my
3      office, I could search in my office. If you
4      want me to search on my phone, I could search
5      through 3,947 emails.
6  Q  Is that what you were just doing?
7  A  Yeah.
8  Q  Okay. Well, would you be kind enough at the
9      lunch break to ask your assistant to search for
10     all emails to and from Mr. Feeley or regarding
11     Mr. Feeley?
12 A  I would have to do that search myself.
13     MR. ROTH:     We'll check for
14     the subpoena to make sure that that's a request
15     that's within the scope of the subpoena.
16     MR. ASSAF:     Okay.
17 A  So yeah. So I could go back to my office and
18     do it, but I would do it myself. I'm not going
19     to have my paralegal do it.
20 Q  Okay.
21 A  But I can do it. And it wouldn't take me long.
22 Q  All right. Well, we'll see. We'll see if we
23     can -- and while you're doing that, could you
24     see if you have any article -- any other emails
25     regarding the Bloomberg article?

THOMAS W. BEVAN, ESQ. - 05/15/2018    Pages 70..73

Page 70

1  A  Any emails that I have regarding Mr. Feeley,
2  sure.
3      MR. ROTH:    So is this a
4  new discovery request?
5      MR. ASSAF:    No, it's an
6  outstanding discovery request.
7      MR. ROTH:    That's why I
8  want to look at the subpoena and make sure.
9      MR. ASSAF:    Since his
10  statement in the article – he's quoted in the
11  article and he talked to the reporter and it's
12  neither logged nor produced. I'm kind of
13  curious to why not.
14      MR. ROTH:    Okay. I'm
15  curious to see what's in the subpoena.
16      MR. ASSAF:    Unless you
17  think it's nonresponsive.
18      MR. ROTH:    I think it may
19  be nonresponsive, but I'll look at the
20  subpoena. And let's move on.
21      -----
22      (Defendants' Exhibit 291A was marked.)
23      -----
24  BY MR. ASSAF:
25  Q  We now have the errata sheet, D Ex 291.

Page 71

1      MR. McDERMOTT:    Thank you.
2  Can we mark that, please?
3      MR. ASSAF:    It's D Ex 291.
4      MR. McDERMOTT:    Thank you.
5  Q  Okay. Regarding the errata sheet, on the
6  second page of D Ex 291, you corrected page
7  114.
8      MR. McDERMOTT:    Excuse me.
9  Just for a point of clarification, D Ex 291, is
10  this a new exhibit or is this the previous D Ex
11  291?
12      MR. ASSAF:    Let's do this
13  as 291A.
14      MR. McDERMOTT:    Thank you.
15  Q  Okay. Could you turn to page 114?
16      21 to 25. "What documents or data were
17  used to arrive at the figure 2,653 Bevan Law
18  Firm clients?"
19      "I believe they were clients that had
20  filed suit against Eastern Magnesia Talc" or
21  could have – "and/or could have filed suit
22  against Eastern Magnesia Talc and either
23  settled their claims with Eastern Magnesia Talc
24  or had their claims dismissed against Eastern
25  Magnesia Talc. And they were at sites where

Page 72

1  there was a high likelihood of Eastern Magnesia
2  Talc exposure. I believe those were the
3  criteria we were looking at."
4      Okay. And then you say change, "The
5  Bevan clients" – what's that word?
6  A  "referenced."
7  Q  "referenced did."
8  A  "not include clients that did not file cases
9  against Eastern Magnesia Talc."
10      That's all one sentence.
11  Q  Okay. What's the reason for the change?
12  Because you don't have it there, do you?
13  Withdrawn.
14      The errata sheet -- you've worked with
15  errata sheets in the past, haven't you?
16  A  Yes.
17  Q  And you clarify, identify the change, correct?
18  A  Yes.
19  Q  And then you provide the reason for the change,
20  correct?
21  A  I've never done it before. It says -- yeah,
22  and "Reason for Change." I did not put the
23  reason for change.
24  Q  In 30 years of practice, you don't understand
25  that you have to put the reason for the change

Page 73

1  in an errata sheet?
2      MR. ROTH:    Objection.
3  A  I've never – I don't think I've ever done an
4  errata sheet where I've made changes. Or if
5  the change is obvious, the change is obvious.
6  I don't -- you know, you're not making any
7  sense to me.
8  Q  You've never as a practicing attorney worked
9  with an errata sheet?
10      MR. McDERMOTT:    Objection.
11      MR. ROTH:    Objection.
12  A  I've had a few things. Usually it's a typo or
13  something on there.
14  Q  Usually a typo or something like that?
15  A  Yes.
16  Q  And then you would put "typo," correct?
17  A  No. I've never done that.
18  Q  Okay. You provide the reason why you're
19  putting the change in, don't you, Mr. Bevan?
20  A  I don't recall I've ever provided the reason
21  why. I mean if the reason's obvious.
22  Q  Okay. In your practice, as you sit here today,
23  you can't recall ever providing the reason why
24  you're changing something in a deposition
25  testimony for an errata sheet?

THOMAS W. BEVAN, ESQ. - 05/15/2018      Pages 74..77

Page 74

1   A  I don't think so.  You know, it's usually
2      self-explanatory.
3   Q  And so "Reason for the Change," what does that
4      mean to you?
5   A  It means what is the change about.
6   Q  The reason for the change.
7         What is the reason for your change?
8   A  The reason for my change was that the clients
9      that we referenced did not include cases where
10     we did not file against Eastern Magnesia Talc.
11  Q  So did you misspeak?  Was it a typo?  What was
12     the --
13  A  No, I was -- yeah, I misspoke.  I was incorrect
14     on that.
15  Q  You were incorrect on that.
16        And how did you realize you were
17     incorrect?
18  A  I went back and I talked to Pat to find out --
19     well, when I got the deposition, I talked to
20     Pat to find out exactly how we identified those
21     2,000 some cases, and he confirmed with me that
22     we did not include cases for people that could
23     have filed against Eastern Magnesia Talc but
24     did not.
25  Q  Did you talk to anybody else besides Mr. Walsh

Page 75

1      about your testimony?
2   A  No.  I did the errata sheet.  I don't think I
3      talked to anybody about the errata sheet.  I
4      gave it to a paralegal to send off.
5   Q  You didn't talk to anybody from Cohen,
6      Placitella -- this is a yes or no.
7         You didn't talk to anybody at Cohen,
8      Placitella & Roth regarding that testimony
9      regarding 2,653?
10  A  No.
11        MR. ROTH:      Do you want me
12     to answer that too?  You're looking right at
13     me, Gene.
14  Q  Did you talk to anybody -- did you talk to your
15     lawyer about it?
16        MR. McDERMOTT:  Objection.
17  A  Not the errata sheet.  Immediately after the
18     deposition, we talked about the deposition,
19     sure.
20        MR. McDERMOTT:  Privilege.
21  Q  Did you talk about the 2,653?
22  A  I believe, you know, Kevin asked me about how
23     we got to that and how we arrived at those
24     numbers and I told him.
25  Q  And did he advise you that you had to clarify

Page 76

1      your testimony?
2   A  No.
3   Q  Did you know at that point you had to clarify
4      your testimony?
5   A  No.  I didn't know until I did this, whatever
6      date this was.  It was all on that same date.
7      May 4.
8   Q  It was a month after your deposition?
9   A  Yeah.  When I got the transcript, I reviewed it
10     and checked with Pat on how we arrived at that
11     number, confirmed it, and that's when I put
12     that change in there.
13  Q  And then if you turn to page 115, lines 1 to
14     11.  I'll turn your attention to 7.
15        Question, "The figure 2,653 includes
16     clients who did file and clients who could have
17     filed?"
18        Answer, "I believe so, yes."
19        Do you see that?
20  A  Yes.
21  Q  That's inaccurate testimony?
22  A  Yeah, that was inaccurate.  We did not include
23     clients that could have filed.  The number
24     would have been much larger if we would have
25     included that.

Page 77

1   Q  Did you have any -- did you and Mr. Walsh
2      generate any documents on this in trying to
3      check whether the 2,653 was correct?
4   A  No.  I mean, I could do the search again and
5      probably come up with that number again.
6   Q  Did you review the testimony with Mr. Walsh?
7      Did you show him the testimony?
8   A  No.
9   Q  When you left the deposition on April 4, is it
10     fair to say that you knew that your affidavit
11     was then wrong?
12  A  No.
13  Q  When you left the deposition on April 4, is it
14     clear --
15  A  I'm sorry.  Why is my affidavit wrong?
16  Q  Withdrawn.
17        When you left the deposition on April 4,
18     if you included people who did not file, your
19     deposition would be wrong, fair?
20        MR. ROTH:      Objection to
21     form.
22  A  Yeah, you have to restate that question to me.
23  Q  Sure.
24        If you had included people who did not
25     file in that 2,653, then your affidavit would

THOMAS W. BEVAN, ESQ. - 05/15/2018      Pages 78..81

Page 78

1  be inaccurate, fair?
2      MR. ROTH:    Sorry.
3  Objection.
4  A  If I -- if I included people who -- that did
5  not file --
6  Q  File in that 2,653 number, then it would be
7  wrong under the class definition, fair?
8      MR. ROTH:    Objection to
9  form.
10 A  I believe so. I believe the class definition
11 did not include people who could have but did
12 not file.
13 Q  And at the time of your deposition, did you
14 realize that the class definition did not
15 include people who could have filed?
16 A  I think I had forgotten that. I didn't realize
17 that. And I indicated that our number included
18 people that could have filed, but it did not
19 include that number of people.
20 Q  Regarding that 2,653 number, are they people in
21 the Bevan database?
22 A  I believe so.
23 Q  So if I had the -- access to the Bevan
24 database, I could generate that 2,653 number?
25 A  I believe so. I believe they're all still in

Page 79

1  the database. I -- you know, as far as I know,
2  I think that's how we did it.
3  Q  And you're familiar with the claims and the
4  allegations in the Williams case, correct?
5  A  Yeah, I'm somewhat familiar. I read the
6  complaint. I've read the circuit court
7  decision, which highlights it pretty well.
8  Q  You don't want to say you're familiar, you want
9  to say you're somewhat familiar?
10     MR. ROTH:    Objection to
11 the form.
12 A  Yeah, I don't think I'm as familiar as probably
13 you are familiar with it. I don't think I'm as
14 familiar with Mr. Roth or Mr. Placitella.
15 So ...
16 Q  Would the following statement be true: Tom
17 Bevan is familiar with the claims and
18 allegations in the Williams case?
19     MR. ROTH:    Objection.
20 A  I said I'm somewhat familiar. I think, yes.
21 Q  Well, could you turn to your affidavit again?
22 D Ex 145.
23 A  Yes.
24 Q  In paragraph 2, the last sentence, it says, "I
25 am familiar with the claims and allegations

Page 80

1  made in the Williams class action."
2  Q  Do you see that?
3  A  Yes.
4  Q  Do you want to do an errata for that,
5  Mr. Bevan, and make it "somewhat familiar"?
6      MR. ROTH:    Objection to
7  form. Why don't we be a little less
8  dismissive.
9  A  I would say that, you know, I could reread the
10 complaint again and familiarize myself even
11 more with it. But certainly at the time that I
12 did the affidavit, it was accurate.
13 Q  So in January of 2018, you were familiar with
14 the claims and allegations, fair?
15 A  Fair.
16 Q  And now you're somewhat familiar?
17 A  Fair.
18 Q  After sitting through two days of depositions?
19 A  Yeah.
20 Q  What did you do to prepare for today's
21 deposition?
22 A  I met with my attorneys.
23 Q  Who?
24 A  Mr. McDermott and Mr. Gallucci.
25 Q  How long?

Page 81

1  A  A few hours.
2  Q  Anybody else there?
3  A  No.
4  Q  Anybody else on the phone?
5  A  No.
6  Q  Did you review any documents?
7  A  No. No. The last document I reviewed, I
8  reviewed my deposition prior to the last
9  deposition. I reviewed this deposition a few
10 weeks ago when I signed it. I did not review
11 any other documents in preparation.
12 Q  How long did the preparation session last?
13 A  I said I met with them --
14     MR. McDERMOTT:    Asked and
15 answered.
16 A  A few hours I think I said.
17     MR. McDERMOTT:    Objection.
18 Q  Two hours, four hours?
19 A  Three, give or take an hour.
20 Q  Okay. And it was only discussions, you didn't
21 look at any documents?
22 A  Correct.
23 Q  Were you shown anything on a screen?
24 A  No.
25 Q  Other than your two attorneys that you

THOMAS W. BEVAN, ESQ. – 05/15/2018        Pages 82..85

Page 82

1    identified, did you talk to anybody from Cohen,
2    Placitella & Roth regarding today's deposition?
3    A  No.
4    Q  Did you have any communications with Cohen,
5    Placitella & Roth regarding today's deposition?
6    A  No.  I said hi to them this morning.
7    Q  Did you bring any documents with you today?
8    A  Nothing related to this case.
9    Q  Going back to 236.  Or I'm sorry, 237, the
10      Bloomberg article.
11   A  Yes.
12   Q  Did you tell the reporter that you were
13      involved in the Williams case?
14   A  I don't recall.
15   Q  Okay.  Or did you tell them you were involved
16      in a federal court case involving six people in
17      New Jersey that may or may not be Williams?
18        MR. ROTH:    Objection.
19   A  I don't recall.
20   Q  All right.  So could you just turn to the
21      second page of the Bloomberg printout.
22        It says, "This has really opened a
23      Pandora's Box,' said Tom Bevan, a lawyer in
24      Boston Heights, Ohio, who represented hundreds
25      of people who sued Engelhard in the 1990s and

Page 83

1    is involved in a current federal case against
2    BASF."
3        Do you see that?
4    A  Yes.
5    Q  Do you have any idea of what – withdrawn.
6        When you read the article, did you have
7    any understanding of what the "current federal
8    case against BASF" referred to?
9    A  I assume it's this class action but ...
10   Q  Williams?
11   A  Yeah.
12   Q  Okay.  And when you read that, you knew it had
13      to do with Williams, correct?
14   A  You know, I don't know that I really gave it
15      much thought.
16   Q  Are you involved in any other federal case
17      against BASF?
18   A  I'm involved in the Ross case, and I don't
19      recall – I know it's filed in New Jersey.
20      Whether that's a state court or federal court,
21      I'm not sure.
22   Q  Was the Ross case even filed at this time?
23   A  I don't know when the Ross case was filed.
24      That was probably filed in – I don't know.
25      I'm not sure when the Ross case was – '16 or

Page 84

1    '15.
2    Q  The quote "This has really opened a Pandora's
3      Box," is that an accurate quote?
4    A  I think it is.
5    Q  You said that to the reporter?
6    A  I assume I said it.  I don't recall saying it,
7      but I would agree with that statement.
8    Q  And did you tell him you were involved in the
9      federal case?
10   A  I don't recall.  I know I – I know I told them
11      I was representing Mrs. Holley, who's the
12      executrix of the Darnell estate.
13   Q  How are you involved in the federal case?
14   A  Well, I still represent thousands of people
15      that potentially are class members.  I'm not
16      handling the federal case in any way.  I'm not
17      counsel of record, but I am still the attorneys
18      for these – for Mrs. Williams, for Marilyn
19      Holley, for the Ware family.  I'm the attorney
20      for the Clark family.
21   Q  But independent of your relationships with
22      Holley, Ware, and the other plaintiffs, you
23      have a fee agreement with Cohen, Placitella &
24      Roth, correct?
25        MR. ROTH:    Objection.

Page 85

1    A  Say that again.  Independent of?
2    Q  Independent of your relationships with the
3      named plaintiffs, you have a separate
4      relationship with Cohen, Placitella & Roth –
5        MR. McDERMOTT:  Objection.
6    Q  – correct?
7    A  I have relationships, yes.
8    Q  You have a fee arrangement with Cohen,
9      Placitella & Roth, correct?
10        MR. McDERMOTT:  Objection.
11        MR. ROTH:    Objection.
12   A  Yes.
13   Q  Has that been disclosed to your individual
14      clients?
15        MR. ROTH:    Objection.
16        MR. McDERMOTT:  Same objection.
17        MR. ROTH:    Privilege.
18        MR. McDERMOTT:  Continuing
19      objection about these questions.
20   A  I'm – I'm fairly certain that, for instance,
21      on the Ross case, I assume that the client
22      signed a fee agreement with both our firm on
23      there and the Placitella firm.
24   Q  Regarding the Williams case, have you disclosed
25      your arrangements with Cohen, Placitella & Roth

THOMAS W. BEVAN, ESQ. - 05/15/2018      Pages 86..89

Page 86

1  to the named plaintiffs in Williams?
2  A  I'm sure I have.
3         MR. ROTH:     Objection.
4  Privilege.
5         MR. McDERMOTT:   Continuing
6  objection to this line of questions.
7  Q  You're sure you have?
8  A  Yeah.
9  Q  Okay.  So when I depose them, they should know
10    about it?
11  A  If they recall.  If they don't -- this has been
12    going on for a long time.
13  Q  Okay.  Would it have been in writing or orally?
14  A  Probably orally.
15  Q  What would you have told them?
16         MR. ROTH:     Objection.
17  Privilege.
18         MR. ASSAF:    Not privileged.
19         MR. ROTH:     Okay.
20         MR. ASSAF:    He's -- let him
21    finish.
22         MR. ROTH:     No.  No.  No.
23    I can make --
24         MR. ASSAF:    I'll tell you
25    why.  I'll tell you why it's not privileged.

Page 87

1  Not privileged because what he -- his
2  discussions with named plaintiffs, not
3  privileged.
4         MR. ROTH:     His discussions
5  with named plaintiffs about the facts
6  underlying the Williams claim are not
7  privileged, period.  Everything else is
8  privileged.
9  Q  You can answer.
10         MR. McDERMOTT:  I'll join in
11  that objection.
12  A  Why don't you repeat the question again.
13  Q  Sure.
14     What did you tell them, the named
15  plaintiffs, about your fee arrangements with
16  Cohen, Placitella & Roth?
17         MR. ROTH:     Same objection.
18  A  I don't recall, other than I was working with
19  Cohen, Placitella & Roth.
20  Q  You told them you were working with them.
21     Did you tell them that you had a fee
22  arrangement with them?
23  A  I believe I did.  I don't recall what I told
24  them.
25  Q  You don't recall in words or in substance what

Page 88

1  you told them about your fee arrangement?
2         MR. ROTH:     Objection.
3  A  No.
4         MR. ROTH:     Privilege.
5         MR. McDERMOTT:   Continuing
6  objection on this line.  I think I read a Court
7  order surrounding this.
8  Q  Regarding your familiarity, whether you're
9    somewhat familiar or familiar with the facts
10    and claims in the Williams case, did you tell
11    your plaintiffs, your named plaintiffs,
12    clients, that you had familiarity with the
13    allegations?
14  A  I'm sure I explained the basic gist of the
15    allegations.
16  Q  When's the first time you heard about the
17    allegations that Engelhard may have done
18    something inappropriate?
19  A  I believe it was either 2010 or 2011.
20  Q  How did you hear about it?
21  A  From Chris Placitella.
22  Q  What happened?
23  A  I believe Chris and I spoke on the phone, and
24    he told me that there was evidence that Eastern
25    Magnesia Talc contained asbestos, that they

Page 89

1  knew it and that they had been deceiving people
2  for many years.
3  Q  Did he ask for your help?
4         MR. ROTH:     Objection.
5  Privilege, work-product.
6  A  If he asked for my help, he asked if I -- you
7  know, if this was something that would interest
8  me on behalf of my clients.
9  Q  Did you convey to him what you recalled,
10    regarding the facts, at that point?
11  A  I'm sure I did.
12  Q  What did you tell him?
13  A  I'm sure I told him that they told me that
14    their talc did not contain asbestos, that they
15    sent me letters and affidavits, threatening
16    letters, that they would seek sanctions if I
17    did not dismiss them.  And as a result, we
18    either dismissed them or settled with them for
19    very low amounts.
20  Q  You told them all of this in your first
21    conversation?
22  A  I am sure I did, because that's about a
23    two-minute conversation, what I just told you.
24  Q  Okay.  So Mr. Placitella calls you.
25     Prior to Mr. Placitella calling you about

THOMAS W. BEVAN, ESQ. - 05/15/2018      Pages 90..93

Page 90

1  Engelhard for the first time, when's the last
2  time you had spoken to him?
3  A  The last time I had spoken to him?
4  Q  Yeah.
5  A  I don't know if we had ever spoken.  We may
6  have.  We may have corresponded by email, but
7  I'm not – I don't recall.
8  Q  Okay.  And prior to you talking to
9  Mr. Placitella, when's the last time you had
10  any conversations with any lawyer representing
11  Engelhard?
12  A  Me personally?
13  Q  Yeah.
14  A  Probably early 2000s.  Early to mid-2000s.
15  Q  When's the last time you had reviewed any
16  letters from Engelhard when you first talked to
17  Mr. Placitella?
18  A  Maybe mid-2000s.  I'm not sure.  You know,
19  probably in the Graham case.  Maybe in 2008 or
20  so.
21  Q  By the way, did R.T. Vanderbilt have asbestos
22  in its talc?
23  A  I believe there's some evidence that R.T.
24  Vanderbilt had asbestos in their talc.
25  Q  Did Southern Talc had asbestos in the talc?

Page 91

1  A  I've seen some evidence of that, yes.
2  Q  Did R.T. Vanderbilt take the position there's
3  no asbestos in their talc?
4  A  I'm not sure.  I'm not sure what they – what
5  position they take.
6  Q  Has R.T. Vanderbilt submitted pleadings to you
7  and letters to you saying there's no asbestos
8  in our talc?
9  A  I'm not sure.
10  Q  You can't remember?
11  A  I'm not sure, yeah.
12  Q  And Southern Talc, has Southern Talc submitted
13  pleadings saying there's no asbestos in their
14  talc?
15  A  I don't recall Southern Talc ever submitting
16  anything.  I don't recall that.
17  Q  Have they submitted letters to you saying
18  there's no asbestos in the talc?
19  A  I don't believe so.
20  Q  With respect to R.T. Vanderbilt, what do you
21  recall about R.T. Vanderbilt telling you
22  there's no asbestos in the talc?
23  A  The best that I can recall – and I have not
24  dealt with R.T. Vanderbilt in probably ten
25  years.  The best that I can recall is – the

Page 92

1  big fights I've always had with R.T. Vanderbilt
2  of course in the rubber plants was product ID,
3  was their product there, but I had one – I
4  feel like I had a case where their product was
5  there, it wasn't out of the rubber industry,
6  and I don't recall what their argument was,
7  whether it was an argument that their talc
8  couldn't cause mesothelioma, their talc –
9  there was no evidence of mesothelioma with
10  their employees.  We battled over that issue, I
11  recall.
12  Q  So Mr. Placitella calls you up, the first time
13  you recall talking to him, and you tell him
14  about these letters and positions that
15  Engelhard had taken and you recalled them and
16  you were able to tell him that with some
17  specificity?
18      MR. ROTH:     Objection to
19  form and foundation.
20  A  Yeah.  Yes.
21  Q  And Vanderbilt – you can't tell me what
22  positions Vanderbilt's taken?
23  A  They certainly didn't take an aggressive
24  position like Eastern Magnesia Talc, as far as
25  whether or not there was asbestos in their

Page 93

1  talc.
2  Q  So if I'm able to show you pleadings in cases
3  you've been involved in, including summary
4  judgments that you've lost and briefs in which
5  they're saying there's no asbestos in the talc
6  and you're saying they're lying, would that jog
7  your memory at all as to whether they've taken
8  an aggressive position?
9      MR. ROTH:     Objection to
10  form and foundation.
11  A  It would jog my memory what – I guess what I
12  mean by an aggressive position is the threat of
13  sanctions, the – I can recall, for instance,
14  Mr. Joslyn being very threatening in
15  depositions or in breaks or after depositions.
16  I can recall specific instances of Mr. Joslyn.
17  Q  And you told Mr. Placitella that?
18      MR. ROTH:     I'm sorry.
19  Were you finished, Mr. Bevan?
20      THE WITNESS:    Yeah, I'm
21  finished.
22  A  Whether I told him – like this one incidence I
23  recall of Mr. Joslyn, whether I've told that to
24  Mr. Placitella, I don't know.  I can tell him
25  now if you want me to.

THOMAS W. BEVAN, ESQ. - 05/15/2018      Pages 94..97

Page 94

1  Q  Okay. So Mr. Placitella calls you.
2      And do you then call any of your clients?
3  A  Within some time, yes.
4  Q  Who do you call?
5  A  I'm sure I talked to Marilyn Holley. I know I
6      talked to Nancy Pease. I believe I talked to
7      Mrs. Ware. I don't -- I don't know if I
8      personally talked to the other two or not. I
9      don't recall.
10 Q  Who are the other two? Or who were they at the
11     time?
12 A  Well, the other one is Jennifer Graham's
13     daughter, and I'm -- Donnette Wengerd and
14     Kimberlee Williams are the other two.
15 Q  They're the only five people you talked to who
16     are clients?
17 A  That's all I can recall that I've talked to.
18 Q  So you personally called them?
19 A  I know I personally talked to Nancy Pease,
20     Marilyn Holley, and Mrs. Ware. I don't recall
21     talking to Kimberlee Williams or Donnette
22     Wengerd.
23 Q  Ever?
24 A  Well, I've talked to them, yes.
25 Q  But about Williams?

Page 95

1  A  About this case, I don't know if I have talked
2      to them about this case personally myself.
3  Q  As we sit here, you can't recall any
4      conversations with Ms. Wengerd or Ms. Williams
5      regarding this case?
6  A  I just don't recall.
7  Q  Okay. So what did you say to Ms. Holley?
8  A  That we're looking into a potential fraud case
9      against BASF because her mother was exposed to
10     talc or soapstone at Goodrich and Eastern
11     Magnesia Talc lied to us and said that there
12     was never any evidence of any asbestos in their
13     talc. And as a result of that lie, we settled
14     for a nominal amount with Eastern Magnesia
15     Talc, an amount that we would not have
16     otherwise settled with them for, had they been
17     truthful in their response to our discovery.
18 Q  Okay. Anything else that you can recall saying
19     to Ms. Holley?
20 A  That's all I can recall at this time.
21 Q  Did she ask you any questions?
22 A  I'm sure she asked me how my family was.
23     Particularly pertaining to this case, I don't
24     recall if she asked me questions.
25 Q  How long did the conversation last?

Page 96

1  A  I'm sure it wasn't long. Five minutes maybe.
2  Q  Was she the first client you called?
3  A  I don't recall.
4  Q  Was there anybody else with you when you called
5      her?
6  A  I don't think so.
7  Q  Did you talk to anybody else between your
8      Placitella conversation and Ms. Holley?
9  A  Well, I'm sure I talked to, you know, my
10     partner, Pat, probably.
11 Q  Probably or yes?
12        MR. ROTH:      Objection.
13 A  I may have.
14     I may have talked to my paralegal, Erin
15     Clark.
16 Q  So Mr. Placitella calls you, and then you call
17     Ms. Holley and tell her that you're
18     investigating a fraud claim, her mother was
19     exposed to talc, Emtal lied about it, and as a
20     result of the lie, you settled for less than
21     you had to?
22 A  That is probably a pretty good summary.
23 Q  And you knew all of that from your own personal
24     history in dealing with Engelhard and your
25     initial conversation with Mr. Placitella?

Page 97

1  A  Well, I know what Engelhard told me -- or
2      Eastern Magnesia Talc, because that's what I
3      always refer to them. I know what they told me
4      over the years.
5  Q  And in terms of the lie, the alleged lie, how
6      were you concluding that there was a lie?
7  A  Nothing other than what Mr. Placitella told me.
8  Q  The basis for your conveying to your clients
9      that there was a lie was solely based on what
10     Mr. Placitella told you, fair?
11 A  Yes.
12        MR. ROTH:      Objection.
13 Q  Okay. Now, Ms. Pease, could you tell me
14     everything that happened in that conversation?
15 A  It would have been a similar conversation. It
16     would have been the same.
17 Q  And again, the basis for you telling the
18     plaintiff, Ms. Pease, that there was a lie was
19     solely based on what Mr. Placitella told you?
20 A  Yes.
21 Q  Ms. Ware, same conversation?
22 A  It would have been the same conversation.
23 Q  Same reliance --
24 A  Yes.
25 Q  -- on Mr. Placitella?

THOMAS W. BEVAN, ESQ. - 05/15/2018    Pages 98..101

Page 98

1        And Ms. Graham and Ms. Kimberlee
2    Williams, you don't recall one way or the other
3    having a conversation with them?
4    A   I don't recall having a conversation with the
5    two of them.
6    Q   Okay.  Were there any clients that you
7    contacted and then did not become named
8    plaintiffs?
9    A   It was possibly the Myers case, but I don't
10   recall for sure whether or not Harold Myers was
11   a case that we considered and talked to
12   Mrs. Myers.
13   Q   Out of the five named plaintiffs, how many meso
14   cases were there?
15   A   I believe four of them were mesos.  Meso lung
16   cancer.
17   Q   Was there any reason why there were four mesos?
18   Withdrawn.
19        MR. McDERMOTT:   Objection.
20   Q   Withdrawn.
21        Did Mr. Placitella in words and substance
22   ask you to find meso cases?
23        MR. ROTH:     Objection to
24   the form and work-product.
25        Don't answer that question.  Please.

Page 99

1    Q   You can answer.
2    A   I will decline to answer.
3        MR. ASSAF:     502.
4    Q   You can answer.
5        MR. ROTH:     No.  Yeah, I
6    don't think there's a 502 on this.
7    Q   You're not going to answer the question?
8    A   I won't answer that, no.
9        MR. ASSAF:     Counsel, same
10   instruction?
11        MR. McDERMOTT:  I don't know
12   anything about 502.
13        MR. ASSAF:     Are you
14   instructing him not to answer?  Because I don't
15   think Mr. Roth can.
16        MR. McDERMOTT:  I will instruct
17   him not to answer.
18        THE WITNESS:    Thank you.
19        MR. ROTH:     That's why I
20   said please.
21   BY MR. ASSAF:
22   Q   Okay.  How long did the Holley, Ware, and Pease
23   conversations last?
24   A   I thought I told you.  About five minutes
25   probably.  I don't think it would have been a

Page 100

1    long conversation.
2    Q   Five minutes each, or five minutes in total for
3    the three of them?
4    A   Five minutes each.
5    Q   Okay.  And then when's the next time you spoke
6    to them about the case that became known as
7    Williams?
8    A   I can't give you any specific dates.
9    Occasionally I've talked to Marilyn Holley.
10        I don't recall if I've ever talked to
11   Mrs. Pease after the initial conversation, and
12   then she developed Alzheimer's or dementia or
13   something, so her sister, Gayle, has taken over
14   and I spoke once with Gayle.
15        And Donnette Wengerd, I know I've talked
16   to her once in the last year or two, a couple
17   years.  I don't recall when.
18   Q   When Mr. Placitella called you, did you take
19   notes?
20   A   No.
21   Q   When you called the clients, did you take
22   notes?
23   A   No.
24   Q   When you called Ms. Holley, Pease, and Ware,
25   did you tell them to expect a call from

Page 101

1    Mr. Placitella, or did you arrange a meeting or
2    say -- what did you say?  How did you end it?
3    A   I'm certain I mentioned Mr. Placitella's
4    office.  And how I connected them, I don't
5    recall for sure, but somehow I connected them.
6    I probably had the paralegal, Erin Clark, you
7    know, connected too or let them know that hey,
8    they're going to be calling.
9    Q   When you talked to Ms. Holley, Ms. Pease, and
10   Ms. Ware, did they provide you any factual
11   information regarding why they settled their
12   cases?
13   A   No.
14   Q   They wouldn't know why they settled, they were
15   relying on you, fair?
16   A   I'm sure they relied on me.
17   Q   Right.
18        Did you ever provide them with any
19   reasons why you were settling the Emtal cases?
20   A   The settlement was not solely Emtal, it was
21   with a group of talc defendants.  And I'm
22   sure -- for instance, for all of them, I spoke
23   with them, whether it was Mrs. Pease, I don't
24   recall if it was -- Mrs. Clark alive at the
25   time that I settled it.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 102..105

Page 102

1    Same with the Darnell case. I talked
2    with Kathryn Darnell very regularly. Whether
3    that settlement was done while Kathryn was
4    still alive or if it was done afterwards and I
5    conversed with Marilyn, I don't recall because
6    it's a long time ago.
7        But I spoke with these clients quite
8    regularly about what we were doing and why we
9    were doing it and made my recommendations to
10   them.
11   Q  And in your initial conversations with Holley,
12      Pease, and Ware, did you convey to them in
13      words or in substance that you wouldn't have
14      not recommended a group settlement if you
15      thought there was an asbestos -- a talc company
16      out there who had evidence of asbestos in it?
17      MR. ROTH:    Objection to
18   form.
19      MR. McDERMOTT:   Object as to
20   form. There's two negatives in that question.
21   Q  Withdrawn.
22      When you were talking to Ware, Pease, and
23      Holley, did you tell them that you recommended
24      a group settlement on the assumption that there
25      was no asbestos in any of the talc defendants'

Page 103

1    products?
2       MR. ROTH:    Objection.
3    A  How that -- I stated that, I don't recall, but
4    I'm certain I would have alluded to that fact,
5    which was this is why we did what we did,
6    because we were of the belief that there was no
7    asbestos in Eastern Magnesia Talc.
8    Q  And if you had thought -- withdrawn.
9        If you had a belief that there was
10      asbestos in another talc manufacturer's
11      product, you wouldn't have given them a benefit
12      of the group settlement, fair?
13      MR. ROTH:    Objection.
14   A  Well, no. Just based on what you're -- just on
15      those simple facts. That's just not enough
16      facts to go on.
17   Q  Well, you knew that Southern Talc had documents
18      showing asbestos in their talc, true?
19   A  I believe I had something that said that there
20      was asbestos in Southern Talc.
21   Q  And you -- you also knew at the time of group
22      settlement that R.T. Vanderbilt had documents
23      showing asbestos in their talc, true?
24   A  I believe I was aware of that, yes.
25   Q  Correct. And you still recommended a group

Page 104

1    settlement, true?
2    A  Based on the fact that I had no product ID,
3    yes.
4    Q  But you knew --
5    A  Do you understand what I mean by that?
6    Q  I know what you mean by product ID, Mr. Bevan.
7    A  There's two parts to it.
8    Q  There's --
9    A  Our clients -- was their product where my
10      clients worked and did their product contain
11      asbestos. The evidence was very clear that
12      Eastern Magnesia Talc product, and a tremendous
13      amount of it, was where my clients worked.
14        There wasn't evidence of much, if any,
15      Southern talc or R.T. Vanderbilt talc where my
16      clients worked during the years that they
17      worked there.
18   Q  Okay. So -- and thank you for that
19      clarification. There are two important
20      components --
21   A  Yes.
22   Q  -- of assessing claims against a talc
23      manufacturer, whether there's asbestos in the
24      talc?
25   A  Yes.

Page 105

1    Q  And product ID, correct?
2    A  Yes.
3    Q  And exposure, correct?
4    A  Yes.
5    Q  Okay. So -- and then there could be other
6       issues that would go into your settlement,
7       whether there is a statute of limitations
8       problem, correct?
9    A  That could be an issue.
10   Q  Whether, for example, you have some procedural
11      problems, like your witness list is stricken?
12      That could also factor into a settlement,
13      correct?
14   A  I suppose.
15   Q  Whether there are alternative exposures,
16      correct?
17   A  Yes.
18   Q  Whether a claimant is relying on a doctor whose
19      credentials may be subject to attack under 292,
20      correct? Withdrawn.
21        You understand a number of talc cases
22      were dismissed administratively as a result of
23      House Bill 292, correct?
24   A  I think so, yes.
25   Q  Okay. And do you think those people have been

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 106..109

Page 106

1    harmed by Engelhard?
2    A  I think yes.  Yes.
3    Q  Would an administrative dismissal by a Court be
4       an issue similar to product ID, in your mind,
5       in trying to resolve cases?
6            MR. ROTH:      Objection.
7    A  If a court administratively dismisses a case --
8       you're going to have to repeat that.
9    Q  Sure.
10           You and I had a short discussion about
11      House Bill 292, correct?
12   A  I'm familiar with it.
13   Q  Yeah.
14   A  I don't recall you and I talking about it.
15   Q  All right.  But you understand that after 292
16      was enacted, there were a number of asbestos
17      cases dismissed, correct?
18   A  Yes.
19   Q  And a number of your talc asbestos cases were
20      dismissed, correct?
21   A  I assume.  I don't know for sure, but I
22      assume --
23   Q  Do you think --
24   A  -- there was some.
25   Q  -- the people who had their claims

Page 107

1       administratively dismissed against Engelhard
2       should still have a claim against Engelhard?
3            MR. ROTH:      Objection.
4    A  I guess I don't understand your question.
5    Q  Sure.  Let's go back to your affidavit.  Okay?
6    A  Okay.
7    Q  When the definition is about claims that were
8       dismissed, do you understand that that includes
9       administrative dismissals as well?
10   A  I don't know that that's what we looked at, as
11      far as dismissal.  We were looking at cases
12      that got dismissed either on summary judgment
13      or were voluntarily dismissed.
14   Q  So your testimony is that the 2,653 does not
15      include administrative dismissals?
16   A  No, that's not my -- what I'm telling you.
17   Q  All right.  It does include administrative
18      dismissals?
19   A  Yes.
20   Q  Of course, right?
21   A  Well, if there was some.  I assume there was
22      some.  Yeah, I don't how many, but ...
23   Q  And administrative dismissals as a result of
24      Bill 292 would also be included in that 2,653
25      number, correct?

Page 108

1            MR. ROTH:      Objection.
2    A  I believe there's probably some in there.  I
3       don't know how many.
4    Q  You and Mr. Walsh never went back and tried to
5       figure out whether there were administrative
6       292 dismissals in that 2,653 number, did you?
7            MR. ROTH:      Objection.
8    A  No.
9            MR. McDERMOTT:   Can we take a
10      break?
11           MR. ASSAF:     We have five
12      minutes on tape.
13           MR. McDERMOTT:   Okay.
14   Q  I would ask you not to discuss your testimony
15      with anybody during the break.
16   A  Sure.
17           MR. ASSAF:     Thank you.
18           THE VIDEOGRAPHER:  Off the record.
19      The time is 11:05.
20           -----
21           (Recess taken.)
22           -----
23           THE VIDEOGRAPHER:  We're back on
24      the record.  The time is 11:13.
25   BY MR. ASSAF:

Page 109

1    Q  I'm going to show you what's been previously
2       marked as D Ex1.  D Ex1 in the second amended
3       complaint in the Williams case.
4            Have you seen this before?
5    A  Yes.  I've seen the Williams complaint.  The
6       second amended, I'm not sure.
7    Q  For the original complaint, did you review that
8       complaint prior to filing?
9    A  I reviewed it.  I don't know if I reviewed it
10      prior to filing.
11   Q  Have you ever made any suggested changes to the
12      complaint?
13   A  Not that I recall, no.
14   Q  Did you ever tell Mr. -- withdrawn.
15           Have you ever told anybody from Cohen,
16      Placitella & Roth that there were facts in the
17      complaint that were inaccurate?
18   A  Not that I recall.
19   Q  Do you know whether there any inaccuracies
20      in the complaint?
21   A  I don't know.
22   Q  Do you view yourself as an agent for your
23      various clients?
24   A  Yes.
25   Q  Okay.  And did you want to make sure the

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 110..113

Page 110

1   complaint was accurate, in order to protect
2   their interests?
3   A  I didn't feel that was my job in this
4   situation, no.
5   Q  So you talked to Mr. Placitella, you have five
6   minute conversations with three of the five
7   plaintiffs, and then what else do you do in
8   terms of the Williams case?
9        MR. ROTH:    Objection.
10  A  What have I done?
11  Q  Yeah.
12  A  Gathered documents in response to the subpoena.
13  Testified.  I've read pleadings.  That's
14  probably the extent of it.
15  Q  What else have you done in terms of conveying
16  your factual knowledge to people?
17  A  I know I told Mr. Placitella what happened.
18  Q  In that first conversation?
19  A  In multiple conversations.
20  Q  Okay.  So you had other conversations with
21  Mr. Placitella apart from that first one?
22  A  Yes.
23  Q  Okay.  How many others?
24  A  I have no idea.
25  Q  Were they all on the phone, or were some in

Page 111

1   person?
2   A  We've spoken in person.
3   Q  Did he come out here to Ohio?
4   A  He's been out here at least once that I can
5   recall.  At least once.
6   Q  When did you convey, if ever, to Mr. Placitella
7   your understanding of the facts?
8   A  I'm sure I conveyed facts the first time we
9   talked.
10  Q  Other than that first five-minute conversation.
11  A  It's been many times.
12  Q  Did you ever provide him anything in writing?
13  A  You know, I'm sure there was emails exchanged.
14  You know, emails.
15  Q  And in those emails, were there facts that you
16  had recalled and were trying to convey to him
17  to help him out?
18        MR. ROTH:    Objection.  I
19  think the Court has ruled on emails.
20  You don't have to answer that.
21  Q  You definitely have to answer this one.
22        MR. McDERMOTT:  Can we -- hold
23  on one second, please.
24        MR. ASSAF:    I'm not asking
25  him what was said.  I'm not asking what the

Page 112

1   facts are, Harry, I'm asking if he conveyed
2   facts to him.
3        MR. McDERMOTT:  Can we just --
4   Q  Could you -- witness, could you leave the room,
5   please?
6   A  Sure.
7        MR. ASSAF:    Go off the
8   record.
9        THE VIDEOGRAPHER: Off the record.
10  The time is 11:17.
11       -----
12  (Discussion held off the record.)
13       -----
14       THE VIDEOGRAPHER: We're back on
15  the record.
16       MR. McDERMOTT:  Tom, after
17  conferring, we're just going to lodge an
18  objection.
19       Go ahead and answer Mr. Assaf's last
20  question.
21       THE WITNESS:    Can you read
22  the question back to me?
23  BY MR. ASSAF:
24  Q  Withdrawn.  Withdrawn.
25       Did you convey facts to Mr. Placitella in

Page 113

1   these emails?
2   A  I believe that I probably conveyed some facts.
3   Q  And are these facts that you also conveyed to
4   the five named plaintiffs?
5        MR. ROTH:    Objection to
6   form.
7   A  You know, I'm not sure what I said in the
8   email, so I really can't accurately --
9   Q  Let's try it this way.
10  A  -- say that for sure.
11  Q  You never spoke to Ms. Wengerd or Ms. Graham or
12  Kimberlee Williams --
13       MR. ROTH:    Objection.
14  Q  -- as far as you can recall regarding this
15  case?
16  A  I don't think I did.  I -- I -- no, I've
17  probably spoken to Donnette Wengerd, but not
18  early on.  I don't recall for sure.
19  Q  And the Holley, Pease, and Ware conversations
20  were five minutes, correct?
21       MR. McDERMOTT:  Objection.
22  A  I'm estimating.
23  Q  So now I'm trying to -- is it fair to say that
24  you had more substantive, more detailed,
25  factual conversations with Mr. Placitella than

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 114..117

Page 114

1  you did with the named plaintiffs? Fair?
2       MR. ROTH:    Objection to
3  form.
4  A  Certainly from Mr. Placitella's end. You know,
5     he knew more than you, you know, my clients knew.
6  Q  You provided Mr. Placitella with more facts
7     than you provided to your clients, fair?
8       MR. ROTH:    Objection.
9  A  I think so.
10 Q  Well, since you never spoke to Ms. Wengerd or
11    Ms. Williams regarding the facts, by definition
12    you had to provide Mr. Placitella with more
13    facts, fair?
14       MR. ROTH:    Objection.
15 A  Me personally, yeah, sure.
16 Q  And in providing these facts, some of the facts
17    were in emails, correct?
18 A  I think. I'm not positive, but I think.
19 Q  Have you reviewed these emails?
20 A  I -- no. I got a stack of emails, but I have
21    not reviewed them.
22 Q  When did you get a stack of emails?
23 A  Some -- some time ago. I printed out a stack
24    of my emails.
25 Q  A week, a month, two months?

Page 115

1  A  I don't recall when it was.
2  Q  And did you review them in the context of this
3     case?
4  A  I did not review them, I just printed them.
5  Q  Why did you print them?
6  A  In case I was going to have to turn them over.
7  Q  You weren't curious as to what were on the
8     emails?
9  A  It's a lot of emails. I didn't have the time.
10    I'm not going to review them if I don't have
11    to.
12 Q  What do you mean "a lot"?
13 A  It's, you know, dozens of emails. I mean it's
14    probably a four-inch, five-inch stack of
15    emails.
16 Q  To and from Mr. Placitella and his colleagues?
17 A  Yes.
18 Q  And those emails, again, contain information
19    that your clients don't have --
20       MR. ROTH:    Objection.
21 Q  -- correct, the five --
22       MR. ROTH:    Form and
23  foundation.
24 A  I wouldn't agree with that.
25 Q  Well, those emails contain facts that you

Page 116

1  didn't discuss with your clients, correct?
2       MR. ROTH:    Objection.
3  A  I don't know.
4  Q  You never discussed anything with Ms. Williams?
5  A  Me personally?
6  Q  Correct. Correct.
7  A  No.
8  Q  And she's the named plaintiff in this case,
9     correct?
10 A  I think she's the lead plaintiff.
11       MR. ROTH:    Objection.
12 Q  So if there are any facts in those emails,
13    Mr. Placitella would have greater access to
14    those facts than Ms. Williams, true?
15 A  I can't answer that. I don't -- I don't know.
16 Q  Did you provide Mr. Placitella with facts
17    regarding the underlying Engelhard cases?
18 A  Again, I'm not sure what I put in the email.
19 Q  Well, you said previously you did put facts in
20    the --
21 A  I said I think I did, but I don't know exactly
22    what I put in.
23 Q  And you wouldn't know until you or somebody
24    reviewed them as to whether there are facts in
25    those emails?

Page 117

1  A  That's true.
2  Q  Okay. And would it -- would there be some
3     reason why you wouldn't convey to
4     Mr. Placitella facts in those emails?
5       MR. ROTH:    Objection.
6  A  Yeah, if it didn't come up. If there wasn't a
7     need at the time.
8  Q  Well, in this four-inch stack of dozens and
9     dozens of emails, can you think of any reason
10    why you wouldn't convey to him a fact that
11    would be relevant to the case?
12 A  If it didn't come up, I didn't put it in an
13    email.
14 Q  Well, what type of communications would you
15    have with Mr. Placitella if you weren't
16    conveying to him facts regarding the underlying
17    action?
18 A  Well, first of all, I've had communications
19    with Mr. Placitella and people of his -- from
20    his firm on things unrelated to this case.
21    I've had conversations in email communications
22    with them with respect to the Ross case. That
23    would all be in that same stack of emails.
24 Q  So let's put the Ross case and other cases --
25    let's just talk about the Williams case.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 118..121

Page 118

1   A  Okay.
2   Q  Okay.  Those emails contain facts that you are
3       historically familiar with after reviewing the
4       documents and after looking at your files,
5       right?
6           MR. ROTH:     Objection to
7       form.
8   Q  Well, let's start this --
9   A  I don't know.
10  Q  -- way, Mr. Bevan.
11          When Mr. Placitella calls -- withdrawn.
12      Withdrawn.
13          When Mr. Placitella calls you and tells
14      you about what he's found and then you call
15      your clients, didn't you go back to your files
16      and start looking at them to see what the facts
17      were and try to understand all of the
18      correspondence and what happened in the cases?
19  A  I don't think I went back to the client files,
20      no.
21  Q  How did you understand, then, what the facts of
22      the underlying -- what happened in the
23      underlying cases?
24  A  Because I was there.  I handled it.  I was the
25      one that had the conversations with Eastern

Page 119

1       Magnesia Talc lawyers.
2   Q  Okay.
3   A  I was the one that received the letters.  I was
4       the one that was there in the depositions when
5       they were there.  I was there in the court
6       hearings when they were there.  I handled the
7       cases.  I handled every aspect of it.  So I
8       recall what happened.
9   Q  You handled every aspect of the cases?
10  A  Well, I mean I, you know --
11  Q  You just said that.
12  A  Yeah.  As an attorney, yes.
13  Q  Okay.  All right.  I'm going to write that one
14      down.  We're going to come back to that.
15  A  Go ahead and write that one down.
16  Q  Every aspect.  Okay.
17          MR. ROTH:     As an attorney.
18      Make sure you get it right.
19  Q  And then as part of your role as an attorney,
20      when a client first comes to you, you review --
21      you perform a thorough investigation to
22      determine the underlying facts, correct?
23  A  Yes.
24  Q  And you also try to figure out from the client
25      whether they've been exposed to asbestos,

Page 120

1       correct?
2   A  Yes.
3   Q  You even have that on your website, correct?
4   A  Sure.
5   Q  Various ways how people could be exposed to
6       asbestos, correct?
7   A  Yes.
8   Q  Let me show you what's been marked as
9       Defendants' Exhibit 241 and 242.
10          Do you recognize that as a screenshot of
11      your website?
12  A  Yeah, I haven't looked at it in years, but I
13      don't dispute that fact.
14  Q  Okay.  In terms of 242, there's a listing of
15      products on that, correct?
16  A  Well, it's some pictures of products.
17  Q  Have you ever heard the term "photo array"?
18      Photo array.
19  Q  Photo array?
20  A  Yeah.
21  A  No.
22  Q  When clients come in, do you show them photos
23      of various products in order to help them with
24      product ID?
25  A  We have on occasion, but typically no.

Page 121

1   Q  Okay.  And in your photo gallery on your
2       website, there's no listing of talc?
3   A  There's no picture of talc.
4   Q  Okay.  Why is that?
5   A  I don't think I have a picture of talc.
6   Q  You're trying to inform your prospective and
7       new clients of various ways that they could
8       have come in contact with asbestos, correct?
9   A  No.  These are just -- these are just some
10      pictures.  I mean, this is, you know, one-tenth
11      of 1 percent of the types of asbestos products
12      that exist.  So it's not meant to be
13      exhaustive, if that's what you're asking me.
14  Q  The entire client set?
15  A  I don't think I've ever reviewed these pictures
16      with my clients.
17  Q  Are there any Bar rules regarding information
18      contained on your website and whether it has to
19      be accurate?
20  A  Yeah, it should be accurate.
21  Q  And it shouldn't mislead or omit important
22      information for clients, correct?
23          MR. ROTH:     Objection to
24      form.
25  A  Yeah.  Yes.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 122..125

Page 122

1  Q  And so if a client came in with meso, you would
2     expect them to be able to look at this and see
3     whether they would have gotten meso or worked
4     with one of these products, correct?
5  A  No.
6  Q  Never?
7        MR. ROTH:   Objection.
8  A  No.
9  Q  You said you -- did you tell Mr. Placitella
10    everything you can recall without looking at
11    documents?
12 A  I don't recall.
13 Q  Well, did you review documents to try to convey
14    facts to Mr. Placitella?
15 A  The only documents I think I've reviewed was
16    the talc settlement files that I referenced in
17    the last deposition that was eight and a half
18    inches thick. That's the only one document
19    that I recall that I reviewed at the time. I
20    don't recall what was in there, if there was
21    some letters in there from Eastern Magnesia
22    Talc. I don't recall.
23 Q  In terms of the facts, if you conveyed facts to
24    Mr. Placitella, how can I see those facts?
25       MR. ROTH:   Objection to

Page 123

1     the form and foundation.
2  Q  Are they anywhere else for me to see?
3  A  I guess you could ask me the facts.
4  Q  Well, what facts -- tell me -- could you tell
5     me everything you conveyed to Mr. Placitella in
6     terms of the facts of the case?
7  A  Things that I've conveyed to Mr. --
8  Q  Everything.
9  A  I'll tell you what I can recall, which is that
10    we filed suits against Eastern Magnesia Talc
11    starting in the very early '90s when I began to
12    practice law, that I got threatening letters
13    and phone calls --
14       MR. ROTH:   Mr. Bevan, hold
15    on a second. I want to make sure you have
16    Mr. Assaf's full attention.
17 Q  I -- definitely do.
18 A  Okay.
19 Q  I think I know where this is going.
20 A  I received many threatening letters and phone
21    calls, as well as personal conversations.
22       Typically the people I dealt with was an
23    individual, I believe his name was Scott
24    Martin, and then I know an individual named
25    Allen Joslyn. I don't recall if I dealt with

Page 124

1     anybody beyond that. I would speak to them at
2     breaks in depositions or after depositions.
3     They would call me. Well, Scott Martin
4     typically would call me. They would send me
5     letters. They would make sanction threats
6     against me.
7        I recall a specific incident in a
8     deposition, it was the John Nardella
9     deposition, when Allen Joslyn came and, you
10    know, very aggressively after the deposition
11    about why I hadn't dismissed Eastern Magnesia
12    Talc.
13       I recall that one specifically, because
14    Mr. Nardella, who I represented who was a guy
15    that wasn't afraid to speak his mind, when
16    Mr. Joslyn walked away, he looked at me and
17    said, "What an asshole." And I had many
18    conversations with both of them.
19       We dismissed cases. We ultimately did a
20    global talc settlement at numbers that were
21    very low.
22       And our issue with the talc case was that
23    the product ID we had was predominately Eastern
24    Magnesia Talc product ID. It was significant
25    amounts of Eastern Magnesia Talc.

Page 125

1        Most of my clients that worked in the
2     rubber plants, if not all, but certainly most
3     of them, talked about talc, or they referred to
4     it as soapstone exposure. It was I would use
5     the word ubiquitous in the rubber industry. It
6     was everywhere.
7        And as a -- but the problem that I had in
8     pursuing the talc case was that, you know, from
9     a product ID standpoint, the only company I
10    could make a good case against was Eastern
11    Magnesia Talc, but their talc didn't contain
12    asbestos, or so they said. And that was the
13    basis of our decision to settle the talc
14    companies.
15       Another fact I recall is at one point I
16    dismissed Eastern Magnesia Talc from some
17    cases. I received a phone call from Sam
18    Martillotta, who was the lead defense counsel
19    representing the talc entities in a global
20    negotiation, and I received a very angry phone
21    call from Mr. Martillotta, that why did I
22    dismiss Eastern Magnesia Talc. And I said
23    "Well, because their talc doesn't contain
24    asbestos."
25       And he said, well, you know, that makes

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 126..129

Page 126

1  it, you know, difficult for us to do any type
2  of deals. And he still got a deal done. And I
3  was always surprised that Eastern Magnesia Talc
4  was on the paperwork. So he somehow got
5  Eastern Magnesia Talc to continue to
6  participate.
7       You know, there's probably more facts
8  involved. That's what I can recall at that
9  time.
10 Q  And you told Mr. Placitella all of that?
11 A  I don't know if I ever told him the John
12    Nardella story that I just told right now.
13 Q  And did you tell any of your clients any of
14    that in –
15 A  Well –
16 Q  – these five minute conversations?
17 A  You took the notes of what I said, and that was
18    a summary of what – what I said was a summary
19    of those facts.
20 Q  And any of those facts in the complaint that
21    you know of?
22 A  I don't recall. I haven't looked at that
23    complaint in quite some time, so I don't know.
24 Q  In terms of the facts that you just gave me, do
25    you have any other facts?

Page 127

1  A  I'm sure I have other facts. I know that's
2     what I can recall right now. I mean, I have a
3     lot of, you know, evidence that Eastern
4     Magnesia Talc sold very large quantities of
5     talc to the Akron rubber plants where my
6     clients worked.
7  Q  Goodyear Aerospace?
8  A  The Goodyear Aerospace is a little different,
9     because Goodyear Tire, the talc would have been
10    used in the floor tile manufacturing. In
11    Goodyear Tire, the floor tile was made in the
12    vinyl division, which was at the Goodyear
13    Aerospace facility, and the employees there
14    were Goodyear Aerospace employees working in
15    that, but vinyl division was a Goodyear Tire
16    division. And so Goodyear Tire central
17    purchasing did the purchasing for the vinyl
18    division.
19 Q  So you believe that Emtal talc was used at
20    Goodyear Aerospace?
21 A  I believe it would have been shipped from
22    Goodyear Tire over to Goodyear Aerospace.
23 Q  Do you have proof of that? Withdrawn.
24    Did you ever supply a Court with proof of
25    that and a Court believed you?

Page 128

1  A  I don't know that we ever litigated that,
2     because, again, it's the same problem, which
3     is, you know, the time when I was litigating
4     Goodyear Aerospace cases, I was under the
5     belief that based on Eastern Magnesia Talc's
6     statement that their talc did not contain
7     asbestos.
8  Q  Did you ever show to any Court that Goodyear
9     Aerospace used Emtal talc, yes or no? Any
10    Court.
11 A  I don't believe that ever came up in a case.
12 Q  Did you ever show any Court that Emtal talc was
13    used at Goodyear Aerospace, yes or no?
14 A  I don't believe that ever came up.
15 Q  Did you ever make an offer of proof that – or
16    make an allegation that Emtal was used at
17    Goodyear Aerospace to any Court?
18 A  Yeah, I don't – I don't recall.
19 Q  You didn't mention Mr. Kluznik.
20 A  That name I'm familiar with. I don't – I
21    don't recall. You know, I don't recall having
22    any dealings with Mr. – I may have, but I just
23    don't recall that, because when we were
24    litigating these cases predominantly in the
25    '90s, early 2000s, it was always the Cahill

Page 129

1     Gordon people and it was always Scott Martin
2     and Allen Joslyn are the ones that I recall.
3  Q  Well, you mentioned three attorneys that you
4     had three discussions with that weren't
5     associated with you; Martin, Joslyn, and a
6     fellow named Sam Martillotta.
7  A  Yes. Yes.
8  Q  By the way, do you know Mr. Martillotta?
9  A  I know him, yes.
10 Q  Based on your dealings with him, do you think
11    he has a reputation for honesty?
12 A  I don't know.
13 Q  Well, have you ever found him to be anything
14    but honest?
15 A  Not that I know of.
16 Q  We'll mark this. This is Defendants' 243.
17    Defendants' 243 is a printout from the
18    Mansour Gavin website of Samuel R. Martillotta.
19    Is this the person that you mentioned in
20    your recitation of the facts, Mr. Bevan?
21 A  Yes, it is.
22 Q  Okay. And you had dealings with him and
23    conversations with him regarding the settlement
24    of various talc cases?
25 A  Yes.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 130..133

Page 130

1   Q   And, in fact, you had both correspondence with
2       him and telephone calls with him, correct?
3   A   Yes.
4   Q   And he was representing a group of talc
5       defendants, correct?
6   A   Well, he was representing Southern Talc. He
7       was – as far as the settlement, he was the
8       liaison for them, so I don't – I don't
9       believe. He certainly didn't hold himself out
10      that he was representing anybody else.
11  Q   As far as you know, he was acting as settlement
12      liaison counsel for a group of talc companies,
13      correct?
14  A   That's how I would describe it.
15  Q   And based upon your dealings with him over the
16      years, do you have any reason to question what
17      he would say regarding the talc litigation that
18      was anything but honest?
19          MR. ROTH:     Objection to
20      form.
21  Q   Do you think he's a truth teller?
22  A   You know, at this point, I don't know. I don't
23      know. From the defense side, what I've seen on
24      Eastern Magnesia Talc shocks me, and so,
25      frankly, I don't trust him all that much

Page 131

1       anymore either.
2   Q   Okay. Do you have any – what's your factual
3       basis for thinking that he's anything but
4       honest?
5   A   Well, if the Eastern Magnesia Talc and the BASF
6       people would so blatantly lie, why wouldn't
7       other defendants lie as well?
8   Q   Other than the answer you gave, do you have any
9       facts that you have personal knowledge of
10      regarding Mr. Martillotta being dishonest?
11  A   No.
12  Q   So the answer you just gave me was you
13      surmising. You don't have any facts, do you,
14      Mr. Bevan?
15          MR. ROTH:     Objection to
16      form and foundation.
17          MR. McDERMOTT:   Objection.
18  A   I didn't say it was a fact. I said based on
19      the way Eastern Magnesia Talc and Cahill Gordon
20      handled this matter, I don't trust any of you.
21  Q   Okay. And you think that's fair based upon
22      your dealings with Mr. Martillotta? You
23      can't even –
24          MR. McDERMOTT:   Objection.
25  Q   As another member of the Ohio Bar, you're able

Page 132

1       to sit here and say you don't know whether he's
2       honest or not?
3           MR. McDERMOTT:   Objection.
4           MR. ROTH:     Objection.
5   A   That is correct.
6   Q   But you don't have any facts to back that up?
7           MR. ROTH:     Objection.
8           MR. McDERMOTT:   Objection.
9       Asked and answered.
10  A   No facts other than what BASF or Eastern
11      Magnesia Talc and its lawyers, Cahill Gordon,
12      did.
13          MR. McDERMOTT:   Move to strike.
14  A   Hopefully Mr. Martillotta's more honest than
15      your clients were.
16          MR. ASSAF:     Move to strike.
17  Q   Do you have any facts?
18          MR. ROTH:     Asked and
19      answered.
20  Q   You're a lawyer – withdrawn.
21      You're a lawyer, right, practicing law
22      for a long time in this jurisdiction?
23  A   Yes.
24  Q   Yes. Okay.
25      Now I'm asking you for facts that you

Page 133

1       could tell a judge regarding why you think
2       Mr. Martillotta isn't honest. Do you have any
3       facts?
4           MR. ROTH:     Objection.
5           MR. McDERMOTT:   Objection.
6       Asked and answered.
7   A   I think I answered your question already.
8   Q   Do you have any facts?
9   A   I said I don't have any facts, I just don't
10      trust him because of what Cahill Gordon and
11      Eastern Magnesia Talc did in this case.
12          MR. McDERMOTT:   Continuing
13      objection to this line of questioning.
14  Q   So let's turn to the second amended complaint.
15      Let's start off with Ms. Pease.
16      Can you turn to paragraph 20 on page 21
17      of D Ex 1?
18      By the way, in your meetings with
19      Mr. Placitella, did he take notes?
20  A   I never saw him take any notes.
21  Q   Did you ever take any notes?
22  A   No.
23  Q   Did you ever provide him with any specific
24      documents? In other words, "Here's a document
25      I found, you should look at it"?

THOMAS W. BEVAN, ESQ. - 05/15/2018    Pages 134..137

Page 134

1  A  Are we talking about Eastern Magnesia Talc or
2     other stuff?  I'm sure I've given
3     Mr. Placitella documents over the years
4     unrelated to Eastern Magnesia Talc.
5  Q  Well, I thought until this case you didn't know
6     Mr. Placitella?
7  A  I don't think that's what I said.
8        MR. ROTH:        Objection.
9  A  I said I don't think I ever spoke to him.
10 Q  Spoke to him, okay.
11 A  But I wasn't sure I said.
12 Q  Okay.  So but since -- so regarding anything
13    regarding Engelhard, Eastern Magnesia Talc, the
14    Williams case, did you provide specific
15    documents to Mr. Placitella along the lines of
16    "I found this" or "You should look at this"?
17 A  I think I have provided him, but I'm not sure.
18    I think I may have provided him something in
19    the Ross case.
20 Q  So these stack of emails I'm getting to, I'm
21    going to ask you to review these emails and
22    I want to find out, are there going to be
23    emails in there in which you're conveying to
24    Mr. Placitella either facts or your
25    understanding of facts.

Page 135

1        MR. ROTH:        So is there a
2     question?
3        MR. ASSAF:        Yeah.
4  Q  In those emails to Mr. Placitella, do you
5     provide him with your understanding of certain
6     facts or documents regarding this case?
7        MR. McDERMOTT:   Objection.  No
8     foundation.
9  A  I thought I --
10       MR. ROTH:        Asked and
11    answered.
12 A  -- answered that multiple times, which is I
13    think I gave him some facts.  I'm not sure what
14    I put in the emails.
15 Q  Regarding Ms. Pease.  So first of all, if you
16    turn to paragraph 22, it says, "commenced an
17    asbestos injury lawsuit in Cuyahoga County."
18       Do you see that?
19 A  Yes.
20 Q  And further down, it says:  This suit replaced
21    a Summit County asbestos personal injury case.
22    Correct?
23 A  Yes.
24 Q  There's nothing else about that, about that
25    Summit County case in there, is there?

Page 136

1  A  I don't see anything else.
2  Q  Well, you said you handled every aspect of
3     these clients' cases, correct?
4  A  I said --
5        MR. ROTH:        Objection to
6     form.
7  A  -- as a lawyer.
8  Q  As a lawyer, yeah.
9  A  I did the lawyering for them, yes.
10 Q  So as a lawyer, would you explain to me what
11    happened to that Summit County case?
12 A  We dismissed the case and refiled it in
13    Cuyahoga County.
14 Q  And you dismissed it because the case wasn't
15    going well, fair?
16       MR. ROTH:        Objection.
17 A  I would say we dismissed it because we felt
18    that it was more prudent to pursue this case in
19    Cuyahoga County where we would have a judge
20    handling it.
21 Q  You didn't think Judge Victor was up for the
22    task?
23 A  Judge Victor wasn't handling the case.
24 Q  Let me show you what's Defendants' Exhibit 135.
25    135 is a multiple page document entitled

Page 137

1     "Memorandum and Support of Motion for Summary
2     Judgment for Lack of Product Identification on
3     Behalf of Eastern Magnesia Talc Company."
4        Do you see that?
5  A  Yes.
6  Q  You understand that Emtal moved for summary
7     judgment on product ID grounds in Summit
8     County?
9  A  Yes.
10 Q  And you believe that the Summit County Court
11    was going to grant that and you told your
12    client that it was better to dismiss and refile
13    in Cuyahoga County, correct?
14 A  Yes --
15 Q  Withdrawn.
16       In words or in substance, you conveyed to
17    your client that you should dismiss because you
18    were going to lose on product ID grounds?
19       MR. ROTH:        Objection.
20 A  I thought we won this, by the way.
21       So I did not like having a magistrate
22    handling the case.  It was Magistrate Shoemaker
23    handling the case, and I thought we were
24    better -- because the cases were starting to
25    move in Cuyahoga County.  And so we dismissed

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 138..141

Page 138

1    and refiled it in Cuyahoga County.
2    Q   Did you file an opposition to the product ID
3        motion, or did you --
4    A   I'm not positive, but I thought we opposed that
5        and that the motion was denied, the Eastern
6        Magnesia motion was denied, but I --
7    Q   Let me show you Defendants' Exhibit 136.
8            Defendants' Exhibit 136 is a document
9        from Summit County.
10           Do you recognize that?
11   A   Yes.
12   Q   What is it?
13   A   This is a dismissal pursuant to Ohio Civil Rule
14       41(A) (1) of voluntary dismissal, which we
15       filed in Summit County and then refiled the
16       case in Cuyahoga County.
17   Q   Fair to say that you filed with a pending
18       motion for summary judgment based on product
19       ID?
20   A   Again, I think what I said was I thought that
21       motion for summary judgment on product ID was
22       denied, but I'm not certain.
23   Q   And then you refiled in Cuyahoga County,
24       correct?
25   A   Cuyahoga, yes.

Page 139

1    Q   And I'll show you Defendants' 137.
2            Is this the complaint you filed?
3    A   It appears to be.
4    Q   At this time, what was your factual basis for
5        asserting that your client was injured by Emtal
6        talc?
7    A   Our belief was that Eastern Magnesia Talc
8        supplied very large quantities of talc or
9        soapstone to good -- BFGoodrich, where
10       Mr. Clark worked, and that perhaps we could
11       develop a case that showed that Eastern
12       Magnesia Talc contained asbestos.
13   Q   By June 20 of 1995, had Engelhard told you
14       there was no asbestos in their talc?
15   A   Yes, I believe so.
16   Q   And did you rely on that information in
17       dismissing prior cases?
18   A   In dismissing prior cases, yes.
19   Q   Did you believe Emtal when they told you there
20       was no asbestos in the talc?
21   A   I believed it when I dismissed them.
22   Q   And then after you dismissed them, did you
23       continue to believe there was no asbestos in
24       the talc?
25   A   I believed that it was very questionable,

Page 140

1        whether there was asbestos in their talc.
2    Q   But when you dismissed them, you said you
3        believed them, so, in other words, when Allen
4        Joslyn told you "Dismiss me because there's no
5        asbestos in the talc," you say you believed
6        him, correct?
7    A   Yes.
8    Q   Okay.  And how long did that belief last?
9    A   I believe it lasted until I heard from
10       Mr. Placitella. I believed that there was no
11       evidence that there was asbestos in their talc.
12   Q   Okay.  So after Mr. Joslyn related that story
13       about the Nardella deposition and Mr. Joslyn
14       threatening you, right?
15   A   Yes.  And I don't know when the Nardella
16       deposition was.
17   Q   Well, I think the Nardella deposition is
18       actually in the prior motion for product ID.
19       It's referenced.  I don't know, you tell me.
20           Take out the motion for summary judgment
21       product ID.  Right here.  I think there's a
22       reference to Nardella at the bottom.
23   A   Assuming that was the only Nardella deposition.
24       I don't know if there was more than one or not.
25   Q   Okay.

Page 141

1    A   I don't know.
2    Q   So Joslyn tells you in your words that there's
3        no asbestos in the talc, right?
4    A   Yes.
5    Q   And you ask for proof of that, right?
6    A   Well, they sent me the affidavit or report.
7    Q   And you read those affidavits carefully,
8        correct?
9    A   I read them, yes.
10   Q   In fact, you read them so -- in such detail
11       that you actually had questions on them,
12       correct?
13   A   I think I may have, you know, questioned it.
14   Q   Okay.  So Joslyn tells you no asbestos in the
15       talc.  He sends you supporting affidavits,
16       which you read carefully and in detail, fair?
17   A   Yes.
18   Q   And then at that point, in your mind, you say
19       you believed the position that there was no
20       asbestos in the talc?
21   A   I believed that there was no evidence of
22       asbestos in their talc.
23   Q   And then after that, you continue to file
24       cases?
25   A   Yes.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 142..145

Page 142

1  Q  And so what's your – your good faith factual
2     basis for filing a claim against Emtal saying
3     that there's asbestos in their talc?
4  A  The – one of the reasons why we filed was
5     because the other defendants were pointing the
6     finger at the talc exposure and pointing it at
7     Eastern Magnesia Talc, and the one that was
8     particularly aggressive on that was Owens
9     Corning.
10        And it created a problem if they're able
11    to point to the empty chair.  And so by having
12    Eastern Magnesia Talc in the case, they're not
13    pointing to the empty chair, because Eastern
14    Magnesia Talc, they're saying, "No, our talc
15    does not contain asbestos."
16        And then it was our intent to let the
17    Court then settle it, and if the Court said,
18    "No asbestos in the Eastern Magnesia Talc,"
19    then that would cut off the defense by Owens
20    Corning, amongst others, that it was the talc
21    that was causing the mesothelioma, not their
22    product.
23        So it was a – a legal strategy is why we
24    continued to sue Eastern Magnesia Talc.  That,
25    plus the conversation with Sam Martillotta,

Page 143

1     which would have come after this time, which
2     was "Eastern Magnesia Talc's got to be at the
3     table if you want to have any deals.  Don't
4     dismiss Eastern Magnesia Talc."  And that was
5     why we continued to sue Eastern Magnesia Talc.
6  Q  So in terms of just the chronology, you say you
7     believed the position that Emtal had no
8     asbestos in the talc, or did you not believe
9     that?
10 A  I believed what he told me, which was "We
11    tested our talc multiple times, it never
12    contained any asbestos.  There was no evidence
13    of any asbestos ever in our talc."
14 Q  You believed that?
15 A  I believed it when he told me that.
16 Q  So as a factual matter, in the 1990s, you
17    believed that there was no asbestos in the
18    Emtal talc, true?
19 A  Yes.
20 Q  So that's point one on facts.
21        But you continued to sue Emtal for legal
22    strategic issues, correct?
23 A  Correct.
24 Q  The issue that another asbestos defendant
25    suggested you should sue them for tactical

Page 144

1     reasons, for the empty chair?
2        MR. ROTH:      Objection to
3     the form.
4  A  Well, and, again, Sam Martillotta said they
5     needed to be at the table to be able to do
6     deals, one.
7        And two, the other defendants were
8     pointing the finger at talc as being the cause
9     of my client's disease and rather than have the
10    big, empty chair, which was Eastern Magnesia
11    Talc, which was the big player in the Akron
12    rubber industry, as far as talc goes, rather
13    than have the empty chair there, we would sue
14    Eastern Magnesia Talc to allow them to defend
15    their position.  Otherwise we would have had
16    Owens Corning pointing at the talc as being the
17    cause of it and not have a response to it.
18 Q  Owens Corning doesn't have – manufacture talc
19    or produce talc?
20 A  Not that I'm aware of.
21 Q  Correct.
22        Owens Corning as an asbestos defendant
23    was encouraging you to bring in talc defendants
24    to shift responsibility?
25        MR. ROTH:      Objection to

Page 145

1     form.
2  A  I wouldn't say they were encouraging me to
3     bring in, they were pointing the finger at
4     talc.  And so in response to that, I thought it
5     was important to have the talc players there to
6     defend against that.  And in deposition, the
7     Owens Corning attorneys and the talc attorneys
8     would clash.
9  Q  Did Owens Corning ever convey to you in words,
10    in substance, that they wanted you to bring
11    Emtal into lawsuits?
12        MR. ROTH:      Objection.
13    Form and foundation.
14 A  No.  They never asked me to bring anybody in.
15    I did that in response to their defense
16    strategy.  And that was my strategy in response
17    to that.
18 Q  So in terms of the other talc manufacturers or
19    producers, did you believe at that point
20    there were any other talc companies that had
21    asbestos in their talc?
22        MR. ROTH:      At what point
23    are you talking about?
24 Q  Mid-1990s.
25 A  Evidence in the mid-1990s that I would have had

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 146..149

Page 146

1    would have included -- I recall a study of
2    Milwhite talc by I believe it was by NIOSH that
3    showed asbestos in Milwhite talc.
4        Possibly Cyprus. I'm not sure. I don't
5    recall for sure on Southern Talc. I don't
6    recall anything on Georgia Talc.
7    Q   I'll show you. I'll show you Southern Talc in
8    a second.
9    A   Okay. So yeah. I mean I had some, yes, you
10   know.
11   Q   So I understand the Owens Corning tactical
12   issue and I understand the Sam Martillotta
13   alleged encouragement to bring Emtal in to
14   share the pain of the litigation, but I'm
15   trying to understand what was your good faith
16   factual basis since you as an attorney
17   believed -- you say you believed that when
18   Emtal said they had no asbestos in their talc.
19       What was your good faith factual basis
20   for bringing in Emtal?
21       MR. ROTH:   Objection.
22   A   Again, it was a -- it was a strategic reason,
23   which was to provide a shield to this defense
24   that Owens Corning was putting forth that it
25   was the talc, not their product.

Page 147

1    Q   Aside from the tactical reason, the legal
2    tactical reason that -- regarding Owens
3    Corning, I'm asking what's your good faith
4    factual basis in 1995 to continue to file
5    lawsuits against Emtal?
6    A   I don't, you know, beyond that. That's what my
7    reason was.
8    Q   But you -- you didn't have any good faith
9    factual basis to believe there was asbestos in
10   the talc?
11   A   I had no evidence that there was asbestos in
12   the talc, that is correct.
13   Q   Well, no, no, no. You put it stronger than
14   that, Mr. Bevan.
15       Your testimony is you believed there was
16   no asbestos in the talc --
17       MR. ROTH:   Objection to
18   form.
19   Q   -- right?
20       MR. ROTH:   Foundation.
21   A   No. No. I believed what Mr. Joslyn and
22   Mr. Martin told me, that they had tested it and
23   they never found any evidence of asbestos in
24   it. So it was an asbestos free talc. I had no
25   evidence that there was asbestos in the Eastern

Page 148

1    Magnesia Talc when I filed these cases.
2    Q   And yet you continued to file them?
3    A   Yes.
4    Q   And, again, I'm trying to understand under the
5    Ohio equivalent Rule 11 what's your good faith
6    factual basis for continuing to file against
7    Emtal?
8    A   And I'm telling you it was the other defendants
9    pointing the finger at the talc defendants. So
10   either they get out and that eliminates that
11   defense by the other defendants, or they stay
12   in and there's not an empty chair at trial.
13   One or the other. Or we settle the cases.
14   Q   But they're -- would you agree with me, they're
15   tactical reasons, they have nothing to do with
16   Emtal's product and what you believe, they're
17   your lawyer strategic reasons based on
18   discussions with Owens Corning or your
19   perception of Owens Corning?
20   A   It wasn't based on discussions with Owens
21   Corning, it wasn't my perception, it's what I
22   saw Owens Corning doing in defense of these
23   cases. And so I had an entity out there that
24   there's asbestos in that talc. And so that was
25   my basis for filing the suit against Eastern

Page 149

1    Magnesia Talc.
2    Q   You had an entity out there saying what?
3    A   That there was asbestos in talc, in the talc,
4    and that's what caused my clients' injuries.
5    Q   Which entity was saying that?
6    A   That's Owens Corning.
7    Q   Okay. But you just said they weren't saying
8    anything about Emtal, they were saying talc
9    generally?
10   A   They were saying talc generally, and what I
11   said was I didn't have discussions with Owens
12   Corning about this, it's what I witnessed them
13   doing in defense of rubber worker asbestos
14   cases.
15   Q   You never had a discussion with Owens Corning
16   regarding Emtal?
17   A   I don't -- I don't think so.
18   Q   And you never saw any pleadings by Owens
19   Corning saying there's asbestos in Emtal talc?
20   A   I don't recall seeing any pleadings on it.
21   Q   Let me show you what's been marked as
22   Defendants' Exhibit 138.
23       This is entitled "Motion for Summary
24   Judgment and to Dismiss on Behalf of Eastern
25   Magnesia Talc Company."

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 150..153

Page 150

1        On the ground that the statute of
2    limitations has run and to dismiss the
3    consortium claim for insufficient service and
4    lack of personal jurisdiction.
5        Do you see this?
6    A  Yep.
7    Q  Do you know what happened with this case --
8    with this motion?
9    A  I don't know what happened to it.  I assume it
10    was denied, but maybe it was never ruled upon.
11    I don't know.
12    Q  Let me show you Defendants' Exhibit 139.
13        Defendants' Exhibit 139 is an order dated
14    9/23/97.
15        Do you see that?
16    A  Yes.
17    Q  It says, "Motion by Emtal for summary judgment
18    is withdrawn as moot."
19        Do you see that?
20    A  Yes.
21    Q  And do you know why it was withdrawn as moot?
22    A  I don't know.  I believe that prior to that we
23    had settled with the talc entities.  I don't
24    know.
25    Q  And you settled with the group of the talc

Page 151

1    entities, including Emtal, correct?
2    A  Yes.
3    Q  Now let me show you this.  247.
4        Defendants' Exhibit 247 is a notice of
5    dismissal.  Georgia Talc, Harwick Chemical,
6    Eastern Magnesia, International Talc, R.T.
7    Vanderbilt, Johnson & Johnson, and Southern
8    Talc.  Do you see that?
9    A  Yes.
10    Q  So this was one of those group talc
11    settlements?
12    A  Yes.
13    Q  And this is in -- on the fourth of December,
14    1998, correct?
15    A  I can't read it, but it sounds about right.
16    Q  Now, at the time, you dismissed Southern Talc
17    as part of this group, correct?
18    A  Yes.
19    Q  And at this point you have evidence that
20    Southern Talc has asbestos in its talc,
21    correct?
22    A  I think I had something on Southern Talc, yes.
23    Q  In fact, you told the Court you have evidence
24    that there's asbestos in Southern talc,
25    correct?

Page 152

1    A  You know, if we responded to a summary
2    judgment, we would have presented whatever
3    evidence we had that Southern Talc contained
4    asbestos.
5    Q  And notwithstanding the fact that you had
6    evidence of Southern Talc having asbestos in
7    it, you still allowed them to be part of the
8    group settlement?
9    A  Yes.
10    Q  Okay.  Let me show you what's been previously
11    marked as Defendants' Exhibit 12.
12        Defendants' Exhibit 12 was previously
13    marked.  It's Pease versus Owens Corning, et
14    al, and if you turn to page 15, it says
15    plaintiffs -- the bottom of the page,
16    Mr. Bevan.
17        "Plaintiffs refer the Court to a
18    September 10, 1971 Harwick Document in which
19    Plaintiffs have highlighted a barely legible
20    note written by Harwick personnel which states:
21    'Jan Scotland has informed us that BFGoodrich
22    is discontinuing the purchase of Code 26
23    (A-White Talc) due to the asbestos content.  He
24    indicated 'this is not a new problem..."
25        BFGoodrich, however, did not create a 'no

Page 153

1    asbestos' talc specification until seven years
2    later.  (See Exhibit 25)."  And then it
3    continues.
4        "Also, BFGoodrich did not remove
5    asbestos-containing 'White Talc' from Southern
6    Talc from its supplier list until 1980.  (See
7    Exhibit 26)."
8        Correct?
9    A  Correct.
10    Q  Now, Nancy Pease's husband had worked at
11    BFGoodrich prior to 1980, correct?
12    A  Yes.
13    Q  Okay.  So he would have been exposed to
14    Southern Talc at BFGoodrich, according to your
15    papers?
16    A  There's where the product ID becomes
17    problematic for us.  Southern Talc -- there was
18    a document that said Southern Talc contained
19    asbestos.  The question was evidence of
20    Southern Talc sales to Goodrich, and that's
21    where the problem arose.
22    Q  Well, you refer to internal documents from
23    BFGoodrich regarding Southern Talc, right, on
24    page 15 and 16?
25    A  Yes.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 154..157

Page 154

1   Q  Okay.  So you thought you had product ID
2      covered?
3   A  No.  I knew I had a problem with product ID
4      with Southern Talc.  I had a big problem with
5      product ID with Southern Talc.
6   Q  Not according to your papers.  Your papers
7      suggest that BFGoodrich used Southern Talc.
8   A  I don't have evidence that they did during this
9      time period.  Let's see.  1971.  1980.
10  Q  Well, let's try it this way, Mr. Bevan:  If you
11     had no evidence of product ID, why were you
12     suing Southern Talc?
13  A  I thought I would be able to develop evidence
14     that they did.
15  Q  At the time -- after this complaint, though, is
16     it your position you understood that Southern
17     Talc was not used by BFGoodrich?
18  A  No.  No, I'm not saying that Southern Talc
19     wasn't used.  My recollection is that there was
20     some small sales late in time of Southern Talc,
21     either the late '70s or the early '80s, small
22     quantities.  And in the '70s, most of the '70s,
23     it was -- and in the '60s it was Eastern
24     Magnesia Talc.  That was what the evidence
25     showed.

Page 155

1      I had scant evidence of sales of R.T.
2      Vanderbilt, scant evidence of Milwhite.  I
3      believe there was a shipment of Milwhite maybe
4      in the '80s.  Scant evidence for Cyprus,
5      International Talc, all of those.
6          The predominant evidence was Eastern
7      Magnesia Talc.
8   Q  Could you turn to Exhibit 26?
9   A  Yeah.
10  Q  It's towards the ends.  It's like five, six
11     pages from the end.
12         Do you see it?
13  A  Yes.
14  Q  June 11, 1980.  It's an internal BFGoodrich
15     document?
16  A  Yes.
17  Q  And it says, "Recent Raw Materials
18     investigation has found that all talc supplied
19     by Southern Talc contains significant amounts
20     of asbestos-like particles, (tremolite)."
21         Do you see that?
22  A  Yes.
23  Q  So at this point, in 1997, you know that there
24     are internal documents showing that Southern
25     Talc, wherever it's used, had evidence of

Page 156

1      asbestos-like particles in it, correct?
2   A  Yes.
3   Q  Okay.  And you understood that Southern Talc
4      was used in other facilities in Ohio, correct?
5      You didn't have any product ID at all?
6   A  I have never seen -- the only product ID that I
7      can recall of Southern Talc would have been in
8      the early 1950s.  I don't think I've ever seen
9      any evidence of Southern Talc sales in the '60s
10     and I don't think in the '70s.  Maybe around
11     1980 or so, but I -- you know, there may have
12     been some sales, but going back to looking --
13     you were asking about other plants in Ohio.
14         I don't recall ever -- I'm not sure about
15     Goodyear and General Tire and Firestone, other
16     than if I had any evidence, it would have been
17     in the early '50s or in the '50s sometime.  I
18     don't recall anything in the '60s or the '70s.
19  Q  When did you come to the conclusion that you
20     had no product ID evidence for Southern Talc in
21     the Ohio plants?
22  A  During the course of this case.  You know,
23     you're seeing some documents here.  And, you
24     know, if I would have had good evidence of
25     exposure, I presumably would have put that in

Page 157

1      there.
2   Q  Okay.  So as of 1997, you would have concluded
3      that you had no product ID evidence for
4      Southern Talc in the Ohio facilities?
5   A  No, no good -- I mean, I'm not saying there's a
6      total lack of evidence, but no real good
7      evidence to be able to, you know, effectively
8      pursue.
9   Q  Why would you continue to be able to sue
10     Southern Talc?
11  A  It's the same situation as Eastern Magnesia,
12     which is the other defendants are pointing at
13     things, such as this document that you're
14     pointing at here, and if I have an empty chair
15     there, then it puts my client at a
16     disadvantage.
17  Q  So even though you factually believed there was
18     no product ID support, you continued to file
19     claims against Southern Talc, fair?
20         MR. ROTH:     Objection.
21     Foundation.
22  A  Yes, but factually, at that time, you know,
23     you're seeing some of the best stuff I had,
24     which is you, know, probably not enough to get
25     by a summary judgment motion.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 158..161

Page 158

1  Q  But it's enough, in your mind, to meet your
2     Rule 11 obligation?
3  A  Yes.
4  Q  And have you told Southern Talc in pleadings
5     that you feel as though there's no evidence of
6     product ID?
7         MR. ROTH:     Objection.
8     Form, foundation.
9  A  I doubt it.
10 Q  No.  And when you file a complaint, do you tell
11    the Court that?
12 A  No.
13 Q  Why not?
14 A  Because I'm able to try to develop my client's
15    case.
16 Q  But you say you've now looked at this and you
17    know there's no product ID for Southern Talc?
18        MR. ROTH:     Objection.
19 Q  What are you trying to develop, Mr. Bevan?
20        MR. ROTH:     Objection.
21 A  I guess the same thing that we developed now
22    against Eastern Magnesia Talc, that maybe
23    there's hidden records, maybe there's something
24    there that the defense lawyers or the defendant
25    is not being honest about, just like Eastern

Page 159

1     Magnesia Talc was not honest.
2  Q  So when you were filing, continuing to file
3     cases against Southern Talc throughout the late
4     1990s and 2000s, you were still skeptical as to
5     whether Southern Talc had product ID that they
6     were somehow concealing from you?
7         MR. ROTH:     Objection.
8  A  I would say that I was still hopeful that maybe
9     I would be able to develop some evidence.  At a
10    bare minimum, it would fend off the defense of
11    the other defendants.
12 Q  What evidence could you have developed?  You
13    seem like you knew exactly what -- let me
14    finish.  Withdrawn.
15        What evidence after 1997 did you think
16    you needed to develop in order to build a
17    product ID case that you didn't have in 1997?
18        MR. ROTH:     Objection.
19 A  Perhaps somebody would have come forward with
20    the sales records, that in fact they did sell
21    during these relevant time frames.
22 Q  Did you continue to ask for those sales
23    records?
24 A  Yes.
25 Q  And did they continue to tell you that they

Page 160

1     didn't exist or they didn't show sales?
2  A  We never got anything.  So ...
3  Q  Why not?
4  A  Well, either they didn't make the sales, which
5     is what is probably the most likely excuse, or
6     they lied like BASF lied.
7  Q  Are you still filing cases against Southern
8     Talc?
9  A  I don't know that we've filed a case in some
10    time against Southern Talc.
11 Q  When was the last case you filed?
12 A  I don't know.  I am not -- I have not litigated
13    a case with Southern Talc in many years, maybe
14    going on ten years.  Whether they're still
15    pending in some pending cases, whether they're
16    still a defendant in some pending cases, I
17    don't know, but we have not, that I can recall,
18    actively litigated a case against Southern Talc
19    in many years.
20 Q  Do you think it was fair for Southern Talc to
21    continue to be sued by your client after you
22    concluded there was product ID problems?
23        MR. McDERMOTT:  Objection.
24        MR. ROTH:     Objection.
25 A  I -- I didn't have a concern with it and

Page 161

1     Southern Talc didn't have a concern with it.
2  Q  So you continued to file cases against Southern
3     Talc and you think Southern Talc thought that
4     was perfectly fine?
5         MR. ROTH:     Objection.
6         MR. McDERMOTT:  Same objection.
7  A  I'm sure they didn't like getting sued, but it
8     was never brought to my attention that hey,
9     there's a problem with this.
10 Q  Well, they probably didn't like being sued when
11    the plaintiffs' lawyer had concluded that he
12    had product ID problems and that Southern Talc
13    actually wasn't in Ohio facilities that he was
14    suing for.
15        MR. McDERMOTT:  Objection.
16        MR. ROTH:     Objection.
17 A  I think you're mischaracterizing my statement,
18    but I don't know if that's a question or not.
19 Q  Okay.  So you settled with all of the talc
20    manufacturers in this -- in Pease, correct?
21 A  I believe so.
22 Q  Even the ones that have product ID problems,
23    correct?
24 A  Yes.
25 Q  And the ones that have asbestos in their talc,

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 162..165

Page 162

1    correct?
2    A  Yes.
3    Q  And you settle for how much money?
4    A  My recollection was it was $1,000 a case across
5       the board for 290-some cases or something.
6       That's my recollection.
7    Q  Did you tell your clients, like Ms. --
8       withdrawn.
9          Regarding Mrs. Pease, did you tell her or
10      her husband why you were settling the talc
11      cases?
12   A  I'm sure we had a discussion, yes.  In fact, I
13      believe that talc settlement came as a result
14      of a Court ordered settlement conference.  I
15      don't know if Nancy Pease was there.  She may
16      have been there out in the hallway.
17   Q  Have you talked to Gayle Williams about the
18      Pease case?
19   A  I've talked to her one time.
20   Q  You know she's a plaintiff in this case?
21   A  Yes, I know that she's --
22   Q  Did you talk to her about this case?
23   A  I just -- I met her, you know, and we just
24      exchanged pleasantries.  You know, she knew of
25      me because I had been representing the family

Page 163

1    for many years, but I don't think we really
2    talked much in detail that I can recall.  We
3    may have.  It wasn't much.
4    Q  Did you convey to her whether you would be
5       compensated for the class action lawsuit?
6    A  I don't think that came up.  I don't recall.
7    Q  Well, if she's your client, right, you would
8       expect her to know?
9    A  Are you asking me a question?
10   Q  Yeah.
11   A  What's the question?
12   Q  Would you expect your client to be informed by
13      you of whether you have a fee arrangement to be
14      compensated in the Williams class action?
15          MR. ROTH:    Objection.
16   A  I don't -- I don't know that I have a fee
17      arrangement on her case.  I don't -- you know,
18      if they're successful in settling the Pease
19      case, I don't know that I have a fee
20      arrangement.  I don't know that.
21   Q  I thought you said you do have a fee
22      arrangement --
23   A  I said I've got fee arrangements with them on
24      the Clark case.  I don't know.  I would have
25      to -- I would have to look.  I don't know.

Page 164

1    Q  You don't know whether you have a fee
2       arrangement with Cohen, Placitella regarding
3       the Williams class action?
4    A  I'd have to take a look at it, whether it
5       applies to -- no, whether it applies to the
6       Clark case is what you were asking me.
7    Q  She's a named representative in the Williams
8       case.
9    A  Yes.
10   Q  You don't think it applies?
11   A  I'd have to take a look at the agreement to see
12      whether it applies or not.
13   Q  When did you enter into the agreement?
14          MR. ROTH:    Objection.
15          MR. McDERMOTT:  Same objection.
16   A  I don't recall.  I think it was many years ago.
17   Q  Was it written?
18   A  Yes.
19   Q  Was it negotiated?
20          MR. ROTH:    I'm sorry.  I
21      missed the last question.
22   Q  Was it negotiated?
23          MR. ROTH:    Objection.
24          MR. McDERMOTT:  Same objection.
25          MR. ROTH:    Don't answer.

Page 165

1          MR. McDERMOTT:  Don't answer
2       that.
3    Q  You can answer.
4          MR. McDERMOTT:  You're ruling
5       on that.
6          MR. ASSAF:    No, I'm not.
7       I'm not asking him the terms of it, I want to
8       know whether it was negotiated.
9          MR. McDERMOTT:  Those are the
10      terms.  Please.
11          MR. ASSAF:    Are you
12      instructing?
13          MR. McDERMOTT:  Not to answer.
14          THE WITNESS:    Okay.  I won't
15      answer it.
16   Q  Do you have a copy of it?
17   A  Yes.
18          MR. McDERMOTT:  Same objection.
19   Q  Have you ever provided notice of that written
20      agreement to any of the named plaintiffs in the
21      Williams class action?
22          MR. ROTH:    Objection to
23      form.
24   A  I don't recall.  I know that there's a fee
25      agreement that those clients signed on that

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 166..169

Page 166

1   case and I have to look at that fee agreement
2   to see what it says. If it includes me or if
3   the fee agreement's just with the Placitella
4   firm, I don't know. I have to take a look.
5   Q  Whose idea was the $1,000 a case?
6   A  You know, I think that -- that really came from
7   what the talc defendants did with several other
8   firms in a negotiation with Akron rubber worker
9   cases. It included the Colley firm, the
10  Spangenberg firm, and the Smith firm it was my
11  recollection. And I think on some of these
12  cases they paid a little bit more on, but
13  that's what I can recall, the best I can
14  recall.
15  Q  Did you and Mr. Martillotta discuss whether it
16  would be 1,000 or 10,000?
17  A  I'm sure we discussed it. I think we discussed
18  it more in terms of a total number and then we
19  applied it to the cases. They had it in their
20  mind that it was whatever per case. For us it
21  was, yes, per case. I don't know if our
22  numbers were the same as their numbers, as far
23  as --
24  Q  When you say it was developed by the talc
25  defendants, what do you mean by that?

Page 167

1   A  There was -- these weren't the first Akron
2   rubber worker cases to be settled with talc
3   defendants. There was other cases that were
4   settled by those other three firms that I
5   mentioned, and I think this deal kind of fell
6   in line with those other deals.
7   Q  Is this the aggregate settlement program? Is
8   that a name for this?
9   A  I would call it a global settlement. That's
10  what I would call it.
11  Q  Okay. In terms of the global settlement
12  program, though, those numbers were being used
13  by talc defendants who had strong product ID
14  cases and weak product ID cases, correct?
15  A  They were -- those types of talc defendants
16  were part of that group. What, you know, each
17  defendant used for their numbers and how it
18  divvied up, I was not privy to whether it was
19  an equal -- equally split amongst the seven
20  defendants I think or whether certain
21  defendants paid more. I was not privy to any
22  of that.
23  Q  All you know is your client got $1,000?
24  A  Yes.
25  Q  And that $1,000 came from a group of talc

Page 168

1   defendants who may have had a good product ID
2   case or a weak product ID case, correct?
3       MR. ROTH:    Objection to
4   the form.
5   A  Yes.
6   Q  They may have had asbestos in their talc or no
7   asbestos in their talc, correct?
8   A  Correct.
9       MR. ROTH:    Objection.
10  Q  They may have had a statute of limitations
11  problem or no statute of limitations problem,
12  correct?
13      MR. ROTH:    Objection.
14  A  I don't recall a statute of limitations
15  problem.
16  Q  Well, we just saw that Pease was the subject of
17  a motion for statute of limitation --
18  A  That's what Eastern Magnesia said. I don't
19  believe there was a problem with that.
20  Q  The seven different talc companies had
21  different weaknesses and strengths, in terms of
22  their defenses, fair?
23      MR. McDERMOTT:  Objection.
24  A  Yes.
25  Q  And notwithstanding those strengths and

Page 169

1   weaknesses, your client was getting $1,000,
2   correct?
3   A  Yes.
4   Q  Were there any global settlements that you
5   negotiated with Mr. Martillotta that excluded
6   certain individuals because they said they had
7   a really strong case against a particular talc
8   manufacturer?
9   A  I don't recall that. I think there may have
10  been some plaintiffs that got paid more, but I
11  don't --
12  Q  As we sit here today, you can't identify a
13  single plaintiff in which you negotiated an
14  exception to the global talc settlements, true?
15  A  An exception, yeah, I don't think so. I mean,
16  we may have -- as part of the global deal, that
17  was all accounted for, but I don't recall doing
18  a deal that we're settling these cases, but,
19  you know, these eight cases over here being
20  carved out. No, that was not --
21  Q  If there was an individual with a particularly
22  strong case against a particular talc
23  manufacturer, they still were part of the
24  global from your client base?
25  A  Well, we didn't have any strong cases, again,

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 170..173

Page 170

1   based on what we had to deal with, which was,
2   you know, what -- Eastern Magnesia Talc, from a
3   product ID, they were far and away the
4   strongest defendant.  And obviously from an
5   asbestos content, what we know now is that was
6   a very strong defendant as well, but at the
7   time, what we were dealing with was a very
8   strong product ID case but a weak or
9   nonexistent asbestos content case.
10  Q  For the Bevan plaintiffs, were you able to show
11     product ID against R.T. Vanderbilt?
12         MR. ROTH:     Objection to
13     form.
14  A  I don't believe.  That was a real problem.  The
15     product ID with R.T. Vanderbilt was a big
16     problem, and I don't know that -- for instance,
17     this group, this 290 that you gave me, those
18     were Goodyear and Goodrich cases.  I don't
19     believe we had any ID at Goodrich.
20         I believe there was a shipment in a
21     specific year to Goodyear, maybe 1978, of a
22     small amount of R.T. Vanderbilt talc, but R.T.
23     Vanderbilt was a tough one from a product ID
24     standpoint.  Very tough.
25  Q  Do you continue to sue R.T. Vanderbilt, even

Page 171

1   though they're tough product ID cases?
2   A  I don't know when we last sued R.T. Vanderbilt.
3   Q  You have cases pending against them today,
4      don't you?
5   A  We've got cases pending.  So whether there's
6      talc defendants in those cases, I don't know,
7      probably.
8   Q  Have you ever told --
9   A  But I don't think that we're actively
10     litigating any case against R.T. Vanderbilt
11     right now that I'm aware of.
12  Q  Have you --
13  A  There might be a case.
14  Q  Have you disclosed to R.T. Vanderbilt or any
15     Court that you have a weak product ID case?
16         MR. ROTH:     Objection to
17     form.
18         MR. McDERMOTT:   Same objection.
19  A  They know what our product ID case is and they
20     challenge us on it.
21  Q  And you continue to sue them?
22  A  In some cases I have.
23  Q  Okay.  So Pease.
24         By the way, out of all of the talc cases
25     that you've handled, how many of them have you

Page 172

1   taken to trial?
2   A  None.
3   Q  You know there's an allegation here that the
4      plaintiff would have taken her case to trial,
5      correct?
6   A  Rather than take whatever they paid, sure.
7      Yes.
8   Q  So she would be the only one of the 2,653
9      people ever to have taken a talc case to trial?
10         MR. ROTH:     Objection to
11     the form and foundation.
12  Q  At least within the Bevan Firm.
13         MR. ROTH:     Objection.
14  A  No. No.
15         MR. ROTH:     Excuse me.
16  A  I disagree.
17         MR. ROTH:     Mr. Bevan, hold
18     on one second.
19         Objection to form and foundation. Thank
20     you.
21         THE WITNESS:   Sorry.
22  A  No, we would have -- if --
23  Q  Withdrawn.
24  A  -- Eastern Magnesia Talc was not going to pay
25     fair settlements based on the truth, then we

Page 173

1   would have taken multiple cases to trial.
2   Q  Could you tell us how many talc cases you have
3      taken to trial in your career?
4   A  I think I --
5         MR. ROTH:     Asked and
6      answered.
7   A  -- already told you.  None.
8   Q  All right.  Let's do Holley.
9         Okay.  Now, Ms. Holley, did you talk to
10     her or Ms. Wengerd about this lawsuit?
11  A  You're talking about two different cases, you
12     understand?
13  Q  I'm sorry.
14         Did you talk to Ms. Darnell about this
15     lawsuit?
16  A  Well, she was dead by the time we initiated
17     this lawsuit.
18  Q  And did you talk to Ms. Holley about it?
19  A  Yes.
20  Q  That was that five-minute conversation?
21  A  Yes.
22  Q  Did you have any discussions -- hold on.
23         Did you ever discuss the underlying
24     Engelhard case with Ms. Holley?  Yes or no.
25  A  What do you mean by "the underlying Engelhard

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 174..177

Page 174

1   case"?
2   Q  So Mr. Placitella called you up, and you I
3       think said you called Ms. Holley, and did you
4       tell her any facts regarding the underlying
5       case?  Why it was dismissed, what it was about,
6       how you were lied to in the underlying case?
7   A  I think I already told you that in detail and
8       you took notes about the things.  That Eastern
9       Magnesia Talc lied, her mother was exposed to
10      talc, we had sued them, we took less than what
11      we should have because Eastern Magnesia Talc
12      lied to us.
13  Q  Okay.  And so my question is:  Did Tom Bevan
14      discuss with Marilyn Holley the underlying
15      Engelhard case?
16          MR. ROTH:     Asked and
17      answered.
18  Q  Did you discuss the underlying case with
19      Ms. Holley during that initial conversation?
20  A  Well, first, I never would have called anything
21      the Engelhard case.
22  Q  Withdrawn.
23      Did you discuss with Ms. Holley the --
24      her mother's litigation after your conversation
25      with Mr. Placitella?

Page 175

1   A  Yes.
2   Q  No doubt in your mind on that?
3   A  Yeah.
4   Q  Okay.  So let's do Exhibit 5.
5       I'm going to show you what's been marked
6       as Defendants' Exhibit 5.  It's Darnell versus
7       BFGoodrich.
8       Now, in terms of this case, did you
9       handle every aspect of this case?
10  A  Yes.
11  Q  And what was your view of the product ID
12      defenses in this case?
13  A  Well, that's a pretty broad question.
14      Mrs. Darnell worked at Goodrich, I want to say
15      from 1969 to mid to later 1980s.  She worked in
16      the banbury area, she was around the curing
17      areas.  She had some significant exposures.
18      She testified, I'm certain, about a heavy talc
19      or soapstone exposure.  She also had exposure
20      to tire curing presses, insulation products,
21      raw asbestos fiber.
22      Those were, I think -- one of the
23      defenses.  You asked about defenses.  One of
24      the defenses was that her brother died of
25      mesothelioma, so there must have been something

Page 176

1   in common between the two that caused her
2       mesothelioma.  We figured out what that was and
3       I think that answers your question.
4   Q  Did she have mesothelioma?
5   A  Yes.
6   Q  And what was her settlement for?  How much?
7   A  With who?
8   Q  The talc companies.
9   A  I want to say I'm thinking 7,500, but I'm not
10      certain on that.  A little bit more, a
11      little --
12  Q  Was it $2,000?
13  A  Maybe it was 2,000.  You know, it might have
14      been 2,000.  It was a low number.
15  Q  And she was -- she settled with a number of
16      asbestos manufacturers, correct?
17  A  Yes.
18  Q  In fact, I think you said she was exposed to
19      raw asbestos in her job. --
20  A  Yes.
21  Q  -- correct?
22  A  Yes, chrysotile.
23  Q  You, though, in that case stipulated that there
24      was no brand name, manufacturer, distributor
25      evidence that she could supply, correct?

Page 177

1   A  For?
2   Q  For any soapstone or soapstone-related
3       products.
4   A  I stipulated to it?
5   Q  Did you?
6   A  I don't recall stipulating to it.  She was --
7       she was at Goodrich during the time that
8       Eastern Magnesia Talc I believe was the sole
9       supplier and they supplied very large
10      quantities during the time that she was there.
11      And it was distributed through C.P. Hall
12      Company, which was the entity that she and her
13      brother had in common, because her brother
14      worked for -- her brother who died of
15      mesothelioma worked for C.P. Hall Company as
16      well.
17  Q  Let me show you what's been marked as
18      Defendants' Exhibit 14 and turn your attention
19      to the bottom of page 226.
20      Line 23.  Mr. Bevan says, "Brent, we
21      stipulated and we will stipulate again that she
22      doesn't know the brand name, manufacturer,
23      distributor or supplier of any insulation
24      products as well as any soapstone products as
25      well."

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 178..181

Page 178

1      Do you see that?
2   A  Yeah.
3   Q  Does that refresh your recollection as to
4      whether there's a stipulation that she couldn't
5      make any product ID?
6   A  That's not what you asked me, but yes, that's
7      what that says.  But that's not what you asked
8      me.
9      If you want to go back and reask me that
10     question, I'll answer it the same way.
11  Q  And did you -- she didn't -- she also, when you
12     were litigating the case, didn't know what talc
13     was, correct?
14  A  I actually called -- they usually called it
15     soapstone.  I mean, you know --
16  Q  I'm not asking what they usually called it,
17     Mr. Bevan, I'm asking what her testimony was.
18     MR. ROTH:      I'm sorry.  Did
19     you finish your answer?
20  A  I did not finish my answer.
21     My answer was my rubber worker clients
22     referred to it as soapstone.  It was called
23     soapstone in the rubber industry.
24  Q  Exhibit 13.  Could you turn to page 113, the
25     bottom of it?

Page 179

1      Question, "Do you draw a distinction,
2      ma'am, between soapstone and talc?
3      A, "And talcum?"
4      Question, "Talc, do you know what talc
5      is?"
6      Answer, "No."
7      "Okay."
8      "You're talking about talcum?"
9      "I'm talking about a material that is
10     used in some industries that is referred to as
11     talc."
12     Answer, "I've never heard of it."
13     Do you see that?
14  A  Yes.
15  Q  Were you at that deposition?
16  A  I think I was at all of her depositions, so I
17     believe I was.
18     Yes.
19  Q  And even when you weren't at your client's
20     deposition, as part of knowing every aspect of
21     their case, would you review those depositions?
22  A  I don't know that I'd review every deposition,
23     but, you know, I was at most of those
24     depositions, most of my class depositions.
25  Q  Well, if your client had been deposed and then

Page 180

1      was going to provide a statement to a Court or
2      to a trust, you would want to make sure that
3      trust statement was accurate, correct, it
4      wasn't inconsistent with what she said in her
5      deposition?  Or would that be okay?
6      MR. ROTH:      Object to the
7      form.
8   A  I don't know what you're --
9      MR. McDERMOTT:   Same objection.
10  A  -- referring to, so I'm not --
11     MR. McDERMOTT:   Vague.
12  Q  I'm just asking you --
13  A  You have to give me a bit more specifics.
14  Q  You've had clients submit claim forms to
15     asbestos trusts, correct?
16  A  Yes.
17  Q  As an officer of the court, do you do anything
18     to make sure they're accurate?
19  A  I have staff that files those claim forms.
20  Q  And you wouldn't want your staff filing things
21     that were inaccurate, correct?
22  A  No.
23  Q  And you certainly wouldn't want staff filing
24     things that were inconsistent with sworn
25     testimony of your clients, correct?

Page 181

1      MR. ROTH:      Objection to
2      form and foundation.
3   A  It depends on the circumstance.
4   Q  What would be one of the circumstances where it
5      would be okay to have inconsistent sworn
6      testimony in a submission to a trust?
7   A  Well, for instance, if a client doesn't recall
8      a product in his or her deposition but a
9      coworker could recall a product or the product
10     was there, then that client may file a claim
11     against that trust, even though that client in
12     the deposition did not recall that product.
13  Q  Do you know how many cases you settled on
14     behalf of Holley or Darnell?
15  A  I don't.  I would estimate 30 to 40.  When you
16     say "cases," I'm referring to different
17     settlements.  I would estimate 30 to 40
18     different settlements.  Maybe more but ...
19  Q  Do you know how many defendants or trusts have
20     provided money to Holley/Darnell?
21  A  I would -- and again I'm estimating, 30 to 40,
22     but that's a pretty rough estimate.
23  Q  Does 98 sound right?
24  A  98 sounds awfully high.  I would be surprised
25     if it was 98, but I can count them up.  I'm

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 182..185

Page 182

1   sure I could come up with a list the files with
2   the files, but 98, I would be –
3   Q   When's the last time you –
4   A   – surprised.
5   Q   Sorry.
6       When's the last time you reviewed the
7   Holley/Darnell file?
8   A   You know, beginning to end, I've never reviewed
9   the whole file.  I mean, I was creating it as
10  we were working on the case and, you know,
11  whatever we have saved that we produced, I
12  don't think I went through and reviewed the
13  whole file.  I think we, you know, produced the
14  file.
15  Q   You said that you're familiar with I think
16  every aspect of your clients' cases?
17  A   You know, I don't know that that's what I said,
18  but I've been involved in every aspect of their
19  cases.
20  Q   And when we talked about some strengths and
21  weaknesses of various cases, do you think
22  you're able to discuss what the strengths and
23  weaknesses of various clients are?
24  A   I've got a pretty good idea of what the
25  strengths and weaknesses of the cases were.

Page 183

1   Q   In terms of reading films, do you think that
2   there are some films that give stronger cases
3   or weaker cases?
4       MR. McDERMOTT:  Objection.  No
5   foundation.
6   A   You would have to be a bit more specific,
7   because I guess it would depend on the case.
8   Q   Okay.  Have you brought asbestos claims
9   against talc manufacturers?
10  A   Yes.
11  Q   And lung cancer cases?
12  A   Yes.
13  Q   And mesothelioma cases?
14  A   Yes.
15  Q   Do you think that there's a difference in value
16  in those cases?
17  A   Typically, yes.
18  Q   Why?
19  A   Because mesothelioma is a signature asbestos
20  disease, that the only known cause in this
21  country is exposure to asbestos.  So there's
22  not as many defenses.  It's also an
23  extremely – extremely progressive.  Those are
24  cases where the people are dead, have
25  tremendous pain and suffering.  There's no such

Page 184

1   thing as a mild mesothelioma case.  So those
2   typically have the highest value.
3       Followed by – secondly by lung cancers
4   that have less value, because there are other
5   causes that the defendants could point to of
6   lung cancer cases that they can't point to on
7   mesothelioma cases.
8       And then asbestosis cases.  Again, I
9   think it depends on the severity of the
10  asbestosis case.  There could be a really
11  severe asbestosis case and there could be a
12  mild asbestosis case.
13  Q   What are the other causes of lung cancer?
14  A   Cigarette smoking.  That's the one that jumps
15  out first and foremost.  I'm sure there's
16  others, but that's what I had to deal with
17  usually is cigarette smoking.
18  Q   In terms of interviewing your clients who are
19  going to bring cases against talc
20  manufacturers, did you ask them about their
21  smoking?
22  A   I believe on the intake when we take in a
23  client we ask them about their smoking history.
24  Q   And that's because, especially for lung cancer
25  cases, there could be alternative causation

Page 185

1   with smoking, correct?
2   A   Yeah.  Yeah, it confounds things.  Now, the two
3   of them, the asbestos and cigarette smoking
4   acts synergistically, so the two combined
5   greatly increase the risk much more than any
6   one individual exposure would cause.  But it's
7   a factor.  It's a factor we have to deal with
8   in these cases.
9   Q   And a nonsmoker has – all things being equal,
10  a nonsmoker has a stronger case than a person
11  who smoked a pack a day for 30 years, in terms
12  of a lung cancer injury against an asbestos
13  manufacturer?
14      MR. ROTH:    Objection to
15  form.
16  A   Yes.
17  Q   Correct?
18  A   Yes.
19  Q   And you weigh that as a lawyer, correct, in
20  terms of assessing settlements and payouts?
21  A   That is a factor that we would consider.
22  Q   What are the other factors that you would
23  consider, in terms of assessing the strengths
24  and weakness of a case against a talc
25  manufacturer?

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 186..189

Page 186

1  A  Well, the most important factor would be
2     product ID. You know, can I – is that
3     defendant's product in my client's worksite and
4     was my client likely to be exposed to that
5     defendant's product in his or her worksite.
6     That's number one.
7  Q  Can we skew that as two?  Product ID, whether
8     it's sold to the facility, and then exposure,
9     whether the person worked in an area where they
10    would have been exposed to it?
11 A  That's fair.
12 Q  Fair enough?
13 A  That's fair.
14 Q  Okay.  So we have product ID, we have exposure.
15    We have whether there's asbestos in the
16    product, correct?
17 A  That's extremely important.  Maybe that's
18    number one.  Actually, that's probably number
19    one, as far as exposure.
20 Q  And do you believe that there's gradations in
21    terms of value in the case?  Again I'm putting
22    on your lawyer's hat advising your client and
23    thinking about settlement and resolutions.
24    If there's a talc manufacturer with 3
25    percent asbestos, do you think that's a

Page 187

1     stronger case for you than a talc manufacturer
2     with trace amounts of asbestos in sporadic
3     testing?
4     MR. ROTH:    Objection to
5     form.
6  A  If everything – if all things are equal.  You
7     know, so if he's exposed to both of those
8     products the exact same amount and in an exact
9     same manner, then obviously the higher
10    percentage creates a greater risk of exposure,
11    if all things are equal.
12 Q  Would it be fair to say higher amounts of
13    asbestos make a stronger case?
14    MR. ROTH:    Objection.
15    MR. McDERMOTT:  Objection.
16    MR. ROTH:    Form and
17    foundation.
18    MR. McDERMOTT:  Form and
19    foundation.
20 A  Again if all other things are equal.
21 Q  And in terms of assessing the strengths and
22    weaknesses of plaintiffs, all things being
23    equal, in terms of factoring a case, would you
24    agree with me that exposure over 30 years to an
25    asbestos containing talc makes a stronger case

Page 188

1     than exposure over a month?
2     MR. McDERMOTT:  Objection.
3     MR. ROTH:    Objection to
4     foundation.
5     MR. McDERMOTT:  Foundation.
6  A  Well, again, if all things are equal, then yes,
7     30 years is more exposure than 30 days.
8     MR. McDERMOTT:  Are we talking
9     about specific diseases?  That's what I'm just
10    kind of missing here.  Mesothelioma versus lung
11    cancer.
12    MR. ASSAF:    Please don't –
13    MR. McDERMOTT:  No.  No.  I'm
14    asking so I can clarify my objection.
15    MR. ASSAF:    No.  No.
16    MR. McDERMOTT:  That's why I
17    want to know.
18    MR. ASSAF:    Don't interrupt
19    the questioning.
20    MR. McDERMOTT:  I am going to
21    interrupt.  I don't –
22    MR. ASSAF:    No.
23    MR. McDERMOTT:  Understand
24    it –
25    MR. ASSAF:    No.

Page 189

1     MR. McDERMOTT:  – so I don't
2     know how my client can, all right?
3  Q  You can leave.
4     MR. McDERMOTT:  Don't tell me
5     what or what not to do, please.
6  Q  Witness, can you be excused?  Please step out.
7     MR. ROTH:    Watch your
8     microphone.
9     -----
10    (Mr. Bevan no longer present.)
11    -----
12    MR. McDERMOTT:  I'm trying to
13    have you –
14    MR. ASSAF:    No.
15    MR. McDERMOTT:  – clarify your
16    question.
17    MR. ASSAF:    It's form or
18    foundation.
19    MR. McDERMOTT:  All right.
20    MR. ASSAF:    It's not
21    interrupting trying –
22    MR. McDERMOTT:  No.
23    MR. ASSAF:    – to suggest
24    answers to the witness.
25    MR. McDERMOTT:  It's not a

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 190..193

Page 190

1  suggestion.
2       MR. ASSAF:    No.
3       MR. McDERMOTT:  You ask such
4  vague questions.
5       MR. ASSAF:    You have form
6  or foundation.
7       MR. McDERMOTT:  All right.
8       MR. ASSAF:    Let's get the
9  judge on again.  We have form and foundation.
10  That's it.  You want –
11       MR. ROTH:     Okay.  Well,
12  now we're off the record, why don't –
13       MR. ASSAF:    No, let's go on
14  the record.
15       MR. ROTH:     We're now out
16  of the hearing of the witness.
17       Mr. McDermott, can you explain to
18  Mr. Assaf what your issue is, and maybe –
19       MR. McDERMOTT:  My issue
20  is that –
21       MR. ROTH:     – you can
22  clarify the question.
23       MR. McDERMOTT:  My issue is
24  this, is that it depends upon the disease to
25  answer that question.  Your question wasn't

Page 191

1  clear.  For me to interpose a correct
2  objection, just tell me what disease you're
3  talking about, that's all.  That's all I –
4       MR. ASSAF:     Then make a
5  form or foundation objection.
6       MR. McDERMOTT:  But you can't
7  clear it up by form and foundation –
8       MR. ASSAF:     You're not
9  litigating the case –
10       MR. McDERMOTT:  – Mr. Assaf,
11  because you've been asking vague and
12  hypothetical questions all day.
13       MR. ASSAF:     It's not.  He's
14  one of the most experienced plaintiffs asbestos
15  lawyers in the country.  I think he understands
16  my question.
17       MR. McDERMOTT:  I think I take
18  issue with that.
19       MR. ASSAF:     All right.
20  Let's bring him back in.  Form or – well,
21  let's not.
22       Anything except form or foundation, let's
23  get the judge on the line.
24       MR. McDERMOTT:  Just continue
25  the deposition.

Page 192

1       MR. ASSAF:     All right.
2       -----
3       (Mr. Bevan now present.)
4       -----
5  BY MR. ASSAF:
6  Q  By the way, Mr. Bevan, did you discuss your
7     testimony during the prior breaks?
8  A  No.
9  Q  In terms of –
10       MR. ROTH:      There was only
11  one break.
12  Q  In terms of – yeah, the prior break.
13       In terms of your settlement of asbestos
14     talc cases, how long have you been doing that?
15  A  I think the first time I did a settlement with
16     any talc defendant was in 1997 and I think the
17     last time was probably in I want to say 2011
18     maybe.
19  Q  Could you tell me roughly how many talc cases
20     you've settled?  Round numbers.
21       MR. ROTH:      Objection to
22     form.  Form and foundation.
23  A  Boy, I'm not sure.  1 to 2,000.
24  Q  And could you tell me how many – on behalf of
25     how many plaintiffs you've settled asbestos

Page 193

1     cases apart from talc?
2  A  How many individual plaintiffs I have settled
3     asbestos cases for.  Probably I'm going to
4     estimate 20 to 30,000.
5  Q  All right.  Do you think you have a good
6     understanding of strengths and weaknesses of
7     matters when you're recommending settlements to
8     your clients?
9  A  When I have all of the evidence.
10  Q  Let's take a break.  Lunch.
11       THE VIDEOGRAPHER: Off the record.
12     The time is 12:49.
13       -----
14       (Recess taken.)
15       -----
16       THE VIDEOGRAPHER: We're back on
17     the record.  The time is 1:29.
18  BY MR. ASSAF:
19  Q  Do you think that BASF spoliated documents?
20  A  My understanding is that they did.
21  Q  What's your understanding from?
22  A  My understanding is that Eastern Magnesia
23     tested their talc in the 1970s, found that it
24     contained asbestos, and destroyed any documents
25     related to that.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 194..197

Page 194

1  Q  What's your understanding from? What source?
2  A  From what I've heard from Mr. Placitella and
3     what I've read in the complaint. I'm not sure
4     if I've seen any documents to that extent, but
5     that's what I've been told.
6  Q  Did Mr. Placitella talk to you about any state
7     court proceedings regarding spoliation or
8     crime-fraud?
9           MR. ROTH:     Objection.
10     Form.
11          Hold on for a second.
12          That's a yes or no.
13  A  I don't recall what's in state court, what's in
14     federal court.
15  Q  Did he tell you about any spoliation or
16     crime-fraud hearings, period?
17  A  I assume there was one in this case, because I
18     thought that was one of the issues that was up
19     at the circuit court, but I don't recall.
20  Q  Has he talked to you about any -- withdrawn.
21          Regarding the spoliation allegations,
22     what do you understand the facts alleged are?
23  A  My understanding of the facts was what I just
24     said and that sometime in the 1980s, they
25     gathered up the documents and destroyed them.

Page 195

1  Q  And when did Mr. Placitella convey that to you
2     in words or in substance?
3           MR. ROTH:     Objection to
4     form and foundation.
5  A  It would have been 2010 or '11. I believe it
6     was in the complaint as well.
7  Q  Other than that, have you had any conversations
8     with Mr. Placitella regarding spoliation
9     allegation?
10          MR. McDERMOTT:   Objection.
11  A  No.
12  Q  Have you initiated any efforts in Ohio to
13     reopen any cases?
14  A  No.
15  Q  Why not?
16  A  Because that's being handled by the Placitella
17     firm as part of the class action.
18  Q  Could you? Withdrawn.
19          Do you have the capability and experience
20     and resources to try to reopen individual cases
21     here?
22  A  I certainly have the resources. You know, as
23     far as the ability and experience, I think
24     Mr. Placitella knows things that I don't know,
25     and so I would think that he would be in a

Page 196

1     better position to do that than I would.
2  Q  Well, you know the facts better than he does,
3     in terms of the underlying cases, true?
4  A  Yes.
5  Q  And you're barred in Ohio? You're a member of
6     the Bar?
7  A  Yeah, I'm a member of the Bar in Ohio.
8  Q  And you can associate with Mr. Placitella to
9     bring a case here, correct?
10  A  Yeah. Yeah. Yeah, sure.
11  Q  Is there any impediment to doing so?
12  A  I don't know. I haven't researched it to
13     determine if there's any impediment, but we
14     chose to pursue it the way it's being pursued.
15  Q  Do you view yourself as kind of co-counsel in
16     Williams?
17  A  If -- I guess it depends if -- for instance,
18     take the Darnell case and if the Darnell case,
19     if we're set back to square one and Darnell's
20     able to pursue the -- her claim against Eastern
21     Magnesia Talc with all of the relevant
22     evidence, than I would assume that I would be
23     co-counsel because I know a tremendous amount
24     of the Darnell case.
25          I wouldn't be able to do it by myself, I

Page 197

1     would need the assistance of the Placitella
2     firm because they know more about BASF and what
3     BASF knew, when they knew it, what they did
4     with the evidence, those things.
5  Q  Do you view yourself as having a co-counsel
6     relationship with Mr. Placitella?
7  A  Certainly in the Ross case and certainly --
8     yeah, if we get to that point that I described,
9     then yes.
10  Q  At trial, would you be co-counsel?
11          MR. ROTH:     Trial of what
12     case?
13  A  It depends on what issue's being tried.
14  Q  The Williams case.
15  A  It depends on what issue's being tried in the
16     Williams case.
17  Q  Well, what issue can you imagine you would be
18     co-counsel?
19          MR. ROTH:     Objection to
20     form and foundation.
21  A  If, again, the Williams case was set back to
22     square one and we were permitted to try our
23     case, I'm familiar with the medical and the
24     facts of the case. I would assume that I would
25     have a role in that as co-counsel.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 198..201

Page 198

1   Q  So yes, if the Williams case is either
2      certified or not certified, you would handle
3      whatever has to do with Ms. Darnell?
4   A  Again, it depends on what the issue is whether
5      I'm going to be handling it or not.
6   Q  Is that spelled out in the fee agreement?
7          MR. McDERMOTT:  Objection.
8   A  I don't -- I don't recall.
9          MR. ROTH:     Wait.  Wait.
10     I'm sorry.
11         Okay.  Yeah.  Objection.  Privilege.
12  Q  Why else -- withdrawn.
13         Where's the list of -- I'm sorry.  I know
14     you gave me this list, Mr. Bevan, of which
15     clients you talked to and which ones you
16     didn't, so let me just try to find this.  I
17     think I have it.
18         Okay.  So Holley, Pease, and Ware.
19     Holley, Pease, and Ware.
20         So in terms of Kimberlee Williams, we're
21     going to get to her in a second, but I want to
22     turn your attention to D Ex 1.
23         Kimberlee Williams was one of the people
24     that you said you didn't talk to --
25  A  I have not --

Page 199

1   Q  -- correct?
2   A  I don't recall when I last talked to Kimberlee
3      Williams, but it's been quite some time.
4   Q  And you certainly -- again, we went through
5      that initial phone conversation with
6      Mr. Placitella where you called three of the
7      plaintiffs, but you didn't called Wengerd and
8      you didn't call Kimberlee Williams?
9   A  I --
10         MR. ROTH:     Objection.
11  A  Whether I called them or not, I don't recall
12     talking to them.
13  Q  Right.  Okay.
14         Could you turn to paragraph 19 on page
15     21?  It begins at the bottom of page 20.
16         "Plaintiff Williams and her husband did
17     not know that she and her husband have been the
18     victim of Defendants' Fraudulent Asbestos
19     Defense Scheme described herein while her
20     husband was alive, and she did not learn of
21     such fact until late 2010/early 2011, when she
22     was first informed of same by her attorney."
23         Do you see that?
24  A  Yes.
25  Q  Is that true?

Page 200

1   A  That's -- my paralegal contacted her.  She's
2      the one who talked to her.  I have not talked
3      to Ms. Williams.
4   Q  Well, it doesn't say your paralegal, it says
5      Tom Bevan.
6   A  Yeah.
7   Q  So that's not correct?
8          MR. ROTH:     Does it say --
9      I'm sorry.  Does it say Tom Bevan?  Because I
10     missed that part.
11         MR. ASSAF:     Okay.  "When
12     she was informed of same by her attorney,
13     Thomas W. Bevan."  Hold on.  We'll pause here.
14         MR. ROTH:      Thank you.
15         MR. ASSAF:      We'll go over
16     it again.
17         MR. ROTH:      You don't have
18     to go over it again, let me just catch up.
19  Q  "of such fact until late 2010/early 2011, when
20     she was first --
21         MR. ROTH:      Ah, thank you.
22  Q  -- informed of same by her attorney, Thomas
23     Bevan, Esquire."
24         Is that you?
25  A  I'm Thomas W. Bevan, Esquire, yes.

Page 201

1   Q  Okay.  Who's your legal assistant that you
2      think --
3   A  Erin Clark would have contacted Mrs. Williams.
4   Q  Okay.  But Erin Clark's not in the complaint.
5   A  She contacted her on behalf of me.
6   Q  And she actually wasn't even in the plaintiffs'
7      initial disclosures, did you know that?
8   A  I don't know what you're talking about.
9          MR. ROTH:      Object to form,
10     foundation.
11  Q  Well, you know what an initial disclosure is?
12  A  I do not.
13  Q  You don't know what a Rule 26 initial
14     disclosure is, Mr. Bevan?
15  A  No.  Is that federal court?
16  Q  Yeah.
17  A  Yeah, I have not practiced in federal court.
18  Q  So that's wrong, as far as you know?
19  A  No.
20         MR. ROTH:      Objection.
21     Form and foundation.
22  A  Erin Clark contacted her on behalf of me.
23  Q  It's correct if it means on behalf of Tom Bevan
24     and that's how it would be correct?
25  A  It would be if it says on behalf -- by some --

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 202..205

Page 202

1    on behalf. It would be more specific I guess
2    is what I'm saying.
3    Q   And what did you tell Ms. Clark?
4    A   To contact Mrs. Williams and get her in touch
5        with the folks at the Placitella firm.
6    Q   Well, you told her more than that, didn't you?
7    A   Well, I told her what --
8          MR. ROTH:      Objection to
9    form and foundation.
10   A   -- you know, what was going on, why.
11   Q   What did you tell her exactly?
12   A   I told her that we were going to look into
13       pursuing a fraud case against Eastern Magnesia
14       Talc because they lied to Mrs. Williams or
15       Mr. Williams at the time that the case was
16       being litigated when they said that they had
17       tested their talc and never found any evidence
18       of asbestos in their talc. That has now been
19       proven to be a lie, and so we were going to
20       look into a potential fraud against BASF, to
21       contact Mrs. Williams and get her in touch with
22       the Placitella firm.
23   Q   An do you know if she did that?
24   A   Oh, yeah, she did.
25   Q   Did she tell you she did that?

Page 203

1    A   Yes.
2    Q   Did she take notes of that conversation, or you
3        don't know?
4    A   I don't know. I doubt it.
5    Q   Why do you doubt it?
6    A   Why would she take notes?
7    Q   Did you check?
8    A   I do not believe she took notes.
9    Q   What's your factual basis for not believing she
10       didn't take notes?
11   A   She had no reason to take notes and I guess she
12       would have told me if she took notes. I can
13       find out and tell you tomorrow whether she took
14       notes or not.
15   Q   Did you check her files?
16   A   She doesn't have any files.
17   Q   Does she keep a notebook?
18   A   I've never seen her with a notebook.
19   Q   Did she email you and tell you that she had
20       talked to Mrs. Williams?
21         MR. ROTH:      Objection to
22   form, foundation.
23   A   I highly doubt it. Her office is about 10 feet
24       from mine.
25   Q   So we are starting with Ware. Sorry for that

Page 204

1    little detour.
2          MR. ROTH:      I don't think
3    you are.
4    Q   But keep D Ex 1 out.
5          Ms. Ware. So did you know Ralph Ware?
6    A   I've spoken with Ralph Ware, yes.
7    Q   Have you ever spoken with Donna Ware?
8    A   Yes.
9    Q   Honest? Is she honest?
10   A   I had no reason to believe that she wouldn't be
11       honest.
12   Q   I'm going to show you what's been marked as
13       Defendants' Exhibit 46 -- 146.
14         MR. ROTH:      I'm sorry?
15         MR. ASSAF:     Defendants'
16   Exhibit 146.
17         MR. ROTH:      Thank you.
18   Q   This is a complaint on or about August 5, 2002.
19         Do you recognize this?
20   A   Whether I specifically recognize this, I don't
21       recall, but it looks similar to the complaints
22       that we've filed.
23   Q   Can you turn to page 35?
24         Tell me if that's your signature.
25   A   Yes.

Page 205

1    Q   And you sued Engelhard here?
2    A   Yes.
3    Q   And this was in -- this was I guess eight years
4        after you first believed that there was no
5        asbestos in Engelhard's talc?
6    A   Eight years before I was first told that.
7    Q   Eight years after?
8    A   Eight years after I was first told that, yes.
9    Q   And even though you say you believed --
10   A   Well, hold on, let me --
11   Q   Sorry.
12   A   -- just find the date.
13         Yeah, I would say roughly eight years.
14       It could have been more. I'd say roughly eight
15       years.
16   Q   And you brought this lawsuit against Emtal even
17       though you say you believed Cahill when they
18       told you there was no asbestos in the talc?
19   A   Yes.
20   Q   What's Harshaw?
21   A   Harshaw was a local distributor, supplier.
22         No I'm sorry. Did you say Harshaw?
23   Q   Yeah.
24   A   Oh. Harshaw was a chemical company that at
25       some point in time merged with Engelhard.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 206..209

Page 206

1   Q  Have you brought cases against Harshaw?
2   A  I have brought premises cases against Harshaw.
3   Q  Would you explain to me what a premises case
4      is?
5   A  It's a lawsuit against the owner of a premises,
6      where one of my clients may have been exposed
7      to asbestos at the Harshaw plant but did not
8      work for Harshaw.  And so they filed a premises
9      liability lawsuit against the premises owner.
10  Q  And, again, based on your 30 years of
11     experience, are premises cases valued higher or
12     lower than the direct exposure worker cases?
13          MR. ROTH:     Objection to
14     form and foundation.
15  A  Oh, yeah, that's not a question I can answer
16     because --
17  Q  All right.
18  A  -- there's just too many variables.
19  Q  Are the Harshaw cases that you've been involved
20     with talc cases?
21  A  No.  If I -- if I sued Harshaw, that was
22     because of a premises liability lawsuit not
23     having to do with talc.
24  Q  What was the factual basis for you bringing a
25     lawsuit against Harshaw on behalf of Ware?

Page 207

1   A  This would have been a multi-plaintiff
2      complaint.  So presumably one of these people
3      had exposure at a Harshaw plant and that's why
4      Harshaw was named as a defendant.
5          Typically what we did in those
6      situations, as the case began to go through
7      litigation, then we would dismiss out the
8      defendants that didn't belong in that
9      individual case.  So as far as I know, we
10     weren't pursing a case against Harshaw for
11     Mr. Ware.
12  Q  Okay.  Let me show you Defendants' 156 and 157.
13         Let me show you Defendants' 156A and 157.
14         So on 157 --
15          MR. ASSAF:     You must have
16     an extra copy of 157 floating over there.
17         Thank you.
18  Q  157.  Do you recognize this, Mr. Ware?  I think
19     it's entitled "Defendants' Supplemental Answers
20     to Plaintiffs'."
21          MR. ROTH:     Mr. Bevan.
22  Q  I'm sorry.  Withdrawn.
23         Mr. Bevan, do you recognize Defendants'
24     157 entitled "Defendants' Supplemental Answers
25     to Plaintiffs' Master Discovery Requests"?

Page 208

1   A  I do not recognize this.  No, I do not
2      recognize this document.
3   Q  Okay.  Defendants' 156A.
4          If you turn to the second page where it
5      talks about -- where there's a mention -- or
6      the third page.
7          "Goodyear Aerospace/Aircraft," do you see
8      that?
9   A  Yes.
10  Q  Are you familiar with this document?
11  A  Yes.
12  Q  Okay.  Did you understand -- do you have any
13     questions to -- any reasons to disbelieve this
14     document?
15          MR. ROTH:     Objection to
16     the form and foundation.
17  Q  Withdrawn.  Let me try this way.
18         Do you believe that this document is in
19     any way fraudulent?
20  A  I have no knowledge that it's fraudulent.  I
21     haven't seen the records to back it up, but I
22     have no knowledge that it's fraudulent.
23  Q  Did you have any product ID evidence suggesting
24     that Goodyear Aerospace and Aircraft had more
25     than three 50-pound bags in 30 years?

Page 209

1   A  Yeah.  Most of the -- for, again, the vinyl
2      division, as I explained which was a Goodyear
3      Tire division, the purchasing was done by
4      central Goodyear Tire purchasing and so it
5      would not show up, I don't believe, on this
6      document, sales of -- or talc being used at
7      Goodyear Aerospace.
8   Q  So if you -- based upon all of your experience
9      and knowledge of these issues, if somebody had
10     filed a product ID motion, if Emtal had filed a
11     product ID motion, you surely, in order to
12     protect your clients' rights, would have put
13     that in opposing papers, correct?
14          MR. ROTH:     Objection to
15     form.
16  A  No, not necessarily.  Depending on how we were
17     handling the case.
18  Q  Well, what situation would it be where you were
19     not -- where you were handling the cases and
20     decided not to tell the Court about your
21     product ID theory?
22  A  Well, in the case -- excuse me.
23         In the case of Eastern Magnesia Talc, if
24     we did not have evidence that it contained
25     asbestos, then the product ID part was somewhat

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 210..213

Page 210

1  moot.
2      And so if – for instance, if Eastern
3  Magnesia Talc would file a – would have back
4  in the day before I knew what I know now would
5  have filed a motion for summary judgment on a
6  Goodyear Aerospace case, it wouldn't have been
7  a matter that we would have spent any time on,
8  because even if we were able to prove that the
9  raw materials for the vinyl division came from
10  Goodyear over to Goodyear Aerospace, it still
11  left us in the same position, which is we
12  didn't have the evidence that Eastern Magnesia
13  Talc contained asbestos.
14      So in a situation, if it was a Goodyear
15  Aerospace case, I don't think I would have, you
16  know, tried to, you know, connect all of those
17  dots, because I know I couldn't connect the
18  final dot, the most important one, which is did
19  their product contain asbestos.
20  Q  In fact, for Goodyear Aerospace, as long as
21  you've been handling cases against Emtal, you
22  never filed papers with this vinyl theory in
23  them, did you, Mr. Bevan?
24  A  Actually, I tried a case against Goodyear Tire
25  & Rubber Company under that theory, that

Page 211

1  Goodyear Tire & Rubber Company was supplying
2  the raw asbestos fiber through central
3  purchasing, through this exact theory I'm
4  talking about.
5  Q  Regarding Emtal, you never raised that in any
6  Court papers on behalf of these thousands of
7  plaintiffs, did you, Mr. Bevan?
8      MR. ROTH:   Objection.
9  A  I don't believe I did. Like I said, I did it
10  on the raw asbestos side, but I wouldn't have
11  done it on the Emtal because the evidence I had
12  was that Emtal didn't have asbestos.
13  Q  And even in 1994 when you had cases against
14  Goodyear – involving Goodyear Aerospace, you
15  didn't raise the vinyl theory regarding Emtal
16  at that point, did you?
17  A  I'm trying to recall if I had any Goodyear
18  Aerospace cases in 1994. I don't know if I had
19  any back then. It's possible. I don't recall
20  any.
21  Q  If you did have them, you would expect to –
22  would you have – withdrawn.
23      If I could show you a case in 1994
24  regarding Goodyear Aerospace, would you expect
25  to see your vinyl theory there regarding Emtal?

Page 212

1      MR. ROTH:   Objection to
2  form.
3      MR. McDERMOTT:   Objection.
4  Form.
5  A  I don't think – I don't think we developed
6  that until it was in probably '98 or '99. It
7  was a time when I was starting to litigate a
8  fair number of Goodyear Aerospace cases. I
9  think we had between 100 and 200 Goodyear
10  Aerospace cases that arose around 1999. And we
11  were litigating those in the early 2000s,
12  around 2000. When we started –
13  Q  Do you have any piece of paper showing Emtal
14  being shipped from the vinyl facility to
15  Goodyear Aerospace?
16  A  No.
17      MR. McDERMOTT:   Objection.
18  Q  But you have the thousands of cases that you've
19  litigated. You can't show me a single piece of
20  paper?
21      MR. McDERMOTT:   Objection.
22  A  My understanding, from what Goodyear's told me,
23  they destroyed their records, so – as part of
24  their normal record keeping policy.
25  Q  Let me show you 151.

Page 213

1      Defendants' Exhibit 151 is a March 13,
2  2003 letter to Jan Spellacy?
3  A  Yes.
4  Q  From Dr. Parmar?
5  A  Yes.
6  Q  There's a reference in paragraph 2 to a B
7  reader report by Dr. Ray Harron dated May 16,
8  2002 with a narrative.
9      Do you see that?
10  A  Yes.
11  Q  Who's Dr. Harron?
12  A  He was a B reader from West Virginia.
13  Q  Honest and competent?
14  A  I found him to be quite honest and competent in
15  my dealings with him. He saved some of my
16  clients' lives.
17  Q  So you think that a Court could rely on his B
18  reads?
19  A  Well, we don't use him anymore and he withdrew
20  from the litigation. I'm not so sure he's
21  alive anymore.
22  Q  As of 2003, did you believe that a Court should
23  rely on the B reads of Mr. Harron?
24      MR. McDERMOTT:   Objection.
25  A  As of 2003, I think the Courts were relying

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 214..217

Page 214

1  upon B reads of Dr. Harron. I believe. I
2  don't know when that -- I explained it earlier.
3  I don't know when that occurred, but I don't
4  believe it was as of 2003. It certainly wasn't
5  as of 2002, which is the date indicated by the
6  B read in there.
7  Q  Could we agree that one of Mr. Ware's medical
8  reports supporting his diagnosis was a B reader
9  by Dr. Harron?
10  A  No. Not for his mesothelioma. I think
11  Mr. Ware was originally an asbestosis client
12  and he developed mesothelioma. So not for
13  mesothelioma.
14  Q  So Mr. Harron, as far as you can testify to,
15  had no involvement with Mr. Ware's talc claim?
16  A  Well, again, other than what I just said.
17     MR. McDERMOTT:  Objection.
18  Q  Well, at this point in 2003, Mr. Ware had
19  mesothelioma?
20  A  Yes.
21  Q  Right. And this report is supporting that
22  diagnosis of mesothelioma, correct?
23  A  Yes.
24  Q  And these were the claims that you were
25  pursuing against talc claims -- talc

Page 215

1  defendants, correct?
2     MR. McDERMOTT:  Objection.
3  A  Say that again.
4  Q  You were supporting -- you were pursuing
5  mesothelioma claims against talc defendants,
6  correct?
7  A  Yes.
8  Q  Do you think that a claimant who's relying on
9  Dr. Harron has some weakness in their case
10  because of the fact that Dr. Harron's providing
11  the diagnosis?
12     MR. McDERMOTT:  Objection.
13     MR. ROTH:  Objection.
14  Foundation.
15  A  No.
16  Q  Your professional practice and the way you
17  conduct your practice is that you're perfectly
18  comfortable relying on reads by Dr. Harron?
19     MR. McDERMOTT:  Objection.
20     MR. ROTH:  Objection.
21  Foundation.
22  A  I don't rely upon reads by Dr. Harron anymore
23  and haven't since approximately 2004.
24  Q  Do you think the allegations against Dr. Harron
25  were well rounded?

Page 216

1     MR. McDERMOTT:  Objection.
2  A  I don't know.
3  Q  Really?
4  A  What's that strange look on your face for?
5     MR. McDERMOTT:  Objection.
6  Q  Based on representing tens of thousands of
7  people and being one of the most distinguished
8  plaintiffs lawyers in the country for asbestos
9  claims, you don't have any understanding of
10  what the claims were against Dr. Harron?
11     MR. ROTH:  That wasn't --
12  objection.
13     MR. McDERMOTT:  Objection.
14     MR. ASSAF:  I'm asking the
15  question.
16  A  I don't think that's the question you asked me,
17  for starters.
18  Q  I'm asking you now, though.
19     MR. McDERMOTT:  Objection.
20  A  Why don't you repeat your question?
21  Q  Sure.
22     Based upon your experience in handling
23  asbestos claims, do you have any understanding
24  of what the allegations were against
25  Dr. Harron?

Page 217

1  A  I explained earlier in the deposition what my
2  understanding was of the allegations.
3  Q  And do you think that there was any factual
4  basis to those allegations?
5     MR. McDERMOTT:  Objection.
6  A  I have no idea.
7  Q  Did you understand that Courts had in fact
8  found that Dr. Harron should not be relied on?
9     MR. McDERMOTT:  Objection.
10  Q  Let's put it this way -- withdrawn.
11     You know that bankruptcy trusts won't
12  rely on Dr. Harron's B reads, right?
13  A  Correct.
14     MR. McDERMOTT:  Objection.
15  Q  Right?
16     So is that a factor, then, in terms of
17  your assessing the strength and weaknesses of a
18  possible claim, whether you're relying on
19  Dr. Harron's claim -- B reads?
20     MR. ROTH:  Objection.
21  Foundation.
22     MR. McDERMOTT:  Objection.
23  A  You know, I don't -- I guess I'm not quite
24  understanding your question. I can tell you
25  that as of 2002 when Dr. Harron did a B read

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 218..221

Page 218

1  for Mr. Ware, there was no Court that had an
2  issue with him, no bankruptcy trust that had an
3  issue with him. He had testified numerous
4  times, as far as I know. I think he had
5  testified in cases that we had filed and won.
6  And so there was not an issue.
7       Since 2004, we have not relied upon
8  Dr. Harron and, in fact, we got our cases
9  reread where Dr. Harron was involved.
10      So whether or not we had Dr. Harron on a
11  case or not is not any indication to me whether
12  or not the case is strong or weak.
13 Q  As --
14 A  And it certainly has no indication on the Ware
15  case, which is a mesothelioma case. And the B
16  read that Dr. Harron did has nothing to do with
17  Mr. Ware's diagnosis of mesothelioma.
18 Q  Well, except at the bottom of page 2,
19  Dr. Parmar bases his opinions on the review of
20  Dr. Harron.
21      MR. McDERMOTT:   Objection.
22 Q  Do you see that at the bottom of page 2?
23  "Based on these reviews and studies, the
24  following."
25 A  Yeah, keep reading.

Page 219

1 Q  "the following are noted."
2 A  "Noted."
3 Q  Okay.
4 A  Not "I relied upon the following to make my
5  diagnosis."
6  "the following are noted." So he notes
7  there's a B read by Dr. Harron. He doesn't
8  say, "I'm relying upon the B read of Dr. Harron
9  to make a diagnosis of mesothelioma."
10 Q  What does "based upon these reviews and
11  studies" mean to you?
12      MR. ROTH:       Well,
13  objection --
14      MR. McDERMOTT:   Objection.
15      MR. ROTH:       -- to form and
16  foundation.
17      MR. ASSAF:       Foundation?
18  That he's --
19      MR. ROTH:       Well, you're
20  asking him --
21      MR. ASSAF:       -- acutely
22  aware of all of the clients' cases?
23      MR. ROTH:       If I'm allowed
24  to say anything, you're asking --
25 Q  Withdrawn.

Page 220

1      MR. ROTH:       -- what's this
2  sentence mean to you.
3 A  I think I told you what the sentence means to
4  me.
5 Q  "Based upon these reviews and studies." Do you
6  have an understanding of what that phrase
7  means?
8      MR. ROTH:       All right.
9  Objection.
10 A  If you take it in the context of the following,
11  "the following are noted." He said based on
12  these reviews and studies, he's noted the
13  following. Dr. Harron found this.
14 Q  So when Dr. Parmar says "Based upon these
15  reviews and studies," you understand that to
16  mean the studies contained in this letter,
17  correct?
18      MR. McDERMOTT:   Objection.
19 Q  Fair?
20      It's not saying based on every possible
21  study?
22 A  He's listing what he's reviewed.
23 Q  Okay.
24 A  Okay.
25 Q  A lawyer would figure that out by reading that?

Page 221

1 A  Just like a defense doctor --
2      MR. ROTH:       Objection.
3 A  -- may say reviewed an x-ray of Dr. Harron. He
4  saw Dr. Harron's x-ray interpretation.
5 Q  So as we sit here today, you don't have any
6  basis to question the integrity of reads by
7  Dr. Harron?
8      MR. McDERMOTT:   Objection.
9      MR. ROTH:       Objection to
10  the form and foundation.
11 A  No. I found him to be a very effective and
12  good B reader.
13 Q  I'm going to show you Exhibit 150.
14      Defendants' Exhibit 150 is entitled T.H.
15  Agriculture & Nutrition.
16      Have you seen this document before?
17 A  I don't recall seeing it.
18 Q  Did you see it at any time prior to --
19  withdrawn.
20      Have you seen it at any time within the
21  past year?
22 A  I don't recall seeing it in the past year.
23 Q  Did you see it in preparation for your
24  deposition?
25 A  No.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 222..225

Page 222

1  Q  Do you know what it is?
2  A  It appears to be an affidavit from Donna Ware.
3  Q  Do you know what it relates to?  Well,
4     withdrawn.
5        Your Donna Ware's attorney, right?
6  A  Yes.
7  Q  And I think you said you're aware of all
8     aspects of their cases, correct?
9        MR. ROTH:     Objection.
10    Form and foundation.
11 A  Yeah.
12 Q  Okay.  Do you know, what does this relate to?
13 A  According to her, her husband, Ralph Ware, was
14    exposed to asbestos contained in joint
15    compounds and she initialed "Bondex joint
16    compound."
17 Q  Paragraph 2 says, "My spouse performed home
18    repair and home remodeling jobs."
19       Do you see that?
20 A  Yes.  Uh-huh.
21 Q  Do you know why that's in the affidavit?
22 A  I don't know why.
23 Q  Is this a form affidavit?  Did you create this
24    for other clients?
25 A  You know, it looks fairly consistent, you know,

Page 223

1     and sent off to a client and the client either
2     signs it or doesn't sign it, you know.
3  Q  Do you expect it to be truthful?
4  A  Yeah.
5  Q  Do you do anything to make sure it's true?
6  A  Once we get the -- if we get the notarized
7     affidavit, we put it in the client's file.
8  Q  Well, you mentioned, again, you're familiar
9     with various aspects of your clients' cases,
10    and I asked you about are you familiar with
11    their depositions.
12       And, you know, Mr. -- Ms. Ware, rather,
13    was deposed, right?
14 A  I don't recall if she was deposed or not.  I
15    don't recall.  I don't think I was at her
16    deposition, if she was deposed.
17 Q  Let me show you Defendants' 149.
18       Do you recognize this?
19 A  I don't know that I've ever seen it.  I may
20    have.
21 Q  Well, this deposition was taken at a time you
22    were representing her, correct?
23 A  Correct.
24 Q  All right.  Could you turn to page 54 of the
25    deposition?

Page 224

1     Starting on line 2, question, "Did he
2     ever perform any remodeling or home improvement
3     work after that time?"
4        Answer, "If he did -- he wasn't in that
5     type of work, he would have people do it for
6     us."
7        "Did Ralph perform any of his own vehicle
8     maintenance?"
9        "No."
10       Do you see that?
11 A  Yeah.
12 Q  So did you understand that your client,
13    Mrs. Ware, was saying under oath that Ralph
14    didn't perform home remodeling work?
15 A  Say that again.
16 Q  Do you understand from this deposition of your
17    client that your client was testifying that her
18    husband did not perform home remodeling work?
19       MR. McDERMOTT:  Objection.
20       MR. ROTH:     Objection.
21    Foundation.
22 A  It looks like that's what she says in the
23    deposition.
24 Q  Based upon your experience in dealing with
25    asbestos claimants and in dealing with

Page 225

1     Ms. Ware, can you provide any explanation of
2     why the affidavit is inconsistent with the
3     testimony?
4        MR. McDERMOTT:  Objection.
5  A  I don't know whether that's inconsistent or
6     not.  I don't know.  Maybe she thought of
7     something else that he had done with respect to
8     joint compound.  I really don't know.
9  Q  Did you have -- prior to coming in today, did
10    you have any understanding that the affidavit
11    was inconsistent with her deposition testimony?
12       MR. ROTH:     Objection.
13       MR. McDERMOTT:  Objection.
14       MR. ROTH:     Foundation.
15 A  I haven't -- I already told you I don't know
16    that I've seen this document or the deposition.
17    So ...
18 Q  Would you expect that the lawyers at your firm
19    would check the affidavit to make sure it was
20    consistent with the deposition testimony?
21 A  No.  I assume that if she put it in the
22    affidavit, she put it -- and signed it, she was
23    accurate about it.
24 Q  You don't think the lawyer had any duty to
25    check what was being sworn to was consistent

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 226..229

Page 226

1   with prior statements?
2       MR. ROTH:   Objection –
3   A   No.
4       MR. ROTH:   – to form and
5   foundation.
6   Q   Do you think defense lawyers have – should
7       have the same approach, that they don't have to
8       check to see whether or not an affidavit is
9       inconsistent with prior sworn testimony?
10  A   Again it depends on the situation.  You know,
11      if the defense lawyers know that what they're
12      putting out in an affidavit or in Court
13      pleadings is a lie, I think they have an
14      obligation to tell the truth.
15  Q   Do you think that the Bevan attorneys had an
16      obligation to make sure that Ms. Ware was
17      telling the truth?
18      MR. McDERMOTT:  Objection.
19  A   This is Ms. Ware's statement.  So, you know,
20      all we can go on is what our client told us.
21  Q   But you got compensation because she submitted
22      that statement, right?
23  A   I don't think so.
24  Q   You don't think she received money from T.H.
25      Agriculture & Nutrition?

Page 227

1   A   I don't think so.
2   Q   Okay.  Let's pull that out.
3       Did you submit this to T.H. Agriculture?
4       Was it a trust?
5   A   I don't know if it was submitted or not.
6   Q   Who would know that?
7   A   I could find out from my people that handled
8       the claims.
9   Q   And do you know what the payouts were?
10  A   For –
11  Q   Yes.
12  A   I don't know.
13  Q   Could you check that for me?
14  A   Yeah, I could find that out, what the end pay
15      is on cases.  I –
16  Q   No, whether Ms. Ware got money.
17  A   Oh, whether she got paid.  Yeah, I could check
18      that out.
19  Q   I think she thinks she did.
20  A   She thinks she did?
21  Q   Yeah.
22  A   I would be surprised.
23  Q   Okay.
24  A   But I could be wrong on that.
25  Q   All right.  I could be wrong too.

Page 228

1   A   I would be surprised.
2   Q   I don't know.  Why don't you check that out?
3   A   I'll check it out.
4   Q   All right.
5       MR. ROTH:   I'm not sure if
6       there were questions or just discussion –
7       MR. ASSAF:   Just
8   discussion.
9       MR. ROTH:   – but I think
10      there's a foundation objection in there
11      somewhere.
12  Q   Would you agree with me that Ms. Ware
13      submitted – withdrawn.
14      Would you agree with me that a plaintiff
15      who signed a false affidavit is differently
16      situated than other plaintiffs who haven't
17      submitted false affidavits?
18      MR. McDERMOTT:  Objection.
19      MR. ROTH:   Objection.
20  Foundation.
21      MR. McDERMOTT:  Foundation.
22  A   I don't know how – that question doesn't make
23      any sense to me, so I don't know.
24  Q   Okay.  Let's try it this way.
25      We were talking about strengths and

Page 229

1       weaknesses of cases, right?
2   A   Yes.
3   Q   In terms of your assessing the value of a case,
4       would you agree with me that if you have a
5       client who has an affidavit that's false, that
6       that makes it a weaker case, all things being
7       equal?
8       MR. ROTH:   Objection to
9       foundation.
10  Q   Or you think it just doesn't matter?
11      MR. McDERMOTT:  Objection.
12  A   Yeah, again I don't – I don't really know how
13      to answer that question.
14  Q   You can't answer that question?
15  A   No.
16  Q   Do you think there's any import to having a
17      false affidavit?
18      MR. McDERMOTT:  Objection.
19  A   It depends, I guess, on the circumstance,
20      but –
21  Q   Let's try it this way.
22      Based upon of all your experience in
23      submitting claims and affidavits for clients,
24      do you have any concern regarding a false
25      affidavit by a claimant?

Page 230

1        MR. ROTH:    Objection to
2     form.
3   A  I don't recall it ever being an issue on any
4     case I've ever handled.
5   Q  Not a problem for you?
6        MR. ROTH:    Objection.
7        MR. McDERMOTT:  Objection.
8   A  I can't recall ever having a problem with a
9     client doing a false affidavit.
10  Q  Well, now knowing about Ms. Ware's sworn
11    testimony in a deposition and this affidavit,
12    are you going to go talk to her?
13       MR. McDERMOTT:  Objection.
14       MR. ROTH:    Objection.
15  A  I guess I would have to get an Ouija board out
16    to talk to Mrs. Ware.
17  Q  Do you have any concerns of whether this was
18    submitted to a Court or a trust?
19  A  I don't know what her basis was for saying
20    that, so I don't know and I can't determine
21    that now.
22  Q  Okay.  Do you know how much Mrs. Ware received
23    in settlements?
24  A  I do not.
25  Q  Does a million dollars sound about right?

Page 231

1   A  It would be a guess, so I really don't know.
2   Q  Do you know whether Mrs. Ware settled with the
3     talc defendants?
4   A  I don't know.
5   Q  Well, when you had a discussion with Ms. Ware,
6     did you tell her that the talc defendants lied
7     to her or lied to you regarding her case?
8        MR. McDERMOTT:  Objection.
9   A  I'm sure I did, yes.
10  Q  So did they lie to you in settlement
11    discussions, or was her case dismissed on the
12    merits?
13       MR. McDERMOTT:  Objection.
14  A  I don't know how her case was resolved.
15  Q  You can't remember?
16  A  No.
17  Q  Well, what did you tell Mr. Placitella about
18    it?
19       MR. McDERMOTT:  Objection.
20       MR. ROTH:    Objection.
21  A  I don't recall.  Whatever happened happened.
22    The case was either settled or dismissed
23    against the talc company.  One or the other.
24  Q  Well, since 2010, you've provided facts to
25    Mr. Placitella regarding the Ware case,

Page 232

1     correct?
2        MR. ROTH:    Objection to
3     form.
4   A  I'm sure I gave them something.
5   Q  But you just – as we sit here today, you can't
6     recall the facts regarding the settlement
7     negotiations or even if there were settlement
8     negotiations regarding Ware?
9   A  No.  I have to look at the file to see if there
10    was a check that was paid to Mr. Ware or
11    Mrs. Ware as a result of the talc settlement.
12    That's what I would have to do.
13  Q  But I'm asking about the facts regarding the
14    negotiations.
15  A  I don't recall.
16  Q  But you must have recalled it sometime, because
17    Mr. Placitella wasn't involved in the Ware
18    settlement negotiations back in 2002, was he?
19  A  He was not.
20  Q  Right.  You were.
21  A  I don't know what was discussed, if there was a
22    settlement negotiation on the Ware case or not.
23    I don't recall.
24  Q  My question is, Mr. Bevan, how would
25    Mr. Placitella learn the facts of what happened

Page 233

1     in the Ware case except from you?
2   A  I can go to the file and tell you whether or
3     not the talc companies paid Mr. Ware or if
4     Mr. Ware dismissed Eastern Magnesia without
5     payment.  That's what I can do.
6   Q  But I'm asking you:  Do you have any
7     independent recollection of what was said
8     regarding the Ware settlement negotiations at
9     the time of the Ware litigation?
10  A  Yeah --
11       MR. ROTH:    Objection.
12  A  – with respect to Ware, no, I don't have any
13    independent recollection of what was discussed
14    with the talc – with Eastern Magnesia Talc.
15  Q  Back at the time closer to the events in
16    question, 2009, 2010, when Mr. Placitella
17    called you, did you have a better recollection
18    of what happened with Ware?
19  A  I don't think.
20  Q  Did you, over the course of the last few years
21    in communicating with Mr. Placitella, provide
22    him with any facts other than "I don't recall"
23    regarding Ware?
24       MR. McDERMOTT:  Objection.
25       MR. ROTH:    Objection to

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 234..237

Page 234

1   form.
2   A  I believe I would have provided him with the
3     facts of where Mr. Ware worked, what his
4     disease was, when he worked there, and whether
5     or not we had filed suit against Eastern
6     Magnesia Talc or the Eastern Magnesia Talc
7     entities.  That would have been the information
8     that I would have given to him.
9        And I may have looked at the file to
10    determine if we got a talc settlement or
11    didn't.  I don't recall.  I don't recall that,
12    the answer to that.
13  Q  Do you know when the Ware case was dismissed?
14  A  I don't.
15  Q  Do you know any of the circumstances regarding
16    its dismissal?
17        MR. McDERMOTT:  Objection.
18  A  No.
19  Q  Did you ever provide information regarding
20    whether the Ware case was dismissed because of
21    some settlement to Mr. Placitella?
22  A  If there was a settlement, it would be in the
23    file.
24  Q  But did you ever talk to him about it?
25  A  I don't recall talking to him about it, no.

Page 235

1   Q  Did you ever email -- this four- or five-inch
2     stack of emails.  Did you ever email him about
3     it?
4         MR. ROTH:     Objection.
5         MR. McDERMOTT:  Objection.
6   A  I don't recall emailing him about it.
7   Q  So anything that he got from the complaint
8     would have just been from the documents,
9     because you have no independent recollection?
10        MR. ROTH:     Objection.
11    Form and --
12  Q  Of the Ware.
13        MR. ROTH:     Form and
14    foundation.
15        MR. McDERMOTT:  Objection.
16  A  Of what ended up happening, whether Ware was
17    settled or dismissed, I would go to the file to
18    determine that.
19  Q  So what is it in the file that -- could you
20    turn to paragraph 28 in the second amended
21    complaint, D Ex 1?
22  A  Yeah.
23  Q  In the middle, it says:  Reasonably relying and
24    acting upon the misrepresentations and material
25    omissions of Defendants regarding Emtal's [sic]

Page 236

1   talc product and the absence of any evidence
2     indicating Engelhard's talc contained asbestos
3     fibers that were made to their attorney and
4     representative, Thomas Bevan, Esquire, as more
5     particularly set forth herein, Plaintiff Ware
6     and her husband's estate in 2003 voluntarily
7     dismissed their lawsuit against Engelhard's
8     predecessors as part of a multi-plaintiff,
9     multi-talc defendant settlement that BASF's
10    predecessors were party to, without receiving
11    any full, fair and adequate compensation for
12    their asbestos injury.
13        Do you see that?
14  A  Yes.
15  Q  Do you know how Mr. Placitella knew that?
16  A  It must be in the file.  I must have told him
17    that, you know, we dismissed the case and that
18    Ware didn't get paid by any of the talc
19    companies.  I'm not sure about that 1997 date.
20    That seems like maybe that's a typo.
21  Q  How would I find out the facts regarding the
22    multiparty defendant settlement referenced in
23    paragraph 28?
24  A  It would either be in those settlement files,
25    so on a dismissal or something in there, or in

Page 237

1   the client's file that -- if there was a
2     settlement, you know, it would be in the client
3     file.
4   Q  So other than looking at documents that you
5     produced, you don't have any other information
6     to produce, to give to me?
7   A  No, I could probably go online to the court
8     system and see if I could find, you know, a
9     dismissal.
10  Q  As we sit here today, Mr. Bevan, can you
11    provide me with any information other than
12    what's in the documents?
13        MR. ROTH:     Objection.
14    Form and foundation.
15        MR. McDERMOTT:  Objection.
16  A  As far as stuff that I recall that's not in the
17    documents?
18  Q  As far as regarding Ware's decision to
19    voluntarily terminate and enter into a
20    multiparty settlement.  Do you have any
21    recollection of any of the facts other than
22    what's in the documents?
23  A  Yeah, I don't -- no, I don't recall exactly how
24    the Ware case got concluded, as I sit here
25    today.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 238..241

Page 238

1  Q  Okay.
2  A  If I spend some time researching it, I could
3     probably figure it out, but as I sit here
4     today, I don't recall exactly how the Ware case
5     resolved against Eastern Magnesia Talc.
6  Q  Is it the same for the other plaintiffs?  I'll
7     short circuit this.
8        Do you have -- other than what's in the
9     documents, do you have any independent
10    recollection of why any of the named plaintiffs
11    cases were settled?
12 A  Oh, I have --
13       MR. ROTH:      Excuse me.
14    Objection to form and foundation.  You're --
15       MR. ASSAF:      Okay.
16       MR. ROTH:      -- conflating
17    your questions here and it's not fair.
18 A  I have -- I think of the five cases, I would
19    have the least recollection of the Ware case.
20 Q  Okay.  Fair enough.
21       Okay.  Let's go to -- what's the one you
22    have the most recollection of?
23 A  Oh, it would probably be Darnell.
24 Q  Okay.  How about Jennifer Graham's case?
25 A  I have recollection of Jennifer Graham.  I

Page 239

1     think I recall how that got resolved against
2     Eastern Magnesia.  I thought they got out on
3     summary judgment, but that's my recollection.
4  Q  Summary judgment on product ID?
5  A  I think it was summary judgment on asbestos
6     content, which would, you know, be a similar
7     product ID.  I mean, I think the Court looked
8     at that as one and the same.
9  Q  Product ID is --
10 A  What's with the weird look on your face?  You
11    know --
12 Q  Because product ID is the same as asbestos
13    content?
14       MR. ROTH:      That's not what
15    he said.
16       MR. McDERMOTT:  Objection.
17 A  I said I think that's looked at as the same.
18    So what the Court is determining is was this
19    person exposed to an asbestos product
20    manufactured or supplied by the defendant, and
21    that's a two-part test.
22       Okay.  One, did the defendant supply that
23    product or sell that product to the worksite
24    where the client worked.  And, two, did that
25    product actually cause -- contain asbestos.

Page 240

1  Q  So you think a product ID analysis under Ohio
2     law includes whether there's asbestos in the
3     product?
4  A  Certainly.
5        MR. ROTH:      Objection to
6     form and foundation.
7  Q  And the cases that you've litigated regarding,
8     for example, R.T. Vanderbilt, had to do with
9     whether there was asbestos in the product, as
10    opposed to whether they were just exposed to a
11    product?
12       MR. McDERMOTT:  Objection.
13       MR. ROTH:      Objection to
14    form --
15       MR. McDERMOTT:  Form and --
16       MR. ROTH:      -- and
17    foundation.
18       MR. McDERMOTT:  -- foundation.
19 Q  Wow.  They don't like that question at all.
20    I'll try a different one.  Withdrawn.
21       MR. ROTH:      Thank you.
22 Q  Let's talk about Ms. Graham.
23 A  Sure.
24 Q  Let's see where the complaint is.
25       MR. ASSAF:      That was a good

Page 241

1     objection.
2        MR. McDERMOTT:  Thank you.  I
3     really feel better.
4  Q  I'm going to show you Exhibit 39, Defendants'
5     Exhibit 39.
6        This is a summons dated April 11, 2008
7     attaching a multiparty -- a multi-defendant
8     complaint on behalf of Jennifer Graham.
9        Do you recognize this?
10 A  Yes.
11 Q  So this is roughly how many years after you say
12    you believed Cahill when they told you there
13    was no asbestos in Emtal talc?
14 A  I would say roughly -- roughly 15 years or so.
15 Q  At any point did you call up Cahill and say "I
16    believe your there's no asbestos in the talc,
17    but I'm just going to keep filing cases
18    anyway"?
19 A  I don't think I ever had that conversation with
20    them, no.
21 Q  Did they ever have that conversation with you
22    saying, "Hey, I thought we told you there's no
23    asbestos in the talc and you keep filing these
24    cases against my client"?
25 A  I think they always threw it in my face, that

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 242..245

Page 242

1   we had dismissed them in the past, why am I
2   suing them again.
3   Q   And did you tell them it's because you don't
4   believe them or you do believe them or you had
5   tactical reason?
6   A   I told them -- I'm sure that I told them that
7   I've got other defendants pointing the finger
8   at you and I'm not going to have an open chair
9   and I got Sam Martillotta telling me that I
10   can't -- I got to have you in on the cases if
11   we're going to do any deals.
12   Q   But did you tell them that you did believe them
13   that there's no asbestos in the talc?
14       MR. ROTH:     Objection to
15   the form and foundation.
16       MR. McDERMOTT:   Objection.
17   A   I don't know if I told them I believed them,
18   but I told them, you know, I don't have any
19   evidence to show that there was asbestos in the
20   talc, so put forth your case, put forth your
21   defense.
22   Q   Okay.  So then -- withdrawn.
23       Who's John Mismas?  Mismas?
24   A   He was an attorney that used to work at my
25   firm.

Page 243

1   Q   Did he have dealings on the Emtal case for
2   Jennifer Graham?
3   A   On the Jennifer Graham.  He worked on the
4   Jennifer Graham case.
5   Q   Did he report to you on what was happening?
6   A   Yes.
7   Q   I'm going to show you what's been marked as
8   Defendants' Exhibit 46.
9       It's a November 12, 2008 letter unsigned
10   to John Mismas apparently from Jennifer
11   Riester.
12       Do you recognize this?
13   A   I don't know if I saw this at the time or not.
14   I'm not sure.
15   Q   Do you have any independent recollection of
16   this document?
17   A   When I'm looking down and seeing these
18   dismissals, it -- yeah, it rings a bell.  So I
19   think I probably saw this at the time.
20   Q   Okay.  Do you know Jennifer Riester?
21   A   Yes.
22   Q   Trustworthy?
23   A   I don't know.
24   Q   Reputation for honesty?
25   A   I don't know.

Page 244

1   Q   Okay.
2   A   I would say if she knew what Cahill Gordon did
3   and Eastern Magnesia Talc, then she's not
4   trustworthy.
5   Q   You keep saying if they knew what Cahill Gordon
6   did.
7       How do you know what Cahill Gordon did?
8   A   What's been reported to me.
9   Q   Based on what Mr. Placitella told you and what
10   he wrote in the complaint?
11   A   Yeah.
12       MR. ROTH:     Objection.
13   Form and foundation.
14   A   If it's not true, then, you know.
15   Q   Your factual basis for believing Cahill Gordon
16   lied is Mr. Placitella?
17   A   Yes.
18       MR. McDERMOTT:   Objection.
19       MR. ROTH:     Objection.
20       MR. ASSAF:     Basis?
21       MR. ROTH:     You got your
22   question, you get your answer.  Main objection.
23   Q   Could you turn to the second page of this?
24       It says, "The Affidavit of William H.
25   Ashton summarizes numerous investigations,

Page 245

1   examinations, and studies of the Johnson mine.
2   The conclusion derived from all of these
3   studies is that the talc produced from this
4   mine did not contain asbestos."
5       Do you see that?
6   A   Yes.
7   Q   Have you ever reviewed the Ashton affidavit?
8   A   I assume that I did.  I probably did.  I don't
9   recall the names.  I reviewed the stuff that
10   they had submitted to us over the years.
11   Q   And you would have reviewed this carefully?
12   A   I think I would have reviewed it carefully.
13   Q   Okay.  It says here that the affidavit
14   summarizes numerous investigations,
15   examinations, and studies of the Johnson mine.
16       Do you see that?
17   A   Yes.
18   Q   Does that mean to you that Ashton summarizes
19   every investigation ever done on the Johnson
20   mine?
21       MR. McDERMOTT:   Objection.
22   A   Yes.
23   Q   It does?
24   A   I assume, yes.  I assume he wouldn't have left
25   anything out.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 246..249

Page 246

1  Q  Okay. So when it says "numerous," you think
2     that that means everything?
3          MR. McDERMOTT:  Objection.
4  A  I see he says derived from all of the
5     studies -- these studies that the talc produced
6     did not contain asbestos. So I assume that he
7     wasn't holding anything back. Whether he was
8     or not, I don't know if he was or not.
9        I assume that he wasn't holding anything
10    back.
11 Q  Well, it says, "these studies." If you want to
12    diagram this, going back to law school, "these
13    studies" refer to what?
14         MR. McDERMOTT:  Objection.
15         MR. ROTH:     Objection.
16 A  I assume it's studies from the -- of the
17    Eastern Magnesia Talc mine that he reviewed.
18 Q  The numerous studies, correct?
19 A  Uh-huh.
20 Q  Okay. So could you pull back out Exhibit 151?
21    It's the Dr. Parmar declaration.
22       In the bottom of page 2 where he says
23    "Based on these reviews and studies." Now, do
24    you read that phrase to mean based on every
25    review and study ever done on Mr. Ware, or

Page 247

1     based on the things above?
2          MR. McDERMOTT:  Objection.
3  A  I think he's saying based on everything that he
4     has, he's noting the following. So I presume
5     he didn't hold anything back.
6  Q  So he lists six things, correct?
7          MR. ROTH:     Which "he" are
8     we talking about? I'm sorry.
9          MR. ASSAF:    Exhibit 151.
10         THE WITNESS:   From Dr. Parmar
11    in the Ware case.
12 Q  I have reviewed various medical records and
13    studies. And he lists six things, correct?
14 A  Well, he's really listing nine things, because
15    he's listed --
16 Q  Fair enough.
17 A  -- surgical pathology material.
18 Q  Plus nine things.
19       So do you think that his opinion is based
20    on the review of those nine items --
21         MR. McDERMOTT:  Objection.
22 Q  -- or something beyond those?
23         MR. ROTH:     Objection to
24    form and foundation.
25         MR. McDERMOTT:  Objection.

Page 248

1  A  I think his opinion -- I think he has
2     considered every single thing that I gave him.
3     So I'm assuming -- or that my office gave him.
4     So I assume that he lists every single thing
5     that he got from us.
6  Q  Do you know that?
7          MR. McDERMOTT:  Objection.
8  Q  Withdrawn.
9        As we sit here today, do you know that
10    Dr. Parmar's report lists everything that you
11    gave him? Can you testify to that?
12 A  I can testify looking at what he's reviewed,
13    this is what we would typically give him.
14 Q  And why does he, based upon your experience,
15    identify for the reader what he's basing his
16    opinion on?
17         MR. ROTH:     Objection.
18 A  He's noting all of these pertinent medical
19    effects.
20 Q  Is there a reason why you don't want to say it
21    refers just to the nine things?
22         MR. McDERMOTT:  Objection.
23         MR. ROTH:     Objection.
24    Form.
25 A  I'm saying that -- that's what I'm saying,

Page 249

1     these nine -- these things that we gave him.
2  Q  That's how you as a lawyer would read it, that
3     it's based upon these nine items that I'm --
4  A  I'm basing -- I'm reading it that he's basing
5     his opinion on every single thing that he had
6     in front of him to review in the Ware case.
7  Q  But it doesn't say that. It says these nine
8     things.
9          MR. McDERMOTT:  Objection.
10         MR. ROTH:     Objection.
11 A  Yeah, and I think that's probably everything
12    that he had.
13 Q  But you don't know that, do you, Mr. Bevan?
14    I'm --
15 A  I think I answered your question.
16 Q  Withdrawn.
17 A  I said looking at what he listed, that's
18    everything that we would typically give an
19    expert.
20 Q  I'm asking you questions as a factual witness,
21    okay?
22       Can you tell me and the Court that you
23    know that everything you gave him is listed
24    here? Can you tell me that for certain?
25 A  I can tell you that it's extremely likely that

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 250..253

Page 250

1    everything that we gave him is listed there.
2  Q  Based upon these reviews and studies, you think
3     that means everything regarding Mr. Ware?
4        MR. ROTH:    Objection.
5  Q  Withdrawn.
6  A  Your question doesn't make any sense.
7  Q  So let's explore this a little bit.
8        So your approach to lawyering is that if
9     there's an adverse opinion, like, for example,
10    a doctor raises a question of whether somebody
11    actively had meso, that that should be
12    disclosed to a Court or opposing counsel or,
13    say, a bankruptcy trust?  Is that how you
14    approach your practice?
15        MR. McDERMOTT:  Objection.
16        MR. ROTH:    Objection to
17    form, foundation.
18  A  You know, you're not giving me enough
19    information so --
20  Q  Well, you said you want to --
21        MR. ROTH:    Well, I'm
22    sorry --
23  Q  You want to identify everything.
24        MR. ROTH:    Excuse me,
25    Mr. Assaf.

Page 251

1        Were you finished with your answer?
2  Q  Withdrawn.  Withdrawn.
3        Is it your opinion that a lawyer should
4     disclose everything, including adverse
5     evidence, to any opponent?
6  A  I think --
7        MR. ROTH:    Objection.
8     Form and foundation.
9  A  Again it depends on what the evidence is.  So
10    I'll just have to give you examples.  If --
11  Q  It's really a yes or no question.
12  A  No, it isn't a yes or no question.
13        MR. ROTH:    Objection.
14        MR. McDERMOTT:  Objection.
15  A  You can be snarky as much as you want, it's not
16    a yes or no question.  So if you want a yes or
17    no answer, I can't give you a yes or no answer.
18  Q  You can't answer the question whether you have
19    an obligation to disclose adverse evidence?
20  A  I said it depends on the circumstances.  If you
21    would like, I can explain.
22  Q  Based upon your experience, have you disclosed
23    adverse evidence, whether somebody has
24    mesothelioma, to bankruptcy trusts?
25        MR. McDERMOTT:  Objection.

Page 252

1  A  We --
2        MR. ROTH:    Objection.
3  A  -- submit to the bankruptcy trust, if it's a
4     mesothelioma case, a diagnosing medical report
5     diagnosing mesothelioma.  That's all we have to
6     submit to the bankruptcy court.  We don't give,
7     you know, 10,000 pages of records.
8  Q  And if there's a medical record -- if there's a
9     medical record suggesting that the person
10    didn't have mesothelioma, do you submit that as
11    well?
12        MR. McDERMOTT:  Object to form
13    and foundation.
14  A  No.  If there's one that suggested that he did
15    have mesothelioma, we submit the report that
16    indicates it's mesothelioma.
17  Q  You submit the one that's favorable for your
18    client?
19        MR. ROSH:    Objection.
20  A  The one that diagnoses mesothelioma, yes.
21  Q  Okay.  So let's get out the -- we'll get out
22    the Ashton affidavit in a second, but if you
23    continue on, it says:  A sample from the
24    Johnson mine was analyzed in 1982 using
25    Scanning Electron Microscopy (SEM) and EDS, as

Page 253

1     well as x-ray diffraction analysis and TEM.
2     The analysis revealed that no asbestos was
3     present in the sample.
4        Do you see that?
5  A  Yes.
6  Q  Do you have any reason to believe that's
7     untrue?
8  A  I don't know one way or the other.
9  Q  Did you rely on that in settling the case?
10  A  In what we've done in the past, I relied upon
11    what Eastern Magnesia told us, which is there
12    was no asbestos in our talc.  Whether it was
13    the Ashton affidavit or whatever else they gave
14    me, you know, whether it was their pleadings,
15    whether it was their letters.  Whatever it was,
16    that's what I relied upon.
17  Q  Well, did you rely on -- withdrawn.
18        In determining to settle or dismiss
19    cases, did you rely on statements from
20    Engelhard that they had conducted testing in
21    1982 and found no asbestos in the sample
22    tested?
23  A  I don't recall the year, when they said they
24    tested.  I relied upon them saying there was no
25    asbestos in their talc.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 254..257

Page 254

1   Q  But as a lawyer, you wanted to understand the
2      factual basis for that claim, correct?
3          MR. ROTH:     Objection.
4   A  I inquired to them and they said there was no
5      asbestos in their talc. I'm not sure what else
6      to tell you. I believed them.
7   Q  But they gave you other information to support
8      whatever claim was being made, didn't they,
9      Mr. Bevan?
10         MR. McDERMOTT:   Objection.
11  A  They give me things. They give me affidavits
12     and/or reports along with their letter.
13  Q  They told you that there was testing done in
14     1982 from a sample and they found no asbestos.
15     I'm just asking: Did you rely on that or not?
16  A  I don't – again, for purposes of this case,
17     the letter in this case, I don't think we
18     dismissed Eastern Magnesia Talc. I think they
19     got out on summary judgment. I think.
20  Q  In terms of your career dealing with Eastern
21     Magnesia Talc, did you rely on the Ashton
22     affidavit in dismissing cases?
23  A  I don't recall the name. So I think it's in
24     the records, the letters to them – to me and
25     what they provided me. Whether it was Ashton

Page 255

1      or somebody else, I don't recall the names, but
2      they provided letters to me and they provided
3      reports that said there's no asbestos in our
4      talc.
5   Q  Is there a difference to you as a practicing
6      and experienced lawyer between a letter from
7      opposing counsel and between a sworn affidavit?
8          MR. McDERMOTT:   Objection.
9   A  Well, there's certainly a difference.
10     Whether – you know, I treated them the same.
11     I assumed that the lawyers weren't going to lie
12     in their pleadings and their letters to me, in
13     their conversations to me.
14  Q  So you treat letters, even today, in litigation
15     the same as you would treat an affidavit?
16  A  I try to, yeah. You know –
17  Q  So –
18  A  – I guess I'm more skeptical today than I was
19     20 years ago.
20  Q  Because of what Mr. Placitella told you?
21         MR. ROTH:     Objection to –
22  A  Because of what –
23         MR. ROTH:      – form and
24     foundation.
25  A  – your clients did.

Page 256

1          MR. McDERMOTT:   Objection.
2   Q  Well, you don't know if they did anything, do
3      you, Mr. Bevan?
4   A  I guess if they didn't do anything and
5      Mr. Placitella's lying, then, you know, he's
6      the one that fooled me, not Eastern Magnesia
7      Talc.
8   Q  In dismissing or resolving cases with Engelhard
9      in 1992 to 2008, did you rely on the 1997 NIOSH
10     study referenced in this letter?
11  A  You mean 1977?
12  Q  1977.
13  A  I don't recall. I don't know if that's what
14     they gave me back in the day or not. I don't
15     recall.
16  Q  If they gave it to you, you would have reviewed
17     it?
18  A  I would have reviewed it if they gave it to me.
19  Q  You would have reviewed it with a critical eye
20     and weighed whether it was credible or not,
21     fair?
22  A  I would have – it would have just been one of
23     the pieces of evidence that I looked at that
24     they provided.
25  Q  And in deciding to dismiss cases you do, you

Page 257

1      weigh various pieces of evidence; the NIOSH
2      study, samples, letters, affidavits, that all
3      goes into your judgment as an experienced trial
4      lawyer, correct?
5   A  It may or may not, depending on what it is.
6   Q  Well, in this case, you certainly wouldn't have
7      ignored the sample studies in terms of coming
8      to some reliance on Engelhard, would you?
9          MR. McDERMOTT:   Objection.
10  A  In this case, I reviewed what Eastern Magnesia
11     Talc gave me and in the context of them not
12     giving me the studies that show that there was
13     asbestos in their talc. Had they given me the
14     studies that showed that there was asbestos in
15     their talc, it would have been an entirely
16     different result.
17  Q  Okay. I'm not asking you about what would have
18     been, I'm asking you what you relied on, okay?
19  A  Yeah, but what I rely upon is not in a vacuum.
20     Okay. What I rely upon has to be taken into
21     context. It's in the context of Engelhard –
22     or Eastern Magnesia Talc not giving me the
23     correct information, the truthful information.
24     And so they gave me this part and that's
25     what – that's all I had to rely upon.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 258..261

Page 258

1  Q  And again that answer is based upon
2     Mr. Placitella telling you that not everything
3     was given to you, correct?
4        MR. ROTH:   Objection to
5     form and foundation.
6        MR. McDERMOTT:   Objection.
7  A  I think that's the extent of the information I
8     have on that. I don't have any independent
9     information. I believe there's some documents
10    out there that are on appeal and hopefully at
11    some point I'll get to look at them and I'll be
12    able to answer with more information.
13 Q  If Mr. Placitella didn't tell you that
14    Engelhard had lied and not given you documents,
15    your testimony would be different?
16       MR. McDERMOTT:   Objection.
17 A  I would still be in the dark if he didn't tell
18    me.
19 Q  And your testimony as a fact witness would be
20    different absent what Mr. Placitella told you,
21    correct?
22       MR. McDERMOTT:   Objection.
23       MR. ROTH:   Objection to
24    form and foundation.
25 A  Again that depends on what's being asked of me.

Page 259

1  Q  Well, in terms of the reasons for settlement.
2     Withdrawn.
3        MR. ROTH:   Objection.
4  Q  Withdrawn.
5        In terms of your reasons for settlement,
6     did you ever discuss with your client the
7     Ashton affidavit, any client?
8  A  I don't know if I ever used the name "Ashton
9     affidavit."
10 Q  Did you ever tell your clients in words or in
11    substance that Engelhard has tested samples?
12 A  I believe my conversations with the clients
13    would have been that I have no evidence that
14    there was asbestos in the Eastern Magnesia
15    Talc. That's what I would have told them about
16    Eastern Magnesia Talc.
17 Q  I'm not asking what you would have told them,
18    I'm asking what you remember specifically
19    telling people.
20 A  Well, first of all –
21       MR. ROTH:   Objection to
22    form.
23 A  – I disagree with what you just said –
24       MR. ROTH:   Right.
25 A  – but I did tell them that, yes.

Page 260

1  Q  Okay. Did you tell them – withdrawn.
2     In terms of relying on what Engelhard
3     said to you, did you rely upon the RJ Lee
4     analysis of an Emtal talc sample?
5  A  Again, I don't know if that's one of the
6     reports that they sent to me. It may have
7     been. I don't know for sure which specific
8     reports they sent to me over the years.
9  Q  And –
10 A  But obviously on this case they obviously sent
11    something. But again, I think this case was
12    different, because I don't think we dismissed
13    them on this case or settled with them on this
14    case. I think they got out on summary
15    judgment.
16 Q  As a general principle, though, if Engelhard
17    sent you materials, you would have reviewed and
18    considered those materials in deciding whether
19    to recommend dismissal or settlement, fair?
20 A  I would have considered those materials and the
21    lack of any evidence that showed that there was
22    asbestos in their talc.
23 Q  Okay. Let's show you Defendants' Exhibit 42.
24    Defendants' Exhibit 42, previously used
25    as Defendant Eastern Magnesia Talc Company's

Page 261

1     motion for summary judgment.
2        If you turn to the second page, the
3     bottom of the second paragraph says: Plaintiff
4     has not offered any evidence that she was ever
5     exposed to a product manufactured or supplied
6     by EMT.
7        Do you see that?
8  A  Yes.
9  Q  What does that mean to you?
10 A  It's self-explanatory. The plaintiff was not
11    exposed to a product manufactured or supplied
12    by Eastern Magnesia Talc.
13 Q  And then the bottom of the third page, it says,
14    "With regard to EMT, it has not been proven by
15    plaintiff that such products were used by the
16    plaintiff or her husband."
17       Do you see that? The bottom of page 3.
18 A  I see that.
19 Q  And then if you turn to page 5, the first full
20    paragraph, it says, "In the case at bar there
21    is no such product identification."
22 A  Yes.
23 Q  Do you know what happened to this motion for
24    summary judgment?
25 A  I thought it was granted.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 262..265

Page 262

1  Q  Well, I think if you go up to the top, in that
2     box.
3  A  Yeah, it was granted.
4  Q  It was granted.
5     And did you oppose it?
6  A  I assume we opposed it. I don't -- I don't
7     know for sure.
8  Q  Okay. Was Jennifer Graham exposed to R.T.
9     Vanderbilt talc?
10 A  I believe she offered and identified Vanderbilt
11    in her deposition. That's the best I can
12    recall.
13 Q  Let me show you Defendants' Exhibit 47,
14    verification of plaintiffs' second amended
15    answers to interrogatory. And if you turn to
16    the Bates number in the bottom right-hand
17    corner, 2334, there's a reference to "Talc
18    manufactured by R.T. Vanderbilt and others."
19    Do you see that?
20 A  Maybe you can point that out to -- oh, right
21    here. Okay. Talc -- yes.
22 Q  And you were involved in these interrogatory
23    responses. In fact, I see you signed a couple
24    of them. Correct? You signed the proof of
25    service?

Page 263

1  A  Yes.
2  Q  So for Jennifer Graham at least, in July of
3     2008, you believed you had product ID for R.T.
4     Vanderbilt?
5  A  We believed it, yes.
6  Q  And at this point, you also had knowledge as an
7     attorney, based on your experience, that R.T.
8     Vanderbilt had evidence of asbestos in their
9     talc, true?
10 A  We had some evidence of asbestos, yes, in R.T.
11    Vanderbilt talc. I believe we did.
12 Q  I don't want to bury the lead, so while we're
13    waiting, let me show you ...
14    All right. Let me show you what I'm
15    marking as Defendants' Exhibit 288.
16    -----
17    (Defendants' Exhibit 288 was marked.)
18    -----
19 Q  288 is defendant Vanderbilt -- R.T.
20    Vanderbilt's motion for summary judgment,
21    correct?
22 A  Yes.
23 Q  If you turn to page 5, it says, "Plaintiff,
24    however, cannot maintain her claim against R.T.
25    Vanderbilt because the product at issue does

Page 264

1     not contain asbestos as demonstrated by
2     scientific evidence, and as defined by state
3     and federal law."
4     Do you see that?
5  A  Yes.
6  Q  And you were opposing counsel in this case,
7     correct?
8  A  I was plaintiff counsel in this case.
9  Q  Plaintiff's counsel. I'm sorry. You were
10    plaintiff's counsel.
11    And you know that there were testing
12    documents showing the presence of asbestos in
13    R.T. Vanderbilt's talc product, correct?
14 A  I think.
15 Q  I'll show you --
16 A  I'm not positive, but, you know.
17 Q  Let me show you -- I'll show you your
18    opposition.
19 A  Yeah, that would help.
20 Q  But if -- let me get this to you so it's fair.
21    -----
22    (Defendants' Exhibit 289 was marked.)
23    -----
24 Q  289 is plaintiff's brief in opposition to
25    motion for summary judgment.

Page 265

1     What exhibit number is that? 289. I
2     think it's a duplicate of 104.
3     If you turn to page 19, Mr. Bevan.
4  A  Okay.
5  Q  You write, "The central argument that R.T.
6     Vanderbilt makes in the case sub judice is that
7     Vanderbilt's talc does not now, nor ever has,
8     contained asbestos. This argument is contrary
9     to tests that Vanderbilt has run on its talc,
10    other entities have run on the talc, and
11    specifically, the tests that were run on the
12    talc by the Ohio Division of Safety & Hygiene."
13    And then you continue. You cite some
14    NIOSH documents and some other testing
15    documents showing various tests of asbestos
16    levels of 2 to 3 percent in R.T. Vanderbilt's
17    talc.
18    Do you see that?
19 A  Yes.
20 Q  So could we agree that at least as of February
21    of 2009, Tom Bevan believed that there was
22    evidence of asbestos in R.T. Vanderbilt's talc?
23 A  Yes.
24 Q  Notwithstanding this evidence that you knew of,
25    R.T. Vanderbilt continued to take the position

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 266..269

Page 266

1    that there was no asbestos in their talc,
2    correct?
3  A  I believe they took that position. I'm looking
4    at their summary judgment motion. It looks
5    like they take that position.
6  Q  In fact, if you turn to their summary judgment
7    motion on page 6, they say, "Although there was
8    some confusion in previous decades due to the
9    complexity of its composition, prominent
10   mineralogists who have analyzed R.T.
11   Vanderbilt's product have concluded that it
12   does not contain asbestos."
13       Do you see that?
14  A  On page 6?
15  Q  Of their motion.
16  A  Okay. Yeah, there. I see it now.
17  Q  So, by the way, when R.T. Vanderbilt was
18   telling Courts that they had no asbestos in
19   their talc, did you ever tell a Court that they
20   were engaged in some fraudulent scheme?
21       MR. McDERMOTT:   Objection.
22       MR. ROTH:   Objection.
23  A  Not that I recall.
24  Q  Well, you had documents showing tests of
25   asbestos in their talc, correct?

Page 267

1        MR. McDERMOTT:   Objection.
2  A  I believe documents that they produced, yes.
3  Q  But they still told Courts there was no
4    asbestos in their talc, correct?
5  A  But they explained why.
6  Q  Okay. But you didn't think that was
7    fraudulent, for them to continue to take the
8    position there's no asbestos in their talc?
9        MR. McDERMOTT:   Objection.
10  A  Because they gave us the documents.
11       -----
12       (Defendants' Exhibit 290 was marked.)
13       -----
14  Q  Let me show you Defendants' Exhibit 290.
15       Defendants' Exhibit 290 is the reply
16   brief. If you turn to page 4, the first full
17   paragraph, the second sentence reads, "Instead,
18   Plaintiff relies on reports --" sorry. I'll
19   wait for you.
20       Page 4 --
21  A  I got it.
22  Q  -- of Defendants' Exhibit 290.
23       "plaintiff relies on reports, one over 30
24   years old, prepared prior to advancements in
25   the understanding of and methodology used in

Page 268

1    the proper identification of asbestos, and
2    prior to current law regulations, like the OSHA
3    1992 Final Ruling, which recognized these
4    advancements and ruled accordingly."
5        Do you see that?
6  A  Yes.
7  Q  "What may have been 'state of the art' over 30
8    years ago is scientifically ancient history
9    now, and cannot serve to defeat summary
10   judgment."
11       Do you see that?
12  A  Yes.
13  Q  I won't ask you about the second part, about
14   defeating summary judgment, but the first part,
15   it says, "What may have been 'state of the art'
16   30 years ago is scientifically ancient history
17   now."
18       Do you see that?
19       MR. ROTH:   Objection.
20  A  I see where they wrote that, yes.
21  Q  Okay. What did you understand that to mean?
22  A  I understand that to mean yeah, people found
23   asbestos in their talc but don't believe it,
24   believe what we're giving you now.
25  Q  Well, as an experienced asbestos lawyer, did

Page 269

1    you understand that since the 1970s until today
2    there have been developments in microscopy that
3    helps refine the testing of asbestos fibers?
4        MR. ROTH:   Objection.
5    Foundation.
6  A  I don't know that to be a fact. I believe that
7    defendants try to make arguments that newer
8    studies are more reliable than older studies,
9    but I don't know that that's a fact.
10  Q  You've never looked into whether modern
11   science, in terms of microscopy, has advanced
12   over the last 30 years?
13       MR. ROTH:   Objection to
14   the form and foundation.
15       MR. McDERMOTT:   Objection.
16  A  Well, you're asking me a different question
17   now. I mean, I assume modern science in terms
18   of microscopy has advanced --
19  Q  Withdrawn.
20  A  -- over the years, but with respect to whether
21   something's asbestos or not, I'm not so sure
22   that there's a difference between now and 1977.
23  Q  So I'm sorry we keep missing each other. When
24   I ask you a follow up question, I -- it is a
25   different question. I try not to ask the same

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 270..273

Page 270

1   question over.
2        MR. ROTH:     Okay. I'll
3   object to that statement.
4        MR. ASSAF:     Okay. All this
5   objection saying it's a different question,
6   well, of course it's a different question.
7        MR. ROTH:     Yeah. Okay.
8   Q   Okay. So you don't -- you don't recognize that
9       there's been scientific developments in
10      microscopy from 1975 until today?
11       MR. ROTH:     Objection.
12       MR. McDERMOTT:   Objection.
13  A   I didn't say that. I think I said that there
14      has been developments in microscopy since the
15      1970s.
16  Q   And do you also acknowledge that there has been
17      developments in testing methods from 1975 until
18      today for asbestos content?
19  A   I would say I'm not an expert on that, so I
20      don't know that I could answer that question.
21  Q   Could you dispute that?
22       MR. McDERMOTT:   Objection.
23       MR. ROTH:     Objection.
24  A   I don't know. I would go to my -- you know, I
25      would go to an expert and ask them whether or

Page 271

1   not they can dispute it. I'm not a scientist.
2   Q   So even as a trained lawyer in the asbestos
3       field, you would find it necessary to hear what
4       an expert has to say on microscopy and testing
5       advances over the last 30 years, fair?
6        MR. ROTH:     Objection to
7       form and foundation.
8        MR. McDERMOTT:   Objection.
9   A   I don't know how to answer that question, you
10      know.
11  Q   Just answer yes or no.
12  A   I don't know.
13       MR. McDERMOTT:   Objection.
14  A   I can't answer that in a yes or no.
15  Q   Well, as a --
16  A   You would have to -- you're asking it
17      generally. So you would have to be more
18      specific.
19  Q   Well, I just asked you about advances in
20      testing for asbestos, correct, and you said,
21      "I'd have to ask an expert."
22  A   Yes.
23  Q   Right?
24  A   Yes.
25  Q   And I'm saying: Would you agree with me that

Page 272

1   it would? Even for somebody like you who is an
2   accomplished plaintiffs lawyer in the asbestos
3   bar, you would want to hear what an expert has
4   to say before giving me a definitive answer on
5   whether testing methods have changed over the
6   last three decades?
7        MR. McDERMOTT:   Objection.
8   Q   Fair?
9        MR. ROTH:     Objection.
10       MR. McDERMOTT:   Form,
11      foundation, and relevance.
12  A   That's probably fair.
13       MR. ASSAF:     Relevance a
14      science thing.
15       MR. McDERMOTT:   I know what
16      you're asking and it's not relevant to science.
17       MR. ASSAF:     Let's go off
18      the record.
19       THE VIDEOGRAPHER: Off the record.
20      The time is 2:54.
21           -----
22           (Recess taken.)
23           -----
24       THE VIDEOGRAPHER: We're back on
25      the record. The time is 3:09.

Page 273

1   BY MR. ASSAF:
2   Q   Mr. Bevan, I'm showing you what's marked as
3       Defendants' Exhibit 260. It's entitled
4       "Judgment Entry."
5           Do you recognize this?
6   A   I don't, not per se. I may have read it at the
7       time.
8   Q   We just reviewed R.T. Vanderbilt's filings for
9       partial summary judgment based on asbestos
10      content before the break.
11  A   Yes.
12  Q   Here in the second paragraph, it says, "The
13      main issue presented to the Court was whether
14      Vanderbilt's talc product contained asbestos."
15          Do you see that?
16  A   Yes.
17  Q   And then down further, it says, "As of August
18      10, 2009, the Plaintiff has failed to submit
19      expert reports on the asbestos content of
20      Vanderbilt talc. At the hearing on the Motion
21      to Dismiss, Plaintiff indicated they would rely
22      on the reports of Dr. Kahn, Dr. Castleman, and
23      Dr. Rao. The experts reports submitted do not
24      provide any explanation for the changes in the
25      studies from NIOSH, the Bureau of Mines and

THOMAS W. BEVAN, ESQ. - 05/15/2018    Pages 274..277

Page 274

1    OSHA. Plaintiffs' expert reports are
2    inadequate and fail to meet the evidentiary
3    burden required to establish causation.
4        Accordingly, R.T. Vanderbilt's Motion for
5    Summary Judgment is Granted."
6        Do you see that?
7    A  Yes.
8    Q  Why did you not submit adequate expert reports?
9    A  We didn't think it was needed.
10   Q  Were you right?
11   A  Not according to Judge Spellacy.
12   Q  Did you appeal that?
13   A  I don't know that we appealed it.
14   Q  Did you settle then with R.T. Vanderbilt's
15       talc -- R.T. Vanderbilt on behalf of Ms. Graham
16       or Ms. Graham's estate?
17   A  I don't know. It would be in the file if we
18       did.
19   Q  You don't have any independent recollection of
20       settlement negotiations?
21   A  No.
22   Q  Okay. Let me show you what's been marked as
23       Defendants' Exhibit 261. It's a multiple page
24       document entitled Emtal's Motion for Summary
25       Judgment.

Page 275

1        Do you recognize this document?
2    A  Yes.
3    Q  This was Emtal's motion for summary judgment
4        based on product ID?
5        MR. ROTH:    Objection to
6    form and foundation.
7    A  Motion for summary judgment.
8    Q  Okay. And then plaintiffs responded to that
9        motion for summary judgment, correct?
10   A  Correct.
11   Q  I'll show you Defendants' Exhibit 262.
12       Did you work on this case for Ms. Graham?
13   A  Yeah, I was definitely involved and I think I
14       was present at her deposition. It looks like
15       this one was -- response was filed by Jessica
16       Bacon.
17   Q  And would you agree with me that you tried to
18       establish product ID and you addressed the new
19       Ohio HB 292 in this brief?
20   A  It looks like we submitted the C.P. Hall
21       records, as well as Jennifer Graham's
22       testimony. I thought I saw in there somewhere
23       a reference to House Bill 292.
24       Yeah.
25   Q  And then Defendants' 263 is plaintiffs -- or

Page 276

1    I'm sorry, Emtal's reply to your -- regarding
2    summary judgment?
3        I think it's attached to two-sixty --
4    sorry. There you go. 262.
5    A  I see it. I recall that.
6    Q  And then Exhibit 261, going back, this motion
7        was granted by the judge, correct, of
8        Ms. Graham?
9    A  Yeah, summary judgment was granted.
10   Q  Did you seek an appeal?
11   A  No.
12   Q  Why not?
13   A  We had no evidence that their talc contained
14       asbestos at the time.
15   Q  After you talked to Mr. Placitella in 2009 or
16       early 2010, did you seek to reopen the Graham
17       case?
18   A  No. We filed this case and included Graham in
19       this case.
20   Q  When you say "we filed"?
21   A  Well, they filed. We connected Donnette
22       Wengerd with the Placitella firm and they filed
23       the case.
24   Q  When Mr. Placitella called you, did you think
25       about trying to reopen the Graham or Wengerd

Page 277

1        case since it was so close in time?
2    A  I don't recall if we -- if I gave that any
3        thought. That was what was suggested, and I
4        went along with that.
5    Q  Did you talk to Mrs. -- withdrawn.
6        I have that Ms. Graham or Ms. Wengerd --
7        I don't think they're one of the people you
8        talked to. Sorry. I keep losing my list.
9    A  I don't recall if I talked Donnette Wengerd.
10       I'm sure I didn't talk to Jennifer Graham,
11       because she would have been long deceased.
12   Q  So with respect to Ms. Wengerd, though, after
13       Mr. Placitella called you, why wouldn't you
14       have called her?
15   A  I would have had somebody else call her.
16   Q  Ms.?
17   A  Probably Erin Clark.
18   Q  You don't know one way or the other?
19   A  I don't know. She would have been the only one
20       I would have called.
21   Q  But you just lost a case for Ms. Wengerd within
22       the past year, correct, when Mr. Placitella
23       called you?
24   A  I don't know if it's within the last year.
25       Let's see. I'm assuming, you know, a year and

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 278..281

Page 278

1    a half to – or so.
2    Q   Okay.
3    A   I'm basing that on the R.T. Vanderbilt. I
4       don't know when the – I can't tell on this
5       when the Eastern Magnesia Talc was granted.
6    Q   I think June 18, 2009.
7    A   So a year and a half later or so.
8    Q   And you didn't think to call Ms. Wengerd?
9    A   No, I didn't say that.
10       MR. ROTH:    I'm sorry.
11    Objection to form.
12    A   I said that I would have had somebody call,
13       most likely Erin Clark from the office, to
14       connect Ms. Wengerd with the Placitella firm.
15    Q   What I'm trying to understand is why you,
16       having just been involved in a case for her,
17       wouldn't have picked up the phone and explained
18       to her how this impacted her case.
19       MR. McDERMOTT:   Objection.
20       MR. ROTH:    Objection to
21    form and foundation.
22    A   I had Erin Clark handle it.
23    Q   She's not a lawyer, is she?
24    A   No.
25    Q   And she didn't know any of the underlying facts

Page 279

1    regarding the Wengerd litigation, did she?
2    A   I – I think that Erin Clark was with us during
3       that case, yeah.  So she was involved.
4    Q   So you think Ms. Clark does have knowledge of
5       the underlying cases on behalf of some of the
6       plaintiffs in this case?
7       MR. ROTH:    Objection.
8    Form and foundation.
9    A   No, she's familiar with the Graham case and the
10       Wengerd – and Donnette Wengerd.  And I had my
11       paralegal call her to connect her with the
12       Placitella firm.  I'm not understanding what
13       you don't understand about it.  That's what
14       happened.
15    Q   Did you discuss with Ms. Wengerd at any time,
16       ever, your understanding of the facts of what
17       happened in her mother's case?
18    A   I know I've talked to her in the last eight
19       years.  I can't recall the specifics of our
20       conversation, but I have talked to her in the
21       last eight years.
22    Q   Did you ever convey to her in words or in
23       substance why you thought you lost her mother's
24       case?
25       MR. ROTH:    Objection to

Page 280

1    form and foundation.
2    A   I don't recall.
3    Q   Let me show you what's been marked as
4       Defendants' Exhibit 264.  It's a case on behalf
5       of Kimberlee Williams and Charles Williams
6       against a number of defendants.
7       Do you recognize this?
8    A   You know, it's been many years since I've seen
9       this, so I really can't.  I don't really
10       recognize it per se, no.
11    Q   At the time you filed this case, did you have a
12       good faith factual belief that Emtal's talc
13       contained asbestos?
14    A   At the time that I filed this case, I had a
15       good faith belief that Eastern Magnesia Talc
16       was at Goodyear and that Mr. Williams would
17       have been exposed to it, and at that time I
18       wanted to explore whether or not I could prove
19       that their talc contained asbestos.  So I
20       didn't have any evidence at that time that
21       their talc contained asbestos, I had a hunch.
22    Q   Did you have a hunch about R.T. Vanderbilt?
23    A   I'm sure if they're in there I would have had a
24       hunch about them, yes.
25    Q   Did you have a hunch about Vermont Talc?

Page 281

1    A   If they're in there, yes.
2    Q   So I thought you told me earlier that Southern
3       Talc did not really sell to the BFGoodrich or
4       Ohio facilities?
5       MR. ROTH:    Objection.
6    Foundation.
7    A   I don't think I said that.  I think what I
8       said – no, that's not what I said.
9    Q   Okay.  Did they sell to the Ohio facilities?
10    A   I think there's evidence that they made some
11       sales to Ohio facilities, yes.
12    Q   Because you included them here as well –
13    A   Yes.  Yes.
14    Q   – as a defendant.  You must have had a good
15       faith factual belief to include them.
16       MR. ROTH:    Objection to
17    form.
18    A   Again, it was a hunch that their talc may have
19       contained asbestos.
20    Q   Let me show you what's been marked as
21       Defendants' Exhibit 265.
22       - - - - -
23       (Defendants' Exhibit 292 was marked.)
24       - - - - -
25    Q   And I'll also show you D Ex 292.

Page 282

1      Okay?
2  A  Yep.
3  Q  Defendants' Exhibit 265 is an April 23, 1992
4     letter.
5      Do you recognize this letter?
6  A  I believe I recognize this letter.
7  Q  Okay. It was sent to Mr. Economus.
8  A  Yes.
9  Q  Now, is this the time when you were at the same
10    office, or were you sharing cases, were you
11    partners? How did it work at this point?
12      MR. ROTH:      Objection.
13  A  We were both working on asbestos cases
14    together. I would essentially work under Dale.
15    He was my mentor. I was not an employee, but I
16    was, you know -- you know, I handled the
17    asbestos cases and that's all I pretty much did
18    at that point in time.
19  Q  Okay. Did you discuss this letter with
20    Mr. Economus?
21  A  I recall -- yes, I believe so. I believe that
22    he gave me this letter and said, you know,
23    "What do you want to do with this?"
24  Q  And what did you say?
25  A  I looked at it. I think we eventually

Page 283

1     dismissed them. I don't know when it was, but
2     we eventually dismissed them.
3  Q  Do you have any -- other than the document
4     itself, do you have any independent
5     recollection of the facts surrounding this
6     document?
7  A  Other than I had conversations with Scott
8     Martin and Allen Joslyn. And there was
9     documents that -- it looks like some of it is
10    in here. That is my -- I guess that would be
11    the extent of my recollection, was talking with
12    Mr. Martin and Mr. Joslyn and reading their
13    letters. This one's a nice one.
14  Q  And they provided you with some affidavits and
15    expert reports, correct, as well as sales
16    information? I'm sorry, a specification sheet.
17  A  Yeah, there was -- a specification sheet from
18    Goodrich is in here.
19  Q  Do you know how many cases at this point were
20    pending?
21      MR. ROTH:      Objection.
22  Q  For tire workers against a talc company.
23      MR. McDERMOTT:  Objection.
24  A  From my office --
25  Q  Yeah.

Page 284

1  A  -- or total?
2  Q  From your office.
3  A  Five probably.
4  Q  Okay.
5  A  They list one, two, three. I would think there
6     was a couple more in there. Probably five.
7  Q  So I've also handed you the Ashton affidavit,
8     which is Exhibit -- Defendants' Exhibit 292.
9      Do you recognize this, Mr. Bevan?
10  A  I believe this is an affidavit that was
11    provided to us at some point.
12  Q  Before dismissing clients' cases against the
13    defendant, if they had provided you an
14    affidavit like Ashton, you would have reviewed
15    it in some detail, correct?
16  A  I would have read it.
17  Q  Could you turn to paragraph 2 on page 2 of
18    Defendants' Exhibit 292?
19      It says, "From the 1940s through the
20    1980s, talc mined in Vermont and specifically,
21    the talc mined by Engelhard (and its
22    predecessors) from the talc mine located in
23    Johnson, Vermont has been considered to be talc
24    free from contamination by asbestos. This
25    conclusion is the result of numerous

Page 285

1     investigations, examinations and studies of the
2     Johnson mine. The following paragraphs
3     discuss, in chronological order, the studies
4     and investigations."
5      Do you see that?
6  A  Yeah.
7  Q  And then they lay out a number of
8     investigations, correct?
9  A  Yes.
10  Q  And you would have reviewed what was set forth
11    here, correct?
12  A  I believe I did.
13  Q  Is it your testimony that paragraphs -- all of
14    the paragraphs following 2 set forth every
15    study ever done on talc --
16      MR. McDERMOTT:  Objection.
17  Q  -- at the Johnson mine?
18  A  I assumed that --
19      MR. McDERMOTT:  Objection.
20  A  -- this was all the studies that they did of
21    the Johnson mine at the time. That's what I
22    believed.
23  Q  And you -- based upon your experience as a
24    plaintiffs asbestos lawyer, it was your
25    understanding that this would have encompassed

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 286..289

Page 286

1   all of the testing ever done on the Johnson
2   mine for asbestos?
3       MR. McDERMOTT:   Objection.
4       MR. ROTH:     Objection.
5   A  Oh, that was made clear to me.
6   Q  Because you had worked with other companies,
7      BFGoodrich, where you were aware that they were
8      testing talc from suppliers, correct?
9          MR. McDERMOTT:   Objection.
10  A  I'm not sure if Goodrich or Goodyear tested the
11     talc themselves.  Is that what you're asking
12     me?
13  Q  Yeah.
14  A  I'm not sure on that.
15  Q  In your litigation -- we saw earlier today the
16     Southern Talc testing by BFGoodrich.  Do you
17     remember that?
18  A  Yeah, I don't recall --
19  Q  Exhibit 26.
20  A  I don't recall if Goodrich did the test or if
21     they were relying on another test.  I would
22     have to look at that document again.
23  Q  But based upon your experience you knew that
24     the Ohio facilities were conducting tests of
25     talc for asbestos contact, correct?

Page 287

1   A  Well, I knew that they were looking into
2      whether there was asbestos in their talc.
3   Q  And you were --
4   A  Whether they were conducting the test
5      themselves or relying upon, for instance,
6      Eastern Magnesia to make that, I don't know.
7   Q  You had no idea even that BFGoodrich was --
8      withdrawn.
9          We'll get out the document from earlier
10     today.  You don't remember telling a Court that
11     BFGoodrich had done testing on Southern Talc
12     and had found asbestos?
13  A  I have to look at the document again as to
14     whether or not --
15  Q  All right.
16  A  -- Goodrich did the test or whether they were
17     relying upon someone else to do the test.
18         MR. ASSAF:     Let's go off
19     the record.
20         THE VIDEOGRAPHER: Off the record.
21     It is 3:28.
22         -----
23         (Recess taken.)
24         -----
25         THE VIDEOGRAPHER: We're back on

Page 288

1   the record.
2   BY MR. ASSAF:
3   Q  I'm showing you Defendants' Exhibit 12 and
4      specifically Exhibit 26.
5          Does this refresh your recollection as to
6      whether at some point you knew that BFGoodrich
7      was conducting its own talc test to try to
8      determine whether talc had asbestos?
9   A  It says, "Recent Raw Materials investigation
10     has found that all talc supplied by Southern
11     Talc Company contained significant amounts of
12     asbestos-like particles."
13         I don't know whether Goodrich did the
14     test or relied upon somebody else to do the
15     test, and I think that's what I told you.
16  Q  Based upon your review, though, of company
17     documents and various asbestos and talc company
18     documents, did you have any understanding of
19     whether talc companies were conducting their
20     own internal tests of whether there was
21     asbestos in the talc?
22  A  I recall a letter from Eastern Magnesia Talc to
23     Goodrich or Goodyear stating that their talc
24     did not contain any asbestos.
25  Q  Well, could you tell me in terms of the Ashton

Page 289

1   affidavit, how many internal Engelhard tests
2   are referenced in the Ashton affidavit?
3   A  I don't know.
4   Q  Do you see any in there?
5   A  I don't know.  There's a reference to
6      Dr. Chidester.  I don't know whether that's an
7      internal Eastern Magnesia Talc person or
8      external.  I don't know.  I don't know who he
9      is.
10  Q  Based upon all of your experience over the
11     years with talc litigation, would you have
12     expected to see some evidence of company
13     testing of talc?
14         MR. ROTH:      Objection.
15         MR. McDERMOTT:   Objection.
16  A  I don't -- I don't know.  I -- yeah, I don't
17     know how to answer that question.  You know.
18  Q  So let's go through Ashton.
19         Ashton identifies a 1949 study, correct,
20     paragraph 3?
21  A  Yes.
22  Q  1951 U.S. Geological report --
23  A  Yes.
24  Q  -- correct?
25         A 1962 Geological Survey professional

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 290..293

Page 290

1  paper, correct?
2  A  Yes.
3  Q  A scientific paper from 1976, do you see that?
4    Paragraph 6.
5  A  I see paragraph 6, yes.
6  Q  And in paragraph 7, there's reference, an
7    independent testing laboratory of talc samples
8    in 1982. Do you see that?
9  A  Yes.
10  Q  And then 1983, there's reference, a
11    Dr. Chidester deposition testimony excerpt. Do
12    you see that?
13  A  It says "sworn testimony." I didn't know if
14    that was a deposition, but I think I see a
15    deposition attached.
16  Q  If you turn to Bates numbers 4786 – 4787, I'm
17    sorry, it's Westfall versus Whittaker, Windsor,
18    Eastern Magnesia Talc Company.
19      Do you see that?
20  A  Yes.
21  Q  And Vermont Talc.
22  A  Yeah.
23  Q  When you reviewed that, did you have any
24    questions as to what that deposition related
25    to?

Page 291

1  A  I don't recall reviewing this.
2  Q  Well, given the care and attention that you pay
3    to these cases, you would have expected to
4    review these materials, correct?
5      MR. McDERMOTT:  Objection.
6  A  I don't – you know, I see the – if all of
7    this stuff was attached, I probably would have
8    reviewed it, I just don't recall reviewing the
9    deposition.
10  Q  Okay.
11  A  I can't tell from this letter if that was
12    all – if all of these attachments were on here
13    or it was just the affidavit. A through G.
14  Q  Well, let's try it this way, Mr. Bevan.
15      If you were given an affidavit by
16    opposing counsel that referenced exhibits and
17    they weren't attached, my bet is that you would
18    have asked for the exhibits.
19  A  I assume I would have.
20  Q  Okay. The 1982 test referenced here in
21    paragraph 7 of two talc samples, did that have
22    any weight in your recommendation to your
23    clients to accept a settlement?
24  A  Yeah, I would – that would have, you know,
25    carried some weight in the vacuum of not adding

Page 292

1  up the other evidence, sure.
2  Q  Do you have any independent recollection of
3    what you did with this affidavit in terms of
4    communicating to your clients?
5  A  I had numerous conversations with defense
6    counsel first, so at what point I talked with
7    the clients, I don't recall.
8      Charles Williams and I talked frequently
9    and we, you know, talked frequently about his
10    case. And so I'm certain I talked with him
11    about, you know, who we dismissed or what we
12    were doing in the case.
13      The other ones, I just – I don't have
14    any specific recollection. You know, Clay
15    Compton and there was Loyd Brown I think was
16    referenced in there. There was another woman
17    named Mable Gonzalez I think. And there was
18    somebody else and I don't recall right now.
19      But Charles Williams and I had regular
20    conversations.
21  Q  Do you have any specific recollection of what
22    he said to you or what you said to him?
23  A  I just know that he had a significant talc
24    exposure. I know that. I believe he was a
25    mill man. The talc levels were very high in

Page 293

1  his area. And, you know, we talked regularly.
2      And specifically what I said about this
3    affidavit, I honestly don't recall. I'm sure I
4    would have said, "Hey, we have no evidence that
5    this company's talc contains asbestos, so, you
6    know, we got to let them out."
7  Q  You recall saying that, or you're sure you
8    probably –
9  A  I'm sure I said it. You know, how exactly I
10    worded it, I don't recall.
11  Q  And do you know what he said in response?
12  A  Oh, he would go along with whatever we
13    recommended.
14  Q  Let me show you what's been marked as –
15    withdrawn.
16      After you received this letter, did you
17    dismiss the cases immediately?
18  A  I don't think we dismissed them immediately.
19  Q  Let me show you Defendants' Exhibit 266.
20      Defendants' 266 is a multiple page
21    document dated February 11, 1993.
22      Do you recognize this, Mr. Bevan?
23  A  Yes.
24  Q  Did you write this?
25  A  I believe I did.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 294..297

Page 294

1  Q  Why did you write it?
2  A  My recollection was that I -- whether we had
3     already dismissed them by then or not, but I
4     came across a document, it was a study from --
5     well, I think it says it here.
6        Yeah, a 1950 correspondence from the
7     state of Vermont health department that
8     discussed a level of pneumoconiosis. And I
9     don't know if it was this specific mine or if
10    it was in talc mines in general in Vermont. It
11    refers to Waterbury and Johnson.
12 Q  I'm going to show you what's been marked as
13    Defendants' Exhibit 267.
14       It's a February 22, 1993 response from
15    Scott Martin regarding your study in which he
16    says, "The company referenced in the 1950
17    correspondence is not our client."
18       Do you see that?
19 A  Yeah.
20 Q  Did you think that was fraudulent?
21       MR. ROTH:      Objection.
22 A  That it was not their client?
23 Q  Yeah.
24 A  I assume it was -- I don't know. Actually, I
25    don't know at this point what to believe

Page 295

1     from --
2  Q  If Mr. Placitella told you it was fraudulent,
3     would you believe it was fraudulent?
4        MR. McDERMOTT:   Objection.
5        MR. ROTH:      Objection.
6  A  Well, if he told me why.
7  Q  In the third paragraph, it says: In reaching
8     your decision to dismiss Engelhard, your firm
9     reviewed, inter alia, the Affidavit of William
10    Ashton, which summarizes numerous
11    investigations, examinations, and studies of
12    the mine. The conclusion derived from all of
13    these studies is that talc produced from the
14    Johnson mine did not contain asbestos.
15       Do you see that?
16 A  Yes.
17 Q  What does "inter alia" mean to you?
18 A  I have no idea.
19       MR. McDERMOTT:   Objection.
20 A  It's not a term I've ever used. I've seen it.
21    I don't know what that means.
22 Q  Did you bother to look it up?
23 A  No.
24       MR. ROTH:      Objection.
25 Q  "The conclusion derived from all of these

Page 296

1     studies," are they the studies referenced in
2     the Ashton affidavit?
3        MR. ROTH:      Objection.
4  A  I'm sorry, was that a question?
5  Q  Yeah.
6  A  What was the question?
7  Q  When it says "The conclusion derived from all
8     of these studies," does that mean to you the
9     studies referenced in the Ashton affidavit?
10       MR. McDERMOTT:   Objection.
11       MR. ROTH:      Inter alia.
12 A  I don't know what he's referring to. You know,
13    what I read is, you know, all of the studies
14    show no asbestos in our mine.
15 Q  That's what the studies means to you?
16 A  Yeah. He didn't say, "Yeah, there was some
17    studies that showed asbestos in our mines that
18    we haven't given you, but, you know, we got
19    these other studies that say it wasn't
20    asbestos."
21 Q  So when you read the Ashton affidavit, you
22    thought there were only five studies ever done,
23    five testing documents?
24 A  Yeah. Or -- I didn't count how many he
25    referenced, but the studies that Cahill Gordon

Page 297

1     referred to, I assume they referred to all of
2     the studies from that mine.
3  Q  The RJ Lee test --
4  A  By the way, he says: The only analysis which
5     we have not provided or previously forwarded to
6     you is RJ Lee.
7        So they gave me a RJ Lee, which is more
8     indication that hey, we've given you everything
9     there is, there's only one more here that you
10    haven't gotten, here it is. We're still
11    holding a few back that we're not going to give
12    you because they're not good for us.
13 Q  Kind of like a --
14       MR. ROTH:      Kind of like
15    nothing. Let's move on.
16 Q  If you have an examination showing no meso, you
17    would provide that to a --
18       MR. ROTH:      Kind of totally
19    like that --
20       MR. McDERMOTT:   Objection.
21       MR. ROTH:      -- totally not
22    like that. Move to strike.
23 A  Yeah, I wouldn't put that in the same category
24    in the least.
25 Q  Did you review the RJ Lee analysis?

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 298..301

Page 298

1   A  I assume, because I recall a RJ Lee. Whether I
2      reviewed it at this time, I probably did.  I
3      know I've seen a RJ Lee analysis.
4   Q  Do you have any reason to believe that it's not
5      trustworthy?
6   A  Yes.
7   Q  Why?
8   A  Because when they did the test back in the
9      '70s, again, what Mr. Placitella told me, they
10     found asbestos.  So I don't know what RJ Lee
11     looked at, how they looked at it, when -- what
12     they did, but yeah, I don't put a lot of faith
13     in RJ Lee.
14  Q  Your factual testimony today for this
15     proceeding is predicated a lot on believing
16     Mr. Placitella's rendition of the facts, fair?
17         MR. ROTH:    Objection.
18     Foundation.
19  A  Yeah. Hopefully at some point I'll get to look
20     at all of your documents and then I will create
21     some of my own foundation.
22  Q  Defendants -- is that when you're counsel or
23     when you're a witness?
24         MR. McDERMOTT:  Objection.
25         MR. ROTH:    Objection.

Page 299

1      Move to strike.
2   A  I don't know the answer to that.  Whatever I
3      am.
4   Q  Well, are you serving as both?
5          MR. ROTH:    Objection.
6          MR. McDERMOTT:  Objection.
7   A  I am counsel for these plaintiffs, whether I'm
8      a witness or not is up to you, I guess.
9   Q  So you're counsel for Ms. Wengerd but you
10     still, from the time you heard Mr. Placitella's
11     rendition of the facts until today, have never
12     discussed the case with her?
13         MR. ROTH:    Objection.
14     Foundation.
15  A  No, I didn't say that.
16  Q  When did you discuss the case with Ms. Wengerd?
17  A  I told you I've talked to her in the last eight
18     years.
19  Q  About the case?
20  A  I'm sure we talked about kids and family and
21     mentioned this case.  I don't know details.
22  Q  What did you tell her about the case and what
23     did she tell you?
24  A  I don't recall what we talked about of the
25     case.  At the time when this all started, I

Page 300

1      don't believe I talked to her and I believe
2      that Erin Clark is the one that contacted her
3      for me.
4   Q  Let me show you Defendants' Exhibit 110.
5      It's an October 6, 1993 letter from you
6      to Mr. Martillotta.
7      Do you see that?
8   A  Yes.
9   Q  And there's a reference to Loyd Brown, who I
10     think you stopped and noted in the previous
11     letter correct?
12  A  Yeah.  He's the only Brown, yes.
13  Q  And he worked at Goodyear Aerospace from 1947
14     to 1979?
15  A  Yes.
16  Q  And you believe he was entitled to compensation
17     from Emtal, even though he worked at Goodyear
18     Aerospace?
19  A  As I sit here today, yes.
20  Q  Because of what Mr. Placitella told you?
21         MR. ROTH:    Objection.
22     Foundation.
23  A  No, I think I -- as I said before, I learned
24     sometime, it was definitely not in 1993, it was
25     sometime after that, that the vinyl division

Page 301

1      was a Goodyear Tire division at Goodyear
2      Aerospace, even though the employees were
3      Goodyear Aerospace employees.
4   Q  And you're going to get me those documents?
5   A  What documents?
6   Q  You said you learned it.  How did you learn it?
7   A  From testimony from the workers there.
8   Q  In your cases?
9   A  Yes.
10  Q  Okay.  And, as I said, is there any court
11     pleading referencing that testimony?
12  A  I'm sure there's court pleadings, yes.
13  Q  In any talc case?
14  A  I don't know about a talc case.  Most likely a
15     supplier case against Goodyear Tire.
16  Q  Could you turn to the second page?
17     You reference a Charles Williams with
18     lung cancer and asbestosis.
19     Do you see that?
20  A  Yes.
21  Q  And then you say, "From an exposure standpoint,
22     these ten cases are similar to the Colley and
23     Smith Cases.  From a disease standpoint, I
24     believe these cases are more significant than
25     the Colley and Smith cases, as far as the

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 302..305

Page 302

1    extent of damages and disability, as well as
2    the credibility of medical documentation."
3        Do you see that?
4        What do you mean by "credibility of
5    medical documentation"?
6    A  I think we had -- we've got a meso in here, a
7    lung cancer.  I think these individuals were
8    all treating for asbestosis, and that's how
9    they came to me.
10       If I recall correctly, Clay Compton had
11   a -- was hospitalized for a pleural effusion.
12   Mr. Duhart, I know Mable Gonzalez for sure,
13   Mr. Kessel, and Charles Williams were all being
14   treated by Dr. Fuenning, a local pulmonologist.
15       So they were -- they were -- these were
16   symptomatic people with asbestosis that were
17   treating.
18   Q  When you say, "I believe these cases are more
19   significant than Colley and Smith, as far as
20   the extent of damages," what do you mean there?
21   A  Because, again, these are people that are
22   treating.  A lot of people with asbestosis
23   aren't treating, there's nothing being done
24   with them at the time, but these people were
25   actually treating with doctors for asbestosis.

Page 303

1    Q  And then you make a settlement proposal,
2    correct?
3    A  Yes.
4    Q  Pardon me?
5    A  Yes.
6    Q  $3,000 for mesos, $2,000 for lung cancer,
7    $1,000 for asbestosis and pleural cases.
8        And you say, "I will need a list of all
9    participating defendants prior to the
10   finalization of settlement."
11       Do you see that?
12   A  Yes.
13   Q  So you're asking Mr. Martillotta to provide you
14   with a list of all of the defendants who want
15   to join in on the settlement, correct?
16   A  Yes.
17   Q  And you thought that was full and fair, based
18   on what you knew at the time?
19          MR. ROTH:       Objection.
20   A  I thought what was full and fair?
21   Q  The 3,000, 2,000, 1,000.
22   A  Oh.  Based on what I knew at the time, yeah.
23   Q  And you did that even though you later learned
24   that there were asbestos defendant --
25   withdrawn.

Page 304

1        You recommended 3,000, 2,000, 1,000, even
2    though you later learned that there was
3    asbestos in the talc of Southern Talc and R.T.
4    Vanderbilt, fair?
5          MR. ROTH:       Objection.
6    A  I later learned that, yes, I did.
7    Q  And you continued to settle these cases on a
8    global basis for these sums of money after you
9    found out there was asbestos in R.T. Vanderbilt
10   and Southern Talc, fair?
11          MR. ROTH:       Objection.
12   A  Well, I --
13   Q  Fair?
14   A  No.
15          MR. ROTH:       Objection.
16   A  I can -- no.  As I explained before, the issue
17   with Southern Talc and R.T. Vanderbilt was --
18   was the product ID, whether they sold and how
19   much they sold and when they sold it to the
20   places where my clients worked.  That was the
21   problem that I had with those two entities.
22   Q  Did you find out that R.T. Vanderbilt had
23   asbestos in the talc, yes or no?
24   A  I already said yes, at some point --
25   Q  And did you find out that Southern Talc had

Page 305

1    asbestos in the talc?
2    A  I already answered your question.  Are you
3    going to ask me something new?
4    Q  And then you provided -- you still allowed them
5    to be part of a global settlement for $3,000
6    and --
7          MR. ROTH:       Objection to
8    form.
9    Q  -- $2,000 and $1,000, right?
10          MR. ROTH:       Objection.
11   Foundation.
12          MR. McDERMOTT:  Objection.
13   A  I -- the 1,000 I recall.  I'm not sure about
14   the two and the three, because I believe, for
15   instance, on Darnell, I believe they paid more.
16   Q  Let me show you what's been marked as
17   Defendants' Exhibit 272.  Or is that a 3?  May
18   I see?
19       272.
20       Do you recognize --
21          MR. McDERMOTT:  Excuse me.  I
22   don't have a copy.
23          MR. ASSAF:      I'm sorry.
24          MR. ROTH:       I know you ...
25   Q  272 is a document, July 18, 1996.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 306..309

Page 306

1    Do you recognize this document,
2  Mr. Bevan?
3  A  It looks like a letter that I wrote.  I don't
4    have a specific recollection of it, but ...
5  Q  Okay.  Let me show you what's been marked as
6    273.
7    273 is dated July 19, 1996 to Sam
8  Martillotta from Tom Bevan.  It says, "The
9    following are our remaining filed and unfiled
10    cases against the talc defendants."  And then
11    you list a number of defendants.
12    "At this time, we can settle all of these
13    cases for 280,000.  Our demand includes 30,000
14    for the meso cases; 20,000 for lung cases;
15    10,000 for the asbestosis cases; and 50,000 for
16    the Jenkins case."
17    Do you see that?
18  A  Yes.
19  Q  What happened to these cases?
20  A  I believe we settled these cases, but I'd have
21    to go to the individual files to see if we
22    settled them and when we settled them and what
23    we settled them for.
24  Q  How much did you settle them for?
25  A  I don't recall.  I would have to go to the

Page 307

1    individual files to see what we settled them
2    for.
3  Q  And these were group settlements against all
4    talc defendants?
5  A  I don't know if it was against all talc
6    defendants, but it was against numerous talc
7    defendants, I believe.
8  Q  And you expected talc defendants who had strong
9    product ID defenses and didn't have asbestos in
10    their talc to still participate in the
11    settlements if they wanted releases?
12    MR. ROTH:    Objection.
13  A  Did I expect it?  It was a proposal.
14  Q  Did you sue companies with -- withdrawn.
15    Did you sue talc defendants who did not
16    have asbestos in their talc, knowing what you
17    know today?
18    MR. ROTH:    Objection.
19  Q  Having litigated these cases for 30 years.
20    MR. ROTH:    Objection.
21    MR. McDERMOTT:    Objection.
22  A  I don't recall if I've seen any evidence that
23    Georgia Talc had asbestos in their talc.
24    That's the best I can answer that question.
25  Q  Do you think it was fair to sue Georgia Talc?

Page 308

1    MR. McDERMOTT:    Objection.
2    MR. ROTH:    Objection.
3  A  I thought it was fair.
4  Q  Repeatedly, even though you knew there was no
5    asbestos in their talc?
6    MR. ROTH:    Objection.
7  A  I didn't say I knew that.  I didn't say that.
8  Q  Well, you continued to sue Emtal when you
9    believed there was no asbestos in the talc and
10    you thought that was fine.
11  A  I explained to you --
12    MR. McDERMOTT:    Objection.
13  A  -- the basis for that suit.
14  Q  That there was a tactical reason to do so,
15    correct?
16    MR. ROTH:    Objection.
17  A  That was what I explained to you.
18  Q  Let me show you what's been marked as
19    Defendants' Exhibit 274.
20    "I have enclosed medical reports for our
21    clients that are part of the global talc
22    settlement."
23    Do you see that?
24  A  Yes.
25  Q  When -- withdrawn.

Page 309

1    Did the talc defendants ask for medical
2    reports for the various plaintiffs?
3  A  I presume.  I, you know, I enclosed them, so --
4    per my letter.
5  Q  And if you had medical reports that show that
6    there was no meso, even though you were
7    claiming meso, would you have produced that?
8    MR. McDERMOTT:    Objection.
9    MR. ROTH:    Objection.
10  A  Again, I would have produced what the civil
11    rule says I should produce.  We're talking
12    about 1997.  I'm not sure why -- that wasn't an
13    issue.
14  Q  If you had a medical report showing that your
15    client did not have meso and was still claiming
16    meso, would you have provided that to the
17    defendants?
18    MR. McDERMOTT:    Objection.
19    MR. ROTH:    Objection.
20  A  It depends on the circumstance.
21  Q  Oh, at the bottom of the page, you say, "If any
22    of our clients do not wish to participate in
23    the settlement, we will withdraw as counsel on
24    their case."
25    Do you see that?

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 310..313

Page 310

1   A   Yes.
2   Q   What did you mean by that?
3   A   I meant that we were recommending the
4       settlement to our clients and if our clients
5       didn't want to follow our recommendation and
6       advice, that they should probably seek
7       different counsel.
8   Q   Let me show you what's been marked as
9       Defendants' Exhibit 275.
10          Is it fair to say that the talc
11      defendants didn't find your suggestion that you
12      might withdraw as acceptable?
13  A   Repeat the question.
14  Q   Is it fair to say that the talc defendants were
15      not accepting your proposal that you might
16      withdraw on behalf of some clients?
17          MR. ROTH:     Objection.
18  A   They were concerned with that.  I think he says
19      concerned.
20          They said they were concerned.
21  Q   And it says, "This is a new condition to
22      settlement and is not acceptable to those of
23      our clients who are settling these cases in an
24      effort to have the entire block of litigation
25      behind them."

Page 311

1           Do you see that?
2   A   I saw it in there, yes.
3   Q   What did that mean to you?
4           MR. McDERMOTT:   Objection.
5   A   They wanted to settle them all.
6   Q   It was all or nothing, correct?
7   A   Well, that's what they said in that.  Whether
8       they meant it or not, I don't know.
9   Q   Well, it ended up being all or nothing,
10      correct?
11  A   I believe my response to Mr. Martillotta was I
12      don't think any of my clients are going to, you
13      know, balk at this settlement.  If they are,
14      I'll let you know and we'll cross that bridge
15      when we get there.  But we never had to cross
16      that bridge because the clients were all in
17      agreement.
18  Q   You brought all of the asbestos plaintiffs,
19      talc plaintiffs, as a group to all of the talc
20      defendants who were settling and it was a
21      global deal, fair?
22          MR. ROTH:     Objection.
23  A   I don't know if every single -- I had a list of
24      cases.  I think I list the number of cases in
25      one of these here.

Page 312

1   Q   Let me show you what's been marked as
2       Defendants' Exhibit 276.
3           "Dear Sam:
4           I have enclosed a list of recently filed
5       asbestos cases.
6           Several of these cases were included in
7       our prior talc settlement. (Anderson, Bean,
8       Gumm, Lemasters, Walker, Xenias) Many of these
9       individuals were not rubber workers and had no
10      talc exposure."
11          Do you see that?
12  A   Yes.
13  Q   Rubber workers didn't have talc exposure?
14          MR. ROTH:     Objection.
15          MR. McDERMOTT:   Objection.
16  A   You're not reading it correctly.
17  Q   Okay.  What does it mean?
18  A   It says, "Many of these individuals were not
19      rubber workers and had no talc exposure."
20          So, for instance, Mr. Xenias I believe
21      was a B&W worker and perhaps an Atlantic
22      Foundry worker.  He was not in a site where
23      there was talc.
24          Mr. Walker I believe was a B&W worker.
25          Mr. Anderson was definitely a Babcock &

Page 313

1       Wilcox worker.
2           So I wasn't trying to settle a talc case
3       with them, because they were at a plant where
4       there was no talc.
5   Q   It says, "Please let me know if the talc
6       companies are interested in selling these five
7       rubber worker cases for $1,000 per case."
8           Correct?
9   A   Yes.
10  Q   That was your offer to him?
11  A   Yes.
12  Q   He didn't negotiate that, you came and offered
13      that, correct?
14  A   Yes.
15  Q   Let me show you Defendants' Exhibit 277.
16          It's a letter from Sam Martillotta, a
17      draft letter or an unsigned letter, to Tom
18      Bevan dated November 13, 2000.
19          MR. ROTH:     Mr. Assaf.
20          MR. ASSAF:    Yeah.
21          MR. ROTH:     The copy I have
22      is signed.
23          MR. ASSAF:    Oh.  Better
24      yet.
25  A   My copy's signed as well.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 314..317

Page 314

1  Q  Good.
2  A  You're looking at a different letter than this
3     one.  That's what you gave me.
4  Q  Ah.  Sorry.  I went ahead.
5        Which exhibit are we?  2 --
6  A  77.
7  Q  277.
8        November 4, 1997 from Sam Martillotta.
9     "The talc counsel with whom you have settled
10    are waiting for you to confirm that we will be
11    receiving dismissals with prejudice."
12       Was dismissal with prejudice an important
13    part of the settlement agreement with the talc
14    defendants?
15 A  Yes.
16 Q  Why was that?
17 A  Because they want finale.  They want out.
18 Q  I'm going to show you Defendants' Exhibit 6.
19    February 15, 2001.  From Sam
20    Martillotta -- to Sam Martillotta from you.  It
21    says, "As I indicated to you previously, most
22    of these Plaintiffs did not work in facilities
23    where they would have been exposed to talc."
24       How did you know that?
25 A  Because they would have been at places like

Page 315

1     Babcock & Wilcox or Atlantic Foundry.  Let's
2     see.  2001, we would have had a good number of
3     U.S. Steel cases.
4  Q  Okay.  USX, B&W.
5        U.S. Steel?
6  A  Well, U.S. Steel, USX.
7  Q  Right.
8  A  Atlantic Foundry.  Ford, Canton Forge.
9     Probably Ford, Walton Hills.
10 Q  So plaintiffs who worked at USX, B&W, Atlantic
11    Foundry, they should not be in the Bevan Ohio
12    talc class as part of your affidavit, fair?
13       MR. McDERMOTT:  Objection.
14 A  They should not be included in the 2,600 or
15    whatever that number was, yes.
16 Q  Okay.
17 A  They would not be included in there.
18 Q  All right.
19 A  Unless of course they worked also -- you know,
20    if they worked at two places.
21 Q  And you kept track of where people worked,
22    correct?
23 A  Yes.
24 Q  That was part of your -- I think your presuit
25    investigation that you talk about on your

Page 316

1     website.  You take a detailed review of the
2     work history?
3  A  That would be one of the first things we would
4     look at.
5        MR. ROTH:      Objection.
6  Q  All right.  And it says, "The following
7     Plaintiffs did work in facilities where they
8     were exposed to talc."  And there's Kathy
9     Darnell.
10       It says, "Please let me know if the talc
11    defendants would like to resolve these cases
12    along with the plaintiffs from the Breckenridge
13    complaint."
14       Correct?
15 A  That's what it says.
16 Q  And you also provide medical records, correct?
17 A  It looks like we did, yes.
18 Q  And would you agree with me that you knew that
19    the medical records were important to the
20    settling defendants in order to show some sort
21    of injury that they were going to pay
22    compensation for?
23 A  They would want a diagnosis of an
24    asbestos-related disease.
25 Q  Okay.  I'm handing you Defendants' Exhibit 8.

Page 317

1        By the way, was Ware or Darnell a Harshaw
2     case?
3  A  What do you mean "was it a Harshaw case"?
4  Q  Was it a Harshaw premises case?
5  A  No.
6  Q  How do you know that?
7  A  Because I'm familiar with their work history.
8     They did not work at Harshaw Chemical.
9  Q  So you don't think Ware worked at Harshaw?
10       MR. ROTH:      Objection.
11 A  I don't recall Ware working there.  Maybe I'm
12    wrong on that, I don't know.  I'm certain that
13    Darnell didn't, because I was -- I was at her
14    depositions and that did not come up.
15 Q  Would a Harshaw case be a talc case, in your
16    mind?
17       MR. McDERMOTT:  Objection.
18 Q  Would they be part of the Bevan 2,653?
19 A  If a person worked their career at Harshaw
20    Chemical, I don't believe they would be part of
21    that 2,600.
22 Q  As far as you know, there was no talc at
23    Harshaw chemical?
24 A  Not that I know of.  I guess it depends on the
25    Harshaw Chemical.  The facility I was familiar

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 318..321

Page 318

1    with was out in Lorain County, I believe.
2    Elyria.
3  Q  I'm showing you Defendants' Exhibit 8.
4       March 25, 2001. And there's a list of
5    Breckenridge plaintiffs and Bevan 14
6    plaintiffs.
7       Do you see that?
8  A  Yes.
9  Q  Regarding the Bevan 14 plaintiffs, there's a
10   number of $19,000.
11      Do you see that?
12 A  I'm sorry.
13 Q  On page 3. Sorry.
14 A  I'm sorry. What are you asking me?
15 Q  I'm saying there's a number that says $19,000.
16 A  Okay. Yes. Yes.
17 Q  Do you know what that $19,000 reflects?
18 A  I really don't know.
19 Q  Is it the 3,000, 2,000, 1,000 offer that you
20   had put together earlier?
21      MR. ROTH:    I'm going to –
22   can we go off the record?
23 A  It doesn't add up to that, so ...
24 Q  Okay.
25      MR. ROTH:    Can we go off

Page 319

1    the record?
2       MR. ASSAF:    Sure.
3       MR. ROTH:    Mr. Bevan, can
4    you step out?
5       THE VIDEOGRAPHER: Off the record.
6    The time is 4:08.
7       -----
8    (Mr. Bevan no longer present.)
9       -----
10      MR. ROTH:    This is a
11   document that came up in the original records
12   custodian deposition of Mr. Bevan, I believe,
13   and this did not come from the plaintiffs, it
14   did not come from Mr. Bevan in this form. And
15   I believe what we learned, and part of that may
16   have been with Mr. Farrell, is that the back
17   two pages, page 2 and 3, of this document were
18   the defense copy of this, which shows who's
19   paying what.
20      MR. ASSAF:    Ah. Okay.
21      MR. ROTH:    And so instead
22   of getting in a fight with you about –
23      MR. ASSAF:    Sure. Fair
24   enough.
25      MR. ROTH:    – why this is

Page 320

1    an unfair question to him, he's never likely
2    seen this, except for at the deposition of the
3    custodian record.
4       MR. ASSAF:    Okay. Fair
5    enough. Thank you.
6       -----
7       (Recess taken.)
8       -----
9       (Mr. Bevan now present.)
10      -----
11      THE VIDEOGRAPHER: We're back on
12   the record. The time is 5:14 – 4:14.
13 BY MR. ASSAF:
14 Q  Let me show you what's been marked as
15   Defendants' Exhibit 154. It's a letter or a
16   memo of Claims Resolution Management
17   Corporation.
18      You're familiar with this, Mr. Bevan?
19 A  I think I am. You know, I'm familiar with some
20   of these names on here.
21 Q  Okay. Dr. Ballard?
22 A  I've heard the name before.
23 Q  I'm going to ask you – I'm going to say the
24   name, you tell me if you're familiar with them
25   and whether you've used them for talc cases,

Page 321

1    okay?
2  A  Okay.
3  Q  Dr. Ballard?
4  A  I know the name. I've never used him.
5  Q  Dr. Cooper?
6  A  Never heard the name.
7  Q  Dr. Coulter?
8  A  I don't know that name.
9  Q  Dr. Andrew Harron?
10 A  I'm not sure.
11 Q  Dr. –
12      MR. ROTH:    Not sure? I'm
13   sorry.
14      Do you know the name?
15 A  The name I recognize. Ray Harron had two sons
16   and one of his sons did exams for us one time,
17   but I don't know if that was Andrew Harron
18   or – I think he had more than one son.
19 Q  Dr. Ray Harron?
20 A  I know him, yes.
21 Q  And he's done talc work for you?
22 A  Well –
23      MR. ROTH:    Objection.
24 A  – I would not say talc work. He's done B
25   reads for us.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 322..325

Page 322

1  Q  Dr. Barry Levy?
2  A  I don't know him.
3  Q  Dr. George Martindale?
4  A  I've heard that name, but never have used him
5     as an expert.
6  Q  And Dr. Allen Oaks?
7  A  I think maybe I've heard that name as well, but
8     never used him as an expert.
9  Q  And it says in the beginning, "The reliability
10    of reports prepared by the doctors and
11    screening facilities listed below has been
12    challenged and is the subject of federal grand
13    jury and congressional investigations into
14    alleged fraud."
15       Do you see that?
16  A  Yes.
17  Q  "Based on the evidence presented in the silica
18    MDL, the challenge is credible and compels
19    suspension of the acceptance of these reports."
20       Do you see that?
21  A  I see it.
22  Q  Did you stop using Dr. Harron because of the
23    credible evidence regarding the fraud --
24       MR. McDERMOTT:   Objection.
25  Q  -- identified by the Claims Resolution

Page 323

1     Management Corporation?
2        MR. McDERMOTT:   Objection.
3        MR. ROTH:   Objection.
4  A  I probably stopped using Dr. Harron before this
5     letter.
6  Q  Okay. Let me show you what's been marked as
7     Defendants' Exhibit 287, a composite exhibit,
8     Mr. Bevan.
9        And I'm sorry, I apologize in advance for
10    how small of writing it is, but I was trying to
11    get it all on one page. It's from your
12    database.
13       As you recall from your custodian
14    deposition and the discovery in this case, 30
15    files were selected from the talc cases for the
16    defendants to review, correct?
17  A  No.
18  Q  30 files reviewed from my cases. You added
19    "talc" to it.
20  Q  Oh. It was just any case?
21  A  It was just any -- yeah, it was any case.
22  Q  So we got files -- we got files from any of
23    your asbestos cases from the last 25 years?
24  A  I was given a list of 30 cases, and that's what

Page 324

1     I gave you.
2        MR. ASSAF:   Off the record.
3        THE VIDEOGRAPHER: Off the record.
4     The time is 4:18.
5        -----
6        (Recess taken.)
7        -----
8        THE VIDEOGRAPHER: We're back on
9     the record. The time is 4:35.
10  BY MR. ASSAF:
11  Q  At some point, Mr. Bevan, were you asked to
12    help compile a list of 30 files that would be
13    provided to the defendants to review as part of
14    discovery?
15       MR. McDERMOTT:   Objection.
16       MR. ROTH:   That's not how
17    it worked.
18       MR. ASSAF:   I'm sorry?
19       MR. ROTH:   Object to the
20    form and foundation.
21       MR. ASSAF:   Go ahead.
22       MR. ROTH:   The Court
23    directed that we pull out -- we randomly pull
24    out 30 files from a list of cases.
25       MR. ASSAF:   Yeah, get the

Page 325

1     email out.
2        MR. ROTH:   Is that my
3     email to Peter?
4        MR. ASSAF:   Yeah.
5  BY MR. ASSAF:
6  Q  At some point do you understand that the Court
7     ordered that there be -- that Excel's
8     randomizing function be used to identify 30
9     files of absent putative class members for the
10    Bevan office to pull?
11  A  I was given a list of 30 files and we printed
12    the files out.
13  Q  Okay. And did you understood that they were
14    putative class members?
15  A  I don't know exactly what that means, but I was
16    just given a list of 30, and that's what we
17    did.
18  Q  Okay. You didn't believe that they had
19    anything -- withdrawn.
20       Were the 30 files encompassed within the
21    2,653 number?
22  A  No. I think they were encompassed within I
23    think my entire client database, but I'm not
24    sure.
25  Q  Okay. Well, let's try this. I'm putting 287

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 326..329

Page 326

1    in front of you.
2        And you were the one who worked with your
3    lawyers to provide that information, correct?
4        MR. McDERMOTT:   Objection.
5    Q  You were the person at the Bevan Firm who was
6    the contact for Mr. Little and others and
7    Mr. Roth to provide that information?
8    A  Yes.  And I was given that.  I gave that to
9    my paralegal, Erin Clark, to print out those
10   files, and then we got them to counsel.
11   Whether she scanned them -- I don't know how
12   she did it.
13   Q  All right.  Let's start with -- so I put
14   together what I called the Bevan 30,
15   information from the Bevan database.  So 30
16   randomized files.  And I tried to put it all in
17   one sheet, but not with every field, because if
18   it were every field, it would go on forever.
19   Military, history, et cetera.
20       So this is, though, an extract from the
21   files.  I haven't changed the data, this is
22   what I had, but I did take out certain fields
23   to get it all on to one page, okay?
24   A  Okay.
25   Q  All right.  Anthony Bennett.  Primary employer,

Page 327

1    Ford.  And it says, "asbestosis 1/0."
2        What does, by the way, "asbestosis 1/0"
3    mean?
4    A  That's the profusion reading on the B read.  So
5    he was given a profusion of 1/0, along with
6    pleural disease.
7    Q  Would you agree with me, in terms of valuing
8    cases, the 1/0 is the weakest of the reads in
9    terms of valuing a case?
10       MR. ROTH:     Objection.
11       MR. McDERMOTT:   Objection.
12   A  I don't think that bears much on the value of
13   the case, the 1/0, no.  It is probably the
14   lowest profusion that I would consider
15   asbestosis, but I don't think that that is an
16   indication of the value of the case.
17   Q  You understand that some 1/0s are viewed by
18   Courts as actually not being asbestosis cases?
19       MR. McDERMOTT:   Objection.
20   Q  Fair?
21   A  I've not -- I've never come across that.
22   Q  Is that one of the reasons Dr. Harron got in
23   trouble?
24       MR. McDERMOTT:   Objection.
25       MR. ROTH:     Objection.

Page 328

1    A  I don't recall that at all, no.
2    Q  All right.  So was Mr. Bennett a talc case?
3    A  Based on what you've printed out here, he
4    worked at Ford, Canton.  That would be the
5    Ford, Canton Forge plant in Canton, Ohio.
6        What I don't have is any secondary or
7    other places.  So if he didn't work at another
8    place where there would be talc exposure, he
9    would not be one of those 2,600 some cases that
10   we consider for my affidavit of being the talc
11   cases.
12   Q  Okay.  McKenzie Benson worked at B&W with an
13   asbestosis of 1/0 and a secondary read by
14   Dr. Harron.  Is that a talc case?
15   A  No.  That would be a Babcock & Wilcox.  Same
16   answer as the Ford, Canton.  If he didn't work
17   at one of the rubber plants, then I would say
18   that would not be a talc case.
19   Q  Samuel Biggers.  Talc case?
20   A  Yes.  He worked at Firestone.
21   Q  And that's another asbestos 1/0?
22   A  Yes.
23   Q  There's no secondary diagnosis for Mr. Biggers?
24   A  No.
25   Q  And he stopped working at Firestone in 1973.

Page 329

1    Do you see that?
2    A  Yes.
3    Q  If there was no asbestos in the talc up to
4    1973, would he then be a proper plaintiff for
5    recovery?
6        MR. McDERMOTT:   Objection.
7        MR. ROTH:     Objection.
8    A  Are you asking me a hypothetical?
9    Q  Yeah.
10   A  So hypothetically if there is no asbestos in
11   the talc, then I would not be able to make an
12   asbestosis claim on his behalf against a talc
13   defendant.
14   Q  Okay.  For Larry Briggs, Firestone plant,
15   asbestosis 1/2.  Is that a talc case?
16   A  Yes.
17   Q  And that's a talc settlement case, according to
18   your records, too?
19   A  It says "settled" there, yes.
20   Q  Settled.
21   A  Same with the prior one too, I believe.
22   Q  By the way, do you view your database as
23   reliable, in terms of the information in it?
24       MR. McDERMOTT:   Objection.
25   A  It's fairly reliable to get -- for some of the

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 330..333

Page 330

1   older cases, like I testified in the last
2   deposition, for instance, say on the Williams
3   case, we didn't have this database at the time
4   of the Williams case, so I would go to the file
5   to try to find information.
6   Q   Melvin Brown, Ford, U.S. Steel, General Motors.
7   Talc case?
8   A   Same as the other -- the Ford and Babcock &
9   Wilcox.  Based solely on those employers, no.
10  Q   Daniel Cheezan?
11  A   Same answer.
12  Q   Not a talc case?
13      MR. ROTH:     Objection.
14  A   Again assuming there was no other employment
15  that brought him into contact with talc.
16  Q   Clay Compton is listed there, but there's
17  actually no information in the database?
18  A   Yeah, I think it's because that case was so
19  old.  It long predated the database.  He was a
20  Goodrich worker.  It would be a talc case.
21  Q   Would be a talc case?
22  A   Yes.
23  Q   Do you know what his reads were?
24  A   I believe he was a pleural effusion.  Pleural
25  disease case.  I think he was hospitalized for

Page 331

1   his pleural effusion, in fact.
2   Q   Ray Cottrill.  Goodyear Tire & Rubber,
3   asbestosis 1/0, and his doctor is Ray Harron.
4   A   Yes, that would be a talc.
5   Q   Angel or Angel Cuevas.  It looks like there's
6   no information there.
7   A   I'm not -- I'm not sure what that case
8   involves.
9   Q   So Beth told me some of these, because I guess
10  you produced two separate databases, they're
11  going to be on the second page.  So we'll get
12  to Mr. Cuevas.
13  A   Okay.
14  Q   Okay.  Clyde Curry looks to be the third page.
15  Ford Motor Company, asbestosis 1/0, Dr. Ray
16  Harron.
17  A   Yeah.  Again assuming no other -- no other
18  exposures, no other employment where there was
19  talc present, then that would not be a talc
20  case.
21  Q   Donald, Johnny, which I think is the second
22  page, Firestone/Thew Shovel.  Firestone to 1964
23  and then Thew Shovel '64 to '78.  Dr. Ray
24  Harron, asbestosis 1/0.
25  A   I believe a talc case, but I'm not sure on

Page 332

1   that.
2   Q   Would Thew Shovel be a talc case?
3   A   I'm not sure on that.
4   Q   So if there was no asbestos in the talc up
5   until 1964, he wouldn't be a proper plaintiff?
6       MR. ROTH:     Objection.
7   A   Same answer.  If there's no asbestos in talc,
8   in any talc defendant's product, then, you
9   know, we would be, where I was 20 years ago,
10  not able to prove a case.
11  Q   Jimmie Gasper?
12  A   I believe he was a Goodyear.  Yes.
13  Q   So that's a talc case?
14  A   Yes.
15  Q   Roosevelt Harris.  Harshaw Chemical, primary
16  employer.
17  A   I don't believe that would be a talc case,
18  unless that was some other employment that's
19  not listed on here.
20  Q   Okay.  Lester Henline?
21  A   Again I don't believe that was a talc case
22  because he worked at Babcock & Wilcox, unless
23  there was some other place of employment not
24  listed.
25  Q   And why is he listed as referring attorney,

Page 333

1   TWLP2?
2   A   We used that, and I think I explained that in
3   the last deposition, how to -- when we were
4   trying to keep track of clients, groups of
5   clients.  And the TWLP1s were actually the
6   cases that came originally from the National
7   Tire Workers Litigation Project.
8       And then when I started in 1991 and
9   started to sign up a handful of cases and file
10  those cases, we called those TWLP2s.  So they
11  would be Charles Williams, Clay Compton, the
12  Clark case, Nardella, whatever this one was --
13  oh, Henline, yes.  And there was maybe 10 or 15
14  of those TWLP2s.
15      And then cases that I picked up in '95,
16  '96 were TWLP3s.  And then I just stopped using
17  that altogether.  It didn't serve its purpose
18  anymore.
19  Q   The referring attorney, though, referenced how
20  much of a contingency or referral fee an
21  attorney would get, correct?
22  A   Well, in some cases, yes.
23  Q   Well, in Clair Wilkerson's case, it's "Vince
24  40%."
25      Do you see that?

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 334..337

Page 334

1  A  Yes. Uh-huh.
2  Q  Who's Vince?
3  A  He's an attorney that referred us the Wilkerson
4     case.
5  Q  Okay. And so there were no referral fees
6     associated with TWLP2 or 3?
7  A  No. No.
8  Q  Hoffman, U.S. Steel?
9  A  Same answer. Unless there was some other
10    exposure, not a talc case.
11 Q  Marvin Johnson, U.S. Steel?
12 A  Same answer.
13 Q  Tom Knight, Sunoco/U.S. Steel?
14 A  Same answer.
15 Q  Not a talc case?
16 A  Unless there was some other exposure that's not
17    listed there.
18 Q  Issa Michael.
19 A  Same answer on that one. It says Republic
20    Steel/Ford Motor Company.
21 Q  Samuel Monty. It looks like Firestone.
22 A  Firestone. He would be a talc case.
23 Q  A 1/0 and Dr. Harron.
24 A  I think it's a 1/1 and 1/0.
25 Q  Okay.

Page 335

1      MR. ROTH:   Which one was
2  that, I'm sorry? Monty?
3      MR. ASSAF:   Monty.
4  Q  Joseph Nebgen?
5      MR. ROTH:   Hold on. I
6  object to the Harron question.
7  Q  Joseph Nebgen?
8  A  He's a Firestone. It would be a talc case.
9  Q  Richard Rinehart?
10 A  That would be a Goodyear Aerospace. So that
11    would be a talc case.
12 Q  Under your theory of vinyl?
13 A  Yes.
14 Q  If the vinyl theory isn't proper, then it's not
15    a talc case?
16     MR. ROTH:   Objection.
17     MR. McDERMOTT:   Objection.
18 A  It's proper. I know it. So it's proper.
19 Q  And you have those documents, you're going to
20    get them to us?
21 A  I think I indicated that it was testimony from
22    the workers there is what I indicated.
23 Q  You'll get that to me?
24 A  I'm not going to dig through depositions.
25 Q  All right. Richard Rinehart I think we talked

Page 336

1     about.
2      Paul Sestili, U.S. Steel?
3  A  U.S. Steel would be the same answer. If, you
4     know, there was no other place of employment
5     that would have put him by talc, that would not
6     be a talc case.
7  Q  Not a talc case.
8      Donald Sparks?
9  A  Same answer.
10 Q  Not a talc case.
11     Richard Turpin?
12 A  Same answer.
13 Q  Not a talc case.
14     Gary Venus?
15 A  Same answer as Mr. Rinehart.
16 Q  It would be a talc case if your vinyl theory is
17    correct?
18     MR. ROTH:   Objection.
19 A  My vinyl theory's correct, I know it.
20     MR. McDERMOTT:   Objection.
21 Q  Eugene Villers?
22 A  That's a talc case.
23 Q  General Tire and Mohawk Rubber?
24 A  Yes.
25 Q  Donald Wagner?

Page 337

1  A  That's a talc case.
2  Q  Charles Whitaker?
3  A  That would be a talc case.
4  Q  Clair Wilkerson?
5  A  That would be, again, if there was no other
6     employment other than what's listed there, then
7     that would not be a talc case.
8  Q  And Michael Wittreich?
9  A  Same answer.
10 Q  If you'd turn to the second page.
11     I think we did Melvin Brown. Ford, U.S.
12    Steel, General Motors. Talc case?
13 A  Again, if those were the only places that he
14    worked, then no.
15 Q  Okay. Angel, Angel Cuevas?
16 A  Same answer.
17 Q  Not a talc case?
18 A  Not a talc case, unless there was other
19    exposures not listed there.
20 Q  Donald Johnny?
21 A  I think we covered that one.
22 Q  And Michael Issa?
23     MR. McDERMOTT:   We covered that
24    one.
25 A  I think we covered that one too.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 338..341

Page 338

1   Q  If you turn to Clyde Curry, I think we covered
2      that one.
3         And then from your database, Marilyn
4      Holley, BFGoodrich.  That's a talc case,
5      correct?
6   A  Yes.
7   Q  And there's an indication there that that was
8      settled, correct?
9   A  Yes.
10  Q  Ralph Ware?
11  A  That is a talc case.
12  Q  And was it settled or not settled?
13  A  I don't recall on that one.  That was the one I
14     told you I just didn't recall.  I would have to
15     look in the file to see if there was a
16     settlement in there.
17  Q  So if your database indicates no settlement,
18     how do you know?  You would have to go to the
19     file?
20  A  I would have to go to the file.
21  Q  You would have to pull all of these files?
22  A  Yeah.  You know, yeah, for –
23  Q  So for every – of the 2,653, in order to
24     verify the information, you would have to go to
25     the files?

Page 339

1   A  Well, I think on a fair number of those it
2      would indicate whether there was a settlement
3      or not.  And so I would not say in all of them,
4      no, but if there's a blank, if it's not listed
5      in there, I'd probably want to go to the file
6      just to make sure.
7         But most of those 2,600 are the newer
8      cases when this database was in place.  When we
9      were looking at these cases, a number of these
10     are very old ones.
11  Q  If the 2,653 has the asbestosis read of 1/0 or
12     1/1, where – would that information be in the
13     file to confirm that?
14  A  The B read should be in the file, yes.
15  Q  And in terms of the doctor, if it's Dr. Ray
16     Harron or for others, would that also be in the
17     file?
18  A  Yeah, the medical should be in the file.
19  Q  And again, the settlement, to the extent
20     there's settlement information with talc, the
21     way to confirm that would be to go to the
22     files?
23  A  Yes.
24  Q  Because here, out of the five named plaintiffs,
25     it only has an indication of settlement for

Page 340

1      one, correct?
2   A  Yes.
3   Q  So for Ralph Ware, there's no indication, even
4      though in the complaint it says that it
5      settled?
6   A  Oh, it says – yeah.  If it says that it
7      settled, yeah.  There's no indication in the
8      database.
9   Q  So what would be the controlling document,
10     Mr. Placitella's rendition of the facts in the
11     complaint or the database?
12         MR. ROTH:      Objection.
13  A  The file would be the controlling document.  I
14     would go to the file to determine that.
15  Q  Williams/Clark, Nancy Pease, there's no
16     indication of settlement.
17  A  Yeah.  That one, I'm fairly certain that was
18     settled.  That's just that case is so old.  It
19     was before this database, so it's not in there.
20  Q  And Mr. Placitella in his complaint says that
21     it was settled as well.
22         So in terms of understanding whether the
23     case was settled and on what terms, the place
24     to go would be Mr. Placitella's rendition of
25     the facts or the complaint or the database or

Page 341

1      the file?  Which would have the most reliable
2      information?
3         MR. ROTH:      Objection.
4         MR. McDERMOTT:  Objection.
5   A  Well, I'm going on personal recollection that
6      that case settled with the talc defendants.  So
7      I know that to be a fact.  If I wanted to see
8      the amounts and any documentation that we have,
9      I would go to the file and try to find it in
10     the file.
11  Q  I'm just trying to figure out if I'm looking at
12     the database or somebody's looking at it trying
13     to figure out is this reliable in terms of
14     trying to figure out the data, especially on
15     the settlement, it is much more reliable to go
16     to the files to figure out whether there's a
17     settlement, fair?
18  A  Well, if it says "settled," then it was
19     settled.  So if it's a blank, then to be sure,
20     I would go to the file.
21         Now, there's instances where I wouldn't
22     bother going to the file.  For instance, if it
23     was a, you know, U.S. Steel person and it's
24     blank, you know, I know that we didn't settle
25     with the talc defendants and I wouldn't – it

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 342..345

Page 342

1   would be a waste of an effort to go to the file
2   to see if there was a settlement to talc.
3   Q   Presumably the 2,653 should not include the
4       U.S. Steel people, or does it?
5   A   It does not -- no, it should not include the
6       U.S. Steel people.
7   Q   What happened, did -- if they sue Erntal for
8       some reason, would they be in the 2,653?
9   A   No.
10  Q   It's only talc cases?
11  A   Yes.
12  Q   Or is it by defendant?
13  A   It's only talc cases. So it would not include
14      the U.S. Steel cases.
15  Q   Okay. So if somebody sued Engelhard as a
16      successor to Harshaw, would that be in the
17      2,653 or not in the 2,653?
18  A   Well, if they sued Engelhard as a successor to
19      Harshaw based on a premises liability claim
20      against Harshaw, well, one, it wouldn't be in
21      the 2,653. That would not be.
22  Q   What did you search for to generate the 2,653?
23  A   Whether we had settled with the talc
24      defendants, whether they worked at a site where
25      talc would most likely be, such as the rubber

Page 343

1       plants, and whether we named them.
2   Q   Named them in the complaint?
3   A   In the complaint, yes.
4   Q   So Engelhard? Or Erntal?
5   A   I think it was usually -- yeah, Eastern
6       Magnesia Talc I think is usually how we named
7       them, but we may have named them at Engelhard.
8       I don't recall for sure.
9   Q   So you searched for places where they worked.
10      And could you list all of the places where you
11      thought --
12  A   I could list a good number of them. They would
13      be Goodyear, Goodrich, Firestone, General Tire,
14      Mohawk, Seiberling Rubber, probably R.C.A
15      Rubber, Cooper. That's what jumps out at me
16      right now.
17  Q   Well, you said, "probably R.C.A Rubber." Is
18      that in the 2,653 or not in the 2,653?
19  A   I think that's probably in the 2,653, yeah.
20  Q   Who came up with that list for the 2,653, the
21      list of where they worked?
22  A   I did. Yeah.
23  Q   Did you tell Mr. Placitella or anybody from his
24      firm how you were doing that?
25  A   I don't recall if we discussed that or not. I

Page 344

1       was asked to come up with the number of cases
2       that we had that would have had talc exposure,
3       would have named the talc defendant -- or named
4       Eastern Magnesia Talc and settled or dismissed
5       with Eastern Magnesia Talc. I was given those
6       parameters, and that's what I did.
7   Q   So, for example, R.C.A Rubber, if there's a
8       product ID issue there, would that show up in
9       your database?
10          MR. ROTH:      Objection to
11      form.
12  A   What do you mean by that?
13  Q   Well, if they -- if the Engelhard records show
14      that there were no sales or very few sales or
15      certain times of sales, would that turn up in
16      your database?
17          MR. McDERMOTT:    Objection.
18          MR. ROTH:      Objection.
19  A   I don't -- I don't think so, no.
20  Q   All right. So if R.C.A Rubber, for example,
21      bought Engelhard talc or Erntal talc from 1964
22      to 1970 and then stopped buying it, would that
23      be reflected in your database?
24  A   Would those sales be reflected, no.
25  Q   Yeah.

Page 345

1       And then you had a plaintiff who started
2       working there in 1972 and the rubber companies
3       started using R.T. Vanderbilt talc. Would that
4       be somehow captured in your database?
5   A   I don't -- I don't believe it would be.
6   Q   So the timing of the talc sales wouldn't be
7       reflected in your database?
8   A   I don't think so.
9   Q   And, similarly, the talc sales themselves
10      wouldn't be reflected in your database?
11  A   No.
12  Q   Okay.
13          MR. ROTH:      How much time
14      do you have left?
15          MR. ASSAF:     We're rolling.
16          MR. ROTH:      That didn't
17      help me.
18  Q   I'm showing you Defendants' Exhibit 238,
19      Defendants' Exhibit 239, and Defendants'
20      Exhibit 240.
21      By the way, when you were pulling these
22      30 randomized files, did you tell
23      Mr. Placitella or anybody at his firm that
24      those cases had nothing to do with talc so why
25      am I pulling them?

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 346..349

Page 346

1      MR. ROTH:     Objection.
2   A  I don't recall if we had a conversation or not.
3      I was given a list of 30 and that's what we
4      did.
5   Q  Did it seem odd to you that you were producing
6      files for people who were not even unnamed
7      class members?
8      MR. ROTH:     Objection.
9   A  I--
10     MR. ROTH:     Well, hold on
11     one second.
12     Did it seem odd that the Court ordered
13     the production of files that were unnamed class
14     members?  Yeah, that seemed odd.
15     MR. ASSAF:     No, that's not
16     my question.
17     MR. ROTH:     Okay.
18  Q  My question is:  Did it seem odd to you that
19     you were pulling files from people who were not
20     unnamed class members?
21     MR. ROTH:     Objection.
22     MR. McDERMOTT:  Objection.
23  Q  So if somebody just had asbestos exposure at
24     USX, did you just at some point say, "Gee, I've
25     been doing this a long time and I understand a

Page 347

1      little bit of this case, how are these people
2      at all relevant to discovery in this case?"
3   A  My recollection, I got a list, I gave it to the
4      paralegal, I said, "Get these files out."  And
5      that's what we did.
6   Q  So how did you -- how did the plaintiffs
7      generate the list of the 30?
8      MR. McDERMOTT:  Objection.
9   A  I didn't generate the list.  I don't know how
10     it was generated.  It was given to me.
11  Q  Did you give them information to allow them to
12     generate the list?
13  A  We must have given a database or something.  I
14     don't know how they -- you have to ask them how
15     they got it.  I was under the impression it
16     came from the Court, but I don't know.
17  Q  All right.  Defendants' Exhibit 238 is an entry
18     and an opinion -- and I'm sorry, this is from
19     microfiche, on January 6, 2006 from Judge Harry
20     Hanna, Leo Spellacy, and Francis Sweeney --
21     regarding House Bill 292.
22     Do you recognize this?
23  A  I think I've seen this, yes.
24  Q  Exhibit 239 is again a microfiche article from
25     Mealey's Litigation Report regarding the

Page 348

1      administrative dismissal from a panel based on
2      House Bill 292.
3      And it says in the paragraph, "The
4      three-judge Cuyahoga County Common Pleas panel
5      on March 22 ruled that because it was unlikely
6      that Dr. Ray Harron and Dr. James Ballard would
7      testify at any evidentiary hearing questioning
8      whether their reports met certain criteria,
9      cases relying solely on their diagnoses should
10     be dismissed."
11     Do you see that?
12  A  Yes.
13  Q  And then Exhibit 240 is an example or a listing
14     of certain administrative dismissals.
15     Do you recognize this?
16  A  I recognize some of the names.
17  Q  As your clients?
18  A  Yes.
19  Q  And would the administrative dismissals be
20     included in the Bevan database, the 2,653?
21     Withdrawn.
22     If a case were brought and then
23     dismissed, so it was filed against Engelhard
24     then administratively dismissed, would it be
25     captured in the 2,653?

Page 349

1   A  I think yes, but I'm not certain of that.
2   Q  You don't have a reliable answer on that that a
3      Court could rely on?
4      MR. ROTH:     Objection.
5      MR. ASSAF:     Basis?
6   A  I would have to -- I would have to look at it
7      closer.  We -- we had cases reread, that's why
8      you saw on that thing there was multiple B
9      reads on there.  So I assume that some of these
10     cases that were dismissed were reactivated
11     and -- based on the new B reads.
12  Q  And if your database only lists Dr. Harron as
13     the reader, would you have to go to the files
14     to figure out whether there was an additional B
15     read?
16  A  I would go to the file to look to see if there
17     was an additional B read.
18  Q  The reliable way to figure out whether there
19     was an additional read if it's not on your
20     database would be to go to the file, correct?
21  A  Yeah.  Yes.
22  Q  Let me show you what's been marked as
23     Defendants' Exhibit 234.
24     Paragraph 234 is entitled "Ohio Ethics
25     Guide Client File Retention" by the Board of

THOMAS W. BEVAN, ESQ. – 05/15/2018   Pages 350..353

Page 350

1  Professional Conduct of the Supreme Court of
2  Ohio.
3      Have you ever heard of this document or
4  seen this document?
5  A  I don't think I've ever seen it.
6  Q  Do you have IOLTA trust accounts for your talc
7  clients?
8      MR. ROTH:     Objection.
9      Mr. Bevan, will you step out of the room,
10  please, so I can put something on the record?
11      -----
12      (Mr. Bevan no longer present.)
13      -----
14      THE VIDEOGRAPHER: Do you want to
15  stay on the video record?
16      MR. ROTH:     It doesn't have
17  to be on the video record.
18      THE VIDEOGRAPHER: Off the record.
19      MR. ROTH:     Mr. Bevan's
20  been subjected to records custodian
21  depositions, he's been challenged about his
22  knowledge about the Ohio Ethics or insurance
23  requirements for and preserving records, he's
24  testified respective of whatever the rules are
25  and whatever he is required to do, that he has

Page 351

1  maintained all of this records.
2      This -- you know, if you want to spend
3  your time on this, by my count, we get to 5:15,
4  that's seven hours, including a half hour break
5  for lunch, a 16-minute call with Justice
6  Rivera-Soto, and probably less than 15 minutes
7  when we took a break regarding your
8  spreadsheet.
9      MR. ASSAF:     I don't think
10  that's right. Well, the videographer has the
11  time.
12      THE VIDEOGRAPHER: 6:28, but that
13  includes the call.
14      MR. ASSAF:     So I have
15  roughly six hours. I have another 50 minutes.
16      MR. ROTH:     I've been wrong
17  before.
18      MR. ASSAF:     Okay.
19      MR. ROTH:     Given that we
20  started at nine and it feels like 10 hours.
21  But, you know, I'm objecting to this.
22      MR. ASSAF:     Okay. Let's
23  bring him back in.
24      -----
25      (Mr. Bevan now present.)

Page 352

1      -----
2      THE VIDEOGRAPHER: We're back on
3  the record.
4  BY MR. ASSAF:
5  Q  Do you have IOLTA/trust account records for any
6  clients?
7  A  Yes.
8      I'm sorry. Trust records?
9  Q  Trust account.
10  A  Trust accounts, yes.
11  Q  For IOLTA, I-O-L-T-A?
12  A  Yes.
13  Q  Could you turn to page 3?
14      It says, "IOLTA/trust account records
15  shall be kept by lawyer for seven years after
16  termination of representation."
17      Do you see that?
18  A  Yes.
19  Q  Do you follow that?
20  A  Yes.
21  Q  Okay. Could you turn to page 5 -- to page 7?
22      It says: Email constitute papers or
23  property which the client is entitled to under
24  Professional Rule 1.16(d).
25      It goes on to say a lawyer shall retain

Page 353

1  emails that have a substantive impact upon a
2  client's future representation.
3      Do you see that?
4  A  Yes.
5  Q  And do you conduct your business with emails
6  consistent with those statements?
7  A  You know, I don't correspond with the clients
8  by emails, so it doesn't really come up with --
9  in my practice.
10      So if I have a -- if I do get the
11  occasional email, and I might get a couple a
12  year from a client, you know, I'll print it out
13  and it will go into the client's file.
14  Q  It says, "The retention and maintenance of
15  client-related emails shall be incorporated
16  into the firm's file retention policy."
17      Do you see that?
18  A  Yeah.
19  Q  Have you incorporated the retention of
20  client-related emails into your firm's file
21  retention policy?
22      MR. McDERMOTT:  Objection.
23      MR. ROTH:     Objection.
24  A  I think I testified before we don't have a
25  formal client file retention. Our files are

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 354..357

Page 354

1   electronic and we store them indefinitely.
2   Q  The last sentence says, "Consequently, a lawyer
3      shall undertake steps to collect and store
4      emails by client and matter to ensure they are
5      physically and electronically associated with
6      the client file."
7         Do you see that?
8   A  Yes.
9   Q  Does your firm do that?
10  A  No.  Other than if I get an email from a
11     client.  I'll print it out and scan it to his
12     file or her file.
13  Q  Let's go back to D Ex 1, please.
14        Can you turn to paragraph 228?  It says:
15     When negotiating these aggregate settlements
16     and deciding to recommend and obtain its
17     clients' consent and authorization to
18     participate in them, the Bevan Law Firm
19     reasonably relied upon and acted upon Cahill
20     Gordon and BASF's (or its predecessors')
21     representations from 1992 forward."
22        Do you see that?
23  A  Yes.
24  Q  With respect to the five named plaintiffs,
25     could you identify for me when you obtained

Page 355

1   their consent and authorization to settle with
2   Emtal and the circumstances surrounding each?
3         MR. McDERMOTT:  Objection.
4         MR. ROTH:      Objection.
5   A  You're talking about the five representative
6      plaintiffs?
7   Q  Yes.
8   A  Well, for starters, Graham did not settle with
9      Eastern Magnesia Talc.  So that gets us to
10     four.
11        So the Williams/Clark.
12     I told you I wasn't sure about the Ware
13     case, whether we settled or not, so I can't
14     answer that, but with Williams and Clark, that
15     was back in the '90s at some point.  So it was
16     20 years ago.  I don't recall exactly, you
17     know, when we had that conversation or
18     discussion.
19        With respect to Darnell, that would have
20     been in the early 2000s, probably 2001, maybe
21     2002, and I would have had conversations either
22     with Mrs. Darnell or Marilyn Holley, but I
23     can't give you a date.
24  Q  Did you obtain their consent for each and every
25     settlement that you entered into?

Page 356

1   A  Yes.
2   Q  So if they were to say that you just presented
3      them with what the settlement terms were, would
4      that be accurate?
5         MR. ROTH:      Objection.
6         MR. McDERMOTT:  Objection.
7   A  I presented them with these are what the
8      settlement terms are.  If you want to do this,
9      sign, sign and return it to us.
10  Q  And did you -- with respect to Ware, and I
11     think you said -- the two you didn't talk to,
12     Ware and Wengerd?
13  A  I said we didn't settle with Wengerd.
14  Q  Right.
15     Or Graham at the time.
16        And Ware, I don't recall if we settled or
17     not with Ware.
18  Q  Okay.  And then with respect to Williams and
19     Darnell and Pease, could you tell me what their
20     reaction was to the settlement with the talc
21     companies?
22        MR. McDERMOTT:  Objection.
23        MR. ROTH:      Objection.
24  A  I don't recall their reaction, other than they
25     went along with it.  I don't recall them being

Page 357

1   jubilant or being upset.  I don't recall what
2   their reaction was.
3   Q  Did you tell them about the settlement with the
4      talc companies, or did you have a legal
5      assistant or colleague tell them?
6   A  I'm sure with Darnell, I'm sure with Williams,
7      I'm sure with -- I'm sure with all three of
8      those.  I told you, I think maybe Pease was at
9      the -- or -- yeah, Nancy Pease may have been at
10     the settlement conference when that settlement
11     occurred.
12  Q  There was a settlement conference for the talc
13     settlement?
14  A  Yes.
15  Q  When was that?
16  A  I would be willing to venture that it was
17     August 14 of 1997.  And I base that on I know
18     it was the day before my sister's birthday,
19     which was the day before her wedding, because I
20     know where I went after that settlement
21     conference.
22  Q  Who was at the settlement conference?
23  A  Bruce Mandel was there.  I believe -- I believe
24     it was Scott Martin -- or Allen Joslyn I
25     believe.  I'm sure Sam Martillotta was there.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 358..361

Page 358

1  I think -- Victoria Vance I think was
2  representing Johnson & Johnson. Somebody from
3  the Buckingham firm I believe was representing
4  Harwick. I think those are the players that
5  would have been there.
6  Q  Was it a Court supervised settlement
7  conference?
8  A  Yes.
9  Q  What judicial officer or mediator was present?
10  A  I believe it was Judge James J. Sweeney that
11  was present.
12  Q  And what did Ms. [sic] Judge Sweeney say
13  regarding settlement?
14      MR. ROTH:      Objection.
15  A  I don't recall, other than trying to get all of
16  the parties to settle. And he was successful.
17  Q  Did the parties provide Judge Sweeney with any
18  written information prior to the mediation?
19  A  I don't believe so.
20  Q  Did you have --
21  A  There may have been pending summary judgments,
22  I'm not sure, but Judge Sweeney never required
23  any type of, you know, mediation statements or
24  anything like that.
25  Q  Did you tell Judge Sweeney that you believed

Page 359

1  based on what Cahill told you there was no
2  asbestos in the talc?
3      MR. McDERMOTT:   Objection.
4  A  I don't recall if that was discussed or not.
5  I'm sure that was thrown in our face by Cahill
6  Gordon, but whether I told that to Judge
7  Sweeney -- I'm sure they told Judge Sweeney.
8  Q  Did you tell Judge Sweeney that there was
9  asbestos in Southern Talc?
10      MR. McDERMOTT:   Objection.
11      MR. ROTH:      Objection.
12  A  I don't know what I knew about Southern Talc at
13  that point, if I knew that then or not. I'm
14  not sure. I don't recall.
15  Q  In words or in substance, did Judge Sweeney
16  recommend to you that you settle the case?
17      MR. McDERMOTT:   Objection.
18  A  I don't think so. He wasn't the kind of -- he
19  wasn't an arm-twister. I mean, he got
20  everybody together and talked to people, but he
21  was not the kind of judge that tells one side
22  their case is really bad and brings in the
23  other side and tells them their case is really
24  bad and tries to -- you know, that wasn't his
25  style. So I don't recall that.

Page 360

1  Q  Did you want to settle the case?
2  A  We were agreeable to settling it.
3  Q  Do you believe that Mr. Martillotta said
4  anything at that settlement conference that was
5  misleading or false?
6      MR. McDERMOTT:   Objection.
7  A  I don't recall him saying anything misleading
8  or false.
9  Q  Did you tell Mr. Placitella about that
10  settlement conference?
11      MR. ROTH:      Objection.
12  A  I don't think so. I think this is the first
13  time I've thought about it in 20 plus years.
14  Q  Did you have a number going into that
15  settlement conference that was in your mind?
16      MR. McDERMOTT:   Objection.
17  A  I don't recall. I don't recall.
18  Q  Were you pleased with the settlement?
19      MR. McDERMOTT:   Objection.
20  A  I wasn't -- I didn't go out and celebrate. It
21  was a settlement and we moved forward with
22  other cases.
23  Q  For any of the thousands of talc cases that you
24  had, did you ever hire any geologists as an
25  expert?

Page 361

1  A  I don't recall hiring a geologist. We had
2  Dr. Abraham I think on one case. Whether he
3  is -- I know he's a pathologist. Whether he's
4  a geologist, I don't think so. We may have --
5  Q  He's a pathologist?
6  A  I think he's a pathologist, Dr. Abraham, yeah.
7  Q  Yeah. That's different than a geologist.
8  A  I said whether he's --
9  Q  Right.
10  A  You know, he --
11  Q  I think we'll stipulate that geologists are
12  different than pathologists.
13  A  So I don't recall hiring a geologist.
14  Q  In terms of the thousands of talc cases that
15  you handled, did you ever retain as an expert
16  an epidemiologist?
17  A  No.
18  Q  In terms of the thousands of talc cases that
19  you handled, did you ever retain as an expert
20  an industrial hygienist?
21  A  We've retained industrial hygienists.
22  Q  For the talc cases?
23  A  Whether to specifically address talc --
24  Q  Yes.
25  A  I don't recall if they specifically addressed

THOMAS W. BEVAN, ESQ. – 05/15/2018   Pages 362..365

Page 362

1    talc or not. I'm not sure.
2    Q  The best that you can recall, with respect to
3      the thousands of talc cases you've litigated,
4      can you identify for me any expert that you
5      retained for testimony?
6    A  Oh, we would have retained --
7    Q  Apart from doctors.
8    A  Oh, apart from doctors.
9        We had retained an industrial hygienist
10     by the name of Thomas Eggers.  I think we may
11     have retained Ken Cohen.  There was a
12     Dr. Brustein, who was both a doctor and an
13     industrial hygienist.
14       I'm not recalling other industrial
15     hygienists at this time.
16   Q  And you retained them for testimony in talc
17     cases?
18   A  I think so, yes.
19   Q  Which ones?
20   A  I think -- I think Brustein we retained on a
21     number of cases back in the '90s, which ones
22     for sure, I'm not positive.
23       Same with Eggers.  We retained him
24     numerous times back in the '90s, I just can't
25     tell you which cases.

Page 363

1    Q  So do you remember on the R.T. Vanderbilt
2      summary judgment motion it said you retained
3      some experts?
4    A  Yes.
5    Q  But they didn't provide sufficient opinion?
6    A  According to whoever -- whatever judge that
7      was, Judge Spellacy or Judge Hanna, yes.
8    Q  Were they -- were those opinions ever accepted
9      by any Court?
10         MR. McDERMOTT:   Objection.
11   Q  Withdrawn.  Bad question.
12       Regarding any of the experts you retained
13     in the talc cases, were any of those opinions
14     ever accepted by any Court?
15         MR. ROTH:     Objection.
16   A  I used affidavits in response to summary
17     judgment from Dr. Eggers, from Ken Cohen, I
18     believe from Dr. Brustein on a number of
19     occasions.
20   Q  With respect to talc cases?
21   A  I think with respect to talc cases.
22   Q  And would that be anywhere in the database?
23   A  No, I don't think so.  I don't think.
24   Q  Do you have a separate file regarding your
25     settlement negotiations with Emtal or Cahill or

Page 364

1      any talc company?
2          MR. ROTH:     Objection to
3      form.
4          MR. McDERMOTT:   Objection.
5    A  I already answered that.  I think it was an
6      eight and a half inch high stack of files that
7      were my old talc settlement files going back 20
8      years.
9    Q  But no individual Tom Bevan notes?
10   A  Whatever was in that file.  If my notes were in
11     that file, if there were any notes from that,
12     you know.  You know, there might be some
13     handwriting from me in those files.
14   Q  With respect to the named plaintiffs in this
15     case, apart from the three that you contacted
16     after Mr. Placitella called you, those
17     five-minute conversations, and then seeing some
18     of them to say hi and how are you, have you had
19     any substantive conversation regarding the
20     Williams case at all?
21         MR. ROTH:     Objection to
22     form.
23   A  With those folks?
24   Q  Correct.
25   A  Nothing that I would consider substantive.

Page 365

1    Q  Is there a reason why you haven't discussed
2      with them the case?
3    A  There hasn't been --
4          MR. McDERMOTT:   Objection.
5    A  -- a reason for me to discuss anything with
6      them and Placitella's been handling that and
7      dealing with the clients.  So I just haven't
8      had a need to.
9    Q  You never felt it was appropriate for you to
10     call them and tell them about how you view this
11     case or what the facts were or what your
12     understanding of the settlements were?
13         MR. ROTH:     Objection.
14         MR. McDERMOTT:   Objection.
15   A  Other than the initial conversations that I
16     referred to.  I haven't felt the need to go
17     beyond that.
18   Q  Have you ever attended any meetings with any
19     plaintiff in this case and representatives from
20     Cohen, Placitella & Roth?
21   A  I don't believe so.  I've popped in in the
22     conference room if they were meeting with a
23     client and said hi.
24       We may have had a meeting with Mike Coren
25     and Marilyn Holley early on in this process,

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 366..369

Page 366

1    and I think maybe I stayed in for that whole
2    meeting.
3    Q  What was that meeting about?
4    A  Just about this case.
5    Q  What was said --
6        MR. ROTH:    Objection.
7    Q  -- regarding this case?
8        MR. ROTH:    I'm sorry.
9        MR. McDERMOTT:   Same objection.
10       MR. ROTH:    Objection.
11   Privilege.
12   Q  You can answer.
13       THE WITNESS:    Are you going
14   to let me answer that?  That was between two
15   attorneys and their client.  I think that's
16   clearly privileged.
17       MR. ROTH:    Yeah.
18       THE WITNESS:    I would not
19   answer that.  In fact, I don't care what you
20   guys say, I'm not answering that.
21       MR. ROTH:    Then I'll ask
22   you not to answer it.  If you can't answer it
23   without revealing attorney-client privilege,
24   then please do not.
25   A  It would be discussions with me and attorney

Page 367

1    Mike Coren and Marilyn Holley was there.  And I
2    don't know if anybody else was there.
3    Q  How long did the meeting last?
4    A  I don't recall.
5    Q  Where was it?
6    A  In my conference room.
7    Q  Did you meet with any other of the plaintiff
8    representatives and representatives of Cohen,
9    Placitella?
10   A  I don't recall if anybody else was there at
11   that meeting.  That's the only meeting I
12   recall.  I recall stepping into the conference
13   room and introducing myself to Gayle -- is she
14   Williams?
15   Q  Williams.
16   A  Yeah, Gayle Williams, who I had not -- you
17   know, I met her two sisters many times and her
18   brother many times and her parents, but I had
19   never -- I don't think I had ever met her
20   face-to-face.  So I went in and introduced
21   myself.  But I did not participate in the
22   meeting.
23       I'm sure I popped in the conference room
24   to say hi to Donnette Wengerd and ask her about
25   her children.  I'm sure there was -- from time

Page 368

1    to time, if Marilyn Holley was out meeting with
2    them, I would pop in and say hi to Marilyn.
3    Q  Regarding this first meeting with Mr. Coren and
4    Ms. Holley, during that meeting, did you
5    discuss the facts of the underlying litigation,
6    why the case was settled and why you would have
7    settled it or didn't settle it?
8    A  I'm not going to discuss a meeting that --
9        MR. McDERMOTT:   Objection.
10   A  -- I had with my client, conversations that I
11   had with my client.
12       MR. McDERMOTT:   I instruct you
13   not to --
14   Q  I'm asking for a yes or no.  Did you discuss
15   the facts?
16       MR. McDERMOTT:   Objection.
17   A  I'm not going to answer that question.
18       MR. McDERMOTT:   Privilege.
19   Q  Did you discuss the facts?
20       MR. McDERMOTT:   Objection.
21   Privilege.
22   A  That's no different question than saying "Tell
23   me what you discussed."
24   Q  No, I'm not --
25   A  Okay.  That's the same -- that's the same

Page 369

1    thing.
2    Q  Did you discuss --
3    A  If I were to say "I discussed the facts," it's
4    the same thing.
5        MR. McDERMOTT:   Conversation is
6    privileged.
7    Q  Did you discuss any of the underlying facts of
8    Ms. Holley's case with Mr. Coren and
9    Ms. Holley?
10       MR. McDERMOTT:   Tom, don't
11   answer that question.
12       MR. ROTH:    Let me speak to
13   counsel.
14       THE VIDEOGRAPHER: Off the record.
15       -----
16       (Recess taken.)
17       -----
18       THE VIDEOGRAPHER: We're back on
19   the record.  The time is 5:33.
20       MR. McDERMOTT:   I want to just
21   go on the record.  I've been given some
22   clarification on the infield fly rule of
23   privilege in the Williams matter, and I'm going
24   to withdraw my instruction for you not to
25   answer and I want to see if Mr. Assaf can

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 370..373

Page 370

1  rephrase his question whether I'll invoke that.
2        THE WITNESS:   Okay.
3  BY MR. ASSAF:
4  Q  Regarding this meeting with Ms. Holley and
5     Mr. Coren, did you discuss any of the
6     underlying facts of the case?
7        MR. ROTH:     So –
8        MR. McDERMOTT:   You want to do
9  this?
10       MR. ROTH:     I got it.
11       MR. McDERMOTT:   Okay.
12       MR. ROTH:     I'm going to
13  object to the question as phrased.  If by
14  "underlying case" you mean the case that was
15  either dismissed or settled against Emtal or
16  Engelhard, then there is no objection.
17       THE WITNESS:   I still need, I
18  think, a bit more clarification.
19       MR. ROTH:     Let me try it
20  this way.
21     As part of the discussion we had with
22  Judge Linares, and Mr. Assaf will correct me if
23  he thinks I'm misstating, the way that
24  Justice –
25       MR. ASSAF:    Whoa.  Whoa.

Page 371

1  Whoa.  Stop.  Let me explain it.  If you – I
2  just – I don't want to suggest an answer.
3  BY MR. ASSAF:
4  Q  My first question is:  Did you discuss any of
5     the facts regarding Ms. Holley's case against
6     Engelhard; why it was settled, why it was
7     brought, you know, what you knew about it, you
8     know, any of those facts?  Did you – yes or
9     no.
10 A  About Kathryn Darnell's case against Eastern
11    Magnesia and why we sued them, why we settled
12    with them?
13 Q  Yeah.  Did you discuss any of that?
14 A  I don't recall if we discussed that or not.
15 Q  What did – what generally – what topic did
16    you discuss if you didn't discuss the facts?
17       MR. McDERMOTT:   Objection.
18 A  What –
19       MR. McDERMOTT:   Objection.
20  Privilege.  Isn't this outside the ambit of the
21  ruling?
22       MR. ROTH:     It is.
23       MR. McDERMOTT:   Don't answer
24  it, Tom.
25 Q  You don't know how long this meeting lasted,

Page 372

1     Mr. Bevan?
2  A  If I had to estimate, I would say a half hour
3     to an hour and a half.
4  Q  Okay.  And in this 30- to 90-minute meeting,
5     did you answer any questions from Mr. Coren
6     regarding what happened in your experience
7     litigating against Emtal?
8  A  No.  I don't think he asked me any questions.
9  Q  Did you provide him any information regarding
10    what your – any of the facts related to the
11    Williams complaint?
12 A  I don't –
13       MR. ROTH:     Objection.
14 A  I don't –
15       MR. ROTH:     You can answer.
16 A  I don't think I provided him any facts.
17 Q  Were you just listening?
18 A  Yeah, I was pretty much just there listening.
19 Q  And did Ms. Darnell – or I'm sorry,
20    Ms. Holley, provide you with any information
21    during that meeting?
22       MR. ROTH:     Objection.
23  Privilege.
24       MR. McDERMOTT:   Privilege.
25       MR. ROTH:     I think you can

Page 373

1     answer yes or no, but ...
2  A  I don't recall her providing any facts.
3  Q  All right.  So this 30- to 60-minute meeting,
4     there's no discussion of any of the facts
5     related to the Williams case?
6        MR. ROTH:     Objection.
7  Form and foundation.
8  A  That's not what I said.
9  Q  Is there a discussion of the facts relating to
10    the Williams case?
11       MR. ROTH:     Objection.
12  Privilege.
13 A  To the extent that Mr. Coren went through a
14    rendition of what the Placitella firm had
15    discovered from BASF regarding the fraudulent
16    statements and misrepresentations, I'm sure
17    that that was explained.
18 Q  To you and Ms. Holley?
19 A  It had already been explained to me, to
20    Ms. Holley.
21 Q  And did you ask Mr. Coren any questions about
22    those facts that he was conveying to you?
23       MR. ROTH:     Objection.
24  Privilege.  We're outside the scope of what is
25  permitted.  I'm going to ask you not to answer.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 374..377

Page 374

1    MR. McDERMOTT:  Tom, don't
2    answer.
3  Q  So you sit in this meeting for 30 to 60 minutes
4     with Ms. Holley and Mr. Coren, fair?
5  A  Yes.
6  Q  And you don't mention a single thing regarding
7     Ms. Holley's case, Mr. Darnell's case, in that
8     30 to 60 minutes?
9        MR. McDERMOTT:   Objection.
10       MR. ROTH:      Objection.
11 A  Yeah, I think you're mischaracterizing it.  So
12    I stand by what I told you.  I told you what I
13    can recall being discussed.
14 Q  In this 30- to 90-minute meeting with
15    Mr. Coren, you, Tom Bevan, don't provide
16    Mr. Coren or Ms. Holley with a single fact that
17    you know?
18       MR. McDERMOTT:   Objection.
19 Q  Fair?
20       MR. ROTH:      Objection.
21       MR. McDERMOTT:   Form,
22    foundation.
23 A  Yeah, I don't recall providing any facts.
24 Q  Other than this meeting with Ms. Holley and
25    Mr. Coren, did you attend any other meetings

Page 375

1     with Cohen, Placitella, Roth and any named
2     plaintiffs?
3        MR. ROTH:      Asked and
4     answered.
5  A  Nothing other than what I've mentioned.
6  Q  And have you discussed this case with anybody
7     else other than Coren, Placitella, and Roth?
8        MR. ROTH:      Did you just
9     elevate Mr. Coren?
10 Q  Withdrawn.
11       Did you discuss this case with anybody
12    else other than the Coren – Cohen, Placitella
13    firm?
14 A  Other than Erin Clark and Pat Walsh.
15 Q  And the reporter?
16 A  And the reporter that I had mentioned, yes.
17 Q  Well, two reporters, correct?
18 A  Yes.  Yes.
19 Q  So is it fair to say that you have provided
20    reporters with more factual information than
21    you provided to Mr. Coren?
22       MR. McDERMOTT:  Objection.
23       MR. ROTH:      Wow.
24    Objection.
25 A  No.

Page 376

1  Q  Did Mr. Coren – this is a yes or no.
2     Did Mr. Coren or anybody from the
3     Placitella firm ever interview you regarding
4     your understanding of the facts?
5        MR. McDERMOTT:   Objection.
6        MR. ROTH:      Objection.
7     Privilege and work-product.
8        MR. ASSAF:     Just interview.
9  Q  You can answer.
10 A  I would say that I never felt that I was being
11    interviewed, so I would say no to that.
12 Q  Did you ever review any interrogatory responses
13    provided by the plaintiffs?
14       MR. McDERMOTT:   Objection.
15 A  In this case?
16 Q  Yes.
17 A  I don't recall if I reviewed – their answers
18    in this particular case, yeah, I don't recall
19    if I did or not.
20       MR. ASSAF:     Let's go off
21    the record.  I think I'm almost done.
22       THE VIDEOGRAPHER: Off the record.
23    The time is 5:40.
24       -----
25       (Recess taken.)

Page 377

1        -----
2        THE VIDEOGRAPHER: We're back on
3     the record.  The time is 5:43.
4        MR. ASSAF:      That's Volume
5     I.  Sorry, everybody.
6        Let's go back off the record.  I have to
7     find my copy.
8        THE VIDEOGRAPHER: Off the record.
9        -----
10       (Off the record.)
11       -----
12       THE VIDEOGRAPHER: We're back on
13    the record.  The time is 5:45.
14 BY MR. ASSAF:
15 Q  Let me show you Ms. Holley's deposition from
16    February 21, 2018.
17       MR. ROTH:      Volume II?
18       MR. ASSAF:     Yep.
19       MR. ROTH:      I think I have
20    your copy.
21       MR. ASSAF:      Ah.  That's why
22    I couldn't find it.
23       MR. ROTH:      I didn't have
24    to give it to you either.
25 Q  Okay.  Could you turn to page 228?

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 378..381

Page 378

1    Line 3, "It says, 'Have you had
2    discussions with Mr. Bevan regarding the facts
3    in this case, the Williams case?  Just answer
4    'yes' or 'no.'  Do you see that?"
5        And she says, "I may be mistaken, but I
6    thought you said you haven't spoken to –
7    Mr. Roth I think is pointing to the Williams
8    case.  I think when I was asking about the
9    Williams case in your first deposition, we were
10   talking about the underlying allegations and
11   the facts of the Williams case.  Do you see
12   that?"
13       "So did you discuss the facts?"
14       And she said, "I may have misunderstood
15   the question."
16       Then if you turn to the next page –
17   actually, 239.
18       MR. McDERMOTT:   239?
19       MR. ASSAF:   239.
20 Q Line 19.  "Mr. Coren and Mr. Bevan had
21   discussions?"
22       "Right.  Right.  Right."
23       "Regarding the facts?"
24       Answer, "Right."
25       MR. McDERMOTT:   I'm sorry,

Page 379

1    Gene.  Am I missing something?  We went from
2    228 to –
3        MR. ROTH:   He's skipping.
4        MR. ASSAF:   You can read
5    the whole thing if you'd like but ...
6        MR. McDERMOTT:   I'm just trying
7    to get clarification.
8  Q I'm just trying to understand.  Ms. Holley
9    seems to think that you and Mr. Coren discussed
10   the facts during your meeting.  Do you think
11   she's mistaken?
12       MR. ROTH:   Objection.
13   Form and foundation.
14 A You know, I'm looking up at the lines 11
15   through 18 on page 239.  "Mr. Bevan was just
16   part of that meeting.  I don't recall Mr. Bevan
17   saying anything to me personally.  It was that
18   Mr. Coren did most of the talking because he
19   had just finished a case of this sort and it
20   was Mr. Coren who suggested that we bring the
21   claim.  And he had discussions with Mr. Bevan,
22   but I wasn't privy to those discussions."
23       So that's consistent with my recollection
24   and I believe it's consistent with what I
25   testified to.

Page 380

1  Q So you don't recall discussing any facts in
2    front of Ms. Holley?
3        MR. ROTH:   Asked and
4    answered.
5        MR. McDERMOTT:   Objection.
6  A I answered your question.
7  Q Okay.  Other than the Holley meeting, did you
8    have any – withdrawn.
9        Other than the meeting, did you have any
10   telephone communications with any of the named
11   plaintiffs other than the Placitella early
12   calls?  Withdrawn.
13       MR. ROTH:   Objection.
14 Q Other than the initial three calls after
15   Mr. Placitella's call, did you have any other
16   telephone communications with any of the named
17   plaintiffs?
18 A I have to go one by one.  Mrs. Ware, I do not
19   believe so.  Gayle Williams, no.  Marilyn
20   Holley, I don't think I've had a phone call
21   with her about it, but I don't recall for sure.
22   Donnette Wengerd, I don't believe I've had a
23   phone call with her.  And Mrs. Williams, I do
24   not believe I've had a phone call with her.
25       So I think the answer would be no to

Page 381

1    that.
2  Q You and I have had discussions about your
3    recollection of the documents and the
4    settlement communications with Cahill and
5    Mr. Martillotta today, and a lot of your
6    recollection is just the documents, fair?
7  A Just what Cahill Gordon sent me?
8  Q Yes.
9  A Yes, I recall that.
10       MR. ROTH:   Objection.
11   Foundation.
12 Q Regarding – if your four- or five-inch stack
13   of emails had recollections regarding these
14   discussions with Cahill in the underlying
15   cases, would you be willing to look at those in
16   order to refresh your recollection?
17 A I don't think there's anything there that would
18   refresh my recollection, but I could look at
19   it.  I mean, my recollection I think today is
20   the same as it was, you know, eight years ago
21   when I first talked to Mr. Placitella about
22   this.
23 Q When you sent this four- or five-inch stack of
24   emails to Mr. Placitella or people at his firm,
25   did they contain facts that you didn't testify

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 382..385

Page 382

1   to today or you don't know?
2   A   I don't --
3           MR. ROTH:     Objection to
4   the form.
5   A   You know, when I was printing them out, I kind
6   of looked, but I didn't -- I don't think so.  I
7   mean, well, there's -- yeah, there's certainly
8   stuff about things, nothing related to this,
9   you know.
10  Q   Well, you said you kind of looked.  What do you
11  mean by that?
12  A   No, I was -- I printed all of those out myself.
13  Q   And when did you print those out?
14          MR. McDERMOTT:   Objection.
15  A   I don't know.  The last month.  I'm not sure.
16  Q   Since your last deposition?
17  A   I think I printed those -- I think I printed
18  those when I think you guys filed a motion to
19  compel the production.  And I knew it would
20  take some time to print those, so I think I
21  printed those out just in case I got an order
22  from the Court that said I had to produce them.
23  I had them ready.
24  Q   And did you print them in chronological order?
25  A   I printed them in chronological order.  Yeah, I

Page 383

1   think I started from the oldest one and printed
2   forward.
3   Q   Did you notice in any of the documents whether
4   there were attachments?
5   A   I don't recall if there was attachments.  I'm
6   sure there would be some attachments on the
7   Ross case I'm sure.
8   Q   Okay.  Other than the Ross case, were there
9   attachments to your email to Mr. Placitella?
10  A   I don't recall.  I think maybe, but I don't --
11  yeah, I don't recall for sure.
12  Q   Were there emails regarding any of the
13  settlement negotiations in this case?
14  A   Settlement negotiations?
15  Q   Between the plaintiffs and defendants.
16  A   On this case?
17  Q   Yeah.
18  A   No.  I've never seen any emails on that I
19  recall.
20  Q   Do you have any -- without disclosing what, do
21  you have any information regarding any
22  settlement negotiations between the plaintiffs
23  and the defendants?
24  A   My understanding was --
25          MR. ROTH:     Objection.

Page 384

1           MR. McDERMOTT:   Objection.
2   A   My understanding was there was some mediation
3   or something and that the case didn't settle.
4   And I don't really know anything more than
5   that.
6   Q   Regarding these emails, do you have them at
7   your office?
8   A   Yes.
9   Q   Would it be a burden to produce them to the
10  Court to review?
11          MR. ROTH:     Well,
12  objection.
13          MR. ASSAF:     It's a
14  burdensome question.  It's burdensome.
15          MR. ROTH:     I understand
16  what the question.
17  A   Well, it would be a burden to me, first of all,
18  to go through them and pull out what has
19  nothing to do with this talc case.  That would
20  be a burden.
21  Q   It would be a burden to go through the four or
22  five inches of emails?
23  A   That's probably 6, 700 pages, maybe more.  I
24  don't know, it's probably 800.  I mean, it's,
25  you know.

Page 385

1   Q   800 pages of emails?
2   A   What's a ream of paper, that big?  I mean, I
3   don't know how many.  It's a lot of pages.
4   Q   So there are 800 pages of emails without
5   attachments?
6           MR. ROTH:     Objection.
7           MR. McDERMOTT:   Objection.
8           MR. ROTH:     Form and
9   foundation.
10  A   I did not print out any attachments.
11  Q   So the 800 pages that you're referring to are
12  emails, not documents attached to emails, true?
13  A   There --
14          MR. McDERMOTT:   Objection.
15  A   Let me explain.  They are every email that I
16  ever sent or received that either had Chris
17  Placitella on it, Jared Placitella, Mr. Roth on
18  it, or Mr. Coren.  So the four of those.  It's
19  every email.
20      Some of them relate to Eastern Magnesia
21  Talc, some of them might relate to some gasket
22  company out of Philadelphia or something.  It
23  had nothing to do with this.  So I just printed
24  out everything and figured if I had to go
25  through it, at least the printing part was

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 386..389

Page 386

1    done. If I had to go through it, I could at
2    least have that part done.
3    Q   Well, prior to you talking to Mr. Placitella
4    about the Williams case, you didn't have any
5    dealings with him in terms of cases?
6         MR. ROTH:   Objection.
7    Asked and answered.
8    Q   Gasket cases or otherwise.
9    A   There may be some emails prior to that. You
10   know, he may have asked for something and maybe
11   it was something I was able to assist him with.
12   Q   Other than the burden that you claim in having
13   to review the 800 pages before you turn them
14   over to the Court, is there any financial
15   burden on you in producing those to the Court?
16   A   Whatever my time takes.
17   Q   Do you have any objection to providing those to
18   the Court to review?
19        MR. ROTH:   Objection.
20        MR. McDERMOTT:   Objection.
21   A   Yes.
22   Q   Why?
23   A   The same objections that were stated in our
24   objection to your motion to compel and the
25   Court's ruled on it. And the Court, as far as

Page 387

1    I know, has ruled on it and says I don't have
2    to produce those. So ...
3    Q   Do you think it would be helpful to your case
4    or hurtful to your case?
5         MR. ROTH:   Objection.
6         MR. McDERMOTT:   Objection.
7         MR. ROTH:   Don't answer
8    that.
9    A   I'm not going to answer that.
10   Q   I'm done. No more questions.
11        MR. ROTH:   I've got a
12   couple.
13        Unless you want to take a break.
14        EXAMINATION OF THOMAS W. BEVAN, ESQ.
15   BY MR. ROTH:
16   Q   I apologize at the outset for jumping around a
17   little bit. We're all going to have to dig
18   through some -- we're going to have to dig
19   through some piles of stuff.
20        You were shown by Mr. Assaf some
21   settlement letters sent from you to Sam
22   Martillotta with some settlement proposals. Do
23   you recall that?
24   A   Yes.
25   Q   I'm looking at one, it's Exhibit 276, when you

Page 388

1    were proposing on October 7, 1998 settling five
2    rubber worker cases for $1,000 per case.
3    That's Exhibit 276.
4    A   Yes.
5    Q   And there was another where you proposed, and I
6    don't have this one in front of me, settling
7    mesothelioma cases for $3,000 a case. Do you
8    recall that?
9    A   Yes.
10   Q   Where you have chronic identification, proof of
11   exposure, and proof that the product in which
12   the client has been exposed, is a mesothelioma
13   case worth $3,000? Is that a fair settlement
14   value?
15   A   If I have --
16        MR. ASSAF:   Objection.
17   A   If I have product ID, exposure by that
18   plaintiff, proof that the product contained
19   asbestos --
20   Q   Yes.
21   A   -- it's worth much more than $3,000.
22   Q   And you've testified that you didn't try these
23   talc cases, but given your experience as an
24   asbestos -- as a plaintiffs lawyer representing
25   people who have gotten an array of diseases

Page 389

1    from asbestos exposure, is a jury verdict
2    potential in a talc case where you have proof
3    that the product has -- that the product
4    contains asbestos, you've identified the
5    product in the plaintiff's workplace and the
6    plaintiff's exposure to the product? Is the
7    jury verdict exposure for a defendant greater
8    than $1,000 per case or $3,000 per case if that
9    plaintiff suffered mesothelioma?
10        MR. ASSAF:   Objection.
11   Form, foundation. He's testified he's never
12   tried a talc case.
13        MR. ROTH:   So form,
14   foundation, that's the objections today, right?
15   Work privilege?
16        MR. ASSAF:   Yeah.
17        MR. ROTH:   Okay.
18   A   It's much greater than that, and I would base
19   that on my -- what I've seen from verdicts
20   around the country and verdicts in Ohio. You
21   don't get a thousand dollar verdict on an
22   asbestos case. You can get zero verdicts, but
23   when there's verdicts there, they're quite
24   substantial on asbestos cases from what I've
25   seen.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 390..393

Page 390

1  Q  In Ohio, can a plaintiff bringing a lawsuit
2     claiming an asbestos injury recover from a
3     defendant if they can't prove that that
4     defendant's product contained asbestos?
5  A  No.
6  Q  Is that something that you would expect lawyers
7     both on the plaintiffs side and the defense
8     side to know?
9           MR. ASSAF:    Objection.
10    Foundation.
11 A  Certainly.  And that's one of the things I
12    pointed out earlier in my testimony, is that's
13    one of the key parts of any asbestos case; does
14    the product contain asbestos.
15 Q  If the product does not contain asbestos in
16    terms of either -- well, does it matter how
17    good your product identification is?
18 A  No.
19 Q  Does it matter how good your proof of exposure
20    is?
21 A  No.
22 Q  In terms of these other elements of the claim,
23    that is product identification and exposure, I
24    want to make sure I understand that a little
25    bit.  And maybe it was just to me.  It sounded

Page 391

1     as if some of the questions made that a binary
2     issue, that is you can either have product
3     identification or you don't.
4        Are there cases where you develop product
5     identification during the course of a lawsuit?
6  A  Well, that's -- in most instances, during the
7     course of a lawsuit, we're developing the
8     product identification.  We don't always have
9     everything that we need to be able to be
10    successful in a case at the time that we filed
11    a case.  So we file the case based on a
12    reasonable belief that we may be able to
13    establish a case and then we try to establish
14    that during the course of the litigation.
15 Q  Can you establish product identification if the
16    plaintiff doesn't know what product was in the
17    workplace?
18 A  Yes.  In most -- that's very common, where a
19    plaintiff doesn't know what product -- the name
20    of the product or who the manufacturer or
21    distributor is of the product that he or she
22    was exposed to.  And they rely upon us to do
23    the investigation to find out whose product
24    that was that the individual was exposed to.
25 Q  What are the types of ways or the types of

Page 392

1     evidence that you look for in your
2     investigation to establish product
3     identification?
4  A  We will look for coworkers.  Well, first we'll
5     talk to the client.  Secondly we'll talk to
6     coworkers.  We will go to the defendant to find
7     out what evidence the defendant has that's
8     relevant to the case.  That helps us establish
9     product identification.
10       There could be historical photographs.
11    There could be -- there could be government
12    records.  Sometimes that could be relevant.
13    Sometimes the employer has records that would
14    be relevant.
15 Q  So, generally speaking, you're looking for
16    direct or circumstantial proof that the
17    product, the asbestos containing product, was
18    in a place where your client was working?
19 A  Yes.  Many of these cases are circumstantial,
20    in that, you know, the client says I was
21    exposed to -- in this case we'll say talc or
22    soapstone, and then we have the evidence of who
23    supplied the talc or soapstone during that
24    relevant time that the client was exposed.
25 Q  When you mentioned you sometimes go to the

Page 393

1     defendant's -- strike that.  Let me take a step
2     back.
3        You were shown by Mr. Assaf Ohio Rules of
4     Professional Conduct relating to document
5     retention.  Do you recall that?
6  A  Yes.
7  Q  Are you familiar with rules, professional
8     responsibility in Ohio that require counsel to,
9     although zealously advocate for their clients,
10    also do so with fairness and candor to their
11    opponents?
12 A  I believe that's a -- I don't think that's
13    limited to just Ohio.  I think that's limited
14    to the practice of law in this country, that
15    you can't lie.
16 Q  And when you receive responses from defendants
17    in discovery, do you assume that those
18    responses are going to comport with the
19    professional obligations of candor and fairness
20    to opponents?
21 A  I always have.
22 Q  And I apologize, I'm taking a little side track
23    here, but there was an extensive discussion
24    about R.T. Vanderbilt's talc.  Do you recall
25    that?

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 394..397

Page 394

1  A  Yes.
2  Q  And a summary judgment motion where it was
3     disputed whether or not R.T. Vanderbilt's talc
4     contained asbestos?
5  A  Yes.
6  Q  And in opposition to that motion, you provided
7     test results that showed that the asbestos --
8     that the talc did contain asbestos?
9  A  Yes.
10  Q  Where did you get those test results?
11  A  I believe we got them from R.T. Vanderbilt.
12  Q  So those were test results or documents that
13     would have been in the scope of discovery that
14     were responded to?
15        MR. ASSAF:     Objection.
16     Leading.
17  A  Yes.
18  Q  And when R.T. Vanderbilt supplied -- they
19     disputed the validity of those tests, is that
20     correct?
21  A  I believe so, yes.
22  Q  Okay. But it wasn't an issue of there was no
23     evidence?
24        MR. ASSAF:     Objection.
25     Leading.

Page 395

1  Q  Was there an issue where they said there was no
2     evidence of asbestos in their talc?
3  A  No. They didn't claim that. I think I
4     testified to that earlier. They gave us those
5     records but said, "Well, we have stuff that we
6     think trumps those records."
7  Q  And in terms of the -- well, strike that. I'll
8     come back to that.
9        But if you have no evidence of asbestos
10     in the talc, are you going to undertake an
11     investigation of product ID or exposure in a
12     case?
13        MR. ASSAF:     Objection.
14     Leading.
15  A  Could you rephrase that question?
16  Q  Sure. Although I don't think it was leading,
17     let me try it again.
18  A  Okay.
19  Q  If there is no --
20        MR. ASSAF:     Actually, yeah,
21     you're right. It's a good question. It is
22     good.
23        You can answer it.
24        MR. ROTH:     Okay.
25        MR. ASSAF:     I'm

Page 396

1     withdrawing the objection.
2        MR. ROTH:     That's fine.
3     The witness asked that I rephrase it.
4  Q  If there is no proof -- if there's no asbestos
5     in the talc, do you undertake an investigation
6     of product identification or exposure?
7  A  We would -- yeah, we would not dig into that
8     deeply. There would be no need to dig into it,
9     because if I don't have evidence that there's
10     asbestos in the talc, there's no reason to
11     devote resources and effort into trying to
12     establish anything beyond that.
13  Q  I don't know if you have it handy, it's
14     Exhibit -- Defendants' Exhibit 265. This is an
15     April 23 letter from Scott Martin to
16     Mr. Economus.
17        I have an extra copy if you --
18  A  That would help.
19  Q  Okay. So in this letter, Engelhard's -- well,
20     let me try it a different way.
21        When you received this letter, what did
22     you understand it to mean, in terms of the
23     strength of your case against Engelhard?
24  A  That we couldn't establish a case because they
25     had tested their talc and there was no asbestos

Page 397

1     in their talc and, therefore, we wouldn't be
2     able to establish a case against Eastern
3     Magnesia Talc.
4  Q  Okay. And so under cover of this letter, you
5     also got these three affidavits, one by
6     Mr. Ashton and two by Charles Carter, correct?
7  A  That's what it indicates, yes.
8  Q  Okay. And in the context of being -- let's
9     take a look at the Ashton affidavit.
10  A  I've got it. And I have the Martin letter.
11     You can have that back.
12  Q  I'm sorry?
13  A  I got the Martin letter too.
14  Q  Okay. Hold on to it.
15        In the context of being asked to dismiss
16     cases because you cannot prove that there's
17     asbestos in the talc -- actually, strike that.
18        In the context of being asked to dismiss
19     cases on the basis that the talc produced by
20     Emtal contains no asbestos, what was your
21     understanding of the import, the purpose of
22     this Ashton affidavit?
23        MR. ASSAF:     Objection.
24     Foundation, competency.
25  A  It was to give -- convince me or any other

THOMAS W. BEVAN, ESQ. – 05/15/2018   Pages 398..401

Page 398

1    attorneys that there was no asbestos in the
2    talc that Eastern Magnesia Talc mined and sold.
3  Q  Okay.  And if you turn to the second page of
4    that letter, I'll ask you to look at the third
5    full paragraph that begins "There is
6    substantial precedent for my request."
7  A  Yes.
8  Q  First of all, at the time you received this
9    letter or that the firm received this letter in
10   April of 1992, did you know Jeffrey Schwartz or
11   Allen Rothenberg?
12 A  I did not.
13 Q  Does this letter suggest – did this letter
14   suggest to you whether or not they were given
15   the same information that Mr. Martin was giving
16   to you?
17        MR. ASSAF:     Objection.
18   Leading, foundation, form.
19 A  I was certainly of the impression that they
20   were giving the same stuff to other attorneys.
21 Q  And then does Mr. Martin describe what, if any,
22   decision they made with respect to their cases?
23 A  And, by the way, the letter says, "The enclosed
24   documents were provided to Jeffrey Schwartz of
25   the Allen Rothenberg law firm."  And it says,

Page 399

1    "After this review, Mr. Schwartz voluntarily
2    dismissed Engelhard and Emtal from that
3    litigation."
4        So he's telling me that he gave the same
5    stuff to another law firm and they dismissed
6    Eastern Magnesia Talc and we should do the
7    same.
8  Q  Right.  And let me show you what has been
9    previously marked as Exhibit 127.
10       Do you recall receiving this letter from
11   Scott Martin?
12 A  This looks familiar.  Again, I believe that
13   this would have come in to Dale Economus.  I
14   don't why there's – it's addressed to
15   Mr. Economus, why there's no name on there, but
16   I believe that Dale Economus would have given
17   this to me, because I believe I was the one
18   that was talking with Scott Martin.
19 Q  But did you or Mr. Economus misplace the
20   material that was sent to you under cover of
21   the April 23, 1992 letter?
22 A  I don't think we misplaced it.  I think we
23   reviewed it.
24 Q  I want to show you what's been previously
25   marked as Exhibit 198.

Page 400

1    This is a letter dated December 21, 1992
2    from Scott Martin to Dale Economus.
3        As you were working with Mr. Economus in
4    the asbestos cases, is this a letter you would
5    have seen?
6  A  Yes.
7  Q  And in the context of asking that the cases be
8    dismissed, does it reference "various
9    affidavits and other documents" sent to you
10   earlier?
11 A  Yes.
12 Q  And am I reading it correctly, that it says,
13   "documents forwarded to you with my previous
14   correspondence, talc produced by EMTal from
15   it's sole mine and mill in Johnson, Vermont
16   contained no asbestos"?  And that's underlined,
17   right?
18 A  That's correct.
19 Q  In the context of the correspondence that you
20   had received asking you to dismiss these cases,
21   what did you understand Mr. Martin was
22   conveying to you and Mr. Economus?
23 A  He was clearly conveying that there was no
24   asbestos in Eastern Magnesia Talc and that,
25   therefore, we should dismiss Eastern Magnesia

Page 401

1    Talc.
2  Q  And in addition to receiving these letters, you
3    testified you had discussions with Mr. Martin
4    and Mr. Joslyn in that regard?
5  A  Yes.
6  Q  Did at any time anyone on behalf of Engelhard
7    make reference to any other testing that had
8    been done of Emtal's talc?
9        MR. ASSAF:     Objection.
10   Foundation.
11 A  No.  Other than what they gave me, no.
12 Q  In responses to any discovery, did Engelhard
13   make reference to – or Engelhard and/or
14   Cahill – strike that.
15       In responses to discovery served, did
16   Engelhard and/or Cahill make any reference to
17   any test results of Emtal talc other than what
18   had been provided to you in April of 1992?
19 A  No.
20 Q  Did you know in 1992 or in '93 a scientist
21   employed at Engelhard named Hemstock?
22 A  No.
23 Q  Did you know of an Engelhard employee named
24   Peter Gale?
25 A  Peter who?

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 402..405

Page 402

1  Q  Gale.
2  A  No.
3  Q  How about an employee named Triglius
4     [phonetic]?
5  A  No.
6  Q  I want to go back to the letter, and I think it
7     was 116 [sic]. It was dated February 22, 1993.
8     Mr. Assaf asked about that.
9        I have an extra copy. I don't know that
10    it was marked.
11 A  I have it. 266?
12 Q  February 22.
13       MR. McDERMOTT:  Why don't you
14    take a look at that.
15 Q  This is in response to your letter Mr. Assaf
16    asked you about with regard to a report that
17    you found from the Vermont Department of
18    Health, correct?
19 A  Yes.
20 Q  And in the third paragraph of that letter, they
21    write, "The conclusion derived from all of
22    these studies is that the talc produced from
23    this mine did not contain asbestos." And
24    that's underscored, right?
25 A  Yes.

Page 403

1  Q  Okay. And then you pointed out the next
2     sentence in this letter. Could you read that,
3     please?
4  A  "The only analysis which we have not previously
5     forwarded to you is one just completed by the
6     RJ Lee Group which showed no evidence of
7     asbestos minerals, nor of their nonfibrous
8     analogs, and found the talc to be a platy
9     nonfibrous variety."
10 Q  In the context of the letters that we've been
11    looking at and the request to dismiss Engelhard
12    because there's no – because the Emtal did not
13    contain asbestos, what did you understand this
14    letter to mean with respect to whether there
15    were other studies?
16 A  There was no other studies, that they gave me
17    everything that they had, informed me of all of
18    the studies that they had done, and all of the
19    studies showed there was no asbestos in their
20    talc.
21 Q  Mr. Assaf asked whether you had hired a
22    geologist.
23       In your experience as a lawyer
24    representing people who are injured or die from
25    asbestos-related diseases, what purpose would a

Page 404

1     geologist serve in reviewing asbestos cases?
2     And I'm not just talking about talc, but
3     generally.
4  A  I'm not certain what purpose a geologist would
5     serve.
6  Q  Are there experts who you could consult with
7     who could assess samples of a material to see
8     if it contained asbestos?
9  A  Yes.
10 Q  What are those experts called?
11 A  I would call it a material scientist.
12 Q  Okay.
13 A  Is probably what I would call them.
14 Q  I want to show you what has been marked as
15    Exhibit 7.
16       This is an affidavit of Charles Carter
17    dated September 20, 1988. It's attached in the
18    April 23, 1992 letter from Mr. Martin to
19    Mr. Economus. Do you recall seeing this
20    affidavit?
21 A  I thought this was in that stack there.
22       Yeah, it was in the – it was attached to
23    the April 23, 1992 letter from Mr. Martin to
24    Mr. Economus.
25 Q  Okay. And in the context of being asked to

Page 405

1     dismiss Emtal because its talc does not contain
2     asbestos, what is this affidavit telling you,
3     or how did you understand it?
4  A  That they're not selling Emtal anymore. And I
5     thought another one indicated that it was
6     flooded, that –
7  Q  I'm going to show you that in a minute.
8  A  That there was no more – no way to get another
9     sample to test.
10 Q  And that's where I'm going.
11       This is Exhibit 8, also attached to that
12    April 23 letter.
13 A  Yes.
14 Q  And again in the context of being asked to
15    dismiss Engelhard because its talc does not
16    contain asbestos, what information do you get
17    from this affidavit signed by Mr. Carter on
18    June 19, 1989?
19 A  That there would be no way to get a sample of
20    Eastern Magnesia Talc to have it tested by a
21    material science expert.
22 Q  Okay. And it gives two reasons for that in
23    paragraph 4, correct?
24 A  They said it was closed, and as a consequence,
25    it's presently filled with water, making it

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 406..409

Page 406

1  impossible to obtain any samples of talc from
2  the mine.
3  Q  Does Mr. Carter swear in his affidavit whether
4     there are or are not samples that could be
5     shared with counsel?
6  A  He further states that "Engelhard does not
7     currently possess any samples of the talc
8     produced by this mine."
9  Q  Okay. The third affidavit of Charles Carter,
10    this has been marked as -- previously as
11    Exhibit 6 and is dated August 18, 1989.
12       Have you seen this affidavit before?
13 A  It -- I don't know this was attached to this,
14    the letter from Scott Martin or not. So I
15    don't know for sure. It looks familiar, but
16    I've got several other affidavits from
17    Mr. Carter. So I'm not certain of that, but I
18    think most likely.
19       MR. ASSAF:    Objection.
20    Move to strike. Competency, foundation.
21 Q  You were asked about whether there were other
22    studies.
23       Take a look at paragraph 3 and see
24    whether or not Mr. Carter references whether or
25    not Engelhard possesses any testing data other

Page 407

1  than what was sent under cover of the Ashton --
2  or attached to the Ashton affidavit.
3  A  He indicates that Engelhard does not currently
4     possess any testing data other than data
5     provided to you -- I don't know who "you" is --
6     by way of the Ashton affidavit and the report
7     of Dr. Pooley.
8  Q  And Dr. Pooley's report -- well, there's -- on
9     an August 23, 1992 letter from Scott Martin to
10    Mr. Economus, there is reference to a report of
11    Dr. Pooley.
12       Do you see that?
13 A  Dated -- which letter?
14 Q  The August 23 letter, 1992.
15       MR. McDERMOTT:   April? April
16    23?
17       MR. ROTH:    What did I say?
18       MR. McDERMOTT:   August.
19 A  Oh, April 23.
20 Q  I apologize.
21 A  Okay. Yeah, it references Dr. Pooley, yes, and
22    Charles Carter and William Ashton.
23 Q  And with respect to the -- well, I'm sorry.
24       In the context of the cases you were
25    representing plaintiffs against Engelhard, did

Page 408

1  you receive any testing data other than what
2  was in these letters that we've just been
3  describing?
4  A  No.
5  Q  Let me show you a letter from November 12, 2008
6     that's marked as 145. I thought Mr. Assaf
7     marked it today, but I could be wrong.
8       John Mismas is an attorney in your
9     office?
10 A  He was an attorney in my office at the time.
11 Q  And do you recall Mr. Mismas showing you a copy
12    of this letter? Have you seen this before?
13 A  I believe so, yes.
14 Q  And this is a letter from Jennifer Riester, who
15    is -- was representing Engelhard at the time?
16 A  Yes.
17 Q  Did Ms. Riester provide you with any additional
18    information regarding testing performed on
19    Emtal talc beyond that which you had received
20    up through 1993 and 1994?
21 A  I don't believe so. And I'm looking -- she
22    lists what she provided and it included the
23    Ashton affidavit and the RJ Lee report.
24 Q  And you were asked about the motion for summary
25    judgment that was filed in Graham. Do you

Page 409

1  recall that?
2  A  Yes.
3  Q  And I apologize for not having copies. Did the
4     judge write an opinion when summary judgment
5     was granted?
6  A  I don't think so. I think that what counsel
7     gave me, it just had stamped "granted" on the
8     front, if I recall correctly, but let me see if
9     I can find that again -- I'm not positive. One
10    of those it said -- it just said "granted."
11       MR. McDERMOTT:   Here you go.
12 A  Yeah, this says "granted" on the top.
13       MR. McDERMOTT:   What number is
14    that, Tom?
15       THE WITNESS:    This was
16    Defendants' Exhibit 42.
17 Q  Just give me a minute while I dig through and
18    get my copy out.
19       All right. I'm sorry. I don't think I
20    have a copy of this. I don't think it was
21    produced.
22 A  Yeah, and Defendants' Exhibit 261 is also
23    the -- whatever the filing -- what do
24    you call it. A copy of it. It just says,
25    "Defendant's motion for summary judgment is

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 410..413

Page 410

1    granted" there. I don't believe there was a
2    written opinion.
3  Q  Right. And what I wanted to show you was the
4    Defendant Eastern Magnesia Talc Company's reply
5    to the plaintiff's brief in opposition. It had
6    been previously marked as Exhibit 156.
7        And there's a highlighted block here.
8    What are the issues that Engelhard – or
9    Eastern Magnesia at the time moved for summary
10   judgment in regard?
11       MR. ASSAF:    All of the
12   issues, or the issues that you blocked?
13       MR. ROTH:    The issues in
14   the flyer I think address all the issues.
15  A  It indicates, "As will be shown, none of this
16   evidence creates a genuine issue of material
17   fact as to whether the plaintiff was ever
18   exposed to any talc sold by EMT, that any talc
19   sold by EMT contained asbestos, or that any
20   such talc was a substantial factor contributing
21   to plaintiff's disease."
22  Q  Thank you. I'll take that back. I don't want
23   to lose it.
24       MR. ASSAF:    I think I
25   marked it.

Page 411

1        MR. ROTH:    I thought you
2    did too, but I couldn't – I thought you did
3    too.
4        MR. ASSAF:    I did.
5  A  Yeah, I think it was marked.
6        MR. ROTH:    We can clean
7    that up afterwards. My piles have piles right
8    now.
9  Q  Mr. Bevan, did you ultimately dismiss,
10   voluntarily dismiss, the Charles Williams case?
11  A  I believe so, yes.
12  Q  All right. Let me show you – and we'll mark
13   this as Bevan Exhibit 1.
14       -----
15       (Plaintiffs' Exhibit 1 was marked.)
16       -----
17  Q  Just describe what this is, please.
18       What is that series of documents?
19  A  I believe this is the cover letter transmitting
20   our notice of voluntary dismissal of Engelhard
21   from the Charles Williams case that was filed
22   in federal court in the Northern District of
23   Ohio.
24  Q  And in – I'm sorry.
25  A  And by the way, also on the cover letter we –

Page 412

1    apparently we dismissed also Clay Compton, Loyd
2    Brown, and Mable Gonzalez at that time as well.
3  Q  In reaching the decision to voluntarily dismiss
4    cases that you had filed against Engelhard,
5    what information did you rely upon?
6  A  What was provided to me by the Cahill Gordon
7    firm and Eastern Magnesia Talc.
8  Q  Have you tried other asbestos cases? And by
9    "other asbestos," I mean other than talc cases
10   which you've testified you did not try. Have
11   you tried other asbestos injury cases?
12  A  Yes.
13  Q  How many?
14  A  Well, to verdict, probably five perhaps. I
15   probably started another five and settled
16   during the course of trial. Maybe ten settled
17   during trial. And then of course you know,
18   many, many, many cases that we were litigating
19   that we settled during the course of the
20   litigation.
21  Q  Is it fair to say that most of the cases,
22   asbestos injury cases, settle, in your
23   experience?
24  A  Oh, most cases settle, yes.
25  Q  Okay. Why don't we take a break for a minute.

Page 413

1        THE VIDEOGRAPHER: Off the record.
2    The time is 6:34.
3        -----
4        (Recess taken.)
5        -----
6        THE VIDEOGRAPHER: We're back on
7    the record. The time is 6:42.
8  BY MR. ROTH:
9  Q  This falls around the jump around category and
10   I apologize.
11       You were shown Defendants' Exhibit 135.
12   I don't know whether you have it handy or not.
13  A  Well, if you can tell me what it is, I can –
14  Q  It was the motion for summary judgment filed in
15   the Clark versus Owens Corning fiberglass case
16   in front of Judge Victor in Summit County.
17  A  Yes, I have that.
18  Q  Okay.
19  A  138?
20       MR. PLACITELLA:  135.
21  A  Okay. Yes.
22  Q  Do you have that?
23  A  Yes, I have it.
24  Q  Okay. I believe you testified you weren't sure
25   but you thought you won that motion for summary

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 414..417

Page 414

1   judgment.
2       I want to show you what we'll mark as
3   Bevan Exhibit 2.
4       - - - - -
5       (Plaintiffs' Exhibit 2 was marked.)
6       - - - - -
7   Q   Does this refresh your recollection of the
8       outcome of this case?
9   A   This is what I recall.  And I was correct, the
10      court denied the motion for summary judgment on
11      the Clark case, yes.
12  Q   Okay.  And even though you won -- you defeated
13      summary judgment in that case, you,
14      nevertheless, refiled it in Cuyahoga County?
15  A   Yes.
16  Q   Not related to your victory in the summary
17      judgment motion, I assume?
18  A   That was not a reason for me to dismiss the
19      case.
20  Q   You were asked a couple of questions about the
21      Raymark lawsuit against Stemple and others.
22      You were not named as a defendant in that
23      case?
24  A   No, I was not.
25  Q   And do you recall the outcome, with respect to

Page 415

1   your father and Mr. Economus?
2   A   I was told that they were dismissed.  I don't
3       recall ever reading any documents to that
4       extent.  I wasn't involved and it was over with
5       by the time I became a law clerk, as far as I
6       know, in May of 1989.
7   Q   Okay.  And if there were published opinions to
8       that effect, would you be surprised to learn
9       that they were dismissed by federal judges?
10  A   That would confirm what they told me at the
11      time, yes.
12  Q   Okay.
13  A   That would not surprise me.
14  Q   One of the things you mentioned regarding
15      conversations you had with Mr. Martin and
16      Mr. Joslyn was being threatened with sanctions.
17      Tell us more about that, please.
18  A   Well, that would -- I repeatedly got threatened
19      with sanctions, I believe more so by Mr. Joslyn
20      than Mr. Martin.  It was -- my recollection was
21      that it was a kind of a good cop, bad cop thing
22      and Mr. Martin was the good cop and Mr. Joslyn
23      was the bad copy.  And he would be quite
24      aggressive and threatening with the sanctions,
25      usually after a deposition was over or during

Page 416

1   the break of a deposition.
2       And the one instance I recall was
3   Mr. Joslyn confronting me at the end -- or at a
4   break of the John Nardella deposition.  And I
5   recall that one specifically because -- I still
6   kind of laugh to this day when I recall,
7   Mr. Nardella, who has since passed away and
8   what he said about Mr. Joslyn when Mr. Joslyn
9   walked away.
10  Q   What was the -- what was your understanding of
11      what Mr. Joslyn thought was sanctionable in
12      your conduct?
13  A   That I had no evidence and there was no
14      evidence of asbestos in Eastern Magnesia Talc
15      and, therefore, the claims against them,
16      asbestos claims against them, were frivolous
17      and sanctionable.
18  Q   You were questioned by Mr. Assaf about your
19      filing of lawsuits against Engelhard or Eastern
20      Magnesia after you got the information in 1992
21      and '93.
22  A   Yeah.
23  Q   Have you been involved in cases where
24      defendants, in terms of how cases develop,
25      where defendants may develop evidence that you

Page 417

1   did not have about another defendant?
2   A   Yeah, certainly.  And I know that the Owens
3       Corning was trying to go that route as well.
4       And that was what was happening in these cases.
5       Owens Corning was aggressively trying to
6       point the finger at the talc defendants and
7       trying to establish a case against the talc
8       defendants.
9       And so, you know, I had no evidence that
10      they had asbestos in their talc but, you know,
11      I continued to try and I continued to be
12      deceived by Eastern Magnesia Talc.
13  Q   In these cases that you filed, whether you were
14      sent some product identification, that it was
15      weak or exposure might be weak, were you ever
16      sanctioned or were you ever the subject of a
17      Rule 11, under whatever Ohio's Rule 11 motion
18      practice is?
19      MR. ASSAF:     In the talc
20      cases or any other case?
21  Q   In the talc cases.
22  A   No.
23  Q   Did Engelhard or anyone from Cahill question
24      the diagnosis of your clients?
25  A   Not that I recall.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 418..421

Page 418

1   Q  Let me show you -- and again this may have been
2       marked too and I apologize. It's Exhibit 131.
3   A  I don't think this one was.
4   Q  And this is a letter to you from Scott Martin
5       dated July 24, 1996?
6   A  Yes.
7   Q  In the context of requesting the voluntary
8       dismissal of the Strickland case, what is
9       Mr. Martin telling you about whether Emtal has
10      asbestos in it?
11  A  He indicated there is no evidence whatsoever
12      that talc mined or milled by Emtal contained
13      asbestos.
14  Q  I only mean to be a little bit glib, but do you
15      need to be a scientist or do you need a
16      scientist or did you need an expert in 1996 to
17      decipher what Mr. Martin meant when he wrote to
18      you that there is no evidence whatsoever that
19      talc mined and milled by Emtal contained
20      asbestos?
21  A  It's clear what he meant.
22  Q  I don't have any other questions. And I think
23      we're done.
24          MR. ASSAF:    Whoa. Whoa.
25      Whoa. I have a couple.

Page 419

1           MR. ROTH:    You're at seven
2       hours. What are you --
3           MR. ASSAF:    I don't think
4       so.
5           MR. ROTH:    Well, what was
6       the time before we went to plaintiffs' side?
7           THE VIDEOGRAPHER: He was at 6:51.
8       REEXAMINATION OF THOMAS W. BEVAN, ESQ.
9   BY MR. ASSAF:
10  Q  Ready?
11  A  Sure.
12  Q  Mr. Roth asked you a bunch of questions about
13      how to prove product ID based on all of your
14      experience. Right?
15          MR. ROTH:    Objection.
16  A  He asked me a couple questions, sure.
17  Q  By the way, you never had any problems
18      answering Mr. Roth's questions, did you?
19          MR. McDERMOTT:  Objection.
20  A  His questions were much more direct and simpler
21      than your questions.
22          MR. ROTH:    Thank you very
23      much.
24  A  They were better questions.
25  Q  You would like to see Mr. Roth win, correct?

Page 420

1           MR. McDERMOTT:  Objection.
2           MR. ROTH:    Move to strike.
3   Q  Well, is that not true?
4   A  I think --
5           MR. McDERMOTT:  Objection.
6   A  And I'm not sure what you mean by that.
7   Q  You'd like to see the plaintiffs win this case?
8   A  The plaintiffs should win this case --
9           MR. McDERMOTT:  Objection.
10  A  -- yes. Absolutely.
11  Q  In terms of showing product ID, one of the ways
12      you show it is from interrogatory responses
13      from the defendant, correct?
14  A  Yes.
15  Q  Sales records from the defendants, correct?
16  A  Yes.
17  Q  The sales -- or I'm sorry. The purchasing
18      records from facilities, for example,
19      BFGoodrich purchasing records, correct?
20  A  If they exist, yes.
21  Q  And you also show it through your own client
22      recollection by showing them pictures of
23      various products to see if they could identify
24      it --
25          MR. ROTH:    Asked and

Page 421

1       answered.
2   Q  -- correct?
3   A  Sometimes we show them pictures. Usually not.
4   Q  And do you have any evidence -- withdrawn.
5       Over the 15 years you were litigating
6       with Emtal over product ID for its talc, did
7       you ever feel as though you weren't getting the
8       proper information from Emtal, in terms of
9       their sales records?
10          MR. McDERMOTT:  Objection.
11  A  As I sit here today, I don't believe I did. I
12      think they approached it that we had no
13      asbestos in our talc so we're not giving you
14      anything.
15  Q  Okay. So prior to talking to Mr. Placitella in
16      2010, did you have any reason to believe that
17      you weren't getting the sales information from
18      Emtal that you were seeking?
19  A  Prior to --
20          MR. ROTH:    Objection.
21          MR. McDERMOTT:  Objection.
22  A  Prior to the conversation with Mr. Placitella,
23      I had no reason to believe that Eastern
24      Magnesia wasn't being forthright.
25  Q  And you got all the sales information you

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 422..425

Page 422

1    requested?
2         MR. McDERMOTT:   Objection.
3    A  I don't know if I did.  I don't -- I'm not
4       certain that I did.  I got sales records from
5       C.P. Hall that showed sales of Eastern Magnesia
6       Talc.  Whether I got anything from Eastern
7       Magnesia, I'm not certain that I did.
8    Q  You never got interrogatory responses?
9    A  I'm sure I got interrogatory responses that
10      said there's no asbestos and we're not
11      answering anything else.
12   Q  Did you ever move to compel responses for
13      Eastern Magnesia Talc for product ID?
14   A  I think I tried to work with them.  I talked
15      with them and they gave me what they gave me
16      and, you know, insisted that there was no
17      asbestos in their talc and I believed them.
18   Q  Did you ever move to compel, Mr. Bevan, yes or
19      no?
20   A  I don't recall.
21   Q  Will you come to New Jersey for a class
22      certification hearing?
23   A  If requested I will.
24   Q  Okay.  Mr. Allen Rothenberg, did you ever talk
25      to him regarding talc cases?

Page 423

1    A  I don't think I've ever had a conversation with
2       Allen Rothenberg.
3    Q  And did you have any conversations with anybody
4       outside of Ohio regarding the talc cases, any
5       other plaintiffs' lawyer?
6    A  With respect to this class action or with
7       respect to --
8    Q  With respect to the reasons you dismissed
9       Engelhard.
10   A  No.
11        MR. McDERMOTT:   Objection.
12   A  I don't think so.
13   Q  No more questions.
14        REEXAMINATION OF THOMAS W. BEVAN, ESQ.
15   BY MR. ROTH:
16   Q  Before learning that when Scott Martin said
17      there was no evidence whatsoever that talc
18      mined and milled by Emtal contained asbestos --
19      I'm sorry.  Strike that.
20         Before learning that there were test
21      results conducted by or on Engelhard's behalf
22      about Emtal talc that were positive for
23      asbestos, did you know that Scott Martin's
24      statement to you that there's no evidence
25      whatsoever that talc mined and milled by Emtal

Page 424

1    contained asbestos was false?
2         MR. ASSAF:   Objection.
3    Beyond the scope.
4         MR. ROTH:   Absolutely not.
5    A  I did not know that.
6    Q  Before learning that there were test results
7       done by or on behalf of Emtal or Engelhard that
8       showed that Emtal talc contained asbestos, did
9       you know that Mr. Martin's statement to you
10      that the only analysis which we have not
11      previously forwarded to you other than the
12      Ashton and Carter affidavits and the Pooley
13      report is one completed by the RJ Lee Group
14      which showed no evidence of asbestos mineral,
15      did you know that statement was false?
16        MR. ASSAF:   Objection.
17   Leading and beyond the scope.
18   A  No, not until I talked to Mr. Placitella.
19   Q  Do you know -- do you know today whether or not
20      Engelhard's scientists had testified at
21      deposition in 1983 and verified findings that
22      showed that Emtal contained asbestos?
23        MR. ASSAF:   Objection.
24   Beyond the scope and leading and foundation.
25   A  The extent of what I know is what was told to

Page 425

1    me by Mr. Placitella and what I've read in that
2    complaint.  If it was that level of detail, I
3    don't recall.  I think I heard that level of
4    detail, but I don't recall for sure.
5    Q  No further questions.
6         MR. ASSAF:   Recross.
7    FURTHER EXAMINATION OF THOMAS W. BEVAN, ESQ.
8    BY MR. ASSAF:
9    Q  Regarding your responses to Mr. Roth's
10      questions right now, your position that Cahill
11      did something wrong is based solely on your
12      conversations with Mr. Placitella and documents
13      written by Mr. Placitella?
14        MR. McDERMOTT:   Objection.
15        MR. ROTH:   Objection.
16   A  I wouldn't say solely.
17   Q  Primarily?
18        MR. McDERMOTT:   Objection.
19   A  I wouldn't say primarily.  I would say half of
20      it was based on what Mr. Martin and what
21      Mr. Joslyn said to me in writing, said to Dale
22      Economus in writing, what they said to me
23      orally.  That's half of it.  The other half is
24      the truth, which is what Mr. Placitella told
25      me.

THOMAS W. BEVAN, ESQ. - 05/15/2018   Pages 426..429

Page 426

1   Q   Your testimony of what the truth is is based
2       solely on Mr. Placitella, correct?
3           MR. McDERMOTT:  Objection.
4           MR. ROTH:    Objection.
5           MR. McDERMOTT:  Asked and
6       answered.
7   A   Yeah, I have not -- I don't know that I've seen
8       any documents.  I don't recall that he gave me
9       any documents to this extent.  I know there's
10      documents that are at issue, as to whether or
11      not I will at some point be allowed to see
12      them, but I have to rely upon what
13      Mr. Placitella --
14  Q   If Mr. Placitella's rendition of the facts and
15      recitation of the facts is wrong, then you're
16      wrong?
17          MR. McDERMOTT:  Objection.
18          MR. ROTH:    Objection.
19  A   Well, it depends on in what way they're wrong.
20  Q   No more questions.
21          MR. McDERMOTT:  We'll read.
22          THE VIDEOGRAPHER: Off the record.
23      The time is 6:57.
24          -----
25      (Deposition was concluded at 6:57 p.m.)

Page 427

1           -----
2       (Signature reserved.)
3           -----
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 428

1   THE STATE OF OHIO,  )  SS:
2   COUNTY OF CUYAHOGA.  )
3
4       I, Sarah R. Drown, a Registered Professional
5   Reporter and Notary Public within and for the State
6   of Ohio, duly commissioned and qualified, do hereby
7   certify that THOMAS W. BEVAN, ESQ., was first duly
8   sworn to testify the truth, the whole truth and
9   nothing but the truth in the cause aforesaid; that
10  the testimony then given by him was by me reduced to
11  stenotypy in the presence of said witness,
12  afterwards transcribed on a computer/printer, and
13  that the foregoing is a true and correct transcript
14  of the testimony so given by him as aforesaid.
15      I do further certify that this deposition was
16  taken at the time and place in the foregoing caption
17  specified.  I do further certify that I am not a
18  relative, counsel or attorney of either party, or
19  otherwise interested in the event of this action.
20      IN WITNESS WHEREOF, I have hereunto set my hand
21  and affixed my seal of office at Cleveland, Ohio, on
22  this 18th day of May, 2018.
23
24          Sarah R. Drown, RPR, Notary Public
            within and for the State of Ohio
25          My Commission expires April 22, 2022.

Page 429

1   THE STATE OF          )
                          )  SS:
2   COUNTY OF             )
3
4
5
6       Before me, a Notary Public in and for said
7   state and county, personally appeared the
8   above-named THOMAS W. BEVAN, ESQ., who acknowledged
9   that he did sign the foregoing transcript and that
10  the same is a true and correct transcript of the
11  testimony so given.
12      IN TESTIMONY WHEREOF, I have hereunto affixed
13  my name and official seal at
14          this          day of
15          , 2018.
16
17
18
19          THOMAS W. BEVAN, ESQ.
20
21          Notary Public
22  My Commission expires:
23
24
25

THOMAS W. BEVAN, ESQ. - 05/15/2018          Page 430

Page 430

```
1              DEPOSITION ERRATA SHEET
2    Page No.       Line No.      Change to:
3    Reason for change:
     Page No.       Line No.      Change to:
4
     Reason for change:
5    Page No.       Line No.      Change to:
6    Reason for change:
     Page No.       Line No.      Change to:
7
     Reason for change:
8    Page No.       Line No.      Change to:
9    Reason for change:
     Page No.       Line No.      Change to:
10
     Reason for change:
11   Page No.       Line No.      Change to:
12   Reason for change:
     Page No.       Line No.      Change to:
13
     Reason for change:
14   Page No.       Line No.      Change to:
15   Reason for change:
     Page No.       Line No.      Change to:
16
     Reason for change:
17   Page No.       Line No.      Change to:
18   Reason for change:
     Page No.       Line No.      Change to:
19
     Reason for change:
20   Page No.       Line No.      Change to:
21   Reason for change:
     Page No.       Line No.      Change to:
22
     Reason for change:
23
24   SIGNATURE:           DATE:
25
```

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i1

**$**

**$1,000**
162:4 166:5 167:23,25
169:1 303:7 305:9 313:7
388:2 389:8

**$19,000**
318:10,15,17

**$2,000**
176:12 303:6 305:9

**$3,000**
303:6 305:5 388:7,13,21
389:8

**$400**
14:4

**(**

**(1)**
138:14

**-**

**--I**
407:5

**1**

**1**
76:13 121:11 133:17
192:23 198:22 204:4
235:21 354:13 411:13,15

**1,000**
166:16 303:21 304:1
305:13 318:19

**1.16(d)**
352:24

**1/0**
327:1,2,5,8,13 328:13,21
331:3,15,24 334:23,24
339:11

**1/0s**
327:17

**1/1**
334:24 339:12

**1/2**
329:15

**10**
152:18 203:23 273:18
333:13 351:20

**10,000**
166:16 252:7 306:15

**100**
212:9

**104**
265:2

**11**
10:20 55:14 56:11,20
76:14 148:5 155:14
158:2 195:5 241:6
293:21 379:14 417:17

**11-CV-01754**
5:6

**110**
300:4

**113**
178:24

**114**
35:12 71:7,15

**115**
32:1 76:13

**116**
402:7

**119**
17:3,15,16

**11:05**
108:19

**11:13**
108:24

**11:17**
112:10

**12**
6:23 152:11,12 243:9
288:3 408:5

**127**
399:9

**12:49**
193:12

**12th**
57:4

**13**
6:23 55:12 59:10 178:24

213:1 313:18

**131**
34:4 418:2

**135**
136:24,25 413:11,20

**136**
138:7,8

**137**
139:1

**138**
149:22 413:19

**139**
150:12,13

**14**
177:18 318:5,9 357:17

**145**
25:2 79:22 408:6

**146**
204:13,16

**149**
223:17

**15**
5:2 8:10 56:15 84:1
152:14 153:24 241:14
314:19 333:13 351:6
421:5

**150**
221:13,14

**151**
212:25 213:1 246:20
247:9

**154**
320:15

**156**
207:12 410:6

**156A**
207:13 208:3

**157**
207:12,13,14,16,18,24

**16**
83:25 153:24 213:7

**16-minute**
54:13 351:5

**18**
278:6 305:25 379:15

406:11

**19**
199:14 265:3 306:7
378:20 405:18

**1940s**
284:19

**1947**
300:13

**1949**
289:19

**1950**
294:6,16

**1950s**
156:8

**1951**
289:22

**1962**
289:25

**1964**
331:22 332:5 344:21

**1969**
175:15

**1970**
344:22

**1970s**
193:23 269:1 270:15

**1971**
152:18 154:9

**1972**
345:2

**1973**
328:25 329:4

**1975**
270:10,17

**1976**
290:3

**1977**
256:11,12 269:22

**1978**
170:21

**1979**
300:14

**198**
399:25

**1980**
153:6,11 154:9 155:14
156:11

**1980s**
175:15 194:24 284:20

**1982**
252:24 253:21 254:14
290:8 291:20

**1983**
290:10 424:21

**1988**
404:17

**1989**
18:3,6,8,13,18,20 19:12
405:18 406:11 415:6

**1990s**
82:25 143:16 159:4

**1991**
333:8

**1992**
256:9 268:3 282:3
354:21 398:10 399:21
400:1 401:18,20 404:18,
23 407:9,14 416:20

**1993**
293:21 294:14 300:5,24
402:7 408:20

**1994**
15:18,24 211:13,18,23
408:20

**1995**
13:17 139:13 147:4

**1996**
305:25 306:7 418:5,16

**1997**
155:23 157:2 159:15,17
192:16 236:19 256:9
309:12 314:8 357:17

**1998**
151:14 388:1

**1999**
212:10

**1:29**
193:17

---

**2**

**2**
79:24 213:6 218:18,22
222:17 224:1 246:22
265:16 284:17 285:14
314:5 319:17 414:3,5

**2,000**
74:21 176:13,14 192:23
303:21 304:1 318:19

**2,600**
315:14 317:21 328:9
339:7

**2,653**
27:14 28:6,18 31:8,19
35:16,20 36:7,18 39:1,4
71:17 75:9,21 76:15
77:3,25 78:6,20,24
107:14,24 108:6 172:8
317:18 325:21 338:23
339:11 342:3,8,17,21,22
343:18,19,20 348:20,25

**20**
133:16 139:13 193:4
199:15 255:19 332:9
355:16 360:13 364:7
404:17

**20,000**
306:14

**200**
212:9

**2000**
212:12 313:18

**2000s**
90:14 128:25 159:4
212:11 355:20

**2001**
314:19 315:2 318:4
355:20

**2002**
204:18 213:8 214:5
217:25 232:18 355:21

**2003**
213:2,22,25 214:4,18
236:6

**2004**
22:2 215:23 218:7

**2006**
347:19

**2008**
90:19 241:6 243:9 256:9
263:3 408:5

**2009**
233:16 265:21 273:18
276:15 278:6

**2010**
88:19 195:5 231:24
233:16 276:16 421:16

**2010/early**
199:21 200:19

**2011**
88:19 192:17 199:21
200:19

**2015**
63:9

**2017**
44:12

**2018**
5:2 26:13 33:21 80:13
377:16

**21**
71:16 133:16 199:15
377:16 400:1

**22**
135:16 294:14 348:5
402:7,12

**226**
177:19

**228**
55:8,9 354:14 377:25
379:2

**23**
177:20 282:3 396:15
399:21 404:18,23 405:12
407:9,14,16,19

**2334**
262:17

**234**
349:23,24

**236**
82:9

**237**
63:7,8 82:9

**238**
345:18 347:17

**239**
345:19 347:24 378:17,
18,19 379:15

**24**
418:5

**240**
345:20 348:13

**241**
120:9

**242**
120:9,14

**243**
129:16,17

**244**
32:24 33:3,17

**247**
151:3,4

**25**
71:16 153:2 318:4
323:24

**26**
152:22 153:7 155:8
201:13 286:19 288:4

**260**
273:3

**261**
274:23 276:6 409:22

**262**
275:11 276:4

**263**
275:25

**264**
280:4

**265**
281:21 282:3 396:14

**266**
293:19,20 402:11

**267**
294:13

**272**
305:17,19,25

**273**
306:6,7

**274**
308:19

**275**
310:9

**276**
312:2 387:25 388:3

**277**
313:15 314:7

**28**
235:20 236:23

**280,000**
306:13

**287**
323:7 325:25

**288**
263:15,17,19

**289**
264:22,24 265:1

**290**
170:17 267:12,14,15,22

**290-some**
162:5

**291**
17:1 70:25 71:3,6,9,11

**291A**
70:22 71:13

**292**
23:1,3,6 105:19,23
106:11,15 107:24 108:6
275:19,23 281:23,25
284:8,18 347:21 348:2

**2:54**
272:20

---

**3**

**3**
28:22,25 29:10 44:12
56:15 63:9 186:24
261:17 265:16 289:20
305:17 318:13 319:17
334:6 352:13 378:1
406:23

**3,000**
303:21 304:1 318:19

**3,947**

69:5

**30**
72:24 181:15,17,21
185:11 187:24 188:7
206:10 208:25 267:23
268:7,16 269:12 271:5
307:19 323:14,19,25
324:12,24 325:8,11,16,
20 326:14,15 345:22
346:3 347:7 374:3,8

**30,000**
193:4 306:13

**30-**
372:4 373:3 374:14

**35**
53:16 204:23

**39**
241:4,5

**3:09**
272:25

**3:28**
287:21

---

**4**

**4**
76:7 77:9,13,17 267:16,
20 314:8 405:23

**40**
181:15,17,21

**40%**
333:24

**41**
53:24

**41(A)**
138:14

**42**
260:23,24 409:16

**45**
53:11

**46**
204:13 243:8

**47**
262:13

**4786**
290:16

**4787**
290:16

**4:08**
319:6

**4:14**
320:12

**4:18**
324:4

**4:35**
324:9

---

**5**

**5**
14:7 33:20 175:4,6
204:18 261:19 263:23
352:21

**50**
351:15

**50,000**
306:15

**50-pound**
208:25

**502**
99:3,6,12

**502(d)**
28:1

**50s**
156:17

**54**
223:24

**5:14**
320:12

**5:15**
351:3

**5:33**
369:19

**5:40**
376:23

**5:43**
377:3

**5:45**
377:13

---

**6**

**6**
35:15 66:1 266:7,14
290:4,5 300:5 314:18
347:19 384:23 406:11

**60**
60:8 374:3,8

**60-minute**
373:3

**60s**
154:23 156:9,18

**63**
33:23 34:4

**64**
331:23

**6:28**
351:12

**6:34**
413:2

**6:42**
413:7

**6:51**
419:7

**6:57**
426:23,25

---

**7**

**7**
66:1 76:14 290:6 291:21
352:21 388:1 404:15

**7,500**
176:9

**700**
384:23

**70s**
154:21,22 156:10,18
298:9

**77**
314:6

**78**
331:23

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i4

**8**

**8**
316:25 318:3 405:11

**800**
384:24 385:1,4,11
386:13

**80s**
154:21 155:4

**9**

**9/23/97**
150:14

**90-minute**
372:4 374:14

**90s**
123:11 128:25 355:15
362:21,24

**93**
401:20 416:21

**95**
333:15

**96**
333:16

**98**
181:23,24,25 182:2
212:6

**99**
212:6

**9:03**
5:3

**9:36**
33:9

**9:37**
33:14

**9:40**
37:21

**A**

**a-white**
152:23

**a.m.**
5:3

**ability**
195:23

**able**
10:6 53:10 92:16 93:2
122:2 131:25 142:10
144:5 154:13 157:7,9
158:14 159:9 170:10
182:22 196:20,25 210:8
258:12 329:11 332:10
386:11 391:9,12 397:2

**Abraham**
361:2,6

**absence**
236:1

**absent**
258:20 325:9

**absolutely**
53:22 420:10 424:4

**abuse**
56:18

**accept**
291:23

**acceptable**
310:12,22

**acceptance**
322:19

**accepted**
363:8,14

**accepting**
310:15

**access**
78:23 116:13

**accomplished**
272:2

**account**
352:5,9,14

**accounted**
169:17

**accounts**
350:6 352:10

**accrued**
9:18 10:8

**accuracy**
40:17

**accurate**

15:21 23:15,22 24:2,22,
25 32:12,13,15 80:12
84:3 110:1 121:19,20
180:3,18 225:23 356:4

**accurately**
40:24 113:8

**accused**
7:21

**acknowledge**
56:10 59:25 270:16

**acknowledged**
56:8

**acted**
354:19

**acting**
130:11 235:24

**action**
80:1 83:9 117:17 163:5,
14 164:3 165:21 195:17
423:6

**actions**
9:3 48:12

**actively**
160:18 171:9 250:11

**acts**
185:4

**actual**
57:18

**acutely**
219:21

**add**
46:4 47:15 318:23

**added**
323:19

**adding**
291:25

**addition**
59:18 401:2

**additional**
349:14,17,19 408:17

**address**
361:23 410:14

**addressed**
275:18 361:25 399:14

**adequate**
236:11 274:8

**administrative**
106:3 107:9,15,17,23
108:5 348:1,14,19

**administratively**
9:15 105:22 106:7 107:1
348:24

**admits**
59:18

**advance**
323:9

**advanced**
269:11,18

**advancements**
267:24 268:4

**advances**
271:5,19

**adverse**
250:9 251:4,19,23

**advice**
310:6

**advise**
75:25

**advising**
186:22

**advocate**
393:9

**Aerospace**
127:7,8,13,14,20,22
128:4,9,13,17 208:24
209:7 210:6,10,15,20
211:14,18,24 212:8,10,
15 300:13,18 301:2,3
335:10

**Aerospace/aircraft**
208:7

**affect**
45:22

**affidavit**
23:21,25 24:4,15 25:1,
17,20 29:3 38:23,25
49:8,15,16 60:16 77:10,
15,25 79:21 80:12 107:5
141:6 222:2,21,23 223:7
225:2,10,19,22 226:8,12
228:15 229:5,17,25

230:9,11 244:24 245:7,
13 252:22 253:13 254:22
255:7,15 259:7,9 284:7,
10,14 289:1,2 291:13,15
292:3 293:3 295:9 296:2,
9,21 315:12 328:10
397:9,22 404:16,20
405:2,17 406:3,9,12
407:2,6 408:23

**affidavits**
24:6,21 60:14 89:15
141:7,15 228:17 229:23
254:11 257:2 283:14
363:16 397:5 400:9
406:16 424:12

**affirmed**
11:13

**afraid**
124:15

**age**
6:8

**agent**
109:22

**aggregate**
167:7 354:15

**aggressive**
92:23 93:8,12 142:8
415:24

**aggressively**
124:10 417:5

**ago**
6:23 8:10 62:4 63:4
81:10 102:6 114:23
164:16 255:19 268:8,16
332:9 355:16 381:20

**agree**
23:13 28:1 84:7 115:24
148:14 187:24 214:7
228:12,14 229:4 265:20
271:25 275:17 316:18
327:7

**agreeable**
360:2

**agreement**
13:14 84:23 85:22
164:11,13 165:20,25
166:1 198:6 311:17
314:13

**agreement's**
166:3

**Agriculture**
221:15 226:25 227:3

**Ah**
38:8 200:21 314:4
319:20 377:21

**ahead**
112:19 119:15 314:4
324:21

**Aircraft**
208:24

**AK**
55:5 56:20

**Akron**
127:5 144:11 166:8
167:1

**al**
5:6 152:14

**Alex**
5:7

**alia**
295:9,17 296:11

**alive**
101:24 102:4 199:20
213:21

**allegation**
10:4 128:16 172:3 195:9

**allegations**
20:3 79:4,18,25 80:14
88:13,15,17 194:21
215:24 216:24 217:2,4
378:10

**alleged**
97:5 146:13 194:22
322:14

**Allen**
123:25 124:9 129:2
140:3 283:8 322:6
357:24 398:11,25 422:24
423:2

**allow**
144:14 347:11

**allowed**
9:22 152:7 219:23 305:4
426:11

**alluded**
103:4

**alternative**
105:15 184:25

**altogether**
333:17

**Alzheimer's**
100:12

**Amber**
55:24 56:7

**ambit**
40:21 49:24 371:20

**amended**
109:2,6 133:14 235:20
262:14

**amount**
95:14,15 104:13 170:22
187:8 196:23

**amounts**
89:19 124:25 155:19
187:2,12 288:11 341:8

**analogs**
403:8

**analysis**
240:1 253:1,2 260:4
297:4,25 298:3 403:4
424:10

**analyzed**
252:24 266:10

**ancient**
268:8,16

**and/or**
18:16 35:24 36:15 52:5
71:21 254:12 401:13,16

**anderson**
312:7,25

**Andrew**
321:9,17

**Angel**
331:5 337:15

**angry**
125:20

**answer**
13:1 19:1,3 25:23 27:18
28:3 29:16 30:1,3 35:18,
22 36:11 37:5,7,9 43:18,

24 47:3,4 50:10,13,20
58:20 61:10 75:12 76:18
87:9 98:25 99:1,2,4,7,8,
14,17 111:20,21 112:19
116:15 131:8,12 164:25
165:1,3,13,15 178:10,19,
20,21 179:6,12 190:25
206:15 224:4 229:13,14
234:12 244:22 251:1,17,
18 258:1,12 270:20
271:9,11,14 272:4
289:17 299:2 307:24
328:16 330:11 332:7
334:9,12,14,19 336:3,9,
12,15 337:9,16 349:2
355:14 366:12,14,19,22
368:17 369:11,25 371:2,
23 372:5,15 373:1,25
374:2 376:9 378:3,24
380:25 387:7,9 395:23

**answered**
15:9,16 81:15 132:9,19
133:6,7 135:11,12 173:6
174:17 249:15 305:2
364:5 375:4 380:4,6
386:7 421:1 426:6

**answering**
12:25 366:20 419:18
422:11

**answers**
176:3 189:24 207:19,24
262:15 376:17

**Anthony**
5:14 326:25

**anybody**
26:25 37:2 52:19 61:10,
14 64:20,22 74:25 75:3,
5,7,14 81:2,4 82:1 96:4,7
108:15 109:15 124:1
130:10 145:14 343:23
345:23 367:2,10 375:6,
11 376:2 423:3

**anymore**
131:1 213:19,21 215:22
333:18 405:4

**anyway**
241:18

**apart**
110:21 193:1 362:7,8
364:15

**apologize**
53:19 323:9 387:16
393:22 407:20 409:3
413:10 418:2

**apology**
53:20

**apparently**
35:10 51:16 243:10
412:1

**appeal**
8:11 9:17 10:2 258:10
274:12 276:10

**appealed**
10:2 11:12 274:13

**Appeals**
55:5

**appearance**
59:23

**appears**
139:3 222:2

**appellate**
11:12,13,22

**apples**
25:5

**applied**
166:19

**applies**
44:4 164:5,10,12

**approach**
67:8 226:7 250:8,14

**approached**
421:12

**appropriate**
365:9

**approximately**
22:2 215:23

**April**
33:20 77:9,13,17 241:6
282:3 396:15 398:10
399:21 401:18 404:18,23
405:12 407:15,19

**area**
21:7 175:16 186:9 293:1

**areas**
175:17

**aren't**
302:23

**argument**
11:21 57:1 92:6,7 265:5,
8

**arguments**
269:7

**arm-twister**
359:19

**arose**
153:21 212:10

**arrange**
101:1

**arrangement**
13:11,24 14:1 16:3 85:8
87:22 88:1 163:13,17,20,
22 164:2

**arrangements**
85:25 87:15 163:23

**array**
120:17,18,19 388:25

**arrive**
35:20 71:17

**arrived**
28:6 75:23 76:10

**art**
268:7,15

**Arthur**
6:1

**article**
63:9 64:12,14,24 65:7
66:14 67:10 69:24,25
70:10,11 82:10 83:6
347:24

**article's**
65:8

**asbestos**
14:2,6 88:25 89:14
90:21,24,25 91:3,7,13,
18,22 92:25 93:5 95:12
102:15,16,25 103:7,10,
18,20,23 104:11,23
106:16,19 119:25 120:6
121:8,11 125:12,24
128:7 135:17,21 139:12,
14,20,23 140:1,5,11
141:3,14,20,22 142:3,15,

18 143:8,12,13,17,24
144:22 145:21 146:3,18
147:9,11,16,23,24,25
148:24 149:3,13,19
151:20,24 152:4,6,23
153:19 161:25 168:6,7
170:5,9 175:21 176:16,
19 180:15 183:19,21
185:3,12 186:15,25
187:2,13,25 191:14
192:13,25 193:3,24
199:18 202:18 205:5,18
206:7 209:25 210:13,19
211:2,10,12 216:8,23
222:14 224:25 236:2,12
239:5,12,19,25 240:2,9
241:13,16,23 242:13,19
245:4 246:6 253:2,12,21,
25 254:5,14 255:3
257:13,14 259:14 260:22
263:8,10 264:1,12 265:8,
15,22 266:1,12,18,25
267:4,8 268:1,23,25
269:3,21 270:18 271:2,
20 272:2 273:9,14,19
276:14 280:13,19,21
281:19 282:13,17 284:24
285:24 286:2,25 287:2,
12 288:8,17,21,24 293:5
295:14 296:14,17,20
298:10 303:24 304:3,9,
23 305:1 307:9,16,23
308:5,9 311:18 312:5
323:24 328:21 329:3,10
332:4,7 346:23 359:2,9
388:19,24 389:1,4,22,24
390:2,4,13,14,15 392:17
394:4,7,8 395:2,9 396:4,
10,25 397:17,20 398:1
400:4,16,24 402:23
403:7,13,19 404:1,8
405:2,16 410:19 412:8,9,
11,22 416:14,16 417:10
418:10,13,20 421:13
422:10,17 423:18,23
424:1,8,14,22

**asbestos'**
153:1

**asbestos-containing**
153:5

**asbestos-like**
155:20 156:1 288:12

**asbestos-related**

9:14 316:24 403:25

**asbestosis**
183:8 184:8,10,11,12
214:11 301:18 302:8,16,
22,25 303:7 306:15
327:1,2,15,18 328:13
329:12,15 331:3,15,24
339:11

**Ashton**
244:25 245:7,18 252:22
253:13 254:21,25 259:7,
8 284:7,14 288:25 289:2,
18,19 295:10 296:2,9,21
397:6,9,22 407:1,2,6,22
408:23 424:12

**Aside**
147:1

**asked**
15:9,16 26:6 47:12 61:20
69:2 75:22 81:14 89:6
95:22,24 132:9,18 133:6
135:10 145:14 173:5
174:16 175:23 178:6,7
216:16 223:10 258:25
271:19 291:18 324:11
344:1 372:8 375:3 380:3
386:7,10 396:3 397:15,
18 402:8,16 403:21
404:25 405:14 406:21
408:24 414:20 419:12,16
420:25 426:5

**asking**
19:6 40:25 47:17 51:11
62:10 111:24,25 112:1
121:13 132:25 147:3
156:13 163:9 164:6
165:7 178:16,17 180:12
188:14 191:11 216:14,18
219:20,24 232:13 233:6
249:20 254:15 257:17,18
259:17,18 269:16 271:16
272:16 286:11 303:13
318:14 329:8 368:14
378:8 400:7,20

**asks**
51:14

**aspect**
119:7,9,16 136:2 175:9
179:20 182:16,18

**aspects**
222:8 223:9

**Assaf**
5:21 6:14 12:20 17:6,9,
11,14 18:25 19:4 25:6
28:1,2 32:2,5,9,14 33:2,
18,25 34:7,12,16,20,25
35:4,7,8 37:11,17 38:4,5,
10,14,17,20 39:20,21
40:10 41:4,5,8,13,17
42:14,18 44:15 46:19
48:16 50:6 52:17 53:1,6
54:6,12,18,24 55:9 58:8,
16,22,24 69:16 70:5,9,
16,24 71:3,12 86:18,20,
24 99:3,9,13,21 108:11,
17,25 111:24 112:7,23
132:16 135:3 165:6,11
188:12,15,18,22,25
189:14,17,20,23 190:2,5,
8,13,18 191:4,8,10,13,19
192:1,5 193:18 200:11,
15 204:15 207:15 216:14
219:17,21 228:7 238:15
240:25 244:20 247:9
250:25 270:4 272:13,17
273:1 287:18 288:2
305:23 313:19,20,23
319:2,20,23 320:4,13
324:2,10,18,21,25 325:4,
5 335:3 345:15 346:15
349:5 351:9,14,18,22
352:4 369:25 370:3,22,
25 371:3 376:8,20 377:4,
14,18,21 378:19 379:4
384:13 387:20 388:16
389:10,16 390:9 393:3
394:15,24 395:13,20,25
397:23 398:17 401:9
402:8,15 403:21 406:19
408:6 410:11,24 411:4
416:18 417:19 418:24
419:3,9 424:2,16,23
425:6,8

**Assaf's**
112:19 123:16

**asserting**
139:5

**assess**
404:7

**assessing**
104:22 185:20,23 187:21
217:17 229:3

**asshole**
124:17

**assist**
386:11

**assistance**
197:1

**assistant**
69:9 201:1 357:5

**associate**
196:8

**associated**
15:19,25 16:1 21:4 129:5
334:6 354:5

**Associates**
7:11 13:16

**association**
8:5 15:21

**assume**
11:10 26:19 30:20 42:4
43:3 64:7 83:9 84:6
85:21 106:21,22 107:21
150:9 194:17 196:22
197:24 225:21 245:8,24
246:6,9,16 248:4 262:6
269:17 291:19 294:24
297:1 298:1 349:9
393:17 414:17

**assumed**
255:11 285:18

**assuming**
140:23 248:3 277:25
330:14 331:17

**assumption**
102:24

**Atlantic**
312:21 315:1,8,10

**attached**
276:3 290:15 291:7,17
385:12 404:17,22 405:11
406:13 407:2

**attaching**
11:25 241:7

**attachments**
291:12 383:4,5,6,9
385:5,10

**attack**
105:19

**attempt**
59:22

**attempting**
59:6

**attend**
23:5 374:25

**attended**
23:8 365:18

**attention**
32:1 76:14 123:16 161:8
177:18 198:22 291:2

**attorney**
6:22 7:2 8:21 10:4 12:7,
11 13:13 15:4,10,11 38:6
39:23 50:7 55:13 56:16
59:11,18,23 73:8 84:19
119:12,17,19 146:16
199:22 200:12,22 222:5
236:3 242:24 263:7
332:25 333:19,21 334:3
366:25 408:8,10

**attorney's**
23:21 56:19

**attorney-client**
37:9,12 40:20 44:3,20
45:19 366:23

**attorneys**
23:13,18 42:19 80:22
81:25 84:17 129:3 145:7
226:15 366:15 398:1,20

**August**
44:12 204:18 273:17
357:17 406:11 407:9,14,
18

**authenticity**
33:5

**authorization**
354:17 355:1

**available**
42:6

**avoid**
59:12

**awarded**
56:19

**aware**
24:17,18 103:24 144:20
171:11 219:22 222:7
286:7

**awfully**

181:24

---

**B**

**B&w**
312:21,24 315:4,10
328:12

**Babcock**
312:25 315:1 328:15
330:8 332:22

**back**
11:7 29:16 33:13 36:17,
23 49:4 54:22 55:1 69:17
74:18 82:9 107:5 108:4,
23 112:14,22 118:15,19
119:14 132:6 156:12
178:9 191:20 193:16
196:19 197:21 208:21
210:3 211:19 232:18
233:15 246:7,10,12,20
247:5 256:14 272:24
276:6 287:25 297:11
298:8 319:16 320:11
324:8 351:23 352:2
354:13 355:15 362:21,24
364:7 369:18 377:2,6,12
393:2 395:8 397:11
402:6 410:22 413:6

**Bacon**
275:16

**bad**
40:1 56:17 59:23 359:22,
24 363:11 415:21,23

**bags**
208:25

**Baker**
55:4,24 56:7 57:16

**balk**
311:13

**Ballard**
320:21 321:3 348:6

**banbury**
175:16

**bankruptcy**
217:11 218:2 250:13
251:24 252:3,6

**bar**
8:4 15:17,20 64:18
121:17 131:25 196:6,7

261:20 272:3

**bare**
159:10

**barely**
152:19

**barred**
196:5

**Barry**
322:1

**base**
169:24 357:17 389:18

**based**
28:7,8,21 55:14 97:9,19
103:14 104:2 128:5
129:10 130:15 131:18,21
138:18 148:17,20 170:1
172:25 206:10 209:8
216:6,22 218:23 219:10
220:5,11,14,20 224:24
229:22 244:9 246:23,24
247:1,3,19 248:14 249:3
250:2 251:22 258:1
263:7 273:9 275:4
285:23 286:23 288:16
289:10 303:17,22 322:17
328:3 330:9 342:19
348:1 349:11 359:1
391:11 419:13 425:11,20
426:1

**bases**
218:19

**BASF**
5:5,22,24 30:19 31:4,18
33:21 64:5 66:3 83:2,8,
17 95:9 131:5 132:10
160:6 193:19 197:2,3
202:20 373:15

**BASF's**
29:5 236:9 354:20

**basic**
88:14

**basing**
248:15 249:4 278:3

**basis**
11:23 19:4 37:11 39:15
49:11 56:20 97:8,17
125:13 131:3 139:4
142:2 146:16,19 147:4,9
148:6,25 203:9 206:24

217:4 221:6 230:19
244:15,20 254:2 304:8
308:13 349:5 397:19

**Bates**
262:16 290:16

**battled**
92:10

**Bean**
312:7

**bears**
327:12

**began**
123:11 207:6

**beginning**
26:10 182:8 322:9

**begins**
199:15 398:5

**begun**
40:18

**behalf**
5:15,18 6:3,5 9:17 14:11,
17,24 57:7,11,21 59:5,8
66:3 89:8 137:3 149:24
181:14 192:24 201:5,22,
23,25 202:1 206:25
211:6 241:8 274:15
279:5 280:4 310:16
329:12 401:6 423:21
424:7

**belief**
103:6,9 128:5 139:7
140:8 280:12,15 281:15
391:12

**believe**
6:22 7:10 8:12 13:17
14:4,7 17:21 18:1,14
21:13 22:2 23:17,22
24:1,22,25 26:16 27:1
28:9 35:22 36:5,11,17,21
40:19 55:21 61:9 62:7,
15,16,19 63:1,3,14 64:14
67:7 71:19 72:2 75:22
76:18 78:10,22,25 87:23
88:19,23 90:23 91:19
94:6 98:15 103:19,24
108:2 113:2 123:23
127:19,21 128:11,14
130:9 137:10 139:15,19,
23 140:9 143:8 145:19
146:2 147:9 148:16

150:22 155:3 161:21
162:13 168:19 170:14,
19,20 177:8 179:17
184:22 186:20 195:5
203:8 204:10 208:18
209:5 211:9 213:22
214:1,4 234:2 241:16
242:4,12 253:6 258:9
259:12 262:10 263:11
266:3 267:2 268:23,24
269:6 282:6,21 284:10
285:12 292:24 293:25
294:25 295:3 298:4
300:1,16 301:24 302:18
305:14,15 306:20 307:7
311:11 312:20,24 317:20
318:1 319:12,15 325:18
329:21 330:24 331:25
332:12,17,21 345:5
357:23,25 358:3,10,19
360:3 363:18 365:21
379:24 380:19,22,24
393:12 394:11,21
399:12,16,17 408:13,21
410:1 411:11,19 413:24
415:19 421:11,16,23

**believed**
29:7 55:23 127:25
139:21,25 140:3,5,10
141:19,21 143:7,10,14,
15,17 146:17 147:15,21
157:17 205:4,9,17
241:12 242:17 254:6
263:3,5 265:21 285:22
308:9 358:25 422:17

**believing**
203:9 244:15 298:15

**bell**
243:18

**belong**
207:8

**benefit**
44:11 59:5 103:11

**benefits**
9:19 10:8 59:7

**Bennett**
326:25 328:2

**Benson**
328:12

**best**
10:11 91:23,25 157:23

166:13 262:11 307:24
362:2

**bet**
291:17

**Beth**
331:9

**better**
137:12,24 196:1,2
233:17 241:3 313:23
419:24

**Bevan**
5:12,16 6:7,13,15 7:10,
11 8:20 12:18,19,25
13:6,10,15,16,18 14:10,
16,17,21 15:12,14,19
16:1,4 18:8,16,17 19:15
24:7 25:8 27:8 30:1
32:21 33:20 35:12,16,20
38:6,21 40:12,24 42:7,
20,21,24 44:16 45:23
46:1,9,24 50:18,19,24
52:19 54:25 55:13 56:16
59:11,18,23 60:4 61:7,14
63:10 66:22 68:20 71:17
72:5 73:19 78:21,23
79:17 80:5 82:23 93:19
104:6 118:10 123:14
129:20 131:14 147:14
152:16 154:10 158:19
170:10 172:12,17 174:13
177:20 178:17 189:10
192:3,6 198:14 200:5,9,
13,23,25 201:14,23
207:21,23 210:23 211:7
226:15 232:24 236:4
237:10 249:13 254:9
256:3 265:3,21 273:2
284:9 291:14 293:22
306:2,8 313:18 315:11
317:18 318:5,9 319:3,8,
12,14 320:9,18 323:8
324:11 325:10 326:5,14,
15 348:20 350:9,12
351:25 354:18 364:9
372:1 374:15 378:2,20
379:15,16,21 387:14
411:9,13 414:3 419:8
422:18 423:14 425:7

**Bevan's**
41:21 50:7 350:19

**beyond**
45:24 124:1 147:6

247:22 365:17 396:12
408:19 424:3,17,24

**BFGOODRICH**
31:2 139:9 152:21,25
153:4,11,14,23 154:7,17
155:14 175:7 281:3
286:7,16 287:7,11 288:6
338:4 420:19

**Bharadwaja**
21:12

**big**
92:1 144:10,11 154:4
170:15 385:2

**Biggers**
328:19,23

**Bill**
23:1,3,6 105:23 106:11
107:24 275:23 347:21
348:2

**binary**
391:1

**birthday**
357:18

**bit**
40:15 49:20 58:21
166:12 176:10 180:13
183:6 250:7 347:1
370:18 387:17 390:25
418:14

**blank**
28:15 60:10 339:4
341:19,24

**blatantly**
131:6

**block**
310:24 410:7

**blocked**
410:12

**Bloomberg**
63:8 64:13,19,21 69:25
82:10,21

**blueprint**
44:15

**board**
162:5 230:15 349:25

**Bondex**
222:15

**Boston**
82:24

**bother**
295:22 341:22

**bottom**
18:1 35:15 140:22
152:15 177:19 178:25
199:15 218:18,22 246:22
261:3,13,17 262:16
309:21

**bought**
344:21

**Bowl**
45:13

**box**
65:16 84:3 262:2

**Box,'**
82:23

**Boy**
192:23

**brand**
176:24 177:22

**break**
69:9 108:10,15 192:11,
12 193:10 273:10 351:4,
7 387:13 412:25 416:1,4

**breaks**
93:15 124:2 192:7

**Breckenridge**
316:12 318:5

**Brent**
177:20

**bridge**
311:14,16

**brief**
11:22 12:2 264:24
267:16 275:19 410:5

**briefly**
55:3 62:5

**briefs**
93:4

**Briggs**
329:14

**bring**
48:8,9 82:7 144:23
145:3,10,14 146:13

184:19 191:20 196:9
351:23 379:20

**bringing**
146:20 206:24 390:1

**brings**
359:22

**broad**
50:1 175:13

**broader**
47:16

**brother**
175:24 177:13,14 367:18

**brought**
161:8 183:8 205:16
206:1,2 311:18 330:15
348:22 371:7

**Brown**
292:15 300:9,12 330:6
337:11 412:2

**Bruce**
357:23

**Brustein**
362:12,20 363:18

**Buckingham**
358:3

**build**
159:16

**bulk**
30:23

**bunch**
419:12

**burden**
274:3 384:9,17,20,21
386:12,15

**burdensome**
384:14

**Bureau**
6:20 273:25

**bury**
263:12

**business**
353:5

**Butler**
8:12 9:10,21 57:5,6 58:1,
3 59:1

**buying**
344:22

**BWC**
59:19

**Bye-bye**
54:8

---

**C**

**C.P.**
177:11,15 275:20 422:5

**Cahill**
6:5 65:18 128:25 131:19
132:11 133:10 205:17
241:12,15 244:2,5,7,15
296:25 354:19 359:1,5
363:25 381:4,7,14
401:14,16 412:6 417:23
425:10

**call**
37:25 40:7 43:22 53:12,
18 54:10 64:2 94:2,4
96:16 100:25 118:14
124:3,4 125:17,21 167:9,
10 199:8 241:15 277:15
278:8,12 279:11 351:5,
13 365:10 380:15,20,23,
24 404:11,13 409:24

**called**
6:8 18:2 44:1 55:4 62:4
64:2,3 94:18 96:2,4
100:18,21,24 174:2,3,20
178:14,16,22 199:6,7,11
233:17 276:24 277:13,
14,20,23 326:14 333:10
364:16 404:10

**calling**
89:25 101:8

**calls**
89:24 92:12 94:1 96:16
118:11,13 123:13,21
130:2 380:12,14

**can't**
73:23 91:10 92:21 95:3
100:8 113:8 116:15
131:23 151:15 169:12
184:6 191:6 212:19
229:14 230:8,20 231:15
232:5 242:10 251:17,18
271:14 278:4 279:19

280:9 291:11 355:13,23
362:24 366:22 390:3
393:15

**cancer**
9:14 98:16 183:11 184:6,
13,24 185:12 188:11
301:18 302:7 303:6

**cancers**
184:3

**candor**
393:10,19

**Canton**
315:8 328:4,5,16

**capability**
195:19

**captured**
345:4 348:25

**care**
291:2 366:19

**career**
173:3 254:20 317:19

**carefully**
141:7,16 245:11,12

**carried**
291:25

**Carter**
397:6 404:16 405:17
406:3,9,17,24 407:22
424:12

**carved**
169:20

**case**
5:4,6 6:19 7:1,9 8:10,11,
13,16 9:15 19:9,12 23:25
24:7,16 26:10,11 31:4,12
33:22 44:14,25 46:3,25
48:3,4,8,9,10 51:24 53:2,
5 55:4,6,10,11,22,25
57:16 62:2,3,9,20,25
64:5 65:5,8 66:10,13,24
79:4,18 82:8,13,16 83:1,
8,16,18,22,23,25 84:9,
13,16 85:21,24 88:10
90:19 92:4 95:1,2,5,8,23
98:9,11 100:6 102:1
106:7 109:3 110:8
113:15 115:3,6 116:8
117:11,20,22,24,25
123:6 124:22 125:8,10

128:11 133:11 134:5,14,
19 135:6,21,25 136:11,
12,14,18,23 137:22,23
138:16 139:11 142:12
150:7 156:22 158:15
159:17 160:9,11,13,18
162:4,18,20,22 163:17,
19,24 164:6,8 166:1,5,
20,21 168:2 169:7,22
170:8,9 171:10,13,15,19
172:4,9 173:24 174:1,5,
6,15,18,21 175:8,9,12
176:23 178:12 179:21
182:10 183:7 184:1,10,
11,12 185:10,24 186:21
187:1,13,23,25 191:9
194:17 196:9,18,24
197:7,12,14,16,21,23,24
198:1 202:13,15 206:3
207:6,9,10 209:17,22,23
210:6,15,24 211:23
215:9 218:11,12,15
229:3,6 230:4 231:7,11,
14,22,25 232:22 233:1
234:13,20 236:17 237:24
238:4,19,24 242:20
243:1,4 247:11 249:6
252:4 253:9 254:16,17
257:6,10 260:10,11,13,
14 261:20 264:6,8 265:6
275:12 276:17,18,19,23
277:1,21 278:16,18
279:3,6,9,17,24 280:4,
11,14 292:10,12 299:12,
16,19,21,22,25 301:13,
14,15 306:16 309:24
313:2,7 317:2,3,4,15
323:14,21,22 327:9,13,
16 328:2,14,18,19
329:15,17 330:3,4,7,12,
18,20,21,25 331:7,20,25
332:2,10,13,17,21
333:12,23 334:4,10,15,
22 335:8,11,15 336:6,7,
10,13,16,22 337:1,3,7,
12,17,18 338:4,11
340:18,23 341:6 347:1,2
348:22 355:13 359:16,
22,23 360:1 361:2
364:15,20 365:2,11,19
366:4,7 368:6 369:8
370:6,14 371:5,10 373:5,
10 374:7 375:6,11
376:15,18 378:3,8,9,11
379:19 382:21 383:7,8,

13,16 384:3,19 386:4
387:3,4 388:2,7,13
389:2,8,12,22 390:13
391:10,11,13 392:8,21
395:12 396:23,24 397:2
411:10,21 413:15 414:8,
11,13,19,23 417:7,20
418:8 420:7,8

**cases**
8:17 12:14 13:22,25
14:2,6,10 22:11 30:22
31:5,6,8 46:2 48:6 56:25
57:7 72:8 74:9,21,22
93:2 98:14,22 101:12,19
105:21 106:5,17,19
107:11 116:17 117:24
118:18,23 119:7,9
124:19 125:17 128:4,24
129:24 136:3 137:24
139:17,18 141:24 148:1,
13,23 149:14 159:3
160:7,15,16 161:2 162:5,
11 166:9,12,19 167:2,3,
14 169:18,19,25 170:18
171:1,3,5,6,22,24 173:1,
2,11 181:13,16 182:16,
19,21,25 183:2,3,11,13,
16,24 184:6,7,8,19,25
185:8 192:14,19 193:1,3
195:13,20 196:3 206:1,2,
11,12,19,20 209:19
210:21 211:13,18 212:8,
10,18 218:5,8 219:22
222:8 223:9 227:15
229:1 238:11,18 240:7
241:17,24 242:10 253:19
254:22 256:8,25 279:5
282:10,13,17 283:19
284:12 291:3 293:17
301:8,22,23,24,25
302:18 303:7 304:7
306:10,13,14,15,19,20
307:19 310:23 311:24
312:5,6 313:7 315:3
316:11 320:25 323:15,
19,24,25 324:24 327:8,
18 328:9,11 330:1 333:6,
9,10,15,22 339:8,9
342:10,13,14 344:1
345:24 348:9 349:7,10
360:22,23 361:14,18,22
362:3,17,21,25 363:13,
20,21 381:15 386:5,8
388:2,7,23 389:24 391:4
392:19 397:16,19 398:22

400:4,7,20 404:1 407:24
412:4,8,9,11,18,21,22,24
416:23,24 417:4,13,20,
21 422:25 423:4

**Castleman**
273:22

**Catalysts**
5:5 33:22

**catch**
200:18

**category**
297:23 413:9

**causation**
184:25 274:3

**cause**
9:9 48:25 92:8 144:8,17
183:20 185:6 239:25

**caused**
39:10,16 48:19 49:17
149:4 176:1

**causes**
184:5,13

**causing**
142:21

**celebrate**
360:20

**censured**
8:4 21:25

**central**
127:16 209:4 211:2
265:5

**cert**
11:16

**certain**
57:18 62:17 85:20 101:3
103:4 135:5 138:22
167:20 169:6 175:18
176:10 249:24 292:10
317:12 326:22 340:17
344:15 348:8,14 349:1
404:4 406:17 422:4,7

**certainly**
18:15 19:11 56:14,24
60:16 63:18 80:11 92:23
114:4 125:2 130:9
180:23 195:22 197:7
199:4 214:4 218:14

240:4 255:9 257:6 382:7
390:11 398:19 417:2

**certification**
25:14 28:11 38:24
422:22

**certified**
6:11 198:2

**certiorari**
11:15

**cetera**
326:19

**chair**
142:11,13 144:1,10,13
148:12 157:14 242:8

**challenge**
171:20 322:18

**challenged**
322:12 350:21

**chance**
44:18

**change**
49:1,6,20 72:4,11,17,19,
22,23,25 73:5,19 74:3,5,
6,7,8 76:12

**changed**
49:4,13 272:5 326:21

**changes**
26:1,25 27:1 39:14,16
48:23 49:22 50:8,24 73:4
109:11 273:24

**changing**
37:12 48:21 73:24

**charges**
7:12

**Charles**
280:5 292:8,19 301:17
302:13 333:11 337:2
397:6 404:16 406:9
407:22 411:10,21

**check**
36:23 69:13 77:3 203:7,
15 225:19,25 226:8
227:13,17 228:2,3
232:10

**checked**
36:17 76:10

**Cheezan**
330:10

**chemical**
151:5 205:24 317:8,20,
23,25 332:15

**Chidester**
289:6 290:11

**Chief**
44:6,13 45:25 46:11 49:9

**children**
367:25

**chose**
196:14

**Chris**
88:21,23 385:16

**chronic**
388:10

**chronological**
285:3 382:24,25

**chronology**
143:6

**chrysotile**
176:22

**cigarette**
184:14,17 185:3

**circuit**
79:6 194:19 238:7

**circumstance**
181:3 229:19 309:20

**circumstances**
181:4 234:15 251:20
355:2

**circumstantial**
392:16,19

**cite**
265:13

**civil**
6:9 55:13 56:20 138:13
309:10

**claim**
9:12 10:8,17,21 12:9
53:23 56:17 59:20 60:21
61:15 87:6 96:18 107:2
142:2 150:3 180:14,19
181:10 196:20 214:15
217:18,19 254:2,8

263:24 329:12 342:19
379:21 386:12 390:22
395:3

**claimant**
61:13,14 105:18 215:8
229:25

**claimant's**
60:21,24

**claimants**
224:25

**claiming**
309:7,15 390:2

**claims**
35:25 36:1 57:8 59:5
60:14 61:6,9 71:23,24
79:3,17,25 80:14 88:10
104:22 106:25 107:7
157:19 183:8 214:24,25
215:5 216:9,10,23 227:8
229:23 320:16 322:25
416:15,16

**Clair**
333:23 337:4

**clarification**
12:18 71:9 104:19
369:22 370:18 379:7

**clarified**
49:14,16

**clarifies**
39:7

**clarify**
12:23 49:17 72:17 75:25
76:3 188:14 189:15
190:22

**Clark**
84:20 96:15 101:6,24
139:10 163:24 164:6
201:3,22 202:3 277:17
278:13,22 279:2,4 300:2
326:9 333:12 355:14
375:14 413:15 414:11

**Clark's**
201:4

**clash**
145:8

**class**
5:18 25:14 28:10 35:17
38:24 39:2 47:1 78:7,10,

14 80:1 83:9 84:15
163:5,14 164:3 165:21
179:24 195:17 315:12
325:9,14 346:7,13,20
422:21 423:6

**Clay**
292:14 302:10 330:16
333:11 412:1

**clean**
411:6

**clear**
77:14 104:11 191:1,7
286:5 418:21

**clearly**
366:16 400:23

**clerk**
18:3 415:5

**Cleveland**
5:9 21:7 41:17,18 45:10

**client**
10:13,16,22 28:8 31:13
40:12 47:19 48:1 49:19,
21 59:15 61:2,4 62:1
85:21 96:2 118:19
119:20,24 121:14 122:1
137:12,17 139:5 157:15
160:21 163:7,12 167:23
169:1,24 179:25 181:7,
10,11 184:23 186:4,22
189:2 214:11 223:1
224:12,17 226:20 229:5
230:9 237:2 239:24
241:24 252:18 259:6,7
294:17,22 309:15 325:23
349:25 352:23 353:12,25
354:4,6,11 365:23
366:15 368:10,11 388:12
392:5,18,20,24 420:21

**client's**
9:13 57:17 144:9 158:14
179:19 186:3 223:7
237:1 353:2,13

**client-related**
353:15,20

**clients**
29:4 31:20 35:16,21,22
36:8 39:5 46:1 48:7
57:12 60:5 71:18,19
72:5,8 74:8 76:16,23
85:14 88:12 89:8 94:2,16

THOMAS W. BEVAN, ESQ. - 05/15/2018                 i12

97:8 98:6 100:21 102:7
104:9,10,13,16 109:23
114:5,7 115:19 116:1
118:15 120:22 121:7,16,
22 125:1 126:13 127:6
132:15 162:7 165:25
178:21 180:14,25 182:23
184:18 193:8 198:15
206:6 222:24 229:23
255:25 259:10,12 291:23
292:4,7 304:20 308:21
309:22 310:4,16,23
311:12,16 333:4,5
348:17 350:7 352:6
353:7 365:7 393:9
417:24

**clients'**
136:3 149:4 182:16
209:12 213:16 219:22
223:9 284:12 354:17

**close**
277:1

**closed**
405:24

**closer**
233:15 349:7

**Clyde**
331:14 338:1

**co-counsel**
196:15,23 197:5,10,18,
25

**co-counsel's**
41:23

**Code**
152:22

**Cohen**
27:9 75:5,7 82:1,4 84:23
85:4,8,25 87:16,19
109:15 164:2 362:11
363:17 365:20 367:8
375:1,12

**colleague**
357:5

**colleagues**
115:16

**collect**
354:3

**Colley**
166:9 301:22,25 302:19

**combined**
185:4

**come**
25:19 63:23 77:5 111:3
117:6,12 119:14 120:22
121:8 143:1 156:19
159:19 182:1 317:14
319:13,14 327:21 344:1
353:8 395:8 399:13
422:21

**comes**
119:20

**comfortable**
215:18

**coming**
22:23 61:1 225:9 257:7

**commenced**
135:16

**comment**
48:20 64:20

**common**
176:1 177:13 348:4
391:18

**communicating**
233:21 292:4

**communication**
45:22

**communications**
82:4 117:14,18,21
380:10,16 381:4

**community**
7:16,17

**Comp**
8:17 60:21

**companies**
125:14 130:12 145:20
168:20 176:8 233:3
236:19 286:6 288:19
307:14 313:6 345:2
356:21 357:4

**company**
102:15 125:9 137:3
149:25 177:12,15 205:24
210:25 211:1 231:23
283:22 288:11,16,17
289:12 290:18 294:16
331:15 334:20 364:1
385:22

**company's**
260:25 293:5 410:4

**compel**
382:19 386:24 422:12,18

**compels**
322:18

**compensated**
163:5,14

**compensation**
6:21 8:11 9:11,19 10:7,
17 57:8 59:4,20 60:19
226:21 236:11 300:16
316:22

**competency**
397:24 406:20

**competent**
213:13,14

**compile**
324:12

**complaint**
31:1 55:14 79:6 80:10
109:3,5,7,8,12,17,20
110:1 126:20,23 133:14
139:2 154:15 158:10
194:3 195:6 201:4
204:18 207:2 235:7,21
240:24 241:8 244:10
316:13 340:4,11,20,25
343:2,3 372:11 425:2

**complaints**
30:24 204:21

**complete**
40:23

**completed**
43:5 53:15 403:5 424:13

**complexity**
266:9

**complicated**
50:21 52:7

**components**
104:20

**comport**
393:18

**composite**
323:7

**composition**

266:9

**compound**
222:16 225:8

**compounds**
222:15

**Compton**
292:15 302:10 330:16
333:11 412:1

**computer**
26:21 67:14,23 68:1

**concealing**
159:6

**concede**
52:13

**concern**
160:25 161:1 229:24

**concerned**
310:18,19,20

**concerning**
50:17

**concerns**
230:17

**concluded**
157:2 160:22 161:11
237:24 266:11 426:25

**concluding**
97:6

**conclusion**
156:19 245:2 284:25
295:12,25 296:7 402:21

**conclusions**
22:12

**condition**
310:21

**conduct**
215:17 350:1 353:5
393:4 416:12

**conducted**
253:20 423:21

**conducting**
286:24 287:4 288:7,19

**conference**
54:14 162:14 357:10,12,
21,22 358:7 360:4,10,15
365:22 367:6,12,23

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i13

conferring
112:17

confirm
314:10 339:13,21 415:10

confirmed
74:21 76:11

conflating
238:16

confounds
185:2

confronting
416:3

confusion
266:8

congressional
322:13

connect
210:16,17 278:14 279:11

connected
101:4,5,7 276:21

consent
354:17 355:1,24

consequence
405:24

Consequently
354:2

consider
185:21,23 327:14 328:10
364:25

considered
98:11 248:2 260:18,20
284:23

consistent
222:25 225:20,25 353:6
379:23,24

consolidated
30:24

consortium
150:3

constitute
352:22

consult
404:6

contact
63:23,24 121:8 202:4,21

286:25 326:6 330:15

contacted
98:7 200:1 201:3,5,22
300:2 364:15

contain
40:13 89:14 104:10
115:18,25 118:2 125:11,
23 128:6 142:15 210:19
239:25 245:4 246:6
264:1 266:12 288:24
295:14 381:25 390:14,15
394:8 402:23 403:13
405:1,16

contained
59:24 88:25 121:18
139:12 143:12 152:3
153:18 193:24 209:24
210:13 220:16 222:14
236:2 265:8 273:14
276:13 280:13,19,21
281:19 288:11 388:18
390:4 394:4 400:16
404:8 410:19 418:12,19
423:18 424:1,8,22

containing
187:25 392:17

contains
155:19 293:5 389:4
397:20

contamination
284:24

content
152:23 170:5,9 239:6,13
270:18 273:10,19

context
115:2 220:10 257:11,21
397:8,15,18 400:7,19
403:10 404:25 405:14
407:24 418:7

contingency
333:20

continue
58:2,25 126:5 139:23
141:23 147:4 157:9
159:22,25 160:21 170:25
171:21 191:24 252:23
265:13 267:7

continued
142:24 143:5,21 148:2
157:18 161:2 265:25

304:7 308:8 417:11

continues
153:3

continuing
28:4,19 30:6 85:18 86:5
88:5 133:12 148:6 159:2

contrary
265:8

contributing
410:20

controlling
340:9,13

conversation
62:23 89:21,23 95:25
96:8,25 97:14,15,21,22
98:3,4 100:1,11 110:18
111:10 142:25 173:20
174:19,24 199:5 203:2
241:19,21 279:20 346:2
355:17 364:19 369:5
421:22 423:1

conversations
27:7 39:11,16 47:19
90:10 95:4 99:23 102:11
110:6,19,20 113:19,25
117:21 118:25 123:21
124:18 126:16 129:23
195:7 255:13 259:12
283:7 292:5,20 355:21
364:17 365:15 368:10
415:15 423:3 425:12

conversed
102:5

convey
89:9 102:12 111:6,16
112:25 117:3,10 122:13
145:9 163:4 195:1
279:22

conveyed
111:8 112:1 113:2,3
122:23 123:5,7 137:16

conveying
97:8 110:15 117:16
134:23 373:22 400:22,23

convince
397:25

Cook
5:7

Cooper
321:5 343:15

cop
415:21,22

copies
409:3

copy
32:6,8,12,16 165:16
207:16 305:22 313:21
319:18 377:7,20 396:17
402:9 408:11 409:18,20,
24 415:23

copy's
313:25

Coren
365:24 367:1 368:3
369:8 370:5 372:5
373:13,21 374:4,15,16,
25 375:7,9,12,21 376:1,2
378:20 379:9,18,20
385:18

corner
262:17

Corning
142:9,20 144:16,18,22
145:7,9 146:11,24 147:3
148:18,19,21,22 149:6,
12,15,19 152:13 413:15
417:3,5

Corporation
320:17 323:1

correct
11:22 14:18 18:9 24:19
25:11,15 28:23 30:11,14
33:17,18,22 34:25 43:19
55:8 57:18 64:12 72:17,
20 73:16 77:3 79:4 81:22
83:13 84:24 85:6,9
103:25 105:1,3,8,13,16,
20,23 106:11,17,20
107:25 113:20 114:17
115:21 116:1,6,9 119:22
120:1,3,6,15 121:8,22
122:4 130:2,5,13 132:5
135:22 136:3 137:13
138:24 140:6 141:8,12
143:22,23 144:21 147:12
151:1,14,17,21,25 153:8,
9,11 156:1,4 161:20,23
162:1 167:14 168:2,7,8,
12 169:2 172:5 176:16,

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i14

21,25 178:13 180:3,15,
21,25 185:1,17,19
186:16 191:1 196:9
199:1 200:7 201:23,24
209:13 214:22 215:1,6
217:13 220:17 222:8
223:22,23 232:1 246:18
247:6,13 254:2 257:4,23
258:3,21 262:24 263:21
264:7,13 266:2,25 267:4
271:20 275:9,10 276:7
277:22 283:15 284:15
285:8,11 286:8,25
289:19,24 290:1 291:4
300:11 303:2,15 308:15
311:6,10 313:8,13
315:22 316:14,16 323:16
326:3 333:21 336:17,19
338:5,8 340:1 349:20
364:24 370:22 375:17
394:20 397:6 400:18
402:18 405:23 414:9
419:25 420:13,15,19
421:2 426:2

**corrected**
71:6

**correctly**
30:12 302:10 312:16
400:12 409:8

**correspond**
353:7

**corresponded**
90:6

**correspondence**
118:18 130:1 294:6,17
400:14,19

**Cottrill**
331:2

**couldn't**
92:8 178:4 210:17
377:22 396:24 411:2

**Coulter**
321:7

**counsel**
5:10 24:13 32:25 33:3
45:20 60:12 84:17 99:9
125:18 130:12 250:12
255:7 264:6,8,9,10
291:16 292:6 298:22
299:7,9 309:23 310:7
314:9 326:10 369:13

393:8 406:5 409:6

**Counselor**
19:6 24:5

**count**
181:25 296:24 351:3

**counter**
59:22

**counting**
54:14

**country**
183:21 191:15 216:8
389:20 393:14

**County**
8:12 9:21 57:5,6 58:2,3
59:1 135:17,21,25
136:11,13,19 137:8,10,
13,25 138:1,9,15,16,23
318:1 348:4 413:16
414:14

**couple**
40:11 100:16 262:23
284:6 353:11 387:12
414:20 418:25 419:16

**course**
27:13 30:19 50:15 92:2
107:20 156:22 233:20
270:6 315:19 391:5,7,14
412:16,17,19

**court**
6:25 7:2 8:7,8,20 9:10,21
10:15 11:12,13,16,22
22:1 23:15,23 25:11 29:2
31:15 38:24 39:1 43:5,10
44:6 48:3,4 49:19 50:16
51:11 55:5,19,22 56:10,
18 58:19 79:6 82:16
83:20 88:6 106:3,7
111:19 119:5 127:24,25
128:8,10,12,17 137:10
142:17 151:23 152:17
158:11 162:14 171:15
180:1,17 194:7,13,14,19
201:15,17 209:20 211:6
213:17,22 218:1 226:12
230:18 237:7 239:7,18
249:22 250:12 252:6
266:19 273:13 287:10
301:10,12 324:22 325:6
346:12 347:16 349:3
350:1 358:6 363:9,14
382:22 384:10 386:14,

15,18,25 411:22 414:10

**Court's**
56:3,23 386:25

**Courts**
213:25 217:7 266:18
267:3 327:18

**cover**
397:4 399:20 407:1
411:19,25

**covered**
154:2 337:21,23,25
338:1

**coworker**
181:9

**coworkers**
392:4,6

**crazed**
42:5

**create**
152:25 222:23 298:20

**created**
142:10

**creates**
187:10 410:16

**creating**
182:9

**credentials**
105:19

**credibility**
302:2,4

**credible**
256:20 322:18,23

**crime**
7:21

**crime-fraud**
194:8,16

**criminal**
7:12

**criteria**
36:5 72:3 348:8

**critical**
256:19

**cross**
311:14,15

**Cuevas**
331:5,12 337:15

**Cundiff**
55:16,25 56:8,9

**Cundiff's**
56:17 59:25

**curing**
175:16,20

**curious**
70:13,15 115:7

**current**
83:1,7 268:2

**currently**
406:7 407:3

**Curry**
331:14 338:1

**custodian**
17:4 38:22 39:4 319:12
320:3 323:13 350:20

**cut**
142:19

**Cuyahoga**
135:17 136:13,19
137:13,25 138:1,16,23,
25 348:4 414:14

**Cyprus**
146:4 155:4

_____

                D

**Dale**
13:11 14:2 18:17 19:17
282:14 399:13,16 400:2
425:21

**Dalmut**
5:23,24

**damages**
302:1,20

**Daniel**
330:10

**dark**
258:17

**Darnell**
67:3 84:12 102:1,2
173:14 175:6,14 181:14
196:18,24 198:3 238:23

305:15 316:9 317:1,13
355:19,22 356:19 357:6
372:19

**Darnell's**
67:6,7 196:19 371:10
374:7

**data**
28:8,16 35:19 71:16
326:21 341:14 406:25
407:4 408:1

**database**
78:21,24 79:1 323:12
325:23 326:15 329:22
330:3,17,19 338:3,17
339:8 340:8,11,19,25
341:12 344:9,16,23
345:4,7,10 347:13
348:20 349:12,20 363:22

**databases**
331:10

**date**
5:2 60:5,11,14 61:21
62:1 76:6 205:12 214:5
236:19 355:23

**dated**
10:13 55:15 59:21 60:17
150:13 213:7 241:6
293:21 306:7 313:18
400:1 402:7 404:17
406:11 407:13 418:5

**dates**
59:16 100:8

**daughter**
55:23 94:13

**day**
17:3 34:8,20 185:11
191:12 210:4 256:14
357:18,19 416:6

**days**
60:9 80:18 188:7

**dead**
173:16 183:24

**deal**
52:13 126:2 167:5
169:16,18 170:1 184:16
185:7 311:21

**dealing**
48:5 96:24 170:7 224:24,
25 254:20 365:7

**dealings**
128:22 129:10,22 130:15
131:22 213:15 243:1
386:5

**deals**
126:2 143:3 144:6 167:6
242:11

**dealt**
91:24 123:22,25

**Dear**
312:3

**death**
9:11,19 10:7 57:8 59:5,8

**decades**
266:8 272:6

**deceased**
56:9 57:7 277:11

**deceived**
417:12

**deceiving**
89:1

**December**
151:13 400:1

**decided**
209:20

**deciding**
256:25 260:18 354:16

**decipher**
418:17

**decision**
79:7 125:13 237:18
295:8 398:22 412:3

**declaration**
246:21

**decline**
99:2

**deeply**
396:8

**defeat**
268:9

**defeated**
414:12

**defeating**
268:14

**defend**
47:20 144:14 145:6

**defendant**
12:5,11,15 16:5 18:9
143:24 144:22 158:24
160:16 167:17 170:4,6
192:16 207:4 236:9,22
239:20,22 260:25 263:19
281:14 284:13 303:24
329:13 342:12 344:3
389:7 390:3 392:6,7
410:4 414:22 417:1
420:13

**defendant's**
41:23 186:3,5 332:8
390:4 393:1 409:25

**defendants**
6:8 101:21 130:5 131:7
142:5 144:7,23 148:8,9,
11 157:12 159:11 166:7,
25 167:3,13,15,20,21
168:1 171:6 181:19
184:5 207:8 215:1,5
231:3,6 235:25 242:7
269:7 280:6 298:22
303:9,14 306:10,11
307:4,6,7,8,15 309:1,17
310:11,14 311:20 314:14
316:11,20 323:16 324:13
341:6,25 342:24 383:15,
23 393:16 416:24,25
417:6,8 420:15

**defendants'**
17:1 25:2 32:24 33:3
70:22 102:25 120:9
129:16,17 136:24 138:7,
8 139:1 149:22 150:12,
13 151:4 152:11,12
175:6 177:18 199:18
204:13,15 207:12,13,19,
23,24 208:3 213:1
221:14 223:17 241:4
243:8 260:23,24 262:13
263:15,17 264:22
267:12,14,15,22 273:3
274:23 275:11,25 280:4
281:21,23 282:3 284:8,
18 288:3 293:19,20
294:13 300:4 305:17
308:19 310:9 312:2
313:15 314:18 316:25
318:3 320:15 323:7
345:18,19 347:17 349:23

**defense**
396:14 409:16,22 413:11

**defense**
11:23 60:11 125:18
130:23 142:19 145:15
146:23 148:11,22 149:13
158:24 159:10 199:19
221:1 226:6,11 242:21
292:5 319:18 390:7

**defenses**
168:22 175:12,23,24
183:22 307:9

**defined**
31:11 264:2

**definitely**
37:7 111:21 123:17
275:13 300:24 312:25

**definition**
31:9,16 35:17 39:2 47:1
78:7,10,14 107:7 114:11

**definitive**
272:4

**delays**
59:13

**deleted**
26:10,14

**deliver**
42:8

**demand**
306:13

**dementia**
100:12

**demonstrated**
264:1

**denied**
7:25 11:16 138:5,6,22
150:10 414:10

**department**
294:7 402:17

**depend**
183:7

**depending**
209:16 257:5

**depends**
181:3 184:9 190:24
196:17 197:13,15 198:4
226:10 229:19 251:9,20

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i16

258:25 309:20 317:24
426:19

**depose**
86:9

**deposed**
179:25 223:13,14,16

**deposition**
5:8 7:6 16:14,21 17:4
24:14 31:25 33:20 34:3,
9,21 36:25 37:1 38:7,22
39:3,6 40:12 41:16 43:17
44:15 47:20 48:2 49:21
50:23 51:4,9,21 53:12,
14,19 73:24 74:19 75:18
76:8 77:9,13,17,19 78:13
80:21 81:8,9 82:2,5
122:17 124:8,9,10
140:13,16,17,23 145:6
179:15,20,22 180:5
181:8,12 191:25 217:1
221:24 223:16,21,25
224:16,23 225:11,16,20
230:11 262:11 275:14
290:11,14,15,24 291:9
319:12 320:2 323:14
330:2 333:3 377:15
378:9 382:16 415:25
416:1,4 424:21 426:25

**deposition's**
32:15

**depositions**
80:18 93:15 119:4 124:2
179:16,21,24 223:11
317:14 335:24 350:21

**derived**
245:2 246:4 295:12,25
296:7 402:21

**describe**
130:14 398:21 411:17

**described**
28:9 197:8 199:19

**describing**
408:3

**destroyed**
193:24 194:25 212:23

**detail**
141:10,16 163:2 174:7
284:15 425:2,4

**detailed**

113:24 316:1

**details**
18:15 22:8,9 299:21

**determine**
119:22 196:13 230:20
234:10 235:18 288:8
340:14

**determined**
46:12

**determining**
239:18 253:18

**detour**
204:1

**develop**
139:11 154:13 158:14,19
159:9,16 391:4 416:24,
25

**developed**
100:12 158:21 159:12
166:24 212:5 214:12

**developing**
391:7

**developments**
269:2 270:9,14,17

**devote**
396:11

**diagnoses**
252:20 348:9

**diagnosing**
252:4,5

**diagnosis**
23:10 214:8,22 215:11
218:17 219:5,9 316:23
328:23 417:24

**diagram**
246:12

**didn't**
8:23 14:23 15:4,6 22:4
31:3,21,23 43:22 47:13
50:8 51:3,5,8 65:5,15,20
66:16 67:1 75:5,7 76:5
78:16 81:20 92:23 110:3
115:9 116:1 117:6,12
118:15 125:11 128:19
130:9 131:18 134:5
136:21 147:8 149:11
156:5 159:17 160:1,4,25

161:1,7,10 169:25
178:11,12 198:16,24
199:7,8 202:6 203:10
207:8 210:12 211:12,15
224:14 234:11 236:18
247:5 252:10 254:8
256:4 258:13,17 267:6
270:13 274:9 277:10
278:8,9,25 280:20
290:13 296:16,24 299:15
307:9 308:7 310:5,11
312:13 313:12 317:13
325:18 328:7,16 330:3
333:17 338:14 341:24
345:16 347:9 356:11,13
360:20 363:5 368:7
371:16 377:23 381:25
382:6 384:3 386:4
388:22 395:3

**die**
403:24

**died**
9:13,17 10:18 59:6
175:24 177:14

**difference**
183:15 255:5,9 269:22

**different**
22:12 28:12 43:22 46:14
52:10 127:8 168:20,21
173:11 181:16,18 240:20
257:16 258:15,20 260:12
269:16,25 270:5,6 310:7
314:2 361:7,12 368:22
396:20

**differently**
228:15

**difficult**
69:1 126:1

**diffraction**
253:1

**dig**
335:24 387:17,18 396:7,
8 409:17

**dinner**
44:1

**direct**
206:12 392:16 419:20

**directed**
324:23

**directly**
51:22 52:1

**disability**
302:1

**disadvantage**
157:16

**disagree**
46:16 55:19 56:13,23
172:16 259:23

**disbelieve**
208:13

**disclose**
251:4,19

**disclosed**
85:13,24 171:14 250:12
251:22

**disclosing**
383:20

**disclosure**
201:11,14

**disclosures**
201:7

**discontinuing**
152:22

**discovered**
373:15

**discovery**
68:8 70:4,6 95:17 207:25
323:14 324:14 347:2
393:17 394:13 401:12,15

**discretion**
56:19

**discuss**
50:8 67:1 108:14 116:1
166:15 173:23 174:14,
18,23 182:22 192:6
259:6 279:15 282:19
285:3 299:16 365:5
368:5,8,14,19 369:2,7
370:5 371:4,13,16
375:11 378:13

**discussed**
23:11 49:6 50:11 55:2
67:2,3,4 116:4 166:17
232:21 233:13 294:8
299:12 343:25 359:4
365:1 368:23 369:3

371:14 374:13 375:6
379:9

**discussing**
380:1

**discussion**
23:9 26:6 33:11 46:2,23
47:4 106:10 112:12
149:15 162:12 228:6,8
231:5 355:18 370:21
373:4,9 393:23

**discussions**
19:14 46:9 50:17 52:19
81:20 87:2,4 129:4
148:18,20 149:11 173:22
231:11 366:25 378:2,21
379:21,22 381:2,14
401:3

**disease**
144:9 183:20 190:24
191:2 234:4 301:23
316:24 327:6 330:25
410:21

**diseases**
188:9 388:25 403:25

**dishonest**
131:10

**dismiss**
48:9 89:17 125:22
137:12,17 140:4 143:4
149:24 150:2 207:7
253:18 256:25 273:21
293:17 295:8 397:15,18
400:20,25 403:11 405:1,
15 411:9,10 412:3
414:18

**dismissal**
106:3 107:11 138:13,14
151:5 234:16 236:25
237:9 260:19 314:12
348:1 411:20 418:8

**dismissals**
107:9,15,18,23 108:6
243:18 314:11 348:14,19

**dismissed**
18:17 19:21 29:6 30:10,
14 36:2 71:24 89:18
105:22 106:17,20 107:1,
8,12,13 124:11,19
125:16 136:12,14,17
137:25 139:21,22 140:2

151:16 174:5 231:11,22
233:4 234:13,20 235:17
236:7,17 242:1 254:18
260:12 283:1,2 292:11
293:18 294:3 344:4
348:10,23,24 349:10
370:15 399:2,5 400:8
412:1 415:2,9 423:8

**dismisses**
106:7

**dismissing**
139:17,18 254:22 256:8
284:12

**dismissive**
80:8

**dispute**
120:13 270:21 271:1

**disputed**
394:3,19

**distinction**
179:1

**distinguished**
216:7

**distributed**
177:11

**distributor**
176:24 177:23 205:21
391:21

**district**
44:6,7 48:3,4 57:5
411:22

**division**
127:12,15,16,18 209:2,3
210:9 265:12 300:25
301:1

**divvied**
167:18

**doctor**
21:16,21 105:18 221:1
250:10 331:3 339:15
362:12

**doctors**
20:7,10,14 302:25
322:10 362:7,8

**document**
32:4 33:17 38:22 39:3
40:14,23 59:19 65:1,3

81:7 122:18 133:24
136:25 138:8 152:18
153:18 155:15 157:13
208:2,10,14,18 209:6
221:16 225:16 243:16
274:24 275:1 283:3,6
286:22 287:9,13 293:21
294:4 305:25 306:1
319:11,17 340:9,13
350:3,4 393:4

**documentation**
302:2,5 341:8

**documents**
10:22 35:19 55:15 59:14,
16 61:20,24 67:9 71:16
77:2 81:6,11,21 82:7
103:17,22 110:12 118:4
122:11,13,15 133:24
134:3,15 135:6 153:22
155:24 156:23 193:19,24
194:4,25 235:8 237:4,12,
17,22 238:9 258:9,14
264:12 265:14,15 266:24
267:2,10 283:9 288:17,
18 296:23 298:20 301:4,
5 335:19 381:3,6 383:3
385:12 394:12 398:24
400:9,13 411:18 415:3
425:12 426:8,9,10

**doesn't**
29:14 39:7 40:13 43:9
45:1,13 48:14 52:6 56:1
66:10 67:10 125:23
144:18 177:22 181:7
200:4 203:16 219:7
223:2 228:22 229:10
249:7 250:6 318:23
350:16 353:8 391:16,19

**doing**
45:7 64:4 69:6,23 102:8,
9 148:22 149:13 169:17
192:14 196:11 230:9
292:12 343:24 346:25

**Dolinsky**
6:4,5

**dollar**
389:21

**dollars**
230:25

**don't**
8:17,18,21,22 10:16,19,

24,25 11:10,17,25 12:16
13:1 14:19 15:23 16:5
18:12,15,20 19:10,25
20:8,14,15 22:3,8,23
24:8,10,14 25:16 26:5,
12,16,24 27:1 32:7 34:4,
22 35:11 37:4,5,9 39:23
40:20 46:12,15 50:3
52:25 57:23 58:10,18
61:9,24,25 63:2,19 64:8,
11 65:2,11,22 66:9 67:2,
5,13,17,21,22,24 68:1,
10,12,15,17,18 72:12,24
73:3,6,19,20 74:1 75:2
79:8,12,13 80:7 82:14,19
83:14,18,23,24 84:6,10
86:11 87:12,18,23,25
90:5,7 91:15,16,19 92:6
93:24 94:7,9,20 95:1,6,
23 96:3,6 98:2,4,9,25
99:6,11,14,25 100:10,17
101:4,23 102:5 103:3
106:14,21 107:4,10,22
108:3 109:9,21 111:20
113:16,18 115:1,10,19
116:3,15,21 118:9,19
120:13 121:5,15 122:12,
20,22 123:25 126:11,22,
23 128:1,11,14,18,20,21,
23 129:12 130:8,22,25
131:13,20 132:1,6 133:9
134:7,9 136:1 140:15,19,
24 141:1 143:3 146:4,5
147:6 149:17,20 150:9,
11,22,23 154:8 156:8,10,
14,18 160:9,12,17
161:18 162:15 163:1,6,
16,17,19,20,24,25 164:1,
10,16,25 165:1,24 166:4,
21 168:14,18 169:9,11,
15,17 170:14,16,18
171:2,4,6,9 177:6 179:22
180:8 181:15 182:12,17
188:12,18,21 189:1,4
190:12 194:13,19 195:24
196:12 198:8 199:2,11
200:17 201:8,13 203:3,4
204:2,20 209:5 210:15
211:9,18,19 212:5
213:19 214:2,3 215:22
216:2,9,16,20 217:23
221:5,17,22 222:22
223:14,15,19 225:5,6,8,
15,24 226:7,23,24 227:1,
5,12 228:2,22,23 229:12

THOMAS W. BEVAN, ESQ. - 05/15/2018                i18

230:3,19,20 231:1,4,14,
21 232:15,21,23 233:12,
19,22 234:11,14,25
235:6 237:5,23 238:4
240:19 241:19 242:3,17,
18 243:13,23,25 245:8
246:8 248:20 249:13
252:6 253:8,23 254:16,
17,23 255:1 256:2,13,14
258:8 259:8 260:5,7,12
262:6 263:12 268:23
269:6,9 270:8,20,24
271:9,12 273:6 274:13,
17,19 277:2,7,9,18,19,24
278:4 279:13 280:2,9
281:7 283:1 286:18,20
287:6,10 288:13 289:3,5,
6,8,16 291:1,6,8 292:7,
13,18 293:3,10,18 294:9,
24,25 295:21 296:12
298:10,12 299:2,21,24
300:1 301:14 305:22
306:3,25 307:5,22 311:8,
12,23 317:9,11,12,20
318:18 321:8,17 322:2
325:15 326:11 327:12,15
328:1,6 332:17,21
338:13 343:8,25 344:19
345:5,8 346:2 347:9,14,
16 349:2 350:5 351:9
353:7,24 355:16 356:16,
24,25 357:1 358:15,19
359:4,12,14,18,25 360:7,
12,17 361:1,4,13,25
363:23 365:21 366:19
367:2,4,10,19 369:10
371:2,14,23,25 372:8,12,
14,16 373:2 374:1,6,15,
23 376:17,18 379:16
380:1,20,21,22 381:17
382:1,2,6,15 383:5,10,11
384:4,24 385:3 387:1,7
388:6 389:21 391:3,8
393:12 395:16 396:9,13
399:14,22 402:9,13
406:13,15 407:5 408:21
409:6,19,20 410:1,22
412:25 413:12 415:2
418:3,22 419:3 421:11
422:3,20 423:1,12 425:3,
4 426:7,8

**Donald**
331:21 336:8,25 337:20

**Donna**

204:7 222:2,5

**Donnette**
94:13,21 100:15 113:17
276:21 277:9 279:10
367:24 380:22

**Dornbusch**
6:1

**dot**
210:18

**dots**
210:17

**doubt**
158:9 175:2 203:4,5,23

**dozens**
115:13 117:8,9

**Dr**
20:16,17,21,23,24,25
21:1,12,19,25 22:16,18
23:9 213:4,7,11 214:1,9
215:9,10,18,22,24
216:10,25 217:8,12,19,
25 218:8,9,10,16,19,20
219:7,8 220:13,14 221:3,
4,7 246:21 247:10
248:10 273:22,23 289:6
290:11 302:14 320:21
321:3,5,7,9,11,19 322:1,
3,6,22 323:4 327:22
328:14 331:15,23 334:23
339:15 348:6 349:12
361:2,6 362:12 363:17,
18 407:7,8,11,21

**draft**
26:1,2,3,20 313:17

**draw**
14:3 179:1

**due**
152:23 266:8

**Duhart**
302:12

**duly**
6:10

**duplicate**
265:2

**duty**
225:24

E

**earlier**
44:11 48:6 55:10 58:1
214:2 217:1 281:2
286:15 287:9 318:20
390:12 395:4 400:10

**early**
90:14 113:18 123:11
128:25 154:21 156:8,17
212:11 276:16 355:20
365:25 380:11

**Eastern**
29:8 30:20 31:12,14
35:23,24 36:1,2,4,16,19,
21 62:19 71:20,22,23,24
72:1,9 74:10,23 88:24
92:24 95:10,14 97:2
103:7 104:12 118:25
122:21 123:10 124:11,
23,25 125:10,16,22
126:3,5 127:3 128:5
130:24 131:5,19 132:10
133:11 134:1,4,13 137:3
138:5 139:7,11 142:7,12,
13,18,24 143:2,4,5
144:10,14 147:25 148:25
149:24 151:6 154:23
155:6 157:11 158:22,25
168:18 170:2 172:24
174:8,11 177:8 193:22
196:20 202:13 209:23
210:2,12 233:4,14 234:5,
6 238:5 239:2 244:3
246:17 253:11 254:18,20
256:6 257:10,22 259:14,
16 260:25 261:12 278:5
280:15 287:6 288:22
289:7 290:18 343:5
344:4,5 355:9 371:10
385:20 397:2 398:2
399:6 400:24,25 405:20
410:4,9 412:7 416:14,19
417:12 421:23 422:5,6,
13

**easy**
50:10,13

**Economus**
13:6,7,8,10,12,18 14:2,
10,13,14,16,18,21 15:12,
19 16:2,4 18:8,16,17
19:15,17,22 282:7,20

396:16 399:13,15,16,19
400:2,3,22 404:19,24
407:10 415:1 425:22

**EDS**
252:25

**effect**
415:8

**effective**
221:11

**effectively**
157:7

**effects**
248:19

**effort**
310:24 342:1 396:11

**efforts**
195:12

**effusion**
302:11 330:24 331:1

**Eggers**
362:10,23 363:17

**eight**
122:17 169:19 205:3,6,7,
8,13,14 279:18,21
299:17 364:6 381:20

**either**
19:17 22:12 29:6 35:11,
25 42:7 48:8 51:6 71:22
88:19 89:18 107:12
131:1 134:24 148:10
154:21 160:4 198:1
223:1 231:22 236:24
355:21 370:15 377:24
385:16 390:16 391:2

**Electron**
252:25

**electronic**
354:1

**electronically**
60:23 354:5

**elements**
390:22

**elevate**
375:9

**eliminates**
148:10

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i19

**Elizabeth**
5:23

**Elyria**
318:2

**email**
26:7,17,18 42:7 64:9,22
67:22 90:6 113:8 116:18
117:13,21 203:19 235:1,
2 325:1,3 352:22 353:11
354:10 383:9 385:15,19

**emailed**
43:4 64:24

**emailing**
235:6

**emails**
26:10,14 41:9 68:9,14
69:5,10,24 70:1 111:13,
14,15,19 113:1 114:17,
19,20,22,24 115:8,9,13,
15,18,25 116:12,25
117:4,9,23 118:2 134:20,
21,23 135:4,14 235:2
353:1,5,8,15,20 354:4
381:13,24 383:12,18
384:6,22 385:1,4,12
386:9

**emphasizes**
59:24

**employed**
401:21

**employee**
282:15 401:23 402:3

**employees**
92:10 127:13,14 301:2,3

**employer**
326:25 332:16 392:13

**employers**
330:9

**employment**
330:14 331:18 332:18,23
336:4 337:6

**empty**
142:11,13 144:1,10,13
148:12 157:14

**EMT**
261:6,14 410:18,19

**Emtal**

96:19 101:19,20 127:19
128:9,12,16 137:6 139:5,
19 142:2 143:7,18,21
145:11 146:13,18,20
147:5 148:7 149:8,16,19
150:17 151:1 205:16
209:10 210:21 211:5,11,
12,15,25 212:13 241:13
243:1 260:4 300:17
308:8 342:7 343:4
344:21 355:2 363:25
370:15 372:7 397:20
399:2 400:14 401:17
403:12 405:1,4 408:19
418:9,12,19 421:6,8,18
423:18,22,25 424:7,8,22

**Emtal's**
148:16 235:25 274:24
275:3 276:1 280:12
401:8

**enacted**
106:16

**enclosed**
308:20 309:3 312:4
398:23

**encompassed**
285:25 325:20,22

**encouragement**
146:13

**encouraging**
60:5 144:23 145:2

**ended**
235:16 311:9

**ends**
155:10

**engaged**
266:20

**Engelhard**
82:25 88:17 90:1,11,16
92:15 96:24 97:1 106:1
107:1,2 116:17 134:13
139:13 173:24,25
174:15,21 205:1,25
253:20 256:8 257:8,21
258:14 259:11 260:2,16
284:21 289:1 295:8
342:15,18 343:4,7
344:13,21 348:23 370:16
371:6 396:23 399:2
401:6,12,13,16,21,23

403:11 405:15 406:6,25
407:3,25 408:15 410:8
411:20 412:4 416:19
417:23 423:9 424:7

**Engelhard's**
205:5 236:2,7 396:19
423:21 424:20

**enjoy**
53:13

**enlighten**
16:9

**ensure**
354:4

**enter**
164:13 237:19

**entered**
355:25

**entire**
34:1,3 121:14 310:24
325:23

**entirely**
257:15

**entirety**
34:8

**entities**
125:19 150:23 151:1
234:7 265:10 304:21

**entitled**
39:8 48:24 49:5,7,14
136:25 149:23 207:19,24
221:14 273:3 274:24
300:16 349:24 352:23

**entity**
148:23 149:2,5 177:12

**entry**
273:4 347:17

**epidemiologist**
361:16

**equal**
167:19 185:9 187:6,11,
20,23 188:6 229:7

**equally**
167:19

**equivalent**
148:5

**Eric**
6:3

**Erin**
96:14 101:6 201:3,4,22
277:17 278:13,22 279:2
300:2 326:9 375:14

**errata**
34:5 35:2,5 36:22 39:7,
10,14 40:13,22 41:7 42:6
49:12 50:17,25 51:8 52:5
54:25 70:25 71:5 72:14,
15 73:1,4,9,25 75:2,3,17
80:4

**error**
36:14

**especially**
184:24 341:14

**ESQ**
6:7,13 387:14 419:8
423:14 425:7

**Esquire**
200:23,25 236:4

**essentially**
282:14

**establish**
274:3 275:18 391:13,15
392:2,8 396:12,24 397:2
417:7

**estate**
9:18 10:6,10 55:24 56:7
59:9 84:12 236:6 274:16

**estimate**
181:15,17,22 193:4
372:2

**estimating**
113:22 181:21

**et**
5:5 152:13 326:19

**et al**
5:5

**Ethics**
349:24 350:22

**Eugene**
336:21

**event**
59:13

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i20

**events**
233:15

**eventually**
282:25 283:2

**everybody**
38:15 52:1 359:20 377:5

**evidence**
88:24 90:23 91:1 92:9
95:12 102:16 104:11,14
127:3 140:11 141:21
143:12 145:25 147:11,
23,25 151:19,23 152:3,6
153:19 154:8,11,13,24
155:1,2,4,6,25 156:9,16,
20,24 157:3,6,7 158:5
159:9,12,15 176:25
193:9 196:22 197:4
202:17 208:23 209:24
210:12 211:11 236:1
242:19 251:5,9,19,23
256:23 257:1 259:13
260:21 261:4 263:8,10
264:2 265:22,24 276:13
280:20 281:10 289:12
292:1 293:4 307:22
322:17,23 392:1,7,22
394:23 395:2,9 396:9
403:6 410:16 416:13,14,
25 417:9 418:11,18
421:4 423:17,24 424:14

**evidentiary**
274:2 348:7

**Ex**
70:25 71:3,6,9,10 79:22
133:17 198:22 204:4
235:21 281:25 354:13

**Ex1**
109:2

**exact**
9:25 187:8 211:3

**exactly**
74:20 116:21 159:13
202:11 237:23 238:4
293:9 325:15 355:16

**examination**
6:9,13 52:22 297:16
387:14 425:7

**examinations**
245:1,15 285:1 295:11

**examined**
6:11

**example**
13:19 30:25 105:10
240:8 250:9 344:7,20
348:13 420:18

**examples**
251:10

**exams**
321:16

**Excel's**
325:7

**exception**
169:14,15

**excerpt**
290:11

**exchanged**
111:13 162:24

**excluded**
169:5

**excuse**
14:12 27:25 29:15 33:15
58:7,14 71:8 160:5
172:15 209:22 238:13
250:24 305:21

**excused**
189:6

**executrix**
55:24 56:7 84:12

**exhaustive**
121:13

**exhibit**
17:1 25:2 32:23,24 33:3,
17 34:6 55:7 63:7,8
70:22 71:10 120:9
136:24 138:7,8 149:22
150:12,13 151:4 152:11,
12 153:2,7 155:8 175:4,6
177:18 178:24 204:13,16
213:1 221:13,14 241:4,5
243:8 246:20 247:9
260:23,24 262:13
263:15,17 264:22 265:1
267:12,14,15,22 273:3
274:23 275:11 276:6
280:4 281:21,23 282:3
284:8,18 286:19 288:3,4
293:19 294:13 300:4
305:17 308:19 310:9

312:2 313:15 314:5,18
316:25 318:3 320:15
323:7 345:18,19,20
347:17,24 348:13 349:23
387:25 388:3 396:14
399:9,25 404:15 405:11
406:11 409:16,22 410:6
411:13,15 413:11 414:3,
5 418:2

**exhibits**
291:16,18

**exist**
19:12 121:12 160:1
420:20

**expect**
15:20 100:25 122:2
163:8,12 211:21,24
223:3 225:18 307:13
390:6

**expected**
289:12 291:3 307:8

**experience**
195:19,23 206:11 209:8
216:22 224:24 229:22
248:14 251:22 263:7
285:23 286:23 289:10
372:6 388:23 403:23
412:23 419:14

**experienced**
66:12 191:14 255:6
257:3 268:25

**expert**
249:19 270:19,25 271:4,
21 272:3 273:19 274:1,8
283:15 322:5,8 360:25
361:15,19 362:4 405:21
418:16

**experts**
273:23 363:3,12 404:6,
10

**explain**
136:10 190:17 206:3
251:21 371:1 385:15

**explained**
88:14 209:2 214:2 217:1
267:5 278:17 304:16
308:11,17 333:2 373:17,
19

**explanation**
225:1 273:24

**explore**
250:7 280:18

**exposed**
95:9 96:19 119:25 120:5
153:13 174:9 176:18
186:4,10 187:7 206:6
222:14 239:19 240:10
261:5,11 262:8 280:17
314:23 316:8 388:12
391:22,24 392:21,24
410:18

**exposure**
29:8 31:14 36:4 72:2
105:3 125:4 142:6
156:25 175:19 183:21
185:6 186:8,14,19
187:10,24 188:1,7
206:12 207:3 292:24
301:21 312:10,13,19
328:8 334:10,16 344:2
346:23 388:11,17 389:1,
6,7 390:19,23 395:11
396:6 417:15

**exposures**
105:15 175:17 331:18
337:19

**Express**
42:9

**extensive**
393:23

**extensively**
45:20

**extent**
36:15 110:14 194:4
258:7 283:11 302:1,20
339:19 373:13 415:4
424:25 426:9

**external**
289:8

**extra**
207:16 396:17 402:9

**extract**
326:20

**extremely**
183:23 186:17 249:25

**eye**
256:19

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i21

**F**

**face**
216:4 239:10 241:25
359:5

**face-to-face**
367:20

**facilities**
156:4 157:4 161:13
281:4,9,11 286:24
314:22 316:7 322:11
420:18

**facility**
31:17 127:13 186:8
212:14 317:25

**fact**
36:20 42:5 60:22 103:4
104:2 117:10 120:13
125:15 130:1 131:18
141:10 151:23 152:5
159:20 162:12 176:18
199:21 200:19 210:20
215:10 217:7 218:8
258:19 262:23 266:6
269:6,9 331:1 341:7
366:19 374:16 410:17

**factor**
105:12 185:7,21 186:1
217:16 410:20

**factoring**
187:23

**factors**
185:22

**facts**
19:7 46:2,3 87:5 88:9
89:10 103:15,16 109:16
111:7,8,15 112:1,2,25
113:2,3 114:6,11,13,16
115:25 116:12,14,16,19,
24 117:4,16 118:2,16,21
119:22 122:14,23,24
123:3,4,6 126:7,19,20,
24,25 127:1 129:20
131:9,13 132:6,10,17,25
133:3,8,9 134:24,25
135:6,13 143:20 174:4
194:22,23 196:2 197:24
231:24 232:6,13,25
233:22 234:3 236:21
237:21 278:25 279:16

283:5 298:16 299:11
340:10,25 365:11 368:5,
15,19 369:3,7 370:6
371:5,8,16 372:10,16
373:2,4,9,22 374:23
376:4 378:2,11,13,23
379:10 380:1 381:25
426:14,15

**factual**
101:10 110:16 113:25
131:2 139:4 142:1
143:16 146:16,19 147:4,
9 148:6 203:9 206:24
217:3 244:15 249:20
254:2 280:12 281:15
298:14 375:20

**factually**
157:17,22

**fail**
274:2

**failed**
273:18

**fair**
47:9 77:10,19 78:1,7
80:14,15,17 97:10
101:15 103:12 113:23
114:1,7,13 131:21
136:15 138:17 141:16
157:19 160:20 168:22
172:25 186:11,12,13
187:12 212:8 220:19
236:11 238:17,20 247:16
256:21 260:19 264:20
271:5 272:8,12 298:16
303:17,20 304:4,10,13
307:25 308:3 310:10,14
311:21 315:12 319:23
320:4 327:20 339:1
341:17 374:4,19 375:19
381:6 388:13 412:21

**fairly**
40:25 45:1 85:20 222:25
329:25 340:17

**fairness**
393:10,19

**faith**
56:18 59:23 142:1
146:15,19 147:3,8 148:5
280:12,15 281:15 298:12

**falls**
413:9

**false**
228:15,17 229:5,17,24
230:9 360:5,8 424:1,15

**familiar**
10:23 79:3,5,8,9,12,13,
14,17,20,25 80:5,13,16
88:9 106:12 118:3
128:20 182:15 197:23
208:10 223:8,10 279:9
317:7,25 320:18,19,24
393:7 399:12 406:15

**familiarity**
88:8,12

**familiarize**
80:10

**family**
84:19,20 95:22 162:25
299:20

**far**
19:12 79:1 92:24 107:11
113:14 130:7,11 144:12
166:22 170:3 186:19
195:23 201:18 207:9
214:14 218:4 237:16,18
301:25 302:19 317:22
386:25 415:5

**Farrell**
319:16

**father**
13:11 19:17,22 415:1

**favorable**
252:17

**February**
265:20 293:21 294:14
314:19 377:16 402:7,12

**federal**
6:9 25:11 66:2,20 82:16
83:1,7,16,20 84:9,13,16
194:14 201:15,17 264:3
322:12 411:22 415:9

**fee**
84:23 85:8,22 87:15,21
88:1 163:13,16,19,21,23
164:1 165:24 166:1,3
198:6 333:20

**feel**
92:4 110:3 158:5 241:3
421:7

**Feeley**
63:11,13,14,20,23 66:25
67:1,3,4,22 68:9,11
69:10,11 70:1

**feels**
351:20

**fees**
8:22 14:5 56:19 334:5

**feet**
203:23

**fell**
167:5

**fellow**
129:6

**felt**
136:17 365:9,16 376:10

**fence**
50:5

**fend**
159:10

**fiant**
60:18

**fiber**
175:21 211:2

**fiberglass**
413:15

**fibers**
236:3 269:3

**field**
271:3 326:17,18

**fields**
326:22

**fight**
319:22

**fights**
92:1

**figure**
35:20 36:7 71:17 76:15
108:5 119:24 220:25
238:3 341:11,13,14,16
349:14,18

**figured**
176:2 385:24

**file**
31:3,21 36:8 56:5 60:20

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i22

61:15 72:8 74:10 76:16
77:18,25 78:5,6,12 138:2
141:23 147:4 148:2,6
157:18 158:10 159:2
161:2 181:10 182:7,9,13,
14 210:3 223:7 232:9
233:2 234:9,23 235:17,
19 236:16 237:1,3
274:17 330:4 333:9
338:15,19,20 339:5,13,
14,17,18 340:13,14
341:1,9,10,20,22 342:1
349:16,20,25 353:13,16,
20,25 354:6,12 363:24
364:10,11 391:11

**filed**
7:12 9:14,17 12:9 18:14
19:19 29:5,13 30:19,22
31:20 35:23,24 36:9,16,
19,20 39:5,6,8 55:22
56:7,17 66:2 71:20,21
74:23 76:17,23 78:15,18
83:19,22,23,24 123:10
138:15,17 139:2 142:4
148:1 160:9,11 204:22
206:8 209:10 210:5,22
218:5 234:5 275:15
276:18,20,21,22 280:11,
14 306:9 312:4 348:23
382:18 391:10 408:25
411:21 412:4 413:14
417:13

**files**
46:25 118:4,15,19
122:16 180:19 182:1,2
203:15,16 236:24 306:21
307:1 323:15,19,23
324:12,24 325:9,11,12,
20 326:10,16,21 338:21,
25 339:22 341:16 345:22
346:6,13,19 347:4
349:13 353:25 364:6,7,
13

**filing**
109:8,10 142:2 148:25
159:2 160:7 180:20,23
241:17,23 409:23 416:19

**filings**
273:8

**filled**
405:25

**films**

183:1,2

**final**
210:18 268:3

**finale**
314:17

**finalization**
303:10

**finally**
28:17

**financial**
386:14

**find**
20:25 44:19 45:12 49:5,
14 69:1 74:18,20 98:22
134:22 198:16 203:13
205:12 227:7,14 236:21
237:8 271:3 304:22,25
310:11 330:5 341:9
377:7,22 391:23 392:6
409:9

**finding**
55:19 56:13,23

**findings**
424:21

**fine**
53:22 161:4 308:10
396:2

**finger**
142:6 144:8 145:3 148:9
242:7 417:6

**finish**
86:21 159:14 178:19,20

**finished**
93:19,21 251:1 379:19

**Firestone**
156:15 328:20,25 329:14
331:22 334:21,22 335:8
343:13

**Firestone/thew**
331:22

**firm**
6:23 8:14 9:4,5 12:9,19
13:9,18 15:5,6,24 18:2,7,
9 25:25 26:4,15 27:9
35:16,20 59:16 60:4
61:7,14 64:8,9 71:18
85:22,23 117:20 166:4,9,

10 172:12 195:17 197:2
202:5,22 225:18 242:25
276:22 278:14 279:12
295:8 326:5 343:24
345:23 354:9,18 358:3
373:14 375:13 376:3
381:24 398:9,25 399:5
412:7

**firm's**
59:21 353:16,20

**firms**
15:22 166:8 167:4

**first**
6:10 13:12 32:18 40:11
88:16 89:20 90:1,16
92:12 96:2 110:18,21
111:8,10 117:18 119:20
135:15 167:1 174:20
184:15 192:15 199:22
200:20 205:4,6,8 259:20
261:19 267:16 268:14
292:6 316:3 360:12
368:3 371:4 378:9
381:21 384:17 392:4
398:8

**five**
94:15 96:1 98:13 99:24
100:2,4 108:11 110:5,6
113:4,20 115:21 126:16
155:10 238:18 284:3,6
296:22,23 313:6 339:24
354:24 355:5 384:22
388:1 412:14,15

**five-inch**
115:14 235:1 381:12,23

**five-minute**
111:10 173:20 364:17

**floating**
207:16

**flooded**
405:6

**floor**
127:10,11

**Flory**
42:2

**fly**
369:22

**flyer**
410:14

**folks**
53:10 202:5 364:23

**follow**
269:24 310:5 352:19

**Followed**
184:3

**following**
79:16 218:24 219:1,4,6
220:10,11,13 247:4
285:2,14 306:9 316:6

**follows**
6:12

**fooled**
256:6

**footnote**
59:10

**Ford**
315:8,9 327:1 328:4,5,16
330:6,8 331:15 337:11

**foremost**
184:15

**forever**
326:18

**Forge**
315:8 328:5

**forget**
25:24

**forgotten**
78:16

**form**
10:17 15:2 16:8,19 26:23
36:10 58:5 59:3,19,24
60:20 61:2 64:1 77:21
78:9 79:11 80:7 92:19
93:10 98:24 102:18,20
113:6 114:3 115:22
118:7 121:24 123:1
130:20 131:16 136:6
144:3 145:1,13 147:18
158:8 165:23 168:4
170:13 171:17 172:11,19
180:7 181:2 185:15
187:5,16,18 189:17
190:5,9 191:5,7,20,22
192:22 194:10 195:4
197:20 201:9,21 202:9
203:22 206:14 208:16
209:15 212:2,4 219:15
221:10 222:10,23 226:4

230:2 232:3 234:1
235:11,13 237:14 238:14
240:6,14,15 242:15
244:13 247:24 248:24
250:17 251:8 252:12
255:23 258:5,24 259:22
269:14 271:7 272:10
275:6 278:11,21 279:8
280:1 281:17 305:8
319:14 324:20 344:11
364:3,22 373:7 374:21
379:13 382:4 385:8
389:11,13 398:18

**forma**
51:16

**formal**
353:25

**formed**
13:16

**former**
6:22 7:1 12:7,10 13:9

**forms**
60:5,14,19 180:14,19

**forth**
146:24 236:5 242:20
285:10,14

**forthright**
421:24

**fortiori**
52:20

**forward**
159:19 354:21 360:21
383:2

**forwarded**
59:17 297:5 400:13
403:5 424:11

**found**
56:10 118:14 129:13
133:25 134:16 147:23
155:18 193:23 202:17
213:14 217:8 220:13
221:11 253:21 254:14
268:22 287:12 288:10
298:10 304:9 402:17
403:8

**foundation**
16:20 18:11 19:5 29:23,
25 36:10 40:17 59:3 68:7
92:19 93:10 115:23

123:1 131:16 135:8
145:13 147:20 157:21
158:8 172:11,19 181:2
183:5 187:17,19 188:4,5
189:18 190:6,9 191:5,7,
22 192:22 195:4 197:20
201:10,21 202:9 203:22
206:14 208:16 215:14,21
217:21 219:16,17 221:10
222:10 224:21 225:14
226:5 228:10,20,21
229:9 235:14 237:14
238:14 240:6,17,18
242:15 244:13 247:24
250:17 251:8 252:13
255:24 258:5,24 269:5,
14 271:7 272:11 275:6
278:21 279:8 280:1
281:6 298:18,21 299:14
300:22 305:11 324:20
373:7 374:22 379:13
381:11 385:9 389:11,14
390:10 397:24 398:18
401:10 406:20 424:24

**Foundry**
312:22 315:1,8,11

**four**
81:18 98:15,17 355:10
384:21 385:18

**four-**
235:1 381:12,23

**four-inch**
115:14 117:8

**fourth**
151:13

**frame**
30:23

**frames**
159:21

**Francis**
347:20

**frankly**
45:1 130:25

**fraud**
19:24 95:8 96:18 202:13,
20 322:14,23

**fraudulent**
199:18 208:19,20,22
266:20 267:7 294:20
295:2,3 373:15

**free**
147:24 284:24

**frequently**
292:8,9

**friend**
37:13,15

**friends**
64:16,18

**frivolous**
416:16

**FROI-1**
59:18 60:20

**front**
32:10 53:2 249:6 326:1
380:2 388:6 409:8
413:16

**Fuenning**
302:14

**full**
123:16 236:11 261:19
267:16 303:17,20 398:5

**function**
68:17 325:8

**funny**
68:25

**furnished**
32:17

**further**
35:14 135:20 273:17
406:6 425:5,7

**Furthermore**
55:13

**future**
32:3 353:2

**G**

**Gale**
401:24 402:1

**gallery**
121:1

**Gallucci**
5:14,15 80:24

**Gary**
336:14

**gasket**
385:21 386:8

**Gasper**
332:11

**gathered**
110:12 194:25

**Gavin**
129:18

**Gayle**
100:13,14 162:17
367:13,16 380:19

**Gee**
64:18 346:24

**Gelbard**
20:16

**Gelbard's**
20:17,21

**Gene**
5:21 38:5 75:13 379:1

**general**
156:15 260:16 294:10
330:6 336:23 337:12
343:13

**generally**
149:9,10 271:17 371:15
392:15 404:3

**generate**
77:2 78:24 342:22 347:7,
9,12

**generated**
14:6 347:10

**Gentlemen**
58:15

**genuine**
410:16

**Geological**
289:22,25

**geologist**
361:1,4,7,13 403:22
404:1,4

**geologists**
360:24 361:11

**George**
322:3

**Georgia**

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i24

146:6 151:5 307:23,25

**get all**
358:15

**getting**
134:20 161:7 169:1
319:22 421:7,17

**gist**
88:14

**give**
16:10 29:2 32:22,24
81:19 100:8 180:13
183:2 237:6 248:13
249:18 251:10,17 252:6
254:11 297:11 347:11
355:23 377:24 397:25
409:17

**given**
33:20,23 34:1,3,4,5,8,13,
17,19,23 44:10 103:11
134:2 234:8 257:13
258:3,14 291:2,15
296:18 297:8 323:25
325:11,16 326:8 327:5
344:5 346:3 347:10,13
351:19 369:21 388:23
398:14 399:16

**gives**
48:23 405:22

**giving**
250:18 257:12,22 268:24
272:4 398:15,20 421:13

**glib**
418:14

**global**
124:20 125:19 167:9,11
169:4,14,16,24 304:8
305:5 308:21 311:21

**go**
17:12 32:20 33:6 36:23
37:19 49:23 51:10 55:1
68:14 69:17 103:16
105:6 107:5 112:7,19
118:15 119:15 178:9
190:13 200:15,18 207:6
226:20 230:12 233:2
235:17 237:7 238:21
262:1 270:24,25 272:17
276:4 287:18 289:18
293:12 306:21,25
318:22,25 324:21 326:18

330:4 338:18,20,24
339:5,21 340:14,24
341:9,15,20 342:1
349:13,16,20 353:13
354:13 360:20 365:16
369:21 376:20 377:6
380:18 384:18,21 385:24
386:1 392:6,25 402:6
409:11 417:3

**goes**
48:20 144:12 257:3
352:25

**going**
18:4,19 27:6,17 32:21,25
33:16 40:2 43:2 52:4
53:4 54:17 63:5 68:13
69:18 82:9 86:12 99:7
101:8 106:8 109:1
112:17 115:6,10 119:13,
14 123:19 134:21,22
136:15 137:11,18 156:12
160:14 172:24 175:5
180:1 184:19 188:20
193:3 198:5,21 202:10,
12,19 204:12 221:13
230:12 241:4,17 242:8,
11 243:7 246:12 255:11
276:6 294:12 297:11
301:4 305:3 311:12
314:18 316:21 318:21
320:23 331:11 335:19,24
341:5,22 360:14 364:7
366:13 368:8,17 369:23
370:12 373:25 387:9,17,
18 393:18 395:10 405:7,
10

**Gonzalez**
292:17 302:12 412:2

**good**
6:15,16 7:20 38:2,4
39:25 40:3 45:5 96:22
125:10 139:9 142:1
146:15,19 147:3,8 148:5
156:24 157:5,6 168:1
182:24 193:5 221:12
240:25 280:12,15 281:14
297:12 314:1 315:2
343:12 390:17,19
395:21,22 415:21,22

**Goodrich**
31:6 95:10 153:20
170:18,19 175:14 177:7
283:18 286:10,20 287:16

288:13,23 330:20 343:13

**Goodyear**
127:7,8,9,11,12,14,15,
16,20,22 128:4,8,13,17
156:15 170:18,21 208:7,
24 209:2,4,7 210:6,10,
14,20,24 211:1,14,17,24
212:8,9,15 280:16
286:10 288:23 300:13,17
301:1,3,15 331:2 332:12
335:10 343:13

**Goodyear's**
212:22

**Gordon**
6:5 65:18 129:1 131:19
132:11 133:10 244:2,5,7,
15 296:25 354:20 359:6
381:7 412:6

**gotten**
51:5 122:3 297:10
388:25

**government**
392:11

**gradations**
186:20

**Graham**
90:19 98:1 113:11
238:25 240:22 241:8
243:2,3,4 262:8 263:2
274:15 275:12 276:8,16,
18,25 277:6,10 279:9
355:8 356:15 408:25

**Graham's**
94:12 238:24 274:16
275:21

**grand**
322:12

**grant**
137:11

**granted**
261:25 262:3,4 274:5
276:7,9 278:5 409:5,7,
10,12 410:1

**great**
42:13,15 45:8 52:13

**greater**
116:13 187:10 389:7,18

**greatly**

185:5

**ground**
150:1

**grounds**
40:16 137:7,18

**group**
101:21 102:14,24
103:12,21,25 130:4,12
150:25 151:10,17 152:8
167:16,25 170:17 307:3
311:19 403:6 424:13

**groups**
333:4

**guess**
7:22 56:1 57:23,24 93:11
107:4 123:3 158:21
183:7 196:17 202:1
203:11 205:3 217:23
229:19 230:15 231:1
255:18 256:4 283:10
299:8 317:24 331:9

**guidance**
38:18

**Guide**
349:25

**Gumm**
312:8

**guy**
124:14

**guys**
42:8 366:20 382:18

_____

**H**

**hac**
7:25 8:2

**hadn't**
51:5 124:11

**half**
122:17 278:1,7 351:4
364:6 372:2,3 425:19,23

**Halket**
6:3

**Hall**
177:11,15 275:20 422:5

**hallway**
49:3 162:16

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i25

**hand**
32:3 42:8 67:20

**handed**
40:12 284:7

**handful**
333:9

**handing**
316:25

**handle**
8:17 43:6 175:9 198:2
278:22

**handled**
118:24 119:6,7,9 131:20
136:2 171:25 195:16
227:7 230:4 282:16
361:15,19

**handling**
9:1 84:16 136:20,23
137:22,23 198:5 209:17,
19 210:21 216:22 365:6

**handwriting**
364:13

**handy**
41:7 396:13 413:12

**Hang**
17:5

**Hanna**
347:20 363:7

**happen**
47:12

**happened**
9:4 88:22 97:14 110:17
118:18,22 119:8 136:11
150:7,9 231:21 232:25
233:18 261:23 279:14,17
306:19 342:7 372:6

**happening**
235:16 243:5 417:4

**happy**
40:8

**hardest**
43:2

**harmed**
106:1

**Harold**
98:10

**Harris**
332:15

**Harron**
21:19,25 22:16 23:9
213:7,11,23 214:1,9,14
215:9,18,22,24 216:10,
25 217:8,25 218:8,9,10,
16,20 219:7,8 220:13
221:3,7 321:9,15,17,19
322:22 323:4 327:22
328:14 331:3,16,24
334:23 335:6 339:16
348:6 349:12

**Harron's**
22:18 215:10 217:12,19
221:4

**Harry**
5:17 45:4 112:1 347:19

**Harshaw**
205:20,21,22,24 206:1,2,
7,8,19,21,25 207:3,4,10
317:1,3,4,8,9,15,19,23,
25 332:15 342:16,19,20

**Harwick**
151:5 152:18,20 358:4

**hasn't**
32:13 365:3

**hat**
186:22

**haven't**
44:18 72:15 120:12
126:22 196:12 208:21
215:23 225:15 228:16
296:18 297:10 326:21
365:1,7,16 378:6

**HB**
275:19

**he'd**
51:20

**he's**
40:12,18 48:2 49:13 68:6
70:10 86:20 111:4
118:14 130:21 131:3
132:1 187:7 191:13
213:20 219:18 220:12,22
247:3,4,14,15 248:12,15,
18 249:4 256:5 296:12
300:12 320:1 321:21,24
334:3 335:8 350:21,23
361:3,5,6,8 379:3 389:11

399:4

**headnote**
55:12 56:15

**health**
294:7 402:18

**hear**
88:20 271:3 272:3

**heard**
16:11 18:13 19:11 21:14,
19 58:17 88:16 120:17
140:9 179:12 194:2
299:10 320:22 321:6
322:4,7 350:3 425:3

**hearing**
7:1,5 53:13 190:16
273:20 348:7 422:22

**hearings**
23:5,8 119:6 194:16

**heavy**
175:18

**Heights**
82:24

**held**
33:11 112:12

**help**
22:15 89:3,6 111:17
120:23 264:19 324:12
345:17 396:18

**helpful**
387:3

**helps**
269:3 392:8

**Hemstock**
401:21

**Henline**
332:20 333:13

**Here's**
133:24

**hereinafter**
6:11

**hey**
101:7 161:8 241:22
293:4 297:8

**hi**
82:6 364:18 365:23
367:24 368:2

**hidden**
158:23

**high**
36:3 72:1 181:24 292:25
364:6

**higher**
187:9,12 206:11

**highest**
184:2

**highlighted**
152:19 410:7

**highlights**
79:7

**highly**
203:23

**Hills**
315:9

**Hine**
5:9 42:1

**hire**
360:24

**hired**
403:21

**hiring**
361:1,13

**historical**
392:10

**historically**
118:3

**history**
96:24 184:23 268:8,16
316:2 317:7 326:19

**Hoffman**
334:8

**hold**
111:22 123:14 130:9
172:17 173:22 194:11
200:13 205:10 247:5
335:5 346:10 397:14

**holding**
246:7,9 297:11

**Holley**
84:11,19,22 94:5,20
95:7,19 96:8,17 99:22
100:9,24 101:9 102:11,
23 113:19 173:8,9,18,24

174:3,14,19,23 181:14
198:18,19 338:4 355:22
365:25 367:1 368:1,4
369:9 370:4 372:20
373:18,20 374:4,16,24
379:8 380:2,7,20

**Holley's**
369:8 371:5 374:7
377:15

**Holley/darnell**
181:20 182:7

**home**
222:17,18 224:2,14,18

**honest**
129:14 130:18 131:4
132:2,14 133:2 158:25
159:1 204:9,11 213:13,
14

**honestly**
293:3

**honesty**
7:15 129:11 243:24

**Honor**
38:5,11 41:9,19 42:13,23
43:24 45:3 46:16 48:17
53:8 54:5,14

**hope**
44:10

**hopeful**
159:8

**hopefully**
53:10 132:14 258:10
298:19

**hospitalized**
302:11 330:25

**hour**
81:19 351:4 372:2,3

**hours**
81:1,16,18 351:4,15,20
419:2

**House**
23:1,3,5 105:23 106:11
275:23 347:21 348:2

**hunch**
280:21,22,24,25 281:18

**hundreds**
82:24

**hunt**
51:11

**hurtful**
387:4

**husband**
9:13 59:6 153:10 162:10
199:16,17,20 222:13
224:18 261:16

**husband's**
59:8 236:6

**Hygiene**
265:12

**hygienist**
361:20 362:9,13

**hygienists**
361:21 362:15

**hypothetical**
19:8 191:12 329:8

**hypothetically**
329:10

**hypotheticals**
19:6

—————————

**I**

**I'D**
32:4 164:4,11 179:22
205:14 271:21 306:20
339:5

**I'LL**
13:1 27:4,10 32:24 43:24
63:6 68:7,14 70:19 76:14
86:24,25 87:10 123:9
139:1 146:7 178:10
228:3 238:6 240:20
251:10 258:11 264:15,17
267:18 270:2 275:11
281:25 298:19 311:14
353:12 354:11 366:21
370:1 395:7 398:4
410:22

**I'M**
5:17 14:19,20 15:3 16:9
17:13 18:16 27:6,17
28:15 30:2,4,12 32:21,25
33:15,22 34:10 37:14
38:5 39:9,24 40:8,25
41:9 42:4,21 43:2,21
44:1,11 45:7,9,10 49:7,

14 51:19 53:22 54:14
55:4 56:4 57:14,23 58:8
63:5 65:24 67:18 68:13
69:18 70:12,14 77:15
79:5,12,13,20 82:9
83:18,21,25 84:15,16,19
85:20 86:2 88:14 89:11,
13 90:7,18 91:4,9,11
93:2,18,20 94:5,13 95:22
96:1,9 101:3,16,21 103:4
106:12 107:16 109:1,6
111:8,13,24,25 112:1
113:7,22,23 114:18
115:10 116:18 119:13
127:1 128:20 132:25
134:2,17,20 135:13
138:4,22 144:20 146:4,
14 147:3 148:4,8 154:18
156:14 157:5 158:14
161:7 162:12 164:20
165:6,7 166:17 171:11
173:13 175:5,18 176:9
178:16,17,18 179:9
180:10,12 181:16,21,25
184:15 186:21 188:9,13
189:12 192:23 193:3
194:3 196:7 197:23
198:5,10,13 200:9,25
202:2 204:12,14 205:22
207:22 211:3,17 213:20
216:14,18 217:23 219:8,
23 221:13 228:5 231:9
232:4,13 233:6 236:19
241:4,17 242:6,8 243:7,
14,17 247:8 248:3,25
249:3,4,14,20 250:21
254:5,15 255:18 257:17,
18 259:17,18 263:14
264:9,16 266:3 269:21,
23 270:19 271:1,25
273:2 276:1 277:10,25
278:3,10,15 279:12
280:23 283:16 286:10,14
288:3 290:16 292:10
293:3,9 294:12 296:4
299:7,20 301:12 305:13,
23 309:12 314:18 316:25
317:7,11,12 318:3,12,14,
15,21 320:19,23 321:10,
12 323:9 324:18 325:23,
25 331:7,25 332:3 335:2,
24 340:17 341:5,11
345:18 347:18 349:1
351:21 352:8 357:6,7,25
358:22 359:5,7,13 362:1,

14,22 366:8,20 367:23,
25 368:8,14,17,24
369:23 370:12,23 372:19
373:16,25 376:21 378:25
379:6,8,14 382:15 383:5,
7 387:9,10,25 393:22
395:25 397:12 404:2,4
405:7,10 406:17 407:23
408:21 409:9,19 411:24
420:6,17 422:3,7,9
423:19

**I'VE**
17:16 19:11 20:17 21:5,
14,23 33:23 34:3,5,23
40:16 53:23 57:6 64:20
68:3,13 72:21 73:3,4,12,
17,20 79:6 91:1 92:1
93:23 94:17,24 100:9,10,
15 109:5 110:13 113:16
117:18,21 121:15 122:15
123:7 130:23 134:2
156:8 162:19 163:23
179:12 182:8,18,24
194:2,3,4,5 203:18 204:6
223:19 225:16 230:4
242:7 279:18 280:8
284:7 295:20 298:3
299:17 307:22 320:22
321:4 322:4,7 327:21
346:24 347:23 350:5
351:16 360:13 365:21
369:21 375:5 380:20,22,
24 383:18 387:11
389:19,24 397:10 406:16
423:1 425:1 426:7

**I-O-L-T-A**
352:11

**ID**
92:2 104:2,6 105:1 106:4
120:24 124:23,24 125:9
137:7,18 138:2,19,21
140:18,21 153:16 154:1,
3,5,11 156:5,6,20 157:3,
18 158:6,17 159:5,17
160:22 161:12,22
167:13,14 168:1,2 170:3,
8,11,15,19,23 171:1,15,
19 175:11 178:5 186:2,7,
14 208:23 209:10,11,21,
25 239:4,7,9,12 240:1
263:3 275:4,18 304:18
307:9 344:8 388:17
395:11 419:13 420:11
421:6 422:13

THOMAS W. BEVAN, ESQ. - 05/15/2018                                    i27

**idea**
    18:4 66:7,21 83:5 110:24
    166:5 182:24 217:6
    287:7 295:18

**identification**
    137:2 261:21 268:1
    388:10 390:17,23 391:3,
    5,8,15 392:3,9 396:6
    417:14

**identified**
    74:20 82:1 262:10
    322:25 389:4

**identifies**
    289:19

**identify**
    5:10 6:17 72:17 169:12
    248:15 250:23 325:8
    354:25 362:4 420:23

**identifying**
    34:11

**ignored**
    257:7

**II**
    377:17

**imagine**
    14:22 197:17

**immediately**
    75:17 293:17,18

**impact**
    353:1

**impacted**
    278:18

**impediment**
    196:11,13

**import**
    229:16 397:21

**important**
    23:13,17,22 104:19
    121:21 145:5 186:1,17
    210:18 314:12 316:19

**imposition**
    44:24

**impossible**
    406:1

**impression**
    347:15 398:19

**improvement**
    224:2

**inaccuracies**
    109:19

**inaccurate**
    24:17,18 76:21,22 78:1
    109:17 180:21

**inadequate**
    274:2

**inappropriate**
    88:18

**inch**
    364:6

**inches**
    122:18 384:22

**incidence**
    93:22

**incident**
    124:7

**include**
    23:9 29:12 30:20 31:19
    39:8 72:8 74:9,22 76:22
    78:11,15,19 107:15,17
    281:15 342:3,5,13

**included**
    30:9 36:20 39:4 76:25
    77:18,24 78:4,17 107:24
    146:1 166:9 276:18
    281:12 312:6 315:14,17
    348:20 408:22

**includes**
    36:7,18 76:15 107:8
    166:2 240:2 306:13
    351:13

**including**
    31:15 93:3 151:1 251:4
    351:4

**incomplete**
    35:3 40:14

**inconsistent**
    180:4,24 181:5 225:2,5,
    11 226:9

**incorporated**
    353:15,19

**incorrect**
    40:11 74:13,15,17

**increase**
    185:5

**indefinitely**
    354:1

**independent**
    13:13 84:21 85:1,2
    233:7,13 235:9 238:9
    243:15 258:8 274:19
    283:4 290:7 292:2

**indicate**
    61:3 339:2

**indicated**
    36:22 78:17 152:24
    214:5 273:21 314:21
    335:21,22 405:5 418:11

**indicates**
    30:18 252:16 338:17
    397:7 407:3 410:15

**indicating**
    236:2

**indication**
    218:11,14 297:8 327:16
    338:7 339:25 340:3,7,16

**individual**
    85:13 123:23,24 169:21
    185:6 193:2 195:20
    207:9 306:21 307:1
    364:9 391:24

**individuals**
    169:6 302:7 312:9,18

**industrial**
    361:20,21 362:9,13,14

**industries**
    179:10

**industry**
    92:5 125:5 144:12
    178:23

**infield**
    369:22

**inform**
    49:19 121:6

**information**
    101:11 115:18 121:17,22
    139:16 234:7,19 237:5,
    11 250:19 254:7 257:23
    258:7,9,12 283:16 326:3,
    7,15 329:23 330:5,17

**331:6** 338:24 339:12,20
    341:2 347:11 358:18
    372:9,20 375:20 383:21
    398:15 405:16 408:18
    412:5 416:20 421:8,17,
    25

**informed**
    49:20 152:21 163:12
    199:22 200:12,22 403:17

**initial**
    61:3 96:25 100:11
    102:11 174:19 199:5
    201:7,11,13 365:15
    380:14

**initialed**
    57:11 61:8 222:15

**initially**
    14:3

**initials**
    59:24

**initiate**
    59:19

**initiated**
    173:16 195:12

**injured**
    139:5 403:24

**injuries**
    149:4

**injury**
    135:17,21 185:12 236:12
    316:21 390:2 412:11,22

**inquire**
    39:15 48:24

**inquired**
    254:4

**insisted**
    422:16

**instance**
    30:24 60:7 85:20 93:13
    101:22 170:16 181:7
    196:17 210:2 287:5
    305:15 312:20 330:2
    341:22 416:2

**instances**
    60:25 93:16 341:21
    391:6

**instruct**
27:17 99:16 368:12

**instructing**
30:3 99:14 165:12

**instruction**
39:12 99:10 369:24

**instructions**
52:3

**insufficient**
150:3

**insulation**
175:20 177:23

**insurance**
350:22

**intake**
184:22

**integrity**
221:6

**intend**
31:3

**intending**
31:6

**intent**
142:16

**inter**
295:9,17 296:11

**interest**
89:7

**interested**
313:6

**interests**
110:2

**internal**
153:22 155:14,24 288:20
289:1,7

**International**
151:6 155:5

**interpose**
33:16 50:1 191:1

**interposing**
44:23

**interpretation**
221:4

**interpreted**

**31:7**

**interrogatory**
262:15,22 376:12 420:12
422:8,9

**interrupt**
188:18,21

**interrupting**
189:21

**interview**
376:3,8

**interviewed**
376:11

**interviewing**
184:18

**introduced**
367:20

**introducing**
367:13

**investigating**
96:18

**investigation**
119:21 155:18 245:19
288:9 315:25 391:23
392:2 395:11 396:5

**investigations**
244:25 245:14 285:1,4,8
295:11 322:13

**invoke**
370:1

**involuntarily**
30:13

**involve**
62:15 66:9,24

**involved**
8:15,16,25 13:5,11 23:1
62:12 66:13 82:13,15
83:1,16,18 84:8,13 93:3
126:8 182:18 206:19
218:9 232:17 262:22
275:13 278:16 279:3
415:4 416:23

**involvement**
8:19,23 9:2 18:5,21
214:15

**involves**
331:8

**involving**
82:16 211:14

**IOLTA**
350:6 352:11

**IOLTA/TRUST**
352:5,14

**iphone**
68:21

**isn't**
67:6 133:2 251:12
335:14 371:20

**Issa**
334:18 337:22

**issue**
9:25 10:3,5,9,12 11:7,20
12:1 37:2 44:9,25 45:17,
23 48:10 55:2 56:24
62:11 92:10 105:9 106:4
124:22 143:24 146:12
190:18,19,23 191:18
197:17 198:4 218:2,3,6
230:3 263:25 273:13
304:16 309:13 344:8
391:2 394:22 395:1
410:16 426:10

**issue's**
197:13,15

**issued**
44:14

**issues**
10:11 22:18 57:17 62:11,
20 105:6 143:22 194:18
209:9 410:8,12,13,14

**it's**
23:13,17,22 28:9 31:11,
18 32:9 39:17 40:3
41:22,23 43:12,15 45:4
49:1,2 50:9,13,20 51:16,
25 52:1,2,6,7 60:17 61:3
65:7,10 67:20 70:5,11,17
71:3 73:12 74:1 83:9,19
86:25 102:6 111:11
115:9,13 120:16 121:12
128:2 140:19 148:21
149:12 152:13 155:10,
14,25 157:11 158:1
175:6 183:22 185:6,7
186:8 189:17,20,25
191:13 196:14 199:3
201:23 206:5 207:19

208:20,22 211:19 220:20
223:5 238:17 242:3
243:9 244:14 246:16,21
249:3,25 251:11,15
252:3,16 254:23 257:21
261:10 264:20 265:2
270:5,6 272:16 273:3
274:23 276:3 277:24
280:4,8 290:17 294:14
295:20 298:4 300:5
313:16 320:15 323:11
329:25 330:18 333:23
334:24 335:14,18 339:4,
15 340:19 341:19,23
342:10,13 349:19 369:3
379:24 384:13,14,24
385:3,18 387:25 388:21
389:18 395:21 396:13
399:14 400:15 404:17
405:25 418:2,21

**items**
247:20 249:3

**its**
9:16 14:8 30:21 31:4
56:18 90:22 132:11
151:20 153:6 234:16
265:9 266:9 284:21
288:7 333:17 354:16,20
405:1,15 421:6

---

**J**

**James**
348:6 358:10

**Jan**
152:21 213:2

**January**
26:13 80:13 347:19

**Jared**
5:19 385:17

**Jef**
63:11

**Jeffrey**
398:10,24

**Jenkins**
306:16

**Jennifer**
94:12 238:24,25 241:8
243:2,3,4,10,20 262:8
263:2 275:21 277:10

408:14

**Jersey**
44:7 47:22 48:3,4 50:4
52:9,12 66:3,21 82:17
83:19 422:21

**Jessica**
275:15

**Jimmie**
332:11

**job**
47:19 110:3 176:19

**jobs**
222:18

**jog**
93:6,11

**John**
6:1 124:8 126:11 242:23
243:10 408:8 416:4

**Johnny**
331:21 337:20

**Johnson**
62:10,12,15,16,21 151:7
245:1,15,19 252:24
284:23 285:2,17,21
286:1 294:11 295:14
334:11 358:2 400:15

**join**
27:10 29:24 87:10
303:15

**joint**
222:14,15 225:8

**Joseph**
335:4,7

**Joslyn**
93:14,16,23 123:25
124:9,16 129:2,5 140:4,
12,13 141:2,14 147:21
283:8,12 357:24 401:4
415:16,19,22 416:3,8,11
425:21

**jubilant**
357:1

**judge**
37:18 38:2,8,12,16,19
39:22,25 40:4,8 41:1,4,6,
12,15,20,24,25 42:3,20,
24 43:8,12,15,20,21,25

44:6,13 45:5,9,14,17,25
46:5,8,11,17 47:2,5,6,10,
11,14,15,22,24 49:9,18
50:2,12,22 51:2,7,18,25
52:9,11,24 53:2,3,9,16,
18,20 54:2,7 133:1
134:21 136:19,21,23
190:9 191:23 274:11
276:7 347:19 358:10,12,
17,22,25 359:6,7,8,15,21
363:6,7 370:22 409:4
413:16

**judges**
23:18 415:9

**judgment**
107:12 137:2,7 138:18,
21 140:20 149:24 150:17
152:2 157:25 210:5
239:3,4,5 254:19 257:3
260:15 261:1,24 263:20
264:25 266:4,6 268:10,
14 273:4,9 274:5,25
275:3,7,9 276:2,9 363:2,
17 394:2 408:25 409:4,
25 410:10 413:14 414:1,
10,13,17

**judgments**
93:4 358:21

**judice**
265:6

**judicial**
358:9

**July**
263:2 305:25 306:7
418:5

**jump**
413:9

**jumping**
387:16

**jumps**
184:14 343:15

**June**
139:13 155:14 278:6
405:18

**jurisdiction**
56:25 57:3 132:22 150:4

**jurisdictions**
9:21 10:1 51:19 57:1,10

**jury**
322:13 389:1,7

**Justice**
351:5 370:24


**K**

**Kahn**
273:22

**Kathryn**
102:2,3 371:10

**Kathy**
316:8

**keep**
26:3 203:17 204:4
218:25 241:17,23 244:5
269:23 277:8 333:4

**keeping**
212:24

**Keith**
18:17 19:18

**Ken**
362:11 363:17

**kept**
51:11 315:21 352:15

**Kessel**
302:13

**Kevin**
5:13,15 39:23 75:22

**key**
390:13

**kids**
299:20

**Kimberlee**
5:4 13:20 33:21 94:14,21
98:1 113:12 198:20,23
199:2,8 280:5

**kind**
40:15 50:5 51:15 68:19
69:8 70:12 167:5 188:10
196:15 297:13,14,18
359:18,21 382:5,10
415:21 416:6

**Kirkland**
41:10

**Kluznik**

128:19

**knew**
17:21 77:10 83:12 89:1
96:23 103:17,21 104:4
114:5 154:3 159:13
162:24 197:3 210:4
236:15 244:2,5 265:24
286:23 287:1 288:6
303:18,22 308:4,7
316:18 359:12,13 371:7
382:19

**Knight**
334:13

**know**
11:10,25 15:23 18:12,15,
20 19:10,13 20:8,9,14,15
21:2 22:3,8,9 24:12
25:16 26:5,24 28:16
31:15 38:21 39:23 42:9
43:5 44:5 48:21 53:10,24
57:23 58:18 60:9 61:2,
16,24,25 64:6,8 65:2
66:9,25 67:2,3,5,13,14,
24 68:10,12,15,18 73:6
74:1 75:22 76:3,5 79:1
80:9 83:14,19,23,24
84:10 86:9 89:7 90:5,18
93:24 94:5,7,19 95:1
96:9 97:1,3 99:11 100:15
101:7,14 104:6 106:21
107:10 108:3 109:9,19,
21 110:17 111:13,14
113:7 114:4,5 115:13
116:3,15,21,23 118:9
119:10 121:10 123:19,24
124:10 125:8,25 126:1,7,
11,21,23 127:1,3 128:1,
3,21 129:8,9,12,15
130:11,22,23 132:1
134:5 140:15,19,24
141:1,13 146:10 147:6
150:7,9,11,21,22,24
152:1 155:23 156:11,22,
24 157:7,22,24 158:17
160:9,12,17 161:18
162:15,20,21,23,24
163:8,16,17,19,20,24,25
164:1 165:8,24 166:4,6,
21 167:16,23 169:19
170:2,5,16 171:2,6,19
172:3 176:13 177:22
178:12,15 179:4,22,23
180:8 181:13,19 182:8,
10,13,17 186:2 187:7

188:17 189:2 195:22,24 196:2,12,23 197:2 198:13 199:17 201:7,8, 11,13,18 202:10,23 203:3,4 204:5 207:9 210:4,16,17 211:18 214:2,3 216:2 217:11,23 218:4 222:1,3,12,21,22, 25 223:2,12,19 225:5,6, 8,15 226:10,11,19 227:5, 6,9,12 228:2,22,23 229:12 230:19,20,22 231:1,2,4,14 232:21 234:13,15 236:15,17 237:2,8 239:6,11 242:17, 18 243:13,20,23,25 244:7,14 246:8 248:6,9 249:13,23 250:18 252:7 253:8,14 255:10,16 256:2,5,13 259:8 260:5,7 261:23 262:7 264:11,16 269:6,9 270:20,24 271:9, 10,12 272:15 274:13,17 277:18,19,24,25 278:4, 25 279:18 280:8 282:16, 22 283:1,19 287:6 288:13 289:3,5,6,8,16,17 290:13 291:6,24 292:9, 11,14,23,24 293:1,6,9,11 294:9,24,25 295:21 296:12,13,18 298:3,10 299:2,21 301:14 302:12 305:24 307:5,17 309:3 311:8,13,14,23 313:5 314:24 315:19 316:10 317:6,12,22,24 318:17, 18 320:19 321:4,8,14,17, 20 322:2 325:15 326:11 330:23 332:9 335:18 336:4,19 338:18,22 341:7,23,24 347:9,14,16 351:2,21 353:7,12 355:17 357:17,20 358:23 359:12,24 361:3,10 364:12 367:2,17 371:7,8, 25 374:17 379:14 381:20 382:1,5,9,15 384:4,24,25 385:3 386:10 387:1 390:8 391:16,19 392:20 396:13 398:10 401:20,23 402:9 406:13,15 407:5 412:17 413:12 415:6 417:2,9,10 422:3,16 423:23 424:5,9,15,19,25 426:7,9

**knowing**
179:20 230:10 307:16

**knowledge**
110:16 131:9 208:20,22 209:9 263:6 279:4 350:22

**known**
48:6,7 63:21 100:6 183:20

**knows**
195:24

**Krishan**
21:12

**Kyle**
6:5

---

**L**

**L.C.**
21:6

**laboratory**
290:7

**lack**
40:16 137:2 150:4 157:6 260:21

**large**
127:4 139:8 177:9

**larger**
76:24

**Larry**
329:14

**lasted**
140:9 371:25

**late**
44:1 154:20,21 159:3 199:21 200:19

**laugh**
416:6

**law**
5:8 10:3,5 11:20 14:23 15:4,6,22,24 18:2,3,9 35:16,20 71:17 123:12 132:21 240:2 246:12 264:3 268:2 354:18 393:14 398:25 399:5 415:5

**lawful**
6:8

**lawsuit**
6:20,22 12:6,15 13:5 18:13,18 19:25 20:4,11, 15 29:5 30:11,13,19 31:18 47:21 56:6,9 66:2, 21 135:17 163:5 173:10, 15,17 205:16 206:5,9,22, 25 236:7 390:1 391:5,7 414:21

**lawsuits**
29:13 145:11 147:5 416:19

**lawyer**
46:14 47:7 49:4 52:2,21 53:17,24 66:12 75:15 82:23 90:10 132:20,21 136:7,8,10 148:17 161:11 185:19 220:25 225:24 249:2 251:3 254:1 255:6 257:4 268:25 271:2 272:2 278:23 285:24 352:15,25 354:2 388:24 403:23 423:5

**lawyer's**
48:24 186:22

**lawyering**
136:9 250:8

**lawyers**
19:14 27:8 38:6 119:1 132:11 158:24 191:15 216:8 225:18 226:6,11 255:11 326:3 390:6

**lay**
285:7

**lead**
48:7 116:10 125:18 263:12

**leading**
394:16,25 395:14,16 398:18 424:17,24

**learn**
199:20 232:25 301:6 415:8

**learned**
300:23 301:6 303:23 304:2,6 319:15

**learning**
423:16,20 424:6

**leave**
112:4 189:3

**led**
9:3 46:24

**Lee**
260:3 297:3,6,7,25 298:1,3,10,13 403:6 408:23 424:13

**left**
77:9,13,17 210:11 245:24 345:14

**legal**
22:16,18 60:13 142:23 143:21 147:1 201:1 357:4

**legible**
152:19

**legislation**
22:19

**legislative**
22:24

**Lemasters**
312:8

**Leo**
347:20

**Lester**
332:20

**let's**
20:25 24:15 32:21 33:6 35:9 37:17 53:1,14 54:12 55:1 65:13 70:20 71:12 107:5 113:9 117:24,25 118:8 133:14,15 154:9, 10 173:8 175:4 190:8,13 191:20,21,22 193:10 217:10 227:2 228:24 229:21 238:21 240:22,24 250:7 252:21 260:23 272:17 277:25 287:18 289:18 291:14 297:15 315:1 325:25 326:13 351:22 354:13 376:20 377:6 397:8

**letter**
213:2 220:16 243:9 254:12,17 255:6 256:10 282:4,5,6,19,22 288:22

291:11 293:16 300:5,11
306:3 309:4 313:16,17
314:2 320:15 323:5
396:15,19,21 397:4,10,
13 398:4,9,13,23 399:10,
21 400:1,4 402:6,15,20
403:2,14 404:18,23
405:12 406:14 407:9,13,
14 408:5,12,14 411:19,
25 418:4

**letters**
89:15,16 90:16 91:7,17
92:14 119:3 122:21
123:12,20 124:5 253:15
254:24 255:2,12,14
257:2 283:13 387:21
401:2 403:10 408:2

**level**
11:18 48:18 294:8 425:2,
3

**levels**
265:16 292:25

**Levy**
322:1

**liabilities**
62:17,22

**liability**
206:9,22 342:19

**liaison**
130:8,12

**licensed**
51:20

**lie**
95:13 96:20 97:5,6,9,18
131:6,7 202:19 226:13
231:10 255:11 393:15

**lied**
95:11 96:19 160:6 174:6,
9,12 202:14 231:6,7
244:16 258:14

**likelihood**
36:4 72:1

**limitation**
168:17

**limitations**
105:7 150:2 168:10,11,
14

**limited**

45:18 393:13

**Linares**
44:6,13 45:25 46:11 49:9
370:22

**Linares'**
45:17

**line**
28:5,20 56:4 86:6 88:6
133:13 167:6 177:20
191:23 224:1 378:1,20

**lines**
10:19 76:13 134:15
379:14

**list**
105:11 153:6 182:1
198:13,14 277:8 284:5
303:8,14 306:11 311:23,
24 312:4 318:4 323:25
324:12,24 325:11,16
326:8 343:10,12,20,21
346:3 347:3,7,9,12

**listed**
15:18 247:15 249:17,23
250:1 322:11 330:16
332:19,24,25 334:17
337:6,19 339:4

**Listen**
37:14

**listening**
372:17,18

**listing**
120:14 121:2 220:22
247:14 348:13

**lists**
247:6,13 248:4,10
349:12 408:22

**lit**
11:5

**litigants**
23:18

**litigate**
212:7

**litigated**
44:25 128:1 160:12,18
202:16 212:19 240:7
307:19 362:3

**litigating**

128:3,24 171:10 178:12
191:9 212:11 372:7
412:18 421:5

**litigation**
12:10 16:5,12 17:20,25
19:16 21:9 22:4,7 65:19
130:17 146:14 174:24
207:7 213:20 233:9
255:14 279:1 286:15
289:11 310:24 333:7
347:25 368:5 391:14
399:3 412:20

**little**
11:2 38:18 40:15 58:20
80:7 127:8 166:12
176:10,11 204:1 250:7
326:6 347:1 387:17
390:24 393:22 418:14

**lives**
213:16

**LLC**
5:5

**local**
205:21 302:14

**located**
42:8 284:22

**locations**
31:10

**lodge**
112:17

**logged**
70:12

**long**
14:4 43:25 69:21 80:25
81:12 86:12 95:25 96:1
99:22 100:1 102:6
132:22 140:8 192:14
210:20 277:11 330:19
346:25 367:3 371:25

**longer**
189:10 319:8 350:12

**look**
12:2 17:3,7 25:4 32:4
44:18 53:24 55:20 56:5
67:25 68:4 70:8,19 81:21
122:2 133:25 134:16
163:25 164:4,11 166:1,4
202:12,20 216:4 232:9
239:10 258:11 286:22

287:13 295:22 298:19
316:4 338:15 349:6,16
381:15,18 392:1,4 397:9
398:4 402:14 406:23

**looked**
107:10 120:12 124:16
126:22 158:16 234:9
239:7,17 256:23 269:10
282:25 298:11 382:6,10

**looking**
30:9 33:23 36:6 68:7
72:3 75:12 95:8 107:11
118:4,16 122:10 156:12
237:4 243:17 248:12
249:17 266:3 287:1
314:2 339:9 341:11,12
379:14 387:25 392:15
403:11 408:21

**looks**
204:21 222:25 224:22
266:4 275:14,20 283:9
306:3 316:17 331:5,14
334:21 399:12 406:15

**Lorain**
318:1

**lose**
137:18 410:23

**losing**
277:8

**lost**
10:2 51:17 93:4 277:21
279:23

**lot**
52:12 60:22 115:9,12
127:3 298:12,15 302:22
381:5 385:3

**low**
89:19 124:21 176:14

**lower**
206:12

**lowest**
327:14

**Loyd**
292:15 300:9 412:1

**lunch**
69:9 193:10 351:5

**lung**
98:15 183:11 184:3,6,13,

24 185:12 188:10 301:18
302:7 303:6 306:14

**lying**
93:6 256:5

---

**M**

**ma'am**
179:2

**Mable**
292:17 302:12 412:2

**magistrate**
137:21,22

**Magnesia**
29:8 30:20 31:12,14
35:23,25 36:1,2,4,16,19,
21 62:19 71:20,22,23,25
72:1,9 74:10,23 88:25
92:24 95:11,14 97:2
103:7 104:12 119:1
122:21 123:10 124:11,
24,25 125:11,16,22
126:3,5 127:4 128:5
130:24 131:5,19 132:11
133:11 134:1,4,13 137:3
138:6 139:7,12 142:7,12,
14,18,24 143:2,4,5
144:10,14 148:1 149:1,
25 151:6 154:24 155:7
157:11 158:22 159:1
168:18 170:2 172:24
174:9,11 177:8 193:22
196:21 202:13 209:23
210:3,12 233:4,14 234:6
238:5 239:2 244:3
246:17 253:11 254:18,21
256:6 257:10,22 259:14,
16 260:25 261:12 278:5
280:15 287:6 288:22
289:7 290:18 343:6
344:4,5 355:9 371:11
385:20 397:3 398:2
399:6 400:24,25 405:20
410:4,9 412:7 416:14,20
417:12 421:24 422:5,7,
13

**mailed**
43:4

**main**
244:22 273:13

**maintain**
263:24

**maintained**
351:1

**maintenance**
224:8 353:14

**making**
73:6 405:25

**malpractice**
12:9,14

**man**
63:2 292:25

**Management**
320:16 323:1

**Mandel**
357:23

**manner**
187:9

**Mansour**
129:18

**manufacture**
144:18

**manufactured**
239:20 261:5,11 262:18

**manufacturer**
104:23 169:8,23 176:24
177:22 185:13,25 186:24
187:1 391:20

**manufacturer's**
103:10

**manufacturers**
145:18 161:20 176:16
183:9 184:20

**manufacturing**
127:10

**March**
213:1 318:4 348:5

**Marilyn**
84:18 94:5,20 100:9
102:5 174:14 338:3
355:22 365:25 367:1
368:1,2 380:19

**mark**
26:20 71:2 129:16
411:12 414:2

**marked**
17:1 25:1 32:22 63:7
70:22 109:2 120:8
149:21 152:11,13 175:5
177:17 204:12 243:7
263:17 264:22 267:12
273:2 274:22 280:3
281:20,23 293:14 294:12
305:16 306:5 308:18
310:8 312:1 320:14
323:6 349:22 399:9,25
402:10 404:14 406:10
408:6,7 410:6,25 411:5,
15 414:5 418:2

**marking**
263:15

**Martillotta**
125:18,21 129:6,8,18
131:10,22 133:2 142:25
144:4 146:12 166:15
169:5 242:9 300:6
303:13 306:8 311:11
313:16 314:8,20 357:25
360:3 381:5 387:22

**Martillotta's**
132:14

**Martin**
123:24 124:3 129:1,5
147:22 283:8,12 294:15
357:24 396:15 397:10,13
398:15,21 399:11,18
400:2,21 401:3 404:18,
23 406:14 407:9 415:15,
20,22 418:4,9,17 423:16
425:20

**Martin's**
423:23 424:9

**Martindale**
322:3

**Marvin**
334:11

**master**
30:23 207:25

**material**
179:9 235:24 247:17
399:20 404:7,11 405:21
410:16

**materials**
155:17 210:9 260:17,18,
20 288:9 291:4

**matter**
24:21 44:9 45:13 46:11
131:20 143:16 210:7
229:10 354:4 369:23
390:16,19

**matters**
47:18 52:16 193:7

**Mazel**
38:8

**Mcdermott**
5:12,13 12:17,22 14:12
15:8,15 17:5,10 18:10,23
19:2,5 20:12 22:21,25
24:3 25:3 27:10 28:4,19
29:24 30:6 32:2,7,11,16
33:6,15,19 34:2,10,14,
18,22 35:1,6,10 37:3,5,8,
14 39:19,22,23 40:2,5,10
41:3,18,22 42:1,12,16
43:19,20,23 44:2 46:10
47:5,14,25 49:18 50:14,
22 51:3,10,23 52:8,18,23
53:7,16 54:1,4 55:7
68:22 71:1,4,8,14 73:10
75:16,20 80:24 81:14,17
85:5,10,16,18 86:5 87:10
88:5 98:19 99:11,16
102:19 108:9,13 111:22
112:3,16 113:21 131:17,
24 132:3,8,13 133:5,12
135:7 160:23 161:6,15
164:15,24 165:1,4,9,13,
18 168:23 171:18 180:9,
11 183:4 187:15,18
188:2,5,8,13,16,20,23
189:1,4,12,15,19,22,25
190:3,7,17,19,23 191:6,
10,17,24 195:10 198:7
212:3,17,21 213:24
214:17 215:2,12,19
216:1,5,13,19 217:5,9,
14,22 218:21 219:14
220:18 221:8 224:19
225:4,13 226:18 228:18,
21 229:11,18 230:7,13
231:8,13,19 233:24
234:17 235:5,15 237:15
239:16 240:12,15,18
241:2 242:16 244:18
245:21 246:3,14 247:2,
21,25 248:7,22 249:9
250:15 251:14,25 252:12
254:10 255:8 256:1
257:9 258:6,16,22

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i33

266:21 267:1,9 269:15
270:12,22 271:8,13
272:7,10,15 278:19
283:23 285:16,19 286:3,
9 289:15 291:5 295:4,19
296:10 297:20 298:24
299:6 305:12,21 307:21
308:1,12 309:8,18 311:4
312:15 315:13 317:17
322:24 323:2 324:15
326:4 327:11,19,24
329:6,24 335:17 336:20
337:23 341:4 344:17
346:22 347:8 353:22
355:3 356:6,22 359:3,10,
17 360:6,16,19 363:10
364:4 365:4,14 366:9
368:9,12,16,18,20 369:5,
10,20 370:8,11 371:17,
19,23 372:24 374:1,9,18,
21 375:22 376:5,14
378:18,25 379:6 380:5
382:14 384:1 385:7,14
386:20 387:6 402:13
407:15,18 409:11,13
419:19 420:1,5,9 421:10,
21 422:2 423:11 425:14,
18 426:3,5,17,21

**Mcdermott's**
45:22

**Mckenzie**
328:12

**MDL**
322:18

**Mealey's**
347:25

**mean**
11:22 12:18 47:2 50:3
57:3,4,24 66:9 73:21
74:4 77:4 93:12 104:5,6
115:12,13 119:10 121:10
127:2 146:9 157:5
166:25 169:15 173:25
178:15 182:9 219:11
220:2,16 239:7 245:18
246:24 256:11 261:9
268:21,22 269:17 295:17
296:8 302:4,20 310:2
311:3 312:17 317:3
327:3 344:12 359:19
370:14 381:19 382:7,11
384:24 385:2 396:22
403:14 412:9 418:14

420:6

**means**
15:3 74:5 201:23 220:3,7
246:2 250:3 295:21
296:15 325:15

**meant**
121:12 310:3 311:8
418:17,21

**mediation**
358:18,23 384:2

**mediator**
358:9

**medical**
59:14 60:7,10 197:23
214:7 247:12 248:18
252:4,8,9 302:2,5 308:20
309:1,5,14 316:16,19
339:18

**meet**
35:17 158:1 274:2 367:7

**meeting**
63:20 101:1 365:22,24
366:2,3 367:3,11,22
368:1,3,4,8 370:4 371:25
372:4,21 373:3 374:3,14,
24 379:10,16 380:7,9

**meetings**
133:18 365:18 374:25

**Melvin**
330:6 337:11

**member**
59:21 131:25 196:5,7

**members**
84:15 325:9,14 346:7,14,
20

**memo**
320:16

**Memorandum**
137:1

**memory**
93:7,11

**mention**
67:10 128:19 208:5
374:6

**mentioned**
11:19 12:7 55:10 65:10,
11,12,22 66:16 101:3

129:3,19 167:5 223:8
299:21 375:5,16 392:25
415:14

**mentor**
282:15

**merged**
205:25

**merits**
231:12

**meso**
98:13,15,22 122:1,3
250:11 297:16 302:6
306:14 309:6,7,15,16

**mesos**
98:15,17 303:6

**mesothelioma**
92:8,9 142:21 175:25
176:2,4 177:15 183:13,
19 184:1,7 188:10
214:10,12,13,19,22
215:5 218:15,17 219:9
251:24 252:4,5,10,15,16,
20 388:7,12 389:9

**met**
39:1 80:22 81:13 162:23
348:8 367:17,19

**methodology**
267:25

**methods**
270:17 272:5

**Michael**
334:18 337:8,22

**microfiche**
347:19,24

**microphone**
189:8

**microscopy**
252:25 269:2,11,18
270:10,14 271:4

**mid**
175:15

**mid-1990s**
145:24,25

**mid-2000s**
90:14,18

**middle**

235:23

**Mike**
365:24 367:1

**mild**
184:1,12

**Military**
326:19

**mill**
292:25 400:15

**milled**
418:12,19 423:18,25

**million**
230:25

**Milwhite**
146:2,3 155:2,3

**mind**
19:9 53:13 106:4 124:15
141:18 158:1 166:20
175:2 317:16 360:15

**mine**
62:19 203:24 245:1,4,15,
20 246:17 252:24 284:22
285:2,17,21 286:2 294:9
295:12,14 296:14 297:2
400:15 402:23 406:2,8

**mined**
284:20,21 398:2 418:12,
19 423:18,25

**mineral**
424:14

**mineralogists**
266:10

**minerals**
403:7

**mines**
273:25 294:10 296:17

**minimum**
159:10

**minute**
110:6 126:16 405:7
409:17 412:25

**minutes**
53:11 96:1 99:24 100:2,4
108:12 113:20 351:6,15
374:3,8

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i34

**mischaracterizing**
161:17 374:11

**misconduct**
10:4

**mislead**
23:18 121:21

**misleading**
29:25 360:5,7

**Mismas**
242:23 243:10 408:8,11

**misplace**
399:19

**misplaced**
399:22

**misrepresentations**
235:24 373:16

**missed**
164:21 200:10

**missing**
41:14 65:23,24 188:10
269:23 379:1

**misspeak**
74:11

**misspoke**
74:13

**misstating**
370:23

**mistaken**
378:5 379:11

**misunderstood**
378:14

**mix**
47:11

**mixed**
31:1

**modern**
269:10,17

**Mohawk**
336:23 343:14

**moment**
25:7 33:4 41:2

**money**
162:3 181:20 226:24
227:16 304:8

**month**
76:8 114:25 188:1
382:15

**months**
6:19 59:15 114:25

**Monty**
334:21 335:2,3

**moot**
150:18,21 210:1

**morning**
6:15,16 38:2,4,13 45:5
82:6

**mother**
95:9 96:18 174:9

**mother's**
174:24 279:17,23

**motion**
25:14 137:1 138:3,5,6,
18,21 140:18,20 149:23
150:8,17 157:25 168:17
209:10,11 210:5 261:1,
23 263:20 264:25 266:4,
7,15 273:20 274:4,24
275:3,7,9 276:6 363:2
382:18 386:24 394:2,6
408:24 409:25 413:14,25
414:10,17 417:17

**Motor**
331:15 334:20

**Motors**
330:6 337:12

**move**
18:23,25 22:25 29:22
70:20 132:13,16 137:25
297:15,22 299:1 406:20
420:2 422:12,18

**moved**
137:6 360:21 410:9

**moving**
53:14

**MP**
59:25

**multi-defendant**
241:7

**multi-plaintiff**
207:1 236:8

**multi-talc**
236:9

**multiparty**
236:22 237:20 241:7

**multiple**
21:1 68:9 110:19 135:12
136:25 143:11 173:1
274:23 293:20 349:8

**Myers**
98:9,10,12

---

**N**

**name**
7:8 8:25 9:5 21:13,15,19
22:23 59:25 62:8 63:11
64:6 65:22 68:11 123:23
128:20 167:8 176:24
177:22 254:23 259:8
320:22,24 321:4,6,8,14,
15 322:4,7 362:10
391:19 399:15

**named**
19:20 85:3 86:1 87:2,5,
14 88:11 98:7,13 113:4
114:1 116:8 123:24
129:6 164:7 165:20
207:4 238:10 292:17
339:24 343:1,2,6,7 344:3
354:24 364:14 375:1
380:10,16 401:21,23
402:3 414:22

**names**
30:21 43:22 245:9 255:1
320:20 348:16

**Nancy**
94:6,19 153:10 162:15
340:15 357:9

**Nardella**
124:8,14 126:12 140:13,
15,17,22,23 333:12
416:4,7

**narrative**
213:8

**National**
11:5 16:11 17:19,24
333:6

**Nebgen**
335:4,7

**necessarily**
209:16

**necessary**
49:22 53:21 271:3

**need**
38:18 45:1 49:25 117:7
197:1 303:8 365:8,16
370:17 391:9 396:8
418:15,16

**needed**
53:21 144:5 159:16
274:9

**negatives**
102:20

**negotiate**
313:12

**negotiated**
164:19,22 165:8 169:5,
13

**negotiating**
354:15

**negotiation**
125:20 166:8 232:22

**negotiations**
232:7,8,14,18 233:8
274:20 363:25 383:13,
14,22

**neither**
70:12

**never**
7:12 12:15 20:17 29:13
50:23 51:12 64:20 72:21
73:3,8,17 95:12 108:4
113:11 114:10 116:4
122:6 133:20 143:11
145:14 147:23 149:15,18
150:10 156:6 160:2
161:8 174:20 179:12
182:8 202:17 203:18
210:22 211:5 269:10
299:11 311:15 320:1
321:4,6 322:4,8 327:21
358:22 365:9 367:19
376:10 383:18 389:11
419:17 422:8

**nevertheless**
414:14

**new**
44:7 47:21 48:3,4 50:4

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i35

52:9,12 66:2,21 70:4
71:10 82:17 83:19 121:7
152:24 275:18 305:3
310:21 349:11 422:21

**newer**
269:7 339:7

**nice**
283:13

**nine**
247:14,18,20 248:21
249:1,3,7 351:20

**NIOSH**
146:2 256:9 257:1
265:14 273:25

**nominal**
48:10 95:14

**nonexistent**
170:9

**nonfibrous**
403:7,9

**nonresponsive**
70:17,19

**nonsmoker**
185:9,10

**normal**
212:24

**Northern**
411:22

**notarized**
60:17 223:6

**note**
59:10 67:15 152:20

**notebook**
203:17,18

**noted**
219:1,2,6 220:11,12
300:10

**notes**
100:19,22 126:17
133:19,20,21 174:8
203:2,6,8,10,11,12,14
219:6 364:9,10,11

**notice**
151:4 165:19 383:3
411:20

**noting**
247:4 248:18

**notwithstanding**
152:5 168:25 265:24

**November**
243:9 313:18 314:8
408:5

**number**
5:6 27:2,5,15,22,23 28:6,
12,15,17 29:1 31:8,20
36:18 37:15 38:6 45:12
46:25 49:10,11,12 76:11,
23 77:5 78:6,17,19,20,24
105:21 106:16,19 107:25
108:6 166:18 176:14,15
186:6,18 212:8 262:16
265:1 280:6 285:7
306:11 311:24 315:2,15
318:10,15 325:21 339:1,
9 343:12 344:1 360:14
362:21 363:18 409:13

**numbers**
75:24 124:20 166:22
167:12,17 192:20 290:16

**numerous**
9:20 28:16 218:3 244:25
245:14 246:1,18 284:25
292:5 295:10 307:6
362:24

**Nutrition**
221:15 226:25

---

## O

**Oaks**
322:6

**oath**
6:18 224:13

**object**
27:7 102:19 180:6 201:9
252:12 270:3 324:19
335:6 370:13

**objected**
40:16 47:22

**objecting**
67:19 351:21

**objection**
15:1,8,15 16:7,17 18:10
20:12,13 22:21 24:3,11,
24 25:22 26:22 27:11,16,
24 28:5,14,20 29:15,22,
25 30:7 33:16 36:10
37:3,16 44:20,23 45:21
50:2 57:13 58:4,9,15,17
59:2 63:25 64:10 65:6
66:8,23 67:16 68:7,22
73:2,10,11 75:16 77:20
78:3,8 79:10,19 80:6
81:17 82:18 84:25 85:5,
10,11,15,16,19 86:3,6,16
87:11,17 88:2,6 89:4
92:18 93:9 96:12 97:12
98:19,23 102:17 103:2,
13 106:6 107:3 108:1,7
110:9 111:18 112:18
113:5,13,21 114:2,8,14
115:20 116:2,11 117:5
118:6 121:23 122:7,25
130:19 131:15,17,24
132:3,4,7,8 133:4,5,13
134:8 135:7 136:5,16
137:19 144:2,25 145:12
146:21 147:17 157:20
158:7,18,20 159:7,18
160:23,24 161:5,6,15,16
163:15 164:14,15,23,24
165:18,22 168:3,9,13,23
170:12 171:16,18
172:10,13,19 180:9
181:1 183:4 185:14
187:4,14,15 188:2,3,14
191:2,5 192:21 194:9
195:3,10 197:19 198:7,
11 199:10 201:20 202:8
203:21 206:13 208:15
209:14 211:8 212:1,3,17,
21 213:24 214:17 215:2,
12,13,19,20 216:1,5,12,
13,19 217:5,9,14,20,22
218:21 219:13,14 220:9,
18 221:2,8,9 222:9
224:19,20 225:4,12,13
226:2,18 228:10,18,19
229:8,11,18 230:1,6,7,
13,14 231:8,13,19,20
232:2 233:11,24,25
234:17 235:4,5,10,15
237:13,15 238:14 239:16
240:5,12,13 241:1
242:14,16 244:12,18,19,
22 245:21 246:3,14,15
247:2,21,23,25 248:7,17,
22,23 249:9,10 250:4,15,
16 251:7,13,14,25 252:2,

19 254:3,10 255:8,21
256:1 257:9 258:4,6,16,
22,23 259:3,21 266:21,
22 267:1,9 268:19 269:4,
13,15 270:5,11,12,22,23
271:6,8,13 272:7,9 275:5
278:11,19,20 279:7,25
281:5,16 282:12 283:21,
23 285:16,19 286:3,4,9
289:14,15 291:5 294:21
295:4,5,19,24 296:3,10
297:20 298:17,24,25
299:5,6,13 300:21
303:19 304:5,11,15
305:7,10,12 307:12,18,
20,21 308:1,2,6,12,16
309:8,9,18,19 310:17
311:4,22 312:14,15
315:13 316:5 317:10,17
321:23 322:24 323:2,3
324:15 326:4 327:10,11,
19,24,25 329:6,7,24
330:13 332:6 335:16,17
336:18,20 340:12 341:3,
4 344:10,17,18 346:1,8,
21,22 347:8 349:4 350:8
353:22,23 355:3,4 356:5,
6,22,23 358:14 359:3,10,
11,17 360:6,11,16,19
363:10,15 364:2,4,21
365:4,13,14 366:6,9,10
368:9,16,20 370:16
371:17,19 372:13,22
373:6,11,23 374:9,10,18,
20 375:22,24 376:5,6,14
379:12 380:5,13 381:10
382:3,14 383:25 384:1,
12 385:6,7,14 386:6,17,
19,20,24 387:5,6 388:16
389:10 390:9 394:15,24
395:13 396:1 397:23
398:17 401:9 406:19
419:15,19 420:1,5,9
421:10,20,21 422:2
423:11 424:2,16,23
425:14,15,18 426:3,4,17,
18

**objections**
33:5 386:23 389:14

**obligation**
158:2 226:14,16 251:19

**obligations**
393:19

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i36

**obtain**
354:16 355:24 406:1

**obtained**
354:25

**obvious**
73:5,21

**obviously**
170:4 187:9 260:10

**occasion**
120:25

**occasional**
353:11

**Occasionally**
100:9

**occasions**
363:19

**occurred**
214:3 357:11

**October**
300:5 388:1

**odd**
346:5,12,14,18

**offense**
8:24

**offer**
128:15 313:10 318:19

**offered**
261:4 262:10 313:12

**office**
7:2 13:10,14 14:23 15:13
16:2 41:21,23 63:14,17,
19 68:23 69:3,17 101:4
203:23 248:3 278:13
282:10 283:24 284:2
325:10 384:7 408:9,10

**officer**
50:16 180:17 358:9

**offices**
5:8

**oh**
47:7 56:24 202:24
205:24 206:15 227:17
238:12,23 262:20 286:5
293:12 303:22 309:21
313:23 323:18,21 333:13
340:6 362:6,8 407:19

412:24

**Ohio**
5:9 15:17,20 22:20 32:19
41:19 51:13 55:5 57:3,10
59:20 82:24 111:3
131:25 138:13 148:5
156:4,13,21 157:4
161:13 195:12 196:5,7
240:1 265:12 275:19
281:4,9,11 286:24
315:11 328:5 349:24
350:2,22 389:20 390:1
393:3,8,13 411:23 423:4

**Ohio's**
417:17

**okay**
6:25 9:2 12:2,10,14 13:3,
24 15:24 17:17,22 18:22
21:3 24:21 25:6 26:13,
17,20 27:4,15,19 28:12,
21 30:16 31:25 33:1 34:7
35:7,12 38:16,19 40:4,14
41:12 42:3 43:23 45:10,
11 46:17 47:7 51:2 53:6,
9 55:11 57:20 58:6 60:4
63:5 64:24 65:1 66:12
67:8,17 68:23,24 69:8,
16,20 70:14 71:5,15
72:4,11 73:18,22 81:20
82:15 83:12 86:9,13,19
89:24 90:8 94:1 95:7,18
97:13 98:6 99:22 100:5
104:18 105:5,25 107:5,6
108:13 109:25 110:20,23
117:2 118:1,2 119:2,13,
16 120:14 121:1,4
123:18 129:22 131:2,21
132:24 134:10,12 140:8,
12,25 141:14 146:9
149:7 152:10 153:13
154:1 156:3 157:2
161:19 165:14 167:11
171:23 173:9 174:13
175:4 179:7 180:5 181:5
183:8 186:14 190:11
198:11,18 199:13 200:11
201:1,4 207:12 208:3,12
219:3 220:23,24 222:12
227:2,23 228:24 230:22
238:1,15,20,21,24
239:22 242:22 243:20
244:1 245:13 246:1,20
249:21 252:21 257:17,
18,20 260:1,23 262:8,21

265:4 266:16 267:6
268:21 270:2,4,7,8
274:22 275:8 278:2
281:9 282:1,7,19 284:4
291:10,20 301:10 306:5
312:17 315:4,16 316:25
318:16,24 319:20 320:4,
21 321:1,2 323:6 325:13,
18,25 326:23,24 328:12
329:14 331:13,14 332:20
334:5,25 337:15 342:15
345:12 346:17 351:18,22
352:21 356:18 368:25
370:2,11 372:4 377:25
380:7 383:8 389:17
394:22 395:18,24 396:19
397:4,8,14 398:3 403:1
404:12,25 405:22 406:9
407:21 412:25 413:18,
21,24 414:12 415:7,12
421:15 422:24

**old**
267:24 330:19 339:10
340:18 364:7

**older**
269:8 330:1

**oldest**
383:1

**omissions**
235:25

**omit**
121:21

**once**
59:16 100:14,16 111:4,5
223:6

**one's**
283:13

**one-tenth**
121:10

**ones**
12:6,16 129:2 161:22,25
198:15 292:13 339:10
362:19,21

**online**
237:7

**open**
31:25 242:8

**opened**
10:10 65:16 82:22 84:2

**operating**
68:19

**operator**
5:7

**opinion**
44:13 247:19 248:1,16
249:5 250:9 251:3
347:18 363:5 409:4
410:2

**opinions**
218:19 363:8,13 415:7

**opponent**
251:5

**opponents**
393:11,20

**oppose**
23:3 262:5

**opposed**
138:4 240:10 262:6

**opposing**
209:13 250:12 255:7
264:6 291:16

**opposition**
138:2 264:18,24 394:6
410:5

**orally**
86:13,14 425:23

**oranges**
25:5

**order**
8:13,18,21,22 27:13 88:7
110:1 120:23 150:13
159:16 209:11 285:3
316:20 338:23 381:16
382:21,24,25

**ordered**
50:19 162:14 325:7
346:12

**orders**
12:1

**original**
51:13,14 109:7 319:11

**originally**
26:3 214:11 333:6

**OSHA**
268:2 274:1

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i37

**Ouija**
230:15

**outcome**
414:8,25

**outlined**
34:24

**outset**
387:16

**outside**
49:23 50:5 371:20
373:24 423:4

**outstanding**
70:6

**Owens**
142:8,19 144:16,18,22
145:7,9 146:11,24 147:2
148:18,19,20,22 149:6,
11,15,18 152:13 413:15
417:2,5

**owner**
206:5,9

---

**P**

**p.m.**
426:25

**pack**
185:11

**Paduano**
66:17,18,19

**page**
17:3,13,16 18:1 32:1
35:12 55:15 56:15 65:25
66:1 71:6,15 76:13 82:21
133:16 136:25 152:14,15
153:24 177:19 178:24
199:14,15 204:23 208:4,
6 218:18,22 223:24
244:23 246:22 261:2,13,
17,19 263:23 265:3
266:7,14 267:16,20
274:23 284:17 293:20
301:16 309:21 318:13
319:17 323:11 326:23
331:11,14,22 337:10
352:13,21 377:25 378:16
379:15 398:3

**pages**
33:23 34:4,14,23 155:11

**paid**
166:12 167:21 169:10
172:6 227:17 232:10
233:3 236:18 305:15

**pain**
146:14 183:25

**Pandora's**
65:16 82:23 84:2

**panel**
348:1,4

**paper**
212:13,20 290:1,3 385:2

**papers**
57:18 153:15 154:6
209:13 210:22 211:6
352:22

**paperwork**
126:4

**paragraph**
28:22,25 29:10 35:14
66:1 79:24 133:16
135:16 199:14 213:6
222:17 235:20 236:23
261:3,20 267:17 273:12
284:17 289:20 290:4,5,6
291:21 295:7 348:3
349:24 354:14 398:5
402:20 405:23 406:23

**paragraphs**
285:2,13,14

**paralegal**
43:3 69:19 75:4 96:14
101:6 200:1,4 279:11
326:9 347:4

**parameters**
28:9,10,22 29:1,11 30:8
344:6

**paraphrasing**
46:22

**Pardon**
303:4

**parents**
367:18

**Parmar**
213:4 218:19 220:14

**246:21 247:10**

**Parmar's**
248:10

**part**
119:19 151:17 152:7
167:16 169:16,23 179:20
195:17 200:10 209:25
212:23 236:8 257:24
268:13,14 305:5 308:21
314:13 315:12,24
317:18,20 319:15 324:13
370:21 379:16 385:25
386:2

**partial**
273:9

**participate**
126:6 307:10 309:22
354:18 367:21

**participating**
303:9

**particles**
155:20 156:1 288:12

**particular**
44:12 64:4 169:7,22
376:18

**particularly**
95:23 142:8 169:21
236:5

**parties**
358:16,17

**partner**
28:7 96:10

**partners**
282:11

**parts**
104:7 390:13

**party**
59:17 236:10

**passed**
22:20 416:7

**Pat**
28:7 74:18,20 76:10
96:10 375:14

**pathologist**
361:3,5,6

**pathologists**

**361:12**

**pathology**
247:17

**Paul**
336:2

**pause**
200:13

**pay**
172:24 227:14 291:2
316:21

**paying**
11:8 319:19

**payment**
233:5

**payouts**
185:20 227:9

**Pease**
94:6,19 97:13,18 99:22
100:11,24 101:9,23
102:12,22 113:19 133:15
135:15 152:13 161:20
162:9,15,18 163:18
168:16 171:23 198:18,19
340:15 356:19 357:8,9

**Pease's**
153:10

**pending**
9:12,16 138:17 160:15,
16 171:3,5 283:20
358:21

**people**
7:17 25:24 29:12 30:9,17
31:1,2,10,16 36:18 39:1
40:3 74:22 77:18,24
78:4,11,15,18,19,20
82:16,25 84:14 89:1
94:15 105:25 106:25
110:16 117:19 120:5
123:22 129:1 131:6
172:9 183:24 198:23
207:2 216:7 224:5 227:7
259:19 268:22 277:7
302:16,21,22,24 315:21
342:4,6 346:6,19 347:1
359:20 381:24 388:25
403:24

**percent**
14:7 121:11 186:25
265:16

---

**percentage**
14:5 187:10

**perception**
148:19,21

**perfectly**
161:4 215:17

**perform**
119:21 224:2,7,14,18

**performed**
222:17 408:18

**period**
50:13 59:7 87:7 154:9
194:16

**permitted**
197:22 373:25

**person**
22:13 111:1,2 129:19
185:10 186:9 239:19
252:9 289:7 317:19
326:5 341:23

**personal**
96:23 123:21 131:9
135:21 150:4 341:5

**personally**
8:15,16 51:4 90:12 94:8,
18,19 95:2 114:15 116:5
379:17

**personnel**
152:20

**pertaining**
95:23

**pertinent**
248:18

**Peter**
325:3 401:24,25

**Philadelphia**
385:22

**phone**
5:25 6:2,4 37:18 40:7
53:5 63:15,16 64:2 68:2,
3,16 69:4 81:4 88:23
110:25 123:13,20
125:17,20 199:5 278:17
380:20,23,24

**phonetic**
402:4

**photo**
120:17,18,19 121:1

**photographs**
392:10

**photos**
120:22

**phrase**
220:6 246:24

**phrased**
370:13

**physically**
26:20 354:5

**picked**
278:17 333:15

**picture**
121:3,5

**pictures**
120:16 121:10,15 420:22
421:3

**piece**
212:13,19

**pieces**
256:23 257:1

**piles**
387:19 411:7

**place**
5:8 43:13,16 328:8
332:23 336:4 339:8
340:23 392:18

**places**
304:20 314:25 315:20
328:7 337:13 343:9,10

**Placitella**
5:19,20 25:25 26:4,15
27:9 64:7,9 66:2 75:6,8
79:14 82:2,5 84:23 85:4,
9,23,25 87:16,19 88:21
89:24,25 90:9,17 92:12
93:17,24 94:1 96:8,16,25
97:7,10,19,25 98:21
100:18 101:1 109:16
110:5,17,21 111:6
112:25 113:25 114:6,12
115:16 116:13,16 117:4,
15,19 118:11,13 122:9,
14,24 123:5 126:10
133:19 134:3,6,15,24
135:4 140:10 164:2

166:3 174:2,25 194:2,6
195:1,8,16,24 196:8
197:1,6 199:6 202:5,22
231:17,25 232:17,25
233:16,21 234:21 236:15
244:9,16 255:20 258:2,
13,20 276:15,22,24
277:13,22 278:14 279:12
295:2 298:9 300:20
340:20 343:23 345:23
360:9 364:16 365:20
367:9 373:14 375:1,7,12
376:3 380:11 381:21,24
383:9 385:17 386:3
413:20 421:15,22 424:18
425:1,12,13,24 426:2,13

**Placitella's**
101:3 114:4 256:5
298:16 299:10 340:10,24
365:6 380:15 426:14

**plaintiff**
12:12,13 21:17 67:6,7
97:18 116:8,10 162:20
169:13 172:4 199:16
228:14 236:5 263:3,10,
15,16 263:23 264:8
267:18,23 273:18,21
329:4 332:5 345:1
365:19 367:7 388:18
389:9 390:1 391:16,19
410:17

**plaintiff's**
264:9,10,24 389:5,6
410:5,21

**plaintiffs**
5:18,20 14:9,16,25 15:7
20:20 21:10,22 27:21
57:22 61:5,17,18,20
66:4,20 84:22 85:3 86:1
87:2,5,15 88:11 98:8,13
110:7 113:4 114:1
152:15,17,19 165:20
169:10 170:10 187:22
191:14 192:25 193:2
199:7 211:7 216:8
228:16 238:6,10 272:2
275:8,25 279:6 285:24
299:7 309:2 311:18,19
314:22 315:10 316:7,12
318:5,6,9 319:13 339:24
347:6 354:24 355:6
364:14 375:2 376:13
380:11,17 383:15,22

388:24 390:7 407:25
420:7,8 423:5

**plaintiffs'**
48:11 161:11 201:6
207:20,25 262:14 274:1
411:15 414:5 419:6

**plant**
206:7 207:3 313:3 328:5
329:14

**plants**
92:2 125:2 127:5 156:13,
21 328:17 343:1

**platy**
403:8

**player**
144:11

**players**
145:5 358:4

**pleading**
301:11

**pleadings**
9:1,2,6 10:14 14:11,17,
20,24 23:14,19 55:21
60:13 91:6,13 93:2
110:13 149:18,20 158:4
226:13 253:14 255:12
301:12

**Pleas**
348:4

**pleasantries**
162:24

**please**
5:10 16:24 17:8 29:17
32:4 33:7 42:25 43:9
67:16 71:2 98:25 99:20
111:23 112:5 165:10
188:12 189:5,6 313:5
316:10 350:10 354:13
366:24 403:3 411:17
415:17

**pleased**
360:18

**pleural**
302:11 303:7 327:6
330:24 331:1

**plus**
142:25 247:18 360:13

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i39

**pneumoconiosis**
294:8

**point**
13:25 16:22 62:17 63:13
65:24 71:9 76:3 89:10
125:15 130:22 141:18
142:11 143:20 145:19,22
151:19 155:23 184:5,6
197:8 205:25 211:16
214:18 241:15 258:11
262:20 263:6 282:11,18
283:19 284:11 288:6
292:6 294:25 298:19
304:24 324:11 325:6
346:24 355:15 359:13
417:6 426:11

**pointed**
390:12 403:1

**pointing**
142:5,6,13 144:8,16
145:3 148:9 157:12,14
242:7 378:7

**policies**
26:7

**policy**
212:24 353:16,21

**Pony**
42:9

**Pooley**
407:7,11,21 424:12

**Pooley's**
407:8

**pop**
368:2

**popped**
365:21 367:23

**portion**
29:19

**posed**
46:19

**position**
91:2,5 92:24 93:8,12
141:19 143:7 144:15
154:16 196:1 210:11
265:25 266:3,5 267:8
425:10

**positions**
92:14,22

**positive**
56:5 114:18 138:4
264:16 362:22 409:9
423:22

**possess**
406:7 407:4

**possesses**
406:25

**possible**
211:19 217:18 220:20

**possibly**
98:9 146:4

**potential**
95:8 202:20 389:2

**potentially**
84:15

**Powell**
7:11

**practice**
58:2,25 59:4,12 60:4
72:24 73:22 123:12
215:16,17 250:14 353:9
393:14 417:18

**practiced**
13:14 15:13 201:17

**practicing**
13:13 66:12 73:8 132:21
255:5

**precedent**
398:6

**predated**
330:19

**predecessor**
13:15

**predecessors**
29:5 31:5 236:8,10
284:22

**predecessors'**
354:20

**predicated**
298:15

**predominant**
155:6

**predominantly**
128:24

**predominately**
124:23

**prejudice**
314:11,12

**premarked**
32:23

**premises**
206:2,3,5,8,9,11,22
317:4 342:19

**preparation**
81:11,12 221:23

**prepare**
51:8 80:20

**prepared**
26:1 267:24 322:10

**presence**
264:12

**present**
189:10 192:3 253:3
275:14 319:8 320:9
331:19 350:12 351:25
358:9,11

**presented**
152:2 273:13 322:17
356:2,7

**presently**
405:25

**preserving**
350:23

**presiding**
44:5

**presses**
175:20

**presuit**
315:24

**presumably**
156:25 207:2 342:3

**presume**
247:4 309:3

**pretty**
50:10,13 52:14 79:7
96:22 175:13 181:22
182:24 282:17 372:18

**previous**
26:6 71:10 266:8 300:10
400:13

**previously**
25:1 32:22 38:21 109:1
116:19 152:10,12 260:24
297:5 314:21 399:9,24
403:4 406:10 410:6
424:11

**primarily**
425:17,19

**primary**
326:25 332:15

**principle**
260:16

**print**
115:5 326:9 353:12
354:11 382:13,20,24
385:10

**printed**
55:1 114:23 115:4
325:11 328:3 382:12,17,
21,25 383:1 385:23

**printing**
382:5 385:25

**printout**
63:8 82:21 129:17

**prior**
30:18 37:1 38:22 50:4
63:20 81:8 89:25 90:8
109:8,10 139:17,18
140:18 150:22 153:11
192:7,12 221:18 225:9
226:1,9 267:24 268:2
303:9 312:7 329:21
358:18 386:3,9 421:15,
19,22

**privilege**
37:9,13 39:12 40:20
44:4,20 45:19 46:1,13
47:7,23 48:5 75:20 85:17
86:4,17 88:4 89:5 198:11
366:11,23 368:18,21
369:23 371:20 372:23,24
373:12,24 376:7 389:15

**privileged**
27:13 86:18,25 87:1,3,7,
8 366:16 369:6

**privileges**
44:8

**privy**
167:18,21 379:22

**pro**
7:25 8:2 51:16

**probably**
6:23 8:10 14:21 18:3
63:15 77:5 79:12 83:24
86:14 90:14,19 91:24
96:10,11,22 99:25 101:6
108:2 110:14 113:2,17
115:14 126:7 157:24
160:5 161:10 171:7
186:18 192:17 193:3
212:6 237:7 238:3,23
243:19 245:8 249:11
272:12 277:17 284:3,6
291:7 293:8 298:2 310:6
315:9 323:4 327:13
339:5 343:14,17,19
351:6 355:20 384:23,24
404:13 412:14,15

**problem**
47:25 105:8 125:7 128:2
142:10 152:24 153:21
154:3,4 161:9 168:11,15,
19 170:14,16 230:5,8
304:21

**problematic**
153:17

**problems**
105:11 160:22 161:12,22
419:17

**procedural**
105:10

**Procedure**
6:10

**proceeding**
30:18 298:15

**proceedings**
194:7

**process**
22:24 365:25

**produce**
40:22 144:19 237:6
309:11 382:22 384:9
387:2

**produced**
67:12,13 70:12 182:11,
13 237:5 245:3 246:5
267:2 295:13 309:7,10
331:10 397:19 400:14
402:22 406:8 409:21

**producers**
145:19

**producing**
67:9 346:5 386:15

**product**
29:9 92:2,3,4 103:11
104:2,6,9,10,12 105:1
106:4 120:24 124:23,24
125:9 137:2,7,18 138:2,
18,21 140:18,21 142:22
146:25 148:16 153:16
154:1,3,5,11 156:5,6,20
157:3,18 158:6,17 159:5,
17 160:22 161:12,22
167:13,14 168:1,2 170:3,
8,11,15,23 171:1,15,19
175:11 178:5 181:8,9,12
186:2,3,5,7,14,16 208:23
209:10,11,21,25 210:19
236:1 239:4,7,9,12,19,
23,25 240:1,3,9,11
261:5,11,21 263:3,25
264:13 266:11 273:14
275:4,18 304:18 307:9
332:8 344:8 388:11,17,
18 389:3,5,6 390:4,14,
15,17,23 391:2,4,8,15,
16,19,20,21,23 392:2,9,
17 395:11 396:6 417:14
419:13 420:11 421:6
422:13

**production**
346:13 382:19

**products**
103:1 120:15,16,23
121:11 122:4 175:20
177:3,24 187:8 261:15
420:23

**professional**
215:16 289:25 350:1
352:24 393:4,7,19

**profusion**
327:4,5,14

**program**
167:7,12

**progressive**
183:23

**Project**
16:12 17:20,25 333:7

**prominent**

**266:9**

**proof**
127:23,24 128:15 141:5
262:24 388:10,11,18
389:2 390:19 392:16
396:4

**proper**
268:1 329:4 332:5
335:14,18 421:8

**property**
352:23

**proposal**
303:1 307:13 310:15

**proposals**
387:22

**proposed**
35:17 388:5

**proposing**
388:1

**prospective**
121:6

**protect**
110:1 209:12

**prove**
210:8 280:18 332:10
390:3 397:16 419:13

**proven**
202:19 261:14

**provide**
27:21,22 52:5 61:18,19
72:19 73:18 101:10,18
111:12 114:12 116:16
133:23 134:14 135:5
146:23 180:1 225:1
233:21 234:19 237:11
273:24 297:17 303:13
316:16 326:3,7 358:17
363:5 372:9,20 374:15
408:17

**provided**
73:20 114:6,7 134:17,18
165:19 181:20 231:24
234:2 254:25 255:2
256:24 283:14 284:11,13
297:5 305:4 309:16
324:13 372:16 375:19,21
376:13 394:6 398:24
401:18 407:5 408:22
412:6

**providers**
59:14 60:8

**provides**
44:14

**providing**
73:23 114:16 215:10
373:2 374:23 386:17

**prudent**
136:18

**published**
415:7

**Puerto**
38:9

**pull**
31:25 227:2 246:20
324:23 325:10 338:21
384:18

**pulling**
345:21,25 346:19

**pulmonologist**
21:6 302:14

**purchase**
152:22

**purchasing**
127:17 209:3,4 211:3
420:17,19

**purpose**
25:17 333:17 397:21
403:25 404:4

**purposes**
254:16

**pursing**
31:12 207:10

**pursuant**
6:9 138:13

**pursue**
10:7 31:3 136:18 157:8
196:14,20

**pursued**
57:6 196:14

**pursuing**
59:4 125:8 202:13
214:25 215:4

**put**
42:11 44:9 54:12 60:10
72:22,25 73:16 76:11

116:18,19,22 117:12,24
135:14 147:13 156:25
209:12 217:10 223:7
225:21,22 242:20 297:23
298:12 318:20 326:13,16
336:5 350:10

**putative**
325:9,14

**puts**
157:15

**putting**
73:19 146:24 186:21
226:12 325:25

---

**Q**

**quantities**
127:4 139:8 154:22
177:10

**question**
12:24,25 19:2 29:22 30:4
35:14 36:7 37:7,10 40:24
43:18 44:3 46:19,21,22
47:12,16 48:19 52:25
67:16,19 76:15 77:22
87:12 98:25 99:7 102:20
107:4 112:20,22 130:16
133:7 135:2 153:19
161:18 163:9,11 164:21
174:13 175:13 176:3
178:10 179:1,4 189:16
190:22,25 191:16 206:15
216:15,16,20 217:24
221:6 224:1 228:22
229:13,14 232:24 233:16
240:19 244:22 249:15
250:6,10 251:11,12,16,
18 269:16,24,25 270:1,5,
6,20 271:9 289:17 296:4,
6 305:2 307:24 310:13
320:1 335:6 346:16,18
363:11 368:17,22 369:11
370:1,13 371:4 378:15
380:6 384:14,16 395:15,
21 417:23

**questionable**
139:25

**questioned**
141:13 416:18

**questioning**
28:5,20 133:13 188:19

348:7

**questions**
27:7 40:15,18,21 49:23
50:1,20 85:19 86:6
95:21,24 141:11 190:4
191:12 208:13 228:6
238:17 249:20 290:24
372:5,8 373:21 387:10
391:1 414:20 418:22
419:12,16,18,20,21,24
423:13 425:5,10 426:20

**quite**
63:4 102:7 126:23 199:3
213:14 217:23 389:23
415:23

**quote**
65:15 84:2,3

**quoted**
64:19,21 70:10

---

**R**

**R.c.a**
343:14,17 344:7,20

**R.T.**
90:21,23 91:2,6,20,21,24
92:1 103:22 104:15
151:6 155:1 170:11,15,
22,25 171:2,10,14 240:8
262:8,18 263:3,7,10,19,
24 264:13 265:5,16,22,
25 266:10,17 273:8
274:4,14,15 278:3
280:22 304:3,9,17,22
345:3 363:1 393:24
394:3,11,18

**raise**
34:22 37:2 211:15

**raised**
45:21 211:5

**raises**
250:10

**Ralph**
204:5,6 222:13 224:7,13
338:10 340:3

**Rama**
21:4,8,14

**randomized**
326:16 345:22

**randomizing**
325:8

**randomly**
324:23

**Rao**
20:23,24,25 21:4,6,8,14
273:23

**Raos**
21:1

**raw**
155:17 175:21 176:19
210:9 211:2,10 288:9

**Ray**
21:19 23:9 213:7 321:15,
19 331:2,3,15,23 339:15
348:6

**Raymark**
18:14 19:8,16,18 20:10
414:21

**reaching**
295:7 412:3

**reaction**
356:20,24 357:2

**reactivated**
349:10

**read**
8:18,22 14:20 17:4,16
29:16,19 30:12 51:14,21
52:5 64:14,16 66:14
79:5,6 83:6,12 88:6
110:13 112:21 141:7,9,
10,16 151:15 194:3
214:6 217:25 218:16
219:7,8 246:24 249:2
273:6 284:16 296:13,21
327:4 328:13 339:11,14
349:15,17,19 379:4
403:2 425:1 426:21

**reader**
21:7,23 213:7,12 214:8
221:12 248:15 349:13

**readily**
42:6 43:16

**reading**
30:12 183:1 218:25
220:25 249:4 283:12
312:16 327:4 400:12
415:3

**reads**
213:18,23 214:1 215:18,
22 217:12,19 221:6
267:17 321:25 327:8
330:23 349:9,11

**ready**
382:23 419:10

**real**
157:6 170:14

**realize**
74:16 78:14,16

**realized**
18:3

**really**
19:10 29:10 40:20 46:10
65:15 68:25 82:22 83:14
84:2 113:8 163:1 166:6
169:7 184:10 216:3
225:8 229:12 231:1
241:3 247:14 251:11
280:9 281:3 318:18
353:8 359:22,23 384:4

**ream**
385:2

**reask**
178:9

**reason**
10:3 72:11,19,22,23,25
73:18,20,23 74:3,6,7,8
98:17 117:3,9 130:16
146:22 147:1,2,7 203:11
204:10 242:5 248:20
253:6 298:4 308:14
342:8 365:1,5 396:10
414:18 421:16,23

**reason's**
73:21

**reasonable**
391:12

**reasonably**
235:23 354:19

**reasons**
49:6 101:19 142:4 144:1
148:15,17 208:13 259:1,
5 327:22 405:22 423:8

**recall**
6:24 8:18,22 9:8 10:11,
19,24,25 11:10,17,25
12:16 13:1,4 14:19

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i42

19:17,25 22:23 23:11
24:8,10,14 26:24 61:22
62:8 63:2,19 64:11
73:20,23 82:14,19 83:19
84:6,10 86:11 87:18,23,
25 90:7 91:15,16,21,23,
25 92:6,11,13 93:13,16,
23 94:9,17,20 95:3,6,18,
20,24 96:3 98:2,4,10
100:10,17 101:5,24
102:5 103:3 106:14
109:13,18 111:5 113:14,
18 115:1 119:8 122:10,
12,19,20,22 123:9,25
124:7,13 125:15 126:8,
22 127:2 128:18,21,23
129:2 146:1,5,6 149:20
156:7,14,18 160:17
163:2,6 164:16 165:24
166:13,14 168:14 169:9,
17 177:6 181:7,9,12
194:13,19 198:8 199:2,
11 204:21 211:17,19
221:17,22 223:14,15
230:3,8 231:21 232:6,15,
23 233:22 234:11,25
235:6 237:16,23 238:4
239:1 245:9 253:23
254:23 255:1 256:13,15
262:12 266:23 276:5
277:2,9 279:19 280:2
282:21 286:18,20 288:22
291:1,8 292:7,18 293:3,
7,10 298:1 299:24
302:10 305:13 306:25
307:22 317:11 323:13
328:1 338:13,14 343:8,
25 346:2 355:16 356:16,
24,25 357:1 358:15
359:4,14,25 360:7,17
361:1,13,25 362:2 367:4,
10,12 371:14 373:2
374:13,23 376:17,18
379:16 380:1,21 381:9
383:5,10,11,19 387:23
388:8 393:5,24 399:10
404:19 408:11 409:1,8
414:9,25 415:3 416:2,5,6
417:25 422:20 425:3,4
426:8

**recalled**
89:9 92:15 111:16
232:16

**recalling**

362:14

**receive**
393:16 408:1

**received**
14:3,5 26:14,18 28:13
119:3 123:20 125:17,20
226:24 230:22 293:16
385:16 396:21 398:8,9
400:20 408:19

**receiving**
236:10 314:11 399:10
401:2

**recess**
108:21 193:14 272:22
287:23 320:7 324:6
369:16 376:25 413:4

**recitation**
129:20 426:15

**recognize**
33:4 55:6 63:10,12
120:10 138:10 204:19,20
207:18,23 208:1,2
223:18 241:9 243:12
270:8 273:5 275:1 280:7,
10 282:5,6 284:9 293:22
305:20 306:1 321:15
347:22 348:15,16

**recognized**
268:3

**recollection**
9:13 10:16 11:2 12:3
16:10 17:17,18 22:10,14
55:20 56:6 62:13 63:6
154:19 162:4,6 166:11
178:3 233:7,13,17 235:9
237:21 238:10,19,22,25
239:3 243:15 274:19
283:5,11 288:5 292:2,14,
21 294:2 306:4 341:5
347:3 379:23 381:3,6,16,
18,19 414:7 415:20
420:22

**recollections**
381:13

**recommend**
260:19 354:16 359:16

**recommendation**
291:22 310:5

**recommendations**

102:9

**recommended**
102:14,23 103:25 293:13
304:1

**recommending**
193:7 310:3

**record**
5:2 29:19 33:7,8,11,14
37:19,21,23 54:13,20,23
84:17 108:18,24 112:8,9,
12,15 190:12,14 193:11,
17 212:24 252:8,9
272:18,19,25 287:19,20
288:1 318:22 319:1,5
320:3,12 324:2,3,9
350:10,15,17,18 352:3
369:14,19,21 376:21,22
377:3,6,8,10,13 413:1,7
426:22

**records**
15:18,20 158:23 159:20,
23 208:21 212:23 247:12
252:7 254:24 275:21
316:16,19 319:11 329:18
344:13 350:20,23 351:1
352:5,8,14 392:12,13
395:5,6 420:15,18,19
421:9 422:4

**recover**
59:7 390:2

**recovery**
329:5

**Recross**
425:6

**REEXAMINATION**
419:8 423:14

**refer**
97:3 152:17 153:22
246:13

**reference**
31:9 35:16 65:18 140:22
213:6 262:17 275:23
289:5 290:6,10 300:9
301:17 400:8 401:7,13,
16 407:10

**referenced**
72:6,7 74:9 122:16
140:19 236:22 256:10
289:2 291:16,20 292:16
294:16 296:1,9,25

333:19

**references**
406:24 407:21

**referencing**
301:11

**referral**
333:20 334:5

**referred**
83:8 125:3 178:22
179:10 297:1 334:3
365:16

**referring**
61:25 180:10 181:16
296:12 332:25 333:19
385:11

**refers**
66:22 248:21 294:11

**refile**
137:12

**refiled**
136:12 138:1,15,23
414:14

**refine**
269:3

**reflected**
344:23,24 345:7,10

**reflects**
318:17

**refresh**
11:2 12:3 16:10 17:17
63:6 178:3 288:5 381:16,
18 414:7

**regard**
21:8 261:14 401:4
402:16 410:10

**regarding**
10:12 11:5 15:21 17:19
19:15 23:5 26:11 38:23
39:11 47:19 49:6,16 50:8
69:10,25 70:1 71:5 75:8,
9 78:20 82:2,5 85:24
88:8 89:10 95:5 101:11
113:14 114:11 116:17
117:16 121:17 129:23
130:17 131:10 133:1
134:12,13 135:6,15
147:2 149:16 153:23
162:9 164:2 174:4 194:7,

21 195:8 211:5,15,24,25
229:24 231:7,25 232:6,8,
13 233:8,23 234:15,19
235:25 236:21 237:18
240:7 250:3 276:1 279:1
294:15 318:9 322:23
347:21,25 351:7 358:13
363:12,24 364:19 366:7
368:3 370:4 371:5 372:6,
9 373:15 374:6 376:3
378:2,23 381:12,13
383:12,21 384:6 408:18
415:14 422:25 423:4
425:9

**regular**
292:19

**regularly**
102:2,8 293:1

**regulations**
268:2

**Reindel**
6:6

**rejection**
59:13

**relate**
66:7 222:12 385:20,21

**related**
82:8 140:12 193:25
290:24 372:10 373:5
382:8 414:16

**relates**
222:3

**relating**
373:9 393:4

**relationship**
20:9 85:4 197:6

**relationships**
84:21 85:2,7

**release**
60:10

**releases**
60:7 61:12 307:11

**relevance**
272:11,13

**relevant**
30:23 48:15 117:11
159:21 196:21 272:16

347:2 392:8,12,14,24

**reliability**
322:9

**reliable**
269:8 329:23,25 341:1,
13,15 349:2,18

**reliance**
97:23 257:8

**relied**
101:16 217:8 218:7
219:4 253:10,16,24
257:18 288:14 354:19

**relies**
267:18,23

**rely**
139:16 213:17,23 215:22
217:12 253:9,17,19
254:15,21 256:9 257:19,
20,25 260:3 273:21
349:3 391:22 412:5
426:12

**relying**
101:15 105:18 213:25
215:8,18 217:18 219:8
235:23 260:2 286:21
287:5,17 348:9

**remaining**
306:9

**remember**
91:10 231:15 259:18
286:17 287:10 363:1

**remodeling**
222:18 224:2,14,18

**remove**
153:4

**rendition**
298:16 299:11 340:10,24
373:14 426:14

**reopen**
195:13,20 276:16,25

**repackage**
46:13

**repair**
222:18

**repeat**
87:12 106:8 216:20
310:13

**repeatedly**
308:4 415:18

**rephrase**
49:25 52:25 370:1
395:15 396:3

**replaced**
135:20

**reply**
267:15 276:1 410:4

**report**
141:6 213:7 214:21
243:5 248:10 252:4,15
289:22 309:14 347:25
402:16 407:6,8,10
408:23 424:13

**reported**
244:8

**reporter**
43:5,10 51:12 58:19
62:4,6,24 64:23 70:11
82:12 84:5 375:15,16

**reporters**
62:2,25 375:17,20

**reports**
20:17,19,21,23 21:5,9,13
214:8 254:12 255:3
260:6,8 267:18,23
273:19,22,23 274:1,8
283:15 308:20 309:2,5
322:10,19 348:8

**represent**
5:11 84:14

**representation**
52:18 352:16 353:2

**representations**
50:15 354:21

**representative**
164:7 236:4 355:5

**representatives**
365:19 367:8

**represented**
29:4 82:24 124:14

**representing**
13:20 14:9,15 15:7 48:1
52:3 84:11 90:10 125:19
130:4,6,10 162:25 216:6
223:22 358:2,3 388:24

403:24 407:25 408:15

**Republic**
334:19

**reputation**
7:15,18 129:11 243:24

**request**
69:14 70:4,6 398:6
403:11

**requested**
29:19 422:1,23

**requesting**
59:17 418:7

**requests**
68:8 207:25

**require**
60:21,23 61:9,12,16 62:1
393:8

**required**
274:3 350:25 358:22

**requirements**
350:23

**reread**
80:9 218:9 349:7

**researched**
196:12

**researching**
238:2

**Resolution**
320:16 322:25

**resolutions**
186:23

**resolve**
106:5 316:11

**resolved**
231:14 238:5 239:1

**resolving**
256:8

**resources**
195:20,22 396:11

**respect**
15:17 20:20 21:9,16,21
45:25 46:14 48:5 61:5
91:20 117:22 225:7
233:12 269:20 277:12
354:24 355:19 356:10,18

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i44

362:2 363:20,21 364:14
398:22 403:14 407:23
414:25 423:6,7,8

**respective**
350:24

**responded**
152:1 275:8 394:14

**response**
95:17 110:12 144:17
145:4,15,16 275:15
293:11 294:14 311:11
363:16 402:15

**responses**
262:23 376:12 393:16,18
401:12,15 420:12 422:8,
9,12 425:9

**responsibility**
144:24 393:8

**rest**
42:11

**restate**
77:22

**result**
44:24 89:17 95:13 96:20
105:22 107:23 162:13
232:11 257:16 284:25

**results**
394:7,10,12 401:17
423:21 424:6

**retain**
352:25 361:15,19

**retained**
361:21 362:5,6,9,11,16,
20,23 363:2,12

**retention**
26:7 349:25 353:14,16,
19,21,25 393:5

**retrievable**
43:16

**retrieve**
43:9

**return**
356:9

**returned**
64:2

**Reuters**

62:7,24

**revealed**
253:2

**revealing**
366:23

**review**
20:3,19 25:8 28:8 49:21
50:9 51:4 77:6 81:6,10
109:7 115:2,4,10 119:20
122:13 134:21 179:21,22
218:19 246:25 247:20
249:6 288:16 291:4
297:25 316:1 323:16
324:13 376:12 384:10
386:13,18 399:1

**reviewed**
20:1 22:11 36:24 76:9
81:7,8,9 90:15 109:9
114:19,21 116:24 121:15
122:15,19 182:6,8,12
220:22 221:3 245:7,9,11,
12 246:17 247:12 248:12
256:16,18,19 257:10
260:17 273:8 284:14
285:10 290:23 291:8
295:9 298:2 323:19
376:17 399:23

**reviewing**
37:1 46:24 118:3 291:1,8
404:1

**reviews**
218:23 219:10 220:5,12,
15 246:23 250:2

**revisited**
45:2

**Richard**
335:9,25 336:11

**Rico**
38:9

**Riester**
243:11,20 408:14,17

**right**
12:22 26:7 29:21 32:10,
13 35:1 43:2 45:16 50:12
52:24 53:1,4 54:4 58:11
65:9 67:20 69:22 75:12
82:20 101:17 106:15
107:17,20 118:5 119:13,
18 126:12 127:2 132:21
140:14,21 141:3,5

147:19 151:15 153:23
163:7 171:11 173:8
181:23 189:2,19 190:7
191:19 192:1 193:5
199:13 206:17 214:21
217:12,15 220:8 222:5
223:13,24 226:22 227:25
228:4 229:1 230:25
232:20 259:24 262:20
263:14 271:23 274:10
287:15 292:18 305:9
315:7,18 316:6 326:13,
25 328:2 335:25 343:16
344:20 347:17 351:10
356:14 361:9 373:3
378:22,24 389:14 395:21
399:8 400:17 402:24
409:19 410:3 411:7,12
419:14 425:10

**right-hand**
262:16

**rights**
209:12

**Rinehart**
335:9,25 336:15

**rings**
243:18

**risk**
185:5 187:10

**Rivera-soto**
38:2,3,8,12,16,19 39:25
40:4,8 41:1,4,6,12,15,20,
25 42:3,20,24 43:8,12,
15,21,25 45:5,9,14 46:5,
8,17 47:2,6,11,24 50:12
51:2,7,18,25 52:11 53:3,
9,20 54:2,7 351:6

**RJ**
260:3 297:3,6,7,25
298:1,3,10,13 403:6
408:23 424:13

**Roberto**
38:3

**role**
22:15 119:19 197:25

**rolling**
345:15

**room**
112:4 350:9 365:22
367:6,13,23

**Roosevelt**
332:15

**ROSH**
252:19

**Ross**
83:18,22,23,25 85:21
117:22,24 134:19 197:7
383:7,8

**Roth**
5:17 15:1 16:7,17,19
20:13 24:11,24 25:22
26:22 27:6,9,12,16,20,24
28:14 29:14,21 30:2
45:3,4,6,7,11,16 46:6,7,
15,18 47:9,15 54:16
57:13 58:4,7,12,14,18,23
59:2 63:25 64:10 65:6
66:8,18,23 67:15,18 68:6
69:13 70:3,7,14,18 73:2,
11 75:8,11 77:20 78:2,8
79:10,14,19 80:6 82:2,5,
18 84:24,25 85:4,9,11,
15,17,25 86:3,16,19,22
87:4,16,17,19 88:2,4
89:4 92:18 93:9,18 96:12
97:12 98:23 99:5,15,19
102:17 103:2,13 106:6
107:3 108:1,7 109:16
110:9 111:18 113:5,13
114:2,8,14 115:20,22
116:2,11 117:5 118:6
119:17 121:23 122:7,25
123:14 130:19 131:15
132:4,7,18 133:4 134:8
135:1,10 136:5,16
137:19 144:2,25 145:12,
22 146:21 147:17,20
157:20 158:7,18,20
159:7,18 160:24 161:5,
16 163:15 164:14,20,23,
25 165:22 168:3,9,13
170:12 171:16 172:10,
13,15,17 173:5 174:16
178:18 180:6 181:1
185:14 187:4,14,16
188:3 189:7 190:11,15,
21 192:10,21 194:9
195:3 197:11,19 198:9
199:10 200:8,14,17,21
201:9,20 202:8 203:21
204:2,14,17 206:13
207:21 208:15 209:14
211:8 212:1 215:13,20
216:11 217:20 219:12,

15,19,23 220:1,8 221:2,9
222:9 224:20 225:12,14
226:2,4 228:5,9,19 229:8
230:1,6,14 231:20 232:2
233:11,25 235:4,10,13
237:13 238:13,16 239:14
240:5,13,16,21 242:14
244:12,19,21 246:15
247:7,23 248:17,23
249:10 250:4,16,21,24
251:7,13 252:2 254:3
255:21,23 258:4,23
259:3,21,24 266:22
268:19 269:4,13 270:2,7,
11,23 271:6 272:9 275:5
278:10,20 279:7,25
281:5,16 282:12 283:21
286:4 289:14 294:21
295:5,24 296:3,11
297:14,18,21 298:17,25
299:5,13 300:21 303:19
304:5,11,15 305:7,10,24
307:12,18,20 308:2,6,16
309:9,19 310:17 311:22
312:14 313:19,21 316:5
317:10 318:21,25 319:3,
10,21,25 321:12,23
323:3 324:16,19,22
325:2 326:7 327:10,25
329:7 330:13 332:6
335:1,5,16 336:18
340:12 341:3 344:10,18
345:13,16 346:1,8,10,17,
21 349:4 350:8,16,19
351:16,19 353:23 355:4
356:5,23 358:14 359:11
360:11 363:15 364:2,21
365:13,20 366:6,8,10,17,
21 369:12 370:7,10,12,
19 371:22 372:13,15,22,
25 373:6,11,23 374:10,
20 375:1,3,7,8,23 376:6
377:17,19,23 378:7
379:3,12 380:3,13
381:10 382:3 383:25
384:11,15 385:6,8,17
386:6,19 387:5,7,11,15
389:13,17 395:24 396:2
407:17 410:13 411:1,6
413:8 419:1,5,12,15,22,
25 420:2,25 421:20
423:15 424:4 425:15
426:4,18

**Roth's**
419:18 425:9

**Rothenberg**
398:11,25 422:24 423:2

**rough**
181:22

**roughly**
192:19 205:13,14
241:11,14 351:15

**Round**
192:20

**rounded**
215:25

**route**
417:3

**rubber**
92:2,5 125:2,5 127:5
144:12 149:13 166:8
167:2 178:21,23 210:25
211:1 312:9,13,19 313:7
328:17 331:2 336:23
342:25 343:14,15,17
344:7,20 345:2 388:2

**rule**
10:20 55:14 56:11,20
138:13 148:5 158:2
201:13 309:11 352:24
369:22 417:17

**ruled**
44:7 45:25 111:19
150:10 268:4 348:5
386:25 387:1

**rules**
6:9 52:10 121:17 350:24
393:3,7

**ruling**
45:18 165:4 268:3
371:21

**rulings**
44:11 48:5 50:4

**run**
52:14 150:2 265:9,10,11

**run-of-the-mill**
52:15,16

---

**S**

---

**Safety**
265:12

**sales**
153:20 154:20 155:1
156:9,12 159:20,22
160:1,4 209:6 281:11
283:15 344:14,15,24
345:6,9 420:15,17 421:9,
17,25 422:4,5

**Sam**
125:17 129:6 142:25
144:4 146:12 242:9
306:7 312:3 313:16
314:8,19,20 357:25
387:21

**sample**
252:23 253:3,21 254:14
257:7 260:4 405:9,19

**samples**
257:2 259:11 290:7
291:21 404:7 406:1,4,7

**Samuel**
129:18 328:19 334:21

**sanction**
8:13,21 9:3 10:20 11:7,8,
13,24 124:5

**sanctionable**
416:11,17

**sanctioned**
8:7,8,20 9:22 10:1 21:25
22:3 58:3 417:16

**sanctions**
9:7,10 44:24 55:2 89:16
93:13 415:16,19,24

**sat**
38:21

**satisfied**
46:25

**saved**
65:2 67:12,13 182:11
213:15

**saving**
67:9

**saw**
64:18,20 133:20 148:22
149:18 168:16 221:4
243:13,19 275:22 286:15
311:2 349:8

**saying**
45:12 48:13 50:7 67:21

**sales**

84:6 91:7,13,17 93:5,6
95:18 142:2,14 148:23
149:2,5,7,8,10,19 154:18
157:5 202:2 220:20
224:13 230:19 241:22
244:5 247:3 248:25
253:24 270:5 271:25
293:7 318:15 360:7
368:22 379:17

**says**
25:18 28:11 31:18 35:14
36:15 51:20 55:11,12
56:12,16 59:11 66:1,20
72:21 79:24 82:22
135:16,20 150:17 152:14
155:17 166:2 177:20
178:7 200:4 201:25
220:14 222:17 224:22
235:23 244:24 245:13
246:1,4,11,22 249:7
252:23 261:3,13,20
263:23 268:15 273:12,17
284:19 288:9 290:13
294:5,16 295:7 296:7
297:4 306:8 309:11
310:18,21 312:18 313:5
314:21 316:6,10,15
318:15 322:9 327:1
329:19 334:19 340:4,6,
20 341:18 348:3 352:14,
22 353:14 354:2,14
378:1,5 387:1 392:20
398:23,25 400:12
409:12,24

**scan**
354:11

**scanned**
326:11

**Scanning**
252:25

**scant**
155:1,2,4

**scheme**
199:19 266:20

**school**
246:12

**Schwartz**
398:10,24 399:1

**science**
269:11,17 272:14,16
405:21

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i46

**scientific**
264:2 270:9 290:3

**scientifically**
268:8,16

**scientist**
271:1 401:20 404:11
418:15,16

**scientists**
424:20

**scope**
45:24 68:8 69:15 373:24
394:13 424:3,17,24

**Scotland**
152:21

**Scott**
123:23 124:3 129:1
283:7 294:15 357:24
396:15 399:11,18 400:2
406:14 407:9 418:4
423:16,23

**screen**
81:23

**screening**
322:11

**screenshot**
120:10

**se**
273:6 280:10

**search**
68:12,15,17,21 69:2,3,4,
9,12 77:4 342:22

**searched**
343:9

**searching**
29:2 68:11

**second**
17:6 43:18 44:2 53:17
55:12 65:25 71:6 82:21
109:2,6 111:23 123:15
133:14 146:8 172:18
194:11 198:21 208:4
235:20 244:23 252:22
261:2,3 262:14 267:17
268:13 273:12 301:16
331:11,21 337:10 346:11
398:3

**secondary**

328:6,13,23

**secondly**
184:3 392:5

**section**
14:22

**see**
12:3 33:4 35:15 36:12
55:17 56:21,22 60:2 63:5
65:11,14,22 66:5,16
69:22,24 70:15 76:19
80:2 83:3 118:16 122:2,
24 123:2 135:18 136:1
137:4 150:5,15,19 151:8
153:2,6 154:9 155:12,21
164:11 166:2 178:1
179:13 199:23 208:7
211:25 213:9 218:22
221:18,23 222:19 224:10
226:8 232:9 236:13
237:8 240:24 245:5,16
246:4 253:4 261:7,17,18
262:19,23 264:4 265:18
266:13,16 268:5,11,18,
20 273:15 274:6 276:5
277:25 285:5 289:4,12
290:3,5,8,12,14,19 291:6
294:18 295:15 300:7
301:19 302:3 303:11
305:18 306:17,21 307:1
308:23 309:25 311:1
312:11 315:2 318:7,11
322:15,20,21 329:1
333:25 338:15 341:7
342:2 348:11 349:16
352:17 353:3,17 354:7,
22 369:25 378:4,11
404:7 406:23 407:12
409:8 419:25 420:7,23
426:11

**seeing**
41:9 149:20 156:23
157:23 221:17,22 243:17
364:17 404:19

**seek**
89:16 276:10,16 310:6

**seeking**
421:18

**seen**
20:17 21:5 91:1 109:4,5
130:23 156:6,8 194:4
203:18 208:21 221:16,20
223:19 225:16 280:8

295:20 298:3 307:22
320:2 347:23 350:4,5
383:18 389:19,25 400:5
406:12 408:12 426:7

**Seiberling**
343:14

**selected**
323:15

**self-employed**
14:1 15:4,10,11

**self-explanatory**
74:2 261:10

**sell**
159:20 239:23 281:3,9

**selling**
313:6 405:4

**SEM**
252:25

**send**
43:2 60:11 75:4 124:4

**sends**
141:15

**senior**
53:23

**sense**
56:2 73:7 228:23 250:6

**sent**
51:15,22,25 52:1,2 89:15
141:6 223:1 260:6,8,10,
17 282:7 381:7,23
385:16 387:21 399:20
400:9 407:1 417:14

**sentence**
72:10 79:24 220:2,3
267:17 354:2 403:2

**separate**
45:23 85:3 331:10
363:24

**September**
63:9 152:18 404:17

**series**
411:18

**serve**
268:9 333:17 404:1,5

**served**
401:15

**serves**
59:12

**service**
150:3 262:25

**serving**
299:4

**session**
81:12

**Sestili**
336:2

**set**
48:18 121:14 196:19
197:21 236:5 285:10,14

**settle**
48:9 125:13 142:17
148:13 162:3 253:18
274:14 304:7 306:12,24
311:5 313:2 341:24
355:1,8 356:13 358:16
359:16 360:1 368:7
384:3 412:22,24

**settled**
29:6 35:25 71:23 89:18
95:13,16 96:20 101:11,
14,25 150:23,25 161:19
167:2,4 176:15 181:13
192:20,25 193:2 231:2,
22 235:17 238:11 260:13
306:20,22,23 307:1
314:9 329:19,20 338:8,
12 340:5,7,18,21,23
341:6,18,19 342:23
344:4 355:13 356:16
368:6,7 370:15 371:6,11
412:15,16,19

**settlement**
11:9 101:20 102:3,14,24
103:12,22 104:1 105:6,
12 122:16 124:20 129:23
130:7,11 152:8 162:13,
14 167:7,9,11 176:6
186:23 192:13,15 231:10
232:6,7,11,18,22 233:8
234:10,21,22 236:9,22,
24 237:2,20 259:1,5
260:19 274:20 291:23
303:1,10,15 305:5
308:22 309:23 310:4,22
311:13 312:7 314:13
329:17 338:16,17 339:2,
19,20,25 340:16 341:15,

THOMAS W. BEVAN, ESQ. - 05/15/2018

i47

17 342:2 355:25 356:3,8,
20 357:3,10,12,13,20,22
358:6,13 360:4,10,15,18,
21 363:25 364:7 381:4
383:13,14,22 387:21,22
388:13

**settlements**
151:11 169:4,14 172:25
181:17,18 185:20 193:7
230:23 307:3,11 354:15
365:12

**settling**
101:19 162:10 163:18
169:18 253:9 310:23
311:20 316:20 360:2
388:1,6

**seven**
153:1 167:19 168:20
351:4 352:15 419:1

**severe**
184:11

**severity**
184:9

**share**
146:14

**shared**
406:5

**sharing**
13:10,14 15:13 16:2
282:10

**she's**
116:8,10 162:20,21
163:7 164:7 200:1 244:3
278:23 279:9 379:11

**sheet**
34:5 35:2,5 36:22 39:7,
10,14 40:13,22 41:7 42:6
49:12 50:17,25 51:8 52:6
55:1 70:25 71:5 72:14
73:1,4,9,25 75:2,3,17
283:16,17 326:17

**sheets**
72:15

**shield**
146:23

**shift**
144:24

**shipment**

155:3 170:20

**shipped**
127:21 212:14

**shocks**
130:24

**Shoemaker**
137:22

**short**
106:10 238:7

**shouldn't**
46:20 121:21

**Shovel**
331:22,23 332:2

**show**
16:21 25:1 32:17,18
63:5,6 77:7 93:2 109:1
120:8,22 128:8,12
136:24 138:7 139:1
146:7 149:21 150:12
151:3 152:10 160:1
170:10 175:5 177:17
204:12 207:12,13 209:5
211:23 212:19,25 221:13
223:17 241:4 242:19
243:7 257:12 260:23
262:13 263:13,14
264:15,17 267:14 274:22
275:11 280:3 281:20,25
293:14,19 294:12 296:14
300:4 305:16 306:5
308:18 309:5 310:8
312:1 313:15 314:18
316:20 320:14 323:6
344:8,13 349:22 377:15
399:8,24 404:14 405:7
408:5 410:3 411:12
414:2 418:1 420:12,21
421:3

**showed**
24:12,13 139:11 146:3
154:25 257:14 260:21
296:17 394:7 403:6,19
422:5 424:8,14,22

**showing**
55:4 103:18,23 155:24
212:13 264:12 265:15
266:24 273:2 288:3
297:16 309:14 318:3
345:18 408:11 420:11,22

**shown**

81:23 387:20 393:3
410:15 413:11

**shows**
319:18

**sic**
235:25 358:12 402:7

**side**
130:23 211:10 359:21,23
390:7,8 393:22 419:6

**sideshow**
42:10

**sideways**
50:3

**sign**
50:25 51:21 52:5 60:5,9,
13 61:2,21 223:2 333:9
356:9

**signature**
14:22 57:18 60:1,22,24
61:6,10,12,16 62:1
183:19 204:24

**signed**
10:13,17,22 14:11,17,19
26:2 43:6 55:15 57:11
59:15,20 60:18 61:13
81:10 85:22 165:25
225:22 228:15 262:23,24
313:22,25 405:17

**significant**
124:24 155:19 175:17
288:11 292:23 301:24
302:19

**signing**
14:24 23:14,19 61:4

**signs**
223:2

**silica**
322:17

**silicosis**
22:10

**similar**
97:15 106:4 204:21
239:6 301:22

**similarly**
345:9

**simple**
103:15

**simpler**
419:20

**single**
169:13 212:19 248:2,4
249:5 311:23 374:6,16

**sir**
65:1

**sister**
100:13

**sister's**
357:18

**sisters**
367:17

**sit**
73:22 95:3 132:1 169:12
221:5 232:5 237:10,24
238:3 248:9 300:19
374:3 421:11

**site**
31:13 312:22 342:24

**sites**
29:7,13 30:16 36:3 71:25

**sitting**
32:10 80:18

**situated**
228:16

**situation**
110:4 157:11 209:18
210:14 226:10

**situations**
60:7 207:6

**six**
66:3,20 82:16 155:10
247:6,13 351:15

**skeptical**
159:4 255:18

**skew**
186:7

**skipping**
379:3

**slow**
58:20

**small**
39:24 154:20,21 170:22
323:10

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i48

**Smith**
166:10 301:23,25 302:19

**smoked**
185:11

**smoking**
184:14,17,21,23 185:1,3

**snarky**
251:15

**soapstone**
95:10 125:4 139:9
175:19 177:2,24 178:15,
22,23 179:2 392:22,23

**soapstone-related**
177:2

**sold**
127:4 186:8 304:18,19
398:2 410:18,19

**sole**
177:8 400:15

**solely**
97:9,19 101:20 330:9
348:9 425:11,16 426:2

**somebody**
48:21 50:10 52:20 61:7
116:23 159:19 209:9
250:10 251:23 255:1
272:1 277:15 278:12
288:14 292:18 342:15
346:23 358:2

**somebody's**
341:12

**something's**
269:21

**somewhat**
79:5,9,20 80:5,16 88:9
209:25

**son**
321:18

**sons**
321:15,16

**sorry**
14:14 17:13 42:21 43:21
46:20 58:8 77:15 78:2
82:9 93:18 164:20
172:21 173:13 178:18
182:5 198:10,13 200:9
203:25 204:14 205:11,22

207:22 247:8 250:22
264:9 267:18 269:23
276:1,4 277:8 278:10
283:16 290:17 296:4
305:23 314:4 318:12,13,
14 321:13 323:9 324:18
335:2 347:18 352:8
366:8 372:19 377:5
378:25 397:12 407:23
409:19 411:24 420:17
423:19

**sort**
44:14 316:20 379:19

**sought**
11:15

**sound**
10:23 53:25 181:23
230:25

**sounded**
390:25

**sounds**
151:15 181:24

**source**
194:1

**Southern**
90:25 91:12,15 103:17,
20 104:15 130:6 146:5,7
151:7,16,20,22,24 152:3,
6 153:5,14,17,18,20,23
154:4,5,7,12,16,18,20,23
155:19,24 156:3,7,9,20
157:4,10,19 158:4,17
159:3,5 160:7,10,13,18,
20 161:1,2,3,12 281:2
286:16 287:11 288:10
304:3,10,17,25 359:9,12

**Spangenberg**
166:10

**Sparks**
336:8

**speak**
124:1,15 369:12

**speaking**
38:3 392:15

**specific**
48:19 49:9,11,24 50:23
93:16 100:8 124:7
133:23 134:14 170:21
183:6 188:9 202:1 260:7

271:18 292:14,21 294:9
306:4

**specifically**
124:13 204:20 259:18
265:11 284:20 288:4
293:2 361:23,25 416:5

**specification**
153:1 283:16,17

**specificity**
92:17

**specifics**
180:13 279:19

**Spellacy**
213:2 274:11 347:20
363:7

**spelled**
198:6

**spend**
238:2 351:2

**spent**
210:7

**split**
167:19

**spoke**
88:23 100:5,14 101:22
102:7 113:11 114:10
134:9,10

**spoken**
20:18 90:2,3,5 111:2
113:17 204:6,7 378:6

**spoliated**
193:19

**spoliation**
194:7,15,21 195:8

**sporadic**
187:2

**spouse**
222:17

**spreadsheet**
351:8

**square**
46:16,18,20 196:19
197:22

**stack**
114:20,22,23 115:14
117:8,23 134:20 235:2

364:6 381:12,23 404:21

**staff**
59:22 180:19,20,23

**stage**
11:25 44:23

**stamped**
409:7

**stand**
39:18 48:22 49:2 374:12

**standpoint**
125:9 170:24 301:21,23

**stands**
37:16

**start**
17:14 18:24 24:15 118:8,
16 133:15 326:13

**started**
13:20,25 14:7,9,15 15:6
18:12 38:15 212:12
299:25 333:8,9 345:1,3
351:20 383:1 412:15

**starters**
216:17 355:8

**starting**
18:6 123:11 137:24
203:25 212:7 224:1

**state**
5:11 83:20 194:6,13
264:2 268:7,15 294:7

**stated**
103:3 386:23

**statement**
56:1 70:10 79:16 84:7
128:6 161:17 180:1,3
226:19,22 270:3 423:24
424:9,15

**statements**
226:1 253:19 353:6
358:23 373:16

**states**
152:20 406:6

**stating**
288:23

**statute**
105:7 150:1 168:10,11,
14,17

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i49

**statute's**
61:1

**stay**
148:11 350:15

**stayed**
366:1

**Steel**
31:1,5 55:5 56:20 315:3, 5,6 330:6 334:8,11,13 336:2,3 337:12 341:23 342:4,6,14

**Steel/ford**
334:20

**Stemple**
18:2,6,9 19:8,15,16 20:11 21:5 414:21

**step**
189:6 319:4 350:9 393:1

**stepping**
367:12

**steps**
354:3

**stipulate**
177:21 361:11

**stipulated**
176:23 177:4,21

**stipulating**
177:6

**stipulation**
178:4

**stop**
41:2 50:12 322:22 371:1

**stopped**
300:10 323:4 328:25 333:16 344:22

**store**
354:1,3

**story**
64:4 126:12 140:12

**strange**
216:4

**strategic**
143:22 146:22 148:17

**strategy**
142:23 145:16

**strength**
217:17 396:23

**strengths**
168:21,25 182:20,22,25 185:23 187:21 193:6 228:25

**stricken**
105:11

**Strickland**
418:8

**strike**
18:23,25 22:25 29:22 48:14 132:13,16 297:22 299:1 393:1 395:7 397:17 401:14 406:20 420:2 423:19

**strikes**
50:14

**strong**
167:13 169:7,22,25 170:6,8 218:12 307:8

**stronger**
147:13 183:2 185:10 187:1,13,25

**strongest**
170:4

**studies**
218:23 219:11 220:5,12, 15,16 245:1,3,15 246:5, 11,13,16,18,23 247:13 250:2 257:7,12,14 269:8 273:25 285:1,3,20 295:11,13 296:1,8,9,13, 15,17,19,22,25 297:2 402:22 403:15,16,18,19 406:22

**study**
146:1 220:21 246:25 256:10 257:2 285:15 289:19 294:4,15

**stuff**
60:22 134:2 157:23 237:16 245:9 291:7 382:8 387:19 395:5 398:20 399:5

**style**
359:25

**sub**
265:6

**subject**
46:10 52:21 105:19 168:16 322:12 417:16

**subjected**
350:20

**submission**
181:6

**submit**
23:25 24:6 180:14 227:3 252:3,6,10,15,17 273:18 274:8

**submitted**
24:9,16,22 25:10,13,16 38:23 49:8 55:14 59:14 61:6 91:6,12,17 226:21 227:5 228:13,17 230:18 245:10 273:23 275:20

**submitting**
10:14,21 23:21 91:15 229:23

**subpoena**
69:14,15 70:8,15,20 110:12

**subpoenaed**
48:2

**subsequently**
10:18

**substance**
87:25 98:21 102:13 137:16 145:10 195:2 259:11 279:23 359:15

**substantial**
389:24 398:6 410:20

**substantive**
113:24 353:1 364:19,25

**successful**
163:18 358:16 391:10

**successfully**
9:20 57:6,8

**successor**
342:16,18

**sue**
142:24 143:5,21,25 144:13 157:9 170:25 171:21 307:14,15,25 308:8 342:7

**sued**
19:23 20:7 82:25 160:21 161:7,10 171:2 174:10 205:1 206:21 342:15,18 371:11

**suffered**
389:9

**suffering**
183:25

**sufficient**
363:5

**suggest**
44:17 154:7 189:23 371:2 398:13,14

**suggested**
109:11 143:25 252:14 277:3 379:20

**suggesting**
208:23 252:9

**suggestion**
190:1 310:11

**suing**
154:12 161:14 242:2

**suit**
19:19,20,21 35:23,24 36:16,19,20 71:20,21 135:20 148:25 234:5 308:13

**suits**
29:6 123:10

**summarizes**
244:25 245:14,18 295:10

**summary**
93:3 96:2 107:12 126:18 137:1,6 138:18, 21 140:20 149:23 150:17 152:1 157:25 210:5 239:3,4,5 254:19 260:14 261:1,24 263:20 264:25 266:4,6 268:9,14 273:9 274:5,24 275:3,7,9 276:2,9 358:21 363:2,16 394:2 408:24 409:4,25 410:9 413:14,25 414:10, 13,16

**Summit**
135:21,25 136:11 137:7, 10 138:9,15 413:16

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i50

**summons**
241:6

**sums**
304:8

**Sunoco/u.s.**
334:13

**Super**
45:13

**supervised**
358:6

**Supplemental**
207:19,24

**supplied**
139:8 155:18 177:9
239:20 261:5,11 288:10
392:23 394:18

**supplier**
153:6 177:9,23 205:21
301:15

**suppliers**
286:8

**supply**
127:24 176:25 239:22

**supplying**
211:1

**support**
25:14 137:1 157:18
254:7

**supporting**
141:15 214:8,21 215:4

**suppose**
105:14

**Supreme**
11:15,16 350:1

**sure**
11:4,11 14:19,20 15:3
16:9,23 17:9 18:16 25:4,
9 28:2,15 30:4 32:12
41:3 44:1 57:14,15,23,25
58:16,22 66:14 67:11
68:5 69:14 70:2,8 75:19
77:23 83:21,25 86:2,7
87:13 88:14 89:11,13,22
90:18 91:4,9,11 94:5
95:22 96:1,9 98:10
101:5,16,22 106:9,21
107:5 108:16 109:6,25

111:8,13 112:6 113:7,10,
18 114:15 116:18 119:18
120:4 123:15 127:1
134:2,11,17 135:13
146:4,5 156:14 161:7
162:12 166:17 172:6
180:2,18 182:1 184:15
192:23 194:3 196:10
213:20 216:21 223:5
225:19 226:16 228:5
231:9 232:4 236:19
240:23 242:6 243:14
254:5 260:7 262:7
269:21 277:10 280:23
286:10,14 292:1 293:3,7,
9 299:20 301:12 302:12
305:13 309:12 319:2,23
321:10,12 325:24 331:7,
25 332:3 339:6 341:19
343:8 355:12 357:6,7,25
358:22 359:5,7,14 362:1,
22 367:23,25 373:16
380:21 382:15 383:6,7,
11 390:24 395:16 406:15
413:24 419:11,16 420:6
422:9 425:4

**surely**
209:11

**surgical**
247:17

**surmising**
131:13

**surprise**
415:13

**surprised**
9:24 126:3 181:24 182:4
227:22 228:1 415:8

**surrounding**
88:7 283:5 355:2

**Survey**
289:25

**suspension**
322:19

**swear**
406:3

**Sweeney**
347:20 358:10,12,17,22,
25 359:7,8,15

**sworn**
6:10 37:12 39:14 48:23

180:24 181:5 225:25
226:9 230:10 255:7
290:13

**symptomatic**
302:16

**synergistically**
185:4

**system**
68:19 237:8

---

## T

**T.H.**
221:14 226:24 227:3

**table**
143:3 144:5

**tactical**
143:25 146:11 147:1,2
148:15 242:5 308:14

**take**
17:7 25:4 33:3 44:16
50:15 56:5 60:8 69:21
81:19 91:2,5 92:23
100:18,21 108:9 133:19,
20,21 140:20 164:4,11
166:4 172:6 184:22
191:17 193:10 196:18
203:2,6,10,11 220:10
265:25 266:5 267:7
316:1 326:22 382:20
387:13 393:1 397:9
402:14 406:23 410:22
412:25

**taken**
41:16 92:15,22 93:7
100:13 108:21 172:1,4,9
173:1,3 193:14 223:21
257:20 272:22 287:23
320:7 324:6 369:16
376:25 413:4

**takes**
386:16

**talc**
13:22,25 14:10,15,25
15:7 20:20 21:9,17,22
29:8 30:20 31:12,14
35:23,25 36:1,2,4,16,19
57:21 61:5,17,18,19
62:18,19 65:19 71:20,22,
23,25 72:2,9 74:10,23

88:25 89:14 90:22,24,25
91:3,8,12,14,15,18,22
92:7,8,24 93:1,5 95:10,
11,13,15 96:19 97:2
101:21 102:15,25 103:7,
10,17,18,20,23 104:12,
15,22,24 105:21 106:19
119:1 121:2,3,5 122:16,
22 123:10 124:12,20,22,
24,25 125:3,8,11,13,16,
19,22,23 126:3,5 127:4,
5,9,19 128:6,9,12 129:24
130:4,6,12,17,24 131:5,
19 132:11 133:11 134:1,
4,13 137:3 139:6,7,8,12,
14,20,24 140:1,5,11
141:3,15,20,22 142:3,6,
7,12,14,18,20,24 143:4,
5,8,11,13,18 144:8,11,
12,14,16,18,19,23 145:4,
5,7,18,20,21 146:2,3,5,6,
7,18,25 147:10,12,16,24
148:1,9,24 149:1,3,8,10,
19,25 150:23,25 151:5,6,
8,10,16,20,22,24 152:3,
6,23 153:1,5,6,14,17,18,
20,23 154:4,5,7,12,17,
18,20,24 155:5,7,18,19,
25 156:3,7,9,20 157:4,
10,19 158:4,17,22 159:1,
3,5 160:8,10,13,18,20
161:1,3,12,19,25 162:10,
13 166:7,24 167:2,13,15,
25 168:6,7,20 169:7,14,
22 170:2,22 171:6,24
172:9,24 173:2 174:9,10,
11 175:18 176:8 177:8
178:12 179:2,4,11 183:9
184:19 185:24 186:24
187:1,25 192:14,16,19
193:1,23 196:21 202:14,
17,18 205:5,18 206:20,
23 209:6,23 210:3,13
214:15,25 215:5 231:3,6,
23 232:11 233:3,14
234:6,10 236:1,2,18
238:5 241:13,16,23
242:13,20 244:3 245:3
246:5,17 253:12,25
254:5,18,21 255:4 256:7
257:11,13,15,22 259:15,
16 260:4,22,25 261:12
262:9,17,21 263:9,11
264:13 265:7,9,10,12,17,
22 266:1,19,25 267:4,8

268:23 273:14,20 274:15
276:13 278:5 280:12,15,
19,21,25 281:3,18
283:22 284:20,21,22,23
285:15 286:8,11,16,25
287:2,11 288:7,8,10,11,
17,19,21,22,23 289:7,11,
13 290:7,18,21 291:21
292:23,25 293:5 294:10
295:13 301:13,14 304:3,
10,17,23,25 305:1
306:10 307:4,5,6,8,10,
15,16,23,25 308:5,9,21
309:1 310:10,14 311:19
312:7,10,13,19,23 313:2,
4,5 314:9,13,23 315:12
316:8,10 317:15,22
320:25 321:21,24
323:15,20 328:2,8,10,14,
18,19 329:3,11,12,15,17
330:7,12,15,20,21 331:4,
19,25 332:2,4,7,8,13,17,
21 334:10,15,22 335:8,
11,15 336:5,6,7,10,13,
16,22 337:1,3,7,12,17,18
338:4,11 339:20 341:6,
25 342:2,10,13,23,25
343:6 344:2,3,4,5,21
345:3,6,9,24 350:6 355:9
356:20 357:4,12 359:2,9,
12 360:23 361:14,18,22,
23 362:1,3,16 363:13,20,
21 364:1,7 384:19
385:21 388:23 389:2,12
392:21,23 393:24 394:3,
8 395:2,10 396:5,10,25
397:1,3,17,19 398:2
399:6 400:14,24 401:1,8,
17 402:22 403:8,20
404:2 405:1,15,20 406:1,
7 408:19 410:4,18,20
412:7,9 416:14 417:6,7,
10,12,19,21 418:12,19
421:6,13 422:6,13,17,25
423:4,17,22,25 424:8

**Talc's**
128:5 143:2

**talcum**
179:3,8

**talk**
26:25 27:4 48:21 63:13,
16 74:25 75:5,7,14,21
82:1 96:7 117:25 162:22
173:9,14,18 194:6

198:24 230:12,16 234:24
240:22 277:5,10 315:25
356:11 392:5 422:24

**talked**
25:21,24 62:2,5,24
63:15,18 70:11 74:18,19
75:3,18 90:16 94:5,6,8,
15,17,19,24 95:1 96:9,14
98:11 100:9,10,15 101:9
102:1 110:5 111:9 125:3
162:17,19 163:2 182:20
194:20 198:15 199:2
200:2 203:20 276:15
277:8,9 279:18,20 292:6,
8,9,10 293:1 299:17,20,
24 300:1 335:25 359:20
381:21 422:14 424:18

**talking**
20:24 24:4 46:14 57:14
63:20 90:8 92:13 94:21
102:22 106:14 134:1
145:23 173:11 179:8,9
188:8 191:3 199:12
201:8 211:4 228:25
234:25 247:8 283:11
309:11 355:5 378:10
379:18 386:3 399:18
404:2 421:15

**talks**
66:17 208:5

**tape**
108:12

**task**
136:22

**telephone**
37:25 54:10,13 130:2
380:10,16

**tell**
19:23 29:11 34:4 49:19
51:19 53:4 62:14 82:12,
15 84:8 86:24,25 87:14,
21 88:10 89:12 92:13,16,
21 93:24 96:17 97:13
100:25 102:23 109:14
122:9 123:4,9 126:13
133:1 140:19 158:10
159:25 162:7,9 173:2
174:4 189:4 191:2
192:19,24 194:15 202:3,
11,25 203:13,19 204:24
209:20 217:24 226:14
231:6,17 233:2 242:3,12

249:22,24,25 254:6
258:13,17 259:10,25
260:1 266:19 278:4
288:25 291:11 299:22,23
320:24 343:23 345:22
356:19 357:3,5 358:25
359:8 360:9 362:25
365:10 368:22 413:13
415:17

**teller**
130:21

**telling**
19:18 91:21 97:17
107:16 148:8 226:17
242:9 258:2 259:19
266:18 287:10 399:4
405:2 418:9

**tells**
118:13 141:2,14 359:21,
23

**TEM**
253:1

**ten**
91:24 160:14 301:22
412:16

**tens**
216:6

**term**
16:15 120:17 295:20

**terminate**
237:19

**terminated**
30:10

**termination**
352:16

**terms**
11:19 33:5 61:17 67:8
68:8 97:5 110:8,15
120:14 122:23 123:6
126:24 143:6 145:18
165:7,10 166:18 167:11
168:21 175:8 183:1
184:18 185:11,20,23
186:21 187:21,23 192:9,
12,13 196:3 198:20
217:16 229:3 254:20
257:7 259:1,5 260:2
269:11,17 288:25 292:3
327:7,9 329:23 339:15
340:22,23 341:13 356:3,

8 361:14,18 386:5
390:16,22 395:7 396:22
416:24 420:11 421:8

**test**
239:21 286:20,21 287:4,
16,17 288:7,14,15
291:20 297:3 298:8
394:7,10,12 401:17
405:9 423:20 424:6

**tested**
143:11 147:22 193:23
202:17 253:22,24 259:11
286:10 396:25 405:20

**testified**
6:11,18 49:10 110:13
175:18 218:3,5 330:1
350:24 353:24 379:25
388:22 389:11 395:4
401:3 412:10 413:24
424:20

**testify**
48:3 214:14 248:11,12
348:7 381:25

**testifying**
224:17

**testimony**
6:25 7:3 36:14 37:12
39:15 48:23,24 49:1,4,
15,20 65:20 73:25 75:1,8
76:1,4,21 77:6,7 107:14
108:14 147:15 178:17
180:25 181:6 192:7
225:3,11,20 226:9
230:11 258:15,19 275:22
285:13 290:11,13 298:14
301:7,11 335:21 362:5,
16 390:12 426:1

**testing**
187:3 253:20 254:13
264:11 265:14 269:3
270:17 271:4,20 272:5
286:1,8,16 287:11
289:13 290:7 296:23
401:7 406:25 407:4
408:1,18

**tests**
265:9,11,15 266:24
286:24 288:20 289:1
394:19

**Texas**
22:11

THOMAS W. BEVAN, ESQ. - 05/15/2018

i52

**text**
43:2

**texts**
41:10

**thank**
38:10 40:6 42:16 54:5,6, 7 71:1,4,14 99:18 104:18 108:17 172:19 200:14,21 204:17 207:17 240:21 241:2 320:5 410:22 419:22

**Thanks**
17:10 25:6 58:23

**theory**
209:21 210:22,25 211:3, 15,25 335:12,14 336:16

**theory's**
336:19

**there's**
21:6 38:20 39:12 52:11, 13 65:18 90:23 91:2,7, 13,18,22 93:5 99:6 102:20 104:7,8,23 108:2 120:14 121:2,3 126:7 135:24 140:4,21 141:2 142:3 148:12,24 149:19 151:24 153:16 157:5 158:5,17,23 161:9 165:24 171:5 172:3 178:4 183:15,21,25 184:15 186:15,20,24 196:13 206:18 208:5 213:6 219:7 228:10 229:16 240:2 241:16,22 242:13 250:9 252:8,14 255:3,9 258:9 262:17 267:8 269:22 270:9 281:10 289:5 290:6,10 297:9 300:9 301:12 302:23 316:8 318:4,9,15 328:23 330:16 331:5 332:7 338:7 339:4,20 340:3,7,15 341:16,21 344:7 373:4 381:17 382:7 389:23 396:4,9,10 397:16 399:14,15 403:12 407:8 410:7 422:10 423:24 426:9

**Thew**
331:23 332:2

**they're**

**they've**
44:9 93:7 119:25

**thick**
122:18

**thing**
40:1,3 68:12 158:21 184:1 248:2,4 249:5 272:14 349:8 369:1,4 374:6 379:5 415:21

**things**
32:19 73:12 117:20 123:7 157:13 174:8 180:20,24 185:2,9 187:6, 11,20,22 188:6 195:24 197:4 229:6 247:1,6,13, 14,18 248:21 249:1,8 254:11 316:3 382:8 390:11 415:14

**think**
6:21,23 7:18,20 10:8 11:9 13:17 22:18 26:9,12 27:2,3,17 28:24 32:5,25 38:14,17 39:9 40:3,23 45:17 48:17 49:7,14 50:9 53:7 56:3,4 58:10,25 63:1,11 64:23,25 65:21 67:20 70:17,18 73:3 74:1 75:2 78:16 79:2,12,13,20 81:16 84:4 88:6 96:6 99:6,15,25 105:24,25 106:2,23 111:19 113:16 114:9,18 116:10,21 117:9 118:19 121:5,15 122:15 123:19 129:10 130:21 131:21 133:1,7 134:7,9,17,18 135:13 136:21 138:20 140:17,21 141:13 149:17 151:22 156:8,10 159:15 160:20 161:3,17 163:1,6 164:10, 16 166:6,11,17 167:5,20 169:9,15 171:9 173:4 174:3,7 175:22 176:3,18 179:16 182:12,13,15,21 183:1,15 184:9 186:25 191:15,17 192:15,16

193:5,19 195:23,25 198:17 201:2 204:2 207:18 210:15 212:5,9 213:17,25 214:10 215:8, 24 216:16 217:3 218:4 220:3 222:7 223:15 225:24 226:6,13,15,23, 24 227:1,19 228:9 229:10,16 233:19 238:18 239:1,5,7,17 240:1 241:19,25 243:19 245:12 246:1 247:3,19 248:1 249:11,15 250:2 251:6 254:17,18,19,23 258:7 260:11,12,14 262:1 264:14 265:2 267:6 270:13 274:9 275:13 276:3,24 277:7 278:6,8 279:2,4 281:7,10 282:25 284:5 288:15 290:14 292:15,17 293:18 294:5, 20 300:10,23 302:6,7 307:25 310:18 311:12,24 315:24 317:9 320:19 321:18 322:7 325:22,23 327:12,15 330:18,25 331:21 333:2 334:24 335:21,25 337:11,21,25 338:1 339:1 343:5,6,19 344:19 345:8 347:23 349:1 350:5 351:9 353:24 356:11 357:8 358:1,4 359:18 360:12 361:2,4,6,11 362:10,18, 20 363:21,23 364:5 366:1,15 367:19 370:18 372:8,16,25 374:11 376:21 377:19 378:7,8 379:9,10 380:20,25 381:17,19 382:6,17,18, 20 383:1,10 387:3 393:12,13 395:3,6,16 399:22 402:6 406:18 409:6,19,20 410:14,24 411:5 418:3,22 419:3 420:4 421:12 422:14 423:1,12 425:3

**thinking**
44:12 131:3 176:9 186:23

**thinks**
227:19,20 370:23

**third**
208:6 261:13 295:7

331:14 398:4 402:20 406:9

**Thomas**
6:7,13 33:20 200:13,22, 25 236:4 362:10 387:14 419:8 423:14 425:7

**Thompson**
5:9 42:1

**thorough**
119:21

**thought**
51:13 52:8,9 53:21 54:16 65:4 83:15 99:24 102:15 103:8 134:5 135:9 137:20,23 138:4,20 145:4 154:1,13 161:3 163:21 194:18 225:6 239:2 241:22 261:25 275:22 277:3 279:23 281:2 296:22 303:17,20 308:3,10 343:11 360:13 378:6 404:21 405:5 408:6 411:1,2 413:25 416:11

**thousand**
68:14 389:21

**thousands**
84:14 211:6 212:18 216:6 360:23 361:14,18 362:3

**threat**
93:12

**threatened**
415:16,18

**threatening**
89:15 93:14 123:12,20 140:14 415:24

**threats**
124:5

**three**
81:19 100:3 110:6 129:3, 4 167:4 199:6 208:25 272:6 284:5 305:14 357:7 364:15 380:14 397:5

**three-judge**
348:4

**threw**
241:25

**thrown**
359:5

**ticket**
7:22

**tile**
127:10,11

**time**
5:3 9:12,16 12:16 13:4
17:19 18:2 23:12 30:23
33:9,14 36:24 37:21
44:19 53:18 54:15 60:17
62:18 78:13 80:11 83:22
86:12 88:16 90:1,2,3,9,
15 92:12 94:3,11 95:20
100:5 101:25 102:6
103:21 108:19,24 111:8
112:10 114:23 115:9
117:7 122:19 126:9,23
128:3 132:22 139:4
143:1 151:16 154:9,15,
20 157:22 159:21 160:10
162:19 170:7 173:16
177:7,10 182:3,6 192:15,
17 193:12,17 199:3
202:15 205:25 210:7
212:7 221:18,20 223:21
224:3 233:9,15 238:2
243:13,19 272:20,25
273:7 276:14 277:1
279:15 280:11,14,17,20
282:9,18 285:21 298:2
299:10,25 302:24
303:18,22 306:12 319:6
320:12 321:16 324:4,9
330:3 345:13 346:25
351:3,11 356:15 360:13
362:15 367:25 368:1
369:19 376:23 377:3,13
382:20 386:16 391:10
392:24 398:8 401:6
408:10,15 410:9 412:2
413:2,7 415:5,11 419:6
426:23

**times**
6:17 9:25 11:21 28:17
32:12 45:12 111:11
135:12 143:11 218:4
344:15 362:24 367:17,18

**timing**
345:6

**tire**
11:5 16:11 17:19,24

**title**
55:25

**titled**
7:10

**today**
33:1 53:5 64:19 73:22
82:7 169:12 171:3 221:5
225:9 232:5 237:10,25
238:4 248:9 255:14,18
269:1 270:10,18 286:15
287:10 298:14 299:11
300:19 307:17 381:5,19
382:1 389:14 408:7
421:11 424:19

**today's**
5:2 80:20 82:2,5

**told**
19:22 50:24 51:1 75:24
84:10 86:15 87:20,23
88:1,24 89:13,20,23
93:17,22,23 97:1,3,7,10,
19 99:24 109:15 110:17
126:10,11,12 137:11
139:13,19 140:4 143:10,
15 147:22 151:23 158:4
171:8 173:7 174:7 194:5
202:6,7,12 203:12 205:6,
8,18 212:22 220:3
225:15 226:20 236:16
241:12,22 242:6,17,18
244:9 253:11 254:13
255:20 258:20 259:15,17
267:3 281:2 288:15
295:2,6 298:9 299:17
300:20 331:9 338:14
355:12 357:8 359:1,6,7
374:12 415:2,10 424:25
425:24

**Tom**
5:12,16 6:3 8:20 17:7,12
25:3 32:20 79:16 82:23
112:16 174:13 200:5,9
201:23 265:21 306:8
313:17 334:13 364:9
369:10 371:24 374:1,15
409:14

**tomorrow**
203:13

**top**
262:1 409:12

**topic**
371:15

**Tortorella**
5:25 6:1

**total**
100:2 157:6 166:18
284:1

**totally**
42:4 297:18,21

**touch**
202:4,21

**tough**
170:23,24 171:1

**Tov**
38:9

**trace**
187:2

**track**
315:21 333:4 393:22

**traffic**
7:22

**trained**
271:2

**transcript**
36:25 37:1 51:21 76:9

**translation**
51:17

**transmitting**
411:19

**treat**
255:14,15

**treated**
255:10 302:14

**treating**
302:8,17,22,23,25

**tremendous**
104:12 183:25 196:23

**tremolite**
155:20

**trial**

**7:5** 56:18 148:12 172:1,
4,9 173:1,3 197:10,11
257:3 412:16,17

**tried**
108:4 197:13,15 210:16,
24 275:17 326:16 389:12
412:8,11 422:14

**tries**
359:24

**Triglius**
402:3

**trouble**
59:1 327:23

**troubles**
22:16

**true**
15:21 79:16 103:18,23
104:1 116:14 117:1
143:18 169:14 196:3
199:25 223:5 244:14
263:9 385:12 420:3

**trumps**
395:6

**trust**
61:9,15 130:25 131:20
133:10 180:2,3 181:6,11
218:2 227:4 230:18
250:13 252:3 350:6
352:8,9,10

**trusts**
61:6 180:15 181:19
217:11 251:24

**trustworthy**
243:22 244:4 298:5

**truth**
130:21 172:25 226:14,17
425:24 426:1

**truthful**
23:14 95:17 223:3
257:23

**truthfulness**
7:19

**try**
12:20 32:21 42:5 43:1
53:1,4,14 65:13 113:9
118:17 119:24 122:13
154:10 158:14 195:20
197:22 198:16 208:17

228:24 229:21 240:20
255:16 269:7,25 288:7
291:14 325:25 330:5
341:9 370:19 388:22
391:13 395:17 396:20
412:10 417:11

**trying**
22:15 44:16 77:2 106:5
111:16 113:23 121:6
146:15 148:4 158:19
189:12,21 211:17 276:25
278:15 313:2 323:10
333:4 341:11,12,14
358:15 379:6,8 396:11
417:3,5,7

**Tunis**
6:2,3

**turn**
29:10 32:1 35:12 55:12
56:15 65:25 71:15 76:13,
14 79:21 82:20 115:6
133:14,16 135:16 152:14
155:8 177:18 178:24
198:22 199:14 204:23
208:4 223:24 235:20
244:23 261:2,19 262:15
263:23 265:3 266:6
267:16 284:17 290:16
301:16 337:10 338:1
344:15 352:13,21 354:14
377:25 378:16 386:13
398:3

**Turning**
59:10

**Turpin**
336:11

**twice**
6:19 12:8

**TWLP1S**
333:5

**TWLP2**
333:1 334:6

**TWLP2S**
333:10,14

**TWLP3S**
333:16

**two**
12:14 13:2 17:3 21:2,3
32:12 34:8,9,20 37:15
40:18 62:4 80:18 81:18,

25 94:8,10,14 98:5
100:16 102:20 104:7,19
114:25 144:7 173:11
176:1 185:2,4 186:7
239:24 284:5 291:21
304:21 305:14 315:20
319:17 321:15 331:10
356:11 366:14 367:17
375:17 397:6 405:22

**two-minute**
89:23

**two-part**
239:21

**two-sixty**
276:3

**type**
117:14 126:1 224:5
358:23

**types**
121:11 167:15 391:25

**typically**
8:17 60:6 120:25 123:22
124:4 183:17 184:2
207:5 248:13 249:18

**typo**
73:12,14,16 74:11
236:20

**U**

**U.S.**
30:25 31:5 289:22 315:3,
5,6 330:6 334:8,11
336:2,3 337:11 341:23
342:4,6,14

**ubiquitous**
125:5

**Uh-huh**
222:20 246:19 334:1

**ultimately**
124:19 411:9

**unclear**
16:14,18,22

**underlined**
400:16

**underlying**
8:24 46:2 87:6 116:17
117:16 118:22,23 119:22

173:23,25 174:4,6,14,18
196:3 278:25 279:5
368:5 369:7 370:6,14
378:10 381:14

**underscored**
402:24

**understand**
12:24 16:4 28:25 30:4
40:21 47:25 48:13 53:8
57:16 72:24 104:5
105:21 106:15 107:4,8
118:17,21 137:6 146:11,
12,15 148:4 173:12
188:23 194:22 208:12
217:7 220:15 224:12,16
254:1 268:21,22 269:1
278:15 279:13 325:6
327:17 346:25 379:8
384:15 390:24 396:22
400:21 403:13 405:3

**understanding**
20:6 21:24 22:6 39:13
83:7 111:7 134:25 135:5
193:6,20,21,22 194:1,23
212:22 216:9,23 217:2,
24 220:6 225:10 267:25
279:12,16 285:25 288:18
340:22 365:12 376:4
383:24 384:2 397:21
416:10

**understands**
191:15

**understood**
25:7,10,13 29:12 154:16
156:3 325:13

**undertake**
354:3 395:10 396:5

**unfair**
320:1

**unfiled**
306:9

**unhappy**
19:19

**unique**
52:12

**unnamed**
346:6,13,20

**unnecessary**
59:12

**unrelated**
117:20 134:4

**unsigned**
243:9 313:17

**untrue**
253:7

**upset**
357:1

**use**
22:4 125:4 213:19

**usually**
51:13 73:12,14 74:1
178:14,16 184:17 343:5,
6 415:25 421:3

**USX**
315:4,6,10 346:24

**V**

**vacuum**
257:19 291:25

**vague**
22:22 180:11 190:4
191:11

**validity**
394:19

**value**
48:10 183:15 184:2,4
186:21 229:3 327:12,16
388:14

**valued**
206:11

**valuing**
327:7,9

**Vance**
358:1

**Vanderbilt**
90:21,24 91:2,6,20,21,24
92:1,21 103:22 104:15
151:7 155:2 170:11,15,
22,23,25 171:2,10,14
240:8 262:9,10,18 263:4,
8,11,19,25 265:6,9,25
266:17 273:20 274:15
278:3 280:22 304:4,9,17,
22 345:3 363:1 394:11,
18

THOMAS W. BEVAN, ESQ. - 05/15/2018                    i55

**Vanderbilt's**
92:22 263:20 264:13
265:7,16,22 266:11
273:8,14 274:4,14
393:24 394:3

**variables**
206:18

**variety**
403:9

**various**
109:23 120:5,23 121:7
129:24 182:21,23 223:9
247:12 257:1 265:15
288:17 309:2 400:8
420:23

**vehicle**
224:7

**venture**
357:16

**Venus**
336:14

**verdict**
389:1,7,21 412:14

**verdicts**
389:19,20,22,23

**verification**
262:14

**verified**
424:21

**verify**
338:24

**Vermont**
280:25 284:20,23 290:21
294:7,10 400:15 402:17

**versus**
5:5 7:10,11 19:8,16
20:10 33:21 55:5 152:13
175:6 188:10 290:17
413:15

**vice**
7:25 8:2

**victim**
199:18

**Victor**
136:21,23 413:16

**Victoria**

358:1

**victory**
414:16

**video**
5:7 350:15,17

**videographer**
5:1 33:8,13 37:20 54:22
108:18,23 112:9,14
193:11,16 272:19,24
287:20,25 319:5 320:11
324:3,8 350:14,18
351:10,12 352:2 369:14,
18 376:22 377:2,8,12
413:1,6 419:7 426:22

**view**
10:5 45:2,24 109:22
175:11 196:15 197:5
329:22 365:10

**viewed**
327:17

**Villers**
336:21

**Vince**
333:23 334:2

**vinyl**
127:12,15,17 209:1
210:9,22 211:15,25
212:14 300:25 335:12,14
336:16,19

**violated**
55:13 56:11

**Virginia**
213:12

**visit**
63:17,19

**voice**
34:23

**Volume**
377:4,17

**voluntarily**
30:10 107:13 236:6
237:19 399:1 411:10
412:3

**voluntary**
138:14 411:20 418:7

**W**

**Wagner**
336:25

**wait**
198:9 267:19

**waiting**
54:25 263:13 314:10

**waived**
44:8 46:12 48:11

**waiver**
45:18

**walked**
124:16 416:9

**Walker**
312:8,24

**Walsh**
74:25 77:1,6 108:4
375:14

**Walton**
315:9

**want**
16:21 32:11 40:6 43:22
68:15 69:4 70:8 75:11
79:8 80:4 93:25 109:25
123:15 134:22 143:3
165:7 175:14 176:9
178:9 180:2,20,23
188:17 190:10 192:17
198:21 246:11 248:20
250:20,23 251:15,16
263:12 272:3 282:23
303:14 310:5 314:17
316:23 339:5 350:14
351:2 356:8 360:1
369:20,25 370:8 371:2
387:13 390:24 399:24
402:6 404:14 410:22
414:2

**wanted**
12:23 145:10 254:1
280:18 307:11 311:5
341:7 410:3

**Ware**
84:19,22 94:7,20 97:21
99:22 100:24 101:10
102:12,22 113:19
198:18,19 203:25 204:5,

6,7 206:25 207:11,18
214:11,18 218:1,14
222:2,13 223:12 224:13
225:1 226:16 227:16
228:12 230:16,22 231:2,
5,25 232:8,10,11,17,22
233:1,3,4,8,9,12,18,23
234:3,13,20 235:12,16
236:5,18 237:24 238:4,
19 246:25 247:11 249:6
250:3 317:1,9,11 338:10
340:3 355:12 356:10,12,
16,17 380:18

**Ware's**
214:7,15 218:17 222:5
226:19 230:10 237:18

**wasn't**
8:16 9:1 18:19 57:17
92:5 96:1 104:14 117:6
124:15 134:11 136:14,23
148:20,21 154:19 161:13
163:3 180:4 190:25
201:6 214:4 216:11
224:4 232:17 246:7,9
296:19 309:12 313:2
355:12 359:18,19,24
360:20 379:22 394:22
415:4 421:24

**waste**
342:1

**Watch**
189:7

**water**
405:25

**Waterbury**
294:11

**way**
14:8 17:25 24:15 30:22
31:11 32:21 65:13 84:16
90:21 98:2 113:9 118:10
129:8 131:19 133:18
137:20 154:10 171:24
178:10 192:6 196:14
208:17,19 215:16 217:10
228:24 229:21 253:8
266:17 277:18 291:14
297:4 317:1 327:2
329:22 339:21 345:21
349:18 370:20,23 396:20
398:23 405:8,19 407:6
411:25 419:17 426:19

THOMAS W. BEVAN, ESQ. - 05/15/2018                 i56

**ways**
12:21 13:1 40:11 120:5
121:7 391:25 420:11

**we'll**
11:2 12:2 53:10 60:9,10
61:1 69:13,22 129:16
200:13,15 252:21 287:9
311:14 331:11 361:11
392:4,5,21 411:12 414:2
426:21

**we're**
5:1,4 25:4 33:13 41:13
48:17,18 53:3,4 54:22,25
95:8 108:23 112:14,17
119:14 169:18 171:9
190:12,15 193:16 196:19
198:20 242:11 263:12
268:24 272:24 287:25
297:10,11 309:11 320:11
324:8 345:15 352:2
369:18 373:24 377:2,12
387:17,18 391:7 413:6
418:23 421:13 422:10

**we've**
9:19 12:8 60:25 111:2
160:9 171:5 204:22
253:10 297:8 302:6
361:21 403:10 408:2

**weak**
167:14 168:2 170:8
171:15 218:12 417:15

**weaker**
183:3 229:6

**weakest**
327:8

**weakness**
185:24 215:9

**weaknesses**
168:21 169:1 182:21,23,
25 187:22 193:6 217:17
229:1

**website**
120:3,11 121:2,18
129:18 316:1

**wedding**
357:19

**week**
14:4 62:4 114:25

**weekly**

14:3

**weeks**
81:10

**weigh**
185:19 257:1

**weighed**
256:20

**weight**
291:22,25

**weird**
239:10

**well-founded**
44:22

**Wengerd**
94:13,22 95:4 100:15
113:11,17 114:10 173:10
199:7 276:22,25 277:6,9,
12,21 278:8,14 279:1,10,
15 299:9,16 356:12,13
367:24 380:22

**went**
28:16 36:17 49:3 69:2
74:18 108:4 118:19
182:12 199:4 277:4
314:4 356:25 357:20
367:20 373:13 379:1
419:6

**weren't**
9:22 31:12 49:24 66:14
115:7 117:15 129:4
149:7 167:1 179:19
207:10 255:11 291:17
413:24 421:7,17

**West**
213:12

**Westfall**
290:17

**what's**
7:15 32:22,23 63:7 70:15
72:5,11 109:1 120:8
131:2 136:24 142:1
147:3 148:5 149:21
152:10 163:11 175:5
177:17 193:21 194:1,13
203:9 204:12 205:20
216:4 220:1 237:12,22
238:8,21 239:10 243:7
244:8 258:25 273:2
274:22 280:3 281:20

293:14 294:12 305:16
306:5 308:18 310:8
312:1 320:14 323:6
337:6 349:22 385:2
399:24

**whatsoever**
418:11,18 423:17,25

**wheel**
52:14

**when's**
88:16 90:1,9,15 100:5
182:3,6

**Where's**
198:13

**Whitaker**
337:2

**White**
153:5

**Whittaker**
290:17

**who's**
21:6 41:25 66:13 84:11
201:1 213:11 215:8
242:23 319:18 334:2

**Whoa**
370:25 371:1 418:24,25

**widow**
9:16 59:5

**widow's**
9:18 10:6,9

**widows**
57:7

**wife**
40:5

**Wilcox**
313:1 315:1 328:15
330:9 332:22

**Wilkerson**
334:3 337:4

**Wilkerson's**
333:23

**willfully**
56:17

**William**
244:24 295:9 407:22

**Williams**
5:5 13:20 26:11 33:21
46:3 62:3 65:4,8,11,21
66:10,13,15,16 67:1,2,4,
6,11 79:4,18 80:1 82:13,
17 83:10,13 84:18 85:24
86:1 87:6 88:10 94:14,
21,25 95:4 98:2 100:7
109:3,5 110:8 113:12
114:11 116:4,14 117:25
164:3,7 165:21 196:16
197:14,16,21 198:1,20,
23 199:3,8,16 200:3
201:3 202:4,14,15,21
203:20 280:5,16 292:8,
19 301:17 302:13 330:2,
4 333:11 355:14 356:18
357:6 364:20 367:14,15,
16 369:23 372:11 373:5,
10 378:3,7,9,11 380:19,
23 386:4 411:10,21

**Williams'**
65:22

**Williams/clark**
340:15 355:11

**willing**
357:16 381:15

**win**
419:25 420:7,8

**Windsor**
290:17

**winning**
57:1

**wish**
309:22

**withdraw**
309:23 310:12,16 369:24

**withdrawing**
396:1

**withdrawn**
8:2 11:6 13:5 14:14
15:19 57:20 61:18 72:13
77:16 83:5 98:18,20
102:21 103:8 105:20
109:14 112:24 118:11,12
127:23 132:20 137:15
150:18,21 159:14 162:8
172:23 174:22 194:20
195:18 198:12 207:22

208:17 211:22 217:10
219:25 221:19 222:4
228:13 240:20 242:22
248:8 249:16 250:5
251:2 253:17 259:2,4
260:1 269:19 277:5
287:8 293:15 303:25
307:14 308:25 325:19
348:21 363:11 375:10
380:8,12 421:4

**withdrew**
22:4,7 213:19

**witness**
27:19 32:3,18 39:13,17
42:22 43:1,11,14 48:22
51:14,15,20,22 52:2,4
93:20 99:18 105:11
112:4,21 165:14 172:21
189:6,24 190:16 247:10
249:20 258:19 298:23
299:8 366:13,18 370:2,
17 396:3 409:15

**witnessed**
149:12

**Wittreich**
337:8

**woman**
292:16

**won**
9:24 12:1 45:13 56:24
137:20 218:5 413:25
414:12

**won't**
60:8 99:8 165:14 217:11
268:13

**word**
67:10 72:5 125:5

**worded**
293:10

**words**
87:25 98:21 102:13
133:24 137:16 140:3
141:2 145:9 195:2
259:10 279:22 359:15

**work**
17:24 46:5 206:8 224:3,
5,14,18 242:24 275:12
282:11,14 314:22 316:2,
7 317:7,8 321:21,24
328:7,16 389:15 422:14

**work-product**
89:5 98:24 376:7

**worked**
14:2,7 20:16 29:7,13
30:17 31:10,16 72:14
73:8 104:10,13,16,17
122:3 125:1 127:6
139:10 153:10 175:14,15
177:14,15 186:9 234:3,4
239:24 243:3 286:6
300:13,17 304:20
315:10,19,20,21 317:9,
19 324:17 326:2 328:4,
12,20 332:22 337:14
342:24 343:9,21

**worker**
149:13 166:8 167:2
178:21 206:12 312:21,
22,24 313:1,7 330:20
388:2

**workers**
11:5 16:11 17:19,24
283:22 301:7 312:9,13,
19 333:7 335:22

**workers'**
6:20 8:11,17 9:11,18
10:7 57:7 59:4,20 60:19,
20

**working**
13:19 14:16 87:18,20
127:14 182:10 282:13
317:11 328:25 345:2
392:18 400:3

**workplace**
389:5 391:17

**worksite**
186:3,5 239:23

**worth**
388:13,21

**wouldn't**
69:21 101:14 102:13
103:11 115:24 116:23
117:3,10 131:6 145:2
180:20,23 196:25 204:10
210:6 211:10 245:24
257:6 277:13 278:17
297:23 332:5 341:21,25
342:20 345:6,10 397:1
425:16,19

**Wow**

240:19 375:23

**write**
119:13,15 265:5 293:24
294:1 402:21 409:4

**writing**
86:13 111:12 323:10
425:21,22

**written**
152:20 164:17 165:19
358:18 410:2 425:13

**wrong**
56:3 61:23 77:11,15,19
78:7 201:18 227:24,25
317:12 351:16 408:7
425:11 426:15,16,19

**wrote**
244:10 268:20 306:3
418:17

---

**X**

**x-ray**
22:13 221:3,4 253:1

**x-rays**
22:11

**Xenias**
312:8,20

---

**Y**

**yeah**
8:9 42:15 45:12 55:10
56:4 69:7,17 72:21 74:13
76:9,22 77:22 79:5,12
80:19 83:11 86:8 90:4,13
91:11 92:20 93:20 99:5
106:13 107:22 110:11
114:15 117:6 119:12
120:12,20 121:20,25
128:18 135:3 136:8
146:9 155:9 163:10
169:15 175:3 178:2
185:2 192:12 196:7,10
197:8 198:11 200:6
201:16,17 202:24
205:13,23 206:15 209:1
218:25 222:11 223:4
224:11 227:14,17,21
229:12 233:10 235:22
237:23 243:18 244:11

249:11 255:16 257:19
262:3 264:19 266:16
268:22 270:7 275:13,24
276:9 279:3 283:17,25
285:6 286:13,18 289:16
290:22 291:24 294:6,19,
23 296:5,16,24 297:23
298:12,19 300:12 303:22
313:20 323:22 324:25
325:4 329:9 330:18
331:17 338:22 339:18
340:6,7,17 343:5,19,22
344:25 346:14 349:21
353:18 357:9 361:6,7
366:17 367:16 371:13
372:18 374:11,23 376:18
382:7,25 383:11,17
389:16 395:20 396:7
404:22 407:21 409:12,22
411:5 416:22 417:2
426:7

**year**
6:21 100:16 170:21
221:21,22 253:23
277:22,24,25 278:7
353:12

**years**
6:23 8:10 13:12 53:17,24
72:24 89:2 91:25 97:4
100:17 104:16 120:12
130:16 134:3 153:1
160:13,14,19 163:1
164:16 185:11 187:24
188:7 205:3,6,7,8,13,15
206:10 208:25 233:20
241:11,14 245:10 255:19
260:8 267:24 268:8,16
269:12,20 271:5 279:19,
21 280:8 289:11 299:18
307:19 323:24 332:9
352:15 355:16 360:13
364:8 381:20 421:5

**Yep**
150:6 282:2 377:18

**you'd**
337:10 379:5 420:7

**you'll**
66:25 335:23

**you're**
19:6 20:24 44:1 46:13
48:1,13 50:19 57:14
67:11 69:23 73:6,18,24

75:12 79:3,8,9 80:16
86:7 88:8 93:6 96:17
99:7 103:14 106:8 121:6,
13 131:25 132:20,21
134:23 156:23 157:13,23
161:17 165:4 173:11
179:8 180:8 182:15,22
191:2,8 193:7 196:5
201:8 215:17 217:18
219:19,24 222:7 223:8
238:14 250:18 269:16
271:16 272:16 286:11
293:7 298:22,23 299:9
301:4 303:13 312:16
314:2 320:18,24 335:19
355:5 374:11 385:11
392:15 395:21 419:1
426:15

**you've**
6:18 7:12 24:16 33:25
34:8,12 72:14 73:8 93:3,
4 158:16 171:25 180:14
191:11 192:20,25 206:19
210:21 212:18 231:24
240:7 269:10 320:25
328:3 362:3 388:22
389:4 412:10

**younger**
53:25

---

**Z**

---

**zealously**
393:9

**zero**
389:22