Exhibit W

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF NEW JERSEY

3
  KIMBERLEE WILLIAMS,     )
4  et al.,              )
                        )
5        PLAINTIFFS,     )
                        )
6                        )
     vs.           )    CIVIL ACTION
7                        )    NO. 11-CV-01754
                        )
8  BASF CATALYSTS LLC,     )
  et al.,                )
9                        )
      DEFENDANTS.     )
10

11            - - - - -
     THE VIDEOTAPED DEPOSITION OF MARILYN HOLLEY
12           WEDNESDAY, APRIL 5, 2017
              - - - - -
13

14      The videotaped deposition of MARILYN HOLLEY,

15  called by the Defendants for examination pursuant

16  to the Federal Rules of Civil Procedure, taken

17  before me, the undersigned, Sarah R. Drown, Notary

18  Public within and for the State of Ohio, taken at

19  the offices of Thompson Hine LLP, 3900 Key Center,

20  127 Public Square, Cleveland, Ohio, commencing at

21  10:01 a.m., the day and date above set forth.

22

23

24

25

MARILYN HOLLEY – 04/05/2017          Pages 2..5

---

Page 2

```
1   APPEARANCES:
2
3      On behalf of the Plaintiffs:
4       Michael Coren, Esq.
        Jared M. Placitella, Esq.
5      Cohen, Placitella & Roth, P.C.
        127 Maple Avenue
6       Red Bank, New Jersey  07701
        (888) 219-3599
7       Mcoren@cprlaw.com
        Jmplacitella@cprlaw.com
8
9
       On behalf of the Defendant
10     BASF Catalysts LLC:
11      Eugene F. Assaf, Esq.
        Peter A. Farrell, Esq.
12      Elizabeth Dalmut, Esq.
        Kirkland & Ellis LLP
13      655 Fifteenth Street, Northwest, Suite 1200
        Washington, D.C.  20005
14      (202) 879-5000
        Eugene.assaf@kirkland.com
15      Peter.farrell@kirkland.com
        Elizabeth.dalmut@kirkland.com
16
17
       On behalf of the Defendants
18     Cahill Gordon & Reindel LLP,
       Howard G. (Peter) Sloane,
19     Ira J. Dembrow:
20      Cassandra Fields, Esq.
        Grant Geyerman, Esq.
21      Williams & Connolly, LLP
        725 Twelfth Street, N.W.
22      Washington, D.C.  20005
        (202) 434-5000
23      Cfields@wc.com
        Ggeyerman@wc.com
24
25
```

---

Page 3

```
1   APPEARANCES CONTINUED:
2
       On behalf of the Defendant
3      Thomas D. Halket:
4       Eric Tunis, Esq. (Via phone)
        Herold Law, PA
5       25 Independence Boulevard
        Warren, New Jersey  07059
6       (908) 647-1022
        Etunis@heroldlaw.com
7
8
       On behalf of the Defendant
9      Arthur Dornbusch:
10      Kevin H. Marino, Esq. (Via phone)
        John A. Boyle, Esq. (Via phone)
11      Marino, Tortorella & Boyle PC
        437 Southern Boulevard
12      Chatham Township, New Jersey  07928
        (973) 824-9300
13      Kmarino@khmarino.com
        Jboyle@khmarino.com
14
15
    ALSO PRESENT:
16
       Alex Cook, Videographer
17
18
19
20
21
22
23
24
25
```

---

Page 4

```
1    W I T N E S S   I N D E X
2                         PAGE
3   EXAMINATION
    MARILYN HOLLEY
4   BY MR. ASSAF......................  7
    EXAMINATION
5   BY MS. FIELDS....................  155
    EXAMINATION
6   BY MR. TUNIS.....................  159
7

    E X H I B I T   I N D E X
8
    EXHIBIT                  PAGE
9
10  Defendants' Exhibit 1................  51
11  Defendants' Exhibit 2................  81
12  Defendants' Exhibit 3................  85
13  Defendants' Exhibit 4................  87
14  Defendants' Exhibit 5................  94
15  Defendants' Exhibit 6................  94
16  Defendants' Exhibit 7................  94
17  Defendants' Exhibit 8................  94
18  Defendants' Exhibit 9................  94
19  Defendants' Exhibit 10..............  94
20  Defendants' Exhibit 11..............  94
21  Defendants' Exhibit 12..............  94
22  Defendants' Exhibit 13..............  118
23  Defendants' Exhibit 14..............  121
24  Defendants' Exhibit 15..............  136
25  Defendants' Exhibit 16..............  139
```

---

Page 5

```
1   Defendants' Exhibit 17..............  140
2   Defendants' Exhibit 18..............  141
3   Defendants' Exhibit 19..............  141
4   Defendants' Exhibit 20..............  141
5   Defendants' Exhibit 22..............  142
6   Defendants' Exhibit 23..............  142
7   Defendants' Exhibit 24..............  143
8   Defendants' Exhibit 25..............  143
9   Defendants' Exhibit 26..............  143
10  Defendants' Exhibit 27..............  143
11  Defendants' Exhibit 28..............  143
12  Defendants' Exhibit 29..............  143
13  Defendants' Exhibit 30..............  144
14  Defendants' Exhibit 31..............  144
15  Defendants' Exhibit 32..............  145
16  Defendants' Exhibit 33..............  145
17  Defendants' Exhibit 34..............  145
18  Defendants' Exhibit 35..............  145
19  Defendants' Exhibit 36..............  145
20  Defendants' Exhibit 37..............  146
21  Defendants' Exhibit 38..............  146
22
23
24
25
```

---

MARILYN HOLLEY - 04/05/2017                    Pages 6..9

Page 6

1        THE VIDEOGRAPHER: We're on the
2    record. This is the beginning of the video
3    recorded deposition of Marilyn Holley in the
4    matter of Kimberlee Williams, et al. versus
5    BASF Catalysts LLC, et al. in the United States
6    District Court for the District of New Jersey,
7    civil action number 11-CV-01754.
8        The time on the video monitor is 10:01.
9    Today's date is April 5, 2017. The video
10   operator today is Alex Cook.
11       Will counsel please identify yourselves
12   and who you represent.
13       MR. COREN:     Good day. I'm
14   Michael Coren. I'm representing the plaintiffs
15   in the Williams case, including Ms. Marilyn
16   Holley who is present here today.
17       MR. PLACITELLA:   Jared
18   Placitella for the plaintiffs.
19       MR. ASSAF:     Gene Assaf for
20   defendant BASF.
21       MR. FARRELL:    Peter Farrell
22   for BASF.
23       MS. DALMUT:     Elizabeth
24   Dalmut for BASF.
25       MS. FIELDS:     Cassandra

Page 7

1    Fields for Cahill Gordon and the individual
2    defendants from Cahill Gordon.
3        MR. GEYERMAN:    Grant Geyerman,
4    William & Connolly, for Cahill Gordon &
5    Reindel, Peter Sloane, Ira Dembrow.
6        THE VIDEOGRAPHER: The court
7    reporter today is Sarah Drown.
8        Will the reporter please swear in –
9        MR. TUNIS –   Eric Tunis –
10   excuse me. I assume we're supposed to put our
11   appearances in. Eric Tunis on behalf of Thomas
12   Halket.
13       MR. MARINO:     Kevin Marino
14   and John Boyle by telephone on behalf of Arthur
15   Dornbusch.
16       MARILYN HOLLEY
17   of lawful age, called by the Defendants for
18   examination pursuant to the Federal Rules of Civil
19   Procedure, having been first duly sworn, as
20   hereinafter certified, was examined and testified
21   as follows:
22       EXAMINATION OF MARILYN HOLLEY
23   BY MR. ASSAF:
24   Q  Good morning, Ms. Holley.
25   A  Good morning.

Page 8

1   Q  Do you understand you're a class representative
2       in a lawsuit?
3   A  Yes.
4   Q  What's your understanding of your obligations
5       as a class representative in this case?
6   A  I represent the estate of my mother, Kathryn
7       Darnell, and the other class members.
8   Q  And who are the other class members, if you
9       know?
10  A  I don't know them by name, no.
11  Q  Do you know who they are?
12  A  Yes.
13  Q  Who are they?
14  A  There are other defendants in this matter. I
15      mean other plaintiffs in this matter.
16  Q  And do you know how many of them there are?
17  A  No, I don't know how many.
18  Q  Do you know where they are?
19  A  No.
20  Q  Do you know what the circumstances are to make
21      them class members?
22  A  To the best of my knowledge, they're class
23      members because they were also harmed in this
24      matter.
25  Q  Were you harmed in this matter?

Page 9

1   A  By way of my mother.
2   Q  And would you describe for me how you believe
3       you or your mother were harmed.
4   A  My mother worked at BFGoodrich in Akron, Ohio,
5       where she was exposed to asbestos. And she is
6       a plaintiff in this matter and I represent the
7       estate.
8   Q  Do you think that she was exposed to talc?
9   A  Yes.
10  Q  What's your factual basis to believe that?
11  A  Just by the fact that she worked there and what
12      she said.
13  Q  What she said to you?
14  A  Yes.
15  Q  When did she tell you that she was exposed to
16      talc?
17  A  Just in her description of the job and what she
18      did.
19  Q  But did she tell you specifically – withdrawn.
20      I understand she told you she was exposed
21      to asbestos.
22  A  Right.
23  Q  We're going to get to her deposition later on.
24  A  Okay.
25  Q  Have you read her deposition?

Page 10

1   A   I have not read her deposition.  I was present
2       at her deposition, one of them, yes.
3   Q   And do you recall that she testified that she
4       was exposed to asbestos?
5   A   I don't recall exactly what was said.
6   Q   Do you recall anything about her discussion of
7       talc at the deposition?
8   A   No, I can't say that I do.
9   Q   Apart from the deposition, do you recall her
10      discussion of talc with you?  Not asbestos,
11      talc.
12  A   I don't recall.  I'm not saying that she
13      didn't, but I don't recall.
14  Q   As we sit here today, you don't recall any
15      discussions of talc with her?
16  A   I don't recall.
17  Q   And with respect to conversations with your
18      mother, do you ever -- did you ever discuss a
19      company called R.T. Vanderbilt?
20  A   No.
21  Q   Did you ever discuss a company called Emtal?
22  A   No.
23  Q   Did you ever discuss a company called
24      Engelhard?
25  A   No.

Page 11

1   Q   Did you ever discuss a company called BASF?
2   A   No.
3   Q   Do you think that your mother was exposed to
4       products made by BASF?
5   A   I would have no way of knowing that.
6   Q   Do you think she was exposed to products made
7       by Engelhard?
8   A   I don't know that personally either.
9   Q   In terms of your role as class representative,
10      what do you want out of the case?
11  A   What we want from the case is for the Court to
12      recognize that there was fraud and deceit in
13      what was told to us about talc.
14  Q   And what was told to you about talc?
15  A   In this particular instance we were told
16      that -- that it was harmful to my mom and other
17      class members by way of their employment.
18  Q   Your mother was told that talc was harmful?
19  A   Based upon what I know of this case, and my
20      mother was the one who did the initial
21      conversations with the attorneys, but based
22      upon what I have been told, yes, I do believe
23      that.
24  Q   That your mother was told that talc was
25      harmful?

Page 12

1   A   I'm not saying that she was told that talc was
2       harmful, what I'm saying is with the defendants
3       that that matter, as far as talc being harmful,
4       that would have been discussed with her by the
5       attorneys.
6   Q   Okay.
7   A   And I was not privy to that conversation.
8   Q   Okay.  So let's leave your mother's discussions
9       with her attorneys aside.  I'll come back to
10      that in a second.
11  A   Okay.
12  Q   Other than your mother's discussions with
13      attorneys, do you have any basis to believe as
14      to how your mother was harmed by talc?  Other
15      than what your mother and the attorneys
16      discussed.
17  A   Other than what was presented in the complaint,
18      then I have no personal knowledge.
19  Q   And we're going to get to the complaint and
20      what personal knowledge you have of the
21      complaint in a second.
22          But in terms of your harms or your
23      mother's harms, you mentioned that she was
24      harmed because she was told that talc was
25      harmful.  Is that what you said?

Page 13

1   A   Yes.  That's what I said.
2   Q   Okay.  And if she were told talc was harmful by
3       her attorney or somebody else, how, then, was
4       she harmed and why is it she should get money
5       in this lawsuit?
6   A   She was harmed because she developed
7       mesothelioma, which you can only get by
8       asbestos exposure.
9   Q   Do you think that this lawsuit, the Williams
10      lawsuit, the reason you're here, is a case to
11      compensate for her asbestos injuries?
12  A   I don't think that I could answer that
13      question.
14  Q   Do you think that the harm that you're seeking
15      money for is because of your mother's asbestos
16      injuries?
17  A   Yes.
18  Q   Are you seeking money for any other reason
19      other than the asbestos injuries?
20          MR. COREN:     Objection to
21      form.
22  Q   You can answer.
23          THE WITNESS:     I can answer?
24  A   Repeat the question.
25  Q   Sure.  Other than seeking money for asbestos

Page 14

1    injuries in this case, are you seeking money
2    for any other reason in this case?
3  A  Because of fraudulent representation by the
4    company.
5  Q  And what fraudulent representations are you
6    seeking compensation for?
7  A  Because the company represented that there was
8    no asbestos in the talc.
9  Q  What company represented that?
10  A  At this point I guess it would be referred to
11    as BASF or Engelhard.
12  Q  When did that representation occur?
13  A  I don't have those dates.
14  Q  To whom was that representation made?
15  A  To -- to my mom and other plaintiffs.
16  Q  When did -- excuse me.
17      Who made the representation to your
18    mother and other plaintiffs?
19  A  I would not know that, because those were
20    conversations that my mother had with her
21    attorneys.
22  Q  Did your mother -- withdrawn.
23      Other than the conversations with --
24    between your mother and her attorneys, do you
25    have any personal knowledge of representations

Page 15

1    being made to your mother about talc?
2  A  I have no personal knowledge of that.
3  Q  The only knowledge you have is from Mr. Bevan
4    regarding what was said or not said to your
5    mother, true?
6  A  Correct.
7  Q  So you're relying on Mr. Bevan as the source
8    for the facts in this lawsuit, fair?
9  A  I'd say fair based upon the complaint filed,
10    yes.
11  Q  Did -- in terms of the harms -- you mentioned
12    that you'd like to be compensated for the harms
13    caused by asbestos, true?
14  A  The harms caused by asbestos and the
15    representation by the company.
16  Q  So you would like to be compensated for the
17    harms caused by asbestos and by the
18    representations by the company, and these
19    representations were the -- are the
20    representations that you know through
21    Mr. Bevan, fair?
22  A  Fair.
23  Q  In terms of the harms, other than compensation
24    for asbestos and compensation for these
25    representations that Mr. Bevan knows about, are

Page 16

1    there any other harms that you're seeking
2    compensation for?
3  A  Would you clarify that?
4  Q  Sure.  Other than the asbestos injury to your
5    mother and other than the fraud that Mr. Bevan
6    knows about --
7  A  Right.
8  Q  -- are you seeking compensation for any other
9    harm?
10  A  I'm not certain of that.  I'm not certain of
11    that question.
12  Q  Okay.  Fair enough.
13  A  Okay.
14  Q  Okay.  So you're seeking compensation for the
15    asbestos injuries to your mother?
16  A  Right.
17  Q  True?
18  A  Right.
19  Q  You're seeking compensation for the allegedly
20    fraudulent statements that Mr. Bevan knows
21    about, true?
22  A  True.
23  Q  Are you seeking compensation for anything else?
24  A  I don't know what anything else would be.
25  Q  In this lawsuit, as we sit here today --

Page 17

1  A  Okay.
2  Q  -- you're going to be asking for money,
3    correct?
4  A  Correct.
5  Q  Okay.  And you would like money for the
6    asbestos injuries, correct?
7  A  Yes.
8  Q  And you would like money for the false
9    statements known about by Mr. Bevan, correct?
10  A  Yes.
11  Q  Would you like money for anything else?
12  A  I really --
13      MR. COREN:     Objection to
14    form.
15      Go ahead.
16      THE WITNESS:    Yeah.  Okay.
17  Q  Would you like money for anything else?
18  A  I really would not know how to answer that
19    question.  That's not clear to me.
20  Q  Okay.  Are there any other injuries as you sit
21    here today that you can identify for me, other
22    than the asbestos injury and the alleged injury
23    of fraud through Mr. Bevan, statements made to
24    Mr. Bevan?
25  A  I think if there were any other injuries or

MARILYN HOLLEY - 04/05/2017        Pages 18..21

Page 18

1    anything else asked for that that would be
2    clarified by my attorneys.  I'm not the legal
3    representative.
4  Q  But you're a class representative.
5  A  I'm a class representative.
6  Q  So I'm just asking you as you sit here today --
7    withdrawn.
8       You prepared for this deposition,
9    correct?
10 A  Correct.
11 Q  Did you meet with your attorneys yesterday?
12 A  Yes, I did.
13 Q  Who was present?
14 A  Myself and Attorney Coren.
15 Q  Okay.  Was Mr. Bevan present?
16 A  No, he was not present during that time.
17 Q  Okay.  In preparation for your deposition
18   today, have you spoken to Mr. Bevan?
19 A  I spoke to him in greeting him yesterday at the
20   office.
21 Q  And did you speak to him regarding any of the
22   facts in this case in preparation for your
23   deposition?
24 A  No, I did not.
25 Q  By the way, do you have a fee agreement with

Page 19

1    Mr. Coren or Mr. Placitella's firm?
2  A  I don't recall that.  Our family is represented
3    by Tom Bevan and his associates, so I don't
4    recall that.  I think that's taken care of in
5    our relationship with him.
6  Q  That as a class representative you have a
7    relationship with Mr. Bevan?
8  A  Right.
9  Q  And you -- any relationship, then, with the
10   Williams lawyers would be through Mr. Bevan?
11 A  It's through Mr. Bevan.
12 Q  And you don't know any of the details of that?
13 A  I'm not aware of the details of that.
14 Q  Were you ever given a written fee agreement
15   outlining what the compensation for --
16 A  I don't recall getting a fee agreement.
17 Q  Well, what's your understanding of what the fee
18   agreement is in this case?
19 A  I don't have a particular understanding of the
20   fee agreement in this case, all I know is that
21   our estate is represented by Tom Bevan.
22 Q  You mentioned you had -- your family and the
23   estate has a relationship with Mr. Bevan.
24 A  Yes.
25 Q  What do you mean by that?

Page 20

1  A  That he is the attorney that represents us in
2    the asbestos case and the defendants therein.
3  Q  In any asbestos case?
4  A  Yes.
5  Q  Have you sought compensation for asbestos
6    injuries from companies other than BASF?
7  A  Yes, we have.
8  Q  How many cases?
9  A  There's one case, multiple defendants.
10 Q  Multiple defendants.  How many defendants?
11 A  I'm not sure.  There are a number of.
12 Q  Order of magnitude, three or three, four or
13   five, more than 10?  More than 20?
14 A  More than 20.
15 Q  And have you -- more than 30?
16 A  I'm not sure.
17 Q  Does 98 sound right?
18 A  I really don't know --
19 Q  Okay.
20 A  -- how many defendants there were.
21 Q  Okay.  Would you disagree with the number 98?
22       MR. COREN:       Objection as to
23   form.
24 A  Not being sure how many defendants there are, I
25   can't agree or disagree.

Page 21

1  Q  Okay.  And have you received compensation from
2    other defendants for asbestos-related injuries?
3  A  Yes.
4  Q  From how many defendants?
5  A  I'm not sure how many defendants.
6  Q  Order of magnitude, two or three or more than
7    20?
8  A  More than 20.
9  Q  More than 20?
10 A  More than 20.
11 Q  And have you received compensation in excess
12   of, say, $250,000?
13       MR. COREN:       Objection.
14   I'll instruct her not to answer that.
15       MR. ASSAF:       Grounds?
16   Grounds?
17       MR. COREN:       The grounds
18   are -- one, it's, as we have maintained to you,
19   it's totally irrelevant.  And in the various
20   filings in front of --
21       MR. ASSAF:       Just -- Mike,
22   is it attorney-client privilege or is it some
23   other ground?  No speaking objections, please.
24       MR. COREN:       You asked me
25   the grounds --

MARILYN HOLLEY - 04/05/2017          Pages 22..25

Page 22

1          MR. ASSAF:      Grounds.
2          MR. COREN:      -- and I gave
3  you the --
4          MR. ASSAF:      Under the
5  federal rules --
6          MR. COREN:      Now you don't
7  want me to give you the grounds.
8          MR. ASSAF:      No, under the
9  federal rules you can instruct a witness not to
10 answer for either attorney-client privilege or
11 some other reason succinctly stated.  If you're
12 going to make a speaking objection, I'm going
13 to ask that the witness be excused.
14         So are you basing it on privilege or some
15 other reason under the federal rules of
16 evidence?
17         MR. COREN:      I'm basing it
18 on confidentiality and for the reasons that we
19 set forth in the various submissions to Judge
20 Dickson.
21         MR. ASSAF:      So it's not a
22 privileged instruction, it's a confidentiality
23 instruction?
24         MR. COREN:      That, as well
25 as relevance too, but yes.

Page 23

1          MR. ASSAF:      You're
2  instructing a witness not to answer because of
3  relevance?
4          MR. COREN:      It's the same
5  issues that we had in the answers to
6  interrogatories and it's the same issue that's
7  before Judge Dickson that's pending on the
8  issue of settlements.  It's been very
9  extensively briefed.
10         As we said, you may know that there are
11 settlements, but as to nature and the amount of
12 settlements, no.
13 Q  We'll get to the amounts later, because I
14 actually have some of the documents.
15         You have submitted documents to trusts,
16 correct?
17 A  To the trust, from what I understand, yes.
18 Q  Correct.  And, to your knowledge, have they
19 been truthful applications?  The information in
20 there has been truthful, correct?
21 A  Truth -- excuse me.  Truthful and to the best
22 of my knowledge, confidential.
23 Q  Did you ever sign a confidentiality agreement?
24 A  I signed confidentiality when I signed the
25 releases.

Page 24

1  Q  You signed confidentiality with the trust?
2  A  I can't say for sure whether or not it was with
3     the trust, but Attorney Bevan's office with
4     settlements provided me as fiduciary of the
5     estate releases to sign.
6  Q  And are they releases vis-a-vis Mr. Bevan and
7     the estate?
8  A  Yes.
9  Q  Okay.  And Mr. Bevan's your attorney, correct?
10 A  Mr. Bevan is our attorney.
11 Q  And so the confidentiality agreement between
12    you and Mr. Bevan and the estate, you could
13    change that if you wanted to, correct?  You're
14    the client.
15 A  I really -- I really can't say that.
16 Q  Okay.  So other than the confidentiality with
17    Mr. Bevan, are you aware of any other
18    confidentiality agreement prohibiting you from
19    discussing settlements?
20 A  Not that I can personally recall.
21 Q  Whose idea was it for you to become a class
22    representative in this case?
23 A  I am a class representative in this case based
24    upon being fiduciary of my mother's estate.
25 Q  But I'm saying how did you even find out about

Page 25

1     this case?
2  A  Through our attorneys.
3  Q  Through Mr. Bevan?
4  A  Right.
5  Q  This is the same Mr. Bevan who has knowledge of
6     any facts regarding talc and representations
7     made to your mother, correct?
8          MR. COREN:      Objection to
9     form.
10 A  Correct.
11 Q  And the same Mr. Bevan who has this
12    confidentiality agreement with you, correct?
13 A  Correct.
14 Q  And he's the one who first told you about the
15    possibility of being a plaintiff in this
16    Williams case?
17 A  Yes.
18 Q  When was that?
19 A  I don't have particular dates.
20 Q  At the time Mr. Bevan spoke to you, did you
21    have any facts regarding Emtal, Engelhard,
22    BASF, or Cahill Gordon?  Had you ever even
23    heard of them?
24 A  I had not heard of them previous to talking to
25    him.

Page 26

1  Q  In this case as a class representative, would
2     you like money from the defendants?
3  A  Yes.
4  Q  Other than money, do you want anything else?
5  A  I would like it to be clarified for my mom and
6     other class members that this particular
7     company was not truthful in its representation
8     as to their product and the effect of their
9     product on my mother and other class members.
10 Q  You said the company was not truthful as to its
11    product?
12 A  As to the harm its product could do.
13 Q  When you say the company was not truthful as to
14    the harm the product can do, your basis for
15    that is again Mr. Bevan, correct?  You have no
16    independent personal knowledge?
17 A  I have no independent personal knowledge, but
18    based upon the allegations contained in the
19    complaint, I'm privy to that.
20 Q  Other than what's written in the complaint and
21    what Mr. Bevan has told you, you have no
22    independent personal knowledge of the company
23    doing anything wrong, correct?
24 A  If you put it that way, I would say I do – I
25    do not have any independent personal knowledge.

Page 27

1  Q  And so in terms of the harms and letting people
2     know about the harms, is that your idea or is
3     that Mr. Bevan's idea?
4        MR. COREN:     Objection.  And
5     I'm going to instruct her not to extent – not
6     to answer to the extent the answer relies upon
7     advice of counsel.
8        However, Ms. Holley, if you can answer
9     the question without incorporating or revealing
10    advice of counsel, please respond.
11 A  I can't answer without revealing advice of
12    counsel.
13 Q  Mr. Bevan gave you advice as to letting other
14    people know about the harms?
15       MR. COREN:     Once again,
16    same instruction.  To the extent your answer
17    relies upon advice of counsel, we instruct you
18    not to answer.  If you can answer without
19    incorporating or revealing advice of counsel,
20    you can respond.
21 Q  Can you answer?
22 A  I cannot answer, because I believe that that's
23    attorney-client privilege.
24 Q  Did you and Mr. Bevan – withdrawn.
25       Did you and anybody discuss you receiving

Page 28

1     an incentive award or a bonus for being a class
2     representative?
3  A  No.
4  Q  Do you know – withdrawn.
5        In terms of other class members, have you
6     spoken to any people you believe who are
7     members of the class?
8  A  In a meeting at Attorney Bevan's office there
9     were several of us present.  I don't remember
10    their names, but I think there were three or
11    four other representatives of the class at that
12    meeting.
13 Q  And did they all have a prior relationship with
14    Mr. Bevan?
15       MR. COREN:     Objection.
16    I instruct you to the answer – to the
17    extent your answer relies on advice of counsel
18    you're not to answer, but if you have your own
19    personal basis or knowledge of that, then you
20    can respond.
21       MR. ASSAF:     As to whether a
22    person is represented by an attorney and she
23    knows that?  That's legal advice?
24       MR. COREN:     It depends how
25    she learns it, Gene.

Page 29

1        MR. ASSAF:     It's a fact.
2     Are you instructing her not to answer?
3        MR. COREN:     No.  I'm saying
4     if she has independent knowledge she could
5     answer.  If she doesn't –
6        MR. ASSAF:     It's a fact.
7     Whether somebody's represented or not is a fact
8     that you put even on a privilege log.  It's not
9     revealing advice of counsel.
10 A  Repeat the question.
11 Q  Sure.  Do you have – do you know whether the
12    other people at this meeting with Mr. Bevan
13    also had prior relationships with him for other
14    asbestos cases?
15 A  I would not have that information.
16 Q  Do you know who they were?
17 A  I don't recall who they were.
18 Q  Well, were they Kimberlee Williams?
19 A  I know there are other plaintiffs, but I don't
20    know them personally.  They were probably
21    identified at that meeting, but I don't
22    remember their names.
23 Q  How long did this meeting occur?
24 A  How long ago –
25 Q  Yeah.

MARILYN HOLLEY - 04/05/2017          Pages 30..33

Page 30

1   A   -- or how long was the meeting?
2   Q   How long ago.
3   A   Several years.
4   Q   Before the filing of the complaint?
5   A   I believe the first meeting was before the
6       filing of the complaint, but I can't state
7       unequivocally.
8   Q   Was Mr. Placitella or anybody from
9       Mr. Placitella's firm at that meeting?
10  A   Yes.
11  Q   Was Mr. Placitella there?
12  A   I don't recall.
13  Q   How long did the meeting take place?  How long
14      did it go?
15  A   About an hour or two.
16  Q   Without revealing what was said, did
17      Mr. Placitella make a presentation at that
18      case?
19  A   I don't know if it was him specifically, but
20      someone from the law firm did.
21  Q   Made a presentation?
22  A   Right.
23  Q   Was it a PowerPoint presentation?
24  A   No, it was not.
25  Q   Did they show you documents?

Page 31

1   A   I don't believe there were documents.
2   Q   Was there anybody at the meeting who was not a
3       class representative or an attorney
4       representing the class?
5   A   I really couldn't say.
6   Q   Did you take notes of the meeting?
7   A   I took a few personal notes.
8   Q   And do you have those notes?
9   A   No, I do not.
10  Q   Where are they?
11  A   At home.
12          MR. ASSAF:      Have they been
13      logged?
14          MR. COREN:      I don't know.
15          MR. ASSAF:      Pardon me?
16          MR. COREN:      I don't know.
17      I can't tell you off the top of my head.
18  A   This was several years ago.
19  Q   Have you given them to your attorneys?
20  A   This was several years ago.  As I said, I took
21      a couple of personal notes.
22  Q   Okay.
23  A   That was it.
24  Q   Okay.  And with respect to at least these
25      personal notes, have you given them to your

Page 32

1       attorneys?
2   A   They were personal notes for me.  There was --
3       there was nothing -- to the best of my
4       knowledge, there was nothing in my notes to
5       give to the attorney.
6   Q   Have your attorneys ever asked you for notes
7       relating in any way to this case?
8   A   No, they have not.
9   Q   Really?  They haven't asked you for any
10      documents you have that relate to this
11      complaint or the allegations in this case?
12  A   I'm not certain I understand your question.
13  Q   Okay.  Have your attorneys come to you and
14      said, "Ms. Holley, we'd like you to search your
15      notes and files and computer to see whether
16      there are any documents that relate to this
17      case"?  Have they asked you that in words or in
18      substance?
19  A   I can't say for sure.
20  Q   Well, you've been around the litigation system
21      for years in these asbestos cases, right?
22  A   Correct.
23  Q   And you generally follow your attorneys'
24      advice, correct?
25  A   Correct.

Page 33

1   Q   And if your attorneys had asked you for
2       documents, you would have told them about the
3       documents, correct?
4   A   Personally, I can't think of any documents that
5       they would have asked me for.  The documents
6       that I received were from the attorneys.
7   Q   Well, let's start with the notes that you took
8       during the Bevan class rep meeting with
9       Mr. Placitella.  It's clear you haven't given
10      those to the attorneys.
11  A   Clear.
12  Q   Okay.
13  A   True.
14  Q   And they haven't asked you for them?
15  A   No.
16  Q   So are there -- do you have a computer or a
17      laptop?
18  A   Yes.
19  Q   And do you have emails on that?
20  A   Yes.
21  Q   Do you have emails regarding your
22      communications with Mr. Bevan on that?
23  A   No.
24  Q   Do you have any communications on that
25      regarding this case at all?

MARILYN HOLLEY - 04/05/2017          Pages 34..37

Page 34

```
 1  A  No.
 2  Q  Do you have any communications with other class
 3     representatives?
 4  A  No.
 5  Q  Has anybody ever asked you to look at your
 6     computer for that information?
 7  A  No.
 8  Q  Do you get copies of the -- withdrawn.
 9        Without revealing what's said, are you
10     kept up to date on what's happening in this
11     case?
12  A  Yes.
13  Q  Do you know whether there were any settlement
14     discussions in this case?
15  A  Yes.
16  Q  When were you told about settlement
17     discussions?
18  A  I just know there were settlement discussions.
19     I have no information on those particular
20     discussions.
21  Q  Well, you were told about the economics, the
22     terms, the money that was being offered,
23     weren't you?
24  A  No.
25  Q  As a class representative, you weren't told how
```

Page 35

```
 1     much money was being offered to settle the
 2     case?
 3  A  To settle this particular case?
 4  Q  Yeah.
 5  A  No.
 6  Q  Interesting.  As a class representative, do you
 7     think that you're entitled to know whether your
 8     attorneys are negotiating to settle the case
 9     for some sum of money?
10        MR. COREN:      Objection as to
11     form.
12  A  I have always been advised of relevant
13     settlements in regard to the defendants' end,
14     my mom's asbestos case.
15  Q  Mr. Bevan always tells you that there's a
16     defendant who's willing to pay $10,000, for
17     example, correct?
18  A  Correct.
19  Q  And then you decide --
20  A  I do receive that information.
21  Q  And then you decide whether to take that money,
22     correct?
23  A  Yes.
24  Q  In this case do you expect the same thing to
25     happen?
```

Page 36

```
 1  A  If there is a reasonable settlement offered, I
 2     do expect that.
 3  Q  You expect to be informed of it, correct?
 4  A  I expect to be informed.
 5  Q  And whose decision would it be to accept the
 6     settlement offer for the class?
 7        MR. COREN:      Objection as to
 8     form.
 9  A  My attorneys.
10  Q  You mean Mr. Placitella and Mr. Coren would
11     decide on how much money the class should get?
12  A  They would advise me.
13  Q  What about Mr. Bevan?
14  A  I'm -- I'm not sure in this matter.  They're
15     representing the class action, so I'm not
16     certain how that's done.  I can imagine that
17     Attorney Bevan would be privy to it, but I
18     don't know that for certain.
19  Q  But as we sit here today, you've never been
20     informed that there was an opportunity to
21     settle a case for some sum of money that you
22     would receive, correct?
23  A  In some of the others.
24        MR. COREN:      Objection.
25  Q  Withdrawn.
```

Page 37

```
 1        MR. COREN:      Objection.
 2  A  Okay.
 3  Q  Leave aside the individual asbestos cases with
 4     Mr. Bevan, okay?
 5  A  Okay.  Okay.
 6  Q  With respect to this case, the Williams case,
 7     as we sit here today, you've never been
 8     informed that there was a possibility to settle
 9     a case -- settle these cases at some sum of
10     money and that you will receive some specific
11     sum, correct?
12  A  I've only been advised that there have been
13     some settlement discussions.  No money was
14     discussed.
15  Q  It was never --
16  A  With me.
17  Q  Okay.  Well, you're the class representative.
18  A  Right.  Right.  Right.
19  Q  Other than you, is there anybody else --
20  A  Right.
21  Q  -- you think would be privy to these
22     discussions?
23  A  I wouldn't know that.
24  Q  At the end of the day, do you think that
25     Mr. Placitella and Mr. Bevan get to decide how
```

MARILYN HOLLEY - 04/05/2017        Pages 38..41

Page 38

1   much money the class should get?
2           MR. COREN:     Objection as to
3   form.
4   A   Repeat that.
5   Q   Sure.  In this class action, do you think the
6   class representatives decide how much money the
7   case should be settled for, if it's settled, or
8   the attorneys, like Mr. Placitella, Mr. Coren,
9   and Mr. Bevan?
10          MR. COREN:     Objection as to
11  form.
12  A   I believe that our attorneys would advise us on
13  that.
14  Q   Advise you on who makes the decision?
15  A   No.  Advise on any settlements that have been
16  offered and they feel as though they are
17  settlements that we should take into
18  consideration.
19  Q   And, for example, if somebody had offered
20  you – withdrawn.
21          If a defendant or a group of defendants
22  in this case had offered you, say, $50,000 to
23  settle the case, would you at least want to
24  know about that?
25          MR. COREN:     Objection as to

Page 39

1   form.
2   A   I consider that to be supposition.  As I stated
3   before, I understand in this particular matter
4   that there had been some settlement
5   discussions, but that was with – that was the
6   attorneys, the plaintiffs, and the defendants.
7   As a class action member, I was not privy to
8   that.
9   Q   And as a class representative you were not
10  privy to those discussions, correct?
11  A   No, not to those particular discussions.
12  Q   And so – withdrawn.
13          As we sit here today, do you have any
14  knowledge of whether you had an ability last
15  summer to get a specific sum of money to settle
16  the case?
17  A   I have no knowledge of that.
18          MR. COREN:     Form objection.
19  I'm sorry, I'm a little slow on the draw.
20  Q   In meeting with Mr. Coren yesterday, was there
21  anybody else present in the room?
22  A   No.
23  Q   And did he show you any documents?
24  A   I had already received documents.
25  Q   From whom?

Page 40

1   A   From Mr. Coren.
2   Q   Did you review those documents?
3   A   Yes, I did.
4   Q   Did they refresh your memory and help you
5   remember things?
6   A   Basically they helped in just the review of the
7   case itself.
8   Q   Were they documents relating to your mother's
9   case?
10  A   Yes.  Relating to this particular case.
11  Q   Were they documents relating to the Williams
12  class action?
13  A   Yes.
14  Q   Could you estimate how many documents you got?
15  Was it five, 10, 15, 20?
16  A   I know how many documents I received.
17  Q   Oh.  How many?
18  A   It was – there were three documents.
19  Q   And those documents helped you both prepare for
20  today and refresh your memories as to the
21  events, correct?
22  A   Yes.
23  Q   What three documents refreshed your memories as
24  to the events?
25  A   The complaint, amended complaint, and the

Page 41

1   judge's – the judge's opinion.
2   Q   So the pleadings with the allegations in this
3   case and the Court of Appeals' decisions –
4   A   Correct.
5   Q   – are what you reviewed to prepare you for
6   today's deposition?
7   A   That along with the meeting with Mr. Coren.
8   Q   And were any other documents shown to you?
9           MR. COREN:     Asked and
10  answered.
11  Q   Other than those three.
12  A   Not at this time.  I had received documents
13  before.
14  Q   In preparation for your deposition or just as a
15  class representative?
16  A   These – the documents I reviewed were for
17  preparation of this deposition.
18  Q   The three documents you reviewed?
19  A   Those three documents.
20  Q   Okay.  Did you review any other documents in
21  preparation for your deposition?
22  A   No, I did not.
23  Q   Okay.  In terms of your role as class
24  representative, do you believe that other class
25  members are interested in receiving money for

**Page 42**

1  alleged injuries?
2       MR. COREN:     Objection as to
3  form.
4  A  Do I believe that other --
5  Q  Class members --
6  A  -- class members --
7  Q  -- want money.
8  A  I'd say yes.
9  Q  Okay.  In terms of, say, things that aren't
10  money, all right, instead of money, whatever
11  else, say an apology, do you think other class
12  members would prefer money or an apology?
13       MR. COREN:     Objection as to
14  form.
15  A  I couldn't say what they would prefer.
16  Q  What about you?
17  A  I think I've already stated it, what I -- what
18  my expectation is.
19  Q  Money?
20  A  Monetary compensation and admission of
21  fraudulent representation.
22  Q  Admission of fraudulent representation.
23     The admission of fraudulent
24  representation, we talked about that earlier,
25  that's what --

**Page 43**

1  A  Right.
2  Q  -- Mr. Bevan knows about, not you, right?
3  A  I know about it through Mr. Bevan.
4  Q  You know -- anything you know, you know about
5  it through Mr. Bevan, fair?
6  A  Mr. Bevan and Mr. Coren.
7  Q  Anything you know about the alleged fraudulent
8  misrepresentation you know either through
9  Mr. Bevan or Mr. Coren?
10  A  Through the attorneys, yes.
11  Q  All right.  Do you think that members of the
12  class should get money if they were not harmed?
13       MR. COREN:     Form objection.
14  You can respond.
15       THE WITNESS:     Did you say I
16  could respond?
17       MR. COREN:     Yes.  Yes.
18  A  Actually, I don't think I would be able to
19  answer that question.  Because you're talking
20  about expectations of other people, right?
21  Q  Well, I'm talking about your role as class
22  representative in approving or I guess hearing
23  about a settlement from your attorneys.
24     Do you expect that class members who were
25  not injured should get money?

**Page 44**

1       MR. COREN:     Objection to
2  form.
3  A  And I don't know exactly what you mean by
4  "class members who were not injured."  Why
5  would they be class members?
6  Q  Okay.  Good question.
7     So if somebody, let's say, actually
8  didn't have exposure to Emtal talc and yet
9  filed a complaint against Emtal and had it
10  dismissed, do you think they should get money?
11       MR. COREN:     Objection as to
12  form.
13  A  And had it dismissed?
14  Q  Yeah.  Even though they had never worked with
15  Emtal talc.
16  A  Why would they be a party to the class if they
17  had never worked for -- if they had never been
18  exposed to or harmed?
19  Q  Well, your -- you mentioned earlier you had
20  filed a complaint against dozens of companies,
21  correct?
22  A  Other companies, correct.
23  Q  And do you know whether all of them actually
24  had asbestos that your mother was exposed to?
25  A  No, I would not.  I would not know that.

**Page 45**

1  Q  And if you found out later that one of the
2  companies was listed as a defendant but
3  actually didn't have any product at the place
4  where your mother worked, would you want money
5  from them?
6  A  Wouldn't that be a legal issue?
7  Q  Well, I think it's actually just a matter of
8  ethics, isn't it?
9       MR. COREN:     Objection as to
10  form.
11  A  I don't think it's anything that I can answer.
12  If you repeat the question --
13  Q  Sure.
14  A  -- and I get a better understanding, maybe I
15  can answer you.
16  Q  If you found out that there's a lawsuit against
17  the company and the company actually didn't
18  have any products with asbestos that your
19  mother was exposed to, they were named by
20  mistake, do you think that company still owes
21  you or your estate money?
22  A  Where the company's still in the lawsuit or
23  were they dismissed?
24  Q  Let's say they're still in the lawsuit.
25  A  I still -- I don't think it's anything that I

MARILYN HOLLEY - 04/05/2017          Pages 46..49

Page 46

1   can answer.
2   Q   Well, let's say they were dismissed.
3   A   Not based upon the way that you presented it.
4   Q   Do you think that any company that's sued in an
5       asbestos case needs to pay money to the
6       plaintiff?
7   A   Isn't that speculation?
8   Q   You can answer the question.
9   A   I don't see how I could answer that question.
10      I don't see how -- why I should answer that
11      question, because you're talking about other
12      people and I think you're bringing up legal
13      issues.  And I'm not -- I'm not qualified to
14      answer that.
15  Q   If you found out in this case --
16  A   Okay.
17  Q   -- that your mother was not ever exposed to
18      Emtal talc, do you think you should still get
19      money in this case?
20  A   I don't think we'll find that out.
21  Q   Why --
22  A   She was exposed to Emtal talc.
23  Q   And you know that through Mr. Bevan?
24  A   Yes.
25  Q   Well, if Mr. Bevan's wrong for some reason and

Page 47

1       I am able to show you Mr. Bevan is wrong, will
2       you still want money in this case?
3   A   I think that's speculative.  I don't see how I
4       could answer a question based upon
5       probabilities.  Now, if you ask me a question
6       based upon something in this particular case,
7       yes, but I'm not understanding that question as
8       my being able to give you a substantive answer.
9       If you repeat it or if you phrase it a
10      different way, maybe, but based upon the way
11      that you put the question, I don't see how I
12      can answer that.
13  Q   You've been involved in numerous lawsuits
14      against asbestos companies, true?
15  A   Yes.  Since the death of my mom.
16  Q   Okay.
17  A   Uh-huh.
18  Q   Dozens of them, correct?
19  A   Correct.
20  Q   Okay.  And based upon your experience in dozens
21      of asbestos cases, do you think that you should
22      receive money even if you later learn that the
23      company that you sued did nothing wrong?
24  A   I can't --
25          MR. COREN:      Form objection.

Page 48

1   A   I cannot answer that question.
2   Q   You don't understand that concept?
3   A   It's not a matter of not understanding the
4       concept, it's a matter of what are you really
5       asking me to answer?
6   Q   I'm asking if you found out a company did
7       nothing wrong and you sued them any way, would
8       you let them out of the lawsuit?
9   A   I guess what stops me in this question, when
10      you start off with "if."  So me that's
11      speculative.  I don't know how to answer that.
12  Q   Well, the "if" has to do with proof that the
13      company did not have any asbestos that your
14      mother was exposed to.  That's the "if."
15  A   You said if there were other companies that
16      were claimed to have asbestos --
17  Q   Withdrawn.
18  A   -- were not -- yeah --
19  Q   Withdrawn.
20  A   -- because I'm not understanding --
21  Q   Okay.
22  A   -- that question.
23  Q   Fair enough.
24  A   Okay.
25  Q   Withdrawn.

Page 49

1   A   Okay.
2   Q   Do you know whether you've ever dismissed a
3       company from any of your dozens of lawsuits
4       without taking any money?
5           MR. COREN:      Objection as to
6       form.
7   A   I can't recall.  I really -- I can't recall.
8       There are a number of defendants, so I
9       really -- I cannot recall.
10  Q   Can you think of any reason why you would allow
11      a company out of a lawsuit without paying
12      money?
13  A   I would -- I would actually expect my attorney
14      to handle that.
15  Q   Here's what I'm trying to get at --
16  A   Please.
17  Q   -- Ms. Holley.  And it's not a legal question,
18      it's actually just a basic fairness question.
19  A   Okay.
20  Q   If you found out you sued a company that wasn't
21      responsible for any harm to you, would you
22      still want them to pay you money?  Can you
23      answer that question "yes" or "no"?
24  A   I would rely on advice of counsel.
25  Q   Okay.  Without -- you can't answer the question

MARILYN HOLLEY – 04/05/2017        Pages 50..53

Page 50

1  of whether you expect money from companies even
2  though they did nothing wrong without talking
3  to your attorneys?  You need to talk to your
4  attorneys about that question?
5  A  I don't need to talk to my attorneys about that
6  question, but in my mind, in my way of
7  thinking, the way you are phrasing the
8  question, it doesn't seem to me that it's a
9  question I can answer.  Do you want to repeat
10  it again?
11  Q  Sure.
12  A  Okay.  Please do.
13  Q  Do you think it's fair for people to get money
14  if they were not harmed?
15  A  No, I don't think that's fair.
16  Q  Okay.  And if when a person – withdrawn.
17      When a person files a lawsuit against a
18  company that actually never harmed the person,
19  do you think that company should pay the person
20  money?
21  A  I'm still not understanding the basis of your
22  question.
23  Q  The basis is that you've sued somebody who did
24  nothing wrong and you want them to pay you
25  money.

Page 51

1  A  No.
2  Q  Do you think that's fair?
3  A  No, it would not be fair.
4  Q  Is that something you would want to do?
5  A  In terms of what would I want to do?
6  Q  Take money from a company that actually didn't
7  cause you any harm.
8  A  First of all, I would not expect my attorneys
9  to file against a company or persons that did
10  not do me harm.  That's my first inclination.
11  Q  Okay.  So as far as you know, Mr. Bevan hasn't
12  filed against companies that he knew were
13  uninvolved with your mother, correct?
14  A  To the best of my knowledge.
15  Q  Okay.  Let's get out the complaint, D Ex. 1.
16      (Defendants' Exhibit 1 was marked.)
17  Q  I'm showing you what's been marked D Ex. 1.
18  This is the second amended complaint, and I
19  think you mentioned earlier that you had
20  reviewed this as one of the three documents you
21  reviewed in preparation for your deposition.
22      Do you recognize this document?
23  A  Yes.
24  Q  By the way, did you review this document before
25  it was initially filed?

Page 52

1  A  Yes, I would have.
2  Q  And how would you have gotten that document?
3  A  Through Mr. Bevan.
4  Q  By email?
5  A  Hard copy.
6  Q  Do you still have it?
7  A  Probably.
8  Q  You have files regarding your –
9  A  Right.
10  Q  – Bevan cases at –
11  A  Right.
12  Q  – home, don't you?
13  A  Right.
14  Q  And when I asked you earlier about whether you
15  looked for documents – withdrawn.
16      When I asked you earlier about whether
17  your attorneys asked you to look for documents,
18  did your attorneys ask you to look for
19  documents in your Bevan files at home?
20  A  No, they did not.
21  Q  Okay.
22      MR. ASSAF:      Interesting
23  approach.
24  Q  Okay.  Paragraph 25, could you turn to that,
25  please?

Page 53

1  A  Uh-huh.  I'm not there yet.
2  Q  Okay.
3  A  Okay.
4  Q  Paragraph 25.  I'd like to talk to you about
5  the first sentence.  "On or about November 14,
6  2000, Plaintiff Holley's decedent, Kathryn
7  Darnell, while alive, commenced an asbestos
8  injury lawsuit in the Court of Common Pleas,
9  Cuyahoga County, against BASF's predecessor,
10  Eastern Magnesia, naming same as a defendant in
11  accordance with the accepted asbestos practice
12  in that area in view of settlement programs
13  that potentially responsible product
14  manufacturers or suppliers were negotiating or
15  had developed."
16      Do you see that?
17  A  Yes.
18  Q  What is the "accepted asbestos practice in that
19  area in view of settlement programs that
20  potentially responsible product manufacturers
21  or suppliers were negotiating or had
22  developed"?
23      MR. COREN:      Ms. Holley, I
24  instruct you not to answer to the extent your
25  answer relies upon advice of counsel.  If you

MARILYN HOLLEY – 04/05/2017          Pages 54..57

Page 54

1    could answer the question without incorporating
2    or revealing advice of counsel, please answer.
3  Q   Okay. Ms. Holley, going forward, any question
4    I ask you that you have to reveal advice of
5    counsel you should pause and say I would need
6    to -- advice of counsel, otherwise Mr. Coren
7    will continue to interrupt and try to prompt
8    you not to answer questions like that --
9          MR. COREN:      Objection.
10  Q   -- okay?
11         MR. COREN:      I'm stating
12    an --
13  Q   So --
14         MR. COREN:      -- objection
15    for the record and I'll continue to state an
16    objection for the record.
17  Q   Ms. Holley, what does that sentence mean to
18    you?
19         MR. COREN:      Once again my
20    same instruction.
21  A   What it means to me is that on or about that
22    date that a lawsuit was filed against BASF's
23    predecessor, Eastern Magnesia.
24  Q   We're actually focused on the second part, I
25    apologize.

Page 55

1  A   Okay.
2  Q   The second part, what are -- what were --
3    what's the accepted asbestos practice in
4    Cuyahoga County of a settlement program where
5    potentially responsible product manufacturers
6    were negotiating or had developed? What does
7    that mean?
8  A   I have no knowledge of what that means.
9  Q   Well, you reviewed it in the complaint under
10    the paragraph that talks about your claims,
11    correct?
12  A   Okay.
13         MR. COREN:      And, once
14    again, my same instruction applies.
15  Q   You just mentioned you reviewed the complaint
16    before filing, correct?
17  A   Yes.
18  Q   And this is a paragraph about your underlying
19    lawsuit and Mr. Bevan and your mother's
20    lawsuits, correct?
21  A   Correct.
22  Q   So you would have read this carefully, correct,
23    and wanted to understand it?
24  A   Correct. I do understand it.
25  Q   Okay. And so could you -- since you do

Page 56

1    understand paragraph 25, could you explain to
2    me what the accepted asbestos practice was
3    that's referenced in paragraph 25?
4          MR. COREN:      And once again
5    I instruct you not to answer to the extent your
6    answer relies upon advice of counsel. If you
7    can answer it without incorporating or
8    revealing advice of counsel, please respond.
9  A   The particular -- the particular words that you
10    are pointing out in referring to "Eastern
11    Magnesia, naming same as a defendant in
12    accordance with the accepted asbestos practice
13    in that area," I believe that my attorney would
14    have made that decision. I personally would
15    not know what the accepted practice is in our
16    area.
17  Q   So that first sentence in paragraph 25
18    regarding the accepted asbestos practice for
19    settlement programs that were either being
20    negotiated or developed, Mr. Bevan would be the
21    person who has knowledge of that?
22  A   Well, the paragraph starts off: On or about
23    November 14, 2000, my mom, Kathryn Darnell,
24    commenced an asbestos injury lawsuit. She was
25    the one who dealt with her attorney, Tom Bevan,

Page 57

1    regarding this particular lawsuit. I am not
2    privy to that information.
3  Q   Okay.
4  A   I was not at that meeting.
5  Q   You don't have any facts about the first
6    sentence of paragraph 25 and the person who
7    does have the facts would be Mr. Bevan?
8  A   The person who does have the facts would be
9    Mr. Bevan, as indicated on November 14, that
10    Kathryn Darnell, while alive, commenced. So
11    that would have been between my mother and
12    Attorney Bevan. And I was not a party to any
13    conferences or meetings to develop this
14    particular lawsuit.
15  Q   And so if I wanted to know what's meant by the
16    accepted asbestos practice in Cuyahoga County
17    for settlement program, I would be best to talk
18    to Mr. Bevan, fair?
19  A   Or review the accepted practices.
20  Q   But in terms of this complaint, you have, and
21    as -- withdrawn.
22        As a class representative, in paragraph
23    25 can you refer me to anybody whom I could
24    talk to to get answers about paragraph 25?
25  A   Okay. The lawsuit was brought in the Common

MARILYN HOLLEY - 04/05/2017          Pages 58..61

Page 58

1  Pleas Court of Cuyahoga County and it says in
2  accordance with the accepted asbestos
3  practices. So I don't understand how I would
4  even be able to answer that question, really.
5  Q  And let's step back.
6  A  Okay.
7  Q  When you reviewed the complaint, did you have
8  any questions about what that meant?
9  A  This particular complaint was done by Attorney
10  Bevan with meetings with my mother.
11  Q  Withdrawn.
12      With respect to reviewing the Williams
13  complaint, the second complaint that's in
14  front --
15  A  Right.
16  Q  -- of you.
17  A  Right.
18  Q  When you read it for the first time, did you
19  have any questions about what that meant?
20  A  No. No, I did not.
21  Q  Did you review the complaint for accuracy?
22  A  Yes, however, I don't see anything that I would
23  question in this particular paragraph.
24  Q  Well, you just -- withdrawn.
25      You don't know what -- the accepted

Page 59

1  asbestos practices for settlements in Cuyahoga
2  County, do you?
3  A  No, I don't know the accepted in Cuyahoga
4  County.
5  Q  And if I wanted to find out from anybody
6  involved in this case, do you think Mr. Bevan
7  might be the person to talk to? Or somebody
8  else?
9  A  You're talking about the complaint filed in
10  2000?
11  Q  No. I'm talking about that -- who -- this --
12  withdrawn.
13      Paragraph 25 --
14  A  Okay.
15  Q  -- in your complaint against my client says
16  that there's an accepted asbestos practice in
17  Cuyahoga County for settlement programs. You
18  say you don't know anything about that,
19  correct?
20  A  About what, the accepted practices?
21  Q  Yes.
22  A  To the best of my knowledge and understanding
23  based upon your question, I don't know why I
24  personally would know about accepted practices
25  in Cuyahoga County.

Page 60

1  Q  And as a class representative, could you point
2  me to the person who would know anything about
3  those practices as referenced in the complaint?
4      MR. COREN:     Objection to
5  the form.
6  Q  Could I talk to Mr. Bevan? Would he be a
7  better person to talk to?
8  A  Yes. Because I consider accepted practices to
9  be an issue that the attorneys would know
10  about, not an issue that I would know about
11  personally.
12  Q  So it's something --
13  A  In spite of reviewing -- I review the complaint
14  based upon -- based upon facts that I know of.
15  The legal issues I rely on the attorneys. I
16  consider that to be a legal issue when you say
17  "accepted practices." How would I know about
18  accepted practices as a layperson?
19  Q  That would be Mr. Bevan?
20  A  Right.
21  Q  Okay. And turn to the next sentence. It says,
22  "reasonably relying upon and acting upon the
23  misrepresentations and material omissions of
24  Defendants regarding Engelhard's talc products
25  and the absence of any evidence indicating

Page 61

1  Engelhard's talc contained asbestos fibers that
2  were made to her attorney and representative,
3  Thomas Bevan, as set forth more particularly
4  herein."
5      Do you see that?
6  A  Yes.
7  Q  I think you mentioned earlier that the alleged
8  representations were made to or known about by
9  Mr. Bevan, not you, correct?
10  A  That would be correct.
11  Q  So if I want to ask somebody about that
12  sentence, I would have to ask Mr. Bevan,
13  correct?
14  A  Yes. It says, "that were made to her attorney
15  and representative, Thomas Bevan."
16  Q  And then going to the next sentence, it says,
17  "Plaintiff voluntarily dismissed her lawsuit
18  against Eastern Magnesia as part of a nominal
19  settlement with a group of talc supplier
20  defendants without receiving full, fair and
21  adequate compensation for her asbestos injury
22  claims against BASF's predecessors."
23      Do you know anything about that sentence
24  and the facts underlying it?
25  A  That my mom accepted settlement based upon the

MARILYN HOLLEY - 04/05/2017          Pages 62..65

Page 62

1    facts that her attorneys had at that time.
2  Q  And you know about that through Mr. Bevan,
3    correct?
4  A  Yes, I do.
5  Q  Other than what you know from Mr. Bevan, you
6    don't have any personal knowledge?
7  A  I have no personal knowledge.
8  Q  Turning to the next page, still paragraph 25.
9    "Plaintiff Holley did not know and learn that
10   her decedent was a victim of Defendants'
11   Fraudulent Asbestos Defense Scheme until late
12   2010/early 2011, when she was informed of the
13   same by her attorney, Tom Bevan."
14       Do you see that?
15  A  Yes.
16  Q  Do you have any papers, documents, emails, that
17   could put a more specific date on when
18   Mr. Bevan informed you of this fraudulent
19   asbestos defense scheme?
20  A  To the best of my recollection, it was late
21   2010, early 2011 when I met with -- when I met
22   at Attorney Bevan's office.
23  Q  Okay.  And was that the same meeting
24   Mr. Placitella was at?
25  A  Yes.

Page 63

1  Q  So the first time you heard of this alleged
2    scheme and filing a class action complaint was
3    a meeting with Mr. Bevan and Mr. Placitella
4    that lasted about two hours at Mr. Bevan's
5    office?
6  A  One or two hours.  And let me -- let me
7    clarify.  It was -- Mr. Coren was there.
8  Q  And Mr. Coren too?
9  A  Uh-huh.  Yeah.
10  Q  And after that the complaint was filed?
11  A  Sometime after that.  I don't remember exactly
12   when, but sometime after that meeting the
13   complaint was filed.
14  Q  Did you have any other meetings between that
15   first meeting and the time the complaint was
16   filed?
17  A  I can't recall for sure.  I know that there
18   were at least one or two more meetings, but I
19   can't say specifically if they were before or
20   after the complaint was filed.
21  Q  And at any of those meetings were there people
22   besides your attorneys or other class
23   representatives?
24  A  At the first meeting for sure.
25  Q  The other class reps were at the meeting?

Page 64

1  A  Yes.
2  Q  Were there people who weren't class
3    representatives at the meeting?
4  A  I would not know that.
5  Q  Okay.  After -- withdrawn.
6       After that first meeting, were there
7    other meetings where people attended who were
8    not class reps or attorneys?
9  A  Not that I can recall.  I won't say
10   unequivocally, but not that I can recall.
11  Q  And at this first meeting, did Mr. Placitella
12   in words or in substance, or any of his
13   colleagues, tell you to make sure you
14   maintained all of your documents relating to
15   the underlying Bevan cases against Emtal?
16  A  No, I was not specifically told that.
17  Q  Were you ever told that?
18  A  Not specifically, no.
19  Q  Turning to the next sentence of paragraph 25.
20   "Had Plaintiff's counsel and Plaintiff known
21   about the existence of spoliation described
22   more particularly herein and/or the existence
23   of evidence that BASF's talc and talc products
24   contained asbestos, the settlement demand would
25   have been higher and/or the Plaintiff would

Page 65

1    have taken her case to trial."
2       Do you see that?
3  A  Yes.
4  Q  Do you have any knowledge of the facts
5    surrounding the settlement demand and whether
6    you would have taken the case to trial or is
7    that a Mr. Bevan topic as well?
8  A  I have no personal knowledge of that, no.
9  Q  And it says here plaintiffs would have taken
10   the case to trial.
11       Do you see that?
12  A  Yes.
13  Q  Out of the 98 or so cases -- withdrawn.
14       Out of the 98 or so defendants that
15   you've sued, have any of those cases gone to
16   trial?
17  A  We did not go --
18       MR. COREN:      Form objection.
19       You can answer it.
20       THE WITNESS:     Okay.
21  A  We did not go to trial.
22  Q  In any of them?
23  A  We did not go to trial.
24  Q  But Mr. Bevan would know whether this was the
25   case that you were going to take to trial?

MARILYN HOLLEY - 04/05/2017          Pages 66..69

Page 66

1    He's the person I should ask?
2  A  He would know that. I specifically personally
3     recall that BFGoodrich defendant settled within
4     a week before the trial date.
5  Q  And then the next sentence says, "Plaintiff is
6     willing and offers to return the portion of the
7     settlement contributed by BASF, or such amount
8     the Court deems fair and just, in order to be
9     restored to the status quo ante the settlement
10    with BASF."
11        So the plaintiff, that's you, correct?
12 A  Correct.
13 Q  And that means you're willing to return the
14    money you've already gotten from BASF or
15    Engelhard?
16 A  If I'm not mistaken in the way I read this
17    paragraph, the money would have been returned
18    if there had not been a problem with BASF.
19 Q  Do you know how much money you or the estate
20    received from BASF or Engelhard?
21 A  I don't know. I don't remember the amount. I
22    don't remember.
23 Q  Okay. In settling these cases -- by the way,
24    you've dealt with various settlements of people
25    who had asbestos, correct?

Page 67

1  A  Correct.
2  Q  And have you dealt with defendants who didn't
3     have asbestos?
4  A  I can't recall.
5  Q  By the way, with respect to -- withdrawn.
6        You've been acting as a representative
7     for your mother's estate since 2000 in these
8     asbestos cases?
9  A  No. No. 2000 was prior to her death.
10 Q  Okay.
11 A  Okay. She passed June 7, 2001.
12 Q  Correct.
13 A  Okay.
14 Q  So since that time you've been responsible for
15    handling the asbestos cases?
16 A  Since that time -- in 2001 we did open up an
17    estate with the local Probate Court.
18 Q  And you mentioned before that you've received
19    hard copies of documents from Mr. Bevan?
20 A  Correct.
21 Q  And you say you haven't received any emails
22    from Mr. Bevan?
23 A  No. We usually deal with the documents
24    themselves via hard copy.
25 Q  Okay. So Mr. -- if Mr. Bevan has emails to

Page 68

1     you --
2  A  Mr. Bevan doesn't have emails to me.
3  Q  Okay.
4  A  Not specifically, no.
5  Q  Generally?
6  A  No, not generally. No.
7  Q  All right.
8  A  No. We either met or I received copies from
9     his office.
10 Q  And then in terms of these various documents
11    for your underlying asbestos cases since 2001,
12    have you ever discarded or destroyed any of
13    them?
14 A  No.
15 Q  So you still have them all?
16 A  Yes.
17 Q  Could you describe for me what those files look
18    like? Is it 6 inches, is it a couple boxes?
19 A  It's a lot of paper. It's quite a bit, but I
20    could not give you a general idea because there
21    were a number of documents having been received
22    at various times. I did not receive all of the
23    documents at one time. Okay.
24 Q  But you have some sort of file system?
25 A  Yes.

Page 69

1  Q  Okay.
2  A  From receiving documents from the office, yes.
3  Q  And then these notes we referenced before of
4     your meetings with other class representatives,
5     would those notes be in the same file system?
6  A  And I'm not sure of that. I mean, they
7     were just some cursory notes that I made, yeah.
8     Not putting down facts or anything, but
9     basically the date of the meeting, who -- maybe
10    who was there and how long it took, but not any
11    extensive notes, no.
12 Q  Well, whether they're extensive or not, these
13    notes, are they in the same file system as your
14    Bevan litigation files?
15 A  Pretty much, yes.
16 Q  And in order to find out whether the notes are
17    extensive or not and whether they have actual
18    facts that might be relevant to the case, we
19    wouldn't know actually until an attorney
20    reviewed them, correct?
21 A  Correct.
22 Q  And Mr. Placitella and Mr. Coren haven't asked
23    to review them, correct?
24 A  No. No.
25 Q  Could I ask you just -- I know you'll do this

Page 70

1   any way, but please don't discard them.  Keep
2   hold of them, okay?
3   A   Well, I keep all the –
4   Q   Because I think – I think –
5   A   I keep the material I receive.
6   Q   Good.  I think they're going to ask you now to
7   review them.
8   A   Okay.
9   Q   Okay.  I might be wrong on that, but I think
10   I'm right.
11       Okay.  Let's go to paragraph 228 of the
12   complaint.  I'm going to ask you about 228 to
13   230.
14   A   Okay.
15   Q   So if you take a minute and review those.
16   A   Okay.  228 to 230?
17   Q   Yes, ma'am.
18       Okay.
19   A   Okay.
20   Q   All right.  So in paragraph 228, and then I'm
21   going to continue on to 230, there's the phrase
22   in the first sentence, "When negotiating these
23   aggregate settlements and deciding to recommend
24   and obtain its clients' consent and
25   authorization to participate in them, the Bevan

Page 71

1   Law Firm reasonably relied upon Cahill Gordon's
2   and BASF's (or its predecessors')
3   representations" and it continues.
4       Do you see that?
5   A   Yes.
6   Q   Based upon your experience with Mr. Bevan and
7   over the last 15 years of asbestos litigation
8   with 98 or so defendants, do you have any
9   understanding of what the phrase "aggregate
10   settlement" means?
11       MR. COREN:      And,
12   Mrs. Holley, once again I need to instruct
13   you –
14       MR. ASSAF:      Oh, please.
15   Michael.
16       MR. COREN:      Stop it.
17       MR. ASSAF:      No.  This is
18   not – there's no advice to go here.  I'm
19   asking her if she knows what it means.  It's a
20   yes or no question.  There's no legal advice
21   that can conceivably impact this answer.
22       MR. COREN:      Well, you and I
23   seem to have a disagreement, Gene, on putting
24   my objection on the record.
25       I instruct you not to answer the

Page 72

1   extent your answer relies upon advice of
2   counsel.  If you can answer the question
3   without incorporating or revealing advice of
4   counsel, please respond to Mr. Assaf's
5   question.
6   Q   And to be clear, Ms. Holley, I'm asking you yes
7   or no do you know what that means.
8       MR. ASSAF:      And, Mr. Coren,
9   I'd ask you to stop coaching and suggesting
10   answers to the witness.
11       MR. COREN:      I'm not
12   coaching.  I'm putting an objection on the
13   record.
14   Q   Do you know what the term "aggregate
15   settlement" means?
16   A   I believe I do.
17   Q   Okay.  What is it?
18   A   That it would be the collective group of
19   settlements.
20   Q   So with other plaintiffs?
21   A   With other plaintiffs.
22   Q   And have you participated in aggregate
23   settlements?
24   A   Participated in what way?
25   Q   Have you settled as part of an aggregate

Page 73

1   settlement?
2   A   Yes.
3   Q   And did you – withdrawn.
4       And has Mr. Bevan represented you in
5   these aggregate settlements?
6   A   Yes.
7   Q   Now, if you turn to paragraph 230, at the very
8   bottom of the page, it says, "Correspondingly."
9   Do you see it at the bottom right?
10   A   Uh-huh.
11   Q   "Correspondingly, the Bevan Law Firm asbestos
12   injury clients, including Plaintiff Pease,
13   Plaintiff Holley's decedent, Ms. Darnell, and
14   Plaintiff Ware, as well as others similarly
15   situated to them, would not have given their
16   consent or authorization to participate in an
17   aggregate settlement with BASF."
18       Do you see that?
19   A   Yes.
20   Q   Do you have any knowledge of whether or not you
21   would have given authorization to participate
22   in a settlement with BASF?
23   A   I have no knowledge of that.
24   Q   If I wanted – the person who would have
25   knowledge of that would be Mr. Bevan, correct?

MARILYN HOLLEY - 04/05/2017          Pages 74..77

Page 74

1  A  Yes, it would have been Mr. Bevan.
2  Q  All right. Could you turn to page -- to
3      paragraph 289.
4  A  Okay.
5  Q  It says, "Plaintiffs' claims are typical of the
6      claims of other Class Members'."
7          Do you see that?
8  A  Yes.
9  Q  Do you know what that means?
10 A  Yes.
11 Q  What does that mean to you?
12 A  It says because we were similarly affected by
13     Defendants' spoliation of asbestos evidence.
14 Q  And do you have any facts to that or is that a
15     Mr. Bevan issue?
16 A  That's a Mr. Bevan issue.
17 Q  Okay. Could you turn to paragraph 316.
18 A  I'm there.
19 Q  Okay. It says, "As a further proximate" cause
20     "of the above described deliberate gathering
21     and withholding, destruction and/or concealment
22     of documents and evidence relating to Class
23     Members' underlying asbestos claims, and/or the
24     false and misleading statements thereafter that
25     no documents or evidence existed, Plaintiffs

Page 75

1      and other Class Members may or will incur, or
2      have already incurred pecuniary losses and
3      damages, including but not limited to the loss
4      of their underlying asbestos injury claim, the
5      expenses and costs of proceeding without this
6      evidence incurred in the effort to replace,
7      locate, or identify evidence, and the cost of
8      prosecuting this case to prove the fraudulent
9      concealment and spoliation of evidence."
10         Do you see that?
11 A  Yes.
12 Q  Okay. First of all, the pecuniary damages,
13     what pecuniary damages, what money damages have
14     you suffered?
15 A  What money damages?
16 Q  Yeah.
17 A  Are you asking are there money damages that I
18     have suffered personally?
19 Q  Yes.
20 A  I'd have to give thought to that question. I'm
21     not certain what's involved in money damages
22     for me. Are you talking about time? Are you
23     talking about any kind of material loss that I
24     have had? I'm not sure what that means.
25 Q  What about in terms of your mother's estate,

Page 76

1      what money damages has that incurred?
2  A  What do you mean?
3  Q  Well, it says that class members, plaintiffs --
4  A  Right.
5  Q  -- have -- may or will incur or may have
6      already incurred pecuniary or monetary losses
7      and damages, including but not limited to the
8      loss of their underlying asbestos injury
9      claims, and then it goes on.
10 A  Uh-huh.
11 Q  So let's start there. With respect to the loss
12     of the underlying asbestos injury claim, do you
13     think that that's a loss that you or your
14     mother's estate has incurred?
15 A  Yes.
16 Q  Okay. And how much?
17 A  How much?
18 Q  Is that loss?
19         MR. COREN:     Objection as to
20     form.
21 A  As in a monetary value?
22 Q  Yes.
23 A  I would not be able to answer that.
24 Q  Well, you now have testified you've been
25     involved with Mr. Bevan for 15 years settling

Page 77

1      cases against asbestos defendants, including,
2      as we're going to see, people who actually
3      created asbestos piping where your mother
4      worked.
5  A  Right.
6  Q  And you settled those cases?
7  A  Right.
8  Q  So you have some understanding of what cases
9      settle for, correct?
10 A  I have some understanding of what cases settled
11     for, but I do not know how the figures were
12     derived.
13 Q  Well, as we sit here today, do you have any
14     amount of money that you could identify for me
15     as your loss for having your mother's claim
16     dismissed or settled against BASF?
17         MR. COREN:     Objection as to
18     form.
19         You can respond.
20 A  I have -- I have no idea. That has not been
21     discussed.
22 Q  Well, do you know that you or your mother's
23     estate have settled with other talc
24     manufacturers?
25 A  I know that they have settled with other

Page 78

1  defendants, whether or not they were talc
2  manufacturers, I'm not certain.  I particularly
3  remember defendants like BFGoodrich, Cooper,
4  that sort of thing.
5  Q  And you said you understood the term "aggregate
6     settlements" --
7  A  Right.
8  Q  -- right?
9  A  Right.
10 Q  That's where maybe a bunch of defendants --
11 A  Right.
12 Q  -- were settling --
13 A  Right.
14 Q  -- with a bunch of plaintiffs --
15 A  Right.
16 Q  -- correct?
17 A  Right.  Right.
18 Q  And would you agree with me, would it be fair
19    if I can show you that your mother or your
20    mother's estate settled with talc manufacturers
21    who admitted they had asbestos in the talc,
22    that would be instructive for you in
23    understanding what the damages are in having
24    settled with Engelhard, correct?
25 A  I think it's instructive to a certain extent.

Page 79

1  Q  Because if you have two talc manufacturers and
2     you're settling with them, you would think,
3     based upon your experience with Mr. Bevan, that
4     the talc manufacturer who has asbestos in the
5     talc would pay more than the talc manufacturer
6     who doesn't have asbestos in the talc, fair?
7        MR. COREN:     Form objection.
8        You can respond.
9  A  Fair to a certain extent, because in this
10    particular matter there was fraud involved.
11 Q  Based on what Mr. Bevan told you?
12 A  Based upon what -- yes.  Based upon what
13    Mr. Bevan said and the basis -- the very basis
14    of this lawsuit.
15 Q  Okay.  But in terms of the underlying cases
16    back in 2000 and 2001, 2002, you understood
17    that those cases were being settled against
18    defendants who both had asbestos in their
19    product and didn't have asbestos in their
20    product, correct?
21 A  My understanding is based upon those that had
22    asbestos.  I cannot recall those who did not.
23    If there were those who did not.
24 Q  Well, you settled -- your mother's estate
25    settled with Engelhard, and one of the reasons

Page 80

1  Mr. Bevan told you there was fraud is because
2  she heard that Engelhard didn't have asbestos
3  in the talc, right?
4  A  No.
5  Q  No.
6  A  Well, based upon my understanding of this
7     particular case, the information given to them
8     at that time was that Engelhard did not have
9     asbestos in the talc.
10 Q  And at the time -- withdrawn.
11    Based upon your litigation experience
12    with Mr. Bevan, you have come to learn that you
13    have settled with defendants who actually did
14    have asbestos in the talc, right?
15 A  Yes.
16 Q  And you would agree with me that's going to be
17    relevant information, to see how much a
18    defendant owed somebody who was around talc,
19    correct?
20 A  Correct only if -- only if they admitted that
21    they had asbestos in the talc.  I don't think
22    it -- I don't think it's fair to lump that in
23    with someone who said that they did not have
24    asbestos in the talc but in fact did.  I think
25    that's a -- there's the difference there.

Page 81

1  Q  Okay.  And we'll get to that.  I'm going to
2     show you --
3  A  Right.
4  Q  -- a listing of defendants.
5  A  Okay.
6  Q  Some with asbestos, some without.
7  A  All right.  All right.
8  Q  All right.  Let's see.
9        MR. ASSAF:     Can I have the
10       interrogatory?
11    (Defendants' Exhibit 2 was marked.)
12 A  I think they're right in front of you.  This is
13    D Ex. 2.  "Plaintiff --"
14       MR. COREN:     Gene, when you
15    get to a good spot --
16       MR. ASSAF:     Yeah, I think
17    this will take five minutes or so and then --
18       MR. COREN:     Yeah.
19       MR. ASSAF:     -- we'll take a
20    break.
21 Q  Marilyn Holley's -- withdrawn.
22    D Ex. 2 is entitled:  Plaintiff Marilyn
23    Holley's answers to BASF's first set of
24    interrogatories.
25    Do you see these?

MARILYN HOLLEY - 04/05/2017          Pages 82..85

Page 82

1  A  Yes.

2  Q  Okay.  When did you first see these?

3  A  I first saw these after they were prepared for

4     me, but I can't give you an exact time when

5     they were -- when it was done.  Let's see.

6        Based upon the certificate of service, it

7     looks like it was the end of last year.  Okay.

8  Q  And did you review these interrogatories before

9     they were finalized?  Or did you review them

10    after they were already filed?

11  A  No.  I reviewed them after they were finalized.

12    We discussed them prior to submission.

13  Q  And did you ever sign what's called a

14    verification?

15  A  Yes.

16        MR. ASSAF:     I'm going to

17    ask counsel for a copy of that verification.

18        MR. COREN:     Yes.

19        MR. ASSAF:     If you could

20    email it to me during the dep, that would be

21    useful.  Okay?

22        MR. GEYERMAN:    Same goes for

23    the verifications for the other defendants.

24  Q  So you remember signing the verification?

25  A  I believe so.  I won't say unequivocally, but I

Page 83

1     believe so.

2  Q  And because you've signed verifications for

3     other interrogatory responses in other

4     litigations, correct?

5  A  Correct.

6  Q  And so you know what a verification is?

7  A  Yes.

8  Q  Let's start at the back, actually, 11 and 12.

9        In 11 the second paragraph reads,

10    "Subject to and without waiving the foregoing

11    Objections, Plaintiff possesses no personal

12    information responsive to this request."

13        This is a question --

14  A  Do we have -- oh, I wasn't at the

15    interrogatories.  I'm sorry.

16  Q  Sorry.  Withdrawn.

17        Let's start again.

18  A  Okay.  Interrogatory number 11?

19  Q  11, yep.  Describe in detail the process behind

20    the Decedent's decision to settle or dismiss

21    Engelhard in the Underlying Actions, including

22    the Persons involved, the information reviewed,

23    and the basis for the decisions.

24        Do you see that?

25  A  Uh-huh.

Page 84

1  Q  And then the response, the second paragraph,

2     says, "Plaintiff possesses no personal

3     information responsive to this request."

4        Do you see that?

5  A  Yes.

6  Q  And I think you and I talked about this in the

7     beginning of the deposition, the information --

8     personal -- withdrawn.

9        You have no personal information

10    regarding why the underlying case was settled,

11    what happened in the underlying case, what was

12    said regarding Engelhard in the underlying

13    case, correct?

14  A  I have no personal information of that, that's

15    true.

16  Q  And the person who does have that personal

17    information --

18  A  Would be --

19  Q  -- is -- would be?

20  A  Attorney Bevan.

21  Q  Attorney Bevan.  Okay.

22        Interrogatory 12, I think the same thing.

23    "Describe all efforts made by Decedent and her

24    counsel in the Underlying Action to develop and

25    prosecute claims under Engelhard."

Page 85

1        And, again, just to be clear, the person

2     who would have the factual information to

3     address why the case was settled, what was said

4     by Engelhard would be?

5  A  Attorney Bevan.

6  Q  And on that note, we'll take a break.

7        THE VIDEOGRAPHER: Off the record.

8     The time is 11:36.

9        (Recess taken.)

10        THE VIDEOGRAPHER: Back on the

11    record.  The time is 11:48.

12    (Defendants' Exhibit 3 was marked.)

13  BY MR. ASSAF:

14  Q  Okay.  In front of you, Ms. Holley, is

15    exhibit -- Defendants' Exhibit 3, the response

16    to the Cahill Gordon interrogatories.

17        Do you see these?

18  A  Yes.

19  Q  Did you also review these at some point?

20  A  Yes.

21  Q  Okay.

22  A  I'm certain that I did.  Uh-huh.

23  Q  Did you sign a verification?

24  A  I believe I did, yes.

25  Q  Okay.

MARILYN HOLLEY - 04/05/2017          Pages 86..89

Page 86

1    MR. ASSAF:     Counsel, may we
2    also have a copy of that verification?
3          MR. PLACITELLA:  Sure.
4          MS. FIELDS:     We join in that
5    request.
6          MR. ASSAF:     I don't think
7    it was attached.
8    Q  All right.  And in terms of filling out the
9    disclosed -- the interrogatories, fair to say
10   that you also -- you relied on the facts that
11   you knew from Mr. Bevan?  Withdrawn.
12         In terms of responding to the
13   interrogatories, I know you said that you had
14   no personal knowledge of many of the facts in
15   there, correct?
16   A  Yes.
17   Q  And with respect to the facts you did know, is
18   it fair to say that many of those facts came
19   from Mr. Bevan?
20   A  Many, but I believe in this interrogatories we
21   talked about residences.
22   Q  Yes.
23   Q  Okay.  So that would have been personal
24   knowledge.
25   Q  So other things like residences, I guess it's

Page 87

1    your brother and Linda Neal whom also you
2    identified as potential witnesses?
3    A  Linda Neal, not necessarily my brother.
4    Q  Okay.  All right.
5    A  Uh-uh.
6    Q  But other than that purely personal
7    information --
8    A  Yes.
9    Q  -- the facts of the underlying case and the
10   facts of the alleged fraud, all that's
11   Mr. Bevan?
12   A  Yes.
13   Q  "Go talk to Mr. Bevan"?
14   A  Yes.
15         (Defendants' Exhibit 4 was marked.)
16   Q  May I have put in front of the witness
17   Defendants' Exhibit 4, please.
18         Defendants' Exhibit 4 is entitled "Class
19   Plaintiffs Rule 26(a) Disclosures."
20         Have you ever seen this before?
21   A  I can't recall for sure.  This document goes
22   back to October 2015.
23   Q  Okay.
24   A  And I don't remember -- I can't say yea or nay.
25   Q  Okay.  It's something filed by your --

Page 88

1    plaintiffs' --
2    A  Right.
3    Q  -- lawyers --
4    A  Right.
5    Q  -- in the Williams case?
6    A  Right.
7    Q  And I would like to turn your attention to
8    paragraph 2.
9    A  Paragraph 2.  Okay.
10   Q  Yep.
11         I'm sorry.  Page 2.  Page 2.
12   A  Page 2.
13   Q  Where it says "Thomas Bevan."
14   A  Uh-huh.
15   Q  Do you see that?
16   A  Yes.
17   Q  And I'm going to read this under "Subject."
18   A  Okay.
19   Q  "Mr. Bevan is an attorney in the Akron, Ohio
20   area who has represented the five Ohio-venued
21   Named Class Representative Plaintiffs.  He has
22   knowledge of their asbestos claims, the
23   representations that he and his firm were given
24   by Defendant BASF Catalysts, Cahill, Gordon and
25   the individual attorneys affiliated with these

Page 89

1    Defendants, and the actions taken as a result
2    of Defendants' misrepresentations, half-truth
3    statements, material omissions concerning Emtal
4    talc and the evidence of asbestos in Emtal
5    talc.  He has knowledge about the involuntary
6    dismissal of his clients' claims due to the
7    defendants' misrepresentations, half-truth
8    statements and material omissions concerning
9    Emtal talc and the evidence of asbestos in
10   Emtal talc."
11         Do you see that?
12   A  Yes.
13   Q  Do you think that's true?
14   A  Yes.
15   Q  Yes.  And do you have -- have you ever told
16   Mr. Bevan that he cannot provide facts in this
17   case?
18         MR. COREN:     Objection as to
19   form.
20         Also to the extent that you're relying
21   upon advice of counsel, I'm going to instruct
22   you not to answer.  However, to the extent that
23   you have personal knowledge, you may --
24   without -- you can answer without revealing
25   advice of counsel, please respond.

Page 90

1  A  I have no personal knowledge.
2  Q  Okay.  Let me try it this way:  You've known
3     Mr. Bevan for 15 years?
4  A  Yes.
5  Q  He has a relationship with you and your
6     mother's estate and helping you in all of these
7     asbestos cases, right?
8  A  Correct.
9  Q  You trust him, correct?
10 A  Yes.
11 Q  You think he's a good guy, good lawyer?
12 A  Yes.
13 Q  Okay.  If he has information that would help
14    out your case here, you wouldn't have any
15    objection to him giving it to you to help you
16    out, correct?
17        MR. COREN:     I'm going to
18    instruct you not to answer the question.  It
19    deals with a matter of privilege.  We are
20    asserting at this time the privilege.  Until
21    the Court takes appropriate action under law,
22    I'm instructing the witness not to answer.
23        MR. ASSAF:     On whether she
24    has an objection to him providing us
25    information?

Page 91

1         MR. COREN:     Yes, because
2     it's a matter of privilege and we're
3     instructing her not to answer.  It's a very
4     complicated issue.  It's an issue that's
5     pending before Magistrate Judge Dickson.
6  Q  So let's try it this way:  We've identified --
7     you've identified Mr. Bevan as a guy who
8     understands the facts of the underlying action,
9     the alleged representations, and other issues,
10    fair?
11 A  True.
12 Q  As we sit here today, as a class representative
13    and somebody who's known Mr. Bevan for 15
14    years, can you think of any reason why you as a
15    class rep wouldn't want him to provide those
16    facts to the Court?
17        MR. COREN:     Once again,
18    it's a matter of privilege.  I'm --
19        MR. ASSAF:     It's not
20    privileged, Michael.
21        MR. COREN:     Excuse me.  It
22    is.  It's the assertion of a privilege which we
23    are asserting.
24        MR. ASSAF:     What legal
25    advice or legal communication is at issue,

Page 92

1     Mr. Coren?
2         MR. COREN:     Many.  Many.
3         MR. ASSAF:     What identified
4     by that question?
5         Court reporter, could you read back the
6     question, please?
7         MR. COREN:     You know, I'm
8     not going to respond.  I've asserted my --
9         MR. ASSAF:     Please read
10    back the question.
11    (Requested portion of the record was read.)
12        MR. COREN:     Okay.  And,
13    once again, the issue is a matter of assertion
14    of privilege, which is a complicated one in New
15    Jersey.  It's not an automatic one in New
16    Jersey.  We have asserted the privilege.  It's
17    a matter under submission to judge --
18    Magistrate Judge Dickson.  I'm instructing the
19    client not to answer.
20 Q  Have you had -- yes or no:  Have you had
21    discussions with Mr. Bevan regarding the facts
22    in this case, the Williams case?  Just answer
23    it "yes" or "no" without revealing what was
24    said.
25 A  Yes.

Page 93

1  Q  Okay.  Could you answer yes or no whether
2     you've had discussions with Mr. Bevan as to
3     whether he would be willing to testify in this
4     case?  Don't say what he said, just have you
5     had those discussions?
6  A  I have not had those discussions with him.
7  Q  Okay.  Do you have any written agreement with
8     Mr. Bevan prohibiting him from testifying in
9     this case?
10 A  No.
11 Q  We talked about the arrangements when we
12    started, by the way, and it was your
13    recollection you did not have a written fee
14    arrangement with Mr. Placitella's firm?
15 A  I'm not going to say that I don't have one, I
16    just don't recall that particular document.
17 Q  Would this be in your files that the
18    plaintiffs' counsel haven't reviewed yet?
19 A  Either in my files or Mr. Bevan's.
20 Q  And do you have a separate agreement with
21    Mr. Bevan in writing for compensation in this
22    case, the Williams case?
23 A  I'm not sure.  Really I'm not sure.
24 Q  Would that be in your files as well?
25 A  If it's -- if I have it, if I was given that,

MARILYN HOLLEY - 04/05/2017          Pages 94..97

Page 94

1   yes, it would be.
2   Q   Do you have any idea of how Mr. Placitella's
3       going to be compensated in this case as the
4       class representative?
5   A   No, I don't.  Not personally, no.
6   Q   So he could get 10 percent, 30 percent, 50
7       percent, you wouldn't know?
8   A   I'm not aware.  I'm not aware.  I don't know.
9   Q   That was never discussed with you?
10  A   I don't know.
11  Q   Okay.  Now if you take in front of you D Ex. --
12          MR. ASSAF:      Can you give
13      the witness D Ex. 5 through D Ex. 12?
14          (Defendants' Exhibit 5 was marked.)
15          (Defendants' Exhibit 6 was marked.)
16          (Defendants' Exhibit 7 was marked.)
17          (Defendants' Exhibit 8 was marked.)
18          (Defendants' Exhibit 9 was marked.)
19          (Defendants' Exhibit 10 was marked.)
20          (Defendants' Exhibit 11 was marked.)
21          (Defendants' Exhibit 12 was marked.)
22  Q   We're going to try to get through these in
23      fairly short order.
24          May I help you?
25  A   I just want to make certain that I have 12.

Page 95

1   Q   Oh, I think --
2   A   Okay.
3   Q   Yeah, I think they're all here.
4   A   Okay.  Okay.
5   Q   Here they are.  9, 10, 11, 12.
6   A   Okay.
7   Q   And I'm going to try to do these in order,
8       Ms. Holley --
9   A   Okay.
10  Q   -- okay?
11  A   All right.
12  Q   All right.  First of all, D Ex. 5 is a November
13      14, 2000 filing of a complaint by Ms. Darnell
14      against who I count to be 98 defendants.
15          Do you recognize this document?
16  A   Yes.
17  Q   And these are the 95 defendants from whom
18      you've been pursuing compensation over the last
19      15 years?
20  A   To the best of my knowledge, yes.
21  Q   And some have paid and some haven't?
22  A   Yes.
23  Q   In addition to this lawsuit, were there any
24      other lawsuits filed against any other
25      defendant that you can think of?

Page 96

1   A   When you say "in addition to this lawsuit,"
2       were you referring to --
3   Q   In addition to the lawsuit against 98 asbestos
4       defendants --
5   A   Oh, I see.
6   Q   -- did you file any other asbestos case?
7   A   No, not -- not except the one that we're
8       presently talking about.
9   Q   Okay.  So that's November 14, 2000, okay?
10  A   Uh-huh.
11  Q   Then we're going to go to the very next page --
12      the very next document, D Ex. 6.  It is a
13      letter entitled -- or dated February 15, 2001
14      from Mr. Bevan to Sam Martillotta.
15          Do you see this document?
16  A   Yes.
17  Q   And if you turn to the second page of D Ex. 6,
18      there's a reference to Ms. Darnell.  Do you see
19      this?  Do you see that?
20  A   Yes.
21  Q   The document says, "I have enclosed the above
22      captioned Master Consolidated Complaints.  As I
23      indicated to you previously, most of these
24      Plaintiffs did not work in facilities where
25      they would have been exposed to talc."

Page 97

1       Do you see that?
2   A   Yes.
3   Q   Okay.  "The following Plaintiffs did work in
4       facilities where they were exposed to talc."
5       And then he lists --
6   A   Yes.
7   Q   -- 14 --
8   A   Yes.
9   Q   -- plaintiffs.  Do you see that?
10  A   Yes.
11  Q   And do you see that they have different
12      employers?  Firestone, Goodyear, General Tire?
13  A   Yes.
14  Q   And do you see where they have different years
15      in which they were working at these employers?
16  A   Yes.
17  Q   And that they have different diagnoses?
18  A   Yes.
19  Q   Do you think those -- withdrawn.
20          Based upon your 15 years of dealing with
21      asbestos litigation with Mr. Bevan, do you
22      understand that the differences in exposure and
23      diseases matter in terms of compensation?
24  A   Yes.
25  Q   What's your understanding of the reason for

MARILYN HOLLEY - 04/05/2017          Pages 98..101

Page 98

1    that?
2  A  The severity of the illnesses.  Basically
3     mesothelioma, which my mother had which we know
4     is a lung disease only contracted by exposure
5     to asbestos.
6  Q  So mesothelioma should be the disease for which
7     the greatest compensation is allowed, as
8     opposed to asbestosis?
9  A  To the best of my knowledge and belief, that is
10    true.
11 Q  So the complaint is November of 2010, and in
12    roughly three months later, there's a letter
13    from Mr. Bevan to Mr. Martillotta, whom I'll
14    represent to you was defense counsel for talc
15    defendants group.
16 A  Okay.
17 Q  Okay.  Regarding these 14 cases.
18       And at the end, Mr. Bevan says -- the
19    very last paragraph, I'm also enclosing -- "I
20    have also enclosed diagnosing medical records
21    for each of these cases.  Please let me know if
22    the talc defendants would like to resolve these
23    cases along with the plaintiffs from the
24    Breckenridge complaint.  Obviously, we would
25    also dismiss the defendants from other cases on

Page 99

1     these complaints as well."
2        Do you see that?
3  A  Dismiss the talc defendants.
4  Q  Yes.
5  A  Uh-huh.
6  Q  Okay.  So Mr. Bevan's asking Mr. Martillotta
7     whether we could resolve all of these cases
8     three months after the complaint's filed,
9     right?
10 A  According to the record, yes.
11 Q  Okay.  Now let's go to D Ex. 7, which is the
12    very next document.  And it is in fact a
13    dismissal by Mr. Bevan of your mother's lawsuit
14    against a number of defendants.
15       Do you see that?
16 A  Yes.
17 Q  And included in these defendants are companies
18    like the Asbestos Corporation.  Do you see
19    that?
20 A  Yes.
21 Q  And Bell Asbestos Mines.
22 A  Uh-huh.
23 Q  And Federal Mogul.
24 A  Uh-huh.
25 Q  Do you see that?

Page 100

1  A  Yes.
2  Q  And Georgia-Pacific.  Do you see that?
3  A  Yes.
4  Q  And R.T. Vanderbilt and Company.  Do you see
5     that?
6  A  R.T. Vanderbilt.
7  Q  Yeah, down towards the end.
8  A  Yes.
9  Q  And if you go back up to the E's, Eastern
10    Magnesia Talc Company, do you see that?
11 A  Yes.
12 Q  So in May of 2001, all of the claims against
13    those defendants are dismissed by your mother,
14    do you see that?
15 A  Yes.
16 Q  Okay.  Then a few weeks later -- I'd like to
17    turn your attention to D Ex. 8.
18 A  Okay.
19 Q  D Ex. 8 is a document dated May 25, 2001 from
20    Mr. Martillotta to Mr. Bevan.
21 A  Yes.
22 Q  And it's entitled "Settlement with 7 Talc
23    Defendants."
24       Do you see that?
25 A  Yes.

Page 101

1  Q  By the way, have you seen this document before?
2  A  I can't say that I have.  I may have, but there
3     have been so many documents.  I cannot identify
4     them individually.
5  Q  Okay.  Let's see if I can refresh your
6     recollection on this.
7  A  Okay.
8  Q  Thank you for forwarding to me the release.
9     Please revise the name of Harwick Chemical
10    Corporation to read 'Harwick Chemical Corp. now
11    known as Harwick Standard Distribution
12    Corporation'.  With that change, the talc
13    defendants agree to the language of the Release
14    and urge you to obtain them for the Grant
15    Breckenridge plaintiffs with whom we are
16    settling for a total of $14,000, and the
17    fourteen plaintiffs from the other cases,
18    specifically including Kathryn Darnell.
19       Do you see that?
20 A  Yes.
21 Q  Tom, as soon as you have the executed Releases,
22    please forward them to me and I will forward to
23    you the drafts.
24 A  Uh-huh.
25 Q  In the meantime, prepare and serve on the CLAD

MARILYN HOLLEY - 04/05/2017          Pages 102..105

Page 102

1    the dismissal of the seven talc defendants with
2    whom you are settling in each of these cases.
3        Do you see that?
4    A   Yes.
5    Q   And then if you turn to the second -- or I
6    guess it's page 3 under "Bevan 14 Plaintiffs."
7        Do you see that?
8    A   Yes.
9    Q   And it says $19,000 and Kathryn Darnell.
10       So do you see that?
11   A   Yes.
12   Q   All right.  Does that refresh your recollection
13   that all seven talc defendants were settling
14   for a total of $14,000?
15   A   No, it does not.  It does not refresh my
16   recollection.  And, actually, this is dated May
17   25, 2001.  It was literally only two weeks
18   before my mom passed away.
19   Q   In terms of understanding the facts of this
20   settlement with seven talc defendants for
21   $14,000, would Mr. Bevan be the person that you
22   would encourage me to talk to?
23   A   Yes.  He would definitely have the information
24   on this.  I did not.  I was not a party to
25   this.

Page 103

1    Q   Okay.  Then if you turn to D Ex 9.  It's dated
2    May 16, 2001.
3    A   Yes.
4    Q   So now I'm showing you this because it's a
5    voluntary dismissal of defendants Georgia Talc,
6    Harwick Chemical, Emtal, R.T. Vanderbilt,
7    Johnson & Johnson, and Southern Talc Companies,
8    which seems to be, by my count, seven talc
9    companies.
10   A   Okay.
11   Q   Okay.  Now, remember in the beginning of the
12   deposition I asked you whether talc companies
13   who have asbestos in the talc were paying money
14   different from talc companies that didn't have
15   asbestos in the talc?
16   A   Yes, I recall that.
17   Q   And you said you would expect the talc
18   companies with asbestos to actually pay more,
19   fair?
20   A   Fair.
21   Q   Now, here we have seven talc defendants
22   dismissing the case against your mother and
23   let's assume it's for $14,000, per Mr. Bevan's
24   letter, okay?
25   A   Okay.

Page 104

1    Q   All right.  So did you know that R.T.
2    Vanderbilt in fact had asbestos in its talc?
3    A   No, I did not know that.  Personally, no.
4    Q   Okay.  Well, can you dispute that Mr. Bevan
5    knew that?
6        MR. COREN:    Objection as to
7    form.
8    A   I wouldn't be able to dispute that.  That's
9    based upon his knowledge and belief and it's
10   nothing that I discussed with him.
11   Q   Okay.
12   A   Because this, as I say, this was prior to my
13   mom's passing.  And so this particular
14   defendant -- then she would have had the
15   relationship with Mr. Bevan.
16   Q   Well, this is actually -- this is August 16,
17   2001.
18   A   Okay.
19   Q   This is the dismissal of all seven talc
20   defendants.
21   A   That was the dismissal --
22   Q   Yep.
23   A   -- of all seven and it was -- I have it at
24   home.  I don't remember -- let me see -- the
25   date of my becoming --

Page 105

1    Q   Okay.
2    A   -- executrix of the estate.
3    Q   Okay.  But as we sit here today, do you know
4    whether Southern Talc had asbestos in its talc?
5    A   I have no idea.
6    Q   And could you dispute that Mr. Bevan in fact
7    knew that Southern Talc had asbestos in the
8    talc?
9    A   I would not --
10       MR. COREN:    Objection.
11   A   -- be able to dispute that.
12   Q   Could you turn to D Ex. 10?
13   A   Okay.
14   Q   January 7, 2002 from Mr. Bevan to Sam
15   Martillotta.
16   A   Right.
17   Q   And dated January 7, 2002.
18   A   Uh-huh.
19   Q   Entitled "Talc Settlement."
20   A   Right.
21   Q   "Dear Sam:
22       I have enclosed executed release for the
23   following clients."
24       And then on the next page it says, "The
25   following clients were previously paid."

MARILYN HOLLEY - 04/05/2017     Pages 106..109

Page 106

1    "We have not filed claim for the
2  following individuals."
3       We are waiting releases from the
4  following clients.
5    "Per your release, I have enclosed death
6  certificates for the following clients."
7       And then on page 3 it says, "According to
8  our records, we have previously settled and
9  dismissed, but not yet been paid for the
10  following clients." Do you see where it says
11  Kathryn Darnell?
12 A  Yes, which includes my mom, yes.
13 Q  Which includes your mom.
14 A  Uh-huh.
15 Q  And it says for the talc defendants that she
16  was paid $2,000.  Do you see that?
17 A  I see that.
18 Q  And that $2,000 included money from talc
19  defendants who had asbestos in the talc,
20  correct?
21       MR. COREN:     Objection as to
22  form.
23 A  Does it say that?
24 Q  I'm asking if you know.
25 A  I don't know.

Page 107

1 Q  Mr. Bevan would know, correct?
2 A  Okay.  Right.
3 Q  And would you be surprised, based on what you
4  know of Mr. Bevan and the allegations in this
5  case, if Mr. Bevan recommended a settlement
6  from talc defendants who had asbestos in the
7  talc for a total of $2,000?  Would that
8  surprise you?
9       MR. COREN:     Objection as to
10  form.
11 A  Based upon the way you put your question, I
12  don't know why I would be surprised or not
13  surprised, because we're talking about
14  settlement issues.  Okay.
15 Q  So as we sit here today, you can't think of any
16  reason you would object to settling with a talc
17  defendant who had asbestos in the talc for
18  $2,000?
19 A  I can think --
20       MR. COREN:     Objection as to
21  form.
22 A  -- of no reason for me to object.
23 Q  You can think of no reason you would object to
24  a settlement of $2,000 from a talc defendant
25  with asbestos?

Page 108

1 A  No, not with -- understanding the underlying
2  issues.
3 Q  Could you turn to D Ex. 11, the very next
4  document.  This is January 10, 2002.
5       It says:  Enclosed is a settlement draft
6  from the Mansour Trust Account payable to Bevan
7  & Associates on behalf of the Breckenridge
8  Plaintiffs and 14 additional Plaintiffs listed
9  below, in the amount of $33,000.
10       It says:  Specifically, the settlement is
11  with Defendants Erntal, Georgia Talc -- put a --
12  just remember Georgia Talc.
13 A  Right.
14 Q  Harwick Chemical, Johnson & Johnson, R.T.
15  Vanderbilt -- let's remember R.T. Vanderbilt
16  too -- Southern Talc -- remember them --
17  St. Lawrence Liquidating Company, and Trustee
18  for International Talc Companies.
19       And then it goes through the claims of
20  the Breckenridge complaint.
21       And then the next page, on page 2, says,
22  "In addition, the settlement is with the
23  following Plaintiffs (along with their spouses
24  and/or estates, where applicable) who have
25  filed actions separately in the Cuyahoga County

Page 109

1    Court of Common Pleas."  And you see Kathryn
2  Darnell listed?
3 A  I see it.
4 Q  Correct?
5 A  Uh-huh.
6 Q  Now, we're going to come back to page 2 in a
7  second, but I want to show you -- if you could
8  keep D Ex. 11 in front of you.
9 A  Yes.
10 Q  And then I'm going to show you something filed
11  by Mr. Bevan regarding the Southern Talc
12  company --
13 A  Okay.
14 Q  -- and whether it had asbestos in the talc,
15  okay?
16 A  Oh, okay.
17 Q  So, again, remember, to set this up:  Settling
18  with seven defendants, seven talc defendants,
19  and we're trying to figure out whether they had
20  asbestos in the talc or didn't have asbestos in
21  the talc, okay?
22       So now if you turn to D Ex. 12, this is
23  entitled "Plaintiffs' Responses to Motions for
24  Summary Judgment Filed on Behalf of the
25  BFGoodrich Company."  And it's filed by

**Page 110**

1  Mr. Bevan.
2  A  Uh-huh.
3  Q  Okay.  Now, first of all, it says, if you turn
4    to page 2 --
5  A  Okay.
6  Q  -- "The BFGoodrich plant contained many miles
7    of asbestos insulated steam pipes, asbestos
8    insulated tanks, boilers, and asbestos
9    insulated machinery."
10 A  Where is that?
11 Q  On page 2.  Do you see that right there?
12 A  Okay.
13 Q  "In the late 1980s, BFGoodrich engaged in a
14   major asbestos abatement project in its Akron
15   plant.  One job involved the removal of an
16   astounding 22 miles of asbestos pipe
17   insulation."
18     Do you see that?
19 A  Yes.
20 Q  And your mom had worked at BFGoodrich --
21 A  Yes.
22 Q  -- correct?
23 A  Yes.
24 Q  And then on the next page Mr. Bevan talks about
25    "Between 1950 and 1977, BFGoodrich purchased

**Page 111**

1  millions of pounds of raw asbestos fiber."
2  During that -- "During said time, BFGoodrich
3  purchased over seven million pounds of raw
4  asbestos fiber from Johns Manville and over
5  seven million pounds of raw asbestos from The
6  C.P. Hall Company."
7     Do you see that?
8  A  Yes.
9  Q  And it says, "Talc/soapstone was commonly
10   contaminated with asbestos as was evidenced by
11   BFGoodrich's only laboratory analyses."
12     Do you see that?
13 A  Where is that?
14 Q  That's right there.
15 A  Okay.
16 Q  Okay.
17 A  Okay.
18     MR. ASSAF:     By the way,
19   counsel, we would very much like, if Mr. Bevan
20   has them, the analyses done by BFGoodrich's own
21   laboratory analyses on the talc that he
22   references in these papers.
23 Q  Okay.  Then I'm going to ask you to flip to
24   page 14.
25 A  Of this same document?

**Page 112**

1  Q  Of Mr. Bevan's document.
2  A  Okay.  Okay.
3  Q  Okay.  And may I just point you to this?
4  A  Uh-huh.
5  Q  Right there.
6  A  Right here.
7  Q  "Soapstone/talc was used extensively all over
8    the BFGoodrich plant.  (See affidavit of James
9    Clark.)  Talc/soapstone was commonly
10   contaminated with asbestos as was evidenced by
11   BFGoodrich's own laboratory analyses.  Robert
12   Moddrell, a former BFGoodrich Industrial
13   Hygienist has testified that the talc used at
14   BFGoodrich contained asbestos."
15     Do you see that?
16 A  Yes.
17 Q  Okay.  And it says, if you go to the bottom of
18   page 15, "BFGoodrich did not create a 'no
19   asbestos' talc specification until seven years
20   later.  Also, BFGoodrich did not remove
21   asbestos-containing 'White Talc' from Southern
22   Talc Company --" withdrawn.
23     It says, "Also, BFGoodrich did not remove
24   asbestos-containing 'White Talc' from Southern
25   Talc Company from its supplier list until

**Page 113**

1  1980."
2     Do you see that?
3  A  Yes.
4  Q  So there's Southern Talc.  So Mr. Bevan knows
5    that there's talc used at BFGoodrich, knows
6    that some of the talc has asbestos, and in fact
7    knows that Southern Company has asbestos in it.
8      In fact, if you turn to Exhibit 26 -- may
9    I turn it for you?
10 A  Yes, please.
11 Q  If you turn to Exhibit 26, Mr. Bevan -- it's
12   Exhibit 12A, for the record.
13     Mr. Bevan includes a document showing --
14   that states "Recent Raw Materials investigation
15   has found that all talc supplied by Southern
16   Talc Company contain significant amounts of
17   asbestos-like particles (tremolite)."
18     Do you see that?
19 A  Yes.
20 Q  Okay.  So does that refresh your recollection,
21   going back to D Ex. 11, as to whether Southern
22   Talc Company, which supplied BFGoodrich, had
23   asbestos in its talc?
24 A  It does not refresh my recollection, no.
25 Q  But you know now that Southern Talc Company was

MARILYN HOLLEY - 04/05/2017      Pages 114..117

Page 114

1  one of the seven defendants that settled with
2  your mother's estate for $2,000, correct?
3  A  Yes.
4  Q  Even though Southern Talc was known by
5  Mr. Bevan to have asbestos in its talc,
6  correct?
7  A  Yes.
8  Q  Turning back to Exhibit 11, the second page of
9  this letter.
10 A  This is 10.
11 Q  This is 10. I think it's right there.
12 A  Oh, okay.
13    Okay.
14 Q  The second to last paragraph says, "Tom, I have
15   noticed on CLAD that in the past week you have
16   filed numerous Master Consolidated Complaints
17   naming this group of Defendants. From the
18   information you previously provided to me, it
19   is apparent that nearly all, if not all, of the
20   Plaintiffs represented on these new Master
21   Consolidated Complaints were employees where
22   there were obviously no talc exposures."
23    Do you see that?
24 A  I see that.
25 Q  So as a class representative, do you have any

Page 115

1  understanding about whether Mr. Bevan and
2  Mr. Placitella think that people who filed
3  cases against talc companies in which there was
4  no talc exposure are part of this class?
5    MR. COREN:     Objection as to
6  form.
7  A  And I have no information on it.
8  Q  Who would know that, Mr. Bevan?
9  A  Mr. Bevan and/or Mr. Coren.
10 Q  But you and I talked earlier about people,
11   other class members, and being paid when they
12   weren't harmed. Do you remember we had that
13   whole back and forth about "if" and you were
14   having --
15 A  Yes.
16 Q  -- trouble understanding the "if"? Okay.
17    So here's a document in which it's saying
18   that people are filing complaints against talc
19   companies where the people where actually never
20   exposed to talc. Do you see that?
21 A  That's what it says.
22 Q  Okay. And so now we don't have a hypothetical,
23   we have a situation where you as a class
24   representative know people are filing cases in
25   which they were never even exposed to talc.

Page 116

1    MR. COREN:     Objection.
2  Where does it say that?
3  Q  Do those people get compensation as part of the
4  class?
5    MR. COREN:     Objection as to
6  form.
7  A  You're saying that based upon the documentation
8  that these particular plaintiffs were not --
9  Q  Exposed to talc.
10 A  Exposed to talc. So what do you want from me?
11   What are you asking?
12 Q  Well, as the class representative, let's say
13   you have a pile of money at the end.
14 A  Uh-huh.
15 Q  Let's say you have a million dollars and you
16   have to divide it up amongst class members. So
17   do you think that people who are class members
18   who were actually never exposed to talc deserve
19   to get some money?
20 A  If they were in fact never exposed to talc, but
21   based upon the basis of the lawsuit, I
22   really -- I really don't see me being able to
23   answer that question, I really don't.
24 Q  Well, let's say -- let's put it the other way.
25 A  Okay.

Page 117

1  Q  For people who were exposed to asbestos and
2  talc, like Georgia -- Southern's talc --
3  A  Right.
4  Q  -- because we now know that Southern Talc
5  Company is rife with asbestos.
6  A  Right.
7  Q  Okay. So somebody works with that talc for 20
8  years and develops meso and you have a limited
9  amount of money at the end. Do you think the
10   meso victim should get less money because
11   people who were never exposed to talc are going
12   to make claims? How is that fair?
13    MR. COREN:     Objection to
14   form.
15 A  I'm still not certain how I would factually be
16   able to answer about fairness, in particular --
17   you know, we know that the basis is if they're
18   exposed to talc. But to me, again, this is
19   what I say, the supposition questions, I mean,
20   I just don't see how I can fairly answer them.
21 Q  But you're the class representative.
22 A  I'm the class representative on this particular
23   case. Are you saying that in this particular
24   case we're not talking about being harmed by
25   asbestos?

MARILYN HOLLEY - 04/05/2017    Pages 118..121

Page 118

1  Q  I'm asking you as a class rep do you think that
2     people who were never exposed to talc --
3  A  If they were never exposed to talc, based upon
4     accepted practices, then no, I don't think they
5     would be entitled to compensation, but to add
6     to that, I don't see how I really would make
7     that determination.
8  Q  You would need the Court to help you?
9  A  There you go.  Yes.
10 Q  Okay.  And if the Court were to determine that
11    people were never exposed to my client's talc,
12    Emtal talc, and the Court determined that, you
13    would agree that, yeah, they shouldn't get
14    money either?
15 A  If the Court determined that?
16 Q  Yes.  Correct?
17 A  Yes.
18    (Defendants' Exhibit 13 was marked.)
19 Q  Let's go to D Ex. 13.
20 A  Okay.
21 Q  D Ex. 13 is the deposition of Kathryn Darnell
22    on June 18, 2001.
23 A  Okay.
24 Q  Okay.
25 A  The date again?

Page 119

1  Q  January 18, 2001.
2  A  January.
3  Q  Yes, sorry.
4  A  It wouldn't have been June, no.
5  Q  Sorry.  Could you turn to page 47?
6  A  47?
7  Q  Yep.
8  A  Okay.
9  Q  And it's their question to Ms. Darnell about
10    her exposure to real asbestos in the BFGoodrich
11    plant.
12    Line 6, question, "What were in the bags,
13    ma'am?"
14    Answer, "Asbestos."
15    Question, "Just raw asbestos?"
16    Answer, "Raw asbestos, 50-pound bags.
17    And it was written right on the bags what it
18    was, heck, we didn't know that it was dangerous
19    or anything like that."
20    Do you see that?
21 A  Yes.
22 Q  Okay.  You understood that Ms. Darnell was in
23    fact exposed to real asbestos in the BFGoodrich
24    plant?
25    MR. COREN:    Objection as to

Page 120

1     form.
2  A  Yes.
3  Q  And that's part of the reason why for the last
4     15 or so years you've helped Mr. Bevan recover
5     money from various companies for
6     asbestos-related injuries, correct?
7  A  That's correct.
8  Q  Now would you turn to page 113?
9  A  In the same document?
10 Q  Yes, ma'am.
11    And line 23, page 113 at the bottom.
12 A  Uh-huh.
13 Q  It says, "Do you draw a distinction, ma'am,
14    between soapstone and talc?"
15    Answer, "And talcum?"
16    Question, "Talc, do you know what talc
17 is?"
18    Answer, "No."
19    Question, "Okay."
20    "You're talking about talcum?"
21    Question, "I'm talking about a material
22    that is used in some industries that is
23    referred to as talc, T-A-L-C."
24    Answer, "I've never heard of it."
25    Do you see that?

Page 121

1  A  Yes.
2     (Defendants' Exhibit 14 was marked.)
3  Q  And then if we go to D Ex. 14, the next
4     deposition, January 22, 2001.
5  A  Okay.
6  Q  And if you turn to page 226, I want to refer
7     you to a statement by Mr. Bevan at the bottom.
8  A  Page 226?
9  Q  Yes.
10 A  Okay.
11 Q  Mr. Bevan says, "Brent, we stipulated and we
12    will stipulate again that she doesn't know the
13    brand name, manufacturer, distributor or
14    supplier of any insulation products, as well as
15    any soapstone products as well."
16    Do you see that?
17 A  No.  Where is it?  You said on 226?
18 Q  Right at the bottom.
19 A  Oh, okay.  Okay.
20    Yes.
21 Q  Does that refresh your recollection as to
22    whether your mother didn't know the name of any
23    of the talc manufacturers that she was exposed
24    to?
25 A  Again, I was not part of those conversations.

MARILYN HOLLEY - 04/05/2017     Pages 122..125

Page 122

1  Q  Would Mr. Bevan be the best person to talk to?
2  A  Yes, he would be.
3  Q  It's time for lunch.
4  A  Okay.
5  Q  We're taking a lunch break.
6  A  Okay.
7  Q  Okay. Is that okay with you?
8  A  That's fine with me.
9  Q  Okay. Great.
10        MR. ASSAF:     Let's go off
11  the record.
12        THE VIDEOGRAPHER: Off the record.
13  The time is 12:30.
14        (Recess taken.)
15        THE VIDEOGRAPHER: We're back on
16  the record. The time is 1:08.
17  BY MR. ASSAF:
18  Q  Good afternoon.
19  A  Good afternoon.
20  Q  Did you discuss your deposition testimony over
21  lunch?
22  A  No.
23  Q  Did you review any documents --
24  A  No.
25  Q  -- over lunch? Okay.

Page 123

1       I'm going to show you again Defendants'
2  Exhibit 6 and Defendants' Exhibit 8, the
3  correspondence to and from Bevan regarding
4  settlement with seven top defendants and
5  regarding the Kathryn Darnell complaint.
6  A  You said 6?
7  Q  I'm going to give it to you.
8  A  Okay.
9  Q  So let's start with D Ex. 6.
10  A  All right.
11  Q  D Ex. 6 is February 15, 2001 and it's entitled
12  Re: Kathryn Darnell Complaint. Do you see
13  that?
14  A  Yes.
15  Q  So would this be part of your files? Would
16  Mr. Bevan have sent you a copy of this?
17  A  No. This was February 15, '01. Mom passed --
18  Q  Right.
19  A  -- in June of '01. So it would have been with
20  her.
21  Q  But did you take her files, her litigation
22  files --
23  A  No.
24  Q  -- when she passed?
25  A  No.

Page 124

1  Q  Where are they?
2  A  I think they're at the family home. I'm not
3  sure. I'm not sure, but I think they're at the
4  family home where one of my sisters lives.
5  Q  Okay. Do they still exist?
6  A  Oh, yes. Yes.
7  Q  Okay. And could you -- could you work with
8  Mr. Coren to get those -- to have somebody
9  review those documents?
10  A  Yes, I would be able to do that.
11  Q  Great. Thank you.
12  A  Uh-huh.
13  Q  Now, and also -- so you see it's entitled
14  Kathryn Darnell Complaint?
15  A  Uh-huh.
16  Q  The re line.
17  A  Uh-huh.
18        MR. ASSAF:     Mr. Coren and
19  Mr. Placitella, do you have any reason why this
20  wasn't produced or logged? D Ex. 6. The
21  letter entitled Kathryn Darnell Complaint.
22        MR. COREN:     Is this 6?
23        MR. ASSAF:     Yes, that's 6.
24        MR. COREN:     Your question
25  is, I'm sorry, what?

Page 125

1        MR. ASSAF:     Why that wasn't
2  produced or logged. I just checked over the
3  lunch break and it hasn't been produced and it
4  hasn't been logged.
5        MR. COREN:     I'll have to
6  look into it, Gene, I don't know.
7        MR. ASSAF:     Okay.
8  Q  And also, then, D Ex. 8, which I'm going to put
9  also in front of you, which again, is Bevan
10  correspondence settlement with seven talc
11  defendants.
12        MR. ASSAF:     And as we said,
13  Ms. Darnell's mentioned throughout the letter,
14  and I just don't -- I'm now concerned.
15       It just dawned on me over lunch that this
16  wasn't produced or logged and how could that
17  be? There's only six named plaintiffs and this
18  is -- you met with Bevan prior to the
19  complaint, you've met with Bevan since. She --
20  Bevan is Ms. Holley's lawyer. He has all the
21  files. How could it be that this isn't
22  produced or logged?
23        MR. COREN:     Gene, we'll
24  take a look into it, whether the document still
25  exists or not, because of the date and the

Page 126

1  timing of the things, I'll have to look into it
2  and see.
3       MR. ASSAF:    And will you
4  also agree to look at Ms. Holley's documents,
5  both at her home and at the family home, the
6  underlying -- I hesitate to say what I really
7  think, but how could they not be even reviewed,
8  yet alone put aside so that nothing happens to
9  them? It's one of the named plaintiffs in the
10  case.
11       MR. COREN:    Gene, we'll
12  talk about this later.
13 BY MR. ASSAF:
14 Q  Now, you mentioned when you met with
15  Mr. Placitella and Mr. Bevan when you first
16  heard about the case and you took notes that
17  you hopefully still have at home, do those
18  notes have who else was at the meeting?
19 A  No.
20 Q  Okay. How did you find out about the meeting?
21 A  I was either contacted by phone or mail to come
22  to the meeting.
23 Q  By Mr. Bevan or Mr. Placitella?
24 A  By Mr. Bevan's office.
25 Q  Did you know what the topic of the meeting was?

Page 127

1 A  Not at the time that I received notice.
2 Q  Have you ever been in Mr. Placitella's offices
3  in Pennsylvania or New Jersey?
4 A  No.
5 Q  Are you willing to come to New Jersey for court
6  proceedings?
7 A  Yes. We discussed that.
8 Q  Okay. Have you had any meetings with the class
9  representatives without the attorneys present?
10 A  Not without attorneys present, no.
11 Q  Do you know whether any of the other
12  attorneys -- withdrawn.
13       Do you know whether any of the other
14  class representatives have written fee
15  agreements with Mr. Placitella?
16 A  I would not have that information.
17       MR. ASSAF:    I'll reiterate
18  this request. We've looked over lunch, and the
19  written fee agreement, which I understand is a
20  requirement under New Jersey, but you can tell
21  me --
22       MR. COREN:    Yes, but --
23       MR. ASSAF:    -- is neither
24  logged, nor produced.
25       MR. COREN:    Nor are they

Page 128

1  filed with the Court until the Court asks to
2  see them.
3       MR. ASSAF:    Do you have
4  one?
5       MR. COREN:    What, a fee
6  agreement?
7       MR. ASSAF:    Yeah.
8       MR. COREN:    Yes. My
9  understanding we do, yes.
10       MR. ASSAF:    Okay.
11       MR. COREN:    Okay.
12 Q  So you do have a written fee agreement.
13 A  Okay.
14 Q  Okay.
15       MR. ASSAF:    Could
16  Ms. Holley have a copy of it?
17       MR. COREN:    She probably
18  does but doesn't recollect.
19 A  That could possibly be the case.
20 Q  Okay. Do you have any understanding of the
21  terms?
22 A  Understanding based on that particular fee
23  agreement or do I understand a fee agreement?
24 Q  Well, let's do both.
25 A  Okay.

Page 129

1 Q  Do you understand a fee agreement?
2 A  Yes, I do.
3 Q  What's that?
4 A  The fee agreement is the document between an
5  attorney and client, okay, stipulating how
6  they're going to handle the case and possibly
7  the amount or if it's contingency.
8 Q  Contingency. And do you know whether the
9  Williams case is a contingency case?
10 A  I'm not certain. I really am not certain. I
11  don't recall -- I just don't recall in this
12  particular defendant. I don't recall any of
13  the documents or anything that was presented.
14  Because I think that was -- I believe it was
15  all done while my mom was still living.
16 Q  But with respect to this Williams case, the
17  case in New Jersey.
18 A  Oh, okay. Okay.
19 Q  What do you recall about the fee agreements in
20  that case?
21 A  I have no recollection of the fee agreement in
22  this particular case.
23 Q  Do you even have a general understanding of how
24  much you're entitled to recover?
25 A  Those things have not been discussed with me

MARILYN HOLLEY - 04/05/2017      Pages 130..133

Page 130

1    either by them or Mr. Bevan. We have not -- I
2    have not discussed fees in this case.
3  Q   Or your recovery?
4  A   No.
5  Q   So --
6  A   If I understand what you're saying.
7  Q   Let's make it clear, though.
8  A   Okay.
9  Q   As we sit here today, you have not had any
10   discussions with Mr. Placitella and Mr. Coren's
11   firm or Mr. Bevan's firm about what the fee
12   arrangements are, in terms of the fees and the
13   recovery in this case?
14 A   No.
15 Q   And how do you think that's all going to get
16   sorted out?
17      MR. COREN:      Objection.
18   Gene, you know, you're now --
19      MR. ASSAF:     No speaking
20   objections. Do you have an objection?
21      MR. COREN:      Yeah, I have an
22   objection --
23      MR. ASSAF:     What is it --
24      MR. COREN:      -- because
25   you're --

Page 131

1       MR. ASSAF:     -- form,
2  foundation, or privilege?
3       MR. COREN:     Form,
4  foundation, and privilege.
5       MR. ASSAF:     Okay. You're
6  instructing her not to answer?
7       MR. COREN:     Correct.
8       MR. ASSAF:     Okay. Basis?
9       MR. COREN:     You know,
10 privilege.
11      MR. ASSAF:     Attorney-client
12 privilege?
13      MR. COREN:     Yeah.
14 Attorney-client privilege, because now you need
15 to invade into discussions that occurred
16 regarding, you know, aspects of the fees.
17      MR. ASSAF:     She doesn't --
18 she has no -- she has no -- there are no
19 discussions because she has no -- she says
20 she --
21      MR. COREN:     That's right,
22 she has no recollection. She doesn't recall
23 it.
24      MR. ASSAF:     Of any
25 discussions regarding fees?

Page 132

1       MR. COREN:      She just
2  doesn't recollect --
3       MR. ASSAF:      And the fee
4  agreement isn't logged or produced?
5       MR. COREN:      You don't log
6  and you don't produce fee agreements, Gene.
7  It's not my experience, okay?
8       MR. ASSAF:      Even Jared is
9  raising his eyebrows at that one. You better
10   check that.
11      MR. PLACITELLA:   No --
12 Q  Okay. So --
13      MR. PLACITELLA:    -- based on
14   your comment, Gene but --
15 Q  -- Ms. Holley, in terms of Mr. Bevan's
16   relationship to this Williams case in New
17   Jersey, do you have a written fee agreement
18   with him?
19 A  I don't recall doing the written -- I don't
20   recall doing a fee agreement with regard to
21   this case.
22 Q  Okay. Do you have any understanding of how
23   Mr. Bevan will get paid, if at all?
24 A  I can't recall ever discussing that or seeing
25   anything in writing.

Page 133

1  Q  Is that something you would -- withdrawn.
2      You seem pretty savvy and you've been
3  around litigation for 15 years. It seems like
4  something you would recall?
5  A  Probably.
6  Q  Let's see.
7       MR. ASSAF:      And
8  verifications, have we gotten them?
9       MR. PLACITELLA:  I have someone
10   in my office getting them. We'll get those to
11   you soon.
12      MR. ASSAF:      Great.
13 Q  All right. So let's turn to settlements with
14   other asbestos defendants.
15      Could you tell me in order of magnitude
16   how much you've received for asbestos-related
17   injuries since filing that lawsuit that we saw
18   against 98 defendants?
19      MR. COREN:      I'm going to
20   instruct her not to answer for the reasons we
21   explained earlier, that the issue of the
22   settlement with other parties outside of the
23   settlements with the asbestos trust is an issue
24   that is before the Court on scope of discovery,
25   and I'm going to advise her not to respond

MARILYN HOLLEY - 04/05/2017      Pages 134..137

Page 134

1    until that issue is sorted out with magistrate
2    judge --
3  A  And I consider that confidential.
4  Q  You consider it confidential?
5  A  I do. I consider it confidential.
6  Q  Have you discussed your settlements with
7    anybody other than lawyers?
8  A  No.
9  Q  Like your family members?
10  A  Not discussed settlements, just as fiduciary.
11    When there were settlements, I distribute the
12    checks.
13  Q  And you've distributed checks over the last 15
14    years?
15  A  Yes.
16  Q  Do you have a -- withdrawn.
17    If your attorneys allowed you to answer,
18    would you be able to tell me how much you've
19    recovered from asbestos -- for asbestos-related
20    injuries?
21  A  I would not be able to say that on the top of
22    my head, no.
23  Q  But do you have documentation --
24  A  I have --
25  Q  -- to show it?

Page 135

1  A  -- documentation.
2  Q  Would this be in the files at your home?
3  A  It would be in my files.
4  Q  And let's talk about trusts.
5    You mentioned that you have settled with
6    or made claims against asbestos trusts,
7    correct?
8  A  I believe so, yes.
9  Q  And which attorney, if anyone, has helped you
10    with those?
11  A  That would also be Attorney Bevan.
12  Q  And have you filled out documentation regarding
13    those asbestos trusts and claims to them?
14  A  Yes, through the Probate Court, which has to
15    certify.
16  Q  And as we sit here today, you understand that
17    the information contained in those submissions
18    to the Court and to the trust have to be -- has
19    to be true and accurate?
20  A  Yes.
21  Q  And do you know whether your mother had
22    submitted information to trusts prior to her
23    death?
24  A  She did.
25  Q  And do you know whether that was true and

Page 136

1    accurate?
2  A  To the best of my knowledge it would have been.
3  Q  Would that have been reviewed by Mr. Bevan to
4    ensure that it was true and accurate?
5  A  To the best of my knowledge it would have been.
6    (Defendants' Exhibit 15 was marked.)
7  Q  Let me show you D Ex. 15, which I think is the
8    next document --
9  A  Okay.
10  Q  -- to your right, Ms. Holley.
11  A  Okay.
12  Q  D Ex. 15 is a claim form for discounted cash
13    payment dated September 6, 2000.
14  A  Uh-huh.
15  Q  And the attorney name on the front is Tom
16    Bevan. Do you see that?
17  A  Yes.
18  Q  Have you seen this document before?
19  A  I don't recall seeing this document before.
20  Q  Would this be in your files or your mother's
21    files at the family home?
22  A  Because it was 2000, it would probably be at
23    the family home.
24  Q  Okay. Could you turn to page 13 of the form?
25    This right here. That's it.

Page 137

1    And number five, paragraph 5, states
2    "Injured party may write a narrative statement
3    below (or on a separate page) describing in
4    greater detail injured party's most significant
5    asbestos exposure." 
6    It says, "Ms. Darnell was exposed to J-M
7    pipe covering, cement, and raw asbestos fiber
8    while employed by the BFGoodrich Company from
9    1969 to 1987."
10    Do you see that?
11  A  Yes.
12  Q  There's no mention of talc.
13  A  Okay.
14  Q  Do you know why?
15  A  No. I wouldn't know why.
16  Q  Would Mr. Bevan know?
17  A  I'm not sure.
18  Q  If anybody knows the reason why this says what
19    it says, it would be Mr. Bevan, not you?
20  A  It would be him, not me.
21  Q  And if you turn to page 17.
22  A  Of the same document?
23  Q  Yes.
24    And the first question says, "Has any
25    asbestos-related lawsuit been filed on behalf

MARILYN HOLLEY - 04/05/2017        Pages 138..141

Page 138

1   of this injured party?"
2       Do you see this?
3   A   Yes.
4   Q   It says "No."
5       Do you see that?
6   A   Yes.
7   Q   Is that correct?
8   A   This was in 2000?
9   Q   Yes.  Yes.
10  A   I wouldn't know for sure.  I wouldn't know for
11      sure, because my mom was still living and the
12      interaction with the attorney would have been
13      between her and Attorney Bevan.
14  Q   Who, if anyone, would know whether this
15      statement is correct?
16  A   Attorney Bevan's office.
17  Q   And you would expect it to be true and
18      accurate, correct?
19  A   I would expect it to be true and accurate, yes.
20  Q   And when you've submitted forms to other
21      trusts, have you disclosed the fact that you
22      have in fact filed other lawsuits against other
23      asbestos companies?
24  A   I can't recall that.
25  Q   But you would expect that if that question were

Page 139

1       asked by other trusts that you would in fact
2       disclose the other lawsuits, correct?
3   A   I would expect so if that were the case.
4   Q   And you've never received advice to do
5       something other than that?
6   A   No, I have not.
7   Q   That's something you would remember?
8   A   I believe so.
9   Q   The -- by the way, if you -- withdrawn.
10      Did you file a claims form with the
11      Kaiser Asbestos Trust?  Do you know?
12  A   I can't say for sure.
13  Q   Okay.  Roughly how many trusts have you filed
14      against?
15  A   I couldn't begin to say.  I know that there
16      were a number of defendants sued and there are
17      a number that have been settled, but I really
18      couldn't even give you a ballpark figure.
19      (Defendants' Exhibit 16 was marked.)
20  Q   Let's go to D Ex. 16, the very next document.
21  A   Okay.
22  Q   D Ex. 16 appears to be a document entitled
23      "Kaiser Aluminum & Chemical Corporation
24      Asbestos Personal Injury Trust Release."
25      Do you see this?

Page 140

1   A   Uh-huh.  Yes.
2   Q   Do you recognize this document?
3   A   Well, by just looking at it now I see that I
4       signed in 2012.
5   Q   And would you tell me the process that you
6       would go through before signing a document like
7       this?  Did you talk to Mr. Bevan?  Did you
8       review documents?
9   A   I would talk to Mr. Bevan and we would discuss
10      the particular offer from the company.  And I
11      also -- if it were accepted, I also would have
12      received a release.
13  Q   Okay.  All right.  Now the rest of the
14      documents I'm going to go through pretty
15      quickly.  You can put them all in front of you
16      if you'd like --
17  A   Right.
18  Q   -- to --
19  A   Right.
20  Q   -- Ms. Holley.
21  A   Right.
22      (Defendants' Exhibit 17 was marked.)
23  Q   D Ex. 17 is a document entitled -- or a
24      document that appears to be a release relating
25      to Johns-Manville of Travelers.

Page 141

1   A   Uh-huh.  Uh-huh.
2   Q   Do you recognize this document?
3   A   Yes, I recall it.
4       (Defendants' Exhibit 18 was marked.)
5   Q   D Ex. 18 appears to be a claims resolution form
6       for Kathryn Darnell for $20,000 for Manville.
7   Q   When was this?  This was executed when?
8   Q   This looks like it was executed in 2000.  10 --
9       November 11, 2000.
10  A   If it were 2000, my mother would have handled
11      it.
12  Q   Okay.  All right.
13      (Defendants' Exhibit 19 was marked.)
14  Q   D Ex. 19 is from The Plibrico Asbestos Trust in
15      Hopewell, New Jersey.  A settlement -- a
16      liquidated value of $350,000 and a settlement
17      amount of $29,000.  Do you recognize this
18      document?
19  A   It appears I executed this in September of '07.
20  Q   Okay.
21      (Defendants' Exhibit 20 was marked.)
22  Q   D Ex. 20 is a release agreement for Owens
23      Corning/Fibreboard Asbestos Injury Trust.
24  A   I executed this in '09.
25  Q   And -- let me finish these.

MARILYN HOLLEY - 04/05/2017        Pages 142..145

Page 142

1        (Defendants' Exhibit 21 was marked.)
2   Q   D Ex. 21 is for Owens Corning Personal Injury
3       Trust again dated November 18, 2009. Do you
4       see that?
5   A   Uh-huh. Uh-huh.
6        (Defendants' Exhibit 22 was marked.)
7   Q   D Ex. 22 is for United Gypsum Asbestos Personal
8       Injury Trust.
9   A   Okay.
10  Q   Dated March 23, 2009.
11  A   Okay.
12  Q   Do you see that?
13  A   Yes.
14  Q   You signed that?
15  A   Yes.
16       (Defendants' Exhibit 23 was marked.)
17  Q   D Ex. 23 is from the Probate Court of Summit,
18       Ohio regarding the approval of a proffered
19       settlement of $257,000. And included in that
20       is -- it looks like attorney's fees of $88,000.
21  A   Right. Uh-huh.
22  Q   Is that to Mr. Bevan?
23  A   It would have been Mr. Bevan and the estate
24       attorney, who at that time was Donald Walker.
25  Q   Okay.

Page 143

1        (Defendants' Exhibit 24 was marked.)
2   Q   D Ex. 24 is a settlement amount of $60,000,
3       again with 20,000 to Mr. Bevan in 2004. Do you
4       see this?
5   A   Yes.
6        (Defendants' Exhibit 25 was marked.)
7   Q   D Ex. 25 is a settlement amount of $172,000
8       with attorney's fees of $59,000 dated April 20,
9       2005.
10  A   Yes.
11       (Defendants' Exhibit 26 was marked.)
12  Q   D Ex. 26 is $16,000 dated -- or I'm sorry.
13       $16,000 dated August 4, 2006. Do you see that?
14  A   Uh-huh.
15       (Defendants' Exhibit 27 was marked.)
16  Q   D Ex. 27. $40,000 settlement dated May 21,
17       2007. Do you see that?
18  A   Yes.
19       (Defendants' Exhibit 28 was marked.)
20  Q   D Ex. 28, a settlement amount of $29,000 dated
21       November 15, 2007. Do you see that?
22  A   Yes.
23       (Defendants' Exhibit 29 was marked.)
24  Q   December 22, 2008, a settlement amount of
25       $11,000. Do you see that?

Page 144

1   A   Is that 29?
2   A   Yes.
3   A   Okay. Yes.
4        (Defendants' Exhibit 30 was marked.)
5   Q   D Ex. 30. $26,000, April 16, 2010. Do you see
6       that?
7   A   Yes.
8        (Defendants' Exhibit 31 was marked.)
9   Q   D Ex. 31. Settlement amount of $8,600 dated
10       May 12, 2012. Do you see that?
11  A   Yes.
12  Q   And, by the way, so for a settlement like that
13       of $8,000, do you know whether that settlement
14       has anything to do with whether the company
15       produced a product with or without asbestos and
16       how much asbestos it had and how much exposure
17       your mom had to that product?
18       MR. COREN:    Objection.
19       I'll instruct her not to answer. Once again,
20       the issue of settlements and the issues going
21       into settlements is a matter before Magistrate
22       Dickson, and we're retaining our objections and
23       instructing the witness not to answer on that
24       basis.
25  Q   Could you answer the question but for the

Page 145

1       instruction?
2       MR. COREN:     It's a "yes" or
3   "no" answer, Ms. Darnell -- Ms. Holley. Sorry.
4   Q   You would be able to answer the question unless
5       Mr. Coren hadn't instructed you?
6   A   I believe I would be able to.
7   Q   Okay.
8        (Defendants' Exhibit 32 was marked.)
9   Q   D Ex. 32. $34,000. Another settlement amount.
10       Do you recognize that?
11  A   Yes.
12       (Defendants' Exhibit 33 was marked.)
13  Q   D Ex. 33. $16,000. Do you recognize that?
14  A   Yes.
15       (Defendants' Exhibit 34 was marked.)
16  Q   D Ex. 34. An amended probate order for a
17       settlement amount of $2,300. Do you recognize
18       that?
19  A   Yes.
20       (Defendants' Exhibit 35 was marked.)
21  Q   D Ex. 35. A settlement amount of $11,000 dated
22       April 13, 2015. Do you recognize that?
23  A   Yes.
24       (Defendants' Exhibit 36 was marked.)
25  Q   D Ex. 36. A settlement amount of $19,000 dated

Page 146

1    April 15, 2004.  Do you recognize that?
2  A  Yes.
3      (Defendants' Exhibit 37 was marked.)
4  Q  D Ex. 37.  A settlement amount of $24,000 dated
5    April 27, 2010.  Do you recognize that?
6  A  Yes.
7      (Defendants' Exhibit 38 was marked.)
8  Q  January 20, 2010, a settlement amount of
9    $113,000.  Do you recognize that?
10 A  Is that --
11 Q  D Ex. 38.
12 A  Yes, I see it's 38.
13 Q  Okay.
14 A  Yes.
15 Q  In terms of the various settlements, did you
16   rely on Mr. Bevan's advice before consenting to
17   settlements with other asbestos-related
18   defendants?
19 A  Is the question did I rely on that with
20   relation to other settlements or just one
21   particular settlement at a time?
22 Q  One particular settlement at a time.
23 A  We did one particular settlement at a time.
24 Q  So for each settlement you would have a
25    discussion with him regarding whether you

Page 147

1    should settle or not?
2  A  I'd say yes, that would be a basis of our
3    conversation.
4  Q  Would it be in person or over the phone?
5  A  Either.
6  Q  And would a factor in the settlement be whether
7    in fact the defendant had produced a product
8    with asbestos?
9      MR. COREN:      Objection.
10   Once again you're asking about settlements
11   beyond BASF.
12     And I'm instructing you not to answer.
13     The matter is an issue before the judge
14   on settlements with other parties other than
15   BASF.
16     Engelhard is a matter before Magistrate
17   Judge Dickson and until that is resolved, I'm
18   instructing you not to answer.
19 Q  Was it always Bevan or were there other lawyers
20   or paralegals involved in the recommendation to
21   settle cases?
22 A  To the best of my knowledge, it was always
23   Attorney Bevan.
24 Q  And did you keep notes of those conversations?
25 A  No.

Page 148

1  Q  Since the BASF complaint was filed in two
2    thousand -- in early 2011, have you settled
3    with other defendants for asbestos-related
4    claims?
5  A  Yes.
6  Q  And in settling with those, have you, in light
7    of the BASF complaint, asked specific questions
8    about the asbestos content in the products that
9    you were settling?
10 A  No, I have not asked specific questions with
11   regard to asbestos.
12 Q  Why not?
13 A  No.  Because I --
14     MR. COREN:      Excuse me.
15     THE WITNESS:    Okay.
16     MR. COREN:      Work-product.
17     THE WITNESS:    Yeah.
18     MR. COREN:      Okay.  I'm
19   asserting an objection.
20 Q  And you can answer.
21     MR. COREN:      No.  It's
22   work-product.  She can't answer.  I'm
23   instructing her not to answer.
24     MR. ASSAF:    Why she didn't
25   ask questions?

Page 149

1  A  No.  No.
2      MR. COREN:      It's her mental
3    processes.
4      MR. ASSAF:    Her mental
5    processes?
6      MR. COREN:      Yes.  You're
7    trying to invade into her work-product
8    regarding a settlement and why she made -- and
9    what was on her mind as to things other than
10   BASF.  You're not entitled to it, Gene.  And
11   that's our position and we said that regarding
12   the other settlements.
13     It's a matter before Magistrate Judge
14   Dickson and until all of those issues are
15   resolved, I'm instructing her not to go into
16   details regarding other settlements.
17 Q  After the BASF case was filed in 2011, you had
18   understood from Mr. Bevan that there had been a
19   fraud with Engelhard, fair?
20 A  Yes.  That was my understanding.
21 Q  That -- according to Mr. Bevan, that Engelhard
22   led him to believe that there was no asbestos
23   in the talc, correct?
24 A  That is my understanding.
25 Q  Okay.  In light of that understanding, did you,

MARILYN HOLLEY - 04/05/2017      Pages 150..153

Page 150

1   after the filing of the BASF complaint in 2011,
2   ask specific questions about whether a product
3   contained asbestos so that you wouldn't run
4   into another Engelhard situation?
5        MR. COREN:     And it's the
6   same question that you had asked before, just a
7   little bit different when addressing, and I'm
8   giving her the same instruction.  We're not
9   here to answer questions about her thought
10  processes regarding other settlements.  It's an
11  issue that is before Magistrate Judge Dickson
12  and until it is resolved, we are not -- I'm
13  instructing her not to answer.
14       MR. MARINO:     Michael, could
15  I ask you to speak up when you're talking?
16  It's hard to hear you over the phone.
17       MR. COREN:     Sorry about
18  that.  And I will try.
19  Q   You mentioned that you believe the settlements
20  are confidential?
21  A   Yes.
22  Q   Do you have any written confidentiality
23  agreements in your custody, control, or
24  possession?
25  A   I may have.

Page 151

1   Q   And where would they be?
2   A   They probably would be with my records.
3   Q   The records that are at your house --
4   A   At my house.  The ones that I have, yes.
5   Q   That Mr. Coren hasn't reviewed yet?
6   A   I don't know if he's reviewed them or not.
7   Q   Okay.  Well, earlier you said he hadn't asked
8       you for them?
9   A   Right.  Yeah.
10       MR. ASSAF:     And, Mr. Coren,
11  was she wrong there?  Because let's correct the
12  record.
13       MR. COREN:     What?
14       MR. ASSAF:     Have you asked
15  her for her records?
16       MR. COREN:     Yes, we have.
17       MR. ASSAF:     Oh.
18  Q   So he has asked you for your records?
19  A   I don't recall it, that's what I'm saying.  I
20      don't recall that he asked for specific
21      records.  No, I don't recall that.
22  Q   Because you've dealt with Mr. Bevan and
23      attorneys for 15 years, and if an attorney
24      asked you for records, it would be your normal
25      practice to tell them about the records, fair?

Page 152

1   A   To give whatever they asked for if I had it.
2   Q   Correct.  So if you still -- if you haven't
3       given the records to Mr. Coren, based upon your
4       normal practice, doesn't that tell you he
5       hasn't asked for them?
6        MR. COREN:     Objection.
7   It's argumentative.
8        MR. ASSAF:     Not
9   argumentative.  She said earlier you didn't ask
10  her for them and now after lunch you say you
11  did ask.  Did you review them?
12       MR. COREN:     I'm saying
13  we -- they were requested.  Have we reviewed
14  them yet, I have to ask my staff who handled
15  it.  I don't know.
16       MR. ASSAF:     Well,
17  Mr. Coren, when is this going to happen?
18  Discovery's supposed to end in four months.
19  We've already been in front of the judge.  You
20  filed your -- we've had extensive discovery
21  briefing and her deposition's today.  When
22  exactly are you going to decide whether you're
23  going to review these documents or not?
24       MR. COREN:     I'm not here to
25  argue with you, Gene.  You're trying to you

Page 153

1   know, and I'm not going to let you goad me into
2   an argument with you.
3        MR. ASSAF:     It's not an
4   argument.  I just want to know:  When are you
5   going to review these documents?
6        MR. COREN:     Well, I'm not
7   responding to you today.
8   Q   By the way, going back to the Williams
9       settlement discussions that you heard about,
10      that there were the fact of discussions, would
11      you have anything in your materials so you're
12      able to put a date of when you heard about
13      those discussions?
14  A   No, I wouldn't.
15  Q   Okay.  How would you have heard of them?  By
16      phone or by mail or?  By meeting?
17  A   Probably by conversation, either in a meeting
18      or phone, but I don't -- I don't recall that.
19  Q   And in terms of the settlement discussions in
20      the Williams case, as we sit here today --
21  A   This particular case we're discussing?
22  Q   Yes.
23  A   Okay.
24  Q   With respect to the settlement discussions in
25      this particular case, the Williams case, you

Page 154

1  were never told what the proposed economic
2  settlements were and how much you would
3  receive, correct?
4        MR. COREN:      Objection.
5  Don't answer.
6     Now you're trying to invade
7  communications by and between attorney-clients,
8  including regarding something that was in
9  mediation.  So I'm –
10       MR. ASSAF:      Instructing
11 her –
12       MR. COREN:      – asserting
13 a –
14       MR. ASSAF:      – not to
15 answer?
16       MR. COREN:      – privilege.
17 Yeah.
18       MR. ASSAF:      Instructing her
19 not to answer?
20       MR. COREN:      That's correct.
21 A  I consider that confidential.
22       MR. ASSAF:      I am done
23 questioning for today, with the exception that
24 we haven't received the verifications.  We
25 received a lot of documents last night.  We've

Page 155

1  identified at least two locations of documents
2  today, and there have been numerous
3  instructions not to answer.
4     So I'm done with my questioning for
5  today, but I'm holding open the deposition at
6  least on those topics and on any other
7  discovery issues that will arise, including
8  after Mr. Bevan's deposition.
9     Counsel, any questions?
10       MS. FIELDS:      I have a few
11 questions on behalf of –
12       THE VIDEOGRAPHER: Get a
13 microphone on before you start.
14       MS. FIELDS:      Oh.
15       MR. COREN:      Excuse me.  I
16 need to use the facility.  I apologize.  Can we
17 take a break for five?
18       MR. ASSAF:      Sure.
19       MR. COREN:      Thanks.
20       THE VIDEOGRAPHER: Off the record.
21 The time is 1:43.
22       (Recess taken.)
23       THE VIDEOGRAPHER: We're back on
24 the record.  The time is 1:47.
25       EXAMINATION OF MARILYN HOLLEY

Page 156

1  BY MS. FIELDS:
2  Q  Ms. Holley, I have a few questions on behalf of
3     my clients, Cahill Gordon & Reindel and Ira
4     Dembrow and Peter Sloane.
5        When you talked with Mr. Assaf earlier, I
6     believe he asked you if other than what you've
7     learned from Mr. Bevan if you had any personal
8     knowledge that his client had done anything
9     wrong, and I'd like to ask you that same
10    question with respect to my client.
11       So other than what you've learned from
12    Mr. Bevan, do you have any personal knowledge
13    of any wrongdoing by Cahill Gordon & Reindel?
14 A  I have no personal knowledge, no.
15 Q  And other than what you've learned from
16    Mr. Bevan, do you have any personal knowledge
17    of any wrongdoing by Mr. Peter Sloane?
18 A  No.
19 Q  And I'll ask you the same question.  Other than
20    what you've learned from Mr. Bevan, do you have
21    any personal knowledge of any wrongdoing by
22    Mr. Ira Dembrow?
23 A  No.
24 Q  Do you know who Peter Sloane is?
25 A  I believe he's an attorney.

Page 157

1  Q  Uh-huh.
2  A  That was involved in this originally.  I'm not
3     sure.
4  Q  Have you had any personal contact with
5     Mr. Sloane?
6  A  No.  No.
7  Q  And what is the factual basis for your belief
8     that Mr. Sloane's an attorney?
9  A  In review of documents I saw his name.
10 Q  Okay.  Which documents were those?
11 A  The documents I've reviewed recently.  I think
12    he was referred to in the complaint.
13 Q  Okay.  And with respect to the complaint, do
14    you have any personal knowledge concerning any
15    allegations in the complaint about Cahill
16    Gordon & Reindel?
17 A  No personal knowledge, no.
18 Q  And do you have any personal knowledge of any
19    allegations in the complaint concerning Peter
20    Sloane?
21 A  No.
22 Q  And then I take it that you also have no
23    personal knowledge of any allegations in the
24    complaint concerning Ira Dembrow?
25 A  No.

MARILYN HOLLEY - 04/05/2017        Pages 158..161

Page 158

1  Q  Okay.  Oh, just a few clean up questions.
2        Can you tell me the address of your
3     family home?
4  A  1000 Moeller Avenue.  Moeller is spelled
5     M-O-E-L-L-E-R.  It's avenue.  And that's Akron,
6     Ohio 44307.
7  Q  44307?
8  A  Correct.
9  Q  And is that where you reside?
10 A  No.  One of my sisters resides there.
11 Q  Okay.  And what is her name?
12 A  Cheryl with a -- C-H-E-R-Y-L.  Last name is
13    Wooldridge, W-O-O-L-R-I-D-G-E.
14 Q  Okay.  And that's the location that you
15    referred to before where you think that maybe
16    your mother's documents from her legal affairs
17    might be kept?
18 A  Yes.
19 Q  At this time that's the questions that I can
20    ask you today.
21    MS. FIELDS:     We're going to
22    hold open, obviously, our questions.  We came
23    prepared to depose the witness, but since we've
24    learned that there are additional documents
25    that we weren't aware of, we're obviously going

Page 159

1     to wait to ask the balance of our questions
2     until we have all of the material.
3        Additionally, there were plenty of
4     objections, the validity of which will be ruled
5     upon at a later date and we may find ourselves
6     back here.
7  Q  So at this point that's all that I have for
8     you.
9  A  Okay.
10 Q  So thank you.
11 A  Uh-huh.
12    MR. COREN:     Eric or John.
13    MR. TUNIS:     This is Eric.
14    I have a few questions for Ms. Holley.
15    THE WITNESS:     Okay.
16    EXAMINATION OF MARILYN HOLLEY
17 BY MR. TUNIS:
18 Q  Good afternoon, Ms. Holley.
19 A  Good afternoon.
20 Q  My name's Eric Tunis.  I represent Thomas
21    Halket in connection with the Williams
22    litigation.
23        Are you familiar with the name Thomas
24    Halket?
25 A  Only I think by seeing it on documents, but I

Page 160

1     don't know if he's a plaintiff or what his role
2     is.
3  Q  I see.  Okay.
4        Do you recall approximately -- the
5     approximate date in which your mother was
6     diagnosed with mesothelioma?
7  A  No, not exactly.  Actually, I believe it would
8     have been sometime in 2000, but I'm not certain
9     of the date, no.
10 Q  Was she working at BFGoodrich at the time?  Do
11    you recall that?
12 A  No.  She had retired.
13 Q  Okay.  She retired in 1987, is that correct?
14 A  Correct.  In 1987.
15 Q  And was Mr. Bevan or his law firm the first
16    firm that she retained in connection with her
17    claims relating to her exposure to asbestos?
18 A  To the best of my knowledge, he is the first
19    one.
20 Q  And do you know when your mother retained
21    Bevan's firm?
22 A  I could only guess '99 or 2000.  I'm not sure.
23    I'm not sure.
24 Q  Well, do you think that she retained Mr. Bevan
25    before she was diagnosed with mesothelioma?

Page 161

1  A  I don't know.  I'd hate to say.  I don't know.
2  Q  But it would have been around the time that she
3     was diagnosed, is that fair to say?
4  A  I would say that's fair to say.
5  Q  Do you know whether she personally contacted
6     anyone, either with BFGoodrich or any of the
7     manufacturers of asbestos products that you
8     believe she was exposed to?
9  A  I could only speculate.  I have no personal
10    knowledge of that.
11 Q  Okay.  And do you have any idea when the Bevan
12    firm might have contacted Engelhard regarding
13    your mother's claims related to her exposure to
14    asbestos?
15 A  Again, because I was not involved in the
16    Engelhard settlement, I could only guess that
17    it was 2000, 2001.  I'm really not certain.
18 Q  All right.  I don't have any questions -- any
19    other questions at this time.
20    MR. COREN:     John.
21    MR. BOYLE:     Hi.  This is
22    John Boyle.  I don't have any other questions
23    at this time, although we reserve for the same
24    reasons as everyone else does.
25    MR. PLACITELLA:  Just for the

MARILYN HOLLEY - 04/05/2017          Pages 162..165

Page 162

1  record, counsel, we sent over the verifications
2  to BASF's answers to interrogatories. I sent
3  the emails. Did you guys receive that?
4          MR. FARRELL:    I see an email
5  now with Ms. Holley's verifications. I don't
6  see them for the other plaintiffs.
7          MR. PLACITELLA:  Right. For
8  Ms. Holley's.
9          MR. FARRELL:    Do you have the
10 ones for the other plaintiffs?
11         MR. PLACITELLA:  I'll have to
12 track down. I just asked my office for
13 Ms. Holley's.
14         MR. TUNIS:     Have you sent
15 them to the other defendants?
16         MR. PLACITELLA:  Yes, you should
17 have a copy there.
18         MS. FIELDS:    Not the
19 verifications to the other defendants' --
20         MR. PLACITELLA:  Right.
21         MS. FIELDS:     -- discovery
22 but to BASF's.
23         MR. PLACITELLA:  Correct.
24         MR. FARRELL:    Was this sent
25 to us before?

Page 163

1          MR. PLACITELLA:  We sent those
2  just now.
3          MR. FARRELL:    Had you
4  previously sent it to us?
5          MR. PLACITELLA:  Not that I
6  recall.
7          MR. GEYERMAN:    So on behalf of
8  the Cahill defendants, we want the verification
9  to the Cahill defendants' interrogatories when
10 you locate the verification, if there is a
11 verification.
12         MR. PLACITELLA:  Of course.
13         MR. TUNIS:     Same with
14 respect to Mr. Halket.
15         MR. COREN:     Well, there
16 being no other questions, I guess that's it for
17 today.
18         THE VIDEOGRAPHER: We're off the
19 record at 1:55.
20  (Deposition was concluded at 1:55 p.m.)
21     (Signature reserved.)
22
23
24
25

Page 164

1  THE STATE OF OHIO,  )  SS:
2  COUNTY OF CUYAHOGA.  )
3
4      I, Sarah R. Drown, a Notary Public within and
5  for the State of Ohio, duly commissioned and
6  qualified, do hereby certify that MARILYN HOLLEY,
7  was first duly sworn to testify the truth, the whole
8  truth and nothing but the truth in the cause
9  aforesaid; that the testimony then given by her was
10 by me reduced to stenotypy in the presence of said
11 witness, afterwards transcribed on a
12 computer/printer, and that the foregoing is a true
13 and correct transcript of the testimony so given by
14 her as aforesaid.
15     I do further certify that this deposition was
16 taken at the time and place in the foregoing caption
17 specified. I do further certify that I am not a
18 relative, counsel or attorney of either party, or
19 otherwise interested in the event of this action.
20     IN WITNESS WHEREOF, I have hereunto set my hand
21 and affixed my seal of office at Cleveland, Ohio, on
22 this 11th day of April, 2017.
23         Sarah R. Drown, Notary Public
24         within and for the State of Ohio
25         My Commission expires April 22, 2017.

Page 165

1
2  THE STATE OF            )
3                          )  SS:
4  COUNTY OF               )
5
6
7
8      Before me, a Notary Public in and for said
9  state and county, personally appeared the
10 above-named MARILYN HOLLEY, who acknowledged that
11 she did sign the foregoing transcript and that the
12 same is a true and correct transcript of the
13 testimony so given.
14     IN TESTIMONY WHEREOF, I have hereunto affixed
15 my name and official seal at
16         this        day of
17         , 2017.
18
19
20
21         MARILYN HOLLEY
22
23         Notary Public
24 My Commission expires:
25

Page 166

```
1        DEPOSITION ERRATA SHEET
2  Page No.      Line No.      Change to:
3  Reason for change:
4  Page No.      Line No.      Change to:
5  Reason for change:
6  Page No.      Line No.      Change to:
7  Reason for change:
8  Page No.      Line No.      Change to:
9  Reason for change:
10 Page No.      Line No.      Change to:
11 Reason for change:
   Page No.      Line No.      Change to:
12 Reason for change:
13 Page No.      Line No.      Change to:
14 Reason for change:
   Page No.      Line No.      Change to:
15 Reason for change:
16 Page No.      Line No.      Change to:
17 Reason for change:
   Page No.      Line No.      Change to:
18 Reason for change:
19 Page No.      Line No.      Change to:
20 Reason for change:
   Page No.      Line No.      Change to:
21 Reason for change:
22 Page No.      Line No.      Change to:
23 Reason for change:
   Page No.      Line No.      Change to:
24 Reason for change:
25 SIGNATURE:              DATE:
```

**$**

**$10,000**
35:16

**$11,000**
143:25 145:21

**$113,000**
146:9

**$14,000**
101:16 102:14,21 103:23

**$16,000**
143:12,13 145:13

**$172,000**
143:7

**$19,000**
102:9 145:25

**$2,000**
106:16,18 107:7,18,24
114:2

**$2,300**
145:17

**$20,000**
141:6

**$24,000**
146:4

**$250,000**
21:12

**$257,000**
142:19

**$26,000**
144:5

**$29,000**
141:17 143:20

**$33,000**
108:9

**$34,000**
145:9

**$350,000**
141:16

**$40,000**
143:16

**$50,000**
38:22

**$59,000**
143:8

**$60,000**
143:2

**$8,000**
144:13

**$8,600**
144:9

**$88,000**
142:20

**0**

**01**
123:17,19

**07**
141:19

**09**
141:24

**1**

**1**
51:15,16,17

**10**
20:13 40:15 94:6,19 95:5
105:12 108:4 114:10,11
141:8

**1000**
158:4

**10:01**
6:8

**11**
83:8,9,18,19 94:20 95:5
108:3 109:8 113:21
114:8 141:9

**11-CV-01754**
6:7

**113**
120:8,11

**11:36**
85:8

**11:48**
85:11

**12**
83:8 84:22 94:13,21,25

95:5 109:22 144:10

**12:30**
122:13

**12A**
113:12

**13**
118:18,19,21 136:24
145:22

**14**
53:5 56:23 57:9 95:13
96:9 97:7 98:17 102:6
108:8 111:24 121:2,3

**15**
40:15 71:7 76:25 90:3
91:13 95:19 96:13 97:20
112:18 120:4 123:11,17
133:3 134:13 136:6,7,12
143:21 146:1 151:23

**16**
103:2 104:16 139:19,20,
22 144:5

**17**
137:21 140:22,23

**18**
118:22 119:1 141:4,5
142:3

**19**
141:13,14

**1950**
110:25

**1969**
137:9

**1977**
110:25

**1980**
113:1

**1980s**
110:13

**1987**
137:9 160:13,14

**1:08**
122:16

**1:43**
155:21

**1:47**
155:24

**1:55**
163:19,20

**2**

**2**
81:11,13,22 88:8,9,11,12
108:21 109:6 110:4,11

**20**
20:13,14 21:7,8,9,10
40:15 117:7 141:21,22
143:8 146:8

**20,000**
143:3

**2000**
53:6 56:23 59:10 67:7,9
79:16 95:13 96:9 136:13,
22 138:8 141:8,9,10
160:8,22 161:17

**2001**
67:11,16 68:11 79:16
96:13 100:12,19 102:17
103:2 104:17 118:22
119:1 121:4 123:11
161:17

**2002**
79:16 105:14,17 108:4

**2004**
143:3 146:1

**2005**
143:9

**2006**
143:13

**2007**
143:17,21

**2008**
143:24

**2009**
142:3,10

**2010**
62:21 98:11 144:5 146:5,
8

**2010/early**
62:12

**2011**
62:12,21 148:2 149:17
150:1

**2012**
140:4 144:10

**2015**
87:22 145:22

**2017**
6:9

**21**
142:1,2 143:16

**22**
110:16 121:4 142:6,7
143:24

**226**
121:6,8,17

**228**
70:11,12,16,20

**23**
120:11 142:10,16,17

**230**
70:13,16,21 73:7

**24**
143:1,2

**25**
52:24 53:4 56:1,3,17
57:6,23,24 59:13 62:8
64:19 100:19 102:17
143:6,7

**26**
113:8,11 143:11,12

**26(a)**
87:19

**27**
143:15,16 146:5

**28**
143:19,20

**289**
74:3

**29**
143:23 144:1

**3**

**3**
85:12,15 102:6 106:7

**30**
20:15 94:6 144:4,5

**31**
144:8,9

**316**
74:17

**32**
145:8,9

**33**
145:12,13

**34**
145:15,16

**35**
145:20,21

**36**
145:24,25

**37**
146:3,4

**38**
146:7,11,12

**4**

**4**
87:15,17,18 143:13

**44307**
158:6,7

**47**
119:5,6

**5**

**5**
6:9 94:13,14 95:12 137:1

**50**
94:6

**50-pound**
119:16

**6**

**6**
68:18 94:15 96:12,17
119:12 123:2,6,9,11
124:20,22,23 136:13

**7**

**7**
67:11 94:16 99:11
100:22 105:14,17

**8**

**8**
94:17 100:17,19 123:2
125:8

**9**

**9**
94:18 95:5 103:1

**95**
95:17

**98**
20:17,21 65:13,14 71:8
95:14 96:3 133:18

**99**
160:22

**A**

**abatement**
110:14

**ability**
39:14

**able**
43:18 47:1,8 58:4 76:23
104:8 105:11 116:22
117:16 124:10 134:18,21
145:4,6 153:12

**absence**
60:25

**accept**
36:5

**accepted**
53:11,18 55:3 56:2,12,
15,18 57:16,19 58:2,25
59:3,16,20,24 60:8,17,18
61:25 118:4 140:11

**Account**
108:6

**accuracy**
58:21

**accurate**
135:19 136:1,4 138:18,
19

**acting**
60:22 67:6

**action**
6:7 36:15 38:5 39:7
40:12 63:2 84:24 90:21
91:8

**actions**
83:21 89:1 108:25

**actual**
69:17

**add**
118:5

**addition**
95:23 96:1,3 108:22

**additional**
108:8 158:24

**Additionally**
159:3

**address**
85:3 158:2

**addressing**
150:7

**adequate**
61:21

**admission**
42:20,22,23

**admitted**
78:21 80:20

**advice**
27:7,10,11,13,17,19
28:17,23 29:9 32:24
49:24 53:25 54:2,4,6
56:6,8 71:18,20 72:1,3
89:21,25 91:25 139:4
146:16

**advise**
36:12 38:12,14,15
133:25

**advised**
35:12 37:12

**affairs**
158:16

**affidavit**
112:8

**affiliated**
88:25

**afternoon**
122:18,19 159:18,19

**age**
7:17

**aggregate**
70:23 71:9 72:14,22,25
73:5,17 78:5

**ago**
29:24 30:2 31:18,20

**agree**
20:25 78:18 80:16
101:13 118:13 126:4

**agreement**
18:25 19:14,16,18,20
23:23 24:11,18 25:12
93:7,20 127:19 128:6,12,
23 129:1,4,21 132:4,17,
20 141:22

**agreements**
127:15 129:19 132:6
150:23

**ahead**
17:15

**Akron**
9:4 88:19 110:14 158:5

**Alex**
6:10

**alive**
53:7 57:10

**allegations**
26:18 32:11 41:2 107:4
157:15,19,23

**alleged**
17:22 42:1 43:7 61:7
63:1 87:10 91:9

**allegedly**
16:19

**allow**
49:10

**allowed**
98:7 134:17

**Aluminum**
139:23

**amended**
40:25 51:18 145:16

**amount**
23:11 66:7,21 77:14
108:9 117:9 129:7
141:17 143:2,7,20,24
144:9 145:9,17,21,25
146:4,8

**amounts**
23:13 113:16

**analyses**
111:11,20,21 112:11

**and/or**
64:22,25 74:21,23
108:24 115:9

**answer**
13:12,22,23 17:18 21:14
22:10 23:2 27:6,8,11,16,
18,21,22 28:16,17,18
29:2,5 43:19 45:11,15
46:1,8,9,10,14 47:4,8,12
48:1,5,11 49:23,25 50:9
53:24,25 54:1,2,8 56:5,6,
7 58:4 65:19 71:21,25
72:1,2 76:23 89:22,24
90:18,22 91:3 92:19,22
93:1 116:23 117:16,20
119:14,16 120:15,18,24
131:6 133:20 134:17
144:19,23,25 145:3,4
147:12,18 148:20,22,23
150:9,13 154:5,15,19
155:3

**answered**
41:10

**answers**
23:5 57:24 72:10 81:23
162:2

**ante**
66:9

**anybody**
27:25 30:8 31:2 34:5
37:19 39:21 57:23 59:5
134:7 137:18

**Apart**

**10:9**

**apologize**
54:25 155:16

**apology**
42:11,12

**apparent**
114:19

**Appeals'**
41:3

**appearances**
7:11

**appears**
139:22 140:24 141:5,19

**applicable**
108:24

**applications**
23:19

**applies**
55:14

**approach**
52:23

**appropriate**
90:21

**approval**
142:18

**approving**
43:22

**approximate**
160:5

**approximately**
160:4

**April**
6:9 143:8 144:5 145:22
146:1,5

**area**
53:12,19 56:13,16 88:20

**aren't**
42:9

**argue**
152:25

**argument**
153:2,4

**argumentative**
152:7,9

**arrangement**
93:14

**arrangements**
93:11 130:12

**Arthur**
7:14

**asbestos**
9:5,21 10:4,10 13:8,11,
15,19,25 14:8 15:13,14,
17,24 16:4,15 17:6,22
20:2,3,5 29:14 32:21
35:14 37:3 44:24 45:18
46:5 47:14,21 48:13,16
53:7,11,18 55:3 56:2,12,
18,24 57:16 58:2 59:1,16
61:1,21 62:11,19 64:24
66:25 67:3,8,15 68:11
71:7 73:11 74:13,23 75:4
76:8,12 77:1,3 78:21
79:4,6,18,19,22 80:2,9,
14,21,24 81:6 88:22
89:4,9 90:7 96:3,6 97:21
98:5 99:18,21 103:13,15,
18 104:2 105:4,7 106:19
107:6,17,25 109:14,20
110:7,8,14,16 111:1,4,5,
10 112:10,14 113:6,7,23
114:5 117:1,5,25 119:10,
14,15,16,23 133:14,23
134:19 135:6,13 137:5,7
138:23 139:11,24
141:14,23 142:7 144:15,
16 147:8 148:8,11
149:22 150:3 160:17
161:7,14

**asbestos'**
112:19

**asbestos-containing**
112:21,24

**asbestos-like**
113:17

**asbestos-related**
21:2 120:6 133:16
134:19 137:25 146:17
148:3

**asbestosis**
98:8

**aside**
12:9 37:3 126:8

**asked**

MARILYN HOLLEY - 04/05/2017

i4

18:1 21:24 32:6,9,17
33:1,5,14 34:5 41:9
52:14,16,17 69:22
103:12 139:1 148:7,10
150:6 151:7,14,18,20,24
152:1,5 156:6 162:12

**asking**
17:2 18:6 48:5,6 71:19
72:6 75:17 99:6 106:24
116:11 118:1 147:10

**asks**
128:1

**aspects**
131:16

**Assaf**
6:19 7:23 21:15,21 22:1,
4,8,21 23:1 28:21 29:1,6
31:12,15 52:22 71:14,17
72:8 81:9,16,19 82:16,19
85:13 86:1,6 90:23
91:19,24 92:3,9 94:12
111:18 122:10,17
124:18,23 125:1,7,12
126:3,13 127:17,23
128:3,7,10,15 130:19,23
131:1,5,8,11,17,24
132:3,8 133:7,12 148:24
149:4 151:10,14,17
152:8,16 153:3 154:10,
14,18,22 155:18 156:5

**Assaf's**
72:4

**asserted**
92:8,16

**asserting**
90:20 91:23 148:19
154:12

**assertion**
91:22 92:13

**associates**
19:3 108:7

**assume**
7:10 103:23

**astounding**
110:16

**attached**
86:7

**attended**
64:7

**attention**
88:7 100:17

**attorney**
13:3 18:14 20:1 24:3,9,
10 28:8,22 31:3 32:5
36:17 49:13 56:13,25
57:12 58:9 61:2,14
62:13,22 69:19 84:20,21
85:5 88:19 129:5 135:9,
11 136:15 138:12,13,16
142:24 147:23 151:23
156:25 157:8

**attorney's**
142:20 143:8

**attorney-client**
21:22 22:10 27:23
131:11,14

**attorney-clients**
154:7

**attorneys**
11:21 12:5,9,13,15
14:21,24 18:2,11 25:2
31:19 32:1,6,13 33:1,6,
10 35:8 36:9 38:8,12
39:6 43:10,23 50:3,4,5
51:8 52:17,18 60:9,15
62:1 63:22 64:8 88:25
127:9,10,12 134:17
151:23

**attorneys'**
32:23

**August**
104:16 143:13

**authorization**
70:25 73:16,21

**automatic**
92:15

**avenue**
158:4,5

**award**
28:1

**aware**
19:13 24:17 94:8 158:25

---

**B**

---

**back**
12:9 58:5 79:16 83:8

85:10 87:22 92:5,10
100:9 109:6 113:21
114:8 115:13 122:15
153:8 155:23 159:6

**bags**
119:12,16,17

**balance**
159:1

**ballpark**
139:18

**based**
11:19,21 15:9 24:23
26:18 46:3 47:4,6,10,20
59:23 60:14 61:25 71:6
79:3,11,12,21 80:6,11
82:6 97:20 104:9 107:3,
11 116:7,21 118:3
128:22 132:13 152:3

**BASF**
6:5,20,22,24 11:1,4
14:11 20:6 25:22 66:7,
10,14,18,20 73:17,22
77:16 88:24 147:11,15
148:1,7 149:10,17 150:1

**BASF'S**
53:9 54:22 61:22 64:23
71:2 81:23 162:2,22

**basic**
49:18

**basically**
40:6 69:9 98:2

**basing**
22:14,17

**basis**
9:10 12:13 26:14 28:19
50:21,23 79:13 83:23
116:21 117:17 131:8
144:24 147:2 157:7

**becoming**
104:25

**beginning**
6:2 84:7 103:11

**behalf**
7:11,14 108:7 109:24
137:25 155:11 156:2
163:7

**belief**
98:9 104:9 157:7

**believe**
9:2,10 11:22 12:13 27:22
28:6 30:5 31:1 38:12
41:24 42:4 56:13 72:16
82:25 83:1 85:24 86:20
129:14 135:8 139:8
145:6 149:22 150:19
156:6,25 160:7 161:8

**Bell**
99:21

**best**
8:22 23:21 32:3 51:14
57:17 59:22 62:20 95:20
98:9 122:1 136:2,5
147:22 160:18

**better**
45:14 60:7 132:9

**Bevan**
15:3,7,21,25 16:5,20
17:9,23,24 18:15,18
19:3,7,10,11,21,23 24:6,
10,12,17 25:3,5,11,20
26:15,21 27:13,24 28:14
29:12 33:8,22 35:15
36:13,17 37:4,25 38:9
43:2,3,5,6,9 46:23 47:1
51:11 52:3,10,19 55:19
56:20,25 57:7,9,12,18
58:10 59:6 60:6,19 61:3,
9,12,15 62:2,5,13,18
63:3 64:15 65:7,24
67:19,22,25 68:2 69:14
70:25 71:6 73:4,11,25
74:1,15,16 76:25 79:3,
11,13 80:1,12 84:20,21
85:5 86:11,19 87:11,13
88:13,19 89:16 90:3
91:7,13 92:21 93:2,8,21
96:14 97:21 98:13,18
99:13 100:20 102:6,21
104:4,15 105:6,14 107:1,
4,5 108:6 109:11 110:1,
24 111:19 113:4,11,13
114:5 115:1,8,9 120:4
121:7,11 122:1 123:3,16
125:9,18,19,20 126:15,
23 130:1 132:23 135:11
136:3,16 137:16,19
138:13 140:7,9 142:22,
23 143:3 147:19,23
149:18,21 151:22 156:7,
12,16,20 160:15,24
161:11

**Bevan's**
24:3,9 27:3 28:8 46:25
62:22 63:4 93:19 99:6
103:23 112:1 126:24
130:11 132:15 138:16
146:16 155:8 160:21

**beyond**
147:11

**BFGOODRICH**
9:4 66:3 78:3 109:25
110:6,13,20,25 111:2
112:8,12,14,18,20,23
113:5,22 119:10,23
137:8 160:10 161:6

**BFGOODRICH'S**
111:11,20 112:11

**bit**
68:19 150:7

**boilers**
110:8

**bonus**
28:1

**bottom**
73:8,9 112:17 120:11
121:7,18

**boxes**
68:18

**Boyle**
7:14 161:21,22

**brand**
121:13

**break**
81:20 85:6 122:5 125:3
155:17

**Breckenridge**
98:24 101:15 108:7,20

**Brent**
121:11

**briefed**
23:9

**briefing**
152:21

**bringing**
46:12

**brother**
87:1,3

**brought**
57:25

**bunch**
78:10,14

---

**C**

**C-h-e-r-y-l**
158:12

**C.P.**
111:6

**Cahill**
7:1,2,4 25:22 71:1 85:16
88:24 156:3,13 157:15
163:8,9

**called**
7:17 10:19,21,23 11:1
82:13

**can't**
10:8 20:25 24:2,15 27:11
30:6 31:17 32:19 33:4
47:24 49:7,25 63:17,19
67:4 82:4 87:21,24 101:2
107:15 132:24 138:24
139:12 148:22

**captioned**
96:22

**care**
19:4

**carefully**
55:22

**case**
6:15 8:5 11:10,11,19
13:10 14:1,2 18:22
19:18,20 20:2,3,9 24:22,
23 25:1,16 26:1 30:18
32:7,11,17 33:25 34:11,
14 35:2,3,8,14,24 36:21
37:6,9 38:7,22,23 39:16
40:7,9,10 41:3 46:5,15,
19 47:2,6 59:6 65:1,6,10,
25 69:18 75:8 80:7
84:10,11,13 85:3 87:9
88:5 89:17 90:14 92:22
93:4,9,22 94:3 96:6
103:22 107:5 117:23,24
126:10,16 128:19 129:6,
9,16,17,20,22 130:2,13
132:16,21 139:3 149:17
153:20,21,25

**cases**
20:8 29:14 32:21 37:3,9
47:21 52:10 64:15 65:13,
15 66:23 67:8,15 68:11
77:1,6,8,10 79:15,17
90:7 98:17,21,23,25 99:7
101:17 102:2 115:3,24
147:21

**cash**
136:12

**Cassandra**
6:25

**Catalysts**
6:5 88:24

**cause**
51:7 74:19

**caused**
15:13,14,17

**cement**
137:7

**certain**
16:10 32:12 36:16,18
75:21 78:2,25 79:9 85:22
94:25 117:15 129:10
160:8 161:17

**certificate**
82:6

**certificates**
106:6

**certified**
7:20

**certify**
135:15

**change**
24:13 101:12

**check**
132:10

**checked**
125:2

**checks**
134:12,13

**Chemical**
101:9,10 103:6 108:14
139:23

**Cheryl**
158:12

**circumstances**
8:20

**civil**
6:7 7:18

**CLAD**
101:25 114:15

**claim**
75:4 76:12 77:15 106:1
136:12

**claimed**
48:16

**claims**
55:10 61:22 74:5,6,23
76:9 84:25 88:22 89:6
100:12 108:19 117:12
135:6,13 139:10 141:5
148:4 160:17 161:13

**clarified**
18:2 26:5

**clarify**
16:3 63:7

**Clark**
112:9

**class**
8:1,5,7,8,21,22 11:9,17
18:4,5 19:6 24:21,23
26:1,6,9 28:1,5,7,11
31:3,4 33:8 34:2,25 35:6
36:6,11,15 37:17 38:1,5,
6 39:7,9 40:12 41:15,23,
24 42:5,6,11 43:12,21,24
44:4,5,16 57:22 60:1
63:2,22,25 64:2,8 69:4
74:6,22 75:1 76:3 87:18
88:21 91:12,15 94:4
114:25 115:4,11,23
116:4,12,16,17 117:21,
22 118:1 127:8,14

**clean**
158:1

**clear**
17:19 33:9,11 72:6 85:1
130:7

**client**
24:14 59:15 92:19 129:5
156:8,10

**client's**
118:11

**clients**
73:12 105:23,25 106:4,6,
10 156:3

**clients'**
70:24 89:6

**coaching**
72:9,12

**colleagues**
64:13

**collective**
72:18

**come**
12:9 32:13 80:12 109:6
126:21 127:5

**commenced**
53:7 56:24 57:10

**comment**
132:14

**Common**
53:8 57:25 109:1

**commonly**
111:9 112:9

**communication**
91:25

**communications**
33:22,24 34:2 154:7

**companies**
20:6 44:20,22 45:2 47:14
48:15 50:1 51:12 99:17
103:7,9,12,14,18 108:18
115:3,19 120:5 138:23

**company**
10:19,21,23 11:1 14:4,7,
9 15:15,18 26:7,10,13,22
45:17,20 46:4 47:23
48:6,13 49:3,11,20
50:18,19 51:6,9 100:4,10
108:17 109:12,25 111:6
112:22,25 113:7,16,22,
25 117:5 137:8 140:10
144:14

**company's**
45:22

**compensate**
13:11

**compensated**
15:12,16 94:3

**compensation**
14:6 15:23,24 16:2,8,14,
19,23 19:15 20:5 21:1,11
42:20 61:21 93:21 95:18
97:23 98:7 116:3 118:5

**complaint**
12:17,19,21 15:9 26:19,
20 30:4,6 32:11 40:25
44:9,20 51:15,18 55:9,15
57:20 58:7,9,13,21 59:9,
15 60:3,13 63:2,10,13,
15,20 70:12 95:13 98:11,
24 108:20 123:5,12
124:14,21 125:19 148:1,
7 150:1 157:12,13,15,19,
24

**complaint's**
99:8

**complaints**
96:22 99:1 114:16,21
115:18

**complicated**
91:4 92:14

**computer**
32:15 33:16 34:6

**concealment**
74:21 75:9

**conceivably**
71:21

**concept**
48:2,4

**concerned**
125:14

**concerning**
89:3,8 157:14,19,24

**concluded**
163:20

**conferences**
57:13

**confidential**
23:22 134:3,4,5 150:20
154:21

**confidentiality**
22:18,22 23:23,24 24:1,
11,16,18 25:12 150:22

**connection**
159:21 160:16

**Connolly**
7:4

**consent**
70:24 73:16

**consenting**
146:16

**consider**
39:2 60:8,16 134:3,4,5
154:21

**consideration**
38:18

**Consolidated**
96:22 114:16,21

**contact**
157:4

**contacted**
126:21 161:5,12

**contain**
113:16

**contained**
26:18 61:1 64:24 110:6
112:14 135:17 150:3

**contaminated**
111:10 112:10

**content**
148:8

**contingency**
129:7,8,9

**continue**
54:7,15 70:21

**continues**
71:3

**contracted**
98:4

**contributed**
66:7

**control**
150:23

**conversation**
12:7 147:3 153:17

**conversations**
10:17 11:21 14:20,23
121:25 147:24

**Cook**
6:10

**Cooper**
78:3

**copies**
34:8 67:19 68:8

**copy**
52:5 67:24 82:17 86:2
123:16 128:16 162:17

**Coren**
6:13,14 13:20 17:13
18:14 19:1 20:22 21:13,
17,24 22:2,6,17,24 23:4
25:8 27:4,15 28:15,24
29:3 31:14,16 35:10
36:7,10,24 37:1 38:2,8,
10,25 39:18,20 40:1
41:7,9 42:2,13 43:6,9,13,
17 44:1,11 45:9 47:25
49:5 53:23 54:6,9,11,14,
19 55:13 56:4 60:4 63:7,
8 65:18 69:22 71:11,16,
22 72:8,11 76:19 77:17
79:7 81:14,18 82:18
89:18 90:17 91:1,17,21
92:1,2,7,12 104:6 105:10
106:21 107:9,20 115:5,9
116:1,5 117:13 119:25
124:8,18,22,24 125:5,23
126:11 127:22,25 128:5,
8,11,17 130:17,21,24
131:3,7,9,13,21 132:1,5
133:19 144:18 145:2,5
147:9 148:14,16,18,21
149:2,6 150:5,17 151:5,
10,13,16 152:3,6,12,17,
24 153:6 154:4,12,16,20
155:15,19 159:12 161:20
163:15

**Coren's**
130:10

**Corning**
142:2

**Corning/fibreboard**
141:23

**Corp**
101:10

**Corporation**
99:18 101:10 139:23

**Corporation'**
101:12

**correct**

15:6 17:3,4,6,9 18:9,10
23:16,18,20 24:9,13
25:7,10,12,13 26:15,23
32:22,24,25 33:3 35:17,
18,22 36:3,22 37:11
39:10 40:21 41:4 44:21,
22 47:18,19 51:13 55:11,
16,20,21,22,24 59:19
61:9,10,13 62:3 66:11,
12,25 67:1,12,20 69:20,
21,23 73:25 77:9 78:16,
24 79:20 80:19,20 83:4,5
84:13 86:15 90:8,9,16
106:20 107:1 109:4
110:22 114:2,6 118:16
120:6,7 131:7 135:7
138:7,15,18 139:2
149:23 151:11 152:2
154:3,20 158:8 160:13,
14 162:23

**correspondence**
123:3 125:10

**Correspondingly**
73:8,11

**cost**
75:7

**costs**
75:5

**couldn't**
31:5 42:15 139:15,18

**counsel**
6:11 27:7,10,12,17,19
28:17 29:9 49:24 53:25
54:2,5,6 56:6,8 64:20
72:2,4 82:17 84:24 86:1
89:21,25 93:18 98:14
111:19 155:9 162:1

**count**
95:14 103:8

**County**
53:9 55:4 57:16 58:1
59:2,4,17,25 108:25

**couple**
31:21 68:18

**course**
163:12

**court**
6:6 7:6 11:11 41:3 53:8
58:1 66:8 67:17 90:21
91:16 92:5 109:1 118:8,

10,12,15 127:5 128:1
133:24 135:14,18 142:17

**covering**
137:7

**create**
112:18

**created**
77:3

**cursory**
69:7

**custody**
150:23

**Cuyahoga**
53:9 55:4 57:16 58:1
59:1,3,17,25 108:25

---

### D

**Dalmut**
6:23,24

**damages**
75:3,12,13,15,17,21
76:1,7 78:23

**dangerous**
119:18

**Darnell**
8:7 53:7 56:23 57:10
73:13 95:13 96:18
101:18 102:9 106:11
109:2 118:21 119:9,22
123:5,12 124:14,21
137:6 141:6 145:3

**Darnell's**
125:13

**date**
6:9 34:10 54:22 62:17
66:4 69:9 104:25 118:25
125:25 153:12 159:5
160:5,9

**dated**
96:13 100:19 102:16
103:1 105:17 136:13
142:3,10 143:8,12,13,16,
20 144:9 145:21,25
146:4

**dates**
14:13 25:19

**dawned**
125:15

**day**
6:13 37:24

**deal**
67:23

**dealing**
97:20

**deals**
90:19

**dealt**
56:25 66:24 67:2 151:22

**Dear**
105:21

**death**
47:15 67:9 106:5 135:23

**decedent**
53:6 62:10 73:13 84:23

**Decedent's**
83:20

**deceit**
11:12

**December**
143:24

**decide**
35:19,21 36:11 37:25
38:6 152:22

**deciding**
70:23

**decision**
36:5 38:14 56:14 83:20

**decisions**
41:3 83:23

**deems**
66:8

**defendant**
6:20 35:16 38:21 45:2
53:10 56:11 66:3 80:18
88:24 95:25 104:14
107:17,24 129:12 147:7

**defendants**
7:2,17 8:14 12:2 20:2,9,
10,20,24 21:2,4,5 26:2
38:21 39:6 49:8 60:24
61:20 65:14 67:2 71:8
77:1 78:1,3,10 79:18

80:13 81:4 82:23 89:1
95:14,17 96:4 98:15,22,
25 99:3,14,17 100:13,23
101:13 102:1,13,20
103:5,21 104:20 106:15,
19 107:6 108:11 109:18
114:1,17 123:4 125:11
133:14,18 139:16 146:18
148:3 162:15 163:8

**defendants'**
35:13 51:16 62:10 74:13
81:11 85:12,15 87:15,17,
18 89:2,7 94:14,15,16,
17,18,19,20,21 118:18
121:2 123:1,2 136:6
139:19 140:22 141:4,13,
21 142:1,6,16 143:1,6,
11,15,19,23 144:4,8
145:8,12,15,20,24 146:3,
7 162:19 163:9

**defense**
62:11,19 98:14

**definitely**
102:23

**deliberate**
74:20

**demand**
64:24 65:5

**Dembrow**
7:5 156:4,22 157:24

**dep**
82:20

**depends**
28:24

**depose**
158:23

**deposition**
6:3 9:23,25 10:1,2,7,9
18:8,17,23 41:6,14,17,21
51:21 84:7 103:12
118:21 121:4 122:20
155:5,8 163:20

**deposition's**
152:21

**derived**
77:12

**describe**
9:2 68:17 83:19 84:23

**described**
64:21 74:20

**describing**
137:3

**description**
9:17

**deserve**
116:18

**destroyed**
68:12

**destruction**
74:21

**detail**
83:19 137:4

**details**
19:12,13 149:16

**determination**
118:7

**determine**
118:10

**determined**
118:12,15

**develop**
57:13 84:24

**developed**
13:6 53:15,22 55:6 56:20

**develops**
117:8

**diagnosed**
160:6,25 161:3

**diagnoses**
97:17

**diagnosing**
98:20

**Dickson**
22:20 23:7 91:5 92:18
144:22 147:17 149:14
150:11

**didn't**
10:13 44:8 45:3,17 51:6
67:2 79:19 80:2 103:14
109:20 119:18 121:22
148:24 152:9

**difference**
80:25

**differences**
97:22

**different**
47:10 97:11,14,17
103:14 150:7

**disagree**
20:21,25

**disagreement**
71:23

**discard**
70:1

**discarded**
68:12

**disclose**
139:2

**disclosed**
86:9 138:21

**Disclosures**
87:19

**discounted**
136:12

**discovery**
133:24 152:20 155:7
162:21

**Discovery's**
152:18

**discuss**
10:18,21,23 11:1 27:25
122:20 140:9

**discussed**
12:4,16 37:14 77:21
82:12 94:9 104:10 127:7
129:25 130:2 134:6,10

**discussing**
24:19 132:24 153:21

**discussion**
10:6,10 146:25

**discussions**
10:15 12:8,12 34:14,17,
18,20 37:13,22 39:5,10,
11 92:21 93:2,5,6 130:10
131:15,19,25 153:9,10,
13,19,24

**disease**
98:4,6

**diseases**
97:23

**dismiss**
83:20 98:25 99:3

**dismissal**
89:6 99:13 102:1 103:5
104:19,21

**dismissed**
44:10,13 45:23 46:2 49:2
61:17 77:16 100:13
106:9

**dismissing**
103:22

**dispute**
104:4,8 105:6,11

**distinction**
120:13

**distribute**
134:11

**distributed**
134:13

**Distribution**
101:11

**distributor**
121:13

**District**
6:6

**divide**
116:16

**document**
51:22,24 52:2 87:21
93:16 95:15 96:12,15,21
99:12 100:19 101:1
108:4 111:25 112:1
113:13 115:17 120:9
125:24 129:4 136:8,18,
19 137:22 139:20,22
140:2,6,23,24 141:2,18

**documentation**
116:7 134:23 135:1,12

**documents**
23:14,15 30:25 31:1
32:10,16 33:2,3,4,5
39:23,24 40:2,8,11,14,
16,18,19,23 41:8,12,16,
18,19,20 51:20 52:15,17,
19 62:16 64:14 67:19,23

68:10,21,23 69:2 74:22,
25 101:3 122:23 124:9
126:4 129:13 140:8,14
152:23 153:5 154:25
155:1 157:9,10,11
158:16,24 159:25

**doesn't**
29:5 50:8 68:2 79:6
121:12 128:18 131:17,22
132:2 152:4

**doing**
26:23 132:19,20

**dollars**
116:15

**don't**
8:10,17 10:5,12,13,14,16
11:8 13:12 14:13 16:24
19:2,3,12,16,19 20:18
22:6 25:19 28:9 29:17,
19,21 30:12,19 31:1,14,
16 36:18 43:18 44:3
45:11,25 46:9,10,20
47:3,11 48:2,11 50:5,15
52:12 57:5 58:3,22,25
59:3,18,23 62:6 63:11
66:21,22 70:1 80:21,22
86:6 87:24 93:4,15,16
94:5,8,10 104:24 106:25
107:12 115:22 116:22,23
117:20 118:4,6 125:6,14
129:11,12 132:5,6,19
136:19 151:6,19,20,21
152:15 153:18 154:5
160:1 161:1,18,22 162:5

**Donald**
142:24

**Dornbusch**
7:15

**dozens**
44:20 47:18,20 49:3

**draft**
108:5

**drafts**
101:23

**draw**
39:19 120:13

**Drown**
7:7

**due**

89:6

**duly**
7:19

---

**E**

**E's**
100:9

**earlier**
42:24 44:19 51:19 52:14,
16 61:7 115:10 133:21
151:7 152:9 156:5

**early**
62:21 148:2

**Eastern**
53:10 54:23 56:10 61:18
100:9

**economic**
154:1

**economics**
34:21

**effect**
26:8

**effort**
75:6

**efforts**
84:23

**either**
11:8 22:10 43:8 56:19
68:8 93:19 118:14
126:21 130:1 147:5
153:17 161:6

**Elizabeth**
6:23

**email**
52:4 82:20 162:4

**emails**
33:19,21 62:16 67:21,25
68:2 162:3

**employed**
137:8

**employees**
114:21

**employers**
97:12,15

**employment**
11:17

**Emtal**
10:21 25:21 44:8,9,15
46:18,22 64:15 89:3,4,9,
10 103:6 108:11 118:12

**enclosed**
96:21 98:20 105:22
106:5 108:5

**enclosing**
98:19

**encourage**
102:22

**engaged**
110:13

**Engelhard**
10:24 11:7 14:11 25:21
66:15,20 78:24 79:25
80:2,8 83:21 84:12,25
85:4 147:16 149:19,21
150:4 161:12,16

**Engelhard's**
60:24 61:1

**ensure**
136:4

**entitled**
35:7 81:22 87:18 96:13
100:22 105:19 109:23
118:5 123:11 124:13,21
129:24 139:22 140:23
149:10

**Eric**
7:9,11 159:12,13,20

**estate**
8:6 9:7 19:21,23 24:5,7,
12,24 45:21 66:19 67:7,
17 75:25 76:14 77:23
78:20 79:24 90:6 105:2
114:2 142:23

**estates**
108:24

**estimate**
40:14

**et al**
6:4,5

**ethics**
45:8

**events**
40:21,24

**evidence**
22:16 60:25 64:23 74:13,
22,25 75:6,7,9 89:4,9

**evidenced**
111:10 112:10

**Ex**
51:15,17 81:13,22 94:11,
13 95:12 96:12,17 99:11
100:17,19 103:1 105:12
108:3 109:8,22 113:21
118:19,21 121:3 123:9,
11 124:20 125:8 136:7,
12 139:20,22 140:23
141:5,14,22 142:2,7,17
143:2,7,12,16,20 144:5,9
145:9,13,16,21,25 146:4,
11

**exact**
82:4

**exactly**
10:5 44:3 63:11 152:22
160:7

**examination**
7:18,22 155:25 159:16

**examined**
7:20

**example**
35:17 38:19

**exception**
154:23

**excess**
21:11

**excuse**
7:10 14:16 23:21 91:21
148:14 155:15

**excused**
22:13

**executed**
101:21 105:22 141:7,8,
19,24

**executrix**
105:2

**exhibit**
51:16 81:11 85:12,15
87:15,17,18 94:14,15,16,

17,18,19,20,21 113:8,11,
12 114:8 118:18 121:2
123:2 136:6 139:19
140:22 141:4,13,21
142:1,6,16 143:1,6,11,
15,19,23 144:4,8 145:8,
12,15,20,24 146:3,7

**exist**
124:5

**existed**
74:25

**existence**
64:21,22

**exists**
125:25

**expect**
35:24 36:2,3,4 43:24
49:13 50:1 51:8 103:17
138:17,19,25 139:3

**expectation**
42:18

**expectations**
43:20

**expenses**
75:5

**experience**
47:20 71:6 79:3 80:11
132:7

**explain**
56:1

**explained**
133:21

**exposed**
9:5,8,15,20 10:4 11:3,6
44:18,24 45:19 46:17,22
48:14 96:25 97:4 115:20,
25 116:9,10,18,20 117:1,
11,18 118:2,3,11 119:23
121:23 137:6 161:8

**exposure**
13:8 44:8 97:22 98:4
115:4 119:10 137:5
144:16 160:17 161:13

**exposures**
114:22

**extensive**
69:11,12,17 152:20

**extensively**
23:9 112:7

**extent**
27:5,6,16 28:17 53:24
56:5 72:1 78:25 79:9
89:20,22

**eyebrows**
132:9

**F**

**facilities**
96:24 97:4

**facility**
155:16

**fact**
9:11 29:1,6,7 80:24
99:12 104:2 105:6 113:6,
8 116:20 119:23 138:21,
22 139:1 147:7 153:10

**factor**
147:6

**facts**
15:8 18:22 25:6,21 57:5,
7,8 60:14 61:24 62:1
65:4 69:8,18 74:14
86:10,14,17,18 87:9,10
89:16 91:8,16 92:21
102:19

**factual**
9:10 85:2 157:7

**factually**
117:15

**fair**
15:8,9,21,22 16:12 43:5
48:23 50:13,15 51:2,3
57:18 61:20 66:8 78:18
79:6,9 80:22 86:9,18
91:10 103:19,20 117:12
149:19 151:25 161:3,4

**fairly**
94:23 117:20

**fairness**
49:18 117:16

**false**
17:8 74:24

**familiar**
159:23

**family**
19:2,22 124:2,4 126:5
134:9 136:21,23 158:3

**far**
12:3 51:11

**Farrell**
6:21 162:4,9,24 163:3

**February**
96:13 123:11,17

**federal**
7:18 22:5,9,15 99:23

**fee**
18:25 19:14,16,17,20
93:13 127:14,19 128:5,
12,22,23 129:1,4,19,21
130:11 132:3,6,17,20

**feel**
38:16

**fees**
130:2,12 131:16,25
142:20 143:8

**fiber**
111:1,4 137:7

**fibers**
61:1

**fiduciary**
24:4,24 134:10

**Fields**
6:25 7:1 86:4 155:10,14
156:1 158:21 162:18,21

**figure**
109:19 139:18

**figures**
77:11

**file**
51:9 68:24 69:5,13 96:6
139:10

**filed**
15:9 44:9,20 51:12,25
54:22 59:9 63:10,13,16,
20 82:10 87:25 95:24
99:8 106:1 108:25
109:10,24,25 114:16
115:2 128:1 137:25
138:22 139:13 148:1
149:17 152:20

**files**
32:15 50:17 52:8,19
68:17 69:14 93:17,19,24
123:15,21,22 125:21
135:2,3 136:20,21

**filing**
30:4,6 55:16 63:2 95:13
115:18,24 133:17 150:1

**filings**
21:20

**filled**
135:12

**filling**
86:8

**finalized**
82:9,11

**find**
24:25 46:20 59:5 69:16
126:20 159:5

**fine**
122:8

**finish**
141:25

**Firestone**
97:12

**firm**
19:1 30:9,20 71:1 73:11
88:23 93:14 130:11
160:15,16,21 161:12

**first**
7:19 25:14 30:5 51:8,10
53:5 56:17 57:5 58:18
63:1,15,24 64:6,11 70:22
75:12 81:23 82:2,3 95:12
110:3 126:15 137:24
160:15,18

**five**
20:13 40:15 81:17 88:20
137:1 155:17

**flip**
111:23

**focused**
54:24

**follow**
32:23

**following**
97:3 105:23,25 106:2,4,

6,10 108:23

**follows**
7:21

**foregoing**
83:10

**form**
13:21 17:14 20:23 25:9
35:11 36:8 38:3,11 39:1,
18 42:3,14 43:13 44:2,12
45:10 47:25 49:6 60:5
65:18 76:20 77:18 79:7
89:19 104:7 106:22
107:10,21 115:6 116:6
117:14 120:1 131:1,3
136:12,24 139:10 141:5

**former**
112:12

**forms**
138:20

**forth**
22:19 61:3 115:13

**forward**
54:3 101:22

**forwarding**
101:8

**found**
45:1,16 46:15 48:6 49:20
113:15

**foundation**
131:2,4

**four**
20:12 28:11 152:18

**fourteen**
101:17

**fraud**
11:12 16:5 17:23 79:10
80:1 87:10 149:19

**fraudulent**
14:3,5 16:20 42:21,22,23
43:7 62:11,18 75:8

**front**
21:20 58:14 81:12 85:14
87:16 94:11 109:8 125:9
136:15 140:15 152:19

**full**
61:20

**further**
74:19

**G**

**gathering**
74:20

**Gene**
6:19 28:25 71:23 81:14
125:6,23 126:11 130:18
132:6,14 149:10 152:25

**general**
68:20 97:12 129:23

**generally**
32:23 68:5,6

**Georgia**
103:5 108:11,12 117:2

**Georgia-pacific**
100:2

**getting**
19:16 133:10

**Geyerman**
7:3 82:22 163:7

**give**
22:7 32:5 47:8 68:20
75:20 82:4 94:12 123:7
139:18 152:1

**given**
19:14 31:19,25 33:9
73:15,21 80:7 88:23
93:25 152:3

**giving**
90:15 150:8

**go**
17:15 30:14 65:17,21,23
70:11 71:18 87:13 96:11
99:11 100:9 112:17
118:9,19 121:3 122:10
139:20 140:6,14 149:15

**goad**
153:1

**goes**
76:9 82:22 87:21 108:19

**going**
9:23 12:19 17:2 22:12
27:5 54:3 61:16 65:25
70:6,12,21 77:2 80:16
81:1 82:16 88:17 89:21
90:17 92:8 93:15 94:3,22
95:7 96:11 109:6,10
111:23 113:21 117:11
123:1,7 125:8 129:6
130:15 133:19,25 140:14
144:20 152:17,22,23
153:1,5,8 158:21,25

**good**
6:13 7:24,25 44:6 70:6
81:15 90:11 122:18,19
159:18,19

**Goodyear**
97:12

**Gordon**
7:1,2,4 25:22 85:16
88:24 156:3,13 157:16

**Gordon's**
71:1

**gotten**
52:2 66:14 133:8

**Grant**
7:3 101:14

**Great**
122:9 124:11 133:12

**greater**
137:4

**greatest**
98:7

**greeting**
18:19

**ground**
21:23

**grounds**
21:15,16,17,25 22:1,7

**group**
38:21 61:19 72:18 98:15
114:17

**guess**
14:10 43:22 48:9 86:25
102:6 160:22 161:16
163:16

**guy**
90:11 91:7

**guys**
162:3

**Gypsum**
142:7

**H**

**hadn't**
145:5 151:7

**half-truth**
89:2,7

**Halket**
7:12 159:21,24 163:14

**Hall**
111:6

**handle**
49:14 129:6

**handled**
141:10 152:14

**handling**
67:15

**happen**
35:25 152:17

**happened**
84:11

**happening**
34:10

**happens**
126:8

**hard**
52:5 67:19,24 150:16

**harm**
13:14 16:9 26:12,14
49:21 51:7,10

**harmed**
8:23,25 9:3 12:14,24
13:4,6 43:12 44:18
50:14,18 115:12 117:24

**harmful**
11:16,18,25 12:2,3,25
13:2

**harms**
12:22,23 15:11,12,14,17,
23 16:1 27:1,2,14

**Harwick**
101:9,10,11 103:6
108:14

**hasn't**
51:11 125:3,4 151:5
152:5

**hate**
161:1

**haven't**
32:9 33:9,14 67:21 69:22
93:18 95:21 152:2
154:24

**he's**
25:14 66:1 90:11 151:6
156:25 160:1

**head**
31:17 134:22

**hear**
150:16

**heard**
25:23,24 63:1 80:2
120:24 126:16 153:9,12,
15

**hearing**
43:22

**heck**
119:18

**help**
40:4 90:13,15 94:24
118:8

**helped**
40:6,19 120:4 135:9

**helping**
90:6

**here's**
49:15 115:17

**hereinafter**
7:20

**hesitate**
126:6

**Hi**
161:21

**higher**
64:25

**hold**
70:2 158:22

**holding**
155:5

**Holley**
6:3,16 7:16,22,24 27:8
32:14 49:17 53:23 54:3,
17 62:9 71:12 72:6 85:14
95:8 128:16 132:15
136:10 140:20 145:3
155:25 156:2 159:14,16,
18

**Holley's**
53:6 73:13 81:21,23
125:20 126:4 162:5,8,13

**home**
31:11 52:12,19 104:24
124:2,4 126:5,17 135:2
136:21,23 158:3

**hopefully**
126:17

**Hopewell**
141:15

**hour**
30:15

**hours**
63:4,6

**house**
151:3,4

**Hygienist**
112:13

**hypothetical**
115:22

---

**I**

**I'd**
15:9 42:8 53:4 72:9
75:20 100:16 147:2
156:9 161:1

**I'll**
12:9 21:14 54:15 98:13
125:5 126:1 127:17
144:19 156:19 162:11

**I'm**
6:13,14 10:12 12:1,2
16:10 18:2,5,6 19:13
20:11,16 21:5 22:12,17
24:25 26:19 27:5 29:3
32:12 36:14,15 39:19
43:21 46:13 47:7 48:6,20
49:15 50:21 51:17 53:1
54:11 59:11 66:16 69:6

70:10,12,20 71:18 72:6,
11,12 74:18 75:20,24
78:2 81:1 82:16 83:15
85:22 88:11,17 89:21
90:17,22 91:18 92:7,18
93:15,23 94:8 95:7 98:19
103:4 106:24 109:10
111:23 117:15,22 118:1
120:21 123:1,7 124:2,3,
25 125:8,14 129:10
133:19,25 137:17 140:14
143:12 147:12,17
148:18,22 149:15 150:7,
12 151:19 152:12,24
153:1,6 154:9 155:4,5
157:2 160:8,22,23
161:17

**I've**
37:12 42:17 92:8 120:24
157:11

**idea**
24:21 27:2,3 68:20 77:20
94:2 105:5 161:11

**identified**
29:21 87:2 91:6,7 92:3
155:1

**identify**
6:11 17:21 75:7 77:14
101:3

**illnesses**
98:2

**imagine**
36:16

**impact**
71:21

**incentive**
28:1

**inches**
68:18

**inclination**
51:10

**included**
99:17 106:18 142:19

**includes**
106:12,13 113:13

**including**
6:15 73:12 75:3 76:7
77:1 83:21 101:18 154:8
155:7

**incorporating**
27:9,19 54:1 56:7 72:3

**incur**
75:1 76:5

**incurred**
75:2,6 76:1,6,14

**independent**
26:16,17,22,25 29:4

**indicated**
57:9 96:23

**indicating**
60:25

**individual**
7:1 37:3 88:25

**individually**
101:4

**individuals**
106:2

**Industrial**
112:12

**industries**
120:22

**information**
23:19 29:15 34:6,19
35:20 57:2 80:7,17
83:12,22 84:3,7,9,14,17
85:2 87:7 90:13,25
102:23 114:18 115:7
127:16 135:17,22

**informed**
36:3,4,20 37:8 62:12,18

**initial**
11:20

**initially**
51:25

**injured**
43:25 44:4 137:2,4 138:1

**injuries**
13:11,16,19 14:1 16:15
17:6,20,25 20:6 21:2
42:1 120:6 133:17
134:20

**injury**
16:4 17:22 53:8 56:24
61:21 73:12 75:4 76:8,12
139:24 141:23 142:2,8

**instance**
11:15

**instruct**
21:14 22:9 27:5,17 28:16
53:24 56:5 71:12,25
89:21 90:18 133:20
144:19

**instructed**
145:5

**instructing**
23:2 29:2 90:22 91:3
92:18 131:6 144:23
147:12,18 148:23 149:15
150:13 154:10,18

**instruction**
22:22,23 27:16 54:20
55:14 145:1 150:8

**instructions**
155:3

**instructive**
78:22,25

**insulated**
110:7,8,9

**insulation**
110:17 121:14

**interaction**
138:12

**interested**
41:25

**Interesting**
35:6 52:22

**International**
108:18

**interrogatories**
23:6 81:24 82:8 83:15
85:16 86:9,13,20 162:2
163:9

**interrogatory**
81:10 83:3,18 84:22

**interrupt**
54:7

**invade**
131:15 149:7 154:6

**investigation**
113:14

**involuntary**
89:5

**involved**
47:13 59:6 75:21 76:25
79:10 83:22 110:15
147:20 157:2 161:15

**Ira**
7:5 156:3,22 157:24

**irrelevant**
21:19

**isn't**
45:8 46:7 125:21 132:4

**issue**
23:6,8 45:6 60:9,10,16
74:15,16 91:4,25 92:13
133:21,23 134:1 144:20
147:13 150:11

**issues**
23:5 46:13 60:15 91:9
107:14 108:2 144:20
149:14 155:7

**it's**
19:11 21:18,19 22:21,22
23:4,6,8 29:1,6,8 33:9
38:7 45:7,11,25 48:3,4
49:17,18 50:8,13 60:12
68:19 71:19 78:25 80:22
86:25 87:25 91:2,3,4,18,
19,22 92:15,16 93:25
100:22 102:6 103:1,4,23
104:9 109:25 113:11
114:11 115:17 119:9
122:3 123:11 124:13
126:9 129:7 132:7 145:2
146:12 148:21 149:2,13
150:5,10,16 152:7 153:3
158:5

**its**
26:7,10,12 70:24 71:2
104:2 105:4 110:14
112:25 113:23 114:5

---

**J**

**J-m**
137:6

**James**
112:8

**January**

**105:14,17 108:4 119:1,2
121:4 146:8**

**Jared**
6:17 132:8

**Jersey**
6:6 92:15,16 127:3,5,20
129:17 132:17 141:15

**job**
9:17 110:15

**John**
7:14 159:12 161:20,22

**Johns**
111:4

**Johns-manville**
140:25

**Johnson**
103:7 108:14

**join**
86:4

**judge**
22:19 23:7 91:5 92:17,18
134:2 147:13,17 149:13
150:11 152:19

**judge's**
41:1

**Judgment**
109:24

**June**
67:11 118:22 119:4
123:19

---

**K**

**Kaiser**
139:11,23

**Kathryn**
8:6 53:6 56:23 57:10
101:18 102:9 106:11
109:1 118:21 123:5,12
124:14,21 141:6

**keep**
70:1,3,5 109:8 147:24

**kept**
34:10 158:17

**Kevin**
7:13

**Kimberlee**
6:4 29:18

**kind**
75:23

**knew**
51:12 86:11 104:5 105:7

**know**
8:9,10,11,16,17,18,20
11:8,19 14:19 15:20
16:24 17:18 19:12,20
20:18 23:10 27:2,14 28:4
29:11,16,19,20 30:19
31:14,16 34:13,18 35:7
36:18 37:23 38:24 40:16
43:3,4,7,8 44:3,23,25
46:23 48:11 49:2 51:11
56:15 57:15 58:25 59:3,
18,23,24 60:2,9,10,14,17
61:23 62:2,5,9 63:17
64:4 65:24 66:2,19,21
69:19,25 72:7,14 74:9
77:11,22,25 83:6 86:13,
17 92:7 94:7,8,10 98:3,
21 104:1,3 105:3 106:24,
25 107:1,4,12 113:25
115:8,24 117:4,17
119:18 120:16 121:12,22
125:6 126:25 127:11,13
129:8 130:18 131:9,16
135:21,25 137:14,15,16
138:10,14 139:11,15
144:13 151:6 152:15
153:1,4 156:24 160:1,20
161:1,5

**knowing**
11:5

**knowledge**
8:22 12:18,20 14:25
15:2,3 23:18,22 25:5
26:16,17,22,25 28:19
29:4 32:4 39:14,17 51:14
55:8 56:21 59:22 62:6,7
65:4,8 73:20,23,25
86:14,24 88:22 89:5,23
90:1 95:20 98:9 104:9
136:2,5 147:22 156:8,12,
14,16,21 157:14,17,18,
23 160:18 161:10

**known**
17:9 61:8 64:20 90:2
91:13 101:11 114:4

**knows**
15:25 16:6,20 28:23 43:2
71:19 113:4,5,7 137:18

---

**L**

**laboratory**
111:11,21 112:11

**language**
101:13

**laptop**
33:17

**lasted**
63:4

**late**
62:11,20 110:13

**law**
30:20 71:1 73:11 90:21
160:15

**lawful**
7:17

**Lawrence**
108:17

**lawsuit**
8:2 13:5,9,10 15:8 16:25
45:16,22,24 48:8 49:11
50:17 53:8 54:22 55:19
56:24 57:1,14,25 61:17
79:14 95:23 96:1,3 99:13
116:21 133:17 137:25

**lawsuits**
47:13 49:3 55:20 95:24
138:22 139:2

**lawyer**
90:11 125:20

**lawyers**
19:10 88:3 134:7 147:19

**layperson**
60:18

**learn**
47:22 62:9 80:12

**learned**
156:7,11,15,20 158:24

**learns**
28:25

**leave**

12:8 37:3

**led**
149:22

**legal**
18:2 28:23 45:6 46:12
49:17 60:15,16 71:20
91:24,25 158:16

**let's**
12:8 33:7 44:7 45:24
46:2 51:15 58:5 70:11
76:11 81:8 82:5 83:8,17
91:6 99:11 101:5 103:23
108:15 116:12,15,24
118:19 122:10 123:9
128:24 130:7 133:6,13
135:4 139:20 151:11

**letter**
96:13 98:12 103:24
114:9 124:21 125:13

**letting**
27:1,13

**light**
148:6 149:25

**limited**
75:3 76:7 117:8

**Linda**
87:1,3

**line**
119:12 120:11 124:16

**liquidated**
141:16

**Liquidating**
108:17

**list**
112:25

**listed**
45:2 108:8 109:2

**listing**
81:4

**lists**
97:5

**literally**
102:17

**litigation**
32:20 69:14 71:7 80:11
97:21 123:21 133:3

159:22

**litigations**
83:4

**little**
39:19 150:7

**lives**
124:4

**living**
129:15 138:11

**LLC**
6:5

**local**
67:17

**locate**
75:7 163:10

**location**
158:14

**locations**
155:1

**log**
29:8 132:5

**logged**
31:13 124:20 125:2,4,16,
22 127:24 132:4

**long**
29:23,24 30:1,2,13 69:10

**look**
34:5 52:17,18 68:17
125:6,24 126:1,4

**looked**
52:15 127:18

**looking**
140:3

**looks**
82:7 141:8 142:20

**loss**
75:3,23 76:8,11,13,18
77:15

**losses**
75:2 76:6

**lot**
68:19 154:25

**lump**
80:22

**lunch**
122:3,5,21,25 125:3,15
127:18 152:10

**lung**
98:4

---

**M**

---

**M-o-e-l-l-e-r**
158:5

**ma'am**
70:17 119:13 120:10,13

**machinery**
110:9

**magistrate**
91:5 92:18 134:1 144:21
147:16 149:13 150:11

**Magnesia**
53:10 54:23 56:11 61:18
100:10

**magnitude**
20:12 21:6 133:15

**mail**
126:21 153:16

**maintained**
21:18 64:14

**major**
110:14

**Mansour**
108:6

**manufacturer**
79:4,5 121:13

**manufacturers**
53:14,20 55:5 77:24
78:2,20 79:1 121:23
161:7

**Manville**
111:4 141:6

**March**
142:10

**Marilyn**
6:3,15 7:16,22 81:21,22
155:25 159:16

**Marino**
7:13 150:14

**marked**
51:16,17 81:11 85:12
87:15 94:14,15,16,17,18,
19,20,21 118:18 121:2
136:6 139:19 140:22
141:4,13,21 142:1,6,16
143:1,6,11,15,19,23
144:4,8 145:8,12,15,20,
24 146:3,7

**Martillotta**
96:14 98:13 99:6 100:20
105:15

**Master**
96:22 114:16,20

**material**
60:23 70:5 75:23 89:3,8
120:21 159:2

**materials**
113:14 153:11

**matter**
6:4 8:14,15,24,25 9:6
12:3 36:14 39:3 45:7
48:3,4 79:10 90:19 91:2,
18 92:13,17 97:23
144:21 147:13,16 149:13

**mean**
8:15 19:25 36:10 44:3
54:17 55:7 69:6 74:11
76:2 117:19

**means**
54:21 55:8 66:13 71:10,
19 72:7,15 74:9 75:24

**meant**
57:15 58:8,19

**mediation**
154:9

**medical**
98:20

**meet**
18:11

**meeting**
28:8,12 29:12,21,23
30:1,5,9,13 31:2,6 33:8
39:20 41:7 57:4 62:23
63:3,12,15,24,25 64:3,6,
11 69:9 126:18,20,22,25
153:16,17

**meetings**
57:13 58:10 63:14,18,21

64:7 69:4 127:8

**member**
39:7

**members**
8:7,8,21,23 11:17 26:6,9
28:5,7 41:25 42:5,6,12
43:11,24 44:4,5 75:1
76:3 115:11 116:16,17
134:9

**Members'**
74:6,23

**memories**
40:20,23

**memory**
40:4

**mental**
149:2,4

**mention**
137:12

**mentioned**
12:23 15:11 19:22 44:19
51:19 55:15 61:7 67:18
125:13 126:14 135:5
150:19

**meso**
117:8,10

**mesothelioma**
13:7 98:3,6 160:6,25

**met**
62:21 68:8 125:18,19
126:14

**Michael**
6:14 71:15 91:20 150:14

**microphone**
155:13

**Mike**
21:21

**miles**
110:6,16

**million**
111:3,5 116:15

**millions**
111:1

**mind**
50:6 149:9

**Mines**
99:21

**minute**
70:15

**minutes**
81:17

**misleading**
74:24

**misrepresentation**
43:8

**misrepresentations**
60:23 89:2,7

**mistake**
45:20

**mistaken**
66:16

**Moddrell**
112:12

**Moeller**
158:4

**Mogul**
99:23

**mom**
11:16 14:15 26:5 47:15
56:23 61:25 102:18
106:12,13 110:20 123:17
129:15 138:11 144:17

**mom's**
35:14 104:13

**monetary**
42:20 76:6,21

**money**
13:4,15,18,25 14:1 17:2,
5,8,11,17 26:2,4 34:22
35:1,9,21 36:11,21
37:10,13 38:1,6 39:15
41:25 42:7,10,12,19
43:12,25 44:10 45:4,21
46:5,19 47:2,22 49:4,12,
22 50:1,13,20,25 51:6
66:14,17,19 75:13,15,17,
21 76:1 77:14 103:13
106:18 116:13,19 117:9,
10 118:14 120:5

**monitor**
6:8

**months**
98:12 99:8 152:18

**morning**
7:24,25

**mother**
8:6 9:1,3,4 10:18 11:3,
18,20,24 12:14,15 14:18,
20,22,24 15:1,5 16:5,15
25:7 26:9 44:24 45:4,19
46:17 48:14 51:13 57:11
58:10 77:3 78:19 98:3
100:13 103:22 121:22
135:21 141:10 160:5,20

**mother's**
12:8,12,23 13:15 24:24
40:8 55:19 67:7 75:25
76:14 77:15,22 78:20
79:24 90:6 99:13 114:2
136:20 158:16 161:13

**Motions**
109:23

**multiple**
20:9,10

---

**N**

**name**
8:10 101:9 121:13,22
136:15 157:9 158:11,12
159:23

**name's**
159:20

**named**
45:19 88:21 125:17
126:9

**names**
28:10 29:22

**naming**
53:10 56:11 114:17

**narrative**
137:2

**nature**
23:11

**nay**
87:24

**Neal**
87:1,3

**nearly**
114:19

**necessarily**
87:3

**need**
50:3,5 54:5 71:12 118:8
131:14 155:16

**needs**
46:5

**negotiated**
56:20

**negotiating**
35:8 53:14,21 55:6 70:22

**neither**
127:23

**never**
36:19 37:7,15 44:14,17
50:18 94:9 115:19,25
116:18,20 117:11 118:2,
3,11 120:24 139:4 154:1

**new**
6:6 92:14,15 114:20
127:3,5,20 129:17
132:16 141:15

**night**
154:25

**nominal**
61:18

**normal**
151:24 152:4

**note**
85:6

**notes**
31:6,7,8,21,25 32:2,4,6,
15 33:7 69:3,5,7,11,13,
16 126:16,18 147:24

**notice**
127:1

**noticed**
114:15

**November**
53:5 56:23 57:9 95:12
96:9 98:11 141:9 142:3
143:21

**number**
6:7 20:11,21 49:8 68:21

83:18 99:14 137:1
139:16,17

**numerous**
47:13 114:16 155:2

---

**O**

**object**
107:16,22,23

**objection**
13:20 17:13 20:22 21:13
22:12 25:8 27:4 28:15
35:10 36:7,24 37:1 38:2,
10,25 39:18 42:2,13
43:13 44:1,11 45:9 47:25
49:5 54:9,14,16 60:4
65:18 71:24 72:12 76:19
77:17 79:7 89:18 90:15,
24 104:6 105:10 106:21
107:9,20 115:5 116:1,5
117:13 119:25 130:17,
20,22 144:18 147:9
148:19 152:6 154:4

**objections**
21:23 83:11 130:20
144:22 159:4

**obligations**
8:4

**obtain**
70:24 101:14

**obviously**
98:24 114:22 158:22,25

**occur**
14:12 29:23

**occurred**
131:15

**October**
87:22

**offer**
36:6 140:10

**offered**
34:22 35:1 36:1 38:16,
19,22

**offers**
66:6

**office**
18:20 24:3 28:8 62:22
63:5 68:9 69:2 126:24

**offices**
127:2

**oh**
40:17 71:14 83:14 95:1
96:5 109:16 114:12
121:19 124:6 129:18
151:17 155:14 158:1

**Ohio**
9:4 88:19 142:18 158:6

**Ohio-venued**
88:20

**okay**
9:24 12:6,8,11 13:2
16:12,13,14 17:1,5,16,20
18:15,17 20:19,21 21:1
24:9,16 31:22,24 32:13
33:12 37:2,4,5,17 41:20,
23 42:9 44:6 46:16
47:16,20 48:21,24 49:1,
19,25 50:12,16 51:11,15
52:21,24 53:2,3 54:3,10
55:1,12,25 57:3,25 58:6
59:14 60:21 62:23 64:5
65:20 66:23 67:10,11,13,
25 68:3,23 69:1 70:2,8,9,
11,14,16,18,19 72:17
74:4,17,19 75:12 76:16
79:15 81:1,5 82:2,7,21
83:18 84:21 85:14,21,25
86:23 87:4,23,25 88:9,18
90:2,13 92:12 93:1,7
94:11 95:2,4,6,9,10 96:9
97:3 98:16,17 99:6,11
100:16,18 101:5,7 103:1,
10,11,24,25 104:4,11,18
105:1,3,13 107:2,14
109:13,15,16,21 110:3,5,
12 111:15,16,17,23
112:2,3,17 113:20
114:12,13 115:16,22
116:25 117:7 118:10,20,
23,24 119:8,22 120:19
121:5,10,19 122:4,6,7,9,
25 123:8 124:5,7 125:7
126:20 127:8 128:10,11,
13,14,20,25 129:5,18
130:8 131:5,8 132:7,12,
22 136:9,11,24 137:13
139:13,21 140:13
141:12,20 142:9,11,25
144:3 145:7 146:13
148:15,18 149:25 151:7

133:10 138:16 162:12

153:15,23 157:10,13
158:1,11,14 159:9,15
160:3,13 161:11

**omissions**
60:23 89:3,8

**once**
27:15 54:19 55:13 56:4
71:12 91:17 92:13
144:19 147:10

**ones**
151:4 162:10

**open**
67:16 155:5 158:22

**operator**
6:10

**opinion**
41:1

**opportunity**
36:20

**opposed**
98:8

**order**
20:12 21:6 66:8 69:16
94:23 95:7 133:15
145:16

**originally**
157:2

**outlining**
19:15

**outside**
133:22

**owed**
80:18

**Owens**
141:22 142:2

**owes**
45:20

---

**P**

**p.m.**
163:20

**page**
62:8 73:8 74:2 88:11,12
96:11,17 102:6 105:24
106:7 108:21 109:6

110:4,11,24 111:24
112:18 114:8 119:5
120:8,11 121:6,8 136:24
137:3,21

**paid**
95:21 105:25 106:9,16
115:11 132:23

**paper**
68:19

**papers**
62:16 111:22

**paragraph**
52:24 53:4 55:10,18
56:1,3,17,22 57:6,22,24
58:23 59:13 62:8 64:19
66:17 70:11,20 73:7
74:3,17 83:9 84:1 88:8,9
98:19 114:14 137:1

**paralegals**
147:20

**Pardon**
31:15

**part**
54:24 55:2 61:18 72:25
115:4 116:3 120:3
121:25 123:15

**participate**
70:25 73:16,21

**participated**
72:22,24

**particles**
113:17

**particular**
11:15 19:19 25:19 26:6
34:19 35:3 39:3,11 40:10
47:6 56:9 57:1,14 58:9,
23 79:10 80:7 93:16
104:13 116:8 117:16,22,
23 128:22 129:12,22
140:10 146:21,22,23
153:21,25

**particularly**
61:3 64:22 78:2

**parties**
133:22 147:14

**party**
44:16 57:12 102:24
137:2 138:1

**party's**
137:4

**passed**
67:11 102:18 123:17,24

**passing**
104:13

**pause**
54:5

**pay**
35:16 46:5 49:22 50:19, 24 79:5 103:18

**payable**
108:6

**paying**
49:11 103:13

**payment**
136:13

**Pease**
73:12

**pecuniary**
75:2,12,13 76:6

**pending**
23:7 91:5

**Pennsylvania**
127:3

**people**
27:1,14 28:6 29:12 43:20 46:12 50:13 63:21 64:2,7 66:24 77:2 115:2,10,18, 19,24 116:3,17 117:1,11 118:2,11

**percent**
94:6,7

**person**
28:22 50:16,17,18,19 56:21 57:6,8 59:7 60:2,7 66:1 73:24 84:16 85:1 102:21 122:1 147:4

**personal**
12:18,20 14:25 15:2 26:16,17,22,25 28:19 31:7,21,25 32:2 62:6,7 65:8 83:11 84:2,8,9,14, 16 86:14,23 87:6 89:23 90:1 139:24 142:2,7 156:7,12,14,16,21 157:4, 14,17,18,23 161:9

**personally**
11:8 24:20 29:20 33:4 56:14 59:24 60:11 66:2 75:18 94:5 104:3 161:5

**persons**
51:9 83:22

**Peter**
6:21 7:5 156:4,17,24 157:19

**phone**
126:21 147:4 150:16 153:16,18

**phrase**
47:9 70:21 71:9

**phrasing**
50:7

**pile**
116:13

**pipe**
110:16 137:7

**pipes**
110:7

**piping**
77:3

**place**
30:13 45:3

**Placitella**
6:17,18 30:8,11,17 33:9 36:10 37:25 38:8 62:24 63:3 64:11 69:22 86:3 115:2 124:19 126:15,23 127:15 130:10 132:11,13 133:9 161:25 162:7,11, 16,20,23 163:1,5,12

**Placitella's**
19:1 30:9 93:14 94:2 127:2

**plaintiff**
9:6 25:15 46:6 53:6 61:17 62:9 64:20,25 66:5,11 73:12,13,14 81:13,22 83:11 84:2 160:1

**Plaintiff's**
64:20

**plaintiffs**
6:14,18 8:15 14:15,18

29:19 39:6 65:9 72:20,21 74:25 76:3 78:14 87:19 88:21 96:24 97:3,9 98:23 101:15,17 102:6 108:8, 23 114:20 116:8 125:17 126:9 162:6,10

**plaintiffs'**
74:5 88:1 93:18 109:23

**plant**
110:6,15 112:8 119:11, 24

**pleadings**
41:2

**Pleas**
53:8 58:1 109:1

**please**
6:11 7:8 21:23 27:10 49:16 50:12 52:25 54:2 56:8 70:1 71:14 72:4 87:17 89:25 92:6,9 98:21 101:9,22 113:10

**plenty**
159:3

**Plibrico**
141:14

**point**
14:10 60:1 85:19 112:3 159:7

**pointing**
56:10

**portion**
66:6 92:11

**position**
149:11

**possesses**
83:11 84:2

**possession**
150:24

**possibility**
25:15 37:8

**possibly**
128:19 129:6

**potential**
87:2

**potentially**
53:13,20 55:5

**pounds**
111:1,3,5

**Powerpoint**
30:23

**practice**
53:11,18 55:3 56:2,12, 15,18 57:16 59:16 151:25 152:4

**practices**
57:19 58:3 59:1,20,24 60:3,8,17,18 118:4

**predecessor**
53:9 54:23

**predecessors**
61:22

**predecessors'**
71:2

**prefer**
42:12,15

**preparation**
18:17,22 41:14,17,21 51:21

**prepare**
40:19 41:5 101:25

**prepared**
18:8 82:3 158:23

**present**
6:16 10:1 18:13,15,16 28:9 39:21 127:9,10

**presentation**
30:17,21,23

**presented**
12:17 46:3 129:13

**presently**
96:8

**pretty**
69:15 133:2 140:14

**previous**
25:24

**previously**
96:23 105:25 106:8 114:18 163:4

**prior**
28:13 29:13 67:9 82:12 104:12 125:18 135:22

**privilege**
21:22 22:10,14 27:23 29:8 90:19,20 91:2,18,22 92:14,16 131:2,4,10,12, 14 154:16

**privileged**
22:22 91:20

**privy**
12:7 26:19 36:17 37:21 39:7,10 57:2

**probabilities**
47:5

**probably**
29:20 52:7 128:17 133:5 136:22 151:2 153:17

**probate**
67:17 135:14 142:17 145:16

**problem**
66:18

**Procedure**
7:19

**proceeding**
75:5

**proceedings**
127:6

**process**
83:19 140:5

**processes**
149:3,5 150:10

**produce**
132:6

**produced**
124:20 125:2,3,16,22 127:24 132:4 144:15 147:7

**product**
26:8,9,11,12,14 45:3 53:13,20 55:5 79:19,20 144:15,17 147:7 150:2

**products**
11:4,6 45:18 60:24 64:23 121:14,15 148:8 161:7

**proffered**
142:18

**program**

**programs**
53:12,19 56:19 59:17

**prohibiting**
24:18 93:8

**project**
110:14

**prompt**
54:7

**proof**
48:12

**proposed**
154:1

**prosecute**
84:25

**prosecuting**
75:8

**prove**
75:8

**provide**
89:16 91:15

**provided**
24:4 114:18

**providing**
90:24

**proximate**
74:19

**purchased**
110:25 111:3

**purely**
87:6

**pursuant**
7:18

**pursuing**
95:18

**put**
7:10 26:24 29:8 47:11 62:17 87:16 107:11 108:11 116:24 125:8 126:8 140:15 153:12

**putting**
69:8 71:23 72:12

55:4 57:17

---

**Q**

**qualified**
46:13

**question**
13:13,24 16:11 17:19 27:9 29:10 32:12 43:19 44:6 45:12 46:8,9,11 47:4,5,7,11 48:1,9,22 49:17,18,23,25 50:4,6,8, 9,22 54:1,3 58:4,23 59:23 71:20 72:2,5 75:20 83:13 90:18 92:4,6,10 107:11 116:23 119:9,12, 15 120:16,19,21 124:24 137:24 138:25 144:25 145:4 146:19 150:6 156:10,19

**questioning**
154:23 155:4

**questions**
54:8 58:8,19 117:19 148:7,10,25 150:2,9 155:9,11 156:2 158:1,19, 22 159:1,14 161:18,19, 22 163:16

**quickly**
140:15

**quite**
68:19

**quo**
66:9

---

**R**

**R.T.**
10:19 100:4,6 103:6 104:1 108:14,15

**raising**
132:9

**raw**
111:1,3,5 113:14 119:15, 16 137:7

**read**
9:25 10:1 55:22 58:18 66:16 88:17 92:5,9,11 101:10

**reads**

83:9

---

**real**
119:10,23

**really**
17:12,18 20:18 24:15 31:5 32:9 48:4 49:7,9 58:4 93:23 116:22,23 118:6 126:6 129:10 139:17 161:17

**reason**
13:10,18 14:2 22:11,15 46:25 49:10 91:14 97:25 107:16,22,23 120:3 124:19 137:18

**reasonable**
36:1

**reasonably**
60:22 71:1

**reasons**
22:18 79:25 133:20 161:24

**recall**
10:3,5,6,9,12,13,14,16 19:2,4,16 24:20 29:17 30:12 49:7,9 63:17 64:9, 10 66:3 67:4 79:22 87:21 93:16 103:16 129:11,12, 19 131:22 132:19,20,24 133:4 136:19 138:24 141:3 151:19,20,21 153:18 160:4,11 163:6

**receive**
35:20 36:22 37:10 47:22 68:22 70:5 154:3 162:3

**received**
21:1,11 33:6 39:24 40:16 41:12 66:20 67:18,21 68:8,21 127:1 133:16 139:4 140:12 154:24,25

**receiving**
27:25 41:25 61:20 69:2

**recess**
85:9 122:14 155:22

**recognize**
11:12 51:22 95:15 140:2 141:2,17 145:10,13,17, 22 146:1,5,9

**recollect**
128:18 132:2

**recollection**
62:20 93:13 101:6
102:12,16 113:20,24
121:21 129:21 131:22

**recommend**
70:23

**recommendation**
147:20

**recommended**
107:5

**record**
6:2 54:15,16 71:24 72:13
85:7,11 92:11 99:10
113:12 122:11,12,16
151:12 155:20,24 162:1
163:19

**recorded**
6:3

**records**
98:20 106:8 151:2,3,15,
18,21,24,25 152:3

**recover**
120:4 129:24

**recovered**
134:19

**recovery**
130:3,13

**refer**
57:23 121:6

**reference**
96:18

**referenced**
56:3 60:3 69:3

**references**
111:22

**referred**
14:10 120:23 157:12
158:15

**referring**
56:10 96:2

**refresh**
40:4,20 101:5 102:12,15
113:20,24 121:21

**refreshed**
40:23

**regard**
35:13 132:20 148:11

**regarding**
15:4 18:21 25:6,21
33:21,25 52:8 56:18 57:1
60:24 84:10,12 92:21
98:17 109:11 123:3,5
131:16,25 135:12 142:18
146:25 149:8,11,16
150:10 154:8 161:12

**Reindel**
7:5 156:3,13 157:16

**reiterate**
127:17

**relate**
32:10,16

**related**
161:13

**relating**
32:7 40:8,10,11 64:14
74:22 140:24 160:17

**relation**
146:20

**relationship**
19:5,7,9,23 28:13 90:5
104:15 132:16

**relationships**
29:13

**release**
101:8,13 105:22 106:5
139:24 140:12,24 141:22

**releases**
23:25 24:5,6 101:21
106:3

**relevance**
22:25 23:3

**relevant**
35:12 69:18 80:17

**relied**
71:1 86:10

**relies**
27:6,17 28:17 53:25 56:6
72:1

**rely**
49:24 60:15 146:16,19

**relying**

15:7 60:22 89:20

**remember**
28:9 29:22 40:5 63:11
66:21,22 78:3 82:24
87:24 103:11 104:24
108:12,15,16 109:17
115:12 139:7

**removal**
110:15

**remove**
112:20,23

**rep**
33:8 91:15 118:1

**repeat**
13:24 29:10 38:4 45:12
47:9 50:9

**replace**
75:6

**reporter**
7:7,8 92:5

**represent**
6:12 8:6 9:6 98:14
159:20

**representation**
14:3,12,14,17 15:15 26:7
42:21,22,24

**representations**
14:5,25 15:18,19,20,25
25:6 61:8 71:3 88:23
91:9

**representative**
8:1,5 11:9 18:3,4,5 19:6
24:22,23 26:1 28:2 31:3
34:25 35:6 37:17 39:9
41:15,24 43:22 57:22
60:1 61:2,15 67:6 88:21
91:12 94:4 114:25
115:24 116:12 117:21,22

**representatives**
28:11 34:3 38:6 63:23
64:3 69:4 127:9,14

**represented**
14:7,9 19:2,21 28:22
29:7 73:4 88:20 114:20

**representing**
6:14 31:4 36:15

**represents**

20:1

**reps**
63:25 64:8

**request**
83:12 84:3 86:5 127:18

**requested**
92:11 152:13

**requirement**
127:20

**reserve**
161:23

**reserved**
163:21

**reside**
158:9

**residences**
86:21,25

**resides**
158:10

**resolution**
141:5

**resolve**
98:22 99:7

**resolved**
147:17 149:15 150:12

**respect**
10:17 31:24 37:6 58:12
67:5 76:11 86:17 129:16
153:24 156:10 157:13
163:14

**respond**
27:10,20 28:20 43:14,16
56:8 72:4 77:19 79:8
89:25 92:8 133:25

**responding**
86:12 153:7

**response**
84:1 85:15

**responses**
83:3 109:23

**responsible**
49:21 53:13,20 55:5
67:14

**responsive**
83:12 84:3

**rest**
140:13

**restored**
66:9

**result**
89:1

**retained**
160:16,20,24

**retaining**
144:22

**retired**
160:12,13

**return**
66:6,13

**returned**
66:17

**reveal**
54:4

**revealing**
27:9,11,19 29:9 30:16
34:9 54:2 56:8 72:3
89:24 92:23

**review**
40:2,6 41:20 51:24 57:19
58:21 60:13 69:23 70:7,
15 82:8,9 85:19 122:23
124:9 140:8 152:11,23
153:5 157:9

**reviewed**
41:5,16,18 51:20,21
55:9,15 58:7 69:20 82:11
83:22 93:18 126:7 136:3
151:5,6 152:13 157:11

**reviewing**
58:12 60:13

**revise**
101:9

**rife**
117:5

**right**
9:22 16:7,16,18 19:8
20:17 25:4 30:22 32:21
37:18,20 42:10 43:1,2,
11,20 52:9,11,13 58:15,
17 60:20 68:7 70:10,20
73:9 74:2 76:4 77:5,7
78:7,8,9,11,13,15,17

80:3,14 81:3,7,8,12 86:8
87:4 88:2,4,6 90:7 95:11,
12 99:9 102:12 104:1
105:16,20 107:2 108:13
110:11 111:14 112:5,6
114:11 117:3,6 119:17
121:18 123:10,18 131:21
133:13 136:10,25
140:13,17,19,21 141:12
142:21 151:9 161:18
162:7,20

**Robert**
112:11

**role**
11:9 41:23 43:21 160:1

**room**
39:21

**roughly**
98:12 139:13

**Rule**
87:19

**ruled**
159:4

**rules**
7:18 22:5,9,15

**run**
150:3

---

**S**

**Sam**
96:14 105:14,21

**Sarah**
7:7

**savvy**
133:2

**saw**
82:3 133:17 157:9

**saying**
10:12 12:1,2 24:25 29:3
115:17 116:7 117:23
130:6 151:19 152:12

**says**
58:1 59:15 60:21 61:14,
16 65:9 66:5 73:8 74:5,
12,19 76:3 84:2 88:13
96:21 98:18 102:9
105:24 106:7,10,15

108:5,10,21 110:3 111:9
112:17,23 114:14 115:21
120:13 121:11 131:19
137:6,18,19,24 138:4

**scheme**
62:11,19 63:2

**scope**
133:24

**search**
32:14

**second**
12:10,21 51:18 54:24
55:2 58:13 83:9 84:1
96:17 102:5 109:7 114:8,
14

**see**
32:15 46:9,10 47:3,11
53:16 58:22 61:5 62:14
65:2,11 71:4 73:9,18
74:7 75:10 77:2 80:17
81:8,25 82:2,5 83:24
84:4 85:17 88:15 89:11
96:5,15,18,19 97:1,9,11,
14 99:2,15,18,25 100:2,
4,10,14,24 101:5,19
102:3,7,10 104:24
106:10,16,17 109:1,3
110:11,18 111:7,12
112:8,15 113:2,18
114:23,24 115:20 116:22
117:20 118:6 119:20
120:25 121:16 123:12
124:13 126:2 128:2
133:6 136:16 137:10
138:2,5 139:25 140:3
142:4,12 143:4,13,17,21,
25 144:5,10 146:12
160:3 162:4,6

**seeing**
132:24 136:19 159:25

**seeking**
13:14,18,25 14:1,6 16:1,
8,14,19,23

**seen**
87:20 101:1 136:18

**sent**
123:16 162:1,2,14,24
163:1,4

**sentence**
53:5 54:17 56:17 57:6

60:21 61:12,16,23 64:19
66:5 70:22

**separate**
93:20 137:3

**separately**
108:25

**September**
136:13 141:19

**serve**
101:25

**service**
82:6

**set**
22:19 61:3 81:23 109:17

**settle**
35:1,3,8 36:21 37:8,9
38:23 39:15 77:9 83:20
147:1,21

**settled**
38:7 66:3 72:25 77:6,10,
16,23,25 78:20,24 79:17,
24,25 80:13 84:10 85:3
106:8 114:1 135:5
139:17 148:2

**settlement**
34:13,16,18 36:1,6 37:13
39:4 43:23 53:12,19 55:4
56:19 57:17 59:17 61:19,
25 64:24 65:5 66:7,9
71:10 72:15 73:1,17,22
100:22 102:20 105:19
107:5,14,24 108:5,10,22
123:4 125:10 133:22
141:15,16 142:19 143:2,
7,16,20,24 144:9,12,13
145:9,17,21,25 146:4,8,
21,22,23,24 147:6 149:8
153:9,19,24 161:16

**settlements**
23:8,11,12 24:4,19 35:13
38:15,17 59:1 66:24
70:23 72:19,23 73:5 78:6
133:13,23 134:6,10,11
144:20,21 146:15,17,20
147:10,14 149:12,16
150:10,19 154:2

**settling**
66:23 76:25 78:12 79:2
101:16 102:2,13 107:16
109:17 148:6,9

**seven**
102:1,13,20 103:8,21
104:19,23 109:18 111:3,
5 112:19 114:1 123:4
125:10

**severity**
98:2

**short**
94:23

**shouldn't**
118:13

**show**
30:25 39:23 47:1 78:19
81:2 109:7,10 123:1
134:25 136:7

**showing**
51:17 103:4 113:13

**shown**
41:8

**sign**
23:23 24:5 82:13 85:23

**signature**
163:21

**signed**
23:24 24:1 83:2 140:4
142:14

**significant**
113:16 137:4

**signing**
82:24 140:6

**similarly**
73:14 74:12

**sisters**
124:4 158:10

**sit**
10:14 16:25 17:20 18:6
36:19 37:7 39:13 77:13
91:12 105:3 107:15
130:9 135:16 153:20

**situated**
73:15

**situation**
115:23 150:4

**six**
125:17

**Sloane**
7:5 156:4,17,24 157:5,20

**Sloane's**
157:8

**slow**
39:19

**soapstone**
120:14 121:15

**Soapstone/talc**
112:7

**somebody**
13:3 38:19 44:7 50:23
59:7 61:11 80:18 91:13
117:7 124:8

**somebody's**
29:7

**soon**
101:21 133:11

**sorry**
39:19 83:15,16 88:11
119:3,5 124:25 143:12
145:3 150:17

**sort**
68:24 78:4

**sorted**
130:16 134:1

**sought**
20:5

**sound**
20:17

**source**
15:7

**Southern**
103:7 105:4,7 108:16
109:11 112:21,24 113:4,
7,15,21,25 114:4 117:4

**Southern's**
117:2

**speak**
18:21 150:15

**speaking**
21:23 22:12 130:19

**specific**
37:10 39:15 62:17 148:7,
10 150:2 151:20

**specifically**
9:19 30:19 63:19 64:16,
18 66:2 68:4 101:18
108:10

**specification**
112:19

**speculate**
161:9

**speculation**
46:7

**speculative**
47:3 48:11

**spelled**
158:4

**spite**
60:13

**spoke**
18:19 25:20

**spoken**
18:18 28:6

**spoliation**
64:21 74:13 75:9

**spot**
81:15

**spouses**
108:23

**St**
108:17

**staff**
152:14

**Standard**
101:11

**start**
33:7 48:10 76:11 83:8,17
123:9 155:13

**started**
93:12

**starts**
56:22

**state**
30:6 54:15

**stated**
22:11 39:2 42:17

**statement**
121:7 137:2 138:15

**statements**
16:20 17:9,23 74:24
89:3,8

**states**
6:5 113:14 137:1

**stating**
54:11

**status**
66:9

**steam**
110:7

**step**
58:5

**stipulate**
121:12

**stipulated**
121:11

**stipulating**
129:5

**stop**
71:16 72:9

**stops**
48:9

**Subject**
83:10 88:17

**submission**
82:12 92:17

**submissions**
22:19 135:17

**submitted**
23:15 135:22 138:20

**substance**
32:18 64:12

**substantive**
47:8

**succinctly**
22:11

**sued**
46:4 47:23 48:7 49:20
50:23 65:15 139:16

**suffered**
75:14,18

**suggesting**
72:9

**sum**
35:9 36:21 37:9,11 39:15

**Summary**
109:24

**summer**
39:15

**Summit**
142:17

**supplied**
113:15,22

**supplier**
61:19 112:25 121:14

**suppliers**
53:14,21

**supposed**
7:10 152:18

**supposition**
39:2 117:19

**sure**
13:25 16:4 20:11,16,24 21:5 24:2 29:11 32:19 36:14 38:5 45:13 50:11 63:17,24 64:13 69:6 75:24 86:3 87:21 93:23 124:3 137:17 138:10,11 139:12 155:18 157:3 160:22,23

**surprise**
107:8

**surprised**
107:3,12,13

**surrounding**
65:5

**swear**
7:8

**sworn**
7:19

**system**
32:20 68:24 69:5,13

——————————
          **T**
——————————

**T-a-l-c**
120:23

**take**
30:13 31:6 35:21 38:17

51:6 65:25 70:15 81:17, 19 85:6 94:11 123:21 125:24 155:17 157:22

**taken**
19:4 65:1,6,9 85:9 89:1 122:14 155:22

**takes**
90:21

**talc**
9:8,16 10:7,10,11,15 11:13,14,18,24 12:1,3, 14,24 13:2 14:8 15:1 25:6 44:8,15 46:18,22 60:24 61:1,19 64:23 77:23 78:1,20,21 79:1,4, 5,6 80:3,9,14,18,21,24 89:4,5,9,10 96:25 97:4 98:14,22 99:3 100:10,22 101:12 102:1,13,20 103:5,7,8,12,13,14,15, 17,21 104:2,19 105:4,7, 8,19 106:15,18,19 107:6, 7,16,17,24 108:11,12,16, 18 109:11,14,18,20,21 111:21 112:13,19,21,22, 24,25 113:4,5,6,15,16, 22,23,25 114:4,5,22 115:3,4,18,20,25 116:9, 10,18,20 117:2,4,7,11,18 118:2,3,11,12 120:14,16, 23 121:23 125:10 137:12 149:23

**Talc/soapstone**
111:9 112:9

**talcum**
120:15,20

**talk**
50:3,5 53:4 57:17,24 59:7 60:6,7 87:13 102:22 122:1 126:12 135:4 140:7,9

**talked**
42:24 84:6 86:21 93:11 115:10 156:5

**talking**
25:24 43:19,21 46:11 50:2 59:9,11 75:22,23 96:8 107:13 117:24 120:20,21 150:15

**talks**
55:10 110:24

**tanks**
110:8

**telephone**
7:14

**tell**
9:15,19 31:17 64:13 127:20 133:15 134:18 140:5 151:25 152:4 158:2

**tells**
35:15

**term**
72:14 78:5

**terms**
11:9 12:22 15:11,23 27:1 28:5 34:22 41:23 42:9 51:5 57:20 68:10 75:25 79:15 86:8,12 97:23 102:19 128:21 130:12 132:15 146:15 153:19

**testified**
7:20 10:3 76:24 112:13

**testify**
93:3

**testifying**
93:8

**testimony**
122:20

**thank**
101:8 124:11 159:10

**Thanks**
155:19

**there's**
20:9 35:15 45:16 59:16 70:21 71:18,20 80:25 96:18 98:12 113:4,5 125:17 137:12

**they're**
8:22 36:14 45:24 69:12 70:6 81:12 95:3 117:17 124:2,3 129:6

**thing**
35:24 78:4 84:22

**things**
40:5 42:9 86:25 126:1 129:25 149:9

**think**
9:8 11:3,6 13:9,12,14 17:25 19:4 28:10 33:4 35:7 37:21,24 38:5 42:11,17 43:11,18 44:10 45:7,11,20,25 46:4,12, 18,20 47:3,21 49:10 50:13,15,19 51:2,19 59:6 61:7 70:4,6,9 76:13 78:25 79:2 80:21,22,24 81:12,16 84:6,22 86:6 89:13 90:11 91:14 95:1, 3,25 97:19 107:15,19,23 114:11 115:2 116:17 117:9 118:1,4 124:2,3 126:7 129:14 130:15 136:7 157:11 158:15 159:25 160:24

**thinking**
50:7

**Thomas**
7:11 61:3,15 88:13 159:20,23

**thought**
75:20 150:9

**thousand**
148:2

**three**
20:12 21:6 28:10 40:18, 23 41:11,18,19 51:20 98:12 99:8

**time**
6:8 18:16 25:20 41:12 58:18 62:1 63:1,15 67:14,16 68:23 75:22 80:8,10 82:4 85:8,11 90:20 111:2 122:3,13,16 127:1 142:24 146:21,22, 23 155:21,24 158:19 160:10 161:2,19,23

**times**
68:22

**timing**
126:1

**Tire**
97:12

**today**
6:10,16 7:7 10:14 16:25 17:21 18:6,18 36:19 37:7 39:13 40:20 77:13 91:12

MARILYN HOLLEY - 04/05/2017                                    i23

105:3 107:15 130:9
135:16 152:21 153:7,20
154:23 155:2,5 158:20
163:17

**today's**
6:9 41:6

**told**
9:20 11:13,14,15,18,22,
24 12:1,24 13:2 25:14
26:21 33:2 34:16,21,25
64:16,17 79:11 80:1
89:15 154:1

**Tom**
19:3,21 56:25 62:13
101:21 114:14 136:15

**top**
31:17 123:4 134:21

**topic**
65:7 126:25

**topics**
155:6

**total**
101:16 102:14 107:7

**totally**
21:19

**track**
162:12

**Travelers**
140:25

**tremolite**
113:17

**trial**
65:1,6,10,16,21,23,25
66:4

**trouble**
115:16

**true**
15:5,13 16:17,21,22
33:13 47:14 84:15 89:13
91:11 98:10 135:19,25
136:4 138:17,19

**trust**
23:17 24:1,3 90:9 108:6
133:23 135:18 139:11,24
141:14,23 142:3,8

**Trustee**
108:17

**trusts**
23:15 135:4,6,13,22
138:21 139:1,13

**Truth**
23:21

**truthful**
23:19,20,21 26:7,10,13

**try**
54:7 90:2 91:6 94:22
95:7 150:18

**trying**
49:15 109:19 149:7
152:25 154:6

**Tunis**
7:9,11 159:13,17,20
162:14 163:13

**turn**
52:24 60:21 73:7 74:2,17
88:7 96:17 100:17 102:5
103:1 105:12 108:3
109:22 110:3 113:8,9,11
119:5 120:8 121:6
133:13 136:24 137:21

**Turning**
62:8 64:19 114:8

**two**
21:6 30:15 63:4,6,18
79:1 102:17 148:1 155:1

**typical**
74:5

---

**U**

**Uh-huh**
47:17 53:1 63:9 73:10
76:10 83:25 85:22 88:14
96:10 99:5,22,24 101:24
105:18 106:14 109:5
110:2 112:4 116:14
120:12 124:12,15,17
136:14 140:1 141:1
142:5,21 143:14 157:1
159:11

**Uh-uh**
87:5

**underlying**
55:18 61:24 64:15 68:11
74:23 75:4 76:8,12 79:15
83:21 84:10,11,12,24

87:9 91:8 108:1 126:6

**understand**
8:1 9:20 23:17 32:12
39:3 48:2 55:23,24 56:1
58:3 97:22 127:19
128:23 129:1 130:6
135:16

**understanding**
8:4 19:17,19 45:14 47:7
48:3,20 50:21 59:22 71:9
77:8,10 78:23 79:21 80:6
97:25 102:19 108:1
115:1,16 128:9,20,22
129:23 132:22 149:20,
24,25

**understands**
91:8

**understood**
78:5 79:16 119:22
149:18

**unequivocally**
30:7 64:10 82:25

**uninvolved**
51:13

**United**
6:5 142:7

**urge**
101:14

**use**
155:16

**useful**
82:21

**usually**
67:23

---

**V**

**validity**
159:4

**value**
76:21 141:16

**Vanderbilt**
10:19 100:4,6 103:6
104:2 108:15

**various**
21:19 22:19 66:24 68:10,
22 120:5 146:15

**verification**
82:14,17,24 83:6 85:23
86:2 163:8,10,11

**verifications**
82:23 83:2 133:8 154:24
162:1,5,19

**versus**
6:4

**victim**
62:10 117:10

**video**
6:2,8,9

**VIDEOGRAPHER**
6:1 7:6 85:7,10 122:12,
15 155:12,20,23 163:18

**view**
53:12,19

**vis-a-vis**
24:6

**voluntarily**
61:17

**voluntary**
103:5

---

**W**

**W-o-o-l-r-i-d-g-e**
158:13

**wait**
159:1

**waiting**
106:3

**waiving**
83:10

**Walker**
142:24

**want**
11:10,11 22:7 26:4 38:23
42:7 45:4 47:2 49:22
50:9,24 51:4,5 61:11
91:15 94:25 109:7
116:10 121:6 153:4
163:8

**wanted**
24:13 55:23 57:15 59:5
73:24

**Ware**
73:14

**wasn't**
49:20 83:14 124:20
125:1,16

**way**
9:1 11:5,17 18:25 26:24
32:7 46:3 47:10 48:7
50:6,7 51:24 66:16,23
67:5 70:1 72:24 90:2
91:6 93:12 101:1 107:11
111:18 116:24 139:9
144:12 153:8

**we'd**
32:14

**we'll**
23:13 46:20 81:1,19 85:6
125:23 126:11 133:10

**we're**
6:1 7:10 9:23 12:19
54:24 77:2 91:2 94:22
96:7,11 107:13 109:6,19
117:24 122:5,15 144:22
150:8 153:21 155:23
158:21,25 163:18

**we've**
91:6 127:18 152:19,20
154:25 158:23

**week**
66:4 114:15

**weeks**
100:16 102:17

**weren't**
34:23,25 64:2 115:12
158:25

**what's**
8:4 9:10 19:17 26:20
34:9,10 51:17 55:3 57:15
75:21 82:13 97:25 129:3

**White**
112:21,24

**who's**
35:16 91:13

**William**
7:4

**Williams**
6:4,15 13:9 19:10 25:16
29:18 37:6 40:11 58:12

88:5 92:22 93:22 129:9,
16 132:16 153:8,20,25
159:21

**willing**
35:16 66:6,13 93:3 127:5

**withdrawn**
9:19 14:22 18:7 27:24
28:4 34:8 36:25 38:20
39:12 48:17,19,25 50:16
52:15 57:21 58:11,24
59:12 64:5 65:13 67:5
73:3 80:10 81:21 83:16
84:8 86:11 97:19 112:22
127:12 133:1 134:16
139:9

**withholding**
74:21

**witness**
13:23 17:16 22:9,13 23:2
43:15 65:20 72:10 87:16
90:22 94:13 144:23
148:15,17 158:23 159:15

**witnesses**
87:2

**won't**
64:9 82:25

**Woolridge**
158:13

**words**
32:17 56:9 64:12

**work**
96:24 97:3 124:7

**work-product**
148:16,22 149:7

**worked**
9:4,11 44:14,17 45:4
77:4 110:20

**working**
97:15 160:10

**works**
117:7

**wouldn't**
37:23 45:6 69:19 90:14
91:15 94:7 104:8 119:4
137:15 138:10 150:3
153:14

**write**

137:2

**writing**
93:21 132:25

**written**
19:14 26:20 93:7,13
119:17 127:14,19 128:12
132:17,19 150:22

**wrong**
26:23 46:25 47:1,23 48:7
50:2,24 70:9 151:11
156:9

**wrongdoing**
156:13,17,21

___

**Y**

**yea**
87:24

**yeah**
17:16 29:25 35:4 44:14
48:18 63:9 69:7 75:16
81:16,18 95:3 100:7
118:13 128:7 130:21
131:13 148:17 151:9
154:17

**year**
82:7

**years**
30:3 31:18,20 32:21 71:7
76:25 90:3 91:14 95:19
97:14,20 112:19 117:8
120:4 133:3 134:14
151:23

**yep**
83:19 88:10 104:22
119:7

**yesterday**
18:11,19 39:20

**yet alone**
126:8

**you'd**
15:12 140:16

**you'll**
69:25

**you're**
8:1 13:10,14 15:7 16:1,
14,19 17:2 18:4 22:11
23:1 24:13 28:18 35:7

37:17 43:19 46:11,12
59:9 66:13 79:2 89:20
116:7 117:21 120:20
129:24 130:6,18,25
131:5 147:10 149:6,10
150:15 152:22,25 153:11
154:6

**you've**
32:20 36:19 37:7 47:13
49:2 50:23 65:15 66:14,
24 67:6,14,18 76:24 83:2
90:2 91:7 93:2 95:18
120:4 125:19 133:2,16
134:13,18 138:20 139:4
151:22 156:6,11,15,20