Exhibit X

DONNETTE WENGER - 03/12/2018

```
 1        IN THE UNITED STATES DISTRICT COURT

 2         FOR THE DISTRICT OF NEW JERSEY

 3

 4  KIMBERLEE WILLIAMS,     ) CASE NO. 2:11-CV-01754
    et al.,             ) (JLL)(JAD)
 5                   )
         Plaintiffs,   )
 6                   )
    versus             )
 7                   ) CONTINUED DEPOSITION OF
    BASF CATALYSTS, LLC,     )
 8  et al.,             ) DONNETTE WENGER
                   )
 9       Defendants.    )

10         - - - - - - -

11            Volume II
           - - - - - - -

12

13     Continued Deposition of DONNETTE WENGER, a

14  Plaintiff herein, called by the Defendants for

15  Cross-Examination pursuant to the Federal Rules of

16  Civil Procedure, taken before me, the undersigned,

17  Anika W. Patrick, a Registered Merit Reporter,

18  Certified Realtime Reporter and Notary Public in and

19  for the State of Ohio, at the offices of Thompson Hine,

20  LLP, 3900 Key Center, 127 Public Square, Cleveland,

21  Ohio, on Monday, March 12, 2018, at 9:03 a.m.

22

23

24

25
```

DONNETTE WENGER - 03/12/2018     Pages 193..196

Page 193

1  APPEARANCES:
2
    On Behalf of the Plaintiffs:
3
      William L. Kuzmin, Esq.
4     Cohen, Placitella & Roth
      127 Maple Avenue
5     Red Bank, New Jersey 07701
      732.747.9003
6     wkuzmin@cprlaw.com
    - - - and - - -
7     Eric S. Pasternack, Esq.
      Two Commerce Square
8     2001 Market Street, Suite 2900
      Philadelphia, Pennsylvania 19103
9     215.567.3500
      epasternack@cprlaw.com
10
11   On Behalf of the Defendant BASF Catalysts, LLC:
12     Peter A. Farrell, Esq.
       Elizabeth Dalmut, Esq.
13     Kirkland & Ellis, LLP
       655 Fifteenth Street, Northwest, Suite 1200
14     Washington, D.C. 20005
       202.879.5000
15     Peter.farrell@kirkland.com
       Elizabeth.dalmut@kirkland.com
16
17   On Behalf of the Defendants Cahill Gordon &
     Reindel, LLP, Howard G. (Peter) Sloane, and Ira J.
18   Dembrow (Via Telephone):
19     Anthony Vale, Esq.
       Pepper Hamilton, LLP
20     3000 Two Logan Square
       Eighteenth and Arch Streets
21     Philadelphia, Pennsylvania 19103-4750
       215.981.4000
22     valea@pepperlaw.com
23
24
25

Page 194

1  APPEARANCES (Continued):
2
    On Behalf of the Defendant Thomas D. Halket: (Via
3   Telephone):
4     Eric Tunis, Esq.
      Herold Law, PA
5     25 Independence Boulevard
      Warren, New Jersey 07059
6     908.647.1022
      Etunis@heroldlaw.com
7
8   On Behalf of the Defendant Arthur Dornbusch (Via
    Telephone):
9
      John A. Boyle, Esq.
10    Marino, Tortorella & Boyle, PC
      437 Southern Boulevard
11    Chatham Township, New Jersey 07928
      973.824.9300
12    Jboyle@khmarino.com
13
14    - - - - - - -
15
16
17
18
19
20
21
22
23
24
25

Page 195

1              I N D E X
2
3  EXAMINATION BY              PAGE
4  Mr. Farrell            200
5
6  PLAINTIFF'S EXHIBITS MARKED
7  None
8
9  DEFENDANT'S EXHIBITS MARKED/FIRST REFERENCE   PAGE
10  43,  Deposition Transcript of Jennifer Graham,
        Dated July 3, 2008                 286
11  62,  Deposition Transcript of Donnette Wengerd,
        Dated April 6, 2017            202
12  63,  Plaintiff Donnette Wengerd's Supplemental
        Answers to BASF Catalysts LLC's First Set
13      of Interrogatories            260
14  64,  Plaintiff Donnette Wengerd's Response to
        BASF Catalysts LLC's Second Set of
15      Interrogatories            268
16  65,  Attorney Agreement        271
17  66,  Graham/Wengerd Settlement Payments    274
18  67,  A-Best Release            274
19  68,  APG Release            274
20  69,  AWI Release            274
21  70,  AWI Increase            274
22  71,  B&W Release            274
23  72,  Celotex Settlement Entry    274
24  73,  Celotex Release            274
25  74,  H-W Release            274

Page 196

1              I N D E X (Continued)
2  DEFENDANT'S EXHIBITS MARKED/FIRST REFERENCE    PAGE
3  75,  Fiberboard, U.S. Gypsum Settlement Entry   274
4  76,  Garlock and OI Settlement Entry      274
5  77,  Garlock Release            274
6  78,  Garlock Sealing Check        274
7  79,  General Electric Release        274
8  80,  Goodrich Settlement        274
9  81,  Halliburton Settlement Entry      274
10  82,  JM and Goodrich Settlement Entry      274
11  83,  Johns Manville Check        274
12  84,  Kaiser Check            274
13  85,  Kaiser Release            274
14  86,  Mahoning Valley Supply Check      274
15  87,  Mahoning Valley Supply Settlement Entry   274
16  88,  National Gypsum/Armstrong Settlement Entry  274
17  89,  Owens-Corning Settlement Entry      274
18  90,  Owens-Corning Settlement      274
19  91,  OC Release            274
20  92,  OC Increase Check        274
21  93,  FB Release            274
22  94,  OI Check            274
23  95,  Plibrico Release            274
24  96,  Raytech Settlement Entry        274
25  97,  TN Release            274

DONNETTE WENGER – 03/12/2018      Pages 197..200

Page 197

1    I N D E X (Continued)
2  DEFENDANT'S EXHIBITS MARKED/FIRST REFERENCE    PAGE
3  98, Travelers Release                   274
4  99, Travelers Check                     274
5  100, TN Settlement                      274
6  101, Full and Final Release, OC              274
7  102, USG Release                        274
8  103, Database of Cases                  284
9  104, Plaintiff's Brief in Opposition to Motion
      for Summary Judgment Filed by RT
10     Vanderbilt, Inc.                     289
11  105, E-Mail Chain                      299
12  106, Case Information                  299
13       - - - - - - -
14
15
16
17
18
19
20
21
22
23
24
25

Page 199

1  her right to assistance of counsel in those
2  lines of questioning.
3      MR. FARRELL:  This is Peter Farrell for
4  BASF.  Let me just say in response to
5  Mr. Kuzmin's comments that the Special
6  Discovery Master entered an order granting in
7  part BASF's motion for sanctions based on the
8  last deposition.  That order provided for the
9  no contact provision Mr. Kuzmin is referring
10  to.  No appeal was taken by the Plaintiffs
11  from that order.
12      It was then later a motion for
13  reconsideration filed concerning specific
14  objections that had been raised at the last
15  deposition.  The Plaintiffs filed that motion
16  for reconsideration, then withdrew the motion
17  for reconsideration and agreed that the
18  deposition can go forward today without the
19  reassertion of those objections.
20      So BASF and, I assume, the remaining
21  Defendants obviously disagree with
22  Mr. Kuzmin's position, but we both stated our
23  positions on the record.
24      MR. KUZMIN:  Fair enough.  And I would
25  have one request, Mr. Farrell, given that

Page 198

1      MR. KUZMIN:  Good morning.  This is Bill
2  Kuzmin from Cohen, Placitella & Roth.  I'm
3  here today on behalf of Ms. Wengerd.  Our
4  office understands the ruling of the Special
5  Master in this case.  Take a quick interlude.
6      (Discussion off the record.)
7      MR. KUZMIN:  Getting back to what I had
8  started to say, we understand the ruling of
9  the Special Master as it pertains not only to
10  questions relating to those that were
11  objected to when Ms. Wengerd was not allowed
12  to answer in her last deposition on the basis
13  of privilege, but also the ruling that other
14  questioning may take place of Ms. Wengerd
15  outside of those areas.
16      Keeping in line with the Special Master's
17  ruling that we were not allowed to have any
18  conversation with Ms. Wengerd in order to
19  prep her for today's session, we would just
20  respectfully object to the questioning that
21  would take place outside of those areas for
22  which privilege was asserted, because it
23  would be our position that she did not have
24  an opportunity to meet with counsel
25  beforehand and therefore has been deprived of

Page 200

1      Ms. Wengerd's original deposition was back in
2      April and that we have not had an opportunity
3      to meet with her, prep her for this session,
4      that you would be so kind as to give her the
5      ground rules again of a deposition,
6      specifically related to if she doesn't know
7      an answer, you need to take a break, things
8      of that nature.
9          MR. FARRELL:  Sure.  I would be happy to
10     do that.
11         MR. KUZMIN:  Thank you.
12         MR. FARRELL:  Mrs. Wengerd, are you ready
13     to go?
14  WHEREUPON,
15         DONNETTE WENGERD,
16     after being first duly sworn, as hereinafter
17     certified, testified as follows:
18         CROSS-EXAMINATION
19  BY MR. FARRELL:
20  Q.  So you heard Mr. Kuzmin, your counsel, just refer
21     now to the ground rules of how these things work.
22     You and I were together nine months or whatever it
23     was ago?
24  A.  Uh-huh.
25  Q.  I know you've done at least one of these before,

DONNETTE WENGER - 03/12/2018       Pages 201..204

Page 201

1  but you appreciate what's going to happen here.
2  I'm going to ask questions.  Your obligation is to
3  respond to them as truthfully and accurately as
4  you can.  If you don't understand a question I've
5  asked you, I'm going to assume you've understood
6  it unless you told me you didn't understand what I
7  asked.  So if you're confused about something,
8  please say so, because otherwise, when you respond
9  to the question, we're going to assume that you
10  understood what I said.
11  A.  Understand.  Okay.
12  Q.  As Mr. Kuzmin said, we can take breaks over the
13  course of the deposition.  So if you need to take
14  a break at any point, just let me know.  Okay?
15  A.  Okay.
16  Q.  Any questions about any of that?
17  A.  No.
18  Q.  Any reason you can't give truthful, complete
19  testimony today?
20  A.  No.
21  Q.  Now, you and I were together last April for your
22  deposition in this case, the Williams case.  Did
23  you review the transcript of that deposition,
24  your --
25  A.  No.

Page 202

1  Q.  -- April 2017 deposition?  Can we mark this?
2  MR. KUZMIN:  I don't mean to cut you off.
3  Ms. Wengerd should be advised she's still
4  under oath from last time, unless you want to
5  swear her in again?
6  MR. FARRELL:  Yes.  I thought she was
7  sworn.
8  THE COURT REPORTER:  She was sworn in.
9  MR. KUZMIN:  I apologize.
10  MR. FARRELL:  I couldn't figure out if I
11  needed the extra cup of coffee or if you
12  needed the extra cup of coffee.
13  Could you mark this as DX62?
14  (Whereupon, Defendant's Exhibit 62 was
15  marked for identification.)
16  Q.  Mrs. Wengerd, I've handed you what I've marked as
17  Defense Exhibit 62, which is the transcript of
18  your last deposition, April 6, '17 in the Williams
19  case.  Did Plaintiffs' counsel provide you with a
20  copy of this transcript shortly after that
21  deposition?
22  A.  No.
23  Q.  So you haven't had an opportunity to review it?
24  A.  No.
25  Q.  After the deposition last time, did you leave

Page 203

1  there thinking there was anything that you had
2  said that was inaccurate or needed to be corrected
3  in any way?
4  MR. KUZMIN:  Object to form.  You can
5  answer it.
6  A.  I don't think so.
7  Q.  As you sit here today, are you aware of any
8  testimony you gave in your April 6th, 2017
9  deposition that would need to be corrected in any
10  way?
11  A.  Not that I'm aware of.
12  Q.  What did you do to prepare for today's deposition?
13  You can set that document aside for a second.
14  A.  I did briefly just go over some of the previous
15  information that was sent to me about when the
16  case was originally filed to familiarize myself
17  with some of the names that were questioned about.
18  That's all.
19  Q.  That's all?  What previous information did you
20  review?
21  A.  There were some names that were asked about that I
22  either couldn't remember or didn't know, so I
23  tried to make myself a little bit more familiar
24  with the different names of people or testimony
25  that was asked of me about.

Page 204

1  Q.  Well, which -- withdrawn.
2  Which documents did you review in
3  preparation for your deposition?
4  A.  I believe it was the original filing.
5  Q.  You say "the original filing."  You mean the
6  complaint in this case?
7  A.  Yes.
8  Q.  Other than the complaint in this case, did you
9  review any documents to prepare for your
10  deposition today?
11  A.  No.
12  Q.  When did you review the complaint to prepare for
13  today's deposition?
14  A.  Not long after we last met, which was nine months
15  ago.
16  Q.  Okay.  So what I'm trying to get at is whether you
17  looked at any documents to prepare for your
18  deposition today.
19  A.  No.
20  Q.  Did you do anything to prepare for your deposition
21  today as opposed to the last one?
22  A.  Nope.
23  Q.  Did you speak to anybody about the fact that you
24  were being deposed today?
25  A.  I was only notified by my attorney.  That was the

DONNETTE WENGER - 03/12/2018     Pages 205..208

Page 205

1  only thing that I had communication or prepared
2  about is where to show up.
3  Q.  Who told you where to show up?
4  A.  It was sent to me in an e-mail, and it was an
5     attachment to an e-mail for the address that was
6     in that.
7  Q.  Okay.  Did it say anything else?
8  A.  No.
9  Q.  Who sent the e-mail?
10 A.  I think it was an assistant.  I can pull up her
11    name off the e-mail if you need.
12 Q.  Did the e-mail say anything about the deposition
13    today?
14 A.  Time and place.  That was it.
15 Q.  Have you had any communications with anyone
16    associated with the Cohen Placitella firm since
17    your April 2017 deposition?
18 A.  Yes.
19 Q.  When was that?
20 A.  I had a phone call from Jared a month ago, maybe a
21    little more, just letting me know there was going
22    to be another deposition, but that was all.
23    He -- I was told he couldn't prepare me for it,
24    couldn't answer any questions, just that he was
25    letting me know.  That was via phone.

Page 206

1  Q.  Okay.  Did he say anything other than that?
2  A.  Nope.
3  Q.  Other than this one phone call with Jared
4     Placitella, have you had any other communications
5     with the Cohen -- anyone from the Cohen Placitella
6     firm since your April 2017 deposition?
7        MR. KUZMIN:  Objection to form.  You mean
8     in addition to the e-mails and Jared?
9  Q.  Other than the one e-mail you told me about and
10    the one phone call from Jared.
11 A.  There have been a couple of e-mails going back and
12    forth between the assistant and me just because
13    there was a rescheduling and just general e-mails
14    about when and where and what the new time and
15    place was going to be, things of that nature.  Or
16    to let her know that I received e-mails.
17        And I've also spoken with that assistant
18    just about scheduling and did I receive an e-mail.
19    But nothing subsequent to the nature of the case.
20    I think I may have had one previous phone call
21    with Jared just to check in not long after the
22    last hearing, but I can't remember exactly when.
23    And we didn't really talk about anything other
24    than, you know -- that was all.
25 Q.  So the second phone call with Jared Placitella,

Page 207

1     you mentioned it was after the hearing.  What
2     hearing was that?
3  A.  I'm sorry.  Deposition.
4  Q.  Deposition?
5  A.  Yeah.  It was just to -- just to check in.
6  Q.  Okay.  So no one from the Cohen Placitella firm
7     had any communications with you concerning your
8     deposition in April 2017?
9  A.  That's correct.
10 Q.  What about anyone from the Bevan firm?  Have you
11    had any communications with anybody from the Bevan
12    firm since your April 2017 deposition?
13 A.  No.
14 Q.  No e-mails?
15 A.  I don't believe so.  I think the assistant I've
16    spoken with was with the Placitella firm.  I don't
17    believe I've had any -- I don't think I've had any
18    e-mails or anything to do with the Bevan firm.
19 Q.  Letters from the Bevan firm?
20 A.  They send us stuff, you know, letting us know
21    about, you know, different issues that are coming
22    on the ballot that are general in nature, but
23    nothing specific to me or the case.  But I think
24    that's all I received from them.
25 Q.  What do you mean by "coming on the ballot"?

Page 208

1  A.  Just different -- making us aware of different
2     issues that, you know, might be coming up on a
3     future ballot.  They're informational in nature
4     and that's all.
5  Q.  What do you mean by "ballot"?  Like a voting
6     ballot?
7  A.  Yes.
8  Q.  In what context?
9  A.  Just -- just as far as these are future laws that
10    could be, you know, set forth on the ballot.  You
11    know, please encourage your representative to vote
12    this way or vote that way.  Just general in
13    nature.
14 Q.  Do any of these ballots relate to asbestos cases
15    or is it something else?
16 A.  I believe so.  I don't -- I don't really read
17    through them because I don't take that into
18    consideration when I'm voting.  So I'm sorry I
19    have to be vague, but I really don't look through
20    them.
21 Q.  Have you spoken to Tom Bevan since your April 2017
22    deposition?
23 A.  No.
24 Q.  Have you spoken to, I believe you told me you had
25    met a man named Pat Walsh at the Bevan firm,

DONNETTE WENGER - 03/12/2018     Pages 209..212

Page 209

1  correct?
2  A.  Correct.  I have met him.
3  Q.  Have you had any communications with Mr. Walsh
4     since your 2017 deposition?
5  A.  No.
6  Q.  What about Erin Clark at the Bevan firm?
7  A.  I don't think so.  She – she tends to be, again,
8     a person that will send things in the mail, but I
9     don't think I've spoken with her, either.
10 Q.  So no updates from the Bevan firm regarding
11    bankruptcy trust claims you've made, for example?
12 A.  No.
13 Q.  No communications with the Bevan firm about this
14    case, the Williams case?
15 A.  No.
16 Q.  Are you represented by any counsel other than the
17    Cohen Placitella firm and the Bevan firm?
18 A.  No.
19       MR. KUZMIN:  Object to form.
20 Q.  That was a "no"?
21 A.  That was a "no."
22 Q.  So the last time, then, that you would have spoken
23    to Mr. Bevan was shortly before your April 2017
24    deposition, correct?
25 A.  Correct.

Page 210

1  Q.  So you remember that last – withdrawn.
2        At your last deposition, you'll remember
3     I asked you a number of questions about your
4     preparation for that first session of your
5     deposition?
6  A.  Uh-huh.
7  Q.  Do you remember that?  "Yes"?
8  A.  Yes.
9  Q.  Okay.
10 A.  I think so.
11 Q.  And I asked you whether you discussed your
12    testimony with Mr. Bevan.  Do you recall that?
13 A.  Not particularly.
14 Q.  Okay.  Let me ask it again now.  Did you discuss
15    your April 2017 deposition with Mr. Bevan before
16    that deposition?
17       MR. KUZMIN:  Object to form.  You can
18    answer it.
19 A.  Yes, we did discuss what kind of questions I would
20    be asked, what to generally expect from the
21    deposition.
22 Q.  What did Mr. Bevan tell you?
23       MR. KUZMIN:  Okay.  Hold on.  Before you
24    answer that, can we get a context as to
25    whether or not these conversations took place

Page 211

1  with our office being present?  Because my
2  understanding was, and I'm trying to follow
3  with what the Special Master said, my
4  understanding was that there could be issues
5  that if there was discussions related to this
6  particular case where we were present, that
7  could fall under attorney-client privilege.
8  If it was with Mr. Bevan by himself, I
9  understand that that may be fair game.  So
10 I'm just asking for a context.
11       MR. FARRELL:  Let me try to address that.
12       MR. KUZMIN:  Sure.
13 Q.  But first, can you answer the question I asked
14    you?  I'm only asking about what Mr. Bevan said,
15    not what Mr. Coren or anybody else said.
16       MR. KUZMIN:  Peter, respectfully, if it
17    was conversations with Mr. Bevan while we
18    were there, it could be privileged and –
19 Q.  Your conversation with Mr. Bevan occurred during a
20    meeting shortly before your April 2017 deposition;
21    is that correct?
22 A.  Correct.
23 Q.  Who was in the meeting?
24 A.  The attorneys from the Placitella firm were
25    present while I spoke with Mr. Bevan.  Forgive me

Page 212

1  if I can't remember which attorneys.
2  Q.  So I think last time you told me that Mr. Coren
3     was there?
4  A.  I believe so.  Yes.
5  Q.  The gentleman who was here for your last
6     deposition?
7  A.  Yes.
8  Q.  So Mr. Coren was at this meeting.  Mr. Bevan was
9     at this meeting.
10 A.  Uh-huh.
11 Q.  Was Jared Placitella there?
12 A.  I think so.
13 Q.  Okay.  So other than the three of them and you,
14    did anybody else participate in that meeting
15    shortly before your April 2017 deposition?
16 A.  No, I don't think so.
17 Q.  What did Mr. Bevan tell you at that meeting
18    shortly before your deposition?
19       MR. KUZMIN:  Again hold on before you
20    answer that.  I think about before, Peter, this is
21    where we've got that gray area.  So I
22    understand there was a conversation, I
23    believe, with Mr. Roth and Mr. Assaf –
24       MR. FARRELL:  "Assaf."
25       MR. KUZMIN:  – Assaf about the potential

DONNETTE WENGER - 03/12/2018     Pages 213..216

Page 213

1  of allowing these questions to be answered
2  subject to 502(d) if we decided to proceed
3  that route. So if you can agree to that
4  protection, I'm happy to let her answer.
5  Otherwise, I think I -- given the context,
6  especially if the subject matter relates to
7  this particular case, I think I need to
8  direct her not to answer pursuant to
9  attorney-client privilege.
10      MR. FARRELL: I think that the Special
11  Master's ruling and Mr. Roth's withdrawal of
12  Plaintiffs' motion for reconsideration on
13  this question was clear. Our view is that
14  this privilege has been waived. There's no
15  need for a 502(d). The question needs to be
16  answered. If you're instructing her not to
17  answer the question, then please do so so
18  that we can raise it with the Special Master
19  now.
20      MR. KUZMIN: Okay. Is this a question
21  that was previously -- if you want to direct
22  me to where it was asked and how it was asked
23  and if it's the same question, I'm more than
24  happy to abide by what the Special Master
25  ruled. And I did read the transcript and I'm

Page 214

1  familiar with it, and I'm not trying to be
2  difficult. I think it's a little bit
3  different question than what had been asked
4  in the past, specifically as it relates to
5  meetings with our firm where Mr. Bevan was
6  present. And I did read the Special
7  Master's --
8      MR. FARRELL: I specifically asked at the
9  last deposition, page 12, lines 14 through
10  17, whether she discussed her deposition with
11  Mr. Bevan. She was instructed not to answer.
12  That privilege objection was overruled.
13      MR. KUZMIN: Okay.
14      MR. FARRELL: And the testimony has been
15  ordered to be provided. I'm not going to get
16  into an extended debate about this. If you
17  are instructing her not to answer the
18  question, just say so on the record so that
19  we can get an order from the court.
20      MR. KUZMIN: Okay. Well, Peter, I think
21  the original question was, was it discussed,
22  and she did answer that. And now you're
23  asking what was said and I think now we get
24  into attorney-client privilege, especially
25  where we were present.

Page 215

1      MR. FARRELL: I disagree --
2      MR. KUZMIN: Okay.
3      MR. FARRELL: -- with Mr. Kuzmin.
4      MR. KUZMIN: All right. So I am
5  respectfully -- since you're not going to
6  agree to a 502(d) and, you know, allow that
7  to be looked at at a later time, I'm going to
8  need to instruct her not to answer that
9  question as far as what was discussed. You
10  know, given that we were there and that it
11  dealt with this particular case and the
12  question you had originally asked I believe
13  was answered by her today. So that would be
14  my position.
15      I need to instruct her not to answer, and
16  I'm more than happy to discuss with you a
17  protection or you, know, again, a 502(d) if
18  we want to do that to allow her to answer.
19  But substantive responses or discussions
20  where we were present relating to this case I
21  think does fall into attorney-client
22  privilege.
23      MR. FARRELL: Let's take a two-minute
24  break.
25      MR. KUZMIN: Sure.

Page 216

1      (Recess was taken.)
2      MR. FARRELL: Back on the record.
3  BY MR. FARRELL:
4  Q.  Mrs. Wengerd, are you following Mr. Kuzmin's
5      instruction not to answer my last question?
6  A.  Yes.
7  Q.  You have in front of you what we've marked as
8      DX62, which was your deposition from April 2017.
9      Do you have that?
10  A.  Yes.
11  Q.  Can you turn to page 12? It's the miniature page
12      12 up in the right-hand corner.
13  A.  Okay.
14  Q.  Page 12, do you see line 10?
15  A.  Yes.
16  Q.  I asked you the question, "Did you speak to
17      Mr. Bevan on Tuesday about the Williams case or
18      something else?" Your answer was, "I couldn't
19      speak to what we spoke of because it's under
20      attorney-client privilege." Do you see that?
21  A.  Yes.
22  Q.  Let me ask you that question again. Did you speak
23      to Mr. Bevan on the Tuesday before your April 2017
24      deposition about the Williams case or something
25      else?

DONNETTE WENGER - 03/12/2018       Pages 217..220

Page 217

1  A.  Mr. Bevan came in the room --
2         MR. KUZMIN:  And if you can answer
3     Mr. Farrell's question, I think it was very,
4     very direct to at least start with.
5         MR. FARRELL:  Is that a form or a
6     foundation objection?  We're not going to go
7     the whole day --
8         MR. KUZMIN:  Okay.
9         MR. FARRELL:  -- with clarifications and
10    coachings and speaking objections.
11        MR. KUZMIN:  Peter, I'm not trying to
12    coach.  I'm not trying to give speaking
13    objections.  I'm trying to follow, I think,
14    the guideline of what the Special Master had
15    kind of approved if there was an issue as to
16    the wording of it so that you can get what
17    you need and we don't have to worry about
18    attorney-client.  And that's all I'm trying
19    to do.
20        So you asked her a very specific question
21    and I'm just asking her to answer that
22    question so that you can then proceed how you
23    need to.
24  A.  To -- to my memory, it was about something else.
25    I don't remember if he was present or asked any

Page 218

1     questions in regards to the Williams case.
2  Q.  I think you told me a few minutes ago this morning
3     that Mr. Bevan told you what sort of questions to
4     expect, what to expect the deposition.  Do you
5     remember that from a few minutes ago?
6  A.  No, I'm sorry.  Mr. Placitella and Cohen were the
7     attorneys that gave me that information, not
8     Mr. Bevan.
9  Q.  What did Mr. Bevan tell you during your meeting
10    shortly before your April 2017 deposition?
11        MR. KUZMIN:  Okay.  Again, I'm going to
12    object and direct her not to answer if you
13    are asking for substance.  If you want topics
14    like you did before, I have no problem with
15    that.
16        MR. FARRELL:  Okay.  We're going to need
17    to take a break and get the Special Master on
18    the phone.  This deposition was ordered
19    because of the improper obstruction of the
20    last deposition.  It was ordered as a remedy
21    and a sanction for the conduct at the last
22    deposition.  You've had multiple bites at the
23    apple on these objections.  Of course I'm now
24    going to ask what Mr. Bevan told her.  That
25    was the whole point of the questions I was

Page 219

1     asking last time.  Any privilege between the
2     Plaintiffs and Mr. Bevan has been waived.
3     It's been ruled on multiple times by the
4     court.
5         MR. KUZMIN:  Okay.
6         MR. FARRELL:  And we're not going to
7     proceed through a deposition that's been
8     ordered as a sanction for the conduct at the
9     last deposition with the same sort of
10    obstruction and speaking objections we had
11    last time.
12        MR. KUZMIN:  Okay.  Can I suggest
13    something, Peter?  Can we mark this question,
14    if there may -- there may be others, this may
15    be the only one, when we get done here today
16    so that you can get through what you need to,
17    when we get done, we can contact the Special
18    Master with anything that may have come up,
19    get rulings and then we can go from there?
20        MR. FARRELL:  I'm not going to do that,
21    Bill.
22        MR. KUZMIN:  Okay.
23        MR. FARRELL:  Because I'm not going to
24    come back a third time for this deposition.
25        MR. KUZMIN:  I'm not saying come back.

Page 220

1         Get through everything you need to get
2     through.  We mark these questions.  She will
3     still be here.  We can finish depending on
4     what the Special Master rules rather than
5     calling him piecemeal.
6         MR. FARRELL:  I think we should call him
7     now because we're essentially the first
8     substantive question of the deposition.
9         MR. KUZMIN:  Okay.
10        MR. FARRELL:  You've already instructed
11    her not to answer a question where the
12    privilege has been waived and there was a
13    motion for consideration withdrawn on the
14    question.
15        MR. KUZMIN:  I'm going to disagree with
16    you that the privilege was waived.  That's
17    not how I read the Special Master's ruling.
18    But if we need to call him, that's fine and I
19    can understand we just have a difference of
20    opinion here.  So I guess we'll be going off
21    the record.  Do we need Ms. Wengerd to wait
22    outside while we make this call?
23        MR. FARRELL:  Yes.  Thanks.
24        (Recess was taken.)
25  BY MR. FARRELL:

DONNETTE WENGER - 03/12/2018     Pages 221..224

Page 221

1  Q.  During your meeting with Mr. Bevan, Mr. Coren and
2      Mr. Placitella on the Tuesday before your April
3      2017 deposition, did you speak to Mr. Bevan about
4      the Williams case or something else?
5          MR. KUZMIN:  Object to form.  You can
6      answer.
7  A.  From my memory, I think it was about something
8      else.
9  Q.  What was the something else?
10 A.  He asked how --
11         MR. KUZMIN:  Object to form.  You can
12     answer it.
13 A.  He asked how my kids were.  He spoke about just my
14     mom in general, just that she was a nice lady.  He
15     spoke about my grandfather who he also knew and
16     how he was a really funny guy and how he worked
17     with my grandfather about his case.  That's all I
18     remember.
19 Q.  At this meeting the Tuesday before your April 2017
20     deposition, did Mr. Bevan stay for the whole
21     meeting?
22 A.  No.
23 Q.  How long was he there?
24 A.  Only a few minutes.
25 Q.  Did he say to you anything other than what you

Page 222

1      just told me about your mother and your
2      grandfather?
3  A.  I don't think so.  I don't remember specifically.
4      But not to my knowledge.
5  Q.  How long did the meeting you had on the Tuesday
6      before your deposition last?
7  A.  I don't remember.  I'm guessing 45 minutes or an
8      hour.
9  Q.  What portion of the meeting was Mr. Bevan in?
10 A.  I can't remember if he came in to greet me when I
11     first got there or if he just came in at the end
12     to say goodbye, just to say hello and good-bye.
13 Q.  Was anyone else from the Bevan firm in your
14     meeting with Mr. Coren and Mr. Placitella?
15 A.  No.
16 Q.  What did Mr. Coren say while Mr. Bevan was in the
17     meeting?
18         MR. KUZMIN:  Okay.  I'm going to object
19     to that.  Are you talking about topics or
20     substantive information?
21         MR. FARRELL:  I'm looking for the answer
22     to my question.
23         MR. KUZMIN:  Okay.  If you're talking
24     specifically about what Mr. Coren said, I
25     need to object and direct her not to answer

Page 223

1      on the grounds of possible attorney-client
2      privilege.
3  A.  I really don't remember.  I don't remember
4      specifically if Mr. Coren said something while
5      Mr. Bevan may have been in the room that was
6      subsequent to the case.  It's been so long, I
7      specifically don't remember that detail.
8  Q.  You could have answered the question back in April
9      of 2017, correct?
10 A.  According to my testimony --
11         MR. KUZMIN:  Object.  Hold on.  Object to
12     form.  You can answer it.
13 A.  According to my testimony, it said that I could
14     answer, but Mr. Coren advised that it was
15     attorney-client privilege.  He may have been in
16     the room for something, but I don't remember now.
17 Q.  Last time in your deposition of April 2017 I asked
18     you about documents that you had and your mother
19     had related to her asbestos case.  Do you recall
20     that?
21 A.  Yes.
22 Q.  The file you kept at home?
23 A.  Yes.
24 Q.  When you first spoke to the Cohen Placitella firm
25     about potentially being a plaintiff in the

Page 224

1      Williams case, did they tell you to preserve all
2      of your documents related to your mother's
3      asbestos case?
4  A.  Everything that we had, any documents, was
5      provided to our attorney.  We had nothing -- and
6      that was to Mr. Bevan.  We had nothing else to
7      preserve or to give.  Everything was -- that we
8      had was given to Mr. Bevan.  I don't remember if
9      he specifically said that.  That seems like
10     something that would have been advised, but I
11     don't remember specifically.
12 Q.  Okay.  Let's take that in pieces.  Going back to
13     my original question, you have no specific memory
14     of the Cohen Placitella firm advising you at the
15     start of this case to preserve documents relating
16     to your mother's asbestos case, correct?
17 A.  Correct.
18         MR. KUZMIN:  Object to form.  You can
19     answer.
20 A.  Correct.
21 Q.  Okay.  Then in part of your answer you told me
22     that you had documents at home.
23 A.  Uh-huh.
24 Q.  Correct?
25 A.  Yes.

DONNETTE WENGER - 03/12/2018     Pages 225..228

Page 225

1  Q.  And you gave those documents to Mr. Bevan?
2  A.  Yes.
3  Q.  Okay.  When did you give your documents at home to
4      Mr. Bevan?
5  A.  Some documents were given, I believe, from my
6      mother prior to her passing.  Any records that she
7      had that she worked for Goodyear, anything that
8      she had that would have been requested of her, she
9      would have given over at that time.  Any documents
10     that I had were copies of things that were sent by
11     either the Bevan firm or Mr. Placitella's firm to
12     me as a copy.
13         I have no original documents to preserve
14     or to give over.  I was given a questionnaire
15     prior to the deposition in April to fill out, I
16     guess.  Some written questions were generally
17     asked.  After that, I was asked just to hand over
18     anything that I had.  Whether it was a copy or
19     not, I handed it over to the Bevan firm.  I think
20     specifically Erin.  And I just gave her all my
21     copies that I was given.
22 Q.  Okay.  So let me make sure I'm understanding this,
23     because I think maybe you're talking about two
24     different periods of time and I just want to
25     understand.

Page 226

1  A.  Okay.
2  Q.  So first you said you had documents at home while
3      your mother was still alive?
4  A.  Uh-huh.
5  Q.  So that would have been probably 2008 or so, if
6      you were giving them to Mr. Bevan?  Does that
7      sound correct?
8  A.  Right.
9  Q.  So you gave Mr. Bevan some documents at the time
10     your mother's original asbestos case was filed,
11     correct?
12 A.  I think so.  I think she may have had a copy of
13     her taxes that showed that she worked for
14     Goodyear.  She had no information that was
15     specific to asbestos or to her other than maybe
16     health records or employment verification of some
17     sort.  There was no other paperwork or information
18     that she supplied to Mr. Bevan.
19 Q.  Did your mother have any documents concerning the
20     brand of products she had been exposed to while
21     working at Goodyear?
22 A.  Not that I'm aware of.
23 Q.  Okay.  So now we've talked about 2008.  Let's
24     fast-forward now to 2010, 2011.  This case, the
25     Williams case, was filed in March of 2011,

Page 227

1      correct?
2  A.  I believe that -- somewhere in that date.
3  Q.  Okay.  So in 2010, 2011 when you first learned
4      that you potentially were going to be a plaintiff
5      in this case, the Williams case, did you provide
6      documents to the Bevan firm at that time as well?
7  A.  The only documents that I provided the Bevan firm
8      would have been any health records or -- and I
9      think I was actually copied on it from the
10     coroner.  There was an autopsy done, and I think I
11     received the copy.  They were automatically sent
12     to my attorney, so I didn't need to re-send my
13     copy to them.  They already had it.
14 Q.  So over the course of your mother's asbestos case
15     and bankruptcy trust claims that she filed and you
16     filed, you accumulated some documents at home,
17     correct?
18 A.  Yes.  I accumulated copies of different filings
19     that -- and just general back and forth paperwork
20     that would have been provided from Mr. Bevan's
21     firm.
22 Q.  Did you provide that entire file to the Cohen
23     Placitella firm?
24 A.  I think I gave it to the Bevan firm.  Specifically
25     I think maybe to Erin.  Just my copies of what was

Page 228

1      sent to me that I had held onto.
2  Q.  Why did you give your file to the Bevan firm
3      instead of the Cohen Placitella firm?
4  A.  Because there was, I don't know, a small pile of
5      whatever the copies were I received, and
6      Mr. Bevan's firm is local whereas the Placitella
7      firm is out of state.  And I know that our
8      attorneys have corresponded and worked together
9      because of an out-of-state issue.  So as far as
10     just making a call, you know, just to see how he
11     was doing, I know that they worked together in
12     some capacity.  I don't know what to -- to what
13     extent.
14 Q.  Okay.  So you took the file you had at home --
15 A.  Uh-huh.
16 Q.  -- which contained your mother's records and your
17     records concerning your mother's asbestos case.
18     You gave those to the Bevan firm.  Do you know
19     when?
20 A.  It would have been, I believe, prior to our April
21     deposition.  A few months, maybe, before our
22     deposition.
23 Q.  Okay.  And then the Bevan firm gave those
24     documents to Cohen Placitella?
25 A.  That is my understanding.

DONNETTE WENGER - 03/12/2018      Pages 229..232

Page 229

1      MR. KUZMIN: Object to form. Object to
2   form. I'm just going to ask you to give me a
3   second.
4      THE WITNESS: Oh, sorry.
5      MR. KUZMIN: Thank you.
6  Q.  Do you know whether any of the documents that you
7     keep at home related to your mother's affairs have
8     been produced to the Defendants in the Williams
9     case?
10  A.  I don't know.
11  Q.  You mentioned a few minutes ago that before your
12     deposition in April 2017 you filled out a
13     questionnaire. Do you remember that?
14  A.  Yes.
15  Q.  Who sent you that questionnaire?
16  A.  I don't remember.
17  Q.  Do you still have that questionnaire?
18  A.  No.
19  Q.  What questions were you asked in the
20     questionnaire?
21  A.  I don't remember. It – I believe they were
22     relevant to this current case, but I don't
23     remember the specific questions.
24  Q.  Do you remember what you wrote in the
25     questionnaire?

Page 230

1  A.  I remember I think in our April deposition you
2     asked me about one because I got an address or a
3     phone number or a work history date wrong. So I
4     know that those were provided to you because you
5     specifically asked me about one and I missed an
6     answer. I got something wrong. It was a minor
7     detail.
8  Q.  Are you referring to interrogatories that were
9     served on you in this case or something else?
10  A.  Yes, I'm sorry. That's what I was calling a
11     questionnaire.
12  Q.  Okay. So you received the interrogatories that
13     the Defendants served in this case, correct?
14  A.  Yes. If it's the same document I'm referring to,
15     yes.
16  Q.  Then you filled it out by hand?
17  A.  No. I may have filled out – no, I don't think I
18     filled out any of them by hand. It was filled out
19     by an attorney during a meeting.
20  Q.  Which meeting?
21  A.  It would have been prior to April when the
22     interrogatories were sent, provided.
23  Q.  Who was at that meeting where you discussed your
24     responses to the Defendants' interrogatories?
25  A.  Forgive me because I'm very bad at names. I

Page 231

1     remember two people from the Placitella firm, a
2     lady and a gentleman. Her name might have been
3     Kristen, but I don't remember specifically the
4     names.
5  Q.  Where did the meeting occur?
6  A.  At the Bevan firm.
7  Q.  Was anybody from the Bevan firm in the meeting?
8  A.  No.
9  Q.  How long did that meeting last?
10  A.  I don't remember.
11  Q.  Did you discuss anything other than your responses
12     to those interrogatories?
13  A.  No.
14  Q.  Did Mr. Bevan come in for any portion of that
15     meeting?
16  A.  I don't think I saw him just to say hello even.
17  Q.  You told me earlier that you no longer had your
18     responses to the – what you were then calling a
19     questionnaire which we now know are the
20     interrogatory responses?
21  A.  Correct. I don't think I have them.
22  Q.  You threw them away, the original responses you
23     prepared?
24      MR. KUZMIN: Object to form. You can
25      answer.

Page 232

1  A.  Those were what we filled out in that meeting, so
2     I don't know that I have a copy of them. Maybe in
3     an e-mail I might have a copy, but hard copy is
4     something that I think I brought to the meeting.
5     I may have left it there with the attorneys.
6  Q.  Have you searched your e-mail account to determine
7     whether you have documents related to your
8     mother's asbestos case or the Williams case in it?
9  A.  The only documents I have in my e-mails are just
10     copies of different filings, different times to be
11     here, different filings when it originally was
12     sent or – and I'm not sure that I really have
13     them all. I'm sure there are more that my
14     attorneys have made on my behalf that I don't have
15     copies of. There's nothing original that I have
16     to provide to anyone.
17  Q.  Have you checked your e-mail account to determine
18     whether you have e-mails relating to your mother's
19     asbestos case?
20  A.  Well, yeah, I had to check my e-mails to see what
21     the address was to get here today, and that
22     relates to this case.
23  Q.  I think we're missing each other.
24  A.  Okay.
25  Q.  I'm asking about e-mails concerning your mother's

DONNETTE WENGER - 03/12/2018     Pages 233..236

Page 233

1   case from 2008, 2009.
2   A.  I don't have any e-mails that I am aware of
3       regarding that.
4   Q.  Have you checked your e-mail account to determine
5       whether you do have e-mails related to your
6       mother's case from 2008, 2009?
7   A.  No, I have not.
8   Q.  You haven't checked?
9   A.  I have not checked.
10  Q.  Okay.  Has the Bevan firm -- withdrawn.
11      Has anyone from the Bevan firm
12      communicated with you by e-mail?
13  A.  Yes.
14  Q.  Including about your mother's case from 2008,
15      2009?
16  A.  Yes, I think so.
17  Q.  Now, you also told me at your last deposition that
18      your lawyers communicated with you by letter.  Do
19      you remember that?
20  A.  Yes.
21  Q.  And I asked you last time whether you still had
22      those letters.  Do you still have them?
23  A.  I think they were returned to me after I provided
24      them to the Bevan firm.  That is what I provided,
25      were my copies of the letters, filings.  Just

Page 234

1   general notifications.  That's what was provided
2   back to the Bevan firm.
3   Q.  Okay.  So all of the letters that you received
4       from the Bevan firm in 2008, 2009 and so on
5       concerning your mother's asbestos case, bankruptcy
6       trust filings that you all had made, you took that
7       whole file, including those letters, and you gave
8       them to the Bevan firm a couple of months before
9       your deposition and then that file was returned to
10      you; is that correct?
11  A.  Correct.  I believe it was returned to me.  I
12      don't remember if I had saved every piece or every
13      copy that was ever provided to me by my attorneys,
14      but anything that I had kept was provided.
15  Q.  So some letters that the Bevan firm sent you since
16      2008, you may have discarded?
17      MR. KUZMIN: Object to form.  You can
18      answer it.
19  A.  That's possible.
20  Q.  What sort of letters do you receive from the Bevan
21      firm?
22  A.  Typically the letters would just tell me that
23      they've filed against a particular trust or
24      bankruptcy.  It's a paper that sometimes would
25      need signed and returned.  Sometimes the letter

Page 235

1   would just be general in nature of this is from
2   this -- a check that may have been enclosed was
3   from this bankruptcy or trust.  That's it.
4   Q.  Do you ever receive written communications from
5       anybody at the Bevan firm regarding the substance
6       of your mother's asbestos case?
7       MR. KUZMIN: Just so she's -- you mean
8       the 2008 case?
9       MR. FARRELL: Yes.
10      MR. KUZMIN: Okay.
11  Q.  Let me try to -- maybe we can call these two
12      different things so we're not -- because I'm
13      not -- I don't mean to confuse you about it.  When
14      I say your mother's asbestos case, I mean the case
15      from 2008 that was filed by Mr. Bevan and then the
16      bankruptcy trust claims that were made, right?
17      And that, to me, is distinct from the Williams
18      case, which is this case.  You follow me?
19  A.  Yes, I understand.
20  Q.  Okay.  So Mr. Bevan -- withdrawn.
21      Did anybody from the Bevan firm send you
22      written communications concerning your mother's
23      asbestos case?
24  A.  Not since perhaps shortly after she passed.  I
25      haven't received anything of substantive other

Page 236

1   than this is what we are filing in this trust or
2   bankruptcy, this is where such-and-such a check
3   came from, this trust or bankruptcy.  Other than
4   that, that's all I've received.
5   Q.  Have you ever received from anybody at the Bevan
6       firm communications explaining developments in
7       your mother's asbestos case?
8       MR. KUZMIN: Object to form.  You can
9       answer it.
10  A.  I'm not sure I understand over what period of time
11      you're asking me.
12  Q.  So let's start by focusing on the 2008 to 2009
13      time period.  Okay?
14  A.  Okay.
15  Q.  So your mother's case was filed in 2008 and then
16      there was some activity in the court in 2008,
17      2009, her deposition, for example, some motions
18      were filed and so on.
19  A.  Okay.
20  Q.  Okay.  Do you remember -- withdrawn.
21      Did anyone from the Bevan firm send you
22      written communications concerning developments in
23      your mother's asbestos case from that 2008, 2009
24      time period?
25  A.  I don't remember specifically.  I don't think so.

DONNETTE WENGER - 03/12/2018        Pages 237..240

Page 237

1    However, it is possible any information or
2    developments, copies of letters would be found
3    with my attorney, Mr. Bevan, and his firm.
4  Q. Okay.  When you're going to settle with one of the
5    parties in your mother's original asbestos case,
6    does Mr. Bevan send you a letter or an e-mail
7    saying we have an offer to settle the case for X
8    amount, here's my recommendation regarding that
9    settlement?
10       MR. KUZMIN:  Object to form.  You can
11     answer.
12  A. No.
13  Q. Does Mr. Bevan – withdrawn.
14       Does anyone from the Bevan firm consult
15     with you before deciding whether to accept
16     settlements from defendants in your mother's
17     asbestos case?
18       MR. KUZMIN:  Object to form.  You can
19     answer.
20  A. No.
21  Q. Has anyone from the Bevan firm sent you written
22     communications explaining the reasons why some of
23     the defendants – withdrawn.
24       Has anyone from the Bevan firm sent you
25     written communications explaining the reasons why

Page 238

1    any defendant in your mother's asbestos case was
2    dismissed from that case?
3       MR. KUZMIN:  Object to form.  You can
4     answer.
5  A. That sounds familiar.  Perhaps not long after she
6     passed, I remember specifically Goodyear
7     being – I don't – I'm not sure what the correct
8     terminology is, but was not responsible for any of
9     the exposure and was – the case or whatever was
10    thrown out.  I remember calling and speaking to
11    them about that.  There may have been others, but
12    I don't remember.
13  Q. As you sit here today, to your knowledge, no
14    written communications from anyone at the Bevan
15    firm explaining the reasons why any defendant in
16    your mother's asbestos case was dismissed from
17    that case?
18  A. I honestly don't remember.
19  Q. Is that a "no"?
20       MR. KUZMIN:  I'm not sure there was a
21     question there, but you can answer it if you
22     understood.
23  A. Can you please repeat the question?  I'm not sure
24    I'm understanding what you're asking me.
25  Q. Sure.  To your knowledge, there are no written

Page 239

1    communications from anyone at the Bevan firm to
2    you explaining the reasons why any defendant in
3    your mother's asbestos case was dismissed from
4    that case?
5       MR. KUZMIN:  Object to form.  You can
6     answer.
7  A. If there are any, they would be held with my
8     attorney, Mr. Bevan.  Other than the Goodyear one
9     that I remember specifically, I don't remember if
10    those explanations in written form exist.  It's
11    something that you would have to speak to my
12    attorney about and see what's in his file.
13  Q. Okay.
14  A. It's been ten years.  I'm sorry.  I don't
15    remember.
16  Q. Okay.  Other than the one Goodyear example you
17    gave, you have no recollection of receiving a
18    written communication from anyone at the Bevan
19    firm concerning the reasons a defendant was
20    dismissed from your mother's asbestos case; is
21    that fair?
22  A. That's correct.
23  Q. Okay.  If Mr. Bevan has not produced any written
24    communication to you explaining the reason a
25    defendant was dismissed from your mother's

Page 240

1    asbestos case, it's fair to say that no such
2    communication was ever sent to you.  Is that fair?
3       MR. KUZMIN:  Object to form.  You can
4     answer it.
5  A. No, that's not correct because I don't remember.
6     He could have sent them.  He may not have sent
7     them.  I don't remember.
8  Q. Well, if Mr. Bevan hasn't produced them and you
9     haven't produced them, who would have
10    communications between you and Mr. Bevan regarding
11    the reasons a party was dismissed from your
12    mother's asbestos case?
13       MR. KUZMIN:  Object to form.  You can
14     answer it.
15  A. I'm sorry.  I understand you now.  If he's not
16     provided any for you and I have not provided any
17     to you, then they do not exist.
18  Q. Okay.
19  A. That I'm aware of.
20  Q. So we've talked about written communications.
21     What about oral communications?  Has anyone from
22     the Bevan firm explained to you orally, in words
23     or in substance, the reasons a party was dismissed
24     from your mother's asbestos case?
25  A. Yes.  I spoke – and I don't remember who

Page 241

1  specifically, but I know I did ask about Goodyear
2  specifically that I recall.  I also remember that
3  when I signed with Mr. Placitella's firm and
4  originally met with them all those years ago, I
5  was told why --
6       MR. KUZMIN:  Wait.  Wait.  Wait.  If
7    there -- and again, I need to caution you,
8    anything that may have come from our office I
9    think would fall under privilege.  Peter, I
10   hope you'd agree with me on this one?
11      MR. FARRELL:  Well, it depends who --
12      MR. KUZMIN:  I know that you asked about
13   Bevan.  I got no problem with that.  We're
14   starting to get into our meetings.
15  Q.  Were you about to tell me something that Mr. Bevan
16   told you about the reasons a case was dismissed?
17   Without telling me what the answer was.
18  A.  Yes.
19  Q.  The person who told you this information you were
20   about to describe was Mr. Bevan, correct?
21  A.  Yes.
22  Q.  Okay.  What did Mr. Bevan tell you?
23  A.  He explained to me regarding BASF just why he was
24   referring me to Mr. Placitella's office because my
25   case was -- did not go through or was dismissed

Page 242

1  and that Mr. Placitella's office would be able to
2  assist me in continuing to see that case through.
3  Q.  Okay.  This conversation with Mr. Bevan you're
4   describing, when did that occur?
5  A.  I met -- I believe it was when he introduced me to
6   Mr. Cohen, which would have been prior to the
7   filing of the case.
8  Q.  Okay.  So presumably sometime in 2010 or 2011.
9   Does that sound fair?
10  A.  Yes.
11  Q.  Okay.  Before this conversation with Mr. Bevan
12   when he introduced you to the Cohen Placitella
13   firm, at any time before then had you had any
14   discussion with anyone at the Bevan firm
15   concerning the reasons why your mother's claims
16   against BASF were dismissed?
17  A.  I don't remember.
18  Q.  Let's go back to this initial meeting between you,
19   Bevan, I think you said Mr. Cohen.  Did you
20   mean Mr. Coren?
21  A.  Coren.  I'm sorry.
22  Q.  That's okay.
23  A.  I do that all the time.  Sorry.
24  Q.  There's also a Mr. Cohen, and so I just want to be
25   sure I --

Page 243

1  A.  Okay.
2  Q.  So it's you, Mr. Bevan and Mr. Coren sometime
3   before this case was filed, correct?
4  A.  Yes.
5  Q.  Okay.  What did Mr. Bevan tell you at that
6   meeting?
7       MR. KUZMIN:  Okay.  I need to object and
8    I'm going to -- again, if you're asking for
9    topics, I have no problem to see where this
10   goes.  If we're going to talk substance where
11   we were present and it was obviously
12   consulting related to this case, I need to
13   instruct her not to answer.
14  Q.  Mrs. Wengerd, are you following the instruction
15   not to answer the question I just asked?
16  A.  Yes.
17  Q.  What did you tell Mr. Bevan -- withdrawn.
18       Would you be able to answer the question
19   what did Mr. Bevan tell you at that meeting but
20   for Mr. Kuzmin's instruction not to answer?
21  A.  I would be able to answer it to the best of my
22   knowledge of what I remember.
23  Q.  What did you say to Mr. Bevan at this meeting with
24   Mr. Bevan and Mr. Coren?
25       MR. KUZMIN:  Again, same instruction.  I

Page 244

1   think that this falls into attorney-client
2   privilege and I would instruct Ms. Wengerd
3   not to answer.
4  Q.  Are you following Mr. Kuzmin's instruction not to
5   answer?
6  A.  Yes.
7  Q.  Would you be able to answer that question but for
8   the instruction not to answer?
9  A.  Yes.
10  Q.  Was Mr. Bevan present for the entirety of your
11   meeting with Mr. Coren shortly before this case
12   was filed?
13  A.  No, I don't think he was there for the whole
14   meeting.
15  Q.  What did Mr. Coren say to you during the portion
16   of the meeting when Mr. Bevan was present?
17       MR. KUZMIN:  Okay.  Again, same
18   instruction.  I think that it hits on
19   attorney-client privilege and would instruct
20   you not to answer.
21  Q.  I take it you're going to follow the instruction
22   not to answer?
23  A.  Correct.
24       MR. KUZMIN:  Peter, for all of these, are
25   we going to mark them so we can address them

DONNETTE WENGER - 03/12/2018     Pages 245..248

Page 245

1    all at once?
2        MR. FARRELL: Sure. Can we just mark all
3    of the instructions not to answer?
4 Q.  You told me a few minutes ago that Mr. Bevan
5    explained to you at this meeting why your mother's
6    case against BASF didn't go forward, correct?
7 A.  Correct.
8 Q.  What did he tell you?
9 A.  I think he had said that the reason we weren't
10   able to continue the case was due to lack of
11   evidence, but specifically I can't remember his
12   wording.
13 Q.  Can you tell me anything else about what Mr. Bevan
14   told you?
15 A.  No.
16 Q.  That meeting shortly before the Williams case was
17   filed was the first you had heard about reasons
18   your mother's case against BASF was dismissed?
19 A.  I don't remember if that was the first time or
20   not. I think so.
21 Q.  Last time I -- last time I asked you whether
22   you -- your attorneys asked you to search your
23   files at home for documents. Do you remember
24   that?
25 A.  Yes.

Page 246

1 Q.  Did your attorneys in the Williams case ask you to
2    search the file you keep at home to see if you had
3    any documents concerning your mother's asbestos
4    case?
5        MR. KUZMIN: Object to form. You can
6    answer it.
7 A.  No, I don't think so. I don't remember.
8 Q.  Have you provided -- withdrawn.
9        Have you spoken to Mr. Bevan about
10   whether he has documents concerning your mother's
11   asbestos case?
12 A.  No.
13 Q.  Do you know whether Mr. Bevan has documents
14   concerning your mother's asbestos case?
15 A.  He was my representing attorney. I would hope he
16   does.
17 Q.  You would hope he does, but you're not sure?
18 A.  I have not seen his file.
19 Q.  Do you rely on him to maintain the file related to
20   your mother's asbestos case and bankruptcy trust
21   claims?
22 A.  Yes.
23 Q.  So if you wanted to see documents related to your
24   mother's asbestos case or her bankruptcy trust
25   claims, you would go to Mr. Bevan and say, hey,

Page 247

1    can I get a copy of this particular document?
2 A.  That's correct.
3 Q.  Have you ever done that?
4 A.  No.
5 Q.  Has Plaintiffs' counsel asked you whether you have
6    e-mails from the Bevan firm that relate to your
7    mother's asbestos case?
8 A.  Not that I recall.
9 Q.  Last -- at the last session of your deposition in
10   April 2017, I asked you a number of questions
11   about what the source of the allegations in the
12   complaint were. Do you remember that?
13 A.  Yes.
14 Q.  What is the source of your information concerning
15   the fraud that's alleged in the Williams
16   complaint?
17       MR. KUZMIN: Object to form. You can
18   answer it.
19 A.  The information would have come from my attorneys.
20 Q.  Which attorneys?
21 A.  The Placitella firm.
22 Q.  What about from Mr. Bevan?
23 A.  No. I don't really speak to Mr. Bevan regarding
24   this matter.
25 Q.  Who was involved in the fraud that's alleged in

Page 248

1    the Williams complaint?
2        MR. KUZMIN: Object to form. You can
3    answer.
4 A.  The fraud, my understanding, is BASF and their law
5    firm that represented them.
6 Q.  And the basis for that information is just what
7    Plaintiffs' counsel has told you, correct?
8 A.  That's correct.
9 Q.  You don't have any personal knowledge of those
10   facts alleged in the complaint?
11 A.  No, I do not.
12 Q.  During the meeting that you were telling me about
13   before, shortly before the Williams complaint was
14   filed with Mr. Bevan and Mr. Coren, did either
15   Mr. Bevan or Mr. Coren take notes during that
16   meeting?
17 A.  I don't remember.
18 Q.  Did you take notes during that meeting?
19 A.  No.
20 Q.  Did anyone show you any documents during that
21   meeting?
22 A.  I don't -- I don't think so. I don't remember.
23 Q.  Was any presentation shown to you during that
24   meeting?
25 A.  No.

DONNETTE WENGER - 03/12/2018     Pages 249..252

Page 249

1 Q.  Were there any other plaintiffs in that meeting?
2 A.  Just me.
3 Q.  At your last deposition I asked you how the
4    Westfall case connects to your mother's asbestos
5    case.
6 A.  Uh-huh.
7 Q.  What's the source of your information concerning
8    how the Westfall case concerns – relates to your
9    mother's asbestos case, if at all?
10       MR. KUZMIN:  Object to form.  You can
11    answer it.
12 A.  Again, that information would have come from my
13    attorney, and my understanding is that talc was, I
14    don't know if contaminated or contained asbestos.
15    But specifically any information would have come
16    from my attorney regarding that case.
17 Q.  When you say your attorney, you mean the Cohen
18    Placitella firm?
19 A.  That's correct.
20 Q.  Have you discussed the Westfall case and how it
21    may relate to your mother's asbestos case with
22    anyone from the Bevan firm?
23 A.  No.
24 Q.  Have you spoken to Pat Walsh about the Williams
25    case?

Page 250

1 A.  No.
2 Q.  Would it be fair for somebody who wasn't exposed
3    to talc at all to receive compensation in
4    connection with the Williams case?
5       MR. KUZMIN:  Object to form.  You can
6    answer it.
7 A.  I'm not an expert.  I don't know.
8 Q.  You don't know whether if somebody was never
9    exposed to EMTAL talc at all, whether it would be
10    fair for them to receive compensation in this
11    case, the Williams case?
12       MR. KUZMIN:  Object to form.  You can
13    answer.
14 A.  I don't know.
15 Q.  In your view, can people who were never exposed to
16    EMTAL talc at all receive compensation if
17    compensation is paid in the Williams case?
18       MR. KUZMIN:  Object to form.  You can
19    answer.
20 A.  Again, because I'm not an expert, I don't know.  I
21    know that asbestos can be carried on clothing and
22    other items.  Does that mean they were directly
23    exposed to the talc?  I'm not sure if that
24    constitutes a yes or a no.  So unfortunately, I
25    have to say I don't know because I'm not an

Page 251

1    expert.
2 Q.  Should people who developed mesothelioma receive
3    more compensation than people who developed other
4    types of injuries from asbestos?
5       MR. KUZMIN:  Object to form.  You can
6    answer.
7 A.  I'm not an expert.  I don't know.
8 Q.  Should people with very brief exposure to EMTAL
9    talc receive the same compensation as people who
10    had significant exposure to EMTAL talc?
11       MR. KUZMIN:  Object to form.  You can
12    answer.
13 A.  I don't think it matters.  As long as if they both
14    ended up with the same disease, did it matter how
15    long they were exposed?  If they ended up with the
16    same result of death?  I don't know.
17 Q.  You don't know?  Okay.  If your mother had
18    developed lung cancer instead of mesothelioma,
19    would that have had an affect on the amount of
20    money she recovered from her asbestos case?
21       MR. KUZMIN:  Object to form.  You can
22    answer.
23 A.  I don't know.
24 Q.  How much compensation from BASF are you entitled
25    to because of your mother's exposure to asbestos?

Page 252

1       MR. KUZMIN:  Object to form.  You can
2    answer.
3 A.  How much money does a person – is a person worth?
4 Q.  That wasn't my question.
5 A.  That is your question.  You're asking me how much
6    money I'm asking from BASF because of my mother's
7    death.  How much is her life worth?  That's what
8    you're asking me, sir.
9 Q.  Mrs. Wengerd, respectfully, are you seeking a
10    specific amount of money from BASF in this case?
11 A.  No.
12 Q.  Last time I asked you a number of questions about
13    the mediation that had occurred in this case.  Do
14    you remember that?
15 A.  Yes.
16 Q.  When did that mediation occur?
17       MR. KUZMIN:  Okay.  Peter, can we go off
18    the record and discuss this for a second?  Do
19    you mind?  It's to avoid any issues.  And
20    we've been going for about another hour
21    anyway.
22    MR. FARRELL:  One minute.
23    MR. KUZMIN:  Sure.
24    (Discussion off the record.)
25    MR. FARRELL:  Back on the record.

DONNETTE WENGER - 03/12/2018      Pages 253..256

Page 253

1 BY MR. FARRELL:

2 Q. Mrs. Wengerd, when did the mediation in the
3    Williams case occur?

4        MR. KUZMIN: Object to form. You can
5    answer it.

6 A. I don't know.

7 Q. When did you learn that a mediation occurred in
8    this case?

9 A. After the mediation occurred.

10 Q. What was your role in the mediation, if any?

11       MR. KUZMIN: Object to form. You can
12    answer.

13 A. I had no role.

14 Q. So you had no knowledge that a mediation was under
15    way while the mediation was under way, correct?

16 A. That's correct.

17 Q. You learned about it after the fact?

18 A. Correct.

19 Q. Is it your understanding that proposals were
20    exchanged between the parties during the
21    mediation?

22       MR. KUZMIN: Object to form. You can
23    answer.

24 A. I think so.

25 Q. Did you understand that money had been offered to

Page 254

1    settle the Williams case?

2        MR. KUZMIN: Object to form. You can
3    answer.

4 A. I think Mr. Placitella or Mr. Coren had said
5    something of that nature.

6 Q. After the mediation was over?

7 A. Right.

8 Q. Before the mediation ended, you had no knowledge
9    that money had been offered to settle this case,
10    correct?

11       MR. KUZMIN: Object to form. You can
12    answer.

13 A. Yes, that's correct.

14 Q. Did you decide to end the mediation discussions in
15    the Williams case?

16 A. No.

17 Q. Do you know why the mediation in the Williams case
18    ended?

19 A. No.

20 Q. Has anyone from the Cohen Placitella firm
21    discussed that with you?

22 A. No.

23 Q. At your April 2017 deposition, we discussed some
24    documents concerning a conclusion reached by a
25    doctor about your mother's cancer and that doctor

Page 255

1    concluded that they didn't think it was
2    mesothelioma. Do you remember that?

3 A. Yes.

4 Q. And we discussed that Mr. Bevan was filing claims
5    on bankruptcy trusts for compensation based on the
6    fact that your mother had mesothelioma. Do you
7    remember that?

8 A. Yes.

9 Q. He's filed quite a few of those claims, correct?

10 A. Correct.

11 Q. Did you tell any of the bankruptcy trusts to which
12    you submitted claims that at least one doctor
13    concluded that your mother did not have
14    mesothelioma?

15       MR. KUZMIN: Object to form. You can
16    answer.

17 A. I didn't submit any claims personally.

18 Q. You haven't signed or submitted any bankruptcy
19    trust claims based on your mother's condition?

20 A. My -- my attorney would have filed those claims,
21    not me personally going after them or seeking any
22    information from any person. And I trust my
23    attorney's advice.

24 Q. Does Mr. Bevan consult with you before he submits
25    claims on bankruptcy trusts?

Page 256

1 A. No.

2 Q. So he handles the whole process?

3 A. Correct.

4 Q. Do you know whether Mr. Bevan told any of the
5    bankruptcy trusts to which he submitted claims
6    that at least one doctor concluded that your
7    mother did not have mesothelioma?

8 A. I--

9        MR. KUZMIN: Object to form. You can
10    answer.

11 A. I do not know.

12 Q. Do you think those bankruptcy trusts would have
13    wanted to know that at least one doctor concluded
14    that your mother did not have mesothelioma?

15       MR. KUZMIN: Object to form. You can
16    answer.

17 A. I don't know.

18 Q. Well, if someone had asked you to pay compensation
19    based on a person having mesothelioma, would you
20    have wanted to know that at least one of her
21    doctors concluded that she didn't actually have
22    mesothelioma?

23       MR. KUZMIN: Object to form. You can
24    answer.

25 A. That depends what other information was filed. If

DONNETTE WENGER – 03/12/2018      Pages 257..260

Page 257

1 there were other pieces of information that proved
2 that she had mesothelioma, then I wouldn't be
3 quite as concerned. If there were – if there's
4 proof that she had mesothelioma, then I feel that
5 those claims and filings are justified.
6 Q. Okay. So – withdrawn.
7     So if you had some document saying your
8 mother had mesothelioma and then some other
9 document saying she didn't have mesothelioma,
10 because you had the documents saying she did have
11 mesothelioma, in your view it's fair to say she
12 did have mesothelioma?
13 A. Correct.
14 Q. Is it also fair in your view not to disclose the
15 documents saying that your mother did not have
16 mesothelioma?
17     MR. KUZMIN: Object to form. You can
18     answer.
19 A. I'm not a professional. I can't answer that.
20 Q. If you were asked to pay compensation based on
21 your mother's mesothelioma diagnosis, would you
22 have wanted to know about the documents saying she
23 didn't have mesothelioma?
24     MR. KUZMIN: Object to form. You can
25     answer it.

Page 258

1 A. I just want to make sure I'm understanding.
2 You're asking me in a pretend world if I had
3 control over a trust, if I wanted to know if a
4 person had a first opinion, a second opinion, a
5 third opinion and how many of those opinions said
6 she had mesothelioma and she didn't have mesothelioma,
7 this is a question you're asking me about
8 something that isn't my purview. It's not my
9 judgment. I don't know how to answer it because
10 I'm not an expert on what the letter of the law
11 allows for.
12 Q. That's something you would have Mr. Bevan handle
13 for you?
14 A. Yes, I would have an attorney do an attorney's
15 job. I'm not an attorney and that's why I sought
16 one to represent me.
17 Q. So in your view, there might be legal reasons not
18 to disclose the documents saying your mother
19 didn't have mesothelioma?
20 A. I have no –
21     MR. KUZMIN: Object to form. You can
22     answer.
23 A. I'm not an expert. I don't know.
24 Q. As you sit here today, you can't say whether if
25 you personally had been asked to pay compensation

Page 259

1 because someone had mesothelioma, whether you
2 would have wanted to know that there were
3 documents saying that person didn't have
4 mesothelioma?
5     MR. KUZMIN: Object to form. You can
6     answer.
7 A. I would ask for any information that was needed to
8 prove that she had it. I've had second opinions
9 from doctors before and third opinions. I'm not
10 intimidated that there was an opinion that said
11 she didn't have mesothelioma, because there were
12 other opinions that said the she did. And I'm
13 not a professional. I'm not a law expert. That's
14 why I work with attorneys who know the letter of
15 the law and what should and should not be
16 ethically produced for these filings.
17 Q. Okay. In your view, though – withdrawn.
18     In your view not as an attorney, the fact
19 that you had evidence saying your mother had
20 mesothelioma and you believed she had
21 mesothelioma, that was good enough to support you
22 saying she had mesothelioma. Is that fair?
23     MR. KUZMIN: Object to form. You can
24     answer it.
25 A. I went to professional doctors who said she had

Page 260

1 mesothelioma. This was not my personal opinion.
2 Q. You thought it was appropriate to rely upon the
3 doctors who said she did have mesothelioma?
4 A. Yes.
5 Q. Last time I asked you about your settlements with
6 other companies related to your mother's asbestos
7 case. How much money have you received as
8 compensation for your mother's exposure to
9 asbestos?
10 A. I don't know. That would be something you would
11 have to check with the Bevan firm.
12     MR. KUZMIN: Peter, what line was that
13     questioning about the prior settlements?
14     Unless you're done with it, in which case –
15     MR. FARRELL: I'm moving to something
16     else.
17     MR. KUZMIN: Oh, okay.
18     MR. FARRELL: Mark this as the next, 63,
19     and the next one as 64.
20     (Whereupon, Defendant's Exhibits 63 and
21     64 were marked for identification.)
22 Q. So, Mrs. Wengerd, I've handed you what we've
23 marked as Exhibit 63, Defense Exhibit 63 and 64.
24 Exhibit 63 are the January 29, 2018 responses of
25 Donnette Wengerd, who is you, supplemental answers

DONNETTE WENGER - 03/12/2018      Pages 261..264

Page 261

1   to BASF Catalysts' first set of interrogatories,
2   and Number 64 is the January 29, 2018, your
3   responses to BASF's second set of interrogatories.
4   Do you see those in front of you?
5   A.   Yes.
6   Q.   Have you seen either of these documents before
7   today?
8   A.   Yes, I think so.
9   Q.   When did you see them?
10  A.   I believe they were last provided to me at our
11  April meeting.
12  Q.   So these are a new set from January of --
13  Q.   I'm sorry.  Not 64, but 63, I believe.
14  Q.   Okay.
15  Q.   Was provided.
16  Q.   So both of these -- Defense Exhibit 63 and 64 are
17  both dated January 29, 2018.
18  A.   Oh.
19  Q.   So one of them is a new set of answers and one of
20  them is the first time they were being answered.
21  A.   Gotcha.
22  Q.   So just to be clear, I'm not talking about the set
23  that was served probably a year ago.
24  A.   Okay.  Okay.  I'm sorry.
25  Q.   That's okay.  Have you seen either of these

Page 262

1   documents before?
2   A.   Well, now that I've confused them all, I want to
3   say I don't remember because they're all bleeding
4   into each other.  I would have to compare them to
5   the ones that I received in my e-mail.
6   Q.   Okay.  My question for you is this:  Has anyone at
7   the Cohen Placitella firm sent what we've marked
8   as Defense Exhibit 63 or Defense Exhibit 64 to you
9   for your review?
10  A.   I think so, but I would, again, have to check my
11  e-mail to compare them to what's in there.
12  Q.   Okay.  You're not sure?
13  A.   Right.
14       MR. KUZMIN:  Object to form.
15  Q.   If you turn to Defense Exhibit 63, these are your
16  supplemental responses to BASF's first set of
17  interrogatories.  Do you see interrogatory number
18  1?  Unfortunately, the pages are not numbered.
19  A.   Okay.
20  Q.   This asked about identifying all persons with
21  knowledge relating to your claims.  Do you see
22  that?
23  A.   Yes.
24  Q.   And then number 4, which is on the next page,
25  "Identify all resolutions of claims or

Page 263

1   dispositions with any defendant named in your
2   mother's underlying case."  Do you see that?
3   A.   Yes.
4   Q.   Number 10, which I think is two pages later,
5   "Identify all information provided to your mother
6   and her counsel by counsel for Engelhard in her
7   underlying case."  Do you see that one?
8   A.   Yes.
9   Q.   Number 11 on the next page asks about the process
10  behind dismissal of your mother's case.  Do you
11  see that?
12  A.   Yes.
13  Q.   And then 12, shortly below that, "Describe all
14  efforts made by your mother and her counsel in her
15  underlying case to develop and prosecute her
16  claims."  Do you see those?
17  A.   Yes.
18  Q.   Each of these responses say that you don't have
19  any personal knowledge of the facts requested by
20  the interrogatories; is that correct?
21  A.   Correct.
22  Q.   Okay.  So no personal knowledge that responds to
23  interrogatory number 1?  Feel free to take a look
24  if you'd like.
25  A.   So the interrogatory to number 1 is correct.

Page 264

1   Q.   Okay.  So that means in response to number 1,
2   which asks you to identify all persons with
3   knowledge relating to your claims in the Williams
4   case against BASF, you don't have any personal
5   knowledge that's responsive to that question,
6   correct?
7   A.   No.
8   Q.   Okay.  How about number 4?  Do you want to take a
9   look at that one?
10  A.   Number 4 is correct.
11  Q.   Okay.  So on number 4, again, no personal
12  knowledge of the list of settlements or
13  dispositions with any defendant in your mother's
14  underlying asbestos case?
15  A.   Right.  All that information would have been
16  maintained by my attorney, Mr. Bevan.
17  Q.   Okay.  How about number 10?
18  A.   That is correct.
19  Q.   So you have no personal knowledge of any of the
20  information that was provided to Mr. Bevan's firm
21  by BASF in connection with your mother's
22  underlying asbestos case?
23  A.   Correct.
24  Q.   How about number 11?  Can you take a look at 11?
25  A.   That is correct.  I have no personal information.

DONNETTE WENGER - 03/12/2018    Pages 265..268

Page 265

1  Q.  So no personal knowledge -- withdrawn.
2       You have no personal knowledge of the
3  process behind your mother's dismissal of her case
4  against BASF, correct?
5  A.  That's correct.
6  Q.  No personal knowledge of the reasons your mother's
7  case against BASF was dismissed?
8  A.  Correct.
9  Q.  It says in response -- in your response to
10  interrogatory number 11, "I do not have personal
11  information responsive to this request because I
12  was not part of the process or decision."  That's
13  correct?
14  A.  Correct.
15  Q.  So you weren't involved in any of the briefing
16  that was submitted to the court related to BASF's
17  motion for summary judgment in your mother's
18  underlying asbestos case?
19  A.  Correct.
20  Q.  You had no communications with anyone at the Bevan
21  firm regarding the reasons the Bevan firm sued
22  BASF in your mother's underlying case?
23  A.  Correct.
24  Q.  You had no communications with anyone at the Bevan
25  firm regarding correspondence from BASF's lawyers

Page 266

1  to Mr. Bevan concerning your mother's asbestos
2  case, correct?
3  A.  Correct.
4  Q.  You had no communications with anyone at the Bevan
5  firm regarding the motion for summary judgment
6  that your mother filed -- withdrawn.
7       You had no communications with anyone at
8  the Bevan firm regarding the motion for summary
9  judgment that BASF filed in your mother's asbestos
10  case?
11  A.  Unless it would have been something that would
12  have been provided to me once it was closed,
13  that's correct.
14  Q.  What do you mean by something that would have been
15  provided to you once it was closed?
16  A.  Just that if there was any letter saying we've
17  applied for this and it was -- it did not go
18  through, something of that nature may have been
19  provided.  But again, you would have to go to my
20  attorney, Mr. Bevan's office, for any copy of
21  correspondence.
22  Q.  Okay.
23  A.  But not to my knowledge.  I don't remember.
24  Q.  You don't have any knowledge of a letter or an
25  e-mail or a document like the one you're just

Page 267

1  describing?
2  A.  That's correct.
3  Q.  Do you have any knowledge of any communication
4  between you and anyone at the Bevan firm regarding
5  BASF's motion for summary judgment in your
6  mother's asbestos case?
7  A.  No.
8  Q.  Did you have any communication with anyone at the
9  Bevan firm regarding the opposition brief that was
10  filed on your mother's behalf in response to
11  BASF's motion for summary judgment in your
12  mother's asbestos case?
13      MR. KUZMIN:  And, Peter, for this line of
14  questioning, you're talking about as it
15  happened, in that time period?  Is that fair?
16      MR. FARRELL:  Yes.
17      MR. KUZMIN:  Okay.
18  A.  I don't remember.  I don't think so.
19  Q.  And let me try to make it more precise --
20      MR. KUZMIN:  Thank you.
21  Q.  -- in response to what Mr. Kuzmin said.  In the
22  time period 2008, 2009, while there was active
23  litigation in your mother's asbestos case, did you
24  have any communications with anyone at the Bevan
25  firm regarding the opposition brief that Mr. Bevan

Page 268

1  filed in response to BASF's motion for summary
2  judgment?
3  A.  I don't know.
4  Q.  You don't know or there weren't any?
5  A.  I don't know.  I don't remember.  Mr. Bevan would
6  have to provide such documents if they exist.
7  Q.  Do you remember any such communications?
8  A.  No.
9  Q.  Did you have any communication with anyone at the
10  Bevan firm regarding the reply brief that BASF
11  filed in connection with its motion for summary
12  judgment in your mother's asbestos case?
13  A.  I don't remember.
14      MR. KUZMIN:  Again, at the time it was
15  filed?
16  A.  I don't remember.
17  Q.  Did you have any communications with anyone at the
18  Bevan firm about the court's decision granting
19  BASF's motion for summary judgment?
20  A.  You're asking me if there were communications,
21  like written communications?
22  Q.  Communications of any sort.
23  A.  I think verbal communications, and that was part
24  of why Mr. Bevan introduced me to Mr. Placitella,
25  was explaining that it was -- that part of that

Page 269

1    process and then why I was then being referred to
2    him.
3  Q.  So you're speaking about the conversation from
4    shortly before the Williams case was filed?
5  A.  Right.
6  Q.  In 2008 or 2009, at the time the court made its
7    decision on BASF's motion for summary judgment,
8    did you have any communications with anyone from
9    the Bevan firm about the court's decision?
10 A.  I don't remember.
11 Q.  As you sit here today, you're not aware of any
12   communications between you and anyone at the Bevan
13   firm regarding the court's decision granting
14   BASF's motion for summary judgment?  Again, from
15   the 2008, 2009 time period.
16 A.  Correct.  I don't remember.
17 Q.  Can you turn to interrogatory number 12 and take a
18   look at that one?
19 A.  Okay.  This looks correct.
20 Q.  Okay.  It's correct that you have no personal
21   knowledge of the efforts made by Mr. Bevan to
22   develop or prosecute her claims against BASF in
23   her underlying asbestos case?
24 A.  That's correct.
25 Q.  On the second page of your supplemental response

Page 270

1    to interrogatory number 12, you see there's a
2    number of bullets listing letters from 1992 and
3    then into 1993, I think?
4  A.  Right.
5  Q.  Have you seen any of the letters that are listed
6    in the bullets in your supplemental response to
7    BASF's interrogatory number 12?
8  A.  I don't think so.  I'm not sure.
9  Q.  Do you know why those letters from 1992, 1993, and
10   1996 relate to your mother's asbestos case?
11 A.  No.
12      MR. KUZMIN:  Object to form.  You can
13      answer it.
14 A.  No.  I'm sorry, I don't.
15 Q.  Have you discussed with Mr. Bevan, in words or in
16   substance, what he would have recommended to you
17   as an amount of settlement with BASF if he had
18   known in 2008 or 2009 what he knows today about
19   EMTAL talc?
20      MR. KUZMIN:  Object to form.  You can
21      answer it.
22 A.  No.
23 Q.  Are there any communications you've had with
24   Mr. Bevan about your mother's asbestos case and
25   her claims against BASF that you haven't yet told

Page 271

1    me about?
2  A.  No.
3  Q.  No writings?
4  A.  No.
5  Q.  E-mails?
6  A.  No.
7  Q.  Memos?
8  A.  No.
9  Q.  Oral discussions?
10 A.  No.
11      (Whereupon, Defendant's Exhibit 65 was
12      marked for identification.)
13 Q.  Mrs. Wengerd, I've handed you what we've marked as
14   Defense Exhibit 65.  This is the retention letter
15   that you signed on November 22nd, 2008 with
16   Mr. Bevan; is that correct?
17 A.  Yes.
18 Q.  That's your signature at the bottom?
19 A.  Yes.
20 Q.  In the second paragraph of your retention letter
21   with Mr. Bevan, the second sentence says, "Only
22   client may accept an offer of settlement made by
23   any defendant or person against whom a claim is
24   made."  Do you see that?
25 A.  The third paragraph?

Page 272

1  Q.  Second paragraph.
2      MR. KUZMIN:  Right there.  (Indicating.)
3  A.  Oh, I'm sorry.  I see it.
4  Q.  Does Mr. Bevan or someone from the Bevan firm
5    contact you each time they're about to enter into
6    a settlement to ask you whether you accept or
7    reject the settlement?
8      MR. KUZMIN:  Object to form.  You can
9      answer it.
10 A.  I don't know.  Because so many of what they apply
11   for are sometimes bankruptcies and things like
12   that, it's not necessarily something that – it's
13   not an offer that's made necessarily.  It's
14   something that you apply for.  I'm sent paperwork
15   to sign and return, which I do, but no, not
16   necessarily that I recall.
17 Q.  Can you recall any instance in which someone from
18   the Bevan firm contacted you about a settlement
19   with a defendant in your mother's asbestos case
20   asking you whether you accept or reject the
21   settlement offer?
22 A.  I don't remember.
23      MR. KUZMIN:  Object to form.  You can
24      answer it.
25 A.  I don't remember.

DONNETTE WENGER – 03/12/2018    Pages 273..276

Page 273

1  Q.  When entering into settlements with defendants in
2     your mother's asbestos case, is that something you
3     defer to Mr. Bevan on?
4  A.  Yes.
5  Q.  Has he ever made recommendations one way or the
6     other as to whether to settle a particular claim
7     for a particular dollar amount?
8  A.  I'm not sure.
9  Q.  Can you think of any instance of that occurring?
10  A.  No.
11  Q.  Have you ever told Mr. Bevan not to accept an
12     offer to settle one of the cases – withdrawn.
13        Have you ever told Mr. Bevan not to
14     accept an offer to settle a claim against one of
15     the defendants in your mother's asbestos case?
16  A.  Not that I –
17        MR. KUZMIN: Object to form. You can
18     answer it.
19  A.  Not that I recall.
20  Q.  Have you ever told Mr. Bevan that an offer to
21     settle was not large enough?
22        MR. KUZMIN: Object to form. You can
23     answer.
24  A.  No, I don't think so.
25  Q.  If Mr. Bevan asked a defendant to pay a particular

Page 274

1     amount of money in settlement, you'd defer to him
2     on that?
3  A.  That is correct.
4  Q.  If he asked the defendant to pay a particular
5     amount in settlement, you'd consider that amount
6     to be a reasonable settlement?
7  A.  That is correct.
8  Q.  Why don't we take five minutes. I'm just going to
9     pre-mark a bunch of stuff so hopefully we can just
10     plow through them.
11        MR. KUZMIN: Sure.
12        MR. FARRELL: Off the record.
13        (Recess was taken.)
14        (Whereupon, Defendant's Exhibits 66
15     through 102 were marked for identification.)
16        MR. FARRELL: Back on the record.
17  BY MR. FARRELL:
18  Q.  Mrs. Wengerd, if you turn back to Defense
19     Exhibit 63, these are your supplemental answers to
20     BASF's first set of interrogatories.
21  A.  Uh-huh.
22  Q.  Interrogatory number 4, which we looked at a few
23     minutes ago, your response said you have no
24     personal information and then the response is BASF
25     has referred to documents produced by counsel

Page 275

1     regarding the underlying claims. Do you see that?
2  A.  Yes.
3  Q.  So we've gone through the documents that were
4     produced on your behalf and tried to identify all
5     of the documents referenced in that answer. I've
6     now pre-marked the ones we've identified. I'm
7     going to show them to you now. I just want to get
8     your take on whether there are other documents out
9     there that we haven't found, and so that's what I
10     was trying to pre-mark so we could try to do this
11     more quickly.
12  A.  Okay.
13  Q.  So the court reporter is going to hand you a stack
14     of documents which we've pre-marked as Defense
15     Exhibit 66 through 102, I believe.
16  A.  Okay.
17  Q.  So Defense Exhibit 66, which you have in front of
18     you, is a chart that we created to try to identify
19     all of the settlement-related documents that were
20     produced on your behalf. Do you see that? And
21     then the stack behind it, Defense Exhibit 67
22     through 102, are the documents themselves.
23        So Defense Exhibit 67 is a settlement
24     with A-Best Asbestos Settlement Trust. Do you see
25     that?

Page 276

1  A.  Yes.
2  Q.  The amount of $5,307?
3  A.  Yes.
4  Q.  Defense Exhibit 68 is a settlement with APG
5     Asbestos Trust. And you'll see we tried to mark
6     all of these on the chart that's been marked as
7     66.
8  A.  Yes.
9  Q.  Defense Exhibit 69 is a settlement with Armstrong
10     World Industries. Defense Exhibit 70 is a copy of
11     a check and settlement, again related to Armstrong
12     World Industries.
13        Defense Exhibit 71 is a settlement with
14     Babcock & Wilcox Company. Defense Exhibit 72
15     relates to a settlement with Celotex.
16  A.  Uh-huh.
17  Q.  Defense Exhibit 73 again relates to compensation
18     paid by the Celotex Asbestos Settlement Trust.
19     Seventy-four relates to compensation paid by DII
20     Industries Asbestos Settlement Trust. Defense
21     Exhibit 75 is a document related to compensation
22     paid by Fiberboard U.S. Gypsum.
23        Defense Exhibit 76 relates to settlement
24     of $120,000 paid by Garlock and OI, which I
25     presume is Owens Illinois. Defense Exhibit 77

Page 277

1  relates to a settlement with Garlock Sealing
2  Technologies.  Defense Exhibit 78 is another
3  document related to Garlock Sealing Technologies
4  settlement.  Defense Exhibit 79 relates to
5  settlement with General Electric.
6       Defense Exhibit 80 relates to $4,404.42
7  from Goodrich Corporation.  Defense Exhibit 81
8  relates to $62,227.51 paid by Halliburton.
9  Defense Exhibit 82 relates to settlement with JM
10  and Goodrich in the amount of $36,250.  Defense
11  Exhibit 83 is another document related to
12  settlement monies paid by Johns Manville.
13  Eighty-four relates to settlement payment of
14  $24,721 from Kaiser.  Eighty-five, another
15  document related to settlement with Kaiser.
16       Eighty-six is a check related to
17  settlement monies paid by Mahoning Valley Supply.
18  Eighty-seven, another document related to
19  settlement paid by Mahoning Valley Supply.
20  Eighty-eight relates to $63,447.96 paid in
21  settlement by National Gypsum and Armstrong.
22  Eighty-nine relates to $26,611.25 paid by OC,
23  which is presumably Owens-Corning.
24       Number 90 is another document related to
25  settlement with Owens-Corning.  Number 91, another

Page 278

1  document related to settlement with Owens-Corning.
2  Ninety-two, another document related to
3  Owens-Corning settlement.  Ninety-three, a
4  document related to settlement with Fiberboard.
5  Ninety-four, a copy of a check and a letter
6  concerning settlement with Owens Illinois.
7       Ninety-five, a document concerning
8  settlement monies paid by Plibrico Asbestos Trust.
9  Ninety-six relates to $149,129.69 paid by Raytech.
10  Ninety-seven is a document concerning settlement
11  monies paid by Federal-Mogul.  Ninety-eight is a
12  documented related to settlement with Travelers.
13  Ninety-nine, another document related to
14  settlement of $23,379.52 from Travelers.  100,
15  another document related to settlement with T&N.
16  101, document related to settlement with
17  Owens-Corning.  And 102, a document related to
18  settlement with U.S. Gypsum.
19       MR. KUZMIN:  Before you get into more
20     specifics, just with regard to 66, do you
21     stipulate that to the extent that attorneys'
22     fees are not reflected into the documents
23     corresponding to this chart, that they are
24     estimates from your office?
25       MR. FARRELL:  That is correct.

Page 279

1       MR. KUZMIN:  Okay.
2       MR. FARRELL:  On 66, if an attorney fee
3     wasn't specified, I believe we estimated
4     30-something percent.
5       MR. KUZMIN:  Okay.
6       MR. FARRELL:  Which seemed to be the case
7     for the other documents.
8       MR. KUZMIN:  Not a problem.  Just wanted
9     to be sure.  Thank you.
10  Q.  So having now gone through all of those, are you
11     aware of any settlements relating to your mother's
12     asbestos case or submissions to bankruptcy trusts
13     that we didn't just walk through in Defense
14     Exhibits 67 through 102?
15       MR. KUZMIN:  Object to form.  You can
16     answer it.
17  A.  No, I don't think so.
18  Q.  Defense Exhibit 66, which was BASF's effort to try
19     to catalog all of those settlements, you see it
20     lists on two pages settlements with A-Best, APG,
21     so on and so forth with a date of payment and
22     dollar amounts?
23  A.  Yes.
24  Q.  Does this chart look accurate and complete to you?
25       MR. KUZMIN:  Object to form.  You can

Page 280

1     answer it.
2  A.  I don't know without scrutinizing and comparing it
3     to the documents you just went over that quickly.
4  Q.  Based on our review of the documents, it looked to
5     us as though the total amount of settlement monies
6     paid to date was $1,389,290.62.  Does that number
7     sound correct to you?
8       MR. KUZMIN:  Object to form.  The
9     documents speak for themselves.  You can
10     answer it.
11  A.  I don't know.  I've never added all of it up.
12  Q.  Do you have any basis to dispute that number?
13  A.  No.
14  Q.  Several of the documents we just walked through
15     and that we logged on our Defense Exhibit 66 date
16     back to 2008 and then some of them come later,
17     correct?
18  A.  Correct.
19  Q.  Is it fair to say you were still receiving
20     settlement monies from other parties even after
21     the Williams case was filed, correct?
22  A.  Correct.
23  Q.  As recently as 2016 you've been receiving
24     settlement money from other companies, correct?
25  A.  That is correct.

DONNETTE WENGER - 03/12/2018      Pages 281..284

Page 281

1  Q.  Do you have any other bankruptcy trust claims that
2      are pending and you haven't received final word
3      yet back from those trusts?
4  A.  I have no idea.
5  Q.  So it's possible that more settlement monies will
6      be paid to you at some point in the future?
7  A.  I have no idea.
8         MR. KUZMIN:  Object to form.
9  Q.  Do you know when each of these bankruptcy trust
10     claims were filed on your behalf?
11 A.  No.
12 Q.  It's fair to say you've had claims related to your
13     mother's asbestos exposure essentially pending
14     since 2008 when her original case was filed,
15     correct?
16        MR. KUZMIN:  Object to form.  You can
17     answer it.
18 A.  Pending.  I'm not sure what you mean by pending.
19 Q.  Was there any -- I'm looking here and I see
20     settlements paid in 2009, 2010, 2011, 2012.
21 A.  I don't know if they were pending in 2008 or if
22     they were filed in 2009, 2011, 2012.  But yes,
23     there were still things that my attorney was
24     working on and working through.
25 Q.  All I'm trying to get at, Mrs. Wengerd, is that

Page 282

1      since 2008, you've basically been in the active
2      process of trying to seek compensation for your
3      mother's exposure to asbestos, correct?
4  A.  That is correct.
5  Q.  So there was either a formal litigation pending or
6      bankruptcy trust claims being filed since 2008
7      through today?
8  A.  Correct.
9  Q.  Do you know why some of these settlements are just
10     a few thousand dollars while others are as much
11     as, looks like $150,000?
12 A.  No.
13 Q.  Do you know whether all of these companies that
14     have paid you compensation had asbestos in their
15     product?
16 A.  That is my understanding.
17 Q.  So all of the companies who have paid you
18     settlements so far had asbestos in their products,
19     correct?
20        MR. KUZMIN:  Object to form.  You can
21     answer it.
22 A.  I don't know.  I don't know.  My -- my
23     understanding is that they do, but I have not
24     analyzed each of their products.  That's something
25     I would again have to ask you to refer to my

Page 283

1      attorney to advise.
2  Q.  Okay.  But your understanding is that these are
3      all companies who are responsible in some way for
4      asbestos-containing products?
5  A.  Yes.
6  Q.  It's fair to say then that some factor other than
7      whether a product contained asbestos influences
8      the amount of compensation paid in settlement?
9         MR. KUZMIN:  Object to form.  You can
10     answer it.
11 A.  I don't know what influences the variations in
12     compensation.  I don't know how that's equated.
13 Q.  If they all are responsible for
14     asbestos-containing products and they're paying
15     different amounts in settlement, it's fair to say
16     something other than the fact that their products
17     contained asbestos has influenced the settlement
18     amount in some way?
19        MR. KUZMIN:  Object to form.  You can
20     answer it.
21 A.  It's possible.  I don't know.
22 Q.  We didn't see in any of the documents that were
23     produced to us concerning settlements any
24     settlement with a manufacturer of talc.  Have you
25     received compensation from any talc company

Page 284

1      because of your mother's exposure to asbestos?
2         MR. KUZMIN:  Object to form.  You can
3      answer it.
4  A.  I'm not sure because I'm not sure exactly which of
5      these companies produce only talc or just talc
6      contained within their product.
7         (Whereupon, Defendant's Exhibit 103 was
8      marked for identification.)
9  Q.  So I've handed you what we've marked,
10     Mrs. Wengerd, as Defense Exhibit 103.  This is a
11     copy of a document that was produced to us by the
12     Bevan firm, which is an excerpt or a portion of a
13     database that they maintain related to your
14     mother's asbestos case and documents of a variety
15     of facts, including settlements that they've
16     entered into on your behalf.  Have you ever seen
17     this document or something like it before?
18 A.  No.
19 Q.  If you turn to -- do you see down in the bottom
20     right-hand corner there's a Bates number there?
21     The first page is P-WMS-0012635?
22 A.  Yes.
23 Q.  If you turn to the page that has the Bates number
24     P-WMS-0012642, around 40 percent down on the page
25     do you see two line entries?  One says "Talc check

DONNETTE WENGER - 03/12/2018      Pages 285..288

Page 285

1     number" and the other says "Talc check amount"?
2  A.  Yes, I see.
3  Q.  And in the row for "Talc check amount," it says
4     zero.  Do you see that?
5  A.  Yes.
6  Q.  Would you have any reason to dispute that you've
7     received no settlement monies from any talc
8     company in connection with your mother's asbestos
9     case?
10        MR. KUZMIN:  Object to form.  You can
11        answer it.
12  A.  I have no reason to dispute what's on the sheet.
13  Q.  To your knowledge, have you received settlement
14     monies from a company called Southern Talc
15     Company?
16  A.  I don't know.
17  Q.  To your knowledge, have you received settlement
18     monies from a company called RT Vanderbilt?
19  A.  I don't know.  The name sounds familiar, but I
20     don't know.
21  Q.  Have you received settlement money from a company
22     called Georgia Talc?
23  A.  I don't know.
24  Q.  Mr. Bevan would know the answers to those
25     questions?

Page 286

1  A.  That's correct.
2        MR. KUZMIN:  Object to form.  You can
3        answer.
4  Q.  And you remember -- I'll ask you if you remember.
5     Do you remember at your April 2017 deposition we
6     talked about your mother's deposition testimony
7     from 2008 in her asbestos case?
8  A.  Yes.
9  Q.  Do you recall that?  And I think you told me at
10     the time that you were with your mother for each
11     day of her deposition testimony; is that correct?
12  A.  Correct.  Yes.
13  Q.  And we marked her testimony as an exhibit last
14     time.  It was Defense Exhibit 43.  I have another
15     copy for you.
16  A.  Okay.
17        MR. KUZMIN:  Is this the June 24th?
18  Q.  So this is Defense Exhibit 43, which is the July
19     3rd, 2008 session of your mother's deposition in
20     her asbestos case.  Do you remember when you and I
21     were together in April of 2017, I turned your
22     attention to page 35 of this deposition?
23        MR. KUZMIN:  I'm sorry.  I am going to
24        need a copy.  I only grabbed the first two.
25        Sorry about that.

Page 287

1  A.  Is that the small page numbers?
2  Q.  Yes.  Sorry.
3  A.  Okay.  I'm there.
4  Q.  So page 35, lines 17 through 25, your mother was
5     responding to questions that Mr. Bevan was asking
6     her.  So you see at line 17 it says, by Mr. Bevan,
7     question, "Jennifer, earlier in your testimony you
8     mentioned talc.  Do you recall that?"  Answer,
9     "Yes, I do."  Question, "Do you recall the names
10     of that talc?"  Answer, "I associate that name
11     with Vanderbilt."  Do you see that?
12  A.  Yes.
13  Q.  So in your mother's original case, she identified
14     Vanderbilt as the company whose talc she was
15     exposed to, correct?
16        MR. KUZMIN:  Objection.  Document speaks
17        for itself.  You can answer.
18  A.  Yes.
19  Q.  No mention of EMTAL talc there?
20        MR. KUZMIN:  Object to form.  You can
21        answer.
22  A.  Correct.
23  Q.  Your mother didn't identify EMTAL talc as a brand
24     of talc she was exposed to at all, correct?
25        MR. KUZMIN:  Object to form.  You can

Page 288

1     answer.
2  A.  She didn't indicate that in this, that is correct.
3  Q.  You agree that your mother was exposed to talc
4     sold by Vanderbilt, correct?
5        MR. KUZMIN:  Object to form.  You can
6        answer.
7  A.  To my understanding, yes.
8  Q.  And you had evidence that your mother was exposed
9     to talc sold by Vanderbilt, correct?
10        MR. KUZMIN:  Object to form.  You can
11        answer.
12  A.  Yes.
13  Q.  Were you aware that Vanderbilt, this talc company
14     that your mother referred to, filed a motion for
15     summary judgment in your mother's asbestos case?
16  A.  I -- I don't know.  Possibly.  I believe it
17     was -- Vanderbilt sounds familiar.
18  Q.  In fact, I think I asked you about Vanderbilt a
19     few minutes ago and you said --
20  A.  Yeah.
21  Q.  -- they sounded familiar?
22  A.  Correct.
23  Q.  Do you know why they sound -- can you think of why
24     they sound familiar to you?
25  A.  Because they've been previously discussed.

Page 289

1    (Whereupon, Defendant's Exhibit 104 was
2    marked for identification.)
3 Q.  So I've handed you, Mrs. Wengerd, what we've
4    marked as Defense Exhibit 104.  This is a document
5    from your mother's asbestos case.  It's called
6    "Plaintiffs' Brief in Opposition to Motion for
7    Summary Judgment Filed by RT Vanderbilt, Inc."  Do
8    you see that?
9 A.  Yes.
10 Q.  And it's signed by Jessica Bacon of the Bevan Law
11    Firm?
12 A.  Yes.
13 Q.  Do you know Ms. Bacon?
14 A.  No, I don't think so.
15 Q.  Have you ever dealt with her?
16 A.  Not to my knowledge.
17 Q.  Okay.  It's fair to say, however, that RT
18    Vanderbilt moved for summary judgment in your
19    mother's asbestos case and the Bevan firm filed an
20    opposition to that motion?
21        MR. KUZMIN:  Object to form.  You can
22    answer it.
23 A.  Yes.
24 Q.  If you turn to page 29 of the Bevan firm's
25    opposition to RT Vanderbilt's motion for summary

Page 290

1    judgment in your mother's asbestos case, do you
2    see there's a heading number 5?
3 A.  You said page 29?
4        MR. KUZMIN:  I thought you said 29.
5    Yeah.
6 Q.  Twenty-three.
7 A.  Yes.
8 Q.  So page 23 of the Bevan firm's opposition to
9    Vanderbilt's motion for summary judgment in your
10    mother's asbestos case, do you see heading 5 says,
11    "Jennifer Graham was exposed to RT Vanderbilt
12    talc"?
13 A.  Correct.
14 Q.  And then towards the end of the first paragraph,
15    the Bevan brief says, quote, "Jennifer Graham gave
16    five days of deposition testimony in this case
17    before her death.  Through this deposition
18    testimony one fact became abundantly clear.
19    Jennifer Graham was exposed to RT Vanderbilt's
20    asbestos-containing talc."  Do you see that?
21 A.  Yes.
22 Q.  So it's clear that your lawyers had evidence that
23    your mother was exposed to Vanderbilt talc, right?
24        MR. KUZMIN:  Object to form.  You can
25    answer it.

Page 291

1 A.  Yes.
2 Q.  And if you turn back to page 18 of Defense
3    Exhibit 104.
4 A.  Okay.
5 Q.  So on page 18 of the Bevan firm's opposition to
6    Vanderbilt's motion for summary judgment, do you
7    see heading 1, "Defendant RT Vanderbilt supplied
8    to Plaintiffs' work site"?
9 A.  Yes.
10 Q.  And then that first paragraph begins, quote,
11    "Defendant RT Vanderbilt has admitted selling
12    asbestos-containing talc to Goodyear Tire & Rubber
13    Company where Jennifer Graham was employed.
14    According to answer to interrogatories supplied by
15    Defendant RT Vanderbilt between 1974 and 1980,
16    Defendant RT Vanderbilt sold 62,540 pounds of
17    asbestos-containing talc to Goodyear Tire & Rubber
18    Company's Akron, Ohio, facility."  Do you see
19    that?
20 A.  Yes.
21 Q.  So your lawyers had evidence that RT Vanderbilt's
22    talc, which was sold to Goodyear, where your
23    mother worked, contained asbestos, correct?
24        MR. KUZMIN:  Object to form.  You can
25    answer it.

Page 292

1 A.  Yes.
2 Q.  If you then turn to page 19 of Defense
3    Exhibit 104, you see the second full paragraph
4    that begins, "This is an attempt"?
5 A.  Yes.
6 Q.  The second sentence of that paragraph on page 19
7    of the Bevan firm's opposition to Vanderbilt's
8    motion for summary judgment says, quote, "In 1983,
9    Defendant RT Vanderbilt had their talc analyzed by
10    McCrone Research Associates to see if their talc
11    contained asbestos.  According to their own
12    letter, RT Vanderbilt talc contained in excess of
13    90 percent tremolite asbestos."  Do you see that?
14 A.  Yes.
15 Q.  So the Bevan lawyers also had internal tests that
16    Vanderbilt had conducted showing that Vanderbilt's
17    talc contained asbestos?
18        MR. KUZMIN:  Object to form.  You can
19    answer it.
20 A.  Yes.
21 Q.  In fact, there's a footnote, too, at the bottom of
22    page 19 of the Bevan opposition brief.  It says,
23    quote, "It should be noted that the talc is not
24    contaminated with tremolite, but that the
25    tremolite that they were selling was contaminated

Page 293

1    with talc, considering that their product was 90
2    percent tremolite." Do you see that?
3  A. Yes.
4  Q. So they're emphasizing the fact that there was a
5    lot of asbestos in Vanderbilt talc, correct?
6       MR. KUZMIN: Object to form. You can
7     answer it.
8  A. Yes.
9  Q. If you turn to page 20 of Defense Exhibit 104, the
10    first full paragraph, you see it starts with,
11    "Third"?
12  A. Uh-huh. Yes.
13  Q. That paragraph states – begins, "Third, the Ohio
14    Division of Safety and Hygiene found that RT
15    Vanderbilt's talc at an Ohio job site contained
16    asbestos-formed tremolite." Do you see that?
17  A. Yes.
18  Q. And then down at the bottom of page 20 of Bevan's
19    opposition to Vanderbilt's motion for summary
20    judgment, there's a sentence that says, "Here OSHA
21    found Vanderbilt's talc to have asbestos in it as
22    well." Do you see that?
23  A. Yes.
24  Q. So the Bevan firm also had evidence of government
25    studies concluding that there was asbestos in

Page 294

1    Vanderbilt's talc, correct?
2  A. Yes.
3       MR. KUZMIN: Object to form. You've got
4     to give me a second.
5       THE WITNESS: Sorry.
6  Q. And if you turn to page 21, do you see the second
7    full paragraph that begins, "Sixth"?
8  A. Yes.
9  Q. Page 21, that paragraph states, quote, "Sixth,
10    Clifford L. Kitts, an assistant chemist at
11    Vanderbilt, was deposed on October 5, 1988," and
12    then it cites that deposition as Exhibit 10. And
13    then it goes on to state, quote, "Mr. Kitts
14    testified that he analyzed the ore from the
15    International Talc Mine and identified asbestos
16    fibers therein. The asbestos fibers were in the
17    form of tremolite, chysotile and anthrophyllite."
18    Do you see that?
19  A. Yes.
20  Q. So the Bevan firm also had evidence of
21    Vanderbilt's scientists testifying in depositions
22    that there was asbestos in Vanderbilt's talc,
23    correct?
24       MR. KUZMIN: Object to form. You can
25     answer it.

Page 295

1  A. Yes.
2  Q. Given all of this evidence that the Bevan firm had
3    with respect to Vanderbilt's talc, what would have
4    been a reasonable amount of settlement to have
5    received from Vanderbilt to resolve your mother's
6    asbestos claim?
7       MR. KUZMIN: Object to form. You can
8     answer it.
9  A. I would not have a number without discussing with
10    my attorney.
11  Q. If Mr. Bevan asked Vanderbilt to pay a particular
12    number to settle your mother's case against
13    Vanderbilt, you'd defer to him on that?
14  A. That is correct.
15       MR. KUZMIN: Object to form. You can
16     answer it.
17  A. Sorry. That is correct.
18  Q. If Mr. Bevan asked Vanderbilt to pay a particular
19    amount of money to settle your mother's claim
20    against Vanderbilt, you'd think that was a
21    reasonable amount of money to receive in
22    settlement from Vanderbilt?
23       MR. KUZMIN: Object to form. You can
24     answer it.
25  A. That is correct.

Page 296

1  Q. Knowing what you know today about BASF, Engelhard,
2    EMTAL talc, would you consider it reasonable to
3    receive the same amount of compensation from BASF
4    as you would have expected from Vanderbilt?
5       MR. KUZMIN: Object to form. You can
6     answer it.
7  A. No, not necessarily.
8  Q. Why do you say that?
9  A. Because I believe BASF fraudulently destroyed and
10    hid evidence.
11  Q. Let me ask my question a different way. If you
12    had in 2009 the evidence about EMTAL talc that you
13    say was hidden or destroyed, would you have
14    expected BASF to have paid your mother the same
15    amount of settlement as you would have expected RT
16    Vanderbilt to pay you in settlement?
17       MR. KUZMIN: Object to form. You can
18     answer it.
19  A. I don't know because I don't know what goes into
20    the equation as to – as you've seen and said for
21    yourself, there's a variety of different payments.
22    I don't know what goes into that equation, and
23    it's something that I would have to defer to an
24    attorney.
25  Q. So with respect to RT Vanderbilt, you had evidence

DONNETTE WENGER - 03/12/2018   Pages 297..300

Page 297

1   that your mother was exposed to their talc,
2   correct?
3   A.  Correct.
4   Q.  You had evidence of their own internal documents
5       saying there was asbestos in the talc, correct?
6   A.  Correct.
7   Q.  That's the sort of evidence that the complaint in
8       this case alleges BASF didn't produce to you,
9       right?
10  A.  That is correct.
11  Q.  So Vanderbilt gave you what the complaint here
12      alleges BASF did not give you?
13          MR. KUZMIN:  Object to form.
14  Q.  Fair?
15          MR. KUZMIN:  Oh, object to form.  You an
16      answer it.
17  A.  Correct.
18  Q.  You had evidence of RT Vanderbilt scientists
19      testifying in their deposition that their talc
20      contained asbestos, right?
21  A.  Correct.
22  Q.  That's again another example of evidence that the
23      Williams complaint alleges was not provided to
24      Mr. Bevan in connection with your mother's case by
25      BASF, right?

Page 298

1   A.  Correct.
2   Q.  Okay.  So my question is, if BASF had given you
3       the internal tests like RT Vanderbilt did and BASF
4       had given you the deposition testimony like RT
5       Vanderbilt, would it be reasonable to say BASF
6       and RT Vanderbilt would pay approximately the same
7       amount in settlement?
8           MR. KUZMIN:  Object to form.  You can
9       answer.
10  A.  Not necessarily.  Again, that's something that, A,
11      I'm not qualified to make that decision as to what
12      would have been a decent number or a decent amount
13      to settle.  That's something I would have
14      discussed with my attorney.  And the facts in the
15      case didn't go quite the way that you're asking.
16      You're asking me about a hypothetical.  I'm not
17      going to give you a hypothetical answer.  My
18      consistent answer has been that I would seek
19      counsel from my attorney.
20  Q.  So whatever Mr. Bevan recommended is what you
21      would have done?
22          MR. KUZMIN:  Object to form.  You can
23      answer it.
24  A.  Hypothetically, yes.
25  Q.  Do you know how much money Mr. Bevan asked

Page 299

1   Vanderbilt to pay in settlement to resolve your
2   mother's asbestos case against Vanderbilt?
3   A.  No.
4   Q.  Do you know how your mother's case against
5       Vanderbilt ended?
6   A.  Not off the top of my head.
7           (Whereupon, Defendant's Exhibits 105 and
8           106 were marked for identification.)
9   Q.  I think you have two documents in front of you
10      now, Mrs. Wengerd.  One we've marked as Defense
11      Exhibit 105 and one we've marked as Defense
12      Exhibit 106.  Do you have those in front of you?
13  A.  Yes.
14  Q.  So Defense Exhibit 105 is an e-mail chain.  Up at
15      the top it says -- refers to your mother's name.
16      Do you see that, Jennifer Graham?
17  A.  Yes.
18  Q.  If you turn, the first page of this has Bates
19      stamp P-BEV-001014.  Do you see that?
20  A.  Yes.
21  Q.  Can you turn to the page that has on the bottom
22      P-BEV-001017?
23  A.  Yes.
24  Q.  The first full paragraph on that page, this is an
25      e-mail from a man named Bruce Mandel.  Do you see

Page 300

1   it says, quote, "But I ask you to look at your
2   cases against my two clients, RT Vanderbilt and
3   Hart"?  Do you see that?
4   A.  Yes.
5   Q.  So this is an e-mail from the lawyer who
6       represented Vanderbilt in your mother's asbestos
7       case, correct?
8           MR. KUZMIN:  Object to form.  You can
9       answer it.
10  A.  Yes.
11  Q.  If you look around halfway down in that paragraph,
12      do you see the sentence that begins, "It is, I
13      guess, unfortunate"?
14  A.  Yes.
15  Q.  It says, quote, "It is, I guess, unfortunate from
16      your side that my client was unwilling to respond
17      monetarily to your $25,000 demand, but that is
18      life.  Sometimes we settle, sometimes we don't.
19      You wouldn't have demanded only $25,000 if you
20      didn't know that you had a very weak case against
21      RTV, if one at all."  Do you see that?
22  A.  Yes.
23  Q.  Were you aware that Mr. Bevan demanded only
24      $25,000 from RT Vanderbilt to settle your mother's
25      asbestos claim against Vanderbilt?

DONNETTE WENGER - 03/12/2018      Pages 301..304

Page 301

1    MR. KUZMIN: Object to form. You can
2    answer it.
3 A. I don't remember if he would have consulted me
4    about this.
5 Q. Do you have any basis to dispute that Mr. Bevan
6    asked RT Vanderbilt to pay $25,000 to settle your
7    mother's claim against Vanderbilt?
8 A. No.
9 Q. Did Mr. Bevan discuss the $25,000 settlement
10   demand with you?
11 A. I don't recall.
12 Q. Do you have any document, other writing from
13   anyone at the Bevan firm concerning potential
14   settlement with Vanderbilt company?
15 A. That would have to be provided by Mr. Bevan's
16   office.
17 Q. To your knowledge, does any document like that
18   exist?
19 A. I don't know.
20 Q. If you look at the other document I just gave you,
21   Defense Exhibit 106.
22 A. Yes.
23 Q. This is a copy of the docket sheet in your
24   mother's asbestos case. Do you see up at the top
25   it says, "Estate of Jennifer Graham versus

Page 302

1    Goodyear Tire & Rubber Company, et cetera," and
2    the case number is given CV-08-656405?
3 A. Yes.
4 Q. So this is filings and other information from your
5    mother's case, correct?
6 A. Yes.
7 Q. I asked you a few minutes ago about how your
8    mother's claims against Vanderbilt ended. Do you
9    remember that?
10 A. Yes.
11 Q. If you go down on the first page of Defense
12   Exhibit 106, you see the second entry that's dated
13   August 13th, 2009? It's maybe two-thirds of the
14   way down.
15 A. Yes.
16 Q. The second entry dated August 13th, 2009 says,
17   "Defendant RT Vanderbilt moves this court for an
18   order dismissing case. Vanderbilt's motion to
19   dismiss is converted to a motion for summary
20   judgment. Both Vanderbilt and Plaintiff argued
21   materials and evidence outside complaint. This
22   court converts motion to dismiss to a motion for
23   summary judgment." Do you see all that?
24 A. Yes.
25 Q. And then the next, I guess it's two or three

Page 303

1    sentences say, quote, "The main issue presented to
2    court was whether Vanderbilt's talc product
3    contained asbestos. As of August 10, 2009,
4    Plaintiff failed to submit expert reports on
5    asbestos content. The experts' reports submitted
6    do not provide any explanation for the changes in
7    studies from NIOSH, the Bureau of Mines and OSHA.
8    Vanderbilt's motion for summary judgment is
9    granted." Do you see all that?
10 A. Yes.
11 Q. So you had evidence that your mother was exposed
12   to Vanderbilt's talc, evidence of asbestos in
13   Vanderbilt's talc, but the court dismissed your
14   case against Vanderbilt on summary judgment,
15   correct?
16    MR. KUZMIN: Object to form. Document
17   speaks for itself. Mischaracterization of
18   the document. You can answer the question.
19 A. Again, the document speaks for itself, that that
20   is what you read.
21 Q. That your -- the court dismissed your case against
22   Vanderbilt despite the evidence you had of your
23   mother's exposure to Vanderbilt's talc and
24   evidence of asbestos in their talc, correct?
25    MR. KUZMIN: Same objection. You can

Page 304

1    answer the question.
2 A. Yes.
3    MR. FARRELL: Why don't we take a
4    five-minute break and go off the record.
5    (Recess was taken.)
6    MR. FARRELL: Back on the record.
7 BY MR. FARRELL:
8 Q. So, Mrs. Wengerd, at the start of the day I had
9    been asking you a number of questions, several of
10   which Mr. Kuzmin objected to and instructed you
11   not to answer. We then had our discussion with
12   the Special Discovery Master where he told us to
13   go back to those same questions so that you could
14   answer them subject to a 502(d) order, not that
15   you need to know the details of it. Mr. Kuzmin
16   will know what that means.
17    MR. KUZMIN: For the most part, anyway.
18 Q. I'm going to go back to those questions so you can
19   respond to them fully and we'll figure out what we
20   need to figure out with the court. Okay?
21 A. Okay.
22 Q. So earlier today you were talking to me about the
23   meeting you had with Mr. Bevan, Mr. Coren, I think
24   Jared Placitella shortly before your April 2017
25   deposition. I asked you earlier today, what did

DONNETTE WENGER - 03/12/2018          Pages 305..308

Page 305

1    Mr. Bevan tell you at that meeting shortly before
2    your deposition?
3         MR. KUZMIN:  Okay.  Now, pursuant -- as
4    Mr. Farrell stated, pursuant to our call with
5    the Special Master whereby Federal Rule of
6    Evidence 502(d) order was entered,
7    Ms. Wengerd may answer that question.  I am
8    instructing her to do so without waiver of
9    the previously asserted privilege.  So,
10   Ms. Wengerd, please answer the question.
11 A.  The only thing that I recall discussing with
12   Mr. Bevan was general hello; how are your
13   children; your mom was such a nice lady; your
14   grandfather was such a funny guy; I really enjoyed
15   working with him during his case.
16        I don't recall any specific advice given
17   to me by Mr. Bevan regarding the Williams case.
18   He was just aware that I was there for a meeting
19   with Mr. Coren to discuss the case.  I don't
20   recall him giving me any specific advice or us
21   discussing the Williams case.
22 Q.  What, if anything, did Mr. Coren say while you
23   were there with Mr. Bevan?
24        MR. KUZMIN:  Again, subject to the entry
25   of the 502(d) order by the Special Master

Page 306

1    earlier today, Ms. Wengerd may answer the
2    question without waiver of the previously
3    asserted privilege.  Ms. Wengerd, please
4    answer the question.
5  A.  From what I recall, the two just exchanged polite
6    pleasantries of hi, how you been, it's been a
7    while, comments of that nature.  And the two
8    discussed that I was to have an upcoming
9    deposition, but no other information that I can
10   recall was discussed while Mr. Bevan was in the
11   room.
12 Q.  When you say the two of them, you mean Mr. Coren
13   and Mr. Bevan?
14 A.  Correct.
15 Q.  When you say Mr. Coren and Bevan discussed the
16   fact that you were going to have an upcoming
17   deposition, can you elaborate on that?
18        MR. KUZMIN:  Again, subject to the
19   previously asserted statement that I made, do
20   I have an agreement that this would now carry
21   over to this line of questioning?
22        MR. FARRELL:  Yes.
23        MR. KUZMIN:  Okay.
24 A.  Just Mr. Coren letting Mr. Bevan know that I was
25   to have an upcoming deposition and that they were

Page 307

1    meeting at Mr. Bevan's office to just review what
2    was going to happen at a deposition and just to go
3    over checking in about the case in general.  But
4    there was no actual exchange of information other
5    than generalities about meeting you here and about
6    having to go through a deposition.
7  Q.  What did Mr. Bevan say?
8  A.  I don't even recall anything specific that he said
9    other than acknowledging, oh, okay, good to know.
10   You know, basically where you're at in the case
11   and what's coming up.
12 Q.  What did you say to Mr. Bevan during this
13   conversation?
14 A.  Well, we -- I told him about my children, because
15   he asked.  I think we discussed my mom briefly of,
16   yeah, she was a great lady, I really miss her a
17   lot, things of that nature.  But nothing that was
18   case specific.  And we laughed about a joke my
19   grandfather made all those years ago about a dog
20   dying.  That's it.
21 Q.  What did you say to Mr. Coren while you were there
22   talking with Mr. Coren and Mr. Bevan?
23 A.  I think Mr. Bevan told Mr. Coren that he
24   represented my grandfather and just told him that
25   joke while he was -- Mr. Coren was there.  And

Page 308

1    just generally that my mom was such a nice lady
2    and it was just a shame what happened to her and
3    it was such a short time that we had to be with
4    her before we -- before she passed.  Basically,
5    that's all I remember.
6  Q.  Did Mr. Bevan join you and Mr. Coren to discuss
7    your preparation for your April 2017 deposition?
8  A.  No.
9  Q.  He never came back into the room while you were
10   talking about deposition preparation?
11 A.  No.
12 Q.  I recall at your April 2017 deposition you told me
13   you met with them, by "them" I mean Mr. Coren and
14   Mr. Bevan, on the Tuesday before that deposition
15   and then you also told me there was another
16   meeting several weeks before that.
17 A.  Correct.
18 Q.  Do you remember that?
19 A.  Yes.
20 Q.  Okay.  Who was at the meeting with Mr. Bevan and
21   Mr. Coren several weeks before your deposition?
22 A.  Mr. Bevan, I'm -- I can't remember if I saw him.
23   If I said I did at the time, then I did, but it
24   was only to exchange pleasantries of hello, how
25   have you been.  He wasn't involved in any meeting.

DONNETTE WENGER - 03/12/2018      Pages 309..312

Page 309

1    That would have been the lady and the gentleman,
2    and I think her name was Kristen, and that was to
3    fill out the interrogatories.
4  Q.  Okay. Did anyone from the Bevan firm participate
5    in that meeting regarding your responses to
6    interrogatories?
7  A.  No.
8  Q.  Was Kristen and Jared Placitella from --
9  A.  I think so.
10 Q.  And you?
11 A.  Yes.
12 Q.  Just the three of you?
13 A.  Yes.
14 Q.  Did anyone from the Bevan firm provide information
15    that went into your responses to those
16    interrogatories?
17 A.  Not that I'm aware of.
18 Q.  Have you contacted anyone at the Bevan firm to ask
19    them for information to respond to discovery
20    requests in this case?
21 A.  No.
22 Q.  During the meeting that was the Tuesday before
23    your deposition with Mr. Coren, Mr. Bevan and
24    Jared Placitella, were you shown any documents?
25 A.  I don't think so.

Page 310

1  Q.  What about in the meeting with Jared Placitella
2    and Kristen from the Cohen Placitella firm, were
3    you shown any documents in that meeting?
4  A.  The interrogatories.
5  Q.  Anything else?
6  A.  No.
7  Q.  You also -- we discussed earlier today that you
8    had a meeting with Mr. Bevan and Mr. Coren at
9    Mr. Bevan's office shortly before the Williams
10    case was filed. Do you remember that?
11 A.  Yes.
12 Q.  Does early 2011 sound correct?
13 A.  I don't remember when, but that could be.
14 Q.  It was shortly before the original complaint was
15    filed in this case?
16 A.  Yes.
17 Q.  Mr. Bevan was there, Mr. Coren was there. Anybody
18    else?
19 A.  I don't think so. I don't recall.
20 Q.  How long did that meeting last?
21 A.  I don't recall.
22 Q.  What did Mr. Bevan tell you at that meeting?
23       MR. KUZMIN: Okay. And again, subject to
24    the 502(d) order that was entered pursuant to
25    the Special Master, Ms. Wengerd is directed

Page 311

1    to answer the question, and by answering is
2    not waiving any previously asserted
3    privilege. So you please answer the
4    question.
5  A.  I was introduced to Mr. Coren and he explained
6    that BASF was a company that they had tried to
7    pursue and the case was thrown out, I believe, due
8    to lack of evidence and that Mr. Coren was
9    continuing to seek damages against BASF because
10    they feel that there was fraud that transpired
11    that prevented me from being able to pursue a case
12    against BASF.
13       Once he introduced me to Mr. Coren,
14    Mr. Bevan left and Mr. Coren, again, tried to
15    explain to me a little bit about what a class
16    action is, what my role would be. Just the
17    generalities of what the case was about. And
18    that's all I recall.
19 Q.  What did they tell you the case was about?
20       MR. KUZMIN: Again, I think subject to
21    the 502(d), Ms. Wengerd, you can answer that.
22 A.  The case, from my understanding and from what I
23    recall of them explaining to me, was that talc was
24    contaminated with asbestos or asbestos-containing
25    talc, whichever, and that it was present

Page 312

1    with -- at my mother's work and that she was
2    exposed or could have been exposed while she was
3    working there, and that we tried to pursue filing
4    against the company, but because of lack of
5    evidence, we couldn't and that the company
6    fraudulently destroyed and hid evidence which
7    prevented Mr. Bevan and myself from pursuing a
8    case. And that's why they were continuing to seek
9    justice through the legal system, to get justice
10    for my mother because there was fraud that
11    transpired.
12 Q.  Did they talk to you about why you were going to
13    be a plaintiff in this case as opposed to some
14    other person who had filed a case against BASF in
15    the past?
16       MR. KUZMIN: Okay. Peter, I think we're
17    starting to get into conversations where
18    Mr. Bevan was not present. I don't know if
19    you want to clarify that or not. I think we
20    would clearly be into attorney-client
21    privilege if it was between Ms. Wengerd and
22    Mr. Coren or whoever was here.
23 Q.  Let me try to be more precise. Mr. Bevan is who
24    referred you to the Cohen Placitella firm,
25    correct?

DONNETTE WENGER – 03/12/2018      Pages 313..316

Page 313

1  A.  Correct.

2  Q.  Did he contact you and say I'm referring you to

3      this law firm or did you first just hear from

4      Cohen Placitella out of the blue?

5  A.  I heard from Mr. – from Mr. Bevan first.

6  Q.  Okay.  When did that happen?

7  A.  Prior to my initial meeting with Mr. Coren.

8  Q.  Was this a meeting with Mr. Bevan or was it a

9      phone call?

10 A.  I think it was a phone call.

11 Q.  Roughly when was that phone call?

12 A.  I don't remember.

13 Q.  What did Mr. Bevan tell you during this phone call

14     about the referral to the Cohen Placitella firm?

15     MR. KUZMIN:  I think that this would be

16     subject to attorney-client privilege.

17     However, pursuant to the entry for the 502

18     order by the Special Master, I will allow

19     Ms. Wengerd to answer without waiving such

20     privilege.  Ms. Wengerd, please answer the

21     question.

22 A.  Honestly, I'm not sure quite how the phone

23     conversation went, just that he wanted me to come

24     into the office and to meet with someone regarding

25     my mom's case.  I don't remember any specifics

Page 314

1      over the phone or prior to discussion other than

2      my meeting there.  And when I showed up for the

3      meeting, I didn't have any expectations of what

4      was going to transpire, so I got to meet Mr. Coren

5      just as, you know, it was presented to me.  I had

6      no previous information about him, the firm, his

7      case he was looking for, nothing.

8  Q.  During this phone call with Mr. Bevan, did he say

9      why he wanted you in particular to meet with the

10     Cohen Placitella firm?

11 A.  No, I don't think so.

12 Q.  Did Mr. Bevan talk to you about what you could

13     expect to recover as damages in this case?

14 A.  No.

15 Q.  Did you ask Mr. Bevan any questions?

16 A.  Just if that was what he suggested I do and if he

17     thought that was the best advice, was to work with

18     Mr. Coren's firm and he did.  He felt that it was

19     a confident – he was confident about the referral

20     to this firm.

21 Q.  How long did this phone call last?

22 A.  Oh, no more than a few minutes, maybe.

23 Q.  Did Mr. Bevan say anything other than what you've

24     already told me?

25 A.  Not that I remember.

Page 315

1  Q.  Did you say anything other than what you've

2      already told me?

3  A.  Not that I remember.

4  Q.  So did Mr. Bevan tell you during this phone

5      conversation how much this case could be worth?

6  A.  No.

7  Q.  So you had a phone call with Mr. Bevan.  He

8      explained I want you to come in and meet with some

9      other lawyers, right?

10 A.  Correct.

11 Q.  And then the next thing that happened was this

12     meeting with Bevan, Coren, and maybe Jared

13     Placitella?

14 A.  No, I think I only met with Mr. Coren the first

15     time.  That's all I remember.  I don't think I met

16     Jared at that time.

17 Q.  So just Mr. Coren?

18 A.  Right.

19 Q.  What did Mr. Coren say to you during the portion

20     of the meeting when Mr. Bevan was present?

21     MR. KUZMIN:  And again, to the extent

22     there may be attorney-client privilege

23     implicated subject to the 502(d) order,

24     Ms. Wengerd may answer the question without

25     waiver of the previously asserted privilege.

Page 316

1      So, Ms. Wengerd, please answer the question.

2  A.  The two just tried to explain to me what the

3      referral was about and why they were referring my

4      case is because they felt that in my particular

5      case, I was unable to pursue a case because of the

6      fraud issue, and that significantly impacted my

7      mother's case.

8  Q.  Did they say anything else?

9      MR. KUZMIN:  Again, subject to the

10     502(d), you can answer.

11 A.  No, other than generalities of trying to explain

12     the case to me and what the case was about and why

13     that they felt fraud transpired in my case and

14     couldn't go forward.  No.

15 Q.  You said before that they told you that something

16     significantly impacted your mother's case.  What

17     did you understand them to mean by that?

18 A.  The fraud that transpired.  The hiding and

19     destruction of evidence by the law firm that was

20     representing EMTAL and BASF, that they hid and

21     destroyed evidence which again, therefore, when we

22     asked for evidence or asked for documentation to

23     be presented, it couldn't be because it had been

24     destroyed or hidden.

25 Q.  Did they say anything else?

Page 317

```
1        MR. KUZMIN:  Again, Peter, do I have a
2     502(d)?
3        MR. FARRELL:  Yes.
4        MR. KUZMIN:  Okay.  Please answer the
5     question.
6  A.  Not that I recall.
7  Q.  Have you now told me everything that Mr. Coren
8     told you while Mr. Bevan was present?
9  A.  Yes.
10 Q.  Did you ask any questions of Mr. Coren while
11    Mr. Bevan was present?
12 A.  I don't recall.
13 Q.  Did you ask any questions of Mr. Bevan?
14 A.  I don't recall.
15 Q.  So we've talked about a meeting a couple of weeks
16    before your last deposition, a meeting right
17    before your last deposition, a phone call with
18    Mr. Bevan when he referred you to the Cohen
19    Placitella firm and then this initial meeting with
20    Mr. Coren and Mr. Bevan about this case, right?
21 A.  Correct.
22 Q.  Have you had any other communications with anyone
23    at the Bevan firm regarding the Williams case?
24 A.  No, other than when I turned in the documents,
25    they were to be forwarded to the Placitella firm.
```

Page 318

```
1     I dropped them off, and they knew it was in
2     regards to this matter, I'm sure.
3  Q.  Did you discuss anything with anyone?
4  A.  No.
5  Q.  You just handed them the documents and that was
6     it?
7  A.  Yeah.  I told them this is what was asked of me to
8     drop off and that the Bevan firm would make sure
9     they got to where they needed to go, to the other
10    law firm.
11 Q.  Without telling me what was said in the meeting,
12    have you had any other meetings with the Cohen
13    Placitella firm regarding the basis for the
14    Williams case, the facts underlying the case?
15 A.  Not that I recall.
16 Q.  So just that first meeting with Mr. Coren and
17    Mr. Bevan?
18 A.  The first meeting and then the meeting to fill out
19    the interrogatories and the meeting prior to the
20    April deposition.  That's all.
21 Q.  Other than those three, that's it?
22 A.  Correct.
23 Q.  Okay.  Okay.  I think that's all I have.
24    MR. KUZMIN:  Okay.  You're satisfied that
25    the questions you've asked, you've gotten
```

Page 319

```
1     answers to?  I mean, there's nothing that you
2     feel you've been precluded from asking or
3     getting an answer to subject to the 502
4     restrictions?  Anything like that?
5        MR. FARRELL:  I've asked the questions
6     that I asked earlier today --
7        MR. KUZMIN:  Right.
8        MR. FARRELL:  -- that she was instructed
9     not to answer, so yes, I think I covered what
10    I wanted to cover today.
11       MR. KUZMIN:  Okay.  Very good.  Is there
12    anyone on the phone who has anything?  Not
13    hearing anything.  Good to go?
14       MR. FARRELL:  No questions from
15    Plaintiffs?
16       MR. KUZMIN:  I have nothing.  We'll
17    reserve.
18    -------
19    (Signature was not waived by the Witness.)
20    -------
21    (The deposition was concluded at 12:40 p.m.)
22    -------
23
24
25
```

Page 320

```
1        W I T N E S S  C E R T I F I C A T E
2
3        I, DONNETTE WENGERD, do hereby certify that I have
4     read my deposition taken on March 12, 2018, in the case
5     of Kimberlee Williams, et al. Versus BASF Catalysts,
6     LLC, et al., consisting of 131 pages, and that said
7     deposition is a true and correct transcription of my
8     testimony with changes as noted on the errata sheet.
9
10    _____
11       Donnette Wengerd
11
12    Dated this _____ day of _____, 2018.
13
14
15
        Sworn to and subscribed before me this _____
16
17    day of _____, 2018.
18
19
      _____
20       Notary Public
21
      My commission expires _____.
22
23
24
25
      AP
```

DONNETTE WENGER - 03/12/2018      Pages 321..322

Page 321

```
1        ERRATA SHEET
2   Witness Name: Donnette Wengerd
3   Date of Deposition: March 12, 2018
4   Case: Kimberlee Williams, et al. Versus BASF
    Catalysts, LLC, et al.
5
6   Page  Line   Change and Reason for Change
7   _____  _____  _____
8   _____  _____  _____
9   _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  _____  _____  _____
25  _____  _____  _____
    AP
```

Page 322

```
1            C E R T I F I C A T E
2   STATE OF OHIO, )
                   ) SS:
3   SUMMIT COUNTY. )
4       I, Anika W. Patrick, a Registered Merit Reporter,
    Certified Realtime Reporter and Notary Public within
5   and for the State of Ohio, duly commissioned and
    qualified, do hereby certify that the within-named
6   Witness, DONNETTE WENGERD, was by me first duly sworn
    to testify the truth, the whole truth and nothing but
7   the truth in the cause aforesaid; that the testimony so
    given by her was by me reduced to Stenotypy in the
8   presence of said witness; afterwards prepared and
    produced by means of Computer-Aided Transcription, and
9   that the foregoing is a true and correct transcription
    of the testimony so given by her as aforesaid.
10
        I do further certify that this deposition was
11  taken at the time and place in the foregoing caption
    specified, and was completed without adjournment.
12
        I do further certify that I am not a relative,
13  employee of or attorney for any party or counsel, or
    otherwise financially interested in this action.
14
        I do further certify that I am not, nor is the
15  court reporting firm with which I am affiliated, under
    a contract as defined in Civil Rule 28(D).
16
17      IN WITNESS WHEREOF, I have hereunto set my hand
    and affixed my seal of office at Akron, Ohio, this 13th
18  day of March, 2018.
19
20
    _____
21      Anika W. Patrick, RMR, CRR & Notary Public
    My commission expires March 13, 2020
22
23
24
25
```

DONNETTE WENGER - 03/12/2018                    i1

---

**$**

**$1,389,290.62**
280:6

**$120,000**
276:24

**$149,129.69**
278:9

**$150,000**
282:11

**$23,379.52**
278:14

**$24,721**
277:14

**$25,000**
300:17,19,24 301:6,9

**$26,611.25**
277:22

**$36,250**
277:10

**$4,404.42**
277:6

**$5,307**
276:2

**$62,227.51**
277:8

**$63,447.96**
277:20

---

**1**

**1**
262:18 263:23,25 264:1
291:7

**10**
216:14 263:4 264:17
294:12 303:3

**100**
278:14

**101**
278:16

**102**
274:15 275:15,22 278:17
279:14

**103**
284:7,10

**104**
289:1,4 291:3 292:3
293:9

**105**
299:7,11,14

**106**
299:8,12 301:21 302:12

**11**
263:9 264:24 265:10

**12**
214:9 216:11,12,14
263:13 269:17 270:1,7

**12:40**
319:21

**13th**
302:13,16

**14**
214:9

**17**
202:18 214:10 287:4,6

**18**
291:2,5

**19**
292:2,6,22

**1974**
291:15

**1980**
291:15

**1983**
292:8

**1988**
294:11

**1992**
270:2,9

**1993**
270:3,9

**1996**
270:10

---

**2**

**20**
293:9,18

**2008**
226:5,23 233:1,6,14
234:4,16 235:8,15
236:12,15,16,23 267:22
269:6,15 270:18 271:15
280:16 281:14,21 282:1,
6 286:7,19

**2009**
233:1,6,15 234:4 236:12,
17,23 267:22 269:6,15
270:18 281:20,22 296:12
302:13,16 303:3

**2010**
226:24 227:3 242:8
281:20

**2011**
226:24,25 227:3 242:8
281:20,22 310:12

**2012**
281:20,22

**2016**
280:23

**2017**
202:1 203:8 205:17
206:6 207:8,12 208:21
209:4,23 210:15 211:20
212:15 216:8,23 218:10
221:3,19 223:9,17
229:12 247:10 254:23
286:5,21 304:24 308:7,
12

**2018**
260:24 261:2,17

**21**
294:6,9

**22nd**
271:15

**23**
290:8

**24th**
286:17

**25**
287:4

**29**
260:24 261:2,17 289:24
290:3,4

---

**3**

**30-something**
279:4

**35**
286:22 287:4

**3rd**
286:19

---

**4**

**4**
262:24 264:8,10,11
274:22

**40**
284:24

**43**
286:14,18

**45**
222:7

---

**5**

**5**
290:2,10 294:11

**502**
313:17 319:3

**502(d)**
213:2,15 215:6,17
304:14 305:6,25 310:24
311:21 315:23 316:10
317:2

---

**6**

**6**
202:18

**62**
202:14,17

**62,540**
291:16

**63**
260:18,20,23,24 261:13,
16 262:8,15 274:19

**64**
260:19,21,23 261:2,13,

---

16 262:8

**65**
271:11,14

**66**
274:14 275:15,17 276:7
278:20 279:2,18 280:15

**67**
275:21,23 279:14

**68**
276:4

**69**
276:9

**6th**
203:8

---

**7**

**70**
276:10

**71**
276:13

**72**
276:14

**73**
276:17

**75**
276:21

**76**
276:23

**77**
276:25

**78**
277:2

**79**
277:4

---

**8**

**80**
277:6

**81**
277:7

**82**
277:9

**83**
277:11

---

**9**

**90**
277:24 292:13 293:1

**91**
277:25

---

**A**

**A-BEST**
275:24 279:20

**abide**
213:24

**able**
242:1 243:18,21 244:7
245:10 311:11

**abundantly**
290:18

**accept**
237:15 271:22 272:6,20
273:11,14

**account**
232:6,17 233:4

**accumulated**
227:16,18

**accurate**
279:24

**accurately**
201:3

**acknowledging**
307:9

**action**
311:16

**active**
267:22 282:1

**activity**
236:16

**actual**
307:4

**added**
280:11

**addition**

206:8

**address**
205:5 211:11 230:2
232:21 244:25

**admitted**
291:11

**advice**
255:23 305:16,20 314:17

**advise**
283:1

**advised**
202:3 223:14 224:10

**advising**
224:14

**affairs**
229:7

**affect**
251:19

**ago**
200:23 204:15 205:20
218:2,5 229:11 241:4
245:4 261:23 274:23
288:19 302:7 307:19

**agree**
213:3 215:6 241:10
288:3

**agreed**
199:17

**agreement**
306:20

**Akron**
291:18

**alive**
226:3

**allegations**
247:11

**alleged**
247:15,25 248:10

**alleges**
297:8,12,23

**allow**
215:6,18 313:18

**allowed**
198:11,17

**allowing**
213:1

**allows**
258:11

**amount**
237:8 251:19 252:10
270:17 273:7 274:1,5
276:2 277:10 280:5
283:8,18 285:1,3 295:4,
19,21 296:3,15 298:7,12

**amounts**
279:22 283:15

**analyzed**
282:24 292:9 294:14

**answer**
198:12 200:7 203:5
205:24 210:18,24 211:13
212:20 213:4,8,17
214:11,17,22 215:8,15,
18 216:5,18 217:2,21
218:12 220:11 221:6,12
222:21,25 223:12,14
224:19,21 230:6 231:25
234:18 236:9 237:11,19
238:4,21 239:6 240:4,14
241:17 243:13,15,18,20,
21 244:3,5,7,8,20,22
245:3 246:6 247:18
248:3 249:11 250:6,13,
19 251:6,12,22 252:2
253:5,12,23 254:3,12
255:16 256:10,16,24
257:18,19,25 258:9,22
259:6,24 270:13,21
272:9,24 273:18,23
275:5 279:16 280:1,10
281:17 282:21 283:10,20
284:3 285:11 286:3
287:8,10,17,21 288:1,6,
11 289:22 290:25
291:14,25 292:19 293:7
294:25 295:8,16,24
296:6,18 297:16 298:9,
17,18,23 300:9 301:2
303:18 304:1,11,14
305:7,10 306:1,4 311:1,
3,21 313:19,20 315:24
316:1,10 317:4 319:3,9

**answered**
213:1,16 215:13 223:8
261:20

DONNETTE WENGER - 03/12/2018                    i3

answering
  311:1

answers
  260:25 261:19 274:19
  285:24 319:1

anthrophyllite
  294:17

anybody
  204:23 207:11 211:15
  212:14 231:7 235:5,21
  236:5 310:17

anyway
  252:21 304:17

APG
  276:4 279:20

apologize
  202:9

appeal
  199:10

apple
  218:23

applied
  266:17

apply
  272:10,14

appreciate
  201:1

appropriate
  260:2

approved
  217:15

approximately
  298:6

April
  200:2 201:21 202:1,18
  203:8 205:17 206:6
  207:8,12 208:21 209:23
  210:15 211:20 212:15
  216:8,23 218:10 221:2,
  19 223:8,17 225:15
  228:20 229:12 230:1,21
  247:10 254:23 261:11
  286:5,21 304:24 308:7,
  12 318:20

area
  212:21

areas
  198:15,21

argued
  302:20

Armstrong
  276:9,11 277:21

asbestos
  208:14 223:19 224:3,16
  226:10,15 227:14 228:17
  232:8,19 234:5 235:6,14,
  23 236:7,23 237:5,17
  238:1,16 239:3,20 240:1,
  12,24 246:3,11,14,20,24
  247:7 249:4,9,14,21
  250:21 251:4,20,25
  260:6,9 264:14,22
  265:18 266:1,9 267:6,12,
  23 268:12 269:23
  270:10,24 272:19 273:2,
  15 275:24 276:5,18,20
  278:8 279:12 281:13
  282:3,14,18 283:7,17
  284:1,14 285:8 286:7,20
  288:15 289:5,19 290:1,
  10 291:23 292:11,13,17
  293:5,21,25 294:15,16,
  22 295:6 297:5,20 299:2
  300:6,25 301:24 303:3,5,
  12,24 311:24

asbestos-containing
  283:4,14 290:20 291:12,
  17 311:24

asbestos-formed
  293:16

aside
  203:13

asked
  201:5,7 203:21,25 210:3,
  11,20 211:13 213:22
  214:3,8 215:12 216:16
  217:20,25 221:10,13
  223:17 225:17 229:19
  230:2,5 233:21 241:12
  243:15 245:21,22 247:5,
  10 249:3 252:12 256:18
  257:20 258:25 260:5
  262:20 273:25 274:4
  288:18 295:11,18 298:25
  301:6 302:7 304:25
  307:15 316:22 318:7,25
  319:5,6

asking
  211:10,14 214:23 217:21
  218:13 219:1 232:25
  236:11 238:24 243:8
  252:5,6,8 258:2,7 268:20
  272:20 287:5 298:15,16
  304:9 319:2

asks
  263:9 264:2

Assaf
  212:23,24,25

asserted
  198:22 305:9 306:3,19
  311:2 315:25

assist
  242:2

assistance
  199:1

assistant
  205:10 206:12,17 207:15
  294:10

associate
  287:10

associated
  205:16

Associates
  292:10

assume
  199:20 201:5,9

attachment
  205:5

attempt
  292:4

attention
  286:22

attorney
  204:25 224:5 227:12
  230:19 237:3 239:8,12
  246:15 249:13,16,17
  255:20 258:14,15 259:18
  264:16 266:20 279:2
  281:23 283:1 295:10
  296:24 298:14,19

attorney's
  255:23 258:14

attorney-client
  211:7 213:9 214:24

215:21 216:20 217:18
223:1,15 244:1,19
312:20 313:16 315:22

attorneys
  211:24 212:1 218:7
  228:8 232:5,14 234:13
  245:22 246:1 247:19,20
  259:14

attorneys'
  278:21

August
  302:13,16 303:3

automatically
  227:11

autopsy
  227:10

avoid
  252:19

aware
  203:7,11 208:1 226:22
  233:2 240:19 269:11
  279:11 288:13 300:23
  305:18 309:17

—————————

                B

Babcock
  276:14

back
  198:7 200:1 206:11
  216:2 219:24,25 223:8
  224:12 227:19 234:2
  242:18 252:25 274:16,18
  280:16 281:3 291:2
  304:6,13,18 308:9

Bacon
  289:10,13

bad
  230:25

ballot
  207:22,25 208:3,5,6,10

ballots
  208:14

bankruptcies
  272:11

bankruptcy
  209:11 227:15 234:5,24

235:3,16 236:2,3 246:20, 24 256:5,11,18,25 256:5, 12 279:12 281:1,9 282:6

**based**
199:7 255:5,19 256:19 257:20 280:4

**BASF**
199:4,20 241:23 242:16 245:6,18 248:4 251:24 252:6,10 261:1 264:4,21 265:4,7,22 266:9 268:10 269:22 270:17,25 274:24 296:1,3,9,14 297:8,12,25 298:2,3,5 311:6,9,12 312:14 316:20

**BASF's**
199:7 261:3 262:16 265:16,25 267:5,11 268:1,19 269:7,14 270:7 274:20 279:18

**basically**
282:1 307:10 308:4

**basis**
198:12 248:6 280:12 301:5 318:13

**Bates**
284:20,23 299:18

**begins**
291:10 292:4 293:13 294:7 300:12

**behalf**
198:3 232:14 267:10 275:4,20 281:10 284:16

**believe**
204:4 207:15,17 208:16, 24 212:4,23 215:12 225:5 227:2 228:20 229:21 234:11 242:5 261:10,13 275:15 279:3 288:16 296:9 311:7

**believed**
259:20

**best**
243:21 314:17

**Bevan**
207:10,11,18,19 208:21, 25 209:6,10,13,17,23 210:12,15,22 211:8,14, 17,19,25 212:8,17 214:5,

11 216:17,23 217:1 218:3,8,9,24 219:2 221:1,3,20 222:9,13,16 223:5 224:6,8 225:1,4, 11,19 226:6,9,18 227:6, 7,24 228:2,18,23 231:6, 7,14 233:10,11,24 234:2, 4,8,15,20 235:5,15,20,21 236:5,21 237:3,6,13,14, 21,24 238:14 239:1,8,18, 23 240:8,10,22 241:13, 15,20,22 242:3,11,14,19 243:2,5,17,19,23,24 244:10,16 245:4,13 246:9,13,25 247:6,22,23 248:14,15 249:22 255:4, 24 256:4 258:12 260:11 264:16 265:20,21,24 266:1,4,8 267:4,9,24,25 268:5,10,18,24 269:9,12, 21 270:15,24 271:16,21 272:4,18 273:3,11,13,20, 25 284:12 285:24 287:5, 6 289:10,19,24 290:8,15 291:5 292:7,15,22 293:24 294:20 295:2,11, 18 297:24 298:20,25 300:23 301:5,9,13 304:23 305:1,12,17,23 306:10,13,15,24 307:7, 12,22,23 308:6,14,20,22 309:4,14,18,23 310:8,17, 22 311:14 312:7,18,23 313:5,8,13 314:8,12,15, 23 315:4,7,12,20 317:8, 11,13,18,20,23 318:8,17

**Bevan's**
227:20 228:6 264:20 266:20 293:18 301:15 307:1 310:9

**Bill**
198:1 219:21

**bit**
203:23 214:2 311:15

**bites**
218:22

**bleeding**
262:3

**blue**
313:4

**bottom**
271:18 284:19 292:21

293:18 299:21

**brand**
226:20 287:23

**break**
200:7 201:14 215:24 218:17 304:4

**breaks**
201:12

**brief**
251:8 267:9,25 268:10 289:6 290:15 292:22

**briefing**
265:15

**briefly**
203:14 307:15

**brought**
232:4

**Bruce**
299:25

**bullets**
270:2,6

**bunch**
274:9

**Bureau**
303:7

---

## C

**call**
205:20 206:3,10,20,25 220:6,18,22 228:10 235:11 305:4 313:9,10, 11,13 314:8,21 315:7 317:17

**called**
285:14,18,22 289:5

**calling**
220:5 230:10 231:18 238:10

**can't**
201:18 206:22 212:1 222:10 245:11 257:19 258:24 308:22

**cancer**
251:18 254:25

**capacity**

228:12

**carried**
250:21

**carry**
306:20

**case**
198:5 201:22 202:19 203:16 204:6,8 206:19 207:23 209:14 211:6 213:7 215:11,20 216:17, 24 218:1 221:4,17 223:6, 19 224:1,3,15,16 226:10, 24,25 227:5,14 228:17 229:9,22 230:9,13 232:8, 19,22 233:1,6,14 234:5 235:6,8,14,18,23 236:7, 15,23 237:5,7,17 238:1, 2,9,16,17 239:3,4,20 240:1,12,24 241:16,25 242:2,7 243:3,12 244:11 245:6,10,16,18 246:1,4, 11,14,20,24 247:7 249:4, 5,8,9,16,20,21,25 250:4, 11,17 251:20 252:10,13 253:3,8 254:1,9,15,17 260:7,14 263:2,7,10,15 264:4,14,22 265:3,7,18, 22 266:2,10 267:6,12,23 268:12 269:4,23 270:10, 24 272:19 273:2,15 279:6,12 280:21 281:14 284:14 285:9 286:7,20 287:13 288:15 289:5,19 290:1,10,16 295:12 297:8,24 298:15 299:2,4 300:7,20 301:24 302:2,5, 18 303:14,21 305:15,17, 19,21 307:3,10,18 309:20 310:10,15 311:7, 11,17,19,22 312:8,13,14 313:25 314:7,13 315:5 316:4,5,7,12,13,16 317:20,23 318:14

**cases**
208:14 273:12 300:2

**catalog**
279:19

**Catalysts'**
261:1

**caution**
241:7

**Celotex**
276:15,18

**certified**
200:17

**cetera**
302:1

**chain**
299:14

**changes**
303:6

**chart**
275:18 276:6 278:23
279:24

**check**
206:21 207:5 232:20
235:2 236:2 260:11
262:10 276:11 277:16
278:5 284:25 285:1,3

**checked**
232:17 233:4,8,9

**checking**
307:3

**chemist**
294:10

**children**
305:13 307:14

**chysotile**
294:17

**cites**
294:12

**claim**
271:23 273:6,14 295:6,
19 300:25 301:7

**claims**
209:11 227:15 235:16
242:15 246:21,25 255:4,
9,12,17,19,20,25 256:5
257:5 262:21,25 263:16
264:3 269:22 270:25
275:1 281:1,10,12 282:6
302:8

**clarifications**
217:9

**clarify**
312:19

**Clark**

**class**
311:15

**clear**
213:13 261:22 290:18,22

**clearly**
312:20

**client**
271:22 300:16

**clients**
300:2

**Clifford**
294:10

**closed**
266:12,15

**clothing**
250:21

**coach**
217:12

**coachings**
217:10

**coffee**
202:11,12

**Cohen**
198:2 205:16 206:5
207:6 209:17 218:6
223:24 224:14 227:22
228:3,24 242:6,12,19,24
249:17 254:20 262:7
310:2 312:24 313:4,14
314:10 317:18 318:12

**come**
219:18,24,25 231:14
241:8 247:19 249:12,15
280:16 313:23 315:8

**coming**
207:21,25 208:2 307:11

**comments**
199:5 306:7

**communicated**
233:12,18

**communication**
205:1 239:18,24 240:2
267:3,8 268:9

**communications**
205:15 206:4 207:7,11

**209:**6

**209:3,13 235:4,22 236:6,
22 237:22,25 238:14
239:1 240:10,20,21
265:20,24 266:4,7
267:24 268:7,17,20,21,
22,23 269:8,12 270:23
317:22

**companies**
260:6 280:24 282:13,17
283:3 284:5

**company**
276:14 283:25 285:8,14,
15,18,21 287:14 288:13
291:13 301:14 302:1
311:6 312:4,5

**Company's**
291:18

**compare**
262:4,11

**comparing**
280:2

**compensation**
250:3,10,16,17 251:3,9,
24 255:5 256:18 257:20
258:25 260:8 276:17,19,
21 282:2,14 283:8,12,25
296:3

**complaint**
204:6,8,12 247:12,16
248:1,10,13 297:7,11,23
302:21 310:14

**complete**
201:18 279:24

**concerned**
257:3

**concerning**
199:13 207:7 226:19
228:17 232:25 234:5
235:22 236:22 239:19
242:15 246:3,10,14
247:14 249:7 254:24
266:1 278:6,7,10 283:23
301:13

**concerns**
249:8

**concluded**
255:1,13 256:6,13,21
319:21

**concluding**
293:25

**conclusion**
254:24

**condition**
255:19

**conduct**
218:21 219:8

**conducted**
292:16

**confident**
314:19

**confuse**
235:13

**confused**
201:7 262:2

**connection**
250:4 264:21 268:11
285:8 297:24

**connects**
249:4

**consider**
274:5 296:2

**consideration**
208:18 220:13

**considering**
293:1

**consistent**
298:18

**constitutes**
250:24

**consult**
237:14 255:24

**consulted**
301:3

**consulting**
243:12

**contact**
199:9 219:17 272:5
313:2

**contacted**
272:18 309:18

**contained**
228:16 249:14 283:7,17
284:6 291:23 292:11,12,

17 293:15 297:20 303:3

**contaminated**
249:14 292:24,25 311:24

**content**
303:5

**context**
208:8 210:24 211:10
213:5

**continue**
245:10

**continuing**
242:2 311:9 312:8

**control**
258:3

**conversation**
198:18 211:19 212:22
242:3,11 269:3 307:13
313:23 315:5

**conversations**
210:25 211:17 312:17

**converted**
302:19

**converts**
302:22

**copied**
227:9

**copies**
225:10,21 227:18,25
228:5 232:10,15 233:25
237:2

**copy**
202:20 225:12,18 226:12
227:11,13 232:2,3
234:13 247:1 266:20
276:10 278:5 284:11
286:15,24 301:23

**Coren**
211:15 212:2,8 221:1
222:14,16,24 223:4,14
242:20,21 243:2,24
244:11,15 248:14,15
254:4 304:23 305:19,22
306:12,15,24 307:21,22,
23,25 308:6,13,21
309:23 310:8,17 311:5,8,
13,14 312:22 313:7
314:4 315:12,14,17,19
317:7,10,20 318:16

**Coren's**
314:18

**corner**
216:12 284:20

**coroner**
227:10

**Corporation**
277:7

**correct**
207:9 209:1,2,24,25
211:21,22 223:9 224:16,
17,20,24 226:7,11 227:1,
17 230:13 231:21
234:10,11 238:7 239:22
240:5 241:20 243:3
244:23 245:6,7 247:2
248:7,8 249:19 253:15,
16,18 254:10,13 255:9,
10 256:3 257:13 263:20,
21,25 264:6,10,18,23,25
265:4,5,8,13,14,19,23
266:2,3,13 267:2 269:16,
19,20,24 271:16 274:3,7
278:25 280:7,17,18,21,
22,24,25 281:15 282:3,4,
8,19 286:1,11,12 287:15,
22,24 288:2,4,9,22
290:13 291:23 293:5
294:1,23 295:14,17,25
297:2,3,5,6,10,17,21
298:1 300:7 302:5
303:15,24 306:14 308:17
310:12 312:25 313:1
315:10 317:21 318:22

**corrected**
203:2,9

**corresponded**
228:8

**correspondence**
265:25 266:21

**corresponding**
278:23

**couldn't**
202:10 203:22 205:23,24
216:18 312:5 316:14,23

**counsel**
198:24 199:1 200:20
202:19 209:16 247:5
248:7 263:6,14 274:25
298:19

**couple**
206:11 234:8 317:15

**course**
201:13 218:23 227:14

**court**
202:8 214:19 219:4
236:16 265:16 269:6
275:13 302:17,22 303:2,
13,21 304:20

**court's**
268:18 269:9,13

**cover**
319:10

**covered**
319:9

**created**
275:18

**CROSS-
EXAMINATION**
200:18

**cup**
202:11,12

**current**
229:22

**cut**
202:2

**CV-08-656405**
302:2

---

**D**

**damages**
311:9 314:13

**database**
284:13

**date**
227:2 230:3 279:21
280:6,15

**dated**
261:17 302:12,16

**day**
217:7 286:11 304:8

**days**
290:16

**dealt**
215:11 289:15

**death**
251:16 252:7 290:17

**debate**
214:16

**decent**
298:12

**decide**
254:14

**decided**
213:2

**deciding**
237:15

**decision**
265:12 268:18 269:7,9,
13 298:11

**defendant**
238:1,15 239:2,19,25
263:1 264:13 271:23
272:19 273:25 274:4
291:7,11,15,16 292:9
302:17

**Defendant's**
202:14 260:20 271:11
274:14 284:7 289:1
299:7

**defendants**
199:21 229:8 230:13
237:16,23 273:1,15

**Defendants'**
230:24

**Defense**
202:17 260:23 261:16
262:8,15 271:14 274:18
275:14,17,21,23 276:4,9,
10,13,14,17,20,23,25
277:2,4,6,7,9,10 279:13,
18 280:15 284:10
286:14,18 289:4 291:2
292:2 293:9 299:10,11,
14 301:21 302:11

**defer**
273:3 274:1 295:13
296:23

**demand**
300:17 301:10

**demanded**
300:19,23

DONNETTE WENGER - 03/12/2018 i7

**depending**
220:3

**depends**
241:11 256:25

**deposed**
204:24 294:11

**deposition**
198:12 199:8,15,18
200:1,5 201:13,22,23
202:1,18,21,25 203:9,12
204:3,10,13,18,20
205:12,17,22 206:6
207:3,4,8,12 208:22
209:4,24 210:2,5,15,16,
21 211:20 212:6,15,18
214:9,10 216:8,24 218:4,
10,18,20,22 219:7,9,24
220:8 221:3,20 222:6
223:17 225:15 228:21,22
229:12 230:1 233:17
234:9 236:17 247:9
249:3 254:23 286:5,6,11,
19,22 290:16,17 294:12
297:19 298:4 304:25
305:2 306:9,17,25 307:2,
6 308:7,10,12,14,21
309:23 317:16,17 318:20
319:21

**depositions**
294:21

**deprived**
198:25

**describe**
241:20 263:13

**describing**
242:4 267:1

**despite**
303:22

**destroyed**
296:9,13 312:6 316:21,
24

**destruction**
316:19

**detail**
223:7 230:7

**details**
304:15

**determine**
232:6,17 233:4

**develop**
263:15 269:22

**developed**
251:2,3,18

**developments**
236:6,22 237:2

**diagnosis**
257:21

**didn't**
201:6 203:22 206:23
227:12 245:6 255:1,17
256:21 257:9,23 258:6,
19 259:3,11 279:13
283:22 287:23 288:2
297:8 298:15 300:20
314:3

**difference**
220:19

**different**
203:24 207:21 208:1
214:3 225:24 227:18
232:10,11 235:12 283:15
296:11,21

**difficult**
214:2

**Dll**
276:19

**direct**
213:8,21 217:4 218:12
222:25

**directed**
310:25

**directly**
250:22

**disagree**
199:21 215:1 220:15

**discarded**
234:16

**disclose**
257:14 258:18

**discovery**
199:6 304:12 309:19

**discuss**
210:14,19 215:16 231:11
252:18 301:9 305:19
308:6 318:3

**discussed**
210:11 214:10,21 215:9
230:23 249:20 254:21,23
255:4 270:15 288:25
298:14 306:8,10,15
307:15 310:7

**discussing**
295:9 305:11,21

**discussion**
198:6 242:14 252:24
304:11 314:1

**discussions**
211:5 215:19 254:14
271:9

**disease**
251:14

**dismiss**
302:19,22

**dismissal**
263:10 265:3

**dismissed**
238:2,16 239:3,20,25
240:11,23 241:16,25
242:16 245:18 265:7
303:13,21

**dismissing**
302:18

**dispositions**
263:1 264:13

**dispute**
280:12 285:6,12 301:5

**distinct**
235:17

**Division**
293:14

**docket**
301:23

**doctor**
254:25 255:12 256:6,13

**doctors**
256:21 259:9,25 260:3

**document**
203:13 230:14 247:1
257:7,9 266:25 276:21
277:3,11,15,18,24 278:1,
2,4,7,10,13,15,16,17
284:11,17 287:16 289:4

301:12,17,20 303:16,18,
19

**documentation**
316:22

**documented**
278:12

**documents**
204:2,9,17 223:18 224:2,
4,15,22 225:1,3,5,9,13
226:2,9,19 227:6,7,16
228:24 229:6 232:7,9
245:23 246:3,10,13,23
248:20 254:24 257:10,
15,22 258:18 259:3
261:6 262:1 268:6
274:25 275:3,5,8,14,19,
22 278:22 279:7 280:3,4,
9,14 283:22 284:14
297:4 299:9 309:24
310:3 317:24 318:5

**doesn't**
200:6

**dog**
307:19

**doing**
228:11

**dollar**
273:7 279:22

**dollars**
282:10

**don't**
201:4 202:2 203:6
207:15,16,17 208:16,17,
19 209:7,9 212:16
217:17,25 222:3,7 223:3,
7,16 224:8,11 228:4,12
229:10,16,21,22 230:17
231:3,10,16,21 232:2,14
233:2 234:12 235:13
236:25 238:7,12,18
239:9,14 240:5,7,25
242:17 244:13 245:19
246:7 247:23 248:9,17,
22 249:14 250:7,8,14,20,
25 251:7,13,16,17,23
253:6 256:17 258:9,23
260:10 262:3 263:18
264:4 266:23,24 267:18
268:3,4,5,13,16 269:10,
16 270:8,14 272:10,22,
25 273:24 274:8 279:17

280:2,11 281:21 282:22
283:11,12,21 285:16,19,
20,23 288:16 289:14
296:19,22 300:18 301:3,
11,19 304:3 305:16,19
307:8 309:25 310:13,19,
21 312:18 313:12,25
314:11 315:15 317:12,14

**Donnette**
200:15 260:25

**drop**
318:8

**dropped**
318:1

**due**
245:10 311:7

**duly**
200:16

**DX62**
202:13 216:8

**dying**
307:20

---

**E**

**e-mail**
205:4,5,9,11,12 206:9,18
232:3,6,17 233:4,12
237:6 262:5,11 266:25
299:14,25 300:5

**e-mails**
206:8,11,13,16 207:14,
18 232:9,18,20,25 233:2,
5 247:6 271:5

**earlier**
231:17 287:7 304:22,25
306:1 310:7 319:6

**early**
310:12

**effort**
279:18

**efforts**
263:14 269:21

**Eighty-eight**
277:20

**Eighty-five**
277:14

**Eighty-four**
277:13

**Eighty-nine**
277:22

**Eighty-seven**
277:18

**Eighty-six**
277:16

**either**
203:22 209:9 225:11
248:14 261:6,25 282:5

**elaborate**
306:17

**Electric**
277:5

**emphasizing**
293:4

**employed**
291:13

**employment**
226:16

**EMTAL**
250:9,16 251:8,10
270:19 287:19,23 296:2,
12 316:20

**enclosed**
235:2

**encourage**
208:11

**ended**
251:14,15 254:8,18
299:5 302:8

**Engelhard**
263:6 296:1

**enjoyed**
305:14

**enter**
272:5

**entered**
199:6 284:16 305:6
310:24

**entering**
273:1

**entire**
227:22

**entirety**
244:10

**entitled**
251:24

**entries**
284:25

**entry**
302:12,16 305:24 313:17

**equated**
283:12

**equation**
296:20,22

**Erin**
209:6 225:20 227:25

**especially**
213:6 214:24

**essentially**
220:7 281:13

**Estate**
301:25

**estimated**
279:3

**estimates**
278:24

**et**
302:1

**ethically**
259:16

**evidence**
245:11 259:19 288:8
290:22 291:21 293:24
294:20 295:2 296:10,12,
25 297:4,7,18,22 302:21
303:11,12,22,24 305:6
311:8 312:5,6 316:19,21,
22

**exactly**
206:22 284:4

**example**
209:11 236:17 239:16
297:22

**excerpt**
284:12

**excess**
292:12

**exchange**
307:4 308:24

**exchanged**
253:20 306:5

**exhibit**
202:14,17 260:23,24
261:16 262:8,15 271:11,
14 274:19 275:15,17,21,
23 276:4,9,10,13,14,17,
21,23,25 277:2,4,6,7,9,
11 279:18 280:15 284:7,
10 286:13,14,18 289:1,4
291:3 292:3 293:9
294:12 299:11,12,14
301:21 302:12

**Exhibits**
260:20 274:14 279:14
299:7

**exist**
239:10 240:17 268:6
301:18

**expect**
210:20 218:4 314:13

**expectations**
314:3

**expected**
296:4,14,15

**expert**
250:7,20 251:1,7 258:10,
23 259:13 303:4

**experts'**
303:5

**explain**
311:15 316:2,11

**explained**
240:22 241:23 245:5
311:5 315:8

**explaining**
236:6 237:22,25 238:15
239:2,24 268:25 311:23

**explanation**
303:6

**explanations**
239:10

**exposed**
226:20 250:2,9,15,23
251:15 287:15,24 288:3,

8 290:11,19,23 297:1
303:11 312:2

**exposure**
238:9 251:8,10,25 260:8
281:13 282:3 284:1
303:23

**extended**
214:16

**extent**
228:13 278:21 315:21

**extra**
202:11,12

---

**F**

---

**facility**
291:18

**fact**
204:23 253:17 255:6
259:18 283:16 288:18
290:18 292:21 293:4
306:16

**factor**
283:6

**facts**
248:10 263:19 284:15
298:14 318:14

**failed**
303:4

**fair**
199:24 211:9 239:21
240:1,2 242:9 250:2,10
257:11,14 259:22 267:15
280:19 281:12 283:6,15
289:17 297:14

**fall**
211:7 215:21 241:9

**falls**
244:1

**familiar**
203:23 214:1 238:5
285:19 288:17,21,24

**familiarize**
203:16

**far**
208:9 215:9 228:9
282:18

**Farrell**
199:3,25 200:9,12,19
202:6,10 211:11 212:24
213:10 214:8,14 215:1,3,
23 216:2,3 217:5,9
218:16 219:6,20,23
220:6,10,23,25 222:21
235:9 241:11 245:2
252:22,25 253:1 260:15,
18 267:16 274:12,16,17
278:25 279:2,6 304:3,6,7
305:4 306:22 317:3
319:5,8,14

**Farrell's**
217:3

**fast-forward**
226:24

**Federal**
305:5

**Federal-mogul**
278:11

**fee**
279:2

**feel**
257:4 263:23 311:10
319:2

**fees**
278:22

**felt**
314:18 316:4,13

**Fiberboard**
276:22 278:4

**fibers**
294:16

**figure**
202:10 304:19,20

**file**
223:22 227:22 228:2,14
234:7,9 239:12 246:2,18,
19

**filed**
199:13,15 203:16
226:10,25 227:15,16
234:23 235:15 236:15,18
243:3 244:12 245:17
248:14 255:9,20 256:25
266:6,9 267:10 268:1,11,
15 269:4 280:21 281:10,
14,22 282:6 288:14

289:7,19 310:10,15
312:14

**files**
245:23

**filing**
204:4,5 236:1 242:7
255:4 312:3

**filings**
227:18 232:10,11 233:25
234:6 257:5 259:16
302:4

**fill**
225:15 309:3 318:18

**filled**
229:12 230:16,17,18
232:1

**final**
281:2

**fine**
220:18

**finish**
220:3

**firm**
205:16 206:6 207:6,10,
12,16,18,19 208:25
209:6,10,13,17 211:24
214:5 222:13 223:24
224:14 225:11,19 227:6,
7,21,23,24 228:2,3,6,7,
18,23 231:1,6,7 233:10,
11,24 234:2,4,8,15,21
235:5,21 236:6,21 237:3,
14,21,24 238:15 239:1,
19 240:22 241:3 242:13,
14 247:6,21 248:5
249:18,22 254:20 260:11
262:7 264:20 265:21,25
266:5,8 267:4,9,25
268:10,18 269:9,13
272:4,18 284:12 289:11,
19 293:24 294:20 295:2
301:13 309:4,14,18
310:2 312:24 313:3,14
314:6,10,18,20 316:19
317:19,23,25 318:8,10,
13

**firm's**
289:24 290:8 291:5
292:7

**first**
200:16 210:4 211:13
220:7 222:11 223:24
226:2 227:3 245:17,19
258:4 261:1,20 262:16
274:20 284:21 286:24
290:14 291:10 293:10
299:18,24 302:11 313:3,
5 315:14 318:16,18

**five**
274:8 290:16

**five-minute**
304:4

**focusing**
236:12

**follow**
211:2 217:13 235:18
244:21

**following**
216:4 243:14 244:4

**follows**
200:17

**footnote**
292:21

**Forgive**
211:25 230:25

**form**
203:4 206:7 209:19
210:17 217:5 221:5,11
223:12 224:18 229:1,2
231:24 234:17 236:8
237:10,18 238:3 239:5,
10 240:3,13 246:5
247:17 248:2 249:10
250:5,12,18 251:5,11,21
252:1 253:4,11,22 254:2,
11 255:15 256:9,15,23
257:17,24 258:21 259:5,
23 262:14 270:12,20
272:8,23 273:17,22
279:15,25 280:8 281:8,
16 282:20 283:9,19
284:2 285:10 286:2
287:20,25 288:5,10
289:21 290:24 291:24
292:18 293:6 294:3,17,
24 295:7,15,23 296:5,17
297:13,15 298:8,22
300:8 301:1 303:16

**formal**

DONNETTE WENGER - 03/12/2018                    i10

282:5

**forth**
206:12 208:10 227:19
279:21

**forward**
199:18 245:6 316:14

**forwarded**
317:25

**found**
237:2 275:9 293:14,21

**foundation**
217:6

**fraud**
247:15,25 248:4 311:10
312:10 316:6,13,18

**fraudulently**
296:9 312:6

**free**
263:23

**front**
216:7 261:4 275:17
299:9,12

**full**
292:3 293:10 294:7
299:24

**fully**
304:19

**funny**
221:16 305:14

**future**
208:3,9 281:6

_____

G

**game**
211:9

**Garlock**
276:24 277:1,3

**general**
206:13 207:22 208:12
221:14 227:19 234:1
235:1 277:5 305:12
307:3

**generalities**
307:5 311:17 316:11

**generally**
210:20 225:16 308:1

**gentleman**
212:5 231:2 309:1

**Georgia**
285:22

**getting**
198:7 319:3

**give**
200:4 201:18 217:12
224:7 225:3,14 228:2
229:2 294:4 297:12
298:17

**given**
199:25 213:5 215:10
224:8 225:5,9,14,21
295:2 298:2,4 302:2
305:16

**giving**
226:6 305:20

**go**
199:18 200:13 203:14
217:6 219:19 241:25
242:18 245:6 246:25
252:17 266:17,19 298:15
302:11 304:4,13,18
307:2,6 316:14 318:9
319:13

**goes**
243:10 294:13 296:19,22

**going**
201:1,2,5,9 205:21
206:11,15 214:15 215:5,
7 217:6 218:11,16,24
219:6,20,23 220:15,20
222:18 224:12 227:4
229:2 237:4 243:8,10
244:21,25 252:20 255:21
274:8 275:7,13 286:23
298:17 304:18 306:16
307:2 312:12 314:4

**good**
198:1 259:21 307:9
319:11,13

**good-bye**
222:12

**goodbye**
222:12

**Goodrich**
277:7,10

**Goodyear**
225:7 226:14,21 238:6
239:8,16 241:1 291:12,
17,22 302:1

**Gotcha**
261:21

**gotten**
318:25

**government**
293:24

**grabbed**
286:24

**Graham**
290:11,15,19 291:13
299:16 301:25

**grandfather**
221:15,17 222:2 305:14
307:19,24

**granted**
303:9

**granting**
199:6 268:18 269:13

**gray**
212:21

**great**
307:16

**greet**
222:10

**ground**
200:5,21

**grounds**
223:1

**guess**
220:20 225:16 300:13,15
302:25

**guessing**
222:7

**guideline**
217:14

**guy**
221:16 305:14

**Gypsum**
276:22 277:21 278:18

_____

H

**halfway**
300:11

**Halliburton**
277:8

**hand**
225:17 230:16,18 275:13

**handed**
202:16 225:19 260:22
271:13 284:9 289:3
318:5

**handle**
258:12

**handles**
256:2

**happen**
201:1 307:2 313:6

**happened**
267:15 308:2 315:11

**happy**
200:9 213:4,24 215:16

**hard**
232:3

**Hart**
300:3

**hasn't**
240:8

**haven't**
202:23 233:8 235:25
240:9 255:18 270:25
275:9 281:2

**he's**
240:15 255:9

**head**
299:6

**heading**
290:2,10 291:7

**health**
226:16 227:8

**hear**
313:3

**heard**
200:20 245:17 313:5

**hearing**
206:22 207:1,2 319:13

**held**
228:1 239:7

**hello**
222:12 231:16 305:12
308:24

**here's**
237:8

**hereinafter**
200:16

**hey**
246:25

**hi**
306:6

**hid**
296:10 312:6 316:20

**hidden**
296:13 316:24

**hiding**
316:18

**history**
230:3

**hits**
244:18

**hold**
210:23 212:19 223:11

**home**
223:22 224:22 225:3
226:2 227:16 228:14
229:7 245:23 246:2

**honestly**
238:18 313:22

**hope**
241:10 246:15,17

**hopefully**
274:9

**hour**
222:8 252:20

**Hygiene**
293:14

**hypothetical**
298:16,17

**Hypothetically**
298:24

---

**I**

**I'LL**
286:4

**I'M**
198:2 201:2,5 203:11
204:16 207:3 208:18
211:2,10,14 213:4,23,25
214:1,15 215:7,16
217:11,12,13,18,21
218:6,11,23 219:20,23,
25 220:15 222:7,18,21
225:22 226:22 229:2
230:10,14,25 232:12,13,
25 235:12 236:10 238:7,
20,23,24 239:14 240:15,
19 242:21 243:8 250:7,
20,23,25 251:7 252:6
257:19 258:1,10,15,23
259:9,12,13 260:15
261:13,22,24 270:8,14
272:3,14 273:8 274:8
275:6 281:18,19,25
284:4 286:23 287:3
298:11,16 304:18 308:22
309:17 313:2,22 318:2

**I'VE**
201:4 202:16 206:17
207:15,17 209:9 236:4
259:8 260:22 262:2
271:13 275:5 280:11
284:9 289:3 319:5

**idea**
281:4,7

**identification**
202:15 260:21 271:12
274:15 284:8 289:2
299:8

**identified**
275:6 287:13 294:15

**identify**
262:25 263:5 264:2
275:4,18 287:23

**identifying**
262:20

**Illinois**
276:25 278:6

**impacted**
316:6,16

**implicated**
315:23

**improper**
218:19

**inaccurate**
203:2

**including**
233:14 234:7 284:15

**indicate**
288:2

**Indicating**
272:2

**Industries**
276:10,12,20

**influenced**
283:17

**influences**
283:7,11

**information**
203:15,19 218:7 222:20
226:14,17 237:1 241:19
247:14,19 248:6 249:7,
12,15 255:22 256:25
257:1 259:7 263:5
264:15,20,25 265:11
274:24 302:4 306:9
307:4 309:14,19 314:6

**informational**
208:3

**initial**
242:18 313:7 317:19

**injuries**
251:4

**instance**
272:17 273:9

**instruct**
215:8,15 243:13 244:2,
19

**instructed**
214:11 220:10 304:10
319:8

**instructing**
213:16 214:17 305:8

**instruction**
216:5 243:14,20,25
244:4,8,18,21

**instructions**
245:3

**interlude**
198:5

**internal**
292:15 297:4 298:3

**International**
294:15

**interrogatories**
230:8,12,22,24 231:12
261:1,3 262:17 263:20
274:20 291:14 309:3,6,
16 310:4 318:19

**interrogatory**
231:20 262:17 263:23,25
265:10 269:17 270:1,7
274:22

**intimidated**
259:10

**introduced**
242:5,12 268:24 311:5,
13

**involved**
247:25 265:15 308:25

**isn't**
258:8

**issue**
217:15 228:9 303:1
316:6

**issues**
207:21 208:2 211:4
252:19

**it's**
213:23 214:2 216:11,19
219:3 223:6 230:14
234:24 239:10,14 240:1
243:2 252:19 257:11
258:8 269:20 272:12,13
281:5,12 283:6,15,21
289:5,10,17 290:22
296:23 302:13,25 306:6

**items**
250:22

**its**
268:11 269:6

**J**

**January**
260:24 261:2,12,17

**Jared**
205:20 206:3,8,10,21,25
212:11 304:24 309:8,24
310:1 315:12,16

**Jennifer**
287:7 290:11,15,19
291:13 299:16 301:25

**Jessica**
289:10

**JM**
277:9

**job**
258:15 293:15

**Johns**
277:12

**join**
308:6

**joke**
307:18,25

**judgment**
258:9 265:17 266:5,9
267:5,11 268:2,12,19
269:7,14 288:15 289:7,
18 290:1,9 291:6 292:8
293:20 302:20,23 303:8,
14

**July**
286:18

**June**
286:17

**justice**
312:9

**justified**
257:5

**K**

**Kaiser**
277:14,15

**keep**
229:7 246:2

**Keeping**
198:16

**kept**
223:22 234:14

**kids**
221:13

**kind**
200:4 210:19 217:15

**Kitts**
294:10,13

**knew**
221:15 318:1

**know**
200:6,25 201:14 203:22
205:21,25 206:16,24
207:20,21 208:2,10,11
215:6,10,17 228:4,7,10,
11,12,18 229:6,10 230:4
231:19 232:2 241:1,12
246:13 249:14 250:7,8,
14,20,21,25 251:7,16,17,
23 253:6 254:17 256:4,
11,13,17,20 257:22
258:3,9,23 259:2,14
260:10 268:3,4,5 270:9
272:10 280:2,11 281:9,
21 282:9,13,22 283:11,
12,21 285:16,19,20,23,
24 288:16,23 289:13
296:1,19,22 298:25
299:4 300:20 301:19
304:15,16 306:24 307:9,
10 312:18 314:5

**Knowing**
296:1

**knowledge**
222:4 238:13,25 243:22
248:9 253:14 254:8
262:21 263:19,22 264:3,
5,12,19 265:1,2,6
266:23,24 267:3 269:21
285:13,17 289:16 301:17

**known**
270:18

**knows**
270:18

**Kristen**
231:3 309:2,8 310:2

**Kuzmin**

198:1,2,7 199:9,24
200:11,20 201:12 202:2,
9 203:4 206:7 209:19
210:17,23 211:12,16
212:19,25 213:20
214:13,20 215:2,3,4,25
217:2,8,11 218:11 219:5,
12,22,25 220:9,15 221:5,
11 222:18,23 223:11
224:18 229:1,5 231:24
234:17 235:7,10 236:8
237:10,18 238:3,20
239:5 240:3,13 241:6,12
243:7,25 244:17,24
246:5 247:17 248:2
249:10 250:5,12,18
251:5,11,21 252:1,17,23
253:4,11,22 254:2,11
255:15 256:9,15,23
257:17,24 258:21 259:5,
23 260:12,17 262:14
267:13,17,20,21 268:14
270:12,20 272:2,8,23
273:17,22 274:11 278:19
279:1,5,8,15,25 280:8
281:8,16 282:20 283:9,
19 284:2 285:10 286:2,
17,23 287:16,20,25
288:5,10 289:21 290:4,
24 291:24 292:18 293:6
294:3,24 295:7,15,23
296:5,17 297:13,15
298:8,22 300:8 301:1
303:16,23 304:10,15,17
305:3,24 306:18,23
310:23 311:20 312:16
313:15 315:21 316:9
317:1,4 318:24 319:7,11,
16

**Kuzmin's**
199:5,22 216:4 243:20
244:4

**L**

**lack**
245:10 311:8 312:4

**lady**
221:14 231:2 305:13
307:16 308:1 309:1

**large**
273:21

**laughed**
307:18

**law**
248:4 258:10 259:13,15
289:10 313:3 316:19
318:10

**laws**
208:9

**lawyer**
300:5

**lawyers**
233:18 265:25 290:22
291:21 292:15 315:9

**learn**
253:7

**learned**
227:3 253:17

**leave**
202:25

**left**
232:5 311:14

**legal**
258:17 312:9

**let's**
215:23 224:12 226:23
236:12 242:18

**letter**
233:18 234:25 237:6
258:10 259:14 266:16,24
271:14,20 278:5 292:12

**letters**
207:19 233:22,25 234:3,
7,15,20,22 237:2 270:2,
5,9

**letting**
205:21,25 207:20 306:24

**life**
252:7 300:18

**line**
198:16 216:14 260:12
267:13 284:25 287:6
306:21

**lines**
199:2 214:9 287:4

**list**
264:12

DONNETTE WENGER - 03/12/2018                    i13

**listed**
270:5

**listing**
270:2

**lists**
279:20

**litigation**
267:23 282:5

**little**
203:23 205:21 214:2
311:15

**local**
228:6

**logged**
280:15

**long**
204:14 206:21 221:23
222:5 223:6 231:9 238:5
251:13,15 310:20 314:21

**longer**
231:17

**look**
208:19 263:23 264:9,24
269:18 279:24 300:1,11
301:20

**looked**
204:17 215:7 274:22
280:4

**looking**
222:21 281:19 314:7

**looks**
269:19 282:11

**lot**
293:5 307:17

**lung**
251:18

**M**

**Mahoning**
277:17,19

**mail**
209:8

**main**
303:1

**maintain**
246:19 284:13

**maintained**
264:16

**making**
208:1 228:10

**man**
208:25 299:25

**Mandel**
299:25

**manufacturer**
283:24

**Manville**
277:12

**March**
226:25

**mark**
202:1,13 219:13 220:2
244:25 245:2 260:18
276:5

**marked**
202:15,16 216:7 260:21,
23 262:7 271:12,13
274:15 276:6 284:8,9
286:13 289:2,4 299:8,10,
11

**Master**
198:5,9 199:6 211:3
213:18,24 217:14 218:17
219:18 220:4 304:12
305:5,25 310:25 313:18

**Master's**
198:16 213:11 214:7
220:17

**materials**
302:21

**matter**
213:6 247:24 251:14
318:2

**matters**
251:13

**Mccrone**
292:10

**mean**
202:2 204:5 206:7
207:25 208:5 235:7,13,
14 242:20 249:17 250:22

266:14 281:18 306:12
308:13 316:17 319:1

**means**
264:1 304:16

**mediation**
252:13,16 253:2,7,9,10,
14,15,21 254:6,8,14,17

**meet**
198:24 200:3 313:24
314:4,9 315:8

**meeting**
211:20,23 212:8,9,14,17
218:9 221:1,19,21 222:5,
9,14,17 230:19,20,23
231:5,7,9,15 232:1,4
242:18 243:6,19,23
244:11,14,16 245:5,16
248:12,16,18,21,24
249:1 261:11 304:23
305:1,18 307:1,5 308:16,
20,25 309:5,22 310:1,3,
8,20,22 313:7,8 314:2,3
315:12,20 317:15,16,19
318:11,16,18,19

**meetings**
214:5 241:14 318:12

**memory**
217:24 221:7 224:13

**Memos**
271:7

**mention**
287:19

**mentioned**
207:1 229:11 287:8

**mesothelioma**
251:2,18 255:2,6,14
256:7,14,19,22 257:2,4,
8,9,11,12,16,21,23
258:6,19 259:1,4,11,20,
21,22 260:1,3

**met**
204:14 208:25 209:2
241:4 242:5 308:13
315:14,15

**mind**
252:19

**Mine**
294:15

**Mines**
303:7

**miniature**
216:11

**minor**
230:6

**minute**
252:22

**minutes**
218:2,5 221:24 222:7
229:11 245:4 274:8,23
288:19 302:7 314:22

**Mischaracterization**
303:17

**missed**
230:5

**missing**
232:23

**mom**
221:14 305:13 307:15
308:1

**mom's**
313:25

**monetarily**
300:17

**money**
251:20 252:3,6,10
253:25 254:9 260:7
274:1 280:24 285:21
295:19,21 298:25

**monies**
277:12,17 278:8,11
280:5,20 281:5 285:7,14,
18

**month**
205:20

**months**
200:22 204:14 228:21
234:8

**morning**
198:1 218:2

**mother**
222:1 223:18 225:6
226:3,19 251:17 255:6,
13 256:7,14 257:8,15
258:18 259:19 263:5,14
266:6 286:10 287:4,23

288:3,8,14 290:23
291:23 296:14 297:1
303:11 312:10

**mother's**
224:2,16 226:10 227:14
228:16,17 229:7 232:8,
18,25 233:6,14 234:5
235:6,14,22 236:7,15,23
237:5,16 238:1,16 239:3,
20,25 240:12,24 242:15
245:5,18 246:3,10,14,20,
24 247:7 249:4,9,21
251:25 252:6 254:25
255:19 257:21 260:6,8
263:2,10 264:13,21
265:3,6,17,22 266:1,9
267:6,10,12,23 268:12
270:10,24 272:19 273:2,
15 279:11 281:13 282:3
284:1,14 285:8 286:6,19
287:13 288:15 289:5,19
290:1,10 295:5,12,19
297:24 299:2,4,15 300:6,
24 301:7,24 302:5,8
303:23 312:1 316:7,16

**motion**
199:7,12,15,16 213:12
220:13 265:17 266:5,8
267:5,11 268:1,11,19
269:7,14 288:14 289:6,
20,25 290:9 291:6 292:8
293:19 302:18,19,22
303:8

**motions**
236:17

**moved**
289:18

**moves**
302:17

**moving**
260:15

**multiple**
218:22 219:3

---

**N**

**name**
205:11 231:2 285:19
287:10 299:15 309:2

**named**

208:25 263:1 299:25

**names**
203:17,21,24 230:25
231:4 287:9

**National**
277:21

**nature**
200:8 206:15,19 207:22
208:3,13 235:1 254:5
266:18 306:7 307:17

**necessarily**
272:12,13,16 296:7
298:10

**need**
200:7 201:13 203:9
205:11 213:7,15 215:8,
15 217:17,23 218:16
219:16 220:1,18,21
222:25 227:12 234:25
241:7 243:7,12 286:24
304:15,20

**needed**
202:11,12 203:2 259:7
318:9

**needs**
213:15

**never**
250:8,15 280:11 308:9

**new**
206:14 261:12,19

**nice**
221:14 305:13 308:1

**nine**
200:22 204:14

**Ninety-eight**
278:11

**Ninety-five**
278:7

**Ninety-four**
278:5

**Ninety-nine**
278:13

**Ninety-seven**
278:10

**Ninety-six**
278:9

**Ninety-three**
278:3

**Ninety-two**
278:2

**NIOSH**
303:7

**Nope**
204:22 206:2

**noted**
292:23

**notes**
248:15,18

**notifications**
234:1

**notified**
204:25

**November**
271:15

**number**
210:3 230:3 247:10
252:12 261:2 262:17,24
263:4,9,23,25 264:1,8,
10,11,17,24 265:10
269:17 270:1,2,7 274:22
277:24,25 280:6,12
284:20,23 285:1 290:2
295:9,12 298:12 302:2
304:9

**numbered**
262:18

**numbers**
287:1

---

**O**

**oath**
202:4

**object**
198:20 203:4 209:19
210:17 218:12 221:5,11
222:18,25 223:11 224:18
229:1 231:24 234:17
236:8 237:10,18 238:3
239:5 240:3,13 243:7
246:5 247:17 248:2
249:10 250:5,12,18
251:5,11,21 252:1 253:4,
11,22 254:2,11 255:15

256:9,15,23 257:17,24
258:21 259:5,23 262:14
270:12,20 272:8,23
273:17,22 279:15,25
280:8 281:8,16 282:20
283:9,19 284:2 285:10
286:2 287:20,25 288:5,
10 289:21 290:24 291:24
292:18 293:6 294:3,24
295:7,15,23 296:5,17
297:13,15 298:8,22
300:8 301:1 303:16

**objected**
198:11 304:10

**objection**
206:7 214:12 217:6
287:16 303:25

**objections**
199:14,19 217:10,13
218:23 219:1

**obligation**
201:2

**obstruction**
218:19 219:10

**obviously**
199:21 243:11

**OC**
277:22

**occur**
231:5 242:4 252:16
253:3

**occurred**
211:19 252:13 253:7,9

**occurring**
273:9

**October**
294:11

**offer**
237:7 271:22 272:13,21
273:12,14,20

**offered**
253:25 254:9

**office**
198:4 211:1 241:8,24
242:1 266:20 278:24
301:16 307:1 310:9
313:24

**oh**
   229:4 260:17 261:18
   272:3 297:15 307:9
   314:22

**Ohio**
   291:18 293:13,15

**OI**
   276:24

**okay**
   201:11,14,15 204:16
   205:7 206:1 207:6 210:9,
   14,23 212:13 213:20
   214:13,20 215:2 216:13
   217:8 218:11,16 219:5,
   12,22 220:9 222:18,23
   224:12,21 225:3,22
   226:1,23 227:3 228:14,
   23 230:12 232:24 233:10
   234:3 235:10,20 236:13,
   14,19,20 237:4 239:13,
   16,23 240:18 241:22
   242:3,8,11,22 243:1,5,7
   244:17 251:17 252:17
   257:6 259:17 260:17
   261:14,24,25 262:6,12,
   19 263:22 264:1,8,11,17
   266:22 267:17 269:19,20
   275:12,16 279:1,5 283:2
   286:16 287:3 289:17
   291:4 298:2 304:20,21
   305:3 306:23 307:9
   308:20 309:4 310:23
   312:16 313:6 317:4
   318:23,24 319:11

**once**
   245:1 266:12,15 311:13

**ones**
   262:5 275:6

**opinion**
   220:20 258:4,5 259:10
   260:1

**opinions**
   258:5 259:8,9,12

**opportunity**
   198:24 200:2 202:23

**opposed**
   204:21 312:13

**opposition**
   267:9,25 289:6,20,25
   290:8 291:5 292:7,22

**oh** 293:19

**oral**
   240:21 271:9

**orally**
   240:22

**order**
   198:18 199:6,8,11
   214:19 302:18 304:14
   305:6,25 310:24 313:18
   315:23

**ordered**
   214:15 218:18,20 219:8

**ore**
   294:14

**original**
   200:1 204:4,5 214:21
   224:13 225:13 226:10
   231:22 232:15 237:5
   281:14 287:13 310:14

**originally**
   203:16 215:12 232:11
   241:4

**OSHA**
   293:20 303:7

**out-of-state**
   228:9

**outside**
   198:15,21 220:22 302:21

**overruled**
   214:12

**Owens**
   276:25 278:6

**Owens-corning**
   277:23,25 278:1,3,17

---

**P**

**P-BEV-001014**
   299:19

**P-BEV-001017**
   299:22

**P-WMS-0012635**
   284:21

**P-WMS-0012642**
   284:24

**p.m.**
   319:21

**page**
   214:9 216:11,14 262:24
   263:9 269:25 284:21,23,
   24 286:22 287:1,4
   289:24 290:3,8 291:2,5
   292:2,6,22 293:9,18
   294:6,9 299:18,21,24
   302:11

**pages**
   262:18 263:4 279:20

**paid**
   250:17 276:18,19,22,24
   277:8,12,17,19,20,22
   278:8,9,11 280:6 281:6,
   20 282:14,17 283:8
   296:14

**paper**
   234:24

**paperwork**
   226:17 227:19 272:14

**paragraph**
   271:20,25 272:1 290:14
   291:10 292:3,6 293:10,
   13 294:7,9 299:24
   300:11

**part**
   199:7 224:21 265:12
   268:23,25 304:17

**participate**
   212:14 309:4

**particular**
   211:6 213:7 215:11
   234:23 247:1 273:6,7,25
   274:4 295:11,18 314:9
   316:4

**particularly**
   210:13

**parties**
   237:5 253:20 280:20

**party**
   240:11,23

**passed**
   235:24 238:6 308:4

**passing**
   225:6

**Pat**
   208:25 249:24

**pay**
   256:18 257:20 258:25
   273:25 274:4 295:11,18
   296:16 298:6 299:1
   301:6

**paying**
   283:14

**payment**
   277:13 279:21

**payments**
   296:21

**pending**
   281:2,13,18,21 282:5

**people**
   203:24 231:1 250:15
   251:2,3,8,9

**percent**
   279:4 284:24 292:13
   293:2

**period**
   236:10,13,24 267:15,22
   269:15

**periods**
   225:24

**person**
   209:8 241:19 252:3
   255:22 256:19 258:4
   259:3 271:23 312:14

**personal**
   248:9 260:1 263:19,22
   264:4,11,19,25 265:1,2,
   6,10 269:20 274:24

**personally**
   255:17,21 258:25

**persons**
   262:20 264:2

**pertains**
   198:9

**Peter**
   199:3 211:16 212:20
   214:20 217:11 219:13
   241:9 244:24 252:17
   260:12 267:13 312:16
   317:1

**phone**
205:20,25 206:3,10,20,
25 218:18 230:3 313:9,
10,11,13,22 314:1,8,21
315:4,7 317:17 319:12

**piece**
234:12

**piecemeal**
220:5

**pieces**
224:12 257:1

**pile**
228:4

**place**
198:14,21 205:14 206:15
210:25

**Placitella**
198:2 205:16 206:4,5,25
207:6,16 209:17 211:24
212:11 218:6 221:2
222:14 223:24 224:14
227:23 228:3,6,24 231:1
242:12 247:21 249:18
254:4,20 262:7 268:24
304:24 309:8,24 310:1,2
312:24 313:4,14 314:10
315:13 317:19,25 318:13

**Placitella's**
225:11 241:3,24 242:1

**plaintiff**
223:25 227:4 302:20
303:4 312:13

**plaintiffs**
199:10,15 219:2 249:1
319:15

**Plaintiffs'**
202:19 213:12 247:5
248:7 289:6 291:8

**pleasantries**
306:6 308:24

**please**
201:8 208:11 213:17
238:23 305:10 306:3
311:3 313:20 316:1
317:4

**Plibrico**
278:8

**plow**

**274:10**

**point**
201:14 218:25 281:6

**polite**
306:5

**portion**
222:9 231:14 244:15
284:12 315:19

**position**
198:23 199:22 215:14

**positions**
199:23

**possible**
223:1 234:19 237:1
281:5 283:21

**Possibly**
288:16

**potential**
212:25 301:13

**potentially**
223:25 227:4

**pounds**
291:16

**pre-mark**
274:9 275:10

**pre-marked**
275:6,14

**precise**
267:19 312:23

**precluded**
319:2

**prep**
198:19 200:3

**preparation**
204:3 210:4 308:7,10

**prepare**
203:12 204:9,12,17,20
205:23

**prepared**
205:1 231:23

**present**
211:1,6,25 214:6,25
215:20 217:25 243:11
244:10,16 311:25 312:18
315:20 317:8,11

**presentation**
248:23

**presented**
303:1 314:5 316:23

**preserve**
224:1,7,15 225:13

**presumably**
242:8 277:23

**presume**
276:25

**pretend**
258:2

**prevented**
311:11 312:7

**previous**
203:14,19 206:20 314:6

**previously**
213:21 288:25 305:9
306:2,19 311:2 315:25

**prior**
225:6,15 228:20 230:21
242:6 260:13 313:7
314:1 318:19

**privilege**
198:13,22 211:7 213:9,
14 214:12,24 215:22
216:20 219:1 220:12,16
223:2,15 241:9 244:2,19
305:9 306:3 311:3
312:21 313:16,20
315:22,25

**privileged**
211:18

**probably**
226:5 261:23

**problem**
218:14 241:13 243:9
279:8

**proceed**
213:2 217:22 219:7

**process**
256:2 263:9 265:3,12
269:1 282:2

**produce**
284:5 297:8

**produced**

**229:8 239:23 240:8,9**
259:16 274:25 275:4,20
283:23 284:11

**product**
282:15 283:7 284:6
293:1 303:2

**products**
226:20 282:18,24 283:4,
14,16

**professional**
257:19 259:13,25

**proof**
257:4

**proposals**
253:19

**prosecute**
263:15 269:22

**protection**
213:4 215:17

**prove**
259:8

**proved**
257:1

**provide**
202:19 227:5,22 232:16
268:6 303:6 309:14

**provided**
199:8 214:15 224:5
227:7,20 230:4,22
233:23,24 234:1,13,14
240:16 246:8 261:10,15
263:5 264:20 266:12,15,
19 297:23 301:15

**provision**
199:9

**pull**
205:10

**pursuant**
213:8 305:3,4 310:24
313:17

**pursue**
311:7,11 312:3 316:5

**pursuing**
312:7

**purview**
258:8

**Q**

**qualified**
298:11

**question**
201:4,9 211:13 213:13,
15,17,20,23 214:3,18,21
215:9,12 216:5,16,22
217:3,20,22 219:13
220:8,11,14 222:22
223:8 224:13 238:21,23
243:15,18 244:7 252:4,5
258:7 262:6 264:5 287:7,
9 296:11 298:2 303:18
304:1 305:7,10 306:2,4
311:1,4 313:21 315:24
316:1 317:5

**questioned**
203:17

**questioning**
198:14,20 199:2 260:13
267:14 306:21

**questionnaire**
225:14 229:13,15,17,20,
25 230:11 231:19

**questions**
198:10 201:2,16 205:24
210:3,19 213:1 218:1,3,
25 220:2 225:16 229:19,
23 247:10 252:12 285:25
287:5 304:9,13,18
314:15 317:10,13 318:25
319:5,14

**quick**
198:5

**quickly**
275:11 280:3

**quite**
255:9 257:3 298:15
313:22

**quote**
290:15 291:10 292:8,23
294:9,13 300:1,15 303:1

**R**

**raise**
213:18

**raised**
199:14

**Raytech**
278:9

**re-send**
227:12

**reached**
254:24

**read**
208:16 213:25 214:6
220:17 303:20

**ready**
200:12

**really**
206:23 208:16,19 221:16
223:3 232:12 247:23
305:14 307:16

**reason**
201:18 239:24 245:9
285:6,12

**reasonable**
274:6 295:4,21 296:2
298:5

**reasons**
237:22,25 238:15 239:2,
19 240:11,23 241:16
242:15 245:17 258:17
265:6,21

**reassertion**
199:19

**recall**
210:12 223:19 241:2
247:8 272:16,17 273:19
286:9 287:8,9 301:11
305:11,16,20 306:5,10
307:8 308:12 310:19,21
311:18,23 317:6,12,14
318:15

**receive**
206:18 234:20 235:4
250:3,10,16 251:2,9
295:21 296:3

**received**
206:16 207:24 227:11
228:5 230:12 234:3
235:25 236:4,5 260:7
262:5 281:2 283:25
285:7,13,17,21 295:5

**receiving**
239:17 280:19,23

**recess**
216:1 220:24 274:13
304:5

**recollection**
239:17

**recommendation**
237:8

**recommendations**
273:5

**recommended**
270:16 298:20

**reconsideration**
199:13,16,17 213:12

**record**
198:6 199:23 214:18
216:2 220:21 252:18,24,
25 274:12,16 304:4,6

**records**
225:6 226:16 227:8
228:16,17

**recover**
314:13

**recovered**
251:20

**refer**
200:20 282:25

**referenced**
275:5

**referral**
313:14 314:19 316:3

**referred**
269:1 274:25 288:14
312:24 317:18

**referring**
199:9 230:8,14 241:24
313:2 316:3

**refers**
299:15

**reflected**
278:22

**regard**
278:20

**regarding**

209:10 233:3 235:5
237:8 240:10 241:23
247:23 249:16 265:21,25
266:5,8 267:4,9,25
268:10 269:13 275:1
305:17 309:5 313:24
317:23 318:13

**regards**
218:1 318:2

**reject**
272:7,20

**relate**
208:14 247:6 249:21
270:10

**related**
200:6 211:5 223:19
224:2 229:7 232:7 233:5
243:12 246:19,23 260:6
265:16 276:11,21 277:3,
11,15,16,18,24 278:1,2,
4,12,13,15,16,17 281:12
284:13

**relates**
213:6 214:4 232:22
249:8 276:15,17,19,23
277:1,4,6,8,9,13,20,22
278:9

**relating**
198:10 215:20 224:15
232:18 262:21 264:3
279:11

**relevant**
229:22

**rely**
246:19 260:2

**remaining**
199:20

**remedy**
218:20

**remember**
203:22 206:22 210:1,2,7
212:1 217:25 218:5
221:18 222:3,7,10 223:3,
7,16 224:8,11 229:13,16,
21,23,24 230:1 231:1,3,
10 233:19 234:12
236:20,25 238:6,10,12,
18 239:9,15 240:5,7,25
241:2 242:17 243:22
245:11,19,23 246:7

247:12 248:17,22 252:14
255:2,7 262:3 266:23
267:18 268:5,7,13,16
269:10,16 272:22,25
286:4,5,20 301:3 302:9
308:5,18,22 310:10,13
313:12,25 314:25 315:3,
15

**repeat**
238:23

**reply**
268:10

**reporter**
202:8 275:13

**reports**
303:4,5

**represent**
258:16

**representative**
208:11

**represented**
209:16 248:5 300:6
307:24

**representing**
246:15 316:20

**request**
199:25 265:11

**requested**
225:8 263:19

**requests**
309:20

**rescheduling**
206:13

**Research**
292:10

**reserve**
319:17

**resolutions**
262:25

**resolve**
295:5 299:1

**respect**
295:3 296:25

**respectfully**
198:20 211:16 215:5
252:9

**respond**
201:3,8 300:16 304:19
309:19

**responding**
287:5

**responds**
263:22

**response**
199:4 264:1 265:9
267:10,21 268:1 269:25
270:6 274:23,24

**responses**
215:19 230:24 231:11,
18,20,22 260:24 261:3
262:16 263:18 309:5,15

**responsible**
238:8 283:3,13

**responsive**
264:5 265:11

**restrictions**
319:4

**result**
251:16

**retention**
271:14,20

**return**
272:15

**returned**
233:23 234:9,11,25

**review**
201:23 202:23 203:20
204:2,9,12 262:9 280:4
307:1

**right**
199:1 215:4 226:8
235:16 254:7 262:13
264:15 269:5 270:4
272:2 290:23 297:9,20,
25 315:9,18 317:16,20
319:7

**right-hand**
216:12 284:20

**role**
253:10,13 311:16

**room**
217:1 223:5,16 306:11
308:9

**Roth**
198:2 212:23

**Roth's**
213:11

**Roughly**
313:11

**route**
213:3

**row**
285:3

**RT**
285:18 289:7,17,25
290:11,19 291:7,11,15,
16,21 292:9,12 293:14
296:15,25 297:18 298:3,
4,6 300:2,24 301:6
302:17

**RTV**
300:21

**Rubber**
291:12,17 302:1

**Rule**
305:5

**ruled**
213:25 219:3

**rules**
200:5,21 220:4

**ruling**
198:4,8,13,17 213:11
220:17

**rulings**
219:19

**S**

**Safety**
293:14

**sanction**
218:21 219:8

**sanctions**
199:7

**satisfied**
318:24

**saved**
234:12

**saw**
231:16 308:22

**saying**
219:25 237:7 257:7,9,10,
15,22 258:18 259:3,19,
22 266:16 297:5

**says**
265:9 271:21 284:25
285:1,3 287:6 290:10,15
292:8,22 293:20 299:15
300:1,15 301:25 302:16

**scheduling**
206:18

**scientists**
294:21 297:18

**scrutinizing**
280:2

**Sealing**
277:1,3

**search**
245:22 246:2

**searched**
232:6

**second**
203:13 206:25 229:3
252:18 258:4 259:8
261:3 269:25 271:20,21
272:1 292:3,6 294:4,6
302:12,16

**see**
216:14,20 228:10 232:20
239:12 242:2 243:9
246:2,23 261:4,9 262:17,
21 263:2,7,11,16 270:1
271:24 272:3 275:1,20,
24 276:5 279:19 281:19
283:22 284:19,25 285:2,
4 287:6,11 289:8 290:2,
10,20 291:7,18 292:3,10,
13 293:2,10,16,22 294:6,
18 299:16,19,25 300:3,
12,21 301:24 302:12,23
303:9

**seek**
282:2 298:18 311:9
312:8

**seeking**
252:9 255:21

**seen**
  246:18 261:6,25 270:5
  284:16 296:20

**selling**
  291:11 292:25

**send**
  207:20 209:8 235:21
  236:21 237:6

**sent**
  203:15 205:4,9 225:10
  227:11 228:1 229:15
  230:22 232:12 234:15
  237:21,24 240:2,6 262:7
  272:14

**sentence**
  271:21 292:6 293:20
  300:12

**sentences**
  303:1

**served**
  230:9,13 261:23

**session**
  198:19 200:3 210:4
  247:9 286:19

**set**
  203:13 208:10 261:1,3,
  12,19,22 262:16 274:20

**settle**
  237:4,7 254:1,9 273:6,
  12,14,21 295:12,19
  298:13 300:18,24 301:6

**settlement**
  237:9 270:17 271:22
  272:6,7,18,21 274:1,5,6
  275:23,24 276:4,9,11,13,
  15,18,20,23 277:1,4,5,9,
  12,13,15,17,19,21,25
  278:1,3,4,6,8,10,12,14,
  15,16,18 280:5,20,24
  281:5 283:8,15,17,24
  285:7,13,17,21 295:4,22
  296:15,16 298:7 299:1
  301:9,14

**settlement-related**
  275:19

**settlements**
  237:16 260:5,13 264:12
  273:1 279:11,19,20
  281:20 282:9,18 283:23

284:15

**Seventy-four**
  276:19

**shame**
  308:2

**she's**
  202:3 235:7

**sheet**
  285:12 301:23

**short**
  308:3

**shortly**
  202:20 209:23 211:20
  212:15,18 218:10 235:24
  244:11 245:16 248:13
  263:13 269:4 304:24
  305:1 310:9,14

**show**
  205:2,3 248:20 275:7

**showed**
  226:13 314:2

**showing**
  292:16

**shown**
  248:23 309:24 310:3

**side**
  300:16

**sign**
  272:15

**signature**
  271:18 319:19

**signed**
  234:25 241:3 255:18
  271:15 289:10

**significant**
  251:10

**significantly**
  316:6,16

**sir**
  252:8

**sit**
  203:7 238:13 258:24
  269:11

**site**
  291:8 293:15

**Sixth**
  294:7,9

**small**
  228:4 287:1

**sold**
  288:4,9 291:16,22

**somebody**
  250:2,8

**sorry**
  207:3 208:18 218:6
  229:4 230:10 239:14
  240:15 242:21,23
  261:13,24 270:14 272:3
  286:23,25 287:2 294:5
  295:17

**sort**
  218:3 219:9 226:17
  234:20 268:22 297:7

**sought**
  258:15

**sound**
  226:7 242:9 280:7
  288:23,24 310:12

**sounded**
  288:21

**sounds**
  238:5 285:19 288:17

**source**
  247:11,14 249:7

**Southern**
  285:14

**speak**
  204:23 216:16,19,22
  221:3 239:11 247:23
  280:9

**speaking**
  217:10,12 219:10 238:10
  269:3

**speaks**
  287:16 303:17,19

**Special**
  198:4,9,16 199:5 211:3
  213:10,18,24 214:6
  217:14 218:17 219:17
  220:4,17 304:12 305:5,
  25 310:25 313:18

**specific**
  199:13 207:23 217:20
  224:13 226:15 229:23
  252:10 305:16,20 307:8,
  18

**specifically**
  200:6 214:4,8 222:3,24
  223:4,7 224:9,11 225:20
  227:24 230:5 231:3
  236:25 238:6 239:9
  241:1,2 245:11 249:15

**specifics**
  278:20 313:25

**specified**
  279:3

**spoke**
  211:25 216:19 221:13,15
  223:24 240:25

**spoken**
  206:17 207:16 208:21,24
  209:9,22 246:9 249:24

**stack**
  275:13,21

**stamp**
  299:19

**start**
  217:4 224:15 236:12
  304:8

**started**
  198:8

**starting**
  241:14 312:17

**starts**
  293:10

**state**
  228:7 294:13

**stated**
  199:22 305:4

**statement**
  306:19

**states**
  293:13 294:9

**stay**
  221:20

**stipulate**
  278:21

**studies**
293:25 303:7

**stuff**
207:20 274:9

**subject**
213:2,6 304:14 305:24
306:18 310:23 311:20
313:16 315:23 316:9
319:3

**submissions**
279:12

**submit**
255:17 303:4

**submits**
255:24

**submitted**
255:12,18 256:5 265:16
303:5

**subsequent**
206:19 223:6

**substance**
218:13 235:5 240:23
243:10 270:16

**substantive**
215:19 220:8 222:20
235:25

**such-and-such**
236:2

**sued**
265:21

**suggest**
219:12

**suggested**
314:16

**summary**
265:17 266:5,8 267:5,11
268:1,11,19 269:7,14
288:15 289:7,18,25
290:9 291:6 292:8
293:19 302:19,23 303:8,
14

**supplemental**
260:25 262:16 269:25
270:6 274:19

**supplied**
226:18 291:7,14

**Supply**
277:17,19

**support**
259:21

**sure**
200:9 211:12 215:25
225:22 232:12,13 236:10
238:7,20,23,25 242:25
245:2 246:17 250:23
252:23 258:1 262:12
270:8 273:8 274:11
279:9 281:18 284:4
313:22 318:2,8

**swear**
202:5

**sworn**
200:16 202:7,8

**system**
312:9

---

**T**

**T&n**
278:15

**take**
198:5,14,21 200:7
201:12,13 208:17 215:23
218:17 224:12 244:21
248:15,18 263:23 264:8,
24 269:17 274:8 275:8
304:3

**taken**
199:10 216:1 220:24
274:13 304:5

**talc**
249:13 250:3,9,16,23
251:9,10 270:19 283:24,
25 284:5,25 285:1,3,7,
14,22 287:8,10,14,19,23,
24 288:3,9,13 290:12,20,
23 291:12,17,22 292:9,
10,12,17,23 293:1,5,15,
21 294:1,15,22 295:3
296:2,12 297:1,5,19
303:2,12,13,23,24
311:23,25

**talk**
206:23 243:10 312:12
314:12

**talked**
226:23 240:20 286:6
317:15

**talking**
222:19,23 225:23 261:22
267:14 304:22 307:22
308:10

**taxes**
226:13

**Technologies**
277:2,3

**tell**
210:22 212:17 218:9
224:1 234:22 241:15,22
243:5,17,19 245:8,13
255:11 305:1 310:22
311:19 313:13 315:4

**telling**
241:17 248:12 318:11

**ten**
239:14

**tends**
209:7

**terminology**
238:8

**testified**
200:17 294:14

**testifying**
294:21 297:19

**testimony**
201:19 203:8,24 210:12
214:14 223:10,13 286:6,
11,13 287:7 290:16,18
298:4

**tests**
292:15 298:3

**Thank**
200:11 229:5 267:20
279:9

**Thanks**
220:23

**there's**
213:14 232:15 242:24
257:3 270:1 284:20
290:2 292:21 293:20
296:21 319:1

**they're**
208:3 262:3 272:5
283:14 293:4

**they've**
234:23 284:15 288:25

**thing**
205:1 305:11 315:11

**things**
200:7,21 206:15 209:8
225:10 235:12 272:11
281:23 307:17

**think**
203:6 205:10 206:20
207:15,17,23 209:7,9
210:10 212:2,12,16,20
213:5,7,10 214:2,20,23
215:21 217:3,13 218:2
220:6 221:7 222:3
225:19,23 226:12 227:9,
10,24,25 230:1,17
231:16,21 232:4,23
233:16,23 236:25 241:9
242:19 244:1,13,18
245:9,20 246:7 248:22
251:13 253:24 254:4
255:1 256:12 261:8
262:10 263:4 267:18
268:23 270:3,8 273:9,24
279:17 286:9 288:18,23
289:14 295:20 299:9
304:23 307:15,23 309:2,
9,25 310:19 311:20
312:16,19 313:10,15
314:11 315:14,15 318:23
319:9

**thinking**
203:1

**third**
219:24 258:5 259:9
271:25 293:11,13

**thought**
202:6 260:2 290:4
314:17

**thousand**
282:10

**three**
212:13 302:25 309:12
318:21

**threw**
231:22

**thrown**
238:10 311:7

**time**
202:4,25 205:14 206:14
209:22 212:2 215:7
219:1,11,24 223:17
225:9,24 226:9 227:6
233:21 236:10,13,24
242:13,23 245:19,21
252:12 260:5 261:20
267:15,22 268:14 269:6,
15 272:5 286:10,14
308:3,23 315:15,16

**times**
219:3 232:10

**Tire**
291:12,17 302:1

**today**
198:3 199:18 201:19
203:7 204:10,18,21,24
205:13 215:13 219:15
232:21 238:13 258:24
261:7 269:11 270:18
282:7 296:1 304:22,25
306:1 310:7 319:6,10

**today's**
198:19 203:12 204:13

**told**
201:6 205:3,23 206:9
208:24 212:2 218:2,3,24
222:1 224:21 231:17
233:17 241:5,16,19
245:4,14 248:7 256:4
270:25 273:11,13,20
286:9 304:12 307:14,23,
24 308:12,15 314:24
315:2 316:15 317:7,8
318:7

**Tom**
208:21

**top**
299:6,15 301:24

**topics**
218:13 222:19 243:9

**total**
280:5

**transcript**
201:23 202:17,20 213:25

**transpire**

314:4

**transpired**
311:10 312:11 316:13,18

**Travelers**
278:12,14

**tremolite**
292:13,24,25 293:2,16
294:17

**tried**
203:23 275:4 276:5
311:6,14 312:3 316:2

**trust**
209:11 227:15 234:6,23
235:3,16 236:1,3 246:20,
24 255:19,22 258:3
275:24 276:5,18,20
278:8 281:1,9 282:6

**trusts**
255:5,11,25 256:5,12
279:12 281:3

**truthful**
201:18

**truthfully**
201:3

**try**
211:11 235:11 267:19
275:10,18 279:18 312:23

**trying**
204:16 211:2 214:1
217:11,12,13,18 275:10
281:25 282:2 316:11

**Tuesday**
216:17,23 221:2,19
222:5 308:14 309:22

**turn**
216:11 262:15 269:17
274:18 284:19,23 289:24
291:2 292:2 293:9 294:6
299:18,21

**turned**
286:21 317:24

**Twenty-three**
290:6

**two**
225:23 231:1 235:11
263:4 279:20 284:25
286:24 299:9 300:2

302:25 306:5,7,12 316:2

**two-minute**
215:23

**two-thirds**
302:13

**types**
251:4

**Typically**
234:22

**U**

**U.S.**
276:22 278:18

**Uh-huh**
200:24 210:6 212:10
224:23 226:4 228:15
249:6 274:21 276:16
293:12

**unable**
316:5

**underlying**
263:2,7,15 264:14,22
265:18,22 269:23 275:1
318:14

**understand**
198:8 201:4,6,11 211:9
212:22 220:19 225:25
235:19 236:10 240:15
253:25 316:17

**understanding**
211:2,4 225:22 228:25
238:24 248:4 249:13
253:19 258:1 282:16,23
283:2 288:7 311:22

**understands**
198:4

**understood**
201:5,10 238:22

**unfortunate**
300:13,15

**unfortunately**
250:24 262:18

**unwilling**
300:16

**upcoming**
306:8,16,25

**updates**
209:10

**V**

**vague**
208:19

**Valley**
277:17,19

**Vanderbilt**
285:18 287:11,14 288:4,
9,13,17,18 289:7,18
290:11,23 291:7,11,15,
16 292:9,12,16 293:5
294:11 295:5,11,13,18,
20,22 296:4,16,25
297:11,18 298:3,5,6
299:1,2,5 300:2,6,24,25
301:6,7,14 302:8,17,20
303:14,22

**Vanderbilt's**
289:25 290:9,19 291:6,
21 292:7,16 293:15,19,
21 294:1,21,22 295:3
302:18 303:2,8,12,13,23

**variations**
283:11

**variety**
284:14 296:21

**verbal**
268:23

**verification**
226:16

**versus**
301:25

**view**
213:13 250:15 257:11,14
258:17 259:17,18

**vote**
208:11,12

**voting**
208:5,18

**W**

**wait**
220:21 241:6

**waived**
213:14 219:2 220:12,16
319:19

**waiver**
305:8 306:2 315:25

**waiving**
311:2 313:19

**walk**
279:13

**walked**
280:14

**Walsh**
208:25 209:3 249:24

**want**
202:4 213:21 215:18
218:13 225:24 242:24
258:1 262:2 264:8 275:7
312:19 315:8

**wanted**
246:23 256:13,20 257:22
258:3 259:2 279:8
313:23 314:9 319:10

**wasn't**
250:2 252:4 279:3
308:25

**way**
203:3,10 208:12 253:15
273:5 283:3,18 296:11
298:15 302:14

**we'll**
220:20 304:19 319:16

**we're**
201:9 217:6 218:16
219:6 220:7 232:23
235:12 241:13 243:10
312:16

**we've**
212:21 216:7 226:23
240:20 252:20 260:22
262:7 266:16 271:13
275:3,6,14 284:9 289:3
299:10,11 317:15

**weak**
300:20

**weeks**
308:16,21 317:15

**Wengerd**

198:3,11,14,18 200:12,
15 202:3,16 216:4
220:21 243:14 244:2
252:9 253:2 260:22,25
271:13 274:18 281:25
284:10 289:3 299:10
304:8 305:7,10 306:1,3
310:25 311:21 312:21
313:19,20 315:24 316:1

**Wengerd's**
200:1

**went**
259:25 280:3 309:15
313:23

**weren't**
245:9 265:15 268:4

**Westfall**
249:4,8,20

**what's**
201:1 239:12 249:7
262:11 285:12 307:11

**whichever**
311:25

**Wilcox**
276:14

**Williams**
201:22 202:18 209:14
216:17,24 218:1 221:4
224:1 226:25 227:5
229:8 232:8 235:17
245:16 246:1 247:15
248:1,13 249:24 250:4,
11,17 253:3 254:1,15,17
264:3 269:4 280:21
297:23 305:17,21 310:9
317:23 318:14

**withdrawal**
213:11

**withdrawn**
204:1 210:1 220:13
233:10 235:20 236:20
237:13,23 243:17 246:8
257:6 259:17 265:1
266:6 273:12

**withdrew**
199:16

**Witness**
229:4 294:5 319:19

**word**
281:2

**wording**
217:16 245:12

**words**
240:22 270:15

**work**
200:21 230:3 259:14
291:8 312:1 314:17

**worked**
221:16 225:7 226:13
228:8,11 291:23

**working**
226:21 281:24 305:15
312:3

**world**
258:2 276:10,12

**worry**
217:17

**worth**
252:3,7 315:5

**wouldn't**
257:2 300:19

**writing**
301:12

**writings**
271:3

**written**
225:16 235:4,22 236:22
237:21,25 238:14,25
239:10,18,23 240:20
268:21

**wrong**
230:3,6

**wrote**
229:24

---

**Y**

**yeah**
207:5 232:20 288:20
290:5 307:16 318:7

**year**
261:23

**years**
239:14 241:4 307:19

**you'd**
241:10 263:24 274:1,5
295:13,20

**you'll**
210:2 276:5

**you're**
201:7 213:16 214:22
215:5 222:23 225:23
236:11 237:4 238:24
242:3 243:8 244:21
246:17 252:5,8 258:2,7
260:14 262:12 266:25
267:14 268:20 269:3,11
298:15,16 307:10 318:24

**you've**
200:25 201:5 209:11
218:22 220:10 270:23
280:23 281:12 282:1
285:6 294:3 296:20
314:23 315:1 318:25
319:2

---

**Z**

**zero**
285:4