# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

**KIMBERLEE WILLIAMS, et al.**

Plaintiffs,

vs.

**BASF CATALYSTS LLC, et al.**

Defendants.

No. 2:11-cv-01754 (JAD)

CIVIL ACTION

---

## MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR APPROVAL AND GRANT OF AWARDS OF CLASS COUNSEL'S ATTORNEYS' FEES, CLASS COUNSEL'S REIMBURSEMENT OF LITIGATION EXPENSES AND CLASS REPRESENTATIVE SERVICE AWARDS

---

**COHEN, PLACITELLA & ROTH, P.C.**

Christopher M. Placitella, Esq.
(NJ Atty #: 027781981)
Michael Coren, Esq.
(NJ Atty #: 024871979)
Jared M. Placitella, Esq.
(NJ Atty #: 068272013)
Eric S. Pasternack, Esq.
(NJ Atty #: 015132011)
127 Maple Avenue
Red Bank, NJ 07701
(732) 747-9003
*Attorneys for Plaintiffs and the Putative Class*

# TABLE OF CONTENTS

I.   Introduction ................................................................................................1

II.  Background ...............................................................................................5

   A.   Class Counsel uncover evidence that purports to identify asbestos in Emtal Talc. 5

   B.   Class Counsel and Class Representatives bring suit on behalf of the Class. 6

   C    Class Counsel successfully appeal the decision dismissing the First Amended Complaint to the Third Circuit. ...........................................................8

   D.   Class Counsel file a Second Amended Complaint.......................................9

   E.   Discovery was hard fought and involved many motions including those over the scope of discovery and application of attorney-client and work product privileges and privilege exceptions....................................................................10

   F.   After several unsuccessful rounds of mediations, the parties reach an accord in principle and execute a settlement term sheet in January 2019. Subsequently, after many months of further negotiation on the settlement's specifics, the parties agree upon the Settlement Agreement. ...........................14

III.  Argument .................................................................................................18

   A.   The percentage-of-recovery method. ...........................................................22

     1.   The size of the fund and number of beneficiaries.....................................23

     2.   The presence or absence of substantial objections by members of the class to the settlement terms...............................................................................25

     3.   The skill and efficiency of the attorneys involved....................................27

     4.   The complexity and duration of the litigation..........................................30

     5.   The risk of nonpayment. .........................................................................35

     6.   The Amount of time that Plaintiffs' Counsel devoted to the case. ..........38

     7.   Fee awards in similar cases. ....................................................................39

     8.   The value of benefits attributable to the efforts of Class Counsel relative to the efforts of other groups............................................................................41

     9.   The percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement. ..............................................42

     10.  The Settlement Agreement contains many innovative features...............42

   B.   A lodestar cross-check confirms that this Fee Request is reasonable.........45

C.    Class Counsel's expenses are adequately documented and were reasonably and appropriately incurred. .................................................................50

D.    Incentive awards for the Class Representatives. .........................................51

IV.   Conclusion ...................................................................................................54

# TABLE OF AUTHORITIES

## Cases

*Bradburn Parent Teacher Store, Inc. v. 3M*,
  513 F. Supp. 2d 322 (E.D. Pa. 2007).....................................................................40

*Cantey Hanger, LLP v. Byrd*,
  467 S.W.3d 477 (Tex. 2015) ...............................................................................32

*Cullen v. Whitman Med. Corp.*,
  197 F.R.D. 136 (E.D. Pa. 2000) .................................................................... 27, 52

*Dewey v. Volkswagen Aktiengesellschaft*,
  558 Fed. Appx. 191 (3d Cir. 2014) ............................................................... 21, 39

*Doe v. Terhune*,
  121 F. Supp. 2d 773 (D.N.J. 2000).......................................................................47

*Gunter v. Ridgewood Energy Corp.*,
  223 F.3d 190 (3d Cir. 2000) ..................................................................... 22, 23, 41

*Hegab v. Family Dollar Stores, Inc.*,
  No. 11-1206, 2015 U.S. Dist. LEXIS 28570 (D.N.J. Mar. 9, 2015)...................36

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983) ............................................................................................18

*In re AT&T Corp. Sec. Litig.*,
  455 F.3d 160 (3d Cir. 2006) ........................................................................... 42, 45

*In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*,
  MDL No. 1871, 2012 U.S. Dist. LEXIS 180561 (E.D. Pa. Oct. 19, 2012).........49

*In re Cendant Corp. Sec. Litig.*,
  404 F.3d 173 (3d Cir. 2005) ..................................................... 20, 35, 39, 45

*In re Diet Drugs Prod. Liab. Litig.*,
  582 F.3d 524 (3d Cir. 2009) ............................................................. 22, 36, 41, 50

*In re Flonase Antitrust Litig.*,
  951 F. Supp. 2d 739 (E.D. Pa. 2013).....................................................40

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995) ................................................... 19, 24, 39

*In re NFL Players' Concussion Injury Litig.*,
  MDL No. 2323,
  2018 U.S. Dist. LEXIS 57798 (E.D. Pa. Apr. 5, 2018).................... 42, 45, 48, 52

*In re Orthopedic Bone Screw Prod. Liab. Litig.*,
  No. 97-381, 2000 U.S. Dist. LEXIS 15980 (E.D. Pa. Oct. 23, 2000).................25

*In re Processed Eggs Prods. Antitrust Litig.*,
  MDL No. 2002, 2012 U.S. Dist. LEXIS 160764 (E.D. Pa. Nov. 9, 2012)..........40

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
  106 F. Supp. 2d 721 (D.N.J. 2000)................................................ 18, 45

*In re Rite Aid Corp. Sec. Litig.*,
  396 F.3d 294 (3d Cir. 2005) ..................................................... 40, 45, 46

*In re Rite Aid. Corp. Secs. Litig.*,
  362 F. Supp. 2d 587 (E.D. Pa. 2005).................................................41

*In re Safety Components Int'l Secs. Litig.*,
  166 F. Supp. 2d 72 (D.N.J. 2001)................................................. 27, 50

*In re Schering-Plough Corp.*,
  No. 08-397, 2013 U.S. Dist. LEXIS 147981 (D.N.J. Aug. 28, 2013).................48

*In re ViroPharma Inc. Sec. Litig.*,
  No. 12-2714, 2016 U.S. Dist. LEXIS 8626 (E.D. Pa. Jan. 25, 2016).................48

*In re Vitamins Antitrust Litig.*,
  No. 99-197, 2001 U.S. Dist. LEXIS 25067 (D.D.C. 2000) ................................24

*In re: Heartland Payment*,
  851 F. Supp. 2d 1040 (S.D. Tex. 2012).................................................23

*Krell v. Prudential Ins. Co. of Am. (in Re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions)*,
   148 F.3d 283 (3d Cir. 1998) ...............................................................19

*Lincoln Adventures LLC v. Certain Underwriters at Lloyd's*,
   No. 08-0235, 2019 U.S. Dist. LEXIS 17197 (D.N.J. Oct. 3, 2019)....................40

*Local 56, United Food and Commercial Workers Union v. Campbell Soup Co.*,
   954 F. Supp. 1000 (D.N.J. 1997)..........................................................18

*Lonardo v. Travelers Indemnity Co.*,
   706 F. Supp. 2d 766 (N.D. Ohio 2010) ..................................................24

*Meijer, Inc. v. 3M*,
   No. 04-5871, 2006 U.S. Dist. LEXIS 56744 (E.D. Pa. Aug. 15, 2006)...............27

*Pro v. Hertz Equip. Rental Corp.*,
   No. 06-3830, 2013 U.S. Dist. LEXIS 86995 (D.N.J. June 20, 2013) ........... 18, 24

*Rossi v. Proctor & Gamble*,
   No. 11-7238, 2013 U.S. Dist. LEXIS 143180 (D.N.J. Oct. 3, 2013)...................18

*Rossini v. PNC Fin. Servs. Grp., Inc.*,
   No. 18-370, 2020 U.S. Dist. LEXIS 113242 (W.D. Pa. June 26, 2020).............40

*Schuler v. Meds. Co.*,
   No. 14-1149, 2016 U.S. Dist. LEXIS 82344 (D.N.J. June 24, 2016) .................42

*Schwartz v. Avis Rent a Car Sys., LLC*,
   No. 11-4052, 2016 U.S. Dist. LEXIS 80387 (D.N.J. June 21, 2016) .................52

*Smith v. Daimlerchrysler Servs. N. Am., L.L.C.*,
   No. 00-6003, 2005 U.S. Dist. LEXIS 25116 (D.N.J. Oct. 24, 2005)...................20

*Sullivan v. DB Investments, Inc.*,
   667 F.3d 273 (3d Cir. 2011) ........................................................ 45, 51

*Varacallo v. Mass. Mut. Life. Ins. Co.*,
   226 F.R.D. 207 (D.N.J. 2005) ............................................................21

*Welch & Forbes, Inc. v. Cendant Corp. (In re Cendant Corp. Prides Litig.)*,
    243 F.3d 722 (3d Cir. 2001) ................................................................25

*Williams v. BASF Catalysts LLC*,
    765 F.3d 306 (3d Cir. 2014) ........................................................9, 31

*Williams v. BASF Catalysts LLC*,
    No. 11-1754, 2012 U.S. Dist. LEXIS 175918 (D.N.J. Dec. 12, 2012) .................8

*Williams v. BASF Catalysts LLC*,
    No. 11-1754, 2016 U.S. Dist. LEXIS 46273 (D.N.J. Apr. 5, 2016) ...................10

*Williams v. BASF Catalysts, LLC*,
    No. 11-1754, 2017 U.S. Dist. LEXIS 122053 (D.N.J. Aug. 3, 2017)........... 11, 12

## Statutes

N.J.S.A. § 2C:41-1 ...........................................................................7

N.Y.J.L. § 487 ..............................................................................7, 8

## Rules

Fed. R. Civ. P. 12(b)(6) ......................................................................9

Fed. R. Civ. P. 23(h) ........................................................................18

Federal Rule of Evidence 408 .................................................................14

## Treatises

*Civil RICO: An Effective Deterrent to Fraudulent Asbestos Litigation?*, 40
    Cardozo L. Rev. 2301 (June 2019).........................................................31

# I.      Introduction[1]

After nine years of hard-fought litigation, on September 3, 2020, this Court granted preliminary approval of the Settlement Agreement, which counsel for the parties had been negotiating since the execution of the Term Sheet on January 25, 2019. Subject to the Court granting final approval, this settlement will provide substantial compensation to members of the Class who were deprived of a fair chance to litigate their (or a deceased relative's) original Emtal Talc asbestos claims ("Underlying Lawsuits") because of the Defendants' alleged wrongful conduct that resulted in the dismissal of those claims.

Given the complexity of the procedural and substantive legal issues in the case and the tenacity with which Defendants have contested the allegations that they wrongly concealed evidence of asbestos allegedly found in Emtal Talc, the results achieved by Class Counsel and the Class Representatives are nothing short of extraordinary and warrant approval of this Petition. Under the terms of the Settlement Agreement, Defendants BASF Catalysts, LLC ("BASF") and Cahill Gordon & Reindel LLP ("Cahill") (collectively "Defendants") will establish a non-reversionary $72.5 million settlement fund ("Settlement Fund") to compensate

---

[1] All capitalized terms and phrases used herein have the same meaning as they are defined in the Settlement Agreement and Plan of Distribution preliminary approved by the Court on September 3, 2020 in CM/ECF No. 623.

Settlement Class members for damages that resulted from the dismissal of the Underlying Lawsuits because of Defendants' alleged fraudulent concealment of evidence that Emtal talc contained asbestos.

In addition, Class Counsel obtained Defendants' agreement to pay an additional $3.5 million into a separate Cost Fund to cover (1) the costs of the extensive multi-state, multi-channel notice program that was necessary to reasonably reach and inform Class Members of the Class Action Settlement and their rights under it; and (2) the costs of the claims administration, including a lien resolution program. Only after the parties had agreed to these and other material terms of the Settlement did they take up the issue of Class Counsel's attorneys' fees and reimbursement of their expenses. The parties agreed that BASF and Cahill would pay, over and above the Settlement Fund, Class Counsel's attorneys' fees and litigation expenses awarded by the Court up to a maximum of $22.5 million and $1.2 million, respectively. As negotiated, the payment of Class Counsel's attorneys' fees and costs will not diminish the recovery to Class members.

All in all, due to the services of Class Counsel and the resources they devoted to this unique case, Class Counsel have secured for the Class, if the Settlement is approved by this Court, $99.7 million in monetary benefits and non-financial benefits. Class Counsel accordingly requests an attorney's fee award of $22.5 million and a cost reimbursement award of $1,038,300.27. BASF and Cahill

2

do not oppose this request and have agreed to pay these fees and costs if awarded by the Court.

Class Counsel's $22.5 million fee request represents about 22.6% of the total value of the Settlement when all of the above enumerated financial benefits of the Settlement are considered. This is an eminently fair and reasonable fee percentage in light of the benefits achieved for the Class and the fact that the parties negotiated the fee amount at arm's length. The fee amount meets all of the *Gunther-Prudential* factors under the percentage of recovery method. It also falls well within the ranges approved by courts in the Third Circuit, particularly considering the excellent results achieved, the time devoted by Class Counsel over the eleven years they have been pursuing this cause, and the time and effort to be devoted in the future as the Plan of Distribution ("Plan" or "POD") is administered.

The fee request also readily satisfies the lodestar method of determining fee awards if applied or used as a cross-check to the percentage of benefits method. As of the filing of this Petition, the lawyers and professional staff of Cohen, Placitella & Roth have devoted **21,799.9** hours on this litigation for a lodestar of **$17,665,091.50**, for a multiplier of just **1.27**.

Looked at either way, as a percentage of recovery or lodestar, the requested fee is reasonable and appropriate given the complex, lengthy and challenging

3

nature of this case; the substantial litigation risks incurred by Class Counsel who took this matter on a contingent fee basis; and the vigorous defense and daunting odds that Class Counsel overcame to achieve this settlement, which included multiple motions to dismiss and prosecuting a successful appeal to the Third Circuit in order to proceed. In fact, with the Final Approval Hearing still months away, Class Counsel continue to work daily on the implementation of the Settlement and expect that the lodestar cross-check will only become more favorable to the approval of this Petition.

Class Counsel additionally request that this Court approve this request for reimbursement of expenses in the amount of $1,038,300.27. These expenses are modest in a case of this complexity and length, have been amply documented and were necessary to achieve the results here.

Finally, Class Counsel request that this Court grant incentive awards of $50,000 to each of the six Class Representatives (an aggregate of $300,000) for their contribution over nine years of litigation to achieving this substantial recovery for the members of the Class.

## II.     Background

### A.     Class Counsel uncover evidence that purports to identify asbestos in Emtal Talc.

From 1967 to 1983, a subsidiary of Engelhard Corporation mined talc from the Johnson Mine in Johnson, Vermont under the brand name Emtal Talc.

Beginning in the late 1980s and continuing for many years, numerous plaintiffs filed bodily injury actions (hereinafter the "Underlying Lawsuits") against Engelhard Corporation and later, its corporate successor, BASF. These plaintiffs alleged that asbestos in Emtal Talc caused them to develop asbestos-related injuries.

Based upon Class Counsel's investigation, the initial and amended Complaints alleged that, Engelhard and its successors' defense of the Underlying Lawsuits from the 1980s until 2009, by, with and through their national defense counsel, Cahill Gordon systematically denied that: (1) Emtal talc contained any asbestos; (2) evidence that Emtal talc contained asbestos existed; and (3) any Engelhard employee had ever testified about the presence of asbestos in its talc. Based on these contentions, Plaintiffs alleged that Defendants, for many years, successfully convinced attorneys and their clients in the Underlying Lawsuits to voluntarily outright, or in exchange for nominal settlements, dismiss their cases. When that did not occur, Defendants obtained court-ordered dismissals based on the assertion that Emtal talc did not contain asbestos and thus, was not defective

and could not cause harm. Defendants denied and continue to deny these
allegations.

In 2009, Class Counsel learned of evidence in a state court asbestos case that
appeared to contradict the claims made by Defendants in the Underlying Lawsuits.
Class Counsel's discovery led it to investigate the evidence about Emtal talc
further and pursue additional discovery.  These efforts resulted in the production of
testing results, depositions, and other evidence previously unknown in the
Underlying Lawsuits that became the springboard for the allegations in this
Action.[2]

### B.    Class Counsel and Class Representatives bring suit on behalf of the Class.

Following its investigation, Class Counsel filed the Class Action Lawsuit on
March 28, 2011, on behalf of five of the current six Class Representatives—
Kimberlee Williams, Nancy Pease (who upon her death was succeeded by her
sister Gayle Williams), Marilyn L. Holley, Donna Ware (who upon her death was
eventually succeeded by her niece-in-law Sheila Ware), and Donnette Wengerd.
After Defendants filed several motions to dismiss the initial complaint, the sixth

---

[2] Defendants deny that this evidence was wrongfully concealed in the Underlying
Lawsuits, contend that the amount of asbestos reported to be found in these test
results is insufficient to cause harm to human health and dispute the validity of
some of the tests Plaintiffs claim identify asbestos in certain samples of Emtal
Talc.

Representative Plaintiff, Mrs. Rosanne Chernick, joined in the matter when Class Counsel filed the First Amended Class Action Complaint ("FAC") on August 3, 2011. Each of the Class Representatives represents the estate of a deceased plaintiff who had sued Engelhard or BASF in an Underlying Lawsuit asserting an Emtal talc asbestos claim that was either voluntarily or involuntarily dismissed during the Class Period.

The FAC, like the original complaint, alleged claims under New Jersey law for common-law fraud in various forms, fraudulent concealment (which encompasses New Jersey's stand-alone "spoliation" tort), violation of New Jersey's Racketeer Influenced and Corrupt Organizations Act (NJ-RICO), N.J.S.A. § 2C:41-1, *et seq.*, conspiracy to violate New Jersey's RICO statute, unjust enrichment, and common law conspiracy. In addition, the FAC pleaded a statutory claim against Cahill and the co-defendant individual attorneys for violation of New York Judiciary Law §487 (Misconduct by attorney) ("N.Y.J.L. § 487 Claim").

Defendants moved to dismiss the FAC claiming that (1) the District Court lacked jurisdiction over the case because of the *Rooker-Feldman* doctrine; (2) Plaintiffs had not adequately pleaded their claims; and (3) the District Court lacked the authority to provide Plaintiffs their requested relief because of the Anti-Injunction Act and principles of justiciability. Although the District Court rejected the challenge to its jurisdiction, it otherwise fully granted the motions to dismiss.

7

The Court ruled that Plaintiffs' fraud and fraudulent concealment claims were not actionable as New Jersey's litigation privilege immunized Defendants from tort liability for alleged misstatements made in the Underlying Lawsuits. The District Court further found that Plaintiffs failed to plead an actionable RICO claim, reasoning that the Underlying Lawsuits were personal injury claims, and that Plaintiffs' requested relief would impermissibly undermine prior state court judgments in the Underlying Lawsuits. *Williams v. BASF Catalysts LLC*, No. 11-1754, 2012 U.S. Dist. LEXIS 175918 (D.N.J. Dec. 12, 2012). The Court also held that an actionable N.Y.J.L. § 487 claim was not pled.

**C    Class Counsel successfully appeal the decision dismissing the First Amended Complaint to the Third Circuit.**

The Class Representatives appealed the dismissal to the Third Circuit. The appeal raised complex, novel issues of law, the scope of protection afforded the Defendants by their assertion of a litigation privilege, applicability of RICO to the facts, and the justiciability and availability relief to the Class for conduct that implicated cases long dismissed in state cases around the country. After requesting supplemental briefing, the Third Circuit ultimately reversed the Order dismissing the FAC in part, holding: (1) New Jersey's litigation privilege does not bar Plaintiffs' fraud and fraudulent concealment claims based upon the allegations in the FAC; and (2) the FAC adequately alleged the elements of fraud and fraudulent concealment under New Jersey law. The Third Circuit also affirmed in part,

8

upholding the District Court's decision to dismiss Plaintiffs' RICO claim. *Williams v. BASF Catalysts LLC*, 765 F.3d 306 (3d Cir. 2014). Finally, it denied Defendants' petition for rehearing *en banc* before remanding the matter to the District Court.

### D.    Class Counsel file a Second Amended Complaint.

Following remand of the case to this Court, the Class Representatives filed a Second Amended Complaint ("SAC"). This 155-page document with 43 appended exhibits once more alleged claims against Defendants for fraudulent concealment, fraud, and civil conspiracy under New Jersey law. It also refined the previous allegations based on Class Counsel's continuing investigation.

The SAC alleged that between late 1984 to 2009, Engelhard and Cahill defended asbestos bodily injury cases in state and federal courts in large part by (1) denying that Emtal Talc contained any asbestos, (2) denying the existence of any evidence that it did and/or (3) stating that no Engelhard employee had ever testified about the presence of asbestos in its talc. Plaintiffs claimed that Engelhard and Cahill employed this defense for 25 years, allegedly resulting in thousands of dismissals, either voluntarily, by court order, or through Engelhard's participation in nuisance-value group settlements with other talc defendants.

Defendants again moved to dismiss Plaintiffs' claims under Rule 12(b)(6). The District Court denied the motions to dismiss the SAC and ordered the case to

9

continue to discovery. *Williams v. BASF Catalysts LLC*, No. 11-1754, 2016 U.S. Dist. LEXIS 46273, *23-27 (D.N.J. Apr. 5, 2016). Defendants continued to dispute each and every element of the Plaintiffs' claims, arguing, among other things, that the Underlying Lawsuits were settled or dismissed for a variety of reasons unrelated to the fraud alleged in the SAC.

### E. Discovery was hard fought and involved many motions including those over the scope of discovery and application of attorney-client and work product privileges and privilege exceptions.

As soon as discovery began following the Court's denial of Defendants' motions to dismiss the SAC, the parties engaged in major, protracted disputes over the permissible scope of discovery and application of privileges and privilege exceptions.

Specifically, the parties vigorously disagreed about the extent, if any, to which Defendants were entitled to delve into the merits of the Underlying Lawsuits and discover Plaintiffs' and their original attorneys' files and confidential attorney-client communications from those suits. Defendants argued that discovery of the plaintiffs' files from the Underlying Lawsuits would reveal that (1) some plaintiffs could not prove that they suffered an asbestos related disease, (2) that some claims were time barred, and (3) the Underlying Lawsuits had been dismissed or settled for reasons unrelated to the conduct alleged in the SAC. To that end, Defendants sought discovery not only from the Class Representatives, but also through

subpoenas *duces tecum* to several attorneys who represented absent class members. Plaintiffs however argued, among other things, that Defendants had forfeited the right to discovery regarding the Underlying Lawsuits and sought a protective order precluding their review of those files.

After several rounds of briefing, the District Court per then Chief Judge Linares rejected Plaintiffs' arguments, in part, regarding the scope of discovery and ruled that "exposition" of the Underlying Lawsuits was necessary. *Williams v. BASF Catalysts, LLC*, No. 11-1754, 2017 U.S. Dist. LEXIS 122053, *30, 33 (D.N.J. Aug. 3, 2017). More particularly, the District Court ruled that the "scope of discovery will focus on the alleged wrongful conduct and any alleged harm following from that conduct" including "why Plaintiffs settled or dismissed their underlying claims." *Id.* at *31. The Court ruled that "[t]o fully explore this issue, Defendants will be entitled to discover what Plaintiffs and their counsel knew, and were told, and whether any knowledge, or lack thereof, contributed to Plaintiffs' decisions on resolving the underlying case." *Id.* That inquiry, the Court explained, permitted a limited waiver of the Class Representatives' claims of attorney-client privilege and therefore warranted review of the files and correspondence related to the Underlying Lawsuits. *Id.* at *32-33. However, the Court also ruled that discovery must be "tightly define[d] and control[led]", *id.* at *33, and to that end eventually appointed retired New Jersey Supreme Court Justice Roberto A. Rivera-

11

Soto as Special Discovery Master ("SDM") to manage and preside over discovery. *See Williams v. BASF Catalysts LLC*, No. 11-1754, 2017 U.S. Dist. LEXIS 154772 (D.N.J. Sept. 21, 2017).

In the year following the SDM's appointment, the parties exchanged over 300 pieces of meet-and-confer correspondence; filed more than 50 discovery motions; appeared numerous times for in-person hearings before the Special Master, often during which multiple motions were argued; and participated in numerous telephone conference calls with the Special Master on discovery issues. Based on the SDM's rulings, hundreds of thousands of pages of documents and ESI equivalents were produced which Class Counsel organized and reviewed. In addition, over the course of the discovery, the parties took 28 depositions, with more being scheduled when the Court entered the order staying this matter and directing the parties to mediation.

Another key discovery issue involved Plaintiffs' motion to compel production of documents under the crime-fraud exception to the attorney-client and work-product privileges asserted by BASF and Cahill. Plaintiffs filed their initial crime-fraud brief on November 2, 2017. After considering that brief and Defendants' opposition, the SDM held multiple days of oral argument on the threshold inquiry of whether Plaintiffs had made a *prima facie* showing that Defendants engaged in a fraud or fraudulent conduct triggering the exception to

12

both privileges. Although Defendants' earlier request for a "Science Day" had been denied by the Court without prejudice, the SDM ordered the parties to provide him with expert testimony about the testing record of Emtal talc. While Class Counsel steadfastly maintained its position that an exposition on the science of material testing for asbestos in talc was not needed to determine the crime-fraud exception—or any other issues in the case for that matter—Class Counsel nonetheless prepared to present evidence for the Science Day before the SDM. In addition, Class Counsel appealed to, and sought a stay of the SDM's Science Day order from the District Court. While that appeal and request for an emergency stay were pending (along with several other appeals from the SDM's rulings), on June 26, 2018, Chief Judge Linares stayed the action and ordered that the parties engage in settlement discussions before Magistrate Judge Dickson. CM/ECF # 602.[3]

Another disputed discovery topic involved Class Counsel's challenge to BASF's claims of attorney-client and work product privileges on certain Emtal talc testing documents it withheld from its document production. After extensive briefing and arguments before him as well as his *in camera* review, the Special Master rejected the Defendants' privilege with respect to certain testing documents. BASF immediately appealed the adverse ruling to the District Court,

_____

[3] The discussions with the Magistrate Judge led the parties to resume mediation with Judge Philips described in the next section.

generating even more briefing. This appeal from the SDM's ruling was also pending when Chief Judge Linares stayed the *Williams* Action and ordered that the parties participate in settlement discussions before Judge Dickson.[4]

**F.    After several unsuccessful rounds of mediations, the parties reach an accord in principle and execute a settlement term sheet in January 2019. Subsequently, after many months of further negotiation on the settlement's specifics, the parties agree upon the Settlement Agreement.**

Over the course of this litigation, the parties engaged in four rounds of mediation. The first mediation effort followed the Third Circuit's decision. In the early part of 2015, the parties participated in several sessions, including one in person before retired U.S. District Court Judge Layn R. Phillips. This effort did not result in a settlement and the parties thereafter resumed active litigation.

In 2016, the parties agreed to return to mediation before Judge Phillips. Under Judge Phillips' auspices, the parties shared information under Federal Rule of Evidence 408 and mediation privilege to facilitate discussion on different settlement scenarios and models. Despite several sessions with Judge Phillips, and some without him throughout the summer of 2016, the parties could not reach agreement on material terms and the mediation ended. The parties thereafter once

---

[4] The parties resolved this disputed issue through agreement on a publicly available redacted version of the document and entry of a consent order at CM/ECF No. 622.

more resumed the litigation, undertaking fulsome discovery which, as it tends to do, exposed the strengths and weaknesses of the parties' respective positions.

By July 2018, the parties had completed a significant amount of pre-trial discovery, including extensive document productions among parties and from subpoenaed third parties (mainly law firms and insurance carriers) concerning Emtal talc and the history of the Underlying Lawsuits; depositions of the Class Representatives; depositions of the lead attorneys who originally represented the Class Representatives in their respective underlying actions; a deposition of an attorney previously with the Rothenberg firm who had represented the firm's Pennsylvania absent class members in the Underlying Lawsuits; depositions of numerous BASF personnel and in-house counsel; and depositions of several current or former Cahill personnel involved in the Underlying Lawsuits.

By this time, in conformity with the SDM's scheduling order, Class Counsel had filed and briefed the Class Representative's motion for class certification. Class Counsel had also retained experts on material testing, asbestos claim litigation economics, asbestos disease prevalence and modeling and other pertinent areas.

After entry of the stay, Judge Dickson supervised discussions between counsel for the parties, which included four in-person sessions before him, as well as telephone conferences with the parties. When the parties began making some

progress towards a potential settlement, they agreed, and obtained this Court's consent, to return to Judge Phillips for further mediation. After two, very intense, arm's length in-person mediation sessions with Judge Phillips during the fall-early winter of 2018-2019—augmented with separate unilateral party sessions with Judge Phillips and bilateral telephone and in-person negotiation sessions among just the parties—the parties reached an accord on the elements of a settlement in January 2019. The parties reduced the major terms of the agreement in principle to a written term sheet that the parties executed on January 25, 2019.

Over the next fourteen months, the parties engaged in extensive discussions and negotiations to hammer out disputed specifics of the settlement agreement. The process entailed exchanges of numerous document drafts, telephone calls, e-mail exchanges and in-person meetings. Throughout this time, Class Counsel simultaneously worked on the design and drafting of the Plan of Distribution with the Settlement's appointed claims administrator, Verus LLC, along with input, suggestions and comments received from additional experts and consultants in pertinent fields as well as defense counsels' comments provided in accordance with the Term Sheet. The effort of Class Counsel's drafting team over these fourteen months—some at times working daily, full time and exclusively on the project—culminated in the parties' execution of the Settlement Agreement on March 13, 2020.

Following the execution of the Settlement Agreement, the parties turned their attention to the final element needed for settlement approval, the Notice Plan. Working with defense counsel, Class Counsel vetted and retained BrownGreer PLC to serve as the proposed Settlement's Notice Agent and commissioned it to research and prepare a Notice Plan. Members of Class Counsel's drafting team assisted and facilitated the notice planning by locating and providing data and analysis BrownGreer used in developing the Notice Plan and refining the Class Notice mailing list, which the Court approved and ordered implemented in the Preliminary Approval Order .

Since the Court's Preliminary Approval Order, Class Counsel have worked with the Settlement Trustee, the Settlement Administrator, and the Lien Administrator to finalize the claims infrastructure under the Plan of Distribution. Class Counsel also negotiated and drafted the Settlement Fund and Cost Fund contracts with the Lien Administrator and the Funds' Financial Institution, all of which have been executed. Class Counsel has also monitored BrownGreer's execution of the Notice Plan, and on a daily basis, have taken calls and answered questions from numerous putative Class Members and attorneys who either have in the past or currently are representing potential Class Members or their surviving families.

## III.   Argument

Federal Rule of Civil Procedure 23(h) expressly authorizes the Court to "award reasonable attorney's fees and nontaxable costs that are authorized by law *or by the parties' agreement*." *Rossi v. Proctor & Gamble*, No. 11-7238, 2013 U.S. Dist. LEXIS 143180, *25 (D.N.J. Oct. 3, 2013) (citing Fed. R. Civ. P. 23(h)) (emphasis supplied). "The Supreme Court has suggested that such agreements should be encouraged as a matter of public policy." *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 106 F. Supp. 2d 721, 722 n.1 (D.N.J. 2000) (*citing Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)). "In light of this recognized principle, courts routinely approve agreed-upon attorneys' fees, particularly when the amount is independent and does not impact the benefit obtained for the class." *Pro v. Hertz Equip. Rental Corp.*, No. 06-3830, 2013 U.S. Dist. LEXIS 86995, *16-17 (D.N.J. June 20, 2013); *see also Local 56, United Food and Commercial Workers Union v. Campbell Soup Co.*, 954 F. Supp. 1000, 1005 (D.N.J. 1997) (granting class counsel the maximum amount of fees agreed to by defendant under the settlement agreement, where "class members . . . retain all that the settlement provides [and] do not lose any of the negotiated benefits on account of an attorneys' fee and costs award that equals the 'cap' on such an award set forth in the settlement").

As Judge Phillips' Declaration attests, the amount of Class Counsel's fee and cost reimbursement were separately negotiated by the parties under his auspices only after all substantive settlement terms had been agreed to. CM/ECF # 621-5. All discussions were at arm's length and were guided by prevailing market rates, the history of this litigation, and the decade's long effort of Class Counsel to obtain this historic result. The Court should accordingly approve this Petition for attorney's fees in the amount of $22.5 million that BASF and Cahill have agreed to pay on top of the $72.5 million that will go to compensate the members of the Class and the $3.5 million for the costs of notice and claims administration.

In confirming the reasonableness of this request for agreed upon attorney's fees, a court may use one of two methods to assess the amount and reasonableness of the fee: the percentage-of-recovery method and the lodestar method. *Krell v. Prudential Ins. Co. of Am. (in Re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions)*, 148 F.3d 283, 333 (3d Cir. 1998). These methods are not interchangeable. Each has its own advantages. And "for certain kinds of actions" one method or the other will be "more appropriate as a primary basis for determining the fee." *Id.* (quoting *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 820 (3d Cir. 1995)).

Within the Third Circuit, the percentage-of-recovery method is generally favored in cases involving a constructive common fund because the method allows

a court to award fees "'in a manner that rewards counsel for success and penalizes it for failure.'" *Id.* The lodestar method, by contrast, "is more commonly applied in statutory-fee shifting cases and is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation." *Id.* The lodestar method is also used, as the Third Circuit has recognized, in cases "where the nature of the recovery does not allow the determination of the settlement's value necessary for application of the percentage-of-recovery method." *Id.*

The use of a lodestar cross-check is not required within the Third Circuit. *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 183 n.4 (3d Cir. 2005). Indeed, this District Court has held that cross-checking is not "necessary" where the fee request appears reasonable. *Smith v. Daimlerchrysler Servs. N. Am., L.L.C.*, No. 00-6003, 2005 U.S. Dist. LEXIS 25116, *12 (D.N.J. Oct. 24, 2005). However, a court may use the lodestar method as a cross-check on the reasonableness of an award.

This case does not involve a fee assessed against a defendant involuntarily pursuant to a fee-shifting statute. Nor does it involve a traditional common fund because the Settlement Fund used to compensate Class Members here will not be diminished by the amount of the fee and cost awards allowed. Nevertheless, "where the reality is that the fund and the fee are paid from the same source, the

20

arrangement 'is, for practical purposes, a constructive common fund,' and courts may still apply the percent-of-fund analysis in calculating attorney's fees." *Dewey v. Volkswagen Aktiengesellschaft*, 558 Fed. Appx. 191, 197 (3d Cir. 2014) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 786, 820-21 (3d Cir. 1995).

Based upon this analytical formulation, Class Counsel and the Class Representatives secured a constructive total common fund which provides a $99.7 million benefit package for the Class.[5] The $22.5 million fee request, in other words, amounts to just 22.6% of the total constructive common fund, well within the range of reasonable fees recognized and approved in this circuit as to settlements of this size. *Varacallo v. Mass. Mut. Life. Ins. Co.*, 226 F.R.D. 207, 249 (D.N.J. 2005) ("Many courts, including several in the Third Circuit, have considered 25% to be the 'benchmark' figure for attorney fee awards in class action lawsuits, with adjustments up or down for significant case-specific factors."). And while a lodestar cross-check is not required, Plaintiffs will discuss

---

[5] The settlement also includes significant non-monetary relief which is described in §2.5 of the Settlement Agreement. For instance, a material part of the Settlement was to assure that evidence would remain in the public domain. Further, the POD provides means of assistance for potential class members seeking information to determine their eligibility and file claims.

both methodologies below as Class Counsel's fee request is amply supported and warranted under either method.

## A.     The percentage-of-recovery method.

The Third Circuit has identified ten factors that should be considered to assess the reasonableness of a fee award under the percentage-of-recovery method. *In re Diet Drugs Prod. Liab. Litig.*, 582 F.3d 524 (3d Cir. 2009); *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 197-201 (3d Cir. 2000); *In re Prudential Ins. Co. of America Sales Practices Litig.*, 148 F.3d 283 (3d Cir. 1998) These factors, known as the *Gunter/Prudential* factors, are:

1. the size of the fund and the number of beneficiaries;
2. the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;
3. the skill and efficiency of the attorneys involved;
4. the complexity and duration of the litigation;
5. the risk of nonpayment;
6. the amount of time devoted to the case by plaintiffs' counsel;
7. the awards in similar cases;
8. the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations;
9. the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and
10. any innovative terms of the settlement.

*Id.* Class Counsel's fee request in this matter meets all of the applicable *Gunter/Prudential* factors and should be approved.

### 1. The size of the fund and number of beneficiaries.

The first *Gunter* factor considers the size of the fund and the number of beneficiaries. In considering this factor, courts first examine the value of the settlement. This entails consideration of not only the cash compensation to be paid to class members, but also any non-cash relief that can be readily valued, and the value or amount contributed for attorneys' fees and expenses, and administrative and notice costs where these are paid in addition. *In re: Heartland Payment*, 851 F. Supp. 2d 1040, 1080 (S.D. Tex. 2012).

The value of the settlement here is readily valued at $99.7 million, based on summing: (1) a $72.5 million non-reversionary settlement fund dedicated to compensating Class Members; (2) a $3.5 million Cost Fund to cover the costs of providing the multi-channel class notice program, the claims administration and a lien resolution program; and (3) an agreed maximum of $22.5 million and $1.2 million in attorney's fees and litigation expenses to be paid by Defendants in addition to items (1) and (2).[6]

---

[6] Courts in the Third Circuit and elsewhere have held that a defendant's negotiated agreement to pay attorney's fees separately and over and above other monetary and equitable benefits, subject to court approval, is a benefit to the settlement class. Those courts have further held that where the amount of fees is agreed upon and

23

As to the number of beneficiaries, the Settlement's Administrator has estimated size of the Class to be 18,721 people based on documents and databases relating to the plaintiffs in the Underlying Lawsuits who had sued Engelhard within the class period. This includes those who claimed an asbestos injury in the Underlying Lawsuits and their spouses or children who asserted derivative claims in those lawsuits. Applying a reasonable estimate of asbestos disease prevalence to this class size yields rather substantial projected payments to the Class Members who suffered an asbestos disease in addition to the uniform $500 Part A base compensation payments.[7]

---

set forth in the agreement, that amount is fully includable as part of the class recovery when calculating a fee award under the percentage of recovery and lodestar cross-check methods. *See In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 821 (3d Cir.), *cert. denied*, 516 U.S. 824 (1995) ; *Pro v. Hertz Equip. Rental Corp.*, 2013 U.S. Dist. LEXIS 86995 (D.N.J. June 30, 2013) (including amount of separately agreed upon attorneys fee as part of class recovery when calculating and determining fee award in connection with class action settlement); *Lonardo v. Travelers Indemnity Co.*, 706 F. Supp. 2d 766, 803 (N.D. Ohio 2010) (holding for purposes of calculating the percentage of the fee, agreed upon attorneys' fee award of $4.6 million is part of the Total Class Benefit); *In re Vitamins Antitrust Litig.*, No. 99-197, 2001 U.S. Dist. LEXIS 25067, *56 (D.D.C. 2000) (holding attorneys' fees that are borne by defendants and not plaintiffs are a valuable part of the settlement and fairly characterized as part of the common fund.")

[7] The Class Notice contains a hypothetical table of estimated "Part B" payments at §12 B.2 (Table 1). Part B of the POD is the allocation part under which the bulk of the Settlement Fund will be distributed among eligible class members based on severity of their respective asbestos disease. Table 1 presents a range of hypothetical Part B payment estimates based on (a) receipt and approval by the

All told, the aggregate size of the Fund created as well as the amount of the projected benefits to individual Class Members provide an excellent recovery for such a large class that compares favorably to those being paid under most of the 524(g) asbestos bankruptcy trusts. *See Welch & Forbes, Inc. v. Cendant Corp. (In re Cendant Corp. Prides Litig.)*, 243 F.3d 722, 737 (3d Cir. 2001) (recognizing that "$100 million seems to be the informal marker of a 'very large' settlement") (quoting *In re Orthopedic Bone Screw Prod. Liab. Litig.*, No. 97-381, 2000 U.S. Dist. LEXIS 15980, *30 (E.D. Pa. Oct. 23, 2000)). Accordingly, this Court should find that Class Counsel has met the first factor in favor of granting this Petition.

### 2. The presence or absence of substantial objections by members of the class to the settlement terms.

On September 3, 2020, the Court approved Plaintiff's Motion for Preliminary Approval of the Settlement. As of the date of this Petition's filing, a substantial publication of the notice of the Settlement to the Class has been implemented through mail and various mass media channels.[8] Several national

---

Settlement Fund of 7,500, 8,000 and 8,500 Part B claims; and (b) an asbestos disease distribution rate equal to the historical asbestos disease rates experienced by the Johns Manville Asbestos Trust (which are stated in the table for each disease compensation level).

[8] Upon preliminary approval, BrownGreer, implemented the Notice Plan approved by the Court per the Preliminary Approval Order. BrownGreer has mailed notice packages to 40,000 potential class members and relatives of deceased class members, as well as to 48 lawyers who had represented at least one class member in the Underlying Lawsuits. BrownGreer also issued a press release that was

media and legal profession news outlets have reported on the Settlement, none of which so far has been critical of the proposed settlement in any way. Class Counsel have directly communicated broadly with members of the asbestos bar, including counsel known to have represented plaintiffs in the Underlying Lawsuits about the Settlement. During these outreach communications, Class Counsel received no criticism or expression of concern about the Settlement's terms or on the amount of attorneys' fee they would be requesting and described in the Class Notice. So far, no Class Member has expressed any objection or complaint to the fee. Notably, BrownGreer has also given the mandatory CAFA notice to the Attorney General of the United States and appropriate state attorneys general. As of the date of the filing of this Fee Petition, not one of the CAFA notice recipients has objected to the Settlement.

In view of the size of the settlement here, the settlement structure and the size of the anticipated distributions, combined with the fact the class membership is defined as such that it is not conducive to a professional objector finding a class member to use as a means to mount an objection, Class Counsel do not anticipate that there will be any objections, let alone substantial ones, to either the final

---

picked up by 93 sources with a collective audience of 119 million people. It further initiated a paid Google Ad search campaign as well as paid internet and print media ad campaign.

approval of the Settlement or Class Counsel's attorney fee requests. The Settlement Agreement provides eligible Class Members with substantial monetary compensation via a Plan of Distribution and claims system, which also given the passage of time since Underlying Lawsuits were dismissed or settled includes means of helping Class Members find the proofs that they will need to file claims. The Settlement Agreement moreover assures Class Members that relevant evidence uncovered in this Action and other asbestos cases against Engelhard and BASF will remain in the public domain.

This factor supports Class Counsel's fee request.

### 3. The skill and efficiency of the attorneys involved.

The third *Gunter* factor—the skill and efficiency of the attorneys involved— is best judged by "the results obtained." *In re Safety Components Int'l Secs. Litig.*, 166 F. Supp. 2d 72, 96 (D.N.J. 2001) (quoting *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 148, 149 (E.D. Pa. 2000)). Other factors that courts consider include the difficulties faced in the litigation, the speed and efficiency of the recovery, the experience and expertise of counsel, and the performance and quality of opposing counsel. *Meijer, Inc. v. 3M*, No. 04-5871, 2006 U.S. Dist. LEXIS 56744, *69-70 (E.D. Pa. Aug. 15, 2006).

As to skill, Class Counsel possess decades of experience in handling both class actions and bilateral complex litigation cases. They regularly represent

catastrophically injured clients and the families of deceased victims, including many in asbestos disease claims. They have served in leadership roles in the prosecution of numerous leading-edge mass tort cases, such as the ovarian talc MDL (serving as the liaison counsel), the silicon breast implant litigation, the Vioxx litigation, the Fen-Phen diet drug litigation (serving as one of the national class counsel), numerous community level toxic chemical release cases as well as other MDL and New Jersey Multi-County product liability and Consumer Fraud Act cases. Members of CPR have been appointed by United States Bankruptcy Trustees overseeing federal bankruptcy proceedings to serve on official creditor or official tort claimant committees established in Chapter 11 proceedings, including those involving asbestos company bankruptcies. In addition to representing individuals, CPR's lawyers currently and historically have represented governmental entities in major complex litigation matters involving suppression and misrepresentation claims as a major issue, such as New Jersey's tobacco litigation and Pennsylvania's MTBE gasoline pollution litigation. Indeed, Judge Phillips noted in his declaration that the putative Class has been "represented by highly experience, competent, and committed counsel." CM/ECF # 621-5, ¶ 17.

The results of this case truly speak for themselves. CPR's Christopher M. Placitella uncovered the alleged fraudulent concealment in 2009. Since then, Class Counsel have marshalled evidence through prelitigation investigation and

28

discovery efforts to prepare for trial. Ultimately, through Class Counsel's dedication, efforts and resolve, they obtained the $99.7 million settlement for the Class Members' benefit. It is all the more extraordinary given that Class Counsel achieved this result in the face of the Defendants' vigorous defense at each and every stage of the litigation.

BASF called upon the services of one of the nation's premier law firms, Kirkland & Ellis LLP, to defend it. Since taking on BASF's defense Kirkland has applied the considerable legal talent of numerous experienced litigation and class action partners, associates and adjunct attorney specialists in BASF's defense. The firm of Blank Rome LLP also participated in BASF's defense, adding even more talent and resources to the considerable roster of attorneys defending it. Cahill was likewise very ably represented in its defense: first by the notable national law firm of Williams & Connolly LLP, and then later by the equally talented, experienced and able firm of Troutman Pepper Hamilton Sanders LLP.[9]

Yet in the face of this staunch defense and seemingly unlimited resources, Class Counsel persevered and went forward to develop a case against Defendants sufficiently strong to survive multiple motions to dismiss and eventually reach the

---

[9] Individual defendants in this case were represented by equally esteemed counsel including Marino, Tortorella & Boyle, P.C., and McElroy Deutsch Mulvaney & Carpenter LLP, whose legal team included former New Jersey Supreme Court Justice Walter F. Timpone.

significant settlement now before the Court. So, too, then, this factor weighs in favor of granting the requested fee award.

### 4.  The complexity and duration of the litigation.

The fourth *Gunter* factor asks this Court to consider the complexity and duration of the litigation. In considering this factor, courts fairly look to see whether the fee sought is justified by the work involved in obtaining the settlement. There can be no question about the time, effort and substance of work performed by Class Counsel to achieve this settlement. The substance of Class Counsel's legal work appearing on the court docket (both in the trial Court and the Third Circuit), and the substantial legal analysis underlying the record amassed by them, establish the high level of Class Counsel's performance that was necessary to file this complex lawsuit over nine years ago and then persist in its successful prosecution culminating in this settlement.

The initial Complaint filed in this case reflects the breadth and scope of Class Counsel's pre-suit investigation. The Complaint in both content and format was highly original given the unique facts of an alleged conspiracy to deny the presence of asbestos in Emtal talc and the resulting dismissal of thousands of Underlying Lawsuits over decades of time. Counsel set forth the claims in great particularity in a 157-page, 384 paragraph complaint that contained 43 exhibits. Following the filing of the Complaint, Defendants filed motions to dismiss in

response to which Plaintiffs filed the FAC (among other things adding Class Representative Chernick). Defendants again filed motions to dismiss, which the District Court granted. Undaunted, the Class Representatives appealed the dismissal, resulting in an unanimous published opinion in which the Third Circuit reversed the District Court in large part, holding that: (1) New Jersey's litigation privilege does not bar Plaintiffs' fraud and fraudulent concealment claims in view of what was alleged to have occurred; and (2) the FAC adequately alleged the elements of fraud and fraudulent concealment under New Jersey law. *Williams v. BASF Catalysts LLC*, 765 F.3d 306 (3d Cir. 2014).

The Third Circuit's opinion speaks to the array of procedural and substantive issues involved in this class action, which support Class Counsel's fee award petition. For instance, the scope and applicability of the litigation privilege, just one of the questions on appeal, was a significant and heavily contested issue. As one commentator has observed, "[w]hether or not the litigation privilege insulates a lawyer from a claim of fraud is subject to some dispute[,]" with some courts, such as the Supreme Court of Texas finding that it does. Lester Brickman, *Civil RICO: An Effective Deterrent to Fraudulent Asbestos Litigation?*, 40 Cardozo L. Rev. 2301 (June 2019) (citing *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 480 (Tex. 2015)). Thus, when Class Counsel prosecuted the appeal, its outcome before the Third Circuit was far from certain.

31

Between the time Plaintiffs filed the Complaint and the Third Circuit entered its decision reviving their claims, Class Counsel pressed forward with their investigation outside of the litigation. Following remand from the Third Circuit, Class Counsel prepared the Second Amended Complaint ("SAC") to conform to the Third Circuit's ruling and refine the claims. Like its predecessors, the SAC was also a detailed pleading which exhaustively outlined the alleged fraud in over 155 pages with 43 exhibits. Upon the filing of the SAC, Defendants yet again filed Rule 12(b)(6) motions to dismiss. After another round of briefing, the Court per then Chief Judge Linares denied Defendants' motions to dismiss in substantial part. At this point, the Defendants answered the SAC denying the claims against them and asserting numerous affirmative defenses.

With the close of pleadings in 2015, discovery then began in earnest.[10] Aside from the sheer volume of the discovery, which involved a time period of continuing events dating back to the 1970s, the legal issues raised, including the scope of discovery, the application of privileges and/or waivers of privilege and

---

[10] In this phase of the litigation, the parties exchanged over 300 pieces of meet-and-confer correspondence, produced and reviewed hundreds of thousands of pages of documents and ESI equivalents, and completed 28 depositions. To resolve the accelerating discovery disputes between the parties, this Court appointed a SDM to oversee those proceedings. All told, in the time between the SDM's appointment and this Court's stay of the litigation so that the parties could resume mediation, the SDM presided over and decided more than 50 discovery motions.

whether a science day was needed in a fraud case, were several, complex and novel. All of these novel issues were nuanced and rich with arguments on both sides regarding policy and fundamental fairness to each side.

An illustrative example of this was the parties' dispute over the applicability of the crime-fraud exception, which if the Court agreed with Class Counsel's arguments, would have allowed Plaintiffs to discover evidence from Engelhard's attorneys that Defendants claimed as protected by the attorney-client privilege. The inquiry over the crime-fraud exception not only entailed a complex legal question, but also a significant evidentiary question that required presentation of evidence spanning nearly three decades. Further complicating the issue was Defendants' second request in the case for a "Science Day", which the SDM granted over the Class Representatives' objections. The Class Representatives then sought an emergency stay from both the SDM and the Court and perfected an appeal of it, which was still pending when the case was stayed and the parties were ordered to return to settlement discussions under the Court's auspices.

Another complex issue for Class Counsel was the development of a fair, reasonable and efficient class-wide damage or recovery model. The problems included addressing the elements of damages and/or restitutionary relief available under New Jersey law and how, given the passage of time and the Class Members' potential loss of proof from their Underlying Lawsuits, damages could be fairly

and formulaically allocated among them where the underlying cases sought damages for injuries of varying severity. Recognizing the critical elements for class certification, trial and settlement resolution of the case, Class Counsel engaged experts to assist them in determining a means of fairly assessing and devising an equitable means of allocating damages for the Class.

Seemingly simple issues such as how many people had over the years sued Engelhard alleging an Emtal talc asbestos injury defied an easy answer. While there were productions of legacy records and litigation documents during discovery, no single, definitive list of claims and claimants existed. To overcome this, and as explained in the Declaration of Mark Zabel, Director of Analytics at Verus, Class Counsel engaged Versus to estimate the class size, identify potential members of the Class, and assist Class Counsel in devising a plan of distribution that would be fair, equitable and efficient. To do so, he and his team of analysts at Verus developed a liability claim forecasting model, which required data acquisition from various sources (including the discovery from the *Williams* Action and examination and analysis of numerous asbestos 524(g) trust distribution procedures), data entry and organization, and finally a statistical analysis of the claims and injury distribution. CM/ECF # 621-8. The work also developed an asbestos injury severity point system based on comparable 524(g) asbestos trust's compensation matrixes. The resulting Plan of Distribution, which

is based upon and incorporates all this work, reflects the ingenuity, innovation and success of Class Counsel and Verus in dealing with the complex and novel damages and allocations issues of this case brought about by the fact that the alleged wrongs and harms involved in the Underlying Lawsuits had occurred decades ago.

Finally, the complexity of issues involved in this class settlement, and the significance of each issue to the parties led to nearly 14 months of negotiation between the signing of a term sheet and the execution of the Settlement Agreement. While at times contentious, the parties were aligned in their effort to assure that each term of the Settlement Agreement properly protected the rights of the parties and the Class and fully satisfied the Federal Rules of Civil Procedure and Third Circuit precedent.

### 5.  The risk of nonpayment.

The risk of nonpayment should be "assessed *ex ante* from the outset of the case, not in hindsight." *In re Cendant Corp.*, 264 F.3d 201, 281 (3d Cir. 2001). The *Williams* Action stands out from many other class actions given its devotion to proving allegations of fraud and concealment going back decades in Underlying Lawsuits and the many challenging legal issues, which Defendants and their able counsel raised in defense during the litigation. Class Counsel undertook this unique action on a contingent fee basis and thereby assumed substantial risk that their

efforts would be unsuccessful. *In re Diet Drugs*, 553 F. Supp. 2d at 479. That risk supports the requested fee award. *Hegab v. Family Dollar Stores, Inc.*, No. 11-1206, 2015 U.S. Dist. LEXIS 28570, *32 (D.N.J. Mar. 9, 2015) ("Courts recognize the risk of non-payment as a major factor in considering an award of attorney fees.").

From the outset of and continuing throughout this case, Class Counsel have faced significant risks, many of which could have resulted in Plaintiffs and the putative Class Members receiving no compensation whatsoever. From an evidentiary standpoint, nearly three decades had elapsed since the fraudulent scheme alleged in the SAC began during which time many of the plaintiffs in the Underlying Lawsuits died and considerable evidence was either lost or was not developed in the Underlying Lawsuits because those cases were deemed lost causes. That presented no small challenge. As Judge Phillips observes, without the ability to uncover evidence of the alleged fraud, Plaintiffs could not have pursued their claims here. CM/ECF # 621-5, ¶ 23. Class Counsel overcame these obstacles and uncovered evidence many thought either did not exist or was no longer available.

Substantively, Class Counsel also had to contend with Defendants' threshold legal defenses in which they claimed Plaintiffs could not assert a cognizable legal claim for the conduct at issue. The risk of non-payment looked no greater than

36

when the District Court granted the Defendants' motion to dismiss the FAC. Significant hurdles to recovery continued to arise as discovery unfolded following the Third Circuit's revival and remand of the matter. Defendants vigorously denied the allegations in the SAC. In addition to denying that they committed the alleged fraud or that Emtal Talc contained injurious amounts of asbestos, Defendants contended that the Underlying Lawsuits were settled or dismissed for a variety of legitimate reasons. For example, Defendants contended that many plaintiffs could not prove they were exposed to Emtal Talc (so called product identification); that some plaintiffs could not prove they suffered a compensable asbestos-related injury; and that some of the plaintiffs' claims were time-barred and so on. Defendants have also argued that Plaintiffs in this action who settled with Engelhard for minor amounts did not suffer monetary damages given evidence that many plaintiffs accepted similar settlement values from other talc defendants for whom plaintiffs had evidence of asbestos contamination and exposure which Engelhard was denying. Importantly, Defendants have denied that the documents at the heart of this claim prove that Emtal Talc contained asbestos in sufficient amount to cause harm to humans or, in some cases, that those testing results were scientifically reliable in the first instance. This settlement puts to rest these considerable issues that could have resulted in the failure of Class Counsel's efforts. So, as with preceding *Gunter* factors, this factor supports Class Counsel's fee request.

## 6.  The Amount of time that Plaintiffs' Counsel devoted to the case.

As of the date of this filing, the lawyers and professional staff of Cohen, Placitella & Roth have recorded 21,799.9 hours over the decade of this case, though frankly, Class Counsel believe this time is understated. Not surprisingly, Class Counsel spent many days, late nights, weekends and holidays devoted to this case, some of which was not recorded as they concentrated exclusively on the substance of the work and meeting deadlines than just logging time. The recorded time, however, is substantial. It includes the time members of CPR spent on the investigation and research of the facts and the development of the legal theories pled in the Class Action Complaint, FAC and SAC; the time spent on legal research and drafting that went into responding to several rounds of motions to dismiss, briefing to the Third Circuit, and the myriad of substantive discovery motions, the Class Certification Motion (which the SDM ordered be filed) and Plaintiffs' crime-fraud motion; and the time spent litigating disputes and completing the extensive discovery itself. Class Counsel's recorded time also includes the significant amount of time committed to the multiple rounds of mediation (many spanning multiple days), negotiating the Term Sheet, the Settlement Agreement itself, the collateral agreements supporting the Settlement plan, and developing a Plan of Distribution and Notice Plan that was fair,

reasonable and capable of gaining both class member support and passing this Court's scrutiny.

We also note that the amount of Class Counsel's time devoted to this matter will continue to accrue as they perform their required duties and tasks under the Settlement Agreement and the Plan of Distribution.

This factor amply supports Class Counsel's requested fee award.

### 7.  Fee awards in similar cases.

The seventh factor requires the Court to compare the requested fee award to other common fund cases. *Cendant*, 243 F.3d at 737. The parties negotiated Class Counsel's fee to be paid by the Defendants in addition to the Settlement Fund and Cost Fund only after agreeing to the amount of the fund that would compensate the Class. And so, the fee, and the total amount of money to be paid by the Defendants is deemed for purposes of court review to be a constructive common fund and included in calculating the percentage-of-recovery. *Dewey v. Volkswagen Aktiengesellschaft*, 558 Fed. Appx. 191; *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d at 821; *Pro v. Hertz Equip. Rental Corp.*, 2013 U.S. Dist. LEXIS 86995. Here, Class Counsel's fee amounts to 22.6% of the $99.7 million in benefits that Class Counsel secured for the Class. This percentage fits well within the parameters for class action fee awards approved by the Third Circuit, especially when viewed in the context of the effort undertaken in

this unique and complex case and the compensation and other benefits the settlement provides to the Class.

The Third Circuit has observed that fee awards of 25-33% are appropriate. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 303 (3d Cir. 2005) (noting that the district court did not abuse its discretion in relying on studies, which found fee awards between 25-33%). Cases within the Third Circuit confirm this. *See, e.g.*, *Rossini v. PNC Fin. Servs. Grp., Inc.*, No. 18-370, 2020 U.S. Dist. LEXIS 113242, *65 (W.D. Pa. June 26, 2020) (approving fee request of 25%); *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, No. 17-3711, 2019 U.S. Dist. LEXIS 215507, *10 (E.D. Pa. Dec. 13, 2019) (noting that "fee awards commonly awarded in similar cases . . . range from 19% to 45%"); *Lincoln Adventures LLC v. Certain Underwriters at Lloyd's*, No. 08-0235, 2019 U.S. Dist. LEXIS 17197, *24-25 (D.N.J. Oct. 3, 2019) (approving fee award of one-third of $21,950,000 cash component of the settlement fund); *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 751 (E.D. Pa. 2013) (awarding a one-third fee on a $150 million settlement); *In re Processed Eggs Prods. Antitrust Litig.*, MDL No. 2002, 2012 U.S. Dist. LEXIS 160764 (E.D. Pa. Nov. 9, 2012) (approving fee of 30% of a $25 million fund); *Bradburn Parent Teacher Store, Inc. v. 3M*, 513 F. Supp. 2d 322, 342 (E.D. Pa. 2007) (awarding attorney's fees of 35% of a $81 million common fund); *In re Rite Aid. Corp. Secs. Litig.*, 362 F. Supp. 2d 587 (E.D. Pa. 2005) (approving fee award of

$31,660,328.75 or 25% on a fund of $126,641,315). At 22.6%, the fee request here falls well below the fees awarded in similar cases.

When viewed in terms of the risks undertaken in bringing this Action and the quality and quantity of work performed by Class Counsel in meeting a most vigorous defense over nine years, the request for a fee that is 22.6% of the financial benefit achieved on a common fund basis, is entirely reasonable and, respectfully, should be approved.

### 8. The value of benefits attributable to the efforts of Class Counsel relative to the efforts of other groups.

The eighth factor of the *Gunter/Prudential* analysis assesses the degree to which the efforts of Class Counsel have been aided or augmented by the actions of others such as government prosecutors, similar private cases, and agency litigation to the instant private litigation." *In re Diet Drugs*, 582 F.3d at 544. Class Counsel clears this bar with ease because they had neither the benefit of a government investigation nor another similar lawsuit for fraudulent concealment. Class Counsel had no roadmap for nor assistance in this litigation. The results achieved are based entirely on the years of dedication and skills of Class Counsel in uncovering the facts and devising the legal framework to litigate this case and achieve this settlement.

**9. The percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement.**

A private contingent fee agreement at the time Class Counsel was retained would have far exceeded the percentage of fee award requested here. *In re AT&T Corp. Sec. Litig.*, 455 F.3d 160 (3d Cir. 2006). Courts, including this one, within the Third Circuit had found that a 33% private contingency fee would have been reasonable. *Schuler v. Meds. Co.*, No. 14-1149, 2016 U.S. Dist. LEXIS 82344, *28-29 (D.N.J. June 24, 2016); *In re NFL Players' Concussion Injury Litig.*, MDL No. 2323, 2018 U.S. Dist. LEXIS 57798, *18 (E.D. Pa. Apr. 5, 2018). With Class Counsel only seeking a fee award of 22.6%, the ninth *Gunter* factor weighs in favor of approval.

**10. The Settlement Agreement contains many innovative features.**

One of the prudential factors a court may take into consideration here is whether the Settlement Agreement contains innovative terms. This factor favors approval of Class Counsel's Fee Petition. *NFL*, 2018 U.S. Dist. LEXIS 57798, *18-19 (recognizing that "[p]erhaps the strongest favor weighing in favor of the acceptance of [the NFL]  Class Counsel's fee request is the final factor that takes into account the innovative terms of this Settlement Agreement.").

As mentioned above, one of the troublesome circumstances confronting Class Counsel, through no fault of Class Members, in both litigating and settling

this case were the difficult interrelated facts that: (1) the Underlying Lawsuits are decades old; (2) many, if not most, of them had been fully concluded and the claimant's law firm's files closed; (3) due to the passage of time medical, legal and employment records are unavailable for a host of reasons; and (4) frequently many of the original plaintiffs (and percipient witnesses) in the suits are now deceased or otherwise hard to locate. In addition, the Underlying Lawsuits were asbestos personal injury suits with various levels of disease and resulting harm that ranged from non-malignant asbestosis to fatal mesothelioma. Still, due to Class Counsel's and their consultants' collective persistence, ingenuity and work effort, they were able to craft a fair and reasonable Plan of Distribution that ably addresses and overcomes or mitigates these problems through its innovative allocation methodology, the acceptance of prior bankruptcy trust injury adjudications, providing a searchable litigation document archive, and applying several presumptions derived from the Underlying Lawsuits records to assist the claimants, who often are heirs of some degree to the original plaintiffs.

The Plan's Summary, §2, describes its innovative structure:

The Plan establishes three compensation programs to which Settlement Class Members meeting defined eligibility criteria may apply for compensation award payments (each program being referred to as a "Part"). The Settlement Fund's Part A program provides Base Compensation Payments to Settlement Class Members who can establish that the claimant or claimant's decedent filed an Underlying Lawsuit against Engelhard/BASF during the Class Period which

43

asserted in good faith an asbestos injury caused by alleged exposure to Emtal Talc ("Base Payments").[11] The Plan's Part B program provides compensation payments to Settlement Class Members who satisfy Part A and also present sufficient evidence of an asbestos bodily injury sustained by them (or if applicable, their decedent).[12] The Plan's Part C program establishes an Extraordinary Injury Fund or "EIF" from which the Settlement Trustee may, in exceptional cases, make a discretionary supplemental compensation payment to mesothelioma injury Claimants subject to eligibility guidelines and limitations as set forth in this Plan.

Through the POD's three sub-fund structure and claims administration procedures and the ability to establish a qualifying Part B injury through a prior Qualified Asbestos Trust certification (which the Administrator will assist the

---

[11] A Part A payment will be up to $500 depending on the number of eligible claims received. Each Injured Person in the underlying suit (the Primary Claimant under the Plan) is eligible for one payment  and if there was one or more derivative claimants involved in the Underlying Lawsuit (e.g., a spouse or a deceased plaintiffs wrongful death beneficiaries), then a second Part A payment of equal amount.

[12] Class Members who meet the requirements for a Plan B Supplemental Compensation award will receive a proportionate share of the entire $59.75 Million Part B sub-fund based upon a system of points awarded for the asbestos disease sustained and diagnosed. The amount of the Part B points and compensation payments vary based upon the type and severity level of asbestos disease injury sustained and medically diagnosed. **Table 1** in the POD, reproduced in Appendix 1 to the memorandum, describes the point system. Another innovative procedure is how the asbestos injury can be proved. The medical injury element can be established either by submitting medical records and reports or through a certification of adjudicated asbestos injury from one of eight Qualified Asbestos Trusts ("QAT"). If the claimant elects to proceed by QAT certification, the Claim Administrator on behalf of the claimant will obtain and accept the certification from the QAT as part of the claims administration.

claimant in securing if it exists), practically all eligible Settlement Class Member

making a timely Claim Submission will receive some degree of meaningful

compensation from the Settlement Fund. *C.f., NFL*, 2018 U.S. Dist. LEXIS 57798,

\*18-19 (finding the Settlement innovative as it "provides a complex matrix for

determining Monetary Award amounts"). For these reasons, this factor also favors

approval of  Class Counsel's Fee Request.

**B.    A lodestar cross-check confirms that this Fee Request is reasonable.**

A lodestar cross-check is not required in the Third Circuit, *Cendant*, 404

F.3d at 183 n.4, particularly where, a Court recognizes the fee request appears

reasonable. *Smith*, 2005 U.S. Dist. LEXIS 25116, \*12. This Court nonetheless can

use the lodestar method to cross-check the percentage fee award for

reasonableness. *Rite Aid*, 396 F.3d at 305 (citing *In re Prudential*, 148 F.3d at

333). Again though, the lodestar cross-check is not mandatory and "does not trump

the primary reliance on the percentage of common fund method." *Id.* at 307.

"The lodestar award is calculated by multiplying the number of hours

reasonably worked on a client's case by a reasonable hourly billing rate . . . ." *Id.* at

305. The cross-check "is performed by dividing the proposed fee award by the

lodestar calculation, resulting in a lodestar multiplier." *Sullivan v. DB Investments,*

*Inc.*, 667 F.3d 273, 330 n.61 (3d Cir. 2011) (quoting *AT&T Corp.*, 455 F.3d at

164). The purpose of the multiplier is "to account for the contingent nature or risk involved in a particular case." *Id*. It is supposed to account for the "particular circumstances" of a case, "such as the quality of representation, the benefit obtained for the class, [and] the complexity and novelty of the issues presented." *Id.* Furthermore, because the lodestar cross-check is "not a full-blown lodestar inquiry," the evaluation can be based on summaries and less precise formulations." *Rite Aid*, 396 F.3d at 307 n.16.

Here, as of the filing of this Petition, the lawyers and professional staff of Cohen, Placitella & Roth have devoted 21,799.9 hours to this matter, with Class Counsel having recorded the following number of hours:[13]

---

[13]     The hours reported here do not include those for Jeffrey M. Pollock, Esq. of Fox Rothschild, LLP who was involved in the prosecution of the case, including the appeal before the Third Circuit.

| | |
|---|---|
| Christopher M. Placitella | 4,321.2 hours |
| Stewart L. Cohen | 1,012.9 hours |
| Harry M. Roth | 1,695.7 hours |
| Robert L. Pratter | 1,536.6 hours |
| Michael Coren | 4,530.0 hours |
| Jared M. Placitella | 3,644.1 hours |
| Eric S. Pasternack | 2,277.7 hours |
| Other CPR attorneys and professional staff[14] | 2,781.7 hours |

For purposes of the lodestar check, "[a] reasonable hourly rate is the market rate prevailing in the relevant legal community." *Doe v. Terhune*, 121 F. Supp. 2d 773, 781 (D.N.J. 2000). To determine a reasonable hourly rate, the Court must "assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services by lawyers

---

[14] This includes other members, associates, law clerks, and staff from Cohen, Placitella & Roth, who over the years have worked on the matter. A specific itemization of hours worked by these lawyers and staff members is documented in Addendum A of the Declaration of Christopher M. Placitella.

of reasonably comparable skill, experience, and reputation." *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990).

The hourly rates here range from $925 an hour for the most senior partners to $190 an hour for legal assistants:

| Attorneys with at least 25 years of experience. | $925/hour |
|---|---|
| Attorneys with 15-24 years of experience. | $850/hour |
| Attorneys with 5-14 years of experience. | $700/hour |
| Attorneys with 3-4 years of experience. | $475/hour |
| Attorneys with 1-2 years of experience. | $375/hour |
| Paralegals and Law Clerks. | $309/hour |
| Legal Assistants | $190/hour |

These rates are reasonable, and in line with the prevailing rates in the Third Circuit. *See NFL*, 2018 U.S. Dist. LEXIS 57798, *21 (finding that because the billing rates submitted by partners in the case ranged from $500 to $1,350 per hour, a blended rate of $623.05 per hour should be used); *In re ViroPharma Inc. Sec. Litig.*, No. 12-2714, 2016 U.S. Dist. LEXIS 8626, *53-54 (E.D. Pa. Jan. 25, 2016) (hourly billing rates from four years ago for partners ranged from $610 to $925 with the range for other attorneys going from $350 to $750 an hour); *In re Schering-Plough Corp.*, No. 08-397, 2013 U.S. Dist. LEXIS 147981 (D.N.J. Aug. 28, 2013) (finding from rates 7 years ago that a lodestar cross-check was

48

reasonable with senior partners having charged hourly rates of $975 and the

partners responsible for the day-to-day litigation charging between $775 to $875 an

hour); *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No. 1871,

2012 U.S. Dist. LEXIS 180561, *24-25 (E.D. Pa. Oct. 19, 2012) ("According to a

2011 sampling of nationwide billing rates submitted by the Fee Committee, of

which this Court takes judicial notice, partners at GSK's Philadelphia-based firm

(Pepper Hamilton) bill up to $825 per hour, and partners at other Philadelphia law

firms have similar top hourly rates ($900 at Cozen O'Connor, $875 at Duane

Morris, $750 at Saul Ewing, and $725 at Fox Rothschild").

In then multiplying the hourly rates of Class Counsel by their hours worked,

the lodestar is **$17,665,091.50**:

| Christopher M. Placitella | $3,997,110.00 |
| Stewart L. Cohen | $936,932.50 |
| Harry M. Roth | $1,568,522.50 |
| Robert L. Pratter | $1,421,355.00 |
| Michael Coren | $4,190,250.00 |
| Jared M. Placitella | $2,550,870.00 |
| Eric S. Pasternack | $1,594,390.00 |

Applying this lodestar to the current hours yields a multiplier of **1.27** for Cohen, Placitella & Roth. With the Third Circuit having recognized that multipliers "ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied," the resulting lodestar multiplier here of **1.27** is well within the norm in the Third Circuit; and indeed, at the low end. And as the proceedings continue forward to the Final Approval stage and distribution approval stage, the lodestar will increase and the resulting multiplier decline.

All in all, applying a lodestar cross-check demonstrates the request fee is fair and reasonable and should be approved in the amount requested.

### C.   Class Counsel's expenses are adequately documented and were reasonably and appropriately incurred.

A "private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation[.]" *In re Diet Drugs*, 582 F.3d at 540. As this Court has observed, class counsel are "entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action." *In re Safety Components, Inc. Secs. Litig.*, 166 F.3d 2d 72, 108 (D.N.J. 2001).

Class Counsel will at the Fairness Hearing request reimbursement of their costs in an amount of $1,200,000 based on what they expended to date and forecast

they will incur in the future in attending to the Settlement as Class Counsel. This amount will not come out of the $72.5 million settlement fund. Rather, as Judge Phillips noted in his declaration, only after the parties came to an agreement "on the other material terms of the settlement, including the creation of a $72,500,000 Settlement Trust Fund[,]" did the parties first negotiate over the "amount of attorneys' fees and expenses to be reimbursed" by BASF and Cahill. CM/ECF # 621-5, ¶ 36. And, as Judge Phillips emphasized, "Defendants agreed to not object to an award of attorneys' fees and reasonable costs up to $22,500,000 and $1,200,000, respectively, that is *in addition* to the $72,500,000 Settlement Trust Fund." *Id.*

Class Counsel's expenses are amply documented, Addendum B to the Declaration of Christopher M. Placitella, and were moreover necessary given the vigorous defense mounted by BASF and Cahill, and their extensive resources.

### D. Incentive awards for the Class Representatives.

Class Counsel request that incentive awards of $50,000 for each of the six Class Representatives—$5,000 for each of the years they served as Class Representative—be awarded. Such "awards are not uncommon in class action litigation and particularly where . . . a common fund has been created for the benefit of the class." *Sullivan*, 667 F.3d at 333 n.65. As the Third Circuit has explained, incentive awards are meant "to compensate named plaintiffs for the

51

services they provided and the risks they incurred during the course of the class action litigation[.]" *Id.*

Courts in the Third Circuit have routinely approved incentive awards for class representatives. *See NFL*, 2018 U.S. Dist. LEXIS 57798, *25 (approving incentive awards of $100,000 for each of the class representatives); *Schwartz v. Avis Rent a Car Sys., LLC*, No. 11-4052, 2016 U.S. Dist. LEXIS 80387, *43 (D.N.J. June 21, 2016) (approving incentive awards "given the number of years in which [the class representatives] have been involved in this litigation"); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 145 (E.D. Pa. 2000) ("[c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.").

The Class Representatives here are deserving of incentive awards. Five of the six Class Representatives initiated this litigation with the filing of the Class Action Complaint on March 28, 2011—over nine years ago. The sixth Class Representative, Mrs. Roseanne Chernick, joined in the matter with the filing of the First Amended Complaint on August 3, 2011. Since that time, the Class Representatives have been actively involved in all phases of this litigation. CM/ECF # 621-13, -17, -18, -19, -20, -33, Class Representative Declarations. They did what courts expect of a class representative. They diligently oversaw the

litigation. They reviewed and searched for and provided information to Class Counsel for discovery. They prepared for and attended depositions. They responded to multiple sets of interrogatories, requests for documents, and requests for admissions. They also regularly conferred with Class Counsel on the status of the litigation and strategy through in person meetings, correspondence, and phone calls. And they were involved in key rounds of settlement negotiations leading up to the settlement.

Class Representatives have contributed valuable services to the Class and should be compensated accordingly. The amount requested here for the Class Representatives is particularly warranted given the amount of relief obtained ($99.7 million), their active and necessary role in the litigation, and the number of Class Members who stand to benefit from the work of the Class Representatives.

## IV.   Conclusion

For the foregoing reasons, the Court should grant the Petition and (1) award

Class Counsel the full $22.5 million in attorneys' fees and $1,038,300.27 in

reimbursable expenses that Defendants have agreed to pay over and separate from

the $72.5 million Settlement Fund; and (2) award the Class Representatives

incentive awards of $50,000 each for their contribution to achieving this long

overdue and substantial recovery for the members of the Class.


**COHEN, PLACITELLA & ROTH, P.C.**

/s/ *Christopher M. Placitella*
Christopher M. Placitella, Esq.
(NJ Atty #: 027781981)
Michael Coren, Esq.
(NJ Atty #: 024871979)
Jared M. Placitella, Esq.
(NJ Atty #: 068272013)
Eric S. Pasternack, Esq.
(NJ Atty #: 015132011)
127 Maple Avenue
Red Bank, NJ 07701
(732) 747-9003

***Attorneys for Plaintiffs and the Putative Class***

Dated: October 20, 2020